# Exhibit 2

# Exhibit 2(a)



COUR PERMANENTE D'ARBITRAGE                    PERMANENT COURT OF ARBITRATION

## CERTIFICATION OF COPY OF
## FINAL AWARD DATED 18 JULY 2014


RE:     PCA CASE N° AA 226
        HULLEY ENTERPRISES LIMITED (CYPRUS) v. THE RUSSIAN FEDERATION

I, Judith Alexandra Levine, Senior Legal Counsel of the Permanent Court of Arbitration ("PCA") and Assistant Secretary to the Arbitral Tribunal in the above-referenced matter conducted under the auspices of the PCA pursuant to the 1994 Energy Charter Treaty and the 1976 Arbitration Rules of the United Nations Commission on International Trade Law, hereby CERTIFY that the document annexed hereto (Final Award dated 18 July 2014) is a true and authentic copy of the original document of which it purports to be a copy. I have carefully compared the said copy with the said original and found the same to agree therewith.

Signed, this ......4ʰ....... day of .....November...... 2014, at ....The Hague.........

Judith Levine
Senior Legal Counsel
Permanent Court of Arbitration
Peace Palace
Carnegieplein 2
2517 KJ The Hague
The Netherlands

COUR PERMANENTE D'ARBITRAGE        PERMANENT COURT OF ARBITRATION
Palais de la Paix, Carnegieplein 2, 2517 KJ La Haye, Pays-Bas      Peace Palace, Carnegieplein 2, 2517 KJ The Hague, The Netherlands
Téléphone: + 31 70 302 4165, Télécopie: + 31 70 302 4167        Telephone: + 31 70 302 4165, Facsimile: + 31 70 302 4167
Courriel: bureau@pca-cpa.org        E-mail: bureau@pca-cpa.org

PCA Case No. AA 226

# IN THE MATTER OF AN ARBITRATION BEFORE A TRIBUNAL CONSTITUTED IN ACCORDANCE WITH ARTICLE 26 OF THE ENERGY CHARTER TREATY AND THE 1976 UNCITRAL ARBITRATION RULES

– between –

## HULLEY ENTERPRISES LIMITED (CYPRUS)

– and –

## THE RUSSIAN FEDERATION

---

## FINAL AWARD

---

### 18 July 2014

*Tribunal*
The Hon. L. Yves Fortier PC CC OQ QC, Chairman
Dr. Charles Poncet
Judge Stephen M. Schwebel

Mr. Martin J. Valasek, Assistant to the Tribunal
Mr. Brooks W. Daly, Secretary to the Tribunal
Ms. Judith Levine, Assistant Secretary to the Tribunal

*Registry*
Permanent Court of Arbitration



*Representing Claimant*:

Professor Emmanuel Gaillard
Dr. Yas Banifatemi
Ms. Jennifer Younan
SHEARMAN & STERLING LLP

*Representing Respondent*:

Dr. Claudia Annacker
Mr. Lawrence B. Friedman
Mr. David G. Sabel
Mr. Matthew D. Slater
Mr. William B. McGurn
Mr. J. Cameron Murphy
CLEARY GOTTLIEB STEEN & HAMILTON LLP

Mr. Michael S. Goldberg
Mr. Jay L. Alexander
Dr. Johannes Koepp
Mr. Alejandro A. Escobar
BAKER BOTTS LLP

**TABLE OF CONTENTS**

LIST OF DEFINED TERMS ........................................................................................................ xiii

INTRODUCTION ...................................................................................................................... 1

I.      PROCEDURAL HISTORY ............................................................................................. 2

        A.      COMMENCEMENT OF THE ARBITRATION ............................................................. 2

        B.      CONSTITUTION OF THE TRIBUNAL ...................................................................... 3

        C.      PRELIMINARY PHASE ON JURISDICTION AND ADMISSIBILITY ............................ 4

        D.      BIFURCATION AND OTHER SCHEDULING MATTERS .............................................. 5

        E.      DOCUMENT PRODUCTION AND CONFIDENTIALITY ............................................. 6

        F.      HEARING ON THE MERITS .................................................................................. 8

        G.      POST-HEARING PROCEDURES ............................................................................ 11

II.     FACTUAL BACKGROUND ........................................................................................... 12

        A.      THE PARTIES TO THESE PROCEEDINGS ............................................................... 13

                1.      Claimants and Related Entities ............................................................ 13

                2.      Respondent .......................................................................................... 13

        B.      OAO YUKOS OIL COMPANY ............................................................................. 13

        C.      THE RUSSIAN LOW-TAX REGION PROGRAM ..................................................... 14

        D.      CRIMINAL PROCEEDINGS ................................................................................... 16

        E.      ADDITIONAL MEASURES .................................................................................... 17

                1.      Alleged Frustration of Merger Between Yukos and Sibneft ................. 18

                2.      Tax Reassessments for Years 2000–2004 ............................................ 18

                3.      Auction of YNG ................................................................................... 19

                4.      Bankruptcy Proceedings ...................................................................... 20

                5.      Withdrawal of PwC's Audits ............................................................... 20

III.    PARTIES' WRITTEN SUBMISSIONS ........................................................................ 20

        A.      CLAIMANTS' SKELETON ARGUMENTS ............................................................... 21

        B.      RESPONDENT'S SKELETON ARGUMENTS ........................................................... 34

IV.     PARTIES' REQUESTS FOR RELIEF .......................................................................... 48

        A.      RELIEF REQUESTED BY CLAIMANTS ................................................................. 48

        B.      RELIEF REQUESTED BY RESPONDENT ............................................................... 48

V.   APPLICABLE LAW ................................................................................... 49

    A.   PROCEDURAL LAW ............................................................................ 49

    B.   SUBSTANTIVE LAW ........................................................................... 49

        1.   Energy Charter Treaty ..................................................... 49

        2.   Vienna Convention on the Law of Treaties ..................... 53

VI.   SUMMARY OF WITNESS TESTIMONY ............................................ 54

    A.   CLAIMANTS' WITNESSES ................................................................. 55

        1.   Mr. Jacques Kosciusko-Morizet ..................................... 55

        2.   Mr. Vladimir Dubov ....................................................... 57

        3.   Mr. Frank Rieger ............................................................. 59

        4.   Dr. Andrei Illarionov ...................................................... 61

        5.   Mr. Leonid Nevzlin ........................................................ 64

        6.   Mr. Bruce Misamore ....................................................... 67

        7.   Mr. Steven Theede .......................................................... 69

        8.   Mr. Brent Kaczmarek ...................................................... 72

        9.   Mr. Philip Baker QC ....................................................... 73

        10.   Mr. Yuri Schmidt ............................................................ 74

        11.   Dr. Sergei Kovalev ......................................................... 75

    B.   RESPONDENT'S WITNESSES ............................................................. 76

        1.   Professor James Dow ...................................................... 76

        2.   Mr. Oleg Y. Konnov ....................................................... 78

        3.   Professor Reinier Kraakman ............................................ 81

        4.   Professor H. David Rosenbloom ..................................... 83

        5.   Professor Thomas Z. Lys ................................................ 85

        6.   Ms. Felicity Cullen QC ................................................... 87

        7.   Mr. Dale Hart .................................................................. 88

        8.   Mr. Polyvios Polyviou .................................................... 89

        9.   Mr. John Ellison .............................................................. 90

        10.   Mr. Raymond Gross ........................................................ 91

        11.   Professor Dr. Albert Jan van den Berg ........................... 93

      12.    Professor Stef van Weeghel .................................................................. 94

  C.    THE SO-CALLED "EMPTY CHAIRS" ......................................................... 95

      1.    Individuals that Claimants Wished were Available for Examination ........................... 96

      2.    Individuals that Respondent Wished were Available for Examination ......................... 97

VII.  ISSUES FOR ANALYSIS ............................................................................. 98

VIII. ANALYSIS OF THE EVIDENTIARY RECORD ...................................... 102

  A.    THE TAX OPTIMIZATION SCHEME ....................................................... 102

      1.    Introduction ................................................................................. 102

      2.    The Structure of the Tax Optimization Scheme ......................................... 103

      3.    The Legal Framework of the Tax Optimization Scheme ............................. 105

          (a)    The Low-Tax Region Program ..................................................... 105

          (b)    Anti-Abuse Decisions and Doctrines Promulgated by Russia's Federal Courts ........................................... 107

      4.    The History of the Yukos Trading Entities before 2003 ............................. 125

          (a)    Mordovia ................................................................................. 125

          (b)    Kalmykia ................................................................................. 138

          (c)    Lesnoy and Trekhgorny ............................................................. 140

          (d)    Sarov ....................................................................................... 158

          (e)    Baikonur ................................................................................. 159

          (f)    Evenkia ................................................................................... 160

      5.    Tribunal's Observations ................................................................. 164

  B.    THE TAX ASSESSMENTS STARTING IN DECEMBER 2003 ....................... 170

      1.    Introduction ................................................................................. 170

      2.    Chronology of the Tax Assessments and Related Decisions ....................... 174

          (a)    The 2000 Decision ..................................................................... 175

          (b)    The 2001 Decision ..................................................................... 183

          (c)    The 2002 Decision ..................................................................... 186

          (d)    The 2003 Decision ..................................................................... 189

          (e)    The 2004 Decision ..................................................................... 191

          (f)    Observation ............................................................................. 192

      3.    The Taxes Assessed Against Yukos ................................................... 192

|  |  | (a) | Profit Tax and Other Revenue-based Taxes | 192 |
|  |  | (b) | VAT | 198 |
|  | 4. | The Fines Assessed Against Yukos | | 201 |
|  | 5. | Parties' Arguments and Tribunal's Observations | | 203 |
|  |  | (a) | Profit Tax and Other Revenue-Based Taxes | 204 |
|  |  | (b) | VAT | 219 |
|  |  | (c) | Fines | 239 |
|  |  | (d) | Concluding Observations | 255 |
| C. | | HARASSMENT, INTIMIDATION AND ARRESTS | | 257 |
|  | 1. | Introduction | | 257 |
|  | 2. | Chronology of Facts | | 258 |
|  |  | (a) | Yukos Grows; Mr. Khodorkovsky Becomes More Politically Engaged; Yukos Leaders Receive Warnings | 258 |
|  |  | (b) | Prosecutor General Launches Investigations Involving Searches and Seizures | 260 |
|  |  | (c) | Arrest and Trial of Mr. Khodorkovsky; Flight from Russia of His Associates | 263 |
|  |  | (d) | Complaints of Further Harassment and Intimidation of Yukos Executives, Employees, Lawyers and External Advisers | 265 |
|  |  | (e) | Second Trial of Mr. Khodorkovsky; Allegations of Continuing Harassment and Intimidation | 269 |
|  | 3. | Parties' Arguments and Tribunal's Observations | | 270 |
|  |  | (a) | Are Claimants' Allegations about a Campaign of Harassment Credible? | 271 |
|  |  | (b) | Were the Actions of the Russian Federation Justified as Legitimate Law Enforcement Measures? | 274 |
|  |  | (c) | Did the Events Complained of Impact Claimants' Investments or was Yukos Able to Carry on Unaffected? | 276 |
| D. | | THE UNWINDING OF THE YUKOS–SIBNEFT MERGER | | 279 |
|  | 1. | Introduction | | 279 |
|  | 2. | Chronology | | 281 |
|  |  | (a) | Merger is Announced; NYSE Listing is Put on Hold; Steps are Taken to Complete Merger | 281 |
|  |  | (b) | Mr. Khodorkovsky is Arrested; Yukos Continues with Merger; Sibneft has Second Thoughts | 283 |

|  | (c) | Russian Courts Invalidate the Share Exchange Agreement | 285 |
|  | (d) | Russian Federation Ultimately Acquires Sibneft via Gazprom | 287 |
| 3. | | Parties' Arguments and Tribunal's Observations | 287 |
|  | (a) | Was Yukos' NYSE Listing Put on Hold Because of the Yukos−Sibneft Merger or Fears of Exposing Yukos' Tax Optimization Scheme? | 287 |
|  | (b) | Was the 2003 Interim Dividend a Component of the Yukos−Sibneft Merger or a Means to Siphon Funds out of Russia? | 289 |
|  | (c) | Was the Unwinding of the Merger Caused by the Russian Federation? | 292 |

E. ATTEMPTS TO SETTLE ... 298

1. Introduction ... 298

2. Yukos' Settlement Offers (and the Russian Federation's Replies) ... 300

    (a) Proposals Made to the Bailiffs ... 302

    (b) Proposals for a Global Settlement Conveyed by Mr. Chrétien ... 304

    (c) Requests for a Deferral or Payment in Instalments ... 306

    (d) Other Proposals ... 307

3. Parties' Arguments and Tribunal's Observations ... 308

    (a) Did Yukos Contribute to its Own Demise by Failing to Discharge Tax Debt in the Amount of USD 9 Billion in the First Quarter of 2004? ... 308

    (b) Did Yukos' Settlement Offers Constitute Real Alternatives to Enforcement? ... 312

F. THE AUCTION OF YNG ... 322

1. Introduction ... 322

2. Chronology ... 324

    (a) Yukos' Shares in YNG are Seized and the Government Announces they will be Sold; Yukos Brings Unsuccessful Court Challenges ... 325

    (b) YNG is Valued for Auction while its Tax Liabilities Rapidly Escalate ... 325

    (c) Yukos Tries to Prevent the Auction; Preparations Proceed; an Entity Named Baikal is Created to Purchase YNG ... 327

    (d) After a 10-Minute Auction, the Successful Bidder Baikal is Sold to State-Owned Rosneft; a "Monumental Bargain"; the "State, Looking After its Own Interests" ... 329

    (e) Once it is State-Owned, YNG's Fate Improves, with Reductions in Tax Liabilities and a Dramatic Increase in Value ... 330

3. Parties' Arguments and Tribunal's Observations ... 331

|  |  | (a) | Did the Auction Price Reflect the True Value of YNG; If not, was Either Party Responsible for the Price Reduction? | 332 |
|  |  | (b) | Who was Behind Baikal and were They a Front for the Russian State? | 336 |
|  |  | (c) | What were Yukos' Prospects for Survival Once it Lost its Core Asset? | 340 |
|  | G. | THE BANKRUPTCY OF YUKOS | | 342 |
|  |  | 1. | Introduction | 342 |
|  |  | 2. | Chronology | 343 |
|  |  | (a) | The Initiation of the Bankruptcy | 343 |
|  |  | (b) | The Treatment of Bankruptcy Claims; the Creditors' Meeting; the Declaration of Yukos' Bankruptcy | 349 |
|  |  | (c) | The Liquidation of Yukos' Remaining Assets | 352 |
|  |  | 3. | Parties' Arguments and Tribunal's Observations | 355 |
|  |  | (a) | Why was the Bankruptcy Initiated and Who was Truly Behind It? | 356 |
|  |  | (b) | Were the Bankruptcy Proceedings Conducted Properly and Fairly? | 368 |
|  | H. | THE WITHDRAWAL OF PWC'S AUDIT OPINIONS | | 377 |
|  |  | 1. | Introduction | 377 |
|  |  | 2. | Chronology | 379 |
|  |  | (a) | PwC Serves as Both Auditor and Consultant to Yukos | 379 |
|  |  | (b) | PwC Responds to the Massive Tax Reassessments against Yukos | 380 |
|  |  | (c) | PwC Faces Mounting Pressure from the Russian Federation around the Same Time as Mr. Khodorkovsky's Second Trial Starts | 382 |
|  |  | (d) | PwC's "Volte-Face" in Withdrawing the Yukos Audits; Improved Treatment and Continued Pressures in the Russian Federation | 385 |
|  |  | 3. | Parties' Arguments and Tribunal's Observations | 389 |
|  |  | (a) | Did PwC Withdraw its Audits because it was under Pressure from the Russian Government? | 389 |
|  |  | (b) | Were the Grounds Provided by PwC in its Withdrawal Letter Contrived or Credible? | 391 |
|  |  | (c) | Concluding Observations | 399 |
| IX. | | | PRELIMINARY OBJECTIONS | 401 |
|  | A. | | ARE ALL OR SOME OF THE CLAIMS BARRED BY THE "FORK-IN-THE-ROAD" PROVISION OF THE ECT? | 402 |
|  |  | 1. | Introduction | 402 |

2.   Parties' Positions ..................................................................... 403

3.   Tribunal's Decision .................................................................. 406

B.   "UNCLEAN HANDS" (DID CLAIMANTS ACT ILLEGALLY SO AS TO DEPRIVE THEM OF PROTECTION UNDER THE ECT?) ............................................................. 406

1.   Introduction ............................................................................. 406

2.   Claimants' Alleged "Unclean Hands" ....................................... 408

     (a)   Conduct Related to the Acquisition of Yukos and the Subsequent Consolidation of Control over Yukos and its Subsidiaries ............................... 409

     (b)   Conduct Related to the Cyprus-Russia DTA ....................... 412

     (c)   Conduct Related to the Tax Optimization Scheme ............. 416

     (d)   Actions Taken in Hindrance of the Enforcement of Russia's Tax Claims ......... 416

3.   Parties' Positions Regarding the Impact of Claimants' Allegedly "Unclean Hands" on this Arbitration ............................................. 418

     (a)   Respondent's Position ..................................................... 418

     (b)   Claimants' Position ......................................................... 423

4.   Tribunal's Decision .................................................................. 428

     (a)   Can a Clean Hands Principle or Legality Requirement be Read into the ECT? ............................................................. 429

     (b)   Does the "Clean Hands" Doctrine Constitute a "General Principle of Law Recognized by Civilized Nations"? ............. 431

     (c)   Would any Instances of Claimants' Alleged "Bad Faith and Illegal" Conduct be Caught by a Legality Requirement Read into the ECT? ......... 433

     (d)   Conclusion ...................................................................... 435

C.   RESPONDENT'S OBJECTIONS UNDER ARTICLE 21 OF THE ECT ........................... 435

1.   Introduction ............................................................................. 435

2.   Claimants' Position ................................................................. 437

3.   Respondent's Position ............................................................. 440

4.   Tribunal's Decision .................................................................. 446

     (a)   Introduction .................................................................... 446

     (b)   First Reason:  Assuming the Carve-Out Applies, So Does the Claw-Back, and Any Referral to the Competent Tax Authorities Would Clearly have been Futile ......... 448

     (c)   Second Reason:  The Carve-Out Does Not Apply ............. 453

     (d)   Conclusion ...................................................................... 457

X.     LIABILITY ................................................................................................ 457

   A.   ATTRIBUTION ................................................................................... 458

        1.   Claimants' Position ................................................................ 458

        2.   Respondent's Position ............................................................ 460

        3.   Tribunal's Decision on Attribution ........................................ 462

   B.   ARTICLE 10 OF THE ECT .................................................................. 467

        1.   Introduction ........................................................................... 467

        2.   Applicable Legal Standards under Article 10(1) of the ECT ..................................... 468

             (a)   Claimants' Position ...................................................... 468

             (b)   Respondent's Position ................................................. 472

        3.   Did Respondent Accord Claimants' Investments the Standard of Treatment
             Required by Article 10(1) of the ECT? ................................... 475

             (a)   Claimants' Position ...................................................... 475

             (b)   Respondent's Position ................................................. 480

   C.   ARTICLE 13 OF THE ECT .................................................................. 481

        1.   Introduction ........................................................................... 481

        2.   Applicable Legal Standards under Article 13 of the ECT ......... 482

             (a)   Claimants' Position ...................................................... 482

             (b)   Respondent's Position ................................................. 485

        3.   Did Respondent's Actions Constitute Expropriation (or "Measures Having
             Effect Equivalent to Nationalization or Expropriation") within the Meaning of
             Article 13(1) of the ECT? ...................................................... 488

             (a)   Claimants' Position ...................................................... 488

             (b)   Respondent's Position ................................................. 489

        4.   If Respondent's Actions Constitute Expropriation, Has Respondent Met the
             Criteria for a Lawful Expropriation under Article 13(1) of the ECT? ......................... 492

             (a)   Claimants' Position ...................................................... 492

             (b)   Respondent's Position ................................................. 493

   D.   TRIBUNAL'S DECISION ON BREACH OF THE ECT ............................... 495

   E.   CONTRIBUTORY FAULT ..................................................................... 500

        1.   Introduction ........................................................................... 500

        2.   Contributory Fault as Applied in Other Cases ....................... 502

|  | 3. | Tribunal's Analysis | 503 |
| | | (a) Conduct of Yukos in Some of the Low-Tax Regions | 503 |
| | | (b) Conduct of Yukos under the Cyprus-Russia DTA | 505 |
| | | (c) Conduct of Yukos in Connection with YNG Auction | 506 |
| | | (d) Conduct of Yukos in Connection with its Bankruptcy (Non-Payment of the A Loan) | 508 |
| | 4. | Tribunal's Decision on Contributory Fault | 509 |

XI.  INTEREST .............................................................................................................. 510

A.  CLAIMANTS' POSITION .................................................................................. 510

B.  RESPONDENT'S POSITION .............................................................................. 512

C.  THE LEGAL FRAMEWORK .............................................................................. 513

1.  Energy Charter Treaty ...................................................................... 513

2.  ILC Articles on State Responsibility ................................................ 514

3.  *RosInvestCo* and *Quasar* .................................................................. 514

4.  Treatises ............................................................................................ 514

(a)  General Issues .................................................................... 515

(b)  Rate .................................................................................... 515

(c)  *Dies a quo* ......................................................................... 517

(d)  Simple or Compound ........................................................ 518

(e)  Post-Award Interest .......................................................... 518

D.  TRIBUNAL'S DECISION .................................................................................. 519

XII.  THE QUANTIFICATION OF CLAIMANTS' DAMAGES ............................. 522

A.  CLAIMANTS' POSITION .................................................................................. 522

1.  Valuation Date .................................................................................. 523

2.  Causation .......................................................................................... 524

3.  Calculations Performed by Claimants and Mr. Kaczmarek ............ 524

(a)  The "Scenarios" Presented by Claimants .......................... 524

(b)  Methodology Used for Calculations Based on Scenarios 1 and 2 ......... 526

(c)  Methodology Used for Calculations Based on Scenario 3 ................ 531

(d)  Methodology Used for Calculations Based on 2012 Valuation Date ......... 532

(e)  Summary of Results of Claimants' Calculations ................ 533

|  | 4. | Failure of Claimants to Mitigate ................................................................. | 533 |

|  | 5. | Windfall and Double-Recovery ................................................................... | 534 |

B. | RESPONDENT'S POSITION .................................................................................... | 535 |

|  | 1. | Valuation Date ........................................................................................... | 535 |

|  | 2. | Causation.................................................................................................... | 536 |

|  | 3. | Specific Aspects of the Calculations Performed by Claimants Criticized by Respondent.................................................................................................. | 537 |

|  |  | (a) | Credibility of Claimants' DCF Analysis ......................................... | 537 |

|  |  | (b) | Claimants' Selection of Comparable Companies for Purposes of the Comparable Companies Analysis ................................................... | 538 |

|  |  | (c) | Claimants' Reliance on Comparable Transactions............................. | 539 |

|  |  | (d) | Claimants' Calculations of Hypothetical Cash Flows from Dividends.............. | 539 |

|  |  | (e) | Claimants' Calculations Based on the Loss of a Chance to Obtain a Listing on the New York Stock Exchange ..................................................... | 540 |

|  |  | (f) | Claimants' Calculations Based on the Assumption of a Completed Yukos–Sibneft Merger........................................................................... | 540 |

|  |  | (g) | Claimants' Scenarios 3a to 3d ........................................................ | 540 |

|  |  | (h) | Claimants' Scenario 3e and the Valuation of YNG ........................... | 541 |

|  |  | (i) | Claimants' Calculation of Pre-Award Interest .................................. | 541 |

|  | 4. | Failure of Claimants to Mitigate ................................................................. | 541 |

|  | 5. | Windfall and Double-Recovery ................................................................... | 542 |

C. | TRIBUNAL'S ANALYSIS AND DECISION ............................................................... | 543 |

|  | 1. | Valuation Date ........................................................................................... | 543 |

|  |  | (a) | The Date of the Expropriation........................................................ | 543 |

|  |  | (b) | The Possibility for Claimants to Choose Between a Valuation as of the Date of Expropriation and a Valuation as of the Date of the Award.................. | 544 |

|  | 2. | Causation.................................................................................................... | 546 |

|  |  | (a) | Causation and Reliance on Multiple Actions ..................................... | 546 |

|  |  | (b) | Multiple Causes for the Same Damage ............................................ | 547 |

|  | 3. | Failure of Claimants to Mitigate ................................................................. | 548 |

|  | 4. | The Methodology Followed by the Tribunal ................................................. | 548 |

|  |  | (a) | Valuation of Yukos .......................................................................... | 550 |

    (b) Valuation of Lost Dividends ............................................................. 553

  5. Application of the Methodology Followed by the Tribunal ......................................... 560

    (a) Calculations Based on 19 December 2004 Valuation Date............................... 561

    (b) Calculations Based on 2014 Valuation Date ...................................... 562

    (c) Comparison of the Results Based on the Two Different Valuation Dates ......... 563

  6. Deductions Due to Claimants' Contributory Fault .................................... 564

  7. Windfall and Double Recovery..................................................... 564

XIII. COSTS ................................................................................... 564

 A. INTRODUCTION ........................................................................ 564

 B. CLAIMANTS' POSITION ................................................................ 566

  1. Claimants are Entitled to Recover All Costs Incurred in Connection with these Arbitrations ........................................................................ 566

  2. Claimants' Costs are Reasonable ................................................ 568

  3. Claimants' Comments on Respondent's Submission on Costs................. 570

 C. RESPONDENT'S POSITION ............................................................. 571

  1. Equal Apportionment is an Appropriate Exercise of the Tribunal's Discretion on Costs................................................................................ 571

  2. Schedule of "Types of Costs" Incurred by Respondent................... 572

  3. Respondent's Comments on Claimants' Submission on Costs.............. 573

 D. TRIBUNAL'S DECISION ON COSTS.................................................. 574

  1. Fixing and Allocation of Costs of the Arbitration Pursuant to Article 40(1) of the UNCITRAL Rules .................................................................... 574

  2. Fixing and Allocation of Costs for Legal Representation and Assistance of the Parties Pursuant to Article 40(2) of the UNCITRAL Rules ..................... 575

  3. Conclusion on the Award of Costs .......................................... 576

XIV. DECISION ............................................................................... 578

ANNEXES ...................................................................................... A-1

 A. ANNEX A1:  APPENDIX 1.1, APPENDIX J.1 AND APPENDIX J.2 TO SECOND DOW REPORT (MODIFIED AS DESCRIBED IN NOTE 2401 OF THE AWARD) ......................... A-1

    (a) Appendix 1.1 .......................................................... A-1

    (b) Appendix J.1 New .................................................... A-2

    (c) Appendix J.2 New .................................................... A-3

B.    ANNEX A2:  YUKOS COMPANY STRUCTURE  (EXTRACT FROM EXH. R-3165, REFERRED TO
      IN NOTE 2413 OF THE AWARD) ............................................................................ A-5

C.    TABLES T1–T9 SHOWING THE TRIBUNAL'S DAMAGES CALCULATIONS ............................ A-6

      1.    Table T1:  Calculation of Total Damages of Claimants as of 19 December 2004
            (Date of Expropriation) vs. 30 June 2014 (Date of Award for Valuation
            Purposes)........................................................................................................ A-6

      2.    Table T2:  Equity Value of Yukos Based on Adjustments Made by Professor
            Dow to Mr. Kaczmarek's Comparable Companies Calculations and the
            Evolution of the RTS Oil & Gas Index..................................................................... A-7

      3.    Table T3:  Calculation of Dividends and Interest up to Valuation Date for
            Valuation as of 30 June 2014 ................................................................................ A-8

      4.    Table T4:  FCFtE for Years 2012–2014  (Based on Mr. Kaczmarek's Figures) ......... A-9

      5.    Table T5:  Total Adjustment of Free Cash Flow to the Firm  (Required to Obtain
            FCFtE value for Years 2012–2014 for Mr. Kaczmarek) ........................................... A-10

      6.    Table T6:  Change in Net Debt for Years 2012–2014 ............................................... A-11

      7.    Table T7:  Interest Factors Based on Annual Rate of 3.389 percent (see Table
            T9)................................................................................................................... A-12

      8.    Table T8:  RTS Oil and Gas Index Values from 1 January to 24 June 2014 ............. A-13

      9.    Table T9:  10-Year U.S. Sovereign Bond Rate 2005–2014 ...................................... A-16

## LIST OF DEFINED TERMS

| Term | Definition |
|---|---|
| **2000 Audit Report** | Field Tax Audit Report No. 08-1/1, dated 29 December 2003, finding that Yukos operated a tax evasion scheme |
| **2000 Decision** | Decision No. 14-3-05/1609-1, dated 14 April 2004, holding Yukos liable for a tax offense and reassessing approximately USD 3.48 billion in taxes against Yukos for the year 2000 |
| **2001 Decision** | Decision No. 30-3-15/3, dated 2 September 2004, holding Yukos liable for a tax offense and reassessing approximately USD 4.1 billion in taxes against Yukos for the year 2001 |
| **2002 Decision** | Decision No. 52/896, dated 16 November 2004, holding Yukos liable for a tax offense and reassessing approximately USD 6.7 billion in taxes against Yukos for the year 2002 |
| **2003 Decision** | Decision No. 52/985, dated 6 December 2004, holding Yukos liable for a tax offense and reassessing approximately USD 6 billion in taxes against Yukos for the year 2003 |
| **2003 Interim Dividend** | Yukos' declaration of a USD 2 billion interim dividend in November 2003 |
| **2004 Decision** | Decision No. 52/292, dated 17 March 2006, holding Yukos liable for a tax offense and reassessing approximately USD 3.9 billion in taxes against Yukos for the year 2004 |
| **ADR** | American Depositary Receipt |
| **A Loan** | USD 1 billion loan entered into on 24 September 2003 by Yukos from the Western Banks and secured by certain of Yukos' oil export contracts and by YNG |
| **April 2004 Injunction** | Ruling by the Moscow Arbitrazh Court dated 15 April 2004 prohibiting Yukos from alienating and encumbering its assets |
| **Baikal** | Baikal Finance Group, the entity which purchased YNG at auction and which was bought by Rosneft |
| **BBS Companies** | Behles Petroleum S.A., Baltic Petroleum Trading Limited and South Petroleum Limited |
| **B Loan** | USD 1.6 billion loan entered into on 30 September 2003 by Yukos from Société Générale S.A. and fully collateralized in cash by GML |

| Term | Definition |
|------|------------|
| **Chrétien letters** | Letters from Jean Chrétien to Prime Minister Fradkov, dated 6 and 15 July 2004, and to President Putin, dated 30 July 2004, 10 September 2004 and 17 November 2004 |
| **Claimants** | Hulley, VPL, and YUL |
| **Claimants' Post-Hearing Brief** | Claimants' Post-Hearing Brief, dated 21 December 2012 |
| **Claimants' Skeleton** | Claimants' Skeleton Argument, dated 1 October 2012 |
| **Confidential Sale Agreement** | Confidential sale agreement between the Western Banks and Rosneft dated 13 December 2005 |
| **Counter-Memorial** | Respondent's Counter-Memorial on the Merits, dated 4 April 2011, as corrected 29 July 2011 |
| **Cyprus-Russia DTA** | Agreement Between the Government of the Republic of Cyprus and the Government of the Russian Federation for the Avoidance of Double Taxation with Respect to Taxes on Income and on Capital, signed on 5 December 1998 |
| **DCF** | Discounted Cash Flow |
| **Dresdner** | ZAO Dresdner Bank |
| **Dresdner Summary Letter** | Dresdner Summary Valuation Opinion Letter dated 6 October 2004 |
| **Dresdner Valuation Report** | Dresdner Valuation Report of YNG dated 6 October 2004 |
| **EBITDA** | Earnings before Interest, Taxes, Depreciation and Amortization |
| **ECHR** | European Convention on Human Rights |
| **ECT (or Treaty)** | Energy Charter Treaty, 2080 UNTS 95, signed on 17 December 1994 |
| **ECtHR** | European Court of Human Rights |
| **ECtHR Yukos Judgment** | OAO Neftyanaya Kompaniya Yukos v. Russia, ECtHR, Appl. No. 14902/04, Judgment, 20 September 2011 |
| **EGM** | Extraordinary General Meeting |
| **English Judgment** | BNP Paribas S.A. v. Yukos Oil Company, High Court of England and Wales, Case No. HC 05 C0 12 19, [2005] EWHC 1321 (Ch), Judgment, 24 June 2005 |
| **GML** | GML Limited (formerly named Group Menatep Limited), a company incorporated in Gibraltar and parent company of YUL |

| Term | Definition |
|------|-----------|
| **Final Awards** | Final Awards in these three arbitrations (PCA Case Nos. AA226 (Hulley), AA227 (YUL) and AA228 (VPL)) (including the present Award) |
| **Hearing on the Merits (or Hearing)** | Hearing on the merits held at the Peace Palace in The Hague from 10 October to 9 November 2012 |
| **Hulley** | Hulley Enterprises Limited, a company organized under the laws of Cyprus and Claimant in PCA Case No. AA226, owned by YUL |
| **ICJ** | International Court of Justice |
| **ILC** | International Law Commission of the United Nations |
| **ILC Articles on State Responsibility** | ILC Draft Articles on Responsibility of States for Internationally Wrongful Acts, 2001 |
| **Interim Awards** | Interim Awards on Jurisdiction and Admissibility issued on 30 November 2009 in these three arbitrations (PCA Case Nos. AA226 (Hulley), AA227 (YUL) and AA228 (VPL)) |
| **Law 9-Z** | Law of the Republic of Mordovia No. 9-Z, which is the framework by which Mordovia offered tax benefits to corporate entities operating in the region |
| **Memorial** | Claimants' Memorial on the Merits, dated 15 September 2010 |
| **Moravel** | Moravel Investments Limited |
| **Notices of Arbitration and Statements of Claim** | Claimants' Notices of Arbitration and Statements of Claim by Hulley and YUL, dated 3 February 2005; and by VPL, dated 14 February 2005 |
| **NYSE** | New York Stock Exchange |
| **Oligarchs** | Respondent's style of reference to the individuals who have or had a beneficial interest in the trusts behind Claimants, namely Messrs. Khodorkovsky, Lebedev, Nevzlin, Dubov, Brudno, Shakhnovsky, and Golubovitch |
| **Parties** | Claimants and Respondent |
| **PCA** | Permanent Court of Arbitration |
| **PCIJ** | Permanent Court of International Justice |
| **PwC** | PricewaterhouseCoopers, the former auditor of Yukos |

| **Term** | **Definition** |
|---|---|
| **PwC's Withdrawal Letter** | Letter from PwC to the bankruptcy receiver, Mr. Eduard Rebgun, dated 15 June 2007, by which PwC withdrew its Yukos audits |
| *Quasar* | Quasar de Valores SICAV S.A. et al. v. The Russian Federation, SCC Arbitration, Award, 20 July 2012 |
| **Rehabilitation Plan** | Rehabilitation plan the in context of bankruptcy proceedings proposed by Yukos' management and approved by a majority vote during an EGM on 1 June 2006 |
| **Rejoinder** | Respondent's Rejoinder on the Merits, dated 16 August 2012 |
| **Reply** | Claimants' Reply on the Merits, dated 15 March 2012 |
| **Resolution No. 53** | Resolution of the Plenum of the Supreme Arbitrazh Court No. 53, dated 12 October 2006 |
| **Respondent** | The Russian Federation or Russia |
| **Respondent's Post-Hearing Brief** | Respondent's Post-Hearing Brief, dated 21 December 2012 |
| **Respondent's Skeleton** | Respondent's Skeleton Argument, dated 1 October 2012 |
| *RosInvestCo* | RosInvestCo UK Ltd. v. The Russian Federation, SCC Arbitration V (079/2005), Final Award, 12 September 2010 |
| **Rosneft** | Russian State-owned entity that bought Baikal |
| **Russian Civil Code** | Civil Code of the Russian Federation |
| **Russian Constitution** | Constitution of the Russian Federation |
| **Russian Tax Code** | Tax Code of the Russian Federation |
| **Share Exchange Agreement** | Agreement pursuant to which Yukos would acquire 72 percent (plus one share) of Sibneft shares from Sibneft's principal shareholders in exchange for 26.01 percent of the fully diluted share capital of Yukos |
| **Share Purchase Agreement** | Agreement pursuant to which Yukos would acquire 20 percent (minus one share) of Sibneft shares from Sibneft's principal shareholders for a cash consideration of USD 3 billion |
| **Sibneft** | Russia's fifth largest oil company in 2003 when it agreed to a merger with Yukos |
| **Stichting 1** | Stichting Administratiekantoor Yukos International |

| Term | Definition |
|------|-----------|
| **Stichting 2** | Stichting Administratiekantoor Small World Telecommunication Holdings B.V. |
| **Stichtings** | Stichting 1 and Stichting 2 |
| **TRO** | Temporary Restraining Order |
| **UNCITRAL Rules** | Arbitration Rules of the United Nations Commission on International Trade Law, 1976 |
| **U.S. GAAP** | United States' Generally Accepted Accounting Principles |
| **VAT Law** | Law of the Russian Federation governing Value Added Tax |
| **VCLT** | Vienna Convention on the Law of Treaties, 1155 UNTS 331, signed on 23 May 1969 |
| **VPL** | Veteran Petroleum Limited, a company organized under the laws of Cyprus and Claimant in PCA Case No. AA 228 |
| **Western Banks** | Syndicate of Western banks led by Société Générale S.A. and including BNP Paribas S.A., Citibank N.A., Commerzbank Akziengesellschaft, Calyon S.A., Deutsche Bank A.G., Hillside Apex Fund Limited, ING Bank N.V., KBC Bank N.V., Stark Trading, Shepherd Investments International Limited, Thames River Traditional Funds PLC (High Income Fund), UFJ (Holland) N.V. and V.R. Global Partners L.P. |
| **YNG** | Yuganskneftegaz, Yukos' core production subsidiary |
| **Yukos (or OAO Yukos Oil Company)** | OAO Yukos Oil Company, a joint stock company incorporated in Russia in 1993 |
| **Yukos CIS** | Yukos CIS Investment Limited |
| **Yukos Finance** | Yukos Finance B.V. |
| **Yukos International** | Yukos International U.K. B.V. |
| **YUL** | Yukos Universal Limited, a company organized under the laws of the Isle of Man and Claimant in PCA No. AA 227, shareholder of Yukos |
| **ZATO** | Zakrytoe Administrativno-Territorial'noe Obrazovaniye, or Closed Administrative Territorial Unit. |

## INTRODUCTION

1.  In February 2005, three controlling shareholders of **OAO Yukos Oil Company** (or "**Yukos**")—Hulley Enterprises Limited ("**Hulley**"), a company organized under the laws of Cyprus, Yukos Universal Limited ("**YUL**"), a company organized under the laws of the Isle of Man, and Veteran Petroleum Limited ("**VPL**"), a company organized under the laws of Cyprus (collectively, "**Claimants**")—initiated arbitrations against the **Russian Federation** ("**Respondent**" or "**Russia**"), which together with Claimants constitute the "**Parties**."

2.  The three arbitrations were heard in parallel with the full participation of the Parties at all relevant stages of the proceedings.  Mindful of the fact that each of the three Claimants maintains separate claims in separate arbitrations that require separate awards (the "**Final Awards**"), the Tribunal nevertheless shall discuss these arbitrations as a single set of proceedings, except where circumstances distinct to particular Claimants necessitate separate treatment.

3.  The Final Awards address: (a) those of Respondent's objections to jurisdiction and admissibility that remain to be decided after the Interim Awards on Jurisdiction and Admissibility of 30 November 2009 (the "**Interim Awards**");[1] (b) Claimants' claims on the merits; and (c) quantum.

4.  By any standard, and as will be seen, these have been mammoth arbitrations.  At the highest, Claimants are claiming damages from Respondent of "no less than US$ 114.174 billion."[2] Since February 2005, the Tribunal has held five procedural hearings with the Parties and issued 18 procedural orders.  In the fall of 2008, the Tribunal held a ten-day hearing on jurisdiction and admissibility in The Hague and, in November 2009, issued three Interim Awards, each over 200 pages.  A twenty-one day **Hearing on the Merits** (or "**Hearing**") took place in The Hague from 10 October to 9 November 2012.  The written submissions of the Parties span more than 4,000 pages and the transcripts of the hearings more than 2,700 pages.  Over 8,800 exhibits have been filed with the Tribunal.

---

[1]  *Hulley Enterprises Limited v. The Russian Federation*, PCA Case No. 226, Interim Award on Jurisdiction and Admissibility, 30 November 2009 (hereinafter "Interim Award (Hulley)"); *Yukos Universal Limited v. The Russian Federation*, PCA Case No. 226, Interim Award on Jurisdiction and Admissibility, 30 November 2009 (hereinafter "Interim Award (YUL)"); *Veteran Petroleum Limited v. The Russian Federation*, PCA Case No. 226, Interim Award on Jurisdiction and Admissibility, 30 November 2009 (hereinafter "Interim Award (VPL)").

[2]  Claimants' Reply on the Merits, 15 March 2012 ¶ 1199(3) (hereinafter "Reply").

5.      The facts of this dispute have been the subject of attention in the media for more than a decade, involving as they do, as central actors, Mr. Vladimir Putin, the President of the Russian Federation, and a Russian "oligarch", Mr. Mikhail Khodorkovsky, who, at the outset of the dispute, was the principal shareholder and Chief Executive Officer of Yukos, then the largest oil company in Russia and one of the largest oil companies in the world.

6.      Throughout this lengthy and heavily contested arbitration, in circumstances that were often trying and stressful, counsel for the Parties acted in a highly professional way.  The Tribunal is most grateful for their assistance.  The Tribunal particularly acknowledges the grace and acuity of the participation of Mr. Robert Greig, who was forced by ill health to retire in the midst of the proceedings.

7.      Having studied carefully the voluminous record of these three arbitrations, and having weighed the arguments of the counsel who have so ably represented the Parties, the Tribunal is now ready to deliver its Final Awards.

## I.      PROCEDURAL HISTORY

8.      The Interim Awards recount in detail the procedural history of the arbitrations from their commencement up until the date those Awards were issued.  The Tribunal has also issued 18 procedural orders, each of which contains a relevant procedural history.  In this Part of the Final Award, the Tribunal recalls only the key procedural details from the early phase of the proceedings and summarizes developments since November 2009.

### A.      COMMENCEMENT OF THE ARBITRATION

9.      On 2 November 2004, all three Claimants delivered to the President of Russia notifications of claim with respect to Russia's alleged violation of its obligations under the Energy Charter Treaty ("**ECT**" or "**Treaty**") and sought to settle the disputes amicably pursuant to Article 26(1) of the ECT.[3]

10.     Having failed to settle their disputes amicably within the three-month period prescribed under Article 26(2) of the ECT, on 3 February 2005, Hulley and YUL initiated arbitration proceedings through Notices of Arbitration and Statements of Claim against Respondent.

---

[3]      Energy Charter Treaty, Lisbon, 17 December 1994, 2080 UNTS 95 (hereinafter "ECT" or "Treaty").

Subsequently, through a Notice of Arbitration and Statement of Claim dated 14 February 2005, VPL initiated arbitration proceedings against Respondent. Claimants' requests for arbitration against Respondent were made pursuant to Article 26(4)(b) of the ECT and the Arbitration Rules of the United Nations Commission on International Trade Law, 1976 ("**UNCITRAL Rules**").

11.    Claimants alleged that Respondent had expropriated and failed to protect Claimants' investments in Yukos, resulting in "enormous losses," and sought all available relief in respect of those losses.

B.    CONSTITUTION OF THE TRIBUNAL

12.    The history of the constitution of the Tribunal is recounted in detail in the Interim Awards. The Tribunal is composed of Judge Stephen M. Schwebel (appointed by Respondent on 8 April 2005), Dr. Charles Poncet (appointed as a replacement arbitrator by Claimants on 24 September 2007) and The Hon. L. Yves Fortier PC CC OQ QC (appointed as Chairman on 21 July 2005 by the agreed appointing authority, the Secretary-General of the Permanent Court of Arbitration ("**PCA**")).

13.    On 1 August 2005, the Parties agreed on The Hague as the legal seat of the arbitrations.

14.    On 15 October 2005, Respondent submitted its Statements of Defense, in which it objected to the Tribunal's jurisdiction and denied Claimants' allegations of expropriation and unfair and inequitable treatment.

15.    On 31 October 2005, a preliminary procedural hearing was held in The Hague, at which the Parties and members of the Tribunal signed Terms of Appointment confirming, *inter alia*, that: (a) the members of the Tribunal had been validly appointed in accordance with the ECT and the UNCITRAL Rules; (b) the proceedings would be conducted in accordance with the UNCITRAL Rules; (c) the International Bureau of the PCA would act as registry; (d) the dispute would be decided in accordance with the ECT and applicable rules and principles of international law; (e) the language of the arbitration would be English; and (f) all pleadings, documents, testimonial evidence, deliberations and actions taken by the Tribunal would remain confidential in perpetuity, unless the Parties were to release the arbitrators from this obligation. The Tribunal also set a procedural calendar and determined that it would rule on Respondent's

plea concerning jurisdiction and the admissibility of the claim as a preliminary question.  The calendar was confirmed in **Procedural Order No. 1** on 8 November 2005.

C.     PRELIMINARY PHASE ON JURISDICTION AND ADMISSIBILITY

16.     Respondent filed its First Memorials on Jurisdiction and Admissibility on 28 February 2006 and Claimants filed their Counter-Memorials on Jurisdiction and Admissibility on 30 June 2006.

17.     On 8 September 2006, the Tribunal issued **Procedural Order No. 2** dealing with document production.  The Tribunal invited the Parties to agree on whether requests relating to the Parties' respective "unclean hands" contentions and Respondent's contention that the corporate personality of Claimants "must be disregarded" because they are "an instrumentality of a criminal enterprise" should be considered during the jurisdiction and admissibility phase or deferred to the merits phase.

18.     On 31 October 2006, the Tribunal issued **Procedural Order No. 3**, in which it deferred consideration of the Parties' contentions concerning "unclean hands" and Respondent's "criminal enterprise" contention to the merits phase.   On 3 November 2006, Claimants submitted a stipulation of facts, and on 8 November 2006, Respondent submitted its observations on the stipulation.

19.     Between November 2006 and November 2008, the Tribunal issued six further procedural orders relating to the conduct of the jurisdiction and admissibility phase of the arbitrations. During this period the Parties exchanged two rounds of written submissions on jurisdiction and admissibility, as well as Skeleton Arguments for the hearing.  As noted in the Interim Awards, the written record in the jurisdictional phase contained detailed and extensive filings of hundreds of pages, accompanied by over a thousand exhibits and dozens of witness statements.

20.     The **hearing on jurisdiction and admissibili**ty was conducted at the Peace Palace in The Hague, from 17 to 21 November, 26 to 29 November and 1 December 2008.

21.     On 30 November 2009, the Tribunal rendered the **Interim Awards**, stating in operative part:

             For the reasons set forth above, the Tribunal:

                    (a)     DISMISSES the objections to jurisdiction and/or admissibility based on
                            Article 1(6) and 1(7), Article 17, Article 26(3)(b)(i) and Article 45 of the
                            ECT;

(b)     DEFERS its decision on the objection to jurisdiction and/or admissibility based on Article 21 of the ECT to the merits phase of the arbitration, consistent with [paragraph numbers], above;

(c)     CONFIRMS that its decision on the objections to jurisdiction and/or admissibility involving the Parties' contentions concerning "unclean hands" and Respondent's contention that "Claimant's personality must be disregarded because it is an instrumentality of a criminal enterprise" is deferred to the merits phase of the arbitration, consistent with Procedural Order No. 3;

(d)     HOLDS that, subject to the preceding two sub-paragraphs, the present dispute is admissible and within its jurisdiction, and that the Tribunal has jurisdiction over the Russian Federation in connection with the merits of the present dispute;

(e)     RESERVES all questions concerning costs, fees and expenses, including the Parties' costs of legal representation, for subsequent determination; and

(f)     INVITES the Parties to confer regarding the procedural calendar for the merits phase of the arbitration, and to report to the Tribunal in this respect within 60 days of receipt of this Interim Award.

22.     On 4 February 2010, Respondent wrote to the Tribunal "to protest Claimants' counsel's publication of the [Interim Awards] in violation of applicable obligations," noting that the Interim Awards had appeared on various websites.

### D.     BIFURCATION AND OTHER SCHEDULING MATTERS

23.     On 24 February 2010, the Parties informed the Tribunal that they disagreed as to whether or not to bifurcate the proceedings between a liability and a damages phase, and as to the sequence and timing of document production.  Following an exchange of submissions on these issues, a hearing was held at the International Dispute Resolution Centre in London on 7 May 2010.

24.     The Tribunal issued **Procedural Order No. 10** on 13 May 2010, in which it:  (a) decided that documentary discovery would take place in a single phase, after the Parties' first round of written pleadings on the merits; (b) deferred the decision on bifurcation of the proceedings between a liability and a quantum phase and on the issue of referral arising under Article 21 of the ECT until after the Parties' first round of written pleadings on the merits; and (c) fixed a procedural calendar.  The Tribunal specified that the Parties' first round of written pleadings on the merits was to address all issues, including the deferred preliminary questions, liability, quantum and the issue of referral under Article 21 of the ECT.  With respect to documentary discovery, the Tribunal confirmed that some of its earlier rulings on requests relating to "unclean hands" and "criminal enterprise" in the jurisdiction and admissibility phase had been without prejudice to the Parties' ability to restate one or more of these requests in the merits

phase.  The Parties also agreed for each filing that they would submit one brief and one set of exhibits for all three cases.

25.  In accordance with Procedural Order No. 10 (as amended by the Tribunal on 23 June 2010), Claimants filed their Memorial on the Merits ("**Memorial**") on 16 September 2010.  It spanned 424 pages and was accompanied by 1045 exhibits, nine witness statements and two expert reports (with annexures).   On 17 November 2010, further to a request by Respondent, Claimants provided an electronic copy of the appendices to the report of Claimants' damages expert.

26.  On 4 November 2010, Respondent informed the Tribunal that Baker Botts LLP was joining Cleary Gottlieb Steen & Hamilton LLP as Respondent's counsel in these arbitrations.

27.  Respondent filed its Counter-Memorial on the Merits ("**Counter-Memorial**") on 4 April 2011 and submitted a corrected version on 29 July 2011.  The Counter-Memorial spanned 787 pages and was accompanied by 2868 exhibits and eight expert reports (some with annexures).

28.  On 29 April 2011, the Parties filed their respective submissions on the bifurcation of the proceedings and the issue of referral arising under Article 21 of the ECT.  A hearing on these matters was held at the Church House Conference Centre in London on 9 May 2011.

29.  On 31 May 2011, the Tribunal issued **Procedural Order No. 11**, in which it:  (a) denied Respondent's request that the proceedings be bifurcated between a liability and a damages phase; (b) reserved its decision on referral under Article 21(5)(b)(i) of the ECT to a later stage of the proceedings, when the evidentiary record would be completed; and (c) ordered the Parties to proceed in accordance with the amended procedural calendar.

E.    DOCUMENT PRODUCTION AND CONFIDENTIALITY

30.  The Parties exchanged requests for documents on 17 June 2011 and the following month exchanged objections and comments on objections to the document requests.  Respondent also requested an oral hearing on disclosure issues and repeated a request for more time to file its Rejoinder.

31.  On 11 August 2011, the Tribunal ruled on certain procedural aspects of document production and the timing of submissions, and informed the Parties that it "considered then, as it does

today, that the Amended Procedural Calendar is in compliance with the requirement of due process and equality between the parties taking into account all the circumstances."

32. On 16 September 2011, the Tribunal issued **Procedural Order No. 12**, in which it ruled on the Parties' document requests (with some rulings being "without prejudice" to a further decision after the reply rounds of written submissions).

33. By letter of 23 September 2011, Respondent informed the Tribunal that the European Court of Human Rights ("**ECtHR**") had, on 20 September 2011, issued a judgment in *OAO Neftyanaya Kompaniya Yukos v. Russia* ("**ECtHR Yukos Judgment**"),[4] which addressed the "same circumstances" on which Claimants' claims in these arbitrations are based.

34. On 16 December 2011, Claimants produced documents pursuant to Procedural Order No. 12. Respondent did not produce documents, but wrote to the Tribunal, expressing concern that Claimants had provided no assurance that documents collected for disclosure would be kept confidential and used only for the purposes of these arbitrations.  Respondent requested the Tribunal to issue a directive "requiring the Parties to protect the confidentiality of all documents disclosed by the other, using them solely for purposes of these arbitrations." Claimants objected to Respondent's "eleventh hour" request for a confidentiality order.

35. On 19 December 2011, the Tribunal ordered Respondent to provide by the end of that day documents to Claimants that had been ordered to be produced in Procedural Order No. 12, requested written submissions on confidentiality and directed that until it decided the confidentiality issue, the documents produced by both Parties were to remain confidential and be used solely for purposes of these arbitrations.  Pursuant to the Tribunal's directive, Respondent produced documents on 19 December 2011.

36. On 18 January and 2 February 2012, the Parties exchanged submissions on the scope of confidentiality of the documents produced.  From January to May 2012, the Parties exchanged extensive correspondence concerning compliance with Procedural Order No.12.

37. On 27 February 2012, the Tribunal issued **Procedural Order No. 13**, in which it:  (a) ordered that all documents produced by a Party to the other Party and the Tribunal following an order of the Tribunal "be and remain confidential in perpetuity" and "be used solely for the purpose of

---

[4]     *OAO Neftyanaya Kompaniya Yukos v. Russia*, ECtHR, Appl. No. 14902/04, Judgment, 20 September 2011, Exh. R-3328, (hereinafter "ECtHR Yukos Judgment").

the pursuit or defense of these arbitrations and not for any other purpose;" (b) listed the persons involved in these arbitrations to whom these documents could be disclosed; and (c) invited the Parties to refrain from discussing these arbitrations in public in order not to exacerbate their dispute or otherwise compromise the integrity of these arbitration proceedings.

38.   Claimants filed their Reply on the Merits ("**Reply**") on 15 March 2012.  It spanned 474 pages and was accompanied by a further 629 exhibits and two expert reports (with annexures).

39.   On 30 April 2012, the Tribunal issued **Procedural Order No. 14**, granting some of Respondent's document production requests which had earlier been denied "without prejudice" in Procedural Order No. 12.  Claimants produced documents pursuant to Procedural Order No. 14 on 29 May 2012.  On 29 June 2012, Respondent produced additional documents "in accordance with the parties' continuing obligation to disclose requested documents as they are discovered" under Procedural Order No. 12.  Throughout June and July 2012, the Parties exchanged extensive correspondence as to whether that was in violation of Procedural Order No. 12.

40.   On 16 August 2012, Respondent filed its Rejoinder on the Merits ("**Rejoinder**").  It spanned 819 pages and was accompanied by 1739 exhibits and seven expert reports (with annexures).

## F.   HEARING ON THE MERITS

41.   On 28 August 2012, a pre-hearing telephone conference took place during which the Parties agreed on a number of issues, but disagreed on others.  For example, Respondent requested that the Tribunal set a deadline for the exchange between the Parties of witness "impeachment" evidence prior to the Hearing on the Merits, while Claimants raised several "due process" issues and requested permission to file written submissions in support of their requests.  The Parties then exchanged written comments on these issues.

42.   By exchange of letters dated 10 September 2012, Claimants provided the names and order of three Respondent witnesses they wished to cross-examine and Respondent advised the names and order of ten of Claimants' witnesses whom it wished to cross-examine.

43.   On 12 September 2012, the Tribunal issued **Procedural Order No. 15** dealing with logistical and procedural issues for the Hearing on the Merits.

44.   On 14 September 2012, the Tribunal issued **Procedural Order No. 16**, in which it determined the outstanding procedural issues for the Hearing on the Merits, *inter alia* (a) denying

Respondent's requests relating to the exchange of "impeachment" evidence (noting that "in international arbitration practice, documents used at an evidentiary hearing should generally be submitted with the Parties' written pleadings, in accordance with the established procedural calendar"); and (b) granting Claimants permission to file certain documents that would "complete the record" in relation to selected exhibits that Respondent had included in its Rejoinder.

45.     Claimants filed additional exhibits on 20 September 2012.  On 25 September 2012, Respondent objected to certain of these exhibits on the grounds that they exceeded the scope of Procedural Orders No. 15 and 16.  Following an exchange of views by the Parties, the Tribunal ruled on Respondent's objection in **Procedural Order No. 17** dated 2 October 2012.

46.     On 1 October 2012, the Parties submitted their respective **Skeleton Arguments** in aid of the oral arguments to be presented at the Hearing on the Merits.

47.     On 4 October 2012, Respondent advised that it no longer intended to cross-examine one of Claimants' tax law experts, Mr. Philip Baker QC.  The same day Claimants withdrew the witness statement of former Russian Prime Minister, Mr. Mikhail Kasyanov, which had been submitted with the Memorial, on the ground that Mr. Kasyanov had informed Claimants' counsel that "he will not appear at the hearing in these arbitrations."

48.     On 8 October 2012, Claimants advised that they no longer intended to cross-examine one of Respondent's tax law experts, Professor Rosenbloom.

49.     The **Hearing on the Merits** took place at the Peace Palace, The Hague from 10 October to 9 November 2012.  Over the course of the Hearing, the following were in attendance:

**Tribunal**
The Hon. L. Yves Fortier PC CC OQ QC
Dr. Charles Poncet
Judge Stephen M. Schwebel

| **Claimants** | **Respondent** |
|---|---|
| *Counsel* | *Counsel* |
| Professor Emmanuel Gaillard | Dr. Claudia Annacker |
| Dr. Yas Banifatemi | Mr. Lawrence Friedman |
| Mr. Philippe Pinsolle | Mr. David Sabel |
| Ms. Jennifer Younan | Mr. Matthew Slater |
| Dr. Paschalis Paschalidis | Mr. William McGurn |
| Mr. Ilija Mitrev Penusliski | Mr. Jay Alexander |
| Ms. Kamalia Mehtiyeva | Mr. Samuel Cooper |
| Mr. Gueorgui Babitchev | Mr. Michael Goldberg |
| Mr. Emmanuel Jacomy | Mr. Cameron Murphy |

Mr. Scott Vesel
Ms. Ximena Herrera-Bernal
Ms. Elise Edson
Ms. Ketevan Betaneli
Ms. Coralie Darrigade
Mr. Thomas Voisin
Mr. Dimitrios Katsikis
Mr. Benjamin Siino
Mr. Jean-Marc Elsholz
Ms. Gracia Angulo Duncan
Mr. Benoit Arnauld
Ms. Nanou Leleu-Knobil

*Party Representatives*
Mr. Tim Osborne
Mr. Christopher Cook
Mr. Rodney Hodges

**Claimants' Witnesses**
*Fact Witnesses*
Mr. Vladimir Dubov
Dr. Andrei Illarionov
Mr. Jacques Kosciusko-Morizet
Mr. Bruce Misamore
Mr. Leonid Nevzlin
Mr. Frank Rieger
Mr. Steven Theede

*Expert*
Mr. Brent Kaczmarek

**Assistant to the Tribunal**
Mr. Martin Valasek

**Permanent Court of Arbitration**
Mr. Brooks W. Daly, Secretary to the Tribunal
Ms. Judith Levine, Assistant Secretary to the Tribunal
Ms. Olga Boltenko
Ms. Evgeniya Goriatcheva
Ms. Hinda Rabkin
Ms. Elsa Sardinha

**Interpreters**
Mr. Yuri Somov
Mr. Ilya Feliciano

**Court Reporter**
Mr. Trevor McGowan

Ms. Laurie Achtouk-Spivak
Ms. Marina Akchurina
Mr. Yury Babichev
Mr. Nowell Bamberger
Mr. Adam Bryan
Ms. Chiara Capalti
Ms. Ania Farren
Ms. Giulia Gosi
Mr. Michael Jacobsohn
Mr. Magnus Jones
Mr. Lorenzo Melchionda
Mr. Milo Molfa
Ms. Sara Nadeau-Seguin
Ms. Daria Pavelieva
Mr. Jacopo Roberti di Sarsina
Ms. Teale Toweill
Ms. Marina Weiss
Mr. Larry Work-Dembowski

*Party Representatives*
Mr. Konstantin Vyshkovskiy
Ms. Maria Maslyakova

**Respondent's Witnesses**
*Experts*
Professor James Dow
Mr. Oleg Y. Konnov

50.    On behalf of Claimants, oral arguments were presented by Dr. Yas Banifatemi, Professor
Emmanuel Gaillard, Mr. Philippe Pinsolle and Ms. Jennifer Younan.  On behalf of Respondent,
oral arguments were presented by Dr. Claudia Annacker, Mr. Lawrence Friedman, Mr. David
Sabel and Mr. Matthew Slater.

51.     During the Hearing, on 14 October 2012, the Parties filed brief written submissions on a document production request made by Respondent in follow up to Procedural Order No. 14.  On 15 October 2012, the Tribunal ruled that the time for document production requests had passed, and noted that Respondent was free to ask the Tribunal to draw adverse inferences from any alleged non-compliance by Claimants with the Tribunal's document production orders.

### G.    POST-HEARING PROCEDURES

52.     At the close of the Hearing on 9 November 2012, the Tribunal directed the Parties to submit Post-Hearing Briefs of no more than 100 pages by 21 December 2012.  On 13 November 2012, the Tribunal confirmed that the Post-Hearing Briefs were to be prepared on the basis of a closed evidentiary record as at 9 November 2012.

53.     During November 2012, the Parties provided electronic copies of all additional materials relied upon during the Hearing, demonstrative exhibits and slides from arguments.  They also submitted agreed and contested corrections to the transcript to the court reporter, who in turn circulated amended transcripts on 11 December 2012.

54.     On 21 December 2012, the Parties filed their **Post-Hearing Briefs** spanning 100 pages each.

55.     On 1 August 2013, the Tribunal invited the Parties to comment on a judgment issued on 25 July 2013 by the ECtHR.[5]

56.     On 30 August 2013, the Parties submitted their comments on the ECtHR judgment.

57.     On 26 September 2013, Respondent drew the Tribunal's attention to developments in two other international arbitrations against the Russian Federation connected with Yukos.  Claimants submitted comments in response on 8 October 2013.

58.     On 10 January 2014, the Tribunal sent a letter to the Parties noting that Mr. Mikhail Khodorkovsky, former CEO of Yukos, had been pardoned and released from prison, and inviting the Parties to submit their observations on the impact, if any, of these developments on the present arbitral proceedings.  The Parties submitted their comments in response on 24 January 2014, and further observations in reply on 4 February 2014.

---

[5]     *Khodorkovskiy (2) and Lebedev (2) v. Russia*, ECtHR, Appl. Nos. 11082/06 and 13772/05, Judgment, 25 July 2013, (hereinafter "*Khodorkovsky v. Russia 2*").

59. The Parties filed their costs claims on 17 April 2014, and submitted comments on the opposing side's costs claims on 6 May 2014.

60. On 7 May 2014, the Tribunal formally declared the record in these arbitrations closed.

61. On 9 June 2014, Respondent informed the Tribunal that it was prepared to agree that the Final Awards may be publicly disclosed under certain conditions.  Respondent also requested that the Tribunal modify its Procedural Order No. 13 to lift confidentiality restrictions with respect to documents disclosed in the course of these proceedings, to allow them to be used in "related proceedings" recently commenced against the Russian Federation.  Claimants submitted comments in response on 16 June 2014, and Respondent further commented on 20 June 2014.

62. On 27 June 2014, the Tribunal issued **Procedural Order No. 18** in which it:  (a) ordered that these Final Awards remain confidential for a period of ten calendar days following electronic dispatch to the Parties, after which period the PCA would post the Final Awards to its website and so notify the Parties and the Tribunal, whereupon all confidentiality obligations in respect of the Final Awards shall terminate; and (b) modified Procedural Order No. 13 to provide for limited disclosure of documents in related proceedings.

## II.   FACTUAL BACKGROUND

63. The disputes between the Parties to the present proceedings involve various measures taken by Respondent against Yukos and associated companies primarily in the period between July 2003 and November 2007, when Yukos had emerged after the dissolution of the Soviet Union to become the largest oil company in the Russian Federation.  The measures complained of include criminal prosecutions, harassment of Yukos, its employees and related persons and entities; massive tax reassessments, VAT charges, fines, asset freezes and other measures against Yukos to enforce the tax reassessments; the forced sale of Yukos' core oil production asset; and other measures culminating in the bankruptcy of Yukos in August 2006, the subsequent sale of its remaining assets, and Yukos being struck off the register of companies in November 2007.  Claimants contend, and Respondent denies, that Respondent failed to treat Claimants' investments in Yukos in a fair and equitable manner and on a non-discriminatory basis, in breach of Article 10(1) of the ECT, and that Respondent expropriated Claimants' investments in breach of Article 13(1) of the ECT.  Claimants seek full reparation in excess of USD 114 billion.

64.     The factual matrix of this case is complex.   A detailed exposition of the relevant facts, including specific references to the record, is set out for each part of the narrative in Part VIII (broken down into eight chapters, starting with Yukos' tax optimization scheme and the Russian Federation's tax assessments against Yukos and ending with the bankruptcy of Yukos and the withdrawal of audit opinions by PricewaterhouseCoopers ("**PwC**")).   It is also in Part VIII that the Tribunal makes determinations in respect of the many highly contested issues of fact and observations on the significance of various facts and findings.   By contrast, the purpose of the introductory overview of the facts contained in this Part II of the Award is only to provide sufficient background for what follows.

## A.     THE PARTIES TO THESE PROCEEDINGS

### 1.     Claimants and Related Entities

65.     The three Claimants in these related cases are all part of the Yukos group of companies, which had at its center Yukos, headed by Chief Executive Officer Mr. Mikhail Khodorkovsky.

66.     Claimant in PCA Case No. AA 226, Hulley, was incorporated in the Republic of Cyprus on 17 September 1997 and was a 100 percent owned subsidiary of YUL.

67.     Claimant in PCA Case No. AA 227, YUL, was incorporated on 24 September 1997 in the Isle of Man (a Dependency of the United Kingdom).

68.     Claimant in PCA Case No. AA 228, VPL, was incorporated in the Republic of Cyprus on 7 February 2001.

69.     Hulley held approximately 56.3 percent, YUL held approximately 2.6 percent and VPL held approximately 11.6 percent of the outstanding shares in Yukos.   Collectively therefore, Claimants approximately had a 70.5 percent shareholding in Yukos.

### 2.     Respondent

70.     Respondent in these three arbitrations is the Russian Federation.

## B.     OAO YUKOS OIL COMPANY

71.     After the dissolution of the Soviet Union, Yukos was incorporated as a joint stock company in 1993 by Presidential Decree.   Fully privatized in 1995–1996, it was a vertically integrated

group engaging in exploration, production, refining, marketing and distribution of crude oil, natural gas and petroleum products.   Its three main production subsidiaries were Yuganskneftegaz ("**YNG**"), Samaraneftegaz and, from 1997, Tomskneft.

72.   In May 2002, Yukos became the first Russian company to be ranked among the top ten largest oil and gas companies by market capitalization worldwide.   In the fourth quarter of 2002, Claimants submit that Yukos became the largest oil company in Russia in terms of daily crude oil production.

73.   At its peak in 2003, it had around 100,000 employees, six main refineries and a market capitalization estimated at over USD 33 billion.   According to Claimants, after its projected 2003 merger with then Russia's fifth largest oil company Sibneft ("**Sibneft**"), YukosSibneft would have become the fourth largest private oil producer worldwide, behind BP, Exxon and Shell.   At the time of Respondent's alleged adverse actions in the summer of 2003, Yukos was engaged in negotiations with ExxonMobil and ChevronTexaco for a merger or other form of business combination.   Claimants contend that this level of success was the result of efforts to modernize Yukos' operations and implement Western business practices.   According to Claimants, Yukos' success and the increasing social and economic influence gained by its management—including financial support given by Mr. Khodorkovsky to opposition parties—were perceived as a political threat by the Russian authorities and accordingly Yukos would fall from grace and be targeted for destruction.   Respondent, however, contends that Yukos was a "criminal enterprise", engaged in a variety of tax evasion schemes and other fraudulent activities.

### C.   THE RUSSIAN LOW-TAX REGION PROGRAM

74.   The low-tax region program was established in the 1990s to foster economic development in impoverished areas of the Russian Federation.   The Russian low-tax regions were permitted to exempt taxpayers from federal corporate profit tax for the purpose of fostering taxpayers' investments in the low-tax regions, provided the taxpayer complied with certain requirements.

75.   The Russian low-tax regions that are relevant to Yukos' "tax optimization" scheme include:

- Closed Administrative Territorial Units (known as "**ZATOs**"):   Lesnoy and Trekhgorniy; and

- Other low-tax regions:  Mordovia, Kalmykia and Evenkia.

76.    With respect to the tax benefits available in the ZATOs (Lesnoy and Trekhgorniy), in 1999, the ZATOs were permitted to exempt taxpayers fully from federal corporate profit tax.  In 2000, most ZATOs were permitted to exempt taxpayers from the portion of the federal corporate profit tax that was payable to their budget (*e.g.*, up to 19 percent).  In 2001, all ZATOs were permitted to exempt taxpayers from the portion of the federal corporate profit tax that was payable to their budget (*e.g.*, also up to 19 percent).  In 2002, however, these exemptions were revoked.

77.    With respect to the tax benefits available in other low-tax regions, in 2000 and 2001, Mordovia, Kalmykia and Evenkia were permitted to exempt taxpayers fully from the portion of the federal corporate profit tax that was payable to their budget (*e.g.*, from up to 19 percent to zero percent).  From 1 July 2002 until 31 December 2003, low-tax regions were permitted to exempt taxpayers from the portion of the federal corporate profit tax payable to their budget, but only up to four percent.  An exception existed for 'grandfathered' tax investment agreements entered into prior to 1 July 2001, such that these taxpayers could still receive a zero percent profit tax rate if they fulfilled certain other conditions.  As of 1 January 2004, the existing tax investment agreements were terminated, but the Tax Code of the Russian Federation (the "**Russian Tax Code**") still allowed low-tax regions to reduce the federal corporate profit tax payable to their budget up to four percent.

78.    Respondent contends that Yukos' restructuring of its trading operations from high-tax jurisdictions, such as Moscow and Nefteyugansk, to trading companies incorporated in the low-tax jurisdictions of Lesnoy, Trekhgorny, Mordovia, Kalmykia and Evenkia was aimed at evading taxes, rather than to achieve any genuine economic result.  Respondent alleges that Yukos interposed between Yukos and its customer its "sham" trading shells registered in Russian low-tax regions.  Yukos' oil producing subsidiaries sold the extracted oil to the trading companies at a fraction of the market price.  The trading companies then sold the oil either abroad at a market price or to Yukos' refineries, and subsequently re-bought it at a reduced price and re-sold it at the market price.  Respondent asserts that prices increased step by step from sham shell to sham shell, generating artificially inflated profits through non-armslength transactions.  Those profits were then taxed at reduced rates in the low-tax regions, where the sham trading shells were registered.  Respondent contends that the tax authorities identified abuses by the Lesnoy trading shells, which resulted in further investigations and, ultimately, in the tax assessments against Yukos and related proceedings.

79.   Claimants contend that Yukos, like other Russian companies at that time, was merely taking advantage of the legislation in place in the low-tax regions. Claimants assert that any findings of "abuse" by the Russian tax authorities was a function of the arbitrary and unpredictable interpretations of the law in Russia.

80.   The details of the Russian low-tax region program and Yukos' tax optimization scheme are set out more comprehensively in Chapter VIII.A of this Award.

D.   **CRIMINAL PROCEEDINGS**

81.   Starting in July 2003, a series of criminal investigations were initiated by the Russian Federation against Yukos management and activities.  According to Claimants, these actions included the "targeting" of Yukos' employees, auditor PwC, in-house counsel, lawyers involved in various Yukos-related cases, as well as searches and seizures, threats to revoke its oil licenses, and mutual legal assistance requests and extradition proceedings against Yukos management.   Claimants characterize these actions as harassment, motivated by Mr. Khodorkovsky's participation in Russian opposition politics, that were intended—together with tax reassessments—to lead to the expropriation of Yukos' assets.  Respondent contends that its actions were in response to illegal acts committed by Yukos and its officers and shareholders.

82.   Between July and October 2003, three key Yukos officers were arrested.  In July 2003, Mr. Platon Lebedev, Director of Hulley and YUL, was arrested on charges of embezzlement and fraud; he was sentenced to nine years in prison in May 2005.  In October 2003, Mr. Vasily Shakhovsky, President of Yukos-Moscow, was charged with and later convicted of tax evasion. In October 2003, Mr. Khodorkovsky himself was arrested and charged with crimes including forgery, fraud and tax evasion; he was also sentenced to a nine-year prison term in May 2005. As a result of these arrests, a number of high-ranking Yukos executives fled Russia, such as Mr. Leonid Nevzlin, Deputy Chairman of the Yukos Board of Directors until 2003.   On 2 February 2007, new charges of embezzlement and money laundering were brought against Messrs. Khodorkovsky and Lebedev, leading to further convictions in December 2010. Messrs. Khodorkovsky and Lebedev were each imprisoned for over a decade.

83.   Claimants contend that by April 2006, no fewer than 35 top managers and employees of Yukos had been interrogated, arrested or sentenced, and that lawyers acting for Yukos had been obstructed in their work.  During the same period, Russian authorities conducted searches,

seizures and interrogations of Yukos property and personnel.  Claimants contend that all of these actions amounted to harassment and intimidation, that they deprived Yukos' management of the ability to manage and control Yukos as a business, and that the underlying motive was to expropriate Yukos' assets.

84.   Respondent contends that in addition to participation in tax fraud schemes, Yukos participated in a massive transfer pricing scheme by which hundreds of millions of dollars from the sales of oil and other products were illegally siphoned off to offshore entities for the benefit of Khodorkovsky/Lebedev and other controlling Russian "Oligarchs".[6]

85.   Respondent also contends that Yukos officials have been engaged in violent crimes, such as the murder, attempted murder and assault of persons seeking to enforce Russian tax laws or otherwise perceived to threaten Yukos interests.  Claimants deny Respondent's allegations of criminal acts as well as acts of tax evasion.

86.   Respondent denies that Yukos and its officers were targeted in a discriminatory way, contending that Russian taxation measures have also applied to other offenders and that the searches and seizures were taken as part of legitimate taxation measures and conducted in accordance with normal Russian practice and the appropriate procedural protections available under Russian law.

87.   The particulars of Claimants' allegations concerning harassment, intimidation and arrests are presented in Chapter VIII.C of this Award.

E.   ADDITIONAL MEASURES

88.   In the period between October 2003 and December 2004, Yukos and its subsidiaries faced a series of major setbacks, including the alleged frustration of its merger with Sibneft, hefty tax reassessments, fines, VAT exactions, the freezing of shares and assets, the threatened revocation of licenses, and the forced sale of Yukos' main oil production subsidiary, YNG.  These measures were followed by the bankruptcy of Yukos in August 2006.

---

[6]   Respondent's Counter-Memorial on the Merits dated 4 April 2011, as corrected 29 July 2011, p.1 n.1 (hereinafter "Counter-Memorial"): Respondent employs the term "Oligarchs" throughout its pleadings to refer to Messrs. Khodorkovsky, Lebedev, Nevzlin, Dubov, Brudno, Shakhnovsky, Golubovitch; the individual owners standing behind Claimants (hereinafter the "Oligarchs").

### 1.    Alleged Frustration of Merger Between Yukos and Sibneft

89.    In October 2003, a merger was about to be completed between Yukos and Sibneft, Russia's fifth largest oil company.  According to Claimants, the resulting entity, YukosSibneft, would have become the world's fourth largest oil company.  In November 2003, however, after Yukos had already acquired 92 percent of Sibneft's shares as part of the merger and after the arrest of Mr. Khodorkovsky, Sibneft's controlling shareholder, Mr. Roman Abramovich, called off the merger process and the transactions were then unwound by a series of court decisions.  Further details are included in Chapter VIII.D of this Award.

### 2.    Tax Reassessments for Years 2000–2004

90.    On 28 April 2003, the Tax Ministry issued a Field Tax Audit Report for the years 2000 and 2001 that raised no questions concerning Yukos' tax optimization structure.  On 1 September, 1 October and 1 November 2003, the Tax Ministry issued certificates confirming that Yukos had no outstanding debts.

91.    On 8 December 2003, the Tax Ministry ordered a tax re-audit of Yukos for the year 2000.  On 29 December 2003, the tax authorities of the Russian Federation issued the first of five tax assessments against Yukos that were based on the alleged abuse by Yukos of its tax optimization scheme.

92.    The Tax Ministry demanded payment from Yukos for approximately USD 3.5 billion for 2000, which was largely upheld by the Moscow Arbitrazh Court.  Similarly large tax reassessments were issued in the period between 2004 and 2006 for subsequent tax years.  2001 taxes were re-assessed in the amount of approximately USD 4.1 billion, 2002 taxes in the amount of approximately USD 6.8 billion, 2003 taxes in the amount of approximately USD 6.1 billion, and 2004 taxes in the amount of approximately USD 3.7 billion.  By the time the Tax Ministry issued the last of these demands, Yukos faced a tax bill of more than USD 24 billion, of which approximately USD 10.6 billion constituted allegedly evaded revenue-based taxes (including interest and fines), and the remainder (approximately USD 13.6 billion) comprised of VAT and related, interest and fines.

93.    Respondent contends that the reassessments were a consequence of Yukos' activities relating to the tax fraud scheme.  Claimants submit, however, that the reassessments were so excessive that the Russian authorities' strategy of destroying Yukos became plain.

94.   At the same time that tax reassessments were being filed against Yukos and its subsidiaries, Russian authorities began freezing shares and other assets belonging to Yukos and related entities.   In October 2003, Russian prosecutors froze shares held by YUL and Hulley in Yukos.   Orders issued by the Moscow Arbitrazh Court in April and June 2004 prevented Yukos from disposing of its assets.   An application by Yukos in July 2004 to have sufficient assets released to meet its tax liabilities was ignored and a surcharge of approximately USD 240 million was applied for late payment of taxes.   Claimants also maintain that Yukos' numerous proposals throughout this period to settle the tax claims were ignored or rejected by the Russian authorities, despite the fact that the government settled with taxpayers in several other cases.

95.   In July 2004, Russian authorities began seizing Yukos' shares in YNG, Samaraneftegaz and Tomskneft.   YNG bank accounts were also frozen.   The Russian authorities also used mutual legal assistance treaties to affect Yukos' interests abroad.

96.   Respondent does not dispute the freezing of Yukos' assets but contends that freezing assets of a debtor, including shares owned by it, is a standard enforcement measure for tax levies and judgments.   Respondent maintains that its freezing orders did not cover all of the assets of Yukos in Russia and that Yukos remained in possession of large assets abroad.

97.   The details of the tax assessments against Yukos and of Yukos' attempts to settle the tax claims are set out in Chapters VIII.B and VIII.E, respectively.

### 3.   Auction of YNG

98.   In July 2004, the Russian Federation indicated that it intended to appraise and sell YNG to pay off Yukos' back taxes.   A valuation carried out by investment bank ZAO Dresdner Bank ("**Dresdner**") at the request of the Russian Federation valued YNG at between USD 15.7 billion and USD 18.3 billion.   A valuation carried out by JP Morgan, at the request of Yukos, valued YNG at between USD 16 billion and USD 22 billion.   The Russian Ministry of Justice announced that YNG was worth USD 10.4 billion.

99.   After Yukos' attempts to enjoin the sale of YNG by legal recourse in the United States failed, YNG was sold at auction on 19 December 2004 for USD 9.37 billion to sole bidder and newly incorporated entity, Baikal Finance Group ("**Baikal**"), which was quickly bought by Russian State-owned Rosneft ("**Rosneft**").

100.  Further particulars on this aspect of the case are presented in Chapter VIII.F of this Award.

### 4.    Bankruptcy Proceedings

101.  Claimants allege that the Russian Federation first reported in March 2005 that it intended to "push Yukos into bankruptcy in order to redistribute its remaining assets."  On 6 March 2006, a syndicate of foreign bank creditors of Yukos filed a bankruptcy petition before the Moscow Arbitrazh Court, pursuant to a Confidential Sale Agreement with Rosneft (the "**Confidential Sale Agreement**").  YNG—then owned by Rosneft—filed a separate bankruptcy petition against Yukos, which was subsequently joined to that of the bank syndicate.  On 28 March 2006, bankruptcy proceedings were commenced against Yukos, placing it under external supervision, and on 4 August 2006, Yukos was declared bankrupt.

102.  Yukos' remaining assets were nearly all acquired by State-owned Gazprom and Rosneft, with the bankruptcy auctions raising a total of USD 31.5 billion.  In November 2007, Yukos was liquidated and struck off the register of legal entities.

103.  The specifics relating to Yukos' bankruptcy are set out in Chapter VIII.G of this Award.

### 5.    Withdrawal of PwC's Audits

104.  In June 2007, PwC (which had served as both auditor and consultant to Yukos starting in 1997) withdrew all of its audits of Yukos from 1995 to 2004.

105.  This final aspect of the factual matrix is treated in detail in Chapter VIII.H of this Award.

## III.   PARTIES' WRITTEN SUBMISSIONS

106.  As indicated in the Procedural History above, the Parties submitted two rounds of memorials on the merits.  Each side took full advantage of the written phase of these proceedings, filing detailed and extensive written submissions.  Claimants' Memorial runs to 424 pages and was accompanied by 1045 exhibits and 12 witness statements.  Respondent's Counter-Memorial is 787 pages long, and was accompanied by 2868 exhibits and 8 witness statements.  Claimants' Reply runs to 474 pages, and was accompanied by over 600 further exhibits.  Finally, Respondent's Rejoinder runs to 819 pages, and was submitted with over 1700 further exhibits and seven witness statements.  The Parties filed Post-Hearing Briefs of over 100 pages.

Throughout the arbitration the Parties filed extensive written submissions on various procedural issues.

107. The Tribunal studied these submissions carefully.   The Parties' principal arguments are re-stated in the Tribunal's analysis of the issues in Parts VIII to XIII below.   For the purposes of introduction, the Tribunal reproduces below *verbatim* the written "skeleton arguments" that the Parties submitted prior to the Hearing on the Merits at the Tribunal's request.

## A.   CLAIMANTS' SKELETON ARGUMENTS

108. The text of the paragraphs below is produced directly from paragraphs 1 to 82 of Claimants' Skeleton Argument submitted on 1 October 2012 ("**Claimants' Skeleton**")( footnotes omitted).

### I.   INTRODUCTION

1.   The dispute between the Parties arises from the various actions taken by the Russian Federation against Yukos Oil Company ("Yukos" or the "Company") and related persons and entities, which culminated in the expropriation of the Company for the exclusive benefit of the Russian State and State-owned entities, thereby destroying the Claimants' investments in Yukos.   As the Claimants have demonstrated, by (i) failing to treat the Claimants' investments in Yukos in a fair and equitable manner and on a non-discriminatory basis, and (ii) expropriating the Claimants' investments therein, the Russian Federation breached its obligations under Articles 10(1) and 13(1) of the Energy Charter Treaty ("ECT"), respectively, for which the Claimants are entitled to full reparation.

2.   The Claimants' positions on the merits are described in detail in their written submissions. This skeleton argument summarizes, for the benefit of the Tribunal, the Claimants' principal arguments, with reference to key supporting materials. It does not replace or supplement those submissions, nor is it a substitute for oral argument.

### II.   FACTUAL BACKGROUND

3.   The various actions taken by the Russian Federation against Yukos, and related persons and entities, were aimed at the destruction and expropriation of the Company.   The expropriation of Yukos was achieved in 3 overlapping steps: *first*, the paralysis of the Company (A); *second*, the manufacturing of a pretext for the taking of the Company's assets, namely, the fabrication of debt (B); *finally*, the use of that pretext to take Yukos' assets piece by piece, including its most valuable asset, Yuganskneftegaz, and transfer them to the State-owned companies Rosneft and Gazprom (C).   Each of these steps was accompanied by serious due process violations.   The result was the liquidation of Yukos in November 2007, and the complete and total deprivation of the Claimants' investments therein.

#### A.   PARALYSIS OF YUKOS

4.   Prior to the Russian Federation's attack, Yukos was a flourishing oil company.   In May 2002, it was the only Russian company to be ranked among the top 10 largest oil and gas companies by market capitalization worldwide.   In the fourth quarter of 2002, it became the largest oil company in Russia in terms of daily crude oil production.   In October 2003, it completed its merger with Sibneft, another of

Russia's leading oil companies, creating the world's fourth largest private oil producer, behind BP, ExxonMobil and Shell. Yukos was also engaged in advanced discussions with American oil majors, ExxonMobil and ChevronTexaco, in relation to a merger or other form of business combination. This success was the result of concerted efforts to modernize the Company and implement Western business practices.

5.    Starting in the summer of 2003, the Russian Federation took a series of actions aimed at undermining the ability of the Company's management to run the business. These included: (i) the arrests of Messrs. Lebedev and Khodorkovsky, Yukos' CEO; (ii) the targeting, intimidation and/or prosecution of other high-ranking Yukos managers, employees and related persons; (iii) the harassment, prosecution and/or arrest of Yukos' in-house counsel and lawyers involved in various Yukos-related cases; (iv) the conduct of widespread and aggressive searches and seizures; (v) the seizure of the Claimants' shares in Yukos; (vi) the threats to revoke Yukos' oil licenses; (vii) the numerous mutual legal assistance requests and extradition proceedings to affect Yukos and entities/persons associated with the Company abroad; and (viii) the targeting and harassment of Yukos' auditor, PwC. These actions were taken in violation of the most basic standards of due process and fair treatment.

6.    Contrary to the Respondent's allegations, the actions described above deprived Yukos' management of the ability to manage and control the Company, thereby facilitating its dismantling and ultimate destruction. One early casualty of the Russian Federation's attack on Yukos was the YukosSibneft merger.

## B.    MANUFACTURING A PRETEXT — THE FABRICATION OF DEBT

### 1.    The fabrication of massive tax claims against Yukos for the years 2000-2004

7.    In December 2003, the Russian Federation's campaign against Yukos entered into a new phase with the fabrication of massive tax claims against the Company.

8.    On December 8, 2003, 6 weeks after Mr. Khodorkovsky's arrest, the Tax Ministry ordered a tax re-audit of Yukos for the year 2000. Only 3 weeks later, it issued a Field Tax Audit Report exceeding 100 pages in length and proposing to collect from Yukos US$ 3.4 billion in alleged tax arrears, interest and fines on the purported basis that the use of regional tax incentives by Yukos trading companies constituted unlawful tax evasion by Yukos itself.

9.    The December 2003 re-audit of Yukos was extraordinary in many respects. Less than 8 months earlier, on April 28, 2003, the Tax Ministry had issued a Field Tax Audit Report for the years 2000 and 2001 that raised no questions concerning Yukos' tax optimization structure.  That audit had taken 5 months to conduct, followed by 2 months for drafting the report. On several occasions after this audit, including on September 1, October 1 and November 1, 2003, the Tax Ministry confirmed that Yukos had no outstanding tax debts.  Prior tax audits of the Mordovian trading companies likewise raised no major concerns and specifically found their use of regional tax incentives to be lawful.

10.   The Respondent alleges that the Russian authorities lacked knowledge of Yukos' tax optimization structure and only "discovered" its allegedly abusive features in the course of the 3-week audit carried out in December 2003.  This allegation is not credible.  As the record demonstrates, the Russian authorities had long been aware of Yukos' practices, and the Respondent has failed to identify a single piece of material information relevant to the alleged tax claims that it lacked prior to the December 2003 repeat audit.  In particular:

- Yukos was one of Russia's largest taxpayers and was therefore under constant scrutiny by the Russian tax authorities, who had never found any significant problems prior to the attack on Yukos.

- The use of trading companies incorporated in low-tax regions was a common practice among Russia's vertically integrated oil companies, a fact that was well known to Russian authorities.

- Several trading companies' affiliations with Yukos were reflected in their names, for instance, Yukos-M and Yu-Mordovia.

- Prior to using trading companies in Mordovia—the source of the overwhelming majority of the purported tax claims—Yukos discussed the issue with federal and regional officials, who approved Yukos' plan. Mordovia's Government then signed investment agreements with these trading companies specifying the amounts of monthly payments. Audits of the Mordovian trading companies confirm the tax authorities' knowledge of the factual circumstances later alleged to constitute "abuse".

- As the Respondent concedes, Yukos' financial statements disclosed that companies within Yukos' consolidation perimeter enjoyed tax benefits under the low-tax region program and the overall amounts of such benefits.

- VAT refund submissions documented the entire chain of transactions prior to export, including, in particular, the trading companies' transactions with Yukos' production companies, refineries, and the holding company.

- Yukos' monthly submissions to obtain access to export pipelines confirmed that the trading companies' tax payments were in relation to the trading of oil produced by Yukos' production subsidiaries and exported under Yukos' export quotas.

11.   The Tax Ministry went on to fabricate similar tax claims against Yukos covering the years 2001-2004. As discussed below, the timing of these claims was instrumental in carrying out the Russian Federation's expropriation plan. By the time the Tax Ministry issued the last of these demands, Yukos faced a tax bill of more than US$ 24 billion, of which only US$ 5.2 billion constituted allegedly evaded revenue-based taxes, the remainder being comprised of VAT, interest, and fines. These payment demands dwarfed the Company's consolidated net income for the relevant periods.

### 2.    The purported tax claims were unprecedented, arbitrary and manifestly expropriatory

12.   *Purported bases for revoking regional profit tax incentives.* Yukos' tax optimization structure fully complied with the legislation in force and current practices. Indeed, the Respondent does not allege that Yukos or the trading companies failed to comply with the federal or regional legislation. Nor does it allege that the trading companies failed to fulfill the terms of the investment agreements signed with the regional governments. Rather, it claims that the trading companies failed to satisfy additional, unwritten requirements beyond the statutory eligibility criteria, including, in particular, an alleged "proportionality of investments" requirement that directly contradicted both the legislation and the investment agreements signed by the regional governments. This justification is not credible.

13.   *Re-attribution.* The primary weapon in the expropriation of Yukos' assets was the reattribution of the alleged tax liabilities of the trading companies to Yukos. Russian law did not allow such re-attribution, and the Respondent cannot point to a single example of such a re-attribution other than the Yukos case. Had the Russian authorities genuinely believed that the tax benefits had been improperly granted to the trading companies, which was not the case, the proper course under Russian law

would have been to pursue those companies for the allegedly underpaid taxes. Alternatively, had they genuinely believed that sales had occurred at below market prices, Russian tax law contained a specific statutory mechanism for such transfer-pricing situations.   However, the Russian authorities ignored these statutory provisions.   Re-attribution served 2 purposes: *first*, shifting liability to Yukos itself paved the way for the expropriation of the Company's assets; *second*, re-attribution provided the basis for massive VAT claims.

14.     *VAT.* Simultaneously invoking and contradicting their own re-attribution theory, the tax authorities re-attributed to Yukos all the revenues from the trading companies' transactions, but refused to re-attribute to Yukos the trading companies' entitlements to VAT refunds for export transactions. The purported basis for denying refunds was that the paperwork, although proper and timely, had been submitted by the trading companies rather than Yukos.   This enabled the tax authorities to claim an additional US$ 13.59 billion—56.20% of the total claims against Yukos—despite the uncontested fact that no VAT was owed on these transactions.   Such a step was clearly confiscatory in nature.   Further, the fact that, even when Yukos attempted to submit the updated VAT returns in its own name, its submissions were rejected as improper and untimely, confirms that the purported VAT claims had nothing to do with taxation.   The Respondent has been unable to offer any defense whatsoever for the fundamentally contradictory way in which its re-attribution theory was deployed.

15.     *Fines.* The tax authorities further inflated their claims through the unjustified imposition of fines, including by imposing fines after the statute of limitations had expired; by doubling fines for "willfulness" despite the fact that Yukos did not—and could not possibly—"know" of the alleged illegality; and by doubling fines again for "repeat offenses" despite the fact that at the time of the alleged "repeat" offenses Yukos had never been previously held liable for a similar offense.   Overall, these inflated fines amounted to US$ 8.5 billion, *i.e.*, 35.13% of the total alleged tax liabilities, with the "repeat" offender fines alone amounting to US$ 3.92 billion.

16.     The common thread unifying the Russian Federation's approach was an overarching desire to manufacture and inflate claims against Yukos, with a view to expropriating the Company. As Yukos' tax lawyer noted after reviewing the December 2003 audit report, "[e]ven if we assume political pressure on the court the extent of the violations committed by the Ministry for Taxes and Levies will make it impossible even for the most biased judge to support the clearly unlawful inspection act".   The Russian courts proved Yukos' tax lawyer wrong, rubber-stamping the fabricated tax debts.

### 3.     Due process violations in the administrative and judicial proceedings

17.     The administrative and judicial proceedings with respect to the alleged tax debts were conducted in blatant disregard of Yukos' basic due process rights. This involved, *inter alia*, pressure on the courts to ensure that only Government-friendly judges would preside over Yukos' challenges—and subsequently rewarding those judges for their efforts; overly speedy proceedings, denying Yukos adequate time and facilities to prepare its defense; and arbitrary denials of Yukos' motions to join to the proceedings the trading companies and the Mordovian Government. Coupled with the harassment of Yukos' lawyers noted above, the Russian Federation ensured the hasty conclusion of these proceedings, bringing it one step closer to its objective, namely the taking of Yukos' assets.

C.    APPROPRIATION OF YUKOS' ASSETS – SEIZING YUKOS' ASSETS AND TRANSFERRING THEM TO STATE-OWNED COMPANIES

### 1.    Yukos was prevented from settling its alleged tax debts or discharging them in full

18.    *The swift and manifestly disproportionate enforcement of the 2000 tax reassessment.* On April 14, 2004, the tax authorities issued their payment demands for the year 2000. Yukos was given until April 16, 2004, *i.e.*, less than 48 hours, to pay in full US$ 3.48 billion in alleged tax arrears, interest and fines.

19.    Even this symbolic "voluntary" payment period was illusory. On April 15, 2004, the very next day after the demand for payment was issued, the tax authorities obtained from the Moscow Arbitrazh Court an *ex parte* injunctive order freezing, as a purported security measure, all of Yukos' non-cash Russian assets, with the exception of oil and oil products.

20.    On June 30, 2004, following Yukos' unsuccessful appeal, an enforcement writ was issued giving the Tax Ministry 3 years to collect the 2000 tax debt. Rather than engage in discussions with the Company about the discharge of this debt within that period, the bailiffs initiated enforcement proceedings that very same day. The Company was given 5 days to pay voluntarily US$ 3.42 billion in alleged tax arrears, interest and fines for the year 2000 and threatened with a 7% enforcement fee if it failed to do so.

21.    At the same time, the bailiffs ordered the seizure of (i) monies deposited in Yukos' accounts with 16 Russian banks, and (ii) the Company's Russian non-cash assets (which had previously been the subject of a freeze). On July 1, 2004, a wave of seizures on Yukos' non-monetary assets began, culminating in the seizure on July 14, 2004 of Yukos' shares in its 3 main production subsidiaries—Yuganskneftegaz, Samaraneftegaz and Tomskneft.

22.    It should be recalled that all these seizures were conducted within the framework of the enforcement proceeding initiated on June 30, 2004 to recover from Yukos US$ 3.42 billion in alleged tax liabilities for 2000. These seizures covered virtually all of Yukos' assets, whose value was staggeringly higher.

23.    Further, within days, on July 20, 2004, the Ministry of Justice announced its intention to appraise and sell Yuganskneftegaz to satisfy the 2000 alleged tax debt.

24.    The decision to seize and sell Yuganskneftegaz, which accounted for approximately 12% of Russia's oil output and whose value on any estimation dramatically exceeded that of the alleged tax debt, can only be reconciled with a desire to destroy the Company and appropriate its core assets. This reality is confirmed by the fact that the decision was taken less than 3 weeks after the writ of execution had been issued and when all of Yukos' domestic assets remained seized and available to satisfy the 2000 tax debt.

25.    *The failure to consider Yukos' proposals of alternative means of paying the alleged debt.* Further confirmation of the Russian Federation's expropriatory intent is the systematic rejection of Yukos' numerous offers to the bailiffs, courts and other Russian authorities and officials to settle or discharge its tax debts. These included: (i) the offers of Yukos' Russian non-core assets and its stake in Sibneft, initially 34.5% and subsequently reduced to 20% minus 1 share following the seizure of the 14.5% stake in Sibneft on July 9, 2004, in the context of the Chukotka Arbitrazh Court proceedings; (ii) Yukos' petition to pay its alleged tax debt for the year 2000 in installments; (iii) Yukos' amicable proposal to the Ministry of Finance to defer the payment of the federal share of its alleged debt for 6 months or to pay it in tranches; (iv) the proposals by Mr. Jean Chrétien, former Canadian Prime Minister, to Prime Minister Fradkov and President Putin of a global settlement of the

disputes, which envisaged the payment to the Russian Federation of approximately US$ 8 billion over the course of 2 years; (v) Yukos' October 2004 full settlement proposal in the range of US$ 21 billion, which included non-core assets and Sibneft shares, as well as a concession to re-elect a new board of directors that would include people selected by the Government.

26.    Each of these offers, as well as numerous others, was either denied or, in most cases, simply ignored. The Respondent's attempts to provide *post-hoc* rationalizations for its conduct by qualifying each of Yukos' offers as unacceptable or inadequate are unfounded. In any event, the Russian authorities' failure to work with—or even respond to—the multiple offers by Yukos, one of the largest private taxpayers in Russia, or to consider other options for enforcement, confirms that the Russian Federation was not interested in collecting taxes. This is even more so in light of the fact that the Russian authorities had no difficulty entering into settlement discussions and negotiating repayment plans with other Russian oil companies, including, *inter alia*, Rosneft and Sibneft.

### 2.    The forced sale of Yukos' shares in Yuganskneftegaz

27.    *Fabrication of further debt to maintain the pretext.* Despite the effect of the seizures described above, by the time of the Yuganskneftegaz auction, Yukos had paid off the 2000 tax reassessment in its entirety, eliminating the *raison d'être* of the decision to sell Yuganskneftegaz. Recognizing this difficulty as well as the gross disparity between the alleged tax debts and the value of Yuganskneftegaz, the Tax Ministry set about fabricating new claims.

- On September 2, 2004, the Tax Ministry served Yukos with a tax reassessment for 2001 in the amount of US$ 4.1 billion. Yukos was given only 2 days to pay voluntarily this amount, with the bailiffs initiating enforcement proceedings on September 9, 2004.

- On November 16, 2004, the Tax Ministry served Yukos with a tax reassessment for 2002 in the amount of US$ 6.76 billion, the largest among the 5 tax reassessments for the years 2000-2004. Yukos was given only 1 day to pay voluntarily this amount, with the bailiffs initiating enforcement proceedings on November 18, 2004.

- On December 6, 2004, the Tax Ministry served Yukos with a tax reassessment for 2003 in the amount of US$ 6.1 billion, giving the Company 1 day to pay in full. On December 9, 2004, the bailiffs initiated enforcement proceedings.

28.    In each case, the bailiffs allowed Yukos at most 5 days for voluntary payment and charged the 7% enforcement fee for failure to comply with these unreasonably short time limits.

29.    Thus, in the 4 months from September 2004 up until the auction of Yuganskneftegaz on December 19, 2004, the Russian Federation managed to increase Yukos' alleged tax liability by approximately US$ 17 billion.

30.    *Efforts to depress the auction price of Yuganskneftegaz.* At the same time, with a view to facilitating the Russian Federation's acquisition of Yuganskneftegaz at a bargain price, the Russian Tax Ministry also fabricated claims against Yuganskneftegaz. These claims were premised on the application of statutory provisions on transfer pricing, which the tax authorities systematically refused to apply in relation to Yukos itself. Significantly, these claims concerned the same oil trading revenues that had already been re-attributed to Yukos, thus resulting in double taxation.

31.    Thus, on October 29, 2004, the tax authorities simultaneously: (i) issued a Repeat Field Tax Audit Report for 2001 requesting Yuganskneftegaz to pay US$ 2.35 billion in alleged tax arrears, interest and fines;[93] and (ii) rendered a Decision

holding Yuganskneftegaz liable for an alleged tax offense for the year 2002 and requiring payment of US$ 1.03 billion in alleged tax arrears, interest and fines.

32. On December 3, 2004, a Field Tax Audit Report was issued for the year 2003, imposing on Yuganskneftegaz an additional US$ 1.22 billion in alleged tax arrears, interest and fines.

33. In addition to fabricating these US$ 4.6 billion in additional alleged liability, the Russian authorities also began to sow doubts about the security of Yuganskneftegaz's oil licenses to depress further the Company's value.

34. That all these payments demands, imposed simultaneously on Yukos and its main production subsidiary, were issued in the run-up to the auction of Yuganskneftegaz is no coincidence.  Nor is it a coincidence that, after Yuganskneftegaz was acquired by Rosneft, the tax claims along with the oil license concerns promptly disappeared. Together with the generous payment terms accorded to Rosneft's new subsidiary but systematically denied to Yukos, these facts confirm both the discriminatory nature of the Russian Federation's treatment of Yukos, and the true purpose of the purported tax reassessments against Yuganskneftegaz, namely, to facilitate the expropriation of the Company and not to collect taxes.

35. *Sham auction of Yuganskneftegaz.* As noted above, the Ministry of Justice publicly announced its plan to sell Yuganskneftegaz on July 20, 2004, purportedly in order to satisfy the 2000 alleged tax debt.

36. On August 12, 2004, the bailiffs appointed ZAO Dresdner Bank ("Dresdner") to carry out the valuation of Yuganskneftegaz in preparation for its sale.  On October 6, 2004, Dresdner issued a confidential report valuing Yuganskneftegaz on a standalone basis at US$ 18.6 billion – 21.1 billion.

37. On November 18, 2004, the bailiffs announced that Yuganskneftegaz would be auctioned to satisfy Yukos' outstanding tax debt, with the Russian Federal Property Fund issuing the formal auction notice the following day. The opening price for 100% of the ordinary shares, or 76.79% of Yuganskneftegaz's total share capital, was set at US$ 8.65 billion, a price well below its true value. The auction date was set for December 19, 2004, which was the earliest possible date to hold the auction and only 1 month away.

38. In an attempt to prevent the auction of its core asset, Yukos filed an application with the Moscow Arbitrazh Court to declare unlawful the Bailiff's Resolution of November 18, 2004 and sought interim measures. These efforts failed.

39. Confronted, yet again, with the futility of its efforts to obtain justice before the Russian courts, on December 14, 2004, Yukos filed for Chapter 11 bankruptcy protection before the U.S. Bankruptcy Court for the Southern District of Texas. By that date, only 3 companies, Gazpromneft (the new wholly-owned subsidiary of State-owned Gazprom), First Venture and Intercom, had sought antimonopoly clearance required in anticipation of the auction.  On December 16, 2004, the U.S. Court issued a Temporary Restraining Order ("TRO") enjoining Gazpromneft, its potential lenders, First Venture and Intercom from participating in the auction of Yuganskneftegaz.

40. Nonetheless, on December 19, 2004, which was a Sunday, the Russian authorities proceeded with the auction of Yuganskneftegaz. Gazpromneft and OOO Baikalfinancegroup ("Baikal") were registered as participants. Baikal was a previously unknown company established at the address of a local bar in the provincial town of Tver on December 6, 2004. With only US$ 359 in capital, it mysteriously managed to pay a cash deposit in the amount of US$ 1.77 billion to register for the auction on December 16, 2004.

41.   At the auction, Baikal opened the bidding at US$ 9.35 billion. Gazpromneft's representative asked for a recess and left the room to make a telephone call. Upon his return, he did not make a single bid and Baikal was pronounced the winner of the auction with its opening bid of US$ 9.35 billion. The whole bidding process lasted approximately 10 minutes.

42.   The Respondent's allegation that the low price for Yuganskneftegaz reflected attempts by Yukos to "sabotage" the auction is unconvincing. Neither "litigation risk" nor the TRO had a material effect on the participants or the outcome of the auction. The reality is that, ignoring the advice of its own appraisal firm, the Russian authorities systematically acted in ways that negatively affected the ability and willingness of potential bidders to participate, as well as the price they would be willing to pay. Market participants also understood that political support was required to participate in auctions for Yukos assets.

43.   The use of Baikal as a conduit for the eventual transfer of Yuganskneftegaz to a State-owned company was confirmed when, only a few days later, on December 23, 2004, Rosneft issued a statement announcing its acquisition of Baikal. Meeting journalists that day, President Putin confirmed his knowledge of the acquisition, stating that: "Today, the state, resorting to absolutely legal market mechanisms, is looking after its own interests. I consider this to be quite logical". Rosneft then enabled Baikal to repay the principal and interest on its debt by granting it, on December 30, 2004, a 1-year interest-free loan.

44.   Rosneft benefited significantly from this acquisition, with Rosneft's estimated value increasing dramatically from US$ 7 billion in December 2004 to US$ 80 billion for its IPO in mid-2006. Based on the valuation disclosed by Rosneft at the time, Yuganskneftegaz was worth US$ 55.78 billion. Further, as noted above, the tax bills raised against Yuganskneftegaz as a Yukos subsidiary were almost entirely set aside by the Russian courts following its acquisition by Rosneft.

45.   Looked at from any angle, the Russian Federation's approach to enforcement of the alleged tax debts, culminating in the transfer of Yuganskneftegaz to Rosneft in a sham auction, confirms that the Russian Federation's real goal was to expropriate the Company, and not to collect taxes.

46.   Even after the sham auction of Yuganskneftegaz, there was no legitimate reason to put Yukos into bankruptcy. There were no substantial creditors apart from the Russian Federation, and the seizure of Yukos' assets remained in place, so there was no risk of assets being dissipated and no need to resolve conflicting creditors' claims. Yukos still possessed 2 substantial production subsidiaries— Samaraneftegaz and Tomskneft—as well as refining and marketing assets, and several non-core assets that it could readily have disposed of to pay off its outstanding debts and remain a going concern. However, the Russian authorities' priority was not recouping taxes; nor did they have any intention of allowing Yukos to survive as a going concern. The initiation of the bankruptcy proceedings provided a convenient way to sideline Yukos' management and to facilitate the taking of the Company's remaining assets.

47.   *Forcing Yukos into bankruptcy.* As a result of the Russian Federation's attack, Yukos defaulted on a US$ 1 billion loan granted by a syndicate of Western banks. On December 13, 2005, Rosneft entered into a confidential agreement with the syndicate under which Rosneft agreed to pay the outstanding amount owed by Yukos in exchange for the assignment to Rosneft of the syndicate's rights of claim against Yukos. *Crucially,* the payment of Yukos' debt by Rosneft was conditioned upon the initiation of Yukos' bankruptcy by the syndicate. Pursuant to that agreement, on March 6, 2006, the syndicate filed a petition with the Moscow Arbitrazh Court to declare Yukos bankrupt, and on March 14, 2006, Rosneft paid off the loan.

48. On March 28, 2006, the Moscow Arbitrazh Court ordered the commencement of bankruptcy proceedings, placed Yukos under supervision, appointed Mr. Rebgun as interim administrator, and formally substituted Rosneft for the syndicate as creditor.

49. The Respondent argues that "sound commercial interests" explain both the syndicate's sale of the loan and Rosneft's reasons for acquiring the same. However, even if that were the case, the Respondent still fails to answer the basic question: why not simply have the syndicate of banks assign their claim to Rosneft, and let Rosneft put Yukos into bankruptcy? The only plausible explanation for this elaborate stratagem was to conceal the Russian Federation's role in initiating the bankruptcy of Yukos.

50. *Ensuring the Russian State's control over the bankruptcy proceedings.* After Rosneft initiated the bankruptcy through the syndicate, the Russian courts ensured that the Russian State, either directly or through Rosneft, would become Yukos' main creditor.

51. *First*, the Russian courts bent over backwards to ensure that the tax authorities' purported claims would be admitted, by: (i) delaying a scheduled hearing in order to give "the State more time to prove new tax claims", namely, the US$ 3.9 billion in tax payment demands for 2004, which the tax authorities rushed to issue on March 17, 2006, 11 days after the bankruptcy petition was filed; (ii) merging Yukos' challenge to that payment demand into the bankruptcy proceedings; and (iii) approving all the tax authorities' purported claims against Yukos for the years 2000-2004 following a wholly perfunctory review of the voluminous case files. Consequently, the Federal Taxation Service was by far Yukos' largest creditor with 60.50% of all registered bankruptcy claims.

52. *Second*, in the period leading up to the first meeting of Yukos' registered creditors on July 20, 2006, some 29 purported claims were admitted on behalf of Yuganskneftegaz, now Rosneft's subsidiary, totaling approximately US$ 4.42 billion. Subsequently, Rosneft secured admission of an even larger claim of US$ 5.55 billion premised on an allegation that Yuganskneftegaz had suffered "lost profits" in this amount during the period 2000-2003. These purported claims of US$ 9.97 billion enabled Rosneft to more than recoup the US$ 9.35 billion paid for Yuganskneftegaz and thereby acquire the Company for free. With the admission of these and various smaller claims, Rosneft became Yukos' second largest creditor with 37.17% of all registered bankruptcy claims.

53. *Third*, while the Russian court hearing Yukos' bankruptcy showed great flexibility in admitting any and all claims to benefit the Russian State, it was intransigent and formalistic in finding pretexts not to recognize substantial claims of creditors related to Yukos or to Yukos' shareholders.

54. These combined efforts resulted in the complete monopolization of Yukos' bankruptcy proceedings by the Russian State, which held 97.67% of all bankruptcy claims, guaranteeing its control over the bankruptcy process.

55. *Rejection of Yukos' Rehabilitation Plan.* The Financial Rehabilitation Plan proposed by Yukos' management ("the Rehabilitation Plan") set out a series of concrete measures that would enable Yukos to pay off its alleged liabilities fully within 2 years, while remaining a viable going concern. This would be achieved by, among other things, creating a "cash pool" from the sale of ancillary assets, cash flows generated by Yukos' remaining core assets, and more than US$ 1.5 billion from the sale of Yukos' 53.7% stake in the Lithuanian oil company Mazeikiu Nafta and Yukos' 49% stake in Slovakian oil transport major Transpetrol.

56. By contrast, according to Mr. Rebgun, the potential proceeds from the sale of Yukos' remaining assets, which he significantly undervalued at US$ 17.75 billion (after deducting the 24% profit tax payable on auction proceeds), were not sufficient

to cover the US$ 18.3 billion of registered bankruptcy claims. Accordingly, he did not even bother to propose any measure for the Company's financial restoration but simply recommended liquidation. In the event, despite the fact that the bankruptcy auction prices represented significant markdowns from market value, the bankruptcy estate netted approximately US$ 35.55 billion—twice the amount Mr. Rebgun had put forward to argue in favor of liquidation.

57. Ultimately, the Federal Taxation Service and Rosneft held 93.87% of votes at the meeting of Yukos' creditors of July 25, 2006. It therefore came as no surprise that they rejected the Rehabilitation Plan and voted to liquidate Yukos' assets, despite the fact that Yukos' assets exceeded its alleged liabilities, and the Company was clearly solvent.

58. *The bankruptcy auctions.* Yukos' remaining assets were transferred to the Russian State at well below their fair market value through a series of 17 auctions held between March 2006 and August 2007. Rosneft thereby directly or indirectly acquired Yukos' key remaining assets, including Samaraneftegaz (Lot No. 11) and Tomskneft (Lot No. 10), which were sold at a gross discount of approximately 37% and 33%, respectively, of their fair market value. For its part, Gazprom acquired through Eni/Enel the 20% minus 1 share stake in Sibneft that the Russian Federation had persistently refused to let Yukos sell to pay off alleged tax debts. As with the sham auction of Yuganskneftegaz, there was no genuine competition in the bankruptcy auctions and, in many instances, including those for Samaraneftegaz and Tomskneft, the only participants were Rosneft and a previously unknown entity whose sole role was to satisfy the formal requirement that there be a minimum of 2 bidders.

59. Finally, when, by the end of July 2007, it became clear that despite the low auction prices, the bankruptcy might still generate some surplus, further claims were admitted in the bankruptcy proceedings on behalf of the Russian State, through the Federal Taxation Service and Rosneft. This ensured the completeness of Yukos' destruction and the transfer of its value and assets to the Russian State. Thus, the Russian Federation received, either directly or through State-owned Rosneft or Gazprom, approximately 99.71% of the bankruptcy proceeds and over 95% of Yukos' remaining assets, including all of Yukos' main production assets.

60. On November 12, 2007, the Moscow Arbitrazh Court formally endorsed all the activities of Yukos' receiver Mr. Rebgun, closed the Company's receivership and ordered that Yukos be struck off the register of legal entities. The latter happened on November 21, 2007: Yukos was removed from the register of companies, its shares were legally extinguished and so, too, were the Claimants' investments.

**D.    CONCLUSION**

61. Seen together, the Russian Federation's actions can only be reasonably understood as a deliberate and sustained effort to destroy Yukos, gain control over its assets and eliminate Mr. Khodorkovsky as a potential political opponent. Indeed, viewed any other way, they make no sense and the Respondent has been unable to provide a plausible alternative explanation for its actions.

**III.    LAW**

**A.    THE RUSSIAN FEDERATION IS IN BREACH OF ITS OBLIGATIONS UNDER ART. 10(1) ECT**

62. Under Article 10(1) ECT, the Russian Federation undertook to "encourage and create stable, equitable, favorable and transparent conditions for Investors", to accord at all times "fair and equitable treatment" to investments made in its territory and not to "in any way impair by unreasonable or discriminatory measures [the]

management, maintenance, use, enjoyment or disposal" of such investments, which "shall also enjoy the most constant protection and security".

63. The Russian Federation violated the above mentioned undertakings in the most egregious manner. In particular, it violated its obligation under Article 10(1) ECT to provide to the Claimants' investments fair and equitable treatment, by failing to meet basic requirements of procedural propriety and due process, engaging in conduct that was unreasonable, arbitrary, disproportionate and abusive, and failing to ensure a stable and transparent legal and business framework. The Russian Federation's actions also constituted a denial of justice in breach of the fair and equitable treatment standard of Article 10(1) ECT, as demonstrated by, *inter alia*, the removal of judges refusing to rule in the Russian State's favor and the lack of independence and impartiality of judges hearing Yukos' cases.

64. The Russian Federation also breached Article 10(1) ECT by discriminating against the Claimants' investments. In particular, it (i) singled out Yukos and treated it in a markedly different manner from other similar oil companies in Russia, (ii) treated Yuganskneftegaz differently before and after its acquisition by State-owned Rosneft, in the hands of which the former Yukos subsidiary's alleged tax liabilities all but disappeared, and (iii) ensured a differential treatment in the bankruptcy proceedings between creditors related to Yukos, on the one hand, and State-related creditors, on the other.

65. The Respondent's primary defense is to invoke Article 21 ECT to argue that the Claimants' claims should be dismissed on the ground that they are "based exclusively on measures '*with respect to Taxation Measures.*'" As discussed below, not only is the Respondent's interpretation of Article 21 ECT untenable, but the Russian Federation's conduct had nothing to do with the genuine exercise of its taxation power and is thus not covered by Article 21 ECT.

66. The Respondent has moreover attempted to restrict the scope of its treaty obligations by misrepresenting the content of the fair and equitable treatment and discrimination standards in Article 10(1) ECT. Such attempts are groundless and should be rejected.

**B.   THE RUSSIAN FEDERATION IS IN BREACH OF ITS OBLIGATIONS UNDER ART. 13(1) ECT**

67. The Russian Federation expropriated the Claimants' investments in breach of Article 13(1) ECT.

68. As of October 2003, Yukos was one of the largest oil companies in the world. It held 92% of Sibneft, 3 core production subsidiaries (Yuganskneftegaz, Samaraneftegaz and Tomskneft), as well as refining and marketing subsidiaries. As of November 21, 2007, it ceased to exist as a company, owing to a series of actions by which the Russian Federation seized its assets and transferred their title to State-owned Rosneft and Gazprom. The only plausible explanation for the Russian Federation's actions is the twin desire of dismantling the Company and transferring its assets to the State and the removal of Mr. Khodorkovsky as a potential political opponent. The result of those actions was a complete and total deprivation of the Claimants' investments therein.

69. The Russian Federation moreover failed to satisfy any of the 4 conditions set out in Article 13(1) ECT. The expropriation of the Claimants' investments was manifestly: (i) not in the public interest; (ii) discriminatory; (iii) carried out without due process of law; and (iv) not accompanied by the payment of any compensation, let alone prompt, adequate and effective compensation.

70. Unable to deny the total deprivation of the Claimants' investments and the transfer of title of Yukos' assets to State-owned Rosneft and Gazprom, the Respondent

disaggregates its actions and argues that, when taken in isolation, each of them was, under Russian law, a proper response to Yukos' alleged conduct. While, in fact, many of those actions amounted to a gross distortion or abuse of Russian law, lawfulness under domestic law is not, in any event, the proper inquiry under Article 13(1) ECT. Under the applicable international law standards, the actions of the Russian Federation, in their totality, constitute an expropriation of the Claimants' investments in breach of Article 13(1) ECT for which compensation is due.

## IV.  DAMAGES

71.  The Russian Federation is under an obligation to make full reparation to the Claimants for the financial consequences of its breaches of Articles 10(1) and 13(1) ECT. This standard of reparation is not challenged by the Respondent.

72.  The magnitude of these financial consequences cannot be underestimated. As a result of the Respondent's actions, the Claimants have lost the entire value of their investments in YukosSibneft, as well as the benefits they should have received from those investments.  The Claimants' valuation expert, Navigant, has quantified the Claimants' damages for the loss of their investments in YukosSibneft at US$ 114.174 billion.

73.  Navigant has also quantified the Claimants' damages for the loss of their investments in YukosSibneft in 3 alternative scenarios, assuming that: (i) the Respondent does not bear responsibility for the demerger between Yukos and Sibneft, which it does; (ii) further, all tax reassessments were legitimate, which they were not; and (iii) in addition, the sale of Yuganskneftegaz was legitimate, which it was not, and assessing the Claimants' damages at US$ 107.966 billion, US$ 69.583 billion, and US$ 33.317 billion, respectively.

74.  In its Counter-Memorial, the Respondent chose not to challenge Navigant's valuation of the Claimants' expropriated investments underlying their principal claims for damages, instead seeking to divert the Tribunal's attention through a series of flawed objections.  When the Respondent did make an effort to address the subject, in its Rejoinder, its arguments were inaccurate and entirely divorced from historical data and contemporaneous valuations of YukosSibneft's assets.

75.  Navigant has provided the only reliable and methodologically sound model for calculating the compensation due to the Claimants by the Russian Federation for the expropriation of their investments in breach of Articles 10(1) and 13(1) ECT.

## V.  THE RESPONDENT'S OBJECTIONS SHOULD BE REJECTED

76.  *The Respondent's rehashed 'fork-in-the-road' objection is both* res judicata *and groundless.* The Respondent contends that the Tribunal lacks jurisdiction over the Claimants' claims because the Claimants are allegedly pursuing identical claims before the ECtHR. This very same objection was first raised in the jurisdiction and admissibility phase of these arbitrations and unequivocally dismissed by the Tribunal. It is entirely inappropriate for the Respondent to reopen this issue, which is *res judicata*, on the basis that it was allegedly poorly decided. Further, the Respondent's allegations that the Interim Awards were based on an "incorrect assumption" or that there are "special circumstances" justifying a new examination of the issue are unfounded. The Respondent's objection based on Article 26(3)(b)(i) ECT is manifestly without merit and must fail.

77.  *The Respondent's attempt to rely on Article 21 ECT is misguided.* The issues arising in relation to Article 21 ECT have already been briefed at length in the jurisdiction and admissibility phase of these arbitrations. In deferring the Respondent's objection based on Article 21 ECT to the merits phase, the Tribunal indicated that it did not wish to rule in a vacuum on the issue of the background to, and motivation behind, the Russian Federation's actions. In light of the Parties' pleadings on the

merits, it is clear that those actions had nothing whatsoever to do with the genuine exercise of the Russian Federation's taxation powers, but were rather solely intended to destroy Yukos and gain control of its assets. Article 21 ECT clearly was not meant to shield a Contracting Party from such egregious conduct.

78.     Even assuming, however, that the Russian Federation's actions were a genuine exercise of its taxation powers, which they were not, those actions would nonetheless fall outside the scope of Article 21 ECT, which is limited to the enactment of tax provisions. Further, even if Article 21 ECT were applicable, which it is not, Article 21(5) ECT ensures that Article 13(1) ECT's substantive protection from expropriation remains fully intact. Finally, under any interpretation of Article 21 ECT, many of the Russian Federation's actions had nothing to do with taxation and thus fall outside the ambit of Article 21 ECT altogether.

79.     Conversely, under the Respondent's interpretation of Article 21 ECT, save for expropriatory "charges or payments, to the exclusion of enforcement and collection measures, including interest and fines", investors would stand unprotected from any and all State actions, so long as the respondent State in an arbitration labels its actions as "taxation"—regardless of whether such actions had anything to do with taxation, or were being pursued with the sole aim of expropriating or otherwise harming an investor's investment. Such an interpretation, which would turn Article 21 ECT into a gaping hole in one of the key multilateral treaties on investment protection, is clearly untenable and should be rejected.

80.     *The Respondent's so-called "unclean hands" theory is without merit.* The Respondent argues that over a period of approximately 12 years, an array of actors engaged in a variety of allegedly "illegal and bad faith misconduct" that somehow deprive the Claimants' investments of ECT protection. The Respondent's position is fundamentally unfounded for several reasons. *First*, the so-called "unclean hands" theory finds no support in the text of the ECT, customary international law, or investment treaty jurisprudence. *Second*, even assuming the existence of such a general principle of international law, which the Claimants deny, its scope would be dramatically more limited than the Respondent contends, such that the Respondent has not alleged any facts that could establish its applicability in the present case. As demonstrated by the Claimants, the Respondent's theory is premised almost exclusively on allegations of collateral illegalities, unrelated either to the making of the Claimants' investments, or to the Claimants' claims in these arbitrations, and all but one of which assert misconduct by third parties. *Third*, and in any event, the Respondent has failed utterly to substantiate any of its allegations. *Finally*, the principles of estoppel and proportionality prevent the Respondent from invoking such alleged illegalities in an attempt to escape liability for its violations of the ECT.

81.     In its Rejoinder, while recounting its laundry list of alleged misconduct, the Respondent devotes attention solely to its allegation concerning the application of the 1998 Russia-Cyprus Double Taxation Agreement ("DTA"). Apart from the fact that: (i) this allegation has no bearing on the merits of these arbitrations; and (ii) these arbitrations are not the appropriate forum to hear and decide an alleged dispute on the application of the DTA, the Claimants have, in any event, demonstrated that this allegation is baseless. The Respondent's so-called "unclean hands" objection is thus without merit and must fail.

## VI.     REQUEST FOR RELIEF

82.     For the reasons set out above, the Claimants respectfully request the Arbitral Tribunal to render an Award granting the relief set out in paragraph 1199 of the Claimants' Reply.

### B.   RESPONDENT'S SKELETON ARGUMENTS

109.   The text of the paragraphs below is produced directly from paragraphs 1 to 104 of Respondent's Skeleton Argument submitted on 1 October 2012 ("**Respondent's Skeleton**") (annexes omitted).

### I.   The Russian Federation Properly Assessed Taxes And Fines Against Yukos

1.   Yukos fraudulently evaded billions of dollars of Russian corporate profit tax from 1999 to 2004, abusing the program authorized by the Russian Government in the early 1990s to foster economic development in designated economically underdeveloped areas. Under this program, corporate profits in the low-tax regions were taxed at substantially reduced rates if the taxpayer complied with the applicable legal rules, including Russia's anti-tax abuse principles.

2.   In order to properly avail itself of the benefits available in a low-tax region, Yukos was required to comply with three legal regimes: (a) the federal statute authorizing the low-tax region program and the region's own statutes; (b) Yukos' agreements with the regional authorities; and (c) Russia's federal anti-tax abuse "bad faith taxpayer" doctrine.

3.   The federal bad faith taxpayer doctrine is rooted in Russia's federal Constitution, and has been applied by Russian tax authorities and courts in thousands of cases since the mid-1990s to condemn abusive transactions that, in substance, constitute unlawful tax evasion. As described by Yukos' own tax lawyers in commentaries they published before the assessments at issue in these arbitrations, this doctrine condemns as tax evasion transactions in which "the taxpayer's actions were aimed solely to reduce the amount of its tax payments rather than to achieve an economic result, [as] this would demonstrate that the relevant transaction was inconsistent with law because the motive underlying such transaction was to avoid tax […]. A person's actions aimed solely at tax evasion may not be regarded as actions made in good faith."

4.   Yukos abused the low-tax region program, and evaded Russian corporate profit tax in violation of the bad faith taxpayer doctrine, by implementing what Yukos referred to internally as its "tax optimization" scheme. Pursuant to this scheme, Yukos established dozens of sham "trading companies" in low-tax regions that had no business purpose, and then shifted its own profits to the sham trading companies. These sham trading shells had no genuine economic substance and served no purpose other than to reduce Yukos' tax liabilities, an arrangement described by Yukos' own lawyers as constituting unlawful tax evasion.

5.   The European Court of Human Rights ("ECtHR") unanimously rejected Yukos' challenge of the tax assessments that are at issue here, on the basis of the same core principles that underlie these arbitrations. The ECtHR found that Yukos' "tax optimization" scheme consisted of "switching the tax burden from [Yukos] and its production and service units to letter-box companies in domestic tax havens in Russia," and that these "letter box companies" had "no assets, employees or operations of their own [and] were nominally owned and managed by third parties, although in reality they were set up and run by [Yukos] itself."

6.   According to the ECtHR, the "letter-box companies" (a) purchased oil and oil products from Yukos' production companies at a fraction of their true market prices, (b) "acting in cascade, then sold the oil either abroad, this time at market price or to [Yukos'] refineries and subsequently re-bought it at a reduced price and re-sold it at the market price," (c) thereby accumulated most of Yukos' profits in the low-tax regions, resulting in Yukos paying substantially lower taxes on those

profits, and (d) then unilaterally transferred to Yukos, as a gift or in purported repayment of sham loans, the profits that had been improperly taxed at reduced rates in the low-tax regions. The ECtHR unanimously concluded that this scheme "was obviously aimed at evading the general requirements of the Tax Code […]."

7.  The Russian tax authorities concluded that Yukos' "tax optimization" scheme constituted unlawful tax evasion under the bad faith taxpayer doctrine. In particular, the Russian tax authorities found, and the Russian courts later agreed, that Yukos had abused the low-tax region program because its trading shells (a) did not engage in any genuine business activities in the low-tax regions, but were instead controlled by Yukos from Moscow, (b) purchased oil and oil products at below-market prices solely to artificially concentrate Yukos' profits in low-tax regions, and (c) made only paltry investments in the low-tax regions that were dwarfed by the tax benefits they claimed, thereby failing to fulfill the purpose of the low-tax region program.

8.  Yukos did not then -- or later -- offer any rationale for selling Yukos' oil through its network of low tax region trading companies other than reducing Yukos' own tax liabilities, nor have Claimants done so in these arbitrations.

9.  Yukos was aware of the bad faith taxpayer doctrine and the risk that its scheme would result in substantial tax assessments if the Russian authorities were ever to learn of it. Among other things, (a) Yukos knew that the authorities had previously denied the low-tax region benefits claimed by several sham trading shells in the Lesnoy region and Sibirskaya based on the same Russian anti-abuse rules that were later applied to Yukos (the Russian authorities only later learned that Yukos exercised *de facto* control over and management of Sibirskaya and the Lesnoy trading shells, and that Yukos surreptitiously liquidated the latter in order to prevent the collection of their overdue taxes), (b) Yukos managers had expressly warned the company's senior executives in internal memoranda that public disclosure of the scheme "will result in substantial tax claims against the Company," (c) as Yukos' former deputy general counsel later conceded, none of the company's external lawyers was willing to render an opinion endorsing its scheme (to the contrary, in refusing to render a "clean" opinion, one cited the need to comply with the same bad faith taxpayer doctrine that later led the Russian tax authorities and courts to find that Yukos was guilty of tax evasion), and (d) Yukos had access to the numerous court decisions applying the bad faith taxpayer doctrine to abusive tax schemes -- including those finding Lukoil, one of Yukos' major competitors, liable for substantial additional amounts for having abused the low-tax region program -- and to the published legal commentaries discussing the bad faith taxpayer doctrine and its requirements, including those written by its own tax lawyers.

10. Yukos' knowledge that its "tax optimization" scheme was unlawful is further confirmed by Yukos' repeated lies to the tax authorities, the Russian courts, the ECtHR, and Yukos' own external auditors, including Yukos' knowingly false assertion that it was not affiliated with (and did not control) the sham trading shells, a point now conceded even by Claimants. Yukos' repeated false denial of its affiliation with the sham trading shells can only be explained by the company's awareness of the illegality of its scheme.

11. Yukos' tax evasion was not victimless. The billions of dollars in tax benefits it wrongfully claimed caused commensurate damage to the regional budget of Moscow, where Yukos, as the real party in interest, should have paid profit tax at the full rate.

12. Claimants' claims that the Russian authorities' measures were expropriatory and unfair are meritless. First, Claimants' contention that the legal principles applied by the Russian courts were "novel" or "vague" is, as the ECtHR unanimously found, refuted by the numerous Russian court decisions that applied these principles and similar ones to hold taxpayers liable for tax evasion since the mid-1990s, including

their abuse of the low-tax region program. Moreover, the published legal commentaries, including the guidance published by Yukos' own tax counsel, describe those principles in the same terms as they were applied to Yukos. The relevant Russian judicial precedents include those compiled for the Tribunal by Russian tax law expert Oleg Konnov, whose description of the history and content of the bad faith taxpayer doctrine Claimants have not sought to rebut with any expert testimony.

13. Mr. Konnov shows that the fines assessed against Yukos were also proper because, among other reasons, no taxpayer -- in Russia or elsewhere -- could legitimately claim to be surprised that it may not invoke a limitations period that has expired only because of its own obstruction of tax audits.

14. Claimants also ignore the extensive international precedents demonstrating that the principles applied by the Russian authorities and the actions they took against Yukos' tax evasion were consistent with those of ECT signatories and other nations worldwide.

15. Second, Claimants' attack on Yukos' VAT assessments -- holding Yukos liable for the VAT due on revenues nominally realized by the sham trading shells but properly attributable to Yukos itself -- is also meritless. As the ECtHR unanimously held, the Russian authorities acted properly in disregarding Yukos' sham trading shells for profit tax purposes and denying Yukos the benefit of the shells' 0% VAT filings. Claimants also ignore Yukos' still unexplained failure to submit proper 0% VAT returns in its own name after it received its December 29, 2003 tax audit report. It is not disputed that Yukos could have filed proper VAT returns -- nothing prevented it from doing so -- or that had it done so, it would have avoided more than half of its challenged tax liabilities.

16. Third, Claimants' assertion that the tax assessments were discriminatory is contradicted by the facts. The ECtHR unanimously rejected this charge. Several large Russian companies, including a number of Yukos' principal competitors, were also held liable for tax evasion and assessed substantial amounts of tax on grounds similar to those relied on by the Russian authorities and courts in dealing with Yukos. But unlike Yukos, these other companies promptly paid their taxes and, in the case of Lukoil, publicly abandoned its own "tax optimization" scheme.

17. There were also numerous material differences between Yukos' conduct and that of many other Russian oil companies: (a) no other Russian oil company committed abuses that were as egregious as those of Yukos, (b) none did so for as long as Yukos, (c) none attempted to conceal its abuses as did Yukos (to the extent of lying about them to the tax authorities, the courts, and even its own auditors), (d) none obstructed their tax audits as did Yukos, including by sending documents and employees to distant locations before they could be reviewed and interviewed, (e) none made investments in the low-tax regions that were so miniscule in comparison to the tax benefits they claimed, (f) none diverted billions of dollars offshore to prevent the collection of overdue taxes, and (g) none refused to pay their assessed taxes when ultimately required to do so.

18. Fourth, Claimants' contention that the Russian authorities knew and approved of Yukos' scheme is completely unsupported by any credible evidence, as the ECtHR again unanimously found. Claimants' contention cannot be reconciled with Yukos' unflagging efforts to conceal its scheme from the Russian authorities. Yukos would obviously have had no reason to hide its scheme if it believed the authorities were already aware of it, let alone had approved it, or if it thought its scheme was lawful and its disclosure would not lead to substantial tax claims. Yukos' efforts to conceal its scheme are reflected in (a) the company's convoluted offshore structures, serving no purpose other than to mask Yukos' affiliation with its sham trading shells, (b) Yukos' seriatim restructuring of its Lesnoy trading shells after their abuse of that

- 36 -

region's low tax program was discovered, (c) Yukos' management's internal warnings that disclosure of its scheme "will result in substantial tax claims against the Company," (d) Yukos' failure to disclose its scheme in its purportedly "transparent" financial statements, and (e) Yukos' repeated lies about its scheme to the tax authorities, the courts, the ECtHR, and its own auditors.

19.     In any event, as a matter of Russian law and as Claimants concede, even if the tax authorities had known of Yukos' scheme -- and there is no evidence they did -- they would not have been estopped from later challenging it.

20.     <u>Fifth</u>, Claimants' contention that the assessments against Yukos were fabricated as part of a politically motivated campaign to dismantle Yukos – an allegation on which Claimants have unambiguously staked their claims, contending that the assessments "cannot be explained in any other way" -- is, as the ECtHR again unanimously found, unsupported by any credible evidence. If the assessments were, as Claimants insist, the product of a massive political conspiracy spanning several years and involving numerous government agencies, engineered and implemented by hundreds if not thousands of officials, including no fewer than 60 judges at four different levels of courts, along with a large cast of third parties around the globe, then surely after nearly a decade of challenges -- by Yukos, its minority shareholders, and now Claimants -- at least one internal government memorandum, instruction or minute of a meeting evidencing or referring to the grand conspiracy alleged by Claimants would have surfaced, or one disgruntled former Government official would have reported having participated in a meeting or telephone call where the alleged conspiracy was discussed. Instead, Claimants rely solely on double and triple hearsay renditions of purported conversations by vocal opponents of the Russian Government, inaccurate and uninformed reports by political commentators, and sheer innuendo, none of which, even as proffered, competently supports Claimants' conspiracy allegations.

21.     Claimants' failure to prove the supposed vast conspiracy confirms that it is merely one more sham perpetrated by the Oligarchs who controlled Yukos and were ultimately responsible for its demise.

22.     Yukos' dealings with PricewaterhouseCoopers ("PwC") provide yet another example of Yukos' blaming the Russian Federation for the consequences of its own misconduct.

23.     PwC withdrew all of its Yukos audit opinions in June 2007 (after refusing to continue to audit the company's U.S. GAAP financial statements in 2003, itself an extraordinary event for a supposedly "transparent" company), following confirmation that Yukos' senior managers had repeatedly lied to PwC about, among other things, Yukos' *de facto* control over the management of its sham trading shells -- an essential element in the company's "tax optimization" scheme.

24.     Claimants' attempt to blame the Russian Federation for PwC's withdrawal of the firm's audit opinions finds no support in the record. To the contrary, both PwC's senior Russian representative at the time (in a contemporaneous private conversation with U.S. Embassy officials in Moscow) and PwC's senior Yukos auditor (in sworn U.S. deposition testimony) confirm that PwC, in withdrawing its audit opinions, acted in accordance with applicable auditing standards, a conclusion supported by Mr. John Ellison, a former KPMG LLP partner, in his unchallenged expert report. The U.S. deposition testimony of Mr. Douglas Miller, the PwC partner in charge of auditing Yukos, is especially relevant, because (a) it was sought by counsel for Messrs. Khodorkovsky and Lebedev on the grounds that it would provide the best opportunity to obtain a truthful account of the reasons for PwC's actions, and (b) Mr. Miller repeatedly rejected Claimants' "harassment" theory.

25.     On all of these points, the *RosInvestCo* and *Rovime* awards are inconsistent with the facts and Russian law, and ignore a wealth of uncontested international practice.

II.     **The Russian Federation Is Not Responsible For And Did Not Cause The Unwinding Of The Sibneft Merger**

26.     The Russian Federation is not responsible for the unwinding of Yukos' proposed merger with Sibneft because Claimants do not allege -- let alone establish -- that Sibneft was then exercising governmental authority or acting under the instructions of Russian State organs. Nor was the Russian Federation the cause of the unwinding of the merger. To the contrary, the Russian Federation repeatedly supported the proposed merger, and Claimants themselves acknowledge that the Russian Federation provided all of the approvals necessary for the merger, including approvals granted long after the Russian Federation's supposed attack on Yukos.

27.     The merger in fact collapsed because Yukos refused to accommodate Sibneft's request that Mr. Khodorkovsky, following his resignation from Yukos' management, be replaced by a Sibneft nominee as head of the to-be merged company. Sibneft's proposal would have left Yukos representatives in all of the surviving company's other senior management positions.

28.     Documents that Claimants were ordered to produce in these proceedings (over their objection) show that Claimants and Sibneft's principal shareholders agreed to unwind the merger without the payment of additional compensation by either side, an agreement fatal to Claimants' request for damages relating to the proposed merger. The same documents also reveal that Yukos' management proposed its own plan to unwind the merger without the payment of additional compensation, and that this plan contemplated the initiation of a "sham" lawsuit challenging the previously-completed exchange of Yukos and Sibneft shares. The contemplated lawsuit bears a striking resemblance to the actual lawsuit (challenged by Yukos in these arbitrations) that was brought by two of Yukos' shareholders and ultimately led to the legal unwinding of the merger without the payment of additional compensation.

29.     Claimants' assertion that the US$ 2 billion giga-dividend was required by the Sibneft merger is patently untrue. The record shows that the giga-dividend was approved on November 28, 2003 (and not on September 25, 2003, as Claimants falsely asserted in their Reply), one day after Yukos was informed that the Sibneft merger would not proceed. At the Extraordinary General Meeting of Yukos' shareholders held on November 28, Claimants voted against all the other shareholder proposals linked to the completion of the Sibneft merger, but supported payment of the giga-dividend "for Yukos" (that is, for Claimants to the extent of 70% of the dividend).

III     **Yukos Bears Sole Responsibility For The Consequences Of The Assessments Properly Made Against It, Because It Could Have Avoided Those Consequences -- And Reduced Its Liability By Well More Than Half – By Paying The Amounts Due During The First Quarter Of 2004, While Continuing To Challenge The Assessments In Full**

30.     During the first quarter of 2004, Yukos could have avoided well more than half of its ultimate tax exposure by paying its corporate profit taxes and the interest then due and by filing proper amended VAT returns in its own name. Had Yukos taken these few simple steps -- abiding by its own tax counsel's published advice as to how a taxpayer should mitigate its tax liabilities -- it would also have avoided all of the subsequent enforcement measures about which Claimants complain, and still preserved its right to seek a refund of all the taxes it paid.

31.     If Yukos had mitigated its liabilities in this way, its total exposure under the Russian court rulings that Claimants challenge in these arbitrations would have been capped at less than US$ 9.8 billion, rather than the US$ 25.8 billion that was ultimately assessed.

32.    Yukos had more than ample resources in the first quarter of 2004 to cap its tax exposure at less than US$ 9.8 billion and to satisfy that liability, even after paying its unprecedented US$ 2 billion giga-dividend, but it elected not to do so.

33.    Instead, Yukos pursued an irrational and ultimately self-destructive course of action, for which only the managers of Yukos, installed and controlled by Claimants, are to blame. This course of action included (a) Yukos' continuing denial of any liability for its assessed taxes, (b) Yukos' now acknowledged false denial that it controlled the sham trading shells, (c) Yukos' repeated obstruction of the actions taken by the Russian authorities to enforce and collect the company's overdue taxes, (d) Yukos' dissipation of its own assets and those of the companies it controlled, to frustrate the collection of the taxes it owed, and (e) Yukos' attempt to put pressure on the Russian Government by mounting an aggressive international lobbying and disinformation campaign that sought to politicize what, for the Russian authorities, was always a matter of tax evasion and collection.

34.    All of the subsequent enforcement proceedings and other measures about which Claimants now complain were thus the result of Yukos' own adamant refusal to acknowledge or mitigate its tax liabilities, and its repeated attempts to dissipate and conceal its assets and to frustrate the enforcement and collection of its overdue taxes. Had Yukos not persisted in this self-destructive course of action, there would have been no April injunction (discussed below), and YNG would not have been sold.

35.    Permitting Claimants to benefit from Yukos' self-inflicted wounds would contravene basic legal principles, and provide Claimants with a windfall -- beyond the billions of dollars they have already extracted from Yukos, including by way of dividends, share sales, and *stichting* assets -- to which they are not entitled.

**IV.    The Russian Federation Acted Properly In Enforcing The Tax Assessments Against Yukos, Including By Auctioning YNG**

36.    The tax assessments were enforced against Yukos in compliance with Russian law and after ample notice to Yukos. As the ECtHR unanimously concluded, there is "no reason to doubt that throughout the proceedings the actions of various authorities had a lawful basis and that the legal provisions in question were sufficiently precise and clear." The enforcement actions were also measured and appropriate in the circumstances and entirely consistent with international practice.

37.    Claimants' and Yukos' contention that Yukos was "surprised" by the timing of the assessment for 2000 and the need to make prompt payment is false and indicative of Yukos' lack of good faith. Promptly upon receipt of the December 29, 2003 audit report, Yukos' internal and external counsel advised Yukos that, under established Russian law and practice, it should expect to receive a final tax assessment within about a month, and that this assessment would require Yukos to make full payment promptly, most likely within one day. In the event, the tax assessment for 2000 was issued on April 14, 2004, more than two months later than Yukos' advisors had expected, and required payment in two days, not one.

38.    Although Yukos had ample notice of when and how much it would be required to pay, it made no effort to marshal the necessary assets, instead claiming that it was not able to pay, even though Claimants now acknowledge that Yukos had sufficient resources to pay all of its 2000 taxes.

39.    By the time of Yukos' April 2004 assessment, the tax authorities had learned that Yukos controlled the Lesnoy shell companies and had sought to prevent the payment of their overdue taxes by dissolving them. The tax authorities thus understandably applied to the Moscow Arbitrazh Court in April 2004 for enforcement of Yukos' 2000 tax liability and for an injunction prohibiting Yukos from selling or encumbering the company's shareholdings in its Russian subsidiaries.

40.     As the ECtHR held, the authorities' actions were neither arbitrary nor unfair:

> "[T]he Ministry's action was lodged under the rule which made it unnecessary to wait until the end of the grace period if there was evidence that the dispute was insoluble and, regard being had to the circumstances of the case, [the Court] finds no indication of arbitrariness or unfairness […] in this connection." [emphases added]

41.     The April injunction did not affect Yukos' use of its substantial on- and off-shore cash resources, and did not affect Yukos' offshore assets at all. Yukos nonetheless falsely claimed that the injunction prevented Yukos from paying its taxes, again evidencing its lack of good faith and credibility.

42.     No further enforcement efforts were taken for more than two months. During this period, Yukos continued to generate close to US$ 2 billion each month in gross receipts that Yukos partly transferred off-shore and partly used to voluntarily pay its loan to GML's Moravel shell subsidiary -- but not to pay its tax liabilities.

43.     Yukos also began a pattern of diminishing the value of its assets, often to the benefit of Claimants and the Oligarchs whose interests they represented. For example, Yukos forced its production subsidiaries to guarantee Yukos' already outstanding US$ 1.6 billion loan from Moravel, corroborating the concerns that had led the authorities to obtain the April injunction.

44.     Following Yukos' failure to make (or even to promise to make) any tax payments, as well as its dissipation of substantial assets, Russia's bailiffs finally attached a number of Yukos' on-shore bank accounts at the end of June 2004 -- ten weeks after the April tax assessment and 26 weeks after Yukos' legal advisors advised that it needed to be prepared to pay promptly. It was only then that Yukos began to pay some, but not all, of its taxes.

45.     The authorities also sought to seize Yukos' shares in its production subsidiaries to prevent Yukos from encumbering them. True to form, Yukos attempted to frustrate the bailiffs' efforts by terminating the share registry company contract for its production subsidiaries and concealing their registries, directing that they be sent from central Moscow to remote locations around the country.

46.     Yukos also took steps to reduce the value of its largest production subsidiary, YNG. First, Yukos caused YNG to stop paying its mineral extraction taxes, imperiling its production licenses. Second, Yukos and its trading shells stopped paying YNG for its crude oil, leaving YNG with more than US$ 4 billion in unpaid invoices. And third, Yukos continued to divert funds to GML, its majority shareholder, arranging for the payment of more than US$ 700 million to Moravel, even after the cash freeze orders were in place.

47.     Yukos also made a series of bad faith offers to "settle" a portion of its tax liabilities, repeatedly offering Sibneft shares as a partial payment or as security for proposed future payment, even though Russian law did not allow payment in kind, Yukos' title to the proffered shares had been challenged by a third-party, and an injunction had been issued (at the request of the third-party) prohibiting their sale or encumbrance.

48.     During this entire period, nothing prevented Yukos from selling its assets subject to the bailiffs' approval and using the proceeds to pay its tax obligations.

49.     Thus, the authorities found themselves confronted by a company that was fiercely resisting the payment of its overdue taxes, that had previously obstructed its tax audit, lied to the tax authorities and courts, and attempted to make itself and its subsidiaries judgment proof, and that was now burdening the tax authorities' principal security -- YNG -- with new liabilities. In these circumstances, the bailiffs understandably decided to sell a majority of YNG's shares -- the only

realistic way to timely collect Yukos' unpaid taxes. Despite criticizing the bailiffs for not adequately documenting their decision-making process, the ECtHR concluded that the bailiffs' actions were not unreasonable. It is commonplace in other countries too for tax collection authorities to sell first the assets that best ensure payment.

50.    The sale of the YNG shares was carried out in accordance with Russian law and consistent with international practice. The authorities could have sold the shares to a designated purchaser in a directly negotiated transaction, but instead granted Yukos' request that the shares be auctioned. A formal and careful appraisal was conducted by DKW, and the starting price for the auction was set at a level consistent with DKW's appraisal, taking account of the fact that only 76.79% of the company's shares were sold and that YNG had its own outstanding tax liabilities. All bidders, foreign or domestic, were welcome to participate.

51.    Claimants and Yukos did all they could to prevent the auction from succeeding, threatening a "lifetime of litigation" against anyone who participated in or facilitated the sale. Yukos also initiated sham bankruptcy proceedings in Houston, obtaining a temporary restraining order ("TRO") that prevented all the previously announced bidders and all of their banks from participating in the auction. If the price achieved was lower than it might otherwise have been, the fault lies solely with Claimants and Yukos.

52.    The YNG auction achieved a price of approximately US$ 9.4 billion, US$ 500 million more than the starting price. This result was consistent with the shares' appraised value and contemporaneous fair market value estimates.

53.    The evidence does not support Claimants' contention that the winning bidder, Baikal Finance, conspired with Rosneft. Rather, Baikal Finance found itself unable to finance its winning bid because of the Houston court's TRO, and thus at risk of losing its US$ 1.7 billion deposit unless a substitute purchaser, not dependent on immediate bank financing, could be found on very short notice. Rosneft simply seized a commercial opportunity that presented itself as a result of Claimants' misconduct.

54.    The net proceeds of the YNG sale were not sufficient to meet all of Yukos' tax obligations. The Russian authorities nonetheless gave Yukos ample time to pay the remaining balance, but it declined to do so, making clear that its priority was to place assets behind the shield of the Dutch *stichtings*.

**V.    The Russian Federation Acted Properly In Connection With Yukos' Bankruptcy, Which Was Precipitated By Yukos' Failure To Pay Its Debts To The SocGen Syndicate, And Is Not Attributable To The Russian Federation**

55.    Claimants' bankruptcy-related claims fail because critical conduct essential to these claims was taken by actors for which the Russian Federation is not responsible, including the SocGen syndicate, YNG, Rosneft, the Federal Tax Service acting as creditor, the meeting and committee of Yukos' creditors, Yukos' interim manager and bankruptcy receiver, the participants in Yukos' bankruptcy auctions, and the purchasers of the auctioned assets sold. In taking the actions complained of by Claimants, none of these actors was exercising sovereign authority or acting pursuant to the direction or control of sovereign authority. Claimants have provided no evidence on which the Tribunal could make a contrary finding.

56.    Yukos' dilatory and obstructionist treatment of its commercial creditors paralleled closely its treatment of the tax authorities. In both instances, Yukos (a) falsely claimed it was unable to meet its obligations, (b) forced its creditors to pursue their claims in multiple court proceedings where Yukos presented unsubstantiated defenses, (c) offered to negotiate with its creditors only when they were close to collecting their claims, (d) made unrealistic settlement proposals that were

subsequently withdrawn, and (e) together with its controlling shareholders, strenuously resisted all collection efforts, prompting more aggressive action on the part of its creditors.

57.    Both sides agree that Yukos' bankruptcy was initiated by the SocGen syndicate, based upon Yukos' failure to pay an outstanding English court judgment after it was recognized in Russia.

58.    The SocGen syndicate simultaneously also sought payment of the same debt from Rosneft pursuant to the 2004 loan guarantee that Yukos had foisted on YNG, which Rosneft then owned. Although Rosneft disputed the validity of the guarantee, Rosneft required forbearance from the same banks on covenant breaches arising from the YNG acquisition, and Rosneft needed the banks' cooperation for its planned IPO.  The convergence of the syndicate's and Rosneft's commercial interests resulted in their agreeing that Rosneft would pay the syndicate in full, but only after the syndicate had pursued all legal avenues to obtain payment from Yukos, the primary obligor. If Rosneft instead paid, the syndicate's rights under the loan agreement were to be assigned to Rosneft.

59.    Claimants acknowledge that this agreement was commercially-motivated and on commercial terms, but contend that its confidentiality clause evidences a conspiracy on the part of the SocGen syndicate to act secretly on behalf of Rosneft, which Claimants improperly equate with Respondent. The confidentiality clause, however, was itself a standard commercial term necessary to preserve the possibility that Yukos would pay the SocGen syndicate before Rosneft became unconditionally obligated to do so, and remained in effect only for so long as Yukos' payment would have discharged Rosneft's own obligation to pay the syndicate.

60.    Yukos satisfied the criteria for bankruptcy under Russian law due to its persistent failure to pay its commercial creditors, and was insolvent long before the proceedings were commenced. This is also undisputed.

61.    The proceedings were conducted in compliance with Russian law and international practice. The courts properly allowed the Federal Tax Service's, Rosneft's and YNG's claims, and substantial amounts of YNG's claims were never disputed by Yukos. Belying Claimants' discrimination charge, the courts also allowed some Yukos related-party claims, but properly rejected other abusive claims, such as the Moravel loan, a barely disguised attempt to turn equity into debt.

62.    Yukos' management, actively supported by Claimants, had the opportunity to present a rehabilitation plan to the meeting of creditors. The rough outline management submitted was, however, legally defective and did not provide any basis for creditors to prefer rehabilitation to liquidation. It was not properly presented to or approved by Yukos' shareholders, did not meet the legal requirement that the company's tax claims be satisfied within six months, and did not ensure full, let alone timely, payment of Yukos' creditors' claims.

63.    Once Yukos' liquidation was properly approved, the company's assets were sold at auction in accordance with Russian law and international practice. Yukos' receiver obtained appraisals for the fair value of the assets, and used those appraisals to set minimum bids in the auctions, all of which were exceeded, some by very large margins. The auctions were open to domestic and foreign bidders, adequately noticed and advertised, and competitive. To the extent that any bidders may have been discouraged from participating, this was again the result of Claimants and Yukos having threatened potential bidders with legal action. While the aggregate results exceeded Yukos' own (and other) contemporaneous fair market value estimates, more than US$ 9 billion in creditor claims nonetheless remained unsatisfied.

**VI.     Claimants Have Failed To Establish *Sine Qua Non* Elements Of Their Article 13 And 10(1) ECT Claims**

**A.     Article 21 ECT**

64.     First, as an initial matter, Claimants' claims must be based on measures outside the taxation carve-out of Article 21(1) ECT or, alternatively, within Article 21(1) ECT, but subject to one of the claw-backs of Article 21(2) to (5) ECT.

65.     Taxation carve-outs such as this one fulfill plainly legitimate functions. They (a) preserve the Contracting Parties' sovereign power in the field of taxation, which is of critical importance to the very existence of a State, (b) delineate the extensive network of investment treaties from the even broader network of taxation treaties, (c) pay due regard to the complexity of tax matters, and, in many cases, preserve the coordination role of the competent tax authorities under double taxation treaties.

66.     To fulfill these functions, taxation carve-outs are typically broad, covering all aspects of tax regimes, including tax enforcement measures.

67.     Article 21(1) ECT, under its plain meaning, covers the whole range of measures taken by all branches of government in the field of taxation. Tax legislation and enforcement measures are inextricably linked, and it is not possible to meaningfully dissociate them in the context of Article 21(1) ECT.

68.     The core allegations on which Claimants base their claims are squarely within the scope of Article 21(1) ECT: tax audits, tax assessments, interest and fines provoked by Yukos' failure to pay its assessed taxes, measures to ensure the effective collection of its taxes, and the sale of Yukos' assets to satisfy its tax liabilities.

69.     Claimants seek to avoid Article 21 ECT on two grounds, that Article 21(7)(a) ECT limits the scope of the taxation carve-out to tax legislation and tax treaties and does not apply to *mala fide* taxation measures. These arguments are baseless.

70.     Article 21(7)(a) ECT contains an illustrative list of taxation measures that does not replace the term "measures" with the term "provisions," but underscores that the term "Taxation Measures" covers all aspects of the tax regime, including international and domestic measures.

71.     Claimants' position that Article 21(1) ECT is inapplicable to the taxation measures they complain about fails as a matter of fact and law. The record shows that the taxation measures at issue were a justified response to Yukos' massive tax fraud and its willful strategy to obstruct efforts to collect the taxes due. As a matter of law, Claimants mix two issues, the concept and definition of "Taxation Measures," on the one hand, and their legality, on the other. Legality is determined under Part III of the ECT, but only to the extent of the claw-backs pursuant to Article 21(2) to (5) ECT.

72.     Article 21 ECT contains no claw-back for Article 10(1) ECT, and the Tribunal therefore lacks jurisdiction over core allegations of Claimants' Article 10(1) ECT claims.

73.     Article 21(5) ECT contains a claw-back for Article 13 ECT claims, but is applicable only to "taxes," and is combined with a mandatory referral to the competent tax authorities, a procedure invoked by Respondent in these proceedings. The expropriation claw-back, in its ordinary meaning, supported by the *travaux préparatoires*, applies to charges imposed by the State for public purposes, excluding tax enforcement and collection measures. When compared to the varying practices with respect to clawbacks in taxation carve-outs, the deliberate choice of the ECT negotiating States to reinstate expropriatory "taxes" represents a middle ground, which must be respected.

**B.    Article 13(1) ECT**

74.     In order to establish their claim for a breach of Article 13(1) ECT, Claimants must show that, in addition to being outside the scope of the taxation carveout of Article 21(1) ECT -- or within Article 21(1) ECT, but **reinstated** by Article 21(5) ECT -- the measures complained of must be "measures having effect equivalent to nationalization or expropriation."

75.     <u>First</u>, Claimants have failed to establish that conduct not carved-out by Article 21 ECT that is (a) attributable to Respondent, and (b) an exercise of its sovereign power caused a total or near total deprivation of Claimants' investment. Critically, the core allegations of Claimants' claims are outside the scope of Article 13(1) ECT by virtue of Article 21 ECT. Moreover, Yukos itself engaged in conduct -- by refusing to pay the assessments against it when due, while preserving its right to challenge them – that directly resulted in the company's demise and the ensuing loss of Claimants' investments. Finally, conduct that was essential to Yukos' liquidation, including in particular the filing of the bankruptcy petition by the SocGen syndicate, and the creditors' meeting decision to liquidate Yukos, is not expropriatory because it is not attributable to Respondent under the rules of State responsibility, or does not involve an exercise of sovereign power.

76.     <u>Second</u>, Claimants have failed to establish that the measures complained of frustrated distinct, reasonable, investment-backed expectations, an important element in assessing whether regulatory measures amount to "measures having effect equivalent to nationalization or expropriation." Claimants had no right or legitimate expectation to operate Yukos in violation of Russian law, and no right or legitimate expectation that Respondent would exempt Yukos from the tax enforcement and collection measures about which Claimants complain if Yukos failed to pay its taxes and obstructed the collection of taxes due.

77.     In particular, Claimants have failed to establish that Respondent at any time made a representation, based upon complete disclosure, that it would allow Yukos to operate its fraudulent tax evasion scheme or refrain from enforcing and collecting the taxes Yukos owed. Yukos' tax evasion scheme was illegal under Russian law when Claimants made their investments, and the tax enforcement and collection measures taken against Yukos were all provided for by Russian law at that time. The bad faith taxpayer anti-abuse doctrine that Respondent's tax authorities and courts applied to counter Yukos' tax evasion  dates back to the mid 1990s, well before Claimants acquired their Yukos shares.

78.     <u>Third</u>, putting aside the other elements required to establish "measures having effect equivalent to nationalization or expropriation," the executive and judicial measures at issue, in any event, constitute a legitimate exercise of Respondent's regulatory power.

79.     The measures alleged to be expropriatory are well within the range of what is generally accepted as a legitimate exercise of States' police powers. First, Respondent has established that the measures complained of accord in all material respects with international and comparative standards.

80.     Second, the measures challenged by Claimants conform with Russian law, which in turn accords with international standards, and have been reviewed and upheld by multiple levels of Respondent's judiciary, including the Russian Supreme Court.

81.     Third, the European Court of Human Rights has found that the very same measures Claimants allege to be expropriatory were a legitimate exercise of Respondent's regulatory power.

82.     Fourth, the measures complained of must be assessed in their proper context -- Yukos' massive tax evasion, compounded by its illegal and deliberate strategy to frustrate any effort by the authorities to collect the company's overdue taxes.

83. Contrary to Claimants' perception, respect for the rule of law is not a one-way-street. Foreign investors have a duty to abide by the law, pay taxes, provide required disclosures of their activities in the host State, and cooperate with the authorities.

84. Measures taken to combat illegal conduct may legitimately result in the loss of an investment. Yukos' tax evasion scheme violated Russian law, and the assessment of the evaded taxes was a legitimate measure to combat Yukos' fraud. The resulting tax enforcement and collection measures were completely justified in light of Yukos' failure to pay the assessed taxes and its willful obstruction of Respondent's collection efforts. Indeed, none of the subsequent enforcement measures, including the auction of YNG, would have occurred, and Yukos would not have been liquidated, had Yukos acted as a responsible taxpayer should have done.

### C.   Article 10(1) ECT

85. Claimants' Article 10(1) ECT claims fail for many of the same reasons as their expropriation claim. At the threshold, the core allegations on which Claimants base their Article 10(1) ECT claims are within the taxation carve-out of Article 21(1) ECT. The Tribunal therefore lacks jurisdiction over these claims and Article 10(1) ECT is inapplicable.

86. Again, at the threshold, critical conduct alleged to be unlawful under Article 10(1) ECT is not attributable to Respondent or not an exercise of sovereign authority. The harm attributed to Respondent's alleged breaches of Article 10(1) ECT, the loss of Claimants' Yukos shares, was caused by Yukos' own misconduct and conduct of third parties not attributable to Respondent. Claimants have failed to show that any of the irregularities they allege in the administrative and judicial proceedings at issue affected the outcome of the case, the liquidation of Yukos, and the ensuing loss of Claimants' shares.

87. In any event, Claimants have failed to establish that the challenged measures interfered with their legitimate expectations at the time they made their investment or were not taken in the proper exercise of the authorities' statutory duties. The contested measures (a) accord with international and comparative standards, (b) were reviewed and upheld by the Russian courts, and (c) have been assessed by the ECtHR to be a legitimate exercise of Respondent's taxation power.

88. Finally, but no less important, the host State's conduct under Article 10(1) ECT cannot be assessed in isolation from that of the investor or its investment. Yukos' massive tax fraud and illegal obstruction of the efforts to collect the taxes it owed provoked the measures complained of, which were justified responses to combat Yukos' illegal conduct and enforce overdue taxes. None of the measures at issue can therefore be said to be arbitrary, unfair, or inequitable for purposes of Article 10(1) ECT.

89. Nor are such measures discriminatory within the meaning of Article 10(1) ECT. Article 10(1) ECT does not establish a right of impunity based on the host State's authorities' alleged failure to enforce mandatory legal requirements, and Claimants have in any event failed to show nationality-based discrimination, or unjustified differential treatment of similar cases.

### VII.  The Tribunal Lacks Jurisdiction Over Claimants' Claims Concerning The Alleged Mistreatment Of Messrs. Khodorkovsky And Lebedev And Other Yukos Officials, And In Any Event, These Claims, And Claims Concerning Searches Of Yukos Records, Are Unsupported

90. The Tribunal should reject Claimants' attempt to distract its attention from the only matter that is genuinely at issue in these arbitrations -- Claimants' investments in Yukos, and the consequences for those investments of Yukos' tax evasion scheme -

- with extensive allegations concerning the arrests and prosecution of Yukos officials and searches and seizures of the company's records.

91.     First, the Tribunal cannot assert jurisdiction under Article 26 ECT to address alleged violations of the rights of Yukos officials, because Claimants have not proven that any such violations directly impaired Claimants' management or control of their investments. To the contrary, Yukos expressly confirmed after Mr. Khodorkovsky's arrest and subsequent resignation that they had "no impact whatsoever on [its] operations," and Mr. Lebedev did not even hold a position with Yukos at that time. The prosecutions of Messrs. Khodorkovsky and Lebedev likewise did not impair Yukos' performance, which the company informed its investors in 2005 "was extremely healthy."

92.     Claimants have also failed to establish that the prosecutions of any Yukos officials reflect a systemic failure of the Russian judicial system or, at a minimum, were fundamentally unjustified or groundless. To the contrary, all were reviewed by the Russian courts at multiple levels, and by the ECtHR (with respect to the initiation of Mr. Khodorkovsky's prosecution), and were found to be in accord with Russian law and international standards. Tellingly, Claimants have never disputed that Mr. Khodorkovsky, Mr. Lebedev, or any of the other Yukos officials who were convicted of crimes related to their management of Yukos, actually committed those crimes, relying instead on conclusory complaints about various procedural matters, based on mischaracterizations of the pertinent facts.

93.     Finally, Claimants have not established that the searches of certain of Yukos' offices and the seizure of certain of its records pursuant to the official investigations of its misconduct were expropriatory, evidence a systemic judicial failure, or were otherwise fundamentally unjustified or groundless. This allegation is at best ironic, in light of Yukos' unrelenting obstruction of those investigations. It is also unsustainable. All of these procedures conformed to Russian law, and Yukos' own contemporaneous public statements and internal documents confirm that Yukos itself did not believe they had any significant impact on the company.

**VIII.  The Tribunal Lacks Jurisdiction Over Claimants' Claims, Or Must Dismiss Them, Because They Are Based On Illegal Conduct By Claimants And The Yukos Managers They Installed And Controlled**

94.     The Oligarchs who controlled Claimants acquired and consolidated their investments in Yukos through illegal acts and bad faith conduct, and thereafter perpetrated -- either directly or through the Yukos managers they installed and controlled -- a long series of illegal acts, including the tax evasion that is at the heart of these arbitrations.

95.     Claimants contend that these illegalities are "collateral" or "unrelated to" their investments, even though they relate to the acquisition or enhancement of the value of Yukos, or to Claimants' own unlawful abuse of the Russia-Cyprus Tax Treaty. Through that abuse, Claimants themselves fraudulently evaded -- in violation of both Russian and Cypriot criminal laws -- more than US\$ 230 million in Russian withholding taxes, and more than triple that amount in Russian profit taxes.

96.     This history of repeated illegal conduct by Claimants -- culminating in the diversion of assets worth billions of dollars to the illegally-created Dutch *stichtings*, placing those assets beyond the reach of the Russian tax authorities -- deprives the Tribunal of jurisdiction over Claimants' claims, because ECT protection does not extend to illegal investments, or requires that the Tribunal dismiss those claims under the principle of unclean hands. The Tribunal should reject Claimants' attack on the existence of the principle of unclean hands in international law, as well as their baseless charge that Respondent is estopped from raising Claimants' illegalities.

### IX.  Claimants Have Failed To Establish Any Entitlement To Damages

97.  Claimants are not entitled to any compensation, in light of (a) their own illegal conduct, including their and the Oligarchs' illegal acquisition and consolidation of their ownership and control of Yukos, their abuse of the Russia-Cyprus Tax Treaty, and their implementation of Yukos' tax evasion scheme, and (b) Yukos' failure to mitigate its tax liability, and Yukos' and Claimants' actions to prevent the collection of Yukos' overdue taxes.

98.  Claimants are not entitled to any compensation for acts of the Russian Federation that are within the carve-out of Article 21(1) ECT and not within the clawback of Article 21(5) ECT.

99.  Claimants also are not entitled to any compensation based on Yukos' claimed value at any given point in time, because they have failed to demonstrate any causal link between any diminution in Yukos' then-supposed value and specific violations of the ECT. Claimants' "all-or-nothing" approach does not provide a means by which the Tribunal can (a) assess whether the Russian Federation's actions constituted an "expropriation," or (b) quantify the damages, if any, arising in the event some, but not all, of the measures Claimants complain about are found to violate the ECT. This is the inevitable result of Claimants' failure to present a damages measure, but instead a static valuation, devoid of any causation analysis.

100.  Claimants' valuations also fail on their own terms, because they are entirely dependent on Claimants' unsustainable valuation date of November 21, 2007.

101.  Claimants and their expert concede that the valuations presented in their opening submissions are infected by numerous material errors. These errors fatally undermine Claimants' core assertions and render Claimants' evidence unreliable for any purpose. The revised valuations submitted in Claimants' Reply are likewise riddled with errors and are manifestly result-driven, leaving Claimants with no competent evidence of damages at all. This is true, too, of their "method of collection" scenarios, which are unsupportable and fail of their own terms.

102.  Once Yukos chose not to mitigate its tax liability during the first quarter of 2004 -- by paying no more than US$ 9.8 billion, capping its tax exposure at that amount and avoiding all of the subsequent enforcement measures -- there was no realistic means by which Yukos could have paid all of its liabilities, let alone continued in business as a going concern. Claimants' failure to mitigate is a further reason why their damages model, based on the claimed value of Yukos as of a given date, does not provide a meaningful measure of damages. Thus, even if the Tribunal were to conclude that an award of damages is warranted, it must be capped at Claimants' proportionate interest in the amount, if any, of Yukos' unavoidable liabilities -- not more than US$ 9.8 billion -- that the Tribunal concludes were improperly assessed.

103.  Claimants' damages claim represents a 58% compound annual rate of return on their investment in Yukos. Claimants' requested rate of return fails to take account of Claimants', the Oligarchs', and Yukos' unlawful misconduct and is well beyond that which any legitimate investor would have earned.

104.  Measured against a reasonable return on investment, and after taking account of the returns on their investment in Yukos that Claimants have already received (not to mention the fruits of their ill-gotten gains and assets secreted offshore), Claimants have not incurred any damages at all.

- 47 -

## IV.   PARTIES' REQUESTS FOR RELIEF

### A.   RELIEF REQUESTED BY CLAIMANTS

110.   Claimants request that the Tribunal render an Award:

(1)   Declaring that the Respondent has breached its obligations under Article 10(1) of the Energy Charter Treaty;

(2)   Declaring that the Respondent has breached its obligations under Article 13(1) of the Energy Charter Treaty;

(3)   Ordering the Respondent to pay to the Claimants, in full reparation of their damages, an amount to be determined by the Arbitral Tribunal, estimated by the Claimants at no less than US$ 114.174 billion, to be shared between the Claimants in the following proportions:

- Hulley Enterprises Limited        US$ 93.229 billion
- Yukos Universal Limited        US$ 4.666 billion
- Veteran Petroleum Limited        US$ 16.279 billion

(4)   Ordering the Respondent to pay post-award interest on the above sums to the Claimants at the rate of Libor + 4% compounded annually from the date of the Award until the date of full payment;

(5)   Ordering the Respondent to pay to the Claimants the full costs of these arbitrations, including, without limitation, arbitrators' fees, administrative costs of the PCA, counsel fees, expert fees and all other costs associated with these proceedings;

(6)   Dismissing all of the Respondent's defenses;

(7)   Ordering any such further relief as it may deem appropriate.[7]

### B.   RELIEF REQUESTED BY RESPONDENT

111.   Respondent requests that the Tribunal render an Award:

(a)   Dismissing Claimants' claims on the ground that the Tribunal lacks jurisdiction to entertain them;

(b)   In the alternative, dismissing Claimants' claims on the ground that they are inadmissible;

(c)   In the alternative, dismissing Claimants' claims on the merits in their entirety;

(d)   In the alternative, declaring that Claimants are not entitled to the damages they seek, or to any damages;

(e)   Ordering Claimants to pay the Russian Federation's costs, expenses, and attorney's fees;

---

[7]   Reply ¶ 1199.  *See also* Claimants' Memorial on the Merits, 15 September 2010 (hereinafter "Memorial") ¶ 1056; Claimants' Post-Hearing Brief, 21 December 2012 (hereinafter "Claimants' Post-Hearing Brief") ¶ 302.

(f)     Granting such further relief against the Claimants as the Tribunal deems fit and proper.[8]

## V.     APPLICABLE LAW

### A.     PROCEDURAL LAW

112.     The procedural law to be applied by the Tribunal consists of the procedural provisions of the ECT (particularly Article 26), the UNCITRAL Rules of 1976, and, because The Hague is the place of arbitration, any mandatory provisions of Dutch arbitration law.  The Final Awards are made pursuant to Article 1049 of the *Netherlands Arbitration Act 1986.*

### B.     SUBSTANTIVE LAW

113.     The substantive law to be applied by the Tribunal consists of the substantive provisions of the ECT, the Vienna Convention on the Law of Treaties ("**VCLT**"),[9] and applicable rules and principles of international law, including those authoritatively set out in the Articles on Responsibility of States for Internationally Wrongful Acts of the International Law Commission of the United Nations ("**ILC Articles on State Responsibility**").[10]  In addition to the foregoing sources, the national law of the Russian Federation is relevant with regard to certain issues.

#### 1.     Energy Charter Treaty

114.     Throughout this Award, the Tribunal refers to and analyzes specific provisions of the ECT.  For ease of reference, the key relevant provisions are also collected and reproduced below, in the order in which they appear in the Treaty:

---

[8]     Counter-Memorial ¶ 1654; Respondent's Rejoinder on the Merits, 16 August 2012 (hereinafter "Rejoinder") ¶ 1748; Respondent's Post-Hearing Brief, 21 December 2012 (hereinafter "Respondent's Post-Hearing Brief") ¶ 263.

[9]     Vienna Convention on the Law of Treaties, Vienna, 23 May 1969, 1155 UNTS 331.

[10]     Draft Articles on Responsibility of States for Internationally Wrongful Acts with commentaries (Text adopted by the International Law Commission at its fifty-third session, in 2001), Arts. 1–11 and 28–39, Exh. C-1042; Arts. 49–54, Exh. C-1681 (hereinafter "ILC Articles on State Responsibility").  The full text of the ILC Articles, along with parts of the official commentary, was also submitted by Respondent.  *See* Exhs. R-1031 and R-4235.  The Tribunal is aware that Part II of the ILC Articles on State Responsibility, which sets out the consequences of internationally wrongful acts, is concerned with claims between States and may not directly apply to cases involving persons or entities other than States.  That being said, the ILC Articles reflect customary international law in the matter of state responsibility, and to the extent that a matter is not ruled by the ECT and there are no circumstances commanding otherwise, the Tribunal will turn to the ILC Articles on State Responsibility for guidance.  The Tribunal further notes that both Parties have cited to and relied on Parts I and II of the ILC Articles on State Responsibility in their submissions.

*Article 10*
PROMOTION, PROTECTION AND TREATMENT OF INVESTMENTS

(1)  Each Contracting Party shall, in accordance with the provisions of this Treaty, encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area.  Such conditions shall include a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment.  Such Investments shall also enjoy the most constant protection and security and no Contracting Party shall in any way impair by unreasonable or discriminatory measures their management, maintenance, use, enjoyment or disposal.  In no case shall such Investments be accorded treatment less favourable than that required by international law, including treaty obligations.

[. . .]

*Article 13*
EXPROPRIATION

(1)  Investments of Investors of a Contracting Party in the Area of any other Contracting Party shall not be nationalized, expropriated or subjected to a measure or measures having effect equivalent to nationalization or expropriation (hereinafter referred to as "Expropriation") except where such Expropriation is:

(a)  for a purpose which is in the public interest;

(b)  not discriminatory;

(c)  carried out under due process of law; and

(d)  accompanied by the payment of prompt, adequate and effective compensation.

Such compensation shall amount to the fair market value of the Investment expropriated at the time immediately before the Expropriation or impending Expropriation became known in such a way as to affect the value of the Investment (hereinafter referred to as the "Valuation Date").

Such fair market value shall at the request of the Investor be expressed in a Freely Convertible Currency on the basis of the market rate of exchange existing for that currency on the Valuation Date.  Compensation shall also include interest at a commercial rate established on a market basis from the date of Expropriation until the date of payment.

[. . .]

*Article 21*
TAXATION

(1)  Except as otherwise provided in this Article, nothing in this Treaty shall create rights or impose obligations with respect to Taxation Measures of the Contracting Parties.  In the event of any inconsistency between this Article and any other provision of the Treaty, this Article shall prevail to the extent of the inconsistency.

[. . .]

(5)  (a)  Article 13 shall apply to taxes.

(b)    Whenever an issue arises under Article 13, to the extent it pertains to whether a tax constitutes an expropriation or whether a tax alleged to constitute an expropriation is discriminatory, the following provisions shall apply:

(i)    The Investor or the Contracting Party alleging expropriation shall refer the issue of whether the tax is an expropriation or whether the tax is discriminatory to the relevant Competent Tax Authority.  Failing such referral by the Investor or the Contracting Party, bodies called upon to settle disputes pursuant to Article 26(2)(c) or 27(2) shall make a referral to the relevant Competent Tax Authorities;

(ii)    The Competent Tax Authorities shall, within a period of six months of such referral, strive to resolve the issues so referred. Where nondiscrimination issues are concerned, the Competent Tax Authorities shall apply the non-discrimination provisions of the relevant tax convention or, if there is no non-discrimination provision in the relevant tax convention applicable to the tax or no such tax convention is in force between the Contracting Parties concerned, they shall apply the non-discrimination principles under the Model Tax Convention on Income and Capital of the Organisation for Economic Co-operation and Development;

(iii)    Bodies called upon to settle disputes pursuant to Article 26(2)(c) or 27(2) may take into account any conclusions arrived at by the Competent Tax Authorities regarding whether the tax is an expropriation.  Such bodies shall take into account any conclusions arrived at within the six-month period prescribed in subparagraph (b)(ii) by the Competent Tax Authorities regarding whether the tax is discriminatory.  Such bodies may also take into account any conclusions arrived at by the Competent Tax Authorities after the expiry of the six-month period;

(iv)    Under no circumstances shall involvement of the Competent Tax Authorities, beyond the end of the six-month period referred to in subparagraph (b)(ii), lead to a delay of proceedings under Articles 26 and 27.

[. . .]

(7)    For the purposes of this Article:

(a)    The term "Taxation Measure" includes:

(i)    any provision relating to taxes of the domestic law of the Contracting Party or of a political subdivision thereof or a local authority therein; and

(ii)    any provision relating to taxes of any convention for the avoidance of double taxation or of any other international agreement or arrangement by which the Contracting Party is bound.

(b)    There shall be regarded as taxes on income or on capital all taxes imposed on total income, on total capital or on elements of income or of capital, including taxes on gains from the alienation of property, taxes on estates, inheritances and gifts, or substantially similar taxes, taxes on the total amounts of wages or salaries paid by enterprises, as

well as taxes on capital appreciation.

(c) A "Competent Tax Authority" means the competent authority pursuant to a double taxation agreement in force between the Contracting Parties or, when no such agreement is in force, the minister or ministry responsible for taxes or their authorized representatives.

(d) For the avoidance of doubt, the terms "tax provisions" and "taxes" do not include customs duties.

[. . .]

*Article 26*
SETTLEMENT OF DISPUTES BETWEEN AN INVESTOR AND A CONTRACTING PARTY

(1) Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III shall, if possible, be settled amicably.

(2) If such disputes can not be settled according to the provisions of paragraph (1) within a period of three months from the date on which either party to the dispute requested amicable settlement, the Investor party to the dispute may choose to submit it for resolution:

[. . .]

(c) in accordance with the following paragraphs of this Article.

(3) (a) Subject only to subparagraphs (b) and (c), each Contracting Party hereby          gives its unconditional consent to the submission of a dispute to international          arbitration or conciliation in accordance with the provisions of this Article.

[. . .]

(4) In the event that an Investor chooses to submit the dispute for resolution under subparagraph (2)(c), the Investor shall further provide its consent in writing for the dispute to be submitted to:

[. . .]

(b) a sole arbitrator or ad hoc arbitration tribunal established under the Arbitration Rules of the United Nations Commission on International Trade Law (hereinafter referred to as "UNCITRAL");

[. . .]

(6) A tribunal established under paragraph (4) shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law.

[. . .]

(8) The awards of arbitration, which may include an award of interest, shall be final and binding upon the parties to the dispute.  An award of arbitration concerning a measure of a sub-national government or authority of the disputing Contracting Party shall provide that the Contracting Party may pay monetary damages in lieu of any other remedy granted.  Each Contracting Party shall carry out without delay any such award and shall make provision for the effective enforcement in its Area of such awards.

**2.    Vienna Convention on the Law of Treaties**

115.   Relevant provisions of the VCLT are as follows:

*Article 31*
*General rule of interpretation*

1.      A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose

2.      The context for the purpose of the interpretation of a treaty shall comprise, in addition to the text, including its preamble and annexes:

   *(a)*    any agreement relating to the treaty which was made between all the parties in connection with the conclusion of the treaty;

   *(b)*    any instrument which was made by one or more parties in connection with the conclusion of the treaty and accepted by the other parties as an instrument related to the treaty.

3.      There shall be taken into account, together with the context:

   *(a)*    any subsequent agreement between the parties regarding the interpretation of the treaty or the application of its provisions;

   *(b)*    any subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation;

   *(c)*    any relevant rules of international law applicable in the relations between the parties.

4.      A special meaning shall be given to a term if it is established that the parties so intended.

*Article 32*
*Supplementary means of interpretation*

1.      Recourse may be had to supplementary means of interpretation, including the preparatory work of the treaty and the circumstances of its conclusion, in order to confirm the meaning resulting from the application of article 31, or to determine the meaning when the interpretation according to article 31:

   *(a)*    leaves the meaning ambiguous or obscure; or

   *(b)*    leads to a result which is manifestly absurd or unreasonable.

*Article 33*
*Interpretation of treaties authenticated in two or more langauges*

1.      When a treaty has been authenticated in two or more languages, the text is equally authoritative in each language, unless the treaty provides or the parties agree that, in case of divergence, a particular text shall prevail.

2.      A version of the treaty in a language other than one of those in which the text was authenticated shall be considered an authentic text only if the treaty so provides or the parties so agree.

3.      The terms of the treaty are presumed to have the same meaning in each authentic text.

4.      Except where a particular text prevails in accordance with paragraph 1, when a comparison of the authentic texts discloses a difference of meaning which

the application of articles 31 and 32 does not remove, the meaning which best reconciles the texts, having regard to the object and purpose of the treaty, shall be adopted.

116. Where appropriate, provisions of the ILC Articles on State Responsibility and Russian law are set out in relevant parts of the Award. Additionally, where appropriate, the Tribunal cites to decisions of other international courts and tribunals and legal commentaries which the Parties have submitted as relevant sources to consider in deciding the arbitrations.

## VI.   SUMMARY OF WITNESS TESTIMONY

117. In the merits phase of these proceedings, Claimants and Respondent each submitted statements or opinions from 11 witnesses.[11] In all, the Tribunal has reviewed over 1,400 pages of written testimony, as well as thousands of exhibits to the witness statements and opinions.

118. The purpose of the present part of the Award is to provide an overview of the witnesses' evidence. It is not meant to be exhaustive. Rather, it serves as a summary of the vast evidentiary foundation on which the Tribunal has reached its conclusions. Additional references to witness testimony, including specific extracts of their oral examinations, are set out in the relevant portions of the Tribunal's analysis of the evidentiary record.[12]

119. The Tribunal has considered the evidence of those witnesses that were cross-examined, as well as those witnesses who submitted written statements but were not called to the Hearing. With respect to this latter category, the Tribunal has kept in mind that these witnesses were not

---

[11] Having initially submitted statements or opinions from 12 witnesses, on 4 October 2012, shortly before the Hearing on the Merits, Claimants notified the Tribunal that one of their witnesses, the former Prime Minister of the Russian Federation, Mr. Mikhail Kasyanov, had informed them that he would not appear at the Hearing and that, in the circumstances, Claimants would withdraw his witness statement. Mr. Kasyanov's witness statement has been filed on 3 September 2010 and consisted of a two-paragraph confirmation of the contents of the following documents: Transcript of Mr. Kasyanov's Testimony before the Khamovnichesky Court of Moscow in the second criminal case against Messrs. Khodorkovsky and Lebedev, 24 May 2010, Exh. C-440; *Mikhail Borisovich Khodorkovskiy v. The Russian Federation*, ECtHR, Appls. Nos. 5829/04, 11082/06 and 51111/07, Witness Statement of Mr. Kasyanov, 8 July 2009, Exh. C-446; Mikhail Kasyanov, *Without Putin: Political Dialogues with Evgeny Kiselev*, Novaya Gazeta. 2009 (excerpts), Exh. C-574; Video recording and transcript of interview of Mr. Kasyanov on 24 May 2010 after his testimony in the Khamovnichesky Court of Moscow; Video recording and transcript of interview of Mr. Kasyanov on 24 May 2010 at the Press Center, Exh. C-591; Alexander Bekker & Vladimir Fedorin, *Interview: Mikhail Kasyanov, Prime Minister of the Russian Federation*, Vedomosti, 12 January 2004, Exh. C-677. These documents were submitted as independently-numbered exhibits with the Memorial. Respondent's position at the Hearing was that the documents annexed to Mr. Kasyanov's witness statement could not be considered by the Tribunal (Transcript, Day 18 at 19–21). Claimants maintained that the exhibits stood on their own as part of the record in these arbitrations. The Tribunal has decided that while Mr. Kasyanov's witness statement itself was withdrawn and thus no longer forms part of the record, the documents annexed to the statement, which have come into the record as independent exhibits to the Memorial, and include statements made by Mr. Kasyanov prior to these proceedings, continue to form part of the record of these arbitrations.

[12] *See* Part VIII below.

subject to cross-examination.

## A.   CLAIMANTS' WITNESSES

120.   At the Hearing on the Merits, Respondent called 8 of Claimants' 11 witnesses for examination. They were, in the order in which they testified:

      1)   Mr. Jacques Kosciusko-Morizet;
      2)   Mr. Vladimir Dubov;
      3)   Mr. Frank Rieger;
      4)   Dr. Andrei Illarionov;
      5)   Mr. Leonid Nevzlin;
      6)   Mr. Bruce Misamore;
      7)   Mr. Steven Theede; and
      8)   Mr. Brent Kaczmarek CFA.

121.   Claimants' other witnesses, who did not appear for cross-examination, were:

      9)   Mr. Philip Baker QC;
    10)   Mr. Yuri Schmidt; and
    11)   Dr. Sergei Kovalev.

122.   The following summary first addresses the testimony of Claimants' eight witnesses who appeared before the Tribunal, in order of appearance.  It then reviews the evidence from Claimants' three witnesses whom Respondent chose not to cross-examine.

### 1.   Mr. Jacques Kosciusko-Morizet

123.   Mr. Jacques Kosciusko-Morizet[13] was a Member of the Board of Directors of Yukos and the Chairman of the Board's Audit Committee from June 2000 to December 2004.  In his witness statement, Mr. Kosciusko-Morizet describes Mr. Khodorkovsky's plans in the late 1990s "to modernize Yukos and to break the company's ties with the Soviet traditions" through a Western board and consolidation of Yukos' accounts.  According to Mr. Kosciusko-Morizet, the reforms brought success:  Yukos' shares increased in value by 50 percent after it published U.S. Generally Accepted Account Principles ("**U.S. GAAP**") consolidated financial statements in July 2000, and its leadership in transparency and corporate governance brought the verb

---

[13]   Witness Statement of Jacques Kosciusko-Morizet, 3 September 2010 (hereinafter "Kosciusko-Morizet WS") (original in French, translated into English) submitted with Memorial.  Mr. Kosciusko-Morizet appeared for examination (testifying in English) on 15 October 2012, Transcript, Day 4 at 4–235.  References to Mr. Kosciusko-Morizet's testimony appear in Chapters VIII.C (Harrassment, Intimidation and Arrests), VIII.D (The Unwinding of the Yukos–Sibneft Merger) and VIII.H (The Withdrawal of PwC Audit Opinions).

"to Yukosize" into common parlance in Russian business circles.

124. Mr. Kosciusko-Morizet's statement also deals with the relationship with PwC, which he describes as "cordial and close" while he was Chairman of the Audit Committee.  Yukos was one of PwC's major clients; PwC conducted Yukos' external audits and assisted with training Yukos' in-house accountants and with designing and implementing procedures.  Thus, he testifies, "from 1997 to 2004, PwC was given access to the entire documentation of the whole of Yukos without restriction and had a very detailed and global view of the financial situation and the procedures of Yukos and its subsidiaries."[14]

125. After the arrest of Mr. Platon Lebedev in July 2003, Mr. Kosciusko-Morizet chaired a temporary ad hoc committee set up to assess the situation through interviews with individual managers at Yukos and PwC.  He states that Mr. Michael Kubena, a PwC partner, assured the committee that Yukos had always complied with Russian law, including in its tax optimization structure, and that "PwC did not consider that there was any possibility for the Russian authorities to attack Yukos on these issues."[15]  Mr.Kosciusko-Morizet referred to this advice several times during his oral testimony.  Thus, according to Mr. Kosciusko-Morizet, the "late and spectacular volte-face of PwC," including the withdrawal of the certification of Yukos' accounts that took place on 15 June 2007, was "in blatant contradiction" to his relationship with PwC, was "questionable and damaging to [PwC's] reputation," and can only be explained by Respondent's pressure on PwC's Moscow office from December 2006 onwards.

126. Mr. Kosciusko-Morizet appeared before the Tribunal on 15 October 2012.  He was cross-examined about, *inter alia*:   (a) his responsibilities as the Chairman of Yukos' Audit Committee; (b) the relationship between Yukos and PwC including as to disclosures about Behles Petroleum S.A., Baltic Petroleum Trading Limited and South Petroleum Limited (known collectively as the "**BBS Companies**"); (c) the Yukos consolidation perimeter for purposes of U.S. GAAP; (d) the abandoned plans to list Yukos on the New York Stock Exchange ("**NYSE**") due to the Yukos–Sibneft merger; and (e) his knowledge of Yukos' tax optimization structures and the tax assessments against regional Yukos trading entities (in which context he remarked that "[t]rying to minimise tax is good management . . . within the

---

[14]   Kosciusko-Morizet WS ¶ 17.

[15]   Kosciusko-Morizet WS ¶ 24.

legislation applicable.")[16]

127. Mr. Kosciusko-Morizet was also given the opportunity to recount to the Tribunal a story that Mr. Khodorkovsky had conveyed to him in August 2003 about threats from the Russian authorities and their potential impact on Yukos.[17]

### 2.   Mr. Vladimir Dubov

128. Mr. Vladimir Dubov[18] held various senior positions in Bank Menatep and Yukos entities, including on the Yukos Board from 1998 to 1999.  He was elected as a State Duma Deputy in December 1999 (representing a region encompassing Mordovia) and was Chairman of the Tax Sub-Committee of the State Duma from February 2000 to October 2003.  From 1997 he was a shareholder, and then a beneficiary of trusts holding shares in GML Limited ("**GML**") (the parent company of YUL).  He first met Mr. Khodorkovsky in the late 1980s.  In his witness statement, Mr. Dubov makes three key assertions:  (a) Respondent was aware of, and approved Yukos' trading structure and tax optimization scheme; (b) Yukos' trading companies significantly contributed to the social and economic development of the regions in which they operated; and (c) Respondent's tax claims were aimed at appropriating Yukos' assets and removing Mr. Khodorkovsky as a "potential political threat".

129. Mr. Dubov explains in his statement that, given that Yukos' tax payments accounted for approximately four percent of the country's 2003 budget, the company was under "constant supervision and control of the Russian tax authorities."[19]  Before 2003 there was never "any suggestion that Yukos' trading structure was other than in compliance with legal requirements and appropriate."[20]  The authorities were extensively consulted and approved Yukos' practice of operating through trading companies in low-tax regions like the Republic of Mordovia.  Yukos' trading companies significantly contributed to the local economy.  Yukos' trading companies' VAT refunds were also closely monitored.  According to Mr. Dubov, all four major

---

[16]   Transcript, Day 4 at 65.

[17]   *See* paragraph 775 below.

[18]   Witness Statement of Mr. Vladimir Dubov, 8 September 2010 (hereinafter "Dubov WS") (original in Russian, translated into English), submitted with Memorial.  Mr. Dubov appeared for examination (testifying in Russian through English interpretation) on 16 October 2012, Transcript, Day 5 at 2–191.  References to Mr. Dubov's testimony appear in Chapters VIII.A (The Tax Optimization Scheme), VIII.B (The Tax Assessments Starting in December 2003) and VIII.C (Harrassment, Intimidation and Arrests).

[19]   Dubov WS ¶ 11.

[20]   *Ibid.* ¶ 54.

Russian oil companies (Lukoil, Sibneft, TNK, Yukos) engaged in tax optimization.  Their taxes were closely supervised.   Access to pipelines was conditioned on payment of taxes.   This involved liaising with officials and opening up records to inspection.[21]

130.   Mr. Dubov describes how he and Mr. Khodorkovsky became increasingly involved in social and political activities to build a civil society based on "liberal, open and democratic values" and in 2001 co-founded Open Russia to manage and fund projects to foster a "social and liberal ethos."[22]  Mr. Khodorkovsky's funding of political parties openly and legally "put pressure on other political parties to be more transparent."   These efforts "sent shockwaves through the entire Russian political system."[23]

131.   Mr. Dubov expresses "no doubt that the alleged tax claims and the other trumped-up charges brought against Yukos, Khodorkovsky and his associates, were merely a pretext to remove Khodorkovsky as a potential political threat and to destroy Yukos with a view to taking its assets."[24]  According to Mr. Dubov's statement, as the 2004 presidential elections approached, the Administration shifted attention to seizing Yukos' assets.   At a meeting of the Russian Union of Industrialists and Entrepreneurs with President Putin at the Kremlin in February 2003, Mr. Khodorkovsky raised questions about official corruption.   President Putin rebuked him and suggested that Yukos be scrutinized.   At an April 2003 meeting, President Putin approved the Sibneft merger but warned that Mr. Khodorkovsky should restrict his political activities and not finance the Communist Party.   In October 2003, Mr. Khodorkovsky was arrested just before a planned meeting with opposition parties.[25]

132.   Mr. Dubov testifies that, on 27 October 2003, he learned his name had been removed as a Duma candidate.   He was advised to leave Russia and was told by a Kremlin official that President Putin "had gone absolutely berserk over Khodorkovsky."[26]  He left that night and has not returned since.   In January 2004, the financial support of Messrs. Dubov and Nevzlin to an opposition presidential candidate was announced.   The next day, international arrest warrants

---

[21]   *Ibid.* ¶ 42–53.

[22]   *Ibid.* ¶¶ 55, 61.

[23]   *Ibid.* ¶ 64.

[24]   *Ibid.* ¶ 58.

[25]   *Ibid.* ¶¶ 55–64.

[26]   *Ibid.* ¶ 80.

were issued against both men on "entirely unfounded and politically motivated" charges.  They were both found guilty *in absentia*.[27]

133.   Mr. Dubov appeared before the Tribunal for examination on 16 October 2012.  He was cross-examined about his financial interest in the case, being the beneficiary of the Draco Trust, in which had made an initial investment of around USD 10,000 and which now has a seven percent interest in GML.[28]   He was also extensively cross-examined about the extent of disclosures he made to Russian government officials about Yukos' tax scheme in Mordovia and his knowledge and understanding about the Yukos trading entities in the ZATOs and the tax assessments leveled against them.[29]

134.   Mr. Dubov stated his belief, held since he heard about the tax assessments against Yukos in 2004 from media reports, that the tax claims were being used by Respondent as an instrument of confiscation.[30]   When asked by the Tribunal to elaborate on what information at the time led him to that conclusion, he testified:

> I had a personal relationship with the Deputy Head of Staff of the President, Mr. Vladislav Surkov . . . .  [O]n the first business day following Khodorkovsky's arrest, Surkov asked me to come see him in the Kremlin . . . .  He told me that he was asking for my forgiveness . . . .  I had been struck from the list upon petition from the Prosecutor General by the council of the party without leveling any charges against me. . . .  And I remember asking, "What will happen to Yukos?"  And he said—and I am quoting him verbatim; I remember it very well—he said, "Yukos will be taken away from . . . you gentlemen." . . . And I also had a longstanding good relationship with yet another Deputy Head of the Staff of the President who, in late November of that year, told us . . . there would be criminal claims against every single shareholder.  He said that an instruction had been issued to commence criminal cases against us and to take Yukos from us.[31]

### 3.   Mr. Frank Rieger

135.   Mr. Frank Rieger[32] is the former Acting CFO of Yukos, and held various positions with Yukos and its subsidiaries from 2000 until 2006.  He resigned on 26 March 2006, due to the

---

[27]   *Ibid*. ¶¶ 65–72.

[28]   Transcript, Day 5 at 29–36.

[29]   Transcript, Day 5 at 81–84, 101–102, 149–50, 152–54.

[30]   Transcript, Day 5 at 52.

[31]   *Ibid*. at 181–82.

[32]   Witness Statement of Mr. Frank Rieger, 9 September 2010 (hereinafter "Rieger WS") submitted with Memorial.  Mr. Rieger appeared for examination on 17 October 2012, Transcript, Day 6 at 1–235.  References to Mr. Rieger's testimony appear in Chapters VIII.A (The Tax Optimization Scheme), VIII.B (The Tax Assessments Starting in December 2003), VIII.C (Harrassment, Intimidation and Arrests), VIII.E (Attempts to Settle), VIII.G (The Bankruptcy of Yukos) and VIII.H (The Withdrawal of the PwC Audit Opinions).

"deepening crisis surrounding the company and the persecution of its management."  In his witness statement, Mr. Rieger recounts that under Mr. Khodorkovsky's leadership, Yukos acted as a "trail-blazer" in corporate governance in Russia.  When Mr. Rieger joined Yukos in 2000 from Roland Berger Consulting, he was directed by Mr. Khodorkovsky to "apply the same benchmark of Western corporate accountability and responsibility."  Yukos modernized its production process, disclosed the company's shareholding details, and implemented international accounting and reporting procedures.  Mr. Rieger states that Yukos "set a new standard for corporate social responsibility in Russia" but its achievements provoked concern amongst competitors.

136.  According to Mr. Rieger, the Russian authorities targeted and harassed Yukos' auditor, PwC.  Yukos engaged PwC as its external auditor and gave it "unrestricted access" to its "personnel, management, the Board of Directors, books and accounts."  Mr. Rieger's "personal involvement with PwC was extensive."  After PwC employees began to be questioned by the Prosecutor General's Office, PwC ceased to have further contact with Yukos.  Mr. Rieger learned about PwC's withdrawal of its Yukos audits from 1995 to 2004 from the media.  The suggestion that PwC did not have full access to information or that Yukos deliberately withheld information "defies credibility"; PwC raised no such concerns until its June 2007 withdrawal letter ("**PwC's Withdrawal Letter**").

137.  According to Mr. Rieger, Yukos made numerous attempts to settle the alleged tax claims against it, including through negotiations and significant payments.  However, the Russian authorities did not respond to Yukos' various proposals, and refused to provide written confirmation of the payments.  It became clear to Mr. Rieger that "this was a political case, not a tax case, aimed at the destruction and expropriation of the company itself."

138.  Mr. Rieger claims that Respondent conducted a campaign of harassment against Yukos, including illegal raids by armed masked men, searches and seizures of up to 70 percent of the Accounting Department's documents.  In addition, numerous Yukos employees were questioned by the Prosecutor General's Office.  Mr. Rieger himself was detained and interrogated at Moscow's airport in May 2006.

139.  Mr. Rieger appeared before the Tribunal for examination on 17 October 2012.  He was cross-examined about, *inter alia*:  (a) his role at Yukos and understanding of its related entities; (b) Yukos' accounting structure including the extent to which it was designed by PwC; (c) the timing and process of Yukos' identification of assets for payment of taxes; (d) Yukos'

settlement offers, the responses from the Russian authorities and the legal limits within which the authorities were operating; (e) the repayment of the SocGen and Moravel Investments Limited ("**Moravel**") loans, relevant to the bankruptcy; (f) dividend payments via the "Laurel" group of Yukos companies; and (g) his awareness and understanding of tax assessment of Yukos entities in the ZATOs.

140.   Mr. Rieger was also given an opportunity to describe to the Tribunal how in 2006 he was asked a series of questions at the General Prosecutor Office for which the investigator had already prepared his answers, a situation he said he "couldn't believe" had he not experienced it himself.  He refused to sign the pre-prepared answers and gave his own version instead.[33]

### 4.   Dr. Andrei Illarionov

141.   Dr. Andrei Illarionov[34] served as Chief Economic Advisor to President Putin from April 2000 until his resignation in December 2005.  He was also President Putin's personal representative ("sherpa") to the G-8.  He is currently a Senior Fellow at the Cato Institute's Center for Global Liberty and Prosperity in Washington, D.C., as well as the President of the Institute of Economic Analysis in Moscow, which he founded.  Dr. Ilarionov maintains a residence in Moscow and visits approximately five times a year.[35]  In his witness statement, Dr. Illarionov recounts the evolution of Yukos since its establishment by government decree in 1993 following the dissolution of the USSR and the restructuring of the oil industry.  Yukos saw remarkable growth and improvements in performance after its privatization in 1995–96, as a result of substantial investment, the employment of foreign engineers and managers, and the use of Western technology.  Some officials viewed such reforms negatively.  Yukos' public revelation, in 2002, of details of its shareholding, including the structure of GML, "had the effect of an earthquake on the Russian business community."  It contrasted with the traditionally secretive manner of doing business and was viewed as setting a "harmful"

---

[33]   Transcript, Day 6 at 69–70.

[34]   Witness Statement of Dr. Andrei Illarionov, 11 September 2010 (hereinafter "Illarionov WS") submitted with Memorial.  Dr. Illarionov appeared for examination on 18 October 2012, Transcript, Day 7 at 3–176.  References to Dr. Illarionov's testimony appear in Chapters VIII.B (The Tax Assessments Starting in December 2003), VIII.C (Harassment, Intimidation and Arrests) and VIII.F (The Auction of YNG).

[35]   Transcript, Day 7 at 5.

precedent.  In Dr. Illarionov's words, Yukos was "one of the most dangerous enemies for those who did not want to see Russia a free country."[36]

142.  According to Dr. Illarionov, the arrests of Messrs. Khodorkovsky and Lebedev and the dismantlement of Yukos were politically and economically motivated.  Yukos' intended merger with Western oil majors was seen as a national betrayal and a hurdle to expropriation.  Dr. Illarionov describes the 19 February 2003 meeting at the Kremlin between President Putin and business leaders, at which Mr. Khodorkovsky made a presentation on corruption, to which President Putin responded that everyone knew how various assets, including Yukos, were acquired, and told Mr. Khodorkovsky:  "I return the ball in your corner."  The tone of the meeting became "steely and menacing" as if something had gone "really wrong."  It signaled the "gloves [had come] off," and that Mr. Khodorkovsky was no longer tolerated.  From then on, according to Dr. Illarionov, "a case needed to be fabricated to launch the Government attack under the guise of 'legitimate' court proceedings" and a special unit was set up to fabricate evidence against Yukos.  In October 2003, the "dramatic arrest" of Mr. Khodorkovsky at the airport signaled Yukos could be attacked.  Few dared to voice support, and Prime Minister Mikhail Kasyanov, among others, was dismissed for doing so.[37]

143.  Dr. Illarionov's statement further recounts that the campaign against Yukos culminated in the confiscation of YNG.  While it was independently valued at USD 14.7–17.3 billion, the Russian authorities sold YNG for USD 9.3 billion—"a price well below even the most conservative estimates prepared by experts"—on a Sunday, at a forced auction attended by two participants, to an unknown company (Baikal) which was registered at an address above a local bar and had a charter capital of USD 350.  President Putin said he knew the individuals behind the company and they were "well-established in the oil business."  Four days later, Rosneft purchased Baikal with funds from State banks.  According to Dr. Illarionov, the auction "sent shockwaves" and was internationally condemned.  This "scam" was "one of the low points in Russia's recent history."  The dismantling of Yukos was contrary to "basic principles of due process," and led Dr. Illarionov to resign as sherpa in 2004 and as the President's Chief Economic Advisor in December 2005.[38]

144.  Dr. Illarionov appeared before the Tribunal for examination on 18 October 2012.  Respondent

---

[36]    Illarionov WS ¶¶ 5–16.

[37]    Illarionov WS ¶¶ 17–41.

[38]    Illarionov WS ¶¶ 42–52.

sought to undermine his credibility by showing he is now a vocal critic of the Russian Government, and that he has taken extreme positions against climate change regulation.[39] Respondent also challenged his assertion that Yukos' financial statements had complied with U.S. GAAP, on the basis that Dr. Illarionov lacked an understanding of GAAP and had not read Yukos' financial statements in full.   Dr. Illarionov was cross-examined mostly about his claimed knowledge and understanding of the valuation of YNG and the auction process.[40]

145.    The Tribunal asked Dr. Illarionov whether he had ever felt able to discuss with President Putin the arrest of Mr. Khodorkovsky and the measures of the Russian Government in respect of Yukos.[41]   He replied:

> the most important conversation that I had with Mr. Putin was several days after Mr. Khodorkovsky had been arrested . . . .   Mr. Putin has said that Mr. Khodorkovsky has made mistakes and behaved pretty badly . . . .   And for a long time Mr. Putin himself was protecting Mr. Khodorkovsky from these attacks of his friends, of Mr. Putin's friends, but unfortunately Mr. Khodorkovsky continued to behave badly, and not cooperatively... One thing, he said that Mr. Khodorkovsky lied to us because he was in negotiations with American oil company about possible merger. Another issue he has mentioned: that Mr. Khodorkovsky joined Communist Party in preparation to the parliamentary election of year 2003... That is not something that "mi dogovarivalis"—I will try, "we had an agreement on."  So he said . . .
>
> So he said that after protecting Mr Khodorkovsky for some time—now it's almost a quotation—"I decided and I stepped aside to allow Mr Khodorkovsky to solve his problems with the boys by himself." . . . ."so Mr Khodorkovsky has chosen to fight. Okay," said Mr Putin, "if he has chosen to fight, let him to fight and we'll see what will happen."[42]

146.    The Tribunal also asked Dr. Illarionov about the 50-person special unit that, according to paragraph 35 of his statement, was set up at the Russian General Prosecutor's office to work exclusively on "fabricating" evidence against Mr. Khodorkovsky and Yukos and, in particular, whether he could identify the sources on which he relied for that statement.   He could not disclose the identity of his source—due to that individual still residing in Moscow and thus facing "serious risks" but his source was a "very high-placed official in the Russian administration at the time" and was very reliable.[43]   Dr. Illarionov testified that the official had told him that the targeting of Yukos was "a big mistake … but it is a mistake that would be

---

[39]    Transcript, Day 7 at 12–50.

[40]    For further specific references to the transcript, see discussion in Chapter VIII.F at paragraphs 1013 and 1019.

[41]    Transcript, Day 7 at 153 (referring to Illarionov WS ¶¶ 39–41).

[42]    *Ibid.* at 153–56.

[43]    *Ibid.* at 156–57.  Upon further cross-examination, Dr. Illarionov said he had only ever discussed this special unit with his source and with Claimants' lawyers in these arbitrations. *Ibid.* at 164–65.

impossible to stop . . . .  This unit has been created to 'zanyatsa' Khodorkovsky, [meaning to]
'take care of' Khodorkovsky . . . which means one day . . . security services and officers did
receive an order so-called to solve the problem."[44]

147.   Dr. Illarionov elaborated on his assertion, at paragraph 41 of his statement, that Russian Prime
Minister Mikhail Kasyanov had "expressed his disapproval of Mr. Khodorkovsky's arrest and
the mounting attack on Yukos", and explained that after Mr. Khodorkovsky's arrest:

> there was public outrage in mass media . . . .  From the Government ranks, I cannot recall
> any person who would express disapproval of the arrest . . . with the exception of
> Mr. Kasyanov . . . .  And after making such a statement, Mr. Putin publicly made a very
> rude statement that you can find recorded in video . . . that, "I would ask everybody in the
> Government to shut up on Mr. Khodorkovsky's arrest." And it was very clear that this
> comment was addressed to Mr. Kasyanov, and later Mr. Kasyanov . . . [was] removed from
> his position.'[45]

### 5.   Mr. Leonid Nevzlin

148.   Mr. Leonid Nevzlin[46] is a long-standing friend and close business colleague of
Mr. Khodorkovsky.  They first met at a research centre in 1987.  Mr. Nevzlin held various high
level positions in Bank Menatep and Yukos, including as Vice-President of Yukos responsible
for public relations, and as First Deputy Chairman of the Yukos Board of Directors.
Mr Nevzlin helped found Open Russia in 2001.  He also later served as a senator representing
Mordovia until March 2003.  He is a beneficiary of three of the trusts that hold ownership
shares in GML.  He now resides in Israel, working in philanthropy.

149.   In his witness statement of 15 September 2010, Mr. Nevzlin testifies that his support for
democratic causes led the Russian authorities to target him for persecution.  For example, after
he announced his financial support for an opposition presidential candidate in January 2004, the
Prosecutor General's Office brought "entirely unfounded and politically motivated" charges
against him for tax evasion and embezzlement.  "Ludicrous" murder charges were added in

---

[44]   *Ibid.* at 158.

[45]   *Ibid.* at 159–60.

[46]   Witness Statement of Mr. Leonid Nevzlin, 29 August 2010 (hereinafter "Nevzlin WS") (original in Russian, translated
into English), submitted with Memorial.  Mr. Nevzlin appeared for examination on 18 and 19 October 2012 (testifying
in Russian, through English interpretation), Transcript, Day 7 at 176–224 and Day 8 at 1–43.  References to
Mr. Nevzlin's testimony appear in Chapters VIII.C (Harassment, Intimidation and Arrests) and VIII.D (The
Unwinding of the Yukos–Sibneft Merger).

2004 and 2005.  Israel refused to extradite him to Russia but after a "show trial" in 2008, he was sentenced *in absentia* to life imprisonment.[47]

150. Mr. Nevzlin explains that Mr. Khodorkovsky was perceived by the Kremlin as a political threat and a potential presidential candidate.  According to Mr. Nevzlin, the attacks on Yukos were motivated by the objectives "to remove Mr. Khodorkovsky as a potential political threat," "to punish and make an example of" Yukos leaders, and to "expropriate Yukos without compensation."  Mr. Nevzlin received warnings of the attacks on Yukos, including at a meeting with the Media Minister in Spring 2003, who told him that Mr. Khodorkovsky risked losing everything, including his liberty, if he did not immediately stop criticism of President Putin.  He was told that President Putin was "furious" about Mr. Khodorkovsky's media coverage.[48]

151. With regard to the Yukos–Sibneft merger, Mr. Nevzlin testifies that he understood that "everything that happened with Sibneft was approved by President Putin."  At a meeting with Mr. Khodorkovsky, President Putin cautioned against a U.S. oil major acquiring more than 25 percent of YukosSibneft.  The merger was completed in October 2003, but Mr. Abramovich "abruptly changed his mind and sought to unwind the merger" after it "became apparent that Khodorkovsky was being targeted by the Kremlin."   Mr. Nevzlin testifies that shortly after Mr. Khodorkovsky's arrest in October 2003, Mr. Abramovich approached Mr. Nevzlin in Tel Aviv to convey that the Yukos–Sibneft merger could only be preserved if Sibneft was given management of the merged company.  The companies were not integrated and eventually de-merged.[49]

152. Mr. Nevzlin appeared before the Tribunal for examination on 18 and 19 October 2012.  Respondent highlighted his lack of banking experience when he rose to the top of Bank Menatep.  Mr. Nevzlin pointed out that "there had not been any commercial banks in the Soviet Union, and not a single person in the Soviet Union worked in a commercial bank prior to 1988;" and further that "the position of bank president did not mean that [he] in fact was responsible for banking operations; it was a position that was established specifically for someone who engaged in public relations." [50]

---

[47]   Nevzlin WS ¶¶ 14, 22.

[48]   *Ibid.* ¶¶ 22, 28–36.

[49]   *Ibid.* ¶¶ 24–27.

[50]   Transcript, Day 7 at 180–82.

153.   Mr. Nevzlin was cross-examined on his interest in GML, his motives for testifying in these arbitrations, and a recent UK court case relating to individuals involved in the Yukos–Sibneft merger.   He acknowledged that the trusts in which he has beneficial interests (the Pictor Trust, the Southern Cross Trust and the Palmus Trust) hold a total of approximately 67 percent of GML, and thus that he would benefit financially if the outcome of these arbitrations was favourable to Claimants.[51]   Mr. Nevzlin testified that he had not paid anything for his interests in the trusts and confirmed also that Messrs. Brudno, Lebedev and Shakhnovsky had not paid any consideration for their beneficial interests in the Palmus Trust.   Amidst this line of questioning, Mr. Nevzlin pointed out:

> everything I own, just like my partners used to own, was earned through extremely hard work, starting, as you will know from . . . in 1987 . . . .   [V]irtually all the business revenue, except for what was paid to charity or used for personal needs, was reinvested in the business . . . .   So all the money, all the shares that we owned we earned through our titanic—if you will—efforts that had spread over a long period of time.[52]

154.   Mr. Nevzlin confirmed that he knew about the 2004 tax assessments soon after they were issued, but by that point he had "already realised that Putin will not stop, and will take away the company anyway.   So I was not surprised by tax claims in this size and consequent actions by the Russian Federation."   He also confirmed his long-held belief that the tax assessments were improper, as were the  Russian authorities' enforcement actions, claiming:

> Yukos was led into bankruptcy . . .  They [the Russian authorities] did everything in order to prevent Yukos from paying off its debts.   The company was in perfect shape, with a lot of cash, with the best rating in the country, with a good market capitalisation, but it took about two years for Putin and Sechin . . . to destroy this company completely.[53]

When asked whether he had hoped Yukos would prevail and defeat the assessments, he replied that "[t]hose proceedings took place in the Russian Federation, and the outcomes, the decisions were made in the Kremlin.   The decisions were not made in the courtroom . . . .   We are not talking about a democratic country; we are talking about a dictatorship."[54]

155.   Mr. Nevzlin was questioned about why he had waited until 2010, when providing his witness statement in these proceedings, to disclose that in 2003 Mr. Abramovich told him that

---

[51]   *Ibid.* at 187–92, 207.

[52]   *Ibid.* at 196–99.

[53]   *Ibid.* at 209–13.

[54]   *Ibid.* at 217–18.

Mr. Khodorkovsky "had been targeted because of his involvement in politics."[55]  He was also asked why he had not included this evidence in his 6 August 2006 witness statement in the ECtHR proceedings, nor in any of the Russian criminal cases against Mr. Khodorkovsky.  He explained:

> if I had spread the information about Abramovich and Putin fairly broadly, and if it had become available to the public, then from the perspective of Khodorkovsky, who is in Russian prison, I would have damaged him.
>
>  . . . I would have caused him tremendous amounts of harm . . . in the other corner facing him were Putin, Sechin and others; but I also would have turned Abramovich into an enemy of Khodorkovsky's by disclosing this information.
>
>  . . . [A]fter . . . things moved to a second absurd set of charges and a second trial, Khodorkovsky's position changed radically.  He was no longer wary of a political . . . confrontation with Putin's regime because he realised that he was not going to be able to find truth in a Russian court if he tried to defend himself based on the laws.
>
>  . . . Russian courts have no interest in my position:  it would be either ignored or rejected by them . . . .Because it's not a judge who makes decision on Khodorkovsky and Lebedev; the judge just rubber-stamps decisions that are made by investigative committee and Prosecutor's Office . . . .The fact that I trust this court and tell this court a lot more than I've ever said on the matter, this is a typical position for me, because . . . if we're able to defend our interests, that would be either in courts in free countries or international courts.[56]

156.  Mr. Nevzlin was cross-examined about his May 2011 witness statement to the High Court of Justice in England in a case brought by Mr. Berezovsky against Mr. Abramovich.  Mr. Nevzlin was shown the English judge's decision, in which the judge declined to attach significant weight to Mr. Nevzlin's evidence, as she found him to be "tendentious," that he "expressed opinions about matters in respect of which he had no knowledge," and that she had "the impression that Mr. Nevzlin had crafted his evidence to suit Mr. Berezovsky's case."  Mr. Nevzlin observed the judge was "entitled to her opinion" and he "only told her the truth."[57]

### 6.    Mr. Bruce Misamore

157.  Mr. Bruce Misamore[58] was Chief Financial Officer of Yukos and a Member of its Management

---

[55]    Transcript, Day 8 at 4–5, referencing Nevzlin WS ¶ 35.

[56]    *Ibid.* at 17–25

[57]    *Ibid.* at 34, 37, 39–40.  Extract from *Berezovsky v. Abramovich*, 31 August 2012 ¶¶ 485–86, Exh. R-4654.

[58]    Witness Statement of Mr. Bruce Misamore, 28 July 2010 (hereinafter "Misamore WS") submitted with Memorial.  Mr. Misamore appeared for examination on 22 October 2012, Transcript, Day 9 at 1–268.  References to Mr. Misamore's testimony appear in Chapters VIII.A (The Tax Optimization Scheme), VIII.B (The Tax Assessments Starting in December 2003), VIII.C (Harrassment, Intimidation and Arrests), VIII.D (The Unwinding of the Yukos–Sibneft Merger), VIII.E (Attempts to Settle) and VIII.H (The Withdrawal of PwC's Audit Opinions).

Committee from April 2001 to December 2005.  He was a Member of the Executive Committee of the Yukos Board commencing in 2005.  He has 38 years experience in financial and executive roles in the oil industry.  In his witness statement, Mr. Misamore explains that as CFO, he was to ensure that Yukos met international best practices in financial management. He describes how, by 2003, Yukos had become an industry leader in transparency, corporate governance and production and that, "[c]ontemplating significant expansion and growth" Yukos closed its merger with Sibneft on 3 October 2003 and was in talks with Western oil majors.[59]

158.    Mr. Misamore testifies that PwC played an "integral role" in developing Yukos' financial reporting system and was given full access to Yukos' books, accounts, and employees, and was "very knowledgeable about and had full access to Yukos' principal subsidiaries."  He considers PwC's withdrawal of the Yukos audit reports as having been "motivated by the continuing attack . . . on Yukos and persons associated with the company" and that it was "highly questionable professionally."[60]

159.    According to Mr. Misamore, the campaign by the Russian authorities to dismantle Yukos began in earnest in the summer of 2003 with arrests, raids, searches, and seizures.  In July 2003, Russian authorities raided Yukos' Moscow offices "in an incredible scene full of armed, masked officers" and "trawled through [the company's] computer records for approximately 17 hours."  Large volumes of documents and electronic files were seized, with no copies or record left."  In August 2006, "baseless, politically motivated" criminal investigations were announced against Mr. Misamore and others.[61]

160.    According to Mr. Misamore, Russian authorities also interfered with the Yukos–Sibneft merger; Sibneft put the merger "on hold," and refused to negotiate the demerger.[62]  Russian authorities then imposed a series of "huge fabricated tax reassessments" on Yukos "designed to financially cripple the company" and to "serve as a pretext under which the Government broke up the company and expropriated its assets."  Yukos made numerous efforts to negotiate and to pay its tax bills; these were rejected, "stifle[d]," or went unanswered.[63]  He described how on

---

[59]    Misamore WS ¶¶ 22–24.

[60]    *Ibid.* ¶¶ 26–29.

[61]    *Ibid.* ¶¶ 30–33.

[62]    *Ibid.* ¶¶ 36–37.

[63]    *Ibid.* ¶¶ 38–51.

19 December 2004, the Russian authorities held an auction for YNG.  As one of only two bidders, Baikal won the auction, in ten minutes, for USD 9.35 billion.  Baikal was immediately sold to State-owned Rosneft.   In 2007, the court-appointed receiver in the bankruptcy proceedings, Mr. Eduard Rebgun, liquidated the remaining 40 percent of the company in auctions won by State-owned entities at prices well below market value.[64]

161. Mr. Misamore appeared for examination on 22 October 2012.  He was cross-examined on a wide range of issues encompassing, *inter alia*:  (a) the Yukos–Sibneft merger including the dividend payment and the unwinding of the merger; (b) PwC and its role in developing the concepts of golden shares and call options which allowed Yukos to consolidate the financial performance of companies that it did not own, but for which it had call options; (c) Mr. Misamore's knowledge and understanding of Yukos' domestic offshore trading entities and the tax assessments levied against some of them; (d) the responses to the tax assessments and use of proceeds from the sale of Yukos assets; and (e) the creation of two Dutch foundations, namely Stichting Administratiekantoor Yukos International ("**Stichting 1**") and Stichting Administratiekantoor Small World Telecommunication Holdings B.V. ("**Stichting 2**," together with Stichting 1, the "**Stichtings**").

162. The Tribunal also asked Mr. Misamore whether he was aware of any written legal opinion that concluded that Yukos' tax optimization scheme was lawful under Russian law.  He replied that upon receiving the tax assessment in December 2003, Yukos requested opinions from Mr. Sergey Pepeliaev, a tax expert and regular advisor to Yukos, and PwC.  Mr. Misamore stated that "[b]oth of those opinions basically said what Yukos was doing was completely legal," but he could not recall if Yukos' tax structure had received the blessing of a lawyer or an accounting firm in writing prior to December 2003. He added that he "was informed consistently, throughout the entire time [he] was at Yukos, that everything Yukos did with respect to these things was entirely in accordance with Russian law."[65]

### 7.    Mr. Steven Theede

163. Mr. Steven Theede[66] joined Yukos as its Chief Operating Officer in August 2003, after a

---

[64]    *Ibid.* ¶¶ 51–60.

[65]    Transcript, Day 9 at 250–52.

[66]    Witness Statement of Mr. Steven Theede, 26 August 2010 (hereinafter "Theede WS") submitted with Memorial. Mr. Theede appeared for examination on 23 and 24 October 2012, Transcript, Day 10 at 1–133, Day 11 at 1–59. References to Mr. Theede's testimony appear in Chapters VIII.A (The Tax Optimization Scheme), VIII.B (The Tax

30 year career with ConocoPhilips.  From June 2004 until February 2005, he served as CEO of Yukos.  Upon the advice of the U.S. State Department, in November 2004 he decided not to return to Russia.  From May 2005 until resigning in August 2006, Mr. Theede was President of Yukos.  In his witness statement, Mr. Theede testifies that within a few years he saw "one of the largest oil companies in the world . . . managed in accordance with the highest international standards" be "brought to its knees through the orchestrated attacks of the Russian authorities."[67]

164.   Mr. Theede states that he was involved in many attempts by Yukos to discharge or settle its alleged tax liabilities.  While Yukos did not accept the validity of the tax claims, it nonetheless tried to discharge or settle them, only to be prevented from doing so by Respondent.  For instance, in April 2004, Yukos was told to pay USD 3.4 billion within two days, but the next day was prohibited by the Moscow Arbitrazh Court from alienating assets.  This "impossible situation" of demanding that Yukos pay but depriving it of any means to pay, became a pattern that led to "a state of paralysis."[68]

165.   According to Mr. Theede's statement, Yukos made about 80 proposals and communications to various Russian authorities but "all our efforts were in vain."  For example, he states that in July 2004, an offer by Yukos to relinquish its stake in Sibneft to satisfy the alleged debt was ignored.  Yukos retained former Canadian Prime Minister Jean Chrétien to seek a global settlement, but his proposals went unanswered.  Meanwhile, the tax bill kept increasing and Yukos paid taxes nearly equal to its total revenue.  In October 2004, Mr. Theede testifies that Yukos submitted a "full settlement proposal" in the range of USD 21 billion, but negotiations "came to an abrupt end" when Yukos' principal negotiator, Yukos Vice-President Alexander Temerko was advised to leave Russia to avoid arrest.  In December 2004, YNG, Yukos' core asset, was sold for a "grossly undervalued price" of USD 9.35 billion in a "sham auction" to an "unknown company."  After that, there were no more settlement discussions.  Mr. Theede stated that the undervaluation of YNG became obvious when in 2006 Rosneft valued it at approximately USD 80 billion.[69]

---

Assessments Starting in December 2003), VIII.C (Harrassment, Intimidation and Arrests), VIII.D (The Unwinding of the Yukos–Sibneft Merger), VIII.E (Attempts to Settle), VIII.G (The Bankruptcy of Yukos) and VIII.H (The Withdrawal of PwC's Audit Opinions).

[67]   Theede WS ¶¶ 1–9, 36.

[68]   *Ibid.* ¶¶ 10–11, 28.

[69]   *Ibid.* ¶¶ 9, 24–26.

166.  According to Mr. Theede's statement, in March 2006, a consortium of Western banks that had obtained a judgment in England against Yukos filed a bankruptcy petition with the Moscow Arbitrazh Court.  Mr. Theede states that his urgent letter to the Chief Bailiff, requesting that assets be released to satisfy the debt, went unanswered.  He further describes how, in a confidential agreement, Rosneft agreed to purchase Yukos' debt to the consortium upon the initiation of bankruptcy proceedings, which began in March 2006.  Respondent was thus the only creditor of significance.  Mr. Theede testifies that in July 2006, Mr. Rebgun produced a report concluding that Yukos was insolvent, and at the 20 July 2006 creditors' meeting, he recommended Yukos be declared bankrupt.  By contrast, Yukos had submitted a rehabilitation plan in June 2006 (the "**Rehabilitation Plan**"), which valued the company at USD 31 billion, and would have seen Yukos pay its creditors in two years.  The Rehabilitation Plan was not mentioned in Mr. Regbun's report.  Not wanting to lend credibility to a "charade", Mr. Theede did not attend the 20 July 2006 creditors' meeting and, feeling there was nothing more to do to protect the company's assets, he resigned with effect from 1 August 2006.[70]

167.  Mr. Theede appeared before the Tribunal for examination on 23 and 24 October 2012.  Mr. Theede was cross-examined about, *inter alia*:  (a) the 15 April 2004 injunction ("**April 2004 Injunction**") and its effect on Yukos' control over certain assets; (b) Yukos' perception of the tax assessments as politically motivated; (c) the nature, adequacy and legitimacy of various settlement proposals offered by Yukos to pay off its tax debts; (d) the bankruptcy proceedings and proceeds from asset sales; and (e) the establishment of the Stichtings.

168.  Upon cross-examination, Mr. Theede confirmed that, in light of Yukos' strong performance in 2004, "[d]espite the ongoing external pressure," Yukos' Board approved approximately USD 50 million in bonuses.  Mr. Theede himself received a USD 5 million bonus.  The decision to issue bonuses was motivated by Yukos' acute concerns about employee retention and "hiring others was going to be almost impossible, because . . . it was a scary place to be."[71] He recalled the exceptional hire of Mr. Aleksanyan as executive vice-president of Yukos because the bankruptcy administrator, Mr. Rebgun, wanted a Yukos executive in Moscow with whom he could work directly.  Mr. Theede recounted that Mr. Aleksanyan "went and met with Mr. Rebgun and explained to him that we were in a difficult situation but we wanted to cooperate, and we really felt that we could find a way to survive."  Within three days, police

---

[70]   *Ibid.* ¶¶ 29–34.

[71]   Transcript, Day 11 at 14–16, 21–23.

stormed Mr. Aleksanyan's house and he was held in jail without a hearing for three years and only released as a result of a ECtHR ruling.[72]  He died a year later from an illness contracted in jail.

169.   In response to a Tribunal question, Mr. Theede testified that he met with PwC at least quarterly, but he did not recall that the trading companies ever came up in their discussions.  He never asked PwC for a written opinion on the structure of the trading companies, and he "was told that PwC's consulting arm was actually the architect of those structures."  He did not discuss any of the tax reassessments with either Messrs. Kubena or Miller of PwC.[73]

### 8.   Mr. Brent Kaczmarek

170.   Mr. Brent C. Kaczmarek CFA[74] is Managing Director of Navigant Consulting, Inc. and has served as a financial, valuation and damages expert in more than 40 international investment arbitrations.  Mr. Kaczmarek was retained by Claimants as a damages expert to calculate Claimants' losses result from a "series of acts which resulted in the demerger of Yukos Sibneft, the piece-by-piece sale of Yukos' assets, and eventually the destruction of Yukos," which he defines as "the Actions."

171.   Mr. Kaczmarek's two expert reports and oral testimony are summarized in Part XII of the Award.   In essence he concludes that, assuming the underlying tax assessments and all subsequent Actions were violations of the ECT, Claimants should be compensated for the value of their shareholding in a hypothetical Yukos entity (as merged with Sibneft and listed on the NYSE) as at the date of 21 November 2007, as well as any dividends that would have been paid to them up to that point in time, plus interest.  The total amount of damages calculated on this basis would be USD 114.174 billion.  Mr. Kaczmarek relies on a number of techniques in support of this figure, including valuations of Yukos' assets, a Discounted Cash Flow ("**DCF**") analysis, a comparable companies approach and a comparable transactions approach. Mr. Kaczmarek also offers valuations in scenarios where there is no merger with Sibneft and no listing on the NYSE.  He additionally makes assessments of the damages which would be due

---

[72]   *Ibid.* at 38–39.  *See also* Theede WS ¶ 30.

[73]   *Ibid.* at 50–51, 54.

[74]   First Expert Report of Mr. Brent C. Kaczmarek, CFA, 15 September 2010, filed with Memorial (hereinafter "First Kaczmarek Report"); Second Expert Report of Mr. Brent C. Kaczmarek, 15 March 2012, filed with Reply (hereinafter "Second Kaczmarek Report").  Mr. Kaczmarek appeared for examination on 24 October 2012, Transcript, Day 11 at 60–196.  References to Mr. Kaczmarek's testimony appear in Part XII of the Award (The Quantification of Claimants' Damages).

to compensate Yukos were the Tribunal to find that the original tax assessments did not breach the ECT but that the subsequent enforcement of the tax claims did. His damages calculations for the latter scenario range between USD 33 billion and USD 67 billion.

172. Mr. Kaczmarek was cross-examined about (a) revisions he made between his first and second reports; (b) errors made with respect to the crude oil export tariff rate, the mineral extraction tax rate, inflation rates, the use of the U.S. Consumer Price Index, an erroneous conversion of tons to barrels, (c) assumptions about Yukos' borrowing capacity, and (d) various reasonableness tests. The Tribunal also questioned him about the choice of valuation dates.[75]

### 9.    Mr. Philip Baker QC

173. Mr. Philip Baker QC[76] practices at Gray's Inn Tax Chambers in London and is presently a senior research fellow at the University of London. Claimants presented him as an expert on international tax law to counter claims made by Respondent's expert Professor Rosenbloom, regarding the benefits claimed by Hulley and VPL under the Agreement between Cyprus and the Russian Federation for the Avoidance of Double Taxation with Respect to Taxes on Income and Capital, signed on 5 December 1998 ("**Cyprus-Russia DTA**"). For reasons explained in more detail in Chapter IX.B of this Award (on "Unclean Hands"), Mr. Baker disagrees with Professor Rosenbloom's conclusion that the claims to benefit from the Cyprus-Russia DTA were not appropriate, were vitiated by tax treaty abuse and were not justified by the provisions of the DTA.

174. In essence, Mr. Baker firstly maintains that the benefits that Hulley and VPL received under the Cyprus-Russia DTA are consistent with its purpose. Secondly, Mr. Baker opines that the abuse of law doctrine is found in the domestic law of certain countries, but is not universal and, where it applies, it is for that domestic jurisdiction to resolve whether the doctrine applies to international obligations such as double taxation conventions. Thirdly, Mr. Baker maintains that Hulley and VPL were the beneficial owners of the dividends received from Yukos in the sense of Article 10 of the Cyprus-Russia DTA. Hulley and VPL were acknowledged investment companies holding shares in Russian companies and did not have a permanent

---

[75]    Transcript, Day 11at 192–93.

[76]    Expert Report of Mr. Philip Baker QC, 14 March 2012, filed with Reply. Initially Mr. Baker was expected to appear before the Tribunal, but on 4 October 2012, Respondent informed the Tribunal it no longer wished to cross-examine him. References to his report appear in Chapter IX.B (Unclean Hands).

establishment in Russia under Article 10(4).

### 10.    Mr. Yuri Schmidt

175.   Mr. Yuri Schmidt[77] was Mr. Khodorkovsky's defense lawyer in his 2004 and 2007 criminal trials, prior to which Mr. Schmidt had no previous dealings with Mr. Khodorkovsky or with Yukos.  In his witness statement, Mr. Schmidt recounts that Russian authorities systematically intimidated and harassed Yukos' lawyers and personnel.  Illegal and aggressive raids and seizures were "meticulously calculated to correspond to the critical stages in the dismantlement of Yukos."  Russian authorities also engaged in physical attacks and other provocation, including long and abusive interrogations and beatings.  In February 2007, defense lawyers were illegally and invasively searched at the airport while en route to visit Mr. Khodorkovsky in Siberia.  Russian authorities also (unsuccessfully) brought libel proceedings against and attempted to disbar Mr. Schmidt.  Respondent chose not to call him for cross-examination.

176.   Mr. Schmidt testifies that in the criminal cases against Messrs. Khodorkovsky and Lebedev, Russian authorities violated basic standards of due process and fair trial.  In 50 years of legal practice in Russia, Mr. Schmidt had "never seen breaches of due process so flagrant and so egregious," nor had he ever, even in the "darkest hours of the Soviet regime," "seen the Russian State undertake such coordinated, systematic and intense efforts, and deploy such huge resources, against a person accused of an alleged economic offense."  The raids resulted in the "massive confiscation" of documents that were not returned.  In December 2006, the defendants were transferred to a "pre-trial detention isolator" in Chita and Siberia.  Mr. Schmidt recounts that during the trials, seized documents were presented out of context; the defendants sat in metal and glass cages that were equipped with hidden microphones; criminal charges were brought against defense witnesses; and prosecution motions were systematically granted, while defense motions were refused.

177.   According to Mr. Schmidt, the goal of destroying Yukos and confiscating its assets was carried out by the coordinated actions of all branches of the Russian State.  The judiciary blocked Mr. Khodorkovsky's registration of candidacy for the 2005 parliamentary elections by accelerating his appeal.  The administration transferred Messrs. Khodorkovsky and Lebedev to

---

[77]    Witness Statement of Mr. Yuri Schmidt, 6 September 2010 (hereinafter "Schmidt WS") (original in Russian, translated into English), submitted with Memorial.  References to Mr. Schmidt's testimony appear in Chapter VIII.C (Harassment, Intimidation and Arrests).

the "most inaccessible penal colonies in Russia," "in blatant violation of Russian law."  The legislature amended legislation to permit the transfer and amended the law on NGOs to force the closure of Open Russia.

**11.    Dr. Sergei Kovalev**

178.  Dr. Sergei Kovalev[78] is a Russian human rights activist, former politician, Soviet dissident and political prisoner.  From 1993 to 2003 he served as an elected State Duma Deputy.  He has been nominated for the Nobel Peace Prize.  Dr. Kovalev's expert opinion is on the independence of the Russian judiciary in cases with a political element or representing a particular interest to Russian authorities.  Dr. Kovalev concludes that the Russian judicial system was not, and is still not, independent.  According to Dr. Kovalev, where cases implicate the interests of the State, trials are political and decisions dictated by extralegal motives.  There exists "absolute submission of the Russian judiciary to the executive power."  Respondent did not call him for cross-examination.

179.  Dr. Kovalev opines that the normative regulation of the Russian judiciary ensures its dependence, including through the role of the executive branch of government in the appointment of judges.  Court Presidents have "excessive powers," courts are under-funded, judges earn bonuses for "exemplary behavior" (as defined by the regime), and disciplinary action is taken against disobedient judges.

180.  Dr. Kovalev's answer to the question of whether the Russian judiciary was independent of the executive branch in the Yukos and Khodorkovsky/Lebedev cases, is "unequivocal and definitely negative," because of the "clearly political nature" of the cases.  The political motive was "to dispose of Mikhail Khodorkovsky," whom the Putin administration saw as an "unmistakable political opponent."  According to Dr. Kovalev, the attacks on Yukos also had economic motives, as evidenced by President Putin's vouching for the unknown last minute purchasers of YNG.  Pressure (including the imprisonment of Yukos lawyer Vasiliy Aleksanyan) was exerted on other Yukos associates to obtain testimony.  Dr. Kovalev lists "egregious due process violations" against Messrs. Khodorkovsky and Lebedev, including: (a) a pretrial investigation that was conducted without the defendants' participation; (b) the

---

[78]    Expert Report of Dr. Sergei Kovalev, 2 September 2010 (hereinafter "Kovalev Report") (original in Russian, translated into English), submitted with Memorial.  References to Dr. Kovalev's testimony appear in Chapter VIII.C (Harassment, Intimidation and Arrests).

dismissal by the Court of every defense petition; and (c) the refusal by the Court to allow the defense attorneys to question Prosecution expert witnesses.

**B.    RESPONDENT'S WITNESSES**

181.   Respondent submitted no testimony from fact witnesses.   Respondent submitted 11 expert opinions.   At the Hearing on the Merits, Claimants chose to cross-examine only:[79]

    1)   Professor James Dow PhD; and
    2)   Mr. Oleg Y. Konnov

182.   Respondent's other witnesses, who did not appear for cross-examination, were:

    3)   Professor Reinier Kraakman;
    4)   Professor H. David Rosenbloom;
    5)   Professor Thomas Z. Lys PhD;
    6)   Ms. Felicity Cullen QC;
    7)   Mr. Dale Hart;
    8)   Mr. Polyvios G. Polyviou;
    9)   Mr. John Ellison FCA;
    10)  Mr. Raymond Gross CPA; and
    11)  Professor Dr. Albert Jan van den Berg

183.   The following summary first addresses the testimony of Respondent's two witnesses who appeared before the Tribunal, in order of appearance.   It then reviews the evidence from Respondent's nine witnesses whom Claimants chose not to cross-examine as well as the evidence provided by Professor Stef van Weeghel during the jurisdictional phase of this case.

**1.    Professor James Dow**

184.   Professor James Dow[80] is Professor of Finance at London Business School, where he has taught valuation since 1989.   He has a PhD from Princeton University and economics degrees from Cambridge University.   Professor Dow was retained by Respondent as a damages expert to respond to the reports of Claimants' expert, Mr. Kaczmarek.

---

[79]    Initially, Claimants intended to also cross-examine Professor H. David Rosenbloom.  However, they decided not to after Respondent, shortly before the Hearing on the Merits, advised that it did not wish to cross-examine Claimants' international tax law expert, Mr. Philip Baker QC.

[80]    First Expert Report of Professor James Dow, 1 April 2011, filed with Respondent's Counter Memorial, Second Expert Report of Professor James Dow, 15 August 2012, filed with Rejoinder.  Professor Dow appeared for examination on 25 October 2012, Transcript, Day 12 at 1–202.  References to Professor Dow's testimony appear in Part XII (The Quantification of Claimants' Damages).

185.   Professor Dow's two expert reports and oral testimony are summarized in Part XII of the Award. Professor Dow acknowledges focusing on "explaining why the Kaczmarek Report is not useful for calculating damages in this matter." His reports contain no alternative valuation of his own. He basically describes a series of flaws in the analysis of Mr. Kaczmarek, highlighting his choice of a valuation date which, he says, is arbitrary and unjustifiably inflates damages. He also criticizes Mr. Kaczmarek for ignoring causation and the extent to which Yukos' own actions might have contributed to the loss. Professor Dow identifies a number of errors in Claimants' DCF analysis and questions the way in which Mr. Kaczmarek sought to correct them without impacting the ultimate valuation. He also articulates problems with Claimants' comparable companies method and the assumptions underlying the "alternative collection scenarios" whereby Claimants would have been given an opportunity to make arrangements to pay off legitimate tax assessments. He identifies some "obvious and significant errors" relating to the application of the inflation rate, the export duty rate and the mineral extract tax rate. He also criticizes any valuation based on an American Depository Receipt ("**ADR**") listing on the NYSE as too speculative. Professor Dow was cross-examined about these issues.

186.   At the Hearing, Professor Dow testified that he would be prepared to put some weight on Mr. Kaczmarek's analysis for YNG with corrections (USD 17.1 billion for the comparable companies approach and USD 17.2 billion for the comparable transactions approach); which represented a "reasonable stab".[81] Professor Dow was asked if his corrected figures for Yukos and YukosSibneft valuations resulting from the comparable companies analysis (of USD 67.8 billion and US 93.7 billion respectively) could provide "a valid result in terms of valuation in the same manner as for YNG," to which he answered that: "They are not presented in that context, but I think I'd have to agree that they could be a useful valuation, yes."[82] He qualified this answer by noting he had not done enough analysis, for example by accounting for changes in oil prices. Claimants' counsel also challenged Professor Dow on his criticisms of Claimants' comparable companies approach. With respect to the proper valuation date, from an economic standpoint, he considered that the end of 2004 was the appropriate valuation date, since that is when the loss of value in Yukos had taken place and the market thought, based on the share price, that the company's fortunes had no chance of being reversed. Professor Dow opined that

---

[81]   Transcript, Day 12 at 47.

[82]   Transcript, Day 12 at 47–48.

"it's indisputable that there was no value by the end of 2004.[83]  By the end of 2004, Yukos' share price had plummeted, it was a penny stock, and in the three years that followed there was no recovery in the share price."[84]

### 2.    Mr. Oleg Y. Konnov

187. Mr. Oleg Y. Konnov[85] is a partner at Herbert Smith LLP and head of its Russian tax group based in Moscow.  He has practiced tax law for 17 years and taught at the Law Faculty of Moscow State University.   Respondent retained him as an expert on Russian tax law. Mr. Konnov was the only Russian tax lawyer who appeared as a witness before the Tribunal. Extensive extracts from his testimony are set out in the Analysis portion of the Award, especially the chapters dealing with Yukos' tax optimization scheme and the tax assessments. Accordingly, his testimony is not reproduced here in any detail.

188. His first expert report describes the tax optimization scheme adopted by Yukos using domestic offshore companies and sets out some basic principles of the Russian federal tax legislation at the relevant times.  He then addresses seven specific questions.

189. The first question is whether the tax authorities acted in accordance with applicable law and practice when assessing profit tax on Yukos with respect to sales by the domestic offshore companies.  Mr. Konnov answers affirmatively and opines that the actions of the Russian tax authorities against Yukos were consistent with pronouncements by Russian courts on the "anti-abuse doctrine", which according to Mr. Konnov, was "accepted and consistently applied" by Russian courts before and after the Yukos tax cases.[86]

190. The second question is whether Yukos was automatically entitled to a zero percent VAT rate in connection with exports declared by domestic offshore companies.  Mr. Konnov answers no, because the application of a zero percent VAT rate was "strictly conditioned" on the taxpayer's

---

[83]    *Ibid.* at 176.

[84]    *Ibid.* at 47.

[85]    Mr. Konnov submitted two expert reports for these proceedings.  First Expert Report of Mr. Oleg Konnov, 4 April 2011 (hereinafter "First Konnov Report"); Second Expert Report of Mr. Oleg Konnov, 15 August 2012 (hereinafter "Second Konnov Report").  Mr. Konnov appeared for examination on 29–31 October 2012; Transcript, Day 13 at 1– 257; Day 14 at 1–261; Day 15 at 1–256.  References to Mr. Konnov's testimony appear Chapters VIII.A (The Tax Optimization Scheme), VIII.B (The Tax Assessments Starting in December 2003), VIII.E (Attempts to Settle) and VIII.F (The Auction of YNG).

[86]    First Konnov Report ¶¶ 31–52.

filing of a "special" zero percent monthly VAT return.  According to Mr. Konnov, Yukos should have complied with the specific procedures because the courts and the tax authorities established that Yukos was "the actual owner and exporter of goods."[87]

191.   The third question is whether Yukos had disclosed to the Russian tax authorities prior to the commencement of the 2003 tax audit its tax minimization practices involving the use of domestic offshore companies registered in domestic low-tax jurisdictions.  Mr. Konnov saw nothing in the record indicating that Yukos "made any significant disclosure of its tax scheme," but even so, illegal tax practices may not be legitimized through a tax offender's disclosure.[88]

192.   The fourth question is whether the Russian Tax Ministry complied with applicable law in appointing and conducting a tax audit of Yukos in December 2003.  Mr. Konnov answers affirmatively.[89]

193.   The fifth question is whether the Russian tax authorities and courts complied with applicable law in imposing fines on Yukos.  Mr. Konnov explains that the base fine under Russian tax law is 20 percent, which can be increased to 40 percent if non-payment results from the willful acts of a taxpayer, which in turn may be doubled for repeat offenders.  Mr. Konnov concludes that the imposition of fines on Yukos was justified and accorded with prevailing court practice.[90]

194.   The sixth question concerns actions that Yukos could have taken after receiving the 2000 Tax Audit Report in December 2003 to reduce its tax liability.  Mr. Konnov explains that Yukos could have:  (a) voluntarily paid all tax arrears and accrued interest and reserved cash for fines; (b) filed amended tax returns, and paid tax and interest due for 2001–2003; (c) complied with the legal requirements for claiming the zero percent VAT rate; and (d) discontinued as of 1 January 2004 the use of domestic offshore companies.[91]

195.   The seventh question is whether the tax treatment of YNG changed after its sale to Rosneft.  Mr. Konnov concludes that the treatment of YNG before and after its sale to Rosneft "was

---

[87]   *Ibid.* ¶ 53–59.

[88]   *Ibid.* ¶¶ 59–64.

[89]   *Ibid.* ¶¶ 65–70.

[90]   *Ibid.* ¶¶ 71–82.

[91]   *Ibid.* ¶¶ 83–85.

consistent with then current practice of the Russian tax authorities and courts, and does not suggest any irregularity."[92]

196. Mr. Konnov's second report responds to alleged misstatements of Russian tax law found in the Reply, including with respect to the "anti-abuse doctrine" under Russian tax law,[93] "re-attribution," and the "bad-faith taxpayer" doctrine.[94]   Mr. Konnov also addresses Claimants' arguments about proportionality between tax benefits claimed and investments made in the low-tax regions, Yukos' awareness that its tax optimization scheme was not fully compliant with the law, the application of the Law of the Russian Federation governing Value Added Tax ("**VAT Law**"), and fines on Yukos.[95]

197. Mr. Konnov appeared before the Tribunal for examination on 29, 30 and 31 October 2012.  He was cross-examined on a range of documents from the record, legal authorities and their application to Yukos and its domestic offshore companies.  Issues canvassed in the cross-examination included, *inter alia*:  (a) the factual record underlying his views expressed about alleged improprieties in Yukos' domestic offshore companies; (b) whether oil products must be physically stored or moved from the premises of trading companies; (c) the re-attribution theory applied to Yukos and the existence of legal precedents for the theory at the relevant time; (d) provisions in the regional tax legislation in Mordovia and elsewhere; (e) the investment agreements concluded between the domestic offshore trading companies and Mordovian authorities; (f) the existence of the anti-abuse doctrine at relevant times; (g) fines and penalties; (h) prior audits conducted by local and regional authorities on Yukos' domestic offshore trading companies and the extent to which they demonstrate familiarity with and tolerance of the tax optimization scheme; (i) audit inspection practices; (j) the meaning of "interrelatedness" in the context of Russian tax legislation; (k) the consequences of the reattribution theory on entitlement to VAT refunds and the formalities required to enjoy VAT exemption; (l) the evolution of the ZATO tax laws and certain internal memoranda within ZATO tax inspectorates; and (m) timing for enforcement of tax assessments.[96]

---

[92]   *Ibid.* ¶¶ 89–92.

[93]   Second Konnov Report, ¶¶ 7–17.

[94]   *Ibid.* ¶ 26–41.

[95]   *Ibid.* ¶¶ 84–121.

[96]   Transcript, Day 13 at 49–52, 70–80, 114–20, 151–52; Transcript, Day 14 at 61–68.

198. Mr. Konnov also answered questions from the Tribunal, including about the principle of resolving doubts in favor of the taxpayer.[97]  He was asked why, in the interests of justice the Russian courts did not treat the filings for VAT by the trading companies as filings by Yukos.[98] When he emphasized the formalities required for filing for VAT, he was further asked whether the trustee in bankruptcy (Mr Rebgun), who was charged with maximizing the resources available for creditors, himself could have filed the monthly forms for VAT return. Mr. Konnov answered that he could have done so, subject to the three-year limitation period, *i.e.*, he could have re-filed for the three years preceding his appointment as trustee.[99]  The Tribunal also asked Mr. Konnov how the tax authorities determine the motivation of a taxpayer in making use of a low-tax region and about his experience in advising clients with respect to tax minimization.[100]

199. Mr. Konnov was asked about a comment made by him as an expert witness in the *RosInvestCo UK Ltd. v. The Russian Federation* arbitration ("***RosInvestCo***"), to the effect that "sometimes Russian courts [do not] have an excellent reputation."  Mr. Konnov responded that he had not come across corruption or irregularities in tax cases.[101]  He was invited to share his views on the tax evasion aspects of the convictions of Messrs. Khodorkovsky and Lebedev.  The parts of the judgment dealing with tax elements of the ZATOs and issues of personal income tax avoidance seemed to him to make sense, but he could not comment on other parts of the judgment.[102]

### 3.    Professor Reinier Kraakman

200. Professor Reinier Kraakman[103] is a Harvard law professor specializing in comparative corporate law and governance.  Claimants chose not to call him for cross-examination.  His expert report concerns the activities of Bank Menatep, Mikhail Khodorkovsky and his "tight-knit group of confederates" (the "**Khodorkovsky Group**"), Yukos Oil Company, and Yukos' subsidiaries

---

[97]    Transcript, Day 15 at 37–42 (Dr. Poncet referring to the principle *in dubio contra fiscum*).

[98]    *Ibid.* at 232.

[99]    *Ibid.* at 234–35.

[100]   *Ibid.* at 237–41.

[101]   *Ibid.* at 251–56.  Referring to the case of *RosInvestCo UK Ltd. v. The Russian Federation*, SCC Arbitration V (079/2005), Final Award, 12 September 2010, Exh. C-1049 (hereinafter "*RosInvestCo*").

[102]   *Ibid.* at 249–55.

[103]   Expert Report of Professor Reinier Kraakman, 1 April 2011, filed with Counter-Memorial.  References to his expert report appear in Chapter IX.B (Unlean Hands).

from the period 1995–1999. He addresses provisions of the Russian Civil Law, Joint Stock Company Law ("**JSC Law**") and privatization law.

201. Professor Kraakman maintains that Mr. Khodorkovsky, his Group, and Bank Menatep acted in bad faith and "probably illegally" in violation of the spirit and letter of Presidential Decree No. 889, which was the legal foundation of the Loans-For-Shares ("**LFS**") Program. At stake in the initial auction of Yukos shares in December 1996 were (i) the right to lend funds to the Russian Federation secured by a pledge of 45 percent of Yukos stock, and (ii) the right to purchase a block of 33 percent of Yukos Stock in a so-called "Investment Tender". Bank Menatep held shares pledged by the State and sold those shares to their close affiliates, a "tactic" that "allowed the Khodorkovsky Group to gain title to the pledged shares while avoiding Bank Menatep's agency duty to maximize their value," thus violating "the intent of Decree 889, while making a gesture toward formal compliance."

202. According to Professor Kraakman, secondary sources, and some primary documentation, support "a reasonable inference" that, prior to the Russian Federation's sovereign debt crisis in late 1998, the Khodorkovsky Group systematically skimmed revenue from Yukos' partially-held operating subsidiaries—YNG, Samarneftegaz, and Tomskneft—in bad faith and in violation of the JSC Law's regulations on self-dealing transactions. Circumstantial evidence indicates that the Khodorkovsky Group skimmed revenue directly from Yukos from mid-1996 until 1999, and transferred it to offshore companies around the world that were controlled or beneficially owned by members of the Khodorkovsky Group.

203. He testifies that following the Russian sovereign debt crisis, Yukos and the Khodorkovsky Group largely succeeded in squeezing out minority shareholders from Yukos' operating subsidiaries. Yukos managed this by committing serious violations of the provisions in the JSC Law intended to protect minority shareholders. Yukos exhibited egregious bad faith by blocking minority shareholders from participating in extraordinary shareholders meetings called in March 1999. He claims: "As a professor of corporate law with a particular interest in the JSC Law, I have never read—or read about—anything more chilling in a professional sense than the documents and manipulative behavior surrounding the March 1999 EGMs [Extraordinary General Meetings] held for YNG, Samareneftegaz, and Tomskneft." In Professor Kraakman's opinion, Yukos and the Khodorkovsky Group opportunistically devalued Yukos shares, which Bank Menatep—the Group's financial arm—had previously pledged to Western banks in order to finance Yukos' efforts to gain control of Tomskneft.

### 4. Professor H. David Rosenbloom

204.   Professor H. David Rosenbloom[104] is a practicing attorney, a consultant and NYU law professor specializing in international taxation.  He has worked for the U.S. Government on international tax matters.  Respondent retained him as an international tax law expert.  He opines on the appropriateness of the actions from 2000–2003 by four Cypriot entities—Hulley, VPL, Dunsley Limited, and Nassaubridge Management Limited—in claiming a reduced Russian Federation tax on dividends paid by Yukos and affiliates, under the Cyprus-Russia DTA.

205.   Professor Rosenbloom concludes that each of the four entities is a "paper entity", with "total control" and "ultimate ownership" exercised by Russian individuals operating solely within Russia and enjoying all economic benefits.  According to Professor Rosenbloom, the invocation of the Cyprus-Russia DTA under these circumstances was a "blatant example of tax treaty abuse."  Professor Rosenbloom refers to pervasive recognition of the international "abuse of law" doctrine, to the OECD Commentaries (the DTA follows the OECD Model), and to the VCLT to assert that:  (a) taxpayers must act in good faith to benefit from an income tax treaty; and (b) the employment of entities in one State party to a tax treaty exclusively to reduce taxes otherwise applicable under the laws of the other State party constitutes tax treaty abuse.

206.   For reasons described in more detail in Chapter IX.B (on "Unclean Hands"), Professor Rosenbloom concludes that the benefits claimed were not justified by Article 10 of the Cyprus-Russia DTA, which limits the tax charged by one State on dividends paid from a company in that State to beneficial owners of the stock resident in the other State, provided they do not operate through a "permanent establishment" in the first State, to which the dividends are attributable.  Firstly, he opines, the Cypriot entities were not beneficial owners of the dividends received on Yukos shares, and the beneficial owners were not residents of Cyprus.  Secondly, in his view, the entities were not eligible for the claimed benefits because they operated through permanent establishments in the Russian Federation, to which the dividends were attributable.  In sum, according to Professor Rosenbloom, the claims under the Cyprus-Russia DTA on behalf of the Cypriot entities were unjustified.  They were not only abusive, but without merit.

---

[104]   First Expert Report of Professor H. David Rosenbloom, 1 April 2011, filed with Counter-Memorial, Second Expert Report of Professor H. David Rosenbloom, 15 August 2012, filed with Rejoinder.  Initially Claimants intended to cross-examine Professor Rosenbloom, but decided not to after Respondent advised it would not be cross-examining Mr. Philip Baker QC.  References to Professor Rosenbloom's reports appear in Chapter IX.B (Unclean Hands).

207.  In his second expert report, Professor Rosenbloom replies to the opinion of Claimants' tax law expert, Mr. Baker, which he describes as "long on law and history" but "short, very short, on the facts."  The facts here, according to Professor Rosenbloom, involve Russian nationals and residents earning Russian source income and claiming a treaty-based reduction of normal Russian tax by reason of a "wafer-thin Cypriot corporate veneer managed from Russian soil." Neither the DTA nor any other income tax treaty would condone such a structure and no rational country would endorse it as sound policy.  Professor Rosenbloom then sets out in further detail facts pertaining to several Yukos-related entities which inappropriately claimed benefits under the Cyprus-Russia DTA.

208.  Professor Rosenbloom opines that the primary purpose of a tax treaty is to eliminate or at least mitigate international double taxation and none of the authorities in Mr. Baker's report deal with a country using treaties to reduce tax on its own residents but rather discuss third-country investors.  Interpreting the Cyprus-Russia DTA as an instrument to attract foreign direct investment into Russia without regard to tax revenue loss exceeds the limited scope of OECD-based treaties and undermines the purpose of tax avoidance and evasion.  Professor Rosenbloom also accuses Mr. Baker of failing to differentiate between treaty shopping and "round tripping".  Russia's inaction to insist on strict limitation on benefit or its failure to terminate the Cyprus-Russia DTA does not establish Russia's endorsement of round tripping.

209.  Finally, Professor Rosenbloom refers to documents provided after the filing of his first report, which he says confirm that neither Hulley nor VPL beneficially owned dividends received from Yukos.  Even if Hulley and VPL were considered beneficial owners of the Yukos dividends on the transferred shares, the related-party "repos" or stock-lending agreements, which had no purpose other than to enable claims of treaty benefits, are an improper use of the DTA.

210.  According to Professor Rosenbloom, even if the Yukos structure and transactions with the Cypriot entities were not abusive, dividend distributions by Yukos and its affiliates to Hulley, VPL and the other Cypriot entities did not qualify under the DTA for reduced tax in Russia since they should have been taxed as "business profits" under Article 10(4) of the DTA.  The facts also confirm that all the Laurel subsidiaries had permanent establishments in Russia to which the dividends received from their Russian subsidiaries were attributable.  According to Professor Rosenbloom, it is not necessary to adopt a complicated "economic substance" or "substance-over-form" analysis to see that the Yukos structure cannot be defended as within the scope of the Cyprus-Russia DTA or legitimate tax planning.  Had Mr. Baker and Claimants "focused on the facts presented" they could not reasonably have come to any other conclusion.

- 84 -

5.      Professor Thomas Z. Lys

211.   Professor Thomas Lys[105] is a professor of accounting at Kellogg School of Management, Northwestern University in Chicago.  He has a PhD in accounting and finance from the University of Rochester and an economics degree from the University of Berne, Switzerland.  He has served as a consultant to several companies.  He was retained by Respondent to expound in detail various financial transactions and operations of Yukos.  Claimants chose not to call him for cross-examination.  The appendices attached to Professor Lys' Reports were used at various times throughout the Hearing to help illustrate Yukos' structure and activities.

212.   Professor Lys recounts Yukos' incorporation in 1993, privatization in 1995 and public sale of shares in 1996.  He describes Yukos' structure and activities and the role of the various producing subsidiaries, trading entities and off-shore entities, and the structure and flow of funds originating in the trading companies into "offshore and Yukos entities."

213.   Professor Lys explains that starting in 1999, the majority of Yukos shares were owned by subsidiaries of GML, an entity whose major interest was held by Mr. Khodorkovsky, the CEO and Chairman of the Executive Committee of the Board of Directors of Yukos.  Other shareholders of GML also had senior management positions in Yukos.  In several instances, shares of Yukos stock were transferred between various entities under the control of GML.  Many such transactions placed the Yukos shares temporarily, sometimes for less than a week, under nominal ownership of Cypriot entities on dates that established record ownership for purposes of Yukos dividend distributions, apparently in an effort to reduce Russian taxes on these dividends.  YUL was a wholly-owned subsidiary of GML.  Hulley was a wholly-owned subsidiary of YUL.  Although VPL did not fall under the ownership structure of GML, it was a subsidiary of the Veteran Petroleum Trust (a Jersey trust), of which YUL controlled at least three quarters of the voting rights.

214.   Professor Lys describes and details how there were hundreds of transactions of Yukos shares among the above-described entities and their affiliates; in some instances multiple transactions occurred on a single day.  Many appear to Professor Lys to "have been structured to place Yukos shares temporarily in the hands of Hulley and a specific account held in the name of VPL, both of which are Cypriot entities, as of the record dates of Yukos dividend payments."

---

[105]   First Expert Report of Thomas Z. Lys, 1 April 2011, filed with Counter-Memorial, Supplemental Expert Report of Professor Thomas Z. Lys, 15 August 2012, filed with Rejoinder.  References to Professor Lys' Reports appear in Chapters VIII.A (The Tax Optimization Scheme) and X.E (Contributory Fault).

He states that "they appear to have been performed to allow the Cypriot entities to claim beneficial ownership of these shares to reduce the Russian withholding taxes on the dividends Yukos paid on these shares, pursuant to the [Cyprus-Russia DTA]." Given their timing, Professor Lys sees no apparent business purpose for these transactions.

215. Professor Lys also describes Yukos' dividend flows through YUL, Hulley, VPL, and GML. He concludes that YUL, and its beneficiary GML, not only received the economic benefit of the dividends paid on the Yukos shares owned by Hulley, but also received the benefit of the gains Hulley reported from the sales of Yukos shares to YUL. In other words, the profits earned on those sales were effectively "returned" through the dividend. YUL (and GML) were also the beneficiaries of dividends paid on Yukos shares owned by VPL.

216. Professor Lys describes how from 2000 to 2003, groups of Yukos-related entities "moved funds in a common pattern from Russia's low-tax regions out of Russia, into off-shore entities." He details the flow structures of profits through the Fargoil and Ratibor structures. He sets out the Mega Alyans flow structure, showing the ultimate ownership of trading entities by Laurel, a BVI entity, and its sole shareholder, Stephen Curtis. He describes how Yukos had a call option to acquire all of Mr. Curtis' Laurel shares for one rouble.

217. He also details the flow structures in 2000–2001 of the trading companies registered in the ZATOs of Lesnoy and Trekhgorny (Business-Oil, Flander, Forest-Oil, Greis, Kolkrein, Kverkus, Mitra, Muscron, Nortkes, and Vald Oil). He explains how the Lesnoy and Trekgorny trading companies passed funds through two Russian entities—Neftetrade and Neftemarket—to a number of Cypriot companies, which in turn passed the funds on through Laurel to Halsley and Belmont, two BVI entities owned by Brill.

218. Finally, Professor Lys describes loans made by and to Yukos Capital (incorporated in Luxembourg in 2003). Yukos Capital's 2005 financial statements show that it borrowed extensively from and lent extensively to other Yukos entities. Professor Lys details loan transactions where the exact amount borrowed by Yukos Capital was then lent by Yukos Capital to other Yukos-related entities.

### 6.    Ms. Felicity Cullen QC

219.  Ms. Felicity Cullen QC[106] is a barrister specializing in United Kingdom tax law.  Respondent asked Ms. Cullen to opine on rules concerning the assessment, collection, and enforcement of tax in the UK, in the context of showing that "[t]he treatment by the Russian tax authorities of Yukos' tax evasion scheme is entirely consistent with the positions that would have been taken by the tax authorities of virtually every other country [including the UK]."[107]  Claimants chose not to call her for cross-examination.

220.  Ms. Cullen was asked to give her opinion on the basis of a number of assumptions about a large corporate taxpayer who has entered into transactions to reduce its tax liability.  She was asked to assume that the transactions are considered by tax authorities to involve avoidance and/or criminal evasion of tax, to lack genuine commerciality, and to have been carried out on non-arm's length terms.  The same taxpayer is assumed to have deliberately concealed the true character of its transactions, to have been deliberately uncooperative in tax investigations and to have dissipated assets otherwise available to satisfy potential tax liabilities.  In such assumed circumstances, Ms. Cullen describes the investigation and enforcement options open to an officer of Her Majesty's Revenue and Customs ("**HMRC**") during an enquiry into a tax return.  For example, HMRC can amend a company's self-assessment if its suspected of understating the company's true tax liability and there is a real risk of substantial loss of tax to the government.  Under a discovery process, HMRC is allowed to re-open returns for periods otherwise considered closed when there has been careless or deliberate conduct leading to loss of revenue.

221.  With respect to penalities, Ms. Cullen notes that under the current UK civil tax penalty regime may vary from 30  to 100 percent of the potential lost revenue (depending on whether there was deliberate concealment).   She further describes the considerable methods of enforcement available to HMRC, which include proceedings in English courts, freezing orders, and pursuit of insolvency proceedings.  Criminal action may, according to Ms. Cullen, be pursued where appropriate, in which case HMRC will often conduct a form of "dawn raid", require production of documents, seize items like computers and make arrests.

---

[106]    Expert Report of Ms. Felicity Cullen QC, 4 April 2011.

[107]    Counter-Memorial ¶ 1135.

222.   Ms Cullen observes that traditionally, tax legislation in the UK was construed literally but today, it is construed purposively, which has facilitated challenging and countering tax avoidance schemes.

### 7.   Mr. Dale Hart

223.   Mr. Dale Hart[108] is a retired executive of the U.S. Internal Revenue Service ("**IRS**"). Respondent retained Mr. Hart to describe the U.S. legal framework against tax abuse and evasion and enforcement powers of the IRS, in the context of Respondent's claim that "tax administrations around the world [including the U.S.] would have been at least as firm as the Russian Federation in dealing with abuses of the kind perpetrated by Yukos."[109]   Claimants chose not to call him for cross-examination.

224.   Mr. Hart testifies that under U.S. law, abusive or fraudulent tax shelters are broadly defined to include investment schemes that reduce tax income without changing the value of the business. To combat them, the IRS relies on a legal framework that provides the authority to reallocate income and deductions to properly reflect income.   The framework includes the judicial doctrines of economic substance, business purpose, sham transactions, substance over form and step transactions.   The IRS has extensive civil and criminal enforcement powers, which according to Mr. Hart, it uses "aggressively".   It has broad discretion in determining which tax returns and taxpayers to select for audit and it tailors the scope of its audit to the taxpayer's financial and tax situation.   If evidence of fraud is revealed, the civil audit is discontinued and a criminal investigation may be launched.   Mr. Hart notes that the typical three-year limitation period may be extended for fraud or other misconduct.

225.   With respect to penalties, Mr. Hart describes how U.S. law imposes "heavy" penalties on fraudulently underpaid tax, including failure to pay and failure to file penalties, accuracy-related penalties on underpayments and a civil fraud penalty of 75 percent.   The collection process begins with a formal notice of assessment requesting payment.   According to Mr. Hart, a deferred payment arrangement is only ever considered when the taxpayer is unable to pay in full.   Mr. Hart describes the "strong arsenal" of administrative enforcement collection tools at the disposal of the IRS, including a federal tax lien, a notice of levy and the sale of property by

---

[108]   Expert Report of Mr. Dale Hart, 4 April 2011.

[109]   Counter-Memorial ¶ 1135.

public auction or public sale after determination a minimum bid price that need not be based on fair market value.

### 8.   Mr. Polyvios Polyviou

226.   Mr. Polyvios Polyviou[110] of Chryssafinis & Polyviou LLC in Nicosia is a lawyer practicing Cypriot law.  Respondent retained him as an expert to show that Claimants' alleged abuses of the Cyprus-Russia DTA also violated the criminal laws of Cyprus.  Claimants chose not to call him for cross-examination.

227.   Mr. Polyviou's report is based on the following assumptions:  (a) that for purposes of the Cyprus-Russia DTA, Hulley and Veteran were "residents" of Cyprus and Yukos was a "resident" of Russia; (b) that in reliance on the Cyprus-Russia DTA, Hulley and Veteran paid a reduced five percent withholding tax to Russia on dividends received from Yukos; (c) that Hulley and Veteran had no right to take the benefit of the Cyprus-Russia DTA because the relevant dividends *were* connected with activities carried out in Russia and/or because Hulley and Veteran were not the beneficial owners of the relevant dividends; (d) that the natural persons who declared/confirmed on forms submitted by Hulley and Veteran to Cypriot tax authorities that the relevant dividends received from Yukos were *not* connected with activities carried out in Russia and that Hulley/Veteran was the beneficial owner of the relevant dividends were authorized to do so on Hulley/Veteran's behalf; and (e) that at the time of making the declarations/confirmations, these natural persons *knew* that the dividends from Yukos *were* connected with activities carried out in Russia or that Hulley/Veteran was *not* the beneficial owner and intended for the forms to be submitted to the Cypriot authorities so as to obtain completion, dating, signing and stamping of Box 4 (the "Note of the foreign Tax authority") on the forms.  On the basis of these assumptions, Mr. Polyviou was asked to address two questions, as described below.

228.   The first question was:  "Did the circumstances under which Hulley and Veteran obtained the completion, dating, signing and stamping of certain tax forms by the Cypriot tax authorities give rise to criminal offences under the Criminal Code of Cyprus?"  Mr. Polyviou answers "Yes" under sections 297 (false pretences), 305 (willfully obtaining a "certificate" by false pretences) and 341 (willfully procuring execution of documents by false pretences) of Cap. 154

---

[110]   Expert Report of Mr. Polyvios G. Polyviou, 1 April 2011 (hereinafter "Polyviou Report").   References to Mr. Polyviou's  report appear in Chapters IX.B (Unclean Hands) and X.E (Contributory Fault).

of the Criminal Code.  According to Mr. Polyviou, but for the false pretence, Cypriot tax authorities would have rejected the request to complete, date, sign and stamp the forms as it would have been pointless and tantamount to assisting an abuse of the Cyprus-Russia DTA.

229.  The second question was:  "Were criminal offences committed under the Criminal Code and/or the Companies Law of Cyprus?", assuming that during the period 1 January 2000 to 28 October 2003:  (a) in reliance upon the Cyprus-Russia DTA Hulley and Veteran paid a reduced five percent withholding tax to Russia on dividends received from Yukos; (b) neither Hulley nor Veteran had the right to take the benefit of the Cyprus-Russia DTA, at least vis-à-vis Yukos' above-mentioned dividends; and (c) neither Hulley nor Veteran disclosed point (b) in their annual accounts for financial years 2000–2002?  Mr. Polyviou answered "Yes" under section 311(b)(iii) (directors and officers of corporations keeping fraudulent accounts or falsifying books or accounts) of Cap. 154 and section 143(6) (contents and forms of accounts) of Cap. 113 of the Criminal Code.

### 9.    Mr. John Ellison

230.  Mr. John Ellison[111] is a consultant at KPMG in London, having retired as a senior partner in 2010.  His report concerns the withdrawal by PwC of its audit opinions on Yukos' financial statements for the years 1995–2004.  Claimants chose not to cross-examine him.[112]

231.  Mr. Ellison opines that for a reputable international firm such as KPMG to withdraw an audit opinion is an "unusual and serious" event, of which he knows of only a handful of cases.  At KPMG, whether in the UK, the U.S., or Russia, such decision would necessarily be preceded by extensive consultations with several senior partners of the firm together with its technical departments and legal counsel.  According to Mr. Ellison, PwC's procedures were similar, as shown by a declaration (appended to the Ellison Report) from Ms. Laurie Endsley, PwC's in-house counsel who worked on the Yukos matter at the time of withdrawing the audits.

232.  Mr. Ellison analyzes PwC's letter of 15 June 2007,[113] in which PwC announced the withdrawal of its audit opinions of Yukos' financial statements, explaining that it had acquired new information that caused it to question the reliability of the representations made by Yukos'

---

[111]   Expert Accountant's Report to the Tribunal by John Ellison, FCA, 14 August 2012 (hereinafter "Ellison Report"). References to Mr. Ellison's expert report appear in Chapter VIII.H (The Withdrawal of PwC's Audit Opinions).

[112]   *See* Chapter VI.C (The So-Called "Empty Chairs").

[113]   Letters from ZAO PwC Audit to Mr. Rebgun, 15 June 2007, Exh. C-611 (hereinafter "PwC's Withdrawal Letter").

management during the audits.  Assuming the veracity of the contents of the letter, Mr. Ellison concludes that in withdrawing its audit opinions, PwC acted in accordance with the auditing standards generally accepted in the U.S., Russia and internationally.

233.   Mr. Ellison notes that under U.S. Statement of Auditing Standards No. 1, Section 333, when an auditor after issuing its report becomes aware of facts that existed at the time the report was being compiled, believes there are persons relying or likely to rely on his report and considers that the new facts are material to his report, or shake his confidence in the overall veracity of representations made by management, the auditor must advise his client to disclose the new facts and possibly revise its financial statements.  Mr. Ellison refers to PwC's claim that in light of the bankruptcy of Yukos, PwC "was unable to access the information required that could lead to revision of the financial statements and was also unable to discuss the matter with management, as recommended by [U.S. Auditing standards] AU Section 561."  Mr. Ellison accepts that in those circumstances, PwC "had no option but to withdraw its audit reports."

234.   Under International Standard on Auditing 560 and Russian Federal Auditing Rule 10, when new material facts become known to the auditor after issuance of the audit report, the auditor should consider revising the company's financial statements, discuss the matter with the company's management and "take the action appropriate in the circumstances" or "take steps necessary in the circumstances."  In Mr. Ellison's view, PwC did take the appropriate steps.

**10.   Mr. Raymond Gross**

235.   Mr. Raymond Gross[114] is a partner of KPMG's U.S. Accounting & Reporting Group in London.  Claimants chose not to cross-examine him.  Respondent asked Mr. Gross to review what Yukos' consolidated financial statements prepared under U.S. GAAP revealed with respect to: (a) Yukos' tax optimization scheme, including its use of trading companies in low-tax regions of Russia to buy oil and oil products from production subsidiaries and transfer the proceeds to offshore companies established or controlled by Yukos; (b) the Jurby Lake structure, a group of offshore trading companies controlled by Yukos or its former Russian majority shareholders and comprising Jurby Lake Limited (Ireland) and the BBS Companies; and (c) the taxes assessed against Yukos' trading companies in the ZATO of Lesnoy for tax years 1999 and 2000.

---

[114]   Expert Accountant's Report to the Tribunal by Raymond Gross, CPA, 14 August 2012.

236. Mr. Gross was instructed to assume that the statements would have "put a reader on notice of facts relevant to the nature and legality of Yukos' use of the Tax Optimization Scheme" if they had included:  (a) identification of the involved trading and offshore companies (listed in the exhibits to the Report); (b) the monetary value of the investments made and tax savings achieved by Yukos through the scheme; (c) details of the extent of the trading companies' investments in Russia's low-tax regions; (d) details the extent of Yukos' direction of and control over the trading companies; (e) details of the flow of funds from the trading companies to Yukos; (f) details about the taxes assessed against Yukos' trading companies in the ZATO of Lesnoy in 1999 and 2000 and the Republic of Kalmykia in 2001 due to improperly received tax benefits; and (g) disclosure of the possible financial impact on Yukos if the tax optimization scheme was disallowed by the Russian authorities.

237. Mr. Gross concludes that the statements for the years 2000–2002 and the first three quarters of 2003 were not transparent with regard to Yukos' tax optimization scheme, as they disclosed none of the above-listed information necessary to put a reader on notice.  While the statements showed that Yukos' effective tax level was lower than the statutory tax level, they failed to explain the nature of the difference.  The statements also failed, according to Mr. Gross, to identify the companies composing the Jurby Lake structure.

238. Mr. Gross also concludes that the 2001–2002 statements were not transparent and not consistent with the U.S. GAAP in that they failed to disclose as contingent liabilities the taxes assessed against the trading companies of the ZATO of Lesnoy for 1999 and 2000, despite the fact that these tax assessments were material to the statements.  Under the U.S. GAAP, Yukos could omit these assessments from the statements if it determined that the probability of loss was remote; however, the written support of outside legal counsel or another competent authority which would usually be required for such a determination was not obtained in this case.   Mr. Gross opines that Yukos should have disclosed that the validity of the tax optimization scheme had been called into question and discussed the risk involved in continuing with the scheme.

### 11.    Professor Dr. Albert Jan van den Berg

239.    Professor Dr. Albert Jan van den Berg[115] of Hanotiau & van den Berg in Brussels, specializes in international arbitration.   He was previously in private practice in the Netherlands and is a professor at Erasmus University in Rotterdam.   Respondent retained Professor Van den Berg to provide an expert opinion addressing the legality under Dutch law of the 2005 transfer of Yukos' foreign assets into the Stichtings.   Claimants chose not to cross-examine Professor Van den Berg.

240.    Professor Van den Berg was provided with a 12-page Statement of Assumed Facts on which to base his opinion.   These assumed facts may be summarized as follows.   Before the auction of YNG in December 2004, Yukos' assets outside the Russian Federation (the "**Foreign Assets**") were held by two wholly-owned subsidiaries of Yukos, Yukos Finance B.V. ("**Yukos Finance**") and Yukos CIS Investment Limited ("**Yukos CIS**").   After the auction, Yukos management transferred the Foreign Assets to the two Stichtings, which issued depositary receipts in return to Yukos Finance and Wincanton Holding BV ("**Wincanton**"), a Dutch subsidiary of Yukos CIS.   This restructuring had the "stated purpose . . . to prevent the non-Russian assets of Yukos Oil from being used to satisfy the tax debts that Russian courts had found Yukos Oil to owe, and, more broadly, to prevent the non-Russian assets from being available to satisfy claims of Yukos' Russian creditors."

241.    Under the Articles of Association of the Stichtings (amended in 2008), the management board, including former Yukos managers David Godfrey, Bruce Misamore and Steven Theede, manages the Foreign Assets in the interests of Yukos, its subsidiaries, shareholders, employees and "legitimate" creditors.   As a result of the restructuring:   (a) even after Yukos CIS and Yukos Finance were sold in Yukos' bankruptcy auction, the former Yukos managers have continued to manage and control the Foreign Assets; (b) the lending group under a USD 1 billion loan was unable to enforce an English judgment against Yukos Finance's assets; and (c) Moravel, whose loan had been held to be unenforceable by Russian courts because of its status as a subsidiary of Yukos, was able to negotiate the repayment of its loan from one of the Stichtings.

242.    Based on the above-described assumed facts, Professor Van den Berg opines that the restructuring of Yukos Finance and Yukos CIS was illegal, as Dutch law does not permit a

---

[115]    Legal Opinion on the Validity of Restructuring Devices under Dutch Law by Professor Dr. Albert Jan van den Berg, 14 August 2012 (hereinafter "Van den Berg Report").   References to Professor Van den Berg's legal opinion appear in Chapter VIII.G (The Bankruptcy of Yukos).

company to transfer its assets for the purpose of making it more difficult for a creditor to satisfy its claims, or for the new ultimate parent company to exercise control.  This is so even when a company believes the claims against it are illegitimate.  The company is not entitled to exercise self-help.

243.   According to Professor Van den Berg, this illegality gave rise to the directors' "internal liability" (liability of the directors to the company itself) pursuant to Articles 2:8 and 2:9 of the Dutch Civil Code (the "**DCC**") and to the directors' "external liability" (liability of the directors to creditors) as well as "company liability" (liability of the company to creditors) pursuant to Article 6:162 of the DCC.  Further, this illegality renders the board decisions regarding the restructuring voidable pursuant to Articles 2:8 and 2:15(1)(b) of the DCC (as contrary to the principles of reasonableness and fairness) and pursuant to Article 3:40(1) of the DCC (as contrary to "good morals").  Professor Van den Berg opines that the Stichtings are also disallowed as invalid permanent protective devices; even if they are treated as temporary protective devices, the requirements to uphold such temporary devices are not met in this case.

### 12.   Professor Stef van Weeghel

244.   The Tribunal recalls that Respondent had raised the question of "unclean hands" in the jurisdictional phase of the case, an issue which the Tribunal decided to defer for consideration until the merits phase of the arbitration.[116]   During the jurisdictional phase of the case, Respondent had adduced expert testimony from Professor Stef van Weeghel,[117] a professor of international tax law at the University of Amsterdam and a tax law partner at Stibbe.  In his expert report, Professor Van Weeghel reached three main conclusions about Claimants and taxation law, as summarized in the Interim Awards.[118]  The Parties did not reference his report in their pleadings in the merits phase of the case and he was not cross-examined at the Hearing on the Merits.  The Tribunal has decided to include in the Final Awards the summary of Professor Van Weeghel's expert evidence.

245.   According to Professor Van Weeghel, Hulley was not entitled to obtain the taxation benefits contained in the Cyprus-Russia DTA in respect of the Yukos dividends because:  (a) Hulley

---

[116]   Interim Award, Hulley ¶ 435.  *See also* Procedural Orders Nos. 2 and 3 of 8 September and 31 October 2006.

[117]   Expert Report of Professor Stef van Weeghel, 29 January 2007, filed with Counter-Memorial on Jurisdiction. References to Professor Van Weeghel's Expert Report appear in Part X.E (Contributory Fault).

[118]   Interim Awards, Hulley ¶¶ 191–97.

had a permanent establishment in Russia under Article 10(4) of the Cyprus-Russia DTA) as it either had a place of management in Russia, or it had an agent in Russia; and (b) those dividends were attributable to the permanent establishment in Russia.  He also opines that VPL was similarly not entitled to obtain the taxation benefits contained in the Cyprus-Russia DTA because it was not the beneficial owner of the Yukos dividends within the meaning of Article 10(2) of the Cyprus-Russia DTA.

246.    According to Professor Van Weeghel, the Yukos holding structure is a sham or otherwise abusive under general principles of international tax law and designed specifically to avoid taxation obligations.  Therefore rights to tax benefits under the Cyprus-Russia DTA should be denied.  Tax authorities do not always have to accept artificial legal constructions.  Anti-abuse doctrines to counter artificial legal constructions have developed in and are common to many countries including the Russian Federation and Cyprus.  Professor Van Weeghel refers to the example of the Swiss Federal Court denying the benefits of a double taxation treaty to a Danish company in circumstances analogous to the Yukos holding structure.  He refers to international efforts to control the use of tax havens and notes that the OECD Forum on Harmful Tax Practices in its 2000 Progress Report identified 35 tax havens which included the Isle of Man, Gibraltar, Jersey and the British Virgin Islands.  Professor Van Weeghel examines the Yukos holding structure, and notes that at the bottom of the structure is the successful and profitable Russian oil company developing and exploiting natural energy resources in Russia, while at the top of the structure are a small number of Russian individual shareholders.  He concludes that it is "hardly perceivable" that the Russian individual shareholders, in setting up the Yukos holding structure, had any other goal in mind than low taxation and lack of transparency in respect of the ownership of Yukos shares.  Such a structure would normally fall within the scope of international efforts to counter the harmful use of tax havens.

## C.    THE SO-CALLED "EMPTY CHAIRS"

247.    At the Hearing on the Merits, each side accused the other of leaving conspicuous "empty chairs" in its presentation of witness evidence.  Each side asked the Tribunal to draw adverse inferences against the other from the absence of the persons who should have filled the empty chairs.[119]

---

[119]    *See e.g.*, Transcript Day 2 at 98 (Claimants' opening); Respondent's Rebuttal Slides, p. 650 & ff; *see also* Respondent's Post-Hearing Brief ¶ 135.

### 1.    Individuals that Claimants Wished were Available for Examination

248. At the Hearing, Claimants submitted that the following individuals should have been called as witnesses by Respondent as they could have been cross-examined in respect of the knowledge of Yukos' tax structure by high-ranking Russian officials:

- Aleksei Kudrin, First Deputy Minister of Finance, including in particular on the January 2000 meeting with Mr. Dubov at which the establishment of Yukos' trading companies in Mordovia was discussed;

- Vladimir Gusev, First Deputy Minister in charge of VAT, including in particular on the meeting with Mr. Dubov at which Yukos' VAT refunds in Mordovia were discussed;

- Alexander Pochinok, Tax Minister, including in particular on the December 1999 meeting with Mr. Dubov at which Yukos' plan to use trading companies in Mordovia was discussed;

- Alexander Smirnov, First Deputy Minister of Tax, including in particular on the December 1999 meeting with Mr. Dubov; and

- Nicolai Merkushkin, Head of the Republic of Mordovia, including in particular on the December 1999 meeting.[120]

249. Claimants also argued that they should have had the opportunity to hear from and examine the following individuals in respect of their knowledge of Yukos' tax structure derived from the audits of Yukos' trading companies:

- P. A. Puschin, Senior Tax Inspector of Russian Tax Ministry's Interregional Inspectorate for major Taxpayer No. 1; and

- A.V. Ivushkina, Senior Tax Inspector of Russian Tax Ministry's Interregional Inspectorate for major Taxpayer No. 1.[121]

250. In addition, Claimants complained that they did not have the opportunity to hear from and examine Sergei Bogdanchikov, the President of Rosneft, on the circumstances of Rosneft's acquisition of Baikal in December 2004 and Rosneft's agreement with a syndicate of Western banks led by Société Générale S.A. (the "**Western Banks**") regarding the initiation of Yukos' bankruptcy.[122]

---

[120]   Claimants' Opening Slides, p. 300; Claimants' Closing Slides, p. 14.

[121]   *Ibid.*

[122]   *Ibid.*

251. Finally, Claimants argued that they should have had the opportunity to hear from and examine the following individuals in respect of PwC's audit of Yukos and the circumstances of the withdrawal of PwC's audit reports:

- Douglas Miller, Director, ZAO PwC Audit, including in particular regarding the work conducted for the purposes of the certification of Yukos' accounts for years 1998–2003 and the circumstances of the withdrawal of the reports in 2007; and

- Michael Kubena, General Director, ZAO PwC Audit, including in particular regarding the establishment of Yukos' tax optimization structure and its legality.[123]

**2.      Individuals that Respondent Wished were Available for Examination**

252. At the Hearing, Respondent argued that the following individuals should have been made available for questioning with respect to:  (a) the establishment and history of Yukos' "tax optimization" schemes and Yukos' understanding of their legality; (b) Yukos' relationship with its Lesnoy, Mordovian, and other "sham" trading shells; and (c) Yukos' reaction to the assessments against and criminal investigation of the Lesnoy and Trekhgorniy trading shells, including the restructurings and liquidations, the instructions to destroy documents, and other apparent attempts at obstruction:

- Dmitry Gololobov, Yukos' former Deputy General Counsel;

- Irina Golub, Yukos' former Chief Accountant;

- Dmitry Maruev, former head of the Financial Engineering Section of Yukos Treasury Department (Deputy Chief Accountant);

- Alexey Smirnov, former head of Yukos' Tax Department;

- Vasily Shakhnovsky, GML shareholder/beneficiary and former President of Yukos-Moscow; and

- Mikhail Brudno, GML shareholder/beneficiary.[124]

253. According to Respondent, Mr. Golobolov, together with Mr. Sergey Pepeliaev, Yukos' tax counsel, could also have addressed the following issues: (a) Yukos' unsuccessful attempts to obtain a legal opinion approving its "tax optimization" schemes, including why Mr. Pepeliaev did not provide a legal opinion to Yukos on the schemes prior to the 29 December 2003 tax

---

[123]   *Ibid.*

[124]   Respondent's Rebuttal Slides, pp. 655–56; *see also* Respondent's Post-Hearing Brief ¶ 136.

audit report; (b) the bases for Yukos' responses and reactions to the 29 December 2003 tax audit report, and the bases on which outside counsel prepared its post-hoc opinions for Yukos on the "tax optimization" schemes; and (c) the reasons why Yukos tried to file "annual" amended VAT returns, and did not submit proper amended monthly VAT returns after the "annual" ones were rejected.[125]

254.  Respondent also argued that on the issue of Yukos' consideration of an enhanced ADR listing, including warnings that were provided to Yukos' senior management concerning the substantial risks of disclosing Yukos' "tax optimization" schemes in connection with such a listing, the failure to disclose Messrs. Khodorkovsky's and Lebedev's relationship to the BBS Companies, and Mr. Khodorkovsky's concerns for his own personal liability if he signed Yukos' F-1 Registration Statement, Claimants should have made available for testimony:

- Pavel Malyi, former Deputy Head of Yukos' Corporate Finance Department; and

- Oleg Sheiko, former Vice President/Director of Yukos' Corporate Finance Department.[126]

255.  On issues relating to the understanding by Yukos' Russian management of the legality of Yukos' "tax optimization" scheme, Respondent complained about the absence of:

- Yury Beilin, Yukos' former Deputy CEO; and

- Simon Kukes, Yukos' former CEO.[127]

256.  Finally, with respect to GML's "sustained and aggressive threats that deterred broader participation in the YNG and bankruptcy auctions," Respondent wished they could have heard from and examined Mr. Tim Osborne, GML Director and member of the Stichtings' boards.[128]

## VII.  ISSUES FOR ANALYSIS

257.  In this second phase of the present arbitrations, the Parties presented their arguments and evidence on the many substantive issues related directly to the merits of the case under Articles 10 and 13 of the ECT.  In addition, the Parties presented extensive argument on the

---

[125]   Respondent's Rebuttal Slides, pp. 656–57; *see also* Respondent's Post-Hearing Brief ¶ 136.

[126]   Respondent's Rebuttal Slides, pp. 658; *see also* Respondent's Post-Hearing Brief ¶ 136.

[127]   *Ibid.*

[128]   Respondent's Rebuttal Slides, pp. 659; *see also* Respondent's Post-Hearing Brief ¶ 136.

two preliminary objections that the Tribunal had decided to defer to the merits phase, namely the objection based on Claimants' alleged "unclean hands" and the objection based on Article 21 of the ECT.

258.   The deferred preliminary objections—like the merits issues—require the Tribunal to untangle the complex factual matrix underlying Claimant's claims.  Indeed, the Tribunal had decided to defer the preliminary objections relating to alleged "unclean hands" and Article 21 to avoid making findings on these important questions in a vacuum.

259.   This Award therefore begins, in Part VIII, with the Tribunal's analysis of the factual issues. Guided in large measure by the Parties' presentations of the issues, the Tribunal considers it convenient to analyze the evidentiary record under the following eight headings

    A.    Yukos' Tax Optimization Scheme

    B.    The Russian Federation's Tax Assessments

    C.    Harassment, Intimidation and Arrests

    D.    Unwinding of the Yukos–Sibneft Merger

    E.    Yukos' Attempts to Settle its Tax Liabilities

    F.    Auction of YNG

    G.    The Bankruptcy of Yukos

    H.    The Withdrawal of PwC's Audit Opinions

260.   As mentioned previously, the Tribunal, in Part VIII, makes determinations in respect of the many highly contested issues of fact and observations on the significance of various facts and findings.

261.   Next, in Part IX of this Award, the Tribunal turns to Respondent's preliminary objections. Specifically, the Tribunal considers:

    A.    whether all or some of Claimants' claims are barred by the "fork-in-the-road" provision in Article 26(3)(b)(i) of the ECT (the Tribunal dismissed this objection in the Interim Awards, but Respondent has renewed the objection in this merits phase);

B. whether Claimants' conduct—their alleged "unclean hands"—deprives Claimants of protection under the ECT (in the Interim Awards, the Tribunal confirmed the deferral of its decision on this objection to the merits phase of this arbitration, consistent with Procedural Order No. 3); and/or

C. whether Article 21 of the ECT, which contains a "carve out" for "Taxation Measures", bars the Claimants' claims either as a matter of jurisdiction or admissibility (in the Interim Awards, the Tribunal decided to defer these issues to the merits phase, to avoid ruling on them in a vacuum).

262. Since the Tribunal dismisses each of Respondent's preliminary objections, thereby confirming that it has jurisdiction over Claimants' claims under the ECT, it next addresses Respondent's liability under the ECT.  This analysis is undertaken in Part X of the Award.

263. Claimants allege that Respondent, by conducting investigations and legal proceedings against Yukos, its subsidiaries, and their management, has failed to accord Claimants' investments fair and equitable treatment.  In particular, Claimants allege Respondent failed to refrain from impairing the management, maintenance, use, enjoyment and disposal of Claimants' investments by unreasonable or discriminatory measures, in contravention of Article 10 of the ECT.  Claimants maintain that the treatment of Yukos was discriminatory as compared to other Russian oil companies.

264. Claimants further submit that Respondent's actions amount to an expropriation of the Claimants' investments, in breach of Article 13 of the ECT.  According to Claimants, the alleged interventions of Respondent, and other entities directed and controlled by it—including in the Sibneft demerger, the sale of YNG at a cost alleged to be much lower than its real value to Baikal (a special purpose company that was quickly bought by the State-owned oil company Rosneft) and the pursuit of Yukos' bankruptcy proceedings—resulted in the total loss of value of Claimants' investments.

265. Claimants contend that Respondent's actions were politically and economically motivated, rather than aimed at legitimate tax enforcement.  In that regard, Claimants purport to establish that Respondent acted through almost all its organs, at all levels, in seeking the destruction of Yukos.

266. In response, Respondent contends that Claimants have failed to establish a violation under either Articles 10 or 13 of the ECT.  For Respondent, this case is about Yukos' tax evasion,[129] and therefore about Yukos' self-inflicted demise:  Respondent contends that any losses suffered by Claimants are attributable to their own actions, those of the Yukos managers they installed and allegedly controlled, and of Messrs. Khodorkovsky, Lebedev, Nevzlin, Dubov, Brudno, Shakhnovsky and Golubovitch (the so-called "**Oligarchs**").  It follows, argues Respondent, that Claimants had no legitimate expectation that Russian tax law would not be applied to them and their investment when Yukos breached its tax obligations.

267. In addition to lacking the factual predicate for an expropriation claim under Article 13 of the ECT, Respondent also contends that Claimants' claims fail because the assessment and collection of taxes is in the public interest, as to which States are afforded a wide margin of discretion.  Respondent maintains that its conduct in this regard did not radically depart from either Russian law or international norms.

268. To the extent that Claimants allege discriminatory taxation compared to other Russian oil companies—in contravention of the fair and equitable treatment in Article 10 of the ECT, as well as one of Article 13's four conditions for a lawful expropriation—Respondent answers that these claims fail because Claimants do not contend that their investment was subjected to discrimination based on foreign ownership.  Respondent also disputes the facts presented by Claimants in support of their allegations of discrimination.

269. Respondent further contends that Claimants' allegations of due process violations with respect to tax, tax enforcement, the sale of YNG and Yukos' bankruptcy proceedings are equally meritless, and, in any event, did not affect the management and operations of Yukos.

270. The Tribunal's conclusions on these liability issues, in Part X, follow necessarily as the legal consequences of its factual conclusions in Part VIII.  The Tribunal includes in Part X its decision on the attribution of the conduct of various actors to the Russian Federation, and its findings in relation to Claimant's contributory fault.

271. Finally, in Parts XI, XII and XIII of this Award, respectively, the Tribunal decides the issues relating to interest, the quantification of damages, and the allocation of costs.

---

[129] Rejoinder ¶ 1.

# VIII.        ANALYSIS OF THE EVIDENTIARY RECORD

## A.        THE TAX OPTIMIZATION SCHEME

### 1.        Introduction

272.  In the latter years of the twentieth century and in the early years of the twenty first, oil companies in the Russian Federation were growing, consolidating and becoming large corporate entities.  By the end of 2000, there were nine major oil companies in Russia.  Yukos was the largest, followed by Lukoil.  During that period, all nine major oil companies operated in a similar fashion.  The key features of their operations were firstly vertical integration; secondly transfer pricing; and thirdly the use of low-tax regions to mitigate tax burdens.[130]  In relation to the third element, one-time Prime Minister of Russia, Mikhail Kasyanov stated that "the tax havens in the ZATOs had been used by every oil company."[131]  In fact,

> [t]housands of companies took advantage of the low-tax regimes available in Russian tax havens zones, including businesses engaged in construction, services, the sale of oil products, investments, as well as holding companies and groups of companies involved in financing and taxation arrangements.  This activity was well known to the Russian government, including the Federal Tax Ministry.[132]

273.  Respondent acknowledges that the majority of large Russian oil companies operated in a way similar to Yukos and did "use low-tax regions to evade taxes."  At the same time, Respondent alleges that those companies did so "on a much more modest scale in comparison to Yukos."[133]

274.  In this sense, Yukos was a typical Russian oil company, as it also used the low-tax regions as part of its tax optimization strategy.  A central disputed issue in this arbitration concerns the legality, under Russian law, of the modalities of Yukos' use of the low-tax regions.  Was Yukos merely taking advantage of the legislative arrangements in place to minimize its taxes, or was there an element of abuse in its scheme?  A related disputed issue concerns the legitimacy of

---

[130]  Transcript of Mikhail Kasyanov before the Khamovnichesky Court of Moscow in the Second Criminal Case Brought Against Mikhail Khodorkovsky and Platon Lebedev, 24 May 2010, p. 3, Exh. C-440.  *See also* Statement of Prime Minister Mikhail Mikhailovich Kasyanov to the ECtHR, 8 July 2009, in *Khodorkovskiy v. Russia* (Application Nos. 5829/05, 11082/06 and 51111/07) ¶¶ 10–12, Exh. C-446.  As noted earlier in paragraph 47 and n.11 above, Claimants withdrew Mr. Kasyanov's witness statement in these arbitrations because he did not appear at the Hearing and was not subject to cross examination.  However, the Tribunal has taken notice of his testimony in other proceedings, which forms part of the record in the present proceedings.

[131]  Statement of Prime Minister Mikhail Mikhailovich Kasyanov to the ECtHR, 8 July 2009, in *Khodorkovskiy v. Russia* (Application Nos. 5829/05, 11082/06 and 51111/07) ¶ 34, Exh. C-446.

[132]  Vladimir Samoylenko, *Government Policies in Regard to Internal Tax Havens in Russia*, Publication of International Tax & Investment Center, December 2003, p.1, Exh. C-577.

[133]  Counter-Memorial ¶ 12.

the tax assessments against Yukos that began in December 2003. Was the Russian Federation merely enforcing its tax laws, or rather was it carrying out a punitive campaign against Yukos and its principal beneficial owners? Were the other Russian oil companies subjected to the same tax enforcement actions by the Russian Federation, or was Yukos discriminated against and specifically targeted by the Russian Federation? Before turning to the question of the legitimacy of those tax assessments, which the Tribunal does in the next chapter of the Award, the Tribunal considers it important to address the first question: were Yukos' practices in the low-tax regions, and specifically the practices of Yukos' trading companies in those regions, lawful?

275. In sections 2 and 3 of this chapter, the Tribunal summarizes the evidence that was presented by the Parties regarding the structure and legal framework of Yukos' tax optimization scheme. In section 4, the Tribunal distills, as best it can from the massive documentary record, the complex and extensive background relating to the activities and audits of the Yukos trading entities before December 2003. Finally, in section 5, the Tribunal reviews, on the basis of this complex record, the legality of Yukos' tax optimization scheme under Russian law.

276. The Tribunal observes that it considers the question of the legality of the tax optimization scheme to be a matter of fact in the present arbitration. It is not the role of the Tribunal in the present proceedings to review and determine, as if it were a Russian court of appeal, the decisions made pursuant to Russian law in respect of the legality of this scheme. However, even in considering the issue as a matter of fact, the Tribunal's observations on the legality of Yukos' tax optimization scheme based on what the record reveals will inform its decision on the principal legal questions facing the Tribunal under the ECT.

## 2.    The Structure of the Tax Optimization Scheme

277. The Tribunal has been presented with an enormous volume of material relating to Yukos' structure and tax optimization scheme. In short, Yukos' tax optimization scheme consisted of using "trading companies" located in the low-tax regions as intermediaries in the chain of transactions between Yukos' core oil-producing entities YNG, Samaraneftegaz and Tomskneft at one end, and its customers at the other. The trading companies at issue were established in three types of low-tax regions. The first type was closed administrative territories, or ZATOs (Lesnoy, Trekhgorny, Sarov). ZATOs are territories established in the former Soviet Union as defense and nuclear sites, or as sites with sensitive military, scientific or industrial significance which faced economic catastrophe at the end of the Cold War. For this reason, special tax

regimes were instituted in those territories aimed at boosting economic activity.[134]  The second type was "domestic-offshore territories", regions that faced significant economic challenges and where the Russian Federation wanted to facilitate investment (Mordovia, Evenkia, Kalmykia).[135]  The third low-tax region was Baikonur, a former spaceport, which was treated as a ZATO but is on the territory of Kazakhstan.[136]

278.  The names of the trading entities of particular relevance in this arbitration and the regions or ZATOs in which they were located are set out in the following table:

| Region or ZATO | Company |
| --- | --- |
| **Mordovia** | Alta-Trade<br>Fargoil<br>Macro-Trade<br>Mars-XII (Energotrage)<br>Ratmir<br>Yukos-M<br>Yu-Mordovia |
| **Evenkia** | Evoil<br>Interneft<br>Petroleum-Trading<br>Ratibor<br>Yukos Vostok Trade |
| **Kalmykia** | Siberian Transportation Company |
| **Baikonur** | Mega-Alliance |
| **ZATO Lesnoy** | Business-Oil<br>Mitra<br>Vald-Oil<br>Forest Oil |
| **ZATO Sarov** | Yuksar |
| **ZATO Trekhgorny** | Grace<br>Muskron |

---

[134]  Counter-Memorial ¶ 226, n.274.  *Law of the Russian Federation No. 3297–1* of July 14, 1992, "On Closed Administrative Territorial Entity," Exh. C-404.

[135]  Counter-Memorial ¶ 226, n.274.  Article 1, *Law of the Republic of Mordovia No. 9-Z on the Conditions of the Efficient Use of the Social and Economic Potential of the Republic of Mordovia*, 9 March 1999, Exh. C-414  (hereinafter "*Law 9-Z*"); Article 1, *Law of the Republic of Kalmykia No. 197-II-3* of 12 March 1999, "On Tax Benefits Granted to Enterprises Making Investments in the Economy of the Republic of Kalmykia," Exh. C-413; Article 1, *Law of the Evenkiysky Autonomous District No. 108* of 24 September 1998, "On the Particularities of the Tax System in Evenkiysky Autonomous District," Exh. C-412.

[136]  During his cross-examination, Mr. Konnov clarified the position of Baikonur as having "a special status, [it] is leased by the Russian Federation . . . .  So there are three categories [of low-tax region]." Transcript, Day 14 at 54.  *See also*, Decision of the Government of the Russian Federation No. 747, 25 October 2001, Exh. C-411.

| Region or ZATO | Company |
|---|---|
| | Norteks<br>Kverkus<br>Colrain<br>Virtus |

279. In 2000, sales were conducted by at least 16 of these companies.  From 2001 to 2003, Yukos employed at least eight such companies, and in 2004 at least three of them.   Through this structure, Yukos was able to capture much of the profit from the sale of crude oil to its customers on the books of the entities in the low-tax regions, thus benefiting from substantial tax savings.   Some of these after-tax profits, in turn, left the Russian Federation through dividends to the off-shore holding companies that Yukos controlled (for U.S. GAAP consolidation purposes) through trusts and call options.[137]

### 3.    The Legal Framework of the Tax Optimization Scheme

#### (a)    The Low-Tax Region Program

280. The low-tax region program was established in the 1990s to foster economic development in impoverished areas of the Russian Federation.   The Russian low-tax regions were allowed to exempt taxpayers from federal corporate profit taxfor the purpose of encouraging taxpayers' investments in their regions, provided the taxpayers complied with certain requirements.   There is no dispute between the Parties as to the source of the formal requirements; it is agreed that they are to be found in the low-tax regions' legislation, any applicable tax investment agreements, and the applicable federal legislation, including the Russian Tax Code.   More controversial, and contested by Claimants, is the existence and significance of various so-called "anti-abuse" doctrines which, according to Respondent, have been established and applied in decisions of Russia's federal courts.   The Tribunal addresses these doctrines and the relevant jurisprudence in the next subsection.

281. The benefits provided in the low-tax regions were related to profit tax, which was described by Mr. Konnov in his first report as follows:

> 29.    Profit tax is a federal tax, however tax revenues are shared between the federal, regional and (in certain years) local budgets.   Through the end of 2001, profit tax was governed by the Law of the Russian Federation No. 2116-1 "On Tax on Profit

---

[137]    *See* Lys Reports.

of Enterprises and Organisations" dated December 27, 1991 (the "Profit Tax Law") and subsequently by Chapter 25 of the Tax Code.  In 1999-2006, profit tax rates applicable to Russian entities and foreign entities having a permanent establishment in Russia (with respect to income attributable to such permanent establishments) were as follows:

| Year | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|---|---|---|
| Rate of profit tax total, including: | 35% (30% after April 1) | 30% | 35% | 24% | 24% | 24% | 24% | 24% |
| Rate of profit tax to the federal budget | 13% (11% after April 1) | 11% | 11% | 7.5% | 6% | 5% | 6.5% | 6.5% |
| Rate of profit tax to the regional budget | 22% (19% after April 1) | 19% | 19% | 14.5% | 16% | 17% | 17.5% | 17.5% |
| Rate of profit tax to the local budget | – | – | 5% | 2% | 2% | 2% | – | – |

282. With respect to the tax benefits available in the ZATOs (*e.g.*, Lesnoy and Trekhgorny), in 1999, the ZATOs were allowed to fully exempt taxpayers from federal corporate profit tax.  In 2000, most ZATOs were allowed to exempt taxpayers from the portion of the federal corporate profit tax that was payable to their budget (*i.e.*, up to 19 percent).  In 2001, all ZATOs were permitted to exempt taxpayers from the portion of the federal corporate profit tax that was payable to their budget (*i.e.*, also up to 19 percent).  In 2002, however, these exemptions were revoked.

283. With respect to the tax benefits available in other low-tax regions (*e.g.*, Mordovia, Kalmykia and Evenkia), in 2000 and 2001, such regions were allowed to fully exempt taxpayers from the portion of the federal corporate profit tax that was payable to their budget (*i.e.*, up to 19 percent).  From 1 July 2002 until 31 December 2003, low-tax regions were allowed to exempt taxpayers from the portion of the federal corporate profit tax payable to their budget, but only up to four percent.  An exception existed for "grandfathered" tax investment agreements entered into prior to 1 July 2001, and these taxpayers could still receive a zero percent tax rate on the relevant portion of the profit tax if they fulfilled certain other conditions. As of 1 January 2004, the existing tax investment agreements were terminated, but the Russian Tax Code still allowed low-tax regions to reduce the federal corporate profit tax payable to their budget up to four percent.

(b)     **Anti-Abuse Decisions and Doctrines Promulgated by Russia's Federal Courts**

284.   Before considering the individual court decisions in which the anti-abuse doctrines are said to have been developed and applied, the Tribunal will describe the different courts within the judicial system of the Russian Federation.[138]

285.   The Russian court system is based on four types of distinct judicial procedures—constitutional, civil, administrative and criminal.[139]  Each area has created its own court structure.  For its civil procedure, Russia created a system of commercial, or "arbitrazh" courts.  The arbitrazh courts have jurisdiction over general commercial disputes and disputes directly relating to commercial matters, such as tax disputes.  At the first instance, there are 81 arbitrazh courts, located in and for the constituent entities of the Russian Federation.[140]  At the next level, the appellate instance, there are 20 appellate arbitrazh courts.  Then, at the "cassation instance," there are ten federal arbitrazh courts.[141]  At the apex of the Russian commercial courts system is the Supreme Arbitrazh Court of the Russian Federation.[142]

286.   The Constitutional Court of the Russian Federation and the local constitutional courts of its constituent entities are the courts created for Russia's constitutional procedure.  Among its other functions, the Constitutional Court plays a supervisory role over all four Russian judicial procedures at the federal level; the local constitutional courts play the same role at the level of the constituent entities.  The task of the Constitutional Court is to ensure compliance of the judiciary with the Constitution of the Russian Federation ("**Russian Constitution**").[143]  In this

---

[138]   This information is derived from the Constitution of the Russian Federation, Exh. C-1698 (hereinafter "Russian Constitution") and other particulars in the public domain of interest to narration of the many decisions of the courts of the Russian Federation which the Tribunal reviews.

[139]   Russian Constitution, Article 118(2), Exh. C-1698.

[140]   Russia as a federation consists of 83 "constituent entities"—relatively autonomous territorial and political units.  Most of them have their own constitutions, local laws, presidents, governments, parliaments, and court systems.  Mordovia, for example, is a "constituent entity".  The judicial districts usually match up with these autonomous territorial and political units, but there are several "mismatches": there are 83 "constituent entities" and only 81 first-instance arbitrazh courts.

[141]   In 2000, the Russian Federation created "federal districts", which are administrative units that group several "constituent entities."  Currently there are eight federal districts.  Since there are ten federal arbitrazh courts but only eight federal districts, there is a "mismatch" there too.  For example, the Siberian Federal District has two federal arbitrazh courts, which are the Federal Arbitrazh Court of the East Siberian District and the Federal Arbitrazh Court of the West Siberian District.

[142]   In late 2013, the Ministry of Justice of the Russian Federation announced a judicial reform which would result in merging the Supreme Arbitrazh Court of the Russian Federation with the Supreme Court, which is the apex of the general jurisdiction courts.  The reform has not yet been finalized.

[143]   Exh. C-1698.  The Russian Constitution defines the level of autonomy of the "constituent entities" by assigning certain governance matters of federal importance to the federal bodies while allowing the remaining matters to be

capacity, the Constitutional Court is the court of last resort, which decides whether a particular law applied by the courts of lower instance is constitutional.  For example, an individual or a company may apply to the Constitutional Court in a tax matter when the individual or company considers that a particular provision of the Russian Tax Code applied by an arbitrazh court is not incompliance with the Russian Constitution.  The decisions of the Constitutional Court are not subject to appeal.

287.   The Tribunal turns now to the anti-abuse principle under Russian law.

288.   Respondent's expert on Russian law, Mr. Oleg Konnov, introduced the anti-abuse principle as follows:

> It is essential to distinguish clearly between the legitimate use of the tax benefits and abuse of tax law.  Russian law generally prohibits abuse of law.  The constitutional anti-abuse principle has been incorporated in some branches of law (e.g. civil law).  However, it has been consistently applied even in branches of law where no explicit provisions have been included in the text of the law, e.g. labour law and tax law.  In these instances, Russian courts have themselves developed anti-abuse doctrines.  In the tax area, anti-abuse doctrines have been used to combat aggressive tax planning and abuse.
>
> One should not be misled by the terminology.  Even though the term "substance over form" is not commonly used in Russia, the terms "bad faith," "abuse of rights," "proportionality" and "business substance" are used to achieve the same result as the "substance over form" notion in other countries.
>
> Courts (including the highest courts of Russia) accepted and consistently applied anti-abuse measures both before and after the YUKOS tax cases.  The anti-abuse doctrines have been evolving over the time.  In some cases, the tax authorities challenged the abusive transactions based on the application of civil law principles ("sham" and "fictitious" transactions and transactions "deliberately contrary to fundamentals of civil law and morality"), and in others they applied the notions of "bad faith" and "unjustified tax benefit" developed by court practice.  There were also cases in which the tax authorities used a combination of legal principles to challenge tax avoidance misconduct.[144]

---

decided by the "entities".  At the same time, the Russian Constitution does not allow the "entities" to act contrary to the Russian Federation even within the "entity'" assigned autonomy.  For example, one of the tasks of the Constitutional Court is to ensure that the local laws of the "entities" are in compliance with the Russian Constitution and the federal laws.

[144]   First Konnov Report ¶¶ 45–47.  Mr. Konnov cites:  Article 17(3) of the Russian Constitution, Exh. R-2211; Resolution of the Constitutional Court of the Russian Federation No. 3-P, 15 March 2005, section 4.3, Exh. R-2217 (as support for the proposition that the Constitutional Court describes non-abuse of law as a general legal principle); an assistant professor of the faculty of law of the Higher School of Economics Mr. Kurbatov, who writes: "In general terms, anti-abuse principle is set forth in Article 17 (3) of the Russian Constitution according to which exercise of rights and freedoms by citizens and individuals may not violate rights and freedoms of other persons.  This principle is set forth in Chapter 2 of the Russian Constitution governing rights and freedoms of citizens and individuals. However these rights and freedoms may be applied to legal persons to the extent their nature permits so (see, for instance, para. 1 Section 4 of dicta of the Constitutional Court Ruling No. 20-P dated December 17, 1996, para. 4 Section 2 of dicta of the Constitutional Court Ruling No. 24-P dated October 12, 1998)." (A. Ya, Kurbatov, ABUSE OF LAW: THEORY AND COURT PRACTICE (Consultant Plus, 2009), Exh. R-2214).  Mr. Kurbatov also writes:  "It would be fundamentally wrong to consider anti-abuse as only civil law (branch) principle. It may, however, be set in provisions of specific branches of law"); Resolution of the Plenum of the Supreme Court of the Russian Federation No. 2, 17 March 2004, at

289. In support of his assertion that the various anti-abuse doctrines are part of Russian law, Mr. Konnov relies on a series of decisions issued by various Russian courts, starting with the decision of the Supreme Arbitrazh Court No. 367/96 on 17 September 1996 ("**Sibservice**") and including recent cases such as the 2010 *Novozlatoustovskoye* decision of the same court. Between these bookends, particular reliance is placed on Constitutional Court Ruling 138-0 of 25 July 2001 (which introduced the concept of "bad-faith taxpayer") and on Resolution No. 53 dated 12 October 2006 of the Plenum of the Russian Supreme Arbitrazh Court ("**Resolution No. 53**")(which linked the concepts of "unjustified tax benefit", "actual economic substance" of a transaction and the "business purpose" of a taxpayer's actions).

290. According to Mr. Konnov, the cases upholding the tax assessments against Yukos (*i.e.*, confirming the tax authorities' position that Yukos' tax optimization scheme was abusive) were "an integral part of the evolution of the 'business substance' doctrine which eventually resulted in adoption by the Russian Supreme Arbitrazh Court on 12 October 2006 of Resolution No. 53."[145]

291. Claimants argue that the "business purpose" doctrine could not possibly have played any role in the tax assessments against Yukos, since "it did not exist in Russian law at the time, having only been introduced into Russian law in 2006"[146] (in Resolution No. 53 of the Plenum of the Russian Supreme Arbitrazh Court).  Indeed, Claimants note, "the notion of business purpose was never mentioned in the December 29, 2003 Audit Report and played no role in the tax assessments against Yukos."[147]

292. The Tribunal's task in evaluating the Parties' arguments is a difficult one.  As with many aspects of this case, the record is voluminous and, in certain respects, contradictory.  Moreover, regarding issues of Russian tax law, the Tribunal heard only from Mr. Konnov; Claimants put forward no testimony challenging Mr. Konnov's interpretation of the relevant cases from an

---

clause 27, Exh. R-2213 ("If a court establishes the fact that the employee abused his rights, the court can dismiss his claim on reinstatement in a job ... since in the specified case the employer should not be responsible for the adverse consequences resulting from the employee' bad faith actions.").  *See also* V.V. Arkhipov, *Abuse of Rights in Labor Relations: Wilful Hoax or Honest Mistake?*, Zakonodatelstvo i Ekonomika, No. 2, 2008, Exh. R-2215; Civil Code of the Russian Federation, entered into force on 1 January 1995, Articles 10, 169, 170, Exh. R-909 (hereinafter "Russian Civil Code").  Mr. Konnov notes that in a number of cases Article 170 of the Civil Code was applied jointly with Article 169 of the Russian Civil Code.

[145] First Konnov Report ¶ 49(p).

[146] Claimants' Post-Hearing Brief ¶ 29.

[147] *Ibid.*

expert on the subject.  And, as discussed further below, Claimants' counsel chose not to cross-examine Mr. Konnov on the existence or evolution of the anti-abuse doctrines.  At the same time, in argument, Claimants have challenged almost every aspect of Mr. Konnov's testimony, including on the existence and evolution of the anti-abuse doctrine.

293.  Therefore the Tribunal has had to delve into the voluminous record, including the translations of dozens of Russian court decisions and commentaries thereon, to come to its own view on what anti-abuse principles may have existed during the period relevant for an analysis of Yukos' tax optimization scheme.

294.  The earliest cases relied upon by Respondent, from the mid-1990s, appear to rely on a "substance over form" doctrine.  These cases include *Sibservice* and the Resolution of the Presidium of the Supreme Arbitrazh Court No. 3661/96 on 21 January 1997 ("***Yekaterinburg Telephone***").

295.  Mr. Konnov summarizes these cases as follows:

> a.  As early as in 1996, the Russian Supreme Arbitrazh Court reviewed a case involving the Russia-Austrian joint venture Sibservice.  Sibservice was assembling and selling computers.  Its sales of computers were subject to VAT.  In order to defer or avoid VAT payment, Sibservice entered into loan agreements with customers under which the customers purportedly loaned funds to Sibservice, and Sibservice purportedly repaid the loans by transferring computers to the customers. Based on the letter of the law, the making of the loan and the repayment of the loan (unlike sale of computers) were exempt from VAT.  The Supreme Arbitrazh Court focused on substance of the transactions between Sibservice and its customers and ruled that the sale of computers had been artificially structured using the loan agreements, thereby supporting the position of the tax authorities.  Specifically, the Supreme Arbitrazh Court noted that:
>
> > "The conclusion of the state tax inspectorate that Joint Venture Sibservice supplied the goods on the condition of the prepayment of their price [is justified] since the relations with the customers (buyers) were actually developed that way (supply, contractor relationships) regardless of the name of the agreement."
>
> b.  One year later, in 1997, the Russian Supreme Arbitrazh Court reviewed a case involving the state-owned enterprise *Yekaterinburg City Telephone Network*.  In 1994, the state-owned enterprise had concluded what they claimed to be several joint venture agreements with private persons and legal entities according to which the participants allegedly agreed to cooperate for the purposes of developing the telephone network of the city of Yekaterinburg.  The private persons and legal entities made what purported to be joint venture financing contributions to the state enterprise which they claimed were exempt from VAT and VAT surtax under the then applicable law.  The tax authorities conducted a tax audit of the state enterprise and concluded that in practice no true joint venture activity had been conducted and, therefore, VAT and VAT surtax had to apply.  The Presidium of the Russian Supreme Arbitrazh Court supported this conclusion:

> "In fact, those transactions have been made in order to raise financing from the relevant entities and individuals in order to finance the claimant's business."

With reference to this case, a group of prominent Russian scholars noted later that Russian tax law required that the tax consequences of a transaction or other arrangement be determined according to its substance rather than its form:

> "... Therefore, the arbitrazh courts as well as the tax authorities currently follow the principle of "substance of contract over its name (form)". Thus, any attempts to conceal the real substance of an agreement by using a name of a different contract will most likely be fruitless."[148]

296.   Respondent also refers to Constitutional Court Resolution No. 14-P, 28 October 1999 ("**Energomashbank**"), which, according to Respondent, "reiterated the notion that when looking at the tax aspects of a particular transaction, Russian courts should be mindful of its substance, and not merely its form."   Mr. Konnov describes the case as follows in his First Expert Report:

> d.    Likewise in 1999 the Russian Constitutional Court in the *Energomashbank* case advised Russian courts to analyze the substance of transactions rather than their form:
>
> "... in instances when the courts while examining a case fail to investigate in essence actual facts thereof but limit themselves to the establishment of formal conditions of the application of the law only, the right to judicial defence envisaged by Part 1 of Article 46 of the Constitution of the Russian Federation is found to be substantially infringed."[149]

297.   In their Reply, Claimants write that the *Sibservice* and *Yekaterinburg Telephone* cases:

> involved the application of the principles enshrined in Article 170 of the Russian Civil Code, which allows the tax authorities, in certain well-defined circumstances, to disregard the form of a particular transaction and to impose taxes based on the actual facts (*i.e.*, based on the actual transaction which occurred, or the fact that no such transaction occurred).   Such cases can obviously offer no support to the Respondent's re-attribution theory.   Neither at the time nor in these arbitrations has the Respondent sought to rely on Article 170.   Moreover, as the Accounts Chamber emphasized in its 2002 report on Sibneft, apart from the transfer pricing rules under Articles 20 and 40 of the Russian Tax Code (which were also not used against Yukos), Article 170 is the only basis under Russian law to challenge relations or transactions between companies as being "shams" or

---

[148]   First Konnov Report ¶49(a)-(b) (citing Resolution of the Presidium of the Supreme Arbitrazh Court of the Russian Federation No. 367/96, 17 September 1996, Exh. R-288 (hereinafter "*Sibservice*"); Resolution of the Presidium of the Supreme Arbitrazh Court of the Russian Federation No. 3661/96, 21 January 1997, Exh. R-289 (hereinafter "*Yekaterinburg Telephone*"); for the group of Russian scholars, A.V. Bryzgalin, V.R. Bernik, A.N. Golovkin, *Collection of Economic Agreements and Documents for Companies with Legal, Arbitrazh and Tax Commentaries*, Nalogi i Finansovoe Pravo, 2004, Exh. R-290).

[149]   First Konnov Report ¶ 49(d) (citing Resolution of the Constitutional Court of the Russian Federation No. 14-P, 28 October 1999, Exh. R-293 (hereinafter "*Energomashbank*")).

"fictitious", refuting the Respondent's claim that such theories as the "bad faith taxpayer" concept conferred authority to re-attribute revenues between companies.[150]

298.   Claimants also challenge the relevance of the *Energomashbank* ruling:

> If that case has any relevance to these arbitrations, it is as a wholesale condemnation of the tax authorities' formalistic approach to VAT, divorced from the actual facts, as in breach of Yukos' constitutional rights.   The constitutional issue in the case was the taxpayer's right to a fair opportunity to defend itself against tax claims by the State before a court, and the Constitutional Court held that respect for this right meant that courts could not limit their inquiry to purely "formal conditions", but rather must examine the actual facts.[151]

299.   Putting aside, for the moment, the *remedy* of re-attribution in the case of a finding of abuse, which the Tribunal considers in Chapter VIII.B of the present Award (in connection with the tax assessments themselves), the question here is whether the decisions cited by Respondent support the *existence* of a judicial anti-abuse doctrine in tax cases.

300.   Respondent insists that they do.   Focusing specifically on the *Sibservice* and *Yekaterinburg Telephone* cases, Respondent characterizes these decisions of the Supreme Arbitrazh Court as demonstrating that Russian courts have recognized and applied anti-abuse rules in the tax area to combat aggressive tax planning and abuse since at least 1996.[152]   In its Rejoinder, Respondent dismisses Claimants' comments on these cases as "misleading":

> Claimants misleadingly suggest that Respondent's reliance on the 1996 *Sibservice* decision and the 1997 *Yekaterinburg City Telephone Network* decision *"involve[s] the application of principles enshrined in Article 170 of the Russian Civil Code"* . . . .   But nowhere in these decisions do the courts rely on, or even mention, Article 170 of the Civil Code. Rather, in both the Supreme Arbitrazh Court upheld the tax authorities' assessments by looking at the substance of the challenged transaction, as opposed to its form.[153]

301.   Based on its review of these cases, the Tribunal observes that Respondent's submission appears to be well-founded.   Article 170 of the Russian Civil Code provides as follows:

> Article 170. Invalidity of Mock and Sham Transactions
>
> 1.    A mock transaction, i.e., a transaction made only for appearances without an intent to create the legal consequences corresponding to it, is void.

---

[150]   Reply ¶ 234 (citing Russian Civil Code, Part I, Article 170, Exh. C-1270; *Sibservice*, Exh. R-288; *Yekaterinburg Telephone*, Exh. R-289; and Accounts Chamber Report on the Results of its Audit of OAO Sibneft, December 2002, Conclusions, (finding that transactions involving Sibneft's trading companies complied with Article 170 and that "under current legislation there is no other basis for considering such interrelationships (or transactions) as fictitious and invalid.") (emphasis added), Exh. C-1282).

[151]   Reply ¶ 236. (Original footnote omitted.)

[152]   Rejoinder ¶ 648.

[153]   Rejoinder ¶ 648, n.987.

> 2.   A sham transaction, i.e., a transaction that is made for the purpose of hiding another transaction, is void.  The rules relating to the transaction that the parties actually had in mind, shall be applied, taking into account the nature of the case.

However, there is no mention of Article 170 of the Russian Civil Code in either of the *Sibservice* or *Yekaterinburg* decisions in the record of this arbitration.[154]  Based on this record, it appears to the Tribunal that the Supreme Arbitrazh Court is relying in these cases on a general doctrine of substance over form.  The Tribunal further observes that such a doctrine seems entirely consistent with the principles enshrined in Article 170 of the Russian Civil Code.  It also seems consistent, in a general way, with the anti-abuse principle that Mr. Konnov says existed in the Russian Constitution, even though the Tribunal notes that no authority was brought to its attention in which this principle was expressly extended into the area of tax.[155]

302.   On the other hand, the Tribunal is of the view that Respondent cannot draw much support from the *Energomashbank* decision.  It appears to the Tribunal that, while the Constitutional Court referred to the importance of investigating the "actual facts" of a case as opposed to confirming "the establishment of formal conditions of the application of the law only," it did so in the context of highlighting substance over form as an important feature of "the right to judicial defense" of a taxpayer against the claims of the tax authorities, not as a basis for tax authorities to challenge taxpayers.  At the same time, the Tribunal notes that the *Energomashbank* decision is not inconsistent with the application of the substance over form doctrine by the tax authorities against a taxpayer's scheme.

303.   Another doctrine invoked by Respondent is known as the "bad-faith taxpayer" doctrine, or sometimes as the "good faith taxpayer" doctrine.  This doctrine, submits Respondent, is rooted in the jurisprudence of the Russian Constitutional Court, notably Constitutional Court Ruling No. 24-P of 12 October 1998[156] and Constitutional Court Ruling 138-O of 25 July 2001.[157]  In his First Expert Report, Mr. Konnov summarizes the significance of these cases as follows:

> c.   In 1998, the Russian Constitutional Court introduced the concept of good/bad faith taxpayers.  In 2001, the Russian Constitutional Court held that bad faith taxpayers

---

[154]   The Tribunal observes that there appear to be at least six other decisions in the procedural history of these two cases, and that these are not in the record.

[155]   The authorities cited by Mr. Konnov demonstrate only that the constitutional anti-abuse principle (*i.e.*, persons should not violate other persons' rights and freedoms in exercising their own rights and freedoms) has been extended to the area of labour law.  *See generally* First Konnov Report ¶ 45, n.64, 66 (authorities cited therein).

[156]   Ruling of the Constitutional Court of the Russian Federation No. 24-P, 12 October 1998, Exh. R-2212.

[157]   Ruling of the Constitutional Court of the Russian Federation No. 138-O, 25 July 2001, Exh. R-307.

would not be entitled to the same level of protection as good faith taxpayers. Mr. Savseris in his book "Bad Faith Category In Tax Law" states:

> "The criterion of bad faith taxpayer was chosen by the Constitutional Court of the Russian Federation in order to distinguish legitimate tax planning and illegal tax evasion.
>
> . . .
>
> Since the adoption of the Ruling of the Constitutional Court of the Russian Federation No. 138-0 the criterion of bad faith has become an independent criterion for settlement of disputes on many categories of cases."[158]

304. Claimants do not deny the existence of the "bad-faith taxpayer" doctrine,[159] but argue that its origins and subsequent application by the Russian courts suggest that it has only a "limited role" in Russian law.[160]  The Tribunal considers it important to set out Claimants' position, as articulated at paragraphs 218 to 224 of their Reply, in full:

> 218.  The phrase "good faith taxpayer" first appeared in the inoperative part of a decision of the Constitutional Court arising out of the 1998 financial crisis, during which many tax payments never reached the Treasury because the banks through which such payments were sent had become insolvent.  When the funds did not arrive, the tax authorities simply confiscated the unreceived payments directly from the taxpayers' accounts.  The Court concluded that the constitutional obligation to pay taxes is fulfilled and the tax is deemed "paid" at the moment when the funds are debited from the taxpayer's account and that it would be improper to hold the taxpayer liable for the banks' failure to retransmit those funds to the State.  In these circumstances, the Court held that a second collection of these "paid" taxes would be inconsistent with constitutionally protected property rights.

---

[158]   First Konnov Report ¶ 49(c) (citing Ruling of the Constitutional Court of the Russian Federation No. 24-P, 12 October 1998, at Exh. R-2212; Resolution of the Constitutional Court of the Russian Federation No. 138-0, 25 July 2001, Exh. R-307; S.V. Savseris, *Bad Faith Category in Tax Law*, Statut, 2007, pp. 42, 46, Exh. R-2218.  He also refers to another illustration offered by Professor D.V Vinnitsky, *The Principle of Good Faith and Abuse of Right in Taxation*, Pravo i Ekonomika, No. 1, January 2003, Exh. R-2219 ("the tax legislation does not directly use the notion "good faith" as a necessary criterion for assessing activity of tax relations party.  However, this is not to say that tax law is indifferent to this principle. In contrast, for this branch of law "good faith" is a fundamental principle to be used in the resolution of disputes and execution of certain tax law provisions.").  Mr. Konnov notes that bad faith is one of the anti-abuse doctrines which was applied either on a stand-alone basis or together with other doctrines in the Yukos case.  In many cases, the term "bad faith" was used along with other anti-abuse terms, such as "proportionality", "unjustified tax benefit" or "abuse of rights."  According to Mr. Konnov, during the period in question there were a number of non-Yukos cases where the tax authorities applied the concept of bad faith to disallow tax benefits, and the courts upheld their actions.  Specifically, between 2001 and 2005 the concept of bad faith was applied in the following number of court cases: (i) 2001—262 court cases; (ii) 2002—644 court cases; (iii) 2003—1.189 court cases; (iv) 2004—2.235 court cases; (v) 2005—3.737 court cases. (citing also S.V. Savseris, *Bad Faith Category in Tax Law*, Statut, 2007 at p. 47, Exh. R-310).  According to Mr. Konnov, another prominent Russian scholar Arkady Bryzgalin in 2001 distinguished four methods which could be applied by the state to combat tax evasion, including doctrines of "substance over form" and "business substance." (citing *Methodology of Tax optimization*, Tax and Tax Law Journal, 2001, No. 1, at p. 26, Exh. R-2283).

[159]   Reply ¶ 217, n.368.

[160]   *Ibid* at ¶ 217.

219.   In 2001, the Tax Ministry asked the Constitutional Court to clarify its earlier decision, in particular, whether the rule (that a taxpayer's constitutional duty to pay taxes ceases when the funds are debited from its account) applied even if the taxpayer deliberately contrived, in bad faith, to use an insolvent bank in order to evade taxes.  In the resulting decision, the Russian Constitutional Court held that "the conclusions which are contained in the motivational and operative parts of the [1998] Ruling do not extend to the dishonest taxpayers, and recovery by enforcement in the manner established by law from dishonest taxpayers of taxes not coming into the budget does not violate the constitutional guarantees of the right of private ownership".  This decision introduced the concept of "bad faith taxpayer" into Russian law.

220.   Since introducing this novel doctrine, the Constitutional Court has been called on to address its proper scope on a few occasions, and has consistently imposed limits.

221.   In its decision of October 16, 2003, for example, the Court for the first time recognized the possibility of the doctrine's application in a context other than tax payments through failed banks, in particular, in relation to claims for VAT refunds for exports.  However, the Court emphasized the limited nature of this extension, recalling that, under Article 57 of the Russian Constitution and Article 3(7) of the Tax Code, "law enforcement authorities may not construe the concept of 'good faith tax payer' as imposing on the tax payer additional obligations which are not provided for in the legislation".  The Russian Constitutional Court reiterated this limiting principle in a 2005 decision and specifically criticized the Moscow Arbitrazh Court's sweeping attempt to "universalize" the concept so as to circumvent express statutory provisions in the context of the Yukos case.

222.   In sum, in its limited endorsement of a "bad faith taxpayer" doctrine, the Russian Constitutional Court has at all times clearly indicated that any such doctrine was subordinate to, and controlled by, relevant Constitutional and statutory provisions.

223.   The primacy and supremacy of Constitutional and statutory provisions over the "bad faith taxpayer" concept have since been reaffirmed by the Presidium of the Highest Arbitrazh Court in a decision wholly rejecting, in circumstances unrelated to the Yukos affair but involving tax claims against another oil company, the approach of the Moscow Arbitrazh Courts in the Yukos cases and emphasizing that "courts should assess arguments of tax authorities with respect to underpayment of taxes with consideration of specific statutory provisions rather than such subjective concepts as 'bad-faith taxpayer'".

224.   Accordingly, there was nothing in the "bad faith taxpayer" concept introduced by the Russian Constitutional Court that could have permitted the tax authorities to re-attribute revenues between taxpayers or otherwise disregard directly applicable statutory provisions and impose additional, unwritten obligations beyond those contained in the legislation.[161]

305.   In its Rejoinder, Respondent dismisses Claimants' suggestion that the Constitutional Court has limited the application of the doctrine since it arose in 1998, notably through its decisions since 2003:

661.   Contrary to Claimants' allegations, the Constitutional Court in 2003 was not "called on to address" the "scope" of the bad-faith taxpayer doctrine, much less to "limit[]" it, but rather to adjudicate a complaint that had been raised in connection with the

---

tax authorities' denial of a refund of input VAT based on the taxpayer's bad-faith conduct. Thus, the Constitutional Court confirmed its earlier holdings, including its 1998 ruling, reiterating that "in the sphere of fiscal relations, there shall be a presumption of good faith" in favor of taxpayers, which the authorities bear the burden of rebutting. The Court also noted that the authorities "may not construe the concept of 'good-faith taxpayer' as imposing on the taxpayer additional obligations which are not provided for in the legislation."

662. Claimants' self-serving reliance on this quotation -- which they extract from its all-important context -- is misplaced. It is clear from this ruling that the Court did not at all intend to "limit" the scope of the bad-faith taxpayer doctrine, but rather to clarify that a taxpayer's good or bad faith must be determined on a case-by-case basis, upon "review of all the circumstances of the particular case." That is exactly what the tax authorities and courts did with respect to Yukos. Specifically, the Constitutional Court explained that:

> "[t]he determination of the complainant's good or bad faith in the performance of its tax obligations and realisation of its rights to the reimbursement of amounts of tax deductions is connected with the establishment and review of the factual circumstances of the particular case and falls under the jurisdiction of the arbitrazh courts."

663. That the Court did not intend to limit the scope of the doctrine as formulated in its earlier jurisprudence is also apparent from its actual holding:

> "Based on the above [...] the Constitutional Court of the Russian Federation ruled: 1. The complaint of OOO Export-Service shall not be accepted for examination because the subject matter of the application to the Constitutional Court of the Russian Federation was earlier clarified in a decision which is still in force."

664. In sum, neither in this nor in other later rulings has the "Constitutional Court [...] suggested that the bad faith-taxpayer doctrine could not be used to combat abusive arrangements such as those used by YUKOS."[162]

306. The Tribunal has read and reviewed the many Constitutional Court decisions that form the backbone of the "bad faith taxpayer" doctrine in Russian law as well as papers of various Russian legal scholars. The Tribunal has formed the view that, during the period relevant for the tax assessments against Yukos from 2003 to 2004, the doctrine consisted mainly of the following principles:

- the good faith (honesty) of the taxpayer is presumed;[163]

- the tax authorities have the burden of proving the taxpayer's bad faith (dishonesty), and in doing so "may not construe the concept of 'good faith taxpayer' as imposing

---

[162]     Rejoinder ¶¶ 661–64 (footnotes omitted; emphasis in original).

[163]     Constitutional Court Ruling of the Constitutional Court of the Russian Federation No. 138-O ¶ 2 of the Motivational Part, 25 July 2001, Exh. R-307; Constitutional Court Ruling No. 329-O ¶ 2 of the Motivational Part, 16 October 2003, Exh. R-3238.

on the taxpayer additional obligations which are not provided for in the legislation";[164]

- in the case of a bad-faith (dishonest) taxpayer, the tax authorities have an "obligation . . . [to] ensure protection of the State's interests, including using mechanisms of judicial protection";[165] and

- the determination of the taxpayer's good or bad faith in the performance of its tax obligations and realization of its rights to the reimbursement of amounts of tax deductions is connected with the establishment and review of the factual circumstances of the particular case and falls under the jurisdiction of the arbitrazh courts.[166]

307. It is the Tribunal's opinion that Claimants cannot persuasively maintain that the "bad faith taxpayer" doctrine is subordinated to, and controlled by, not just the Russian Constitution (which must be the case), but also statutory provisions.[167]  It seems evident that if the tax authorities establish dishonesty (bad faith) by the taxpayer in a particular case, based on specific factual circumstances, then the taxpayer may lose certain statutory benefits such as tax deductions or exemptions provided in the legislation.  However, even a bad-faith taxpayer cannot be deprived of its *constitutional* rights or of statutory rights *that guarantee* the taxpayer's constitutional rights.[168]

308. Having reviewed and stated its observations on the important Constitutional Court cases, the Tribunal turns now to the Parties' arguments based on the principal arbitrazh court cases on

---

[164] Constitutional Court Ruling of the Constitutional Court of the Russian Federation No. 329-O ¶ 2 of the Motivational Part, 16 October 2003, Exh. R-3238.

[165] Constitutional Court Ruling of the Constitutional Court of the Russian Federation No. 138-O ¶ 2 of the Operational Part, 25 July 2001, Exh. R-307

[166] Constitutional Court Ruling of the Constitutional Court of the Russian Federation No. 329-O ¶ 2 of the Motivational Part, 16 October 2003, Exh. R-3238.

[167] Reply ¶ 222.

[168] Constitutional Court Ruling of the Constitutional Court of the Russian Federation No. 36-O of 18 January 2005 ¶ 3 of the Motivational Part, Exh. C-1140.  In that case, at issue was Yukos' complaint that the Moscow Arbitrazh Court had failed to grant Yukos the benefit of the statute of limitations (contained in Article 113 of the Tax Code of the Russian Federation (hereinafter "Russian Tax Code")) on the basis that Yukos was a "bad-faith taxpayer".  The Constitutional Court dismissed Yukos' complaint on jurisdictional grounds, but opined in *dicta* that Ruling No. 138-O "cannot serve as a ground for depriving the applicant of the guarantees established by Article 113 of the Tax Code of the Russian Federation."  Earlier in its decision, the court had noted that Article 113 is a guarantee of a taxpayer's constitutional rights.

which Respondent relies.  Although Mr. Konnov refers to dozens of other specific cases,[169] and alludes generally to "thousands of bad faith cases adjudicated in the relevant period,"[170] Respondent places particular emphasis on the *Sibirskaya* case[171] and Resolution No. 53 of the Supreme Arbitrazh Court.[172]  Claimants, for their part, emphasize a Resolution of the Federal Arbitrazh Court for the North-Western District of 5 June 2002 (the "***Pribrezhnoye***" case).[173] The Tribunal considers this case in the next chapter of its Award since it relates more directly to the application of any anti-abuse doctrine to circumstances similar to those that are at issue in the present case, rather than to the existence of any anti-abuse doctrine.

309.  Mr. Konnov describes the *Sibirskaya* case as follows:

    i.    In May 2002, OOO *Sibirskaya Transportnaya Kompaniya* ("Sibirskaya"), which was later found to be a Domestic Offshore Company, lost a cassation appeal before the Federal Arbitrazh Court for the North-Caucasian District.  Like YUKOS two years later, Sibirskaya argued that it had complied with the letter of the Kalmykian law.  The tax authorities and courts, however, concluded that Sibirskaya was a bad faith taxpayer and that the tax benefits granted to it were manifestly disproportionate (0.4%) to the amount of investment made by Sibirskaya:

        "Such investments neither have any effect on the economy nor cover any of the losses of the budget relating to the granting of tax incentives to taxpayers.  On the contrary, those investments result in unjust enrichment (saving) of funds at the expense of budgetary funds. Therefore, being aware of a clear disproportion between the amount of investment and the amount of the tax incentives applied, the claimant has abused its right, i.e., the claimant acted in bad faith."[174]

The Tribunal notes that no further appeals appear to have been made in this case.  During his cross-examination, Mr. Konnov observed that the amount at stake in *Sibirskaya* (around USD 200,000) "was peanuts."[175]

---

[169]    First Konnov Report ¶ 49(e)–(s).

[170]    Second Konnov Report ¶ 13.

[171]    *Sibirskaya*, Federal Arbitrazh Court for the North-Caucasian District, Case No. F08-1678/2002-614A, 20 May 2002, Exh. R-311.

[172]    Resolution of the Plenum of the Supreme Arbitrazh Court of the Russian Federation No. 53, 12 October 2006, Exh. R-1475.

[173]    Resolution of the Federal Arbitrazh Court for the North-Western District No. A42-6604/00-15-8-818/01, 5 June 2002, Exh. C-1278 (hereinafter "*Pribrezhnoye*").  See also discussion at paragraph 645 below.

[174]    First Konnov Report ¶ 49(i) (citing Resolution of Federal Arbitrazh Court of North-Caucasian District No. F08-1678/2002-614A, 20 May 2002, at Exh. R-311).

[175]    Transcript, Day 14 at 214. Mr. Konnov further speculated when he testified that Yukos may have "preferred, after having the loss, [to] immediately make the payment and not to take this case forward." Transcript, Day 14 at 214.

310. Respondent argues that the *Sibirskaya* case is one of "numerous cases [in which] the courts ruled against taxpayers on the basis that disproportion between the tax benefits granted to the taxpayer and amounts of investment into the relevant low-tax region economy is an indication of an abuse of rights and evidence of the bad faith of the taxpayer."[176]   Although *Sibirskaya* involved a Yukos-related entity, Sibirskaya Transportnaya Kompaniya, Respondent argues that "the tax authorities did not realize the connection of that company with Yukos at the time."[177]

311. Claimants challenge the assertion that the authorities did not know that the company was related to Yukos.[178]   Furthermore, and of direct relevance to the topic at issue here, Claimants contest the validity of the "purported 'proportionality' requirement" imposed by the court on the basis of the "bad faith taxpayer" doctrine:

> Not only was the Court's reliance on the "bad faith taxpayer" doctrine improper . . . the purported "proportionality" requirement it sought to introduce was wholly arbitrary and contravened other statutory and Constitutional provisions as well as basic principles of the rule of law.[179]

312. The Tribunal cannot accept Respondent's submission that the *Sibirskaya* case is an authority for the proposition that proportionality, standing alone, is a sufficient criterion for a finding of abuse.   The decision does appear indeed to stand alone and, as far as the Tribunal can tell, was not followed subsequently.   Moreover, contrary to Mr. Konnov's opinion, it was not Sibirskaya Transportnaya Kompaniya that "lost" an appeal at the cassation level of the arbitrazh court, suggesting that the tax authorities had been successful at all other levels.   In fact, the company had actually prevailed in the earlier decisions on this issue.[180]   Those judgments are not in the record.   In addition, Claimants underline that, during his expert testimony in the *Quasar de*

---

[176] Counter-Memorial, ¶ 997, n.1561 (citing Resolutions of Federal Arbitrazh Court of the North-Caucasian District, Case No. F08-1682/2002–623A, 21 May 2002, Exh. R-313; Case No. F08–1674/2002–627A, 21 May 2002, Exh. R-314;, Case No. F08-1793/2002, 28 May 2002, Exh. R-316; Case No. F08–3949/2002–1374A, 22 October 2002, Exh. R-317; Resolution of Federal Arbitrazh Court of the Moscow District, Case No. KA–A41/6270–03, 10 October 2003, Exh. R-319; Decision of the Moscow Arbitrazh Court, Case No. A41-K2-10055/02, 17 November 2004, Exh. R-320).

[177] *Ibid.* ¶ 291.

[178] Reply ¶ 227.

[179] *Ibid.* ¶ 228.

[180] Resolution of the Federal Arbitrazh Court of the North-Caucasian District No. F08-1678/2002–614A, 20 May 2002 p. 1, Exh. R-311.

*Valores SICAV S.A. et al. v. The Russian Federation* ("**Quasar**") arbitration proceedings, Mr. Konnov disclaimed reliance on the "proportionality" requirement.[181]

313.   As is apparent from the many cases reviewed above, Russian courts did consider and rule on tax-related cases before they were seized of the dispute involving the tax assessments against Yukos, including in the "anti-abuse" area.

314.   Respondent also raised a 2006 ruling of the Supreme Arbitrazh Court known as Resolution No. 53.  In principle cases decided *after* the Yukos tax assessments and decisions should not be relevant for ascertaining the state of the law at the time of those assessments and decisions. However, in view of Respondent's argument that Resolution No. 53 represents the end point of the *evolution* of the anti-abuse doctrine in the Russian courts, the decision is of interest to the Tribunal in ascertaining the state of the law on the anti-abuse doctrines not only after, but also before and during the Yukos tax assessments.

315.   In Resolution No. 53, the Supreme Arbitrazh Court set out to ensure greater uniformity in its evaluation of the "justifiability" of tax benefits received by the taxpayer by setting out straightforward interpretations of certain doctrines.  As a starting point, it reaffirmed that the good faith of the taxpayer was presumed and that the tax authority had the burden to prove the facts upon which it relies in making its determinations.  It noted that benefits may be considered unjustified when transactions are recorded without reflecting their true nature or are concluded without a business purpose or connection to economic activity.  In such situations, the court would determine the rights and obligations of the taxpayer on the basis of the actual economic substance of a transaction.  The Supreme Arbitrazh Court noted, however, that no adverse inference should be drawn from the fact that there was another, less beneficial way to conduct a transaction.  It laid out four scenarios which may "point to" an unjustified tax benefit, and nine factors which, taken by themselves, may not constitute grounds to find a tax benefit unjustified.  However, taken in concert with other factors, they may be considered as evidence of an improperly obtained benefit.  Finally, it stated that a court should "establish the existence of economic or other reasons (business purpose) in the taxpayer's actions subject to evaluation of circumstances evidencing its intent to obtain an economic effect as a result of actual business or economic activity."  It held that the tax benefit itself could not be considered an independent business purpose:  "Therefore, if the court determines that the main purpose pursued by the

---

[181]   Claimants' Post-Hearing Brief ¶ 32, n.67.  *Quasar de Valores SICAV S.A. et al. v. The Russian Federation*, SCC Arbitration, Award, 20 July 2012, Exh. R-3383 (hereinafter "*Quasar*").

taxpayer was obtaining of income exclusively or predominantly out of the tax benefit and there was no intention to carry out actual economic activity, the tax benefit may be disallowed."[182]

316.    Many articles on Resolution No. 53 have been written by Russian tax scholars and practitioners.   Two in particular are cited by Mr. Konnov.[183]   Both articles underline the importance of Resolution No. 53, although they reach different conclusions regarding the novelty of its content.   One article by Mr. Y.M. Lermontov concludes that Resolution No. 53 was an innovation in Russian tax law: "[t]he concept of the 'bad-faith' of the taxpayer has been eliminated by Resolution No. 53," and instead other doctrines have been "incorporated into the regulatory framework."[184]   Mr. Lermontov notes that in the past, "the judicial practice concerning the treatment of taxpayers as those of good faith and of bad faith in these matters used to be inconsistent," and that as a result of Resolution No. 53, more specific doctrines such as "business purpose", "substance over form" and "economic justifiability" were substituted in its place.[185]

317.    The other commentary was written by Messrs. A.V. Bryzgalin and V.V. Goryunov. [186] For these authors, the doctrine affirmed in Resolution No. 53 represents less of a break with the bad-faith taxpayer doctrine that existed at the time of the Yukos assessments.   Instead, they see Resolution No. 53 as *linking* the "business purpose" doctrine to the "bad-faith taxpayer" doctrine.   The authors note that bad faith of the taxpayer was "considered for the first time . . . [in] N 138-0 regarding dubious schemes for payment of taxes through 'problem banks.'" The authors further note that since the doctrine had not been "directly provided for in the law," it created "uncertainty" leading to "considerable complications for . . . taxpayers, but also for the judges."   Prior to Resolution No. 53, the authors write, "no criteria in this area existed at all, and the question of bad faith was completely dominated by judicial discretion."   For the authors, Resolution No. 53 represents a "positive step" in which the Supreme Arbitrazh Court "attempted to establish specific indications of bad faith of taxpayers, characteristic features and approximate examples of permissible and impermissible conduct."   The authors suggest that the

---

[182]   Resolution of the Plenum of the Supreme Arbitrazh Court of the Russian Federation No. 53, 12 October 2006, p. 3, Exh. R-1475 (hereinafter "Resolution No. 53").

[183]   Second Konnov Report ¶ 80, n.133.

[184]   Y.M. Lermontov, *Commentary to the Resolution of the Plenum of the Supreme Arbitrazh Court No. 53*, Exh. R-3266.

[185]   *Ibid*.

[186]   A.V. Bryzgalin and V.V. Goryunov, *Commentary on Resolution No. 53 of the Plenum of the Supreme Arbitrazh Court of the Russian Federation*, Exh. R-3267.

change from "bad faith" to "unjustified tax benefit" is more a matter of terminology than doctrine. The authors write that "despite the substitution of terms . . . the concept of an unjustified tax benefit is illustrated in Resolution N[o]. 53 by what used to be called bad-faith behavior of taxpayers."

318.   The link between these doctrines was made, as early as 2002, in a commentary on Constitutional Court Ruling 138-O that was published in 2002 by Mr. Sergey Pepeliaev, who would later be retained by Yukos in the Russian tax litigation.[187]   In his commentary, Mr. Pepeliaev wrote as follows:

> In this Ruling the court considers the issue of limitations on tax planning, which implies the recognition of the right of each taxpayer to use the means, ways and methods permitted by law to reduce such taxpayer's tax liabilities to the maximum extent possible. However, sometimes tax planning goes beyond the permitted limits and results in tax evasion. The boundaries between the tax planning and tax evasion [are] determined by reference [to] the taxpayer's purposes. If tax savings are only ancillary to the relevant economic result, then the relevant tax consequences shall be determined by reference to the form of the relevant transaction. However, where the taxpayer's actions were aimed solely to reduce the amount of its tax payments rather than to achieve an economic result, this would demonstrate that the relevant transaction was inconsistent with law because the motive underlying such transaction was to avoid tax.
>
> . . .
>
> The expression "good faith of the parties to a transaction" is closely related to the expression "good faith taxpayer" which was used by the Constitutional Court of the Russian Federation twice in the opinion section of Resolution No. 24-P dated 12 October 1998. In other words, in the context of the Resolution, the expression "good faith of the parties to a transaction" was used in its public legal meaning. A person's actions aimed solely at tax evasion may not be regarded as actions made in good faith.
>
> . . .
>
> If the parties to a transaction act reasonably, i.e., if they aim to achieve the actual business result and also choose such line of action which leads to minimal tax loss, then the parties' tax liabilities should be determined formally.
>
> . . .
>
> lf it appears that parties act both unreasonably and not in good faith then this constitutes a ground for reassessment of the parties' tax liabilities for which various mechanisms can be used. Upon a claim brought by the tax authorities the actual relations between the parties may be assessed by court[s]. The substance of such court proceedings would be an examination of whether the actions of the relevant parties were aimed at achievement of business (economic) results or whether the idea of tax saving was the prevailing idea. . . .[188]

---

[187]   Second Konnov Report ¶ 12(c).

[188]   S.G. Pepeliaev, *Commentary to the Ruling of the Constitutional Court Ruling of the Russian Federation No. 138-O of July 25, 2001*, Exh. R-352.

319. The Tribunal concludes that, in respect of the period relevant for the Yukos tax assessments and decisions, while the "bad faith taxpayer" doctrine had not yet gelled in the way that it did in 2006, in Resolution No. 53, it had already been recognized and applied in some Russian court decisions.  This conclusion, while based primarily on the Tribunal's review of the cases,[189] is also supported by the cross-examination of Mr. Konnov at the Hearing, as explained in the following paragraphs.

320. In his cross-examination of Mr. Konnov, Professor Gaillard focused on the sanction that the Russian Federation imposed on Yukos in the present case, rather than on the existence of any anti-abuse doctrine *per se*.

321. Mr. Friedman emphasized the limited scope of Claimants' cross-examination of Mr. Konnov during his re-direct examination of the witness:

> MR FRIEDMAN: Just to make sure I am clear, Mr Konnov, you understood the questions yesterday to be about the remedy that's applied based on the anti-abuse doctrine, as opposed to the substance of the anti-abuse doctrine?
>
> A.     I thought that Professor Gaillard limited his question—and the Tribunal did the same thing—very specifically to the attribution; which I explained—and I think the record said that—that I don't view that as a separate instrument.  But I was nevertheless asked the question about court cases with respect to attribution.[190]

322. As Claimants had stipulated to the existence of the bad-faith taxpayer doctrine (while contesting the scope and manner of its application), they instead implied in their argument that any such doctrine was irrelevant, since formal compliance with the legislation governing the low-tax benefits in the respective regions, including fulfilment of the terms of any applicable investment agreements, was sufficient to claim the tax benefits.[191]

323. Accordingly, in his cross-examination of Mr. Konnov, Professor Gaillard stressed the compliance of Yukos' tax scheme with the existing legislative framework.  In his answer, Mr. Konnov, while acknowledging that the formal requirements of the law may have been met, reiterated the relevance of the anti-abuse doctrine:

---

[189]   The Tribunal also observes that the ECtHR, in its separate judgments relating to the claims against the Russian Federation brought by Yukos and Messrs. Khodorkovsky and Lebedev, respectively, considered the relevant domestic (*i.e.*, Russian) law and practice, including the Russian courts' case-law on substance over form and related doctrines. *See* ECtHR Yukos Judgment ¶¶ 428–68; *Khodorkovsky v. Russia (2)* ¶¶ 422–28.

[190]   Transcript, Day 15 at 193–94.

[191]   Reply ¶¶ 148–64.

Q.      So what you are saying is that the Law is not a good law, right?  The Law which gives the regions the power to negotiate their taxes downwards in exchange for contributions to their fund is not a good law?  The system is not good, as far as—

A.      No, I am not saying that at all.  I am not saying that at all.  I am saying that what was done in this case, it was an abuse of law.  So the Law was applied by Yukos in such an abusive manner so that, in violation of the constitutional principles which I've summarized in my report, Yukos did not pay taxes duty  in Moscow.  It used this whole fraudulent sham arrangement, with the use of the Mordovian companies, to evade taxes in Moscow.[192]

324.    Mr. Konnov's insistence on the relevance of the anti-abuse doctrine, notwithstanding Yukos' compliance with the strict letter of the law, can also be seen in the following extract of his cross-examination by Professor Gaillard:

Q.      What do you call the proportionality principle? Is it the proportionality between the investment and the benefits?

A.      Correct.

Q.      Right.  Is this—I will use the words "proportionality principle" within your meaning, what you just said, right?  Is this proportionality principle found in the black letter of the Law of Mordovia; yes or no?

A.      No. As I said—

Q.      Okay.

A.      —neither in Mordovia, nor in Kalmykia, nor in any other jurisdictions.

Q.      Fine.  And we have seen that in the agreements regarding the ZATOs, the trading companies had agreed to contribute to a fund 5% of their tax benefits.  We have seen that earlier, yesterday or this morning, right?

A.      Right.

Q.      Okay.  Now, going back to the Sibirskaya case, in the Sibirskaya case we have a decision of first instance where the taxpayer won; correct?

A.      As I recall, correct.

Q.      Right.  And in the Court of Appeal the taxpayer lost, and it had to do with the Law of Kalmykia; correct?

A.      No.  No.  There was no—again—

Q.      But it was a Kalmykian company

. . .

A.      No, it was not based on the Kalmykian Law.  Obviously Sibirskaya was governed by Kalmykian Law; obviously Kalmykian Law did apply to it, to the same extent Mordovian Law applied to companies registered in Mordovia.  But the assessment was based on the proportionality principle, which, as we discussed, is not found—I think you used the words—in the black letters of the Law.[193]

---

[192]   Transcript, Day 13 at 151–52.

[193]   Transcript, Day 14 at 218–220.

325.   Having completed its review of what it considers to be the central evidence in the record in respect of the legal framework applicable to the Yukos tax optimization scheme under Russian law, the Tribunal now turns to the complex factual matrix involving Yukos' trading entities in the low-tax regions.

### 4.   The History of the Yukos Trading Entities before 2003

326.   In the present proceedings, the Parties vigorously debated the significance of the history of the Yukos trading companies, including various tax audits that took place before 2003.   The pertinent activities of Yukos' trading companies took place in the regions of Mordovia and Kalmykia, as well as in the ZATOs of Lesnoy and Trekhgorny.   The Tribunal will now summarize these activities and the results of the many tax audits which were issued.

### (a)   Mordovia

327.   Mordovia is a region within the Russian Federation.   Sometimes referred to as a "domestic offshore territory", in the late 1990s it was granted some autonomy as regards taxation, which made it a more attractive destination for investment and business operations.[194]   This was part of a broader plan by the Russian Government in the 1990s to foster economic development in areas designated as "economically underdeveloped".[195]   As noted earlier, the special exemption plan for domestic offshore territories was largely repealed as of 1 January 2004.[196]

328.   On 9 March 1999, the *Law of the Republic of Mordovia No. 9-Z* ("***Law 9-Z***") was enacted.[197]   *Law 9-Z* was the framework which allowed Mordovia to offer tax benefits to corporate entities operating in the region.   Article 4.4 of the law states that "[t]he Government of the Republic of Mordovia shall determine the order and terms and conditions of granting the tax benefit under this Law, as well as the order of keeping reports and records to be able to obtain the tax benefits listed in this Law."[198]

---

[194]   Transcript, Day 1 at 45–48.

[195]   Respondent Opening Statement, Day 2 at 109.

[196]   *See* paragraphs 77 and 283 above; First Konnov Report ¶ 33.

[197]   *Law 9-Z*, Exh. C-414.

[198]   *Ibid*.

329.    Mr. Vladimir Dubov, a member of the Yukos management board[199] and later a member of the
        State Duma for the Upper Volga region (which includes Mordovia), was the primary point of
        contact between Yukos and the regional and federal taxation authorities in Mordovia.   He
        appeared as a witness on behalf of Claimants.

330.    In his witness statement, Mr. Dubov stated the following:

- On 20 December 1999, he attended meetings in Mordovia to explain Yukos' plan to
  operate through trading companies in Mordovia.   He met with Mr. Nicolai Merkushkin, the
  head of the Republic of Mordovia; Mordovian Prime Minister Vladimir Volkov,; and
  Mordovian Deputy Prime Minister Vladimir Ruzhenkov, who was also Head of the
  Administration of the Government of Mordovia.   Mr. Dubov swears that "[a]ll terms and
  conditions associated with the use of trading companies in the Republic of Mordovia were
  discussed and agreed at the meeting, including that Yukos' trading companies would pay
  [80 million rubles] per month to the Republic."   He stated that the Mordovian authorities
  "fully approved" of the plan.[200]

- In late December 1999, he met with the Tax Minister of the Russian Federation,
  Mr. Alexander Pochinok, and Mr. Alexander Smirnov, one of Mr. Pochinok's deputy
  ministers, to discuss Yukos' plan to use trading companies in the Republic of Mordovia.
  Mr. Smirnov was very interested and called the head of the Special Inspectorate for Major
  Taxpayers, Mr. Aslambek Pasckachev, and the head of the Oil Department within the
  special inspectorate, Ms. Lydia Smirnova, into the in the meeting, to ask them to analyze
  the beneficial taxation plan.[201]

- After that meeting, he spoke with Mr. Gusev, First Deputy Minister in charge of the VAT
  Department, to discuss Yukos' plan.   He thought this important as "it was obvious to me
  that any trading companies established in Mordovia would be claiming significant VAT
  refunds on the export of oil and oil products."[202]   He also spoke with Ms. Olga Serdiuk,

---

[199]    Transcript, Day 5 at 14.

[200]    Dubov WS ¶¶ 20–21.

[201]    *Ibid*. ¶¶ 22–23.

[202]    *Ibid*. ¶ 24.

then Deputy Head of the Indirect Taxes Department and one of the three deputy First Ministers, Mr. Kirill Ugolnikov.[203]

- Around late December 1999 or January 2000, he met with each of the deputy First Ministers at the Tax Ministry and at the Menatep office on Kolpachniy Lane to outline the plan for the Mordovian companies.  Following these meetings, Mr. Smirnov called the Head of the Regional Department of the Tax Ministry in Mordovia, Mr. Aleksey Averiasov, in Mr. Dubov's presence, to inform him that such discussions had taken place and that Yukos had been "given the green light at the Ministry level for the use of trading companies in the region."[204]

- He met with the then First Deputy Minister of Finance (later Minister of Finance and Deputy Prime Minister), Mr. Alexei Kudrin at the Ministry of Finance in January 2000. They discussed establishing Yukos trading companies in Mordovia so that Yukos could take advantage of tax benefits available in the region and that Yukos' trading companies would be able to contribute to the regional economy through fixed monthly payments. Mr. Dubov recalls that "Alexei Kudrin consented to Yukos' proposal, with the proviso that Yukos' overall tax burden should essentially remain the same."[205]

331.  When he was cross-examined, Mr. Dubov repeated his statement that he told Mr. Kudrin that Yukos was planning to work in Mordovia through trading companies, as well as "which taxes it will pay in each level of national budget, which preferences would the budgets provide for Yukos, what benefits Yukos would reap from these preferences and what amounts would be paid in[to] the federal budget, and if there were any issues, how they were going to be resolved."[206]

332.  Mr. Dubov concludes in his witness statement that, after these meetings, "[i]t follows that all the relevant authorities, both federal and regional, including the Minister of Taxation, his first Deputies, and the First Deputy Minister of Finance were aware of, cooperated with and approved of Yukos' plan to operate through the trading companies in the Republic of Mordovia

---

[203] *Ibid*.

[204] *Ibid*. ¶ 25.

[205] *Ibid*. ¶ 26. It is common ground between Claimants and Respondent (hereinafter "the Parties") that the point of Yukos' tax arrangements was to lower its tax burden, not to keep it at the level it would have been at without resort to them.

[206] Transcript, Day 5 at 84.

to take advantage of the favorable tax climate."[207]  In Mr. Dubov's view, this was favorable both for Mordovia and the Russian Federation, as any improvement in the financial situation of Mordovia would decrease the burden it placed on the federal budget.  According to Mr. Dubov, "[t]he Russian Federation was clearly interested in decreasing the significant disparities in well-being between the regions [of the Federation]."[208]

333.  The record reveals that, as the trading companies began operations, VAT refunds to the companies were very significant.  In fact, VAT refunds to the trading companies often exceeded the total amount of VAT collected in Mordovia from all the other companies operating on its territory.  The regional section of the Federal Treasury therefore had to transfer the necessary funds to the Tax Ministry's regional VAT Department.  This decision to transfer funds, according to Mr. Dubov, had to be taken at the federal level, including obtaining the approval of the Ministry of Finance.

334.  During his cross-examination, Mr. Dubov explained that "[w]hen, as a result of the operations of the trading companies, the VAT refunds increased many times over, many fold, by many hundreds of per cent, the Tax Ministry department asked the question why[;] the Tax Ministry, the Tax and Charges Ministry for Mordovia replied that we have Yukos trading entities incorporated here, these have to do with the Yukos exports; that is why the VAT refunds are so high."[209]  He also stated that "[t]his is exactly why, before the scheme became operational, I had cleared [it] with the head of the department and the First Deputy Minister who was in charge of this department."[210]

335.  In addition, in his witness statement, Mr. Dubov affirms that the funds paid into the Mordovian budget were used to fund various projects, such as Internet House, an internet-training center, and the rebuilding of the Saransk Airport.  In 2001, according to Mr. Dubov, several dignitaries, including President Vladimir Putin, repeatedly visited the area (using the airport) and discussed the trading companies' work in the region.  Mr. Dubov states:  "During such visits, President Putin was told by Nicolai Merkushkin, the Head of the Republic of Mordovia, and other representatives of the Republic of Mordovia, about the social, cultural and industrial projects that had been developed in the region in the previous year through the support and

---

[207]  Dubov WS ¶ 27.

[208]  *Ibid.* ¶ 29.

[209]  Transcript, Day 5 at 149–50.

[210]  Transcript, Day 5 at 150.

cooperation of Yukos."[211]   Mr. Dubov also recalls that President Putin had been told about several other improvement projects funded by Yukos' support, such as the building of plants for machinery construction, construction materials and the production of optic fiber; the realization of a number of environmental projects such as the recycling of rotten wood and raw materials; the rehabilitation of the meat industry; reconstruction of the Saransk Theatre and Saransk Art Museum; the construction of two asphalt plants just outside of Saransk; and the reconstruction of the Saransk-Moscow highway.[212]

336.   Mr. Dubov concludes that "[i]t follows that the federal authorities, who had to authorize the VAT refund, as well as any subsequent transfer of funds, were fully aware of Yukos' trading structure, including the activities of the production and trading companies and the transactions between them."[213]

337.   The Tribunal notes that during his cross-examination, Mr. Dubov could not confirm that the VAT forms submitted by the trading companies to the Tax Ministry contained the full particulars as to how the tax optimization scheme was being implemented by Yukos.  This was because, as he said, he was not familiar with the specifics of the VAT submissions although he knew that they would be submitted to the Leninsky district of Saransk (Mordovia) and they were likely to be very large.[214]   It seems unlikely to the Tribunal that such information would have been disclosed in the VAT forms, as the tax benefits of the low-tax regions did not extend to VAT.

338.   During his cross-examination, Mr. Dubov affirmed that he only discussed with Mr. Kudrin "the general scheme", not the formalities or the details of the activities of the trading companies.[215]   The Tribunal further notes that in his witness statement, Mr. Dubov asserts that "[p]rior to the attacks on Yukos, which began in the Summer of 2003, the Russian authorities never challenged the legality of this structure or the materiality of the facts underlying this structure."[216]   During his cross-examination before the Tribunal, he stated that he had no

---

[211]   Dubov WS ¶ 33.

[212]   *Ibid.* ¶ 33; Memorial ¶ 711.

[213]   Dubov WS ¶ 44.

[214]   Transcript, Day 5 at 152–54.

[215]   Transcript, Day 5 at 81–83.

[216]   Dubov WS ¶ 12.

knowledge of the use of the ZATO Lesnoy companies,[217] and in light of such testimony, Mr. Dubov's evidence must be understood as being limited to Yukos' activities in Mordovia.

339.   In the following subsections, the Tribunal will review the detailed information that was presented to it regarding the trading companies incorporated in Mordovia.

### i.       Alta-Trade (Mercury XXIII)

340.   Alta-Trade was incorporated on 17 December 1999 as Mercury XXIII pursuant to the resolution of a meeting of the company's founders, Polikant ZAO and A-Trust OOO, each with a 50 percent [RUR 5,000] stake in the share capital.  In March 2001, Nefteinvest OOO became a shareholder, taking a 2 percent (RUR 200) share in the company's share capital.[218]  In August 2001, Yukos-Import OOO acquired the shares of Polikant ZAO and A-Trust OOO, and became the owner of 98 percent of the share capital (RUR 9,800).[219]

341.   On 27 June 2001, Alta-Trade concluded an investment agreement with Mordovia, which was supplemented in March 2002.[220]

342.   The record reveals two decisions by the Saransk Tax Inspectorate in 2001 where Alta-Trade was denied the right to offset the VAT in respect of some of its activities.  The decision of 15 June 2001 notes that Alta-Trade is "an enterprise producing oil products and selling its output domestically and [abroad]," that it purchases crude oil from Yu-Mordovia, and that sales are made through OAO NK Yukos and ZAO Trading House Angarsk-Nefto as  commission agents.[221]  The decision of 29 October 2001 refers to transactions with, for example, Siberian Transportation Company and noted that the commission agent was Yukos Export Trade.[222]  Thus, this information pertinent to the activities of Alta-Trade in Mordovia and linking Alta-Trade to the Yukos "family" was known to the authorities as early as 2001.

---

[217]   Transcript, Day 5 at 101–102.

[218]   Field Tax Audit Report No. 08-1/1 of OAO Yukos Oil Company, 29 December 2003 p. 34, Exh. C-103 (hereinafter "2000 Audit Report").

[219]   *Ibid.* pp. 34–35.

[220]   Investment Agreement No. 5, 27 June 2001, as supplemented, Exh. C-1114.

[221]   Decision of the Inspectorate of the Ministry of Taxes and Levies of the Russian Federation for the Leninsky District of Saransk No. 23, 15 June 2001, Exh. C-1110.

[222]   Decision of the Inspectorate of the Ministry of Taxes and Levies of the Russian Federation for the Leninsky District of Saransk No. 48, 29 October 2001, Exh. C-1116.

343.    In April 2002, Alta-Trade's first ever field tax audit was conducted.  It covered the year 2000.[223]  The report from that audit noted the tax-benefit structure under Law 9-Z and the investment agreement between Mordovia and Alta-Trade.  It noted that Alta-Trade was engaged in "crude oil refining [through intermediaries], sale of crude oil and oil products in the domestic market, as well as for export."[224]  It noted the tax benefit structure under Law 9-Z,[225] and that the company had no capital assets on its balance sheet.[226]  It also noted that Alta-Trade's accounting and tax services were completed by Yukos Invest.[227]  The Audit Report found no violation of any tax laws.[228]

344.    As will be seen in the next chapter, tax reassessments would eventually be made against Yukos for Alta-Trade for the years 2000,[229] 2001,[230] 2002[231] and 2003,[232] totaling RUR 7,143,036,557 (approximately. USD 238,101,219).[233]

ii.    Fargoil

345.    Fargoil was registered with state authorities on 23 May 2001.  The sole founder of Fargoil was Mikhail Nikolayevich Silayev, who owned 100 percent of the share capital (RUR 10,000).  On 25 May 2001, he transferred full ownership of the shares to Nassaubridge Management Limited, a company incorporated in Cyprus, for RUR 11,000.[234]

346.    According to the Ministry of Taxation, "[i]n order to get the opportunity to have dividends taxed at a 5% rate, Nassaubridge Management Limited, pursuant to Article 10 of the

---

[223]    Field Tax Audit Report No. 02-52 of OOO Alta Trade, 19 April 2002 ¶ 2.3, Exh. C-1120.

[224]    *Ibid.* ¶ 1.7.

[225]    *Ibid.* ¶ 2.8.

[226]    *Ibid.* ¶ 2.5.

[227]    *Ibid.* ¶ 2.2.

[228]    *Ibid.* ¶ 2.5.  However, there was a 500 ruble (Approx. USD 17) fine for Alta Trade's Director because of incomplete presentation of all required documents.

[229]    Decision No. 14-3-05/1609-1, 14 April 2004 pp. 26–27, Exh. C-104 (hereinafter "2000 Decision").

[230]    Decision No. 30-3-15/3, 2 September 2004 p. 55, Exh. C-155 (hereinafter "2001 Decision").

[231]    Decision No. 52/896, 16 November 2004 p. 101, Exh. C-175 (hereinafter "2002 Decision").

[232]    Decision No. 52/95, 6 December 2004 p. 56, Exh. C-190 (hereinafter "2003 Decision").

[233]    Fiscal Years 2000–2004, Breakdown of the tax reassessments against Yukos by region or ZATO and company, excluding interest and fines p. 6, Exh. C-1752 (hereinafter "Yukos Tax Reassessment Breakdown").  The RUR to USD exchange rate is approximate, based on a rate of 30:1.

[234]    2002 Decision, p. 106, Exh. C-175.

<u>Agreement between the Government of the Russian Federation and the Government of the Republic of Cyprus on Avoidance of Double Taxation of Income and Capital of 5 December 1998</u>, made a direct investment in Fargoil OOO capital, equivalent to USD 120,000 (Bank Payment Order No. 1 of 7 February 2002, issued by Nassaubridge Management Limited, worth 3,590,000 paid as a share capital contribution based on an application of 31 January 2002)."[235] Fargoil's accounts were prepared by Yukos Financial Accounting Centre OOO.[236]

347.   An investment agreement was concluded between Fargoil and Mordovia on 27 June 2001, and supplemented on 26 March 2002.[237]   In April 2002, a report of the Directorate on Implementation of the special-development program was issued pursuant to that agreement, which indicated that Fargoil had contributed over RUR 102 Million to the region.[238]

348.   In September 2003, a Field Tax Audit Report for 2001 to 2002 was issued.  It found no violation of Article 40 of the Russian Tax Code; but did find some underpayments, resulting in an order to Fargoil to pay additional road tax and income tax in the amount of RUR 590,847,939 (USD 19.7 Million).  Notably, the report concluded that "Fargoil lawfully used exemptions applicable to all taxes under review."[239]

349.   Tax reassessments would eventually be made against Yukos for Fargoil for the years 2001,[240] 2002[241] and 2003,[242] totaling RUR 130,243,731,762 (approximately USD 4,341,457,725).[243] The Tribunal notes this was by far the largest of the tax reassessments levied against any one of the trading companies.

---

[235]   *Ibid.*

[236]   *Ibid*. p. 107.

[237]   Investment Agreement No. 9, 27 June 2001, as supplemented, Exh. C-1142.

[238]   Report of the Directorate on Implementation of the Republic's Special-Purpose Development Program of the Republic of Mordovia for 2001–2005 on the Use of Investments Received from OOO Fargoil under Investment Agreement No. 9 of June 27, 2001 for the Year 2001, 15 April 2002, Exh. C-1118.

[239]   Field Tax Audit Report No. 02-105 of OOO Fargoil, 3 September 2003 ¶ 2.16, Exh. C-1124.

[240]   2001 Decision, pp. 110–11, Exh. C-155.

[241]   2002 Decision, pp. 123–24, Exh. C-175.

[242]   2003 Decision, pp. 76–77, Exh. C-190.

[243]   Yukos Tax Reassessment Breakdown p. 6, Exh. C-1752. The RUR to USD exchange rate used here is based on a rate of 30:1.

### iii.   Macro-Trade

350.   Macro-Trade was incorporated on 14 May 2001.  The sole founder and chief accountant of Macro-Trade was Ms. Gulnura Karimovna Zhukova, who was also the founder and director of Mega-Alliance OOO.  Pursuant to a resolution of 24 May 2002 and amendments to the charter of Macro-Trade on 22 October 2002, her shareholding was transferred, in equal 50 percent shares, to Conbrook Limited (LLC) and Silverdale Trading Limited (LLC), both registered in Cyprus.  On 16 December 2002, Macro-Trade's share capital was increased to RUR 7,700,000 and "was formed by a deposit of cash assets into the entity's current account from an account at Trust and Investment Bank JSCB on 20 December 2001 [*sic*]."[244]

351.   Ms. Zhukova submitted a statement in court proceedings in Moscow in May of 2005 in which she alleged that she knew nothing about becoming a director of Macro-Trade and that her name was on the books of the company as a result of a fraud.  She stated that in December 1998 or early 1999, her purse with her passport had been stolen.  She stated that she did not report the theft because the passport was returned at the end of January 1999.[245]  Mr. Konnov, in his first expert report, referred to Ms. Zukhova's statement.[246]  When Professor Gaillard cross-examined Mr. Konnov on this "story", Professor Gaillard pointed out that Macro-Trade was incorporated in May 2001, more than two years *after* Ms. Zukhova's passport was returned to her.[247]

352.   An investment agreement was concluded between Macro-Trade and Mordovia, exempting the company from paying property tax and corporation profit tax payable to the republican and local budgets of the Republic of Mordovia.[248]

353.   Tax reassessments would eventually be made against Yukos for Macro-Trade for the years 2003[249] and 2004,[250] totaling RUR 841,582,281 (approximately USD 28,052,743).[251]

---

[244]   2003 Decision, p. 93, Exh. C-190.

[245]   Application by the Russian Federal Tax Service's Inter-District Inspectorate No. 1 for Major Taxpayers to the Federal Arbitrazh Court for the Moscow District, 4 May 2005 pp. 15–16, Exh. R-257; Transcript, Day 13 at 38.

[246]   First Konnov Report ¶ 20, n.20.

[247]   Transcript, Day 13 at 39.

[248]   2003 Decision, p. 100, Exh. C-190.

[249]   *Ibid*. pp. 100–01.

[250]   Decision No. 52/292, 17 March 2006, p. 86, Exh. R-1539 (hereinafter "2004 Decision").

[251]   Yukos Tax Reassessment Breakdown, p. 6, Exh. C-1752.  The RUR to USD exchange rate used here is approximate, based on a rate of 30:1.

#### iv.     Mars XXII (Energotrade)

354.  Mars XXII was incorporated on 17 December 1999.  The founders were OOO Akra, registered in the Kaluga Region, and Renmet ZAO, registered in Moscow, both with equal shares of 50 percent (RUR 5,000).[252]  Renmet ZAO is also a founder of Elbrus OOO, which had a 20 percent holding in the share capital of Yu-Mordovia and Yukos-M. Ms. Tatiana Subbotina was one of the directors of Mars XXII.  In a witness statement of 18 May 2004, Ms. Subbotina affirmed that, while she was formally in charge of the company, she only signed documents and did not know whether any investment agreements were concluded by Mars-XXII.[253]  According to its charter, the main activities of Mars XXII were the production and wholesale sale of oil products in the internal market and for export.[254]

355.  The Tribunal notes that an investment agreement was concluded between Mars XXII and Mordovia on 27 June 2001, and supplemented on 26 March 2002.[255]

356.  On 27 December 2001, a decision was issued by the Saransk Tax Inspectorate on "a Partial Refusal to Refund (Offset) VAT Amounts."  The decision notes that the commission agent for the export transactions is OAO NK Yukos.  The decision refers to oil prices as well as a chain of VAT transactions, and notes that the suppliers of the crude oil at issue were Ratmir and Norteks.[256]  Again, this information linking Mars XXII to the Yukos "family" was known to the authorities as early as 2001.

357.  In October 2003, a Field Tax Audit Report was issued for 2000 to 2002.  It specifically stated that the "terms and conditions for applying the special taxation procedure have been complied with."[257]  Some minor violations were found, however, with respect to personal income and profit taxes.  The decision specifically noted that Mars XXII used Yukos FBTs for all of their accounting services.[258]

---

[252]    2000 Audit Report, p. 20, Exh. C-103.

[253]    First Konnov Report ¶ 20, n.20 (citing Witness Statement of Subbotina T.G. (Protocol No. 431la, 18 May 2004), Exh. R-258)

[254]    2000 Audit Report, p. 21, Exh. C-103.

[255]    Investment Agreement between Mars XII and Mordovia, 27 June 2011, Exh. C-1111.

[256]    Decision of the Inspectorate of the Ministry of Taxes and Levies of the Russian Federation for the Leninsky District of Saransk No. 53, 27 December 2001, Exh. C-1117.

[257]    Field Tax Audit Report No. 02-126 of Mars XXII, 22 October 2003, p. 4, Exh. C-1125.

[258]    *Ibid*. p. 2.

358. Tax reassessments would eventually be made against Yukos for Mars XXII (Energotrade) for the years 2000,[259] 2001,[260] 2003[261] and 2004,[262] totaling RUR 55,959,738,409 (approximately USD 1,865,324,614).[263]

#### v.   Ratmir (Pluton XXVI)

359. Ratmir was incorporated on 17 December 1999.  Ratmir was originally incorporated under the name of Pluton XXVI OOO.  The founders of Ratmir were Gem OOO, with an 18 percent share (RUR 1,800); Sonata OOO, with an 80 percent share (RUR 8,000); and Nefteinvest OOO with a 2 percent (RUR 200).[264]  All of the founders were registered outside of Mordovia..[265]  Sonata also founded Yu-Mordovia, and maintained a 20 percent stake in that company.

360. Ratmir's accounts were managed by Yukos-Invest.[266]  According to the Tax Ministry, "Ratmir OOO bought and sold crude oil, gas condensate, oil products, petrochemical products, and subsequently sold oil products and petrochemical products for export."[267]

361. An investment agreement was concluded between Ratmir and Mordovia on 27 June 2001 and was supplemented on 26 March 2002.[268]

362. In April 2002, a Field Tax Audit Report was issued for the year 2000.[269]  It noted that there were no capital assets on the balance sheet (no physical facilities to store oil); and that Ratmir was exempt from property and profit tax pursuant to *Law 9-Z*.[270]  It found only a few minor

---

[259]   2000 Decision, , p. 14, Exh. C-104.

[260]   2001 Decision, pp. 122–23, Exh. C-155.

[261]   2003 Decision, pp. 91–92, Exh. C-190.

[262]   2004 Decision, pp. 80–81, Exh. R-1539.

[263]   Yukos Tax Reassessment Breakdown, p. 6, Exh. C-1752.  The RUR to USD exchange rate used here is approximate, based on a rate of 30:1.

[264]   2000 Audit Report, p. 55, Exh. C-103.

[265]   *Ibid*.

[266]   *Ibid*. p. 56.

[267]   *Ibid*.

[268]   Investment Agreement No. 26 between Mordovia and OOO Ratmir, 27 June 2001, as supplemented, Exh. C-1115.

[269]   Field Tax Audit Report No. 02-51, 19 April 2002, Exh. C-1119.

[270]   *Ibid*. pp. 2, 4, 5.

violations and ordered the company to pay RUR 43,299 (approximately USD 1,440) in relation to the profit tax[271]

363.   In October 2002, a Field Tax Audit Report was issued for the year 2001.  It noted that Ratmir was enjoying benefits under the Mordovian tax law, including the exact amounts involved. It found no violations of any tax laws.  The report also noted that Ratmir's accounting reports were managed by Yukos FBTs.[272]  This information linking Ratmir to the Yukos "family" was known to the authorities in 2002.

364.   Tax reassessments would eventually be made against Yukos for Ratmir for the years 2000,[273] 2001,[274] 2002,[275] and 2003,[276] totaling RUR 12,373,090,752 (approximately USD 412,436,359).[277]

### vi.   Yukos-M

365.   Yukos-M was incorporated on 20 January 2000 and registered on 24 January 2000.  When it was founded, its share capital was divided into 24 ordinary, registered shares, each with a nominal value of RUR 400 (96 percent of the company's share capital) and 1 registered preference share with a nominal value of RUR 400 (4 percent of the company's share capital). Elbrus owned 23 ordinary registered shares, totaling RUR 9,200 or 92 percent of the share capital. OAO Yukos Oil Company owned one registered preference share with a nominal value of RUR 400 or 4 percent of the share capital and one ordinary registered share with a nominal value of RUR 400 or 4 percent  of the share capital (for a total of 8 percent of the share capital). The Tribunal notes that Elbrus and Yukos Oil Company were also co-founders of Yu-Mordovia OOO, each with 20 percent of the share capital.[278]  On 22 December 2000, "OAO Yukos Oil Company became the company's sole shareholder (owner of 100% of the company's ordinary and preference shares)".[279]  Yukos-M's accounts were managed by Yukos-Invest.[280]  According

---

[271]   *Ibid*. p. 8.  The RUR to USD exchange rate used here is approximate based on a rate of 30:1.

[272]   Field Tax Audit Report No. 02–144 of OOO Ratmir ¶ 2.1, 16 October 2002, Exh. C-1121.

[273]   2000 Decision, p. 49, Exh. C-104.

[274]   2001 Decision, pp. 42–43, Exh. C-155.

[275]   2002 Decision, p. 105, Exh. C-175.

[276]   2003 Decision, pp. 60–61, Exh. C-190.

[277]   Yukos Tax Reassessment Breakdown, p. 6, Exh. C-1752.  The RUR to USD exchange rate used here is approximate, based on a rate of 30:1.

[278]   2000 Audit Report, p. 41, Exh. C-103.

[279]   *Ibid*.

to the charter documents, in the year 2000, the company was engaged in the sale of crude oil on the domestic and export markets.[281]

366. Yukos-M and Mordovia entered into an investment agreement on 27 June 2001, which was later supplemented on 26 March 2002.[282]

367. In April 2002, a Field Tax Audit Report was issued for the year 2000, but this document is not in the record.  In October 2002, a Field Tax Audit Report was issued for 2001.  It noted the tax benefits accruing to Yukos-M under *Law 9-Z* and the investment agreement between Mordovia and Yukos-M.  It specifically mentioned that for the period under review, Yukos-M engaged in domestic and export sales of crude oil as well as other activities, and found no violation of any tax law.[283]

368. Tax reassessments would eventually be made against Yukos for Yukos-M for the years 2000,[284] 2001,[285] 2002[286] and 2003,[287] totaling RUR 29,519,084,452 (approximately USD 983,969,482).[288]

### vii.   Yu-Mordovia

369. Yu-Mordovia was incorporated on 2 December 1999 and registered on 17 December 1999.  The sole founder of Yu-Mordovia OOO was OAO Yukos Oil Company.[289]  On 17 January 2000, amendments were made to Yu-Mordovia's charter regarding the identity of the founders, the value of the share capital and the number of shares.  The following each had a 20 percent (2.0) share in the share capital:   OAO Yukos Oil Company, Sonata OOO, Elbrus OOO, Stekloprommash ZAO and A-Trust OOO.[290]  The shareholders were registered outside

---

[280]   *Ibid*.

[281]   *Ibid*. p. 42.

[282]   Investment Agreement Between Mordovia and Yukos-M, 27 June 2001, as supplemented, Exh. C-1112.

[283]   Field Tax Audit Report No. 02-145 of ZAO Yukos-M, 16 October 2002, pp. 2–4 Exh. C-1122.

[284]   2000 Decision, , p. 35, Exh. C-104.

[285]   2001 Decision, pp. 64–65, Exh. C-155.

[286]   2002 Decision, pp. 96–98, Exh. C-175.

[287]   2003 Decision, pp. 48–49, Exh. C-190.

[288]   Yukos Tax Reassessment Breakdown, p. 6, Exh. C-1752.  The RUR to USD exchange rate used here is approximate, based on a rate of 30:1.

[289]   2000 Audit Report, p. 51, Exh. C-103.  According to Exhibit C-103, the incorporation of Yu-Mordovia OOO was authorized at the meeting of the Board of Directors of OAO Yukos Oil Company by Resolution No. 120/1-19 of 2 December 1999.

[290]   *Ibid*. pp. 51–52.

Mordovia, either in the Tyumen Region (OAO Yukos Oil Company) or Moscow (the remaining four shareholders).[291]   Yu-Mordovia and Mordovia entered into an investment agreement on 27 June 2001, which was later supplemented on 26 March 2002.[292]

370.   The company's tax assessment, sent to the tax authorities in Saransk, Mordovia on 30 July 2001, described the details of the tax arrangement between Yu-Mordovia and Mordovia, including the tax on actual profit for the first half of 2001, with precise amounts of the benefits enjoyed and amounts paid under the Mordovian law.[293]

371.   Tax reassessments would eventually be made against Yukos for Yu-Mordovia for the years 2000,[294] 2001,[295] 2002[296] and 2003,[297] totaling RUR 21,018,327,538 (approximately USD 700,610,918).[298]

     **(b)   Kalmykia**

372.   Kalmykia is a low-tax region in Russia.  Only one trading company was based there, Siberian Transportation Company (Sibirskaya), registered in 1998.  Kalmykia was authorized to offer tax benefits under the *Law of the Republic of Kalmykia No. 12-II-Z on Tax Benefits Granted to Enterprises Making Investments in the Economy of the Republic of Kalmykia* of 12 March 1999.[299]   Aimed at "further enhancement of the investment climate" in the region, the law was designed to offer exemptions from certain local taxes and corporate taxes to companies making investments in the region.[300]

---

[291]   *Ibid*. p. 52.

[292]   Investment Agreement No. 24 Between Mordovia and OOO Yu Mordovia, 27 June 2001, Exh. C-1113.

[293]   Attachment No. 9 to Instruction of the Ministry of Taxes and Levies of the Russian Federation No. 62 of 15 June 2000, 30 July 20001, Exh. C-1747.

[294]   2000 Decision, pp. 44–45, Exh. C-104.

[295]   2001 Decision, pp. 80–81, Exh. C-155.

[296]   2002 Decision, p. 90, Exh. C-175.

[297]   2003 Decision, p. 43, Exh. C-190.

[298]   Yukos Tax Reassessment Breakdown, p. 6, Exh. C-1752.  The RUR to USD exchange rate used here is approximate, based on a rate of 30:1.

[299]   *Law of the Republic of Kalmykia No. 12-II-Z On Tax Benefits Granted to Enterprises Making Investments in the Economy of the Republic of Kalmykia*, 12 March 1999, Exh. C-413.

[300]   *Ibid*.

### i.     Siberian Transportation Company (Sibirskaya)

373.    Sibirskaya was founded by Step ZAO, registered in Kaluzhskaya Region, and Polinep ZAO, registered in Moscow, both holding 50 percent shares.[301]  The Tribunal notes that Polinep ZAO was also a founder of Sonata OOO and Elbrus OOO, which were founders of Yu-Mordovia OOO and Yukos-M ZAO.[302]

374.    Sibirskaya received tax benefits under the *Law of the Republic of Kalmykia No. 12-II-Z* of 12 March 1999 referred to above and the *Resolution of the Elista Municipal Assembly No. 7* of 25 January 2001.[303]

375.    In September 2001, a resolution was issued by the Inspectorate of the Ministry of Taxes and Levies of Russia (Elista).  It found that the Siberian Transportation Company was ineligible for the tax benefits applied to it in the autonomous region.[304]  On the same day, a tax payment demand was issued to recoup the costs of the inappropriately applied benefits, in the amount of RUR 6,918,617 (approximately USD 230,000).[305]

376.    In December 2001, the Arbitrazh Court of the Republic of Kalmykia ruled that the tax incentives were, in fact, *lawfully* applied to the Siberian Transportation Company and the resolution and payment demand were declared invalid.  In addition, the court specifically stated that it had not found any evidence that the company had acted in bad faith or that it abused its rights.[306]  The Inspectorate of the Ministry of Taxes and Levies of Russia (Elista) appealed the December 2001 judgment.  The court of appeal upheld the decision of the lower court,

---

[301]    2000 Decision, p. 8, Exh. C-104.

[302]    *Ibid*.

[303]    *Law of the Republic of Kalmykia No. 12-II-Z*, 12 March 1999, Exh. C-413.  The resolution is referred to in Exh. R-311.  As is the case with many of the documents referred to below, although the existence of this particular document (the resolution) is evidenced by a reference in an exhibit that is in the record, the resolution itself is not in the record.  Claimants have criticized Respondent for failing to provide a complete record of the pre-2003 audits and related documents.

[304]    Resolution of the Federal Arbitrazh Court of the North-Caucasian District, Case No. F08-1678/2002-614A, 20 May 2002, Exh. R-311 (referring to Resolution No. 01-24/2261 of the Inspectorate of the Ministry of Taxes and Levies of Russia, 25 September 2001).

[305]    *Ibid*. (referring to *Tax payment demand No. 01-23/2261*, 25 September 2001).  The RUR to USD exchange rate used here is approximate, based on a rate of 30:1.

[306]    *Ibid*. (referring to Decision of the Arbitrazh Court of the Republic of Kalmykia, Case No. A22-1306/2001-6/129, 5 December 2001).

affirming that the resolution and the payment demand were invalid.  The court of appeal found no bad faith on the part of the Siberian Transportation Company.[307]

377.    The Inspectorate of the Ministry of Taxes and Levies of Russia (Elista) appealed this decision to the Federal Arbitrazh Court of the North-Caucasian District.  The Federal Arbitrazh Court reversed the decisions of the lower courts and ruled that the Siberian Transportation Company was not eligible for the benefits and that the company had acted in bad faith.  The resolution and the payment demand therefore became valid once again and were reinstated.[308]  The Federal Arbitrazh Court held that the tax benefits granted to the company were disproportionate to the investment it had made in Kalmykia.  It found that the amount invested was 0.4 percent of the amount of tax benefits.  There is no further information in the record as to any further steps in those proceedings, and, in particular, no evidence that the company appealed the decision of the Federal Arbitrazh Court to the Supreme Arbitrazh Court.

378.    Tax reassessments would eventually be made against Yukos for the Siberian Transportation Company for the year 2000,[309] totaling RUR 240,437,174 (approximately USD 8,014,572).[310]

      **(c)**     **Lesnoy and Trekhgorny**

379.    Lesnoy and Trekhgorny are ZATOs.  As noted earlier, ZATOs or "Closed Adminstrative Territorial Units" are restricted-access territories "established in the former Soviet Union from the late 1940s as defense and nuclear power plant cities, which included communities with sensitive military, industrial or scientific facilities, such as arms plants or nuclear research sites."[311]  Due to the fact that their local economies were particularly dependent on increasingly obsolete military or nuclear functions, the ZATOs faced economic collapse at the end of the Cold War.  To address the problem, in 1992, the Russian State Duma "enacted a federal law to define the special tax regime of the ZATOs and the financing of these territories by the federal government, and guaranteed the ZATOs' residents certain social and health benefits."[312]  The number of restricted access jurisdictions in Russia is unknown, and it was not until the late

---

[307]    *Ibid*. (referring to the Resolution of the appellate court, Case No. A22-1306/2001-6/129, 12 March 2002).

[308]    *Ibid*.

[309]    2000 Decision, p. 11, Exh. C-104.

[310]    Yukos Tax Reassessment Breakdown, p. 6, Exh. C-1752.  The RUR to USD exchange rate used here is approximate, based on a rate of 30:1.

[311]    Counter-Memorial ¶ 226, n.274.

[312]    *Ibid*.

1990s that the territories were even named or mapped.[313]  In 1996, about half of the ZATOs were declassified of ZATO status.

### i.      Lesnoy

380.  At the end of 1997, four trading companies were established by Yukos in Lesnoy:  Business-Oil, Forest-Oil, Mitra, and Vald-Oil.   In early 1998, the trading companies entered into agreements with the Lesnoy Town Administration to make investments in the region that would entitle them to certain tax benefits.[314]  These were renewed in 2000.[315]

381.  In January 1999, the trading companies based in Lesnoy and the Lesnoy Administration agreed to allow the companies to use interest-bearing promissory notes of OAO Yukos Oil Company in order to pay their taxes.[316]  This agreement was later formalized in a decision by the head of ZATO Lesnoy.[317]

382.  In 1999, the Lesnoy Administration also entered into several other agreements with the trading companies.  Resolution 189 of the Duma of Lesnoy referred to joint investment activity within the framework of a partnership "between the Lesnoy administration and YUKOS OC OJSC."[318]  The investments included construction and reconstruction of gas stations based on joint-activity agreements entered into "for a total of [RUR] 2,730 Million."[319]  In late 1999, three of the four

---

[313]   Vladimir Samoylenko, *Government Policies in Regard to Internal Tax Havens in Russia*, Publication of International Tax & Investment Center, December 2003, p. 10, Exh. C-577.

[314]   2000 Decision, Exh. C-104 (referring to Agreement No. 10, 9 February 1998 and Agreement No. 4, 28 January 2000 (Business-Oil); Agreement No. 3, 28 January 2000 (Mitra); Agreement No. 2, 28 January 2000 and Agreement No. [unknown] (Vald-Oil)); Memorandum on the results of the audit of the legality of additional tax incentives granted to Mitra, Business-Oil and Forest-Oil in Lesnoy for 1998 and 9 months of 1999 p. 5, Exh. R-294 (referring to Agreement No. 11, 9 February 1998 (Forest Oil)).

[315]   2000 Decision, Exh. C-104 (referring to Agreement No. 4 between the Lesnoy Administration and Business-Oil, 28 January 2000; Agreement No. 3 between the Lesnoy Administration and Mitra, 28 January 2000; Agreement No. 2 between the Lesnoy Administration and Vald-Oil, 28 January 2000.  There is no information on a renewal in favour of Forest-Oil, though it seems likely there was one.

[316]   Report No. 04-14/11-1, 22 February 2002 pp. 7, 9, 11, 12, Exh. R-304 (referring to agreements of 6 January 1999 allowing the use of OAO NK Yukos promissory notes for tax payments by the four trading companies).  *See also* Claimants' Rebuttal, Transcript, Day 20 at 50 for further context.

[317]   Report No. 04-14/11-1, 22 February 2002 pp. 7, 9, 11, 12, Exh. R-304 (referring to Decision No. 1734a of Head of Lesnoy Administration to allow the trading companies to pay taxes for 1999 with OAO NK Yukos promissory notes of OAO NK Yukos, 21 December 1999).

[318]   Decree of the Investigation Committee of the Russian Federation, 16 January 2002, p. 2, Exh. R-377 (referring to *Resolution 189 of the Duma of Lesnoy*, 15 December 1999).

[319]   *Ibid*.

trading companies were subjected to "desk audits", which "confirmed the validity in application of additional tax incentives granted."[320]

383. On 3 December 1999, the Minister of Taxes of the Russian Federation instructed the Interregional State Tax Inspectorate for Operational Control over Problem Taxpayers to audit the legality of tax incentives granted in the Lesnoy ZATO to Mitra, Business Oil and Forest Oil.[321]

384. There is in the record an undated Internal Tax Ministry "Memorandum on the results of the audit" initiated on 3 December 1999.[322]  The Tribunal recalls that this memorandum has been the subject of extensive representations by the Parties.

385. The Tribunal notes that, in essence, the memorandum concludes that while each entity has the *formal* right to receive the "additional tax incentives under Law of the Russian Federation No. 67-FZ of 2 April 1999"[323] based on an examination of the entity's operations, it was established during the interrogation of a witness, in respect of each entity, that "the employees residing on the ZATO territory are not involved in the work related to the main activity of the company."[324]

386. Respondent submitted that this memorandum and the investigation which preceded it "put Yukos on notice" of the tax authorities' investigations into the legality of the use of the ZATOs. On the other hand, Claimants replied that the memorandum was a document internal to the tax ministry.[325]  Claimants also aver that contemporaneous field tax audits conducted in March and

---

[320] Memorandum on the results of the audit of the legality of additional tax incentives granted to Mitra, Business-Oil and Forest-Oil in Lesnoy for 1998 and 9 months of 1999 pp. 1, 3, 5, Exh. R-294 (referring to Desk Audit Report No. 4 for Mitra, 29 October 1999; Desk Audit Report No. 3 for Business Oil, 1 November 1999; Desk Audit Report No. 5 for Forest Oil, 1 November 1999).

[321] *Ibid.*, p. 1.

[322] *Ibid.*  The memorandum is undated but considered to be from early-to-mid 2000 on the basis of the documents referenced in it.  It appears that the audit report, whose findings were summarized in this undated memorandum, was issued on 7 March 2000.  *See* Statement No. 6 on the legality of the use by OOO Business-Oil in 1999 and 2000 of additional tax incentives granted by the head of the municipal formation of Town of Lesnoy No. 6, 29 June 2001, p. 4, Exh. R-295.

[323] Memorandum on the results of the audit of the legality of additional tax incentives granted to Mitra, Business-Oil and Forest-Oil in Lesnoy for 1998 and 9 months of 1999 pp. 2, 4, 6, Exh. R-294

[324] *Ibid.*, pp. 3, 4, 6.

[325] Respondent's Opening Slides, p. 48; Claimants' Post-Hearing Brief ¶¶ 57–58; *see also* Transcript, Day 14 at 86.

May 2000 found no violations of any tax law by Business Oil, Forest Oil or Mitra in relation to the application of these taxation arrangements.[326]

387.  At approximately the same time, Yukos undertook a series of corporate restructurings which resulted in the merger of the audited Lesnoy companies (*i.e.*, Business-Oil, Forest-Oil, Mitra, and Vald-Oil) into another, new company, OOO Perspektiva Optimum, that was registered in the Aginsky Buryatsky Autonomous Okrug (**"ABAO"**) in the Chita Region, which is located thousands of miles from the ZATO of Lesnoy.

388.  Concurrently, a similar restructuring was carried out with respect to a number of other trading entities established in the ZATO of Trekhgorny (*i.e.*, OOO Alebra, OOO Flander, OOO Grace, OOO Kolrein, OOO Kverkus, OOO Muskron, and OOO Norteks), which Yukos merged into still another newly created company also registered in ABAO by the name of OOO Trading Company Alkhanay.

389.  As a result of these restructurings, on 21 May 2001, the Lesnoy and the Trekhgorny trading entities, as well as the subsequently merged successor entities (OOO Perspektiva Optimum and OOO Trading Company Alkhanay), were liquidated.  The new entity that emerged was named OOO Investproekt and was registered in the Kirov region.  In August 2001, Investproekt moved across Russia to the Chita Region.

390.  These restructurings and movements by Yukos—referred to collectively by Respondent as the "**Lesnoy Shuffle**"—are seen differently by the Parties.  According to Claimants, they were merely a simplification of the corporate group of "hundreds of companies." [327]  Claimants also noted that the restructurings occurred before any Tax Ministry decisions were rendered against it.[328]  Respondent, on the other hand, submitted that they were indicative of a pattern of behavior on the part of Yukos that shows an intent to frustrate the taxation authorities.[329]  While the Tribunal need not determine why these restructurings took place at this time, it has formed

---

[326]   These documents are not in the record but see Statement No. 6 on the legality of the use by OOO Business-Oil in 1999 and 2000 of additional tax incentives granted by the head of the municipal formation of Town of Lesnoy No. 6, 29 June 2001, Exh. R-295 (referring to Field Tax Audit Report No. 31 on Business-Oil, 7 March 2000); Decision No. 36, 8 June 2000, Exh. R-2260 (referring to Field Tax Audit Report Act No. 36 on Forest-Oil, 5 May 2000); Statement No. 8 on the audit of OOO Mitra, 11 June 2001, Exh. R-297 (referring to Field Tax Audit Report Act No. 249 on Mitra, 5 May 2000).

[327]   Transcript, Day 20 at 43.

[328]   Claimants' Post-Hearing Brief ¶ 64.

[329]   Transcript, Day 21 at 57–60.

the view that the simplification claim is a simplification.  No persuasive argument has been advanced by Claimants to explain why the series of mergers occurred at this precise time.[330]  At the same time, the Tribunal notes that the tax authorities were then slowly moving away from the taxation autonomy previously given to the ZATOs and that, on 1 January 2002, the right of the ZATOs to grant any tax incentives was removed from the law completely.[331]

391.   In late June and early July 2001, the Tax Ministry circulated internally several memoranda (or "statements") relating to the tax benefits granted to the Lesnoy companies.[332]  The memoranda examined the lawfulness of the benefits granted between 1 January 1999 and March 2001.  Internal Tax Ministry Statement No. 6, which examined the benefits granted to Business-Oil, found that the tax incentives were actually not in accordance with the law on ZATOs and not approved by the Ministry of Finance.  It also found a violation due to payment of taxes with promissory notes.  It assessed taxes of approximately RUR 2.8 Billion (USD 98 Million) for the whole period.   The memorandum also notes specifically that the Lesnoy entities were enterprises of OAO NK Yukos.[333]

392.   Internal Tax Ministry Statement No. 7, which examined the benefits granted to Forest-Oil, found that the company's employees residing in Lesnoy were not engaged in trading, and also found violations due to payment of taxes with Yukos promissory notes and assessed approximately RUR 671 Million (USD 22 Million) in taxes that were not paid in cash.[334]

393.   Benefits granted to Mitra were examined in Internal Tax Ministry Statement No. 8, which found that Lesnoy unlawfully granted tax incentives, found a violation due to payment of taxes

---

[330]   Respondent's Closing Slides, pp. 8–12 (chronicling the series of moves that were taken "for no stated business reason".)

[331]   First Konnov Report ¶ 33.  This change did not affect other types of low-tax regions at this time, although some of their powers to grant incentives were also curbed.

[332]   Statement No. 6 on the legality of the use by OOO Business-Oil in 1999 and 2000 of additional tax incentives granted by the head of the municipal formation of Town of Lesnoy No. 6, 29 June 2001, Exh. R-295; Statement No. 7 on the audit of OOO Forest-Oil), 11 July 2001, Exh. R-296; Statement No. 8 on the audit of OOO Mitra, 11 July 2001, Exh. R-297; Statement No. 9 on the audit of Vald-Oil, 11 July 2001, Exh. R-298.

[333]   Statement No. 6 on the legality of the use by OOO Business-Oil in 1999 and 2000 of additional tax incentives granted by the head of the municipal formation of Town of Lesnoy No. 6, 29 June 2001 pp. 14–18, Exh. R-295.  Contrast the Respondent's submission that the Russian Federation didn't know about the Lesnoy companies' association with Yukos until 2003.  *See*  Transcript, Day 18 at 29–31 (Respondent's closing).  The RUR to USD exchange rate used here is approximate, based on a rate of 30:1.

[334]   Statement No. 7 on the audit of OOO Forest-Oil, 11 July 2001, Exh. R-296.  The RUR to USD exchange rate used here is approximate, based on a rate of 30:1.

by Yukos promissory notes and assessed approximately RUR 783 Million (USD 26 Million) in taxes paid with promissory notes.[335]

394. Internal Tax Ministry Statement No. 9 examined benefits granted to Vald-Oil. It found that Lesnoy could not grant incentives for 2000 and assessed that RUR 986 Million (USD 33 Million) was owed. It also found fault on the basis of a substance over form analysis, and a violation due to payment of taxes by Yukos promissory notes in the amount of RUR 1.8 Billion (USD 60 Million).[336]

395. In September 2001, a criminal investigation was initiated to look into whether the managers of the Lesnoy trading companies were involved in tax evasion.[337]

396. In October 2001, a decision was taken to conduct a repeat field tax audit of Investproekt,[338] and a request was made that the company release the accounting documents of Forest-Oil, Mitra, and Vald-Oil.[339] The repeat Field Tax Audit Report was issued in November 2001 with respect to the legality of the use of the additional tax incentives by the trading companies in the year 1999.[340]

397. Later in November 2001, Ms. Irina Golub, Yukos' Chief Accountant, received an e-mail from Mr. V.N. Kartashov, a general director of Yukos. The e-mail contained a document itemizing in tabular format, all of the information that Mr. Kartashov had regarding investigations into trading companies across the ZATOs and other low-tax regions.[341] It identified, in a column entitled "Risks", a criminal case "in connection with tax evasion" for the four Lesnoy entities and nine Trekhgorny entities. The document also noted that office personnel in all 13 of those firms had been interrogated, including the general directors of some of the Lesnoy companies. The entries for the Lesnoy entities also noted that some documents had been seized.

---

[335] Statement No. 8 on the audit of OOO Mitra, 11 July 2001, Exh. R-297. The RUR to USD exchange rate used here is approximate, based on a rate of 30:1.

[336] *Internal Tax Ministry Statement No. 8* (Vald-Oil), 11 July 2001, Exh. R-298. The RUR to USD exchange rate used here is based on a rate of 30:1.

[337] Decree on institution and initiation of criminal proceedings (against Managers of Business Oil, Forest Oil, Mitra, and Vald-Oil in relation to payment of taxes by Yukos promissory notes), 3 September 2001, Exh. R-376.

[338] Report No. 04-14/11-1, 22 February 2002, Exh. R-304 (referring to Decision No. 04-14/11 on the conduct of a repeat field tax audit of Investproekt, 13 October 2001).

[339] Report. No. 04-14/11-1, 22 February 2002 ¶ 2.3.1, Exh. R-304 (referring to request of 16 October 2001from tax authorities to Investproekt for accounting documents of Forest-Oil, Mitra, and Vald-Oil).

[340] Repeat Field Tax Audit Report No. 04-14/11 of OOO Investproekt, 9 November 2001, Exh. R-2250.

[341] E-mail from Ms. Golub to Mr. Kartashov, 23 November 2001, Exh. R-3338.

398.  In December 2001, Ms. Golub drafted a letter to be used as a template by one or more of the directors of the Lesnoy trading companies regarding the investigation into the use of promissory notes and sent it to Mr. D.V. Gololobov, Deputy Head of Yukos' Legal Department.[342]  Later, Mr. V.G. Aleksanyan, the Head of the Legal Department, wrote to Ms. Golub regarding her draft letter, asking that in correspondence with the authorities, no reference be made to the tax incentives granted by Lesnoy.[343]  Respondent argued during the Hearing that this demonstrates knowledge of and intent to conceal wrongdoing by Yukos.[344]  Claimants answered that the document merely notes that the tax incentives were not at issue in the investigation (only the use of promissory notes to pay taxes was), and that Mr. Aleksanyan was simply asking Ms. Golub not to bring up an issue that was not being investigated.[345]

399.  In December 2001, the tax authorities decided "to conduct additional control activities in respect of Investproekt."[346]

400.  In January 2002, the criminal investigation of the directors of the Lesnoy trading companies was terminated because the investigation had not determined that a crime was committed.  The report stated that "there is no constitution of a crime," and "tax payments in non-monetary form cannot indicate the intention of tax evasion."[347]  The document also concludes that the head of the Lesnoy Administration, Mr. A.I. Ivannikov, believed at the time that tax payments by promissory notes were legal and that his actions and the actions of Lesnoy officials relating to granting of tax benefits should be considered as exceeding their authority and as negligent.[348]

401.  However, a few days later, that decision was reversed.[349]  The reason then given was that no "legal assessment was conducted during the preliminary investigation as to whether the selection by the [trading companies] of such a knowingly illegal method of tax payment involving intentional overpayment of charged taxes and subsequent refund of surplus sums to

---

[342]   Draft letter regarding investigation into use of promissory notes, undated, Exh. R-415.

[343]   E-mail from Mr. Aleksanyan to Ms. Golub, 14 December 2001, Exh. R-3244.

[344]   Transcript, Day 18 at  34–35.

[345]   Transcript, Day 20 at  61.

[346]   Report No. 14/11-1, 22 February 2002, Exh. R-304 (referring to Decision No. 04-15/10 to conduct additional control activities on Investproekt, 17 December 2001).

[347]   Decree on termination of criminal case no. 135070 (in part), 16 January 2002, Exh. R-377.

[348]   *Ibid*.

[349]   Decree on the Reversal of the Decree to Discontinue Criminal Case No. 135070, 1 February 2002, Exh. R-381.

the accounts of these same companies in real monetary form could be considered as 'another method' of tax avoidance . . . ."[350]

402.   Ultimately though, the Tribunal notes that the investigation was suspended because, in the words of the resolution, "all possible investigative actions have been taken in the absence of an accused."[351]   The resolution noted that "this type of tax crime should be assessed as a tax evasion scheme by making advance payments for taxes of future periods," and that "[h]ere a mandatory condition is the fact that the advance payment is made in non-monetary form."[352] The resolution concluded that it was not possible to determine who among the directors of the trading companies or who in the Municipal Department of the City of Lesnoy actually committed a crime.[353]   Claimants stressed, in their Closing Statement, that no further action was taken.[354]   In this connection, the Tribunal recalls that Mr. Khodorkovsky and Mr. Lebedev were ultimately convicted, *inter alia*, for tax evasion, including in relation to the trading companies' use of promissory notes to pay taxes in Lesnoy.[355]

403.   In the period between the reversal and the suspension of the criminal case regarding the promissory notes, the report on additional control measures against Investproekt for 1999 was released.[356]   It considered that Business-Oil was not entitled to tax benefits in 1999, as it "was carrying out its business within ZATO Lesnoy as a matter of form only."[357]   The report also considered that the other Lesnoy companies were not entitled to tax benefits in 1999.   The report estimated their tax liabilities on the basis of Business-Oil as a "similar taxpayer".[358]

404.   The report assessed the value of the tax benefits that it concluded had been improperly granted at approximately RUR 5.3 Billion (USD 177 Million).   However, no assessment or decision

---

[350]   *Ibid.*, p. 3.

[351]   Resolution on Suspension of a Preliminary Investigation Due to Failure to Establish an Individual to be Accused, 4 March 2002, Exh. R-378.

[352]   *Ibid.*

[353]   *Ibid.*

[354]   Transcript, Day 16 at 224 ("There was no court decision issued on any of these, to our knowledge; and nothing has been filed by the Respondent to the contrary. . . In particular, none of the directors or the officials of the City of Lesnoy were convicted, in absentia or otherwise. So these are just the decrees rendered by the prosecution in relation to these facts in relation to the investigation.")

[355]   Judgment in the Name of the Russian Federation, Meshchansky District Court of the City of Moscow, 16 May 2005, p. 57, Exh. R-379.

[356]   Report No. 04-14/11-1, 22 February 2002, Exh. R-304.

[357]   *Ibid.*, p. 2.

[358]   *Ibid.*, p. 4.

was issued on the basis of this report to recoup the funds, which could have occurred any time up until 31 December 2002, before becoming time barred.[359]   No assessment was issued during the subsequent ten-month period against Investproekt.

405.   The Tribunal notes that, in March 2002, Mr. Dmitry Maruev, Yukos' Deputy Financial Manager, e-mailed M. U. Barbarovich and V. M. Zhuravlev and asked that they clean their e-mail folders and servers of references to a number of companies, some of which ("Alebra, Greis, Business Oil, Vald Oil, Kverkys [sic], Kolrein, Mitra, Muskorn, Nortex") had been merged into Investproekt.[360]

406.   Around this time, a demand requesting enforcement of a tax debt against Investproekt in the amount of RUR 25 Million (USD 833,000) was sent by the Ministry of Taxes and Levies for Chernyshevsk District to Bailiffs in the Chita region.   It was returned by the bailiffs who considered this matter to be outside of their jurisdiction since, when the debt was incurred, the company was located in Kirov.   The bailiffs also noted that Investproekt's executive S. A. Verketin still resided in Kirov, and supplied his address.[361]

407.   In April 2002, a decision was issued not to hold Investproekt liable for tax offenses in 2000. Rather, it proposed to collect taxes but not fines as offenses were "discovered after the completion of their reorganization."[362]   It assessed the taxes owed at RUR 11.985 Billion (approximately USD 400 Million).[363]   Two months later, a decision was issued by the Federal Arbitrazh Court for the North West District in the *Pribrezhnoye* case, which found (on nearly identical facts to those relied upon in the decision against Investproekt) that the tax authorities had acted in breach of the Russian Tax Code.[364]   Claimants argued that this decision explains, at least in part, the reason why the tax assessment against Investproekt was never collected.   In

---

[359]   *Ibid.*; *see also* Claimants' Post-Hearing Brief ¶ 63, n.136.

[360]   D. L. Maruev e-mail to M. U. Barbarovich and V.M. Zhuravlev, 15 March 2002, Exh. R-4040.   The e-mail listed the following companies:   Alebra, Belz, Business-Oil, Vald-Oil, Greis, Kverkys, Kolrein, Mitra, Muksar, Muskron, Nortex and Flander.

[361]   Letter from Acting Senior Court Bailiff L.M. Lobanova to the Head of the Interdistrict Inspectorate No. 4 of the Ministry of Taxes and Levies for Chernyshersk District, Exh. R-306.

[362]   Decision No. 02-11/1/1, 2 April 2002 p. 8, Exh. R-303.

[363]   *Ibid.* p. 7.

[364]   *Pribrezhnoye,*, Exh. C-1278.   *See also* Claimants' Post-Hearing Brief ¶¶ 68–70.

their Post-Hearing Brief, Claimants submit that "in the non-political circumstances that prevailed in 2002, the assessment would not have survived court review."[365]

408.  However, in August 2003, a decision was issued relating to the activities of the Investproekt companies in the year 2000.  The taxes owing were assessed at RUR 11.985 Billion (USD 400 Million); and this time, the authorities decided that they would also fine Investproekt, adding an additional approximate amount of RUR 2.4 Billion (USD 84 Million).[366]  It is not clear to the Tribunal as to whether this assessment was ever paid.[367]  The Tribunal notes that the basis for reversing the April 2002 decision (*i.e.*, the decision not to hold the company liable) was not explained in the August 2003 decision.

*Business-Oil*

409.  Business-Oil was registered by order of the head of the Administration of the Town of Lesnoy, on 30 December 1997, with RUR 10,000 capital.  It was founded by Special Project OOO (holding 5 percent of the shares) and Rasin OOO (holding 95 percent of the shares).

410.  In February 1998, Business-Oil and the Lesnoy Town Administration concluded an investment agreement, which granted incentives in relation to 17 different types of taxes and required payment of 5 percent of tax benefits granted by the administration to an off-budgetary fund.[368]  This agreement was later supplemented in 2000, and provided additional incentives in relation to eight additional taxes.[369]

411.  In November 1999, a desk audit was conducted.  The audit report confirmed the validity of the application of the additional tax incentives granted.[370]  The following month, a resolution of the tax authorities was issued which lead to an audit regarding compliance with the tax laws of the

---

[365]  Claimants' Post-Hearing Brief ¶ 69.

[366]  Decision No. 2.6-23 of the Department of the Ministry of Taxes and Levies of the Russian Federation for the Chita Region and Agynsky Butyatsky Autonomous District, 8 August 2003, Exh. R-305.  The RUR to USD exchange rate used here is approximate, based on a rate of 30:1.

[367]  Transcript, Day 20 at 85.

[368]  Memorandum on the results of the audit of the legality of additional tax incentives granted to Mitra, Business-Oil and Forest-Oil in Lesnoy for 1998 and 9 months of 1999, Exh. R-294 and 2000 Decision, Exh. C-104 (referring to Agreement No. 10 Between the Lesnoy Town Administration and OOO Business-Oil, 9 February 1998).

[369]  2000 Decision, Exh. C-104 (referring to Agreement No. 4 Between the Lesnoy Town Administration and OOO Business-Oil, 28 January 2000).

[370]  Memorandum on the results of the audit of the legality of additional tax incentives granted to Mitra, Business-Oil and Forest-Oil in Lesnoy for 1998 and 9 months of 1999 p. 5, Exh. R-294 (referring to a desk audit report No. 3, 1 November 1999).

Russian Federation and a verification of the terms and conditions under which additional tax incentives were granted between 1 January 1998 and 1 October 1999.[371]  In March 2000, a Field Tax Audit Report was issued regarding the lawfulness of the additional incentives for 1998 and nine months of 1999.  The report concluded that "no infringement of the tax legislation was established."[372]

412.  As set out above, however, an internal memorandum of the Tax Ministry questioned the entitlement of Business-Oil to the tax benefits, on the basis that it might not have been fulfilling the requirements of the legislation in substance (as opposed to form).  This, and other concerns about the entity's conduct, led to a criminal investigation inquiring into whether the managers of the Lesnoy entities were involved in tax evasion.  The investigation was ultimately suspended, but charges relating to the Lesnoy entities figured in the case by the Russian prosecutor against Messrs. Lebedev and Khodorkovsky in 2003.

413.  On 5 March 2001, Business-Oil was merged into Perspektiva Optimum, which later merged with Alkhanai Trading to become Investproekt.

414.  Tax reassessments would ultimately be made against Yukos for Business-Oil for the year 2000,[373] totaling RUR 1,620,951,772 (approximately USD 56,698,046).[374]

*Forest-Oil*

415.  Forest-Oil was registered by Resolution 1409 of the Lesnoy Town Administration on 31 December 1997.  In February 1998, Forest-Oil and the Lesnoy Town Administration concluded an investment agreement which granted incentives in relation to 16 different types of taxes and required payment of 5 percent of tax benefits to an off-budgetary fund.[375]

---

[371]  *Ibid.* (referring to Resolution No. 175, 16 December 1999).

[372]  *See* Statement No. 6 on the legality of the use by OOO Business-Oil in 1999 and 2000 of additional tax incentives granted by the head of the municipal formation of Town of Lesnoy No. 6, 29 June 2001, p. 4, Exh. R-295 (referring to Field Tax Audit Report No. 31, 7 March 2000).

[373]  2000 Decision, p. 65, Exh. C-104.

[374]  Yukos Tax Reassessment Breakdown, p. 6, Exh. C-1752.  RUR to USD calculated at 28.5892:1, the official exchange rate on 14 April 2004

[375]  Memorandum on the results of the audit of the legality of additional tax incentives granted to Mitra, Business-Oil and Forest-Oil in Lesnoy for 1998 and 9 months of 1999, p. 5, Exh. R-294 (referring to Agreement No. 11 Between the Lesnoy Town Administration and OOO Forest-Oil, 9 February 1998).

416.   In November 1999, a desk audit was performed which confirmed the validity of the additional tax incentives granted.[376]

417.   In December 1999, a resolution of the tax authorities was issued leading to a field tax audit for 1 January 1998 to 1 October 1999, in order "to inspect its compliance with the tax laws of the Russian Federation and check the terms and conditions under which additional tax incentives were granted."[377]   In May 2000, a Field Tax Audit Report was issued, which found no violation in relation to tax incentives, but found a VAT shortfall of RUR 107,142 [USD 3,500].[378]   In June 2000, a decision in relation to that report held Forest-Oil liable for a 20% fine of RUR 21,428 (USD 700).[379]

418.   As set out above, however, an internal memorandum of the Tax Ministry questioned the entitlement of Forest Oil to the tax benefits because it might not have been fulfilling the requirements of the legislation in substance (as opposed to form).   This, and other concerns about the entity's conduct, led to a criminal investigation inquiring into whether the managers of the Lesnoy entities were involved in tax evasion.   The investigation was ultimately suspended, but, as noted earlier, charges relating to the Lesnoy entities figured in the case by the Russian prosecutor against Messrs. Lebedev and Khodorkovsky in 2003.

419.   On 5 March 2001, Forest-Oil was merged into Perspektiva Optimum, which later merged into Investproekt.

420.   No tax reassessments would be made against Yukos for Forest-Oil.

*Mitra*

421.   Mitra was registered by Resolution 1355 of the Lesnoy Town Administration on 22 December 1997.   It was founded by OOO Alan, with registered address in Kaluga and a 95 percent shareholding, and OOO Special Project, with registered address in Lesnoy and a 5 percent shareholding.   As of 15 June 2000, OOO Neftemarket-2000, with registered address in Moscow

---

[376]   *Ibid*. p. 3 (referring to Desk Audit Report No. 5, 1 November 1999).

[377]   *Ibid*. (referring to Resolution No. 174, 6 December 1999).

[378]   Decision No. 36, 8 June 2000, Exh. R-2260 (referring to Field Tax Audit Report No. 36, 5 May 2000).  The RUR to USD exchange rate used here is approximate, based on a rate of 30:1.

[379]   *Ibid*.  The RUR to USD exchange rate used here is approximate, based on a rate of 30:1.

(and itself 100% owned by OAO Yukos Oil Company) held 100 percent of the shares in Mitra.[380]

422.   In February 1998, Mitra and the Lesnoy Town Administration concluded an investment agreement,[381] which was supplemented in a further agreement in January of 2000, in which the administration provided additional incentives in respect of 8 types of taxes.[382]

423.   In October 1999, a Field Tax Audit Report was issued,[383] followed by a desk audit report[384] which confirmed the validity of the additional tax incentives granted.  In December 1999, a resolution of the tax authorities was issued which led to the conduct of a field tax audit for 1 January 1998 to 1 October 1999 "to inspect its compliance with the tax laws of the Russian Federation and check the terms and conditions under which additional tax incentives were granted."[385]  In May 2000, the Field Tax Audit Report was released.  It found no violation in relation to tax incentives and only a profit tax error in the amount of RUR 3,122,000 (USD 105,000).[386]

424.   As set out above, however, an internal memorandum of the Tax Ministry questioned the entitlement of Mitra to the tax benefits, on the basis that it might not have been fulfilling the requirements of the legislation in substance (as opposed to form).  This, and other concerns about the entity's conduct, led to a criminal investigation inquiring into whether the managers of the Lesnoy entities were involved in tax evasion.  The investigation was ultimately suspended, but, as noted earlier, charges relating to the Lesnoy entities figured in the case by the Russian prosecutor against Messrs. Lebedev and Khodorkovsky in 2003.

425.   On 5 March 2001, Mitra was merged into Perspektiva Optimum, which later merged into Investproekt.

---

[380]   2000 Decision, pp. 72–73, Exh. C-104.

[381]   Memorandum on the results of the audit of the legality of additional tax incentives granted to Mitra, Business-Oil and Forest-Oil in Lesnoy for 1998 and 9 months of 1999, p. 1, Exh. R-294 (referring to Agreement No. 7, 3 February 1998).

[382]   2000 Decision, pp. 73–74, Exh. C-104 (referring to Agreement No. 3, 28 January 2000)

[383]   *Ibid*. p. 1 (referring to Field Tax Audit Report No. 76, 8 October 1999).

[384]   *Ibid*. (referring to Desk Audit Report No. 4, 29 October 1999).

[385]   *Ibid*. (referring to Resolution No. 249, 16 December 1999).

[386]   Statement No. 8 on the audit of OOO Mitra (referring to Field Tax Audit Report No. 249, 5 May 2000).

426.  Tax reassessments would later be made against Yukos for Mitra for the year 2000,[387] totaling RUR 27,124,001 (USD 948,750).[388]

*Vald-Oil*

427.  Vald-Oil was registered by Resolution 1441 of the Lesnoy Town Administration on 30 December 1997.  It was founded by OOO Neftemarket, holding 5 percent of the shares, and OOO Al-Gem holding 95 percent of the shares.

428.  In February 1998, Vald-Oil and the Lesnoy Town Administration apparently concluded an investment agreement[389] which granted incentives in relation to 16 different types of taxes and required payment of 5% of the value of the tax benefits to an off-budgetary fund.  It was supplemented by a further agreement in January of 2000.[390]

429.  As set out above, however, concerns that Vald Oil might not have been fulfilling the requirements of the legislation in substance (as opposed to form), and other concerns about the entity's conduct, led to a criminal investigation inquiring into whether the managers of the Lesnoy entities were involved in tax evasion.  The investigation was ultimately suspended, but, as noted earlier, charges relating to the Lesnoy entities figured in the case by the Russian prosecutor against Messrs. Lebedev and Khodorkovsky in 2003.

430.  On 5 March 2001, Vald-Oil was merged into Perspektiva Optimum, which later merged into Investproekt.

431.  Tax reassessments would eventually be made against Yukos for Vald-Oil for the year 2000,[391] totaling RUR 1,362,216,581 (USD 47,647,943).[392]

---

[387]   2000 Decision, p. 76, Exh. C-104.

[388]   Yukos Tax Reassessment Breakdown, p. 6, Exh. C-1752.  RUR to USD calculated at 28.5892:1, the official exchange rate on 14 April 2004, Exh. R-334.

[389]   2000 Decision, p. 6, Exh. C-104 (referring to investment agreements with, among others, Vald Oil).

[390]   2000 Decision, p. 80, Exh. C-104 (referring to Agreement No. 2, 28 January 2000).

[391]   *Ibid.*, p. 83.

[392]   Yukos Tax Reassessment Breakdown, p. 6, Exh. C-1752.  RUR to USD calculated at 28.5892:1, the official exchange rate on 14 April 2004, Exh. R-334.

### ii.   Trekhgorny

432.   Far less information is available to the Tribunal regarding the activities of the trading companies in the Trekhgorny ZATO than is available for those in Lesnoy.  What the Tribunal has gleaned from the record is that in March 2001, some of the companies based in Trekhgorny ("Greys", "Nortex", "Alebra", "Muskron", "Flander", "Kolrein" and "Kverkus") merged into Torgovaya Kompaniya Alkhanay or Alkhanai Trading on 16 March 2001, a company registered in Aginskoye, in the Aginsko-Buryatsky region.[393]  Two months later, in May 2001, Alkhanai Trading merged with Perspektiva Optimum (the company created from the Lesnoy trading companies) into Investproekt, a company initially based in Kirov, but which then moved to the Chita Autonomous Region as of August 2001.[394]

*Grace*

433.   Grace was registered by Order 1316 of the Trekhgorny Municipal Administration on 25 July 1997.   On 15 March 2001, it merged into Alkhanai Trading, which later merged into Investproekt.  Grace was founded by ZAO Trigor (holding 5 percent of the shares) and OOO Bark (holding 95 percent).[395]

434.   On 11 March 1998, Grace and the Trekhgorny Municipal Administration concluded an investment agreement, supplemented by another agreement on 21 January 2000, under which incentives in relation to 17 different types of taxes were granted.[396]

435.   Tax reassessments would eventually be made against Yukos for Grace for the year 2000,[397] totaling RUR 20,247,201 (USD 708,212).[398]

---

[393]   Judgment in the Name of the Russian Federation, Meshchansky District Court of the City of Moscow, 16 May 2005, p. 48, Exh. R-379.

[394]   *See* various documents on Alkhanay and Perspektiva Optimum, 20 May 2001, Exh. R-302; *see also* Information letter from the Inspectorate of the Ministry of Taxes and Levies of the Russian Federation for Shabalinskiy District, 20 August 2001, Exh. R-301 (noting Investproekt's change of address to the Chita Region).  For further information as to Investproekt, see paragraphs 389–408 above.

[395]   2000 Decision, p. 27, Exh. C-104.

[396]   *Ibid.*, pp. 29–30 (referring to Tax Agreement No. 95, 11 March 1998 and a supplementary tax agreement dated 21 November 2000).

[397]   *Ibid.* pp. 30–31.

[398]   Yukos Tax Reassessment Breakdown, p. 6, Exh. C-1752.  RUR to USD calculated at 28.5892:1, the official exchange rate on 14 April 2004.

*Muskron*

436.   Muskron was registered by Order 1433 of the Municipality of Trekhgorny on 12 August 1997. It was founded by Trigor ZAO, with an address in Trekhgorny and a 5 percent shareholding, as well as Vokit OOO, with an address in Moscow and a 95 percent shareholding.  Vokit bought out Trigor in April of 2000, before selling a 2 percent stake to Neftetrade (itself wholly owned by OAO Yukos Oil Company at the time of Neftetrade's incorporation).   As of September 2000, Neftetrade had acquired 100 percent of Muskron's shareholding.[399]

437.   On 12 July 1998, Muskron and the Trekhgorny Municipal Administration concluded an investment agreement, with a supplementary agreement on 12 January 2000, which granted incentives in relation to eight different types of taxes.[400]

438.   On 15 March 2001, Muskron was merged into Alkhanai Trading, which then merged into Investproekt.[401]

439.   Tax reassessments would eventually be made against Yukos for Muskron for the year 2000,[402] totaling RUR 7,398,094 (USD 258,772).[403]

*Norteks (aka Nortex)*

440.   Norteks was registered by Order 1435 of the Municipality of Trekhgorny 12 August 1997.[404]   It was founded by Trigor ZAO, with an address in Trekhgorny and a 5 percent shareholding, as well as OOO Corvet, with an address in Kaluga and   a 95 percent shareholding.   OOO Neftetrade bought Trigor's shares in Norteks in June of 2000.[405]

441.   On 6 February 1998, Norteks and the Trekhgorny Municipal Administration concluded an investment agreement, supplemented by another agreement on 21 January 2000, granting

---

[399]   2000 Decision, p. 36–37, Exh. C-104.

[400]   *Ibid.* pp. 39–40 (referring to Tax Agreement No. 67, 12 July 1998 and a supplementary tax agreement dated 12 January 2000).

[401]   *Ibid.*, p. 35.

[402]   *Ibid.*, p. 41.

[403]   Yukos Tax Reassessment Breakdown, p. 6, Exh. C-1752.  RUR to USD calculated at 28.5892:1, the official exchange rate on 14 April 2004.

[404]   2000 Decision, p. 14, Exh. C-104.

[405]   *Ibid.*, p. 15.

incentives in relation to eight different types of taxes and requiring payment of five percent of tax benefits into administration's account.[406]

442. On 15 March 2001, Norteks was merged into Alkhanai Trading, which then merged into Investproekt.[407]

443. Tax reassessments would eventually be made against Yukos for Norteks for the year 2000,[408] totaling RUR 3,152,537,572 (USD 110 Million).[409]

*Kverkus (aka Quercus)*

444. Kverkus was registered by Order 1315 of the Administration of the Municipality of Trekhgorny on 25 July 1997.[410]   It was founded by Trigor ZAO, with an address in Trekhgorny and a 5 percent shareholding, as well as OOO Cadet, with an in Kaluga and a 95 percent shareholding.  OOO Neftetrade bought out Trigor's shares in Kverkus in June of 2000.[411]

445. On 26 August 1997, Kverkus and the Trekhgorny Municipal Administration concluded an agreement granting tax benefits to the trading companies.[412]   On 11 March 1998, a second investment agreement was concluded,[413] which was supplemented on 21 January 2000,[414] granting incentives in relation to eight types of taxes.

446. On 15 March 2001, Kverkus was merged into Alkhanai Trading, which then merged into Investproekt.

---

[406]   *Ibid.*, pp. 17–18 (referring to Tax Agreement No. 9, 6 February 1998 and a supplementary tax agreement dated 21 January 2000).

[407]   *Ibid.*, p. 14.

[408]   *Ibid.*, p. 19.

[409]   Yukos Tax Reassessment Breakdown, p. 6, Exh. C-1752.  RUR to USD calculated at 28.5892:1, the official exchange rate on 14 April 2004, Exh. R-334.

[410]   2000 Decision, p. 49, Exh. C-104.

[411]   *Ibid.*, p. 50.

[412]   *Ibid.*, p. 52 (referring to Tax Agreement No. 51, 26 August 1997).

[413]   *Ibid.* (referring to Tax Agreement No. 103, 11 March 1998).

[414]   *Ibid.* (referring to supplementary tax agreement, 21 January 2000).

447. Tax reassessments would eventually be made against Yukos for Kverkus for the year 2000,[415] totaling RUR 3,031,422,237 (USD 106,033,825).[416]

*Colrain (aka Kolrein)*

448. Colrain was registered by Order 1431 of the Municipality of Trekhgorny on 12 August 1997.[417] It was founded by Trigor ZAO, with an address in Trekhgorny and a 5 percent shareholding, as well as OOO Bark, with an address in Kaluga and a 95 percent shareholding.[418]  In November 1999, Trigor sold its five percent share in Colrain to Polinep ZAO.[419]  Neftetrade then bought that five percent share in June 2000.[420]

449. In August 1997, Colrain and the Trekhgorny Municipal Administration concluded an agreement granting tax benefits to the company.[421]   In February 1998, a second investment agreement was concluded,[422] which was amended once in 1999[423] and supplemented in January 2000,[424] granting incentives in relation to eight types of taxes.

450. On 15 March 2001, Colrain merged into Alkhanai Trading, which then merged into Investproekt.[425]

451. No tax reassessments would be made against Yukos for Colrain.

*Virtus*

452. Virtus was registered by Order 1116 of the Head of the Municipality of Trekhgorny on 27 June 1997.[426]   It was founded by OOO Akra OOO, with an address in Kaluga and a 90 percent

---

[415]   *Ibid.*, p. 55.

[416]   Yukos Tax Reassessment Breakdown, p. 6, Exh. C-1752.  RUR to USD calculated at 28.5892:1, the official exchange rate on 14 April 2004.

[417]   2000 Decision, p. 57, Exh. C-104.

[418]   *Ibid.*, p. 58.

[419]   *Ibid.*

[420]   *Ibid.*

[421]   *Ibid.*, p. 59 (referring to Tax Agreement No. 44, 20 August 1997).

[422]   *Ibid.* (referring to Tax Agreement No. 8, 6 February 1998).

[423]   *Ibid.* (referring to amendments on 12 July 1999).

[424]   *Ibid.* (referring to a supplementary tax agreement, 21 January 2000).

[425]   *Ibid.*, p. 58.

shareholding, OOO Depor with an address in Moscowand a 5 percent shareholding, and Trigor ZAO, with an address in Trekhgorny and a 5% shareholding.  Akra bought Trigor's shares in Virtus in March of 2000.[427]

453.  On 6 February 1998, Virtus and Trekhgorny Municipal Administration concluded an investment agreement,[428] which was supplemented on 21 January 2000.[429]  It granted incentives to the company in relation to eight different types of taxes, and required payment of five percent of tax benefits into the administration's account.

454.  Tax reassessments would eventually be made against Yukos for Virtus for the year 2000,[430] totaling RUR 2,359,700 (USD 82,538).[431]

    **(d)    Sarov**

455.  Sarov is a ZATO in the Russian Federation.

### i.    Yuksar

456.  Yuksar was registered by the Sarov Municipal Administration on 13 October 1997.[432]  Yuksar was founded by Yukos with a 49 percent shareholding and YNG with a 51 percent shareholding.[433]  Yuksar was ultimately liquidated.[434]

457.  On 23 October 1997, Yuksar and the Sarov Municipal Council concluded an agreement granting tax incentives to the company.[435]  It was supplemented on 12 March 1998.[436]

---

[426]    2000 Decision, p. 68, Exh. C-104.

[427]    *Ibid.* pp. 67–68.

[428]    *Ibid.*, pp. 68–69 (referring to Tax Agreement No. 7, 6 February 1998).

[429]    *Ibid.*, p. 69 (referring to supplementary tax agreement, 21 January 2000).

[430]    *Ibid.*, p. 69.

[431]    Yukos Tax Reassessment Breakdown, p. 6, Exh. C-1752.  RUR to USD calculated at 28.5892:1, the official exchange rate on 14 April 2004.

[432]    2000 Decision, p. 20, Exh. C-104

[433]    *Ibid.*

[434]    *Ibid* (referring to extract from Unified State Register of Legal Entities on 3 November 2003).

[435]    *Ibid.*, p. 22 (referring to Tax Agreement No. 74/01-17, 23 October 1997).

[436]    *Ibid.* (referring to supplementary tax agreement, 12 March 1998).

458. Tax reassessments would ultimately be made against Yukos for Yuksar for the year 2000,[437] totaling RUR 95,875,131 (USD 3,353,544).[438]

(e)   **Baikonur**

459. As noted earlier, Baikonur is a low-tax region, leased by the Russian Federation from Kazakhstan during the Soviet era for use as a spaceport and aerospace facility.[439]

i.   **Mega-Alliance (aka Mega-Alyans)**

460. Mega-Alliance was registered by Order 00411 of the Administration of Baikonur on 21 December 2000.[440]  The sole founder of the company was Ms. Gulnara Karimovna Zhukova, who was also a founder of Macro-Trade.  The share capital of the company was RUR 8,350. On 28 April 2001, amendments were made to the Charter of Mega-Alliance OOO under which the sole shareholder of Mega-Alliance became Dorchestergate Trading Limited, a company registered in Cyprus.[441]

461. As noted in paragraph 351 above, Ms. Zhukova later denied any connection to Mega-Alliance or Macro-Trade, both of which she was alleged to have founded.   A letter dated 24 October 2003 from the Russian Federation Federal Security Service's Directorate for Moscow Space Forces indicated that Ms. Zhukova had denied any connection with Mega-Alliance and reiterated her story about the theft of her passport.[442]

462. In 2001, Mega-Alliance and the Administration of Baikonur entered into a tax agreement.[443]  It granted benefits to the company in relation to four types of taxes and required payments to the value of three percent of their tax benefits into the "target funds" for the development of the region of Baikonur.

---

[437]   *Ibid.*, p. 23.

[438]   Yukos Tax Reassessment Breakdown, p. 6, Exh. C-1752.  RUR to USD calculated at 28.5892:1, the official exchange rate on 14 April 2004.

[439]   Transcript, Day 14 at 54.

[440]   2001 Decision, p. 112, Exh. C-155.

[441]   *Ibid.*

[442]   2001 Decision, p. 112, Exh. C-155 (referring to Letter No. 31/4664 from the Russian Federation Federal Security Service's Directorate for Moscow Space Forces, 24 October 2003).

[443]   *Ibid.*, p. 114 (referring to contract between the Administration of Baikonur and Mega-Alliance, 24 October 2003).

463. Later that year, the decision of the Government of the Russian Federation No. 747 on the Approval of the Rules for the Granting of Tax Privileges to Organisations and Individual Businessmen Registered on the Territory of the City of Baikonur was issued.[444]  It granted permission to the head of the Administration of Baikonur to grant tax privileges, provided that the individual businessman or organization had "the presence of premises, of property, industrial or other complexes necessary for the manufacture of goods, works or services and situated on the territory of the city of Baikonur (including the Baikonur Spaceport); [and] the realisation of the products, works or services on the territory of the city of Baikonur (including the Baikonur Spaceport)."[445]  It also cautioned that previously offered tax benefits that conflicted with the decision would be considered terminated from the date the decision entered into force.[446]

464. In 2002, Mega-Alliance merged into Regionalniy Finansoviy Tsentr or Regional Finance Center.[447]  Regional Finance Center was liquidated in July of that year.[448]

465. Tax reassessments would later be made against Yukos for Mega Alliance for the year 2001,[449] totaling RUR 1,276,878,700 (USD 43,646,213).[450]

(f)    Evenkia

466. The Evenkia autonomous district is located in Eastern Siberia.[451]  At the time that the trading companies were established in Evenkia, the district had a federally financed budget, fuel supplies were difficult to secure, and unemployment was very high.[452]  Of all the regions of the

---

[444]    Decision of the Government of the Russian Federation No. 747, 25 October 2001, Exh. C-411.

[445]    *Ibid*.

[446]    *Ibid*.

[447]    Notice on record with the unified state register of legal entities of entry on dissolution of legal entity, 19 April 2002, Exh. R-3158.

[448]    Information Extract No. 29170, 27 March 2012, Exh. R-3159.

[449]    2001 Decision, p. 115, Exh. C-155.

[450]    Yukos Tax Reassessment Breakdown, p. 6, Exh. C-1752.  RUR to USD calculated at 29.2552:1, the official exchange rate on 2 September 2004.

[451]    *Yukos Review*, Issue # 3, May–June 2001, p. 8, Exh. C-9.

[452]    *Ibid.*, p. 5.

Russian Federation, Evenkia ranked last in average per capita volume of industrial production, and 69th (out of 89) in terms of per capita income.[453]

467.   In September 1998, Law No. 108 of the Evenkia Autonomous Region "On the Particularities of the Tax System in the Evenkiysky Autonomous District" was enacted,[454] which offered incentives to investors in the region.   Pursuant to Article 6(1)(d) of the law, preferential tax rates were offered to participants in investment projects on the territory of the Evenkiysky Autonomous District. Pursuant to Article 5(1) of the Law, commercial and noncommercial entities were deemed participants of investment projects which are created in the territory of the region, regardless of the origin of their capital, and can include those with foreign legal entities as shareholders, so long as they were participants in programs for the social and economic development of the region and investment projects.

468.   In May 2001, Mr. Boris Zolotarev, the former head of Yukos R&M, became governor of Evenkia.   After his election, he spoke about the positive effects he hoped Yukos investment could have on the region.[455]

### i.      Evoil

469.   Evoil was registered by Order 158 of Administration of Ilimpiisk District of Evenkia on 23 May 2002.[456]   It was founded by Fiana Ltd., a limited liability company registered in Cyprus.[457]

470.   In June 2001, pursuant to an order of the Administration of the Evenkiysky Autonomous District, "On Application of Special Tax Regime," Evoil was granted targeted tax benefits.[458]   It also enjoyed benefits under Law 108 of 24 September 1998, including corporate profit tax payable at a reduced rate of 10.5 percent and a property tax rate of 0 percent.[459]

---

[453]   *Ibid.*, p. 8.

[454]   Law of the Evenkiysky Autonomous District No. 108, 24 September 1998, Exh. C-412.

[455]   *Yukos Review*, Issue # 3, May–June 2001, p. 5, Exh. C-9.

[456]   2002 Decision, p. 146, Exh. C-175.

[457]   *Ibid.*

[458]   Resolution of the Federal Arbitrazh Court for the Moscow District No. KA-A40/3222-05, p. 30, Exh. C-184 (referring to Order No. 53 of the Administration of the Evenkiysky Autonomous District, 29 June 2001).

[459]   2002 Decision, p. 154, Exh. C-175.

471. Tax reassessments would later be made against Yukos for Evoil for the years 2002[460] and 2003,[461] totaling RUR 203,629,769 (approximately USD 6,787,659).[462]

### ii.    Interneft

472. Interneft was registered by Order 333 of Administration of Ilimpiisk District of Evenkia on 23 October 1998.[463]   The sole founder of Interneft is OOO Netax Advertising Agency, registered in Kalmykia.[464]   It was founded with an initial capital of RUR 8,400, split into 100 ordinary registered shares with nominal value of RUR 84.[465]

473. On 26 July 1999, Interneft was awarded a "Certificate of assignment of the status of Participant in the investment programs of the Evenki Autonomous Region."[466]

474. Tax reassessments would later be made against Yukos for Interneft for the year 2000,[467] totaling RUR 224,642 (USD 7,858).[468]

### iii.    Petroleum-Trading (Trion)

475. Petroleum-Trading was registered under the name Trion by Order 146-p of the Administration of Ilimpiisk District of Evenkia on 25 April 2000.  Its new name was registered by Order 193 of Administration of Ilimpiisk District of Evenkia on 31 May 2000.[469]  Petroleum-Trading was founded by Neftepromstroiservice ZAO and Neftepromburservice ZAO, each holding

---

[460]   *Ibid*. pp. 154–55.

[461]   2003 Decision, p. 142, Exh. C-190.

[462]   Yukos Tax Reassessment Breakdown, p. 6, Exh. C-1752.  The RUR to USD exchange rate used here is approximate, based on a rate of 30:1.

[463]   2000 Decision, p. 76, Exh. C-104

[464]   *Ibid*.

[465]   *Ibid*.

[466]   *Ibid*., p. 77.

[467]   *Ibid*., p. 78.

[468]   Yukos Tax Reassessment Breakdown, p. 6, Exh. C-1752.  RUR to USD calculated at 28.5892:1, the official exchange rate on 14 April 2004.

[469]   2000 Decision, p. 55, Exh. C-104.

50 percent of the share capital.  Both parent companies were registered in Kalmykia.[470]  The founding capital was RUR 8,400.

476.   Pursuant to Order No. 53 of the Administration of the Evenkiysky Autonomous District of 29 June 2001, "On Application of Special Tax Regime," Petroleum-Trading was granted targeted tax benefits.[471]

477.   Tax reassessments would be later made against Yukos for Petroleum-Trading for the years 2000[472] and 2002[473] totaling RUR 90,943,100 (approximately USD 3,031,437).[474]

### iv.   Ratibor

478.   Ratibor was registered by Order 168-p of the Administration of the Evenkiysky Autonomous District on 21 July 2000.  It was registered with tax authorities and state authorities on 14 February 2001.[475]  It was founded by Ms. Svetlana Ivanovna Vorobyeva, with a share capital of RUR 10,000.[476]  On 25 May 2001, 100 percent of the share capital of Ratibor OOO was transferred to Dunsley Limited, a company registered in Cyprus.  Dunsley was, in turn, owned by Doluen Limited, with 99.9 percent of the shares, registered in Cyprus, and Abakus (Nominis) Limited, with 0.1 percent of the shares, also registered in Cyprus.[477]

479.   Pursuant to Order No. 53 of the Administration of the Evenkiysky Autonomous District of June 2001, "On the application of the Special Taxation Procedure," Ratibor was granted targeted tax benefits.[478]

480.   Tax reassessments would later be made against Yukos for Ratibor for the years 2001[479] and 2002,[480] totaling RUR 13,870,285,714 (approximately USD 462,342,857).[481]

---

[470] *Ibid.*, p. 55–56.

[471]   Resolution of the Federal Arbitrazh Court for the Moscow District No. KA-A40/3222-05 p. 30, Exh. C-184 (referring to Order No. 53 of the Administration of the Evenkiysky Autonomous District, 29 June 2001).

[472]   2000 Decision, p. 57, Exh. C-104.

[473]   2002 Decision, p. 163–64, Exh. C-175.

[474]   Yukos Tax Reassessment Breakdown, p. 6, Exh. C-1752.  The RUR to USD exchange rate used here is approximate, based on a rate of 30:1.

[475]   2001 Decision, p. 82, Exh. C-155.

[476]   *Ibid.*

[477]   *Ibid.*

[478]   *Ibid.*, p. 99.

### v.    Yukos Vostok Trade

481.    Yukos Vostok Trade was registered by Decision 36 of the Interdistrict Inspectorate of the Russian Ministry of Taxes and Levies No. 3 for the Evenki Autonomous District, 9 February 2004.[482]   It was founded by OAO Yukos Oil Company with 70 percent of the shareholding and Yukos-Import with 30 percent of the shareholding.[483]

482.    While there is no reference to any tax agreements on the record, the Tribunal notes that Field Tax Audit Report No. 52/996 refers to Yukos Vostok Trade making use of the beneficial tax system in Law 108 of 24 September 1998, with a preferential income tax rate reduced to 13 percent and a preferential property tax rate of 0 percent.[484]

483.    Tax reassessments would later be made against Yukos for Yukos Vostok Trade for 2004,[485] totaling RUR 8,660,507,192 (USD 311,337,530).[486]

### 5.    Tribunal's Observations

484.    Having set out the evidence regarding Yukos' tax optimization scheme, the Tribunal now returns to the question posed at the beginning of this chapter:  does the record which it has reviewed at length demonstrate that Yukos was merely taking advantage of the legislation in place in the low-tax regions of the Russian Federation to minimize its taxes, or was there an element of abuse in its activities that made them illegal under Russian law?

485.    The Tribunal first reiterates that the evidence reveals—indeed, the Parties are agreed—that the Russian Federation had enacted (in the late 1990s and early 2000s) a legislative structure to encourage investment in some of its low-tax regions, and that Yukos (as did many other Russian companies, including other oil companies) sought to take advantage of that legislative

---

[479]    *Ibid.*, pp. 99–100.

[480]    2002 Decision, p. 146, Exh. C-175.

[481]    Yukos Tax Reassessment Breakdown, p. 6, Exh. C-1752.  The RUR to USD exchange rate used here is approximate, based on a rate of 30:1.

[482]    2004 Decision, p. 86, Exh. R-1539.

[483]    *Ibid.*

[484]    Field Tax Audit Report No. 52/996, p. 84, 27 December 2005.

[485]    2004 Decision, pp. 90–91, Exh. R-1539.

[486]    Yukos Tax Reassessment Breakdown, p. 6, Exh. C-1752.  RUR to USD calculated at 27.8171:1, the official exchange rate on 17 March 2006.

structure.  As a result, Yukos set up trading companies in various low-tax regions and, where required, entered into investment agreements with the local authorities.

486. There is evidence in the record that Mr. Dubov informed the authorities, at least in respect of the Yukos trading companies in Mordovia, that Yukos was using the legislative arrangements in place to minimize its taxes, and that none of his interlocutors, including the then First Deputy of Finance, Alexei Kudrin, formulated any objection.  Finally, the Tribunal recalls that few of the audits of the trading companies conducted in the regions prior to 2003 ever resulted in any tax assessments, and, when they did, the transgressions were generally minor and the assessments insignificant.

487. In this connection, the Tribunal notes that Respondent chose not to call any fact witnesses to challenge Claimants' fact witnesses.  That is unfortunate.  The Tribunal would have been assisted, for example, by the evidence of Mr. Kudrin who, after his meeting with Mr. Dubov, became Minister of Finance and Deputy Prime Minister of the Russian Federation.  Instead, Respondent has relied solely on the documentary record to build its case that Yukos' activities in the low-tax regions were abusive and illegal.  As Claimants pointed out during the Hearing, and as the Tribunal found out for itself, the documentary record compiled and presented by Respondent to the Tribunal, while significant, is selective and unfortunately incomplete.

488. The record does reveal, however, that Yukos had some concerns about the legality of its trading operations in certain low-tax regions, notably in Lesnoy and Trekhgorny.  As recorded in the previous section of the present chapter, there were audit reports and memoranda that attest to an investigation of whether the practices of some of the Yukos trading companies in those regions were abusing the system, since those companies were acting in conformity with the relevant legislation in form only and not in substance.

489. The Tribunal recalls that, in November 2001, after an extensive corporate restructuring had taken place (as a result of which the trading entities in Lesnoy and Trekhgorny ceased to exist, and were merged into entities created in other regions), Ms. Irina Golub, the Chief Accountant of Yukos, received a document by e-mail from Mr.  Kartashov, a general director of Yukos. That document referred specifically to the ongoing investigations in Lesnoy and Trekhgorny by the Federal Tax Police Service of Sverdlovsk as part of a criminal case "in connection with tax evasion" by the Yukos entities and to the fact that office personnel in Lesnoy and Trekhgorny (including, in the case of the Lesnoy entities, the General Directors) had been interrogated by tax authorities.

490. The Tribunal notes here that the Investigation Group of the Russian Federation's Federal Tax Police Agency for the Sverdlovsk Region was the organization that had issued the "Decree on the institution and initiation of criminal proceedings"[487]—looking into the payment of taxes with promissory notes—three weeks earlier.

491. During the Hearing and in its Post-Hearing Brief, Respondent referred many times to the Kartashov e-mail, as well as the following evidence, which, it argued, demonstrated that Yukos knew that its scheme was unlawful and "took pains to conceal its scheme from the authorities":[488]

- Firstly, the 22 April 2002 memorandum from Mr. Maly, in which he expressed his concern that if Yukos' affiliation with the trading entities were included in the SEC filing, that information "may be used by the Russian tax authorities to challenge [Yukos'] approach to certain transactions and, consequently, will result in substantial tax claims against the [c]ompany";[489]

- Secondly, the e-mail from Mr. Maruev (from the Treasury Department) to employees in 2002 to "clean your folders" of references to the Lesnoy trading companies;[490]

- Thirdly, the internal memorandum from Yukos' General Counsel Mr. Aleksanyan advising Ms. Golub not to draw the attention of the authorities to the use of tax incentives in the ZATO Lesnoy, since "an investigation into the legality of the use of the incentives . . . entails substantial risks, including under criminal law";[491]

---

[487] Decree on the institution and initiation of criminal proceedings of the Investigation Group of the Russian Federation's Federal Tax Police Agency for the Sverdlovsk Region, 3 September 2001, Exh. R-376.

[488] Respondent's Post-Hearing Brief ¶¶ 29, 38.

[489] E-mail from P.N. Maly to O.V. Sheyko, 14 May 2002, Exh. R-184.

[490] E-mail from D.L. Maruev to M.U. Barbarovich and V.M. Zuravlev, 15 March 2002, cc'ing V.A. Podzarov, Exh. R-4040.

[491] Letter from V.G. Aleksanyan to I.Y. Golub dated 14 December 2001. Exh. R-3244. Professor Gaillard argued during the hearing that Mr. Aleksanyan was simply saying "don't …rub an issue which has not been opened." Transcript, Day 20 at 61. The full discussion can be found at Transcript, Day 20 at 57–62. Professor Gaillard suggested that Ms. Golub:

"…receives a letter from Aleksanyan, who is the boss two steps above her. . . which says, 'You'—I summarise it, and then we will go to the details.  Basically it says, 'You stupid, you don't understand that it's not about the tax incentives, it's about the promissory notes. So why do you prepare a letter talking about tax incentives? That's not at issue here.'" Transcript, Day 20 at 58–59.

- Fourthly, Mr. Khodorkovsky's refusal in early 2003 to sign Yukos' registration statement (for a confidential SEC filing) over concerns for his "personal risks";[492] and

- Fifthly, a "blackline" version of Yukos' draft filing for the SEC sent on 23 July 2002 by Natalia Kuznetsova of PwC to Stephen Wilson (at that time Yukos' international tax director), proposing that the following be deleted from an earlier draft: "We use tax optimization mechanisms that may be challenged by the tax authorities" and "If a number of regional tax incentives we have used to reduce our tax burden are successfully challenged by the Russian tax authorities, we will face significant losses associated with the additionally assessed amount of tax and related interest and penalties."[493]

492.   In their reply to the evidence regarding concern over potential tax liabilities, Claimants submit that the Russian tax authorities "were notorious for displaying arbitrary and unpredictable interpretations of law generating significant and unquantifiable risks for taxpayers[,] risks that Yukos and other Russian oil companies . . . disclosed in their financial statements."[494]   They conclude that references by Yukos' management to such risks "[could not] reasonably be construed as evidencing 'knowledge' or 'belief' that Yukos' tax structure was unlawful."[495]   Claimants also argue that Respondent's reliance on Mr. Maly's e-mail was "much ado about nothing," and that "it is clear that any risks were neither a problem, nor an obstacle, to Yukos pursuing the NYSE listing because Yukos continued to draft its Form F-1 into mid-March 2003, nearly a year after this memo."[496]   Claimants also note that, in respect of the blackline filing that it "in fact states—in a sentence the Respondent omits to quote—that Yukos' management 'believe the tax mechanisms used by us comply.'"[497]

---

[492]   E-mail from M.B. Khodorkovsky to O.V. Sheiko, 20 February 2003, Exh. R-3611.

[493]   Facsimile transmission from Natalia Kusnetsova to Stephen Wilson dated 23 July 2002, pp. 133–34, Exh. R-1477.

[494]   Claimants' Post-Hearing Brief ¶ 15.

[495]   *Ibid*.

[496]   Reply ¶ 111.

[497]   Reply ¶ 199 (emphasis in original).  As Claimants note, the full paragraph reads:

"Our results of operation have historically benefited significantly from the use of tax [illegible] mechanisms.  We believe that the tax mechanisms used by us comply with relevant [illegible].  If, however, we phase out all of our current tax optimization mechanisms due to changes to the tax regime or other reasons, we may have to pay significantly higher taxes in the future, and our result of operation may be adversely affected.  In addition, if the various initiatives we have used to reduce our tax burden are successfully challenged by the Russian tax authorities we may face significant losses associated with the assessed amount of tax underpaid and related interest and penalties, which would have a material impact on our financial condition and results of operation."

*Ibid*. n.337.

493.   In fact, the record before the Tribunal reveals that Lukoil, Rosneft, Sibneft and TNK, in their financial statements in those years, all referred to the significant risks associated with the varying interpretation by the Russian tax authorities of the Russian tax legislation.[498]

494.   Although the Yukos entities in Lesnoy and Trekhgorny were only a small part of Yukos' tax optimization scheme,[499] it is clear to the Tribunal that these entities were being investigated as of late 1999 by the tax authorities in these regions, and were suspected of being "shams".  It is the view of the Tribunal that the legal basis for this scrutiny was the jurisprudential "good faith taxpayer" doctrine ("substance over form" or "anti-abuse" doctrine) and that, within the senior management of Yukos, there were a number of persons who were aware that Yukos was vulnerable in respect of certain facets of its tax optimization scheme.

495.   As for the existence of the "good faith taxpayer" doctrine in Russia at that time, the Tribunal has reviewed the evidence of Mr. Konnov, the only expert on Russian tax law to give evidence in these proceedings, who appeared on behalf of Respondent.  Although Claimants elected not

---

[498]   *See* Consolidated Financial Statements of OAO Lukoil, 30 May 2003, Exh. C-371; Consolidated Financial Statements of OJSC Rosneft Oil Company (hereinafter "Rosneft"), 24 June 2005, C-373; Consolidated Financial Statements of AO Siberian Oil Company, 21 June 2002, C-384;and Consolidated Financial Statements of TNK International Limited, 15 May 2003, C-390.  To illustrate, the following is the warning contained in Lukoil's financial statements for the period ending 31 December 2002

"The taxation systems in the Russian Federation and other emerging markets where Group companies operate are relatively new and are characterized by numerous taxes and changing legislation, which may be applied retroactively and is sometimes unclear, contradictory, and subject to interpretation.  Often, differing interpretations exist among different tax authorities within the same jurisdictions and among taxing authorities in different jurisdictions.  Taxes are subject to review and investigation by a number of authorities, which are enabled by law to impose severe fines, penalties and interest charges.  Such factors may create taxation risks in the Russian Federation and other countries where Group companies operate substantially more significant than those in other countries where taxation regimes have been subject to development and clarification over long periods.

. . .

The regional organizational structure of the Russian Federation tax authorities and the regional judicial system can mean that taxation issues successfully defended in one region may be unsuccessful in another region.  The tax authorities in each region may have a different interpretation of similar taxation issues.  There is however some degree of direction provided from the central authority based in Moscow on particular taxation issues.

The Group has implemented tax planning and management strategies based on existing legislation at the time of implementation.  The Group is subject to tax authority audits on an ongoing basis, as is normal in the Russian environment, and, at times, the authorities have attempted to impose additional significant taxes on the Group.  Management believes that it has adequately met and provided for tax liabilities based on its interpretation of existing tax legislation.  However, the relevant tax authorities may have differing interpretations and the effects could be significant."

Exh. C-371, pp. 30–31 (emphasis added).

[499]   The tax assessments levied against Yukos in connection with the trading entities in Lesnoy and Trekhgorny, which related only to the 2000 tax year (since the entities ceased to exist in early 2001), represented approximately 19 percent of the total tax assessment against Yukos for 2000, and represented under 3 percent of the total of all tax assessments against Yukos (for the years 2000–2003).  *See* Yukos Tax Reassessment Breakdown, Exh. C-1752.

to present their own expert on Russian tax law,[500] in their written submissions, they referred to and criticized various Russian court decisions, which they contended did not support Respondent's interpretation.   As noted earlier in the present chapter, the Tribunal has considered Claimant's submissions.

496.   The Tribunal has also considered the lengthy cross-examination of Mr. Konnov by Professor Gaillard.   The Tribunal recalls again that Professor Gaillard did not challenge Mr. Konnov on the existence of the anti-abuse doctrine but rather sought Respondent's expert's acknowledgement that the Yukos tax optimization scheme complied with the existing legislative framework in Russia as well as in the regions.   The Tribunal notes in this context that Claimants stipulate to the existence of the "bad-faith taxpayer" doctrine in their Reply, but argue that "neither it nor any other alleged judicial doctrine had previously been applied as in the Yukos case."[501]

497.   As a matter of background fact, the record before the Tribunal is clear that, at the time of the issuance on 29 December 2003 of the Field Tax Audit Report, the "bad faith taxpayer" doctrine, although it had not yet gelled in the way that it did in 2006 in the ruling of the Supreme Arbitrazh Court in Resolution No. 53, had been recognized and applied in some Russian court decisions.

498.   The Tribunal recalls that the eminent Russian tax lawyer, Mr. Sergey Pepeliaev, who later represented Yukos in the Russian tax litigation, wrote in 2002 that the doctrine existed and that "[i]f it appears that parties act both unreasonably and not in good faith then this constitutes a ground for reassessment of the parties' tax liabilities . . . ."[502]

499.   Beyond this conclusion, which the Tribunal considers a matter of fact, the Tribunal does not need to determine, as a matter of Russian law, whether any of the activities of the Yukos

---

[500]   The Tribunal notes that in the *RosInvestCo* arbitration, the claimant presented a Russian tax law expert, Professor Maggs. The Russian Federation relied on Mr. Konnov.   The *RosInvestCo* tribunal stated that it found Professor Maggs' evidence more persuasive, but it also acknowledged that Professor Maggs did not dispute the existence of the "bad faith taxpayer" doctrine.   *See RosInvestCo* ¶¶ 432, 495, Exh. C-1049. Similarly, in the *Quasar* arbitration, claimants presented a Russian tax law expert, Professor Stephan, as well as an expert on the *Russian Civil Code*, Professor Mozolin, who opined, *inter alia*, on the distinction between good and bad faith taxpayers. *See Quasar*, ¶ 66, 77–78, Exh. R-3383.   As in this arbitration, and the *RosInvestCo* arbitration, the Russian Federation's expert on Russian law was Mr. Konnov.   As in the *RosInvestCo* case, the debate turned primarily on the application to Yukos of the anti-abuse doctrine, as opposed to the existence of the anti-abuse doctrine.

[501]   Reply ¶ 217, n.368.

[502]   S.G. Pepeliaev, *Commentary to the Ruling of the Constitutional Court Ruling of the Russian Federation No. 138-O of July 25, 2001*, Exh. R-352.

trading companies in the low tax regions in 2000, 2001, 2002, and 2003 in the implementation of its tax optimization scheme were in violation of this doctrine.  As noted in the introduction to the present chapter, it is not the role of the Tribunal in the present arbitrations to sit as a court applying Russian law.

500.    However, the Tribunal does note that that, in using the available tax benefit legislation in the Russian Federation, the Yukos group principally availed itself of facilities under the laws of Mordovia, the region which represents approximately 78 percent of the 2000 to 2004 tax reassessments against Yukos.  Another significant portion of the reassessments relates to Evenkia, while the tax reassessments in ZATO Lesnoy and Trekhgorny represent less than three percent of the total.  It is important for the Tribunal to stress that the bad faith doctrine was never used against Yukos prior to December 2003.

501.    The Tribunal will now turn in the next chapter of its Award to the central question which it posed at the beginning of the present chapter:  were the December 2003 and the subsequent tax assessments a legitimate exercise by the Russian Federation of its prerogative to enforce its tax laws or were they, as Claimants argued, a mere fabrication of massive tax claims against Yukos serving as instruments which allowed the premeditated expropriation of all Yukos assets by the State after the arrest of Mr. Lebedev and Mr. Khodorkovsky.

502.    As will be seen, a crucial consideration for the Tribunal concerns the remedy or sanction of "re-attribution", and the application of the "re-attribution" remedy to revenues (for purposes of profit tax) without a corresponding "re-attribution" of tax filings for purposes of VAT.  Also considered in the next chapter is the legitimacy of associated fines levied against Yukos, notably the "willful offender" and "repeat offender" fines.

## B.    THE TAX ASSESSMENTS STARTING IN DECEMBER 2003

### 1.    Introduction

503.    This chapter addresses the next crucial facet in the factual narrative of the present arbitration, namely the tax assessments that were issued against Yukos starting in December 2003, the manner in which those assessments were made and how they were reasoned and, eventually, enforced.

504.    This important review will lead the Tribunal to consider a central question in this case:  were the December 2003 and subsequent tax assessments covering the tax years 2000 to 2004 a

legitimate exercise by the Russian Federation of its prerogative to enforce its tax laws (Respondent's position), or were they a fabrication of massive tax claims against Yukos that allowed the premeditated expropriation of all Yukos assets by the State (Claimants' position)? Or does the record rather suggest that the truth lies somewhere between these two positions: could certain taxes in the assessments have legitimately been imposed while others plainly not, and were the consequential sanctions inexorably exacted by Russian authorities so excessively disproportionate as to require an answer to the question described as key by counsel for the claimant in *Quasar*, Mr. O.T. Johnson:  "Why would Russia have treated Yukos as it did if its purpose was to collect taxes?"[503]

505.   A closely related question concerns the arrests in 2003 of Messrs. Lebedev and Khodorkovsky: were the arrests and the subsequent convictions of Messrs. Lebedev and Khodorkovsky (not once but twice), again, a legitimate exercise by the Russian Federation of its prerogative to enforce its criminal and tax laws (Respondent's position), or were they a politically motivated attack on these individuals as part of a broader campaign to confiscate the rich assets of Yukos (Claimants' position)?

506.   The issues raised by the arrests and convictions of Messrs. Lebedev and Khodorkovsky, and of other individuals connected with Yukos, and the alleged harassment of  Yukos management, are addressed in detail in Chapter VIII.C of the present Award.  The Tribunal considers it opportune however at this time to comment upon some of the circumstances surrounding those arrests.

507.   Claimants have argued that the arrests, and the broader campaign of harassment and intimidation of the leading officers and employees of Yukos, were prompted by President Putin's desire to retaliate against Mr. Khodorkovsky and Yukos for Mr. Khodorkovsky's political and social activism, which Claimants allege became intolerable for President Putin subsequent to a public encounter between the two men in February 2003.

508.   Specifically, on 19 February 2003, in the context of a meeting between President Putin and a group of the country's most powerful businessmen, a televised confrontation between President Putin and Mr. Khodorkovsky took place.[504]   According to the testimony of Dr. Illarionov,

---

[503]   *Quasar* ¶ 41, Exh. R-3383.

[504]   Video recording and transcript of the meeting of the members of the Union of Industrialists and Entrepreneurs with President V. Putin held in the Ekaterininsky Hall, Kremlin, 19 February 2003, Exh. C-1396.

President Putin had scheduled regular meetings between himself and the business leaders, facilitated by the Russian Union of Industrialists and Entrepreneurs headed by Mr. Arkady Volsky.[505]

509. At the meeting, which would, according to Dr. Illarionov, turn out to be the last of its kind, Mr. Khodorkovsky made a presentation on the topic of corruption.   In his presentation, he asserted that corruption in Russia was rife, and that it was "rotting the Russian Government and the Presidential Administration."[506]   While no names were mentioned, relates Dr. Illarionov, President Putin did discuss the acquisition of Severnaya Neft by Rosneft, for which Rosneft had paid approximately USD 622 million.  Dr. Illarionov states that "[i]t was widely considered that the price was exaggerated and that a portion of the price represented kickbacks to State officials."[507]

510. Dr. Illarionov concludes as follows in relation to his understanding of the significance of that encounter:

> During his closing remarks, the President turned to Mr. Khodorkovsky and stated that everyone knew how various assets, including Yukos, were acquired.   The President indicated to Khodorkovsky that "I return the ball in your corner" . . . .  Later, it became clear that this was a signal to the governing elites that Mr. Khodorkovsky could be attacked and he was no longer tolerated.[508]

511. At the same time, the Tribunal's findings in the previous chapter of the present Award suggest that well before the clash between President Putin and Mr. Khodorkovsky at the February 2003 meeting, the tax authorities of the Russian Federation were challenging the tax benefits claimed by some Yukos entities (in ZATO Lesnoy) and, in a few cases, had made findings adverse to those trading companies.  Moreover, the Tribunal recalls, as it did in the previous chapter, that Messrs. Khodorkovsky and Lebedev were ultimately convicted, *inter alia*, for tax evasion in relation to Yukos' activities in Lesnoy, in which (the record revealed) the authorities had suspended an investigation into the commission of tax crimes because, according to the conclusions in the relevant Resolution, it was not then possible to determine who actually committed the crimes.

---

[505]  Illarionov WS ¶ 23.

[506]  *Ibid.* ¶ 29.

[507]  *Ibid.* (citation omitted).

[508]  *Ibid.* ¶ 31.

512.  Respondent emphasized Yukos' earlier tax problems in its comments on the February 2003 meeting.  Respondent noted in its Closing Statement that President Putin publicly told Mr. Khodorkovsky that the political protection or assistance he was allegedly receiving from the Kremlin until that meeting would be removed, and he added that "we've talked about taxes before."[509]

513.  Based on the extensive record that was presented to it, the Tribunal is unable to accept the proposition that the February 2003 confrontation created Yukos' tax problems and that, but for such a confrontation, Yukos would have avoided any and all tax reassessments against it. While this meeting may well have marked a turning point in the relations between Yukos and the Russian Federation, as the Tribunal observed in the previous chapter, within the senior management of Yukos, and well before February 2003, there were individuals who were aware that the company's tax optimization mechanisms were vulnerable and could be challenged by the tax authorities.  Some of the evidence presented to the Tribunal also revealed that there was at least some awareness within Yukos that a successful challenge to the Yukos tax structure would result in "substantial tax claims"[510] or "significant losses associated with the additional assessed amount of tax and related interest and penalties"[511] and possibly even criminal liability.  At the same time, the Tribunal notes that the tax assessments and decisions against Yukos led not just to "substantial tax claims" or to "significant losses" but to its bankruptcy and destruction, and to the transfer of the principal assets of Yukos to Rosneft, a company controlled by the Russian Federation.

514.  The crucial question addressed in this chapter of the Award, therefore, is whether Claimants have discharged their burden of proof and established that the tax assessments, and the enforcement processes of the Russian Federation which followed, are more consistent with the conclusion that they evidence a punitive campaign against Yukos and its principal beneficial owners with sanctions entirely disproportionate to the company's tax liability, rather than with the conclusion that they were a legitimate exercise of tax enforcement.

---

[509]  Transcript, Day 18 at 113.  Counsel for Respondent interprets this as "I am not going to protect Mr. Khodorkovsky anymore.  He is on his own."  *Ibid*.  The full quote of the President's remark is:  "We have already discussed it with you recently, that your company, for example, has had problems with the payment of taxes."  Transcript of the 19 February 2003 Meeting, Exh. C-1396.

[510]  E-mail from P.N. Maly to O.V. Sheyko, 14 May 2002, Exh. R-184.  *See* paragraph 491 above.

[511]  Facsimile transmission from Natalia Kuznetsova to Stephen Wilson, 23 July 2002 p.134, Exh. R-1477.  *See* paragraph 491 above.

515.  In the Tribunal's view, it may well be that, while Yukos was vulnerable on some aspects of its tax optimization scheme, and possibly even would have faced "substantial tax claims" that might have resulted in "significant losses," principally because of the sham-like nature of some elements of its operations in at least some of the low-tax regions, the State apparatus decided to take advantage of that vulnerability by launching a full assault on Yukos and its beneficial owners in order to bankrupt Yukos and appropriate its assets while, at the same time, removing Mr. Khodorkovsky from the political arena.

516.  Dr. Illarionov asserts in his witness statement that "various possible justifications for Mr. Khodorkovsky's arrest and Yukos' dismantlement were tested in the Fall of 2003."[512]  He then goes on to list fifteen "theories" that, he says, "were gradually created as a smoke screen and advanced for public consumption," including "tax evasion schemes."[513]  In other words, Yukos' tax arrangements in certain low-tax regions (some of which, notably in ZATO Lesnoy, as related in Chapter VIII.A, were being scrutinized as of 1999 by the tax authorities and were suspected of being "shams") may have served as a plausible pretext for the State apparatus to crush Mr. Khodorkovsky and expropriate Yukos.   In this chapter, the Tribunal considers evidence that is crucial to its determination of this central issue in the present proceedings.  The Tribunal observes again that its conclusions in this chapter are only concerned with factual findings.  The determination of the relevant legal issues under the provisions of the ECT will be considered later, in Part X of the Award.

### 2.  Chronology of the Tax Assessments and Related Decisions

517.  On 29 December 2003, the tax authorities of the Russian Federation issued the first of five tax assessments against Yukos based on the alleged abuse by Yukos of its tax optimization scheme. These five assessments were:

---

[512]  Illarionov WS ¶ 36.

[513]  *Ibid*.

| Tax Year | Date of Tax Audit Report | Date of Tax Decision | Total Amount Assessed (USD billion) |
|---|---|---|---|
| **2000** | 29 Dec. 2003 (Exh. C-103) | 14 Apr. 2004 (Exh. C-104) | 3.48 |
| **2001** | 30 June 2004 (Exh. R-345) | 2 Sept. 2004 (Exh. C-155) | 4.10 |
| **2002** | 29 Oct. 2004 (Exh. R-346) | 16 Nov. 2004 (Exh. C-175) | 6.76 |
| **2003** | 19 Nov. 2004 (Exh. R-1583) | 6 Dec. 2004 (Exh. C-190) | 6.10 |
| **2004** | 27 Dec. 2005 (Exh. C-200) | 17 Mar. 2006 (Exh. R-1539) | 3.74 |
| **Total for Tax Years 2000–2004** | | | **24.18** |

518.   For each year that the Tax Ministry re-assessed Yukos a Repeat/Field Tax Audit Report and a Decision were issued.  For ease of reference, in this chapter, each Audit Report and Decision will be referred to by the tax year to which it relates.  For example, the Tax Ministry audited Yukos' activities in the year 2000.   It issued Field Tax Audit Report No. 08-1/1 on 29 December 2003 ("**2000 Audit Report**").  It issued Decision No. 14-3-05/1609-1 to hold the taxpayer fiscally liable for a tax offense on 14 April 2004 ("**2000 Decision**").

519.   In the subsections below, the Tribunal records, for each tax year, the extensive chronology of tax assessments and related decisions of the tax authorities, bailiffs and Russian courts.  These events as such are not disputed by the Parties.

(a)   **The 2000 Decision**

520.   As noted above, on 29 December 2003, the 2000 Audit Report, was issued.[514]  It was followed, on 14 April 2004, by the 2000 Decision holding the taxpayer liable for a tax offense.[515]  It levied the following amounts in tax arrears:

---

[514]   2000 Audit Report, Exh. C-103.

[515]   2000 Decision, Exh. C-104.

| COMPANY | TAX BENEFITS | VAT | TOTAL |
|---|---|---|---|
| **Alta Trade** | RUR 2,491,817,840 | RUR 467,486,102 | RUR 2,959,303,942 (USD 104 Million) |
| **Mars XXII** | RUR 18,393,165 | | RUR 18,393,165 (USD 643,361) |
| **Ratmir** | RUR 4,336,209,757 | RUR 1,770,256,037 | RUR 6,106,465,794 (USD 213,593,448) |
| **Yukos-M** | RUR 14,456,555,351 | RUR 9,697,309,558 | RUR 24,153,864,909 (USD 845 Million) |
| **Yu-Mordovia** | RUR 2,210,007,592 | RUR 2,045,653,454 | RUR 4,255,661,046 (USD 149 Million) |
| **Sibirskaya** | RUR 240,437,174 | | RUR 240,437,174 (USD 8.4 Million) |
| **Business-Oil** | RUR 1,584,766,950 PN:* RUR 36,184,822 | | RUR 1,620,951,772 (USD 56.7 Million) |
| **Mitra** | RUR 27,124,001 | | RUR 27,124,001 (USD 948,750) |
| **Vald-Oil** | RUR 1,304,431,717 PN:* RUR 57,784,864 | | RUR 1,362,216,581 (USD 47,647,943) |
| **Grace** | RUR 20,247,201 | | RUR 20,247,201 (USD 708,212) |
| **Muskron** | RUR 7,398,094 | | RUR 7,398,094 (USD 258,772) |
| **Nortex** | RUR 3,152,537,572 | | RUR 3,152,537,572 (USD 110 Million) |
| **Quercus** | RUR 3,031,422,237 | | RUR 3,031,422,237 (USD 106,033,825) |
| **Virtus** | RUR 2,359,700 | | RUR 2,359,700 (USD 82,538) |
| **Yuksar** | RUR 95,875,131 | | RUR 95,875,131 (USD 3. 353,544) |

| COMPANY | TAX BENEFITS | VAT | TOTAL |
|---|---|---|---|
| **Internft** | RUR 224,642 | | RUR 224,642 (USD 7,858)** |
| **Petroleum-Trading** | RUR 23,333,365 | | RUR 23,333,365 (USD 816,160) |

\*   "PN" indicates taxes considered unpaid as they were paid with promissory notes.

\*\*  Internft is ultimately removed from this list by the Decision of 26 May 2004, for not being legally "interdependent."[516]

521.   On the same day, 14 April 2004, a tax payment demand was issued to Yukos in the amount of RUR 80,179,841,454 (USD 2.8 billion).[517]   Payment was due just two days later, on 16 April 2004.   Also on 14 April 2004, a related fine was issued, imposing penalties in the amount of RUR 19,195,696,780 (USD 671 million).[518]   Payment of this sum was also due on 16 April 2004.   The total amount payable within two days by Yukos was thus approximately USD 3.48 billion.

522.   On 15 April 2004, the Tax Ministry registered its claim with the Moscow Arbitrazh Court.[519] On the same day, a ruling of the Moscow Arbitrazh Court prohibiting Yukos from alienating and encumbering "in any way" its assets, including shares and other securities, was issued.[520] Writs of enforcement were also issued.[521]   On 16 April 2004, a resolution of the bailiffs was issued and enforcement proceedings were commenced.[522]

523.   Yukos began parallel proceedings to those initiated by the Tax Ministry, challenging the 2000 Decision as unlawful.   On 19 May 2004, Judge Cheburashkina granted interim relief *suspending* the effect of the 2000 Decision, pending a judgment on the merits of Yukos'

---

[516]   Decision of the Moscow Arbitrazh Court, Case No. A40-17699-04-09-241, 26 May 2004, Exh. C-116.

[517]   Tax Payment Demand No. 14-3-05/1610-8, 14 April 2004, Exh. C-105.

[518]   Tax Penalty Payment Demand No. 14-3-05/1611-1, 14 April 2004, Exh. C-106.

[519]   Ruling of the Moscow Arbitrazh Court to proceed with a claim, to prepare the case for hearing, and to schedule preliminary hearing, Case No. A40-17669/04-109-241, 15 April 2004, Exh. C-107.

[520]   Ruling of the Moscow Arbitrazh Court on adoption of interim measures, 15 April 2004, Exh. C-108 (hereainfter "April 2004 Injunction").

[521]   Enforcement Writs of the Moscow Arbitrazh Court Nos. 370735, 16 April 2004; 370738, 15 April 2004; 370739, 16 April 2004; 370740, 16 April 2004, Exh. C-109.

[522]   Resolution of Bailiff D.A. Borisoff to initiate enforcement proceeding No. 11/5975, 16 April 2004, Exh. C-110.

petition in respect of the lawfulness of the 2000 Decision.[523]   In her decision, Judge Cheburashkina wrote that the seizure of such assets would "cause significant damage to the Applicant's activities and make it impossible to execute the judicial act" and that "the Applicant has presented evidence demonstrating that the consequences indicated in Article 90(2) of the RF Arbitrazh Procedure Code might arise, and that serious damage and disruption might be caused to production activities."[524]

524.   On 26 May 2004, Yukos made a motion in the collection proceedings (those initiated by the Tax Ministry) to join the Republic of Mordovia in those proceedings.[525]   The motion was not successful.   Presumably, Yukos sought the joinder of Mordovia, by far the major focus of its trading companies' activities and investments, in the expectation that Mordovian officials would support the legitimacy of Yukos' tax optimization procedures and attest to the value of Yukos' substantial investments in Mordovia.

525.   In the collection proceedings, the court had also denied Yukos' motion to stay the proceedings.[526]   In a decision dated 26 May 2004 and released on 28 May 2004, Judge Grechishkin of the Moscow Arbitrazh Court granted the Tax Ministry's petition, allowing the collection of tax arrears, interest and fines in the amount of RUR 99,375,110,548 (USD 3.48 billion) pertaining to the 2000 Decision.[527]

526.   Judge Grechishkin found that Yukos had acted in bad faith,[528] that the use by the trading companies of tax benefits was illegal because it was "not aimed at strengthening the economy of the Republic of Mordovia" but rather was used to "evade payment of taxes."[529]   The judge adopted the same reasoning as the Tax Ministry on the VAT issue, writing that:  "In order to use its right to the benefit, the taxpayer had to declare its right and confirm its right by documents in accordance with the current legislation. . . .   The taxpayer—OAO Yukos Oil Company—did not declare its desire to use its benefit either in 2000 or later."[530]   However, this

---

[523]   Ruling of the Moscow Arbitrazh Court to suspend the effect of Decision No. 14-3-05/1609-1 of 14 April 2004, Case No. A40-21839/04-75-276 p. 2, 19 May 2004, Exh. C-112.

[524]   Ibid.

[525]   Motion to join a third party to the proceeding, Case No. A40-17699-04-09-241, 26 May 2004, Exh. C-115.

[526]   Ruling of the Moscow Arbitrazh Court, Case No. A40-17699-04-09-241, 14 May, 2004, Exh. C-111.

[527]   Decision of the Moscow Arbitrazh Court, Case No. A40-17699-04-09-241, 26 May 2004, Exh. C-116.

[528]   Ibid., p. 14.

[529]   Ibid., p. 15.

[530]   Ibid., p. 19.

judgment could not be executed by the Tax Ministry as the interim relief in the parallel proceedings prevented enforcement until a determination of the lawfulness of the 2000 Decision was made.

527.   On 11 June 2004, Judge Cheburashkina, the presiding judge in the case brought by Yukos against the lawfulness of the 2000 Decision, was challenged by the Tax Ministry for bias towards Yukos in the granting of interim relief on 19 May 2004.[531]   The Tax Ministry cited several reasons as a basis for her removal for bias towards Yukos, including:  the allegation that the interim measures "did not comply with the principles of justice in a democratic constitutional State";[532] the allegation that the judge granted a "recess solely for OAO Yukos Oil Company to file a petition to stay proceedings in the [parallel] case to collect tax arrears, interest and fines," which the Tax Ministry saw as "evidence of the Judge's interest in the outcome of the proceedings in favor of the taxpayer";[533] her "behavior" in the preliminary court proceedings;[534] the allegation that the judge declined the petition of the Tax Ministry to abandon these proceedings in favour of the other set of collection proceedings initiated by the Tax Ministry;[535] and the allegation that the Tax Ministry was not granted extra time to copy documents to bring to court.[536]   The challenge was upheld by the Moscow Arbitrazh Court the same day.

528.   On 15 June 2004, Judge O.R. Mikhailova, a deputy chair of the Moscow Arbitrazh Court, was appointed to replace Judge Cheburashkina.[537]   On 22 June 2004, Judge Mikhailova set the date of 19 July 2004 for the hearing of the merits phase of the case on the lawfulness of the 2000 Decision.  She also directed the Tax Ministry to provide originals of the documents rather than photocopies and to organize the documents, including explanations "in order to confirm which circumstances they support."[538]

---

[531]   Russian Federation Ministry of Taxes and Levies, Challenge to Judge N.P. Cheburashkina, Moscow Arbitrazh Court, Case No. 21839/04-76-276, 11 June 2004, Exh. C-117.

[532]   *Ibid.*, p. 2 (emphasis in original omitted).

[533]   *Ibid.* (emphasis in original omitted).

[534]   *Ibid.*

[535]   *Ibid.*, p. 3.

[536]   *Ibid.*, pp. 3–4.

[537]   Ruling of the Moscow Arbitrazh Court, Case No. 21839/04-76-276 p. 1, 22 June 2004, Exh. C-119.

[538]   *Ibid.*

529. In the proceedings to initiate collection of the taxes assessed in the 2000 Decision, on 29 June 2004, a resolution of the Moscow Arbitrazh Court reduced the amount to be collected to approximately USD 3.42 billion.[539]

530. In a decision dated 23 June 2004 but published on 30 June 2004, the interim measures granted by Judge Cheburashkina were annulled by an appeal panel of the Moscow Arbitrazh Court.[540] The court reasoned that as the Tax Ministry had not, at the time of the filing of the request, placed any direct collection orders in accordance with Article 46(4) of the Russian Tax Code on Yukos' bank accounts, the interim measures had been granted without the proper basis in law.[541] It also concluded that there were other specific procedures that could be followed under Article 91(1)(5) (in lieu of the interim relief granted under Article 90(2)) that did not require interim measures.[542]

531. Also on 30 June 2004, a resolution of Bailiff Solovyova was issued initiating enforcement proceedings.[543] The bailiff then issued several more resolutions freezing cash in 16 Yukos bank accounts up to the total amount of taxes then due.[544]

532. On 30 June 2004, the Tax Ministry obtained the reversal of the interim measures and initiated enforcement proceedings.   On the same day, the Field Tax Audit Report for 2001 was released.[545] It assessed taxes, interest, and fines totaling approximately USD 4.1 billion.[546]

533. On 1 July 2004, another resolution was issued by Bailiff Solovyova limiting Yukos' rights pertaining to securities of 37 production, refining, and research subsidiaries.[547]

---

[539]   Appeal Resolution of the Moscow Arbitrazh Court, Case No. A40-17699/04-109-241, 29 June 2004, Exh. C-121.

[540]   Appeal Resolution of the Moscow Arbitrazh Court, Case No. A40-21839/04-76-276, 23 June 2004, Exh. C-120.

[541]   *Ibid.*, p. 4.

[542]   *Ibid.*

[543]   Resolution of Bailiff I.D. Soloyvova to initiate enforcement proceeding No. 10249/21/04, 30 June 2004, Exh. C-123.

[544]   Resolution of Bailiff I.D. Soloyvova to seize monies No. 10249/21/04, 30 June 2004, Exh. C-124.

[545]   Repeat Field Tax Audit Report No. 30-3-14/1 (2001), 30 June 2004, Exh. R-345.

[546]   *Ibid.* at 132–33.  The results of the audit will be discussed below at paragraphs 545–56, in connection with the Tax Ministry decision to which it relates.

[547]   Resolution of Bailiff I.D. Soloyvova to restrict the rights of the securities owner, 1 July 2004, Exh. C-125; *see also* Memorial ¶ 341.

534.	On 9 July 2004, Bailiff Solovyova issued a resolution for a seven percent enforcement fee for the proceedings relating to the 2000 Decision.[548]  The fee amounted to approximately more than RUR 6.8 billion (approximately USD 240 million).

535.	On 13 July 2004, further resolutions were issued by the bailiffs to seize Yukos' 14.5 percent stake in Sibneft which had been ordered by the Chukotka Arbitrazh Court as an interim measure in those proceedings.[549]  The Chukotka proceedings had been initiated by Mr. Roman Abramovich and they related to disputes following the Yukos–Sibneft aborted merger.  The Tribunal notes that while this seizure was not directly related to Yukos' trading companies, as will be seen later, it limited the options available to Yukos to satisfy the payment demands it was facing.

536.	On 14 July 2004, pursuant to another resolution of the bailiffs, 43 ordinary shares and 13 preferred shares of Yukos in YNG were seized.[550]  At the same time, a resolution to restrict the rights of the securities owner with respect to those shares was issued.[551]

537.	On 16 July 2004, Mr. Steven Theede sent a letter signed by Mr. Bruce Misamore to Mr. Alexei Kudrin, then Minister of Finance. In the letter, Yukos petitioned the Ministry, "[i]n consideration of the unprecedented nature of the sum that is subject to collection from OAO Yukos Oil Company" for deferral of, or the opportunity to pay in installments, the amount imposed by the collection decision of the Moscow Arbitrazh Court issued on 28 May 2004.[552]  When he gave evidence, Mr. Theede acknowledged that the letter was not perfect (the proposals did not have a great deal of detail) but he described the letter as an attempt "to create a dialogue [between Yukos and the Russian Federation]."[553]

538.	In the days leading to the Hearing on the Merits in the case brought by Yukos against the lawfulness of the 2000 Decision, certain statements were made "in the mass media relat[ing] to

---

[548]	Resolution of Bailiff I.D. Solovyova No. 10249/21/04 to collect an enforcement fee, 9 July 2004, Exh. C-132;

[549]	Resolutions of Bailiff A.Yu. Seregin to initiate enforcement proceedings Nos. 10599/10/04, 10603/10/04, 10606/10/04, 10607/10/04 and 10608/10/04, 13 July 2004, Exh. C-133; *see also* Memorial ¶¶ 225–28

[550]	Decision of the Moscow Arbitrazh Court, Case No. A40-36718/04-79-445, 6 August 2004, p. 2, Exh. C-141 (referring to 14 July 2004 seizure of Yukos' shares in Yuganskneftegaz (hereinafter "YNG").

[551]	*Ibid.*, p. 1.

[552]	Letter from Steven Theede to Alexei Kudrin, signed by Bruce Misamore, 16 July 2004, Exh. C-138.

[553]	Transcript, Day 10 at 53–55.

the [Yukos] case."[554]   The statements apparently included charges of bias against Judge Mikhailova because she had previously written articles for a magazine edited by one of Yukos' lawyers, Mr. Sergey Pepeliaev.[555]   While Judge Mikhailova denied the accusations of bias, she nonetheless asked to be recused.[556]   On 19 July 2004, the day Judge Mikhailova had originally scheduled a hearing on the lawfulness of the 2000 Decision, the Moscow Arbitrazh Court granted her request to resign.[557]

539.  On 6 August 2004, Yukos in-house counsel, Mr. Gololobov, sent a letter to the Chief Bailiff of the Russian Federation renewing Yukos' request to give priority to its 20 percent stake in Sibneft above other assets.   The same day, the Moscow Arbitrazh Court found that a 14 July 2004 bailiff's resolution to seize shares of YNG was issued in error and that, instead, Yukos' 20 percent stake in Sibneft should have been seized.[558]   The court ruled that federal law on enforcement proceedings outlines a priority order for enforcement against a debtor's assets and enforcement against lower assets is only possible when the higher assets are insufficient to settle the debts.[559]   Since the shares in YNG were of a lower priority than the more liquid Sibneft shares, they should not have been seized before the Sibneft shares.[560]   Claimants consider this to be a "rare victory" by Yukos before the Russian courts.[561]

540.  On 12 August 2004, a ruling of the Moscow Arbitrazh Court denied Yukos' petition to pay by installments the amount levied by the Moscow Arbitrazh Court on 28 May 2004.[562]   Five days later, the same court denied Yukos' application that the bailiffs undertake enforcement against its 34.5 percent stake in Sibneft before enforcement against other assets.[563]

541.  In a decision of 18 August 2004 released on 23 August 2004, Yukos' "rare victory" was overturned by the Ninth Arbitrazh Court of Appeal.   The court quashed the 6 August 2004

---

[554]  Ruling of the Moscow Arbitrazh Court, Case No. A40-21839/04 76-276, p. 1, 19 July 2004, Exh. C-139 (emphasis in original omitted).

[555]  *Ibid.*, p. 3.

[556]  *Ibid.*, p. 4.

[557]  *Ibid.*

[558]  Decision of the Moscow Arbitrazh Court, Case No. A40-36718/04-79-445, p. 26, 6 August 2004, Exh. C-141

[559]  *Ibid.*

[560]  *Ibid.*

[561]  Memorial ¶ 349.

[562]  Ruling of the Moscow Arbitrazh Court, Case No. A40-1397/04ip-109, 12 August 2004, Exh. C-142.

[563]  Decision of the Moscow Arbitrazh Court, Case No. A40-34962/04-94-425, 17 August 2004, Exh. C-143.

decision to give priority to enforcement against the 20 percent stake in Sibneft.  The court found that, as the shares in YNG had been issued by YNG after its privatization, they were not related to primary production and thus could be considered as a higher priority.[564]  As Yukos had not discharged its debt "voluntarily," the court found that the YNG shares were part of an inventory legally open to seizure by the bailiffs.[565]

542.  On 30 August 2004, the Tax Ministry sent a letter to Yukos, denying its request for deferred payment or payment by installments.[566]  This letter was in response to the letter intended to "create a dialogue" between Yukos and the Russian Federation sent more than a month earlier to the Finance Ministry by Messrs. Theede and Misamore.

543.  On 9 September 2004, five days after a decision reassessing taxes against Yukos for 2001, a letter from the Deputy Head of the Bailiffs Department notified the company that the arbitrazh courts had approved seizures against YNG and other production subsidiaries.[567]

544.  On 23 November 2004, the resolution of the Ninth Arbitrazh Court of Appeal of 16 November 2004 was issued.  It affirmed the lawfulness of the 2000 Decision.[568]

    (b)    **The 2001 Decision**

545.  On 2 September 2004, Decision No. 30-3-15/3 holding the taxpayer fiscally liable for a tax offense ("**2001 Decision**") was issued.[569]  It imposed the following taxes:

| COMPANY | TAX BENEFITS | VAT | TOTAL |
|---|---|---|---|
| **Alta-Trade** | RUR 1,271,988,200 | RUR 1,841,854,300 | RUR 3,113,842,500 (USD 106,437,232) |
| **Fargoil** | RUR 1,907,396,200 | RUR 3,170,995,300 | RUR 5,078,391,500 (USD 173,589,362) |

---

[564]    Resolution of the Ninth Arbitrazh Court of Appeal, Case No. 09AP-1554/04-AK, p. 4, 23 August 2004, Exh. C-144.

[565]    *Ibid.*, pp.4–5.

[566]    Letter from the Russian Tax Ministry to Yukos, 30 August 2004, Exh. C-145.

[567]    Letter from the Russian Ministry of Justice to Yukos, 9 September 2004, Exh. C-146.

[568]    Resolution of the Ninth Arbitrazh Court of Appeal, Case No. 09 AP-4078/04-AK, 23 November 2004, Exh. C-147.

[569]    2001 Decision, Exh. C-155.

| COMPANY | TAX BENEFITS | VAT | TOTAL |
|---|---|---|---|
| **Mars XXII (Energotrade)** | RUR 3,056,000 | RUR 18,009,000 | RUR 21,065,000 (USD 720,043) |
| **Ratmir** | RUR 1,787,339,500 | RUR 4,303,815,200 | RUR 6,091,154,700 (USD 208,207,590) |
| **Yukos-M** | RUR 1,723,009,600 | RUR 3,220,911,200 | RUR 4,943,920,800 (USD 168,992,890) |
| **Yu-Mordovia** | RUR 8,153,611,600 | RUR 8,470,436,200 | RUR 16,624,047,800 (USD 568,242,494) |
| **Mega-Alliance** | RUR 1,276,878,700 | | RUR 1,276,878,700 (USD 43,646,213) |
| **Ratibor** | RUR 5,729,645,900 | RUR 7,880,489,700 | RUR 13,610,135,600 (USD 465,221,075) |

546.   It also assessed penalties and fines.

547.   On the same day, a tax payment demand with respect to the 2001 Decision was issued in the amount of RUR 79,279,641,154 (approximately USD 2.7 billion).   Again, payment was due two days later, on 4 September 2004.[570]   A tax penalty was issued in the amount of RUR 40,607,549,520 (approximately USD 1.3 billion), which was also due on 4 September 2004.[571]   The total due by 4 September was thus approximately USD 4.1 billion.

548.   On 3 September 2004, the petition of the Tax Ministry to collect tax penalties of RUR 40,607,549,600 (approximately USD 1.3 billion) was served on Yukos.[572]

549.   On 6 September 2004, a decision was issued by the Interregional Inspectorate of the Tax Ministry.[573]   It ordered the automatic collection of the tax payment demand (approximately USD 2.7 billion) from Yukos bank accounts.   Three days later, on 9 September 2004, a resolution of Bailiff Borisov to initiate enforcement proceedings was issued.[574]   On the same

---

[570]   Tax Payment Demand No. 133, 2 September 2004, Exh. C-156.

[571]   Tax Penalty Payment Demand No. 133, 2 September 2004, Exh. C-157.

[572]   Russian Tax Ministry Petition to collect tax Penalties, 3 September 2004, Exh. C-158.

[573]   Decision No. 52/595, 6 September 2004, Exh. C-159.

[574]   Resolution of Bailiff D.A. Borisov to initiate enforcement proceeding No. 13022/11/04, 9 September 2004, Exh. C-161.

day, there was another resolution of Bailiff Borisov to join the enforcement proceedings for the 2000 Decision and the 2001 Decision.[575]

550.  On 16 September 2004, Yukos reiterated its petition for voluntary enforcement by the bailiffs against its holdings in Sibneft and non-core subsidiaries.[576]  No response was received from the bailiffs.[577]  The next communication received from the bailiffs was on 20 September 2004, when they issued a resolution to collect a seven percent enforcement fee— RUR 5,549,574,880.78 (approximately USD 190 million) for the 2001 Decision.[578]

551.  As it had done in respect of the 2000 Decision, Yukos challenged the lawfulness of the 2001 Decision.  Parallel proceedings were filed by the Tax Ministry for collection of the 2001 Decision.  Judge Dzuba ruled in favour of the Tax Ministry.[579]

552.  On 29 October 2004, a Field Tax Audit Report for 2002 was released.[580]  It assessed tax arrears, interest, and fines of approximately USD 6.8 billion.[581]

553.  On 12 November 2004, Yukos sent a letter to the Judicial Collegium of the Russian Federation complaining that its challenge to Judge Korotenko in the proceedings concerning the lawfulness of the 2001 Decision had not been heard.[582]  Yukos had challenged Judge Korotenko for bias, on the ground that he had presided over the appeal panel of the Moscow Arbitrazh Court which had made a decision in favour of the Tax Ministry in respect of the 2000 Decision.

---

[575]  Resolution of Bailiff D.A. Borisov to join into consolidated enforcement proceedings, 9 September 2004, Exh. C-162. The consolidated enforcement proceeding is No. 10249/21/04.

[576]  Yukos' petition for voluntary enforcement of Resolution of 09.09.2004 to initiate an enforcement proceeding and Demand of 30.06.2004, Exh. C-163.

[577]  Memorial ¶ 354.

[578]  Resolution of the Bailiffs, 20 September 2004, Exh. C-164. RUR to USD is approximate, based on an exchange rate of 29.2552:1, the exchange rate on 2 September 2004, the date that the payment demand was issued.

[579]  Memorial ¶ 261.

[580]  Field Tax Audit Report No. 52/852, 29 October 2004, Exh. R-346.

[581]  The results of the audit will be discussed below at paragraphs 557–65, in connection with the Tax Ministry decision to which it relates.  RUR to USD is approximate, based on a ratio of 28.6696:1, the exchange rate on 16 November 2004, the date the Payment Demand was issued for the 2002 Decision.

[582]  Letter from Yukos to Highest Judicial Qualification Collegium of the Russian Federation, 12 November 2004, Exh. C-165.

554.   In a hearing on 16-17 November 2004, Judge Korotenko denied Yukos' request to join the trading companies as third parties in the case against the 2001 Decision.[583]   Judge Korotenko also denied Yukos' motion to obtain an expert opinion on market prices of oil.[584]

555.   On 18 November 2004, the Moscow Arbitrazh Court, Judge Korotenko presiding, affirmed the legality of the two-day time limits set forth in the previous payment demands.[585]   The court also rejected the arguments relating to the "massive" amounts assessed and the short time granted for voluntary payment.   The court stated that "[t]he tax legislation does not stipulate any deadline for voluntary fulfillment by the taxpayer of the demand to pay taxes.   Upon issue of the Claim, the Inspectorate is entitled to stipulate a time period for its voluntary execution."[586]   This decision of the Moscow Arbitrazh Court was announced on the same day as a *one*-day payment demand, relating to Decision No. 52/896 holding the taxpayer liable for a tax offense ("**2002 Decision**"), became due.   It also affirmed the lawfulness of the 2001 Decision.

556.   Later, on 16 February 2005, a resolution of the Ninth Arbitrazh Court of Appeal of 9 February 2005, was issued.   It reduced the overall amount payable for 2001 by approximately USD 150 million.[587]   On 15 November 2005, the Federal Arbitrazh Court for the Moscow District also reduced, slightly, the amount of fines payable for 2001.[588]

   (c)   **The 2002 Decision**

557.   On 16 November 2004, the 2002 Decision was issued.[589]   It levied the following taxes:

| COMPANY | TAX BENEFITS | VAT | TOTAL |
|---|---|---|---|
| **Alta-Trade** | RUR 64,129,180 | | RUR 64,129,180 (USD 2,236,836) |

---

[583]   Moscow Arbitrazh Court, Transcript of the Hearing of 16–17 November 2004 in Moscow, Exh. C-166.

[584]   *Ibid*.

[585]   Decision of the Moscow Arbitrazh Court, Case Nos. A40-51085/04-143-92 and A40-54628/04-143-134, 17 November 2004, Exh. R-252.

[586]   *Ibid*. at 15.

[587]   Resolution of the Ninth Arbitrazh Court of Appeal, 16 February 2005, Exh. C-167.

[588]   Resolution of the Federal Arbitrazh Court for the Moscow District, Case No. A40-45410/04-141-34, 15 November 2005, Exh. C-168; *see* Memorial ¶ 257.

[589]   2002 Decision, Exh. C-175.

| COMPANY | TAX BENEFITS | VAT | TOTAL |
|---|---|---|---|
| **Fargoil** | RUR 20,705,417,918 | RUR 34,812,409,914 | RUR 55,517,827,832 (USD 1,936,470,262) |
| **Ratmir** | RUR 167,135,313 | | RUR 167,135,313 (USD 5,829,705) |
| **Yukos-M** | RUR 25,947,077 | RUR 260,150,323 | RUR 286,097,400 (USD 9,979,121) |
| **Yu-Mordovia** | RUR 104,408,575 | | RUR 104,408,575 (USD 3,641,787) |
| **Evoil** | RUR 29,678,098 | | RUR 29,678,098 (USD 1,035,177) |
| **Petroleum-Trading** | RUR 8,145,551 | RUR 59,464,184 | RUR 67,609,735 (USD 2,358,238) |
| **Ratibor** | RUR 260,150,114 | | RUR 260,150,114 (USD 9,074,076) |
| **OAO Yukos Oil Company** | | | RUR 33,789,516,238 |

558. It also assessed penalties and fines.

559. On 16 November 2004, a tax payment demand was issued in the amount of RUR 121,771,662,841 (USD 4.2 billion). Payment was due on 17 November 2004—*one* day later.[590] Similarly, on 16 November a tax penalty payment demand was issued in the amount of RUR 72,040,907,796 (USD 2.5 billion). Payment was also due on 17 November 2004.[591] The total amount due in one day was approximately USD 6.7 billion.

560. On 18 November 2004, a decision was issued by the Tax Ministry to enforce and collect taxes and interest against the assets of Yukos.[592] On the same day, Bailiff I.V. Kochergin initiated

---

[590]   Tax Payment Demand No. 175, 16 November 2004, Exh. C-176.

[591]   Tax Penalty Payment Demand No. 175/1, 16 November 2004, Exh. C-177.

[592]   Decision No. 52/900, 18 November 2004, Exh. C-178.

enforcement proceedings and joined these proceedings to the two earlier proceedings for 2000 and 2001.[593]

561.   On 19 November 2004, Field Audit Report No. 52/907 for 2003 was issued.[594]  It assessed tax arrears, interest and fines of approximately USD 5.9 billion.[595]

562.   On 24 November 2004, Yukos filed a petition for voluntary enforcement of the resolution of 18 November 2004.[596]  No response was received from the bailiffs.

563.   In relation to the 2002 Decision, there were no parallel proceedings:  only a single proceeding which addressed both the lawfulness and the collection of the 2002 Decision.  In a hearing on 8-9 December 2004, Yukos challenged Judge D.I. Dzuba, because, it submitted, the judge had "already formed a subjective negative opinion about OAO Yukos Oil Company as the guilty party" since he had presided over the collections case relating to the 2001 Decision.  The challenge was never heard by the court.[597]  On 16 December 2004, Judge Dzuba denied Yukos' request to obtain an expert opinion on oil market prices.[598]

564.   Between these events, on 9 December 2004, a resolution of the bailiffs to collect a 7 percent enforcement fee, RUR 2,737,919,857.85, was issued.[599]   On 23 December 2004, the court upheld the lawfulness of the 2002 Decision.

565.   On 30 June 2005, a resolution of the Federal Arbitrazh Court was issued, upholding earlier court decisions and reducing the overall amount payable for 2002 by USD 45.70 million.[600]

---

[593]   Resolution of Bailiff I.V. Kochergin to initiate enforcement proceeding No. 15315/4/04 and join it to consolidated enforcement proceeding No. 10249/21/04, 18 November 2004, Exh. C-179.

[594]   Field Audit Report No. 52/907, 19 November 2004, Exh. R-1583.  The results of the audit will be discussed below at paragraphs 566–74, in connection with the Tax Ministry decision to which it relates.

[595]   RUR to USD is approximate, based on a ratio of 27.8171:1, the exchange rate on 6 December 2004, the date the Payment Demand was issued for the 2003 Decision.

[596]   Yukos' petition for voluntary enforcement of Resolution 19.11.2004 to initiate an enforcement proceeding, Exh. C-180.

[597]   Transcripts of the Preliminary Hearing of the Moscow Arbitrazh Court, Case Nos. A40-61058/04-141-151 and A40-63472/04-141-162, Exh. C-181 and Exh. C-183.

[598]   Transcript of the Preliminary Hearing of the Moscow Arbitrazh Court, Case Nos. A40-61058/04-141-151 and A40-63472/04-141-162 p. 22, Exh. C-183.

[599]   Resolution of Bailiff I.V. Kochergin to collect a seven percent enforcement fee, 9 December 2004, Exh. C-182.

[600]   Resolution of the Federal Arbitrazh Court No. KA-A40/3222-5, Case Nos. A40-61058/04-141-151 and A40-63472/04-141-162, 30 June 2005, Exh. C-184. *See also* Memorial ¶ 260 n.384.

(d)    **The 2003 Decision**

566.  On 6 December 2004, Decision No. 52/985 holding the taxpayer fiscally liable for a tax offense was issued ("**2003 Decision**").[601]  It levied the following taxes:

| COMPANY | TAX BENEFITS | VAT | TOTAL |
|---|---|---|---|
| **Alta-Trade** | RUR 26,192,854 | | RUR 26,192,854 (USD 937,901) |
| **Fargoil** | RUR 22,549,425,143 | RUR 47,098,087,287 | RUR 69,647,512,430 (USD 2,458,096,703) |
| **Macro-Trade** | RUR 408,084,717 | RUR 46,810,044 | RUR 454,894,761 (USD 16,288,650) |
| **Energotrade (formerly Mars XXII)** | RUR 7,147,772,476 | RUR 6,826,447,412 | RUR 13,974,219,888 (USD 500,382,062) |
| **Ratmir** | RUR 8,345,945 | | RUR 8,345,945 (USD 298,848) |
| **Yukos-M** | RUR 135,201,343 | | RUR 135,201,343 (USD 4,841,224) |
| **Yu-Mordovia** | RUR 34,210,117 | | RUR 34,210,117 (USD 1,224,979) |
| **Evoil** | RUR 173,951,671 | | RUR 173,951,671 (USD 6,228,777) |
| **OAO Yukos Oil Company** | | | RUR 1,773,658,844 |

567.  It also assessed penalties and fines.

568.  On 6 December 2004, a tax payment demand was issued in the amount of RUR 101,464,118,510 (USD 3.6 billion).[602]  Payment was due one day later, on 7 December 2004.  A tax penalty payment demand was also issued on 6 December 2004, in the amount of RUR 68,939,326,976 (USD 2.4 billion).[603]  Payment of this amount was also due one day later,

---

[601]    2003 Decision, Exh. C-190.

[602]    Tax Payment Demand No. 186, 6 December 2004, Exh. C-191.

[603]    Tax Penalty Payment Demand No. 186/1, 6 December 2004, Exh. C-192.

on 7 December 2004.  The total due one day after the payment demands were issued was approximately USD 6 billion.

569.   On 8 December 2004, a resolution of the Tax Ministry was issued to enforce and collect taxes and interest against Yukos' assets.[604]  The following day, Bailiff Kochergin issued a resolution which initiated enforcement proceedings, and joined them to the previous enforcement proceedings.[605]

570.   On 16 December 2004, Yukos again petitioned for voluntary enforcement only against assets of first priority, and requested that the bailiffs not collect an enforcement fee.[606]

571.   The Tribunal notes that, on 31 January 2005, an Interpol "Red Notice" was issued against Mr. Vladimir Dubov, who at this time was living in Israel.  It noted that he was "accused of budgetary funds misappropriation."[607]

572.   On 28 April 2005, the decision was issued by the Moscow Arbitrazh Court[608] reducing the overall amount payable for 2003 by approximately USD 2.6 million.

573.   The Tribunal also notes that, on 16 May 2005, in another Russian court Messrs. Khodorkovsky and Lebedev were convicted of tax evasion and embezzlement.[609]

574.   On 5 December 2005, the Federal Arbitrazh Court for Moscow issued a resolution affirming a small reduction of fines for 2003 by a lower court.[610]

---

[604]   Resolution No. 52/999 of the Tax Ministry's Interregional Inspectorate for Major Taxpayers No. 1, 8 December 2004, Exh. C-193.

[605]   Resolution of Bailiff I.V. Kochergin to initiate enforcement proceeding No. 16305/4/04 and join it to consolidated enforcement proceeding No. 10249/21/04, 9 December 2004, Exh. C-194.

[606]   Yukos' petition for voluntary enforcement of the Resolution of 9 December 2004 to initiate an enforcement proceeding, 16 December 2004, Exh. C-195.

[607]   *Interpol Wants YUKOS V. Dubov and M. Brudno*, Kommersant, 31 January 2005, Exh. C-749.

[608]   Decision of the Moscow Arbitrazh Court, Case Nos. A40-4338/05-107-9 and A40-7780/05-98-90, 28 April 2005, Exh. C-196.

[609]   Judgment of the Meshchansky District Court for the City of Moscow, 16 May 2005, Exh. R-379.

[610]   Resolution of the Federal Arbitrazh Court for Moscow District, Case Nos. A40-4338/05-107-9 and A40-7780/05-98-90, 5 December 2005, Exh. C-197.  *See also* Memorial ¶ 264, n.393.

(e)    The 2004 Decision

575.   On 27 December 2005, a Field Tax Audit Report for 2004 was issued.[611] It assessed tax arrears, interest, and fines against Yukos at approximately USD 3.9 billion.[612]

576.   On 17 March 2006, Decision No. 52/292 was issued holding Yukos fiscally liable for the commission of a tax offence, ("**2004 Decision**").[613]  It levied the following taxes:

| COMPANY | TAX BENEFITS | VAT | TOTAL |
|---|---|---|---|
| **Macro-Trade** | | RUR 386,687,520 | RUR 386,687,520 (USD 13,901,072) |
| **Energotrade (formerly Mars XXII)** | | RUR 41,946,060,356 | RUR 41,946,060,356 (USD 1,507,923,556) |
| **Yukos Vostok Trade** | RUR 1,224,013,181 | RUR 7,436,494,011 | RUR 8,660,507,192 (USD 311,337,530) |
| **OAO Yukos Oil Company** | | | RUR 3,105,399,900 |

577.   The Tribunal notes that there are no documents in the record evidencing a tax payment demand or a tax penalty payment demand issued in respect of the 2004 Decision.

578.   However, on 21 June 2006, the Moscow Arbitrazh Court issued a decision[614] confirming the lawfulness of the Tax Ministry's claims relating to the arrears claimed in the 2004 Decision in the amount of RUR 66,391,719,284 (USD 2.4 billion).   On 18 August 2004, the Ninth Arbitrazh Court of Appeal issued a resolution, ordering a determination of the lawfulness of the 2004 fines in the amount of RUR 42,036,873,518 (USD 1.7 billion) in separate proceedings.[615]

---

[611]    Field Tax Audit Report No. 52/996, 27 December 2005, Exh. C-200.

[612]    RUR to USD is approximate, based on a ratio of 27.8171:1, the exchange rate on 17 March 2006—the date of the 2004 Decision.

[613]    2004 Decision, Exh. R-1539.

[614]    Decision of the Moscow Arbitrazh Court, Case No. A40-11836/06-88-35 "B", 21 June 2006, Exh. R-538.

[615]    Resolution of the Ninth Arbitrazh Court of Appeal No. 09AP-8628/2006 GK, 18 August 2006, Exh. C-336.

The lawfulness of the fines was eventually affirmed by the Moscow Arbitrazh Court on 6 October 2006.[616]

### (f)   Observation

579.  This chronology of the five tax assessments against Yukos for the years 2000–2004 and related decisions of the Tax Ministry, the Russian courts and the bailiffs is lengthy and tedious.  But it is very much part of the factual matrix which will inform the Tribunal when it answers the question posed at the outset of the chapter:  "Why would Russia have treated Yukos as it did if its purpose was to collect taxes?"

### 3.   The Taxes Assessed Against Yukos

580.  The principal taxes assessed against Yukos were profit tax and VAT.  Together they account for over 95 percent of the total amount of more than USD 24 billion including related fines and interest.  Details in relation to profit tax and certain other revenue-based taxes are provided in Subsection (a) below.  Details in relation to VAT are set out in Subsection (b) below.

### (a)   Profit Tax and Other Revenue-based Taxes

581.  As shown in the table below, for the tax years 2000 to 2004, the tax authorities imposed a demand for the payment of profit tax (including interest and fines) ranging from USD 261 million to USD 4 billion per year, for a total of **USD 9.5 billion**.  This represents some 39 percent of the total tax claims levied against Yukos in the reassessments for those years.  Other revenue-based taxes (also including interest and fines) assessed against Yukos added approximately USD 1 billion to the total.  The breakdown by individual tax year is as follows:[617]

| (IN USD BILLION) | 2000 | 2001 | 2002 | 2003 | 2004 | Total | % |
|---|---|---|---|---|---|---|---|
| Profit tax | 1.356 | 1.695 | 4.005 | 2.184 | 0.261 | 9.502 | 39.3 |
| Property tax | 0.006 | 0.010 | 0.009 | 0.013 | 0.003 | 0.039 | 0.2 |
| Road users tax | 0.258 | 0.002 | 0.001 | – | – | 0.261 | 1.1 |

---

[616]   Decision of the Moscow Arbitrazh Court, Case Nos. A40-37697/06-141-233 and A40-49860/06-127-206, 6 October 2006, Exh. C-201.

[617]   Figures derived from Details of Yukos' Alleged Tax Reassessments, Exh. C-593; *see also* Claimants' Opening Slides, pp. 62–63.

| (IN USD BILLION) | 2000 | 2001 | 2002 | 2003 | 2004 | Total | % |
|---|---|---|---|---|---|---|---|
| Tax for the maintenance of housing, social and culture facilities | 0.209 | – | – | – | – | 0.209 | 0.9 |
| Tax on sales of combustibles and lubricants | 0.570 | – | – | – | – | 0.570 | 2.4 |
| Advertisement tax | – | – | – | 0.006 | 0.002 | 0.008 | 0.03 |
| **Total** | **2.399** | **1.707** | **4.015** | **2.203** | **0.266** | **10.589** | **43.93** |

582.    The reasoning by the tax authorities for the imposition of profit tax and the other sundry revenue-based taxes did not vary substantively from year to year.  For purposes of the present chapter, the Tribunal will therefore consider the documents relating to the 2000 tax year.

583.    The 2000 Audit Report concludes that, during the year 2000, Yukos knowingly and deliberately operated a tax evasion scheme through the use of "sham dependent entities".  The Audit Report describes the "discovery"[618] of the scheme as follows:

> During the field tax audit, non-payment by OAO Yukos Oil Company of corporate profit tax, road users tax, property tax and housing support tax, arising from the use of an unlawful scheme involving evasion of tax through artificial creation of sham companies in the oil and oil product movement chain, which were registered in territories with a beneficial tax regime, was discovered.
>
> The aim of using this scheme was non-payment of taxes on the sum of revenue (income) received from the sale of oil and oil products.  For this purpose OAO Yukos Oil Company created sham dependent entities, which functioned as oil and oil product owners (hereinafter – the "owners").  These entities were registered in territories in which a beneficial tax regime applied (Closed administrative-territorial formations) [CATF], regions of the Russian Federation, providing tax benefits on investments).  OAO Yukos Oil Company had control over the operations, conducted by the oil and oil product "owners", by participating in the transactions as an intermediary (confirmed by documents shown in Attachment No. *14* to the field tax audit document) or by bringing in other entities dependent on OAO Yukos Oil Company to participate in transactions as an intermediary.[619]

584.    The 2000 Audit Report continues:

---

[618]    According to Mr. Konnov the use of the term "discovered" at the end of the first paragraph of the cited passage of the Audit Report ("[…] non-payment […] of corporate profit tax […] arising from the use of an unlawful scheme involving evasion of taxes […] was discovered.") is a mistranslation.  Mr. Konnov suggested that the original wording in Russian is better translated as "the audit concluded or established that […]."  Transcript, Day 13 at 167; *see also* Respondent's Closing Slides, p. 97.

[619]    2000 Audit Report, pp. 7–8, Exh. C-103.

The audit established that the actual owner of the oil and oil products was OAO Yukos Oil Company.  The oil was in fact acquired and transferred for refining, and the oil and oil products sold, by OAO Yukos Oil Company, as evidenced by the actual movement of oil and oil products from production entities to oil refineries or to oil bases controlled by OAO Yukos Oil Company, as confirmed in the trade and transport documents, and also the direct participation by OAO Yukos Oil Company in all the operations.  The following also provides proof that the oil and oil products actually belonged to OAO Yukos Oil Company [*sic*] and that the tax evasion scheme applied by them was illegal:

- interdependence of persons participating in the transactions and their control by OAO Yukos Oil Company;

- registration of the "owners" in territories with beneficial tax regimes;

- non-activity by the "owners" in their places of registration;

- the fictitious commission payments to OAO Yukos Oil Company, which are much smaller than the actual payments made on the intermediary market;

- the understated prices of acquisition of oil from production entities and from other sham companies;

- the conduct of accounting in all the entities by OOO Yukos-Invest, or by Yukos-FBTs OOO, which are dependent on OAO Yukos Oil Company;

- the opening of accounts for all the entities in the same banks, which are dependent on OAO Yukos Oil Company;

- the utilisation of promissory note settlements between the entities, or settlements by means of mutual set-off.[620]

585.  The 2000 Audit Report goes into great detail in explaining the tax benefits that were claimed by each of the trading entities.  The Audit Reports for subsequent tax years generally follow the same form.  They audit OAO Yukos Oil Company and the trading companies.  They are divided into separate sections for each trading company; some of the later reassessments also include sums assessed directly against OAO Yukos Oil Company.  The sections on the trading companies generally begin with an overview of the incorporation, ownership, and capital of the company.  They then affirm that the directors of the company and its operations are not based in the region in which it had been incorporated, which according to the authors of the Audit Reports, shows that the company could not benefit from preferential taxation agreements offered to companies operating in the low-tax regions.  The reassessments then assert that the trading companies are "interrelated" and thus "dependent" on OAO Yukos Oil Company, thereby allowing OAO Yukos Oil Company to fraudulently claim taxation benefits.

586.  The 2000 Audit Report concludes in relation to the tax evasion by Yukos as follows:

The tax evasion by OAO Yukos Oil Company, through registration of sham companies in territories with preferential tax rates, with the exclusive aim of evading tax, and

---

[620]   *Ibid.*, pp. 8–9.

which . . . did not actually trade or engage in any activity in those territories or indeed anywhere else, or invest any money in the economies of the relevant constituent entities of the Russian Federation, and which, therefore, illegally applied the additional tax benefits, indicates that OAO Yukos Oil Company acted in bad faith.

According to the Russian Federation Constitutional Court's 25 July 2001 Ruling No. 138-O interpreting the provision contained in Article 3(7) of the RF Tax Code, in the area of taxation there is a presumption of good faith on the part of taxpayers.

As is evident from the above-mentioned Ruling, the presumption of taxpayer good faith, enshrined in the RF Tax Code, presupposes an obligation on the tax authorities to prove any bad faith on the part of taxpayers in the manner set out by the Russian Federation Tax Code, and to conduct the necessary audits in order to establish such bad faith with the aim of ensuring a balance between state and private interests.

Similar provisions are contained in RF Constitutional Court Rulings Nos. 4-O dated 10.01.2002 and 108-O dated 14.05.2002.

The Judgements of the Presidium of the RF Supreme Court of Arbitration Nos. 9408/00 dated 18.09.2001, 7374/01 dated 18.06.2002, 6294/01 dated 05.11.2002 and 11259/02 dated 17.12.2002, and a letter from the Deputy President of the RF Supreme Court of Arbitration No. S5-5/up-342 dated 17.04.2002, also point out the need to examine the question of bad faith on the part of taxpayers, that is, their commission of deliberate acts aimed at not fulfilling the constitutional obligation to pay taxes.

The above-mentioned circumstances, namely OAO Yukos Oil Company carrying out operations involving the purchase and sale of oil and oil products, indicate Yukos Oil Company's OAO bad faith, which evidences its deliberate actions in evading payment of taxes through the application of illegal schemes.

. . . According to the Regulations of 01.01.2000 on the accounting policy for the year 2000, in OAO Yukos Oil Company for purposes of taxation (in order to calculate corporate profit tax, value added tax, Road users tax and housing support tax) revenue from the sale of products and goods (work, services) was determined on the basis of actual payments.

For purposes of taxation revenue was indicated by the entity in the accounts in the line 010 of the account using form No. 2 "Profit and Loss Account" taking into account the Information on the procedure for determination of data indicated in line 1 of "Calculation of tax on actual profit" in a sum of RUR 36,396,312,000 (RUR 36,264,009,000 in Form No. 2, "Profit and Loss Account" + RUR 132,303,000 according to the Information on the procedure for determination of data indicated in p. 1 of "Calculation of tax on actual profit").

According to the data of the audit, revenue from the sale of goods (work, services) amounted to RUR 245,907,712,162.

Thus, the revenue from the sale of goods (work, services) in the sum of RUR 209,511,400,162 was understated as a result of non-indication in the accounting registers of the revenue which had been received as a result of utilising a scheme with the participation of sham entities which were dependent on OAO Yukos Oil Company and which had been created for the purpose of tax evasion on the part of OAO Yukos Oil Company . . . .[621]

587.   The 16 November 2004 decision of the Ninth Arbitrazh Court of Appeal upheld the 2000 Decision to hold Yukos liable for all these taxes.  The English translation of the judgment is 25 pages long.  The key passages, which the Tribunal believes should be set out so as to give

---

[621]   *Ibid.*, pp. 14–15.

visibility to the court's reasoning (which the Tribunal will consider later as part of the totality of the evidence), follow:

> OAO Yukos Oil Company did not agree with the decision of the Court and filed an appeal requesting that the decision of the Court of First Instance be quashed and that the presented claim be granted in full: to declare unlawful the Russian Federation Ministry of Taxes and Levies Decision No. 14-3-05/1609-1 of 14.04.2004 to Hold the Taxpayer Fiscally Liable for a Tax Offense.

> . . . The interested party, the Russian Federation Ministry of Taxes and Levies, argues that the Court of First Instance legally and justifiably found that the decision and resolution issued in Case No. A40-17669/04-109-241 [*i.e.*, the 26 May 2004 decision], which involves the same parties as Case No. A40-21839/04-76-276 [*i.e.*, the case before the Court of Appeal], established the legality and validity of the disputed RF Tax Ministry Decision, the circumstances surrounding OAO Yukos Oil Company's performance of actions aimed at evading taxes through the artificial formation of entities registered in territories with preferential tax rates and their "participation" in the chain of movement of oil and oil products, and the illegality and invalidity of OAO Yukos Oil Company's arguments regarding the illegality of the RF Tax Ministry's disputed Decision.

> . . .

> Pursuant to Article 69(2) of the RF Arbitrazh Procedure Code, facts established by the legally effective judicial act of an arbitrazh court in connection with a previously heard case do not need to be proven again when the arbitrazh court hears another case involving the same parties.

> The Court Decision of 26.05.2004 in Case No. A40-17669/ 04-109-241 established that the tax authority did not breach the requirements of Article 87 of the RF Tax Code when issuing Decision No. 14-3-05/1609-1 of 14.04.2004.   The Court found that RF Tax Ministry Decision No. 14-3-05/1609-1 of 14.04.2004 is consistent with the Russian Federation Tax Code, federal laws adopted pursuant to the RF Tax Code, and other tax laws that were in effect during the audit period.

> . . . The Court found that the entities registered in territories with preferential tax rates and named in the RF Tax Ministry's Decision (Yu-Mordovia OOO, Alta-Trade OOO, Ratmir OOO, Mars XXII OOO, Jupiter XXIV OOO, ZAO Yukos-M, Saturn XXV OOO, Yuksar OOO, Siberian Transportation Company OOO, Quercus OOO, Muskron OOO, Nortex OOO, Grace OOO, Colrain OOO, Virtus OOO, Plast OOO, Mitra OOO, Vald-Oil OOO, Business-Oil OOO, Staf OOO, Petroleum-Trading OOO) were related to each other and dependent on OAO Yukos Oil Company.   The relationship of all the entities and their dependence on OAO Yukos Oil Company, as one of the items of evidence of bad faith on the part of the Applicant which applied the illegal tax evasion scheme is also confirmed by the fact that the same individuals were the founders and (or) officers in the aforementioned entities.

> . . . The Court rightly found that control of the oil and oil-product transactions performed by the entities registered in territories with preferential tax rates was exercised OAO Yukos Oil Company by means of participation in the transactions as an intermediary or by means of involvement of other entities, dependent on OAO Yukos Oil Company, as intermediaries in the transactions.  The entities registered in territories with preferential tax rates concluded agency agreements for the purchase of crude oil with OAO Yukos Oil Company.  In turn, OAO Yukos Oil Company, acting on behalf of entities registered in territories with preferential tax rates, purchased oil from producing entities or from other suppliers.  Thereafter, the crude oil purchased via the agent (OAO Yukos Oil Company) was sold to buyers (Russian or foreign) via this same OAO Yukos Oil Company (as the commission agent or the agent) or transferred for refining to refineries which were subsidiaries of OAO Yukos Oil Company.  Apart from agency agreements, purchase and

sale agreements were drawn up for purchase of oil, according to conditions thereof, OAO Yukos Oil Company "sold" oil from the resources of its producing entities – OAO Yuganskneftegaz, OAO Samaraneftegaz, and OAO Tomskneft.  Unlike OAO Yukos Oil Company and its producing companies, which according to the customs cargo declarations were shippers, the entities registered in regions with preferential tax rates were not mentioned in the export documents.

The dependence of entities, registered in territories with preferential tax rates, on OAO Yukos Oil Company and the control by OAO Yukos Oil Company of all transactions is also confirmed by the fact that the records of all transactions associated with the purchase and transfer of oil for refining, as well as with the sale of oil and oil products (including accounting records) were kept by Yukos-Invest OOO and Yukos-FBTs, which are dependent on OAO Yukos Oil Company.  Furthermore, the entities registered in territories with preferential tax rates entered into production management service contracts with OOO Yukos RM, which is also dependent on OAO Yukos Oil Company.  The financial statements and tax filings were submitted to the tax authorities by post from the address at which OAO Yukos Oil Company was located according to the invoices.  Furthermore, this address was the mailing address of OOO Yukos-Moscow, which is the executive body of OAO Yukos Oil Company.

The accounts of all entities are opened with the same banks, i.e. OAO Trust Investment Bank, OAO Bank Menatep St. Petersburg and Bank Solidarnost, where OAO Yukos Oil Company was a shareholder.

In addition to concluding agreements on the purchase and sale of oil and oil products, these entities also conducted activities involving the purchase and sale of promissory notes, which they used in settlements with one another and with OAO Yukos Oil Company for oil and oil products.  Or by purchasing and selling promissory notes, these entities returned to OAO Yukos Oil Company funds supposedly earned for oil they sold.  Therefore, the business of these entities related to the purchase and sale of promissory notes is a business related to the purchase and sale of oil and oil products.  Therefore, the Court lawfully and justifiably rejected the Applicant's argument that the entities registered in territories with preferential tax rates engaged in business activities other than the sale of oil and oil products.

The Applicant's assertion that the determination of bad faith is possible exclusively in the instances of payment of taxes through insolvent banks is unfounded, as the finding that it is necessary for the tax authorities to conduct audits and determine bad faith was made by the Constitutional Court of the Russian Federation based on the interpretation of Article 3(7) of the RF Tax Code, i.e. the presumption of the taxpayers' good faith. From this follows the obligation of taxpayers to act in good faith when conducting any actions associated with the discharge of their tax liability and the right of the tax authorities to determine bad faith on the part of taxpayers committing actions (inaction) intentionally aimed at tax evasion.

In light of the foregoing circumstances, the Court rightly found that the owner of the oil and oil products was OAO Yukos Oil Company.  The purchase and transfer of the oil for refining and the sale of oil and oil products were actually carried out by OAO Yukos Oil Company as the owner.

. . . The Constitutional Court of the Russian Federation, in Ruling No. 138-O of 25.07.2001, points out that, according to the tenor of Article 3(7) of the RF Tax Code, the presumption of good faith on the part of taxpayers is in effect in the area of tax relations. For the purpose of determination of bad faith on the part of taxpayers, the tax authorities have the right—in order to ensure a balance between State and private interests—to carry out the necessary audit and to file with the arbitrazh courts claims that ensure the receipt of taxes into the budget.  In light of the above, in order to ensure a balance between State and private interests, the tax authorities have the right to conduct audits for the purpose of

determination of the actual owner of sold property and for determination of bad faith on the part thereof, expressed in the application of a tax evasion scheme.

The fact that OAO Yukos Oil Company had the rights of possession, use and disposal with respect to the oil and oil products, and at its own discretion performed with respect thereto any actions, including alienation, transfer for processing, etc. through sham entities dependent on OAO Yukos Oil Company was established by the legally effective judicial acts in Case No. A40-17669/04-109-241.

The Court therefore rightly does not accept the argument of the Applicant and the third party regarding the non-compliance with law and the factual circumstances of the assessment of taxes to OAO Yukos Oil Company as the owner of the oil and oil products.

. . .The circumstances established by the Court concerning the transactions of OAO Yukos Oil Company associated with the purchase and sale of oil and oil products and in their interconnection and collectively indicate bad faith on the part of OAO Yukos Oil Company, which is reflected in the intentional actions aimed at tax evasion by means of application of illegal schemes, as a result of which the RF Tax Ministry lawfully held OAO Yukos Oil Company liable pursuant to Article 122(3) of the Russian Federation Tax Code, for the intentional failure to pay or an incomplete payment of tax as a result of reduction of the tax base, other incorrect tax calculations, or other unlawful actions (inaction), in the form of a fine in the amount of 40 percent of the unpaid tax amount, as established by the judicial acts in Case No. A40-17669/04-109-241.

. . .Therefore, the Moscow Arbitrazh Court in its decision legally and justifiably found that RF Tax Ministry Decision No. 14-3-05/1609-1 of 14.04.2004 to Hold the Taxpayer Fiscally Liable for a Tax Offense is legal and well-founded in part and complies with the Russian Federation Tax Code, federal laws adopted pursuant to the RF Tax Code, and other tax laws that were in effect during the audit period (the Russian Federation Law No. 2116-1 of 27.12.91 "On Corporate Profit Tax", the Russian Federation Law No. 1759-1 of 18.10.1991 "On Road Funds in the Russian Federation", the Russian Federation Law No. 2118-1 of 27.12.1991 "On Fundamentals of the Tax System", the Russian Federation Law No. 2030-1 of 13.12.1991 "On Corporate Property Tax" and the Russian Federation Law No. 1992-1 of 06.12.1991 "On Value Added Tax").[622]

[emphasis added]

588.   The Tribunal will discuss the key elements of this decision, notably its endorsement of the assessment of taxes against Yukos on the basis that Yukos was the "actual owner" of the oil and oil products, in Section VIII.B.5 below.

      **(b)   VAT**

589.   As shown in the table below, for the tax years 2000 to 2004, the tax authorities imposed a demand for the payment of VAT (including interest and fines) ranging from USD 1 billion to USD 4 billion per year, for a total of **USD 13.59 billion**.   This represents some 56 percent of

---

[622]   Resolution of the Ninth Arbitrazh Court of Appeal, Case No. 09AP-4078/04-AK, 16 November 2004, Exh. C-147.

the total tax claims levied against Yukos in the reassessments for those years.  The breakdown by individual tax year is as follows:[623]

|  |  | 2000 | 2001 | 2002 | 2003 | 2004 | Total | % |
|---|---|---|---|---|---|---|---|---|
| **VAT** | Tax Arrears | 0.49 | 0.99 | 1.24 | 1.93 | 1.73 | 6.38 | 26.39 |
|  | Interest & Fines | 0.59 | 1.40 | 1.50 | 1.97 | 1.75 | 7.21 | 29.82 |
|  | **Sub-total** | **1.08** | **2.39** | **2.74** | **3.90** | **3.48** | **13.59** | **56.2** |
| Other taxes | Tax Arrears | 1.19 | 0.75 | 1.91 | 1.16 | 0.16 | 5.17 | 21.38 |
|  | Interest & Fines | 1.21 | 0.96 | 2.11 | 1.05 | 0.10 | 5.42 | 22.46 |
|  | Sub-total | 2.40 | 1.71 | 4.02 | 2.21 | 0.26 | 10.59 | 43.8 |
|  | TOTAL | 3.48 | 4.10 | 6.76 | 6.11 | 3.74 | 24.18 | 100 |

590.   The reasoning of the tax authorities for the imposition of VAT payments did not change from year to year.  For purposes of this chapter, the Tribunal will therefore consider solely the documents relating to the 2000 tax year.

591.   But before turning to the reasoning for the imposition of VAT payments on Yukos, the Tribunal will review some features of the VAT regulations of the Russian Federation.

592.   In Russia, VAT is a federal tax levied at uniform rates throughout the Federation. As a result, all companies pay VAT regardless of the region where they are registered, under identical terms and conditions.  There are accordingly no additional VAT benefits for companies incorporated in low-tax regions.  The applicable rate of VAT to oil and oil products was 20% in 2000 to 2003 and 18 percent in 2004.[624]

593.   If the products were exported, they were either exempt from VAT (2000) or subject to a zero percent VAT rate (2001 onwards).[625]  The zero percent rate is not automatic, but available when the taxpayer files a monthly or quarterly VAT return.[626]  It is common ground between the

---

[623]   Figures derived from Details of Yukos' Alleged Tax Reassessments, Exh. C-593; *see also* Claimants' Opening Slides, pp. 62–63.

[624]   First Konnov Report ¶ 56.  *See also* Articles 165(9) and 164(3), Russian Tax Code, Exhs. R-1484 and R-1483.

[625]   As a result, exporting companies did not charge VAT to their foreign customers and were entitled to the refunds on the VAT charged by their own suppliers.  *See* Dubov WS ¶ 37; *see also* Memorial ¶ 319.

[626]   First Konnov Report ¶¶ 53–58.

Parties that, in the years 1999 to 2003, the Yukos trading companies filed the VAT returns for their exports of oil.[627]

594. The 2000 Decision notes that Yukos failed to reflect revenue from the sale of products "arising from the use of an unlawful scheme involving evasion of tax through artificial creation of sham companies in the oil and oil product movement chain, which were registered in territories with a beneficial tax regime."[628]  The 2000 Decision then states:

> The aim of using this scheme was non-payment of corporate profit tax value added tax, road users tax, tax on sales of fuel and lubricants (hereinafter referred to as F&L) and housing support tax on the sum of revenue (income) received from the sale of oil and oil products.[629]

595. The VAT at issue was the VAT in relation to which the Yukos trading companies had already obtained an exemption or zero percent rate, not VAT that could be said to arise from new or additional transactions or from a finding that the oil or oil products had not actually been exported.  During his cross-examination at the Hearing, Mr. Konnov explained that the reasoning behind the imposition of VAT on Yukos is very clear from the original Russian-language version of the decision.  The 2000 Decision states (in the Russian language original) that it is Yukos, as the actual exporter, which must file the VAT return in order to get the VAT tax benefit which had earlier been granted to its trading entities. Mr. Konnov explained:

> A. And then there is a sentence which I don't see in the English text, which says:
>> "Based on the foregoing, the actual export operations were conducted by OAO NK Yukos and tax claim were provided to ZAO Yukos-M."
>
> And that's the sentence on the point; for some reason it's not in the English text.
>
> So I agree maybe it's not a detailed sentence, but what it clearly tells to any tax lawyer, or to Yukos, I think: that Yukos – sorry, Yukos-M claimed the tax benefits and was provided the tax benefits, and the actual exporter who must file the return is Yukos.[630]

596. In other words, while it was the trading companies that were set up in Yukos' tax structure as the entities exporting oil and oil products to purchasers abroad that filed VAT returns to claim the exemption or zero percent rate that applies to export transactions, and in spite of the fact

---

[627]    Memorial ¶¶ 320–21.  *See also* Decision No. 23 on partial refusal to refund/offset VAT (Alta-Trade), 15 June 2000, Exh. C-1110; Decision No. 48 to deny refunding (offset) VAT (Alta-Trade), 29 October 2001, Exh. C-1116; Decision No. 53 on partial refusal to refund/offset VAT (Mars XXII), 27 December 2004, Exh. C-1117.

[628]    2000 Decision, p. 1, Exh. C-104.

[629]    *Ibid*.

[630]    Transcript, Day 14 at 236.

that the trading companies had already qualified for the exemption or zero percent  rate on the basis of duly submitted VAT returns, the tax authorities subsequently determined that Yukos itself was the "actual exporter", and that it was Yukos, instead of the trading entities,  that had to qualify for the exemption or zero percent rate. Since Yukos had not filed the returns itself, it was deemed to have failed to file the VAT returns required to benefit from the exemption or zero percent rate.

597.   The judgment of the Moscow Arbitrazh Court that confirmed the decision for the 2000 tax year rejected Yukos' appeal against the VAT assessments:

> The court does not accept the arguments of OAO Yukos Oil Company regarding unlawfulness of the RF Tax Ministry Decision No. 14-3-05/1609-1 of 14.04.2004 relating to assessment of the value added tax.  It follows from the RF Tax Ministry Decision that the tax authority assessed VAT reimbursed to entities registered in the territories with preferential tax rates upon their applications on export transactions.  Pursuant to Law No. 1992-1 of 06.12.1991 "On Value-Added Tax," effective during that period, exemption from payment of value-added tax when exporting goods (work, services) was a benefit. In order to use its right to the benefit, the taxpayer had to declare its right and confirm its right by documents in accordance with the current legislation.  The taxpayer – OAO Yukos Oil Company – did not declare its desire to use its benefit either in 2000 or later.[631]

[emphasis added]

598.   At the Hearing, Mr. Konnov described as follows "the essence" of the reasoning in the decision and subsequent judgment:

> [T]hat Yukos did not file tax return, and in the absence of the tax return it is not eligible for a 0% VAT rate.[632]

Mr. Konnov also confirmed at the Hearing that the same reasoning was applied for subsequent tax years.[633]

### 4.    The Fines Assessed Against Yukos

599.   As shown in the table below, for the tax years 2000–2004, the tax authorities imposed fines against Yukos ranging  from  USD 670 million  to  USD 2.5 billion  per year,  for  a  total  of

---

[631]   Decision of the Moscow Arbitrazh Court, Case No. A40-17669/04-109-241, 26 May 2004, p. 19, Exh. C-116.

[632]   Transcript, Day 14 at 240.

[633]   *Ibid.* at 240–51.

**USD 8.5 billion**.  This represents some 35% of the total tax claims levied against Yukos in the reassessments for those years.  The breakdown by individual tax year is as follows:[634]

|  | 2000 | 2001 | 2002 | 2003 | 2004 | Total | % |
|---|---|---|---|---|---|---|---|
| Tax Arrears | 1.68 | 1.74 | 3.15 | 3.09 | 1.90 | 11.55 | 47.73 |
| Interest | 1.13 | 0.97 | 1.10 | 0.54 | 0.38 | 4.13 | 17.14 |
| **Fines** | **0.67** | **1.39** | **2.51** | **2.47** | **1.46** | **8.50** | **35.13** |
| TOTAL | 3.48 | 4.10 | 6.76 | 6.10 | 3.74 | 24.18 | 100 |

600.  Article 122 of the Russian Tax Code establishes a taxpayer's liability for "non-payment or underpayment of taxes."  Pursuant to paragraph 1 of this provision, the sanction is a 20 percent fine on the unpaid amount of taxes.  Under paragraph 3 of this provision, this fine can be increased to 40 percent of the unpaid amount if the offense is committed intentionally. This fine has been referred to in this case as the "willful offender" fine. Under Articles 110(2) and 110(4) of the Russian Tax Code, the intention of a company requires, *inter alia*, that the awareness of the company's executives of the unlawful nature of their actions (or failure to act) be established.  Finally, under Articles 112(2) and 114(4) of the Russian Tax Code, the fines can be increased to 80 percent, concretely, be doubled, in cases of so-called "repeat" offenses, *i.e.* offenses committed by "a person, which has been previously held liable for a similar tax offense."[635]  This fine has been referred to in this case as the "repeat offender" fine.

601.  Yukos was assessed both the "willful offender" and the "repeat offender" fines by the authorities.

602.  The Tax Ministry, referring to Article 110(2) of the Russian Tax Code, claimed that for the year 2000, "[Yukos] deliberately committed the acts aimed at evading payment of taxes, and its officers were aware of the unlawful nature of such actions."[636]  On this basis, the fines on

---

[634]   Figures (in USD billions) derived from Details of Yukos' Alleged Tax Reassessments, Exh. C-593.  The fines levied in relation to unpaid VAT alone account for a total of some USD 4.8 billion for the tax years 2000–2004, with the balance of USD 3.7 billion levied in relation to all of the other types of taxes (the majority—USD 3.3 billion—of the remaining amount being levied in relation to profit tax).

[635]   Russian Tax Code, Part I, Exh. C-401.

[636]   2000 Decision, p. 8, Exh. C-104.

Yukos were doubled from the standard rate of 20 percent to 40 percent. Yukos was thus charged, by reference to Article 122(3), with a 40 percent fine on the amount of its alleged tax arrears.[637]  The same reasoning was used by the tax authorities to impose fines on Yukos for the years 2001–2004.[638]

603.   The Tax Ministry then doubled the fines once more for the years 2001 to 2004 (the year 2000 being considered as the first "offense"), in order to reach an 80 percent fine on the alleged tax arrears.  This was done on the basis of Articles 112(2) and 114(4) of the Russian Tax Code regarding repeat tax offenses.[639]

### 5.   Parties' Arguments and Tribunal's Observations

604.   In Chapter VIII.A of the present Award, the Tribunal has found that Yukos had run afoul of the tax authorities prior to December 2003 in some of the low-tax regions, notably in the ZATOs (Lesnoy and Trekhgorny) and in Kalmykia.  The Tribunal noted earlier that Yukos had wound up its trading entities in Lesnoy and Trekhgorny, and merged them into two separate companies based outside of the ZATOs.  These companies later merged to form Investproekt, based in yet another region of Russia.  The shuffling of these companies, as the Tribunal observed in Chapter VIII.A, while completed before any decisions were issued against the companies for being shams and for their use of promissory notes to pay (and even overpay) its tax bills, does raise troubling questions which were never answered to the satisfaction of the Tribunal.  It suggests that Yukos was aware of the vulnerability of its tax optimization scheme and took steps to minimize its exposure when elements of the scheme were being investigated.  This evidence has been thoroughly reviewed and commented upon by the Tribunal in Chapter VIII.A.

605.   In principle, therefore, both Yukos and members of its management were exposed to further findings of civil and/or criminal liability in connection with these activities as there is no evidence in the record that any tax payable as a result of the investigation of the trading entities in the ZATOs was ever paid.  It is in this context that the Russian Federation charged

---

[637]   *Ibid.*

[638]   2001 Decision, p. 157, Exh. C-155; 2002 Decision, p. 166, Exh. C-175; 2003 Decision, p. 144, Exh. C-190; 2004 Decision, pp. 89–90, Exh. C-200.

[639]   2001 Decision, pp. 163–64, Exh. C-155; 2002 Decision, pp. 165–66, Exh. C-175; 2003 Decision, p. 144, Exh. C-190; 2004 Decision, p. 89, Exh. C-200.

Messrs. Khodorkovsky and Lebedev with tax offenses, and reassessed taxes against Yukos as of December 2003.

606.  In this section, the Tribunal considers the Parties' specific arguments in respect of each element of the tax assessments that began in December 2003 and continued at a very rapid pace throughout 2004 (covering the tax years 2000 through 2004).  As described in the earlier subsections of the present chapter, these elements included assessments for profit tax and other revenue-based taxes, VAT and fines.  While the Tribunal considers the Parties' arguments for each discrete element of the tax assessments, ultimately its conclusions are based on a consideration of the tax assessments as a whole as well as the two trials and convictions of Messrs. Khodorkovsky and Lebedev.  The Tribunal adopts this totality-of-the-evidence approach for several reasons.

607.  Firstly, the Parties' arguments regarding the tax assessments rest on all-or-nothing propositions.  On the one hand, Claimants argue that the tax assessments *as a whole* were conceived and crafted to fabricate debt "under the guise of taxes," and in amounts deliberately large enough to bankrupt Yukos.  Respondent, on the other hand, insists that the tax assessments were *entirely* legitimate, and that Yukos' demise was self-inflicted.

608.  Secondly, the discrete elements of the tax assessments are, in fact and in law, closely intertwined.  For example, as explained in greater detail below, the enormous liability imposed on Yukos for non-payment of VAT (and for the multiple fines associated with their non-payment) was made possible only because the revenues of Yukos' trading entities were "re-attributed" to Yukos itself.  It would therefore be artificial to deal with the complexity of this case by deconstructing the various elements of the tax assessments without, in the end, taking the broader perspective that is required to properly appreciate each one of them.

(a)    **Profit Tax and Other Revenue-Based Taxes**

i.    **Introduction**

609.  Claimants submit that the revocation of regional tax benefits on revenue-based taxes (principally the regional and local shares of profit tax) was the first step in the Russian Federation's fabrication of taxes targeting Yukos.  Claimants argue that the revocation of these benefits was arbitrary because (a) such benefits were expressly provided for in Russian federal and regional legislation with which the Yukos entities complied, and (b) the tax benefits were

known to and approved by the relevant authorities (with whom, in some cases the trading entities entered into tax investment agreements).[640]

610. Respondent submits that the Russian Federation's revocation of the tax benefits was a legitimate and appropriate response to Yukos' tax optimization scheme under Russia's anti-abuse doctrine. Respondent contends that all of the Yukos trading entities were sham letter-box companies, with no assets, employees or operations of their own, that were managed by Yukos itself.[641]

### ii. Was the "Bad-Faith Taxpayer" Doctrine Available at the Time of the Yukos Tax Assessments to Challenge a Tax Evasion Scheme?

611. As an initial matter, the Tribunal notes that it has already confirmed, in Chapter VIII.A of the present Award, that the "bad-faith taxpayer doctrine" existed in the Russian Federation at the time of the issuance of the 2000 Tax Audit in December 2003 and, therefore, at the time of subsequent audits as well.[642] Indeed, even Claimants acknowledged the existence of the doctrine.[643]

612. Claimants cannot, therefore, impugn the Russian Federation's revocation of the benefits related to profit tax solely on the basis that the low-tax regions were competent to grant such tax benefits under that applicable legislation, and that "no breach of that legislation has been alleged."[644] However, such an argument does not seem to take account of the impact of Russia's anti-abuse doctrine or "bad-faith taxpayer" doctrine which, as the Tribunal has already concluded, may constitute a ground for the reassessment of a party's tax liabilities.

613. The Tribunal recalls however that, at the time of the tax assessments against Yukos, the "business purpose" doctrine (a variant of the "substance over form" and "bad faith taxpayer" doctrines) had not yet been explicitly adopted into Russian law. As noted earlier in Chapter VIII.A, the "business purpose" doctrine was not adopted until October 2006, in Resolution No. 53 dated 12 October 2006 of the Plenum of the Russian Supreme Arbitrazh Court. As also mentioned in Chapter VIII.A, Russian tax scholars and practitioners appear

---

[640] Claimants' Opening Statement, pp. 49–80; Claimants' Post-Hearing Brief ¶¶ 7–11.

[641] Respondent's Opening Statement, pp. 11–22.

[642] *See* above at paragraph 497.

[643] Reply ¶¶ 219–28.

[644] Claimants' Post-Hearing Brief ¶ 7.

divided as to whether Resolution No. 53 represented a break with the doctrines that existed at the time of the Yukos assessments, or was a natural evolution of those doctrines.

614. The Tribunal, recalling that Mr. Pepeliaev alluded to something akin to the "business purpose" doctrine in his commentary on Constitutional Court Ruling 138-O (published in 2002), is of the view that it was open to the Russian authorities and the courts to rely on the "bad faith taxpayer" doctrine to challenge a tax evasion scheme at the time of the Yukos tax assessments, whether based on "substance over form" or "business purpose."  Although this was an area of the law that was evolving at the time, this alone cannot be determinative.  Indeed, the anti-abuse doctrine was a judicial doctrine, and the Tribunal does not consider it appropriate to criticize the Russian Federation only because such a doctrine had not yet fully crystallized.  To the contrary, the circumstances surrounding Yukos' tax optimization scheme suggest to the Tribunal that this is precisely the kind of case in which the doctrine could be relied upon by the authorities and the judiciary.  Nevertheless, Claimants argue that the decision to revoke the profit tax benefits was illegitimate because of the manner in which the "bad-faith taxpayer" doctrine was applied.  In particular, Claimants submit that the "re-attribution" of the trading companies' revenue to Yukos was unprecedented and had no basis in law.  Further, Claimants submit that there were glaring violations of due process throughout the tax assessment and tax enforcement proceedings.  The Tribunal addresses each of those arguments in turn.

### iii.    Was "Re-attribution" an Appropriate Remedy to Apply to Yukos?

615. Claimants argue that the authorities should have applied the transfer-pricing rules of Articles 20 and 40 of the Russian Tax Code to address any concerns about Yukos' avoidance of tax in the low-tax regions.  Instead, the authorities "re-attributed" to Yukos the revenues of all of its trading companies.  According to Claimants, this remedy was unprecedented, had no basis in law and was obviously another ploy in the Russian Federation's fabrication of taxes against Yukos.[645]

616. As mentioned, Claimants submit that the proper decision, and indeed the only decision, that the tax authorities should have issued would have been to apply the transfer-pricing provisions of Articles 20 and 40 of the Russian Tax Code.  In this context, in their Post-Hearing Brief, Claimants argue as follows:

---

[645]    Claimants' Opening Slides, p. 60.

11.    Similarly, the Respondent's attempt to dismiss the relevance of the ubiquitous references to Yukos in the tax authorities' documentation relating to the trading companies ignores the realities of the Russian context.  There was no domestic market for crude oil in Russia, and as Dresdner observed, "[o]il sales on the Russian internal market consist[ed] mainly of internal sales between the sister companies of the large integrated Russian oil companies".  In this context, when conducting a tax audit of a company whose activities consisted of trading crude oil produced by Yukos' production companies, it would have been natural for the tax authorities to examine whether the trading company and the production company were "interdependent" under Article 20 of the Tax Code, and if so, whether the sales transactions complied with the transfer pricing provisions of Article 40. This is precisely what the tax authorities did, finding no violations of Article 40 prior to the December 2003 Audit Report.[646]

617.   Claimants add:

Mr. Konnov has conceded that the transfer pricing provisions of Articles 20 and 40 were available to the tax authorities and, although cumbersome to apply, could have fully dealt with any allegedly improper tax savings, yet as he has confirmed, the tax authorities never offered any explanation as to why they did not use Article 40 and instead invented a re-attribution theory.  As Mr. Savseris has written, referring specifically to the Yukos case, it was wholly inappropriate for the tax authorities to resort to judicial doctrines to address a situation covered by these express statutory provisions, noting that "[i]f the generally established principles in the West for the application of judicial doctrines were respected, this would have been impossible".[647]

618.   During the Hearing, Respondent asserted that re-attribution "is an entirely appropriate application of the 'substance over form' anti-abuse doctrine."[648]  Respondent referred to what it called "pre-December 30, 2003 cases" (*Bashkirian refineries* case (2003–2005); Lukoil (2002) and VAT cases) as well as what it called "post-Yukos authorities" (*Korus-Holding* (2005–2006), *MIAN* (2007–2008) and *Syktyvkarsky Milk Factory* (2008–2009)).[649]

619.   However, Mr. Konnov, when asked a specific question by the Chairman of the Tribunal, had great difficulty in explaining the existence of a pre-Yukos precedent for the re-attribution that was imposed on Yukos with the assessments.  Claimants recall this incident in their Post-Hearing Brief in the following words:

---

[646]    Claimant's Post-Hearing Brief ¶ 11 (citing Transcript, Day 15 (Konnov) at 177:6-180:7; Accounts Chamber of the Russian Federation, Analytical Note "On the Economic and Financial Situation of Natural Monopolies", 2003, p. 183 (noting "the absence of a full-fledged domestic market of crude oil in the Russian Federation"), Exh. C-416; ZAO Dresdner Bank Valuation Report of Yuganskneftegaz, 6 October 2004, p. 95, Exh. C-274 (hereinafter "Dresdner Valuation Report"); Table:  Field tax audits of Yukos' trading companies in Mordovia, April 2002–October 2003 (noting that audits of Fargoil and Mars XXII in 2003 found no violations of Art. 40), Exh. C-1758).

[647]    Claimant's Post-Hearing Brief ¶ 40 (citing Transcript of Mr. Konnov's cross-examination in the *Quasar* arbitration, 24 October 2011, pp. 55–56, 58–59, Exh. C-1697; S.V. Savseris, "Bad Faith of the Taxpayer as Judicial Doctrine Against Tax Evasion" (2005), p. 5, Exh. C-1748).

[648]    Respondent's Closing Slides, p. 105.

[649]    *Ibid*. pp. 105–15.  *See also* First Konnov Report ¶¶ 50–51.

> *First*, as the Tribunal will recall, when asked point blank by the President to identify a precedent for reattribution, Mr. Konnov was unable to do so.  The next day Mr. Konnov sought to "correct" this answer by referring to cases involving the "Bashkirian oil refineries" and a Lukoil assessment that never went to court.  However, Mr. Konnov then corrected the correction by noting, with respect to the Bashkirian cases, that "the court decisions . . . are not particularly helpful because the lower court decided in favour of the taxpayer, and only in 2005 the court decided in favour of the tax authorities."[650]

620.  Having reviewed the decisions cited by Respondent, the Tribunal concludes that none of them is truly apposite to Respondent's argument:

(1)  the "*Bashkirian refineries* case":  in this case (cases, actually), the tax authorities did "re-attribute" sales revenue from a Baikonur entity to the three selling oil refineries, and they did so by assessments dated 16 July 2003.  However, these assessments were overturned, in each of the three cases, by the first instance arbitrazh court in November 2003, and the tax authorities' appeals in early 2004 were initially unsuccessful.  It was only in 2005 that the Supreme Arbitrazh Court overturned the lower court decisions, and upheld the July 2003 assessments (Exhibits R-1488, 1489, and 1490).  Thus, this case cannot serve as a pre-Yukos precedent.

(2)  the "*Lukoil* case":  this case involved the invalidation of a lease between OAO Lukoil-Ukhtaneftepererabotka and a Baikonur shell, and the resulting claim against the former for taxes.  While the court decisions (first instance, appellate and cassation levels) all date back to 2002, they do not show that the taxes of the Lukoil entity were "re-attributed" to Lukoil.  In the view of the Tribunal, therefore, this case does not support Respondent's re-attribution theory.

(3)  the "VAT cases":  Respondent argues that "[b]oth before and after the Yukos assessments, the Russian tax authorities routinely assessed VAT on purchasers with respect to revenues representing value that had been added by their suppliers, rather than the purchasers themselves."[651]  Respondent points to one pre-Yukos example in the record, a decision that dates from 22 September 2003 (Exhibit R-3372).  On the Tribunal's reading of this decision, it is difficult to make out the re-attribution from seller to purchaser, since the

---

[650]   Claimant's Post-Hearing Brief, ¶ 38 (citing Transcript, Day 14 at 221–23 (Mr. Konnov) ("I don't think I can give you any reference to the pre-Yukos precedent where attribution was applied in an identical way."); Transcript, Day 15 at 83–84 (Mr. Konnov); Transcript, Day 15 at 215 (Mr. Konnov)).  Claimants cite their Reply ¶ 233 to note that: "Moreover, these alleged precedents involved alleged evasion of excise taxes rather than alleged abuses of profit tax incentives, and were decided on entirely different legal grounds."  *Ibid.* n.85.

[651]   Respondent's Closing Slides, p. 110.

Court's attention is quite definitely on the purchaser in its analysis of the transaction.  In any event, it is not a situation which is at all analogous to the Yukos case.

621.  By contrast, the *Korus-Holding* case appears to be on all fours with the Yukos case, in terms of the re-attribution remedy, but it was decided in 2006, well after the assessments against Yukos in 2003 and 2004.

622.  The Tribunal notes another factor that supports Claimants' position, namely the contrast between the first and second decisions involving Investproekt.  In the first decision, dated 2 April 2002,[652] the tax authorities refused to impose any tax liability on Investproekt for the past tax offenses of Business-Oil, Vald-Oil, Forest-Oil and Mitra.  In the second decision, dated 8 August 2003,[653] Investproekt was held liable for those offenses.  The Tribunal observes that the basis for reversing, in August 2003, the earlier decision of April 2002, was not explained in the August 2003 decision,[654] and the latter decision followed soon after the arrest of Mr. Lebedev on 2 July 2003.  Moreover, neither of these earlier assessments purported to re-attribute the tax burden to Yukos, but rather to the successor entity of the trading companies—Investproekt.

623.  Regarding the transfer-pricing provisions of the Russian Tax Code as a proposed alternative remedy for whatever mischief is connected to the use of the Yukos trading entities, Respondent in its Rejoinder argues:

> 701.  Claimants suggest that the "proper course of action" for the authorities "would have been to pursue" Yukos' trading shells as opposed to Yukos.  But the tax authorities looked to the economic substance and concluded that Yukos was the real taxpayer.  That was both legally and practically sensible.  As illustrated by the authorities' inability to collect unpaid taxes from the Lesnoy trading shells, Yukos deliberately engineered its scheme so that its trading shells, if they were ever audited and reassessed, would have no assets with which to pay any such assessment, with the result that Yukos' fraudulent scheme would have enjoyed *de facto* impunity.  Yukos was at all times the real party in interest in the challenged transactions.  It was thus entirely appropriate for the tax authorities to pursue their claims against it, instead of the trading shells it had created to evade taxes.
>
> 702.  Equally unavailing is Claimants' reliance on Article 40 of the Tax Code.  The Yukos "tax optimization" scheme was not an ordinary "transfer pricing" scheme, but rather a tax evasion scheme involving the abusive exploitation of the low-tax region program through dozens of sham entities which had no genuine business operations.  It was therefore entirely appropriate for the authorities to challenge that scheme by reference to anti-abuse rules, rather than the transfer pricing rules set forth in Article 40, insofar as

---

[652]  Decision No. 02-11/1/1, 2 April 2002, Exh. R-303.

[653]  Decision No. 2.6-23, 8 August 2003, Exh. R-305.

[654]  *Ibid.*

> Yukos had deliberately constructed its tax evasion scheme so as to circumvent the application of Article 40, including by (a) using chains of shells which increased the likelihood that, if audited, each link in the chain could avoid an assessment under the 20% "safe harbor," and (b) owning most of the trading shells through call options, offshore companies, and other devices, which would make it more difficult for the authorities to establish an "interdependence" within the technical meaning of Article 40 between Yukos and its trading shells.[655]

624. During the Hearing, Respondent argued that the "substance over form" doctrine would be illusory if re-attribution were precluded, since it would permit tax evasion with impunity as the taxpayer could simply cause the relevant income or revenues to be recorded, on paper, in the books of a judgment proof domestic affiliate or a foreign affiliate that was solvent but territorially beyond the reach of any enforcement measure.[656]   Respondent also referred to other jurisdictions where a "general anti-avoidance provision" allows the tax authorities to allocate "any income" to "any person" in connection with "an avoidance transaction".[657]

625. The Tribunal sees some merit, in principle, to Respondent's argument that the "anti-abuse" doctrine would be eviscerated if the tax authorities were unable to attribute income to the person responsible for the wrongdoing.   The Tribunal also notes with interest Respondent's reference to the anti-avoidance provisions of other countries, such as the United States, France, Germany, Canada and Australia, which grant the taxation authorities similar powers, as well as to some decisions from other jurisdictions.[658]   In the Russian context, however, it is clear to the

---

[655]   Rejoinder ¶¶ 701–702 (citing ¶¶ 599, 597–600 of Rejoinder; Second Konnov Report ¶¶ 19, 24–25 and 63). Respondent also notes:  "This also confirms the lack of merit in Claimants' contention that Respondent's "multiple allegations about non-arm's length pricing […] contradict" Respondent's "concession that Yukos' alleged tax liabilities [are] not premised on any violation of transfer pricing rules" [citing Reply ¶ 214].  In reality, there is no such contradiction, because it is well-settled in Russian tax law that the transfer pricing rules set forth in Article 40 of the Tax Code are not the exclusive remedy available to the Russian tax authorities to combat abusive tax practices based on price manipulations (see First Konnov Report ¶¶ 40–44).  In other countries too, the general view is that the existence of specific statutory anti-avoidance rules does not prevent the authorities from deploying their anti-abuse arsenal, including general anti-avoidance rules, whether enacted by statute (as is the case, for instance, in Germany) or developed by the judiciary (as is the case, for instance, in the United States) . . . .

In the Yukos case, the authorities' reliance on alternative theories of liability was not only proper but particularly appropriate, because the Yukos tax evasion scheme was deliberately engineered so that Yukos, through its trading shells, could circumvent the transfer pricing rules, which require an under- or over-statement of prices of more than 20 percent of the market price.  Yukos evaded those rules by running inventories through chains of multiple trading shells in a series of nominally independent transactions, none of which individually exceeded the 20 percent threshold. See Protocol of Witness Interrogation of Vladislav P. Brazhkov (15 February 2008), 4, 6 (Exh. R-3370)." Ibid. n.1098

Respondent further notes:  "Yukos' internal communications confirm that it was a "headache" for Yukos' employees to ensure that the transactions among the trading shells were structured to prevent detection of the scheme by the tax authorities. [citing Counter-Memorial ¶ 304 and e-mail from A.V. Brazhkov to A.P Kuchusheva, 9 October 2001, Exh. R-325]." Ibid. n.1099.

[656]   Respondent's Closing Slides, p. 115.

[657]   Ibid. p. 118.

[658]   Respondent's Opening Slides, pp. 95–103.

Tribunal that there was no precedent for re-attribution at the time that the tax assessments and related decisions were issued in respect of Yukos.

626. Moreover, the Tribunal could have been persuaded to accept Respondent's argument if the tax authorities had only imposed revenue-based taxes against Yukos on the basis of re-attribution. However, and as already noted, the tax authorities attributed to Yukos the trading companies' revenues while, at the same time, refusing to attribute to Yukos the trading companies' VAT refunds and it did so for purely technical reasons.  This leads the Tribunal to the conclusion that the authorities used the "re-attribution" formula not only so as to be able to collect the revenue-based taxes, but also so as to establish a basis for imposing the massive VAT liability and excessive fines that followed.

627. In short, the Tribunal accepts the following conclusion, as expressed in paragraph 41 of Claimants' Post-Hearing Brief:

> The obvious explanation for the Respondent's use of a novel and arbitrary re-attribution theory rather than correctly applying existing law on interdependence and transfer pricing is that this was not a *bona fide* exercise of taxation powers; instead, the novel re-attribution theory provided a pretext to impose US$ 13.59 billion in VAT claims that, as Mr. Konnov confirmed, could not have been made in the absence of the unprecedented re-attribution of revenues.[659]

### iv.    Did the Russian Federation Violate Due Process?

628. Claimants submit that the Russian Federation violated due process by (a) ensuring that the courts were obedient and did not question the legality of the tax assessments; (b) ensuring that Yukos could not present its case; and (c) ensuring that neither the trading companies nor the Mordovian authorities could participate in the proceedings.

629. Regarding the legality and legitimacy of the tax assessments which Claimants say the courts should have scrutinized, the Tribunal recalls its finding in Chapter VIII.A that, during the period relevant for the tax assessments against Yukos (2003–2004), the "bad faith taxpayer" doctrine included the following principles:

- The good faith (honesty) of the taxpayer is presumed.
- The tax authorities have the burden to prove the taxpayer's bad faith (dishonesty), and in doing so "may not construe the concept of 'good faith taxpayers' as imposing on the taxpayer additional obligations which are not provided for in the legislation."

---

[659]    Claimant's Post-Hearing Brief ¶ 41 (citing Transcript, Day 15 at 94–95).

630. In the view of the Tribunal, questions can be asked about whether the tax assessments disclose a record establishing that the tax authorities discharged their burden of proving Yukos' bad faith in respect of all the trading entities said to be an integral part of its tax evasion scheme. Some of these questions were raised by Yukos' tax lawyers immediately after the 2000 tax assessment was issued. They commented:

> The act of inspection of OAO NK YUKOS contains the amounts of revenues of each company however it is absolutely unclear what control actions produced this information and what documents confirm it, etc.[660]

631. This question was developed in the Objections against the tax assessment filed by Yukos on 12 January 2004. Under objection no. 6 ("Breach of the procedure for conducting an audit"), Yukos complained that the auditors referred to materials from the criminal case, but did not indicate "what specific documents of the criminal case confirm the fault of the taxpayer."[661] Yukos' detailed objection continued:

> Attention should also be paid to the failure to analyze and indicate taxation objects on additionally assessed taxes for all re-assessments under 17 companies. Furthermore, audit materials do not contain any source documents (waybills, statements, commercial invoices, etc.) and does not contain contracts for sale and purchase of goods and information about payment for goods. At the same time the auditors concentrated only on the matter of unlawfulness of tax benefits' application, although does not review at all the basic matter that shall be proved in the course of tax audit - the value of taxation objects of these 17 companies. It should be mentioned that it is impossible to state the fact of non-payment of taxes without analysis of business operations and economic results obtained thereunder (revenues, profits). However, the auditors do not bother themselves with study of business operations, under which billions of Rubles are imputed to OAO NK YUKOS for payment.
>
> This directly contradict to Article 100 of the Tax Code of the Russian Federation, which indicates that the Audit Report must contain information about tax confirmed by the documents and Instruction of the Ministry of Taxes and Levies the Russian Federation No. 60 of 10.04.2000 "On Procedure for Compilation of Field Tax Audit Report and Proceedings in the Case of Violation of the Legislation on Taxes and Levies", according to which the Audit Report must contain references to source accounting documents (with indication, in case of necessity, according transactions and order for reflection the respective operations in the accounting registers) and other evidences confirming the fact of violation. The Instruction also stipulates that the Report must be based on results of audit of <u>all</u> documents that may be related to the stated facts, and on results of performance of all other actions necessary for exercising tax control.
>
> According to this Instruction, the following must be attached to the Audit Report:
>
> • clarified calculations by types of taxes (levies) drawn up by the auditors in connection with the discovered tax offence (except for the cases when the specified calculations are presented in the body text of the report). Calculations must be signed by the

---

[660] S. Pepeliaev, *Summary of the tax inspection of OAO NK Yukos*, p. 2, 5 January 2004, Exh. C-1128.

[661] Objections against Report No. 08-1, p. 13, 12 January 2004, Exh. R-335.

auditor (the auditors), the head of the company or private entrepreneur or their representatives; and

- materials of cross audits (in case these were performed).

However, these requirements are not met and source documents and tax returns of 17 companies mentioned in the Report are not attached to the Report, which virtually deprives OAO NK YUKOS of opportunity to assess accusations of tax offence brought against it.

It is also necessary to mention that in violation of the requirements of the abovementioned Instruction about fairness and reasonableness of the reflected facts, the Audit Report was written in obviously biased manner, with accusative tendency and starts with conclusions on presence of a certain tax evasion "scheme". The obvious prejudice of the auditors does not allow to consider the Audit Report as the evidence of committed tax offence.[662]

632. The Tribunal notes that Article 100(2) of the Russian Tax Code requires a tax audit to contain "documentarily attested references to facts of tax offenses revealed during the audit . . . ."[663]

633. The Russian Tax Code also requires the Director of the Tax Authority to consider the taxpayer's objections prior to issuing a decision (which may hold, or not hold, the taxpayer liable for a tax offense, or direct further tax control measures).[664]   Article 101(3) provides:

3.   The decision to hold the taxpayer liable for a tax offense shall indicate the circumstances of the committed tax offence, how they were established by the audit, the documents and other evidence, which attest to these circumstances, arguments presented by the taxpayer for his defense and the results of their verification, the decision to hold the taxpayer for specific tax offenses with a reference to the articles of this Code providing for such tax offenses and liability incurred.[665]

634. The 2000 Decision summarizes Yukos' objections, but selectively so. Notably, Yukos' specific objection regarding the tax authorities' failure to document the facts allegedly underpinning the conclusions in the tax audit is omitted from the description in the Decision of Yukos' objection no. 6.[666]   Moreover, while the decision contains responses or comments regarding some of Yukos' other objections, it does not contain any response to this specific objection.[667]

635. The court decisions that affirmed the legality of the decision, both in first instance and on appeal, used similar wording to dismiss Yukos' objection based on breach of procedure for conducting an audit:

---

[662]   *Ibid.* at 14–15.

[663]   Art. 100(2), Russian Tax Code, Exh. C-1704.

[664]   Art. 101(1) and (2), Russian Tax Code, Exh. C-1704.

[665]   Art. 101(3), Russian Tax Code, Exh. C-1704.

[666]   2000 Decision, pp. 86–87, Exh. C-104.

[667]   *Ibid.*, pp. 87–90.

> Results of the audit and the Decision were formalized in compliance with requirements of Articles 100 and 101 of the Russian Federation Tax Code.  The Decision indicates its subject, essence and features of the tax offense imputed to the taxpayer, with reference to Article 122(3) of the Russian Federation Tax Code.  Demand for the payment of tax arrears, interest and fines indicated in the Decision of the Russian Federation Ministry of Taxes and Levies No. 14-3-05/1609-1 of 14.04.2004 are well-founded, comply with the current legislation and are supported by the primary documents of audit materials, presented by the Russian Federation Ministry of Taxes and levies to the Court for substantiation of its claim.[668]

636.   The Ninth Arbitrazh Court of Appeal added that "[Yukos'] reference to a lack of documents and information confirming bad faith on the part of the taxpayer is unfounded."[669]   The Tribunal observes, however, that neither court identifies any specific documents in coming to these conclusions; nor did Respondent submit to the Tribunal the record that was before those courts, or present a witness who could attest to it.  This makes it impossible for the Tribunal to assess whether the tax authorities did indeed discharge their burden against Yukos in issuing and defending their tax assessments.

637.   Claimants sum up their argument on this important point in their Post-Hearing Brief with the following submission.  The Tribunal notes that these crucial allegations of Claimants were never rebutted by Respondent:

> In addition, the December 29, 2003 Audit Report did not comply with the requirements of the Russian Tax Code, including, in particular, by failing to document the factual allegations made and by relying on unidentified and undisclosed documents from the criminal investigation against Mr. Khodorkovsky.  Continuing this flagrant breach of due process, the tax authorities refused to allow Yukos access to the documents upon which the purported claims were based, making it impossible for Yukos to defend itself.  Notwithstanding the fact that the results of the court cases were determined in the Kremlin and it therefore could not possibly have made any difference how Yukos presented its defense, this refusal even to subject the purported claims to the scrutiny of Yukos' lawyers attests to the Russian authorities' complete lack of belief in the validity of those claims and their determination to destroy the company at a rapid pace.[670]

638.   Respondent avers that "the unbroken thread of Yukos' tax evasion" demonstrates that the Russian Federation's assessments against Yukos were entirely proper, and marshalled a

---

[668]   Resolution of the Ninth Arbitrazh Court of Appeal, Case No. 09AP-4078/04-AK, 23 November 2004, p. 5, Exh. C-147; *see also* Decision of the Moscow Arbitrazh Court, Case No. A40-17669/04-109-241, 26 May 2004, p. 21, Exh. C-116.

[669]   *Ibid.*, p. 9.

[670]   Claimants' Post-Hearing Brief ¶ 24.

substantial amount of evidence that suggests that Yukos was abusing at least some of the low tax regions prior to 2003.[671]

639.   However, the Tribunal observes that nearly all of the evidence on this point relates to the entities in Lesnoy and Trekhgorny.   The Tribunal has not found any evidence in the massive record that would support Respondent's submission that there was a basis for the Russian authorities to conclude that the entities in Mordovia, for example, were "shams".   Indeed, instead of pointing to any specific evidence on which the tax authorities might have based their finding that the Mordovian entities were shams, Respondent reversed the burden and asserted that "there is no evidence that the Mordovian shells ever had any greater substance than the Lesnoy shells";[672] and that "[f]actually, Yukos did not even attempt to demonstrate that any genuine trading activities had ever been conducted in Mordovia."[673]   While the incomplete record before the Tribunal may not, in point of fact, establish that the Mordovian trading companies conducted genuine trading activities in Mordovia, the Tribunal notes that the Russian courts systematically denied Yukos' motions to join to the proceedings its trading companies and the Government of the Republic of Mordovia.   This leads the Tribunal to conclude that the Russian courts may have prevented Yukos from adducing evidence bearing on the nature of its activities in Mordovia.[674]   The record, insofar as the Tribunal has been able to find, does not reveal reasons, still less persuasive reasons, for denial by the Russian courts of joinder of the Mordovian government and the trading companies.

640.   In the specific context of determining whether, in relation to the tax assessments against Yukos, the tax authorities discharged their own burden of proving Yukos' bad faith so as to be able to rely on the "bad-faith taxpayer" doctrine, the Tribunal makes two observations.   Firstly, the tax authorities failed to address at the time of the 2000 Decision, Yukos' reasoned objection based on the absence of specific documents in the tax audit.   Secondly, Respondent failed to identify during the Hearing any satisfactory evidence that the abuses found in the trading firms operating in Lesnoy and Trekhgorny were also found in the trading companies operating in Mordovia and all the other low-tax regions where Yukos entities were present.   While it is true, and suggestive, that Claimants did not introduce evidence at the Hearing showing that trading

---

[671]   Respondent's Closing Slides, pp. 3–35.

[672]   *Ibid*. p. 33.

[673]   *Ibid*. p. 98.

[674]   *See* Reply ¶ 286.

companies which operated in Mordovia were not "shams", it is first and foremost the conduct of the tax authorities that the Tribunal must examine in the context of the tax assessments that these authorities imposed on Yukos.  Focusing exclusively on Claimants' failure to demonstrate that the Mordovian entities were not "shams" would empty of meaning the important principle that the tax authorities had the burden of proving the taxpayer's bad faith under Russian law. On this point, the following extract from the *Pribrezhnoye* decision issued by the Federal Arbitrazh Court for the North-Western District on 5 June 2002 (well before the tax assessments against Yukos) is instructive:

> In addition, the IMNS's reference to the absence of presentation of evidence by the Company on the conduct of its business in the ZATO territory, which was supported by the court, is erroneous.
>
> Pursuant to Article 53 (part one) of the Arbitrazh Procedure Code of the Russian Federation in considering disputes on the invalidity of acts of State authorities, local self-government authorities and other authorities; it is up to the relevant authority to prove the circumstances, which provided the grounds for issuing the said acts.  Due to the fact that the disputed tax benefit had been granted to the defendant by a competent ZATO authority, and that the IMNS issuing the challenged non-regulatory decision found the granting of the benefit unlawful, the courts erroneously imposed the burden of proof on the Company.[675]

[emphasis added]

641.  Looking at the tax assessments themselves, the Tribunal observes that, if there is an "unbroken thread" running through the tax authorities' analysis of Yukos' tax optimization scheme, it is the consistent and uniform finding that each trading entity is "interdependent" with Yukos.  But that interdependence in the view of the Tribunal of itself does not establish bad faith on the part of all the trading entities.

642.  In its objections to the Tax Audit (objection No. 1: "Illegal conclusions concerning legal definition of interdependent persons"), Yukos complained about the authorities' reliance on interdependence as the principal factor motivating their conclusion that Yukos' tax optimization scheme was a tax evasion scheme, noting that interdependence has a specific meaning under the Russian Tax Code (in Article 20), and with strictly determined legal consequences (under Article 40).[676]  These provisions allow authorities to disregard prices used in transactions between interdependent persons when those prices deviate by more than 20 percent from the market price, and to assess additional taxes and interest calculated as if the

---

[675]  *Pribrezhnoye*, p. 5, Exh. C-1278.

[676]  Objections against Report No. 08-1, pp. 1–5, 12 January 2004, Exh. R-335.

transactions were concluded at the market price.  Again, the Tribunal notes that this objection was not directly addressed in the 2000 Decision.[677]

643.  The Tribunal notes that the relevant audit reports and decisions do refer generally to various factors that would seem to be relevant to a finding that the legislation in low-tax regions was being abused by Yukos.  For example, they refer to the absence of trading activity in the regions and the absence of sufficient or even of any investment by the trading entities in the low tax regions.  However, a close analysis of the tax assessment for 2000, for example, reveals that it was not established by the tax authorities that each of the trading entities which it labelled as a "sham" had no trading activity whatsoever, as opposed to just being "interdependent" on Yukos or not having physical facilities to handle oil and oil refining.

644.  The Tribunal agrees with Claimants (and apparently also with Mr. Konnov) that it is nonsense to require a trading company to demonstrate physical interaction with the goods or commodities that it is trading, especially in the era of electronic communications.  In this sense, the Tribunal is highly skeptical of the reasoning in the 2000 Audit Report (and subsequent reports) that the absence of physical movement of oil in and out of the low-tax region where the respective trading entity is located is evidence of a sham.  The Tribunal observes that the reasoning on this point in the 2000 Audit Report is also inconsistent with the decision in the *Pribrezhnoye* case.

645.  In that case, the Federal Arbitrazh Court for the North-Western District reversed decisions of lower courts that had accepted the tax authorities' efforts to impose additional eligibility requirements on a ZATO-based oil trading company beyond those laid out in the ZATO law.  It explicitly noted that:

> Under these circumstances the examination of whether the Company had fixed assets for oil products storage and transportation in the ZATO territory is beyond the scope of this case, because operations of trade in oil products, i.e. conclusion of contracts of sale, do not require the Company to own such fixed assets or for the oil products to be present within the ZATO territory.[678]

---

[677]  2000 Decision, pp. 87–90, Exh. C-104. There is also only a minor reference to the objection in the Decision of the Moscow Arbitrazh Court, Case No. A40-17669/04-109-241, 26 May 2004, p. 19, Exh. C-116. ("The court considers unfounded the Respondents' arguments that the status of interdependent entities has legal importance solely for the possibility of applying market prices to determine the results of the transactions for tax purposes.  Interdependence of entities in this case is one of the circumstances by which the tax authority substantiates bad faith of the taxpayer.").

[678]  *Pribrezhnoye*, p. 3, Exh. C-1278

646. The court added

> The references by the courts to the facts that transfer and acceptance of crude oil occurred outside the ZATO territory; that [the manager of a customer company was in a different ZATO when the transfer was signed]; that the phone numbers of the rented office premises are recorded to the name of a person other than the Company; and that the defendant had not paid the office electricity bills are equally unfounded.  <u>The said circumstances per se do not refute the fact that the Company was doing business as a trade company in the territory of the ZATO, and they have no relevance for the case because they are not taken into account by tax legislation in determining eligibility for tax benefits.</u>
>
> The examination of the said circumstances by the first instance court and the court of appeal reveals their misinterpretation of Article 5(1) of the ZATO Law, in that the court went beyond the eligibility criteria for tax benefits that are explicitly set forth in this provision.  In violation of Article 3(7) of the TC, the first instance court and the court of appeal regarded the absence of any criteria on doing business in ZATO territory other than fixed assets, workers on payroll and salary payments as grounds for the independent establishment of such criteria by a tax authority or a court.[679]

> [emphasis added]

647. Finally, the Tribunal agrees with Claimants that the criterion of "proportionality" seems to be difficult to apply as a stand-alone basis to invalidate the structure in the low-tax regions.  This is due to the fact that the proportion between the tax savings and the investment in the low-tax region should have been readily apparent to the tax authorities on the face of the tax filings and related tax documents.   On the other hand, where properly evidenced, a grossly disproportionate arrangement combined with an "empty shell" structure could, in the Tribunal's view, validly attract the attention of the authorities under the "anti-abuse" doctrine.

648. To conclude, it thus appears to the Tribunal that the Tax Ministry, in its assessments against Yukos, painted all of the Yukos' entities in the low tax regions with the same brush, even though it marshalled little, if any, documented evidence that all, and not only some, of the trading entities were abusing the low tax regime in which they had respectively been constituted.  On the one hand, the Tribunal accepts that, if Claimants had evidence of genuine business activity of the trading companies in the low-tax regions, they would have introduced it or referred to it orally.  Accordingly, resolution of these critical issues is not free from doubt.  But on the other hand, and on balance, where neither side was able to demonstrate the facts, but where Yukos' files were in the hands of Respondent, the Tribunal feels justified in holding Respondent bound by the burden of proof.  Respondent failed to meet that burden.  Moreover, it refused to join Mordovian authorities and the trading companies to the litigation.  Furthermore, the re-attribution remedy was unprecedented at that time in the Russian

---

[679]  *Ibid.*, p. 4.

Federation.  Respondent's resort to re-attribution appears to be linked to its determination to impose a massive VAT liability on Yukos.

(b)   **VAT**

i.   **Introduction**

649.   Claimants argue that the imposition of VAT by the tax authorities, and more specifically their refusal to attribute to Yukos the trading companies' VAT returns and refunds, is arbitrary because (a) it is undisputed that the goods at issue in the underlying transactions were exported and that the trading entities timely and duly filed VAT returns (and thus that the transactions benefited from the exemption from VAT or zero percent rating, depending on the year);[680] (b) the refusal to attribute the trading companies' VAT returns and refunds to Yukos is inconsistent with Respondent's attribution to Yukos of the trading companies' revenues for purposes of calculation of tax (be it profit tax or VAT or any of the other taxes); and (c) Yukos' refilings of VAT returns were rejected on the basis of technicalities, thus demonstrating that Respondent had no intention of treating Yukos in good faith.[681]

650.   Respondent takes the position that the VAT assessments against Yukos were perfectly proper, and consistent with the corporate profit tax assessments.  In both cases, Respondent argues, the assessments were based on the application of Russian tax law to the true situation, established by the tax authorities, that Yukos was the "real taxpayer" and "actual exporter" in the various transactions that the trading companies had entered into. Respondent's position is also based on its assertions that under Russian law, the granting of a zero percent VAT rate is subject to compliance with stringent documentary requirements; and that it is undisputed that Yukos itself never filed regular VAT returns or proper amended VAT returns in relation to the transactions in question.[682]

651.   The Tribunal observes that there was no element in Yukos' tax scheme that enabled Yukos to benefit improperly or illegally from a VAT exemption or a zero percent rating.  As noted earlier

---

[680]   *See* Second Konnov Report ¶ 84, n.137.  Mr. Konnov explains:  "Prior to entry into force on January 1, 2001 of Chapter 21 of the Russian Tax Code governing VAT, VAT was governed by Law of the Russian Federation No. 1992-1, On the Value Added Tax, December 6, 1991 (the 'VAT Law').  Under the terminology of the VAT Law, exports were 'exempt' from VAT whilst under the Russian Tax Code they are subject to 0% VAT rate.  In substance, exemption from VAT on exports was similar to the 0% tax regime." *Ibid.*

[681]   Claimants' Opening Slides, p. 63.

[682]   Respondent's Opening Slides, p. 111.

in this Award, VAT is a uniform federal tax that benefits from an exemption or a zero percent rating if the transaction involves an export to a foreign purchaser.  In other words, even if Yukos' tax scheme was entirely unlawful (or unlawful in some respects), and the authorities were justified in attributing the trading companies' revenues to Yukos for tax purposes, there is no suggestion by Respondent that the trading companies (or Yukos) did anything "wrong" vis-à-vis VAT with their tax scheme. The Tribunal must consider the propriety of the multibillion dollar VAT assessments against Yukos in this context.

652.   The Tribunal addresses the specific questions arising on the topic of the VAT assessments in the following subsections.

### ii.   Was the Imposition of VAT Payments on Yukos Inconsistent with the Attribution to Yukos of the Trading Companies' Revenues?

653.   Claimants assert that when the Russian Tax Ministry reattributed to Yukos all of the revenues (including the export revenues) of its trading companies, it should have attributed to Yukos the VAT refunds previously obtained by the trading companies with respect to their exports. Instead, in what Claimants characterize as a "contradiction with its own theory," the Tax Ministry chose to impose the amounts on Yukos, justifying the VAT payment demands on the failure by Yukos, as the "real taxpayer", to file on time "the documentation required to validate the VAT exemption or the 0% VAT rate".[683]

654.   Claimants sum up their argument in their Memorial as follows:

> This formalistic position, systematically challenged by Yukos before the arbitrazh courts, but endorsed without any thorough analysis by these courts, was obviously circular: the trading companies, not Yukos, had exported oil and oil products and filed all the necessary documentation; under the applicable laws, Yukos did not have to file and could not have filed such documentation at the relevant times.  The fact that, even when Yukos attempted to submit the updated VAT returns in its own name to satisfy the Tax Ministry, its submissions were simply rejected as improper and untimely, amply shows the Tax Ministry's bad faith and true intentions.[684]

---

[683]   Memorial ¶ 321–22.

[684]   Memorial ¶ 322 (citing as regards Yukos' tax reassessment for the year 2000, Decision of the Moscow Arbitrazh Court of 26 May 2004, 28 May 2004, p. 19 of the Russian original, Exh. C-116; as regards Yukos' tax reassessment for the year 2001, Resolution of the Ninth Arbitrazh Court of Appeal of 9 February 2005, 16 February 2005, p. 23 of the Russian original, Exh. C-167; as regards Yukos' tax reassessment for the year 2003, Decision of the Moscow Arbitrazh Court of 21 April 2005, 28 April 2005, p. 59 of the Russian original, Exh. C-196, and Resolution of the Federal Arbitrazh Court for the Moscow District of 18 November 2005, 5 December 2005, p. 17 of the Russian original, Exh. C-197; as regards Yukos' tax reassessment for the year 2004, Resolution of the Ninth Arbitrazh Court of Appeal of 11 August 2006, 18 August 2006, p. 35 of the Russian original, Exh. C-336; as regards Yukos' tax reassessment for the year 2002, Transcript of the hearing held at the Moscow Arbitrazh Court on 14–16 December

655.  In its Counter-Memorial, Respondent asserts that the tax authorities were justified to treat Yukos itself as the real party in interest, "which for VAT purposes, meant treating it as the real exporter.  This approach simply reflected reality."[685]  As such, Respondent argues, Yukos could have benefited from exemption (or "zero-rating") only if, as "the true exporter", it had timely filed "the requisite documentation in the correct manner."[686]

656.  Claimants reaffirm their position in their Reply, stating that Respondent's position on VAT "was wholly inconsistent with the entire re-attribution theory upon which all of the other purported tax claims were premised."[687]  In short, Claimants argue that "it was arbitrary and contradictory for the authorities to re-attribute the trading companies' oil, revenues, profits, tax liabilities and activities to Yukos but to refuse to re-attribute to Yukos those companies' entitlement to VAT refunds."[688]

657.  More specifically, Claimants note that "there is no support in Russian law for the tax authorities to conclude that the 'true exporter' could be someone other than the legal owner as reflected in the relevant documentation."[689]  In particular, Claimants assert that neither Article 165 of the Russian Tax Code nor the decision of the Constitutional Court[690] affirming the constitutionality of Article 165, on which Respondent relies, say anything about "true exporters".[691]

658.  The Tribunal notes that, in audit reports and decisions prior to the reassessments in December 2003, there are frequent references to the trading companies' use of export agents.  For example, in Decision No. 23 in respect of Alta-Trade, the decision notes that "Oil products are being exported through commission agent OAO NK Yukos and ZAO Trading House Angarsk-Nefto."[692]  To prove that exports in fact took place, more than ten commission agreements were provided to the authorities, along with

---

2004, p. 21 of the Russian original, Exh. C-183; as regards Yukos' tax reassessment for the year 2003, Decision of the Moscow Arbitrazh Court of 21 April 2005, 28 April 2005, p. 59 of the Russian original, Exh. C-196).

[685]  Counter-Memorial ¶ 1073.

[686]  *Ibid.* ¶ 1074.

[687]  Reply ¶ 244.

[688]  *Ibid.*

[689]  Reply ¶ 245.

[690]  Resolution of the Constitutional Court of the Russian Federation No. 12-P, 14 July 2003, Exh. R-1501.

[691]  Reply ¶ 246.

[692]  Decision No. 23 on partial refusal to refund/offset VAT (Alta-Trade), 15 June 2000, p. 1, Exh. C-1110

> "certificates of transactions entered into by the commission agent, bank statements evidencing crediting of funds to the commission agent's accounts, bank statements evidencing crediting of funds to OOO Alta-Trade's accounts, commission agents reports, copies of complete custom freight declarations and shipping documents confirming export of goods by sea outside the CIS member states[,] . . . complete customs freight declarations [with] the necessary notes made by customs authorities – "clearance allowed", "goods exported", and also notes made on shipping documents – "loading allowed" on loading instructions, notes made on marine bills of lading concerning acceptance of cargos for transportation.[693]

659.  The Tribunal also notes that, in these audits, the taxation authorities did not appear to be concerned with these relationships.  Several other audit reports and decisions also mention the use of export agents.[694]

660.  In its Rejoinder, Respondent maintains its position regarding the propriety of the VAT assessments and their consistency with the profit tax assessments against Yukos.  Respondent explains why Claimants are wrong, in its view, for characterizing the VAT assessments as being arbitrary and contradictory:

> Once again, Claimants are wrong.  The authorities' approach with respect to Yukos' VAT liability was consistent with their approach to Yukos' corporate profit tax liability.  In both instances, they treated Yukos as the actual owner and exporter of the oil and oil products, and therefore the actual entity responsible for both profit tax and VAT.  Thus, the authorities found that:
>
> (i)    Yukos was the real party in interest in the challenged transactions.
>
> (ii)   The profit generated through those transactions was Yukos' own profit, which Yukos had fictitiously allocated to the trading shells for no purpose other than to evade taxes which it otherwise was obligated to pay.
>
> (iii)  Yukos, not its trading shells, was the real exporter of the oil and oil products that were the subject matter of those transactions.
>
> The inescapable conclusion from these findings is that Yukos, not its trading shells, should have filed the requisite documents to claim a 0% VAT rate, which as discussed below Yukos did not do properly.  The VAT was thus due from Yukos and the Yukos VAT assessments were proper.[695]

661.  Claimants sum up their position in their Post Hearing Brief:

---

[693]   *Ibid.*

[694]   *See* Decision No. 48 to deny refunding (offset) VAT (Alta-Trade), 29 October 2001, p. 1, Exh. C-1116; Decision No. 53 on partial refusal to refund/offset VAT (Mars XXII), 27 December 2004, p. 1, Exh. C-1117; Field Tax Audit Report No. 02-52, 19 April 2002 ¶ 1.7, Exh. C-1120; Field Tax Audit Report No. 02/105, 3 March 2003 ¶ 1.10, Exh. C-1124; Field Tax Audit Report No. 02-126, 22 October 2003, p. 3, Exh. C-1125; and Exh. C-1121, p. 3, which notes Article 165 of the Russian Tax Code, and states "No offense were discovered during the audit as to whether the value added tax actually paid to suppliers for materials acquired/booked, work performed or services provided, to the extent they were used to produce export goods, has been properly refunded/credited; whether OOO Ratmir had documents to support actual exports of such goods, and whether it properly assessed tax on domestic sales of goods."

[695]   Rejoinder ¶¶ 706–7.

> If the tax authorities had authority to reassign items from the debit side of the trading companies' taxpayer accounts to the debit side of Yukos' taxpayer account, then they must also have had the corresponding authority to transfer the entries on the credit side – particularly in light of the tax authorities' own prior determinations that the 0% export VAT rate applied to all of the transactions in question.[696]

662.   During his cross-examination of Mr. Konnov, Professor Gaillard recalled that the revenue of the trading companies was attributed to Yukos:

> Q.    So can we agree that the revenues were found in the books of separate legal entities, which were the trading companies; can we agree on that?
>
> A.    I think you already asked that question, and I said that, yes, the tax authorities used the books of the domestic offshore companies to get the figures.
>
> Q.    Right. And they took this amount and deemed this amount to be revenues of the Yukos; correct?
>
> A.    That is correct: they treated that revenue as revenue of Yukos.[697]

663.   Similarly, Mr. Konnov confirmed that if there had been no attribution of revenue to Yukos the VAT issue would not have arisen:

> Q.    I may disagree with you on some aspects of that, but I'm not reopening that. I am just talking about VAT.
>
> If the tax authorities had decided that the trading companies themselves had violated, say, the Mordovian Law, or the Law which is applicable to them, or the Federal Anti-Abuse Law, or whatever Law, but they have violated that Law; and if the tax authorities had said, "Okay, they abused, so all these tax benefits which they had, they should never have had these benefits, because there is no proportionality, because it's form over substance", whatever reason, "So they should pay, they should reimburse all these benefits", and possibly pay interest, fines, whatever -- okay? -- if that had been the case, would the VAT issue have arisen at all?
>
> A.    No.
>
> Q.    You are with me on that?
>
> A.    Yes.
>
> Q.    So it would not.  And the VAT issue arises only because it's Yukos which has been deemed to be the person having the revenues, and hence not having declared those revenues, and hence not having paid the VAT corresponding to the sales which generated those revenues; correct?
>
> A.    To be more specific, the VAT issue arises because VAT returns were not refiled.
>
> Q.    No, because they were not filed in the first place, right?
>
> A.    No, because they were not refiled by Yukos.  So the basis is not attribution; the basis is failure to file VAT returns.

---

[696]   Claimant's Post-Hearing Brief ¶ 43 (citations omitted).

[697]   Transcript, Day 13 at 85–86.

THE CHAIRMAN: That's not the question.  If there had been no reattribution, if the trading companies had been assessed the profit tax, et cetera, there would not have been a VAT issue.

A.    Right.  But I think I responded to that.

THE CHAIRMAN: Yes.

A.    I responded to that.  That's correct.[698]

664.    Mr. Konnov acknowledged that the trading companies had filed their VAT returns and had claimed the VAT refunds as required:

Q.    Right.  Do you agree with me that it's not disputed that the trading companies themselves have filed properly the VAT returns, and have requested and they have been granted the 0% rate because the goods were exported?  Correct?  Do we agree on that?

A.    I agree, they were.  As we discussed earlier today, there were a few minor issues. But apart from these minor issues, this is correct: the domestic companies filed VAT returns, claimed refund, and obtained refund.[699]

665.    Mr. Konnov confirmed that Yukos was assessed the massive VAT liability because it failed to file in its own name VAT returns in respect of the trading entities' exports, since it had been found by the tax authorities to be the true exporter:

PROFESSOR GAILLARD: Okay, the next question is: is it your understanding of what happened that when the VAT issue did arise for Yukos, because Yukos was deemed to be the person having received the revenues from the sales, when it did arise, is it your understanding of the case that the reason why they had to pay this massive amount of VAT is from the outset because they were criticised for not having submitted themselves the tax returns in time?  Is that your understanding of what happened?

A.    Right: VAT returns primarily, and the documents that need to be attached to that. But the main issue relates to the failure of Yukos to file the VAT returns with respect to these exports.

. . .

A.    I thought I had responded to that in my reports.  But in essence the Tax Code requires VAT returns to be filed by the exporter.  There is a formalistic procedure. Tax authorities have historically applied the law very formally.  They said that Yukos had to refile.  There is nothing difficult in refiling, and Yukos did not refile.

So therefore the basis for VAT assessment is not failure of Yukos to export, as we agreed;  but the basis is failure of Yukos to file the documentation in its own name.[700]

[emphasis added]

---

[698]    Transcript, Day 14 at 227–28.

[699]    *Ibid*. at 230.

[700]    *Ibid*. at 229 and at 230–31.

666.   However, Mr. Konnov did not perceive any inconsistency between the attribution of revenue to Yukos and the position of the tax authorities and the courts that Yukos itself needed to file the VAT returns:

> Q.   Do we agree that for the revenues themselves, the authorities applied a substance over form principle?  Do we agree on that?
>
> A.   The tax authorities applied substance over form for both profits tax and VAT purposes.[701]

667.   In his First Report, Mr. Konnov explains his position in the following terms:

> At the outset, I should note that the tax authorities and courts were fully consistent in treating YUKOS for profit tax and VAT purposes.  Revenue of the Domestic Offshore Companies was recognized as revenue of YUKOS for both profit tax and VAT purposes.[702]

668.   The Tribunal observes that while the approach taken by the Tax Ministry was consistent in the sense that revenue was recognized as revenue of Yukos for both profit tax and VAT purposes, it was inconsistent in that, while the burden of the substance over form doctrine was imposed on Yukos, its corresponding benefit was not.   Put another way, while technicalities and formalism are said to preclude the attribution of the VAT filings of the trading entities to Yukos, it does not appear that the Tax Ministry was concerned with technicalities and formalism when it came time to attribute their revenue to Yukos.

669.   A member of the Tribunal put the pertinent question to Mr. Konnov.  The following exchange with the witness is important:

> JUDGE SCHWEBEL: In substance, Russian courts treated the activities of the trading companies as the activities of Yukos itself, while at the same time they did not attribute to Yukos a critical element of those activities, namely their filing for VAT refunds.
>
> In the interests of obvious justice, why did not the Russian courts treat the filings for VAT by the trading companies as filings by Yukos?
>
> A.   If I may, I see two aspects in your question.  First, I do not think that Russian tax authorities -- as I think was suggested in your question -- treated the activities of trading companies as the activities of Yukos.  I think it would be more correct, if I may, to say that they established that trading companies conducted no activity, and therefore they simply ignored that for tax purposes.
>
> As regards . . .  the substance of your question, the reason is very simple: is that, as I mentioned, in order to get the tax benefit, you need to comply with the substance and with the documents.   And here the documentary requirement was not burdensome; it was not difficult to refile the VAT return.  The tax authorities did

---

[701]   *Ibid.* at 231.

[702]   First Konnov Report ¶ 54

> look at the substance, but simply said, "You need to comply with the documentary requirement," and consistently Yukos failed to comply with that.
>
> So I don't see contradiction.[703]

670. Respondent relies on both Article 165 of the Russian Tax Code and Constitutional Court Resolution No. 12-P. Neither of these texts, however, appears to the Tribunal to provide a clear basis for the authorities' refusal to attribute to Yukos the VAT filings that had been made by the trading entities when they were considered the taxpayer. On the other hand, they do support the basic proposition that the Russian Tax Code requires the VAT return to be filed by the "taxpayer."[704]

671. In the view of the Tribunal, the jurisprudence of the Russian courts does not support the imposition of VAT payments on Yukos as happened in this case. In particular, the *Energomashbank* decision of the Russian Constitutional Court stands for the proposition that courts must not limit themselves to a purely formalistic analysis in assessing tax claims by the State, but rather must examine the actual facts in order to respect the taxpayer's right to a fair opportunity to defend itself against the claim.[705]

### iii. Would any Illicit Conduct by a Taxpayer Justify the Denial of a VAT Exemption, Irrespective of Whether the Illicit Conduct was Connected to VAT, and without any Regard to Proportionality?

672. In its Counter-Memorial, Respondent raises an additional argument in support of the authorities' denial of the VAT exemption to Yukos. Respondent asserts that, in any event, "the denial of [a] VAT exemption is appropriate when the exporter, like Yukos, has been involved in flagrantly illicit conduct."[706] In support of its argument, Respondent relies on what it characterizes as the practice in many countries to deny "the benefit of exemption or 0% rating, even where documentary requirements have been punctually satisfied, if the relevant export transaction is tainted by illegality (as was the case with Yukos) or even simply by

---

[703]   Transcript, Day 15 at 231–32.

[704]   Second Konnov Report ¶ 89.

[705]   Resolution of the Russian Constitutional Court No. 14–P ¶ 4, 28 October 1999, Exh. R-293 (the right to judicial defense is infringed when courts fail to investigate actual facts and limit themselves to establishing "formal conditions for the application of the law").  *See also* Reply ¶ 236 and Second Konnov Report ¶ 72.

[706]   Counter-Memorial ¶ 1076.

impropriety."[707]    In particular, Respondent relies on the decision of the ECJ in *R. v. Germany*.[708]

673.   Respondent summarizes the *R. v. Germany* decision as follows in its Counter-Memorial:

> More recently, the European Court of Justice, in the case of R. v. Germany, upheld the imposition of VAT by the German tax authorities on export transactions that had been carried out by an individual who had made fraudulent misrepresentations in his applications for exemption from German VAT, notwithstanding the fact that the fraud had not deprived Germany of any tax revenues, since the goods in question had effectively been exported out of Germany and therefore—but for the fraud in the attendant documentation—would have been unquestionably entitled to full exemption from German VAT.  The ECJ rejected the argument that imposition of VAT on the exporter would violate "principles of fiscal neutrality or legal certainty, or . . . legitimate expectations," holding that none of those principles can "legitimately be invoked by a taxable person who has intentionally participated in tax evasion. . ."  This was true, the court held, even though the tax evaded was not one that the taxpayer himself would normally have had to pay, and even though the result was that Germany ended up with a windfall, collecting a tax that, in the absence of fraud, it would never have been able to assess.[709]

674.   In their Reply, Claimants contend that this decision is of no assistance to Respondent, because it "does not suggest that the tax authorities may deny VAT exemptions because of allegations of illegality unrelated to actual compliance with the VAT law."[710]   Indeed, contrary to the *R. v. Germany* decision (in which, Claimants assert, the ECJ expressly rejected a punitive approach), Claimants argue that the "staggering demands for VAT payment—plus fines and interest— made by the Tax Ministry"[711] constitute an entirely disproportionate response to the alleged

---

[707]   *Ibid.* ¶ 1206.

[708]   *R. v. Germany*, ECJ, Case C-285/09, Judgment, 7 December 2010, Exh. R-1401 (hereinafter "*R. v. Germany*").

[709]   Counter-Memorial ¶ 1208 (citing *R. v. Germany* ¶ 22).  Respondent notes: "In fact, as made clear by the ECJ, the German taxpayer had not himself evaded any tax for which he might have been liable, because the sole purpose and effect of his fraudulent conduct had been to assist unrelated third parties—his foreign customers—to evade taxes in their home country of Portugal." *Ibid.* n.1878.

Respondent adds further: "The ECJ stated that "[t]hose principles cannot legitimately be invoked by a taxable person who has intentionally participated in tax evasion and who has jeopardized the operation of the common system on VAT". *Ibid.* ¶ 54.  The ECJ also summarily dismissed the argument that imposition of VAT on an exporter (who, as had been pointed out by the Advocate General, would probably never be able to recover it from his customer) would violate the general EU principle of proportionality.  The court held that the exporter's involvement in the third party's tax evasion scheme was "decisive" in this regard.  Specifically the court stated that "[a]s regards the principle of proportionality, it must be observed that this does not preclude a supplier who participates in tax evasion from being obliged to pay VAT subsequently on this intra-community supply, inasmuch as his involvement in the evasion is a decisive factor to be taken into account in an assessment of the proportionality of a national measure. . . .") *Ibid.* n.1879.

[710]   Reply ¶ 248.

[711]   *Ibid.* ¶ 249.

defects in the paperwork submitted by Yukos, and are evidence of "the tax authorities' manifest bad faith on this issue."[712]

675. According to Respondent, however, the decision is directly applicable to the present case because, in that case, the ECJ held "that it is entirely appropriate for a State to deny VAT refunds (or exemptions) to an exporting company whose conduct, like Yukos', involves '*evasion, avoidance or abuse,*' even though the scheme did not deprive that State of any VAT or other revenues."[713]   Respondent asserts that Claimants' attempt to distinguish the *R. v. Germany* decision on the grounds that, in that case, the scheme involved an attempt to evade VAT charges, whereas Yukos' fraud was designed to evade a tax on profits, is "sophistic."[714] Respondent explains:

> What makes the European Court of Justice's decision relevant to these arbitrations is its holding that, because the export transactions in that case were part of an abusive scheme, Germany was entitled to levy VAT on those exports, notwithstanding the fact that no German tax (of any kind) had been evaded.  Reasoning by analogy, Russia's VAT assessments against Yukos were appropriate *a fortiori*, since Yukos' fraudulent scheme— unlike the one in *R v. Germany*—most assuredly involved a revenue loss for Russia, to wit, the loss of huge amounts of corporate profit tax that the Yukos tax evasion scheme was engineered to evade.[715]

676. In its Post-Hearing Brief, Respondent again invokes the ECJ's decision in *R. v. Germany*.[716] Claimants, in their own Post-Hearing Brief, reiterated that "Yukos' tax optimization structure was not aimed at,  and indeed could not possibly achieve, any reduction in VAT liabilities."[717] Claimants conclude that this decision is of no assistance to the Tribunal.

677. The Tribunal is not persuaded that the Russian Federation's imposition of massive VAT liabilities on Yukos can be excused or justified on the basis of the *R. v. Germany* decision. Firstly, no element of Yukos' tax optimization scheme could be said to constitute an abuse of the VAT system.  In the *R. v. Germany* case, however, the taxpayer who was denied the VAT exemption was convicted on two counts of tax evasion by means of which he had evaded more that €1 million of VAT in 2002 and more than €1.5 million of VAT in 2003.  Secondly, the Tribunal considers the imposition of VAT on Yukos to be a disproportionate response to

---

[712]   *Ibid*. ¶ 252.

[713]   Rejoinder ¶ 709 (emphasis in original) (citing *R. v. Germany* ¶ 51, Exh. R-1401).

[714]   Rejoinder ¶ 710.

[715]   *Ibid*.

[716]   Respondent's Post-Hearing Brief ¶ 42.

[717]   Claimants Post-Hearing Brief ¶ 42.

whatever abuse took place in the low-tax regions, considering that the tax authorities had already imposed all of the revenue-based taxes deemed to be owed by the trading entities on Yukos.  In the *R. v. Germany* decision, the ECJ reminded Member States that they

> must observe the general principles of law that form part of the European Union legal order, which include, in particular, the principles of legal certainty and proportionality and the principle of protection of legitimate expectations (see, to that effect, Joined Cases C-286/94, C-340/95, C-401/95 and C-47/96 *Molenheide and Others* [1977] ECR 1-7281, paragraph 48; Case C-384/04 *Federation of Technological Industries and* others [2006] ECR 1-4191, paragraphs 29 and 30; and Case C-271/06 *Netto Supermarkt* [2008] ECR 1-771, paragraph 18).  As regards, in particular, the principle of proportionality, the Court has already held that, in accordance with that principle, the measures which the Member States may thus adopt must not go further than is necessary to attain the objectives of ensuring the correct levying and collection of the tax and the prevention of tax evasion (see, in particular, Case C-188/09 *Profaktor Kulesza, Frankowski Jóźwiak, Orlowski* [2010] ECR 1-0000, paragraph 26).[718]

678.  In the present case, with respect to the denial by the Russian tax authorities of the VAT exemption to Yukos, the Tribunal finds that the Russian Federation did go much further than was necessary to attain a legitimate objective of collecting taxes.

### iv.   Did Yukos Contribute to its Own Demise by Failing to File Proper VAT documentation, or Does the Evidence Suggest that Any Efforts by Yukos to Minimize its Liability would have been Thwarted by the Authorities?

679.  In its Counter-Memorial, Respondent also contends that Yukos acted self-destructively in relation to VAT, in as much as:

(a)    Yukos could have avoided further VAT assessments "easily and at no cost, simply by having Yukos itself (or one of the other genuine companies of the Yukos group) acknowledge its status as the real exporter and file the requisite documentation itself".[719]

(b)    Yukos, when it belatedly filed amended VAT returns for some prior periods, "submitted those returns in a format that was incapable of being processed by the authorities' computer, with the result that, as any tax expert would have predicted, they were rejected."[720]

---

[718]   *R. v. Germany* ¶ 45, Exh. R-1401.

[719]   Counter-Memorial ¶ 1078.

[720]   *Ibid*. ¶ 1079.

680.  In relation to the format for filing the VAT returns, Respondent, in its Counter-Memorial, wrote:

> For an unexplained reason, Yukos belatedly filed <u>yearly</u> VAT returns, whereas quarterly or monthly returns were required. See Konnov Report, ¶ 58. See Article 163 of the Tax Code, providing with respect to VAT that "1. Tax period shall be established as a calendar month, unless otherwise provided by paragraph 2 of this Article (this applies to taxpayers performing the obligations of tax agents, hereinafter referred to as tax agents). 2. For taxpayers (tax agents) whose monthly revenues from the sale of goods (works, services) within a quarter, excluding the tax and sales tax, do not exceed one million rubles, the tax period shall be established as a quarter."  With effect from Jan. 1, 2004, Article 163 was amended to read: "1. Tax period shall be established as a calendar month, unless otherwise provided by paragraph 2 of this Article (this applies to taxpayers performing the obligations of tax agents, hereinafter referred to as tax agents). 2. For taxpayers (tax agents) whose monthly revenues from the sale of goods (works, services) within a quarter, excluding the tax, do not exceed one million rubles, the tax period shall be established as a quarter." [Exh. R-1502].   Not surprisingly, the courts have rejected such returns. See, e.g., Decision of the Moscow Arbitrazh Court, Case No. A40-4338/05-107-9/ A40-7780/05-98-90 (Apr. 28, 2005), 59 [Exh. C-196] ("The <u>tax return</u> submitted by OAO Yukos Oil Company for value added tax for 2003 cannot be considered, since it <u>does not meet the requirements</u> of tax legislation regarding submission of a VAT tax return <u>for each tax period, which is a month or quarter</u>").[721]

> [emphasis added by Respondent]

681.  For Claimants, the particular format of the VAT filings was just a pretext by the tax authorities for refusing to credit Yukos for the VAT refunds obtained by the trading companies:

> The Respondent accuses Yukos of having "acted self-destructively" by filing yearly VAT returns instead of quarterly or monthly returns and, by way of support, refers to the Decision of the Moscow Arbitrazh Court regarding the alleged tax reassessment for the year 2003.  However, the monthly reporting requirement relates solely to the periodicity at which, in the ordinary course of events, companies are required to file VAT returns.  In circumstances where the documentation was being submitted <u>four years after the fact</u>, it would have made no sense—and would likely have generated unnecessary additional work for the tax authorities—to disaggregate the annual information into monthly data.[722]

> [emphasis in original]

---

[721]   Counter-Memorial ¶ 1079, n.1707

[722]   Reply ¶ 250. Claimants note that:  "The Respondent is unable to make up its mind as to whether the documents needed to be filed on a monthly or quarterly basis or whether either is permissible, a position whose vagueness cannot be reconciled with the purported certainty with which it affirms that yearly submissions were improper.  [citing Counter-Memorial ¶ 1079, n.1707.]" *Ibid*. n.440.

Claimants add further:  "The Respondent offers no support for its assertion that the returns submitted by Yukos were "incapable of being processed by the authorities' computer", an assertion which is implausible on its face, particularly in light of the Respondent's own uncertainty as to whether monthly or quarterly submissions were required, and was in any event not relied on as a basis for the original rejection." *Ibid*. n.442.

682. Claimants add in their Reply that "the text of Article 165 of the Russian Tax Code seriously undermines this pretext in that it imposes no timing restrictions whatsoever in relation to the submission of the required documentation for obtaining a VAT refund."[723]

683. Respondent disagrees:

> Equally meritless is the allegation that the "monthly reporting requirement relates solely to the periodicity at which, in the ordinary course of events, companies are required to file VAT returns" and is not applicable when "the documentation is being submitted four years after the fact." Contrary to Claimants' suggestion, the Russian Tax Code does not contemplate any exception for non-"ordinary course" filings, and in particular allows no derogation from the requirement that filings be made on a monthly (or, in cases not relevant to Yukos, quarterly) basis. Rather, it clearly provides what a taxpayer must file to claim a 0% VAT rate on exports, and neither Yukos nor any other taxpayer is entitled to decide for itself whether or not to comply with the law based on "convenience".[724]

684. In his Second Expert Report, Mr. Konnov refers to the strict formalism of Russian tax legislation with respect to VAT and cites, in support of the decision of the tax authorities, a decision of the Russian Supreme Arbitrazh Court issued in 2011:

> 86.   The strict formalism of Russian tax legislation with respect to VAT was recently confirmed in the *Forward* VAT case (unrelated to YUKOS) which has reached the Russian Supreme Arbitrazh Court. *Forward* was a construction company. In relation to the construction of a residential building in the city of Bryansk, it was collecting investment contributions. *Forward* failed to assess VAT on its remuneration when due. Based on a field audit, the tax authorities assessed VAT (and profit tax) on *Forward*. The taxpayer claimed input VAT credit in court. Neither the amounts of input VAT, nor the payment made by the suppliers was disputed by the tax authorities. The taxpayer submitted to the court documents evidencing input VAT, but failed to file an amended VAT return claiming the respective amounts of input VAT. Even though the amount of the input VAT paid by the taxpayer was undisputed, the court denied the input VAT credit solely on the basis that the taxpayer failed to file an amended VAT return.

> 87.   The Supreme Arbitrazh Court concluded that, in accordance with the Russian Tax Code and the prevailing court practice, input VAT credit had to be claimed by a taxpayer in accordance with the relevant provisions of the Russian Tax Code, and that the tax authorities were not obliged to identify and credit undeclared input VAT on their own:

> > "The fact that documents confirming, in the taxpayer's opinion, a right for tax credit are available without reflecting (showing, claiming) the amount of the tax credit in a tax return is not a ground for reduction of VAT payable to the

---

[723]   Reply ¶ 251 (citing Russian Tax Code, Article 165, Exh. R-1484 ("In the event that no documents (copies thereof) referred above are provided by the taxpayer within 180 days after the expiry of 180 days of the date of the release by the regional customs authority under export or transit customs procedure, said transactions involving the sale of goods (performance of works, provision of services) shall be taxed at a rate of 10 percent or 18 percent accordingly. In the event that subsequently the taxpayer submits to the tax authorities any documents (copies thereof) proving eligibility of the zero percent tax rate application, the tax paid shall be refunded to the taxpayer in the manner and on terms and conditions expressly provided by article 176 of this Code.").

[724]   Rejoinder ¶ 719(iii) (citing Reply ¶ 250–51, stating that "Claimants also rely on Article 165 of the Tax Code in making this argument, but Article 165 had nothing to do with the period (*i.e.*, monthly or annual) that Yukos' VAT filing should have covered." and also citing Second Konnov Report ¶ 93).

> budget for a tax period. Availability of documents confirming the right for VAT credit does not replace an obligation to claim it in a tax return."

> 88.   The Supreme Arbitrazh Court unequivocally confirmed that, as concerns VAT, Russian tax legislation is very formal and no VAT benefit can be allowed if it was not properly claimed by a taxpayer in a tax return.[725]

685.   When he gave evidence, Mr. Konnov also offered a practical justification for the monthly/quarterly requirement:

> But secondly, you cannot simply amend VAT law to allow annual return, because there are a few corresponding provisions. For instance, there is a provision on the chamber audit, on which I was questioned by Professor Gaillard: it is three months. And what that means: that if one taxpayer is on a monthly VAT return and the other one is on a quarterly return, the three months are sufficient for the tax authorities to do a counter-audit with respect to all the suppliers and other interested parties.

> If, however, you simply introduce annual return, and without corresponding changes to other provisions in the Tax Code, the tax authorities -- basically the VAT law will not function properly. So you can do that, but that would mean not only allowing acceptance of annual return, but redrafting the whole VAT chapter of the Tax Code to work it properly.[726]

686.   The Tribunal observes that while this practical justification does seem to support the monthly/quarterly filing requirement when the tax authorities are auditing the underlying transactions, it is more difficult to understand how that justification applied to Yukos' attempts to obtain credit for the trading companies' VAT refunds, in a situation where those VAT refunds had already been vetted and approved by the authorities at the time they had been claimed (for the first time) by the trading entities.

687.   In their Reply, Claimants assert that there was no reason to believe that, if Yukos had disaggregated the VAT data into monthly submissions as Respondent suggests it should have done the tax authorities would have accepted the filings:

> Indeed, the Claimants note that if such resubmissions were a genuinely available option, the Respondent offers no explanation as to why, once Yukos' allegedly self-destructive management had been replaced with a bankruptcy receiver, that receiver, Mr. Rebgun, failed to resubmit the VAT returns in the allegedly required format, given that if such an option had existed, Mr. Rebgun's fiduciary duties to the creditors would have required him to take advantage of it.[727]

---

[725]   Second Konnov Report ¶¶ 86–88 (citing Resolution of the Presidium of the Supreme Arbitrazh Court of the Russian Federation No. 23/11, 26 April 2011, Exh. R-3270).

[726]   Transcript, Day 15 at 199.

[727]   Reply ¶ 252 (citing Counter-Memorial ¶¶ 1079, 1105(viii), 1237(vii), 1272, 1279(vii), 1322(vii)).

688. In respect of this point, Professor Gaillard opined that the Russian authorities, including the courts, would certainly have found another reason to deny Yukos the VAT exemption if Yukos had filed monthly amended returns.  Professor Gaillard referred Mr. Konnov to the following extract from the Moscow Arbitrazh Court's decision relating to the 2003 tax year:

> "The tax return submitted by … Yukos Oil Company for value added tax for 2003 cannot be considered, since it does not meet the requirements of tax legislation regarding submission of a VAT tax return for each tax period, which is a month or quarter, and documents were not submitted at these times confirming the sale of goods for export and tax deductions . . . "[728]

689. Professor Gaillard then put the following question to Respondent's expert:

> Q.    Simply, Mr Konnov, when you look at this sentence which the Chairman directed you to, do you also see that the court says that the tax return cannot be considered because:
>
> "... documents were not submitted at these times …"
>
> Do you see that?
>
> A.    Yes, I do.
>
> Q.    So the reason the court is articulating is that: (1) it's not monthly or quarterly; and (2) it was not submitted at the right time. Correct?[729]

690. Mr. Konnov disagreed with Professor Gaillard's interpretation:

> No, no. It says that you need to submit supporting documents, which are in Article 165, with your VAT return. Article 165 says VAT return and supporting documents.[730]

691. Earlier in his evidence, Mr. Konnov had also supported the court's reasoning in the following words:

> And this is exactly the reason I explain in my report, I believe, that Yukos had to file monthly returns, and there is no such thing as an annual return.  And the document that is in the record suggests that Yukos filed an annual return by even using a pen, I believe, or one way or another just crossing out and filling in the form the way it electronically cannot be done.  And the court addresses it here, and says that, "What you filed is not a proper VAT return."[731]

692. The Tribunal finds the following exchange between Professor Gaillard and Mr. Konnov of particular interest.  Professor Gaillard asked Mr. Konnov for his reaction to another reason

---

[728]   Transcript, Day 14 at 259 (referring to Decision of the Moscow Arbitrazh Court, Case Nos. A40-4338/05-107-9 and A40-7780/05-98-90, 28 April 2005, p. 59, Exh. C-196).

[729]   *Ibid.* at 260.

[730]   *Ibid.* at 261.

[731]   *Ibid.* at 259.

which could have been invoked by the Russian authorities/courts to deny the VAT refunds to

Yukos even if it had filed "proper" monthly VAT returns:

> Q. Okay.  Do you see the sentence pursuant to which the court [the Moscow Arbitrazh Court rejecting Yukos's VAT argument in relation to the 2002 tax year] says:
>
>> "The court did not accept the argument of … YUKOS [Oil Company] that tax returns submitted to tax authorities by the said organisations [*i.e.*, the trading entities] shall be deemed as tax returns of … YUKOS [Oil Company] since such returns were signed by persons who had no powers to submit tax returns on behalf of … YUKOS [Oil Company]."
>
> Do you see that?
>
> A. Right.
>
>   . . .
>
> PROFESSOR GAILLARD: So what interests me is this sentence which we read, the court saying that they:
>
>> "... did not accept the argument of … Yukos that tax returns submitted … by the [trading companies] shall be deemed as tax returns of … YUKOS [Oil Company] since such tax returns were signed by persons who had no powers to submit tax returns on behalf of … YUKOS [Oil Company]."
>
> Can you confirm that this is a correct translation of the Russian original?
>
> A. I think it is.  And I think, again, as you have read out, the court responds to "the argument of … Yukos".  So this sentence suggests that Yukos argued that they should be deemed as if they were filed by Yukos.  And probably the question was: how can someone act on behalf of Yukos?  And the court said, "Look, they cannot be accepted as Yukos tax returns, at least because someone who signed them, in the name of Yukos-M here, could not act on behalf of Yukos."
>
> Q. But conversely the papers themselves would say that Ratibor -- or Yukos-M, in this example -- is the exporter.  The documentation they could file would say Yukos-M, Ratibor, Fargoil, whatever, has sold abroad.  So the documents are not going to bear the name of Yukos, are they?
>
> A. Absolutely.
>
> Q. Right.  So Yukos loses one way or the other, because either the documents do not say that they are the exporter, or they are not deemed to be the beneficiaries of the revenues, right?
>
> A. No, Yukos wins one way: it simply refiles.[732]

693. According to Respondent, Claimants' submission that there was no reason to believe that, had

Yukos made proper filings, the tax authorities would have accepted them, is "gratuitously self-

---

[732]   *Ibid.* at 248–250.

serving".[733]   According to Respondent, "Russian law clearly indicates what Yukos should have done, but inexplicably failed to do."[734]

694.   The Tribunal is of the view, having considered the evidence and arguments canvassed above, that the Russian Federation was determined to impose the VAT liability on Yukos, and would have done whatever was necessary to ensure that the VAT liability was imposed on Yukos. The Tribunal observes that this determination of the Russian Federation to do whatever it deemed necessary to impose massive tax liabilities on Yukos is also evidenced by the second trial and conviction of Mikhail Khodorkovsky.   After having been convicted of various tax-related crimes in May 2005,[735] largely stemming from his leadership of Yukos, for which he was sentenced to a term of nine years of imprisonment, Mr. Khodorkovsky was implausibly convicted of money laundering and theft of oil in December 2010.[736]   This second verdict, for which Mr. Khodorkovsky was sentenced to an additional thirteen years and six months in prison, was based on essentially the same circumstances surrounding Yukos that led to the original conviction for tax evasion.   This shows how far the Russian Federation was willing to go to keep Mr. Khodorkovsky imprisoned, and supports the Tribunal's conclusion that it was Respondent's intent to impose VAT liability on Yukos no matter what Yukos did.

695.   The Tribunal also heard submissions from the Parties on the responsibility of the bankruptcy trustee (Mr. Rebgun) for his failure to file VAT forms in the proper format.

696.   On this issue, Respondent contends as follows:

> Finally, while the Russian Federation does not speak for Mr. Rebgun or know the circumstances of his treatment of the VAT issue, it is specious for Claimants to attempt to blame Mr. Rebgun for Yukos' failure to file proper amended VAT returns for 2000-2003 (or any amended VAT return at all for 2004).   Mr. Rebgun took office only in August 2006. Until then, Yukos had been managed by a team that Claimants themselves had appointed.   That team, as noted above, had submitted non-processable amended VAT filings for years 2000-2003 in August 2004, and had done nothing in the ensuing two-year

---

[733]   Rejoinder ¶ 719(iv).

[734]   *Ibid.* (citing Decision of the Moscow Arbitrazh Court, Case No. A40-4338/05-107-9 and A-40-7780/05-98-90, 28 April 2005, p. 59, Exh. C-196 ("The tax return submitted by OAO Yukos Oil Company for value added tax for 2003 cannot be considered, since it does not meet the requirements of tax legislation regarding submission of a VAT tax return for each tax period, which is a month or quarter[.]"); Resolution of the Ninth Arbitrazh Appellate Court, Case No. 09AP-7979/05-AK, 16 August 2005, p. 60, Exh. R-251 ("The court legally and reasonably indicated that the value added tax return of OAO NK YUKOS for 2003 provided by OAO NK YUKOS shall not be accepted as it did not comply with the requirements of the tax legislation connected with filing of VAT returns for each tax period which was a month or a quarter.").

[735]   Judgment of the Meshchansky District Court for the City of Moscow, 16 May 2005, Exh. R-379.

[736]   Verdict of the Khamovnichesky Court of Moscow, Case No. 1-23/10, 27 December 2010, Exh. C-1057.

period to correct those errors.  As for the 2004 tax year, the managers appointed by Claimants failed to submit any amended returns at all.  Accordingly, Claimants and their appointees bear sole responsibility for Yukos' mishandling of the VAT filings. Mr. Rebgun cannot be blamed, if only because by the time he finally took office (a) the 2000-2004 tax assessments had already been issued and become due and payable for all five of the relevant years, (b) the court rulings that had upheld the 2000-2003 tax assessments had become *res judicata*, and (c) in any event, the three-year time limits to file amended VAT returns had already expired for the whole of the 2000, 2001, and 2002 tax years, as well as for more than half of the 2003 tax year.  In any event, as established at paragraphs 388-395 above, it is clear as a matter of public international law that the Russian Federation is not responsible for acts or omissions of bankruptcy receivers such as Mr. Rebgun.[737]

697.  To conclude this subsection, the Tribunal will now quote the following exchange between a member of the Tribunal and Respondent's expert Mr. Konnov, in respect of Yukos' VAT liability.

> JUDGE SCHWEBEL: Is it right, then, to infer from your testimony—particularly what you've just said—that the management of Yukos, or its counsel, in not filing full VAT returns monthly, committed an astounding error worth more than $13 billion?
>
> A.      Right.  It's absolutely clear to me—whether you call it "error" or whether that was intentional action, I don't know—but the defect in the VAT return was so apparent for not only a professional tax advisor and not only for Yukos, which, as we know, had a big tax team and was filing and processing this VAT return on a routine basis, but we also -- I think I referred to documents, correspondence by Golub where she admitted that it should be monthly and they required it monthly.
>
> So I think I have absolutely no doubt that they perfectly understood that the amended returns cannot and will not be accepted.
>
> JUDGE SCHWEBEL: And can you find any rational explanation for such behaviour?

---

[737]      Rejoinder ¶ 719(v) (citing Reply ¶ 252; Second Konnov Report ¶ 95; *Kotov v. Russia*, ECtHR, Appl. No. 54522/00, Judgment (3 April 2012) ¶ 107, Exh. R-3371, noting that:  "It would appear that the liquidator, at the relevant time, enjoyed a considerable amount of operational and institutional independence, as State authorities did not have the power to give instructions to him and therefore could not directly interfere with the liquidation process as such. The State's involvement in the liquidation procedure resulted only from its role in establishing the legislative framework for such procedures, in defining the functions and the powers of the creditors' body and of the liquidator, and in overseeing observance of the rules. It follows that the liquidator did not act as a State agent.  Consequently, the respondent State cannot be held directly responsible for his wrongful acts in the present case.  The fact that a court was entitled to review the lawfulness of the liquidator's actions does not alter this analysis.")

Respondent further notes:  "In particular: (a) the 2000 tax assessment became final and irreversible on 30 December 2005, when the Federal Arbitrazh Court of the Moscow District dismissed Yukos' appeal of the 2000 tax assessment. *See* Resolution of the Federal Arbitrazh Court of the Moscow District, Case No. KA-A40/12571-04, 30 December 2005, Exh. R-1555; (b) the 2001 tax assessment became final and irreversible on 20 February 2006, when the panel of three judges of the Supreme Arbitrazh Court dismissed Yukos' application for supervisory review of the 2001 tax assessments. *See* Ruling of the Supreme Arbitrazh Court, Case No. 7801/05, 20 February 2006, Exh. R-589; (c) the 2002 tax assessment became final and irreversible on 12 October 2005, when the panel of three judges of the Supreme Arbitrazh Court dismissed Yukos' application for supervisory review of the 2002 executive enforcement proceedings. *See* Ruling of the Supreme Arbitrazh Court, Case No. 11868/05, 12 October 2005, Exh. R-593; and (d) the 2003 tax assessment became final and irreversible on 22 February 2006, when the Supreme Arbitrazh Court dismissed Yukos' application for supervisory review of the 2003 tax assessment.  *See* Ruling of the Supreme Arbitrazh Court, Case No. 12304, 22 February 2006, Exh. R-1565." *Ibid*. n.1134.

A.   I have difficulties finding the rational behaviour, and there is nothing in the record. My only guess, and that would only be a guess: that what Yukos was trying to do, it was trying to take a position that in its view will not compromise its position with respect to the profits tax.

In other words, if Yukos—Yukos clearly would not follow my advice, and my advice, as you have seen, will be to refile both.  If they refiled proper VAT return without refiling—sorry, if they refiled proper—if they refiled proper VAT returns without refiling proper profit tax return, I think they were—my guess, my speculation, is they thought that court would look at that and would see that as them taking an inconsistent position for VAT and profits tax purposes.

So therefore my guess, again, is that they filed something—which I would not call even maybe a VAT return, but something that they knew was apparently not acceptable—just to take procedural actions.   But, as came during the cross-examination by Professor Gaillard, I think I mentioned that they file in August and they don't even refer to these returns till the—till late 2005—till 2005.

So that's my only guess: that they tried to put in—to file something with the tax service which could later on be used in argument, but would not compromise, in their view, their position on the profits tax.

JUDGE SCHWEBEL: Could the Trustee in Bankruptcy, who was charged with maximising the resources available for creditors, himself have filed the monthly forms for VAT return?

A.   Yes, he could have refiled, subject to the three-year limitation that I referred to previously.  So you look at the date when he came to power, if I may say, and for the previous three years he could have refiled.

…

THE CHAIRMAN: Should he be criticised for that?

A.   I would say so.  But it's easy now to criticise, when I look back.  So I would say I would—

Yes, I would say I would criticise him [738]

### v.     Extracts from Other Yukos-Related Awards

698.  The *Quasar* tribunal, citing the *RosInvestCo* tribunal's holding, traversed the VAT issue in the following words and concluded without any hesitation that Respondent's position on this issue was indefensible:

### D)     The rejection of the VAT refund

80.   The unattractiveness of the Respondent's position in this connection is readily apparent. The amounts involved were vast – in excess of $13.5 billion.  The export sales in question undoubtedly qualified for VAT refunds.  The trading company sellers had duly applied for them.  But once the tax authorities had invalidated the transactions by which the sellers had come into possession of the goods, they concluded that Yukos was the true original owner and therefore should be deemed to be the true export seller.  If this was so, one would expect that by a parity of reasoning under their basic premise, the tax authorities should have held that the true applicant for the refund was also Yukos – and that Yukos

---

[738]   Transcript, Day 15 at 232–35.

was therefore entitled to the VAT credit in the same way as it was assigned the debit for the profit tax.  To try to have it both ways would surely bespeak unprincipled hostility towards the taxpayer.

81.     Yet that is precisely what the tax officials did – with the subsequent endorsement of the courts.

82.     Unsurprisingly, *RosInvest* viewed this conduct in the harsh light it deserves:

> "The extremely formalistic interpretation of the VAT lax law regarding Yukos and its trading companies to the effect that, though exports were undisputely not subject to VAT, the documentation also undisputedly submitted by the trading companies could not be used in relation to Yukos and thus Yukos was liable far more than US$ 13.5 billion in VAT related taxes is difficult to accept as a justification for a tax liability the size of which was sufficient to lead Yukos into bankruptcy." (¶452)

The present Tribunal entirely endorses this conclusion, and agrees with the Claimants that the ECHR appears, in ¶¶601-602, to have entirely missed the point being made, namely that if the tax authorities were going to attribute to Yukos the transactions carried out in the names of its trading companies, they should also have attributed to Yukos the submission of normal VAT documentation by the trading companies.  Given that the export transactions in question were indisputably zero-rated for VAT purposes, the refusal to do so can only seem confiscatory to a degree which comes close to validating the claims in their entirety on this basis alone.[739]

[emphasis added]

699.     The following extract from the judgment of the ECtHR, which found in favour of the Russian Federation on this issue is of interest:

> 601.     The Court notes that both Section 5 of Law no. 1992-1 of 6 December 1991 "On Value-Added Tax" governing the relevant sphere until 1 January 2001 as well as Article 165 of the Tax Code applicable to the subsequent period provided unequivocally that a zero rate of value-added tax in respect of exported goods and its refund could by no means be applied automatically, and that the company was required to claim the tax exemptions or refunds under its own name under the procedure set out initially in Letter no. B3-8-05/848, 04-03-08 of the State Tax Service of Russia and the Ministry of Finance and subsequently in Article 176 of the Tax Code to substantiate the requests in order to obtain the impugned refunds (see paragraphs 326-336).  In view of the above, the Court finds that the relevant rules made the procedure for VAT refunds sufficiently clear and accessible for the applicant company to able to comply with it.

> 602.     Having examined the case file materials and the parties' submissions, including the company's allegation made at the hearing on 4 March 2010 that it had filed the VAT exemption forms for each of the years 2000 to 2003 on 31 August 2004, the Court finds that the applicant company failed to submit any proof that it had made a properly substantiated filing in accordance with the established procedure, and not simply raised it as one of the arguments in the Tax Assessment proceedings, and that it had then contested any refusal by the tax authorities before the competent domestic courts (see paragraphs 49 and 171, 196, 196 and 216).  The Court concludes that the applicant company did not receive any adverse treatment in this respect.[740]

---

[739]     *Quasar* ¶¶ 80–82, R-3383.

[740]     ECtHR Yukos Judgment ¶¶ 601–602, Exh. R-3328.

700.   In the view of this Tribunal however, far from not receiving "any adverse treatment in this respect" as the ECtHR held, Yukos received some thirteen billion dollars worth of adverse treatment by reason of the imposition on it of VAT liabilities earlier excluded by the undisputed export of the oil in question.

### (c)   Fines

#### i.   Introduction

701.   Claimants contend that neither the "willful offender" nor the "repeat offender" fines should have been assessed, and that "the animating, confiscatory purpose behind the Respondent's actions is palpable."[741]   Claimants also assert that the imposition of fines for the year 2000 was barred by the statute of limitations, and that the authorities' reliance on what Claimants characterize as a new, retroactive, and judicially-created exception to the statute is further demonstration of its expropriatory intent.[742]

702.   Respondent insists that the authorities' conduct was proper, that the Russian courts properly rejected Yukos' arguments against the fines, and that the Tribunal should do the same here in the present arbitration.

703.   The following questions with respect to fines arise from a review of the Parties' written and oral submissions:

- Were the fines levied in relation to the 2000 tax year barred by the statute of limitations?;

- Were the "willful offender" fines properly imposed?;

- Were the "repeat offender" fines properly imposed?;

- Could Yukos have avoided the fines?; and

- Was the quantum of the fines reasonable, in terms of both the rate and the absolute amount?

---

[741]   Claimants' Post-Hearing Brief ¶ 47.

[742]   *Ibid*. ¶ 45.

ii.   **Were Fines Levied in Relation to the 2000 Tax Year Barred by the Statute of Limitations?**

704.   Article 113 of the Russian Tax Code establishes a three-year statute of limitations for all tax offenses.[743]  In respect of the 2000 tax year, Yukos had argued before the Russian courts that it was improper for the authorities to levy any fine because their assessment was not issued until 14 April 2004, *i.e.*, a few months after the posited expiration of the statute of limitations for fines. Yukos' argument was considered by Russia's courts and ultimately rejected on the ground that the statute of limitations had been tolled by Yukos' "interference" with the authorities' following the December 2003 tax audit.

705.   The Tribunal notes that after the 2000 Audit Report was issued, Mr. Pepeliaev, in his first opinion to his client Yukos, on 5 January 2004, concluded that:

> The Russian tax law envisages a legal process to collect fines. However the fine cannot be actually collected in 2004 due to the expiration of the 3-year limitation period.[744]

706.   In a later opinion, Mr. Pepeliaev wrote:

> In accordance with the currently applicable procedure set out in Art. 101 of the Tax Code of the Russian Federation, a decision to hold the company liable pursuant to the Inspection Report of December 29, 2003 may be passed no earlier than in 2004.  Moreover, by virtue of art. 113 of the Tax Code of the Russian Federation no one may be held liable for a tax offence if three years have expired (limitation period) from the date of this tax offence or from the date following the end date of the tax period in which this offence was committed. In breach of this rule of law, the Inspection Report says that YUKOS should be held liable for the activities of 17 companies that took place in 2000.[745]

707.   Respondent, in its Counter-Memorial, objects that Claimants did not raise the statute of limitations argument in their Memorial.  In any event, Respondent submits, the argument is meritless.  Respondent adopts the reasoning of the Russian Courts.[746]  Respondent adds: "[T]he statute of limitations provided a windfall to Yukos, insofar as the tax authorities never disturbed

---

[743]   Russian Tax Code, Article 11(1), Exh. C-1276.  Mr. Konnov opines, in his Second Expert Report, that, under Russian law, the statute of limitations applies to fines only, and does not apply to tax arrears or default interest.  Second Konnov Report, ¶ 109.

[744]   S. Pepeliaev, *Summary of the tax inspection of OAO NK Yukos*, p. 1, 5 January 2004, Exh. C-1128.

[745]   S. Pepeliaev et al., Opinion regarding compliance with legislation of Inspection Report No. 08-1/1 of 20 December 2003 issued by the Tax Ministry of Russia, 15 January 2004, p. 3, Exh. C-1129.

[746]   *See also* Respondent's Skeleton Argument, 1 October 2012 ¶ 13 (hereinafter, "Respondent's Skeleton") ("no taxpayer—in Russia or elsewhere—could legitimately claim to be surprised that it may not invoke a limitations period that has expired only because of its own obstruction of tax audits.").

Yukos' abuses of the low-tax region regime <u>prior to 2000</u>.  Yukos thus obtained a 'free ride' for the frauds it perpetrated in 1999, which involved significant amounts."[747]

708.  In their Reply, Claimants invoked the limitations period.  They argue that it was unlawful for the tax authorities to seek to collect fines in relation to 2000 because "the decision of the Russian tax authorities to hold Yukos liable in respect of alleged tax offenses committed in 2000 was issued on 14 April 2004, several months <u>after</u> the three-year statute of limitations had expired in relation to the year 2000 (*i.e.*, after 31 December 2003)."[748]

709.  Claimants respond to Respondent's reliance on the decisions of the Russian courts in the following words:

> The Respondent's assertion (see Respondent's Counter-Memorial on the Merits, April 4, 2011, footnote 1708) that the Russian courts approved its circumvention of the statute of limitations against Yukos is unavailing given that, as discussed below, the ECtHR has found the Russian courts' decisions to violate the principle of legality embodied in Article 1 of Protocol No. 1 to the European Convention on Human Rights, notwithstanding the extraordinary broad deference it accords to States under that provision.[749]

710.  Claimants assert that the tax authorities were able to circumvent the statute of limitations only because the Constitutional Court "creat[ed] for the first time an exception to the statute of limitations for any taxpayer who 'resisted' tax inspection, so long as an audit report was issued before the end of the limitations period."[750]

711.  Respondent resists Claimants' submission that the Constitutional Court's resolution allowing tolling of the statute of limitations in cases of taxpayer obstruction was "*tailor-made*" for Yukos.[751]  In its Rejoinder, Respondent argues that Claimants' submission is unsupported by any evidence and contradicted by the fact that this exception has been applied to numerous taxpayers, all unrelated to Yukos.[752]  As to the specific Constitutional Court Resolution No. 9 P,

---

[747]   Counter-Memorial ¶ 1081, n.1708.  Claimants reply that the 1999 audit report relating to Investproekt (Exh. R-304) was issued with ten months remaining on the statute of limitations, but that no Decision or Tax Payment Demand was issued (or, at least, none is in the record of this arbitration).  *See* Claimants' Post-Hearing Brief ¶ 63, n.36.

[748]   Reply at ¶ 258 (emphasis in original).

[749]   *Ibid.*, n.453

[750]   *Ibid.* (referring to Resolution of the Russian Constitutional Court No. 9–P, Exh. C-1141).

[751]   *Ibid.*

[752]   Rejoinder ¶ 725.

Respondent says that it was issued in response to two different complaints, only one of which was related to Yukos.[753]

712.  In his Second Expert Report, Mr. Konnov explains that the Constitutional Court ruled, in Resolution No. 9-P, as follows:

      a.    if a taxpayer obstructs tax control and tax audits, the arbitrazh court may rule that the tax authority was justified in acting after expiration of the limitations period; and

      b.    in any event, the limitations period for tax offenses ends at the moment of execution of a tax audit report summarising documented facts of tax offenses identified in the course of the audit.[754]

713.  Mr. Konnov addresses Claimants' argument on this point:

> The Claimants' allegation (Claimants' Reply on the Merits, para. 258) that the Russian Constitutional Court created an "exception to the statute of limitations for any taxpayer who "resisted" tax inspection, so long as an audit report was issued before the end of the limitations period" is misleading (emphasis added).  The Constitutional Court made two separate conclusions not dependent on each other.  The Claimants' contention that the "tax audit report" rule was "tailor-made" for YUKOS is not correct either.  The tax authorities would have nonetheless been deemed within the statute of limitations period under the obstruction of the audit limb of the Resolution.[755]
>
>               [emphasis in original]

714.  Mr. Konnov also adds:

> The ruling of the Constitutional Court issued in July 2005 is described by the Claimants as "tailor-made" to YUKOS and in conflict with the ruling of the Constitutional Court issued in January 2005. I cannot agree.  There is no inconsistency between these two rulings.  Rather, in the July 2005 ruling, the Constitutional Court analyzed, in particular, the impact on the limitations period resulting from obstruction of the audit, an issue which was not addressed in any way in the January 2005 ruling.
>
> The Claimants' reliance on the dissenting opinions in the July 2005 ruling is incomplete.  The Claimants refer only to two dissenting opinions relating to the July 2005 ruling.  However, they fail to mention the third dissenting opinion to the same ruling in which Judge G.A. Gadzhiev has taken an approach which, in my opinion, is even harsher than the approach taken by the Constitutional Court.  In the view of Judge G.A. Gadzhiev, the statute of limitations should be applied differently depending on the amount of the tax arrears at issue.  He believes that the non-differentiated statute of limitation, as it is provided in the tax legislation, contradicts the constitutional principle of equality before the law.[756]

---

[753] *Ibid. ¶* 724, n.1151.

[754] Second Konnov Report ¶ 111.

[755] *Ibid.*, n.177.

[756] *Ibid. ¶¶* 112–13.

715.  Finally, Respondent adds in its Rejoinder on this point:

> It is also worth reiterating that, as noted above, the Russian authorities' long-standing position, including when the Yukos cases were being argued in the Russian courts, has been that the three-year limitation period runs from the end of the taxable period in which <u>payment</u> was due (because this is the period when the tax offense actually occurred), and not from the end of the taxable period in which the relevant income or revenue accrued (and therefore, here, that the statute of limitations expired on December 31, 2004 rather than December 31, 2003).  While this position was rejected by the courts in the Yukos case, it was upheld in other cases, and ultimately endorsed by the Supreme Arbitrazh Court.  As a result, if the Yukos case were before the Russian courts today, it would be undisputable that the fines for tax year 2000 were assessed in a timely manner.[757]

716.  In their Post-Hearing Brief, Claimants assert that "it is factually untrue that alleged obstruction by Yukos caused the tax authorities to miss the statute of limitations: the audit was completed in just 3 weeks and <u>before</u> the limitations period had expired."[758]

717.  In its Post-Hearing Brief, Respondent asserts that "Yukos unquestionably obstructed the field tax audit leading to the 2000 assessment, and it was completely foreseeable that Russian law would not allow Yukos to invoke a limitations period so as to benefit from its own obstruction."[759]

718.  The Tribunal concludes, on the basis of the record, that Respondent has made a credible argument regarding Yukos' obstruction of the field tax audit leading to the 2000 assessment.[760] However, the Tribunal agrees with Claimants, and with the ECtHR, that the retroactive application of Resolution 9–P violated a fundamental principle of legality.[761]  The Tribunal concludes that the fines levied in relation to the 2000 tax year were therefore barred by the statute of limitations.

---

[757]  Rejoinder ¶ 731 (citing Resolution of the Presidium of the Supreme Arbitrazh Court No. 4134/11, 27 September 2011, Exh. R-3298, interpreting a rule on calculation of the statute of limitations in Article 113 that was identical to the one in effect in 2003–2004.  As Mr. Konnov points out "the panel of three judges when transferring the case to the Presidium of the Russian Supreme Arbitrazh Court noted that courts had previously issued inconsistent rulings on this subject."; Second Konnov Report ¶ 121).

[758]  Claimants' Post-Hearing Brief ¶ 45 (emphasis in original).

[759]  Respondent's Post-Hearing Brief ¶ 45 (citations omitted).

[760]  Counter-Memorial ¶ 355; Rejoinder ¶¶ 723–30

[761]  Reply ¶ 258; ECtHR Yukos Judgment, Exh. R-3328.

### iii.   Were the "Willful Offender" Fines Properly Imposed?

719.   Claimants contest the imposition of the "willful offender" fines for the years 2000 through 2003 because "for Yukos' executives to be 'aware of the unlawful nature of such actions', there must have existed an enforceable decision of the tax authorities to that effect."[762]   Such a decision, Claimants note, did not come until 14 April 2004, and thus only *after* Yukos filed its tax returns for the years 2000, 2001, 2002 and 2003.[763]   Consequently, for the years 2000 through 2003, Yukos' executives could not have been "aware" of the alleged "unlawful nature of the[ir] actions."[764]

720.   In respect of the 2004 tax year, Claimants have a different argument:

> As regards the 2004 tax reassessment, the regional and local tax benefits that these companies had enjoyed were significantly reduced by the federal legislator as from January 1, 2004.  With the change in legislation, the alleged tax offenses for which Yukos was held liable with respect to the year 2004 could therefore not have been considered similar to those which had allegedly been committed by Yukos in 2000-2003 under the former legislation. In this context, the reference made by the Moscow Arbitrazh Court in 2006 to the 2000, 2001, 2002 and 2003 Decisions in order to justify the 40% fines for the year 2004 appear to be nothing less than a manifest misapplication of the law to Yukos.[765]

721.   In response, Respondent asserts, in its Counter-Memorial, that "'willfulness' does not require criminal *mens rea*: it is sufficient that the taxpayer's underassessment indicate a degree of awareness of the potential unlawfulness of its conduct."[766]   Nor does Respondent accept Claimants' argument that, in order for a violation to be deemed "willful", the taxpayer must already have been found liable. Respondent counters that:

> Even if Yukos, *quod non*, had been transparent and subjectively in good faith with respect to its "tax optimization" scheme, the very complexity of its scheme made it unavoidable that it would, at a minimum, be deemed "willful": one does not create a network of trading companies carelessly or as a result of honest mistake.  In any event, . . . Yukos' managers knew perfectly well that their scheme was illegal when they first implemented it -- an aggravated form of "willfulness."[767]

---

[762]   Memorial ¶ 330.

[763]   *Ibid.*

[764]   *Ibid.*

[765]   *Ibid.* ¶ 331 (citing  Decision of the Moscow Arbitrazh Court of 2 October 2006, 4 October 2006, confirming lawfulness of fines imposed on Yukos with respect to its tax reassessment for the year 2004, p. 31, Exh. C-201). Claimants note that "[a]s from 1 January 2004, the benefits on corporate profit tax that the regions were authorized to grant to taxpayers out of the regional and local shares of this tax were limited to four percent."

[766]   Counter-Memorial ¶ 1082.  *See* Konnov Report ¶ 72.

[767]   Counter-Memorial ¶ 1082.

722. Mr. Konnov supported Respondent's position with the following observations in his First
Report:

> At the time, YUKOS was one of the major Russian companies with substantial tax, legal
> and accounting departments.  It knew that: (i) its tax minimization practices in ZATO
> Lesnoy had been investigated and challenged since late 1999; and (ii) its Sibirskaya
> Domestic Trading Company had been challenged by the tax authorities in 2001 and had
> lost its tax case in 2002.  It also must have known that Russian authorities have been
> regularly challenging transactions involving other taxpayers aimed at tax evasion,
> including by means of abuses of companies registered in low-tax jurisdictions, and that
> Russian highest courts had introduced anti-abuse doctrines, including "bad faith."
> Accordingly, in my view, YUKOS was a clear target for assessment of a "wilful offender
> fine," which would have been justified even under far less extreme circumstances.[768]

723. In their Reply, Claimants argue that Respondent is wrong in its contention that the Tax Ministry
was merely required to show a "degree of awareness of the potential unlawfulness of Yukos'
conduct."[769]   Claimants contend that Respondent's theory is "refuted by the plain text of the
provision itself as well as the Respondent's own expert, who accepts that the statute requires
the Authorities to prove that the offender 'was aware of the unlawful nature of his action
(or inaction)'."[770]   Claimants contend that Respondent's position requires it to "attempt to
rewrite the statute."[771]

724. Claimants take particular issue with the imposition of fines in respect of the VAT refunds:

> [A]s a general point, the imposition of fines in circumstances where no violation of
> statutory law has been alleged is a matter of dubious legitimacy.  Particularly improper was
> the imposition of fines in relation to the revocation of VAT refunds.  In circumstances
> where it was not alleged that any tax was owed, much less unpaid or underpaid, there was
> no statutory basis for such fines.[772]

725. Claimants elaborate this argument in their Post-Hearing Brief:

> Particularly egregious is the imposition of such inflated fines in relation to VAT, where it
> is not even alleged that there was any intent to evade VAT nor any actual evasion of VAT.
> In any case, as set out above, Yukos was not, and could not possibly be "aware of the
> unlawful nature of its actions".[773]

---

[768]   First Konnov Report ¶ 76 (citations omitted).

[769]   Reply ¶ 260

[770]   *Ibid*. (citing First Konnov Report ¶ 72).

[771]   Reply ¶ 260.

[772]   *Ibid*. ¶ 257 (citations omitted).

[773]   Claimants' Post-Hearing Brief ¶ 46 (citations omitted).

726. In its Rejoinder, Respondent reiterates its argument that the relevant inquiry for purposes of the "willful offender" fine is whether Yukos' management was aware of the illegality of its tax scheme.[774]   Respondent states that Yukos did not implement the tax optimization scheme by accident, and that it knew that the scheme was unlawful.   In support of its submission, Respondent raised several arguments:

- Yukos masked its affiliation with the trading shells and falsely denied to the Russian authorities and courts that it had any knowledge of their documents or officers

- Yukos knew from its experience with its sham Lesnoy trading shells that its scheme was unlawful

- Yukos's senior management was warned at least twice that the authorities would have challenged Yukos' "tax optimization" scheme if they had known the names and details of Yukos' trading shells and their affiliation with Yukos

- No legal counsel ever provided Yukos with an opinion that its "tax optimization" scheme was lawful

- Yukos lied about its affiliation with its sham trading companies to the Russian tax authorities and courts, the ECtHR, and PwC

- Yukos had access to the case law and commentaries published by its own tax counsel, which confirmed its scheme was unlawful.[775]

727. Finally, Respondent argues:

> The Tribunal should reject Claimants' contention that the willful offender fines were improper because Yukos' tax practices were purportedly based on the trading shells' investment agreements with local tax authorities, which as Mr. Konnov opined - without contradiction - were not sufficient to establish compliance with federal anti-abuse doctrines.[776]

728. The Tribunal is of the view that the willful offender fines were clearly improper insofar as they related to VAT.  This follows necessarily from the Tribunal's findings that there was no valid basis to impose the VAT liability on Yukos.

729. On the totality of the evidence, the Tribunal is also of the view that the willful offender fines as they related to the revenue-based taxes were improperly assessed against Yukos.  The Tribunal recalls its findings, above, that those taxes, considering all of the evidence, were not properly assessed against Yukos.

---

[774]   Rejoinder ¶ 734.

[775]   Respondent's Opening Slides, p. 130.

[776]   Respondent's Post-Hearing Brief ¶ 44 (citations omitted).

730.   Moreover, while he did not appear at the Hearing, the contemporaneous quote from
       Mr. Kasyanov to journalists in January 2004 shows just how unlikely it was that Yukos could
       have been certain that its tax optimization plan was illegal:

> [Question:] The Tax Ministry claimed from Yukos to pay an additional 98 billion rubles,
> which the company allegedly saved on taxes in 2000 with the help of the schemes, which
> was also used by other companies. Until autumn 2003, neither the Ministry of Finance nor
> the Tax Ministry, though criticizing the schemes, had challenged their legality.  How do
> you react to the fact that the tax optimization is retroactively declared unlawful?
>
> [Answer:] If lawful actions for tax optimization are declared unlawful retroactively, then I
> react to that negatively.  For the simple reason that there were loopholes in the law
> allowing the optimization of payments.  The Tax Code did not forbid Yukos and other
> companies to conduct transactions through domestic offshore zones.[777]

                                                                        [emphasis added]

731.   The opinion of Mr. Kasyanov, the Prime Minister at the time the assessment was made, is
       persuasive.  It confirms the conclusion of the Tribunal that, even if the legality of Yukos' tax
       optimization scheme was, in certain regions and respects, questionable and vulnerable to attack
       by the tax authorities, it could not be characterized as a "willful offense".

732.   The Tribunal also recalls Claimants' position as to the governing statutory provision in the
       Russian Tax Code:

> Whereas the Tax Code clearly provides that fines may be increased for willfulness only "if
> the person who committed it was aware of the unlawful nature of his actions (inaction) and
> intended or consciously allowed the harmful consequences of such actions (inaction)" the
> Respondent claimed that such fines could be imposed if the taxpayer had "a degree of
> awareness of the potential unlawfulness of its conduct".  The Respondent's position is
> obviously not the law.[778]

                                                                        [emphasis in original]

733.   The Tribunal agrees.  Respondent's interpretation of the standard is inconsistent with the
       Russian Tax Code.  The strict language of the Russian Tax Code makes it difficult for the
       Tribunal to conclude that Yukos should have been assessed the willful offender fines, even if
       there were a basis to conclude (as the Tribunal has held earlier) that some of the revenue-based
       taxes could legitimately have been imposed against Yukos.

---

[777]   Memorial ¶ 330 (quoting Alexander Bekker, Vladimir Fedorin, *Interview:  Mikhail Kasyanov, Prime Minister of the
        Russian Federation*, Vedomosti, 12 January 2004, p. 5, Exh. C-677).

[778]   Claimants' Post Hearing Brief ¶ 46 (citations omitted).

### iv. Were the "Repeat Offender" Fines Properly Imposed?

734. Claimants contend that the 100 percent increase of the fines imposed on the basis of the "Repeat Offender" provision of the Russian Tax Code was even less justified than the imposition of the "Willful Offender" fine:

> [T]he plain wording of Article 112(2) of the Russian Tax Code directs that such increase be only permitted in cases in which a taxpayer has been held liable for a similar tax offense *prior* to the commission of the disputed offense.  The Presidium of Highest Arbitrazh Court of the Russian Federation has been unequivocal in considering that the previous similar offense must not only be committed, but also be *detected and sanctioned*.  No such sanction came before April 14, 2004.  As a result, in declaring that the tax offenses allegedly committed by Yukos in 2001, 2002 and 2003 were repeat offenses triggering a further 100% increase, both the Russian tax authorities and the Russian courts grossly misapplied Article 112(2).  As regards the 2004 fines, their 100% increase was all the more egregious that the tax offenses purportedly committed by Yukos in 2004 were not similar to those allegedly committed in 2000-2003.[779]

735. Claimants also rely on the Resolution of the Presidium of the Highest Arbitrazh Court of the Russian Federation No. 15557/07 of 1 April 2008 (Annex (Merits) C 415) for the proposition that, in order for a taxpayer to be considered a "Repeat Offender", the taxpayer's previous similar offence must have been "detected and sanctioned" before the commission of the repeat offence.  Respondent takes issue with Claimants' reliance on this decision adopted in 2008, "years after Yukos' appeals against the assessments at issue had run their course."[780] Respondent contends that the jurisprudence prior to 2008, at the time that the authorities imposed the "Repeat Offender" fines, supported the authorities' approach:

> Prior to the issuance of the 2008 Resolution, there had been a number of cases, unrelated to Yukos, in which the courts had upheld the assessment of repeat offender fines in the same manner as was done in the Yukos cases.  Thus, when the tax authorities levied repeat offender fines against Yukos -- an egregious repeat offender if there ever was one -- they were not deviating from established practice but rather, applying one of the interpretations of the relevant statute that was in current use at the time.  As much was effectively conceded by Yukos' own lawyer who, while urging that Yukos not be assessed a repeat offender fine, noted the "unclarity" of the law.[781]

---

[779] Memorial ¶ 332 (citing Resolution of the Presidium of the Highest Arbitrazh Court of the Russian Federation No. 15557/07, 1 April 2008, Exh. C-415).

[780] Counter-Memorial ¶ 1084.

[781] *Ibid*. (citing First Konnov Report ¶¶ 77–82; Article 112(2) of the Russian Tax Code, Exh. R-2248).  Respondent also points to the following in support of its position:  First Konnov Report ¶¶ 79–80; Resolution of the Federal Arbitrazh Court of the Far-Eastern District, Case No. F-03-A73/05-2/244, 14 March 2005, Exh. R-1506; Resolution of the Federal Arbitrazh Court of the Povolzhsky District, Case No. A65-7415/04-CA1-32, 5 October 2004, Exh. R-1504); Resolution of the Federal Arbitrazh Court of the North-Western District, Case No. A44-498/ 2006-8, 21 August 2006, Exh. R-3282; Resolution of the Federal Arbitrazh Court of West-Siberian District, Case No. F04-5193/2007 (36847-A75-43), 3 August 2007, Exh. R-3377; Resolution of the Federal Arbitrazh Court of the West-Siberian District, Case No. F04-1778/2008 (2088-A27-25), 12 March 2008, Exh. R-1505.

736. Claimants contend, in their Reply, that Respondent's argument should be rejected.  According to Claimants, Respondent does not contest the existence and significance of the 2008 decision, but merely contends that because this decision came in 2008, it should not be considered by the Tribunal.  Claimants conclude:

> In other words, while the Respondent concedes that the repeat offender fines were unlawful under the correct interpretation of the provision, it seeks to justify the fines on the basis of an alleged uncertainty about the correctness of that interpretation.[782]

737. In their Post-Hearing Brief, Claimants also criticize Respondent's reliance on the pre-2008 jurisprudence:

> The Respondent and its expert concede that the imposition of repeat offender fines against Yukos was contrary to the interpretation of the Highest Arbitrazh Court issued in 2008. The Respondent's only defense is to argue that some other courts had previously applied the statute in the same (incorrect) way.  Thus, notwithstanding the requirement in Article 3(7) of the Tax Code to resolve doubts in favor of the taxpayer, the Respondent insists it was appropriate for the tax authorities to apply an interpretation that was both incorrect and nearly US$ 4 billion less favorable to the taxpayer.  The animating, confiscatory purpose behind the Respondent's actions is palpable.[783]

738. Mr. Konnov was cross-examined at length about the 2008 Arbitrazh Court decision.[784]  Throughout, he maintained his support for the authorities' treatment of Yukos, prior to the 2008 decision.  He did not concede that it was incorrect, but merely that it was a function of the uncertainty inherent in the provision.

739. Mr. Konnov had indeed referred to the "uncertainty" or ambiguity surrounding Article 112(2) of the Russian Tax Code in his First Expert Report:

> 77.    The Claimants argue that the imposition of repeat offender fines on YUKOS was unjustified and ignored the plain language of the governing law and the Supreme Arbitrazh Court guidance. I cannot agree with the suggestion by the Claimants that the language of Article 112(2) of the Tax Code was "plain" and that there is only one possible interpretation of that provision. The relevant provision of the Tax Code reads as follows:
>
> > "Aggravating circumstance means commitment of a tax offence by a person previously held liable for an analogous violation".
>
> 78.    YUKOS itself admitted during the court hearings related to the 2000 tax year there was more than one possible reading of Article 112(2) of the Tax Code.  The minutes of the court hearing read as follows:

---

[782] Reply ¶ 261.

[783] Claimant's Post-Hearing Brief ¶ 47 (citing Transcript, Day 15 at 20–23 (Mr. Konnov); Transcript, Day 18 at 101 (Respondent's closing)).

[784] *See* Transcript, Day 15 at 5–23.

> [A representative of YUKOS] "... believes that there is unclarity in interpretation of Article 112 of the Russian Tax Code."[785]

740. Claimants assert that Respondent's position is untenable, given that "Article 3(7) of the Tax Code requires doubts as to the proper interpretation of its provisions to be resolved in favor of the taxpayer."[786]

741. In relation to Article 3(7) of the Russian Tax Code, Respondent makes the following final argument in its Post-Hearing Brief:

> Claimants' contention that purported ambiguities in the statute governing repeat offender fines had to be resolved in Yukos' favor is baseless (Claim. Reb., Day 20 Tr. 196:18:23; Konn. Test., Day 15 Tr. 33:14-33:25, 34:25-35:8). As Mr. Konnov explained without contradiction (Konn. Test., Day 15 Tr. 34:1-34:24), and as is confirmed in a 2004 article written by Mr. Zaripov (Exh. R-3223), only those doubts that courts cannot resolve must be decided in favor of the taxpayer. Here, however, the relevant Tax Code provision was interpreted consistently with prior caselaw, confirming that it did not give rise to any irresolvable doubts. Konn. Rep. 1, ¶ 79; Konn. Rep. 2, ¶ 102.[787]

742. Respondent has another defense for the "repeat offender" fines, namely that Yukos would have been deemed a repeat tax offender even under the approach adopted by the 2008 Resolution, because it had been subjected to fines for underpayment of taxes well before any of the assessments was issued. Respondent refers in this connection to paragraphs 81 and 82 of the First Konnov Report, which reads as follows:

> 81. Furthermore, there could have been additional grounds for imposition of repeat offender fines on YUKOS. Based on my experience, any Russian company of a size comparable to that of YUKOS at the end of 1990s and the beginning of this decade was regularly subject to tax audits. Almost all of these audits resulted in discovery of tax violations and imposition of fines, even though in some instances the amounts were relatively insignificant. The Nefteyugansk Tax Inspectorate imposed fines on YUKOS pursuant to Decision No. 289 dated June 9, 2003. Even before that, the tax authorities conducted a tax audit of YUKOS. The Report of the Nefteyugansk Tax Inspectorate No. 66, dated April 28, 2003, notes that on April 16, 2001 the Inter-Regional Inspectorate of the Tax Ministry for Operational Oversight of Problem Taxpayers issued a report No. 34-03-10/6. Although I have not been able to review that act, it would not be unreasonable to assume that fines were imposed on YUKOS based on that act. Moreover, the US GAAP financials produced by YUKOS suggest that in each of 1998, 1999, 2000, 2001, 2002 and 2003, YUKOS was subject to substantial fines and interest for tax violations.

> 82. In accordance with the prevailing court practice, a repeat offender fine may be levied so long as the prior fine involved the same provision of the Tax Code with respect to

---

[785] First Konnov Report ¶¶ 77–78.

[786] Reply ¶ 261 (citing Russian Tax Code, Article 3(7), Exh. C-1276; Reply ¶ 231 and n.250).

[787] Respondent's Post-Hearing Brief ¶ 46, n.140. For the exchange between Dr. Poncet and Mr. Konnov on the principle "*in dubio contra fiscum*," *see* Transcript, Day 15 at 37–42.

the same taxes, even if the nature and the amount of the violations were different. Accordingly, even minor violations with respect to the same taxes imposed in connection with different arrangements would have sufficed to justify the repeat offender fines even under the approach taken by the 2008 Resolution.[788]

743. Claimants counter Respondent's alternative argument as follows:

> The Respondent's alternative theory, according to which any previous violation on profit tax, on whatever basis and in whatever amount, would be sufficient to justify these US$ 3.92 billion in repeat offender fines is far-fetched to say the least, relying on Mr. Konnov's dubious assertion as to the content of "prevailing court practice", his speculation that Yukos may have had a previous violation at some point in time and his assumption that that hypothetical violation involved the same provision of the Tax Code with respect to the same taxes.  In any event, since by the Respondent's own admission its tax claims were not premised on alleged violations of any provision of the Tax Code, Mr. Konnov's theory has no conceivable application in relation to Yukos.[789]

744. On the issue of the "repeat offender" fines, the Tribunal is persuaded by Claimants' argument that these fines should not have been imposed.

### v.   Could Yukos Have Avoided the Fines?

745. In its Counter-Memorial, Respondent draws the attention of the Tribunal to Article 81(4) of the Russian Tax Code which allows taxpayers to avoid <u>all</u> penalties for past misdeeds provided only that they file amended tax returns before being formally notified of the onset of the audit relating to the relevant tax years.  If the taxpayer takes advantage of Article 81(4) in a timely fashion, it needs to pay only the tax previously evaded (and interest), but no fine.  This provision, combined with the Russian practice (followed in the Yukos case) of auditing "open" tax years (*i.e.,* tax years not time-barred by the statute of limitations) one after the other, rather than simultaneously, gives tax offenders an opportunity to eliminate their exposure to fines by filing last-minute amended returns.[790]

746. On the basis of this provision, Respondent contends that Yukos could have easily avoided the fines associated with the assessments for tax years 2001, 2002 and 2003, if only it had taken advantage of Article 81(4) of the Russian Tax Code:

> In Yukos' case, the authorities had made clear their complete condemnation of Yukos' scheme when they delivered their audit report for 2000 to Yukos, *i.e.*, on December 29, 2003.  They did not, however, announce commencement of their audit of the next year

---

[788]   First Konnov Report ¶¶ 81–82 (citations omitted).

[789]   Reply ¶ 262 (citing Counter-Memorial ¶¶ 993, 1085).

[790]   Counter-Memorial ¶ 1087 (citing First Konnov Report ¶¶ 83–85).

(2001) until March 23, 2004, *i.e.*, 84 days later.  As a result, Yukos had a window of opportunity of nearly three months duration in which it could have legally avoided any penalty whatsoever for tax year 2001 (including a willful offender fine and a repeat offender fine), simply by filing amended returns and paying the respective taxes and interest.  The authorities' audit for 2002 and 2003 did not start until August 9, 2004  and October 28, 2004, respectively, and Yukos could likewise have avoided all penalties simply by filing amended returns for 2002 and 2003 before those dates and paying the overdue taxes and interest.  Instead, Yukos' managers recklessly squandered this opportunity.[791]

747. As an additional point for the tax year 2003, Respondent asserts that Yukos had only itself to blame "for filing a fraudulent annual return for that year, which ended on or around 28 March 2004, the filing deadline."[792]  It is Respondent's position that instead of continuing to pretend that its scheme was lawful, some three months after the December 2003 audit, Yukos could have filed an amended return.[793]

748. Similarly, Respondent submits that Yukos could have filed a "lawful tax return" for the 2004 tax year.  On the basis of this reasoning, Respondent sums up its position as follows:

> Had Yukos filed lawful tax returns beginning as of January 1, 2004 (*i.e.*, after its receipt of the December 29, 2003 tax audit report) and exercised in timely fashion its right to file amended returns for years 2001 and 2002, and paid the respective taxes and default interest, it would have reduced its overall tax liabilities in an amount that would have ensured that Yukos would have not faced bankruptcy proceedings, and that would in all likelihood also have avoided the need for the YNG auction.[794]

749. Claimants reject Respondent's suggestion that Yukos should have pre-emptively conceded the validity of the December 2003 tax audit for the 2000 tax year and filed amended tax returns for subsequent years prior to being notified of the audits for those years.  Claimants assert that Respondent's position "confirms the Russian authorities' complete disregard for due process and fundamental rights of taxpayers."[795]  According to Claimants, Yukos had every right to avail itself of its rights under Russian law to challenge these unlawful tax reassessments and fines in court, or even await the results of the tax authorities' own review of Yukos' objections and declaration of their final position in the decision to hold Yukos liable with respect to the

---

[791] Counter-Memorial ¶ 1088 (citing Field Tax Audit Report No. 30-3-14/1, 30 June 2004, p. 3, Exh. R-345; Field Tax Audit Report No. 52/852, 29 October 2004, p. 3 Exh. R-346; Field Tax Audit Report No. 52/907, 19 November 2004, p. 2, Exh. R-260; Counter-Memorial ¶¶ 353–65).

[792] Counter-Memorial ¶ 1089.

[793] *Ibid*.

[794] *Ibid*. ¶ 1090.

[795] Reply ¶ 264.

year 2000.[796]  Claimants note that Respondent decided to carry out additional control measures and to review the 29 December 2003 audit report in light of Yukos' objections but communicated no information about this review prior to issuing its Decision to hold Yukos liable on 14 April 2004 when it dismissed Yukos' objections.[797]

750.   The Tribunal does not accept that, if Yukos had acted as Respondent maintains, it would have been able to escape the imposition of fines.  As with the issue of VAT liability, the Tribunal is convinced that had Yukos done so, the Russian Federation would still have found a way or a reason to impose the fines on Yukos.

###### vi.      Was the Quantum of the Fines Reasonable, in Terms of Both the Rate and the Absolute Amount?

751.   In its Counter-Memorial, Respondent compares the regime for fines in the Russian Federation with those that exist in other countries.  Respondent notes that fines for taxpayers that have underpaid their taxes, whether or not associated with tax evasion, can lead to fines at rates ranging up to 300 percent of the evaded tax (this highest rate applies, according to Respondent, in Austria, the Netherlands, and Switzerland).  On this basis, Respondent concludes: "It is clear from the foregoing that the fines levied on Yukos were not excessive by international standards."[798]

752.   The Tribunal notes that Claimants did not address this last submission of Respondent.  In any event, given the Tribunal's conclusions regarding the legitimacy of the willful and repeat offender fines imposed by the tax authorities on Yukos, it is unnecessary for the Tribunal to deal with this contention.

###### vii.      Extracts from Other Yukos-Related Awards

753.   In respect of the limitations period as it applied to the 2000 tax year, the ECtHR found, "notwithstanding the State's margin of appreciation", against the Russian Federation:

> 571.    Turning to the facts of the case, the Court would note firstly that the rule which, in the present case, underwent changes as a result of the decision of 14 July 2005, was contained in Article 113 of Chapter 15 "General provisions concerning the liability for tax

---

[796]   *Ibid.*

[797]   *Ibid.*, n.475.

[798]   Counter-Memorial ¶ 1224.

offences" of the Tax Code (see paragraph 403) and thus formed a part of the domestic substantive law.  Even though the rule in itself did not describe the substantive elements of the offence and the applicable penalty, it nevertheless constituted a *sine qua non* condition with which the authorities had to comply in order to be able to prosecute the relevant taxpayers in connection with the alleged tax offences.  Accordingly, Article 113 of the Tax Code defined a crime for the purposes of the Court's analysis of lawfulness.  It remains to be determined whether in the circumstances the decision of 14 July 2005 could be seen as a gradual clarification of the rules on criminal liability which "[was] consistent with the essence of the offence and could reasonably be foreseen" (see *Kafkaris*, cited above, § 141).

572.   In this connection the Court may accept that the change in question did not change the substance of the offence.  The Constitutional Court interpreted the existing rules on time-limits in relation to taxpayers who acted abusively.  At the same time, the Court is not persuaded that the change in question could have been reasonably foreseen.

573.   It observes that the decision of 14 July 2005 had changed the rules applicable at the relevant time by creating an exception from a rule which had had no previous exceptions (see paragraphs 86 and 88).  The decision represented a reversal and departure from the well-established practice directions of the Supreme Commercial Court (see, by contrast, *Achour*, cited above, § 52) and the Court finds no indication in the cases submitted by the parties suggesting a divergent practice or any previous difficulty in connection with the application of Article 113 of the Tax Code at the domestic level (see paragraphs 407-408).  Although the previous jurisprudence of the Constitutional Court contained some general references to unfavourable legal consequences which taxpayers acting in bad faith could face in certain situations, these indications, as such, were insufficient to provide a clear guidance to the applicant company in the circumstances of the present case.

574.   Overall, notwithstanding the State's margin of appreciation in this sphere, the Court finds that there has been a violation of Article 1 of Protocol No. 1 on account of the change in interpretation of the rules on the statutory time-bar resulting from the Constitutional Court's decision of 14 July 2005 and the effect of this decision on the outcome of the Tax Assessment 2000 proceedings.

575.   Since the applicant company's conviction under Article 122 of the Tax Code in the 2000 Tax Assessment proceedings laid the basis for finding the applicant company liable for a repeated offence with a 100% increase in the amount of the penalties due in the 2001 Tax Assessment proceedings, the Court also finds that the 2001 Tax Assessment in the part ordering the applicant company to pay the double fines was not in accordance with the law, as required by Article 1 of Protocol No. 1.[799]

754.   On the issue of the "repeat offender" fines, the *RosInvestCo* tribunal held as follows against the Russian Federation:

> From the evidence on file, the Tribunal concludes that the interpretation of Articles 122 and 114 of the Tax Code used on Yukos was not used before or thereafter in any comparable cases.  Again, this resulted in an extremely large liability in the range of US$ 3.8 billion.[800]
>
> . . .
>
> **Repeat offender fines:** The US$ 3.8 billion repeat offender fines on the basis of conduct pre-dating the tax audit again appears to the Tribunal as a departure from practice applied

---

[799]   ECtHR Yukos Judgment, ¶¶ 571–75, Exh. R-3328.

[800]   *RosInvestCo* ¶ 454, Exh. C-1049.

earlier and from that granted to other companies and thus to be one part of a cumulative effort to prevent Yukos' ongoing existence.[801]

### (d)   Concluding Observations

755.   The Tribunal recalls that, at the outset of this chapter, it referred to the question put by Counsel for the claimant to the arbitral tribunal in the *Quasar* arbitration.  "Why would Russia have treated Yukos as it did if its purpose was to collect taxes?"[802]

756.   After having now traversed, at some length, the treatment of Yukos by Russian tax authorities, the bailiffs and the courts, and having considered the totality of the evidence, especially the VAT evidence, the Tribunal has concluded that the primary objective of the Russian Federation was not to collect taxes but rather to bankrupt Yukos and appropriate its valuable assets.

757.   The principal reasons, discussed in this chapter, which lead the Tribunal to this conclusion include:

> i)   the attribution to Yukos of the revenues earned by its trading companies, even though there was no precedent in Russia for such attribution based on the theory of "actual owner", and the refusal at the same time to give Yukos any of the benefits of the VAT filings made by the trading companies, with the result that Yukos was assessed USD 13.5 billion or 56 percent of the total tax claims levied against Yukos;

> ii)   the imposition on Yukos of the "willful offender" fines, at the very least as they related to VAT;

> iii)   the refusal of the tax authorities to give Yukos the benefit of Article 3(7) of the Russian Tax Code to resolve doubts as to the interpretation of Article 112(2) of the Russian Tax Code in favor of the taxpayer, with the resulting imposition of nearly USD 4 billion in "repeat offender" fines; and

> iv)   the imposition of "repeat offender" fines on Yukos when the conduct that was punished occurred prior to the determination by the courts that the conduct was wrongful; for example, the "repeat offender" fine assessed against Yukos for the

---

[801]   *Ibid*. ¶ 620(c).

[802]   *See* above at paragraphs 504 and 579.

2001 tax year is based on the finding by the courts in 2004 that the conduct in 2000 was wrongful.

758.   In reaching its conclusion, the Tribunal has also taken into account the fact that, in February 2007, before Messrs. Khodorkovsky and Lebedev had served half of their prison terms, the Prosecutor General's Office levelled new charges against them, this time for theft of oil and funds from Yukos, embezzlement and money laundering.

759.   As will be seen in subsequent chapters of this Part VIII of the Award which now follow, the Tribunal is sustained in this central and all important conclusion by its analysis of other disturbing facets of the Yukos saga, including:

   i)     the campaign of harassment carried out by the Russian authorities under the cloak of "investigative activities" including arrests, interrogations, searches and seizures against Yukos senior executives, mid-level employees, in-house counsel, external lawyers and related entities;[803]

   ii)    Yukos' repeated, reasonable attempts to settle its tax debts with the Russian Federation, all of which proved futile;[804]

   iii)   the seizure of YNG, Yukos' main production subsidiary, and its auction in questionable circumstances for an inadequate price;[805]

   iv)    the way in which Yukos' bankruptcy proceedings were initiated and conducted;[806] and

   v)     the pressure brought to bear by the Russian authorities on PwC, which ultimately conduced to the withdrawal of PwC's audits of Yukos' financial statements.[807]

760.   The Tribunal will determine later in this Award how these conclusions impact the liability of Respondent under the ECT.

---

[803]   *See* Chapter VIII.C.

[804]   *See* Chapter VIII.E.

[805]   *See* Chapter VIII.F.

[806]   *See* Chapter VIII.G.

[807]   *See* Chapter VIII.H.

C.   HARASSMENT, INTIMIDATION AND ARRESTS

1.   **Introduction**

761.   Claimants allege that Respondent carried out a campaign of harassment and intimidation of Yukos, its management, employees, external advisers and associates with a view to destroying the company and removing Mr. Khodorkovsky as a political threat:

> In what has been described as "a literal orgy of lawlessness", the Russian Federation instigated and conducted a campaign of terror aimed at depriving Yukos of its ability to run its business, and thus facilitating the destruction of the company.  This was achieved through an escalating process of arrests, intimidation, harassment, searches and seizures. The breadth of the campaign, which targeted not only Yukos and its management but also entities and individuals associated with the company, and the flagrant violations of due process that characterized the actions of the Russian Federation, underscore both the ruthlessness with which the Russian Federation sought the destruction of Yukos and the coordinated nature of the attack.
>
> The undeniable effect of the actions described below was to undermine the viability of Yukos, placing the Russian Federation in a position to carry out the dismantling of the Company.[808]

762.   Claimants allege that Respondent's harassment campaign has "continued throughout the time period at issue in these arbitrations and continues even today," most notably with a second round of charges in 2007 against Messrs. Khodorkovsky and Lebedev leading to a trial described as a "travesty of justice" that resulted in a sentence of a further thirteen and a half years in prison.[809]

763.   Respondent for the most part does not question the facts underlying Claimants' allegations, though it does question the credibility of some of Claimants' witness accounts.  Rather, the events described by Claimants as constituting a campaign of "harassment and intimidation" are, according to Respondent, better characterized as legitimate acts of law enforcement undertaken in full compliance with Russian law and Russian practices as well as standards of other countries.[810]

764.   In any event, Respondent considers the events complained of to be largely irrelevant to the Tribunal's enquiry in these arbitrations.  That is because Article 26 of the ECT limits the Tribunal's jurisdiction to disputes alleging the breach of an obligation under Part III of the ECT, of which Articles 10(1) and 13 are directed only to investments, and afford no personal

---

[808]   Memorial ¶¶ 106–7.  *See also* Memorial ¶¶ 65, 83–197; Reply ¶¶ 17–94; Claimants' Post-Hearing Brief ¶¶ 156–65.

[809]   Reply ¶¶ 17, 41.

[810]   *See* Counter-Memorial ¶ 673; Transcript, Day 18 at 113–21 (Respondent's closing).

protection for nationals.  Respondent observes that "the alleged violations of the human rights of Messrs. Khodorkovsky, Lebedev and others . . . are outside the scope of this Tribunal's jurisdiction, unless Claimants can establish that any such violations directly impaired the management or operation of their investments."[811]  Respondent argues Claimants have failed to do so,[812] and that the prosecutions of Messrs. Khodorkovsky and Lebedev did not destroy Yukos.  To the contrary, Yukos exceeded its 2003 performance in 2004.[813]

765.  The Tribunal recognizes that it is not a human rights court.  Nevertheless, it is within the scope of the Tribunal's jurisdiction to consider the allegations of harassment and intimidation as they form part of the factual matrix of Claimants' complaints that the Russian Federation violated its obligations under Part III of the ECT.  The Tribunal's task includes determining whether the Russian Federation "in any way impair[ed] by unreasonable or discriminatory measures [Claimants'] management, maintenance, use, enjoyment or disposal" of its investment, or subjected Claimants' investment to measures having the effect equivalent to an expropriation. In the context of that inquiry, the Tribunal will set out the evidentiary record with respect to the alleged "campaign of harassment and intimidation."

## 2.  Chronology of Facts

### (a)  Yukos Grows; Mr. Khodorkovsky Becomes More Politically Engaged; Yukos Leaders Receive Warnings

766.  Claimants allege that by early 2003 "Mikhail Khodorkovsky's participation in the social policy and political spheres in Russia, coupled with Yukos' growing economic power, came to be perceived as a threat by the Russian authorities."[814]

767.  As already noted in Chapter VIII.B above, President Putin's former Chief Economic Advisor, Dr. Illarionov alleged in his witness statement that around late 2002, a "special unit was set up at the General Prosecutor's office, comprised of approximately 50 people and working exclusively on fabricating evidence against Mr. Khodorkovsky and Yukos."[815]  The special unit

---

[811]  Rejoinder ¶ 1335.

[812]  *Ibid*. ¶ 1331.

[813]  *Russia's Yukos says interim oil output up 5.3% on year in 2004*, Prime–TASS Energy Service (Russia), 21 March 2005, Exh. R-509.

[814]  Memorial ¶ 63.

[815]  Illarionov WS ¶¶ 35–36.

came up with approximately 15 possible theories to justify Mr. Khodorkovsky's arrest, amongst them "tax evasion schemes allegedly set up either for Mr. Khodorkovsky's personal benefit or for the benefit of Yukos."[816]   Upon cross-examination, Dr. Illarionov declined to identify his source, a "high-placed official in the Russian Administration at the time" who still lives in Moscow, out of concerns for the official's safety.[817]   Dr. Illarionov testified that the official told him the unit had "been created to 'zanyatsa' Khodorkovsky. . . 'take care of' Khodorkovsky . . which means one day some kind of security services and officers did receive an order so-called to solve the problem."[818]

768.   The turning point, according to Claimants, was a meeting at the Kremlin between President Putin and the Russian Union of Industrialists and Entrepreneurs on 19 February 2003, to which the Tribunal has referred earlier, at which Mr. Khodorkovsky delivered a speech about corruption in Russia.[819]   President Putin responded by alluding to some companies, including Yukos, having accumulated considerable wealth from non-payment of tax, and thus told Mr. Khodorkovsky that he was "passing the puck back to you."[820]   At this point, according to Dr. Illarionov, the tone became "steely and menacing,"[821] and from then on, the "gloves were off."[822]   The Tribunal has observed earlier in this Award that the Russian authorities, particularly in the ZATOs, were questioning the legality of Yukos' tax optimization scheme prior to the February 2003 meeting and that this meeting was not a "turning point" in terms of being the catalyst for challenging the Yukos tax scheme.[823]   Nevertheless the record does show that from around the time of the February 2003 meeting, the Russian authorities escalated the intensity and extent of their investigations into Yukos and associated individuals and entities.

769.   In the months following the February 2003 meeting, Mr. Khodorkovsky's financial support for

---

[816]   *Ibid*.

[817]   Transcript, Day 7 at 156–57.

[818]   *Ibid*. at 158.   As discussed below in Subsection 3(a), Respondent describes Dr. Illarionov's evidence as "rank hearsay" and a "lie," Transcript, Day 18 at 114–16.

[819]   Memorial ¶¶ 63, 86–91.

[820]   Excerpt of Television Report "Un milliardaire en Sibérie" broadcast on TF1 on 1 October 2006, Exh. C-590; Video recording and transcript of the meeting of the members of the Union of Industrialists and Entrepreneurs with President V. Putin held in the Ekaterininsky Hall, Kremlin, on 19 February 2003, Exh. C-1396.

[821]   Illarionov WS ¶¶ 31–32.

[822]   *Ibid*. Memorial ¶¶ 86–91.   *See also* Statement of Prime Minister Mikhail Mikhailovich Kasyanov to the ECtHR, 8 July 2009, in *Khodorkovskiy v. The Russian Federation* (Application Nos. 5829/05, 11082/06 and 51111/07) ¶¶ 10–12, Exh. C-446.; Kovalev Report ¶ 53.

[823]   *See* above at paragraph 513.

opposition parties, including the Communist party, apparently was increasingly of concern to President Putin.   For example, Mr. Dubov testified that President Putin had advised Mr. Khodorkovsky in April 2003 to restrict his political activities and not to finance the Communists.[824]   Similarly, former Prime Minister Kasyanov testified to the ECtHR that a conversation with President Putin had left him in no doubt that "by funding the communists Khodorkovsky had crossed a line so far as Putin was concerned and that the criminal prosecution case of Yukos employees was started exactly because of the funding of political parties not sanctioned by Putin."[825]

770.  Mr. Khodorkovsky's close business associate, Mr. Leonid Nevzlin, testified that in the Spring of 2003 the then Media Minister met him for lunch and informed him that "the decision had been taken to seize Yukos, and that [President Putin's deputy chiefs of staff] would not stop at anything in order to achieve that end, including arresting Khodorkovsky."[826]   From this, Mr. Nevzlin received the message that Mr. Khodorkovsky should put an end to his criticism of President Putin and his administration, "otherwise he could lose everything."   Mr. Nevzlin reported warnings from other sources at the time, including Sibneft's Roman Abramovich saying President Putin told him he "would like to see Mr. Khodorkovsky's bottom on a prison bench" and Federation Council members telling Mr. Nevzlin that Mr. Khodorkovsky "could face problems should he stay in Russia."[827]

### (b)   Prosecutor General Launches Investigations Involving Searches and Seizures

771.  From June 2003, the Office of the Prosecutor General of the Russian Federation launched a series of investigations against various members of Yukos' management, most prominently among them Mr.  Khodorkovsky and Mr. Platon Lebedev (GML director and close associate of Mr. Khodorkovsky).[828]   Mr. Lebedev was arrested on his hospital bed on 2 July 2003 on charges of fraud, embezzlement and tax evasion.[829]   Two days later, Messrs. Khodorkovsky and

---

[824]   Dubov WS ¶ 69.

[825]   Statement of Prime Minister Mikhail Mikhailovich Kasyanov to the ECtHR, 8 July 2009, in *Khodorkovskiy v. The Russian Federation* (Application Nos. 5829/05, 11082/06 and 51111/07) ¶¶ 17–19, Exh. C-446.

[826]   Nevzlin WS ¶ 30.

[827]   *Ibid.* ¶¶ 31–33.

[828]   Memorial ¶ 108;  'Chronology', *Attack on Yukos*, Yukos Review, Special Issue, 2003, p. 5, Exh. C-22.

[829]   *Attack on Yukos*, Yukos Review, Special Issue, 2003, Exh. C-22; *Oil Executive is Arrested, and Russians Look for Putin's Role*, NY Times, 3 July 2003, Exh. C-637; *Yukos oil oligarch arrested in raid*, The Washington Times, 26 October 2003, Exh. C-658.  Respondent points out that the ECtHR dismissed a complaint by Mr. Lebedev that the

Nevzlin were summoned for questioning in what Mr. Nevzlin described as an "absurd" investigation.[830]   That same day, the Russian authorities raided the office of the registrar of Yukos' shares and confiscated documents.[831]

772.   On 11 July 2003, the Russian authorities conducted the first large-scale raid on Yukos.  Yukos' then Chief Financial Officer, Mr. Bruce Misamore, describes it as:

> an incredible scene full of armed, masked officers—during which they trawled through our computer records for approximately 17 hours.  This was to begin a wave of raids on Yukos' Moscow headquarters and other companies affiliated with Yukos by investigative officers . . . sometimes accompanied by . . . heavily armed police officers.[832]

773.   Yukos group Financial Controller, Mr. Frank Rieger, also recounts the raids on the accounting department, which started from July 2003.  He describes how the staff was forced to stop work during the raid, that a Deputy Chief Accountant had been told by the authorities that they "knew that she had grandchildren, a dacha *etc* and that she had better tell them what they wanted to hear," another staff member resigned having been told by the prosecutors it would be best for him, and that the authorities regularly seized "lorry loads of documents" in an unsystematic fashion, without leaving copies or any record of the documents seized.[833]

774.   According to Mr. Misamore, the loss of key documents "created great difficulties not only in managing the company, but in preparing the annual financial statements."[834]   Mr. Misamore elaborated that "these raids with the guys in their balaclavas and their AK47s coming in and harassing our employees, taking original documents away from our offices, not leaving us with any copies, we couldn't even accomplish accounting . . . .   We lost our entire U.S. GAAP consolidation accounting group by the end of 2004:  they all left the company because they didn't want to be harassed."[835]  Steven Theede, who joined Yukos as Chief Operating Office in August 2003 noted that by the end of 2003:

---

Russian Federation violated its human rights obligations with respect to his health in detention conditions, *Lebedev v. The Russian Federation* (No. 1) (Application No. 4493/04), ECtHR Decision of 18 May 2006, Exh. R-4000.

[830]   Nevzlin WS ¶ 34.

[831]   "Yukos Repurchases its Shares," Vedomosti, 7 July 2003, Exh. C-638.

[832]   Misamore WS ¶ 31.   *See also* "Police raid Russian oil giant," BBC News, 11 July 2003, Exh. C-640; "Prosecutors Search Yukos Office for 17 Hours," The Moscow Times, 14 July 2003, Exh. C-641.

[833]   Rieger WS ¶¶ 27–28.   *See also* Misamore WS ¶ 32.

[834]   Misamore WS ¶ 32.

[835]   Transcript, Day 4 at 244–45.

> It was obvious that . . . the Government was out to get us; it was that simple.  The number of raids we had in the office, police coming and charging through our accounting department, knocking computers off desks, . . . tipping desks up on their side.  I had four men in black masks outside my office with machine guns once, trying to get in.[836]

775. Following the arrest of Mr. Lebedev, the Board of Directors of Yukos set up a temporary *ad hoc* committee to assess the situation and potential risks related to the arrest, which was chaired by Mr. Jacques Kosciusko-Morizet, then chair of the Board's Audit Committee.[837] Mr. Kosciusko-Morizet testified (over Respondent's objection) about Mr. Khodorkovsky's appearance before the *ad hoc* committee in August 2003.[838]  Although Mr. Khodorkovsky initially assured the Board that "everything is fine," Mr. Kosciusko-Morizet pressed him for "some explanation" and recounted his response to the Tribunal:

> He said the following, 'I'm in touch with generals from the FSB' [the successor of the KGB] . . . 'They want a kompromat.' . . . 'kompromat', which is a Soviet word . . . A kompromat is a document which gives you leverage on somebody, and practically forces him or her to follow whatever instructions he or she is given.  And we asked, 'What kind of kompromat do they mean?' 'Well', he said, 'all I have to do is write two lines: I committed criminal deeds.' And then I said, 'And what will happen if you sign such a kompromat?' He said, 'Nothing. They will just keep it, and from time to time I'll receive a phone call asking me for some favour.' And I asked again, 'But for Yukos—so will you sign it?' . . . He said, 'No, I don't want to live like that with my children.' And then I said, 'But under the assumption that you would sign it, what would happen?' And his words were, 'Well, if I would sign such a two-line letter, the problems of Yukos would disappear faster than it takes to switch off the light in this room.' . . . And I did not leave this meeting in a very optimistic mood on future events. And indeed two months later he was in jail, in pre-trial detention. He did not sign the kompromat.[839]

776. Dr. Illarionov testifies that in September 2003 he met with Mr. Khodorkovsky to tell him he was in danger and it would be preferable for him to leave Russia.  Mr. Khodorkovsky reportedly replied that he did not feel he had committed any offence and did not want to leave Russia.[840]

777. In early October 2003, the authorities conducted raids at the home of Mr. Lebedev, the offices of GML Management Services SA, and a boarding school for disadvantaged children sponsored by Yukos.[841]  Further raids were conducted in the office of Mr. Lebedev's lawyer, a

---

[836] *Ibid*. at 9.

[837] Kosciusko-Morizet WS ¶ 23.

[838] Transcript, Day 4 at 226–28.

[839] *Ibid*.

[840] Illarionov WS ¶ 39.

[841] Memorial ¶ 161, *Attack on Yukos*, Yukos Review, Special Issue, 2003, Exh. C-22; *Yukos Targeted in Three New Raids*, The Moscow Times, 6 October 2003, Exh. C-652.

move criticized by the Moscow Bar Association at the time.[842]

### (c)   Arrest and Trial of Mr. Khodorkovsky; Flight from Russia of His Associates

778.  On 25 October 2003, Mr. Khodorkovsky was arrested at gunpoint by an armed special forces unit in a Siberian airport, and taken to Moscow where he was charged with economic crimes including fraud, tax evasion and embezzlement.[843]  He was detained for over ten years until his much publicized release on 20 December 2013.[844]  According to Claimants, the arrest "paved the way for the subsequent actions of the Russian Federation, which eventually resulted in the dismantling of Yukos."[845]  The ECtHR, in its judgment of 31 May 2011, criticized the manner of Mr. Khodorkovsky's arrest, the denial of bail, violations of due process and attorney-client privilege, and the subjection of Mr. Khodorkovsky to inhuman and degrading treatment in his pre-trial detention.[846]

779.  Mr. Yuri Schmidt, a criminal lawyer who has acted for Mr. Khodorkovsky, testifies that never before in his 50 years of experience had he "seen the Russian State undertake such coordinated, systematic and intense efforts, and deploy such huge resources, against a person accused of an alleged economic offense."[847]  Respondent chose not to cross-examine Mr. Schmidt.

780.  In response to a question from a member of the Tribunal, Dr. Illarionov testified about a conversation he had with President Putin shortly after the arrest of Mr. Khodorkovsky. According to Dr. Illarionov, President Putin explained that Mr. Khodorkovsky had "behave[d] badly" and stopped "cooperating," for example by negotiating with an American oil company about a possible merger and supporting the Communist Party in advance of the Duma elections.

---

[842]   Memorial ¶ 161, *Lawyer Outcry: Yukos Raids Illegal*, The St. Petersburg Times, 14 October 2003, Exh. C-657.

[843]   Memorial ¶ 112, *Attack on Yukos*, Yukos Review, Special Issue, 2003, Exh. C-22; *Yukos oil oligarch arrested in raid*, The Washington Times, 26 October 2003, Exh. C-658.

[844]   The Parties agree that Mr. Khodorkovsky's release has no impact whatsoever on the present arbitration proceedings.  *See* Claimants' Letter to the Tribunal of 24 January 2014 ("The Claimants submit that Mr. Khodorkovsky's pardon by the President of the Russian Federation and his release from prison . . . have no impact whatsoever on the present proceedings"); and Respondent's Letter to the Tribunal of 24 January 2014 ("Mr. Khodorkovsky's pardon itself has no effect on these proceedings").  Claimants further point out that the pardon entailed no admission of guilt by Mr. Khodorkovsky.  Respondent further points out that the pardon had no effect on Mr. Khodorkovsky's criminal convictions or the findings by Russian courts with respect to tax evasion by Yukos.  The Tribunal also notes that Mr. Lebedev was released after his sentence was reduced by the Russian Supreme Court on 23 January 2014.  *See* Respondent's Letter to the Tribunal of 24 January 2014.

[845]   Memorial ¶ 122.

[846]   Reply ¶¶ 25–28.  ECtHR, *Khodorkovskiy v. Russia* (Application No. 5829/04), Judgment of 31 May 2011 ¶¶ 193–95, (hereinafter "*Khodorkovsky v. Russia I*", Exh. C-1300.

[847]   Schmidt WS ¶ 59.

Following these actions, President Putin decided to "step aside" and allow Mr. Khodorkovsky to fend for himself against "the boys."[848]  Dr. Illarianov also recalled that there was wide "public outrage" in the mass media.  The then Prime Minister, Mr. Mikhail Kasyanov, publicly disapproved of the arrest. Dr. Illarianov referred to President Putin's order that "I would ask everybody in the Government to shut up on Mr. Khodorkovsky's arrest," and it was very clear to him that this comment was addressed to Mr. Kasyanov, who was later removed from his position.[849]

781.  Mr. Dubov testifies that a Kremlin official informed him on 27 October 2003 that his name had been struck off the list of candidates running for the Duma, at the direction of President Putin.[850]  At the Hearing Mr. Dubov elaborated on the conversation he had with the Kremlin official, to whom he had asked "What will happen to Yukos?"  Mr. Dubov received the answer "Yukos will be taken away from you gentlemen" and that there would be criminal claims against every single shareholder.[851]  He was told President Putin had "gone berserk over Khodorkovsky."  Upon advice from the official, Mr. Dubov left Russia that night and has never returned.   Mr. Nevzlin also left Russia late in 2003 and has not returned since. Shortly thereafter Mr. Dubov, Mr. Nevzlin and Mr. Brudno were charged with embezzlement and money laundering.[852]   International arrest warrants were issued in January 2004 for Messrs. Nevzlin and Dubov, the day after Mr. Nevzlin announced their joint support for a presidential candidate opposing President Putin.[853]

782.  On 3 November 2003, Mr. Khodorkovsky resigned as CEO of Yukos.  In that connection, Respondent submits that he resigned voluntarily and that, shortly thereafter, Yukos confirmed that it had "a strong management team in place", that it was "continuing to operate" and that it was "business as usual" following Mr. Khodorkovsky's resignation.[854]  However, raids and arrests at the offices and homes of Yukos-connected personnel continued over the ensuing

---

[848]   Transcript, Day 7 at 155.

[849]   *Ibid*. at 159–60.

[850]   Dubov WS ¶ 79.

[851]   Transcript, Day 5 at 182.

[852]   Decision to Deny Extradition of Mikhail Brudno to the Russian Federation, Prosecutor General's Office of Lithuania, 24 August 2007, Exh. C-469; Memorial ¶ 123;  Dubov WS ¶¶ 79–81, Nevzlin WS ¶ 14.

[853]   Memorial ¶ 123, Nevzlin WS ¶ 14.

[854]   *Yukos Conference Call on Recent Developments – Final*, Financial Disclosure Wire, 5 November 2003 Exh. R-3991.

years, including on NGOs and service providers connected with Yukos.[855]   Claimants also allege that Yukos' auditors, PwC, were targeted and harassed because of their association with Yukos,[856] an issue discussed in more detail below in Chapter VIII.H.

### (d)   Complaints of Further Harassment and Intimidation of Yukos Executives, Employees, Lawyers and External Advisers

783.   Claimants have also referred the Tribunal to the interrogations and arrests of in-house and external lawyers for Yukos and Messrs. Khodorkovsky and Lebedev.[857] Their telephones were put under surveillance. In his witness statement, Mr. Schmidt recounts that the treatment of some lawyers acting for Yukos personnel included threats, harsh interrogations and beatings requiring hospitalization, leading some local and international bar associations to voice their deep concerns.[858]   Mr. Schmidt himself recounts incidents of intimidation against him, including disbarment and libel suits.[859]

784.   Mr. Schmidt observes that "the timing of the attacks on the lawyers acting for Messrs. Khodorkovsky and Lebedev and on Yukos' lawyers and personnel was always meticulously calculated to correspond to the critical stages in the dismantlement of Yukos."[860] Thus, at a time when Yukos was deeply engaged in its defense of tax proceedings brought against it, the Head of Yukos' Legal Department, Mr. Gololobov, was arrested and his computers and documents confiscated.   In July 2004, at the time of the enforcement

---

[855]   *Special forces raid Russian oil firm's headquarters*, The Daily Telegraph, 4 July 2004 Exh. C-690; *Yukos raided, banks declare it in default*, Gazeta, 5 July 2004, Exh. C-691; *Police Surround Yukos Headquarters*, The Moscow Times, 5 July 2004, Exh. C-692; *Police raid threatens Yukos oil production*, The Guardian, 5 July 2004, Exh. C-693; *Top Yukos executives flee threat of arrest*, The Financial Times, 25 November 2004, Exh. C-725; *Prosecutor General Gets Busy with Yukos Staff*, Kommersant, 17 December 2004, Exh. C-733.

[856]   Memorial ¶¶ 143–51.

[857]   *Russia Seeks To Prosecute Two More At Yukos*, NY Times, 19 November 2004 Exh. C-723; *Prosecutor General Gets Busy with Yukos Staff*, Kommersant, 17 December 2004 Exh. C-733; *Yukos Lawyer Shows Signs of Three Crimes*, Kommersant, 12 January 2005 Exh. C-747; *Moscow court upholds arrest warrant for Yukos lawyer*, RIA Novosti, 26 December 2005 Exh. C-788; *Yukos Lawyer, a Mother of Two, Gets 7 Years*, The Washington Post, 20 April 2006 Exh. C-800.  *See also*, more recently, *Khodorkovsky v. Russia 2* ¶¶ 634–48, 931–32 and the Parties' respective submissions of 30 August 2013 on that judgment.

[858]   Schmidt WS ¶¶ 16–18; *Striving for Judicial Independence:  A Report into Proposed Changes to the Judiciary in Russia*, International Bar Association Human Rights Institute Report, June 2005 Exh. C-601; Letter from the IBA Executive Director to General Procurator of the Russian Federation (undated) Exh. C-604; Witness Statement of Pavel Petrovich Ivlev of 15 March 2006 in *Mikhail Borisovich Khodorkovsky v. The Russian Federation*, ECtHR, (Application No. 11082/06), Exh. C-441; *Family of Yukos Lawyer Detained*, Kommersant, 9 February 2005, Exh. C-750.

[859]   Schmidt WS ¶¶ 20–22.

[860]   *Ibid*. ¶¶ 16(3) and 17.

proceedings by the court bailiffs for the tax assessments and the service by the Tax Ministry of the Field Tax Audit Report for 2001, an estimated 100 officials raided Yukos' headquarters on a Saturday afternoon, confiscating computer servers.  At the time of the forced sale of YNG in December 2004, there were further raids on Yukos offices and personnel.[861]   Searches were carried out in the offices of Yukos' external lawyers, ALM Feldmans, who also faced an extensive audit of their own after the search.

785.   On 31 May 2005, the Meshchansky Court of the city of Moscow sentenced Messrs. Khodorkovsky and Lebedev to nine years in prison on charges of fraud and tax evasion, following a trial that was widely criticized for its lack of due process.[862]  Mr. Schmidt, himself intimately involved with the trial, stated he had never seen "such a mockery of justice and violations of the most basic standards of due process and fundamental rights, including the right to a fair trial, at all stages of a case."[863]  Similar observations were made by Russian and international media outlets and opposition parties within Russia.[864]  Messrs. Khodorkovsky and Lebedev were transferred to Siberia to serve their sentences in remote penal colonies, and their sentences were reduced on appeal to 8 years, which Claimants maintain was in violation of Russian law at the time.[865]

786.   Meanwhile, a number of Yukos associates who had fled Russia were subject to extradition requests from the Russian Federation, none of which were granted by the courts of the countries where they were residing.  Mr. Nevzlin mentioned his trial *in absentia* and Israel's refusal to extradite him to Russia.[866]  In 2005 and 2007, courts in the United Kingdom refused to extradite former financial and business managers of Yukos, on the basis that the prosecutions were "so politically motivated that there is a substantial risk that the Judges of the Moscow City court would succumb to political interference in a way which would call into question their independence."[867]  Courts in Lithuania, Cyprus and the Czech Republic also refused to extradite

---

[861]   Memorial ¶ 155.

[862]   Memorial ¶ 520–47, Reply ¶ 30.

[863]   Schmidt WS ¶¶ 16(4)(5), 23, 26.  He recounted how Mr. Khodorkovsky's lawyers were denied the opportunity to meet with him in crucial weeks to prepare for the defence.

[864]   *Yukos verdict alarms Russia press*, BBC News, 1 June 2005, Exh. C-753; *Khodorkovsky sentenced, Russia Guilty*, International Herald Tribunal, 2 June 2005, Exh. C-754.

[865]   Reply ¶¶ 39–40.

[866]   Nevzlin WS ¶ 14, Transcript, Day 8 at 28.

[867]   Memorial ¶¶ 189–92, *The Government of the Russian Federation v. Dmitry Maruev and Natalya Chernysheva*, Bow Street Magistrates' Court, 18 March 2005, Exh. C-462.  *See also The Government of the Russian Federation v. Alexander Vikotrovich Temerko*, Bow Street Magistrates' Court, 23 December 2005, Exh. C-464; *The Government of*

former Yukos managers or former Yukos service providers on the basis of the political dimensions of the underlying requests.[868]

787.   In late 2003, most of the shares in Yukos held by Claimants Hulley and YUL were seized by the Russian courts and remained frozen until the liquidation of Yukos in November 2007.[869] The shares owned by Claimant Veteran, which were held in a Swiss bank account, were also subject to an asset freeze following a request for mutual legal assistance from the Russian Federation to Switzerland.   However, in June 2004, the Swiss Federal Tribunal overturned the freeze orders and released the shares.   Over the following years, the Swiss courts were also engaged in mutual legal assistance requests for searches and seizures of documents of various Yukos-related entities, culminating in the Swiss Federal Tribunal expressing the view that the case against Mr. Khodorkovsky was politically motivated and "orchestrated by the regime in power with a view to subordinating the class of rich 'oligarchs' and eliminating potential or sworn political opponents."[870]

788.   By late 2004, many mid-level Yukos managers and employees had been arrested, questioned or put on wanted lists, generating an atmosphere of pressure.   Several of the remaining senior executives decided not to return to Russia.[871]   In August 2006, the Russian Prosecutor General's office announced criminal investigations against senior level executives, including Messrs. Misamore and Theede.   Mr. Misamore, noting he had never been formally notified of the charges, considers that they were part of a "general campaign to intimidate those associated with Yukos."[872]   Mr. Rieger also testified about being interrogated by the Russian Prosecutor General's Office, when he was presented with a series of questions for which the investigator had already prepared his answers.   He described this as:

---

the Russian Federation v. Ramil Raisovich Bourganov and Alexander Gorbachev, Bow Street Magistrates' Court, 17 August 2005, Exh. C-463; *The Government of the Russian Federation v. Andrei Borisovich Azarov*, City of Westminster Magistrates' Court, 19 December 2007, Exh. C-465.

[868]   Memorial ¶¶ 193–97, In the matter of the Application by the Russian Federation for the extradition of Kartashov Vlatislav Nicolay, Nicosia District Court, Cyprus, Judgment, 10 April 2008, Exh. C-460; Decision to Deny Extradition of Elena Vybornova to the Russian Federation, High Court of Olomouc, Czech Republic, 31 July 2007, Exh. C-461; Decision to Grant Refugee Status to Igor Babenko, Supreme Administrative Court of Lithuania, 16 October 2006, Exh. C-468; Decision to Deny Extradition of Mikhail Brudno to the Russian Federation, Prosecutor General's Office of Lithuania, 24 August 2007, Exh. C-469.

[869]   Memorial ¶ 167.

[870]   Judgment of the Swiss Federal Tribunal, 13 August 2007, *Mikhail Khodorokovsky v. Swiss Federal Prosecutor's Office* ¶ 4, Exh. C-477.   For similar conclusions reached by courts in other mutual legal assistance cases, see Exhs. C-478–82.

[871]   Memorial ¶ 123.

[872]   Misamore WS ¶ 35.

a kind of never expected story.  And if I wouldn't have been the witness of such an event, I couldn't believe this: being called as a witness, arriving, and seeing, "Here, Mr Rieger, we'd like to talk to you today.  These are the questions, and wouldn't you mind to look at this document? . . . .  I think this is what you'd like to say to us."[873]

Mr. Rieger refused to sign and was kept for eight hours of questioning.  The next morning, the German Embassy advised him to leave the country.  He has not returned to Russia since May 2006.[874]  Similarly, Mr. Theede was advised by the U.S. State Department that it was not safe for him to return to Russia.[875]

789.   By the time bankruptcy proceedings had started against Yukos at the end of March 2006, approximately 35 senior managers, employees and in-house counsel of Yukos had been interrogated, arrested and/or sentenced.[876]   At that time, Mr. Theede appointed Vasily Aleksanyan as Executive Vice President of Yukos to serve as the main point of contact for the bankruptcy.[877]  Shortly afterwards, on 6 April 2006, Mr. Aleksanyan was arrested at home by masked and armed men and charged with embezzlement allegedly committed when he was head of the Yukos legal department.[878]  A few months after his detention, he was diagnosed with lymphoma and AIDS.  It is alleged that he was offered medical treatment and freedom in return for evidence against Messrs. Khodorkovsky and Lebedev, an offer which he refused.[879] He remained in pre-trial detention for almost three years in conditions described by Russia's own human rights council as "simply monstrous."[880]   His treatment was criticized by the ECtHR, whose initial interim measures were ignored by the Russian Federation, but after the ECtHR issued a final judgment, the authorities released Mr. Aleksanyan on bail (for USD 1.8 million) and finally dropped charges against him due to the statute of limitations.[881]  Claimants' expert witness on the independence of the Russian judiciary, Dr. Sergei Kovalev, whom

---

[873]   Transcript, Day 6 at 69.

[874]   Rieger WS ¶¶ 32–35.

[875]   Transcript, Day 11 at 16.

[876]   *Ioukos, un deuxième président en prison*, Libération, 8 April 2006, Exh. C-798.

[877]   Theede WS ¶ 30.

[878]   *Top Yukos official Aleksanyan detained in Moscow*, RIA Novosti, 6 April 2006, Exh. C-796; *Arrest of Yukos Oil Company Executive Vice-President is a Brutal and Unjust Attack on the Company's Attempts to Secure a Fair Bankruptcy Process*, Yukos Press Release, 7 April 2006, Exh. C-797; *Ioukos, un deuxième président en prison*, Libération, 8 April 2006, Exh. C-798.

[879]   As described in his testimony to the Supreme Court of the Russian Federation, 22 January 2008, Exh. C-598.

[880]   Jonas Bernstein, *Aleksanyan's Plight:  a case of the 'Legal Nihilism' Medvedev has vowed to fight?*, Eurasia Daily Monitor, Volume 5, Issue 21, 4 February 2008, Exh. C-880.

[881]   ECtHR, *Aleksanyan v. Russia* (Application No. 46468/06), Judgment, 22 December 2008, Exh. C-449.

Respondent chose not to cross-examine, described Mr. Aleksanyan's treatment as "[o]ne of the most glaring examples of pressure exerted on individuals associated with Mikhail Khodorkovsky and Yukos."[882]   Mr. Theede testified that the plight of Mr. Aleksanyan (who after his release from prison died at age 39)[883] demonstrated the severe risks which other persons in Russia associated with Yukos faced constantly and stated that it had become extremely difficult to manage the company.[884]

### (e)  Second Trial of Mr. Khodorkovsky; Allegations of Continuing Harassment and Intimidation

790.   In February 2007, before Messrs. Khodorkovsky and Lebedev had served half of their prison terms, the Prosecutor-General's Office levelled new charges against them, this time for theft of oil and funds from Yukos, embezzlement and money laundering.[885]

791.   Claimants describe the second trial as a "travesty of justice," a view shared by international organizations and human rights NGOs such as the International Bar Association and Amnesty International.[886]   Before the verdict was issued, President Putin responded to a question during his annual televised address that: "It is my conviction that a 'thief should be in jail.' . . .  we must start from the fact that Khodorkovsky's guilt has been proved in court."[887]

792.   On 27 December 2010, Judge Danilkin issued his verdict finding Messrs. Khodorkovsky and Lebedev guilty of charges of embezzlement and money laundering.  He sentenced them to the maximum penalty requested by the prosecution, thirteen and a half years.  The verdicts were

---

[882]   Kovalev Report ¶ 60.

[883]   Reply ¶ 61.

[884]   Transcript, Day 11 at 39. *See also* Speech of Vasily Aleksanyan before the Supreme Court of the Russian Federation, 22 January 2008, www.khodorkovksy.ru, Exh. C-598; *Russia Closes Criminal Case Against Yukos Executive Aleksanyan*, Business Week, 24 June 2010, Exh. C-893; *Aleksanyan's Death 'Practically Murder'*, The Moscow Times, 5 October 2011, Exh. C-1458.

[885]   *Procuracy-General of the Russian Federation completes investigation of criminal case with respect to Mikhail Khodorkovsky and Platon Lebedev*, News, 16 February 2007, The Procuracy-General of the Russian Federation Website, Exh. C-423.

[886]   Reply ¶ 42.   *The Khodorkovsky trial:  A report on the observation of the criminal trial of Mikhail Borisovich Khodorkovsky and Platon Leonidovich Lebedev*, International Bar Association Human Rights Institute, March 2009 to December 2010, September 2011, Exh. C-1334.  *Unfair trial concerns cast doubt on the integrity of the conviction of Mikhail Khodorkovsky and Platon Lebedev*, Amnesty International, Public Statement of 27 December 2010, Exh. C-1330.

[887]   *Transcript of a Conversation with Vladimir Putin*, 16 December 2010, Official Site of the Prime Minister of the Russian Federation, Exh. C-1435.  Respondent avers that the comments were taken out of context and referred to the convictions after the first trial.  *See* Rejoinder ¶ 1381.

widely criticized.[888]   Judge Danilkin questioned over 90 fact witnesses and reviewed an extensive documentary record.  His verdict focused on a holding that in the period 1996–2003, Messrs. Khodorkovsky and Lebedev "stole" the entire oil output of the Yukos production entities, concealed the fact that the oil was "stolen" both from Yukos' shareholders and the Russian tax authorities, orchestrated the "theft" through Lesnoy and Trekhgorny entities, which led to tax evasion, and then "laundered" the proceeds of the "theft."  Judge Danilkin rejected all of Mr. Khodorkovsky's arguments, including those relating to double jeopardy.[889]

793.   Within a few months, the 689-page verdict was upheld on appeal, a decision noted with concern by the European Parliament, which condemned "political interference with the trial."[890]  Russia's own Human Rights Council reviewed the second criminal case at the request of then President Medvedev.  The Council issued a report in December 2011 which concluded that the trial was unlawful and should be annulled.  The author of the report told local media there was "no evidence or substance behind the accusations of embezzlement," and that Messrs. Khodorkovsky and Lebedev had received "punishment for carrying out legal activities."[891]   Other members of the Council described the verdict as "profoundly unjust," "contradictory, arbitrary and malicious," "illegal," containing "numerous legal errors and inaccuracies" and selectively prosecuted.[892]

### 3.   Parties' Arguments and Tribunal's Observations

794.   As demonstrated above, the record of this case is replete with evidence pertaining to the events underlying the so-called campaign of harassment and intimidation.   The following section

---

[888]   Reply ¶ 48.   Verdict of the Khamovnichesky Court of Moscow in the second criminal case against Messrs. Khodorkovsky and Lebedev, 27 December 2010, Exh. C-1057.

[889]   Verdict of the Khamovnichesky Court of Moscow in the second criminal case against Messrs. Khodorkovsky and Lebedev, 27 December 2010, p. 494, Exh. C-1057 ("Arguments of the defence that the charges of embezzlement of oil and tax evasion are the same crimes because taxes, as per their theory, were paid on the stolen oil, are unsustainable. Taxes were paid on profit, and the organized group participants stole property in the form of oil. Profit is not property because it is a calculated accounting value which is a difference between income and expenses. It is impossible to steal figures, which exist in accounting records, but it is possible to commit theft of oil, which is a material value, which is property. Relations concerning the making of tax payments (taxes) to the budget are the object of a tax offence (crime) . . . While relations concerning right, title, and interest in certain property are the object of embezzlement (theft) . . .").

[890]   European Parliament, Resolution of 9 June 2011 on the EU-Russia summit ¶ 16, Exh. C-1315.

[891]   *Rights Council:  Free Khodorkovsky*, The Moscow Times, 22 December 2011, Exh. C-1463.

[892]   Report on the Results of Public and Scientific Analysis of the Materials of the Criminal Case against M. Khodorkovsky and P. Lebedev (Judged by the Khamovnichesky Court of Moscow, Which Rendered the Corresponding Verdict on 27 December 2010) (Unanimously approved by the Russian Presidential Council for Civil Society and Human Rights on 21 December 2011), Exh. C-1290.  As to Respondent's position with respect to Mr. Aleksanyan, see paragraph 806 below.

addresses (a) the credibility of Claimants' allegations of a campaign of harassment and intimidation, (b) the characterization of such events in the context of the Russian Federation's law enforcement efforts against Yukos' tax optimization scheme and (c) the actual impact of the events on Claimants' investment.

### (a)    Are Claimants' Allegations about a Campaign of Harassment Credible?

795.    Respondent does not deny that the investigations, searches, seizures, arrests, interrogations and criminal trials took place.  Respondent's main defence to the allegations is not that they are not true, but that the events complained of were legitimate and justified for purposes of law enforcement, that they were in line with practice in Russia and other countries, and that in any event they were not expropriatory and did not impair Claimants' investment.[893]

796.    There are, however, some portions of the witness testimony with which Respondent takes issue. Respondent contends that Claimants' "conspiracy theory relies heavily on circumstantial evidence and sheer innuendo, attributable to the Oligarchs' public relations and lobbying campaign."[894]  Respondent argues that:

> if the assessments and the subsequent enforcement measures were the product of a massive political conspiracy spanning several years and implemented by hundreds if not thousands of officials, including no fewer than 60 judges at four different levels of courts, along with a large cast of third parties worldwide, then surely, after nearly a decade of vigorous challenges, at least one document referring to this purported conspiracy would have surfaced, or one disgruntled conspirator would have reported having participated in it. Conspicuously, Claimants have offered no such evidence at all.  To the contrary, they rely on double and triple hearsay renditions of purported conversations, provided by vocal opponents of the Russian Government, inaccurate and uninformed reports by political commentators, and mere speculation.[895]

797.    Respondent also argues that "Claimants' hearing testimony on this issue is not credible, in light of its reliance on those who stand to gain billions of dollars if Claimants prevail."[896]

798.    For example, Respondent decries Dr. Illarionov's testimony about a special unit established to come up with a theory to put Mr. Khodorkovsky away as "rank hearsay of the most grotesque

---

[893]    Transcript, Day 3 at 184–85.

[894]    Counter-Memorial ¶¶ 777–823; Respondent's Post-Hearing Brief ¶ 56.

[895]    Respondent's Post-Hearing Brief ¶ 57, citing Transcript, Day 2 at 104–7 (Respondent's opening); Respondent's Closing Slides, pp. 282–92, 723–24.

[896]    Respondent's Post-Hearing Brief n.163, citing Respondent's Closing Slides, pp. 282–92.

sort, because Dr. Illarionov declined to identify the person who supposedly told him that."[897] Respondent described Dr. Illarionov's report as "manifestly not credible" because he had said nothing about it for seven years, and because he continued to serve President Putin for more than two years after hearing that report."[898]

799.   The Tribunal found Dr. Illarionov to be a credible and convincing witness.  He offered a satisfactory explanation for protecting the source of his information about the special unit.  The Tribunal does not consider his evidence impeached merely because he had not come forward earlier with his evidence about the special unit nor that he stayed for a certain period in his position working for the President.

800.   Similarly, Respondent attacks the credibility of Mr. Nevzlin's testimony on the basis that he had waited until 2010 to disclose certain facts, such as what Mr. Abramovich had told him about Mr. Khodorkovsky being targeted for political reasons.[899]  When pressed as to why he had not disclosed the information in the earlier Russian criminal proceedings or the ECtHR proceedings, Mr. Nevzlin gave the following explanations:[900]

> [I]f I had spread the information about Abramovich and Putin fairly broadly, and if it had become available to the public, then from the perspective of Khodorkovsky, who is in Russian prison, I would have damaged him. . . .  I would have caused him tremendous amounts of harm. . . . in the other corner facing him were Putin, Sechin and others; but I also would have turned Abramovich into an enemy of Khodorkovsky by disclosing this information.
>
> . . .
>
> [After] things moved to a second absurd set of charges and a second trial, Khodorkovsky's position changed radically.  He was no longer wary of a political . . . confrontation with Putin's regime because he realised that he was not going to be able to find truth in a Russian court if he tried to defend himself based on the laws . . .
>
> . . .
>
> Russian courts have no interest in my position: it would be either ignored or rejected by them.  Because it's not a judge who makes decision on Khodorkovsky and Lebedev; the judge just rubber-stamps decisions that are made by investigative committee and Prosecutor's Office. . . . The fact that I trust this court and tell this court a lot more than I've ever said on the matter, this is a typical position for me, because . . . if we're able to defend our interests, that would be either in courts in free countries or international courts.

---

[897]   Transcript, Day 18 at 114.

[898]   Transcript, Day 18 at 114–15 (Respondent's closing).  For the explanation from Dr. Illarionov about safety concerns for his source, see Transcript, Day 7 at 156.

[899]   Nevzlin WS ¶ 35; Transcript, Day 8 at 4–5. The Tribunal notes that in the judgment issued by the High Court in London, Mrs. Justice Gloster DBE was "not impressed" by Mr. Nevzlin as a witness (*Berezovsky v Abramovich, Berezovsky v Hine & Others* [2012] EWHC 2463 (Comm) ¶¶ 485–90, Ex. R-4654; *see also* Transcript, Day 8 at 39–40).

[900]   Transcript, Day 8 at 17–25.

801.   The Tribunal accepts Mr. Nevzlin's explanations.  The Tribunal notes again that the Russian Federation called no fact witnesses of their own to contradict or weaken the testimony of Claimants' fact witnesses.  Respondent chose not to cross-examine Mr. Schmidt, simply noting instead that as he was Mr. Khodorkovsky's criminal lawyer his statement is "special pleading."[901]   Respondent also chose not to cross-examine Dr. Kovalev, whose evidence, accordingly, also stands unchallenged.

802.   During the Hearing on the Merits, the Chairman of the Tribunal invited Respondent's counsel:[902]

> to address the allegations of harassment:  Rieger being presented by the Prosecutor's Office with a statement, "Just sign here on the bottom line"; the number of Yukos employees who were detained; Misamore, who was told "You shouldn't go back to Russia"; the campaign to make life impossible for Yukos-related officials, officers? That stands uncontradicted on the record right now.  And it bothers us, my colleagues and me, and we would like to hear from the Respondent in respect of these matters.

803.   With respect to Mr. Rieger, Respondent's counsel pointed out that the incident had occurred in 2006, several years after the arrest of Mr. Khodorkovsky and that "it's not atypical that an investigatory agency would have an idea of what they think a witness does or doesn't know, and might suggest to that [witness] what that evidence is and then find out from the witness whether they agree with it or disagree with it.  Mr. Rieger said he didn't agree, and he didn't sign it."  The Chairman recalled:  "He was threatened, he was detained at the airport.  This is background that speaks about the atmosphere.  The Russian authorities are seen as being out to get Yukos."  Respondent's counsel explained that: "I think that what you are seeing is the authorities having established that there was quite substantial fraud at many, many different levels of activity within a large company."[903]

804.   The Tribunal accepts the evidence of Claimants' witnesses who testified with respect to the campaign of harassment and intimidation conducted by Respondent against Yukos.  The Tribunal will now turn to the nature and consequences of the events described above.

---

[901]   Counter-Memorial ¶ 696.

[902]   Transcript, Day 19 at 46 (Respondent's closing).

[903]   *Ibid*. at 47.

(b)     **Were the Actions of the Russian Federation Justified as Legitimate Law Enforcement Measures?**

805.    Respondent explains that its actions were consistent with a legitimate wide-scale investigation as part of "an attempt to enforce and try to understand what turned out to be one of the largest frauds in the experience of the modern Russian State."[904]   Thus, in response to Mr. Kosciusko-Morizet's evidence recounting Mr. Khodorkovsky's *kompromat*, Respondent observes that this "is absolutely consistent with the fact that the authorities had valid grounds to bring criminal charges against Mr. Khodorkovsky."[905]   Likewise, Respondent describes as "no surprise" that Mr. Dubov would have been advised to leave the country and warned that every shareholder of Yukos would face criminal charges.   Respondent states that this is "not inconsistent with the unbroken thread of tax evasion in which Yukos engaged and for which it was held to account."[906]

806.    In a similar vein, while acknowledging the unfortunate circumstances surrounding Mr. Aleksanyan's illness, Respondent remarked that "it is not shocking" that the Russian authorities were interested in Mr. Aleksanyan, given his role since 2001 in suppressing information about vulnerabilities of Yukos in the low-tax regions.[907]

807.    Respondent argues that the "searches of Yukos offices and the seizures of its records as part of Russian law enforcement authorities' investigations have parallels in other countries as proper instruments of law enforcement, especially when those authorities are faced with the types of egregious violations in which Yukos engaged."   Respondent cites the EU and the U.S. as jurisdictions that authorize expansive and aggressive, even armed, searches and seizures to combat financial crimes.[908]

---

[904]   *Ibid*. at 49–52.

[905]   Transcript, Day 18 at 118–19 (Respondent's closing); Respondent's Post-Hearing Brief ¶ 205(iv).

[906]   Transcript, Day 18 at 116–17 (Respondent's closing); Respondent's Post-Hearing Brief ¶ 205(ii).

[907]   Transcript, Day 19 at 50 (Respondent's closing).

[908]   Respondent's Post-Hearing Brief ¶ 209–10.  For example, in the European Union, companies are often subjected to "dawn raids", in which EU officials, without prior judicial authorization, conduct searches and seizures.  *See* Transcript, Day 19 at 49–50 (Respondent's closing) ("[I]n the United States a search warrant is never executed unarmed; it's always executed by armed officers, sometimes wearing other gear that suggests something  more than a simple commercial exercise.  That's the way it happens.  In Russia, that's the way it's always done. It's just their practice.  It doesn't reflect or project anything unique to Yukos.").  Claimants however point to the "very exacting standard of proof" at the ECtHR requiring "incontrovertible and direct" evidence, but that the ECtHR nevertheless accepted that "the circumstances surrounding the applicants' criminal case may be interpreted as supporting the applicants' claim of improper motives" and that "it is clear that the authorities were trying to reduce political influence

808. As for the convictions of Messrs. Khodorkovsky and Lebedev in 2005, Respondent asserts that Claimants have not criticized the conduct of the Russian appellate judges who upheld the convictions.[909]  Respondent points to the ECtHR as having "rejected the central premise of Claimants' argument that Mr. Khodorkovsky was prosecuted in 2005 for political or other improper reasons."[910]

809. With respect to the second criminal trial of Messrs. Khodorkovsky and Lebedev, Respondent notes that it "had no effect on the investments at issue in these arbitrations and that, regardless, Claimants have not contested the factual bases of the charges in that trial.  Their attempt to portray the charges as concerning the physical theft of oil, rather than complicated schemes of corporate abuse and sham auctions to secure underpayments of oil purchased from Yukos' subsidiaries for the Oligarchs' benefit, is manifestly baseless."[911]  Respondent contends that the IBA Report was prepared without access to the full court file and without any knowledge of Russian criminal law, and that other criticisms reported by Claimants were biased and ill-informed.

810. Respondent also contends that its actions were necessary due to Yukos' attempts to obstruct Russia's investigative efforts.[912]  Claimants deny that Yukos was obstructing the investigation, and note that most of the evidence relied upon by Respondent was based on interrogation records of individuals that Respondent has failed to put forward as witnesses.  Claimants urge the Tribunal to treat the interrogation records with skepticism, "[g]iven the campaign of terror being waged against persons associated with Yukos and the relentless pressure deployed by the prosecutors to get Yukos' former employees or other Yukos-related persons to give false incriminating evidence against Yukos and Yukos' management."[913]

811. The Tribunal accepts that the Russian Federation had the power to conduct searches and seizures in Yukos' premises during the ongoing criminal investigations.  Nevertheless, having reviewed the record, the Tribunal finds that the investigation of Yukos was carried out by the

---

of 'oligarchs' and that the State was one of the main beneficiaries of the dismantlement of Yukos."  *See Khodorkovsky v. Russia 2* ¶¶ 634–48, 931–32; and Claimants' submissions dated 30 August 2013 ¶ 47 concerning that judgment.

[909]   Respondent's Post-Hearing Brief ¶¶ 204, 206.

[910]   *Khodorkovsky v. Russia 1*; Rejoinder ¶ 1334.

[911]   Respondent's Post-Hearing Brief n.484.  *See also* Rejoinder ¶¶ 1371–86.

[912]   Counter-Memorial ¶¶ 674–79.

[913]   Reply ¶¶ 77.

Russian Federation with excessive harshness.  Respondent's counsel acknowledged that in the context of the large-scale fraud investigation "not everything is pretty in those circumstances, and we may each of us have circumstances that we would regret or have done differently."[914]  The Tribunal considers "not pretty" to be an understatement in this case.  The treatment of Yukos senior executives, mid-level employees, in-house counsel, external lawyers and related entities as described in this chapter support Claimants' central submission that the Russian authorities were conducting a "ruthless campaign to destroy Yukos, appropriate its assets and eliminate Mr. Khodorkovsky as a political opponent."[915]  The legal consequences of Claimants' submission will be analyzed later in Part X of this Award when the Tribunal considers the alleged violations of Chapter III of the ECT.

812.  The Tribunal will now examine the effect on Yukos, as a matter of fact, of the campaign of harassment and intimidation waged against it by Respondent.

### (c)    Did the Events Complained of Impact Claimants' Investments or was Yukos Able to Carry on Unaffected?

813.  Having noted that the record is replete with evidence of intimidation and harassment of Yukos personnel by the Russian authorities, the key question for the Tribunal is whether such intimidation and harassment actually disrupted Yukos' operations and thus adversely affected Claimants' investment.

814.  Claimants maintain that the harassment and intimidation campaign "crippled" Yukos by prosecuting its management and paralyzing its operations through massive raids and seizures with a view to undermining the viability of Yukos.

815.  Claimants' witnesses spoke of the impact that the searches, seizures and, generally, the campaign of intimidation had on the company.  As noted earlier, Mr. Misamore testified that the loss of key documents created difficulties in running the company and preparing the annual financial statements.[916]  Mr. Rieger stated that 60 to 70 percent of the accounting department's documents were confiscated.  He explained in his witness statement:  "[w]hen you take into account the fact that all the day to day business operations of the company were reflected in

---

[914]   Transcript, Day 19 at 51 (Respondent's closing).

[915]   Claimants' Post-Hearing Brief, ¶ 165.

[916]   Misamore WS ¶ 32.

paperwork, such as invoices, bills, *etc.*, we soon reached a stage where Yukos employees didn't have access to the basic data they needed to perform their functions."  He recalled that "[t]he constant threats and harassment caused many of my former colleagues to leave the company and, in the worst case, the country; a fate that I would soon share."[917]

816.   Mr. Misamore described how staff retention became extremely difficult for Yukos.  For example, he said that in the GAAP section of the accounting department "they all left the company because they didn't want to be harassed."[918]  Similarly, in defending the company's decision to pay bonuses in 2004, Mr. Theede testified that:

> [I]t was a Stalinesque-type of environment there. It was a fearful kind of a place to have to work. We never knew when we were going to have another raid, and people would come in and, as I said yesterday, knock computers off the desks, tip desks over, and just roughneck through the place; or when someone would be called in for questioning to the Prosecutor's Office with totally unknown and illogical results.  And in that kind of an environment, Yukos was not a particularly friendly place to work.  We had huge concerns about retaining our employees.  And if we didn't meet contractual obligations to them to pay the bonuses, it was our view that they would begin to leave.  And so it was in that light that we felt it was really very important that we lived up to the obligations we had to these people, just so we could retain them and so that we could continue to operate the company. Because if we lost those people, hiring others was going to be almost impossible, because people just—it was a scary place to be, and to bring new people in—in fact, I don't really recall us being able to hire any new employees after the attack started . . .[919]

817.   Respondent denies that Claimants have proven, as a matter of fact, that the harassment campaign impaired their investment.[920]  As mentioned earlier, Respondent notes for example that Mr. Khodorkovsky resigned voluntarily, that Yukos' revenues in 2003 and 2004 were higher than before the arrests of Mr. Khodorkovsky and Mr. Lebedev, and that Yukos issued public statements following the arrest of Mr. Khodorkovsky to the effect that Yukos' operations were proceeding normally.

818.   Respondent argues that Mr. Misamore's claims in his witness statement, seven years after the fact, about the disruptive effect of the raids, are not credible as they are contradicted by his contemporaneous statements to his colleagues, the audit committee and the board of directors in

---

[917]   Rieger WS ¶¶ 28–29.

[918]   Transcript, Day 9 at 244–45.

[919]   Transcript, Day 11 at 15–16.

[920]   Rejoinder ¶¶ 1338–45, ¶¶ 1387–99; ¶¶ 1400–34.   Respondent's Post-Hearing Brief ¶¶ 200–206.   *See also* Respondent's submissions of 30 August 2013 ¶ 7, concerning *Khodorkovsky v. Russia 2*.

2003.[921]  Respondent points to the following evidence in the record:

- The working group set up to deal study the effect of the government's actions confirmed that as at August 2003, despite the searches and seizures, "[o]perational activities [were] proceeding normally" and as at September 2003 "there had been no new adverse developments" and it was "business as usual"[922]

- Yukos stated on a conference call with financial analysts in November 2003 that Mr. Khodorkovsky's arrest and subsequent resignation had "no impact whatsoever on [its] operations"[923]

- Some 16 months later, Yukos stated to investors and the press that it "was extremely healthy."[924]

- The January–March 2004 internal Yukos newsletter publishing 2003 operational results of Yukos shows that the Company was not disrupted.[925]

819.  The Tribunal views these statements of Yukos officers pertaining to the well-being of the company as an attempt by Yukos to project to its investors an image of stability and thus maintain their confidence.  It is obvious to the Tribunal that a company which was targeted in the way Yukos was during those many years had to be severely affected and that its operations could not be managed by its officers and other employees in the normal and usual manner.  In short, the Tribunal agrees with Claimants that, as a matter of fact, Respondent's aggressive campaign against Yukos impacted significantly the management of the company.

820.  Having reviewed the abundant evidence in the record of the intimidation and harassment of Yukos' senior executives, mid-level employees, in-house counsel and external lawyers by the Russian authorities, the Tribunal is convinced that such intimidation and harassment not only disrupted the operations of Yukos but also contributed to its demise and thereby damaged Claimants' investment.

---

[921]   Transcript, Day 19 at 87–88,

[922]   Rejoinder ¶ 1422, Respondent's Post-Hearing Brief ¶ 207, Report of Working Group, 25 September 2003, Exh. R-4102.

[923]   *Yukos Conference Call on Recent Developments – Final,* Financial Disclosure Wire, 5 November 2003, Exh. R-3991.

[924]   *Russia's Yukos says interim oil output up 5.3% on year in 2004,* Prime-TASS Energy Service, 21 March 2005, Exh. R-509.

[925]   Yukos Review, January–February–March 2004, Exh. C-23.

821.  The Tribunal will now turn its attention to another chapter in Claimants' litany of conduct by the Russian Federation alleged to have negatively impacted their investment.

D.  **THE UNWINDING OF THE YUKOS–SIBNEFT MERGER**

1.  **Introduction**

822.  In April 2003, Yukos, which was then Russia's largest oil company, announced plans to merge with Sibneft, then Russia's fourth largest oil company, into a new entity that would be called YukosSibneft Oil Company and constitute the world's fourth largest private oil producer.

823.  Steps were taken to effectuate the merger between April and October 2003.  By 3 October 2003, the main components of the transaction (a share purchase and a share exchange between Yukos' and Sibneft's principal shareholders) had been completed.  An Extraordinary General Meeting ("**EGM**") of Yukos' shareholders was scheduled for 28 November 2003 for the approval of the merger's final details.[926]  However, shortly before the scheduled meeting, the Sibneft shareholders announced their intention to halt the merger process.[927]

824.  Ultimately, the share exchange component of the merger was invalidated through a series of court cases in Moscow and the Russian Far Eastern province of Chukotka,[928] and Sibneft was acquired by the Russian Federation through the State-owned company Gazprom.[929]

825.  Claimants submit that Respondent was responsible for the unwinding of the merger, making it "one of the first casualties" of the Russian Federation's assault on Yukos.[930]  According to Claimants, Sibneft's decision to halt the merger process was the direct result of Mr. Khodorkovsky's arrest.  The arrest led Sibneft to insist on a change of the senior executives of the merged entity.  This request was not acceptable to Yukos and the deal was aborted.  Claimants also argue that the Russian courts were then "only too happy to lend their assistance" by invalidating parts of the merger on spurious grounds, paving the way for the Russian

---

[926]  Minutes No. 120/1-21 of the Board of Directors of Yukos, 25 September 2003, pp. 8–9, Item 11, Exh. C-1103.

[927]  Misamore WS ¶ 37; Memorial ¶ 208; Counter-Memorial ¶ 326.

[928]  Appeal Resolution of the Moscow Arbitrazh Court of 31 May 2004, Exh. C-72; Resolution of the Federal Arbitrazh Court for the Moscow District of 26 August 2004, Exh. C-73; Resolution of the Federal Arbitrazh Court for the Far-East District, 25 April 2006, Exh. C-78.

[929]  Memorial ¶¶ 231−37.

[930]  *Ibid.* ¶ 199; Reply ¶ 95.

Federation's acquisition of Sibneft.[931]   Claimants' primary damages claim of USD 114.174 billion reflects the value of YukosSibneft as a successfully merged entity.   Alternatively, Claimants submit that if the Tribunal does not hold Respondent responsible for the unwinding of the merger, the damages claim should be reduced by approximately USD 6 billion.[932]

826.   Respondent denies any responsibility for the unwinding of the merger.   Sibneft, Respondent argues, was neither exercising governmental authority nor acting under the instructions of Russian state organs.   The Russian Government in fact supported the merger.   Moreover, Sibneft's leaders had every right to insist on changes to the management of the merged entity due to concerns about Mr. Khodorkovsky's arrest and charges of criminal activities against him; in so doing, they were acting "in the pursuit of their own legitimate commercial interests."[933]   As for the Moscow and Chukotka courts, Respondent submits that they acted in accordance with Russian company law.   Respondent also suggests that Yukos acquiesced in the court proceedings as they allowed Yukos to cancel the merger without obtaining the approval of minority shareholders and thus risking further claims being brought against it.[934]

827.   In this chapter, the Tribunal will consider the circumstances of the Yukos−Sibneft merger and seek to determine whether the Russian Federation is responsible for the unwinding of the merger.   The Tribunal's view on this issue may have an impact on the quantum of damages the Tribunal may ultimately award Claimants.   The Tribunal will also consider in this chapter whether the merger was an important factor, as Claimants submit, in Yukos' decision not to pursue its ADR listing on the NYSE.   The Tribunal recalls that Respondent argues that Yukos' decision was taken because the company had concerns about elements of its tax optimization scheme.   The Tribunal will also consider Yukos' declaration of a USD 2 billion interim dividend in November 2003 ("**2003 Interim Dividend**"), which Respondent argues was intended to shield this sum from the reach of the Russian tax authorities.[935]

---

[931]   Reply ¶¶ 135−37.

[932]   *Ibid*. ¶¶ 859, 861; Second Expert Report of Brent Kaczmarek, 15 March 2012 ¶¶ 65; 75−76.

[933]   Counter-Memorial ¶¶ 322−30; Rejoinder ¶¶ 776−79.

[934]   Rejoinder ¶¶ 805−06.

[935]   *Ibid*. ¶¶ 809−23.

### 2.      Chronology

828.  In the context of arguments about the Yukos−Sibneft merger, Respondent has accused Claimants of fighting a "losing battle with the calendar,"[936] while Claimants have accused Respondent of attempting "to rewrite history".[937]   The Tribunal therefore considers it useful to lay out a short chronology of key events.

### (a)      Merger is Announced; NYSE Listing is Put on Hold; Steps are Taken to Complete Merger

829.  On 22 April 2003, Yukos and Sibneft announced their merger in a press release describing the principal features of the transaction.[938]   The merger would be achieved in two parts.  Firstly, Yukos would acquire 20 percent (minus one share) of Sibneft shares from Sibneft's principal shareholders for a cash consideration of USD 3 billion pursuant to a Share Purchase Agreement ("**Share Purchase Agreement**").   Secondly, Yukos would acquire 72 percent (plus one share) of Sibneft shares from Sibneft's principal shareholders in exchange for 26.01 percent of the fully diluted share capital of Yukos pursuant to a Share Exchange Agreement (the "**Share Exchange Agreement**").[939]

830.  A few days after the merger was announced, President Putin stated that he had approved the transaction in a meeting with Mr. Khodorkovsky, Mr. Roman Abramovich (a Board member and significant shareholder of Sibneft) and Mr. Evgeny Shvidler (Sibneft's CEO).[940]

831.  Concurrently with this announcement, the proposed listing of Yukos on the NYSE, which Yukos and a team of external advisers had been preparing for over a year, was put on hold.  By then, Yukos and its advisers had conducted an extensive review of the company's operations

---

[936]   Transcript, Day 3 at 18 (Respondent's opening).

[937]   Transcript, Day 17 at 11 (Claimants' closing).

[938]   *Yukos and Sibneft Agree in Principle to Merger*, Yukos Press Release and Sibneft Press Release, 22 April 2003, Exh. C-629.

[939]   Memorial ¶ 47 & n.61.

[940]   Nevzlin WS ¶ 26; Dubov WS ¶ 69; *Sibneft President Eugene Shvidler comments on upcoming merger with Yukos to create YukosSibneft, a new international energy super major*, BusinessWeek Online, 21 May 2003, Exh. C-634.

for purposes of drafting the required SEC form.[941]   A first draft had been circulated in June 2002 and a near final draft had been circulated on 19 March 2003.[942]

832.   From April to October 2003, steps were taken to complete the merger.   On 30 April 2003, Yukos and Sibneft's principal shareholders signed the Share Purchase Agreement[943] and the Share Exchange Agreement.[944]   The share exchange component of the merger was broken down into two tranches:   the exchange of 57.5 percent of Sibneft shares for newly issued shares in Yukos representing 17.2 percent of Yukos' fully diluted share capital and the exchange of 14.5 percent of Sibneft shares for 8.8 percent of Yukos shares (consisting of a mixture of newly issued shares, treasury shares and shares acquired through a share buy-back).[945]

833.   On 1 May 2003, Yukos' and Sibneft's principal shareholders signed a Shareholders' Agreement, which specified, *inter alia*, that the Yukos shareholder group would nominate the "Senior Management Positions."[946]   On 27 May 2003, Yukos' shareholders approved the merger.[947]

834.   On 30 May 2003, Yukos made a first cash payment of USD 1.25 billion pursuant to the Share Purchase Agreement.[948]   On 30 June, the Yukos Board of Directors adopted resolutions

---

[941]   *See* Memorandum from Mr. Maly to Mr. Sheyko, 22 April 2002, Exh. R-184.

[942]   Reply ¶¶ 101–02; Draft Yukos F-1 Form and Registration Statement Under the Securities Act of 1933, 19 March 2003, Exh. C-1067.

[943]   Deed of Share Purchase between Kravin Investments Limited, White Pearl Investments Limited, Marthacello Co Limited, N.P. Gemini Holdings Limited, Heflinham Holdings Limited and Kindselia Holdings Limited, and Yukos Oil Company, 30 April 2003, Exh. C-1101 (hereinafter the "Share Purchase Agreement").   In another arbitration, Yukos' lawyers described the Sibneft shareholders party to the Share Purchase Agreement as "companies incorporated under the laws of Cyprus . . . [and] ultimately controlled by Roman Abramovich, the owner of Chelsea Football Club and Governor of Chukotka."   *See Yukos Oil Company v. Kravin Investments and others*, LCIA Arbitration No. 4589, Statement of Case, 2 May 2005, ¶¶ 10−12, Exh. R-3601.

[944]   Deed of Share Exchange between Kravin Investments Limited, White Pearl Investments Limited, Marthacello Co Limited, N.P. Gemini Holdings Limited, Heflinham Holdings Limited and Kindselia Holdings Limited, and Yukos Oil Company, 30 April 2003, Exh. C-1100 (hereinafter the "Share Exchange Agreement").

[945]   *Ibid*; *see* Memorial ¶ 47.

[946]   Shareholders' Agreement in respect of Yukos Oil Company among Yukos Universal Limited (hereinafter "YUL"), Hulley Enterprises Limited (hereainfter "Hulley"), White Pearl Investments Limited, N.P. Gemini Holdings Limited, Marthacello Co. Limited, Kindselia Holdings Limited, Heflinham Holdings Limited and Kravin Investments Limited, 1 May 2003, Article 6.1, Exh. C-1102.

[947]   Minutes No. 2 of the Extraordinary General Meeting of Yukos Shareholders, 27 May 2003, Exh. C-50; *Extraordinary meeting of YUKOS shareholders adopts decision associated with realization of transaction with Sibneft*, Yukos Press Release, 28 May 2003, Exh. C-635.

[948]   Receipt from Kravin Investments Limited, 30 May 2003, Exh. C-54; *see* Yukos Oil Company U.S. GAAP Interim Condensed Consolidated Financial Statements, 30 June 2003, p. 9, Exh. C-30.

with respect to the merger.[949]  In July and August 2003, regulatory approvals were obtained for the merger.[950]  On 28 August 2003, Yukos made a further cash payment of USD 500 million pursuant to the Share Purchase Agreement.[951]

835.   On 25 September 2003, the Yukos Board of Directors set 28 November 2003 as the date for the EGM at which final details for the merger would be submitted to shareholders.[952]

836.   On 2 October 2003, Yukos made a final cash payment of USD 1.25 billion pursuant to the Share Purchase Agreement.[953]

837.   On 3 October 2003, Yukos acquired 72 percent plus one share of Sibneft shares, in exchange for 26.01 percent of Yukos shares, pursuant to the Share Exchange Agreement.[954]

838.   Thus, by 3 October 2003, with both the share purchase and share exchange components of the transaction complete, Yukos had acquired 92 percent of Sibneft.  The remaining steps for implementing the merger included the "full operational integration" of the two companies, changing the name of Yukos to YukosSibneft and electing a new board of directors.[955]

### (b)   Mr. Khodorkovsky is Arrested; Yukos Continues with Merger; Sibneft has Second Thoughts

839.   The Tribunal recalls that Mr. Khodorkovsky was arrested on 25 October 2003.

---

[949]   *Board of Directors of YUKOS Oil Company approves issuance of up to 1 billion shares*, Yukos Press Release, 7 July 2003, Exh. C-639.

[950]   Notification of the State registration of the additional share issue by the Federal Commission for the Securities Market, 23 July 2003, Exh. C-51; Opinion and Directive issued by the Ministry for Antimonopoly Policies and Support to Entrepreneurship, 14 August 2003, Exh. C-52.

[951]   Receipt from Kravin Investments Limited, 28 August 2003, Exh. C-55; *see* Yukos Oil Company U.S. GAAP Interim Condensed Consolidated Financial Statements, 30 June 2003, p. 9, Exh. C-30.

[952]   Minutes No. 120/1-21 of the Board of Directors of Yukos, 25 September 2003, pp. 8–9, Item 11, Exh. C-1103.

[953]   Receipt from Kravin Investments Limited, 2 October 2003, and account statement evidencing payment of USD 1.25 billion under the Share Purchase Agreement, Exh. C-57; *see* Yukos Oil Company U.S. GAAP Interim Condensed Consolidated Financial Statements, 30 June 2003, p. 9, Exh. C-30.

[954]   Account statements evidencing transfer of 57.5 percent of Sibneft (2,724,362,618 shares) to Yukos under the Share Exchange Agreement, 3 October 2003, Exh. C-58; Notices of transaction and account statements evidencing transfer of 17.2 percent of Yukos (463,517,826 shares) to Sibneft's principal shareholders under the Share Exchange Agreement, 3 October 2003, Exh. C-59; Account statements evidencing transfer of 14.5 percent of Sibneft (689,373,122 shares) to Carenet under the Share Exchange Agreement, 10 October 2003, Exh. C-60; Account statements evidencing transfer of 8.8 percent of Yukos (238,879,333 shares) to Sibneft's principal shareholders under the Share Exchange Agreement, 10 October 2003, Exh. C-61; Yukos Oil Company U.S. GAAP Interim Condensed Consolidated Financial Statements, 30 June 2003, p. 9, Exh. C-30.

[955]   Memorial ¶¶ 54, 208; *Sibneft Principal Shareholders and Yukos Oil Company Finalize Merger Transaction*, Yukos Press Release and Sibneft Press Release, 3 October 2003, Exh. C-648.

840.  On 28 October 2003, the Yukos Board of Directors recommended, in view of the capital restructuring of the company in anticipation of the merger, that shareholders approve the 2003 Interim Dividend of USD 2 billion to all shareholders of record as at 25 September 2003.[956] Mr. Khodorkovsky resigned as CEO of Yukos on 3 November 2003.  Yukos then issued a press release which named the persons it would nominate to the new management board of the merged YukosSibneft entity.[957]   Mr Khodorkovsky was not on that list.   On 21 and 22 November 2003, Yukos and Sibneft senior executives met to discuss the logistics of the merger.[958]

841.  In late November, the media reported that Mr. Abramovich had met with President Putin to discuss the Yukos–Sibneft merger.  Reference was made to the fact that "Abramovich is understood to have raised the prospect of changing the management team of the combined company with Putin, who welcomed the idea."[959]

842.  In his witness statement, Mr. Nevzlin narrates that he had met with Mr. Abramovich in "late 2003" in Tel Aviv and that he had been told that

>  YukosSibneft could be saved if the management of the merged company was transferred to his team . . . President Putin had told Roman Abramovich that Mikhail Khodorkovsky had been targeted because of his involvement in politics and . . . was too angry with Mikhail Khodorkovsky to even discuss his release.[960]

843.  Shortly before the Yukos EGM scheduled for 28 November 2003, representatives of Sibneft's principal shareholders summoned representatives of Yukos' principal shareholders and advised them that they no longer wished to proceed with the merger.  They asked that steps be taken to unwind the merger.[961]   However, the EGM was held as scheduled.  The agenda included: (a) early termination of the powers of board members and election of a new board; (b) approval of new articles of association (including a name change to YukosSibneft); and (c) payment of

---

[956]  Abstract from Minutes No. 120/1-24 of the Meeting of the Board of Directors of Yukos, 28 October 2003, Exh. R-3605.

[957]  *YukosSibneft Proposed Management Board*, Yukos Press Release, 4 November 2003, Exh. C-666.

[958]  Agenda, material and list of attendees for 21−22 November 2003 meeting, Exh. C-62.

[959]  *Abramovich met Putin before vetoing Yukos−Sibneft merger*, The Sunday Telegraph, 30 November 2003, Exh. C-669.

[960]  Nevzlin WS ¶¶ 27, 35.

[961]  Memorial ¶ 208; Counter-Memorial ¶ 326; *see Yukos Oil Company v. Kravin Investments and others*, LCIA Arbitration No. 4589, Statement of Case, 2 May 2005, Exh. R-3601.  Around the same time as Sibneft advised Yukos it was pulling out of the merger, the media reported that an economic and tax crimes unit of Russia's interior ministry had announced it had no questions for Mr. Abramovich. *Kremlin seen as a deep well of influence*, The Financial Times, 29−30 November 2003, Exh. C-668.

the 2003 Interim Dividend.  Claimants voted against the election of Sibneft's nominees to the Yukos Board of Directors, abstained on the vote to change the company's name to YukosSibneft and voted to approve the dividend.[962]

844.   After the EGM, Yukos' principal shareholders proceeded as if the merger was still going forward.  For example, on 2 December 2003, GML issued a press release stating that the merger agreements remained in full effect.[963]  On 8 December 2003, Claimant Hulley received payment for the 2003 Interim Dividend.[964]   At the same time, Yukos and its principal shareholders were exploring options to negotiate the unwinding of the merger with Sibneft.[965] Yukos continued to resist Sibneft's proposal to appoint Sibneft nominees as members of the merged entity.[966]

(c)   **Russian Courts Invalidate the Share Exchange Agreement**

845.   On 19 January 2004, a few weeks after Yukos received the 2000 Tax Audit Report, NP Gemini Holdings Limited and Nimegan Trading Limited, two former Sibneft shareholders,[967] applied to a Moscow court to have the issue of Yukos shares carried out in the context of the first tranche of the share exchange declared invalid.[968]   On 1 March 2004, the Moscow Arbitrazh Court annulled the share issue.[969]  The decision was upheld on appeal on 31 May 2004 and confirmed

---

[962]   Agenda for the Extraordinary General Shareholders' Meeting of Yukos Oil Company, 28 November 2003, Exh. R-3606; *Yukos Oil Company v. Kravin Investments and others*, LCIA Arbitration No. 4589, Statement of Case, 2 May 2005, Exh. R-3601; Misamore WS ¶¶ 22, 37; *Completion of Yukos−Sibneft Merger Suspended*, Interfax, 28 November 2003, Exh. R-3609 (quoting Mr. Nevzlin as saying:  "The Sibneft shareholders came to us this week and told us some technical difficulties had emerged.  They asked for Yukos charter amendments to be taken off the agenda at today's meeting and to leave the board of directors intact.  We coordinated our voting with [the Sibneft shareholders].  As for the Yukos dividends, we voted for Yukos"); *see Yukos Oil Company Shareholders' Meeting approves dividend of about $2 billion*, Yukos Press Release, 28 November 2003, Exh. C-666.

[963]   *Yukos Sibneft Merger*, Company News, Group Menatep Website, 2 December 2003, Exh. C-670.

[964]   Transcript, Day 9 at 22−24 (cross-examination of Mr. Misamore).

[965]   *Statement on the Status of Negotiations with Representatives of Former Principal Shareholders of Sibneft*, Yukos Press Release, 17 December 2003, Exh. C-672.

[966]   *Yukos Oil Company retains consultants for negotiations with former Sibneft core shareholders*, Yukos Press Release, 2 February 2004, Exh. C-680; Misamore WS ¶ 37.

[967]   At the time of the application, the two petitioners were Yukos shareholders.  NP Gemini Holding Limited was a former principal shareholder of Sibneft and had participated in all steps of the merger.  Nimegan Trading Limited was already a shareholder of Yukos when the Share Exchange Agreement was signed, with less than 0.001 percent of Yukos shares.  According to Claimants, both companies were linked to Mr. Abramovich through Millhouse Capital, an investment company that manages Mr. Abramovich's assets.  Memorial ¶¶ 216–19.

[968]   Petition to declare the FCSM (Federal Commission for the Securities Market) decision to register the issuance of securities unlawful, and to declare as null and void the issuance of the securities, 19 January 2004, Exh. C-71.

[969]   Decision of the Moscow Arbitrazh Court, Case No. A40–2353/04–92–35, 1 March 2004, Exh. R-549.

by the Federal Arbitrazh Court on 26 August 2004.[970]  Accordingly, in September 2004, Yukos returned to Sibneft's shareholders the 57.5 percent shareholding in Sibneft it had received in exchange for its newly issued shares.  Yukos' shareholding in Sibneft was then reduced to 34.5 percent.[971]

846. On 6 July 2004, Nimegan Trading Limited commenced legal proceedings against Yukos and others before the Arbitrazh Court of Chukotka, the Russian Far Eastern province where Mr. Abramovich was governor, seeking to have the second tranche of the share exchange (concerning a 14.5 percent stake in Sibneft) declared invalid.  In order to confer jurisdiction to the Chukotka Court, a defendant related to Mr. Abramovich had opened a bank account in the Chukotka province on the day that Nimegan paid the filing fee.  The other nominal defendants all supported the court action.[972]  The Chukotka Arbitrazh Court invalidated the second tranche of the share exchange on 14 September 2004.  After a series of appeals, this decision was ultimately confirmed by the Federal Arbitrazh Court for the Far-East District in April 2006,[973] following which Yukos returned the 14.5 percent shareholding in Sibneft obtained through the second tranche of the share exchange to Sibneft's shareholders.  Yukos' shareholding in Sibneft was then reduced to the 20 percent minus one share acquired pursuant to the Share Purchase Agreement.

847. On 30 September 2004, Yukos commenced an LCIA arbitration against the former principal shareholders of Sibneft, seeking an injunction prohibiting the respondents from initiating, continuing or encouraging any proceedings in the Russian courts to invalidate the share exchange.[974]  Ultimately, the arbitration would be discontinued by Yukos' Russian bankruptcy receiver, Mr. Eduard Rebgun.[975]

---

[970] Appeal Resolution of the Moscow Arbitrazh Court, 31 May 2004, Exh. C-72; Resolution of the Federal Arbitrazh Court for the Moscow District, 26 August 2004, Exh. C-73.

[971] Yukos' withdrawal instructions to Custody Department of Deutsch Bank, 24 September 2004, Exh. C-74.

[972] Payment Order for filing fee for the Chukotka proceedings, 27 May 2004, Exh. C-75; Petition to Declare Invalid an Interested Party Transaction and to Apply the Consequences of the Invalidity of the Transaction, 6 July 2004, Exh. C-76; Documents relating to the opening of Marthacello's bank accounts in Chukotka, 8 July 2004, Exh. C-77.

[973] Resolution of the Federal Arbitrazh Court for the Far-East District, 25 April 2006, Exh. C-78.

[974] *Yukos Oil Company v. Kravin Investments and others*, LCIA Arbitration No. 4589, Request for Arbitration, 30 September 2004, Exh. R-3600; *Yukos Oil Company v. Kravin Investments and others*, LCIA Arbitration No. 4589, Statement of Case, 2 May 2005, Exh. R-3601.

[975] Misamore WS ¶ 37.

(d)     **Russian Federation Ultimately Acquires Sibneft via Gazprom**

848.   In 2005, the Russian State-owned company Gazprom acquired 75.68 percent of Sibneft shares from Sibneft's principal shareholders for around USD 15 billion.[976]   In May 2006, Sibneft changed its name to OAO GazpromNeft.[977]

849.   The Tribunal notes that the 20 percent minus one shareholding in Sibneft that Yukos had acquired under the Share Purchase Agreement was sold in Yukos' bankruptcy auctions in April 2007 to EniNeftegaz, an Italian company,[978] and that in 2009, Gazprom exercised a call option (which had been in place since April 2007) to purchase the Sibneft shares from EniNeftegaz for the sum of USD 4.1 billion.[979]

3.     **Parties' Arguments and Tribunal's Observations**

(a)     **Was Yukos' NYSE Listing Put on Hold Because of the Yukos−Sibneft Merger or Fears of Exposing Yukos' Tax Optimization Scheme?**

850.   Claimants maintain that Yukos' proposed NYSE listing was put on hold in April 2003 as a result of the proposed Yukos−Sibneft merger and the need to conduct further due diligence.[980]

851.   In his witness statement, Mr. Misamore stated that

> Yukos' plan to obtain a Level 2 or 3 ADR listing on the NYSE was put on hold because of the decision in the beginning of 2003 to merge with Sibneft . . . and the need for further due diligence with respect to Sibneft to ensure complete transparency and financial statement accuracy before proceeding with any kind of listing of the merged company.[981]

852.   Mr. Misamore confirmed this statement in his re-direct examination before the Tribunal:

---

[976]   Gazprom 2005 Annual Report (excerpts), Exh. C-370; *Shares and Registrar*, Gazprom Neft Website, Exh. C-389; *Gazprom and Millhouse Capital Sign Legally Binding Documents for Purchase/Sale of 72.663 percent Stake in Sibneft*, Gazprom Press Release, 28 September 2005, Exh. C-771; *Management Committee Approves Gazprom's Buying into Sibneft*, Gazprom Press Release, 28 September 2005, Exh. C-772; *Gazprom agrees $13bn deal with Abramovich*, The Financial Times, 29 September 2005, Exh. C-773.

[977]   *Sibneft Changes Name to Gazprom Neft*, The Moscow Times, 16 May 2006, Exh. C-803.

[978]   *Gazprom, indirectly, wins assets of Yukos*, NY Times, 4 April 2007, Exh. C-847; *Eni announces $5.83 bn acquisition of Yukos assets. Major first step into Russian upstream market*, Eni Press Release, 4 April 2007, Exh. C-849; *A Yukos Auction With a 2nd Act*, The Washington Post, 5 April 2007, Exh. C-851; *On Working Meeting Between Alexey Miller and Paolo Scaroni*, Gazprom Press Release, 17 September 2007, Exh. C-877; *Eni to keep Gazprom Neft stake until 2009*, Reuters, 9 November 2007, Exh. C-878.

[979]   *How Putin Put Kremlin Back on Top*, The Moscow Times, 1 February 2008, Exh. C-879.

[980]   *See* Reply ¶ 104.

[981]   Misamore WS ¶ 20.

> Mr. Khodorkovsky informed me early in 2003 that he was working on a significant transaction—that turned out to be Sibneft—and he asked me to put the F-1 registration process on hold.   Certainly I could not have gone ahead with an F-1 in a significant transaction mode anyway.   So we put it on hold solely as a result of what subsequently became the Sibneft transaction.[982]

853.   Mr. Kosciusko-Morizet also confirmed this explanation when he testified.   After referring to the considerable work done in preparation for the NYSE listing and the extensive disclosure involved, he said:

> So work was pursued during and until the end of the year and the beginning of 2003, and then in April it was interrupted by the prospect of the Sibneft-Yukos merger, which obviously was material to any filing.   So negotiations were going on, and that prevented the filing of an ADR 3.[983]

854.   The Tribunal notes that, in the April−June 2003 edition of the *Yukos Review*, it was reported that the merger plans were "likely to push back Yukos' listing on the New York stock exchange from later this year into 2004."[984]

855.   Claimants also refer to an e-mail of 29 April 2003 from a lawyer at Akin Gump—the firm advising Yukos on its proposed NYSE listing—to Mr. Misamore reporting that the lawyer had spoken to an SEC official "to let him know about the proposed merger . . . and to tell him that although the timetable for the listing has been extended due to the merger, the company still intends to pursue a listing after the merger . . . ."[985]

856.   Respondent, however, maintains that the NYSE listing project was "abandoned" not because of the merger but because of "fears that, as a result of the extensive disclosures required by the [SEC], the process would publicly reveal Yukos' 'tax optimization' program, and this in turn would lead to major tax reassessments."[986]   According to Respondent:

> Whatever excuse Yukos may have provided to the SEC in March 2003 for halting its proposed NYSE listing, the possibility of a 2003 listing was in fact called off in February of that year as the result of Mr. Khodorkovsky's refusal to sign the company's registration statement out of an understandable concern for his own personal liability.[987]

---

[982]   Transcript, Day 9 at 240.

[983]   Transcript, Day 4 at 72–73.

[984]   Yukos Review, Issue 13, April−June 2003, p. 79, Exh. C-19.

[985]   E-mail from Mr. Robert Langer to Mr. Bruce Misamore, 29 April 2003, Exh. C-1384.

[986]   Counter-Memorial ¶ 1019.

[987]   Respondent's Post-Hearing Brief ¶ 77.

857. In support of its submission, Respondent refers to an exchange of e-mails of 19 and 20 February 2004 between Mr. Oleg Sheiko, Yukos' Director of Corporate Finance, and Mr. Khodorkovsky, in which Mr. Sheiko notes that Mr. Misamore had been asked by Mr. Khodorkovsky to delay the NYSE, and Mr. Khodorkovsky replies:

> If the lawyers do not confirm to me that my personal risks are limited by a reasonable period of time, I will not sign the form, because if my political career develops in 5 years, the American hook will become dangerous. I warned about this.[988]

858. Claimants did not comment on this e-mail.  In the Tribunal's view, this e-mail is consistent with Mr. Misamore's testimony that, in "early 2003", Mr. Khodorkovsky had asked him to put the listing on hold due to a substantial transaction, which turned out to be the merger with Sibneft.

859. Respondent also relies on a "blackline" version of Yukos' draft filing for the SEC sent by PwC to Yukos on 23 July 2002.[989]  As telling as that document may be with respect to Yukos' awareness of its tax risks,[990] the Tribunal notes that this document pre-dates by more than 9 months Yukos' decision to suspend the NYSE listing.

860. In conclusion, the Tribunal finds that Yukos' decision to put the NYSE listing project on hold in the spring of 2003 appears to have been motivated by the anticipated Yukos–Sibneft merger.

### (b)   Was the 2003 Interim Dividend a Component of the Yukos−Sibneft Merger or a Means to Siphon Funds out of Russia?

861. Claimants submit that the timing and amount of the 2003 Interim Dividend were solely related to and dictated by the Yukos−Sibneft merger.  They write:

> Yukos and Sibneft had agreed to target specific levels of net debt intended to reflect the relative values of the individual companies prior to the completion of the merger.  At that time, Yukos was substantially underleveraged as compared to Sibneft, with significant cash reserves.  It was therefore agreed that in order to leverage up and meet its target net debt level, Yukos would undertake the payment of dividends, a share buy-back and/or the taking out of a loan.  The 2003 interim dividend was therefore part of the Company's efforts to match the capital structure of Yukos and Sibneft, and return value to its shareholders prior to the completion of the merger, as is confirmed by the contemporaneous documentation.[991]

---

[988]   E-mail from Mr. Oleg Sheiko to Mr. Mikhail Khodorkovsky, 19 February 2003 and reply e-mail from Mr. Mikhail Khodorkovsky to Mr. Oleg Sheiko, 20 February 2003, Exh. R-3611.

[989]   Extract from Yukos' Draft F-1 Form, 23 July 2002, Exh. R-1477.

[990]   As to which, see paragraph 491 above.

[991]   Reply ¶ 115 (footnote omitted); *see* Transcript, Day 17 at 7–11 (Claimants' closing).

862.  With respect to the "contemporaneous documentation", Claimants refer to Yukos' press release of 22 April 2003 announcing the merger, which stated that

> [p]rior to completing the transaction, YUKOS intends to increase its leverage and is considering, among other things, cash distributions to its shareholders in the form of dividends and share buybacks.  It is expected that after such capital restructuring and the completion of the transaction, YukosSibneft will have a moderate level of leverage and a strong working capital position.[992]

863.  Claimants also refer to analysts' reports from the same period, which are all consistent with their submission.  For example, a Brunswick UBS Report dated 23 April 2003 stated that "Yukos has every reason to leverage up further—if its leverage reached levels similar to Sibneft . . ., implying $3.75 bn of new debt, Yukos could return $5.15 bn to shareholders . . . *before* the deal."[993]  An internal Yukos PowerPoint presentation about the merger also referred to the plan to declare a dividend in order to achieve the targeted net debt level.[994]  Mr. Misamore testified that the 2003 Interim Dividend was "an integral part" of the merger transaction:

> [The approval and payment of the dividend] was entirely related to the Sibneft transaction . . . [A]s part of the Sibneft transaction it was a desire of both of the shareholder groups to have a capital structure in YukosSibneft which did not disadvantage either of the two shareholder groups.  And therefore there were a series of transactions in association with the Sibneft merger/acquisition that were undertaken, including share repurchases, the bank debt, the payment of the dividend . . . and that was the reason for the dividend[, it] was the very last step in the consummation of the Sibneft transaction.[995]

864.  Claimants explain that the decision to pay the 2003 Interim Dividend was taken in three steps.[996]  Firstly, on 25 September 2003, when the Yukos Board of Directors scheduled for 28 November 2003 an EGM of Yukos' shareholders for purposes of approving the merger, the agenda included as an item "payment of dividend for 9 months of 2003."[997]  Secondly, on 28 October 2003, the Yukos Board of Directors set the amount of and process for approving and

---

[992]   *Yukos and Sibneft Agree in Principle to Merger*, Yukos Press Release and Sibneft Press Release, 22 April 2003, Exh. C-629.

[993]   Brunswick UBS Report "YukosSibneft", 23 April 2003, p. 9, Exh. C-1370 (emphasis in the original).  *See also* a Credit Suisse First Boston Report which predicted a dividend distribution in excess of USD 1.7 billion to shareholders as a means for Yukos to increase its net debt in the context of the merger. Credit Suisse First Boston Report "Yukos and Sibneft merge to form a GEM supermajor," 24 April 2003, p. 4, Exh. C-1371.

[994]   "YukosSibneft, Detailed transaction plan and Major Issues," Yukos PowerPoint Presentation, 18 June 2003, Exh. C-1068.

[995]   Transcript, Day 9 at 21, 236.

[996]   For a description of these steps, see Joint Stock Companies Law of the Russian Federation, Arts. 42–43, Exh. R-3604.

[997]   Minutes No. 120/1-21 of the Board of Directors of Yukos, 25 September 2003, p. 8, Item 11, Exh. C-1103.

paying the dividend.[998]  Thirdly, Yukos shareholders approved the 2003 Interim Dividend at the EGM on 28 November 2003.  According to Claimants, this sequence of events undermines Respondent's argument that the 2003 Interim Dividend was declared with unprecedented haste as a "clever", "eleventh hour" ploy to siphon funds out of Russia.[999]

865.  In its Counter-Memorial, Respondent argues that the 2003 Interim Dividend "betrays an unusual sense of urgency on the part of those who proposed it . . . who evidently sensed the gathering storm, wanted to get as much money as possible, as quickly as possible, out of the company, and out of Russia, and into their pockets."[1000]  In its Rejoinder, Respondent argues that, while the dividend might have had its origins in the Yukos–Sibneft merger, "by the time the dividend was actually declared, on November 28, 2003, the Sibneft merger had been halted and there was no longer any merger-related reason for the dividend."[1001]  Respondent recalls that Sibneft's principal shareholders informed Claimants before the EGM that they no longer wished to proceed with the merger, and points out that Claimants agreed with the Sibneft shareholders not to vote for items 1 and 2 of the EGM's agenda (changes to the board and the company's articles of association), but proceeded to vote in favour of the dividend.  Thus, Respondent argues, "the giga-dividend can only be explained by Claimants' desire to transfer outside the reach of the Russian authorities US\$ 2 billion that could otherwise have been used to pay Yukos' taxes and other liabilities."[1002]

866.  During the hearing, in response to a question from the Tribunal regarding the fact that the 2003 Interim Dividend had been planned since the spring of 2003, counsel for Respondent explained that, between this planning stage and the declaration of the dividend, "the world had changed," Mr. Khodorkovsky had been arrested and Sibneft had called off the merger, so that the "link between the declaration of the dividend and the Sibneft merger had been severed, and any prudent company, frankly, would have marshaled its resources rather than declared and paid a dividend that was unprecedented in size, at a time when it was under considerable financial pressure."[1003]

---

[998]   Agenda for the Extraordinary General Shareholders' Meeting of Yukos Oil Company, 28 November 2003, Exh. R-3606.

[999]   Counter-Memorial ¶ 351.

[1000]  Counter-Memorial ¶ 350.

[1001]  Rejoinder ¶ 821.

[1002]  *Ibid*.

[1003]  Transcript, Day 18 at 162 (Respondent's closing).

867.  It is not entirely clear to the Tribunal when Yukos' shareholders found out about the decision of Sibneft's shareholders to withdraw from the merger.[1004]  However, the exact timing does not matter.  The Tribunal accepts that Sibneft's decision was communicated to Yukos shortly before the EGM, but in time for Yukos' shareholders to agree with Sibneft's principal shareholders not to vote on the first two items of the agenda.

868.  Mr. Misamore testified that the Sibneft shareholders, Hulley and YUL "agreed between themselves to agree to vote for the dividend" because it was "an integral part of that [merger] transaction," although one of the parties had, at that point, changed its mind.[1005]  Claimants submit that, after the Sibneft announcement, as at 28 November 2003, the completed merger transaction was still in place and the 2003 Interim Dividend was a final step in consummating the merger.  The status of the transaction was not affected and there were ongoing negotiations to resolve outstanding issues with Sibneft.[1006]  In fact, in an announcement by GML in December 2003, it was stated that the merger agreement remained in full effect.[1007]

869.  In conclusion, the Tribunal finds that the decision to approve the 2003 Interim Dividend at the EGM on 28 November 2003 was an integral part of the merger process, which was still legally alive at the date of the EGM.  Whether it was practically still alive is questionable.  On balance, the evidence does not support Respondent's contention that the dividend was simply an "eleventh hour" device to siphon funds out of Russia for improper purposes.  Nevertheless the Tribunal sees some force in Respondent's contention that Yukos' stockholders might have more prudently acted to conserve Yukos' resources rather than to proceed with a massive dividend whose essential rationale was evaporating.

### (c)   Was the Unwinding of the Merger Caused by the Russian Federation?

870.  As noted earlier, the Russian Federation initially supported the Yukos−Sibneft merger.  President Putin expressed his approval of the transaction in a meeting with Mr. Khodorkovsky

---

[1004]   Some sources suggest that the announcement was made on the day of the EGM (*e.g.*, Misamore WS ¶ 37), while others state it took place on the eve of the meeting (*e.g.*, *Yukos Oil Company v. Kravin Investments and others*, LCIA Arbitration No. 4589, Statement of Case, 2 May 2005, Exh. R-3601).

[1005]   Transcript, Day 9 at 20 (cross-examination of Mr. Misamore).  However, as Respondent pointed out in its closing statement, Sibneft shareholders were not yet Yukos shareholders of record and could therefore not have voted for the dividend. S*ee* Transcript, Day 18 at 147–48.

[1006]   *See e.g.*, Yukos Review, Issue 16, January–February–March 2004, p. 58, Exh. C-23.

[1007]   *Yukos Sibneft Merger*, Company News, Group Menatep Website, 2 December 2003, Exh. C-670.

and Messrs. Abramovich and Shvidler in April 2003.[1008]  In May 2003, Mr. Shvidler stated in an interview that President Putin and Prime Minister Kasyanov had encouraged him to promote the merged YukosSibneft entity as a "national-champion".[1009]  On 22 July 2003, the Russian Federal Commission for the Securities Market approved the registration of new Yukos shares to be issued in connection with the merger.[1010]  On 14 August 2003, the Russian Ministry for Antimonopoly Policies and Support to Entrepreneurship approved Yukos' acquisition of the Sibneft shares.[1011]

871.  Following the arrest of Mr. Khodorkovsky in October 2003, Sibneft declared that it would halt the merger process unless the management team was changed.

872.  Claimants argue that the Russian Federation is responsible for the unwinding of the Yukos–Sibneft merger, despite its initial support for the transaction.  Claimants frame the question as one of causation.  As Claimants' counsel put it:  "[B]ut for the Russian Federation's attack on Yukos, the Yukos–Sibneft merger would never have been unwound.  And that point is not seriously challenged by the Respondent."[1012]  Claimants describe the arrest of Mr. Khodorkovsky as having "marked a radical escalation in the Russian Federation's attack on Yukos and . . . also marked the beginning of the end for the YukosSibneft merger."[1013]  According to Mr. Theede:

> [A]fter [Sibneft] saw what the Russian Federation was doing to Yukos, . . . saw it being destroyed . . . and in my opinion it was a direct result of that that caused Sibneft to want to detach itself from Yukos . . . .  I knew Sibneft was doing everything they could to get out of this, and they were fairly panicked because they wanted to get out before the Government destroyed our company . . .  [A]s soon as Sibneft saw and learned what was happening to Yukos, they wanted out of the deal . . . .  [W]e had completed the merger, we were moving ahead with it; everything was really going along quite smoothly, and I think we were all excited about it.  But Mr. Khodorkovsky's arrest and the political fallout from that, and then the subsequent attack on the company that was related to

---

[1008]   Nevzlin WS ¶ 26; Dubov WS ¶ 69; President of Russia, Official Web Portal, 24 April 2003, Exh. C-1053.

[1009]   *Sibneft President Eugene Shvidler comments on upcoming merger with Yukos to create YukosSibneft, a new international energy super major*, BusinessWeek Online, 21 May 2003, Exh. C-634.

[1010]   Notification of the State registration of the additional share issue by the Federal Commission for the Securities Market, 23 July 2003, Exh. C-51.

[1011]   Opinion and Directive issued by the Ministry for Antimonopoly Policies and Support to Entrepreneurship, 14 August 2003, Exh. C-52.  Respondent points out that some of these approvals were given *after* the arrest of Mr. Lebedev and Mr. Nevzlin's flight to Israel. Rejoinder ¶ 792.

[1012]   Transcript, Day 17 at 16 (Claimants' closing).

[1013]   Reply ¶ 127.

> Mr. Khodorkovsky's arrest, scared Sibneft off.  And there's no question in my mind that they were afraid that the attack on Yukos was going to carry over to them . . . .[1014]

873.   Mr. Nevzlin also testified that "[a]fter it became apparent that Mikhail Khodorkovsky was being targeted by the Kremlin, Roman Abramovich abruptly changed his mind and sought to unwind the merger."[1015]

874.   In support of their submission, Claimants mention that Mr. Abramovich met with President Putin only a few days before Sibneft's announcement of its decision to cancel the merger.[1016]

875.   Respondent does not dispute that concerns over Mr. Khodorkovsky's arrest led Sibneft to change its mind about the merger.  Respondent says that Sibneft's decision

> was not at all surprising, as Messrs. Khodorkovsky and Lebedev, Yukos' two leading Directors, had recently been arrested and charged with various criminal acts . . . .  [Their] future leadership of the company was thus in serious doubt, and any proposed partner would have understandably been concerned . . . .[1017]

876.   One London newspaper speculated that "[a]nalysts believe Mr. Abramovich's decision to cut ties with Yukos is an attempt to insulate himself from an apparently politically motivated campaign by the Kremlin against Mr. Khodorkovsky and Yukos."[1018]

877.   However, Respondent forcefully denies that Mr. Abramovich's decision was made "at the behest" of President Putin.  It writes in its Counter-Memorial that

> Mr. Abramovich did not need the President of the Russian Federation to tell him that Sibneft's proposed merger partner was the subject of a contentious tax dispute . . . .  In the circumstances, any reasonable company would have sought to extricate itself from the planned merger, or at least to ensure that the new company was not led by two executives recently indicted for tax evasion.[1019]

---

[1014]   Transcript, Day 10 at 39–41, 46.

[1015]   Nevzlin WS ¶ 27.

[1016]   Memorial ¶ 211 (citing *Abramovich met Putin before vetoing Yukos−Sibneft merger*, The Sunday Telegraph, 30 November 2003, Exh. C-669).

[1017]   Counter-Memorial ¶ 326.

[1018]   *Abramovich pulls out of $11bn merger with Yukos*, The Independent, 29 November 2003, Exh. C-667.

[1019]   Counter-Memorial ¶ 767(iv); *see* Rejoinder ¶ 786.

878.   According to Respondent, the meeting between Mr. Abramovich and President Putin, if at all relevant, only demonstrates that the Russian President welcomed Sibneft's proposal of a change in the management of the merged entity.[1020]

879.   The Tribunal notes that the Parties agree that Sibneft was firmly of the view that the only way for the merger to be saved would be if there was a change in the senior management of the merged company, *i.e.*, if Mr Shvidler was appointed as President.   Yukos was equally "adamant" that management issues were "not negotiable."[1021]   As the BBC reported on 28 November 2003, the "breaking point [of the merger] came when Yukos was not ready to hand over management of the company."[1022]

880.   Claimants characterize Mr. Abramovich's insistence on a change of management as "a manifestly unreasonable proposal which sought to turn the agreed terms of the merger upside-down."[1023]   They refer to the terms of the initial merger agreement which provided that Yukos would nominate the "Senior Management Positions" including the President,[1024] and to the 22 April 2003 press release which announced that Mr. Khodorkovsky would be CEO.[1025]   Claimants contend that Yukos' refusal to change the agreed terms of the merger was "hardly surprising" and that Respondent's "attempt to rely on such refusal to exonerate itself from responsibility for the consequences of its own actions should be rejected."[1026]

881.   Respondent replies that Yukos "could and should have accommodated" the entirely reasonable concerns of Sibneft.[1027]   Respondent points out that Yukos would still have nominated the other senior managers and that the CEO Yukos suggested in replacement of Mr. Khodorkovsky (Mr. Simon Kukes), was a relatively unknown figure.   With respect to causation, Respondent argues that it was "Yukos' stubborn refusal to consider Sibneft's change-in-management proposal—

---

[1020]   Counter-Memorial ¶ 328.

[1021]   *Abramovich met Putin before vetoing Yukos–Sibneft merger*, The Sunday Telegraph, 30 November 2003, Exh. C-669.

[1022]   *Yukos–Sibneft Merger Called Off*, BBC News, 28 November 2003, Exh. R-397 (quoting Mr. Boris Berezovsky).

[1023]   Reply ¶ 134.

[1024]   Shareholders' Agreement in respect of Yukos Oil Company among YUL, Hulley, White Pearl Investments Limited, N.P. Gemini Holdings Limited, Marthacello Co. Limited, Kindselia Holdings Limited, Heflinham Holdings Limited and Kravin Investments Limited, 1 May 2003, Article 6.1, Exh. C-1102.

[1025]   *Yukos and Sibneft Agree in Principle to Merger*, Yukos Press Release and Sibneft Press Release, 22 April 2003, Exh. C-629.

[1026]   Reply ¶ 134.

[1027]   Rejoinder ¶ 786.

and not any action on the part of the Russian Federation—that ultimately doomed the Yukos–Sibneft merger."[1028]

882.  Respondent also argues that it cannot bear any responsibility for the unwinding of the merger because Claimants and/or Yukos voluntarily agreed to it.  It is a matter of public record that, in early 2004, Yukos retained external advisers for negotiations with Sibneft.[1029]  Respondent also alleges that Claimants signed two protocols dated December 2003 and February 2004 to unwind the merger.[1030]  The Tribunal notes that these protocols are not in the record of this arbitration.   Under cross-examination, Mr. Misamore stated that he did not recall ever seeing the protocols.[1031]

883.  Claimants acknowledge that, "[a]lthough under no obligation to do so, Yukos and its majority shareholders agreed to enter into formal discussions with the former principal shareholders of Sibneft to consider a possible unwind of the transaction."[1032]  Claimants add however that Yukos and its majority shareholders made it clear that unless an acceptable agreement was reached and approved by the Yukos Board of Directors and its shareholders, Yukos would maintain the existing agreements and proceed with its merger with Sibneft.[1033]

884.  The Tribunal observes that, in the end, the decisions of the Moscow and Chukotka Arbitrazh Courts, although criticized by Claimants, effectively put an end to the merger.  There never was a consensual negotiated solution.[1034]

885.  Respondent speculates that it could have been Yukos that instigated the two court cases in order to achieve the demerger without having to seek the approval of minority shareholders.[1035]  Respondent refers to an e-mail of 13 February 2004 where Yukos' counsel Mr. Gololobov

---

[1028]  Counter-Memorial ¶ 330.

[1029]  *Yukos Oil Company retains consultants for negotiations with former Sibneft core shareholders*, Yukos Press Release, 2 February 2004, Exh. C-680.

[1030]  Respondent's Post-Hearing Brief ¶ 75 n.193 (citing *Yukos Oil Company v. Kravin Investments and others*, LCIA Arbitration No. 4589, Statement of Case, 2 May 2005, Exh. R-3601 ¶¶ 41, 44, 50).

[1031]  Transcript, Day 9 at 11–12.

[1032]  Memorial ¶ 212.

[1033]  *Yukos Sibneft Merger*, Company News, Group Menatep Website, 2 December 2003, Exh. C-670; *Statement on the Status of Negotiations with Representatives of Former Principal Shareholders of Sibneft*, Yukos Press Release, 17 December 2003, Exh. C-672.

[1034]  *See* Transcript, Day 17 at 25.

[1035]  Rejoinder ¶¶ 797–806.

proposed a five-part "Scheme of Actions for Unwinding Transaction."[1036]   The first step was a "[s]uit to have issuance of shares declared invalid,"[1037] which, Respondent argues, bears a striking resemblance to the lawsuit brought in January 2004 by NP Gemini Holdings Limited and Nimegan Trading Limited before the Moscow Arbitrazh Court.

886.   The Tribunal notes that this e-mail was sent after the commencement of the Moscow lawsuit. Respondent's theory is also inconsistent with the fact that Yukos applied to an LCIA tribunal to prevent the former Sibneft shareholders from pursuing actions for the invalidation of the share issuance before the Moscow and Chukotka courts.   The Tribunal finds this argument of Respondent unpersuasive.

887.   The central question remains.   Did the Russian Federation cause the demerger?   In the view of the Tribunal, it did not.   It is abundantly clear that Sibneft wanted out of the merger after the arrest of Mr. Khodorkovsky.   It was perfectly understandable for Sibneft to have second thoughts about the merger under the leadership of a CEO who was under arrest and embroiled in controversy.[1038]   The Tribunal does not see the fingerprints of Respondent in Sibneft's decision to insist upon a change in management after the arrest of Mr. Khodorkovsky or in Sibneft's subsequent announcement that it would not proceed with the merger.

888.   The Tribunal therefore concludes that Claimants have not established any basis which would allow them to claim damages based on the assumption that the merged YukosSibneft company would have been successful.[1039]

889.   However, the circumstances of the Yukos−Sibneft merger are instructive in evaluating Yukos' attempts to settle its tax debts with the Russian authorities, which will be discussed in the next chapter.

890.   The Tribunal will now review the attempts by Yukos to settle its tax debts and the reaction of the Russian authorities to Yukos' offers.

---

[1036]   E-mail from Mr. Dmitry Gololobov to Mr. Yuriy Beilin attaching "Scheme of Actions for the Unwinding Transaction," 13 February 2004, Exh. R-3602.

[1037]   *Ibid.*, Flowchart.

[1038]   The Tribunal notes that Sibneft's position was not inconsistent with the spirit of the Shareholders' Agreement, which contained a provision allowing the Sibneft shareholder group to remove any Yukos-appointed senior managers if they committed fraud or embezzlement.   Shareholders' Agreement in respect of Yukos Oil Company among YUL, Hulley, White Pearl Investments Limited, N.P. Gemini Holdings Limited, Marthacello Co. Limited, Kindselia Holdings Limited, Heflinham Holdings Limited and Kravin Investments Limited, 1 May 2003, Article 6.1, Exh. C-1102.

[1039]   *See* Part XII on Quantification of Damages at paragraph 1779.

E.    ATTEMPTS TO SETTLE

  1.    Introduction

891.  In the second half of 2004, Yukos made several proposals to the Russian authorities for the settlement of its tax debts.  None of these proposals was accepted by the Russian Federation, which moved to auction off YNG in December 2004 in spite of Yukos' protests.

892.  This chapter examines the context of Yukos' settlement offers, their content and the Russian Federation's reaction to them, with a view to determining whether the conduct of the Russian Federation was more consistent with the goal of collecting taxes or, as Claimants argue, with the aim of leading Yukos to bankruptcy and appropriating its most valuable assets.

893.  Claimants submit that, through its settlement offers, Yukos sought to initiate a dialogue with the Russian Federation that could lead to Yukos paying its tax debts while "preserv[ing] the company as a going concern."[1040]   However, the settlement offers were met with a "complete lack of responsiveness" and utter inflexibility from the Russian Federation.[1041]  For Claimants, this reaction is "one of the strongest testaments" to the fact that Respondent was not interested in tax collection, but only the destruction of Yukos.[1042]   As put by Claimants' counsel at the Hearing:

> the bottom line is: if the Russian Federation was interested in collecting taxes, it would have responded to Yukos; it would have worked with Yukos to try and find a way for the company to pay its alleged tax debt. . . . And we say that this is consistent and supports the Claimants' conclusion that this was not about paying taxes but was about the expropriation of the company.[1043]

894.  Claimants add that the Russian Federation's real intent with respect to Yukos is also revealed by the fact that it did settle the tax debts of other oil companies, such as Rosneft, Sibneft and TNK-BP.[1044]

895.  Claimants also submit that, in addition to rejecting Yukos' settlement offers, the Russian authorities actively prevented Yukos from discharging its tax liabilities by freezing and seizing

---

[1040]    Theede WS ¶ 9; *see also* Transcript, Day 17 at 126.

[1041]    Reply ¶ 321.

[1042]    Transcript, Day 20 at 216 (Claimants' closing); *see also* Rieger WS ¶ 24.

[1043]    Transcript, Day 17 at 105 (Claimants' closing).

[1044]    Claimants' Skeleton Argument, 1 October 2012 ¶ 26 (hereinafter "Claimants' Skeleton").

Yukos' assets (through the April 2004 injunction of the Moscow Arbitrazh Court and the bailiffs' resolutions of June and July 2004).[1045]   As a result, Yukos could only pay its tax debts from the proceeds of the business operations of its subsidiaries, which did not suffice to meet Yukos' liabilities in the short time allowed by the Russian authorities.[1046]

896.   For its part, Respondent submits that the Russian authorities responded to each of Yukos' offers[1047] and, moreover, were entitled to reject these offers because none of them amounted to a serious proposal.[1048]   From Respondent's perspective, Yukos' settlement offers were a mere posturing exercise intended to give "an appearance of cooperation, while fostering the image—embellished by their public relations machines—that Yukos was a victim of the authorities' conduct."[1049]   Yukos' offers were "invariably unacceptable, either because they were contrary to Russian law, or because they involved impaired assets, or because they were otherwise inadequate."[1050]

897.   Respondent further submits that, by the second half of 2004, "Yukos' management faced a serious credibility problem, among other things because it had made manifestly false claims that it was unable to pay any of its tax bills."[1051]   Given Yukos' bad faith, the Russian authorities' refusal to negotiate was reasonable.[1052]   Respondent concludes that Yukos caused its own demise by failing to pay its tax debts in full in the first quarter of 2004 (instead making disingenuous and inadequate settlement proposals), thereby attracting mounting interest and fines.[1053]

898.   The Tribunal recalls that the *Quasar* tribunal found that the Russian Federation's failure "even to respond" to the offers made by Yukos, "the largest private taxpayer in Russia" and a major

---

[1045]   Memorial ¶ 351.

[1046]   *Ibid*. ¶¶ 351, 353.

[1047]   Respondent's Closing Slides, p. 895; *see also* Rejoinder ¶ 893.

[1048]   Counter-Memorial ¶ 419.

[1049]   Rejoinder ¶ 897.

[1050]   Counter-Memorial ¶ 419; *see also* Rejoinder ¶ 893.

[1051]   Counter-Memorial ¶ 418.

[1052]   Respondent's Closing Slides, pp. 804–806.

[1053]   Respondent's Post-Hearing Brief ¶¶ 220–21.

force of the national economy, raised "significant doubts as to whether the Respondent acted in good faith in attempting to resolve its tax dispute with Yukos."[1054]

**2.     Yukos' Settlement Offers (and the Russian Federation's Replies)**

899.   To place the settlement offers in context, it is helpful to recall the dates of some key events.[1055]

900.   The 2000 Audit Report, the first audit report to assess tax arrears against Yukos, was issued on 29 December 2003.[1056]   The 2000 Decision holding Yukos fiscally liable for a tax offense and concluding that an amount of approximately USD 3.48 billion was due within two days, was issued on 14 April 2004.[1057]

901.   On 15 April 2004, the Moscow Arbitrazh Court, upon application by the Tax Ministry, issued the 2004 Injunction prohibiting Yukos "from alienation and encumbrance in any way of its assets, including shares (including prohibition from the transfer of securities to a nominee holder and in trust management), interests in the charter capital of other legal entities, securities, excluding main types of products manufactured by [it]."[1058]

902.   In a decision dated 23 June 2004 and published on 30 June 2004, the Appeal Panel of the Moscow Arbitrazh Court reversed a 19 May 2004 ruling that had provisionally suspended the effect of the 2000 Decision.[1059]

903.   On 29 June 2004, an appeal resolution of the Moscow Arbitrazh Court upheld a first instance decision allowing the Tax Ministry to collect "tax arrears, interest, and fines" from Yukos in an amount of USD 3.42 billion.[1060]   On 30 June 2004, the Moscow Arbitrazh Court issued an enforcement writ for this amount.[1061]

---

[1054]   *Quasar* ¶ 102, Exh. R-3383.

[1055]   For a complete narrative, *see* Chapter VIII.B of this Award.

[1056]   2000 Audit Report, Exh. C-103.

[1057]   2000 Decision, Exh. C-104.

[1058]   April 2004 Injunction, Exh. C-108.

[1059]   Decision of Judge Cheburashkina to Suspend the Effect of Decision No. 14-3-05/1609-1 of 14 April 2004, Exh. C-112; Moscow Arbitrazh Court, Appeal Resolution in the name of the Russian Federation, 23 June 2004, Exh. C-120.

[1060]   Decision of the Moscow Arbitrazh Court, 26 May 2004, Exh. C-116; Moscow Arbitrazh Court, Appeal Resolution, 29 June 2004, Exh. C-121.

[1061]   Enforcement Writ No. 383729, 30 June 2004, Exh. C-122.

904.   On the same day, Bailiff Solovyova issued a resolution to initiate an enforcement proceeding. The resolution granted Yukos a 5-day period for voluntary payment of the full amount due, failing which the Bailiff would consider imposing a 7 percent enforcement fee.[1062]   The Bailiff then issued several more resolutions, freezing cash in 16 Yukos bank accounts.[1063]

905.   The 2001 Tax Audit, assessing USD 4.1 billion in taxes, interest and fines against Yukos, was released on 30 June 2004.[1064]

906.   During July 2004, Bailiffs Solovyova and Borisov issued further resolutions restricting Yukos' access to its assets and imposing the collection of a 7 percent enforcement fee. [1065]

907.   On 9 July 2004, the Chukotka Arbitrazh Court issued interim measure orders in proceedings between former shareholders of Sibneft and Yukos, attaching 72 percent of Sibneft's share capital and thus shrinking Yukos' alienable stake in Sibneft to 20 percent minus one share (the "**Chukotka Injunctions**").[1066]

908.   On 6 July 2004, Yukos began making cash payments against its tax debts from the proceeds of the business operations of its subsidiaries.[1067]   By 16 November 2004, Yukos had paid USD 3.47 billion—a little more than the amount of its tax liability for the year 2000.[1068]

909.   However, Yukos' tax liabilities increased with the 2001 Decision, the 2002 Decision and the 2003 Decision, which were issued on 2 September, 16 November and 6 December 2004, respectively, and required payment by Yukos of tax arrears, fines and interest in the amounts of USD 4.1, 6.7 and 6 billion.[1069]

910.   YNG was auctioned on 19 December 2004.[1070]

---

[1062]   Resolution of the bailiff to initiate enforcement proceeding 10249/21/04, 30 June 2004, Exh. C-123.

[1063]   Resolutions of the bailiffs to seize monies, 30 June 2004, Exh. C-124.

[1064]   Repeat Field Tax Audit Report No. 30-3-14/1 (2001), 30 June 2004, Exh. R-345.

[1065]   Resolution to restrict the rights of the securities owner, 1 July 2004, Exh. C-125; Resolution No. 10249/21/04 to Collect an Enforcement Fee, 9 July 2004, Exh. C-132.

[1066]   Rulings of the Arbitrazh Court of the Chukotka Autonomous District, Case No. A80- 141/2004, 9 July 2004, Exh. R-553.

[1067]   Reply ¶ 320, referring to Exhs. C-212 to C-238.

[1068]   Memorial ¶ 358, referring to Exh. C-234.

[1069]   2001 Decision, Exh. C-155; 2002 Decision, Exh. C-175; 2003 Decision, Exh. C-190.

[1070]   Protocol of the results of the auction to sell shares in OAO Yuganskneftegaz, 19 December 2004, Exh. C-290.

911.  Between 29–30 June 2004—when one appeals decision lifted the provisional suspension of the effect of the 2000 Decision and another confirmed the Tax Ministry's USD 3.42 billion claim against Yukos—and December 2004—when the YNG auction took place—Yukos made several proposals to the Russian authorities to settle its tax debts.  These proposals may be classified in four categories: (a) proposals made to the bailiffs, requesting enforcement against specific assets; (b) proposals for a global settlement conveyed by the Right Honourable Jean Chrétien, PC, OM, CC, QC, former Prime Minister of Canada; (c) requests for a deferral or payment in instalments; and (d) other proposals (which are not in the documentary record in this arbitration).  The Rehabilitation Plan, proposed by Yukos' management in the bankruptcy proceedings and discussed in greater detail in Chapter VIII.G of this Award, can be seen as Yukos' final attempt to discharge its tax liabilities while continuing as a going concern.

### (a)   Proposals Made to the Bailiffs

912.  On 2 July 2004, Mr. Gololobov, Yukos' legal counsel, wrote to Bailiff Solovyeva, explaining that the April 2004 Injunction and the Bailiff's 30 June 2004 seizure of 16 Yukos bank accounts prevented Yukos from voluntarily complying with the 30 June 2004 enforcement resolution and requesting that Bailiff Solovyeva accept, by way of voluntary enforcement, the transfer of a 34.5 percent stake in Sibneft, corresponding to the 20 percent minus one share stake obtained by Yukos under the Share Purchase Agreement plus the 14.5 percent stake obtained by Yukos as the second tranche under the Share Exchange Agreement.[1071] Mr. Gololobov's letter stated that the value of the 34.5 percent stake in Sibneft was approximately USD 4 billion.

913.  On 9 July 2004, Mr. Gololobov again requested Bailiff Solovyeva to accept Yukos' 34.5 percent stake in Sibneft in payment of Yukos' tax debts.[1072] Respondent has described this request dated 13 July 2004 as being "in clear violation of the Chukotka [I]njunctions."[1073] However, Claimants correctly point out that, while 13 July 2004 may have been the date when the letter was received by the Bailiff, the letter itself is dated 9 July 2004.[1074]

---

[1071]  Petition for voluntary enforcement of the Resolution of 30 June 2004 to initiate enforcement proceedings and the Demand of 30 June 2004, 2 July 2004, Exh. C-126.

[1072]  Application on the procedure of performance of the Resolution on commencement of enforcement proceedings dated 30 June 2004 and the Demand dated 3 June 2004, 9 July 2004, Exh. R-554.

[1073]  Counter-Memorial ¶ 425.

[1074]  Reply ¶ 328 n.630.

914.   On 14 July 2004, Mr. Gololobov amended Yukos' previous requests and lowered the offer to a 20 percent minus one share stake in Sibneft ostensibly to take account of the Chukotka Injunctions dated 9 July 2004.[1075]  Mr. Gololobov indicated that the 20 percent minus one share stake in Sibneft was worth between USD 2.3 and 2.5 billion.[1076]

915.   On 6 August 2004, Mr. Gololobov wrote to Chief Bailiff Melnikov, requesting that the 20 percent minus one share stake in Sibneft, as well as Yukos' holdings in 15 other companies with a purported value of approximately USD 1.1 billion, be used for enforcement purposes as a matter of priority.[1077]   The letter incorrectly stated that the 20 percent stake comprised 1,637,633,048 shares (a number that in fact corresponds to a 34.5 percent stake), prompting Respondent to argue that Yukos sought to conceal from the bailiffs that at least a 14.5 percent stake in Sibneft was encumbered pursuant to the Chukotka Injunctions.[1078]   The letter also stated that the total value of the assets offered in payment was USD 3.4 billion.[1079]  But, the annex to the letter valued the shareholdings in Sibneft at USD 2.351 billion, which corresponds to the value of a 20 percent minus one share stake (as stated in Yukos' letter of 14 July 2004), and all the assets offered at USD 3.4 billion.[1080]  It is obvious that the letter contained some errors, which could have been corrected by the bailiffs by comparing it to its annex and the letter of 14 July 2004.

916.   On 16 September, 24 November and 16 December 2004, Yukos wrote further letters to the bailiffs (in response to the issuance of the 2001, 2002 and 2003 Decisions),[1081] again proposing that enforcement be made as a matter of priority against its stake in Sibneft and 15 other entities.[1082]  These proposals did not specify the number or percentage of Sibneft shares that Yukos was offering, but the total value of the assets offered in each case was said to be USD 3.407 billion.  This figure is identical to the total amount of assets referred to in the annex

---

[1075]   Addendum to petition regarding the process of enforcement of the Resolution of June 30, 2004 to initiate enforcement proceedings and the Demand of June 30, 2004, 14 July 2004, Exh. C-137.

[1076]   *Ibid.*

[1077]   Letter from Mr. Gololobov to Chief Bailiff A.T. Melnikov, 6 August 2004, Exh. C-140.

[1078]   Counter-Memorial ¶ 427, n.636.

[1079]   Letter from Mr. Gololobov to Chief Bailiff A.T. Melnikov, 6 August 2004, Exh. C-140.

[1080]   *Ibid.*

[1081]   Memorial ¶¶ 354, 356.

[1082]   Petition for voluntary enforcement of Resolution of 09.09.2004 to initiate an enforcement proceeding and Demand of 30.06.2004, 16 September 2004, Exh. C-163; Petition for voluntary enforcement of Resolution 19 November 2004 to initiate an enforcement proceeding, 24 November 2004, Exh. C-180; Petition for voluntary enforcement of the Resolution of 09.12.2004 to initiate an enforcement proceeding, 16 December 2004, Exh. C-195.

to the 6 August 2004 letter, and it appears to have been calculated on the basis of a 20 percent minus one share stake in Sibneft.[1083]

917.   The bailiffs did not respond to the proposals made by Mr. Gololobov in July 2004.  Yukos challenged the bailiffs' silence before the Moscow Arbitrazh Court, which found, in a decision dated 17 August 2004, that the bailiffs had acted lawfully because both the 14.5 percent stake in Sibneft, which was attached pursuant to the Chukotka Injunctions, and the remaining 20 percent minus one share stake in Sibneft, were disputed by Sibneft's former shareholders.[1084]

918.   The Department of Bailiffs within the Russian Ministry of Justice responded to Yukos' 6 August 2004 letter on 9 September 2004, referring in particular to the decision of the Moscow Arbitrazh Court of 17 August 2004 and concluding that the Russian judiciary had "affirmed the right of the bailiff to make the final decision regarding the sequence for seizures."[1085]

919.   The bailiffs did not respond to Yukos' letters of 16 September, 24 November and 16 December 2004.  Respondent submits that the bailiffs did not need to respond as, by then, Yukos had already been put on notice by the 17 July 2004 decision of the Moscow Arbitrazh Court that its offers of Sibneft shares were unacceptable.[1086]  The Tribunal notes, however, that the bailiffs also failed to react to Yukos' offer of shares in companies other than Sibneft, in respect of which the Moscow Arbitrazh Court had not commented.

    **(b)   Proposals for a Global Settlement Conveyed by Mr. Chrétien**

920.   Mr. Chrétien wrote to Prime Minister Fradkov on behalf of Yukos for the first time on 6 July 2004, offering a "global settlement" of USD 8 billion for the taxes assessed against Yukos in 2000–2003, with 2 billion to be paid in cash in July 2004 and two more tranches to be paid in

---

[1083]   With respect to the Sibneft shares, in addition to the proposals listed here, Yukos also applied on 22 April 2004 to the Moscow Arbitrazh Court for a replacement of the April 2004 Injunction with a new injunction that would instead freeze Yukos' 57.5 percent stake in Sibneft (*see* Exhs. R-476 and R-477).  Yukos' application was rejected the following day (Exh. R-452).  Respondent discussed this application in the context of Yukos' settlement offers (Counter-Memorial ¶ 420).  However, since the purpose of the application was the unfreezing of Yukos' assets in the context of interim measures ordered against it, rather than a final settlement of the tax claims, the Tribunal considers that this application cannot properly be characterized as a settlement proposal.

[1084]   Decision of the Moscow Arbitrazh Court, 17 August 2004, Exh. C-143.

[1085]   Letter from Mr. Sazanov, Deputy Head of the Bailiffs Department to Mr. Gololobov, 9 September 2004, Exh. C-146. *See also* Memorial ¶ 350.

[1086]   Rejoinder ¶ 893(c).

July 2005 and July 2006.[1087]   As security for the payment of the July 2005 tranche, Yukos offered its 35 percent stake in Sibneft.[1088]

921.   Having received no reply, Mr. Chrétien reiterated the global settlement proposal in another letter to Prime Minister Fradkov dated 15 July 2004 and in letters addressed to President Putin dated 30 July, 10 September and 17 November 2004.[1089]

922.   Noting that Mr. Chrétien's letter of 30 July 2004 offered an "uncontested" 35 percent stake in Sibneft as collateral, Respondent again argues that Yukos sought to conceal from Respondent that at that time at least a 14.5 percent stake in Sibneft was encumbered pursuant to the Chukotka Injunctions.   However, as Mr. Chrétien's letter in this respect contradicted Mr. Gololobov's letter to the bailiffs of 14 July 2004, the Tribunal views the reference to the uncontested stake in Sibneft as a mistake rather than a deliberate attempt by Yukos to mislead the Russian authorities.

923.   Referring to Mr. Chrétien's letters of 30 July 2004 and 17 November 2004, Respondent submits that, while Prime Minister Fradkov and President Putin did not respond to Mr. Chrétien in writing, they did discuss with him the tax claims against Yukos.[1090]

924.   In his letter of 30 July 2004, Mr. Chrétien refers to a discussion with President Putin during a "meeting in July."[1091]   In his letter of 17 November 2004, he describes a meeting with President Putin as follows:

> [w]hen we last met in Moscow, you told me that I could take the mandate to represent the interests of Group Menatep, and possibly other minority shareholders of Yukos, to find a solution to the tax problems confronting them. . . . When you and I last spoke after our meeting, you asked for a letter outlining our proposal to settle this matter and you assured me that a response from the Minister responsible for this file would be forthcoming.  I sent you the letter at the end of July, but have received no communications from your government as yet.[1092]

---

[1087]   Letters from Jean Chrétien to Prime Minister Fradkov of 6 and 15 July 2004, and to President Putin of 30 July 2004, 10 September 2004 and 17 November 2004, Exh. C-129 (hereinafter "Chrétien letters").

[1088]   *Ibid.*

[1089]   *Ibid.*

[1090]   Respondent's Closing Slides, pp. 302, 324.

[1091]   Chrétien letters, Exh. C-129.

[1092]   *Ibid.*

925. From these excerpts, it appears that President Putin initially encouraged the overture of a dialogue regarding Yukos' tax liability, but that neither he nor any other Russian authority ever responded to the concrete proposal made by Mr. Chrétien on Yukos' behalf.

926. Under cross-examination at the Hearing, Mr. Theede expressed Yukos' frustration with the lack of response from the Russian Federation:

> By this time it was really becoming obvious that Mr. Chrétien's, you know, admirable efforts just weren't going to get us where we needed to go, because he had been made—a lot of promises had been made to him about 'All I want Yukos to do is pay taxes, you know? That's all I want out of them: I just want them to pay taxes.  And if you can get them to do that, then send me a proposal and it will work.'
>
> And he did all that, and never got a response.  And it's now several months after the original proposal.  I suppose—I suppose, you know, no question in my mind—the authorities probably already by July had in mind the amount of money that they were going to rack up against us in tax liabilities.  They probably knew that they were going for something in the order of $30 billion, and so to them the $8 billion was low.  And of course, they couldn't come back and say, 'Look, our plan is to tax you $30 billion, and so you guys are well off the mark.' They couldn't say that, because it would have blown their cover.
>
> But we were trying, and thought Mr Chrétien was a very credible way to open the dialogue I've been talking about all afternoon.  But by this time, I don't—I had pretty much lost hope, and was, I guess, impressed that Mr Chrétien was continuing to try, but to no avail.[1093]

### (c)   Requests for a Deferral or Payment in Instalments

927. On 16 July 2004, Mr. Steven Theede sent a letter signed by Mr. Bruce Misamore to the Minister of Finance, Mr. Kudrin, then Minister of Finance, requesting a six-month deferral or payment in instalments of the tax arrears and interest for the year 2000.[1094]  The letter referred to the "unprecedented nature" of the sum subject to collection and the potentially negative consequences of rapid enforcement on Yukos' production operations and the Russian budget.[1095]  During the Hearing, Mr. Theede acknowledged that the letter was not perfect (the proposals were not detailed) but he described the letter as an attempt to "create a dialogue" between Yukos and the Russian Federation.[1096]  The Ministry of Finance rejected Mr. Theede's request by letter dated 30 August 2004, relying on Art. 62(1)(2) of the Russian Tax Code,

---

[1093]   Transcript, Day 10 at 100–101.

[1094]   Petition for deferral or payment in instalments, 16 July 2004, Exh. C-138.

[1095]   *Ibid.*

[1096]   Transcript, Day 10 at 54.

which provides that the term for the payment of tax cannot be changed if the entity applying for such a change is the subject of proceedings for a tax offence.[1097]

928.  On 12 August 2004, Yukos petitioned the Moscow Arbitrazh Court for the right to pay its tax debt for the year 2000 in 15 monthly instalments of USD 143.96 million.  Judge Grechishkin denied the petition, stating that while he had discretion under the law to order payment in instalments, in this case the circumstances did not justify such an order.[1098]

    **(d)   Other Proposals**

929.  Claimants submit that the settlement offers described above are "just a sample" of the "roughly 80 proposals and attempts to communicate with various authorities" made by Yukos.[1099]  They say that other settlement proposals were made, but did not leave a paper trail.

930.  For example, Mr. Rieger recounts in his witness statement that, in the summer of 2004, he and Mr. Gololobov had a meeting with Chief Bailiff Belyakov during which they "explained that Yukos could start selling off its assets within a month in order to pay off its alleged tax debts" and "left a two-page letter for the Russian authorities setting out Yukos' settlement proposal." Mr. Rieger adds that the authorities did not respond to this proposal.[1100]  Noting that Mr. Rieger could not recall the exact terms of the proposal, Respondent suggests that, in the light of the timing, there is no reason to believe that the proposal differed from that made in Mr. Golobolov's 6 August 2004 letter (described in paragraph 915 above).[1101]

931.  In their respective witness statements, Messrs. Theede and Misamore also recount that, in October 2004, "the company put everything it could into a last settlement effort" and presented to the Russian authorities a USD 21 billion settlement proposal that included Yukos shares, Sibneft shares, non-core assets and "a concession to re-elect a new board of directors that would include a number of people selected by the Government."[1102]  While Yukos was initially

---

[1097]  Letter from the Tax Ministry to Yukos, 30 August 2004, Exh. C-145, referring to Russian Tax Code, Article 62, Exh. R-557.

[1098]  Ruling of the Moscow Arbitrazh Court, 12 August 2004, Exh. C-142.

[1099]  Transcript, Day 17 at 105 (Claimants' closing), referring to Theede WS ¶ 9.

[1100]  Rieger WS ¶¶ 21–23.

[1101]  Respondent's Closing Slides, p. 319, referring to Transcript, Day 6 at 130 (cross-examination of Mr. Rieger).

[1102]  Misamore WS ¶ 47; Theede WS ¶ 21.

"cautiously optimistic", the negotiations ended abruptly when Mr. Temerko, Yukos' chief negotiator in the process, was threatened with arrest and fled Russia. [1103]

932.  Respondent emphasizes that there is no written record of this proposal and no witness statement by Mr. Temerko. Respondent also contends that "[i]f there were such a proposal in any amount, there is no rational basis for believing it totalled US $21 billion, because after it was allegedly made in October 2004, Yukos continued to make proposals it valued at US$ 3.4 billion, and Mr. Chrétien kept reiterating his 'global settlement' proposal of US$ 8 billion."[1104]

933.  When asked in cross-examination whether there was a record of this offer, Mr. Theede replied "[y]ou have no record, but you do have my word.  And I believe certainly Bruce Misamore and I have exactly the same recollection."[1105]  Mr. Misamore was not cross-examined regarding this settlement proposal.

### 3.    Parties' Arguments and Tribunal's Observations

#### (a)    Did Yukos Contribute to its Own Demise by Failing to Discharge Tax Debt in the Amount of USD 9 Billion in the First Quarter of 2004?

934.  As discussed in paragraphs 679–80 and 745–48 above, Respondent submits that Yukos could have avoided some of the taxes, fines and interest eventually assessed against it, in the first quarter of 2004, by filing amended VAT returns in its own name, amended tax returns for 2000–2002 and a tax return for 2003 recognizing all of Yukos' income without assigning it to its trading entities.  According to Respondent, had Yukos taken these steps, it would have faced only USD 9 billion in unavoidable tax debt, comprising the full amount assessed against it for the year 2000 and the amounts assessed against it for 2001–2003 minus VAT, willful and repeat offender fines and a part of the default interest accrued on the taxes for those years.[1106]

935.  Respondent also contends that Yukos could have paid this amount—USD 9 billion—in the first quarter of 2004.  At that time, Respondent argues, Yukos had both the ability to calculate its tax liabilities for 2001–2003 based on the amounts assessed against it for the year 2000 and

---

sufficient funds.[1107]   Specifically, Respondent submits that Yukos had "unrestricted access" to: (a) over USD 6.8 billion in cash, constituting revenue from Yukos' trading entities paid out in dividends to Brittany Ltd., a British Virgin Islands indirect subsidiary of Yukos;[1108] (b) USD 3 billion in cash, which Yukos was entitled to receive in the context of the unwinding of the Sibneft merger for the 20 percent minus one share stake it had acquired under the Share Purchase Agreement;[1109] (c) over USD 1.1 billion in cash generated by Yukos' continuing operations;[1110] (d) the USD 2 billion "giga-dividend" Yukos paid out to its shareholders in December 2003 and January 2004;[1111] and (e) at least USD 1.55 billion in offshore non-monetary assets.[1112]   Respondent also points out that, until the April 2004 Injunction, all of Yukos' assets in Russia were available to it to pay its tax debts.[1113]

936.   Respondent submits that, by re-filing its VAT and tax returns and paying USD 9 billion in the first quarter of 2004, Yukos could have avoided the 7 percent enforcement fee imposed by the bailiffs and "all of the enforcement measures about which Claimants complain, including the April 14, 2004 injunction, the June 30, 2003 cash freeze orders, the seizures of shares, and the YNG auction."[1114]   Yukos would thus "have survived as a going concern and still could have pursued a claim for a refund of any amounts the courts found it did not need to pay."[1115]

937.   Respondent insists that, as Mr Konnov stated in his second expert report, "[t]he filing of tax returns and the payment of the tax would not have prejudiced Yukos' appeal rights."[1116]   According to Respondent, Mr Konnov's opinion is confirmed by Yukos' counsel Mr Pepeliaev who, in a commentary published in 2002, wrote:

---

[1107]   Respondent's Closing Slides, p. 247, referring to Exh. C-1756.

[1108]   Respondent's Post-Hearing Brief ¶ 79, n.199; Rejoinder ¶¶ 838–41.  For a description of Brittany's place in the Yukos corporate structure and revenue flow structure see Supplemental Expert Report of Thomas Z. Lys, 15 August 2012, ¶¶ 105, 114, 130–37 and Appendix I.

[1109]   Respondent's Post-Hearing Brief ¶ 79, n.199; Rejoinder ¶ 842.

[1110]   *Ibid.*; Rejoinder ¶¶ 843–44.

[1111]   *Ibid.*; Rejoinder ¶ 845.

[1112]   *Ibid.*; Counter-Memorial ¶ 372, n.500.

[1113]   Respondent's Closing Slides, p. 267.

[1114]   Rejoinder ¶ 834.  Respondent adds that even if Yukos had waited until after the 2000 Decision was issued in April 2004, it could have avoided all enforcement measures by paying only USD 10.8 billion (Respondent's Post-Hearing Brief ¶ 84).

[1115]   Respondent's Post-Hearing Brief ¶ 250.

[1116]   Respondent's Closing Slides, p. 248, referring to Second Konnov Report ¶ 104.

> We often recommend for the sake of a client's safety to pay tax for a short period (a month) in a maximum amount which can possibly be inferred from interpretation of the relevant provision.   And immediately thereafter we file an application to the tax inspectorate requesting a refund or offset of an overpaid amount.  It basically reads, 'Hey!  We used to interpret this norm this way but our consultants tell us that we overpaid tax, so please refund it.'  Of course, the inspectorate refuses to refund implying that we paid correctly – the more the better.  Then a court claim is filed and it is up to court to decide.  As a result a precedent is established.[1117]

938.   However, Respondent submits, despite this possibility to discharge the totality of its tax debt at an early stage for a fraction of the amounts eventually assessed against it, Yukos "failed to use the time and its resources to pay its tax debt," its managers choosing to "ignore that payment was due as provided in the assessment, not months later."[1118]   Instead, Yukos only started making payments and considering a payment plan in July 2004.[1119]

939.   Respondent submits that, in the light of Yukos' conduct, the Russian authorities were entitled to view Yukos' settlement offers with "caution and scepticism".[1120]   In addition, by the time of the first settlement offers, Yukos' untrustworthiness had become manifest in other ways, particularly when Yukos: (a) accused the Russian authorities of running a "tax racket"; (b) denied affiliation with, or the ability to get information about, its trading entities; (c) asked that the April 2004 Injunction be substituted with an injunction against already-encumbered Sibneft shares; and (d) engaged in serial corporate dissolution to frustrate tax collection.[1121]

940.   Respondent concludes that the destruction of Yukos is therefore "the consequence of the contributory fault and failure to mitigate of Yukos, under the control of Claimants."[1122]

941.   Claimants reject the argument that they could have avoided enforcement of the tax assessments by the Russian Federation and the bankruptcy of Yukos by paying USD 9 billion in the first quarter of 2004, asserting that, to be convinced by this argument, "the Tribunal would need to ignore the most salient facts—the Respondent's breaches—and assume . . . that the very same Russian authorities who committed those breaches would have acted differently if only Yukos had taken the actions specified by the Respondent."[1123]   Claimants argue that there is no "duty

---

[1117]   Rejoinder ¶ 849, referring to S.G. Pepeliaev, *Tax Law Should Be Understandable*, Raschet, No. 4, 2002, Exh. R-3287.

[1118]   Respondent's Closing Slides, p. 292.

[1119]   *Ibid.*, pp. 264–65, referring to Transcript, Day 10 at 21 (cross-examination of Mr. Theede).

[1120]   Transcript, Day 18 at 265.

[1121]   Transcript, Day 18 at 265.

[1122]   Respondent's Post-Hearing Brief ¶ 250.

[1123]   Claimants' Post-Hearing Brief ¶ 276.

to appease" and that "a victim of extortion is not to blame if the threats against it are carried out after it refuses to pay."[1124]

942.   In addition, Claimants are of the view that taking the steps suggested by Respondent would have prejudiced Yukos' position for subsequent litigation.[1125]   As Mr. Theede stated at the Hearing, "you don't run a business by talking about paying taxes until they become an official tax."[1126]

943.   Moreover, Claimants submit that, as a matter of fact, Yukos "did everything it could to pay off the tax assessments as soon as they became due."[1127]   The obligation to pay arose on 16 April 2004,[1128] and Yukos made its first payment shortly thereafter on 6 July 2004.   However, contrary to Respondent's contention, Yukos did not have enough cash available to settle an alleged tax debt of USD 9 billion in the first quarter of 2004.   Mr. Theede explained at the Hearing that the USD 6.8 billion on the balance sheet of Brittany Ltd. "were basically loans of cash that had already been repatriated into Russia to fund our capital programs and operating expenses and so forth" and thus represented a "zero-sum" game.[1129]   The offer by the former Sibneft shareholders to buy back the 20 percent minus one share stake in Sibneft that Yukos had acquired pursuant to the Share Purchase Agreement for USD 3 billion was only made in October 2004 (and was rejected because it significantly undervalued the shares).[1130]   The 2 billion dividend could not be reversed and the sale of Yukos' offshore assets would have taken longer than three months to realize.[1131]   As for Yukos' assets in Russia, Yukos was prevented from using them by the April 2004 Injunction, which was "grossly disproportionate" to the debt it was intended to secure, and subsequent seizures.[1132]

944.   Thus, according to Claimants, by adding the "wide-ranging freeze and seizures" of the company's non-cash assets to the "massive payment demands" and "impossibly short

---

[1124]   *Ibid.* ¶ 275.

[1125]   *Ibid.* ¶¶ 280–281.

[1126]   Transcript, Day 10 at 21.

[1127]   Claimants' Post-Hearing Brief ¶ 83.

[1128]   Transcript, Day 20 at 112–13.

[1129]   Transcript, Day 11 at 41–42.

[1130]   Claimants' Post-Hearing Brief ¶ 291.

[1131]   *Ibid.*

[1132]   *Ibid.* ¶¶ 85–86, 91.

deadlines," the Russian Federation itself "engineer[ed] the circumstances of non-payment."[1133] In the circumstances, "it was evident that Yukos would not be able [to] settle its alleged tax debts or discharge them in full without the cooperation of the Russian authorities."[1134]

945.   In the Tribunal's view, Yukos cannot be held responsible (even in part) for the rejection of its settlement offers and the enforcement measures subsequently taken by the Russian Federation merely because it did not pay USD 9 billion in the first quarter of 2004.  Although the 2000 Audit Report was issued at the end of 2003, Yukos' obligation to pay its tax debt for the year 2000 did not arise until the 2000 Decision was issued in April 2004.  Similarly, Yukos' obligation to pay its tax debts for 2001–2003 arose only with the issuance of the 2001, 2002 and 2003 Decisions in September–December 2004.  Although some of the amounts that became due under these decisions could have been estimated based on the findings set out in the 2000 Audit Report, the Tribunal does not see why Yukos, at a time when it considered the tax assessments to be ill-founded, should have made any payments before a legal obligation to pay the tax arose.  The Tribunal notes that Yukos began making payments toward its tax debts on 6 July 2004, less than a week after the issuance of the appeals decisions in its challenge proceedings against the 2000 Decision and the enforcement proceedings initiated by the Russian Federation.  In the circumstances, the Tribunal does not consider it unreasonable for Yukos to have delayed payment of its tax debts until these decisions were issued.

   **(b)   Did Yukos' Settlement Offers Constitute Real Alternatives to Enforcement?**

946.   Respondent invokes several reasons why Yukos' settlement offers could not be accepted by the Russian Federation, all of which are disputed by Claimants.  Principally, the Parties disagree as to whether (i) all the Sibneft shares were either encumbered or disputed; (ii) Yukos sought to enter into negotiations that are not permissible under Russian law; and (iii) Russian law permits payment in kind of tax arrears.

947.   For Respondent, because of the flaws in Yukos' offers, the Russian authorities were justified in doubting the sincerity of Yukos' intention to pay.  This justified distrust explains why the Russian authorities did not respond to each one of Yukos' offers (although, according to Respondent, they did respond to all the sound offers).

---

[1133]   *Ibid.* ¶ 88.

[1134]   *Ibid.* ¶ 84.

948.    Disputing that Yukos' offers suffered from any insurmountable defects, Claimants repeat that it was Yukos' genuine intention to commence a dialogue with the Russian Federation aimed at finding a workable solution to pay off its tax debts.

949.    In this section, the Tribunal first addresses the specific areas of disagreement between the Parties and then makes some general observations regarding Yukos' settlement offers and the Russian Federation's responses.

### i.    Whether all the Sibneft Shares were Either Encumbered or Disputed

950.    Respondent submits that the Sibneft shares could not be accepted in payment of Yukos' tax debts because Yukos' ownership of these shares was disputed by Sibneft's former shareholders.[1135]  This defect, says Respondent, affected all the offers made to the bailiffs, all the offers conveyed by Mr. Chrétien to Prime Minister Fradkov and President Putin, as well as the USD 21 billion settlement proposal allegedly made by Yukos in October 2004.

951.    Claimants recognize that Yukos' ownership of the 14.5 percent stake in Sibneft corresponding to the second tranche under the Share Exchange Agreement was challenged by Nimegan Trading Limited before the Chukotka Arbitrazh Court in proceedings initiated on 6 July 2004 and that those shares were attached by the Chukotka Injunctions of 9 July 2004, pending resolution of the merits of the dispute.  Claimants assert, however, that the 20 percent minus one share stake in Sibneft acquired by Yukos under the Share Purchase Agreement was never encumbered or challenged in any legal proceeding.[1136]

952.    As explained in paragraphs 2–915 and 922 above, the Tribunal considers that, although Yukos initially offered a 34.5 percent stake in Sibneft in payment of its tax debts to the bailiffs, after the Chukotka Injunctions it sought only to offer in payment the 20 percent minus one share stake in Sibneft that was not the object of the Injunctions.

953.    As for this 20 percent stake, the Tribunal notes that a number of Sibneft's original shareholders wrote to the Russian authorities in July and August 2004, opposing Yukos' proposals to use Sibneft shares to settle its tax debts, since the shares' ownership was disputed between them

---

[1135]    Counter-Memorial ¶¶ 420–30; Respondent's Skeleton ¶ 47.

[1136]    Memorial ¶ 229; Claimants' Post-Hearing Brief ¶ 92, referring to Transcript, Day 6 at 95–97, 112, 116 (Mr. Rieger); Transcript, Day 9 at 242–43 (Mr. Misamore); Transcript, Day 9 at 36–39, 44–45, 48–49, 71, 74, 92–93 (Mr. Theede); Day 17 at 106–12 (Claimants' closing).

and Yukos.  Thus, on 6 July 2004, these former shareholders wrote to the bailiffs, claiming that "rights to the shares of OAO Sibneft held by OAO NK YUKOS are the subject of the dispute and OAO NK YUKOS is unable to exercise its ownership rights to such shares."[1137]  On 13 July 2004, the same former shareholders wrote to the Deputy Minister for Taxes, stating that "OAO NK YUKOS is not entitled to use the whole block of shares in OAO Sibneft held by it for settlements with its creditors, including with respect to tax liabilities."[1138]  In a further letter dated 16 August 2004, the former shareholders specifically asserted that the Share Purchase Agreement and the Share Exchange Agreement constituted "a single transaction" and that "all 92 percent of shares in [Sibneft] that were transferred to [Yukos] under both agreements are in dispute."[1139]

954.  Despite these allegations, it is clear to the Tribunal that the Share Purchase Agreement was never formally challenged.  The 6 July 2004 letter refers to an LCIA proceeding; yet, the only LCIA proceeding related to Sibneft shares that is in the record in this arbitration is LCIA Arbitration No. 4589, in the context of which Yukos sought damages arising out of the purported termination of the Share Exchange Agreement, but made no claim in relation to the Share Purchase Agreement.[1140]

955.  In light of these findings, the Tribunal considers the bailiffs' failure to respond in July 2004 to Yukos' settlement offers to be inexcusable.  On 2 July 2004, when Yukos first wrote to the bailiffs to request enforcement against its 34.5 percent shareholding in Sibneft, its ownership of these shares had not yet been challenged.  The Chukotka court proceedings (challenging the transfer of the 14.5 percent stake) were commenced four days later, on 6 July 2004.  This was also the date on which the former Sibneft shareholders, for the first time, wrote to the bailiffs claiming that Yukos was "unable to exercise its ownership rights" to the Sibneft shares.  For four days, therefore, the bailiffs had no reason to believe that ownership of these shares by

---

[1137]  Application of White Pearl Investments Limited, Kindselia Holdings Limited, Heflinham Holdings Limited, Marthacello Co. Limited and N.P. Gemini Holdings Limited to the Chief Bailiff of the First Interdistrict Department of the Bailiff Service for the Central Administrative District of Moscow, 6 July 2004, Exh. R-552.

[1138]  Letter from White Pearl Investments Limited, Kindselia Holdings Limited, Heflinham Holdings Limited, Marthacello Co. Limited and N.P. Gemini Holdings Limited to the Deputy Minister of Taxes and Levies of the Russian Federation, 13July 2004, Exh. R-555.

[1139]  Letter from N.P. Gemini Holdings Limited, Heflinham Holdings Limited, White Pearl Investments Limited, Kindselia Holdings Limited and Marthacello Co. Limited to the Deputy Minister of Taxes and Levies of the Russian Federation, 16 August 2004, Exh. R-559.

[1140]  LCIA Arbitration No. 4589:  *Yukos Oil Company v. Kravin Investments and others*, Statement of Case ¶ 94, Exh. R-3645.

Yukos was disputed.  Yet the bailiffs did not respond to Yukos' offer during that period or at any time thereafter.

956.  In addition, after Yukos, on 14 July 2004, reduced its offer to the 20 percent minus one share holding in Sibneft, the only basis for Respondent's assertion that "the bailiffs had reason to believe that Yukos' title to even this block of proffered shares was in dispute"[1141] were the "warnings" received from the former Sibneft shareholders.  The Tribunal is not persuaded that mere letters to the bailiffs from a third party asserting a claim to an asset held by the debtor (without asserting this claim vis-à-vis the debtor itself) can constitute a sufficient reason for the bailiffs to disregard the debtor's request to use this asset for enforcement purposes.

### ii.   Whether Yukos Sought to Enter into Negotiations that are Not Permissible under Russian Law

957.  According to Respondent, Yukos management believed erroneously that tax assessments provided an opportunity for a "business negotiation" that could end in a "compromise".[1142] Such negotiations, says Respondent, seeking a reduction, deferral or payment in instalments of tax arrears, are not permitted under Russian law.[1143]  Specifically, Respondent contends that, once "a resolution of the highest tax authority or a court judgment has entered into force, the tax authorities and bailiffs cannot reduce the amount of the tax that's due."[1144]  Nor, avers Respondent, can the tax authorities agree to a delay for payment of more than 6 months, or change the term for payment when the entity applying for such a change is the subject of proceedings for a tax offence.[1145]  Moreover, adds Respondent, the Moscow Arbitrazh Court was justified in rejecting Yukos' request for payment in instalments of its tax arrears due to the absence of exceptional circumstances.[1146]

958.  Respondent maintains that a major problem with Yukos' settlement proposals was that the amounts offered were insufficient to cover the tax arrears, fines and interest assessed against

---

[1141]   Counter-Memorial ¶ 426.

[1142]   Respondent's Post-Hearing Brief ¶ 101, referring to Transcript, Day 10 at 7 (cross-examination of Mr. Theede); Transcript, Day 6 at 110–11 (cross-examination of Mr. Rieger).

[1143]   Respondent's Post-Hearing Brief ¶ 101.

[1144]   Transcript, Day 18 at 270; *see also* Respondent's Closing Slides, p. 299.

[1145]   Transcript, Day 18 at 270–71; Respondent's Closing Slides, p. 315.

[1146]   Respondent's Closing Slides, pp. 316–18, referring to Decision of the Moscow Arbitrazh Court, 12 August 2004, Exh. C-142.

Yukos at that time and thus demonstrated that Yukos never intended to pay its tax debts in full.[1147]

959.   Respondent contends that, even if it accepted that Yukos' 20 percent minus one shareholding in Sibneft was formally unencumbered, its value was nevertheless uncertain, since Yukos was unable to offer a controlling block of shares and the public controversy with respect to the shares could affect their market value.[1148]   The fact that Yukos did not itself sell the Sibneft shares is also proof of their illiquidity.[1149]   Respondent notes that Yukos' Board, when authorising the sale of the shares in August 2004, expressly acknowledged that "certain terms of the sale of these stakes may differ from the existing market terms because of the need to sell the assets as soon as possible in order to discharge the Company's tax liabilities."[1150]   When the 20 percent minus one shareholding in Sibneft was tendered on 14 July 2004, it was valued by Yukos at USD 2.3 billion, which was insufficient to cover Yukos' liabilities for the year 2000. The value of the Sibneft shares plus the shares in the other 15 companies offered by Yukos in its letters of 16 September, 24 November and 16 December was also insufficient having regard to Yukos' tax debt assessed in the 2001, 2002 and 2003 Decisions.[1151]

960.   As for Mr. Chrétien's offer of USD 8 billion to settle the claims for the years 2000–2003, asserts Respondent, it would have covered only about half the amount then assessed against Yukos.[1152]   The USD 21 billion settlement offer allegedly made by Yukos in October 2004 was also insufficient, submits Respondent, since Yukos' tax liabilities for the years 2000–2004 totalled USD 24.2 billion.[1153]

961.   Claimants deny that Yukos was asking the authorities for a reduction in the amount of the tax arrears that were due.[1154]   As Mr. Theede testified at the Hearing, Yukos "never tried to make any kind of proposal that was less than the tax that was due . . . we didn't try to negotiate the

---

[1147]   Respondent's Closing Slides, p. 292.

[1148]   Counter-Memorial ¶ 423.

[1149]   Respondent's Closing Slides, pp. 216, 313.

[1150]   Respondent's Closing Slides, p. 295, referring to Minutes No.120–18 of Meeting of Yukos' Board of Directors, 19 August 2004, Exh. C-210.

[1151]   Respondent's Closing Slides, pp. 308–309.

[1152]   Respondent's Closing Slides, p. 296.

[1153]   Rejoinder ¶ 896, n.1425.

[1154]   Transcript, Day 20 at 215; Claimants' Post-Hearing Brief ¶ 93.

amount; we were willing to pay all the taxes back."[1155]  Mr. Theede further observed that Yukos "could never in a million years have anticipated the level of taxes that would ultimately be presented to the company; and fines and VAT."[1156]  Claimants submit that the Russian authorities could have ascertained the sincerity of Yukos' intention if only they had bothered to discuss the settlement offers.[1157]

962.  A dialogue, say Claimants, was necessary given the enormous amounts assessed against Yukos. During the Hearing, when asked by a member of the Tribunal: "when a State assesses taxes and the taxpayer has exhausted administrative and judicial recourse in respect of the assessments, is it normal for the State to enter into a dialogue to negotiate a settlement of the assessments with the taxpayer?," Mr. Theede replied that while he was not "sure what is normal . . . , there was no way that we would have been able to pay the taxes without being able to talk to the authorities and come to some agreement.  We felt like our feet were nailed to the floor and we were being asked to jump.  It was very frustrating."[1158]

963.  Concerning the value of the Sibneft shares, Claimants assert that they were Yukos' most liquid asset.[1159]  Yukos' assessment of the value of its 20 percent minus one shareholding at USD 2.3 billion in its letters to the bailiffs was not exaggerated since, as stated above, in the bankruptcy proceedings in 2006, Gazprom acquired these shares for USD 4.1 billion.[1160]  Under cross-examination at the Hearing, Mr. Theede acknowledged that Yukos did not try to sell the Sibneft shares itself.[1161]  He explained that Yukos did not know what the Russian authorities wanted.  He testified that if the bailiffs had said to Yukos "'[w]e don't want the shares, but we will take the $3 billion.  You can sell the Sibneft stock without any interference,' [Yukos] would have done that in a second."[1162]

964.  Claimants also note that the settlement offers conveyed by Mr. Chrétien in July 2004 were well in excess of the tax debt that had been assessed at that time—USD 3.42 billion for the year

---

[1155]  Transcript, Day 10 at 8–12.

[1156]  *Ibid.* at 9.

[1157]  Claimants' Post-Hearing Brief ¶ 93.

[1158]  Transcript, Day 10 at 40.

[1159]  Claimants' Post-Hearing Brief ¶ 92.

[1160]  *Ibid.*

[1161]  Transcript, Day 11 at 49–50.

[1162]  *Ibid.* at 48.

2000.[1163]  At the Hearing, Mr. Theede explained that the USD 8 billion figure was arrived at by considering the 2000 tax assessment of USD 3.4 billion and scaling it back for subsequent years to account for the shorter period over which interest would be calculated.[1164]   In terms of Yukos' ability to honor the proposal, Mr. Theede confirmed that Yukos would have been in a position to pay the first installment of USD 2 billion in July 2004, and states that, despite the absence of a response from the Tax Ministry, Yukos "did take immediate action to start accumulating the offshore cash … within a day or two of this letter."[1165]  When asked to explain why the settlement offer remained at the level of USD 8 billion in the proposal of 10 September 2004, when the amount of taxes assessed against Yukos (for 2000 and 2001) had reached USD 7.5 billion, Mr. Theede stated as follows:

> [W]hat [the 10 September proposal] is saying is: with what we've already paid, plus the [VAT] that you haven't refunded us, we've nearly paid our 2000 tax arrears.  I think it's important to maybe explain . . . this [VAT], because by the end of the attack that . . . unrefunded [VAT] amounted to nearly [USD] 5 billion of the total assessment against the company.  And what it was is: when you sell oil in Russia, you pay a [VAT] on it; and then, if you export it, you automatically get that [VAT] back.[1166]

965.  And Mr. Theede testified that in October 2004 Yukos made a USD 21 billion offer. Mr. Theede's evidence on this alleged offer was confirmed by Mr. Misamore.  However, the Tribunal notes that there is no documentary evidence of this offer in the record.

966.  As for Respondent's argument that the amounts and payment modalities of tax arrears cannot be negotiated under Russian law, Claimants submit that it is disingenuous, since the Russian Federation has entered into negotiations and agreed settlements of tax assessments with other Russian and international oil companies such as Sibneft, TNK-BP and Rosneft.[1167]

967.  The Tribunal observes that according to press reports submitted by Claimants Sibneft was able to settle a 1 billion tax arrears claim by paying only 300 million,[1168] while the one billion tax arrears claim against TNK-BP was reduced by "hundreds of million of dollars," after a meeting

---

[1163]  Claimants' Post-Hearing Brief ¶ 92.

[1164]  Transcript, Day 10 at 82–85.

[1165]  *Ibid.* at 89.

[1166]  *Ibid.* at 96.

[1167]  Claimants' Post-Hearing Brief ¶ 93.

[1168]  *Sibneft Pays Off Tax Claim*, The Moscow Times, 19 April 2005, Exh. C-1418; "Sibneft 'settles its tax demand'," BBC News, 18 April 2005, Exh. C-752.

took place between Lord Browne, BP's chief executive, and President Putin.[1169]   As for Rosneft, the Tribunal notes that its financial statements reveal that, after Rosneft purchased YNG, the Russian authorities approved a restructuring plan allowing it to pay the tax arrears that had been assessed against YNG in February and October 2004 in quarterly payments over a period of 5 years starting in March 2008.[1170]

968.   Claimants also affirm that Rosneft received a concession from Respondent in the guise of an 83 percent reduction in the amount of YNG's tax arrears and a corresponding 89 percent reduction in fines.[1171]

969.   Respondent answers that Yukos' case is "totally different" from those of Sibneft or TNK-BP, because there is no evidence that these companies, contrary to Yukos, engaged in "knowing and longstanding tax evasion" and lied to the courts and tax authorities.  From the limited record available in this arbitration in this respect, it does appear as if these companies cooperated with the tax authorities in order to settle the amount due.  Moreover, there is no evidence that the authorities compromised after having reached a final assessment of liability.[1172]   For Respondent, "considering the flagrancy of Yukos' violation, the not[o]riety of its failure to accept responsibility and indeed its efforts to undermine tax enforcement, common sense and straightforward deterrent interest would dictate different results."[1173]

970.   Regarding Rosneft, Respondent explains that, unlike Yukos, it was eligible for a "tax restructuring process" because it had, also unlike Yukos, been designated as a "strategic company" by the Russian Government.  According to Mr. Konnov's first expert report, Article 191 of the *Federal Law on Insolvency* "contemplates a possibility to restructure federal tax debt of certain 'strategic' companies in order to prevent their bankruptcy."[1174]   A list of

---

[1169]   *TNK-BP Tax Bill Slashed by Moscow*, Financial Times, 11 August 2005, Exh. C-762.

[1170]   Rosneft Consolidated Financial Statements as of December 31, 2007 and 2006 and for the years ended 31 December 2007, 2006 and 2005, p. 50, Exh. C-377; Management's Discussion and Analysis of Financial Condition and Results of Operations for the three and nine months ended 30 September 2007 and 2006, p. 38, Exh. C-378.

[1171]   Memorial ¶ 278.

[1172]   Respondent's Closing Slides, p. 326.

[1173]   *Ibid.*, p. 327.

[1174]   First Konnov Report ¶ 91.

"strategic" companies was approved in early 2004, and Rosneft (contrary to Yukos) was eligible for inclusion on the list given its status as a state-owned company.[1175]

971. At the Hearing, counsel for Respondent provided the following explanation as to the requirements for a "strategic" company:

> It was necessary to be State-owned. It was necessary that one of the ministries request that the company qualify to be a strategic company and to undertake responsibilities of a strategic company, and ultimately to be approved by the relevant federal agency, which involved the defence services; and in the case of Rosneft involved committing to supply petroleum products to the Ministry of Defence of the Russian Federation. So these were all things that were not open to Yukos.[1176]

972. While Claimants appeared to suggest at the Hearing that, since "it's the Government that decides which company is strategic," it would have been "fairly easy" for Respondent to accept Yukos as a strategic company. The Tribunal notes that no specific requirements for purposes of designating a strategic company were proffered by either side.[1177]

### iii.   Whether Russian Law Permits Payment in Kind of Tax Arrears

973. Respondent submits that the Russian Federation could not accept Yukos' shares in Sibneft and other companies as payment because Russian law does not allow a taxpayer to settle its liabilities in kind.[1178] Specifically, Article 45(3) of the Russian Tax Code stipulates that "[t]he obligation to pay taxes/duties shall be executed in the currency of the Russian Federation."[1179] This defect affected all of Yukos' settlement offers with the exception of those conveyed by Mr. Chrétien.

974. Claimants reply that Respondent misrepresents "both the legal context and the substance of Yukos' settlement proposals."[1180] While Article 45(3) of the Russian Tax Code requires the payment of taxes in Russian rubles, Article 45(1) expressly provides that in case of late or incomplete payments, outstanding taxes may be collected through a forced sale of the taxpayer's assets other than cash, as provided for in Articles 47 and 48 of the Russian Tax Code

---

[1175]   *Ibid.*

[1176]   Transcript, Day 19 at 30.

[1177]   Transcript, Day 17 at 253.

[1178]   Counter-Memorial ¶ 423.

[1179]   Russian Tax Code, Article 45, Exh. R-550.

[1180]   Reply ¶ 326.

and Article 46 of the *Federal Law "On Enforcement Proceedings"*.[1181]  Respondent itself relies on the latter provision for the proposition that, for the purposes of the settlement of Yukos' alleged tax liabilities, the company's assets seized by the bailiffs were subject to a coercive sale.

### iv.    Concluding Observations

975.    Having reviewed the totality of the evidence and the Parties' representations, the Tribunal is of the view that Yukos' settlement offers represented a good faith attempt by the company to initiate a dialogue with the Russian Federation regarding the payment of Yukos' tax arrears. While it is true that these offers were for less than the total amount of taxes, fines and arrears assessed against Yukos, the Tribunal observes that, at the time when each offer was made, it either would have been sufficient to cover the amounts for which decisions had been issued by the Tax Ministry at the time, or was close enough to those amounts to allow the Russian Federation to assume that Yukos did indeed intend to discharge its tax liabilities.   As for Yukos' offer of its 20 percent minus one share holding of Sibneft shares, in the opinion of the Tribunal, since this shareholding was never formally disputed, it should have convinced the Russian Tax authorities that Yukos was serious in wishing to settle its tax liabilities.

976.    Respondent's argument that the Russian Federation does not negotiate tax liabilities is belied by the fact that it agreed to tax settlements with other companies.   Given the paucity of evidence before this Tribunal regarding the settlements actually reached by Sibneft and TNK-BP, the Tribunal cannot judge the extent to which their situations were similar to that of Yukos. However, the simple fact that these companies were able to negotiate the reduction of tax arrears initially claimed by the tax authorities suggests to the Tribunal that such negotiations can in fact take place under Russian law and practice.

977.    Thus, even if Yukos' settlement offers may not have resolved definitively all of its tax liabilities, the Tribunal sees no valid reason why the Russian Federation, if it sought only to collect taxes (and, presumably, to allow its largest taxpayer to continue in business) would not have reacted more positively to Yukos' settlement offers at the very least to the extent of engaging constructively in discussion.

---

[1181]    *Ibid.*, referring to Federal Law No. 119-FZ of 21 July 1997 "On Enforcement Proceedings" (as amended), Article 46, Exh. C-1274.

978.   The Russian Federation never showed any interest in Yukos' offers.  With the exception of the letter of 9 September 2004, the bailiffs never replied to Yukos, never even troubling to explain why they considered its offers inadequate.  The Tribunal finds this silence very revealing, particularly in circumstances where the bailiffs' views as to the unacceptability of the offers were based in part on correspondence they had received from a third party (the former Sibneft shareholders), which had not even been copied to Yukos.  The settlement offers conveyed by Mr. Chrétien, at the end of the day, were also met with silence.

979.   When the Russian authorities did provide responses to Yukos' proposals, these were in the nature of blanket rejections.  It is manifest that the authorities never seriously considered any one of Yukos' proposals.  The only letter from the bailiffs to Yukos (dated 9 September 2004) relies on the decision of the Moscow Arbitrazh Court of 17 July 2004, which merely addressed the issue of the Sibneft shares, but fails to explain why the shares in the other 15 companies offered by Yukos could not be accepted in payment.  The Tribunal notes that the letter has a ring of finality to it, emphasizing as it does "the right of the bailiff to make the final decision."[1182]  In the entire period from July to December 2004, the Russian authorities did not make a single counter-proposal to Yukos or even state that they were prepared to engage with the taxpayer.  Mr. Rieger testified at the Hearing that "it was like a one way road:  making proposals, talking, offering, and . . . no substantial feedback . . . no sitting down and willing to discuss."[1183]  This statement aptly describes the impression that the Tribunal garners from the record.

980.   In conclusion, Respondent's total failure to engage with any of Yukos' settlement proposals raises significant doubts in the Tribunal's mind as to whether Respondent's true and sole concern in its dealings with Yukos after the tax assesments were issued was the collection of taxes.

## F.   THE AUCTION OF YNG

### 1.   Introduction

981.   After having reviewed these futile attempts by Yukos to settle its tax debts to the State, the Tribunal comes to one of the most striking episodes in the saga of Yukos' demise, the

---

[1182]   Letter from Mr. Sazanov, Deputy Head of the Bailiffs Department to Mr. Gololobov, 9 September 2004, Exh. C-146.

[1183]   Transcript, Day 6 at 40.

December 2004 auction of its core asset, the oil production company Yuganskneftegaz ("**YNG**") and the subsequent acquisition of YNG by State-owned Rosneft.

982.  Claimants argue that the auction was a sham, "carefully orchestrated to achieve the transfer of Yukos' crown jewel to the State at the lowest price that could be achieved while maintaining a façade of legality."[1184]  Claimants accuse Respondent of having depressed the value of YNG by fabricating USD 4.6 billion in tax claims against the company.  They argue that Respondent set a low starting price which ignored both a valuation by Dresdner and Dresdner's advice on how to conduct the auction in order to maximize the sale price.  Claimants deny that their own actions contributed to the low price achieved at the auction.  They maintain that the sole bidder at the auction, a previously unknown entity called Baikal Finance Group ("**Baikal**"), was a dummy that was used to mask the Russian State's interest and involvement in the process.[1185]

983.  Respondent answers that the decision to sell YNG to satisfy Yukos' massive debt was a direct consequence of Yukos' misconduct and the only realistic way to collect Yukos' unpaid taxes in circumstances where Yukos had fiercely obstructed audits, resisted payment and attempted to make itself judgment proof.[1186]  Although YNG was sold during a 10-minute auction attended by two bidders on a Sunday afternoon in the outskirts of Moscow, Respondent observes that it was done in compliance with Russian law.  Respondent avers that the price realized— USD 9.35 billion—was consistent with the formal appraisal conducted by Dresdner and other market estimates, and notes that this price reflected YNG's own tax liabilities.[1187]  If the price was lower than it might otherwise have been, says Respondent, the fault lies solely with Claimants and Yukos, who sabotaged the auction through a sham bankruptcy proceeding in Texas and published threats of "a lifetime of litigation" which kept potential bidders away. Respondent rejects Claimants' theory that Baikal was a veneer for the Russian Government. Rather, Respondent submits that it was a special purpose vehicle associated with Surgutneftegaz.  When Baikal suddenly found itself unable to finance its purchase (due to the Temporary Restraining Order ("**TRO**") obtained by Yukos in Texas), Rosneft simply seized a

---

[1184]   Claimants' Post-Hearing Brief ¶ 97; *see* Press Conference with Russian and Foreign Media, 23 December 2004, Russian President Official Website, Exh. C-422; *see also* Memorial ¶¶ 334, 409; Reply ¶ 293; Claimants' Skeleton ¶ 45.

[1185]   Claimants' Post-Hearing Brief ¶¶ 110–14; Memorial ¶¶ 386–95; Reply ¶¶ 370–76; Claimants' Skeleton ¶¶ 40–43.

[1186]   Respondent's Post-Hearing Brief ¶¶ 87–121; Counter-Memorial ¶¶ 450–527; Rejoinder ¶¶ 951–1008; Respondent's Skeleton ¶¶ 36–54.

[1187]   *See, e.g.*, Deutsche Bank, Project Chekov, December 2004, Slide 6, Exh. C-284.

commercial opportunity that presented itself as a result of Claimants' misconduct.[1188]

984. At the outset of its analysis, the Tribunal will recall that during the February 2003 meeting with the Union of Industrialists and Entrepreneurs Industrialists attended by Michael Khordokovsky and referred to earlier in this Award, President Putin made this seemingly prescient observation:

> [C]ertain things are obviously clear.   [Rosneft] is a State-owned company.   It has insufficient reserves and should increase them.   Some other oil companies, such as Yukos, have a surplus of reserves.[1189]

985. As will be seen, after having reviewed the totality of the circumstances leading to the YNG auction and the auction itself, the Tribunal concludes that this episode provides yet more compelling evidence that the Russian Federation was not engaged in a true, good faith tax collection exercise but rather was intent on confiscating the most valuable asset of Yukos and effectively transferring it to the Russian State.

986. The Tribunal notes that its findings are consistent with those of the *RosInvestCo* and *Quasar* tribunals, which found "many aspects of the YNG auction more than suspect"[1190] and concluded that "the auction of YNG was rigged."[1191]

### 2.    Chronology

987. As is evident from the chronology of events recounted in Chapter VIII.B, and as observed by the ECtHR, the Russian authorities "were unyieldingly inflexible as to the pace of the enforcement proceedings, acting very swiftly."[1192]   This chronology reviews the key events as of the date when the sale of YNG was announced to the auction itself on 19 December 2004, and the transfer of the YNG shares to the Russian State-owned Rosneft three days later on 22 December.

---

[1188]   *See* Respondent's Skeleton ¶¶ 46–52; Respondent's Closing Slides, pp. 327–70.

[1189]   Video recording and transcript of meeting of the members of the Union of Industrialists and Entrepreneurs with President V. Putin held in the Ekaterininsky Hall, Kremlin, 19 February 2003, Exh. C-1396.

[1190]   *Quasar* ¶ 116, Exh. R-3383.

[1191]   *RosInvestCo* ¶ 620(d), Exh. C-1049.

[1192]   ECtHR Yukos Judgment ¶ 656, Exh. R-3328; Chapter VIII.B.

(a)     **Yukos' Shares in YNG are Seized and the Government Announces they will be Sold; Yukos Brings Unsuccessful Court Challenges**

988.    On 20 July 2004, the Ministry of Justice announced its plan to sell YNG in order to satisfy Yukos' tax debt for the year 2000.[1193]   Mr. Misamore testified that at the time of this announcement the only tax levied against Yukos and confirmed by the courts was for the year 2000, in the amount of approximately USD 3.42 billion, which Yukos had already started to pay.[1194]   In the circumstances, he viewed the seizure of YNG as disproportionate and unjustified.

989.    Industry analysts interpreted the bailiff's plans to sell "Yukos's most valuable asset" as "a clear sign the authorities are going in for the kill," observing that the move "leaves little doubt the authorities' final goal is for Yukos to cease to exist in its current form, materially erasing most, if not all, shareholder value in the process." [1195]

990.    On 23 July 2004, GML director Tim Osborne declared that any purchaser of YNG would be "buying a whole heap of trouble."[1196]

991.    Yukos applied to the Russian courts to prevent the sale from proceeding, but to no avail.[1197]   In a letter to the Chief Bailiff of the Russian Federation dated 6 August 2004, Yukos requested that any sale of YNG be conducted by public auction.  This request was granted.[1198]

(b)     **YNG is Valued for Auction while its Tax Liabilities Rapidly Escalate**

992.    On 12 August 2004, the bailiffs appointed Dresdner to carry out the valuation of YNG.[1199]

---

[1193]   *Moscow set to seize huge Yukos oil division—Investors may lose everything in tax fight, analysts warn*, International Herald Tribune, 21 July 2004, Exh. C-698.

[1194]   Misamore WS ¶ 52.

[1195]   *Moscow set to seize huge Yukos oil division—Investors may lose everything in tax fight, analysts warn*, International Herald Tribune, 21 July 2004, Exh. C-698 (quoting Mr. Steven Dashevsky).

[1196]   *Yukos Says Asset Sale Could Prove Fatal Blow*, NY Times, 23 July 2004, Exh. R-648.

[1197]   Ruling of Moscow Arbitrazh Court, 29 November 2004, Exh. C-283.

[1198]   Letter from Yukos' counsel D.V. Gololobov to the Chief Bailiff of the Russian Federation A.T. Melnikov, 6 August 2004, Exh. C-140; *Moscow set to seize huge Yukos oil division—Investors may lose everything in tax fight, analysts warn*, International Herald Tribune, 21 July 2004, Exh. C-698.  Respondent points out that the sale of the YNG shares could, instead, have been negotiated with a designated purchaser.  Rejoinder ¶¶ 978, 984; Transcript, Day 3 at 115 (Respondent's opening).

[1199]   Resolution of Moscow Court Bailiff D.A. Borisov, 12 August 2004, Exh. C-270.

993.  Dresdner issued its valuation report on 6 October 2004; it valued YNG as a stand-alone enterprise at USD 18.6 to 21.1 billion.[1200]  Dresdner noted in the summary of its Report that this amount could be reduced by tax and other liabilities, which would lower the value to USD 14.7 to 17.3 billion.[1201]  In its report, Dresdner observed that "[t]he sales process usually has a significant impact on the revenue from the sale" and that "[a] quick auction will most likely prevent the achievement of a full price."[1202]  Dresdner added that "[i]f access to full information is not provided to potential purchasers, this will lead to a significant reduction in the number of parties interested in YNG and also in their ability to offer the full price."[1203]

994.  A few days after Dresdner delivered its report, on 11 October 2004, the bailiffs recommended a minimum sale price for the YNG shares that reflected a 60 percent discount of the value determined by Dresdner.[1204]  The bailiffs' declaration caused Yukos shares to fall "so far so fast . . . that trading had to be halted twice on MICEX."[1205]

995.  On 13 October 2004, GML's Tim Osborne reiterated his earlier threat, and said that "[w]hoever buys [YNG] is going to be buying themselves a lifetime of litigation."[1206]

996.  On 29 October 2004, following an audit that began on 23 September 2004, YNG received a tax reassessment for transfer pricing violations, in the amount of USD 2.35 billion for the year 2001.[1207]  On the same day, following an audit that began on 1 October 2004, the tax authorities issued a decision finding YNG liable for a tax offense for the year 2002 in the amount of

---

[1200]  Dresdner Valuation Report, Exh. C-274, ZAO Dresdner Bank Summary Valuation Opinion Letter, 6 October 2004, Exh. C-273 (hereinafter "Dresdner Summary Letter").

[1201]  Dresdner Summary Letter, 6 October 2004, p. 6, Exh. C-273.

[1202]  Dresdner Valuation Report ¶ 11.2.

[1203]  *Ibid*. ¶ 12.8.

[1204]  Resolution of Moscow Court Bailiff D.A. Borisov, 11 October 2004, Exh. C-1160; *see Basic Yukos asset valued merely at $10.4 billion*, RIA Novosti, 12 October 2004, Exh. C-710; *Russia to press on with Yukos sell-off*, The Financial Times, 13 October 2004, Exh. C-711; *Low valuation for Yukos unit sale*, NY Times, 14 October 2004, Exh. C-712.

[1205]  *Yukos Unit Up for Sale at Discount Price*, Moscow Times, 13 October 2004, Exh. R-625.  Dresdner, on 14 October 2004, released, "in the interests of transparency" and "with the permission of the Ministry of Justice," a summary of the valuation report on its own website, including the USD 14.7 to 17.3 billion range Dresdner had estimated for YNG post-liabilities.  Summary valuation opinion letter on Yuganskneftegaz, Dresdner Bank Corporate Website, 14 October 2004, Exh. C-275, with link to Dresdner Summary Letter.  Claimants characterize Dresdner's decision to do so as an extraordinary reaction taken to correct the public record.  Memorial ¶ 370; Counter-Memorial ¶ 458 & n.686.)

[1206]  *Yukos Unit Up for Sale at Discount Price*, Moscow Times, 13 October 2004, Exh. R-625.

[1207]  Repeat Field Tax Audit Report No. 30–03–14/2, 29 October 2004, Exh. C-251; Memorial ¶ 271; Counter-Memorial ¶ 482; Reply ¶¶ 360–61; Rejoinder ¶¶ 959–60.  As explained in the First Konnov Report, "under the transfer pricing rules, the tax authorities were permitted to substitute the contract price with the market price," but they "could do this . . . only if the market price deviated from the contract price by more than 20%."  First Konnov Report ¶ 87.

USD 1.03 billion.[1208]   A further tax audit on YNG was commenced on 12 October 2004, resulting in a tax assessment on 3 December 2004 of USD 1.22 billion for the year 2003.[1209] According to Claimants, these three successive tax assessments over a period of less than five weeks on the eve of the YNG auction amounted to double-taxation and were part of the Russian Federation's strategy to depress the auction price of YNG and destroy Yukos.[1210]

997.   By mid-November, Yukos' settlement proposals were continuing to fall on deaf ears.[1211]   On 18 November 2004, the bailiffs announced that YNG would be auctioned and the Ministry of Justice appointed the Russian Federal Property Fund to handle the auction.[1212]   The Russian Federal Property Fund issued the formal auction notice the next day and fixed the auction date for 19 December 2004.[1213]   This was a Sunday, and the earliest possible date to hold the auction under the relevant regulations.[1214]   The opening price for 100 percent of the ordinary shares (or 76.79 percent of YNG's total share capital) was set at USD 8.65 billion.

998.   Yukos applied to the Moscow Arbitrazh Court for a declaration that this decision was unlawful and sought interim measures.  Both applications were swiftly denied.[1215]

## (c)    Yukos Tries to Prevent the Auction; Preparations Proceed; an Entity Named Baikal is Created to Purchase YNG

999.   On 6 December 2004, Baikal was incorporated in the town of Tver by a sole founder, Ms. Valentina Davletgareeva, with capital of USD 359.[1216]   A few days later, Ms. Davletgareeva sold her stake in Baikal to a company called Makoil.[1217]

---

[1208]   Memorial ¶ 271; Decision of Moscow Arbitrazh Court, 25 April 2006, p. 2, Exh. C-255.

[1209]   Field Tax Audit Report No. 52/975, 3 December 2004, Exh. C-252; *but see* Decision of the Moscow Arbitrazh Court, 21 April 2006, Exh. C-256.

[1210]   Claimants' Post-Hearing Brief ¶¶ 84, 98–100.

[1211]   *See* Chapter VIII.E.

[1212]   Resolution of Bailiff I.V. Kochergin to appoint a seller, 18 November 2004, Exh. C-279; Agreement No. 4-UYu/2–1/1772–1 between Ministry of Justice and Russian Federal Property Fund, 18 November 2004, Exh. R-623.

[1213]   Notice of auction published by the Russian Federal Property Fund, 19 November 2004, Exh. C-280.

[1214]   *See* YNG Auction Regulation (RP11197–221), 18 November 2004, Exh. R-3764.

[1215]   Memorial ¶ 382; Ruling of the Moscow Arbitrazh Court, 29 November 2004, Exh. C-283; Resolution of the Federal Arbitrazh Court for the Moscow District, 3 May 2005, Exh. C-292; Resolution of Bailiff D.A. Borisov, 31 December 2004, Exh. C-291.

[1216]   Baikalfinancegroup Limited Liability Company, Charter, 2 December 2004, Exh. R-672; Certificate of registration of OOO Baikalfinancegroup as a legal entity, 6 December 2004, Exh. C-286.

[1217]   Baikalfinancegroup Limited Liability Company, Charter (amended version), 9 December 2004, Exh. R-674.

1000. On 10 December 2004, the Federal Antimonopoly Service reported that three entities—Gazpromneft, ZAO Intercom and OOO First Venture Company—had filed for clearance to participate in the auction.  While Gazpromneft did eventually register for the auction, the other two companies did not.[1218]

1001. Having failed to convince the Russian courts to prevent the auction from proceeding, Yukos, in its own words, sought "to obtain justice"[1219] elsewhere.  On 13 December 2004, GML posted a full-page advertisement entitled "Buyer Beware" in the Financial Times.[1220]  The next day, Yukos filed for Chapter 11 bankruptcy protection in Texas.[1221]  On 16 December 2004, the U.S. court granted Yukos' request for a TRO enjoining registered and prospective bidders from participating in the YNG auction.[1222]

1002. Meanwhile, on 14 December 2004, Baikal applied for antimonopoly clearance in order to participate in the auction.[1223]  Two days later it registered for the auction and made a deposit of USD 1.77 billion.[1224]  The only other company to register for the auction was State-owned Gazpromneft on 16 December 2004.[1225]  Gazpromneft challenged the TRO on an emergency basis on 18 December 2004, but its appeal was denied that night, about ten hours before the auction was scheduled to commence in Moscow.[1226]

---

[1218]   *FAS of Russia Received Three Applications to Participate in the Auction for the Sale of Yuganskneftegaz*, Press Release, 10 December 2004, Exh. R-684.

[1219]   Memorial ¶ 383.

[1220]   *Buyer Beware*, Advertisement, Financial Times, 13 December 2004, Exh. R-649.

[1221]   *In re Yukos Oil Co.*, U.S. Bankruptcy Court for the Southern District of Texas, Case No. 04–47742–H3–11, Yukos' Original Complaint for Injunctive Relief, 14 December 2004, Exh. R-656 (hereinafter "U.S. Bankruptcy Complaint"); *In re Yukos Oil Co.*, U.S. Bankruptcy Court for the Southern District of Texas, Case No. 04–47742–H3–11, Yukos' Verified Emergency Motion for Temporary Restraining Order and Preliminary Injunction, 14 December 2004, Exh. R-629; *In re Yukos Oil Co.*, U.S. Bankruptcy Court for the Southern District of Texas, Case No. 04–47742–H3–11, Yukos' Voluntary Petition, 14 December 2004, Exh. R-658; Yukos-Moscow Limited, Resolution No. 1 of Management Board, 10 December 2004, Exh. R-657.

[1222]   *In re Yukos Oil Co.*, U.S. Bankruptcy Court for the Southern District of Texas, Case No. 04–47742–H3–11, Temporary Restraining Order, 16 December 2004, Exh. C-287.

[1223]   Application to Federal Antimonopoly Service regarding approval of acquisition by Baikal Finance (hererinafter "Baikal") of 76.79 percent interest in YNG, 14 December 2004, Exh. R-3793.

[1224]   Application to Participate in the Auction for the Sale of Seized Shares in OAO Yuganskneftegaz filed by Baikal Finance, 16 December 2004, Exh. R-3805.

[1225]   Protocol of the Results of an Auction to Sell Shares in OAO Yuganzkneftegaz, 19 December 2004, Exh. C-290.

[1226]   *Yukos Oil Co. v. OOO Gazpromneft*, U.S. District Court for the Southern District of Texas, Case No. 04cv4756, Hearing Minutes and Orders, 18 December 2004, Exh. R-697.

(d)    **After a 10-Minute Auction, the Successful Bidder Baikal is Sold to State-Owned Rosneft; a "Monumental Bargain"; the "State, Looking After its Own Interests"**

1003. The auction of YNG took place on 19 December 2004 at 4:00 p.m.  Baikal opened the bidding at USD 9.35 billion.  Gazpromneft's representative then asked for a recess and left the room to make a call.  Upon his return, Baikal was declared the winner with its opening bid.  The bidding process was over within ten minutes.[1227]

1004. One press article reported that the Baikal bidders worked for Surgutneftegaz and had "hastily departed for vacations abroad as soon as the auction ended."[1228]  At a press conference on 21 December 2004, President Putin was invited to comment on the perception that "a state company is in fact behind the organisation Baikal Finance Group" and responded as follows:

> As is well known, the shareholders of this company are all private individuals, but they are individuals who have been involved in business in the energy sphere for many years.  They intend, as far as I am informed, to establish relations with other energy companies in Russia which have an interest in their company.  And within the framework of current legislation, the participants of this process have the right to work with this company after the auction is held.  For us, it is only important that all these actions, as I already said, are within strict accordance with the current legislation of Russia. I hope that this is the way it will be.  As for the ability of state company to buy these assets, they of course have this right, just like other market participants.[1229]

1005. What was not public knowledge at the time President Putin gave his press conference was the fact that, the previous day, the State-owned company Rosneft had sought and obtained antimonopoly clearance to acquire Baikal.[1230]

1006. On 22 December 2004, Rosneft purchased Baikal, before it had paid the balance of the purchase price for the YNG shares.[1231]  Rosneft's purchase was announced publicly the

---

[1227]    *See* Protocol of the Results of an Auction to Sell Shares in OAO Yuganzkneftegaz, 19 December 2004, Exh. C-290.

[1228]    *Yugansk Was Purchased by Surgutneftegaz Employees*, OilCapital.ru, 21 December 2004, Exh. R-3789.

[1229]    Press Statement and Answers to Questions Following Russian–German Bilateral Consultations, Russian President Official Website, 21 December 2004, p. 2, Exh. C-421.

[1230]    Rosneft's request to Federal Antimonopoly Service to approve acquisition of a 100 percent interest in Baikal, 20 December 2004, Exh. C-1162; Federal Antimonopoly Service's approval of Rosneft's acquisition, 20 December 2004, Exh. C-1163.

[1231]    *See* Rosneft IPO Prospectus, 14 July 2006, pp. 75–76, Exh. C-380.

following day.[1232]   During another press conference, on 23 December 2004, President Putin said:

> Now regarding the acquisition by Rosneft of the well-known asset of the company—I do not remember its exact name—is it Baikal Investment Company?  Essentially, Rosneft, a 100% state owned company, has bought the well-known asset Yuganskneftegaz.  That is the story.  In my view, everything was done according to the best market rules.  As I have said, I think it was at a press conference in Germany, a state-owned company or, rather companies with 100% state capital, just as any other market players, have the right to do so and, as it emerged, exercised it.
>
> Now what would I like to say in this context?  You all know only too well how the privatisation drive was carried out in this country in the early 90s and, how, using all sorts of stratagems, some of them in breach even of the then current legislation, many market players received state property worth many billions.  Today, the state, resorting to absolutely legal market mechanisms, is looking after its own interests.  I consider this to be quite logical.[1233]

[emphasis added]

**(e)     Once it is State-Owned, YNG's Fate Improves, with Reductions in Tax Liabilities and a Dramatic Increase in Value**

1007. The Tribunal notes that, as at 31 December 2004, ten days after Baikal purchased YNG for USD 9.35 billion, Rosneft stated in its consolidated financial statements that "negative goodwill" in the amount of USD 7.052 billion arose in the context of its acquisition of YNG "as a result of excess of the net assets measured at fair value, over the purchase price."[1234] Rosneft's total revenues increased from USD 5.28 billion in 2004 to USD 23.95 billion in 2005, while its net income increased from USD 0.84 billion to USD 4.16 billion over the same period.[1235]   At the time of its IPO in mid-2006, Rosneft's share capital was USD 79.8 billion;[1236] YNG alone was then valued at USD 55.78 billion.[1237]   Rosneft itself described the YNG acquisition as "the most monumental bargain in Russia's modern history."[1238]

1008. Subsequent to the YNG auction, Yukos continued its efforts to have the sale invalidated in the

---

[1232]  *OJSC 'OC 'Rosneft' Buys 100% Share of 'Baykalfinancegroup' LLC And Becomes the Owner of Its Assets—76.6% Yuganskneftegas Shares*, Rosneft Press Release, 23 December 2004, Exh. C-741.

[1233]  Press Conference with Russian and Foreign Media, Russian President Official Website, 23 December 2004, p. 4, Exh. C-422.

[1234]  Rosneft's Consolidated Financial Statements as of 31 December 2003 and 2004, p. 24, NAV-213.

[1235]  Rosneft IPO Prospectus, 14 July 2006, p. 16, Exh. C-380.

[1236]  Rosneft Website, p. 16, Exh. C-381.

[1237]  Rosneft IPO Prospectus, 14 July 2006, Table 40, Exh. C-380.

[1238]  Place in economy of Russia, Rosneft:  About company, Rosneft Website, p. 14, Exh. C-381.

Russian courts, but all its claims were dismissed.[1239]

1009. The Tribunal notes with interest that very soon after it was acquired by Rosneft, a significant portion of the tax assessments levied against YNG were set aside or vastly reduced by Russian courts.[1240]   According to Mr. Konnov, after YNG contested the assessments, "the court-appointed experts who calculated the market prices" found in a number of cases "that the price deviation was within the 20% 'safe harbour' [for transfer pricing]."[1241]   As a consequence, "large parts of the assessments against YNG were overturned by the courts."[1242] Claimants, while not explicitly disputing the "supposed technicality" of the provisions on transfer pricing,[1243] insist that, given the "scale of the reduction . . . the purported tax reassessments against Yugankneftegaz lacked any credibility in the first place."[1244]

1010. As for YNG's remaining debts, Rosneft, according to Mr. Konnov, as a "strategic company" owned by the State and supplying the State with petroleum, was able to "restructure[e] them through a series of negotiations.[1245]

### 3.   Parties' Arguments and Tribunal's Observations

1011. The Tribunal now returns to the Parties' central arguments in respect of the YNG auction which it summarized at the outset of this Chapter and will seek to determine whether the events which

---

[1239]   *See* Memorial ¶ 382 n.578; Resolution of the Federal Arbitrazh Court for the Moscow District, 12 October 2007, Exh. C-294.

[1240]   On 16 February 2005, the Federal Arbitrazh Court granted YNG's cassation complaint and referred for re-examination YNG's challenge of the 1999 tax reassessment.  Resolution of the Federal Arbitrazh Court for the Moscow District, 16 February 2005, Exh. C-253; *Yugansk's New Victory*, Vedomosti, 11 October 2005, Exh. C-784; *but see* First Konnov Report ¶¶ 86–92.  On 10 October 2005, the Moscow Arbitrazh Court found that the 1999 reassessment against YNG violated the three-year limitation period under Article 87 of the Russian Tax Code.  Decision of the Moscow Arbitrazh Court, 12 October 2005, Exh. C-254; *Yugansk's New Victory*, Vedomosti, 11 October 2005, Exh. C-784.  On 16 April 2006, the Moscow Arbitrazh Court reduced YNG's alleged tax arrears for 2002 by 83 percent and the corresponding fines by 89 percent (to USD 760 million).  Decision of the Moscow Arbitrazh Court, 25 April 2006, Exh. C-255; Rosneft 2005 U.S. GAAP Consolidated Financial Statements, p.59, Exh. C-374.  In December 2007, having agreed in May–June 2007 that Rosneft was eligible for a tax restructuring process and that the total amounts of its tax debts (including that of YNG) could be restructured, the State approved the restructuring of Rosneft's tax debt, allowing for quarterly repayment of outstanding tax over five years, starting in March 2008.  Memorial ¶ 283; Rosneft 2007 U.S. GAAP Consolidated Financial Statements, p. 50, Exh. C-377; Rosneft Management's Discussion and Analysis of Financial Condition and Results of Operations for 2007 and 2006, p. 38, Exh. C-378.

[1241]   First Konnov Report ¶ 88.

[1242]   *Ibid*.  Mr. Konnov refers to a total of 16 decisions of various courts in this regard, First Konnov Report ¶¶ 88–89 nn.161–69.

[1243]   Reply ¶ 360.

[1244]   *Ibid.* ¶ 361.

[1245]   First Konnov Report ¶ 91; Transcript, Day 19 at 30–31.

it has traversed are consistent with a genuine attempt by the Russian Federation to collect taxes, or whether they disclose that the auction was rigged so as to enable YNG to fall into the hands of the State through the veneer of a legitimate process.  The Tribunal will review, in turn, (a) the fairness of the price achieved at the auction, (b) the role of Baikal and its acquisition by Rosneft, and (c) the impact of the YNG auction on the future of Yukos.

(a) **Did the Auction Price Reflect the True Value of YNG; If not, was Either Party Responsible for the Price Reduction?**

1012.  The Parties have different views as to whether the sale price of USD 9.35 billion reflected the fair value of YNG.  Claimants argue that if the purpose of the auction had been to collect revenues in order to pay legitimate tax debts, the Russian Federation would have been expected to make every effort to maximize the proceeds.  Instead, Claimants allege that Russia took steps to reduce the price so that it could, via Rosneft, acquire YNG for a derisory amount, and still be able to enforce the remaining tax liabilities against other Yukos assets.[1246]  Respondent maintains that the price for which YNG was acquired was not a "knock down" price but, to the extent it was, only Yukos was to blame.[1247]

1013.  Claimants complain that the auction price paid by Baikal represented less than half of the enterprise value of YNG, which the Dresdner Valuation Report had assessed to be in the range of USD 18.6–21.1 billion.  Respondent answers that other contemporaneous valuations, including Morgan Stanley's, estimated a much lower value (USD 8.9 billion).[1248]  Respondent also recalls that it was necessary to adjust the value of the enterprise to account for the fact that only the 76.79 percent stake of Yukos in YNG was being auctioned.  Respondent put these issues to Dr. Illarionov, when challenging his claim that the price achieved was "well below even the most conservative estimates prepared by experts."[1249]  Dr. Illarionov admitted that his figure of USD 14.7–17.3 billion was based on a full enterprise value that did not take into account the tax liabilities.[1250]  At the end of his cross-examination, however, Dr. Illarionov maintained that he did not think "this discount rate of 60% that has been applied by the Russian

---

[1246]  Claimants' Post-Hearing Brief ¶ 101.

[1247]  Respondent's Closing Sides, pp. 354–65.

[1248]  *See* Dresdner Valuation Report; *see also YNG Sale:  A Shock and Awe Negotiating Tactic?,* Morgan Stanley Equity Research Report on Yukos, 22 July 2004, Exh. R-632.

[1249]  Illarionov WS ¶ 44; *see* Transcript, Day 7 at 85–86 (cross-examination of Dr. Illarionov).

[1250]  Transcript, Day 7 at 53–56, 77, 80–81 (cross-examination of Dr. Illarionov); *but see* Transcript, Day 17 at 255–56 (Claimants' closing, arguing that the demonstrative charts put to Dr. Illarionov during the cross-examination were not entirely accurate).

authorities produces a number that [he] would consider . . . a legitimate valuation."[1251]

1014. Respondent points out that Dresdner's valuation did not take into account outstanding tax liabilities in the amount of USD 4.6 billion, and that "[i]f this were to be judicially upheld, the estimate of net debt and other liabilities would increase by a corresponding amount."[1252] Claimants reply that these tax liabilities were fabricated by the Russian authorities in the period from October to December 2004 in order to depress the price of YNG.  The tax liabilities, say Claimants, related to transfer pricing and were applied to oil trading revenue that had already been re-attributed to Yukos, thus resulting in double taxation.[1253]  Respondent argues that YNG's transfer pricing issues had arisen over many years and that the allegation of double taxation was misconceived.  Respondent says the assessments were made in accordance with Russian law, since Yukos had forced YNG to sell oil to the trading companies at very low prices which exposed it to liability.[1254]

1015. Claimants also argue that the sale price was affected by the nature and speed of the process adopted by the Russian authorities.  While it is common ground that the time frame for the auction was within the minimum statutory requirements, Claimants recall that the Government ignored Dresdner's recommendation for a two-stage auction process to allow for proper due diligence, and its warning that failure to provide access to full information could lead to a reduction in the number of potential purchasers and the price they would be willing to pay.[1255] No due diligence was provided beyond a "data room" that consisted of the report itself, auction rules and 89 pages of additional documents.  Respondent answers that Russian law requires no due diligence, that Gazpromneft was still able to undertake a thorough assessment, and that any due diligence issue was due to Yukos' lack of cooperation with Dresdner.[1256]

1016. The bare minimum time frame meant that the auction was conducted on a Sunday, which Dr. Illarionov described as "highly unusual . . . since the Russian Government agencies are closed on Saturdays and Sundays."[1257]  Respondent's suggestion at the Hearing that Sunday

---

[1251]  Transcript, Day 7 at 87.

[1252]  Dresdner Summary Letter, p. 6.

[1253]  Memorial ¶¶ 269–75; Reply ¶ 266.

[1254]  Rejoinder ¶¶ 958–60; First Konnov Report ¶¶ 86–92.

[1255]  Dresdner Valuation Report ¶¶ 11.2, 12.8.

[1256]  Rejoinder ¶¶ 978–81.

[1257]  Illarionov WS ¶ 43.

was chosen to reduce the impact of Moscow's traffic was scoffed at by Claimants as "absurd."[1258]

1017.  Claimants conclude that by any measure "the auction process was perfunctory and did not involve genuine competition."[1259]   Although the auction process complied with the letter of Russian legislation,[1260] Claimants insist that it is not a defence to an expropriation claim under international law that the State complied with its own domestic law.

1018.  Respondent accuses Yukos of turning YNG into a "wasting asset"[1261] by foisting upon it "upstream guarantees"[1262] for its loan in favour of Moravel and forcing YNG to borrow USD 485 million from affiliate Yukos Capital.  Respondent adds that Yukos caused YNG to default on at least USD 586 million of mineral extraction tax, imperilling its oil licenses.  Yukos' press service issued a statement on 11 October 2004 attributing the non-payment of mineral extraction tax to YNG's accounts having been frozen.[1263]

1019.  Respondent alleges that the low turn-out at the auction was attributable to Claimants' own acts of sabotage, namely their "intimidation campaign"[1264] and Yukos' "spurious bankruptcy filing in the United States"[1265] the purpose of which was to block the YNG auction by targeting both the companies that had expressed an interest in bidding as well as their banks.[1266]  According to Respondent, the TRO led banks to withdraw their financing, drove two of the companies that had applied for antimonopoly clearance not to register for the auction and resulted in Gazpromneft not submitting a bid.  Dr. Illarionov was cross-examined about Claimants' media campaigns aimed at warding off prospective bidders from the auction.[1267]  When he was asked

---

[1258]  Claimants' Post-Hearing Brief ¶ 104; *see* Transcript, Day 7 at 137–40.

[1259]  *Ibid*. ¶109.

[1260]  A point also noted in the ECtHR Yukos Judgment.  *See* ECtHR Yukos Judgment ¶ 647, Exh. R-3328.

[1261]  Rejoinder ¶ 955.

[1262]  *Ibid*. ¶ 966.

[1263]  *Yuganskneftegaz may lose licenses in three months*, RIA Novosti, 11 October 2004, Exh. C-709.

[1264]  Rejoinder ¶ 982; *see Yukos Says Asset Sale Could Prove Fatal Blow*, NY Times, 23 July 2004, Exh. R-648; *Buyer Beware*, Advertisement, Financial Times, 13 December 2004, Exh. R-649.

[1265]  Rejoinder ¶ 982.

[1266]  *See* Yukos-Moscow Limited, Resolution No. 1 of Management Board, 10 December 2004, Exh. R-657.  In the circumstances, the Tribunal wonders why Gazpromneft attended the auction at all, except that two participants were required for the auction to proceed.

[1267]  Transcript, Day 7 at 90–91; *Yukos Says Asset Sale Could Prove Fatal Blow*, NY Times, 23 July 2004, p. 3, Exh. R-648 (quoting Mr. Tim Osborne stating that "[a]nyone that buys those assets [referring to the YNG auction] is buying a whole heap of trouble"); Transcript, Day 7 at 98–99; *Buyer Beware*, Advertisement, Financial Times, 13 December

whether these statements likely encouraged or discouraged bidders from participating in the auction, he answered that Gazpromneft and Baikal probably "felt very well protected, maybe by the Russian Government."[1268]

1020. Having considered all of the factors that it has reviewed, the Tribunal concludes that the price of USD 9.35 billion which Baikal paid at the auction for the 76.79 percent stake of Yukos in YNG was far below the fair value of those shares.

1021. In the opinion of the Tribunal, the imposition during the few weeks prior to the auction of massive tax liabilities on YNG (which were cancelled in the months after the acquisition of YNG by Rosneft) appear designed specifically to depress the value of YNG.  The amount of the tax liabilities imposed which were subtracted from the Dresdner valuation cannot be justified.  In addition, in the view of the Tribunal, the failure by YNG to pay its mineral extraction tax was inextricably linked to the asset freeze of Yukos' cash.

1022. The Tribunal also finds that the Russian authorities deliberately ignored the advice of Dresdner that haste in carrying out the auction could decrease the price.  The Tribunal notes that the *Quasar* tribunal criticized Respondent's decision to hold the auction only one month after its announcement, and found that "the auction procedure was highly irregular in a number of ways that all relate to the extraordinary speed with which it was conducted."[1269]

1023. While the Tribunal accepts, as did the *RosInvestCo* and *Quasar* tribunals,[1270] that the actions of Claimants in warding off prospective buyers through a media campaign and the TRO may have deterred some potential buyers and may have resulted in a low winning bid,[1271] these actions, at

---

2004, Exh. R-649; Transcript, Day 7 at 114; *Mystery Russian Company Wins Bid on Yukos Unit— Offer of $9.37 Billion Seals Fate of Beleaguered Firm, But Many Questions Linger*, The Wall Street Journal (Europe), 20 December 2004, p. 3, Exh. C-738 ("Menatep intends to take every action available in order to protect its interest in Yukos").

[1268] Transcript, Day 7 at 100–01.

[1269] *Quasar* ¶ 117, Exh. R-3383.

[1270] *RosInvestCo* ¶ 522, Exh. C-1049 (accepting that "had Claimant not discouraged international bidders and without the bankruptcy proceedings in the United States, more bidders might have participated, and that the process seems to have been conducted within the limits of discretion awarded by Russian law"); *Quasar* ¶115, Exh. R-3383 (the tribunal was "receptive to the Respondent's argument that some of the blame associated with the poor turnout and low winning bid at the YNG auction should be attributed to the Claimants for their media campaign . . . and for initiating bankruptcy proceedings . . . that led to the TRO" and to the "argument that Yukos' actions reasonably could have deterred potential bidders from participating in the YNG auction")  Both tribunals contrasted these findings with their serious doubts about the bona fide nature of the auction, stemming largely from the dubious identity of Baikal and the circumstances of its acquisition by Rosneft.

[1271] On the other hand, the Tribunal notes that the Russian Justice Minister on 14 October 2004, in a commentary on the auction price, is reported to have said that this value "takes into account the 'high risk to a potential buyer' of the

the end of the day, had no relevant impact on the bankruptcy of Yukos.[1272]  The circumstances surrounding the appearance and disappearance of Baikal make the auction process seem all the more questionable to the Tribunal.  The Tribunal now turns to these events.

### (b)   Who was Behind Baikal and were They a Front for the Russian State?

1024.   In the view of the Tribunal, one of the most opaque facets of the YNG auction is the identity of Baikal, the sole and successful bidder at the auction which was acquired by State-owned Rosneft three days after its successful bid.  Baikal did not exist until less than two weeks before the YNG auction.  It was obviously a vehicle created solely for the purpose of bidding for YNG at the auction.  As noted earlier, it was incorporated with capital of USD 359.

1025.   During the closing oral arguments, the Chairman told Respondent's counsel: "you still have to convince us that Baikalfinance . . . was not a sham company.  That's your challenge."[1273]

1026.   Respondent sought to explain that Baikal was a special purpose vehicle established strictly for bidding at the auction.  Respondent added that "it was well known that those lying behind Baikal was [sic] Surgutneftegaz."[1274]  Respondent stated that Baikal was represented at the auction by two managers of Surgutneftegaz, Mr. Igor Minibayev and Ms. Valentina Komarova.  Ms. Valentina Davletgareeva, the person who incorporated Baikal, was also connected to companies affiliated with Surgutneftegaz.  According to Counsel for Respondent, she sold 100 percent of her interest in Baikal to Makoil, a company owned in part by a secretary to the Board of Surgutneftegaz.[1275]   Accordingly, Respondent submits that "all of those who had a connection to the company in a formal manner or who were identified with it can be identified as having significant positions or relationships with respect to Surgutneftegaz."[1276]  Baikal's Tver office was close to a subsidiary of Surgutneftegaz, which in turn was located directly across the river from YNG.[1277]   In addition, there had been reports in the media since

---

Yukos asset."  *In the Yukos Saga, Yet Another Gloomy Chapter*, The Wall Street Journal (Europe), 14 October 2004, Exh. C-713.

[1272]   *See* Chapter X.E at paragraph 1625.

[1273]   Transcript, Day 19 at 33.

[1274]   Transcript, Day 21 at 151; Rejoinder ¶¶ 36, 1002, 1007.

[1275]   Rejoinder ¶ 1002 nn.1690–91.

[1276]   Transcript, Day 21 at 151; Respondent's Closing Slides, pp. 772–80.

[1277]   *See* Transcript, Day 21 at 151, Respondent's Closing Sides, pp. 782, 790.

September 2004 that Surgutneftegaz was interested in the auction.[1278]

1027.  Claimants insist that, even accepting Respondent's theory that Baikal was a front for Surgutneftegaz, the "facts in the record . . . compel the conclusion that Baikal served the interests of the State, and any involvement of Surgut, a company known to be 'friendly with the Kremlin', was solely to mask the State's involvement."[1279]

1028.  The fact that Baikal was incorporated only a few weeks before the auction and had the minimum-required capital is, according to Respondent, irrelevant.  The other three entities who had antimonopoly clearance for the auction were also relatively new companies with little capital.  Respondent alleged that Baikal paid the USD 1.77 billion deposit itself after having received the financing from a third party.[1280]  Respondent submitted that Surgutneftegaz had sufficient resources to enable Baikal Finance to pay the deposit, but not the full purchase price without recourse to international capital markets.[1281]  Respondent's theory is that such financing was foreclosed on the day of the auction by the TRO, leaving Baikal (and Surgutneftegaz) with a stark choice of defaulting on the obligation to pay the balance, and lose the USD 1.77 billion deposit, or find someone else to buy the asset.[1282]  On the other hand, Respondent's counsel agreed that the transaction "turned out to be very productive for Rosneft; there's no question about it."[1283]

1029.  Claimants contend that the nature and speed of events that followed the auction cannot be reconciled with Respondent's suggestion that Rosneft's acquisition of Baikal was entirely fortuitous and unplanned.  On 20 December 2004, the day after the auction, they point out that Rosneft sought and obtained, in less than a day, antimonopoly clearance to acquire Baikal.[1284]  Respondent's attempts to explain these events by pointing out that Rosneft and the authorities

---

[1278]  *Surgut drops first hint of interest in Yukos assets*, AFP, 28 September 2004, Exh. C-704 (stating that "President Vladimir Putin and his entourage of secret service agents and Soviet era officials would be delighted with the transaction").

[1279]  Claimants' Post-Hearing Brief ¶ 110 (footnote omitted).

[1280]  Transcript, Day 19 at 34.

[1281]  Transcript, Day 19 at 34–35.

[1282]  Transcript, Day 19 at 34–35, 43.

[1283]  Transcript, Day 19 at 35.

[1284]  Rosneft's request to Federal Antimonopoly Service to approve acquisition of a 100 percent interest in Baikal, 20 December 2004, Exh. C-1162; Federal Antimonopoly Service's approval of Rosneft's acquisition of a 100 percent interest in Baikal, 20 December 2004, Exh. C-1163; Federal Antimonopoly Service's instructions with respect to Rosneft's acquisition of a 100 percent interest in Baikal, 20 December 2004, Exh. C-1164.

were familiar with such filings confirm, according to Claimants, that the authorities did not perform even a perfunctory review of the 13-page application and its 98 pages of attachments.[1285]

1030. Claimants also refer to the fact that Rosneft filed for antimonopoly clearance on a Monday, the day after the auction.  Thus, Respondent's allegation that Surgutneftegaz was obliged to sell "the bid" because the TRO prevented it from accessing financing rings hollow since Surgutneftegaz would have needed to seek and be denied financing by every commercial bank on the Sunday of the auction.  Claimants ask whether Baikal would have risked a deposit of USD 1.77 billion by making a bid without first having financing in place.[1286]

1031. Respondent claims Rosneft had no ownership interest in Baikal prior to the auction, and that Rosneft put together a finance package for the purchase of Baikal after the auction, on an emergency basis, and, in so doing, even breached covenants related to its prior borrowings.

1032. When Rosneft completed the acquisition of YNG on 22 December 2004, using funds borrowed from State-owned banks, the transaction was described in the Russian Press as "the State budget via a State bank help[ing] a State company acquire from the State a very profitable asset."[1287]  Claimants urge the Tribunal to reach the "inescapable conclusion"[1288] that it was determined in advance that Rosneft would acquire YNG, and that the elaborate sham involving Baikal was set up to mask the State's involvement and thus reduce legal risks.

1033. Claimants also submit that the events *after* the auction speak for themselves.  YNG's tax debts were reduced from USD 4 billion to less than a billion.  In addition, after having filed claims by YNG of almost USD 10 billion in Yukos' bankruptcy, the net cost to Rosneft for the purchase of Yukos' jewel was, according to Claimants, less than USD 3 billion.  Thus, bearing in mind that in 2006 Rosneft's IPO valued YNG at USD 55.78 billion, Rosneft's description of the

---

[1285]   Rejoinder ¶ 1004 & n.1698; *see* Approval of the Federal Antimonopoly Service regarding the acquisition by Baikal Finance of a 76.79 percent interest in YNG, 15 December 2004, Exh. R-3813; Order of the Federal Antimonopoly Service regarding the acquisition by Baikal Finance of 76.79 percent interest in YNG, 15 December 2004, Exh. R-3814.

[1286]   Claimants' Post-Hearing Brief ¶ 112.

[1287]   *From the Editors:  The State Whirligig*, Vedomosti, 15 August 2005, Exh. C-764.

[1288]   Claimants' Post-Hearing Brief ¶ 113.

transaction as "the most monumental bargain in Russia's modern history" was, conclude Claimants, an understatement.[1289]

1034. The Tribunal notes that the *RosInvestCo* tribunal in reaching its conclusion that the auction was rigged observed that "the winning bidder was a completely unknown company just created before the auction and disappearing right after the auction and assigning its interests to Ru[ss]ian state-owned Rosneft."[1290]  To the *RosInvestCo* tribunal, "[t]he circumstances that this bidder was further found to have no real offices and nevertheless was able to raise the deposit in the range of US$ 1.7 billion and then the purchase price with the apparent help of Rosneft further contribute to the impression that the scheme was set up under the control of respondent to bring Yukos' assets under Respondent's control."[1291]

1035. The identity of Baikal was also of "[p]aramount"[1292] concern for the *Quasar* tribunal, which described its unease with the circumstances of Baikal's purchase as follows:

> an unknown entity, placed a $9.3 billion, uncontested winning bid for YNG, the largest oil production company in Russia, and was then acquired a mere three days later by state-owned Rosneft, even before payment of the purchase price was due. . . . The Respondent's argument . . . to the effect that [the] YNG auction was of a public nature, and that [Baikal] bid $500 million above the starting price, are insufficient to remove the suspicion of collusion, particularly when [Baikal] was quickly taken over by Rosneft before payment of the purchase price was due.[1293]

1036. Having assessed the evidence with respect to the identity and role of Baikal, and the timing and nature of Rosneft's acquisition of that company, this Tribunal agrees with the conclusions of the *RosInvestCo* and *Quasar* tribunals that the YNG auction was rigged.

1037. The additional evidence placed before this Tribunal connecting Baikal to Surgutneftegez does not erase the suspicion that Baikal was created by instruments of Respondent in order to facilitate the acquisition of YNG by State-owned Rosneft.  The statement by Rosneft that the purchase was a "monumental bargain", the remarks by President Putin acknowledging that the

---

[1289]   *Ibid.* ¶ 114; *see* "Place in economy of Russia, Rosneft:  About company," Rosneft Website, p. 14, Exh. C-381.

[1290]   *RosInvestCo* ¶ 523, Exh. C-1049.

[1291]   *Ibid.*

[1292]   *Quasar* ¶ 118, Exh. R-3383.

[1293]   *Ibid.*

State had looked after the State's interest [1294] by increasing its reserves, and the good fortunes of YNG once it was in the hands of a State-owned company all support the Tribunal's conclusion that the auction of YNG was not driven by motives of tax collection but by the desire of the State to acquire Yukos' most valuable asset and bankrupt Yukos.  In short, it was in effect a devious and calculated expropriation by Respondent of YNG.

(c)   **What were Yukos' Prospects for Survival Once it Lost its Core Asset?**

1038. While the legal implications of the YNG auction will be discussed in Part X of the Award, the Tribunal will set out briefly Claimants' factual allegations that the sale of YNG dealt a "fatal blow" to the survival prospects of Yukos.[1295]  Was the sale of YNG the point of no return for the survival of Yukos?  On the basis of the totality of the evidence and, in particular, the testimony of Messrs. Misamore and Theede and Dr. Illarionov, the Tribunal answers that question in the affirmative.

1039. Mr. Misamore testified that with the auction of YNG, "Yukos lost over 60% of its total production capacity."  This "meant a massive downsizing of the company's activities."  Mr. Misamore hoped it "was not the end of the company," and Yukos started 2005 on the basis that it would carry on operations on a smaller scale with the remaining production assets and refineries.  However, "it soon became evident there was little that Yukos' management could do to protect the company's Russian assets.  Despite our best efforts to challenge the tax reassessments, the Russian courts were biased against us.  Bankruptcy proceedings in Russia were increasingly likely and the Yuganskneftegaz auction had highlighted the real risk that company assets would be transferred to State-owned entities at substantial undervalue."[1296]

1040. Mr. Theede considered the announcement of the auction as the point in time when "the die was finally cast" for Yukos.  The auction put an end to settlement discussions with the Russian Government.  He considered the sale of YNG at a "grossly undervalued price through a sham

---

[1294]   Press Statement and Answers to Questions Following Russian–German Bilateral Consultations, Russian President Official Website, 21 December 2004, p. 2, Exh. C-421; Press Conference with Russian and Foreign Media, Russian President Official Website, 23 December 2004, p. 4, Exh. C-422.

[1295]   ECtHR Yukos Judgment ¶ 653; *Yukos Says Asset Sale Could Prove Fatal Blow*, NY Times, 23 July 2004, Exh. R-648; *Moscow set to seize huge Yukos oil division—Investors may lose everything in tax fight, analysts warn*, International Herald Tribune, 21 July 2004, Exh. C-698.

[1296]   Misamore WS ¶¶ 58–59.

auction" to be a "clear theft by the Russian State," which became all the more obvious in the context of the IPO by Rosneft in July 2006.[1297]

1041. Dr. Illarionov described the confiscation of YNG as the "culminating point of th[e] attack" on Yukos, following which the Russian authorities took no further steps to satisfy Yukos' alleged tax debts. Such conduct was inconsistent with a genuine attempt to collect taxes.[1298]

1042. At the time, Claimant YUL and its subsidiaries (including Hulley), as majority shareholders of Yukos, acknowledged that they had "lost the power to govern the financial and operating policies of Yukos so as to obtain benefits from its activities."[1299] It was noted in the 2004 Annual Report for YUL that Yukos had become "incapable of operating as a business as evidenced by the forced sale of [YNG]."[1300]

1043. The effect of the auction on Yukos' prospects did not escape the attention of the ECtHR, which acknowledged that YNG had been Yukos' "only hope of survival."[1301] It was "rather obvious" to the ECtHR that the choice of YNG as the first Yukos asset to be auctioned to satisfy Yukos' tax debts was "capable of dealing a fatal blow to its ability to survive the tax claims and to continue its existence."[1302] This Tribunal agrees. This Tribunal also agrees with the *Quasar* tribunal's characterization of the seizure of YNG as an extreme measure capable of "drastic" consequences for Yukos.[1303]

1044. Those "drastic" consequences will be important for the Tribunal's determination of an appropriate valuation date for purposes of calculating damages. The dim prospects of resuscitation of Yukos after the "fatal blow" of the YNG auction are discussed in the next chapter on Bankruptcy.

---

[1297] Theede WS ¶ 25–27 (evoking the Rosneft IPO as a moment "where Rosneft was valued at approximately US $ 80 billion, with YNG accounting for 70% of its crude oil production").

[1298] Illarionov WS ¶¶ 42–43.

[1299] YUL (and its subsidiaries), Annual Report and Consolidated Financial Statements for the Year Ended 31 December 2004, p. 2, Exh. R-4229. Deloitte, auditors of YUL, in their report on the financial statements, after referring to the auction of YNG, wrote: "These events indicate a material uncertainty which may cast significant doubt on Yukos's ability to continue as a going concern and therefore it may be unable to realize its assets and discharge its liabilities in the normal course of business." *Ibid.* at 3.

[1300] *Ibid.* at 2.

[1301] ECtHR Yukos Judgment ¶ 654.

[1302] *Ibid.* ¶ 653.

[1303] *Quasar* ¶ 116, Exh. R-3383.

### G.   THE BANKRUPTCY OF YUKOS

#### 1.   Introduction

1045. Claimants' case is that Yukos' bankruptcy, announced by the Moscow Arbitrazh Court on 4 August 2006 and followed by the removal of Yukos from the companies' register on 21 November 2007, was the "final act of the destruction of the Company by the Russian Federation and the expropriation of its assets for the sole benefit of the Russian State and State-owned companies Rosneft and Gazprom."[1304]   Claimants allege that Respondent "instigated" a syndicate of western banks led by Société Générale (the "**Western Banks**")[1305] to commence bankruptcy proceedings against Yukos based on Yukos' default under a loan agreement concluded between Yukos and the Western Banks for the purposes of funding the Sibneft merger.[1306]   Claimants contend that Respondent ensured, through the initiation of bankruptcy proceedings and discriminatory treatment of bankruptcy claims, that the Russian State and Rosneft would hold over 97 percent of the alleged claims against Yukos in the bankruptcy.[1307] Having made certain that Yukos' proposed Rehabilitation Plan would be rejected at the general creditors' meeting, the Russian Federation completed its expropriation scheme by auctioning Yukos' remaining assets.   Through the bankruptcy and liquidation of Yukos, the Russian State directly received more than 60.5 percent of the bankruptcy proceeds and, indirectly, through Rosneft, received more than 39.21 percent of the bankruptcy proceeds and all of Yukos' main production assets.

1046. Respondent denies all allegations of impropriety or bias in relation to the bankruptcy proceedings.   Moreover, Respondent argues that the bankruptcy proceedings are irrelevant to the Tribunal's determination because the conduct that directly caused Yukos' liquidation—the initiation of Yukos' bankruptcy and the vote to liquidate Yukos—is either not attributable to Respondent or not an exercise of its sovereign power.   Respondent's case is that "the insolvency of the Yukos holding company was the consequence of the Oligarchs' and Yukos' management's disastrous strategy of tax evasion, resistance to and obstruction of the collection

---

[1304]   Memorial ¶¶ 411–13.

[1305]   The Western Banks included BNP Paribas S.A., Citibank N.A., Commerzbank Akziengesellschaft, Calyon S.A., Deutsche Bank A.G., Hillside Apex Fund Limited, ING Bank N.V., KBC Bank N.V., Société Générale S.A., Stark Trading, Shepherd Investments International Limited, Thames River Traditional Funds PLC (High Income Fund), UFJ (Holland) N.V., and V.R. Global Partners L.P.

[1306]   Presumably for the $3 billion Share Purchase of 20 percent of Sibneft shares.   *See* Yukos, *YukosSibneft, Greater Opportunities to Build Value*, Presentation of 8 October 2003, Exh. C-42.

[1307]   Claimant's Post-Hearing Brief ¶ 126; Memorial ¶ 439; Reply ¶ 412.

of overdue taxes, self imposition of massive non-tax and intercompany liabilities on the company, and failure to draw on Yukos' ample offshore assets."[1308]

**2.     Chronology**

**(a)     The Initiation of the Bankruptcy**

1047. The initiation of bankruptcy proceedings against Yukos is inextricably tied up in the history of two loans connected with the Sibneft merger, one from the Western Banks ("**A Loan**") and the other from Société Générale ("**B Loan**").   It is therefore important to review the key facts relating to each of those loans.

1048. For purposes of funding the Sibneft merger, Yukos entered into two loan agreements.   The A Loan consisted of USD 1 billion borrowed by Yukos from the Western Banks, which was secured by certain of Yukos' oil export contracts and by YNG.   This loan was entered into on 24 September 2003.[1309]

1049. The B Loan consisted of USD 1.6 billion borrowed by Yukos from Société Générale, which was fully collateralized in cash by GML, Yukos' ultimate parent company.   This loan was entered into on 30 September 2003.[1310]

1050. On 3 October 2003, Société Générale drew on the collateral under the B Loan, making GML the lender.   GML's rights were then assigned to Moravel, which was GML's wholly-owned indirect subsidiary in Cyprus.[1311]

1051. On 30 June 2004, an appeal panel of the Moscow Arbitrazh Court issued an enforcement writ against Yukos for payment of the taxes assessed for the year 2000.   Following this development, the Western Banks notified Yukos that they would not demand immediate

---

[1308]   Counter-Memorial ¶ 445.

[1309]   Memorial ¶ 374, Guarantee between YNG and Société Générale, 24 May 2004, Exh. R-581.

[1310]   B Loan Agreement, 30 September 2003, Exh. R-468.

[1311]   *Yukos Oil Company Arranges 1.6 Billion Loan*, Yukos Press Release, 6 October 2003, Exh. C-653; Respondent's Closing Slides, p. 381; Memorial ¶¶ 441–44; Counter-Memorial ¶¶ 548, 578, 1531–33; Rejoinder ¶¶ 1054–56, 1136–37.

payment, but would instead rely on the security supporting the A Loan, namely payments through the proceeds of export sales of crude oil.[1312]

1052. Soon after, however, as described in the previous chapter, the tax authorities seized and auctioned YNG, depriving Yukos of its primary oil producing asset.  Claimants contend that when YNG was taken from Yukos in December 2004, YNG stopped shipping oil under the export contracts and "[i]t was thus the actions of the Russian Federation, not Yukos, which obstructed the payment of [the A Loan]."[1313]

1053. Since Yukos ceased making payments under the A Loan, the Western Banks brought a claim against Yukos for approximately USD 472.8 million, plus interest under the A Loan.  The claim was recognized by the High Court of England and Wales on 24 June 2005 ("**English Judgment**").[1314]  Respondent contends that, by this time, Yukos had already paid Moravel over USD 1 billion under the B Loan, and thus had more than enough cash to have repaid the Western Banks in full under the A Loan.

1054. During this same time period, Yukos management implemented two restructurings that transferred Yukos' non-Russian assets, previously held through Yukos' wholly-owned Dutch and Armenian subsidiaries Yukos Finance and Yukos CIS into two "stichting administratiekantoor".

1055. A stichting is a Dutch "foundation."[1315]  It does not have members or shareholders.  All management powers are vested in a board of directors, subject only to the stichting's articles of association and Dutch law.[1316]  In the case of a stichting administratiekantoor or "foundation trust," the stichting issues depository receipts for shares in exchange for shares transferred to it.[1317]  This trust-like structure separates legal ownership and beneficial ownership:  the

---

[1312]   Appeal Resolution of the Moscow Arbitrazh Court, 29 June 2004, Exh. C-121; Enforcement Writ No. 383729 of 30 June 2004, Exh. C-122; Claimant's Post-Hearing Brief ¶ 118.

[1313]   Claimant's Post-Hearing Brief ¶ 118.

[1314]   *BNP Paribas v. Yukos Oil Company*, High Court of England and Wales, Judgment, 24 June 2005, Exh. R-455 (hereinafter "English Judgment").

[1315]   Dutch Civil Code (Burgerlijk Wetboek) art. 285(2), Exh. R-709; Counter-Memorial ¶ 528.

[1316]   C. Asser, *Handleiding tot de beoefening van het Nederlands Burgerlijk Recht* (W.E.J. Tjeenk Willink, 1997) ¶ 475, Exh. R-723; ¶¶ 480, 484, Exh. R-724.

[1317]   C. Asser, *Handleiding tot de beoefening van het Nederlands Burgerlijk Recht* (Kluwer, 2009) ¶ 658, Exh. R-725.

stitching is the legal owner of the shares and the holder of the depositary receipts for shares is the beneficial owner of the shares.[1318]

1056. The first restructuring took place in April 2005 and consisted in the transfer of all of the assets of Yukos Finance to Yukos International U.K. B.V. ("**Yukos International**"), a wholly-owned Dutch subsidiary of Yukos Finance, and the subsequent transfer of Yukos Finance's shares in Yukos International to Stichting 1 in exchange for depositary receipts for those shares.[1319]

1057. The second restructuring took place in September 2005 and consisted in the transfer of all the shares owned by Yukos CIS in Yukos Hydrocarbons Investments Limited ("**YHIL**") to Wincanton, a Dutch company; and the subsequent transfer of all of Wincanton's shares in YHIL to Small World Telecommunication Holding B.V. ("**Small World**"),[1320] another Dutch company wholly-owned by Wincanton.  Finally, Wincanton's shares in Small World were transferred to Stichting 2[1321] in exchange for depositary receipts for those shares.[1322]

1058. The members of the Stichtings' boards are former managers of Yukos and individuals close to Yukos.[1323]  The Stichtings hold "substantial value"[1324] and remain in place today.

1059. Articles 2.2 and 2.3 of the original Articles of Association of the Stichtings provide:

> 2.  The Foundation will exercise the rights attached to the shares in such a way as to guarantee to the best of its ability, whether or not by conducting court proceedings, the interests of the Company and the other, direct or indirect, subsidiaries of Yukos Oil Company (the "Parent Company"), which jointly constitute the group of which the Company forms a part (the "Group"), the management, executive staff and employees of the Group, the Group's legitimate creditors (including creditors with undisputed claims) and all other acknowledged stakeholders of the Group.

---

[1318] *Ibid.*

[1319] Counter-Memorial ¶ 529; Articles of Association of Stichting Administratiekantoor Yukos International (hereinafter "Stichting 1"), 14 April 2005, Exh. C-1181.

[1320] Small World Telecommunication Holding B.V. later changed its name to Financial Performance Holdings B.V. Counter-Memorial ¶ 530; *see also* Article 2.1 of the Articles of Association, Stichting Administratiekantoor Small World Telecommunications Holdings B.V. (hereinafter "Stichting 2"), 20 June 2006, Exh. R-712.

[1321] Stichting 2 later changed its name to Stichting Administratiekantoor Financial Performance Holdings. *See* Counter-Memorial ¶ 530.

[1322] Counter-Memorial ¶ 530; Articles of Association of Stichting 2, 26 September 2005, Exh. C-1182.

[1323] Counter-Memorial ¶ 532; Minutes of the Yukos Board of Directors Executive Committee, 26 October 2005, Exh. R-716; Transcript, Day 9 at 232 (cross-examination of Mr. Misamore).

[1324] Respondent's Post-Hearing Brief ¶ 120; Transcript, Day 9 at 233–34 (cross-examination of Mr. Misamore) (asserting that the maximum value held by Stichting 1 was USD 1.8 billion in 2006, and the maximum value held by Stichting 2 was around USD 500 million as of the date of the Hearing); Counter-Memorial ¶ 536.

> 3. Excluded from the Foundation's objects are the exercising of rights attached to the shares as a result of or in the implementation of an unlawful claim, judgment or transaction, including but not limited to those resulting from or related to the tax assessments imposed on Yukos Oil Company and members of the Group in the Russian Federation on or after the fourteenth of April two thousand and four, specifically including, but without prejudice to the above, any claim against, transfer of, sale of, revendication of, attachment judgment in respect of, allocation of or other applicability to, or expropriation of the shares, assets or other property of, or other imposition of charges on Yukos Oil Company and any part of the Group.[1325]

1060. Respondent asserts that the Stichtings were used to insulate assets from the reach of the Western Banks. Respondent puts particular emphasis on proceedings in Dutch courts, where the Western Banks attempted to enforce the English Judgment.[1326] On 15 July 2005, the Western Banks petitioned the District Court of Amsterdam to enforce the English Judgment, and to issue a judgment permitting the sale and transfer of Yukos' share interest in Yukos Finance.[1327] The Western Banks informed the court that the creation of the Stichtings had rendered Yukos' shares in Yukos Finance, over which the Western Banks had obtained a prejudgment attachment, "worthless" and "more or less unsellable."[1328] Respondent asserts that the Western Banks' failure to enforce the English Judgment in the Netherlands was "the death knell of Yukos' pretense of cooperation in its negotiations with the syndicate."[1329]

1061. Back in Russia, on 22 September 2005, the bailiff adopted a resolution to seize all of Yukos' assets.[1330]

1062. The Western Banks proceeded to seek to enforce the English Judgment against Yukos in Russia. The Western Banks succeeded in the first instance, before the Moscow Arbitrazh Court, but the Court's favourable ruling (issued on 28 September 2005) was reversed on "procedural" grounds by the Federal Arbitrazh Court for the Moscow District on 5 December 2005.

---

[1325] Articles of Association of Stichting 1, 14 April 2005, Exh. C-1181; Articles of Association of Stichting 2, 26 September 2005, Exh. C-1182.

[1326] Rejoinder ¶¶ 1073–75; English Judgment, Exh. R-455.

[1327] Rejoinder ¶ 1076; *BNP Paribas S.A. et al. v. OAO Yukos Oil Company et al.*, Decision of the District Court of Amsterdam, 29 September 2005 ¶ 2.1, Exh R-756.

[1328] *BNP Paribas S.A. et al. v. OAO Yukos Oil Company et al.*, Decision of the District Court. of Amsterdam, 29 September 2005 ¶ 2.3, Exh R-756.

[1329] Rejoinder ¶ 1083.

[1330] Resolution of Bailiff A.V. Reydik, 22 September 2005, Exh. C-301.

1063. Following the unfavourable decision by the Federal Arbitrazh Court for the Moscow District, the Western Banks entered into a confidential sale agreement with Rosneft ("**Confidential Sale Agreement**").[1331]

1064. Pursuant to this Confidential Sale Agreement, Rosneft agreed to satisfy the outstanding debt owed by Yukos to the Western Banks (the outstanding principal being at the time USD 455,124,215.03), in exchange for the assignment of the banks' rights of claim against Yukos under the A Loan to Rosneft.[1332]

1065. Significantly, the payment of the purchase price by Rosneft was predicated upon the Western Banks agreeing to take the steps described in Schedule 8 of the Confidential Sale Agreement, entitled "Application For Bankruptcy."   Schedule 8 sets out the Western Banks' obligations under three steps:  "1. Proceedings on recognition and enforcement of the English Judgment in Russia  (the  'Enforcement  Case')";  "2. Execution  proceedings  against  the  Borrower [*i.e.*, Yukos]  (based  on  the  Enforcement  Case)  (the  'Execution  Proceedings')";  and "3. Bankruptcy proceedings against the Borrower.[1333]

1066. Following the conclusion of the Confidential Sale Agreement between the Western Banks and Rosneft, the enforcement of the A Loan was back before the Russian courts.  On 21 December 2005, the Moscow Arbitrazh Court formally recognized the English Judgment against Yukos in favour of the Western Banks and issued a writ of enforcement with respect to the judgment.

1067. On 29 December 2005, the Western Banks submitted the enforcement writ to the bailiffs, who then initiated enforcement proceedings to recover from Yukos the amounts ordered under the English Judgment, namely USD 455,124,214.99 in principal and USD 9,459,143.18 in interest. These enforcement proceedings failed. Claimants assert that they were bound to fail due to the seizure of Yukos' assets, which had been imposed since July 2004.

1068. The order of the Moscow Arbitrazh Court that recognized the English Judgment was challenged by Yukos, and upheld by the Federal Arbitrazh Court of the Moscow District.  In its decision of 2 March 2006, the Federal Arbitrazh Court reasoned as follows:

---

[1331] Sale Agreement Relating To Certain Rights And Benefits Arising Under A Credit Agreement dated 24 September 2003 Between, Amongst Others, "Yukos Oil Company" and Société Générale SA, 13 December 2005, Exh. C-300 (hereinafter "Confidential Sale Agreement").

[1332] *Ibid*, p. 4.

[1333] *Ibid*., pp. 37–38.

> When re-examining the case, the Court did comply with the directions given by the cassation Resolution of December 5, 2005.  The Court fully and comprehensively reviewed the circumstances of the case.  Its conclusions on the application of legal rules are consistent with the established circumstances and evidence in the case.[1334]

1069.   On 6 March 2006, the Western Banks petitioned the Moscow Arbitrazh Court to declare Yukos bankrupt.[1335]

1070.   In an undated letter, Mr. Theede wrote in mid-March to the bailiffs requesting that the authorities "immediately release Company property from the freezing order in an amount sufficient to satisfy" the debt owed to the A Loan lenders, and thus avert the commencement of the bankruptcy proceedings.[1336]

1071.   On 14 March 2006, consistent with the terms of the Confidential Sale Agreement, Rosneft paid the Western Banks the full outstanding amount of the A Loan; in exchange, the Western Banks assigned their rights of claim to Rosneft.[1337]

1072.   On 24 March 2006, YNG—by then a subsidiary of Rosneft—filed a separate and parallel petition against Yukos before the Moscow Arbitrazh Court to declare Yukos bankrupt.[1338]

1073.   According to Respondent, the YNG petition was based on a judgment in respect of transportation services provided while Yukos owned YNG in January through March 2004, under a January 2003 contract.[1339]

1074.   The YNG petition was formally granted on 27 March 2006.[1340]  Since Russian law does not allow separate bankruptcy proceedings against one company, YNG's claim was joined to the bankruptcy proceedings initiated by the Western Banks.[1341]

---

[1334]   Resolution of the Federal Arbitrazh Court for the Moscow District, 2 March 2006, p. 4, Exh. C-302.

[1335]   Banks' Petition to Declare Yukos Bankrupt Filed with the Moscow Arbitrazh Court, 6 March 2006, Exh. R-3885; *Creditors Petition Russian Court to Declare Yukos Bankrupt*, World Markets Analysis, 13 March 2006, Exh. R-3882.

[1336]   Letter from Yukos' President S. Theede to the Head of the Interdistrict Department for Special Enforcement Proceedings of the Chief Directorate of the Federal Bailiffs Service for Moscow V.A. Savostov (undated), p. 3, Exh. C-1180; Claimant's Post-Hearing Brief ¶ 125.

[1337]   Ruling of the Moscow Arbitrazh Court, 28 March 2006, p. 3, Exh. C-307; Memorial ¶ 425; Claimants' Skeleton ¶ 47.

[1338]   Memorial ¶ 427; Counter-Memorial ¶ 561; Ruling of the Moscow Arbitrazh Court, 27 March 2006, p. 1, Exh. C-305.

[1339]   Rejoinder ¶ 1098.

[1340]   Ruling of the Moscow Arbitrazh Court, 27 March 2006, p.1, Exh. C-305.

[1341]   Register of Yukos Creditors' Claims, 30 October 2007 (Claim No. 2), p. 34, and (Claim No. 3), p. 109, Exh. C-353.

1075. On 28 March 2006, the Moscow Arbitrazh Court ordered the commencement of bankruptcy proceedings, placed Yukos under supervision, appointed Mr. Rebgun as interim administrator, and formally substituted Rosneft for the Western Banks as creditor.[1342]

1076. The Tribunal recalls that around that time Mr. Theede appointed Mr. Aleksanyan to represent Yukos in connection with the bankruptcy proceedings, but that within days of his appointment, Mr. Aleksanyan was arrested on 6 April 2006 at his house by masked and armed men on charges of money laundering and embezzlement allegedly committed when he was head of Yukos' legal department.[1343]

### (b)    The Treatment of Bankruptcy Claims; the Creditors' Meeting; the Declaration of Yukos' Bankruptcy

1077. In accordance with Russian bankruptcy law, it was for Mr. Rebgun, as interim administrator of Yukos, to convene a first meeting of Yukos' creditors.   At that meeting, Yukos' creditors would, under the options available under Russian Bankruptcy Law, vote either in favour of a Rehabilitation Plan proposed by Yukos or for the alternative of a liquidation of Yukos.

1078. In anticipation of these steps, on 1 June 2006, Yukos convened an extraordinary general shareholders' meeting and approved, by majority vote, the Rehabilitation Plan proposed by Yukos' management.[1344]   Also, the shareholders appointed Mr. Osborne as their representative in the bankruptcy proceedings.

1079. Claimants' Rehabilitation Plan was based on, *inter alia*:[1345]

  i)    The remaining assets valued at USD 31 billion exceeding the USD 29.5 billion in tax claims filed with Mr. Rebgun;

  ii)   a two year program to pay off the claims in bankruptcy;

---

[1342]   Rulings of the Moscow Arbitrazh Court, 28 March 2006, Exh. C-306 and Exh. C-307.

[1343]   *Top Yukos official Aleksanyan detained in Moscow*, RIA Novosti, 6 April 2006, Exh. C-796; *Arrest of Yukos Oil Company Executive Vice-President is a Brutal and Unjust Attack on the Company's Attempts to Secure a Fair Bankruptcy Process*, Yukos Press Release, 7 April 2006, Yukos Website, Exh. C-797; *Ioukos, un deuxième président en prison*, Libération, 8 April 2006, Exh. C-798; *Le Kremlin s'acharne contre le groupe pétrolier Youkos*, Le Figaro, 13 April 2006, Exh. C-799; Theede WS ¶ 30.

[1344]   Minutes of Extraordinary General Meeting of Yukos' Shareholders held on 1 June 2006, Exh. C-311.

[1345]   Memorial ¶ 458; Letter from Fulbright & Jaworski LLP to Chadbourne & Parke LLP, 1 June 2006, enclosing Yukos' Outline of Proposed Financial Rehabilitation Plan, Exh. C-312 (hereinafter "Rehabilitation Plan").

iii)  the creation of a "Cash Pool separate from the Company," funded by constant cash flows generated by Yukos' production, refining and marketing subsidiaries (approximately USD 3–3.5 billion of annual Earnings Before Interest, Taxes, Depreciation and Amortification ("**EBITDA**");

iv)  the sale of non-core assets: approximately USD 8.9 billion from the sale of Russian assets (20 percent stock of Sibneft ordinary shares, approximately USD 4.2 billion; 23.7 percent of YNG's outstanding share capital in the form of preferred shares (estimated at USD 3.6 billion); 100 percent of shares in Arctic Gas, approximately USD 1.1 billion) and approximately USD 1.5 billion from foreign assets (from the sale of its 53.7 percent stake in Lithuanian oil company Mazeikiu Nafta and 49 percent stock in Slovakian oil transport major Transpetrol); and

v)  supplementing the Cash Pool with amounts awarded in pending international arbitrations and Russian litigation where Yukos was seeking approximately USD 18 billion.

1080. On the same day that the shareholders approved the Rehabilitation Plan (*i.e.*, on 1 June 2006), Yukos' counsel transmitted an "Outline of the Proposed Financial Rehabilitation Plan" to Mr. Rebgun's counsel in the U.S. (Chadbourne & Parke LLP), requesting that the Rehabilitation Plan be placed on the agenda of the first meeting of Yukos' creditors, and circulated to all of Yukos' registered creditors.

1081. On 2 June 2006, Mr. Rebgun sent to Yukos' registered creditors and to Yukos' CEO, Mr. Theede, a notice informing them that the first creditors' meeting would be held on 16 June 2006 and inviting them to consult the materials that would be discussed at the meeting in his office from 9 to 15 June 2006.[1346]

1082. In the event, the first meeting of Yukos' creditors did not take place as scheduled on 16 June 2006.  On 8 June 2006, the first meeting of Yukos' creditors was adjourned by the Moscow Arbitrazh Court pending a 14 June 2006 hearing on the admission into bankruptcy proceedings of outstanding tax claims by the Federal Taxation Service for 2000 to 2004.  Mr. Rebgun, in turn, requested a postponement of the Court's hearing on Yukos' bankruptcy.[1347]

---

[1346]   Notice of the First Yukos Creditors' Meeting to be held on 16 June 2006, 2 June 2006, Exh. C-314.

[1347]   Memorial ¶¶ 432–34, 454.

1083. At the hearing of 14 June 2006, a bankruptcy judge (not a tax judge) of the Moscow Arbitrazh Court ruled in favour of the Federal Taxation Service "after taking just 15 minutes to consider 127,000 pages of information submitted by Russian tax officials," admitting in their entirety as valid bankruptcy claims the tax authorities' claims based on years 2000–2003, plus 2004.  In so doing, the judge confirmed the Federal Taxation Service as Yukos' largest creditor, with registered claims of USD 13.06 billion (amounting to 60.5 percent of all registered bankruptcy claims).[1348]

1084. Some two weeks later, the Court's hearing on Yukos' bankruptcy was postponed to 1 August 2006.  The Court granted the postponement, noting that the "first meeting of creditors did not take place because not all of the creditors' claims submitted before the established deadline have been reviewed by the Court."[1349]

1085. On 28 June 2006, Mr. Rebgun sent a revised notice of the first creditors' meeting to be held on 20 July 2006 and invited registered creditors to consult the bankruptcy materials from 14 to 19 July 2006.[1350]  Claimants assert that Mr. Rebgun did not circulate the Rehabilitation Plan that had been proposed by Yukos with his original notice of 2 June 2006.[1351]  Indeed, the existence of the Rehabilitation Plan appears to have been notified to the creditors by Mr. Rebgun only in his revised notice of 28 June 2006, and made available for review between 14 and 19 July.

1086. On 17 July 2006, the Moscow Arbitrazh Court admitted into the bankruptcy proceedings four claims by YNG (now Rosneft's subsidiary) based on the sale of oil produced by YNG and sold to Yukos' trading companies in 2004.  The Court decided that Yukos, not the trading companies, was liable to pay for the purchased oil.  Thus, YNG's registered claims (Rosneft's) were USD 4.42 billion (including penalties) or 22.16 percent of the claims admitted into the bankruptcy proceedings at the time.[1352]

---

[1348] *Judge sets speed-reading record…*, Reuters, 16 June 2006, Exh. C-809; Claimants' Summary Chart of Registered Creditors' claims, Exh. C-594 (hereinafter "Summary Chart of Creditors").

[1349] Ruling of the Moscow Arbitrazh Court, 27 June 2006, Exh. C-315.

[1350] Notice of the First Yukos Creditors' Meeting to be held on 20 July 2006, 28 June 2006, Exh. C-316.

[1351] Memorial ¶ 453.

[1352] Resolutions of the Ninth Arbitrazh Court of Appeal, 31 August 2006 and 7 September 2006, Exh. C-339 and Exh. C-340.  On 20 July 2006, a further 29 claims were admitted on behalf of YNG (by now Rosneft's subsidiary). Summary Chart of Creditors, Exh. C-594; Claimants' Skeleton ¶ 52; Memorial ¶¶ 435–36; Reply ¶ 399.

1087. In accordance with Mr. Rebgun's revised notice of 28 June 2006, the first meeting of Yukos' creditors was held on 20 July 2006.  Creditors were offered two alternative scenarios:  (1) the Rehabilitation Plan proposed by Yukos' management; and (2) the Analysis of Yukos' Financial Situation proposed by Mr. Rebgun.  At the request of Federal Taxation Service, the meeting was adjourned to 25 July 2006 to allow Mr. Rebgun to complete his Analysis with a separate exhibit analyzing the possibility of Yukos' breakeven activities.[1353]

1088. Mr. Rebgun's Analysis did not contemplate the restoration of Yukos' financial situation. Instead, Mr. Rebgun concluded that Yukos' remaining assets, totalling approximately USD 17.75 billion after a deduction of a 24 percent profit tax, were not sufficient to cover the USD 18.3 billion of registered bankruptcy claims.  On this basis, Mr. Rebgun recommended that Yukos be declared bankrupt and that receivership proceedings against Yukos be initiated.[1354]

1089. On 25 July 2006, when the creditors' meeting that had been adjourned resumed, the creditors voted against the Rehabilitation Plan and recommended that Yukos be declared bankrupt. Twenty-four creditors were admitted as voting participants to the creditors' meeting.  The Tribunal notes that Respondent, through the Federal Taxation Service, and indirectly through Rosneft (which had acquired the Western Banks' claim under the A Loan) and YNG (now Rosneft's subsidiary), had 93.87% of the votes.[1355]

1090. On 4 August 2006, Yukos was declared bankrupt by the Moscow Arbitrazh Court and placed under receivership, which was to be completed within one year.[1356]

(c)    The Liquidation of Yukos' Remaining Assets

1091. On 9 October 2006, the Moscow Arbitrazh Court admitted further claims by YNG into the bankruptcy proceedings.  These claims, worth USD 5.5 billion, were for alleged "lost profits"

---

[1353] Analysis of Yukos' Financial Situation, 2006, Exh. C-317; Summary Analysis of the Debtor's Financial Situation submitted by Mr. Rebgun to the U.S. Bankruptcy Court for the Southern District of New York in the Chapter 15 Case as Exhibit B to his Status Report of 7 August 2006, Exh. C-318; Summary Chart of Creditors, Exh. C-594; Memorial ¶¶ 458–61; Counter-Memorial ¶¶ 620–32.

[1354] Summary Analysis of the Debtor's Financial Situation submitted by Mr. Rebgun to the U.S. Bankruptcy Court for the Southern District of New York in the Chapter 15 Case as Exhibit B to his Status Report of 7 August 2006, pp. 7–8, Exh. C-318.

[1355] Protocol of the First Meeting of Yukos' Creditors held on 20 July 2006, 25 July 2006, Exh. C-319; Memorial ¶ 464.

[1356] Decision of the Moscow Arbitrazh Court, 1 August 2006, Exh. C-324.

during 2000 to 2003. Thus, from July to October 2006, the Russian courts admitted over USD 9.9 billion of claims by YNG into Yukos' bankruptcy.[1357]

1092. YNG was fully consolidated into Rosneft as of 1 October 2006.[1358] As a result of this consolidation, on 9 November 2006, the Moscow Arbitrazh Court ordered that YNG be replaced by Rosneft as a bankruptcy creditor, thereby attributing to Rosneft all of the claims registered to that time in the name of YNG. Eventually, adding a few minor claims, Rosneft held USD 10.69 billion or 37.17% of all registered bankruptcy claims.[1359]

1093. Under Russian bankruptcy law, Mr. Rebgun needed to select an appraiser in connection with the liquidation of Yukos' assets. On 23 October 2006, Mr. Rebgun selected a consortium of five appraisers headed by ZAO ROSECO ("**ROSECO**").[1360]

1094. On 15 January 2007, ROSECO issued an appraisal report on Yukos' assets, including the preliminary results of an appraisal of its subsidiaries and dependent companies.[1361] There is some uncertainty, however, over what exactly the appraisers determined in respect of the value of Yukos' remaining assets.

1095. On 19 January 2007, Mr. Rebgun reportedly declared that his appraisers had valued Yukos' assets at USD 22 billion.[1362] It was also reported that Mr. Rebgun later revised his valuation of Yukos' assets to USD 25.6 and 26.8 billion and indicated that "the liquidation discount during the sale would not exceed 30 percent."[1363] Another article reported that the consortium of appraisers had valued Yukos' remaining assets at USD 33 billion.[1364]

1096. Between March and August 2007, 17 bankruptcy auctions took place. The Tribunal observes that Respondent held (directly or through Rosneft) 97.67 percent of all claims against Yukos

---

[1357]   Ruling of the Moscow Arbitrazh Court, 9 October 2006, Exh. C-343; Claimants' Skeleton ¶ 52.

[1358]   Rosneft 2007 U.S. GAAP Consolidated Financial Statements, p. 8, Exh. C-377; Memorial ¶ 437.

[1359]   Ruling of the Moscow Arbitrazh Court, 9 November 2006, Exh. C-344 and Summary Chart of Creditors, Exh. C-594; Memorial ¶ 438.

[1360]   Receiver's Report on His Activities and the Results of the Receivership for the Period from 4 August 2006 through 1 November 2007, 1 November 2007, p. 3, Exh. C-361 (hereinafter "Receiver's Report").

[1361]   Ruling of the Moscow Arbitrazh Court, 12 November 2007, p. 7, Exh. C-362.

[1362]   *Yukos assets valued at $22 bln – bankruptcy receiver spokesman*, RIA Novosti, 19 January 2007, Exh. C-828; Claimant's Post-Hearing Brief ¶ 129.

[1363]   *21 Yukos Assets Bundled for Auction*, The Moscow Times, 5 March 2007, Exh. C-831.

[1364]   *Appraisers say Yukos worth over $33 bln*, RIA Novosti, 22 January 2007, Exh. C-829; Claimant's Post-Hearing Brief ¶ 129; Memorial ¶ 469.

and received (directly or through Rosneft) approximately 99.71 percent of the bankruptcy proceeds.[1365]  The most important assets were auctioned off as follows:[1366]

- Lot 1 (27 March 2007):  remainder of Yukos' stake (9.44 percent) in YNG sold to Rosneft, acting through its indirect subsidiary OOO RN-Razvitiye, for USD 7.59 billion;

- Lot 2 (4 April 2007): 20 percent minus 1 share in Gazpromneft (ex-Sibneft), Urengoil and Arctic Gas sold to OOO EniNeftegaz (the Russian subsidiary of Italian companies Eni (60 percent) and Enel (40 percent)) for USD 5.83 billion; transferred to Gazprom in 2009; immediately announced that EniNeftegaz would cede control of the assets to Gazprom under option agreements signed prior to the auction.

- Lot 5 (18 April 2007):  Manoil sold to Rosneft.

- Lot 10   (3 May  2007): Tomskneft, Achinsk, Angarsk, East Siberian and Strezhevskoy sold to Rosneft (via Neft-Aktiv) for $6.82 billion.

- Lot 11   (10 May  2007): Samaraneftegaz, Syzran, Novokuybyshevsk and Kuybyshev sold to Rosneft for USD 6.4 billion.

1097. Between August and October 2007, the Federal Taxation Service successfully applied for "late" claims, consisting chiefly of claims for 24 percent profit taxes on the proceeds arising from the bankruptcy auctions.[1367]  These claims amounted to USD 8.82 billion.[1368]

1098. On 31 October 2007, upon liquidation, Yukos still had some USD 9 billion in unsatisfied liabilities.  One third of these were tax claims.[1369]

---

[1365]   Receiver's Report, pp. 30–43, Exh. C-361.

[1366]   Claimants' Rebuttal Slides, p. 32.

[1367]   Memorial ¶¶ 490–91; Counter-Memorial ¶¶ 665–69; Reply ¶¶ 418–20; Rejoinder ¶¶ 1182–83.

[1368]   Respondent explains at Counter-Memorial ¶ 665 n.1100:

Pursuant to Art. 142(4) of the Russian Bankruptcy Law, any claim submitted after closure of the register of claims (in the case of Yukos, on Oct. 12, 2006), as well as any claim for mandatory payments arising after the commencement of receivership (irrespective of when it was filed against the debtor), is validly filed as a "late" claim and recorded on a separate list. "Late" claims are satisfied after full satisfaction of timely claims included in the register of bankruptcy claims. *See* Art. 142(4) of the 2002 Russian Bankruptcy Law [Exh. R-776]."

1099. On 15 November 2007, the Moscow Arbitrazh Court formally endorsed all of Mr. Rebgun's activities as receiver, closed Yukos' receivership, and ordered that Yukos be struck off the register of legal entities.[1370]  Yukos was struck off the register of companies and its shares were legally extinguished on 21 November 2007.[1371]

### 3.    Parties' Arguments and Tribunal's Observations

1100. In broad terms, Claimants allege that the Russian Federation decided to "push Yukos into bankruptcy in order to redistribute its remaining assets."  In their Memorial, Claimants set out what they characterized as Russia's orchestrated plan to bankrupt and liquidate Yukos:

> The Russian Federation ensured, through the initiation of bankruptcy proceedings at the behest of Rosneft and using the cover of a consortium of Western banks (1), and through the biased and discriminatory conduct of the proceedings by its courts, that the Russian State and Rosneft would hold over 97% of the alleged claims against Yukos in the bankruptcy (2).  Having also made certain that Yukos' rehabilitation plan would be rejected (3), the Russian Federation completed its expropriation scheme by auctioning the Company's remaining assets.  As a result of the bankruptcy and liquidation of Yukos, the Russian State received directly more than 60.5% of the bankruptcy proceeds and, through Rosneft, more than 39.21% of the bankruptcy proceeds and all of Yukos' main production assets (4).[1372]

1101. Respondent rejects this suggestion, and argues instead that it was Yukos' management that forced the company into bankruptcy:

> [T]he bankruptcy and ultimately the liquidation of Yukos was not the aim or the result of a massive, global plot orchestrated by the Russian Government, but rather the inevitable consequence of the consistent and repeated lawless and reckless misconduct of the Oligarchs and the Yukos management they installed to conduct their—including Claimants'—investment.[1373]

1102. According to Respondent, "Claimants have failed to establish their primary contentions regarding Yukos' bankruptcy proceedings:  that the bankruptcy was instigated 'by the Russian Federation through State-owned Rosneft,' that 'the only logic behind the decision to liquidate

---

[1369]   Yukos Liquidation Balance Sheets, 31 October 2007, Exh. R-753 and Analysis of Financial Condition of Yukos Oil Company OJSC Conclusions and Actions (undated), p. 36, R-748.

[1370]   Ruling of the Moscow Arbitrazh Court, 12 November 2007, Exh. C-362.

[1371]   Certificate Recording an Entry in the Unified Register of Legal Entities, 21 November 2007, Exh. C-363.

[1372]   Memorial ¶ 412.

[1373]   Counter-Memorial ¶ 540.

Yukos was to expropriate the company,' and that the proceedings were conducted improperly so that the Russian Federation could 'take its assets.'[1374]

1103. The Parties' arguments are related to and can be organized under the following two headings: (a) why was the bankruptcy initiated and who was truly behind it?   And (b) were the bankruptcy proceedings conducted properly and fairly?

1104. The Parties' arguments and the Tribunal's observations on each of these are presented below.

### (a)   Why was the Bankruptcy Initiated and Who was Truly Behind It?

1105. It is not contested that the non-payment of the A Loan was an important factor leading to the bankruptcy of Yukos, since it was the creditor under the A Loan, the Western Banks, who initiated the bankruptcy (consistent with terms agreed with Rosneft in the Confidential Sale Agreement).   There is disagreement, however, over the following two issues related to the non-payment of the A Loan:

  i)   Who was responsible for the non-payment of the A Loan – was Yukos prevented from paying by Respondent's conduct, or did Yukos have some control over the matter?

  ii)   Was the Confidential Sale Agreement a reasonable commercial arrangement between the Western Banks, as creditor, and Rosneft, as parent of YNG, the guarantor of the A Loan, or was it imposed on the Western Banks as part of Respondent's deliberate plan (executed through or with the assistance of Rosneft) to expropriate the remaining assets of Yukos?

1106. Each of these issues is analyzed in the respective subsections below, followed by the Tribunal's observations on why the bankruptcy was initiated and who was truly behind it.

### (i)   Non-Payment of the A Loan

1107. The Parties present opposing views on the reasons for which the A Loan had not been paid off by Yukos by the end of 2005.

---

[1374]   Respondent's Post-Hearing Brief ¶ 122 (internal footnotes omitted).

1108. Respondent argues that the Western Banks were not paid simply because "Yukos adamantly refused to pay."[1375]  In other words, according to Respondent, "Yukos' dilatory and obstructionist treatment of its commercial creditors paralleled closely its treatment of its tax creditors."[1376]  Respondent advances four arguments, as summarized at paragraphs 125 to 129 of its Post-Hearing Brief.

1109. Firstly, starting in January 2004, Yukos refused the syndicate's requests for full prepayment of the loan and denied the syndicate's requests to subordinate the B Loan to the A Loan. Secondly, Yukos "re-routed" its exports and chose to leave the banks with an unsecured non-performing loan.  Thirdly, Yukos failed to satisfy the English Judgment even though it had the available resources to pay it, frustrating collection efforts in the United States and in the Netherlands.  Fourthly, Yukos engaged in "bad-faith negotiations" with the syndicate, which eventually led the syndicate to contact Rosneft and come to an agreement with it.

1110. Claimants generally argue that "Yukos worked closely with [the syndicate] to ensure payment of the debt" but that "at each step, the Russian Federation's actions impeded the Company's efforts."[1377]  Claimants submit that "[h]ad the A Lenders not received an offer from Rosneft in the interim, they too would have been paid out of the proceeds of the sale of the Dutch assets, along with Moravel."[1378]

1111. Each of Respondent's specific arguments in relation to the non-payment of the A Loan is addressed in the respective subsections below.

> (a)  *Yukos' Refusal to Fully Prepay the A Loan or to Subordinate the B Loan*

1112. Respondent argues that "[t]rouble arose almost immediately after the A Loan was funded."[1379]  It claims that the syndicate "first raised the possibility of Yukos' bankruptcy" in early 2004.[1380]

---

[1375]   Respondent's Post-Hearing Brief ¶ 124.

[1376]   Rejoinder ¶ 1052.

[1377]   Claimants' Post-Hearing Brief ¶ 117 (footnote omitted).

[1378]   Claimants' Post-Hearing Brief ¶119.  The debt of Moravel Investment Limited (hereinafter "Moravel") was paid in 2008 through the proceeds from the sale of Yukos' stake in the Lithuanian oil company Mazeikiu Nafta.  Reply ¶ 391; Transcript, Day 20 at 229 (Claimant's rebuttal):  "Indeed, Moravel would eventually be paid out from the proceeds of the sale of Mazeikiu Nafta, and pursuant to a court order, and the banks would have similarly been paid out from the proceeds of the sale of that asset had they not in the meantime received an offer that was difficult to refuse."

[1379]   Rejoinder ¶ 1057.

[1380]   *Ibid.*

In January 2004, the following options were discussed: full prepayment of the A Loan; partial acceleration of the A Loan; additional security; and subordination of the B Loan to the A Loan.[1381]  Respondent, relying on a news article, claims that the syndicate was "especially concerned" with the so-called "giga-dividend."[1382]

1113. After the syndicate served notice on Yukos of a potential event of default in April 2004,[1383] Respondent asserts that Yukos "compelled" its production subsidiaries YNG, Samaraneftegaz, and Tomskneft to provide guarantees[1384] and agreed to make pre-payments.[1385]  Respondent notes that Yukos insisted that the A Loan and the B Loan be treated *pari passu*.[1386]

1114. Respondent emphasizes that if Yukos had subordinated the B Loan, the syndicate would have been paid in full.[1387]  In response to Claimants' argument that the loans were *pari passu*,[1388] Respondent underlines that the B Loan "was nothing more and nothing less than a shareholder loan."[1389]  Therefore, according to Respondent, there is nothing that prevented Yukos (or Claimants) from agreeing to subordination.[1390]

1115. While Claimants defend the 2003 interim "giga dividend," and assert that they never favored the B Loan over the A Loan (treating the two loans *pari passu*),[1391] they do not address Respondent's argument that the B Loan was a shareholder loan and that they could have agreed to subordinate it to the A Loan.

---

[1381] *Ibid.* ¶ 1057; Société Générale Meeting Agenda, Paris, 22 January 2004, Exh. R-3823.

[1382] Rejoinder ¶ 1057.

[1383] Letter from Société Générale to Yukos Oil Company re: US$ 1.6 billion Loan Agreement dated 30 September 2003 with "Yukos Oil Company," 30 April 2004, Exh. R-3827.

[1384] Rejoinder ¶ 1058; Financial and Performance Guarantee between Yuganskneftegaz and Société Générale S.A., 24 May 2004, Exh. R-581; Financial and Performance Guarantee between Yuganskneftegaz and Société Générale S.A., 25 May 2004, Exh. R-582.

[1385] Rejoinder ¶ 1058; Yukos Oil Company Notice of Prepayment, 25 May 2004, Exh. R-3832; Yukos Oil Company Notice of Prepayment, 22 June 2004, Exh. R-3833.

[1386] Rejoinder ¶ 1058.

[1387] Counter-Memorial ¶ 557; Transcript, Day 19 at 60–63 (Respondent's closing).

[1388] Transcript, Day 20 at 227–28 (Claimants' rebuttal).

[1389] Rejoinder ¶ 1056; Transcript, Day 19 at 60 (Respondent's closing):  "Although Yukos nominally borrowed $1.6 billion from SocGen, it was fully collateralised in cash by Group Menatep. SocGen drew on the collateral before making the loan through an intermediary bank. And as a result, ultimately GML's rights in the loan were assigned to Moravel, which was its wholly owned subsidiary. So there is no doubt that this was a shareholder loan from the outset, not a commercial loan."

[1390] Transcript, Day 21 at 157 (Respondent's rebuttal).

[1391] Reply ¶¶ 384–85; Transcript, Day 20 at 227–28 (Claimants' rebuttal).

*(b)*     *The Export Contracts as Security for the A Loan*

1116. On 2 July 2004, the syndicate declared an Event of Default, following the bailiff's cash freeze orders.[1392]   Respondent explains that, as Yukos claimed that it was unable to pay the relevant amounts, the syndicate did not call the loan "but instead relied on the default as the basis to access funds under the export trade guarantees."[1393]

1117. The syndicate received payment through this security mechanism[1394] until the end of 2004 and recovered around half of Yukos' USD 1 billion obligation.[1395]   Respondent notes that on 27 December 2004, following the sale of YNG, Yukos notified the syndicate that it would cease payment under the A Loan.[1396]   Respondent asserts that Yukos "continued to export oil produced by its other oil production subsidiaries Samaraneftegaz and Tomskneft" but that it "simply manipulated the export stream so that the oil was not exported pursuant to the specific export agreements used to secure the A Loan."[1397]

1118. At the Hearing, Mr. Theede asserted that there was "no cash from exported oil to be used to pay the banks" because of a sweep by the tax authorities.[1398]   Respondent responds that this is "simply false,"[1399] and seeks to demonstrate that none of the funds under the export guarantee came from Yukos accounts, whether in Russia or elsewhere.[1400]

1119. Claimants argue that "with the sham auction of [YNG] in December 2004, [YNG] stopped shipping oil under the export contracts" and that therefore it was Respondent who "obstructed payment of the A Loan."[1401]

---

[1392]   Rejoinder ¶ 1059; Letter From Société Générale S.A. To Yukos Oil Company, re: Event of Default, 2 July 2004, Exh. R-3835.

[1393]   Rejoinder ¶ 1060.

[1394]   Respondent provides a detailed explanation of this mechanism at note 1771 of its Rejoinder.

[1395]   Rejoinder ¶ 1062.

[1396]   Rejoinder ¶ 1063.

[1397]   *Ibid.*; Transcript, Day 19 at 63-66 (Respondent's closing).

[1398]   Transcript, Day 10 at 103-04 (cross-examination of Mr. Theede).

[1399]   Respondent's Post-Hearing Brief ¶ 127.

[1400]   *Ibid.*, referring to Banks' Petition to Declare Yukos Bankrupt Filed with the Moscow Arbitrazh Court, 6 March 2006, Exh. R-3885.

[1401]   Claimants' Post-Hearing Brief ¶ 118; *see* Transcript, Day 20 at 228 (Claimants' rebuttal).

(c)   *The English Judgment and the Syndicate's Unsuccessful Collection Efforts*

1120. Respondent asserts that, as a result of Yukos' re-routing of its export streams, the syndicate was left with "what had become, effectively, an unsecured loan."[1402]   The syndicate therefore reduced its claim to judgment, obtaining the English Judgment in June 2005.[1403]

1121. Respondent faults Yukos for seeking to frustrate the syndicate's efforts to collect on the English Judgment, in the United States, the Netherlands, and Russia.[1404]   Respondent puts particular emphasis on the Dutch Stichtings.[1405]   Respondent argues that Yukos must be faulted for its use of the Stichtings to put its foreign assets out of reach of not just Rosneft or the tax authorities, but also of the Western Banks.   Respondent contends that that the creation of the Stichtings "constitutes a blatant violation of Russian bankruptcy and criminal law."[1406]   Respondent also submitted with its Rejoinder an expert report by Professor Dr. Albert Jan van den Berg (the "**Van den Berg Report**"), arguing that the creation of the Stichtings was illegal under Dutch law.[1407]

1122. Professor Van den Berg concludes that the creation of the Stichtings was:

> illegal, as it goes against the Dutch law principle, discussed in length above, that does not permit a company, or its directors, to transfer its assets for the purpose of making it more difficult for a creditor to satisfy its claims against the company and its assets, or for the new ultimate parent company to exercise control, even when the company reacts to what it believes to be illegitimate acts.
>
> In this connection, the establishment of the Stichting-structure (including the issuance of depositary receipts) as a protective device was not valid either, as it qualifies as a permanent protective device and, in any event, was established to make it more difficult for creditors to collect on debts.[1408]

---

[1402]   Rejoinder ¶ 1064.

[1403]   Rejoinder ¶¶ 1073–75; English Judgment, Exh. R-455.

[1404]   Respondent's Post-Hearing Brief ¶ 127; Rejoinder ¶¶ 1076–92.

[1405]   Rejoinder ¶ 1076; Transcript, Day 19 at 66–67 (Respondent's closing); Transcript, Day 21 at 165 (Respondent's rebuttal).

[1406]   Counter-Memorial ¶¶ 537–38; *Criminal Code of the Russian Federation No. 63-FZ*, 13 June 1996, Article 195, Exh. R-720.

[1407]   Rejoinder ¶ 86; Van den Berg Report.

[1408]   Van den Berg Report ¶¶ 94–95.

1123. Claimants chose not to cross-examine Professor Van den Berg at the Hearing;[1409] his conclusions stand unrebutted.

1124. In response to Respondent's claim that the Stichtings were created to frustrate the syndicate's collection efforts, Claimants state that Respondent "misrepresents the purpose" of the Stichtings.[1410]   Claimants argue that the Stichtings "sought to protect certain [assets] from further attack by the Respondent and in the best interests of the Yukos group, its management, employees, shareholders and legitimate creditors."[1411]   At the Hearing, Mr. Theede asserted that the Stichtings were created to remove certain assets from the reach of Respondent:[1412]

> after [the YNG auction] happened, it became very obvious that we were not going to be able to do anything to protect our Russian assets; they were going to take them away from us, one way or another.   And of course it was going to be through taxes: that was the decided approach.
>
> But we were presented with a way to add some additional security to our international assets.[1413]

1125. Claimants emphasize "the big picture":  Yukos was facing tax claims in Russia and its assets were frozen.[1414]   Claimants assert that Yukos repatriated almost all of the cash it had offshore.[1415]   Claimants contend that Yukos was actively trying to sell the Dutch assets to satisfy the English Judgment, and that, had the syndicate not accepted an offer it could not refuse from Rosneft in the meanwhile, the proceeds of the sale of Mazeikiu Nafta would have been applied to the English Judgment.[1416]   Claimants claim that Respondent was actively preventing Yukos from successfully selling the Dutch assets.[1417]

---

[1409]   Letter from Claimants to the Arbitral Tribunal, 20 September 2012 (confirming Claimants' decision not to cross-examine Professor Van den Berg at the hearing).

[1410]   Reply ¶ 389.

[1411]   Reply ¶ 390.

[1412]   Transcript, Day 10 at 106–10 (cross-examination of Mr. Theede).

[1413]   Transcript, Day 10 at 108 (cross-examination of Mr. Theede).

[1414]   Transcript, Day 17 at 125–26 (Claimants' closing).

[1415]   Transcript, Day 17 at 120–24 (Claimants' closing, excerpting relevant portions of Mr. Theede's and Mr. Misamore's testimonies).

[1416]   Transcript, Day 10 at 117–18 (cross-examination of Mr. Theede); Transcript, Day 20 at 228–29 (Claimants' rebuttal); Claimants' Post-Hearing Brief ¶¶ 119, 124.

[1417]   Transcript, Day 10 at 105–106 (cross-examination of Mr. Theede).

1126. Respondent criticizes Claimant's assertion that Yukos was unable to satisfy the English Judgment because of the asset freeze.[1418]  Respondent emphasizes that counsel for Yukos in the English proceedings stated that the

> evidence would show that Yukos had assets outside Russia free from the Russian court's freezing order which could have been, and which still could be, exploited to raise money with which to make payments under the Loan Agreement as they became due.[1419]

1127. Respondent also notes that Mr. Misamore conceded at the Hearing that when Stichting 2 was formed in September 2005, it held approximately USD 500 million in cash, more than enough to satisfy the debt to the syndicate.[1420]

1128. In response to Claimants' argument that Yukos was trying to sell the Dutch assets to satisfy the judgment,[1421] Respondent claims that the proceeds were used to pay bonuses and to pay Moravel.[1422]

#### (d)    Yukos' Negotiations with the Syndicate

1129. Respondent submits that Yukos engaged in bad faith negotiations with the syndicate.[1423]  It notes that Yukos offered the syndicate a "poisoned chalice": seats on the board of a stichting in lieu of actual payment.[1424]  Respondent claims that once Yukos had successfully obstructed collection efforts in the Netherlands, it withdrew its settlement offer to the syndicate.[1425]

1130. Claimants assert that, had the syndicate not been paid by Rosneft, it would have eventually been paid by Yukos.[1426]

1131. Claimants also rely on an undated letter sent by Mr. Theede to the bailiff, probably between 10 and 14 March 2006.[1427]   In that letter, Mr. Theede asserts that Yukos finds itself in a

---

[1418]   Respondent's Post-Hearing Brief ¶ 129.

[1419]   English Judgment ¶ 15, Exh. R-455.

[1420]   Respondent's Post-Hearing Brief ¶ 127; Transcript, Day 9 at 223–24 (cross-examination of Mr. Misamore).

[1421]   Transcript, Day 20 at 228–29 (Claimants' rebuttal); Transcript, Day 10 at 112 (cross-examination of Mr. Theede).

[1422]   Transcript, Day 19 at 45–46 (Respondent's closing).

[1423]   Respondent's Post-Hearing Brief ¶ 128.

[1424]   Rejoinder ¶¶ 1081, 1083.

[1425]   Rejoinder ¶ 1083; Respondent's Post-Hearing Brief ¶ 128.

[1426]   Claimants' Post-Hearing Brief ¶ 119.

"straightjacket" and asks the bailiff to lift the freeze to enable Yukos to pay the syndicate.[1428] Respondent criticizes Claimants' reliance on this letter noting that the letter was sent *after* the bankruptcy petition was filed.[1429]

### (ii) The Confidential Sale Agreement Between the Western Banks and Rosneft

1132. Claimants argue that, while it was the Western Banks that formally initiated the bankruptcy of Yukos, it was the Russian Federation, acting through Rosneft, that orchestrated the commencement of the bankruptcy. In particular, Claimants place great emphasis on the Confidential Sale Agreement that was entered into between the Western Banks and Rosneft on 13 December 2005. Pursuant to that Agreement, Rosneft agreed to satisfy the outstanding debt owed by Yukos to the Western Banks (over USD 455 million plus interest) in exchange for the Western Banks agreeing to take the steps described in Schedule 8 of the Confidential Sale Agreement, entitled "Application for Bankruptcy."

1133. Claimants assert that each of Rosneft, on the one hand, and the Western Banks, on the other, fulfilled their respective roles under the Confidential Sale Agreement meticulously. Thus, on 6 March 2006, having completed the other steps contemplated under the Confidential Sale Agreement, the Western Banks filed a petition with the Moscow Arbitrazh Court to declare Yukos bankrupt.[1430] On 14 March 2006, the Moscow Arbitrazh Court formally substituted Rosneft in the place of the Western Banks for the purposes of the bankruptcy proceedings.[1431]

1134. Respondent explains that the Confidential Sale Agreement was concluded between Rosneft and the Western Banks because of the "convergence of their commercial interests":

> The SocGen syndicate simultaneously also sought payment of the same debt from Rosneft pursuant to the 2004 loan guarantee that Yukos had foisted on YNG, which Rosneft then owned. Although Rosneft disputed the validity of the guarantee, Rosneft required forbearance from the same banks on covenant breaches arising from the YNG acquisition, and Rosneft needed the bank's cooperation for its planned IPO. The convergence of the syndicate's and Rosneft's commercial interests resulted in their agreeing that Rosneft

---

[1427] Letter from Mr. Theede to Mr. Savostov (undated), Exh. C-1180; Transcript, Day 20 at 230–33 (Claimants' rebuttal); Theede WS ¶ 29.

[1428] Letter from Mr. Theede to Mr. Savostov (undated), Exh. C-1180.

[1429] Transcript, Day 21 at 159 (Respondent's rebuttal); Respondent's Post-Hearing Brief ¶ 128 (the letter is "typical of Yukos' consistent strategy of doing too little, too late, and then blaming others.")

[1430] Banks' Petition to Declare Yukos Bankrupt Filed with the Moscow Arbitrazh Court, 6 March 2006, Exh. C-303.

[1431] Ruling of the Moscow Arbitrazh Court, 28 March 2006, Exh. C-307.

> would pay the syndicate in full, but only after the syndicate had pursued all legal avenues to obtain payment from Yukos, the primary obligor.   If Rosneft instead paid, the syndicate's rights under the A Loan agreement were to be assigned to Rosneft.[1432]

1135.   Respondent disagrees with Claimants that the confidentiality clause in the Confidential Sale Agreement evidences a "conspiracy on the part of the SocGen syndicate to act secretly on behalf of Rosneft, which Claimants improperly equate with Respondent."  Instead, Respondent contends that the confidentiality clause was a standard commercial term "necessary to preserve the possibility that Yukos would pay the SocGen syndicate before Rosneft became unconditionally obligated to do so, and remained in effect only for so long as Yukos' payment would have discharged Rosneft's own obligations to pay the syndicate."[1433]

1136.   Respondent argues that the syndicate "ha[d] been nothing if not patient during this whole process"[1434] and that, in its frustrated effort to satisfy the English Judgment, the syndicate in last resort turned to Rosneft for payment under the YNG guarantee.[1435]  After "a little bit of a dance going on between them," the syndicate and Rosneft concluded a mutually advantageous deal.[1436]

1137.   Respondent asserts that the syndicate originally pressed Rosneft for payment under the YNG guarantee[1437] but eventually came to a commercially sound arrangement with it.[1438]  Respondent claims that these propositions stand unrebutted.[1439]

1138.   Claimants contend that Yukos "work[ed] closely" with the syndicate until the syndicate received from Rosneft an offer it could not refuse.[1440]  In the words of Mr. Theede, "banks being banks, that was an easy, low-risk way out of this for them, and so that's what happened and that's what they did."[1441]  Having said this, Claimants note that "there is no commercial

---

[1432]   Respondent's Skeleton ¶ 58.

[1433]   Respondent's Skeleton ¶ 59.

[1434]   Respondent's Post-Hearing Brief ¶ 129, quoting *Creditors Petition Russian Court to Declare Yukos Bankrupt*, World Markets Research Centre, 13 March 2006, Exh. R-3882.

[1435]   Respondent's Post-Hearing Brief ¶ 129; Counter-Memorial ¶¶ 577–80; Rejoinder ¶¶ 1065–71; Transcript, Day 19 at 69–72 (Respondent's closing).

[1436]   Transcript, Day 19 at 69–72 (Respondent's closing); *see* Confidential Sale Agreement, Exh. C-300.

[1437]   Counter-Memorial ¶¶ 577–80; Rejoinder ¶¶ 1065–71.

[1438]   Post-Hearing Brief ¶ 129; Counter-Memorial ¶¶ 575–83; Rejoinder ¶¶ 1086–88.

[1439]   Post-Hearing Brief ¶ 129; Transcript, Day 10 at 113–14 (cross-examination of Mr. Theede).

[1440]   Claimants' Post-Hearing Brief ¶ 119; Transcript, Day 20 at 228–29 (Claimants' rebuttal).

[1441]   Transcript, Day 10 at 113 (cross-examination of Mr. Theede).

rationale for why Rosneft would insist upon the <u>further and highly unusual</u> step that the A Lenders initiate bankruptcy proceedings against Yukos, save for the sake of appearances."[1442]

1139. The Parties also disagree when it comes to the significance of the separate and parallel bankruptcy petition filed by YNG (then a subsidiary of Rosneft) on 24 March 2006. According to Respondent, the YNG petition "alone disposes of Claimants' contention that the bankruptcy filing by the SocGen syndicate had been orchestrated by the Russian Federation so as to allow Rosneft not to 'appear as the instigator of Yukos' bankruptcy.'"[1443]

1140. According to Claimants, Rosneft had decided to "hedge its bets" by filing a separate bankruptcy petition through YNG in the event the court would reject the petition filed by the banks.[1444]   Claimants further contend that having the syndicate file its petition prior to YNG was "evidently important to Rosneft and the Kremlin's public relations efforts."[1445]   Finally, Claimants argue that the YNG petition refutes Respondent's argument that Yukos itself caused the bankruptcy by failing to pay the syndicate:  "Respondent offers no explanation as to how the Claimants suffered additional damages because it was the Société Générale syndicate who initiated the bankruptcy rather than Rosneft."[1446]

(iii)   **Tribunal's Observations**

1141. Having considered the extensive record and the maze of documents as well as the Parties' arguments, the Tribunal concludes that while it is undisputed that the Western Banks formally initiated the bankruptcy proceedings, and that Yukos is partly to blame for giving the Banks the incentive to enter into the Confidential Sale Agreement with Rosneft, the role of Rosneft and of Respondent in creating the conditions for Yukos' bankruptcy cannot be ignored.

1142. Turning firstly to the fault that Yukos bears in this matter, the Tribunal largely accepts Respondent's arguments that Yukos could have paid the A Loan in full prior to the end of 2005, whether by subordinating the B Loan to the A Loan, allowing the export contracts to continue to operate as security for the Western Banks, or indeed using assets that were placed into the

---

[1442] Claimants' Post-Hearing Brief ¶ 121 (underlining in original).

[1443] Counter-Memorial ¶ 572 (quoting Memorial ¶ 427); *see* Rejoinder ¶ 1090.

[1444] Memorial ¶ 427; *Yuganskneftegaz demands Yukos' bankruptcy over $1 million debt*, Vedomosti, 3 April 2006, Exh. C-795.

[1445] Claimant's Post-Hearing Brief ¶ 300.

[1446] *Ibid.*

Stichtings.  It can therefore be said that Yukos is not without fault in connection with the initiation of the bankruptcy, since it contributed to creating conditions that gave the Western Banks every incentive to enter into the Confidential Sale Agreement with Rosneft, and it was pursuant to that Confidential Sale Agreement that the Banks initiated bankruptcy proceedings against Yukos in exchange for payment from Rosneft under the A Loan.  As Mr. Theede testified, banks being banks, the solution presented by the Confidential Sale Agreement was "an easy, low-risk way out of this for them."[1447]

1143. However, to focus only on these narrow reasons for non-payment of the A Loan, and on the commercial considerations that drove the Western Banks to enter into the Confidential Sale Agreement, is to miss the bigger picture.  The Tribunal observes that Yukos was current in its payments to the Western Banks until December 2004, when YNG was auctioned to Rosneft.  Had YNG not been seized, therefore, it is reasonable to assume that Yukos would not have had problems repaying the A Loan.  By the same token, given the circumstances under which YNG was seized (discussed in Chapter VIII.F of this Award), it stands to reason that Yukos felt justified in forcing Respondent, through Rosneft, to pay the Western Banks under the YNG guarantee, rather than paying the debt itself.

1144. The Tribunal therefore cannot accept Respondent's argument that because Yukos, even after the seizure of YNG, *could have* paid the Western Banks under the A Loan but did not do so, there is no link to be made between Rosneft (and, indeed, Respondent) and the bankruptcy.  The big picture established by the record, including in respect of the tax assessments and the auction of YNG, suggests otherwise.

1145. The Tribunal's conclusion is also supported by two particular facts more closely related to the enforcement of the A Loan in Russia.

1146. Firstly, the Tribunal notes that the Western Banks entered into the Confidential Sale Agreement with Rosneft very soon after the Federal Arbitrazh Court for the Moscow District reversed an earlier decision that had authorized the enforcement of the English Judgment, and that the same Court ultimately allowed the Western Banks to proceed with its enforcement after it had entered into the Confidential Sale Agreement.  This suggests to the Tribunal, at best, a very happy coincidence as between the decision of the Court and the interests served by the terms presented to the Western Banks in the Confidential Sale Agreement.  It is also consistent with

---

[1447]   Transcript, Day 10 at 113 (cross-examination of Mr. Theede).

Claimants' argument that the decisions of the Court and the conduct of Rosneft were being coordinated as part of a deliberate strategy to drive Yukos into bankruptcy.

1147.  Secondly, if Rosneft itself (or the State, as its owner) were not interested in orchestrating the initiation of the bankruptcy proceedings against Yukos, why was the requirement to initiate bankruptcy included in the Confidential Sale Agreement?  In other words, while the Tribunal can accept both that the Western Banks had a commercial interest in getting paid by Rosneft (especially after the 5 December 2005 decision of the Federal Arbitrazh Court that reversed the enforcement of the English Judgment) and that Rosneft had a commercial interest in having the Western Banks' claim against Yukos assigned to it in exchange for such payment, the Tribunal does not see any evident commercial rationale for the inclusion in the Confidential Sale Agreement of the requirement that the Banks initiate bankruptcy in order to be paid.

1148.  It thus appears to the Tribunal that the Western Banks, since Yukos was not reimbursing the loan, were actively "encouraged" to enter into the Confidential Sale Agreement in order to accomplish their objective of being paid.  While, as the Tribunal said earlier, Yukos must shoulder some of the blame for not paying the Western Banks and thereby increasing its exposure to the risk that it could be petitioned into bankrupcy, it appears undeniable to the Tribunal that initiating bankruptcy was not a goal of  the Western Banks, but rather the objective of Rosneft, in the interests of its owner, the Russian Federation.  The Tribunal concludes that in the end the bankruptcy was initiated by the Russian Federation.  The separate and parallel bankruptcy petition filed by Rosneft-controlled YNG on 24 March 2006 reinforces this conclusion.

1149.  The Tribunal, in light of the evidence reviewed above, finds the following passage from Claimants' Post-Hearing Brief compelling and adopts it as its own:

> The only rational explanation for the highly unusual manner in which the bankruptcy proceedings against Yukos were initiated was to act as a cover for the Russian Federation's involvement, allowing the Russian government to keep its word—in the context of ongoing legal proceedings, including these arbitrations—that it was not interested in the bankruptcy of Yukos (and thus maintaining the appearance that it was commercial parties—not the State—that sought Yukos' bankruptcy), while achieving its desired end.[1448]

---

[1448]   Claimants' Post-Hearing Brief ¶ 123.

**(b)      Were the Bankruptcy Proceedings Conducted Properly and Fairly?**

1150. Claimants paint the bankruptcy as "the final act of the destruction" of Yukos.[1449]  Claimants argue that Respondent (or entities whose conduct is attributable to Respondent)[1450] not only initiated the bankruptcy, but also (i) ensured that it monopolized the bankruptcy process by discriminatory rejection and allowance of bankruptcy claims;[1451] (ii) ensured the rejection of Yukos' proposed Rehabilitation Plan;[1452] and (iii) confiscated the residual assets of Yukos through sham auctions and Yukos' eventual liquidation.[1453]

1151. Claimants claim that Respondent monopolized the bankruptcy and, directly or indirectly, obtained 97.67 percent of all bankruptcy claims, obtained approximately 93.87 percent of the votes in the creditors' meeting, claimed USD 6 billion in profit tax on the auction proceedings, acquired over 95 percent of Yukos' remaining assets in the bankruptcy, and received as creditor approximately 99.71 percent of the bankruptcy proceeds.[1454]

**(i)      The Courts' Treatment of Bankruptcy Claims**

1152. Claimants argue that the Russian courts never had the interests of Yukos or its rehabilitation in mind when conducting the bankruptcy proceedings.  Firstly, the Russian courts ensured that the Russian State would become Yukos' main creditor in the bankruptcy proceedings by postponing the date of the first meeting of Yukos' creditors to give the State "more time to prove new tax claims" against Yukos.[1455]  These tax claims comprised Yukos' outstanding alleged tax liabilities for the years 2000 to 2003.  As noted above, at the hearing of the Moscow Arbitrazh Court on 14 June 2006, the bankruptcy judge ruled in favour of the Federal Taxation Service, setting "a new speed reading record" after taking just 15 minutes to consider 127,000 pages of information submitted by Russian tax officials.[1456]  As a result of that judgment, the

---

[1449]  Memorial ¶ 411.

[1450]  For the Tribunal's discussion of attribution, see Chapter X.A of this Award.

[1451]  *Ibid*. ¶¶ 431–51.

[1452]  *Ibid*. ¶ 452–67.

[1453]  *Ibid*. ¶¶ 468–94.

[1454]  Claimants' Post-Hearing Brief ¶¶ 126–33.

[1455]  *Yukos creditors' meeting delayed by Moscow court*, Reuters, 8 June 2006, Exh. C-808.

[1456]  *Judge sets speed-reading record…*, Reuters, 16 June 2006, Exh. C-809.

Federal Taxation Service became Yukos' single largest creditor with registered claims amounting to approximately USD 13.06 billion.[1457]

1153. Secondly, Claimants contend that the Russian courts ensured that State-controlled Rosneft—of which the Russian State has been the majority shareholder since the company's privatization in the nineties—would become Yukos' second largest creditor in the bankruptcy.  On 17 July 2006, the Moscow Arbitrazh Court admitted into the bankruptcy proceedings four claims by YNG, which by that that time had already become a subsidiary of Rosneft:

> The claims were based on the sale of oil produced by Yuganskneftegaz and sold to Yukos' trading companies in 2004:  the Court decided that Yukos, and not the trading companies—notwithstanding that those companies were Yuganskneftegaz's counterparties under the relevant oil sale contracts—was liable to pay for the oil sold.[1458]

1154. Thirdly, in Claimants' view, the Russian courts ensured that creditor claims belonging to Yukos-related entities or to Yukos' shareholders would not be recognized in the bankruptcy proceedings.  For example, in its Memorial on the Merits, Claimants explain the Russian courts' treatment of Moravel Investment Limited, a GML affiliate:

> This was the case, for example, for the claim filed by Moravel Investment Limited ("Moravel"), a GML affiliate, on the basis of an LCIA award of September 16, 2005, rendered by an arbitral tribunal comprised of Peter Leaver QC, Jonathan Hirst QC and J. William Rowley QC, Chairman.  The award ordered Yukos to pay to Moravel US$ 655,725,238.60 in principal plus corresponding interest, which was outstanding under the B Loan Agreement concluded between Yukos and Société Générale in September 2003 for the purposes of Yukos' merger with Sibneft.  This loan was identical, in all material aspects, to the A Loan which had been assigned to Rosneft by the Western Banks headed by Société Générale and on the basis of which Rosneft had been admitted into the bankruptcy proceedings.  However, unlike Rosneft's claim, for which the Russian courts had recognized the English Judgment rendered in favor of the Western banks (later assigned to Rosneft), the courts refused the enforcement of the awards in favor of Moravel.[1459]

1155. Russian courts accorded similar treatment to the remaining Yukos affiliates with outstanding claims against Yukos, such as Yukos Capital SARL, Glendale Group Limited, OOO Yu-Mordovia, OOO Yukos Vostok Trade, ZAO Yukos-M, OOO Siberian Internet Company, OOO Trading House Yukos-M, ZAO Krasnoyarskgeofizika, ZAO Lipetskneftprodukt, and

---

[1457]   Resolution of the Ninth Arbitrazh Court of Appeal, 11 August 2006, Exh. C-336; Decision of the Moscow Arbitrazh Court, 2 October 2006, Exh. C-201; Register of Yukos Creditors' Claims, 30 October 2007, Exh. C-353; Summary Chart of Creditors, Exh. C-594.

[1458]   Memorial ¶ 435.

[1459]   Memorial ¶ 441 (internal footnotes omitted).

OOO Alta-Trade. As Claimants contend, "the common ground for denying the claims of these companies was the alleged lack of evidence of the existence of the claims."[1460]

### (ii) The Rejection of Yukos' Rehabilitation Plan

1156. On 1 June 2006, Yukos' general shareholders' meeting approved Yukos' Financial Rehabilitation Plan and appointed Mr. Osborne as the shareholders' representative in the bankruptcy proceedings.[1461] Claimants point out that according to Yukos' Rehabilitation Plan, Yukos was in a position to pay off its alleged liabilities fully within two years.[1462] Mr. Rebgun, the appointed administrator, was required to circulate Yukos' Rehabilitation Plan to all Yukos' registered creditors. According to Claimants, Mr. Rebgun did not do so, although Respondent alleges that Mr. Rebgun made the Rehabilitation Plan available for the creditors' review before the creditors' meeting.

1157. Mr. Rebgun's own proposal to the creditors was to sell all Yukos' assets to satisfy the creditors' claims and then liquidate the company. At the creditors' meeting of 25 July 2006, at which the Federal Taxation Service and Rosneft held 93.87 percent of votes, Yukos' Rehabilitation Plan was rejected, and the creditors decided to liquidate Yukos, "which had the added bonus of creating an additional claim for the tax authorities of 24% profit tax on the auction proceedings, a claim on which it would collect US$ 6 billion."[1463]

1158. In their Post-Hearing Brief, Claimants further contend that:

> During the hearing, the Respondent made a limited number of unfounded attacks on Yukos' Financial Rehabilitation Plan. For example, the Respondent alleged that Yukos' Financial Rehabilitation Plan was "highly speculative" as the "cash pool" was to be funded from "uncertain revenues" including US$ 18 billion from "litigation claims." However, as even the most cursory review of the Plan reveals, "litigation claims" were not ascribed a value in determining the aggregate value of Yukos' assets available to pay claims and were merely intended to supplement the "cash pool", if and when anything was received.[1464]

1159. Yukos' creditors gathered for their first meeting on 20 July 2006. Yukos' management proposed a Rehabilitation Plan[1465] and Mr. Rebgun proposed its Analysis of Yukos' Financial

---

[1460] Memorial ¶ 448.

[1461] Minutes of Extraordinary General Meeting of Yukos' Shareholders held on 1 June 2006, Exh. C-311.

[1462] Claimants' Skeleton ¶ 55.

[1463] Claimants' Post-Hearing Brief ¶ 127.

[1464] *Ibid.* ¶ 128.

[1465] Rehabilitation Plan, Exh. C-312.

Situation.[1466]   After the meeting was adjourned and resumed on 25 July 2006, the Federal Taxation Service, representing together with Rosneft 93.87 percent of the votes, voted against the Rehabilitation Plan and in favor of the liquidation of Yukos.[1467]

1160.   Claimants argue that the decision to liquidate was "preposterou[s], even from an economic standpoint"[1468] and that "[t]he absurdity of Yukos' fate was only the flip side of the coin of the Russian Federation's and Rosneft's fortune."[1469]   Claimants allege that there was an "obvious conflict of interest" in the vote as the sales of Yukos' assets were subject to a 24 percent profit tax, "which meant that liquidation would bring an enormous windfall to the Federal Taxation Service".[1470]

1161.   Respondent denies all allegations of impropriety in relation to Mr. Rebgun's conduct of the creditors' meeting and the rejection of Yukos' Rehabilitation Plan:

> All registered creditors and the representatives of the debtor had an opportunity to review the Rehabilitation Plan and the analysis of Yukos' financial situation (along with relevant enclosures) prepared by Mr. Rebgun at his offices during the week preceding the meeting (and for five full days, from July 20, 2006 until July 25, 2006).[1471]

1162.   Respondent contends that the Rehabilitation Plan was rejected because it was flawed and overly optimistic:

> Yukos' management, actively supported by the Claimants, had the opportunity to present a rehabilitation claim to the meeting of creditors.  The rough outline management submitted was, however, legally defective and did not provide any basis for creditors to prefer rehabilitation to liquidation.  It was not properly presented to or approved by Yukos shareholders, did not meet the legal requirements that the company's tax claims be satisfied within six months, and did not ensure full, let alone timely, payment of Yukos' creditors' claims.[1472]

1163.   Respondent argues that the Rehabilitation Plan was "a blatant and untenable attempt on the part of the Oligarchs to secure their own interests over those of the creditors" and that "the

---

[1466]   Analysis of Yukos' Financial Situation 2006, Exh. C-317; see Summary Analysis of the Debtor's Financial Situation submitted by Mr. Rebgun to the U.S. Bankruptcy Court for the Southern District of New York in the Chapter 15 Proceeding as Exhibit B to his Status Report of 7 August 2006, Exh. C-318.

[1467]   Protocol of the First Meeting of Yukos' Creditors held on 20–25 July 2006, Exh. C-319.

[1468]   Memorial ¶ 466.

[1469]   Memorial ¶ 467.

[1470]   Reply ¶ 418.

[1471]   Counter-Memorial ¶ 607.

[1472]   Respondent's Skeleton ¶ 62; see also Respondent's Post-Hearing Brief ¶ 123.

creditors' decision to reject the plan was reasonable and taken in accordance with Russian law, which vests full discretion with the creditors, consistently with international practice."[1473]

1164. Respondent underlines that in Russia, "the vote for the liquidation or rehabilitation of the debtor is within the full discretion of the creditors."[1474]

1165. On the question of the late claims, Respondent does not contest that the Federal Taxation Service claimed USD 8.82 billion in profit taxes out of the proceeds of the bankruptcy and eventually received USD 6.02 billion; it submits however, that "[t]hese are standard '*late*' claims that arise in connection with any sale generating profits, including in the context of rehabilitation proceedings"[1475] and that there is therefore nothing improper about them.

### (iii)   The Declaration of Yukos' Bankruptcy

1166. On 1 August 2006, the Moscow Arbitrazh Court stated that it had "established that the debtor showed the signs of bankruptcy as defined in Article 3 of the Federal Law 'On Insolvency (Bankruptcy)'" and that Yukos had "not fulfilled its monetary obligations towards its creditors for three months from the time when these obligations should have been fulfilled," without making any reference to the difference between Yukos' liabilities and its assets.[1476]

1167. The Claimants assert that on 1 August 2006, when Yukos was declared bankrupt, "Yukos' assets exceeded its alleged liabilities, and . . . the Company was clearly solvent."[1477]   The Claimants further suggest that "there was nothing inevitable about the bankruptcy of Yukos" and that "Yukos could have avoided bankruptcy if allowed to pay off its fabricated tax debts."[1478]   To support this claim, Claimants refer to the Rehabilitation Plan proposed by Yukos' management, which proposed "to leave intact Yukos' 'core assets' as a viable ongoing company, while addressing and paying in full all valid creditors' claims."[1479]

---

[1473]   Counter-Memorial ¶ 611.

[1474]   Counter-Memorial ¶ 632.  This is consistent with international practice, *see* Counter-Memorial ¶ 1501.

[1475]   Rejoinder ¶ 1182.

[1476]   Decision of the Moscow Arbitrazh Court, 1 August 2006, Exh. C-324.

[1477]   Memorial ¶ 822.

[1478]   Memorial ¶ 825.

[1479]   Claimants' Post-Hearing Brief ¶128; *see also* Rehabilitation Plan, Exh. C-312.

1168. By contrast, Respondent points out that the insolvency test applicable to the initiation of bankruptcy proceedings against Yukos was an "illiquidity test," based on the debtor's inability to discharge a certain debt "within three months of its due date."[1480]  According to Respondent, this "illiquidity test" was satisfied when the Western Banks filed a petition for Yukos' bankruptcy.[1481]  Further, the question of whether the bankruptcy proceedings will result in the adoption of a financial rehabilitation plan and the company's survival or in the company's liquidation depends on whether the financial rehabilitation plan provides for the discharge of all the creditors' claims within certain applicable time limits.[1482]  Respondent points out that the debt repayment schedule in the Rehabilitation Plan did not do so.[1483]

1169. Respondent denies all allegations of impropriety or bias relating to the way the Russian courts conducted the bankruptcy proceedings:

> As confirmed by the Moscow Arbitrazh Court, the syndicate's petition satisfied the insolvency test under Russian bankruptcy law applicable at the time, which was based on the debtor's inability to discharge a debt exceeding US\$ 3,500 within three months of its due date.
>
> Nothing in Russian law in this regard concerning the initiation of bankruptcy proceedings is at odds with international practice.  In a number of other jurisdictions, the so-called "illiquidity test: (*i.e.*, the debtor's inability to pay its debts as they become due) is sufficient to initiate bankruptcy proceedings.[1484]

1170. In any event, Respondent claims that Yukos' liabilities did exceed its assets, a position Respondent seeks to support by stressing that, after the sale of Yukos' assets, liabilities of Yukos in an amount of USD 9.2 billion remained unsatisfied.[1485]

### (iv)   The Liquidation of Yukos' Remaining Assets

1171. According to Claimants, the last stage in the "confiscation of Yukos"[1486] was the bankruptcy auctions of Yukos' remaining assets.[1487]

---

[1480]   Counter-Memorial ¶¶ 584, 1491; Article 3(2) of the Russian *Federal Law on Insolvency (Bankruptcy)*, Exh. R-776.

[1481]   Counter-Memorial ¶ 1491.

[1482]   Article 84(3) of the Russian Federal Law on Insolvency (Bankruptcy), Exh. R-776; Protocol of the First Meeting of Yukos' Creditors held on 20–25 July 2006, p. 11, Exh. C-319; Summary Analysis of the Debtor's Financial Situation submitted by Mr. Rebgun to the U.S. Bankruptcy Court for the Southern District of New York in the Chapter 15 Proceeding as Exhibit B to his Status Report of 7 August 200, p. 86, Exh. C-318.

[1483]   Counter-Memorial ¶ 623.

[1484]   Counter-Memorial ¶ 584–85; *see also* Respondent's Post-Hearing Brief ¶¶ 130–34.

[1485]   Counter-Memorial ¶ 669; Rejoinder ¶ 1161, Respondent's Post-Hearing Brief ¶ 134; Respondent's Opening Slides, p. 452.

1172. Claimants' argument regarding the auctions does not point to specific acts.  While Claimants fault Rosneft for the initiation of the bankruptcy, the courts for the discriminatory rejection and allowance of claims, the Federal Taxation Service and Rosneft for the rejection of the Rehabilitation Plan, they fault "the Russian Federation" for the auctions.[1488]  Claimants state "[t]he results of the auctions speak for themselves."[1489]  Claimants argue that the small number of bidders, the speed of the auctions, the below-market-value resulting prices, and the overall benefits to Respondent leave no doubt about Respondent's "monopolization" of the auctions.[1490]

1173. Claimants note that Respondent as creditor in the bankruptcy was involved in the auctions in four ways.  Firstly, it approved the procedure for the auctions[1491] and Mr. Rebgun's allotment of Yukos' assets into twenty lots.[1492]  Secondly, it selected the Russian Federal Property Fund to organize and conduct the auctions.[1493]  Thirdly, it set the starting price for the auctioned assets.[1494]  Fourthly, it "actively communicated with [Mr. Rebgun] on other issues as well."[1495]

1174. Respondent underlines that this involvement was in accordance with Russian law and emphasizes that Respondent as creditor in the bankruptcy did not have the power to control the identity of the bidders, and that in each instance the starting price for the auctioned assets was at least equal to the appraised market value.[1496]

1175. Claimants assert that "[a]s creditor, the Russian Federation received, either directly or through Rosneft, approximately 99.71% of the bankruptcy proceeds."[1497]  This occurred through

---

[1486] Memorial ¶ 468.

[1487] Memorial ¶¶ 468–94.

[1488] Reply ¶ 438.

[1489] Reply ¶¶ 421, 432.

[1490] Reply ¶ 425.

[1491] Counter-Memorial ¶ 633; Finalization Order, Exh. R-752; *see also* Receiver's Report, pp. 28–29, Exh. R-751.

[1492] Memorial ¶ 470.

[1493] Memorial ¶ 470; *see also* Ruling of the Moscow Arbitrazh Court, 12 November 2007, p. 8, Exh. C-362.

[1494] Reply ¶ 425.

[1495] Reply ¶ 425, citing Ruling of the Moscow Arbitrazh Court, 12 November 2007, pp. 8–9, 21, Exh. C-362.

[1496] Rejoinder ¶ 1162; Counter-Memorial ¶¶ 633–38; *see also* Procedure for the Conduct of Public Auctions in Respect of the Assets of OAO NK Yukos during the Receivership Proceedings, Clauses 2.1–2.3, 20 February 2007, Exh. R-3943 and Minutes No. 5 of the Meeting of the Creditors' Committee of OAO NK Yukos, 21 February 2007, Exh. R-3944; Russian Bankruptcy Law 2002, Articles 110(5) and 111(3), Exh. R-3892.

[1497] Claimants' Post-Hearing Brief ¶ 132.

"Rosneft [having] won 11 out of the 17 bankruptcy auctions, including acquiring Samaraneftegaz (Lot No. 11) and Tomskeneft (Lot No. 10)."[1498]

1176. In their Skeleton Argument, Claimants summarize the eleven auctions that completed the bankruptcy proceedings as follows:

> Yukos' remaining assets were transferred to the Russian State at well below their fair market value through a series of 17 auctions held between March 2006 and August 2007. Rosneft thereby directly or indirectly acquired Yukos' key remaining assets, including Samaraneftegaz (Lot No. 11) and Tomskneft (Lot No. 10), which were sold at a gross discount of approximately 37% and 33%, respectively, of their fair market value. For its part, Gazprom acquired through Eni/Enel the 20% minus 1 share stake in Sibneft that the Russian Federation had persistently refused to let Yukos sell to pay off alleged tax debts. As with the sham auction of Yuganskneftegaz, there was no genuine competition in the bankruptcy auctions and, in many instances, including those for Samaraneftegaz and Tomskneft, the only participants were Rosneft and a previously unknown entity whose sole role was to satisfy the formal requirement that there be a minimum of 2 bidders.

> Finally, when, by the end of July 2007, it became clear that despite the low auction prices, the bankruptcy might still generate some surplus, further claims were admitted in the bankruptcy proceedings on behalf of the Russian State, through the Federal Taxation Service and Rosneft. This ensured the completeness of Yukos' destruction and the transfer of its value and assets to the Russian State. Thus, the Russian Federation received, either directly or through State-owned Rosneft or Gazprom, approximately 99.71% of the bankruptcy proceeds and over 95% of Yukos' remaining assets, including all of Yukos' main production assets.

> On November 12, 2007, the Moscow Arbitrazh Court formally endorsed all the activities of Yukos' receiver Mr. Rebgun, closed the Company's receivership and ordered that Yukos be struck off the register of legal entities. The latter happened on November 21, 2007.[1499]

1177. Respondent contends that Yukos' bankruptcy auctions were held in full compliance with Russian law, and that Mr. Rebgun had secured appraisals for the fair value of the assets:

> Once Yukos' liquidation was properly approved, the company's assets were sold at auction in accordance with Russian law and international practice. Yukos' receiver obtained appraisals for the fair value of the assets, and used those appraisals to set minimum bids in the auctions, all of which were exceeded, some by very large margins. The auctions were open to domestic and foreign bidders, adequately noticed and advertised, and competitive. To the extent that any bidders may have been discouraged from participating, this was again the result of Claimants and Yukos having threatened potential bidders with legal action. While the aggregate results exceeded Yukos' own (and other) contemporaneous fair market value estimates, more than US$ 9 billion in creditor claims nonetheless remained unsatisfied.[1500]

---

[1498]   Claimants' Post-Hearing Brief ¶ 131.

[1499]   Claimants' Skeleton ¶¶ 58–60 (internal footnotes omitted).

[1500]   Respondent's Skeleton ¶ 63; *see also* Respondent's Post-Hearing Brief ¶¶ 133–34.

### (v)   Tribunal's Observations

1178. The Tribunal notes Respondent's insistence that all aspects of the bankruptcy were conducted in accordance with Russian bankruptcy law. However, the Tribunal's inquiry is not limited to a mere review of the formalities of the bankruptcy. It must address and review all the substantial features of the proceedings.

1179. Thus, the Tribunal views as improper and unfair that, for example:

- All claims filed by Rosneft and the Federal Taxation Service, valued in the billions, were peremptorily accepted by the Court, while the many claims filed by Yukos' affiliated companies were rejected by the Court in a very summary way; and

- Yukos was saddled with a claim of some USD 6 billion that related only to the profit tax to be collected by the Federal Taxation Service as a result of the liquidation of Yukos' assets in the bankruptcy.[1501]

- The Tribunal is also troubled by the fact that Rosneft's acquisition of YNG (discussed in Chapter VIII.F of this Award) generated a claim of almost USD 10 billion against Yukos in the bankruptcy, including a claim based on the attribution to Yukos of debts owed to YNG by Yukos' trading companies. Since the Tribunal has already found that Rosneft's acquisition of YNG was, to say the least, questionable, in its view, this claim is equally questionable.

1180. In light of the above conclusions, the Tribunal cannot accept that it was in any sense proper or fair for the creditors' committee to reject the Rehabilitation Plan, for the court to declare Yukos bankrupt, or for Yukos to have been deprived of all of its remaining assets through a hasty and questionable liquidation process. On the contrary, it is evident to the Tribunal that the totality of the bankruptcy proceedings reviewed in this chapter were not part of a process for the collection of taxes but rather, as submitted by Claimants, indeed the "final act of the destruction of the Company by the Russian Federation and the expropriation of its assets for the sole benefit of the Russian State and State-owned companies Rosneft and Gazprom."

---

[1501]   The Tribunal notes that this claim or liability was considered in determining whether Yukos should be liquidated or rehabilitated, and indeed declared bankrupt, and the Federal Taxation Service itself—which stood to benefit from that claim—had a majority vote at the creditors' meeting.

1181. The Tribunal notes that its conclusions are consistent with those of the *RosInvestCo* tribunal and the *Quasar* tribunal.

1182. With respect to the bankruptcy proceedings, the *RosInvestCo* tribunal concluded as follows:

> Though the Tribunal did not find the bankruptcy auctions to be conducted contrary to Russian law, this does not change the general impression from the evidence on file for the Tribunal, since the application for bankruptcy by the SocGen Group was also conducted by association with the State-controlled company, Rosneft, and that they fitted into the obvious general pattern and obvious intention of the totality of the scheme to deprive Yukos of its assets.[1502]

1183. The *Quasar* tribunal concluded:

> 141.   The Tribunal has carefully considered each of the Respondent's defences, but is ultimately unpersuaded by them.  The issue here is not one of the legality of the bankruptcy proceedings, nor their conformity with Russian bankruptcy regulations.  Rather, it is whether the steps that were taken can properly and fairly be characterised as part of an ordinary process of collecting taxes.  In the Tribunal's view, they cannot fairly be so characterised, particularly when viewed against the broader chronology of which they form part (as summarised later in this section).  This conclusion is not overcome by the Respondent's various technical analyses of the consortium agreement.
>
> . . .
>
> 157.   But the Tribunal also notes that, as a result of these auctions, "at the end of the day" . . . the Russian Federation has ended up with 93% of Yukos Oil Company." . . .
>
> 158.   As summarised below, the overall chronology of which the liquidation auctions form part, casts them and their outcome in a particular light.  After careful consideration of the entire record, the Tribunal concludes that, as with the preceding events, the liquidation auctions were part of the same overall scheme of confiscation.  In this regard, the Tribunal's findings are consistent with those of the *RosInvest* Tribunal. . . .  The ECHR's finding to the contrary—*i.e.*, that Yukos failed to prove that the Russian Federation "had misused those [enforcement] proceedings with a view to destroying the company and taking control of its assets"—must be understood as based on a heightened requirement of "incontrovertible and direct proof," given the "wide margin of appreciation" a State enjoys under Protocol No. 1 to the European Convention on Human Rights. . . .[1503]

## H.   THE WITHDRAWAL OF PWC'S AUDIT OPINIONS

### 1.   Introduction

1184. As noted earlier in this Award,[1504] Yukos' auditor, PwC, withdrew its audit reports for Yukos in June 2007.  This withdrawal was often mentioned, mostly by Respondent's counsel, during

---

[1502]   *RosInvestCo* ¶ 620, Exh. C-1049.

[1503]   *Quasar*, Exh. 3383.

[1504]   *See* paragraph 104 above.

these proceedings.  Although neither Party called as a witness anyone from PwC, the Tribunal has formed the view that it is essential for it to review PwC's role in the present Awards.

1185.  PwC was Yukos' auditor from 1997 to 2004.  It also played an advisory role to Yukos, consulting on the company's domestic and international structures.  On 15 June 2007, PwC formally withdrew all its prior audit reports for Yukos for the period from 31 December 1995 until 31 December 2004, stating that "new information" had led it to conclude that such reports could no longer be relied upon as trustworthy.[1505]

1186.  Claimants say that the Russian Government exerted pressure on PwC to withdraw the audits in order to bolster the legitimacy of the destruction of Yukos.  The harassment of PwC, say Claimants, took the form of searches, seizures, interrogations, criminal charges, two tax lawsuits, and the potential loss of clients and its license to do business in Russia.  Rather than risk its business and employees for the sake of a client that was "no longer a going concern," PwC chose the "only viable option," namely to cooperate with the Russian authorities by finding pretexts to withdraw its Yukos audits.[1506]

1187.  In contrast, Respondent says that PwC and Yukos had had a troubled relationship for a long time, noting that PwC refused to audit the company after 2004.  During interrogations of PwC auditor Douglas Miller in May and June 2007, PwC received credible "new" information showing that Yukos' senior management had repeatedly lied to its auditors, confirming PwC's prior suspicions on four particular issues, and causing PwC to lose confidence in the content of its audit reports.  At the time, Yukos was in bankruptcy and former executives and company records were no longer accessible.  PwC thus could not conduct satisfactory inquiries to determine how the new information affected the audited financial statements.  In the circumstances, the "only viable option" for PwC was to withdraw the audits, a move endorsed and approved by Respondent's audit expert, Mr. Ellison.[1507]

1188.  No witnesses from PwC were presented by the Parties.[1508]  PwC is not on trial before this Tribunal.  The Tribunal draws no conclusions in this Award on PwC's professional conduct.

---

[1505]  PwC's Withdrawal Letter, Exh. C-611.

[1506]  Transcript, Day 2 at 50 (Claimants' opening), quoting U.S. State Department Cable No. 07MOSCOW2159, 10 May 2007, WikiLeaks Website, Exh. C-1358.

[1507]  Respondent's Opening Slides, p. 205; Respondent's Skeleton ¶¶ 45–50; Respondent's Closing Slides, pp. 188–89; Ellison Report.

[1508]  For the names of specific individuals from PwC who potentially could have testified, see paragraph 251 above.

Nevertheless, the events surrounding PwC's withdrawal of the Yukos audits help to inform the Tribunal's view as to whether Yukos was the object of a series of politically-motivated attacks, or is now simply "blaming the Russian Federation for the consequences of its own misconduct."[1509]

### 2.   Chronology

1189. Absent direct testimony from PwC, the Tribunal must draw its conclusions from the testimony of Claimants' witnesses; correspondence amongst Yukos, PwC, external advisors and the Russian authorities; and the testimony of PwC personnel before other fora.  There are also contemporaneous U.S. State Department cables, which emerged via "Wikileaks" and reveal the "candid"[1510] and "unguarded"[1511] views of PwC's senior management.

### (a)   PwC Serves as Both Auditor and Consultant to Yukos

1190. From 1997, Yukos was one of PwC's major clients in Russia.  At the Hearing, Claimants' witnesses described a "perfectly normal", "cordial and close" business relationship in which PwC was a "permanent partner of Yukos and its subsidiaries for a long time."[1512]  PwC conducted Yukos' external audits and assisted with training Yukos' in-house accountants.  PwC played an "integral role"[1513] in developing Yukos' financial reporting system, and, according to Mr. Theede, "PwC's consulting arm was actually the architect of [the trading company] structures."[1514]

1191. Mr. Kosciusko-Morizet testified that "from 1997 to 2004, PwC was given access to the entire documentation of the whole of the Yukos group without restriction and had a very detailed and global view of the financial situation and the procedures of Yukos and its subsidiaries."[1515]  It was a consistent theme among Claimants' witnesses that PwC enjoyed full access to Yukos'

---

[1509] *See* Respondent's Skeleton ¶ 22.

[1510] Reply ¶ 507.

[1511] Transcript, Day 3 at 41 (Respondent's opening).

[1512] Transcript, Day 11 at 50 (cross-examination of Mr. Theede); Kosciusko-Morizet WS ¶ 15; Transcript, Day 6 at 28 (cross-examination of Mr. Rieger).

[1513] Misamore WS ¶ 25.

[1514] Transcript, Day 11 at 50.  *See also* the reference to PwC's consulting contract in Letter from Michael Kubena to Bruce Misamore, 15 January 2004, Exh. C-609; Rieger WS ¶¶ 15–19.

[1515] Kosciusko-Morizet WS ¶ 17.

accounts, employees and information, "including related-party transactions, shareholders, costs [and] taxation."[1516]   PwC also maintained a permanent staff presence within Yukos and performed site visits to Yukos entities.[1517]

1192. Claimants' witnesses pointed out that PwC never voiced complaints about access to the company or any of its staff.   Mr. Kosciusko-Morizet affirmed that PwC was "perfectly able to check for themselves any documentation, ask for any documentation anywhere in the group at any level."[1518]   Mr. Misamore observed that if PwC "did not have sufficient information, they should have asked for more."[1519]   It is interesting to note that in 1998 PwC initially refused to sign the Yukos financials, as it was unable to resolve which trading companies should be consolidated as "controlled by Yukos and used for tax optimization."   However, the next year, PwC did sign, as by then it had apparently been shown information sufficient to enable it to understand the control relationships.[1520]

1193. Similarly, as detailed in the next section, PwC occasionally requested additional information about certain aspects of Yukos' activities, and was provided each time with sufficient answers to enable it to certify the financial statements according to U.S. GAAP standards.

### (b) PwC Responds to the Massive Tax Reassessments against Yukos

1194. When Mr. Lebedev was arrested in 2003 on tax-related charges, Yukos turned to PwC. Mr. Michael Kubena, a PwC partner, assured the specially-formed *ad hoc* Yukos Board committee chaired by Mr. Kosciusko-Morizet that Yukos had always complied with Russian law, including in the operation of its tax optimization structure, and that PwC did not believe that there was any possibility that the Russian authorities would attack Yukos on these issues.[1521]

1195. In December 2003, after Yukos received the 2000 Audit Report, Yukos again asked PwC for its

---

[1516]   *See e.g.*, Transcript, Day 6 at 28 (cross-examination of Mr. Rieger).

[1517]   Rieger WS ¶ 16.

[1518]   Transcript, Day 4 at 29.   Mr. Kosciusko-Morizet added that PwC "had every possibility to check whatever they wanted to check.   And if they agreed on the consolidated perimeter, that was enough for us . . . . The U.S. GAAP consolidating statements were done according to the rules . . . .   The accounts were approved by an eminent firm." Transcript, Day 4 at 52.

[1519]   Transcript, Day 9 at 249.

[1520]   Russian Federation Prosecutor General's Office, Record of Interrogation of Douglas Miller, 4 May 2007, Exh. R-137.

[1521]   Kosciusko-Morizet WS ¶ 24.

comments.  In a letter dated 15 January 2004, Mr. Kubena advised that, under the relevant Russian tax legislation, Yukos was not required to discharge the tax obligations of other taxpayers, regardless of whether they were affiliated parties.[1522]

1196. PwC's advice to Yukos was to set up a Board committee with independent legal counsel to carry out an investigation.[1523]  Mr. Kosciusko-Morizet thus resurrected the special *ad hoc* Board committee and Yukos engaged the law firm Akin Gump to examine the tax reassessments. PwC explained in a letter to Yukos of 29 January 2004 that an independent investigation of the pending charges and allegations against key Yukos personnel would enable PwC to obtain an understanding of possible illegal acts for purposes of its own auditing standards.[1524] Mr. Kosciusko-Morizet said that "to understand this letter, you have to remember the events . . . if you know that the problem was political, as everybody did . . . .  The answer is you get cold feet and you start hedging, and this letter in technical language is about hedging."[1525]  PwC's persistence about the investigation led Mr. Kosciusko-Morizet to suggest at the time that PwC was "trying to evade its responsibilities."[1526]  At the Hearing, he explained what he meant by this comment:

> You're an auditor, you're in Russia, you know it's political; you get cold feet.  What do you do?  You don't want to be involved in the matter, so you find reasons to technically withdraw from the issue.  What happened here is that we made every effort to satisfy the PwC requirements.  The effort continued.  Akin Gump was hired.  A couple of memos, interviews and so on.  And in the midst of April . . . assets of Yukos . . . were frozen.  So that was that.  At that point, any realistic hope of having PwC approving the 2003 GAAP accounts disappeared, for it was practically impossible.  Even though we had satisfied all their requirements, they would not have approved the accounts because they knew—they thought, "It's a political struggle.  What about our office?"  And they were right, because two years later they got into a problem that we all know about . . . .  They know it's political; they don't want to be in the middle of the battle, they don't want to be touched. So they will keep raising arguments, technical arguments, in order not to be dragged into the fight.[1527]

1197. In April 2004, PwC decided they would no longer audit Yukos.  Mr. Doug Miller, a PwC Moscow partner, explained several years later, in an interrogation before the Prosecutor

---

[1522]   Letter from Michael Kubena to Bruce Misamore, 15 January 2004, Exh. C-609.  An earlier draft of this letter also concluded that Yukos should not be liable for the trading shells' taxes, but did not exclude the possibility that there would be tax consequences for Yukos if the authorities and courts re-qualified its transactions and the nature of its business.  Exh. C-1064, CP12026–27.

[1523]   Letter from Donn Kingsley to Simon Kukes, 29 January 2004, Exh. C-1064, CP11726.

[1524]   Transcript, Day 4 at 154–55.

[1525]   *Ibid.*, pp. 153–54.

[1526]   E-mail from Jacques Kosciusko-Morizet to Bruce Misamore, 16 February 2004, Exh. C-1064, CP11807.

[1527]   Transcript, Day 4 at 165–66.

General of the Russian Federation, that the results of the Yukos/Akin Gump investigation "were not final for us, they did not help us, i.e. we did not obtain the confirmation or comfort that would satisfy us as auditors.  This was one of the factors which led to our refusal to audit the company in the future."[1528]

1198. The timing of PwC's April 2004 decision to cease auditing Yukos coincides with the period when, according to Mr. Rieger, harassment of PwC at the hands of the Russian authorities commenced.  PwC employees involved in Yukos' Russian accounts were interrogated.[1529]  In the spring of 2005, Mr. Miller told Mr. Rieger that he could not even meet with Yukos employees or management anymore, which Mr. Rieger understood to be a "direct result of the permanent pressure put by the Russian authorities on PwC."[1530]

### (c)    PwC Faces Mounting Pressure from the Russian Federation around the Same Time as Mr. Khodorkovsky's Second Trial Starts

1199. Pressure on PwC from the Russian authorities was sustained.  In March 2006, a court case was brought against PwC for tax violations relating to expatriate salaries.  There was speculation that the lawsuit was indirectly connected with investigations against Yukos.[1531]

1200. In December 2006, a second court case was filed against PwC by the Tax Inspectorate.  The Tax Inspectorate accused PwC of colluding with Yukos on tax evasion.  PwC categorically rejected the claims that the Yukos audit reports were defective in any professional, legal or regulatory way.[1532]  While PwC acknowledged that it had raised certain matters with Yukos, it insisted that these matters did not materially affect the company's financial statements or alter PwC's opinion in respect of the financial statements.[1533]

1201. In March 2007, PwC's Moscow offices were raided by 50 officers from the Prosecutor General's Office and the Interior Ministry.  Documents were seized and PwC was eventually

---

[1528]  Russian Federation General Prosecutor's Office, Record of Interrogation of Douglas Miller of PwC Russia, 4 May 2007, Exh. R-137 at 17.

[1529]  Rieger WS ¶ 18.

[1530]  *Ibid.*

[1531]  U.S. State Department Cable No. 07MOSCOW466, "Update on PWC's Russian tax issues," 2 February 2007, WikiLeaks Website, Exh. C-1352.

[1532]  "Official Position of PricewaterhouseCoopers," PwC Press Release, 25 December 2006, Exh. C-826; "Official Position of PricewaterhouseCoopers Regarding the Claims of Tax Inspectorate 5," PwC Press Release, 17 January 2007, Exh. C-827.

[1533]  *Ibid.*

fined.[1534]  A press report observed:

> [w]hat is clear is that the firm's association with Yukos and the fact that the oil company was paralysed and eventually bankrupted after being slapped with more than US$30 billion in back-tax claims despite financial reports approved by PwC has made the auditor a clear target for Russian tax authorities.[1535]

1202. PwC published an official statement in which it "strongly object[ed] to the seizure of such information . . . [and] strongly denie[d] any wrongdoing in either the 2002 tax case or in relation to its audits," and stated that it continued "to work to resolve both matters."[1536] Mr. Kubena told the U.S. Embassy that the treatment of PwC employees during the March 2007 raids was "shocking" and a "disgrace."[1537] Nevertheless, he was reported as saying that he wished to limit the public profile of the case and urged restraint in discussing it until the facts were clear.  He said that, in the meantime, PwC "better not . . . raise the public profile of the case in ways that could come back to hurt the prospects for a reasonable solution."[1538]

1203. On 20 March 2007, the Moscow Arbitrazh Court found against PwC in the Yukos audit case and imposed a fine.[1539]  PwC employees, including Mr. Kubena, also faced criminal charges.[1540] Mr. Kubena expressed disappointment about the outcome to the U.S. Embassy, but again urged restraint when discussing the case in public.[1541]  PwC was anxious about the renewal of its license.  Having met with PwC representatives, the U.S. Ambassador sought reassurance from Finance Minister Kudrin, who advised the Ambassador that there was no basis for the license to be revoked.[1542]  The press still speculated, however, that PwC might risk losing the license.[1543]

---

[1534]   *Russia, With Yukos Still in Sights, Raids PwC*, Wall Street Journal, 10 March 2007, Exh. C-832.

[1535]   *PwC Offices Searched in Yukos-Related Tax Evasion Investigation in Russia*, Global Insight, 12 March 2007, Exh. C-835; U.S. State Department Cable No. 07MOSCOW1028, "GOR Agencies visit PwC Moscow Office March 9," 12 March 2007, Wikileaks Website, Exh. C-1353.

[1536]   "PricewaterhouseCoopers' Official Statement," PwC Press Release, 12 March 2007, Exh. C-834.

[1537]   U.S. State Department Cable No. 07MOSCOW1028, "GOR Agencies visit PwC Moscow Office March 9," 12 March 2007, Wikileaks Website, Exh. C-1353.

[1538]   *Ibid.*

[1539]   *PwC Puts On a Brave Face After Losing Case*, Moscow Times, 22 March 2007, Exh. C-838; *see also* PwC Press Release, 20 March 2007, Exh. C-836.

[1540]   Letter from the Russian Federation Prosecutor General's Office to Michael Kubena, 26 June 2007 and Resolution On Denial to Initiate Prosecution against ZAO PricewaterhouseCoopers Audit, 25 June 2007, Exh. C-1243.

[1541]   U.S. State Department Cable No. 07MOSCOW1210, "Russia: PWC fined in Yukos tax audit case," 21 March 2007, Wikileaks Website, Exh. C-1354.

[1542]   U.S. State Department Cable No. 07MOSCOW1354, "Ambassador's 3/27 meeting with Finance Minister Kudrin," 28 March 2007, Wikileaks Website, Exh. C-1355.

[1543]   *Court Blasts PricewaterhouseCoopers*, Kommersant, 2 April 2007, Exh. C-845.

In fact, the license was renewed in April 2007 but PwC continued to fear that it would be revoked long after.[1544]  Press reports in April also noted that PwC had started losing clients, including State-owned companies Transneft and Sakhalin II.[1545]

1204. While these events were unfolding, in early 2007, prosecutors filed new charges against Mr. Khodorkovsky, causing PwC to start an internal review.  According to the declaration of a PwC in-house counsel in a separate forum, PwC was at that time already considering and drafting a possible withdrawal of the audits.[1546]

1205. In April 2007, the Russian tax authorities asked the Finance Ministry to initiate a "review" of PwC's auditing practices.[1547]  On 18 April 2007, PwC received a summons from prosecutors in the second Khodorkovsky trial.  The prosecutors wanted to interrogate Mr. Miller while reprimanding PwC for failing to cooperate with earlier requests.[1548]  On 19 April 2007, PwC urgently recalled Mr. Miller from his new post in London.  They informed him that PwC was now cooperating with investigators.  Mr. Miller was instructed to attend the Prosecutor General's Office, where he was interrogated on six occasions in May and June.[1549]  During these sessions he was presented with "new" evidence obtained in connection with the Khodorkovsky prosecution.[1550]  Other PwC personnel were also interrogated in the first half of 2007.  During his last interrogation session, on 4 June 2007, Mr. Miller told the prosecutor that, in his opinion, the audit opinions issued in respect of Yukos' financial statements "starting from at least 1999 should be withdrawn." [1551]

1206. The Tribunal notes that, on 14 June 2007, the Prosecutor General's Office wrote to Mr. Kubena that, in connection with criminal investigations of Messrs. Khodorkovsky and Lebedev, "the

---

[1544]  Order of the Ministry of Finance of the Russian Federation No. 348, 19 April 2007, Exh. R-885; U.S. State Department Cable No. 07MOSCOW5403, "PWC's travails in Russia worsen," 15 November 2007, Exh. C-1360.

[1545]  *PwC loses Russia's Sakhalin-2 audit contract*, Reuters, 13 April 2007, Exh. C-855; *Russia's Transneft drops PwC as auditor, picks KPMG*, Reuters, 25 April 2007, Exh. C-858.

[1546]  In the Matter of an Application of Michael Khodorkovsky and Platon Lebedev for an Order Seeking Discovery Under 28 U.S.C. § 1782, Declaration of Laurie Endsley, 31 January 2011 ¶ 9, Exh. R-881.

[1547]  U.S. State Department Cable No. 07MOSCOW3343, "Russia: PricewaterhouseCoopers Withdraws Audits of Yukos," 9 July 2007, Exh. C-1358.

[1548]  Letter from Russian Federation Prosecutor General's Office to PwC, 18 April 2007, Exh. C-1241.

[1549]  Letter from ZAO PwC Audit to Doug Miller, 23 April 2007, Exh. C-1242.

[1550]  Russian Federation Prosecutor General's Office, Records of Interrogations of Douglas Miller of PwC Russia, 4 May 2007, Exh. R-137; 8 May 2007, Exh. R-17; 10 May 2007, Exh. R-18; 4 June 2007, Exh. R-871.

[1551]  Russian Federation Prosecutor General's Office, Records of Interrogations of Douglas Miller of PwC Russia, 4 June 2007, Exh. R-871.

investigation has at its disposal data that certain persons at the present time are relying" on PwC's audit reports for Yukos.[1552]  PwC was asked to consider whether its Yukos audit reports "ought to be relied upon" and whether PwC could confirm the reliability of the financial reports for 1995–2004 in light of "information, that had earlier been inaccessible to the auditors."[1553] The Tribunal also notes that the following day PwC withdrew its Yukos audit reports.

> (d)   PwC's "Volte-Face" in Withdrawing the Yukos Audits; Improved Treatment and Continued Pressures in the Russian Federation

1207. On 15 June 2007, in a letter from Mr. Kubena to Yukos' receiver, Mr. Rebgun, PwC withdrew all of its audit reports for Yukos for the years 1995 to 2004 on the basis of "new information" it had received that had caused it to lose confidence in Yukos' management.[1554]  Four categories of "new" information were highlighted by PwC, concerning:

- control over Behles Petroleum S.A., Baltic Petroleum Trading Limited and South Petroleum Limited (the "**BBS Companies**");
- Yukos' control over the trading companies and consequential avoidance of profit tax;
- Yukos' purchases of Bank Menatep's liabilities; and
- compensation to certain individuals who had led Yukos at the time of its privatization.[1555]

1208. Senior PwC manager Pete Gerendasi reportedly explained to the U.S. Embassy that the "new" information had been carefully reviewed and deemed credible; that PwC's U.S. headquarters had been closely consulted; and that PwC had concluded after a thorough review that, "since Yukos was no longer a going concern, the only viable option was to withdraw its audits."[1556] The Embassy observed that Mr. Gerendasi was uncomfortable discussing the sources of the "new" information but that he was "unequivocal" that the withdrawal was "a difficult call."[1557]

---

[1552]   Letter from the Russian Federation Prosecutor General's Office to PwC, 14 June 2007, Exh. C-610.

[1553]   Letter from the Russian Federation Prosecutor General's Office to PwC, 14 June 2007, Exh. C-610; *see also* In the Matter of the Application of Michael Khodorkovsky and Platon Lebedev for an Order Seeking Discovery Under 28 U.S.C. 1782, Deposition of Douglas Miller, 18 December 2009, p. 257, Exh. R-4309 (hereinafter "Miller Deposition").

[1554]   PwC's Withdrawal Letter, Exh. C-611.

[1555]   *Ibid.*

[1556]   U.S. State Department Cable, 07MOSCOW3343, "Russia: PricewaterhouseCoopers Withdraws Audits of Yukos," 9 July 2007, Wikileaks Website ¶ 3, Exh. C-1358.

[1557]   *Ibid.* ¶ 7.

As described in the Wikileaks cable, at the time, PwC was still facing: (a) a review by the Finance Ministry of its auditing practices; (b) an appeal regarding the expatriate tax case; and (c) an appeal regarding the Yukos collusion case.[1558]  While Mr. Gerendasi noted that PwC's legal counsel "was uncertain what effect PwC's decision to withdraw its Yukos audits would have on the outcome" of the Yukos collusion case, he stated that "the withdrawal would not have an adverse effect on the Finance Ministry's review of PwC's auditing practices."[1559]

1209.  PwC made a public announcement of its withdrawal decision on 24 June 2007.[1560]  The *Financial Times* reported:

> PwC's sudden about face comes after a government pressure campaign that included police raids in March on its Moscow office and an ongoing criminal investigation into alleged underpayment of taxes by Yukos.  The audit firm has also risked losing its license . . . . The move will strengthen the Kremlin's case against Mikhail Khodorkovsky.[1561]

1210.  The Tribunal notes that just one day after the public announcement, the criminal charges against Mr. Kubena and other PwC personnel were dropped.[1562]  In dropping the charges, the prosecutor noted that "the unjustified nature of the [audit opinions] . . .  was the result of misrepresentation by [Yukos'] major shareholders and the persons acting on their instructions."[1563]

1211.  In July 2009, the *Financial Times* reported that the prosecutors had cleared PwC with respect to its Yukos audits, having found no wrongdoing by the firm.  PwC was "pleased . . . the general prosecutor ha[d] decided not to take any action against PwC Russia, its partners or employees."[1564]

1212.  PwC has always denied that there was a tit-for-tat deal whereby the Russian authorities would drop their cases against PwC in return for PwC withdrawing its audits.  PwC told the *Financial Times* that "the audit firm's apparent reversal of fortune had nothing to do with its withdrawal

---

[1558]  *Ibid.* ¶¶ 4–6.

[1559]  *Ibid.* ¶ 6–7.

[1560]  "Withdrawal of Yukos Audit Reports," PwC Press Release, 24 June 2007, Exh. C-864.

[1561]  *PwC withdraws Yukos audits*, Financial Times, 25 June 2007, Exh. C-865.

[1562]  Letter from Russian Federation Prosecutor General's Office to PwC, 26 June 2007, enclosing Resolution on Denial to Initiate Prosecution against ZAO PriceWaterhouseCoopers Audit, 25 June 2007, Exh. C-1237.

[1563]  *Ibid.*

[1564]  *Moscow clears PwC over Yukos audits*, Financial Times, 19 July 2007, Exh. C-874.

of the audits . . . and nothing to do with any attempt to reduce the legal pressure."[1565]   A few years later, in a 2009 deposition conducted in the U.S. by Mr. Khodorkovsky's criminal lawyers, Mr. Miller categorically denied any connection between PwC's decision to withdraw its audits and the legal pressure against PwC:

> Q. Mr. Miller, how much did the—did the criminal investigation into PwC in 2007 impact PwC's decision to withdraw the audits?
>
> . . .
>
> THE WITNESS: I believe that the decision to withdraw was based firmly [on] the information that was shown to us . . . during the investigation.
>
> Q. And is it the same answer as to the tax claims filed against PwC?
>
> A. Yes.
>
> . . .
>
> Q. And did you receive any assurances from the investigators, including Mr. Karimov, that if PwC withdrew the audits, that the criminal investigation against PwC would be terminated?
>
> A. No.
>
> Q. Have you received any other assurances from the investigators as to treatment of PwC if you were—if PwC were to withdraw the audit letters?
>
> A. No.
>
> . . .
>
> Q. How about any of the investigators from the Russian authorities, did anybody ask you to develop reasons to withdraw the Yukos audits?
>
> A. No.
>
> Q. Are you aware of anyone from the . . . [Prosecutor General's Office] asking PwC to develop reasons to withdraw the audits?
>
> A. No, I'm not aware of that.[1566]

1213. At the same time, the Tribunal notes that an October 2007 Wikileaks cable reveals that Messrs. Kubena and Gerendasi of PwC conveyed to the U.S. Embassy "that the Yukos and expatriate salary tax cases against the auditor were politically motivated."[1567]   Mr. Kubena speculated that the case against PwC for colluding with Yukos might have been "an effort by the [Government of Russia] to prove ex post facto that its actions against Yukos had a legitimate basis."[1568]   Mr. Gerendasi drew a direct connection between the expatriate tax case

---

[1565] *Ibid.*

[1566] Miller Deposition, pp. 256–7, 264, Exh. R-4309.

[1567] U.S. State Department Cable No. 07MOSCOW5083, "Update on PWC's Yukos, Russian tax cases," 19 October 2007 ¶ 1, Exh. C-1359.

[1568] *Ibid.*

against PwC and the prosecution against Yukos' former management, saying that "tax and law enforcement authorities may be trying to cast PwC as reckless in an attempt to underscore that the [Government of Russia] rightly prosecuted Yukos senior management."[1569]   Following this meeting, the Ambassador commented that "PwC is under serious duress in Russia." [1570]

1214. The following month, PwC told the Embassy it was worried that the criminal charges laid in the context of the expatriate tax case had "devolved into a pressure tactic against the firm."[1571]   As for the Yukos tax case, which was on appeal, Mr. Gerendasi noted that "[a]lthough the potential financial penalties in this case were only on the order of USD 500,000 . . . the real threat remained to the firm's auditing license."[1572]   The Ambassador noted that "Russia matters to PwC," and that "[d]espite the rather stark picture Gerendasi painted, he said that PwC remained bullish on Russia and intended to maintain its operations in-country . . . .   He added that in the interest of facilitating a resolution to the firm's short-term difficulties, PwC's international leadership would try to meet with senior [Russian governmental] officials in the near future."[1573]

1215. Mr. Miller and other PwC employees then cooperated as prosecution witnesses in the second Khodorkovsky trial.  The record discloses that they consulted with the prosecutors prior to their testimony, as demonstrated by an e-mail dated 28 March 2009 from the Prosecutor General's Office, in which the prosecutors answered questions posed by Mr. Miller as follows:

> *2. For every witness, exactly on what issues and/or arguments should they dwell in their witness testimony?*
>
> - The testimony of each witness from among your company's employees should be unified, that is testify to the same thing, in the same sense and featuring the same style (offensive and aggressive with regard to the Defense) . . .
>
> *3. Can we obtain a list of approximate expected questions by the Prosecutor for each witness?*
>
> - Carefully analyze your testimony (records of interrogations) and recall our recent conversation: you will understand the general meaning of such questions. You and I should phrase specific questions ourselves once you have personally got to the bottom of the situation.[1574]

---

[1569]   *Ibid*. ¶ 5.

[1570]   *Ibid*. ¶ 6.

[1571]   U.S. State Department Cable No. 07MOSCOW5403, "PWC's travails in Russia worsen," 15 November 2007 ¶ 4, Exh. C-1360.

[1572]   Ibid. ¶ 5.

[1573]   *Ibid*. ¶ 8.

[1574]   E-mail from Sergei Mikhailov to Doug Miller, 28 March 2009, Exh. C-1244.

1216. In December 2009, the U.S. Embassy commented on the role that PwC played in the Khodorkovsky trial and related Yukos lawsuits.  It observed as follows:

> . . . if the audits were properly withdrawn, this will be a "black mark" for the [Yukos/Khodorkovsky] defense; if not, it could help the defense, but would greatly tarnish PWC's international reputation . . . .  [The Khodorkovsky trial is] applying a superficial rule-of-law gloss to a cynical system where political enemies are eliminated with impunity . . . .  There is a widespread understanding that Khodorkovskiy violated the tacit rules of the game: if you keep out of politics, you can line your pockets as much as you desire.  Most Russians believe the Khodorkovskiy trial is politically motivated . . .[1575]

1217. Eventually the two court cases against PwC were resolved in PwC's favor and PwC's fines were refunded.[1576]   Meanwhile, Mr. Miller's evidence, and that of other cooperative PwC witnesses, was accepted and relied upon by the trial judge who found Mr. Khodorkovsky guilty at the conclusion of his second criminal trial.[1577]

### 3.    Parties' Arguments and Tribunal's Observations

1218. The main question the Tribunal will address is whether PwC's withdrawal of its Yukos audits was a decision brought about by pressure from the Russian Federation, as Claimants argue, or whether PwC decided to withdraw the audit opinions out of the genuine concern that they were tainted by newly-discovered misrepresentations, as Respondent argues.   There is a third possibility as well, namely, that PwC's withdrawal of its audits was a tactical response to pressure of the Russian authorities but that nevertheless PwC did have some valid grounds to believe that Yukos had made important misrepresentations to it.

### (a)    Did PwC Withdraw its Audits because it was under Pressure from the Russian Government?

1219. Claimants' witnesses were unequivocal.   In their view, PwC gave in to pressure from the Russian authorities when it withdrew the audits.  Mr. Rieger had noticed that after the attacks on Yukos began in 2003, "PwC grew much more distant from Yukos . . . .  I understood this to be the direct result of the permanent pressure put by the Russian authorities on PwC."[1578]

---

[1575]   U.S. State Department Cable No. 09MOSCOW3144, "Rule of Law Lipstick on a Political Pig: Khodorkovskiy case plods along," 30 December 2009 ¶¶ 3, 8, Exh. C-1361.

[1576]   *Tax Authorities Performed Their Duty to Yukos' Auditor*, Kommersant, 19 June 2009, Exh. R-4310.

[1577]   Verdict of the Khamovnichesky Court of Moscow in the second criminal case against Michael Khodorkovsky and Platon Lebedev, 27 December 2010, pp. 448–49, Exh. C-1057.

[1578]   Rieger WS ¶ 18.

Mr. Misamore stated at the Hearing his belief that "PwC withdrew its audit reports as a result of tremendous pressure from the Russian Government . . . ."[1579]  Mr. Kosciusko-Morizet agreed. He testified:

> Well, knowing Russia, knowing that this whole Yukos affair is basically political, with a financial dimension for some people of course, there is a complete logic here in the harassment that PwC was submitted to from December 2006; the raid on their offices, the usual methods of armed masked men with machine guns, in March; their denial again of any wrongdoing in April; and finally this letter, I would not say written but signed by Doug Miller; and then I believe that all the criminal prosecutions disappeared in a matter of days . . . . I saw this letter. I considered that this letter was extorted from them by force. I know and they know what happened to the Yukos personnel, Vasily Aleksanyan, . . . Svetlana Bakhmina and others; there is a long list. And they had to face a decision between, of course, protecting their business and protecting their people, especially their Russian personnel, from dire consequences and/or insisting on no wrongdoing; that is, keeping the ethical line . . . . But PwC, as everybody else, was familiar with the kind of treatment you could expect if you resist in that context, and they made a decision—I don't blame them for that decision—protecting their staff. It's just unethical but realistic. And now they have a thriving business in Moscow.[1580]

1220. Respondent did not deny that the raids, seizures and lawsuits occurred, but explained they were part of regular law enforcement activities.  Respondent pointed out, for example, that many companies (including Ernst & Young) faced lawsuits about expatriation tax issues.  It argued that auditor collusion lawsuits are standard in other countries.[1581]

1221. The record before the Tribunal is abundantly clear.  PwC's treatment improved significantly once it started to cooperate with the authorities and then withdrew its audits.  Almost overnight, charges were dropped against PwC personnel.  PwC's own legal problems started to be resolved.  At the same time, some cases took longer to resolve, and concerns by PwC over loss of its license were real.  It is clear that cooperation from PwC, once given, was expected to be enduring. This is easily understood.  Mr. Khodorkovsky's second trial was still ongoing.

1222. Respondent relies heavily on Mr. Miller's deposition to contradict Claimants' account of the events.[1582]  That deposition was taken under oath in the U.S., at the request of Mr. Khodorkovsky's own lawyers, and, according to Respondent, it is "hard to imagine a

---

[1579]   Transcript, Day 9 at 182.

[1580]   Transcript, Day 4 at 203–04. For Mr. Kosciusko-Morizet's testimony at the second Khodorkovsky trial, *see also* Verdict of the Khamovnichesky Court of Moscow, 27 December 2010, pp. 468ff, Exh. C-1057.

[1581]   Rejoinder ¶ 1283.

[1582]   *Ibid*. ¶¶ 1273–74.

clearer or more credible denial of Claimants' 'harassment' theory."[1583]

1223. Although Mr. Miller was not offered as a witness, the Tribunal does not accept his denial in another forum of any link between PwC's decision to withdraw the audits and the pressure against PwC mounted by the Russian authorities. Mr. Miller was then subjected to six sessions of interrogation. When he was recalled from London his superiors instructed him to cooperate with the Russian authorities. The March 2009 e-mail exchange with the prosecutor's office, suggests that he was prepared to cooperate when he testified in Mr. Khodorkovsky's second trial. Moreover, the candid views expressed by PwC officials in the U.S. Embassy's cables published by Wikileaks confirm that PwC was under pressure. The cables demonstrate that PwC was concerned not to aggravate its difficulties with the Government ("better not raise the public profile of the case in ways that could come back to hurt the prospects for a reasonable solution");[1584] that PwC was anxious not to lose its license or its business in Russia;[1585] that it considered the Yukos cases to be politically motivated and saw some connections between the withdrawal of the audit opinions and PwC's treatment by the Russia Government;[1586] and that it felt that criminal charges in the expatriate tax case were being used as a "pressure tactic."[1587] The Embassy considered PwC to be under duress and concluded that "the political and legal concerns that are driving the heightened scrutiny of PWC's accounting practices appear to have taken on a life of their own."[1588]

### (b)     Were the Grounds Provided by PwC in its Withdrawal Letter Contrived or Credible?

1224. As noted earlier, Claimants assert that PwC played a role in establishing and auditing Yukos' domestic and international structures, and that, at all times, PwC had access to all the

---

[1583] *Ibid*. ¶¶ 1274–75.

[1584] U.S. State Department Cable No. 07MOSCOW1028, "GOR Agencies visit PwC Moscow Office March 9," 12 March 2007, Wikileaks Website, Exh. C-1353.

[1585] U.S. State Department Cable No. 07MOSCOW5403, "PwC's travails in Russia worsen," 15 November 2007 ¶ 5, Exh. C-1360.

[1586] U.S. State Department Cable No. 07MOSCOW5083, "Update on PWC's Yukos, Russian tax cases," 19 October 2007 ¶¶ 1, 5, Exh. C-1359.

[1587] U.S. State Department Cable No. 07MOSCOW5403, "PWC's travails in Russia worsen," 15 November 2007 ¶ 4, Exh. C-1360.

[1588] *Ibid*. ¶ 9.

information it required.[1589]

1225. Respondent on the other hand points to "a long and troubled relationship" between Yukos and PwC, recalling that PwC had refused to continue to audit the company's U.S. GAAP statements after 2003.[1590]  Respondent asserts that in 2007 PwC withdrew its opinions in good faith, upon learning "new information" via Mr. Miller's interrogations in May and June 2007.[1591]  Respondent emphasizes "that the Tribunal is not a trier of fact as to the reliability of the information learned by PwC.  In order to rebut Claimants' unsupported harassment theory, it is sufficient that PwC had a good-faith belief in the credibility of that information. . . ."[1592]  According to Respondent, it is for Claimants to prove that Yukos never lied to PwC and that PwC's four reasons for withdrawal of the audits were a mere pretext.  Although the Tribunal agrees with Respondent that it is not a trier of facts as to the soundness of this "new information," it finds it appropriate to examine those four reasons.

### i.   Did Yukos' Management Lie to PwC about the BBS Companies Being "Related"?

1226. The first category of alleged misinformation identified in PwC's Withdrawal Letter was the following:

> Whilst we were auditing the Company, its management many times declared to us that the Company and companies to which substantial volumes of crude oil and oil products were exported, namely Behles Petroleum S.A., Baltic Petroleum Trading Limited and South Petroleum Limited (hereinafter together referred to as "BBS"), were not affiliated parties.  In the course of the Investigation, we were provided with information showing that BBS had been controlled by the shareholders of Group Menatep Limited (hereinafter "Group Menatep") and had been used to their advantage.  At the material time, Group Menatep held a controlling block of shares in the Company.[1593]

1227. It appears as if Yukos' management had repeatedly assured PwC that Yukos was not "related" to the BBS Companies (in the sense of sharing the same beneficial owners within the meaning

---

[1589]   At the Hearing, Mr. Misamore stated that he did not "agree that anything was misrepresented to PwC."  In his view, "PwC had access to all the information they wanted; and if they didn't have sufficient information, they should have asked for more."  Transcript, Day 9 at 249.  Mr. Theede also testified that up until the Russian Federation's attack on PwC began, "there was never any indication of any concerns or problems or anything to me."  Transcript, Day 11 at 50.  *See also* Misamore WS ¶ 29; Rieger WS ¶ 18; Kosciusko-Morizet WS ¶ 17.

[1590]   Respondent's Opening Slides, p. 205; Respondent's Post-Hearing Brief ¶ 61.

[1591]   Respondent's Post-Hearing Brief ¶ 61.

[1592]   *Ibid.*

[1593]   PwC's Withdrawal Letter, Exh. C-611.

of GAAP standards).[1594] PwC had looked at the issue itself and expressed doubts, but concluded that even if they were related, the transactions with the BBS Companies were done under fair market conditions, and were so immaterial that they could have no impact on the financial statements and thus did not need to be disclosed.[1595] Then, in 2007, while being interrogated, Mr. Miller found out "new information," in the form of the record of an interrogation of a Mr. Anilionis, who described how the BBS Companies were set up in a structure that would enable Messrs. Khodorkovsky and Lebedev to "keep [them] under control but on the surface the structure should not belong to 'Yukos.'"[1596]   A trade office was set up in Geneva, prices were coordinated with Mr. Lebedev, and Yukos' employees were responsible for oil trading activities.   The discovery of this "lie", even though relating to an immaterial matter from a financial reporting standpoint, is said to have shattered PwC's confidence in the statements of Yukos' management and thus caused PwC to withdraw its audit opinions.[1597]   Claimants say it is simply not credible for PwC to have invoked the BBS Companies issue as an excuse to withdraw its audit opinions.[1598]   They also question the reliability of the source of "new information," the interrogation of Mr. Anilionis.[1599]

1228. When Mr. Kosciusko-Morizet was shown documents indicating that PwC had raised concerns in the past about Yukos' relationship with the BBS Companies, he emphasized that PwC had approved Yukos' G.A.A.P. accounts and thus " any problem they might have had was solved."[1600]   Mr. Misamore also confirmed the view that the BBS Companies were not related parties vis-à-vis Yukos, that the issue had been on PwC's radar, and that PwC could have caused Yukos to identify the BBS Companies as related if it were essential, but did not.[1601]

1229. Mr. Misamore denied that PwC had repeatedly recommended that Yukos disclose the ownership structure of the BBS Companies and that Yukos had refused such disclosure.   He explained that PwC had conducted a study in 2002 and that it had not been able to "reach a

---

[1594]   Mr. Misamore confirmed on cross-examination that he still believed that they were unrelated. Transcript, Day 9 at 171.

[1595]   PwC Memorandum "Matters for Partner Attention – Summary of Significant Issues," 31 December 2000, item 8, Exh. C-1232; *see also* Record of Interview of Bruce Misamore, 9 March 2009, pp. 49–50, Exh. R-3347.

[1596]   Interrogation Protocol of G.P. Anilionis, 18 January 2007, p. 15, Exh. R-3581.

[1597]   Miller Deposition, pp. 176–77, Exh. R-4309.

[1598]   Reply ¶ 457.

[1599]   Transcript, Day 20 at 203 (Claimants' closing).

[1600]   Transcript, Day 4 at 124; *see also* Transcript, Day 4 at133.

[1601]   Transcript, Day 9 at 176–77.

conclusion as to whether or not [information about Yukos' relationship with the BBS Companies] should be disclosed."[1602]   Further, he noted that PwC signed Yukos' audited financial statements without that information.  Upon being shown an internal PwC document, "Matters for Partner Attention", for year 2000, wherein PwC stated that "[t]he absence of disclosure, while not desirable, does not constitute a material omission,"[1603] Mr. Misamore said that this document too supports his view that disclosure was not so desirable as to warrant PwC insisting on its inclusion in Yukos' F-1 document.[1604]

1230. Nevertheless, the Tribunal is unconvinced by the claims that the BBS Companies, apparently the, or certainly, a, principal exporter of the oil produced by Yukos, were not controlled by or related to Yukos.  PwC's contention that it was misled in this regard may have been true.

### ii.    Did Yukos Management Lie to PwC about Yukos' Control over the Trading Companies?

1231. The second category of alleged misinformation identified in PwC's Withdrawal Letter was the following:

> Now we have information demonstrating that the management of certain Russian legal entities affiliated with the Company did not control the activities of these entities, rather these legal entities were fully controlled directly by the Company's management.  Since the management of these affiliated entities were not in control of these entities' activities, the court found that these activities were fictitious.  Consecutively, the courts found that the profit earned by these legal entities affiliated with the Company was a profit of the Company, and therefore the Company should have accrued and paid taxes on this profit. Nevertheless, in the course of the audits, the Company's management told us that key issues of the activities of these affiliated legal entities were under supervision and control of their own management.[1605]

1232. This is an issue that was traversed at length in Chapters VIII.A and B of the present Award.

1233. Claimants argued that PwC was fully aware of the structures of the trading companies, and that in the context of the preparation of Yukos' U.S. GAAP financial statements, PwC had given specific and detailed advice to Yukos on how to demonstrate control over affiliated companies

---

[1602]   *Ibid*. at 64.

[1603]   PwC Memorandum "Matters for Partner Attention—Summary of Significant Issues," 31 December 2000, p. 6, Exh. C-1232.

[1604]   Transcript, Day 9 at 178.

[1605]   PwC's Withdrawal Letter, Exh. C-611.

so that they could be included within the consolidation umbrella.[1606]   Respondent accuses Claimants of conflating concepts of accounting (control relationships amongst various Yukos entities for consolidation purposes under the U.S. GAAP), which PwC *did* understand, with questions of tax (how much *actual* control Yukos exerted at an operational level over the trading shells from Moscow while maintaining the fiction of management in the low-tax region to avoid tax under Russian tax law), which PwC certainly did *not* appreciate, because it never audited the trading companies.[1607]   Respondent does not actually refer to any "new" information PwC learned which would have caused them concern about this in June 2007; it simply points to a series of negatives (PwC did *not* design the trading company scheme, PwC did *not* audit the trading companies).

1234. At the hearing, Respondent referred to the August 2007 interrogation of Mr. Kubena's predecessor as PwC tax advisor in Russia, Mr. Klubnichkin, to show PwC never audited the trading companies.[1608]   While PwC was fully aware of Yukos' use of the tax optimization scheme, Mr. Klubnichkin said, it was *not* aware of any abusive elements.  Mr. Klubnichkin said that as Yukos' auditor, PwC had "never been aware of the fictitious nature of these 'operational' companies . . . .   The deceit lies in the fact that a corporation creates false appearance of normal activity, of a serious business, with respect to a fictitious business . . . . We could only learn about such nature of these companies in case of a full audit of these companies themselves, which would include our visits to their operational premises."[1609]   The Tribunal notes that Mr. Klubnichkin's interrogation took place in August 2007, *after* the PwC withdrawal.

1235. Respondent submits that PwC did not know about the Lesnoy assessments.  Respondent thus disputes that PwC was ever aware that the trading companies were sham entities directly controlled by Yukos from Moscow, and disputes that Yukos' tax scheme was adopted on PwC's advice or recommendation.[1610]

1236. Claimants' response is two-fold.  Firstly, they refer to oral and documentary evidence in the

---

[1606]   *See* Reply ¶¶ 469–70, referring to PwC Memorandum "Audit Summary Points and Matters For Partner Attention—31 December 1999 and 1998," Exh. C-1230; and for 2001, Exh. C-1233.

[1607]   Respondent's Post-Hearing Brief ¶ 64.

[1608]   Respondent's Closing Slides, pp. 205, citing Interrogation of K.M. Klubnichkin, 1 August 2007, Exh. RHB-S-72 (in English)/C-1065, RP 9988-9997 (in Russian).

[1609]   Interrogation of K.M. Klubnichkin, 1 August 2007, Exh. RHB-S-72 (in English)/C-1065, RP 9988-9997 (in Russian).

[1610]   Respondent's Post-Hearing Brief ¶¶ 65–67.

record confirming PwC's participation in the Yukos tax scheme in the regions.[1611]  They point to a contemporaneous internal memo from PwC Cyprus to PwC Moscow, which discloses that PwC was familiar with the details of the group structure and the relationships of the trading companies.[1612]  In addition, Claimants underline the closeness of Yukos' relationship with PwC as shown by PwC's attendance at an "international symposium" held by Yukos in early 2002, at which tax issues, group structure, international accounting standards and related party disclosure requirements were discussed.[1613]

1237.  Finally, Claimants point to a timing problem that in their view undermines the credibility of PwC's statement that it obtained "new information" only in May 2007.  The Tribunal finds much force in Claimants' submission that PwC was on notice of the Russian Federation's alleged concerns about Yukos' tax optimization structure at least as early as January 2004, when it issued its opinion on the 2000 Audit Report.  As Yukos' auditor since 1997, PwC obviously had a strong incentive in ensuring that its previous audit reports were accurate, and if there was anything new or worrying in what it had seen, it would have raised it at the time.  PwC did not withdraw the audits in 2004, 2005, or 2006 when the issues were being aired through the Russian courts and in the public domain.  Rather it waited three and a half years, and then suddenly decided that there was "new information" on the basis of which the audits should be withdrawn.

### iii.  Did Yukos' Management Lie to PwC about Transactions with Bank Menatep?

1238.  The third category of alleged misinformation identified in PwC's Withdrawal Letter was the following:

> In the course of the Investigation, we were shown documents demonstrating that the Company had made significant payments to meet liabilities of the companies effectively

---

[1611]   Claimants' Post-Hearing Brief ¶¶ 135–42, citing Transcript, Day 6 at 27 (cross-examination of Mr. Rieger); Transcript, Day 4 at 27 (cross-examination of Mr. Kosciusko-Morizet).  Mr. Misamore recalled that it was PwC's recommendation to use indirect control for purposes of consolidation.  Transcript, Day 9 at 34.  Mr. Theede recalled that PwC had been the "architect" of the domestic trading companies' structure.  Transcript, Day 11 at 50.  Mr. Kosciusko-Morizet specified that Yukos, as in the case of other Russian companies, had "made use of means of tax optimization that were provided for by Russian law" and that "these means had been recommended and put in place by PwC's experts."  Morizet WS ¶ 24.  *See also* Letter from Enrique Munoz to Michel Soublin, 13 October 2000, Exh. C-1064, CP1408.

[1612]   Transcript, Day 16 at 157, citing to Letter from Chris Santis (PwC Cyprus) to Kelly Allin (PwC Moscow), 10 April 2003, Exh. R-349.

[1613]   Claimants' Post-Hearing Brief ¶ 146, citing to Minutes of Yukos Moscow International Symposium, 29–31 January 2002, Exh. C-1064, CP4146.

owned and controlled by Group Menatep before AKB Menatep Bank. Complete information about the nature of these transactions and relations was not disclosed to us in the course of the audits.[1614]

1239.  This "new information" concerned transactions going back to the late 1990s, when Yukos purchased what Respondent calls "worthless claims" against Bank Menatep, which was in bankruptcy at the time.[1615]  The principal shareholders of Bank Menatep were the same as the principal shareholders of Yukos.  PwC was concerned that the purchase of claims against a bankrupt bank was undertaken to further the interests of the companies' common shareholders, using Yukos' funds and at the expense of Yukos' minority shareholders.  By May 2000, Yukos had accumulated USD 500 million in claims against Bank Menatep, but had at most USD 220 million in guarantees.

1240.  During one of the 2007 interrogations, Mr. Miller was shown minutes of a May 2000 meeting, in which Yukos' managers stated that "it would be not be desirable to disclose this information since those shares were bought out from the borrowers."[1616]  The minutes then state that "[i]t is necessary to immediately demonstrate to the Company's auditors the intention to sell the excess of the purchased assets—with a book profit—to unrelated third parties. . . ."  Although Mr. Miller could not in fact remember if he worked on this issue or if the information was disclosed to PwC, he was outraged what he described as the "unacceptable manipulation of information" revealed by the minutes and by Yukos' plan to lie to the auditors about its worthless claims against Bank Menatep.[1617]

1241.  Claimants assert that PwC was always fully aware of the substance of the transactions concerning the assumption of Bank Menatep's debt, and that the transactions were accounted for in Yukos' financial statements and draft F-1 forms.[1618]

---

[1614]   PwC's Withdrawal Letter, Exh. C-611.

[1615]   White & Case, Memorandum, 25 July 2001, Exh. R-3585.

[1616]   Minutes of Meeting, 31 May 2000, Exh. C-1231.

[1617]   Reply ¶ 481, citing to Russian Federation General Prosecutor's Office, Record of Interrogation of Douglas Miller, 4 June 2007, Exh. R-871.

[1618]   Yukos U.S. GAAP Consolidated Financial Statements, 31 December 1999, Exh. C-1066; for 2000, Exh. C-27; for 2001, Exh. C-28; Draft Yukos F-1 Form and Registration Statement Under the Securities Act of 1933, 19 March 2003, Exh. C-1067.

### iv. Did Yukos' Management Lie to PwC about its Compensation Payments to Certain VPL Managers?

1242. The fourth category of alleged misinformation identified in PwC's Withdrawal Letter was the following:

> The Company failed to timely disclose to us information about certain payments made by the shareholders of Group Menatep in favor of certain individuals, who were leading executives of the Company at the time of its privatization. In the course of the Investigation, some information disclosed to us ran counter to the explanations given to us by the management and shareholders of the Company in the course of our audits with regard to the exact nature of those payments.[1619]

1243. This allegation concerned the extraordinarily generous compensation plan that had been put in place for certain persons who had been managers of Yukos at the time of its privatization. PwC suspected that the immense sums paid to those persons could not have been for services rendered to Yukos itself. Respondent alleges that Yukos had misrepresented to PwC the purpose of the compensation plan. PwC's long-held suspicion about the nature of the payments was only confirmed when the Prosecutor General showed Mr. Miller statements signed by the beneficiaries of the payments to the effect that they had been made to them "not for services provided to Yukos but were . . . connected to Group Menatep's acquisition of Yukos."[1620] Mr. Miller expressed "indignation" at the "lie" and alleged that Mr. Khodorkovsky had told him he would go to jail if forced to disclose the real reason for the payments.[1621] This category of so-called "lies" was seen as important to PwC not in terms of material effect on the audited reports, but insofar as they undermined the credibility of Yukos' management's statements.[1622]

1244. Claimants affirm that Mr. Miller had always been familiar with the payment arrangements. How the payments are identified in the accounts is only an accounting issue (as opined by Clifford Chance and Cleary Gottlieb at the time).[1623] When PwC signed off on the Yukos financial statements, they were aware of the issue. Even Mr. Miller acknowledged that the

---

[1619] PwC's Withdrawal Letter, Exh. C-611.

[1620] Counter-Memorial ¶¶ 724, 728, citing to Minutes of Audit Committee of the Yukos Board of Directors, 26 February 2003, Exh. R-3583.

[1621] Russian Federation Prosecutor General's Office, Record of Interrogation of Douglas Miller, 10 May 2007, p. 8, Exh. R-18.

[1622] Miller Deposition, pp. 176–77, Exh. R-4309.

[1623] Reply ¶ 461, citing to E-mail from Doug Miller to Bruce Misamore, 14 August 2002, attaching PwC Memorandum "Veteran Managers' Plan and Agreement: Determination of Accounting for Plan," Exh. C-1235.

"reliability of the financial statements is not affected."[1624]  Claimants were prepared to disclose the existence and purpose of the compensation fund to the public for the ADR listing.[1625]

### (c)   Concluding Observations

1245. The Tribunal observes that there are some notable timing problems concerning the date of PwC's withdrawal following the revelation of "new" information.  For example, the fact that PwC did not audit the trading shells would have been known to Mr. Miller before June 2007.  PwC would have known about alleged "sham" or "abusive" elements of the Yukos tax optimization scheme at least as early as January 2004 when it was shown the 2000 Audit Report.  It is not understandable that PwC would wait until June 2007 before determining that its audits were unreliable.  Respondent itself notes that "[a] question can be raised as to whether PwC waited too long to withdraw its audit opinions."[1626]

1246. In addition, PwC said that its withdrawal letter was drafted on the basis of "new" information that Mr. Miller learned in the course of his interrogations in May 2007.  However, it appears that a draft withdrawal letter was prepared as early as March of that year.[1627]

1247. PwC was clearly pressed by the Russian authorities to find grounds for withdrawing its audits of Yukos.  Bearing in mind the complexity of the Yukos structure, the business environment at the time it was set up, and the grey areas of Russian tax law at the time, it is not surprising that PwC could identify elements of evidence with respect to some aspects of Yukos' business practice that it affirms gave rise to credibility issues.  As far as the Tribunal can judge, Yukos may not have been candid in its representations to PwC about control of the BBS Companies and about the reasons for the immense payments Yukos undertook to make, and did make, to individuals who were involved in its privatization.

1248. However, the Tribunal cannot accept that the four issues identified in PwC's Withdrawal Letter were in fact "new" for PwC.  In addition, even if the information was new, it was not unequivocal, and could have been tested with Yukos when it was still operational.  In this

---

[1624]  *Ibid*. ¶ 464, citing to Russian Federation General Prosecutor's Office, Record of Interrogation of Douglas Miller, 4 June 2007, Exh. R-871.

[1625]  *Ibid*. ¶ 466, citing to Group Menatep Limited, "Information for the Management of OAO NK 'Yukos,'" Exh. C-597.

[1626]  Counter-Memorial ¶ 708.

[1627]  In the Matter of an Application of Michael Khodorkovsky and Platon Lebedev for an Order Seeking Discovery Under 28 U.S.C. § 1782, Declaration of Laurie Endsley, 31 January 2011 ¶ 9, Exh. R-881.

regard, the Tribunal notes that PwC did not give former Yukos senior officials an opportunity to comment on the new information before signing the withdrawal letter.   At the Hearing, Mr. Misamore testified that he stood by the following statement he made in 2009 in relation to the PwC withdrawal:

> PWC never said anything to me or, as far as I know, anyone else at Yukos, to my knowledge, about a lack of information or the refusal to provide information, other than the instance concerning the ownership interests in [the] BBS [Companies]. If PWC had asked me to intervene—and I did intervene with the BBS inquiry—I would have gone to Group Menatep shareholders or their lawyers, and would have urged the release of the requested information.[1628]

1249. According to Respondent's accounting expert, Mr. Ellison, who was not cross-examined, the U.S. Statement of Auditing Standards No. 1 sets the following standard for the "Subsequent Discovery of Facts Existing at the Date of the Auditor's Report":

> When the auditor becomes aware of information which relates to financial statements previously reported on by him, but which was not known to him at the date of his report, and which is of such a nature and from such a source that he would have investigated it had it come to his attention during the course of his audit, he should, as soon as practicable, undertake to determine whether the information is reliable and whether the facts existed at the date of his report.   In this connection, the auditor should discuss the matter with his client at whatever management levels he deems appropriate, including the board of directors, and request cooperation in whatever investigation may be necessary.[1629]
>
> [emphasis added]

1250. Similar steps are expected to be taken under international and Russian auditing standards.[1630] Mr. Ellison notes that PwC's Withdrawal Letter stated that "due to the company undergoing bankruptcy and the former company executives no longer working for the company, PwC was unable to access the information required that could lead to revision of the financial statements and was also unable to discuss the matter with management, as recommended by [the audit standards]."   Mr. Ellison concludes that under those circumstances "PwC had no option but to withdraw its audit reports."[1631]

1251. Mr. Ellison observes that when a reputable international firm withdraws an audit opinion it is an "unusual and serious" event.[1632]   In light of the seriousness of the decision to withdraw the

---

[1628]   Record of Interview of Bruce Misamore, 9 March 2009, p. 51, Exh. R-3347.

[1629]   U.S. Statement of Auditing Standards No. 1, Section 561(4), attached as Exh. 4 to Ellison Report.

[1630]   Mr. Ellison refers to a similar obligation to "discuss the matter with management" under the International Auditing Standards ISA 560 and Russian Federal Auditing Rule No. 10.   Ellison Report ¶¶ 3.5.5, 3.5.11, 3.6.1.

[1631]   *Ibid.* ¶ 3.4.28.

[1632]   *Ibid.* ¶ 2.3.1.

audit opinions, and the industry standard of consulting with the audited company before taking any action, it is noteworthy that PwC made no effort to reach out to Yukos' management or ex-management to discuss the "new" information.

1252. PwC's senior executives confided to the U.S. Embassy that the withdrawal decision was a "difficult" call.[1633]  At stake for PwC on the one hand was its reputation and loyalty to a "dead" client, and on the other hand its continued viability in the Russian market.  As the cables reveal, Russia mattered to PwC.[1634]  PwC's senior executives met with the Russian Government to resolve PwC's problems.  And, as noted earlier, after PwC made its decision, criminal charges were dropped, and PwC prevailed in two lawsuits, received a refund of its fines, maintained its license and retained important Russian clients such as Gazprom.  As observed by Mr. Kosciusko-Morizet, "PwC undoubtedly opted in the end for the most pragmatic approach so as to maintain its office in Russia and protect its employees from being sued."[1635]

1253. As the Tribunal stated at the outset of this chapter, PwC is not on trial before this Tribunal, which draws no conclusion in the present Award about PwC's professional conduct.  However, the pressure mounted by the Russian authorities against Yukos' auditors, which led to PwC's eventual withdrawal of its audits and even to a PwC auditor testifying against Messrs. Khodorkovsky and Lebedev at their second trial, informs the Tribunal's view that Yukos was the object of a series of politically-motivated attacks by the Russian authorities that eventually led to its destruction, as alleged by Claimants.

## IX.   PRELIMINARY OBJECTIONS

1254. Before turning to the central question of Respondent's liability under the ECT on the basis of the extensive factual record canvassed in the preceding Part VIII, the Tribunal addresses in this Part IX three preliminary objections made by Respondent, including two that were not finally resolved in the Tribunal's Interim Awards.

1255. The Tribunal considers, in this order, Respondent's preliminary objections related to: (a) the ECT's "fork-in-the-road" provision—Article 26(3)(b)(i); (b) Claimants' allegedly "unclean

---

[1633]   U.S. State Department Cable No. 07MOSCOW3343, "Russia: PricewaterhouseCoopers Withdraws Audits of Yukos," 9 July 2007 ¶ 7, Exh. C-1358.

[1634]   U.S. State Department Cable No. 07MOSCOW5403, "PWC's travails in Russia worsen," 15 November 2007 ¶ 8, Exh. C-1360.

[1635]   Kosciusko-Morizet WS ¶ 25.

hands"; and (c) the relevance of Article 21 of the ECT.

**A.** **ARE ALL OR SOME OF THE CLAIMS BARRED BY THE "FORK-IN-THE-ROAD" PROVISION OF THE ECT?**

    **1.** **Introduction**

1256. Article 26(3)(b)(i) of the ECT contains the ECT's "fork-in-the-road" provision.  It must be read together with the preceding paragraphs of Article 26:

> *Article 26*
> SETTLEMENT OF DISPUTES BETWEEN AN INVESTOR AND A CONTRACTING PARTY
>
> (1)    Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III shall, if possible, be settled amicably.
>
> (2)    If such disputes can not be settled according to the provisions of paragraph (1) within a period of three months from the date on which either party to the dispute requested amicable settlement, the Investor party to the dispute may choose to submit it for resolution:
>
>     (a)    to the courts or administrative tribunals of the Contracting Party party to the dispute;
>
>     (b)    in accordance with any applicable, previously agreed dispute settlement procedure; or
>
>     (c)    in accordance with the following paragraphs of this Article.
>
> (3)    (a)    Subject only to subparagraphs (b) and (c), each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article.
>
>     (b)(i)    The Contracting Parties listed in Annex ID do not give such unconditional consent where the Investor has previously submitted the dispute under subparagraph (2)(a) or (b);
>
>     (ii)    For the sake of transparency, each Contracting Party that is listed in Annex ID shall provide a written statement of its policies, practices and conditions in this regard to the Secretariat no later than the date of the deposit of its instrument of ratification, acceptance or approval in accordance with Article 39 or the deposit of its instrument of accession in accordance with Article 41.
>
>     [. . .]

1257. Before turning to the Parties' submissions, the Tribunal recalls its dismissal in the Interim Awards of Respondent's identical Article 26(3)(b)(i) objection to jurisdiction and/or admissibility:

> The Tribunal finds that Respondent's arguments are unconvincing.  Indeed, in its written submissions, Respondent did appear to concede that, as a general matter, there is ample

authority for the application of a "triple identity" test [identity of parties, cause of action and object of the dispute] in the context of a "fork-in-the-road" provision.  To that extent, there is no question that the various Russian court proceedings and applications to the European Court of Human Rights cited by Respondent fail to trigger the "fork-in-the-road provision" of the ECT.[1636]

**2.   Parties' Positions**

1258. In its Counter-Memorial, Respondent renews its objection that the Tribunal lacks jurisdiction pursuant to Article 26(3)(b)(i) of the ECT.  In its view, developments subsequent to the Interim Awards show that Claimants, as Yukos shareholders, are seeking before the ECtHR damages for the same alleged loss arising from Yukos' demise.  Accordingly, Respondent submits that the ECT arbitrations expose it to double recovery.[1637]

1259. Respondent relies on the Application for Just Satisfaction made by Yukos' former representative, Mr. Gardner, before the ECtHR, requesting damages "and, for the first time … compensation for the 'ultimate stakeholders' in Yukos through a Stichting created under Dutch law."[1638]  Respondent argues that these circumstances deprive the Tribunal of jurisdiction under Articles 26(3)(b)(i) and 26(2)(b), and Annex ID of the ECT.[1639]

1260. Respondent submits that the European Convention on Human Rights ("**ECHR**") and ECT claims share the same fundamental basis, and, accordingly, the ECT claims should be dismissed.  As previously submitted in its First Memorial on Jurisdiction and Admissibility, Respondent emphasizes that its consent to submit a dispute to international arbitration is expressly conditioned on Claimants not having already submitted the dispute to a "previously agreed dispute resolution procedure," pursuant to Article 26(3)(b)(i) read in conjunction with Article 26(2)(a) and Annex ID of the ECT.[1640]

1261. Respondent argues that the Tribunal's dismissal of this objection was premised on the "incorrect assumption" that the parties in the proceedings before the ECtHR and the present

---

[1636]   Interim Awards ¶¶ 598–600 (YUL); 609–11 (VPL); 597–99 (Hulley).

[1637]   Respondent's Counter Memorial ¶ 837.

[1638]   Rejoinder ¶ 369; Counter-Memorial ¶ 827.

[1639]   Counter-Memorial ¶ 828.  Annex ID lists the Contracting Parties that have conditioned their consent to the submission of a dispute under the Treaty to international arbitration on the condition that the Investor has not previously submitted the dispute to the courts or administrative tribunals of the Contracting Party to the dispute.  The Russian Federation is listed in Annex ID.  (Interim Awards ¶¶ 588–89 (YUL); ¶¶ 599–600 (VPL); ¶¶ 587–88 (Hulley).

[1640]   Counter-Memorial ¶ 829.

proceedings are different.[1641]   Respondent further submits that the Tribunal erred in "fail[ing] to mention the requirements of the 'triple identity test' and state which requirement was not fulfilled."[1642]   In satisfaction of the identity threshold, Respondent submits as follows:

- the Application for Just Satisfaction before the ECtHR establishes that the "'ultimate stakeholders', including Claimants, are the only Yukos interests that are represented in the EC[t]HR proceedings";[1643]

- the monetary relief requested in both proceedings for Yukos' alleged expropriation is identical;[1644] and

- the ECHR and ECT claims both aim to obtain compensation for the purported expropriation of Yukos and "have the same normative source," as Article 13(1) of the ECT and Article 1 of Protocol No. 1 ECHR do not lay down independent standards by which Respondent's conduct is to be judged.[1645]

1262. Claimants maintain their rejection of this objection, emphasizing in their Reply that "it is entirely inappropriate and an abuse of process for the Respondent now to seek to reopen this issue."[1646]

1263. Firstly, Claimants emphasize that the merits phase of these arbitrations is not an instance of appeal and, further, that the principles of *res judicata* and *ne bis in idem* are absolute bars to Respondent renewing this objection.[1647]

1264. Secondly, Claimants submit that Respondent's contention that the parties in the ECtHR proceedings and these arbitrations are the same is incorrect.  Mr. Gardner[1648] does not act on behalf of Claimants, nor did Claimants make any submissions in those proceedings.  Contrary to Respondent's characterization, Mr. Gardner was not seeking compensation "on behalf of Claimants."  Rather, Claimants say Mr. Gardner he was simply arguing that the destruction of

---

[1641]   *Ibid.* ¶ 830.

[1642]   *Ibid.*

[1643]   *Ibid.* ¶ 831.

[1644]   *Ibid.* ¶ 832.

[1645]   *Ibid.* ¶ 833.

[1646]   Reply ¶ 967.

[1647]   *Ibid.* ¶ 969.

[1648]   Yukos' counsel before the ECtHR.

the Company need not pose an obstacle to an award of just satisfaction, "because the Dutch Foundation was able to receive such an award and dispose of it in accordance with its statutes."[1649]  Claimants also highlight that Mr. Gardner's submission is dated 4 May 2009, thus preceding the Interim Awards in these arbitrations by several months.

1265. Thirdly, Claimants submit that Respondent advanced essentially the same argument previously before the ECtHR.  Claimants submit that Respondent's position in that regard was rejected by the ECtHR because the parties in the ECT arbitrations were different, and thus the matters were not substantially the same.[1650]

1266. Finally, Claimants submit that no issue of double recovery arises in these arbitrations.  They repeat the disclaimer they provided to the Tribunal on 1 April 2010, that "should any pecuniary damages be awarded to Yukos in the ECtHR proceedings, and should the Claimants receive any payments, such payments would be deducted from the amounts claimed in these arbitrations."[1651]

1267. In its Rejoinder, Respondent draws the Tribunal's attention to the 2012 decision in *Chevron v. Ecuador*,[1652] which, according to Respondent, confirms "a narrow interpretation of 'fork-in-the-road' provisions that focuses strictly on the legal bases of the claims would deprive such a clause of effective scope."[1653]

1268. Respondent also objects to Claimants' *res judicata* argument.  Respondent submits that the ECtHR proceedings, which were "formally instituted by Yukos, under Claimants' direction and control" and involve "the very same economic interests that are represented in these arbitrations, constitute a special circumstance that justifies a new examination of Respondent's Article 26(3)(b)(i) ECT objection."[1654]

1269. Respondent also alleges that Claimants admit there is privity of interest between the two proceedings.  In support of this assertion, Respondent refers to:

---

[1649] Reply ¶ 971.

[1650] *Ibid.* ¶ 972, citing ECtHR Yukos Judgment ¶¶ 524–26.

[1651] Reply ¶ 963, citing Letter from the Claimants to the Arbitral Tribunal of 1 April 2010.

[1652] *Chevron Corporation and Texaco Petroleum Company v. Republic of Ecuador*, PCA Case No. 2009–23, Third Interim Award on Jurisdiction and Admissibility, 27 February 2012 (hereinafter "*Chevron v. Ecuador*").

[1653] Rejoinder ¶ 370, citing *Chevron v. Ecuador* ¶ 4.76.

[1654] Rejoinder ¶ 374.

- the passage of the Reply (mentioned at paragraph 1266 above) where Claimants state that they will deduct any payments they receive in the ECtHR proceedings from the amounts claimed in these arbitrations; and

- the Application for Just Satisfaction (mentioned at paragraph 1261 above), where Mr. Gardner characterized Claimants in these arbitrations as the "ultimate stakeholders" in Yukos.[1655]

1270. Finally, Respondent submits that Claimants' reliance on positions that the ECtHR has already finally rejected – namely that Respondent's taxation measures against Yukos were *mala fides*, briefed extensively in its Rejoinder,[1656] "creates a risk of conflicting determinations, one of the ills that Article 26(3)(b)(i) ECT is designed to avoid."[1657]

### 3.   Tribunal's Decision

1271. Having considered the Parties' submissions and reviewed the reasons for its dismissal in the Interim Awards of Respondent's identical objection to jurisdiction pursuant to Article 26(3)(b)(i) of the ECT, the Tribunal sees no reason to reopen this issue and change its decision.

1272. Accordingly, Respondent's objection that the Tribunal lacks jurisdiction pursuant to Article 26(3)(b)(i) of the ECT is dismissed.

## B.   "UNCLEAN HANDS" (DID CLAIMANTS ACT ILLEGALLY SO AS TO DEPRIVE THEM OF PROTECTION UNDER THE ECT?)

### 1.   Introduction

1273. As its second preliminary objection, Respondent submits that Claimants have come to this Tribunal with "unclean hands," with one or many of the following consequences: (a) the Tribunal does not have jurisdiction over Claimants' claims; (b) Claimants' claims are inadmissible; and/or (c) Claimants should be deprived of the substantive protections of the ECT. The Tribunal addresses this argument in the present chapter.

1274. Should the Tribunal reject the "unclean hands" argument as a preliminary objection,

---

[1655] *Ibid.* ¶ 369.

[1656] *Ibid.* ¶¶ 99–193.

[1657] *Ibid.* ¶ 374.

Respondent also submits that some instances of Claimants' unclean hands should be treated as contributory fault and/or a failure to mitigate on the part of Claimants, and that any damages awarded to Claimants should be discounted on the basis of their unclean hands. These arguments are addressed in Chapters X.E and XII.C.

1275. Respondent initially made its "unclean hands" argument in the jurisdictional phase of these arbitrations. In Paragraph 3 of its Procedural Order No. 3 dated 31 October 2006, the Tribunal decided that it would be "appropriate to defer consideration of the Parties' contentions concerning 'unclean hands' [and] Respondent's 'criminal enterprise' contention . . . to the merits phase, if any."

1276. In its Interim Awards, the Tribunal stated:

> The Tribunal is well aware of Respondent's argument that Claimant in this arbitration has "unclean hands" and that Claimant's corporate personality should be disregarded because it is an instrumentality of a "criminal enterprise." The Tribunal recalls that it addressed these issues in its Procedural Orders Nos. 2 and 3 on 8 September and 31 October 2006. Specifically, the Tribunal then decided to defer consideration of Respondent's arguments concerning the "unclean hands" of Claimant or Claimant being an instrumentality of a "criminal enterprise" to any merits phase of this arbitration. Accordingly, by finding, as it does, that Claimant qualifies as an Investor owning and controlling an Investment for the purposes of Articles 1(7) and (6) of the ECT, the Tribunal does not dispose of the issues argued by Respondent concerning the "unclean hands" of Claimant and Claimant being an instrumentality of a "criminal enterprise," which it will address during any merits phase of this arbitration.[1658]

1277. As anticipated in the Interim Awards, now with the benefit of a full presentation of the facts by the Parties on all aspects of the Yukos affair, the Tribunal addresses Respondent's "unclean hands" argument in this final Award.

1278. The Tribunal notes that, in their First Submission on Costs, Claimants argue that Respondent, after insisting on its "unclean hands" allegations and the assertion that Claimants are an instrumentality of a "criminal enterprise" in the jurisdictional phase of this arbitration and dedicating nearly two hundred pages of its Counter-Memorial and Rejoinder to the first of these two arguments, ultimately abandoned these arguments at the Hearing, pursuing only the allegations related to alleged abuse by Claimants of the Cyprus-Russia DTA.[1659] In its Reply Submission on Costs, Respondent confirmed that it had not abandoned its unclean hands defense. To the contrary, Respondent argued that Claimants had explicitly refused to join issue

---

[1658] Interim Awards ¶ 435 (Hulley); ¶ 436; (YUL); ¶ 492 (VPL).

[1659] Exh. C-916.

and submit rebuttal and Respondent had accordingly relied on its arguments as undisputed and accepted. According to Respondent, this alleviated the need to devote substantial hearing time to these points.[1660]

1279. Claimants correctly observe that at the merits hearing (and in their Post-Hearing Brief) Respondent expanded only on the Cyprus-Russia DTA abuses part of its "unclean hands" argument, making only passing reference to other aspects of this argument.[1661] However, in the Tribunal's view, this circumstance speaks only to Respondent's freedom to present its case as it chooses, and represents Respondent's strategic decision to focus on certain arguments instead of others in the limited time available to it at the Hearing and within the page limit for post-hearing submissions imposed by the Tribunal. The fact that Respondent did not repeat in full all of the arguments made in previous pleadings at the Hearing and in its Post-Hearing Brief does not mean that these arguments were abandoned.

1280. Below, the Tribunal first summarizes the factual allegations constituting the foundation of Respondent's "unclean hands" argument and then the Parties' arguments regarding the impact of the alleged facts on the Tribunal's jurisdiction, the admissibility of claims and the availability of the substantive protections of the ECT to Claimants. In the last section of this chapter, the Tribunal sets out its decision with respect to "unclean hands" as a preliminary objection.

### 2.    Claimants' Alleged "Unclean Hands"

1281. Respondent lists 28 instances of alleged "illegal and bad faith conduct" by Claimants or "attributable to" Claimants involving a variety of actors and spanning over ten years, from the privatization of Yukos in the mid-1990s to its liquidation in November 2007. Claimants dispute that any of their conduct (or any conduct attributable to them) was illegal or in bad faith.

1282. Given the number and diversity of Respondent's allegations, the Tribunal presents them below in groups intended to facilitate its subsequent analysis. Where facts related to Respondent's "unclean hands" allegations fall outside the scope of the analysis of the factual background set out in Part VIII above, they are briefly summarized here.

---

[1660]   Respondent's Reply Submission on Costs ¶¶ 16–18

[1661]   *See e.g.* Transcript, Day 19 at 169–74, 179; Respondent's Post-Hearing Brief ¶¶ 146, 148.

(a)     **Conduct Related to the Acquisition of Yukos and the Subsequent Consolidation of Control over Yukos and its Subsidiaries**

1283. The first eleven items of Respondent's list of "illegal and bad faith conduct" are dedicated to conduct related to the acquisition of Yukos by Bank Menatep; and the so-called "Oligarchs" and their subsequent consolidation of control and ownership over Yukos and its subsidiaries:

i.       Violating the legal requirements governing the loans-for-shares program that allowed Menatep to gain its controlling interest in Yukos.

ii.      Using shell company proxies to feign competition in the loans-for-shares auction and a simultaneous investment tender for Yukos shares.

iii.     Precluding actual competitors from bidding on Yukos shares in the loans-for-shares auction and investment tender, including through the abuse of Menatep's role as auction organizer to disqualify Russian competitors.

iv.     Rigging a subsequent auction for the Yukos shares that were being held as collateral following the initial loans-for-shares auction, which deprived the Russian Government of substantial revenue.

v.      Conspiring with Yukos' pre-existing managers to facilitate the unlawful acquisition of Yukos by the Oligarchs, including by entering into an agreement whereby "Yukos Universal" committed to pay them compensation consisting of 15% of Menatep's beneficial interest in Yukos, ultimately worth billions of dollars, for "services rendered to 'Yukos'".

vi.     Colluding with others to predetermine the post-privatization ownership of Yukos.

vii.    Skimming profits from Yukos and its production subsidiaries for their own self-enrichment.

viii.   Abusing Russian corporate law and principles of corporate governance by squeezing out minority shareholders in Yukos' production subsidiaries through ruthless and self-enriching share dilutions, asset stripping, and transfer pricing.

ix.     Siphoning off huge sums for the benefit of the Oligarchs from Yukos' proceeds from the sale of oil and oil products, while concealing related-party transactions from Yukos' own auditor.

x.      Further mistreatment of minority shareholders by manipulating shareholder meetings, pressuring the Russian Federal Securities Commission not to pursue its challenges against illegal misconduct, relying on fraudulently determined stock and asset values and deceiving those minority shareholders, the government, and domestic and foreign courts about the nature and control of offshore companies that were created to benefit Claimants and their cohorts.

xi.   Manipulating Yukos' stock value to devalue and reacquire the interests of creditors to which Yukos stock had been pledged.[1662]

1284.   As context to Respondent's allegations, it is useful to recall some of Yukos' early history.  The Russian Federation created the company in 1993 as part of a large-scale reorganization of the Soviet oil production and processing industry into vertically integrated oil companies.  Yukos remained largely state-run until 1995.[1663]

1285.   Respondent recounts, based on a report by Professor Reinier Kraakman that, in March 1995, a consortium of Russian commercial banks, including Bank Menatep (the Chairman of which was Mr. Khodorkovsky), proposed to the Russian government that they would lend it money in exchange for the right to hold as collateral and manage shares of major state-owned companies such as Yukos.[1664]  A presidential decree of August 1995 provided for the auctioning of the right to hold and manage shares of individual companies.[1665]  Once the terms of the proposed management agreement expired, the government would have a choice between paying back the loan and reclaiming its shares, and allowing the lender to sell the shares, with the government keeping 70 percent of the difference between the sale price and the original amount of the loan.[1666]  This mechanism became known as the "loans-for-shares program."

1286.   In December 1995, the Russian Government retained Bank Menatep to organize the auction for the shares in Yukos.[1667]

1287.   Respondent alleges that Bank Menatep "completely rigged the auction" by preventing potential competitors from participating, while using two front companies, Laguna and Regent, to formally comply with the requirements for bids.[1668]  Respondent recounts that Laguna won the right to hold as collateral and manage a 45 percent stake in Yukos for a USD 159 million loan to the Russian government and an additional investment obligation of USD 200 million.  According to Respondent, Laguna acquired an additional 33 percent stake in Yukos by pledging just over USD 150 million in investments at a simultaneously held "investment

---

[1662]   Rejoinder ¶¶ 1435–36.

[1663]   Counter-Memorial ¶ 19.

[1664]   *Ibid.*¶ 20.

[1665]   Decree of the President of the Russian Federation No. 889 On the Procedure for Putting the Federally Owned Shares in Pledge, 31 August 1995, Exh. R-7.

[1666]   Counter-Memorial ¶ 21.

[1667]   *Ibid.* ¶ 23.

[1668]   *Ibid.* ¶¶ 27–28.

tender."[1669]   Bank Menatep acquired Laguna's rights to hold and manage Yukos shares immediately thereafter.[1670] Respondent further alleges that Bank Menatep then used "another rigged auction and another shell affiliate, named Monblan," to obtain full ownership of the stake in Yukos.[1671]   Respondent also suggests that Bank Menatep was "an insider among insiders" and used Yukos' own funds to pay for its takeover of Yukos.[1672]

1288. Respondent makes additional allegations regarding Bank Menatep's and the Oligarchs' treatment of foreign and Russian investors holding minority shares in Yukos' main production subsidiaries—YNG, Samaraneftegaz and Tomskneft—in the aftermath of the privatization.[1673] Respondent alleges that from 1996 to 1999 Bank Menatep and the Oligarchs engaged in significant profit skimming and, in 1999 and 2000, abused Russian corporate law and principles of corporate governance to "squeeze out the minority shareholders through massive share dilutions, transfer pricing, and asset stripping,"[1674] until "the minority shareholders sold or swapped their shares on the Oligarchs' terms."[1675]

1289. Claimants do not engage with the detail of Respondent's allegations.  They contend that these allegations "amount to little more than innuendo based upon a handful of sensationalized journalistic accounts."[1676]   In particular, Claimants point out that Respondent is "unable to make out any failure by Bank Menatep to comply with the terms of the loans-for-shares program"[1677] and underline that it was the Russian government itself that had the authority to preclude foreign companies and individuals from bidding and to disallow bids.[1678]   Claimants add that Respondent's "vague insinuations" as to the source of funds used to privatize Yukos do not prove that anything unlawful took place.[1679]   Claimants suggest that Respondent's argument "amounts to nothing more than an attempt to shift blame for the actions of the

---

[1669] *Ibid*. ¶ 28.

[1670] Kraakman Report ¶ 20.

[1671] Counter-Memorial ¶ 29.

[1672] *Ibid*. ¶ 33.

[1673] *Ibid*. ¶ 45.

[1674] *Ibid*. ¶¶ 915, 946–49; *see* Kraakman Report ¶¶ 28–42.

[1675] Counter-Memorial ¶¶ 916, 951–61, 75; *see* Kraakman Report ¶¶ 44–62.

[1676] Reply ¶ 1142.

[1677] *Ibid*. ¶ 1143.

[1678] *Ibid*. ¶¶ 1144–45.

[1679] *Ibid*. ¶ 1146.

Russian Government itself onto Bank Menatep."[1680]

1290. As regards the manner of the consolidation of Bank Menatep's ownership over Yukos, Claimants reply that Respondent's allegations are vague and "not only irrelevant, but also moot."[1681]   Claimants point out that Respondent relies on share issuances and transfers that were ultimately cancelled and on an alleged dispute with a minority shareholder that was eventually settled.[1682]

### (b)     Conduct Related to the Cyprus-Russia DTA

1291. Next, Respondent complains of Claimants' use of the Cyprus-Russia DTA, listing the following "bad faith and illegal conduct":

> xii.   Submitting fraudulent claims under, or otherwise abusing, the Russia-Cyprus Tax Treaty to evade hundreds of millions of dollars in Russian taxes payable on dividends involving Yukos shares, thereby also violating Russian and Cypriot criminal laws.

> xiii.   Entering into hundreds of sham transactions involving the sale and repurchase of Yukos shares between Claimants and their affiliates, the sole purpose of which was to fraudulently suggest that Claimants beneficially owned dividends declared on Yukos shares, and thereby to further Claimants' fraudulent claims for favorable tax treatment under the Russia-Cyprus Tax Treaty.

> xiv.   Evading hundreds of millions of dollars in Russian taxes on profits from transactions in and profits from sales of Yukos shares.

> [. . .]

> xvi.   Diverting the proceeds of the Yukos tax evasion scheme into highly opaque Cypriot and British Virgin Islands entities and trusts to conceal the unlawful provenance of those proceeds, including through dividend distributions to undisclosed Cypriot parent companies of trading shells, thereby further abusing the Russia-Cyprus Tax Treaty.[1683]

1292. The Russia–Cyprus DTA, as stated in its preamble, serves the "avoidance of double taxation with respect to taxes on income and capital" and the promotion of "economic cooperation between the two countries."   Article 10 of the DTA provides:

---

[1680]   *Ibid*. ¶ 1147.

[1681]   *Ibid*. ¶¶ 1149, 1151–53.

[1682]   *Ibid*. ¶¶ 1149–50.

[1683]   Rejoinder ¶¶ 1435–36.

1. Dividends paid by a company which is a resident of a Contracting State to a resident of the other Contracting State may be taxed in that other State.

2. However, such dividends may also be taxed in the State of which the company paying the dividends is a resident and according to the laws of that State, but if the beneficial owner of the dividends is a resident of the other State, the tax so charged shall not exceed:

    5% of the gross amount of the dividends…."

1293. The Parties agree that Claimants Hulley and VPL obtained monetary benefits running in excess of USD 230 million under this provision by claiming the reduced withholding tax rate of 5 percent instead of the standard 15 percent rate of the Russian Federation.

1294. Respondent argues that, in so doing, Hulley and VPL fraudulently relied on the Russia–Cyprus DTA to evade Russian taxes, because they: (a) were not the "beneficial owners" of the dividend income but mere "conduits" for the Oligarchs, and (b) had a "permanent establishment" in Russia to which the dividend income was attributable.[1684]   According to Respondent, Claimants' reliance on the DTA was a "complete perversion of the Treaty's purpose," and, as stated by Professor Rosenbloom, a "blatant example of tax treaty abuse."[1685]   Respondent alleges that Claimants contrived a series of artificial sales and repurchases of Yukos shares by Hulley from YUL, and VPL parked shares in a UBS Moscow account at suspicious times, solely to benefit from the DTA.  According to Respondent, Claimants offer no justification for this practice, aside from their expert, Mr. Baker, mischaracterizing it as a "standard arrangement."[1686]

1295. Respondent submits that the beneficial ownership requirement "should be construed in light of the object and purposes of the [DTA], including avoiding double taxation and the prevention of fiscal evasion and avoidance."[1687]   According to Respondent, Hulley and VPL never had the full right to use or enjoy Yukos' dividends.  In support, Respondent refers to the following documents:

- Hulley's and VPL's bank statements from 1 January 2000 to 31 December 2004, as well as GML's statement for 2004, which purportedly establish that the

---

[1684]   Counter-Memorial ¶¶ 922–23; Rejoinder ¶ 1448.

[1685]   Counter-Memorial ¶ 165; Rosenbloom Report ¶ 77.

[1686]   Rejoinder ¶¶ 1488–90; Baker Report, ¶70.

[1687]   *Ibid.* ¶ 1449, relying on the 2011 OECD Discussion Draft for the Model Tax Convention, Exh. R-1959.

dividends paid to Hulley and VPL by Yukos only stayed in their accounts for one or two days prior to going to YUL;[1688]

- Hulley's Articles of Association, which according to Respondent reserved to the "Oligarchs" any decision concerning the disposal of Hulley's assets;[1689] and

- the Deed of Appointment of Chiltern as a custodian trustee for VPL, which, according to Respondent, provides that all dividend income from VPL's Yukos shares "shall be paid" to YUL so long as Chiltern owns VPL.

1296. Respondent also argues that Claimants have contradicted their own arguments in the jurisdictional phase of these proceedings by acknowledging an "obligation to pass all future dividends" to YUL; this, argues Respondent, falls within even Claimants' narrow interpretation of the beneficial ownership limitation.[1690]

1297. Respondent further asserts that Hulley and VPL each had a "Russian permanent establishment."[1691]   Respondent interprets Claimants' admission that Hulley and VPL were holding companies to mean that any activity necessary to conduct the business of holding Yukos shares had to be carried out in Russia through a "deemed permanent establishment" (Article 5(5) of the Cyprus-Russia DTA) or a "fixed place of business" (Article 5(2) of the Cyprus-Russia DTA).[1692]   Respondent contends that Messrs. Lebedev and Kakorin, both Russian citizens and residents, carried out all the activities relating to Hulley's and VPL's Yukos shares from Russia.[1693]

1298. Respondent further submits that Claimants' alleged abuses violate both Russian and Cypriot criminal laws, as shown in the expert report of Mr. Polyviou.[1694]

1299. Finally, Respondent argues that Claimants' expert, Mr. Baker, fails to differentiate the "tolerated" practice of "treaty shopping" from the "universally condemned" practice of "round

---

[1688]   *Ibid.* ¶¶ 1457–65, referring to Exhs. R-334 to R-4154.

[1689]   *Ibid.* ¶¶ 1466–87, referring to Exh. R-236.

[1690]   *Ibid.* ¶¶ 1478–79.

[1691]   *Ibid.* ¶¶ 1491–501.

[1692]   *Ibid.* ¶ 1491.

[1693]   *Ibid.* ¶ 1500.

[1694]   Counter-Memorial ¶ 927.

tripping," which Respondent alleges is what Claimants did.[1695]   Accordingly, Respondent submits that, "at best," Hulley and VPL "perverted" the purposes of the Cyprus-Russia DTA, even if they satisfied its "literal requirements."[1696]

1300. Claimants protest that Respondent's allegations are unsubstantiated in fact and in law.

1301. Firstly, Claimants argue that the beneficial ownership limitation set forth in Article 10(2)(a) of the Cyprus-Russia DTA is a "narrow one targeted at nominees, agents and other conduits under an obligation to pass on the amount received as a dividend to another party."[1697] Hulley and VPL in the present case had the full right to use and enjoy the dividends they received from Yukos and were under no obligation to pass them on to another entity, as is evident from Clause 117 and Article 1 of their respective Articles of Association, which provide that the power to propose the declaration and payment of dividends lies solely with the directors of the respective companies.[1698]

1302. Claimants assert that shares "transferred to a company shortly before the dividend dates and transferred back after the dividend has been paid are lawful and a common feature in stock-lending, and also in the sale and repurchase of shares ('repos')."[1699]

1303. Secondly, Claimants assert that Hulley and VPL were holding companies, and that their business as such was not carried on in Russia.[1700]   None of the cumulative conditions in Article 10(4) of the DTA were made out to show that Hulley or VPL had a permanent establishment in Russia, as demonstrated by Mr. Baker's report.[1701]

1304. Thirdly, Claimants reject the fraudulent abuse analysis made by Respondent's expert Professor Rosenbloom, noting that there is no anti-abuse principle in the DTA.[1702]   Claimants emphasize

---

[1695]   Rejoinder ¶ 1508.

[1696]   *Ibid.* ¶ 1509.

[1697]   Reply ¶ 1157.

[1698]   *Ibid.* ¶ 1158.

[1699]   *Ibid.* ¶ 1161.

[1700]   *Ibid.* ¶ 1163.

[1701]   *Ibid.* ¶¶ 1164–74.

[1702]   *Ibid.* ¶ 1176.

that 'treaty shopping' to minimize tax is permissible.[1703]

1305. Finally, Claimants submit that Hulley's and VPL's claims under the Cyprus-Russia DTA were consistent with the purpose of the DTA. Claimants recall that one purpose of double-taxation treaties is to promote the flow of investment, and argue that both countries have derived significant benefits from the DTA.[1704]

1306. In any event, Claimants submit that the claiming of benefits under a double-taxation treaty is a technical matter, for which specific mechanisms of redress are available under the treaty itself and domestic law. Accordingly, this Tribunal is not the proper forum to hear and decide such disputes.[1705]

### (c)   Conduct Related to the Tax Optimization Scheme

1307. Three items on Respondent's list of Claimants' "illegal and bad faith" conduct relate to Claimants' use of the low-tax regions of the Russian Federation to mitigate tax burdens:

> xv.   Engineering through management installed and controlled by Claimants the massive Yukos tax evasion scheme to avoid paying hundreds of billions of rubles in Russian taxes.
>
> [. . .]
>
> xvii.   Engaging in abusive corporate restructurings to conceal Yukos' affiliation with its trading shells, thereby preventing Russian authorities from identifying and addressing Yukos' tax abuses.
>
> xviii.   Concealing Yukos' continued control of its trading shells by resorting to call options or other artifices and by fabricating corporate and other transactional documents.[1706]

1308. A detailed discussion of these allegations is found in Chapter VIII.A of this Award.

### (d)   Actions Taken in Hindrance of the Enforcement of Russia's Tax Claims

1309. The remaining ten items on Respondent's list of Claimants' "bad faith and illegal conduct" refer to actions allegedly taken to obstruct enforcement of Russia's tax claims against Yukos:

---

[1703]   *Ibid.* ¶ 1175, citing *MIL (Investments) S.A. v. Canada* [2006] 5 CTC 2552 (Tax Court of Canada), affirmed by Federal Court of Appeal of Canada.

[1704]   *Ibid.* ¶ 1177.

[1705]   *Ibid.* ¶ 1189.

[1706]   Rejoinder ¶¶ 1435–36.

xix.   Repeatedly obstructing the conduct of the tax authorities' audits of Yukos by refusing to provide documents and information which would show the extent of Yukos' abuses, and by causing Yukos' producing subsidiaries and other related entities to be similarly obstructive.

xx.   Failing to pay Yukos' tax liabilities for tax year 2000 and following years, despite having received ample notice that Yukos would be required to pay these amounts and despite the fact that Yukos had abundant resources to do so.

xxi.   Dissipating assets to frustrate the Russian authorities' collection of the tax assessments, including by way of paying dividends of unprecedented amounts, making spontaneously accelerated loan "*prepayments*" to Oligarch-owned Moravel, and foisting upon YNG an upstream guarantee up to US$ 3 billion for the repayment of Yukos' alleged "*debts*" to Moravel.

xxii.   Offering to the Russian authorities assets which Yukos knew to be tainted to settle its tax liabilities.

xxiii.   Concealing the share registers of Yukos' subsidiaries to obstruct the bailiffs' enforcement of Yukos' tax obligations.

xxiv.   Sabotaging the YNG auction through litigation threats and a spurious bankruptcy filing in the United States that effectively prevented all but one bidder from placing a bid at the auction and artificially depressed the amount of the auction proceeds.

xxv.   Implementing asset-stripping measures by diverting Yukos' valuable assets to the *stichtings* managed by former Yukos officers and representatives of Claimants in anticipation of Yukos' bankruptcy.

xxvi.   Failing to repay Yukos' debt to the SocGen syndicate and frustrating the banks' attempts to collect against Yukos' Dutch assets.

xxvii.   In the process of all of the foregoing, lying to Yukos' auditors PwC about core aspects of their misconduct and, through PwC's certification of Yukos' financial statements based on this deception of Yukos' auditors, to Yukos' creditors and other members of the investing public who relied upon those financial statements and PwC's certification of them.

xxviii.   Yukos management's shielding of Yukos' very substantial foreign assets behind the veil of two Dutch *stichtings*, to place those assets beyond the reach of Russian tax authorities, violated Dutch law.[1707]

1310.   In sum, Respondent alleges that Yukos neither paid its tax debts in full immediately after these debts were assessed, nor made reasonable settlement offers; dissipated the assets it had on hand; lied to its auditors; obstructed the work of the bailiffs; and sabotaged the YNG auction. Each of these allegations is discussed by the Tribunal in Part VIII of this Award.

---

[1707]   *Ibid.* ¶¶ 1435–36.

3.  **Parties' Positions Regarding the Impact of Claimants' Allegedly "Unclean Hands" on this Arbitration**

1311. The Parties disagree as to whether any of the instances of alleged illegal or bad faith conduct enumerated above could serve as a complete bar to Claimants' claims under the ECT (whether as a matter of jurisdiction, admissibility or otherwise) by virtue of the application of some rule or principle of law.

1312. Between them, the Parties have dedicated to this controversy several hundreds of pages of pleadings in the merits phase alone, citing in the process dozens of arbitral awards and decisions rendered by the Permanent Court of International Justice (the "**PCIJ**"), the International Court of Justice ("**ICJ**") and mixed-claims commissions.  Below, the Tribunal does not attempt to do justice to the full breadth of the Parties' arguments, but focuses instead on their most salient points.

(a)  **Respondent's Position**

1313. Respondent submits that Claimants' "unclean hands" deprive the Tribunal of jurisdiction, render Claimants' claims inadmissible and/or deprive Claimants of the substantive protections of the ECT.  This submission is based on two main principles.

1314. First, Respondent argues that "the ECT protects only *bona fide* and lawful investments and Respondent's consent to arbitrate only extends to such investments."[1708]  Respondent emphasizes that, as provided by Article 31(1) of the VCLT, a treaty must be interpreted in good faith and in accordance with its object and purpose.  According to Respondent, the object and purpose of the ECT does not include the promotion and protection of illegal investments.[1709]  Rather, as stated in the Treaty's introductory note, "[t]he fundamental aim of the [ECT] is to strengthen the rule of law on energy issues."  Respondent argues that several arbitral awards, including *Phoenix Action, Ltd. v. Czech Republic* ("**Phoenix**")*, SAUR International S.A. v. The Argentine Republic* and *Plama Consortium Limited v. Bulgaria* ("**Plama**") support the proposition that, even in the absence of an express legality requirement clause in an investment treaty, illegal investments will not be protected.[1710]  With respect to *Plama*, in particular,

---

[1708]  Respondent's Post-Hearing Brief ¶ 147.

[1709]  Counter-Memorial ¶ 898.

[1710]  Rejoinder ¶¶ 1551–52, 1527, 1563, 1566, referring to *Plama Consortium Limited v. Bulgaria*, ICSID Case No. ARB/03/24, Award, 27 August 2008, Exh. C-994 (hereinafter "*Plama*"); *Phoenix Action Ltd. v. Czech Republic*,

Respondent notes that the tribunal dismissed the claimants' ECT claims in the merits phase on the grounds that: (a) the investment violated Bulgarian law and applicable principles of international law; (b) the claimant's conduct was not in good faith; and (c) to grant ECT protection would therefore have been contrary to the clean hands requirement.[1711]

1315. Second, Respondent argues that a claimant who is guilty of illegal conduct is deprived of the necessary *ius standi* to complain of corresponding illegalities by the State.[1712] This requirement of "clean hands," argues Respondent, is a "general principle of law" within the meaning of Article 38(1)(c) of the ICJ Statute.[1713] Respondent cites the ICJ's decision in the *Case Concerning the Gabčíkovo-Nagymaros Project* and various dissenting opinions by ICJ judges, as well as a number of decisions of mixed claims commissions rendered in cases of diplomatic protection.[1714] Regarding the latter set of cases, Respondent submits that the "unclean hands

---

ICSID Case No. ARB/06/5, Award, 15 April 2009, Exh. R-1078 (hereinafter "*Phoenix*"); *SAUR International S.A. v. Argentina*, ICSID Case No. ARB/04/4, Decision on Jurisdiction and Liability, 6 June 2012, Exh. R-4186 (hereinafter "*SAUR*").

[1711] *Ibid.* ¶ 1552.

[1712] Counter-Memorial ¶ 892.

[1713] *Ibid.* ¶ 893.

[1714] Counter-Memorial ¶¶ 894–95, referring to *Case Concerning the Gabčíkovo-Nagymaros Project (Hungary/Slovakia)*, Judgment, 25 September 1997, ICJ Reports 1997, p. 7 ¶ 133, Exh. C-948 (hereinafter "*Gabčíkovo-Nagymaros*"); *Samuel Brannan v. Mexico*, U.S.-Mexico Mixed Claims Commission, Opinion of the Umpire, 1868, *in* HISTORY AND DIGEST OF THE INTERNATIONAL ARBITRATIONS TO WHICH THE U.S. HAS BEEN A PARTY, Vol. 3 (John Bassett Moore, ed. 1898), p. 2757, 2758, Exh. R-1056; *The "Lawrence" Case*, U.S.-Great Britain Mixed Claims Commission, Judgment of the Umpire, 4 January 1855, Hornby's Report 397, 1856, p. 398, Exh. R-1057; *William Whitty v. The United States*, U.S.-British Claims Commission, Decision of the Commissioners, *in* HISTORY AND DIGEST OF THE INTERNATIONAL ARBITRATIONS TO WHICH THE U.S. HAS BEEN A PARTY, Vol. 3 (John Bassett Moore, ed. 1898), p. 2820, 2823, Exh. R-1058; *Frederick G. Fitch v. Mexico*, U.S.-Mexico Mixed Claims Commission, Opinion of the Umpire, 21 June 1876, *in* HISTORY AND DIGEST OF THE INTERNATIONAL ARBITRATIONS TO WHICH THE U.S. HAS BEEN A PARTY, Vol. 4 (John Bassett Moore, ed. 1898), p. 3476, 3477, Exh. R-1059; *Jarvis Case*, U.S.-Venezuela Mixed Claims Commission, Opinion of the Commissioner, UNRIAA, 1903–1905, Vol. 9, p. 208, 212, Exh. R-1060; *Cucullu's case*, U.S.-Mexico Mixed Claims Commission, Opinion of Mr. Palacio, 1868, *in* HISTORY AND DIGEST OF THE INTERNATIONAL ARBITRATIONS TO WHICH THE U.S. HAS BEEN A PARTY, Vol. 4 (John Bassett Moore, ed. 1898), p. 3477, 3480, Exh. R-1061; *Case of the Brig "Mary Lowell"*, U.S.-Spain Claims Commission, Opinion of the Umpire, 9 December 1879, Spain-U.S. Claims Commission, *in* HISTORY AND DIGEST OF THE INTERNATIONAL ARBITRATIONS TO WHICH THE U.S. HAS BEEN A PARTY, Vol. 3 (John Bassett Moore, ed. 1898), p. 2772, 2775, 2777, Exh. R-1062; *Robert Eakin v. United States*, No. 118, U.S.-Great Britain Claims Commission, PAPERS RELATING TO THE FOREIGN RELATIONS OF THE UNITED STATES, Vol. 3 (Washington Government Printing Office, 1874), p. 15, Exh. R-1063; *Clark Case ("The Medea and The Good Return")*, U.S.-Ecuador Claims Commission, 1862, Opinion of Mr. Hassaurek, *in* HISTORY AND DIGEST OF THE INTERNATIONAL ARBITRATIONS TO WHICH THE U.S. HAS BEEN A PARTY, Vol. 3 (John Bassett Moore, ed. 1898), p. 2729, 2738–39, Exh. R-1064; *Case Concerning Military and Paramilitary Activities in and against Nicaragua (Nicaragua v. United States of America)*, Merits, Judgment, 27 June 1986, Dissenting Opinion of Judge Schwebel, ICJ Reports 1986, p. 259 ¶¶ 268, 272, Exh. R-1071; *Case Concerning Arrest Warrant of 11 April 2000 (Democratic Republic of the Congo v. Belgium)*, Judgment, 14 February 2002, Dissenting Opinion of Judge van den Wyngaert, ICJ Reports 2002, p. 137 ¶ 84, Exh. R-1072; *Legal Status of Eastern Greenland (Denmark v. Norway)*, Judgment, 5 April 1933, Dissenting Opinion of Judge Anzilotti, PCIJ Series A/B No. 53, p. 76, 95, Exh. R-1073; *Interpretation of Peace Treaties with Bulgaria, Hungary and Romania*, Second Phase, Advisory Opinion, 18 July 1950, Dissenting Opinion of Judge Read, ICJ Reports 1950, p. 231, 244, Exh. R-1074. *See also* Rejoinder ¶¶ 1529–40, citing *Case Concerning the*

principle has [an even] greater role with respect to claims brought directly by private parties, including in investor-State arbitration, than in the context of diplomatic protection."[1715] Respondent also relies on *Barcelona Traction* for the proposition that in international law the corporate "veil is lifted" to "prevent the misuse of the privileges of legal personality, as in certain cases of fraud or malfeasance . . . or to prevent the evasion of legal requirements or of obligations."[1716]   Finally, Respondent argues that if the "unclean hands" doctrine was not included in the ILC Articles on State Responsibility and Articles on Diplomatic Protection of the International Law Commission, it is only "because it corresponded to the doctrine of inadmissibility" and did not fall within the projected scope of both sets of ILC Articles.[1717]

1316. With respect to Claimants' contention that the instances of "unclean hands" referred to by Respondent can have no impact on this arbitration because they are collateral illegalities unrelated to either the making of Claimants' investments or their claims in these arbitrations,[1718] Respondent argues that it is "unsupported both by the investment treaty awards on which [Claimants rely], and by common sense and good faith."[1719]

1317. With respect to post-investment conduct, Respondent submits that the awards in *Gustav FW Hamester GmbH & Co KG v. Ghana* ("***Hamester***") and *AG Frankfurt Airport Services Worldwide v. Philippines* ("***Fraport***") recognize the relevance of such misconduct to the merits of an investment treaty claim.[1720]

1318. As regards illegalities pre-dating the acquisition of the investment, Respondent relies on the award in *Anderson v. Costa Rica* ("***Anderson***").[1721]   Respondent submits that the tribunal in that

---

[1715] *Barcelona Traction Light and Power Company Limited (Belgium v. Spain) (New Application: 1962)*, Second Phase, Judgment, 5 February 1970, ICJ Reports 1970, p. 3, Exh. C-930; *Mavrommatis Palestine Concessions (Greece v. Great Britain),* Judgment, 30 August 1924, PCIJ Series A No. 2, p. 6, 13, Exh. R-1043; ILC, Provisional Summary Record of the 2844th Meeting held 25 May 2005, A/CN.4/SR.2844, Agenda Item 2, 6 June 2005, p. 4, 7, Exh. R-4191.

[1715] Rejoinder ¶ 1538.

[1716] *Case Concerning the Barcelona Traction Light and Power Company Limited (Belgium v. Spain) (New Application: 1962)*, Second Phase, Judgment, 5 February 1970, ICJ Reports 1970, p. 3 ¶ 56, Exh. C-930.

[1717] Rejoinder ¶¶ 1543, 1545–47.

[1718] Reply ¶¶ 1134–38.

[1719] Rejoinder ¶ 1568.

[1720] *Ibid.* ¶¶ 1569–70, referring to *Gustav F W Hamester GmbH & Co KG v. Ghana*, ICSID Case No. ARB/07/24, Award, 18 June 2010, Exh. R-1079 (hereinafter "*Hamester*"); *Fraport AG Frankfurt Airport Services Worldwide v. Philippines*, ICSID Case No. ARB/03/25, Award, 16 August 2007, Exh. R- 1006 (hereinafter "*Fraport*").

[1721] Resondent's Rejoinder ¶ 1571, referring to *Anderson v. Costa Rica*, ICSID ARB(AF)/07/3, Award, 19 May 2010, Exh. R-4204 (hereinafter "*Anderson*").

case dismissed claims brought by Canadian individuals who had invested in a "Ponzi scheme" for lack of jurisdiction *ratione materiae*. Respondent highlights that tribunal's finding that the entire underlying transaction was illegal and, by that fact, "it follows that the acquisition by each [c]laimant of the asset resulting from that transaction was also not in accordance with the law of Costa Rica."[1722] Respondent submits that the finding of the *Anderson* tribunal applies in the present case, highlighting that:

> where an investment is simply transferred by the same ultimate owner from one investment vehicle to another, the concept of the unity of the investment requires that the process of the making and operation of the investment by the ultimate owner and the owner's investment vehicle be considered as a whole for purposes of determining the legality of the investment, even if the acquisition of the investment by the claimant, standing alone, is not illegal.[1723]

1319. To hold otherwise, argues Respondent, would extend investment treaty protection to claimants who shift investments through several layers of ownership and control in order to launder their illegal investments into legal ones qualifying for treaty protection.[1724]

1320. In response to Claimants' assertion that 'in accordance with the law' requirements should be limited to domestic laws regulating the admission of foreign investment, Respondent submits a number of counter-arguments, including the following:

- Claimants' reliance on the "isolated 2010 dictum" in *Mr. Saba Fakes v. the Republic of Turkey* ("**Saba Fakes**") to limit the substantive scope of the 'in accordance with the law' requirement is "unpersuasive and contrary to a consistent line of arbitral awards that have applied 'in accordance with the law' clauses to domestic legislation other than laws governing the admission of investments."[1725]

- the illegalities "infecting" Claimants' investments are "quintessential breaches of 'fundamental principles'" and were "central to the profitability of and dividend flow from Claimants' investments."[1726]

---

[1722] *Ibid.*, quoting *Anderson* ¶ 55.

[1723] *Ibid.* ¶ 1572.

[1724] *Ibid.*

[1725] *Ibid.* ¶ 1577, referring to *Mr Saba Fakes v. The Republic of Turkey*, ICSID ARB/07/20, Award, 17 July 2010, Exh. C-1537 (hereinafter "*Saba Fakes*").

[1726] *Ibid.* ¶ 1582.

- Claimants' attempt to exclude minor violations from the scope of 'in accordance with the law' clauses is unavailing, as none of the illegalities of which Respondent complains are minor.[1727]

1321. In response to Claimants' contention that they were not the relevant actors in the context of Respondent's allegations regarding Yukos' tax optimization scheme and the obstruction of the enforcement of tax claims against Yukos by the Russian Federation, Respondent submits that Claimants are "essential instrumentalities of illegal acts, through Claimants' control of Yukos and its management,"[1728] noting that during the relevant period, "Claimants owned a majority of Yukos shares and appointed the totality of the members of its board of directors, including . . . Mikhail Khodorkovsky."[1729]

1322. Respondent also states that it is not estopped from invoking Claimants' unclean hands in this arbitration by any failure to take prompt action.[1730]   Respondent submits that Claimants have failed to satisfy the legal standard for estoppel.[1731]   This standard, argues Respondent, was confirmed by the ICJ in the *North Sea Continental Shelf Cases*:

> [I]t appears to the Court that only the existence of a situation of estoppel could suffice to lend substance to this contention, -- that is to say if the Federal Republic were now precluded from denying the applicability of the conventional regime, by reason of part conduct, declarations, etc., <u>which</u> not only <u>clearly and consistently evinced acceptance</u> of that regime, but <u>also had caused Denmark or the Netherlands, in reliance on such conduct, detrimentally to change position or suffer some prejudice</u>.  Of this there is no evidence whatever in the present case.[1732]

---

[1727]   *Ibid.* ¶ 1580.

[1728]   Counter-Memorial ¶ 909.

[1729]   *Ibid.* ¶ 933.

[1730]   Rejoinder ¶ 1597.

[1731]   *Ibid.* ¶¶ 1588–98.

[1732]   *Ibid.* ¶ 1589, quoting *North Sea Continental Shelf (Federal Republic of Germany/Denmark and Federal Republic of Germany/Netherlands)*, Judgment, 20 February 1969, ICJ Reports 1969, p. 3 ¶ 30, Exh. R-4208; *see also* ¶¶ 1590–92, citing *Delimitation of the Maritime Boundary in the Gulf of Maine Area (Canada/U.S.)*, Judgment, 12 October 1984, ICJ Reports 1984, p. 246 ¶ 145, Exh. R-4209; *Case of the Land and Maritime Boundary (Cameroon/Nigeria)*, Preliminary Objections, Judgment, 11 June 1998, ICJ Reports 1998, p. 275 ¶ 57, Exh. R-4210; *Land, Island and Maritime Frontier Dispute (El Salvador/Honduras)*, Application by Nigeria for Permission to Intervene, Judgment, 13 September 1990, ICJ Reports 1990, p. 92 ¶ 63, Exh. R-4211; *Aerial Incident of 10 August 1999 (Pakistan v. India)*, Jurisdiction of the Court, Judgment, 21 June 2000, ICJ Reports 2000, p. 12 ¶ 45, Exh. R-4212; *Legality of Use of Force (Serbia and Montenegro v. Canada)*, Preliminary Objections, Judgment, 15 December 2004, ICJ Reports 2004, p. 429 ¶ 42, Exh. R-4213; WTO, Guatemala—Definitive Anti-Dumping Measures On Grey Portland Cement From Mexico, Report of the Panel, 24 October 2000 ¶¶ 8.23–8.24, Exh. R-4214; WTO, Argentina—Definitive Anti-Dumping Duties On Poultry From Brazil, Report of the Panel, 22 April 2003 ¶ 7.39, Exh. R-4215; *Pope & Talbot Inc. v. The Government of Canada*, UNCITRAL, Interim Award, 26 June 2000 ¶ 111, Exh. C-953.

1323. Respondent submits that Claimants have failed to identify an unequivocal representation by Respondent.   In that regard, Respondent argues that Claimants' reliance on Respondent's alleged failure to challenge illegalities earlier does not amount to an unequivocal representation.   Respondent also submits that Claimants have failed to establish that they changed their conduct to their detriment in reliance on said representation.   Particularly regarding the alleged abuses of the Cyprus-Russia DTA, Respondent contends it raised its objection to Hulley's and VPL's alleged violations in these arbitrations as early as October 2006, and thus, argues Respondent, "Claimants' further suggestion that Respondent might be estopped because it did not also raise these abuses 'in an appropriate forum' is absurd."[1733]

1324. Respondent adds that informal or *contra legem* acceptance of an investment by the host State's authorities that is illegal under the host State's domestic law, or based on covert arrangements unknown to the host State, cannot provide a basis for estoppel.   In support, Respondent relies on the *Fraport* award.[1734]

1325. Finally, Respondent rejects Claimants proportionality argument, stating that it is based on "rules governing countermeasures by an injured State in inter-State relations."[1735]   In the words of Respondent: "the legality requirement excludes illegal investments from the scope of ECT protection.   As a result it is not that a host State is not justified in breaching obligations with respect to illegal investments, but instead that it has no treaty obligations in the first instance."[1736]

### (b)   Claimants' Position

1326. Claimants object that their "unclean hands," even if proven by Respondent, could have no impact on their claims in these arbitrations because: (a) the ECT does not contain any principle of "unclean hands"; (b) no principle of "unclean hands" has been recognized as a general principle of law; and (c) the instances of "unclean hands" alleged by Respondent are "collateral illegalities" that do not fall within the parameters of any "unclean hands" doctrine.

1327. Claimants assert that it is "impossible to find any textual basis in the [ECT] for the

---

[1733]   *Ibid.* ¶¶ 1593–95.

[1734]   *Ibid.* ¶ 1596, referring to *Fraport* ¶ 347.

[1735]   *Ibid.* ¶¶ 1584–7.

[1736]   *Ibid.* ¶ 1586.

Respondent's contention."[1737]  They add that the introductory note to the ECT—a note which Claimants contend is not an official document or interpretation of the ECT—confers an obligation to strengthen the rule of law on States parties, rather than on the investor.[1738] Claimants highlight that Respondent chose not to quote the remainder of the note, which goes on to state that the ECT's aim of strengthening the rule of law on energy issues is to be accomplished "by creating a level playing field of rules to be observed by all participating governments, thus minimising the risks associated with energy-related investments and trade."[1739]  In this regard, Claimants contend that denying a claimant access to a forum for resolving its claims altogether would violate, rather than support, the rule of law.[1740]

1328. Claimants seek to distinguish the *Phoenix* and *Hamester* ICSID awards relied upon by Respondent.  Claimants highlight that the statement relied on by Respondent to infer that a jurisdictional requirement of compliance with host State laws is implicit, even when not stated, is *obiter dictum* on account of the BIT provisions being applied by those tribunals.[1741] Similarly, Claimants submit that any reliance on the *Plama* award to insert a jurisdictional requirement of "clean hands" into the relevant treaty is incorrect. Claimants submit that in the *Plama* decision on jurisdiction, the tribunal considered and rejected an argument that the illegality of the investment could affect its capacity to hear the dispute.[1742]

1329. Further, Claimants emphasize that the bar for recognition of general principles of international law is set "extremely high".[1743]  Claimants assert that Respondent's "unclean hands" theory fails to meet this high threshold.

1330. Claimants allege that neither the PCIJ nor the ICJ have ever endorsed "unclean hands" as a general principle of law.[1744]  They also argue that the inter-state cases relied on by Respondent are inapposite to this arbitration as they concern "situations in which two sovereign States have

---

[1737]  Reply ¶ 1029.

[1738]  *Ibid.* ¶ 1100.

[1739]  *Ibid.* ¶ 1101.

[1740]  *Ibid.* ¶ 1102.

[1741]  *Ibid.* ¶ 1098, referring to *Phoenix* ¶ 101, Exh. R-1078; *Hamester* ¶ 123–24, Exh. R-1079.

[1742]  *Ibid.* ¶ 1099, referring to *Plama*, Exh. C-994.

[1743]  *Ibid.* ¶ 1039.

[1744]  *Ibid.* ¶¶ 1040–55.

assumed an identical or reciprocal obligation."[1745]   Claimants further argue that the awards of mixed claims commissions are of little guidance, as they deal mostly with diplomatic protection and are of "ancient vintage."  In support, Claimants cite the *Saba Fakes v. Turkey* ICSID award, in which the tribunal held that the "rules of customary international law applicable in the context of diplomatic protection do not apply as such to investor-State arbitration."[1746]

1331.   Claimants note that the ILC Articles on State Responsibility and Articles on Diplomatic Protection do not contain a principle of "unclean hands."[1747]   They also argue that most scholars reject the existence of an "unclean hands" general principle altogether, while its proponents argue that it should be subject to certain well-defined limits.[1748]

1332.   Claimants also submit that the investment tribunal awards relied on by Respondent in support of a general principle of "unclean hands" were decided on other grounds and that Respondent's analysis of these awards is incomplete and misleading.[1749]   According to Claimants, in each of the ICSID awards cited by Respondent—*Plama*, *Phoenix*, *Hamester* and *Inceysa Vallisoletana, S.L. v. Republic of El Salvador* ("**Inceysa**")—the tribunal's decision rested on a clause in the relevant BIT conditioning jurisdiction on compliance by the investor with the laws of the host State.[1750]

1333.   Furthermore, Claimants argue that even if Respondent can make the case for a general principle of "unclean hands" or a legality requirement under the ECT, Respondent's theory as applied to this case rests on allegations of collateral illegalities unrelated to either the making of

---

[1745]   *Ibid.* ¶¶ 1040, 1055.

[1746]   *Ibid.* ¶¶ 1056–67, referring to *Saba Fakes* ¶ 69, Exh. C-1537.

[1747]   *Ibid.* ¶¶ 1068–71.

[1748]   *Ibid.* ¶¶ 1072–77.  For scholars rejecting the principle, Claimants cite to: Jean Salmon, ed., Dictionnaire de droit international public, 2001, pp. 677–78, Exh. C-1613 ; Luis Garcia-Arias, *La doctrine des «Clean Hands» en droit international public*, 1960, 30 *Annuaire des anciens auditeurs de l'académie de droit* 14, p. 18, Exh. R-1075; ILC, Sixth report on diplomatic protection by John Dugard, Special Rapporteur, 57th Session, 2 May – 5 August 2005, U.N. Doc. A/CN.4/546 ¶ 15, Exh. C-1678; Charles Rousseau, Droit international public, tome V, Les Rapports conflictuels ¶ 170, Exh. C-1612.  For proponents of the principle, with limits, Claimants cite to: Bin Cheng, General Principles of Law as Applied by International Courts and Tribunals, pp. 157–58, Exh. R-1054; Sir Gerald Fitzmaurice, *The General Principles of International Law Considered From the Standpoint of the Rule of Law*, 1957, 92 Collected Courses of the Hague Academy of International Law 1, p. 119, Exh. R-1053.

[1749]   *Ibid.* ¶ 1094.

[1750]   *Ibid.* ¶ 1094–1105, referring to *Plama*, Exh. C-994; *Inceysa Vallisoletana, S.L. v. El Salvador*, ICSID Case No. ARB/03/26, Award, 2 August 2006, Exh. R-1083 (hereinafter "*Inceysa*"); *Phoenix*, Exh. R-1078; *Hamester*, Exh. R-1079.

Claimants' investments or their claims in these arbitrations.[1751]

1334. Claimants submit that even when interpreting treaty provisions expressly requiring compliance with host State laws as a condition of jurisdiction, investment tribunals have strictly construed such provisions.[1752]   Claimants submit that investment tribunals have only subjected the initial making of the investment to a legality test.   They also assert that the limited temporal scope employed by investment tribunals renders alleged pre-investment conduct irrelevant,[1753] and limits its substantive scope, *e.g.*, by extending only to host State laws "governing the admission of foreign investments in its territory."[1754]   Claimants emphasize that misconduct unrelated to the making of an investment, or which concerns minor violations, has been disregarded by investment tribunals.[1755]

1335. Claimants also submit that Anglo-American jurisprudence confirms that alleged illegalities must have an "immediate" and "necessary" relation to a claimant's cause of action.[1756]

1336. It follows, argue Claimants, that none of Respondent's allegations are covered by any principle of "unclean hands".  The actions complained of by Respondent with respect to the acquisition of Yukos pre-date Claimants' investments, depriving the Tribunal of jurisdiction *ratione temporis* over those actions.[1757]   The alleged abuses of the Cyprus-Russia DTA do not, according to Claimants, have the required "immediate" or "necessary" relation to Claimants' claims.[1758]   Claimants argue that to bar Hulley and VPL permanently from bringing claims under the ECT for having claiming benefits under the Cyprus-Russia DTA to which they were not entitled rests on an "impossibly broad interpretation" of the "unclean hands" concept.[1759]

1337. Claimants also point out that only the allegations of DTA abuses concern the conduct of Claimants themselves, while the other 24 allegations concern the conduct of persons other than Claimants.  Claimants contend that Respondent provides no basis on which the conduct of these

---

[1751]   *Ibid.* ¶¶ 1134–38.

[1752]   *Ibid.* ¶ 1105.

[1753]   *Ibid.* ¶¶ 1106–12.

[1754]   *Ibid.* ¶¶ 1118–19.

[1755]   *Ibid.* ¶ 1120.

[1756]   *Ibid.* ¶¶ 1105, 1078, 1134.

[1757]   *Ibid.* ¶ 1135.

[1758]   *Ibid.* ¶ 1137.

[1759]   *Ibid.*

third parties could render Claimants' hands "unclean".[1760]

1338. Claimants further assert that, even if any principle of "unclean hands" is potentially applicable in the situation at hand, Respondent is estopped from raising matters in these arbitrations of which it has long been aware, but has never challenged.[1761]  Claimants argue that acquiescence, or the silence or absence of protest in circumstances which generally call for a positive reaction signifying an objection, may "in and of itself" result in estoppel, where the other elements of estoppel are not made out.[1762]

1339. In particular, Claimants reject Respondent's allegations with respect to the creation and original acquisition of Yukos in 1995.  Claimants submit that it was Respondent that "planned, organized, conducted and completed the privatization of the Russian Federation's property through the loans-for-shares program, including the privatization of Yukos."[1763]  Similarly, Claimants highlight that Respondent did not take legal action against Claimants for any of the alleged violations of the Cyprus-Russia DTA by Hulley and VPL.  Claimants underline that Respondent must have had knowledge of many, if not all, of the alleged violations "as early as October 2003, through the searches and seizures of documents at the Moscow premises of GML MS, or at least as early as October 6, 2006 when the Respondent first raised the matter in these arbitrations."[1764]

1340. Claimants also submit that, even if an "unclean hands" general principle existed, it would not confer upon States the right to violate investors' rights.[1765]  Drawing an analogy to counter-measures, Claimants refer to Articles 49 and 54 of the ILC Articles on State Responsibility and to the ILC Commentary on the provisions, which states that such measures "are not intended as a form of punishment for wrongful conduct, but as an instrument for achieving compliance with the obligations of the responsible State."[1766]

1341. The ILC Commentary further emphasizes that proportionality is a stand-alone requirement, such that even where a counter-measure is carried out for a permissible purpose, it must still be

---

[1760]   *Ibid.* ¶ 1136.

[1761]   *Ibid.* ¶ 1181.

[1762]   *Ibid.* ¶ 1183.

[1763]   *Ibid.* ¶ 1188.

[1764]   *Ibid.* ¶ 1189.

[1765]   *Ibid.* ¶ 1191.

[1766]   *Ibid.* ¶ 1194.

proportionate to the original breach.[1767]

1342. Claimants submit that the need to weigh the proportionality of Respondent's response to the illegalities it alleges against Claimants provides further reason for rejecting Respondent's "unclean hands" objection to jurisdiction/admissibility.  In Claimants' own words: "it is for the tribunal to assess such allegations . . . in its consideration of the merits of the investor's claims, bearing in mind that any response by the host State to any alleged illegality must comport with its international obligations."[1768]

### 4.   Tribunal's Decision

1343. Article 26(6) of the ECT provides that "[a] tribunal established under paragraph (4) shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law."

1344. Article 31 of the VCLT, which is widely recognized as reflecting customary international law, provides in its first paragraph that "[a] treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose."

1345. Looking first at the text of the ECT, the Tribunal observes that it does not contain any express reference to a principle of "clean hands."  Nor, unlike some other investment treaties, does the ECT contain an express requirement that investments be made in accordance with the laws of the host country.[1769]  These points are not disputed by the Parties.

1346. In the absence of any specific textual hook, the Tribunal must consider whether, given the need to interpret treaties in good faith and take account of their object and purpose, the ECT as a whole may be understood as conditioning the protection of investments on their legality, or on the good faith of the investor.  The Tribunal addresses this question in subsection (a) below.

---

[1767] *Ibid.* ¶ 1195.

[1768] *Ibid.* ¶ 1197.

[1769] *See e.g.* the bilateral investment treaties applied in *Fraport*, Exh. R-1006 (Germany–Philippines BIT:  "[t]he term investment shall mean any kind of asset accepted in accordance with the respective laws and regulations of either Contracting State"); *Inceysa*, Exh. R-1083 (Spain–El Salvador BIT:  "[e]ach Contracting Party shall protect in its territory investments made, in accordance with its legislation"; "[the BIT shall] apply to investments made . . . in accordance with the laws"); *Phoenix*, Exh. RE-1078 (Israel–Czech Republic BIT:  "[t]he term 'investment' shall comprise any kinds of asset invested . . . in accordance with the respective laws and regulations."

1347. In addition to any potential limitation on the protection of investments inherent in the ECT, a principle of "clean hands" could be relevant to this arbitration pursuant to Article 26(6) of the ECT if it were an "applicable rule[. . .] or principle[. . .] of international law."  The Parties dispute whether "clean hands" exists as a "general principle of international law recognized by civilized nations" in the meaning of Article 38(1)(c) of the Statute of the ICJ.  The Tribunal addresses this question in subsection (b) below.

1348. Finally, in subsection (c) below, the Tribunal considers whether any of the 28 instances of "bad faith and illegal conduct" of which Respondent accuses Claimants fall within the scope of any "unclean hands" or similar principle applicable in the ECT context.

### (a)    Can a Clean Hands Principle or Legality Requirement be Read into the ECT?

1349. The Tribunal notes that there is support in the decisions of tribunals in investment treaty arbitrations for the notion that, even where the applicable investment treaty does not contain an express requirement of compliance with host State laws (as is the case with the ECT), an investment that is made in breach of the laws of the host State may either: (a) not qualify as an investment, thus depriving the tribunal of jurisdiction; or (b) be refused the benefit of the substantive protections of the investment treaty.

1350. The *Plama* tribunal, deciding a case under the ECT, thus stated that the "substantive protections of the ECT cannot apply to investments made contrary to law."[1770]  It acknowledged that the ECT "does not contain a provision requiring the conformity of the Investment with a particular law," but stated that "[t]his does not mean . . . that the protections provided for by the ECT cover all kinds of investments, including those contrary to domestic and international law."[1771]  The tribunal explained that, in that case, granting the claimant protection would have "be[en] contrary to the principle *nemo auditor propriam turpitudinem allegans*" and "the basic notion of international public policy—that a contract obtained by wrongful means (fraudulent misrepresentation) should not be enforced by a tribunal."[1772]

1351. Other arbitral tribunals have stated in *obiter dicta* that the principle that an investment "will not be protected if it has been created in violation of national or international principles of good

---

[1770]  *Plama*, Exh. C-994 ¶ 139.

[1771]  *Ibid.* ¶ 138.

[1772]  *Ibid. ¶* 143.

faith" or "of the host State's law" is a "general principle[. . . ] that exist[s] independently of specific language" in an investment treaty.[1773]

1352. The Tribunal agrees with this proposition.  In imposing obligations on States to treat investors in a fair and transparent fashion, investment treaties seek to encourage legal and *bona fide* investments.  An investor who has obtained an investment in the host State only by acting in bad faith or in violation of the laws of the host state, has brought itself within the scope of application of the ECT through wrongful acts.  Such an investor should not be allowed to benefit from the Treaty.

1353. For reasons that will become apparent further in this chapter, the Tribunal does not need to decide here whether the legality requirement it reads into the ECT operates as a bar to jurisdiction or, as suggested in *Plama*, to deprive claimants of the substantive protections of the ECT.

1354. However, the Tribunal does need to address Respondent's contention that the right to invoke the ECT must be denied to an investor not only in the case of illegality in the *making* of the investment but also in its *performance*.  The Tribunal finds Respondent's contention unpersuasive.

1355. There is no compelling reason to deny altogether the right to invoke the ECT to any investor who has breached the law of the host State in the course of its investment.  If the investor acts illegally, the host state can request it to correct its behavior and impose upon it sanctions available under domestic law, as the Russian Federation indeed purports to have done by reassessing taxes and imposing fines.  However, if the investor believes these sanctions to be unjustified (as Claimants do in the present case), it must have the possibility of challenging their validity in accordance with the applicable investment treaty.  It would undermine the purpose and object of the ECT to deny the investor the right to make its case before an arbitral tribunal based on the same alleged violations the existence of which the investor seeks to dispute on the merits.

---

[1773] *Hamester* ¶¶ 123–24, Exh. R-1079. *See also Phoenix* ¶ 101, Exh. R-1078 ("it is the Tribunal's view that this condition – the conformity of the establishment of the investment with the national laws – is implicit even when not expressly stated in the relevant BIT"); *SAUR* ¶ 308, Exh. R-4186 ("[the tribunal] is aware that the finality of the investment arbitration system is to protect only lawful and bona fide investments. Whether or not the BIT between France and Argentina mentions the requirement that the investor act in conformity with domestic legislation does not constitute a relevant factor. The condition of not committing a serious violation of the legal order is a tacit condition, inherent to any BIT as, in any event, it is incomprehensible that a State offer the benefit of protection through arbitration if the investor, in order to obtain such protection, has acted contrary to the law.")

1356. Respondent has not been able to cite any apposite authority in support of its contention.  The statements of investment tribunals it relies on were all made *obiter* and are too vague to allow any certain conclusions to be drawn as to their intended meaning.  For example, the statement in *Fraport* that illegal acts in the course of an investment "might be a defense to claimed substantive violations" appears to suggest that, in some cases, the State's actions will have been justified as an appropriate response to the investor's violations of national law.[1774]  As is clear from the decision, the statement by the *Fraport* tribunal does not imply the unavailability of the substantive protections of the treaty, but rather concludes that the respondent State has not incurred any liability under the treaty.

## (b)   Does the "Clean Hands" Doctrine Constitute a "General Principle of Law Recognized by Civilized Nations"?

1357. Since the Tribunal will not read into the ECT any legality requirement with respect to the conduct of the investment, it must consider Respondent's more general proposition that a claimant who comes before an international tribunal with "unclean hands" is barred from claiming on the basis of a "general principle of law."

1358. The Tribunal is not persuaded that there exists a "general principle of law recognized by civilized nations" within the meaning of Article 38(1)(c) of the ICJ Statute that would bar an investor from making a claim before an arbitral tribunal under an investment treaty because it has so-called "unclean hands."

1359. General principles of law require a certain level of recognition and consensus.  However, on the basis of the cases cited by the Parties, the Tribunal has formed the view that there is a significant amount of controversy as to the existence of an "unclean hands" principle in international law.

1360. Respondent has demonstrated that certain principles associated with the "clean hands" doctrine, such as *exceptio non adimpleti contractus* and *ex iniuria ius non oritur* have been endorsed by the PCIJ and the ICJ.[1775]  However, the Tribunal notes that Judge Simma in his separate opinion

---

[1774]   *Fraport*, Exh. R-1006 ¶¶ 395, 345.  The Tribunal notes that the Chairman, Mr. Fortier, was the Chairman of the Fraport tribunal.

[1775]   *See The Diversion of Water from the Meuse (Netherlands v. Belgium)*, Judgment, 28 June 1937, Individual Opinion of Judge Hudson, PCIJ Series A/B No. 70, p. 73, 77, Exh. C-1502 ("[i]t would seem to be an important principle of equity that where two parties have assumed an identical or reciprocal obligation, one party which is engaged in continuing non-performance of that obligation should not be permitted to take advantage of a similar non-performance of that obligation by the other party"); *Gabčíkovo-Nagymaros*, ¶ 133 Exh. C-948 ("[t]he Court, however, cannot

in the *Application of the Interim Accord of 13 December 1995* raises doubt as to the continuing existence of the *exceptio non adimpleti contractus* principle.[1776]

1361. With regard to the "unclean hands" doctrine proper, Respondent has referred to the dissenting opinion of Judge Schwebel (a member of this Tribunal) in the *Military and Paramilitary Activities in and against Nicaragua* ICJ case, where he concluded that Nicaragua's claims against the United States should fail because Nicaragua had "not come to Court with clean hands."[1777]   Respondent also referred to other dissenting ICJ and PCIJ opinions where the principle of "unclean hands" was invoked (albeit often without referring to it by name).[1778]

1362. However, as Claimants point out, despite what appears to have been an extensive review of jurisprudence, Respondent has been unable to cite a single majority decision where an international court or arbitral tribunal has applied the principle of "unclean hands" in an inter-State or investor-State dispute and concluded that, as a principle of international law, it operated as a bar to a claim.

1363. The Tribunal therefore concludes that "unclean hands" does not exist as a general principle of international law which would bar a claim by an investor, such as Claimants in this case.

---

disregard the fact that the Treaty has not been fully implemented by either party for years, and indeed that their acts of commission and omission have contributed to creating the factual situation that now exists. Nor can it overlook that factual situation . . . when deciding on the legal requirements for the future conduct of the Parties.  This does not mean that facts—in this case, facts which flow from wrongful conduct—determine the law. The principle *ex injuria jus non oritur* is sustained by the Court's finding that the legal relationship created by the 1977 Treaty is preserved and cannot in this case be treated as voided by unlawful conduct.")

[1776]   *Application of the Interim Accord of 13 December 1995 (the Former Yugoslav Republic of Macedonia v. Greece)*, Judgment, 5 December 2011, Separate Opinion of Judge Simma, ICJ Reports 2011, p. 695 ¶¶ 19–20, Exh. C-1545.

[1777]   *Case Concerning Military and Paramilitary Activities in and against Nicaragua (Nicaragua v. United States of America)*, Merits, Judgment, 27 June 1986, Dissenting Opinion of Judge Schwebel, ICJ Reports 1986, p. 259 ¶ 268, Exh. R-1071.

[1778]   *Legal Status of Eastern Greenland (Denmark v. Norway)*, Judgment, 5 April 1933, Dissenting Opinion of Judge Anzilotti, PCIJ Series A/B No. 53, p. 76, 95, Exh. R-1073; *Interpretation of Peace Treaties with Bulgaria, Hungary and Romania* (Second Phase), Advisory Opinion, 18 July 1950, Dissenting Opinion of Judge Read, ICJ Reports 1950, p. 231, 244, Exh. R-1074; *Case Concerning United States Diplomatic and Consular Staff in Tehran (United States of America v. Iran)*, Judgment, 24 May 1980, Dissenting Opinion of Judge Morozov, ICJ Reports 1980, p. 51 ¶ 3, Exh. R-1087; *Case Concerning Arrest Warrant of 11 April 2000 (Democratic Republic of the Congo v. Belgium)*, Judgment, 14 February 2002, Dissenting Opinion of Judge van den Wyngaert, ICJ Reports 2002, p. 137 ¶ 84, Exh. R-1072 ("The Congo did not come to the Court with clean hands").

(c)    **Would any Instances of Claimants' Alleged "Bad Faith and Illegal" Conduct be Caught by a Legality Requirement Read into the ECT?**

1364. To summarize, the Tribunal accepts that a claimant may be barred from seeking relief under the ECT if its investment was made in bad faith or in violation of the laws of the host state.

1365. It follows that the alleged instances of "unclean hands" listed in Subsections IX.B.2(b), (c) and (d) above—specifically, the instances related to the alleged abuse of the Russia–Cyprus DTA, the tax optimization scheme and the obstruction of Russia's enforcement of tax claims against Yukos, all of which relate to actions that were taken after the making of Claimants' investment, cannot have any impact on the availability of ECT protection for Claimants.

1366. This leaves for the Tribunal's consideration Respondent's allegations of bad faith and illegal conduct in the acquisition of Yukos and the subsequent consolidation of control and ownership over Yukos and its subsidiaries, set out in Subsection IX.B.2(a) above.

1367. It is common ground between the Parties that these actions were taken before Claimants became shareholders of Yukos in 1999, 2000 and 2001 and, consequently, were not taken by Claimants themselves, but by other actors, such as Bank Menatep and the Oligarchs.[1779] Claimants submit that these actions are thus irrelevant to these arbitrations, as the conduct complained of was not that of Claimants' themselves and, in any event, pre-dates Claimants' investment.[1780]

1368. Respondent replies that, on the contrary, the process of the acquisition of the Yukos shares by Claimants should not be seen in isolation but as an integral part of the "making of the investment" by Claimants.  Respondent's argument was most convincingly put by Dr. Claudia Annacker during the Hearing.  Dr. Annacker argued as follows:

> Contrary to Claimants' position, the serious illegalities that infect the entire process of the acquisition of the Yukos shares by Claimants cannot simply be ignored because the transfer of the shares to the Claimants . . . viewed in isolation, is asserted to be legal. These illegalities cannot somehow be cured through multiple transfers within this network of the oligarchs' offshore companies from one shell company to another.
>
> Indeed, the making of an investment is often a process rather than an instantaneous act, and often comprises a number of diverse transactions. These transactions must be treated as an

---

[1779]    *See* Counter-Memorial ¶¶ 910–13, explaining the alleged illegal conduct of Bank Menatep and the Oligarchs in the acquisition of Yukos shares by the Oligarchs in 1995 and 1996.

[1780]    *See* Reply ¶¶ 1135–36.

> integrated whole. The transactions may have a separate legal existence, but they have a common economic aim . . .
>
> Indeed, it would be incompatible with economic reality and undermine the integrity of the legal process if serious irregularities – illegalities – infecting the process of the making of the investment would not affect the availability of investment treaty protection, whether or not a specific transaction, part of the process, if viewed in isolation, might be legal.
>
> Now, this conclusion applies a fortiori where a claimant is not unrelated to the persons or entities that committed these illegalities, but is an investment vehicle owned and controlled by the same persons who committed the illegalities . . . Otherwise, investment treaty protection could be achieved simply by shifting investments through layers of ownership and control to launder illegal investments . . .
>
> While Claimants' acquisition of their shares may be a separate legal transaction, there is a common economic aim pursued by the same oligarchs . . .[1781]

1369. The Tribunal agrees with Respondent that an examination of the legality of an investment should not be limited to verifying whether the last in a series of transactions leading up to the investment was in conformity with the law.  The making of the investment will often consist of several consecutive acts and all of these must be legal and *bona fide*.

1370. In the present case, however, Respondent has failed to demonstrate that the alleged illegalities to which it refers are sufficiently connected with the final transaction by which the investment was made by Claimants.  The transactions by which each Claimant acquired its investment were their purchases of Yukos shares.  As established in the Interim Award, these purchases were legal and occurred starting in 1999.[1782]  On the other hand, the alleged illegalities connected to the acquisition of Yukos through the loans-for-shares program occurred in 1995 and 1996, at the time of Yukos' privatization.  They involved Bank Menatep and the Oligarchs, an entity and persons separate from Claimants, one of which—Veteran—had not even come into existence.[1783]  With respect to Respondent's other allegations, regarding profit skimming and the oppression of minority shareholders, it is also clear to the Tribunal that they are not part of the transaction or transactions by which each Claimant acquired their interest in Yukos.

1371. Respondent relies on *Anderson* for the proposition that "illegalities infecting an investment that pre-date a claimant's acquisition of the investment are not irrelevant or outside the tribunal's jurisdiction *ratione temporis*."[1784]  However, the tribunal in that case examined and found to be

---

[1781]   Transcript, Day 19 at 171–174 (Respondent's closing).

[1782]   Interim Awards ¶¶ 431 (YUL); 430 (Hulley); 474 (VPL).

[1783]   VPL was incorporated in 2001 (Interim Award ¶ 44 (VPL).

[1784]   Rejoinder ¶ 1571, referring to Anderson, Exh. R-4204.

illegal the very transaction through which the claimants obtained their investment, not any prior transactions made by other persons.[1785]

1372. While it is true that the claimants in *Anderson* were not blamed for the illegality that tainted their investment, nevertheless it is the very transaction by which their respective investments were obtained that was considered illegal by the tribunal, and led it to decline jurisdiction.

### (d)   Conclusion

1373. The Tribunal concludes that Respondent's "unclean hands" argument fails as a preliminary objection.  It does not operate to deprive the Tribunal of its jurisdiction in this arbitration, render inadmissible any of the Claimants' claims or otherwise bar Claimants' from invoking the substantive protections of the ECT.

1374. However, as will be seen in Chapter X.E and Part XII, some of the instances of Claimants' "illegal and bad faith" conduct complained of by Respondent in the context of this preliminary objection, could have an impact on the Tribunal's assessment of liability and damages.

### C.   RESPONDENT'S OBJECTIONS UNDER ARTICLE 21 OF THE ECT

#### 1.   Introduction

1375. Another important threshold issue in this arbitration arises from Respondent's objection under Article 21 of the ECT.  Respondent argues that, pursuant to this complex provision (containing a "carve out" *from* the ECT for "Taxation Measures" at Article 21(1) and a "claw back" *for* Article 13 of the ECT in relation to "taxes" at Article 21(5)), the Tribunal lacks jurisdiction over claims with respect to "Taxation Measures" other than those based on expropriatory "taxes".[1786]  Claimants argue that the objection is without merit since, *inter alia*, Article 21 does not apply to actions—including expropriations—carried out "under the guise of taxation."[1787]

---

[1785]   *Ibid*.

[1786]   *See e.g.*, Respondent's Post-Hearing Brief ¶¶ 162–72.

[1787]   *See e.g.*, Claimants' Post-Hearing Brief ¶¶ 203–30.

1376. The relevant provisions of Article 21 of the ECT for present purposes are paragraphs 1 (the "carve-out"), 5 (the "claw-back") and 7 (definitions), which in the English version[1788] read as follows:

> (1) Except as otherwise provided in this Article, nothing in this Treaty shall create rights or impose obligations with respect to Taxation Measures of the Contracting Parties.  In the event of any inconsistency between this Article and any other provision of the Treaty, this Article shall prevail to the extent of the inconsistency.
>
> . . .
>
> (5)  (a)  Article 13 shall apply to taxes.
>
>   (b)  Whenever an issue arises under Article 13, to the extent it pertains to whether a tax constitutes an expropriation or whether a tax alleged to constitute an expropriation is discriminatory, the following provisions shall apply:
>
>   (i)  The Investor or the Contracting Party alleging expropriation shall refer the issue of whether the tax is an expropriation or whether the tax is discriminatory to the relevant Competent Tax Authority.  Failing such referral by the Investor or the Contracting Party, bodies called upon to settle disputes pursuant to Article 26(2)(c) or 27(2) shall make a referral to the relevant Competent Tax Authorities;
>
>   (ii)  The Competent Tax Authorities shall, within a period of six months of such referral, strive to resolve the issues so referred.  Where nondiscrimination issues are concerned, the Competent Tax Authorities shall apply the non-discrimination provisions of the relevant tax convention or, if there is no non-discrimination provision in the relevant tax convention applicable to the tax or no such tax convention is in force between the Contracting Parties concerned, they shall apply the non-discrimination principles under the Model Tax Convention on Income and Capital of the Organisation for Economic Co-operation and Development;
>
>   (iii)  Bodies called upon to settle disputes pursuant to Article 26(2)(c) or 27(2) may take into account any conclusions arrived at by the Competent Tax Authorities regarding whether the tax is an expropriation.  Such bodies shall take into account any conclusions arrived at within the six-month period prescribed in subparagraph (b)(ii) by the Competent Tax Authorities regarding whether the tax is discriminatory.  Such bodies may also take into account any conclusions arrived at by the Competent Tax Authorities after the expiry of the six-month period;
>
>   (iv)  Under no circumstances shall involvement of the Competent Tax Authorities, beyond the end of the six-month period referred to in subparagraph (b)(ii), lead to a delay of proceedings under Articles 26 and 27.
>
>   . . .

---

[1788]  The Tribunal has taken note of Claimants' highlighting of the differences in the wording of paragraphs 5 and 7 of Article 21 in some of the other official languages of the ECT.  As will be seen from the Tribunal's findings in this chapter, the Tribunal does not need to address the relevance, if any, of these differences.

(7) For the purposes of this Article:

    (a)    The term "Taxation Measure" includes:

        (i)    any provision relating to taxes of the domestic law of the Contracting Party or of a political subdivision thereof or a local authority therein;

        and

        (ii)    any provision relating to taxes of any convention for the avoidance of double taxation or of any other international agreement or arrangement by which the Contracting Party is bound.

    (b)    There shall be regarded as taxes on income or on capital all taxes imposed on total income, on total capital or on elements of income or of capital, including taxes on gains from the alienation of property, taxes on estates, inheritances and gifts, or substantially similar taxes, taxes on the total amounts of wages or salaries paid by enterprises, as well as taxes on capital appreciation.

    (c)    A "Competent Tax Authority" means the competent authority pursuant to a double taxation agreement in force between the Contracting Parties or, when no such agreement is in force, the minister or ministry responsible for taxes or their authorized representatives.

    (d)    For the avoidance of doubt, the terms "tax provisions" and "taxes" do not include customs duties.

1377. Respondent's objection under Article 21 of the ECT was originally addressed by the Parties during the jurisdictional phase of the arbitration. In its Interim Awards, the Tribunal observed that some of the arguments raised by the Parties under Article 21 went to the heart of the merits of the dispute, in that they related to the background to and motivation behind Respondent's tax assessments, enforcement measures and other conduct, and that the Tribunal would not rule on these issues in a vacuum.[1789] As a consequence, the Tribunal decided "to defer its definitive interpretation of Article 21, and its characterization of [Claimants'] claims for purposes of Article 21, to the next phase of the arbitration."[1790]

1378. As a consequence, the Parties had a further opportunity to develop their positions under Article 21 of the ECT during the merits phase of the present proceedings. Claimants' and Respondent's arguments are now summarized in turn.

### 2.    Claimants' Position

1379. Claimants argue that Article 21 of the ECT does not apply to the case at hand since Respondent's actions were "actions under the guise of taxation" rather than "*bona fide* taxation

---

[1789]    Interim Awards ¶¶ 583–84 (Hulley), ¶¶ 584–85 (YUL), ¶¶ 595–96 (VPL).

[1790]    Interim Awards ¶ 584 (Hulley), ¶ 585 (YUL), ¶ 596 (VPL).

actions"[1791] and merely a tool "to achieve a purpose that had nothing to do with taxation:  the elimination of a potential opponent and the appropriation of Yukos' assets."[1792]  According to Claimants, "[i]t is no answer for a state to say that its courts have used the [word] 'taxation' . . . in describing judgments by which they effect the dispossession of foreign investors.  If that were enough, investment protection through international law would likely become an illusion, as states would quickly learn to avoid responsibility by dressing up all adverse measures, perhaps expropriation first of all, as taxation."[1793]  Claimants refer in particular to the decisions of the *Quasar* and *RosInvestCo* tribunals to support their view that in a case such as this one a carve-out with regard to taxation measures cannot apply.[1794]

1380.  In addition, Claimants suggest that the carve-out under Article 21 of the ECT is narrower than that in other treaties in that it only applies to the enactment of "provisions" relating to taxes, but not to the application of these provisions and the "collection and enforcement" of taxes.[1795]  Claimants refer to the ECT's *travaux préparatoires* in this regard.[1796]  In particular, they point out that during the negotiations of the ECT, the French delegation, in response to a memorandum of the Legal Sub-Group noting that "taxation measures" were identified in an illustrative manner, took the view that Article 21(7) of the ECT would constitute a definition and that, therefore, "includes" in that provision would have to be replaced by "means".[1797]

1381.  Claimants say that they "have no issue with the right of the Russian Federation to enact tax provisions or with the content of Russian tax law," but only with "the manner in which Russian tax law was grossly distorted, misapplied and abused to effect the destruction of Yukos."[1798]

---

[1791]  Transcript, Day 2 at 4 (Claimants' opening); Transcript, Day 17 at 156 (Claimants' closing); Claimants' Post-Hearing Brief ¶ 204.

[1792]  Transcript, Day 17 at 170 (Claimants' closing); Claimants' Post-Hearing Brief ¶ 206.

[1793]  Transcript, Day 17 at 171 (Claimants' closing) (quoting *Quasar* ¶ 179, Exh. R-3383).

[1794]  Transcript, Day 2 at 4–8 (Claimants' opening); Transcript, Day 17 at 168–69 (Claimants' closing); Claimants' Opening Slides, pp. 219–20; Claimants' Post-Hearing Brief ¶ 207 (discussing *RosInvestCo* ¶ 628, Exh. C-1049; *Renta4 S.V.S.A. v. Russian Federation*, SCC Arbitration V024/2007, Award on Preliminary Objections, 20 March 2009 ¶ 74, Exh. C-1048).

[1795]  Transcript, Day 2 at 10 (Claimants' opening); Transcript, Day 17 at 174 (Claimants' closing); Claimants' Opening Slides, pp. 226–30; Claimants' Post-Hearing Brief ¶¶ 204, 208.

[1796]  Claimants' Post-Hearing Brief ¶ 211.

[1797]  Memorial ¶ 1034 n.1418.

[1798]  Claimants' Post-Hearing Brief ¶ 209.

Accordingly, Claimants take the view that for this reason alone Article 21 of the ECT cannot apply.[1799]

1382. Claimants also take the view that, in any event, the ECT's protection would still apply with regard to the expropriation standard under Article 13 of the ECT, due to the claw-back provision in Article 21(5) of the ECT, which they say must have the same scope as Article 21(1) of the ECT.[1800]   Claimants suggest that Respondent's interpretation (according to which the claw-back provision would be narrower in scope than the taxation carve-out) would lead to "a gaping hole in the ECT where investors would stand completely unprotected from expropriatory taxation," thus "defeat[ing] the object and purpose of the 'claw-back' and of the ECT itself."[1801]   Claimants also dispute Respondent's argument that Russian law should determine the meaning of "tax" under Article 21(5) of the ECT, since "for the interpretation of a treaty, you do not look at domestic law of one of the States parties to a treaty."[1802]

1383. In any event, Claimants argue that many of Respondent's actions that they complain of have nothing to do with taxation and thus fall outside of the scope of Article 21 of the ECT.[1803]   In this regard, Claimants state that "the attacks on Yukos and related persons involved all of the following organs and entities:  the Presidential Administration, the Russian courts, Ministry of Justice, Federal Bailiff Service, Penitentiary Service, Ministry of Natural Resources, Internal Affairs, FSB, Prosecutor General's Office, Federal Property Fund, Rosneft" and included "freezes, searches and seizures," the auctioning of YNG and the forcing of Yukos into bankruptcy, all of which would "have nothing to do with taxation."[1804]

1384. Finally, Claimants assert that referring any questions with regard to taxation measures to the Russian Federation's tax authorities as envisaged under the claw-back provision of Article 21(5) of the ECT would be an exercise in futility, as the relevant Russian authorities would already have looked at the issues, the Parties' submissions would be too voluminous to be considered by any of the relevant authorities and the Tribunal would, in any event, not be

---

[1799]   Claimants' Post-Hearing Brief ¶ 209.

[1800]   Transcript, Day 2 at 10 (Claimants' opening); Transcript, Day 17 at 192 (Claimants' closing); Claimants' Post-Hearing Brief ¶¶ 204, 214–21.

[1801]   Claimants' Post-Hearing Brief ¶ 220 (emphasis in the original); Transcript, Day 17 at 190–91 (Claimants' closing).

[1802]   Transcript, Day 17 at 195 (Claimants' closing).

[1803]   Transcript, Day 2 at 11 (Claimants' opening); Transcript, Day 17 at 207 (Claimants' closing); Claimants' Post-Hearing Brief ¶¶ 204, 222–24.

[1804]   Transcript, Day 17 at 208 (Claimants' closing).

bound by any comments of these authorities.[1805]  As a consequence, Claimants argue that, even if the Tribunal were to find that Article 21(5) of the ECT applies, it should still proceed with its examination of the case without any referral to the Russian authorities.

### 3.    Respondent's Position

1385. Respondent argues that most of the actions complained of by Claimants are outside the scope of the Tribunal's scrutiny due to the taxation carve-out provision in Article 21(1) of the ECT.

1386. Respondent points out that taxation carve-outs have a number of functions, which include preserving States' sovereignty in fiscal matters, the coordination of obligations under investment treaties and double taxation treaties, and assuring that complex tax issues are addressed with the necessary expertise.[1806]  To achieve these functions, taxation carve-outs would typically be "broad, covering all aspects of the tax regime."[1807]  Respondent refers to a number of instances where investment treaty tribunals gave effect to taxation carve-outs in international investment treaties, namely the decisions in *Duke Energy v. Ecuador*, *EnCana v. Ecuador*, *El Paso International Company v. The Argentine Republic* ("*El Paso*"), *Burlington v. Ecuador* and *Nations Energy v. Panama*.[1808]

1387. With regard to the wording of Article 21(1) of the ECT, Respondent argues that the term "measures" is given a broad meaning throughout the ECT, in contradistinction to the narrower term of "laws and regulations".[1809]  As a consequence, says Respondent, an interpretation of Article 21(1) of the ECT in accordance with recognized principles of treaty interpretation shows that the provision "covers all measures taken by the legislative, executive, and judiciary in the field of taxation, whether of general or individual application."[1810]  Respondent refers to the ICJ's judgment in *Fisheries Jurisdiction (Spain v. Canada)* to support its view that

---

[1805]   Transcript, Day 17 at 200 (Claimants' closing); Claimants' Post-Hearing Brief ¶ 229.

[1806]   Transcript, Day 3 at 156–59 (Respondent's opening); Respondent's Opening Slides, pp. 454–58.

[1807]   Transcript, Day 3 at 159 (Respondent's opening).

[1808]   Transcript, Day 3 at 161–62 (Respondent's opening) (discussing *Duke Energy v. Ecuador*, ICSID ARB/04/19, Award, 18 August 2008 ¶ 188, Exh. C-993; *EnCana v. Ecuador*, LCIA UN3481, UNCITRAL, Award, 3 February 2006 ¶ 168, Exh. C-976; *El Paso Energy International Company v. The Argentine Republic*, ICSID ARB/03/15, Award, 31 October 2011 ¶ 449, Exh. C-1544/R-4190 (hereinafter "*El Paso*"); *Burlington Resources v. Ecuador*, ICSID Case ARB/08/5, Decision on Jurisdiction, 2 June 2010 ¶ 249, Exh. R-992; *Nations Energy v. Panama*, ICSID ARB/06/19, Award, 24 November 2010 ¶ 483, Exh. R-1032); Respondent's Opening Slides, pp. 458–60.

[1809]   Transcript, Day 3 at 162 (Respondent's opening); Respondent's Opening Slides, pp. 461–62; Respondent's Post-Hearing Brief ¶ 164.

[1810]   Respondent's Post-Hearing Brief ¶ 162.

"measures" has a broad ordinary meaning and that, contrary to Claimants' suggestion that "Taxation Measures" only refer to legislative "provisions", legislation and implementing measures cannot be dissociated.[1811]   According to Respondent, such a dissociation would be absurd, since "[e]very time a contracting State enforces tax legislation that is carved out, but would be inconsistent with the treatment standards in Part III, the State would incur international responsibility for breach of Part III of the Energy Charter Treaty."[1812]

1388. Respondent disputes Claimants' argument that Article 21(7) of the ECT, properly interpreted, applies only to the enactment of "provisions" relating to taxes.  Respondent points out that the word "includes" used in Article 21(7) of the ECT stands in contrast to the word "means" used elsewhere, thus suggesting that the enumeration in that provision is not exhaustive.[1813]  Respondent also argues that, if the term "Taxation Measure" were limited to provisions relating to taxes, the use of the word "includes" would not make sense, since Article 21(7) of the ECT specifically refers to both "any provision relating to taxes" in "the domestic law of the Contracting Party" and "any provision relating to taxes" in an "international agreement . . . by which the Contracting Party is bound."[1814]   Since "all provisions relating to taxes are either contained in domestic law or in international treaties," Respondent claims that there would be nothing left to add.[1815]

1389. Respondent rather suggests that "[t]he term 'Taxation Measure' has a meaning in itself" and that "it provides a benchmark to determine which measures or categories of measures, in addition to those expressly listed, constitute 'Taxation Measures' for purposes of Article 21 of the ECT."[1816]   Respondent refers to the ECT's *travaux préparatoires* to support its view that the list in Article 21(7) of the ECT is "illustrative" and "not a definition".[1817]   In particular, Respondent points out that, during the negotiations of the ECT, the Canadian delegation, in

---

[1811]   Transcript, Day 3 at 163–64, 170 (Respondent's opening) (discussing *Fisheries Jurisdiction (Spain v. Canada)*, Jurisdiction of the Court, Judgment, 4 December 1998, ICJ Reports 1998, p. 460 ¶¶ 66–67, Exh. R-1028); Respondent's Opening Slides, pp. 462–63.

[1812]   Transcript, Day 3 at 170 (Respondent's opening); Transcript, Day 21 at 173 (Respondent's rebuttal).

[1813]   Transcript, Day 21 at 171 (Respondent's rebuttal); Respondent's Opening Slides, p. 465; Respondent's Post-Hearing Brief ¶ 163.

[1814]   Transcript, Day 21 at 176 (Respondent's rebuttal).

[1815]   Transcript, Day 21 at 178 (Respondent's rebuttal).

[1816]   Transcript, Day 21 at 171–72 (Respondent's rebuttal).

[1817]   Transcript, Day 3 at 167–68 (Respondent's opening) (discussing Memorandum from the Chairman of the Legal Sub-Group to the Chairman of Working Group II, Document No. LEG-14, 5 March 1993, p. 2, Exh. R-1020); Respondent's Opening Slides, pp. 466–67.

response to a memorandum of the Legal Sub-Group noting that "taxation measures" were identified in an illustrative manner, remarked that this was intentional and that "it would be counterproductive to come up with anything more precise."[1818]   It also suggests that, while the French delegation expressed a preference for an exhaustive definition and for the word "includes" to be replaced by "means", by not proceeding with the suggested replacement, the "negotiating States chose to maintain an illustrative list."[1819]

1390.   In addition, Respondent refers to Article 21(2)(b) and (3)(b) of the ECT as implying that the term "Taxation Measure" includes the generic term "measure" "as consistently used throughout the Energy Charter Treaty."[1820]   According to Respondent, "Claimants would have this Tribunal rewrite Article 21(7)(a) to read:   'The term 'Taxation Measure' only includes provisions relating to taxes.'"[1821]   In reality, according to Respondent, "[t]he purpose of Article 21, paragraph 7(a) ECT is not to replace the term 'measures' with the term 'provisions', but to clarify that the carve-out extends to both domestic and international taxation measures."[1822] This would be in line with general treaty practice, which would show that "there is not a single taxation carve-out that is limited in scope to tax legislation."[1823]

1391.   The result of this interpretation, according to Respondent, is that "the core allegations on which Claimants base their claims are squarely within the taxation carve-out of Article 21(1)" of the ECT.[1824]

1392.   With regard to Claimants' argument that Article 21(1) of the ECT should be inapplicable to the present case, since the measures adopted by Respondent were taken, according to the Claimants, under the guise of taxation (rather than constituting "real" taxation measures),

---

[1818]   Transcript, Day 3 at 167 (Respondent's opening) (discussing Canada Department of Finance, Tax Policy Branch:  Fax from A. Castonguay to F. Mullen et al., 19 March 1993, p. 4, Exh. R-1010).

[1819]   Transcript, Day 3 at 168 (Respondent's opening) (discussing Memorandum from the Ministère du Budget of France to the ECT Secretariat, 19 March 1993, p. 3, Exh. C-1045).

[1820]   Transcript, Day 21 at 173 (Respondent's rebuttal).

[1821]   Transcript, Day 3 at 170–71 (Respondent's opening).

[1822]   Transcript, Day 3 at 169 (Respondent's opening).

[1823]   Transcript, Day 21 at 173 (Respondent's rebuttal).

[1824]   Transcript, Day 3 at 164 (Respondent's opening).

Respondent refers to the ECtHR Yukos Judgment to support its claim that the tax assessments against Yukos pursued a legitimate aim and were not politically motivated.[1825]

1393. In any event, Respondent claims, referring to the ICJ's *Fisheries Jurisdiction (Spain v. Canada)* judgment, that the question of legality can have no impact on the qualification of an act as a "taxation measure",[1826] and it suggests that measures "in apparent reliance" on taxation legislation, even if abusive, must be covered by a taxation carve-out.[1827] Respondent also refers to a number of decisions of investment treaty tribunals to support this view. In particular, Respondent quotes from the decision in *EnCana v. Ecuador*, according to which "provided a matter is sufficiently clearly connected to a taxation law or regulation (or to a procedure, requirement or practice of the taxation authorities in apparent reliance on such a law or regulation), its legality is a matter for the courts of the host State."[1828] Similarly, Respondent quotes from the decision in *Burlington v. Ecuador* as having taken the view that the claim that a State "used its tax power in bad faith . . . challenges [that State's] tax power, and therefore raises 'matters of taxation'."[1829]

1394. In addition, Respondent avers that an exception to a substantive standard (such as the carve-out of Article 21(1)) cannot logically refer to the substantive standard (such as the expropriation standard of Article 13) to determine whether or not the exception applies.[1830] Therefore, according to Respondent, "neither the standards under Article 13 . . . nor the standards under Article 10, paragraph 1 of the ECT can be used to determine the scope or the applicability of the taxation carve-out."[1831] Accordingly, Respondent claims that the question of the legality of any taxation measures, including their *bona fide* nature, falls under Article 21(1) of the ECT and can be determined by an arbitral tribunal "only to the extent clawed back" pursuant to

[1825] Transcript, Day 3 at 171–72 (Respondent's opening); Transcript, Day 21 at 178 (Respondent's rebuttal); Respondent's Opening Slides, pp. 468–69; ECtHR Yukos Judgment ¶¶ 8, 606, 647.

[1826] Respondent's Opening Slides, p. 469 (quoting *Fisheries Jurisdiction (Spain v. Canada)*, Jurisdiction of the Court, Judgment, 4 December 1998, ICJ Reports 1998, p. 460 ¶ 68, Exh. R-1028).

[1827] Transcript, Day 3 at 172–73 (Respondent's opening); Respondent's Opening Slides, pp. 470–71.

[1828] Transcript, Day 3 at 174 (Respondent's opening); Transcript, Day 21 at 179, 183 (Respondent's rebuttal) (discussing *EnCana v. Ecuador*, LCIA UN3481, UNCITRAL, Award, 3 February 2006 ¶ 142, Exh. C-976).

[1829] Transcript, Day 3 at 174 (Respondent's opening); Transcript, Day 21 at 182–83 (Respondent's rebuttal) (discussing *Burlington Resources v. Ecuador*, ICSID Case ARB/08/5, Decision on Jurisdiction, 2 June 2010 ¶ 207, Exh. R-992).

[1830] Transcript, Day 21 at 180 (Respondent's rebuttal).

[1831] Transcript, Day 21 at 182 (Respondent's rebuttal).

Article 21(5) of the ECT.[1832]  This would mean in particular that "[t]he Tribunal . . . lacks jurisdiction over Claimants' Article 10 claims, and Article 10(1) ECT is inapplicable."[1833]

1395. With regard to the claw-back provision in Article 21(5) of the ECT, Respondent argues that the reference to "taxes" rather than "taxation measures" is deliberate and implies that only "compulsory contributions to the Government" can be examined under that provision, but not "fines, interest, enforcement fees" or "other tax collection and enforcement measures."[1834]  The basis for this would be that, in its ordinary meaning, "a tax" would be "a charge or a contribution imposed by the State for public purposes," but not "tax enforcement and collection measures."[1835]

1396. To support its reading of the claw-back provision, Respondent refers to the *travaux préparatoires*, claiming that, while the claw-back provision originally referred to "Taxation Measures", in June 1993 a new version of the draft of the provision was circulated, in which these references were replaced with references to "taxes".[1836]  According to Respondent, this change "was certainly not incidental or unintentional."[1837]  Respondent also dismisses the idea that the different wording of Article 21(5) of the ECT in some of the other official languages of the ECT should be accorded any relevance, since the negotiations of the Treaty would have been conducted solely in English and translations into other languages would only have been prepared after the conclusion of the negotiations without input from the negotiating teams.[1838]  This must, according to Respondent, be taken into account as part of the circumstances surrounding the conclusion of the ECT in accordance with Article 32 of the VCLT.[1839]

1397. With regard to the meaning of "taxes", Respondent submits that, since this term "is not defined in the Energy Charter Treaty, and . . . has no autonomous meaning in international law,"[1840] it

---

[1832] Transcript, Day 3 at 173 (Respondent's opening); Respondent's Post-Hearing Brief ¶ 168.

[1833] Transcript, Day 3 at 176 (Respondent's opening).

[1834] Transcript, Day 3 at 182 (Respondent's opening); Respondent's Opening Slides, pp. 472–79; Respondent's Post-Hearing Brief ¶ 172.

[1835] Transcript, Day 3 at 179 (Respondent's opening).

[1836] Transcript, Day 3 at 177 (Respondent's opening) (discussing European Energy Charter, Conference Secretariat, Room Document 3, Plenary Session 28 June1993–2 July 1993, 28 June 1993, pp. 3–4, Exh. R-1035).

[1837] Transcript, Day 3 at 177 (Respondent's opening).

[1838] Transcript, Day 21 at 185 (Respondent's rebuttal); Respondent's Rebuttal Slides, pp. 470–73.

[1839] Transcript, Day 21 at 186 (Respondent's rebuttal).

[1840] Transcript, Day 3 at 179 (Respondent's opening).

needs to be determined pursuant to Russian law.  This would be in line with the practice under tax treaties, which generally leaves the term of "taxes" undefined, adopting the meaning of the term under the domestic law of the State that imposed the tax.[1841]  Respondent refers in this regard for instance to Article 3(2) of the OECD Model Tax Convention on Income and Capital and the Cyprus-Russia DTA, pointing out that both instruments are referenced in the claw-back provision of Article 21(5) of the ECT.[1842]

1398. More generally, Respondent argues that "in the absence of autonomous rules or concepts of international law, international law must turn for guidance to domestic law . . . as developed within the State's domestic jurisdiction."[1843]  Under Russian law, a "tax" would be defined in Article 8 of the Russian Tax Code as a "mandatory . . . payment" collected "to provide financial support to the government" for public purposes.[1844]  This would exclude "tax enforcement, [and] collection measures," including "interest, fines, [and] enforcement fees."[1845]

1399. Respondent argues that a limited claw-back would also be "very much in line with treaty practice," which would be "diverse" and variable "with respect to the type of measures that are clawed back."[1846]  In particular, Respondent refers to the Russia-Sweden BIT, which contains a carve-out with regard to "taxation matters", whilst also providing that some of its provisions shall apply to "taxes".[1847]  For Respondent, this provision constitutes proof that "States are . . . free to claw back only a subcategory of the measures they decided to exclude from the scope of the Treaty" and that "they do so".[1848]  The "deliberate choice of the ECT Contracting Parties to limit the expropriation claw-back to taxes" would in fact "represen[t] a middle ground of varying practices of the ECT Contracting Parties."[1849]

---

[1841]   Transcript, Day 3 at 180 (Respondent's opening).

[1842]   Transcript, Day 3 at 180–81 (Respondent's opening); Transcript, Day 21 at 188 (Respondent's rebuttal); 2010 OECD Model Tax Convention, Article 3(2), Exh. R-1017; Agreement between the Government of the Republic of Cyprus and the Government of the Russian Federation on the Avoidance of Double Taxation with Respect to Taxes on Income and Capital, Article 3(2), Exh. C-916.

[1843]   Transcript, Day 3 at 181 (Respondent's opening).

[1844]   Transcript, Day 3 at 182 (Respondent's opening); Russian Tax Code, Article 8, Exh. R-551.

[1845]   Transcript, Day 3 at 182 (Respondent's opening).

[1846]   Transcript, Day 3 at 178 (Respondent's opening).

[1847]   Transcript, Day 21 at 184 (Respondent's rebuttal); Agreement between the Government of the Kingdom of Sweden and the Government of the Russian Federation on the Promotion and Reciprocal Protection of Investments, 19 April 1995, Article 11(2), Exh. R-3451.

[1848]   Transcript, Day 21 at 184 (Respondent's rebuttal).

[1849]   Transcript, Day 3 at 179 (Respondent's opening).

1400. Finally, Respondent argues that, if the Tribunal were to find that both the carve-out and the claw-back provisions apply, the Tribunal would be required to make a referral to the "Competent Tax Authorities".[1850]   This would include "the Russian Ministry of Finance, the Cypriot Ministry of Finance, and the UK Inland Revenue"[1851]; and this is so "because the referral procedure replicates the dispute settlement procedures under double taxation agreements."[1852]   According to Respondent, "[t]he referral mechanism . . . forms part of the ECT Contracting Parties' consent to submit themselves to international arbitration pursuant to Article 26 ECT, and it precludes any ruling by the Tribunal whether a tax constitutes an expropriation . . . without having made referral to the tax authorities."[1853]

### 4.   Tribunal's Decision

#### (a)   Introduction

1401. As mentioned earlier, the Tribunal deferred its decision on Article 21 because the Parties' arguments in relation to this provision during the jurisdictional phase raised issues that went to the heart of the merits of the dispute and the Tribunal decided that it could not rule on these issues in a vacuum.

1402. Now, at the conclusion of the merits phase of the present proceedings, the Tribunal has the necessary context within which to evaluate the Parties' arguments, analyze and interpret Article 21, and characterize Claimants' claims for purposes of Article 21.

1403. Before turning to Article 21 itself, the Tribunal considers it helpful to recall its principal findings on those core issues relating to the merits that are particularly relevant for Article 21.

1404. In Chapter VIII.B, the Tribunal concluded, on the totality of the evidence, that the tax authorities used the "re-attribution" formula not only so as to be able to collect the revenue-based taxes against Yukos, but also so as to establish a basis for imposing on Yukos the massive VAT liability and excessive fines that followed.  In the Tribunal's view, while Yukos was vulnerable on some aspects of its tax optimization scheme, principally because of the sham-like nature of certain elements of its operations in at least some of the low-tax regions,

---

[1850]   Transcript, Day 21 at 189–90 (Respondent's rebuttal).

[1851]   Transcript, Day 21 at 191 (Respondent's rebuttal).

[1852]   Transcript, Day 21 at 191 (Respondent's rebuttal).

[1853]   Transcript, Day 21 at 192 (Respondent's rebuttal).

and could have faced some legitimate claims relating to revenue-based taxes had the Russian Federation limited itself to *bona fide* taxation measures, the State apparatus decided to take advantage of that vulnerability; it did so by launching a full assault on Yukos and its beneficial owners in order to bankrupt Yukos and appropriate its assets while, at the same time, removing Mr. Khodorkovsky from the political arena. The Tribunal has come to these conclusions based on its review of the entire record, as detailed in the other chapters of Part VIII, above.

1405. The Tribunal now has to decide, in these circumstances, if and how Article 21 applies, and whether it deprives the Tribunal of its jurisdiction, as argued by Respondent, to consider Claimants' claims under Article 10 of the ECT (in the event the carve-out applies), and perhaps even under Article 13 of the ECT (if the carve-out applies and the claw-back does not apply).

1406. Both Parties made extensive submissions on Article 21, both in writing and orally. Having considered the Parties' arguments, the Tribunal concludes that it has jurisdiction to rule on Claimants' claims under Article 13 of the ECT for two independent reasons, each of which in and of itself suffices to justify the jurisdiction of the Tribunal. Firstly, the Tribunal finds that, irrespective of its findings regarding the applicability of Article 21 of the ECT to the present case, it would have "indirect" jurisdiction over claims under Article 13 of the ECT because any measures excluded by the carve-out under Article 21(1) of the ECT would be brought back within the Tribunal's jurisdiction by the claw-back of Article 21(5) of the ECT and any referral to the Competent Taxation Authorities within the meaning of this latter provision would clearly have been futile.

1407. Secondly, the Tribunal finds that, in any event, the carve-out of Article 21(1) can apply only to *bona fide* taxation actions, *i.e.*, actions that are motivated by the purpose of raising general revenue for the State. By contrast, actions that are taken only under the guise of taxation, but in reality aim to achieve an entirely unrelated purpose (such as the destruction of a company or the elimination of a political opponent) cannot qualify for exemption from the protection standards of the ECT under the taxation carve-out in Article 21(1). As a consequence, the Tribunal finds that it does indeed have "direct" jurisdiction over claims under Article 13 (as well as Article 10) in the extraordinary circumstances of this case.

1408. The Tribunal will now develop each of these reasons.

      **(b)**    **First Reason:  Assuming the Carve-Out Applies, So Does the Claw-Back, and Any Referral to the Competent Tax Authorities Would Clearly have been Futile**

1409. Firstly, the Tribunal concludes that it has jurisdiction under Article 13 of the ECT, even assuming that the carve-out in Article 21(1) of the ECT applies.  This determination is based on both the scope of the expropriation claw-back in Article 21(5) of the ECT relative to the scope of the taxation carve-out in Article 21(1) of the ECT, and the futility of any referral to the Competent Tax Authorities under Article 21(5) of the ECT.  The Tribunal will expand upon each of these points in turn.

         **i.**    **The Scope of the Claw-Back in Article 21(5)**

1410. Respondent argues that the term "Taxation Measures", used in the carve-out, should be given a broad meaning, including collection and enforcement measures, while the term "taxes", used in the claw-back, should be given a narrow meaning, which would exclude collection and enforcement measures.  The Tribunal cannot accept Respondent's arguments for the following reasons.

1411. Firstly, the Tribunal observes that the term "Taxation Measures", used in Article 21(1), is defined in Article 21(7)(a) to mean "provisions" of domestic tax law and tax treaties, while the term "taxes", used in Article 21(5), is not defined in the Treaty.

1412. Pursuant to Article 31 of the VCLT, "[a] treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose."

1413. In the view of the Tribunal, the ordinary meaning of "tax" used in Article 21(5) cannot be narrower than the meaning of "Taxation Measure" used in Article 21(1).  Respondent's interpretation of "Taxation Measures" and "taxes" would, as Claimants submit, result in a wide carve-out and a narrow claw-back, "reinstating protection from expropriation [under Article 13 of the ECT] only in relation to 'charges and payments', but not collection and enforcement measures or interests and fines."[1854]  The Tribunal agrees with Claimants that such an interpretation would lead to "<u>a gaping hole in the ECT</u> where investors would stand completely

---

[1854]   Claimants' Post-Hearing Brief ¶ 220.

unprotected from expropriatory taxation."[1855]  Such an interpretation would defeat the object and purpose of the claw-back and of the ECT itself.

1414. Respondent refers the Tribunal to a number of treaties that contain a taxation carve-out, but that either do not contain any claw-back provision or limit the claw-back to certain substantive protection standards, and argues that its proposed interpretation of Article 21 of the ECT corresponds to a "middle ground of varying practices."  The Tribunal, having reviewed those treaties, finds those provisions of no assistance to its interpretation of Article 21 of the ECT.

1415. In any event, the Tribunal, having found that the interpretation of Article 21 of the ECT according to the general rule of interpretation under Article 31 of the VCLT results in a meaning that is neither ambiguous nor obscure and does not lead to a result which is manifestly absurd or unreasonable, does not need to call in aid any other rule of interpretation.  Finally, the Tribunal does not find much helpful guidance in the *travaux préparatoires* of the ECT.  Respondent claims that the replacement of "Taxation Measures" with "taxes" in a draft of Article 21(5) of the ECT circulated in June 1993 could not have been incidental.  However, if this replacement had been motivated by the intention of the negotiators to limit the scope of the claw-back provision in Article 21(5) of the ECT compared to the scope of the carve-out in Article 21(1) of ECT, the Tribunal would expect such a motivation to have found some additional expression in the record.

1416. The Tribunal therefore holds that any measures falling under the taxation carve-out of Article 21(1) of the ECT are also covered by the scope of the expropriation claw-back in Article 21(5) of the ECT.

## ii.    The Referral to Competent Tax Authorities

1417. The Tribunal recalls Article 21(5)(b), which sets out the following referral mechanism:

> (b)    Whenever an issue arises under Article 13, to the extent it pertains to whether a tax constitutes an expropriation or whether a tax alleged to constitute an expropriation is discriminatory, the following provisions shall apply:
>
> (i)    The Investor or the Contracting Party alleging expropriation shall refer the issue of whether the tax is an expropriation or whether the tax is discriminatory to the relevant Competent Tax Authority.  Failing such referral by the Investor or the Contracting Party, bodies called upon to settle

---

[1855]    Claimants' Post-Hearing Brief ¶ 220 (emphasis in the original).

disputes pursuant to Article 26(2)(c) or 27(2) shall make a referral to the relevant Competent Tax Authorities;

(ii)    The Competent Tax Authorities shall, within a period of six months of such referral, strive to resolve the issues so referred.  Where non discrimination issues are concerned, the Competent Tax Authorities shall apply the non-discrimination provisions of the relevant tax convention or, if there is no non-discrimination provision in the relevant tax convention applicable to the tax or no such tax convention is in force between the Contracting Parties concerned, they shall apply the non-discrimination principles under the Model Tax Convention on Income and Capital of the Organisation for Economic Co-operation and Development;

(iii)    Bodies called upon to settle disputes pursuant to Article 26(2)(c) or 27(2) may take into account any conclusions arrived at by the Competent Tax Authorities regarding whether the tax is an expropriation.  Such bodies shall take into account any conclusions arrived at within the six-month period prescribed in subparagraph (b)(ii) by the Competent Tax Authorities regarding whether the tax is discriminatory.  Such bodies may also take into account any conclusions arrived at by the Competent Tax Authorities after the expiry of the six-month period;

(iv)    Under no circumstances shall involvement of the Competent Tax Authorities, beyond the end of the six-month period referred to in subparagraph (b)(ii), lead to a delay of proceedings under Articles 26 and 27.

1418.  According to Respondent, "[t]he referral mechanism . . . precludes any ruling by the Tribunal whether a tax constitutes an expropriation . . . without having made referral to the tax authorities."[1856]  Specifically, Respondent argues that Article 21(5)(b)(i) requires the Tribunal to make a referral to "the Russian Ministry of Finance, the Cypriot Ministry of Finance, and the UK Inland Revenue."[1857]

1419.  Claimants, on the other hand, take the view that a referral is not warranted, for two reasons.  Firstly, Claimants argue that the requirement is triggered only if there is an allegation that "a tax constitutes an expropriation," whereas in the present case, according to Claimants, their investments were not expropriated by "a tax", but "by a combination of many types of actions of which taxation—as labeled by the Russian Federation—was only one."[1858]  Secondly, Claimants argue that any referral made to the Russian Ministry of Finance, or the tax authorities of the United Kingdom and Cyprus for that matter, would be an exercise in futility.[1859]  According to Claimants, the Russian Ministry of Finance would effectively be asked to "be a judge in its own cause," and asking the tax authorities to review the entire file—written

---

[1856]   Transcript, Day 21 at 192 (Respondent's rebuttal).

[1857]   Transcript, Day 21 at 191 (Respondent's rebuttal).

[1858]   Claimants' Post-Hearing Brief ¶ 229.

[1859]   Claimants' Post-Hearing Brief ¶ 229.

submissions, relevant correspondence, expert reports, witness statements, hearing transcripts and over 8,000 exhibits—and to comment on it, would amount to a "useless exercise".[1860]

1420. The Tribunal does not accept Claimants' first argument, since it ignores the logic by which the Tribunal would have come to this point in its reasoning.  If the Tribunal were considering Respondent's measures under the claw-back of Article 21(5), it would be because the Tribunal would have found previously that there was no meaningful distinction between the scope of "Taxation Measures" and "taxes" for purposes of Article 21, or indeed because it would have found that even if measures "under the guise" of taxation were covered by the carve-out, then they must also be covered by the claw-back.  The referral mechanism therefore cannot be avoided on the basis of a narrow interpretation of the term "tax" in Article 21(5)(b)(i).

1421. Claimants' futility argument, however, is persuasive.  In this particular case, the Tribunal is convinced that a referral to the tax authorities of the Russian Federation, the United Kingdom and/or Cyprus would be (and, at any earlier stage of the proceedings, would have been) an exercise in futility.

1422. The record before the Tribunal is enormous.  The arguments and allegations of the Parties relating to various taxes and the reasons for which they should or should not be considered expropriatory have filled briefs adding up to thousands of pages, have relied on some 8,800 exhibits and were presented to the Tribunal in oral hearings scheduled over a six-week period.  It is inconceivable that the gist of this case, for either side, could have been reduced to a meaningful submission of a size and scope that might have been digested by the relevant tax authorities in a way that would have given them an opportunity to provide timely and pertinent guidance to the Tribunal.

1423. Thus, while the Tribunal acknowledges that the referral mechanism in the claw-back provision of Article 21(5) was designed to assist tribunals "to distinguish normal and abusive taxes," as noted by Professor Park in his "Tax Arbitration and Investor Protection" article cited by Respondent,[1861] this is simply not a case in which the Tribunal could have been assisted by referring the matter to the tax authorities.  As the Tribunal has noted at various stages in the present Award, its conclusions ultimately rest on a consideration of the totality of the evidence

---

[1860] Claimants' Post-Hearing Brief ¶ 229.

[1861] Respondent's Closing Sides, p. 849; William Park, Tax Arbitration and Investor Protection, in INVESTMENT PROTECTION AND THE ENERGY CHARTER TREATY (Graham Coop & Clarisse Ribeiro eds., 2008), p. 115, p. 131, Exh. R-3410.

presented to it.  The tax authorities, on the other hand, would necessarily need to focus on discrete taxes or discrete issues related to taxes.

1424. The requirement for an investor to make a referral under Article 21(5)(b)(i), first sentence (and, *a fortiori*, the requirement for the Tribunal to make a referral under Article 21(5)(b)(i), second sentence) cannot, in the Tribunal's view, apply in cases where such a referral would obviously be futile.  Like any provision in an international treaty, Article 21(5)(b)(i) of the ECT must be interpreted in good faith.  A good faith interpretation of the provision leads to the conclusion that a referral cannot be required if following the referral procedure would clearly be futile under the circumstances of a specific case.

1425. It has long been recognized, with regard to the exhaustion of local remedies requirement in the context of the principles on diplomatic protection,[1862] that following a prescribed procedure may be dispensed with under circumstances where doing so clearly would not produce the result that the procedure seeks to achieve.  The relevant principle is set out in Article 15(a) of the 2006 ILC Draft Articles on Diplomatic Protection, providing that "[l]ocal remedies do not need to be exhausted where . . . there are no reasonably available local remedies to provide effective redress, or the local remedies provide no reasonable possibility of such redress."[1863] Tribunals adjudicating claims of investors under international investment treaties have made similar findings with regard to the obligation of investors to observe so-called cooling-off periods[1864] or the requirement to submit a dispute to litigation in the host State's domestic courts for a certain period of time.[1865]

1426. The Tribunal is of the view that a referral must be regarded as clearly futile if there is no possibility that the relevant authorities would in fact be able to come to some timely and meaningful conclusion about the dispute or make any timely determinations that could

---

[1862] *See e.g.*, *Certain Norwegian Loans (France v. Norway)*, Judgment, 6 July 1957, ICJ Reports 1957, p. 9, Separate Opinion of Judge Lauterpacht, p. 34, at p. 39; *Barcelona Traction, Light and Power Company, Limited (Belgium v. Spain) (Second Phase)*, Judgment, 5 February 1970, ICJ Reports 1970, p. 3, Separate Opinion of Judge Tanaka, p. 114, at pp. 144–45.

[1863] Draft Articles on Diplomatic Protection, adopted by the International Law Commission at its 58th session, 2006, Article 15(a).

[1864] *See e.g.*, *Occidental Petroleum Corporation & Occidental Exploration and Production Company v. Republic of Ecuador*, ICSID Case No. ARB/06/111, Decision on Jurisdiction, 9 September 2008 ¶ 94.

[1865] *See e.g.*, *BG Group Plc. v. The Republic of Argentina*, UNCITRAL, Award, 24 December 2007 ¶ 147, Exh. R-3576; *Ambiente Ufficio S.P.A. v. The Argentine Republic*, ICSID Case No. ARB/08/9, Decision on Jurisdiction and Admissibility, 8 February 2013 ¶ 607.

potentially serve to assist the Tribunal's decision-making.  The Tribunal finds, for the reasons stated above, that no such possibility exists or existed in this case.

1427. Furthermore, the Tribunal notes that neither Party disputes that, in the event of a referral, any determinations of the Competent Tax Authorities regarding whatever discrete issues they might have been able to focus on relating to whether any tax was an expropriation would not have been binding on the Tribunal.  The wording of Article 21(5)(b)(iii) of the ECT is very clear: bodies such as the present Tribunal *may* take into account any conclusion arrived at by the Competent Tax Authorities regarding which the tax is an expropriation.[1866]

1428. In conclusion, the Tribunal holds that a referral of the dispute to the "Competent Tax Authorities" within the meaning of Article 21(5)(b)(i) of the ECT would clearly have been futile at the outset of this arbitration and was therefore not required.  It remains futile today.

### iii.   Conclusion

1429. As a consequence, assuming (for the sake of argument) that some of Respondent's measures fell within the scope of the carve-out in Article 21(1), the Tribunal would nevertheless be in a position to proceed to determine whether the relevant measures constituted a violation of Article 13 of the ECT under the claw-back.  It could do so even though it has not referred the issue of whether any tax is an expropriation to any of the Competent Tax Authorities because to do so would clearly be an exercise in futility.

### (c)   Second Reason:  The Carve-Out Does Not Apply

1430. Secondly, and independently from the above reasoning, the Tribunal concludes that it has jurisdiction to rule on Claimants' claims under Article 13 of the ECT due to the fact that the Article 21 carve-out does not apply to the Russian Federation's measures because they are not, as the Tribunal has concluded above, on the whole, a *bona fide* exercise of the Russian Federation's tax powers.

1431. This accords with Claimants' view that Article 21 of the ECT can apply only to *bona fide* taxation actions, *i.e.*, actions that are motivated for the purpose of raising general revenue for the State.  By contrast, actions that are taken only "under the guise" of taxation, but in reality

---

[1866]   Claimants' Post-Hearing Brief ¶ 229; Transcript, Day 21 at 194 (Respondent's rebuttal).

aim to achieve an entirely unrelated purpose (such as the destruction of a company or the elimination of a political opponent), argue Claimants, cannot qualify for exemption from the protection standards of the ECT under the taxation carve-out in Article 21(1).

1432. The Tribunal essentially accepts the latter interpretation of Article 21.

1433. To find otherwise would mean that the mere labelling of a measure as "taxation" would be sufficient to bring such measure within the ambit of Article 21(1) of the ECT, and produce a loophole in the protective scope of the ECT.  Since the claw-back in Article 21(5) of the ECT relates only to expropriations under Article 13 of the ECT, a State could, simply by labelling a measure as "taxation", effectively avoid the control of that measure under the ECT's other protection standards.  It would seem difficult to reconcile such an interpretation with the purpose of Part III of the ECT.

1434. The Tribunal cannot agree with Respondent that, by finding that Article 21(1) of the ECT applies only to *bona fide* taxation, the Tribunal would be conflating the requirements for the application of the taxation carve-out (representing an exception to the protection standards under the ECT) and the requirements for the application of the protection standards themselves. For example, Article 13 of the ECT could be violated through a *bona fide* taxation measure that was aimed at the raising of State revenue, but whose effect was expropriatory.  By contrast, the characterization of an incriminated action by a respondent State as a Taxation Measure for purposes of Article 21(1) of the ECT would be independent of the effects of that action, but rather depend on the motivation underlying it.

1435. The Tribunal also sees no reason to assume that it would be better for the question of the motivation underlying a particular measure to first be addressed through the "Competent Tax Authorities" (pursuant to the referral mechanism under Article 21(5) of the ECT), as the particular expertise of these authorities does not extend to the question of whether an act that on its face appears to be a taxation measure is in reality implemented for improper reasons.  To the contrary, where the tax authorities of a State have participated in measures against an investor whose true purpose is unrelated to taxation, submitting these issues to the preliminary examination of the same authorities would add little value for an arbitral tribunal.

1436. The Tribunal further observes that, by making this finding, it is in good company, and that the two eminent arbitral tribunals which have previously considered, on an admittedly more limited record, essential elements of the dispute now before it, have adopted the same view.

1437. Thus, the *RosInvestCo* tribunal concluded that:

> [I]t is generally accepted that the mere fact that measures by a host state are taken in the form of application and enforcement of its tax law, does not prevent a tribunal from examining whether this conduct of the host state must be considered, under the applicable BIT or other international treaties on investment protection, as an abuse of tax law to in fact enact an expropriation.[1867]

1438. Similarly, the *Quasar* tribunal opined that:

> It is no answer for a state to say that its courts have used the word "taxation" . . . in describing judgments by which they effect the dispossession of foreign investors.  If that were enough, investment protection through international law would likely become an illusion, as states would quickly learn to avoid responsibility by dressing up all adverse measures, perhaps expropriation first of all, as taxation.  When agreeing to the jurisdiction of international tribunals, states perforce accept that those jurisdictions will exercise their judgment, and not be stumped by the use of labels.[1868]

1439. By contrast, neither the *EnCana v. Ecuador* decision[1869] nor the *Burlington v. Ecuador* award[1870] to which Respondent refers in support of its view that any measure "adopted in apparent [reliance on] tax legislation" should fall under the taxation carve-out,[1871] in fact appears to endorse such a position.

1440. Thus, while the tribunal in *EnCana* stated that, for a measure to fall under the taxation carve-out in the treaty before it, it would have to be "sufficiently clearly connected to a taxation law or regulation (or to a procedure, requirement or practice of the taxation authorities in apparent reliance on such a law or regulation),"[1872] the emphasis in this formulation appears to have been on the "sufficiently clea[r]" connection to an existing legal provision or practice, rather than the "apparent reliance" of the authorities on the existence of a legal basis for their actions.  This is supported by another statement of the *EnCana* tribunal in the same paragraph, according to which "an arbitrary demand unsupported by any provision of the law of the host State would not qualify" for an exemption under the taxation carve-out.[1873]

---

[1867] *RosInvestCo* ¶ 628, Exh. C-1049.

[1868] *Quasar* ¶ 179, Exh. R-3383.

[1869] Transcript, Day 3 at 174 (Respondent's opening); Transcript, Day 21 at 179, 183 (Respondent's rebuttal) (discussing *EnCana v. Ecuador*, LCIA UN3481, UNCITRAL, Award, 3 February 2006 ¶ 142, Exh. C-976).

[1870] Transcript, Day 3 at 174 (Respondent's opening); Transcript, Day 21 at 182–83 (Respondent's rebuttal) (discussing *Burlington Resources v. Ecuador*, ICSID Case ARB/08/5, Decision on Jurisdiction, 2 June 2010 ¶ 207, Exh. R-992).

[1871] Transcript, Day 3 at 174 (Respondent's opening).

[1872] *EnCana v. Ecuador*, LCIA UN3481, UNCITRAL, Award, 3 February 2006 ¶ 142(1), Exh. C-976.

[1873] *EnCana v. Ecuador*, LCIA UN3481, UNCITRAL, Award, 3 February 2006 ¶ 142(1), Exh. C-976.

1441. The context of the statement also makes it clear that the tribunal was only addressing minimum requirements for the application of the taxation carve-out before it, rather than expressing any views about situations in which the carve-out provision would not apply.  Thus the tribunal emphasized that, for a measure to come under the treaty's carve-out, it would have to be "sufficiently clearly connected to" or supported by some taxation law, regulation or actual practice (the latter of which would in turn have to be based on a taxation law or regulation).  It did, however, neither say nor imply that any measure which the authorities based on a taxation law or regulation would by definition be regarded as a taxation measure and therefore justify the application of the carve-out.

1442. It makes sense to regard a tax demand that is effectively motivated not by the aim of raising public revenue but by a purpose extraneous to taxation as an "arbitrary demand" that, in the words of the *EnCana* tribunal, cannot qualify for an exemption under a taxation carve-out.[1874] Such an interpretation is also supported by the statement of Claimants' expert Professor Crawford, who was the presiding arbitrator in the *EnCana* arbitration and according to whom the decision was not meant to imply "that anything labelled as a taxation measure is excluded" by a taxation carve-out.[1875]

1443. Neither does the *Burlington* decision referred to by Respondent support the view that a taxation carve-out would have to apply to any measure adopted by tax authorities in apparent reliance on tax legislation.  In *Burlington*, the tribunal notes that "bad faith" of the respondent mentioned by the claimant rested on its allegation that Ecuador had forced the claimant to give up certain contractual rights by the use of its taxation legislation.[1876]  There was no suggestion in that case that Ecuador had taken any measures against the investor for motives that were entirely unrelated to the raising of public revenue.  As a consequence, the tribunal in *Burlington*, when it said that the claimant's suggestion "that Respondent used its tax power in bad faith in order to force Claimant to surrender its rights" under the contracts raised "matters of taxation",[1877] was referring to the specific situation in that case that cannot in any way be compared to the one at issue in the present proceedings.

---

[1874] *EnCana v. Ecuador*, LCIA UN3481, UNCITRAL, Award, 3 February 2006 ¶ 142(1), Exh. C-976.

[1875] Transcript, Day 17 at 161 (Claimants' closing); Further Opinion on Jurisdictional Issues by James Crawford, 3 May 2007 ¶ 5, Exh. C-613.

[1876] *Burlington Resources v. Ecuador*, ICSID Case ARB/08/5, Decision on Jurisdiction, 2 June 2010 ¶ 175, Exh. R-992.

[1877] *Burlington Resources v. Ecuador*, ICSID Case ARB/08/5, Decision on Jurisdiction, 2 June 2010 ¶ 207, Exh. R-992.

1444. It follows that Article 21(1) of the ECT, which applies only to *bona fide* taxation measures, does not find any application in this arbitration.  The tax assessments levied against Yukos by the Russian Federation, which the Tribunal has found were designed mainly to impose massive liabilities based on VAT and related fines, and were essentially aimed at paralyzing Yukos rather than collecting taxes, are not exempt from scrutiny under the ECT, as they are not captured by the carve-out of Article 21(1).

1445. Similarly, and *a fortiori*, subsequent steps in the enforcement of the tax assessments are not captured by the carve-out, because the Tribunal has found that they too were exigently pursued by means that indicate that Yukos was not just being chased to pay taxes, but was being driven into bankruptcy.

### (d)   Conclusion

1446. Based on the analysis set out in this chapter of the Award and for the two independent reasons set out above, the Tribunal has jurisdiction to consider whether the Russian Federation is liable to Claimants under Article 13 of the ECT for the measures which it has adopted and which have resulted in the evisceration of their investments and the destruction of Yukos.

1447. While the Tribunal's finding that the carve-out in Article 21(1) does not apply would in principle allow the Tribunal to consider the measures under both Articles 10 and 13 of the ECT, in the circumstances, as will be seen, it will not be necessary for the Tribunal to consider whether the expropriatory measures of Respondent are also in breach of Article 10 of the ECT.

## X.   LIABILITY

1448. Having dismissed Respondent's preliminary objections to the Tribunal's jurisdiction, the admissibility of Claimants' claims and the applicability of the ECT in the present case, the Tribunal now turns to the question of the Russian Federation's liability under the Treaty.  In Part VIII, the Tribunal canvassed the evidentiary record put before it by the Parties.  In this Part X, the Tribunal draws the legal consequences of its factual conclusions, beginning by addressing questions of attribution.

1449. As has already been mentioned, the Tribunal's eventual conclusions regarding the alleged breaches by Respondent of Article 13 (Expropriation) of the ECT will make it unnecessary for the Tribunal to consider the application of Article 10 (Promotion, Protection and Treatment of

Investments).  Nevertheless, for the sake of completeness, the Tribunal will set out the Parties'
arguments with regard to Article 10.  The Tribunal will then set out the Parties' arguments in
respect of Article 13.  Finally, the Tribunal will set out its decision regarding Respondent's
liability and Claimants' contributory fault.

## A.   ATTRIBUTION

1450. The Parties are divided on the question of whether some of the actions of which Claimants
complain are attributable to the Russian Federation.  Below, the Tribunal sets out the Parties'
submissions and its own views on this question.

### 1.   Claimants' Position

1451. Claimants summarize their position with regard to the attribution of acts said to constitute
breaches of the ECT to Respondent in their Memorial as follows:

> [T]he Russian Federation has acted through almost all of its organs, be it Executive or
> Judiciary, at all levels, including the highest, in seeking the destruction of Yukos. These
> include the President of the Russian Federation, the Presidential Administration, the Tax
> Ministry (later to become the Federal Taxation Service, a federal body of executive
> authority within the Ministry of Finance), the Ministry of Justice (under whose authority
> federal bodies of executive authority such as the Federal Bailiff Service or the Federal
> Penitentiary Service are acting), the Prosecutor General's Office (a federal body entrusted
> with the task of execution of the laws in the name of the Russian Federation), the Ministry
> of Internal Affairs (responsible for the police forces), the Federal Security Service (also a
> federal body of executive authority, acting under the authority of the President). When not
> acting through these Executive organs or through the Russian courts, the Russian
> Federation was acting through State-owned entities, first and foremost State-owned
> company Rosneft . . .[1878]

[emphasis added]

1452. Claimants put forward a similar view at the Hearing:

> [W]e complain of acts of the executive organs.  That's the President; the Prime Minister;
> ministries, including Tax, Justice and Interior Ministries; and their constituent bodies, the
> Federal Bailiffs Service and the Federal Penitentiary Service under Justice.
>
> We complain of the actions of executive bodies or agencies: that would be the Prosecutor
> General's Office, the Federal Property Fund and the Federal Security Services.   We also
> complain of the actions of the courts . . . .   These are actions of the Russian Federation
> State organs, and they are, by definition, actions of the State.[1879]

[emphasis added]

---

[1878]   Memorial ¶ 551.

[1879]   Transcript, Day 20 at 252.

1453. In particular, with regard to the bankruptcy proceedings against Yukos, Claimants assert that:

> The Russian Federation initiated the bankruptcy proceedings through <u>Rosneft</u>, whilst the <u>Russian courts</u> ensured that the Russian State directly and through <u>Rosneft</u> would be the main creditor in the proceedings, systematically rejecting the claims of creditors related to Yukos or Yukos' shareholders.  Thus placed in the driving seat in these bankruptcy proceedings, the Russian State, acting through the <u>Federal Taxation Service</u> and <u>Rosneft</u>, rejected the Rehabilitation Plan proposed by Yukos' management and paved the way for itself, through <u>bankruptcy receiver (Mr. Rebgun)</u> and the <u>Russian Federal Property Fund</u> to distribute the rest of Yukos' assets by auctioning them at bargain prices. The vast majority of the proceeds went to the Russian State, with <u>Rosneft</u> acquiring Yukos' two other main production assets, Samaraneftegaz and Tomskneft, at a substantial discount."[1880]

> [emphasis added]

1454. Claimants seek to attribute the following actions of Rosneft (some of them through Rosneft-controlled YNG) to Respondent:

> Rosneft's action in acquiring Yugansk through Baikal, a special vehicle used to conceal Rosneft's involvement in the Yuganskneftegaz auction.

> Rosneft's entering into an agreement with the consortium of banks in order to initiate the bankruptcy and precipitate the liquidation of Yukos.

> . . .

> [T]he decisions made at the creditors' meeting hand in hand with the Russian Tax Ministry, namely: to vote against the rehabilitation plan; to vote against the admission of any Yukos-related creditor; and to vote for the liquidation of Yukos.[1881]

1455. Claimants take the view that "the actions of Rosneft are attributable to the Russian State"[1882] due to the latter's ownership of and control over the former, which would be "established by the fact that members of Rosneft's Board of Directors hold parallel positions in the Executive branch of the Russian Federation and that Rosneft's President is appointed by the Russian Executive."[1883]  Claimants refer to a statement made by Rosneft in the context of its IPO in July 2006, acknowledging that "the Russian Government . . . controls Rosneft and may cause Rosneft to engage in business practices that do not maximize shareholder value."[1884]  Claimants also cite a statement made by President Putin at a press conference in December 2004 and a decision rendered by the Amsterdam Court of Appeal in proceedings between Yukos Capital

[1880] Reply ¶ 718; *see also* Transcript, Day 20 at 252.
[1881] Transcript, Day 20 at 253–54.
[1882] Reply ¶ 721.
[1883] Memorial ¶ 551.  *See also* Transcript, Day 20 at 254–55.
[1884] Transcript, Day 20 at 257.

and Rosneft in April 2009 as further support for the control of Rosneft's actions by Respondent.[1885]

1456. Finally, Claimants submit that Respondent's argument that, for a breach of a host State's ECT obligations to have occurred, challenged actions must have been taken by the host State in the exercise of *puissance publique* is a "nice invention."[1886]   All that matters, argue Claimants, is whether the acting entity is an organ of the State, not the capacity in which it is acting.[1887]   Claimants quote the commentary to Article 4 of the ILC Articles on State Responsibility:  "[i]t is irrelevant for the purposes of attribution that the conduct of a State organ may be classified as 'commercial' or acta iure gestionis . . . the entry into or breach of a contract by a State organ is nonetheless an act of the State for the purposes of article 4, and it might in certain circumstances amount to an internationally wrongful act."[1888]

### 2. Respondent's Position

1457. Respondent denies that the actions of any of the following entities can be attributed to it, as none of these entities would have exercised governmental authority or acted under the instructions of, or under the direction or control of, Respondent: Sibneft, Gemini Holdings, Nimegan Trading, Rosneft, YNG.[1889]   Respondent also denies that the actions of Mr. Rebgun, Yukos' interim manager and receiver, or the actions of "the meeting and the committee of Yukos' bankruptcy creditors," can be attributed to Respondent, for the same reasons.[1890]

1458. Concerning the attribution of Mr. Rebgun's actions to the Russian Federation, Respondent points out that "[i]n most European legal systems a liquidator or bankruptcy receiver is not a State organ"[1891] and that bankruptcy managers and receivers do not "generally exercise elements of governmental authority or act under the instructions, direction or control of the

---

[1885]   Transcript, Day 20 at 257, referring to *Press Conference with Russian and Foreign Media*, President of Russia Official Web Portal, 23 December 2004, Exh. C-422; *Yukos Capital SARL v. OAO Rosneft*, Amsterdam Court of Appeal, Decision, 28 April 2009, Exh. C-484.

[1886]   Transcript, Day 1 at 157–58 (Claimants' opening).

[1887]   Transcript, Day 20 at 249 (Claimants' rebuttal).

[1888]   Transcript, Day 1 at 148 (Claimants' opening).

[1889]   Counter-Memorial ¶¶ 1442; 1472–1475; Rejoinder ¶¶ 77, 381, 1044; Respondent's Opening Slides, Vol. 6, slide 3.

[1890]   Rejoinder ¶¶ 77, 381; *see also* ¶ 1044; Respondent's Opening Slides, Vol. 6, slide 3.

[1891]   Rejoinder ¶ 389.

State."[1892]   Respondent cites several decisions of investment treaty tribunals as well as the decision of the Grand Chamber of the ECtHR in *Kotov v. Russia* to support this view.[1893]

1459. Regarding Rosneft, Respondent does not deny that it held 75.16 percent of the shares in this company, that members of the company's Board of Directors held parallel positions in the Russian Government, or that the company's President was appointed by the Russian Government.   However, Respondent insists that this is not enough to satisfy the standard of attribution under Article 8 of the ILC Articles on State Responsibility, and that Claimants must prove a link between any relevant actions of Rosneft or YNG and specific instructions given by the Russian State.[1894]   As explained by Respondent at the Hearing:

> [W]hat Claimants must establish to attribute the conduct of Rosneft under Article 8 to Respondent—but which they clearly have not proven—is that in acquiring YNG from Baikalfinance, entering into the agreement with SocGen and voting for Yukos' liquidation at the creditors' meeting, Rosneft was <u>acting pursuant to specific instructions</u> of a Russian State organ.[1895]

> [emphasis added]

1460. Similarly, with respect to the initiation of bankruptcy proceedings, Respondent asserts that "what Claimants must establish, but what they clearly have not proven, is that in filing the bankruptcy petitions . . . YNG were acting under the instructions or directions or control of Russian State organs."[1896]

1461. With regard to the standard applicable under Article 8 of the ILC Articles on State Responsibility, Respondent explains that:

> The commentary to Article 8 of the ILC Articles on State Responsibility notes that "it is made clear that the instructions, direction or control must relate to the conduct which is said to have amounted to an internationally wrongful act."   As regards "direction or control," the commentary states that "[s]uch conduct will be attributable to the State only if it directed or controlled the specific operation and the conduct complained of was an integral part of that operation."[1897]

---

[1892]   Rejoinder ¶ 391.

[1893]   Rejoinder ¶¶ 389–390, referring to *Plama* ¶ 253; *Jan Oostergetel and Theodora Laurentius v. The Slovak Republic*, UNCITRAL, Final Award, 23 April 2012 ¶ 155, Exh. R-2940 (hereinafter "*Jan Oostergetel*"); *Case of Kotov v. Russia*, ECtHR [GC], Appl. No. 54522/00, Judgment, 3 April 2012, Exh. R-3531 (hereinafter "*Kotov v. Russia*").

[1894]   Rejoinder ¶ 387.

[1895]   Transcript, Day 21 at 196.  *See also* Transcript, Day 19 at 116.

[1896]   Transcript, Day 19 at 115–16.

[1897]   Counter-Memorial ¶ 1444, referring to Commentary to ILC Articles on State Responsibility, Article 8 ¶¶ 3 and 7, Exh. C-1042.  *See also* Rejoinder ¶ 382; Transcript, Day 21 at 196.

1462. Respondent also quotes the following passage from the commentary on the ILC Articles on State Responsibility, which notes that the fact a State initially establishes a corporate entity is not a sufficient basis for the attribution to the State of the conduct of that entity, unless the entity exercises elements of governmental authority.[1898]

1463. Respondent refers to several decisions of investment treaty tribunals (in particular *Jan de Nul v. Egypt*, *White Industries v. India* and *Hamester*) as well as to the decision of the Iran–U.S. Claims Tribunal in *Flexi-Van Leasing v. Iran* to support these statements.[1899]

1464. Finally, although Respondent does not deny that the Russian Tax Ministry is a State organ, the actions of which can in principle be attributed to the State under Article 4 of the ILC Articles on State Responsibility, Respondent submits that it cannot be held liable for the actions taken by the Tax Ministry in the context of Yukos' bankruptcy because such actions were not taken in the exercise of *puissance publique*.  In particular, Respondent submits that it cannot be held liable for the Tax Ministry's vote to liquidate Yukos at the creditors' meeting.[1900]

### 3.    Tribunal's Decision on Attribution

1465. The Parties' differences in respect of attribution are centered on whether there can be attributed to Respondent actions of Rosneft in the acquisition of YNG, and in precipitating and participating in the bankruptcy proceedings.  Their differences also include whether the course of the bankruptcy proceedings and the actions in respect of them by the bankruptcy administrator, Mr. Rebgun, are, in whole or in part, attributable to the Russian Federation.

1466. The ILC Articles on State Responsibility are in point.  They and their commentary are conveniently republished in a book edited by Professor James Crawford, then the Commission's special rapporteur on the topic.[1901]  Chapter II, "Attribution of Conduct to a State," in its introductory commentary, observes that, "the general rule is that the only conduct

---

[1898]   Counter-Memorial ¶ 1473; Rejoinder ¶ 385, referring to Commentary to ILC Articles on State Responsibility, Article 8, ¶ 6 Exh. C-1042.  *See also* Respondent's Rebuttal Slides, Vol. 7, slide 50.

[1899]   Transcript, Day 21 at 197, referring to *Jan de Nul N.V. and Dredging International N.V. v. Arab Republic of Egypt*, ICSID ARB/04/13, Award, 6 November 2008 ¶ 173, Exh. C-997; *White Industries Australia Limited v. The Republic of India*, UNCITRAL, Award, 30 November 2011 ¶¶ 8.1.10 and 8.1.18, Exh. R-3545; *Hamester* ¶ 179; Counter-Memorial ¶ 1474, referring to *Flexi-Van Leasing, Inc. v. The Government of the Islamic Republic of Iran*, Iran-U.S. Claims Tribunal, Case No. 36, (1988) 12 Iran-U.S.C.T.R. 335, Award, 11 October 1986 p. 349, Exh. R-1154.

[1900]   Respondent's Post-Hearing Brief ¶ 177; Transcript, Day 19 at 119, 161–62 (Respondent's closing).

[1901]   Articles on Responsibility of States for Internationally Wrongful Acts with commentaries (Text adopted by the International Law Commission at its fifty-third session, in 2001), Articles 1–11 and 28–39, Exh. C-1042.

attributed to the State at the international level is that of its organs of government, or of others who have acted under the direction, instigation or control of those organs, i.e., as agents of the State."[1902]   Article 8, "Conduct directed or controlled by a State," provides that "[t]he conduct of a person or group of persons shall be considered an act of State under international law if the person or group of persons is in fact acting on the instructions of, or under the direction and control of, that State in carrying out the conduct."[1903]   The commentary to Article 8 observes that:

> Questions arise with respect to the conduct of companies or enterprises which are State-owned and controlled . . . .   The fact that the State initially establishes a corporate entity . . . is not a sufficient basis for the attribution to the State of the subsequent conduct of that entity . . . .   Since corporate entities, although owned by and in that sense subject to the control of the State, are considered to be separate, *prima facie* their conduct in carrying out their activities is not attributable to the State unless they are exercising elements of governmental authority . . . [and] the instructions, direction or control [of the State] must relate to the conduct which is said to have amounted to an internationally wrongful act.[1904]

1467. The Parties agree that the actions of organs of the Russian State, whether executive, judicial or administrative, are attributable to Russia.  As noted, disagreement is essentially confined to the actions of Rosneft (and Rosneft-controlled YNG) and the actions of the bankruptcy administrator.

1468. The Russian State owned all, or, subsequently, over 70 percent of the shares of Rosneft.  Rosneft's officers were and are appointed by the State and many of the members of Rosneft's Board of Directors concurrently occupied and occupy senior executive positions in Government, some close to President Putin.[1905]  All this however does not suffice to attribute to the Russian State the actions of which Claimants especially complain:   (a) Rosneft's collaboration with Baikal in the sale of YNG at auction and its immediate repurchase by Rosneft; (b) Rosneft's agreement with the SocGen bank creditors syndicate of Yukos to pay the debt of Yukos to those banks, the banks at the same time undertaking to petition Russian courts

---

[1902]  *Ibid.* p. 54.

[1903]  *Ibid.* p. 47.

[1904]  *Ibid.* p. 48.

[1905]  For example, Mr. Igor Sechin, the Chairman of Rosneft's Board of Directors from 2004 to 2012, was also from 2004 to 2008 Deputy Head of the Administration of the President of the Russian Federation and aide to the President, and, from 2008 to 2012, Deputy Prime Minister of the Russian Federation.  In 2011, he became President of Rosneft.  Mr. Sergei Naryshkin, now the Chairman of the State Duma, was member of the Rosneft Board of Directors from 2004 to 2009, while also holding the post, from 2004 to 2011, of Head of the Executive Office of the President of the Russian Federation (*see* Rosneft Annual Reports 2004, 2005, 2006, 2007, 2009, Exh. C-379; Rosneft Annual Report 2010, Exh. C-1265; *see also* Rosneft Annual Report 2012 (available on Rosneft's web-site).

for the bankruptcy of Yukos; and (c) Rosneft's successful bids at the bankruptcy auction for much of what was left of Yukos.

1469. That is because it would be difficult, if not impossible, to prove that Rosneft in so acting, did so at the instructions or direction, or under the control of the Russian State—but for one remarkable fortuity that bears on the auction of the shares of YNG and their acquisition by Rosneft.

1470. President Putin conducted a press conference with Russian and foreign media on 23 December 2004.[1906]  He was asked by V. Terekhov (Interfax), "in the wake of serious events that occurred tonight, when Nefteyugansk passed into the ownership of a state company.  Will you comment . . . ?"  President Putin replied:

> Now regarding the acquisition by Rosneft of the well-known asset of the company—I do not remember its exact name—is it Baikal Investment Company?  Essentially, Rosneft, a 100% state owned company, has bought the well-known asset Yuganskneftgaz.  That is the story.  In my view, everything was done according to the best market rules . . . a state owned company or, rather, companies with 100% state capital, just as any other market players, have the right to do so and, as it emerged, exercised it.  Now what would I like to say in this context?  You all know only too well how the privatization drive was carried out in this country in the early 90s and how, using all sorts of stratagems, some of them in breach even of the then current legislation, many market players received state property worth many billions.  Today, the state, resorting to absolutely legal market mechanisms, is looking after its own interests.  I consider this to be quite logical.

1471. Towards the end of this lengthy press conference, K. Eggert (BBC), noting that there had been a lot of criticism in Western press and official circles of the sale of YNG, asked for the reaction of President Putin to "this criticism and does it concern you at all?"  President Putin responded by sharply criticizing the Texas bankruptcy proceedings brought by Yukos and the responsive court ruling as "unacceptable from an international legal point of view . . . a breach of international politeness" and a manifestation of U.S. "imperium".  He concluded:  "As for the deal that took place, I think that it was carried out in strict conformity with the Russian legislation and in accordance with the norms of international law and the international commitments that Russia has taken on as part of the agreements that we have signed with our partners on the international stage.  So I do not see any real problems here."

1472. In this latter comment about agreements that Russia had signed, President Putin may have had the ECT in mind.  What at any rate is critical is his statement at the opening of the press

---

[1906]   President of Russia Official Web Portal, Press Conference with Russian and Foreign Media, 23 December 2004, Exh. C-422.

conference that, with regard to Rosneft's purchase of the YNG shares from Baikal, "the state, resorting to absolutely legal market mechanisms, is looking after its own interests." He did not say that Rosneft was looking after its own interests, but that the purchase signified that the Russian State was looking after "its own interests". In the view of the Tribunal, that statement constitutes President Putin's public acceptance and assertion that Rosneft's purchase of the YNG shares from Baikal was an action in the State's interest, the inference being that the State, then 100 percent shareholder of Rosneft, the most senior officers of which were members of President Putin's entourage, directed that purchase in the interest of the State. It follows that that act, as well as the auction of YNG shares that underlay it, is attributable to the Russian State.

1473. Claimants have invoked as well Rosneft's press release of 27 June 2005, in which Rosneft declared that, given that it is wholly owned by the State, "Rosneft acts on its behalf."[1907] They also noted a statement made by Rosneft in the context of its IPO in July 2006, acknowledging that "the Russian Government . . . controls Rosneft . . . ."[1908]

1474. It does not necessarily follow from the foregoing that the actions of Rosneft in contracting with the SocGen bank creditors of Yukos, and in bidding at the bankruptcy auction of Yukos itself, are attributable to Russia. Yet it may well be that in taking those actions, Rosneft did so at the *sub rosa* direction of the Russian State, at the direction of senior officers of President Putin's entourage who concurrently ran Rosneft. In the view of the Tribunal, it may reasonably be concluded that Rosneft was so directed. Or, if not, that it was not because it did not need to be; Rosneft was such a creature of President Putin's entourage that it reflexively implemented his policies. But proving that admittedly is elusive, in the absence of an inculpatory admission on behalf of the Russian State such as that of President Putin in respect of the acquisition of YNG.

1475. Are the actions of the bankruptcy administrator, Mr. Rebgun, attributable to the Russian Federation?

1476. Respondent observed in its Rejoinder that "[i]n most European legal systems a liquidator or bankruptcy receiver is not a State organ" and that bankruptcy managers and receivers do not "generally exercise elements of governmental authority or act under the instructions, direction

---

[1907] *Rosneft Shareholders' AGM Held*, Rosneft Press Release, 27 June 2005, Rosneft Website, Exh. C-1419.

[1908] Rosneft IPO Prospectus, 14 July 2006, Exh. C-380.

or control of the State".[1909]   Respondent cited pertinent awards of investment treaty tribunals, including *Plama*[1910] and *Oostergeel v. Slovak Republic*[1911] as well as the decision of the Grand Chamber of the ECtHR in *Kotov v. Russia*[1912] in support of this conclusion.  Those decisions are indeed supportive.

1477.  Claimants did not address these arguments at the Hearing, where they appeared to limit their complaints in the context of the bankruptcy proceedings to "the actions of the Russian courts, who appointed the interim receiver and confirmed all his actions, as well as the actions of the admitted creditors, namely the Tax Ministry and Rosneft."[1913]

1478.  Respondent has maintained that the actions of the Tax Ministry—incontestably an organ of the Russian State—in asserting and realizing its predominant claims to the assets of Yukos in the bankruptcy proceedings, nevertheless are not in breach of the ECT because the Tax Ministry there acted as a mere commercial creditor and did not exercise governmental authority.  "The votes of the Russian tax authorities are attributable to Respondent, but are not an exercise of *puissance publique.*  The tax authorities voted at the Creditors' Meeting, and, more generally, participated in Yukos' bankruptcy proceedings in their capacity as a Yukos creditor alongside other creditors, enjoyed no special prerogatives or privileges, and were subject to the same rules as private creditors, the 2002 Bankruptcy Law."[1914]   Moreover, Respondent contends that the Moscow Arbitrazh Court's "acceptance of the bankruptcy petitions and ratification of the creditors' decision to liquidate Yukos does not change this conclusion . . . [It] enforced legislation governing private-law relations, specifically, bankruptcy legislation, which imposes limitations inherent in private property.  Loss resulting from a court's enforcement of legal limitations inherent in private property is not compensable under Article 13 or 10(1) ECT, irrespective of whether the court proceedings were instituted by a State organ."[1915]

1479.  The foregoing line of argument runs up however against the ILC Articles on State Responsibility.  Article 4 provides that "[t]he conduct of any State organ shall be considered an

---

[1909]   Rejoinder ¶¶ 389–390.

[1910]   *Plama* ¶¶ 252–53.

[1911]   *Jan Oostergetel* ¶¶ 151–58.

[1912]   *Kotov v. Russia* ¶¶ 99–107.

[1913]   Transcript, Day 20 at 252.

[1914]   Respondent's Post-Hearing Brief ¶ 177.

[1915]   *Ibid.* ¶ 178.

act of that State under international law, whether the organ exercises legislative, executive, judicial or any other functions, whatever position it holds in the organization of the State . . . ." The commentary to this article specifies that "[i]t is irrelevant for the purposes of attribution that the conduct of a State organ may be classified as 'commercial' or as '*acta iure gestionis*'."[1916]

1480. In respect of attribution, the Tribunal concludes that the Russian Federation is responsible for its organs, executive, judicial and administrative, in the actions that they took against and in relation to Yukos and its stockholders; that, for the reasons stated above, the Russian Federation, speaking through its President, accepted responsibility for Rosneft's acquisition of YNG and for the auction that underlay it; and that, in respect of other actions of Rosneft that bear on the destruction of Yukos, while proof of specific State direction is lacking, it may reasonably be held that the highest officers of Rosneft who at the same time served as officials of the Russian Federation in close association with President Putin acted in implementation of the policy of the Russian Federation.  The actions of Mr. Rebgun as bankruptcy administrator are not attributable to Respondent.[1917]

## B.   ARTICLE 10 OF THE ECT

### 1.   Introduction

1481. Article 10(1) provides, in relevant part:

> *Article 10*
> PROMOTION, PROTECTION AND TREATMENT OF INVESTMENTS
>
> (1)   Each Contracting Party shall, in accordance with the provisions of this Treaty, encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area.   Such conditions shall include a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment.   Such Investments shall also enjoy the most constant protection and security and no Contracting Party shall in any way impair by unreasonable or discriminatory measures their management, maintenance, use, enjoyment or disposal.   In no case shall such Investments be accorded treatment less favourable than that required by international law, including treaty obligations. . . .

---

[1916]   ILC Aricles on State Responsibility, Articles 1–11 and 28–39, p. 40, Exh. C-1042.

[1917]   It is of interest to note that, in an interview with the Vedomosti paper in October 2006, Mr. Rebgun is alleged to have acknowledged his ties to the Russian security establishment known as the "siloviki."   *Yukos liquidator says process will be legal*, AFP World News, 10 August 2006, Exh. C-822.

1482. The Tribunal will first summarize the Parties' arguments regarding applicable legal standards under Article 10(1) of the ECT, and then turn to the Parties' arguments regarding whether Claimants have made out a breach of these standards by Respondent.

## 2. Applicable Legal Standards under Article 10(1) of the ECT

### (a) Claimants' Position

1483. In respect of the obligations imposed by Article 10(1) on host States, Claimants refer, as being particularly relevant to the present case, to Respondent's obligation to accord Claimants' investments "fair and equitable treatment" and its obligation not to impair Claimants' investments by discriminatory measures.[1918]

1484. With regard to fair and equitable treatment, Claimants submit that, as a general matter, it is "a broad and widely accepted standard"[1919] encompassing such fundamental standards as "good faith, due process, non-discrimination and proportionality",[1920] "procedural propriety",[1921] "the right to be heard and to present evidence",[1922] "proper notice of administrative actions to be taken by the State"[1923] and "transparency, protection of legitimate expectations . . . and freedom from coercion and harassment".[1924]

1485. Claimants submit that fair and equitable treatment in Article 10(1) of the ECT is a "non-contingent, autonomous" standard that is broader than both the historical customary international law standard for the treatment of aliens elaborated in *Neer* (which requires "a showing of outrage, bad faith, willful neglect of duty, or 'insufficiency of governmental action so far short of international standards that every reasonable and impartial man would readily

---

[1918]   Memorial ¶ 556.

[1919]   *Ibid.* ¶ 558, quoting Judge Schwebel in *MTD Equity Sdn. Bhd. and MTD Chile S.A. v. Republic of Chile*, ICSID Case No. ARB/–1/07, Award, 25 May 2004 ¶ 109, Exh. C-969 (hereinafter "*MTD v. Chile*").

[1920]   *Ibid.* quoting Judge Schwebel in *MTD v. Chile*, Exh. C-969 and *Saluka Investments BV v. The Czech Republic* (UNCITRAL), Partial Award, 17 March 2006 ¶ 303, Exh. C-977 (hereinafter "*Saluka*"); Reply ¶ 581.

[1921]   Memorial ¶ 564.

[1922]   *Ibid.* ¶ 566.

[1923]   *Ibid.* ¶ 567.

[1924]   *Ibid.* ¶ 558.

recognize its insufficiency'")[1925] and the current customary international law minimum standard of treatment for investments.[1926]

1486. Claimants emphasize that fair and equitable treatment is an "objective standard that does not require bad faith by the [host] State."[1927]

1487. Claimants further submit that denial of justice can constitute a breach of the fair and equitable treatment standard and refer to several awards that define the legal standard for establishing a denial of justice: *Azinian v. Mexico*, *Rumeli v. Kazakhstan*, *Chattin*, *Mondev v. United States*, *Brown v. Great Britain*, and *Petrobart v. Kyrgyz Republic*.[1928]   Claimants submit that "[i]nternational law has long accepted the responsibility of States for the actions of their courts, especially where those actions involve judicial impropriety and malfunctions in the administration of justice."[1929]   Claimants submit that a substantive denial of justice may be found in instances of gross misapplication of the law,[1930] but that most often denial of justice will be related to procedural inadequacies.[1931]   Accordingly, say Claimants, the concepts of due process and denial of justice are "closely linked", such that "a failure to allow a party due process will often result in a denial of justice."[1932]

1488. However, Claimants contend that Respondent, by arguing that the threshold for Article 10(1) is "demanding" or "high", conflates the standard for breaches of due process with the historical standard for denial of justice.[1933]   In support of their criticism, Claimants refer to the awards in *Vivendi II* and *Rumeli v. Kazakhstan* and to a recent commentary by Judge Schwebel, a member of this Tribunal, where he wrote that:

---

[1925]   Reply ¶ 584, quoting Counter-Memorial ¶ 1564.

[1926]   Reply ¶ 584–606, citing *Azurix Corp. v. Argentine Republic*, ICSID Case No. ARB/01/12, Award, 14 July 2006 ¶¶ 360–61, 372, Exh. C-979 (hereinafter "*Azurix*").

[1927]   Transcript, Day 1 at 154, quoting *National Grid P.L.C. v. Argentine Republic* (UNCITRAL) Award, 3 November 2008 ¶ 173, Exh. C-996; *see also* Memorial ¶ 559.

[1928]   Memorial ¶¶ 618–28.

[1929]   *Ibid.* ¶ 619.

[1930]   *Ibid.* ¶ 621.

[1931]   *Ibid.* ¶ 622.

[1932]   *Ibid.*¶ 623, quoting *Waguih Elie George Siag and Clorinda Vecchi v. The Arab Republic of Egypt*, ICSID Case No. ARB/05/15, Award, 1 June 2009 ¶ 452, Exh. C-998.

[1933]   *Ibid.* ¶¶ 607–16.

> [w]hat in another case may or may not be fair and equitable treatment by a State of foreign investment may involve procedural matters, or matters of substance, or both, far removed from the confines and criteria of a denial of justice.[1934]

1489. It follows, submit Claimants, that while investment tribunals have considered the fair and equitable treatment standard to include the manner in which an investor and its investment are treated by the host State's courts "mainly through the prism of denial of justice . . . this is by no means exhaustive of the standard."[1935]   In sum, Claimants' position is that, while denial of justice forms part of the fair and equitable treatment standard, the latter standard is not limited to the former.[1936]

1490. Claimants also submit that freedom from arbitrariness and discrimination forms part of the fair and equitable treatment standard.[1937]   In support of their submission, Claimants refer to the award in *Saluka Investments BV v. The Czech Republic* ("***Saluka***")—quoted verbatim by the *Biwater Gauff v. United Republic of Tanzania* ("***Biwater***") and *Rumeli v. Kazakhstan* tribunals—which established the proposition that the standard of reasonableness has no different meaning in this context than in that of the fair and equitable treatment standard with which it is associated.[1938]

1491. Claimants submit that the *Plama v. Bulgaria* award confirms that "unreasonable" conduct is synonymous with "arbitrary" conduct.[1939]   Claimants also contend that many tribunals, such as those in *Lemire v. Ukraine* and *Siemens A.G. v. The Argentine Republic* ("***Siemens***"), have ruled that various State actions, not "based on reason", and comparable to those alleged against Respondent were "arbitrary".[1940]

---

[1934] *Ibid.* ¶ 608, referring to Judge Stephen M. Schwebel, "Is *Neer* Far from Fair and Equitable?" (2011) 27 Arb. Int'l 555 p. 559, Exh. C-1647.

[1935] *Ibid.* ¶ 611.

[1936] *Ibid.* ¶ 615

[1937] *Ibid.* ¶ 645, citing *CMS Gas Transmission Company v. The Argentine Republic*, ICSID Case No. ARB/01/8, Award, 12 May  2005 (hereinafter "*CMS v. Argentina*").

[1938] Memorial ¶ 645, citing *Saluka*, ¶ 460, Exh. C-977; *Biwater Gauff (Tanzania) Ltd. v. United Republic of Tanzania*, ICSID Case No. ARB/05/22, Award, 24 July 2008 and Concurring and Dissenting Opinion by Gary Born ¶ 692, Exh. C-991 (hereinafter *"Biwater"*); *Rumeli Telekom A.S. and Telsim Mobil Telekomunikasyon Hizmetleri A.S. v. Republic of Kazakhstan*, ICSID Case No. ARB/05/16, Award, 29 July 2008 ¶ 679, Exh. C-992.

[1939] Memorial ¶ 646, *Plama*, Exh. C-994.

[1940] *Ibid.* ¶¶ 651–52.

1492. Claimants further submit that the principle of proportionality is an element of the fair and equitable treatment standard, as confirmed in *MTD Equity Sdn. Bhd. and MTD Chile S.A. v. Chile* ("**MTD v. Chile**") and *Vivendi v. Argentina*.[1941]

1493. Many arbitral tribunals, say Claimants, have also held that a stable legal and business environment is an essential element of fair and equitable treatment.[1942]  They refer to the concepts of consistency, transparency and treatment that does not frustrate the legitimate expectations of the investor as being essential to ensure such an environment[1943]  Claimants cite the *PSEG Global v. Turkey* award, where the tribunal stated that "the 'roller-coaster' effect of the continuing legislative changes" seriously breached the fair and equitable treatment obligation.[1944]

1494. Claimants also contend that Article 10(1) of the ECT includes a stand-alone prohibition against discrimination that is breached if the management, maintenance, use, enjoyment or disposal of the investor's investment is impaired.  The test for identifying discriminatory measures, submit Claimants, is described in *Plama* as entailing "like persons being treated in a different manner in similar circumstances without reasonable or justifiable grounds."[1945]

1495. Further, Claimants argue that the non-discrimination standard in Article 10(1) of the ECT is not limited to measures taken because of the foreign nationality of the investor.  Claimants emphasize that nothing in the wording of Article 10(1) of the ECT suggests such a limit to the standard.  This is particularly obvious when Article 10(1) is contrasted with Article 10(7) of the ECT, which contains the most-favored-nation treatment and national treatment standards.  It follows, argue Claimants, that "when the ECT's drafters intended to restrict a non-discrimination provision to nationality-based discrimination, they expressly did so."[1946]  Claimants contend that the former U.S. BIT negotiator, Mr. Vandevelde supported this interpretation:

> Nothing in the language [of the ECT] suggests that it is limited to discrimination based on nationality . . . .  Although the most common competitive disadvantages imposed on

---

[1941]   *Ibid.* ¶ 679.

[1942]   *Ibid.* ¶ 697.

[1943]   *Ibid.* ¶ 698.

[1944]   *Ibid.* ¶ 703.

[1945]   *Ibid.* ¶ 737.

[1946]   Reply ¶ 641.

> foreign investments may be nationality-based, a competitive disadvantage imposed on some other basis may be just as detrimental to the investment.[1947]

1496. Claimants also rely on the awards in *Plama*, *Al-Bahloul v. Tajikistan*[1948] and *National Grid*[1949] for the proposition that arbitral tribunals interpreting the ECT and other investment protection treaties with identical or similar provisions have concluded that the non-discrimination standard is not restricted to a protection against nationality-based discrimination.[1950]

1497. Claimants contend that the authorities relied upon by Respondent for the contrary proposition either contradict Respondent's position or are inapposite.[1951]   Claimants characterize Respondent's "selective quoting" from the *LG&E Energy Corp. et al. v. The Argentine Republic* award as "unfortunate."   They say that, in fact, in the paragraph immediately following the one cited by Respondent, the Tribunal said the exact opposite.   They point out that the tribunal found that "while there was no intent to discriminate against the investments on account of the investors' nationality, there was differential treatment of similar companies."[1952]   Claimants also highlight that Respondent's reliance on declarations from the U.S. and Canada is of no assistance, as they are non-signatories to the ECT.[1953]

### (b)   Respondent's Position

1498. Respondent submits that, in determining whether the host State's conduct is fair and equitable, an investor's legitimate and reasonable expectations are the "dominant" element.   Respondent also submits that the assessment of the reasonableness and legitimacy of an investor's expectations of fair and equitable treatment must be based on the state of the law of the host State, its political and historical conditions, and any particular conditions of treatment the State

---

[1947]   *Ibid.* ¶ 642, referring to Kenneth Vandevelde, *Bilateral Investment Treaties, History, Policy and Interpretation* (OUP 2010) pp. 213–14, Exh. C-1018.

[1948]   *Mohammad Ammar Al-Bahloul v. Republic of Tajikistan* (SCC Case No. V064/2008), Partial Award on Jurisdiction and Liability of 2 September 2009 ¶ 248, Exh. C-1531.

[1949]   *National Grid P.L.C. v. Argentine Republic* (UNCITRAL), Award, 3 November 2008 ¶ 198, Exh. C-996.

[1950]   *Ibid.* ¶¶ 644–46.

[1951]   *Ibid.* ¶¶ 647–51.

[1952]   *Ibid.* ¶ 650, referring to Counter-Memorial p. 748, n.2479; *LG&E Energy Corp et al. v. The Argentine Republic,* ICSID Case No. ARB/02/1, Decision on Liability, 3 October 2006 ¶¶ 147–48, Exh. C-981 (hereinafter "*LG&E*").

[1953]   *Ibid.* ¶¶ 652–53.

offered the investor at the time it made its investment.[1954]  In support of these propositions, Respondent cites *Saluka* and *Duke Energy v. Ecuador*.[1955]

1499. Respondent also refers to the award in *M.C.I. v. Ecuador* to support the proposition that the obligation to provide an investor with stable, equitable, favorable and transparent conditions cannot be construed as an obligation to refrain from enforcing existing law.[1956]  Respondent relies on Professor Dolzer's view that "[t]he pre-investment legal order forms the framework for the positive reach of the expectation which will be protected and also the scope of considerations upon which the host state is entitled to rely when it defends [itself]."[1957]

1500. Respondent refers to the awards in *Lauder v. Czech Republic* and *Genin v. Estonia* in support of its contention that conduct cannot be in breach of the fair and equitable treatment standard if authorities are only taking the actions necessary to enforce the their laws.[1958]  Respondent also relies on the *Genin v. Estonia* award for the proposition that where a State's actions are the justified exercise of its power to enforce its laws, the procedural irregularities complained of by investors must be very severe to amount to a violation of the relevant investment treaty.[1959]

1501. Moreover, Respondent contends that the fair and equitable treatment standard in Article 10(1) of the ECT—specifically with respect to establishing a denial of justice, or conduct that is otherwise manifestly unfair or unreasonable—corresponds to an international law minimum standard of treatment of foreign investment.[1960]  This minimum standard, submits Respondent, incorporates the customary international law minimum standard of treatment for alien property, as well as treaty obligations of the host State, but excludes decisions by international organizations, such as the ECtHR.[1961]

---

[1954]   Counter-Memorial ¶¶ 1549–50.

[1955]   *Ibid*. citing *Saluka* ¶¶ 301–302; *Duke Energy Eletroquil Partners S.A. v. Republic of Ecuador*, ICSID ARB/04/19, Award, 18 August 2008 ¶ 340, Exh. C-993.

[1956]   Counter-Memorial ¶ 1551.

[1957]   *Ibid.* ¶ 1552.

[1958]   *Ibid.* ¶ 1553, referring to *Lauder v. The Czech Republic*, UNCITRAL, Final Award, 3 September 2001 ¶¶ 296–97, Counter-Memorial ¶¶ 1566–67, referring to *Alex Genin, Eastern Credit Ltd., Inc. and A.S. Baltoil v. The Republic of Estonia*, ICSID ARB/99/2, Award, 25 June 2001, 17 ICSID Rev. 395 (2002) ¶ 367, Exh. R-1095.

[1959]   *Ibid.* ¶ 1567.

[1960]   *Ibid.* ¶ 1559.

[1961]   *Ibid.* ¶ 1561.

1502. According to Respondent, Claimants' burden for showing a violation of the minimum standard is "demanding".[1962]   Thus, some tribunals have equated the fair and equitable treatment standard with the *Neer* standard, which for allegations of due process violations by a host State's courts would require a showing of outrage, bad faith, willful neglect of duty, or "insufficiency of governmental action so far short of international standards that every reasonable and impartial man would readily recognize its insufficiency".[1963]

1503. Thus, due process violations in one or more proceedings "do not by themselves establish a treaty violation if the procedures are only part of the judicial process available to the parties."[1964]   Citing *AMTO v. Ukraine*, Respondent argues that the assessment of the conduct of national courts must include the availability of remedies in the host State's legal system and whether or not such remedies were exercised; and if they were exercised, whether they were exercised fully and wisely.[1965]   In addition, in order to prove their claim for denial of justice, Claimants must show a "clear and malicious misapplication of the law" based on the content of judicial opinions themselves.[1966]

1504. With respect to the standard of non-discrimination, Respondent submits that Article 10(1) of the ECT "only prohibits discrimination based on nationality."[1967]   Accordingly, it argues that discriminatory measures must have been "taken because of the foreign nationality of the shareholders."[1968]

1505. Part VII of the Table of Contents in Respondent's Rejoinder provides a short list of the conditions that, according to Respondent, Claimants' claims must meet in order to show a breach of Article 10(1) (in addition to showing that the conduct alleged to be in breach of Article 10(1) is attributable to Respondent and is an exercise of *puissance publique*, as discussed above in Chapter X.A):

---

[1962]   *Ibid.* ¶ 1562, referring to *AES Summit Generation Ltd. and AES-Tisza Eromu Kft v. Hungary*, ICSID ARB/07/22, Award, 23 September 2010 ¶ 9.3.40, Exh. R-1103; *see also* Counter-Memorial ¶ 1568.

[1963]   Counter-Memorial ¶ 1564, *see esp.* p. 738, n.2456; *ibid.* ¶ 1568, referring to *B.E.Chattin (U.S.) v. United Mexican States*, U.S.–Mexico General Claims Commission, Opinion of 23 July 1927, 4 U.N.R.I.A.A. 282, 295, ¶ 29, Exh. C-924.

[1964]   Counter-Memorial ¶ 1571.

[1965]   *Ibid.* citing *Limited Liability Company AMTO v. Ukraine*, SCC 080/2005, Final Award, 26 March 2008 ¶ 76, Exh. C-989.

[1966]   Counter-Memorial ¶ 1572.

[1967]   *Ibid.* ¶ 1580.

[1968]   *Ibid.* ¶¶ 1581–84.

1. Regardless of the standard of review under Article 10(1), Claimants must establish that the Russian Federation's actions interfered with Claimants' legitimate and reasonable expectations based on a full disclosure of the facts relevant to Claimants' investments and based on operation of the investments in accordance with Russian law

    a) . . . Claimants must establish . . . specific, legal commitments by Respondent based on a full disclosure of the facts relevant to their investments

    b) Claimants also must establish that the Russian Federation's actions interfered with their expectations that are based on an operation of their investments in accordance with Russian law

2. Claimants must establish a systemic judicial failure, or, at a minimum, that the conduct they attack is otherwise manifestly unfair or unreasonable

    a) Claimants must establish that the Russian court decisions they attack constitute a denial of justice or are otherwise manifestly unfair or unreasonable

    b) Specifically with respect to the taxation measures Claimants challenge, Claimants must establish a systemic judicial failure or, at a minimum, that the measures are manifestly unfair or unreasonable, and contrary to internationally recognized tax policies and practices

    c) Specifically with respect to Yukos' bankruptcy proceedings, Claimants must demonstrate a systemic failure of the Russian judicial system, or, at a minimum, that the bankruptcy proceedings were manifestly unfair or unreasonable

3. To establish "unreasonable or discriminatory measures" that impaired the management, maintenance, use or enjoyment of their investments, Claimants must prove a systemic judicial failure, or, at a minimum, that the taxation measures complained of are contrary to international tax practices or treated similar cases differently on the basis of nationality, without reasonable justification.[1969]

1506. Finally, Respondent submits that in order to substantiate their claim, Claimants must prove a direct causal link between the loss of their shares and measures in breach of Article 10(1) ECT.[1970]

### 3. Did Respondent Accord Claimants' Investments the Standard of Treatment Required by Article 10(1) of the ECT?

#### (a) Claimants' Position

1507. Claimants submit that Respondent violated its obligations under Article 10(1) of the ECT by failing to accord Claimants' investments fair and equitable treatment and by impairing Claimants' investments by discriminatory measures.

1508. In terms of fair and equitable treatment, Claimants contend that Respondent's actions, both individually and collectively, constitute breaches of the most basic requirements of procedural

---

[1969]   Rejoinder, Table of Contents, pp. v–vi.

[1970]   Respondent's Post-Hearing Brief ¶ 173.

propriety and due process, as well as a denial of justice.[1971]  Claimants emphasize that their case is not limited to one of "systematic denial of justice", as Respondent maintains.[1972]

1509. Claimants also emphasize that, in considering whether Respondent violated the fair and equitable treatment standard under Article 10(1) of the ECT, the Tribunal should not view each fact in isolation, but rather look at the totality of Respondent's actions.[1973]  Thus, Claimants state that, while some of Respondent's actions could and do, in and of themselves, constitute breaches of Articles 10(1), their position is that "the totality of the Russian Federation's actions and their cumulative effect" constitute a violation of the fair and equitable treatment standard.[1974]

1510. Claimants offer a list of specific actions taken by Respondent, or attributable to it, which, they say, demonstrate that Respondent breached the fair and equitable treatment standard.

1511. Firstly, Claimants contend that Respondent breached the fair and equitable treatment standard by the conduct of "over 150 raids . . . in brutal conditions from July 4, 2003 to November 18, 2004, and the innumerable searches and seizures conducted by armed and masked officers at Yukos' headquarters, the premises of affiliates or entities related to Yukos, or the offices of lawyers acting in Yukos-related cases, leaving neither a copy nor a simple list of the documents and items seized, in breach of even the most basic requirements of Russian law."[1975]  Claimants allege that these searches and seizures were part of the Russian Federation's campaign to destroy Yukos and had a major disruptive effect on the operations of Yukos, reducing the company's chances of survival in the face of the Russian Federation's attacks (and, in

---

[1971]   Memorial ¶¶ 568, 618.

[1972]   Transcript, Day 17 at 134 (Claimants' closing); *Ibid.* at 145.

[1973]   Transcript, Day 1 at 155–57 (Claimants' opening), referring to *RosInvestCo* ¶ 621, Exh. C-1049; *Quasar* ¶ 44, Exh. R-3383; Transcript, Day 17 at 149–154, referring to *Vivendi* ¶ 7.5.31 ("It is well-established under international law that even if a single act or omission by a government may not constitute a violation of an international obligation, several acts taken together can warrant finding that such obligation has been breached. The ad hoc Committee recognized this when it noted that '[i]t was open to Claimants to claim, and they did claim, that these acts taken together, or some of them, amounted to a breach of Articles 3 and/or 5 of the BIT"); *Walter Bau AG v The Kingdom of Thailand*, UNCITRAL, Award, 1 july 2009 ¶ 12.43 (hereinafter "*Walter Bau*") ("The Respondent's argument that 'creeping expropriation' only, and not breaches of FET, can be defined by a series of acts is not correct.  The Tribunal sees no reason why a breach of a FET obligation cannot be a series of cumulative acts and omissions.  One of these may not on its own be enough, but taken together, they can constitute a breach of FET obligations."); *see also* Claimants' Post-Hearing Brief ¶¶ 182–84.

[1974]   Claimants' Post-Hearing Brief, ¶ 182.

[1975]   *Ibid.* ¶ 161, referring to Memorial ¶¶ 152–66; Reply ¶¶ 74–94; Rieger WS ¶ 28; Misamore WS ¶¶ 31–32; Schmidt WS ¶ 16; *see also* Memorial ¶¶ 569–79.

particular, "the accelerated pace in which tax debts were fabricated").[1976]  As for the "campaign of harassment" on PwC, and subsequent raid, Claimants allege that it precipitated PwC's withdrawal of its certification of Yukos' audits.[1977]

1512. Secondly, Claimants contend that Respondent did not provide proper notice of administrative actions to be taken by the State.[1978]  In that regard, Claimants submit that the Tax Ministry, the Russian courts and the bailiffs repeatedly failed to afford Yukos reasonable timeframes in which to pay or challenge the alleged tax reassessments:  just two days to voluntarily pay after issuance of the 2000 Decision, and a single day to pay after issuance of each of the 2002 and 2003 Decisions.  In addition, Claimants allege that Respondent did not wait for these short time limits to expire before filing a petition for collection with the Moscow Arbitrazh Court, which Claimants allege were swiftly "rubber-stamped" in favor of Respondent.[1979]

1513. Thirdly, Claimants submit that Respondent did not afford them the opportunity to be heard by an impartial tribunal.  Claimants contend that Respondent instead ensured that government-friendly judges sanctioned the tax reassessments and that the three judges who failed to rule against Yukos were removed, and their rulings later overturned.  Yukos' requests for interim relief to suspend the effect of the tax reassessment decisions pending appeal on the merits were also systematically rejected.  Claimants further submit that hearings on these matters were set, and appeals ruled upon, almost immediately, and that Yukos was not given real access to case materials.[1980]

1514. Fourthly, Claimants assert that the sale of YNG was a sham auction, orchestrated by Respondent under the pretext of satisfying Yukos' alleged tax liability for the 2000 Decision; an alleged liability that Claimants submit was fully paid prior to the auction date.[1981]  With only State-owned Gazprom and Baikal in attendance,[1982] Claimants contend that Baikal acquired YNG for a "bargain" price.  Claimant also notes that Baikal was purchased by State-owned

---

[1976]   Claimants' Post-Hearing Brief ¶¶ 159, 161–62, 165.

[1977]   Memorial ¶ 578.

[1978]   *Ibid.* ¶¶ 567, 586.

[1979]   *Ibid.* ¶¶ 582–90.

[1980]   *Ibid.* ¶¶ 581–86.

[1981]   *Ibid.* ¶ 594.

[1982]   *Ibid.* ¶¶ 595.

Rosneft shortly following the auction, and that President Putin himself admitted Baikal was used as a front company to shield the future owner – Rosneft – from legal claims.[1983]

1515. Fifthly, Claimants assert that the initiation of bankruptcy proceedings against Yukos at the behest of Rosneft, the biased conduct of those proceedings by Russian courts, and the sale of Yukos' remaining assets also violated due process requirements.[1984]

1516. Claimants submit that the following actions taken by Respondent in breach of due process amount to a denial of justice:

- the administration of justice by Russian courts with respect to all Yukos related matters did not meet generally accepted international law standards of due process, impartiality and legitimacy;[1985]

- Russian courts were unduly hasty in their decision-making, refusing to provide Yukos with sufficient time or adequate opportunity to review the evidence on which the tax reassessment payment demands were based which eventually lead to its bankruptcy;[1986] and

- the systematic removal of judges who ruled in Yukos' favor and dismissal of Yukos' challenges against judges who had previously ruled against it in tax proceedings.[1987]

1517. In their discussion of denial of justice, Claimants invited the Tribunal to note the fact that Yukos lost nearly all of its cases in 2000 against the tax authorities and the statistic put forward by Mr. Konnov that the taxpayer in Russia wins in 75 percent of the cases.[1988]

1518. Moreover, Claimants argue that even if it purported to discuss denial of justice claims, Respondent has actually failed to defend its conduct, limiting itself to misstating the standard applicable to a claim of denial of justice.[1989]   According to Claimants, Respondent has "concentrated its energies on urging the Arbitral Tribunal to impose a higher burden on

---

[1983] *Ibid.* ¶¶ 599.

[1984] *Ibid.* ¶¶ 601–17.

[1985] *Ibid.* ¶ 643.

[1986] *Ibid.* ¶ 626.

[1987] *Ibid.* ¶ 629.

[1988] Transcript, Day 17 at 135 (Claimants' closing).

[1989] Reply ¶ 612.

Claimants, for the facts of the Russian Federation's conduct are devastating."[1990]  Claimants assert that Respondent's attempts to elevate the applicable threshold fail because Respondent's conduct was indefensible under any plausible interpretation of the standards contained in Article 10(1) of the ECT.[1991]

1519. Claimants also contend that Respondent's actions were arbitrary, unreasonable, disproportionate, and abusive,[1992] in their reference to the following actions of Respondent:

- Respondent's unrelenting campaign of coercion, harassment, and intimidation against Yukos and related persons and entities;[1993]

- the imposition of arbitrarily and disproportionately large payment demands by Respondent under the guise of tax reassessments, enforced within short time periods and accompanied by arbitrary freezing of assets orders;[1994] and

- Respondent's unreasonable and arbitrary rejection of Yukos' proposals to settle or resolve the alleged tax claims.[1995]

1520. Claimants submit that Respondent failed to ensure a predictable and stable legal and business framework for the Claimants' investments.[1996]  They refer as examples to:

- Respondent's reversal of its previous acceptance of Yukos' tax optimization structure as legal;

- Respondent's reversal of its approval of the Sibneft merger; and

- a general lack of transparency on the part of Respondent.[1997]

---

[1990] *Ibid.* ¶ 631.

[1991] *Ibid.*

[1992] Memorial ¶¶ 644–95.  Claimants submit that while Article 10(1) of the ECT only expressly prohibits "unreasonable or discriminatory measures", jurisprudence confirms that "unreasonable" measures have the same meaning as "arbitrary" conduct, and similarly violate the fair and equitable treatment standard (*Ibid.* ¶¶ 665–67, citing *EDF (Services) Limited v. The Republic of Romania*, ICSID Case No. ARB/05/13, Award, 8 October 2009 ¶ 303, Exh. C-1001; *Plama* ¶ 184; *Saluka* ¶ 460; *CMS v. Argentina* ¶ 290).

[1993] Memorial ¶¶ 654–77.

[1994] *Ibid.* ¶¶ 678–95.

[1995] *Ibid.* ¶¶ 689–701.

[1996] *Ibid.* ¶¶ 702–21.

1521. In support of their contention that Respondent discriminated against Claimants' investments, Claimants rely on the following facts:

- Respondent treated Yukos in a significantly different way from other comparable Russian oil companies;

- Respondent treated YNG differently before and after its acquisition by Rosneft; and

- Respondent ensured differential treatment between creditors related to Yukos or Yukos' shareholders, and State or State-related creditors in the Yukos bankruptcy proceedings.

1522. In their Reply, Claimants assert that in its Counter-Memorial Respondent does not address Claimants' claims of discrimination under Article 10(1) of the ECT, except in its assertion that Claimants' allegations with respect to the Yukos–Sibneft demerger do not involve discrimination based on nationality.[1998]   Claimants also argue that Respondent improperly invokes its domestic law in defense of its breaches of international law.[1999]

1523. Also in their Reply, Claimants argue that Respondent's only defense against the bulk of Claimants' claims under Article 10(1) is to invoke Article 21(1) ECT.  According to Claimants, in providing no other defense, Respondent has conceded that its conduct breached Article 10(1).   Claimants view Respondent's defense as resting

> squarely on the theory that Article 21(1) . . . operates as a license to ECT signatories to freely violate their treaty obligations under Article 10(1) . . . so long as they create the appearance that their actions have some connection, however remote and indirect, to taxation.[2000]

### (b)   Respondent's Position

1524. Respondent's main position is that Claimants have failed to establish any violation of Article 10(1) of the ECT.

1525. In particular, Respondent submits that (a) Claimants have failed to establish that conduct, which is attributable to Respondent and an exercise of its sovereign power, proximately caused

---

[1997]   *Ibid.* ¶¶ 722–33.

[1998]   Reply ¶¶ 654–90.

[1999]   *Ibid.* ¶ 619.

[2000]   *Ibid. ¶* 577.

the loss of Claimants' investment;[2001] (b) Claimants have failed to establish that the measures they challenge interfered with Claimants' legitimate expectations;[2002] and (c) the measures relating to the imposition and enforcement of taxes were well within the range of a State's generally accepted regulatory powers.[2003]

1526. Respondent also argues that Claimants have failed to show that the challenged measures constitute a denial of justice or are otherwise manifestly unfair or unreasonable.[2004]  In particular, Respondent argues that Claimants have failed to establish that the Moscow and Chukotka courts "clearly and maliciously" misapplied Russian law when granting the claims of Gemini Holdings and Nimegian Trading in the context of the Yukos–Sibneft merger.[2005]

1527. Respondent also asserts that the challenged measures were not discriminatory.[2006]

## C.   ARTICLE 13 OF THE ECT

### 1.   Introduction

1528. Article 13(1) of the ECT provides, in relevant part:

*Article 13*

EXPROPRIATION

(1)   Investments of Investors of a Contracting Party in the Area of any other Contracting Party shall not be nationalized, expropriated or subjected to a measure or measures having effect equivalent to nationalization or expropriation (hereinafter referred to as "Expropriation") except where such Expropriation is:

(a)   for a purpose which is in the public interest;

(b)   not discriminatory;

(c)   carried out under due process of law; and

(d)   accompanied by the payment of prompt, adequate and effective compensation.

Such compensation shall amount to the fair market value of the Investment expropriated at the time immediately before the Expropriation or impending

---

[2001]   Post-Hearing Brief ¶¶ 174–80.

[2002]   *Ibid*. ¶¶ 184–90; Counter-Memorial ¶¶ 1545, 1555–58.

[2003]   Respondent's Post-Hearing Brief ¶¶ 191–99.  Particulars of Respondent's submission are summarized in the next chapter, which deals with Article 13 of the ECT.

[2004]   Counter-Memorial ¶ 1545.

[2005]   *Ibid*. ¶ 1573.

[2006]   *See* following chapter on Article 13 ECT.

Expropriation became known in such a way as to affect the value of the Investment (hereinafter referred to as the "Valuation Date").

Such fair market value shall at the request of the Investor be expressed in a Freely Convertible Currency on the basis of the market rate of exchange existing for that currency on the Valuation Date.  Compensation shall also include interest at a commercial rate established on a market basis from the date of Expropriation until the date of payment.

1529. The Parties analyze Article 13 in two steps, first by addressing what constitutes expropriation or "measures having effect equivalent to nationalization or expropriation," and then by discussing what constitutes a legal expropriation, *i.e.*, an expropriation conducted in accordance with the four conditions set out in Article 13(1):  that the expropriation be (a) in the public interest; (b) not discriminatory; (c) carried out under due process of law; and (d) accompanied by the payment of prompt, adequate and effective compensation.  The Tribunal will summarize first the Parties' principal arguments regarding the legal standards of Article 13 and will then review the facts of the present case in the light of these standards.

## 2. Applicable Legal Standards under Article 13 of the ECT

### (a) Claimants' Position

1530. Claimants note that Article 13(1) of the ECT deals with nationalization and expropriation, as well as other equivalent measures.  Claimants submit that such equivalent measures include "covert or incidental interference with the use of property which has the effect of depriving the owner . . . of the use or reasonably-to-be-expected economic benefit of property even if not necessarily to the obvious benefit of the host State."[2007]

1531. Claimants submit that the standard for expropriation is objective and that while the showing of intent to expropriate may evidence a measure to be expropriatory, it is not a requirement of expropriation.[2008]

1532. Claimants emphasize that, in considering whether Respondent expropriated Claimants' investment within the meaning of Article 13(1), the Tribunal should look at the totality of

---

[2007] Memorial ¶ 855, quoting *Metalclad Corp. v. The United Mexican States*, ICSID Case No. ARB(AF)/97/1, Award, 30 August 2000 ¶ 103, Exh. C-954.

[2008] Memorial. ¶ 856, referring to *Compañía de aguas del Aconquija S.A. and Vivendi Universal S.A. v. Argentine Republic*, ICSID Case No. ARB/97/3, Award, 20 August 2007 ¶ 7.5.20, Exh. C-986 (hereinafter *"Vivendi v. Argentina"*); *Tecmed* ¶ 116; *Waste Management, Inc. v. United Mexican States*, ICSID ARB(AF)/00/3, Award, 30 April 2004 ¶ 79, Exh. C-968; *see also* Transcript, Day 1 at 154.

Respondent's actions and not at each fact in isolation.[2009]   The question is not, Claimants submit, whether each of Respondent's individual actions was lawful under Russian law, or was no different than the practice in other jurisdictions, but whether the totality of Respondent's conduct was lawful under international law.[2010]

1533. Claimants argue that, contrary to Respondent's assertion, the standard for expropriation is not limited to the investor's legitimate expectations.[2011]   Respondent's reference in this regard to the treaty practice of various States is unavailing, as whether or not other treaties refer to legitimate expectations as a criterion to establish expropriation is irrelevant to the interpretation of the ECT.[2012]

1534. With regard to the requirement that expropriation be in the public interest, Claimants submit that international tribunals have emphasized that expropriation must have occurred for a "*bona fide* public purpose"[2013] and not for "purely extraneous political reasons,"[2014] "amusement and private profit"[2015] or "reprisal."[2016]   Claimants submit that a State's broad discretion to determine what constitutes "public interest" is not unfettered.[2017]

---

[2009]   Transcript, Day 1 at 153–56 (Claimants' opening), referring to *RosInvestCo* ¶ 621, Exh. C-1049; *Quasar* ¶ 44, Exh. R-3383; Transcript, Day 17, 149–154 (Claimants' closing), referring to *Compañía de Desarollo de Santa Elena, S.A. v. The Republic of Costa Rica*, ICSID ARB/96/1, Final Award, 17 February 2000 ¶ 76, Exh. C-952 (hereinafter "*Santa Elena*")("[i]t is clear . . . that a measure or series of measures can still eventually amount to a taking, though the individual steps in the process do not formally purport to amount to a taking or to a transfer of title"; *Tradex Hellas v. Albania*, ICSID ARB/94/2, Award, 29 April 1999 ¶ 191, Exh. R-1114; *Azurix* ¶ 308; *Biwater* ¶ 455 ("[i]n terms of what might qualify as 'expropriation', the Arbitral Tribunal accepts BGT's submission that it must consider the Republic's conduct both in terms of the effect of individual, isolated, acts complained of, as well as in terms of the cumulative effect of a series of individual and connected acts, in so far as such a cumulative effect might be to deprive the investor in whole or in material part of the use or economic benefit of its assets"; OECD Draft Convention on the Protection of Foreign Property ¶ 4(b), Exh. C-1040; *Pope & Talbot v. The Government of Canada*, UNCITRAL, Award on the Merits of Phase 2, 10 April 2001 ¶ 181, Exh. C-1518; *Ioannis Kardassopoulos and Ron Fuchs v. The Republic of Georgia*, ICSID ARB/05/18 and ARB/07/15, Award, 3 March 2010 ¶ 404, Exh. C-1533 (hereinafter "*Kardassopoulos*"); Michael Reisman & Robert Sloane, "Indirect Expropriation and its Valuation in the BIT Generation," (2003) 74 British Yearbook of International Law 115 p. 123, Exh. C-1643 ("[d]iscrete acts, analyzed in isolation rather than in the context of the overall flow of events . . . may not be expropriatory in themselves.  Only in retrospect will it become evident that those acts comprised part of an accretion of deleterious acts and omissions, which in the aggregate expropriated the foreign investor's property rights."); Claimants' Post-Hearing Brief ¶¶ 182–191; Reply ¶¶ 693, 699, 700.

[2010]   Reply ¶¶ 693.

[2011]   Transcript, Day 20 at 248 (Claimants' rebuttal).

[2012]   Transcript, Day 20 at 248–49 (Claimants' rebuttal).

[2013]   Memorial ¶ 867, referring to *Liberian Easter Timber Corporation (LETCO) v. The Government of the Republic of Liberia*, ICSID ARB/83/2, Award, 31 March 1986, Exh C-937, *Walter Fletcher Smith Case* (Cuba, USA), II RIAA 917–18, Award, 2 May 1929, Exh C-926.

[2014]   *Ibid.* ¶ 868, quoting *BP Exploration Company (Libya) Limited v. Government of the Libyan Arab Republic*, Award (Merits), 10 October 1973, 53 Int'l L. Rep. 297, p. 329, Exh. C-931 (hereinafter "*BP Exploration*").

[2015]   *Ibid.* ¶ 870, referring to *Walter Fletcher Smith Case* (Cuba, USA), II RIAA 917–18, Award, 2 May 1929, Exh C-926.

1535. Claimants challenge Respondent's assertion that States should be afforded a particularly wide margin of discretion when seeking to collect taxes.  According to Claimants, a State alleging that it has legitimately exercised its powers of taxation is not impervious to scrutiny under international law;[2018] "taxation, like the exercise of any other sovereign power, can be expropriatory."[2019]

1536. With regard to non-discrimination, Claimants assert that it is defined as the singling out of a person or group of people without a reasonable basis.  Thus, Claimants submit, a finding of "unjustified differential treatment, whether in law or in fact," has been regarded as discriminatory.[2020]  Claimants quote a commentary that the "expropriation of an investment because of animosity between the host-state officials and the investor or in retaliation for lawful, but politically unpopular, conduct of the investment would violate the non-discrimination condition."[2021]  Claimants add that, as in the case of Article 10(1) of the ECT, discrimination under Article 13(1) refers not only to nationality-based discrimination, but to other types of unjustified discriminatory treatment as well.[2022]

1537. Claimants also maintain that, by stating that an expropriation must be "carried out under due process of law," the ECT, unlike some other investment treaties, requires that expropriations conform not only to local, but also international standards of due process.[2023]  Claimants argue that due process "contains both substantive and procedural elements";[2024] implies that "whenever a State seizes property, the measures taken must be free from arbitrariness" and that the "administrative or judicial machinery used or available must correspond at least to the minimum standard required by international law;"[2025] and requires that the investor must be

---

[2016] *Ibid.*, referring to Kenneth Vandevelde, *Bilateral Investment Treaties, History, Policy and Interpretation* (OUP 2010), p. 272, Exh. C-1018.

[2017] *Ibid.*

[2018] Reply ¶ 754.

[2019] *Ibid.* ¶¶ 756, 761.

[2020] Memorial ¶ 878, citing *ADC Affiliate Limited and ADC & ADMC Management Limited v. The Republic of Hungary*, ICSID ARB/03/16, Award, 2 October 2006, Exh. C-980 (hereinafter "*ADC*"); *BP Exploration* ¶ 329, Exh. C-931.

[2021] *Ibid.* ¶ 879, citing Kenneth J. Vandevelde, *Bilateral Investment Treaties: History, Policy and Interpretation* (OUP, 2010), p. 273, Exh. C-1018.

[2022] Reply ¶¶ 637, 733.

[2023] Memorial ¶ 882.

[2024] *Ibid.* ¶ 883, quoting OECD, Draft Convention on the Protection of Foreign Property, Notes and Comments, Art. 3, 7 ILM 117, p. 126, Exh. C-1040.

[2025] *Ibid.*

given "reasonable advance notice, a fair hearing and an unbiased adjudicator to assess the actions in dispute."[2026]

1538. Finally, Claimants submit that the taking of property without compensation engages the international responsibility of States, regardless of the purpose of the taking.[2027]

### (b) Respondent's Position

1539. Respondent submits that the standard for expropriation under Article 13 of the ECT must not be conflated with the standard for fair and equitable treatment under Article 10(1), as otherwise the taxation carve-out of Article 21, pursuant to which a tribunal may lack jurisdiction over fair and equitable treatment claims, while retaining jurisdiction over claims of expropriation, would be rendered meaningless.[2028]

1540. Respondent also contends that the absence of one or more of the four requirements of Article 13(1) (*i.e.*, public purpose, non-discrimination, due process and compensation) "is not in itself indicative of expropriation."[2029]

1541. Respondent submits that, to show expropriation or equivalent measures under Article 13(1), Claimants must (in addition to showing that the challenged actions are attributable to Respondent and constitute an exercise of *puissance publique*), demonstrate firstly that the challenged measures "proximately" caused a total or substantial deprivation of their investment;[2030] and secondly that they interfered with their legitimate expectations.[2031]

1542. The importance of the causal link between the challenged measures and the investors' investment, argues Respondent, has been confirmed by international tribunals in *Otis Elevator v. Iran*, *Elettronica*, *Link-Trading Joint Stock Company v. Moldova* and *El Paso v.*

---

[2026]   *Ibid.* ¶ 884, quoting *ADC* ¶ 435.

[2027]   *Ibid.* ¶ 888, citing *Santa Elena* ¶¶ 71–72.

[2028]   Transcript, Day 19 at 103–105 (Respondent's closing), referring to *Nations Energy Inc. and others v. Panama*, ICSID ARB/06/19, Award, 24 November 2010 ¶¶ 682–83, Exh. R-1032; *Fireman's Fund Insurance Company v. The United Mexican States*, ICSID ARB(AF)/02/01, Award, 17 July 2006 ¶ 208, Exh. R-1141.

[2029]   Transcript, Day 19 at 103–105 (Respondent's closing), quoting *Corn Products International Inc. v. The United Mexican States*, ICSID ARB(AF)/04/01, Decision on Responsibility, 15 January 2008 ¶ 90, Exh. R-1108.

[2030]   Counter-Memorial ¶¶ 1096–1104; Rejoinder ¶¶ 403–06; Transcript, Day 19 at 108–10 (Respondent's closing); Respondent's Post-Hearing Brief ¶ 173.

[2031]   Rejoinder ¶¶ 407–24; Transcript, Day 19 at 123–24 (Respondent's closing).

*Argentina*.[2032]   By applying the standard resulting from these precedents to the present case, Respondent submits that Claimants must prove that the loss of their shares was the "only possible, unavoidable consequence of conduct attributable to Respondent, conduct that is *iure imperii* and not excluded under Article 21 ECT."[2033]   Therefore, Claimants cannot base a claim for expropriation on damages suffered as a result of their own conduct or the conduct of their investment.[2034]

1543.   As regards investors' legitimate expectations, Respondent submits that they are a "central element of claims" under Article 13(1) of the ECT.[2035]   Respondent argues that this is in accordance with the treaty practice of both ECT and non-ECT Contracting Parties, which, in turn, reflects customary international law.[2036]   Respondent then submits that:

> [P]roperty rights have inherent limitations.   The host State has the power to accept and define the rights acquired by an investor at the time of the making of the investment.   And a foreign investor acquires rights in an investment, subject to the existing regulatory framework.   So absent a specific commitment from the host State to the investor, an expropriation may occur only where the State measure does not reflect a pre-existing lawful limitation inherent in private property.[2037]

1544.   Thus, argues Respondent, without a specific commitment from the host State, an investor has no right or legitimate expectation to non-enforcement or exemption from taxes and associated penalties, regardless of any earlier knowledge or tolerance of the tax authorities.[2038]   Moreover, legitimate expectations cannot be based on host State commitments when the investor has provided the State with incomplete and inaccurate information.   Nor can legitimate

---

[2032]   Transcript, Day 19 at 106–109 (Respondent's closing), referring to *Otis Elevator Company v. Iran*, Iran–United States Claims Tribunal Case No. 284, (1987) 14 I. 28, Award, 29 April 1987 ¶ 47, Exh. C-1113; *Case Concerning Elettronica Sicula S.p.A. (ELSI)*, United States v. Italy, Judgment, 20 July 1989 ¶ 119, Exh. C-942; *Link-Trading Joint Stock Company v. Moldova*, UNCITRAL, Final Award, 18 April 2002 ¶ 91, Exh. R-3533; *El Paso* ¶ 272, Exh. C-1544/R-4190.

[2033]   Transcript, Day 19 at 108.

[2034]   Counter-Memorial ¶ 1103.

[2035]   Transcript, Day 19 at 123–24 (Respondent's closing), referring to *LG&E* ¶¶ 189–90.

[2036]   Transcript, Day 19 at 124–25 (Respondent's closing), citing 2004 and 2012 U.S. Model BITs, Annex B ¶ 1, Exhs. R-3513 and R-3514; 2004 Canada Model BIT, Annex B.13(1) ¶ b, Exh. R-3512; Canada–Romania BIT, Annex B ¶ (b), Exh. R-3494; Canada–Latvia BIT, Annex B, ¶ (2), Exh. R-3491; Canada–Czech Republic BIT, Annex A, ¶ (b), Exh. R-4646; India–Latvia BIT, Protocol *ad* Articles 5, ¶ (4)(a), Exh. R-4648; Slovak Republic–India BIT ¶ 2, Exh. R-4649.

[2037]   Transcript, Day 19 at 125–26 (Respondent's closing); *see also* Counter-Memorial ¶ 982.

[2038]   Counter-Memorial ¶ 984; Transcript, Day 19 at 129–30 (Respondent's closing); *see also* Respondent's Post-Hearing Brief ¶ 184.

expectations be premised on illegal conduct.[2039]   Respondent also submits that legitimate expectations include an expectation of "the evolution of the regulatory regime, including through interpretation or application of the law, even if without precedent, and changes through legislative amendment."[2040]

1545.   In addition, Respondent submits that a distinction must be made between expropriatory measures that breach a host State's obligations under the ECT and the legitimate exercise of a State's regulatory power, including for the imposition and enforcement of taxes.[2041]   Factors which distinguish one from the other include the compatibility of the measures with international and comparative standards, as well as their compatibility with national law and review by domestic courts.[2042]   Applying the latter criterion, Respondent submits that States cannot usually incur international responsibility through the actions of their tax authorities so long as domestic courts are available to resolve disputes between the tax authorities and taxpayers.[2043]

1546.   Thus, in the present case, to establish a violation of Article 13(1) of the ECT, Claimants must demonstrate that the decisions of the Russian courts that upheld the challenged taxation measures, as well as the decisions issued in the context of Yukos' bankruptcy, are themselves "measures having effect equivalent to nationalization or expropriation."[2044]   Accordingly, Respondent says, Claimants must demonstrate that these decisions were the result of a systemic failure of the Russian judicial system or, at a minimum, are manifestly improper, abusive, extraordinarily excessive or arbitrary, in manifest violation of Russian law, and in violation of international and comparative standards, so as to place them outside Russia's wide margin of discretion in taxation matters.[2045]   Respondent emphasizes that this Tribunal cannot sit as an appellate court reviewing the decisions of the Russian courts.

---

[2039]   Transcript, Day 19, 126–27 (Respondent's closing), referring to *International Thunderbird Gaming Corporation v. The United Mexican States*, UNCITRAL, Award, 26 January 2006 ¶ 208, Exh. R-1143.

[2040]   Respondent's Post-Hearing Brief ¶ 185.

[2041]   Transcript, Day 19, 133–34 (Respondent's closing); Respondent's Post-Hearing Brief ¶ 191.

[2042]   Transcript, Day 19 at 136, 142 (Respondent's closing); Respondent's Post-Hearing Brief ¶¶ 192–93.

[2043]   Transcript, Day 19 at 136, 141–42 (Respondent's closing).

[2044]   Counter-Memorial ¶ 1107; Rejoinder ¶ 425.

[2045]   Rejoinder ¶¶ 425–69.

1547. Finally, Respondent submits that Claimants must establish a violation of the requirements in Article 13(1) of the ECT.[2046] Regarding the non-discrimination requirement, Respondent submits that Article 13(1) calls for proof that similar cases were, without reasonable justification, treated differently on the basis of nationality. Accordingly, Claimants must allege differential treatment based on foreign ownership.[2047]

### 3. Did Respondent's Actions Constitute Expropriation (or "Measures Having Effect Equivalent to Nationalization or Expropriation") within the Meaning of Article 13(1) of the ECT?

#### (a) Claimants' Position

1548. According to Claimants, Respondent completely and totally deprived Claimants of their investments in Yukos through a series of "coordinated and mutually reinforcing actions," which were motivated by a political and economic agenda and not any legitimate tax collection purpose.[2048]

1549. Claimants submit that Respondent expropriated their investments by:[2049]

(a) seizing, in October 2003, approximately 99 percent of the shares held by Hulley and YUL in Yukos, thus preventing Claimants from disposing of their shares before they lost all value;[2050]

(b) causing the unwinding of the Yukos–Sibneft merger, allowing the State-owned company Gazprom to acquire Sibneft;[2051]

(c) "fabricat[ing] massive tax debts" against Yukos, while simultaneously freezing or seizing the company's assets and interfering with its day-to-day management

---

[2046] *Ibid.* ¶¶ 471–86.

[2047] *Ibid.* ¶ 765.

[2048] Memorial ¶¶ 801, 829–64. The measures Claimants consider to be expropriatory are discussed at length in Part VIII.

[2049] *Ibid.* ¶¶ 802–28.

[2050] *Ibid.* ¶¶ 803–804. The seizure of about 4.5 percent of Hulley's and YUL's shares in Yukos was subsequently revoked, but 94.5 percent remained frozen until the liquidation of Yukos in November 2007.

[2051] *Ibid.* ¶¶ 805–807. For a discussion of the unwinding of the Yukos–Sibneft merger see Chapter VIII.D.

        through the harassment of executive officers, employees and other related persons, "thereby engineering the circumstance of non-payment";[2052]

(d)     selling YNG in a sham auction that allowed State-owned company Rosneft to acquire Yukos' "crown jewel" for an "absurdly low price";[2053] and

(e)     initiating and controlling the Yukos bankruptcy so as to obtain, either directly or through State-owned Rosneft, Yukos' main production assets, as well as almost all of the bankruptcy proceeds.[2054]

1550. Claimants submit that the liquidation of Yukos on 21 November 2007 "marked the final act in the expropriation of Yukos."[2055]

1551. Finally, Claimants argue that, even viewed individually, the harassment campaign against Yukos and its associates, the sale of YNG and the bankruptcy of Yukos each constitute an act of expropriation.[2056]

### (b)    Respondent's Position

1552. Respondent submits that Claimants have failed to establish that any of the challenged measures constitute expropriation or "measures having effect equivalent to nationalization or expropriation" within the meaning of Article 13(1) of the ECT.

1553. Firstly, Respondent maintains that Claimants have failed to establish that conduct that is attributable to Respondent and an exercise of its sovereign power proximately caused Claimants' total or substantial deprivation of their investment.[2057]   Respondent argues that the actions that directly caused Yukos' liquidation and the ensuing loss of Claimants' Yukos shares—the bankruptcy petition and the decision to liquidate Yukos—are either not attributable to Respondent, or not an exercise of its sovereign power.[2058]   The Moscow Arbitrazh Court's

---

[2052]   *Ibid.* ¶¶ 808–12.  For a discussion of the legitimacy of the Russian Federation's tax assessments against Yukos see Chapter VIII.B.  For a discussion of the "harassment campaign" against Yukos and related persons see Chapter VIII.C.

[2053]   *Ibid.* ¶¶ 813–19.  For a discussion of the YNG auction see Chapter VIII.F.

[2054]   *Ibid.* ¶¶ 820–25. For a discussion of the Yukos bankruptcy see Chapter VIII.G.

[2055]   *Ibid.* ¶¶ 826–27.

[2056]   *Ibid.* ¶ 858.

[2057]   *Ibid.* ¶¶ 1096–1104.

[2058]   Respondent's Post-Hearing Brief ¶ 174.

acceptance of the bankruptcy petitions and ratification of the creditors' decision to liquidate Yukos does not change this conclusion, as loss resulting from a court's enforcement of legal limitations inherent in private property is not compensable under Article 13 of the ECT, irrespective of whether the court proceedings were instituted by a State organ.[2059]

1554. According to Respondent, it is therefore not responsible for the loss of Claimants' investment unless "Claimants can prove that Respondent is responsible for Yukos' financial situation that led to its liquidation."[2060]  Yet, argues Respondent, Yukos' financial situation was actually "the result of Claimants' and their owners' decision to siphon off billions of dollars from Yukos and its subsidiaries to further their own financial interests, at the expense of Yukos' creditors and minority shareholders."[2061]

1555. Respondent emphasizes that Claimants could have avoided Yukos' insolvency, which, in Respondent's view, led to Yukos' bankruptcy and eventual liquidation, by paying the taxes assessed against it for years 2000–2003 in the first quarter of 2004; filing amended VAT and other tax returns; and petitioning for a refund of any amounts paid that it believed not to be legally due.[2062]

1556. As for the criminal proceedings against Messrs. Khodorkovsky and Lebedev and certain Yukos officials, as well as the searches, seizures and arrests carried out in support of those proceedings, Respondent submits that these events did not cause Yukos' liquidation. According to Respondent, the evidence establishes that these measures did not impair Yukos' operations.[2063]

1557. Respondent further contends that Claimants have failed to establish that the measures they challenge interfered with Claimants' legitimate expectations.[2064]

1558. With regard to the tax assessments, Respondent argues that Claimants had no "legitimate expectation that the tax authorities would not apply the substance-over-form, proportionality, and bad-faith taxpayer doctrines to attribute the income nominally earned by Yukos' sham

---

[2059]   *Ibid.* ¶ 178.

[2060]   *Ibid.* ¶ 179.

[2061]   *Ibid.* ¶ 179; *see also* Rejoinder ¶ 746.

[2062]   Rejoinder ¶ 745.  For a detailed discussion, see paragraphs 679–97, 745–50, and 934–45 above.

[2063]   Respondent's Post-Hearing Brief ¶ 182.

[2064]   Counter-Memorial ¶¶ 978–1095.

trading shells to Yukos," because Respondent had never made any specific representation, based upon full disclosure, that Respondent would allow Yukos to operate its tax schemes with impunity.[2065]   Nor had Claimants ever sought or obtained a formal tax ruling on the legality of Yukos' tax scheme.[2066]   In fact, prior to the 2000 Tax Audit Report, according to Respondent, Yukos sought, but was unable to obtain, a legal opinion supporting the legality of its tax scheme.[2067]

1559. In addition, Respondent submits that Claimants had no legitimate expectation that Yukos would not be held liable for the taxes assessed.   According to Respondent, the attribution for tax purposes of revenues nominally earned by sham entities to a company that sought to evade taxes was a proper application of legal doctrines that were well-settled in Russia, and are employed by many other States.[2068]   Yukos itself, argues Respondent, was well aware that its tax schemes, if discovered or disclosed, would result in substantial tax liabilities.[2069]

1560. Respondent also argues that the Russian legislation on which the enforcement measures (including the asset freezes, fines, default interest, enforcement fees and the forced sales of Yukos' assets) were based was already extant in the 1990s.   These enforcement measures were thus foreseeable consequences of Yukos' failure to pay.[2070]

1561. Respondent then submits that the measures taken for the imposition and enforcement of taxes were well within the range of a State's generally accepted regulatory powers.[2071]   This is shown by the fact that these measures were in conformity with Russian law and were upheld by national courts, and were in accordance with international and comparable standards and practices of other countries.[2072]

1562. According to Respondent, Claimants have failed to show that the Russian courts contributed to any "measures having effect equivalent to nationalization or expropriation" through any of the

---

[2065]   Respondent's Post-Hearing Brief ¶ 187–88; *see also* Counter-Memorial ¶¶ 1030–65; Rejoinder ¶¶ 748–756.  For a discussion of the state of tax law in Russia at the relevant time see Chapters VIII.A and VIII.B.

[2066]   Respondent's Post-Hearing Brief ¶ 186.

[2067]   Respondent's Post-Hearing Brief ¶ 186.

[2068]   Respondent's Post-Hearing Brief ¶ 188 (*see* discussion in Chapters VIII.A and VIII.B).

[2069]   Counter-Memorial ¶¶ 1003–29; Rejoinder ¶¶ 584–645; Respondent's Post-Hearing Brief ¶ 189.

[2070]   Respondent's Post-Hearing Brief ¶ 189.

[2071]   *Ibid.* ¶ 191.

[2072]   *Ibid.* ¶ 192–93; *see also* Counter-Memorial ¶¶ 1106, 1120–1232.

decisions they issued in the context of the enforcement of the tax demands,[2073] the Yukos–Sibneft demerger,[2074] the criminal proceedings against Messrs. Khodorkovsky and Lebedev,[2075] or the Yukos bankruptcy proceedings.[2076]

1563. Finally, Respondent submits that the ECtHR unanimously determined that the challenged tax assessments were a legitimate exercise of Respondent's regulatory powers.[2077] According to Respondent, given that the vast majority of the ECT Contracting States (including the Russian Federation, the United Kingdom, and Cyprus) are also ECHR Contracting States and that the ECHR enshrines the common *ordre public* of the European States in terms of democracy and the rule of law, the "ECtHR's interpretation and application of the ECHR to the measures at issue, through a final and binding judgment, must be taken into account under Article 31(3)(c) VCLT in assessing whether they are within the bounds of generally recognized regulatory powers."[2078]

### 4. If Respondent's Actions Constitute Expropriation, Has Respondent Met the Criteria for a Lawful Expropriation under Article 13(1) of the ECT?

#### (a) Claimants' Position

1564. Claimants submit that Respondent did not meet any of the four requirements under Article 13(1) of the ECT for a lawful expropriation (*i.e.*, public interest, non-discrimination, due process and adequate compensation).[2079]

1565. According to Claimants, the expropriation of Claimants' investment was not in the public interest. In fact, "the facts of the case unmistakably show that the actions of the Russian Federation had nothing to do with the legitimate exercise of sovereign power, whether taxation, law enforcement or otherwise, but were rather a blatant confiscation of strategic assets and the

---

[2073] Counter-Memorial ¶¶ 1337–1434.

[2074] *Ibid.* ¶¶ 1435–51.

[2075] *Ibid.* ¶¶ 1452–6.

[2076] *Ibid.* ¶¶ 1457–1543.

[2077] Respondent's Post-Hearing Brief ¶¶ 194–95, referring to ECtHR Yukos Judgment ¶ 606, Exh. R-3328 (". . . each of the Tax Assessments 2000–2003 pursued a legitimate aim of securing the payment of taxes and constituted a proportionate measure in pursuance of this aim.").

[2078] Respondent's Post-Hearing Brief ¶ 195; *see also* Transcript, Day 19 at 143–49.

[2079] Memorial ¶¶ 865–90.

elimination of a potential political opponent."[2080]   Claimants invoke the finding of the *RosInvestCo* tribunal that the Russian Federation's actions were "linked to the strategic objective to return assets to the control of the Russian State and to an effort to suppress a political opponent."[2081]   According to Claimants, Respondent's justification that it only sought to enforce its laws is without any basis.[2082]

1566. Claimants also submit that the expropriation of their investments was discriminatory and was not carried out under due process of law.[2083]   Nor was the expropriation accompanied by compensation, let alone "prompt, adequate and effective compensation."[2084]

1567. Claimants conclude that the Russian Federation's actions are in breach of Article 13(1) and constitute an internationally wrongful act for which Respondent is responsible.[2085]

(b)   **Respondent's Position**

1568. Even if Claimants could establish expropriation, which Respondent contends they cannot, Respondent maintains that the requirements in Article 13(1) of the ECT have not been breached.

1569. Respondent submits that no lack of public interest has been established.[2086]   Respondent states that its actions were legitimate, as "the purposes justifying imposition and enforcement of taxes, including severe penalties, fines and other sanctions in case of non-compliance of taxpayers with their obligations to pay taxes, are firmly recognized in international law."[2087]   Respondent asserts that Claimants have not addressed the ECtHR's rejection of Yukos' "political motivation" charge.[2088]

---

[2080]   Claimants' Post-Hearing Brief ¶ 167; *see also* Memorial ¶¶ 1010–12; Reply ¶¶ 511–13.

[2081]   Reply ¶ 726.

[2082]   *Ibid.* ¶¶ 745–838.

[2083]   *Ibid.* ¶¶ 881, 885–87.

[2084]   *Ibid.* ¶ 889.

[2085]   *Ibid.* ¶ 890.

[2086]   Counter-Memorial ¶¶ 1318–36.

[2087]   *Ibid.* ¶ 1324.

[2088]   Rejoinder ¶ 764.

1570. Respondent also contends that Claimants have failed to establish discrimination under Article 13(1)(b) of the ECT because Claimants do not allege any discrimination based on foreign ownership or residence, which Respondent contends is the intended scope of the term "discriminatory" in this provision.[2089]   Respondent submits that selective tax enforcement is not discriminatory within the meaning of Article 13(1)(b) of the ECT.

1571. According to Respondent, Yukos "was a visible and logical candidate for tax assessments, penalties, and enforcement actions" as its abuses of the low-tax region policy were particularly egregious and the amounts of taxes it evaded unprecedented.[2090]   Other Russian oil companies, argues Respondent, cannot be compared.   Some companies, such as Rosneft, Tatneft and Surgutneftegaz did not resort to tax minimization schemes involving the use of low-tax regions.[2091]   While some other companies, such as Lukoil, did use such schemes, they abandoned them much earlier than Yukos.[2092]   Other companies, which continued to rely on the low-tax regions program, for example Sibneft, satisfied the "proportionality of investments" requirement of the Russian anti-avoidance rules.[2093]   Finally, tax arrears, default interest and fines were in fact assessed against some companies, including TNK-BP, Sibneft and Lukoil.[2094]

1572. Respondent also submits that Claimants have failed to establish due process violations cognizable under Article 13(1)(c) of the ECT.   For this assertion, Respondent relies on its own articulation of the requisite legal standard, namely that "administrative authorities cannot be faulted for conduct upheld by their own courts unless the court system is disavowed at the international level," which Respondent argues is not the case here.[2095]

1573. Respondent contends that in the present case most of the due process violations raised by Claimants have been reviewed by Russian courts and dismissed on the merits, while the due process arguments raised by Claimants for the first time in this arbitration are "specious."[2096]

---

[2089]   Counter-Memorial ¶¶ 1238–51.

[2090]   *Ibid.* ¶¶ 1255, 1268.

[2091]   *Ibid.* ¶ 1260.

[2092]   *Ibid.* ¶¶ 1261, 1269.

[2093]   *Ibid.* ¶ 1262.

[2094]   *Ibid.* ¶ 1264.

[2095]   *Ibid.* ¶ 1280.

[2096]   *Ibid.* ¶ 1290.

1574. Respondent specifically submits that the pace of the court proceedings that led to decisions upholding the Tax Ministry's tax demands against Yukos was in conformity with Russian procedural law and practice.  Respondent notes that, pursuant to Article 215(1) of the Arbitrazh Procedure Code, first instance judgments in tax disputes must be rendered no later than two months after institution of the court proceedings.[2097]  Respondent denies that Yukos was not provided with sufficient time to review documents during the collection proceedings pertaining to the 2000 Decision conducted by Judge Grechishkin.[2098]  Respondent also argues that the removal of Judge Cheburashkina and the recusal of Judge Mikhailova were proper, as there was cause to doubt the impartiality of these two judges.[2099]  Finally, Respondent argues that Yukos' challenges to Judges Korotenko and Dzuba (who were charged with reviewing Yukos' challenges to the 2001 Decision and 2002 Decision, respectively) on the ground that they had previously been involved in other proceedings for the collection of taxes against Yukos, were soundly rejected, as Yukos was not able to point to any rule of Russian law that would prevent a judge from hearing similar or related cases.[2100]

### D.   TRIBUNAL'S DECISION ON BREACH OF THE ECT

1575. As set out in Section X.C.2 above, the Parties are in sharp disagreement about the place and content of the legitimate expectations that Yukos had or could have had in devising and implementing its tax avoidance arrangements.  Claimants maintain, as Mr. Dubov testified, that the most senior officials of the Russian Federation were informed of and approved Yukos' plans in respect of low-tax jurisdictions.  Claimants point to the legislation of those jurisdictions which, while requiring a specified level of local investment by a trading company, for the most part did not refer to or require the presence of trading company personnel in the low-tax jurisdiction or specify that the activities of the trading company take place in that jurisdiction.  Respondent stresses that virtually all the significant work of the trading companies was done not in the low-tax jurisdictions by a small number of low-level and uninformed functionaries but in and by Yukos' Moscow offices, facts that led two panels of the ECtHR to conclude that the trading companies were  a "sham".  Respondent emphasizes that Yukos never

---

[2097] Counter-Memorial ¶¶ 1291–92, referring to *Arbitrazh Procedure Code*, Art. 215, Exh. R-1566.

[2098] *Ibid.* ¶¶ 1293–99.

[2099] *Ibid.* ¶¶ 1300–1301.  For a description of the removal of Judge Cheburashkina and the recusal of Judge Mikhailova, see paragraphs 527–28, 539 above.

[2100] *Ibid.* ¶¶ 1302–51.  For a description of the challenges to Judges Korotenko and Dzuba, see paragraphs 553, 563 above.

secured and apparently was unable to secure a legal opinion upholding the lawfulness of its tax planning arrangements and operations.

1576. The Tribunal accepts that federal legislation and the legislation of the low-tax jurisdictions did not provide, or at any rate, uniformly provide, that the trading companies actually conduct their trading operations in the territory of the low-tax jurisdictions. Such a provision in any event would have been increasingly deprived of its force in view of the advent of electronic communications. Nevertheless there are indications in the record that Yukos itself had doubts, or at least apprehensions, about the legality of aspects of its *modus operandi*. Internal Yukos communications noted above at paragraph 491 so suggest, as may the unwillingness of Mr. Khodorkovsky to sign papers required for SEC registration. Yukos was able to advance no convincing explanation for the "Lesnoy shuffle", which may well have been carried out to frustrate investigation of perceived tax improprieties. While both PwC (Yukos' tax consultants) and Mr. Pepeliaev (Yukos' tax lawyer) opined in early January 2004, after the initial tax assessment was issued, that the tax assessment against Yukos itself was not well-founded,[2101] the absence of a prior legal opinion supporting the propriety of Yukos' arrangements in the low-tax jurisdictions is striking and may be suggestive. So also is the inability of Yukos to explain immense payments to former Yukos employees and its inability to sustain the claim that certain of its primary trading companies (the BBS companies) were not controlled by it. There is also the issue of the questionable use by Claimants of the Cyprus-Russia DTA, which the Tribunal addresses in Chapter X.E on contributory fault.

1577. The Tribunal has not overlooked or discounted the foregoing and other weaknesses in the contentions of Claimants. But are they sufficient to support what the Tribunal understands to be a central contention of Respondent, namely, that Claimants should have expected that the Russian Federation would react as it did to what it claims were violations of Russian tax law and practice as its courts had interpreted that law and practice to be?

1578. In the view of the Tribunal, the expectations of Claimants may have been, and certainly should have been, that Yukos' tax avoidance operations risked adverse reaction from Russian authorities. It is common ground between the Parties that Yukos and its competitors viewed

---

[2101] *See* Letter from Michael Kubena to Bruce Misamore, 15 January 2004, Exh. C-609; Sergey Pepeliaev, Summary of the Tax Inspection of OAO NK Yukos, 5 January 2004, Exh. C-1128; Sergey Pepeliaev et al., Opinion Regarding Compliance with Legislation of Inspection Report No. 08-1/1 of 29 December 2003 issued by the Tax Ministry of Russia, 15 January 2004, Exh. C-1129 (all referring to the 2000 Audit Report, Exh. C-103). *See also* paragraphs 705, 706 and 1195 above.

positions taken by the tax authorities on issues of tax liability to be exigent, erratic and unpredictable.  The Tribunal however is unable to accept that the expectations of Yukos should have included the extremity of the actions which in the event were imposed upon it.  Not only did Mikhail Khodorkovsky not appear to expect to be arrested even after the arrest of Platon Lebedev, he and his colleagues surely could not have been expected to anticipate the rationale and immensity of the tax assessments and fines.  They could not have been expected to anticipate that their legal counsel would labor under the disabilities imposed upon them.  They could not have been expected to anticipate the sale of YNG for so low a price under such questionable circumstances.  They could not have been expected to anticipate that more than thirteen billion dollars in unpaid taxes and fines would be imposed on Yukos for unpaid VAT on oil exports when that oil had in fact been exported.  They could not have been expected to anticipate that they risked the evisceration of their investments and the destruction of Yukos.

1579. The Tribunal has earlier concluded that "the primary objective of the Russian Federation was not to collect taxes but rather to bankrupt Yukos and appropriate its valuable assets."[2102]   For the reasons that emerge in Part VIII, if the true objective were no more than tax collection, Yukos, its officers and employees, and its properties and facilities, would not have been treated, and mistreated, as in fact they were.  Among the many incidents in this train of mistreatment that are within the remit of this Tribunal, two stand out:  finding Yukos liable for the payment of more than 13 billion dollars in VAT in respect of oil that had been exported by the trading companies and should have been free of VAT and free of fines in respect of VAT; and the auction of YNG at a price that was far less than its value.  But for these actions, for which the Russian Federation for reasons set out above and in preceding chapters was responsible, Yukos would have been able to pay the tax claims of the Russian Federation justified or not; it would not have been bankrupted and liquidated (unless the Russian Federation were intent on its liquidation and found still additional grounds for achieving that end, as the second criminal trial of Messrs. Khodorkovsky and Lebedev indeed suggests).

1580. Respondent has not explicitly expropriated Yukos or the holdings of its shareholders, but the measures that Respondent has taken in respect of Yukos, set forth in detail in Part VIII, in the view of the Tribunal have had an effect "equivalent to nationalization or expropriation".  The four conditions specified in Article 13 (1) of the ECT do not qualify that conclusion.

---

[2102] *See* paragraph 756 above.

1581. As to condition (a), whether the destruction of Russia's leading oil company and largest taxpayer was in the public interest is profoundly questionable.  It was in the interest of the largest State-owned oil company, Rosneft, which took over the principal assets of Yukos virtually cost-free, but that is not the same as saying that it was in the public interest of the economy, polity and population of the Russian Federation.

1582. As to condition (b), the treatment of Yukos and the appropriation of its assets by Rosneft (and to a much lesser extent, another State-owned corporation, Gazprom), when compared to the treatment of other Russian oil companies that also took advantage of investments in low-tax jurisdictions, may well have been discriminatory, a question that was inconclusively argued between the Parties and need not be and has not been decided by this Tribunal.

1583. As to condition (c), Yukos was subjected to processes of law, but the Tribunal does not accept that the effective expropriation of Yukos was "carried out under due process of law" for multiple reasons set out above, notably in Section VIII.C.3.  The harsh treatment accorded to Messrs. Khodorkovsky and Lebedev remotely jailed and caged in court,  the mistreatment of counsel of Yukos and the difficulties counsel encountered in reading the record and conferring with Messrs. Khodorkovsky and Lebedev, the very pace of the legal proceedings, do not comport with the due process of law.  Rather the Russian court proceedings, and most egregiously, the second trial and second sentencing of Messrs. Khodorkovsky and Lebedev on the creative legal theory of their theft of Yukos' oil production, indicate that Russian courts bent to the will of Russian executive authorities to bankrupt Yukos, assign its assets to a State-controlled company, and incarcerate a man who gave signs of becoming a political competitor.

1584. As to condition (d), what in any event is incontestable is Respondent's failure to meet its prescription, because the effective expropriation of Yukos was not "accompanied by the payment of prompt, adequate and effective compensation", or, in point of fact, any compensation whatsoever.  In order for the Russian Federation to be found in breach of its treaty obligations under Article 13 of the ECT, the foregoing violations of the conditions of Article 13 more than suffice.

1585. It follows that Respondent stands in breach of its treaty obligations under Article 13 of the ECT.  Accordingly Respondent's liability under international law for breach of treaty is established.  The Tribunal reaches this conclusion based on its consideration of the totality of the extensive evidence before it.  Having found Respondent liable under international law for

breach of Article 13 of the ECT, the Tribunal does not need to consider whether Respondent's actions are also in breach of Article 10 of the Treaty.

1586. The establishment of liability under international law is at the heart of its doctrine and jurisprudence. The Statute of the PCIJ, in Article 36(2), referred to "(c) the existence of any fact which, if established, would constitute a breach of an international obligation; (d) the nature or extent of the reparation to be made for the breach of an international obligation". The identical provision is found in Article 36(2) of the Statute of the ICJ.

1587. The PCIJ held in the *Factory at Chorzów* case that:

> It is a principle of international law that the breach of an engagement involves an obligation to make reparation in an adequate form. Reparation therefore is the indispensable complement of a failure to apply a convention and there is no necessity for this to be stated in the convention itself.[2103]

1588. In a subsequent phase of the *Factory at Chorzów* case, the Court specified the content of the obligation of reparation in the following oft-quoted terms:

> The essential principle contained in the actual notion of an illegal act—a principle which seems to be established by international practice and in particular by the decisions of arbitral tribunals—is that reparation must, so far as possible, wipe out all the consequences of the illegal act and re-establish the situation which would, in all probability, have existed if that act had not been committed. Restitution in kind, or, if this is not possible, payment of a sum corresponding to the value which a restitution in kind would bear; the award, if need be, of damages for the loss sustained which would not be covered by restitution in kind or payment in place of it—such are the principles which should serve to determine the amount of compensation due for an act contrary to international law.[2104]

1589. The ILC Articles on State Responsibility provide, in Article 31, an article entitled "Reparation", that "[t]he responsible State is under an obligation to make full reparation for the injury caused by the internationally wrongful act." In support of this conclusion the Articles quote the foregoing holdings in the *Factory at Chorzów* case.[2105]

1590. Article 36 of the Articles, entitled "Compensation", provides that:

---

[2103] *Case concerning the Factory at Chorzów* (Germany v. Poland), Jurisdiction, Judgment, 26 July 1927, P.C.I.J., Series A, No. 9, p. 21, Exh. C-1501.

[2104] *Case concerning the Factory at Chorzów* (Germany v. Poland), Merits, Judgment, 13 September 1928, P.C.I.J., Series A, No. 17, p. 47, Exh. C-925.

[2105] Articles on Responsibility of States for Internationally Wrongful Acts with commentaries (Text adopted by the International Law Commission at its fifty-third session, in 2001), Articles 1–11 and 28–39, p. 91, Exh. C-1042.

> 1. The State responsible for an internationally wrongful act is under an obligation to compensate for the damage caused thereby . . . .

The commentary to the Articles states that:

> the function of compensation is to address the actual losses incurred as a result of the internationally wrongful act.  Compensation corresponds to the financially assessable damage suffered . . . it is not concerned to punish . . . nor does compensation have an expressive or exemplary character."[2106]

1591. Article 13 of the ECT specifies, in the event of expropriation, that "compensation shall amount to the fair market value of the Investment expropriated at the time immediately before the Expropriation . . . the Valuation Date."

1592. Article 39 of the ILC Articles on State Responsibility, entitled "Contribution to the injury," provides that  "[i]n the determination of reparation, account shall be taken of the contribution to the injury by wilful or negligent action or omission of the injured . . . entity in relation to whom reparation is sought."  The ILC's commentary to the Articles refers to notions of "contributory negligence" and "comparative fault".[2107]

1593. The Tribunal will assess damages in the light of the foregoing accepted principles of international law.

## E.   CONTRIBUTORY FAULT

### 1.   Introduction

1594. The Tribunal now has to determine whether the damages caused to Claimants by the wrongful acts of Respondent should be reduced because, as Respondent argues, "Claimants may not recover from the Russian Federation the fruits of their own wrongdoing."[2108]

1595. In support of its submission, Respondent invokes mainly the legal principle of contributory fault.  In its Closing Statement, Respondent argued that Claimants failed to establish that their loss was caused by the Russian Federation's actions in violation of its obligations under the ECT, notably by failing to account for the effects of Claimants' own actions and of Yukos'

---

[2106]   *Ibid.*, p. 99.

[2107]   *Ibid.*, pp. 109–10.

[2108]   Respondent's Opening Statement, Vol. 10, Slide 4.

actions.[2109]   It argued[2110] that Claimants ignored Article 39 of the ILC Articles on State Responsibility, which provides:[2111]

> Article 39. Contribution to the injury
>
> In the determination of reparation, account shall be taken of the contribution to the injury by willful or negligent action or omission of the injured State or any person or entity in relation to whom reparation is sought.

1596. Extracts of the ILC's Commentary to Article 39 are pertinent, including the following:[2112]

> Article 39 deals with the situation where damage has been caused by an internationally wrongful act of a State, which is accordingly responsible for the damage in accordance with Articles 1 and 28, but where the injured State, or the individual victim of the breach, has <u>materially contributed</u> to the damage <u>by some willful or negligent act or omission</u>.

> [emphasis added]

1597. The Tribunal also refers to Article 31 of the ILC Articles on State Responsibility , which states:

> Article 31. Reparation
>
> 1. The responsible State is under an obligation to make full reparation for the injury caused by the internationally wrongful act.
>
> 2. Injury includes any damage, whether material or moral, caused by the internationally wrongful act of a State.

1598. The following extract from the ILC's Commentary to Article 31 is also noted:[2113]

> It is true that cases can occur where an identifiable element of injury can properly be allocated to one of several concurrently operating causes alone. <u>But unless some part of the injury can be shown to be severable in causal terms</u> from that attributed to the responsible State, the latter is held responsible for all the consequences, not being too remote, of its wrongful conduct.

> [emphasis added]

1599. The Tribunal must therefore decide, on the basis of the totality of the evidence before it, whether there is a sufficient causal link between any willful or negligent act or omission of the Claimants (or of Yukos, which they controlled) and the loss Claimants ultimately suffered at the hands of the Russian Federation through the destruction of Yukos.

---

[2109] Respondent's Closing Statement, Vol. 12, Slide 4.

[2110] Respondent's Closing Statement, Vol. 12, Slide 5.

[2111] Articles on Responsibility of States for Internationally Wrongful Acts with commentaries (Text adopted by the International Law Commission at its fifty-third session, in 2001), Articles 1–11 and 28–39, p. 109 Exh. C-1042.

[2112] *Ibid.*

[2113] *Ibid.*, p. 93.

1600. The Tribunal notes that it is not any contribution by the injured party to the damage which it has suffered which will trigger a finding of contributory fault. The contribution must be material and significant. In this regard, the Tribunal has a wide margin of discretion in apportioning fault.

## 2.   Contributory Fault as Applied in Other Cases

1601. Before it proceeds with its analysis of the potential contributory fault of Claimants (and Yukos) in the present case which may have contributed to the injury caused to them by the internationally wrongful act of the Russian Federation, the Tribunal has reviewed decisions of investor-state tribunals which have addressed the principle of contributory fault.

1602. This review leads the Tribunal to three conclusions which will inform its analysis.

1603. Firstly, the legal concept of contributory fault must not be confused with the investor's duty to mitigate its losses. There are cases where the claimant's damages were reduced because the tribunal found that it failed to take some reasonable steps to minimize its losses. In such cases, "the injured party must be held responsible for its own contribution to the loss."[2114]

1604. Secondly, there are cases where the contributory fault of the investor, while it may have increased the loss which it sustained, was unrelated to the wrongdoing of the State.[2115] The fault of the investor in those cases contributed to the losses which flowed from the wrongful act of the State.

1605. Finally, the Tribunal identified certain decisions where the tribunals found that the victim contributed to the State's wrongful conduct.[2116] The contributory fault of the investor in those cases provoked the wrongful conduct of the State.

1606. While there is no doctrine of precedent *stricto sensu* in international arbitration, the Tribunal has found these decisions of assistance in its analysis.

---

[2114] *EDF International S.A. and Ors v. Argentine Republic*, ICSID, ARB/03/23, Award, 11 June 2012 ¶ 1301. *See also Middle East Cement Shipping and Handling Co. S.A. v. Arab Republic of Egypt*, ICSID, ARB/99/6, Award, 12 April 2002, Exh. C-962 and *AIG Capital Partners, Inc and Anor v. Republic of Kazakhstan*, ICSID, ARB/01/6, Award, 7 October 2003, Exh. R-1110.

[2115] *MTD. v. Chile*, Exh. C-969 and *Iurii Bogdanov, Agurdino-Invest Ltd. and Agurdino-Chimia JSC v. Republic of Moldova*, SCC Rules, Award, 22 September 2005, Exh. R-1179.

[2116] *Antoine Goetz & Consorts et S.A. Affinage des Metaux v. Republique du Burundi*, ICSID, ARB/01/2, Award, 21 June 2012 and *Occidental Petroleum Corporation and Occidental Exploration and Production Company v. Republic of Ecuador*, ICSID, ARB/06/111, Award, 5 October 2012 (a case also chaired by Mr. Fortier).

**3.      Tribunal's Analysis**

1607. In Chapter IX.A above, the Tribunal reviewed some 28 instances of alleged "illegal and bad faith conduct" by Claimants or "attributable to the Claimants", which Respondent argues have contributed to Yukos' demise or should, in any event, prevent Claimants from recovering damages from the Russian Federation.  For the reasons set out in that chapter, the Tribunal has already concluded that most of these "actions or omissions" cannot be considered as having materially contributed to Yukos' demise.

1608. There are, however, four remaining instances of alleged willful or negligent conduct by Claimants and/or Yukos which, the Tribunal agrees, must be considered as potentially constituting fault that may have contributed to the destruction of Yukos, for which the Tribunal has found Respondent responsible.  These four instances are:

   i)   Yukos' conduct in some of the low-tax regions;

   ii)  Yukos' use of the Cyprus-Russia DTA;

   iii) Yukos' conduct in connection with the YNG auction, notably the procuring of a Temporary Restraining Order by a Texas court and the published threat of a "lifetime of litigation"; and

   iv)  Yukos' conduct in connection with its bankruptcy, notably the non-payment of the A Loan.

1609. The Tribunal will now review these four instances and seek to determine whether any one of them qualifies as contributory fault as that legal principle has been interpreted in the decisions which it has reviewed earlier.

**(a)      Conduct of Yukos in Some of the Low-Tax Regions**

1610. At the outset of its review, the Tribunal needs to recall that the central, indeed the only, focus of its remit with respect to the tax optimization schemes in the ZATOs and other low tax regions of Russia was the series of arrangements implemented by one Russian oil company, Yukos.  These arrangements have been documented by hundreds of exhibits which the Tribunal has considered and analyzed in Chapters VIII.A and VIII.B of the present Award.

1611. While there is ample evidence in the record that nearly all Russian oil companies also availed themselves of such tax optimization arrangements which were permitted by law, [2117] there is no evidence that the operations of those other oil companies, in any respect, breached the legislation and abused the low tax regimes as the Tribunal has found Yukos did through the sham-like nature of some elements of its operations in at least some of the low-tax regions notably in the ZATOs of Lesnoy and Trekhgorny.

1612. The Tribunal also recalls its further findings, in Chapters VIII.A and VIII.B above, that this abuse by Yukos in some of the low-tax regions occurred prior to the confrontation between President Putin and Mr. Khodorkovsky in February 2003.   At the February 2003 meeting, President Putin said to Mr. Khodorkovsky that, henceforth, he would no longer receive any protection from the Kremlin.   Specifically, President Putin said to Mr. Khodorkovsky:  "We have already discussed it with you recently, that your company, for example, has had problems with the payment of taxes."[2118]

1613. This specific reference by President Putin to Yukos' tax issues at the February 2003 meeting is significant.

1614. While the Tribunal has concluded, on the basis of the totality of the evidence, that Respondent's tax assessments and tax collection efforts against Yukos were not aimed primarily at the collection of taxes, but rather at bankrupting Yukos and facilitating the transfer of its assets to the State, it cannot ignore that Yukos' tax avoidance arrangements in some of the low-tax regions made it possible for Respondent to invoke and rely on that conduct as a justification of its actions against Mr. Khodorkovsky and Yukos.

1615. Accordingly, even though the Tribunal has found that President Putin and his administration used Yukos' tax problems as a pretextual justification for setting in motion a plan to bankrupt Yukos, as opposed to just collecting the taxes that might have been legitimately assessed

---

[2117]   Transcript of Testimony of Mikhail Kasyanov before the Khamovnichesky Court of Moscow of May 24, 2010, p. 3, Exh. C-440; Statement of Prime Minister Mikhail Mikhailovich Kasyanov of 8 July  2009 in *Khodorkovsky v. Russia 1*, ¶ 40, Exh. C-446; TNK-BP's use of low tax regions was disclosed in *TNK International Limited Interim Consolidated Financial Statements*, as of 30 June 2003, p. 8, Exh. C-391; and *TNK-BP Limited Consolidated Financial Statements*, as of 31 December 2003, Exh. C-392; Lukoil's use of low tax regions was noted in *Board of the Audit Chamber of the Russian Federation, Audit Chamber Report on Yukos, Lukoil and Sibneft for 2003 and January–March 2004*, Exh. R-266, *OAO Lukoil, Securities filing, Offering Circular*, 26 November 2002, Exh. R-322, and *OAO Lukoil, Annual Report for 2001*, Exh. R-321.

[2118]   Video recording and transcript of the meeting of the members of the Union of Industrialists and Entrepreneurs with President V. Putin held in the Ekaterininsky Hall, Kremlin, on 19 February 2003, Exh. C-1396.

against the trading companies on the basis of the "bad faith taxpayer" doctrine, the Tribunal concludes that there is a sufficient causal link between Yukos' abuse of the system in some of the low-tax regions and its demise which triggers a finding of contributory fault on the part of Yukos.

### (b)   Conduct of Yukos under the Cyprus-Russia DTA

1616. As detailed in the Expert Reports of Thomas Z. Lys, Yukos' "tax optimization" plan included use of the trading companies in the low-tax regions to receive proceeds from the sale of Yukos' oil and oil products, and the transfer of those proceeds to other Yukos-controlled trading and holding companies in the Russian Federation and in off-shore jurisdictions such as Cyprus and the British Virgin Islands.[2119]

1617. Respondent, relying on the expert reports of Professor H. David Rosenbloom,[2120] Professor Dr. Stef van Weeghel and Mr. Polyvios G. Polyviou, has argued that Yukos' use of the Cyprus-Russia DTA was abusive.  Claimants, relying on the Expert Report of Mr. Philip Baker QC, counter Respondent's argument and assert that the use by Yukos of the DTA was not abusive. It is noteworthy that the Parties did not call as witnesses one another's respective experts on that issue.

1618. Claimants note that, to this day, the Russian authorities "have done absolutely nothing" in respect of the alleged improper invocation of DTA benefits by Claimants, including under the specific mechanisms of review that exist under the treaty itself and/or under the domestic laws of the contracting parties.[2121]  They also submit that the first time Respondent raised any issue regarding the tax arrangements subject to the Cyprus-Russia DTA was on 6 October 2006 in the present arbitration and that Respondent "concocted [this issue] specifically for the purposes of these arbitrations."[2122]

1619. The Tribunal accepts Claimants' argument that it is incongruous for the Russian Federation to complain in these proceedings about Yukos' use of the treaty while never having invoked the

---

[2119]   Second Lys Report, , pp. 39 ff.

[2120]   Respondent's Post-Hearing Brief, ¶¶ 150–61.

[2121]   Claimants' Post-Hearing Brief, ¶¶ 192–202.

[2122]   *Ibid.* ¶¶ 198–200, referring to Respondent's Comments on Issues Raised by Procedural Order No. 2 of 8 September 2006.

mechanisms available to it to trigger the review of such use by, for example, invoking the information-sharing provisions of the treaty.[2123]

1620. At the same time, it seems clear to the Tribunal, on the facts, that Yukos' operations under the DTA were wholly conducted by Mr. Lebedev from Yukos' established offices in Moscow, that his "place of management" where he habitually concluded contracts relating to operations under the Treaty was in Moscow, which of itself demonstrates that Yukos' avoidance of hundreds of millions of dollars in Russian taxes through the Cyprus-Russia DTA, was questionable.  Hulley appears to the Tribunal to have falsely declared on Cypriot withholding tax forms that "income"—dividends from Yukos—"was not connected with activities carried on in the Russian Federation" despite Mr. Lebedev's activities in Moscow.[2124]

1621. In any event, even if there was an abuse by Yukos of that treaty, as in the Tribunal's *prima facie* view there was, such conduct would be subsumed into and enlarge the abuse by some of Yukos' trading companies in some of the low tax regions, which the Tribunal has already found amounted to contributory fault on the part of Yukos.

(c) **Conduct of Yukos in Connection with YNG Auction**

1622. The Tribunal reiterates that the abusive use of some of the low-tax regions by Yukos including its questionable use of the Cyprus-Russia DTA occurred prior to the February 2003 encounter between President Putin and Mr. Khodorkovsky and thus prior to the plan formed by the Russian Federation not simply to collect taxes from Yukos but to bankrupt the company and transfer its assets to the State.

1623. The YNG auction took place in December 2004 well after Respondent had put in motion its plan to expropriate Yukos.  It was preceded by Yukos' resort to bankruptcy proceedings in Texas, the issuance of a Temporary Restraining Order by the Texas court, and Yukos' public threats, most strikingly a full page advertisement in the *Financial Times,* warning prospective purchasers of YNG against participating in the auction.

---

[2123] Transcript, Day 20 at 146.

[2124] Counter-Memorial, ¶ 164, referring to Hulley Enterprises Limited, Claims for an Exemption of Passive Incomes Sourced in Russia before the Payment is Made (Form 1013DT) for 2000, 2001, Exh. R-193; Veteran Petroleum Limited, Claims for an Exemption of Passive Incomes Sourced in Russia before the Payment is Made (Form 1013DT) for 2001, 2002, Exh. R-194; Hulley Enterprises Limited, Annual Report and Financial Statements for the year ended Dec. 31, 2003, 7 April 2004, Exh. R-190; Veteran Petroleum Limited, Annual Report and Financial Statements for the year ended Dec. 31, 2003, 15 December 2006 Exh. R-192.

1624. Respondent submits that these actions discouraged prospective purchasers of YNG from taking part in the auction and depreciated the price realized at the auction.

1625. The Tribunal agrees that, but for these actions of Yukos, it is reasonable to surmise that the auction of YNG on 19 December 2004, the unlawful measure of Respondent that dealt as "fatal blow" to the survival prospects of Yukos, could have resulted in a higher bid price than the auction actually did.  However, in the view of the Tribunal, Yukos' ultimate fate would have been no different if it had not threatened a lifetime of litigation or obtained a Temporary Restraining Order from a Texas Court.  Its demise may have been postponed, or the path to its demise altered in some minor way, but it would not have been avoided.

1626. The Tribunal observes with interest that the *RosinvestCo* tribunal found that "Yukos did in some respects contribute to its own demise" and that it referred in that context to the Houston bankruptcy proceedings.[2125]

1627. In addition, before concluding its analysis of this facet of Claimants' conduct, the Tribunal needs to contrast these actions of Yukos with a series of actions of Respondent before the YNG auction which must have depreciated the auction price very significantly and thus served the Russian Federation objective of acquiring the Yukos assets at a bargain price.

1628. Those actions of Respondent include:

- The threat by Russia's Ministry of Natural Resources to withdraw YNG's operating licenses;[2126]

- The massive tax liabilities imposed on YNG in October and December 2004;[2127]

- The statement by the Russian Federation Ministry of Justice that the USD 10.4 billion valuation of YNG was "due to the high risk to a potential buyer";[2128]

---

[2125] *RosInvestCo* ¶ 634, Exh. C-1049.

[2126] *Russian Government May Revoke YUKOS Unit's Licenses*, FWN Select, 10 September 2004, Exh. C-701.

[2127] *Repeat Field Tax Audit Report No. 30-03-14/2*, 29 October 2004, Exh. C-251; *see* Decision of the Moscow Arbitrazh Court, 25 April 2006, p. 2, Exh. C-255; Memorial ¶ 271.

[2128] *In the Yukos Saga, Yet Another Gloomy Chapter*, Wall Street Journal, 14 October 2004, Exh. C-713.

- The decision by Respondent to fix the date of the auction exactly one month after the auction was announced, being the minimum length of the notice required under Russian law;[2129]

- The alleged pressure of Respondent on would be bidders from India and China not to participate in the auction.[2130]

1629. In conclusion, the Tribunal finds that the actions of Yukos which may have depreciated the auction price, do not constitute contributory fault as they did not contribute in a material way to its demise.

### (d)   Conduct of Yukos in Connection with its Bankruptcy (Non-Payment of the A Loan)

1630. With respect to the non payment by Yukos of the A Loan and Respondent's submission that such non-payment rendered Yukos responsible for its own bankruptcy, the Tribunal accepts Respondent's contention that Yukos was in a position to pay off the balance of the A Loan and that its willful failure to do so contributed to the circumstances of its bankruptcy by leading SocGen to petition for it.  At the same time, the loan provisions contemplated that YNG oil production and sale would fuel payment of the loan, and it was understandable that, once YNG was taken over by Rosneft, Claimants should have felt that responsibility for repayment of the A Loan was not theirs or theirs alone.

1631. Moreover, in the view of the Tribunal, even if Yukos had paid off the A Loan, it represented only a fraction of the claims against Yukos which could have been used to petition the company into bankruptcy.  In view of the larger circumstances, it is difficult to conclude that, even if the A Loan had been paid, another ground for pushing Yukos into bankruptcy would not have been found.

1632. Consequently, the Tribunal concludes that, while Yukos may have been at fault in refusing to pay off the A Loan, its behavior does not rise to the level of contributory fault.

---

[2129] In its report of 6 October 2004, Dresdner wrote that "[a] quick auction will most likely prevent the achievement of a full price since purchasers will only be able to conduct a limited audit of the financial and economic performance and accordingly will discount their valuation of the target asset." [emphasis added].    Dresdner Valuation Rpeort, Section 11.2, Exh. C-274.

[2130] *Russia's Latest Auction Farce Eerily Familiar*, The Moscow Times, 21 December 2004, p. 1, Exh. C-739.

### 4.    Tribunal's Decision on Contributory Fault

1633. Paraphrasing the words of Article 39 of the ILC Articles on State Responsibility and its commentary, the Tribunal must now determine whether Claimants' and Yukos' tax avoidance arrangements in some of the low-tax regions, including their questionable use of the Cyprus-Russia DTA summarized above, contributed to their injury in a material and significant way, or were these minor contributory factors which, based on subsequent events such as the decision of the Russian authorities to destroy Yukos, cannot be considered, legally, as a link in the causative chain.   As the Tribunal noted earlier in this chapter, an award of damages may be reduced if the victim of the wrongful act of the respondent State also committed a fault which contributed to the prejudice it suffered and for which the trier of facts, in the exercise of its discretion, considers the claiming party should bear some responsibility.[2131]

1634. In the view of the Tribunal, Claimants should pay a price for Yukos' abuse of the low-tax regions by some of its trading entities, including its questionable use of the Cyprus-Russia DTA, which contributed in a material way to the prejudice which they subsequently suffered at the hands of the Russian Federation.

1635. In considering the extent of the contribution of Claimants' faults to their injury, the Tribunal notes that the subsequent conduct of the Russian Federation, as the Tribunal has found, was disproportionate and tantamount to expropriation of Claimants' investment in Yukos. Claimants' damages were caused by the series of events starting with the arrest of Messrs. Khodorkovsky and Lebedev, and the tax assessments, and culminating in the YNG auction, which led to the bankruptcy and liquidation of Yukos.   The Tribunal must now determine to what extent and in what proportion Claimants' and Yukos' conduct prior to 2003, including their questionable use of the Cyprus-Russia DTA, contributed so as to lessen the responsibility of Respondent.

1636. The Tribunal agrees with the ICSID Annulment Committee in the *MTD v. Chile* case that "the role of the two parties contributing to the loss [is] [ . . . ] only with difficulty commensurable

---

[2131]   *See* ruling in *MTD  v. Chile* ¶¶ 242–43 that "the Claimants should bear part of the damages suffered."  In that case, that "part" was quantified as 50 percent of the damages.  *See also Occidental Petroleum Corporation and Occidental Exploration and Production Company v. Republic of Ecuador*, ICSID, ARB/06/111, Award, 5 October 2012 ¶¶ 659–687.  In that case, that "part" was quantified as 25 percent of the damages.

and the Tribunal [has] a corresponding margin of estimation."[2132]   However, the Tribunal, as other tribunals have done, must reach a decision and it has done so on the basis of all the evidence which it has reviewed.

1637. Having considered and weighed all the arguments which the Parties have presented to it in respect of this issue the Tribunal, in the exercise of its wide discretion, finds that, as a result of the material and significant mis-conduct by Claimants and by Yukos (which they controlled), Claimants have contributed to the extent of 25 percent to the prejudice which they suffered as a result of Respondent's destruction of Yukos.  The resulting apportionment of responsibility as between Claimants and Respondent, namely 25 percent and 75 percent, is fair and reasonable in the circumstances of the present case.

## XI.   INTEREST

1638. As will be seen in Part XII of the Award dealing with quantification of Claimants' damages for Respondent's breach of the ECT, one of the elements factored into the Tribunal's calculation of damages will be interest.[2133]   Accordingly, the Tribunal, in the present Part XI will determine the applicable rate of such interest, whether it should be simple or compound and, if compound, the period of compounding.

### A.   CLAIMANTS' POSITION

1639. Claimants request the Tribunal to award them pre- and post-award interest.[2134]   In their Submission on Costs, Claimants also request interest on any costs awarded to them.[2135]

1640. According to Claimants, "payment of interest can be required to ensure full reparation."[2136]   Claimants quote the tribunal in *Vivendi v. Argentina*, which stated that the purpose of the payment of interest is "to compensate the damage resulting from the fact that, during the period of non-payment by the debtor, the creditor is deprived of the use and disposition of that sum he

---

[2132]   *MTD Equity Sdn Bhd. v. The Republic of Chile*, ICSID Case No. ARB/01/7, Decision on Annulment, 21 March 2007 ¶ 101.  *See also Occidental Petroleum Corporation and Occidental Exploration and Production Company v. Republic of Ecuador*, ICSID, ARB/06/111, Award, 5 October 2012 ¶¶ 659–87.

[2133]   In particular see paragraphs 1822–23 below on pre-award interest on the dividend streams that Claimants would have obtained in the absence of Respondent's breach.

[2134]   Memorial ¶¶ 969–70; Reply ¶¶ 859, 1199; Claimants' Post-Hearing Brief ¶ 302.

[2135]   Claimants' Submission on Costs ¶ 64.

[2136]   Memorial ¶ 959, citing to ILC Articles on State Responsibility, Art. 38, Exh. C-1042.

was supposed to receive."[2137]   Claimants submit that the Tribunal has "full discretion to determine the most appropriate rate of interest to achieve full reparation"[2138] and quote the award in *Compañía del Desarollo de Santa Elena, S.A. v. Republic of Costa Rica* ("**Santa Elena**"):

> [T]he determination of interest is a product of the exercise of judgment, taking into account all of the circumstances of the case at hand and especially considerations of fairness which must form part of the law to be applied by this Tribunal.[2139]

1641.  Claimants further contend that the Tribunal may award compound interest[2140] and that compound interest has become "the norm in investment arbitration as regards full reparation."[2141]   Putting emphasis on the awards in *Santa Elena* and *Wena Hotels Limited v. Arab Republic of Egypt* ("**Wena**"), Claimants explain that compound interest should be awarded in order for the amount of compensation to reflect the additional sum that the claimant would have earned if the money had been reinvested each year at generally prevailing rates of interest.[2142]

1642.  Claimants' valuation expert, Mr. Kaczmarek, analyzed three possible rates of interest:   the LIBOR plus two or four percent; the yield on Russian sovereign bonds issued in USD; and the U.S. Prime rate of interest plus two percent.[2143]

1643.  According to Claimants:

> Navigant observed that the Russian Federation's breaches "have effectively turned Claimants into unwilling lenders to Russia."  The yield on Russian sovereign bonds issued

---

[2137]   *Ibid.*, citing to *Vivendi v. The Argentine Republic* ¶ 9.2.3, Exh. C-986.

[2138]   *Ibid.* ¶ 961.

[2139]   *Santa Elena* ¶ 103, Exh. C-952.

[2140]   Memorial ¶ 963, citing to *Metalclad v. Mexico*, ICSID Case No. ARB(AF)/97/1, Award, 30 August 2000 ¶ 128, Exh. C-954; *Wena Hotels Limited v. Arab Republic of Egypt*, ICSID Case No. ARB/98/4, Award, 8 December 2000 ¶ 129, Exh. C-956 (hereinafter "*Wena*"); *Santa Elena* ¶ 104, Exh. C-952; *MTD v. Chile* ¶ 251, Exh. C-969; *Azurix* ¶ 440, Exh. C-979; *Siemens* ¶¶ 399–401, Exh. C-983 (hereinafter "*Siemens*"); *ADC* ¶ 522, Exh. C-980; *Vivendi* ¶¶ 9.2.5–9.2.6, Exh. C-986; *Siag v. Egypt*, ICSID Case No. ARB/05/15, Award, 1 June 2009 ¶ 595, Exh. C-998; F.A. Mann, *Compound Interest as an Item of Damage in International Law*, 21 U.C. Davis L. Rev. 577 (1987–1988), Exh. C-1025; Stephen M. Schwebel, *Compound Interest in International Law*, 2(5) Transnational Dispute Management (2005), Exh. C-1029; John Yukio Gotanda, *Compounding Interest in Interest:  The Global Economy, Deflation, and Interest, in* CONTEMPORARY ISSUES IN INTERNATIONAL ARBITRATION AND MEDIATION. THE FORDHAM PAPERS (2009–2010), pp. 261–87, Exh. C-1024; *see also* Reply ¶ 845 n.1472, citing to *Kardassopoulos* ¶¶ 650–78, Exh. C-1533; *Gemplus S.A., SLP S.A., Gemplus et al. v. Mexico, Talsud S.A6. v. The United Mexico States*, ICSID Cases Nos. ARB (AF)/04/3 & ARB (AF)/04/4, Award, 16 June 2010 ¶¶ 16–26, Exh. C-1536 (hereinafter "*Gemplus*").

[2141]   Memorial ¶ 965.

[2142]   *Ibid.* ¶¶ 963–64, citing to *Wena* ¶ 129, Exh. C-956; *Santa Elena* ¶ 104, Exh. C-952.

[2143]   Memorial ¶ 966; First Kaczmarek Report ¶¶ 375–81; Reply ¶ 859 n.1491; Second Kaczmarek Report ¶¶ 64–65.

in U.S. dollars corresponds to the rate that the Russian Federation offers to its <u>willing</u> lenders.  Therefore, in order to be fully compensated for the Russian Federation's breaches, the Claimants should be awarded interest at a commercial rate <u>higher</u> than this latter rate.  LIBOR +4% would represent such an appropriate commercial rate, which is the rate used by Navigant in its expert report.[2144]

[emphasis in the original]

1644. Claimants have requested that interest of LIBOR plus 4 percent, compounded annually, be applied pre- and post- award, including on costs.[2145]

1645. At the Hearing, Claimants presented the following table to summarize their submission on interest rates:[2146]

| Interest Rate | Description | Justification |
|---|---|---|
| Russian Cost of Debt | Cost of raising money for the Russian Government | The actions have effectively turned the Claimants into unwilling lenders to Russia. |
| U.S. Prime Rate | Rate that US banks charge their most creditworthy customers | The U.S prime rate is not widely available in the market.  A 2% premium reflects a rate that would be more broadly available. |
| LIBOR | Rate of interest that banks charge one another for loans in the money market | Historically, LIBOR + 2% has closely tracked the U.S. Prime rate of interest.  As such, LIBOR + 4% would be a commercial rate of interest on par with the U.S. Prime rate + 2% |

1646. Claimants noted that the Russian cost of debt is "a natural candidate" for interest rate.[2147]  In response to a question by the Chairman whether Claimants "still rely on LIBOR", counsel for Claimants noted that he had "avoided making any comment on the reliability of LIBOR."[2148]

**B.    RESPONDENT'S POSITION**

1647. Respondent submits that Claimants' request for pre- and post-award interest is "manifestly unfounded and disproportionate, and should be rejected."[2149]  Respondent refers to the

---

[2144]    Memorial ¶ 967.

[2145]    Memorial ¶ 970; Reply ¶¶ 859, 1199; Claimants' Post-Hearing Brief ¶ 309; Claimants' Submission on Costs ¶ 64.

[2146]    Transcript, Day 17 at 259 (Claimants' closing), showing Exh. C-1787.

[2147]    *Ibid*.

[2148]    *Ibid*. at 260 (Claimants' closing).

Commentary on Article 38 of the ILC Articles on State Responsibility for the proposition that there is "no automatic entitlement to the payment of interest."[2150]

1648. Respondent emphasizes that compound interest is not awarded automatically by tribunals.[2151] Respondent observes that the *RosInvestCo* tribunal used LIBOR alone, calculated annually, without any compounding.[2152]

1649. Respondent criticizes Claimants and their expert for failing to provide a justification for their preferred rate of LIBOR plus four percent.[2153]   According to Respondent, awarding Claimants interest at LIBOR plus four percent compounded annually would "unduly punish" Respondent while granting Claimants a "windfall."[2154]

### C.   THE LEGAL FRAMEWORK

#### 1.   Energy Charter Treaty

1650. Article 26(8) of the ECT provides that "awards of arbitration, <u>which may include an award of interest</u>, shall be final and binding upon the parties to the dispute" [emphasis added].   In the case of a lawful expropriation, Article 13(1) of the ECT directs that compensation "<u>shall</u> also include <u>interest at a commercial rate established on a market basis</u> from the date of Expropriation until the date of payment" [emphasis added].[2155]

---

[2149]   Rejoinder ¶ 1743.

[2150]   *Ibid.*, quoting Commentary on ILC Articles on State Responsibility, Article 38 ¶ 7, Exh. R-4235.

[2151]   *Ibid.*   Respondent explains that, as noted by the tribunal in *Duke Energy Electroquil Partners and Electroquil S.A. v. Republic of Ecuador*, ICSID ARB/04/19, Award, 18 August 2008 ¶ 473, Exh. C-993, "the award of compound interest is not a principle of international law."   As explained by BORZU SABAHI, COMPENSATION AND RESTITUTION IN INVESTOR-STATE ARBITRATION (2011), p. 152, Exh. R-4234, "compound interest, in international investment law, may be awarded if the aggrieved party can prove that it 'could have received compound interest . . . by placing its money in a readily available and commonly used investment vehicle . . .'."   In *RosInvestCo* ¶¶ 688–90, Exh. C-1049, the tribunal notes that the practice of awarding compound interest is "by no means unanimous" and that awarding interest at "a normal commercial rate" does not imply that the tribunal "is bound to award compound interest."   Rejoinder ¶ 1743 n.2952.

[2152]   Rejoinder ¶ 1746; *RosInvestCo* ¶¶ 684–90, Exh. C-1049.

[2153]   Rejoinder ¶ 1746.

[2154]   *Ibid.* ¶ 1747, quoting John Yukio Gotanda, *Awarding Interest in International Arbitration*, 90 Am. J. of Int'l Law 40 (1996) pp. 59–60, Exh. R-4236.

[2155]   See Subsection XII.C.1(b) below for discussion on the applicability of the Article 13 standard in lawful and unlawful expropriations.

1651. The Tribunal observes that arbitral tribunals hearing disputes under the ECT have awarded pre- and post-award interest at various rates.[2156]

### 2.    ILC Articles on State Responsibility

1652. Article 38 of the ILC Articles on State Responsibility reads as follows:

> 1. Interest on any principal sum due under this chapter shall be payable when necessary in order to ensure full reparation.  The interest rate and mode of calculation shall be set so as to achieve that result.

> 2. Interest runs from the date when the principal sum should have been paid until the date the obligation to pay is fulfilled.[2157]

1653. The Commentary on Article 38 provides that "[t]he awarding of interest depends on the circumstances of each case; in particular, on whether an award of interest is necessary in order to ensure full reparation."[2158]

### 3.    *RosInvestCo* and *Quasar*

1654. The *RosInvestCo* tribunal awarded pre- and post-award interest using LIBOR alone, calculated annually, without any compounding,[2159] while the *Quasar* tribunal awarded pre- and post-award interest at a rate of 6.434 percent (corresponding to the relevant average yield of medium-term Russian sovereign bonds dealt in USD) compounded annually.[2160]

### 4.    Treatises

1655. Two books on the issue of damages in international investment cases have recently been published.  The Tribunal has found the chapters of these books dealing with interest very informative.[2161]

---

[2156] *See e.g. Nykomb Synergetics Technology Holding AB (Sweden) v. Latvia*, SCC, Award, 16 December 2003, p. 40 (pre-award and post-award interest at six percent, corresponding to the prevailing interest rate in Latvia), Exh. C-967; *Kardassopoulos* ¶¶ 658–68, 677–78 (pre-award and post-award interest at LIBOR plus four percent compounded semi-annually), Exh. C-1533.

[2157] Exh. C-1042.

[2158] ¶ 7, Exh. C-1042.

[2159] *RosInvestCo* ¶¶ 684–92, Exh. C-1049.

[2160] *Quasar* ¶ 226, Exh. R-3383.

[2161] SERGEY RIPINSKY & KEVIN WILLIAMS, DAMAGES IN INTERNATIONAL INVESTMENT LAW (2008), pp. 363–91 (other extracts of which constitute Exh. C-1610) (hereinafter "Ripinsky and Williams"); IRMGARD MARBOE, CALCULATION

1656. The following paragraphs summarize these authors' respective analyses and conclusions on various aspects of the issue of interest in international investment cases.

### (a)   General Issues

1657. Dr. Irmgard Marboe explains that, on the one hand, interest should compensate the temporary withholding of money:  interest should address the claimant's financial disadvantage of not being able to dispose of money, which materializes either in loss of profit from alternative investments or in costs for a loan.[2162]   On the other hand, the awarding of interest should prevent the debtor's unjust enrichment since the debtor gains a financial profit through the withholding of the money.[2163]   Additionally, post-award interest, writes Dr. Marboe, serves the purpose of creating an effective incentive for the respondent to comply with an arbitral award without delay.[2164]

1658. Dr. Sergey Ripinsky and Mr. Kevin Williams stress the well-established mantra that tribunals enjoy a wide margin of discretion in awarding interest.[2165]

### (b)   Rate

1659. Dr. Ripinsky and Mr. Williams write that choosing the rate is "perhaps the issue where one sees the greatest variety in approaches of arbitration tribunals."[2166]   They consider four different approaches.

1660. The first is the "investment alternatives" approach, adopted by the majority opinion in the Iran–U.S. Claims Tribunal case *Sylvania Technical Systems v. Iran* ("**Sylvania**") and explained in the following terms:

> [T]he Tribunal will derive a rate of interest based approximately on the amount that the successful claimant would have been in a position to have earned if it had been paid in time

---

of Compensation and Damages in International Investment Law (2009), pp. 317–92 (other extracts of which constitute Exh. C-1607) (hereinafter "Marboe").

[2162]   Marboe ¶ 6.05.

[2163]   *Ibid*. ¶ 6.06; *see also Santa Elena* ¶ 101, Exh. C-952 ("[the claimant] is entitled to the full present value of the compensation that it should have received at the time of the taking.  Conversely, the taking state is not entitled unjustly to enrich itself by reason of the fact that the payment of compensation has been long delayed.").

[2164]   Marboe ¶ 6.38, citing to John Yukio Gotanda, Supplemental Damages in Private International Law, 1997, p. 58.

[2165]   Ripinsky and Williams, pp. 365–66.

[2166]   *Ibid*., p. 366. Dr. Marboe calls it "one of the most difficult decisions."  Marboe ¶ 6.40.

and thus had the funds available to invest in a form of commercial investment in common use in its own country.[2167]

1661. According to Dr. Ripinsky and Mr. Williams, this approach was followed in subsequent awards of the Iran–U.S. Claims Tribunal as well as by the *Santa Elena* tribunal.[2168]

1662. The second approach is the "borrowing rate" approach, which is based on borrowing rates from banks in the claimant's country.[2169] Investment tribunals have often used the LIBOR, an inter-bank borrowing rate of interest. Some tribunals have also added a certain percentage to the LIBOR rate to arrive at the approximate rate that international investors would have had to pay if they had been obliged to borrow the money. According to Ripinsky and Williams, tribunals have "normally" added two percent to LIBOR.[2170]

1663. Dr. Marboe notes that Judge Holtzmann had argued in favor of a borrowing rate approach in his separately recorded view on interest in the *Sylvania* decision, because it "is reasonable to assume that most businesses habitually borrow while fewer regularly invest in certificates of deposit."[2171] Dr. Marboe writes that the borrowing rate approach can lead to different results, such as the selection of the prime rate, the borrowing rate of the investor, the cost of capital of the investor, the borrowing rate of the State (the "coerced loan theory") or the average borrowing rate.[2172]

1664. In respect of the prime rate, Dr. Marboe writes:

> The "prime" or "base" rate plays an important role in negotiations about company loan conditions in Anglo-American countries. As such, it seems to be an appropriate basis for the assessment of the damages incurred by a delayed payment. However, it must be taken into account that not all enterprises can borrow money from the banks at the prime rate. Therefore, an increase by a few percentage points might be necessary as has been the practice in the cases mentioned above. The question then arises, of course, how many percentage points are appropriate. It appears, therefore, that the prime rate does not really offer a viable means of ensuring adequate and consistent decisions on interest.[2173]

1665. In respect of the "coerced loan theory", she opines:

---

[2167] Ripinsky and Williams, p. 368, quoting *Sylvania Technical Systems v. Iran*, Award, 27 June 1985, 8 Iran–U.S. Claims Tribunal Reports, 298, 320 (footnote omitted) (hereinafter "*Sylvania*").

[2168] *Ibid.*, p. 368; *see* Marboe ¶¶ 6.107–6.120.

[2169] Ripinsky and Williams, p. 369.

[2170] *Ibid.*, p. 370.

[2171] Marboe ¶ 6.82, quoting *Sylvania*, p.321 n.13.

[2172] *Ibid.* ¶¶ 6.85–6.106.

[2173] *Ibid.* ¶ 6.93.

According to this approach, the amount of interest has nothing to do with the claimant's actual loss, but rather depends on the respondent's risk characteristics.

This approach measures the financial effect of the delay from the perspective of the respondent. It has to be borne in mind, however, that pre-award interest in international investment cases should fulfil the function of compensation or damages. Therefore, the perspective of the claimant is decisive.

The perspective of the respondent, however, is important when it comes to the prevention of enrichment as an additional function of the interest claim. While this is only of secondary importance concerning pre-award interest, it becomes relevant with regard to post-award interest. This means that the "coerced loan theory" would better fit with the determination of post-award interest.[2174]

1666. The third approach to interest is to rely on the interest rate applicable under the host State's domestic law provisions concerned. Dr. Ripinsky and Mr. Williams observe that investment tribunals have done so,[2175] while Dr. Marboe asserts that, in international investment disputes, "national legal interest rates are not applicable and not adequate."[2176]

1667. Finally, in a number of disputes, write Dr. Ripinsky and Mr. Williams, tribunals have adopted a specific rate ranging from 5 to 10 percent, calling it "reasonable", "fair" or "appropriate".[2177] Dr. Marboe writes that "fair" rates have ranged from 5 to 17.5 percent.[2178]

1668. The Tribunal notes that, overall, Dr. Ripinsky and Mr. Williams favor the "investment alternatives" approach, with the caveat that, in situations where the debtor's actions force the claimant to borrow funds, it would be appropriate to award interest at the claimant's actual borrowing rate,[2179] whereas Dr. Marboe appears to prefer the use of inter-bank interest rates.[2180]

(c)   *Dies a quo*

1669. The authors of both treatises affirm that, in cases of expropriation, "interest has invariably been calculated from the date of the taking."[2181]

---

[2174]   *Ibid*. ¶¶ 6.101–6.103 (footnote omitted).

[2175]   Ripinsky and Williams, pp. 370–72.

[2176]   Marboe ¶¶ 6.70.

[2177]   Ripinsky and Williams, p. 372.

[2178]   Marboe ¶ 6.149; *see also* ¶¶ 6.150–6.161.

[2179]   Ripinsky and Williams, p. 373.

[2180]   *See* Marboe ¶ 6.147.

[2181]   Ripinsky and Williams, p. 375; *see ibid*. ¶ 6.163.

### (d)   Simple or Compound

1670. With respect to the important issue of whether interest awarded should be simple or compound, Dr. Ripinsky and Mr. Williams opine that "there is a trend away from only awarding simple interest to generally awarding compound interest,"[2182] while Dr. Marboe states that "compound interest as opposed to simple interest appears to be predominantly accepted as appropriate in recent international investment arbitration" because it is "regarded as better reflecting actual economic realities both for the purpose of remedying the loss actually incurred by the injured party and for the prevention of unjustified enrichment of the respondent State."[2183] Dr. Ripinsky and Mr. Williams refer to the *Santa Elena* award, issued in 2000, as "a turning point in jurisprudence."[2184]

1671. Dr. Ripinsky and Mr. Williams observe that the period of compounding has ranged from one year to one month and that annual compounding has been "predominant."[2185]

### (e)   Post-Award Interest

1672. After an extensive review of arbitral decisions, Dr. Ripinsky and Mr. Williams conclude that in the majority of cases, tribunals have not considered post-award interest separately from pre-award interest and have simply granted interest until the date of full payment of the award. This "automatically turns pre-award interest into post-award."[2186]

1673. They note that when post-award interest has been granted separately, tribunals have been more severe towards the respondent, compared to the pre-award interest granted.[2187]

1674. According to Dr. Ripinsky and Mr. Williams, "[t]hese changes can be explained by the desire of some tribunals to ensure prompt compliance with the award by adding a punitive element to

---

[2182]   Ripinsky and Williams, p. 379.

[2183]   Marboe ¶ 6.236; but see Marboe's list of exceptions ¶¶ 6.237–6.261.

[2184]   Ripinsky and Williams, p. 385.

[2185]   *Ibid.*, p. 387.

[2186]   *Ibid.*; *see also* Marboe ¶¶ 6.243–6.261.

[2187]   Ripinsky and Williams, p. 389.

interest and thereby turning the post-award interest from a purely compensatory instrument into a sanction."[2188]

1675. Dr. Ripinsky and Mr. Williams also note that some tribunals have provided for a grace period following the date of the award, during which interest does not accrue.[2189]

### D.   TRIBUNAL'S DECISION

1676. The Tribunal, having considered the Parties' submissions, the treatises of the learned authors quoted extensively above, the many decisions of tribunals which have traversed the issue of interest and, of course, the totality of the evidence in the case at hand that it considers pertinent to its determination of this facet of the present arbitrations, will now proceed with its analysis and exercise its judgment.

1677. As we saw earlier, the ECT, the relevant legal instrument, envisages an award of interest in an arbitral award.  In addition, the Treaty decrees mandatory payment of interest "at a commercial rate established on a market basis" in the case of a lawful arbitration.  In the view of the Tribunal, there can be no doubt that, *a fortiori*, in the case of an unlawful expropriation, as in the present case, Claimants are entitled to interest from Respondent in order to ensure full reparation for the injury they suffered as a result of those of Respondent's measures that the Tribunal has found to be internationally wrongful.

1678. Neither the Treaty nor the ILC Articles on State Responsibility provide specific rules regarding how interest should be determined.  In addition, as the Tribunal has found, the practice of past tribunals is varied and inconsistent and does not provide clear guidance.  Thus, as is well established, the Tribunal has a wide margin of discretion to determine the rate of interest applicable and whether it should be simple or compound.

1679. Of the three rates proposed by Claimants, the LIBOR plus two or four percent, the yield on Russian sovereign bonds issued in USD and the U.S. Prime rate plus two percent, the Tribunal has rejected outright the first two for the following brief reasons.  LIBOR, as Claimants' counsel implicitly recognized during the Hearing, has been discredited, while the yield on

---

[2188]   *Ibid.*, p. 389; *see* Marboe ¶ 6.245.

[2189]   Ripinsky and Williams, p. 390; *see also* Marboe ¶¶ 6.262–6.268.

Russian sovereign bonds issued in USD would lead, in the Tribunal's opinion, to excessive compensation for Claimants.

1680. As for the U.S. Prime rate plus two percent, the Tribunal initially saw merit in this rate which is a version of the borrowing rate approach reviewed earlier. The Tribunal notes that this method was put forward by Judge Holtzmann in his separately recorded view on interest in the *Sylvania* Iran–U.S. Claims Tribunal case.[2190]

1681. The Tribunal has concluded however that this method should also be rejected. It is not an appropriate basis for the assessment of the damages in this case. There is no evidence that Claimants had to borrow money because they were not compensated at the time of the expropriation.

1682. On the other hand, the Tribunal finds apposite the following statement of the *Siemens v. Argentina* tribunal:

> The Tribunal considers that the rate of interest to be taken into account is not the rate associated with corporate borrowing but the interest rate the amount of compensation would have earned had it been paid after the expropriation.[2191]

1683. The Tribunal recalls that a rate of interest based on return of investment during the relevant period was adopted by the *Santa Elena* tribunal:

> [W]here an owner of property has at some earlier time lost the value of his asset but has not received the monetary equivalent that then became due to him, the amount of compensation should reflect, at least in part, the additional sum that his money would have earned, had it, and the income generated by it, been reinvested each year at generally prevailing rates of interest.[2192]

1684. The Tribunal observes that many investor-state tribunals have adopted this "investment alternatives approach,"[2193] using rates of U.S. debt instruments even when the claimant was not a U.S. investor.[2194]

---

[2190] *Sylvania*, p. 321 n.13.

[2191] *Siemens* ¶ 396, Exh. C-983.

[2192] *Santa Elena* ¶ 104, Exh. C-952. The Chairman of the Tribunal was also the Chairman of the ICSID tribunal in *Santa Elena*.

[2193] Ripinsky and Williams, pp. 368–69; Marboe ¶¶ 6.107–6.119; *Sylvania*, pp. 320–21; *Santa Elena* ¶ 104, Exh. C-952; *Siemens* ¶ 396, Exh. C-983.

[2194] Ripinsky and Williams, p. 369 & n.42; *see e.g.*, *Alpha Projektholding GmbH (Austria) v. Ukraine*, ICSID Case No. ARB/07/16, Award, 8 November 2010 ¶ 514 & n.666; *EDF International S.A., SAUR International S.A. Leon*

1685. The Tribunal, in the exercise of its discretion, has concluded that it would be appropriate to award to Claimants interest on a rate based on ten-year U.S. Treasury bond rates.

1686. As will be seen in Part XII on damages, the Tribunal has ruled that Claimants' shares in Yukos should be valued as of the date of the Award.  Accordingly, there will be no pre-award interest granted to Claimants in respect of the damages representing the value of their shares.[2195]

1687. However, in order that they may be made whole, the Tribunal will grant pre-award interest to Claimants for the damages which represent the value of the dividend streams for which, as will be seen,[2196] the Tribunal has decided Claimants should be compensated.  In order to compute the pre-award interest awarded to Claimants at the rate based on ten-year U.S. Treasury bond rates, the Tribunal will use the average yield of ten-year U.S. Treasury bonds over the period from 1 January 2005 to 30 May 2014 as the applicable rate of interest, which the Tribunal has determined to be 3.389 percent.[2197]

1688. As will also be seen in Part XII on damages, the Tribunal has decided to award Claimants post-award interest on the damages of USD 50,020,867,798 for which the Tribunal has found Respondent liable.

1689. As to whether the interest awarded should be simple or compound, while the Tribunal recognizes that the awarding of compound interest under international law now represents a form of "jurisprudence constante" in investor-state expropriation cases,[2198] the Tribunal has concluded that, in the circumstances of this case, it would be just and reasonable to award Claimants simple pre-award interest and post-award interest compounded annually if Respondent fails to pay in full to Claimants the damages for which it has been held liable before the expiry of the grace period hereinafter granted.

---

*Participationes Argentinas S.A. v. The Argentine Republic*, ICSID Case No. ARB/03/23, Award, 11 June 2012 ¶ 1325ff, Exh. R-4186; *Gemplus,* Exh. C-1536.

[2195] Pre-award interest on the value of the Claimants' shares has, however, been applied in the context of calculating the amount of damages that would have to be awarded on the basis of a valuation date corresponding to the date of the expropriation of Claimants' investment.  *See* paragraph 1847 below.

[2196] *See* Subsection XII.C.4.

[2197] *See* Table T9 appended to this Award.

[2198] *Oko Pankki Oyj (formerly called OKO Osuuspankkien Keskuspankki OYJ), VTB Bank (Deutschland) AG (formerly called Ost-West Handelsbank AG) and Sampo Bank PLC v. The Republic of Estonia*, ICSID Case No. ARB/04/6), Award, 19 November 2007 ¶ 349, Exh. C-1530.

1690. The Tribunal notes that Claimants claim interest on the costs that may be awarded to them by the Tribunal at the same rate as the interest awarded to them on the damages.[2199]   In the event that Respondent fails to pay in full to Claimants the costs awarded to them in Part XIII of the present Award before the expiry of the grace period, post-award interest will accrue on any outstanding amount, compounded annually.

1691. In the circumstances of the present case, in view of the significant amount of damages which Respondent owes Claimants as a result of this Final Award, the Tribunal considers it reasonable to grant to Respondent a grace period of 180 days following the date of the Award before interest will accrue if not paid in full to Claimants by then.

1692. In order to compute any post-award interest awarded to Claimants on their damages and their costs, the Tribunal orders that the interest rate be determined as the yield on ten-year U.S. Treasury bonds as of 15 January 2015 and then the dates of compounding yearly thereafter.

## XII.   THE QUANTIFICATION OF CLAIMANTS' DAMAGES

1693. The Tribunal will now determine the damages caused to Claimants by Respondent's breach of Article 13 of the ECT.  The Parties' positions in this regard can be summarized as follows.

### A.   CLAIMANTS' POSITION

1694. Claimants assert that they are entitled to full reparation for Respondent's breach of its obligations under the ECT "through financial compensation measured at the date of expropriation or at the date of the award, whichever is the greatest"[2200] and seek damages in "an amount to be determined by the Arbitral Tribunal," but estimated at "no less than US$ 114.174 billion."[2201]  Claimants maintain that, while Article 13(1) of the ECT provides a specific rule of compensation, this rule applies only to legal expropriations (*i.e.*, expropriations satisfying the conditions contained in Article 13(1)), and that, where one or more of the conditions of Article 13(1) have not been met, the rules of customary international law apply to the issue of

---

[2199]   Claimants' Submission on Costs ¶ 64.

[2200]   Claimants' Post-Hearing Brief ¶ 232.

[2201]   Reply ¶ 1199.  *See also* Claimants' Post-Hearing Brief ¶ 302.

reparation.[2202]   According to Claimants, in order to achieve full reparation in the event of an unlawful expropriation, an investor must be able to choose between a valuation of the damages it has suffered as at the date of the breach and a valuation as at the date of the award.[2203]

### 1.    Valuation Date

1695.  Claimants submit that there are two potentially relevant dates with regard to the assessment of damages, namely the moment when a treaty breach occurs and the moment when an award is rendered.  Claimants take the view that "an investor should be compensated in the highest amount between the valuation of the damages it has suffered as at the date of the breach and that at the date of the award."[2204]   The reason for this alternative valuation, according to Claimants, is that "to the extent the assets expropriated have increased in value during the arbitration process, this increase must accrue for the benefit of the Claimants, not to the Russian Federation."[2205]   Claimants refer to a number of legal authorities to support the conclusion that, in cases of unlawful expropriations, investors are entitled to choose between a valuation as at the date of the breach and a valuation as at the date of the award.[2206]

1696.  Claimants assert that the date of the expropriation of their investment in this case was 21 November 2007, the date on which Yukos was struck off the Russian register of legal entities.  The justification for choosing this date, according to Claimants, is that "[i]n cases involving expropriations through a series of coordinated interferences by the State, the date of expropriation corresponds to the date on which the governmental interference ripened into an irreversible deprivation of the investor's property,"[2207] and that striking Yukos from the register of legal entities constituted "a point of no return."[2208]

---

[2202]   Memorial ¶¶ 897–99; Transcript, Day 17 at 219–18.

[2203]   Memorial ¶ 917.

[2204]   *Ibid*.  *See also* ¶ 913; Claimants' Post-Hearing Brief ¶¶ 232–33.

[2205]   Memorial ¶ 913.

[2206]   Memorial ¶¶ 915–17; Reply ¶ 845.  Claimants refer in particular to *ADC*, ¶¶ 496–97, Exh. C-980; *Siemens* ¶ 352, Exh. C-983; *Kardassopoulos* ¶ 514, Exh. C-1533; *Amoco International Finance Corporation v. Iran*, Partial Award, 14 July 1987, 15 Iran–U.S. Claims Tribunal Reports, 189,  pp. 300–01, Exh. C-939 (hereinafter "*Amco*").

[2207]   Memorial ¶ 912, n.1314.  *See also* Reply ¶ 940.

[2208]   Reply ¶ 943.

### 2. Causation

1697. With regard to causation, Claimants assert that they do not need to establish a link between individual actions of Respondent and the damages suffered, but that it suffices for them to show that the sum of Respondent's actions caused those damages.  Claimants argue that:

> [T]he Russian Federation sought and achieved the dismantlement and destruction of Yukos, and the Claimants' investments therein, through a series of cumulative actions. . . . The breach, and the Respondent's responsibility, arises from the Russian Federation's actions taken as a whole and not from each and every one of these actions.  It is the cumulative effect of these acts that is criticized by the Claimants.[2209]

1698. Claimants also argue that:

> [A] causal link needs only be established between the actions of the Russian Federation taken as a whole and the Claimants' damages, namely the destruction of their investments. This causal link is obvious . . . .[2210]

1699. According to Claimants, there is ample authority to support their position that the Tribunal need only consider "the totality of the Russian Federation's actions and their result:  the inexcusable treatment of the Claimants' investments and, ultimately, their outright expropriation."[2211]

### 3. Calculations Performed by Claimants and Mr. Kaczmarek

1700. Claimants have submitted two expert reports on damages authored by Mr. Brent Kaczmarek of Navigant Consulting, dated 15 September 2010 and 15 March 2012, together with their Memorial and their Reply, respectively.   The calculations contained in these reports and referred to in Claimants' pleadings can be summarized as follows.

#### (a) The "Scenarios" Presented by Claimants

1701. Claimants perform calculations based on three different "scenarios."   Within each of these scenarios, Claimants also differentiate between a number of sub-scenarios.

1702. The first scenario developed by Claimants is based on two fundamental assumptions, namely (a) that the tax assessments against Yukos constituted a breach of the ECT, and (b) that this

---

[2209]   *Ibid.* ¶ 904.

[2210]   *Ibid.* ¶ 911.

[2211]   Claimants' Post-Hearing Brief ¶ 191, citing to *e.g.*, *Walter Bau* ¶ 12.43, Exh. C-1000; *Pope & Talbot v. Canada*, UNCITRAL, Award on the Merits of Phase 2 ¶ 181, Exh. C-1518; *Kardassopoulos* ¶ 451, Exh. C-1533; *El Paso* ¶ 519, Exh. C-1544/R-4190.

breach caused the merger between Yukos and Sibneft to be cancelled.  In addition, Claimants call in aid an optional assumption in the context of this scenario, namely (c) that Yukos would have had a 70 percent chance of obtaining a listing on the NYSE, which would have further increased its value.[2212]  Claimants' first scenario can thus be subdivided into two sub-scenarios: sub-scenario 1a, which is based only on assumptions (a) and (b); and sub-scenario 1b, which is based on all three assumptions (a), (b), and (c).

1703. Claimants' second scenario is based on assumption (a) described above, namely that the tax assessments against Yukos constituted a breach of the ECT, whilst excluding assumption (b) (thus not seeking damages for the demerger between Yukos and Sibneft).  Here again two sub-scenarios can be distinguished: sub-scenario 2a is based solely on assumption (a), whereas sub-scenario 2b is based on both assumptions (a) and (c).

1704. Claimants' third scenario assumes that the tax assessments against Yukos did not constitute a breach of the ECT, but that the subsequent enforcement of the tax claims did.  Accordingly, Claimants calculate the "damages arising out of the 2004 and 2007 auctions, regardless of the merits of the alleged tax claims imposed on Yukos."[2213]  Within this third scenario, Claimants distinguish five sub-scenarios (subsequently referred to as 3a, 3b, 3c, 3d and 3e),[2214] all of which assume that Yukos should have been allowed to settle its alleged tax debts one way or another (thus avoiding the liquidation of the company), but propose different modalities as to how this could have been done.[2215]

1705. Sub-scenario 3a assumes that Yukos would have been allowed a grace period of five years and would then have "been able to pay off the entire amount of its alleged tax liabilities out of its operating cash-flows only by 2009."[2216]

1706. Sub-scenario 3b assumes that Yukos would have been granted a grace period of three years and would then have been able to pay off its alleged tax liabilities with a combination of its free cash flows and the sale of non-core assets during that period.[2217]

---

[2212]   First Kaczmarek Report ¶ 20.

[2213]   Memorial ¶ 977.

[2214]   Sub-scenarios 3b and 3d were first presented in Reply ¶ 873.

[2215]   Memorial ¶ 979.

[2216]   *Ibid.* ¶ 983.  *See also* Second Kaczmarek Report ¶ 33.

[2217]   Second Kaczmarek Report ¶ 36.

1707. Sub-scenario 3c assumes that Yukos would have been granted a grace period of one year and would then have been able to pay off its alleged tax liabilities with a combination of its free cash flows, the sale of non-core assets and debt financing during that period.[2218]

1708. Sub-scenario 3d also assumes that Yukos would have been granted a grace period of only one year, but then assumes (in contradistinction to sub-scenario 3c) that Yukos would have paid off its alleged tax liabilities with a combination of free cash flows, the sale of certain core assets and (limited) debt financing.[2219]

1709. Finally, sub-scenario 3e assumes that, while Yukos would have had to sell YNG to settle its alleged tax obligations, the auction "would have been conducted in a manner ensuring a fair, rather than grossly undervalued, price," generating proceeds of USD 19.703 billion,[2220] with the result that Yukos would have paid off its alleged tax liabilities with these proceeds as well as its cash flows in 2004 and 2005, while remaining a going concern.[2221]

1710. In accordance with Claimants' submissions regarding the relevant valuation dates, Claimants base their damages calculations in the first place on a valuation date of 21 November 2007. Accordingly, Claimants provide calculations for all three scenarios based on this date. In addition, Claimants also carry out a number of calculations based on the date of 1 January 2012, as a proxy for the date of the award, "for comparison purposes."[2222] Claimants provide calculations based on this date for scenarios 1 and 2, but not for scenario 3.

(b)     Methodology Used for Calculations Based on Scenarios 1 and 2

1711. Claimants' calculations for scenarios 1 and 2 as of November 2007 are in principle based on the following methodology: the total of the damages claimed corresponds to the sum of Claimants' share in a hypothetical Yukos entity as of the valuation date plus the hypothetical cash flows that Claimants would have received in the form of dividends based on Claimants' shareholding in Yukos from 2004 to November 2007. In addition, in scenarios 1b and 2b, Claimants also

---

[2218]   *Ibid.* ¶ 34.

[2219]   *Ibid.* ¶ 38.

[2220]   Memorial ¶¶ 989–90.

[2221]   *Ibid.* ¶ 993.  *See also* Second Kaczmarek Report ¶ 30.

[2222]   Second Kaczmarek Report ¶ 155; Reply ¶ 946.

include the value they attribute to the "lost chance" of listing Yukos' shares on the NYSE.[2223] The total amount thus obtained is then "brought forward" to a date close to the date of Mr. Kaczmarek's report  by adding pre-award interest.[2224]  Each one of these steps is set out in more detail below.

### i.      Value of Shares

1712. With regard to the valuation date of 21 November 2007, Claimants calculate the value of their shares in Yukos as follows:

### (a)  Valuation of Yukos

1713. As a first step, Claimants calculate the value of the relevant Yukos entity, as defined by the assets that Claimants assume Yukos would have owned in November 2007 in the absence of Respondent's alleged breaches.[2225]  The assets taken into account depend on the scenario.  For the purposes of scenario 1, both Yukos' and Sibneft's original assets are taken into account,[2226] whereas for scenario 2 the calculations are based only on Yukos' assets.[2227]  Claimants use three different methods for valuating Yukos, namely the DCF method, the comparable companies method and the comparable transactions method.[2228]

1714. With regard to the DCF method, Claimants describe their approach as an attempt to reconstruct the "pro-forma financial statements" that the relevant Yukos entity would have presented in November 2007, based on the financial and operational data published by Rosneft and Gazprom Neft, which held the majority of Yukos' assets at that point in time.[2229]  Where no such data is available, Claimants rely on "historical financial statements and operating information published by Yukos and Sibneft . . . as well as a benchmark of indicators from

---

[2223]  The total loss T under Claimants' scenario 1b based on a valuation date of November 2007 can thus be described as T = Value of Shares in November 2007 (V) + Dividends received from 2004 to 2007 (D) + Value of "lost chance" to list shares on NYSE (LC).  Memorial ¶ 920.  *See also* Claimants' Opening Slides, p. 204.

[2224]  Memorial ¶¶ 925, 969, 976.  *See also* Claimants' Opening Slides, p. 204.

[2225]  Memorial ¶ 931.

[2226]  *Ibid.*

[2227]  *Ibid.* ¶ 972.

[2228]  *Ibid.* ¶¶ 927, 972.

[2229]  *Ibid.* ¶ 931.  For scenario 2, Mr. Kaczmarek uses the Dicounted Cash Flow (hereinafter "DCF") model developed for scenario 1 with a number of adjustments.  First Kaczmarek Report ¶ 417.

Yukos' and Sibneft's industry peers in Russia."[2230]   Based on this data, Claimants estimate cash flows between 2007 and 2015 as well as a "terminal value" of the entity in 2015.[2231]   Claimants then bring the above estimates to their November 2007 value by applying a discount rate based on Yukos' cost of capital.[2232]   This operation leads them to Yukos' enterprise value as of November 2007.[2233]

1715.   Claimants also use a comparable companies approach, based on data available for a pool of Russian (Rosneft, Gazprom Neft, Lukoil, TNK-BP and Surgutneftegaz) and international (BP, Chevron, Conoco-Philips, Exxon-Mobil, Royal Dutch Shell and Total SA) oil companies.[2234] This approach identifies companies with characteristics similar to Yukos (notably in terms of production, reserves, profitability, revenue growth and financing structure), establishes the ratios between the enterprise value of these companies and relevant operating or financial metrics (EBITDA, reserves and production), and then applies these ratios to the relevant metrics of Yukos in order to estimate the latter's enterprise value.[2235]   The net income, EBITDA, reserves and production of Yukos are derived from the "pro-forma financial statements" established in the context of the DCF method.[2236]

1716.   Finally, Claimants use a comparable transactions approach based on public purchase transactions of comparable companies.[2237]   In this regard, Claimants apply a "sum of the parts valuation," in which they select transactions that are meant to match the upstream and downstream business of Yukos separately.[2238]   Here again, the operating and financial metrics of Yukos as determined in the context of the DCF method are used to calculate the value of the company.[2239]

1717.   Claimants then calculate a synthesized enterprise value of Yukos based on the results of the three approaches, weighing the DCF approach at 50 percent, the comparable companies

---

[2230]   Memorial ¶ 931.

[2231]   Ibid. ¶ 932.

[2232]   Ibid. ¶¶ 933–34.  See also First Kaczmarek Report ¶¶ 84, 87.

[2233]   Memorial ¶ 935.

[2234]   Ibid. ¶ 938.

[2235]   Ibid.

[2236]   First Kaczmarek Report ¶ 429.

[2237]   Memorial ¶ 940.

[2238]   Ibid. ¶ 941.

[2239]   Ibid.

approach at 40 percent and the comparable transactions approach at 10 percent.[2240]   By then subtracting Yukos' assumed debt, they arrive at Yukos' synthesized equity value.[2241]

*(b)  Calculation of the Value of Claimants' Shareholding*

1718. In a final step, for each of the scenarios considered, Claimants calculate the value of Claimants' shareholding in Yukos by multiplying the company's equity value by Claimants' share in the company—53 percent (corresponding to the dilution of Claimants' shareholding associated with the creation of YukosSibneft) for scenario 1 and 70.5 percent (corresponding to Claimants' original shareholding in Yukos) for scenario 2.[2242]

ii.     **Additional Indicators Relied on by Claimants to Confirm the Value of Yukos Shares**

1719. With regard to scenario 1, Mr. Kaczmarek avers that he confirmed his valuation with a number of additional indicators.   Claimants calculate Yukos' enterprise value based on the market capitalization of Rosneft in November 2007, with a number of adjustments made in order to take into account the differences between Rosneft's assets and Yukos' (fictitious) assets as of that date.   The result of this calculation is an enterprise value that is about USD 4.5 billion lower than the enterprise value calculated on the basis of the above-described methodology.[2243]

1720. Mr. Kaczmarek  also confirms his valuation of Yukos' enterprise value as of November 2007 based on the increase of three benchmarks (Urals blend prices, the RTS Oil and Gas index and Lukoil's market capitalization) between October 2003 and November 2007.[2244]   These calculations lead to an enterprise value of Yukos that is approximately halfway between USD 14.4 billion lower (RTS Oil and Gas) and USD 46.5 billion higher (Lukoil market capitalization) than the enterprise value of Yukos calculated on the basis of Claimants' basic methodology.[2245]

---

[2240]   *Ibid*. ¶¶ 944–45.  Claimants note that they assign a low weight to the results of their comparable transactions approach, due to the "absence of a transaction involving a company similar to YukosSibneft in the years preceding the date of valuation." *Ibid*. ¶ 945.

[2241]   *Ibid*. ¶ 945.

[2242]   *Ibid*. ¶¶ 949, 972.

[2243]   Claimants' Post-Hearing Brief ¶ 263.  *See also* Memorial ¶ 946.

[2244]   Claimants' Post-Hearing Brief ¶ 260.  *See also* Exh. C-1783.

[2245]   Claimants' Post-Hearing Brief ¶ 261.  *See also* Exh. C-1783.

1721. Finally, Claimants calculate Yukos' enterprise value on the basis of a share swap involving YNG shares that would have taken place between Rosneft and Yukos in October 2006, which Claimants say implies a valuation of YNG's equity at USD 46.2 billion at that point in time.[2246] On that basis, Claimants calculate an enterprise value of Yukos as of 21 November 2007 that is approximately USD 12.8 billion lower than the value calculated on the basis of their basic methodology.[2247]

### iii.    Hypothetical Cash Flows from Dividends

1722. The second component of Claimants' damages calculation is the cash flows from dividends that Claimants argue would have been paid to them in the first and second scenarios but for Respondent's treaty breaches.  Claimants assume that, without the alleged breaches of the ECT by Respondent, Yukos would have paid dividends to its shareholders between 30 September 2003 and 21 November 2007.[2248]  Accordingly, Claimants say that they would have received a pro rata share of these dividends, calculated on the basis of their shareholding in the company.[2249]

### iv.    Loss of Chance

1723. The third component of Claimants' damages calculation is based on Claimants' valuation of what they refer to as the loss of a chance to obtain a listing of Yukos on the NYSE.  Claimants submit that, without the breaches of Respondent, Yukos would likely have been listed on the NYSE, and that this listing would have decreased the company's costs of capital and thus increased Yukos' share value.[2250]  Claimants quantify the value of the loss of this chance by multiplying the assumed increase in share value with the probability of a successful listing, which they assume to be 70 percent.[2251]  This loss for Claimants is the amount thus obtained, multiplied by Claimants' shareholding in Yukos.[2252]

---

[2246]   Claimants' Post-Hearing Brief ¶ 262.  *See also* Exh. C-1773.

[2247]   Claimants' Post-Hearing Brief ¶ 262.  *See also* Exh. C-1784.

[2248]   Memorial ¶ 952.

[2249]   *Ibid*. ¶ 953.

[2250]   *Ibid*. ¶¶ 954–56.

[2251]   *Ibid*. ¶ 958.

[2252]   *Ibid*. ¶¶ 956, 958.

### v. Pre-Award Interest

1724. In a final step for purposes of their calculations with regard to scenarios 1 and 2, Claimants bring forward the total amount thus obtained to a date close to the date of their last submissions,[2253] and add pre-award interest of LIBOR plus four percent on a compound basis.[2254]

### (c) Methodology Used for Calculations Based on Scenario 3

1725. Claimants' calculations for scenarios 3a to 3d are based on their calculations for the second scenario, but are adjusted to take into account the settlement of Yukos' tax liabilities through Yukos' cash flow, the sale of certain assets and/or debt financing.[2255]  These scenarios do not assume any payment of dividends to Yukos' shareholders or the loss of a chance of obtaining a listing of Yukos on the NYSE.[2256]  Rather, Claimants determine Yukos' equity value as of November 2007 and derive the value of their ownership interest in Yukos from that figure. They then bring forward the amount thus obtained to a date close to the date of their last submissions again by adding compound pre-award interest at a rate of LIBOR plus four percent.[2257]

1726. Claimants' calculations for scenario 3e (which assumes the sale of YNG at a price higher than that achieved in the 2004 auction) are somewhat more complex.  In this scenario, Claimants estimate the enterprise value of YNG as of November 2007, and then subtract this amount from their estimate of the enterprise value of Yukos as of the same date.  This leaves Claimants with a figure for the enterprise value of Yukos' assets without YNG.[2258]  Claimants then subtract the assumed debt of this smaller Yukos entity and thus arrive at the equity value of Yukos (without YNG) in November 2007.[2259]  Claimants calculate their losses as a pro rata share (based on their 70.5 percent shareholding in Yukos) of the sum of this equity value, their estimate of free cash flows that a diminished Yukos (without YNG) would have achieved between January

---

[2253]  The date used for purposes of Mr. Kaczmarek's second report is 15 March 2012.  Second Kaczmarek Report ¶ 15.

[2254]  Memorial ¶ 969.  For Claimants' arguments on interest see Section XI.A.1 above.

[2255]  First Kaczmarek Report ¶¶ 555, 567.

[2256]  *Ibid.* ¶¶ 556, 568.

[2257]  *Ibid.*

[2258]  *Ibid.* ¶ 545.

[2259]  *Ibid.* ¶ 546.

2005 and November 2007, and pre-award interest brought forward to a date close to the date of their last submissions.[2260]

### (d)    Methodology Used for Calculations Based on 2012 Valuation Date

1727.    The position of Claimants is that, because of the unlawful taking by Respondent of Yukos, they are entitled to select the evaluation of the damages either at the date of Respondent's breach or at the date of the award, whichever is the highest.[2261]   Thus, Claimants, in their Reply, also quantify their damages in scenarios 1 and 2 based on a valuation date of 1 January 2012. Claimants state they chose this date for practical purposes since it is close to the date of submission of Mr. Kaczmarek's second expert report and that, if need be, calculations "can subsequently be updated at a date closer to the award."[2262]

1728.    While Mr. Kaczmarek does not set out the methodology used in this regard in any great detail,[2263] it can be inferred from some of the appendices to his second report.[2264]   In these appendices, Mr. Kaczmarek estimates Yukos' cash flows for the years 2004 to 2011 as well as the terminal value of Yukos as of 1 January 2012 for scenarios 1 and 2 and then applies pre-award interest of LIBOR plus four percent to bring these figures to the present (*i.e.*, 15 March 2012)[2265] value and thus obtain Yukos' total damages.[2266]   For scenarios 1b and 2b, Claimants also add the incremental value of the chance of obtaining a listing on the NYSE.[2267] Claimants then calculate their damages as a percentage of Yukos' damages, based on their shareholding in the relevant entity.[2268]

---

[2260]   *Ibid.* ¶ 547.

[2261]   Memorial ¶ 917.

[2262]   Claimants' Post-Hearing Brief ¶ 233 n.499.

[2263]   *See* Second Kaczmarek Report ¶ 155.

[2264]   Second Kaczmarek Report, Appendices AG to AK.

[2265]   *Ibid.*

[2266]   Second Kaczmarek Report, Appendices AG.1 and AK.1.  Claimants provide alternative computations based on pre-award interest at Russian Sovereign Cost of Debt, Prime +2 percent and LIBOR +2 percent.  Second Kaczmarek Report, Appendices AG.3 to AG.8 and AK.2 to AK.4.

[2267]   Second Kaczmarek Report, Appendices AH and AI.

[2268]   *Ibid.*, Appendices AG.1 and AI.

(e)     **Summary of Results of Claimants' Calculations**

1729. The valuation by Mr. Kaczmarek of each of the scenarios described above (including pre-award interest through 15 March 2012) is summarized in the following table (amounts in USD billion):

| Valuation date | Scenario | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 1a | 1b | 2a | 2b | 3a | 3b | 3c | 3d | 3e |
| 21 November 2007 | 106.815[2269] | 114.174[2270] | 102.015[2271] | 107.966[2272] | 67.236[2273] | 68.593[2274] | 62.763[2275] | 69.583[2276] | 33.317[2277] |
| 1 January 2012 | 91.922[2278] | 94.931[2279] | 88.737[2280] | 91.217[2281] | n.a. | n.a. | n.a. | n.a. | n.a. |

**4.     Failure of Claimants to Mitigate**

1730. In response to Respondent's contention that Claimants should promptly have paid the original taxes assessed against Yukos (as well as those Yukos should have anticipated would be imposed for succeeding years on the same grounds) to avoid massive damages, Claimants aver that there is no "duty to appease" and that "a victim of extortion is not to blame if the threats against it are carried out after it refuses to pay."[2282]

1731. Claimants also argue that Yukos had no reason to concede the validity of the Russian authorities' position with regard to the initial tax assessments "in circumstances where its objections to the December 29, 2003 Audit Report were still under consideration" and where it

---

[2269]   *Ibid.* ¶ 15.

[2270]   Reply ¶ 859.

[2271]   Second Kaczmarek Report ¶ 18.

[2272]   Reply ¶ 861.

[2273]   *Ibid.* ¶ 875.

[2274]   *Ibid.*

[2275]   *Ibid.*

[2276]   *Ibid.*

[2277]   *Ibid.* ¶ 864.

[2278]   Second Kaczmarek Report ¶ 155.

[2279]   Second Kaczmarek Report, Appendix AH.

[2280]   Second Kaczmarek Report ¶ 155 and Appendix AK.

[2281]   Second Kaczmarek Report, Appendix AI.

[2282]   Claimants' Post-Hearing Brief ¶ 275.

had received advice from its lawyers that the Audit Report was "totally inconsistent with the Russian tax law."[2283]   In any event, Claimants say that Yukos did not have enough cash to settle an alleged tax debt of USD 9 billion in the first quarter of 2004.[2284]

1732. In addition, Claimants assert that, to apply Respondent's argument, "the Tribunal would need to ignore the most salient facts—the Respondent's breaches—and assume . . . that the very same Russian authorities who committed those breaches would have acted differently if only Yukos had taken the actions specified by the Respondent."[2285]   In particular, with regard to Respondent's argument that Yukos could have significantly reduced its tax burden by filing corrected VAT returns during the first quarter of 2004, Claimants contend that the actual conduct of the Russian authorities demonstrates that any amended returns that Yukos might have submitted would, in any event, have been either ignored or rejected.[2286]

### 5.   Windfall and Double-Recovery

1733. Finally, Claimants also reject Respondent's arguments that any award of damages should avoid presenting Claimants with a windfall and take into account the risk of double-recovery. According to Claimants, these arguments of Respondent merely seek to "repackage its so-called 'unclean hands' theory in the context of damages" and Respondent, they say, "has failed to articulate any basis on which alleged collateral illegalities could . . . be relevant to an assessment of damages."[2287]   In any event, conclude Claimants, any benefits they may have received through their investments prior to Respondent's breaches of the ECT are irrelevant for the calculation of the damages in the present arbitration and, furthermore, any assets located outside Russia have been excluded from Mr. Kaczmarek's valuations.[2288]

---

[2283]   *Ibid.* ¶ 281, quoting Sergey Pepeliaev, Summary of the tax inspection of OAO NK Yukos, 5 January 2004, pp. 1, 3, Exh. C-1128.

[2284]   *Ibid.* ¶ 292.

[2285]   *Ibid.* ¶ 276.

[2286]   *Ibid.* ¶ 287.

[2287]   Reply ¶¶ 883–85.

[2288]   Reply ¶ 963.

## B.    RESPONDENT'S POSITION

1734. Respondent argues that, even if it were held to be liable for a breach of the ECT, Claimants should not be awarded any damages in this case.[2289]   Respondent has submitted two expert reports on damages by Professor James Dow, one dated 1 April 2011 and the other 15 August 2012, with their Counter-Memorial and their Rejoinder, respectively.   These reports and Respondent's arguments with regard to Claimants' damages calculations can be summarized as follows.

### 1.    Valuation Date

1735. Respondent disagrees with both valuation dates proposed by Claimants.

1736. With regard to Claimants' valuation as of the date of expropriation, Respondent invokes the principle that "the valuation date should be when the purported substantial deprivation of the investor's investment has occurred."[2290]   Respondent objects, however, to Claimants' assessment that in this case a substantial deprivation of their investment occurred on 21 November 2007, a date which Respondent considers "arbitrary."[2291]   Respondent argues that "the hallmark of an appropriate valuation date is the loss of effective control over the investor's investment"[2292] and concludes that "Claimants have repeatedly averred that they lost control of their investment and that it lost all value long before November 21, 2007."[2293]

1737. As a result, Respondent disputes that the date of 21 November 2007 chosen by Claimants has any relevance.   As Professor Dow explained at the Hearing:

> I am very clear in stating that the 2007 date has no economic relevance, in my view.  And I say that because at the end of 2004 Yukos shares had lost essentially all of their value. Yukos was a penny stock.  It wasn't expected to recover, the market did not expect it to recover; that was reflected in the share price. . . .  So from an economic point of view, the date of delisting in 2007 is a bureaucratic event, not an event at which value was lost.[2294]

---

[2289]    Respondent's Post-Hearing Brief ¶¶ 262–63.

[2290]    Rejoinder ¶ 1666.

[2291]    Counter-Memorial ¶ 1618.

[2292]    Rejoinder ¶ 1666.

[2293]    Ibid. ¶ 1666.  *See also* Respondent's Post-Hearing Brief ¶ 238.

[2294]    Transcript, Day 12 at 14.  *See also* at 49.

1738. While Respondent does not propose any specific alternative date when Claimants lost control of their investments, Professor Dow suggested at the Hearing that such a date would, in any event, have to be before the end of 2004.[2295]

1739. Respondent also rejects Claimants' submission that the date of an award can be used as an alternative valuation date.   In this regard, Respondent argues that the "standard theoretical framework economists typically use to calculate damages is an '*ex ante*' one" where damages are assessed at the moment of the relevant breaches and then brought to present value with pre-judgment interest.[2296]   By contrast, an "*ex post*" approach would, according to Respondent, use information based on hindsight, provide no principled basis for choosing a date and therefore be vulnerable to error.[2297]   In addition, Respondent claims that, "with each passing day after the alleged takings date, it becomes increasingly speculative to value the asset taken as of some later date."[2298]

1740. In his first report, Professor Dow writes that there is a "general preference among economists for the *ex ante* approach when evaluating damages in commercial matters" and refers, in this connection, to an article published in the 1990 Journal of Accounting, Auditing and Finance.[2299] Relying on this article, Respondent submits that "an expropriation relieves the owner not only of the value of the asset on the date of expropriation, but also of the risk associated with owning it" and that, as a consequence, "[t]he only way to recognize both aspects is to assess the value of the asset on the date of expropriation, when neither its owner nor the State knows whether the asset will increase or decrease in value."[2300]

2. Causation

1741. Respondent also disagrees with Claimants with respect to causation.   In particular, Respondent emphasizes the need to establish "a sufficient causal link" between breach and damage, where

---

[2295]   *Ibid.* at 175.

[2296]   Counter-Memorial ¶ 1617.

[2297]   *Ibid.* ¶ 1618.

[2298]   Respondent's Post-Hearing Brief ¶ 239.

[2299]   First Dow Report ¶ 13, citing to Franklin M. Fisher and R. Craig Romaine, *Janis Joplin's Yearbook and the Theory of Damages*, Journal of Accounting, Auditing and Finance (1990), p. 153, Exh. R-1980.

[2300]   Respondent's Post-Hearing Brief ¶ 239.

the latter is the "proximate result" of the former.[2301]   Respondent advocates the following methodology:

> [I]f the damages are caused by a series of harmful actions . . . each violation can be treated as a new action and the corresponding incremental change can be estimated at the time of the action, . . . [t]he incremental damage figures for each violation can then be added together to obtain a total damage figure.[2302]

1742. According to Respondent, Claimants' approach to damages fails "to connect any of the alleged treaty violations to a specific amount of damages" and provides "no mechanism for determining the incremental damages allegedly caused by any specific alleged violation."[2303] As a consequence, Respondent alleges that Claimants' valuations "do not accommodate the situation where the Tribunal finds that fewer than all of the scores of alleged 'bad acts' were violations."[2304]

### 3.   Specific Aspects of the Calculations Performed by Claimants Criticized by Respondent

1743. Principally, Respondent criticizes Claimants' damages claims as being "based on inherently incorrect or speculative assumptions."[2305]   According to Professor Dow, Mr. Kaczmarek's various calculations are "riddled with errors" and the obvious result of "reverse engineering to a desired result."[2306]   Respondent and its expert raise numerous arguments in support of their criticism, the most important of which are summarized below.

#### (a)   Credibility of Claimants' DCF Analysis

1744. One of Respondent's main criticisms with regard to Claimants' valuation is directed at Mr. Kaczmarek's DCF analysis.   In particular, in his first expert report, Professor Dow identifies what Respondent claims are "three obvious and significant errors" regarding the valuation of YNG.[2307]   Respondent points out that, while Mr. Kaczmarek admitted to two of

---

[2301]   Counter-Memorial ¶ 1606, quoting U.S. and Germany Mixed Claims Commission, Administrative Decision No. II, 1 November 1923, 23, p. 29, Exh. R-1188.

[2302]   *Ibid.* ¶ 1617.

[2303]   *Ibid.* ¶ 1619.  *See also* ¶ 1627.

[2304]   *Ibid.* ¶ 1619.  *See also* ¶ 1628.

[2305]   *Ibid.* ¶ 1637.

[2306]   Second Dow Report ¶ 422.

[2307]   Counter-Memorial ¶ 1630.

these errors in his second expert report, the valuation of YNG remained virtually unchanged.[2308] As a consequence, Respondent claims that Mr. Kaczmarek's "main task" in his second report must have been to "find a way to make up for gaping holes in his initial valuation that he concedes were the result of readily identifiable errors that he realized had to be corrected, after Professor Dow had identified them."[2309]   Respondent points out that, while the necessary corrections identified by Professor Dow caused Claimants' expert to make adjustments of over USD 10 billion to his valuation of YNG, Mr. Kaczmarek still ended up with virtually the same figure as in his first report as a consequence of a series of simultaneous "discretionary" upward adjustments.[2310]

1745. Respondent also claims that Claimants' expert "did the same thing in his other two DCF models, correcting mistakes that reduce his valuation of Yukos and YukosSibneft by USD 40 billion and USD 90 billion, respectively, and then adjusting other elements to bring his conclusions back up to where he started."[2311]   According to Respondent, "Mr. Kaczmarek confirmed . . . that his DCF model is simply a device for justifying an *a priori* conclusion, conceding repeatedly that his focus was not on critically analyzing the inputs to his model, but rather on whether the output met pre-conceived notions that were never disclosed in his reports."[2312]   As a result, Respondent concludes that Claimants' results have been "reverse engineered"[2313] and are "made-up numbers around which models were built."[2314]

### (b)   Claimants' Selection of Comparable Companies for Purposes of the Comparable Companies Analysis

1746. With regard to Claimants' use of the comparable companies method, Respondent criticizes Claimants' valuation as being based on an "unsupportable decision to weigh Rosneft as 70% of the analysis, when Rosneft's market metrics never resembled Yukos' or those of other private

---

[2308]   Second Dow Report ¶ 8.  *See also* Second Kaczmarek Report ¶¶ 82–97.

[2309]   Rejoinder ¶ 1606.

[2310]   *Ibid*. ¶ 1612.

[2311]   *Ibid*. ¶ 1613.  Respondent identifies a number of errors which it says were made by Mr. Kaczmarek in his first report before being corrected in his second report.  In addition, Respondent identifies a number of errors which it says were made by Mr. Kaczmarek in his second report.  Rejoinder ¶¶ 1620–36.

[2312]   Respondent's Post-Hearing Brief ¶ 240, citing to Trancript, Day 11 at 112, 116–17, 143–44, 153–54.

[2313]   Rejoinder ¶ 1618, quoting Second Dow Report ¶ 390.

[2314]   *Ibid*. ¶ 1619.

Russian oil companies."[2315]   Professor Dow, provides a "corrected" comparable companies analysis that excludes the data with regard to Rosneft, Gazprom Neft and the international major oil companies from the analysis,[2316] and leads to an enterprise value for Yukos in 2007 that is approximately USD 32 billion lower than the enterprise value calculated by Mr. Kaczmarek based on the comparable companies method.[2317]

### (c)   Claimants' Reliance on Comparable Transactions

1747. With regard to Claimants' calculations based on comparable transactions, Respondent asserts that Claimants' expert, Mr. Kaczmarek, admits that no truly comparable transactions exist.[2318] In addition, Professor Dow criticizes Mr. Kaczmarek's selection criteria for identifying comparable upstream and downstream transactions as "indefensible from an economic perspective."[2319]

### (d)   Claimants' Calculations of Hypothetical Cash Flows from Dividends

1748. Respondent does not explicitly address Claimants' calculations of hypothetical dividends that would have been paid by Yukos to its shareholders if there had been no breach of the ECT as alleged by Claimants.   However, when criticizing Mr. Kaczmarek's calculations with regard to scenario 3, Professor Dow does comment on the free cash flows of Yukos that, according to Claimants, would have been the basis for the payment of dividends.   Thus, according to Professor Dow, the free cash flows identified by Mr. Kaczmarek in this context are "inflated because they are based on his . . . grossly erroneous[] Yukos DCF model that overstates Yukos cash flows."[2320]   Professor Dow provides an alternative set of figures that he refers to as the "corrected" cash flows from Mr. Kaczmarek's model.[2321]

---

[2315]   Respondent's Post-Hearing Brief ¶ 242.

[2316]   Second Dow Report ¶ 417.

[2317]   Second Dow Report, p. 195, Figure 73.

[2318]   Respondent's Post-Hearing Brief ¶ 242.  *See also* Second Dow Report ¶ 420.

[2319]   Second Dow Report ¶ 423.

[2320]   *Ibid.* ¶ 492.

[2321]   *Ibid.* ¶ 492 and Figure 81.

(e)    **Claimants' Calculations Based on the Loss of a Chance to Obtain a Listing on the New York Stock Exchange**

1749. Professor Dow also criticizes Claimants' assumption that Yukos would have benefited from a listing on the NYSE as "thrice wrong because it assumes an event that did not happen, that was entirely within Yukos' control, and overstates the economic benefit that would be expected were the event to have come to pass."[2322]   In addition, Professor Dow states that there is no basis for the assumption that, without Respondent's actions, Yukos would have had a 70 percent chance of being listed on the NYSE.[2323]

(f)    **Claimants' Calculations Based on the Assumption of a Completed Yukos–Sibneft Merger**

1750. Professor Dow criticizes Claimants' calculations based on a completed Yukos–Sibneft merger arguing that such a merger was never completed and that the valuation of a combined YukosSibneft entity is therefore utterly speculative.[2324]   In particular, Professor Dow claims that Mr. Kaczmarek's calculations largely ignore "the effects of the merger on operational costs, any impact on costs as a result of changed regulatory requirements, and the combined entity's creditworthiness and cost of borrowing."[2325]

(g)    **Claimants' Scenarios 3a to 3d**

1751. With regard to Claimants' scenarios 3a to 3d, which assume payment of Yukos' tax liabilities over a period of one, three or five years, Respondent asserts that Russian law did not allow the Tax Ministry to enter into any such arrangements as postulated by Claimants[2326] and that it was, in any event, not obligated to do so.[2327]   In addition, Respondent claims that, based on the knowledge available regarding the development of oil prices in 2004, Claimants' calculations in relation to expected cash flows are not realistic.[2328]   Respondent also disputes that Claimants

---

[2322]    *Ibid.* ¶ 204.

[2323]    *Ibid.* ¶ 215.

[2324]    *Ibid.* ¶ 204.

[2325]    *Ibid.* ¶ 208.

[2326]    Counter-Memorial ¶ 1631.

[2327]    Rejoinder ¶ 1662 and n.2559.

[2328]    Counter-Memorial ¶ 1631.  *See also* Second Dow Report ¶ 492.

would have been able to negotiate a loan of USD 16 billion, as assumed in Claimants' scenario 3c.[2329]

### (h)    Claimants' Scenario 3e and the Valuation of YNG

1752. With regard to Claimants' scenario 3e (which assumes that the auctioning of YNG was necessary, but should have been realized at a fair price) and the valuation of YNG in Mr. Kaczmarek's first expert report, Respondent claims that Mr. Kaczmarek made three "obvious and significant errors" relating to the application of the inflation rate, the export duty rate and the mineral extraction tax rate.[2330]   Adjusting for these errors, the valuation of YNG would have been USD 12.5 billion,[2331] with the consequence that Yukos would not have been able to pay its taxes by the end of 2005, even if YNG had been sold at a higher price.[2332]

### (i)    Claimants' Calculation of Pre-Award Interest

1753. As described in Part XI above, Respondent submits that Claimants are not entitled to claim pre-award interest.

### 4.    Failure of Claimants to Mitigate

1754. Respondent asserts that Claimants had "repeated opportunities to mitigate the damage caused,"[2333] and that, in particular, by paying its taxes in early 2004, Yukos could have "halved the total amount to be paid"[2334] rather than "subject[ing] itself to . . . US$ 12 billion in additional 2000–2003 Avoidable Taxes and Fees."[2335]   If Yukos had paid its taxes and filed appropriate returns during the first quarter of 2004, Respondent says it "would have survived as a going concern and still could have pursued a claim for a refund of any amounts the courts found it did not need to pay."[2336]   Accordingly, the "loss of all value of Yukos" would be "the

---

[2329]   Counter-Memorial ¶ 1632; Rejoinder ¶¶ 1655–57.

[2330]   Counter-Memorial ¶ 1630.  *See also* Respondent's Post-Hearing Brief ¶ 246; Second Dow Report ¶ 452.

[2331]   Counter-Memorial ¶ 1630; Rejoinder ¶ 1647.

[2332]   Counter-Memorial ¶ 1630.

[2333]   *Ibid.* ¶ 1602.

[2334]   Rejoinder ¶ 1729.

[2335]   *Ibid.* ¶ 1730.  *See also* Respondent's Post-Hearing Brief ¶ 220.

[2336]   Respondent's Post-Hearing Brief ¶¶ 220–22, 250.

consequence of the contributory fault and the failure to mitigate of Yukos, under the control of Claimants."[2337]

1755. Respondent claims that, as a consequence, "Claimants' maximum damage claim is for their proportion of the harm (if any) Yukos would have suffered if the assessment and payment of the 2000–2003 Unavoidable Taxes were deemed to constitute a violation of the ECT."[2338] Respondent calculates this "maximum damage" as amounting to USD 6.27 billion.[2339]

### 5.    Windfall and Double-Recovery

1756. In addition, Respondent claims that any calculation of damages should take into account any previous benefits obtained by Claimants from their investments in Russia, so as to prevent any "double-recovery."[2340]   Respondent contends that granting Claimants the damages sought "would be a massive windfall to Claimants, who have already received far more from their investment in Yukos than they would have received had they invested in a comparable Russian oil company during the same period."[2341]   Respondent also suggests that, had the market known of "Yukos' lack of transparency, its disregard of minority interests, and its failures of corporate governance, not to mention its internal documents acknowledging the civil and criminal exposure it faced from its massive tax fraud, Yukos would not have experienced the share appreciation . . . on which Claimants' damages claim depends."[2342]   As a consequence, Respondent claims that "the market metrics . . . are not fair indicators of value and cannot be relied upon by the Tribunal."[2343]

1757. Respondent concludes that "any damages award should provide for no more than a reasonable rate of return."[2344]   Since Claimants would "have already gained that return through Yukos' dividends and share repurchases, . . . hundreds of millions of dollars worth of Russian taxes

---

[2337]   *Ibid.* ¶ 250.

[2338]   Rejoinder ¶ 1732.  *See also* Respondent's Post-Hearing Brief ¶¶ 220, 233, 252.

[2339]   Respondent's Post-Hearing Brief ¶ 252.  *See also* Transcript, Day 19 at 270.

[2340]   Counter-Memorial ¶ 1648.

[2341]   Respondent's Post-Hearing Brief ¶ 232 (footnote omitted).

[2342]   *Ibid.* ¶ 261.

[2343]   *Ibid.* ¶ 261.

[2344]   *Ibid.* ¶ 233.  *See* ¶¶ 254–62.

they evaded through abuse of the [Cyprus-Russia DTA], and all the assets that were stripped from Yukos," the "proper measure of damages in this case" would in any event be "zero."[2345]

## C.   TRIBUNAL'S ANALYSIS AND DECISION

1758. Having reviewed and considered the Parties' submissions and their experts' reports, the Tribunal will now determine the damages suffered by Claimants as a result of Respondent's unlawful expropriation of Yukos' assets in breach of Article 13 of the ECT.

### 1.   Valuation Date

1759. With regard to the date of valuation, the Tribunal needs to address two issues, namely (a) the date of the expropriation of Claimants' investment by Respondent, and (b) whether Claimants are entitled to choose between a valuation based on that date of expropriation and a valuation based on the date of the award.  Each of these questions is addressed in turn.

#### (a)   The Date of the Expropriation

1760. As noted earlier, Claimants have advanced the date of 21 November 2007, the day on which Yukos was struck off the Russian register of legal entities, as the date of the expropriation of their investment, and have performed their main damages analysis based on a valuation of their shares in Yukos as of that date.

1761. The Tribunal agrees with Respondent that the date of 21 November 2007 cannot be the date of Yukos' expropriation.  The Tribunal observes that both Parties are agreed that, in principle, in the event of an expropriation through a series of actions, the date of the expropriation is the date on which the incriminated actions first lead to a deprivation of the investor's property that crossed the threshold and became tantamount to an expropriation.[2346]  This is the date that is relevant for the determination of the Tribunal.

1762. The Tribunal finds that the threshold to the expropriation of Claimants' investment was crossed earlier than in November 2007.  On the basis of the record, it is clear to the Tribunal that a substantial and irreversible deprivation of Claimants' assets occurred on 19 December 2004,

---

[2345]   *Ibid.* ¶ 262.

[2346]   Memorial ¶ 912, n.1314; Reply ¶ 940; Rejoinder ¶ 1666; Respondent's Post-Hearing Brief ¶ 238.

the date of the YNG auction.  YNG was Yukos' main production asset and its loss, with the conclusion of the auction on that date, marked a substantial and irreversible diminution of Claimants' investment.[2347]  This conclusion of the Tribunal is confirmed by statements made by Claimants in December 2004 to the effect that they had "lost the power to govern the financial and operating policies of Yukos so as to obtain the benefits from its activities" and that Yukos had become "incapable of operating as a business."[2348]  The date of the expropriation of Claimants' investment is therefore determined by the Tribunal to be 19 December 2004.

    **(b)**    **The Possibility for Claimants to Choose Between a Valuation as of the Date of Expropriation and a Valuation as of the Date of the Award**

1763.  The Tribunal also holds that, in the case of an unlawful expropriation, as in the present case, Claimants are entitled to select either the date of expropriation or the date of the award as the date of valuation.

1764.  As the Tribunal noted earlier, Respondent, relying on the opinion of its expert on damages, maintains that Claimants may not make such a choice and that there is a preference amongst economists for what he refers to as an "*ex ante*" approach to the evaluation of damages.[2349]  In support of his opinion, Professor Dow relies on a single article published in an economics journal in 1990.[2350]

1765.  Neither the text of Article 13 of the ECT nor its *travaux* provide a definitive answer to the question of whether damages should be assessed as of the date of expropriation or the date of the award.  The text of Article 13, after specifying the four conditions that must be met to render an expropriation lawful, provides that for "such" an expropriation, that is, for a lawful expropriation, damages shall be calculated as of the date of the taking.  *A contrario,* the text of Article 13 may be read to import that damages for an unlawful taking need not be calculated as of the date of taking.  It follows that this Tribunal is not required by the terms of the ECT to assess damages as of the time of the expropriation. Moreover, conflating the measure of

---

[2347]  *See* Subsection VIII.F.3(c) above.

[2348]  YUL (and its subsidiaries), Annual Report and Consolidated Financial Statements for The Year Ended 31 December 2004, Exh. R-4229.  *See also* Rejoinder ¶ 1673.

[2349]  First Dow Report ¶ 13.

[2350]  Franklin M. Fisher and R. Craig Romaine, *Janis Joplin's Yearbook and the Theory of Damages*, Journal of Accounting, Auditing and Finance (1990), p. 153, Exh. R-1980.

damages for a lawful taking with the measure of damages for an unlawful taking is, on its face, an unconvincing option.

1766. In the view of the Tribunal, and in exercise of the latitude that the terms of Article 13 of the ECT afford it in this regard, the question of whether an expropriated investor is entitled to choose between a valuation as of the expropriation date and the date of an award is one best answered by considering which party should bear the risk and enjoy the benefits of unanticipated events leading to a change in the value of the expropriated asset between the time of the expropriatory actions and the rendering of an award. The Tribunal finds that the principles on the reparation for injury as expressed in the ILC Articles on State Responsibility are relevant in this regard. According to Article 35 of the ILC Articles, a State responsible for an illegal expropriation is in the first place obliged to make restitution by putting the injured party into the position that it would be in if the wrongful act had not taken place. This obligation of restitution applies as of the date when a decision is rendered. Only to the extent where it is not possible to make good the damage caused by restitution is the State under an obligation to compensate pursuant to Article 36 of the ILC Articles on State Responsibility.

1767. The consequences of the application of these principles (restitution as of the date of the decision, compensation for any damage not made good by restitution) for the calculation of damages in the event of illegal expropriation are twofold. First, investors must enjoy the benefits of unanticipated events that increase the value of an expropriated asset up to the date of the decision, because they have a right to compensation in lieu of their right to restitution of the expropriated asset *as of that date*. If the value of the asset increases, this also increases the value of the right to restitution and, accordingly, the right to compensation where restitution is not possible.

1768. Second, investors do not bear the risk of unanticipated events decreasing the value of an expropriated asset over that time period. While such events decrease the value of the right to restitution (and accordingly the right to compensation in lieu of restitution), they do not affect an investor's entitlement to compensation of the damage "not made good by restitution" within the meaning of Article 36(1) of the ILC Articles on State Responsibility. If the asset could be returned to the investor on the date where a decision is rendered, but its value had decreased since the expropriation, the investor would be entitled to the difference in value, the reason being that in the absence of the expropriation the investor could have sold the asset at an earlier date at its previous higher value. The same analysis must also apply where the asset cannot be returned, allowing the investor to claim compensation in the amount of the asset's higher value.

1769. It follows for the several reasons stated above that in the event of an illegal expropriation an investor is entitled to choose between a valuation as of the expropriation date and as of the date of the award.  The Tribunal finds support for this conclusion in the fact that this approach has been adopted by tribunals in a number of recent decisions dealing with illegal expropriation.[2351] One of these tribunals, in *Ioannis Kardassopoulous and Ron Fuchs v. The Republic of Georgia*, so interpreted the ECT.[2352]

## 2.     Causation

1770. The Parties disagree with regard to the requirements for showing the causation of damages.[2353] The Tribunal finds it useful to address the Parties' views on this matter in two steps.  First, the Tribunal will address the requirements for showing the causation of damages where several actions are invoked at the same time.  Second, it will deal with the consequences of damage being caused by several actions, only some of which are breaches attributable to the respondent party.

### (a)     Causation and Reliance on Multiple Actions

1771. Claimants assert that "a causal link needs only be established between the actions of the Russian Federation taken as a whole and Claimants' damages" and that "[t]his causal link is obvious."[2354]  Respondent takes the view that, by simply asserting a link between the totality of a number of "bad acts" and the damage, Claimants put themselves in a position where they have to show that "all of the scores of alleged 'bad acts' were [treaty] violations."[2355]

1772. The Tribunal holds that Claimants do, in fact, establish that a specific series of actions of Respondent, consisting of the 2000–2004 tax assessments against Yukos and the subsequent enforcement measures (including the forced auction of YNG), constituted an illegal

---

[2351]  *See e.g.*, *ADC* ¶¶ 496–97, Exh. C-980; *Siemens* ¶ 352, Exh. C-983; *Amoco*, pp. 300–301, Exh. C-939.  *See also* Marboe ¶ 3.287, Exh. C-1607.

[2352]  *Kardassopoulos* ¶ 514, Exh. C-1533.

[2353]  Reply ¶ 911 (Claimants assert that "a causal link needs only be established between the actions of the Russian Federation taken as a whole and the Claimants' damages" and that "[t]his causal link is obvious.").  *See also* Claimants' Post-Hearing Brief ¶ 191.  By contrast, *see* Counter-Memorial ¶ 1619 (Respondent takes the view that, by simply asserting a link between the totality of a number of "bad acts" and a damage, Claimants put themselves in a position where they have to show that "all of the scores of alleged 'bad acts' were [treaty] violations.").  *See also* Counter-Memorial ¶ 1628

[2354]  Reply ¶ 911.  *See also* Claimants' Post-Hearing Brief ¶ 191.

[2355]  Counter-Memorial ¶ 1619.  *See also* Counter-Memorial ¶ 1628.

expropriation of Claimants' investment, and that this expropriation caused Claimants damage. In particular, the 2000–2004 tax assessments were actions that contributed to the expropriation of Claimants' investment, and without these assessments, the damage to Claimants would not have occurred.  While other actions taken by Respondent may or may not have contributed to a violation of the ECT's standards, showing that they did is not required for establishing causation with regard to the damage suffered by Claimants.  All of the heads of damage subsequently identified by the Tribunal are consequences of the 2000–2004 tax assessments that led to the expropriation of Claimants' investment, and this expropriation was clearly a breach of Article 13 ECT.

### (b)   Multiple Causes for the Same Damage

1773. The Parties also do not agree with regard to the consequences of damage being caused by several events, where only some of those events are breaches attributable to a respondent party. Respondent appears to suggest that concurrent causation of a particular line of damage by Claimants' own conduct, the conduct of third parties and conduct of Respondent that is not wrongful should exclude Respondent's responsibility for that damage,[2356] and that Claimants bear the burden of showing that no such causation exists.[2357]  The Tribunal does not agree with that argument.

1774. In this regard, the Tribunal finds it instructive to look to the ILC Articles on State Responsibility.  Article 31 of the ILC Articles provides that "[t]he responsible State is under an obligation to make full reparation for the injury caused."[2358]  The official commentary to this provision notes that "[o]ften two separate factors combine to cause damage," before pointing out that:

> Although, in such cases, the injury in question was effectively caused by a combination of factors, only one of which is to be ascribed to the responsible State, international practice and the decisions of international tribunals do not support the reduction or attenuation of reparation for concurrent causes, except in cases of contributory fault. . . .  Such a result should follow *a fortiori* in cases where the concurrent cause is not the act of another State . . . but of private individuals. . . .  [U]nless some part of the injury can be shown to

---

[2356]   Respondent's Post-Hearing Brief ¶ 234.  *See also* Counter-Memorial ¶ 1619; Rejoinder ¶ 1719.  Claimants do not specifically address this point.

[2357]   Rejoinder ¶ 1719.

[2358]   Exh. R-1031.

> be severable in causal terms from that attributed to the responsible State, the latter is held responsible for all the consequences, not being too remote, of its wrongful conduct.[2359]

1775. As the commentary makes clear, the mere fact that damage was caused not only by a breach, but also by a concurrent action that is not a breach does not, as such, interrupt the relationship of causation that otherwise exists between the breach and the damage.  Rather, it falls to the Respondent to establish that a particular consequence of its actions is severable in causal terms (due to the intervening actions of Claimants or a third party) or too remote to give rise to Respondent's duty to compensate.  As the Tribunal considers that Respondent has not demonstrated this with regard to any of the heads of damage identified in the remainder of this Chapter, the Tribunal holds that causation exists between the damage and Respondent's expropriation of Claimants' investment.[2360]

### 3.      Failure of Claimants to Mitigate

1776. Respondent asserts that Claimants could have significantly mitigated their damages by taking a few simple steps in the first quarter of 2004, namely by paying the taxes then assessed against Yukos, filing amended VAT returns in Yukos' name, and filing amended tax returns for the years 2000–2002 and a tax return for 2003 recognizing all of Yukos' income without assigning it to its trading entities.  The Tribunal has considered each of the actions Respondent suggests Claimants should have taken (set out in paragraphs 679–80, 745–48 and 934–35 above) and has concluded that the suggested actions would not ultimately have made a difference to the enforcement measures subsequently taken by the Russian Federation.  As seen in Part VIII above, the measures taken by the Russian Federation demonstrate that its primary objective was to bankrupt Yukos and appropriate its assets and that it was determined to do whatever was necessary to achieve this purpose.  In light of this finding, the Tribunal cannot accept that by paying the taxes then assessed or re-filing VAT and tax returns in early 2004, Claimants could have deterred Respondent in the pursuit of its objective.

### 4.      The Methodology Followed by the Tribunal

1777. Having made these determinations in respect of the valuation dates, causation and mitigation, the Tribunal now turns to the specific methodology of establishing the damages in this

---

[2359] *Ibid.* ¶¶ 12–13 (footnotes omitted), Exh. R-1031.

[2360] Claimants' contributory fault and the associated reduction of the damages suffered has already been addressed above in Chapter X.E.

arbitration.  As an initial matter, the Tribunal observes that, since it has decided that Claimants are entitled to the higher of the damages determined as of the date of expropriation and as of the date of the award, the Tribunal must establish the total amount of damages caused by Respondent's actions on each of the two valuation dates identified, namely the date of the YNG auction and the date of this Award.  For purposes of the Tribunal's calculations, the date of the Award will be deemed to be 30 June 2014.  Claimants will be entitled to the higher of these two figures, subject to the deduction of 25 percent for contributory fault.[2361]

1778. On each of these valuation dates, Claimants are entitled to the following heads of damages: (1) the value of Claimants' shares in Yukos valued as of the valuation date; (2) the value of the dividends that the Tribunal determines would have been paid to Claimants by Yukos up to the valuation date but for the expropriation of Yukos; and (3) pre-award simple interest on these amounts.

1779. By contrast, the Tribunal considers that a potential listing of Yukos on the NYSE and the benefits that Claimants might have derived from such a listing are too uncertain to be taken into account for purposes of calculating Claimants' damages.  This element of Claimants' damages case is therefore rejected.

1780. The Tribunal also finds that the assessment of Claimants' damages must be based on their shareholding in Yukos, without taking into account the potential effects of a completed merger between Yukos and Sibneft.  The Tribunal has not been convinced, on the balance of probabilities, that in the absence of Respondent's expropriatory actions, the envisaged merger would have been completed;[2362] indeed, the Tribunal considers that assuming a completed merger in the "but for" scenario is too speculative.  As a consequence, the Tribunal rejects Claimants' first damages scenario, notably the valuation of Claimants' share in YukosSibneft.

1781. Before turning to the calculation of the damages components for the two relevant valuation dates, the Tribunal explains in the following subsections the methodology it has decided to adopt for valuing Yukos on each of the given dates, and the basis on which it has determined the amount of dividends that would likely have been paid to Claimants, in the "but for" scenario, prior to each of the valuation dates.

---

[2361] *See* Chapter X.E.

[2362] *See* Chapter VIII.D.

### (a)   Valuation of Yukos

1782. As set out earlier in this chapter, for purposes of the damages calculation, the Tribunal has decided that the relevant valuation dates are the date of the YNG auction and the date of this Award.  However, the starting point for the Tribunal's analysis must be the calculations done by Claimants as of their suggested valuation date of 21 November 2007.  Claimants have put forward alternative valuations of Yukos as of that date calculated on the basis of various valuation methods.  These methods and the valuations of Yukos derived from them (in USD billion) are summarized in the following table:[2363]

| | |
|---|---|
| DCF method | 88.593[2364] |
| Comparable companies method | 92.924[2365] |
| Comparable transactions method | 87.620[2366] |
| Rosneft's market capitalization on 21 November 2007, adjusted | 83.07[2367] |
| Yukos' market capitalization on 24 October 2003 adjusted pursuant to development of Urals Blend price index | 104.835[2368] |
| Yukos' market capitalization on 24 October 2003 adjusted pursuant to development of RTS Oil & Gas index | 74.191[2369] |
| Yukos' market capitalization on 24 Oct 2003 adjusted pursuant to development of Lukoil's market capitalization | 129.028[2370] |
| Implied value of YNG based on share swap between Rosnest and Yukos in October 2006 (adjusted pursuant to development of RTS Oil & Gas index) and proceeds from auctions of non-YNG assets in 2007 | 75.657[2371] |

1783. Respondent has not put forward a methodology for valuating Yukos or any valuation figures of its own.  However, Professor Dow has provided a "corrected" version of Claimants' comparable companies analysis, making adjustments for what he considered to be the principal errors

---

[2363]  For any of these valuations, Claimants' respective damages (under this head of damage) would correspond to their pro rata stake in the outstanding shares of Yukos, which were 56.3 percent for Hulley, 2.6 percent for YUL and 11.6 percent for VPL (a total of 70.5 percent for Claimants taken together).  All figures are in USD.

[2364]  Second Kaczmarek Report, p. 11, Table 3; ¶ 69.

[2365]  Second Kaczmarek Report, p. 11, Table 3; p. 38, Table 24..

[2366]  Second Kaczmarek Report, p. 11, Table 3; p. 39, Table 25.

[2367]  Claimants' Post-Hearing Brief ¶ 263; Exh. C-1785.  The equity value has been obtained from the enterprise value assumed by Claimants (USD 92.3 billion) on the basis of an assumed 90/10 equity/capital structure.  *See* Exh. C-1784.

[2368]  Claimants' Post-Hearing Brief ¶ 261; Exh. C-1785.

[2369]  Claimants' Post-Hearing Brief ¶ 261; Exh. C-1785.  The RTS Oil and Gas index is built up of the prices of Russian share companies in the oil and gas sector.  Transcript, Day 12 at 68 (Professor Dow).

[2370]  Claimants' Post-Hearing Brief ¶ 261; Exh. C-1785.

[2371]  Claimants' Post-Hearing Brief ¶ 262; Exhs. C-1784, C-1785.

contained therein.[2372]   Based on these adjustments, Respondent's expert arrives—in orally advancing what "could be" a "useful" evaluation—at a "corrected" enterprise value of Yukos, as of 21 November 2007, in the amount of USD 67.862 billion.[2373]   Assuming a 90/10 equity/debt capital structure of Yukos, this corresponds to an equity value of Yukos, as of 21 November 2007, of approximately USD 61.076 billion. [2374]

1784. Having considered the extensive expert evidence presented by Mr. Kaczmarek and Professor Dow, including the written evidence in the two expert reports that each submitted (with detailed accompanying annexes and appendices), and the testimony that was elicited from them during the Hearing, the Tribunal concludes, for the reasons set out below, that the "corrected" comparable companies figure is the best available estimate for what Yukos would have been worth on 21 November 2007 but for the expropriation.

1785. The Tribunal finds that neither of the other two primary valuation methods put forward by Claimants is sufficiently reliable to ground a determination of damages for this case.   On balance, the Tribunal was persuaded by Professor Dow's analysis of Claimants' DCF model, and is compelled to agree that little weight should be given to it.   The Tribunal observes that Claimants' expert admitted at the Hearing that his DCF analysis had been influenced by his own pre-determined notions as to what would be an appropriate result.[2375]   Similarly, the Tribunal can put little stock in Claimants' calculations based on the comparable transactions method, since both Parties agree that, in fact, there were no comparable transactions,[2376] and thus no basis that would allow a useful comparison.

1786. As for the remaining valuation methods put forward by Claimants, and the valuations of Yukos generated by them, the Tribunal notes that Claimants use these secondary valuations primarily in support of their main valuation.   Moreover, some of these figures were only introduced by Claimants at a very late stage of the proceedings (through demonstrative exhibits at the Hearing and in Claimants' Post-Hearing Brief[2377]) and could therefore not be properly addressed by

---

[2372]   Second Dow Report ¶ 417.

[2373]   *Ibid*. ¶ 444; p. 182, Figure 67; p. 195, Figure 73; Appendix 16.1.   *See also* Transcript, Day 12 at 47 (Professor Dow).

[2374]   A 90/10 equity/capital structure corresponds to the assumption made by Claimants for purposes of their calculations. *See* Exh. C-1784.

[2375]   Transcript, Day 11 at 190.

[2376]   Memorial ¶ 945; Respondent's Post-Hearing Brief ¶ 242.

[2377]   Claimants' Post-Hearing Brief ¶¶ 261–63; Exh. C-1785.

Respondent.  Accordingly, the Tribunal finds that none of these secondary valuation methods can serve as a suitable independent basis for determining the value of Yukos.

1787. By contrast to all of the other methods canvassed above, the Tribunal does have a measure of confidence in the comparable companies method as a means of determining Yukos' value. While Professor Dow stated at the Hearing that he had not performed an analysis sufficient to fully endorse the figure resulting from his corrections to Claimants' comparable companies approach, he agreed that it "could be a useful valuation."[2378]  The Tribunal  for its part finds that the comparable companies method is, in the circumstances, the most tenable approach to determine Yukos' value as of 21 November 2007, and therefore the starting point for the Tribunal's further analysis.

1788. The next step for the Tribunal consists in determining the value of Yukos as of the relevant valuation dates by adjusting Yukos' value as of November 2007 on the basis of the development of a relevant index.  Having considered the various options in this regard, the Tribunal finds that the RTS Oil and Gas index is the most appropriate index for that purpose. The RTS Oil and Gas index is based on prices of trades executed in securities admitted to trading on the Moscow Stock Exchange[2379] and presently includes preferred or common shares of nine Russian oil and gas companies, the most important of which are Gazprom, Lukoil, Novatek, Rosneft and Surgutneftegas.[2380]  The methodology for establishing the index as well as its current and historical values are transparent and publicly available on the webpage of the Moscow Stock Exchange.[2381]  Both Parties have referred to the RTS Oil & Gas index as a reliable indicator reflecting the changes in the value of Russian oil and gas companies[2382] and have used it in their calculations to carry forward certain valuations from one date to another.[2383]

---

[2378]   Transcript, Day 12 at 47.

[2379]   "Methodology of the Moscow Exchange Sector Indices calculation," March 2013 ¶ 1.1, available at http://fs.moex.com/files/4032 (last accessed 4 July 2014).

[2380]   Preferred or common shares in each of these companies are weighted as 15 percent of the index's total.  *See* "Constituents of Sectoral Indices valid from December 17, 2013 to March 17, 2014," available at http://moex.com/s933 (last accessed 4 July 2014).

[2381]   http://fs.moex.com/files/4032 (last accessed 4 July 2014).

[2382]   Transcript, Day 12 at 67–68 (Professor Dow); Claimants' Post-Hearing Brief ¶ 260.

[2383]   Second Kaczmarek Report ¶ 134, n.282 (carrying forward a valuation of certain Yukos assets from November 2007 to December 2005); Second Dow Report ¶ 519 and Appendix 15.2 (carrying forward a valuation of Tomskneft and Samareneftegaz from November 2007 to May 2007); Appendix 28.3 (carrying forward a valuation of certain Yukos assets from November 2007 to December 2004).

1789. In order to determine the value of Yukos on each of the two valuation dates, the Tribunal will now adjust Yukos' value as of 21 November 2007 (USD 61.076 billion) by multiplying it by a factor that reflects the change in the RTS Oil and Gas index between 21 November 2007 and each of the two valuation dates. This adjustment factor is calculated and applied for each of the two valuation dates in subsections 5(a) and 5(b) below.

1790. Having explained the Tribunal's methodology in respect of the first head of damage (the valuation of Yukos on each of the valuation dates), the Tribunal will now explain the basis on which it has determined the value of "lost" dividends, namely the dividends that would likely have been paid to Claimants, in the "but for" scenario, prior to each of the valuation dates.

     **(b)**     **Valuation of Lost Dividends**

1791. A second element of the damages suffered by Claimants as a result of Respondent's expropriation of their investment is the loss of dividends that would otherwise have been paid to them as Yukos shareholders. For each valuation calculated as of the two valuation dates, the Tribunal must determine the value of the lost dividends up to each date, since the value of Yukos as of that date, while it captures the expectations of future profit, does not capture any of the past profit that the company would likely have generated.

1792. The Tribunal recalls that the two valuation dates are the date of the YNG auction (19 December 2004) and the date of this Award (deemed to be 30 June 2014 for valuation purposes). For the first valuation date, the Tribunal must therefore determine the value of the lost dividends up to 19 December 2004; for the second valuation date, the Tribunal must determine the value of the lost dividends up to 30 June 2014.

1793. The starting point for the Tribunal's analysis are the "Yukos lost cash flows" (*i.e.*, free cash flow to equity) that Claimants' expert calculated with respect to his valuation of Claimants' damages. In his first report, Mr. Kaczmarek values Yukos as of 21 November 2007 only, and therefore produces a model of "lost cash flows" that does not extend beyond that date.[2384] The "lost cash flows" between 2004 and 21 November 2007 are presented as being based on actual historical information, as opposed to the cash flows included in Mr. Kaczmarek's DCF model

---

[2384] First Kaczmarek Report, Appendix J.1.

for the period 21 November 2007 through the end of 2015, which are based on forecasts and projections built up from information available prior to the period.[2385]

1794. In his second report, Mr. Kaczmarek updates his valuation of Yukos as of November 2007 (including his presentation of "lost cash flows" to that date),[2386] but also presents, for the first time, a valuation of Yukos as of 1 January 2012 (as a proxy for the valuation of Yukos as of the date of the Award).[2387]   For purposes of the valuation as of 1 January 2012, Mr. Kaczmarek produces a model of "lost cash flows" that extends from 2004 through to the end of 2011.[2388] The "lost cash flows" between 2004 and 2011 are presented as being based on actual historical information, as opposed to the cash flows included in Mr. Kaczmarek's DCF model for the period 2012 through the end of 2019, which are based on forecasts and projections built up from information available prior to the period.[2389]

1795. The Tribunal observes that no free cash flow to equity figures are provided by Claimants' expert for the years 2012 to 2014.   While Claimants offered to update their damages calculations at a date closer to the Award,[2390] the Tribunal has been able to establish the relevant figures on the basis of Mr. Kaczmarek's methodology, using data provided elsewhere in Mr. Kaczmarek's reports.   The Tribunal's calculations are set out in Tables T4 to T6, attached to the Award, and explained in greater detail in the following paragraphs.

1796. To calculate Yukos' free cash flow to equity, Mr. Kaczmarek uses the following formula: Free cash flow to equity = Free cash flow to the firm – Tax-adjusted interest payments + Change in net debt + 20 percent of Sibneft dividends.[2391]   Mr. Kaczmarek provides figures regarding the free cash flow to the firm and the tax-adjusted interest payments for the relevant time period in Appendix AJ.2 to his second report.[2392]   In addition, in note (5) to Appendix AJ.1 to his second report, Mr. Kaczmarek defines Yukos' annual change in net debt as the annual change in

---

[2385]   *Ibid.*, Appendix J.2.

[2386]   Second Kaczmarek Report, Appendix J.1–updated.

[2387]   *Ibid.* ¶ 155.

[2388]   *Ibid.*, Appendix AJ.1.

[2389]   *Ibid.*, Appendix AJ.2.

[2390]   Reply ¶ 946; Second Kaczmarek Report ¶ 155.

[2391]   Second Kaczmarek Report, Appendix AJ.1.

[2392]   Tables T4 and T5 attached to the Award.

Yukos' long-term debt plus its short-term debt less its cash.[2393]  Mr. Kaczmarek provides these figures in Appendix AJ.4 to his second report.[2394]  With regard to the Sibneft dividends, Mr. Kaczmarek provides figures for years 2004 through 2011 in Appendix AJ.1 to his second report.[2395]  For the years 2012 through 2014, the Tribunal has assumed that the Sibneft dividends would have been equal to those paid in 2010, the last year for which Mr. Kaczmarek has provided an annual figure (his figure for 2011 being based on annualized third quarter figures).

1797. With these additional numbers calculated by the Tribunal, on the basis of data and formulas set out in Mr. Kaczmarek's reports, the Tribunal is able to arrive at numbers for Yukos' "lost cash flows" (*i.e.*, free cash flows to equity) for the entire period extending from 2004 through 2014. The Tribunal then, in principle, has the input it needs in order to determine the lost dividends for each of the valuation dates: for the first valuation date (the date of the YNG auction), the Tribunal can therefore arrive at a value (based on Mr. Kaczmarek's model) for the lost dividends up to 19 December 2004; and for the second valuation date (the date of the Award), the Tribunal can also arrive at a value (based on Mr. Kaczmarek's model) of the lost dividends up to 30 June 2014.  The Tribunal notes that the total amount of lost dividends, based on Mr. Kaczmarek's model, for the period from 2004 to 30 June 2014, is USD 67.213 billion.[2396]

1798. As mentioned earlier, however, Claimants' calculation of Yukos' lost cash flows is merely a starting point for the Tribunal's determination of what it views as the correct estimate of the dividends that Claimants would have earned from Yukos in the "but for" scenario.  As explained in the following paragraphs, several fundamental considerations lead the Tribunal to modify the calculations of Claimants' expert.

1799. Firstly, although Yukos' lost cash flows determined by Mr. Kaczmarek are based in part on actual historical information (*i.e.*, largely information about the performance of Yukos' former assets disclosed by Rosneft in its financial reports),[2397] the Tribunal is unable to dissociate them

---

[2393]  Table T5 attached to the Award.

[2394]  Table T6 attached to the Award.

[2395]  Second Kaczmarek Report, Appendix AJ.1.

[2396]  The relevant calculations with regard to both dividends and interest are set out in Table T3 attached to this Award.

[2397]  *See e.g.*, Second Kaczmarek Report, Appendix AJ.8, nn.6–8 (which indicate that actual tariff rates and tax expenses, as reported by Rosneft, are used for the 2004–2011 period).  *See also* Second Kaczmarek Report, Appendix AJ.9, n.2 (which indicates that "[f]or the period 2004–2011, the crude sales percentages are based on actual crude sales as reported by Rosneft and Lukoil").

from Claimants' DCF model, which was convincingly criticized by Respondent's expert and its counsel.

1800. In his second report, Professor Dow identifies and explains a "series of errors" embedded in Claimants' DCF valuation of Yukos.[2398]   His "corrections" of those errors result in a very substantial reduction (51 percent) in the valuation of Yukos generated by the DCF model. Although not all of those "corrections" apply to the cash flows discussed above, which are based in part on actual historical information (and thus are not plagued by some of the errors associated with forecasts and projections), some of the "corrections"—notably those related to the interpretation of the historical information—in the view of the Tribunal, do impact the cash flows.

1801. For example, the Tribunal accepts Professor Dow's opinion that Claimants have underestimated Yukos' transportation costs (by implicitly assuming that, in the "but for" scenario, "Yukos would have been able to capture the efficiencies of Rosneft's proprietary pipeline network").[2399] The Tribunal also accepts Professor Dow's opinion that Claimants' model overlooks certain operating expenses of Yukos, thus evidencing a "basic flaw" in Claimants' DCF model, namely that there is "no systematic attempt" to ensure that all of Yukos' costs have been accounted for.[2400]

1802. Although, for the reasons stated above, the Tribunal does not consider it appropriate to accept all of Professor Dow's "corrections" for purposes of the valuation of the dividends, the Tribunal notes that the spreadsheets submitted by Respondent's expert with his Second Report allow the Tribunal to calculate "corrected" free cash flow to equity figures for the relevant years.[2401]   While Respondent's expert has not explicitly endorsed this "corrected" version as representing his views with regard to Yukos' free cash flow to equity, it is evident to the Tribunal that it represents a figure that is more in line with his views.   According to this "corrected" methodology, Yukos' dividends in 2004 would have been USD 3.218 billion

---

[2398]   Second Dow Report ¶¶ 237–317.

[2399]   *Ibid.* ¶ 256.

[2400]   *Ibid.* ¶ 277.

[2401]   Second Dow Report, Appendix 1 (in Excel format).  The results obtained by switching the values in the "Corrected?" column on the first sheet of Appendix 1 (Appendix 1.1) from 0 to 1 (meaning that the corrections are applied) in sheets 2 and 3 (Appendix J.1 and Appendix J.2) are reproduced in Annex A1 to this Award.

(instead of USD 3.645 billion), and the sum of Yukos' dividends over the period from 2004 through the first half of 2014 would have been USD 49.293 billion (instead of USD 67.213).[2402]

1803. The Tribunal has formed the view that Professor Dow's corrections, however, do not take into account all the risks that Yukos would have had to contend with in carrying on business during the period 2004 through to the present if the company had not been expropriated.  The Tribunal agrees with Respondent that "an expropriation relieves the owner not only of the value of the asset on the date of expropriation, but also of the risk associated with owning it."[2403] Accordingly, in any model of the cash flows that would have been generated by Yukos had it not been expropriated (*i.e.*, the cash flows in a "but for" scenario), it is necessary to take into account the risks to those cash flows that were eliminated by the expropriation.  Those risks must be factored back into the cash flow model in the "but for" scenario.

1804. The Tribunal observes that Mr. Kaczmarek's cash flow model does not factor in those risks in his calculations.  To the contrary, Mr. Kaczmarek models Yukos' financial performance after the date of expropriation based, in large measure, on the results achieved by Yukos' assets *in the hands of Rosneft*.[2404]  As Respondent rightly submits, "Mr. Kaczmarek effectively valued Yukos as if it were a State-owned strategic enterprise, which it never was."[2405]

1805. The first significant risk that, in the Tribunal's view, is not adequately accounted for in the cash flow models of either expert is the real risk of substantially higher taxes.  Since taxes other than income taxes (also referred to as "non-income taxes") consistently account for well over 50 percent of Yukos' net income from year to year,[2406] Yukos' cash flows could be significantly affected by any increases in the tariffs and rates relating to the non-income taxes.[2407]  In Mr. Kaczmarek's model, the taxes that are established annually by legislation (such as the export customs duty and domestic excise tax for refined products) are based on actual historical data (if available) and, for the forecast period, are based on the prior year's tax rate plus an adjustment to account for annual inflation.[2408]  In other words, there is no accounting for the

---

[2402]   The relevant calculations with regard to both dividends and interest are set out in Table T3 attached to this Award.

[2403]   Respondent's Post-Hearing Brief ¶ 239.

[2404]   Second Kaczmarek Report, Appendix AJ and related Appendices.

[2405]   Respondent's Post-Hearing Brief ¶ 242.

[2406]   *See* line items for "taxes other than income tax" and "net income" in Second Kaczmarek Report, Appendix AJ.3.

[2407]   *See* breakdown of Yukos' non-income taxes (including crude oil unified mineral extraction tax, export customs duties, and various excise taxes) and associated tariffs and rates.  Second Kaczmarek Report, Appendix AJ.8.

[2408]   First Kaczmarek Report ¶ 259.

possibility—even likelihood—that had Yukos remained in private hands, the State would have increased taxes, perhaps even substantially, in order to capture a greater share of the rent earned from the exploitation of Russia's natural resources.  Yet, the record shows that this is precisely what the Russian Federation did in 2002 and 2003, when Yukos was still in private hands.  In paragraph 188 of his first report, for example, Mr. Kaczmarek explains that large tax increases in 2002 and 2003 caused surging profits at Yukos to level off during that period.[2409]

1806.  In this connection, the Tribunal notes that Yukos, in its 2002 Annual Report, disclosed the following concerns about taxation:

> We are subject to numerous taxes that have had a significant effect on our results of operations. Russian tax legislation is and has been subject to varying interpretations and frequent changes. [2410]
>
> . . .
>
> In the context of the significant regulatory changes related to Russia's transition from a centrally planned to a market economy over the past 10 years and the general instability of the new market institutions introduced in connection with this transition, taxes, tax rates and implementation of taxation in Russia have experienced numerous changes.  Although there are signs of improved political stability in Russia, further changes to the tax system may be introduced which may adversely affect the financial performance of our Company. In addition, uncertainty related to Russian tax laws exposes us to enforcement measures and the risk of significant fines and could result in a greater than expected tax burden.[2411]

1807.  The 2002 Annual Report also alerted the Yukos shareholders to risks related to the Company's dividend policy:

> Reserves available for distribution to shareholders are based on the statutory accounting reports of YUKOS Oil Company, which are prepared in accordance with Regulations on Accounting and Reporting of the Russian Federation and which differ from U.S. GAAP. Russian legislation identifies the basis of distribution as net income. For 2002, the current year statutory net income for YUKOS Oil Company as reported in the annual statutory accounting reports was RR 40,701 million.  However, current legislation and other statutory laws and regulations dealing with distribution rights are open to legal interpretation and, consequently, actual distributable reserves may differ from the amount disclosed.[2412]

1808.  Finally, and perhaps most significantly, there are the risks associated with the complex and opaque structure set up by Claimants, or by others on their behalf, in order to transfer money earned by Yukos out of the Russian Federation through a vast offshore structure.  This structure

---

[2409]   First Kaczmarek Report ¶ 188.

[2410]   Yukos Annual Report, 2002, p. 81, Exh. C-26.

[2411]   *Ibid.*, p. 84.

[2412]   *Ibid.*, p. 58.

is well documented in the reports of Professor Lys.  An organizational chart attached as an appendix to a letter from PwC Cyprus to PwC Moscow dated 10 April 2003 shows the complexity of the structure as of that date, and the fact that Yukos' control over it was established by means of call options.[2413]  With this structure, Yukos was able to consolidate the profits of the trading companies and offshore holding companies (entities within its "consolidation perimeter") into its results while remaining "free to segregate these profits from minority shareholder claims whenever it served the majority shareholders' or management's interests."[2414]

1809. As Respondent rightly points out, Yukos' claim of corporate governance reforms, Western standards of transparency and protection of minority interests, which Mr. Kaczmarek highlighted in his first report[2415] (and which was a recurring theme heard from Claimants in this case), "was a façade."[2416]  Notably, even the company's President, Mr. Theede, testified that they had no knowledge that Yukos was using offshore structures that it did not own.[2417]

1810. The Tribunal notes that even after the tax assessments at issue in the present arbitration were issued, Claimants and their owners were able to divert money earned by Yukos out of Yukos, and into the two Stichtings,[2418] and therefore away from the tax authorities. The Tribunal cannot exclude the possibility that, but for the expropriation, the very same mechanism would have been resorted to by Claimants under different circumstances to divert some of the money earned by Yukos.

1811. In light of all the circumstances, and taking into account:   (a) the figures based on Mr. Kaczmarek's calculations; (b) the figures based on Professor Dow's "corrections"; and (c) the additional risks described above, which the Tribunal finds must be factored into its damages analysis, the Tribunal, in the exercise of its discretion, concludes that it is appropriate to determine and fix the dividend payments that it assumes Yukos would have paid to its

---

[2413]   Exh. R-3165, p. 5.  The Tribunal has included a copy of the chart in Annex A2 to this Award.  *See also* Second Lys Report, Appendix F.

[2414]   Respondent's Post-Hearing Brief ¶ 258.

[2415]   First Kaczmarek Report ¶ 156.

[2416]   Respondent's Post-Hearing Brief ¶ 260.

[2417]   Transcript, Day 11 at 59.  The Tribunal notes that Mr. Kosciusko-Morizet, the Chairman of the Board's Audit Committee, acknowledged that he had no opinion, and had made no enquiries, as to whether Yukos owned the low tax region entities (*see* Transcript, Day 4 at 60–61).

[2418]   Respondent's Counter-Memorial ¶¶ 528–39.  The Tribunal recalls that Claimants do not dispute that money was transferred into the Stichtings. *See* above at ¶¶ 1054–60, 1124.

shareholders in the "but for" scenario in the amounts set out in the far right column of the following table (in USD billion):

| Year | Kaczmarek | Dow | Tribunal |
|---|---|---|---|
| 2004 | 3.645 | 3.218 | 2.5 |
| 2005 | 4.796 | 4.489 | 3.5 |
| 2006 | 4.677 | 4.396 | 3.5 |
| 2007 | 8.484 | 7.670 | 6 |
| 2008 | 7.819 | 6.749 | 6 |
| 2009 | 7.642 | 5.463 | 5 |
| 2010 | 4.254 | 4.842 | 3.5 |
| 2011 | 6.285 | 4.283 | 4 |
| 2012 | 8.395 | 3.724 | 5 |
| 2013 | 7.628 | 3.148 | 4 |
| 2014 (first half) | 3.586 | 1.310 | 2 |
| Total | 67.213 | 49.293 | 45 |

1812. Accordingly, the Tribunal concludes that Yukos' dividends in 2004 would have been USD 2.5 billion, and the sum of Yukos' dividends over the period from 2004 through the first half of 2014 would have been USD 45 billion.[2419]

### 5.    Application of the Methodology Followed by the Tribunal

1813. The Tribunal, applying the methodology outlined above to the two valuation dates of 19 December 2004 and 30 June 2014, can now proceed to the valuation of the expropriated company as of those two dates.[2420]

---

[2419]   The relevant calculations with regard to both dividends and interest are set out in Table T3 attached to this Award.

[2420]   *See* Table T1 annexed to this Award.

### (a) Calculations Based on 19 December 2004 Valuation Date

1814. The damages suffered by Claimants based on a valuation date of 19 December 2004 are determined as follows.

### i. Valuation of Shares in Yukos

1815. As explained earlier, the Tribunal will determine the equity value of Yukos as of 19 December 2004 by adjusting what it considers, based on the Parties' submissions, to be the best available estimate of this value as of 21 November 2007, *i.e.*, an amount of USD 61.076 billion, with a factor that reflects the development of the RTS Oil and Gas index between 19 December 2004 and 21 November 2007. The value of the RTS Oil and Gas index on 19 December 2004 was 92.85, whereas on 21 November 2007 it had a value of 267.8. The adjustment factor to be applied to determine Yukos' value as of the earlier date is therefore x=92.85/267.8=0.3467. By applying this factor to the amount of USD 61.076 billion, the Tribunal arrives at an equity value of Yukos as of 19 December 2004 in the amount of USD 21.176 billion.[2421]

1816. The value of Claimants' 70.5 percent share in Yukos, calculated as a pro rata share of this amount, corresponds to USD (70.5/100)*21.176=14.929 billion.

### ii. Dividends

1817. According to the Tribunal's methodology outlined above, the dividends that would have been paid to Yukos' shareholders throughout 2004 will be assumed to be USD 2.5 billion. Since the valuation date is 19 December 2004, there are 12 days missing for the full year which must be taken into consideration. Accordingly, this amount must be multiplied by a factor x=(365−12)/365, corresponding to approximately 97 percent. This gives a total amount of free cash flow to equity based on a valuation date of 19 December 2004 of USD 2.418 billion. Claimants' share of this amount corresponds to dividends of USD (70.5/100)*2.418=1.705 billion.

---

[2421]   *See* Table T2 annexed to this Award.

### iii.   Interest

1818. By applying an annual interest rate of 3.389 percent,[2422] the total amount of interest payable on the equity value of Yukos and the dividends that would have been paid to its shareholders from 1 January 2005 to 30 June 2014 is 7.596 billion.[2423]   The total amount of interest payable to Claimants on this basis is 70.5 percent of this figure, *i.e.*, USD 5.355 billion.

### iv.   Total Damages Suffered by Claimants

1819. The damages suffered by Claimants due to the breach by Respondent of Article 13 of the ECT based on a 19 December 2004 valuation date is the sum of the Claimants' share of these components calculated above, *i.e.*, 70.5 percent of (21.176 + 2.418 + 7.596), which amounts to USD 21.988 billion.[2424]

### (b)   Calculations Based on 2014 Valuation Date

1820. The damages suffered by Claimants based on a valuation date of 30 June 2014 are determined as follows.

### i.   Valuation of Claimants' Share in Yukos

1821. As for the calculations based on the date of the expropriation, the Tribunal will determine the equity value of Yukos as of 30 June 2014 by adjusting what it considers, based on the Parties' submissions, the best available estimate of this value as of 21 November 2007, *i.e.*, the amount of USD 61.076 billion, with a factor that reflects the development of the RTS Oil and Gas index between 21 November 2007 and 30 June 2014.   For practical purposes, and in order to eliminate the effects of random fluctuations of the index on the amount to be awarded, the

---

[2422]   *See* Part XI.   The Tribunal has assumed that dividends would have been paid in each case at the end of the relevant year and that interest would have started accruing at the determined pre-award interest rate from 1 January of the year thereafter.

[2423]   To avoid unnecessarily complicating the calculations, this figure does not take into account interest for the period from 19 to 31 December 2004.   Adding this interest would not affect the Tribunal's conclusions.

[2424]   *See* Table T1 annexed to this Award.   Claimants' shareholdings in Yukos, as percentages of Yukos Issued Shares, were 48.72 percent, 2.25 percent and 10 percent for Hulley, YUL and VPL, respectively.   Interim Awards ¶ 419 (Hulley); ¶ 419 (YUL); ¶ 419 (VPL).   In absolute numbers, out of a total number of 2,236,964,578 Issued Shares, Hulley held 1,090,043,968 shares, YUL held 50,340,995 shares and VPL held 223,699,175 shares, while 302,000,000 shares were Treasury Shares.   First Kaczmarek Report, Appendix C.5.b.   This translates into a total number of 1,934,964,578 Outstanding Shares, of which 56.33405 percent, 2.60165 percent and 11.56089 percent were held by Hulley, YUL and VPL, respectively.   The exact combined share of Claimants in Yukos Outstanding Shares was 70.49659 percent.

Tribunal has chosen to use the average of the values of the index over the period from 6 January 2014 to 24 June 2014 as the basis for its calculations.  This average value of the RTS Oil and Gas index is 186.90.[2425]  The adjustment factor to be applied to determine Yukos' value as of the later date is therefore x=186.90/267.8=69.79 percent.  By applying this factor to the amount of USD 61.076 billion the Tribunal arrives at an equity value of Yukos as of 30 June 2014 in the amount of USD 42.625 billion.[2426]

1822. The value of Claimants' 70.5 percent share in Yukos, calculated as a pro rata share of this amount, corresponds to USD (70.5/100)*42.625=30.049 billion.

### ii. Dividends and Interest on Dividends

1823. According to the Tribunal's methodology outlined earlier, the dividends that would have been paid to Yukos' shareholders from the beginning of 2004 to 30 June 2014 will be assumed to correspond to USD 45 billion.  Together with interest, the total amount for this period is USD 51.981 billion.[2427]

1824. Claimants' share of this amount corresponds to USD (70.5/100)*51.981=36.645 billion.

### iii. Total Damages Suffered by Claimants

1825. The damages suffered by Claimants due to the breach by Respondent of Article 13 of the ECT, based on a valuation date of 30 June 2014, is the sum of the Claimants' share of the two components calculated above, *i.e.*, 70.5 percent of (42.625 + 51.981), which amounts to USD 66.694 billion.[2428]

### (c) Comparison of the Results Based on the Two Different Valuation Dates

1826. The total amount of Claimants' damages based on a valuation date of 19 December 2004 is USD 21.988 billion, whereas the total amount of their damages based on a valuation date of 30 June 2014 is USD 66.694 billion.  Since the Tribunal has concluded earlier that Claimants are entitled to the higher of these two amounts, the total amount of damages to be awarded

---

[2425]   *See* Table T8 annexed to this Award.

[2426]   *See* Table T2 annexed to this Award.

[2427]   *See* Table T3 annexed to this Award.

[2428]   *See* Table T1 annexed to this Award.

before taking into account any deductions necessary as a consequence of Claimants' contributory fault is USD 66.694 billion.

### 6. Deductions Due to Claimants' Contributory Fault

1827. As determined earlier,[2429] the Tribunal has concluded that the Claimants contributed to the extent of 25 percent to the prejudice they suffered at the hands of the Russian Federation. As a consequence, the amount of damages to be paid by Respondent to Claimants will be reduced by 25 percent to USD 50,020,867,798 and the Tribunal so finds.[2430]

### 7. Windfall and Double Recovery

1828. The Tribunal sees no reason to make any further deductions beyond those set out above. In particular, any advantages that Claimants may have obtained through their investments prior to Respondent's expropriatory actions can not have any impact on the damages they have suffered. The Tribunal sees no risk of "double-recovery" in this regard.

1829. Finally, the rate of return that Claimants may realize on their original investment in Yukos as a result of the damages that the Tribunal has awarded to them for the expropriation of their shares is irrelevant. It is the value of the expropriated investment on the date of the Award rather than the amount originally invested by Claimants that is the basis for the calculation of the damages awarded.

## XIII. COSTS

### A. INTRODUCTION

1830. The Tribunal notes that Claimants and Respondent have each requested that the opposing party be ordered to pay the full costs of the arbitration.[2431]

1831. The Tribunal observes that the Treaty contains no provisions on the allocation of the costs of arbitration in the case of a dispute between an Investor and a Contracting Party.[2432]

---

[2429] *See* Section X.E.4.

[2430] Claimants shall be paid this amount in proportion to their shareholdings (as to which see n.2424 above) as follows: EUR 39,971,834,360 (Hulley), EUR 1,846,000,687 (YUL) and EUR 8,203,032,751 (VPL). As per paragraphs 1690–92 above, post-award interest will be due on any outstanding amounts not paid in full within 180 days.

[2431] Reply ¶ 1199(5); Rejoinder ¶ 1748(v).

1832. However, Articles 38 to 40 of the UNCITRAL Rules do provide the Tribunal with guidelines with respect to the allocation of costs in arbitration.

1833. Article 38 defines the "costs of arbitration" as follows:

> The arbitral tribunal shall fix the costs of arbitration in its award.  The term "costs" includes only:
>
> (a)   The fees of the arbitral tribunal to be stated separately as to each arbitrator and to be fixed by the tribunal itself in accordance with article 39;
>
> (b)   The travel and other expenses incurred by the arbitrators;
>
> (c)   The costs of expert advice and of other assistance required by the arbitral tribunal;
>
> (d)   The travel and other expenses of witnesses to the extent such expenses are approved by the arbitral tribunal;
>
> (e)   The costs for legal representation and assistance of the successful party if such costs were claimed during the arbitral proceedings, and only to the extent that the arbitral tribunal determines that the amount of such costs is reasonable;
>
> (f)   Any fees and expenses of the appointing authority as well as the expenses of the Secretary-General of the Permanent Court of Arbitration at The Hague.

1834. Paragraphs 1 and 2 of Article 40 of the UNCITRAL Rules set out the guidelines which will inform the Tribunal in its determination of the apportionment of costs.  They read as follows:

> 1.   Except as provided in paragraph 2, the costs of arbitration shall in principle be borne by the unsuccessful party.  However, the arbitral tribunal may apportion each of such costs between the parties if it determines that apportionment is reasonable, taking into account the circumstances of the case.
>
> 2.   With respect to the costs of legal representation and assistance referred to in article 38, paragraph (e), the arbitral tribunal, taking into account the circumstances of the case, shall be free to determine which party shall bear such costs or may apportion such costs between the parties if it determines that apportionment is reasonable.

1835. On 18 March 2014, the Tribunal requested the Parties to file their claims for costs with appropriate schedules by 17 April 2014 and to submit comments on the opposing Party's claims by 6 May 2014.  The Tribunal wrote:

> The Parties are requested to present their claims with schedules showing a breakdown of costs for legal representation and assistance, including lawyers' fees, experts' fees and other costs associated with presenting their case.  The breakdown of lawyers' fees should indicate the number of attorneys (together with charge out rates) and the amount of time involved in the discrete phases of these proceedings (Phase 1 being the period up to the

---

[2432]   As opposed to the allocation of the costs of arbitration in the case of a dispute between Contracting Parties, which is addressed in Article 27(3)(j) as follows:  "The expenses of the tribunal, including the remuneration of its members, shall be borne in equal shares by the Contracting Parties parties to the dispute. The tribunal may, however, at its discretion direct that a higher proportion of the costs be paid by one of the Contracting Parties parties to the dispute."

> Interim Awards; Phase 2 being the period after the Interim Awards).  It is expected that the breakdowns should be in sufficient detail for the Tribunal to appreciate the work in respect of which the costs were incurred.

1836. As requested, the Parties filed their cost claims on 17 April 2014 and submitted comments on the opposing side's cost claims on 6 May 2014.

## B.   CLAIMANTS' POSITION

### 1.   Claimants are Entitled to Recover All Costs Incurred in Connection with these Arbitrations

1837. Claimants note that Article 40 of the UNCITRAL Rules "establishes two approaches with respect to costs."[2433]  Firstly, Article 40(1) establishes a "clear presumption" that the losing party pays all costs referred to in Article 38(a) to (d) and (f)—"loser pays" or "costs follow the event."[2434]  Secondly, Article 40(2) requires that, when allocating costs for legal representation referred to in Article 38(e), tribunals take into account "the circumstances of the case."[2435]

1838. Claimants submit that Respondent should bear all costs set out in Article 38(a) to (d) and (f), namely the fees and expenses of the Tribunal and the PCA (including those of the PCA's Secretary-General).

1839. Claimants aver that Respondent was the unsuccessful party in the jurisdiction and admissibility phase.  Claimants assert that they "prevailed on every single issue that was finally decided in the jurisdiction and admissibility phase of these arbitrations."[2436]  They consider that Respondent should bear the fees and expenses of the Tribunal and the PCA related to that phase.

1840. Claimants submit that they should prevail at the merits stage as well and that Respondent should bear the fees and expenses of the Tribunal and the PCA related to that phase.[2437]

---

[2433]   Claimants' Submission on Costs ¶ 4.

[2434]   *Ibid.* ¶ 5.

[2435]   *Ibid.* ¶ 6.

[2436]   *Ibid.* ¶ 10.

[2437]   *Ibid.* ¶ 11.

1841. According to Claimants, no circumstances in this case require the Tribunal to depart from the starting point of "costs follow the event"; to the contrary, they argue, the circumstances in this case "only further necessitate" an order of costs in favour of Claimants.[2438]

1842. Claimants submit that, taking into account the circumstances of the case—and in particular the Parties' success in the arbitrations, their conduct during the proceedings, and the actual measures of Respondent which gave rise to the dispute—Respondent should bear all of Claimants' costs of legal representation and assistance.

1843. Claimants contend that where the investor prevails in an investor-State arbitration, an order that the State pay the investor's costs of legal representation is based on the principle of reparation, which mandates that the investor be fully compensated for its losses, including those incurred as a result of having to litigate.[2439]

1844. According to Claimants:

> In the present case, the Respondent's approach to these proceedings has been to raise (and re-raise) as many objections, arguments and issues as possible, no matter how irrelevant or implausible they may be, in the hopes of delaying the proceedings and somehow burying or obfuscating the straightforward facts of the case.[2440]

1845. Claimants opine that Respondent's "obstructionist conduct" in this case should lead the Tribunal to order it to pay all costs of legal representation.[2441]

1846. Claimants submit that "in no other case has the need to take into account the underlying conduct of the host State been more relevant than in these arbitrations."[2442]   Claimants argue

---

[2438]   *Ibid.* ¶ 12.

[2439]   Claimants' Submission on Costs ¶¶ 17–19 (quoting *Gemplus* ¶¶ 17-21–17-22, Exh. C-1536; *ADC* ¶ 533, Exh. C-980; *Southern Pacific Properties (Middle East) Limited v. Arab Republic of Egypt*, ICSID Case No. ARB/84/3, Award, 20 May 1992, ¶ 207, Exh. C-945.

[2440]   Claimants' Submission on Costs ¶ 22.

[2441]   Claimants' Submission on Costs ¶¶ 22, 52–53.  Claimants list what they term Respondent's "constant attempts to extend deadlines and otherwise prolong or disrupt the proceedings" (¶¶ 23–31), "deliberate attempts to withhold evidence" (¶¶ 32–39), "manifest disregard for the Arbitral Tribunal's orders" (¶¶ 40–41), "renewed and abandoned jurisdiction and admissibility objections" (¶¶ 42–48), and "overly burdensome, disorganized and fundamentally misleading presentation of its case" (¶¶ 49–51).

[2442]   Claimants' Submission on Costs ¶ 54 (referring to *Deutsche Bank AG v. Democratic Socialist Republic of Sri Lanka* ICSID Case No. ARB/09/02, Award, 31 October 2012, ¶ 588, Exh. C-1792; *ADC* ¶ 533, Exh. C-980; *Kardassopoulos* ¶ 689, Exh. C-1533.

that Respondent's conduct "has been decried by every single court or tribunal, organization, and independent observer outside Russia" and "must be sanctioned in full."[2443]

### 2.   Claimants' Costs are Reasonable

1847. Pursuant to the Tribunal's directions, Claimants presented a summary of the costs they have incurred in connection with these arbitrations on a per-phase basis:[2444]

**Table 1: The Claimants' costs for legal representation incurred in Phase 1**

| Shearman & Sterling LLP Fees and Expenses | |
|---|---:|
| 1. Legal assistants | |
|     Number of legal assistants | 4 |
|     Charge out rate range (USD/hour) | 160.00-200.00 |
|     Total hours | 4,376.40 |
|     Total legal assistant fees | USD 763,222.50 |
| 2. Attorneys | |
|     Number of attorneys | 21 |
|     Charge out rate range (USD/hour) | 235.00-995.00 |
|     Total hours | 52,076.90 |
|     Total attorney fees | USD 23,018,168.50 |
| 3. Expenses | USD 2,081,685.55 |
| 4. Total | USD 25,863,076.55 |
| **Expert Fees and Expenses** | |
| 1. Prof. James Crawford | USD 53,222.06 |
| 2. Mr. Vladimir Gladyshev | USD 1,269,662.80 |
| 3. Mr. Brian Green QC | GBP 996,962.10 |
| 4. Navigant | USD 1,052,897.49 |
| 5. Prof. W. Michael Reisman | USD 204,000.00 |
| 6. Total | USD 2,579,782.35 |
| | GBP 996,962.10 |
| **Deductions**[89] | |
| | USD 482,260.11 |
| **Grand Total (Phase 1)** | |
| | USD 27,960,598.79 |
| | GBP 996,962.10 |

---

[89]   The deducted amounts comprise: (*i*) experts' fees and expenses advanced by Shearman & Sterling LLP and subsequently reimbursed by the Claimants (deducted to avoid double-counting of those amounts); and (*ii*) the fees and expenses of persons consulted by the Claimants, but who did not tender testimony.

. . .

---

[2443]   Claimants' Submission on Costs ¶ 55.

[2444]   *Ibid.* ¶¶ 56–63.

**Table 2: The Claimants' costs for legal representation incurred in Phase 2**

| Shearman & Sterling LLP Fees and Expenses[90] | |
|---|---|
| 1. Legal assistants | |
|    Number of legal assistants | 7 |
|    Charge out rate range (USD/hour) | 205.00-255.00 |
|    Total hours | 4,887.60 |
|    Total legal assistant fees | USD 1,123,195.50 |
| 2. Attorneys | |
|    Number of attorneys | 27 |
|    Charge out rate range (USD/hour) | 290.00-1,065.00 |
|    Total hours | 70,525.90 |
|    Total attorney fees | USD 39,931,981.50 |
| 3. Expenses | USD 3,252,001.07 |
| 4. Total | USD 44,307,178.07 |
| **Expert Fees and Expenses** | |
| 1. Dr. Philip Baker QC | GBP 69,500.00 |
| 2. Dr. Sergei Kovalev | USD 70,000.00 |
| 3. Navigant | USD 7,370,493.22 |
| 4. Total | USD 7,440,493.22 |
| | GBP 69,500.00 |
| **Compensation for Witness Time and Expenses** | |
| 1. Mr. Y Schmidt | USD 70,000.00 |
| **Deductions**[91] | |
| | USD 150,214.52 |
| **Grand Total (Phase 2)** | |
| | USD 51,667,456.77 |
| | GBP 69,500.00 |

---

[90]   The Shearman & Sterling LLP Fees and Expenses for Phase 2 comprise invoices up to and inclusive of December 2012.

[91]   The deducted amounts comprise: (*i*) experts' fees and expenses advanced by Shearman & Sterling LLP and subsequently reimbursed by the Claimants (deducted to avoid double-counting of those amounts); (*ii*) the fees and expenses of persons consulted by the Claimants, but who did not tender testimony; and (*iii*) the compensation for the time and expenses of Mr. Schmidt, which were advanced by Shearman & Sterling LLP and subsequently reimbursed by the Claimants (deducted to avoid double-counting of this amount).

1848. Claimants submit that their costs in the jurisdiction and admissibility phase are reasonable given:

> *(i)* the large number of objections raised by the Respondent in the jurisdiction and admissibility phase, *(ii)* the numerous expert opinions tendered by the Respondent, *(iii)* the volume of procedural issues that arose in the course of the proceedings attributable solely to the Respondent, and *(iv)* the matters and amounts at stake in the arbitrations.[2445]

---

[2445]   Claimants' Submission on Costs ¶ 60.

1849. Claimants submit that their costs in the merits phase are reasonable given:

> (*i*) the large number of issues raised by the Respondent in the merits phase, (*ii*) the numerous expert statements tendered by the Respondent, (*iii*) the volume of procedural issues that arose in the course of the proceedings attributable solely to the Respondent, and (*iv*) the matters and amounts at stake in the arbitrations.[2446]

1850. Claimants request interest on any cost award at a rate of LIBOR + 4 percent compounded annually.[2447]

### 3. Claimants' Comments on Respondent's Submission on Costs

1851. Claimants summarize their comments on Respondent's Submission on Costs as follows:

> Respondent has elected not to provide a "breakdown of costs", as directed by the Arbitral Tribunal. Its so-called "Schedule of Costs" cannot in any way facilitate the Tribunal's task in reaching its decision on costs, including in assessing the reasonableness of either of the Parties' claimed amounts. Moreover, the Respondent's argument that each Party should bear its own costs is based on a flawed presentation of investment treaty case law and a blatantly self-serving description of the Respondent's conduct throughout these arbitrations. At the same time, the Respondent's position speaks volumes as to its true conviction (or lack thereof) in its defenses to the Claimants' claims. Had the Respondent truly believed that the Claimants, Yukos and/or related persons and entities had engaged in large-scale criminal conduct—ranging from embezzlement and money laundering to tax fraud and even murder—it would have insisted that its full costs be shouldered by the Claimants, instead of proposing, as it has done now, that it bear its own costs in defending the Claimants' claims.[2448]

1852. Claimants assert that comparing the comprehensive presentation of their costs for legal representation with Respondent's "opaque" Schedule of Costs would be "akin to comparing apples and oranges."[2449] Even then, Claimants maintain that their costs would still be reasonable. In particular, Claimants note that "in ordering respondent States to bear investors' costs, investment treaty tribunals have found that it is not unusual for claimants' costs to be higher than those of respondents, given that, *inter alia*, the burden of proof generally falls on claimants."[2450]

---

[2446] Claimants' Submission on Costs ¶ 63.

[2447] *Ibid.* ¶ 64.

[2448] Claimants' Comments on Respondent's Submission on Costs dated 6 May 2014, p. 1.

[2449] *Ibid.*, p. 3.

[2450] *Ibid.*, p. 3 (referring to *ADC* ¶ 535, Exh. C-980; *Waguih Elie George Siag and Clorinda Vecchi v. The Arab Republic of Egypt*, ICSID Case No. ARB/05/15, Award, 1 June 2009, ¶ 624, Exh. C-998.

## C.   RESPONDENT'S POSITION

### 1.   Equal Apportionment is an Appropriate Exercise of the Tribunal's Discretion on Costs

1853. Respondent notes that, while Article 40(1) of the UNCITRAL Rules states that the costs referred to in Article 38(a) to (d) and (f) should "in principle be borne by the unsuccessful party," it gives the Tribunal the discretion to "apportion each of such costs between the parties if it determines that apportionment is reasonable, taking into account the circumstances of the case."   Respondent asserts that Article 40(2) grants the Tribunal "complete discretion" in its apportionment of the Parties' costs of legal representation.[2451]

1854. Respondent argues that the following factors should inform the exercise of the Tribunal's discretion:

> (a) whether the dispute involved novel and complex questions of law and a long and complex procedure such that it would be unfair to penalize a non-prevailing party for maintaining its positions with an adverse costs award;
>
> (b) the constructive and professional conduct of the parties and their positive impact on the tribunal's settlement of the dispute, which militates in favor of equal apportionment of costs;
>
> (c) any bad faith, unreasonable or unnecessarily burdensome conduct of a party for which the other party should be compensated;
>
> (d) whether the non-prevailing party succeeds in some respects during the arbitration with legal, factual or procedural arguments, making it inappropriate to award the ultimately successful party its costs; and
>
> (e) the nature of the dispute resolution mechanism and the traditional position under public international law and in investor-state arbitration that parties "bear their own costs of legal representation and assistance."[2452]

1855. Respondent submits that, in light of the above-mentioned factors, the "appropriate approach here is for each side to bear its own costs."[2453]  Further:

> If, in the exercise of its discretion, the Tribunal decides that equal apportionment of costs in these cases is not appropriate, and that the costs incurred by the prevailing party should be borne by the unsuccessful party, Respondent would then request that Claimants should bear Respondent's costs based upon the relative success of the parties in these arbitrations on issues of jurisdiction, the merits and Claimants' demand for damages.  It is clear from

---

[2451]   Respondent's Submission on Costs ¶ 3.

[2452]   *Ibid.* ¶ 4 (footnotes omitted).

[2453]   *Ibid.* ¶¶ 5–8.

the Procedural Orders issued throughout the proceedings and from the Interim Awards on Jurisdiction and Admissibility that neither side has been fully successful.[2454]

### 2.    Schedule of "Types of Costs" Incurred by Respondent

1856. Respondent submits a schedule indicating the "types of costs" incurred by Respondent in defense of Claimants' claims.

#### A. Tribunal and PCA Fees and Expenses

Initial and supplemental deposits paid to the PCA

TOTAL  €3,950,000

#### B. Attorneys' Fees and Expenses

Phase 1

For the period from February 3, 2005 to November 30, 2009:

Review of Claimants' Notifications of Claim dated October 27, 2004; review of Claimants' Statements of Claim dated February 3 and February 14, 2005; preparation of Respondent's Statements of Defense dated October 15, 2005; preparation of Respondent's First Memorials on Jurisdiction and Admissibility dated February 28, 2006; review of Claimants' Counter-Memorials on Jurisdiction and Admissibility dated June 30, 2006; preparation of requests for disclosure, preparation of documents and responses to Claimants' requests for disclosure, review of documents produced by Claimants; preparation of Respondent's Second Memorials on Jurisdiction and Admissibility dated January 31, 2007; review of Claimants' Rejoinders on Jurisdiction and Admissibility dated June 1, 2007;

Correspondence and various procedural submissions with the Tribunal and Claimants' counsel;

Attendance at hearings of October 31, 2005, December 1, 2007, May 8-9, 2008 and from November 17 to December 1, 2008.

Lawyers Involved in Phase 1

Partners (5), billing range $700-900/hour, in excess of 3,500 hours

Associates (15), billing range $300-$625/hour, in excess of 12,000 hours

Paralegals/stagiaires/trainees (10), billing range $125-$225/hour, in excess of 5,000 hours

Phase 2

For the period from November 30, 2009 until the present:

Review of Claimants' Memorial on the Merits dated September 16, 2010; preparation of Respondent's Counter-Memorial on the Merits dated April 4, 2011; preparation of requests for disclosure, preparation of documents and responses to Claimants' requests for disclosure, review of documents produced by Claimants; preparation of Respondent's Short Submission on Bifurcation of Liability and Quantum and on Referral under Article 21 of the ECT dated April 29, 2011; preparation of Respondent's First and Second Submissions on Confidentiality dated January 18 and February 2, 2012; review of Claimants' Reply on the Merits dated March 15, 2012;

---

[2454]   *Ibid.* ¶ 9.

preparation of Respondent's Rejoinder on the Merits dated August 16, 2012; preparation of Respondent's Post-Hearing Brief dated December 21, 2012;

Correspondence and various procedural submissions with the Tribunal and Claimants' counsel;

Attendance at hearings of May 7, 2010, May 9, 2011 and from October 10 to November 9, 2012.

<u>Lawyers Involved in Phase 2</u>

Partners (5), billing range $775-950/hour, in excess of 7,000 hours

Associates (20), billing range $375-$675/hour, in excess of 25,000 hours

Paralegals/stagiaires/trainees (15), billing range $150-$275/hour, in excess of 10,000 hours

TOTAL  US$ 27,000,000

**C. Experts' Fees and Expenses**

For services provided by expert witnesses in connection with preparation of expert reports for submission with Respondent's First Memorials on Jurisdiction and Admissibility, Second Memorials on Jurisdiction and Admissibility, Counter-Memorial on the Merits and Rejoinder on the Merits and preparation for testimony at the hearings on jurisdiction and admissibility and the merits and remaining jurisdiction and admissibility issues, and related expenses.

TOTAL  US$ 4,500,000[2455]

### 3.   Respondent's Comments on Claimants' Submission on Costs

1857. With respect to Claimants' request for costs, Respondent says it is "plainly excessive and unprecedented in its amount" and opines that it "raises serious questions of credibility."[2456]

1858. Respondent submits that Claimants' characterization of the proceedings amounts to "outright misrepresentations rather than the actual facts."[2457]   According to Respondent, the alleged misrepresentations of Claimants include:  Claimants' "continued disregard for the ECtHR's unanimous rejections of the essential premise for Claimants' contentions here,"[2458] "misrepresentation that Respondent abandoned its unclean hands defense,"[2459] "mischaracterization of Respondent's justified requests for extensions of deadlines, alleged 'delay tactics' and approach to document production,"[2460] "meritless criticisms of Respondent's

---

[2455]   Respondent's Submission on Costs ¶ 10.

[2456]   Respondent's Comments on Claimants' Submission on Costs dated 6 May 2014 ¶ 2 n.1.

[2457]   *Ibid.* ¶ 9.

[2458]   *Ibid.* ¶¶ 10–15.

[2459]   *Ibid.* ¶¶ 16–18.

[2460]   *Ibid.* ¶¶ 19–31.

presentation of its case,"[2461] and "conspicuous silence concerning their own misconduct in these arbitrations."[2462]

### D.   TRIBUNAL'S DECISION ON COSTS

#### 1.   Fixing and Allocation of Costs of the Arbitration Pursuant to Article 40(1) of the UNCITRAL Rules

1859. The Parties deposited with the PCA a total of EUR 8,440,000 to cover the costs of the arbitration; EUR 4,240,000 by Claimants and EUR 4,200,000 by Respondent.[2463]   In determining the amount of its members' fees, the Tribunal has taken account of Article 39(1) of the UNCITRAL Rules, pursuant to which "[t]he fees and expenses of the arbitral tribunal shall be reasonable in amount, taking into account the amount in dispute, the complexity of the subject matter, the time spent by the arbitrators and any other relevant circumstances of the case."

1860. The fees of Mr. Daniel Price, the arbitrator initially appointed by Claimants, amount to EUR 103,537.50.   Mr. Price's expenses amount to EUR 3,678.99.   The fees of Dr. Charles Poncet, the arbitrator appointed by Claimants following the resignation of Mr. Price, amount to EUR 1,513,880.   Dr. Poncet's expenses amount to EUR 85,549.64.

1861. The fees of Judge Stephen M. Schwebel, the arbitrator appointed by Respondent, amount to EUR 2,011,092.66.   His expenses amount to EUR 51,927.29.

1862. The fees of The Hon. L. Yves Fortier, PC CC OQ QC, the Chairman, amount to EUR 1,732,937.50.   The Chairman's expenses amount to EUR 51,782.24.

1863. The fees of Mr. Martin J. Valasek, the Assistant to the Tribunal, amount to EUR 970,562.50.   Mr. Valasek's expenses amount to EUR 51,718.96.

1864. Pursuant to the Terms of Appointment and the agreement of the Parties, the PCA Secretary-General served as the Appointing Authority, and the International Bureau of the PCA was

---

[2461]   *Ibid.* ¶¶ 32–36.

[2462]   *Ibid.* ¶¶ 37–38.

[2463]   Over the course of the proceedings, the Parties contributed in equal shares to the deposits.  In July 2014, the Tribunal requested a final supplementary deposit of EUR 40,000 and invited either Party to cover the full amount in advance of issuance of the Final Awards, which Claimants accepted to do.

designated to act as Registry in these arbitrations.  The PCA's fees for its services amount to EUR 866,552.60.

1865. Other tribunal costs, including court reporters, interpreters, hearing rooms, meeting facilities, travel and all other expenses relating to the arbitration proceedings, amount to EUR 996,780.12.

1866. Accordingly, the costs of the arbitration, including all items set out in paragraphs (a), (b), (c), (d) and (f) of Article 38 of the UNCITRAL Rules, amount to EUR 8,440,000 for the jurisdiction and merit phases.

1867. The Tribunal recalls again the terms of Article 40(1) of the UNCITRAL Rules:

> Except as provided in paragraph 2, the costs of arbitration shall in principle be borne by the unsuccessful party.  However, the arbitral tribunal may apportion each of such costs between the parties if it determines that apportionment is reasonable, taking into account the circumstances of the case.

1868. The costs are therefore to be awarded to the successful party and against the unsuccessful party, unless the circumstances of the case justify a different approach.

1869. In the present proceedings, it is clear that Claimants have prevailed and been successful in both the jurisdiction and merits phases.  The Tribunal can see no reason why Respondent, the unsuccessful party, should not bear the costs of the arbitration, EUR 8,440,000, and it so orders Respondent to bear such costs and to reimburse the contributions that Claimants deposited in the amount of EUR 4,240,000.[2464]

1870. There is no unexpended balance on deposit.

### 2. Fixing and Allocation of Costs for Legal Representation and Assistance of the Parties Pursuant to Article 40(2) of the UNCITRAL Rules

1871. The Tribunal recalls again the terms of Article 40(2) of the UNCITRAL Rules:

> With respect to the costs of legal representation and assistance referred to in article 38, paragraph (e), the arbitral tribunal, taking into account the circumstances of the case, shall be free to determine which party shall bear such costs or may apportion such costs between the parties if it determines that apportionment is reasonable.

---

[2464] Claimants shall be paid this amount in proportion to their shareholdings (as to which see n.2424 above) as follows: EUR 3,388,197 (Hulley), EUR 156,476 (YUL) and EUR 695,327 (VPL).  As per paragraphs 1690–92 above, post-award interest will be due on any outstanding amounts not paid in full within 180 days.

1872. Paragraph (e) of Article 38 provides that the term "costs" includes:

> The costs for legal representation and assistance of the successful party if such costs were claimed during the arbitral proceedings, and only to the extent that the arbitral tribunal determines that the amount of such costs is reasonable.

1873. The Tribunal observes that Claimants' costs for their legal representation and the assistance of their experts amount to USD 79,628,055.56 plus an additional GBP 1,066,462.10, which, Claimants submit, are "reasonable" taking into account the circumstances of the case.

1874. Respondent, on the other hand, provides the Tribunal with a schedule indicating the "types of costs" incurred by Respondent in its defence.  It presents a "total" figure of USD 27,000,000 which does not adequately assist the Tribunal in assessing the reasonableness of the Parties' respective costs.

### 3.    Conclusion on the Award of Costs

1875. It is well established that an UNCITRAL tribunal such as the present one has the unfettered discretion to fix and to decide in what proportion the costs for legal representation and assistance of the parties shall be borne by the Parties.

1876. In the present case, the Tribunal has formed the view that Claimants, the successful Party, should be awarded a significant portion of their costs of legal representation and assistance. The Tribunal now has to determine the portion which it considers reasonable.  In determining this reasonable portion, the Tribunal takes into account a number of relevant factors.  The Tribunal will now proceed to review some of the factors which it considers particularly relevant in the instant case.

1877. Claimants, in their prayer for relief, asked the Tribunal to order Respondent to pay to Claimants damages of more than USD 100 billion.

1878. The stakes were high and, if Claimants were thorough and vigorous in pressing their claims, Respondent was no less thorough and vigorous in presenting its defences.

1879. The thousands of pages of written pleadings and exhibits submitted by the Parties, the myriad requests for production of documents, the Tribunal's lengthy procedural orders, the ten days of hearings in The Hague in the fall of 2008 on Respondent's objections to jurisdiction and admissibility, the 21 days of Hearings on the Merits in The Hague in the fall of 2013, all demonstrate the importance which both sides attached to this arbitration.

1880. The Parties litigated vigorously.  Each Party was represented by eminent counsel.  The quality of the written and oral pleadings was outstanding.  Counsel of both Parties are commended for their high professionalism.

1881. In the circumstances, it is unsurprising that the cost submissions of the Parties, as to their amounts, should reflect the very considerable work which each Party was required to expend in order to, on the one hand, press its claims and, on the other hand, defend itself.

1882. It also is not surprising that Claimants' costs in this case should be higher than those of Respondent since they bore the burden of proof for their claims under the ECT and produced many fact witnesses in the Hearing on the Merits whereas Respondent produced no fact witness.

1883. However, the Tribunal agrees with Respondent that some of the fees of Claimants' experts are "plainly excessive".

1884. Another factor which the Tribunal considers relevant in fixing the costs of Claimants which should be borne by Respondent is the fact that, at the end of the day, Claimants' experts were of limited assistance to the Tribunal in its determination of Claimants' damages.

1885. Even if Claimants were successful in asserting the Tribunal's jurisdiction over Respondent, in prevailing on the liability of Respondent and being awarded an immense sum in damages, at the end of the day, as was seen in Part XII, the damages awarded to Claimants were reduced significantly by the Tribunal from the claims advanced by them.

1886. Finally, a factor which the Tribunal has considered particularly relevant in fixing the portion of their costs which Claimants should be awarded is the egregious nature of many measures of Respondent which the Tribunal has found were in breach of the ECT.

1887. Having scrutinized the costs for legal representation and assistance of Claimants and taking into consideration all the factors traversed above, the Tribunal, in the exercise of its discretion, considers that reimbursement by Respondent to Claimants of USD 60,000,000 as part of their costs would be fair and reasonable in the circumstances and it so orders.[2465]  The Tribunal notes that USD 60,000,000 is approximately 75 percent of Claimants' grand total of costs for the jurisdiction and merits phases, namely USD 79,628,055.56 and GBP 1,066,462.10.

---

[2465]   Claimants shall be paid this amount in proportion to their shareholdings (as to which see n.2424 above) as follows: EUR 47,946,190 (Hulley), EUR 2,214,277 (YUL) and EUR 9,839,533 (VPL).  As per paragraphs 1690–92 above, post-award interest will be due on any outstanding amounts not paid in full within 180 days.

## XIV.  DECISION

1888. For the reasons set forth above, the Tribunal unanimously:

(a)    DISMISSES the objections to jurisdiction and/or admissibility, based on Article 21 of the Energy Charter Treaty;

(b)    DISMISSES the objections to jurisdiction and/or admissibility, pertaining to Respondent's contentions concerning "unclean hands" and "illegal and bad faith conduct";

(c)    DISMISSES the renewed objections to jurisdiction and/or admissibility based on Article 26(3)(b)(i) of the Energy Charter Treaty;

(d)    HOLDS that the present dispute is admissible and within the Tribunal's jurisdiction;

(e)    DECLARES that Respondent has breached its obligations under Article 13(1) of the Energy Charter Treaty;

(f)    ORDERS Respondent to pay to Claimant Hulley Enterprises Limited damages in the amount of USD 39,971,834,360;

(g)    ORDERS Respondent to pay the amount of EUR 3,388,197 to Claimant Hulley Enterprises Limited as reimbursement for the costs of the arbitration;

(h)    ORDERS Respondent to pay the amount of USD 47,946,190 to Claimant Hulley Enterprises Limited for a portion of the costs of its legal representation and assistance in the arbitration proceedings; and

(i)    ORDERS Respondent to pay to Claimant Hulley Enterprises Limited, if within 180 days of the issuance of this Award Respondent fails to pay in full the amounts set forth in paragraphs (f), (g) and (h) above, post-award interest on any outstanding amount starting from 15 January 2015, compounded annually. Post-award interest shall be determined as the yield on 10-year U.S. treasury bonds as of 15 January 2015 and then the dates of compounding yearly thereafter.

Done at The Hague, this 18th day of July , 2014.


_____
Dr. Charles Poncet
Co-arbitrator

_____
Judge Stephen M. Schwebel
Co-arbitrator


_____
The Hon. L. Yves Fortier PC CC OQ QC
Chairman

**ANNEXES**

A.   ANNEX A1:  APPENDIX 1.1, APPENDIX J.1 AND APPENDIX J.2 TO SECOND DOW REPORT
     (modified as described in note 2401 of the Award)

(a)   Appendix 1.1

| "Updated" Yukos 2007 DCF Error Correction | Corrected? |
|---|---|
| Upstream Capex Base Year | 1 |
| US Cost of Equity | 1 |
| Refining Capex Partial Year Error | 1 |
| Missing Opex | 1 |
| Transport Cost Error | 1 |
| Forecasts-Forwards Conflation Error | 1 |
| PPP & Inflation Related Errors | 1 |

| Enterprise Value | | |
|---|---|---|
| Original | $ | 95,251,061,670 |
| New | $ | 46,461,814,366 |
| Diff. | $ | 48,789,247,303 |

Note:
Results obtained from the live (excel) version of Appendix 1 to Second Dow Report provided by Respondent together with  its Rejoinder by switching the values in the "Corrected?" column on the first sheet of the Appendix (Appendix 1.1) from 0 to 1.  The Annex shows the resulting figures for Appendix J.1 and Appendix J.2 to Second Dow Report.

**(b)  Appendix J.1 New**

| Notes and Sources | JD Notes | Calculation Logic | Component | 2003 | 2004 | 2005 | 2006 | 2007 (thru 11/21) |
|---|---|---|---|---|---|---|---|---|
| 1 | | [A] | Net Income | | 3,218,665,217 | 4,769,239,020 | 4,605,289,478 | 5,791,709,065 |
| 2 | | [B] | Tax-Adjusted Interest Payments | | 195,973,436 | 248,407,275 | 314,870,094 | 354,283,284 |
| 1 | | [C] | Depreciation | | 1,115,919,143 | 1,322,594,049 | 1,567,551,997 | 2,045,753,987 |
| 3 | | [D] | Working Current Assets | 6,162,391,781 | 6,024,533,190 | 7,377,817,999 | 8,724,114,903 | 9,724,344,823 |
| 3 | | [E] | Working Current Liabilities | 2,134,154,107 | 2,668,988,513 | 3,420,223,168 | 4,389,513,676 | 5,143,659,866 |
| Calc. | | [F] = D - E | Working Capital | 4,028,237,674 | 3,355,544,677 | 3,957,594,831 | 4,334,601,227 | 4,580,684,958 |
| Calc. | | [G] = $F_t$ - $F_{t-1}$ | Change in Working Capital | | (672,692,997) | 602,050,154 | 377,006,395 | 246,083,731 |
| 4 | | [H] | Capital Expenditures | | 2,466,678,051 | 2,397,031,851 | 2,729,804,072 | 3,506,855,747 |
| Calc. | | [I] = A + B + C - G - H | Free Cash Flow to the Firm | | 2,736,572,742 | 3,341,158,338 | 3,380,901,101 | 4,438,806,858 |
| 2 | | [J] = -B | Tax-Adjusted Interest Payments | | (195,973,436) | (248,407,275) | (314,870,094) | (354,283,284) |
| 5 | | [K] | Change in Net Debt | | 659,445,111 | 944,541,730 | 1,209,587,786 | 1,765,630,302 |
| 6 | | [L] | 20% of Sibneft Dividends | | 18,332,400 | 452,067,800 | 120,400,000 | 367,673,425 |
| Calc. | | [M] = I + J + K + L | Free Cash Flow to Equity | | 3,218,376,817 | 4,489,360,593 | 4,396,018,793 | 6,217,827,301 |
| | | | | | | 5.079593664 | | |

Kaczmarek Sources & Notes:

(1) See Appendix J.3 - Updated - Yukos Income Statement

(2) Interest expense from Appendix J.3 - Updated multiplied by (1-t), where t is equal to the tax rate, found in Appendix J.14 - Updated.  Tax is deducted because FCFF should not include the tax benefits associated with interest deductions (however, the tax benefit is included in FCFE).

(3) Total current assets and total current liabilities from Appendix J.4 - Updated - Yukos Balance Sheet.  To estimate current assets and liabilities as of November 21, 2007, we prorate the growth in current assets and liabilities using the portion of the year that has passed (324 of 365 days).

(4) See Appendix J.11 - Updated - Yukos Capital Expenditures

(5) Equal to the annual change in long-term debt plus short-term debt less cash from Appendix J.4 - Updated - Yukos Balance Sheet.  To estimate Change in Net Debt through November 21, 2007, we prorated total annual Change in Net Debt using the portion of the year that has passed (324 of 365 days).

(6) 20 percent of Sibneft dividends paid in period as per Gazprom Neft 2008 Databook at "Consolidated Statement of Cash Flow" tab.  (NAV – 93)

Note that 2007 dividends through November 21, 2007 are prorated using the portion of the year that has passed (324 of 365 days).

**Sibneft Dividend Calculations:**

| | | | | | |
|---|---|---|---|---|---|
| [1] | Sibneft Dividend Percent of FCFE | 0.570% | 10.070% | 2.739% | 5.913% |
| [2] | 3-year trailing average: | | | 4.459% | 6.241% |
| [3] | Original 2007 3-year trailing average | | | | 5.763% |

**JD Sources & Notes:**

[1]   I calculate the percent of Sibneft dividends out of the total Free Cash Flow to Equity

[2]   I take a 3-year trailing average of the Sibneft dividend percentage

[3]   I use the 3-year trailing average from 2007, from Mr. Kaczmarek's original Appendix J.1 - Updated, not
accounting for any of my error corrections.

### (c)   Appendix J.2 New

| Notes and Sources | JD Notes | Calculation Logic | Component | 2007 (11/21) | 2007 (11/21-12/31) | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | [A] | Net Income | | 1,361,133,090 | 7,455,550,093 | 6,427,501,357 | 6,006,613,697 | 5,045,829,975 | 4,384,146,086 | 3,708,280,652 | 3,070,944,832 | 2,334,065,782 |
| 2 | | [B] | Tax-Adjusted Interest Payments | | 44,832,144 | 479,741,072 | 531,331,847 | 571,246,674 | 605,797,716 | 629,784,929 | 651,057,050 | 669,451,288 | 684,150,862 |
| 1 | | [C] | Depreciation | | 258,876,276 | 2,704,730,012 | 3,104,829,762 | 3,504,929,511 | 3,905,029,260 | 4,305,129,010 | 4,705,228,759 | 5,105,328,509 | 5,505,428,258 |
| 3 | | [D] | Working Current Assets | 9,724,344,823 | 9,850,917,128 | 12,177,374,651 | 12,589,339,638 | 13,407,409,267 | 13,369,206,217 | 13,408,627,169 | 13,531,800,418 | 13,703,949,405 | 13,851,885,035 |
| 3 | | [E] | Working Current Liabilities | 5,143,659,866 | 5,239,091,945 | 6,978,529,152 | 7,314,488,967 | 7,856,248,155 | 7,923,070,306 | 8,013,305,077 | 8,146,948,549 | 8,301,151,669 | 8,440,844,708 |
| Calc. | | [F] = D - E | Working Capital | 4,580,684,958 | 4,611,825,183 | 5,198,845,499 | 5,274,850,671 | 5,551,161,112 | 5,446,135,911 | 5,395,322,092 | 5,384,851,869 | 5,402,797,736 | 5,411,040,326 |
| Calc. | | $[G] = F_t - F_{t-1}$ | Change in Working Capital | | 31,140,225 | 587,020,316 | 76,005,171 | 276,310,442 | (105,025,201) | (50,813,819) | (10,470,224) | 17,945,867 | 8,242,591 |
| 4 | | [H] | Capital Expenditures | | 443,768,783 | 4,431,646,288 | 4,875,675,642 | 5,328,869,547 | 5,477,680,110 | 5,630,784,296 | 5,788,308,596 | 5,950,383,281 | 6,117,142,509 |
| Calc. | | [I] = A + B + C - G - H | Free Cash Flow to the Firm | | 1,189,932,502 | 5,621,354,572 | 5,111,982,153 | 4,477,609,893 | 4,184,002,043 | 3,739,089,547 | 3,286,728,089 | 2,877,395,481 | 2,398,259,802 |
| 5 | | [J] | Present Value Factor | | 0.99 | 0.94 | 0.85 | 0.77 | 0.70 | 0.63 | 0.57 | 0.51 | 0.47 |
| Calc. | | [K] = I x J | 21 Nov 2007 Value of Cash Flows | | 1,183,236,882 | 5,288,134,152 | 4,349,283,009 | 3,445,414,267 | 2,911,749,015 | 2,353,394,696 | 1,870,938,602 | 1,481,365,313 | 1,116,672,182 |
| | [1] | | Tax-Adjusted Interest Payments | | (44,832,144) | (479,741,072) | (531,331,847) | (571,246,674) | (605,797,716) | (629,784,929) | (651,057,050) | (669,451,288) | (684,150,862) |
| | [2] | | Change in Net Debt | | 223,428,526 | 1,218,705,221 | 567,399,775 | 656,429,909 | 457,761,231 | 400,500,967 | 330,547,803 | 260,836,833 | 178,168,714 |
| | [3] | | 20% of Sibneft Dividends | | 83,698,156 | 388,992,116 | 314,850,715 | 279,056,857 | 246,836,495 | 214,656,963 | 181,411,623 | 150,988,716 | 115,730,221 |
| | [4] | | Free Cash Flow to Equity | 6217827301 | 1,452,227,040 | 6,749,310,837 | 5,462,900,795 | 4,841,849,986 | 4,282,802,054 | 3,724,462,548 | 3,147,630,465 | 2,619,769,742 | 2,008,007,875 |
| | | | | | 7,670,054,341 | 6,749,310,837 | 5,462,900,795 | 4,841,849,986 | 4,282,802,054 | 3,724,462,548 | 3,147,630,465 | 2,619,769,742 | 2,008,007,875 |

| Notes and Sources | JD Notes | Calculation Logic | Component | 2007 (11/21) | 2008 (11/21-12/31) | 2009 | 2010 |
|---|---|---|---|---|---|---|---|
| | | **Terminal Value Calculation:** | | | | | |
| Calc. | | $[L] = J_{2015} \times (1 + M)$    Terminal Year FCFF | 2,482,198,895 | | | | |
| 6 | | [M]    Terminal Growth Rate | 3.50% | | | | |
| 7 | | [N]    WACC | 10.57% | | | | |
| Calc. | | $[O] = L / (N - M)$    Terminal Value as of 2015 | 35,114,161,268 | | | | |
| Calc. | | $[P] = J_{2015}$    Present Value Factor | 0.47 | | | | |
| Calc. | | $[Q] = O \times P$    **Terminal Value as of 11/21/2007** | 16,349,774,549 | | | | |
| | | **Enterprise Value Summary:** | | | | | |
| Calc. | | $[R] = \sum(K)$    Sum of Discounted Cash Flows | 24,000,188,118 | | | | |
| Calc. | | $[S] = Q$    Discounted Terminal Value | 16,349,774,549 | | | | |
| 8 | | [T]    Value of 20% of Sibneft | 6,111,851,700 | | | | |
| Calc. | | $[U] = R + S + T$    **Enterprise Value as of 11/21/2007** | 46,461,814,366 | | | | |

**Kaczmarek Sources & Notes:**

(1) See Appendix J.3 - Updated - Yukos Income Statement

(2) Interest expense from Appendix J.3 - Updated multiplied by (1-t), where t is equal to the tax rate, found in Appendix J.14 - Updated. Tax is deducted because FCFF should not include the tax benefits associated with interest deductions (the benefit is captured through the use of after-tax cost of debt in the WACC).

(3) Total current assets and total current liabilities from Appendix J.4 - Updated - Yukos Balance Sheet. To estimate current assets and liabilities as of November 21, 2007, we prorate the growth in current assets and liabilities using the portion of the year that has passed (324 of 365 days).

(4) See Appendix J.11 - Updated - Yukos Capital Expenditures

(5) Present value factor calculated as $1 / (1+WACC)^t$, where t = number of years from 11/21/2007 to cash flow date. We assume mid-year (June 30) cash flows in our DCF valuation.

(6) Terminal growth rate represents the perpetual growth rate for Yukos FCFF. Our estimate of 3.5% is based on analyst estimates for Yukos and Rosneft (which is comprised primarily of former Yukos assets). See HSBC. *Yukos: A potential alignment of interests* at p. 19. 25 May 2004. **(NAV – 401)**; Erste Bank.. *Company Report: Yukos* at p. 9. 26 January 2004. **(NAV – 412)**; Smith Barney. *Yukos: A binary issue* at p. 3. 28 April 2004. **(NAV – 173)**; Credit Suisse. *Yukos: Increasing Concerns* at p. 18. 21 December 2004. **(NAV – 402)**; Brunswick UBS Warburg. *Yukos: The "GEM supermajor"* at p. 12. 10 April 2003. **(NAV – 398)**; Morgan Stanley. *Rosneft: All Access* at p. 31. 29 August 2006. **(NAV – 272)**; ABN Amro. *Rosneft: Outcome of Yukos auctions* at p. 18. 5 September 2007. **(NAV – 262)**; HSBC. *Rosneft OAO* at p. 8. 7 December 2007. **(NAV – 273)**; Deutsche UFG. *Rosneft: Blue-Sky's down to Earth* at p. 4. 11 July 2007. **(NAV – 259)**

(7) See Appendix J.15 - Updated - Yukos WACC Calculation

(8) Based on 20% of Sibneft adjusted market capitalization as of 21 November 2007. See Appendix F.4 - Updated.

**JD Sources & Notes:**

[1]   I copy tax-adjusted interest payments from above

[2]   I calculate Change in Net Debt using Mr. Kaczmarek's method from his Appendix J.1 - Updated

[3]   I infer Sibneft dividends as the difference between FCFE and the non-dividend components of FCFE.

[4]   I calculate Free Cash Flow to Equity using Mr. Kaczmarek's method from his Appendix J.1 - Updated. I adjust by a percentage factor to account for Sibneft dividends, equal to the percent of those dividends out of FCFE for the prior 3 years. See Appendix J.1

A-4

**B.    ANNEX A2:  YUKOS COMPANY STRUCTURE
      (extract from Exh. R-3165, referred to in note 2413 of the Award)**



**C.   TABLES T1–T9 SHOWING THE TRIBUNAL'S DAMAGES CALCULATIONS**

**1.   Table T1:  Calculation of Total Damages of Claimants as of 19 December 2004 (Date of Expropriation) vs. 30 June 2014 (Date of Award for Valuation Purposes)**

| 19  December  2004 | |
| --- | --- |
| **Damages component** | **Amount** *(in USD)* |
| Yukos Equity Value | 21,175,832,823 |
| Dividends to end of 2004 | 2,417,808,219 |
| *Sum of Equity Value and Dividends* | *23,593,641,042* |
| Interest through 30 June 2014 | 7,596,090,702 |
| **Total** | **31,189,731,744** |

| | **Outstanding Shares** | **% of Outstanding Shares** | **Damages** *(in USD)* |
| --- | --- | --- | --- |
| **Yukos Total** | 1,934,964,578 | 100.00 | **31,189,731,744** |
| Claimant Hulley | 1,090,043,968 | 56.33405 | 17,570,439,964 |
| Claimant YUL | 50,340,995 | 2.60165 | 811,447,480 |
| Claimant VPL | 223,699,175 | 11.56089 | 3,605,811,362 |
| **Claimants Total** | 1,364,084,138 | 70.49659 | **21,987,698,805** |

| 30  June  2014 | |
| --- | --- |
| **Damages component** | **Amount** *(in USD)* |
| Yukos Equity Value | 42,625,343,615 |
| Dividends and interest (through 30 June 2014) | 51,981,340,000 |
| **Total** | **94,606,683,615** |

| | **Outstanding Shares** | **% of Outstanding Shares** | **Damages** *(in USD)* |
| --- | --- | --- | --- |
| **Yukos Total** | 1,934,964,578 | 100.00 | **94,606,683,615** |
| Claimant Hulley | 1,090,043,968 | 56.33405 | 53,295,779,147 |
| Claimant YUL | 50,340,995 | 2.60165 | 2,461,334,249 |
| Claimant VPL | 223,699,175 | 11.56089 | 10,937,377,001 |
| **Claimants Total** | 1,364,084,138 | 70.49659 | **66,694,490,398** |

| Damages After 25% Reduction | |
| --- | --- |
| Claimant Hulley | 39,971,834,360 |
| Claimant YUL | 1,846,000,687 |
| Claimant VPL | 8,203,032,751 |
| **Claimants Total** | **50,020,867,798** |

Note: Claimants' shareholdings and total number of Outstanding Shares taken from Appendix C.5.b to First Kaczmarek Report

**2.    Table T2:  Equity Value of Yukos Based on Adjustments Made by Professor Dow to Mr. Kaczmarek's Comparable Companies Calculations and the Evolution of the RTS Oil & Gas Index**

| Valuation Date | RTS Oil & Gas Index | Ratio between RTS Index at given date and 21 November 2007 | Value of Yukos *(in USD)* |
|---|---|---|---|
| **19 December 2004** | 92.85 | 0.346713966 | 21,175,832,823 |
| **21 November 2007** | 267.8 | 1 | 61,075,800,000 |
| **30 June 2014** | 186.90* | 0.697908887 | 42,625,343,615 |

| * RTS Oil & Gas Index value corresponding to average of values over first 5 months in 2014, *see* **Table T8** |
|---|

3.    **Table T3:  Calculation of Dividends and Interest up to Valuation Date for Valuation as of 30 June 2014**

| Year | Kaczmarek FCFtE figure | Dow-adjusted Kaczmarek FCFtE figure | Tribunal's FCFtE figure | Interest to 30 June 2014 | Total |
|---|---|---|---|---|---|
| **2004** | 3,645,331,570 | 3,218,376,817 | 2,500,000,000 | 804,887,500 | 3,304,887,500 |
| **2005** | 4,796,449,237 | 4,489,360,593 | 3,500,000,000 | 1,008,227,500 | 4,508,227,500 |
| **2006** | 4,676,741,445 | 4,396,018,793 | 3,500,000,000 | 889,612,500 | 4,389,612,500 |
| **2007** | 8,484,005,345 | 7,670,054,341 | 6,000,000,000 | 1,321,710,000 | 7,321,710,000 |
| **2008** | 7,818,745,258 | 6,749,310,837 | 6,000,000,000 | 1,118,370,000 | 7,118,370,000 |
| **2009** | 7,642,393,629 | 5,462,900,795 | 5,000,000,000 | 762,525,000 | 5,762,525,000 |
| **2010** | 4,254,461,116 | 4,841,849,986 | 3,500,000,000 | 415,152,500 | 3,915,152,500 |
| **2011** | 6,285,189,113 | 4,282,802,054 | 4,000,000,000 | 338,900,000 | 4,338,900,000 |
| **2012** | 8,395,083,921 | 3,724,462,548 | 5,000,000,000 | 254,175,000 | 5,254,175,000 |
| **2013** | 7,627,873,208 | 3,147,630,465 | 4,000,000,000 | 67,780,000 | 4,067,780,000 |
| **2014** (to 30 June) | 3,586,359,907 | 1,309,884,871 | 2,000,000,000 | 0 | 2,000,000,000 |
| **Sum** | 67,212,633,749 | 49,292,652,101 | 45,000,000,000 | 6,981,340,000 | **51,981,340,000** |

Notes:
- Kaczmarek figures for 2004 to 2011 taken from Second Kaczmarek Report, Appendix AJ.1.
- Kaczmarek figures for 2012 to 2014 calculated as follows:
Free cash flow to equity (FCFTE) = Free cash flow to the firm - Tax-adjusted interest payments + Change in net debt + 20% of Sibneft dividends, see Appendix AJ.1 to Second Kaczmarek Report.
- Dow-adjusted Kaczmarek figures calculated with excel version of Appendix 1 to Second Dow Report (taking into account all of Dow's corrections).
- Interest has been applied in line with the factors stated in Table T7.

**4.    Table T4:  FCFtE for Years 2012–2014
        (Based on Mr. Kaczmarek's Figures)**

|  | *Free cash flow to the firm* | *Total adjustment as calculated in Table T5* | *Adjusted result* |
|---|---|---|---|
| 2012 | 8,650,212,831 | -255,128,910 | 8,395,083,921 |
| 2013 | 7,838,948,724 | -211,075,516 | 7,627,873,208 |
| 2014 | 7,330,053,779 | -157,333,965 | 7,172,719,814 |

Notes:
- Free cash flow to the firm figures taken from Appendix AJ.2 to Second Kaczmarek Report.
- Total adjustment calculated in Table T5.

5. **Table T5:  Total Adjustment of Free Cash Flow to the Firm
(Required to Obtain FCFtE value for Years 2012–2014 for Mr. Kaczmarek)**

|  | Tax-adjusted interest payments (subtracted) | Change in net debt | 20% of Sibneft dividends | Total adjustment |
|---|---|---|---|---|
| 2012 | -381,230,527 | -19,498,383 | 145,600,000 | -255,128,910 |
| 2013 | -375,218,163 | 18,542,647 | 145,600,000 | -211,075,516 |
| 2014 | -373,949,497 | 71,015,532 | 145,600,000 | -157,333,965 |

Notes:
- Total adjustment formula taken from Appendix AJ.1 to Second Kaczmarek Report.
- Figures for tax-adjusted interest payments taken from Appendix AJ.2 to Second Kaczmarek Report.
- Change in net debt calculated in Table T6.
- For Sibneft dividends for years 2012 to 2014, it has been assumed that these were equal to the dividends paid in 2010, the last year for which Claimants have provided annual figures (the 2011 figures were based on annualized third quarter figures, see note (6) to Appendix AJ.1 to the Second Kaczmarek Report).

6.      Table T6:  Change in Net Debt for Years 2012–2014

| | Change in net debt | | |
|---|---|---|---|
| | **2012** | **2013** | **2014** |
| Long-term debt Y | 7,000,000,000 | 6,965,681,451 | 6,952,780,045 |
| Short-term debt Y | 597,731,821 | 594,801,351 | 593,699,697 |
| | | | |
| Long-term debt Y-1 | 7,189,462,610 | 7,000,000,000 | 6,965,681,451 |
| Short-term debt Y-1 | 613,910,083 | 597,731,821 | 594,801,351 |
| Difference between Sum of Long-term and Short-term debt for Y and Y-1 | -205,640,872 | -37,249,019 | -14,003,060 |
| | | | |
| Cash Y | 2,468,733,701 | 2,412,942,035 | 2,327,923,443 |
| Cash Y-1 | 2,654,876,190 | 2,468,733,701 | 2,412,942,035 |
| Difference Cash Y and Cash Y-1 | -186,142,489 | -55,791,666 | -85,018,592 |
| Difference 1 minus Difference 2 | -19,498,383 | 18,542,647 | 71,015,532 |

Note:
- Formula for change in net debt (as change in long-term debt plus short-term debt, less cash) taken from note (5) to Appendix AJ.1 to Second Kaczmarek Report and Appendix AJ.4 to Second Kaczmarek Report.

**7.    Table T7:  Interest Factors Based on Annual Rate of 3.389 percent (see Table T9)**

|       | Interest Factors |
|-------|------------------|
| 0.5Y  | 0.01695 |
| 1Y    | 0.03389 |
| 1.5Y  | 0.05084 |
| 2.5Y  | 0.08473 |
| 3.5Y  | 0.11862 |
| 4.5Y  | 0.15251 |
| 5.5Y  | 0.18640 |
| 6.5Y  | 0.22029 |
| 7.5Y  | 0.25418 |
| 8.5Y  | 0.28807 |
| 9.5Y  | 0.32196 |

8.    **Table T8:  RTS Oil and Gas Index Values from 1 January to 24 June 2014**

| Date | Value |
|---|---|
| 24.06.2014 | 212.32 |
| 23.06.2014 | 204.45 |
| 20.06.2014 | 202.34 |
| 19.06.2014 | 204.35 |
| 18.06.2014 | 204.70 |
| 17.06.2014 | 201.10 |
| 16.06.2014 | 202.16 |
| 11.06.2014 | 201.74 |
| 10.06.2014 | 200.20 |
| 09.06.2014 | 198.74 |
| 06.06.2014 | 198.02 |
| 05.06.2014 | 193.64 |
| 04.06.2014 | 191.37 |
| 03.06.2014 | 191.84 |
| 02.06.2014 | 192.09 |
| 30.05.2014 | 187.51 |
| 29.05.2014 | 191.62 |
| 28.05.2014 | 190.06 |
| 27.05.2014 | 190.95 |
| 26.05.2014 | 197.69 |
| 23.05.2014 | 196.70 |
| 22.05.2014 | 195.66 |
| 21.05.2014 | 196.28 |
| 20.05.2014 | 193.19 |
| 19.05.2014 | 191.71 |
| 16.05.2014 | 188.03 |
| 15.05.2014 | 186.38 |
| 14.05.2014 | 187.74 |
| 13.05.2014 | 186.26 |
| 12.05.2014 | 184.38 |
| 08.05.2014 | 184.14 |
| 07.05.2014 | 184.98 |
| 06.05.2014 | 177.49 |
| 05.05.2014 | 173.50 |
| 02.05.2014 | 174.25 |
| 30.04.2014 | 175.39 |
| 29.04.2014 | 175.77 |
| 28.04.2014 | 173.16 |
| 25.04.2014 | 170.99 |
| 24.04.2014 | 173.90 |
| 23.04.2014 | 176.68 |

| Date | Value |
|------|-------|
| 22.04.2014 | 177.43 |
| 21.04.2014 | 178.37 |
| 18.04.2014 | 179.98 |
| 17.04.2014 | 175.73 |
| 16.04.2014 | 173.51 |
| 15.04.2014 | 172.15 |
| 14.04.2014 | 176.96 |
| 11.04.2014 | 179.60 |
| 10.04.2014 | 181.58 |
| 09.04.2014 | 177.85 |
| 08.04.2014 | 177.96 |
| 07.04.2014 | 176.97 |
| 04.04.2014 | 181.85 |
| 03.04.2014 | 178.37 |
| 02.04.2014 | 179.82 |
| 01.04.2014 | 181.96 |
| 31.03.2014 | 181.08 |
| 28.03.2014 | 175.42 |
| 27.03.2014 | 175.17 |
| 26.03.2014 | 177.70 |
| 25.03.2014 | 172.92 |
| 24.03.2014 | 167.71 |
| 21.03.2014 | 169.63 |
| 20.03.2014 | 172.14 |
| 19.03.2014 | 172.44 |
| 18.03.2014 | 172.97 |
| 17.03.2014 | 168.16 |
| 14.03.2014 | 162.30 |
| 13.03.2014 | 165.81 |
| 12.03.2014 | 168.25 |
| 11.03.2014 | 171.47 |
| 07.03.2014 | 174.78 |
| 06.03.2014 | 175.04 |
| 05.03.2014 | 177.77 |
| 04.03.2014 | 178.02 |
| 03.03.2014 | 169.50 |
| 28.02.2014 | 186.96 |
| 27.02.2014 | 186.38 |
| 26.02.2014 | 189.54 |
| 25.02.2014 | 191.17 |
| 24.02.2014 | 192.46 |
| 21.02.2014 | 191.80 |
| 20.02.2014 | 190.39 |
| 19.02.2014 | 190.63 |

| Date | Value |
|---|---|
| 18.02.2014 | 195.14 |
| 17.02.2014 | 195.39 |
| 14.02.2014 | 195.31 |
| 13.02.2014 | 192.39 |
| 12.02.2014 | 196.54 |
| 11.02.2014 | 194.62 |
| 10.02.2014 | 193.61 |
| 07.02.2014 | 193.33 |
| 06.02.2014 | 191.41 |
| 05.02.2014 | 189.33 |
| 04.02.2014 | 186.14 |
| 03.02.2014 | 186.13 |
| 31.01.2014 | 188.71 |
| 30.01.2014 | 192.36 |
| 29.01.2014 | 189.39 |
| 28.01.2014 | 192.63 |
| 27.01.2014 | 195.94 |
| 24.01.2014 | 196.68 |
| 23.01.2014 | 199.51 |
| 22.01.2014 | 200.07 |
| 21.01.2014 | 200.13 |
| 20.01.2014 | 199.53 |
| 17.01.2014 | 199.45 |
| 16.01.2014 | 199.19 |
| 15.01.2014 | 200.58 |
| 14.01.2014 | 199.51 |
| 13.01.2014 | 200.84 |
| 10.01.2014 | 199.89 |
| 09.01.2014 | 198.47 |
| 08.01.2014 | 198.14 |
| 06.01.2014 | 198.55 |
|  |  |
| Sum | 21680.08 |
| **Average** | 186.90 |

9.    **Table T9:  10-Year U.S. Sovereign Bond Rate 2005–2014**

| Date | Value |
|------|-------|
| 2005-01 | 4.22 |
| 2005-02 | 4.17 |
| 2005-03 | 4.50 |
| 2005-04 | 4.34 |
| 2005-05 | 4.14 |
| 2005-06 | 4.00 |
| 2005-07 | 4.18 |
| 2005-08 | 4.26 |
| 2005-09 | 4.20 |
| 2005-10 | 4.46 |
| 2005-11 | 4.54 |
| 2005-12 | 4.47 |
| 2006-01 | 4.42 |
| 2006-02 | 4.57 |
| 2006-03 | 4.72 |
| 2006-04 | 4.99 |
| 2006-05 | 5.11 |
| 2006-06 | 5.11 |
| 2006-07 | 5.09 |
| 2006-08 | 4.88 |
| 2006-09 | 4.72 |
| 2006-10 | 4.73 |
| 2006-11 | 4.60 |
| 2006-12 | 4.56 |
| 2007-01 | 4.76 |
| 2007-02 | 4.72 |
| 2007-03 | 4.56 |
| 2007-04 | 4.69 |
| 2007-05 | 4.75 |
| 2007-06 | 5.10 |
| 2007-07 | 5.00 |
| 2007-08 | 4.67 |
| 2007-09 | 4.52 |
| 2007-10 | 4.53 |
| 2007-11 | 4.15 |
| 2007-12 | 4.10 |
| 2008-01 | 3.74 |
| 2008-02 | 3.74 |
| 2008-03 | 3.51 |
| 2008-04 | 3.68 |
| 2008-05 | 3.88 |

| Date | Value |
|---|---|
| 2008-06 | 4.10 |
| 2008-07 | 4.01 |
| 2008-08 | 3.89 |
| 2008-09 | 3.69 |
| 2008-10 | 3.81 |
| 2008-11 | 3.53 |
| 2008-12 | 2.42 |
| 2009-01 | 2.52 |
| 2009-02 | 2.87 |
| 2009-03 | 2.82 |
| 2009-04 | 2.93 |
| 2009-05 | 3.29 |
| 2009-06 | 3.72 |
| 2009-07 | 3.56 |
| 2009-08 | 3.59 |
| 2009-09 | 3.40 |
| 2009-10 | 3.39 |
| 2009-11 | 3.40 |
| 2009-12 | 3.59 |
| 2010-01 | 3.73 |
| 2010-02 | 3.69 |
| 2010-03 | 3.73 |
| 2010-04 | 3.85 |
| 2010-05 | 3.42 |
| 2010-06 | 3.20 |
| 2010-07 | 3.01 |
| 2010-08 | 2.70 |
| 2010-09 | 2.65 |
| 2010-10 | 2.54 |
| 2010-11 | 2.76 |
| 2010-12 | 3.29 |
| 2011-01 | 3.39 |
| 2011-02 | 3.58 |
| 2011-03 | 3.41 |
| 2011-04 | 3.46 |
| 2011-05 | 3.17 |
| 2011-06 | 3.00 |
| 2011-07 | 3.00 |
| 2011-08 | 2.30 |
| 2011-09 | 1.98 |
| 2011-10 | 2.15 |
| 2011-11 | 2.01 |
| 2011-12 | 1.98 |
| 2012-01 | 1.97 |

| Date | Value |
|---|---|
| 2012-02 | 1.97 |
| 2012-03 | 2.17 |
| 2012-04 | 2.05 |
| 2012-05 | 1.80 |
| 2012-06 | 1.62 |
| 2012-07 | 1.53 |
| 2012-08 | 1.68 |
| 2012-09 | 1.72 |
| 2012-10 | 1.75 |
| 2012-11 | 1.65 |
| 2012-12 | 1.72 |
| 2013-01 | 1.91 |
| 2013-02 | 1.98 |
| 2013-03 | 1.96 |
| 2013-04 | 1.76 |
| 2013-05 | 1.93 |
| 2013-06 | 2.30 |
| 2013-07 | 2.58 |
| 2013-08 | 2.74 |
| 2013-09 | 2.81 |
| 2013-10 | 2.62 |
| 2013-11 | 2.72 |
| 2013-12 | 2.90 |
| 2014-01 | 2.86 |
| 2014-02 | 2.71 |
| 2014-03 | 2.72 |
| 2014-04 | 2.71 |
| 2014-05 | 2.56 |
| Sum | 383.01 |
| **Average** | **3.389** |

Note:
- Ten-year US treasury constant maturities, according to
*http://www.federalreserve.gov/releases/h15/data.htm*

# Exhibit 2(b)



COUR PERMANENTE D'ARBITRAGE      PERMANENT COURT OF ARBITRATION

## CERTIFICATION OF COPY OF
## FINAL AWARD DATED 18 JULY 2014

RE:      **PCA CASE N° AA 227**
         **YUKOS UNIVERSAL LIMITED (ISLE OF MAN) v. THE RUSSIAN FEDERATION**

I, Judith Alexandra Levine, Senior Legal Counsel of the Permanent Court of Arbitration ("PCA") and Assistant Secretary to the Arbitral Tribunal in the above-referenced matter conducted under the auspices of the PCA pursuant to the 1994 Energy Charter Treaty and the 1976 Arbitration Rules of the United Nations Commission on International Trade Law, hereby CERTIFY that the document annexed hereto (Final Award dated 18 July 2014) is a true and authentic copy of the original document of which it purports to be a copy. I have carefully compared the said copy with the said original and found the same to agree therewith.

Signed, this ......4th...... day of ...November..... 2014, at ....The Hague.......

Judith Levine
Senior Legal Counsel
Permanent Court of Arbitration
Peace Palace
Carnegieplein 2
2517 KJ The Hague
The Netherlands

COUR PERMANENTE D'ARBITRAGE     PERMANENT COURT OF ARBITRATION
Palais de la Paix, Carnegieplein 2, 2517 KJ La Haye, Pays-Bas     Peace Palace, Carnegieplein 2, 2517 KJ The Hague, The Netherlands
Téléphone: + 31 70 302 4165, Télécopie: + 31 70 302 4167     Telephone: + 31 70 302 4165, Facsimile: + 31 70 302 4167
Courriel: bureau@pca-cpa.org     E-mail: bureau@pca-cpa.org

PCA Case No. AA 227

# IN THE MATTER OF AN ARBITRATION BEFORE A TRIBUNAL CONSTITUTED IN ACCORDANCE WITH ARTICLE 26 OF THE ENERGY CHARTER TREATY AND THE 1976 UNCITRAL ARBITRATION RULES

- between -

## YUKOS UNIVERSAL LIMITED (ISLE OF MAN)

- and -

## THE RUSSIAN FEDERATION

---

## FINAL AWARD

---

### 18 July 2014

*Tribunal*
The Hon. L. Yves Fortier PC CC OQ QC, Chairman
Dr. Charles Poncet
Judge Stephen M. Schwebel

Mr. Martin J. Valasek, Assistant to the Tribunal
Mr. Brooks W. Daly, Secretary to the Tribunal
Ms. Judith Levine, Assistant Secretary to the Tribunal

*Registry*
Permanent Court of Arbitration



*Representing Claimant*:

Professor Emmanuel Gaillard
Dr. Yas Banifatemi
Ms. Jennifer Younan
SHEARMAN & STERLING LLP

*Representing Respondent*:

Dr. Claudia Annacker
Mr. Lawrence B. Friedman
Mr. David G. Sabel
Mr. Matthew D. Slater
Mr. William B. McGurn
Mr. J. Cameron Murphy
CLEARY GOTTLIEB STEEN & HAMILTON LLP

Mr. Michael S. Goldberg
Mr. Jay L. Alexander
Dr. Johannes Koepp
Mr. Alejandro A. Escobar
BAKER BOTTS LLP

**TABLE OF CONTENTS**

LIST OF DEFINED TERMS..................................................................................................... xiii

INTRODUCTION .................................................................................................................. 1

I.    PROCEDURAL HISTORY .......................................................................................... 2

    A.    COMMENCEMENT OF THE ARBITRATION ............................................................ 2

    B.    CONSTITUTION OF THE TRIBUNAL ..................................................................... 3

    C.    PRELIMINARY PHASE ON JURISDICTION AND ADMISSIBILITY ............................ 4

    D.    BIFURCATION AND OTHER SCHEDULING MATTERS.............................................. 5

    E.    DOCUMENT PRODUCTION AND CONFIDENTIALITY .............................................. 6

    F.    HEARING ON THE MERITS ................................................................................... 8

    G.    POST-HEARING PROCEDURES ........................................................................... 11

II.   FACTUAL BACKGROUND ...................................................................................... 12

    A.    THE PARTIES TO THESE PROCEEDINGS ........................................................... 13

        1.    Claimants and Related Entities .......................................................... 13

        2.    Respondent ........................................................................................ 13

    B.    OAO YUKOS OIL COMPANY ........................................................................... 13

    C.    THE RUSSIAN LOW-TAX REGION PROGRAM ................................................... 14

    D.    CRIMINAL PROCEEDINGS ................................................................................. 16

    E.    ADDITIONAL MEASURES .................................................................................. 17

        1.    Alleged Frustration of Merger Between Yukos and Sibneft.......................... 18

        2.    Tax Reassessments for Years 2000–2004.................................................. 18

        3.    Auction of YNG.................................................................................... 19

        4.    Bankruptcy Proceedings ...................................................................... 20

        5.    Withdrawal of PwC's Audits ............................................................... 20

III.  PARTIES' WRITTEN SUBMISSIONS ........................................................................ 20

    A.    CLAIMANTS' SKELETON ARGUMENTS.............................................................. 21

    B.    RESPONDENT'S SKELETON ARGUMENTS .......................................................... 34

IV.   PARTIES' REQUESTS FOR RELIEF .......................................................................... 48

    A.    RELIEF REQUESTED BY CLAIMANTS ................................................................ 48

    B.    RELIEF REQUESTED BY RESPONDENT................................................................ 48

V.   APPLICABLE LAW ................................................................................................. 49

    A.   PROCEDURAL LAW ................................................................................... 49

    B.   SUBSTANTIVE LAW .................................................................................. 49

        1.   Energy Charter Treaty ...................................................... 49

        2.   Vienna Convention on the Law of Treaties ..................... 53

VI.   SUMMARY OF WITNESS TESTIMONY ............................................................ 54

    A.   CLAIMANTS' WITNESSES ........................................................................ 55

        1.   Mr. Jacques Kosciusko-Morizet ...................................... 55

        2.   Mr. Vladimir Dubov ........................................................ 57

        3.   Mr. Frank Rieger ............................................................. 59

        4.   Dr. Andrei Illarionov ....................................................... 61

        5.   Mr. Leonid Nevzlin .......................................................... 64

        6.   Mr. Bruce Misamore ........................................................ 67

        7.   Mr. Steven Theede ........................................................... 69

        8.   Mr. Brent Kaczmarek ...................................................... 72

        9.   Mr. Philip Baker QC ........................................................ 73

        10.   Mr. Yuri Schmidt ............................................................ 74

        11.   Dr. Sergei Kovalev .......................................................... 75

    B.   RESPONDENT'S WITNESSES .................................................................... 76

        1.   Professor James Dow ....................................................... 76

        2.   Mr. Oleg Y. Konnov ........................................................ 78

        3.   Professor Reinier Kraakman ........................................... 81

        4.   Professor H. David Rosenbloom ..................................... 83

        5.   Professor Thomas Z. Lys ................................................. 85

        6.   Ms. Felicity Cullen QC .................................................... 87

        7.   Mr. Dale Hart .................................................................. 88

        8.   Mr. Polyvios Polyviou ..................................................... 89

        9.   Mr. John Ellison .............................................................. 90

        10.   Mr. Raymond Gross ........................................................ 91

        11.   Professor Dr. Albert Jan van den Berg ........................... 93

12.  Professor Stef van Weeghel ................................................................. 94

C.  THE SO-CALLED "EMPTY CHAIRS" ........................................................... 95

1.  Individuals that Claimants Wished were Available for Examination ........................... 96

2.  Individuals that Respondent Wished were Available for Examination ......................... 97

VII.  ISSUES FOR ANALYSIS .................................................................................. 98

VIII.  ANALYSIS OF THE EVIDENTIARY RECORD ............................................................ 102

A.  THE TAX OPTIMIZATION SCHEME ............................................................ 102

1.  Introduction ................................................................................ 102

2.  The Structure of the Tax Optimization Scheme .............................................. 103

3.  The Legal Framework of the Tax Optimization Scheme ...................................... 105

(a)  The Low-Tax Region Program ....................................................... 105

(b)  Anti-Abuse Decisions and Doctrines Promulgated by Russia's Federal
Courts .......................................................................... 107

4.  The History of the Yukos Trading Entities before 2003 ...................................... 125

(a)  Mordovia ........................................................................ 125

(b)  Kalmykia ........................................................................ 138

(c)  Lesnoy and Trekhgorny ............................................................ 140

(d)  Sarov ........................................................................... 158

(e)  Baikonur ........................................................................ 159

(f)  Evenkia ......................................................................... 160

5.  Tribunal's Observations ..................................................................... 164

B.  THE TAX ASSESSMENTS STARTING IN DECEMBER 2003 ........................................ 170

1.  Introduction ................................................................................ 170

2.  Chronology of the Tax Assessments and Related Decisions .................................. 174

(a)  The 2000 Decision ................................................................ 175

(b)  The 2001 Decision ................................................................ 183

(c)  The 2002 Decision ................................................................ 186

(d)  The 2003 Decision ................................................................ 189

(e)  The 2004 Decision ................................................................ 191

(f)  Observation ...................................................................... 192

3.  The Taxes Assessed Against Yukos ......................................................... 192

|  |  | (a) | Profit Tax and Other Revenue-based Taxes | 192 |
|  |  | (b) | VAT | 198 |
|  | 4. | The Fines Assessed Against Yukos | | 201 |
|  | 5. | Parties' Arguments and Tribunal's Observations | | 203 |
|  |  | (a) | Profit Tax and Other Revenue-Based Taxes | 204 |
|  |  | (b) | VAT | 219 |
|  |  | (c) | Fines | 239 |
|  |  | (d) | Concluding Observations | 255 |
| C. | HARASSMENT, INTIMIDATION AND ARRESTS | | | 257 |
|  | 1. | Introduction | | 257 |
|  | 2. | Chronology of Facts | | 258 |
|  |  | (a) | Yukos Grows; Mr. Khodorkovsky Becomes More Politically Engaged; Yukos Leaders Receive Warnings | 258 |
|  |  | (b) | Prosecutor General Launches Investigations Involving Searches and Seizures | 260 |
|  |  | (c) | Arrest and Trial of Mr. Khodorkovsky; Flight from Russia of His Associates | 263 |
|  |  | (d) | Complaints of Further Harassment and Intimidation of Yukos Executives, Employees, Lawyers and External Advisers | 265 |
|  |  | (e) | Second Trial of Mr. Khodorkovsky; Allegations of Continuing Harassment and Intimidation | 269 |
|  | 3. | Parties' Arguments and Tribunal's Observations | | 270 |
|  |  | (a) | Are Claimants' Allegations about a Campaign of Harassment Credible? | 271 |
|  |  | (b) | Were the Actions of the Russian Federation Justified as Legitimate Law Enforcement Measures? | 274 |
|  |  | (c) | Did the Events Complained of Impact Claimants' Investments or was Yukos Able to Carry on Unaffected? | 276 |
| D. | THE UNWINDING OF THE YUKOS–SIBNEFT MERGER | | | 279 |
|  | 1. | Introduction | | 279 |
|  | 2. | Chronology | | 281 |
|  |  | (a) | Merger is Announced; NYSE Listing is Put on Hold; Steps are Taken to Complete Merger | 281 |
|  |  | (b) | Mr. Khodorkovsky is Arrested; Yukos Continues with Merger; Sibneft has Second Thoughts | 283 |

(c) Russian Courts Invalidate the Share Exchange Agreement ............................... 285

(d) Russian Federation Ultimately Acquires Sibneft via Gazprom......................... 287

3. Parties' Arguments and Tribunal's Observations ........................................ 287

(a) Was Yukos' NYSE Listing Put on Hold Because of the Yukos−Sibneft Merger or Fears of Exposing Yukos' Tax Optimization Scheme? ................... 287

(b) Was the 2003 Interim Dividend a Component of the Yukos−Sibneft Merger or a Means to Siphon Funds out of Russia? .......................................... 289

(c) Was the Unwinding of the Merger Caused by the Russian Federation?........... 292

E. ATTEMPTS TO SETTLE......................................................................................... 298

1. Introduction................................................................................................... 298

2. Yukos' Settlement Offers (and the Russian Federation's Replies)............................. 300

(a) Proposals Made to the Bailiffs ........................................................... 302

(b) Proposals for a Global Settlement Conveyed by Mr. Chrétien ......................... 304

(c) Requests for a Deferral or Payment in Instalments ............................................. 306

(d) Other Proposals ................................................................................. 307

3. Parties' Arguments and Tribunal's Observations ........................................ 308

(a) Did Yukos Contribute to its Own Demise by Failing to Discharge Tax Debt in the Amount of USD 9 Billion in the First Quarter of 2004? ................ 308

(b) Did Yukos' Settlement Offers Constitute Real Alternatives to Enforcement? ................................................................................. 312

F. THE AUCTION OF YNG ....................................................................................... 322

1. Introduction................................................................................................... 322

2. Chronology ................................................................................................... 324

(a) Yukos' Shares in YNG are Seized and the Government Announces they will be Sold; Yukos Brings Unsuccessful Court Challenges ........................... 325

(b) YNG is Valued for Auction while its Tax Liabilities Rapidly Escalate............. 325

(c) Yukos Tries to Prevent the Auction; Preparations Proceed; an Entity Named Baikal is Created to Purchase YNG...................................................... 327

(d) After a 10-Minute Auction, the Successful Bidder Baikal is Sold to State-Owned Rosneft; a "Monumental Bargain"; the "State, Looking After its Own Interests"................................................................................. 329

(e) Once it is State-Owned, YNG's Fate Improves, with Reductions in Tax Liabilities and a Dramatic Increase in Value ....................................................... 330

3. Parties' Arguments and Tribunal's Observations ........................................ 331

      (a)   Did the Auction Price Reflect the True Value of YNG; If not, was Either Party Responsible for the Price Reduction? ........................................ 332

      (b)   Who was Behind Baikal and were They a Front for the Russian State? ........... 336

      (c)   What were Yukos' Prospects for Survival Once it Lost its Core Asset? ........... 340

  G.   THE BANKRUPTCY OF YUKOS ........................................................................ 342

    1.   Introduction ................................................................................................ 342

    2.   Chronology ................................................................................................. 343

      (a)   The Initiation of the Bankruptcy ....................................................... 343

      (b)   The Treatment of Bankruptcy Claims; the Creditors' Meeting; the Declaration of Yukos' Bankruptcy ..................................................... 349

      (c)   The Liquidation of Yukos' Remaining Assets ................................... 352

    3.   Parties' Arguments and Tribunal's Observations ........................................ 355

      (a)   Why was the Bankruptcy Initiated and Who was Truly Behind It? ................. 356

      (b)   Were the Bankruptcy Proceedings Conducted Properly and Fairly? ................. 368

  H.   THE WITHDRAWAL OF PWC'S AUDIT OPINIONS ......................................... 377

    1.   Introduction ................................................................................................ 377

    2.   Chronology ................................................................................................. 379

      (a)   PwC Serves as Both Auditor and Consultant to Yukos ...................... 379

      (b)   PwC Responds to the Massive Tax Reassessments against Yukos ................... 380

      (c)   PwC Faces Mounting Pressure from the Russian Federation around the Same Time as Mr. Khodorkovsky's Second Trial Starts ................................. 382

      (d)   PwC's "Volte-Face" in Withdrawing the Yukos Audits; Improved Treatment and Continued Pressures in the Russian Federation ........................ 385

    3.   Parties' Arguments and Tribunal's Observations ........................................ 389

      (a)   Did PwC Withdraw its Audits because it was under Pressure from the Russian Government? ........................................................................ 389

      (b)   Were the Grounds Provided by PwC in its Withdrawal Letter Contrived or Credible? ............................................................................................ 391

      (c)   Concluding Observations ................................................................... 399

IX.  PRELIMINARY OBJECTIONS ............................................................................. 401

  A.   ARE ALL OR SOME OF THE CLAIMS BARRED BY THE "FORK-IN-THE-ROAD" PROVISION OF THE ECT? ............................................................................................................. 402

    1.   Introduction ................................................................................................ 402

2.    Parties' Positions ....................................................................... 403

3.    Tribunal's Decision ................................................................... 406

B.    "UNCLEAN HANDS" (DID CLAIMANTS ACT ILLEGALLY SO AS TO DEPRIVE THEM OF PROTECTION UNDER THE ECT?) ................................................... 406

    1.    Introduction .............................................................................. 406

    2.    Claimants' Alleged "Unclean Hands" ...................................... 408

        (a)    Conduct Related to the Acquisition of Yukos and the Subsequent Consolidation of Control over Yukos and its Subsidiaries ............................... 409

        (b)    Conduct Related to the Cyprus-Russia DTA .................................... 412

        (c)    Conduct Related to the Tax Optimization Scheme ............................ 416

        (d)    Actions Taken in Hindrance of the Enforcement of Russia's Tax Claims ......... 416

    3.    Parties' Positions Regarding the Impact of Claimants' Allegedly "Unclean Hands" on this Arbitration ....................................... 418

        (a)    Respondent's Position .................................................... 418

        (b)    Claimants' Position ...................................................... 423

    4.    Tribunal's Decision ................................................................... 428

        (a)    Can a Clean Hands Principle or Legality Requirement be Read into the ECT? ................................................. 429

        (b)    Does the "Clean Hands" Doctrine Constitute a "General Principle of Law Recognized by Civilized Nations"? ................ 431

        (c)    Would any Instances of Claimants' Alleged "Bad Faith and Illegal" Conduct be Caught by a Legality Requirement Read into the ECT? ................ 433

        (d)    Conclusion .............................................................. 435

C.    RESPONDENT'S OBJECTIONS UNDER ARTICLE 21 OF THE ECT ........................... 435

    1.    Introduction .............................................................................. 435

    2.    Claimants' Position .................................................................. 437

    3.    Respondent's Position .............................................................. 440

    4.    Tribunal's Decision ................................................................... 446

        (a)    Introduction .............................................................. 446

        (b)    First Reason:  Assuming the Carve-Out Applies, So Does the Claw-Back, and Any Referral to the Competent Tax Authorities Would Clearly have been Futile ........................................ 448

        (c)    Second Reason:  The Carve-Out Does Not Apply ............................ 453

        (d)    Conclusion .............................................................. 457

X.   LIABILITY .................................................................................................. 457

    A.   ATTRIBUTION ..................................................................................... 458

        1.   Claimants' Position ..................................................................... 458

        2.   Respondent's Position ................................................................. 460

        3.   Tribunal's Decision on Attribution ............................................ 462

    B.   ARTICLE 10 OF THE ECT ..................................................................... 467

        1.   Introduction ................................................................................ 467

        2.   Applicable Legal Standards under Article 10(1) of the ECT ..... 468

            (a)   Claimants' Position ......................................................... 468

            (b)   Respondent's Position ..................................................... 472

        3.   Did Respondent Accord Claimants' Investments the Standard of Treatment Required by Article 10(1) of the ECT? ..................................... 475

            (a)   Claimants' Position ......................................................... 475

            (b)   Respondent's Position ..................................................... 480

    C.   ARTICLE 13 OF THE ECT ..................................................................... 481

        1.   Introduction ................................................................................ 481

        2.   Applicable Legal Standards under Article 13 of the ECT ......... 482

            (a)   Claimants' Position ......................................................... 482

            (b)   Respondent's Position ..................................................... 485

        3.   Did Respondent's Actions Constitute Expropriation (or "Measures Having Effect Equivalent to Nationalization or Expropriation") within the Meaning of Article 13(1) of the ECT? ....................................... 488

            (a)   Claimants' Position ......................................................... 488

            (b)   Respondent's Position ..................................................... 489

        4.   If Respondent's Actions Constitute Expropriation, Has Respondent Met the Criteria for a Lawful Expropriation under Article 13(1) of the ECT? ....... 492

            (a)   Claimants' Position ......................................................... 492

            (b)   Respondent's Position ..................................................... 493

    D.   TRIBUNAL'S DECISION ON BREACH OF THE ECT .................................. 495

    E.   CONTRIBUTORY FAULT ....................................................................... 500

        1.   Introduction ................................................................................ 500

        2.   Contributory Fault as Applied in Other Cases ........................... 502

|  |  | 3. | Tribunal's Analysis ............................................................................. | 503 |
|  |  |  | (a) | Conduct of Yukos in Some of the Low-Tax Regions ......................... | 503 |
|  |  |  | (b) | Conduct of Yukos under the Cyprus-Russia DTA ............................ | 505 |
|  |  |  | (c) | Conduct of Yukos in Connection with YNG Auction........................ | 506 |
|  |  |  | (d) | Conduct of Yukos in Connection with its Bankruptcy (Non-Payment of the A Loan) ............................................................................................ | 508 |
|  |  | 4. | Tribunal's Decision on Contributory Fault ................................. | 509 |
| XI. | INTEREST ......................................................................................................... | | | 510 |
|  | A. | CLAIMANTS' POSITION .......................................................................... | | 510 |
|  | B. | RESPONDENT'S POSITION ....................................................................... | | 512 |
|  | C. | THE LEGAL FRAMEWORK ....................................................................... | | 513 |
|  |  | 1. | Energy Charter Treaty ............................................................... | 513 |
|  |  | 2. | ILC Articles on State Responsibility ........................................ | 514 |
|  |  | 3. | *RosInvestCo* and *Quasar* ...................................................... | 514 |
|  |  | 4. | Treatises ...................................................................................... | 514 |
|  |  |  | (a) | General Issues.................................................................................. | 515 |
|  |  |  | (b) | Rate................................................................................................... | 515 |
|  |  |  | (c) | *Dies a quo* ...................................................................................... | 517 |
|  |  |  | (d) | Simple or Compound ...................................................................... | 518 |
|  |  |  | (e) | Post-Award Interest ........................................................................ | 518 |
|  | D. | TRIBUNAL'S DECISION .......................................................................... | | 519 |
| XII. | THE QUANTIFICATION OF CLAIMANTS' DAMAGES ........................................ | | | 522 |
|  | A. | CLAIMANTS' POSITION .......................................................................... | | 522 |
|  |  | 1. | Valuation Date ............................................................................ | 523 |
|  |  | 2. | Causation...................................................................................... | 524 |
|  |  | 3. | Calculations Performed by Claimants and Mr. Kaczmarek ........ | 524 |
|  |  |  | (a) | The "Scenarios" Presented by Claimants ....................................... | 524 |
|  |  |  | (b) | Methodology Used for Calculations Based on Scenarios 1 and 2..... | 526 |
|  |  |  | (c) | Methodology Used for Calculations Based on Scenario 3 ............... | 531 |
|  |  |  | (d) | Methodology Used for Calculations Based on 2012 Valuation Date... | 532 |
|  |  |  | (e) | Summary of Results of Claimants' Calculations............................. | 533 |

4.    Failure of Claimants to Mitigate ................................................................. 533

5.    Windfall and Double-Recovery .................................................................. 534

B.    RESPONDENT'S POSITION ................................................................................... 535

1.    Valuation Date ........................................................................................... 535

2.    Causation.................................................................................................... 536

3.    Specific Aspects of the Calculations Performed by Claimants Criticized by Respondent................................................................................................. 537

    (a)    Credibility of Claimants' DCF Analysis ........................................ 537

    (b)    Claimants' Selection of Comparable Companies for Purposes of the Comparable Companies Analysis ................................................... 538

    (c)    Claimants' Reliance on Comparable Transactions............................ 539

    (d)    Claimants' Calculations of Hypothetical Cash Flows from Dividends.............. 539

    (e)    Claimants' Calculations Based on the Loss of a Chance to Obtain a Listing on the New York Stock Exchange .......................................... 540

    (f)    Claimants' Calculations Based on the Assumption of a Completed Yukos–Sibneft Merger........................................................................ 540

    (g)    Claimants' Scenarios 3a to 3d ....................................................... 540

    (h)    Claimants' Scenario 3e and the Valuation of YNG ........................ 541

    (i)    Claimants' Calculation of Pre-Award Interest .................................. 541

4.    Failure of Claimants to Mitigate ................................................................. 541

5.    Windfall and Double-Recovery .................................................................. 542

C.    TRIBUNAL'S ANALYSIS AND DECISION ............................................................. 543

1.    Valuation Date ........................................................................................... 543

    (a)    The Date of the Expropriation......................................................... 543

    (b)    The Possibility for Claimants to Choose Between a Valuation as of the Date of Expropriation and a Valuation as of the Date of the Award.................. 544

2.    Causation.................................................................................................... 546

    (a)    Causation and Reliance on Multiple Actions ................................... 546

    (b)    Multiple Causes for the Same Damage ........................................... 547

3.    Failure of Claimants to Mitigate ................................................................. 548

4.    The Methodology Followed by the Tribunal ............................................... 548

    (a)    Valuation of Yukos ....................................................................... 550

(b)   Valuation of Lost Dividends ............................................................... 553

5.   Application of the Methodology Followed by the Tribunal ......................................... 560

(a)   Calculations Based on 19 December 2004 Valuation Date .............................. 561

(b)   Calculations Based on 2014 Valuation Date ....................................... 562

(c)   Comparison of the Results Based on the Two Different Valuation Dates ......... 563

6.   Deductions Due to Claimants' Contributory Fault ..................................... 564

7.   Windfall and Double Recovery ...................................................... 564

XIII. COSTS ................................................................................................ 564

   A.   INTRODUCTION ......................................................................... 564

   B.   CLAIMANTS' POSITION ................................................................ 566

       1.   Claimants are Entitled to Recover All Costs Incurred in Connection with these Arbitrations ...................................................... 566

       2.   Claimants' Costs are Reasonable ........................................... 568

       3.   Claimants' Comments on Respondent's Submission on Costs................................ 570

   C.   RESPONDENT'S POSITION .............................................................. 571

       1.   Equal Apportionment is an Appropriate Exercise of the Tribunal's Discretion on Costs.................................................................... 571

       2.   Schedule of "Types of Costs" Incurred by Respondent................................ 572

       3.   Respondent's Comments on Claimants' Submission on Costs................................ 573

   D.   TRIBUNAL'S DECISION ON COSTS....................................................... 574

       1.   Fixing and Allocation of Costs of the Arbitration Pursuant to Article 40(1) of the UNCITRAL Rules .......................................... 574

       2.   Fixing and Allocation of Costs for Legal Representation and Assistance of the Parties Pursuant to Article 40(2) of the UNCITRAL Rules .......................... 575

       3.   Conclusion on the Award of Costs .......................................... 576

XIV. DECISION ........................................................................................ 578

ANNEXES ................................................................................................ A-1

   A.   ANNEX A1:  APPENDIX 1.1, APPENDIX J.1 AND APPENDIX J.2 TO SECOND DOW REPORT (MODIFIED AS DESCRIBED IN NOTE 2401 OF THE AWARD) .................................... A-1

       (a)   Appendix 1.1 ............................................................... A-1

       (b)   Appendix J.1 New ......................................................... A-2

       (c)   Appendix J.2 New ......................................................... A-3

B.    ANNEX A2:  YUKOS COMPANY STRUCTURE  (EXTRACT FROM EXH. R-3165, REFERRED TO IN NOTE 2413 OF THE AWARD) ................................................................. A-5

C.    TABLES T1–T9 SHOWING THE TRIBUNAL'S DAMAGES CALCULATIONS ............................ A-6

    1.    Table T1:  Calculation of Total Damages of Claimants as of 19 December 2004 (Date of Expropriation) vs. 30 June 2014 (Date of Award for Valuation Purposes) ................................................................................................ A-6

    2.    Table T2:  Equity Value of Yukos Based on Adjustments Made by Professor Dow to Mr. Kaczmarek's Comparable Companies Calculations and the Evolution of the RTS Oil & Gas Index ................................................... A-7

    3.    Table T3:  Calculation of Dividends and Interest up to Valuation Date for Valuation as of 30 June 2014 ................................................................ A-8

    4.    Table T4:  FCFtE for Years 2012–2014  (Based on Mr. Kaczmarek's Figures) ......... A-9

    5.    Table T5:  Total Adjustment of Free Cash Flow to the Firm  (Required to Obtain FCFtE value for Years 2012–2014 for Mr. Kaczmarek) .......................................... A-10

    6.    Table T6:  Change in Net Debt for Years 2012–2014 ................................................. A-11

    7.    Table T7:  Interest Factors Based on Annual Rate of 3.389 percent (see Table T9) ....................................................................................................... A-12

    8.    Table T8:  RTS Oil and Gas Index Values from 1 January to 24 June 2014 ............. A-13

    9.    Table T9:  10-Year U.S. Sovereign Bond Rate 2005–2014 ....................................... A-16

## LIST OF DEFINED TERMS

| Term | Definition |
|------|------------|
| **2000 Audit Report** | Field Tax Audit Report No. 08-1/1, dated 29 December 2003, finding that Yukos operated a tax evasion scheme |
| **2000 Decision** | Decision No. 14-3-05/1609-1, dated 14 April 2004, holding Yukos liable for a tax offense and reassessing approximately USD 3.48 billion in taxes against Yukos for the year 2000 |
| **2001 Decision** | Decision No. 30-3-15/3, dated 2 September 2004, holding Yukos liable for a tax offense and reassessing approximately USD 4.1 billion in taxes against Yukos for the year 2001 |
| **2002 Decision** | Decision No. 52/896, dated 16 November 2004, holding Yukos liable for a tax offense and reassessing approximately USD 6.7 billion in taxes against Yukos for the year 2002 |
| **2003 Decision** | Decision No. 52/985, dated 6 December 2004, holding Yukos liable for a tax offense and reassessing approximately USD 6 billion in taxes against Yukos for the year 2003 |
| **2003 Interim Dividend** | Yukos' declaration of a USD 2 billion interim dividend in November 2003 |
| **2004 Decision** | Decision No. 52/292, dated 17 March 2006, holding Yukos liable for a tax offense and reassessing approximately USD 3.9 billion in taxes against Yukos for the year 2004 |
| **ADR** | American Depositary Receipt |
| **A Loan** | USD 1 billion loan entered into on 24 September 2003 by Yukos from the Western Banks and secured by certain of Yukos' oil export contracts and by YNG |
| **April 2004 Injunction** | Ruling by the Moscow Arbitrazh Court dated 15 April 2004 prohibiting Yukos from alienating and encumbering its assets |
| **Baikal** | Baikal Finance Group, the entity which purchased YNG at auction and which was bought by Rosneft |
| **BBS Companies** | Behles Petroleum S.A., Baltic Petroleum Trading Limited and South Petroleum Limited |
| **B Loan** | USD 1.6 billion loan entered into on 30 September 2003 by Yukos from Société Générale S.A. and fully collateralized in cash by GML |

| Term | Definition |
|---|---|
| **Chrétien letters** | Letters from Jean Chrétien to Prime Minister Fradkov, dated 6 and 15 July 2004, and to President Putin, dated 30 July 2004, 10 September 2004 and 17 November 2004 |
| **Claimants** | Hulley, VPL, and YUL |
| **Claimants' Post-Hearing Brief** | Claimants' Post-Hearing Brief, dated 21 December 2012 |
| **Claimants' Skeleton** | Claimants' Skeleton Argument, dated 1 October 2012 |
| **Confidential Sale Agreement** | Confidential sale agreement between the Western Banks and Rosneft dated 13 December 2005 |
| **Counter-Memorial** | Respondent's Counter-Memorial on the Merits, dated 4 April 2011, as corrected 29 July 2011 |
| **Cyprus-Russia DTA** | Agreement Between the Government of the Republic of Cyprus and the Government of the Russian Federation for the Avoidance of Double Taxation with Respect to Taxes on Income and on Capital, signed on 5 December 1998 |
| **DCF** | Discounted Cash Flow |
| **Dresdner** | ZAO Dresdner Bank |
| **Dresdner Summary Letter** | Dresdner Summary Valuation Opinion Letter dated 6 October 2004 |
| **Dresdner Valuation Report** | Dresdner Valuation Report of YNG dated 6 October 2004 |
| **EBITDA** | Earnings before Interest, Taxes, Depreciation and Amortization |
| **ECHR** | European Convention on Human Rights |
| **ECT (or Treaty)** | Energy Charter Treaty, 2080 UNTS 95, signed on 17 December 1994 |
| **ECtHR** | European Court of Human Rights |
| **ECtHR Yukos Judgment** | OAO Neftyanaya Kompaniya Yukos v. Russia, ECtHR, Appl. No. 14902/04, Judgment, 20 September 2011 |
| **EGM** | Extraordinary General Meeting |
| **English Judgment** | BNP Paribas S.A. v. Yukos Oil Company, High Court of England and Wales, Case No. HC 05 C0 12 19, [2005] EWHC 1321 (Ch), Judgment, 24 June 2005 |
| **GML** | GML Limited (formerly named Group Menatep Limited), a company incorporated in Gibraltar and parent company of YUL |

| Term | Definition |
|------|-----------|
| **Final Awards** | Final Awards in these three arbitrations (PCA Case Nos. AA226 (Hulley), AA227 (YUL) and AA228 (VPL)) (including the present Award) |
| **Hearing on the Merits (or Hearing)** | Hearing on the merits held at the Peace Palace in The Hague from 10 October to 9 November 2012 |
| **Hulley** | Hulley Enterprises Limited, a company organized under the laws of Cyprus and Claimant in PCA Case No. AA226, owned by YUL |
| **ICJ** | International Court of Justice |
| **ILC** | International Law Commission of the United Nations |
| **ILC Articles on State Responsibility** | ILC Draft Articles on Responsibility of States for Internationally Wrongful Acts, 2001 |
| **Interim Awards** | Interim Awards on Jurisdiction and Admissibility issued on 30 November 2009 in these three arbitrations (PCA Case Nos. AA226 (Hulley), AA227 (YUL) and AA228 (VPL)) |
| **Law 9-Z** | Law of the Republic of Mordovia No. 9-Z, which is the framework by which Mordovia offered tax benefits to corporate entities operating in the region |
| **Memorial** | Claimants' Memorial on the Merits, dated 15 September 2010 |
| **Moravel** | Moravel Investments Limited |
| **Notices of Arbitration and Statements of Claim** | Claimants' Notices of Arbitration and Statements of Claim by Hulley and YUL, dated 3 February 2005; and by VPL, dated 14 February 2005 |
| **NYSE** | New York Stock Exchange |
| **Oligarchs** | Respondent's style of reference to the individuals who have or had a beneficial interest in the trusts behind Claimants, namely Messrs. Khodorkovsky, Lebedev, Nevzlin, Dubov, Brudno, Shakhnovsky, and Golubovitch |
| **Parties** | Claimants and Respondent |
| **PCA** | Permanent Court of Arbitration |
| **PCIJ** | Permanent Court of International Justice |
| **PwC** | PricewaterhouseCoopers, the former auditor of Yukos |

| **Term** | **Definition** |
|---|---|
| **PwC's Withdrawal Letter** | Letter from PwC to the bankruptcy receiver, Mr. Eduard Rebgun, dated 15 June 2007, by which PwC withdrew its Yukos audits |
| *Quasar* | Quasar de Valores SICAV S.A. et al. v. The Russian Federation, SCC Arbitration, Award, 20 July 2012 |
| **Rehabilitation Plan** | Rehabilitation plan the in context of bankruptcy proceedings proposed by Yukos' management and approved by a majority vote during an EGM on 1 June 2006 |
| **Rejoinder** | Respondent's Rejoinder on the Merits, dated 16 August 2012 |
| **Reply** | Claimants' Reply on the Merits, dated 15 March 2012 |
| **Resolution No. 53** | Resolution of the Plenum of the Supreme Arbitrazh Court No. 53, dated 12 October 2006 |
| **Respondent** | The Russian Federation or Russia |
| **Respondent's Post-Hearing Brief** | Respondent's Post-Hearing Brief, dated 21 December 2012 |
| **Respondent's Skeleton** | Respondent's Skeleton Argument, dated 1 October 2012 |
| *RosInvestCo* | RosInvestCo UK Ltd. v. The Russian Federation, SCC Arbitration V (079/2005), Final Award, 12 September 2010 |
| **Rosneft** | Russian State-owned entity that bought Baikal |
| **Russian Civil Code** | Civil Code of the Russian Federation |
| **Russian Constitution** | Constitution of the Russian Federation |
| **Russian Tax Code** | Tax Code of the Russian Federation |
| **Share Exchange Agreement** | Agreement pursuant to which Yukos would acquire 72 percent (plus one share) of Sibneft shares from Sibneft's principal shareholders in exchange for 26.01 percent of the fully diluted share capital of Yukos |
| **Share Purchase Agreement** | Agreement pursuant to which Yukos would acquire 20 percent (minus one share) of Sibneft shares from Sibneft's principal shareholders for a cash consideration of USD 3 billion |
| **Sibneft** | Russia's fifth largest oil company in 2003 when it agreed to a merger with Yukos |
| **Stichting 1** | Stichting Administratiekantoor Yukos International |

| **Term** | **Definition** |
|---|---|
| **Stichting 2** | Stichting Administratiekantoor Small World Telecommunication Holdings B.V. |
| **Stichtings** | Stichting 1 and Stichting 2 |
| **TRO** | Temporary Restraining Order |
| **UNCITRAL Rules** | Arbitration Rules of the United Nations Commission on International Trade Law, 1976 |
| **U.S. GAAP** | United States' Generally Accepted Accounting Principles |
| **VAT Law** | Law of the Russian Federation governing Value Added Tax |
| **VCLT** | Vienna Convention on the Law of Treaties, 1155 UNTS 331, signed on 23 May 1969 |
| **VPL** | Veteran Petroleum Limited, a company organized under the laws of Cyprus and Claimant in PCA Case No. AA 228 |
| **Western Banks** | Syndicate of Western banks led by Société Générale S.A. and including BNP Paribas S.A., Citibank N.A., Commerzbank Akziengesellschaft, Calyon S.A., Deutsche Bank A.G., Hillside Apex Fund Limited, ING Bank N.V., KBC Bank N.V., Stark Trading, Shepherd Investments International Limited, Thames River Traditional Funds PLC (High Income Fund), UFJ (Holland) N.V. and V.R. Global Partners L.P. |
| **YNG** | Yuganskneftegaz, Yukos' core production subsidiary |
| **Yukos (or OAO Yukos Oil Company)** | OAO Yukos Oil Company, a joint stock company incorporated in Russia in 1993 |
| **Yukos CIS** | Yukos CIS Investment Limited |
| **Yukos Finance** | Yukos Finance B.V. |
| **Yukos International** | Yukos International U.K. B.V. |
| **YUL** | Yukos Universal Limited, a company organized under the laws of the Isle of Man and Claimant in PCA No. AA 227, shareholder of Yukos |
| **ZATO** | Zakrytoe Administrativno-Territorial'noe Obrazovaniye, or Closed Administrative Territorial Unit. |

**INTRODUCTION**

1.  In February 2005, three controlling shareholders of **OAO Yukos Oil Company** (or "**Yukos**")—Hulley Enterprises Limited ("**Hulley**"), a company organized under the laws of Cyprus, Yukos Universal Limited ("**YUL**"), a company organized under the laws of the Isle of Man, and Veteran Petroleum Limited ("**VPL**"), a company organized under the laws of Cyprus (collectively, "**Claimants**")—initiated arbitrations against the **Russian Federation** ("**Respondent**" or "**Russia**"), which together with Claimants constitute the "**Parties**."

2.  The three arbitrations were heard in parallel with the full participation of the Parties at all relevant stages of the proceedings.  Mindful of the fact that each of the three Claimants maintains separate claims in separate arbitrations that require separate awards (the "**Final Awards**"), the Tribunal nevertheless shall discuss these arbitrations as a single set of proceedings, except where circumstances distinct to particular Claimants necessitate separate treatment.

3.  The Final Awards address: (a) those of Respondent's objections to jurisdiction and admissibility that remain to be decided after the Interim Awards on Jurisdiction and Admissibility of 30 November 2009 (the "**Interim Awards**");[1] (b) Claimants' claims on the merits; and (c) quantum.

4.  By any standard, and as will be seen, these have been mammoth arbitrations.  At the highest, Claimants are claiming damages from Respondent of "no less than US$ 114.174 billion."[2] Since February 2005, the Tribunal has held five procedural hearings with the Parties and issued 18 procedural orders.  In the fall of 2008, the Tribunal held a ten-day hearing on jurisdiction and admissibility in The Hague and, in November 2009, issued three Interim Awards, each over 200 pages.  A twenty-one day **Hearing on the Merits** (or "**Hearing**") took place in The Hague from 10 October to 9 November 2012.  The written submissions of the Parties span more than 4,000 pages and the transcripts of the hearings more than 2,700 pages.  Over 8,800 exhibits have been filed with the Tribunal.

---

[1]  *Hulley Enterprises Limited v. The Russian Federation*, PCA Case No. 226, Interim Award on Jurisdiction and Admissibility, 30 November 2009 (hereinafter "Interim Award (Hulley)"); *Yukos Universal Limited v. The Russian Federation*, PCA Case No. 226, Interim Award on Jurisdiction and Admissibility, 30 November 2009 (hereinafter "Interim Award (YUL)"); *Veteran Petroleum Limited v. The Russian Federation*, PCA Case No. 226, Interim Award on Jurisdiction and Admissibility, 30 November 2009 (hereinafter "Interim Award (VPL)").

[2]  Claimants' Reply on the Merits, 15 March 2012 ¶ 1199(3) (hereinafter "Reply").

5.      The facts of this dispute have been the subject of attention in the media for more than a decade, involving as they do, as central actors, Mr. Vladimir Putin, the President of the Russian Federation, and a Russian "oligarch", Mr. Mikhail Khodorkovsky, who, at the outset of the dispute, was the principal shareholder and Chief Executive Officer of Yukos, then the largest oil company in Russia and one of the largest oil companies in the world.

6.      Throughout this lengthy and heavily contested arbitration, in circumstances that were often trying and stressful, counsel for the Parties acted in a highly professional way.  The Tribunal is most grateful for their assistance.  The Tribunal particularly acknowledges the grace and acuity of the participation of Mr. Robert Greig, who was forced by ill health to retire in the midst of the proceedings.

7.      Having studied carefully the voluminous record of these three arbitrations, and having weighed the arguments of the counsel who have so ably represented the Parties, the Tribunal is now ready to deliver its Final Awards.

## I.      PROCEDURAL HISTORY

8.      The Interim Awards recount in detail the procedural history of the arbitrations from their commencement up until the date those Awards were issued.  The Tribunal has also issued 18 procedural orders, each of which contains a relevant procedural history.  In this Part of the Final Award, the Tribunal recalls only the key procedural details from the early phase of the proceedings and summarizes developments since November 2009.

### A.      COMMENCEMENT OF THE ARBITRATION

9.      On 2 November 2004, all three Claimants delivered to the President of Russia notifications of claim with respect to Russia's alleged violation of its obligations under the Energy Charter Treaty ("**ECT**" or "**Treaty**") and sought to settle the disputes amicably pursuant to Article 26(1) of the ECT.[3]

10.     Having failed to settle their disputes amicably within the three-month period prescribed under Article 26(2) of the ECT, on 3 February 2005, Hulley and YUL initiated arbitration proceedings through Notices of Arbitration and Statements of Claim against Respondent.

---

[3]      Energy Charter Treaty, Lisbon, 17 December 1994, 2080 UNTS 95 (hereinafter "ECT" or "Treaty").

Subsequently, through a Notice of Arbitration and Statement of Claim dated 14 February 2005, VPL initiated arbitration proceedings against Respondent. Claimants' requests for arbitration against Respondent were made pursuant to Article 26(4)(b) of the ECT and the Arbitration Rules of the United Nations Commission on International Trade Law, 1976 ("**UNCITRAL Rules**").

11.   Claimants alleged that Respondent had expropriated and failed to protect Claimants' investments in Yukos, resulting in "enormous losses," and sought all available relief in respect of those losses.

## B.   CONSTITUTION OF THE TRIBUNAL

12.   The history of the constitution of the Tribunal is recounted in detail in the Interim Awards. The Tribunal is composed of Judge Stephen M. Schwebel (appointed by Respondent on 8 April 2005), Dr. Charles Poncet (appointed as a replacement arbitrator by Claimants on 24 September 2007) and The Hon. L. Yves Fortier PC CC OQ QC (appointed as Chairman on 21 July 2005 by the agreed appointing authority, the Secretary-General of the Permanent Court of Arbitration ("**PCA**")).

13.   On 1 August 2005, the Parties agreed on The Hague as the legal seat of the arbitrations.

14.   On 15 October 2005, Respondent submitted its Statements of Defense, in which it objected to the Tribunal's jurisdiction and denied Claimants' allegations of expropriation and unfair and inequitable treatment.

15.   On 31 October 2005, a preliminary procedural hearing was held in The Hague, at which the Parties and members of the Tribunal signed Terms of Appointment confirming, *inter alia*, that: (a) the members of the Tribunal had been validly appointed in accordance with the ECT and the UNCITRAL Rules; (b) the proceedings would be conducted in accordance with the UNCITRAL Rules; (c) the International Bureau of the PCA would act as registry; (d) the dispute would be decided in accordance with the ECT and applicable rules and principles of international law; (e) the language of the arbitration would be English; and (f) all pleadings, documents, testimonial evidence, deliberations and actions taken by the Tribunal would remain confidential in perpetuity, unless the Parties were to release the arbitrators from this obligation. The Tribunal also set a procedural calendar and determined that it would rule on Respondent's

plea concerning jurisdiction and the admissibility of the claim as a preliminary question.   The calendar was confirmed in **Procedural Order No. 1** on 8 November 2005.

## C.   PRELIMINARY PHASE ON JURISDICTION AND ADMISSIBILITY

16.   Respondent filed its First Memorials on Jurisdiction and Admissibility on 28 February 2006 and Claimants filed their Counter-Memorials on Jurisdiction and Admissibility on 30 June 2006.

17.   On 8 September 2006, the Tribunal issued **Procedural Order No. 2** dealing with document production.   The Tribunal invited the Parties to agree on whether requests relating to the Parties' respective "unclean hands" contentions and Respondent's contention that the corporate personality of Claimants "must be disregarded" because they are "an instrumentality of a criminal enterprise" should be considered during the jurisdiction and admissibility phase or deferred to the merits phase.

18.   On 31 October 2006, the Tribunal issued **Procedural Order No. 3**, in which it deferred consideration of the Parties' contentions concerning "unclean hands" and Respondent's "criminal enterprise" contention to the merits phase.   On 3 November 2006, Claimants submitted a stipulation of facts, and on 8 November 2006, Respondent submitted its observations on the stipulation.

19.   Between November 2006 and November 2008, the Tribunal issued six further procedural orders relating to the conduct of the jurisdiction and admissibility phase of the arbitrations. During this period the Parties exchanged two rounds of written submissions on jurisdiction and admissibility, as well as Skeleton Arguments for the hearing.   As noted in the Interim Awards, the written record in the jurisdictional phase contained detailed and extensive filings of hundreds of pages, accompanied by over a thousand exhibits and dozens of witness statements.

20.   The **hearing on jurisdiction and admissibility** was conducted at the Peace Palace in The Hague, from 17 to 21 November, 26 to 29 November and 1 December 2008.

21.   On 30 November 2009, the Tribunal rendered the **Interim Awards**, stating in operative part:

> For the reasons set forth above, the Tribunal:
>
> (a)   DISMISSES the objections to jurisdiction and/or admissibility based on Article 1(6) and 1(7), Article 17, Article 26(3)(b)(i) and Article 45 of the ECT;

     (b)     DEFERS its decision on the objection to jurisdiction and/or admissibility based on Article 21 of the ECT to the merits phase of the arbitration, consistent with [paragraph numbers], above;

     (c)     CONFIRMS that its decision on the objections to jurisdiction and/or admissibility involving the Parties' contentions concerning "unclean hands" and Respondent's contention that "Claimant's personality must be disregarded because it is an instrumentality of a criminal enterprise" is deferred to the merits phase of the arbitration, consistent with Procedural Order No. 3;

     (d)     HOLDS that, subject to the preceding two sub-paragraphs, the present dispute is admissible and within its jurisdiction, and that the Tribunal has jurisdiction over the Russian Federation in connection with the merits of the present dispute;

     (e)     RESERVES all questions concerning costs, fees and expenses, including the Parties' costs of legal representation, for subsequent determination; and

     (f)     INVITES the Parties to confer regarding the procedural calendar for the merits phase of the arbitration, and to report to the Tribunal in this respect within 60 days of receipt of this Interim Award.

22.     On 4 February 2010, Respondent wrote to the Tribunal "to protest Claimants' counsel's publication of the [Interim Awards] in violation of applicable obligations," noting that the Interim Awards had appeared on various websites.

## D.    BIFURCATION AND OTHER SCHEDULING MATTERS

23.     On 24 February 2010, the Parties informed the Tribunal that they disagreed as to whether or not to bifurcate the proceedings between a liability and a damages phase, and as to the sequence and timing of document production.  Following an exchange of submissions on these issues, a hearing was held at the International Dispute Resolution Centre in London on 7 May 2010.

24.     The Tribunal issued **Procedural Order No. 10** on 13 May 2010, in which it:  (a) decided that documentary discovery would take place in a single phase, after the Parties' first round of written pleadings on the merits; (b) deferred the decision on bifurcation of the proceedings between a liability and a quantum phase and on the issue of referral arising under Article 21 of the ECT until after the Parties' first round of written pleadings on the merits; and (c) fixed a procedural calendar.  The Tribunal specified that the Parties' first round of written pleadings on the merits was to address all issues, including the deferred preliminary questions, liability, quantum and the issue of referral under Article 21 of the ECT.  With respect to documentary discovery, the Tribunal confirmed that some of its earlier rulings on requests relating to "unclean hands" and "criminal enterprise" in the jurisdiction and admissibility phase had been without prejudice to the Parties' ability to restate one or more of these requests in the merits

phase.  The Parties also agreed for each filing that they would submit one brief and one set of exhibits for all three cases.

25.     In accordance with Procedural Order No. 10 (as amended by the Tribunal on 23 June 2010), Claimants filed their Memorial on the Merits ("**Memorial**") on 16 September 2010.  It spanned 424 pages and was accompanied by 1045 exhibits, nine witness statements and two expert reports (with annexures).   On 17 November 2010, further to a request by Respondent, Claimants provided an electronic copy of the appendices to the report of Claimants' damages expert.

26.     On 4 November 2010, Respondent informed the Tribunal that Baker Botts LLP was joining Cleary Gottlieb Steen & Hamilton LLP as Respondent's counsel in these arbitrations.

27.     Respondent filed its Counter-Memorial on the Merits ("**Counter-Memorial**") on 4 April 2011 and submitted a corrected version on 29 July 2011.  The Counter-Memorial spanned 787 pages and was accompanied by 2868 exhibits and eight expert reports (some with annexures).

28.     On 29 April 2011, the Parties filed their respective submissions on the bifurcation of the proceedings and the issue of referral arising under Article 21 of the ECT.  A hearing on these matters was held at the Church House Conference Centre in London on 9 May 2011.

29.     On 31 May 2011, the Tribunal issued **Procedural Order No. 11**, in which it:   (a) denied Respondent's request that the proceedings be bifurcated between a liability and a damages phase; (b) reserved its decision on referral under Article 21(5)(b)(i) of the ECT to a later stage of the proceedings, when the evidentiary record would be completed; and (c) ordered the Parties to proceed in accordance with the amended procedural calendar.

E.     DOCUMENT PRODUCTION AND CONFIDENTIALITY

30.     The Parties exchanged requests for documents on 17 June 2011 and the following month exchanged objections and comments on objections to the document requests.  Respondent also requested an oral hearing on disclosure issues and repeated a request for more time to file its Rejoinder.

31.     On 11 August 2011, the Tribunal ruled on certain procedural aspects of document production and the timing of submissions, and informed the Parties that it "considered then, as it does

today, that the Amended Procedural Calendar is in compliance with the requirement of due process and equality between the parties taking into account all the circumstances."

32.    On 16 September 2011, the Tribunal issued **Procedural Order No. 12**, in which it ruled on the Parties' document requests (with some rulings being "without prejudice" to a further decision after the reply rounds of written submissions).

33.    By letter of 23 September 2011, Respondent informed the Tribunal that the European Court of Human Rights ("**ECtHR**") had, on 20 September 2011, issued a judgment in *OAO Neftyanaya Kompaniya Yukos v. Russia* ("**ECtHR Yukos Judgment**"),[4] which addressed the "same circumstances" on which Claimants' claims in these arbitrations are based.

34.    On 16 December 2011, Claimants produced documents pursuant to Procedural Order No. 12. Respondent did not produce documents, but wrote to the Tribunal, expressing concern that Claimants had provided no assurance that documents collected for disclosure would be kept confidential and used only for the purposes of these arbitrations.  Respondent requested the Tribunal to issue a directive "requiring the Parties to protect the confidentiality of all documents disclosed by the other, using them solely for purposes of these arbitrations." Claimants objected to Respondent's "eleventh hour" request for a confidentiality order.

35.    On 19 December 2011, the Tribunal ordered Respondent to provide by the end of that day documents to Claimants that had been ordered to be produced in Procedural Order No. 12, requested written submissions on confidentiality and directed that until it decided the confidentiality issue, the documents produced by both Parties were to remain confidential and be used solely for purposes of these arbitrations.  Pursuant to the Tribunal's directive, Respondent produced documents on 19 December 2011.

36.    On 18 January and 2 February 2012, the Parties exchanged submissions on the scope of confidentiality of the documents produced.  From January to May 2012, the Parties exchanged extensive correspondence concerning compliance with Procedural Order No.12.

37.    On 27 February 2012, the Tribunal issued **Procedural Order No. 13**, in which it:  (a) ordered that all documents produced by a Party to the other Party and the Tribunal following an order of the Tribunal "be and remain confidential in perpetuity" and "be used solely for the purpose of

---

[4]    *OAO Neftyanaya Kompaniya Yukos v. Russia*, ECtHR, Appl. No. 14902/04, Judgment, 20 September 2011, Exh. R-3328, (hereinafter "ECtHR Yukos Judgment").

the pursuit or defense of these arbitrations and not for any other purpose;" (b) listed the persons involved in these arbitrations to whom these documents could be disclosed; and (c) invited the Parties to refrain from discussing these arbitrations in public in order not to exacerbate their dispute or otherwise compromise the integrity of these arbitration proceedings.

38.   Claimants filed their Reply on the Merits ("**Reply**") on 15 March 2012.  It spanned 474 pages and was accompanied by a further 629 exhibits and two expert reports (with annexures).

39.   On 30 April 2012, the Tribunal issued **Procedural Order No. 14**, granting some of Respondent's document production requests which had earlier been denied "without prejudice" in Procedural Order No. 12.  Claimants produced documents pursuant to Procedural Order No. 14 on 29 May 2012.  On 29 June 2012, Respondent produced additional documents "in accordance with the parties' continuing obligation to disclose requested documents as they are discovered" under Procedural Order No. 12.  Throughout June and July 2012, the Parties exchanged extensive correspondence as to whether that was in violation of Procedural Order No. 12.

40.   On 16 August 2012, Respondent filed its Rejoinder on the Merits ("**Rejoinder**").  It spanned 819 pages and was accompanied by 1739 exhibits and seven expert reports (with annexures).

## F.   HEARING ON THE MERITS

41.   On 28 August 2012, a pre-hearing telephone conference took place during which the Parties agreed on a number of issues, but disagreed on others.  For example, Respondent requested that the Tribunal set a deadline for the exchange between the Parties of witness "impeachment" evidence prior to the Hearing on the Merits, while Claimants raised several "due process" issues and requested permission to file written submissions in support of their requests.  The Parties then exchanged written comments on these issues.

42.   By exchange of letters dated 10 September 2012, Claimants provided the names and order of three Respondent witnesses they wished to cross-examine and Respondent advised the names and order of ten of Claimants' witnesses whom it wished to cross-examine.

43.   On 12 September 2012, the Tribunal issued **Procedural Order No. 15** dealing with logistical and procedural issues for the Hearing on the Merits.

44.   On 14 September 2012, the Tribunal issued **Procedural Order No. 16**, in which it determined the outstanding procedural issues for the Hearing on the Merits, *inter alia* (a) denying

Respondent's requests relating to the exchange of "impeachment" evidence (noting that "in international arbitration practice, documents used at an evidentiary hearing should generally be submitted with the Parties' written pleadings, in accordance with the established procedural calendar"); and (b) granting Claimants permission to file certain documents that would "complete the record" in relation to selected exhibits that Respondent had included in its Rejoinder.

45.     Claimants filed additional exhibits on 20 September 2012.  On 25 September 2012, Respondent objected to certain of these exhibits on the grounds that they exceeded the scope of Procedural Orders No. 15 and 16.  Following an exchange of views by the Parties, the Tribunal ruled on Respondent's objection in **Procedural Order No. 17** dated 2 October 2012.

46.     On 1 October 2012, the Parties submitted their respective **Skeleton Arguments** in aid of the oral arguments to be presented at the Hearing on the Merits.

47.     On 4 October 2012, Respondent advised that it no longer intended to cross-examine one of Claimants' tax law experts, Mr. Philip Baker QC.  The same day Claimants withdrew the witness statement of former Russian Prime Minister, Mr. Mikhail Kasyanov, which had been submitted with the Memorial, on the ground that Mr. Kasyanov had informed Claimants' counsel that "he will not appear at the hearing in these arbitrations."

48.     On 8 October 2012, Claimants advised that they no longer intended to cross-examine one of Respondent's tax law experts, Professor Rosenbloom.

49.     The **Hearing on the Merits** took place at the Peace Palace, The Hague from 10 October to 9 November 2012.  Over the course of the Hearing, the following were in attendance:

**Tribunal**
The Hon. L. Yves Fortier PC CC OQ QC
Dr. Charles Poncet
Judge Stephen M. Schwebel

| **Claimants** | **Respondent** |
|---|---|
| *Counsel* | *Counsel* |
| Professor Emmanuel Gaillard | Dr. Claudia Annacker |
| Dr. Yas Banifatemi | Mr. Lawrence Friedman |
| Mr. Philippe Pinsolle | Mr. David Sabel |
| Ms. Jennifer Younan | Mr. Matthew Slater |
| Dr. Paschalis Paschalidis | Mr. William McGurn |
| Mr. Ilija Mitrev Penusliski | Mr. Jay Alexander |
| Ms. Kamalia Mehtiyeva | Mr. Samuel Cooper |
| Mr. Gueorgui Babitchev | Mr. Michael Goldberg |
| Mr. Emmanuel Jacomy | Mr. Cameron Murphy |

Mr. Scott Vesel
Ms. Ximena Herrera-Bernal
Ms. Elise Edson
Ms. Ketevan Betaneli
Ms. Coralie Darrigade
Mr. Thomas Voisin
Mr. Dimitrios Katsikis
Mr. Benjamin Siino
Mr. Jean-Marc Elsholz
Ms. Gracia Angulo Duncan
Mr. Benoit Arnauld
Ms. Nanou Leleu-Knobil

*Party Representatives*
Mr. Tim Osborne
Mr. Christopher Cook
Mr. Rodney Hodges

**Claimants' Witnesses**
*Fact Witnesses*
Mr. Vladimir Dubov
Dr. Andrei Illarionov
Mr. Jacques Kosciusko-Morizet
Mr. Bruce Misamore
Mr. Leonid Nevzlin
Mr. Frank Rieger
Mr. Steven Theede

*Expert*
Mr. Brent Kaczmarek

**Assistant to the Tribunal**
Mr. Martin Valasek

**Permanent Court of Arbitration**
Mr. Brooks W. Daly, Secretary to the Tribunal
Ms. Judith Levine, Assistant Secretary to the Tribunal
Ms. Olga Boltenko
Ms. Evgeniya Goriatcheva
Ms. Hinda Rabkin
Ms. Elsa Sardinha

**Interpreters**
Mr. Yuri Somov
Mr. Ilya Feliciano

**Court Reporter**
Mr. Trevor McGowan

Ms. Laurie Achtouk-Spivak
Ms. Marina Akchurina
Mr. Yury Babichev
Mr. Nowell Bamberger
Mr. Adam Bryan
Ms. Chiara Capalti
Ms. Ania Farren
Ms. Giulia Gosi
Mr. Michael Jacobsohn
Mr. Magnus Jones
Mr. Lorenzo Melchionda
Mr. Milo Molfa
Ms. Sara Nadeau-Seguin
Ms. Daria Pavelieva
Mr. Jacopo Roberti di Sarsina
Ms. Teale Toweill
Ms. Marina Weiss
Mr. Larry Work-Dembowski

*Party Representatives*
Mr. Konstantin Vyshkovskiy
Ms. Maria Maslyakova

**Respondent's Witnesses**
*Experts*
Professor James Dow
Mr. Oleg Y. Konnov

50.   On behalf of Claimants, oral arguments were presented by Dr. Yas Banifatemi, Professor Emmanuel Gaillard, Mr. Philippe Pinsolle and Ms. Jennifer Younan.  On behalf of Respondent, oral arguments were presented by Dr. Claudia Annacker, Mr. Lawrence Friedman, Mr. David Sabel and Mr. Matthew Slater.

51.     During the Hearing, on 14 October 2012, the Parties filed brief written submissions on a document production request made by Respondent in follow up to Procedural Order No. 14.  On 15 October 2012, the Tribunal ruled that the time for document production requests had passed, and noted that Respondent was free to ask the Tribunal to draw adverse inferences from any alleged non-compliance by Claimants with the Tribunal's document production orders.

### G.     POST-HEARING PROCEDURES

52.     At the close of the Hearing on 9 November 2012, the Tribunal directed the Parties to submit Post-Hearing Briefs of no more than 100 pages by 21 December 2012.  On 13 November 2012, the Tribunal confirmed that the Post-Hearing Briefs were to be prepared on the basis of a closed evidentiary record as at 9 November 2012.

53.     During November 2012, the Parties provided electronic copies of all additional materials relied upon during the Hearing, demonstrative exhibits and slides from arguments.   They also submitted agreed and contested corrections to the transcript to the court reporter, who in turn circulated amended transcripts on 11 December 2012.

54.     On 21 December 2012, the Parties filed their **Post-Hearing Briefs** spanning 100 pages each.

55.     On 1 August 2013, the Tribunal invited the Parties to comment on a judgment issued on 25 July 2013 by the ECtHR.[5]

56.     On 30 August 2013, the Parties submitted their comments on the ECtHR judgment.

57.     On 26 September 2013, Respondent drew the Tribunal's attention to developments in two other international arbitrations against the Russian Federation connected with Yukos.   Claimants submitted comments in response on 8 October 2013.

58.     On 10 January 2014, the Tribunal sent a letter to the Parties noting that Mr. Mikhail Khodorkovsky, former CEO of Yukos, had been pardoned and released from prison, and inviting the Parties to submit their observations on the impact, if any, of these developments on the present arbitral proceedings.   The Parties submitted their comments in response on 24 January 2014, and further observations in reply on 4 February 2014.

---

[5]     *Khodorkovskiy (2) and Lebedev (2) v. Russia*, ECtHR, Appl. Nos. 11082/06 and 13772/05, Judgment, 25 July 2013, (hereinafter "*Khodorkovsky v. Russia 2*").

59.    The Parties filed their costs claims on 17 April 2014, and submitted comments on the opposing side's costs claims on 6 May 2014.

60.    On 7 May 2014, the Tribunal formally declared the record in these arbitrations closed.

61.    On 9 June 2014, Respondent informed the Tribunal that it was prepared to agree that the Final Awards may be publicly disclosed under certain conditions.  Respondent also requested that the Tribunal modify its Procedural Order No. 13 to lift confidentiality restrictions with respect to documents disclosed in the course of these proceedings, to allow them to be used in "related proceedings" recently commenced against the Russian Federation.  Claimants submitted comments in response on 16 June 2014, and Respondent further commented on 20 June 2014.

62.    On 27 June 2014, the Tribunal issued **Procedural Order No. 18** in which it:  (a) ordered that these Final Awards remain confidential for a period of ten calendar days following electronic dispatch to the Parties, after which period the PCA would post the Final Awards to its website and so notify the Parties and the Tribunal, whereupon all confidentiality obligations in respect of the Final Awards shall terminate; and (b) modified Procedural Order No. 13 to provide for limited disclosure of documents in related proceedings.

## II.    FACTUAL BACKGROUND

63.    The disputes between the Parties to the present proceedings involve various measures taken by Respondent against Yukos and associated companies primarily in the period between July 2003 and November 2007, when Yukos had emerged after the dissolution of the Soviet Union to become the largest oil company in the Russian Federation.  The measures complained of include criminal prosecutions, harassment of Yukos, its employees and related persons and entities; massive tax reassessments, VAT charges, fines, asset freezes and other measures against Yukos to enforce the tax reassessments; the forced sale of Yukos' core oil production asset; and other measures culminating in the bankruptcy of Yukos in August 2006, the subsequent sale of its remaining assets, and Yukos being struck off the register of companies in November 2007.  Claimants contend, and Respondent denies, that Respondent failed to treat Claimants' investments in Yukos in a fair and equitable manner and on a non-discriminatory basis, in breach of Article 10(1) of the ECT, and that Respondent expropriated Claimants' investments in breach of Article 13(1) of the ECT.  Claimants seek full reparation in excess of USD 114 billion.

64. The factual matrix of this case is complex.  A detailed exposition of the relevant facts, including specific references to the record, is set out for each part of the narrative in Part VIII (broken down into eight chapters, starting with Yukos' tax optimization scheme and the Russian Federation's tax assessments against Yukos and ending with the bankruptcy of Yukos and the withdrawal of audit opinions by PricewaterhouseCoopers ("**PwC**")).  It is also in Part VIII that the Tribunal makes determinations in respect of the many highly contested issues of fact and observations on the significance of various facts and findings.  By contrast, the purpose of the introductory overview of the facts contained in this Part II of the Award is only to provide sufficient background for what follows.

## A.    THE PARTIES TO THESE PROCEEDINGS

### 1.    Claimants and Related Entities

65. The three Claimants in these related cases are all part of the Yukos group of companies, which had at its center Yukos, headed by Chief Executive Officer Mr. Mikhail Khodorkovsky.

66. Claimant in PCA Case No. AA 226, Hulley, was incorporated in the Republic of Cyprus on 17 September 1997 and was a 100 percent owned subsidiary of YUL.

67. Claimant in PCA Case No. AA 227, YUL, was incorporated on 24 September 1997 in the Isle of Man (a Dependency of the United Kingdom).

68. Claimant in PCA Case No. AA 228, VPL, was incorporated in the Republic of Cyprus on 7 February 2001.

69. Hulley held approximately 56.3 percent, YUL held approximately 2.6 percent and VPL held approximately 11.6 percent of the outstanding shares in Yukos.  Collectively therefore, Claimants approximately had a 70.5 percent shareholding in Yukos.

### 2.    Respondent

70. Respondent in these three arbitrations is the Russian Federation.

## B.    OAO YUKOS OIL COMPANY

71. After the dissolution of the Soviet Union, Yukos was incorporated as a joint stock company in 1993 by Presidential Decree.  Fully privatized in 1995–1996, it was a vertically integrated

group engaging in exploration, production, refining, marketing and distribution of crude oil, natural gas and petroleum products.  Its three main production subsidiaries were Yuganskneftegaz ("**YNG**"), Samaraneftegaz and, from 1997, Tomskneft.

72.    In May 2002, Yukos became the first Russian company to be ranked among the top ten largest oil and gas companies by market capitalization worldwide.  In the fourth quarter of 2002, Claimants submit that Yukos became the largest oil company in Russia in terms of daily crude oil production.

73.    At its peak in 2003, it had around 100,000 employees, six main refineries and a market capitalization estimated at over USD 33 billion.  According to Claimants, after its projected 2003 merger with then Russia's fifth largest oil company Sibneft ("**Sibneft**"), YukosSibneft would have become the fourth largest private oil producer worldwide, behind BP, Exxon and Shell.  At the time of Respondent's alleged adverse actions in the summer of 2003, Yukos was engaged in negotiations with ExxonMobil and ChevronTexaco for a merger or other form of business combination.  Claimants contend that this level of success was the result of efforts to modernize Yukos' operations and implement Western business practices.  According to Claimants, Yukos' success and the increasing social and economic influence gained by its management—including financial support given by Mr. Khodorkovsky to opposition parties— were perceived as a political threat by the Russian authorities and accordingly Yukos would fall from grace and be targeted for destruction.  Respondent, however, contends that Yukos was a "criminal enterprise", engaged in a variety of tax evasion schemes and other fraudulent activities.

## C.    THE RUSSIAN LOW-TAX REGION PROGRAM

74.    The low-tax region program was established in the 1990s to foster economic development in impoverished areas of the Russian Federation.  The Russian low-tax regions were permitted to exempt taxpayers from federal corporate profit tax for the purpose of fostering taxpayers' investments in the low-tax regions, provided the taxpayer complied with certain requirements.

75.    The Russian low-tax regions that are relevant to Yukos' "tax optimization" scheme include:

- Closed Administrative Territorial Units (known as "**ZATOs**"):  Lesnoy and Trekhgorniy; and

- Other low-tax regions:  Mordovia, Kalmykia and Evenkia.

76.     With respect to the tax benefits available in the ZATOs (Lesnoy and Trekhgorniy), in 1999, the ZATOs were permitted to exempt taxpayers fully from federal corporate profit tax.  In 2000, most ZATOs were permitted to exempt taxpayers from the portion of the federal corporate profit tax that was payable to their budget (*e.g.*, up to 19 percent).  In 2001, all ZATOs were permitted to exempt taxpayers from the portion of the federal corporate profit tax that was payable to their budget (*e.g.*, also up to 19 percent).  In 2002, however, these exemptions were revoked.

77.     With respect to the tax benefits available in other low-tax regions, in 2000 and 2001, Mordovia, Kalmykia and Evenkia were permitted to exempt taxpayers fully from the portion of the federal corporate profit tax that was payable to their budget (*e.g.*, from up to 19 percent to zero percent).  From 1 July 2002 until 31 December 2003, low-tax regions were permitted to exempt taxpayers from the portion of the federal corporate profit tax payable to their budget, but only up to four percent.  An exception existed for 'grandfathered' tax investment agreements entered into prior to 1 July 2001, such that these taxpayers could still receive a zero percent profit tax rate if they fulfilled certain other conditions.  As of 1 January 2004, the existing tax investment agreements were terminated, but the Tax Code of the Russian Federation (the "**Russian Tax Code**") still allowed low-tax regions to reduce the federal corporate profit tax payable to their budget up to four percent.

78.     Respondent contends that Yukos' restructuring of its trading operations from high-tax jurisdictions, such as Moscow and Nefteyugansk, to trading companies incorporated in the low-tax jurisdictions of Lesnoy, Trekhgorny, Mordovia, Kalmykia and Evenkia was aimed at evading taxes, rather than to achieve any genuine economic result.  Respondent alleges that Yukos interposed between Yukos and its customer its "sham" trading shells registered in Russian low-tax regions.  Yukos' oil producing subsidiaries sold the extracted oil to the trading companies at a fraction of the market price.  The trading companies then sold the oil either abroad at a market price or to Yukos' refineries, and subsequently re-bought it at a reduced price and re-sold it at the market price.  Respondent asserts that prices increased step by step from sham shell to sham shell, generating artificially inflated profits through non-armslength transactions.  Those profits were then taxed at reduced rates in the low-tax regions, where the sham trading shells were registered.  Respondent contends that the tax authorities identified abuses by the Lesnoy trading shells, which resulted in further investigations and, ultimately, in the tax assessments against Yukos and related proceedings.

79.   Claimants contend that Yukos, like other Russian companies at that time, was merely taking advantage of the legislation in place in the low-tax regions. Claimants assert that any findings of "abuse" by the Russian tax authorities was a function of the arbitrary and unpredictable interpretations of the law in Russia.

80.   The details of the Russian low-tax region program and Yukos' tax optimization scheme are set out more comprehensively in Chapter VIII.A of this Award.

### D.   CRIMINAL PROCEEDINGS

81.   Starting in July 2003, a series of criminal investigations were initiated by the Russian Federation against Yukos management and activities.  According to Claimants, these actions included the "targeting" of Yukos' employees, auditor PwC, in-house counsel, lawyers involved in various Yukos-related cases, as well as searches and seizures, threats to revoke its oil licenses, and mutual legal assistance requests and extradition proceedings against Yukos management.   Claimants characterize these actions as harassment, motivated by Mr. Khodorkovsky's participation in Russian opposition politics, that were intended—together with tax reassessments—to lead to the expropriation of Yukos' assets.  Respondent contends that its actions were in response to illegal acts committed by Yukos and its officers and shareholders.

82.   Between July and October 2003, three key Yukos officers were arrested.  In July 2003, Mr. Platon Lebedev, Director of Hulley and YUL, was arrested on charges of embezzlement and fraud; he was sentenced to nine years in prison in May 2005.  In October 2003, Mr. Vasily Shakhovsky, President of Yukos-Moscow, was charged with and later convicted of tax evasion. In October 2003, Mr. Khodorkovsky himself was arrested and charged with crimes including forgery, fraud and tax evasion; he was also sentenced to a nine-year prison term in May 2005. As a result of these arrests, a number of high-ranking Yukos executives fled Russia, such as Mr. Leonid Nevzlin, Deputy Chairman of the Yukos Board of Directors until 2003.   On 2 February 2007, new charges of embezzlement and money laundering were brought against Messrs. Khodorkovsky and Lebedev, leading to further convictions in December 2010. Messrs. Khodorkovsky and Lebedev were each imprisoned for over a decade.

83.   Claimants contend that by April 2006, no fewer than 35 top managers and employees of Yukos had been interrogated, arrested or sentenced, and that lawyers acting for Yukos had been obstructed in their work.  During the same period, Russian authorities conducted searches,

seizures and interrogations of Yukos property and personnel. Claimants contend that all of these actions amounted to harassment and intimidation, that they deprived Yukos' management of the ability to manage and control Yukos as a business, and that the underlying motive was to expropriate Yukos' assets.

84. Respondent contends that in addition to participation in tax fraud schemes, Yukos participated in a massive transfer pricing scheme by which hundreds of millions of dollars from the sales of oil and other products were illegally siphoned off to offshore entities for the benefit of Khodorkovsky/Lebedev and other controlling Russian "Oligarchs".[6]

85. Respondent also contends that Yukos officials have been engaged in violent crimes, such as the murder, attempted murder and assault of persons seeking to enforce Russian tax laws or otherwise perceived to threaten Yukos interests. Claimants deny Respondent's allegations of criminal acts as well as acts of tax evasion.

86. Respondent denies that Yukos and its officers were targeted in a discriminatory way, contending that Russian taxation measures have also applied to other offenders and that the searches and seizures were taken as part of legitimate taxation measures and conducted in accordance with normal Russian practice and the appropriate procedural protections available under Russian law.

87. The particulars of Claimants' allegations concerning harassment, intimidation and arrests are presented in Chapter VIII.C of this Award.

E.   ADDITIONAL MEASURES

88. In the period between October 2003 and December 2004, Yukos and its subsidiaries faced a series of major setbacks, including the alleged frustration of its merger with Sibneft, hefty tax reassessments, fines, VAT exactions, the freezing of shares and assets, the threatened revocation of licenses, and the forced sale of Yukos' main oil production subsidiary, YNG. These measures were followed by the bankruptcy of Yukos in August 2006.

---

[6]   Respondent's Counter-Memorial on the Merits dated 4 April 2011, as corrected 29 July 2011, p.1 n.1 (hereinafter "Counter-Memorial"): Respondent employs the term "Oligarchs" throughout its pleadings to refer to Messrs. Khodorkovsky, Lebedev, Nevzlin, Dubov, Brudno, Shakhnovsky, Golubovitch; the individual owners standing behind Claimants (hereinafter the "Oligarchs").

### 1. Alleged Frustration of Merger Between Yukos and Sibneft

89.     In October 2003, a merger was about to be completed between Yukos and Sibneft, Russia's fifth largest oil company.  According to Claimants, the resulting entity, YukosSibneft, would have become the world's fourth largest oil company.  In November 2003, however, after Yukos had already acquired 92 percent of Sibneft's shares as part of the merger and after the arrest of Mr. Khodorkovsky, Sibneft's controlling shareholder, Mr. Roman Abramovich, called off the merger process and the transactions were then unwound by a series of court decisions.  Further details are included in Chapter VIII.D of this Award.

### 2. Tax Reassessments for Years 2000–2004

90.     On 28 April 2003, the Tax Ministry issued a Field Tax Audit Report for the years 2000 and 2001 that raised no questions concerning Yukos' tax optimization structure.  On 1 September, 1 October and 1 November 2003, the Tax Ministry issued certificates confirming that Yukos had no outstanding debts.

91.     On 8 December 2003, the Tax Ministry ordered a tax re-audit of Yukos for the year 2000.  On 29 December 2003, the tax authorities of the Russian Federation issued the first of five tax assessments against Yukos that were based on the alleged abuse by Yukos of its tax optimization scheme.

92.     The Tax Ministry demanded payment from Yukos for approximately USD 3.5 billion for 2000, which was largely upheld by the Moscow Arbitrazh Court.  Similarly large tax reassessments were issued in the period between 2004 and 2006 for subsequent tax years.  2001 taxes were re-assessed in the amount of approximately USD 4.1 billion, 2002 taxes in the amount of approximately USD 6.8 billion, 2003 taxes in the amount of approximately USD 6.1 billion, and 2004 taxes in the amount of approximately USD 3.7 billion.  By the time the Tax Ministry issued the last of these demands, Yukos faced a tax bill of more than USD 24 billion, of which approximately USD 10.6 billion constituted allegedly evaded revenue-based taxes (including interest and fines), and the remainder (approximately USD 13.6 billion) comprised of VAT and related, interest and fines.

93.     Respondent contends that the reassessments were a consequence of Yukos' activities relating to the tax fraud scheme.  Claimants submit, however, that the reassessments were so excessive that the Russian authorities' strategy of destroying Yukos became plain.

94.    At the same time that tax reassessments were being filed against Yukos and its subsidiaries, Russian authorities began freezing shares and other assets belonging to Yukos and related entities.   In October 2003, Russian prosecutors froze shares held by YUL and Hulley in Yukos.   Orders issued by the Moscow Arbitrazh Court in April and June 2004 prevented Yukos from disposing of its assets.   An application by Yukos in July 2004 to have sufficient assets released to meet its tax liabilities was ignored and a surcharge of approximately USD 240 million was applied for late payment of taxes.   Claimants also maintain that Yukos' numerous proposals throughout this period to settle the tax claims were ignored or rejected by the Russian authorities, despite the fact that the government settled with taxpayers in several other cases.

95.    In July 2004, Russian authorities began seizing Yukos' shares in YNG, Samaraneftegaz and Tomskneft.   YNG bank accounts were also frozen.   The Russian authorities also used mutual legal assistance treaties to affect Yukos' interests abroad.

96.    Respondent does not dispute the freezing of Yukos' assets but contends that freezing assets of a debtor, including shares owned by it, is a standard enforcement measure for tax levies and judgments.   Respondent maintains that its freezing orders did not cover all of the assets of Yukos in Russia and that Yukos remained in possession of large assets abroad.

97.    The details of the tax assessments against Yukos and of Yukos' attempts to settle the tax claims are set out in Chapters VIII.B and VIII.E, respectively.

### 3.    Auction of YNG

98.    In July 2004, the Russian Federation indicated that it intended to appraise and sell YNG to pay off Yukos' back taxes.   A valuation carried out by investment bank ZAO Dresdner Bank ("**Dresdner**") at the request of the Russian Federation valued YNG at between USD 15.7 billion and USD 18.3 billion.   A valuation carried out by JP Morgan, at the request of Yukos, valued YNG at between USD 16 billion and USD 22 billion.   The Russian Ministry of Justice announced that YNG was worth USD 10.4 billion.

99.    After Yukos' attempts to enjoin the sale of YNG by legal recourse in the United States failed, YNG was sold at auction on 19 December 2004 for USD 9.37 billion to sole bidder and newly incorporated entity, Baikal Finance Group ("**Baikal**"), which was quickly bought by Russian State-owned Rosneft ("**Rosneft**").

100. Further particulars on this aspect of the case are presented in Chapter VIII.F of this Award.

### 4. Bankruptcy Proceedings

101. Claimants allege that the Russian Federation first reported in March 2005 that it intended to "push Yukos into bankruptcy in order to redistribute its remaining assets."  On 6 March 2006, a syndicate of foreign bank creditors of Yukos filed a bankruptcy petition before the Moscow Arbitrazh Court, pursuant to a Confidential Sale Agreement with Rosneft (the "**Confidential Sale Agreement**").  YNG—then owned by Rosneft—filed a separate bankruptcy petition against Yukos, which was subsequently joined to that of the bank syndicate.  On 28 March 2006, bankruptcy proceedings were commenced against Yukos, placing it under external supervision, and on 4 August 2006, Yukos was declared bankrupt.

102. Yukos' remaining assets were nearly all acquired by State-owned Gazprom and Rosneft, with the bankruptcy auctions raising a total of USD 31.5 billion.  In November 2007, Yukos was liquidated and struck off the register of legal entities.

103. The specifics relating to Yukos' bankruptcy are set out in Chapter VIII.G of this Award.

### 5. Withdrawal of PwC's Audits

104. In June 2007, PwC (which had served as both auditor and consultant to Yukos starting in 1997) withdrew all of its audits of Yukos from 1995 to 2004.

105. This final aspect of the factual matrix is treated in detail in Chapter VIII.H of this Award.

## III. PARTIES' WRITTEN SUBMISSIONS

106. As indicated in the Procedural History above, the Parties submitted two rounds of memorials on the merits.  Each side took full advantage of the written phase of these proceedings, filing detailed and extensive written submissions.  Claimants' Memorial runs to 424 pages and was accompanied by 1045 exhibits and 12 witness statements.  Respondent's Counter-Memorial is 787 pages long, and was accompanied by 2868 exhibits and 8 witness statements.  Claimants' Reply runs to 474 pages, and was accompanied by over 600 further exhibits.  Finally, Respondent's Rejoinder runs to 819 pages, and was submitted with over 1700 further exhibits and seven witness statements.  The Parties filed Post-Hearing Briefs of over 100 pages.

Throughout the arbitration the Parties filed extensive written submissions on various procedural issues.

107. The Tribunal studied these submissions carefully. The Parties' principal arguments are re-stated in the Tribunal's analysis of the issues in Parts VIII to XIII below. For the purposes of introduction, the Tribunal reproduces below *verbatim* the written "skeleton arguments" that the Parties submitted prior to the Hearing on the Merits at the Tribunal's request.

## A.   CLAIMANTS' SKELETON ARGUMENTS

108. The text of the paragraphs below is produced directly from paragraphs 1 to 82 of Claimants' Skeleton Argument submitted on 1 October 2012 ("**Claimants' Skeleton**")( footnotes omitted).

### I.   INTRODUCTION

1. The dispute between the Parties arises from the various actions taken by the Russian Federation against Yukos Oil Company ("Yukos" or the "Company") and related persons and entities, which culminated in the expropriation of the Company for the exclusive benefit of the Russian State and State-owned entities, thereby destroying the Claimants' investments in Yukos. As the Claimants have demonstrated, by (i) failing to treat the Claimants' investments in Yukos in a fair and equitable manner and on a non-discriminatory basis, and (ii) expropriating the Claimants' investments therein, the Russian Federation breached its obligations under Articles 10(1) and 13(1) of the Energy Charter Treaty ("ECT"), respectively, for which the Claimants are entitled to full reparation.

2. The Claimants' positions on the merits are described in detail in their written submissions. This skeleton argument summarizes, for the benefit of the Tribunal, the Claimants' principal arguments, with reference to key supporting materials. It does not replace or supplement those submissions, nor is it a substitute for oral argument.

### II.   FACTUAL BACKGROUND

3. The various actions taken by the Russian Federation against Yukos, and related persons and entities, were aimed at the destruction and expropriation of the Company. The expropriation of Yukos was achieved in 3 overlapping steps: *first*, the paralysis of the Company (A); *second*, the manufacturing of a pretext for the taking of the Company's assets, namely, the fabrication of debt (B); *finally*, the use of that pretext to take Yukos' assets piece by piece, including its most valuable asset, Yuganskneftegaz, and transfer them to the State-owned companies Rosneft and Gazprom (C). Each of these steps was accompanied by serious due process violations. The result was the liquidation of Yukos in November 2007, and the complete and total deprivation of the Claimants' investments therein.

#### A.   PARALYSIS OF YUKOS

4. Prior to the Russian Federation's attack, Yukos was a flourishing oil company. In May 2002, it was the only Russian company to be ranked among the top 10 largest oil and gas companies by market capitalization worldwide. In the fourth quarter of 2002, it became the largest oil company in Russia in terms of daily crude oil production. In October 2003, it completed its merger with Sibneft, another of

Russia's leading oil companies, creating the world's fourth largest private oil producer, behind BP, ExxonMobil and Shell. Yukos was also engaged in advanced discussions with American oil majors, ExxonMobil and ChevronTexaco, in relation to a merger or other form of business combination. This success was the result of concerted efforts to modernize the Company and implement Western business practices.

5.   Starting in the summer of 2003, the Russian Federation took a series of actions aimed at undermining the ability of the Company's management to run the business. These included: (i) the arrests of Messrs. Lebedev and Khodorkovsky, Yukos' CEO; (ii) the targeting, intimidation and/or prosecution of other high-ranking Yukos managers, employees and related persons; (iii) the harassment, prosecution and/or arrest of Yukos' in-house counsel and lawyers involved in various Yukos-related cases; (iv) the conduct of widespread and aggressive searches and seizures; (v) the seizure of the Claimants' shares in Yukos; (vi) the threats to revoke Yukos' oil licenses; (vii) the numerous mutual legal assistance requests and extradition proceedings to affect Yukos and entities/persons associated with the Company abroad; and (viii) the targeting and harassment of Yukos' auditor, PwC. These actions were taken in violation of the most basic standards of due process and fair treatment.

6.   Contrary to the Respondent's allegations, the actions described above deprived Yukos' management of the ability to manage and control the Company, thereby facilitating its dismantling and ultimate destruction. One early casualty of the Russian Federation's attack on Yukos was the YukosSibneft merger.

## B.   MANUFACTURING A PRETEXT — THE FABRICATION OF DEBT

### 1.   The fabrication of massive tax claims against Yukos for the years 2000-2004

7.   In December 2003, the Russian Federation's campaign against Yukos entered into a new phase with the fabrication of massive tax claims against the Company.

8.   On December 8, 2003, 6 weeks after Mr. Khodorkovsky's arrest, the Tax Ministry ordered a tax re-audit of Yukos for the year 2000. Only 3 weeks later, it issued a Field Tax Audit Report exceeding 100 pages in length and proposing to collect from Yukos US$ 3.4 billion in alleged tax arrears, interest and fines on the purported basis that the use of regional tax incentives by Yukos trading companies constituted unlawful tax evasion by Yukos itself.

9.   The December 2003 re-audit of Yukos was extraordinary in many respects. Less than 8 months earlier, on April 28, 2003, the Tax Ministry had issued a Field Tax Audit Report for the years 2000 and 2001 that raised no questions concerning Yukos' tax optimization structure.  That audit had taken 5 months to conduct, followed by 2 months for drafting the report. On several occasions after this audit, including on September 1, October 1 and November 1, 2003, the Tax Ministry confirmed that Yukos had no outstanding tax debts.  Prior tax audits of the Mordovian trading companies likewise raised no major concerns and specifically found their use of regional tax incentives to be lawful.

10.   The Respondent alleges that the Russian authorities lacked knowledge of Yukos' tax optimization structure and only "discovered" its allegedly abusive features in the course of the 3-week audit carried out in December 2003.  This allegation is not credible.  As the record demonstrates, the Russian authorities had long been aware of Yukos' practices, and the Respondent has failed to identify a single piece of material information relevant to the alleged tax claims that it lacked prior to the December 2003 repeat audit.  In particular:

- Yukos was one of Russia's largest taxpayers and was therefore under constant scrutiny by the Russian tax authorities, who had never found any significant problems prior to the attack on Yukos.

- The use of trading companies incorporated in low-tax regions was a common practice among Russia's vertically integrated oil companies, a fact that was well known to Russian authorities.

- Several trading companies' affiliations with Yukos were reflected in their names, for instance, Yukos-M and Yu-Mordovia.

- Prior to using trading companies in Mordovia—the source of the overwhelming majority of the purported tax claims—Yukos discussed the issue with federal and regional officials, who approved Yukos' plan.  Mordovia's Government then signed investment agreements with these trading companies specifying the amounts of monthly payments.  Audits of the Mordovian trading companies confirm the tax authorities' knowledge of the factual circumstances later alleged to constitute "abuse".

- As the Respondent concedes, Yukos' financial statements disclosed that companies within Yukos' consolidation perimeter enjoyed tax benefits under the low-tax region program and the overall amounts of such benefits.

- VAT refund submissions documented the entire chain of transactions prior to export, including, in particular, the trading companies' transactions with Yukos' production companies, refineries, and the holding company.

- Yukos' monthly submissions to obtain access to export pipelines confirmed that the trading companies' tax payments were in relation to the trading of oil produced by Yukos' production subsidiaries and exported under Yukos' export quotas.

11.  The Tax Ministry went on to fabricate similar tax claims against Yukos covering the years 2001-2004. As discussed below, the timing of these claims was instrumental in carrying out the Russian Federation's expropriation plan. By the time the Tax Ministry issued the last of these demands, Yukos faced a tax bill of more than US$ 24 billion, of which only US$ 5.2 billion constituted allegedly evaded revenue-based taxes, the remainder being comprised of VAT, interest, and fines.  These payment demands dwarfed the Company's consolidated net income for the relevant periods.

## 2.     The purported tax claims were unprecedented, arbitrary and manifestly expropriatory

12.  *Purported bases for revoking regional profit tax incentives.* Yukos' tax optimization structure fully complied with the legislation in force and current practices. Indeed, the Respondent does not allege that Yukos or the trading companies failed to comply with the federal or regional legislation. Nor does it allege that the trading companies failed to fulfill the terms of the investment agreements signed with the regional governments.  Rather, it claims that the trading companies failed to satisfy additional, unwritten requirements beyond the statutory eligibility criteria, including, in particular, an alleged "proportionality of investments" requirement that directly contradicted both the legislation and the investment agreements signed by the regional governments. This justification is not credible.

13.  *Re-attribution.* The primary weapon in the expropriation of Yukos' assets was the reattribution of the alleged tax liabilities of the trading companies to Yukos. Russian law did not allow such re-attribution, and the Respondent cannot point to a single example of such a re-attribution other than the Yukos case.  Had the Russian authorities genuinely believed that the tax benefits had been improperly granted to the trading companies, which was not the case, the proper course under Russian law

would have been to pursue those companies for the allegedly underpaid taxes. Alternatively, had they genuinely believed that sales had occurred at below market prices, Russian tax law contained a specific statutory mechanism for such transfer-pricing situations. However, the Russian authorities ignored these statutory provisions. Re-attribution served 2 purposes: *first*, shifting liability to Yukos itself paved the way for the expropriation of the Company's assets; *second*, re-attribution provided the basis for massive VAT claims.

14. *VAT*. Simultaneously invoking and contradicting their own re-attribution theory, the tax authorities re-attributed to Yukos all the revenues from the trading companies' transactions, but refused to re-attribute to Yukos the trading companies' entitlements to VAT refunds for export transactions. The purported basis for denying refunds was that the paperwork, although proper and timely, had been submitted by the trading companies rather than Yukos. This enabled the tax authorities to claim an additional US$ 13.59 billion—56.20% of the total claims against Yukos—despite the uncontested fact that no VAT was owed on these transactions. Such a step was clearly confiscatory in nature. Further, the fact that, even when Yukos attempted to submit the updated VAT returns in its own name, its submissions were rejected as improper and untimely, confirms that the purported VAT claims had nothing to do with taxation. The Respondent has been unable to offer any defense whatsoever for the fundamentally contradictory way in which its re-attribution theory was deployed.

15. *Fines*. The tax authorities further inflated their claims through the unjustified imposition of fines, including by imposing fines after the statute of limitations had expired; by doubling fines for "willfulness" despite the fact that Yukos did not—and could not possibly—"know" of the alleged illegality; and by doubling fines again for "repeat offenses" despite the fact that at the time of the alleged "repeat" offenses Yukos had never been previously held liable for a similar offense. Overall, these inflated fines amounted to US$ 8.5 billion, *i.e.*, 35.13% of the total alleged tax liabilities, with the "repeat" offender fines alone amounting to US$ 3.92 billion.

16. The common thread unifying the Russian Federation's approach was an overarching desire to manufacture and inflate claims against Yukos, with a view to expropriating the Company. As Yukos' tax lawyer noted after reviewing the December 2003 audit report, "[e]ven if we assume political pressure on the court the extent of the violations committed by the Ministry for Taxes and Levies will make it impossible even for the most biased judge to support the clearly unlawful inspection act". The Russian courts proved Yukos' tax lawyer wrong, rubber-stamping the fabricated tax debts.

### 3.   Due process violations in the administrative and judicial proceedings

17. The administrative and judicial proceedings with respect to the alleged tax debts were conducted in blatant disregard of Yukos' basic due process rights. This involved, *inter alia*, pressure on the courts to ensure that only Government-friendly judges would preside over Yukos' challenges—and subsequently rewarding those judges for their efforts; overly speedy proceedings, denying Yukos adequate time and facilities to prepare its defense; and arbitrary denials of Yukos' motions to join to the proceedings the trading companies and the Mordovian Government. Coupled with the harassment of Yukos' lawyers noted above, the Russian Federation ensured the hasty conclusion of these proceedings, bringing it one step closer to its objective, namely the taking of Yukos' assets.

C.    **APPROPRIATION OF YUKOS' ASSETS – SEIZING YUKOS' ASSETS AND TRANSFERRING THEM TO STATE-OWNED COMPANIES**

     1.    **Yukos was prevented from settling its alleged tax debts or discharging them in full**

18.    *The swift and manifestly disproportionate enforcement of the 2000 tax reassessment*. On April 14, 2004, the tax authorities issued their payment demands for the year 2000. Yukos was given until April 16, 2004, *i.e.*, less than 48 hours, to pay in full US$ 3.48 billion in alleged tax arrears, interest and fines.

19.    Even this symbolic "voluntary" payment period was illusory. On April 15, 2004, the very next day after the demand for payment was issued, the tax authorities obtained from the Moscow Arbitrazh Court an *ex parte* injunctive order freezing, as a purported security measure, all of Yukos' non-cash Russian assets, with the exception of oil and oil products.

20.    On June 30, 2004, following Yukos' unsuccessful appeal, an enforcement writ was issued giving the Tax Ministry 3 years to collect the 2000 tax debt. Rather than engage in discussions with the Company about the discharge of this debt within that period, the bailiffs initiated enforcement proceedings that very same day. The Company was given 5 days to pay voluntarily US$ 3.42 billion in alleged tax arrears, interest and fines for the year 2000 and threatened with a 7% enforcement fee if it failed to do so.

21.    At the same time, the bailiffs ordered the seizure of (i) monies deposited in Yukos' accounts with 16 Russian banks, and (ii) the Company's Russian non-cash assets (which had previously been the subject of a freeze). On July 1, 2004, a wave of seizures on Yukos' non-monetary assets began, culminating in the seizure on July 14, 2004 of Yukos' shares in its 3 main production subsidiaries—Yuganskneftegaz, Samaraneftegaz and Tomskneft.

22.    It should be recalled that all these seizures were conducted within the framework of the enforcement proceeding initiated on June 30, 2004 to recover from Yukos US$ 3.42 billion in alleged tax liabilities for 2000. These seizures covered virtually all of Yukos' assets, whose value was staggeringly higher.

23.    Further, within days, on July 20, 2004, the Ministry of Justice announced its intention to appraise and sell Yuganskneftegaz to satisfy the 2000 alleged tax debt.

24.    The decision to seize and sell Yuganskneftegaz, which accounted for approximately 12% of Russia's oil output and whose value on any estimation dramatically exceeded that of the alleged tax debt, can only be reconciled with a desire to destroy the Company and appropriate its core assets. This reality is confirmed by the fact that the decision was taken less than 3 weeks after the writ of execution had been issued and when all of Yukos' domestic assets remained seized and available to satisfy the 2000 tax debt.

25.    *The failure to consider Yukos' proposals of alternative means of paying the alleged debt.* Further confirmation of the Russian Federation's expropriatory intent is the systematic rejection of Yukos' numerous offers to the bailiffs, courts and other Russian authorities and officials to settle or discharge its tax debts. These included: (i) the offers of Yukos' Russian non-core assets and its stake in Sibneft, initially 34.5% and subsequently reduced to 20% minus 1 share following the seizure of the 14.5% stake in Sibneft on July 9, 2004, in the context of the Chukotka Arbitrazh Court proceedings; (ii) Yukos' petition to pay its alleged tax debt for the year 2000 in installments; (iii) Yukos' amicable proposal to the Ministry of Finance to defer the payment of the federal share of its alleged debt for 6 months or to pay it in tranches; (iv) the proposals by Mr. Jean Chrétien, former Canadian Prime Minister, to Prime Minister Fradkov and President Putin of a global settlement of the

disputes, which envisaged the payment to the Russian Federation of approximately US$ 8 billion over the course of 2 years; (v) Yukos' October 2004 full settlement proposal in the range of US$ 21 billion, which included non-core assets and Sibneft shares, as well as a concession to re-elect a new board of directors that would include people selected by the Government.

26.   Each of these offers, as well as numerous others, was either denied or, in most cases, simply ignored. The Respondent's attempts to provide *post-hoc* rationalizations for its conduct by qualifying each of Yukos' offers as unacceptable or inadequate are unfounded. In any event, the Russian authorities' failure to work with—or even respond to—the multiple offers by Yukos, one of the largest private taxpayers in Russia, or to consider other options for enforcement, confirms that the Russian Federation was not interested in collecting taxes. This is even more so in light of the fact that the Russian authorities had no difficulty entering into settlement discussions and negotiating repayment plans with other Russian oil companies, including, *inter alia*, Rosneft and Sibneft.

### 2.   The forced sale of Yukos' shares in Yuganskneftegaz

27.   *Fabrication of further debt to maintain the pretext.* Despite the effect of the seizures described above, by the time of the Yuganskneftegaz auction, Yukos had paid off the 2000 tax reassessment in its entirety, eliminating the *raison d'être* of the decision to sell Yuganskneftegaz. Recognizing this difficulty as well as the gross disparity between the alleged tax debts and the value of Yuganskneftegaz, the Tax Ministry set about fabricating new claims.

- On September 2, 2004, the Tax Ministry served Yukos with a tax reassessment for 2001 in the amount of US$ 4.1 billion. Yukos was given only 2 days to pay voluntarily this amount, with the bailiffs initiating enforcement proceedings on September 9, 2004.

- On November 16, 2004, the Tax Ministry served Yukos with a tax reassessment for 2002 in the amount of US$ 6.76 billion, the largest among the 5 tax reassessments for the years 2000-2004. Yukos was given only 1 day to pay voluntarily this amount, with the bailiffs initiating enforcement proceedings on November 18, 2004.

- On December 6, 2004, the Tax Ministry served Yukos with a tax reassessment for 2003 in the amount of US$ 6.1 billion, giving the Company 1 day to pay in full. On December 9, 2004, the bailiffs initiated enforcement proceedings.

28.   In each case, the bailiffs allowed Yukos at most 5 days for voluntary payment and charged the 7% enforcement fee for failure to comply with these unreasonably short time limits.

29.   Thus, in the 4 months from September 2004 up until the auction of Yuganskneftegaz on December 19, 2004, the Russian Federation managed to increase Yukos' alleged tax liability by approximately US$ 17 billion.

30.   *Efforts to depress the auction price of Yuganskneftegaz.* At the same time, with a view to facilitating the Russian Federation's acquisition of Yuganskneftegaz at a bargain price, the Russian Tax Ministry also fabricated claims against Yuganskneftegaz. These claims were premised on the application of statutory provisions on transfer pricing, which the tax authorities systematically refused to apply in relation to Yukos itself. Significantly, these claims concerned the same oil trading revenues that had already been re-attributed to Yukos, thus resulting in double taxation.

31.   Thus, on October 29, 2004, the tax authorities simultaneously: (i) issued a Repeat Field Tax Audit Report for 2001 requesting Yuganskneftegaz to pay US$ 2.35 billion in alleged tax arrears, interest and fines;[93] and (ii) rendered a Decision

holding Yuganskneftegaz liable for an alleged tax offense for the year 2002 and requiring payment of US$ 1.03 billion in alleged tax arrears, interest and fines.

32.     On December 3, 2004, a Field Tax Audit Report was issued for the year 2003, imposing on Yuganskneftegaz an additional US$ 1.22 billion in alleged tax arrears, interest and fines.

33.     In addition to fabricating these US$ 4.6 billion in additional alleged liability, the Russian authorities also began to sow doubts about the security of Yuganskneftegaz's oil licenses to depress further the Company's value.

34.     That all these payments demands, imposed simultaneously on Yukos and its main production subsidiary, were issued in the run-up to the auction of Yuganskneftegaz is no coincidence.  Nor is it a coincidence that, after Yuganskneftegaz was acquired by Rosneft, the tax claims along with the oil license concerns promptly disappeared. Together with the generous payment terms accorded to Rosneft's new subsidiary but systematically denied to Yukos, these facts confirm both the discriminatory nature of the Russian Federation's treatment of Yukos, and the true purpose of the purported tax reassessments against Yuganskneftegaz, namely, to facilitate the expropriation of the Company and not to collect taxes.

35.     *Sham auction of Yuganskneftegaz.* As noted above, the Ministry of Justice publicly announced its plan to sell Yuganskneftegaz on July 20, 2004, purportedly in order to satisfy the 2000 alleged tax debt.

36.     On August 12, 2004, the bailiffs appointed ZAO Dresdner Bank ("Dresdner") to carry out the valuation of Yuganskneftegaz in preparation for its sale.  On October 6, 2004, Dresdner issued a confidential report valuing Yuganskneftegaz on a standalone basis at US$ 18.6 billion – 21.1 billion.

37.     On November 18, 2004, the bailiffs announced that Yuganskneftegaz would be auctioned to satisfy Yukos' outstanding tax debt, with the Russian Federal Property Fund issuing the formal auction notice the following day. The opening price for 100% of the ordinary shares, or 76.79% of Yuganskneftegaz's total share capital, was set at US$ 8.65 billion, a price well below its true value. The auction date was set for December 19, 2004, which was the earliest possible date to hold the auction and only 1 month away.

38.     In an attempt to prevent the auction of its core asset, Yukos filed an application with the Moscow Arbitrazh Court to declare unlawful the Bailiff's Resolution of November 18, 2004 and sought interim measures. These efforts failed.

39.     Confronted, yet again, with the futility of its efforts to obtain justice before the Russian courts, on December 14, 2004, Yukos filed for Chapter 11 bankruptcy protection before the U.S. Bankruptcy Court for the Southern District of Texas. By that date, only 3 companies, Gazpromneft (the new wholly-owned subsidiary of State-owned Gazprom), First Venture and Intercom, had sought antimonopoly clearance required in anticipation of the auction.  On December 16, 2004, the U.S. Court issued a Temporary Restraining Order ("TRO") enjoining Gazpromneft, its potential lenders, First Venture and Intercom from participating in the auction of Yuganskneftegaz.

40.     Nonetheless, on December 19, 2004, which was a Sunday, the Russian authorities proceeded with the auction of Yuganskneftegaz. Gazpromneft and OOO Baikalfinancegroup ("Baikal") were registered as participants. Baikal was a previously unknown company established at the address of a local bar in the provincial town of Tver on December 6, 2004. With only US$ 359 in capital, it mysteriously managed to pay a cash deposit in the amount of US$ 1.77 billion to register for the auction on December 16, 2004.

41.   At the auction, Baikal opened the bidding at US$ 9.35 billion. Gazpromneft's representative asked for a recess and left the room to make a telephone call. Upon his return, he did not make a single bid and Baikal was pronounced the winner of the auction with its opening bid of US$ 9.35 billion. The whole bidding process lasted approximately 10 minutes.

42.   The Respondent's allegation that the low price for Yuganskneftegaz reflected attempts by Yukos to "sabotage" the auction is unconvincing.  Neither "litigation risk" nor the TRO had a material effect on the participants or the outcome of the auction.  The reality is that, ignoring the advice of its own appraisal firm, the Russian authorities systematically acted in ways that negatively affected the ability and willingness of potential bidders to participate, as well as the price they would be willing to pay.  Market participants also understood that political support was required to participate in auctions for Yukos assets.

43.   The use of Baikal as a conduit for the eventual transfer of Yuganskneftegaz to a State-owned company was confirmed when, only a few days later, on December 23, 2004, Rosneft issued a statement announcing its acquisition of Baikal.  Meeting journalists that day, President Putin confirmed his knowledge of the acquisition, stating that: "Today, the state, resorting to absolutely legal market mechanisms, is looking after its own interests. I consider this to be quite logical".  Rosneft then enabled Baikal to repay the principal and interest on its debt by granting it, on December 30, 2004, a 1-year interest-free loan.

44.   Rosneft benefited significantly from this acquisition, with Rosneft's estimated value increasing dramatically from US$ 7 billion in December 2004 to US$ 80 billion for its IPO in mid-2006. Based on the valuation disclosed by Rosneft at the time, Yuganskneftegaz was worth US$ 55.78 billion.  Further, as noted above, the tax bills raised against Yuganskneftegaz as a Yukos subsidiary were almost entirely set aside by the Russian courts following its acquisition by Rosneft.

45.   Looked at from any angle, the Russian Federation's approach to enforcement of the alleged tax debts, culminating in the transfer of Yuganskneftegaz to Rosneft in a sham auction, confirms that the Russian Federation's real goal was to expropriate the Company, and not to collect taxes.

46.   Even after the sham auction of Yuganskneftegaz, there was no legitimate reason to put Yukos into bankruptcy. There were no substantial creditors apart from the Russian Federation, and the seizure of Yukos' assets remained in place, so there was no risk of assets being dissipated and no need to resolve conflicting creditors' claims.  Yukos still possessed 2 substantial production subsidiaries—Samaraneftegaz and Tomskneft—as well as refining and marketing assets, and several non-core assets that it could readily have disposed of to pay off its outstanding debts and remain a going concern. However, the Russian authorities' priority was not recouping taxes; nor did they have any intention of allowing Yukos to survive as a going concern. The initiation of the bankruptcy proceedings provided a convenient way to sideline Yukos' management and to facilitate the taking of the Company's remaining assets.

47.   *Forcing Yukos into bankruptcy.* As a result of the Russian Federation's attack, Yukos defaulted on a US$ 1 billion loan granted by a syndicate of Western banks. On December 13, 2005, Rosneft entered into a confidential agreement with the syndicate under which Rosneft agreed to pay the outstanding amount owed by Yukos in exchange for the assignment to Rosneft of the syndicate's rights of claim against Yukos. *Crucially*, the payment of Yukos' debt by Rosneft was conditioned upon the initiation of Yukos' bankruptcy by the syndicate. Pursuant to that agreement, on March 6, 2006, the syndicate filed a petition with the Moscow Arbitrazh Court to declare Yukos bankrupt, and on March 14, 2006, Rosneft paid off the loan.

48.   On March 28, 2006, the Moscow Arbitrazh Court ordered the commencement of bankruptcy proceedings, placed Yukos under supervision, appointed Mr. Rebgun as interim administrator, and formally substituted Rosneft for the syndicate as creditor.

49.   The Respondent argues that "sound commercial interests" explain both the syndicate's sale of the loan and Rosneft's reasons for acquiring the same. However, even if that were the case, the Respondent still fails to answer the basic question: why not simply have the syndicate of banks assign their claim to Rosneft, and let Rosneft put Yukos into bankruptcy? The only plausible explanation for this elaborate stratagem was to conceal the Russian Federation's role in initiating the bankruptcy of Yukos.

50.   *Ensuring the Russian State's control over the bankruptcy proceedings.* After Rosneft initiated the bankruptcy through the syndicate, the Russian courts ensured that the Russian State, either directly or through Rosneft, would become Yukos' main creditor.

51.   *First*, the Russian courts bent over backwards to ensure that the tax authorities' purported claims would be admitted, by: (i) delaying a scheduled hearing in order to give "the State more time to prove new tax claims", namely, the US$ 3.9 billion in tax payment demands for 2004, which the tax authorities rushed to issue on March 17, 2006, 11 days after the bankruptcy petition was filed; (ii) merging Yukos' challenge to that payment demand into the bankruptcy proceedings; and (iii) approving all the tax authorities' purported claims against Yukos for the years 2000-2004 following a wholly perfunctory review of the voluminous case files. Consequently, the Federal Taxation Service was by far Yukos' largest creditor with 60.50% of all registered bankruptcy claims.

52.   *Second*, in the period leading up to the first meeting of Yukos' registered creditors on July 20, 2006, some 29 purported claims were admitted on behalf of Yuganskneftegaz, now Rosneft's subsidiary, totaling approximately US$ 4.42 billion. Subsequently, Rosneft secured admission of an even larger claim of US$ 5.55 billion premised on an allegation that Yuganskneftegaz had suffered "lost profits" in this amount during the period 2000-2003. These purported claims of US$ 9.97 billion enabled Rosneft to more than recoup the US$ 9.35 billion paid for Yuganskneftegaz and thereby acquire the Company for free. With the admission of these and various smaller claims, Rosneft became Yukos' second largest creditor with 37.17% of all registered bankruptcy claims.

53.   *Third*, while the Russian court hearing Yukos' bankruptcy showed great flexibility in admitting any and all claims to benefit the Russian State, it was intransigent and formalistic in finding pretexts not to recognize substantial claims of creditors related to Yukos or to Yukos' shareholders.

54.   These combined efforts resulted in the complete monopolization of Yukos' bankruptcy proceedings by the Russian State, which held 97.67% of all bankruptcy claims, guaranteeing its control over the bankruptcy process.

55.   *Rejection of Yukos' Rehabilitation Plan.* The Financial Rehabilitation Plan proposed by Yukos' management ("the Rehabilitation Plan") set out a series of concrete measures that would enable Yukos to pay off its alleged liabilities fully within 2 years, while remaining a viable going concern. This would be achieved by, among other things, creating a "cash pool" from the sale of ancillary assets, cash flows generated by Yukos' remaining core assets, and more than US$ 1.5 billion from the sale of Yukos' 53.7% stake in the Lithuanian oil company Mazeikiu Nafta and Yukos' 49% stake in Slovakian oil transport major Transpetrol.

56.   By contrast, according to Mr. Rebgun, the potential proceeds from the sale of Yukos' remaining assets, which he significantly undervalued at US$ 17.75 billion (after deducting the 24% profit tax payable on auction proceeds), were not sufficient

to cover the US$ 18.3 billion of registered bankruptcy claims. Accordingly, he did not even bother to propose any measure for the Company's financial restoration but simply recommended liquidation. In the event, despite the fact that the bankruptcy auction prices represented significant markdowns from market value, the bankruptcy estate netted approximately US$ 35.55 billion—twice the amount Mr. Rebgun had put forward to argue in favor of liquidation.

57.   Ultimately, the Federal Taxation Service and Rosneft held 93.87% of votes at the meeting of Yukos' creditors of July 25, 2006. It therefore came as no surprise that they rejected the Rehabilitation Plan and voted to liquidate Yukos' assets, despite the fact that Yukos' assets exceeded its alleged liabilities, and the Company was clearly solvent.

58.   *The bankruptcy auctions.* Yukos' remaining assets were transferred to the Russian State at well below their fair market value through a series of 17 auctions held between March 2006 and August 2007. Rosneft thereby directly or indirectly acquired Yukos' key remaining assets, including Samaraneftegaz (Lot No. 11) and Tomskneft (Lot No. 10), which were sold at a gross discount of approximately 37% and 33%, respectively, of their fair market value. For its part, Gazprom acquired through Eni/Enel the 20% minus 1 share stake in Sibneft that the Russian Federation had persistently refused to let Yukos sell to pay off alleged tax debts. As with the sham auction of Yuganskneftegaz, there was no genuine competition in the bankruptcy auctions and, in many instances, including those for Samaraneftegaz and Tomskneft, the only participants were Rosneft and a previously unknown entity whose sole role was to satisfy the formal requirement that there be a minimum of 2 bidders.

59.   Finally, when, by the end of July 2007, it became clear that despite the low auction prices, the bankruptcy might still generate some surplus, further claims were admitted in the bankruptcy proceedings on behalf of the Russian State, through the Federal Taxation Service and Rosneft. This ensured the completeness of Yukos' destruction and the transfer of its value and assets to the Russian State. Thus, the Russian Federation received, either directly or through State-owned Rosneft or Gazprom, approximately 99.71% of the bankruptcy proceeds and over 95% of Yukos' remaining assets, including all of Yukos' main production assets.

60.   On November 12, 2007, the Moscow Arbitrazh Court formally endorsed all the activities of Yukos' receiver Mr. Rebgun, closed the Company's receivership and ordered that Yukos be struck off the register of legal entities. The latter happened on November 21, 2007: Yukos was removed from the register of companies, its shares were legally extinguished and so, too, were the Claimants' investments.

## D.   CONCLUSION

61.   Seen together, the Russian Federation's actions can only be reasonably understood as a deliberate and sustained effort to destroy Yukos, gain control over its assets and eliminate Mr. Khodorkovsky as a potential political opponent.  Indeed, viewed any other way, they make no sense and the Respondent has been unable to provide a plausible alternative explanation for its actions.

## III.   LAW

### A.   THE RUSSIAN FEDERATION IS IN BREACH OF ITS OBLIGATIONS UNDER ART. 10(1) ECT

62.   Under Article 10(1) ECT, the Russian Federation undertook to "encourage and create stable, equitable, favorable and transparent conditions for Investors", to accord at all times "fair and equitable treatment" to investments made in its territory and not to "in any way impair by unreasonable or discriminatory measures [the]

management, maintenance, use, enjoyment or disposal" of such investments, which "shall also enjoy the most constant protection and security".

63.    The Russian Federation violated the above mentioned undertakings in the most egregious manner. In particular, it violated its obligation under Article 10(1) ECT to provide to the Claimants' investments fair and equitable treatment, by failing to meet basic requirements of procedural propriety and due process, engaging in conduct that was unreasonable, arbitrary, disproportionate and abusive, and failing to ensure a stable and transparent legal and business framework. The Russian Federation's actions also constituted a denial of justice in breach of the fair and equitable treatment standard of Article 10(1) ECT, as demonstrated by, *inter alia*, the removal of judges refusing to rule in the Russian State's favor and the lack of independence and impartiality of judges hearing Yukos' cases.

64.    The Russian Federation also breached Article 10(1) ECT by discriminating against the Claimants' investments. In particular, it (i) singled out Yukos and treated it in a markedly different manner from other similar oil companies in Russia, (ii) treated Yuganskneftegaz differently before and after its acquisition by State-owned Rosneft, in the hands of which the former Yukos subsidiary's alleged tax liabilities all but disappeared, and (iii) ensured a differential treatment in the bankruptcy proceedings between creditors related to Yukos, on the one hand, and State-related creditors, on the other.

65.    The Respondent's primary defense is to invoke Article 21 ECT to argue that the Claimants' claims should be dismissed on the ground that they are "based exclusively on measures '*with respect to Taxation Measures.*'" As discussed below, not only is the Respondent's interpretation of Article 21 ECT untenable, but the Russian Federation's conduct had nothing to do with the genuine exercise of its taxation power and is thus not covered by Article 21 ECT.

66.    The Respondent has moreover attempted to restrict the scope of its treaty obligations by misrepresenting the content of the fair and equitable treatment and discrimination standards in Article 10(1) ECT. Such attempts are groundless and should be rejected.

**B.    THE RUSSIAN FEDERATION IS IN BREACH OF ITS OBLIGATIONS UNDER ART. 13(1) ECT**

67.    The Russian Federation expropriated the Claimants' investments in breach of Article 13(1) ECT.

68.    As of October 2003, Yukos was one of the largest oil companies in the world. It held 92% of Sibneft, 3 core production subsidiaries (Yuganskneftegaz, Samaraneftegaz and Tomskneft), as well as refining and marketing subsidiaries. As of November 21, 2007, it ceased to exist as a company, owing to a series of actions by which the Russian Federation seized its assets and transferred their title to State-owned Rosneft and Gazprom. The only plausible explanation for the Russian Federation's actions is the twin desire of dismantling the Company and transferring its assets to the State and the removal of Mr. Khodorkovsky as a potential political opponent. The result of those actions was a complete and total deprivation of the Claimants' investments therein.

69.    The Russian Federation moreover failed to satisfy any of the 4 conditions set out in Article 13(1) ECT. The expropriation of the Claimants' investments was manifestly: (i) not in the public interest; (ii) discriminatory; (iii) carried out without due process of law; and (iv) not accompanied by the payment of any compensation, let alone prompt, adequate and effective compensation.

70.    Unable to deny the total deprivation of the Claimants' investments and the transfer of title of Yukos' assets to State-owned Rosneft and Gazprom, the Respondent

disaggregates its actions and argues that, when taken in isolation, each of them was, under Russian law, a proper response to Yukos' alleged conduct. While, in fact, many of those actions amounted to a gross distortion or abuse of Russian law, lawfulness under domestic law is not, in any event, the proper inquiry under Article 13(1) ECT. Under the applicable international law standards, the actions of the Russian Federation, in their totality, constitute an expropriation of the Claimants' investments in breach of Article 13(1) ECT for which compensation is due.

## IV.   DAMAGES

71.   The Russian Federation is under an obligation to make full reparation to the Claimants for the financial consequences of its breaches of Articles 10(1) and 13(1) ECT. This standard of reparation is not challenged by the Respondent.

72.   The magnitude of these financial consequences cannot be underestimated. As a result of the Respondent's actions, the Claimants have lost the entire value of their investments in YukosSibneft, as well as the benefits they should have received from those investments.  The Claimants' valuation expert, Navigant, has quantified the Claimants' damages for the loss of their investments in YukosSibneft at US$ 114.174 billion.

73.   Navigant has also quantified the Claimants' damages for the loss of their investments in YukosSibneft in 3 alternative scenarios, assuming that: (i) the Respondent does not bear responsibility for the demerger between Yukos and Sibneft, which it does; (ii) further, all tax reassessments were legitimate, which they were not; and (iii) in addition, the sale of Yuganskneftegaz was legitimate, which it was not, and assessing the Claimants' damages at US$ 107.966 billion, US$ 69.583 billion, and US$ 33.317 billion, respectively.

74.   In its Counter-Memorial, the Respondent chose not to challenge Navigant's valuation of the Claimants' expropriated investments underlying their principal claims for damages, instead seeking to divert the Tribunal's attention through a series of flawed objections.  When the Respondent did make an effort to address the subject, in its Rejoinder, its arguments were inaccurate and entirely divorced from historical data and contemporaneous valuations of YukosSibneft's assets.

75.   Navigant has provided the only reliable and methodologically sound model for calculating the compensation due to the Claimants by the Russian Federation for the expropriation of their investments in breach of Articles 10(1) and 13(1) ECT.

## V.   THE RESPONDENT'S OBJECTIONS SHOULD BE REJECTED

76.   *The Respondent's rehashed 'fork-in-the-road' objection is both* res judicata *and groundless.* The Respondent contends that the Tribunal lacks jurisdiction over the Claimants' claims because the Claimants are allegedly pursuing identical claims before the ECtHR. This very same objection was first raised in the jurisdiction and admissibility phase of these arbitrations and unequivocally dismissed by the Tribunal. It is entirely inappropriate for the Respondent to reopen this issue, which is *res judicata*, on the basis that it was allegedly poorly decided. Further, the Respondent's allegations that the Interim Awards were based on an "incorrect assumption" or that there are "special circumstances" justifying a new examination of the issue are unfounded. The Respondent's objection based on Article 26(3)(b)(i) ECT is manifestly without merit and must fail.

77.   *The Respondent's attempt to rely on Article 21 ECT is misguided.* The issues arising in relation to Article 21 ECT have already been briefed at length in the jurisdiction and admissibility phase of these arbitrations. In deferring the Respondent's objection based on Article 21 ECT to the merits phase, the Tribunal indicated that it did not wish to rule in a vacuum on the issue of the background to, and motivation behind, the Russian Federation's actions. In light of the Parties' pleadings on the

merits, it is clear that those actions had nothing whatsoever to do with the genuine exercise of the Russian Federation's taxation powers, but were rather solely intended to destroy Yukos and gain control of its assets. Article 21 ECT clearly was not meant to shield a Contracting Party from such egregious conduct.

78. Even assuming, however, that the Russian Federation's actions were a genuine exercise of its taxation powers, which they were not, those actions would nonetheless fall outside the scope of Article 21 ECT, which is limited to the enactment of tax provisions. Further, even if Article 21 ECT were applicable, which it is not, Article 21(5) ECT ensures that Article 13(1) ECT's substantive protection from expropriation remains fully intact. Finally, under any interpretation of Article 21 ECT, many of the Russian Federation's actions had nothing to do with taxation and thus fall outside the ambit of Article 21 ECT altogether.

79. Conversely, under the Respondent's interpretation of Article 21 ECT, save for expropriatory "charges or payments, to the exclusion of enforcement and collection measures, including interest and fines", investors would stand unprotected from any and all State actions, so long as the respondent State in an arbitration labels its actions as "taxation"—regardless of whether such actions had anything to do with taxation, or were being pursued with the sole aim of expropriating or otherwise harming an investor's investment. Such an interpretation, which would turn Article 21 ECT into a gaping hole in one of the key multilateral treaties on investment protection, is clearly untenable and should be rejected.

80. *The Respondent's so-called "unclean hands" theory is without merit.* The Respondent argues that over a period of approximately 12 years, an array of actors engaged in a variety of allegedly "illegal and bad faith misconduct" that somehow deprive the Claimants' investments of ECT protection. The Respondent's position is fundamentally unfounded for several reasons. *First*, the so-called "unclean hands" theory finds no support in the text of the ECT, customary international law, or investment treaty jurisprudence. *Second*, even assuming the existence of such a general principle of international law, which the Claimants deny, its scope would be dramatically more limited than the Respondent contends, such that the Respondent has not alleged any facts that could establish its applicability in the present case. As demonstrated by the Claimants, the Respondent's theory is premised almost exclusively on allegations of collateral illegalities, unrelated either to the making of the Claimants' investments, or to the Claimants' claims in these arbitrations, and all but one of which assert misconduct by third parties. *Third*, and in any event, the Respondent has failed utterly to substantiate any of its allegations. *Finally*, the principles of estoppel and proportionality prevent the Respondent from invoking such alleged illegalities in an attempt to escape liability for its violations of the ECT.

81. In its Rejoinder, while recounting its laundry list of alleged misconduct, the Respondent devotes attention solely to its allegation concerning the application of the 1998 Russia-Cyprus Double Taxation Agreement ("DTA"). Apart from the fact that: (i) this allegation has no bearing on the merits of these arbitrations; and (ii) these arbitrations are not the appropriate forum to hear and decide an alleged dispute on the application of the DTA, the Claimants have, in any event, demonstrated that this allegation is baseless. The Respondent's so-called "unclean hands" objection is thus without merit and must fail.

## VI.   REQUEST FOR RELIEF

82. For the reasons set out above, the Claimants respectfully request the Arbitral Tribunal to render an Award granting the relief set out in paragraph 1199 of the Claimants' Reply.

B.   RESPONDENT'S SKELETON ARGUMENTS

109. The text of the paragraphs below is produced directly from paragraphs 1 to 104 of Respondent's Skeleton Argument submitted on 1 October 2012 ("**Respondent's Skeleton**") (annexes omitted).

### I.   The Russian Federation Properly Assessed Taxes And Fines Against Yukos

1.   Yukos fraudulently evaded billions of dollars of Russian corporate profit tax from 1999 to 2004, abusing the program authorized by the Russian Government in the early 1990s to foster economic development in designated economically underdeveloped areas. Under this program, corporate profits in the low-tax regions were taxed at substantially reduced rates if the taxpayer complied with the applicable legal rules, including Russia's anti-tax abuse principles.

2.   In order to properly avail itself of the benefits available in a low-tax region, Yukos was required to comply with three legal regimes: (a) the federal statute authorizing the low-tax region program and the region's own statutes; (b) Yukos' agreements with the regional authorities; and (c) Russia's federal anti-tax abuse "bad faith taxpayer" doctrine.

3.   The federal bad faith taxpayer doctrine is rooted in Russia's federal Constitution, and has been applied by Russian tax authorities and courts in thousands of cases since the mid-1990s to condemn abusive transactions that, in substance, constitute unlawful tax evasion. As described by Yukos' own tax lawyers in commentaries they published before the assessments at issue in these arbitrations, this doctrine condemns as tax evasion transactions in which "the taxpayer's actions were aimed solely to reduce the amount of its tax payments rather than to achieve an economic result, [as] this would demonstrate that the relevant transaction was inconsistent with law because the motive underlying such transaction was to avoid tax […]. A person's actions aimed solely at tax evasion may not be regarded as actions made in good faith."

4.   Yukos abused the low-tax region program, and evaded Russian corporate profit tax in violation of the bad faith taxpayer doctrine, by implementing what Yukos referred to internally as its "tax optimization" scheme. Pursuant to this scheme, Yukos established dozens of sham "trading companies" in low-tax regions that had no business purpose, and then shifted its own profits to the sham trading companies. These sham trading shells had no genuine economic substance and served no purpose other than to reduce Yukos' tax liabilities, an arrangement described by Yukos' own lawyers as constituting unlawful tax evasion.

5.   The European Court of Human Rights ("ECtHR") unanimously rejected Yukos' challenge of the tax assessments that are at issue here, on the basis of the same core principles that underlie these arbitrations. The ECtHR found that Yukos' "tax optimization" scheme consisted of "switching the tax burden from [Yukos] and its production and service units to letter-box companies in domestic tax havens in Russia," and that these "letter box companies" had "no assets, employees or operations of their own [and] were nominally owned and managed by third parties, although in reality they were set up and run by [Yukos] itself."

6.   According to the ECtHR, the "letter-box companies" (a) purchased oil and oil products from Yukos' production companies at a fraction of their true market prices, (b) "acting in cascade, then sold the oil either abroad, this time at market price or to [Yukos'] refineries and subsequently re-bought it at a reduced price and re-sold it at the market price," (c) thereby accumulated most of Yukos' profits in the low-tax regions, resulting in Yukos paying substantially lower taxes on those

profits, and (d) then unilaterally transferred to Yukos, as a gift or in purported repayment of sham loans, the profits that had been improperly taxed at reduced rates in the low-tax regions. The ECtHR unanimously concluded that this scheme "was obviously aimed at evading the general requirements of the Tax Code […]."

7.      The Russian tax authorities concluded that Yukos' "tax optimization" scheme constituted unlawful tax evasion under the bad faith taxpayer doctrine. In particular, the Russian tax authorities found, and the Russian courts later agreed, that Yukos had abused the low-tax region program because its trading shells (a) did not engage in any genuine business activities in the low-tax regions, but were instead controlled by Yukos from Moscow, (b) purchased oil and oil products at below-market prices solely to artificially concentrate Yukos' profits in low-tax regions, and (c) made only paltry investments in the low-tax regions that were dwarfed by the tax benefits they claimed, thereby failing to fulfill the purpose of the low-tax region program.

8.      Yukos did not then -- or later -- offer any rationale for selling Yukos' oil through its network of low tax region trading companies other than reducing Yukos' own tax liabilities, nor have Claimants done so in these arbitrations.

9.      Yukos was aware of the bad faith taxpayer doctrine and the risk that its scheme would result in substantial tax assessments if the Russian authorities were ever to learn of it. Among other things, (a) Yukos knew that the authorities had previously denied the low-tax region benefits claimed by several sham trading shells in the Lesnoy region and Sibirskaya based on the same Russian anti-abuse rules that were later applied to Yukos (the Russian authorities only later learned that Yukos exercised *de facto* control over and management of Sibirskaya and the Lesnoy trading shells, and that Yukos surreptitiously liquidated the latter in order to prevent the collection of their overdue taxes), (b) Yukos managers had expressly warned the company's senior executives in internal memoranda that public disclosure of the scheme "will result in substantial tax claims against the Company," (c) as Yukos' former deputy general counsel later conceded, none of the company's external lawyers was willing to render an opinion endorsing its scheme (to the contrary, in refusing to render a "clean" opinion, one cited the need to comply with the same bad faith taxpayer doctrine that later led the Russian tax authorities and courts to find that Yukos was guilty of tax evasion), and (d) Yukos had access to the numerous court decisions applying the bad faith taxpayer doctrine to abusive tax schemes -- including those finding Lukoil, one of Yukos' major competitors, liable for substantial additional amounts for having abused the low-tax region program -- and to the published legal commentaries discussing the bad faith taxpayer doctrine and its requirements, including those written by its own tax lawyers.

10.     Yukos' knowledge that its "tax optimization" scheme was unlawful is further confirmed by Yukos' repeated lies to the tax authorities, the Russian courts, the ECtHR, and Yukos' own external auditors, including Yukos' knowingly false assertion that it was not affiliated with (and did not control) the sham trading shells, a point now conceded even by Claimants. Yukos' repeated false denial of its affiliation with the sham trading shells can only be explained by the company's awareness of the illegality of its scheme.

11.     Yukos' tax evasion was not victimless. The billions of dollars in tax benefits it wrongfully claimed caused commensurate damage to the regional budget of Moscow, where Yukos, as the real party in interest, should have paid profit tax at the full rate.

12.     Claimants' claims that the Russian authorities' measures were expropriatory and unfair are meritless. First, Claimants' contention that the legal principles applied by the Russian courts were "novel" or "vague" is, as the ECtHR unanimously found, refuted by the numerous Russian court decisions that applied these principles and similar ones to hold taxpayers liable for tax evasion since the mid-1990s, including

their abuse of the low-tax region program. Moreover, the published legal commentaries, including the guidance published by Yukos' own tax counsel, describe those principles in the same terms as they were applied to Yukos. The relevant Russian judicial precedents include those compiled for the Tribunal by Russian tax law expert Oleg Konnov, whose description of the history and content of the bad faith taxpayer doctrine Claimants have not sought to rebut with any expert testimony.

13. Mr. Konnov shows that the fines assessed against Yukos were also proper because, among other reasons, no taxpayer -- in Russia or elsewhere -- could legitimately claim to be surprised that it may not invoke a limitations period that has expired only because of its own obstruction of tax audits.

14. Claimants also ignore the extensive international precedents demonstrating that the principles applied by the Russian authorities and the actions they took against Yukos' tax evasion were consistent with those of ECT signatories and other nations worldwide.

15. Second, Claimants' attack on Yukos' VAT assessments -- holding Yukos liable for the VAT due on revenues nominally realized by the sham trading shells but properly attributable to Yukos itself -- is also meritless. As the ECtHR unanimously held, the Russian authorities acted properly in disregarding Yukos' sham trading shells for profit tax purposes and denying Yukos the benefit of the shells' 0% VAT filings. Claimants also ignore Yukos' still unexplained failure to submit proper 0% VAT returns in its own name after it received its December 29, 2003 tax audit report. It is not disputed that Yukos could have filed proper VAT returns -- nothing prevented it from doing so -- or that had it done so, it would have avoided more than half of its challenged tax liabilities.

16. Third, Claimants' assertion that the tax assessments were discriminatory is contradicted by the facts. The ECtHR unanimously rejected this charge. Several large Russian companies, including a number of Yukos' principal competitors, were also held liable for tax evasion and assessed substantial amounts of tax on grounds similar to those relied on by the Russian authorities and courts in dealing with Yukos. But unlike Yukos, these other companies promptly paid their taxes and, in the case of Lukoil, publicly abandoned its own "tax optimization" scheme.

17. There were also numerous material differences between Yukos' conduct and that of many other Russian oil companies: (a) no other Russian oil company committed abuses that were as egregious as those of Yukos, (b) none did so for as long as Yukos, (c) none attempted to conceal its abuses as did Yukos (to the extent of lying about them to the tax authorities, the courts, and even its own auditors), (d) none obstructed their tax audits as did Yukos, including by sending documents and employees to distant locations before they could be reviewed and interviewed, (e) none made investments in the low-tax regions that were so miniscule in comparison to the tax benefits they claimed, (f) none diverted billions of dollars offshore to prevent the collection of overdue taxes, and (g) none refused to pay their assessed taxes when ultimately required to do so.

18. Fourth, Claimants' contention that the Russian authorities knew and approved of Yukos' scheme is completely unsupported by any credible evidence, as the ECtHR again unanimously found. Claimants' contention cannot be reconciled with Yukos' unflagging efforts to conceal its scheme from the Russian authorities. Yukos would obviously have had no reason to hide its scheme if it believed the authorities were already aware of it, let alone had approved it, or if it thought its scheme was lawful and its disclosure would not lead to substantial tax claims. Yukos' efforts to conceal its scheme are reflected in (a) the company's convoluted offshore structures, serving no purpose other than to mask Yukos' affiliation with its sham trading shells, (b) Yukos' *seriatim* restructuring of its Lesnoy trading shells after their abuse of that

- 36 -

region's low tax program was discovered, (c) Yukos' management's internal warnings that disclosure of its scheme "will result in substantial tax claims against the Company," (d) Yukos' failure to disclose its scheme in its purportedly "transparent" financial statements, and (e) Yukos' repeated lies about its scheme to the tax authorities, the courts, the ECtHR, and its own auditors.

19.    In any event, as a matter of Russian law and as Claimants concede, even if the tax authorities had known of Yukos' scheme -- and there is no evidence they did -- they would not have been estopped from later challenging it.

20.    <u>Fifth</u>, Claimants' contention that the assessments against Yukos were fabricated as part of a politically motivated campaign to dismantle Yukos – an allegation on which Claimants have unambiguously staked their claims, contending that the assessments "cannot be explained in any other way" -- is, as the ECtHR again unanimously found, unsupported by any credible evidence. If the assessments were, as Claimants insist, the product of a massive political conspiracy spanning several years and involving numerous government agencies, engineered and implemented by hundreds if not thousands of officials, including no fewer than 60 judges at four different levels of courts, along with a large cast of third parties around the globe, then surely after nearly a decade of challenges -- by Yukos, its minority shareholders, and now Claimants -- at least one internal government memorandum, instruction or minute of a meeting evidencing or referring to the grand conspiracy alleged by Claimants would have surfaced, or one disgruntled former Government official would have reported having participated in a meeting or telephone call where the alleged conspiracy was discussed. Instead, Claimants rely solely on double and triple hearsay renditions of purported conversations by vocal opponents of the Russian Government, inaccurate and uninformed reports by political commentators, and sheer innuendo, none of which, even as proffered, competently supports Claimants' conspiracy allegations.

21.    Claimants' failure to prove the supposed vast conspiracy confirms that it is merely one more sham perpetrated by the Oligarchs who controlled Yukos and were ultimately responsible for its demise.

22.    Yukos' dealings with PricewaterhouseCoopers ("PwC") provide yet another example of Yukos' blaming the Russian Federation for the consequences of its own misconduct.

23.    PwC withdrew all of its Yukos audit opinions in June 2007 (after refusing to continue to audit the company's U.S. GAAP financial statements in 2003, itself an extraordinary event for a supposedly "transparent" company), following confirmation that Yukos' senior managers had repeatedly lied to PwC about, among other things, Yukos' *de facto* control over the management of its sham trading shells -- an essential element in the company's "tax optimization" scheme.

24.    Claimants' attempt to blame the Russian Federation for PwC's withdrawal of the firm's audit opinions finds no support in the record. To the contrary, both PwC's senior Russian representative at the time (in a contemporaneous private conversation with U.S. Embassy officials in Moscow) and PwC's senior Yukos auditor (in sworn U.S. deposition testimony) confirm that PwC, in withdrawing its audit opinions, acted in accordance with applicable auditing standards, a conclusion supported by Mr. John Ellison, a former KPMG LLP partner, in his unchallenged expert report. The U.S. deposition testimony of Mr. Douglas Miller, the PwC partner in charge of auditing Yukos, is especially relevant, because (a) it was sought by counsel for Messrs. Khodorkovsky and Lebedev on the grounds that it would provide the best opportunity to obtain a truthful account of the reasons for PwC's actions, and (b) Mr. Miller repeatedly rejected Claimants' "harassment" theory.

25.    On all of these points, the *RosInvestCo* and *Rovime* awards are inconsistent with the facts and Russian law, and ignore a wealth of uncontested international practice.

**II.     The Russian Federation Is Not Responsible For And Did Not Cause The Unwinding Of The Sibneft Merger**

26.     The Russian Federation is not responsible for the unwinding of Yukos' proposed merger with Sibneft because Claimants do not allege -- let alone establish -- that Sibneft was then exercising governmental authority or acting under the instructions of Russian State organs. Nor was the Russian Federation the cause of the unwinding of the merger. To the contrary, the Russian Federation repeatedly supported the proposed merger, and Claimants themselves acknowledge that the Russian Federation provided all of the approvals necessary for the merger, including approvals granted long after the Russian Federation's supposed attack on Yukos.

27.     The merger in fact collapsed because Yukos refused to accommodate Sibneft's request that Mr. Khodorkovsky, following his resignation from Yukos' management, be replaced by a Sibneft nominee as head of the to-be merged company. Sibneft's proposal would have left Yukos representatives in all of the surviving company's other senior management positions.

28.     Documents that Claimants were ordered to produce in these proceedings (over their objection) show that Claimants and Sibneft's principal shareholders agreed to unwind the merger without the payment of additional compensation by either side, an agreement fatal to Claimants' request for damages relating to the proposed merger. The same documents also reveal that Yukos' management proposed its own plan to unwind the merger without the payment of additional compensation, and that this plan contemplated the initiation of a "sham" lawsuit challenging the previously-completed exchange of Yukos and Sibneft shares. The contemplated lawsuit bears a striking resemblance to the actual lawsuit (challenged by Yukos in these arbitrations) that was brought by two of Yukos' shareholders and ultimately led to the legal unwinding of the merger without the payment of additional compensation.

29.     Claimants' assertion that the US$ 2 billion giga-dividend was required by the Sibneft merger is patently untrue. The record shows that the giga-dividend was approved on November 28, 2003 (and not on September 25, 2003, as Claimants falsely asserted in their Reply), one day after Yukos was informed that the Sibneft merger would not proceed. At the Extraordinary General Meeting of Yukos' shareholders held on November 28, Claimants voted against all the other shareholder proposals linked to the completion of the Sibneft merger, but supported payment of the giga-dividend "for Yukos" (that is, for Claimants to the extent of 70% of the dividend).

**III     Yukos Bears Sole Responsibility For The Consequences Of The Assessments Properly Made Against It, Because It Could Have Avoided Those Consequences -- And Reduced Its Liability By Well More Than Half – By Paying The Amounts Due During The First Quarter Of 2004, While Continuing To Challenge The Assessments In Full**

30.     During the first quarter of 2004, Yukos could have avoided well more than half of its ultimate tax exposure by paying its corporate profit taxes and the interest then due and by filing proper amended VAT returns in its own name. Had Yukos taken these few simple steps -- abiding by its own tax counsel's published advice as to how a taxpayer should mitigate its tax liabilities -- it would also have avoided all of the subsequent enforcement measures about which Claimants complain, and still preserved its right to seek a refund of all the taxes it paid.

31.     If Yukos had mitigated its liabilities in this way, its total exposure under the Russian court rulings that Claimants challenge in these arbitrations would have been capped at less than US$ 9.8 billion, rather than the US$ 25.8 billion that was ultimately assessed.

32.     Yukos had more than ample resources in the first quarter of 2004 to cap its tax exposure at less than US$ 9.8 billion and to satisfy that liability, even after paying its unprecedented US$ 2 billion giga-dividend, but it elected not to do so.

33.     Instead, Yukos pursued an irrational and ultimately self-destructive course of action, for which only the managers of Yukos, installed and controlled by Claimants, are to blame. This course of action included (a) Yukos' continuing denial of any liability for its assessed taxes, (b) Yukos' now acknowledged false denial that it controlled the sham trading shells, (c) Yukos' repeated obstruction of the actions taken by the Russian authorities to enforce and collect the company's overdue taxes, (d) Yukos' dissipation of its own assets and those of the companies it controlled, to frustrate the collection of the taxes it owed, and (e) Yukos' attempt to put pressure on the Russian Government by mounting an aggressive international lobbying and disinformation campaign that sought to politicize what, for the Russian authorities, was always a matter of tax evasion and collection.

34.     All of the subsequent enforcement proceedings and other measures about which Claimants now complain were thus the result of Yukos' own adamant refusal to acknowledge or mitigate its tax liabilities, and its repeated attempts to dissipate and conceal its assets and to frustrate the enforcement and collection of its overdue taxes. Had Yukos not persisted in this self-destructive course of action, there would have been no April injunction (discussed below), and YNG would not have been sold.

35.     Permitting Claimants to benefit from Yukos' self-inflicted wounds would contravene basic legal principles, and provide Claimants with a windfall -- beyond the billions of dollars they have already extracted from Yukos, including by way of dividends, share sales, and *stichting* assets -- to which they are not entitled.

**IV.     The Russian Federation Acted Properly In Enforcing The Tax Assessments Against Yukos, Including By Auctioning YNG**

36.     The tax assessments were enforced against Yukos in compliance with Russian law and after ample notice to Yukos. As the ECtHR unanimously concluded, there is "no reason to doubt that throughout the proceedings the actions of various authorities had a lawful basis and that the legal provisions in question were sufficiently precise and clear." The enforcement actions were also measured and appropriate in the circumstances and entirely consistent with international practice.

37.     Claimants' and Yukos' contention that Yukos was "surprised" by the timing of the assessment for 2000 and the need to make prompt payment is false and indicative of Yukos' lack of good faith. Promptly upon receipt of the December 29, 2003 audit report, Yukos' internal and external counsel advised Yukos that, under established Russian law and practice, it should expect to receive a final tax assessment within about a month, and that this assessment would require Yukos to make full payment promptly, most likely within one day. In the event, the tax assessment for 2000 was issued on April 14, 2004, more than two months later than Yukos' advisors had expected, and required payment in two days, not one.

38.     Although Yukos had ample notice of when and how much it would be required to pay, it made no effort to marshal the necessary assets, instead claiming that it was not able to pay, even though Claimants now acknowledge that Yukos had sufficient resources to pay all of its 2000 taxes.

39.     By the time of Yukos' April 2004 assessment, the tax authorities had learned that Yukos controlled the Lesnoy shell companies and had sought to prevent the payment of their overdue taxes by dissolving them. The tax authorities thus understandably applied to the Moscow Arbitrazh Court in April 2004 for enforcement of Yukos' 2000 tax liability and for an injunction prohibiting Yukos from selling or encumbering the company's shareholdings in its Russian subsidiaries.

40.     As the ECtHR held, the authorities' actions were neither arbitrary nor unfair:

"[T]he Ministry's action was lodged under the rule which made it unnecessary to wait until the end of the grace period if there was evidence that the dispute was insoluble and, regard being had to the circumstances of the case, [the Court] finds no indication of arbitrariness or unfairness […] in this connection." [emphases added]

41.     The April injunction did not affect Yukos' use of its substantial on- and off-shore cash resources, and did not affect Yukos' offshore assets at all. Yukos nonetheless falsely claimed that the injunction prevented Yukos from paying its taxes, again evidencing its lack of good faith and credibility.

42.     No further enforcement efforts were taken for more than two months. During this period, Yukos continued to generate close to US$ 2 billion each month in gross receipts that Yukos partly transferred off-shore and partly used to voluntarily pay its loan to GML's Moravel shell subsidiary -- but not to pay its tax liabilities.

43.     Yukos also began a pattern of diminishing the value of its assets, often to the benefit of Claimants and the Oligarchs whose interests they represented. For example, Yukos forced its production subsidiaries to guarantee Yukos' already outstanding US$ 1.6 billion loan from Moravel, corroborating the concerns that had led the authorities to obtain the April injunction.

44.     Following Yukos' failure to make (or even to promise to make) any tax payments, as well as its dissipation of substantial assets, Russia's bailiffs finally attached a number of Yukos' on-shore bank accounts at the end of June 2004 -- ten weeks after the April tax assessment and 26 weeks after Yukos' legal advisors advised that it needed to be prepared to pay promptly. It was only then that Yukos began to pay some, but not all, of its taxes.

45.     The authorities also sought to seize Yukos' shares in its production subsidiaries to prevent Yukos from encumbering them. True to form, Yukos attempted to frustrate the bailiffs' efforts by terminating the share registry company contract for its production subsidiaries and concealing their registries, directing that they be sent from central Moscow to remote locations around the country.

46.     Yukos also took steps to reduce the value of its largest production subsidiary, YNG. First, Yukos caused YNG to stop paying its mineral extraction taxes, imperiling its production licenses. Second, Yukos and its trading shells stopped paying YNG for its crude oil, leaving YNG with more than US$ 4 billion in unpaid invoices. And third, Yukos continued to divert funds to GML, its majority shareholder, arranging for the payment of more than US$ 700 million to Moravel, even after the cash freeze orders were in place.

47.     Yukos also made a series of bad faith offers to "settle" a portion of its tax liabilities, repeatedly offering Sibneft shares as a partial payment or as security for proposed future payment, even though Russian law did not allow payment in kind, Yukos' title to the proffered shares had been challenged by a third-party, and an injunction had been issued (at the request of the third-party) prohibiting their sale or encumbrance.

48.     During this entire period, nothing prevented Yukos from selling its assets subject to the bailiffs' approval and using the proceeds to pay its tax obligations.

49.     Thus, the authorities found themselves confronted by a company that was fiercely resisting the payment of its overdue taxes, that had previously obstructed its tax audit, lied to the tax authorities and courts, and attempted to make itself and its subsidiaries judgment proof, and that was now burdening the tax authorities' principal security -- YNG -- with new liabilities. In these circumstances, the bailiffs understandably decided to sell a majority of YNG's shares -- the only

realistic way to timely collect Yukos' unpaid taxes. Despite criticizing the bailiffs for not adequately documenting their decision-making process, the ECtHR concluded that the bailiffs' actions were not unreasonable. It is commonplace in other countries too for tax collection authorities to sell first the assets that best ensure payment.

50.    The sale of the YNG shares was carried out in accordance with Russian law and consistent with international practice. The authorities could have sold the shares to a designated purchaser in a directly negotiated transaction, but instead granted Yukos' request that the shares be auctioned. A formal and careful appraisal was conducted by DKW, and the starting price for the auction was set at a level consistent with DKW's appraisal, taking account of the fact that only 76.79% of the company's shares were sold and that YNG had its own outstanding tax liabilities. All bidders, foreign or domestic, were welcome to participate.

51.    Claimants and Yukos did all they could to prevent the auction from succeeding, threatening a "lifetime of litigation" against anyone who participated in or facilitated the sale. Yukos also initiated sham bankruptcy proceedings in Houston, obtaining a temporary restraining order ("TRO") that prevented all the previously announced bidders and all of their banks from participating in the auction. If the price achieved was lower than it might otherwise have been, the fault lies solely with Claimants and Yukos.

52.    The YNG auction achieved a price of approximately US$ 9.4 billion, US$ 500 million more than the starting price. This result was consistent with the shares' appraised value and contemporaneous fair market value estimates.

53.    The evidence does not support Claimants' contention that the winning bidder, Baikal Finance, conspired with Rosneft. Rather, Baikal Finance found itself unable to finance its winning bid because of the Houston court's TRO, and thus at risk of losing its US$ 1.7 billion deposit unless a substitute purchaser, not dependent on immediate bank financing, could be found on very short notice. Rosneft simply seized a commercial opportunity that presented itself as a result of Claimants' misconduct.

54.    The net proceeds of the YNG sale were not sufficient to meet all of Yukos' tax obligations. The Russian authorities nonetheless gave Yukos ample time to pay the remaining balance, but it declined to do so, making clear that its priority was to place assets behind the shield of the Dutch *stichtings*.

**V.    The Russian Federation Acted Properly In Connection With Yukos' Bankruptcy, Which Was Precipitated By Yukos' Failure To Pay Its Debts To The SocGen Syndicate, And Is Not Attributable To The Russian Federation**

55.    Claimants' bankruptcy-related claims fail because critical conduct essential to these claims was taken by actors for which the Russian Federation is not responsible, including the SocGen syndicate, YNG, Rosneft, the Federal Tax Service acting as creditor, the meeting and committee of Yukos' creditors, Yukos' interim manager and bankruptcy receiver, the participants in Yukos' bankruptcy auctions, and the purchasers of the auctioned assets sold. In taking the actions complained of by Claimants, none of these actors was exercising sovereign authority or acting pursuant to the direction or control of sovereign authority. Claimants have provided no evidence on which the Tribunal could make a contrary finding.

56.    Yukos' dilatory and obstructionist treatment of its commercial creditors paralleled closely its treatment of the tax authorities. In both instances, Yukos (a) falsely claimed it was unable to meet its obligations, (b) forced its creditors to pursue their claims in multiple court proceedings where Yukos presented unsubstantiated defenses, (c) offered to negotiate with its creditors only when they were close to collecting their claims, (d) made unrealistic settlement proposals that were

subsequently withdrawn, and (e) together with its controlling shareholders, strenuously resisted all collection efforts, prompting more aggressive action on the part of its creditors.

57.    Both sides agree that Yukos' bankruptcy was initiated by the SocGen syndicate, based upon Yukos' failure to pay an outstanding English court judgment after it was recognized in Russia.

58.    The SocGen syndicate simultaneously also sought payment of the same debt from Rosneft pursuant to the 2004 loan guarantee that Yukos had foisted on YNG, which Rosneft then owned. Although Rosneft disputed the validity of the guarantee, Rosneft required forbearance from the same banks on covenant breaches arising from the YNG acquisition, and Rosneft needed the banks' cooperation for its planned IPO.   The convergence of the syndicate's and Rosneft's commercial interests resulted in their agreeing that Rosneft would pay the syndicate in full, but only after the syndicate had pursued all legal avenues to obtain payment from Yukos, the primary obligor. If Rosneft instead paid, the syndicate's rights under the loan agreement were to be assigned to Rosneft.

59.    Claimants acknowledge that this agreement was commercially-motivated and on commercial terms, but contend that its confidentiality clause evidences a conspiracy on the part of the SocGen syndicate to act secretly on behalf of Rosneft, which Claimants improperly equate with Respondent. The confidentiality clause, however, was itself a standard commercial term necessary to preserve the possibility that Yukos would pay the SocGen syndicate before Rosneft became unconditionally obligated to do so, and remained in effect only for so long as Yukos' payment would have discharged Rosneft's own obligation to pay the syndicate.

60.    Yukos satisfied the criteria for bankruptcy under Russian law due to its persistent failure to pay its commercial creditors, and was insolvent long before the proceedings were commenced. This is also undisputed.

61.    The proceedings were conducted in compliance with Russian law and international practice. The courts properly allowed the Federal Tax Service's, Rosneft's and YNG's claims, and substantial amounts of YNG's claims were never disputed by Yukos. Belying Claimants' discrimination charge, the courts also allowed some Yukos related-party claims, but properly rejected other abusive claims, such as the Moravel loan, a barely disguised attempt to turn equity into debt.

62.    Yukos' management, actively supported by Claimants, had the opportunity to present a rehabilitation plan to the meeting of creditors. The rough outline management submitted was, however, legally defective and did not provide any basis for creditors to prefer rehabilitation to liquidation. It was not properly presented to or approved by Yukos' shareholders, did not meet the legal requirement that the company's tax claims be satisfied within six months, and did not ensure full, let alone timely, payment of Yukos' creditors' claims.

63.    Once Yukos' liquidation was properly approved, the company's assets were sold at auction in accordance with Russian law and international practice. Yukos' receiver obtained appraisals for the fair value of the assets, and used those appraisals to set minimum bids in the auctions, all of which were exceeded, some by very large margins. The auctions were open to domestic and foreign bidders, adequately noticed and advertised, and competitive. To the extent that any bidders may have been discouraged from participating, this was again the result of Claimants and Yukos having threatened potential bidders with legal action. While the aggregate results exceeded Yukos' own (and other) contemporaneous fair market value estimates, more than US$ 9 billion in creditor claims nonetheless remained unsatisfied.

VI.     **Claimants Have Failed To Establish *Sine Qua Non* Elements Of Their Article 13 And 10(1) ECT Claims**

A.      **Article 21 ECT**

64.     First, as an initial matter, Claimants' claims must be based on measures outside the taxation carve-out of Article 21(1) ECT or, alternatively, within Article 21(1) ECT, but subject to one of the claw-backs of Article 21(2) to (5) ECT.

65.     Taxation carve-outs such as this one fulfill plainly legitimate functions. They (a) preserve the Contracting Parties' sovereign power in the field of taxation, which is of critical importance to the very existence of a State, (b) delineate the extensive network of investment treaties from the even broader network of taxation treaties, (c) pay due regard to the complexity of tax matters, and, in many cases, preserve the coordination role of the competent tax authorities under double taxation treaties.

66.     To fulfill these functions, taxation carve-outs are typically broad, covering all aspects of tax regimes, including tax enforcement measures.

67.     Article 21(1) ECT, under its plain meaning, covers the whole range of measures taken by all branches of government in the field of taxation. Tax legislation and enforcement measures are inextricably linked, and it is not possible to meaningfully dissociate them in the context of Article 21(1) ECT.

68.     The core allegations on which Claimants base their claims are squarely within the scope of Article 21(1) ECT: tax audits, tax assessments, interest and fines provoked by Yukos' failure to pay its assessed taxes, measures to ensure the effective collection of its taxes, and the sale of Yukos' assets to satisfy its tax liabilities.

69.     Claimants seek to avoid Article 21 ECT on two grounds, that Article 21(7)(a) ECT limits the scope of the taxation carve-out to tax legislation and tax treaties and does not apply to *mala fide* taxation measures. These arguments are baseless.

70.     Article 21(7)(a) ECT contains an illustrative list of taxation measures that does not replace the term "measures" with the term "provisions," but underscores that the term "Taxation Measures" covers all aspects of the tax regime, including international and domestic measures.

71.     Claimants' position that Article 21(1) ECT is inapplicable to the taxation measures they complain about fails as a matter of fact and law. The record shows that the taxation measures at issue were a justified response to Yukos' massive tax fraud and its willful strategy to obstruct efforts to collect the taxes due. As a matter of law, Claimants mix two issues, the concept and definition of "Taxation Measures," on the one hand, and their legality, on the other. Legality is determined under Part III of the ECT, but only to the extent of the claw-backs pursuant to Article 21(2) to (5) ECT.

72.     Article 21 ECT contains no claw-back for Article 10(1) ECT, and the Tribunal therefore lacks jurisdiction over core allegations of Claimants' Article 10(1) ECT claims.

73.     Article 21(5) ECT contains a claw-back for Article 13 ECT claims, but is applicable only to "taxes," and is combined with a mandatory referral to the competent tax authorities, a procedure invoked by Respondent in these proceedings. The expropriation claw-back, in its ordinary meaning, supported by the *travaux préparatoires*, applies to charges imposed by the State for public purposes, excluding tax enforcement and collection measures. When compared to the varying practices with respect to clawbacks in taxation carve-outs, the deliberate choice of the ECT negotiating States to reinstate expropriatory "taxes" represents a middle ground, which must be respected.

**B.     Article 13(1) ECT**

74.     In order to establish their claim for a breach of Article 13(1) ECT, Claimants must show that, in addition to being outside the scope of the taxation carveout of Article 21(1) ECT -- or within Article 21(1) ECT, but **reinstated** by Article 21(5) ECT -- the measures complained of must be "measures having effect equivalent to nationalization or expropriation."

75.     <u>First</u>, Claimants have failed to establish that conduct not carved-out by Article 21 ECT that is (a) attributable to Respondent, and (b) an exercise of its sovereign power caused a total or near total deprivation of Claimants' investment. Critically, the core allegations of Claimants' claims are outside the scope of Article 13(1) ECT by virtue of Article 21 ECT. Moreover, Yukos itself engaged in conduct -- by refusing to pay the assessments against it when due, while preserving its right to challenge them – that directly resulted in the company's demise and the ensuing loss of Claimants' investments. Finally, conduct that was essential to Yukos' liquidation, including in particular the filing of the bankruptcy petition by the SocGen syndicate, and the creditors' meeting decision to liquidate Yukos, is not expropriatory because it is not attributable to Respondent under the rules of State responsibility, or does not involve an exercise of sovereign power.

76.     <u>Second</u>, Claimants have failed to establish that the measures complained of frustrated distinct, reasonable, investment-backed expectations, an important element in assessing whether regulatory measures amount to "measures having effect equivalent to nationalization or expropriation." Claimants had no right or legitimate expectation to operate Yukos in violation of Russian law, and no right or legitimate expectation that Respondent would exempt Yukos from the tax enforcement and collection measures about which Claimants complain if Yukos failed to pay its taxes and obstructed the collection of taxes due.

77.     In particular, Claimants have failed to establish that Respondent at any time made a representation, based upon complete disclosure, that it would allow Yukos to operate its fraudulent tax evasion scheme or refrain from enforcing and collecting the taxes Yukos owed. Yukos' tax evasion scheme was illegal under Russian law when Claimants made their investments, and the tax enforcement and collection measures taken against Yukos were all provided for by Russian law at that time. The bad faith taxpayer anti-abuse doctrine that Respondent's tax authorities and courts applied to counter Yukos' tax evasion  dates back to the mid 1990s, well before Claimants acquired their Yukos shares.

78.     <u>Third</u>, putting aside the other elements required to establish "measures having effect equivalent to nationalization or expropriation," the executive and judicial measures at issue, in any event, constitute a legitimate exercise of Respondent's regulatory power.

79.     The measures alleged to be expropriatory are well within the range of what is generally accepted as a legitimate exercise of States' police powers. First, Respondent has established that the measures complained of accord in all material respects with international and comparative standards.

80.     Second, the measures challenged by Claimants conform with Russian law, which in turn accords with international standards, and have been reviewed and upheld by multiple levels of Respondent's judiciary, including the Russian Supreme Court.

81.     Third, the European Court of Human Rights has found that the very same measures Claimants allege to be expropriatory were a legitimate exercise of Respondent's regulatory power.

82.     Fourth, the measures complained of must be assessed in their proper context -- Yukos' massive tax evasion, compounded by its illegal and deliberate strategy to frustrate any effort by the authorities to collect the company's overdue taxes.

83.   Contrary to Claimants' perception, respect for the rule of law is not a oneway-street. Foreign investors have a duty to abide by the law, pay taxes, provide required disclosures of their activities in the host State, and cooperate with the authorities.

84.   Measures taken to combat illegal conduct may legitimately result in the loss of an investment. Yukos' tax evasion scheme violated Russian law, and the assessment of the evaded taxes was a legitimate measure to combat Yukos' fraud. The resulting tax enforcement and collection measures were completely justified in light of Yukos' failure to pay the assessed taxes and its willful obstruction of Respondent's collection efforts. Indeed, none of the subsequent enforcement measures, including the auction of YNG, would have occurred, and Yukos would not have been liquidated, had Yukos acted as a responsible taxpayer should have done.

### C.   Article 10(1) ECT

85.   Claimants' Article 10(1) ECT claims fail for many of the same reasons as their expropriation claim. At the threshold, the core allegations on which Claimants base their Article 10(1) ECT claims are within the taxation carve-out of Article 21(1) ECT. The Tribunal therefore lacks jurisdiction over these claims and Article 10(1) ECT is inapplicable.

86.   Again, at the threshold, critical conduct alleged to be unlawful under Article 10(1) ECT is not attributable to Respondent or not an exercise of sovereign authority. The harm attributed to Respondent's alleged breaches of Article 10(1) ECT, the loss of Claimants' Yukos shares, was caused by Yukos' own misconduct and conduct of third parties not attributable to Respondent. Claimants have failed to show that any of the irregularities they allege in the administrative and judicial proceedings at issue affected the outcome of the case, the liquidation of Yukos, and the ensuing loss of Claimants' shares.

87.   In any event, Claimants have failed to establish that the challenged measures interfered with their legitimate expectations at the time they made their investment or were not taken in the proper exercise of the authorities' statutory duties. The contested measures (a) accord with international and comparative standards, (b) were reviewed and upheld by the Russian courts, and (c) have been assessed by the ECtHR to be a legitimate exercise of Respondent's taxation power.

88.   Finally, but no less important, the host State's conduct under Article 10(1) ECT cannot be assessed in isolation from that of the investor or its investment. Yukos' massive tax fraud and illegal obstruction of the efforts to collect the taxes it owed provoked the measures complained of, which were justified responses to combat Yukos' illegal conduct and enforce overdue taxes. None of the measures at issue can therefore be said to be arbitrary, unfair, or inequitable for purposes of Article 10(1) ECT.

89.   Nor are such measures discriminatory within the meaning of Article 10(1) ECT. Article 10(1) ECT does not establish a right of impunity based on the host State's authorities' alleged failure to enforce mandatory legal requirements, and Claimants have in any event failed to show nationality-based discrimination, or unjustified differential treatment of similar cases.

### VII.   The Tribunal Lacks Jurisdiction Over Claimants' Claims Concerning The Alleged Mistreatment Of Messrs. Khodorkovsky And Lebedev And Other Yukos Officials, And In Any Event, These Claims, And Claims Concerning Searches Of Yukos Records, Are Unsupported

90.   The Tribunal should reject Claimants' attempt to distract its attention from the only matter that is genuinely at issue in these arbitrations -- Claimants' investments in Yukos, and the consequences for those investments of Yukos' tax evasion scheme -

- with extensive allegations concerning the arrests and prosecution of Yukos officials and searches and seizures of the company's records.

91.    First, the Tribunal cannot assert jurisdiction under Article 26 ECT to address alleged violations of the rights of Yukos officials, because Claimants have not proven that any such violations directly impaired Claimants' management or control of their investments. To the contrary, Yukos expressly confirmed after Mr. Khodorkovsky's arrest and subsequent resignation that they had "no impact whatsoever on [its] operations," and Mr. Lebedev did not even hold a position with Yukos at that time. The prosecutions of Messrs. Khodorkovsky and Lebedev likewise did not impair Yukos' performance, which the company informed its investors in 2005 "was extremely healthy."

92.    Claimants have also failed to establish that the prosecutions of any Yukos officials reflect a systemic failure of the Russian judicial system or, at a minimum, were fundamentally unjustified or groundless. To the contrary, all were reviewed by the Russian courts at multiple levels, and by the ECtHR (with respect to the initiation of Mr. Khodorkovsky's prosecution), and were found to be in accord with Russian law and international standards. Tellingly, Claimants have never disputed that Mr. Khodorkovsky, Mr. Lebedev, or any of the other Yukos officials who were convicted of crimes related to their management of Yukos, actually committed those crimes, relying instead on conclusory complaints about various procedural matters, based on mischaracterizations of the pertinent facts.

93.    Finally, Claimants have not established that the searches of certain of Yukos' offices and the seizure of certain of its records pursuant to the official investigations of its misconduct were expropriatory, evidence a systemic judicial failure, or were otherwise fundamentally unjustified or groundless. This allegation is at best ironic, in light of Yukos' unrelenting obstruction of those investigations. It is also unsustainable. All of these procedures conformed to Russian law, and Yukos' own contemporaneous public statements and internal documents confirm that Yukos itself did not believe they had any significant impact on the company.

**VIII.   The Tribunal Lacks Jurisdiction Over Claimants' Claims, Or Must Dismiss Them, Because They Are Based On Illegal Conduct By Claimants And The Yukos Managers They Installed And Controlled**

94.    The Oligarchs who controlled Claimants acquired and consolidated their investments in Yukos through illegal acts and bad faith conduct, and thereafter perpetrated -- either directly or through the Yukos managers they installed and controlled -- a long series of illegal acts, including the tax evasion that is at the heart of these arbitrations.

95.    Claimants contend that these illegalities are "collateral" or "unrelated to" their investments, even though they relate to the acquisition or enhancement of the value of Yukos, or to Claimants' own unlawful abuse of the Russia-Cyprus Tax Treaty. Through that abuse, Claimants themselves fraudulently evaded -- in violation of both Russian and Cypriot criminal laws -- more than US$ 230 million in Russian withholding taxes, and more than triple that amount in Russian profit taxes.

96.    This history of repeated illegal conduct by Claimants -- culminating in the diversion of assets worth billions of dollars to the illegally-created Dutch *stichtings*, placing those assets beyond the reach of the Russian tax authorities -- deprives the Tribunal of jurisdiction over Claimants' claims, because ECT protection does not extend to illegal investments, or requires that the Tribunal dismiss those claims under the principle of unclean hands. The Tribunal should reject Claimants' attack on the existence of the principle of unclean hands in international law, as well as their baseless charge that Respondent is estopped from raising Claimants' illegalities.

### IX.   Claimants Have Failed To Establish Any Entitlement To Damages

97.   Claimants are not entitled to any compensation, in light of (a) their own illegal conduct, including their and the Oligarchs' illegal acquisition and consolidation of their ownership and control of Yukos, their abuse of the Russia-Cyprus Tax Treaty, and their implementation of Yukos' tax evasion scheme, and (b) Yukos' failure to mitigate its tax liability, and Yukos' and Claimants' actions to prevent the collection of Yukos' overdue taxes.

98.   Claimants are not entitled to any compensation for acts of the Russian Federation that are within the carve-out of Article 21(1) ECT and not within the clawback of Article 21(5) ECT.

99.   Claimants also are not entitled to any compensation based on Yukos' claimed value at any given point in time, because they have failed to demonstrate any causal link between any diminution in Yukos' then-supposed value and specific violations of the ECT. Claimants' "all-or-nothing" approach does not provide a means by which the Tribunal can (a) assess whether the Russian Federation's actions constituted an "expropriation," or (b) quantify the damages, if any, arising in the event some, but not all, of the measures Claimants complain about are found to violate the ECT. This is the inevitable result of Claimants' failure to present a damages measure, but instead a static valuation, devoid of any causation analysis.

100.   Claimants' valuations also fail on their own terms, because they are entirely dependent on Claimants' unsustainable valuation date of November 21, 2007.

101.   Claimants and their expert concede that the valuations presented in their opening submissions are infected by numerous material errors. These errors fatally undermine Claimants' core assertions and render Claimants' evidence unreliable for any purpose. The revised valuations submitted in Claimants' Reply are likewise riddled with errors and are manifestly result-driven, leaving Claimants with no competent evidence of damages at all. This is true, too, of their "method of collection" scenarios, which are unsupportable and fail of their own terms.

102.   Once Yukos chose not to mitigate its tax liability during the first quarter of 2004 - - by paying no more than US$ 9.8 billion, capping its tax exposure at that amount and avoiding all of the subsequent enforcement measures -- there was no realistic means by which Yukos could have paid all of its liabilities, let alone continued in business as a going concern. Claimants' failure to mitigate is a further reason why their damages model, based on the claimed value of Yukos as of a given date, does not provide a meaningful measure of damages. Thus, even if the Tribunal were to conclude that an award of damages is warranted, it must be capped at Claimants' proportionate interest in the amount, if any, of Yukos' unavoidable liabilities -- not more than US$ 9.8 billion -- that the Tribunal concludes were improperly assessed.

103.   Claimants' damages claim represents a 58% compound annual rate of return on their investment in Yukos. Claimants' requested rate of return fails to take account of Claimants', the Oligarchs', and Yukos' unlawful misconduct and is well beyond that which any legitimate investor would have earned.

104.   Measured against a reasonable return on investment, and after taking account of the returns on their investment in Yukos that Claimants have already received (not to mention the fruits of their ill-gotten gains and assets secreted offshore), Claimants have not incurred any damages at all.

## IV.   PARTIES' REQUESTS FOR RELIEF

### A.   RELIEF REQUESTED BY CLAIMANTS

110.   Claimants request that the Tribunal render an Award:

(1)   Declaring that the Respondent has breached its obligations under Article 10(1) of the Energy Charter Treaty;

(2)   Declaring that the Respondent has breached its obligations under Article 13(1) of the Energy Charter Treaty;

(3)   Ordering the Respondent to pay to the Claimants, in full reparation of their damages, an amount to be determined by the Arbitral Tribunal, estimated by the Claimants at no less than US$ 114.174 billion, to be shared between the Claimants in the following proportions:

- Hulley Enterprises Limited        US$ 93.229 billion
- Yukos Universal Limited          US$ 4.666 billion
- Veteran Petroleum Limited        US$ 16.279 billion

(4)   Ordering the Respondent to pay post-award interest on the above sums to the Claimants at the rate of Libor + 4% compounded annually from the date of the Award until the date of full payment;

(5)   Ordering the Respondent to pay to the Claimants the full costs of these arbitrations, including, without limitation, arbitrators' fees, administrative costs of the PCA, counsel fees, expert fees and all other costs associated with these proceedings;

(6)   Dismissing all of the Respondent's defenses;

(7)   Ordering any such further relief as it may deem appropriate.[7]

### B.   RELIEF REQUESTED BY RESPONDENT

111.   Respondent requests that the Tribunal render an Award:

(a)   Dismissing Claimants' claims on the ground that the Tribunal lacks jurisdiction to entertain them;

(b)   In the alternative, dismissing Claimants' claims on the ground that they are inadmissible;

(c)   In the alternative, dismissing Claimants' claims on the merits in their entirety;

(d)   In the alternative, declaring that Claimants are not entitled to the damages they seek, or to any damages;

(e)   Ordering Claimants to pay the Russian Federation's costs, expenses, and attorney's fees;

---

[7]   Reply ¶ 1199.  *See also* Claimants' Memorial on the Merits, 15 September 2010 (hereinafter "Memorial") ¶ 1056; Claimants' Post-Hearing Brief, 21 December 2012 (hereinafter "Claimants' Post-Hearing Brief") ¶ 302.

(f)   Granting such further relief against the Claimants as the Tribunal deems fit and proper.[8]

## V.   APPLICABLE LAW

### A.   PROCEDURAL LAW

112.   The procedural law to be applied by the Tribunal consists of the procedural provisions of the ECT (particularly Article 26), the UNCITRAL Rules of 1976, and, because The Hague is the place of arbitration, any mandatory provisions of Dutch arbitration law.  The Final Awards are made pursuant to Article 1049 of the *Netherlands Arbitration Act 1986.*

### B.   SUBSTANTIVE LAW

113.   The substantive law to be applied by the Tribunal consists of the substantive provisions of the ECT, the Vienna Convention on the Law of Treaties ("**VCLT**"),[9] and applicable rules and principles of international law, including those authoritatively set out in the Articles on Responsibility of States for Internationally Wrongful Acts of the International Law Commission of the United Nations ("**ILC Articles on State Responsibility**").[10]  In addition to the foregoing sources, the national law of the Russian Federation is relevant with regard to certain issues.

#### 1.   Energy Charter Treaty

114.   Throughout this Award, the Tribunal refers to and analyzes specific provisions of the ECT.  For ease of reference, the key relevant provisions are also collected and reproduced below, in the order in which they appear in the Treaty:

---

[8]   Counter-Memorial ¶ 1654; Respondent's Rejoinder on the Merits, 16 August 2012 (hereinafter "Rejoinder") ¶ 1748; Respondent's Post-Hearing Brief, 21 December 2012 (hereinafter "Respondent's Post-Hearing Brief") ¶ 263.

[9]   Vienna Convention on the Law of Treaties, Vienna, 23 May 1969, 1155 UNTS 331.

[10]   Draft Articles on Responsibility of States for Internationally Wrongful Acts with commentaries (Text adopted by the International Law Commission at its fifty-third session, in 2001), Arts. 1–11 and 28–39, Exh. C-1042; Arts. 49–54, Exh. C-1681 (hereinafter "ILC Articles on State Responsibility").  The full text of the ILC Articles, along with parts of the official commentary, was also submitted by Respondent.  *See* Exhs. R-1031 and R-4235.  The Tribunal is aware that Part II of the ILC Articles on State Responsibility, which sets out the consequences of internationally wrongful acts, is concerned with claims between States and may not directly apply to cases involving persons or entities other than States.  That being said, the ILC Articles reflect customary international law in the matter of state responsibility, and to the extent that a matter is not ruled by the ECT and there are no circumstances commanding otherwise, the Tribunal will turn to the ILC Articles on State Responsibility for guidance.  The Tribunal further notes that both Parties have cited to and relied on Parts I and II of the ILC Articles on State Responsibility in their submissions.

*Article 10*
PROMOTION, PROTECTION AND TREATMENT OF INVESTMENTS

(1)   Each Contracting Party shall, in accordance with the provisions of this Treaty, encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area.  Such conditions shall include a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment.  Such Investments shall also enjoy the most constant protection and security and no Contracting Party shall in any way impair by unreasonable or discriminatory measures their management, maintenance, use, enjoyment or disposal.  In no case shall such Investments be accorded treatment less favourable than that required by international law, including treaty obligations.

[. . .]

*Article 13*
EXPROPRIATION

(1)   Investments of Investors of a Contracting Party in the Area of any other Contracting Party shall not be nationalized, expropriated or subjected to a measure or measures having effect equivalent to nationalization or expropriation (hereinafter referred to as "Expropriation") except where such Expropriation is:

(a)   for a purpose which is in the public interest;

(b)   not discriminatory;

(c)   carried out under due process of law; and

(d)   accompanied by the payment of prompt, adequate and effective compensation.

Such compensation shall amount to the fair market value of the Investment expropriated at the time immediately before the Expropriation or impending Expropriation became known in such a way as to affect the value of the Investment (hereinafter referred to as the "Valuation Date").

Such fair market value shall at the request of the Investor be expressed in a Freely Convertible Currency on the basis of the market rate of exchange existing for that currency on the Valuation Date.  Compensation shall also include interest at a commercial rate established on a market basis from the date of Expropriation until the date of payment.

[. . .]

*Article 21*
TAXATION

(1)   Except as otherwise provided in this Article, nothing in this Treaty shall create rights or impose obligations with respect to Taxation Measures of the Contracting Parties.  In the event of any inconsistency between this Article and any other provision of the Treaty, this Article shall prevail to the extent of the inconsistency.

[. . .]

(5)   (a)   Article 13 shall apply to taxes.

(b) Whenever an issue arises under Article 13, to the extent it pertains to whether a tax constitutes an expropriation or whether a tax alleged to constitute an expropriation is discriminatory, the following provisions shall apply:

(i) The Investor or the Contracting Party alleging expropriation shall refer the issue of whether the tax is an expropriation or whether the tax is discriminatory to the relevant Competent Tax Authority.  Failing such referral by the Investor or the Contracting Party, bodies called upon to settle disputes pursuant to Article 26(2)(c) or 27(2) shall make a referral to the relevant Competent Tax Authorities;

(ii) The Competent Tax Authorities shall, within a period of six months of such referral, strive to resolve the issues so referred.  Where nondiscrimination issues are concerned, the Competent Tax Authorities shall apply the non-discrimination provisions of the relevant tax convention or, if there is no non-discrimination provision in the relevant tax convention applicable to the tax or no such tax convention is in force between the Contracting Parties concerned, they shall apply the non-discrimination principles under the Model Tax Convention on Income and Capital of the Organisation for Economic Co-operation and Development;

(iii) Bodies called upon to settle disputes pursuant to Article 26(2)(c) or 27(2) may take into account any conclusions arrived at by the Competent Tax Authorities regarding whether the tax is an expropriation.  Such bodies shall take into account any conclusions arrived at within the six-month period prescribed in subparagraph (b)(ii) by the Competent Tax Authorities regarding whether the tax is discriminatory.  Such bodies may also take into account any conclusions arrived at by the Competent Tax Authorities after the expiry of the six-month period;

(iv) Under no circumstances shall involvement of the Competent Tax Authorities, beyond the end of the six-month period referred to in subparagraph (b)(ii), lead to a delay of proceedings under Articles 26 and 27.

[. . .]

(7) For the purposes of this Article:

(a) The term "Taxation Measure" includes:

(i) any provision relating to taxes of the domestic law of the Contracting Party or of a political subdivision thereof or a local authority therein; and

(ii) any provision relating to taxes of any convention for the avoidance of double taxation or of any other international agreement or arrangement by which the Contracting Party is bound.

(b) There shall be regarded as taxes on income or on capital all taxes imposed on total income, on total capital or on elements of income or of capital, including taxes on gains from the alienation of property, taxes on estates, inheritances and gifts, or substantially similar taxes, taxes on the total amounts of wages or salaries paid by enterprises, as

well as taxes on capital appreciation.

(c)    A "Competent Tax Authority" means the competent authority pursuant to a double taxation agreement in force between the Contracting Parties or, when no such agreement is in force, the minister or ministry responsible for taxes or their authorized representatives.

(d)    For the avoidance of doubt, the terms "tax provisions" and "taxes" do not include customs duties.

[. . .]

*Article 26*
SETTLEMENT OF DISPUTES BETWEEN AN INVESTOR AND A CONTRACTING PARTY

(1)    Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III shall, if possible, be settled amicably.

(2)    If such disputes can not be settled according to the provisions of paragraph (1) within a period of three months from the date on which either party to the dispute requested amicable settlement, the Investor party to the dispute may choose to submit it for resolution:

[. . .]

(c)    in accordance with the following paragraphs of this Article.

(3)    (a)    Subject only to subparagraphs (b) and (c), each Contracting Party hereby    gives its unconditional consent to the submission of a dispute to international    arbitration or conciliation in accordance with the provisions of this Article.

[. . .]

(4)    In the event that an Investor chooses to submit the dispute for resolution under subparagraph (2)(c), the Investor shall further provide its consent in writing for the dispute to be submitted to:

[. . .]

(b)    a sole arbitrator or ad hoc arbitration tribunal established under the Arbitration Rules of the United Nations Commission on International Trade Law (hereinafter referred to as "UNCITRAL");

[. . .]

(6)    A tribunal established under paragraph (4) shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law.

[. . .]

(8)    The awards of arbitration, which may include an award of interest, shall be final and binding upon the parties to the dispute.  An award of arbitration concerning a measure of a sub-national government or authority of the disputing Contracting Party shall provide that the Contracting Party may pay monetary damages in lieu of any other remedy granted.  Each Contracting Party shall carry out without delay any such award and shall make provision for the effective enforcement in its Area of such awards.

**2.    Vienna Convention on the Law of Treaties**

115.   Relevant provisions of the VCLT are as follows:

*Article 31*
*General rule of interpretation*

1.    A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose

2.    The context for the purpose of the interpretation of a treaty shall comprise, in addition to the text, including its preamble and annexes:

   *(a)*    any agreement relating to the treaty which was made between all the parties in connection with the conclusion of the treaty;

   *(b)*    any instrument which was made by one or more parties in connection with the conclusion of the treaty and accepted by the other parties as an instrument related to the treaty.

3.    There shall be taken into account, together with the context:

   *(a)*    any subsequent agreement between the parties regarding the interpretation of the treaty or the application of its provisions;

   *(b)*    any subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation;

   *(c)*    any relevant rules of international law applicable in the relations between the parties.

4.    A special meaning shall be given to a term if it is established that the parties so intended.

*Article 32*
*Supplementary means of interpretation*

1.    Recourse may be had to supplementary means of interpretation, including the preparatory work of the treaty and the circumstances of its conclusion, in order to confirm the meaning resulting from the application of article 31, or to determine the meaning when the interpretation according to article 31:

   *(a)*    leaves the meaning ambiguous or obscure; or

   *(b)*    leads to a result which is manifestly absurd or unreasonable.

*Article 33*
*Interpretation of treaties authenticated in two or more langauges*

1.    When a treaty has been authenticated in two or more languages, the text is equally authoritative in each language, unless the treaty provides or the parties agree that, in case of divergence, a particular text shall prevail.

2.    A version of the treaty in a language other than one of those in which the text was authenticated shall be considered an authentic text only if the treaty so provides or the parties so agree.

3.    The terms of the treaty are presumed to have the same meaning in each authentic text.

4.    Except where a particular text prevails in accordance with paragraph 1, when a comparison of the authentic texts discloses a difference of meaning which

the application of articles 31 and 32 does not remove, the meaning which best reconciles the texts, having regard to the object and purpose of the treaty, shall be adopted.

116. Where appropriate, provisions of the ILC Articles on State Responsibility and Russian law are set out in relevant parts of the Award. Additionally, where appropriate, the Tribunal cites to decisions of other international courts and tribunals and legal commentaries which the Parties have submitted as relevant sources to consider in deciding the arbitrations.

## VI.   SUMMARY OF WITNESS TESTIMONY

117. In the merits phase of these proceedings, Claimants and Respondent each submitted statements or opinions from 11 witnesses.[11] In all, the Tribunal has reviewed over 1,400 pages of written testimony, as well as thousands of exhibits to the witness statements and opinions.

118. The purpose of the present part of the Award is to provide an overview of the witnesses' evidence. It is not meant to be exhaustive. Rather, it serves as a summary of the vast evidentiary foundation on which the Tribunal has reached its conclusions. Additional references to witness testimony, including specific extracts of their oral examinations, are set out in the relevant portions of the Tribunal's analysis of the evidentiary record.[12]

119. The Tribunal has considered the evidence of those witnesses that were cross-examined, as well as those witnesses who submitted written statements but were not called to the Hearing. With respect to this latter category, the Tribunal has kept in mind that these witnesses were not

---

[11]   Having initially submitted statements or opinions from 12 witnesses, on 4 October 2012, shortly before the Hearing on the Merits, Claimants notified the Tribunal that one of their witnesses, the former Prime Minister of the Russian Federation, Mr. Mikhail Kasyanov, had informed them that he would not appear at the Hearing and that, in the circumstances, Claimants would withdraw his witness statement. Mr. Kasyanov's witness statement has been filed on 3 September 2010 and consisted of a two-paragraph confirmation of the contents of the following documents: Transcript of Mr. Kasyanov's Testimony before the Khamovnichesky Court of Moscow in the second criminal case against Messrs. Khodorkovsky and Lebedev, 24 May 2010, Exh. C-440; *Mikhail Borisovich Khodorkovskiy v. The Russian Federation*, ECtHR, Appls. Nos. 5829/04, 11082/06 and 51111/07, Witness Statement of Mr. Kasyanov, 8 July 2009, Exh. C-446; Mikhail Kasyanov, *Without Putin: Political Dialogues with Evgeny Kiselev*, Novaya Gazeta. 2009 (excerpts), Exh. C-574; Video recording and transcript of interview of Mr. Kasyanov on 24 May 2010 after his testimony in the Khamovnichesky Court of Moscow; Video recording and transcript of interview of Mr. Kasyanov on 24 May 2010 at the Press Center, Exh. C-591; Alexander Bekker & Vladimir Fedorin, *Interview: Mikhail Kasyanov, Prime Minister of the Russian Federation*, Vedomosti, 12 January 2004, Exh. C-677. These documents were submitted as independently-numbered exhibits with the Memorial. Respondent's position at the Hearing was that the documents annexed to Mr. Kasyanov's witness statement could not be considered by the Tribunal (Transcript, Day 18 at 19–21). Claimants maintained that the exhibits stood on their own as part of the record in these arbitrations. The Tribunal has decided that while Mr. Kasyanov's witness statement itself was withdrawn and thus no longer forms part of the record, the documents annexed to the statement, which have come into the record as independent exhibits to the Memorial, and include statements made by Mr. Kasyanov prior to these proceedings, continue to form part of the record of these arbitrations.

[12]   *See* Part VIII below.

subject to cross-examination.

## A.   CLAIMANTS' WITNESSES

120.   At the Hearing on the Merits, Respondent called 8 of Claimants' 11 witnesses for examination. They were, in the order in which they testified:

1)   Mr. Jacques Kosciusko-Morizet;
2)   Mr. Vladimir Dubov;
3)   Mr. Frank Rieger;
4)   Dr. Andrei Illarionov;
5)   Mr. Leonid Nevzlin;
6)   Mr. Bruce Misamore;
7)   Mr. Steven Theede; and
8)   Mr. Brent Kaczmarek CFA.

121.   Claimants' other witnesses, who did not appear for cross-examination, were:

9)   Mr. Philip Baker QC;
10)   Mr. Yuri Schmidt; and
11)   Dr. Sergei Kovalev.

122.   The following summary first addresses the testimony of Claimants' eight witnesses who appeared before the Tribunal, in order of appearance.   It then reviews the evidence from Claimants' three witnesses whom Respondent chose not to cross-examine.

### 1.   Mr. Jacques Kosciusko-Morizet

123.   Mr. Jacques Kosciusko-Morizet[13] was a Member of the Board of Directors of Yukos and the Chairman of the Board's Audit Committee from June 2000 to December 2004.   In his witness statement, Mr. Kosciusko-Morizet describes Mr. Khodorkovsky's plans in the late 1990s "to modernize Yukos and to break the company's ties with the Soviet traditions" through a Western board and consolidation of Yukos' accounts.   According to Mr. Kosciusko-Morizet, the reforms brought success:   Yukos' shares increased in value by 50 percent after it published U.S. Generally Accepted Account Principles ("**U.S. GAAP**") consolidated financial statements in July 2000, and its leadership in transparency and corporate governance brought the verb

---

[13]   Witness Statement of Jacques Kosciusko-Morizet, 3 September 2010 (hereinafter "Kosciusko-Morizet WS") (original in French, translated into English) submitted with Memorial.   Mr. Kosciusko-Morizet appeared for examination (testifying in English) on 15 October 2012, Transcript, Day 4 at 4–235.   References to Mr. Kosciusko-Morizet's testimony appear in Chapters VIII.C (Harrassment, Intimidation and Arrests), VIII.D (The Unwinding of the Yukos–Sibneft Merger) and VIII.H (The Withdrawal of PwC Audit Opinions).

"to Yukosize" into common parlance in Russian business circles.

124.  Mr. Kosciusko-Morizet's statement also deals with the relationship with PwC, which he describes as "cordial and close" while he was Chairman of the Audit Committee.  Yukos was one of PwC's major clients; PwC conducted Yukos' external audits and assisted with training Yukos' in-house accountants and with designing and implementing procedures.  Thus, he testifies, "from 1997 to 2004, PwC was given access to the entire documentation of the whole of Yukos without restriction and had a very detailed and global view of the financial situation and the procedures of Yukos and its subsidiaries."[14]

125.  After the arrest of Mr. Platon Lebedev in July 2003, Mr. Kosciusko-Morizet chaired a temporary ad hoc committee set up to assess the situation through interviews with individual managers at Yukos and PwC.  He states that Mr. Michael Kubena, a PwC partner, assured the committee that Yukos had always complied with Russian law, including in its tax optimization structure, and that "PwC did not consider that there was any possibility for the Russian authorities to attack Yukos on these issues."[15]  Mr.Kosciusko-Morizet referred to this advice several times during his oral testimony.  Thus, according to Mr. Kosciusko-Morizet, the "late and spectacular volte-face of PwC," including the withdrawal of the certification of Yukos' accounts that took place on 15 June 2007, was "in blatant contradiction" to his relationship with PwC, was "questionable and damaging to [PwC's] reputation," and can only be explained by Respondent's pressure on PwC's Moscow office from December 2006 onwards.

126.  Mr. Kosciusko-Morizet appeared before the Tribunal on 15 October 2012.  He was cross-examined about, *inter alia*:  (a) his responsibilities as the Chairman of Yukos' Audit Committee; (b) the relationship between Yukos and PwC including as to disclosures about Behles Petroleum S.A., Baltic Petroleum Trading Limited and South Petroleum Limited (known collectively as the "**BBS Companies**"); (c) the Yukos consolidation perimeter for purposes of U.S. GAAP; (d) the abandoned plans to list Yukos on the New York Stock Exchange ("**NYSE**") due to the Yukos–Sibneft merger; and (e) his knowledge of Yukos' tax optimization structures and the tax assessments against regional Yukos trading entities (in which context he remarked that "[t]rying to minimise tax is good management . . . within the

---

[14]   Kosciusko-Morizet WS ¶ 17.

[15]   Kosciusko-Morizet WS ¶ 24.

legislation applicable.")[16]

127.   Mr. Kosciusko-Morizet was also given the opportunity to recount to the Tribunal a story that Mr. Khodorkovsky had conveyed to him in August 2003 about threats from the Russian authorities and their potential impact on Yukos.[17]

### 2.   Mr. Vladimir Dubov

128.   Mr. Vladimir Dubov[18] held various senior positions in Bank Menatep and Yukos entities, including on the Yukos Board from 1998 to 1999.  He was elected as a State Duma Deputy in December 1999 (representing a region encompassing Mordovia) and was Chairman of the Tax Sub-Committee of the State Duma from February 2000 to October 2003.  From 1997 he was a shareholder, and then a beneficiary of trusts holding shares in GML Limited ("**GML**") (the parent company of YUL).  He first met Mr. Khodorkovsky in the late 1980s.  In his witness statement, Mr. Dubov makes three key assertions:  (a) Respondent was aware of, and approved Yukos' trading structure and tax optimization scheme; (b) Yukos' trading companies significantly contributed to the social and economic development of the regions in which they operated; and (c) Respondent's tax claims were aimed at appropriating Yukos' assets and removing Mr. Khodorkovsky as a "potential political threat".

129.   Mr. Dubov explains in his statement that, given that Yukos' tax payments accounted for approximately four percent of the country's 2003 budget, the company was under "constant supervision and control of the Russian tax authorities."[19]  Before 2003 there was never "any suggestion that Yukos' trading structure was other than in compliance with legal requirements and appropriate."[20]  The authorities were extensively consulted and approved Yukos' practice of operating through trading companies in low-tax regions like the Republic of Mordovia.  Yukos' trading companies significantly contributed to the local economy.  Yukos' trading companies' VAT refunds were also closely monitored.  According to Mr. Dubov, all four major

---

[16]   Transcript, Day 4 at 65.

[17]   *See* paragraph 775 below.

[18]   Witness Statement of Mr. Vladimir Dubov, 8 September 2010 (hereinafter "Dubov WS") (original in Russian, translated into English), submitted with Memorial.  Mr. Dubov appeared for examination (testifying in Russian through English interpretation) on 16 October 2012, Transcript, Day 5 at 2–191.  References to Mr. Dubov's testimony appear in Chapters VIII.A (The Tax Optimization Scheme), VIII.B (The Tax Assessments Starting in December 2003) and VIII.C (Harrassment, Intimidation and Arrests).

[19]   Dubov WS ¶ 11.

[20]   *Ibid.* ¶ 54.

Russian oil companies (Lukoil, Sibneft, TNK, Yukos) engaged in tax optimization.  Their taxes were closely supervised.  Access to pipelines was conditioned on payment of taxes.  This involved liaising with officials and opening up records to inspection.[21]

130.   Mr. Dubov describes how he and Mr. Khodorkovsky became increasingly involved in social and political activities to build a civil society based on "liberal, open and democratic values" and in 2001 co-founded Open Russia to manage and fund projects to foster a "social and liberal ethos."[22]  Mr. Khodorkovsky's funding of political parties openly and legally "put pressure on other political parties to be more transparent."  These efforts "sent shockwaves through the entire Russian political system."[23]

131.   Mr. Dubov expresses "no doubt that the alleged tax claims and the other trumped-up charges brought against Yukos, Khodorkovsky and his associates, were merely a pretext to remove Khodorkovsky as a potential political threat and to destroy Yukos with a view to taking its assets."[24]  According to Mr. Dubov's statement, as the 2004 presidential elections approached, the Administration shifted attention to seizing Yukos' assets.  At a meeting of the Russian Union of Industrialists and Entrepreneurs with President Putin at the Kremlin in February 2003, Mr. Khodorkovsky raised questions about official corruption.  President Putin rebuked him and suggested that Yukos be scrutinized.  At an April 2003 meeting, President Putin approved the Sibneft merger but warned that Mr. Khodorkovsky should restrict his political activities and not finance the Communist Party.  In October 2003, Mr. Khodorkovsky was arrested just before a planned meeting with opposition parties.[25]

132.   Mr. Dubov testifies that, on 27 October 2003, he learned his name had been removed as a Duma candidate.  He was advised to leave Russia and was told by a Kremlin official that President Putin "had gone absolutely berserk over Khodorkovsky."[26]  He left that night and has not returned since.  In January 2004, the financial support of Messrs. Dubov and Nevzlin to an opposition presidential candidate was announced.  The next day, international arrest warrants

---

[21]   *Ibid.* ¶ 42–53.

[22]   *Ibid.* ¶¶ 55, 61.

[23]   *Ibid.* ¶ 64.

[24]   *Ibid.* ¶ 58.

[25]   *Ibid.* ¶¶ 55–64.

[26]   *Ibid.* ¶ 80.

were issued against both men on "entirely unfounded and politically motivated" charges.  They were both found guilty *in absentia*.[27]

133.  Mr. Dubov appeared before the Tribunal for examination on 16 October 2012.  He was cross-examined about his financial interest in the case, being the beneficiary of the Draco Trust, in which had made an initial investment of around USD 10,000 and which now has a seven percent interest in GML.[28]  He was also extensively cross-examined about the extent of disclosures he made to Russian government officials about Yukos' tax scheme in Mordovia and his knowledge and understanding about the Yukos trading entities in the ZATOs and the tax assessments leveled against them.[29]

134.  Mr. Dubov stated his belief, held since he heard about the tax assessments against Yukos in 2004 from media reports, that the tax claims were being used by Respondent as an instrument of confiscation.[30]  When asked by the Tribunal to elaborate on what information at the time led him to that conclusion, he testified:

> I had a personal relationship with the Deputy Head of Staff of the President, Mr. Vladislav Surkov . . . .  [O]n the first business day following Khodorkovsky's arrest, Surkov asked me to come see him in the Kremlin . . . .  He told me that he was asking for my forgiveness . . . .  I had been struck from the list upon petition from the Prosecutor General by the council of the party without leveling any charges against me. . . .  And I remember asking, "What will happen to Yukos?"  And he said—and I am quoting him verbatim; I remember it very well—he said, "Yukos will be taken away from . . . you gentlemen." . . . And I also had a longstanding good relationship with yet another Deputy Head of the Staff of the President who, in late November of that year, told us . . . there would be criminal claims against every single shareholder.  He said that an instruction had been issued to commence criminal cases against us and to take Yukos from us.[31]

### 3.  Mr. Frank Rieger

135.  Mr. Frank Rieger[32] is the former Acting CFO of Yukos, and held various positions with Yukos and its subsidiaries from 2000 until 2006.  He resigned on 26 March 2006, due to the

---

[27]  *Ibid.* ¶¶ 65–72.

[28]  Transcript, Day 5 at 29–36.

[29]  Transcript, Day 5 at 81–84, 101–102, 149–50, 152–54.

[30]  Transcript, Day 5 at 52.

[31]  *Ibid.* at 181–82.

[32]  Witness Statement of Mr. Frank Rieger, 9 September 2010 (hereinafter "Rieger WS") submitted with Memorial.  Mr. Rieger appeared for examination on 17 October 2012, Transcript, Day 6 at 1–235.  References to Mr. Rieger's testimony appear in Chapters VIII.A (The Tax Optimization Scheme), VIII.B (The Tax Assessments Starting in December 2003), VIII.C (Harrassment, Intimidation and Arrests), VIII.E (Attempts to Settle), VIII.G (The Bankruptcy of Yukos) and VIII.H (The Withdrawal of the PwC Audit Opinions).

"deepening crisis surrounding the company and the persecution of its management."  In his witness statement, Mr. Rieger recounts that under Mr. Khodorkovsky's leadership, Yukos acted as a "trail-blazer" in corporate governance in Russia.  When Mr. Rieger joined Yukos in 2000 from Roland Berger Consulting, he was directed by Mr. Khodorkovsky to "apply the same benchmark of Western corporate accountability and responsibility."  Yukos modernized its production process, disclosed the company's shareholding details, and implemented international accounting and reporting procedures.  Mr. Rieger states that Yukos "set a new standard for corporate social responsibility in Russia" but its achievements provoked concern amongst competitors.

136.  According to Mr. Rieger, the Russian authorities targeted and harassed Yukos' auditor, PwC.  Yukos engaged PwC as its external auditor and gave it "unrestricted access" to its "personnel, management, the Board of Directors, books and accounts."  Mr. Rieger's "personal involvement with PwC was extensive."  After PwC employees began to be questioned by the Prosecutor General's Office, PwC ceased to have further contact with Yukos.  Mr. Rieger learned about PwC's withdrawal of its Yukos audits from 1995 to 2004 from the media.  The suggestion that PwC did not have full access to information or that Yukos deliberately withheld information "defies credibility"; PwC raised no such concerns until its June 2007 withdrawal letter ("**PwC's Withdrawal Letter**").

137.  According to Mr. Rieger, Yukos made numerous attempts to settle the alleged tax claims against it, including through negotiations and significant payments.  However, the Russian authorities did not respond to Yukos' various proposals, and refused to provide written confirmation of the payments.  It became clear to Mr. Rieger that "this was a political case, not a tax case, aimed at the destruction and expropriation of the company itself."

138.  Mr. Rieger claims that Respondent conducted a campaign of harassment against Yukos, including illegal raids by armed masked men, searches and seizures of up to 70 percent of the Accounting Department's documents.  In addition, numerous Yukos employees were questioned by the Prosecutor General's Office.  Mr. Rieger himself was detained and interrogated at Moscow's airport in May 2006.

139.  Mr. Rieger appeared before the Tribunal for examination on 17 October 2012.  He was cross-examined about, *inter alia*:  (a) his role at Yukos and understanding of its related entities; (b) Yukos' accounting structure including the extent to which it was designed by PwC; (c) the timing and process of Yukos' identification of assets for payment of taxes; (d) Yukos'

settlement offers, the responses from the Russian authorities and the legal limits within which the authorities were operating; (e) the repayment of the SocGen and Moravel Investments Limited ("**Moravel**") loans, relevant to the bankruptcy; (f) dividend payments via the "Laurel" group of Yukos companies; and (g) his awareness and understanding of tax assessment of Yukos entities in the ZATOs.

140.  Mr. Rieger was also given an opportunity to describe to the Tribunal how in 2006 he was asked a series of questions at the General Prosecutor Office for which the investigator had already prepared his answers, a situation he said he "couldn't believe" had he not experienced it himself.  He refused to sign the pre-prepared answers and gave his own version instead.[33]

### 4.   Dr. Andrei Illarionov

141.  Dr. Andrei Illarionov[34] served as Chief Economic Advisor to President Putin from April 2000 until his resignation in December 2005.  He was also President Putin's personal representative ("sherpa") to the G-8.  He is currently a Senior Fellow at the Cato Institute's Center for Global Liberty and Prosperity in Washington, D.C., as well as the President of the Institute of Economic Analysis in Moscow, which he founded.  Dr. Ilarionov maintains a residence in Moscow and visits approximately five times a year.[35]  In his witness statement, Dr. Illarionov recounts the evolution of Yukos since its establishment by government decree in 1993 following the dissolution of the USSR and the restructuring of the oil industry.  Yukos saw remarkable growth and improvements in performance after its privatization in 1995–96, as a result of substantial investment, the employment of foreign engineers and managers, and the use of Western technology.  Some officials viewed such reforms negatively.  Yukos' public revelation, in 2002, of details of its shareholding, including the structure of GML, "had the effect of an earthquake on the Russian business community."  It contrasted with the traditionally secretive manner of doing business and was viewed as setting a "harmful"

---

[33]   Transcript, Day 6 at 69–70.

[34]   Witness Statement of Dr. Andrei Illarionov, 11 September 2010 (hereinafter "Illarionov WS") submitted with Memorial.  Dr. Illarionov appeared for examination on 18 October 2012, Transcript, Day 7 at 3–176.  References to Dr. Illarionov's testimony appear in Chapters VIII.B (The Tax Assessments Starting in December 2003), VIII.C (Harassment, Intimidation and Arrests) and VIII.F (The Auction of YNG).

[35]   Transcript, Day 7 at 5.

precedent.  In Dr. Illarionov's words, Yukos was "one of the most dangerous enemies for those who did not want to see Russia a free country."[36]

142.   According to Dr. Illarionov, the arrests of Messrs. Khodorkovsky and Lebedev and the dismantlement of Yukos were politically and economically motivated.  Yukos' intended merger with Western oil majors was seen as a national betrayal and a hurdle to expropriation. Dr. Illarionov describes the 19 February 2003 meeting at the Kremlin between President Putin and business leaders, at which Mr. Khodorkovsky made a presentation on corruption, to which President Putin responded that everyone knew how various assets, including Yukos, were acquired, and told Mr. Khodorkovsky:  "I return the ball in your corner."  The tone of the meeting became "steely and menacing" as if something had gone "really wrong."  It signaled the "gloves [had come] off," and that Mr. Khodorkovsky was no longer tolerated.  From then on, according to Dr. Illarionov, "a case needed to be fabricated to launch the Government attack under the guise of 'legitimate' court proceedings" and a special unit was set up to fabricate evidence against Yukos.  In October 2003, the "dramatic arrest" of Mr. Khodorkovsky at the airport signaled Yukos could be attacked.  Few dared to voice support, and Prime Minister Mikhail Kasyanov, among others, was dismissed for doing so.[37]

143.   Dr. Illarionov's statement further recounts that the campaign against Yukos culminated in the confiscation of YNG.  While it was independently valued at USD 14.7–17.3 billion, the Russian authorities sold YNG for USD 9.3 billion—"a price well below even the most conservative estimates prepared by experts"—on a Sunday, at a forced auction attended by two participants, to an unknown company (Baikal) which was registered at an address above a local bar and had a charter capital of USD 350.  President Putin said he knew the individuals behind the company and they were "well-established in the oil business."  Four days later, Rosneft purchased Baikal with funds from State banks.  According to Dr. Illarionov, the auction "sent shockwaves" and was internationally condemned.  This "scam" was "one of the low points in Russia's recent history."  The dismantling of Yukos was contrary to "basic principles of due process," and led Dr. Illarionov to resign as sherpa in 2004 and as the President's Chief Economic Advisor in December 2005.[38]

144.   Dr. Illarionov appeared before the Tribunal for examination on 18 October 2012.  Respondent

---

[36]   Illarionov WS ¶¶ 5–16.

[37]   Illarionov WS ¶¶ 17–41.

[38]   Illarionov WS ¶¶ 42–52.

sought to undermine his credibility by showing he is now a vocal critic of the Russian Government, and that he has taken extreme positions against climate change regulation.[39] Respondent also challenged his assertion that Yukos' financial statements had complied with U.S. GAAP, on the basis that Dr. Illarionov lacked an understanding of GAAP and had not read Yukos' financial statements in full.   Dr. Illarionov was cross-examined mostly about his claimed knowledge and understanding of the valuation of YNG and the auction process.[40]

145.   The Tribunal asked Dr. Illarionov whether he had ever felt able to discuss with President Putin the arrest of Mr. Khodorkovsky and the measures of the Russian Government in respect of Yukos.[41]   He replied:

> the most important conversation that I had with Mr. Putin was several days after Mr. Khodorkovsky had been arrested . . . .   Mr. Putin has said that Mr. Khodorkovsky has made mistakes and behaved pretty badly . . . .   And for a long time Mr. Putin himself was protecting Mr. Khodorkovsky from these attacks of his friends, of Mr. Putin's friends, but unfortunately Mr. Khodorkovsky continued to behave badly, and not cooperatively... One thing, he said that Mr. Khodorkovsky lied to us because he was in negotiations with American oil company about possible merger. Another issue he has mentioned: that Mr. Khodorkovsky joined Communist Party in preparation to the parliamentary election of year 2003... That is not something that "mi dogovarivalis"—I will try, "we had an agreement on."  So he said . . .
>
> So he said that after protecting Mr Khodorkovsky for some time—now it's almost a quotation—"I decided and I stepped aside to allow Mr Khodorkovsky to solve his problems with the boys by himself." . . . ."so Mr Khodorkovsky has chosen to fight. Okay," said Mr Putin, "if he has chosen to fight, let him to fight and we'll see what will happen."[42]

146.   The Tribunal also asked Dr. Illarionov about the 50-person special unit that, according to paragraph 35 of his statement, was set up at the Russian General Prosecutor's office to work exclusively on "fabricating" evidence against Mr. Khodorkovsky and Yukos and, in particular, whether he could identify the sources on which he relied for that statement.   He could not disclose the identity of his source—due to that individual still residing in Moscow and thus facing "serious risks" but his source was a "very high-placed official in the Russian administration at the time" and was very reliable.[43]   Dr. Illarionov testified that the official had told him that the targeting of Yukos was "a big mistake … but it is a mistake that would be

---

[39]   Transcript, Day 7 at 12–50.

[40]   For further specific references to the transcript, see discussion in Chapter VIII.F at paragraphs 1013 and 1019.

[41]   Transcript, Day 7 at 153 (referring to Illarionov WS ¶¶ 39–41).

[42]   *Ibid.* at 153–56.

[43]   *Ibid.* at 156–57.  Upon further cross-examination, Dr. Illarionov said he had only ever discussed this special unit with his source and with Claimants' lawyers in these arbitrations. *Ibid.* at 164–65.

impossible to stop . . . .  This unit has been created to 'zanyatsa' Khodorkovsky, [meaning to] 'take care of' Khodorkovsky . . . which means one day . . . security services and officers did receive an order so-called to solve the problem."[44]

147.  Dr. Illarionov elaborated on his assertion, at paragraph 41 of his statement, that Russian Prime Minister Mikhail Kasyanov had "expressed his disapproval of Mr. Khodorkovsky's arrest and the mounting attack on Yukos", and explained that after Mr. Khodorkovsky's arrest:

> there was public outrage in mass media . . . .  From the Government ranks, I cannot recall any person who would express disapproval of the arrest . . . with the exception of Mr. Kasyanov . . . .  And after making such a statement, Mr. Putin publicly made a very rude statement that you can find recorded in video . . . that, "I would ask everybody in the Government to shut up on Mr. Khodorkovsky's arrest." And it was very clear that this comment was addressed to Mr. Kasyanov, and later Mr. Kasyanov . . . [was] removed from his position.'[45]

### 5.  Mr. Leonid Nevzlin

148.  Mr. Leonid Nevzlin[46] is a long-standing friend and close business colleague of Mr. Khodorkovsky.  They first met at a research centre in 1987.  Mr. Nevzlin held various high level positions in Bank Menatep and Yukos, including as Vice-President of Yukos responsible for public relations, and as First Deputy Chairman of the Yukos Board of Directors. Mr Nevzlin helped found Open Russia in 2001.  He also later served as a senator representing Mordovia until March 2003.  He is a beneficiary of three of the trusts that hold ownership shares in GML.  He now resides in Israel, working in philanthropy.

149.  In his witness statement of 15 September 2010, Mr. Nevzlin testifies that his support for democratic causes led the Russian authorities to target him for persecution.  For example, after he announced his financial support for an opposition presidential candidate in January 2004, the Prosecutor General's Office brought "entirely unfounded and politically motivated" charges against him for tax evasion and embezzlement.  "Ludicrous" murder charges were added in

---

44    *Ibid*. at 158.

45    *Ibid*. at 159–60.

46    Witness Statement of Mr. Leonid Nevzlin, 29 August 2010 (hereinafter "Nevzlin WS") (original in Russian, translated into English), submitted with Memorial.  Mr. Nevzlin appeared for examination on 18 and 19 October 2012 (testifying in Russian, through English interpretation), Transcript, Day 7 at 176–224 and Day 8 at 1–43.  References to Mr. Nevzlin's testimony appear in Chapters VIII.C (Harassment, Intimidation and Arrests) and VIII.D (The Unwinding of the Yukos–Sibneft Merger).

2004 and 2005.  Israel refused to extradite him to Russia but after a "show trial" in 2008, he was sentenced *in absentia* to life imprisonment.[47]

150.  Mr. Nevzlin explains that Mr. Khodorkovsky was perceived by the Kremlin as a political threat and a potential presidential candidate.  According to Mr. Nevzlin, the attacks on Yukos were motivated by the objectives "to remove Mr. Khodorkovsky as a potential political threat," "to punish and make an example of" Yukos leaders, and to "expropriate Yukos without compensation."  Mr. Nevzlin received warnings of the attacks on Yukos, including at a meeting with the Media Minister in Spring 2003, who told him that Mr. Khodorkovsky risked losing everything, including his liberty, if he did not immediately stop criticism of President Putin.  He was told that President Putin was "furious" about Mr. Khodorkovsky's media coverage.[48]

151.  With regard to the Yukos–Sibneft merger, Mr. Nevzlin testifies that he understood that "everything that happened with Sibneft was approved by President Putin."  At a meeting with Mr. Khodorkovsky, President Putin cautioned against a U.S. oil major acquiring more than 25 percent of YukosSibneft.  The merger was completed in October 2003, but Mr. Abramovich "abruptly changed his mind and sought to unwind the merger" after it "became apparent that Khodorkovsky was being targeted by the Kremlin."  Mr. Nevzlin testifies that shortly after Mr. Khodorkovsky's arrest in October 2003, Mr. Abramovich approached Mr. Nevzlin in Tel Aviv to convey that the Yukos–Sibneft merger could only be preserved if Sibneft was given management of the merged company.  The companies were not integrated and eventually de-merged.[49]

152.  Mr. Nevzlin appeared before the Tribunal for examination on 18 and 19 October 2012.  Respondent highlighted his lack of banking experience when he rose to the top of Bank Menatep.  Mr. Nevzlin pointed out that "there had not been any commercial banks in the Soviet Union, and not a single person in the Soviet Union worked in a commercial bank prior to 1988;" and further that "the position of bank president did not mean that [he] in fact was responsible for banking operations; it was a position that was established specifically for someone who engaged in public relations."[50]

---

[47]   Nevzlin WS ¶¶ 14, 22.

[48]   *Ibid.* ¶¶ 22, 28–36.

[49]   *Ibid.* ¶¶ 24–27.

[50]   Transcript, Day 7 at 180–82.

153.   Mr. Nevzlin was cross-examined on his interest in GML, his motives for testifying in these arbitrations, and a recent UK court case relating to individuals involved in the Yukos–Sibneft merger.  He acknowledged that the trusts in which he has beneficial interests (the Pictor Trust, the Southern Cross Trust and the Palmus Trust) hold a total of approximately 67 percent of GML, and thus that he would benefit financially if the outcome of these arbitrations was favourable to Claimants.[51]  Mr. Nevzlin testified that he had not paid anything for his interests in the trusts and confirmed also that Messrs. Brudno, Lebedev and Shakhnovsky had not paid any consideration for their beneficial interests in the Palmus Trust.  Amidst this line of questioning, Mr. Nevzlin pointed out:

> everything I own, just like my partners used to own, was earned through extremely hard work, starting, as you will know from . . . in 1987 . . . .   [V]irtually all the business revenue, except for what was paid to charity or used for personal needs, was reinvested in the business . . . .   So all the money, all the shares that we owned we earned through our titanic—if you will—efforts that had spread over a long period of time.[52]

154.   Mr. Nevzlin confirmed that he knew about the 2004 tax assessments soon after they were issued, but by that point he had "already realised that Putin will not stop, and will take away the company anyway.  So I was not surprised by tax claims in this size and consequent actions by the Russian Federation."  He also confirmed his long-held belief that the tax assessments were improper, as were the  Russian authorities' enforcement actions, claiming:

> Yukos was led into bankruptcy . . .  They [the Russian authorities] did everything in order to prevent Yukos from paying off its debts.  The company was in perfect shape, with a lot of cash, with the best rating in the country, with a good market capitalisation, but it took about two years for Putin and Sechin . . . to destroy this company completely.[53]

When asked whether he had hoped Yukos would prevail and defeat the assessments, he replied that "[t]hose proceedings took place in the Russian Federation, and the outcomes, the decisions were made in the Kremlin.  The decisions were not made in the courtroom . . . .   We are not talking about a democratic country; we are talking about a dictatorship."[54]

155.   Mr. Nevzlin was questioned about why he had waited until 2010, when providing his witness statement in these proceedings, to disclose that in 2003 Mr. Abramovich told him that

---

[51]   *Ibid.* at 187–92, 207.

[52]   *Ibid.* at 196–99.

[53]   *Ibid.* at 209–13.

[54]   *Ibid.* at 217–18.

Mr. Khodorkovsky "had been targeted because of his involvement in politics."[55]  He was also asked why he had not included this evidence in his 6 August 2006 witness statement in the ECtHR proceedings, nor in any of the Russian criminal cases against Mr. Khodorkovsky.  He explained:

> if I had spread the information about Abramovich and Putin fairly broadly, and if it had become available to the public, then from the perspective of Khodorkovsky, who is in Russian prison, I would have damaged him.
>
> . . . I would have caused him tremendous amounts of harm . . . in the other corner facing him were Putin, Sechin and others; but I also would have turned Abramovich into an enemy of Khodorkovsky's by disclosing this information.
>
> . . .  [A]fter . . . things moved to a second absurd set of charges and a second trial, Khodorkovsky's position changed radically.   He was no longer wary of a political . . . confrontation with Putin's regime because he realised that he was not going to be able to find truth in a Russian court if he tried to defend himself based on the laws.
>
> . . . Russian courts have no interest in my position:  it would be either ignored or rejected by them . . . .Because it's not a judge who makes decision on Khodorkovsky and Lebedev; the judge just rubber-stamps decisions that are made by investigative committee and Prosecutor's Office . . . .The fact that I trust this court and tell this court a lot more than I've ever said on the matter, this is a typical position for me, because . . . if we're able to defend our interests, that would be either in courts in free countries or international courts.[56]

156.  Mr. Nevzlin was cross-examined about his May 2011 witness statement to the High Court of Justice in England in a case brought by Mr. Berezovsky against Mr. Abramovich.  Mr. Nevzlin was shown the English judge's decision, in which the judge declined to attach significant weight to Mr. Nevzlin's evidence, as she found him to be "tendentious," that he "expressed opinions about matters in respect of which he had no knowledge," and that she had "the impression that Mr. Nevzlin had crafted his evidence to suit Mr. Berezovsky's case."  Mr. Nevzlin observed the judge was "entitled to her opinion" and he "only told her the truth."[57]

### 6.    Mr. Bruce Misamore

157.  Mr. Bruce Misamore[58] was Chief Financial Officer of Yukos and a Member of its Management

---

[55]    Transcript, Day 8 at 4–5, referencing Nevzlin WS ¶ 35.

[56]    *Ibid.* at 17–25

[57]    *Ibid.* at 34, 37, 39–40.  Extract from *Berezovsky v. Abramovich*, 31 August 2012 ¶¶ 485–86, Exh. R-4654.

[58]    Witness Statement of Mr. Bruce Misamore, 28 July 2010 (hereinafter "Misamore WS") submitted with Memorial.  Mr. Misamore appeared for examination on 22 October 2012, Transcript, Day 9 at 1–268.   References to Mr. Misamore's testimony appear in Chapters VIII.A (The Tax Optimization Scheme), VIII.B (The Tax Assessments Starting in December 2003), VIII.C (Harrassment, Intimidation and Arrests), VIII.D (The Unwinding of the Yukos–Sibneft Merger), VIII.E (Attempts to Settle) and VIII.H (The Withdrawal of PwC's Audit Opinions).

Committee from April 2001 to December 2005.  He was a Member of the Executive Committee of the Yukos Board commencing in 2005.  He has 38 years experience in financial and executive roles in the oil industry.  In his witness statement, Mr. Misamore explains that as CFO, he was to ensure that Yukos met international best practices in financial management.  He describes how, by 2003, Yukos had become an industry leader in transparency, corporate governance and production and that, "[c]ontemplating significant expansion and growth" Yukos closed its merger with Sibneft on 3 October 2003 and was in talks with Western oil majors.[59]

158.   Mr. Misamore testifies that PwC played an "integral role" in developing Yukos' financial reporting system and was given full access to Yukos' books, accounts, and employees, and was "very knowledgeable about and had full access to Yukos' principal subsidiaries."  He considers PwC's withdrawal of the Yukos audit reports as having been "motivated by the continuing attack . . . on Yukos and persons associated with the company" and that it was "highly questionable professionally."[60]

159.   According to Mr. Misamore, the campaign by the Russian authorities to dismantle Yukos began in earnest in the summer of 2003 with arrests, raids, searches, and seizures.  In July 2003, Russian authorities raided Yukos' Moscow offices "in an incredible scene full of armed, masked officers" and "trawled through [the company's] computer records for approximately 17 hours."  Large volumes of documents and electronic files were seized, with no copies or record left."  In August 2006, "baseless, politically motivated" criminal investigations were announced against Mr. Misamore and others.[61]

160.   According to Mr. Misamore, Russian authorities also interfered with the Yukos–Sibneft merger; Sibneft put the merger "on hold," and refused to negotiate the demerger.[62]  Russian authorities then imposed a series of "huge fabricated tax reassessments" on Yukos "designed to financially cripple the company" and to "serve as a pretext under which the Government broke up the company and expropriated its assets."  Yukos made numerous efforts to negotiate and to pay its tax bills; these were rejected, "stifle[d]," or went unanswered.[63]  He described how on

---

[59]   Misamore WS ¶¶ 22–24.

[60]   *Ibid.* ¶¶ 26–29.

[61]   *Ibid.* ¶¶ 30–33.

[62]   *Ibid.* ¶¶ 36–37.

[63]   *Ibid.* ¶¶ 38–51.

19 December 2004, the Russian authorities held an auction for YNG.  As one of only two bidders, Baikal won the auction, in ten minutes, for USD 9.35 billion.  Baikal was immediately sold to State-owned Rosneft.   In 2007, the court-appointed receiver in the bankruptcy proceedings, Mr. Eduard Rebgun, liquidated the remaining 40 percent of the company in auctions won by State-owned entities at prices well below market value.[64]

161.   Mr. Misamore appeared for examination on 22 October 2012.  He was cross-examined on a wide range of issues encompassing, *inter alia*:  (a) the Yukos–Sibneft merger including the dividend payment and the unwinding of the merger; (b) PwC and its role in developing the concepts of golden shares and call options which allowed Yukos to consolidate the financial performance of companies that it did not own, but for which it had call options; (c) Mr. Misamore's knowledge and understanding of Yukos' domestic offshore trading entities and the tax assessments levied against some of them; (d) the responses to the tax assessments and use of proceeds from the sale of Yukos assets; and (e) the creation of two Dutch foundations, namely Stichting Administratiekantoor Yukos International ("**Stichting 1**") and Stichting Administratiekantoor Small World Telecommunication Holdings B.V. ("**Stichting 2**," together with Stichting 1, the "**Stichtings**").

162.   The Tribunal also asked Mr. Misamore whether he was aware of any written legal opinion that concluded that Yukos' tax optimization scheme was lawful under Russian law.  He replied that upon receiving the tax assessment in December 2003, Yukos requested opinions from Mr. Sergey Pepeliaev, a tax expert and regular advisor to Yukos, and PwC.  Mr. Misamore stated that "[b]oth of those opinions basically said what Yukos was doing was completely legal," but he could not recall if Yukos' tax structure had received the blessing of a lawyer or an accounting firm in writing prior to December 2003. He added that he "was informed consistently, throughout the entire time [he] was at Yukos, that everything Yukos did with respect to these things was entirely in accordance with Russian law."[65]

### 7.    Mr. Steven Theede

163.   Mr. Steven Theede[66] joined Yukos as its Chief Operating Officer in August 2003, after a

---

[64]    *Ibid.* ¶¶ 51–60.

[65]    Transcript, Day 9 at 250–52.

[66]    Witness Statement of Mr. Steven Theede, 26 August 2010 (hereinafter "Theede WS") submitted with Memorial. Mr. Theede appeared for examination on 23 and 24 October 2012, Transcript, Day 10 at 1–133, Day 11 at 1–59. References to Mr. Theede's testimony appear in Chapters VIII.A (The Tax Optimization Scheme), VIII.B (The Tax

30 year career with ConocoPhilips.  From June 2004 until February 2005, he served as CEO of Yukos.  Upon the advice of the U.S. State Department, in November 2004 he decided not to return to Russia.  From May 2005 until resigning in August 2006, Mr. Theede was President of Yukos.  In his witness statement, Mr. Theede testifies that within a few years he saw "one of the largest oil companies in the world . . . managed in accordance with the highest international standards" be "brought to its knees through the orchestrated attacks of the Russian authorities."[67]

164.  Mr. Theede states that he was involved in many attempts by Yukos to discharge or settle its alleged tax liabilities.  While Yukos did not accept the validity of the tax claims, it nonetheless tried to discharge or settle them, only to be prevented from doing so by Respondent.  For instance, in April 2004, Yukos was told to pay USD 3.4 billion within two days, but the next day was prohibited by the Moscow Arbitrazh Court from alienating assets.  This "impossible situation" of demanding that Yukos pay but depriving it of any means to pay, became a pattern that led to "a state of paralysis."[68]

165.  According to Mr. Theede's statement, Yukos made about 80 proposals and communications to various Russian authorities but "all our efforts were in vain."  For example, he states that in July 2004, an offer by Yukos to relinquish its stake in Sibneft to satisfy the alleged debt was ignored.  Yukos retained former Canadian Prime Minister Jean Chrétien to seek a global settlement, but his proposals went unanswered.  Meanwhile, the tax bill kept increasing and Yukos paid taxes nearly equal to its total revenue.  In October 2004, Mr. Theede testifies that Yukos submitted a "full settlement proposal" in the range of USD 21 billion, but negotiations "came to an abrupt end" when Yukos' principal negotiator, Yukos Vice-President Alexander Temerko was advised to leave Russia to avoid arrest.  In December 2004, YNG, Yukos' core asset, was sold for a "grossly undervalued price" of USD 9.35 billion in a "sham auction" to an "unknown company."  After that, there were no more settlement discussions.  Mr. Theede stated that the undervaluation of YNG became obvious when in 2006 Rosneft valued it at approximately USD 80 billion.[69]

---

Assessments Starting in December 2003), VIII.C (Harrassment, Intimidation and Arrests), VIII.D (The Unwinding of the Yukos–Sibneft Merger), VIII.E (Attempts to Settle), VIII.G (The Bankruptcy of Yukos) and VIII.H (The Withdrawal of PwC's Audit Opinions).

[67]  Theede WS ¶¶ 1–9, 36.

[68]  *Ibid.* ¶¶ 10–11, 28.

[69]  *Ibid.* ¶¶ 9, 24–26.

166.   According to Mr. Theede's statement, in March 2006, a consortium of Western banks that had obtained a judgment in England against Yukos filed a bankruptcy petition with the Moscow Arbitrazh Court.   Mr. Theede states that his urgent letter to the Chief Bailiff, requesting that assets be released to satisfy the debt, went unanswered.   He further describes how, in a confidential agreement, Rosneft agreed to purchase Yukos' debt to the consortium upon the initiation of bankruptcy proceedings, which began in March 2006.   Respondent was thus the only creditor of significance.   Mr. Theede testifies that in July 2006, Mr. Rebgun produced a report concluding that Yukos was insolvent, and at the 20 July 2006 creditors' meeting, he recommended Yukos be declared bankrupt.   By contrast, Yukos had submitted a rehabilitation plan in June 2006 (the "**Rehabilitation Plan**"), which valued the company at USD 31 billion, and would have seen Yukos pay its creditors in two years.   The Rehabilitation Plan was not mentioned in Mr. Regbun's report.   Not wanting to lend credibility to a "charade", Mr. Theede did not attend the 20 July 2006 creditors' meeting and, feeling there was nothing more to do to protect the company's assets, he resigned with effect from 1 August 2006.[70]

167.   Mr. Theede appeared before the Tribunal for examination on 23 and 24 October 2012. Mr. Theede was cross-examined about, *inter alia*:  (a) the 15 April 2004 injunction ("**April 2004 Injunction**") and its effect on Yukos' control over certain assets; (b) Yukos' perception of the tax assessments as politically motivated; (c) the nature, adequacy and legitimacy of various settlement proposals offered by Yukos to pay off its tax debts; (d) the bankruptcy proceedings and proceeds from asset sales; and (e) the establishment of the Stichtings.

168.   Upon cross-examination, Mr. Theede confirmed that, in light of Yukos' strong performance in 2004, "[d]espite the ongoing external pressure," Yukos' Board approved approximately USD 50 million in bonuses.   Mr. Theede himself received a USD 5 million bonus.   The decision to issue bonuses was motivated by Yukos' acute concerns about employee retention and "hiring others was going to be almost impossible, because . . . it was a scary place to be."[71] He recalled the exceptional hire of Mr. Aleksanyan as executive vice-president of Yukos because the bankruptcy administrator, Mr. Rebgun, wanted a Yukos executive in Moscow with whom he could work directly.   Mr. Theede recounted that Mr. Aleksanyan "went and met with Mr. Rebgun and explained to him that we were in a difficult situation but we wanted to cooperate, and we really felt that we could find a way to survive."   Within three days, police

---

[70]   *Ibid.* ¶¶ 29–34.

[71]   Transcript, Day 11 at 14–16, 21–23.

stormed Mr. Aleksanyan's house and he was held in jail without a hearing for three years and only released as a result of a ECtHR ruling.[72]  He died a year later from an illness contracted in jail.

169.   In response to a Tribunal question, Mr. Theede testified that he met with PwC at least quarterly, but he did not recall that the trading companies ever came up in their discussions.  He never asked PwC for a written opinion on the structure of the trading companies, and he "was told that PwC's consulting arm was actually the architect of those structures."  He did not discuss any of the tax reassessments with either Messrs. Kubena or Miller of PwC.[73]

### 8.   Mr. Brent Kaczmarek

170.   Mr. Brent C. Kaczmarek CFA[74] is Managing Director of Navigant Consulting, Inc. and has served as a financial, valuation and damages expert in more than 40 international investment arbitrations.  Mr. Kaczmarek was retained by Claimants as a damages expert to calculate Claimants' losses result from a "series of acts which resulted in the demerger of Yukos Sibneft, the piece-by-piece sale of Yukos' assets, and eventually the destruction of Yukos," which he defines as "the Actions."

171.   Mr. Kaczmarek's two expert reports and oral testimony are summarized in Part XII of the Award.   In essence he concludes that, assuming the underlying tax assessments and all subsequent Actions were violations of the ECT, Claimants should be compensated for the value of their shareholding in a hypothetical Yukos entity (as merged with Sibneft and listed on the NYSE) as at the date of 21 November 2007, as well as any dividends that would have been paid to them up to that point in time, plus interest.  The total amount of damages calculated on this basis would be USD 114.174 billion.  Mr. Kaczmarek relies on a number of techniques in support of this figure, including valuations of Yukos' assets, a Discounted Cash Flow ("**DCF**") analysis, a comparable companies approach and a comparable transactions approach. Mr. Kaczmarek also offers valuations in scenarios where there is no merger with Sibneft and no listing on the NYSE.  He additionally makes assessments of the damages which would be due

---

[72]   *Ibid.* at 38–39.  *See also* Theede WS ¶ 30.

[73]   *Ibid.* at 50–51, 54.

[74]   First Expert Report of Mr. Brent C. Kaczmarek, CFA, 15 September 2010, filed with Memorial (hereinafter "First Kaczmarek Report"); Second Expert Report of Mr. Brent C. Kaczmarek, 15 March 2012, filed with Reply (hereinafter "Second Kaczmarek Report").  Mr. Kaczmarek appeared for examination on 24 October 2012, Transcript, Day 11 at 60–196.  References to Mr. Kaczmarek's testimony appear in Part XII of the Award (The Quantification of Claimants' Damages).

to compensate Yukos were the Tribunal to find that the original tax assessments did not breach the ECT but that the subsequent enforcement of the tax claims did.  His damages calculations for the latter scenario range between USD 33 billion and USD 67 billion.

172. Mr. Kaczmarek was cross-examined about (a) revisions he made between his first and second reports; (b) errors made with respect to the crude oil export tariff rate, the mineral extraction tax rate, inflation rates, the use of the U.S. Consumer Price Index, an erroneous conversion of tons to barrels, (c) assumptions about Yukos' borrowing capacity, and (d) various reasonableness tests.  The Tribunal also questioned him about the choice of valuation dates.[75]

### 9.    Mr. Philip Baker QC

173. Mr. Philip Baker QC[76] practices at Gray's Inn Tax Chambers in London and is presently a senior research fellow at the University of London.  Claimants presented him as an expert on international tax law to counter claims made by Respondent's expert Professor Rosenbloom, regarding the benefits claimed by Hulley and VPL under the Agreement between Cyprus and the Russian Federation for the Avoidance of Double Taxation with Respect to Taxes on Income and Capital, signed on 5 December 1998 ("**Cyprus-Russia DTA**").  For reasons explained in more detail in Chapter IX.B of this Award (on "Unclean Hands"), Mr. Baker disagrees with Professor Rosenbloom's conclusion that the claims to benefit from the Cyprus-Russia DTA were not appropriate, were vitiated by tax treaty abuse and were not justified by the provisions of the DTA.

174. In essence, Mr. Baker firstly maintains that the benefits that Hulley and VPL received under the Cyprus-Russia DTA are consistent with its purpose.  Secondly, Mr. Baker opines that the abuse of law doctrine is found in the domestic law of certain countries, but is not universal and, where it applies, it is for that domestic jurisdiction to resolve whether the doctrine applies to international obligations such as double taxation conventions.  Thirdly, Mr. Baker maintains that Hulley and VPL were the beneficial owners of the dividends received from Yukos in the sense of Article 10 of the Cyprus-Russia DTA.  Hulley and VPL were acknowledged investment companies holding shares in Russian companies and did not have a permanent

---

[75]    Transcript, Day 11at 192–93.

[76]    Expert Report of Mr. Philip Baker QC, 14 March 2012, filed with Reply.  Initially Mr. Baker was expected to appear before the Tribunal, but on 4 October 2012, Respondent informed the Tribunal it no longer wished to cross-examine him.  References to his report appear in Chapter IX.B (Unclean Hands).

establishment in Russia under Article 10(4).

### 10.    Mr. Yuri Schmidt

175.    Mr. Yuri Schmidt[77] was Mr. Khodorkovsky's defense lawyer in his 2004 and 2007 criminal trials, prior to which Mr. Schmidt had no previous dealings with Mr. Khodorkovsky or with Yukos.  In his witness statement, Mr. Schmidt recounts that Russian authorities systematically intimidated and harassed Yukos' lawyers and personnel.  Illegal and aggressive raids and seizures were "meticulously calculated to correspond to the critical stages in the dismantlement of Yukos."  Russian authorities also engaged in physical attacks and other provocation, including long and abusive interrogations and beatings.  In February 2007, defense lawyers were illegally and invasively searched at the airport while en route to visit Mr. Khodorkovsky in Siberia.  Russian authorities also (unsuccessfully) brought libel proceedings against and attempted to disbar Mr. Schmidt.  Respondent chose not to call him for cross-examination.

176.    Mr. Schmidt testifies that in the criminal cases against Messrs. Khodorkovsky and Lebedev, Russian authorities violated basic standards of due process and fair trial.  In 50 years of legal practice in Russia, Mr. Schmidt had "never seen breaches of due process so flagrant and so egregious," nor had he ever, even in the "darkest hours of the Soviet regime," "seen the Russian State undertake such coordinated, systematic and intense efforts, and deploy such huge resources, against a person accused of an alleged economic offense."  The raids resulted in the "massive confiscation" of documents that were not returned.  In December 2006, the defendants were transferred to a "pre-trial detention isolator" in Chita and Siberia.  Mr. Schmidt recounts that during the trials, seized documents were presented out of context; the defendants sat in metal and glass cages that were equipped with hidden microphones; criminal charges were brought against defense witnesses; and prosecution motions were systematically granted, while defense motions were refused.

177.    According to Mr. Schmidt, the goal of destroying Yukos and confiscating its assets was carried out by the coordinated actions of all branches of the Russian State.  The judiciary blocked Mr. Khodorkovsky's registration of candidacy for the 2005 parliamentary elections by accelerating his appeal.  The administration transferred Messrs. Khodorkovsky and Lebedev to

---

[77]    Witness Statement of Mr. Yuri Schmidt, 6 September 2010 (hereinafter "Schmidt WS") (original in Russian, translated into English), submitted with Memorial.  References to Mr. Schmidt's testimony appear in Chapter VIII.C (Harassment, Intimidation and Arrests).

the "most inaccessible penal colonies in Russia," "in blatant violation of Russian law."  The legislature amended legislation to permit the transfer and amended the law on NGOs to force the closure of Open Russia.

**11.   Dr. Sergei Kovalev**

178.  Dr. Sergei Kovalev[78] is a Russian human rights activist, former politician, Soviet dissident and political prisoner.  From 1993 to 2003 he served as an elected State Duma Deputy.  He has been nominated for the Nobel Peace Prize.  Dr. Kovalev's expert opinion is on the independence of the Russian judiciary in cases with a political element or representing a particular interest to Russian authorities.  Dr. Kovalev concludes that the Russian judicial system was not, and is still not, independent.  According to Dr. Kovalev, where cases implicate the interests of the State, trials are political and decisions dictated by extralegal motives.  There exists "absolute submission of the Russian judiciary to the executive power."  Respondent did not call him for cross-examination.

179.  Dr. Kovalev opines that the normative regulation of the Russian judiciary ensures its dependence, including through the role of the executive branch of government in the appointment of judges.  Court Presidents have "excessive powers," courts are under-funded, judges earn bonuses for "exemplary behavior" (as defined by the regime), and disciplinary action is taken against disobedient judges.

180.  Dr. Kovalev's answer to the question of whether the Russian judiciary was independent of the executive branch in the Yukos and Khodorkovsky/Lebedev cases, is "unequivocal and definitely negative," because of the "clearly political nature" of the cases.  The political motive was "to dispose of Mikhail Khodorkovsky," whom the Putin administration saw as an "unmistakable political opponent."  According to Dr. Kovalev, the attacks on Yukos also had economic motives, as evidenced by President Putin's vouching for the unknown last minute purchasers of YNG.  Pressure (including the imprisonment of Yukos lawyer Vasiliy Aleksanyan) was exerted on other Yukos associates to obtain testimony.  Dr. Kovalev lists "egregious due process violations" against Messrs. Khodorkovsky and Lebedev, including: (a) a pretrial investigation that was conducted without the defendants' participation; (b) the

---

[78]  Expert Report of Dr. Sergei Kovalev, 2 September 2010 (hereinafter "Kovalev Report") (original in Russian, translated into English), submitted with Memorial.  References to Dr. Kovalev's testimony appear in Chapter VIII.C (Harassment, Intimidation and Arrests).

dismissal by the Court of every defense petition; and (c) the refusal by the Court to allow the defense attorneys to question Prosecution expert witnesses.

## B.   RESPONDENT'S WITNESSES

181.   Respondent submitted no testimony from fact witnesses.   Respondent submitted 11 expert opinions.   At the Hearing on the Merits, Claimants chose to cross-examine only:[79]

       1)   Professor James Dow PhD; and
       2)   Mr. Oleg Y. Konnov

182.   Respondent's other witnesses, who did not appear for cross-examination, were:

       3)   Professor Reinier Kraakman;
       4)   Professor H. David Rosenbloom;
       5)   Professor Thomas Z. Lys PhD;
       6)   Ms. Felicity Cullen QC;
       7)   Mr. Dale Hart;
       8)   Mr. Polyvios G. Polyviou;
       9)   Mr. John Ellison FCA;
      10)   Mr. Raymond Gross CPA; and
      11)   Professor Dr. Albert Jan van den Berg

183.   The following summary first addresses the testimony of Respondent's two witnesses who appeared before the Tribunal, in order of appearance.   It then reviews the evidence from Respondent's nine witnesses whom Claimants chose not to cross-examine as well as the evidence provided by Professor Stef van Weeghel during the jurisdictional phase of this case.

### 1.   Professor James Dow

184.   Professor James Dow[80] is Professor of Finance at London Business School, where he has taught valuation since 1989.   He has a PhD from Princeton University and economics degrees from Cambridge University.   Professor Dow was retained by Respondent as a damages expert to respond to the reports of Claimants' expert, Mr. Kaczmarek.

---

[79]   Initially, Claimants intended to also cross-examine Professor H. David Rosenbloom.   However, they decided not to after Respondent, shortly before the Hearing on the Merits, advised that it did not wish to cross-examine Claimants' international tax law expert, Mr. Philip Baker QC.

[80]   First Expert Report of Professor James Dow, 1 April 2011, filed with Respondent's Counter Memorial, Second Expert Report of Professor James Dow, 15 August 2012, filed with Rejoinder.   Professor Dow appeared for examination on 25 October 2012, Transcript, Day 12 at 1–202.   References to Professor Dow's testimony appear in Part XII (The Quantification of Claimants' Damages).

185.  Professor Dow's two expert reports and oral testimony are summarized in Part XII of the Award.  Professor Dow acknowledges focusing on "explaining why the Kaczmarek Report is not useful for calculating damages in this matter."  His reports contain no alternative valuation of his own.  He basically describes a series of flaws in the analysis of Mr. Kaczmarek, highlighting his choice of a valuation date which, he says, is arbitrary and unjustifiably inflates damages.  He also criticizes Mr. Kaczmarek for ignoring causation and the extent to which Yukos' own actions might have contributed to the loss.  Professor Dow identifies a number of errors in Claimants' DCF analysis and questions the way in which Mr. Kaczmarek sought to correct them without impacting the ultimate valuation.  He also articulates problems with Claimants' comparable companies method and the assumptions underlying the "alternative collection scenarios" whereby Claimants would have been given an opportunity to make arrangements to pay off legitimate tax assessments.  He identifies some "obvious and significant errors" relating to the application of the inflation rate, the export duty rate and the mineral extract tax rate.  He also criticizes any valuation based on an American Depository Receipt ("**ADR**") listing on the NYSE as too speculative.  Professor Dow was cross-examined about these issues.

186.  At the Hearing, Professor Dow testified that he would be prepared to put some weight on Mr. Kaczmarek's analysis for YNG with corrections (USD 17.1 billion for the comparable companies approach and USD 17.2 billion for the comparable transactions approach); which represented a "reasonable stab".[81]  Professor Dow was asked if his corrected figures for Yukos and YukosSibneft valuations resulting from the comparable companies analysis (of USD 67.8 billion and US 93.7 billion respectively) could provide "a valid result in terms of valuation in the same manner as for YNG," to which he answered that:  "They are not presented in that context, but I think I'd have to agree that they could be a useful valuation, yes."[82]  He qualified this answer by noting he had not done enough analysis, for example by accounting for changes in oil prices.  Claimants' counsel also challenged Professor Dow on his criticisms of Claimants' comparable companies approach.  With respect to the proper valuation date, from an economic standpoint, he considered that the end of 2004 was the appropriate valuation date, since that is when the loss of value in Yukos had taken place and the market thought, based on the share price, that the company's fortunes had no chance of being reversed.  Professor Dow opined that

---

"it's indisputable that there was no value by the end of 2004.[83]  By the end of 2004, Yukos' share price had plummeted, it was a penny stock, and in the three years that followed there was no recovery in the share price."[84]

### 2.    Mr. Oleg Y. Konnov

187.  Mr. Oleg Y. Konnov[85] is a partner at Herbert Smith LLP and head of its Russian tax group based in Moscow.  He has practiced tax law for 17 years and taught at the Law Faculty of Moscow State University.   Respondent retained him as an expert on Russian tax law.  Mr. Konnov was the only Russian tax lawyer who appeared as a witness before the Tribunal.  Extensive extracts from his testimony are set out in the Analysis portion of the Award, especially the chapters dealing with Yukos' tax optimization scheme and the tax assessments.  Accordingly, his testimony is not reproduced here in any detail.

188.  His first expert report describes the tax optimization scheme adopted by Yukos using domestic offshore companies and sets out some basic principles of the Russian federal tax legislation at the relevant times.  He then addresses seven specific questions.

189.  The first question is whether the tax authorities acted in accordance with applicable law and practice when assessing profit tax on Yukos with respect to sales by the domestic offshore companies.  Mr. Konnov answers affirmatively and opines that the actions of the Russian tax authorities against Yukos were consistent with pronouncements by Russian courts on the "anti-abuse doctrine", which according to Mr. Konnov, was "accepted and consistently applied" by Russian courts before and after the Yukos tax cases.[86]

190.  The second question is whether Yukos was automatically entitled to a zero percent VAT rate in connection with exports declared by domestic offshore companies.  Mr. Konnov answers no, because the application of a zero percent VAT rate was "strictly conditioned" on the taxpayer's

---

[83]    *Ibid.* at 176.

[84]    *Ibid.* at 47.

[85]    Mr. Konnov submitted two expert reports for these proceedings.  First Expert Report of Mr. Oleg Konnov, 4 April 2011 (hereinafter "First Konnov Report"); Second Expert Report of Mr. Oleg Konnov, 15 August 2012 (hereinafter "Second Konnov Report").  Mr. Konnov appeared for examination on 29–31 October 2012; Transcript, Day 13 at 1–257; Day 14 at 1–261; Day 15 at 1–256.  References to Mr. Konnov's testimony appear Chapters VIII.A (The Tax Optimization Scheme), VIII.B (The Tax Assessments Starting in December 2003), VIII.E (Attempts to Settle) and VIII.F (The Auction of YNG).

[86]    First Konnov Report ¶¶ 31–52.

filing of a "special" zero percent monthly VAT return.  According to Mr. Konnov, Yukos should have complied with the specific procedures because the courts and the tax authorities established that Yukos was "the actual owner and exporter of goods."[87]

191.   The third question is whether Yukos had disclosed to the Russian tax authorities prior to the commencement of the 2003 tax audit its tax minimization practices involving the use of domestic offshore companies registered in domestic low-tax jurisdictions.  Mr. Konnov saw nothing in the record indicating that Yukos "made any significant disclosure of its tax scheme," but even so, illegal tax practices may not be legitimized through a tax offender's disclosure.[88]

192.   The fourth question is whether the Russian Tax Ministry complied with applicable law in appointing and conducting a tax audit of Yukos in December 2003.  Mr. Konnov answers affirmatively.[89]

193.   The fifth question is whether the Russian tax authorities and courts complied with applicable law in imposing fines on Yukos.  Mr. Konnov explains that the base fine under Russian tax law is 20 percent, which can be increased to 40 percent if non-payment results from the willful acts of a taxpayer, which in turn may be doubled for repeat offenders.  Mr. Konnov concludes that the imposition of fines on Yukos was justified and accorded with prevailing court practice.[90]

194.   The sixth question concerns actions that Yukos could have taken after receiving the 2000 Tax Audit Report in December 2003 to reduce its tax liability.  Mr. Konnov explains that Yukos could have:  (a) voluntarily paid all tax arrears and accrued interest and reserved cash for fines; (b) filed amended tax returns, and paid tax and interest due for 2001–2003; (c) complied with the legal requirements for claiming the zero percent VAT rate; and (d) discontinued as of 1 January 2004 the use of domestic offshore companies.[91]

195.   The seventh question is whether the tax treatment of YNG changed after its sale to Rosneft.  Mr. Konnov concludes that the treatment of YNG before and after its sale to Rosneft "was

---

[87]   *Ibid.* ¶ 53–59.

[88]   *Ibid.* ¶¶ 59–64.

[89]   *Ibid.* ¶¶ 65–70.

[90]   *Ibid.* ¶¶ 71–82.

[91]   *Ibid.* ¶¶ 83–85.

consistent with then current practice of the Russian tax authorities and courts, and does not suggest any irregularity."[92]

196.   Mr. Konnov's  second report responds to alleged misstatements of Russian tax law found in the Reply, including with respect to the "anti-abuse doctrine" under Russian tax law,[93] "re-attribution," and the "bad-faith taxpayer" doctrine.[94]   Mr. Konnov also addresses Claimants' arguments about proportionality between tax benefits claimed and investments made in the low-tax regions, Yukos' awareness that its tax optimization scheme was not fully compliant with the law, the application of the Law of the Russian Federation governing Value Added Tax ("**VAT Law**"), and fines on Yukos.[95]

197.   Mr. Konnov appeared before the Tribunal for examination on 29, 30 and 31 October 2012.  He was cross-examined on a range of documents from the record, legal authorities and their application to Yukos and its domestic offshore companies.   Issues canvassed in the cross-examination included, *inter alia*:  (a) the factual record underlying his views expressed about alleged improprieties in Yukos' domestic offshore companies; (b) whether oil products must be physically stored or moved from the premises of trading companies; (c) the re-attribution theory applied to Yukos and the existence of legal precedents for the theory at the relevant time; (d) provisions in the regional tax legislation in Mordovia and elsewhere; (e) the investment agreements concluded between the domestic offshore trading companies and Mordovian authorities; (f) the existence of the anti-abuse doctrine at relevant times; (g) fines and penalties; (h) prior audits conducted by local and regional authorities on Yukos' domestic offshore trading companies and the extent to which they demonstrate familiarity with and tolerance of the tax optimization scheme; (i) audit inspection practices; (j) the meaning of "interrelatedness" in the context of Russian tax legislation; (k) the consequences of the reattribution theory on entitlement to VAT refunds and the formalities required to enjoy VAT exemption; (l) the evolution of the ZATO tax laws and certain internal memoranda within ZATO tax inspectorates; and (m) timing for enforcement of tax assessments.[96]

---

[92]   *Ibid*. ¶¶ 89–92.

[93]   Second Konnov Report, ¶¶ 7–17.

[94]   *Ibid*. ¶ 26–41.

[95]   *Ibid*. ¶¶ 84–121.

[96]   Transcript, Day 13 at 49–52, 70–80, 114–20, 151–52; Transcript, Day 14 at 61–68.

198.    Mr. Konnov also answered questions from the Tribunal, including about the principle of resolving doubts in favor of the taxpayer.[97]   He was asked why, in the interests of justice the Russian courts did not treat the filings for VAT by the trading companies as filings by Yukos.[98] When he emphasized the formalities required for filing for VAT, he was further asked whether the trustee in bankruptcy (Mr Rebgun), who was charged with maximizing the resources available for creditors, himself could have filed the monthly forms for VAT return. Mr. Konnov answered that he could have done so, subject to the three-year limitation period, *i.e.*, he could have re-filed for the three years preceding his appointment as trustee.[99]   The Tribunal also asked Mr. Konnov how the tax authorities determine the motivation of a taxpayer in making use of a low-tax region and about his experience in advising clients with respect to tax minimization.[100]

199.    Mr. Konnov was asked about a comment made by him as an expert witness in the *RosInvestCo UK Ltd. v. The Russian Federation* arbitration ("**RosInvestCo**"), to the effect that "sometimes Russian courts [do not] have an excellent reputation."  Mr. Konnov responded that he had not come across corruption or irregularities in tax cases.[101]   He was invited to share his views on the tax evasion aspects of the convictions of Messrs. Khodorkovsky and Lebedev.  The parts of the judgment dealing with tax elements of the ZATOs and issues of personal income tax avoidance seemed to him to make sense, but he could not comment on other parts of the judgment.[102]

### 3.    Professor Reinier Kraakman

200.    Professor Reinier Kraakman[103] is a Harvard law professor specializing in comparative corporate law and governance.  Claimants chose not to call him for cross-examination.  His expert report concerns the activities of Bank Menatep, Mikhail Khodorkovsky and his "tight-knit group of confederates" (the "**Khodorkovsky Group**"), Yukos Oil Company, and Yukos' subsidiaries

---

[97]    Transcript, Day 15 at 37–42 (Dr. Poncet referring to the principle *in dubio contra fiscum*).

[98]    *Ibid.* at 232.

[99]    *Ibid.* at 234–35.

[100]    *Ibid.* at 237–41.

[101]    *Ibid.* at 251–56.   Referring to the case of *RosInvestCo UK Ltd. v. The Russian Federation*, SCC Arbitration V (079/2005), Final Award, 12 September 2010, Exh. C-1049 (hereinafter "*RosInvestCo*").

[102]    *Ibid.* at 249–55.

[103]    Expert Report of Professor Reinier Kraakman, 1 April 2011, filed with Counter-Memorial.  References to his expert report appear in Chapter IX.B (Unlean Hands).

from the period 1995–1999.  He addresses provisions of the Russian Civil Law, Joint Stock Company Law ("**JSC Law**") and privatization law.

201.  Professor Kraakman maintains that Mr. Khodorkovsky, his Group, and Bank Menatep acted in bad faith and "probably illegally" in violation of the spirit and letter of Presidential Decree No. 889, which was the legal foundation of the Loans-For-Shares ("**LFS**") Program.  At stake in the initial auction of Yukos shares in December 1996 were (i) the right to lend funds to the Russian Federation secured by a pledge of 45 percent of Yukos stock, and (ii) the right to purchase a block of 33 percent of Yukos Stock in a so-called "Investment Tender".  Bank Menatep held shares pledged by the State and sold those shares to their close affiliates, a "tactic" that "allowed the Khodorkovsky Group to gain title to the pledged shares while avoiding Bank Menatep's agency duty to maximize their value," thus violating "the intent of Decree 889, while making a gesture toward formal compliance."

202.  According to Professor Kraakman, secondary sources, and some primary documentation, support "a reasonable inference" that, prior to the Russian Federation's sovereign debt crisis in late 1998, the Khodorkovsky Group systematically skimmed revenue from Yukos' partially-held operating subsidiaries—YNG, Samarneftegaz, and Tomskneft—in bad faith and in violation of the JSC Law's regulations on self-dealing transactions.  Circumstantial evidence indicates that the Khodorkovsky Group skimmed revenue directly from Yukos from mid-1996 until 1999, and transferred it to offshore companies around the world that were controlled or beneficially owned by members of the Khodorkovsky Group.

203.  He testifies that following the Russian sovereign debt crisis, Yukos and the Khodorkovsky Group largely succeeded in squeezing out minority shareholders from Yukos' operating subsidiaries.  Yukos managed this by committing serious violations of the provisions in the JSC Law intended to protect minority shareholders.  Yukos exhibited egregious bad faith by blocking minority shareholders from participating in extraordinary shareholders meetings called in March 1999.  He claims:  "As a professor of corporate law with a particular interest in the JSC Law, I have never read—or read about—anything more chilling in a professional sense than the documents and manipulative behavior surrounding the March 1999 EGMs [Extraordinary General Meetings] held for YNG, Samareneftegaz, and Tomskneft."  In Professor Kraakman's opinion, Yukos and the Khodorkovsky Group opportunistically devalued Yukos shares, which Bank Menatep—the Group's financial arm—had previously pledged to Western banks in order to finance Yukos' efforts to gain control of Tomskneft.

### 4. Professor H. David Rosenbloom

204. Professor H. David Rosenbloom[104] is a practicing attorney, a consultant and NYU law professor specializing in international taxation.  He has worked for the U.S. Government on international tax matters.  Respondent retained him as an international tax law expert.  He opines on the appropriateness of the actions from 2000–2003 by four Cypriot entities—Hulley, VPL, Dunsley Limited, and Nassaubridge Management Limited—in claiming a reduced Russian Federation tax on dividends paid by Yukos and affiliates, under the Cyprus-Russia DTA.

205. Professor Rosenbloom concludes that each of the four entities is a "paper entity", with "total control" and "ultimate ownership" exercised by Russian individuals operating solely within Russia and enjoying all economic benefits.  According to Professor Rosenbloom, the invocation of the Cyprus-Russia DTA under these circumstances was a "blatant example of tax treaty abuse."  Professor Rosenbloom refers to pervasive recognition of the international "abuse of law" doctrine, to the OECD Commentaries (the DTA follows the OECD Model), and to the VCLT to assert that:  (a) taxpayers must act in good faith to benefit from an income tax treaty; and (b) the employment of entities in one State party to a tax treaty exclusively to reduce taxes otherwise applicable under the laws of the other State party constitutes tax treaty abuse.

206. For reasons described in more detail in Chapter IX.B (on "Unclean Hands"), Professor Rosenbloom concludes that the benefits claimed were not justified by Article 10 of the Cyprus-Russia DTA, which limits the tax charged by one State on dividends paid from a company in that State to beneficial owners of the stock resident in the other State, provided they do not operate through a "permanent establishment" in the first State, to which the dividends are attributable.  Firstly, he opines, the Cypriot entities were not beneficial owners of the dividends received on Yukos shares, and the beneficial owners were not residents of Cyprus.  Secondly, in his view, the entities were not eligible for the claimed benefits because they operated through permanent establishments in the Russian Federation, to which the dividends were attributable.  In sum, according to Professor Rosenbloom, the claims under the Cyprus-Russia DTA on behalf of the Cypriot entities were unjustified.  They were not only abusive, but without merit.

---

[104] First Expert Report of Professor H. David Rosenbloom, 1 April 2011, filed with Counter-Memorial, Second Expert Report of Professor H. David Rosenbloom, 15 August 2012, filed with Rejoinder.  Initially Claimants intended to cross-examine Professor Rosenbloom, but decided not to after Respondent advised it would not be cross-examining Mr. Philip Baker QC.  References to Professor Rosenbloom's reports appear in Chapter IX.B (Unclean Hands).

207.   In his second expert report, Professor Rosenbloom replies to the opinion of Claimants' tax law expert, Mr. Baker, which he describes as "long on law and history" but "short, very short, on the facts."   The facts here, according to Professor Rosenbloom, involve Russian nationals and residents earning Russian source income and claiming a treaty-based reduction of normal Russian tax by reason of a "wafer-thin Cypriot corporate veneer managed from Russian soil." Neither the DTA nor any other income tax treaty would condone such a structure and no rational country would endorse it as sound policy.   Professor Rosenbloom then sets out in further detail facts pertaining to several Yukos-related entities which inappropriately claimed benefits under the Cyprus-Russia DTA.

208.   Professor Rosenbloom opines that the primary purpose of a tax treaty is to eliminate or at least mitigate international double taxation and none of the authorities in Mr. Baker's report deal with a country using treaties to reduce tax on its own residents but rather discuss third-country investors.   Interpreting the Cyprus-Russia DTA as an instrument to attract foreign direct investment into Russia without regard to tax revenue loss exceeds the limited scope of OECD-based treaties and undermines the purpose of tax avoidance and evasion.   Professor Rosenbloom also accuses Mr. Baker of failing to differentiate between treaty shopping and "round tripping".   Russia's inaction to insist on strict limitation on benefit or its failure to terminate the Cyprus-Russia DTA does not establish Russia's endorsement of round tripping.

209.   Finally, Professor Rosenbloom refers to documents provided after the filing of his first report, which he says confirm that neither Hulley nor VPL beneficially owned dividends received from Yukos.   Even if Hulley and VPL were considered beneficial owners of the Yukos dividends on the transferred shares, the related-party "repos" or stock-lending agreements, which had no purpose other than to enable claims of treaty benefits, are an improper use of the DTA.

210.   According to Professor Rosenbloom, even if the Yukos structure and transactions with the Cypriot entities were not abusive, dividend distributions by Yukos and its affiliates to Hulley, VPL and the other Cypriot entities did not qualify under the DTA for reduced tax in Russia since they should have been taxed as "business profits" under Article 10(4) of the DTA.   The facts also confirm that all the Laurel subsidiaries had permanent establishments in Russia to which the dividends received from their Russian subsidiaries were attributable.   According to Professor Rosenbloom, it is not necessary to adopt a complicated "economic substance" or "substance-over-form" analysis to see that the Yukos structure cannot be defended as within the scope of the Cyprus-Russia DTA or legitimate tax planning.   Had Mr. Baker and Claimants "focused on the facts presented" they could not reasonably have come to any other conclusion.

### 5.   Professor Thomas Z. Lys

211.   Professor Thomas Lys[105] is a professor of accounting at Kellogg School of Management, Northwestern University in Chicago.   He has a PhD in accounting and finance from the University of Rochester and an economics degree from the University of Berne, Switzerland.   He has served as a consultant to several companies.   He was retained by Respondent to expound in detail various financial transactions and operations of Yukos.   Claimants chose not to call him for cross-examination.   The appendices attached to Professor Lys' Reports were used at various times throughout the Hearing to help illustrate Yukos' structure and activities.

212.   Professor Lys recounts Yukos' incorporation in 1993, privatization in 1995 and public sale of shares in 1996.   He describes Yukos' structure and activities and the role of the various producing subsidiaries, trading entities and off-shore entities, and the structure and flow of funds originating in the trading companies into "offshore and Yukos entities."

213.   Professor Lys explains that starting in 1999, the majority of Yukos shares were owned by subsidiaries of GML, an entity whose major interest was held by Mr. Khodorkovsky, the CEO and Chairman of the Executive Committee of the Board of Directors of Yukos.   Other shareholders of GML also had senior management positions in Yukos.   In several instances, shares of Yukos stock were transferred between various entities under the control of GML. Many such transactions placed the Yukos shares temporarily, sometimes for less than a week, under nominal ownership of Cypriot entities on dates that established record ownership for purposes of Yukos dividend distributions, apparently in an effort to reduce Russian taxes on these dividends.   YUL was a wholly-owned subsidiary of GML.   Hulley was a wholly-owned subsidiary of YUL.   Although VPL did not fall under the ownership structure of GML, it was a subsidiary of the Veteran Petroleum Trust (a Jersey trust), of which YUL controlled at least three quarters of the voting rights.

214.   Professor Lys describes and details how there were hundreds of transactions of Yukos shares among the above-described entities and their affiliates; in some instances multiple transactions occurred on a single day.   Many appear to Professor Lys to "have been structured to place Yukos shares temporarily in the hands of Hulley and a specific account held in the name of VPL, both of which are Cypriot entities, as of the record dates of Yukos dividend payments."

---

[105]   First Expert Report of Thomas Z. Lys, 1 April 2011, filed with Counter-Memorial, Supplemental Expert Report of Professor Thomas Z. Lys, 15 August 2012, filed with Rejoinder.   References to Professor Lys' Reports appear in Chapters VIII.A (The Tax Optimization Scheme) and X.E (Contributory Fault).

He states that "they appear to have been performed to allow the Cypriot entities to claim beneficial ownership of these shares to reduce the Russian withholding taxes on the dividends Yukos paid on these shares, pursuant to the [Cyprus-Russia DTA]."  Given their timing, Professor Lys sees no apparent business purpose for these transactions.

215.   Professor Lys also describes Yukos' dividend flows through YUL, Hulley, VPL, and GML.  He concludes that YUL, and its beneficiary GML, not only received the economic benefit of the dividends paid on the Yukos shares owned by Hulley, but also received the benefit of the gains Hulley reported from the sales of Yukos shares to YUL.  In other words, the profits earned on those sales were effectively "returned" through the dividend.  YUL (and GML) were also the beneficiaries of dividends paid on Yukos shares owned by VPL.

216.   Professor Lys describes how from 2000 to 2003, groups of Yukos-related entities "moved funds in a common pattern from Russia's low-tax regions out of Russia, into off-shore entities."  He details the flow structures of profits through the Fargoil and Ratibor structures.  He sets out the Mega Alyans flow structure, showing the ultimate ownership of trading entities by Laurel, a BVI entity, and its sole shareholder, Stephen Curtis.  He describes how Yukos had a call option to acquire all of Mr. Curtis' Laurel shares for one rouble.

217.   He also details the flow structures in 2000–2001 of the trading companies registered in the ZATOs of Lesnoy and Trekhgorny (Business-Oil, Flander, Forest-Oil, Greis, Kolkrein, Kverkus, Mitra, Muscron, Nortkes, and Vald Oil).  He explains how the Lesnoy and Trekgorny trading companies passed funds through two Russian entities—Neftetrade and Neftemarket—to a number of Cypriot companies, which in turn passed the funds on through Laurel to Halsley and Belmont, two BVI entities owned by Brill.

218.   Finally, Professor Lys describes loans made by and to Yukos Capital (incorporated in Luxembourg in 2003).  Yukos Capital's 2005 financial statements show that it borrowed extensively from and lent extensively to other Yukos entities.  Professor Lys details loan transactions where the exact amount borrowed by Yukos Capital was then lent by Yukos Capital to other Yukos-related entities.

### 6.   Ms. Felicity Cullen QC

219. Ms. Felicity Cullen QC[106] is a barrister specializing in United Kingdom tax law.  Respondent asked Ms. Cullen to opine on rules concerning the assessment, collection, and enforcement of tax in the UK, in the context of showing that "[t]he treatment by the Russian tax authorities of Yukos' tax evasion scheme is entirely consistent with the positions that would have been taken by the tax authorities of virtually every other country [including the UK]."[107]  Claimants chose not to call her for cross-examination.

220. Ms. Cullen was asked to give her opinion on the basis of a number of assumptions about a large corporate taxpayer who has entered into transactions to reduce its tax liability.  She was asked to assume that the transactions are considered by tax authorities to involve avoidance and/or criminal evasion of tax, to lack genuine commerciality, and to have been carried out on non-arm's length terms.  The same taxpayer is assumed to have deliberately concealed the true character of its transactions, to have been deliberately uncooperative in tax investigations and to have dissipated assets otherwise available to satisfy potential tax liabilities.  In such assumed circumstances, Ms. Cullen describes the investigation and enforcement options open to an officer of Her Majesty's Revenue and Customs ("**HMRC**") during an enquiry into a tax return.  For example, HMRC can amend a company's self-assessment if its suspected of understating the company's true tax liability and there is a real risk of substantial loss of tax to the government.  Under a discovery process, HMRC is allowed to re-open returns for periods otherwise considered closed when there has been careless or deliberate conduct leading to loss of revenue.

221. With respect to penalities, Ms. Cullen notes that under the current UK civil tax penalty regime may vary from 30  to 100 percent of the potential lost revenue (depending on whether there was deliberate concealment).  She further describes the considerable methods of enforcement available to HMRC, which include proceedings in English courts, freezing orders, and pursuit of insolvency proceedings.  Criminal action may, according to Ms. Cullen, be pursued where appropriate, in which case HMRC will often conduct a form of "dawn raid", require production of documents, seize items like computers and make arrests.

---

[106]   Expert Report of Ms. Felicity Cullen QC, 4 April 2011.

[107]   Counter-Memorial ¶ 1135.

222.   Ms Cullen observes that traditionally, tax legislation in the UK was construed literally but today, it is construed purposively, which has facilitated challenging and countering tax avoidance schemes.

### 7.   Mr. Dale Hart

223.   Mr. Dale Hart[108] is a retired executive of the U.S. Internal Revenue Service ("**IRS**"). Respondent retained Mr. Hart to describe the U.S. legal framework against tax abuse and evasion and enforcement powers of the IRS, in the context of Respondent's claim that "tax administrations around the world [including the U.S.] would have been at least as firm as the Russian Federation in dealing with abuses of the kind perpetrated by Yukos."[109]   Claimants chose not to call him for cross-examination.

224.   Mr. Hart testifies that under U.S. law, abusive or fraudulent tax shelters are broadly defined to include investment schemes that reduce tax income without changing the value of the business. To combat them, the IRS relies on a legal framework that provides the authority to reallocate income and deductions to properly reflect income.   The framework includes the judicial doctrines of economic substance, business purpose, sham transactions, substance over form and step transactions.   The IRS has extensive civil and criminal enforcement powers, which according to Mr. Hart, it uses "aggressively".   It has broad discretion in determining which tax returns and taxpayers to select for audit and it tailors the scope of its audit to the taxpayer's financial and tax situation.  If evidence of fraud is revealed, the civil audit is discontinued and a criminal investigation may be launched.   Mr. Hart notes that the typical three-year limitation period may be extended for fraud or other misconduct.

225.   With respect to penalties, Mr. Hart describes how U.S. law imposes "heavy" penalties on fraudulently underpaid tax, including failure to pay and failure to file penalties, accuracy-related penalties on underpayments and a civil fraud penalty of 75 percent.   The collection process begins with a formal notice of assessment requesting payment.   According to Mr. Hart, a deferred payment arrangement is only ever considered when the taxpayer is unable to pay in full.   Mr. Hart describes the "strong arsenal" of administrative enforcement collection tools at the disposal of the IRS, including a federal tax lien, a notice of levy and the sale of property by

---

[108]    Expert Report of Mr. Dale Hart, 4 April 2011.

[109]    Counter-Memorial ¶ 1135.

public auction or public sale after determination a minimum bid price that need not be based on fair market value.

### 8.   Mr. Polyvios Polyviou

226.   Mr. Polyvios Polyviou[110] of Chryssafinis & Polyviou LLC in Nicosia is a lawyer practicing Cypriot law.  Respondent retained him as an expert to show that Claimants' alleged abuses of the Cyprus-Russia DTA also violated the criminal laws of Cyprus.  Claimants chose not to call him for cross-examination.

227.   Mr. Polyviou's report is based on the following assumptions:  (a) that for purposes of the Cyprus-Russia DTA, Hulley and Veteran were "residents" of Cyprus and Yukos was a "resident" of Russia; (b) that in reliance on the Cyprus-Russia DTA, Hulley and Veteran paid a reduced five percent withholding tax to Russia on dividends received from Yukos; (c) that Hulley and Veteran had no right to take the benefit of the Cyprus-Russia DTA because the relevant dividends *were* connected with activities carried out in Russia and/or because Hulley and Veteran were not the beneficial owners of the relevant dividends; (d) that the natural persons who declared/confirmed on forms submitted by Hulley and Veteran to Cypriot tax authorities that the relevant dividends received from Yukos were *not* connected with activities carried out in Russia and that Hulley/Veteran was the beneficial owner of the relevant dividends were authorized to do so on Hulley/Veteran's behalf; and (e) that at the time of making the declarations/confirmations, these natural persons *knew* that the dividends from Yukos *were* connected with activities carried out in Russia or that Hulley/Veteran was *not* the beneficial owner and intended for the forms to be submitted to the Cypriot authorities so as to obtain completion, dating, signing and stamping of Box 4 (the "Note of the foreign Tax authority") on the forms.  On the basis of these assumptions, Mr. Polyviou was asked to address two questions, as described below.

228.   The first question was:  "Did the circumstances under which Hulley and Veteran obtained the completion, dating, signing and stamping of certain tax forms by the Cypriot tax authorities give rise to criminal offences under the Criminal Code of Cyprus?"  Mr. Polyviou answers "Yes" under sections 297 (false pretences), 305 (willfully obtaining a "certificate" by false pretences) and 341 (willfully procuring execution of documents by false pretences) of Cap. 154

---

[110]   Expert Report of Mr. Polyvios G. Polyviou, 1 April 2011 (hereinafter "Polyviou Report").   References to Mr. Polyviou's  report appear in Chapters IX.B (Unclean Hands) and X.E (Contributory Fault).

of the Criminal Code.   According to Mr. Polyviou, but for the false pretence, Cypriot tax authorities would have rejected the request to complete, date, sign and stamp the forms as it would have been pointless and tantamount to assisting an abuse of the Cyprus-Russia DTA.

229.   The second question was: "Were criminal offences committed under the Criminal Code and/or the Companies Law of Cyprus?", assuming that during the period 1 January 2000 to 28 October 2003:   (a) in reliance upon the Cyprus-Russia DTA Hulley and Veteran paid a reduced five percent withholding tax to Russia on dividends received from Yukos; (b) neither Hulley nor Veteran had the right to take the benefit of the Cyprus-Russia DTA, at least vis-à-vis Yukos' above-mentioned dividends; and (c) neither Hulley nor Veteran disclosed point (b) in their annual accounts for financial years 2000–2002?   Mr. Polyviou answered "Yes" under section 311(b)(iii) (directors and officers of corporations keeping fraudulent accounts or falsifying books or accounts) of Cap. 154 and section 143(6) (contents and forms of accounts) of Cap. 113 of the Criminal Code.

### 9.   Mr. John Ellison

230.   Mr. John Ellison[111] is a consultant at KPMG in London, having retired as a senior partner in 2010.   His report concerns the withdrawal by PwC of its audit opinions on Yukos' financial statements for the years 1995–2004.   Claimants chose not to cross-examine him.[112]

231.   Mr. Ellison opines that for a reputable international firm such as KPMG to withdraw an audit opinion is an "unusual and serious" event, of which he knows of only a handful of cases.   At KPMG, whether in the UK, the U.S., or Russia, such decision would necessarily be preceded by extensive consultations with several senior partners of the firm together with its technical departments and legal counsel.   According to Mr. Ellison, PwC's procedures were similar, as shown by a declaration (appended to the Ellison Report) from Ms. Laurie Endsley, PwC's in-house counsel who worked on the Yukos matter at the time of withdrawing the audits.

232.   Mr. Ellison analyzes PwC's letter of 15 June 2007,[113] in which PwC announced the withdrawal of its audit opinions of Yukos' financial statements, explaining that it had acquired new information that caused it to question the reliability of the representations made by Yukos'

---

[111]   Expert Accountant's Report to the Tribunal by John Ellison, FCA, 14 August 2012 (hereinafter "Ellison Report"). References to Mr. Ellison's expert report appear in Chapter VIII.H (The Withdrawal of PwC's Audit Opinions).

[112]   *See* Chapter VI.C (The So-Called "Empty Chairs").

[113]   Letters from ZAO PwC Audit to Mr. Rebgun, 15 June 2007, Exh. C-611 (hereinafter "PwC's Withdrawal Letter").

management during the audits.  Assuming the veracity of the contents of the letter, Mr. Ellison concludes that in withdrawing its audit opinions, PwC acted in accordance with the auditing standards generally accepted in the U.S., Russia and internationally.

233.  Mr. Ellison notes that under U.S. Statement of Auditing Standards No. 1, Section 333, when an auditor after issuing its report becomes aware of facts that existed at the time the report was being compiled, believes there are persons relying or likely to rely on his report and considers that the new facts are material to his report, or shake his confidence in the overall veracity of representations made by management, the auditor must advise his client to disclose the new facts and possibly revise its financial statements.  Mr. Ellison refers to PwC's claim that in light of the bankruptcy of Yukos, PwC "was unable to access the information required that could lead to revision of the financial statements and was also unable to discuss the matter with management, as recommended by [U.S. Auditing standards] AU Section 561."  Mr. Ellison accepts that in those circumstances, PwC "had no option but to withdraw its audit reports."

234.  Under International Standard on Auditing 560 and Russian Federal Auditing Rule 10, when new material facts become known to the auditor after issuance of the audit report, the auditor should consider revising the company's financial statements, discuss the matter with the company's management and "take the action appropriate in the circumstances" or "take steps necessary in the circumstances."  In Mr. Ellison's view, PwC did take the appropriate steps.

### 10.   Mr. Raymond Gross

235.  Mr. Raymond Gross[114] is a partner of KPMG's U.S. Accounting & Reporting Group in London. Claimants chose not to cross-examine him.  Respondent asked Mr. Gross to review what Yukos' consolidated financial statements prepared under U.S. GAAP revealed with respect to: (a) Yukos' tax optimization scheme, including its use of trading companies in low-tax regions of Russia to buy oil and oil products from production subsidiaries and transfer the proceeds to offshore companies established or controlled by Yukos; (b) the Jurby Lake structure, a group of offshore trading companies controlled by Yukos or its former Russian majority shareholders and comprising Jurby Lake Limited (Ireland) and the BBS Companies; and (c) the taxes assessed against Yukos' trading companies in the ZATO of Lesnoy for tax years 1999 and 2000.

---

[114]   Expert Accountant's Report to the Tribunal by Raymond Gross, CPA, 14 August 2012.

236.  Mr. Gross was instructed to assume that the statements would have "put a reader on notice of facts relevant to the nature and legality of Yukos' use of the Tax Optimization Scheme" if they had included:  (a) identification of the involved trading and offshore companies (listed in the exhibits to the Report); (b) the monetary value of the investments made and tax savings achieved by Yukos through the scheme; (c) details of the extent of the trading companies' investments in Russia's low-tax regions; (d) details the extent of Yukos' direction of and control over the trading companies; (e) details of the flow of funds from the trading companies to Yukos; (f) details about the taxes assessed against Yukos' trading companies in the ZATO of Lesnoy in 1999 and 2000 and the Republic of Kalmykia in 2001 due to improperly received tax benefits; and (g) disclosure of the possible financial impact on Yukos if the tax optimization scheme was disallowed by the Russian authorities.

237.  Mr. Gross concludes that the statements for the years 2000–2002 and the first three quarters of 2003 were not transparent with regard to Yukos' tax optimization scheme, as they disclosed none of the above-listed information necessary to put a reader on notice.  While the statements showed that Yukos' effective tax level was lower than the statutory tax level, they failed to explain the nature of the difference.  The statements also failed, according to Mr. Gross, to identify the companies composing the Jurby Lake structure.

238.  Mr. Gross also concludes that the 2001–2002 statements were not transparent and not consistent with the U.S. GAAP in that they failed to disclose as contingent liabilities the taxes assessed against the trading companies of the ZATO of Lesnoy for 1999 and 2000, despite the fact that these tax assessments were material to the statements.  Under the U.S. GAAP, Yukos could omit these assessments from the statements if it determined that the probability of loss was remote; however, the written support of outside legal counsel or another competent authority which would usually be required for such a determination was not obtained in this case.  Mr. Gross opines that Yukos should have disclosed that the validity of the tax optimization scheme had been called into question and discussed the risk involved in continuing with the scheme.

### 11.   Professor Dr. Albert Jan van den Berg

239.   Professor Dr. Albert Jan van den Berg[115] of Hanotiau & van den Berg in Brussels, specializes in international arbitration.   He was previously in private practice in the Netherlands and is a professor at Erasmus University in Rotterdam.   Respondent retained Professor Van den Berg to provide an expert opinion addressing the legality under Dutch law of the 2005 transfer of Yukos' foreign assets into the Stichtings.   Claimants chose not to cross-examine Professor Van den Berg.

240.   Professor Van den Berg was provided with a 12-page Statement of Assumed Facts on which to base his opinion.   These assumed facts may be summarized as follows.   Before the auction of YNG in December 2004, Yukos' assets outside the Russian Federation (the "**Foreign Assets**") were held by two wholly-owned subsidiaries of Yukos, Yukos Finance B.V. ("**Yukos Finance**") and Yukos CIS Investment Limited ("**Yukos CIS**").   After the auction, Yukos management transferred the Foreign Assets to the two Stichtings, which issued depositary receipts in return to Yukos Finance and Wincanton Holding BV ("**Wincanton**"), a Dutch subsidiary of Yukos CIS.   This restructuring had the "stated purpose . . . to prevent the non-Russian assets of Yukos Oil from being used to satisfy the tax debts that Russian courts had found Yukos Oil to owe, and, more broadly, to prevent the non-Russian assets from being available to satisfy claims of Yukos' Russian creditors."

241.   Under the Articles of Association of the Stichtings (amended in 2008), the management board, including former Yukos managers David Godfrey, Bruce Misamore and Steven Theede, manages the Foreign Assets in the interests of Yukos, its subsidiaries, shareholders, employees and "legitimate" creditors.   As a result of the restructuring:   (a) even after Yukos CIS and Yukos Finance were sold in Yukos' bankruptcy auction, the former Yukos managers have continued to manage and control the Foreign Assets; (b) the lending group under a USD 1 billion loan was unable to enforce an English judgment against Yukos Finance's assets; and (c) Moravel, whose loan had been held to be unenforceable by Russian courts because of its status as a subsidiary of Yukos, was able to negotiate the repayment of its loan from one of the Stichtings.

242.   Based on the above-described assumed facts, Professor Van den Berg opines that the restructuring of Yukos Finance and Yukos CIS was illegal, as Dutch law does not permit a

---

[115]   Legal Opinion on the Validity of Restructuring Devices under Dutch Law by Professor Dr. Albert Jan van den Berg, 14 August 2012 (hereinafter "Van den Berg Report").   References to Professor Van den Berg's legal opinion appear in Chapter VIII.G (The Bankruptcy of Yukos).

company to transfer its assets for the purpose of making it more difficult for a creditor to satisfy its claims, or for the new ultimate parent company to exercise control.  This is so even when a company believes the claims against it are illegitimate.  The company is not entitled to exercise self-help.

243.  According to Professor Van den Berg, this illegality gave rise to the directors' "internal liability" (liability of the directors to the company itself) pursuant to Articles 2:8 and 2:9 of the Dutch Civil Code (the "**DCC**") and to the directors' "external liability" (liability of the directors to creditors) as well as "company liability" (liability of the company to creditors) pursuant to Article 6:162 of the DCC.  Further, this illegality renders the board decisions regarding the restructuring voidable pursuant to Articles 2:8 and 2:15(1)(b) of the DCC (as contrary to the principles of reasonableness and fairness) and pursuant to Article 3:40(1) of the DCC (as contrary to "good morals").  Professor Van den Berg opines that the Stichtings are also disallowed as invalid permanent protective devices; even if they are treated as temporary protective devices, the requirements to uphold such temporary devices are not met in this case.

**12.    Professor Stef van Weeghel**

244.  The Tribunal recalls that Respondent had raised the question of "unclean hands" in the jurisdictional phase of the case, an issue which the Tribunal decided to defer for consideration until the merits phase of the arbitration.[116]  During the jurisdictional phase of the case, Respondent had adduced expert testimony from Professor Stef van Weeghel,[117] a professor of international tax law at the University of Amsterdam and a tax law partner at Stibbe.  In his expert report, Professor Van Weeghel reached three main conclusions about Claimants and taxation law, as summarized in the Interim Awards.[118]  The Parties did not reference his report in their pleadings in the merits phase of the case and he was not cross-examined at the Hearing on the Merits.  The Tribunal has decided to include in the Final Awards the summary of Professor Van Weeghel's expert evidence.

245.  According to Professor Van Weeghel, Hulley was not entitled to obtain the taxation benefits contained in the Cyprus-Russia DTA in respect of the Yukos dividends because:  (a) Hulley

---

[116]    Interim Award, Hulley ¶ 435.  *See also* Procedural Orders Nos. 2 and 3 of 8 September and 31 October 2006.

[117]    Expert Report of Professor Stef van Weeghel, 29 January 2007, filed with Counter-Memorial on Jurisdiction. References to Professor Van Weeghel's Expert Report appear in Part X.E (Contributory Fault).

[118]    Interim Awards, Hulley ¶¶ 191–97.

had a permanent establishment in Russia under Article 10(4) of the Cyprus-Russia DTA) as it either had a place of management in Russia, or it had an agent in Russia; and (b) those dividends were attributable to the permanent establishment in Russia.  He also opines that VPL was similarly not entitled to obtain the taxation benefits contained in the Cyprus-Russia DTA because it was not the beneficial owner of the Yukos dividends within the meaning of Article 10(2) of the Cyprus-Russia DTA.

246. According to Professor Van Weeghel, the Yukos holding structure is a sham or otherwise abusive under general principles of international tax law and designed specifically to avoid taxation obligations.  Therefore rights to tax benefits under the Cyprus-Russia DTA should be denied.  Tax authorities do not always have to accept artificial legal constructions.  Anti-abuse doctrines to counter artificial legal constructions have developed in and are common to many countries including the Russian Federation and Cyprus.  Professor Van Weeghel refers to the example of the Swiss Federal Court denying the benefits of a double taxation treaty to a Danish company in circumstances analogous to the Yukos holding structure.  He refers to international efforts to control the use of tax havens and notes that the OECD Forum on Harmful Tax Practices in its 2000 Progress Report identified 35 tax havens which included the Isle of Man, Gibraltar, Jersey and the British Virgin Islands.  Professor Van Weeghel examines the Yukos holding structure, and notes that at the bottom of the structure is the successful and profitable Russian oil company developing and exploiting natural energy resources in Russia, while at the top of the structure are a small number of Russian individual shareholders.  He concludes that it is "hardly perceivable" that the Russian individual shareholders, in setting up the Yukos holding structure, had any other goal in mind than low taxation and lack of transparency in respect of the ownership of Yukos shares.  Such a structure would normally fall within the scope of international efforts to counter the harmful use of tax havens.

C.    THE SO-CALLED "EMPTY CHAIRS"

247. At the Hearing on the Merits, each side accused the other of leaving conspicuous "empty chairs" in its presentation of witness evidence.  Each side asked the Tribunal to draw adverse inferences against the other from the absence of the persons who should have filled the empty chairs.[119]

---

[119]  *See e.g.*, Transcript Day 2 at 98 (Claimants' opening); Respondent's Rebuttal Slides, p. 650 & ff; *see also* Respondent's Post-Hearing Brief ¶ 135.

**1.      Individuals that Claimants Wished were Available for Examination**

248.    At the Hearing, Claimants submitted that the following individuals should have been called as witnesses by Respondent as they could have been cross-examined in respect of the knowledge of Yukos' tax structure by high-ranking Russian officials:

- Aleksei Kudrin, First Deputy Minister of Finance, including in particular on the January 2000 meeting with Mr. Dubov at which the establishment of Yukos' trading companies in Mordovia was discussed;

- Vladimir Gusev, First Deputy Minister in charge of VAT, including in particular on the meeting with Mr. Dubov at which Yukos' VAT refunds in Mordovia were discussed;

- Alexander Pochinok, Tax Minister, including in particular on the December 1999 meeting with Mr. Dubov at which Yukos' plan to use trading companies in Mordovia was discussed;

- Alexander Smirnov, First Deputy Minister of Tax, including in particular on the December 1999 meeting with Mr. Dubov; and

- Nicolai Merkushkin, Head of the Republic of Mordovia, including in particular on the December 1999 meeting.[120]

249.    Claimants also argued that they should have had the opportunity to hear from and examine the following individuals in respect of their knowledge of Yukos' tax structure derived from the audits of Yukos' trading companies:

- P. A. Puschin, Senior Tax Inspector of Russian Tax Ministry's Interregional Inspectorate for major Taxpayer No. 1; and

- A.V. Ivushkina, Senior Tax Inspector of Russian Tax Ministry's Interregional Inspectorate for major Taxpayer No. 1.[121]

250.    In addition, Claimants complained that they did not have the opportunity to hear from and examine Sergei Bogdanchikov, the President of Rosneft, on the circumstances of Rosneft's acquisition of Baikal in December 2004 and Rosneft's agreement with a syndicate of Western banks led by Société Générale S.A. (the "**Western Banks**") regarding the initiation of Yukos' bankruptcy.[122]

---

[120]    Claimants' Opening Slides, p. 300; Claimants' Closing Slides, p. 14.

[121]    *Ibid.*

[122]    *Ibid.*

251. Finally, Claimants argued that they should have had the opportunity to hear from and examine the following individuals in respect of PwC's audit of Yukos and the circumstances of the withdrawal of PwC's audit reports:

- Douglas Miller, Director, ZAO PwC Audit, including in particular regarding the work conducted for the purposes of the certification of Yukos' accounts for years 1998–2003 and the circumstances of the withdrawal of the reports in 2007; and

- Michael Kubena, General Director, ZAO PwC Audit, including in particular regarding the establishment of Yukos' tax optimization structure and its legality.[123]

**2.  Individuals that Respondent Wished were Available for Examination**

252. At the Hearing, Respondent argued that the following individuals should have been made available for questioning with respect to:  (a) the establishment and history of Yukos' "tax optimization" schemes and Yukos' understanding of their legality; (b) Yukos' relationship with its Lesnoy, Mordovian, and other "sham" trading shells; and (c) Yukos' reaction to the assessments against and criminal investigation of the Lesnoy and Trekhgorniy trading shells, including the restructurings and liquidations, the instructions to destroy documents, and other apparent attempts at obstruction:

- Dmitry Gololobov, Yukos' former Deputy General Counsel;

- Irina Golub, Yukos' former Chief Accountant;

- Dmitry Maruev, former head of the Financial Engineering Section of Yukos Treasury Department (Deputy Chief Accountant);

- Alexey Smirnov, former head of Yukos' Tax Department;

- Vasily Shakhnovsky, GML shareholder/beneficiary and former President of Yukos-Moscow; and

- Mikhail Brudno, GML shareholder/beneficiary.[124]

253. According to Respondent, Mr. Golobolov, together with Mr. Sergey Pepeliaev, Yukos' tax counsel, could also have addressed the following issues: (a) Yukos' unsuccessful attempts to obtain a legal opinion approving its "tax optimization" schemes, including why Mr. Pepeliaev did not provide a legal opinion to Yukos on the schemes prior to the 29 December 2003 tax

---

[123]   *Ibid.*

[124]   Respondent's Rebuttal Slides, pp. 655–56; *see also* Respondent's Post-Hearing Brief ¶ 136.

audit report; (b) the bases for Yukos' responses and reactions to the 29 December 2003 tax audit report, and the bases on which outside counsel prepared its post-hoc opinions for Yukos on the "tax optimization" schemes; and (c) the reasons why Yukos tried to file "annual" amended VAT returns, and did not submit proper amended monthly VAT returns after the "annual" ones were rejected.[125]

254.   Respondent also argued that on the issue of Yukos' consideration of an enhanced ADR listing, including warnings that were provided to Yukos' senior management concerning the substantial risks of disclosing Yukos' "tax optimization" schemes in connection with such a listing, the failure to disclose Messrs. Khodorkovsky's and Lebedev's relationship to the BBS Companies, and Mr. Khodorkovsky's concerns for his own personal liability if he signed Yukos' F-1 Registration Statement, Claimants should have made available for testimony:

- Pavel Malyi, former Deputy Head of Yukos' Corporate Finance Department; and

- Oleg Sheiko, former Vice President/Director of Yukos' Corporate Finance Department.[126]

255.   On issues relating to the understanding by Yukos' Russian management of the legality of Yukos' "tax optimization" scheme, Respondent complained about the absence of:

- Yury Beilin, Yukos' former Deputy CEO; and

- Simon Kukes, Yukos' former CEO.[127]

256.   Finally, with respect to GML's "sustained and aggressive threats that deterred broader participation in the YNG and bankruptcy auctions," Respondent wished they could have heard from and examined Mr. Tim Osborne, GML Director and member of the Stichtings' boards.[128]

## VII.   ISSUES FOR ANALYSIS

257.   In this second phase of the present arbitrations, the Parties presented their arguments and evidence on the many substantive issues related directly to the merits of the case under Articles 10 and 13 of the ECT.  In addition, the Parties presented extensive argument on the

---

[125]   Respondent's Rebuttal Slides, pp. 656–57; *see also* Respondent's Post-Hearing Brief ¶ 136.

[126]   Respondent's Rebuttal Slides, pp. 658; *see also* Respondent's Post-Hearing Brief ¶ 136.

[127]   *Ibid.*

[128]   Respondent's Rebuttal Slides, pp. 659; *see also* Respondent's Post-Hearing Brief ¶ 136.

two preliminary objections that the Tribunal had decided to defer to the merits phase, namely the objection based on Claimants' alleged "unclean hands" and the objection based on Article 21 of the ECT.

258. The deferred preliminary objections—like the merits issues—require the Tribunal to untangle the complex factual matrix underlying Claimant's claims. Indeed, the Tribunal had decided to defer the preliminary objections relating to alleged "unclean hands" and Article 21 to avoid making findings on these important questions in a vacuum.

259. This Award therefore begins, in Part VIII, with the Tribunal's analysis of the factual issues. Guided in large measure by the Parties' presentations of the issues, the Tribunal considers it convenient to analyze the evidentiary record under the following eight headings

A.   Yukos' Tax Optimization Scheme

B.   The Russian Federation's Tax Assessments

C.   Harassment, Intimidation and Arrests

D.   Unwinding of the Yukos–Sibneft Merger

E.   Yukos' Attempts to Settle its Tax Liabilities

F.   Auction of YNG

G.   The Bankruptcy of Yukos

H.   The Withdrawal of PwC's Audit Opinions

260. As mentioned previously, the Tribunal, in Part VIII, makes determinations in respect of the many highly contested issues of fact and observations on the significance of various facts and findings.

261. Next, in Part IX of this Award, the Tribunal turns to Respondent's preliminary objections. Specifically, the Tribunal considers:

A.   whether all or some of Claimants' claims are barred by the "fork-in-the-road" provision in Article 26(3)(b)(i) of the ECT (the Tribunal dismissed this objection in the Interim Awards, but Respondent has renewed the objection in this merits phase);

B.   whether Claimants' conduct—their alleged "unclean hands"—deprives Claimants of protection under the ECT (in the Interim Awards, the Tribunal confirmed the deferral of its decision on this objection to the merits phase of this arbitration, consistent with Procedural Order No. 3); and/or

C.   whether Article 21 of the ECT, which contains a "carve out" for "Taxation Measures", bars the Claimants' claims either as a matter of jurisdiction or admissibility (in the Interim Awards, the Tribunal decided to defer these issues to the merits phase, to avoid ruling on them in a vacuum).

262.   Since the Tribunal dismisses each of Respondent's preliminary objections, thereby confirming that it has jurisdiction over Claimants' claims under the ECT, it next addresses Respondent's liability under the ECT.  This analysis is undertaken in Part X of the Award.

263.   Claimants allege that Respondent, by conducting investigations and legal proceedings against Yukos, its subsidiaries, and their management, has failed to accord Claimants' investments fair and equitable treatment.  In particular, Claimants allege Respondent failed to refrain from impairing the management, maintenance, use, enjoyment and disposal of Claimants' investments by unreasonable or discriminatory measures, in contravention of Article 10 of the ECT.  Claimants maintain that the treatment of Yukos was discriminatory as compared to other Russian oil companies.

264.   Claimants further submit that Respondent's actions amount to an expropriation of the Claimants' investments, in breach of Article 13 of the ECT.  According to Claimants, the alleged interventions of Respondent, and other entities directed and controlled by it—including in the Sibneft demerger, the sale of YNG at a cost alleged to be much lower than its real value to Baikal (a special purpose company that was quickly bought by the State-owned oil company Rosneft) and the pursuit of Yukos' bankruptcy proceedings—resulted in the total loss of value of Claimants' investments.

265.   Claimants contend that Respondent's actions were politically and economically motivated, rather than aimed at legitimate tax enforcement.  In that regard, Claimants purport to establish that Respondent acted through almost all its organs, at all levels, in seeking the destruction of Yukos.

266.  In response, Respondent contends that Claimants have failed to establish a violation under either Articles 10 or 13 of the ECT.  For Respondent, this case is about Yukos' tax evasion,[129] and therefore about Yukos' self-inflicted demise:  Respondent contends that any losses suffered by Claimants are attributable to their own actions, those of the Yukos managers they installed and allegedly controlled, and of Messrs. Khodorkovsky, Lebedev, Nevzlin, Dubov, Brudno, Shakhnovsky and Golubovitch (the so-called "**Oligarchs**").  It follows, argues Respondent, that Claimants had no legitimate expectation that Russian tax law would not be applied to them and their investment when Yukos breached its tax obligations.

267.  In addition to lacking the factual predicate for an expropriation claim under Article 13 of the ECT, Respondent also contends that Claimants' claims fail because the assessment and collection of taxes is in the public interest, as to which States are afforded a wide margin of discretion.  Respondent maintains that its conduct in this regard did not radically depart from either Russian law or international norms.

268.  To the extent that Claimants allege discriminatory taxation compared to other Russian oil companies—in contravention of the fair and equitable treatment in Article 10 of the ECT, as well as one of Article 13's four conditions for a lawful expropriation—Respondent answers that these claims fail because Claimants do not contend that their investment was subjected to discrimination based on foreign ownership.  Respondent also disputes the facts presented by Claimants in support of their allegations of discrimination.

269.  Respondent further contends that Claimants' allegations of due process violations with respect to tax, tax enforcement, the sale of YNG and Yukos' bankruptcy proceedings are equally meritless, and, in any event, did not affect the management and operations of Yukos.

270.  The Tribunal's conclusions on these liability issues, in Part X, follow necessarily as the legal consequences of its factual conclusions in Part VIII.  The Tribunal includes in Part X its decision on the attribution of the conduct of various actors to the Russian Federation, and its findings in relation to Claimant's contributory fault.

271.  Finally, in Parts XI, XII and XIII of this Award, respectively, the Tribunal decides the issues relating to interest, the quantification of damages, and the allocation of costs.

---

[129]   Rejoinder ¶ 1.

# VIII.     ANALYSIS OF THE EVIDENTIARY RECORD

## A.   THE TAX OPTIMIZATION SCHEME

### 1.     Introduction

272.  In the latter years of the twentieth century and in the early years of the twenty first, oil companies in the Russian Federation were growing, consolidating and becoming large corporate entities.  By the end of 2000, there were nine major oil companies in Russia.  Yukos was the largest, followed by Lukoil.  During that period, all nine major oil companies operated in a similar fashion.  The key features of their operations were firstly vertical integration; secondly transfer pricing; and thirdly the use of low-tax regions to mitigate tax burdens.[130]  In relation to the third element, one-time Prime Minister of Russia, Mikhail Kasyanov stated that "the tax havens in the ZATOs had been used by every oil company."[131]  In fact,

> [t]housands of companies took advantage of the low-tax regimes available in Russian tax havens zones, including businesses engaged in construction, services, the sale of oil products, investments, as well as holding companies and groups of companies involved in financing and taxation arrangements.  This activity was well known to the Russian government, including the Federal Tax Ministry.[132]

273.  Respondent acknowledges that the majority of large Russian oil companies operated in a way similar to Yukos and did "use low-tax regions to evade taxes."  At the same time, Respondent alleges that those companies did so "on a much more modest scale in comparison to Yukos."[133]

274.  In this sense, Yukos was a typical Russian oil company, as it also used the low-tax regions as part of its tax optimization strategy.  A central disputed issue in this arbitration concerns the legality, under Russian law, of the modalities of Yukos' use of the low-tax regions.  Was Yukos merely taking advantage of the legislative arrangements in place to minimize its taxes, or was there an element of abuse in its scheme?  A related disputed issue concerns the legitimacy of

---

[130]  Transcript of Mikhail Kasyanov before the Khamovnichesky Court of Moscow in the Second Criminal Case Brought Against Mikhail Khodorkovsky and Platon Lebedev, 24 May 2010, p. 3, Exh. C-440.  *See also* Statement of Prime Minister Mikhail Mikhailovich Kasyanov to the ECtHR, 8 July 2009, in *Khodorkovskiy v. Russia* (Application Nos. 5829/05, 11082/06 and 51111/07) ¶¶ 10–12, Exh. C-446.  As noted earlier in paragraph 47 and n.11 above, Claimants withdrew Mr. Kasyanov's witness statement in these arbitrations because he did not appear at the Hearing and was not subject to cross examination.  However, the Tribunal has taken notice of his testimony in other proceedings, which forms part of the record in the present proceedings.

[131]  Statement of Prime Minister Mikhail Mikhailovich Kasyanov to the ECtHR, 8 July 2009, in *Khodorkovskiy v. Russia* (Application Nos. 5829/05, 11082/06 and 51111/07) ¶ 34, Exh. C-446.

[132]  Vladimir Samoylenko, *Government Policies in Regard to Internal Tax Havens in Russia*, Publication of International Tax & Investment Center, December 2003, p.1, Exh. C-577.

[133]  Counter-Memorial ¶ 12.

the tax assessments against Yukos that began in December 2003.  Was the Russian Federation merely enforcing its tax laws, or rather was it carrying out a punitive campaign against Yukos and its principal beneficial owners?  Were the other Russian oil companies subjected to the same tax enforcement actions by the Russian Federation, or was Yukos discriminated against and specifically targeted by the Russian Federation?  Before turning to the question of the legitimacy of those tax assessments, which the Tribunal does in the next chapter of the Award, the Tribunal considers it important to address the first question: were Yukos' practices in the low-tax regions, and specifically the practices of Yukos' trading companies in those regions, lawful?

275.  In sections 2 and 3 of this chapter, the Tribunal summarizes the evidence that was presented by the Parties regarding the structure and legal framework of Yukos' tax optimization scheme.  In section 4, the Tribunal distills, as best it can from the massive documentary record, the complex and extensive background relating to the activities and audits of the Yukos trading entities before December 2003.  Finally, in section 5, the Tribunal reviews, on the basis of this complex record, the legality of Yukos' tax optimization scheme under Russian law.

276.  The Tribunal observes that it considers the question of the legality of the tax optimization scheme to be a matter of fact in the present arbitration.  It is not the role of the Tribunal in the present proceedings to review and determine, as if it were a Russian court of appeal, the decisions made pursuant to Russian law in respect of the legality of this scheme.  However, even in considering the issue as a matter of fact, the Tribunal's observations on the legality of Yukos' tax optimization scheme based on what the record reveals will inform its decision on the principal legal questions facing the Tribunal under the ECT.

### 2.   The Structure of the Tax Optimization Scheme

277.  The Tribunal has been presented with an enormous volume of material relating to Yukos' structure and tax optimization scheme.  In short, Yukos' tax optimization scheme consisted of using "trading companies" located in the low-tax regions as intermediaries in the chain of transactions between Yukos' core oil-producing entities YNG, Samaraneftegaz and Tomskneft at one end, and its customers at the other.  The trading companies at issue were established in three types of low-tax regions.  The first type was closed administrative territories, or ZATOs (Lesnoy, Trekhgorny, Sarov).  ZATOs are territories established in the former Soviet Union as defense and nuclear sites, or as sites with sensitive military, scientific or industrial significance which faced economic catastrophe at the end of the Cold War.  For this reason, special tax

regimes were instituted in those territories aimed at boosting economic activity.[134]  The second type was "domestic-offshore territories", regions that faced significant economic challenges and where the Russian Federation wanted to facilitate investment (Mordovia, Evenkia, Kalmykia).[135]  The third low-tax region was Baikonur, a former spaceport, which was treated as a ZATO but is on the territory of Kazakhstan.[136]

278.   The names of the trading entities of particular relevance in this arbitration and the regions or ZATOs in which they were located are set out in the following table:

| Region or ZATO | Company |
|---|---|
| **Mordovia** | Alta-Trade<br>Fargoil<br>Macro-Trade<br>Mars-XII (Energotrage)<br>Ratmir<br>Yukos-M<br>Yu-Mordovia |
| **Evenkia** | Evoil<br>Intern:ft<br>Petroleum-Trading<br>Ratibor<br>Yukos Vostok Trade |
| **Kalmykia** | Siberian Transportation Company |
| **Baikonur** | Mega-Alliance |
| **ZATO Lesnoy** | Business-Oil<br>Mitra<br>Vald-Oil<br>Forest Oil |
| **ZATO Sarov** | Yuksar |
| **ZATO Trekhgorny** | Grace<br>Muskron |

---

[134]   Counter-Memorial ¶ 226, n.274.  *Law of the Russian Federation No. 3297–1* of July 14, 1992, "On Closed Administrative Territorial Entity," Exh. C-404.

[135]   Counter-Memorial ¶ 226, n.274.  Article 1, *Law of the Republic of Mordovia No. 9-Z on the Conditions of the Efficient Use of the Social and Economic Potential of the Republic of Mordovia,* 9 March 1999, Exh. C-414  (hereinafter "*Law 9-Z*"); Article 1, *Law of the Republic of Kalmykia No. 197-II-3* of 12 March 1999, "On Tax Benefits Granted to Enterprises Making Investments in the Economy of the Republic of Kalmykia," Exh. C-413; Article 1, *Law of the Evenkiysky Autonomous District No. 108* of 24 September 1998, "On the Particularities of the Tax System in Evenkiysky Autonomous District," Exh. C-412.

[136]   During his cross-examination, Mr. Konnov clarified the position of Baikonur as having "a special status, [it] is leased by the Russian Federation . . . .  So there are three categories [of low-tax region]." Transcript, Day 14 at 54.  *See also*, Decision of the Government of the Russian Federation No. 747, 25 October 2001, Exh. C-411.

| Region or ZATO | Company |
|---|---|
|  | Norteks<br>Kverkus<br>Colrain<br>Virtus |

279.   In 2000, sales were conducted by at least 16 of these companies.  From 2001 to 2003, Yukos employed at least eight such companies, and in 2004 at least three of them.  Through this structure, Yukos was able to capture much of the profit from the sale of crude oil to its customers on the books of the entities in the low-tax regions, thus benefiting from substantial tax savings.  Some of these after-tax profits, in turn, left the Russian Federation through dividends to the off-shore holding companies that Yukos controlled (for U.S. GAAP consolidation purposes) through trusts and call options.[137]

### 3.   The Legal Framework of the Tax Optimization Scheme

### (a)   The Low-Tax Region Program

280.   The low-tax region program was established in the 1990s to foster economic development in impoverished areas of the Russian Federation.  The Russian low-tax regions were allowed to exempt taxpayers from federal corporate profit tax for the purpose of encouraging taxpayers' investments in their regions, provided the taxpayers complied with certain requirements.  There is no dispute between the Parties as to the source of the formal requirements; it is agreed that they are to be found in the low-tax regions' legislation, any applicable tax investment agreements, and the applicable federal legislation, including the Russian Tax Code.  More controversial, and contested by Claimants, is the existence and significance of various so-called "anti-abuse" doctrines which, according to Respondent, have been established and applied in decisions of Russia's federal courts.  The Tribunal addresses these doctrines and the relevant jurisprudence in the next subsection.

281.   The benefits provided in the low-tax regions were related to profit tax, which was described by Mr. Konnov in his first report as follows:

> 29.   Profit tax is a federal tax, however tax revenues are shared between the federal, regional and (in certain years) local budgets.  Through the end of 2001, profit tax was governed by the Law of the Russian Federation No. 2116-1 "On Tax on Profit

---

[137]   *See* Lys Reports.

of Enterprises and Organisations" dated December 27, 1991 (the "Profit Tax Law") and subsequently by Chapter 25 of the Tax Code.  In 1999-2006, profit tax rates applicable to Russian entities and foreign entities having a permanent establishment in Russia (with respect to income attributable to such permanent establishments) were as follows:

| Year | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
|------|------|------|------|------|------|------|------|------|
| Rate of profit tax total, including: | 35% (30% after April 1) | 30% | 35% | 24% | 24% | 24% | 24% | 24% |
| Rate of profit tax to the federal budget | 13% (11% after April 1) | 11% | 11% | 7.5% | 6% | 5% | 6.5% | 6.5% |
| Rate of profit tax to the regional budget | 22% (19% after April 1) | 19% | 19% | 14.5% | 16% | 17% | 17.5% | 17.5% |
| Rate of profit tax to the local budget | – | – | 5% | 2% | 2% | 2% | – | – |

282.  With respect to the tax benefits available in the ZATOs (*e.g.*, Lesnoy and Trekhgorny), in 1999, the ZATOs were allowed to fully exempt taxpayers from federal corporate profit tax.  In 2000, most ZATOs were allowed to exempt taxpayers from the portion of the federal corporate profit tax that was payable to their budget (*i.e.*, up to 19 percent).  In 2001, all ZATOs were permitted to exempt taxpayers from the portion of the federal corporate profit tax that was payable to their budget (*i.e.*, also up to 19 percent).  In 2002, however, these exemptions were revoked.

283.  With respect to the tax benefits available in other low-tax regions (*e.g.*, Mordovia, Kalmykia and Evenkia), in 2000 and 2001, such regions were allowed to fully exempt taxpayers from the portion of the federal corporate profit tax that was payable to their budget (*i.e.*, up to 19 percent).   From 1 July 2002 until 31 December 2003, low-tax regions were allowed to exempt taxpayers from the portion of the federal corporate profit tax payable to their budget, but only up to four percent.   An exception existed for "grandfathered" tax investment agreements entered into prior to 1 July 2001, and these taxpayers could still receive a zero percent tax rate on the relevant portion of the profit tax if they fulfilled certain other conditions. As of 1 January 2004, the existing tax investment agreements were terminated, but the Russian Tax Code still allowed low-tax regions to reduce the federal corporate profit tax payable to their budget up to four percent.

(b)     **Anti-Abuse Decisions and Doctrines Promulgated by Russia's Federal Courts**

284.   Before considering the individual court decisions in which the anti-abuse doctrines are said to have been developed and applied, the Tribunal will describe the different courts within the judicial system of the Russian Federation.[138]

285.   The Russian court system is based on four types of distinct judicial procedures—constitutional, civil, administrative and criminal.[139]   Each area has created its own court structure.   For its civil procedure, Russia created a system of commercial, or "arbitrazh" courts.   The arbitrazh courts have jurisdiction over general commercial disputes and disputes directly relating to commercial matters, such as tax disputes.   At the first instance, there are 81 arbitrazh courts, located in and for the constituent entities of the Russian Federation.[140]   At the next level, the appellate instance, there are 20 appellate arbitrazh courts.   Then, at the "cassation instance," there are ten federal arbitrazh courts.[141]   At the apex of the Russian commercial courts system is the Supreme Arbitrazh Court of the Russian Federation.[142]

286.   The Constitutional Court of the Russian Federation and the local constitutional courts of its constituent entities are the courts created for Russia's constitutional procedure.   Among its other functions, the Constitutional Court plays a supervisory role over all four Russian judicial procedures at the federal level; the local constitutional courts play the same role at the level of the constituent entities.   The task of the Constitutional Court is to ensure compliance of the judiciary with the Constitution of the Russian Federation ("**Russian Constitution**").[143]   In this

---

[138]   This information is derived from the Constitution of the Russian Federation, Exh. C-1698 (hereinafter "Russian Constitution") and other particulars in the public domain of interest to narration of the many decisions of the courts of the Russian Federation which the Tribunal reviews.

[139]   Russian Constitution, Article 118(2), Exh. C-1698.

[140]   Russia as a federation consists of 83 "constituent entities"—relatively autonomous territorial and political units.   Most of them have their own constitutions, local laws, presidents, governments, parliaments, and court systems.   Mordovia, for example, is a "constituent entity".   The judicial districts usually match up with these autonomous territorial and political units, but there are several "mismatches": there are 83 "constituent entities" and only 81 first-instance arbitrazh courts.

[141]   In 2000, the Russian Federation created "federal districts", which are administrative units that group several "constituent entities."   Currently there are eight federal districts.   Since there are ten federal arbitrazh courts but only eight federal districts, there is a "mismatch" there too.   For example, the Siberian Federal District has two federal arbitrazh courts, which are the Federal Arbitrazh Court of the East Siberian District and the Federal Arbitrazh Court of the West Siberian District.

[142]   In late 2013, the Ministry of Justice of the Russian Federation announced a judicial reform which would result in merging the Supreme Arbitrazh Court of the Russian Federation with the Supreme Court, which is the apex of the general jurisdiction courts.   The reform has not yet been finalized.

[143]   Exh. C-1698.   The Russian Constitution defines the level of autonomy of the "constituent entities" by assigning certain governance matters of federal importance to the federal bodies while allowing the remaining matters to be

capacity, the Constitutional Court is the court of last resort, which decides whether a particular law applied by the courts of lower instance is constitutional.  For example, an individual or a company may apply to the Constitutional Court in a tax matter when the individual or company considers that a particular provision of the Russian Tax Code applied by an arbitrazh court is not incompliance with the Russian Constitution.  The decisions of the Constitutional Court are not subject to appeal.

287.   The Tribunal turns now to the anti-abuse principle under Russian law.

288.   Respondent's expert on Russian law, Mr. Oleg Konnov, introduced the anti-abuse principle as follows:

> It is essential to distinguish clearly between the legitimate use of the tax benefits and abuse of tax law.  Russian law generally prohibits abuse of law.  The constitutional anti-abuse principle has been incorporated in some branches of law (e.g. civil law).  However, it has been consistently applied even in branches of law where no explicit provisions have been included in the text of the law, e.g. labour law and tax law.  In these instances, Russian courts have themselves developed anti-abuse doctrines.  In the tax area, anti-abuse doctrines have been used to combat aggressive tax planning and abuse.

> One should not be misled by the terminology.  Even though the term "substance over form" is not commonly used in Russia, the terms "bad faith," "abuse of rights," "proportionality" and "business substance" are used to achieve the same result as the "substance over form" notion in other countries.

> Courts (including the highest courts of Russia) accepted and consistently applied anti-abuse measures both before and after the YUKOS tax cases.  The anti-abuse doctrines have been evolving over the time.  In some cases, the tax authorities challenged the abusive transactions based on the application of civil law principles ("sham" and "fictitious" transactions and transactions "deliberately contrary to fundamentals of civil law and morality"), and in others they applied the notions of "bad faith" and "unjustified tax benefit" developed by court practice.  There were also cases in which the tax authorities used a combination of legal principles to challenge tax avoidance misconduct.[144]

---

decided by the "entities".  At the same time, the Russian Constitution does not allow the "entities" to act contrary to the Russian Federation even within the "entity'" assigned autonomy.  For example, one of the tasks of the Constitutional Court is to ensure that the local laws of the "entities" are in compliance with the Russian Constitution and the federal laws.

[144]   First Konnov Report ¶¶ 45–47.  Mr. Konnov cites:  Article 17(3) of the Russian Constitution, Exh. R-2211; Resolution of the Constitutional Court of the Russian Federation No. 3-P, 15 March 2005, section 4.3, Exh. R-2217 (as support for the proposition that the Constitutional Court describes non-abuse of law as a general legal principle); an assistant professor of the faculty of law of the Higher School of Economics Mr. Kurbatov, who writes: "In general terms, anti-abuse principle is set forth in Article 17 (3) of the Russian Constitution according to which exercise of rights and freedoms by citizens and individuals may not violate rights and freedoms of other persons.  This principle is set forth in Chapter 2 of the Russian Constitution governing rights and freedoms of citizens and individuals. However these rights and freedoms may be applied to legal persons to the extent their nature permits so (see, for instance, para. 1 Section 4 of dicta of the Constitutional Court Ruling No. 20-P dated December 17, 1996, para. 4 Section 2 of dicta of the Constitutional Court Ruling No. 24-P dated October 12, 1998)." (A. Ya, Kurbatov, ABUSE OF LAW: THEORY AND COURT PRACTICE (Consultant Plus, 2009), Exh. R-2214).  Mr. Kurbatov also writes:  "It would be fundamentally wrong to consider anti-abuse as only civil law (branch) principle. It may, however, be set in provisions of specific branches of law"); Resolution of the Plenum of the Supreme Court of the Russian Federation No. 2, 17 March 2004, at

289.   In support of his assertion that the various anti-abuse doctrines are part of Russian law, Mr. Konnov relies on a series of decisions issued by various Russian courts, starting with the decision of the Supreme Arbitrazh Court No. 367/96 on 17 September 1996 ("**Sibservice**") and including recent cases such as the 2010 *Novozlatoustovskoye* decision of the same court. Between these bookends, particular reliance is placed on Constitutional Court Ruling 138-0 of 25 July 2001 (which introduced the concept of "bad-faith taxpayer") and on Resolution No. 53 dated 12 October 2006 of the Plenum of the Russian Supreme Arbitrazh Court ("**Resolution No. 53**")(which linked the concepts of "unjustified tax benefit", "actual economic substance" of a transaction and the "business purpose" of a taxpayer's actions).

290.   According to Mr. Konnov, the cases upholding the tax assessments against Yukos (*i.e.*, confirming the tax authorities' position that Yukos' tax optimization scheme was abusive) were "an integral part of the evolution of the 'business substance' doctrine which eventually resulted in adoption by the Russian Supreme Arbitrazh Court on 12 October 2006 of Resolution No. 53."[145]

291.   Claimants argue that the "business purpose" doctrine could not possibly have played any role in the tax assessments against Yukos, since "it did not exist in Russian law at the time, having only been introduced into Russian law in 2006"[146] (in Resolution No. 53 of the Plenum of the Russian Supreme Arbitrazh Court).   Indeed, Claimants note, "the notion of business purpose was never mentioned in the December 29, 2003 Audit Report and played no role in the tax assessments against Yukos."[147]

292.   The Tribunal's task in evaluating the Parties' arguments is a difficult one.   As with many aspects of this case, the record is voluminous and, in certain respects, contradictory.   Moreover, regarding issues of Russian tax law, the Tribunal heard only from Mr. Konnov; Claimants put forward no testimony challenging Mr. Konnov's interpretation of the relevant cases from an

---

clause 27, Exh. R-2213 ("If a court establishes the fact that the employee abused his rights, the court can dismiss his claim on reinstatement in a job ... since in the specified case the employer should not be responsible for the adverse consequences resulting from the employee' bad faith actions.").   *See also* V.V. Arkhipov, *Abuse of Rights in Labor Relations: Wilful Hoax or Honest Mistake?*, Zakonodatelstvo i Ekonomika, No. 2, 2008, Exh. R-2215; Civil Code of the Russian Federation, entered into force on 1 January 1995, Articles 10, 169, 170, Exh. R-909 (hereinafter "Russian Civil Code").   Mr. Konnov notes that in a number of cases Article 170 of the Civil Code was applied jointly with Article 169 of the Russian Civil Code.

[145]   First Konnov Report ¶ 49(p).

[146]   Claimants' Post-Hearing Brief ¶ 29.

[147]   *Ibid*.

expert on the subject.  And, as discussed further below, Claimants' counsel chose not to cross-examine Mr. Konnov on the existence or evolution of the anti-abuse doctrines.  At the same time, in argument, Claimants have challenged almost every aspect of Mr. Konnov's testimony, including on the existence and evolution of the anti-abuse doctrine.

293.  Therefore the Tribunal has had to delve into the voluminous record, including the translations of dozens of Russian court decisions and commentaries thereon, to come to its own view on what anti-abuse principles may have existed during the period relevant for an analysis of Yukos' tax optimization scheme.

294.  The earliest cases relied upon by Respondent, from the mid-1990s, appear to rely on a "substance over form" doctrine.  These cases include *Sibservice* and the Resolution of the Presidium of the Supreme Arbitrazh Court No. 3661/96 on 21 January 1997 ("*Yekaterinburg Telephone*").

295.  Mr. Konnov summarizes these cases as follows:

    a.    As early as in 1996, the Russian Supreme Arbitrazh Court reviewed a case involving the Russia-Austrian joint venture Sibservice.  Sibservice was assembling and selling computers.  Its sales of computers were subject to VAT.  In order to defer or avoid VAT payment, Sibservice entered into loan agreements with customers under which the customers purportedly loaned funds to Sibservice, and Sibservice purportedly repaid the loans by transferring computers to the customers.  Based on the letter of the law, the making of the loan and the repayment of the loan (unlike sale of computers) were exempt from VAT.  The Supreme Arbitrazh Court focused on substance of the transactions between Sibservice and its customers and ruled that the sale of computers had been artificially structured using the loan agreements, thereby supporting the position of the tax authorities.  Specifically, the Supreme Arbitrazh Court noted that:

        "The conclusion of the state tax inspectorate that Joint Venture Sibservice supplied the goods on the condition of the prepayment of their price [is justified] since the relations with the customers (buyers) were actually developed that way (supply, contractor relationships) regardless of the name of the agreement."

    b.    One year later, in 1997, the Russian Supreme Arbitrazh Court reviewed a case involving the state-owned enterprise *Yekaterinburg City Telephone Network*.  In 1994, the state-owned enterprise had concluded what they claimed to be several joint venture agreements with private persons and legal entities according to which the participants allegedly agreed to cooperate for the purposes of developing the telephone network of the city of Yekaterinburg.  The private persons and legal entities made what purported to be joint venture financing contributions to the state enterprise which they claimed were exempt from VAT and VAT surtax under the then applicable law.  The tax authorities conducted a tax audit of the state enterprise and concluded that in practice no true joint venture activity had been conducted and, therefore, VAT and VAT surtax had to apply.  The Presidium of the Russian Supreme Arbitrazh Court supported this conclusion:

> "In fact, those transactions have been made in order to raise financing from the relevant entities and individuals in order to finance the claimant's business."

With reference to this case, a group of prominent Russian scholars noted later that Russian tax law required that the tax consequences of a transaction or other arrangement be determined according to its substance rather than its form:

> ". . . Therefore, the arbitrazh courts as well as the tax authorities currently follow the principle of "substance of contract over its name (form)". Thus, any attempts to conceal the real substance of an agreement by using a name of a different contract will most likely be fruitless."[148]

296.   Respondent also refers to Constitutional Court Resolution No. 14-P, 28 October 1999 ("***Energomashbank***"), which, according to Respondent, "reiterated the notion that when looking at the tax aspects of a particular transaction, Russian courts should be mindful of its substance, and not merely its form."   Mr. Konnov describes the case as follows in his First Expert Report:

> d.   Likewise in 1999 the Russian Constitutional Court in the *Energomashbank* case advised Russian courts to analyze the substance of transactions rather than their form:
>
> ". . . in instances when the courts while examining a case fail to investigate in essence actual facts thereof but limit themselves to the establishment of formal conditions of the application of the law only, the right to judicial defence envisaged by Part 1 of Article 46 of the Constitution of the Russian Federation is found to be substantially infringed."[149]

297.   In their Reply, Claimants write that the *Sibservice* and *Yekaterinburg Telephone* cases:

> involved the application of the principles enshrined in Article 170 of the Russian Civil Code, which allows the tax authorities, in certain well-defined circumstances, to disregard the form of a particular transaction and to impose taxes based on the actual facts (*i.e.*, based on the actual transaction which occurred, or the fact that no such transaction occurred).   Such cases can obviously offer no support to the Respondent's re-attribution theory.   Neither at the time nor in these arbitrations has the Respondent sought to rely on Article 170.   Moreover, as the Accounts Chamber emphasized in its 2002 report on Sibneft, apart from the transfer pricing rules under Articles 20 and 40 of the Russian Tax Code (which were also not used against Yukos), Article 170 is the only basis under Russian law to challenge relations or transactions between companies as being "shams" or

---

[148]   First Konnov Report ¶49(a)-(b) (citing Resolution of the Presidium of the Supreme Arbitrazh Court of the Russian Federation No. 367/96, 17 September 1996, Exh. R-288 (hereinafter "*Sibservice*"); Resolution of the Presidium of the Supreme Arbitrazh Court of the Russian Federation No. 3661/96, 21 January 1997, Exh. R-289 (hereinafter "*Yekaterinburg Telephone*"); for the group of Russian scholars, A.V. Bryzgalin, V.R. Bemik, A.N. Golovkin, *Collection of Economic Agreements and Documents for Companies with Legal, Arbitrazh and Tax Commentaries*, Nalogi i Finansovoe Pravo, 2004, Exh. R-290).

[149]   First Konnov Report ¶ 49(d) (citing Resolution of the Constitutional Court of the Russian Federation No. 14-P, 28 October 1999, Exh. R-293 (hereinafter "*Energomashbank*").

"fictitious", refuting the Respondent's claim that such theories as the "bad faith taxpayer" concept conferred authority to re-attribute revenues between companies.[150]

298.   Claimants also challenge the relevance of the *Energomashbank* ruling:

> If that case has any relevance to these arbitrations, it is as a wholesale condemnation of the tax authorities' formalistic approach to VAT, divorced from the actual facts, as in breach of Yukos' constitutional rights.  The constitutional issue in the case was the taxpayer's right to a fair opportunity to defend itself against tax claims by the State before a court, and the Constitutional Court held that respect for this right meant that courts could not limit their inquiry to purely "formal conditions", but rather must examine the actual facts.[151]

299.   Putting aside, for the moment, the *remedy* of re-attribution in the case of a finding of abuse, which the Tribunal considers in Chapter VIII.B of the present Award (in connection with the tax assessments themselves), the question here is whether the decisions cited by Respondent support the *existence* of a judicial anti-abuse doctrine in tax cases.

300.   Respondent insists that they do.  Focusing specifically on the *Sibservice* and *Yekaterinburg Telephone* cases, Respondent characterizes these decisions of the Supreme Arbitrazh Court as demonstrating that Russian courts have recognized and applied anti-abuse rules in the tax area to combat aggressive tax planning and abuse since at least 1996.[152]   In its Rejoinder, Respondent dismisses Claimants' comments on these cases as "misleading":

> Claimants misleadingly suggest that Respondent's reliance on the 1996 *Sibservice* decision and the 1997 *Yekaterinburg City Telephone Network* decision *"involve[s] the application of principles enshrined in Article 170 of the Russian Civil Code"* . . . .  But nowhere in these decisions do the courts rely on, or even mention, Article 170 of the Civil Code.  Rather, in both the Supreme Arbitrazh Court upheld the tax authorities' assessments by looking at the substance of the challenged transaction, as opposed to its form.[153]

301.   Based on its review of these cases, the Tribunal observes that Respondent's submission appears to be well-founded.  Article 170 of the Russian Civil Code provides as follows:

> Article 170. Invalidity of Mock and Sham Transactions
>
> 1.   A mock transaction, i.e., a transaction made only for appearances without an intent to create the legal consequences corresponding to it, is void.

---

[150]   Reply ¶ 234 (citing Russian Civil Code, Part I, Article 170, Exh. C-1270; *Sibserve*, Exh. R-288; *Yekaterinburg Telephone*, Exh. R-289; and Accounts Chamber Report on the Results of its Audit of OAO Sibneft, December 2002, Conclusions, (finding that transactions involving Sibneft's trading companies complied with Article 170 and that "under current legislation there is no other basis for considering such interrelationships (or transactions) as fictitious and invalid.") (emphasis added), Exh. C-1282).

[151]   Reply ¶ 236. (Original footnote omitted.)

[152]   Rejoinder ¶ 648.

[153]   Rejoinder ¶ 648, n.987.

> 2.   A sham transaction, i.e., a transaction that is made for the purpose of hiding another transaction, is void.  The rules relating to the transaction that the parties actually had in mind, shall be applied, taking into account the nature of the case.

However, there is no mention of Article 170 of the Russian Civil Code in either of the *Sibservice* or *Yekaterinburg* decisions in the record of this arbitration.[154]  Based on this record, it appears to the Tribunal that the Supreme Arbitrazh Court is relying in these cases on a general doctrine of substance over form.  The Tribunal further observes that such a doctrine seems entirely consistent with the principles enshrined in Article 170 of the Russian Civil Code.  It also seems consistent, in a general way, with the anti-abuse principle that Mr. Konnov says existed in the Russian Constitution, even though the Tribunal notes that no authority was brought to its attention in which this principle was expressly extended into the area of tax.[155]

302.   On the other hand, the Tribunal is of the view that Respondent cannot draw much support from the *Energomashbank* decision.  It appears to the Tribunal that, while the Constitutional Court referred to the importance of investigating the "actual facts" of a case as opposed to confirming "the establishment of formal conditions of the application of the law only," it did so in the context of highlighting substance over form as an important feature of "the right to judicial defense" of a taxpayer against the claims of the tax authorities, not as a basis for tax authorities to challenge taxpayers.  At the same time, the Tribunal notes that the *Energomashbank* decision is not inconsistent with the application of the substance over form doctrine by the tax authorities against a taxpayer's scheme.

303.   Another doctrine invoked by Respondent is known as the "bad-faith taxpayer" doctrine, or sometimes as the "good faith taxpayer" doctrine.  This doctrine, submits Respondent, is rooted in the jurisprudence of the Russian Constitutional Court, notably Constitutional Court Ruling No. 24-P of 12 October 1998[156] and Constitutional Court Ruling 138-O of 25 July 2001.[157]  In his First Expert Report, Mr. Konnov summarizes the significance of these cases as follows:

> c.   In 1998, the Russian Constitutional Court introduced the concept of good/bad faith taxpayers.  In 2001, the Russian Constitutional Court held that bad faith taxpayers

---

[154]   The Tribunal observes that there appear to be at least six other decisions in the procedural history of these two cases, and that these are not in the record.

[155]   The authorities cited by Mr. Konnov demonstrate only that the constitutional anti-abuse principle (*i.e.*, persons should not violate other persons' rights and freedoms in exercising their own rights and freedoms) has been extended to the area of labour law.  *See generally* First Konnov Report ¶ 45, n.64, 66 (authorities cited therein).

[156]   Ruling of the Constitutional Court of the Russian Federation No. 24-P, 12 October 1998, Exh. R-2212.

[157]   Ruling of the Constitutional Court of the Russian Federation No. 138-O, 25 July 2001, Exh. R-307.

would not be entitled to the same level of protection as good faith taxpayers. Mr. Savseris in his book "Bad Faith Category In Tax Law" states:

> "The criterion of bad faith taxpayer was chosen by the Constitutional Court of the Russian Federation in order to distinguish legitimate tax planning and illegal tax evasion.
> . . .
>
> Since the adoption of the Ruling of the Constitutional Court of the Russian Federation No. 138-0 the criterion of bad faith has become an independent criterion for settlement of disputes on many categories of cases."[158]

304. Claimants do not deny the existence of the "bad-faith taxpayer" doctrine,[159] but argue that its origins and subsequent application by the Russian courts suggest that it has only a "limited role" in Russian law.[160]   The Tribunal considers it important to set out Claimants' position, as articulated at paragraphs 218 to 224 of their Reply, in full:

> 218.   The phrase "good faith taxpayer" first appeared in the inoperative part of a decision of the Constitutional Court arising out of the 1998 financial crisis, during which many tax payments never reached the Treasury because the banks through which such payments were sent had become insolvent.  When the funds did not arrive, the tax authorities simply confiscated the unreceived payments directly from the taxpayers' accounts.  The Court concluded that the constitutional obligation to pay taxes is fulfilled and the tax is deemed "paid" at the moment when the funds are debited from the taxpayer's account and that it would be improper to hold the taxpayer liable for the banks' failure to retransmit those funds to the State.  In these circumstances, the Court held that a second collection of these "paid" taxes would be inconsistent with constitutionally protected property rights.

---

[158]   First Konnov Report ¶ 49(c) (citing Ruling of the Constitutional Court of the Russian Federation No. 24-P, 12 October 1998, at Exh. R-2212; Resolution of the Constitutional Court of the Russian Federation No. 138-0, 25 July 2001, Exh. R-307; S.V. Savseris, *Bad Faith Category in Tax Law*, Statut, 2007, pp. 42, 46, Exh. R-2218.  He also refers to another illustration offered by Professor D.V Vinnitsky, *The Principle of Good Faith and Abuse of Right in Taxation*, Pravo i Ekonomika, No. 1, January 2003, Exh. R-2219 ("the tax legislation does not directly use the notion "good faith" as a necessary criterion for assessing activity of tax relations party.  However, this is not to say that tax law is indifferent to this principle. In contrast, for this branch of law "good faith" is a fundamental principle to be used in the resolution of disputes and execution of certain tax law provisions.").  Mr. Konnov notes that bad faith is one of the anti-abuse doctrines which was applied either on a stand-alone basis or together with other doctrines in the Yukos case.  In many cases, the term "bad faith" was used along with other anti-abuse terms, such as "proportionality", "unjustified tax benefit" or "abuse of rights."  According to Mr. Konnov, during the period in question there were a number of non-Yukos cases where the tax authorities applied the concept of bad faith to disallow tax benefits, and the courts upheld their actions.  Specifically, between 2001 and 2005 the concept of bad faith was applied in the following number of court cases: (i) 2001—262 court cases; (ii) 2002—644 court cases; (iii) 2003—1.189 court cases; (iv) 2004—2.235 court cases; (v) 2005—3.737 court cases. (citing also S.V. Savseris, *Bad Faith Category in Tax Law*, Statut, 2007 p. 47, Exh. R-310).  According to Mr. Konnov, another prominent Russian scholar Arkady Bryzgalin in 2001 distinguished four methods which could be applied by the state to combat tax evasion, including doctrines of "substance over form" and "business substance." (citing *Methodology of Tax optimization*, Tax and Tax Law Journal, 2001, No. 1, at p. 26, Exh. R-2283).

[159]   Reply ¶ 217, n.368.

[160]   *Ibid* at ¶ 217.

219.  In 2001, the Tax Ministry asked the Constitutional Court to clarify its earlier decision, in particular, whether the rule (that a taxpayer's constitutional duty to pay taxes ceases when the funds are debited from its account) applied even if the taxpayer deliberately contrived, in bad faith, to use an insolvent bank in order to evade taxes.  In the resulting decision, the Russian Constitutional Court held that "the conclusions which are contained in the motivational and operative parts of the [1998] Ruling do not extend to the dishonest taxpayers, and recovery by enforcement in the manner established by law from dishonest taxpayers of taxes not coming into the budget does not violate the constitutional guarantees of the right of private ownership".  This decision introduced the concept of "bad faith taxpayer" into Russian law.

220.  Since introducing this novel doctrine, the Constitutional Court has been called on to address its proper scope on a few occasions, and has consistently imposed limits.

221.  In its decision of October 16, 2003, for example, the Court for the first time recognized the possibility of the doctrine's application in a context other than tax payments through failed banks, in particular, in relation to claims for VAT refunds for exports.  However, the Court emphasized the limited nature of this extension, recalling that, under Article 57 of the Russian Constitution and Article 3(7) of the Tax Code, "law enforcement authorities may not construe the concept of 'good faith tax payer' as imposing on the tax payer additional obligations which are not provided for in the legislation".  The Russian Constitutional Court reiterated this limiting principle in a 2005 decision and specifically criticized the Moscow Arbitrazh Court's sweeping attempt to "universalize" the concept so as to circumvent express statutory provisions in the context of the Yukos case.

222.  In sum, in its limited endorsement of a "bad faith taxpayer" doctrine, the Russian Constitutional Court has at all times clearly indicated that any such doctrine was subordinate to, and controlled by, relevant Constitutional and statutory provisions.

223.  The primacy and supremacy of Constitutional and statutory provisions over the "bad faith taxpayer" concept have since been reaffirmed by the Presidium of the Highest Arbitrazh Court in a decision wholly rejecting, in circumstances unrelated to the Yukos affair but involving tax claims against another oil company, the approach of the Moscow Arbitrazh Courts in the Yukos cases and emphasizing that "courts should assess arguments of tax authorities with respect to underpayment of taxes with consideration of specific statutory provisions rather than such subjective concepts as 'bad-faith taxpayer'".

224.  Accordingly, there was nothing in the "bad faith taxpayer" concept introduced by the Russian Constitutional Court that could have permitted the tax authorities to re-attribute revenues between taxpayers or otherwise disregard directly applicable statutory provisions and impose additional, unwritten obligations beyond those contained in the legislation.[161]

305.  In its Rejoinder, Respondent dismisses Claimants' suggestion that the Constitutional Court has limited the application of the doctrine since it arose in 1998, notably through its decisions since 2003:

661.  Contrary to Claimants' allegations, the Constitutional Court in 2003 was not "called on to address" the "scope" of the bad-faith taxpayer doctrine, much less to "limit[]" it, but rather to adjudicate a complaint that had been raised in connection with the

---

[161]   Reply ¶¶ 218–24 (footnotes omitted; emphasis in original).

tax authorities' denial of a refund of input VAT based on the taxpayer's bad-faith conduct. Thus, the Constitutional Court confirmed its earlier holdings, including its 1998 ruling, reiterating that "in the sphere of fiscal relations, there shall be a presumption of good faith" in favor of taxpayers, which the authorities bear the burden of rebutting. The Court also noted that the authorities "may not construe the concept of 'good-faith taxpayer' as imposing on the taxpayer additional obligations which are not provided for in the legislation."

662. Claimants' self-serving reliance on this quotation -- which they extract from its all-important context -- is misplaced. It is clear from this ruling that the Court did not at all intend to "limit" the scope of the bad-faith taxpayer doctrine, but rather to clarify that a taxpayer's good or bad faith must be determined on a case-by-case basis, upon "review of all the circumstances of the particular case." That is exactly what the tax authorities and courts did with respect to Yukos. Specifically, the Constitutional Court explained that:

"[t]he determination of the complainant's good or bad faith in the performance of its tax obligations and realisation of its rights to the reimbursement of amounts of tax deductions is connected with the establishment and review of the factual circumstances of the particular case and falls under the jurisdiction of the arbitrazh courts."

663. That the Court did not intend to limit the scope of the doctrine as formulated in its earlier jurisprudence is also apparent from its actual holding:

"Based on the above [...] the Constitutional Court of the Russian Federation ruled: 1. The complaint of OOO Export-Service shall not be accepted for examination because the subject matter of the application to the Constitutional Court of the Russian Federation was earlier clarified in a decision which is still in force."

664. In sum, neither in this nor in other later rulings has the "Constitutional Court [...] suggested that the bad faith-taxpayer doctrine could not be used to combat abusive arrangements such as those used by YUKOS."[162]

306. The Tribunal has read and reviewed the many Constitutional Court decisions that form the backbone of the "bad faith taxpayer" doctrine in Russian law as well as papers of various Russian legal scholars. The Tribunal has formed the view that, during the period relevant for the tax assessments against Yukos from 2003 to 2004, the doctrine consisted mainly of the following principles:

- the good faith (honesty) of the taxpayer is presumed;[163]

- the tax authorities have the burden of proving the taxpayer's bad faith (dishonesty), and in doing so "may not construe the concept of 'good faith taxpayer' as imposing

---

[162] Rejoinder ¶¶ 661–64 (footnotes omitted; emphasis in original).

[163] Constitutional Court Ruling of the Constitutional Court of the Russian Federation No. 138-O ¶ 2 of the Motivational Part, 25 July 2001, Exh. R-307; Constitutional Court Ruling No. 329-O ¶ 2 of the Motivational Part, 16 October 2003, Exh. R-3238.

on the taxpayer additional obligations which are not provided for in the legislation";[164]

- in the case of a bad-faith (dishonest) taxpayer, the tax authorities have an "obligation . . . [to] ensure protection of the State's interests, including using mechanisms of judicial protection";[165] and

- the determination of the taxpayer's good or bad faith in the performance of its tax obligations and realization of its rights to the reimbursement of amounts of tax deductions is connected with the establishment and review of the factual circumstances of the particular case and falls under the jurisdiction of the arbitrazh courts.[166]

307.  It is the Tribunal's opinion that Claimants cannot persuasively maintain that the "bad faith taxpayer" doctrine is subordinated to, and controlled by, not just the Russian Constitution (which must be the case), but also statutory provisions.[167]  It seems evident that if the tax authorities establish dishonesty (bad faith) by the taxpayer in a particular case, based on specific factual circumstances, then the taxpayer may lose certain statutory benefits such as tax deductions or exemptions provided in the legislation.  However, even a bad-faith taxpayer cannot be deprived of its *constitutional* rights or of statutory rights *that guarantee* the taxpayer's constitutional rights.[168]

308.  Having reviewed and stated its observations on the important Constitutional Court cases, the Tribunal turns now to the Parties' arguments based on the principal arbitrazh court cases on

---

[164]  Constitutional Court Ruling of the Constitutional Court of the Russian Federation No. 329-O ¶ 2 of the Motivational Part, 16 October 2003, Exh. R-3238.

[165]  Constitutional Court Ruling of the Constitutional Court of the Russian Federation No. 138-O ¶ 2 of the Operational Part, 25 July 2001, Exh. R-307

[166]  Constitutional Court Ruling of the Constitutional Court of the Russian Federation No. 329-O ¶ 2 of the Motivational Part, 16 October 2003, Exh. R-3238.

[167]  Reply ¶ 222.

[168]  Constitutional Court Ruling of the Constitutional Court of the Russian Federation No. 36-O of 18 January 2005 ¶ 3 of the Motivational Part, Exh. C-1140.  In that case, at issue was Yukos' complaint that the Moscow Arbitrazh Court had failed to grant Yukos the benefit of the statute of limitations (contained in Article 113 of the Tax Code of the Russian Federation (hereinafter "Russian Tax Code")) on the basis that Yukos was a "bad-faith taxpayer".  The Constitutional Court dismissed Yukos' complaint on jurisdictional grounds, but opined in *dicta* that Ruling No. 138-O "cannot serve as a ground for depriving the applicant of the guarantees established by Article 113 of the Tax Code of the Russian Federation."  Earlier in its decision, the court had noted that Article 113 is a guarantee of a taxpayer's constitutional rights.

which Respondent relies.  Although Mr. Konnov refers to dozens of other specific cases,[169] and alludes generally to "thousands of bad faith cases adjudicated in the relevant period,"[170] Respondent places particular emphasis on the *Sibirskaya* case[171] and Resolution No. 53 of the Supreme Arbitrazh Court.[172]  Claimants, for their part, emphasize a Resolution of the Federal Arbitrazh Court for the North-Western District of 5 June 2002 (the "***Pribrezhnoye***" case).[173]  The Tribunal considers this case in the next chapter of its Award since it relates more directly to the application of any anti-abuse doctrine to circumstances similar to those that are at issue in the present case, rather than to the existence of any anti-abuse doctrine.

309.  Mr. Konnov describes the *Sibirskaya* case as follows:

    i.    In May 2002, OOO *Sibirskaya Transportnaya Kompaniya* ("Sibirskaya"), which was later found to be a Domestic Offshore Company, lost a cassation appeal before the Federal Arbitrazh Court for the North-Caucasian District.  Like YUKOS two years later, Sibirskaya argued that it had complied with the letter of the Kalmykian law.  The tax authorities and courts, however, concluded that Sibirskaya was a bad faith taxpayer and that the tax benefits granted to it were manifestly disproportionate (0.4%) to the amount of investment made by Sibirskaya:

> "Such investments neither have any effect on the economy nor cover any of the losses of the budget relating to the granting of tax incentives to taxpayers.  On the contrary, those investments result in unjust enrichment (saving) of funds at the expense of budgetary funds. Therefore, being aware of a clear disproportion between the amount of investment and the amount of the tax incentives applied, the claimant has abused its right, i.e., the claimant acted in bad faith."[174]

The Tribunal notes that no further appeals appear to have been made in this case.  During his cross-examination, Mr. Konnov observed that the amount at stake in *Sibirskaya* (around USD 200,000) "was peanuts."[175]

---

[169]   First Konnov Report ¶ 49(e)–(s).

[170]   Second Konnov Report ¶ 13.

[171]   *Sibirskaya*, Federal Arbitrazh Court for the North-Caucasian District, Case No. F08-1678/2002-614A, 20 May 2002, Exh. R-311.

[172]   Resolution of the Plenum of the Supreme Arbitrazh Court of the Russian Federation No. 53, 12 October 2006, Exh. R-1475.

[173]   Resolution of the Federal Arbitrazh Court for the North-Western District No. A42-6604/00-15-8-818/01, 5 June 2002, Exh. C-1278 (hereinafter "*Pribrezhnoye*").  See also discussion at paragraph 645 below.

[174]   First Konnov Report ¶ 49(i) (citing Resolution of Federal Arbitrazh Court of North-Caucasian District No. F08-1678/2002-614A, 20 May 2002, at Exh. R-311).

[175]   Transcript, Day 14 at 214. Mr. Konnov further speculated when he testified that Yukos may have "preferred, after having the loss, [to] immediately make the payment and not to take this case forward." Transcript, Day 14 at 214.

310.   Respondent argues that the *Sibirskaya* case is one of "numerous cases [in which] the courts ruled against taxpayers on the basis that disproportion between the tax benefits granted to the taxpayer and amounts of investment into the relevant low-tax region economy is an indication of an abuse of rights and evidence of the bad faith of the taxpayer."[176]   Although *Sibirskaya* involved a Yukos-related entity, Sibirskaya Transportnaya Kompaniya, Respondent argues that "the tax authorities did not realize the connection of that company with Yukos at the time."[177]

311.   Claimants challenge the assertion that the authorities did not know that the company was related to Yukos.[178]   Furthermore, and of direct relevance to the topic at issue here, Claimants contest the validity of the "purported 'proportionality' requirement" imposed by the court on the basis of the "bad faith taxpayer" doctrine:

> Not only was the Court's reliance on the "bad faith taxpayer" doctrine improper . . . the purported "proportionality" requirement it sought to introduce was wholly arbitrary and contravened other statutory and Constitutional provisions as well as basic principles of the rule of law.[179]

312.   The Tribunal cannot accept Respondent's submission that the *Sibirskaya* case is an authority for the proposition that proportionality, standing alone, is a sufficient criterion for a finding of abuse.   The decision does appear indeed to stand alone and, as far as the Tribunal can tell, was not followed subsequently.   Moreover, contrary to Mr. Konnov's opinion, it was not Sibirskaya Transportnaya Kompaniya that "lost" an appeal at the cassation level of the arbitrazh court, suggesting that the tax authorities had been successful at all other levels.   In fact, the company had actually prevailed in the earlier decisions on this issue.[180]   Those judgments are not in the record.   In addition, Claimants underline that, during his expert testimony in the *Quasar de*

---

[176]   Counter-Memorial, ¶ 997, n.1561 (citing Resolutions of Federal Arbitrazh Court of the North-Caucasian District, Case No. F08-1682/2002–623A, 21 May 2002, Exh. R-313; Case No. F08–1674/2002–627A, 21 May 2002, Exh. R-314;, Case No. F08-1793/2002, 28 May 2002, Exh. R-316; Case No. F08–3949/2002–1374A, 22 October 2002, Exh. R-317; Resolution of Federal Arbitrazh Court of the Moscow District, Case No. KA–A41/6270–03, 10 October 2003, Exh. R-319; Decision of the Moscow Arbitrazh Court, Case No. A41-K2-10055/02, 17 November 2004, Exh. R-320).

[177]   *Ibid.* ¶ 291.

[178]   Reply ¶ 227.

[179]   *Ibid.* ¶ 228.

[180]   Resolution of the Federal Arbitrazh Court of the North-Caucasian District No. F08-1678/2002–614A, 20 May 2002 p. 1, Exh. R-311.

*Valores SICAV S.A. et al. v. The Russian Federation* ("**Quasar**") arbitration proceedings, Mr. Konnov disclaimed reliance on the "proportionality" requirement.[181]

313.   As is apparent from the many cases reviewed above, Russian courts did consider and rule on tax-related cases before they were seized of the dispute involving the tax assessments against Yukos, including in the "anti-abuse" area.

314.   Respondent also raised a 2006 ruling of the Supreme Arbitrazh Court known as Resolution No. 53.  In principle cases decided *after* the Yukos tax assessments and decisions should not be relevant for ascertaining the state of the law at the time of those assessments and decisions. However, in view of Respondent's argument that Resolution No. 53 represents the end point of the *evolution* of the anti-abuse doctrine in the Russian courts, the decision is of interest to the Tribunal in ascertaining the state of the law on the anti-abuse doctrines not only after, but also before and during the Yukos tax assessments.

315.   In Resolution No. 53, the Supreme Arbitrazh Court set out to ensure greater uniformity in its evaluation of the "justifiability" of tax benefits received by the taxpayer by setting out straightforward interpretations of certain doctrines.  As a starting point, it reaffirmed that the good faith of the taxpayer was presumed and that the tax authority had the burden to prove the facts upon which it relies in making its determinations.  It noted that benefits may be considered unjustified when transactions are recorded without reflecting their true nature or are concluded without a business purpose or connection to economic activity.  In such situations, the court would determine the rights and obligations of the taxpayer on the basis of the actual economic substance of a transaction.  The Supreme Arbitrazh Court noted, however, that no adverse inference should be drawn from the fact that there was another, less beneficial way to conduct a transaction.  It laid out four scenarios which may "point to" an unjustified tax benefit, and nine factors which, taken by themselves, may not constitute grounds to find a tax benefit unjustified.  However, taken in concert with other factors, they may be considered as evidence of an improperly obtained benefit.  Finally, it stated that a court should "establish the existence of economic or other reasons (business purpose) in the taxpayer's actions subject to evaluation of circumstances evidencing its intent to obtain an economic effect as a result of actual business or economic activity."  It held that the tax benefit itself could not be considered an independent business purpose:  "Therefore, if the court determines that the main purpose pursued by the

---

[181]   Claimants' Post-Hearing Brief ¶ 32, n.67.  *Quasar de Valores SICAV S.A. et al. v. The Russian Federation*, SCC Arbitration, Award, 20 July 2012, Exh. R-3383 (hereinafter "*Quasar*").

taxpayer was obtaining of income exclusively or predominantly out of the tax benefit and there was no intention to carry out actual economic activity, the tax benefit may be disallowed."[182]

316.    Many articles on Resolution No. 53 have been written by Russian tax scholars and practitioners.   Two in particular are cited by Mr. Konnov.[183]   Both articles underline the importance of Resolution No. 53, although they reach different conclusions regarding the novelty of its content.   One article by Mr. Y.M. Lermontov concludes that Resolution No. 53 was an innovation in Russian tax law: "[t]he concept of the 'bad-faith' of the taxpayer has been eliminated by Resolution No. 53," and instead other doctrines have been "incorporated into the regulatory framework."[184]   Mr. Lermontov notes that in the past, "the judicial practice concerning the treatment of taxpayers as those of good faith and of bad faith in these matters used to be inconsistent," and that as a result of Resolution No. 53, more specific doctrines such as "business purpose", "substance over form" and "economic justifiability" were substituted in its place.[185]

317.    The other commentary was written by Messrs. A.V. Bryzgalin and V.V. Goryunov.[186]   For these authors, the doctrine affirmed in Resolution No. 53 represents less of a break with the bad-faith taxpayer doctrine that existed at the time of the Yukos assessments.   Instead, they see Resolution No. 53 as *linking* the "business purpose" doctrine to the "bad-faith taxpayer" doctrine.   The authors note that bad faith of the taxpayer was "considered for the first time . . . [in] N 138-0 regarding dubious schemes for payment of taxes through 'problem banks.'"   The authors further note that since the doctrine had not been "directly provided for in the law," it created "uncertainty" leading to "considerable complications for . . . taxpayers, but also for the judges."   Prior to Resolution No. 53, the authors write, "no criteria in this area existed at all, and the question of bad faith was completely dominated by judicial discretion."   For the authors, Resolution No. 53 represents a "positive step" in which the Supreme Arbitrazh Court "attempted to establish specific indications of bad faith of taxpayers, characteristic features and approximate examples of permissible and impermissible conduct."   The authors suggest that the

---

[182]   Resolution of the Plenum of the Supreme Arbitrazh Court of the Russian Federation No. 53, 12 October 2006, p. 3, Exh. R-1475 (hereinafter "Resolution No. 53").

[183]   Second Konnov Report ¶ 80, n.133.

[184]   Y.M. Lermontov, *Commentary to the Resolution of the Plenum of the Supreme Arbitrazh Court No. 53*, Exh. R-3266.

[185]   *Ibid*.

[186]   A.V. Bryzgalin and V.V. Goryunov, *Commentary on Resolution No. 53 of the Plenum of the Supreme Arbitrazh Court of the Russian Federation*, Exh. R-3267.

change from "bad faith" to "unjustified tax benefit" is more a matter of terminology than doctrine. The authors write that "despite the substitution of terms . . . the concept of an unjustified tax benefit is illustrated in Resolution N[o]. 53 by what used to be called bad-faith behavior of taxpayers."

318. The link between these doctrines was made, as early as 2002, in a commentary on Constitutional Court Ruling 138-O that was published in 2002 by Mr. Sergey Pepeliaev, who would later be retained by Yukos in the Russian tax litigation.[187]   In his commentary, Mr. Pepeliaev wrote as follows:

> In this Ruling the court considers the issue of limitations on tax planning, which implies the recognition of the right of each taxpayer to use the means, ways and methods permitted by law to reduce such taxpayer's tax liabilities to the maximum extent possible. However, sometimes tax planning goes beyond the permitted limits and results in tax evasion. The boundaries between the tax planning and tax evasion [are] determined by reference [to] the taxpayer's purposes. If tax savings are only ancillary to the relevant economic result, then the relevant tax consequences shall be determined by reference to the form of the relevant transaction. However, where the taxpayer's actions were aimed solely to reduce the amount of its tax payments rather than to achieve an economic result, this would demonstrate that the relevant transaction was inconsistent with law because the motive underlying such transaction was to avoid tax.
>
> . . .
>
> The expression "good faith of the parties to a transaction" is closely related to the expression "good faith taxpayer" which was used by the Constitutional Court of the Russian Federation twice in the opinion section of Resolution No. 24-P dated 12 October 1998. In other words, in the context of the Resolution, the expression "good faith of the parties to a transaction" was used in its public legal meaning. A person's actions aimed solely at tax evasion may not be regarded as actions made in good faith.
>
> . . .
>
> If the parties to a transaction act reasonably, i.e., if they aim to achieve the actual business result and also choose such line of action which leads to minimal tax loss, then the parties' tax liabilities should be determined formally.
>
> . . .
>
> If it appears that parties act both unreasonably and not in good faith then this constitutes a ground for reassessment of the parties' tax liabilities for which various mechanisms can be used. Upon a claim brought by the tax authorities the actual relations between the parties may be assessed by court[s]. The substance of such court proceedings would be an examination of whether the actions of the relevant parties were aimed at achievement of business (economic) results or whether the idea of tax saving was the prevailing idea. . . .[188]

---

[187]   Second Konnov Report ¶ 12(c).

[188]   S.G. Pepeliaev, *Commentary to the Ruling of the Constitutional Court Ruling of the Russian Federation No. 138-O of July 25, 2001*, Exh. R-352.

319.   The Tribunal concludes that, in respect of the period relevant for the Yukos tax assessments and decisions, while the "bad faith taxpayer" doctrine had not yet gelled in the way that it did in 2006, in Resolution No. 53, it had already been recognized and applied in some Russian court decisions.  This conclusion, while based primarily on the Tribunal's review of the cases,[189] is also supported by the cross-examination of Mr. Konnov at the Hearing, as explained in the following paragraphs.

320.   In his cross-examination of Mr. Konnov, Professor Gaillard focused on the sanction that the Russian Federation imposed on Yukos in the present case, rather than on the existence of any anti-abuse doctrine *per se*.

321.   Mr. Friedman emphasized the limited scope of Claimants' cross-examination of Mr. Konnov during his re-direct examination of the witness:

> MR FRIEDMAN: Just to make sure I am clear, Mr Konnov, you understood the questions yesterday to be about the remedy that's applied based on the anti-abuse doctrine, as opposed to the substance of the anti-abuse doctrine?
>
> A.    I thought that Professor Gaillard limited his question—and the Tribunal did the same thing—very specifically to the attribution; which I explained—and I think the record said that—that I don't view that as a separate instrument.  But I was nevertheless asked the question about court cases with respect to attribution.[190]

322.   As Claimants had stipulated to the existence of the bad-faith taxpayer doctrine (while contesting the scope and manner of its application), they instead implied in their argument that any such doctrine was irrelevant, since formal compliance with the legislation governing the low-tax benefits in the respective regions, including fulfilment of the terms of any applicable investment agreements, was sufficient to claim the tax benefits.[191]

323.   Accordingly, in his cross-examination of Mr. Konnov, Professor Gaillard stressed the compliance of Yukos' tax scheme with the existing legislative framework.  In his answer, Mr. Konnov, while acknowledging that the formal requirements of the law may have been met, reiterated the relevance of the anti-abuse doctrine:

---

[189]    The Tribunal also observes that the ECtHR, in its separate judgments relating to the claims against the Russian Federation brought by Yukos and Messrs. Khodorkovsky and Lebedev, respectively, considered the relevant domestic (*i.e.*, Russian) law and practice, including the Russian courts' case-law on substance over form and related doctrines. *See* ECtHR Yukos Judgment ¶¶ 428–68; *Khodorkovsky v. Russia (2)* ¶¶ 422–28.

[190]    Transcript, Day 15 at 193–94.

[191]    Reply ¶¶ 148–64.

Q.    So what you are saying is that the Law is not a good law, right?  The Law which gives the regions the power to negotiate their taxes downwards in exchange for contributions to their fund is not a good law?  The system is not good, as far as—

A.    No, I am not saying that at all.  I am not saying that at all.  I am saying that what was done in this case, it was an abuse of law.  So the Law was applied by Yukos in such an abusive manner so that, in violation of the constitutional principles which I've summarized in my report, Yukos did not pay taxes duty  in Moscow.  It used this whole fraudulent sham arrangement, with the use of the Mordovian companies, to evade taxes in Moscow.[192]

324.    Mr. Konnov's insistence on the relevance of the anti-abuse doctrine, notwithstanding Yukos' compliance with the strict letter of the law, can also be seen in the following extract of his cross-examination by Professor Gaillard:

Q.    What do you call the proportionality principle? Is it the proportionality between the investment and the benefits?

A.    Correct.

Q.    Right.   Is this—I will use the words "proportionality principle" within your meaning, what you just said, right?  Is this proportionality principle found in the black letter of the Law of Mordovia; yes or no?

A.    No. As I said—

Q.    Okay.

A.    —neither in Mordovia, nor in Kalmykia, nor in any other jurisdictions.

Q.    Fine.  And we have seen that in the agreements regarding the ZATOs, the trading companies had agreed to contribute to a fund 5% of their tax benefits.  We have seen that earlier, yesterday or this morning, right?

A.    Right.

Q.    Okay.  Now, going back to the Sibirskaya case, in the Sibirskaya case we have a decision of first instance where the taxpayer won; correct?

A.    As I recall, correct.

Q.    Right.  And in the Court of Appeal the taxpayer lost, and it had to do with the Law of Kalmykia; correct?

A.    No.  No.  There was no—again—

Q.    But it was a Kalmykian company

. . .

A.    No, it was not based on the Kalmykian Law.  Obviously Sibirskaya was governed by Kalmykian Law; obviously Kalmykian Law did apply to it, to the same extent Mordovian Law applied to companies registered in Mordovia.  But the assessment was based on the proportionality principle, which, as we discussed, is not found—I think you used the words—in the black letters of the Law.[193]

---

[192]    Transcript, Day 13 at 151–52.

[193]    Transcript, Day 14 at 218–220.

325. Having completed its review of what it considers to be the central evidence in the record in respect of the legal framework applicable to the Yukos tax optimization scheme under Russian law, the Tribunal now turns to the complex factual matrix involving Yukos' trading entities in the low-tax regions.

### 4.     The History of the Yukos Trading Entities before 2003

326. In the present proceedings, the Parties vigorously debated the significance of the history of the Yukos trading companies, including various tax audits that took place before 2003. The pertinent activities of Yukos' trading companies took place in the regions of Mordovia and Kalmykia, as well as in the ZATOs of Lesnoy and Trekhgorny. The Tribunal will now summarize these activities and the results of the many tax audits which were issued.

### (a)     Mordovia

327. Mordovia is a region within the Russian Federation. Sometimes referred to as a "domestic offshore territory", in the late 1990s it was granted some autonomy as regards taxation, which made it a more attractive destination for investment and business operations.[194] This was part of a broader plan by the Russian Government in the 1990s to foster economic development in areas designated as "economically underdeveloped".[195] As noted earlier, the special exemption plan for domestic offshore territories was largely repealed as of 1 January 2004.[196]

328. On 9 March 1999, the *Law of the Republic of Mordovia No. 9-Z* ("***Law 9-Z***") was enacted.[197] *Law 9-Z* was the framework which allowed Mordovia to offer tax benefits to corporate entities operating in the region. Article 4.4 of the law states that "[t]he Government of the Republic of Mordovia shall determine the order and terms and conditions of granting the tax benefit under this Law, as well as the order of keeping reports and records to be able to obtain the tax benefits listed in this Law."[198]

---

[194]   Transcript, Day 1 at 45–48.

[195]   Respondent Opening Statement, Day 2 at 109.

[196]   *See* paragraphs 77 and 283 above; First Konnov Report ¶ 33.

[197]   *Law 9-Z*, Exh. C-414.

[198]   *Ibid*.

329.    Mr. Vladimir Dubov, a member of the Yukos management board[199] and later a member of the
State Duma for the Upper Volga region (which includes Mordovia), was the primary point of
contact between Yukos and the regional and federal taxation authorities in Mordovia.   He
appeared as a witness on behalf of Claimants.

330.    In his witness statement, Mr. Dubov stated the following:

- On 20 December 1999, he attended meetings in Mordovia to explain Yukos' plan to
operate through trading companies in Mordovia.   He met with Mr. Nicolai Merkushkin, the
head of the Republic of Mordovia; Mordovian Prime Minister Vladimir Volkov,; and
Mordovian Deputy Prime Minister Vladimir Ruzhenkov, who was also Head of the
Administration of the Government of Mordovia.   Mr. Dubov swears that "[a]ll terms and
conditions associated with the use of trading companies in the Republic of Mordovia were
discussed and agreed at the meeting, including that Yukos' trading companies would pay
[80 million rubles] per month to the Republic."   He stated that the Mordovian authorities
"fully approved" of the plan.[200]

- In late December 1999, he met with the Tax Minister of the Russian Federation,
Mr. Alexander Pochinok, and Mr. Alexander Smirnov, one of Mr. Pochinok's deputy
ministers, to discuss Yukos' plan to use trading companies in the Republic of Mordovia.
Mr. Smirnov was very interested and called the head of the Special Inspectorate for Major
Taxpayers, Mr. Aslambek Pasckachev, and the head of the Oil Department within the
special inspectorate, Ms. Lydia Smirnova, into the in the meeting, to ask them to analyze
the beneficial taxation plan.[201]

- After that meeting, he spoke with Mr. Gusev, First Deputy Minister in charge of the VAT
Department, to discuss Yukos' plan.   He thought this important as "it was obvious to me
that any trading companies established in Mordovia would be claiming significant VAT
refunds on the export of oil and oil products."[202]   He also spoke with Ms. Olga Serdiuk,

---

[199]   Transcript, Day 5 at 14.

[200]   Dubov WS ¶¶ 20–21.

[201]   *Ibid*. ¶¶ 22–23.

[202]   *Ibid*. ¶ 24.

then Deputy Head of the Indirect Taxes Department and one of the three deputy First Ministers, Mr. Kirill Ugolnikov.[203]

- Around late December 1999 or January 2000, he met with each of the deputy First Ministers at the Tax Ministry and at the Menatep office on Kolpachniy Lane to outline the plan for the Mordovian companies. Following these meetings, Mr. Smirnov called the Head of the Regional Department of the Tax Ministry in Mordovia, Mr. Aleksey Averiasov, in Mr. Dubov's presence, to inform him that such discussions had taken place and that Yukos had been "given the green light at the Ministry level for the use of trading companies in the region."[204]

- He met with the then First Deputy Minister of Finance (later Minister of Finance and Deputy Prime Minister), Mr. Alexei Kudrin at the Ministry of Finance in January 2000. They discussed establishing Yukos trading companies in Mordovia so that Yukos could take advantage of tax benefits available in the region and that Yukos' trading companies would be able to contribute to the regional economy through fixed monthly payments. Mr. Dubov recalls that "Alexei Kudrin consented to Yukos' proposal, with the proviso that Yukos' overall tax burden should essentially remain the same."[205]

331. When he was cross-examined, Mr. Dubov repeated his statement that he told Mr. Kudrin that Yukos was planning to work in Mordovia through trading companies, as well as "which taxes it will pay in each level of national budget, which preferences would the budgets provide for Yukos, what benefits Yukos would reap from these preferences and what amounts would be paid in[to] the federal budget, and if there were any issues, how they were going to be resolved."[206]

332. Mr. Dubov concludes in his witness statement that, after these meetings, "[i]t follows that all the relevant authorities, both federal and regional, including the Minister of Taxation, his first Deputies, and the First Deputy Minister of Finance were aware of, cooperated with and approved of Yukos' plan to operate through the trading companies in the Republic of Mordovia

---

[203]   *Ibid*.

[204]   *Ibid*. ¶ 25.

[205]   *Ibid*. ¶ 26. It is common ground between Claimants and Respondent (hereinafter "the Parties") that the point of Yukos' tax arrangements was to lower its tax burden, not to keep it at the level it would have been at without resort to them.

[206]   Transcript, Day 5 at 84.

to take advantage of the favorable tax climate."[207]  In Mr. Dubov's view, this was favorable both for Mordovia and the Russian Federation, as any improvement in the financial situation of Mordovia would decrease the burden it placed on the federal budget.  According to Mr. Dubov, "[t]he Russian Federation was clearly interested in decreasing the significant disparities in well-being between the regions [of the Federation]."[208]

333.   The record reveals that, as the trading companies began operations, VAT refunds to the companies were very significant.   In fact, VAT refunds to the trading companies often exceeded the total amount of VAT collected in Mordovia from all the other companies operating on its territory.  The regional section of the Federal Treasury therefore had to transfer the necessary funds to the Tax Ministry's regional VAT Department.  This decision to transfer funds, according to Mr. Dubov, had to be taken at the federal level, including obtaining the approval of the Ministry of Finance.

334.   During his cross-examination, Mr. Dubov explained that "[w]hen, as a result of the operations of the trading companies, the VAT refunds increased many times over, many fold, by many hundreds of per cent, the Tax Ministry department asked the question why[;] the Tax Ministry, the Tax and Charges Ministry for Mordovia replied that we have Yukos trading entities incorporated here, these have to do with the Yukos exports; that is why the VAT refunds are so high."[209]  He also stated that "[t]his is exactly why, before the scheme became operational, I had cleared [it] with the head of the department and the First Deputy Minister who was in charge of this department."[210]

335.   In addition, in his witness statement, Mr. Dubov affirms that the funds paid into the Mordovian budget were used to fund various projects, such as Internet House, an internet-training center, and the rebuilding of the Saransk Airport.   In 2001, according to Mr. Dubov, several dignitaries, including President Vladimir Putin, repeatedly visited the area (using the airport) and discussed the trading companies' work in the region.  Mr. Dubov states:  "During such visits, President Putin was told by Nicolai Merkushkin, the Head of the Republic of Mordovia, and other representatives of the Republic of Mordovia, about the social, cultural and industrial projects that had been developed in the region in the previous year through the support and

---

[207]   Dubov WS ¶ 27.

[208]   *Ibid.* ¶ 29.

[209]   Transcript, Day 5 at 149–50.

[210]   Transcript, Day 5 at 150.

cooperation of Yukos."[211]   Mr. Dubov also recalls that President Putin had been told about several other improvement projects funded by Yukos' support, such as the building of plants for machinery construction, construction materials and the production of optic fiber; the realization of a number of environmental projects such as the recycling of rotten wood and raw materials; the rehabilitation of the meat industry; reconstruction of the Saransk Theatre and Saransk Art Museum; the construction of two asphalt plants just outside of Saransk; and the reconstruction of the Saransk-Moscow highway.[212]

336.   Mr. Dubov concludes that "[i]t follows that the federal authorities, who had to authorize the VAT refund, as well as any subsequent transfer of funds, were fully aware of Yukos' trading structure, including the activities of the production and trading companies and the transactions between them."[213]

337.   The Tribunal notes that during his cross-examination, Mr. Dubov could not confirm that the VAT forms submitted by the trading companies to the Tax Ministry contained the full particulars as to how the tax optimization scheme was being implemented by Yukos.  This was because, as he said, he was not familiar with the specifics of the VAT submissions although he knew that they would be submitted to the Leninsky district of Saransk (Mordovia) and they were likely to be very large.[214]  It seems unlikely to the Tribunal that such information would have been disclosed in the VAT forms, as the tax benefits of the low-tax regions did not extend to VAT.

338.   During his cross-examination, Mr. Dubov affirmed that he only discussed with Mr. Kudrin "the general scheme", not the formalities or the details of the activities of the trading companies.[215] The Tribunal further notes that in his witness statement, Mr. Dubov asserts that "[p]rior to the attacks on Yukos, which began in the Summer of 2003, the Russian authorities never challenged the legality of this structure or the materiality of the facts underlying this structure."[216]   During his cross-examination before the Tribunal, he stated that he had no

---

[211]   Dubov WS ¶ 33.

[212]   *Ibid.* ¶ 33; Memorial ¶ 711.

[213]   Dubov WS ¶ 44.

[214]   Transcript, Day 5 at 152–54.

[215]   Transcript, Day 5 at 81–83.

[216]   Dubov WS ¶ 12.

knowledge of the use of the ZATO Lesnoy companies,[217] and in light of such testimony, Mr. Dubov's evidence must be understood as being limited to Yukos' activities in Mordovia.

339.  In the following subsections, the Tribunal will review the detailed information that was presented to it regarding the trading companies incorporated in Mordovia.

### i.      Alta-Trade (Mercury XXIII)

340.  Alta-Trade was incorporated on 17 December 1999 as Mercury XXIII pursuant to the resolution of a meeting of the company's founders, Polikant ZAO and A-Trust OOO, each with a 50 percent [RUR 5,000] stake in the share capital.  In March 2001, Nefteinvest OOO became a shareholder, taking a 2 percent (RUR 200) share in the company's share capital.[218]  In August 2001, Yukos-Import OOO acquired the shares of Polikant ZAO and A-Trust OOO, and became the owner of 98 percent of the share capital (RUR 9,800).[219]

341.  On 27 June 2001, Alta-Trade concluded an investment agreement with Mordovia, which was supplemented in March 2002.[220]

342.  The record reveals two decisions by the Saransk Tax Inspectorate in 2001 where Alta-Trade was denied the right to offset the VAT in respect of some of its activities.  The decision of 15 June 2001 notes that Alta-Trade is "an enterprise producing oil products and selling its output domestically and [abroad]," that it purchases crude oil from Yu-Mordovia, and that sales are made through OAO NK Yukos and ZAO Trading House Angarsk-Nefto as  commission agents.[221]  The decision of 29 October 2001 refers to transactions with, for example, Siberian Transportation Company and noted that the commission agent was Yukos Export Trade.[222]  Thus, this information pertinent to the activities of Alta-Trade in Mordovia and linking Alta-Trade to the Yukos "family" was known to the authorities as early as 2001.

---

[217]   Transcript, Day 5 at 101–102.

[218]   Field Tax Audit Report No. 08-1/1 of OAO Yukos Oil Company, 29 December 2003 p. 34, Exh. C-103 (hereinafter "2000 Audit Report").

[219]   *Ibid*. pp. 34–35.

[220]   Investment Agreement No. 5, 27 June 2001, as supplemented, Exh. C-1114.

[221]   Decision of the Inspectorate of the Ministry of Taxes and Levies of the Russian Federation for the Leninsky District of Saransk No. 23, 15 June 2001, Exh. C-1110.

[222]   Decision of the Inspectorate of the Ministry of Taxes and Levies of the Russian Federation for the Leninsky District of Saransk No. 48, 29 October 2001, Exh. C-1116.

343.    In April 2002, Alta-Trade's first ever field tax audit was conducted.  It covered the year
        2000.[223]  The report from that audit noted the tax-benefit structure under Law 9-Z and the
        investment agreement between Mordovia and Alta-Trade.  It noted that Alta-Trade was
        engaged in "crude oil refining [through intermediaries], sale of crude oil and oil products in the
        domestic market, as well as for export."[224]  It noted the tax benefit structure under Law 9-Z,[225]
        and that the company had no capital assets on its balance sheet.[226]  It also noted that
        Alta-Trade's accounting and tax services were completed by Yukos Invest.[227]  The Audit
        Report found no violation of any tax laws.[228]

344.    As will be seen in the next chapter, tax reassessments would eventually be made against Yukos
        for Alta-Trade for the years 2000,[229] 2001,[230] 2002[231] and 2003,[232] totaling RUR 7,143,036,557
        (approximately. USD 238,101,219).[233]

            ii.    Fargoil

345.    Fargoil was registered with state authorities on 23 May 2001.  The sole founder of Fargoil was
        Mikhail Nikolayevich Silayev, who owned 100 percent of the share capital (RUR 10,000).  On
        25 May 2001, he transferred full ownership of the shares to Nassaubridge Management
        Limited, a company incorporated in Cyprus, for RUR 11,000.[234]

346.    According to the Ministry of Taxation, "[i]n order to get the opportunity to have dividends
        taxed at a 5% rate, Nassaubridge Management Limited, pursuant to Article 10 of the

---

[223]    Field Tax Audit Report No. 02-52 of OOO Alta Trade, 19 April 2002 ¶ 2.3, Exh. C-1120.

[224]    *Ibid.* ¶ 1.7.

[225]    *Ibid.* ¶ 2.8.

[226]    *Ibid.* ¶ 2.5.

[227]    *Ibid.* ¶ 2.2.

[228]    *Ibid.* ¶ 2.5.  However, there was a 500 ruble (Approx. USD 17) fine for Alta Trade's Director because of incomplete presentation of all required documents.

[229]    Decision No. 14-3-05/1609-1, 14 April 2004 pp. 26–27, Exh. C-104 (hereinafter "2000 Decision").

[230]    Decision No. 30-3-15/3, 2 September 2004 p. 55, Exh. C-155 (hereinafter "2001 Decision").

[231]    Decision No. 52/896, 16 November 2004 p. 101, Exh. C-175 (hereinafter "2002 Decision").

[232]    Decision No. 52/95, 6 December 2004 p. 56, Exh. C-190 (hereinafter "2003 Decision").

[233]    Fiscal Years 2000–2004, Breakdown of the tax reassessments against Yukos by region or ZATO and company, excluding interest and fines p. 6, Exh. C-1752 (hereinafter "Yukos Tax Reassessment Breakdown").  The RUR to USD exchange rate is approximate, based on a rate of 30:1.

[234]    2002 Decision, p. 106, Exh. C-175.

*Agreement between the Government of the Russian Federation and the Government of the Republic of Cyprus on Avoidance of Double Taxation of Income and Capital of 5 December 1998*, made a direct investment in Fargoil OOO capital, equivalent to USD 120,000 (Bank Payment Order No. 1 of 7 February 2002, issued by Nassaubridge Management Limited, worth 3,590,000 paid as a share capital contribution based on an application of 31 January 2002)."[235] Fargoil's accounts were prepared by Yukos Financial Accounting Centre OOO.[236]

347.   An investment agreement was concluded between Fargoil and Mordovia on 27 June 2001, and supplemented on 26 March 2002.[237]   In April 2002, a report of the Directorate on Implementation of the special-development program was issued pursuant to that agreement, which indicated that Fargoil had contributed over RUR 102 Million to the region.[238]

348.   In September 2003, a Field Tax Audit Report for 2001 to 2002 was issued.  It found no violation of Article 40 of the Russian Tax Code; but did find some underpayments, resulting in an order to Fargoil to pay additional road tax and income tax in the amount of RUR 590,847,939 (USD 19.7 Million).  Notably, the report concluded that "Fargoil lawfully used exemptions applicable to all taxes under review."[239]

349.   Tax reassessments would eventually be made against Yukos for Fargoil for the years 2001,[240] 2002[241] and 2003,[242] totaling RUR 130,243,731,762 (approximately USD 4,341,457,725).[243] The Tribunal notes this was by far the largest of the tax reassessments levied against any one of the trading companies.

---

[235]   *Ibid.*

[236]   *Ibid.* p. 107.

[237]   Investment Agreement No. 9, 27 June 2001, as supplemented, Exh. C-1142.

[238]   Report of the Directorate on Implementation of the Republic's Special-Purpose Development Program of the Republic of Mordovia for 2001–2005 on the Use of Investments Received from OOO Fargoil under Investment Agreement No. 9 of June 27, 2001 for the Year 2001, 15 April 2002, Exh. C-1118.

[239]   Field Tax Audit Report No. 02-105 of OOO Fargoil, 3 September 2003 ¶ 2.16, Exh. C-1124.

[240]   2001 Decision, pp. 110–11, Exh. C-155.

[241]   2002 Decision, pp. 123–24, Exh. C-175.

[242]   2003 Decision, pp. 76–77, Exh. C-190.

[243]   Yukos Tax Reassessment Breakdown p. 6, Exh. C-1752. The RUR to USD exchange rate used here is based on a rate of 30:1.

### iii.    Macro-Trade

350.    Macro-Trade was incorporated on 14 May 2001.  The sole founder and chief accountant of
Macro-Trade was Ms. Gulnura Karimovna Zhukova, who was also the founder and director of
Mega-Alliance OOO.  Pursuant to a resolution of 24 May 2002 and amendments to the charter
of Macro-Trade on 22 October 2002, her shareholding was transferred, in equal 50 percent
shares, to Conbrook Limited (LLC) and Silverdale Trading Limited (LLC), both registered in
Cyprus.  On 16 December 2002, Macro-Trade's share capital was increased to RUR 7,700,000
and "was formed by a deposit of cash assets into the entity's current account from an account at
Trust and Investment Bank JSCB on 20 December 2001 [*sic*]."[244]

351.    Ms. Zhukova submitted a statement in court proceedings in Moscow in May of 2005 in which
she alleged that she knew nothing about becoming a director of Macro-Trade and that her name
was on the books of the company as a result of a fraud.  She stated that in December 1998 or
early 1999, her purse with her passport had been stolen.  She stated that she did not report the
theft because the passport was returned at the end of January 1999.[245]  Mr. Konnov, in his first
expert report, referred to Ms. Zukhova's statement.[246]  When Professor Gaillard cross-examined
Mr. Konnov on this "story", Professor Gaillard pointed out that Macro-Trade was incorporated
in May 2001, more than two years *after* Ms. Zukhova's passport was returned to her.[247]

352.    An investment agreement was concluded between Macro-Trade and Mordovia, exempting the
company from paying property tax and corporation profit tax payable to the republican and
local budgets of the Republic of Mordovia.[248]

353.    Tax reassessments would eventually be made against Yukos for Macro-Trade for the years
2003[249] and 2004,[250] totaling RUR 841,582,281 (approximately USD 28,052,743).[251]

---

[244]   2003 Decision, p. 93, Exh. C-190.

[245]   Application by the Russian Federal Tax Service's Inter-District Inspectorate No. 1 for Major Taxpayers to the Federal
Arbitrazh Court for the Moscow District, 4 May 2005 pp. 15–16, Exh. R-257; Transcript, Day 13 at 38.

[246]   First Konnov Report ¶ 20, n.20.

[247]   Transcript, Day 13 at 39.

[248]   2003 Decision, p. 100, Exh. C-190.

[249]   *Ibid*. pp. 100–01.

[250]   Decision No. 52/292, 17 March 2006, p. 86, Exh. R-1539 (hereinafter "2004 Decision").

[251]   Yukos Tax Reassessment Breakdown, p. 6, Exh. C-1752.  The RUR to USD exchange rate used here is approximate,
based on a rate of 30:1.

#### iv.    Mars XXII (Energotrade)

354.  Mars XXII was incorporated on 17 December 1999.  The founders were OOO Akra, registered in the Kaluga Region, and Renmet ZAO, registered in Moscow, both with equal shares of 50 percent (RUR 5,000).[252]   Renmet ZAO is also a founder of Elbrus OOO, which had a 20 percent holding in the share capital of Yu-Mordovia and Yukos-M. Ms. Tatiana Subbotina was one of the directors of Mars XXII.  In a witness statement of 18 May 2004, Ms. Subbotina affirmed that, while she was formally in charge of the company, she only signed documents and did not know whether any investment agreements were concluded by Mars-XXII.[253]  According to its charter, the main activities of Mars XXII were the production and wholesale sale of oil products in the internal market and for export.[254]

355.  The Tribunal notes that an investment agreement was concluded between Mars XXII and Mordovia on 27 June 2001, and supplemented on 26 March 2002.[255]

356.  On 27 December 2001, a decision was issued by the Saransk Tax Inspectorate on "a Partial Refusal to Refund (Offset) VAT Amounts."  The decision notes that the commission agent for the export transactions is OAO NK Yukos.  The decision refers to oil prices as well as a chain of VAT transactions, and notes that the suppliers of the crude oil at issue were Ratmir and Norteks.[256]  Again, this information linking Mars XXII to the Yukos "family" was known to the authorities as early as 2001.

357.  In October 2003, a Field Tax Audit Report was issued for 2000 to 2002.  It specifically stated that the "terms and conditions for applying the special taxation procedure have been complied with."[257]   Some minor violations were found, however, with respect to personal income and profit taxes.  The decision specifically noted that Mars XXII used Yukos FBTs for all of their accounting services.[258]

---

[252]    2000 Audit Report, p. 20, Exh. C-103.

[253]    First Konnov Report ¶ 20, n.20 (citing Witness Statement of Subbotina T.G. (Protocol No. 431la, 18 May 2004), Exh. R-258)

[254]    2000 Audit Report, p. 21, Exh. C-103.

[255]    Investment Agreement between Mars XII and Mordovia, 27 June 2011, Exh. C-1111.

[256]    Decision of the Inspectorate of the Ministry of Taxes and Levies of the Russian Federation for the Leninsky District of Saransk No. 53, 27 December 2001, Exh. C-1117.

[257]    Field Tax Audit Report No. 02-126 of Mars XXII, 22 October 2003, p. 4, Exh. C-1125.

[258]    *Ibid*. p. 2.

358. Tax reassessments would eventually be made against Yukos for Mars XXII (Energotrade) for the years 2000,[259] 2001,[260] 2003[261] and 2004,[262] totaling RUR 55,959,738,409 (approximately USD 1,865,324,614).[263]

### v.   Ratmir (Pluton XXVI)

359. Ratmir was incorporated on 17 December 1999.  Ratmir was originally incorporated under the name of Pluton XXVI OOO.  The founders of Ratmir were Gem OOO, with an 18 percent share (RUR 1,800); Sonata OOO, with an 80 percent share (RUR 8,000); and Nefteinvest OOO with a 2 percent (RUR 200).[264]  All of the founders were registered outside of Mordovia..[265]  Sonata also founded Yu-Mordovia, and maintained a 20 percent stake in that company.

360. Ratmir's accounts were managed by Yukos-Invest.[266]  According to the Tax Ministry, "Ratmir OOO bought and sold crude oil, gas condensate, oil products, petrochemical products, and subsequently sold oil products and petrochemical products for export."[267]

361. An investment agreement was concluded between Ratmir and Mordovia on 27 June 2001 and was supplemented on 26 March 2002.[268]

362. In April 2002, a Field Tax Audit Report was issued for the year 2000.[269]  It noted that there were no capital assets on the balance sheet (no physical facilities to store oil); and that Ratmir was exempt from property and profit tax pursuant to *Law 9-Z*.[270]  It found only a few minor

---

[259]  2000 Decision, , p. 14, Exh. C-104.

[260]  2001 Decision, pp. 122–23, Exh. C-155.

[261]  2003 Decision, pp. 91–92, Exh. C-190.

[262]  2004 Decision, pp. 80–81, Exh. R-1539.

[263]  Yukos Tax Reassessment Breakdown, p. 6, Exh. C-1752.  The RUR to USD exchange rate used here is approximate, based on a rate of 30:1.

[264]  2000 Audit Report, p. 55, Exh. C-103.

[265]  *Ibid*.

[266]  *Ibid*. p. 56.

[267]  *Ibid*.

[268]  Investment Agreement No. 26 between Mordovia and OOO Ratmir, 27 June 2001, as supplemented, Exh. C-1115.

[269]  Field Tax Audit Report No. 02-51, 19 April 2002, Exh. C-1119.

[270]  *Ibid*. pp. 2, 4, 5.

violations and ordered the company to pay RUR 43,299 (approximately USD 1,440) in relation to the profit tax[271]

363.   In October 2002, a Field Tax Audit Report was issued for the year 2001.  It noted that Ratmir was enjoying benefits under the Mordovian tax law, including the exact amounts involved. It found no violations of any tax laws.  The report also noted that Ratmir's accounting reports were managed by Yukos FBTs.[272]  This information linking Ratmir to the Yukos "family" was known to the authorities in 2002.

364.   Tax reassessments would eventually be made against Yukos for Ratmir for the years 2000,[273] 2001,[274] 2002,[275] and 2003,[276] totaling RUR 12,373,090,752 (approximately USD 412,436,359).[277]

### vi.   Yukos-M

365.   Yukos-M was incorporated on 20 January 2000 and registered on 24 January 2000.  When it was founded, its share capital was divided into 24 ordinary, registered shares, each with a nominal value of RUR 400 (96 percent of the company's share capital) and 1 registered preference share with a nominal value of RUR 400 (4 percent of the company's share capital). Elbrus owned 23 ordinary registered shares, totaling RUR 9,200 or 92 percent of the share capital. OAO Yukos Oil Company owned one registered preference share with a nominal value of RUR 400 or 4 percent of the share capital and one ordinary registered share with a nominal value of RUR 400 or 4 percent  of the share capital (for a total of 8 percent of the share capital). The Tribunal notes that Elbrus and Yukos Oil Company were also co-founders of Yu-Mordovia OOO, each with 20 percent of the share capital.[278]  On 22 December 2000, "OAO Yukos Oil Company became the company's sole shareholder (owner of 100% of the company's ordinary and preference shares)".[279]  Yukos-M's accounts were managed by Yukos-Invest.[280]  According

---

[271]   *Ibid*. p. 8.  The RUR to USD exchange rate used here is approximate based on a rate of 30:1.

[272]   Field Tax Audit Report No. 02–144 of OOO Ratmir ¶ 2.1, 16 October 2002, Exh. C-1121.

[273]   2000 Decision, p. 49, Exh. C-104.

[274]   2001 Decision, pp. 42–43, Exh. C-155.

[275]   2002 Decision, p. 105, Exh. C-175.

[276]   2003 Decision, pp. 60–61, Exh. C-190.

[277]   Yukos Tax Reassessment Breakdown, p. 6, Exh. C-1752.  The RUR to USD exchange rate used here is approximate, based on a rate of 30:1.

[278]   2000 Audit Report, p. 41, Exh. C-103.

[279]   *Ibid*.

to the charter documents, in the year 2000, the company was engaged in the sale of crude oil on the domestic and export markets.[281]

366.  Yukos-M and Mordovia entered into an investment agreement on 27 June 2001, which was later supplemented on 26 March 2002.[282]

367.  In April 2002, a Field Tax Audit Report was issued for the year 2000, but this document is not in the record.  In October 2002, a Field Tax Audit Report was issued for 2001.  It noted the tax benefits accruing to Yukos-M under *Law 9-Z* and the investment agreement between Mordovia and Yukos-M.  It specifically mentioned that for the period under review, Yukos-M engaged in domestic and export sales of crude oil as well as other activities, and found no violation of any tax law.[283]

368.  Tax reassessments would eventually be made against Yukos for Yukos-M for the years 2000,[284] 2001,[285] 2002[286] and 2003,[287] totaling RUR 29,519,084,452 (approximately USD 983,969,482).[288]

### vii.  Yu-Mordovia

369.  Yu-Mordovia was incorporated on 2 December 1999 and registered on 17 December 1999. The sole founder of Yu-Mordovia OOO was OAO Yukos Oil Company.[289]  On 17 January 2000, amendments were made to Yu-Mordovia's charter regarding the identity of the founders, the value of the share capital and the number of shares.  The following each had a 20 percent (2.0) share in the share capital:  OAO Yukos Oil Company, Sonata OOO, Elbrus OOO, Stekloprommash ZAO and A-Trust OOO.[290]  The shareholders were registered outside

---

[280]  *Ibid*.

[281]  *Ibid*. p. 42.

[282]  Investment Agreement Between Mordovia and Yukos-M, 27 June 2001, as supplemented, Exh. C-1112.

[283]  Field Tax Audit Report No. 02-145 of ZAO Yukos-M, 16 October 2002, pp. 2–4 Exh. C-1122.

[284]  2000 Decision, , p. 35, Exh. C-104.

[285]  2001 Decision, pp. 64–65, Exh. C-155.

[286]  2002 Decision, pp. 96–98, Exh. C-175.

[287]  2003 Decision, pp. 48–49, Exh. C-190.

[288]  Yukos Tax Reassessment Breakdown, p. 6, Exh. C-1752.  The RUR to USD exchange rate used here is approximate, based on a rate of 30:1.

[289]  2000 Audit Report, p. 51, Exh. C-103.  According to Exhibit C-103, the incorporation of Yu-Mordovia OOO was authorized at the meeting of the Board of Directors of OAO Yukos Oil Company by Resolution No. 120/1-19 of 2 December 1999.

[290]  *Ibid*. pp. 51–52.

Mordovia, either in the Tyumen Region (OAO Yukos Oil Company) or Moscow (the remaining four shareholders).[291]   Yu-Mordovia and Mordovia entered into an investment agreement on 27 June 2001, which was later supplemented on 26 March 2002.[292]

370.   The company's tax assessment, sent to the tax authorities in Saransk, Mordovia on 30 July 2001, described the details of the tax arrangement between Yu-Mordovia and Mordovia, including the tax on actual profit for the first half of 2001, with precise amounts of the benefits enjoyed and amounts paid under the Mordovian law.[293]

371.   Tax reassessments would eventually be made against Yukos for Yu-Mordovia for the years 2000,[294] 2001,[295] 2002[296] and 2003,[297] totaling RUR 21,018,327,538 (approximately USD 700,610,918).[298]

     **(b)**     **Kalmykia**

372.   Kalmykia is a low-tax region in Russia.  Only one trading company was based there, Siberian Transportation Company (Sibirskaya), registered in 1998.  Kalmykia was authorized to offer tax benefits under the *Law of the Republic of Kalmykia No. 12-II-Z on Tax Benefits Granted to Enterprises Making Investments in the Economy of the Republic of Kalmykia* of 12 March 1999.[299]  Aimed at "further enhancement of the investment climate" in the region, the law was designed to offer exemptions from certain local taxes and corporate taxes to companies making investments in the region.[300]

---

[291]   *Ibid*. p. 52.

[292]   Investment Agreement No. 24 Between Mordovia and OOO Yu Mordovia, 27 June 2001, Exh. C-1113.

[293]   Attachment No. 9 to Instruction of the Ministry of Taxes and Levies of the Russian Federation No. 62 of 15 June 2000, 30 July 20001, Exh. C-1747.

[294]   2000 Decision, pp. 44–45, Exh. C-104.

[295]   2001 Decision, pp. 80–81, Exh. C-155.

[296]   2002 Decision, p. 90, Exh. C-175.

[297]   2003 Decision, p. 43, Exh. C-190.

[298]   Yukos Tax Reassessment Breakdown, p. 6, Exh. C-1752.  The RUR to USD exchange rate used here is approximate, based on a rate of 30:1.

[299]   *Law of the Republic of Kalmykia No. 12-II-Z On Tax Benefits Granted to Enterprises Making Investments in the Economy of the Republic of Kalmykia*, 12 March 1999, Exh. C-413.

[300]   *Ibid*.

#### i.  Siberian Transportation Company (Sibirskaya)

373.  Sibirskaya was founded by Step ZAO, registered in Kaluzhskaya Region, and Polinep ZAO, registered in Moscow, both holding 50 percent shares.[301]  The Tribunal notes that Polinep ZAO was also a founder of Sonata OOO and Elbrus OOO, which were founders of Yu-Mordovia OOO and Yukos-M ZAO.[302]

374.  Sibirskaya received tax benefits under the *Law of the Republic of Kalmykia No. 12-II-Z* of 12 March 1999 referred to above and the *Resolution of the Elista Municipal Assembly No. 7* of 25 January 2001.[303]

375.  In September 2001, a resolution was issued by the Inspectorate of the Ministry of Taxes and Levies of Russia (Elista).  It found that the Siberian Transportation Company was ineligible for the tax benefits applied to it in the autonomous region.[304]  On the same day, a tax payment demand was issued to recoup the costs of the inappropriately applied benefits, in the amount of RUR 6,918,617 (approximately USD 230,000).[305]

376.  In December 2001, the Arbitrazh Court of the Republic of Kalmykia ruled that the tax incentives were, in fact, *lawfully* applied to the Siberian Transportation Company and the resolution and payment demand were declared invalid.  In addition, the court specifically stated that it had not found any evidence that the company had acted in bad faith or that it abused its rights.[306]  The Inspectorate of the Ministry of Taxes and Levies of Russia (Elista) appealed the December 2001 judgment.  The court of appeal upheld the decision of the lower court,

---

[301]  2000 Decision, p. 8, Exh. C-104.

[302]  *Ibid*.

[303]  *Law of the Republic of Kalmykia No. 12-II-Z*, 12 March 1999, Exh. C-413.  The resolution is referred to in Exh. R-311.  As is the case with many of the documents referred to below, although the existence of this particular document (the resolution) is evidenced by a reference in an exhibit that is in the record, the resolution itself is not in the record.  Claimants have criticized Respondent for failing to provide a complete record of the pre-2003 audits and related documents.

[304]  Resolution of the Federal Arbitrazh Court of the North-Caucasian District, Case No. F08-1678/2002-614A, 20 May 2002, Exh. R-311 (referring to Resolution No. 01-24/2261 of the Inspectorate of the Ministry of Taxes and Levies of Russia, 25 September 2001).

[305]  *Ibid*. (referring to *Tax payment demand No. 01-23/2261*, 25 September 2001).  The RUR to USD exchange rate used here is approximate, based on a rate of 30:1.

[306]  *Ibid*. (referring to Decision of the Arbitrazh Court of the Republic of Kalmykia, Case No. A22-1306/2001-6/129, 5 December 2001).

affirming that the resolution and the payment demand were invalid.  The court of appeal found no bad faith on the part of the Siberian Transportation Company.[307]

377.   The Inspectorate of the Ministry of Taxes and Levies of Russia (Elista) appealed this decision to the Federal Arbitrazh Court of the North-Caucasian District.  The Federal Arbitrazh Court reversed the decisions of the lower courts and ruled that the Siberian Transportation Company was not eligible for the benefits and that the company had acted in bad faith.  The resolution and the payment demand therefore became valid once again and were reinstated.[308]   The Federal Arbitrazh Court held that the tax benefits granted to the company were disproportionate to the investment it had made in Kalmykia.  It found that the amount invested was 0.4 percent of the amount of tax benefits.  There is no further information in the record as to any further steps in those proceedings, and, in particular, no evidence that the company appealed the decision of the Federal Arbitrazh Court to the Supreme Arbitrazh Court.

378.   Tax reassessments would eventually be made against Yukos for the Siberian Transportation Company for the year 2000,[309] totaling RUR 240,437,174 (approximately USD 8,014,572).[310]

(c)   **Lesnoy and Trekhgorny**

379.   Lesnoy and Trekhgorny are ZATOs.  As noted earlier, ZATOs or "Closed Adminstrative Territorial Units" are restricted-access territories "established in the former Soviet Union from the late 1940s as defense and nuclear power plant cities, which included communities with sensitive military, industrial or scientific facilities, such as arms plants or nuclear research sites."[311]  Due to the fact that their local economies were particularly dependent on increasingly obsolete military or nuclear functions, the ZATOs faced economic collapse at the end of the Cold War.  To address the problem, in 1992, the Russian State Duma "enacted a federal law to define the special tax regime of the ZATOs and the financing of these territories by the federal government, and guaranteed the ZATOs' residents certain social and health benefits."[312]  The number of restricted access jurisdictions in Russia is unknown, and it was not until the late

---

[307]   *Ibid.* (referring to the Resolution of the appellate court, Case No. A22-1306/2001-6/129, 12 March 2002).

[308]   *Ibid.*

[309]   2000 Decision, p. 11, Exh. C-104.

[310]   Yukos Tax Reassessment Breakdown, p. 6, Exh. C-1752.  The RUR to USD exchange rate used here is approximate, based on a rate of 30:1.

[311]   Counter-Memorial ¶ 226, n.274.

[312]   *Ibid.*

1990s that the territories were even named or mapped.[313]  In 1996, about half of the ZATOs were declassified of ZATO status.

### i.   Lesnoy

380.   At the end of 1997, four trading companies were established by Yukos in Lesnoy:  Business-Oil, Forest-Oil, Mitra, and Vald-Oil.   In early 1998, the trading companies entered into agreements with the Lesnoy Town Administration to make investments in the region that would entitle them to certain tax benefits.[314]  These were renewed in 2000.[315]

381.   In January 1999, the trading companies based in Lesnoy and the Lesnoy Administration agreed to allow the companies to use interest-bearing promissory notes of OAO Yukos Oil Company in order to pay their taxes.[316]  This agreement was later formalized in a decision by the head of ZATO Lesnoy.[317]

382.   In 1999, the Lesnoy Administration also entered into several other agreements with the trading companies.   Resolution 189 of the Duma of Lesnoy referred to joint investment activity within the framework of a partnership "between the Lesnoy administration and YUKOS OC OJSC."[318]  The investments included construction and reconstruction of gas stations based on joint-activity agreements entered into "for a total of [RUR] 2,730 Million."[319]  In late 1999, three of the four

---

[313]   Vladimir Samoylenko, *Government Policies in Regard to Internal Tax Havens in Russia*, Publication of International Tax & Investment Center, December 2003, p. 10, Exh. C-577.

[314]   2000 Decision, Exh. C-104 (referring to Agreement No. 10, 9 February 1998 and Agreement No. 4, 28 January 2000 (Business-Oil); Agreement No. 3, 28 January 2000 (Mitra); Agreement No. 2, 28 January 2000 and Agreement No. [unknown] (Vald-Oil)); Memorandum on the results of the audit of the legality of additional tax incentives granted to Mitra, Business-Oil and Forest-Oil in Lesnoy for 1998 and 9 months of 1999 p. 5, Exh. R-294 (referring to Agreement No. 11, 9 February 1998 (Forest Oil)).

[315]   2000 Decision, Exh. C-104 (referring to Agreement No. 4 between the Lesnoy Administration and Business-Oil, 28 January 2000; Agreement No. 3 between the Lesnoy Administration and Mitra, 28 January 2000; Agreement No. 2 between the Lesnoy Administration and Vald-Oil, 28 January 2000.  There is no information on a renewal in favour of Forest-Oil, though it seems likely there was one.

[316]   Report No. 04-14/11-1, 22 February 2002 pp. 7, 9, 11, 12, Exh. R-304 (referring to agreements of 6 January 1999 allowing the use of OAO NK Yukos promissory notes for tax payments by the four trading companies).  *See also* Claimants' Rebuttal, Transcript, Day 20 at 50 for further context.

[317]   Report No. 04-14/11-1, 22 February 2002 pp. 7, 9, 11, 12, Exh. R-304 (referring to Decision No. 1734a of Head of Lesnoy Administration to allow the trading companies to pay taxes for 1999 with OAO NK Yukos promissory notes of OAO NK Yukos, 21 December 1999).

[318]   Decree of the Investigation Committee of the Russian Federation, 16 January 2002, p. 2, Exh. R-377 (referring to *Resolution 189 of the Duma of Lesnoy*, 15 December 1999).

[319]   *Ibid*.

trading companies were subjected to "desk audits", which "confirmed the validity in application of additional tax incentives granted."[320]

383. On 3 December 1999, the Minister of Taxes of the Russian Federation instructed the Interregional State Tax Inspectorate for Operational Control over Problem Taxpayers to audit the legality of tax incentives granted in the Lesnoy ZATO to Mitra, Business Oil and Forest Oil.[321]

384. There is in the record an undated Internal Tax Ministry "Memorandum on the results of the audit" initiated on 3 December 1999.[322]  The Tribunal recalls that this memorandum has been the subject of extensive representations by the Parties.

385. The Tribunal notes that, in essence, the memorandum concludes that while each entity has the *formal* right to receive the "additional tax incentives under Law of the Russian Federation No. 67-FZ of 2 April 1999"[323] based on an examination of the entity's operations, it was established during the interrogation of a witness, in respect of each entity, that "the employees residing on the ZATO territory are not involved in the work related to the main activity of the company."[324]

386. Respondent submitted that this memorandum and the investigation which preceded it "put Yukos on notice" of the tax authorities' investigations into the legality of the use of the ZATOs. On the other hand, Claimants replied that the memorandum was a document internal to the tax ministry.[325]  Claimants also aver that contemporaneous field tax audits conducted in March and

---

[320]  Memorandum on the results of the audit of the legality of additional tax incentives granted to Mitra, Business-Oil and Forest-Oil in Lesnoy for 1998 and 9 months of 1999 pp. 1, 3, 5, Exh. R-294 (referring to Desk Audit Report No. 4 for Mitra, 29 October 1999; Desk Audit Report No. 3 for Business Oil, 1 November 1999; Desk Audit Report No. 5 for Forest Oil, 1 November 1999).

[321]  *Ibid.*, p. 1.

[322]  *Ibid.*  The memorandum is undated but considered to be from early-to-mid 2000 on the basis of the documents referenced in it.  It appears that the audit report, whose findings were summarized in this undated memorandum, was issued on 7 March 2000.  *See* Statement No. 6 on the legality of the use by OOO Business-Oil in 1999 and 2000 of additional tax incentives granted by the head of the municipal formation of Town of Lesnoy No. 6, 29 June 2001, p. 4, Exh. R-295.

[323]  Memorandum on the results of the audit of the legality of additional tax incentives granted to Mitra, Business-Oil and Forest-Oil in Lesnoy for 1998 and 9 months of 1999 pp. 2, 4, 6, Exh. R-294

[324]  *Ibid.*, pp. 3, 4, 6.

[325]  Respondent's Opening Slides, p. 48; Claimants' Post-Hearing Brief ¶¶ 57–58; *see also* Transcript, Day 14 at 86.

May 2000 found no violations of any tax law by Business Oil, Forest Oil or Mitra in relation to the application of these taxation arrangements.[326]

387. At approximately the same time, Yukos undertook a series of corporate restructurings which resulted in the merger of the audited Lesnoy companies (*i.e.*, Business-Oil, Forest-Oil, Mitra, and Vald-Oil) into another, new company, OOO Perspektiva Optimum, that was registered in the Aginsky Buryatsky Autonomous Okrug (**"ABAO"**) in the Chita Region, which is located thousands of miles from the ZATO of Lesnoy.

388. Concurrently, a similar restructuring was carried out with respect to a number of other trading entities established in the ZATO of Trekhgorny (*i.e.*, OOO Alebra, OOO Flander, OOO Grace, OOO Kolrein, OOO Kverkus, OOO Muskron, and OOO Norteks), which Yukos merged into still another newly created company also registered in ABAO by the name of OOO Trading Company Alkhanay.

389. As a result of these restructurings, on 21 May 2001, the Lesnoy and the Trekhgorny trading entities, as well as the subsequently merged successor entities (OOO Perspektiva Optimum and OOO Trading Company Alkhanay), were liquidated. The new entity that emerged was named OOO Investproekt and was registered in the Kirov region. In August 2001, Investproekt moved across Russia to the Chita Region.

390. These restructurings and movements by Yukos—referred to collectively by Respondent as the "**Lesnoy Shuffle**"—are seen differently by the Parties. According to Claimants, they were merely a simplification of the corporate group of "hundreds of companies." [327] Claimants also noted that the restructurings occurred before any Tax Ministry decisions were rendered against it.[328] Respondent, on the other hand, submitted that they were indicative of a pattern of behavior on the part of Yukos that shows an intent to frustrate the taxation authorities.[329] While the Tribunal need not determine why these restructurings took place at this time, it has formed

---

[326] These documents are not in the record but see Statement No. 6 on the legality of the use by OOO Business-Oil in 1999 and 2000 of additional tax incentives granted by the head of the municipal formation of Town of Lesnoy No. 6, 29 June 2001, Exh. R-295 (referring to Field Tax Audit Report No. 31 on Business-Oil, 7 March 2000); Decision No. 36, 8 June 2000, Exh. R-2260 (referring to Field Tax Audit Report Act No. 36 on Forest-Oil, 5 May 2000); Statement No. 8 on the audit of OOO Mitra, 11 June 2001, Exh. R-297 (referring to Field Tax Audit Report Act No. 249 on Mitra, 5 May 2000).

[327] Transcript, Day 20 at 43.

[328] Claimants' Post-Hearing Brief ¶ 64.

[329] Transcript, Day 21 at 57–60.

the view that the simplification claim is a simplification.  No persuasive argument has been advanced by Claimants to explain why the series of mergers occurred at this precise time.[330]  At the same time, the Tribunal notes that the tax authorities were then slowly moving away from the taxation autonomy previously given to the ZATOs and that, on 1 January 2002, the right of the ZATOs to grant any tax incentives was removed from the law completely.[331]

391.    In late June and early July 2001, the Tax Ministry circulated internally several memoranda (or "statements") relating to the tax benefits granted to the Lesnoy companies.[332]  The memoranda examined the lawfulness of the benefits granted between 1 January 1999 and March 2001.  Internal Tax Ministry Statement No. 6, which examined the benefits granted to Business-Oil, found that the tax incentives were actually not in accordance with the law on ZATOs and not approved by the Ministry of Finance.  It also found a violation due to payment of taxes with promissory notes.  It assessed taxes of approximately RUR 2.8 Billion (USD 98 Million) for the whole period.   The memorandum also notes specifically that the Lesnoy entities were enterprises of OAO NK Yukos.[333]

392.    Internal Tax Ministry Statement No. 7, which examined the benefits granted to Forest-Oil, found that the company's employees residing in Lesnoy were not engaged in trading, and also found violations due to payment of taxes with Yukos promissory notes and assessed approximately RUR 671 Million (USD 22 Million) in taxes that were not paid in cash.[334]

393.    Benefits granted to Mitra were examined in Internal Tax Ministry Statement No. 8, which found that Lesnoy unlawfully granted tax incentives, found a violation due to payment of taxes

---

[330]    Respondent's Closing Slides, pp. 8–12 (chronicling the series of moves that were taken "for no stated business reason".)

[331]    First Konnov Report ¶ 33.  This change did not affect other types of low-tax regions at this time, although some of their powers to grant incentives were also curbed.

[332]    Statement No. 6 on the legality of the use by OOO Business-Oil in 1999 and 2000 of additional tax incentives granted by the head of the municipal formation of Town of Lesnoy No. 6, 29 June 2001, Exh. R-295; Statement No. 7 on the audit of OOO Forest-Oil), 11 July 2001, Exh. R-296; Statement No. 8 on the audit of OOO Mitra, 11 July 2001, Exh. R-297; Statement No. 9 on the audit of Vald-Oil, 11 July 2001, Exh. R-298.

[333]    Statement No. 6 on the legality of the use by OOO Business-Oil in 1999 and 2000 of additional tax incentives granted by the head of the municipal formation of Town of Lesnoy No. 6, 29 June 2001 pp. 14–18, Exh. R-295.  Contrast the Respondent's submission that the Russian Federation didn't know about the Lesnoy companies' association with Yukos until 2003.  *See*  Transcript, Day 18 at 29–31 (Respondent's closing).  The RUR to USD exchange rate used here is approximate, based on a rate of 30:1.

[334]    Statement No. 7 on the audit of OOO Forest-Oil, 11 July 2001, Exh. R-296.  The RUR to USD exchange rate used here is approximate, based on a rate of 30:1.

by Yukos promissory notes and assessed approximately RUR 783 Million (USD 26 Million) in taxes paid with promissory notes.[335]

394. Internal Tax Ministry Statement No. 9 examined benefits granted to Vald-Oil. It found that Lesnoy could not grant incentives for 2000 and assessed that RUR 986 Million (USD 33 Million) was owed. It also found fault on the basis of a substance over form analysis, and a violation due to payment of taxes by Yukos promissory notes in the amount of RUR 1.8 Billion (USD 60 Million).[336]

395. In September 2001, a criminal investigation was initiated to look into whether the managers of the Lesnoy trading companies were involved in tax evasion.[337]

396. In October 2001, a decision was taken to conduct a repeat field tax audit of Investproekt,[338] and a request was made that the company release the accounting documents of Forest-Oil, Mitra, and Vald-Oil.[339]  The repeat Field Tax Audit Report was issued in November 2001 with respect to the legality of the use of the additional tax incentives by the trading companies in the year 1999.[340]

397. Later in November 2001, Ms. Irina Golub, Yukos' Chief Accountant, received an e-mail from Mr. V.N. Kartashov, a general director of Yukos.  The e-mail contained a document itemizing in tabular format, all of the information that Mr. Kartashov had regarding investigations into trading companies across the ZATOs and other low-tax regions.[341]  It identified, in a column entitled "Risks", a criminal case "in connection with tax evasion" for the four Lesnoy entities and nine Trekhgorny entities.  The document also noted that office personnel in all 13 of those firms had been interrogated, including the general directors of some of the Lesnoy companies.  The entries for the Lesnoy entities also noted that some documents had been seized.

---

[335]   Statement No. 8 on the audit of OOO Mitra, 11 July 2001, Exh. R-297.  The RUR to USD exchange rate used here is approximate, based on a rate of 30:1.

[336]   *Internal Tax Ministry Statement No. 8* (Vald-Oil), 11 July 2001, Exh. R-298.  The RUR to USD exchange rate used here is based on a rate of 30:1.

[337]   Decree on institution and initiation of criminal proceedings (against Managers of Business Oil, Forest Oil, Mitra, and Vald-Oil in relation to payment of taxes by Yukos promissory notes), 3 September 2001, Exh. R-376.

[338]   Report No. 04-14/11-1, 22 February 2002, Exh. R-304 (referring to Decision No. 04-14/11 on the conduct of a repeat field tax audit of Investproekt, 13 October 2001).

[339]   Report No. 04-14/11-1, 22 February 2002 ¶ 2.3.1, Exh. R-304 (referring to request of 16 October 2001from tax authorities to Investproekt for accounting documents of Forest-Oil, Mitra, and Vald-Oil).

[340]   Repeat Field Tax Audit Report No. 04-14/11 of OOO Investproekt, 9 November 2001, Exh. R-2250.

[341]   E-mail from Ms. Golub to Mr. Kartashov, 23 November 2001, Exh. R-3338.

398. In December 2001, Ms. Golub drafted a letter to be used as a template by one or more of the directors of the Lesnoy trading companies regarding the investigation into the use of promissory notes and sent it to Mr. D.V. Gololobov, Deputy Head of Yukos' Legal Department.[342]   Later, Mr. V.G. Aleksanyan, the Head of the Legal Department, wrote to Ms. Golub regarding her draft letter, asking that in correspondence with the authorities, no reference be made to the tax incentives granted by Lesnoy.[343]   Respondent argued during the Hearing that this demonstrates knowledge of and intent to conceal wrongdoing by Yukos.[344] Claimants answered that the document merely notes that the tax incentives were not at issue in the investigation (only the use of promissory notes to pay taxes was), and that Mr. Aleksanyan was simply asking Ms. Golub not to bring up an issue that was not being investigated.[345]

399. In December 2001, the tax authorities decided "to conduct additional control activities in respect of Investproekt."[346]

400. In January 2002, the criminal investigation of the directors of the Lesnoy trading companies was terminated because the investigation had not determined that a crime was committed.  The report stated that "there is no constitution of a crime," and "tax payments in non-monetary form cannot indicate the intention of tax evasion."[347]   The document also concludes that the head of the Lesnoy Administration, Mr. A.I. Ivannikov, believed at the time that tax payments by promissory notes were legal and that his actions and the actions of Lesnoy officials relating to granting of tax benefits should be considered as exceeding their authority and as negligent.[348]

401. However, a few days later, that decision was reversed.[349]   The reason then given was that no "legal assessment was conducted during the preliminary investigation as to whether the selection by the [trading companies] of such a knowingly illegal method of tax payment involving intentional overpayment of charged taxes and subsequent refund of surplus sums to

---

[342]   Draft letter regarding investigation into use of promissory notes, undated, Exh. R-415.

[343]   E-mail from Mr. Aleksanyan to Ms. Golub, 14 December 2001, Exh. R-3244.

[344]   Transcript, Day 18 at  34–35.

[345]   Transcript, Day 20 at  61.

[346]   Report No. 14/11-1, 22 February 2002, Exh. R-304 (referring to Decision No. 04-15/10 to conduct additional control activities on Investproekt, 17 December 2001).

[347]   Decree on termination of criminal case no. 135070 (in part), 16 January 2002, Exh. R-377.

[348]   *Ibid*.

[349]   Decree on the Reversal of the Decree to Discontinue Criminal Case No. 135070, 1 February 2002, Exh. R-381.

the accounts of these same companies in real monetary form could be considered as 'another method' of tax avoidance . . . ."[350]

402. Ultimately though, the Tribunal notes that the investigation was suspended because, in the words of the resolution, "all possible investigative actions have been taken in the absence of an accused."[351]   The resolution noted that "this type of tax crime should be assessed as a tax evasion scheme by making advance payments for taxes of future periods," and that "[h]ere a mandatory condition is the fact that the advance payment is made in non-monetary form."[352] The resolution concluded that it was not possible to determine who among the directors of the trading companies or who in the Municipal Department of the City of Lesnoy actually committed a crime.[353]   Claimants stressed, in their Closing Statement, that no further action was taken.[354]   In this connection, the Tribunal recalls that Mr. Khodorkovsky and Mr. Lebedev were ultimately convicted, *inter alia*, for tax evasion, including in relation to the trading companies' use of promissory notes to pay taxes in Lesnoy.[355]

403. In the period between the reversal and the suspension of the criminal case regarding the promissory notes, the report on additional control measures against Investproekt for 1999 was released.[356]   It considered that Business-Oil was not entitled to tax benefits in 1999, as it "was carrying out its business within ZATO Lesnoy as a matter of form only."[357]   The report also considered that the other Lesnoy companies were not entitled to tax benefits in 1999.   The report estimated their tax liabilities on the basis of Business-Oil as a "similar taxpayer".[358]

404. The report assessed the value of the tax benefits that it concluded had been improperly granted at approximately RUR 5.3 Billion (USD 177 Million).   However, no assessment or decision

---

[350]   *Ibid.*, p. 3.

[351]   Resolution on Suspension of a Preliminary Investigation Due to Failure to Establish an Individual to be Accused, 4 March 2002, Exh. R-378.

[352]   *Ibid.*

[353]   *Ibid.*

[354]   Transcript, Day 16 at 224 ("There was no court decision issued on any of these, to our knowledge; and nothing has been filed by the Respondent to the contrary. . . In particular, none of the directors or the officials of the City of Lesnoy were convicted, in absentia or otherwise. So these are just the decrees rendered by the prosecution in relation to these facts in relation to the investigation.")

[355]   Judgment in the Name of the Russian Federation, Meshchansky District Court of the City of Moscow, 16 May 2005, p. 57, Exh. R-379.

[356]   Report No. 04-14/11-1, 22 February 2002, Exh. R-304.

[357]   *Ibid.*, p. 2.

[358]   *Ibid.*, p. 4.

was issued on the basis of this report to recoup the funds, which could have occurred any time up until 31 December 2002, before becoming time barred.[359]  No assessment was issued during the subsequent ten-month period against Investproekt.

405.  The Tribunal notes that, in March 2002, Mr. Dmitry Maruev, Yukos' Deputy Financial Manager, e-mailed M. U. Barbarovich and V. M. Zhuravlev and asked that they clean their e-mail folders and servers of references to a number of companies, some of which ("Alebra, Greis, Business Oil, Vald Oil, Kverkys [sic], Kolrein, Mitra, Muskorn, Nortex") had been merged into Investproekt.[360]

406.  Around this time, a demand requesting enforcement of a tax debt against Investproekt in the amount of RUR 25 Million (USD 833,000) was sent by the Ministry of Taxes and Levies for Chernyshevsk District to Bailiffs in the Chita region.  It was returned by the bailiffs who considered this matter to be outside of their jurisdiction since, when the debt was incurred, the company was located in Kirov.  The bailiffs also noted that Investproekt's executive S. A. Verketin still resided in Kirov, and supplied his address.[361]

407.  In April 2002, a decision was issued not to hold Investproekt liable for tax offenses in 2000.  Rather, it proposed to collect taxes but not fines as offenses were "discovered after the completion of their reorganization."[362]  It assessed the taxes owed at RUR 11.985 Billion (approximately USD 400 Million).[363]  Two months later, a decision was issued by the Federal Arbitrazh Court for the North West District in the *Pribrezhnoye* case, which found (on nearly identical facts to those relied upon in the decision against Investproekt) that the tax authorities had acted in breach of the Russian Tax Code.[364]  Claimants argued that this decision explains, at least in part, the reason why the tax assessment against Investproekt was never collected.  In

---

[359]  *Ibid.*; *see also* Claimants' Post-Hearing Brief ¶ 63, n.136.

[360]  D. L. Maruev e-mail to M. U. Barbarovich and V.M. Zhuravlev, 15 March 2002, Exh. R-4040.  The e-mail listed the following companies:  Alebra, Belz, Business-Oil, Vald-Oil, Greis, Kverkys, Kolrein, Mitra, Muksar, Muskron, Nortex and Flander.

[361]  Letter from Acting Senior Court Bailiff L.M. Lobanova to the Head of the Interdistrict Inspectorate No. 4 of the Ministry of Taxes and Levies for Chernyshersk District, Exh. R-306.

[362]  Decision No. 02-11/1/1, 2 April 2002 p. 8, Exh. R-303.

[363]  *Ibid.* p. 7.

[364]  *Pribrezhnoye*,, Exh. C-1278.  *See also* Claimants' Post-Hearing Brief ¶¶ 68–70.

their Post-Hearing Brief, Claimants submit that "in the non-political circumstances that prevailed in 2002, the assessment would not have survived court review."[365]

408. However, in August 2003, a decision was issued relating to the activities of the Investproekt companies in the year 2000. The taxes owing were assessed at RUR 11.985 Billion (USD 400 Million); and this time, the authorities decided that they would also fine Investproekt, adding an additional approximate amount of RUR 2.4 Billion (USD 84 Million).[366] It is not clear to the Tribunal as to whether this assessment was ever paid.[367] The Tribunal notes that the basis for reversing the April 2002 decision (*i.e.*, the decision not to hold the company liable) was not explained in the August 2003 decision.

*Business-Oil*

409. Business-Oil was registered by order of the head of the Administration of the Town of Lesnoy, on 30 December 1997, with RUR 10,000 capital. It was founded by Special Project OOO (holding 5 percent of the shares) and Rasin OOO (holding 95 percent of the shares).

410. In February 1998, Business-Oil and the Lesnoy Town Administration concluded an investment agreement, which granted incentives in relation to 17 different types of taxes and required payment of 5 percent of tax benefits granted by the administration to an off-budgetary fund.[368] This agreement was later supplemented in 2000, and provided additional incentives in relation to eight additional taxes.[369]

411. In November 1999, a desk audit was conducted. The audit report confirmed the validity of the application of the additional tax incentives granted.[370] The following month, a resolution of the tax authorities was issued which lead to an audit regarding compliance with the tax laws of the

---

[365] Claimants' Post-Hearing Brief ¶ 69.

[366] Decision No. 2.6-23 of the Department of the Ministry of Taxes and Levies of the Russian Federation for the Chita Region and Agynsky Butyatsky Autonomous District, 8 August 2003, Exh. R-305. The RUR to USD exchange rate used here is approximate, based on a rate of 30:1.

[367] Transcript, Day 20 at 85.

[368] Memorandum on the results of the audit of the legality of additional tax incentives granted to Mitra, Business-Oil and Forest-Oil in Lesnoy for 1998 and 9 months of 1999, Exh. R-294 and 2000 Decision, Exh. C-104 (referring to Agreement No. 10 Between the Lesnoy Town Administration and OOO Business-Oil, 9 February 1998).

[369] 2000 Decision, Exh. C-104 (referring to Agreement No. 4 Between the Lesnoy Town Administration and OOO Business-Oil, 28 January 2000).

[370] Memorandum on the results of the audit of the legality of additional tax incentives granted to Mitra, Business-Oil and Forest-Oil in Lesnoy for 1998 and 9 months of 1999 p. 5, Exh. R-294 (referring to a desk audit report No. 3, 1 November 1999).

Russian Federation and a verification of the terms and conditions under which additional tax incentives were granted between 1 January 1998 and 1 October 1999.[371]   In March 2000, a Field Tax Audit Report was issued regarding the lawfulness of the additional incentives for 1998 and nine months of 1999.   The report concluded that "no infringement of the tax legislation was established."[372]

412.   As set out above, however, an internal memorandum of the Tax Ministry questioned the entitlement of Business-Oil to the tax benefits, on the basis that it might not have been fulfilling the requirements of the legislation in substance (as opposed to form).   This, and other concerns about the entity's conduct, led to a criminal investigation inquiring into whether the managers of the Lesnoy entities were involved in tax evasion.   The investigation was ultimately suspended, but charges relating to the Lesnoy entities figured in the case by the Russian prosecutor against Messrs. Lebedev and Khodorkovsky in 2003.

413.   On 5 March 2001, Business-Oil was merged into Perspektiva Optimum, which later merged with Alkhanai Trading to become Investproekt.

414.   Tax reassessments would ultimately be made against Yukos for Business-Oil for the year 2000,[373] totaling RUR 1,620,951,772 (approximately USD 56,698,046).[374]

*Forest-Oil*

415.   Forest-Oil was registered by Resolution 1409 of the Lesnoy Town Administration on 31 December 1997.   In February 1998, Forest-Oil and the Lesnoy Town Administration concluded an investment agreement which granted incentives in relation to 16 different types of taxes and required payment of 5 percent of tax benefits to an off-budgetary fund.[375]

---

[371]   *Ibid*. (referring to Resolution No. 175, 16 December 1999).

[372]   *See* Statement No. 6 on the legality of the use by OOO Business-Oil in 1999 and 2000 of additional tax incentives granted by the head of the municipal formation of Town of Lesnoy No. 6, 29 June 2001, p. 4, Exh. R-295 (referring to Field Tax Audit Report No. 31, 7 March 2000).

[373]   2000 Decision, p. 65, Exh. C-104.

[374]   Yukos Tax Reassessment Breakdown, p. 6, Exh. C-1752.  RUR to USD calculated at 28.5892:1, the official exchange rate on 14 April 2004

[375]   Memorandum on the results of the audit of the legality of additional tax incentives granted to Mitra, Business-Oil and Forest-Oil in Lesnoy for 1998 and 9 months of 1999, p. 5, Exh. R-294 (referring to Agreement No. 11 Between the Lesnoy Town Administration and OOO Forest-Oil, 9 February 1998).

416.   In November 1999, a desk audit was performed which confirmed the validity of the additional tax incentives granted.[376]

417.   In December 1999, a resolution of the tax authorities was issued leading to a field tax audit for 1 January 1998 to 1 October 1999, in order "to inspect its compliance with the tax laws of the Russian Federation and check the terms and conditions under which additional tax incentives were granted."[377]   In May 2000, a Field Tax Audit Report was issued, which found no violation in relation to tax incentives, but found a VAT shortfall of RUR 107,142 [USD 3,500].[378]   In June 2000, a decision in relation to that report held Forest-Oil liable for a 20% fine of RUR 21,428 (USD 700).[379]

418.   As set out above, however, an internal memorandum of the Tax Ministry questioned the entitlement of Forest Oil to the tax benefits because it might not have been fulfilling the requirements of the legislation in substance (as opposed to form).   This, and other concerns about the entity's conduct, led to a criminal investigation inquiring into whether the managers of the Lesnoy entities were involved in tax evasion.   The investigation was ultimately suspended, but, as noted earlier, charges relating to the Lesnoy entities figured in the case by the Russian prosecutor against Messrs. Lebedev and Khodorkovsky in 2003.

419.   On 5 March 2001, Forest-Oil was merged into Perspektiva Optimum, which later merged into Investproekt.

420.   No tax reassessments would be made against Yukos for Forest-Oil.

*Mitra*

421.   Mitra was registered by Resolution 1355 of the Lesnoy Town Administration on 22 December 1997.   It was founded by OOO Alan, with registered address in Kaluga and a 95 percent shareholding, and OOO Special Project, with registered address in Lesnoy and a 5 percent shareholding.   As of 15 June 2000, OOO Neftemarket-2000, with registered address in Moscow

---

[376]   *Ibid*. p. 3 (referring to Desk Audit Report No. 5, 1 November 1999).

[377]   *Ibid*. (referring to Resolution No. 174, 6 December 1999).

[378]   Decision No. 36, 8 June 2000, Exh. R-2260 (referring to Field Tax Audit Report No. 36, 5 May 2000).  The RUR to USD exchange rate used here is approximate, based on a rate of 30:1.

[379]   *Ibid*.  The RUR to USD exchange rate used here is approximate, based on a rate of 30:1.

(and itself 100% owned by OAO Yukos Oil Company) held 100 percent of the shares in Mitra.[380]

422.   In February 1998, Mitra and the Lesnoy Town Administration concluded an investment agreement,[381] which was supplemented in a further agreement in January of 2000, in which the administration provided additional incentives in respect of 8 types of taxes.[382]

423.   In October 1999, a Field Tax Audit Report was issued,[383] followed by a desk audit report[384] which confirmed the validity of the additional tax incentives granted.  In December 1999, a resolution of the tax authorities was issued which led to the conduct of a field tax audit for 1 January 1998 to 1 October 1999 "to inspect its compliance with the tax laws of the Russian Federation and check the terms and conditions under which additional tax incentives were granted."[385]   In May 2000, the Field Tax Audit Report was released.  It found no violation in relation to tax incentives and only a profit tax error in the amount of RUR 3,122,000 (USD 105,000).[386]

424.   As set out above, however, an internal memorandum of the Tax Ministry questioned the entitlement of Mitra to the tax benefits, on the basis that it might not have been fulfilling the requirements of the legislation in substance (as opposed to form).  This, and other concerns about the entity's conduct, led to a criminal investigation inquiring into whether the managers of the Lesnoy entities were involved in tax evasion.  The investigation was ultimately suspended, but, as noted earlier, charges relating to the Lesnoy entities figured in the case by the Russian prosecutor against Messrs. Lebedev and Khodorkovsky in 2003.

425.   On 5 March 2001, Mitra was merged into Perspektiva Optimum, which later merged into Investproekt.

---

[380]   2000 Decision, pp. 72–73, Exh. C-104.

[381]   Memorandum on the results of the audit of the legality of additional tax incentives granted to Mitra, Business-Oil and Forest-Oil in Lesnoy for 1998 and 9 months of 1999, p. 1, Exh. R-294 (referring to Agreement No. 7, 3 February 1998).

[382]   2000 Decision, pp. 73–74, Exh. C-104 (referring to Agreement No. 3, 28 January 2000)

[383]   *Ibid*. p. 1 (referring to Field Tax Audit Report No. 76, 8 October 1999).

[384]   *Ibid*. (referring to Desk Audit Report No. 4, 29 October 1999).

[385]   *Ibid*. (referring to Resolution No. 249, 16 December 1999).

[386]   Statement No. 8 on the audit of OOO Mitra (referring to Field Tax Audit Report No. 249, 5 May 2000).

426. Tax reassessments would later be made against Yukos for Mitra for the year 2000,[387] totaling RUR 27,124,001 (USD 948,750).[388]

*Vald-Oil*

427. Vald-Oil was registered by Resolution 1441 of the Lesnoy Town Administration on 30 December 1997.  It was founded by OOO Neftemarket, holding 5 percent of the shares, and OOO Al-Gem holding 95 percent of the shares.

428. In February 1998, Vald-Oil and the Lesnoy Town Administration apparently concluded an investment agreement[389] which granted incentives in relation to 16 different types of taxes and required payment of 5% of the value of the tax benefits to an off-budgetary fund.  It was supplemented by a further agreement in January of 2000.[390]

429. As set out above, however, concerns that Vald Oil might not have been fulfilling the requirements of the legislation in substance (as opposed to form), and other concerns about the entity's conduct, led to a criminal investigation inquiring into whether the managers of the Lesnoy entities were involved in tax evasion.  The investigation was ultimately suspended, but, as noted earlier, charges relating to the Lesnoy entities figured in the case by the Russian prosecutor against Messrs. Lebedev and Khodorkovsky in 2003.

430. On 5 March 2001, Vald-Oil was merged into Perspektiva Optimum, which later merged into Investproekt.

431. Tax reassessments would eventually be made against Yukos for Vald-Oil for the year 2000,[391] totaling RUR 1,362,216,581 (USD 47,647,943).[392]

---

[387]   2000 Decision, p. 76, Exh. C-104.

[388]   Yukos Tax Reassessment Breakdown, p. 6, Exh. C-1752.  RUR to USD calculated at 28.5892:1, the official exchange rate on 14 April 2004, Exh. R-334.

[389]   2000 Decision, p. 6, Exh. C-104 (referring to investment agreements with, among others, Vald Oil).

[390]   2000 Decision, p. 80, Exh. C-104 (referring to Agreement No. 2, 28 January 2000).

[391]   *Ibid.*, p. 83.

[392]   Yukos Tax Reassessment Breakdown, p. 6, Exh. C-1752.  RUR to USD calculated at 28.5892:1, the official exchange rate on 14 April 2004, Exh. R-334.

ii.   Trekhgorny

432.   Far less information is available to the Tribunal regarding the activities of the trading companies in the Trekhgorny ZATO than is available for those in Lesnoy.  What the Tribunal has gleaned from the record is that in March 2001, some of the companies based in Trekhgorny ("Greys", "Nortex", "Alebra", "Muskron", "Flander", "Kolrein" and "Kverkus") merged into Torgovaya Kompaniya Alkhanay or Alkhanai Trading on 16 March 2001, a company registered in Aginskoye, in the Aginsko-Buryatsky region.[393]  Two months later, in May 2001, Alkhanai Trading merged with Perspektiva Optimum (the company created from the Lesnoy trading companies) into Investproekt, a company initially based in Kirov, but which then moved to the Chita Autonomous Region as of August 2001.[394]

*Grace*

433.   Grace was registered by Order 1316 of the Trekhgorny Municipal Administration on 25 July 1997.   On 15 March 2001, it merged into Alkhanai Trading, which later merged into Investproekt.  Grace was founded by ZAO Trigor (holding 5 percent of the shares) and OOO Bark (holding 95 percent).[395]

434.   On 11 March 1998, Grace and the Trekhgorny Municipal Administration concluded an investment agreement, supplemented by another agreement on 21 January 2000, under which incentives in relation to 17 different types of taxes were granted.[396]

435.   Tax reassessments would eventually be made against Yukos for Grace for the year 2000,[397] totaling RUR 20,247,201 (USD 708,212).[398]

---

[393]   Judgment in the Name of the Russian Federation, Meshchansky District Court of the City of Moscow, 16 May 2005, p. 48, Exh. R-379.

[394]   *See* various documents on Alkhanay and Perspektiva Optimum, 20 May 2001, Exh. R-302; *see also* Information letter from the Inspectorate of the Ministry of Taxes and Levies of the Russian Federation for Shabalinskiy District, 20 August 2001, Exh. R-301 (noting Investproekt's change of address to the Chita Region).  For further information as to Investproekt, see paragraphs 389–408 above.

[395]   2000 Decision, p. 27, Exh. C-104.

[396]   *Ibid.*, pp. 29–30 (referring to Tax Agreement No. 95, 11 March 1998 and a supplementary tax agreement dated 21 November 2000).

[397]   *Ibid.* pp. 30–31.

[398]   Yukos Tax Reassessment Breakdown, p. 6, Exh. C-1752.  RUR to USD calculated at 28.5892:1, the official exchange rate on 14 April 2004.

*Muskron*

436.  Muskron was registered by Order 1433 of the Municipality of Trekhgorny on 12 August 1997. It was founded by Trigor ZAO, with an address in Trekhgorny and a 5 percent shareholding, as well as Vokit OOO, with an address in Moscow and a 95 percent shareholding.  Vokit bought out Trigor in April of 2000, before selling a 2 percent stake to Neftetrade (itself wholly owned by OAO Yukos Oil Company at the time of Neftetrade's incorporation).   As of September 2000, Neftetrade had acquired 100 percent of Muskron's shareholding.[399]

437.  On 12 July 1998, Muskron and the Trekhgorny Municipal Administration concluded an investment agreement, with a supplementary agreement on 12 January 2000, which granted incentives in relation to eight different types of taxes.[400]

438.  On 15 March 2001, Muskron was merged into Alkhanai Trading, which then merged into Investproekt.[401]

439.  Tax reassessments would eventually be made against Yukos for Muskron for the year 2000,[402] totaling RUR 7,398,094 (USD 258,772).[403]

*Norteks (aka Nortex)*

440.  Norteks was registered by Order 1435 of the Municipality of Trekhgorny 12 August 1997.[404]  It was founded by Trigor ZAO, with an address in Trekhgorny and a 5 percent shareholding, as well as OOO Corvet, with an address in Kaluga and   a 95 percent shareholding.  OOO Neftetrade bought Trigor's shares in Norteks in June of 2000.[405]

441.  On 6 February 1998, Norteks and the Trekhgorny Municipal Administration concluded an investment agreement, supplemented by another agreement on 21 January 2000, granting

---

[399]   2000 Decision, p. 36–37, Exh. C-104.

[400]   *Ibid*. pp. 39–40 (referring to Tax Agreement No. 67, 12 July 1998 and a supplementary tax agreement dated 12 January 2000).

[401]   *Ibid*., p. 35.

[402]   *Ibid*., p. 41.

[403]   Yukos Tax Reassessment Breakdown, p. 6, Exh. C-1752.  RUR to USD calculated at 28.5892:1, the official exchange rate on 14 April 2004.

[404]   2000 Decision, p. 14, Exh. C-104.

[405]   *Ibid*., p. 15.

incentives in relation to eight different types of taxes and requiring payment of five percent of tax benefits into administration's account.[406]

442.   On 15 March 2001, Norteks was merged into Alkhanai Trading, which then merged into Investproekt.[407]

443.   Tax reassessments would eventually be made against Yukos for Norteks for the year 2000,[408] totaling RUR 3,152,537,572 (USD 110 Million).[409]

*Kverkus (aka Quercus)*

444.   Kverkus was registered by Order 1315 of the Administration of the Municipality of Trekhgorny on 25 July 1997.[410]   It was founded by Trigor ZAO, with an address in Trekhgorny and a 5 percent shareholding, as well as OOO Cadet, with an in Kaluga and a 95 percent shareholding.  OOO Neftetrade bought out Trigor's shares in Kverkus in June of 2000.[411]

445.   On 26 August 1997, Kverkus and the Trekhgorny Municipal Administration concluded an agreement granting tax benefits to the trading companies.[412]   On 11 March 1998, a second investment agreement was concluded,[413] which was supplemented on 21 January 2000,[414] granting incentives in relation to eight types of taxes.

446.   On 15 March 2001, Kverkus was merged into Alkhanai Trading, which then merged into Investproekt.

---

[406]   *Ibid.*, pp. 17–18 (referring to Tax Agreement No. 9, 6 February 1998 and a supplementary tax agreement dated 21 January 2000).

[407]   *Ibid.*, p. 14.

[408]   *Ibid.*, p. 19.

[409]   Yukos Tax Reassessment Breakdown, p. 6, Exh. C-1752.  RUR to USD calculated at 28.5892:1, the official exchange rate on 14 April 2004, Exh. R-334.

[410]   2000 Decision, p. 49, Exh. C-104.

[411]   *Ibid.*, p. 50.

[412]   *Ibid.*, p. 52 (referring to Tax Agreement No. 51, 26 August 1997).

[413]   *Ibid.* (referring to Tax Agreement No. 103, 11 March 1998).

[414]   *Ibid.* (referring to supplementary tax agreement, 21 January 2000).

447. Tax reassessments would eventually be made against Yukos for Kverkus for the year 2000,[415] totaling RUR 3,031,422,237 (USD 106,033,825).[416]

*Colrain (aka Kolrein)*

448. Colrain was registered by Order 1431 of the Municipality of Trekhgorny on 12 August 1997.[417] It was founded by Trigor ZAO, with an address in Trekhgorny and a 5 percent shareholding, as well as OOO Bark, with an address in Kaluga and a 95 percent shareholding.[418] In November 1999, Trigor sold its five percent share in Colrain to Polinep ZAO.[419] Neftetrade then bought that five percent share in June 2000.[420]

449. In August 1997, Colrain and the Trekhgorny Municipal Administration concluded an agreement granting tax benefits to the company.[421] In February 1998, a second investment agreement was concluded,[422] which was amended once in 1999[423] and supplemented in January 2000,[424] granting incentives in relation to eight types of taxes.

450. On 15 March 2001, Colrain merged into Alkhanai Trading, which then merged into Investproekt.[425]

451. No tax reassessments would be made against Yukos for Colrain.

*Virtus*

452. Virtus was registered by Order 1116 of the Head of the Municipality of Trekhgorny on 27 June 1997.[426] It was founded by OOO Akra OOO, with an address in Kaluga and a 90 percent

---

[415] *Ibid.*, p. 55.

[416] Yukos Tax Reassessment Breakdown, p. 6, Exh. C-1752. RUR to USD calculated at 28.5892:1, the official exchange rate on 14 April 2004.

[417] 2000 Decision, p. 57, Exh. C-104.

[418] *Ibid.*, p. 58.

[419] *Ibid.*

[420] *Ibid.*

[421] *Ibid.*, p. 59 (referring to Tax Agreement No. 44, 20 August 1997).

[422] *Ibid.* (referring to Tax Agreement No. 8, 6 February 1998).

[423] *Ibid.* (referring to amendments on 12 July 1999).

[424] *Ibid.* (referring to a supplementary tax agreement, 21 January 2000).

[425] *Ibid.*, p. 58.

shareholding, OOO Depor with an address in Moscowand a 5 percent shareholding, and Trigor ZAO, with an address in Trekhgorny and a 5% shareholding.  Akra bought Trigor's shares in Virtus in March of 2000.[427]

453.   On 6 February 1998, Virtus and Trekhgorny Municipal Administration concluded an investment agreement,[428] which was supplemented on 21 January 2000.[429]  It granted incentives to the company in relation to eight different types of taxes, and required payment of five percent of tax benefits into the administration's account.

454.   Tax reassessments would eventually be made against Yukos for Virtus for the year 2000,[430] totaling RUR 2,359,700 (USD 82,538).[431]

   **(d)   Sarov**

455.   Sarov is a ZATO in the Russian Federation.

   **i.   Yuksar**

456.   Yuksar was registered by the Sarov Municipal Administration on 13 October 1997.[432]  Yuksar was founded by Yukos with a 49 percent shareholding and YNG with a 51 percent shareholding.[433]  Yuksar was ultimately liquidated.[434]

457.   On 23 October 1997, Yuksar and the Sarov Municipal Council concluded an agreement granting tax incentives to the company.[435]  It was supplemented on 12 March 1998.[436]

---

[426]   2000 Decision, p. 68, Exh. C-104.

[427]   *Ibid.* pp. 67–68.

[428]   *Ibid.*, pp. 68–69 (referring to Tax Agreement No. 7, 6 February 1998).

[429]   *Ibid.*, p. 69 (referring to supplementary tax agreement, 21 January 2000).

[430]   *Ibid.*, p. 69.

[431]   Yukos Tax Reassessment Breakdown, p. 6, Exh. C-1752.  RUR to USD calculated at 28.5892:1, the official exchange rate on 14 April 2004.

[432]   2000 Decision, p. 20, Exh. C-104

[433]   *Ibid.*

[434]   *Ibid* (referring to extract from Unified State Register of Legal Entities on 3 November 2003).

[435]   *Ibid.*, p. 22 (referring to Tax Agreement No. 74/01-17, 23 October 1997).

[436]   *Ibid.* (referring to supplementary tax agreement, 12 March 1998).

458.   Tax reassessments would ultimately be made against Yukos for Yuksar for the year 2000,[437] totaling RUR 95,875,131 (USD 3,353,544).[438]

(e)    **Baikonur**

459.   As noted earlier, Baikonur is a low-tax region, leased by the Russian Federation from Kazakhstan during the Soviet era for use as a spaceport and aerospace facility.[439]

i.    **Mega-Alliance (aka Mega-Alyans)**

460.   Mega-Alliance was registered by Order 00411 of the Administration of Baikonur on 21 December 2000.[440]  The sole founder of the company was Ms. Gulnara Karimovna Zhukova, who was also a founder of Macro-Trade.  The share capital of the company was RUR 8,350.  On 28 April 2001, amendments were made to the Charter of Mega-Alliance OOO under which the sole shareholder of Mega-Alliance became Dorchestergate Trading Limited, a company registered in Cyprus.[441]

461.   As noted in paragraph 351 above, Ms. Zhukova later denied any connection to Mega-Alliance or Macro-Trade, both of which she was alleged to have founded.  A letter dated 24 October 2003 from the Russian Federation Federal Security Service's Directorate for Moscow Space Forces indicated that Ms. Zhukova had denied any connection with Mega-Alliance and reiterated her story about the theft of her passport.[442]

462.   In 2001, Mega-Alliance and the Administration of Baikonur entered into a tax agreement.[443]  It granted benefits to the company in relation to four types of taxes and required payments to the value of three percent of their tax benefits into the "target funds" for the development of the region of Baikonur.

---

[437]   *Ibid.*, p. 23.

[438]   Yukos Tax Reassessment Breakdown, p. 6, Exh. C-1752.  RUR to USD calculated at 28.5892:1, the official exchange rate on 14 April 2004.

[439]   Transcript, Day 14 at 54.

[440]   2001 Decision, p. 112, Exh. C-155.

[441]   *Ibid.*

[442]   2001 Decision, p. 112, Exh. C-155 (referring to Letter No. 31/4664 from the Russian Federation Federal Security Service's Directorate for Moscow Space Forces, 24 October 2003).

[443]   *Ibid.*, p. 114 (referring to contract between the Administration of Baikonur and Mega-Alliance, 24 October 2003).

463. Later that year, the decision of the Government of the Russian Federation No. 747 on the Approval of the Rules for the Granting of Tax Privileges to Organisations and Individual Businessmen Registered on the Territory of the City of Baikonur was issued.[444]  It granted permission to the head of the Administration of Baikonur to grant tax privileges, provided that the individual businessman or organization had "the presence of premises, of property, industrial or other complexes necessary for the manufacture of goods, works or services and situated on the territory of the city of Baikonur (including the Baikonur Spaceport); [and] the realisation of the products, works or services on the territory of the city of Baikonur (including the Baikonur Spaceport)."[445]  It also cautioned that previously offered tax benefits that conflicted with the decision would be considered terminated from the date the decision entered into force.[446]

464. In 2002, Mega-Alliance merged into Regionalniy Finansoviy Tsentr or Regional Finance Center.[447]  Regional Finance Center was liquidated in July of that year.[448]

465. Tax reassessments would later be made against Yukos for Mega Alliance for the year 2001,[449] totaling RUR 1,276,878,700 (USD 43,646,213).[450]

(f) **Evenkia**

466. The Evenkia autonomous district is located in Eastern Siberia.[451]  At the time that the trading companies were established in Evenkia, the district had a federally financed budget, fuel supplies were difficult to secure, and unemployment was very high.[452]  Of all the regions of the

---

[444]   Decision of the Government of the Russian Federation No. 747, 25 October 2001, Exh. C-411.

[445]   *Ibid.*

[446]   *Ibid.*

[447]   Notice on record with the unified state register of legal entities of entry on dissolution of legal entity, 19 April 2002, Exh. R-3158.

[448]   Information Extract No. 29170, 27 March 2012, Exh. R-3159.

[449]   2001 Decision, p. 115, Exh. C-155.

[450]   Yukos Tax Reassessment Breakdown, p. 6, Exh. C-1752.  RUR to USD calculated at 29.2552:1, the official exchange rate on 2 September 2004.

[451]   *Yukos Review*, Issue # 3, May–June 2001, p. 8, Exh. C-9.

[452]   *Ibid.*, p. 5.

Russian Federation, Evenkia ranked last in average per capita volume of industrial production, and 69th (out of 89) in terms of per capita income.[453]

467.   In September 1998, Law No. 108 of the Evenkia Autonomous Region "On the Particularities of the Tax System in the Evenkiysky Autonomous District" was enacted,[454] which offered incentives to investors in the region.   Pursuant to Article 6(1)(d) of the law, preferential tax rates were offered to participants in investment projects on the territory of the Evenkiysky Autonomous District. Pursuant to Article 5(1) of the Law, commercial and noncommercial entities were deemed participants of investment projects which are created in the territory of the region, regardless of the origin of their capital, and can include those with foreign legal entities as shareholders, so long as they were participants in programs for the social and economic development of the region and investment projects.

468.   In May 2001, Mr. Boris Zolotarev, the former head of Yukos R&M, became governor of Evenkia.   After his election, he spoke about the positive effects he hoped Yukos investment could have on the region.[455]

### i.   Evoil

469.   Evoil was registered by Order 158 of Administration of Ilimpiisk District of Evenkia on 23 May 2002.[456]   It was founded by Fiana Ltd., a limited liability company registered in Cyprus.[457]

470.   In June 2001, pursuant to an order of the Administration of the Evenkiysky Autonomous District, "On Application of Special Tax Regime," Evoil was granted targeted tax benefits.[458]   It also enjoyed benefits under Law 108 of 24 September 1998, including corporate profit tax payable at a reduced rate of 10.5 percent and a property tax rate of 0 percent.[459]

---

[453]   *Ibid.*, p. 8.

[454]   Law of the Evenkiysky Autonomous District No. 108, 24 September 1998, Exh. C-412.

[455]   *Yukos Review*, Issue # 3, May–June 2001, p. 5, Exh. C-9.

[456]   2002 Decision, p. 146, Exh. C-175.

[457]   *Ibid.*

[458]   Resolution of the Federal Arbitrazh Court for the Moscow District No. KA-A40/3222-05, p. 30, Exh. C-184 (referring to Order No. 53 of the Administration of the Evenkiysky Autonomous District, 29 June 2001).

[459]   2002 Decision, p. 154, Exh. C-175.

471.  Tax reassessments would later be made against Yukos for Evoil for the years 2002[460] and 2003,[461] totaling RUR 203,629,769 (approximately USD 6,787,659).[462]

### ii.   Interneft

472.  Interneft was registered by Order 333 of Administration of Ilimpiisk District of Evenkia on 23 October 1998.[463]   The sole founder of Interneft is OOO Netax Advertising Agency, registered in Kalmykia.[464]   It was founded with an initial capital of RUR 8,400, split into 100 ordinary registered shares with nominal value of RUR 84.[465]

473.  On 26 July 1999, Interneft was awarded a "Certificate of assignment of the status of Participant in the investment programs of the Evenki Autonomous Region."[466]

474.  Tax reassessments would later be made against Yukos for Interneft for the year 2000,[467] totaling RUR 224,642 (USD 7,858).[468]

### iii.   Petroleum-Trading (Trion)

475.  Petroleum-Trading was registered under the name Trion by Order 146-p of the Administration of Ilimpiisk District of Evenkia on 25 April 2000.  Its new name was registered by Order 193 of Administration of Ilimpiisk District of Evenkia on 31 May 2000.[469]   Petroleum-Trading was founded by Neftepromstroiservice ZAO and Neftepromburservice ZAO, each holding

---

[460]  *Ibid*. pp. 154–55.

[461]  2003 Decision, p. 142, Exh. C-190.

[462]  Yukos Tax Reassessment Breakdown, p. 6, Exh. C-1752.  The RUR to USD exchange rate used here is approximate, based on a rate of 30:1.

[463]  2000 Decision, p. 76, Exh. C-104

[464]  *Ibid*.

[465]  *Ibid*.

[466]  *Ibid*., p. 77.

[467]  *Ibid.*, p. 78.

[468]  Yukos Tax Reassessment Breakdown, p. 6, Exh. C-1752.  RUR to USD calculated at 28.5892:1, the official exchange rate on 14 April 2004.

[469]  2000 Decision, p. 55, Exh. C-104.

50 percent of the share capital.  Both parent companies were registered in Kalmykia.[470]  The founding capital was RUR 8,400.

476.    Pursuant to Order No. 53 of the Administration of the Evenkiysky Autonomous District of 29 June 2001, "On Application of Special Tax Regime," Petroleum-Trading was granted targeted tax benefits.[471]

477.    Tax reassessments would be later made against Yukos for Petroleum-Trading for the years 2000[472] and 2002[473] totaling RUR 90,943,100 (approximately USD 3,031,437).[474]

#### iv.    Ratibor

478.    Ratibor was registered by Order 168-p of the Administration of the Evenkiysky Autonomous District on 21 July 2000.   It was registered with tax authorities and state authorities on 14 February 2001.[475]  It was founded by Ms. Svetlana Ivanovna Vorobyeva, with a share capital of RUR 10,000.[476]   On 25 May 2001, 100 percent of the share capital of Ratibor OOO was transferred to Dunsley Limited, a company registered in Cyprus.  Dunsley was, in turn, owned by Doluen Limited, with 99.9 percent of the shares, registered in Cyprus, and Abakus (Nominis) Limited, with 0.1 percent of the shares, also registered in Cyprus.[477]

479.    Pursuant to Order No. 53 of the Administration of the Evenkiysky Autonomous District of June 2001, "On the application of the Special Taxation Procedure," Ratibor was granted targeted tax benefits.[478]

480.    Tax reassessments would later be made against Yukos for Ratibor for the years 2001[479] and 2002,[480] totaling RUR 13,870,285,714 (approximately USD 462,342,857).[481]

---

[470]   *Ibid.*, p. 55–56.

[471]   Resolution of the Federal Arbitrazh Court for the Moscow District No. KA-A40/3222-05 p. 30, Exh. C-184 (referring to Order No. 53 of the Administration of the Evenkiysky Autonomous District, 29 June 2001).

[472]   2000 Decision, p. 57, Exh. C-104.

[473]   2002 Decision, p. 163–64, Exh. C-175.

[474]   Yukos Tax Reassessment Breakdown, p. 6, Exh. C-1752.  The RUR to USD exchange rate used here is approximate, based on a rate of 30:1.

[475]   2001 Decision, p. 82, Exh. C-155.

[476]   *Ibid*.

[477]   *Ibid.*

[478]   *Ibid.*, p. 99.

v.      Yukos Vostok Trade

481.   Yukos Vostok Trade was registered by Decision 36 of the Interdistrict Inspectorate of the Russian Ministry of Taxes and Levies No. 3 for the Evenki Autonomous District, 9 February 2004.[482]   It was founded by OAO Yukos Oil Company with 70 percent of the shareholding and Yukos-Import with 30 percent of the shareholding.[483]

482.   While there is no reference to any tax agreements on the record, the Tribunal notes that Field Tax Audit Report No. 52/996 refers to Yukos Vostok Trade making use of the beneficial tax system in Law 108 of 24 September 1998, with a preferential income tax rate reduced to 13 percent and a preferential property tax rate of 0 percent.[484]

483.   Tax reassessments would later be made against Yukos for Yukos Vostok Trade for 2004,[485] totaling RUR 8,660,507,192 (USD 311,337,530).[486]

### 5.      Tribunal's Observations

484.   Having set out the evidence regarding Yukos' tax optimization scheme, the Tribunal now returns to the question posed at the beginning of this chapter:  does the record which it has reviewed at length demonstrate that Yukos was merely taking advantage of the legislation in place in the low-tax regions of the Russian Federation to minimize its taxes, or was there an element of abuse in its activities that made them illegal under Russian law?

485.   The Tribunal first reiterates that the evidence reveals—indeed, the Parties are agreed—that the Russian Federation had enacted (in the late 1990s and early 2000s) a legislative structure to encourage investment in some of its low-tax regions, and that Yukos (as did many other Russian companies, including other oil companies) sought to take advantage of that legislative

---

[479]   *Ibid.*, pp. 99–100.

[480]   2002 Decision, p. 146, Exh. C-175.

[481]   Yukos Tax Reassessment Breakdown, p. 6, Exh. C-1752.  The RUR to USD exchange rate used here is approximate, based on a rate of 30:1.

[482]   2004 Decision, p. 86, Exh. R-1539.

[483]   *Ibid.*

[484]   Field Tax Audit Report No. 52/996, p. 84, 27 December 2005.

[485]   2004 Decision, pp. 90–91, Exh. R-1539.

[486]   Yukos Tax Reassessment Breakdown, p. 6, Exh. C-1752.  RUR to USD calculated at 27.8171:1, the official exchange rate on 17 March 2006.

structure.  As a result, Yukos set up trading companies in various low-tax regions and, where required, entered into investment agreements with the local authorities.

486.  There is evidence in the record that Mr. Dubov informed the authorities, at least in respect of the Yukos trading companies in Mordovia, that Yukos was using the legislative arrangements in place to minimize its taxes, and that none of his interlocutors, including the then First Deputy of Finance, Alexei Kudrin, formulated any objection.  Finally, the Tribunal recalls that few of the audits of the trading companies conducted in the regions prior to 2003 ever resulted in any tax assessments, and, when they did, the transgressions were generally minor and the assessments insignificant.

487.  In this connection, the Tribunal notes that Respondent chose not to call any fact witnesses to challenge Claimants' fact witnesses.  That is unfortunate.  The Tribunal would have been assisted, for example, by the evidence of Mr. Kudrin who, after his meeting with Mr. Dubov, became Minister of Finance and Deputy Prime Minister of the Russian Federation.  Instead, Respondent has relied solely on the documentary record to build its case that Yukos' activities in the low-tax regions were abusive and illegal.  As Claimants pointed out during the Hearing, and as the Tribunal found out for itself, the documentary record compiled and presented by Respondent to the Tribunal, while significant, is selective and unfortunately incomplete.

488.  The record does reveal, however, that Yukos had some concerns about the legality of its trading operations in certain low-tax regions, notably in Lesnoy and Trekhgorny.  As recorded in the previous section of the present chapter, there were audit reports and memoranda that attest to an investigation of whether the practices of some of the Yukos trading companies in those regions were abusing the system, since those companies were acting in conformity with the relevant legislation in form only and not in substance.

489.  The Tribunal recalls that, in November 2001, after an extensive corporate restructuring had taken place (as a result of which the trading entities in Lesnoy and Trekhgorny ceased to exist, and were merged into entities created in other regions), Ms. Irina Golub, the Chief Accountant of Yukos, received a document by e-mail from Mr.  Kartashov, a general director of Yukos.  That document referred specifically to the ongoing investigations in Lesnoy and Trekhgorny by the Federal Tax Police Service of Sverdlovsk as part of a criminal case "in connection with tax evasion" by the Yukos entities and to the fact that office personnel in Lesnoy and Trekhgorny (including, in the case of the Lesnoy entities, the General Directors) had been interrogated by tax authorities.

490. The Tribunal notes here that the Investigation Group of the Russian Federation's Federal Tax Police Agency for the Sverdlovsk Region was the organization that had issued the "Decree on the institution and initiation of criminal proceedings"[487]—looking into the payment of taxes with promissory notes—three weeks earlier.

491. During the Hearing and in its Post-Hearing Brief, Respondent referred many times to the Kartashov e-mail, as well as the following evidence, which, it argued, demonstrated that Yukos knew that its scheme was unlawful and "took pains to conceal its scheme from the authorities":[488]

- Firstly, the 22 April 2002 memorandum from Mr. Maly, in which he expressed his concern that if Yukos' affiliation with the trading entities were included in the SEC filing, that information "may be used by the Russian tax authorities to challenge [Yukos'] approach to certain transactions and, consequently, will result in substantial tax claims against the [c]ompany";[489]

- Secondly, the e-mail from Mr. Maruev (from the Treasury Department) to employees in 2002 to "clean your folders" of references to the Lesnoy trading companies;[490]

- Thirdly, the internal memorandum from Yukos' General Counsel Mr. Aleksanyan advising Ms. Golub not to draw the attention of the authorities to the use of tax incentives in the ZATO Lesnoy, since "an investigation into the legality of the use of the incentives . . . entails substantial risks, including under criminal law";[491]

---

[487] Decree on the institution and initiation of criminal proceedings of the Investigation Group of the Russian Federation's Federal Tax Police Agency for the Sverdlovsk Region, 3 September 2001, Exh. R-376.

[488] Respondent's Post-Hearing Brief ¶¶ 29, 38.

[489] E-mail from P.N. Maly to O.V. Sheyko, 14 May 2002, Exh. R-184.

[490] E-mail from D.L. Maruev to M.U. Barbarovich and V.M. Zuravlev, 15 March 2002, cc'ing V.A. Podzarov, Exh. R-4040.

[491] Letter from V.G. Aleksanyan to I.Y. Golub dated 14 December 2001. Exh. R-3244. Professor Gaillard argued during the hearing that Mr. Aleksanyan was simply saying "don't …rub an issue which has not been opened." Transcript, Day 20 at 61. The full discussion can be found at Transcript, Day 20 at 57–62. Professor Gaillard suggested that Ms. Golub:

"…receives a letter from Aleksanyan, who is the boss two steps above her. . . which says, 'You'—I summarise it, and then we will go to the details. Basically it says, 'You stupid, you don't understand that it's not about the tax incentives, it's about the promissory notes. So why do you prepare a letter talking about tax incentives? That's not at issue here.'" Transcript, Day 20 at 58–59.

- Fourthly, Mr. Khodorkovsky's refusal in early 2003 to sign Yukos' registration statement (for a confidential SEC filing) over concerns for his "personal risks";[492] and

- Fifthly, a "blackline" version of Yukos' draft filing for the SEC sent on 23 July 2002 by Natalia Kuznetsova of PwC to Stephen Wilson (at that time Yukos' international tax director), proposing that the following be deleted from an earlier draft: "We use tax optimization mechanisms that may be challenged by the tax authorities" and "If a number of regional tax incentives we have used to reduce our tax burden are successfully challenged by the Russian tax authorities, we will face significant losses associated with the additionally assessed amount of tax and related interest and penalties."[493]

492. In their reply to the evidence regarding concern over potential tax liabilities, Claimants submit that the Russian tax authorities "were notorious for displaying arbitrary and unpredictable interpretations of law generating significant and unquantifiable risks for taxpayers[,] risks that Yukos and other Russian oil companies . . . disclosed in their financial statements."[494]  They conclude that references by Yukos' management to such risks "[could not] reasonably be construed as evidencing 'knowledge' or 'belief' that Yukos' tax structure was unlawful."[495]  Claimants also argue that Respondent's reliance on Mr. Maly's e-mail was "much ado about nothing," and that "it is clear that any risks were neither a problem, nor an obstacle, to Yukos pursuing the NYSE listing because Yukos continued to draft its Form F-1 into mid-March 2003, nearly a year after this memo."[496]  Claimants also note that, in respect of the blackline filing that it "in fact states—in a sentence the Respondent omits to quote—that Yukos' management 'believe the tax mechanisms used by us comply.'"[497]

---

[492] E-mail from M.B. Khodorkovsky to O.V. Sheiko, 20 February 2003, Exh. R-3611.

[493] Facsimile transmission from Natalia Kusnetzova to Stephen Wilson dated 23 July 2002, pp. 133–34, Exh. R-1477.

[494] Claimants' Post-Hearing Brief ¶ 15.

[495] *Ibid*.

[496] Reply ¶ 111.

[497] Reply ¶ 199 (emphasis in original).  As Claimants note, the full paragraph reads:

"Our results of operation have historically benefited significantly from the use of tax [illegible] mechanisms.  We believe that the tax mechanisms used by us comply with relevant [illegible].  If, however, we phase out all of our current tax optimization mechanisms due to changes to the tax regime or other reasons, we may have to pay significantly higher taxes in the future, and our result of operation may be adversely affected.  In addition, if the various initiatives we have used to reduce our tax burden are successfully challenged by the Russian tax authorities we may face significant losses associated with the assessed amount of tax underpaid and related interest and penalties, which would have a material impact on our financial condition and results of operation."

*Ibid*. n.337.

493.  In fact, the record before the Tribunal reveals that Lukoil, Rosneft, Sibneft and TNK, in their financial statements in those years, all referred to the significant risks associated with the varying interpretation by the Russian tax authorities of the Russian tax legislation.[498]

494.  Although the Yukos entities in Lesnoy and Trekhgorny were only a small part of Yukos' tax optimization scheme,[499] it is clear to the Tribunal that these entities were being investigated as of late 1999 by the tax authorities in these regions, and were suspected of being "shams".  It is the view of the Tribunal that the legal basis for this scrutiny was the jurisprudential "good faith taxpayer" doctrine ("substance over form" or "anti-abuse" doctrine) and that, within the senior management of Yukos, there were a number of persons who were aware that Yukos was vulnerable in respect of certain facets of its tax optimization scheme.

495.  As for the existence of the "good faith taxpayer" doctrine in Russia at that time, the Tribunal has reviewed the evidence of Mr. Konnov, the only expert on Russian tax law to give evidence in these proceedings, who appeared on behalf of Respondent.  Although Claimants elected not

---

[498]  *See* Consolidated Financial Statements of OAO Lukoil, 30 May 2003, Exh. C-371; Consolidated Financial Statements of OJSC Rosneft Oil Company (hereinafter "Rosneft"), 24 June 2005, C-373; Consolidated Financial Statements of AO Siberian Oil Company, 21 June 2002, C-384;and Consolidated Financial Statements of TNK International Limited, 15 May 2003, C-390.  To illustrate, the following is the warning contained in Lukoil's financial statements for the period ending 31 December 2002

"The taxation systems in the Russian Federation and other emerging markets where Group companies operate are relatively new and are characterized by numerous taxes and changing legislation, which may be applied retroactively and is sometimes unclear, contradictory, and subject to interpretation.  Often, differing interpretations exist among different tax authorities within the same jurisdictions and among taxing authorities in different jurisdictions.  Taxes are subject to review and investigation by a number of authorities, which are enabled by law to impose severe fines, penalties and interest charges.  Such factors may create taxation risks in the Russian Federation and other countries where Group companies operate substantially more significant than those in other countries where taxation regimes have been subject to development and clarification over long periods.

. . .

The regional organizational structure of the Russian Federation tax authorities and the regional judicial system can mean that taxation issues successfully defended in one region may be unsuccessful in another region.  The tax authorities in each region may have a different interpretation of similar taxation issues.  There is however some degree of direction provided from the central authority based in Moscow on particular taxation issues.

The Group has implemented tax planning and management strategies based on existing legislation at the time of implementation.  The Group is subject to tax authority audits on an ongoing basis, as is normal in the Russian environment, and, at times, the authorities have attempted to impose additional significant taxes on the Group.  Management believes that it has adequately met and provided for tax liabilities based on its interpretation of existing tax legislation.  However, the relevant tax authorities may have differing interpretations and the effects could be significant."

Exh. C-371, pp. 30–31 (emphasis added).

[499]  The tax assessments levied against Yukos in connection with the trading entities in Lesnoy and Trekhgorny, which related only to the 2000 tax year (since the entities ceased to exist in early 2001), represented approximately 19 percent of the total tax assessment against Yukos for 2000, and represented under 3 percent of the total of all tax assessments against Yukos (for the years 2000–2003).  *See* Yukos Tax Reassessment Breakdown, Exh. C-1752.

to present their own expert on Russian tax law,[500] in their written submissions, they referred to and criticized various Russian court decisions, which they contended did not support Respondent's interpretation.   As noted earlier in the present chapter, the Tribunal has considered Claimant's submissions.

496.   The Tribunal has also considered the lengthy cross-examination of Mr. Konnov by Professor Gaillard.  The Tribunal recalls again that Professor Gaillard did not challenge Mr. Konnov on the existence of the anti-abuse doctrine but rather sought Respondent's expert's acknowledgement that the Yukos tax optimization scheme complied with the existing legislative framework in Russia as well as in the regions.  The Tribunal notes in this context that Claimants stipulate to the existence of the "bad-faith taxpayer" doctrine in their Reply, but argue that "neither it nor any other alleged judicial doctrine had previously been applied as in the Yukos case."[501]

497.   As a matter of background fact, the record before the Tribunal is clear that, at the time of the issuance on 29 December 2003 of the Field Tax Audit Report, the "bad faith taxpayer" doctrine, although it had not yet gelled in the way that it did in 2006 in the ruling of the Supreme Arbitrazh Court in Resolution No. 53, had been recognized and applied in some Russian court decisions.

498.   The Tribunal recalls that the eminent Russian tax lawyer, Mr. Sergey Pepeliaev, who later represented Yukos in the Russian tax litigation, wrote in 2002 that the doctrine existed and that "[i]f it appears that parties act both unreasonably and not in good faith then this constitutes a ground for reassessment of the parties' tax liabilities . . . ."[502]

499.   Beyond this conclusion, which the Tribunal considers a matter of fact, the Tribunal does not need to determine, as a matter of Russian law, whether any of the activities of the Yukos

---

[500]   The Tribunal notes that in the *RosInvestCo* arbitration, the claimant presented a Russian tax law expert, Professor Maggs. The Russian Federation relied on Mr. Konnov.  The *RosInvestCo* tribunal stated that it found Professor Maggs' evidence more persuasive, but it also acknowledged that Professor Maggs did not dispute the existence of the "bad faith taxpayer" doctrine.  *See RosInvestCo* ¶¶ 432, 495, Exh. C-1049. Similarly, in the *Quasar* arbitration, claimants presented a Russian tax law expert, Professor Stephan, as well as an expert on the *Russian Civil Code*, Professor Mozolin, who opined, *inter alia*, on the distinction between good and bad faith taxpayers. *See Quasar*, ¶ 66, 77–78, Exh. R-3383.  As in this arbitration, and the *RosInvestCo* arbitration, the Russian Federation's expert on Russian law was Mr. Konnov.  As in the *RosInvestCo* case, the debate turned primarily on the application to Yukos of the anti-abuse doctrine, as opposed to the existence of the anti-abuse doctrine.

[501]   Reply ¶ 217, n.368.

[502]   S.G. Pepeliaev, *Commentary to the Ruling of the Constitutional Court Ruling of the Russian Federation No. 138-O of July 25, 2001*, Exh. R-352.

trading companies in the low tax regions in 2000, 2001, 2002, and 2003 in the implementation of its tax optimization scheme were in violation of this doctrine.  As noted in the introduction to the present chapter, it is not the role of the Tribunal in the present arbitrations to sit as a court applying Russian law.

500.   However, the Tribunal does note that that, in using the available tax benefit legislation in the Russian Federation, the Yukos group principally availed itself of facilities under the laws of Mordovia, the region which represents approximately 78 percent of the 2000 to 2004 tax reassessments against Yukos.  Another significant portion of the reassessments relates to Evenkia, while the tax reassessments in ZATO Lesnoy and Trekhgorny represent less than three percent of the total.  It is important for the Tribunal to stress that the bad faith doctrine was never used against Yukos prior to December 2003.

501.   The Tribunal will now turn in the next chapter of its Award to the central question which it posed at the beginning of the present chapter:  were the December 2003 and the subsequent tax assessments a legitimate exercise by the Russian Federation of its prerogative to enforce its tax laws or were they, as Claimants argued, a mere fabrication of massive tax claims against Yukos serving as instruments which allowed the premeditated expropriation of all Yukos assets by the State after the arrest of Mr. Lebedev and Mr. Khodorkovsky.

502.   As will be seen, a crucial consideration for the Tribunal concerns the remedy or sanction of "re-attribution", and the application of the "re-attribution" remedy to revenues (for purposes of profit tax) without a corresponding "re-attribution" of tax filings for purposes of VAT.  Also considered in the next chapter is the legitimacy of associated fines levied against Yukos, notably the "willful offender" and "repeat offender" fines.

**B.    THE TAX ASSESSMENTS STARTING IN DECEMBER 2003**

### 1.    Introduction

503.   This chapter addresses the next crucial facet in the factual narrative of the present arbitration, namely the tax assessments that were issued against Yukos starting in December 2003, the manner in which those assessments were made and how they were reasoned and, eventually, enforced.

504.   This important review will lead the Tribunal to consider a central question in this case:  were the December 2003 and subsequent tax assessments covering the tax years 2000 to 2004 a

legitimate exercise by the Russian Federation of its prerogative to enforce its tax laws (Respondent's position), or were they a fabrication of massive tax claims against Yukos that allowed the premeditated expropriation of all Yukos assets by the State (Claimants' position)? Or does the record rather suggest that the truth lies somewhere between these two positions: could certain taxes in the assessments have legitimately been imposed while others plainly not, and were the consequential sanctions inexorably exacted by Russian authorities so excessively disproportionate as to require an answer to the question described as key by counsel for the claimant in *Quasar*, Mr. O.T. Johnson:  "Why would Russia have treated Yukos as it did if its purpose was to collect taxes?"[503]

505.  A closely related question concerns the arrests in 2003 of Messrs. Lebedev and Khodorkovsky: were the arrests and the subsequent convictions of Messrs. Lebedev and Khodorkovsky (not once but twice), again, a legitimate exercise by the Russian Federation of its prerogative to enforce its criminal and tax laws (Respondent's position), or were they a politically motivated attack on these individuals as part of a broader campaign to confiscate the rich assets of Yukos (Claimants' position)?

506.  The issues raised by the arrests and convictions of Messrs. Lebedev and Khodorkovsky, and of other individuals connected with Yukos, and the alleged harassment of  Yukos management, are addressed in detail in Chapter VIII.C of the present Award.  The Tribunal considers it opportune however at this time to comment upon some of the circumstances surrounding those arrests.

507.  Claimants have argued that the arrests, and the broader campaign of harassment and intimidation of the leading officers and employees of Yukos, were prompted by President Putin's desire to retaliate against Mr. Khodorkovsky and Yukos for Mr. Khodorkovsky's political and social activism, which Claimants allege became intolerable for President Putin subsequent to a public encounter between the two men in February 2003.

508.  Specifically, on 19 February 2003, in the context of a meeting between President Putin and a group of the country's most powerful businessmen, a televised confrontation between President Putin and Mr. Khodorkovsky took place.[504]  According to the testimony of Dr. Illarionov,

---

[503]  *Quasar* ¶ 41, Exh. R-3383.

[504]  Video recording and transcript of the meeting of the members of the Union of Industrialists and Entrepreneurs with President V. Putin held in the Ekaterininsky Hall, Kremlin, 19 February 2003, Exh. C-1396.

President Putin had scheduled regular meetings between himself and the business leaders, facilitated by the Russian Union of Industrialists and Entrepreneurs headed by Mr. Arkady Volsky.[505]

509.   At the meeting, which would, according to Dr. Illarionov, turn out to be the last of its kind, Mr. Khodorkovsky made a presentation on the topic of corruption.   In his presentation, he asserted that corruption in Russia was rife, and that it was "rotting the Russian Government and the Presidential Administration."[506]   While no names were mentioned, relates Dr. Illarionov, President Putin did discuss the acquisition of Severnaya Neft by Rosneft, for which Rosneft had paid approximately USD 622 million.   Dr. Illarionov states that "[i]t was widely considered that the price was exaggerated and that a portion of the price represented kickbacks to State officials."[507]

510.   Dr. Illarionov concludes as follows in relation to his understanding of the significance of that encounter:

> During his closing remarks, the President turned to Mr. Khodorkovsky and stated that everyone knew how various assets, including Yukos, were acquired.   The President indicated to Khodorkovsky that "I return the ball in your corner" . . . .   Later, it became clear that this was a signal to the governing elites that Mr. Khodorkovsky could be attacked and he was no longer tolerated.[508]

511.   At the same time, the Tribunal's findings in the previous chapter of the present Award suggest that well before the clash between President Putin and Mr. Khodorkovsky at the February 2003 meeting, the tax authorities of the Russian Federation were challenging the tax benefits claimed by some Yukos entities (in ZATO Lesnoy) and, in a few cases, had made findings adverse to those trading companies.   Moreover, the Tribunal recalls, as it did in the previous chapter, that Messrs. Khodorkovsky and Lebedev were ultimately convicted, *inter alia*, for tax evasion in relation to Yukos' activities in Lesnoy, in which (the record revealed) the authorities had suspended an investigation into the commission of tax crimes because, according to the conclusions in the relevant Resolution, it was not then possible to determine who actually committed the crimes.

---

[505]   Illarionov WS ¶ 23.

[506]   *Ibid.* ¶ 29.

[507]   *Ibid.* (citation omitted).

[508]   *Ibid.* ¶ 31.

512.   Respondent emphasized Yukos' earlier tax problems in its comments on the February 2003 meeting.   Respondent noted in its Closing Statement that President Putin publicly told Mr. Khodorkovsky that the political protection or assistance he was allegedly receiving from the Kremlin until that meeting would be removed, and he added that "we've talked about taxes before."[509]

513.   Based on the extensive record that was presented to it, the Tribunal is unable to accept the proposition that the February 2003 confrontation created Yukos' tax problems and that, but for such a confrontation, Yukos would have avoided any and all tax reassessments against it. While this meeting may well have marked a turning point in the relations between Yukos and the Russian Federation, as the Tribunal observed in the previous chapter, within the senior management of Yukos, and well before February 2003, there were individuals who were aware that the company's tax optimization mechanisms were vulnerable and could be challenged by the tax authorities.   Some of the evidence presented to the Tribunal also revealed that there was at least some awareness within Yukos that a successful challenge to the Yukos tax structure would result in "substantial tax claims"[510] or "significant losses associated with the additional assessed amount of tax and related interest and penalties"[511] and possibly even criminal liability.   At the same time, the Tribunal notes that the tax assessments and decisions against Yukos led not just to "substantial tax claims" or to "significant losses" but to its bankruptcy and destruction, and to the transfer of the principal assets of Yukos to Rosneft, a company controlled by the Russian Federation.

514.   The crucial question addressed in this chapter of the Award, therefore, is whether Claimants have discharged their burden of proof and established that the tax assessments, and the enforcement processes of the Russian Federation which followed, are more consistent with the conclusion that they evidence a punitive campaign against Yukos and its principal beneficial owners with sanctions entirely disproportionate to the company's tax liability, rather than with the conclusion that they were a legitimate exercise of tax enforcement.

---

[509]   Transcript, Day 18 at 113.  Counsel for Respondent interprets this as "I am not going to protect Mr. Khodorkovsky anymore.  He is on his own."  *Ibid.*  The full quote of the President's remark is:  "We have already discussed it with you recently, that your company, for example, has had problems with the payment of taxes."  Transcript of the 19 February 2003 Meeting, Exh. C-1396.

[510]   E-mail from P.N. Maly to O.V. Sheyko, 14 May 2002, Exh. R-184.  *See* paragraph 491 above.

[511]   Facsimile transmission from Natalia Kuznetsova to Stephen Wilson, 23 July 2002 p.134, Exh. R-1477.  *See* paragraph 491 above.

515.   In the Tribunal's view, it may well be that, while Yukos was vulnerable on some aspects of its tax optimization scheme, and possibly even would have faced "substantial tax claims" that might have resulted in "significant losses," principally because of the sham-like nature of some elements of its operations in at least some of the low-tax regions, the State apparatus decided to take advantage of that vulnerability by launching a full assault on Yukos and its beneficial owners in order to bankrupt Yukos and appropriate its assets while, at the same time, removing Mr. Khodorkovsky from the political arena.

516.   Dr. Illarionov asserts in his witness statement that "various possible justifications for Mr. Khodorkovsky's arrest and Yukos' dismantlement were tested in the Fall of 2003."[512]   He then goes on to list fifteen "theories" that, he says, "were gradually created as a smoke screen and advanced for public consumption," including "tax evasion schemes."[513]   In other words, Yukos' tax arrangements in certain low-tax regions (some of which, notably in ZATO Lesnoy, as related in Chapter VIII.A, were being scrutinized as of 1999 by the tax authorities and were suspected of being "shams") may have served as a plausible pretext for the State apparatus to crush Mr. Khodorkovsky and expropriate Yukos.   In this chapter, the Tribunal considers evidence that is crucial to its determination of this central issue in the present proceedings.   The Tribunal observes again that its conclusions in this chapter are only concerned with factual findings.   The determination of the relevant legal issues under the provisions of the ECT will be considered later, in Part X of the Award.

**2.   Chronology of the Tax Assessments and Related Decisions**

517.   On 29 December 2003, the tax authorities of the Russian Federation issued the first of five tax assessments against Yukos based on the alleged abuse by Yukos of its tax optimization scheme. These five assessments were:

---

[512]   Illarionov WS ¶ 36.

[513]   *Ibid.*

| Tax Year | Date of Tax Audit Report | Date of Tax Decision | Total Amount Assessed (USD billion) |
|---|---|---|---|
| **2000** | 29 Dec. 2003 (Exh. C-103) | 14 Apr. 2004 (Exh. C-104) | 3.48 |
| **2001** | 30 June 2004 (Exh. R-345) | 2 Sept. 2004 (Exh. C-155) | 4.10 |
| **2002** | 29 Oct. 2004 (Exh. R-346) | 16 Nov. 2004 (Exh. C-175) | 6.76 |
| **2003** | 19 Nov. 2004 (Exh. R-1583) | 6 Dec. 2004 (Exh. C-190) | 6.10 |
| **2004** | 27 Dec. 2005 (Exh. C-200) | 17 Mar. 2006 (Exh. R-1539) | 3.74 |
| **Total for Tax Years 2000–2004** | | | **24.18** |

518.  For each year that the Tax Ministry re-assessed Yukos a Repeat/Field Tax Audit Report and a Decision were issued.  For ease of reference, in this chapter, each Audit Report and Decision will be referred to by the tax year to which it relates.  For example, the Tax Ministry audited Yukos' activities in the year 2000.  It issued Field Tax Audit Report No. 08-1/1 on 29 December 2003 ("**2000 Audit Report**").  It issued Decision No. 14-3-05/1609-1 to hold the taxpayer fiscally liable for a tax offense on 14 April 2004 ("**2000 Decision**").

519.  In the subsections below, the Tribunal records, for each tax year, the extensive chronology of tax assessments and related decisions of the tax authorities, bailiffs and Russian courts.  These events as such are not disputed by the Parties.

(a)  **The 2000 Decision**

520.  As noted above, on 29 December 2003, the 2000 Audit Report, was issued.[514]  It was followed, on 14 April 2004, by the 2000 Decision holding the taxpayer liable for a tax offense.[515]  It levied the following amounts in tax arrears:

---

[514]  2000 Audit Report, Exh. C-103.

[515]  2000 Decision, Exh. C-104.

| COMPANY | TAX BENEFITS | VAT | TOTAL |
|---|---|---|---|
| **Alta Trade** | RUR 2,491,817,840 | RUR 467,486,102 | RUR 2,959,303,942 (USD 104 Million) |
| **Mars XXII** | RUR 18,393,165 | | RUR 18,393,165 (USD 643,361) |
| **Ratmir** | RUR 4,336,209,757 | RUR 1,770,256,037 | RUR 6,106,465,794 (USD 213,593,448) |
| **Yukos-M** | RUR 14,456,555,351 | RUR 9,697,309,558 | RUR 24,153,864,909 (USD 845 Million) |
| **Yu-Mordovia** | RUR 2,210,007,592 | RUR 2,045,653,454 | RUR 4,255,661,046 (USD 149 Million) |
| **Sibirskaya** | RUR 240,437,174 | | RUR 240,437,174  (USD 8.4 Million) |
| **Business-Oil** | RUR 1,584,766,950 PN:* RUR 36,184,822 | | RUR 1,620,951,772 (USD 56.7 Million) |
| **Mitra** | RUR 27,124,001 | | RUR 27,124,001 (USD 948,750) |
| **Vald-Oil** | RUR 1,304,431,717 PN:* RUR 57,784,864 | | RUR 1,362,216,581 (USD 47,647,943) |
| **Grace** | RUR 20,247,201 | | RUR 20,247,201 (USD 708,212) |
| **Muskron** | RUR 7,398,094 | | RUR 7,398,094 (USD 258,772) |
| **Nortex** | RUR 3,152,537,572 | | RUR 3,152,537,572 (USD 110 Million) |
| **Quercus** | RUR 3,031,422,237 | | RUR 3,031,422,237 (USD 106,033,825) |
| **Virtus** | RUR 2,359,700 | | RUR 2,359,700 (USD 82,538) |
| **Yuksar** | RUR 95,875,131 | | RUR 95,875,131  (USD 3. 353,544) |

| COMPANY | TAX BENEFITS | VAT | TOTAL |
|---|---|---|---|
| **Internft** | RUR 224,642 | | RUR 224,642<br><br>(USD 7,858)** |
| **Petroleum-Trading** | RUR 23,333,365 | | RUR 23,333,365<br>(USD 816,160) |

\*    "PN" indicates taxes considered unpaid as they were paid with promissory notes.

\*\*  Internft is ultimately removed from this list by the Decision of 26 May 2004, for not being legally "interdependent."[516]

521.   On the same day, 14 April 2004, a tax payment demand was issued to Yukos in the amount of RUR 80,179,841,454 (USD 2.8 billion).[517]   Payment was due just two days later, on 16 April 2004.  Also on 14 April 2004, a related fine was issued, imposing penalties in the amount of RUR 19,195,696,780 (USD 671 million).[518]   Payment of this sum was also due on 16 April 2004.   The total amount payable within two days by Yukos was thus approximately USD 3.48 billion.

522.   On 15 April 2004, the Tax Ministry registered its claim with the Moscow Arbitrazh Court.[519] On the same day, a ruling of the Moscow Arbitrazh Court prohibiting Yukos from alienating and encumbering "in any way" its assets, including shares and other securities, was issued.[520] Writs of enforcement were also issued.[521]   On 16 April 2004, a resolution of the bailiffs was issued and enforcement proceedings were commenced.[522]

523.   Yukos began parallel proceedings to those initiated by the Tax Ministry, challenging the 2000 Decision as unlawful.   On 19 May 2004, Judge Cheburashkina granted interim relief *suspending* the effect of the 2000 Decision, pending a judgment on the merits of Yukos'

---

[516]   Decision of the Moscow Arbitrazh Court, Case No. A40-17699-04-09-241, 26 May 2004, Exh. C-116.

[517]   Tax Payment Demand No. 14-3-05/1610-8, 14 April 2004, Exh. C-105.

[518]   Tax Penalty Payment Demand No. 14-3-05/1611-1, 14 April 2004, Exh. C-106.

[519]   Ruling of the Moscow Arbitrazh Court to proceed with a claim, to prepare the case for hearing, and to schedule preliminary hearing, Case No. A40-17669/04-109-241, 15 April 2004, Exh. C-107.

[520]   Ruling of the Moscow Arbitrazh Court on adoption of interim measures, 15 April 2004, Exh. C-108 (hereainfter "April 2004 Injunction").

[521]   Enforcement Writs of the Moscow Arbitrazh Court Nos. 370735, 16 April 2004; 370738, 15 April 2004; 370739, 16 April 2004; 370740, 16 April 2004, Exh. C-109.

[522]   Resolution of Bailiff D.A. Borisoff to initiate enforcement proceeding No. 11/5975, 16 April 2004, Exh. C-110.

petition in respect of the lawfulness of the 2000 Decision.[523]   In her decision, Judge Cheburashkina wrote that the seizure of such assets would "cause significant damage to the Applicant's activities and make it impossible to execute the judicial act" and that "the Applicant has presented evidence demonstrating that the consequences indicated in Article 90(2) of the RF Arbitrazh Procedure Code might arise, and that serious damage and disruption might be caused to production activities."[524]

524.   On 26 May 2004, Yukos made a motion in the collection proceedings (those initiated by the Tax Ministry) to join the Republic of Mordovia in those proceedings.[525]   The motion was not successful.  Presumably, Yukos sought the joinder of Mordovia, by far the major focus of its trading companies' activities and investments, in the expectation that Mordovian officials would support the legitimacy of Yukos' tax optimization procedures and attest to the value of Yukos' substantial investments in Mordovia.

525.   In the collection proceedings, the court had also denied Yukos' motion to stay the proceedings.[526]   In a decision dated 26 May 2004 and released on 28 May 2004, Judge Grechishkin of the Moscow Arbitrazh Court granted the Tax Ministry's petition, allowing the collection of tax arrears, interest and fines in the amount of RUR 99,375,110,548 (USD 3.48 billion) pertaining to the 2000 Decision.[527]

526.   Judge Grechishkin found that Yukos had acted in bad faith,[528] that the use by the trading companies of tax benefits was illegal because it was "not aimed at strengthening the economy of the Republic of Mordovia" but rather was used to "evade payment of taxes."[529]   The judge adopted the same reasoning as the Tax Ministry on the VAT issue, writing that:  "In order to use its right to the benefit, the taxpayer had to declare its right and confirm its right by documents in accordance with the current legislation. . . .   The taxpayer—OAO Yukos Oil Company—did not declare its desire to use its benefit either in 2000 or later."[530]   However, this

---

[523]   Ruling of the Moscow Arbitrazh Court to suspend the effect of Decision No. 14-3-05/1609-1 of 14 April 2004, Case No. A40-21839/04-75-276 p. 2, 19 May 2004, Exh. C-112.

[524]   Ibid.

[525]   Motion to join a third party to the proceeding, Case No. A40-17699-04-09-241, 26 May 2004, Exh. C-115.

[526]   Ruling of the Moscow Arbitrazh Court, Case No. A40-17699-04-09-241, 14 May, 2004, Exh. C-111.

[527]   Decision of the Moscow Arbitrazh Court, Case No. A40-17699-04-09-241, 26 May 2004, Exh. C-116.

[528]   Ibid., p. 14.

[529]   Ibid., p. 15.

[530]   Ibid., p. 19.

judgment could not be executed by the Tax Ministry as the interim relief in the parallel proceedings prevented enforcement until a determination of the lawfulness of the 2000 Decision was made.

527.   On 11 June 2004, Judge Cheburashkina, the presiding judge in the case brought by Yukos against the lawfulness of the 2000 Decision, was challenged by the Tax Ministry for bias towards Yukos in the granting of interim relief on 19 May 2004.[531]   The Tax Ministry cited several reasons as a basis for her removal for bias towards Yukos, including:  the allegation that the interim measures "did not comply with the principles of justice in a democratic constitutional State";[532] the allegation that the judge granted a "recess solely for OAO Yukos Oil Company to file a petition to stay proceedings in the [parallel] case to collect tax arrears, interest and fines," which the Tax Ministry saw as "evidence of the Judge's interest in the outcome of the proceedings in favor of the taxpayer";[533] her "behavior" in the preliminary court proceedings;[534] the allegation that the judge declined the petition of the Tax Ministry to abandon these proceedings in favour of the other set of collection proceedings initiated by the Tax Ministry;[535] and the allegation that the Tax Ministry was not granted extra time to copy documents to bring to court.[536]   The challenge was upheld by the Moscow Arbitrazh Court the same day.

528.   On 15 June 2004, Judge O.R. Mikhailova, a deputy chair of the Moscow Arbitrazh Court, was appointed to replace Judge Cheburashkina.[537]   On 22 June 2004, Judge Mikhailova set the date of 19 July 2004 for the hearing of the merits phase of the case on the lawfulness of the 2000 Decision.  She also directed the Tax Ministry to provide originals of the documents rather than photocopies and to organize the documents, including explanations "in order to confirm which circumstances they support."[538]

---

[531]   Russian Federation Ministry of Taxes and Levies, Challenge to Judge N.P. Cheburashkina, Moscow Arbitrazh Court, Case No. 21839/04-76-276, 11 June 2004, Exh. C-117.

[532]   *Ibid.*, p. 2 (emphasis in original omitted).

[533]   *Ibid.* (emphasis in original omitted).

[534]   *Ibid.*

[535]   *Ibid.*, p. 3.

[536]   *Ibid.*, pp. 3–4.

[537]   Ruling of the Moscow Arbitrazh Court, Case No. 21839/04-76-276 p. 1, 22 June 2004, Exh. C-119.

[538]   *Ibid.*

529.   In the proceedings to initiate collection of the taxes assessed in the 2000 Decision, on 29 June 2004, a resolution of the Moscow Arbitrazh Court reduced the amount to be collected to approximately USD 3.42 billion.[539]

530.   In a decision dated 23 June 2004 but published on 30 June 2004, the interim measures granted by Judge Cheburashkina were annulled by an appeal panel of the Moscow Arbitrazh Court.[540] The court reasoned that as the Tax Ministry had not, at the time of the filing of the request, placed any direct collection orders in accordance with Article 46(4) of the Russian Tax Code on Yukos' bank accounts, the interim measures had been granted without the proper basis in law.[541]   It also concluded that there were other specific procedures that could be followed under Article 91(1)(5) (in lieu of the interim relief granted under Article 90(2)) that did not require interim measures.[542]

531.   Also on 30 June 2004, a resolution of Bailiff Solovyova was issued initiating enforcement proceedings.[543]   The bailiff then issued several more resolutions freezing cash in 16 Yukos bank accounts up to the total amount of taxes then due.[544]

532.   On 30 June 2004, the Tax Ministry obtained the reversal of the interim measures and initiated enforcement proceedings.   On the same day, the Field Tax Audit Report for 2001 was released.[545]   It assessed taxes, interest, and fines totaling approximately USD 4.1 billion.[546]

533.   On 1 July 2004, another resolution was issued by Bailiff Solovyova limiting Yukos' rights pertaining to securities of 37 production, refining, and research subsidiaries.[547]

---

[539]   Appeal Resolution of the Moscow Arbitrazh Court, Case No. A40-17699/04-109-241, 29 June 2004, Exh. C-121.

[540]   Appeal Resolution of the Moscow Arbitrazh Court, Case No. A40-21839/04-76-276, 23 June 2004, Exh. C-120.

[541]   *Ibid.*, p. 4.

[542]   *Ibid.*

[543]   Resolution of Bailiff I.D. Soloyyova to initiate enforcement proceeding No. 10249/21/04, 30 June 2004, Exh. C-123.

[544]   Resolution of Bailiff I.D. Soloyyova to seize monies No. 10249/21/04, 30 June 2004, Exh. C-124.

[545]   Repeat Field Tax Audit Report No. 30-3-14/1 (2001), 30 June 2004, Exh. R-345.

[546]   *Ibid.* at 132–33.  The results of the audit will be discussed below at paragraphs 545–56, in connection with the Tax Ministry decision to which it relates.

[547]   Resolution of Bailiff I.D. Soloyyova to restrict the rights of the securities owner, 1 July 2004, Exh. C-125; *see also* Memorial ¶ 341.

534.   On 9 July 2004, Bailiff Solovyova issued a resolution for a seven percent enforcement fee for the proceedings relating to the 2000 Decision.[548]  The fee amounted to approximately more than RUR 6.8 billion (approximately USD 240 million).

535.   On 13 July 2004, further resolutions were issued by the bailiffs to seize Yukos' 14.5 percent stake in Sibneft which had been ordered by the Chukotka Arbitrazh Court as an interim measure in those proceedings.[549]  The Chukotka proceedings had been initiated by Mr. Roman Abramovich and they related to disputes following the Yukos–Sibneft aborted merger.   The Tribunal notes that while this seizure was not directly related to Yukos' trading companies, as will be seen later, it limited the options available to Yukos to satisfy the payment demands it was facing.

536.   On 14 July 2004, pursuant to another resolution of the bailiffs, 43 ordinary shares and 13 preferred shares of Yukos in YNG were seized.[550]  At the same time, a resolution to restrict the rights of the securities owner with respect to those shares was issued.[551]

537.   On 16 July 2004, Mr. Steven Theede sent a letter signed by Mr. Bruce Misamore to Mr. Alexei Kudrin, then Minister of Finance. In the letter, Yukos petitioned the Ministry, "[i]n consideration of the unprecedented nature of the sum that is subject to collection from OAO Yukos Oil Company" for deferral of, or the opportunity to pay in installments, the amount imposed by the collection decision of the Moscow Arbitrazh Court issued on 28 May 2004.[552]  When he gave evidence, Mr. Theede acknowledged that the letter was not perfect (the proposals did not have a great deal of detail) but he described the letter as an attempt "to create a dialogue [between Yukos and the Russian Federation]."[553]

538.   In the days leading to the Hearing on the Merits in the case brought by Yukos against the lawfulness of the 2000 Decision, certain statements were made "in the mass media relat[ing] to

---

[548]   Resolution of Bailiff I.D. Solovyova No. 10249/21/04 to collect an enforcement fee, 9 July 2004, Exh. C-132;

[549]   Resolutions of Bailiff A.Yu. Seregin to initiate enforcement proceedings Nos. 10599/10/04, 10603/10/04, 10606/10/04, 10607/10/04 and 10608/10/04, 13 July 2004, Exh. C-133; *see also* Memorial ¶¶ 225–28

[550]   Decision of the Moscow Arbitrazh Court, Case No. A40-36718/04-79-445, 6 August 2004, p. 2, Exh. C-141 (referring to 14 July 2004 seizure of Yukos' shares in Yuganskneftegaz (hereinafter "YNG").

[551]   *Ibid.*, p. 1.

[552]   Letter from Steven Theede to Alexei Kudrin, signed by Bruce Misamore, 16 July 2004, Exh. C-138.

[553]   Transcript, Day 10 at 53–55.

the [Yukos] case."[554]   The statements apparently included charges of bias against Judge Mikhailova because she had previously written articles for a magazine edited by one of Yukos' lawyers, Mr. Sergey Pepeliaev.[555]   While Judge Mikhailova denied the accusations of bias, she nonetheless asked to be recused.[556]   On 19 July 2004, the day Judge Mikhailova had originally scheduled a hearing on the lawfulness of the 2000 Decision, the Moscow Arbitrazh Court granted her request to resign.[557]

539.   On 6 August 2004, Yukos in-house counsel, Mr. Gololobov, sent a letter to the Chief Bailiff of the Russian Federation renewing Yukos' request to give priority to its 20 percent stake in Sibneft above other assets.   The same day, the Moscow Arbitrazh Court found that a 14 July 2004 bailiff's resolution to seize shares of YNG was issued in error and that, instead, Yukos' 20 percent stake in Sibneft should have been seized.[558]   The court ruled that federal law on enforcement proceedings outlines a priority order for enforcement against a debtor's assets and enforcement against lower assets is only possible when the higher assets are insufficient to settle the debts.[559]   Since the shares in YNG were of a lower priority than the more liquid Sibneft shares, they should not have been seized before the Sibneft shares.[560]   Claimants consider this to be a "rare victory" by Yukos before the Russian courts.[561]

540.   On 12 August 2004, a ruling of the Moscow Arbitrazh Court denied Yukos' petition to pay by installments the amount levied by the Moscow Arbitrazh Court on 28 May 2004.[562]   Five days later, the same court denied Yukos' application that the bailiffs undertake enforcement against its 34.5 percent stake in Sibneft before enforcement against other assets.[563]

541.   In a decision of 18 August 2004 released on 23 August 2004, Yukos' "rare victory" was overturned by the Ninth Arbitrazh Court of Appeal.   The court quashed the 6 August 2004

---

[554]   Ruling of the Moscow Arbitrazh Court, Case No. A40-21839/04 76-276, p. 1, 19 July 2004, Exh. C-139 (emphasis in original omitted).

[555]   *Ibid.*, p. 3.

[556]   *Ibid.*, p. 4.

[557]   *Ibid.*

[558]   Decision of the Moscow Arbitrazh Court, Case No. A40-36718/04-79-445, p. 26, 6 August 2004, Exh. C-141

[559]   *Ibid.*

[560]   *Ibid.*

[561]   Memorial ¶ 349.

[562]   Ruling of the Moscow Arbitrazh Court, Case No. A40-1397/04ip-109, 12 August 2004, Exh. C-142.

[563]   Decision of the Moscow Arbitrazh Court, Case No. A40-34962/04-94-425, 17 August 2004, Exh. C-143.

decision to give priority to enforcement against the 20 percent stake in Sibneft.  The court found that, as the shares in YNG had been issued by YNG after its privatization, they were not related to primary production and thus could be considered as a higher priority.[564]  As Yukos had not discharged its debt "voluntarily," the court found that the YNG shares were part of an inventory legally open to seizure by the bailiffs.[565]

542.  On 30 August 2004, the Tax Ministry sent a letter to Yukos, denying its request for deferred payment or payment by installments.[566]  This letter was in response to the letter intended to "create a dialogue" between Yukos and the Russian Federation sent more than a month earlier to the Finance Ministry by Messrs. Theede and Misamore.

543.  On 9 September 2004, five days after a decision reassessing taxes against Yukos for 2001, a letter from the Deputy Head of the Bailiffs Department notified the company that the arbitrazh courts had approved seizures against YNG and other production subsidiaries.[567]

544.  On 23 November 2004, the resolution of the Ninth Arbitrazh Court of Appeal of 16 November 2004 was issued.  It affirmed the lawfulness of the 2000 Decision.[568]

### (b)  The 2001 Decision

545.  On 2 September 2004, Decision No. 30-3-15/3 holding the taxpayer fiscally liable for a tax offense ("**2001 Decision**") was issued.[569]  It imposed the following taxes:

| COMPANY | TAX BENEFITS | VAT | TOTAL |
|---|---|---|---|
| **Alta-Trade** | RUR 1,271,988,200 | RUR 1,841,854,300 | RUR 3,113,842,500 (USD 106,437,232) |
| **Fargoil** | RUR 1,907,396,200 | RUR 3,170,995,300 | RUR 5,078,391,500 (USD 173,589,362) |

---

[564]  Resolution of the Ninth Arbitrazh Court of Appeal, Case No. 09AP-1554/04-AK, p. 4, 23 August 2004, Exh. C-144.

[565]  *Ibid.*, pp.4–5.

[566]  Letter from the Russian Tax Ministry to Yukos, 30 August 2004, Exh. C-145.

[567]  Letter from the Russian Ministry of Justice to Yukos, 9 September 2004, Exh. C-146.

[568]  Resolution of the Ninth Arbitrazh Court of Appeal, Case No. 09 AP-4078/04-AK, 23 November 2004, Exh. C-147.

[569]  2001 Decision, Exh. C-155.

| COMPANY | TAX BENEFITS | VAT | TOTAL |
|---|---|---|---|
| **Mars XXII (Energotrade)** | RUR 3,056,000 | RUR 18,009,000 | RUR 21,065,000 (USD 720,043) |
| **Ratmir** | RUR 1,787,339,500 | RUR 4,303,815,200 | RUR 6,091,154,700 (USD 208,207,590) |
| **Yukos-M** | RUR 1,723,009,600 | RUR 3,220,911,200 | RUR 4,943,920,800 (USD 168,992,890) |
| **Yu-Mordovia** | RUR 8,153,611,600 | RUR 8,470,436,200 | RUR 16,624,047,800 (USD 568,242,494) |
| **Mega-Alliance** | RUR 1,276,878,700 | | RUR 1,276,878,700 (USD 43,646,213) |
| **Ratibor** | RUR 5,729,645,900 | RUR 7,880,489,700 | RUR 13,610,135,600 (USD 465,221,075) |

546.  It also assessed penalties and fines.

547.  On the same day, a tax payment demand with respect to the 2001 Decision was issued in the amount of RUR 79,279,641,154 (approximately USD 2.7 billion).   Again, payment was due two days later, on 4 September 2004.[570]   A tax penalty was issued in the amount of RUR 40,607,549,520 (approximately USD 1.3 billion), which was also due on 4 September 2004.[571]   The total due by 4 September was thus approximately USD 4.1 billion.

548.  On 3 September 2004, the petition of the Tax Ministry to collect tax penalties of RUR 40,607,549,600 (approximately USD 1.3 billion) was served on Yukos.[572]

549.  On 6 September 2004, a decision was issued by the Interregional Inspectorate of the Tax Ministry.[573]   It ordered the automatic collection of the tax payment demand (approximately USD 2.7 billion) from Yukos bank accounts.   Three days later, on 9 September 2004, a resolution of Bailiff Borisov to initiate enforcement proceedings was issued.[574]   On the same

---

[570]   Tax Payment Demand No. 133, 2 September 2004, Exh. C-156.

[571]   Tax Penalty Payment Demand No. 133, 2 September 2004, Exh. C-157.

[572]   Russian Tax Ministry Petition to collect tax Penalties, 3 September 2004, Exh. C-158.

[573]   Decision No. 52/595, 6 September 2004, Exh. C-159.

[574]   Resolution of Bailiff D.A. Borisov to initiate enforcement proceeding No. 13022/11/04, 9 September 2004, Exh. C-161.

day, there was another resolution of Bailiff Borisov to join the enforcement proceedings for the 2000 Decision and the 2001 Decision.[575]

550.  On 16 September 2004, Yukos reiterated its petition for voluntary enforcement by the bailiffs against its holdings in Sibneft and non-core subsidiaries.[576]  No response was received from the bailiffs.[577]  The next communication received from the bailiffs was on 20 September 2004, when they issued a resolution to collect a seven percent enforcement fee— RUR 5,549,574,880.78 (approximately USD 190 million) for the 2001 Decision.[578]

551.  As it had done in respect of the 2000 Decision, Yukos challenged the lawfulness of the 2001 Decision.  Parallel proceedings were filed by the Tax Ministry for collection of the 2001 Decision.  Judge Dzuba ruled in favour of the Tax Ministry.[579]

552.  On 29 October 2004, a Field Tax Audit Report for 2002 was released.[580]  It assessed tax arrears, interest, and fines of approximately USD 6.8 billion.[581]

553.  On 12 November 2004, Yukos sent a letter to the Judicial Collegium of the Russian Federation complaining that its challenge to Judge Korotenko in the proceedings concerning the lawfulness of the 2001 Decision had not been heard.[582]  Yukos had challenged Judge Korotenko for bias, on the ground that he had presided over the appeal panel of the Moscow Arbitrazh Court which had made a decision in favour of the Tax Ministry in respect of the 2000 Decision.

---

[575]  Resolution of Bailiff D.A. Borisov to join into consolidated enforcement proceedings, 9 September 2004, Exh. C-162. The consolidated enforcement proceeding is No. 10249/21/04.

[576]  Yukos' petition for voluntary enforcement of Resolution of 09.09.2004 to initiate an enforcement proceeding and Demand of 30.06.2004, Exh. C-163.

[577]  Memorial ¶ 354.

[578]  Resolution of the Bailiffs, 20 September 2004, Exh. C-164. RUR to USD is approximate, based on an exchange rate of 29.2552:1, the exchange rate on 2 September 2004, the date that the payment demand was issued.

[579]  Memorial ¶ 261.

[580]  Field Tax Audit Report No. 52/852, 29 October 2004, Exh. R-346.

[581]  The results of the audit will be discussed below at paragraphs 557–65, in connection with the Tax Ministry decision to which it relates.  RUR to USD is approximate, based on a ratio of 28.6696:1, the exchange rate on 16 November 2004, the date the Payment Demand was issued for the 2002 Decision.

[582]  Letter from Yukos to Highest Judicial Qualification Collegium of the Russian Federation, 12 November 2004, Exh. C-165.

554. In a hearing on 16-17 November 2004, Judge Korotenko denied Yukos' request to join the trading companies as third parties in the case against the 2001 Decision.[583]  Judge Korotenko also denied Yukos' motion to obtain an expert opinion on market prices of oil.[584]

555. On 18 November 2004, the Moscow Arbitrazh Court, Judge Korotenko presiding, affirmed the legality of the two-day time limits set forth in the previous payment demands.[585]  The court also rejected the arguments relating to the "massive" amounts assessed and the short time granted for voluntary payment.  The court stated that "[t]he tax legislation does not stipulate any deadline for voluntary fulfillment by the taxpayer of the demand to pay taxes.  Upon issue of the Claim, the Inspectorate is entitled to stipulate a time period for its voluntary execution."[586]  This decision of the Moscow Arbitrazh Court was announced on the same day as a *one*-day payment demand, relating to Decision No. 52/896 holding the taxpayer liable for a tax offense ("**2002 Decision**"), became due.  It also affirmed the lawfulness of the 2001 Decision.

556. Later, on 16 February 2005, a resolution of the Ninth Arbitrazh Court of Appeal of 9 February 2005, was issued.  It reduced the overall amount payable for 2001 by approximately USD 150 million.[587]  On 15 November 2005, the Federal Arbitrazh Court for the Moscow District also reduced, slightly, the amount of fines payable for 2001.[588]

(c)    The 2002 Decision

557. On 16 November 2004, the 2002 Decision was issued.[589]  It levied the following taxes:

| COMPANY | TAX BENEFITS | VAT | TOTAL |
|---|---|---|---|
| **Alta-Trade** | RUR 64,129,180 | | RUR 64,129,180 (USD 2,236,836) |

---

[583]    Moscow Arbitrazh Court, Transcript of the Hearing of 16–17 November 2004 in Moscow, Exh. C-166.

[584]    *Ibid*.

[585]    Decision of the Moscow Arbitrazh Court, Case Nos. A40-51085/04-143-92 and A40-54628/04-143-134, 17 November 2004, Exh. R-252.

[586]    *Ibid*. at 15.

[587]    Resolution of the Ninth Arbitrazh Court of Appeal, 16 February 2005, Exh. C-167.

[588]    Resolution of the Federal Arbitrazh Court for the Moscow District, Case No. A40-45410/04-141-34, 15 November 2005, Exh. C-168; *see* Memorial ¶ 257.

[589]    2002 Decision, Exh. C-175.

| COMPANY | TAX BENEFITS | VAT | TOTAL |
|---|---|---|---|
| **Fargoil** | RUR 20,705,417,918 | RUR 34,812,409,914 | RUR 55,517,827,832 (USD 1,936,470,262) |
| **Ratmir** | RUR 167,135,313 | | RUR 167,135,313 (USD 5,829,705) |
| **Yukos-M** | RUR 25,947,077 | RUR 260,150,323 | RUR 286,097,400 (USD 9,979,121) |
| **Yu-Mordovia** | RUR 104,408,575 | | RUR 104,408,575 (USD 3,641,787) |
| **Evoil** | RUR 29,678,098 | | RUR 29,678,098 (USD 1,035,177) |
| **Petroleum-Trading** | RUR 8,145,551 | RUR 59,464,184 | RUR 67,609,735 (USD 2,358,238) |
| **Ratibor** | RUR 260,150,114 | | RUR 260,150,114 (USD 9,074,076) |
| **OAO Yukos Oil Company** | | | RUR 33,789,516,238 |

558.    It also assessed penalties and fines.

559.    On 16 November 2004, a tax payment demand was issued in the amount of RUR 121,771,662,841 (USD 4.2 billion).  Payment was due on 17 November 2004—*one* day later.[590]  Similarly, on 16 November a tax penalty payment demand was issued in the amount of RUR 72,040,907,796 (USD 2.5 billion).  Payment was also due on 17 November 2004.[591]  The total amount due in one day was approximately USD 6.7 billion.

560.    On 18 November 2004, a decision was issued by the Tax Ministry to enforce and collect taxes and interest against the assets of Yukos.[592]  On the same day, Bailiff I.V. Kochergin initiated

---

[590]    Tax Payment Demand No. 175, 16 November 2004, Exh. C-176.

[591]    Tax Penalty Payment Demand No. 175/1, 16 November 2004, Exh. C-177.

[592]    Decision No. 52/900, 18 November 2004, Exh. C-178.

enforcement proceedings and joined these proceedings to the two earlier proceedings for 2000 and 2001.[593]

561.  On 19 November 2004, Field Audit Report No. 52/907 for 2003 was issued.[594]  It assessed tax arrears, interest and fines of approximately USD 5.9 billion.[595]

562.  On 24 November 2004, Yukos filed a petition for voluntary enforcement of the resolution of 18 November 2004.[596]  No response was received from the bailiffs.

563.  In relation to the 2002 Decision, there were no parallel proceedings:  only a single proceeding which addressed both the lawfulness and the collection of the 2002 Decision.  In a hearing on 8-9 December 2004, Yukos challenged Judge D.I. Dzuba, because, it submitted, the judge had "already formed a subjective negative opinion about OAO Yukos Oil Company as the guilty party" since he had presided over the collections case relating to the 2001 Decision.  The challenge was never heard by the court.[597]  On 16 December 2004, Judge Dzuba denied Yukos' request to obtain an expert opinion on oil market prices.[598]

564.  Between these events, on 9 December 2004, a resolution of the bailiffs to collect a 7 percent enforcement fee, RUR 2,737,919,857.85, was issued.[599]  On 23 December 2004, the court upheld the lawfulness of the 2002 Decision.

565.  On 30 June 2005, a resolution of the Federal Arbitrazh Court was issued, upholding earlier court decisions and reducing the overall amount payable for 2002 by USD 45.70 million.[600]

---

[593]   Resolution of Bailiff I.V. Kochergin to initiate enforcement proceeding No. 15315/4/04 and join it to consolidated enforcement proceeding No. 10249/21/04, 18 November 2004, Exh. C-179.

[594]   Field Audit Report No. 52/907, 19 November 2004, Exh. R-1583.  The results of the audit will be discussed below at paragraphs 566–74, in connection with the Tax Ministry decision to which it relates.

[595]   RUR to USD is approximate, based on a ratio of 27.8171:1, the exchange rate on 6 December 2004, the date the Payment Demand was issued for the 2003 Decision.

[596]   Yukos' petition for voluntary enforcement of Resolution 19.11.2004 to initiate an enforcement proceeding, Exh. C-180.

[597]   Transcripts of the Preliminary Hearing of the Moscow Arbitrazh Court, Case Nos. A40-61058/04-141-151 and A40-63472/04-141-162, Exh. C-181 and Exh. C-183.

[598]   Transcript of the Preliminary Hearing of the Moscow Arbitrazh Court, Case Nos. A40-61058/04-141-151 and A40-63472/04-141-162 p. 22, Exh. C-183.

[599]   Resolution of Bailiff I.V. Kochergin to collect a seven percent enforcement fee, 9 December 2004, Exh. C-182.

[600]   Resolution of the Federal Arbitrazh Court No. KA-A40/3222-5, Case Nos. A40-61058/04-141-151 and A40-63472/04-141-162, 30 June 2005, Exh. C-184. *See also* Memorial ¶ 260 n.384.

(d)    The 2003 Decision

566.   On 6 December 2004, Decision No. 52/985 holding the taxpayer fiscally liable for a tax offense
        was issued ("**2003 Decision**").[601]  It levied the following taxes:

| COMPANY | TAX BENEFITS | VAT | TOTAL |
|---|---|---|---|
| **Alta-Trade** | RUR 26,192,854 | | RUR 26,192,854 (USD 937,901) |
| **Fargoil** | RUR 22,549,425,143 | RUR 47,098,087,287 | RUR 69,647,512,430 (USD 2,458,096,703) |
| **Macro-Trade** | RUR 408,084,717 | RUR 46,810,044 | RUR 454,894,761 (USD 16,288,650) |
| **Energotrade (formerly Mars XXII)** | RUR 7,147,772,476 | RUR 6,826,447,412 | RUR 13,974,219,888 (USD 500,382,062) |
| **Ratmir** | RUR 8,345,945 | | RUR 8,345,945 (USD 298,848) |
| **Yukos-M** | RUR 135,201,343 | | RUR 135,201,343 (USD 4,841,224) |
| **Yu-Mordovia** | RUR 34,210,117 | | RUR 34,210,117 (USD 1,224,979) |
| **Evoil** | RUR 173,951,671 | | RUR 173,951,671 (USD 6,228,777) |
| **OAO Yukos Oil Company** | | | RUR 1,773,658,844 |

567.   It also assessed penalties and fines.

568.   On 6 December 2004, a tax payment demand was issued in the amount of
        RUR 101,464,118,510 (USD 3.6 billion).[602]  Payment was due one day later, on 7 December
        2004.  A tax penalty payment demand was also issued on 6 December 2004, in the amount of
        RUR 68,939,326,976 (USD 2.4 billion).[603]  Payment of this amount was also due one day later,

---

[601]    2003 Decision, Exh. C-190.

[602]    Tax Payment Demand No. 186, 6 December 2004, Exh. C-191.

[603]    Tax Penalty Payment Demand No. 186/1, 6 December 2004, Exh. C-192.

on 7 December 2004.  The total due one day after the payment demands were issued was approximately USD 6 billion.

569.  On 8 December 2004, a resolution of the Tax Ministry was issued to enforce and collect taxes and interest against Yukos' assets.[604]  The following day, Bailiff Kochergin issued a resolution which initiated enforcement proceedings, and joined them to the previous enforcement proceedings.[605]

570.  On 16 December 2004, Yukos again petitioned for voluntary enforcement only against assets of first priority, and requested that the bailiffs not collect an enforcement fee.[606]

571.  The Tribunal notes that, on 31 January 2005, an Interpol "Red Notice" was issued against Mr. Vladimir Dubov, who at this time was living in Israel.  It noted that he was "accused of budgetary funds misappropriation."[607]

572.  On 28 April 2005, the decision was issued by the Moscow Arbitrazh Court[608] reducing the overall amount payable for 2003 by approximately USD 2.6 million.

573.  The Tribunal also notes that, on 16 May 2005, in another Russian court Messrs. Khodorkovsky and Lebedev were convicted of tax evasion and embezzlement.[609]

574.  On 5 December 2005, the Federal Arbitrazh Court for Moscow issued a resolution affirming a small reduction of fines for 2003 by a lower court.[610]

---

[604]  Resolution No. 52/999 of the Tax Ministry's Interregional Inspectorate for Major Taxpayers No. 1, 8 December 2004, Exh. C-193.

[605]  Resolution of Bailiff I.V. Kochergin to initiate enforcement proceeding No. 16305/4/04 and join it to consolidated enforcement proceeding No. 10249/21/04, 9 December 2004, Exh. C-194.

[606]  Yukos' petition for voluntary enforcement of the Resolution of 9 December 2004 to initiate an enforcement proceeding, 16 December 2004, Exh. C-195.

[607]  *Interpol Wants YUKOS V. Dubov and M. Brudno*, Kommersant, 31 January 2005, Exh. C-749.

[608]  Decision of the Moscow Arbitrazh Court, Case Nos. A40-4338/05-107-9 and A40-7780/05-98-90, 28 April 2005, Exh. C-196.

[609]  Judgment of the Meshchansky District Court for the City of Moscow, 16 May 2005, Exh. R-379.

[610]  Resolution of the Federal Arbitrazh Court for Moscow District, Case Nos. A40-4338/05-107-9 and A40-7780/05-98-90, 5 December 2005, Exh. C-197.  *See also* Memorial ¶ 264, n.393.

(e)    The 2004 Decision

575.   On 27 December 2005, a Field Tax Audit Report for 2004 was issued.[611] It assessed tax arrears, interest, and fines against Yukos at approximately USD 3.9 billion.[612]

576.   On 17 March 2006, Decision No. 52/292 was issued holding Yukos fiscally liable for the commission of a tax offence, ("**2004 Decision**").[613]  It levied the following taxes:

| COMPANY | TAX BENEFITS | VAT | TOTAL |
|---|---|---|---|
| **Macro-Trade** | | RUR 386,687,520 | RUR 386,687,520 (USD 13,901,072) |
| **Energotrade (formerly Mars XXII)** | | RUR 41,946,060,356 | RUR 41,946,060,356 (USD 1,507,923,556) |
| **Yukos Vostok Trade** | RUR 1,224,013,181 | RUR 7,436,494,011 | RUR 8,660,507,192 (USD 311,337,530) |
| **OAO Yukos Oil Company** | | | RUR 3,105,399,900 |

577.   The Tribunal notes that there are no documents in the record evidencing a tax payment demand or a tax penalty payment demand issued in respect of the 2004 Decision.

578.   However, on 21 June 2006, the Moscow Arbitrazh Court issued a decision[614] confirming the lawfulness of the Tax Ministry's claims relating to the arrears claimed in the 2004 Decision in the amount of RUR 66,391,719,284 (USD 2.4 billion).   On 18 August 2004, the Ninth Arbitrazh Court of Appeal issued a resolution, ordering a determination of the lawfulness of the 2004 fines in the amount of RUR 42,036,873,518 (USD 1.7 billion) in separate proceedings.[615]

---

[611]   Field Tax Audit Report No. 52/996, 27 December 2005, Exh. C-200.

[612]   RUR to USD is approximate, based on a ratio of 27.8171:1, the exchange rate on 17 March 2006—the date of the 2004 Decision.

[613]   2004 Decision, Exh. R-1539.

[614]   Decision of the Moscow Arbitrazh Court, Case No. A40-11836/06-88-35 "B", 21 June 2006, Exh. R-538.

[615]   Resolution of the Ninth Arbitrazh Court of Appeal No. 09AP-8628/2006 GK, 18 August 2006, Exh. C-336.

The lawfulness of the fines was eventually affirmed by the Moscow Arbitrazh Court on 6 October 2006.[616]

(f)    **Observation**

579.   This chronology of the five tax assessments against Yukos for the years 2000–2004 and related decisions of the Tax Ministry, the Russian courts and the bailiffs is lengthy and tedious.  But it is very much part of the factual matrix which will inform the Tribunal when it answers the question posed at the outset of the chapter:  "Why would Russia have treated Yukos as it did if its purpose was to collect taxes?"

3.    **The Taxes Assessed Against Yukos**

580.   The principal taxes assessed against Yukos were profit tax and VAT.  Together they account for over 95 percent of the total amount of more than USD 24 billion including related fines and interest.  Details in relation to profit tax and certain other revenue-based taxes are provided in Subsection (a) below.  Details in relation to VAT are set out in Subsection (b) below.

(a)    **Profit Tax and Other Revenue-based Taxes**

581.   As shown in the table below, for the tax years 2000 to 2004, the tax authorities imposed a demand for the payment of profit tax (including interest and fines) ranging from USD 261 million to USD 4 billion per year, for a total of **USD 9.5 billion**.  This represents some 39 percent of the total tax claims levied against Yukos in the reassessments for those years.  Other revenue-based taxes (also including interest and fines) assessed against Yukos added approximately USD 1 billion to the total.  The breakdown by individual tax year is as follows:[617]

| (IN USD BILLION) | 2000 | 2001 | 2002 | 2003 | 2004 | Total | % |
|---|---|---|---|---|---|---|---|
| Profit tax | 1.356 | 1.695 | 4.005 | 2.184 | 0.261 | 9.502 | 39.3 |
| Property tax | 0.006 | 0.010 | 0.009 | 0.013 | 0.003 | 0.039 | 0.2 |
| Road users tax | 0.258 | 0.002 | 0.001 | – | – | 0.261 | 1.1 |

---

[616]   Decision of the Moscow Arbitrazh Court, Case Nos. A40-37697/06-141-233 and A40-49860/06-127-206, 6 October 2006, Exh. C-201.

[617]   Figures derived from Details of Yukos' Alleged Tax Reassessments, Exh. C-593; *see also* Claimants' Opening Slides, pp. 62–63.

| (IN USD BILLION) | 2000 | 2001 | 2002 | 2003 | 2004 | Total | % |
|---|---|---|---|---|---|---|---|
| Tax for the maintenance of housing, social and culture facilities | 0.209 | – | – | – | – | 0.209 | 0.9 |
| Tax on sales of combustibles and lubricants | 0.570 | – | – | – | – | 0.570 | 2.4 |
| Advertisement tax | – | – | – | 0.006 | 0.002 | 0.008 | 0.03 |
| **Total** | **2.399** | **1.707** | **4.015** | **2.203** | **0.266** | **10.589** | **43.93** |

582.  The reasoning by the tax authorities for the imposition of profit tax and the other sundry revenue-based taxes did not vary substantively from year to year.  For purposes of the present chapter, the Tribunal will therefore consider the documents relating to the 2000 tax year.

583.  The 2000 Audit Report concludes that, during the year 2000, Yukos knowingly and deliberately operated a tax evasion scheme through the use of "sham dependent entities".  The Audit Report describes the "discovery"[618] of the scheme as follows:

> During the field tax audit, non-payment by OAO Yukos Oil Company of corporate profit tax, road users tax, property tax and housing support tax, arising from the use of an unlawful scheme involving evasion of tax through artificial creation of sham companies in the oil and oil product movement chain, which were registered in territories with a beneficial tax regime, was discovered.
>
> The aim of using this scheme was non-payment of taxes on the sum of revenue (income) received from the sale of oil and oil products.  For this purpose OAO Yukos Oil Company created sham dependent entities, which functioned as oil and oil product owners (hereinafter – the "owners").  These entities were registered in territories in which a beneficial tax regime applied (Closed administrative-territorial formations) [CATF], regions of the Russian Federation, providing tax benefits on investments).  OAO Yukos Oil Company had control over the operations, conducted by the oil and oil product "owners", by participating in the transactions as an intermediary (confirmed by documents shown in Attachment No. *14* to the field tax audit document) or by bringing in other entities dependent on OAO Yukos Oil Company to participate in transactions as an intermediary.[619]

584.  The 2000 Audit Report continues:

---

[618]   According to Mr. Konnov the use of the term "discovered" at the end of the first paragraph of the cited passage of the Audit Report ("[…] non-payment […] of corporate profit tax […] arising from the use of an unlawful scheme involving evasion of taxes […] was discovered.") is a mistranslation.  Mr. Konnov suggested that the original wording in Russian is better translated as "the audit concluded or established that […]."  Transcript, Day 13 at 167; *see also* Respondent's Closing Slides, p. 97.

[619]   2000 Audit Report, pp. 7–8, Exh. C-103.

The audit established that the actual owner of the oil and oil products was OAO Yukos Oil Company.  The oil was in fact acquired and transferred for refining, and the oil and oil products sold, by OAO Yukos Oil Company, as evidenced by the actual movement of oil and oil products from production entities to oil refineries or to oil bases controlled by OAO Yukos Oil Company, as confirmed in the trade and transport documents, and also the direct participation by OAO Yukos Oil Company in all the operations.  The following also provides proof that the oil and oil products actually belonged to OAO Yukos Oil Company [*sic*] and that the tax evasion scheme applied by them was illegal:

- interdependence of persons participating in the transactions and their control by OAO Yukos Oil Company;

- registration of the "owners" in territories with beneficial tax regimes;

- non-activity by the "owners" in their places of registration;

- the fictitious commission payments to OAO Yukos Oil Company, which are much smaller than the actual payments made on the intermediary market;

- the understated prices of acquisition of oil from production entities and from other sham companies;

- the conduct of accounting in all the entities by OOO Yukos-Invest, or by Yukos-FBTs OOO, which are dependent on OAO Yukos Oil Company;

- the opening of accounts for all the entities in the same banks, which are dependent on OAO Yukos Oil Company;

- the utilisation of promissory note settlements between the entities, or settlements by means of mutual set-off.[620]

585. The 2000 Audit Report goes into great detail in explaining the tax benefits that were claimed by each of the trading entities.  The Audit Reports for subsequent tax years generally follow the same form.  They audit OAO Yukos Oil Company and the trading companies.  They are divided into separate sections for each trading company; some of the later reassessments also include sums assessed directly against OAO Yukos Oil Company.  The sections on the trading companies generally begin with an overview of the incorporation, ownership, and capital of the company.  They then affirm that the directors of the company and its operations are not based in the region in which it had been incorporated, which according to the authors of the Audit Reports, shows that the company could not benefit from preferential taxation agreements offered to companies operating in the low-tax regions.  The reassessments then assert that the trading companies are "interrelated" and thus "dependent" on OAO Yukos Oil Company, thereby allowing OAO Yukos Oil Company to fraudulently claim taxation benefits.

586. The 2000 Audit Report concludes in relation to the tax evasion by Yukos as follows:

The tax evasion by OAO Yukos Oil Company, through registration of sham companies in territories with preferential tax rates, with the exclusive aim of evading tax, and

---

[620]   *Ibid.*, pp. 8–9.

which . . . did not actually trade or engage in any activity in those territories or indeed anywhere else, or invest any money in the economies of the relevant constituent entities of the Russian Federation, and which, therefore, illegally applied the additional tax benefits, indicates that OAO Yukos Oil Company acted in bad faith.

According to the Russian Federation Constitutional Court's 25 July 2001 Ruling No. 138-O interpreting the provision contained in Article 3(7) of the RF Tax Code, in the area of taxation there is a presumption of good faith on the part of taxpayers.

As is evident from the above-mentioned Ruling, the presumption of taxpayer good faith, enshrined in the RF Tax Code, presupposes an obligation on the tax authorities to prove any bad faith on the part of taxpayers in the manner set out by the Russian Federation Tax Code, and to conduct the necessary audits in order to establish such bad faith with the aim of ensuring a balance between state and private interests.

Similar provisions are contained in RF Constitutional Court Rulings Nos. 4-O dated 10.01.2002 and 108-O dated 14.05.2002.

The Judgements of the Presidium of the RF Supreme Court of Arbitration Nos. 9408/00 dated 18.09.2001, 7374/01 dated 18.06.2002, 6294/01 dated 05.11.2002 and 11259/02 dated 17.12.2002, and a letter from the Deputy President of the RF Supreme Court of Arbitration No. S5-5/up-342 dated 17.04.2002, also point out the need to examine the question of bad faith on the part of taxpayers, that is, their commission of deliberate acts aimed at not fulfilling the constitutional obligation to pay taxes.

The above-mentioned circumstances, namely OAO Yukos Oil Company carrying out operations involving the purchase and sale of oil and oil products, indicate Yukos Oil Company's OAO bad faith, which evidences its deliberate actions in evading payment of taxes through the application of illegal schemes.

. . . According to the Regulations of 01.01.2000 on the accounting policy for the year 2000, in OAO Yukos Oil Company for purposes of taxation (in order to calculate corporate profit tax, value added tax, Road users tax and housing support tax) revenue from the sale of products and goods (work, services) was determined on the basis of actual payments.

For purposes of taxation revenue was indicated by the entity in the accounts in the line 010 of the account using form No. 2 "Profit and Loss Account" taking into account the Information on the procedure for determination of data indicated in line 1 of "Calculation of tax on actual profit" in a sum of RUR 36,396,312,000 (RUR 36,264,009,000 in Form No. 2, "Profit and Loss Account" + RUR 132,303,000 according to the Information on the procedure for determination of data indicated in p. 1 of "Calculation of tax on actual profit").

According to the data of the audit, revenue from the sale of goods (work, services) amounted to RUR 245,907,712,162.

Thus, the revenue from the sale of goods (work, services) in the sum of RUR 209,511,400,162 was understated as a result of non-indication in the accounting registers of the revenue which had been received as a result of utilising a scheme with the participation of sham entities which were dependent on OAO Yukos Oil Company and which had been created for the purpose of tax evasion on the part of OAO Yukos Oil Company . . . .[621]

587.   The 16 November 2004 decision of the Ninth Arbitrazh Court of Appeal upheld the 2000 Decision to hold Yukos liable for all these taxes.  The English translation of the judgment is 25 pages long.  The key passages, which the Tribunal believes should be set out so as to give

---

[621]   *Ibid.*, pp. 14–15.

visibility to the court's reasoning (which the Tribunal will consider later as part of the totality of the evidence), follow:

> OAO Yukos Oil Company did not agree with the decision of the Court and filed an appeal requesting that the decision of the Court of First Instance be quashed and that the presented claim be granted in full: to declare unlawful the Russian Federation Ministry of Taxes and Levies Decision No. 14-3-05/1609-1 of 14.04.2004 to Hold the Taxpayer Fiscally Liable for a Tax Offense.

> . . . The interested party, the Russian Federation Ministry of Taxes and Levies, argues that the Court of First Instance legally and justifiably found that the decision and resolution issued in Case No. A40-17669/04-109-241 [*i.e.*, the 26 May 2004 decision], which involves the same parties as Case No. A40-21839/04-76-276 [*i.e.*, the case before the Court of Appeal], established the legality and validity of the disputed RF Tax Ministry Decision, the circumstances surrounding OAO Yukos Oil Company's performance of actions aimed at evading taxes through the artificial formation of entities registered in territories with preferential tax rates and their "participation" in the chain of movement of oil and oil products, and the illegality and invalidity of OAO Yukos Oil Company's arguments regarding the illegality of the RF Tax Ministry's disputed Decision.

> . . .

> Pursuant to Article 69(2) of the RF Arbitrazh Procedure Code, facts established by the legally effective judicial act of an arbitrazh court in connection with a previously heard case do not need to be proven again when the arbitrazh court hears another case involving the same parties.

> The Court Decision of 26.05.2004 in Case No. A40-17669/ 04-109-241 established that the tax authority did not breach the requirements of Article 87 of the RF Tax Code when issuing Decision No. 14-3-05/1609-1 of 14.04.2004.   The Court found that RF Tax Ministry Decision No. 14-3-05/1609-1 of 14.04.2004 is consistent with the Russian Federation Tax Code, federal laws adopted pursuant to the RF Tax Code, and other tax laws that were in effect during the audit period.

> . . . The Court found that the entities registered in territories with preferential tax rates and named in the RF Tax Ministry's Decision (Yu-Mordovia OOO, Alta-Trade OOO, Ratmir OOO, Mars XXII OOO, Jupiter XXIV OOO, ZAO Yukos-M, Saturn XXV OOO, Yuksar OOO, Siberian Transportation Company OOO, Quercus OOO, Muskron OOO, Nortex OOO, Grace OOO, Colrain OOO, Virtus OOO, Plast OOO, Mitra OOO, Vald-Oil OOO, Business-Oil OOO, Staf OOO, Petroleum-Trading OOO) were related to each other and dependent on OAO Yukos Oil Company.   The relationship of all the entities and their dependence on OAO Yukos Oil Company, as one of the items of evidence of bad faith on the part of the Applicant which applied the illegal tax evasion scheme is also confirmed by the fact that the same individuals were the founders and (or) officers in the aforementioned entities.

> . . . The Court rightly found that control of the oil and oil-product transactions performed by the entities registered in territories with preferential tax rates was exercised OAO Yukos Oil Company by means of participation in the transactions as an intermediary or by means of involvement of other entities, dependent on OAO Yukos Oil Company, as intermediaries in the transactions.  The entities registered in territories with preferential tax rates concluded agency agreements for the purchase of crude oil with OAO Yukos Oil Company.  In turn, OAO Yukos Oil Company, acting on behalf of entities registered in territories with preferential tax rates, purchased oil from producing entities or from other suppliers.  Thereafter, the crude oil purchased via the agent (OAO Yukos Oil Company) was sold to buyers (Russian or foreign) via this same OAO Yukos Oil Company (as the commission agent or the agent) or transferred for refining to refineries which were subsidiaries of OAO Yukos Oil Company.  Apart from agency agreements, purchase and

sale agreements were drawn up for purchase of oil, according to conditions thereof, OAO Yukos Oil Company "sold" oil from the resources of its producing entities – OAO Yuganskneftegaz, OAO Samaraneftegaz, and OAO Tomskneft.  Unlike OAO Yukos Oil Company and its producing companies, which according to the customs cargo declarations were shippers, the entities registered in regions with preferential tax rates were not mentioned in the export documents.

The dependence of entities, registered in territories with preferential tax rates, on OAO Yukos Oil Company and the control by OAO Yukos Oil Company of all transactions is also confirmed by the fact that the records of all transactions associated with the purchase and transfer of oil for refining, as well as with the sale of oil and oil products (including accounting records) were kept by Yukos-Invest OOO and Yukos-FBTs, which are dependent on OAO Yukos Oil Company.  Furthermore, the entities registered in territories with preferential tax rates entered into production management service contracts with OOO Yukos RM, which is also dependent on OAO Yukos Oil Company.  The financial statements and tax filings were submitted to the tax authorities by post from the address at which OAO Yukos Oil Company was located according to the invoices.  Furthermore, this address was the mailing address of OOO Yukos-Moscow, which is the executive body of OAO Yukos Oil Company.

The accounts of all entities are opened with the same banks, i.e. OAO Trust Investment Bank, OAO Bank Menatep St. Petersburg and Bank Solidarnost, where OAO Yukos Oil Company was a shareholder.

In addition to concluding agreements on the purchase and sale of oil and oil products, these entities also conducted activities involving the purchase and sale of promissory notes, which they used in settlements with one another and with OAO Yukos Oil Company for oil and oil products.  Or by purchasing and selling promissory notes, these entities returned to OAO Yukos Oil Company funds supposedly earned for oil they sold.  Therefore, the business of these entities related to the purchase and sale of promissory notes is a business related to the purchase and sale of oil and oil products.  Therefore, the Court lawfully and justifiably rejected the Applicant's argument that the entities registered in territories with preferential tax rates engaged in business activities other than the sale of oil and oil products.

The Applicant's assertion that the determination of bad faith is possible exclusively in the instances of payment of taxes through insolvent banks is unfounded, as the finding that it is necessary for the tax authorities to conduct audits and determine bad faith was made by the Constitutional Court of the Russian Federation based on the interpretation of Article 3(7) of the RF Tax Code, i.e. the presumption of the taxpayers' good faith. From this follows the obligation of taxpayers to act in good faith when conducting any actions associated with the discharge of their tax liability and the right of the tax authorities to determine bad faith on the part of taxpayers committing actions (inaction) intentionally aimed at tax evasion.

In light of the foregoing circumstances, the Court rightly found that the owner of the oil and oil products was OAO Yukos Oil Company.  The purchase and transfer of the oil for refining and the sale of oil and oil products were actually carried out by OAO Yukos Oil Company as the owner.

. . . The Constitutional Court of the Russian Federation, in Ruling No. 138-O of 25.07.2001, points out that, according to the tenor of Article 3(7) of the RF Tax Code, the presumption of good faith on the part of taxpayers is in effect in the area of tax relations. For the purpose of determination of bad faith on the part of taxpayers, the tax authorities have the right—in order to ensure a balance between State and private interests—to carry out the necessary audit and to file with the arbitrazh courts claims that ensure the receipt of taxes into the budget.  In light of the above, in order to ensure a balance between State and private interests, the tax authorities have the right to conduct audits for the purpose of

determination of the actual owner of sold property and for determination of bad faith on the part thereof, expressed in the application of a tax evasion scheme.

The fact that OAO Yukos Oil Company had the rights of possession, use and disposal with respect to the oil and oil products, and at its own discretion performed with respect thereto any actions, including alienation, transfer for processing, etc. through sham entities dependent on OAO Yukos Oil Company was established by the legally effective judicial acts in Case No. A40-17669/04-109-241.

The Court therefore rightly does not accept the argument of the Applicant and the third party regarding the non-compliance with law and the factual circumstances of the assessment of taxes to OAO Yukos Oil Company as the owner of the oil and oil products.

. . .The circumstances established by the Court concerning the transactions of OAO Yukos Oil Company associated with the purchase and sale of oil and oil products and in their interconnection and collectively indicate bad faith on the part of OAO Yukos Oil Company, which is reflected in the intentional actions aimed at tax evasion by means of application of illegal schemes, as a result of which the RF Tax Ministry lawfully held OAO Yukos Oil Company liable pursuant to Article 122(3) of the Russian Federation Tax Code, for the intentional failure to pay or an incomplete payment of tax as a result of reduction of the tax base, other incorrect tax calculations, or other unlawful actions (inaction), in the form of a fine in the amount of 40 percent of the unpaid tax amount, as established by the judicial acts in Case No. A40-17669/04-109-241.

. . .Therefore, the Moscow Arbitrazh Court in its decision legally and justifiably found that RF Tax Ministry Decision No. 14-3-05/1609-1 of 14.04.2004 to Hold the Taxpayer Fiscally Liable for a Tax Offense is legal and well-founded in part and complies with the Russian Federation Tax Code, federal laws adopted pursuant to the RF Tax Code, and other tax laws that were in effect during the audit period (the Russian Federation Law No. 2116-1 of 27.12.91 "On Corporate Profit Tax", the Russian Federation Law No. 1759-1 of 18.10.1991 "On Road Funds in the Russian Federation", the Russian Federation Law No. 2118-1 of 27.12.1991 "On Fundamentals of the Tax System", the Russian Federation Law No. 2030-1 of 13.12.1991 "On Corporate Property Tax" and the Russian Federation Law No. 1992-1 of 06.12.1991 "On Value Added Tax").[622]

[emphasis added]

588.   The Tribunal will discuss the key elements of this decision, notably its endorsement of the assessment of taxes against Yukos on the basis that Yukos was the "actual owner" of the oil and oil products, in Section VIII.B.5 below.

(b)   **VAT**

589.   As shown in the table below, for the tax years 2000 to 2004, the tax authorities imposed a demand for the payment of VAT (including interest and fines) ranging from USD 1 billion to USD 4 billion per year, for a total of **USD 13.59 billion**.  This represents some 56 percent of

---

[622]   Resolution of the Ninth Arbitrazh Court of Appeal, Case No. 09AP-4078/04-AK, 16 November 2004, Exh. C-147.

the total tax claims levied against Yukos in the reassessments for those years.  The breakdown by individual tax year is as follows:[623]

|  |  | 2000 | 2001 | 2002 | 2003 | 2004 | Total | % |
|---|---|---|---|---|---|---|---|---|
| **VAT** | Tax Arrears | 0.49 | 0.99 | 1.24 | 1.93 | 1.73 | 6.38 | 26.39 |
|  | Interest & Fines | 0.59 | 1.40 | 1.50 | 1.97 | 1.75 | 7.21 | 29.82 |
|  | **Sub-total** | **1.08** | **2.39** | **2.74** | **3.90** | **3.48** | **13.59** | **56.2** |
| Other taxes | Tax Arrears | 1.19 | 0.75 | 1.91 | 1.16 | 0.16 | 5.17 | 21.38 |
|  | Interest & Fines | 1.21 | 0.96 | 2.11 | 1.05 | 0.10 | 5.42 | 22.46 |
|  | Sub-total | 2.40 | 1.71 | 4.02 | 2.21 | 0.26 | 10.59 | 43.8 |
|  | TOTAL | 3.48 | 4.10 | 6.76 | 6.11 | 3.74 | 24.18 | 100 |

590.  The reasoning of the tax authorities for the imposition of VAT payments did not change from year to year.  For purposes of this chapter, the Tribunal will therefore consider solely the documents relating to the 2000 tax year.

591.  But before turning to the reasoning for the imposition of VAT payments on Yukos, the Tribunal will review some features of the VAT regulations of the Russian Federation.

592.  In Russia, VAT is a federal tax levied at uniform rates throughout the Federation. As a result, all companies pay VAT regardless of the region where they are registered, under identical terms and conditions.  There are accordingly no additional VAT benefits for companies incorporated in low-tax regions.  The applicable rate of VAT to oil and oil products was 20% in 2000 to 2003 and 18 percent in 2004.[624]

593.  If the products were exported, they were either exempt from VAT (2000) or subject to a zero percent VAT rate (2001 onwards).[625]  The zero percent rate is not automatic, but available when the taxpayer files a monthly or quarterly VAT return.[626]  It is common ground between the

---

[623]   Figures derived from Details of Yukos' Alleged Tax Reassessments, Exh. C-593; *see also* Claimants' Opening Slides, pp. 62–63.

[624]   First Konnov Report ¶ 56.  *See also* Articles 165(9) and 164(3), Russian Tax Code, Exhs. R-1484 and R-1483.

[625]   As a result, exporting companies did not charge VAT to their foreign customers and were entitled to the refunds on the VAT charged by their own suppliers.  *See* Dubov WS ¶ 37; *see also* Memorial ¶ 319.

[626]   First Konnov Report ¶¶ 53–58.

Parties that, in the years 1999 to 2003, the Yukos trading companies filed the VAT returns for their exports of oil.[627]

594.   The 2000 Decision notes that Yukos failed to reflect revenue from the sale of products "arising from the use of an unlawful scheme involving evasion of tax through artificial creation of sham companies in the oil and oil product movement chain, which were registered in territories with a beneficial tax regime."[628]   The 2000 Decision then states:

> The aim of using this scheme was non-payment of corporate profit tax value added tax, road users tax, tax on sales of fuel and lubricants (hereinafter referred to as F&L) and housing support tax on the sum of revenue (income) received from the sale of oil and oil products.[629]

595.   The VAT at issue was the VAT in relation to which the Yukos trading companies had already obtained an exemption or zero percent rate, not VAT that could be said to arise from new or additional transactions or from a finding that the oil or oil products had not actually been exported.   During his cross-examination at the Hearing, Mr. Konnov explained that the reasoning behind the imposition of VAT on Yukos is very clear from the original Russian-language version of the decision.   The 2000 Decision states (in the Russian language original) that it is Yukos, as the actual exporter, which must file the VAT return in order to get the VAT tax benefit which had earlier been granted to its trading entities. Mr. Konnov explained:

> A.   And then there is a sentence which I don't see in the English text, which says:
>
>> "Based on the foregoing, the actual export operations were conducted by OAO NK Yukos and tax claim were provided to ZAO Yukos-M."
>
> And that's the sentence on the point; for some reason it's not in the English text.
>
> So I agree maybe it's not a detailed sentence, but what it clearly tells to any tax lawyer, or to Yukos, I think: that Yukos – sorry, Yukos-M claimed the tax benefits and was provided the tax benefits, and the actual exporter who must file the return is Yukos.[630]

596.   In other words, while it was the trading companies that were set up in Yukos' tax structure as the entities exporting oil and oil products to purchasers abroad that filed VAT returns to claim the exemption or zero percent rate that applies to export transactions, and in spite of the fact

---

[627]   Memorial ¶¶ 320–21.   *See also* Decision No. 23 on partial refusal to refund/offset VAT (Alta-Trade), 15 June 2000, Exh. C-1110; Decision No. 48 to deny refunding (offset) VAT (Alta-Trade), 29 October 2001, Exh. C-1116; Decision No. 53 on partial refusal to refund/offset VAT (Mars XXII), 27 December 2004, Exh. C-1117.

[628]   2000 Decision, p. 1, Exh. C-104.

[629]   *Ibid*.

[630]   Transcript, Day 14 at 236.

that the trading companies had already qualified for the exemption or zero percent  rate on the basis of duly submitted VAT returns, the tax authorities subsequently determined that Yukos itself was the "actual exporter", and that it was Yukos, instead of the trading entities,  that had to qualify for the exemption or zero percent rate. Since Yukos had not filed the returns itself, it was deemed to have failed to file the VAT returns required to benefit from the exemption or zero percent rate.

597. The judgment of the Moscow Arbitrazh Court that confirmed the decision for the 2000 tax year rejected Yukos' appeal against the VAT assessments:

> The court does not accept the arguments of OAO Yukos Oil Company regarding unlawfulness of the RF Tax Ministry Decision No. 14-3-05/1609-1 of 14.04.2004 relating to assessment of the value added tax.  It follows from the RF Tax Ministry Decision that the tax authority assessed VAT reimbursed to entities registered in the territories with preferential tax rates upon their applications on export transactions.  Pursuant to Law No. 1992-1 of 06.12.1991 "On Value-Added Tax," effective during that period, exemption from payment of value-added tax when exporting goods (work, services) was a benefit. In order to use its right to the benefit, the taxpayer had to declare its right and confirm its right by documents in accordance with the current legislation.  The taxpayer – OAO Yukos Oil Company – did not declare its desire to use its benefit either in 2000 or later.[631]

> [emphasis added]

598. At the Hearing, Mr. Konnov described as follows "the essence" of the reasoning in the decision and subsequent judgment:

> [T]hat Yukos did not file tax return, and in the absence of the tax return it is not eligible for a 0% VAT rate.[632]

Mr. Konnov also confirmed at the Hearing that the same reasoning was applied for subsequent tax years.[633]

### 4.    The Fines Assessed Against Yukos

599. As shown in the table below, for the tax years 2000–2004, the tax authorities imposed fines against Yukos ranging  from  USD 670 million  to  USD 2.5 billion  per year, for a  total of

---

[631]    Decision of the Moscow Arbitrazh Court, Case No. A40-17669/04-109-241, 26 May 2004, p. 19, Exh. C-116.

[632]    Transcript, Day 14 at 240

[633]    *Ibid.* at 240–51.

**USD 8.5 billion**.  This represents some 35% of the total tax claims levied against Yukos in the reassessments for those years.  The breakdown by individual tax year is as follows:[634]

|  | 2000 | 2001 | 2002 | 2003 | 2004 | Total | % |
|---|---|---|---|---|---|---|---|
| Tax Arrears | 1.68 | 1.74 | 3.15 | 3.09 | 1.90 | 11.55 | 47.73 |
| Interest | 1.13 | 0.97 | 1.10 | 0.54 | 0.38 | 4.13 | 17.14 |
| **Fines** | **0.67** | **1.39** | **2.51** | **2.47** | **1.46** | **8.50** | **35.13** |
| TOTAL | 3.48 | 4.10 | 6.76 | 6.10 | 3.74 | 24.18 | 100 |

600.  Article 122 of the Russian Tax Code establishes a taxpayer's liability for "non-payment or underpayment of taxes."  Pursuant to paragraph 1 of this provision, the sanction is a 20 percent fine on the unpaid amount of taxes.  Under paragraph 3 of this provision, this fine can be increased to 40 percent of the unpaid amount if the offense is committed intentionally. This fine has been referred to in this case as the "willful offender" fine. Under Articles 110(2) and 110(4) of the Russian Tax Code, the intention of a company requires, *inter alia*, that the awareness of the company's executives of the unlawful nature of their actions (or failure to act) be established.  Finally, under Articles 112(2) and 114(4) of the Russian Tax Code, the fines can be increased to 80 percent, concretely, be doubled, in cases of so-called "repeat" offenses, *i.e.* offenses committed by "a person, which has been previously held liable for a similar tax offense."[635]  This fine has been referred to in this case as the "repeat offender" fine.

601.  Yukos was assessed both the "willful offender" and the "repeat offender" fines by the authorities.

602.  The Tax Ministry, referring to Article 110(2) of the Russian Tax Code, claimed that for the year 2000, "[Yukos] deliberately committed the acts aimed at evading payment of taxes, and its officers were aware of the unlawful nature of such actions."[636]  On this basis, the fines on

---

[634]  Figures (in USD billions) derived from Details of Yukos' Alleged Tax Reassessments, Exh. C-593.  The fines levied in relation to unpaid VAT alone account for a total of some USD 4.8 billion for the tax years 2000–2004, with the balance of USD 3.7 billion levied in relation to all of the other types of taxes (the majority—USD 3.3 billion—of the remaining amount being levied in relation to profit tax).

[635]  Russian Tax Code, Part I, Exh. C-401.

[636]  2000 Decision, p. 8, Exh. C-104.

Yukos were doubled from the standard rate of 20 percent to 40 percent.  Yukos was thus charged, by reference to Article 122(3), with a 40 percent fine on the amount of its alleged tax arrears.[637]  The same reasoning was used by the tax authorities to impose fines on Yukos for the years 2001–2004.[638]

603.   The Tax Ministry then doubled the fines once more for the years 2001 to 2004 (the year 2000 being considered as the first "offense"), in order to reach an 80 percent fine on the alleged tax arrears.  This was done on the basis of Articles 112(2) and 114(4) of the Russian Tax Code regarding repeat tax offenses.[639]

### 5.   Parties' Arguments and Tribunal's Observations

604.   In Chapter VIII.A of the present Award, the Tribunal has found that Yukos had run afoul of the tax authorities prior to December 2003 in some of the low-tax regions, notably in the ZATOs (Lesnoy and Trekhgorny) and in Kalmykia.  The Tribunal noted earlier that Yukos had wound up its trading entities in Lesnoy and Trekhgorny, and merged them into two separate companies based outside of the ZATOs.  These companies later merged to form Investproekt, based in yet another region of Russia.  The shuffling of these companies, as the Tribunal observed in Chapter VIII.A, while completed before any decisions were issued against the companies for being shams and for their use of promissory notes to pay (and even overpay) its tax bills, does raise troubling questions which were never answered to the satisfaction of the Tribunal.  It suggests that Yukos was aware of the vulnerability of its tax optimization scheme and took steps to minimize its exposure when elements of the scheme were being investigated.  This evidence has been thoroughly reviewed and commented upon by the Tribunal in Chapter VIII.A.

605.   In principle, therefore, both Yukos and members of its management were exposed to further findings of civil and/or criminal liability in connection with these activities as there is no evidence in the record that any tax payable as a result of the investigation of the trading entities in the ZATOs was ever paid.  It is in this context that the Russian Federation charged

---

[637]   *Ibid.*

[638]   2001 Decision, p. 157, Exh. C-155; 2002 Decision, p. 166, Exh. C-175; 2003 Decision, p. 144, Exh. C-190; 2004 Decision, pp. 89–90, Exh. C-200.

[639]   2001 Decision, pp. 163–64, Exh. C-155; 2002 Decision, pp. 165–66, Exh. C-175; 2003 Decision, p. 144, Exh. C-190; 2004 Decision, p. 89, Exh. C-200.

Messrs. Khodorkovsky and Lebedev with tax offenses, and reassessed taxes against Yukos as of December 2003.

606.  In this section, the Tribunal considers the Parties' specific arguments in respect of each element of the tax assessments that began in December 2003 and continued at a very rapid pace throughout 2004 (covering the tax years 2000 through 2004).  As described in the earlier subsections of the present chapter, these elements included assessments for profit tax and other revenue-based taxes, VAT and fines.  While the Tribunal considers the Parties' arguments for each discrete element of the tax assessments, ultimately its conclusions are based on a consideration of the tax assessments as a whole as well as the two trials and convictions of Messrs. Khodorkovsky and Lebedev.  The Tribunal adopts this totality-of-the-evidence approach for several reasons.

607.  Firstly, the Parties' arguments regarding the tax assessments rest on all-or-nothing propositions.  On the one hand, Claimants argue that the tax assessments *as a whole* were conceived and crafted to fabricate debt "under the guise of taxes," and in amounts deliberately large enough to bankrupt Yukos.  Respondent, on the other hand, insists that the tax assessments were *entirely* legitimate, and that Yukos' demise was self-inflicted.

608.  Secondly, the discrete elements of the tax assessments are, in fact and in law, closely intertwined.  For example, as explained in greater detail below, the enormous liability imposed on Yukos for non-payment of VAT (and for the multiple fines associated with their non-payment) was made possible only because the revenues of Yukos' trading entities were "re-attributed" to Yukos itself.  It would therefore be artificial to deal with the complexity of this case by deconstructing the various elements of the tax assessments without, in the end, taking the broader perspective that is required to properly appreciate each one of them.

### (a)    Profit Tax and Other Revenue-Based Taxes

### i.    Introduction

609.  Claimants submit that the revocation of regional tax benefits on revenue-based taxes (principally the regional and local shares of profit tax) was the first step in the Russian Federation's fabrication of taxes targeting Yukos.  Claimants argue that the revocation of these benefits was arbitrary because (a) such benefits were expressly provided for in Russian federal and regional legislation with which the Yukos entities complied, and (b) the tax benefits were

known to and approved by the relevant authorities (with whom, in some cases the trading entities entered into tax investment agreements).[640]

610.  Respondent submits that the Russian Federation's revocation of the tax benefits was a legitimate and appropriate response to Yukos' tax optimization scheme under Russia's anti-abuse doctrine.  Respondent contends that all of the Yukos trading entities were sham letter-box companies, with no assets, employees or operations of their own, that were managed by Yukos itself.[641]

### ii. Was the "Bad-Faith Taxpayer" Doctrine Available at the Time of the Yukos Tax Assessments to Challenge a Tax Evasion Scheme?

611.  As an initial matter, the Tribunal notes that it has already confirmed, in Chapter VIII.A of the present Award, that the "bad-faith taxpayer doctrine" existed in the Russian Federation at the time of the issuance of the 2000 Tax Audit in December 2003 and, therefore, at the time of subsequent audits as well.[642]  Indeed, even Claimants acknowledged the existence of the doctrine.[643]

612.  Claimants cannot, therefore, impugn the Russian Federation's revocation of the benefits related to profit tax solely on the basis that the low-tax regions were competent to grant such tax benefits under that applicable legislation, and that "no breach of that legislation has been alleged."[644]  However, such an argument does not seem to take account of the impact of Russia's anti-abuse doctrine or "bad-faith taxpayer" doctrine which, as the Tribunal has already concluded, may constitute a ground for the reassessment of a party's tax liabilities.

613.  The Tribunal recalls however that, at the time of the tax assessments against Yukos, the "business purpose" doctrine (a variant of the "substance over form" and "bad faith taxpayer" doctrines) had not yet been explicitly adopted into Russian law.  As noted earlier in Chapter VIII.A, the "business purpose" doctrine was not adopted until October 2006, in Resolution No. 53 dated 12 October 2006 of the Plenum of the Russian Supreme Arbitrazh Court.  As also mentioned in Chapter VIII.A, Russian tax scholars and practitioners appear

---

[640]   Claimants' Opening Statement, pp.  49–80; Claimants' Post-Hearing Brief ¶¶ 7–11.

[641]   Respondent's Opening Statement,  pp. 11–22.

[642]   *See* above at paragraph 497.

[643]   Reply ¶¶ 219–28.

[644]   Claimants' Post-Hearing Brief ¶ 7.

divided as to whether Resolution No. 53 represented a break with the doctrines that existed at the time of the Yukos assessments, or was a natural evolution of those doctrines.

614. The Tribunal, recalling that Mr. Pepeliaev alluded to something akin to the "business purpose" doctrine in his commentary on Constitutional Court Ruling 138-O (published in 2002), is of the view that it was open to the Russian authorities and the courts to rely on the "bad faith taxpayer" doctrine to challenge a tax evasion scheme at the time of the Yukos tax assessments, whether based on "substance over form" or "business purpose."  Although this was an area of the law that was evolving at the time, this alone cannot be determinative.  Indeed, the anti-abuse doctrine was a judicial doctrine, and the Tribunal does not consider it appropriate to criticize the Russian Federation only because such a doctrine had not yet fully crystallized.  To the contrary, the circumstances surrounding Yukos' tax optimization scheme suggest to the Tribunal that this is precisely the kind of case in which the doctrine could be relied upon by the authorities and the judiciary.  Nevertheless, Claimants argue that the decision to revoke the profit tax benefits was illegitimate because of the manner in which the "bad-faith taxpayer" doctrine was applied.  In particular, Claimants submit that the "re-attribution" of the trading companies' revenue to Yukos was unprecedented and had no basis in law.  Further, Claimants submit that there were glaring violations of due process throughout the tax assessment and tax enforcement proceedings.  The Tribunal addresses each of those arguments in turn.

### iii.   Was "Re-attribution" an Appropriate Remedy to Apply to Yukos?

615. Claimants argue that the authorities should have applied the transfer-pricing rules of Articles 20 and 40 of the Russian Tax Code to address any concerns about Yukos' avoidance of tax in the low-tax regions.  Instead, the authorities "re-attributed" to Yukos the revenues of all of its trading companies.  According to Claimants, this remedy was unprecedented, had no basis in law and was obviously another ploy in the Russian Federation's fabrication of taxes against Yukos.[645]

616. As mentioned, Claimants submit that the proper decision, and indeed the only decision, that the tax authorities should have issued would have been to apply the transfer-pricing provisions of Articles 20 and 40 of the Russian Tax Code.  In this context, in their Post-Hearing Brief, Claimants argue as follows:

---

[645]   Claimants' Opening Slides, p. 60.

11.   Similarly, the Respondent's attempt to dismiss the relevance of the ubiquitous references to Yukos in the tax authorities' documentation relating to the trading companies ignores the realities of the Russian context.  There was no domestic market for crude oil in Russia, and as Dresdner observed, "[o]il sales on the Russian internal market consist[ed] mainly of internal sales between the sister companies of the large integrated Russian oil companies".  In this context, when conducting a tax audit of a company whose activities consisted of trading crude oil produced by Yukos' production companies, it would have been natural for the tax authorities to examine whether the trading company and the production company were "interdependent" under Article 20 of the Tax Code, and if so, whether the sales transactions complied with the transfer pricing provisions of Article 40.  This is precisely what the tax authorities did, finding no violations of Article 40 prior to the December 2003 Audit Report.[646]

617.   Claimants add:

> Mr. Konnov has conceded that the transfer pricing provisions of Articles 20 and 40 were available to the tax authorities and, although cumbersome to apply, could have fully dealt with any allegedly improper tax savings, yet as he has confirmed, the tax authorities never offered any explanation as to why they did not use Article 40 and instead invented a re-attribution theory.  As Mr. Savseris has written, referring specifically to the Yukos case, it was wholly inappropriate for the tax authorities to resort to judicial doctrines to address a situation covered by these express statutory provisions, noting that "[i]f the generally established principles in the West for the application of judicial doctrines were respected, this would have been impossible".[647]

618.   During the Hearing, Respondent asserted that re-attribution "is an entirely appropriate application of the 'substance over form' anti-abuse doctrine."[648]  Respondent referred to what it called "pre-December 30, 2003 cases" (*Bashkirian refineries* case (2003–2005); Lukoil (2002) and VAT cases) as well as what it called "post-Yukos authorities" (*Korus-Holding* (2005–2006), *MIAN* (2007–2008) and *Syktyvkarsky Milk Factory* (2008–2009)).[649]

619.   However, Mr. Konnov, when asked a specific question by the Chairman of the Tribunal, had great difficulty in explaining the existence of a pre-Yukos precedent for the re-attribution that was imposed on Yukos with the assessments.  Claimants recall this incident in their Post-Hearing Brief in the following words:

---

[646]   Claimant's Post-Hearing Brief ¶ 11 (citing Transcript, Day 15 (Konnov) at 177:6-180:7; Accounts Chamber of the Russian Federation, Analytical Note "On the Economic and Financial Situation of Natural Monopolies", 2003, p. 183 (noting "the absence of a full-fledged domestic market of crude oil in the Russian Federation"), Exh. C-416; ZAO Dresdner Bank Valuation Report of Yuganskneftegaz, 6 October 2004, p. 95, Exh. C-274 (hereinafter "Dresdner Valuation Report"); Table:  Field tax audits of Yukos' trading companies in Mordovia, April 2002–October 2003 (noting that audits of Fargoil and Mars XXII in 2003 found no violations of Art. 40), Exh. C-1758).

[647]   Claimant's Post-Hearing Brief ¶ 40 (citing Transcript of Mr. Konnov's cross-examination in the *Quasar* arbitration, 24 October 2011, pp. 55–56, 58–59, Exh. C-1697; S.V. Savseris, "Bad Faith of the Taxpayer as Judicial Doctrine Against Tax Evasion" (2005), p. 5, Exh. C-1748).

[648]   Respondent's Closing Slides, p. 105.

[649]   *Ibid*. pp. 105–15.  *See also* First Konnov Report ¶¶ 50–51.

> *First*, as the Tribunal will recall, when asked point blank by the President to identify a precedent for reattribution, Mr. Konnov was unable to do so. The next day Mr. Konnov sought to "correct" this answer by referring to cases involving the "Bashkirian oil refineries" and a Lukoil assessment that never went to court. However, Mr. Konnov then corrected the correction by noting, with respect to the Bashkirian cases, that "the court decisions . . . are not particularly helpful because the lower court decided in favour of the taxpayer, and only in 2005 the court decided in favour of the tax authorities."[650]

620. Having reviewed the decisions cited by Respondent, the Tribunal concludes that none of them is truly apposite to Respondent's argument:

(1) the "*Bashkirian refineries* case": in this case (cases, actually), the tax authorities did "re-attribute" sales revenue from a Baikonur entity to the three selling oil refineries, and they did so by assessments dated 16 July 2003. However, these assessments were overturned, in each of the three cases, by the first instance arbitrazh court in November 2003, and the tax authorities' appeals in early 2004 were initially unsuccessful. It was only in 2005 that the Supreme Arbitrazh Court overturned the lower court decisions, and upheld the July 2003 assessments (Exhibits R-1488, 1489, and 1490). Thus, this case cannot serve as a pre-Yukos precedent.

(2) the "*Lukoil* case": this case involved the invalidation of a lease between OAO Lukoil-Ukhtanneftepererabotka and a Baikonur shell, and the resulting claim against the former for taxes. While the court decisions (first instance, appellate and cassation levels) all date back to 2002, they do not show that the taxes of the Lukoil entity were "re-attributed" to Lukoil. In the view of the Tribunal, therefore, this case does not support Respondent's re-attribution theory.

(3) the "VAT cases": Respondent argues that "[b]oth before and after the Yukos assessments, the Russian tax authorities routinely assessed VAT on purchasers with respect to revenues representing value that had been added by their suppliers, rather than the purchasers themselves."[651] Respondent points to one pre-Yukos example in the record, a decision that dates from 22 September 2003 (Exhibit R-3372). On the Tribunal's reading of this decision, it is difficult to make out the re-attribution from seller to purchaser, since the

---

[650] Claimant's Post-Hearing Brief, ¶ 38 (citing Transcript, Day 14 at 221–23 (Mr. Konnov) ("I don't think I can give you any reference to the pre-Yukos precedent where attribution was applied in an identical way."); Transcript, Day 15 at 83–84 (Mr. Konnov); Transcript, Day 15 at 215 (Mr. Konnov)). Claimants cite their Reply ¶ 233 to note that: "Moreover, these alleged precedents involved alleged evasion of excise taxes rather than alleged abuses of profit tax incentives, and were decided on entirely different legal grounds." *Ibid.* n.85.

[651] Respondent's Closing Slides, p. 110.

Court's attention is quite definitely on the purchaser in its analysis of the transaction.  In any event, it is not a situation which is at all analogous to the Yukos case.

621.  By contrast, the *Korus-Holding* case appears to be on all fours with the Yukos case, in terms of the re-attribution remedy, but it was decided in 2006, well after the assessments against Yukos in 2003 and 2004.

622.  The Tribunal notes another factor that supports Claimants' position, namely the contrast between the first and second decisions involving Investproekt.  In the first decision, dated 2 April 2002,[652] the tax authorities refused to impose any tax liability on Investproekt for the past tax offenses of Business-Oil, Vald-Oil, Forest-Oil and Mitra.  In the second decision, dated 8 August 2003,[653] Investproekt was held liable for those offenses.  The Tribunal observes that the basis for reversing, in August 2003, the earlier decision of April 2002, was not explained in the August 2003 decision,[654] and the latter decision followed soon after the arrest of Mr. Lebedev on 2 July 2003.  Moreover, neither of these earlier assessments purported to re-attribute the tax burden to Yukos, but rather to the successor entity of the trading companies—Investproekt.

623.  Regarding the transfer-pricing provisions of the Russian Tax Code as a proposed alternative remedy for whatever mischief is connected to the use of the Yukos trading entities, Respondent in its Rejoinder argues:

> 701.  Claimants suggest that the "proper course of action" for the authorities "would have been to pursue" Yukos' trading shells as opposed to Yukos.  But the tax authorities looked to the economic substance and concluded that Yukos was the real taxpayer.  That was both legally and practically sensible.  As illustrated by the authorities' inability to collect unpaid taxes from the Lesnoy trading shells, Yukos deliberately engineered its scheme so that its trading shells, if they were ever audited and reassessed, would have no assets with which to pay any such assessment, with the result that Yukos' fraudulent scheme would have enjoyed *de facto* impunity.  Yukos was at all times the real party in interest in the challenged transactions.  It was thus entirely appropriate for the tax authorities to pursue their claims against it, instead of the trading shells it had created to evade taxes.
>
> 702.  Equally unavailing is Claimants' reliance on Article 40 of the Tax Code.  The Yukos "tax optimization" scheme was not an ordinary "transfer pricing" scheme, but rather a tax evasion scheme involving the abusive exploitation of the low-tax region program through dozens of sham entities which had no genuine business operations.  It was therefore entirely appropriate for the authorities to challenge that scheme by reference to anti-abuse rules, rather than the transfer pricing rules set forth in Article 40, insofar as

---

[652] Decision No. 02-11/1/1, 2 April 2002, Exh. R-303.

[653] Decision No. 2.6-23, 8 August 2003, Exh. R-305.

[654] *Ibid.*

Yukos had deliberately constructed its tax evasion scheme so as to circumvent the application of Article 40, including by (a) using chains of shells which increased the likelihood that, if audited, each link in the chain could avoid an assessment under the 20% "safe harbor," and (b) owning most of the trading shells through call options, offshore companies, and other devices, which would make it more difficult for the authorities to establish an "interdependence" within the technical meaning of Article 40 between Yukos and its trading shells.[655]

624.  During the Hearing, Respondent argued that the "substance over form" doctrine would be illusory if re-attribution were precluded, since it would permit tax evasion with impunity as the taxpayer could simply cause the relevant income or revenues to be recorded, on paper, in the books of a judgment proof domestic affiliate or a foreign affiliate that was solvent but territorially beyond the reach of any enforcement measure.[656]  Respondent also referred to other jurisdictions where a "general anti-avoidance provision" allows the tax authorities to allocate "any income" to "any person" in connection with "an avoidance transaction".[657]

625.  The Tribunal sees some merit, in principle, to Respondent's argument that the "anti-abuse" doctrine would be eviscerated if the tax authorities were unable to attribute income to the person responsible for the wrongdoing.  The Tribunal also notes with interest Respondent's reference to the anti-avoidance provisions of other countries, such as the United States, France, Germany, Canada and Australia, which grant the taxation authorities similar powers, as well as to some decisions from other jurisdictions.[658]  In the Russian context, however, it is clear to the

---

[655]   Rejoinder ¶¶ 701–702 (citing ¶¶ 599, 597–600 of Rejoinder; Second Konnov Report ¶¶ 19, 24–25 and 63). Respondent also notes:  "This also confirms the lack of merit in Claimants' contention that Respondent's "multiple allegations about non-arm's length pricing […] contradict" Respondent's "concession that Yukos' alleged tax liabilities [are] not premised on any violation of transfer pricing rules" [citing Reply ¶ 214].  In reality, there is no such contradiction, because it is well-settled in Russian tax law that the transfer pricing rules set forth in Article 40 of the Tax Code are not the exclusive remedy available to the Russian tax authorities to combat abusive tax practices based on price manipulations (see First Konnov Report ¶¶ 40–44).  In other countries too, the general view is that the existence of specific statutory anti-avoidance rules does not prevent the authorities from deploying their anti-abuse arsenal, including general anti-avoidance rules, whether enacted by statute (as is the case, for instance, in Germany) or developed by the judiciary (as is the case, for instance, in the United States) . . . .

In the Yukos case, the authorities' reliance on alternative theories of liability was not only proper but particularly appropriate, because the Yukos tax evasion scheme was deliberately engineered so that Yukos, through its trading shells, could circumvent the transfer pricing rules, which require an under- or over-statement of prices of more than 20 percent of the market price.  Yukos evaded those rules by running inventories through chains of multiple trading shells in a series of nominally independent transactions, none of which individually exceeded the 20 percent threshold. See Protocol of Witness Interrogation of Vladislav P. Brazhkov (15 February 2008), 4, 6 (Exh. R-3370)." Ibid. n.1098

Respondent further notes:  "Yukos' internal communications confirm that it was a "headache" for Yukos' employees to ensure that the transactions among the trading shells were structured to prevent detection of the scheme by the tax authorities. [citing Counter-Memorial ¶ 304 and e-mail from A.V. Brazhkov to A.P Kuchusheva, 9 October 2001, Exh. R-325]." Ibid. n.1099.

[656]   Respondent's Closing Slides, p. 115.

[657]   Ibid. p. 118.

[658]   Respondent's Opening Slides, pp. 95–103.

Tribunal that there was no precedent for re-attribution at the time that the tax assessments and related decisions were issued in respect of Yukos.

626. Moreover, the Tribunal could have been persuaded to accept Respondent's argument if the tax authorities had only imposed revenue-based taxes against Yukos on the basis of re-attribution. However, and as already noted, the tax authorities attributed to Yukos the trading companies' revenues while, at the same time, refusing to attribute to Yukos the trading companies' VAT refunds and it did so for purely technical reasons. This leads the Tribunal to the conclusion that the authorities used the "re-attribution" formula not only so as to be able to collect the revenue-based taxes, but also so as to establish a basis for imposing the massive VAT liability and excessive fines that followed.

627. In short, the Tribunal accepts the following conclusion, as expressed in paragraph 41 of Claimants' Post-Hearing Brief:

> The obvious explanation for the Respondent's use of a novel and arbitrary re-attribution theory rather than correctly applying existing law on interdependence and transfer pricing is that this was not a *bona fide* exercise of taxation powers; instead, the novel re-attribution theory provided a pretext to impose US$ 13.59 billion in VAT claims that, as Mr. Konnov confirmed, could not have been made in the absence of the unprecedented re-attribution of revenues.[659]

### iv.    Did the Russian Federation Violate Due Process?

628. Claimants submit that the Russian Federation violated due process by (a) ensuring that the courts were obedient and did not question the legality of the tax assessments; (b) ensuring that Yukos could not present its case; and (c) ensuring that neither the trading companies nor the Mordovian authorities could participate in the proceedings.

629. Regarding the legality and legitimacy of the tax assessments which Claimants say the courts should have scrutinized, the Tribunal recalls its finding in Chapter VIII.A that, during the period relevant for the tax assessments against Yukos (2003–2004), the "bad faith taxpayer" doctrine included the following principles:

- The good faith (honesty) of the taxpayer is presumed.
- The tax authorities have the burden to prove the taxpayer's bad faith (dishonesty), and in doing so "may not construe the concept of 'good faith taxpayers' as imposing on the taxpayer additional obligations which are not provided for in the legislation."

---

[659]    Claimant's Post-Hearing Brief ¶ 41 (citing Transcript, Day 15 at 94–95).

630.   In the view of the Tribunal, questions can be asked about whether the tax assessments disclose a record establishing that the tax authorities discharged their burden of proving Yukos' bad faith in respect of all the trading entities said to be an integral part of its tax evasion scheme. Some of these questions were raised by Yukos' tax lawyers immediately after the 2000 tax assessment was issued.  They commented:

> The act of inspection of OAO NK YUKOS contains the amounts of revenues of each company however it is absolutely unclear what control actions produced this information and what documents confirm it, etc.[660]

631.   This question was developed in the Objections against the tax assessment filed by Yukos on 12 January 2004.  Under objection no. 6 ("Breach of the procedure for conducting an audit"), Yukos complained that the auditors referred to materials from the criminal case, but did not indicate "what specific documents of the criminal case confirm the fault of the taxpayer."[661] Yukos' detailed objection continued:

> Attention should also be paid to the failure to analyze and indicate taxation objects on additionally assessed taxes for all re-assessments under 17 companies.  Furthermore, audit materials do not contain any source documents (waybills, statements, commercial invoices, etc.) and does not contain contracts for sale and purchase of goods and information about payment for goods.  At the same time the auditors concentrated only on the matter of unlawfulness of tax benefits' application, although does not review at all the basic matter that shall be proved in the course of tax audit - the value of taxation objects of these 17 companies.  It should be mentioned that it is impossible to state the fact of non-payment of taxes without analysis of business operations and economic results obtained thereunder (revenues, profits).  However, the auditors do not bother themselves with study of business operations, under which billions of Rubles are imputed to OAO NK YUKOS for payment.
>
> This directly contradict to Article 100 of the Tax Code of the Russian Federation, which indicates that the Audit Report must contain information about tax confirmed by the documents and Instruction of the Ministry of Taxes and Levies the Russian Federation No. 60 of 10.04.2000 "On Procedure for Compilation of Field Tax Audit Report and Proceedings in the Case of Violation of the Legislation on Taxes and Levies", according to which the Audit Report must contain references to source accounting documents (with indication, in case of necessity, according transactions and order for reflection the respective operations in the accounting registers) and other evidences confirming the fact of violation.  The Instruction also stipulates that the Report must be based on results of audit of <u>all</u> documents that may be related to the stated facts, and on results of performance of all other actions necessary for exercising tax control.
>
> According to this Instruction, the following must be attached to the Audit Report:
>
> • clarified calculations by types of taxes (levies) drawn up by the auditors in connection with the discovered tax offence (except for the cases when the specified calculations are presented in the body text of the report).  Calculations must be signed by the

---

[660]   S. Pepeliaev, *Summary of the tax inspection of OAO NK Yukos*, p. 2, 5 January 2004, Exh. C-1128.

[661]   Objections against Report No. 08-1, p. 13, 12 January 2004, Exh. R-335.

auditor (the auditors), the head of the company or private entrepreneur or their representatives; and

- materials of cross audits (in case these were performed).

However, these requirements are not met and source documents and tax returns of 17 companies mentioned in the Report are not attached to the Report, which virtually deprives OAO NK YUKOS of opportunity to assess accusations of tax offence brought against it.

It is also necessary to mention that in violation of the requirements of the abovementioned Instruction about fairness and reasonableness of the reflected facts, the Audit Report was written in obviously biased manner, with accusative tendency and starts with conclusions on presence of a certain tax evasion "scheme". The obvious prejudice of the auditors does not allow to consider the Audit Report as the evidence of committed tax offence.[662]

632. The Tribunal notes that Article 100(2) of the Russian Tax Code requires a tax audit to contain "documentarily attested references to facts of tax offenses revealed during the audit . . . ."[663]

633. The Russian Tax Code also requires the Director of the Tax Authority to consider the taxpayer's objections prior to issuing a decision (which may hold, or not hold, the taxpayer liable for a tax offense, or direct further tax control measures).[664] Article 101(3) provides:

3. The decision to hold the taxpayer liable for a tax offense shall indicate the circumstances of the committed tax offence, how they were established by the audit, the documents and other evidence, which attest to these circumstances, arguments presented by the taxpayer for his defense and the results of their verification, the decision to hold the taxpayer for specific tax offenses with a reference to the articles of this Code providing for such tax offenses and liability incurred.[665]

634. The 2000 Decision summarizes Yukos' objections, but selectively so. Notably, Yukos' specific objection regarding the tax authorities' failure to document the facts allegedly underpinning the conclusions in the tax audit is omitted from the description in the Decision of Yukos' objection no. 6.[666] Moreover, while the decision contains responses or comments regarding some of Yukos' other objections, it does not contain any response to this specific objection.[667]

635. The court decisions that affirmed the legality of the decision, both in first instance and on appeal, used similar wording to dismiss Yukos' objection based on breach of procedure for conducting an audit:

---

[662] *Ibid.* at 14–15.

[663] Art. 100(2), Russian Tax Code, Exh. C-1704.

[664] Art. 101(1) and (2), Russian Tax Code, Exh. C-1704.

[665] Art. 101(3), Russian Tax Code, Exh. C-1704.

[666] 2000 Decision, pp. 86–87, Exh. C-104.

[667] *Ibid.*, pp. 87–90.

> Results of the audit and the Decision were formalized in compliance with requirements of Articles 100 and 101 of the Russian Federation Tax Code. The Decision indicates its subject, essence and features of the tax offense imputed to the taxpayer, with reference to Article 122(3) of the Russian Federation Tax Code. Demand for the payment of tax arrears, interest and fines indicated in the Decision of the Russian Federation Ministry of Taxes and Levies No. 14-3-05/1609-1 of 14.04.2004 are well-founded, comply with the current legislation and are supported by the primary documents of audit materials, presented by the Russian Federation Ministry of Taxes and levies to the Court for substantiation of its claim.[668]

636. The Ninth Arbitrazh Court of Appeal added that "[Yukos'] reference to a lack of documents and information confirming bad faith on the part of the taxpayer is unfounded."[669] The Tribunal observes, however, that neither court identifies any specific documents in coming to these conclusions; nor did Respondent submit to the Tribunal the record that was before those courts, or present a witness who could attest to it. This makes it impossible for the Tribunal to assess whether the tax authorities did indeed discharge their burden against Yukos in issuing and defending their tax assessments.

637. Claimants sum up their argument on this important point in their Post-Hearing Brief with the following submission. The Tribunal notes that these crucial allegations of Claimants were never rebutted by Respondent:

> In addition, the December 29, 2003 Audit Report did not comply with the requirements of the Russian Tax Code, including, in particular, by failing to document the factual allegations made and by relying on unidentified and undisclosed documents from the criminal investigation against Mr. Khodorkovsky. Continuing this flagrant breach of due process, the tax authorities refused to allow Yukos access to the documents upon which the purported claims were based, making it impossible for Yukos to defend itself. Notwithstanding the fact that the results of the court cases were determined in the Kremlin and it therefore could not possibly have made any difference how Yukos presented its defense, this refusal even to subject the purported claims to the scrutiny of Yukos' lawyers attests to the Russian authorities' complete lack of belief in the validity of those claims and their determination to destroy the company at a rapid pace.[670]

638. Respondent avers that "the unbroken thread of Yukos' tax evasion" demonstrates that the Russian Federation's assessments against Yukos were entirely proper, and marshalled a

---

[668]   Resolution of the Ninth Arbitrazh Court of Appeal, Case No. 09AP-4078/04-AK, 23 November 2004, p. 5, Exh. C-147; *see also* Decision of the Moscow Arbitrazh Court, Case No. A40-17669/04-109-241, 26 May 2004, p. 21, Exh. C-116.

[669]   *Ibid.*, p. 9.

[670]   Claimants' Post-Hearing Brief ¶ 24.

substantial amount of evidence that suggests that Yukos was abusing at least some of the low tax regions prior to 2003.[671]

639. However, the Tribunal observes that nearly all of the evidence on this point relates to the entities in Lesnoy and Trekhgorny.  The Tribunal has not found any evidence in the massive record that would support Respondent's submission that there was a basis for the Russian authorities to conclude that the entities in Mordovia, for example, were "shams".  Indeed, instead of pointing to any specific evidence on which the tax authorities might have based their finding that the Mordovian entities were shams, Respondent reversed the burden and asserted that "there is no evidence that the Mordovian shells ever had any greater substance than the Lesnoy shells";[672] and that "[f]actually, Yukos did not even attempt to demonstrate that any genuine trading activities had ever been conducted in Mordovia."[673]  While the incomplete record before the Tribunal may not, in point of fact, establish that the Mordovian trading companies conducted genuine trading activities in Mordovia, the Tribunal notes that the Russian courts systematically denied Yukos' motions to join to the proceedings its trading companies and the Government of the Republic of Mordovia.  This leads the Tribunal to conclude that the Russian courts may have prevented Yukos from adducing evidence bearing on the nature of its activities in Mordovia.[674]  The record, insofar as the Tribunal has been able to find, does not reveal reasons, still less persuasive reasons, for denial by the Russian courts of joinder of the Mordovian government and the trading companies.

640. In the specific context of determining whether, in relation to the tax assessments against Yukos, the tax authorities discharged their own burden of proving Yukos' bad faith so as to be able to rely on the "bad-faith taxpayer" doctrine, the Tribunal makes two observations.  Firstly, the tax authorities failed to address at the time of the 2000 Decision, Yukos' reasoned objection based on the absence of specific documents in the tax audit.  Secondly, Respondent failed to identify during the Hearing any satisfactory evidence that the abuses found in the trading firms operating in Lesnoy and Trekhgorny were also found in the trading companies operating in Mordovia and all the other low-tax regions where Yukos entities were present.  While it is true, and suggestive, that Claimants did not introduce evidence at the Hearing showing that trading

---

[671]   Respondent's Closing Slides, pp. 3–35.

[672]   *Ibid.* p. 33.

[673]   *Ibid.* p. 98.

[674]   *See* Reply ¶ 286.

companies which operated in Mordovia were not "shams", it is first and foremost the conduct of the tax authorities that the Tribunal must examine in the context of the tax assessments that these authorities imposed on Yukos.  Focusing exclusively on Claimants' failure to demonstrate that the Mordovian entities were not "shams" would empty of meaning the important principle that the tax authorities had the burden of proving the taxpayer's bad faith under Russian law. On this point, the following extract from the *Pribrezhnoye* decision issued by the Federal Arbitrazh Court for the North-Western District on 5 June 2002 (well before the tax assessments against Yukos) is instructive:

> In addition, the IMNS's reference to the absence of presentation of evidence by the Company on the conduct of its business in the ZATO territory, which was supported by the court, is erroneous.
>
> Pursuant to Article 53 (part one) of the Arbitrazh Procedure Code of the Russian Federation in considering disputes on the invalidity of acts of State authorities, local self-government authorities and other authorities; it is up to the relevant authority to prove the circumstances, which provided the grounds for issuing the said acts.  Due to the fact that the disputed tax benefit had been granted to the defendant by a competent ZATO authority, and that the IMNS issuing the challenged non-regulatory decision found the granting of the benefit unlawful, <u>the courts erroneously imposed the burden of proof on the Company</u>.[675]

[emphasis added]

641.    Looking at the tax assessments themselves, the Tribunal observes that, if there is an "unbroken thread" running through the tax authorities' analysis of Yukos' tax optimization scheme, it is the consistent and uniform finding that each trading entity is "interdependent" with Yukos.  But that interdependence in the view of the Tribunal of itself does not establish bad faith on the part of all the trading entities.

642.    In its objections to the Tax Audit (objection No. 1: "Illegal conclusions concerning legal definition of interdependent persons"), Yukos complained about the authorities' reliance on interdependence as the principal factor motivating their conclusion that Yukos' tax optimization scheme was a tax evasion scheme, noting that interdependence has a specific meaning under the Russian Tax Code (in Article 20), and with strictly determined legal consequences (under Article 40).[676]  These provisions allow authorities to disregard prices used in transactions between interdependent persons when those prices deviate by more than 20 percent from the market price, and to assess additional taxes and interest calculated as if the

---

[675]    *Pribrezhnoye*, p. 5, Exh. C-1278.

[676]    Objections against Report No. 08-1, pp. 1–5, 12 January 2004, Exh. R-335.

transactions were concluded at the market price.  Again, the Tribunal notes that this objection was not directly addressed in the 2000 Decision.[677]

643.   The Tribunal notes that the relevant audit reports and decisions do refer generally to various factors that would seem to be relevant to a finding that the legislation in low-tax regions was being abused by Yukos.  For example, they refer to the absence of trading activity in the regions and the absence of sufficient or even of any investment by the trading entities in the low tax regions.  However, a close analysis of the tax assessment for 2000, for example, reveals that it was not established by the tax authorities that each of the trading entities which it labelled as a "sham" had no trading activity whatsoever, as opposed to just being "interdependent" on Yukos or not having physical facilities to handle oil and oil refining.

644.   The Tribunal agrees with Claimants (and apparently also with Mr. Konnov) that it is nonsense to require a trading company to demonstrate physical interaction with the goods or commodities that it is trading, especially in the era of electronic communications.  In this sense, the Tribunal is highly skeptical of the reasoning in the 2000 Audit Report (and subsequent reports) that the absence of physical movement of oil in and out of the low-tax region where the respective trading entity is located is evidence of a sham.  The Tribunal observes that the reasoning on this point in the 2000 Audit Report is also inconsistent with the decision in the *Pribrezhnoye* case.

645.   In that case, the Federal Arbitrazh Court for the North-Western District reversed decisions of lower courts that had accepted the tax authorities' efforts to impose additional eligibility requirements on a ZATO-based oil trading company beyond those laid out in the ZATO law.  It explicitly noted that:

> Under these circumstances the examination of whether the Company had fixed assets for oil products storage and transportation in the ZATO territory is beyond the scope of this case, because operations of trade in oil products, i.e. conclusion of contracts of sale, do not require the Company to own such fixed assets or for the oil products to be present within the ZATO territory.[678]

---

[677]   2000 Decision, pp. 87–90, Exh. C-104. There is also only a minor reference to the objection in the Decision of the Moscow Arbitrazh Court, Case No. A40-17669/04-109-241, 26 May 2004, p. 19, Exh. C-116. ("The court considers unfounded the Respondents' arguments that the status of interdependent entities has legal importance solely for the possibility of applying market prices to determine the results of the transactions for tax purposes.  Interdependence of entities in this case is one of the circumstances by which the tax authority substantiates bad faith of the taxpayer.").

[678]   *Pribrezhnoye*, p. 3, Exh. C-1278

646.  The court added

> The references by the courts to the facts that transfer and acceptance of crude oil occurred outside the ZATO territory; that [the manager of a customer company was in a different ZATO when the transfer was signed]; that the phone numbers of the rented office premises are recorded to the name of a person other than the Company; and that the defendant had not paid the office electricity bills are equally unfounded.  <u>The said circumstances per se do not refute the fact that the Company was doing business as a trade company in the territory of the ZATO, and they have no relevance for the case because they are not taken into account by tax legislation in determining eligibility for tax benefits.</u>
>
> The examination of the said circumstances by the first instance court and the court of appeal reveals their misinterpretation of Article 5(1) of the ZATO Law, in that the court went beyond the eligibility criteria for tax benefits that are explicitly set forth in this provision.  In violation of Article 3(7) of the TC, the first instance court and the court of appeal regarded the absence of any criteria on doing business in ZATO territory other than fixed assets, workers on payroll and salary payments as grounds for the independent establishment of such criteria by a tax authority or a court.[679]

[emphasis added]

647.  Finally, the Tribunal agrees with Claimants that the criterion of "proportionality" seems to be difficult to apply as a stand-alone basis to invalidate the structure in the low-tax regions.  This is due to the fact that the proportion between the tax savings and the investment in the low-tax region should have been readily apparent to the tax authorities on the face of the tax filings and related tax documents.   On the other hand, where properly evidenced, a grossly disproportionate arrangement combined with an "empty shell" structure could, in the Tribunal's view, validly attract the attention of the authorities under the "anti-abuse" doctrine.

648.  To conclude, it thus appears to the Tribunal that the Tax Ministry, in its assessments against Yukos, painted all of the Yukos' entities in the low tax regions with the same brush, even though it marshalled little, if any, documented evidence that all, and not only some, of the trading entities were abusing the low tax regime in which they had respectively been constituted.  On the one hand, the Tribunal accepts that, if Claimants had evidence of genuine business activity of the trading companies in the low-tax regions, they would have introduced it or referred to it orally.  Accordingly, resolution of these critical issues is not free from doubt.  But on the other hand, and on balance, where neither side was able to demonstrate the facts, but where Yukos' files were in the hands of Respondent, the Tribunal feels justified in holding Respondent bound by the burden of proof.  Respondent failed to meet that burden.  Moreover, it refused to join Mordovian authorities and the trading companies to the litigation.  Furthermore, the re-attribution remedy was unprecedented at that time in the Russian

---

[679]    *Ibid.*, p. 4.

Federation.  Respondent's resort to re-attribution appears to be linked to its determination to impose a massive VAT liability on Yukos.

### (b)   VAT

#### i.   Introduction

649.   Claimants argue that the imposition of VAT by the tax authorities, and more specifically their refusal to attribute to Yukos the trading companies' VAT returns and refunds, is arbitrary because (a) it is undisputed that the goods at issue in the underlying transactions were exported and that the trading entities timely and duly filed VAT returns (and thus that the transactions benefited from the exemption from VAT or zero percent rating, depending on the year);[680] (b) the refusal to attribute the trading companies' VAT returns and refunds to Yukos is inconsistent with Respondent's attribution to Yukos of the trading companies' revenues for purposes of calculation of tax (be it profit tax or VAT or any of the other taxes); and (c) Yukos' refilings of VAT returns were rejected on the basis of technicalities, thus demonstrating that Respondent had no intention of treating Yukos in good faith.[681]

650.   Respondent takes the position that the VAT assessments against Yukos were perfectly proper, and consistent with the corporate profit tax assessments.  In both cases, Respondent argues, the assessments were based on the application of Russian tax law to the true situation, established by the tax authorities, that Yukos was the "real taxpayer" and "actual exporter" in the various transactions that the trading companies had entered into. Respondent's position is also based on its assertions that under Russian law, the granting of a zero percent VAT rate is subject to compliance with stringent documentary requirements; and that it is undisputed that Yukos itself never filed regular VAT returns or proper amended VAT returns in relation to the transactions in question.[682]

651.   The Tribunal observes that there was no element in Yukos' tax scheme that enabled Yukos to benefit improperly or illegally from a VAT exemption or a zero percent rating.  As noted earlier

---

[680]   *See* Second Konnov Report ¶ 84, n.137.  Mr. Konnov explains:  "Prior to entry into force on January 1, 2001 of Chapter 21 of the Russian Tax Code governing VAT, VAT was governed by Law of the Russian Federation No. 1992-1, On the Value Added Tax, December 6, 1991 (the 'VAT Law').  Under the terminology of the VAT Law, exports were 'exempt' from VAT whilst under the Russian Tax Code they are subject to 0% VAT rate.  In substance, exemption from VAT on exports was similar to the 0% tax regime." *Ibid.*

[681]   Claimants' Opening Slides, p. 63.

[682]   Respondent's Opening Slides, p. 111.

in this Award, VAT is a uniform federal tax that benefits from an exemption or a zero percent rating if the transaction involves an export to a foreign purchaser.  In other words, even if Yukos' tax scheme was entirely unlawful (or unlawful in some respects), and the authorities were justified in attributing the trading companies' revenues to Yukos for tax purposes, there is no suggestion by Respondent that the trading companies (or Yukos) did anything "wrong" vis-à-vis VAT with their tax scheme. The Tribunal must consider the propriety of the multibillion dollar VAT assessments against Yukos in this context.

652. The Tribunal addresses the specific questions arising on the topic of the VAT assessments in the following subsections.

### ii. Was the Imposition of VAT Payments on Yukos Inconsistent with the Attribution to Yukos of the Trading Companies' Revenues?

653. Claimants assert that when the Russian Tax Ministry reattributed to Yukos all of the revenues (including the export revenues) of its trading companies, it should have attributed to Yukos the VAT refunds previously obtained by the trading companies with respect to their exports. Instead, in what Claimants characterize as a "contradiction with its own theory," the Tax Ministry chose to impose the amounts on Yukos, justifying the VAT payment demands on the failure by Yukos, as the "real taxpayer", to file on time "the documentation required to validate the VAT exemption or the 0% VAT rate".[683]

654. Claimants sum up their argument in their Memorial as follows:

> This formalistic position, systematically challenged by Yukos before the arbitrazh courts, but endorsed without any thorough analysis by these courts, was obviously circular: the trading companies, not Yukos, had exported oil and oil products and filed all the necessary documentation; under the applicable laws, Yukos did not have to file and could not have filed such documentation at the relevant times.  The fact that, even when Yukos attempted to submit the updated VAT returns in its own name to satisfy the Tax Ministry, its submissions were simply rejected as improper and untimely, amply shows the Tax Ministry's bad faith and true intentions.[684]

---

[683] Memorial ¶ 321–22.

[684] Memorial ¶ 322 (citing as regards Yukos' tax reassessment for the year 2000, Decision of the Moscow Arbitrazh Court of 26 May 2004, 28 May 2004, p. 19 of the Russian original, Exh. C-116; as regards Yukos' tax reassessment for the year 2001, Resolution of the Ninth Arbitrazh Court of Appeal of 9 February 2005, 16 February 2005, p. 23 of the Russian original, Exh. C-167; as regards Yukos' tax reassessment for the year 2003, Decision of the Moscow Arbitrazh Court of 21 April 2005, 28 April 2005, p. 59 of the Russian original, Exh. C-196, and Resolution of the Federal Arbitrazh Court for the Moscow District of 18 November 2005, 5 December 2005, p. 17 of the Russian original, Exh. C-197; as regards Yukos' tax reassessment for the year 2004, Resolution of the Ninth Arbitrazh Court of Appeal of 11 August 2006, 18 August 2006, p. 35 of the Russian original, Exh. C-336; as regards Yukos' tax reassessment for the year 2002, Transcript of the hearing held at the Moscow Arbitrazh Court on 14–16 December

655.   In its Counter-Memorial, Respondent asserts that the tax authorities were justified to treat Yukos itself as the real party in interest, "which for VAT purposes, meant treating it as the real exporter.  This approach simply reflected reality."[685]   As such, Respondent argues, Yukos could have benefited from exemption (or "zero-rating") only if, as "the true exporter", it had timely filed "the requisite documentation in the correct manner."[686]

656.   Claimants reaffirm their position in their Reply, stating that Respondent's position on VAT "was wholly inconsistent with the entire re-attribution theory upon which all of the other purported tax claims were premised."[687]   In short, Claimants argue that "it was arbitrary and contradictory for the authorities to re-attribute the trading companies' oil, revenues, profits, tax liabilities and activities to Yukos but to refuse to re-attribute to Yukos those companies' entitlement to VAT refunds."[688]

657.   More specifically, Claimants note that "there is no support in Russian law for the tax authorities to conclude that the 'true exporter' could be someone other than the legal owner as reflected in the relevant documentation."[689]   In particular, Claimants assert that neither Article 165 of the Russian Tax Code nor the decision of the Constitutional Court[690] affirming the constitutionality of Article 165, on which Respondent relies, say anything about "true exporters".[691]

658.   The Tribunal notes that, in audit reports and decisions prior to the reassessments in December 2003, there are frequent references to the trading companies' use of export agents.  For example, in Decision No. 23 in respect of Alta-Trade, the decision notes that "Oil products are being exported through commission agent OAO NK Yukos and ZAO Trading House Angarsk-Nefto."[692]   To prove that exports in fact took place, more than ten commission agreements were provided to the authorities, along with

---

2004, p. 21 of the Russian original, Exh. C-183; as regards Yukos' tax reassessment for the year 2003, Decision of the Moscow Arbitrazh Court of 21 April 2005, 28 April 2005, p. 59 of the Russian original, Exh. C-196).

[685]   Counter-Memorial ¶ 1073.

[686]   Ibid. ¶ 1074.

[687]   Reply ¶ 244.

[688]   Ibid.

[689]   Reply ¶ 245.

[690]   Resolution of the Constitutional Court of the Russian Federation No. 12-P, 14 July 2003, Exh. R-1501.

[691]   Reply ¶ 246.

[692]   Decision No. 23 on partial refusal to refund/offset VAT (Alta-Trade), 15 June 2000, p. 1, Exh. C-1110

> "certificates of transactions entered into by the commission agent, bank statements evidencing crediting of funds to the commission agent's accounts, bank statements evidencing crediting of funds to OOO Alta-Trade's accounts, commission agents reports, copies of complete custom freight declarations and shipping documents confirming export of goods by sea outside the CIS member states[,] . . . complete customs freight declarations [with] the necessary notes made by customs authorities – "clearance allowed", "goods exported", and also notes made on shipping documents – "loading allowed" on loading instructions, notes made on marine bills of lading concerning acceptance of cargos for transportation.[693]

659.   The Tribunal also notes that, in these audits, the taxation authorities did not appear to be concerned with these relationships.  Several other audit reports and decisions also mention the use of export agents.[694]

660.   In its Rejoinder, Respondent maintains its position regarding the propriety of the VAT assessments and their consistency with the profit tax assessments against Yukos.  Respondent explains why Claimants are wrong, in its view, for characterizing the VAT assessments as being arbitrary and contradictory:

> Once again, Claimants are wrong.  The authorities' approach with respect to Yukos' VAT liability was consistent with their approach to Yukos' corporate profit tax liability.  In both instances, they treated Yukos as the actual owner and exporter of the oil and oil products, and therefore the actual entity responsible for both profit tax and VAT.  Thus, the authorities found that:
>
> (i)     Yukos was the real party in interest in the challenged transactions.
>
> (ii)    The profit generated through those transactions was Yukos' own profit, which Yukos had fictitiously allocated to the trading shells for no purpose other than to evade taxes which it otherwise was obligated to pay.
>
> (iii)   Yukos, not its trading shells, was the real exporter of the oil and oil products that were the subject matter of those transactions.
>
> The inescapable conclusion from these findings is that Yukos, not its trading shells, should have filed the requisite documents to claim a 0% VAT rate, which as discussed below Yukos did not do properly.  The VAT was thus due from Yukos and the Yukos VAT assessments were proper.[695]

661.   Claimants sum up their position in their Post Hearing Brief:

---

[693]   *Ibid.*

[694]   *See* Decision No. 48 to deny refunding (offset) VAT (Alta-Trade), 29 October 2001, p. 1, Exh. C-1116; Decision No. 53 on partial refusal to refund/offset VAT (Mars XXII), 27 December 2004, p. 1, Exh. C-1117; Field Tax Audit Report No. 02-52, 19 April 2002 ¶ 1.7, Exh. C-1120; Field Tax Audit Report No. 02/105, 3 March 2003 ¶ 1.10, Exh. C-1124; Field Tax Audit Report No. 02-126, 22 October 2003, p. 3, Exh. C-1125; and Exh. C-1121, p. 3, which notes Article 165 of the Russian Tax Code, and states "No offense were discovered during the audit as to whether the value added tax actually paid to suppliers for materials acquired/booked, work performed or services provided, to the extent they were used to produce export goods, has been properly refunded/credited; whether OOO Ratmir had documents to support actual exports of such goods, and whether it properly assessed tax on domestic sales of goods."

[695]   Rejoinder ¶¶ 706–7.

> If the tax authorities had authority to reassign items from the debit side of the trading companies' taxpayer accounts to the debit side of Yukos' taxpayer account, then they must also have had the corresponding authority to transfer the entries on the credit side – particularly in light of the tax authorities' own prior determinations that the 0% export VAT rate applied to all of the transactions in question.[696]

662.   During his cross-examination of Mr. Konnov, Professor Gaillard recalled that the revenue of the trading companies was attributed to Yukos:

> Q.   So can we agree that the revenues were found in the books of separate legal entities, which were the trading companies; can we agree on that?
>
> A.   I think you already asked that question, and I said that, yes, the tax authorities used the books of the domestic offshore companies to get the figures.
>
> Q.   Right. And they took this amount and deemed this amount to be revenues of the Yukos; correct?
>
> A.   That is correct: they treated that revenue as revenue of Yukos.[697]

663.   Similarly, Mr. Konnov confirmed that if there had been no attribution of revenue to Yukos the VAT issue would not have arisen:

> Q.   I may disagree with you on some aspects of that, but I'm not reopening that. I am just talking about VAT.
>
> If the tax authorities had decided that the trading companies themselves had violated, say, the Mordovian Law, or the Law which is applicable to them, or the Federal Anti-Abuse Law, or whatever Law, but they have violated that Law; and if the tax authorities had said, "Okay, they abused, so all these tax benefits which they had, they should never have had these benefits, because there is no proportionality, because it's form over substance", whatever reason, "So they should pay, they should reimburse all these benefits", and possibly pay interest, fines, whatever -- okay? -- if that had been the case, would the VAT issue have arisen at all?
>
> A.   No.
>
> Q.   You are with me on that?
>
> A.   Yes.
>
> Q.   So it would not.  And the VAT issue arises only because it's Yukos which has been deemed to be the person having the revenues, and hence not having declared those revenues, and hence not having paid the VAT corresponding to the sales which generated those revenues; correct?
>
> A.   To be more specific, the VAT issue arises because VAT returns were not refiled.
>
> Q.   No, because they were not filed in the first place, right?
>
> A.   No, because they were not refiled by Yukos.  So the basis is not attribution; the basis is failure to file VAT returns.

---

[696]   Claimant's Post-Hearing Brief ¶ 43 (citations omitted).

[697]   Transcript, Day 13 at 85–86.

THE CHAIRMAN: That's not the question.  If there had been no reattribution, if the trading companies had been assessed the profit tax, et cetera, there would not have been a VAT issue.

A.     Right.  But I think I responded to that.

THE CHAIRMAN: Yes.

A.     I responded to that.  That's correct.[698]

664.   Mr. Konnov acknowledged that the trading companies had filed their VAT returns and had claimed the VAT refunds as required:

Q.     Right.  Do you agree with me that it's not disputed that the trading companies themselves have filed properly the VAT returns, and have requested and they have been granted the 0% rate because the goods were exported?  Correct?  Do we agree on that?

A.     I agree, they were.  As we discussed earlier today, there were a few minor issues. But apart from these minor issues, this is correct: the domestic companies filed VAT returns, claimed refund, and obtained refund.[699]

665.   Mr. Konnov confirmed that Yukos was assessed the massive VAT liability because it failed to file in its own name VAT returns in respect of the trading entities' exports, since it had been found by the tax authorities to be the true exporter:

PROFESSOR GAILLARD: Okay, the next question is: is it your understanding of what happened that when the VAT issue did arise for Yukos, because Yukos was deemed to be the person having received the revenues from the sales, when it did arise, is it your understanding of the case that the reason why they had to pay this massive amount of VAT is from the outset because they were criticised for not having submitted themselves the tax returns in time?  Is that your understanding of what happened?

A.     Right: VAT returns primarily, and the documents that need to be attached to that. But the main issue relates to the failure of Yukos to file the VAT returns with respect to these exports.

. . .

A.     I thought I had responded to that in my reports.  But in essence the Tax Code requires VAT returns to be filed by the exporter.  There is a formalistic procedure. Tax authorities have historically applied the law very formally.  They said that Yukos had to refile.  There is nothing difficult in refiling, and Yukos did not refile.

So therefore the basis for VAT assessment is not failure of Yukos to export, as we agreed; but the basis is failure of Yukos to file the documentation in its own name.[700]

[emphasis added]

---

[698]   Transcript, Day 14 at 227–28.

[699]   *Ibid.* at 230.

[700]   *Ibid.* at 229 and at 230–31.

666.   However, Mr. Konnov did not perceive any inconsistency between the attribution of revenue to Yukos and the position of the tax authorities and the courts that Yukos itself needed to file the VAT returns:

> Q.   Do we agree that for the revenues themselves, the authorities applied a substance over form principle?  Do we agree on that?
>
> A.   The tax authorities applied substance over form for both profits tax and VAT purposes.[701]

667.   In his First Report, Mr. Konnov explains his position in the following terms:

> At the outset, I should note that the tax authorities and courts were fully consistent in treating YUKOS for profit tax and VAT purposes.  Revenue of the Domestic Offshore Companies was recognized as revenue of YUKOS for both profit tax and VAT purposes.[702]

668.   The Tribunal observes that while the approach taken by the Tax Ministry was consistent in the sense that revenue was recognized as revenue of Yukos for both profit tax and VAT purposes, it was inconsistent in that, while the burden of the substance over form doctrine was imposed on Yukos, its corresponding benefit was not.  Put another way, while technicalities and formalism are said to preclude the attribution of the VAT filings of the trading entities to Yukos, it does not appear that the Tax Ministry was concerned with technicalities and formalism when it came time to attribute their revenue to Yukos.

669.   A member of the Tribunal put the pertinent question to Mr. Konnov.  The following exchange with the witness is important:

> JUDGE SCHWEBEL: In substance, Russian courts treated the activities of the trading companies as the activities of Yukos itself, while at the same time they did not attribute to Yukos a critical element of those activities, namely their filing for VAT refunds.
>
> In the interests of obvious justice, why did not the Russian courts treat the filings for VAT by the trading companies as filings by Yukos?
>
> A.   If I may, I see two aspects in your question.  First, I do not think that Russian tax authorities -- as I think was suggested in your question -- treated the activities of trading companies as the activities of Yukos.  I think it would be more correct, if I may, to say that they established that trading companies conducted no activity, and therefore they simply ignored that for tax purposes.
>
> As regards . . .  the substance of your question, the reason is very simple: is that, as I mentioned, in order to get the tax benefit, you need to comply with the substance and with the documents.  And here the documentary requirement was not burdensome; it was not difficult to refile the VAT return.  The tax authorities did

---

[701]   *Ibid.* at 231.

[702]   First Konnov Report ¶ 54

> look at the substance, but simply said, "You need to comply with the documentary requirement," and consistently Yukos failed to comply with that.
>
> So I don't see contradiction.[703]

670. Respondent relies on both Article 165 of the Russian Tax Code and Constitutional Court Resolution No. 12-P.  Neither of these texts, however, appears to the Tribunal to provide a clear basis for the authorities' refusal to attribute to Yukos the VAT filings that had been made by the trading entities when they were considered the taxpayer.  On the other hand, they do support the basic proposition that the Russian Tax Code requires the VAT return to be filed by the "taxpayer."[704]

671. In the view of the Tribunal, the jurisprudence of the Russian courts does not support the imposition of VAT payments on Yukos as happened in this case.  In particular, the *Energomashbank* decision of the Russian Constitutional Court stands for the proposition that courts must not limit themselves to a purely formalistic analysis in assessing tax claims by the State, but rather must examine the actual facts in order to respect the taxpayer's right to a fair opportunity to defend itself against the claim.[705]

### iii.    Would any Illicit Conduct by a Taxpayer Justify the Denial of a VAT Exemption, Irrespective of Whether the Illicit Conduct was Connected to VAT, and without any Regard to Proportionality?

672. In its Counter-Memorial, Respondent raises an additional argument in support of the authorities' denial of the VAT exemption to Yukos.  Respondent asserts that, in any event, "the denial of [a] VAT exemption is appropriate when the exporter, like Yukos, has been involved in flagrantly illicit conduct."[706]   In support of its argument, Respondent relies on what it characterizes as the practice in many countries to deny "the benefit of exemption or 0% rating, even where documentary requirements have been punctually satisfied, if the relevant export transaction is tainted by illegality (as was the case with Yukos) or even simply by

---

[703]    Transcript, Day 15 at 231–32.

[704]    Second Konnov Report ¶ 89.

[705]    Resolution of the Russian Constitutional Court No. 14–P ¶ 4, 28 October 1999, Exh. R-293 (the right to judicial defense is infringed when courts fail to investigate actual facts and limit themselves to establishing "formal conditions for the application of the law").  *See also* Reply ¶ 236 and Second Konnov Report ¶ 72.

[706]    Counter-Memorial ¶ 1076.

impropriety."[707]     In particular, Respondent relies on the decision of the ECJ in *R. v. Germany*.[708]

673.   Respondent summarizes the *R. v. Germany* decision as follows in its Counter-Memorial:

> More recently, the European Court of Justice, in the case of R. v. Germany, upheld the imposition of VAT by the German tax authorities on export transactions that had been carried out by an individual who had made fraudulent misrepresentations in his applications for exemption from German VAT, notwithstanding the fact that the fraud had not deprived Germany of any tax revenues, since the goods in question had effectively been exported out of Germany and therefore—but for the fraud in the attendant documentation—would have been unquestionably entitled to full exemption from German VAT.   The ECJ rejected the argument that imposition of VAT on the exporter would violate "principles of fiscal neutrality or legal certainty, or . . . legitimate expectations," holding that none of those principles can "legitimately be invoked by a taxable person who has intentionally participated in tax evasion. . ."   This was true, the court held, even though the tax evaded was not one that the taxpayer himself would normally have had to pay, and even though the result was that Germany ended up with a windfall, collecting a tax that, in the absence of fraud, it would never have been able to assess.[709]

674.   In their Reply, Claimants contend that this decision is of no assistance to Respondent, because it "does not suggest that the tax authorities may deny VAT exemptions because of allegations of illegality unrelated to actual compliance with the VAT law."[710]   Indeed, contrary to the *R. v. Germany* decision (in which, Claimants assert, the ECJ expressly rejected a punitive approach), Claimants argue that the "staggering demands for VAT payment—plus fines and interest— made by the Tax Ministry"[711] constitute an entirely disproportionate response to the alleged

---

[707]   *Ibid.* ¶ 1206.

[708]   *R. v. Germany*, ECJ, Case C-285/09, Judgment, 7 December 2010, Exh. R-1401 (hereinafter "*R. v. Germany*").

[709]   Counter-Memorial ¶ 1208 (citing *R. v. Germany* ¶ 22).   Respondent notes: "In fact, as made clear by the ECJ, the German taxpayer had not himself evaded any tax for which he might have been liable, because the sole purpose and effect of his fraudulent conduct had been to assist unrelated third parties—his foreign customers—to evade taxes in their home country of Portugal." *Ibid.* n.1878.

Respondent adds further:   "The ECJ stated that "[t]hose principles cannot legitimately be invoked by a taxable person who has intentionally participated in tax evasion and who has jeopardized the operation of the common system on VAT". *Ibid.* ¶ 54.   The ECJ also summarily dismissed the argument that imposition of VAT on an exporter (who, as had been pointed out by the Advocate General, would probably never be able to recover it from his customer) would violate the general EU principle of proportionality.   The court held that the exporter's involvement in the third party's tax evasion scheme was "decisive" in this regard.   Specifically the court stated that "[a]s regards the principle of proportionality, it must be observed that this does not preclude a supplier who participates in tax evasion from being obliged to pay VAT subsequently on this intra-community supply, inasmuch as his involvement in the evasion is a decisive factor to be taken into account in an assessment of the proportionality of a national measure. . . .") *Ibid.* n.1879.

[710]   Reply ¶ 248.

[711]   *Ibid.* ¶ 249.

defects in the paperwork submitted by Yukos, and are evidence of "the tax authorities' manifest bad faith on this issue."[712]

675. According to Respondent, however, the decision is directly applicable to the present case because, in that case, the ECJ held "that it is entirely appropriate for a State to deny VAT refunds (or exemptions) to an exporting company whose conduct, like Yukos', involves '*evasion, avoidance or abuse,*' even though the scheme did not deprive that State of any VAT or other revenues."[713]   Respondent asserts that Claimants' attempt to distinguish the *R. v. Germany* decision on the grounds that, in that case, the scheme involved an attempt to evade VAT charges, whereas Yukos' fraud was designed to evade a tax on profits, is "sophistic."[714] Respondent explains:

> What makes the European Court of Justice's decision relevant to these arbitrations is its holding that, because the export transactions in that case were part of an abusive scheme, Germany was entitled to levy VAT on those exports, notwithstanding the fact that no German tax (of any kind) had been evaded.  Reasoning by analogy, Russia's VAT assessments against Yukos were appropriate *a fortiori*, since Yukos' fraudulent scheme— unlike the one in *R v. Germany*—most assuredly involved a revenue loss for Russia, to wit, the loss of huge amounts of corporate profit tax that the Yukos tax evasion scheme was engineered to evade.[715]

676. In its Post-Hearing Brief, Respondent again invokes the ECJ's decision in *R. v. Germany*.[716] Claimants, in their own Post-Hearing Brief, reiterated that "Yukos' tax optimization structure was not aimed at,  and indeed could not possibly achieve, any reduction in VAT liabilities."[717] Claimants conclude that this decision is of no assistance to the Tribunal.

677. The Tribunal is not persuaded that the Russian Federation's imposition of massive VAT liabilities on Yukos can be excused or justified on the basis of the *R. v. Germany* decision. Firstly, no element of Yukos' tax optimization scheme could be said to constitute an abuse of the VAT system.  In the *R. v. Germany* case, however, the taxpayer who was denied the VAT exemption was convicted on two counts of tax evasion by means of which he had evaded more that €1 million of VAT in 2002 and more than €1.5 million of VAT in 2003.  Secondly, the Tribunal considers the imposition of VAT on Yukos to be a disproportionate response to

---

[712]   *Ibid*. ¶ 252.

[713]   Rejoinder ¶ 709 (emphasis in original) (citing *R. v. Germany* ¶ 51, Exh. R-1401).

[714]   Rejoinder ¶ 710.

[715]   *Ibid*.

[716]   Respondent's Post-Hearing Brief ¶ 42.

[717]   Claimants Post-Hearing Brief ¶ 42.

whatever abuse took place in the low-tax regions, considering that the tax authorities had already imposed all of the revenue-based taxes deemed to be owed by the trading entities on Yukos.  In the *R. v. Germany* decision, the ECJ reminded Member States that they

> must observe the general principles of law that form part of the European Union legal order, which include, in particular, the principles of legal certainty and proportionality and the principle of protection of legitimate expectations (see, to that effect, Joined Cases C-286/94, C-340/95, C-401/95 and C-47/96 *Molenheide and Others* [1977] ECR 1-7281, paragraph 48; Case C-384/04 *Federation of Technological Industries and* others [2006] ECR 1-4191, paragraphs 29 and 30; and Case C-271/06 *Netto Supermarkt* [2008] ECR 1-771, paragraph 18).  As regards, in particular, the principle of proportionality, the Court has already held that, in accordance with that principle, the measures which the Member States may thus adopt must not go further than is necessary to attain the objectives of ensuring the correct levying and collection of the tax and the prevention of tax evasion (see, in particular, Case C-188/09 *Profaktor Kulesza, Frankowski Józwiak, Orlowski* [2010] ECR 1-0000, paragraph 26).[718]

678.   In the present case, with respect to the denial by the Russian tax authorities of the VAT exemption to Yukos, the Tribunal finds that the Russian Federation did go much further than was necessary to attain a legitimate objective of collecting taxes.

### iv.   Did Yukos Contribute to its Own Demise by Failing to File Proper VAT documentation, or Does the Evidence Suggest that Any Efforts by Yukos to Minimize its Liability would have been Thwarted by the Authorities?

679.   In its Counter-Memorial, Respondent also contends that Yukos acted self-destructively in relation to VAT, in as much as:

(a)    Yukos could have avoided further VAT assessments "easily and at no cost, simply by having Yukos itself (or one of the other genuine companies of the Yukos group) acknowledge its status as the real exporter and file the requisite documentation itself".[719]

(b)    Yukos, when it belatedly filed amended VAT returns for some prior periods, "submitted those returns in a format that was incapable of being processed by the authorities' computer, with the result that, as any tax expert would have predicted, they were rejected."[720]

---

[718]   *R. v. Germany* ¶ 45, Exh. R-1401.

[719]   Counter-Memorial ¶ 1078.

[720]   *Ibid*. ¶ 1079.

680.   In relation to the format for filing the VAT returns, Respondent, in its Counter-Memorial, wrote:

> For an unexplained reason, Yukos belatedly filed yearly VAT returns, whereas quarterly or monthly returns were required. See Konnov Report, ¶ 58. See Article 163 of the Tax Code, providing with respect to VAT that "1. Tax period shall be established as a calendar month, unless otherwise provided by paragraph 2 of this Article (this applies to taxpayers performing the obligations of tax agents, hereinafter referred to as tax agents). 2. For taxpayers (tax agents) whose monthly revenues from the sale of goods (works, services) within a quarter, excluding the tax and sales tax, do not exceed one million rubles, the tax period shall be established as a quarter."  With effect from Jan. 1, 2004, Article 163 was amended to read: "1. Tax period shall be established as a calendar month, unless otherwise provided by paragraph 2 of this Article (this applies to taxpayers performing the obligations of tax agents, hereinafter referred to as tax agents). 2. For taxpayers (tax agents) whose monthly revenues from the sale of goods (works, services) within a quarter, excluding the tax, do not exceed one million rubles, the tax period shall be established as a quarter." [Exh. R-1502].   Not surprisingly, the courts have rejected such returns. See, e.g., Decision of the Moscow Arbitrazh Court, Case No. A40-4338/05-107-9/ A40-7780/05-98-90 (Apr. 28, 2005), 59 [Exh. C-196] ("The tax return submitted by OAO Yukos Oil Company for value added tax for 2003 cannot be considered, since it does not meet the requirements of tax legislation regarding submission of a VAT tax return for each tax period, which is a month or quarter").[721]

> [emphasis added by Respondent]

681.   For Claimants, the particular format of the VAT filings was just a pretext by the tax authorities for refusing to credit Yukos for the VAT refunds obtained by the trading companies:

> The Respondent accuses Yukos of having "acted self-destructively" by filing yearly VAT returns instead of quarterly or monthly returns and, by way of support, refers to the Decision of the Moscow Arbitrazh Court regarding the alleged tax reassessment for the year 2003.  However, the monthly reporting requirement relates solely to the periodicity at which, in the ordinary course of events, companies are required to file VAT returns.  In circumstances where the documentation was being submitted four years after the fact, it would have made no sense—and would likely have generated unnecessary additional work for the tax authorities—to disaggregate the annual information into monthly data.[722]

> [emphasis in original]

---

[721]   Counter-Memorial ¶ 1079, n.1707.

[722]   Reply ¶ 250. Claimants note that:  "The Respondent is unable to make up its mind as to whether the documents needed to be filed on a monthly or quarterly basis or whether either is permissible, a position whose vagueness cannot be reconciled with the purported certainty with which it affirms that yearly submissions were improper.  [citing Counter-Memorial ¶ 1079, n.1707.]" Ibid. n.440.

Claimants add further:  "The Respondent offers no support for its assertion that the returns submitted by Yukos were "incapable of being processed by the authorities' computer", an assertion which is implausible on its face, particularly in light of the Respondent's own uncertainty as to whether monthly or quarterly submissions were required, and was in any event not relied on as a basis for the original rejection." Ibid. n.442.

682. Claimants add in their Reply that "the text of Article 165 of the Russian Tax Code seriously undermines this pretext in that it imposes no timing restrictions whatsoever in relation to the submission of the required documentation for obtaining a VAT refund."[723]

683. Respondent disagrees:

> Equally meritless is the allegation that the "monthly reporting requirement relates solely to the periodicity at which, in the ordinary course of events, companies are required to file VAT returns" and is not applicable when "the documentation is being submitted four years after the fact." Contrary to Claimants' suggestion, the Russian Tax Code does not contemplate any exception for non-"ordinary course" filings, and in particular allows no derogation from the requirement that filings be made on a monthly (or, in cases not relevant to Yukos, quarterly) basis. Rather, it clearly provides what a taxpayer must file to claim a 0% VAT rate on exports, and neither Yukos nor any other taxpayer is entitled to decide for itself whether or not to comply with the law based on "convenience".[724]

684. In his Second Expert Report, Mr. Konnov refers to the strict formalism of Russian tax legislation with respect to VAT and cites, in support of the decision of the tax authorities, a decision of the Russian Supreme Arbitrazh Court issued in 2011:

> 86.   The strict formalism of Russian tax legislation with respect to VAT was recently confirmed in the *Forward* VAT case (unrelated to YUKOS) which has reached the Russian Supreme Arbitrazh Court. *Forward* was a construction company. In relation to the construction of a residential building in the city of Bryansk, it was collecting investment contributions. *Forward* failed to assess VAT on its remuneration when due. Based on a field audit, the tax authorities assessed VAT (and profit tax) on *Forward*. The taxpayer claimed input VAT credit in court. Neither the amounts of input VAT, nor the payment made by the suppliers was disputed by the tax authorities. The taxpayer submitted to the court documents evidencing input VAT, but failed to file an amended VAT return claiming the respective amounts of input VAT. Even though the amount of the input VAT paid by the taxpayer was undisputed, the court denied the input VAT credit solely on the basis that the taxpayer failed to file an amended VAT return.

> 87.   The Supreme Arbitrazh Court concluded that, in accordance with the Russian Tax Code and the prevailing court practice, input VAT credit had to be claimed by a taxpayer in accordance with the relevant provisions of the Russian Tax Code, and that the tax authorities were not obliged to identify and credit undeclared input VAT on their own:

>> "The fact that documents confirming, in the taxpayer's opinion, a right for tax credit are available without reflecting (showing, claiming) the amount of the tax credit in a tax return is not a ground for reduction of VAT payable to the

---

[723]   Reply ¶ 251 (citing Russian Tax Code, Article 165, Exh. R-1484 ("In the event that no documents (copies thereof) referred above are provided by the taxpayer within 180 days after the expiry of 180 days of the date of the release by the regional customs authority under export or transit customs procedure, said transactions involving the sale of goods (performance of works, provision of services) shall be taxed at a rate of 10 percent or 18 percent accordingly. In the event that subsequently the taxpayer submits to the tax authorities any documents (copies thereof) proving eligibility of the zero percent tax rate application, the tax paid shall be refunded to the taxpayer in the manner and on terms and conditions expressly provided by article 176 of this Code.").

[724]   Rejoinder ¶ 719(iii) (citing Reply ¶ 250–51, stating that "Claimants also rely on Article 165 of the Tax Code in making this argument, but Article 165 had nothing to do with the period (*i.e.*, monthly or annual) that Yukos' VAT filing should have covered." and also citing Second Konnov Report ¶ 93).

> budget for a tax period. Availability of documents confirming the right for VAT credit does not replace an obligation to claim it in a tax return."

> 88.    The Supreme Arbitrazh Court unequivocally confirmed that, as concerns VAT, Russian tax legislation is very formal and no VAT benefit can be allowed if it was not properly claimed by a taxpayer in a tax return.[725]

685.   When he gave evidence, Mr. Konnov also offered a practical justification for the monthly/quarterly requirement:

> But secondly, you cannot simply amend VAT law to allow annual return, because there are a few corresponding provisions. For instance, there is a provision on the chamber audit, on which I was questioned by Professor Gaillard: it is three months. And what that means: that if one taxpayer is on a monthly VAT return and the other one is on a quarterly return, the three months are sufficient for the tax authorities to do a counter-audit with respect to all the suppliers and other interested parties.

> If, however, you simply introduce annual return, and without corresponding changes to other provisions in the Tax Code, the tax authorities -- basically the VAT law will not function properly. So you can do that, but that would mean not only allowing acceptance of annual return, but redrafting the whole VAT chapter of the Tax Code to work it properly.[726]

686.   The Tribunal observes that while this practical justification does seem to support the monthly/quarterly filing requirement when the tax authorities are auditing the underlying transactions, it is more difficult to understand how that justification applied to Yukos' attempts to obtain credit for the trading companies' VAT refunds, in a situation where those VAT refunds had already been vetted and approved by the authorities at the time they had been claimed (for the first time) by the trading entities.

687.   In their Reply, Claimants assert that there was no reason to believe that, if Yukos had disaggregated the VAT data into monthly submissions as Respondent suggests it should have done the tax authorities would have accepted the filings:

> Indeed, the Claimants note that if such resubmissions were a genuinely available option, the Respondent offers no explanation as to why, once Yukos' allegedly self-destructive management had been replaced with a bankruptcy receiver, that receiver, Mr. Rebgun, failed to resubmit the VAT returns in the allegedly required format, given that if such an option had existed, Mr. Rebgun's fiduciary duties to the creditors would have required him to take advantage of it.[727]

---

[725]   Second Konnov Report ¶¶ 86–88 (citing Resolution of the Presidium of the Supreme Arbitrazh Court of the Russian Federation No. 23/11, 26 April 2011, Exh. R-3270).

[726]   Transcript, Day 15 at 199.

[727]   Reply ¶ 252 (citing Counter-Memorial ¶¶ 1079, 1105(viii), 1237(vii), 1272, 1279(vii), 1322(vii)).

688.   In respect of this point, Professor Gaillard opined that the Russian authorities, including the courts, would certainly have found another reason to deny Yukos the VAT exemption if Yukos had filed monthly amended returns.  Professor Gaillard referred Mr. Konnov to the following extract from the Moscow Arbitrazh Court's decision relating to the 2003 tax year:

> "The tax return submitted by … Yukos Oil Company for value added tax for 2003 cannot be considered, since it does not meet the requirements of tax legislation regarding submission of a VAT tax return for each tax period, which is a month or quarter, and documents were not submitted at these times confirming the sale of goods for export and tax deductions . . . ."[728]

689.   Professor Gaillard then put the following question to Respondent's expert:

> Q.   Simply, Mr Konnov, when you look at this sentence which the Chairman directed you to, do you also see that the court says that the tax return cannot be considered because:
>
> "... documents were not submitted at these times …"
>
> Do you see that?
>
> A.   Yes, I do.
>
> Q.   So the reason the court is articulating is that: (1) it's not monthly or quarterly; and (2) it was not submitted at the right time. Correct?[729]

690.   Mr. Konnov disagreed with Professor Gaillard's interpretation:

> No, no. It says that you need to submit supporting documents, which are in Article 165, with your VAT return. Article 165 says VAT return and supporting documents.[730]

691.   Earlier in his evidence, Mr. Konnov had also supported the court's reasoning in the following words:

> And this is exactly the reason I explain in my report, I believe, that Yukos had to file monthly returns, and there is no such thing as an annual return.  And the document that is in the record suggests that Yukos filed an annual return by even using a pen, I believe, or one way or another just crossing out and filling in the form the way it electronically cannot be done.  And the court addresses it here, and says that, "What you filed is not a proper VAT return."[731]

692.   The Tribunal finds the following exchange between Professor Gaillard and Mr. Konnov of particular interest.  Professor Gaillard asked Mr. Konnov for his reaction to another reason

---

[728]   Transcript, Day 14 at 259 (referring to Decision of the Moscow Arbitrazh Court, Case Nos. A40-4338/05-107-9 and A40-7780/05-98-90, 28 April 2005, p. 59, Exh. C-196).

[729]   *Ibid.* at 260.

[730]   *Ibid.* at 261.

[731]   *Ibid.* at 259.

which could have been invoked by the Russian authorities/courts to deny the VAT refunds to

Yukos even if it had filed "proper" monthly VAT returns:

> Q.  Okay.  Do you see the sentence pursuant to which the court [the Moscow Arbitrazh Court rejecting Yukos's VAT argument in relation to the 2002 tax year] says:
>
>> "The court did not accept the argument of … YUKOS [Oil Company] that tax returns submitted to tax authorities by the said organisations [*i.e.*, the trading entities] shall be deemed as tax returns of … YUKOS [Oil Company] since such returns were signed by persons who had no powers to submit tax returns on behalf of … YUKOS [Oil Company]."
>
> Do you see that?
>
> A.  Right.
>
> . . .
>
> PROFESSOR GAILLARD: So what interests me is this sentence which we read, the court saying that they:
>
>> "... did not accept the argument of … Yukos that tax returns submitted … by the [trading companies] shall be deemed as tax returns of … YUKOS [Oil Company] since such tax returns were signed by persons who had no powers to submit tax returns on behalf of … YUKOS [Oil Company]."
>
> Can you confirm that this is a correct translation of the Russian original?
>
> A.  I think it is.  And I think, again, as you have read out, the court responds to "the argument of … Yukos".  So this sentence suggests that Yukos argued that they should be deemed as if they were filed by Yukos.  And probably the question was: how can someone act on behalf of Yukos?  And the court said, "Look, they cannot be accepted as Yukos tax returns, at least because someone who signed them, in the name of Yukos-M here, could not act on behalf of Yukos."
>
> Q.  But conversely the papers themselves would say that Ratibor -- or Yukos-M, in this example -- is the exporter.  The documentation they could file would say Yukos-M, Ratibor, Fargoil, whatever, has sold abroad.  So the documents are not going to bear the name of Yukos, are they?
>
> A.  Absolutely.
>
> Q.  Right.  So Yukos loses one way or the other, because either the documents do not say that they are the exporter, or they are not deemed to be the beneficiaries of the revenues, right?
>
> A.  No, Yukos wins one way: it simply refiles.[732]

693. According to Respondent, Claimants' submission that there was no reason to believe that, had

Yukos made proper filings, the tax authorities would have accepted them, is "gratuitously self-

---

[732]   *Ibid.* at 248–250.

serving".[733]   According to Respondent, "Russian law clearly indicates what Yukos should have done, but inexplicably failed to do."[734]

694.   The Tribunal is of the view, having considered the evidence and arguments canvassed above, that the Russian Federation was determined to impose the VAT liability on Yukos, and would have done whatever was necessary to ensure that the VAT liability was imposed on Yukos. The Tribunal observes that this determination of the Russian Federation to do whatever it deemed necessary to impose massive tax liabilities on Yukos is also evidenced by the second trial and conviction of Mikhail Khodorkovsky.  After having been convicted of various tax-related crimes in May 2005,[735] largely stemming from his leadership of Yukos, for which he was sentenced to a term of nine years of imprisonment, Mr. Khodorkovsky was implausibly convicted of money laundering and theft of oil in December 2010.[736]  This second verdict, for which Mr. Khodorkovsky was sentenced to an additional thirteen years and six months in prison, was based on essentially the same circumstances surrounding Yukos that led to the original conviction for tax evasion.  This shows how far the Russian Federation was willing to go to keep Mr. Khodorkovsky imprisoned, and supports the Tribunal's conclusion that it was Respondent's intent to impose VAT liability on Yukos no matter what Yukos did.

695.   The Tribunal also heard submissions from the Parties on the responsibility of the bankruptcy trustee (Mr. Rebgun) for his failure to file VAT forms in the proper format.

696.   On this issue, Respondent contends as follows:

> Finally, while the Russian Federation does not speak for Mr. Rebgun or know the circumstances of his treatment of the VAT issue, it is specious for Claimants to attempt to blame Mr. Rebgun for Yukos' failure to file proper amended VAT returns for 2000-2003 (or any amended VAT return at all for 2004).  Mr. Rebgun took office only in August 2006. Until then, Yukos had been managed by a team that Claimants themselves had appointed.  That team, as noted above, had submitted non-processable amended VAT filings for years 2000-2003 in August 2004, and had done nothing in the ensuing two-year

---

[733]   Rejoinder ¶ 719(iv).

[734]   *Ibid.* (citing Decision of the Moscow Arbitrazh Court, Case No. A40-4338/05-107-9 and A-40-7780/05-98-90, 28 April 2005, p. 59, Exh. C-196 ("The tax return submitted by OAO Yukos Oil Company for value added tax for 2003 cannot be considered, since it does not meet the requirements of tax legislation regarding submission of a VAT tax return for each tax period, which is a month or quarter[.]"); Resolution of the Ninth Arbitrazh Appellate Court, Case No. 09AP-7979/05-AK, 16 August 2005, p. 60, Exh. R-251 ("The court legally and reasonably indicated that the value added tax return of OAO NK YUKOS for 2003 provided by OAO NK YUKOS shall not be accepted as it did not comply with the requirements of the tax legislation connected with filing of VAT returns for each tax period which was a month or a quarter.").

[735]   Judgment of the Meshchansky District Court for the City of Moscow, 16 May 2005, Exh. R-379.

[736]   Verdict of the Khamovnichesky Court of Moscow, Case No. 1-23/10, 27 December 2010, Exh. C-1057.

period to correct those errors.  As for the 2004 tax year, the managers appointed by Claimants failed to submit any amended returns at all.  Accordingly, Claimants and their appointees bear sole responsibility for Yukos' mishandling of the VAT filings. Mr. Rebgun cannot be blamed, if only because by the time he finally took office (a) the 2000-2004 tax assessments had already been issued and become due and payable for all five of the relevant years, (b) the court rulings that had upheld the 2000-2003 tax assessments had become *res judicata*, and (c) in any event, the three-year time limits to file amended VAT returns had already expired for the whole of the 2000, 2001, and 2002 tax years, as well as for more than half of the 2003 tax year.  In any event, as established at paragraphs 388-395 above, it is clear as a matter of public international law that the Russian Federation is not responsible for acts or omissions of bankruptcy receivers such as Mr. Rebgun.[737]

697.   To conclude this subsection, the Tribunal will now quote the following exchange between a member of the Tribunal and Respondent's expert Mr. Konnov, in respect of Yukos' VAT liability.

> JUDGE SCHWEBEL: Is it right, then, to infer from your testimony—particularly what you've just said—that the management of Yukos, or its counsel, in not filing full VAT returns monthly, committed an astounding error worth more than $13 billion?
>
> A.   Right.  It's absolutely clear to me—whether you call it "error" or whether that was intentional action, I don't know—but the defect in the VAT return was so apparent for not only a professional tax advisor and not only for Yukos, which, as we know, had a big tax team and was filing and processing this VAT return on a routine basis, but we also -- I think I referred to documents, correspondence by Golub where she admitted that it should be monthly and they required it monthly.
>
> So I think I have absolutely no doubt that they perfectly understood that the amended returns cannot and will not be accepted.
>
> JUDGE SCHWEBEL: And can you find any rational explanation for such behaviour?

---

[737]   Rejoinder ¶ 719(v) (citing Reply ¶ 252; Second Konnov Report ¶ 95; *Kotov v. Russia*, ECtHR, Appl. No. 54522/00, Judgment (3 April 2012) ¶ 107, Exh. R-3371, noting that:  "It would appear that the liquidator, at the relevant time, enjoyed a considerable amount of operational and institutional independence, as State authorities did not have the power to give instructions to him and therefore could not directly interfere with the liquidation process as such. The State's involvement in the liquidation procedure resulted only from its role in establishing the legislative framework for such procedures, in defining the functions and the powers of the creditors' body and of the liquidator, and in overseeing observance of the rules. It follows that the liquidator did not act as a State agent.  Consequently, the respondent State cannot be held directly responsible for his wrongful acts in the present case.  The fact that a court was entitled to review the lawfulness of the liquidator's actions does not alter this analysis.")

Respondent further notes:  "In particular: (a) the 2000 tax assessment became final and irreversible on 30 December 2005, when the Federal Arbitrazh Court of the Moscow District dismissed Yukos' appeal of the 2000 tax assessment in proceedings upon Yukos' challenge of the 2000 tax assessment.  *See* Resolution of the Federal Arbitrazh Court of the Moscow District, Case No. KA-A40/12571-04, 30 December 2005, Exh. R-1555; (b) the 2001 tax assessment became final and irreversible on 20 February 2006, when the panel of three judges of the Supreme Arbitrazh Court dismissed Yukos' application for supervisory review of the 2001 tax assessments.  *See* Ruling of the Supreme Arbitrazh Court, Case No. 7801/05, 20 February 2006, Exh. R-589; (c) the 2002 tax assessment became final and irreversible on 12 October 2005, when the panel of three judges of the Supreme Arbitrazh Court dismissed Yukos' application for supervisory review of the 2002 executive enforcement proceedings. *See* Ruling of the Supreme Arbitrazh Court, Case No. 11868/05, 12 October 2005, Exh. R-593; and (d) the 2003 tax assessment became final and irreversible on 22 February 2006, when the Supreme Arbitrazh Court dismissed Yukos' application for supervisory review of the 2003 tax assessment.  *See* Ruling of the Supreme Arbitrazh Court, Case No. 12304, 22 February 2006, Exh. R-1565." *Ibid*. n.1134.

A.   I have difficulties finding the rational behaviour, and there is nothing in the record. My only guess, and that would only be a guess: that what Yukos was trying to do, it was trying to take a position that in its view will not compromise its position with respect to the profits tax.

In other words, if Yukos—Yukos clearly would not follow my advice, and my advice, as you have seen, will be to refile both.  If they refiled proper VAT return without refiling—sorry, if they refiled proper—if they refiled proper VAT returns without refiling proper profit tax return, I think they were—my guess, my speculation, is they thought that court would look at that and would see that as them taking an inconsistent position for VAT and profits tax purposes.

So therefore my guess, again, is that they filed something—which I would not call even maybe a VAT return, but something that they knew was apparently not acceptable—just to take procedural actions.  But, as came during the cross-examination by Professor Gaillard, I think I mentioned that they file in August and they don't even refer to these returns till the—till late 2005—till 2005.

So that's my only guess: that they tried to put in—to file something with the tax service which could later on be used in argument, but would not compromise, in their view, their position on the profits tax.

JUDGE SCHWEBEL:  Could the Trustee in Bankruptcy, who was charged with maximising the resources available for creditors, himself have filed the monthly forms for VAT return?

A.   Yes, he could have refiled, subject to the three-year limitation that I referred to previously.  So you look at the date when he came to power, if I may say, and for the previous three years he could have refiled.

…

THE CHAIRMAN: Should he be criticised for that?

A.   I would say so.  But it's easy now to criticise, when I look back.  So I would say I would—

Yes, I would say I would criticise him [738]

### v.    Extracts from Other Yukos-Related Awards

698.   The *Quasar* tribunal, citing the *RosInvestCo* tribunal's holding, traversed the VAT issue in the following words and concluded without any hesitation that Respondent's position on this issue was indefensible:

#### D)    The rejection of the VAT refund

80.   The unattractiveness of the Respondent's position in this connection is readily apparent. The amounts involved were vast – in excess of $13.5 billion.  The export sales in question undoubtedly qualified for VAT refunds.  The trading company sellers had duly applied for them.  But once the tax authorities had invalidated the transactions by which the sellers had come into possession of the goods, they concluded that Yukos was the true original owner and therefore should be deemed to be the true export seller.  If this was so, one would expect that by a parity of reasoning under their basic premise, the tax authorities should have held that the true applicant for the refund was also Yukos – and that Yukos

---

[738]   Transcript, Day 15 at 232–35.

was therefore entitled to the VAT credit in the same way as it was assigned the debit for the profit tax.  To try to have it both ways would surely bespeak unprincipled hostility towards the taxpayer.

81.    Yet that is precisely what the tax officials did – with the subsequent endorsement of the courts.

82.    Unsurprisingly, *RosInvest* viewed this conduct in the harsh light it deserves:

"The extremely formalistic interpretation of the VAT lax law regarding Yukos and its trading companies to the effect that, though exports were undisputely not subject to VAT, the documentation also undisputedly submitted by the trading companies could not be used in relation to Yukos and thus Yukos was liable far more than US$ 13.5 billion in VAT related taxes is difficult to accept as a justification for a tax liability the size of which was sufficient to lead Yukos into bankruptcy." (¶452)

The present Tribunal entirely endorses this conclusion, and agrees with the Claimants that the ECHR appears, in ¶¶601-602, to have entirely missed the point being made, namely that if the tax authorities were going to attribute to Yukos the transactions carried out in the names of its trading companies, they should also have attributed to Yukos the submission of normal VAT documentation by the trading companies.  Given that the export transactions in question were indisputably zero-rated for VAT purposes, <u>the refusal to do so can only seem confiscatory to a degree which comes close to validating the claims in their entirety on this basis alone</u>.[739]

[emphasis added]

699.    The following extract from the judgment of the ECtHR, which found in favour of the Russian Federation on this issue is of interest:

601.    The Court notes that both Section 5 of Law no. 1992-1 of 6 December 1991 "On Value-Added Tax" governing the relevant sphere until 1 January 2001 as well as Article 165 of the Tax Code applicable to the subsequent period provided unequivocally that a zero rate of value-added tax in respect of exported goods and its refund could by no means be applied automatically, and that the company was required to claim the tax exemptions or refunds under its own name under the procedure set out initially in Letter no. B3-8-05/848, 04-03-08 of the State Tax Service of Russia and the Ministry of Finance and subsequently in Article 176 of the Tax Code to substantiate the requests in order to obtain the impugned refunds (see paragraphs 326-336).  In view of the above, the Court finds that the relevant rules made the procedure for VAT refunds sufficiently clear and accessible for the applicant company to able to comply with it.

602.    Having examined the case file materials and the parties' submissions, including the company's allegation made at the hearing on 4 March 2010 that it had filed the VAT exemption forms for each of the years 2000 to 2003 on 31 August 2004, the Court finds that the applicant company failed to submit any proof that it had made a properly substantiated filing in accordance with the established procedure, and not simply raised it as one of the arguments in the Tax Assessment proceedings, and that it had then contested any refusal by the tax authorities before the competent domestic courts (see paragraphs 49 and 171, 196, 196 and 216).  The Court concludes that the applicant company did not receive any adverse treatment in this respect.[740]

---

[739]    *Quasar* ¶¶ 80–82, R-3383.

[740]    ECtHR Yukos Judgment ¶¶ 601–602, Exh. R-3328.

700. In the view of this Tribunal however, far from not receiving "any adverse treatment in this respect" as the ECtHR held, Yukos received some thirteen billion dollars worth of adverse treatment by reason of the imposition on it of VAT liabilities earlier excluded by the undisputed export of the oil in question.

### (c)    Fines

#### i.    Introduction

701. Claimants contend that neither the "willful offender" nor the "repeat offender" fines should have been assessed, and that "the animating, confiscatory purpose behind the Respondent's actions is palpable."[741]  Claimants also assert that the imposition of fines for the year 2000 was barred by the statute of limitations, and that the authorities' reliance on what Claimants characterize as a new, retroactive, and judicially-created exception to the statute is further demonstration of its expropriatory intent.[742]

702. Respondent insists that the authorities' conduct was proper, that the Russian courts properly rejected Yukos' arguments against the fines, and that the Tribunal should do the same here in the present arbitration.

703. The following questions with respect to fines arise from a review of the Parties' written and oral submissions:

- Were the fines levied in relation to the 2000 tax year barred by the statute of limitations?;

- Were the "willful offender" fines properly imposed?;

- Were the "repeat offender" fines properly imposed?;

- Could Yukos have avoided the fines?; and

- Was the quantum of the fines reasonable, in terms of both the rate and the absolute amount?

---

[741] Claimants' Post-Hearing Brief ¶ 47.

[742] *Ibid*. ¶ 45.

ii.     **Were Fines Levied in Relation to the 2000 Tax Year Barred by the Statute of Limitations?**

704.    Article 113 of the Russian Tax Code establishes a three-year statute of limitations for all tax offenses.[743]  In respect of the 2000 tax year, Yukos had argued before the Russian courts that it was improper for the authorities to levy any fine because their assessment was not issued until 14 April 2004, *i.e.*, a few months after the posited expiration of the statute of limitations for fines.  Yukos' argument was considered by Russia's courts and ultimately rejected on the ground that the statute of limitations had been tolled by Yukos' "interference" with the authorities' following the December 2003 tax audit.

705.    The Tribunal notes that after the 2000 Audit Report was issued, Mr. Pepeliaev, in his first opinion to his client Yukos, on 5 January 2004, concluded that:

> The Russian tax law envisages a legal process to collect fines. However the fine cannot be actually collected in 2004 due to the expiration of the 3-year limitation period.[744]

706.    In a later opinion, Mr. Pepeliaev wrote:

> In accordance with the currently applicable procedure set out in Art. 101 of the Tax Code of the Russian Federation, a decision to hold the company liable pursuant to the Inspection Report of December 29, 2003 may be passed no earlier than in 2004.  Moreover, by virtue of art. 113 of the Tax Code of the Russian Federation no one may be held liable for a tax offence if three years have expired (limitation period) from the date of this tax offence or from the date following the end date of the tax period in which this offence was committed. In breach of this rule of law, the Inspection Report says that YUKOS should be held liable for the activities of 17 companies that took place in 2000.[745]

707.    Respondent, in its Counter-Memorial, objects that Claimants did not raise the statute of limitations argument in their Memorial.  In any event, Respondent submits, the argument is meritless.  Respondent adopts the reasoning of the Russian Courts.[746]  Respondent adds: "[T]he statute of limitations provided a windfall to Yukos, insofar as the tax authorities never disturbed

---

[743]   Russian Tax Code, Article 11(1), Exh. C-1276.  Mr. Konnov opines, in his Second Expert Report, that, under Russian law, the statute of limitations applies to fines only, and does not apply to tax arrears or default interest.  Second Konnov Report, ¶ 109.

[744]   S. Pepeliaev, *Summary of the tax inspection of OAO NK Yukos*, p. 1, 5 January 2004, Exh. C-1128.

[745]   S. Pepeliaev et al., Opinion regarding compliance with legislation of Inspection Report No. 08-1/1 of 20 December 2003 issued by the Tax Ministry of Russia, 15 January 2004, p. 3, Exh. C-1129.

[746]   *See also* Respondent's Skeleton Argument, 1 October 2012 ¶ 13 (hereinafter, "Respondent's Skeleton") ("no taxpayer—in Russia or elsewhere—could legitimately claim to be surprised that it may not invoke a limitations period that has expired only because of its own obstruction of tax audits.").

Yukos' abuses of the low-tax region regime prior to 2000.  Yukos thus obtained a 'free ride' for the frauds it perpetrated in 1999, which involved significant amounts."[747]

708. In their Reply, Claimants invoked the limitations period.  They argue that it was unlawful for the tax authorities to seek to collect fines in relation to 2000 because "the decision of the Russian tax authorities to hold Yukos liable in respect of alleged tax offenses committed in 2000 was issued on 14 April 2004, several months after the three-year statute of limitations had expired in relation to the year 2000 (i.e., after 31 December 2003)."[748]

709. Claimants respond to Respondent's reliance on the decisions of the Russian courts in the following words:

> The Respondent's assertion (see Respondent's Counter-Memorial on the Merits, April 4, 2011, footnote 1708) that the Russian courts approved its circumvention of the statute of limitations against Yukos is unavailing given that, as discussed below, the ECtHR has found the Russian courts' decisions to violate the principle of legality embodied in Article 1 of Protocol No. 1 to the European Convention on Human Rights, notwithstanding the extraordinary broad deference it accords to States under that provision.[749]

710. Claimants assert that the tax authorities were able to circumvent the statute of limitations only because the Constitutional Court "creat[ed] for the first time an exception to the statute of limitations for any taxpayer who 'resisted' tax inspection, so long as an audit report was issued before the end of the limitations period."[750]

711. Respondent resists Claimants' submission that the Constitutional Court's resolution allowing tolling of the statute of limitations in cases of taxpayer obstruction was "*tailor-made*" for Yukos.[751]  In its Rejoinder, Respondent argues that Claimants' submission is unsupported by any evidence and contradicted by the fact that this exception has been applied to numerous taxpayers, all unrelated to Yukos.[752]  As to the specific Constitutional Court Resolution No. 9 P,

---

[747]  Counter-Memorial ¶ 1081, n.1708.  Claimants reply that the 1999 audit report relating to Investproekt (Exh. R-304) was issued with ten months remaining on the statute of limitations, but that no Decision or Tax Payment Demand was issued (or, at least, none is in the record of this arbitration).  *See* Claimants' Post-Hearing Brief ¶ 63, n.36.

[748]  Reply at ¶ 258 (emphasis in original).

[749]  *Ibid.*, n.453

[750]  *Ibid.* (referring to Resolution of the Russian Constitutional Court No. 9–P, Exh. C-1141).

[751]  *Ibid.*

[752]  Rejoinder ¶ 725.

Respondent says that it was issued in response to two different complaints, only one of which was related to Yukos.[753]

712. In his Second Expert Report, Mr. Konnov explains that the Constitutional Court ruled, in Resolution No. 9-P, as follows:

      a.    if a taxpayer obstructs tax control and tax audits, the arbitrazh court may rule that the tax authority was justified in acting after expiration of the limitations period; and

      b.    in any event, the limitations period for tax offenses ends at the moment of execution of a tax audit report summarising documented facts of tax offenses identified in the course of the audit.[754]

713. Mr. Konnov addresses Claimants' argument on this point:

> The Claimants' allegation (Claimants' Reply on the Merits, para. 258) that the Russian Constitutional Court created an "exception to the statute of limitations for any taxpayer who "resisted" tax inspection, so long as an audit report was issued before the end of the limitations period" is misleading (emphasis added). The Constitutional Court made two separate conclusions not dependent on each other. The Claimants' contention that the "tax audit report" rule was "tailor-made" for YUKOS is not correct either. The tax authorities would have nonetheless been deemed within the statute of limitations period under the obstruction of the audit limb of the Resolution.[755]
>
>                                [emphasis in original]

714. Mr. Konnov also adds:

> The ruling of the Constitutional Court issued in July 2005 is described by the Claimants as "tailor-made" to YUKOS and in conflict with the ruling of the Constitutional Court issued in January 2005. I cannot agree. There is no inconsistency between these two rulings. Rather, in the July 2005 ruling, the Constitutional Court analyzed, in particular, the impact on the limitations period resulting from obstruction of the audit, an issue which was not addressed in any way in the January 2005 ruling.
>
> The Claimants' reliance on the dissenting opinions in the July 2005 ruling is incomplete. The Claimants refer only to two dissenting opinions relating to the July 2005 ruling. However, they fail to mention the third dissenting opinion to the same ruling in which Judge G.A. Gadzhiev has taken an approach which, in my opinion, is even harsher than the approach taken by the Constitutional Court. In the view of Judge G.A. Gadzhiev, the statute of limitations should be applied differently depending on the amount of the tax arrears at issue. He believes that the non-differentiated statute of limitation, as it is provided in the tax legislation, contradicts the constitutional principle of equality before the law.[756]

---

[753]   *Ibid.* ¶ 724, n.1151.

[754]   Second Konnov Report ¶ 111.

[755]   *Ibid.*, n.177.

[756]   *Ibid.* ¶¶ 112–13.

715.   Finally, Respondent adds in its Rejoinder on this point:

> It is also worth reiterating that, as noted above, the Russian authorities' long-standing position, including when the Yukos cases were being argued in the Russian courts, has been that the three-year limitation period runs from the end of the taxable period in which <u>payment</u> was due (because this is the period when the tax offense actually occurred), and not from the end of the taxable period in which the relevant income or revenue accrued (and therefore, here, that the statute of limitations expired on December 31, 2004 rather than December 31, 2003). While this position was rejected by the courts in the Yukos case, it was upheld in other cases, and ultimately endorsed by the Supreme Arbitrazh Court. As a result, if the Yukos case were before the Russian courts today, it would be undisputable that the fines for tax year 2000 were assessed in a timely manner.[757]

716.   In their Post-Hearing Brief, Claimants assert that "it is factually untrue that alleged obstruction by Yukos caused the tax authorities to miss the statute of limitations: the audit was completed in just 3 weeks and <u>before</u> the limitations period had expired."[758]

717.   In its Post-Hearing Brief, Respondent asserts that "Yukos unquestionably obstructed the field tax audit leading to the 2000 assessment, and it was completely foreseeable that Russian law would not allow Yukos to invoke a limitations period so as to benefit from its own obstruction."[759]

718.   The Tribunal concludes, on the basis of the record, that Respondent has made a credible argument regarding Yukos' obstruction of the field tax audit leading to the 2000 assessment.[760] However, the Tribunal agrees with Claimants, and with the ECtHR, that the retroactive application of Resolution 9–P violated a fundamental principle of legality.[761] The Tribunal concludes that the fines levied in relation to the 2000 tax year were therefore barred by the statute of limitations.

---

[757]   Rejoinder ¶ 731 (citing Resolution of the Presidium of the Supreme Arbitrazh Court No. 4134/11, 27 September 2011, Exh. R-3298, interpreting a rule on calculation of the statute of limitations in Article 113 that was identical to the one in effect in 2003–2004. As Mr. Konnov points out "the panel of three judges when transferring the case to the Presidium of the Russian Supreme Arbitrazh Court noted that courts had previously issued inconsistent rulings on this subject."; Second Konnov Report ¶ 121).

[758]   Claimants' Post-Hearing Brief ¶ 45 (emphasis in original).

[759]   Respondent's Post-Hearing Brief ¶ 45 (citations omitted).

[760]   Counter-Memorial ¶ 355; Rejoinder ¶¶ 723–30

[761]   Reply ¶ 258; ECtHR Yukos Judgment, Exh. R-3328.

### iii.    Were the "Willful Offender" Fines Properly Imposed?

719.    Claimants contest the imposition of the "willful offender" fines for the years 2000 through 2003 because "for Yukos' executives to be 'aware of the unlawful nature of such actions', there must have existed an enforceable decision of the tax authorities to that effect."[762]  Such a decision, Claimants note, did not come until 14 April 2004, and thus only *after* Yukos filed its tax returns for the years 2000, 2001, 2002 and 2003.[763]  Consequently, for the years 2000 through 2003, Yukos' executives could not have been "aware" of the alleged "unlawful nature of the[ir] actions."[764]

720.    In respect of the 2004 tax year, Claimants have a different argument:

> As regards the 2004 tax reassessment, the regional and local tax benefits that these companies had enjoyed were significantly reduced by the federal legislator as from January 1, 2004.  With the change in legislation, the alleged tax offenses for which Yukos was held liable with respect to the year 2004 could therefore not have been considered similar to those which had allegedly been committed by Yukos in 2000-2003 under the former legislation. In this context, the reference made by the Moscow Arbitrazh Court in 2006 to the 2000, 2001, 2002 and 2003 Decisions in order to justify the 40% fines for the year 2004 appear to be nothing less than a manifest misapplication of the law to Yukos.[765]

721.    In response, Respondent asserts, in its Counter-Memorial, that "'willfulness' does not require criminal *mens rea*: it is sufficient that the taxpayer's underassessment indicate a degree of awareness of the potential unlawfulness of its conduct."[766]  Nor does Respondent accept Claimants' argument that, in order for a violation to be deemed "willful", the taxpayer must already have been found liable. Respondent counters that:

> Even if Yukos, *quod non*, had been transparent and subjectively in good faith with respect to its "tax optimization" scheme, the very complexity of its scheme made it unavoidable that it would, at a minimum, be deemed "willful": one does not create a network of trading companies carelessly or as a result of honest mistake.  In any event, . . . Yukos' managers knew perfectly well that their scheme was illegal when they first implemented it -- an aggravated form of "willfulness."[767]

---

[762]    Memorial ¶ 330.

[763]    *Ibid.*

[764]    *Ibid.*

[765]    *Ibid.* ¶ 331 (citing   Decision of the Moscow Arbitrazh Court of 2 October 2006, 4 October 2006, confirming lawfulness of fines imposed on Yukos with respect to its tax reassessment for the year 2004, p. 31, Exh. C-201). Claimants note that "[a]s from 1 January 2004, the benefits on corporate profit tax that the regions were authorized to grant to taxpayers out of the regional and local shares of this tax were limited to four percent."

[766]    Counter-Memorial ¶ 1082.  *See* Konnov Report ¶ 72.

[767]    Counter-Memorial ¶ 1082.

722. Mr. Konnov supported Respondent's position with the following observations in his First Report:

> At the time, YUKOS was one of the major Russian companies with substantial tax, legal and accounting departments. It knew that: (i) its tax minimization practices in ZATO Lesnoy had been investigated and challenged since late 1999; and (ii) its Sibirskaya Domestic Trading Company had been challenged by the tax authorities in 2001 and had lost its tax case in 2002. It also must have known that Russian authorities have been regularly challenging transactions involving other taxpayers aimed at tax evasion, including by means of abuses of companies registered in low-tax jurisdictions, and that Russian highest courts had introduced anti-abuse doctrines, including "bad faith." Accordingly, in my view, YUKOS was a clear target for assessment of a "wilful offender fine," which would have been justified even under far less extreme circumstances.[768]

723. In their Reply, Claimants argue that Respondent is wrong in its contention that the Tax Ministry was merely required to show a "degree of awareness of the potential unlawfulness of Yukos' conduct."[769]   Claimants contend that Respondent's theory is "refuted by the plain text of the provision itself as well as the Respondent's own expert, who accepts that the statute requires the Authorities to prove that the offender 'was aware of the unlawful nature of his action (or inaction)'."[770]   Claimants contend that Respondent's position requires it to "attempt to rewrite the statute."[771]

724. Claimants take particular issue with the imposition of fines in respect of the VAT refunds:

> [A]s a general point, the imposition of fines in circumstances where no violation of statutory law has been alleged is a matter of dubious legitimacy. Particularly improper was the imposition of fines in relation to the revocation of VAT refunds. In circumstances where it was not alleged that any tax was owed, much less unpaid or underpaid, there was no statutory basis for such fines.[772]

725. Claimants elaborate this argument in their Post-Hearing Brief:

> Particularly egregious is the imposition of such inflated fines in relation to VAT, where it is not even alleged that there was any intent to evade VAT nor any actual evasion of VAT. In any case, as set out above, Yukos was not, and could not possibly be "aware of the unlawful nature of its actions".[773]

---

[768]   First Konnov Report ¶ 76 (citations omitted).

[769]   Reply ¶ 260

[770]   *Ibid*. (citing First Konnov Report ¶ 72).

[771]   Reply ¶ 260.

[772]   *Ibid*. ¶ 257 (citations omitted).

[773]   Claimants' Post-Hearing Brief ¶ 46 (citations omitted).

726. In its Rejoinder, Respondent reiterates its argument that the relevant inquiry for purposes of the "willful offender" fine is whether Yukos' management was aware of the illegality of its tax scheme.[774]   Respondent states that Yukos did not implement the tax optimization scheme by accident, and that it knew that the scheme was unlawful.   In support of its submission, Respondent raised several arguments:

- Yukos masked its affiliation with the trading shells and falsely denied to the Russian authorities and courts that it had any knowledge of their documents or officers

- Yukos knew from its experience with its sham Lesnoy trading shells that its scheme was unlawful

- Yukos's senior management was warned at least twice that the authorities would have challenged Yukos' "tax optimization" scheme if they had known the names and details of Yukos' trading shells and their affiliation with Yukos

- No legal counsel ever provided Yukos with an opinion that its "tax optimization" scheme was lawful

- Yukos lied about its affiliation with its sham trading companies to the Russian tax authorities and courts, the ECtHR, and PwC

- Yukos had access to the case law and commentaries published by its own tax counsel, which confirmed its scheme was unlawful.[775]

727. Finally, Respondent argues:

> The Tribunal should reject Claimants' contention that the willful offender fines were improper because Yukos' tax practices were purportedly based on the trading shells' investment agreements with local tax authorities, which as Mr. Konnov opined - without contradiction - were not sufficient to establish compliance with federal anti-abuse doctrines.[776]

728. The Tribunal is of the view that the willful offender fines were clearly improper insofar as they related to VAT.  This follows necessarily from the Tribunal's findings that there was no valid basis to impose the VAT liability on Yukos.

729. On the totality of the evidence, the Tribunal is also of the view that the willful offender fines as they related to the revenue-based taxes were improperly assessed against Yukos.  The Tribunal recalls its findings, above, that those taxes, considering all of the evidence, were not properly assessed against Yukos.

---

[774]   Rejoinder ¶ 734.

[775]   Respondent's Opening Slides, p. 130.

[776]   Respondent's Post-Hearing Brief ¶ 44 (citations omitted).

730. Moreover, while he did not appear at the Hearing, the contemporaneous quote from Mr. Kasyanov to journalists in January 2004 shows just how unlikely it was that Yukos could have been certain that its tax optimization plan was illegal:

> [Question:] The Tax Ministry claimed from Yukos to pay an additional 98 billion rubles, which the company allegedly saved on taxes in 2000 with the help of the schemes, which was also used by other companies. Until autumn 2003, neither the Ministry of Finance nor the Tax Ministry, though criticizing the schemes, had challenged their legality.  How do you react to the fact that the tax optimization is retroactively declared unlawful?
>
> [Answer:] If lawful actions for tax optimization are declared unlawful retroactively, then I react to that negatively.  For the simple reason that there were loopholes in the law allowing the optimization of payments.  The Tax Code did not forbid Yukos and other companies to conduct transactions through domestic offshore zones.[777]
>
> [emphasis added]

731. The opinion of Mr. Kasyanov, the Prime Minister at the time the assessment was made, is persuasive.  It confirms the conclusion of the Tribunal that, even if the legality of Yukos' tax optimization scheme was, in certain regions and respects, questionable and vulnerable to attack by the tax authorities, it could not be characterized as a "willful offense".

732. The Tribunal also recalls Claimants' position as to the governing statutory provision in the Russian Tax Code:

> Whereas the Tax Code clearly provides that fines may be increased for willfulness only "if the person who committed it was aware of the unlawful nature of his actions (inaction) and intended or consciously allowed the harmful consequences of such actions (inaction)" the Respondent claimed that such fines could be imposed if the taxpayer had "a degree of awareness of the potential unlawfulness of its conduct".  The Respondent's position is obviously not the law.[778]
>
> [emphasis in original]

733. The Tribunal agrees.  Respondent's interpretation of the standard is inconsistent with the Russian Tax Code.  The strict language of the Russian Tax Code makes it difficult for the Tribunal to conclude that Yukos should have been assessed the willful offender fines, even if there were a basis to conclude (as the Tribunal has held earlier) that some of the revenue-based taxes could legitimately have been imposed against Yukos.

---

[777]   Memorial ¶ 330 (quoting Alexander Bekker, Vladimir Fedorin, *Interview:  Mikhail Kasyanov, Prime Minister of the Russian Federation*, Vedomosti, 12 January 2004, p. 5, Exh. C-677).

[778]   Claimants' Post Hearing Brief ¶ 46 (citations omitted).

#### iv.   Were the "Repeat Offender" Fines Properly Imposed?

734.   Claimants contend that the 100 percent increase of the fines imposed on the basis of the "Repeat Offender" provision of the Russian Tax Code was even less justified than the imposition of the "Willful Offender" fine:

> [T]he plain wording of Article 112(2) of the Russian Tax Code directs that such increase be only permitted in cases in which a taxpayer has been held liable for a similar tax offense *prior* to the commission of the disputed offense.  The Presidium of Highest Arbitrazh Court of the Russian Federation has been unequivocal in considering that the previous similar offense must not only be committed, but also be *detected and sanctioned*.  No such sanction came before April 14, 2004.  As a result, in declaring that the tax offenses allegedly committed by Yukos in 2001, 2002 and 2003 were repeat offenses triggering a further 100% increase, both the Russian tax authorities and the Russian courts grossly misapplied Article 112(2).  As regards the 2004 fines, their 100% increase was all the more egregious that the tax offenses purportedly committed by Yukos in 2004 were not similar to those allegedly committed in 2000-2003.[779]

735.   Claimants also rely on the Resolution of the Presidium of the Highest Arbitrazh Court of the Russian Federation No. 15557/07 of 1 April 2008 (Annex (Merits) C 415) for the proposition that, in order for a taxpayer to be considered a "Repeat Offender", the taxpayer's previous similar offence must have been "detected and sanctioned" before the commission of the repeat offence.  Respondent takes issue with Claimants' reliance on this decision adopted in 2008, "years after Yukos' appeals against the assessments at issue had run their course."[780] Respondent contends that the jurisprudence prior to 2008, at the time that the authorities imposed the "Repeat Offender" fines, supported the authorities' approach:

> Prior to the issuance of the 2008 Resolution, there had been a number of cases, unrelated to Yukos, in which the courts had upheld the assessment of repeat offender fines in the same manner as was done in the Yukos cases.  Thus, when the tax authorities levied repeat offender fines against Yukos -- an egregious repeat offender if there ever was one -- they were not deviating from established practice but rather, applying one of the interpretations of the relevant statute that was in current use at the time.  As much as was effectively conceded by Yukos' own lawyer who, while urging that Yukos not be assessed a repeat offender fine, noted the "unclarity" of the law.[781]

---

[779]   Memorial ¶ 332 (citing Resolution of the Presidium of the Highest Arbitrazh Court of the Russian Federation No. 15557/07, 1 April 2008, Exh. C-415).

[780]   Counter-Memorial ¶ 1084.

[781]   *Ibid.* (citing First Konnov Report ¶¶ 77–82; Article 112(2) of the Russian Tax Code, Exh. R-2248).  Respondent also points to the following in support of its position:  First Konnov Report ¶¶ 79–80; Resolution of the Federal Arbitrazh Court of the Far-Eastern District, Case No. F-03-A73/05-2/244, 14 March 2005, Exh. R-1506; Resolution of the Federal Arbitrazh Court of the Povolzhsky District, Case No. A65-7415/04-CA1-32, 5 October 2004, Exh. R-1504); Resolution of the Federal Arbitrazh Court of the North-Western District, Case No. A44-498/ 2006-8, 21 August 2006, Exh. R-3282; Resolution of the Federal Arbitrazh Court of West-Siberian District, Case No. F04-5193/2007 (36847-A75-43), 3 August 2007, Exh. R-3377; Resolution of the Federal Arbitrazh Court of the West-Siberian District, Case No. F04-1778/2008 (2088-A27-25), 12 March 2008, Exh. R-1505.

736.  Claimants contend, in their Reply, that Respondent's argument should be rejected.  According to Claimants, Respondent does not contest the existence and significance of the 2008 decision, but merely contends that because this decision came in 2008, it should not be considered by the Tribunal.  Claimants conclude:

> In other words, while the Respondent concedes that the repeat offender fines were unlawful under the correct interpretation of the provision, it seeks to justify the fines on the basis of an alleged uncertainty about the correctness of that interpretation.[782]

737.  In their Post-Hearing Brief, Claimants also criticize Respondent's reliance on the pre-2008 jurisprudence:

> The Respondent and its expert concede that the imposition of repeat offender fines against Yukos was contrary to the interpretation of the Highest Arbitrazh Court issued in 2008.  The Respondent's only defense is to argue that some other courts had previously applied the statute in the same (incorrect) way.  Thus, notwithstanding the requirement in Article 3(7) of the Tax Code to resolve doubts in favor of the taxpayer, the Respondent insists it was appropriate for the tax authorities to apply an interpretation that was both incorrect and nearly US$ 4 billion less favorable to the taxpayer.  The animating, confiscatory purpose behind the Respondent's actions is palpable.[783]

738.  Mr. Konnov was cross-examined at length about the 2008 Arbitrazh Court decision.[784]  Throughout, he maintained his support for the authorities' treatment of Yukos, prior to the 2008 decision.  He did not concede that it was incorrect, but merely that it was a function of the uncertainty inherent in the provision.

739.  Mr. Konnov had indeed referred to the "uncertainty" or ambiguity surrounding Article 112(2) of the Russian Tax Code in his First Expert Report:

> 77.    The Claimants argue that the imposition of repeat offender fines on YUKOS was unjustified and ignored the plain language of the governing law and the Supreme Arbitrazh Court guidance. I cannot agree with the suggestion by the Claimants that the language of Article 112(2) of the Tax Code was "plain" and that there is only one possible interpretation of that provision. The relevant provision of the Tax Code reads as follows:
>
> > "Aggravating circumstance means commitment of a tax offence by a person previously held liable for an analogous violation".
>
> 78.    YUKOS itself admitted during the court hearings related to the 2000 tax year there was more than one possible reading of Article 112(2) of the Tax Code.  The minutes of the court hearing read as follows:

---

[782]  Reply ¶ 261.

[783]  Claimant's Post-Hearing Brief ¶ 47 (citing Transcript, Day 15 at 20–23 (Mr. Konnov); Transcript, Day 18 at 101 (Respondent's closing)).

[784]  *See* Transcript, Day 15 at 5–23.

> [A representative of YUKOS] ". . . believes that there is unclarity in interpretation of Article 112 of the Russian Tax Code."[785]

740. Claimants assert that Respondent's position is untenable, given that "Article 3(7) of the Tax Code requires doubts as to the proper interpretation of its provisions to be resolved in favor of the taxpayer."[786]

741. In relation to Article 3(7) of the Russian Tax Code, Respondent makes the following final argument in its Post-Hearing Brief:

> Claimants' contention that purported ambiguities in the statute governing repeat offender fines had to be resolved in Yukos' favor is baseless (Claim. Reb., Day 20 Tr. 196:18:23; Konn. Test., Day 15 Tr. 33:14-33:25, 34:25-35:8). As Mr. Konnov explained without contradiction (Konn. Test., Day 15 Tr. 34:1-34:24), and as is confirmed in a 2004 article written by Mr. Zaripov (Exh. R-3223), only those doubts that courts cannot resolve must be decided in favor of the taxpayer. Here, however, the relevant Tax Code provision was interpreted consistently with prior caselaw, confirming that it did not give rise to any irresolvable doubts. Konn. Rep. 1, ¶ 79; Konn. Rep. 2, ¶ 102.[787]

742. Respondent has another defense for the "repeat offender" fines, namely that Yukos would have been deemed a repeat tax offender even under the approach adopted by the 2008 Resolution, because it had been subjected to fines for underpayment of taxes well before any of the assessments was issued. Respondent refers in this connection to paragraphs 81 and 82 of the First Konnov Report, which reads as follows:

> 81. Furthermore, there could have been additional grounds for imposition of repeat offender fines on YUKOS. Based on my experience, any Russian company of a size comparable to that of YUKOS at the end of 1990s and the beginning of this decade was regularly subject to tax audits. Almost all of these audits resulted in discovery of tax violations and imposition of fines, even though in some instances the amounts were relatively insignificant. The Nefteyugansk Tax Inspectorate imposed fines on YUKOS pursuant to Decision No. 289 dated June 9, 2003. Even before that, the tax authorities conducted a tax audit of YUKOS. The Report of the Nefteyugansk Tax Inspectorate No. 66, dated April 28, 2003, notes that on April 16, 2001 the Inter-Regional Inspectorate of the Tax Ministry for Operational Oversight of Problem Taxpayers issued a report No. 34-03-10/6. Although I have not been able to review that act, it would not be unreasonable to assume that fines were imposed on YUKOS based on that act. Moreover, the US GAAP financials produced by YUKOS suggest that in each of 1998, 1999, 2000, 2001, 2002 and 2003, YUKOS was subject to substantial fines and interest for tax violations.

> 82. In accordance with the prevailing court practice, a repeat offender fine may be levied so long as the prior fine involved the same provision of the Tax Code with respect to

---

[785]   First Konnov Report ¶¶ 77–78.

[786]   Reply ¶ 261 (citing Russian Tax Code, Article 3(7), Exh. C-1276; Reply ¶ 231 and n.250).

[787]   Respondent's Post-Hearing Brief ¶ 46, n.140. For the exchange between Dr. Poncet and Mr. Konnov on the principle "*in dubio contra fiscum*," *see* Transcript, Day 15 at 37–42.

the same taxes, even if the nature and the amount of the violations were different. Accordingly, even minor violations with respect to the same taxes imposed in connection with different arrangements would have sufficed to justify the repeat offender fines even under the approach taken by the 2008 Resolution.[788]

743. Claimants counter Respondent's alternative argument as follows:

> The Respondent's alternative theory, according to which any previous violation on profit tax, on whatever basis and in whatever amount, would be sufficient to justify these US\$ 3.92 billion in repeat offender fines is far-fetched to say the least, relying on Mr. Konnov's dubious assertion as to the content of "prevailing court practice", his speculation that Yukos may have had a previous violation at some point in time and his assumption that that hypothetical violation involved the same provision of the Tax Code with respect to the same taxes. In any event, since by the Respondent's own admission its tax claims were not premised on alleged violations of any provision of the Tax Code, Mr. Konnov's theory has no conceivable application in relation to Yukos.[789]

744. On the issue of the "repeat offender" fines, the Tribunal is persuaded by Claimants' argument that these fines should not have been imposed.

### v.    Could Yukos Have Avoided the Fines?

745. In its Counter-Memorial, Respondent draws the attention of the Tribunal to Article 81(4) of the Russian Tax Code which allows taxpayers to avoid <u>all</u> penalties for past misdeeds provided only that they file amended tax returns before being formally notified of the onset of the audit relating to the relevant tax years. If the taxpayer takes advantage of Article 81(4) in a timely fashion, it needs to pay only the tax previously evaded (and interest), but no fine. This provision, combined with the Russian practice (followed in the Yukos case) of auditing "open" tax years (*i.e.,* tax years not time-barred by the statute of limitations) one after the other, rather than simultaneously, gives tax offenders an opportunity to eliminate their exposure to fines by filing last-minute amended returns.[790]

746. On the basis of this provision, Respondent contends that Yukos could have easily avoided the fines associated with the assessments for tax years 2001, 2002 and 2003, if only it had taken advantage of Article 81(4) of the Russian Tax Code:

> In Yukos' case, the authorities had made clear their complete condemnation of Yukos' scheme when they delivered their audit report for 2000 to Yukos, *i.e.*, on December 29, 2003. They did not, however, announce commencement of their audit of the next year

---

[788]    First Konnov Report ¶¶ 81–82 (citations omitted).

[789]    Reply ¶ 262 (citing Counter-Memorial ¶¶ 993, 1085).

[790]    Counter-Memorial ¶ 1087 (citing First Konnov Report ¶¶ 83–85).

(2001) until March 23, 2004, *i.e.*, 84 days later.  As a result, Yukos had a window of opportunity of nearly three months duration in which it could have legally avoided any penalty whatsoever for tax year 2001 (including a willful offender fine and a repeat offender fine), simply by filing amended returns and paying the respective taxes and interest.  The authorities' audit for 2002 and 2003 did not start until August 9, 2004  and October 28, 2004, respectively, and Yukos could likewise have avoided all penalties simply by filing amended returns for 2002 and 2003 before those dates and paying the overdue taxes and interest.  Instead, Yukos' managers recklessly squandered this opportunity.[791]

747.   As an additional point for the tax year 2003, Respondent asserts that Yukos had only itself to blame "for filing a fraudulent annual return for that year, which ended on or around 28 March 2004, the filing deadline."[792]  It is Respondent's position that instead of continuing to pretend that its scheme was lawful, some three months after the December 2003 audit, Yukos could have filed an amended return.[793]

748.   Similarly, Respondent submits that Yukos could have filed a "lawful tax return" for the 2004 tax year.  On the basis of this reasoning, Respondent sums up its position as follows:

> Had Yukos filed lawful tax returns beginning as of January 1, 2004 (*i.e.*, after its receipt of the December 29, 2003 tax audit report) and exercised in timely fashion its right to file amended returns for years 2001 and 2002, and paid the respective taxes and default interest, it would have reduced its overall tax liabilities in an amount that would have ensured that Yukos would have not faced bankruptcy proceedings, and that would in all likelihood also have avoided the need for the YNG auction.[794]

749.   Claimants reject Respondent's suggestion that Yukos should have pre-emptively conceded the validity of the December 2003 tax audit for the 2000 tax year and filed amended tax returns for subsequent years prior to being notified of the audits for those years.  Claimants assert that Respondent's position "confirms the Russian authorities' complete disregard for due process and fundamental rights of taxpayers."[795]  According to Claimants, Yukos had every right to avail itself of its rights under Russian law to challenge these unlawful tax reassessments and fines in court, or even await the results of the tax authorities' own review of Yukos' objections and declaration of their final position in the decision to hold Yukos liable with respect to the

---

[791]   Counter-Memorial ¶ 1088 (citing Field Tax Audit Report No. 30-3-14/1, 30 June 2004, p. 3, Exh. R-345; Field Tax Audit Report No. 52/852, 29 October 2004, p. 3 Exh. R-346; Field Tax Audit Report No. 52/907, 19 November 2004, p. 2, Exh. R-260; Counter-Memorial ¶¶ 353–65).

[792]   Counter-Memorial ¶ 1089.

[793]   *Ibid*.

[794]   *Ibid*. ¶ 1090.

[795]   Reply ¶ 264.

year 2000.[796]  Claimants note that Respondent decided to carry out additional control measures and to review the 29 December 2003 audit report in light of Yukos' objections but communicated no information about this review prior to issuing its Decision to hold Yukos liable on 14 April 2004 when it dismissed Yukos' objections.[797]

750.  The Tribunal does not accept that, if Yukos had acted as Respondent maintains, it would have been able to escape the imposition of fines.  As with the issue of VAT liability, the Tribunal is convinced that had Yukos done so, the Russian Federation would still have found a way or a reason to impose the fines on Yukos.

### vi.    Was the Quantum of the Fines Reasonable, in Terms of Both the Rate and the Absolute Amount?

751.  In its Counter-Memorial, Respondent compares the regime for fines in the Russian Federation with those that exist in other countries.  Respondent notes that fines for taxpayers that have underpaid their taxes, whether or not associated with tax evasion, can lead to fines at rates ranging up to 300 percent of the evaded tax (this highest rate applies, according to Respondent, in Austria, the Netherlands, and Switzerland).  On this basis, Respondent concludes: "It is clear from the foregoing that the fines levied on Yukos were not excessive by international standards."[798]

752.  The Tribunal notes that Claimants did not address this last submission of Respondent.  In any event, given the Tribunal's conclusions regarding the legitimacy of the willful and repeat offender fines imposed by the tax authorities on Yukos, it is unnecessary for the Tribunal to deal with this contention.

### vii.   Extracts from Other Yukos-Related Awards

753.  In respect of the limitations period as it applied to the 2000 tax year, the ECtHR found, "notwithstanding the State's margin of appreciation", against the Russian Federation:

> 571.    Turning to the facts of the case, the Court would note firstly that the rule which, in the present case, underwent changes as a result of the decision of 14 July 2005, was contained in Article 113 of Chapter 15 "General provisions concerning the liability for tax

---

[796]   *Ibid*.

[797]   *Ibid*., n.475.

[798]   Counter-Memorial ¶ 1224.

offences" of the Tax Code (see paragraph 403) and thus formed a part of the domestic substantive law. Even though the rule in itself did not describe the substantive elements of the offence and the applicable penalty, it nevertheless constituted a *sine qua non* condition with which the authorities had to comply in order to be able to prosecute the relevant taxpayers in connection with the alleged tax offences. Accordingly, Article 113 of the Tax Code defined a crime for the purposes of the Court's analysis of lawfulness. It remains to be determined whether in the circumstances the decision of 14 July 2005 could be seen as a gradual clarification of the rules on criminal liability which "[was] consistent with the essence of the offence and could reasonably be foreseen" (see *Kafkaris*, cited above, § 141).

572. In this connection the Court may accept that the change in question did not change the substance of the offence. The Constitutional Court interpreted the existing rules on time-limits in relation to taxpayers who acted abusively. At the same time, the Court is not persuaded that the change in question could have been reasonably foreseen.

573. It observes that the decision of 14 July 2005 had changed the rules applicable at the relevant time by creating an exception from a rule which had had no previous exceptions (see paragraphs 86 and 88). The decision represented a reversal and departure from the well-established practice directions of the Supreme Commercial Court (see, by contrast, *Achour*, cited above, § 52) and the Court finds no indication in the cases submitted by the parties suggesting a divergent practice or any previous difficulty in connection with the application of Article 113 of the Tax Code at the domestic level (see paragraphs 407-408). Although the previous jurisprudence of the Constitutional Court contained some general references to unfavourable legal consequences which taxpayers acting in bad faith could face in certain situations, these indications, as such, were insufficient to provide a clear guidance to the applicant company in the circumstances of the present case.

574. Overall, notwithstanding the State's margin of appreciation in this sphere, the Court finds that there has been a violation of Article 1 of Protocol No. 1 on account of the change in interpretation of the rules on the statutory time-bar resulting from the Constitutional Court's decision of 14 July 2005 and the effect of this decision on the outcome of the Tax Assessment 2000 proceedings.

575. Since the applicant company's conviction under Article 122 of the Tax Code in the 2000 Tax Assessment proceedings laid the basis for finding the applicant company liable for a repeated offence with a 100% increase in the amount of the penalties due in the 2001 Tax Assessment proceedings, the Court also finds that the 2001 Tax Assessment in the part ordering the applicant company to pay the double fines was not in accordance with the law, as required by Article 1 of Protocol No. 1.[799]

754. On the issue of the "repeat offender" fines, the *RosInvestCo* tribunal held as follows against the Russian Federation:

> From the evidence on file, the Tribunal concludes that the interpretation of Articles 122 and 114 of the Tax Code used on Yukos was not used before or thereafter in any comparable cases. Again, this resulted in an extremely large liability in the range of US$ 3.8 billion.[800]
>
> . . .
>
> **Repeat offender fines:** The US$ 3.8 billion repeat offender fines on the basis of conduct pre-dating the tax audit again appears to the Tribunal as a departure from practice applied

---

[799]   ECtHR Yukos Judgment, ¶¶ 571–75, Exh. R-3328.

[800]   *RosInvestCo* ¶ 454, Exh. C-1049.

earlier and from that granted to other companies and thus to be one part of a cumulative effort to prevent Yukos' ongoing existence.[801]

**(d)   Concluding Observations**

755.   The Tribunal recalls that, at the outset of this chapter, it referred to the question put by Counsel for the claimant to the arbitral tribunal in the *Quasar* arbitration.  "Why would Russia have treated Yukos as it did if its purpose was to collect taxes?"[802]

756.   After having now traversed, at some length, the treatment of Yukos by Russian tax authorities, the bailiffs and the courts, and having considered the totality of the evidence, especially the VAT evidence, the Tribunal has concluded that the primary objective of the Russian Federation was not to collect taxes but rather to bankrupt Yukos and appropriate its valuable assets.

757.   The principal reasons, discussed in this chapter, which lead the Tribunal to this conclusion include:

i)     the attribution to Yukos of the revenues earned by its trading companies, even though there was no precedent in Russia for such attribution based on the theory of "actual owner", and the refusal at the same time to give Yukos any of the benefits of the VAT filings made by the trading companies, with the result that Yukos was assessed USD 13.5 billion or 56 percent of the total tax claims levied against Yukos;

ii)    the imposition on Yukos of the "willful offender" fines, at the very least as they related to VAT;

iii)   the refusal of the tax authorities to give Yukos the benefit of Article 3(7) of the Russian Tax Code to resolve doubts as to the interpretation of Article 112(2) of the Russian Tax Code in favor of the taxpayer, with the resulting imposition of nearly USD 4 billion in "repeat offender" fines; and

iv)    the imposition of "repeat offender" fines on Yukos when the conduct that was punished occurred prior to the determination by the courts that the conduct was wrongful; for example, the "repeat offender" fine assessed against Yukos for the

---

[801]   *Ibid.* ¶ 620(c).

[802]   *See* above at paragraphs 504 and 579.

2001 tax year is based on the finding by the courts in 2004 that the conduct in 2000 was wrongful.

758.  In reaching its conclusion, the Tribunal has also taken into account the fact that, in February 2007, before Messrs. Khodorkovsky and Lebedev had served half of their prison terms, the Prosecutor General's Office levelled new charges against them, this time for theft of oil and funds from Yukos, embezzlement and money laundering.

759.  As will be seen in subsequent chapters of this Part VIII of the Award which now follow, the Tribunal is sustained in this central and all important conclusion by its analysis of other disturbing facets of the Yukos saga, including:

  i)  the campaign of harassment carried out by the Russian authorities under the cloak of "investigative activities" including arrests, interrogations, searches and seizures against Yukos senior executives, mid-level employees, in-house counsel, external lawyers and related entities;[803]

  ii)  Yukos' repeated, reasonable attempts to settle its tax debts with the Russian Federation, all of which proved futile;[804]

  iii)  the seizure of YNG, Yukos' main production subsidiary, and its auction in questionable circumstances for an inadequate price;[805]

  iv)  the way in which Yukos' bankruptcy proceedings were initiated and conducted;[806] and

  v)  the pressure brought to bear by the Russian authorities on PwC, which ultimately conduced to the withdrawal of PwC's audits of Yukos' financial statements.[807]

760.  The Tribunal will determine later in this Award how these conclusions impact the liability of Respondent under the ECT.

---

[803]   *See* Chapter VIII.C.

[804]   *See* Chapter VIII.E.

[805]   *See* Chapter VIII.F.

[806]   *See* Chapter VIII.G.

[807]   *See* Chapter VIII.H.

C.   HARASSMENT, INTIMIDATION AND ARRESTS

1.   **Introduction**

761.   Claimants allege that Respondent carried out a campaign of harassment and intimidation of Yukos, its management, employees, external advisers and associates with a view to destroying the company and removing Mr. Khodorkovsky as a political threat:

> In what has been described as "a literal orgy of lawlessness", the Russian Federation instigated and conducted a campaign of terror aimed at depriving Yukos of its ability to run its business, and thus facilitating the destruction of the company.  This was achieved through an escalating process of arrests, intimidation, harassment, searches and seizures. The breadth of the campaign, which targeted not only Yukos and its management but also entities and individuals associated with the company, and the flagrant violations of due process that characterized the actions of the Russian Federation, underscore both the ruthlessness with which the Russian Federation sought the destruction of Yukos and the coordinated nature of the attack.

> The undeniable effect of the actions described below was to undermine the viability of Yukos, placing the Russian Federation in a position to carry out the dismantling of the Company.[808]

762.   Claimants allege that Respondent's harassment campaign has "continued throughout the time period at issue in these arbitrations and continues even today," most notably with a second round of charges in 2007 against Messrs. Khodorkovsky and Lebedev leading to a trial described as a "travesty of justice" that resulted in a sentence of a further thirteen and a half years in prison.[809]

763.   Respondent for the most part does not question the facts underlying Claimants' allegations, though it does question the credibility of some of Claimants' witness accounts.  Rather, the events described by Claimants as constituting a campaign of "harassment and intimidation" are, according to Respondent, better characterized as legitimate acts of law enforcement undertaken in full compliance with Russian law and Russian practices as well as standards of other countries.[810]

764.   In any event, Respondent considers the events complained of to be largely irrelevant to the Tribunal's enquiry in these arbitrations.  That is because Article 26 of the ECT limits the Tribunal's jurisdiction to disputes alleging the breach of an obligation under Part III of the ECT, of which Articles 10(1) and 13 are directed only to investments, and afford no personal

---

[808]   Memorial ¶¶ 106–7.  *See also* Memorial ¶¶ 65, 83–197; Reply ¶¶ 17–94; Claimants' Post-Hearing Brief ¶¶ 156–65.

[809]   Reply ¶¶ 17, 41.

[810]   *See* Counter-Memorial ¶ 673; Transcript, Day 18 at 113–21 (Respondent's closing).

protection for nationals.  Respondent observes that "the alleged violations of the human rights of Messrs. Khodorkovsky, Lebedev and others . . . are outside the scope of this Tribunal's jurisdiction, unless Claimants can establish that any such violations directly impaired the management or operation of their investments."[811]  Respondent argues Claimants have failed to do so,[812] and that the prosecutions of Messrs. Khodorkovsky and Lebedev did not destroy Yukos.  To the contrary, Yukos exceeded its 2003 performance in 2004.[813]

765.   The Tribunal recognizes that it is not a human rights court.  Nevertheless, it is within the scope of the Tribunal's jurisdiction to consider the allegations of harassment and intimidation as they form part of the factual matrix of Claimants' complaints that the Russian Federation violated its obligations under Part III of the ECT.  The Tribunal's task includes determining whether the Russian Federation "in any way impair[ed] by unreasonable or discriminatory measures [Claimants'] management, maintenance, use, enjoyment or disposal" of its investment, or subjected Claimants' investment to measures having the effect equivalent to an expropriation. In the context of that inquiry, the Tribunal will set out the evidentiary record with respect to the alleged "campaign of harassment and intimidation."

### 2.   Chronology of Facts

#### (a)   Yukos Grows; Mr. Khodorkovsky Becomes More Politically Engaged; Yukos Leaders Receive Warnings

766.   Claimants allege that by early 2003 "Mikhail Khodorkovsky's participation in the social policy and political spheres in Russia, coupled with Yukos' growing economic power, came to be perceived as a threat by the Russian authorities."[814]

767.   As already noted in Chapter VIII.B above, President Putin's former Chief Economic Advisor, Dr. Illarionov alleged in his witness statement that around late 2002, a "special unit was set up at the General Prosecutor's office, comprised of approximately 50 people and working exclusively on fabricating evidence against Mr. Khodorkovsky and Yukos."[815]  The special unit

---

[811]   Rejoinder ¶ 1335.

[812]   *Ibid*. ¶ 1331.

[813]   *Russia's Yukos says interim oil output up 5.3% on year in 2004*, Prime–TASS Energy Service (Russia), 21 March 2005, Exh. R-509.

[814]   Memorial ¶ 63.

[815]   Illarionov WS ¶¶ 35–36.

came up with approximately 15 possible theories to justify Mr. Khodorkovsky's arrest, amongst them "tax evasion schemes allegedly set up either for Mr. Khodorkovsky's personal benefit or for the benefit of Yukos."[816]   Upon cross-examination, Dr. Illarionov declined to identify his source, a "high-placed official in the Russian Administration at the time" who still lives in Moscow, out of concerns for the official's safety.[817]   Dr. Illarionov testified that the official told him   the   unit   had   "been   created   to   'zanyatsa'   Khodorkovsky. . . 'take   care   of' Khodorkovsky  . . which means one day some kind of security services and officers did receive an order so-called to solve the problem."[818]

768.   The turning point, according to Claimants, was a meeting at the Kremlin between President Putin and the Russian Union of Industrialists and Entrepreneurs on 19 February 2003, to which the Tribunal has referred earlier, at which Mr. Khodorkovsky delivered a speech about corruption in Russia.[819]   President Putin responded by alluding to some companies, including Yukos, having accumulated considerable wealth from non-payment of tax, and thus told Mr. Khodorkovsky that he was "passing the puck back to you."[820]   At this point, according to Dr. Illarionov, the tone became "steely and menacing,"[821] and from then on, the "gloves were off."[822]   The Tribunal has observed earlier in this Award that the Russian authorities, particularly in the ZATOs, were questioning the legality of Yukos' tax optimization scheme prior to the February 2003 meeting and that this meeting was not a "turning point" in terms of being the catalyst for challenging the Yukos tax scheme.[823]   Nevertheless the record does show that from around the time of the February 2003 meeting, the Russian authorities escalated the intensity and extent of their investigations into Yukos and associated individuals and entities.

769.   In the months following the February 2003 meeting, Mr. Khodorkovsky's financial support for

---

[816]   *Ibid*.

[817]   Transcript, Day 7 at 156–57.

[818]   *Ibid*. at 158.  As discussed below in Subsection 3(a), Respondent describes Dr. Illarionov's evidence as "rank hearsay" and a "lie", Transcript, Day 18 at 114–16.

[819]   Memorial ¶¶ 63, 86–91.

[820]   Excerpt of Television Report "Un milliardaire en Sibérie" broadcast on TF1 on 1 October 2006, Exh. C-590; Video recording and transcript of the meeting of the members of the Union of Industrialists and Entrepreneurs with President V. Putin held in the Ekaterininsky Hall, Kremlin, on 19 February 2003, Exh. C-1396.

[821]   Illarionov WS ¶¶ 31–32.

[822]   *Ibid*.  Memorial ¶¶ 86–91.  *See also* Statement of Prime Minister Mikhail Mikhailovich Kasyanov to the ECtHR, 8 July 2009, in *Khodorkovskiy v. The Russian Federation* (Application Nos. 5829/05, 11082/06 and 51111/07) ¶¶ 10–12, Exh. C-446.; Kovalev Report ¶ 53.

[823]   *See* above at paragraph 513.

opposition parties, including the Communist party, apparently was increasingly of concern to President Putin.   For example, Mr. Dubov testified that President Putin had advised Mr. Khodorkovsky in April 2003 to restrict his political activities and not to finance the Communists.[824]   Similarly, former Prime Minister Kasyanov testified to the ECtHR that a conversation with President Putin had left him in no doubt that "by funding the communists Khodorkovsky had crossed a line so far as Putin was concerned and that the criminal prosecution case of Yukos employees was started exactly because of the funding of political parties not sanctioned by Putin."[825]

770.   Mr. Khodorkovsky's close business associate, Mr. Leonid Nevzlin, testified that in the Spring of 2003 the then Media Minister met him for lunch and informed him that "the decision had been taken to seize Yukos, and that [President Putin's deputy chiefs of staff] would not stop at anything in order to achieve that end, including arresting Khodorkovsky."[826]   From this, Mr. Nevzlin received the message that Mr. Khodorkovsky should put an end to his criticism of President Putin and his administration, "otherwise he could lose everything."   Mr. Nevzlin reported warnings from other sources at the time, including Sibneft's Roman Abramovich saying President Putin told him he "would like to see Mr. Khodorkovsky's bottom on a prison bench" and Federation Council members telling Mr. Nevzlin that Mr. Khodorkovsky "could face problems should he stay in Russia."[827]

### (b)   Prosecutor General Launches Investigations Involving Searches and Seizures

771.   From June 2003, the Office of the Prosecutor General of the Russian Federation launched a series of investigations against various members of Yukos' management, most prominently among them Mr. Khodorkovsky and Mr. Platon Lebedev (GML director and close associate of Mr. Khodorkovsky).[828]   Mr. Lebedev was arrested on his hospital bed on 2 July 2003 on charges of fraud, embezzlement and tax evasion.[829]   Two days later, Messrs. Khodorkovsky and

---

[824]   Dubov WS ¶ 69.

[825]   Statement of Prime Minister Mikhail Mikhailovich Kasyanov to the ECtHR, 8 July 2009, in *Khodorkovskiy v. The Russian Federation* (Application Nos. 5829/05, 11082/06 and 51111/07) ¶¶ 17–19, Exh. C-446.

[826]   Nevzlin WS ¶ 30.

[827]   *Ibid*. ¶¶ 31–33.

[828]   Memorial ¶ 108;  'Chronology', *Attack on Yukos*, Yukos Review, Special Issue, 2003, p. 5, Exh. C-22.

[829]   *Attack on Yukos*, Yukos Review, Special Issue, 2003, Exh. C-22; *Oil Executive is Arrested, and Russians Look for Putin's Role*, NY Times, 3 July 2003, Exh. C-637; *Yukos oil oligarch arrested in raid*, The Washington Times, 26 October 2003, Exh. C-658.  Respondent points out that the ECtHR dismissed a complaint by Mr. Lebedev that the

Nevzlin were summoned for questioning in what Mr. Nevzlin described as an "absurd" investigation.[830]   That same day, the Russian authorities raided the office of the registrar of Yukos' shares and confiscated documents.[831]

772.   On 11 July 2003, the Russian authorities conducted the first large-scale raid on Yukos.  Yukos' then Chief Financial Officer, Mr. Bruce Misamore, describes it as:

> an incredible scene full of armed, masked officers—during which they trawled through our computer records for approximately 17 hours.  This was to begin a wave of raids on Yukos' Moscow headquarters and other companies affiliated with Yukos by investigative officers . . . sometimes accompanied by . . . heavily armed police officers.[832]

773.   Yukos group Financial Controller, Mr. Frank Rieger, also recounts the raids on the accounting department, which started from July 2003.  He describes how the staff was forced to stop work during the raid, that a Deputy Chief Accountant had been told by the authorities that they "knew that she had grandchildren, a dacha *etc* and that she had better tell them what they wanted to hear," another staff member resigned having been told by the prosecutors it would be best for him, and that the authorities regularly seized "lorry loads of documents" in an unsystematic fashion, without leaving copies or any record of the documents seized.[833]

774.   According to Mr. Misamore, the loss of key documents "created great difficulties not only in managing the company, but in preparing the annual financial statements."[834]   Mr. Misamore elaborated that "these raids with the guys in their balaclavas and their AK47s coming in and harassing our employees, taking original documents away from our offices, not leaving us with any copies, we couldn't even accomplish accounting . . . .  We lost our entire U.S. GAAP consolidation accounting group by the end of 2004:  they all left the company because they didn't want to be harassed."[835]  Steven Theede, who joined Yukos as Chief Operating Office in August 2003 noted that by the end of 2003:

---

Russian Federation violated its human rights obligations with respect to his health in detention conditions, *Lebedev v. The Russian Federation* (No. 1) (Application No. 4493/04), ECtHR Decision of 18 May 2006, Exh. R-4000.

[830]   Nevzlin WS ¶ 34.

[831]   "Yukos Repurchases its Shares," Vedomosti, 7 July 2003, Exh. C-638.

[832]   Misamore WS ¶ 31.  *See also* "Police raid Russian oil giant," BBC News, 11 July 2003, Exh. C-640; "Prosecutors Search Yukos Office for 17 Hours," The Moscow Times, 14 July 2003, Exh. C-641.

[833]   Rieger WS ¶¶ 27–28.  *See also* Misamore WS ¶ 32.

[834]   Misamore WS ¶ 32.

[835]   Transcript, Day 4 at 244–45.

> It was obvious that . . . the Government was out to get us; it was that simple.  The number of raids we had in the office, police coming and charging through our accounting department, knocking computers off desks, . . . tipping desks up on their side.  I had four men in black masks outside my office with machine guns once, trying to get in.[836]

775.   Following the arrest of Mr. Lebedev, the Board of Directors of Yukos set up a temporary *ad hoc* committee to assess the situation and potential risks related to the arrest, which was chaired by Mr. Jacques Kosciusko-Morizet, then chair of the Board's Audit Committee.[837]  Mr. Kosciusko-Morizet testified (over Respondent's objection) about Mr. Khodorkovsky's appearance before the *ad hoc* committee in August 2003.[838]   Although Mr. Khodorkovsky initially assured the Board that "everything is fine," Mr. Kosciusko-Morizet pressed him for "some explanation" and recounted his response to the Tribunal:

> He said the following, 'I'm in touch with generals from the FSB' [the successor of the KGB] . . . 'They want a kompromat.' . . . 'kompromat', which is a Soviet word . . . A kompromat is a document which gives you leverage on somebody, and practically forces him or her to follow whatever instructions he or she is given.  And we asked, 'What kind of kompromat do they mean?' 'Well', he said, 'all I have to do is write two lines: I committed criminal deeds.' And then I said, 'And what will happen if you sign such a kompromat?' He said, 'Nothing. They will just keep it, and from time to time I'll receive a phone call asking me for some favour.' And I asked again, 'But for Yukos—so will you sign it?' . . . He said, 'No, I don't want to live like that with my children.' And then I said, 'But under the assumption that you would sign it, what would happen?' And his words were, 'Well, if I would sign such a two-line letter, the problems of Yukos would disappear faster than it takes to switch off the light in this room.' . . . And I did not leave this meeting in a very optimistic mood on future events. And indeed two months later he was in jail, in pre-trial detention. He did not sign the kompromat.[839]

776.   Dr. Illarionov testifies that in September 2003 he met with Mr. Khodorkovsky to tell him he was in danger and it would be preferable for him to leave Russia.  Mr. Khodorkovsky reportedly replied that he did not feel he had committed any offence and did not want to leave Russia.[840]

777.   In early October 2003, the authorities conducted raids at the home of Mr. Lebedev, the offices of GML Management Services SA, and a boarding school for disadvantaged children sponsored by Yukos.[841]  Further raids were conducted in the office of Mr. Lebedev's lawyer, a

---

[836]   *Ibid*. at 9.

[837]   Kosciusko-Morizet WS ¶ 23.

[838]   Transcript, Day 4 at 226–28.

[839]   *Ibid*.

[840]   Illarionov WS ¶ 39.

[841]   Memorial ¶ 161, *Attack on Yukos*, Yukos Review, Special Issue, 2003, Exh. C-22; *Yukos Targeted in Three New Raids*, The Moscow Times, 6 October 2003, Exh. C-652.

move criticized by the Moscow Bar Association at the time.[842]

### (c) Arrest and Trial of Mr. Khodorkovsky; Flight from Russia of His Associates

778. On 25 October 2003, Mr. Khodorkovsky was arrested at gunpoint by an armed special forces unit in a Siberian airport, and taken to Moscow where he was charged with economic crimes including fraud, tax evasion and embezzlement.[843]   He was detained for over ten years until his much publicized release on 20 December 2013.[844]   According to Claimants, the arrest "paved the way for the subsequent actions of the Russian Federation, which eventually resulted in the dismantling of Yukos."[845]   The ECtHR, in its judgment of 31 May 2011, criticized the manner of Mr. Khodorkovsky's arrest, the denial of bail, violations of due process and attorney-client privilege, and the subjection of Mr. Khodorkovsky to inhuman and degrading treatment in his pre-trial detention.[846]

779. Mr. Yuri Schmidt, a criminal lawyer who has acted for Mr. Khodorkovsky, testifies that never before in his 50 years of experience had he "seen the Russian State undertake such coordinated, systematic and intense efforts, and deploy such huge resources, against a person accused of an alleged economic offense."[847]   Respondent chose not to cross-examine Mr. Schmidt.

780. In response to a question from a member of the Tribunal, Dr. Illarionov testified about a conversation he had with President Putin shortly after the arrest of Mr. Khodorkovsky. According to Dr. Illarionov, President Putin explained that Mr. Khodorkovsky had "behave[d] badly" and stopped "cooperating," for example by negotiating with an American oil company about a possible merger and supporting the Communist Party in advance of the Duma elections.

---

[842]   Memorial ¶ 161, *Lawyer Outcry: Yukos Raids Illegal*, The St. Petersburg Times, 14 October 2003, Exh. C-657.

[843]   Memorial ¶ 112, *Attack on Yukos*, Yukos Review, Special Issue, 2003, Exh. C-22; *Yukos oil oligarch arrested in raid*, The Washington Times, 26 October 2003, Exh. C-658.

[844]   The Parties agree that Mr. Khodorkovsky's release has no impact whatsoever on the present arbitration proceedings. *See* Claimants' Letter to the Tribunal of 24 January 2014 ("The Claimants submit that Mr. Khodorkovsky's pardon by the President of the Russian Federation and his release from prison . . . have no impact whatsoever on the present proceedings"); and Respondent's Letter to the Tribunal of 24 January 2014 ("Mr. Khodorkovsky's pardon itself has no effect on these proceedings").   Claimants further point out that the pardon entailed no admission of guilt by Mr. Khodorkovsky.   Respondent further points out that the pardon had no effect on Mr. Khodorkovsky's criminal convictions or the findings by Russian courts with respect to tax evasion by Yukos.   The Tribunal also notes that Mr. Lebedev was released after his sentence was reduced by the Russian Supreme Court on 23 January 2014.   *See* Respondent's Letter to the Tribunal of 24 January 2014.

[845]   Memorial ¶ 122.

[846]   Reply ¶¶ 25–28.  ECtHR, *Khodorkovskiy v. Russia* (Application No. 5829/04), Judgment of 31 May 2011 ¶¶ 193–95, (hereinafter "*Khodorkovsky v. Russia I*", Exh. C-1300.

[847]   Schmidt WS ¶ 59.

Following these actions, President Putin decided to "step aside" and allow Mr. Khodorkovsky to fend for himself against "the boys."[848]  Dr. Illarianov also recalled that there was wide "public outrage" in the mass media.  The then Prime Minister, Mr. Mikhail Kasyanov, publicly disapproved of the arrest. Dr. Illarionov referred to President Putin's order that "I would ask everybody in the Government to shut up on Mr. Khodorkovsky's arrest," and it was very clear to him that this comment was addressed to Mr. Kasyanov, who was later removed from his position.[849]

781.  Mr. Dubov testifies that a Kremlin official informed him on 27 October 2003 that his name had been struck off the list of candidates running for the Duma, at the direction of President Putin.[850]  At the Hearing Mr. Dubov elaborated on the conversation he had with the Kremlin official, to whom he had asked "What will happen to Yukos?"  Mr. Dubov received the answer "Yukos will be taken away from you gentlemen" and that there would be criminal claims against every single shareholder.[851]  He was told President Putin had "gone berserk over Khodorkovsky."  Upon advice from the official, Mr. Dubov left Russia that night and has never returned.   Mr. Nevzlin also left Russia late in 2003 and has not returned since. Shortly thereafter Mr. Dubov, Mr. Nevzlin and Mr. Brudno were charged with embezzlement and money laundering.[852]   International arrest warrants were issued in January 2004 for Messrs. Nevzlin and Dubov, the day after Mr. Nevzlin announced their joint support for a presidential candidate opposing President Putin.[853]

782.  On 3 November 2003, Mr. Khodorkovsky resigned as CEO of Yukos.  In that connection, Respondent submits that he resigned voluntarily and that, shortly thereafter, Yukos confirmed that it had "a strong management team in place", that it was "continuing to operate" and that it was "business as usual" following Mr. Khodorkovsky's resignation.[854]  However, raids and arrests at the offices and homes of Yukos-connected personnel continued over the ensuing

---

[848]  Transcript, Day 7 at 155.

[849]  *Ibid*. at 159–60.

[850]  Dubov WS ¶ 79.

[851]  Transcript, Day 5 at 182.

[852]  Decision to Deny Extradition of Mikhail Brudno to the Russian Federation, Prosecutor General's Office of Lithuania, 24 August 2007, Exh. C-469; Memorial ¶ 123;  Dubov WS ¶¶ 79–81, Nevzlin WS ¶ 14.

[853]  Memorial ¶ 123, Nevzlin WS ¶ 14.

[854]  *Yukos Conference Call on Recent Developments – Final*, Financial Disclosure Wire, 5 November 2003 Exh. R-3991.

years, including on NGOs and service providers connected with Yukos.[855]   Claimants also allege that Yukos' auditors, PwC, were targeted and harassed because of their association with Yukos,[856] an issue discussed in more detail below in Chapter VIII.H.

### (d) Complaints of Further Harassment and Intimidation of Yukos Executives, Employees, Lawyers and External Advisers

783. Claimants have also referred the Tribunal to the interrogations and arrests of in-house and external lawyers for Yukos and Messrs. Khodorkovsky and Lebedev.[857] Their telephones were put under surveillance. In his witness statement, Mr. Schmidt recounts that the treatment of some lawyers acting for Yukos personnel included threats, harsh interrogations and beatings requiring hospitalization, leading some local and international bar associations to voice their deep concerns.[858]   Mr. Schmidt himself recounts incidents of intimidation against him, including disbarment and libel suits.[859]

784. Mr. Schmidt observes that "the timing of the attacks on the lawyers acting for Messrs. Khodorkovsky and Lebedev and on Yukos' lawyers and personnel was always meticulously calculated to correspond to the critical stages in the dismantlement of Yukos."[860] Thus, at a time when Yukos was deeply engaged in its defense of tax proceedings brought against it, the Head of Yukos' Legal Department, Mr. Gololobov, was arrested and his computers and documents confiscated.   In July 2004, at the time of the enforcement

---

[855]   *Special forces raid Russian oil firm's headquarters*, The Daily Telegraph, 4 July 2004 Exh. C-690; *Yukos raided, banks declare it in default*, Gazeta, 5 July 2004, Exh. C-691; *Police Surround Yukos Headquarters*, The Moscow Times, 5 July 2004, Exh. C-692; *Police raid threatens Yukos oil production*, The Guardian, 5 July 2004, Exh. C-693; *Top Yukos executives flee threat of arrest*, The Financial Times, 25 November 2004, Exh. C-725; *Prosecutor General Gets Busy with Yukos Staff*, Kommersant, 17 December 2004, Exh. C-733.

[856]   Memorial ¶¶ 143–51.

[857]   *Russia Seeks To Prosecute Two More At Yukos*, NY Times, 19 November 2004 Exh. C-723; *Prosecutor General Gets Busy with Yukos Staff*, Kommersant, 17 December 2004 Exh. C-733; *Yukos Lawyer Shows Signs of Three Crimes*, Kommersant, 12 January 2005 Exh. C-747; *Moscow court upholds arrest warrant for Yukos lawyer*, RIA Novosti, 26 December 2005 Exh. C-788; *Yukos Lawyer, a Mother of Two, Gets 7 Years*, The Washington Post, 20 April 2006 Exh. C-800.   *See also*, more recently, *Khodorkovsky v. Russia 2* ¶¶ 634–48, 931–32 and the Parties' respective submissions of 30 August 2013 on that judgment.

[858]   Schmidt WS ¶¶ 16–18; *Striving for Judicial Independence:  A Report into Proposed Changes to the Judiciary in Russia*, International Bar Association Human Rights Institute Report, June 2005 Exh. C-601; Letter from the IBA Executive Director to General Procurator of the Russian Federation (undated) Exh. C-604; Witness Statement of Pavel Petrovich Ivlev of 15 March 2006 in *Mikhail Borisovich Khodorkovsky v. The Russian Federation*, ECtHR, (Application No. 11082/06), Exh. C-441; *Family of Yukos Lawyer Detained*, Kommersant, 9 February 2005, Exh. C-750.

[859]   Schmidt WS ¶¶ 20–22.

[860]   *Ibid*. ¶¶ 16(3) and 17.

proceedings by the court bailiffs for the tax assessments and the service by the Tax Ministry of the Field Tax Audit Report for 2001, an estimated 100 officials raided Yukos' headquarters on a Saturday afternoon, confiscating computer servers.  At the time of the forced sale of YNG in December 2004, there were further raids on Yukos offices and personnel.[861]   Searches were carried out in the offices of Yukos' external lawyers, ALM Feldmans, who also faced an extensive audit of their own after the search.

785.   On 31 May 2005, the Meshchansky Court of the city of Moscow sentenced Messrs. Khodorkovsky and Lebedev to nine years in prison on charges of fraud and tax evasion, following a trial that was widely criticized for its lack of due process.[862]  Mr. Schmidt, himself intimately involved with the trial, stated he had never seen "such a mockery of justice and violations of the most basic standards of due process and fundamental rights, including the right to a fair trial, at all stages of a case."[863]  Similar observations were made by Russian and international media outlets and opposition parties within Russia.[864]  Messrs. Khodorkovsky and Lebedev were transferred to Siberia to serve their sentences in remote penal colonies, and their sentences were reduced on appeal to 8 years, which Claimants maintain was in violation of Russian law at the time.[865]

786.   Meanwhile, a number of Yukos associates who had fled Russia were subject to extradition requests from the Russian Federation, none of which were granted by the courts of the countries where they were residing.  Mr. Nevzlin mentioned his trial *in absentia* and Israel's refusal to extradite him to Russia.[866]  In 2005 and 2007, courts in the United Kingdom refused to extradite former financial and business managers of Yukos, on the basis that the prosecutions were "so politically motivated that there is a substantial risk that the Judges of the Moscow City court would succumb to political interference in a way which would call into question their independence."[867]  Courts in Lithuania, Cyprus and the Czech Republic also refused to extradite

---

[861]   Memorial ¶ 155.

[862]   Memorial ¶ 520–47, Reply ¶ 30.

[863]   Schmidt WS ¶¶ 16(4)(5), 23, 26.  He recounted how Mr. Khodorkovsky's lawyers were denied the opportunity to meet with him in crucial weeks to prepare for the defence.

[864]   *Yukos verdict alarms Russia press*, BBC News, 1 June 2005, Exh. C-753; *Khodorkovsky sentenced, Russia Guilty*, International Herald Tribunal, 2 June 2005, Exh. C-754.

[865]   Reply ¶¶ 39–40.

[866]   Nevzlin WS ¶ 14, Transcript, Day 8 at 28.

[867]   Memorial ¶¶ 189–92, *The Government of the Russian Federation v. Dmitry Maruev and Natalya Chernysheva*, Bow Street Magistrates' Court, 18 March 2005, Exh. C-462.  *See also The Government of the Russian Federation v. Alexander Vikotrovich Temerko*, Bow Street Magistrates' Court, 23 December 2005, Exh. C-464; *The Government of*

former Yukos managers or former Yukos service providers on the basis of the political dimensions of the underlying requests.[868]

787. In late 2003, most of the shares in Yukos held by Claimants Hulley and YUL were seized by the Russian courts and remained frozen until the liquidation of Yukos in November 2007.[869] The shares owned by Claimant Veteran, which were held in a Swiss bank account, were also subject to an asset freeze following a request for mutual legal assistance from the Russian Federation to Switzerland.  However, in June 2004, the Swiss Federal Tribunal overturned the freeze orders and released the shares.  Over the following years, the Swiss courts were also engaged in mutual legal assistance requests for searches and seizures of documents of various Yukos-related entities, culminating in the Swiss Federal Tribunal expressing the view that the case against Mr. Khodorkovsky was politically motivated and "orchestrated by the regime in power with a view to subordinating the class of rich 'oligarchs' and eliminating potential or sworn political opponents."[870]

788. By late 2004, many mid-level Yukos managers and employees had been arrested, questioned or put on wanted lists, generating an atmosphere of pressure.  Several of the remaining senior executives decided not to return to Russia.[871]  In August 2006, the Russian Prosecutor General's office announced criminal investigations against senior level executives, including Messrs. Misamore and Theede.  Mr. Misamore, noting he had never been formally notified of the charges, considers that they were part of a "general campaign to intimidate those associated with Yukos."[872]  Mr. Rieger also testified about being interrogated by the Russian Prosecutor General's Office, when he was presented with a series of questions for which the investigator had already prepared his answers.  He described this as:

---

*the Russian Federation v. Ramil Raisovich Bourganov and Alexander Gorbachev*, Bow Street Magistrates' Court, 17 August 2005, Exh. C-463; *The Government of the Russian Federation v. Andrei Borisovich Azarov*, City of Westminster Magistrates' Court, 19 December 2007, Exh. C-465.

[868] Memorial ¶¶ 193–97, In the matter of the Application by the Russian Federation for the extradition of Kartashov Vlatislav Nicolay, Nicosia District Court, Cyprus, Judgment, 10 April 2008, Exh. C-460; Decision to Deny Extradition of Elena Vybornova to the Russian Federation, High Court of Olomouc, Czech Republic, 31 July 2007, Exh. C-461; Decision to Grant Refugee Status to Igor Babenko, Supreme Administrative Court of Lithuania, 16 October 2006, Exh. C-468; Decision to Deny Extradition of Mikhail Brudno to the Russian Federation, Prosecutor General's Office of Lithuania, 24 August 2007, Exh. C-469.

[869] Memorial ¶ 167.

[870] Judgment of the Swiss Federal Tribunal, 13 August 2007, *Mikhail Khodorokovsky v. Swiss Federal Prosecutor's Office* ¶ 4, Exh. C-477.  For similar conclusions reached by courts in other mutual legal assistance cases, see Exhs. C-478–82.

[871] Memorial ¶ 123.

[872] Misamore WS ¶ 35.

a kind of never expected story.  And if I wouldn't have been the witness of such an event, I couldn't believe this: being called as a witness, arriving, and seeing, "Here, Mr Rieger, we'd like to talk to you today.  These are the questions, and wouldn't you mind to look at this document? . . . .  I think this is what you'd like to say to us."[873]

Mr. Rieger refused to sign and was kept for eight hours of questioning.  The next morning, the German Embassy advised him to leave the country.  He has not returned to Russia since May 2006.[874]  Similarly, Mr. Theede was advised by the U.S. State Department that it was not safe for him to return to Russia.[875]

789.   By the time bankruptcy proceedings had started against Yukos at the end of March 2006, approximately 35 senior managers, employees and in-house counsel of Yukos had been interrogated, arrested and/or sentenced.[876]   At that time, Mr. Theede appointed Vasily Aleksanyan as Executive Vice President of Yukos to serve as the main point of contact for the bankruptcy.[877]  Shortly afterwards, on 6 April 2006, Mr. Aleksanyan was arrested at home by masked and armed men and charged with embezzlement allegedly committed when he was head of the Yukos legal department.[878]  A few months after his detention, he was diagnosed with lymphoma and AIDS.  It is alleged that he was offered medical treatment and freedom in return for evidence against Messrs. Khodorkovsky and Lebedev, an offer which he refused.[879]  He remained in pre-trial detention for almost three years in conditions described by Russia's own human rights council as "simply monstrous."[880]   His treatment was criticized by the ECtHR, whose initial interim measures were ignored by the Russian Federation, but after the ECtHR issued a final judgment, the authorities released Mr. Aleksanyan on bail (for USD 1.8 million) and finally dropped charges against him due to the statute of limitations.[881]  Claimants' expert witness on the independence of the Russian judiciary, Dr. Sergei Kovalev, whom

---

[873]   Transcript, Day 6 at 69.

[874]   Rieger WS ¶¶ 32–35.

[875]   Transcript, Day 11 at 16.

[876]   *Ioukos, un deuxième président en prison*, Libération, 8 April 2006, Exh. C-798.

[877]   Theede WS ¶ 30.

[878]   *Top Yukos official Aleksanyan detained in Moscow*, RIA Novosti, 6 April 2006, Exh. C-796; *Arrest of Yukos Oil Company Executive Vice-President is a Brutal and Unjust Attack on the Company's Attempts to Secure a Fair Bankruptcy Process*, Yukos Press Release, 7 April 2006, Exh. C-797; *Ioukos, un deuxième président en prison*, Libération, 8 April 2006, Exh. C-798.

[879]   As described in his testimony to the Supreme Court of the Russian Federation, 22 January 2008, Exh. C-598.

[880]   Jonas Bernstein, *Aleksanyan's Plight:  a case of the 'Legal Nihilism' Medvedev has vowed to fight?*, Eurasia Daily Monitor, Volume 5, Issue 21, 4 February 2008, Exh. C-880.

[881]   ECtHR, *Aleksanyan v. Russia* (Application No. 46468/06), Judgment, 22 December 2008, Exh. C-449.

Respondent chose not to cross-examine, described Mr. Aleksanyan's treatment as "[o]ne of the most glaring examples of pressure exerted on individuals associated with Mikhail Khodorkovsky and Yukos."[882]  Mr. Theede testified that the plight of Mr. Aleksanyan (who after his release from prison died at age 39)[883] demonstrated the severe risks which other persons in Russia associated with Yukos faced constantly and stated that it had become extremely difficult to manage the company.[884]

### (e)   Second Trial of Mr. Khodorkovsky; Allegations of Continuing Harassment and Intimidation

790. In February 2007, before Messrs. Khodorkovsky and Lebedev had served half of their prison terms, the Prosecutor-General's Office levelled new charges against them, this time for theft of oil and funds from Yukos, embezzlement and money laundering.[885]

791. Claimants describe the second trial as a "travesty of justice," a view shared by international organizations and human rights NGOs such as the International Bar Association and Amnesty International.[886]  Before the verdict was issued, President Putin responded to a question during his annual televised address that: "It is my conviction that a 'thief should be in jail.' . . .  we must start from the fact that Khodorkovsky's guilt has been proved in court."[887]

792. On 27 December 2010, Judge Danilkin issued his verdict finding Messrs. Khodorkovsky and Lebedev guilty of charges of embezzlement and money laundering.  He sentenced them to the maximum penalty requested by the prosecution, thirteen and a half years.  The verdicts were

---

[882]   Kovalev Report ¶ 60.

[883]   Reply ¶ 61.

[884]   Transcript, Day 11 at 39. *See also* Speech of Vasily Aleksanyan before the Supreme Court of the Russian Federation, 22 January 2008, www.khodorkovksy.ru, Exh. C-598; *Russia Closes Criminal Case Against Yukos Executive Aleksanyan*, Business Week, 24 June 2010, Exh. C-893; *Aleksanyan's Death 'Practically Murder'*, The Moscow Times, 5 October 2011, Exh. C-1458.

[885]   *Procuracy-General of the Russian Federation completes investigation of criminal case with respect to Mikhail Khodorkovsky and Platon Lebedev*, News, 16 February 2007, The Procuracy-General of the Russian Federation Website, Exh. C-423.

[886]   Reply ¶ 42.  *The Khodorkovsky trial:  A report on the observation of the criminal trial of Mikhail Borisovich Khodorkovsky and Platon Leonidovich Lebedev*, International Bar Association Human Rights Institute, March 2009 to December 2010, September 2011, Exh. C-1334.  *Unfair trial concerns cast doubt on the integrity of the conviction of Mikhail Khodorkovsky and Platon Lebedev*, Amnesty International, Public Statement of 27 December 2010, Exh. C-1330.

[887]   *Transcript of a Conversation with Vladimir Putin*, 16 December 2010, Official Site of the Prime Minister of the Russian Federation, Exh. C-1435.  Respondent avers that the comments were taken out of context and referred to the convictions after the first trial.  *See* Rejoinder ¶ 1381.

widely criticized.[888]   Judge Danilkin questioned over 90 fact witnesses and reviewed an extensive documentary record.  His verdict focused on a holding that in the period 1996–2003, Messrs. Khodorkovsky and Lebedev "stole" the entire oil output of the Yukos production entities, concealed the fact that the oil was "stolen" both from Yukos' shareholders and the Russian tax authorities, orchestrated the "theft" through Lesnoy and Trekhgorny entities, which led to tax evasion, and then "laundered" the proceeds of the "theft."  Judge Danilkin rejected all of Mr. Khodorkovsky's arguments, including those relating to double jeopardy.[889]

793.   Within a few months, the 689-page verdict was upheld on appeal, a decision noted with concern by the European Parliament, which condemned "political interference with the trial."[890] Russia's own Human Rights Council reviewed the second criminal case at the request of then President Medvedev.  The Council issued a report in December 2011 which concluded that the trial was unlawful and should be annulled.  The author of the report told local media there was "no evidence or substance behind the accusations of embezzlement," and that Messrs. Khodorkovsky and Lebedev had received "punishment for carrying out legal activities."[891]   Other members of the Council described the verdict as "profoundly unjust," "contradictory, arbitrary and malicious," "illegal," containing "numerous legal errors and inaccuracies" and selectively prosecuted.[892]

### 3.   Parties' Arguments and Tribunal's Observations

794.   As demonstrated above, the record of this case is replete with evidence pertaining to the events underlying the so-called campaign of harassment and intimidation.   The following section

---

[888]   Reply ¶ 48.   Verdict of the Khamovnichesky Court of Moscow in the second criminal case against Messrs. Khodorkovsky and Lebedev, 27 December 2010, Exh. C-1057.

[889]   Verdict of the Khamovnichesky Court of Moscow in the second criminal case against Messrs. Khodorkovsky and Lebedev, 27 December 2010, p. 494, Exh. C-1057 ("Arguments of the defence that the charges of embezzlement of oil and tax evasion are the same crimes because taxes, as per their theory, were paid on the stolen oil, are unsustainable. Taxes were paid on profit, and the organized group participants stole property in the form of oil. Profit is not property because it is a calculated accounting value which is a difference between income and expenses. It is impossible to steal figures, which exist in accounting records, but it is possible to commit theft of oil, which is a material value, which is property. Relations concerning the making of tax payments (taxes) to the budget are the object of a tax offence (crime) . . . While relations concerning right, title, and interest in certain property are the object of embezzlement (theft) . . .").

[890]   European Parliament, Resolution of 9 June 2011 on the EU-Russia summit ¶ 16, Exh. C-1315.

[891]   *Rights Council:  Free Khodorkovsky*, The Moscow Times, 22 December 2011, Exh. C-1463.

[892]   Report on the Results of Public and Scientific Analysis of the Materials of the Criminal Case against M. Khodorkovsky and P. Lebedev (Judged by the Khamovnichesky Court of Moscow, Which Rendered the Corresponding Verdict on 27 December 2010) (Unanimously approved by the Russian Presidential Council for Civil Society and Human Rights on 21 December 2011), Exh. C-1290.  As to Respondent's position with respect to Mr. Aleksanyan, see paragraph 806 below.

addresses (a) the credibility of Claimants' allegations of a campaign of harassment and intimidation, (b) the characterization of such events in the context of the Russian Federation's law enforcement efforts against Yukos' tax optimization scheme and (c) the actual impact of the events on Claimants' investment.

### (a)   Are Claimants' Allegations about a Campaign of Harassment Credible?

795.   Respondent does not deny that the investigations, searches, seizures, arrests, interrogations and criminal trials took place.  Respondent's main defence to the allegations is not that they are not true, but that the events complained of were legitimate and justified for purposes of law enforcement, that they were in line with practice in Russia and other countries, and that in any event they were not expropriatory and did not impair Claimants' investment.[893]

796.   There are, however, some portions of the witness testimony with which Respondent takes issue. Respondent contends that Claimants' "conspiracy theory relies heavily on circumstantial evidence and sheer innuendo, attributable to the Oligarchs' public relations and lobbying campaign."[894]  Respondent argues that:

> if the assessments and the subsequent enforcement measures were the product of a massive political conspiracy spanning several years and implemented by hundreds if not thousands of officials, including no fewer than 60 judges at four different levels of courts, along with a large cast of third parties worldwide, then surely, after nearly a decade of vigorous challenges, at least one document referring to this purported conspiracy would have surfaced, or one disgruntled conspirator would have reported having participated in it. Conspicuously, Claimants have offered no such evidence at all.  To the contrary, they rely on double and triple hearsay renditions of purported conversations, provided by vocal opponents of the Russian Government, inaccurate and uninformed reports by political commentators, and mere speculation.[895]

797.   Respondent also argues that "Claimants' hearing testimony on this issue is not credible, in light of its reliance on those who stand to gain billions of dollars if Claimants prevail."[896]

798.   For example, Respondent decries Dr. Illarionov's testimony about a special unit established to come up with a theory to put Mr. Khodorkovsky away as "rank hearsay of the most grotesque

---

[893]   Transcript, Day 3 at 184–85.

[894]   Counter-Memorial ¶¶ 777–823; Respondent's Post-Hearing Brief ¶ 56.

[895]   Respondent's Post-Hearing Brief ¶ 57, citing Transcript, Day 2 at 104–7 (Respondent's opening); Respondent's Closing Slides, pp. 282–92, 723–24.

[896]   Respondent's Post-Hearing Brief n.163, citing Respondent's Closing Slides, pp. 282–92.

sort, because Dr. Illarionov declined to identify the person who supposedly told him that."[897] Respondent described Dr. Illarionov's report as "manifestly not credible" because he had said nothing about it for seven years, and because he continued to serve President Putin for more than two years after hearing that report."[898]

799.   The Tribunal found Dr. Illarionov to be a credible and convincing witness.   He offered a satisfactory explanation for protecting the source of his information about the special unit.   The Tribunal does not consider his evidence impeached merely because he had not come forward earlier with his evidence about the special unit nor that he stayed for a certain period in his position working for the President.

800.   Similarly, Respondent attacks the credibility of Mr. Nevzlin's testimony on the basis that he had waited until 2010 to disclose certain facts, such as what Mr. Abramovich had told him about Mr. Khodorkovsky being targeted for political reasons.[899]   When pressed as to why he had not disclosed the information in the earlier Russian criminal proceedings or the ECtHR proceedings, Mr. Nevzlin gave the following explanations: [900]

> [I]f I had spread the information about Abramovich and Putin fairly broadly, and if it had become available to the public, then from the perspective of Khodorkovsky, who is in Russian prison, I would have damaged him. . . .   I would have caused him tremendous amounts of harm. . . . in the other corner facing him were Putin, Sechin and others; but I also would have turned Abramovich into an enemy of Khodorkovsky by disclosing this information.
>
> . . .
>
> [After] things moved to a second absurd set of charges and a second trial, Khodorkovsky's position changed radically.   He was no longer wary of a political . . . confrontation with Putin's regime because he realised that he was not going to be able to find truth in a Russian court if he tried to defend himself based on the laws . . .
>
> . . .
>
> Russian courts have no interest in my position: it would be either ignored or rejected by them.   Because it's not a judge who makes decision on Khodorkovsky and Lebedev; the judge just rubber-stamps decisions that are made by investigative committee and Prosecutor's Office. . . . The fact that I trust this court and tell this court a lot more than I've ever said on the matter, this is a typical position for me, because . . . if we're able to defend our interests, that would be either in courts in free countries or international courts.

---

[897]   Transcript, Day 18 at 114.

[898]   Transcript, Day 18 at 114–15 (Respondent's closing).   For the explanation from Dr. Illarionov about safety concerns for his source, see Transcript, Day 7 at 156.

[899]   Nevzlin WS ¶ 35; Transcript, Day 8 at 4–5. The Tribunal notes that in the judgment issued by the High Court in London, Mrs. Justice Gloster DBE was "not impressed" by Mr. Nevzlin as a witness (*Berezovsky v Abramovich, Berezovsky v Hine & Others* [2012] EWHC 2463 (Comm) ¶¶ 485–90, Exh. R-4654; *see also* Transcript, Day 8 at 39–40).

[900]   Transcript, Day 8 at 17–25.

801. The Tribunal accepts Mr. Nevzlin's explanations.  The Tribunal notes again that the Russian Federation called no fact witnesses of their own to contradict or weaken the testimony of Claimants' fact witnesses.  Respondent chose not to cross-examine Mr. Schmidt, simply noting instead that as he was Mr. Khodorkovsky's criminal lawyer his statement is "special pleading."[901]   Respondent also chose not to cross-examine Dr. Kovalev, whose evidence, accordingly, also stands unchallenged.

802. During the Hearing on the Merits, the Chairman of the Tribunal invited Respondent's counsel:[902]

> to address the allegations of harassment:  Rieger being presented by the Prosecutor's Office with a statement, "Just sign here on the bottom line"; the number of Yukos employees who were detained; Misamore, who was told "You shouldn't go back to Russia"; the campaign to make life impossible for Yukos-related officials, officers? That stands uncontradicted on the record right now.  And it bothers us, my colleagues and me, and we would like to hear from the Respondent in respect of these matters.

803. With respect to Mr. Rieger, Respondent's counsel pointed out that the incident had occurred in 2006, several years after the arrest of Mr. Khodorkovsky and that "it's not atypical that an investigatory agency would have an idea of what they think a witness does or doesn't know, and might suggest to that [witness] what that evidence is and then find out from the witness whether they agree with it or disagree with it.  Mr. Rieger said he didn't agree, and he didn't sign it."  The Chairman recalled:  "He was threatened, he was detained at the airport.  This is background that speaks about the atmosphere.  The Russian authorities are seen as being out to get Yukos."  Respondent's counsel explained that: "I think that what you are seeing is the authorities having established that there was quite substantial fraud at many, many different levels of activity within a large company."[903]

804. The Tribunal accepts the evidence of Claimants' witnesses who testified with respect to the campaign of harassment and intimidation conducted by Respondent against Yukos.  The Tribunal will now turn to the nature and consequences of the events described above.

---

[901] Counter-Memorial ¶ 696.

[902] Transcript, Day 19 at 46 (Respondent's closing).

[903] *Ibid*. at 47.

### (b) Were the Actions of the Russian Federation Justified as Legitimate Law Enforcement Measures?

805. Respondent explains that its actions were consistent with a legitimate wide-scale investigation as part of "an attempt to enforce and try to understand what turned out to be one of the largest frauds in the experience of the modern Russian State."[904] Thus, in response to Mr. Kosciusko-Morizet's evidence recounting Mr. Khodorkovsky's *kompromat*, Respondent observes that this "is absolutely consistent with the fact that the authorities had valid grounds to bring criminal charges against Mr. Khodorkovsky."[905] Likewise, Respondent describes as "no surprise" that Mr. Dubov would have been advised to leave the country and warned that every shareholder of Yukos would face criminal charges. Respondent states that this is "not inconsistent with the unbroken thread of tax evasion in which Yukos engaged and for which it was held to account."[906]

806. In a similar vein, while acknowledging the unfortunate circumstances surrounding Mr. Aleksanyan's illness, Respondent remarked that "it is not shocking" that the Russian authorities were interested in Mr. Aleksanyan, given his role since 2001 in suppressing information about vulnerabilities of Yukos in the low-tax regions.[907]

807. Respondent argues that the "searches of Yukos offices and the seizures of its records as part of Russian law enforcement authorities' investigations have parallels in other countries as proper instruments of law enforcement, especially when those authorities are faced with the types of egregious violations in which Yukos engaged." Respondent cites the EU and the U.S. as jurisdictions that authorize expansive and aggressive, even armed, searches and seizures to combat financial crimes.[908]

---

[904]   *Ibid*. at 49–52.

[905]   Transcript, Day 18 at 118–19 (Respondent's closing); Respondent's Post-Hearing Brief ¶ 205(iv).

[906]   Transcript, Day 18 at 116–17 (Respondent's closing); Respondent's Post-Hearing Brief ¶ 205(ii).

[907]   Transcript, Day 19 at 50 (Respondent's closing).

[908]   Respondent's Post-Hearing Brief ¶ 209–10. For example, in the European Union, companies are often subjected to "dawn raids", in which EU officials, without prior judicial authorization, conduct searches and seizures. *See* Transcript, Day 19 at 49–50 (Respondent's closing) ("[I]n the United States a search warrant is never executed unarmed; it's always executed by armed officers, sometimes wearing other gear that suggests something more than a simple commercial exercise. That's the way it happens. In Russia, that's the way it's always done. It's just their practice. It doesn't reflect or project anything unique to Yukos."). Claimants however point to the "very exacting standard of proof" at the ECtHR requiring "incontrovertible and direct" evidence, but that the ECtHR nevertheless accepted that "the circumstances surrounding the applicants' criminal case may be interpreted as supporting the applicants' claim of improper motives" and that "it is clear that the authorities were trying to reduce political influence

808.   As for the convictions of Messrs. Khodorkovsky and Lebedev in 2005, Respondent asserts that Claimants have not criticized the conduct of the Russian appellate judges who upheld the convictions.[909]   Respondent points to the ECtHR as having "rejected the central premise of Claimants' argument that Mr. Khodorkovsky was prosecuted in 2005 for political or other improper reasons."[910]

809.   With respect to the second criminal trial of Messrs. Khodorkovsky and Lebedev, Respondent notes that it "had no effect on the investments at issue in these arbitrations and that, regardless, Claimants have not contested the factual bases of the charges in that trial.  Their attempt to portray the charges as concerning the physical theft of oil, rather than complicated schemes of corporate abuse and sham auctions to secure underpayments of oil purchased from Yukos' subsidiaries for the Oligarchs' benefit, is manifestly baseless."[911]   Respondent contends that the IBA Report was prepared without access to the full court file and without any knowledge of Russian criminal law, and that other criticisms reported by Claimants were biased and ill-informed.

810.   Respondent also contends that its actions were necessary due to Yukos' attempts to obstruct Russia's investigative efforts.[912]   Claimants deny that Yukos was obstructing the investigation, and note that most of the evidence relied upon by Respondent was based on interrogation records of individuals that Respondent has failed to put forward as witnesses.  Claimants urge the Tribunal to treat the interrogation records with skepticism, "[g]iven the campaign of terror being waged against persons associated with Yukos and the relentless pressure deployed by the prosecutors to get Yukos' former employees or other Yukos-related persons to give false incriminating evidence against Yukos and Yukos' management."[913]

811.   The Tribunal accepts that the Russian Federation had the power to conduct searches and seizures in Yukos' premises during the ongoing criminal investigations.  Nevertheless, having reviewed the record, the Tribunal finds that the investigation of Yukos was carried out by the

---

of 'oligarchs' and that the State was one of the main beneficiaries of the dismantlement of Yukos."  *See Khodorkovsky v. Russia 2* ¶¶ 634–48, 931–32; and Claimants' submissions dated 30 August 2013 ¶ 47 concerning that judgment.

[909]   Respondent's Post-Hearing Brief ¶¶ 204, 206.

[910]   *Khodorkovsky v. Russia 1*; Rejoinder ¶ 1334.

[911]   Respondent's Post-Hearing Brief n.484.  *See also* Rejoinder ¶¶ 1371–86.

[912]   Counter-Memorial ¶¶ 674–79.

[913]   Reply ¶¶ 77.

Russian Federation with excessive harshness.  Respondent's counsel acknowledged that in the context of the large-scale fraud investigation "not everything is pretty in those circumstances, and we may each of us have circumstances that we would regret or have done differently."[914]  The Tribunal considers "not pretty" to be an understatement in this case.  The treatment of Yukos senior executives, mid-level employees, in-house counsel, external lawyers and related entities as described in this chapter support Claimants' central submission that the Russian authorities were conducting a "ruthless campaign to destroy Yukos, appropriate its assets and eliminate Mr. Khodorkovsky as a political opponent."[915]  The legal consequences of Claimants' submission will be analyzed later in Part X of this Award when the Tribunal considers the alleged violations of Chapter III of the ECT.

812. The Tribunal will now examine the effect on Yukos, as a matter of fact, of the campaign of harassment and intimidation waged against it by Respondent.

### (c)      Did the Events Complained of Impact Claimants' Investments or was Yukos Able to Carry on Unaffected?

813. Having noted that the record is replete with evidence of intimidation and harassment of Yukos personnel by the Russian authorities, the key question for the Tribunal is whether such intimidation and harassment actually disrupted Yukos' operations and thus adversely affected Claimants' investment.

814. Claimants maintain that the harassment and intimidation campaign "crippled" Yukos by prosecuting its management and paralyzing its operations through massive raids and seizures with a view to undermining the viability of Yukos.

815. Claimants' witnesses spoke of the impact that the searches, seizures and, generally, the campaign of intimidation had on the company.  As noted earlier, Mr. Misamore testified that the loss of key documents created difficulties in running the company and preparing the annual financial statements.[916]  Mr. Rieger stated that 60 to 70 percent of the accounting department's documents were confiscated.  He explained in his witness statement:  "[w]hen you take into account the fact that all the day to day business operations of the company were reflected in

---

[914]   Transcript, Day 19 at 51 (Respondent's closing).

[915]   Claimants' Post-Hearing Brief, ¶ 165.

[916]   Misamore WS ¶ 32.

paperwork, such as invoices, bills, *etc.*, we soon reached a stage where Yukos employees didn't have access to the basic data they needed to perform their functions."  He recalled that "[t]he constant threats and harassment caused many of my former colleagues to leave the company and, in the worst case, the country; a fate that I would soon share."[917]

816.  Mr. Misamore described how staff retention became extremely difficult for Yukos.  For example, he said that in the GAAP section of the accounting department "they all left the company because they didn't want to be harassed."[918]  Similarly, in defending the company's decision to pay bonuses in 2004, Mr. Theede testified that:

> [I]t was a Stalinesque-type of environment there. It was a fearful kind of a place to have to work. We never knew when we were going to have another raid, and people would come in and, as I said yesterday, knock computers off the desks, tip desks over, and just roughneck through the place; or when someone would be called in for questioning to the Prosecutor's Office with totally unknown and illogical results.  And in that kind of an environment, Yukos was not a particularly friendly place to work.  We had huge concerns about retaining our employees.  And if we didn't meet contractual obligations to them to pay the bonuses, it was our view that they would begin to leave.  And so it was in that light that we felt it was really very important that we lived up to the obligations we had to these people, just so we could retain them and so that we could continue to operate the company. Because if we lost those people, hiring others was going to be almost impossible, because people just—it was a scary place to be, and to bring new people in—in fact, I don't really recall us being able to hire any new employees after the attack started . . .[919]

817.  Respondent denies that Claimants have proven, as a matter of fact, that the harassment campaign impaired their investment.[920]  As mentioned earlier, Respondent notes for example that Mr. Khodorkovsky resigned voluntarily, that Yukos' revenues in 2003 and 2004 were higher than before the arrests of Mr. Khodorkovsky and Mr. Lebedev, and that Yukos issued public statements following the arrest of Mr. Khodorkovsky to the effect that Yukos' operations were proceeding normally.

818.  Respondent argues that Mr. Misamore's claims in his witness statement, seven years after the fact, about the disruptive effect of the raids, are not credible as they are contradicted by his contemporaneous statements to his colleagues, the audit committee and the board of directors in

---

[917]   Rieger WS ¶¶ 28–29.

[918]   Transcript, Day 9 at 244–45.

[919]   Transcript, Day 11 at 15–16.

[920]   Rejoinder ¶¶ 1338–45, ¶¶ 1387–99; ¶¶ 1400–34.   Respondent's Post-Hearing Brief ¶¶ 200–206.   *See also* Respondent's submissions of 30 August 2013 ¶ 7, concerning *Khodorkovsky v. Russia 2.*

2003.[921]   Respondent points to the following evidence in the record:

- The working group set up to deal study the effect of the government's actions confirmed that as at August 2003, despite the searches and seizures, "[o]perational activities [were] proceeding normally" and as at September 2003 "there had been no new adverse developments" and it was "business as usual"[922]

- Yukos stated on a conference call with financial analysts in November 2003 that Mr. Khodorkovsky's arrest and subsequent resignation had "no impact whatsoever on [its] operations"[923]

- Some 16 months later, Yukos stated to investors and the press that it "was extremely healthy."[924]

- The January–March 2004 internal Yukos newsletter publishing 2003 operational results of Yukos shows that the Company was not disrupted.[925]

819. The Tribunal views these statements of Yukos officers pertaining to the well-being of the company as an attempt by Yukos to project to its investors an image of stability and thus maintain their confidence.  It is obvious to the Tribunal that a company which was targeted in the way Yukos was during those many years had to be severely affected and that its operations could not be managed by its officers and other employees in the normal and usual manner.  In short, the Tribunal agrees with Claimants that, as a matter of fact, Respondent's aggressive campaign against Yukos impacted significantly the management of the company.

820. Having reviewed the abundant evidence in the record of the intimidation and harassment of Yukos' senior executives, mid-level employees, in-house counsel and external lawyers by the Russian authorities, the Tribunal is convinced that such intimidation and harassment not only disrupted the operations of Yukos but also contributed to its demise and thereby damaged Claimants' investment.

---

[921]   Transcript, Day 19 at 87–88,

[922]   Rejoinder ¶ 1422, Respondent's Post-Hearing Brief ¶ 207, Report of Working Group, 25 September 2003, Exh. R-4102.

[923]   *Yukos Conference Call on Recent Developments – Final,* Financial Disclosure Wire, 5 November 2003, Exh. R-3991.

[924]   *Russia's Yukos says interim oil output up 5.3% on year in 2004,* Prime-TASS Energy Service, 21 March 2005, Exh. R-509.

[925]   Yukos Review, January–February–March 2004, Exh. C-23.

821. The Tribunal will now turn its attention to another chapter in Claimants' litany of conduct by the Russian Federation alleged to have negatively impacted their investment.

**D.    THE UNWINDING OF THE YUKOS–SIBNEFT MERGER**

**1.    Introduction**

822. In April 2003, Yukos, which was then Russia's largest oil company, announced plans to merge with Sibneft, then Russia's fourth largest oil company, into a new entity that would be called YukosSibneft Oil Company and constitute the world's fourth largest private oil producer.

823. Steps were taken to effectuate the merger between April and October 2003.  By 3 October 2003, the main components of the transaction (a share purchase and a share exchange between Yukos' and Sibneft's principal shareholders) had been completed.  An Extraordinary General Meeting ("**EGM**") of Yukos' shareholders was scheduled for 28 November 2003 for the approval of the merger's final details.[926]  However, shortly before the scheduled meeting, the Sibneft shareholders announced their intention to halt the merger process.[927]

824. Ultimately, the share exchange component of the merger was invalidated through a series of court cases in Moscow and the Russian Far Eastern province of Chukotka,[928] and Sibneft was acquired by the Russian Federation through the State-owned company Gazprom.[929]

825. Claimants submit that Respondent was responsible for the unwinding of the merger, making it "one of the first casualties" of the Russian Federation's assault on Yukos.[930]  According to Claimants, Sibneft's decision to halt the merger process was the direct result of Mr. Khodorkovsky's arrest.  The arrest led Sibneft to insist on a change of the senior executives of the merged entity.  This request was not acceptable to Yukos and the deal was aborted.  Claimants also argue that the Russian courts were then "only too happy to lend their assistance" by invalidating parts of the merger on spurious grounds, paving the way for the Russian

---

[926]    Minutes No. 120/1-21 of the Board of Directors of Yukos, 25 September 2003, pp. 8–9, Item 11, Exh. C-1103.

[927]    Misamore WS ¶ 37; Memorial ¶ 208; Counter-Memorial ¶ 326.

[928]    Appeal Resolution of the Moscow Arbitrazh Court of 31 May 2004, Exh. C-72; Resolution of the Federal Arbitrazh Court for the Moscow District of 26 August 2004, Exh. C-73; Resolution of the Federal Arbitrazh Court for the Far-East District, 25 April 2006, Exh. C-78.

[929]    Memorial ¶¶ 231−37.

[930]    *Ibid*. ¶ 199; Reply ¶ 95.

Federation's acquisition of Sibneft.[931]   Claimants' primary damages claim of USD 114.174 billion reflects the value of YukosSibneft as a successfully merged entity.   Alternatively, Claimants submit that if the Tribunal does not hold Respondent responsible for the unwinding of the merger, the damages claim should be reduced by approximately USD 6 billion.[932]

826.   Respondent denies any responsibility for the unwinding of the merger.   Sibneft, Respondent argues, was neither exercising governmental authority nor acting under the instructions of Russian state organs.   The Russian Government in fact supported the merger.   Moreover, Sibneft's leaders had every right to insist on changes to the management of the merged entity due to concerns about Mr. Khodorkovsky's arrest and charges of criminal activities against him; in so doing, they were acting "in the pursuit of their own legitimate commercial interests."[933]   As for the Moscow and Chukotka courts, Respondent submits that they acted in accordance with Russian company law.   Respondent also suggests that Yukos acquiesced in the court proceedings as they allowed Yukos to cancel the merger without obtaining the approval of minority shareholders and thus risking further claims being brought against it.[934]

827.   In this chapter, the Tribunal will consider the circumstances of the Yukos−Sibneft merger and seek to determine whether the Russian Federation is responsible for the unwinding of the merger.   The Tribunal's view on this issue may have an impact on the quantum of damages the Tribunal may ultimately award Claimants.   The Tribunal will also consider in this chapter whether the merger was an important factor, as Claimants submit, in Yukos' decision not to pursue its ADR listing on the NYSE.   The Tribunal recalls that Respondent argues that Yukos' decision was taken because the company had concerns about elements of its tax optimization scheme.   The Tribunal will also consider Yukos' declaration of a USD 2 billion interim dividend in November 2003 ("**2003 Interim Dividend**"), which Respondent argues was intended to shield this sum from the reach of the Russian tax authorities.[935]

---

[931]   Reply ¶¶ 135−37.

[932]   *Ibid*. ¶¶ 859, 861; Second Expert Report of Brent Kaczmarek, 15 March 2012 ¶¶ 65; 75−76.

[933]   Counter-Memorial ¶¶ 322−30; Rejoinder ¶¶ 776−79.

[934]   Rejoinder ¶¶ 805−06.

[935]   *Ibid*. ¶¶ 809−23.

### 2.      Chronology

828.   In the context of arguments about the Yukos−Sibneft merger, Respondent has accused Claimants of fighting a "losing battle with the calendar,"[936] while Claimants have accused Respondent of attempting "to rewrite history".[937]   The Tribunal therefore considers it useful to lay out a short chronology of key events.

### (a)      Merger is Announced; NYSE Listing is Put on Hold; Steps are Taken to Complete Merger

829.   On 22 April 2003, Yukos and Sibneft announced their merger in a press release describing the principal features of the transaction.[938]   The merger would be achieved in two parts.   Firstly, Yukos would acquire 20 percent (minus one share) of Sibneft shares from Sibneft's principal shareholders for a cash consideration of USD 3 billion pursuant to a Share Purchase Agreement ("**Share Purchase Agreement**").   Secondly, Yukos would acquire 72 percent (plus one share) of Sibneft shares from Sibneft's principal shareholders in exchange for 26.01 percent of the fully diluted share capital of Yukos pursuant to a Share Exchange Agreement (the "**Share Exchange Agreement**").[939]

830.   A few days after the merger was announced, President Putin stated that he had approved the transaction in a meeting with Mr. Khodorkovsky, Mr. Roman Abramovich (a Board member and significant shareholder of Sibneft) and Mr. Evgeny Shvidler (Sibneft's CEO).[940]

831.   Concurrently with this announcement, the proposed listing of Yukos on the NYSE, which Yukos and a team of external advisers had been preparing for over a year, was put on hold.   By then, Yukos and its advisers had conducted an extensive review of the company's operations

---

[936]   Transcript, Day 3 at 18 (Respondent's opening).

[937]   Transcript, Day 17 at 11 (Claimants' closing).

[938]   *Yukos and Sibneft Agree in Principle to Merger*, Yukos Press Release and Sibneft Press Release, 22 April 2003, Exh. C-629.

[939]   Memorial ¶ 47 & n.61.

[940]   Nevzlin WS ¶ 26; Dubov WS ¶ 69; *Sibneft President Eugene Shvidler comments on upcoming merger with Yukos to create YukosSibneft, a new international energy super major*, BusinessWeek Online, 21 May 2003, Exh. C-634.

for purposes of drafting the required SEC form.[941]   A first draft had been circulated in June 2002 and a near final draft had been circulated on 19 March 2003.[942]

832.   From April to October 2003, steps were taken to complete the merger.   On 30 April 2003, Yukos and Sibneft's principal shareholders signed the Share Purchase Agreement[943] and the Share Exchange Agreement.[944]   The share exchange component of the merger was broken down into two tranches:   the exchange of 57.5 percent of Sibneft shares for newly issued shares in Yukos representing 17.2 percent of Yukos' fully diluted share capital and the exchange of 14.5 percent of Sibneft shares for 8.8 percent of Yukos shares (consisting of a mixture of newly issued shares, treasury shares and shares acquired through a share buy-back).[945]

833.   On 1 May 2003, Yukos' and Sibneft's principal shareholders signed a Shareholders' Agreement, which specified, *inter alia*, that the Yukos shareholder group would nominate the "Senior Management Positions."[946]   On 27 May 2003, Yukos' shareholders approved the merger.[947]

834.   On 30 May 2003, Yukos made a first cash payment of USD 1.25 billion pursuant to the Share Purchase Agreement.[948]   On 30 June, the Yukos Board of Directors adopted resolutions

---

[941]   *See* Memorandum from Mr. Maly to Mr. Sheyko, 22 April 2002, Exh. R-184.

[942]   Reply ¶¶ 101–02; Draft Yukos F-1 Form and Registration Statement Under the Securities Act of 1933, 19 March 2003, Exh. C-1067.

[943]   Deed of Share Purchase between Kravin Investments Limited, White Pearl Investments Limited, Marthacello Co Limited, N.P. Gemini Holdings Limited, Heflinham Holdings Limited and Kindselia Holdings Limited, and Yukos Oil Company, 30 April 2003, Exh. C-1101 (hereinafter the "Share Purchase Agreement").   In another arbitration, Yukos' lawyers described the Sibneft shareholders party to the Share Purchase Agreement as "companies incorporated under the laws of Cyprus . . . [and] ultimately controlled by Roman Abramovich, the owner of Chelsea Football Club and Governor of Chukotka." *See Yukos Oil Company v. Kravin Investments and others*, LCIA Arbitration No. 4589, Statement of Case, 2 May 2005, ¶¶ 10−12, Exh. R-3601.

[944]   Deed of Share Exchange between Kravin Investments Limited, White Pearl Investments Limited, Marthacello Co Limited, N.P. Gemini Holdings Limited, Heflinham Holdings Limited and Kindselia Holdings Limited, and Yukos Oil Company, 30 April 2003, Exh. C-1100 (hereinafter the "Share Exchange Agreement").

[945]   *Ibid*; *see* Memorial ¶ 47.

[946]   Shareholders' Agreement in respect of Yukos Oil Company among Yukos Universal Limited (hereinafter "YUL"), Hulley Enterprises Limited (hereainfter "Hulley"), White Pearl Investments Limited, N.P. Gemini Holdings Limited, Marthacello Co. Limited, Kindselia Holdings Limited, Heflinham Holdings Limited and Kravin Investments Limited, 1 May 2003, Article 6.1, Exh. C-1102.

[947]   Minutes No. 2 of the Extraordinary General Meeting of Yukos Shareholders, 27 May 2003, Exh. C-50; *Extraordinary meeting of YUKOS shareholders adopts decision associated with realization of transaction with Sibneft*, Yukos Press Release, 28 May 2003, Exh. C-635.

[948]   Receipt from Kravin Investments Limited, 30 May 2003, Exh. C-54; *see* Yukos Oil Company U.S. GAAP Interim Condensed Consolidated Financial Statements, 30 June 2003, p. 9, Exh. C-30.

with respect to the merger.[949]  In July and August 2003, regulatory approvals were obtained for the merger.[950]  On 28 August 2003, Yukos made a further cash payment of USD 500 million pursuant to the Share Purchase Agreement.[951]

835.   On 25 September 2003, the Yukos Board of Directors set 28 November 2003 as the date for the EGM at which final details for the merger would be submitted to shareholders.[952]

836.   On 2 October 2003, Yukos made a final cash payment of USD 1.25 billion pursuant to the Share Purchase Agreement.[953]

837.   On 3 October 2003, Yukos acquired 72 percent plus one share of Sibneft shares, in exchange for 26.01 percent of Yukos shares, pursuant to the Share Exchange Agreement.[954]

838.   Thus, by 3 October 2003, with both the share purchase and share exchange components of the transaction complete, Yukos had acquired 92 percent of Sibneft.  The remaining steps for implementing the merger included the "full operational integration" of the two companies, changing the name of Yukos to YukosSibneft and electing a new board of directors.[955]

### (b)   Mr. Khodorkovsky is Arrested; Yukos Continues with Merger; Sibneft has Second Thoughts

839.   The Tribunal recalls that Mr. Khodorkovsky was arrested on 25 October 2003.

---

[949]   *Board of Directors of YUKOS Oil Company approves issuance of up to 1 billion shares*, Yukos Press Release, 7 July 2003, Exh. C-639.

[950]   Notification of the State registration of the additional share issue by the Federal Commission for the Securities Market, 23 July 2003, Exh. C-51; Opinion and Directive issued by the Ministry for Antimonopoly Policies and Support to Entrepreneurship, 14 August 2003, Exh. C-52.

[951]   Receipt from Kravin Investments Limited, 28 August 2003, Exh. C-55; *see* Yukos Oil Company U.S. GAAP Interim Condensed Consolidated Financial Statements, 30 June 2003, p. 9, Exh. C-30.

[952]   Minutes No. 120/1-21 of the Board of Directors of Yukos, 25 September 2003, pp. 8–9, Item 11, Exh. C-1103.

[953]   Receipt from Kravin Investments Limited, 2 October 2003, and account statement evidencing payment of USD 1.25 billion under the Share Purchase Agreement, Exh. C-57; *see* Yukos Oil Company U.S. GAAP Interim Condensed Consolidated Financial Statements, 30 June 2003, p. 9, Exh. C-30.

[954]   Account statements evidencing transfer of 57.5 percent of Sibneft (2,724,362,618 shares) to Yukos under the Share Exchange Agreement, 3 October 2003, Exh. C-58; Notices of transaction and account statements evidencing transfer of 17.2 percent of Yukos (463,517,826 shares) to Sibneft's principal shareholders under the Share Exchange Agreement, 3 October 2003, Exh. C-59; Account statements evidencing transfer of 14.5 percent of Sibneft (689,373,122 shares) to Carenet under the Share Exchange Agreement, 10 October 2003, Exh. C-60; Account statements evidencing transfer of 8.8 percent of Yukos (238,879,333 shares) to Sibneft's principal shareholders under the Share Exchange Agreement, 10 October 2003, Exh. C-61; Yukos Oil Company U.S. GAAP Interim Condensed Consolidated Financial Statements, 30 June 2003, p. 9, Exh. C-30.

[955]   Memorial ¶¶ 54, 208; *Sibneft Principal Shareholders and Yukos Oil Company Finalize Merger Transaction*, Yukos Press Release and Sibneft Press Release, 3 October 2003, Exh. C-648.

840. On 28 October 2003, the Yukos Board of Directors recommended, in view of the capital restructuring of the company in anticipation of the merger, that shareholders approve the 2003 Interim Dividend of USD 2 billion to all shareholders of record as at 25 September 2003.[956] Mr. Khodorkovsky resigned as CEO of Yukos on 3 November 2003.  Yukos then issued a press release which named the persons it would nominate to the new management board of the merged YukosSibneft entity.[957]   Mr Khodorkovsky was not on that list.   On 21 and 22 November 2003, Yukos and Sibneft senior executives met to discuss the logistics of the merger.[958]

841. In late November, the media reported that Mr. Abramovich had met with President Putin to discuss the Yukos–Sibneft merger.  Reference was made to the fact that "Abramovich is understood to have raised the prospect of changing the management team of the combined company with Putin, who welcomed the idea."[959]

842. In his witness statement, Mr. Nevzlin narrates that he had met with Mr. Abramovich in "late 2003" in Tel Aviv and that he had been told that

> YukosSibneft could be saved if the management of the merged company was transferred to his team . . . President Putin had told Roman Abramovich that Mikhail Khodorkovsky had been targeted because of his involvement in politics and . . . was too angry with Mikhail Khodorkovsky to even discuss his release.[960]

843. Shortly before the Yukos EGM scheduled for 28 November 2003, representatives of Sibneft's principal shareholders summoned representatives of Yukos' principal shareholders and advised them that they no longer wished to proceed with the merger.  They asked that steps be taken to unwind the merger.[961]   However, the EGM was held as scheduled.   The agenda included: (a) early termination of the powers of board members and election of a new board; (b) approval of new articles of association (including a name change to YukosSibneft); and (c) payment of

---

[956] Abstract from Minutes No. 120/1-24 of the Meeting of the Board of Directors of Yukos, 28 October 2003, Exh. R-3605.

[957] *YukosSibneft Proposed Management Board*, Yukos Press Release, 4 November 2003, Exh. C-666.

[958] Agenda, material and list of attendees for 21−22 November 2003 meeting, Exh. C-62.

[959] *Abramovich met Putin before vetoing Yukos−Sibneft merger*, The Sunday Telegraph, 30 November 2003, Exh. C-669.

[960] Nevzlin WS ¶¶ 27, 35.

[961] Memorial ¶ 208; Counter-Memorial ¶ 326; *see Yukos Oil Company v. Kravin Investments and others*, LCIA Arbitration No. 4589, Statement of Case, 2 May 2005, Exh. R-3601.  Around the same time as Sibneft advised Yukos it was pulling out of the merger, the media reported that an economic and tax crimes unit of Russia's interior ministry had announced it had no questions for Mr. Abramovich. *Kremlin seen as a deep well of influence*, The Financial Times, 29−30 November 2003, Exh. C-668.

the 2003 Interim Dividend.  Claimants voted against the election of Sibneft's nominees to the Yukos Board of Directors, abstained on the vote to change the company's name to YukosSibneft and voted to approve the dividend.[962]

844.   After the EGM, Yukos' principal shareholders proceeded as if the merger was still going forward.  For example, on 2 December 2003, GML issued a press release stating that the merger agreements remained in full effect.[963]  On 8 December 2003, Claimant Hulley received payment for the 2003 Interim Dividend.[964]  At the same time, Yukos and its principal shareholders were exploring options to negotiate the unwinding of the merger with Sibneft.[965] Yukos continued to resist Sibneft's proposal to appoint Sibneft nominees as members of the merged entity.[966]

### (c)   Russian Courts Invalidate the Share Exchange Agreement

845.   On 19 January 2004, a few weeks after Yukos received the 2000 Tax Audit Report, NP Gemini Holdings Limited and Nimegan Trading Limited, two former Sibneft shareholders,[967] applied to a Moscow court to have the issue of Yukos shares carried out in the context of the first tranche of the share exchange declared invalid.[968]  On 1 March 2004, the Moscow Arbitrazh Court annulled the share issue.[969]  The decision was upheld on appeal on 31 May 2004 and confirmed

---

[962]   Agenda for the Extraordinary General Shareholders' Meeting of Yukos Oil Company, 28 November 2003, Exh. R-3606; *Yukos Oil Company v. Kravin Investments and others*, LCIA Arbitration No. 4589, Statement of Case, 2 May 2005, Exh. R-3601; Misamore WS ¶¶ 22, 37; *Completion of Yukos−Sibneft Merger Suspended*, Interfax, 28 November 2003, Exh. R-3609 (quoting Mr. Nevzlin as saying:  "The Sibneft shareholders came to us this week and told us some technical difficulties had emerged.  They asked for Yukos charter amendments to be taken off the agenda at today's meeting and to leave the board of directors intact.  We coordinated our voting with [the Sibneft shareholders].  As for the Yukos dividends, we voted for Yukos"); *see Yukos Oil Company Shareholders' Meeting approves dividend of about $2 billion*, Yukos Press Release, 28 November 2003, Exh. C-666.

[963]   *Yukos Sibneft Merger*, Company News, Group Menatep Website, 2 December 2003, Exh. C-670.

[964]   Transcript, Day 9 at 22−24 (cross-examination of Mr. Misamore).

[965]   *Statement on the Status of Negotiations with Representatives of Former Principal Shareholders of Sibneft*, Yukos Press Release, 17 December 2003, Exh. C-672.

[966]   *Yukos Oil Company retains consultants for negotiations with former Sibneft core shareholders*, Yukos Press Release, 2 February 2004, Exh. C-680; Misamore WS ¶ 37.

[967]   At the time of the application, the two petitioners were Yukos shareholders.  NP Gemini Holding Limited was a former principal shareholder of Sibneft and had participated in all the steps of the merger.  Nimegan Trading Limited was already a shareholder of Yukos when the Share Exchange Agreement was signed, with less than 0.001 percent of Yukos shares.  According to Claimants, both companies were linked to Mr. Abramovich through Millhouse Capital, an investment company that manages Mr. Abramovich's assets.  Memorial ¶¶ 216–19.

[968]   Petition to declare the FCSM (Federal Commission for the Securities Market) decision to register the issuance of securities unlawful, and to declare as null and void the issuance of the securities, 19 January 2004, Exh. C-71.

[969]   Decision of the Moscow Arbitrazh Court, Case No. A40–2353/04–92–35, 1 March 2004, Exh. R-549.

by the Federal Arbitrazh Court on 26 August 2004.[970]  Accordingly, in September 2004, Yukos returned to Sibneft's shareholders the 57.5 percent shareholding in Sibneft it had received in exchange for its newly issued shares.  Yukos' shareholding in Sibneft was then reduced to 34.5 percent.[971]

846.   On 6 July 2004, Nimegan Trading Limited commenced legal proceedings against Yukos and others before the Arbitrazh Court of Chukotka, the Russian Far Eastern province where Mr. Abramovich was governor, seeking to have the second tranche of the share exchange (concerning a 14.5 percent stake in Sibneft) declared invalid.  In order to confer jurisdiction to the Chukotka Court, a defendant related to Mr. Abramovich had opened a bank account in the Chukotka province on the day that Nimegan paid the filing fee.  The other nominal defendants all supported the court action.[972]  The Chukotka Arbitrazh Court invalidated the second tranche of the share exchange on 14 September 2004.  After a series of appeals, this decision was ultimately confirmed by the Federal Arbitrazh Court for the Far-East District in April 2006,[973] following which Yukos returned the 14.5 percent shareholding in Sibneft obtained through the second tranche of the share exchange to Sibneft's shareholders.  Yukos' shareholding in Sibneft was then reduced to the 20 percent minus one share acquired pursuant to the Share Purchase Agreement.

847.   On 30 September 2004, Yukos commenced an LCIA arbitration against the former principal shareholders of Sibneft, seeking an injunction prohibiting the respondents from initiating, continuing or encouraging any proceedings in the Russian courts to invalidate the share exchange.[974]  Ultimately, the arbitration would be discontinued by Yukos' Russian bankruptcy receiver, Mr. Eduard Rebgun.[975]

---

[970]   Appeal Resolution of the Moscow Arbitrazh Court, 31 May 2004, Exh. C-72; Resolution of the Federal Arbitrazh Court for the Moscow District, 26 August 2004, Exh. C-73.

[971]   Yukos' withdrawal instructions to Custody Department of Deutsch Bank, 24 September 2004, Exh. C-74.

[972]   Payment Order for filing fee for the Chukotka proceedings, 27 May 2004, Exh. C-75; Petition to Declare Invalid an Interested Party Transaction and to Apply the Consequences of the Invalidity of the Transaction, 6 July 2004, Exh. C-76; Documents relating to the opening of Marthacello's bank accounts in Chukotka, 8 July 2004, Exh. C-77.

[973]   Resolution of the Federal Arbitrazh Court for the Far-East District, 25 April 2006, Exh. C-78.

[974]   *Yukos Oil Company v. Kravin Investments and others*, LCIA Arbitration No. 4589, Request for Arbitration, 30 September 2004, Exh. R-3600; *Yukos Oil Company v. Kravin Investments and others*, LCIA Arbitration No. 4589, Statement of Case, 2 May 2005, Exh. R-3601.

[975]   Misamore WS ¶ 37.

(d)   **Russian Federation Ultimately Acquires Sibneft via Gazprom**

848.   In 2005, the Russian State-owned company Gazprom acquired 75.68 percent of Sibneft shares from Sibneft's principal shareholders for around USD 15 billion.[976]   In May 2006, Sibneft changed its name to OAO GazpromNeft.[977]

849.   The Tribunal notes that the 20 percent minus one shareholding in Sibneft that Yukos had acquired under the Share Purchase Agreement was sold in Yukos' bankruptcy auctions in April 2007 to EniNeftegaz, an Italian company,[978] and that in 2009, Gazprom exercised a call option (which had been in place since April 2007) to purchase the Sibneft shares from EniNeftegaz for the sum of USD 4.1 billion.[979]

3.   **Parties' Arguments and Tribunal's Observations**

(a)   **Was Yukos' NYSE Listing Put on Hold Because of the Yukos−Sibneft Merger or Fears of Exposing Yukos' Tax Optimization Scheme?**

850.   Claimants maintain that Yukos' proposed NYSE listing was put on hold in April 2003 as a result of the proposed Yukos−Sibneft merger and the need to conduct further due diligence.[980]

851.   In his witness statement, Mr. Misamore stated that

> Yukos' plan to obtain a Level 2 or 3 ADR listing on the NYSE was put on hold because of the decision in the beginning of 2003 to merge with Sibneft . . . and the need for further due diligence with respect to Sibneft to ensure complete transparency and financial statement accuracy before proceeding with any kind of listing of the merged company.[981]

852.   Mr. Misamore confirmed this statement in his re-direct examination before the Tribunal:

---

[976]   Gazprom 2005 Annual Report (excerpts), Exh. C-370; *Shares and Registrar*, Gazprom Neft Website, Exh. C-389; *Gazprom and Millhouse Capital Sign Legally Binding Documents for Purchase/Sale of 72.663 percent Stake in Sibneft*, Gazprom Press Release, 28 September 2005, Exh. C-771; *Management Committee Approves Gazprom's Buying into Sibneft*, Gazprom Press Release, 28 September 2005, Exh. C-772; *Gazprom agrees $13bn deal with Abramovich*, The Financial Times, 29 September 2005, Exh. C-773.

[977]   *Sibneft Changes Name to Gazprom Neft*, The Moscow Times, 16 May 2006, Exh. C-803.

[978]   *Gazprom, indirectly, wins assets of Yukos*, NY Times, 4 April 2007, Exh. C-847; *Eni announces $5.83 bn acquisition of Yukos assets. Major first step into Russian upstream market*, Eni Press Release, 4 April 2007, Exh. C-849; *A Yukos Auction With a 2nd Act*, The Washington Post, 5 April 2007, Exh. C-851; *On Working Meeting Between Alexey Miller and Paolo Scaroni*, Gazprom Press Release, 17 September 2007, Exh. C-877; *Eni to keep Gazprom Neft stake until 2009*, Reuters, 9 November 2007, Exh. C-878.

[979]   *How Putin Put Kremlin Back on Top*, The Moscow Times, 1 February 2008, Exh. C-879.

[980]   *See* Reply ¶ 104.

[981]   Misamore WS ¶ 20.

> Mr. Khodorkovsky informed me early in 2003 that he was working on a significant transaction—that turned out to be Sibneft—and he asked me to put the F-1 registration process on hold.  Certainly I could not have gone ahead with an F-1 in a significant transaction mode anyway.  So we put it on hold solely as a result of what subsequently became the Sibneft transaction.[982]

853.   Mr. Kosciusko-Morizet also confirmed this explanation when he testified.  After referring to the considerable work done in preparation for the NYSE listing and the extensive disclosure involved, he said:

> So work was pursued during and until the end of the year and the beginning of 2003, and then in April it was interrupted by the prospect of the Sibneft-Yukos merger, which obviously was material to any filing.  So negotiations were going on, and that prevented the filing of an ADR 3.[983]

854.   The Tribunal notes that, in the April−June 2003 edition of the *Yukos Review*, it was reported that the merger plans were "likely to push back Yukos' listing on the New York stock exchange from later this year into 2004."[984]

855.   Claimants also refer to an e-mail of 29 April 2003 from a lawyer at Akin Gump—the firm advising Yukos on its proposed NYSE listing—to Mr. Misamore reporting that the lawyer had spoken to an SEC official "to let him know about the proposed merger . . . and to tell him that although the timetable for the listing has been extended due to the merger, the company still intends to pursue a listing after the merger . . . ."[985]

856.   Respondent, however, maintains that the NYSE listing project was "abandoned" not because of the merger but because of "fears that, as a result of the extensive disclosures required by the [SEC], the process would publicly reveal Yukos' 'tax optimization' program, and this in turn would lead to major tax reassessments."[986]  According to Respondent:

> Whatever excuse Yukos may have provided to the SEC in March 2003 for halting its proposed NYSE listing, the possibility of a 2003 listing was in fact called off in February of that year as the result of Mr. Khodorkovsky's refusal to sign the company's registration statement out of an understandable concern for his own personal liability.[987]

---

[982]   Transcript, Day 9 at 240.

[983]   Transcript, Day 4 at 72–73.

[984]   Yukos Review, Issue 13, April−June 2003, p. 79, Exh. C-19.

[985]   E-mail from Mr. Robert Langer to Mr. Bruce Misamore, 29 April 2003, Exh. C-1384.

[986]   Counter-Memorial ¶ 1019.

[987]   Respondent's Post-Hearing Brief ¶ 77.

857.   In support of its submission, Respondent refers to an exchange of e-mails of 19 and 20 February 2004 between Mr. Oleg Sheiko, Yukos' Director of Corporate Finance, and Mr. Khodorkovsky, in which Mr. Sheiko notes that Mr. Misamore had been asked by Mr. Khodorkovsky to delay the NYSE, and Mr. Khodorkovsky replies:

> If the lawyers do not confirm to me that my personal risks are limited by a reasonable period of time, I will not sign the form, because if my political career develops in 5 years, the American hook will become dangerous. I warned about this.[988]

858.   Claimants did not comment on this e-mail.  In the Tribunal's view, this e-mail is consistent with Mr. Misamore's testimony that, in "early 2003", Mr. Khodorkovsky had asked him to put the listing on hold due to a substantial transaction, which turned out to be the merger with Sibneft.

859.   Respondent also relies on a "blackline" version of Yukos' draft filing for the SEC sent by PwC to Yukos on 23 July 2002.[989]  As telling as that document may be with respect to Yukos' awareness of its tax risks,[990] the Tribunal notes that this document pre-dates by more than 9 months Yukos' decision to suspend the NYSE listing.

860.   In conclusion, the Tribunal finds that Yukos' decision to put the NYSE listing project on hold in the spring of 2003 appears to have been motivated by the anticipated Yukos–Sibneft merger.

### (b)   Was the 2003 Interim Dividend a Component of the Yukos−Sibneft Merger or a Means to Siphon Funds out of Russia?

861.   Claimants submit that the timing and amount of the 2003 Interim Dividend were solely related to and dictated by the Yukos−Sibneft merger.  They write:

> Yukos and Sibneft had agreed to target specific levels of net debt intended to reflect the relative values of the individual companies prior to the completion of the merger.  At that time, Yukos was substantially underleveraged as compared to Sibneft, with significant cash reserves.  It was therefore agreed that in order to leverage up and meet its target net debt level, Yukos would undertake the payment of dividends, a share buy-back and/or the taking out of a loan.  The 2003 interim dividend was therefore part of the Company's efforts to match the capital structure of Yukos and Sibneft, and return value to its shareholders prior to the completion of the merger, as is confirmed by the contemporaneous documentation.[991]

---

[988]   E-mail from Mr. Oleg Sheiko to Mr. Mikhail Khodorkovsky, 19 February 2003 and reply e-mail from Mr. Mikhail Khodorkovsky to Mr. Oleg Sheiko, 20 February 2003, Exh. R-3611.

[989]   Extract from Yukos' Draft F-1 Form, 23 July 2002, Exh. R-1477.

[990]   As to which, see paragraph 491 above.

[991]   Reply ¶ 115 (footnote omitted); *see* Transcript, Day 17 at 7–11 (Claimants' closing).

862. With respect to the "contemporaneous documentation", Claimants refer to Yukos' press release of 22 April 2003 announcing the merger, which stated that

> [p]rior to completing the transaction, YUKOS intends to increase its leverage and is considering, among other things, cash distributions to its shareholders in the form of dividends and share buybacks.  It is expected that after such capital restructuring and the completion of the transaction, YukosSibneft will have a moderate level of leverage and a strong working capital position.[992]

863. Claimants also refer to analysts' reports from the same period, which are all consistent with their submission.  For example, a Brunswick UBS Report dated 23 April 2003 stated that "Yukos has every reason to leverage up further—if its leverage reached levels similar to Sibneft . . ., implying $3.75 bn of new debt, Yukos could return $5.15 bn to shareholders . . . *before* the deal."[993]  An internal Yukos PowerPoint presentation about the merger also referred to the plan to declare a dividend in order to achieve the targeted net debt level.[994] Mr. Misamore testified that the 2003 Interim Dividend was "an integral part" of the merger transaction:

> [The approval and payment of the dividend] was entirely related to the Sibneft transaction . . . [A]s part of the Sibneft transaction it was a desire of both of the shareholder groups to have a capital structure in YukosSibneft which did not disadvantage either of the two shareholder groups.  And therefore there were a series of transactions in association with the Sibneft merger/acquisition that were undertaken, including share repurchases, the bank debt, the payment of the dividend . . . and that was the reason for the dividend[, it] was the very last step in the consummation of the Sibneft transaction.[995]

864. Claimants explain that the decision to pay the 2003 Interim Dividend was taken in three steps.[996]  Firstly, on 25 September 2003, when the Yukos Board of Directors scheduled for 28 November 2003 an EGM of Yukos' shareholders for purposes of approving the merger, the agenda included as an item "payment of dividend for 9 months of 2003."[997]  Secondly, on 28 October 2003, the Yukos Board of Directors set the amount of and process for approving and

---

[992]   *Yukos and Sibneft Agree in Principle to Merger*, Yukos Press Release and Sibneft Press Release, 22 April 2003, Exh. C-629.

[993]   Brunswick UBS Report "YukosSibneft", 23 April 2003, p. 9, Exh. C-1370 (emphasis in the original).  *See also* a Credit Suisse First Boston Report which predicted a dividend distribution in excess of USD 1.7 billion to shareholders as a means for Yukos to increase its net debt in the context of the merger. Credit Suisse First Boston Report "Yukos and Sibneft merge to form a GEM supermajor," 24 April 2003, p. 4, Exh. C-1371.

[994]   "YukosSibneft, Detailed transaction plan and Major Issues," Yukos PowerPoint Presentation, 18 June 2003, Exh. C-1068.

[995]   Transcript, Day 9 at 21, 236.

[996]   For a description of these steps, see Joint Stock Companies Law of the Russian Federation, Arts. 42–43, Exh. R-3604.

[997]   Minutes No. 120/1-21 of the Board of Directors of Yukos, 25 September 2003, p. 8, Item 11, Exh. C-1103.

paying the dividend.[998]  Thirdly, Yukos shareholders approved the 2003 Interim Dividend at the EGM on 28 November 2003.  According to Claimants, this sequence of events undermines Respondent's argument that the 2003 Interim Dividend was declared with unprecedented haste as a "clever", "eleventh hour" ploy to siphon funds out of Russia.[999]

865.  In its Counter-Memorial, Respondent argues that the 2003 Interim Dividend "betrays an unusual sense of urgency on the part of those who proposed it . . . who evidently sensed the gathering storm, wanted to get as much money as possible, as quickly as possible, out of the company, and out of Russia, and into their pockets."[1000]  In its Rejoinder, Respondent argues that, while the dividend might have had its origins in the Yukos–Sibneft merger, "by the time the dividend was actually declared, on November 28, 2003, the Sibneft merger had been halted and there was no longer any merger-related reason for the dividend."[1001]  Respondent recalls that Sibneft's principal shareholders informed Claimants before the EGM that they no longer wished to proceed with the merger, and points out that Claimants agreed with the Sibneft shareholders not to vote for items 1 and 2 of the EGM's agenda (changes to the board and the company's articles of association), but proceeded to vote in favour of the dividend.  Thus, Respondent argues, "the giga-dividend can only be explained by Claimants' desire to transfer outside the reach of the Russian authorities US$ 2 billion that could otherwise have been used to pay Yukos' taxes and other liabilities."[1002]

866.  During the hearing, in response to a question from the Tribunal regarding the fact that the 2003 Interim Dividend had been planned since the spring of 2003, counsel for Respondent explained that, between this planning stage and the declaration of the dividend, "the world had changed," Mr. Khodorkovsky had been arrested and Sibneft had called off the merger, so that the "link between the declaration of the dividend and the Sibneft merger had been severed, and any prudent company, frankly, would have marshaled its resources rather than declared and paid a dividend that was unprecedented in size, at a time when it was under considerable financial pressure."[1003]

---

[998]   Agenda for the Extraordinary General Shareholders' Meeting of Yukos Oil Company, 28 November 2003, Exh. R-3606.

[999]   Counter-Memorial ¶ 351.

[1000]   Counter-Memorial ¶ 350.

[1001]   Rejoinder ¶ 821.

[1002]   *Ibid*.

[1003]   Transcript, Day 18 at 162 (Respondent's closing).

867. It is not entirely clear to the Tribunal when Yukos' shareholders found out about the decision of Sibneft's shareholders to withdraw from the merger.[1004]  However, the exact timing does not matter.  The Tribunal accepts that Sibneft's decision was communicated to Yukos shortly before the EGM, but in time for Yukos' shareholders to agree with Sibneft's principal shareholders not to vote on the first two items of the agenda.

868. Mr. Misamore testified that the Sibneft shareholders, Hulley and YUL "agreed between themselves to agree to vote for the dividend" because it was "an integral part of that [merger] transaction," although one of the parties had, at that point, changed its mind.[1005]  Claimants submit that, after the Sibneft announcement, as at 28 November 2003, the completed merger transaction was still in place and the 2003 Interim Dividend was a final step in consummating the merger.  The status of the transaction was not affected and there were ongoing negotiations to resolve outstanding issues with Sibneft.[1006]  In fact, in an announcement by GML in December 2003, it was stated that the merger agreement remained in full effect.[1007]

869. In conclusion, the Tribunal finds that the decision to approve the 2003 Interim Dividend at the EGM on 28 November 2003 was an integral part of the merger process, which was still legally alive at the date of the EGM.  Whether it was practically still alive is questionable.  On balance, the evidence does not support Respondent's contention that the dividend was simply an "eleventh hour" device to siphon funds out of Russia for improper purposes.  Nevertheless the Tribunal sees some force in Respondent's contention that Yukos' stockholders might have more prudently acted to conserve Yukos' resources rather than to proceed with a massive dividend whose essential rationale was evaporating.

### (c)   Was the Unwinding of the Merger Caused by the Russian Federation?

870. As noted earlier, the Russian Federation initially supported the Yukos−Sibneft merger.  President Putin expressed his approval of the transaction in a meeting with Mr. Khodorkovsky

---

[1004]   Some sources suggest that the announcement was made on the day of the EGM (*e.g.*, Misamore WS ¶ 37), while others state it took place on the eve of the meeting (*e.g.*, *Yukos Oil Company v. Kravin Investments and others*, LCIA Arbitration No. 4589, Statement of Case, 2 May 2005, Exh. R-3601).

[1005]   Transcript, Day 9 at 20 (cross-examination of Mr. Misamore).  However, as Respondent pointed out in its closing statement, Sibneft shareholders were not yet Yukos shareholders of record and could therefore not have voted for the dividend. S*ee* Transcript, Day 18 at 147–48.

[1006]   *See e.g.*, Yukos Review, Issue 16, January–February–March 2004, p. 58, Exh. C-23.

[1007]   *Yukos Sibneft Merger*, Company News, Group Menatep Website, 2 December 2003, Exh. C-670.

and Messrs. Abramovich and Shvidler in April 2003.[1008]   In May 2003, Mr. Shvidler stated in an interview that President Putin and Prime Minister Kasyanov had encouraged him to promote the merged YukosSibneft entity as a "national-champion".[1009]   On 22 July 2003, the Russian Federal Commission for the Securities Market approved the registration of new Yukos shares to be issued in connection with the merger.[1010]   On 14 August 2003, the Russian Ministry for Antimonopoly Policies and Support to Entrepreneurship approved Yukos' acquisition of the Sibneft shares.[1011]

871.   Following the arrest of Mr. Khodorkovsky in October 2003, Sibneft declared that it would halt the merger process unless the management team was changed.

872.   Claimants argue that the Russian Federation is responsible for the unwinding of the Yukos–Sibneft merger, despite its initial support for the transaction.   Claimants frame the question as one of causation.   As Claimants' counsel put it:  "[B]ut for the Russian Federation's attack on Yukos, the Yukos–Sibneft merger would never have been unwound.   And that point is not seriously challenged by the Respondent."[1012]   Claimants describe the arrest of Mr. Khodorkovsky as having "marked a radical escalation in the Russian Federation's attack on Yukos and . . . also marked the beginning of the end for the YukosSibneft merger."[1013]   According to Mr. Theede:

> [A]fter [Sibneft] saw what the Russian Federation was doing to Yukos, . . . saw it being destroyed . . . and in my opinion it was a direct result of that that caused Sibneft to want to detach itself from Yukos . . . . I knew Sibneft was doing everything they could to get out of this, and they were fairly panicked because they wanted to get out before the Government destroyed our company . . .   [A]s soon as Sibneft saw and learned what was happening to Yukos, they wanted out of the deal . . . .   [W]e had completed the merger, we were moving ahead with it; everything was really going along quite smoothly, and I think we were all excited about it.   But Mr. Khodorkovsky's arrest and the political fallout from that, and then the subsequent attack on the company that was related to

---

[1008]   Nevzlin WS ¶ 26; Dubov WS ¶ 69; President of Russia, Official Web Portal, 24 April 2003, Exh. C-1053.

[1009]   *Sibneft President Eugene Shvidler comments on upcoming merger with Yukos to create YukosSibneft, a new international energy super major*, BusinessWeek Online, 21 May 2003, Exh. C-634.

[1010]   Notification of the State registration of the additional share issue by the Federal Commission for the Securities Market, 23 July 2003, Exh. C-51.

[1011]   Opinion and Directive issued by the Ministry for Antimonopoly Policies and Support to Entrepreneurship, 14 August 2003, Exh. C-52.   Respondent points out that some of these approvals were given *after* the arrest of Mr. Lebedev and Mr. Nevzlin's flight to Israel. Rejoinder ¶ 792.

[1012]   Transcript, Day 17 at 16 (Claimants' closing).

[1013]   Reply ¶ 127.

> Mr. Khodorkovsky's arrest, scared Sibneft off.  And there's no question in my mind that they were afraid that the attack on Yukos was going to carry over to them . . . .[1014]

873. Mr. Nevzlin also testified that "[a]fter it became apparent that Mikhail Khodorkovsky was being targeted by the Kremlin, Roman Abramovich abruptly changed his mind and sought to unwind the merger."[1015]

874. In support of their submission, Claimants mention that Mr. Abramovich met with President Putin only a few days before Sibneft's announcement of its decision to cancel the merger.[1016]

875. Respondent does not dispute that concerns over Mr. Khodorkovsky's arrest led Sibneft to change its mind about the merger.  Respondent says that Sibneft's decision

> was not at all surprising, as Messrs. Khodorkovsky and Lebedev, Yukos' two leading Directors, had recently been arrested and charged with various criminal acts . . . .  [Their] future leadership of the company was thus in serious doubt, and any proposed partner would have understandably been concerned . . . .[1017]

876. One London newspaper speculated that "[a]nalysts believe Mr. Abramovich's decision to cut ties with Yukos is an attempt to insulate himself from an apparently politically motivated campaign by the Kremlin against Mr. Khodorkovsky and Yukos."[1018]

877. However, Respondent forcefully denies that Mr. Abramovich's decision was made "at the behest" of President Putin.  It writes in its Counter-Memorial that

> Mr. Abramovich did not need the President of the Russian Federation to tell him that Sibneft's proposed merger partner was the subject of a contentious tax dispute . . . .  In the circumstances, any reasonable company would have sought to extricate itself from the planned merger, or at least to ensure that the new company was not led by two executives recently indicted for tax evasion.[1019]

---

[1014] Transcript, Day 10 at 39–41, 46.

[1015] Nevzlin WS ¶ 27.

[1016] Memorial ¶ 211 (citing *Abramovich met Putin before vetoing Yukos−Sibneft merger*, The Sunday Telegraph, 30 November 2003, Exh. C-669).

[1017] Counter-Memorial ¶ 326.

[1018] *Abramovich pulls out of $11bn merger with Yukos*, The Independent, 29 November 2003, Exh. C-667.

[1019] Counter-Memorial ¶ 767(iv); *see* Rejoinder ¶ 786.

878.  According to Respondent, the meeting between Mr. Abramovich and President Putin, if at all relevant, only demonstrates that the Russian President welcomed Sibneft's proposal of a change in the management of the merged entity.[1020]

879.  The Tribunal notes that the Parties agree that Sibneft was firmly of the view that the only way for the merger to be saved would be if there was a change in the senior management of the merged company, *i.e.*, if Mr Shvidler was appointed as President.   Yukos was equally "adamant" that management issues were "not negotiable."[1021]   As the BBC reported on 28 November 2003, the "breaking point [of the merger] came when Yukos was not ready to hand over management of the company."[1022]

880.  Claimants characterize Mr. Abramovich's insistence on a change of management as "a manifestly unreasonable proposal which sought to turn the agreed terms of the merger upside-down."[1023]  They refer to the terms of the initial merger agreement which provided that Yukos would nominate the "Senior Management Positions" including the President,[1024] and to the 22 April 2003 press release which announced that Mr. Khodorkovsky would be CEO.[1025] Claimants contend that Yukos' refusal to change the agreed terms of the merger was "hardly surprising" and that Respondent's "attempt to rely on such refusal to exonerate itself from responsibility for the consequences of its own actions should be rejected."[1026]

881.  Respondent replies that Yukos "could and should have accommodated" the entirely reasonable concerns of Sibneft.[1027]  Respondent points out that Yukos would still have nominated the other senior managers and that the CEO Yukos suggested in replacement of Mr. Khodorkovsky (Mr. Simon Kukes), was a relatively unknown figure.  With respect to causation, Respondent argues that it was "Yukos' stubborn refusal to consider Sibneft's change-in-management proposal—

---

[1020]  Counter-Memorial ¶ 328.

[1021]  *Abramovich met Putin before vetoing Yukos–Sibneft merger*, The Sunday Telegraph, 30 November 2003, Exh. C-669.

[1022]  *Yukos–Sibneft Merger Called Off*, BBC News, 28 November 2003, Exh. R-397 (quoting Mr. Boris Berezovsky).

[1023]  Reply ¶ 134.

[1024]  Shareholders' Agreement in respect of Yukos Oil Company among YUL, Hulley, White Pearl Investments Limited, N.P. Gemini Holdings Limited, Marthacello Co. Limited, Kindselia Holdings Limited, Heflinham Holdings Limited and Kravin Investments Limited, 1 May 2003, Article 6.1, Exh. C-1102.

[1025]  *Yukos and Sibneft Agree in Principle to Merger*, Yukos Press Release and Sibneft Press Release, 22 April 2003, Exh. C-629.

[1026]  Reply ¶ 134.

[1027]  Rejoinder ¶ 786.

and not any action on the part of the Russian Federation—that ultimately doomed the Yukos–Sibneft merger."[1028]

882.  Respondent also argues that it cannot bear any responsibility for the unwinding of the merger because Claimants and/or Yukos voluntarily agreed to it.  It is a matter of public record that, in early 2004, Yukos retained external advisers for negotiations with Sibneft.[1029]  Respondent also alleges that Claimants signed two protocols dated December 2003 and February 2004 to unwind the merger.[1030]  The Tribunal notes that these protocols are not in the record of this arbitration.   Under cross-examination, Mr. Misamore stated that he did not recall ever seeing the protocols.[1031]

883.  Claimants acknowledge that, "[a]lthough under no obligation to do so, Yukos and its majority shareholders agreed to enter into formal discussions with the former principal shareholders of Sibneft to consider a possible unwind of the transaction."[1032]  Claimants add however that Yukos and its majority shareholders made it clear that unless an acceptable agreement was reached and approved by the Yukos Board of Directors and its shareholders, Yukos would maintain the existing agreements and proceed with its merger with Sibneft.[1033]

884.  The Tribunal observes that, in the end, the decisions of the Moscow and Chukotka Arbitrazh Courts, although criticized by Claimants, effectively put an end to the merger.  There never was a consensual negotiated solution.[1034]

885.  Respondent speculates that it could have been Yukos that instigated the two court cases in order to achieve the demerger without having to seek the approval of minority shareholders.[1035]  Respondent refers to an e-mail of 13 February 2004 where Yukos' counsel Mr. Gololobov

---

[1028]  Counter-Memorial ¶ 330.

[1029]  *Yukos Oil Company retains consultants for negotiations with former Sibneft core shareholders*, Yukos Press Release, 2 February 2004, Exh. C-680.

[1030]  Respondent's Post-Hearing Brief ¶ 75 n.193 (citing *Yukos Oil Company v. Kravin Investments and others*, LCIA Arbitration No. 4589, Statement of Case, 2 May 2005, Exh. R-3601 ¶¶ 41, 44, 50).

[1031]  Transcript, Day 9 at 11–12.

[1032]  Memorial ¶ 212.

[1033]  *Yukos Sibneft Merger*, Company News, Group Menatep Website, 2 December 2003, Exh. C-670; *Statement on the Status of Negotiations with Representatives of Former Principal Shareholders of Sibneft*, Yukos Press Release, 17 December 2003, Exh. C-672.

[1034]  *See* Transcript, Day 17 at 25.

[1035]  Rejoinder ¶¶ 797–806.

proposed a five-part "Scheme of Actions for Unwinding Transaction."[1036]  The first step was a "[s]uit to have issuance of shares declared invalid,"[1037] which, Respondent argues, bears a striking resemblance to the lawsuit brought in January 2004 by NP Gemini Holdings Limited and Nimegan Trading Limited before the Moscow Arbitrazh Court.

886.   The Tribunal notes that this e-mail was sent after the commencement of the Moscow lawsuit.  Respondent's theory is also inconsistent with the fact that Yukos applied to an LCIA tribunal to prevent the former Sibneft shareholders from pursuing actions for the invalidation of the share issuance before the Moscow and Chukotka courts.   The Tribunal finds this argument of Respondent unpersuasive.

887.   The central question remains.  Did the Russian Federation cause the demerger?  In the view of the Tribunal, it did not.  It is abundantly clear that Sibneft wanted out of the merger after the arrest of Mr. Khodorkovsky.   It was perfectly understandable for Sibneft to have second thoughts about the merger under the leadership of a CEO who was under arrest and embroiled in controversy.[1038]   The Tribunal does not see the fingerprints of Respondent in Sibneft's decision to insist upon a change in management after the arrest of Mr. Khodorkovsky or in Sibneft's subsequent announcement that it would not proceed with the merger.

888.   The Tribunal therefore concludes that Claimants have not established any basis which would allow them to claim damages based on the assumption that the merged YukosSibneft company would have been successful.[1039]

889.   However, the circumstances of the Yukos−Sibneft merger are instructive in evaluating Yukos' attempts to settle its tax debts with the Russian authorities, which will be discussed in the next chapter.

890.   The Tribunal will now review the attempts by Yukos to settle its tax debts and the reaction of the Russian authorities to Yukos' offers.

---

[1036]   E-mail from Mr. Dmitry Gololobov to Mr. Yuriy Beilin attaching "Scheme of Actions for the Unwinding Transaction," 13 February 2004, Exh. R-3602.

[1037]   *Ibid.*, Flowchart.

[1038]   The Tribunal notes that Sibneft's position was not inconsistent with the spirit of the Shareholders' Agreement, which contained a provision allowing the Sibneft shareholder group to remove any Yukos-appointed senior managers if they committed fraud or embezzlement.  Shareholders' Agreement in respect of Yukos Oil Company among YUL, Hulley, White Pearl Investments Limited, N.P. Gemini Holdings Limited, Marthacello Co. Limited, Kindselia Holdings Limited, Heflinham Holdings Limited and Kravin Investments Limited, 1 May 2003, Article 6.1, Exh. C-1102.

[1039]   *See* Part XII on Quantification of Damages at paragraph 1779.

**E.   ATTEMPTS TO SETTLE**

**1.   Introduction**

891.   In the second half of 2004, Yukos made several proposals to the Russian authorities for the settlement of its tax debts.  None of these proposals was accepted by the Russian Federation, which moved to auction off YNG in December 2004 in spite of Yukos' protests.

892.   This chapter examines the context of Yukos' settlement offers, their content and the Russian Federation's reaction to them, with a view to determining whether the conduct of the Russian Federation was more consistent with the goal of collecting taxes or, as Claimants argue, with the aim of leading Yukos to bankruptcy and appropriating its most valuable assets.

893.   Claimants submit that, through its settlement offers, Yukos sought to initiate a dialogue with the Russian Federation that could lead to Yukos paying its tax debts while "preserv[ing] the company as a going concern."[1040]   However, the settlement offers were met with a "complete lack of responsiveness" and utter inflexibility from the Russian Federation.[1041]   For Claimants, this reaction is "one of the strongest testaments" to the fact that Respondent was not interested in tax collection, but only the destruction of Yukos.[1042]   As put by Claimants' counsel at the Hearing:

> the bottom line is: if the Russian Federation was interested in collecting taxes, it would have responded to Yukos; it would have worked with Yukos to try and find a way for the company to pay its alleged tax debt. . . . And we say that this is consistent and supports the Claimants' conclusion that this was not about paying taxes but was about the expropriation of the company.[1043]

894.   Claimants add that the Russian Federation's real intent with respect to Yukos is also revealed by the fact that it did settle the tax debts of other oil companies, such as Rosneft, Sibneft and TNK-BP.[1044]

895.   Claimants also submit that, in addition to rejecting Yukos' settlement offers, the Russian authorities actively prevented Yukos from discharging its tax liabilities by freezing and seizing

---

[1040]   Theede WS ¶ 9; *see also* Transcript, Day 17 at 126.

[1041]   Reply ¶ 321.

[1042]   Transcript, Day 20 at 216 (Claimants' closing); *see also* Rieger WS ¶ 24.

[1043]   Transcript, Day 17 at 105 (Claimants' closing).

[1044]   Claimants' Skeleton Argument, 1 October 2012 ¶ 26 (hereinafter "Claimants' Skeleton").

Yukos' assets (through the April 2004 injunction of the Moscow Arbitrazh Court and the bailiffs' resolutions of June and July 2004).[1045]  As a result, Yukos could only pay its tax debts from the proceeds of the business operations of its subsidiaries, which did not suffice to meet Yukos' liabilities in the short time allowed by the Russian authorities.[1046]

896.  For its part, Respondent submits that the Russian authorities responded to each of Yukos' offers[1047] and, moreover, were entitled to reject these offers because none of them amounted to a serious proposal.[1048]  From Respondent's perspective, Yukos' settlement offers were a mere posturing exercise intended to give "an appearance of cooperation, while fostering the image— embellished by their public relations machines—that Yukos was a victim of the authorities' conduct."[1049]  Yukos' offers were "invariably unacceptable, either because they were contrary to Russian law, or because they involved impaired assets, or because they were otherwise inadequate."[1050]

897.  Respondent further submits that, by the second half of 2004, "Yukos' management faced a serious credibility problem, among other things because it had made manifestly false claims that it was unable to pay any of its tax bills."[1051]  Given Yukos' bad faith, the Russian authorities' refusal to negotiate was reasonable.[1052]  Respondent concludes that Yukos caused its own demise by failing to pay its tax debts in full in the first quarter of 2004 (instead making disingenuous and inadequate settlement proposals), thereby attracting mounting interest and fines.[1053]

898.  The Tribunal recalls that the *Quasar* tribunal found that the Russian Federation's failure "even to respond" to the offers made by Yukos, "the largest private taxpayer in Russia" and a major

---

[1045]  Memorial ¶ 351.

[1046]  *Ibid.* ¶¶ 351, 353.

[1047]  Respondent's Closing Slides, p. 895; *see also* Rejoinder ¶ 893.

[1048]  Counter-Memorial ¶ 419.

[1049]  Rejoinder ¶ 897.

[1050]  Counter-Memorial ¶ 419; *see also* Rejoinder ¶ 893.

[1051]  Counter-Memorial ¶ 418.

[1052]  Respondent's Closing Slides, pp. 804–806.

[1053]  Respondent's Post-Hearing Brief ¶¶ 220–21.

force of the national economy, raised "significant doubts as to whether the Respondent acted in good faith in attempting to resolve its tax dispute with Yukos."[1054]

### 2.    Yukos' Settlement Offers (and the Russian Federation's Replies)

899.   To place the settlement offers in context, it is helpful to recall the dates of some key events.[1055]

900.   The 2000 Audit Report, the first audit report to assess tax arrears against Yukos, was issued on 29 December 2003.[1056]   The 2000 Decision holding Yukos fiscally liable for a tax offense and concluding that an amount of approximately USD 3.48 billion was due within two days, was issued on 14 April 2004.[1057]

901.   On 15 April 2004, the Moscow Arbitrazh Court, upon application by the Tax Ministry, issued the 2004 Injunction prohibiting Yukos "from alienation and encumbrance in any way of its assets, including shares (including prohibition from the transfer of securities to a nominee holder and in trust management), interests in the charter capital of other legal entities, securities, excluding main types of products manufactured by [it]."[1058]

902.   In a decision dated 23 June 2004 and published on 30 June 2004, the Appeal Panel of the Moscow Arbitrazh Court reversed a 19 May 2004 ruling that had provisionally suspended the effect of the 2000 Decision.[1059]

903.   On 29 June 2004, an appeal resolution of the Moscow Arbitrazh Court upheld a first instance decision allowing the Tax Ministry to collect "tax arrears, interest, and fines" from Yukos in an amount of USD 3.42 billion.[1060]   On 30 June 2004, the Moscow Arbitrazh Court issued an enforcement writ for this amount.[1061]

---

[1054]   *Quasar* ¶ 102, Exh. R-3383.

[1055]   For a complete narrative, *see* Chapter VIII.B of this Award.

[1056]   2000 Audit Report, Exh. C-103.

[1057]   2000 Decision, Exh. C-104.

[1058]   April 2004 Injunction, Exh. C-108.

[1059]   Decision of Judge Cheburashkina to Suspend the Effect of Decision No. 14-3-05/1609-1 of 14 April 2004, Exh. C-112; Moscow Arbitrazh Court, Appeal Resolution in the name of the Russian Federation, 23 June 2004, Exh. C-120.

[1060]   Decision of the Moscow Arbitrazh Court, 26 May 2004, Exh. C-116; Moscow Arbitrazh Court, Appeal Resolution, 29 June 2004, Exh. C-121.

[1061]   Enforcement Writ No. 383729, 30 June 2004, Exh. C-122.

904.    On the same day, Bailiff Solovyova issued a resolution to initiate an enforcement proceeding. The resolution granted Yukos a 5-day period for voluntary payment of the full amount due, failing which the Bailiff would consider imposing a 7 percent enforcement fee.[1062]  The Bailiff then issued several more resolutions, freezing cash in 16 Yukos bank accounts.[1063]

905.    The 2001 Tax Audit, assessing USD 4.1 billion in taxes, interest and fines against Yukos, was released on 30 June 2004.[1064]

906.    During July 2004, Bailiffs Solovyova and Borisov issued further resolutions restricting Yukos' access to its assets and imposing the collection of a 7 percent enforcement fee.[1065]

907.    On 9 July 2004, the Chukotka Arbitrazh Court issued interim measure orders in proceedings between former shareholders of Sibneft and Yukos, attaching 72 percent of Sibneft's share capital and thus shrinking Yukos' alienable stake in Sibneft to 20 percent minus one share (the "**Chukotka Injunctions**").[1066]

908.    On 6 July 2004, Yukos began making cash payments against its tax debts from the proceeds of the business operations of its subsidiaries.[1067]  By 16 November 2004, Yukos had paid USD 3.47 billion—a little more than the amount of its tax liability for the year 2000.[1068]

909.    However, Yukos' tax liabilities increased with the 2001 Decision, the 2002 Decision and the 2003 Decision, which were issued on 2 September, 16 November and 6 December 2004, respectively, and required payment by Yukos of tax arrears, fines and interest in the amounts of USD 4.1, 6.7 and 6 billion.[1069]

910.    YNG was auctioned on 19 December 2004.[1070]

---

[1062]    Resolution of the bailiff to initiate enforcement proceeding 10249/21/04, 30 June 2004, Exh. C-123.

[1063]    Resolutions of the bailiffs to seize monies, 30 June 2004, Exh. C-124.

[1064]    Repeat Field Tax Audit Report No. 30-3-14/1 (2001), 30 June 2004, Exh. R-345.

[1065]    Resolution to restrict the rights of the securities owner, 1 July 2004, Exh. C-125; Resolution No. 10249/21/04 to Collect an Enforcement Fee, 9 July 2004, Exh. C-132.

[1066]    Rulings of the Arbitrazh Court of the Chukotka Autonomous District, Case No. A80- 141/2004, 9 July 2004, Exh. R-553.

[1067]    Reply ¶ 320, referring to Exhs. C-212 to C-238.

[1068]    Memorial ¶ 358, referring to Exh. C-234.

[1069]    2001 Decision, Exh. C-155; 2002 Decision, Exh. C-175; 2003 Decision, Exh. C-190.

[1070]    Protocol of the results of the auction to sell shares in OAO Yuganskneftegaz, 19 December 2004, Exh. C-290.

911. Between 29–30 June 2004—when one appeals decision lifted the provisional suspension of the effect of the 2000 Decision and another confirmed the Tax Ministry's USD 3.42 billion claim against Yukos—and December 2004—when the YNG auction took place—Yukos made several proposals to the Russian authorities to settle its tax debts. These proposals may be classified in four categories: (a) proposals made to the bailiffs, requesting enforcement against specific assets; (b) proposals for a global settlement conveyed by the Right Honourable Jean Chrétien, PC, OM, CC, QC, former Prime Minister of Canada; (c) requests for a deferral or payment in instalments; and (d) other proposals (which are not in the documentary record in this arbitration). The Rehabilitation Plan, proposed by Yukos' management in the bankruptcy proceedings and discussed in greater detail in Chapter VIII.G of this Award, can be seen as Yukos' final attempt to discharge its tax liabilities while continuing as a going concern.

### (a)   Proposals Made to the Bailiffs

912. On 2 July 2004, Mr. Gololobov, Yukos' legal counsel, wrote to Bailiff Solovyeva, explaining that the April 2004 Injunction and the Bailiff's 30 June 2004 seizure of 16 Yukos bank accounts prevented Yukos from voluntarily complying with the 30 June 2004 enforcement resolution and requesting that Bailiff Solovyeva accept, by way of voluntary enforcement, the transfer of a 34.5 percent stake in Sibneft, corresponding to the 20 percent minus one share stake obtained by Yukos under the Share Purchase Agreement plus the 14.5 percent stake obtained by Yukos as the second tranche under the Share Exchange Agreement.[1071] Mr. Gololobov's letter stated that the value of the 34.5 percent stake in Sibneft was approximately USD 4 billion.

913. On 9 July 2004, Mr. Gololobov again requested Bailiff Solovyeva to accept Yukos' 34.5 percent stake in Sibneft in payment of Yukos' tax debts.[1072] Respondent has described this request dated 13 July 2004 as being "in clear violation of the Chukotka [I]njunctions."[1073] However, Claimants correctly point out that, while 13 July 2004 may have been the date when the letter was received by the Bailiff, the letter itself is dated 9 July 2004.[1074]

---

[1071]   Petition for voluntary enforcement of the Resolution of 30 June 2004 to initiate enforcement proceedings and the Demand of 30 June 2004, 2 July 2004, Exh. C-126.

[1072]   Application on the procedure of performance of the Resolution on commencement of enforcement proceedings dated 30 June 2004 and the Demand dated 3 June 2004, 9 July 2004, Exh. R-554.

[1073]   Counter-Memorial ¶ 425.

[1074]   Reply ¶ 328 n.630.

914.   On 14 July 2004, Mr. Gololobov amended Yukos' previous requests and lowered the offer to a 20 percent minus one share stake in Sibneft ostensibly to take account of the Chukotka Injunctions dated 9 July 2004.[1075]  Mr. Gololobov indicated that the 20 percent minus one share stake in Sibneft was worth between USD 2.3 and 2.5 billion.[1076]

915.   On 6 August 2004, Mr. Gololobov wrote to Chief Bailiff Melnikov, requesting that the 20 percent minus one share stake in Sibneft, as well as Yukos' holdings in 15 other companies with a purported value of approximately USD 1.1 billion, be used for enforcement purposes as a matter of priority.[1077]   The letter incorrectly stated that the 20 percent stake comprised 1,637,633,048 shares (a number that in fact corresponds to a 34.5 percent stake), prompting Respondent to argue that Yukos sought to conceal from the bailiffs that at least a 14.5 percent stake in Sibneft was encumbered pursuant to the Chukotka Injunctions.[1078]   The letter also stated that the total value of the assets offered in payment was USD 3.4 billion.[1079]   But, the annex to the letter valued the shareholdings in Sibneft at USD 2.351 billion, which corresponds to the value of a 20 percent minus one share stake (as stated in Yukos' letter of 14 July 2004), and all the assets offered at USD 3.4 billion.[1080]   It is obvious that the letter contained some errors, which could have been corrected by the bailiffs by comparing it to its annex and the letter of 14 July 2004.

916.   On 16 September, 24 November and 16 December 2004, Yukos wrote further letters to the bailiffs (in response to the issuance of the 2001, 2002 and 2003 Decisions),[1081] again proposing that enforcement be made as a matter of priority against its stake in Sibneft and 15 other entities.[1082]   These proposals did not specify the number or percentage of Sibneft shares that Yukos was offering, but the total value of the assets offered in each case was said to be USD 3.407 billion.   This figure is identical to the total amount of assets referred to in the annex

---

[1075]   Addendum to petition regarding the process of enforcement of the Resolution of June 30, 2004 to initiate enforcement proceedings and the Demand of June 30, 2004, 14 July 2004, Exh. C-137.

[1076]   *Ibid.*

[1077]   Letter from Mr. Gololobov to Chief Bailiff A.T. Melnikov, 6 August 2004, Exh. C-140.

[1078]   Counter-Memorial ¶ 427, n.636.

[1079]   Letter from Mr. Gololobov to Chief Bailiff A.T. Melnikov, 6 August 2004, Exh. C-140.

[1080]   *Ibid.*

[1081]   Memorial ¶¶ 354, 356.

[1082]   Petition for voluntary enforcement of Resolution of 09.09.2004 to initiate an enforcement proceeding and Demand of 30.06.2004, 16 September 2004, Exh. C-163; Petition for voluntary enforcement of Resolution 19 November 2004 to initiate an enforcement proceeding, 24 November 2004, Exh. C-180; Petition for voluntary enforcement of the Resolution of 09.12.2004 to initiate an enforcement proceeding, 16 December 2004, Exh. C-195.

to the 6 August 2004 letter, and it appears to have been calculated on the basis of a 20 percent minus one share stake in Sibneft.[1083]

917.   The bailiffs did not respond to the proposals made by Mr. Gololobov in July 2004.  Yukos challenged the bailiffs' silence before the Moscow Arbitrazh Court, which found, in a decision dated 17 August 2004, that the bailiffs had acted lawfully because both the 14.5 percent stake in Sibneft, which was attached pursuant to the Chukotka Injunctions, and the remaining 20 percent minus one share stake in Sibneft, were disputed by Sibneft's former shareholders.[1084]

918.   The Department of Bailiffs within the Russian Ministry of Justice responded to Yukos' 6 August 2004 letter on 9 September 2004, referring in particular to the decision of the Moscow Arbitrazh Court of 17 August 2004 and concluding that the Russian judiciary had "affirmed the right of the bailiff to make the final decision regarding the sequence for seizures."[1085]

919.   The bailiffs did not respond to Yukos' letters of 16 September, 24 November and 16 December 2004.  Respondent submits that the bailiffs did not need to respond as, by then, Yukos had already been put on notice by the 17 July 2004 decision of the Moscow Arbitrazh Court that its offers of Sibneft shares were unacceptable.[1086]  The Tribunal notes, however, that the bailiffs also failed to react to Yukos' offer of shares in companies other than Sibneft, in respect of which the Moscow Arbitrazh Court had not commented.

(b)   Proposals for a Global Settlement Conveyed by Mr. Chrétien

920.   Mr. Chrétien wrote to Prime Minister Fradkov on behalf of Yukos for the first time on 6 July 2004, offering a "global settlement" of USD 8 billion for the taxes assessed against Yukos in 2000–2003, with 2 billion to be paid in cash in July 2004 and two more tranches to be paid in

---

[1083]   With respect to the Sibneft shares, in addition to the proposals listed here, Yukos also applied on 22 April 2004 to the Moscow Arbitrazh Court for a replacement of the April 2004 Injunction with a new injunction that would instead freeze Yukos' 57.5 percent stake in Sibneft (see Exhs. R-476 and R-477).  Yukos' application was rejected the following day (Exh. R-452).  Respondent discussed this application in the context of Yukos' settlement offers (Counter-Memorial ¶ 420).  However, since the purpose of the application was the unfreezing of Yukos' assets in the context of interim measures ordered against it, rather than a final settlement of the tax claims, the Tribunal considers that this application cannot properly be characterized as a settlement proposal.

[1084]   Decision of the Moscow Arbitrazh Court, 17 August 2004, Exh. C-143.

[1085]   Letter from Mr. Sazanov, Deputy Head of the Bailiffs Department to Mr. Gololobov, 9 September 2004, Exh. C-146. See also Memorial ¶ 350.

[1086]   Rejoinder ¶ 893(c).

July 2005 and July 2006.[1087]   As security for the payment of the July 2005 tranche, Yukos offered its 35 percent stake in Sibneft.[1088]

921.   Having received no reply, Mr. Chrétien reiterated the global settlement proposal in another letter to Prime Minister Fradkov dated 15 July 2004 and in letters addressed to President Putin dated 30 July, 10 September and 17 November 2004.[1089]

922.   Noting that Mr. Chrétien's letter of 30 July 2004 offered an "uncontested" 35 percent stake in Sibneft as collateral, Respondent again argues that Yukos sought to conceal from Respondent that at that time at least a 14.5 percent stake in Sibneft was encumbered pursuant to the Chukotka Injunctions.   However, as Mr. Chrétien's letter in this respect contradicted Mr. Gololobov's letter to the bailiffs of 14 July 2004, the Tribunal views the reference to the uncontested stake in Sibneft as a mistake rather than a deliberate attempt by Yukos to mislead the Russian authorities.

923.   Referring to Mr. Chrétien's letters of 30 July 2004 and 17 November 2004, Respondent submits that, while Prime Minister Fradkov and President Putin did not respond to Mr. Chrétien in writing, they did discuss with him the tax claims against Yukos.[1090]

924.   In his letter of 30 July 2004, Mr. Chrétien refers to a discussion with President Putin during a "meeting in July."[1091]   In his letter of 17 November 2004, he describes a meeting with President Putin as follows:

> [w]hen we last met in Moscow, you told me that I could take the mandate to represent the interests of Group Menatep, and possibly other minority shareholders of Yukos, to find a solution to the tax problems confronting them. . . . When you and I last spoke after our meeting, you asked for a letter outlining our proposal to settle this matter and you assured me that a response from the Minister responsible for this file would be forthcoming.  I sent you the letter at the end of July, but have received no communications from your government as yet.[1092]

---

[1087]   Letters from Jean Chrétien to Prime Minister Fradkov of 6 and 15 July 2004, and to President Putin of 30 July 2004, 10 September 2004 and 17 November 2004, Exh. C-129 (hereinafter "Chrétien letters").

[1088]   *Ibid*.

[1089]   *Ibid*.

[1090]   Respondent's Closing Slides, pp. 302, 324.

[1091]   Chrétien letters, Exh. C-129.

[1092]   *Ibid*.

925. From these excerpts, it appears that President Putin initially encouraged the overture of a dialogue regarding Yukos' tax liability, but that neither he nor any other Russian authority ever responded to the concrete proposal made by Mr. Chrétien on Yukos' behalf.

926. Under cross-examination at the Hearing, Mr. Theede expressed Yukos' frustration with the lack of response from the Russian Federation:

> By this time it was really becoming obvious that Mr. Chrétien's, you know, admirable efforts just weren't going to get us where we needed to go, because he had been made—a lot of promises had been made to him about 'All I want Yukos to do is pay taxes, you know? That's all I want out of them: I just want them to pay taxes.  And if you can get them to do that, then send me a proposal and it will work.'

> And he did all that, and never got a response.  And it's now several months after the original proposal.  I suppose—I suppose, you know, no question in my mind—the authorities probably already by July had in mind the amount of money that they were going to rack up against us in tax liabilities.  They probably knew that they were going for something in the order of \$30 billion, and so to them the \$8 billion was low.  And of course, they couldn't come back and say, 'Look, our plan is to tax you \$30 billion, and so you guys are well off the mark.' They couldn't say that, because it would have blown their cover.

> But we were trying, and thought Mr Chrétien was a very credible way to open the dialogue I've been talking about all afternoon.  But by this time, I don't—I had pretty much lost hope, and was, I guess, impressed that Mr Chrétien was continuing to try, but to no avail.[1093]

### (c)      Requests for a Deferral or Payment in Instalments

927. On 16 July 2004, Mr. Steven Theede sent a letter signed by Mr. Bruce Misamore to the Minister of Finance, Mr. Kudrin, then Minister of Finance, requesting a six-month deferral or payment in instalments of the tax arrears and interest for the year 2000.[1094]  The letter referred to the "unprecedented nature" of the sum subject to collection and the potentially negative consequences of rapid enforcement on Yukos' production operations and the Russian budget.[1095]  During the Hearing, Mr. Theede acknowledged that the letter was not perfect (the proposals were not detailed) but he described the letter as an attempt to "create a dialogue" between Yukos and the Russian Federation.[1096]  The Ministry of Finance rejected Mr. Theede's request by letter dated 30 August 2004, relying on Art. 62(1)(2) of the Russian Tax Code,

---

[1093]   Transcript, Day 10 at 100–101.

[1094]   Petition for deferral or payment in instalments, 16 July 2004, Exh. C-138.

[1095]   *Ibid.*

[1096]   Transcript, Day 10 at 54.

which provides that the term for the payment of tax cannot be changed if the entity applying for such a change is the subject of proceedings for a tax offence.[1097]

928. On 12 August 2004, Yukos petitioned the Moscow Arbitrazh Court for the right to pay its tax debt for the year 2000 in 15 monthly instalments of USD 143.96 million.  Judge Grechishkin denied the petition, stating that while he had discretion under the law to order payment in instalments, in this case the circumstances did not justify such an order.[1098]

### (d)   Other Proposals

929. Claimants submit that the settlement offers described above are "just a sample" of the "roughly 80 proposals and attempts to communicate with various authorities" made by Yukos.[1099]  They say that other settlement proposals were made, but did not leave a paper trail.

930. For example, Mr. Rieger recounts in his witness statement that, in the summer of 2004, he and Mr. Gololobov had a meeting with Chief Bailiff Belyakov during which they "explained that Yukos could start selling off its assets within a month in order to pay off its alleged tax debts" and "left a two-page letter for the Russian authorities setting out Yukos' settlement proposal." Mr. Rieger adds that the authorities did not respond to this proposal.[1100]  Noting that Mr. Rieger could not recall the exact terms of the proposal, Respondent suggests that, in the light of the timing, there is no reason to believe that the proposal differed from that made in Mr. Golobolov's 6 August 2004 letter (described in paragraph 915 above).[1101]

931. In their respective witness statements, Messrs. Theede and Misamore also recount that, in October 2004, "the company put everything it could into a last settlement effort" and presented to the Russian authorities a USD 21 billion settlement proposal that included Yukos shares, Sibneft shares, non-core assets and "a concession to re-elect a new board of directors that would include a number of people selected by the Government."[1102]  While Yukos was initially

---

[1097]   Letter from the Tax Ministry to Yukos, 30 August 2004, Exh. C-145, referring to Russian Tax Code, Article 62, Exh. R-557.

[1098]   Ruling of the Moscow Arbitrazh Court, 12 August 2004, Exh. C-142.

[1099]   Transcript, Day 17 at 105 (Claimants' closing), referring to Theede WS ¶ 9.

[1100]   Rieger WS ¶¶ 21–23.

[1101]   Respondent's Closing Slides, p. 319, referring to Transcript, Day 6 at 130 (cross-examination of Mr. Rieger).

[1102]   Misamore WS ¶ 47; Theede WS ¶ 21.

"cautiously optimistic", the negotiations ended abruptly when Mr. Temerko, Yukos' chief negotiator in the process, was threatened with arrest and fled Russia. [1103]

932.   Respondent emphasizes that there is no written record of this proposal and no witness statement by Mr. Temerko. Respondent also contends that "[i]f there were such a proposal in any amount, there is no rational basis for believing it totalled US $21 billion, because after it was allegedly made in October 2004, Yukos continued to make proposals it valued at US$ 3.4 billion, and Mr. Chrétien kept reiterating his 'global settlement' proposal of US$ 8 billion."[1104]

933.   When asked in cross-examination whether there was a record of this offer, Mr. Theede replied "[y]ou have no record, but you do have my word.  And I believe certainly Bruce Misamore and I have exactly the same recollection."[1105]  Mr. Misamore was not cross-examined regarding this settlement proposal.

### 3.   Parties' Arguments and Tribunal's Observations

#### (a)   Did Yukos Contribute to its Own Demise by Failing to Discharge Tax Debt in the Amount of USD 9 Billion in the First Quarter of 2004?

934.   As discussed in paragraphs 679–80 and 745–48 above, Respondent submits that Yukos could have avoided some of the taxes, fines and interest eventually assessed against it, in the first quarter of 2004, by filing amended VAT returns in its own name, amended tax returns for 2000–2002 and a tax return for 2003 recognizing all of Yukos' income without assigning it to its trading entities.  According to Respondent, had Yukos taken these steps, it would have faced only USD 9 billion in unavoidable tax debt, comprising the full amount assessed against it for the year 2000 and the amounts assessed against it for 2001–2003 minus VAT, willful and repeat offender fines and a part of the default interest accrued on the taxes for those years.[1106]

935.   Respondent also contends that Yukos could have paid this amount—USD 9 billion—in the first quarter of 2004.  At that time, Respondent argues, Yukos had both the ability to calculate its tax liabilities for 2001–2003 based on the amounts assessed against it for the year 2000 and

---

[1103]   Theede WS ¶¶ 22–23; Misamore WS ¶ 48.

[1104]   Respondent's Post-Hearing Brief ¶ 102(iii).

[1105]   Transcript, Day 10 at 75.

[1106]   Respondent's Closing Slides, p. 228.

sufficient funds.[1107]  Specifically, Respondent submits that Yukos had "unrestricted access" to: (a) over USD 6.8 billion in cash, constituting revenue from Yukos' trading entities paid out in dividends to Brittany Ltd., a British Virgin Islands indirect subsidiary of Yukos;[1108] (b) USD 3 billion in cash, which Yukos was entitled to receive in the context of the unwinding of the Sibneft merger for the 20 percent minus one share stake it had acquired under the Share Purchase Agreement;[1109] (c) over USD 1.1 billion in cash generated by Yukos' continuing operations;[1110] (d) the USD 2 billion "giga-dividend" Yukos paid out to its shareholders in December 2003 and January 2004;[1111] and (e) at least USD 1.55 billion in offshore non-monetary assets.[1112]  Respondent also points out that, until the April 2004 Injunction, all of Yukos' assets in Russia were available to it to pay its tax debts.[1113]

936.  Respondent submits that, by re-filing its VAT and tax returns and paying USD 9 billion in the first quarter of 2004, Yukos could have avoided the 7 percent enforcement fee imposed by the bailiffs and "all of the enforcement measures about which Claimants complain, including the April 14, 2004 injunction, the June 30, 2003 cash freeze orders, the seizures of shares, and the YNG auction."[1114]  Yukos would thus "have survived as a going concern and still could have pursued a claim for a refund of any amounts the courts found it did not need to pay."[1115]

937.  Respondent insists that, as Mr Konnov stated in his second expert report, "[t]he filing of tax returns and the payment of the tax would not have prejudiced Yukos' appeal rights."[1116]  According to Respondent, Mr Konnov's opinion is confirmed by Yukos' counsel Mr Pepeliaev who, in a commentary published in 2002, wrote:

[1107]  Respondent's Closing Slides, p. 247, referring to Exh. C-1756.

[1108]  Respondent's Post-Hearing Brief ¶ 79, n.199; Rejoinder ¶¶ 838–41.  For a description of Brittany's place in the Yukos corporate structure and revenue flow structure see Supplemental Expert Report of Thomas Z. Lys, 15 August 2012, ¶¶ 105, 114, 130–37 and Appendix I.

[1109]  Respondent's Post-Hearing Brief ¶ 79, n.199; Rejoinder ¶ 842.

[1110]  Ibid.; Rejoinder ¶¶ 843–44.

[1111]  Ibid.; Rejoinder ¶ 845.

[1112]  Ibid.; Counter-Memorial ¶ 372, n.500.

[1113]  Respondent's Closing Slides, p. 267.

[1114]  Rejoinder ¶ 834.  Respondent adds that even if Yukos had waited until after the 2000 Decision was issued in April 2004, it could have avoided all enforcement measures by paying only USD 10.8 billion (Respondent's Post-Hearing Brief ¶ 84).

[1115]  Respondent's Post-Hearing Brief ¶ 250.

[1116]  Respondent's Closing Slides, p. 248, referring to Second Konnov Report ¶ 104.

> We often recommend for the sake of a client's safety to pay tax for a short period (a month) in a maximum amount which can possibly be inferred from interpretation of the relevant provision. And immediately thereafter we file an application to the tax inspectorate requesting a refund or offset of an overpaid amount. It basically reads, 'Hey! We used to interpret this norm this way but our consultants tell us that we overpaid tax, so please refund it.' Of course, the inspectorate refuses to refund implying that we paid correctly – the more the better. Then a court claim is filed and it is up to court to decide. As a result a precedent is established.[1117]

938.  However, Respondent submits, despite this possibility to discharge the totality of its tax debt at an early stage for a fraction of the amounts eventually assessed against it, Yukos "failed to use the time and its resources to pay its tax debt," its managers choosing to "ignore that payment was due as provided in the assessment, not months later."[1118]  Instead, Yukos only started making payments and considering a payment plan in July 2004.[1119]

939.  Respondent submits that, in the light of Yukos' conduct, the Russian authorities were entitled to view Yukos' settlement offers with "caution and scepticism".[1120]  In addition, by the time of the first settlement offers, Yukos' untrustworthiness had become manifest in other ways, particularly when Yukos: (a) accused the Russian authorities of running a "tax racket"; (b) denied affiliation with, or the ability to get information about, its trading entities; (c) asked that the April 2004 Injunction be substituted with an injunction against already-encumbered Sibneft shares; and (d) engaged in serial corporate dissolution to frustrate tax collection.[1121]

940.  Respondent concludes that the destruction of Yukos is therefore "the consequence of the contributory fault and failure to mitigate of Yukos, under the control of Claimants."[1122]

941.  Claimants reject the argument that they could have avoided enforcement of the tax assessments by the Russian Federation and the bankruptcy of Yukos by paying USD 9 billion in the first quarter of 2004, asserting that, to be convinced by this argument, "the Tribunal would need to ignore the most salient facts—the Respondent's breaches—and assume . . . that the very same Russian authorities who committed those breaches would have acted differently if only Yukos had taken the actions specified by the Respondent."[1123]  Claimants argue that there is no "duty

---

[1117]  Rejoinder ¶ 849, referring to S.G. Pepeliaev, *Tax Law Should Be Understandable*, Raschet, No. 4, 2002, Exh. R-3287.

[1118]  Respondent's Closing Slides, p. 292.

[1119]  *Ibid.*, pp. 264–65, referring to Transcript, Day 10 at 21 (cross-examination of Mr. Theede).

[1120]  Transcript, Day 18 at 265.

[1121]  Transcript, Day 18 at 265.

[1122]  Respondent's Post-Hearing Brief ¶ 250.

[1123]  Claimants' Post-Hearing Brief ¶ 276.

to appease" and that "a victim of extortion is not to blame if the threats against it are carried out after it refuses to pay."[1124]

942.    In addition, Claimants are of the view that taking the steps suggested by Respondent would have prejudiced Yukos' position for subsequent litigation.[1125]    As Mr. Theede stated at the Hearing, "you don't run a business by talking about paying taxes until they become an official tax."[1126]

943.    Moreover, Claimants submit that, as a matter of fact, Yukos "did everything it could to pay off the tax assessments as soon as they became due."[1127]    The obligation to pay arose on 16 April 2004,[1128] and Yukos made its first payment shortly thereafter on 6 July 2004.    However, contrary to Respondent's contention, Yukos did not have enough cash available to settle an alleged tax debt of USD 9 billion in the first quarter of 2004.    Mr. Theede explained at the Hearing that the USD 6.8 billion on the balance sheet of Brittany Ltd. "were basically loans of cash that had already been repatriated into Russia to fund our capital programs and operating expenses and so forth" and thus represented a "zero-sum" game.[1129]    The offer by the former Sibneft shareholders to buy back the 20 percent minus one share stake in Sibneft that Yukos had acquired pursuant to the Share Purchase Agreement for USD 3 billion was only made in October 2004 (and was rejected because it significantly undervalued the shares).[1130]    The 2 billion dividend could not be reversed and the sale of Yukos' offshore assets would have taken longer than three months to realize.[1131]    As for Yukos' assets in Russia, Yukos was prevented from using them by the April 2004 Injunction, which was "grossly disproportionate" to the debt it was intended to secure, and subsequent seizures.[1132]

944.    Thus, according to Claimants, by adding the "wide-ranging freeze and seizures" of the company's non-cash assets to the "massive payment demands" and "impossibly short

---

[1124]   *Ibid.* ¶ 275.

[1125]   *Ibid.* ¶¶ 280–281.

[1126]   Transcript, Day 10 at 21.

[1127]   Claimants' Post-Hearing Brief ¶ 83.

[1128]   Transcript, Day 20 at 112–13.

[1129]   Transcript, Day 11 at 41–42.

[1130]   Claimants' Post-Hearing Brief ¶ 291.

[1131]   *Ibid.*

[1132]   *Ibid.* ¶¶ 85–86, 91.

deadlines," the Russian Federation itself "engineer[ed] the circumstances of non-payment."[1133]
In the circumstances, "it was evident that Yukos would not be able [to] settle its alleged tax
debts or discharge them in full without the cooperation of the Russian authorities."[1134]

945.   In the Tribunal's view, Yukos cannot be held responsible (even in part) for the rejection of its
settlement offers and the enforcement measures subsequently taken by the Russian Federation
merely because it did not pay USD 9 billion in the first quarter of 2004.   Although the 2000
Audit Report was issued at the end of 2003, Yukos' obligation to pay its tax debt for the year
2000 did not arise until the 2000 Decision was issued in April 2004.   Similarly, Yukos'
obligation to pay its tax debts for 2001–2003 arose only with the issuance of the 2001, 2002
and 2003 Decisions in September–December 2004.   Although some of the amounts that became
due under these decisions could have been estimated based on the findings set out in the 2000
Audit Report, the Tribunal does not see why Yukos, at a time when it considered the tax
assessments to be ill-founded, should have made any payments before a legal obligation to pay
the tax arose.   The Tribunal notes that Yukos began making payments toward its tax debts on
6 July 2004, less than a week after the issuance of the appeals decisions in its challenge
proceedings against the 2000 Decision and the enforcement proceedings initiated by the
Russian Federation.   In the circumstances, the Tribunal does not consider it unreasonable for
Yukos to have delayed payment of its tax debts until these decisions were issued.

### (b)   Did Yukos' Settlement Offers Constitute Real Alternatives to Enforcement?

946.   Respondent invokes several reasons why Yukos' settlement offers could not be accepted by the
Russian Federation, all of which are disputed by Claimants.   Principally, the Parties disagree as
to whether (i) all the Sibneft shares were either encumbered or disputed; (ii) Yukos sought to
enter into negotiations that are not permissible under Russian law; and (iii) Russian law permits
payment in kind of tax arrears.

947.   For Respondent, because of the flaws in Yukos' offers, the Russian authorities were justified in
doubting the sincerity of Yukos' intention to pay.   This justified distrust explains why the
Russian authorities did not respond to each one of Yukos' offers (although, according to
Respondent, they did respond to all the sound offers).

---

[1133]   *Ibid.* ¶ 88.

[1134]   *Ibid.* ¶ 84.

948.  Disputing that Yukos' offers suffered from any insurmountable defects, Claimants repeat that it was Yukos' genuine intention to commence a dialogue with the Russian Federation aimed at finding a workable solution to pay off its tax debts.

949.  In this section, the Tribunal first addresses the specific areas of disagreement between the Parties and then makes some general observations regarding Yukos' settlement offers and the Russian Federation's responses.

### i.  Whether all the Sibneft Shares were Either Encumbered or Disputed

950.  Respondent submits that the Sibneft shares could not be accepted in payment of Yukos' tax debts because Yukos' ownership of these shares was disputed by Sibneft's former shareholders.[1135]  This defect, says Respondent, affected all the offers made to the bailiffs, all the offers conveyed by Mr. Chrétien to Prime Minister Fradkov and President Putin, as well as the USD 21 billion settlement proposal allegedly made by Yukos in October 2004.

951.  Claimants recognize that Yukos' ownership of the 14.5 percent stake in Sibneft corresponding to the second tranche under the Share Exchange Agreement was challenged by Nimegan Trading Limited before the Chukotka Arbitrazh Court in proceedings initiated on 6 July 2004 and that those shares were attached by the Chukotka Injunctions of 9 July 2004, pending resolution of the merits of the dispute.  Claimants assert, however, that the 20 percent minus one share stake in Sibneft acquired by Yukos under the Share Purchase Agreement was never encumbered or challenged in any legal proceeding.[1136]

952.  As explained in paragraphs 2–915 and 922 above, the Tribunal considers that, although Yukos initially offered a 34.5 percent stake in Sibneft in payment of its tax debts to the bailiffs, after the Chukotka Injunctions it sought only to offer in payment the 20 percent minus one share stake in Sibneft that was not the object of the Injunctions.

953.  As for this 20 percent stake, the Tribunal notes that a number of Sibneft's original shareholders wrote to the Russian authorities in July and August 2004, opposing Yukos' proposals to use Sibneft shares to settle its tax debts, since the shares' ownership was disputed between them

---

[1135]  Counter-Memorial ¶¶ 420–30; Respondent's Skeleton ¶ 47.

[1136]  Memorial ¶ 229; Claimants' Post-Hearing Brief ¶ 92, referring to Transcript, Day 6 at 95–97, 112, 116 (Mr. Rieger); Transcript, Day 9 at 242–43 (Mr. Misamore); Transcript, Day 9 at 36–39, 44–45, 48–49, 71, 74, 92–93 (Mr. Theede); Day 17 at 106–12 (Claimants' closing).

and Yukos. Thus, on 6 July 2004, these former shareholders wrote to the bailiffs, claiming that "rights to the shares of OAO Sibneft held by OAO NK YUKOS are the subject of the dispute and OAO NK YUKOS is unable to exercise its ownership rights to such shares."[1137] On 13 July 2004, the same former shareholders wrote to the Deputy Minister for Taxes, stating that "OAO NK YUKOS is not entitled to use the whole block of shares in OAO Sibneft held by it for settlements with its creditors, including with respect to tax liabilities."[1138] In a further letter dated 16 August 2004, the former shareholders specifically asserted that the Share Purchase Agreement and the Share Exchange Agreement constituted "a single transaction" and that "all 92 percent of shares in [Sibneft] that were transferred to [Yukos] under both agreements are in dispute."[1139]

954. Despite these allegations, it is clear to the Tribunal that the Share Purchase Agreement was never formally challenged. The 6 July 2004 letter refers to an LCIA proceeding; yet, the only LCIA proceeding related to Sibneft shares that is in the record in this arbitration is LCIA Arbitration No. 4589, in the context of which Yukos sought damages arising out of the purported termination of the Share Exchange Agreement, but made no claim in relation to the Share Purchase Agreement.[1140]

955. In light of these findings, the Tribunal considers the bailiffs' failure to respond in July 2004 to Yukos' settlement offers to be inexcusable. On 2 July 2004, when Yukos first wrote to the bailiffs to request enforcement against its 34.5 percent shareholding in Sibneft, its ownership of these shares had not yet been challenged. The Chukotka court proceedings (challenging the transfer of the 14.5 percent stake) were commenced four days later, on 6 July 2004. This was also the date on which the former Sibneft shareholders, for the first time, wrote to the bailiffs claiming that Yukos was "unable to exercise its ownership rights" to the Sibneft shares. For four days, therefore, the bailiffs had no reason to believe that ownership of these shares by

---

[1137]   Application of White Pearl Investments Limited, Kindselia Holdings Limited, Heflinham Holdings Limited, Marthacello Co. Limited and N.P. Gemini Holdings Limited to the Chief Bailiff of the First Interdistrict Department of the Bailiff Service for the Central Administrative District of Moscow, 6 July 2004, Exh. R-552.

[1138]   Letter from White Pearl Investments Limited, Kindselia Holdings Limited, Heflinham Holdings Limited, Marthacello Co. Limited and N.P. Gemini Holdings Limited to the Deputy Minister of Taxes and Levies of the Russian Federation, 13July 2004, Exh. R-555.

[1139]   Letter from N.P. Gemini Holdings Limited, Heflinham Holdings Limited, White Pearl Investments Limited, Kindselia Holdings Limited and Marthacello Co. Limited to the Deputy Minister of Taxes and Levies of the Russian Federation, 16 August 2004, Exh. R-559.

[1140]   LCIA Arbitration No. 4589:  *Yukos Oil Company v. Kravin Investments and others*, Statement of Case ¶ 94, Exh. R-3645.

Yukos was disputed.  Yet the bailiffs did not respond to Yukos' offer during that period or at any time thereafter.

956.  In addition, after Yukos, on 14 July 2004, reduced its offer to the 20 percent minus one share holding in Sibneft, the only basis for Respondent's assertion that "the bailiffs had reason to believe that Yukos' title to even this block of proffered shares was in dispute"[1141] were the "warnings" received from the former Sibneft shareholders.  The Tribunal is not persuaded that mere letters to the bailiffs from a third party asserting a claim to an asset held by the debtor (without asserting this claim vis-à-vis the debtor itself) can constitute a sufficient reason for the bailiffs to disregard the debtor's request to use this asset for enforcement purposes.

### ii.   Whether Yukos Sought to Enter into Negotiations that are Not Permissible under Russian Law

957.  According to Respondent, Yukos management believed erroneously that tax assessments provided an opportunity for a "business negotiation" that could end in a "compromise".[1142] Such negotiations, says Respondent, seeking a reduction, deferral or payment in instalments of tax arrears, are not permitted under Russian law.[1143]  Specifically, Respondent contends that, once "a resolution of the highest tax authority or a court judgment has entered into force, the tax authorities and bailiffs cannot reduce the amount of the tax that's due."[1144]  Nor, avers Respondent, can the tax authorities agree to a delay for payment of more than 6 months, or change the term for payment when the entity applying for such a change is the subject of proceedings for a tax offence.[1145]  Moreover, adds Respondent, the Moscow Arbitrazh Court was justified in rejecting Yukos' request for payment in instalments of its tax arrears due to the absence of exceptional circumstances.[1146]

958.  Respondent maintains that a major problem with Yukos' settlement proposals was that the amounts offered were insufficient to cover the tax arrears, fines and interest assessed against

---

[1141]   Counter-Memorial ¶ 426.

[1142]   Respondent's Post-Hearing Brief ¶ 101, referring to Transcript, Day 10 at 7 (cross-examination of Mr. Theede); Transcript, Day 6 at 110–11 (cross-examination of Mr. Rieger).

[1143]   Respondent's Post-Hearing Brief ¶ 101.

[1144]   Transcript, Day 18 at 270; *see also* Respondent's Closing Slides, p. 299.

[1145]   Transcript, Day 18 at 270–71; Respondent's Closing Slides, p. 315.

[1146]   Respondent's Closing Slides, pp. 316–18, referring to Decision of the Moscow Arbitrazh Court, 12 August 2004, Exh. C-142.

Yukos at that time and thus demonstrated that Yukos never intended to pay its tax debts in full.[1147]

959. Respondent contends that, even if it accepted that Yukos' 20 percent minus one shareholding in Sibneft was formally unencumbered, its value was nevertheless uncertain, since Yukos was unable to offer a controlling block of shares and the public controversy with respect to the shares could affect their market value.[1148]   The fact that Yukos did not itself sell the Sibneft shares is also proof of their illiquidity.[1149]   Respondent notes that Yukos' Board, when authorising the sale of the shares in August 2004, expressly acknowledged that "certain terms of the sale of these stakes may differ from the existing market terms because of the need to sell the assets as soon as possible in order to discharge the Company's tax liabilities."[1150]   When the 20 percent minus one shareholding in Sibneft was tendered on 14 July 2004, it was valued by Yukos at USD 2.3 billion, which was insufficient to cover Yukos' liabilities for the year 2000. The value of the Sibneft shares plus the shares in the other 15 companies offered by Yukos in its letters of 16 September, 24 November and 16 December was also insufficient having regard to Yukos' tax debt assessed in the 2001, 2002 and 2003 Decisions.[1151]

960. As for Mr. Chrétien's offer of USD 8 billion to settle the claims for the years 2000–2003, asserts Respondent, it would have covered only about half the amount then assessed against Yukos.[1152]   The USD 21 billion settlement offer allegedly made by Yukos in October 2004 was also insufficient, submits Respondent, since Yukos' tax liabilities for the years 2000–2004 totalled USD 24.2 billion.[1153]

961. Claimants deny that Yukos was asking the authorities for a reduction in the amount of the tax arrears that were due.[1154]   As Mr. Theede testified at the Hearing, Yukos "never tried to make any kind of proposal that was less than the tax that was due . . . we didn't try to negotiate the

---

[1147]   Respondent's Closing Slides, p. 292.

[1148]   Counter-Memorial ¶ 423.

[1149]   Respondent's Closing Slides, pp. 216, 313.

[1150]   Respondent's Closing Slides, p. 295, referring to Minutes No.120–18 of Meeting of Yukos' Board of Directors, 19 August 2004, Exh. C-210.

[1151]   Respondent's Closing Slides, pp. 308–309.

[1152]   Respondent's Closing Slides, p. 296.

[1153]   Rejoinder ¶ 896, n.1425.

[1154]   Transcript, Day 20 at 215; Claimants' Post-Hearing Brief ¶ 93.

amount; we were willing to pay all the taxes back."[1155]  Mr. Theede further observed that Yukos "could never in a million years have anticipated the level of taxes that would ultimately be presented to the company; and fines and VAT."[1156]  Claimants submit that the Russian authorities could have ascertained the sincerity of Yukos' intention if only they had bothered to discuss the settlement offers.[1157]

962.  A dialogue, say Claimants, was necessary given the enormous amounts assessed against Yukos. During the Hearing, when asked by a member of the Tribunal: "when a State assesses taxes and the taxpayer has exhausted administrative and judicial recourse in respect of the assessments, is it normal for the State to enter into a dialogue to negotiate a settlement of the assessments with the taxpayer?," Mr. Theede replied that while he was not "sure what is normal . . . , there was no way that we would have been able to pay the taxes without being able to talk to the authorities and come to some agreement.  We felt like our feet were nailed to the floor and we were being asked to jump.  It was very frustrating."[1158]

963.  Concerning the value of the Sibneft shares, Claimants assert that they were Yukos' most liquid asset.[1159]  Yukos' assessment of the value of its 20 percent minus one shareholding at USD 2.3 billion in its letters to the bailiffs was not exaggerated since, as stated above, in the bankruptcy proceedings in 2006, Gazprom acquired these shares for USD 4.1 billion.[1160]  Under cross-examination at the Hearing, Mr. Theede acknowledged that Yukos did not try to sell the Sibneft shares itself.[1161]  He explained that Yukos did not know what the Russian authorities wanted.  He testified that if the bailiffs had said to Yukos "'[w]e don't want the shares, but we will take the $3 billion.  You can sell the Sibneft stock without any interference,' [Yukos] would have done that in a second."[1162]

964.  Claimants also note that the settlement offers conveyed by Mr. Chrétien in July 2004 were well in excess of the tax debt that had been assessed at that time—USD 3.42 billion for the year

---

[1155]  Transcript, Day 10 at 8–12.
[1156]  *Ibid.* at 9.
[1157]  Claimants' Post-Hearing Brief ¶ 93.
[1158]  Transcript, Day 10 at 40.
[1159]  Claimants' Post-Hearing Brief ¶ 92.
[1160]  *Ibid.*
[1161]  Transcript, Day 11 at 49–50.
[1162]  *Ibid.* at 48.

2000.[1163]  At the Hearing, Mr. Theede explained that the USD 8 billion figure was arrived at by considering the 2000 tax assessment of USD 3.4 billion and scaling it back for subsequent years to account for the shorter period over which interest would be calculated.[1164]  In terms of Yukos' ability to honor the proposal, Mr. Theede confirmed that Yukos would have been in a position to pay the first installment of USD 2 billion in July 2004, and states that, despite the absence of a response from the Tax Ministry, Yukos "did take immediate action to start accumulating the offshore cash … within a day or two of this letter."[1165]  When asked to explain why the settlement offer remained at the level of USD 8 billion in the proposal of 10 September 2004, when the amount of taxes assessed against Yukos (for 2000 and 2001) had reached USD 7.5 billion, Mr. Theede stated as follows:

> [W]hat [the 10 September proposal] is saying is: with what we've already paid, plus the [VAT] that you haven't refunded us, we've nearly paid our 2000 tax arrears.  I think it's important to maybe explain . . . this [VAT], because by the end of the attack that . . . unrefunded [VAT] amounted to nearly [USD] 5 billion of the total assessment against the company.  And what it was is: when you sell oil in Russia, you pay a [VAT] on it; and then, if you export it, you automatically get that [VAT] back.[1166]

965.   And Mr. Theede testified that in October 2004 Yukos made a USD 21 billion offer.  Mr. Theede's evidence on this alleged offer was confirmed by Mr. Misamore.  However, the Tribunal notes that there is no documentary evidence of this offer in the record.

966.   As for Respondent's argument that the amounts and payment modalities of tax arrears cannot be negotiated under Russian law, Claimants submit that it is disingenuous, since the Russian Federation has entered into negotiations and agreed settlements of tax assessments with other Russian and international oil companies such as Sibneft, TNK-BP and Rosneft.[1167]

967.   The Tribunal observes that according to press reports submitted by Claimants Sibneft was able to settle a 1 billion tax arrears claim by paying only 300 million,[1168] while the one billion tax arrears claim against TNK-BP was reduced by "hundreds of million of dollars," after a meeting

---

[1163]   Claimants' Post-Hearing Brief ¶ 92.

[1164]   Transcript, Day 10 at 82–85.

[1165]   *Ibid.* at 89.

[1166]   *Ibid.* at 96.

[1167]   Claimants' Post-Hearing Brief ¶ 93.

[1168]   *Sibneft Pays Off Tax Claim*, The Moscow Times, 19 April 2005, Exh. C-1418; "Sibneft 'settles its tax demand'," BBC News, 18 April 2005, Exh. C-752.

took place between Lord Browne, BP's chief executive, and President Putin.[1169]   As for Rosneft, the Tribunal notes that its financial statements reveal that, after Rosneft purchased YNG, the Russian authorities approved a restructuring plan allowing it to pay the tax arrears that had been assessed against YNG in February and October 2004 in quarterly payments over a period of 5 years starting in March 2008.[1170]

968.   Claimants also affirm that Rosneft received a concession from Respondent in the guise of an 83 percent reduction in the amount of YNG's tax arrears and a corresponding 89 percent reduction in fines.[1171]

969.   Respondent answers that Yukos' case is "totally different" from those of Sibneft or TNK-BP, because there is no evidence that these companies, contrary to Yukos, engaged in "knowing and longstanding tax evasion" and lied to the courts and tax authorities.   From the limited record available in this arbitration in this respect, it does appear as if these companies cooperated with the tax authorities in order to settle the amount due.   Moreover, there is no evidence that the authorities compromised after having reached a final assessment of liability.[1172]   For Respondent, "considering the flagrancy of Yukos' violation, the not[o]riety of its failure to accept responsibility and indeed its efforts to undermine tax enforcement, common sense and straightforward deterrent interest would dictate different results."[1173]

970.   Regarding Rosneft, Respondent explains that, unlike Yukos, it was eligible for a "tax restructuring process" because it had, also unlike Yukos, been designated as a "strategic company" by the Russian Government.   According to Mr. Konnov's first expert report, Article 191 of the *Federal Law on Insolvency* "contemplates a possibility to restructure federal tax debt of certain 'strategic' companies in order to prevent their bankruptcy."[1174]   A list of

---

[1169]   *TNK-BP Tax Bill Slashed by Moscow*, Financial Times, 11 August 2005, Exh. C-762.

[1170]   Rosneft Consolidated Financial Statements as of December 31, 2007 and 2006 and for the years ended 31 December 2007, 2006 and 2005, p. 50, Exh. C-377; Management's Discussion and Analysis of Financial Condition and Results of Operations for the three and nine months ended 30 September 2007 and 2006, p. 38, Exh. C-378.

[1171]   Memorial ¶ 278.

[1172]   Respondent's Closing Slides, p. 326.

[1173]   *Ibid.*, p. 327.

[1174]   First Konnov Report ¶ 91.

"strategic" companies was approved in early 2004, and Rosneft (contrary to Yukos) was eligible for inclusion on the list given its status as a state-owned company.[1175]

971. At the Hearing, counsel for Respondent provided the following explanation as to the requirements for a "strategic" company:

> It was necessary to be State-owned.  It was necessary that one of the ministries request that the company qualify to be a strategic company and to undertake responsibilities of a strategic company, and ultimately to be approved by the relevant federal agency, which involved the defence services; and in the case of Rosneft involved committing to supply petroleum products to the Ministry of Defence of the Russian Federation.  So these were all things that were not open to Yukos.[1176]

972. While Claimants appeared to suggest at the Hearing that, since "it's the Government that decides which company is strategic," it would have been "fairly easy" for Respondent to accept Yukos as a strategic company.  The Tribunal notes that no specific requirements for purposes of designating a strategic company were proffered by either side.[1177]

### iii. Whether Russian Law Permits Payment in Kind of Tax Arrears

973. Respondent submits that the Russian Federation could not accept Yukos' shares in Sibneft and other companies as payment because Russian law does not allow a taxpayer to settle its liabilities in kind.[1178]  Specifically, Article 45(3) of the Russian Tax Code stipulates that "[t]he obligation to pay taxes/duties shall be executed in the currency of the Russian Federation."[1179]  This defect affected all of Yukos' settlement offers with the exception of those conveyed by Mr. Chrétien.

974. Claimants reply that Respondent misrepresents "both the legal context and the substance of Yukos' settlement proposals."[1180]  While Article 45(3) of the Russian Tax Code requires the payment of taxes in Russian rubles, Article 45(1) expressly provides that in case of late or incomplete payments, outstanding taxes may be collected through a forced sale of the taxpayer's assets other than cash, as provided for in Articles 47 and 48 of the Russian Tax Code

---

[1175] *Ibid.*

[1176] Transcript, Day 19 at 30.

[1177] Transcript, Day 17 at 253.

[1178] Counter-Memorial ¶ 423.

[1179] Russian Tax Code, Article 45, Exh. R-550.

[1180] Reply ¶ 326.

and Article 46 of the *Federal Law "On Enforcement Proceedings"*.[1181]  Respondent itself relies on the latter provision for the proposition that, for the purposes of the settlement of Yukos' alleged tax liabilities, the company's assets seized by the bailiffs were subject to a coercive sale.

### iv.    Concluding Observations

975.   Having reviewed the totality of the evidence and the Parties' representations, the Tribunal is of the view that Yukos' settlement offers represented a good faith attempt by the company to initiate a dialogue with the Russian Federation regarding the payment of Yukos' tax arrears. While it is true that these offers were for less than the total amount of taxes, fines and arrears assessed against Yukos, the Tribunal observes that, at the time when each offer was made, it either would have been sufficient to cover the amounts for which decisions had been issued by the Tax Ministry at the time, or was close enough to those amounts to allow the Russian Federation to assume that Yukos did indeed intend to discharge its tax liabilities.   As for Yukos' offer of its 20 percent minus one share holding of Sibneft shares, in the opinion of the Tribunal, since this shareholding was never formally disputed, it should have convinced the Russian Tax authorities that Yukos was serious in wishing to settle its tax liabilities.

976.   Respondent's argument that the Russian Federation does not negotiate tax liabilities is belied by the fact that it agreed to tax settlements with other companies.   Given the paucity of evidence before this Tribunal regarding the settlements actually reached by Sibneft and TNK-BP, the Tribunal cannot judge the extent to which their situations were similar to that of Yukos. However, the simple fact that these companies were able to negotiate the reduction of tax arrears initially claimed by the tax authorities suggests to the Tribunal that such negotiations can in fact take place under Russian law and practice.

977.   Thus, even if Yukos' settlement offers may not have resolved definitively all of its tax liabilities, the Tribunal sees no valid reason why the Russian Federation, if it sought only to collect taxes (and, presumably, to allow its largest taxpayer to continue in business) would not have reacted more positively to Yukos' settlement offers at the very least to the extent of engaging constructively in discussion.

---

[1181]    *Ibid.*, referring to Federal Law No. 119-FZ of 21 July 1997 "On Enforcement Proceedings" (as amended), Article 46, Exh. C-1274.

978. The Russian Federation never showed any interest in Yukos' offers.  With the exception of the letter of 9 September 2004, the bailiffs never replied to Yukos, never even troubling to explain why they considered its offers inadequate.  The Tribunal finds this silence very revealing, particularly in circumstances where the bailiffs' views as to the unacceptability of the offers were based in part on correspondence they had received from a third party (the former Sibneft shareholders), which had not even been copied to Yukos.  The settlement offers conveyed by Mr. Chrétien, at the end of the day, were also met with silence.

979. When the Russian authorities did provide responses to Yukos' proposals, these were in the nature of blanket rejections.  It is manifest that the authorities never seriously considered any one of Yukos' proposals.  The only letter from the bailiffs to Yukos (dated 9 September 2004) relies on the decision of the Moscow Arbitrazh Court of 17 July 2004, which merely addressed the issue of the Sibneft shares, but fails to explain why the shares in the other 15 companies offered by Yukos could not be accepted in payment.  The Tribunal notes that the letter has a ring of finality to it, emphasizing as it does "the right of the bailiff to make the final decision."[1182]  In the entire period from July to December 2004, the Russian authorities did not make a single counter-proposal to Yukos or even state that they were prepared to engage with the taxpayer.  Mr. Rieger testified at the Hearing that "it was like a one way road:  making proposals, talking, offering, and . . . no substantial feedback . . . no sitting down and willing to discuss."[1183]  This statement aptly describes the impression that the Tribunal garners from the record.

980. In conclusion, Respondent's total failure to engage with any of Yukos' settlement proposals raises significant doubts in the Tribunal's mind as to whether Respondent's true and sole concern in its dealings with Yukos after the tax assesments were issued was the collection of taxes.

## F.   THE AUCTION OF YNG

### 1.   Introduction

981. After having reviewed these futile attempts by Yukos to settle its tax debts to the State, the Tribunal comes to one of the most striking episodes in the saga of Yukos' demise, the

---

[1182]   Letter from Mr. Sazanov, Deputy Head of the Bailiffs Department to Mr. Gololobov, 9 September 2004, Exh. C-146.

[1183]   Transcript, Day 6 at 40.

December 2004 auction of its core asset, the oil production company Yuganskneftegaz ("**YNG**") and the subsequent acquisition of YNG by State-owned Rosneft.

982.   Claimants argue that the auction was a sham, "carefully orchestrated to achieve the transfer of Yukos' crown jewel to the State at the lowest price that could be achieved while maintaining a façade of legality."[1184]   Claimants accuse Respondent of having depressed the value of YNG by fabricating USD 4.6 billion in tax claims against the company.   They argue that Respondent set a low starting price which ignored both a valuation by Dresdner and Dresdner's advice on how to conduct the auction in order to maximize the sale price.   Claimants deny that their own actions contributed to the low price achieved at the auction.   They maintain that the sole bidder at the auction, a previously unknown entity called Baikal Finance Group ("**Baikal**"), was a dummy that was used to mask the Russian State's interest and involvement in the process.[1185]

983.   Respondent answers that the decision to sell YNG to satisfy Yukos' massive debt was a direct consequence of Yukos' misconduct and the only realistic way to collect Yukos' unpaid taxes in circumstances where Yukos had fiercely obstructed audits, resisted payment and attempted to make itself judgment proof.[1186]   Although YNG was sold during a 10-minute auction attended by two bidders on a Sunday afternoon in the outskirts of Moscow, Respondent observes that it was done in compliance with Russian law.   Respondent avers that the price realized— USD 9.35 billion—was consistent with the formal appraisal conducted by Dresdner and other market estimates, and notes that this price reflected YNG's own tax liabilities.[1187]   If the price was lower than it might otherwise have been, says Respondent, the fault lies solely with Claimants and Yukos, who sabotaged the auction through a sham bankruptcy proceeding in Texas and published threats of "a lifetime of litigation" which kept potential bidders away. Respondent rejects Claimants' theory that Baikal was a veneer for the Russian Government. Rather, Respondent submits that it was a special purpose vehicle associated with Surgutneftegaz.   When Baikal suddenly found itself unable to finance its purchase (due to the Temporary Restraining Order ("**TRO**") obtained by Yukos in Texas), Rosneft simply seized a

---

[1184]   Claimants' Post-Hearing Brief ¶ 97; *see* Press Conference with Russian and Foreign Media, 23 December 2004, Russian President Official Website, Exh. C-422; *see also* Memorial ¶¶ 334, 409; Reply ¶ 293; Claimants' Skeleton ¶ 45.

[1185]   Claimants' Post-Hearing Brief ¶¶ 110–14; Memorial ¶¶ 386–95; Reply ¶¶ 370–76; Claimants' Skeleton ¶¶ 40–43.

[1186]   Respondent's Post-Hearing Brief ¶¶ 87–121; Counter-Memorial ¶¶ 450–527; Rejoinder ¶¶ 951–1008; Respondent's Skeleton ¶¶ 36–54.

[1187]   *See, e.g.,* Deutsche Bank, Project Chekov, December 2004, Slide 6, Exh. C-284.

commercial opportunity that presented itself as a result of Claimants' misconduct.[1188]

984. At the outset of its analysis, the Tribunal will recall that during the February 2003 meeting with the Union of Industrialists and Entrepreneurs Industrialists attended by Michael Khordokovsky and referred to earlier in this Award, President Putin made this seemingly prescient observation:

> [C]ertain things are obviously clear.   [Rosneft] is a State-owned company.   It has insufficient reserves and should increase them.   Some other oil companies, such as Yukos, have a surplus of reserves.[1189]

985. As will be seen, after having reviewed the totality of the circumstances leading to the YNG auction and the auction itself, the Tribunal concludes that this episode provides yet more compelling evidence that the Russian Federation was not engaged in a true, good faith tax collection exercise but rather was intent on confiscating the most valuable asset of Yukos and effectively transferring it to the Russian State.

986. The Tribunal notes that its findings are consistent with those of the *RosInvestCo* and *Quasar* tribunals, which found "many aspects of the YNG auction more than suspect"[1190] and concluded that "the auction of YNG was rigged."[1191]

2.   **Chronology**

987. As is evident from the chronology of events recounted in Chapter VIII.B, and as observed by the ECtHR, the Russian authorities "were unyieldingly inflexible as to the pace of the enforcement proceedings, acting very swiftly."[1192]   This chronology reviews the key events as of the date when the sale of YNG was announced to the auction itself on 19 December 2004, and the transfer of the YNG shares to the Russian State-owned Rosneft three days later on 22 December.

---

[1188]   *See* Respondent's Skeleton ¶¶ 46–52; Respondent's Closing Slides, pp. 327–70.

[1189]   Video recording and transcript of meeting of the members of the Union of Industrialists and Entrepreneurs with President V. Putin held in the Ekaterininsky Hall, Kremlin, 19 February 2003, Exh. C-1396.

[1190]   *Quasar* ¶ 116, Exh. R-3383.

[1191]   *RosInvestCo* ¶ 620(d), Exh. C-1049.

[1192]   ECtHR Yukos Judgment ¶ 656, Exh. R-3328; Chapter VIII.B.

(a)    **Yukos' Shares in YNG are Seized and the Government Announces they will be Sold; Yukos Brings Unsuccessful Court Challenges**

988.    On 20 July 2004, the Ministry of Justice announced its plan to sell YNG in order to satisfy Yukos' tax debt for the year 2000.[1193]   Mr. Misamore testified that at the time of this announcement the only tax levied against Yukos and confirmed by the courts was for the year 2000, in the amount of approximately USD 3.42 billion, which Yukos had already started to pay.[1194]   In the circumstances, he viewed the seizure of YNG as disproportionate and unjustified.

989.    Industry analysts interpreted the bailiff's plans to sell "Yukos's most valuable asset" as "a clear sign the authorities are going in for the kill," observing that the move "leaves little doubt the authorities' final goal is for Yukos to cease to exist in its current form, materially erasing most, if not all, shareholder value in the process." [1195]

990.    On 23 July 2004, GML director Tim Osborne declared that any purchaser of YNG would be "buying a whole heap of trouble."[1196]

991.    Yukos applied to the Russian courts to prevent the sale from proceeding, but to no avail.[1197]   In a letter to the Chief Bailiff of the Russian Federation dated 6 August 2004, Yukos requested that any sale of YNG be conducted by public auction.  This request was granted.[1198]

(b)    **YNG is Valued for Auction while its Tax Liabilities Rapidly Escalate**

992.    On 12 August 2004, the bailiffs appointed Dresdner to carry out the valuation of YNG.[1199]

---

[1193]    *Moscow set to seize huge Yukos oil division—Investors may lose everything in tax fight, analysts warn*, International Herald Tribune, 21 July 2004, Exh. C-698.

[1194]    Misamore WS ¶ 52.

[1195]    *Moscow set to seize huge Yukos oil division—Investors may lose everything in tax fight, analysts warn*, International Herald Tribune, 21 July 2004, Exh. C-698 (quoting Mr. Steven Dashevsky).

[1196]    *Yukos Says Asset Sale Could Prove Fatal Blow*, NY Times, 23 July 2004, Exh. R-648.

[1197]    Ruling of Moscow Arbitrazh Court, 29 November 2004, Exh. C-283.

[1198]    Letter from Yukos' counsel D.V. Gololobov to the Chief Bailiff of the Russian Federation A.T. Melnikov, 6 August 2004, Exh. C-140; *Moscow set to seize huge Yukos oil division—Investors may lose everything in tax fight, analysts warn*, International Herald Tribune, 21 July 2004, Exh. C-698.  Respondent points out that the sale of the YNG shares could, instead, have been negotiated with a designated purchaser.  Rejoinder ¶¶ 978, 984; Transcript, Day 3 at 115 (Respondent's opening).

[1199]    Resolution of Moscow Court Bailiff D.A. Borisov, 12 August 2004, Exh. C-270.

993. Dresdner issued its valuation report on 6 October 2004; it valued YNG as a stand-alone enterprise at USD 18.6 to 21.1 billion.[1200]  Dresdner noted in the summary of its Report that this amount could be reduced by tax and other liabilities, which would lower the value to USD 14.7 to 17.3 billion.[1201]  In its report, Dresdner observed that "[t]he sales process usually has a significant impact on the revenue from the sale" and that "[a] quick auction will most likely prevent the achievement of a full price."[1202]  Dresdner added that "[i]f access to full information is not provided to potential purchasers, this will lead to a significant reduction in the number of parties interested in YNG and also in their ability to offer the full price."[1203]

994. A few days after Dresdner delivered its report, on 11 October 2004, the bailiffs recommended a minimum sale price for the YNG shares that reflected a 60 percent discount of the value determined by Dresdner.[1204]  The bailiffs' declaration caused Yukos shares to fall "so far so fast . . . that trading had to be halted twice on MICEX."[1205]

995. On 13 October 2004, GML's Tim Osborne reiterated his earlier threat, and said that "[w]hoever buys [YNG] is going to be buying themselves a lifetime of litigation."[1206]

996. On 29 October 2004, following an audit that began on 23 September 2004, YNG received a tax reassessment for transfer pricing violations, in the amount of USD 2.35 billion for the year 2001.[1207]  On the same day, following an audit that began on 1 October 2004, the tax authorities issued a decision finding YNG liable for a tax offense for the year 2002 in the amount of

---

[1200]   Dresdner Valuation Report, Exh. C-274, ZAO Dresdner Bank Summary Valuation Opinion Letter, 6 October 2004, Exh. C-273 (hereinafter "Dresdner Summary Letter").

[1201]   Dresdner Summary Letter, 6 October 2004, p. 6, Exh. C-273.

[1202]   Dresdner Valuation Report ¶ 11.2.

[1203]   *Ibid*. ¶ 12.8.

[1204]   Resolution of Moscow Court Bailiff D.A. Borisov, 11 October 2004, Exh. C-1160; *see Basic Yukos asset valued merely at $10.4 billion*, RIA Novosti, 12 October 2004, Exh. C-710; *Russia to press on with Yukos sell-off*, The Financial Times, 13 October 2004, Exh. C-711; *Low valuation for Yukos unit sale*, NY Times, 14 October 2004, Exh. C-712.

[1205]   *Yukos Unit Up for Sale at Discount Price*, Moscow Times, 13 October 2004, Exh. R-625.  Dresdner, on 14 October 2004, released, "in the interests of transparency" and "with the permission of the Ministry of Justice," a summary of the valuation report on its own website, including the USD 14.7 to 17.3 billion range Dresdner had estimated for YNG post-liabilities.  Summary valuation opinion letter on Yuganskneftegaz, Dresdner Bank Corporate Website, 14 October 2004, Exh. C-275, with link to Dresdner Summary Letter.  Claimants characterize Dresdner's decision to do so as an extraordinary reaction taken to correct the public record.  Memorial ¶ 370; Counter-Memorial ¶ 458 & n.686.)

[1206]   *Yukos Unit Up for Sale at Discount Price*, Moscow Times, 13 October 2004, Exh. R-625.

[1207]   Repeat Field Tax Audit Report No. 30–03–14/2, 29 October 2004, Exh. C-251; Memorial ¶ 271; Counter-Memorial ¶ 482; Reply ¶¶ 360–61; Rejoinder ¶¶ 959–60.  As explained in the First Konnov Report, "under the transfer pricing rules, the tax authorities were permitted to substitute the contract price with the market price," but they "could do this . . . only if the market price deviated from the contract price by more than 20%."  First Konnov Report ¶ 87.

USD 1.03 billion.[1208]   A further tax audit on YNG was commenced on 12 October 2004, resulting in a tax assessment on 3 December 2004 of USD 1.22 billion for the year 2003.[1209] According to Claimants, these three successive tax assessments over a period of less than five weeks on the eve of the YNG auction amounted to double-taxation and were part of the Russian Federation's strategy to depress the auction price of YNG and destroy Yukos.[1210]

997.   By mid-November, Yukos' settlement proposals were continuing to fall on deaf ears.[1211]   On 18 November 2004, the bailiffs announced that YNG would be auctioned and the Ministry of Justice appointed the Russian Federal Property Fund to handle the auction.[1212]   The Russian Federal Property Fund issued the formal auction notice the next day and fixed the auction date for 19 December 2004.[1213]   This was a Sunday, and the earliest possible date to hold the auction under the relevant regulations.[1214]   The opening price for 100 percent of the ordinary shares (or 76.79 percent of YNG's total share capital) was set at USD 8.65 billion.

998.   Yukos applied to the Moscow Arbitrazh Court for a declaration that this decision was unlawful and sought interim measures.  Both applications were swiftly denied.[1215]

### (c)   Yukos Tries to Prevent the Auction; Preparations Proceed; an Entity Named Baikal is Created to Purchase YNG

999.   On 6 December 2004, Baikal was incorporated in the town of Tver by a sole founder, Ms. Valentina Davletgareeva, with capital of USD 359.[1216]   A few days later, Ms. Davletgareeva sold her stake in Baikal to a company called Makoil.[1217]

---

[1208]   Memorial ¶ 271; Decision of Moscow Arbitrazh Court, 25 April 2006, p. 2, Exh. C-255.

[1209]   Field Tax Audit Report No. 52/975, 3 December 2004, Exh. C-252; *but see* Decision of the Moscow Arbitrazh Court, 21 April 2006, Exh. C-256.

[1210]   Claimants' Post-Hearing Brief ¶¶ 84, 98–100.

[1211]   *See* Chapter VIII.E.

[1212]   Resolution of Bailiff I.V. Kochergin to appoint a seller, 18 November 2004, Exh. C-279; Agreement No. 4-UYu/2– 1/1772–1 between Ministry of Justice and Russian Federal Property Fund, 18 November 2004, Exh. R-623.

[1213]   Notice of auction published by the Russian Federal Property Fund, 19 November 2004, Exh. C-280.

[1214]   *See* YNG Auction Regulation (RP11197–221), 18 November 2004, Exh. R-3764.

[1215]   Memorial ¶ 382; Ruling of the Moscow Arbitrazh Court, 29 November 2004, Exh. C-283; Resolution of the Federal Arbitrazh Court for the Moscow District, 3 May 2005, Exh. C-292; Resolution of Bailiff D.A. Borisov, 31 December 2004, Exh. C-291.

[1216]   Baikalfinancegroup Limited Liability Company, Charter, 2 December 2004, Exh. R-672; Certificate of registration of OOO Baikalfinancegroup as a legal entity, 6 December 2004, Exh. C-286.

[1217]   Baikalfinancegroup Limited Liability Company, Charter (amended version), 9 December 2004, Exh. R-674.

1000. On 10 December 2004, the Federal Antimonopoly Service reported that three entities—Gazpromneft, ZAO Intercom and OOO First Venture Company—had filed for clearance to participate in the auction.  While Gazpromneft did eventually register for the auction, the other two companies did not.[1218]

1001. Having failed to convince the Russian courts to prevent the auction from proceeding, Yukos, in its own words, sought "to obtain justice"[1219] elsewhere.  On 13 December 2004, GML posted a full-page advertisement entitled "Buyer Beware" in the Financial Times.[1220]  The next day, Yukos filed for Chapter 11 bankruptcy protection in Texas.[1221]  On 16 December 2004, the U.S. court granted Yukos' request for a TRO enjoining registered and prospective bidders from participating in the YNG auction.[1222]

1002. Meanwhile, on 14 December 2004, Baikal applied for antimonopoly clearance in order to participate in the auction.[1223]  Two days later it registered for the auction and made a deposit of USD 1.77 billion.[1224]  The only other company to register for the auction was State-owned Gazpromneft on 16 December 2004.[1225]  Gazpromneft challenged the TRO on an emergency basis on 18 December 2004, but its appeal was denied that night, about ten hours before the auction was scheduled to commence in Moscow.[1226]

---

[1218]   *FAS of Russia Received Three Applications to Participate in the Auction for the Sale of Yuganskneftegaz*, Press Release, 10 December 2004, Exh. R-684.

[1219]   Memorial ¶ 383.

[1220]   *Buyer Beware*, Advertisement, Financial Times, 13 December 2004, Exh. R-649.

[1221]   *In re Yukos Oil Co.*, U.S. Bankruptcy Court for the Southern District of Texas, Case No. 04–47742–H3–11, Yukos' Original Complaint for Injunctive Relief, 14 December 2004, Exh. R-656 (hereinafter "U.S. Bankruptcy Complaint"); *In re Yukos Oil Co.*, U.S. Bankruptcy Court for the Southern District of Texas, Case No. 04–47742–H3–11, Yukos' Verified Emergency Motion for Temporary Restraining Order and Preliminary Injunction, 14 December 2004, Exh. R-629; *In re Yukos Oil Co.*, U.S. Bankruptcy Court for the Southern District of Texas, Case No. 04–47742–H3–11, Yukos' Voluntary Petition, 14 December 2004, Exh. R-658; Yukos-Moscow Limited, Resolution No. 1 of Management Board, 10 December 2004, Exh. R-657.

[1222]   *In re Yukos Oil Co.*, U.S. Bankruptcy Court for the Southern District of Texas, Case No. 04–47742–H3–11, Temporary Restraining Order, 16 December 2004, Exh. C-287.

[1223]   Application to Federal Antimonopoly Service regarding approval of acquisition by Baikal Finance (hereinafter "Baikal") of 76.79 percent interest in YNG, 14 December 2004, Exh. R-3793.

[1224]   Application to Participate in the Auction for the Sale of Seized Shares in OAO Yuganskneftegaz filed by Baikal Finance, 16 December 2004, Exh. R-3805.

[1225]   Protocol of the Results of an Auction to Sell Shares in OAO Yuganzkneftegaz, 19 December 2004, Exh. C-290.

[1226]   *Yukos Oil Co. v. OOO Gazpromneft*, U.S. District Court for the Southern District of Texas, Case No. 04cv4756, Hearing Minutes and Orders, 18 December 2004, Exh. R-697.

     **(d)**     **After a 10-Minute Auction, the Successful Bidder Baikal is Sold to State-Owned Rosneft; a "Monumental Bargain"; the "State, Looking After its Own Interests"**

1003. The auction of YNG took place on 19 December 2004 at 4:00 p.m.  Baikal opened the bidding at USD 9.35 billion.  Gazpromneft's representative then asked for a recess and left the room to make a call.  Upon his return, Baikal was declared the winner with its opening bid.  The bidding process was over within ten minutes.[1227]

1004. One press article reported that the Baikal bidders worked for Surgutneftegaz and had "hastily departed for vacations abroad as soon as the auction ended."[1228]  At a press conference on 21 December 2004, President Putin was invited to comment on the perception that "a state company is in fact behind the organisation Baikal Finance Group" and responded as follows:

> As is well known, the shareholders of this company are all private individuals, but they are individuals who have been involved in business in the energy sphere for many years.  They intend, as far as I am informed, to establish relations with other energy companies in Russia which have an interest in their company.  And within the framework of current legislation, the participants of this process have the right to work with this company after the auction is held.  For us, it is only important that all these actions, as I already said, are within strict accordance with the current legislation of Russia. I hope that this is the way it will be.  As for the ability of state company to buy these assets, they of course have this right, just like other market participants.[1229]

1005. What was not public knowledge at the time President Putin gave his press conference was the fact that, the previous day, the State-owned company Rosneft had sought and obtained antimonopoly clearance to acquire Baikal.[1230]

1006. On 22 December 2004, Rosneft purchased Baikal, before it had paid the balance of the purchase price for the YNG shares.[1231]  Rosneft's purchase was announced publicly the

---

[1227]    *See* Protocol of the Results of an Auction to Sell Shares in OAO Yuganzkneftegaz, 19 December 2004, Exh. C-290.

[1228]    *Yugansk Was Purchased by Surgutneftegaz Employees*, OilCapital.ru, 21 December 2004, Exh. R-3789.

[1229]    Press Statement and Answers to Questions Following Russian–German Bilateral Consultations, Russian President Official Website, 21 December 2004, p. 2, Exh. C-421.

[1230]    Rosneft's request to Federal Antimonopoly Service to approve acquisition of a 100 percent interest in Baikal, 20 December 2004, Exh. C-1162; Federal Antimonopoly Service's approval of Rosneft's acquisition, 20 December 2004, Exh. C-1163.

[1231]    *See* Rosneft IPO Prospectus, 14 July 2006, pp. 75–76, Exh. C-380.

following day.[1232]   During another press conference, on 23 December 2004, President Putin said:

> Now regarding the acquisition by Rosneft of the well-known asset of the company—I do not remember its exact name—is it Baikal Investment Company?  Essentially, Rosneft, a 100% state owned company, has bought the well-known asset Yuganskneftegaz.  That is the story.  In my view, everything was done according to the best market rules.  As I have said, I think it was at a press conference in Germany, a state-owned company or, rather companies with 100% state capital, just as any other market players, have the right to do so and, as it emerged, exercised it.
>
> Now what would I like to say in this context?  You all know only too well how the privatisation drive was carried out in this country in the early 90s and, how, using all sorts of stratagems, some of them in breach even of the then current legislation, many market players received state property worth many billions.  <u>Today, the state, resorting to absolutely legal market mechanisms, is looking after its own interests</u>.  I consider this to be quite logical.[1233]

[emphasis added]

### (e)   Once it is State-Owned, YNG's Fate Improves, with Reductions in Tax Liabilities and a Dramatic Increase in Value

1007.   The Tribunal notes that, as at 31 December 2004, ten days after Baikal purchased YNG for USD 9.35 billion, Rosneft stated in its consolidated financial statements that "negative goodwill" in the amount of USD 7.052 billion arose in the context of its acquisition of YNG "as a result of excess of the net assets measured at fair value, over the purchase price."[1234] Rosneft's total revenues increased from USD 5.28 billion in 2004 to USD 23.95 billion in 2005, while its net income increased from USD 0.84 billion to USD 4.16 billion over the same period.[1235]   At the time of its IPO in mid-2006, Rosneft's share capital was USD 79.8 billion;[1236] YNG alone was then valued at USD 55.78 billion.[1237]   Rosneft itself described the YNG acquisition as "the most monumental bargain in Russia's modern history."[1238]

1008.   Subsequent to the YNG auction, Yukos continued its efforts to have the sale invalidated in the

---

[1232]   *OJSC 'OC 'Rosneft' Buys 100% Share of 'Baykalfinancegroup' LLC And Becomes the Owner of Its Assets—76.6% Yuganskneftegas Shares*, Rosneft Press Release, 23 December 2004, Exh. C-741.

[1233]   Press Conference with Russian and Foreign Media, Russian President Official Website, 23 December 2004, p. 4, Exh. C-422.

[1234]   Rosneft's Consolidated Financial Statements as of 31 December 2003 and 2004, p. 24, NAV-213.

[1235]   Rosneft IPO Prospectus, 14 July 2006, p. 16, Exh. C-380.

[1236]   Rosneft Website, p. 16, Exh. C-381.

[1237]   Rosneft IPO Prospectus, 14 July 2006, Table 40, Exh. C-380.

[1238]   Place in economy of Russia, Rosneft:  About company, Rosneft Website, p. 14, Exh. C-381.

Russian courts, but all its claims were dismissed.[1239]

1009. The Tribunal notes with interest that very soon after it was acquired by Rosneft, a significant portion of the tax assessments levied against YNG were set aside or vastly reduced by Russian courts.[1240]  According to Mr. Konnov, after YNG contested the assessments, "the court-appointed experts who calculated the market prices" found in a number of cases "that the price deviation was within the 20% 'safe harbour' [for transfer pricing]."[1241]  As a consequence, "large parts of the assessments against YNG were overturned by the courts."[1242] Claimants, while not explicitly disputing the "supposed technicality" of the provisions on transfer pricing,[1243] insist that, given the "scale of the reduction . . . the purported tax reassessments against Yugansknektegaz lacked any credibility in the first place."[1244]

1010. As for YNG's remaining debts, Rosneft, according to Mr. Konnov, as a "strategic company" owned by the State and supplying the State with petroleum, was able to "restructure[e] them through a series of negotiations.[1245]

### 3.    Parties' Arguments and Tribunal's Observations

1011. The Tribunal now returns to the Parties' central arguments in respect of the YNG auction which it summarized at the outset of this Chapter and will seek to determine whether the events which

---

[1239]   *See* Memorial ¶ 382 n.578; Resolution of the Federal Arbitrazh Court for the Moscow District, 12 October 2007, Exh. C-294.

[1240]   On 16 February 2005, the Federal Arbitrazh Court granted YNG's cassation complaint and referred for re-examination YNG's challenge of the 1999 tax reassessment.  Resolution of the Federal Arbitrazh Court for the Moscow District, 16 February 2005, Exh. C-253; *Yugansk's New Victory*, Vedomosti, 11 October 2005, Exh. C-784; *but see* First Konnov Report ¶¶ 86–92.  On 10 October 2005, the Moscow Arbitrazh Court found that the 1999 reassessment against YNG violated the three-year limitation period under Article 87 of the Russian Tax Code.  Decision of the Moscow Arbitrazh Court, 12 October 2005, Exh. C-254; *Yugansk's New Victory*, Vedomosti, 11 October 2005, Exh. C-784.  On 16 April 2006, the Moscow Arbitrazh Court reduced YNG's alleged tax arrears for 2002 by 83 percent and the corresponding fines by 89 percent (to USD 760 million).  Decision of the Moscow Arbitrazh Court, 25 April 2006, Exh. C-255; Rosneft 2005 U.S. GAAP Consolidated Financial Statements, p.59, Exh. C-374.  In December 2007, having agreed in May–June 2007 that Rosneft was eligible for a tax restructuring process and that the total amounts of its tax debts (including that of YNG) could be restructured, the State approved the restructuring of Rosneft's tax debt, allowing for quarterly repayment of outstanding tax over five years, starting in March 2008.  Memorial ¶ 283; Rosneft 2007 U.S. GAAP Consolidated Financial Statements, p. 50, Exh. C-377; Rosneft Management's Discussion and Analysis of Financial Condition and Results of Operations for 2007 and 2006, p. 38, Exh. C-378.

[1241]   First Konnov Report ¶ 88.

[1242]   *Ibid*.  Mr. Konnov refers to a total of 16 decisions of various courts in this regard, First Konnov Report ¶¶ 88–89 nn.161–69.

[1243]   Reply ¶ 360.

[1244]   *Ibid.* ¶ 361.

[1245]   First Konnov Report ¶ 91; Transcript, Day 19 at 30–31.

it has traversed are consistent with a genuine attempt by the Russian Federation to collect taxes, or whether they disclose that the auction was rigged so as to enable YNG to fall into the hands of the State through the veneer of a legitimate process.  The Tribunal will review, in turn, (a) the fairness of the price achieved at the auction, (b) the role of Baikal and its acquisition by Rosneft, and (c) the impact of the YNG auction on the future of Yukos.

(a)    **Did the Auction Price Reflect the True Value of YNG; If not, was Either Party Responsible for the Price Reduction?**

1012. The Parties have different views as to whether the sale price of USD 9.35 billion reflected the fair value of YNG.  Claimants argue that if the purpose of the auction had been to collect revenues in order to pay legitimate tax debts, the Russian Federation would have been expected to make every effort to maximize the proceeds.  Instead, Claimants allege that Russia took steps to reduce the price so that it could, via Rosneft, acquire YNG for a derisory amount, and still be able to enforce the remaining tax liabilities against other Yukos assets.[1246]  Respondent maintains that the price for which YNG was acquired was not a "knock down" price but, to the extent it was, only Yukos was to blame.[1247]

1013. Claimants complain that the auction price paid by Baikal represented less than half of the enterprise value of YNG, which the Dresdner Valuation Report had assessed to be in the range of USD 18.6–21.1 billion.  Respondent answers that other contemporaneous valuations, including Morgan Stanley's, estimated a much lower value (USD 8.9 billion).[1248]  Respondent also recalls that it was necessary to adjust the value of the enterprise to account for the fact that only the 76.79 percent stake of Yukos in YNG was being auctioned.  Respondent put these issues to Dr. Illarionov, when challenging his claim that the price achieved was "well below even the most conservative estimates prepared by experts."[1249]  Dr. Illarionov admitted that his figure of USD 14.7–17.3 billion was based on a full enterprise value that did not take into account the tax liabilities.[1250]  At the end of his cross-examination, however, Dr. Illarionov maintained that he did not think "this discount rate of 60% that has been applied by the Russian

---

[1246]   Claimants' Post-Hearing Brief ¶ 101.

[1247]   Respondent's Closing Sides, pp. 354–65.

[1248]   *See* Dresdner Valuation Report; *see also YNG Sale:  A Shock and Awe Negotiating Tactic?,* Morgan Stanley Equity Research Report on Yukos, 22 July 2004, Exh. R-632.

[1249]   Illarionov WS ¶ 44; *see* Transcript, Day 7 at 85–86 (cross-examination of Dr. Illarionov).

[1250]   Transcript, Day 7 at 53–56, 77, 80–81 (cross-examination of Dr. Illarionov); *but see* Transcript, Day 17 at 255–56 (Claimants' closing, arguing that the demonstrative charts put to Dr. Illarionov during the cross-examination were not entirely accurate).

authorities produces a number that [he] would consider . . . a legitimate valuation."[1251]

1014. Respondent points out that Dresdner's valuation did not take into account outstanding tax liabilities in the amount of USD 4.6 billion, and that "[i]f this were to be judicially upheld, the estimate of net debt and other liabilities would increase by a corresponding amount."[1252] Claimants reply that these tax liabilities were fabricated by the Russian authorities in the period from October to December 2004 in order to depress the price of YNG. The tax liabilities, say Claimants, related to transfer pricing and were applied to oil trading revenue that had already been re-attributed to Yukos, thus resulting in double taxation.[1253] Respondent argues that YNG's transfer pricing issues had arisen over many years and that the allegation of double taxation was misconceived. Respondent says the assessments were made in accordance with Russian law, since Yukos had forced YNG to sell oil to the trading companies at very low prices which exposed it to liability.[1254]

1015. Claimants also argue that the sale price was affected by the nature and speed of the process adopted by the Russian authorities. While it is common ground that the time frame for the auction was within the minimum statutory requirements, Claimants recall that the Government ignored Dresdner's recommendation for a two-stage auction process to allow for proper due diligence, and its warning that failure to provide access to full information could lead to a reduction in the number of potential purchasers and the price they would be willing to pay.[1255] No due diligence was provided beyond a "data room" that consisted of the report itself, auction rules and 89 pages of additional documents. Respondent answers that Russian law requires no due diligence, that Gazpromneft was still able to undertake a thorough assessment, and that any due diligence issue was due to Yukos' lack of cooperation with Dresdner.[1256]

1016. The bare minimum time frame meant that the auction was conducted on a Sunday, which Dr. Illarionov described as "highly unusual . . . since the Russian Government agencies are closed on Saturdays and Sundays."[1257] Respondent's suggestion at the Hearing that Sunday

---

[1251] Transcript, Day 7 at 87.

[1252] Dresdner Summary Letter, p. 6.

[1253] Memorial ¶¶ 269–75; Reply ¶ 266.

[1254] Rejoinder ¶¶ 958–60; First Konnov Report ¶¶ 86–92.

[1255] Dresdner Valuation Report ¶¶ 11.2, 12.8.

[1256] Rejoinder ¶¶ 978–81.

[1257] Illarionov WS ¶ 43.

was chosen to reduce the impact of Moscow's traffic was scoffed at by Claimants as "absurd."[1258]

1017. Claimants conclude that by any measure "the auction process was perfunctory and did not involve genuine competition."[1259]   Although the auction process complied with the letter of Russian legislation,[1260] Claimants insist that it is not a defence to an expropriation claim under international law that the State complied with its own domestic law.

1018. Respondent accuses Yukos of turning YNG into a "wasting asset"[1261] by foisting upon it "upstream guarantees"[1262] for its loan in favour of Moravel and forcing YNG to borrow USD 485 million from affiliate Yukos Capital.  Respondent adds that Yukos caused YNG to default on at least USD 586 million of mineral extraction tax, imperilling its oil licenses.  Yukos' press service issued a statement on 11 October 2004 attributing the non-payment of mineral extraction tax to YNG's accounts having been frozen.[1263]

1019. Respondent alleges that the low turn-out at the auction was attributable to Claimants' own acts of sabotage, namely their "intimidation campaign"[1264] and Yukos' "spurious bankruptcy filing in the United States"[1265] the purpose of which was to block the YNG auction by targeting both the companies that had expressed an interest in bidding as well as their banks.[1266]  According to Respondent, the TRO led banks to withdraw their financing, drove two of the companies that had applied for antimonopoly clearance not to register for the auction and resulted in Gazpromneft not submitting a bid.  Dr. Illarionov was cross-examined about Claimants' media campaigns aimed at warding off prospective bidders from the auction.[1267]  When he was asked

---

[1258]   Claimants' Post-Hearing Brief ¶ 104; *see* Transcript, Day 7 at 137–40.

[1259]   *Ibid*. ¶109.

[1260]   A point also noted in the ECtHR Yukos Judgment.  *See* ECtHR Yukos Judgment ¶ 647, Exh. R-3328.

[1261]   Rejoinder ¶ 955.

[1262]   *Ibid*. ¶ 966.

[1263]   *Yuganskneftegaz may lose licenses in three months*, RIA Novosti, 11 October 2004, Exh. C-709.

[1264]   Rejoinder ¶ 982; *see Yukos Says Asset Sale Could Prove Fatal Blow*, NY Times, 23 July 2004, Exh. R-648; *Buyer Beware*, Advertisement, Financial Times, 13 December 2004, Exh. R-649.

[1265]   Rejoinder ¶ 982.

[1266]   *See* Yukos-Moscow Limited, Resolution No. 1 of Management Board, 10 December 2004, Exh. R-657.  In the circumstances, the Tribunal wonders why Gazpromneft attended the auction at all, except that two participants were required for the auction to proceed.

[1267]   Transcript, Day 7 at 90–91; *Yukos Says Asset Sale Could Prove Fatal Blow*, NY Times, 23 July 2004, p. 3, Exh. R-648 (quoting Mr. Tim Osborne stating that "[a]nyone that buys those assets [referring to the YNG auction] is buying a whole heap of trouble"); Transcript, Day 7 at 98–99; *Buyer Beware*, Advertisement, Financial Times, 13 December

whether these statements likely encouraged or discouraged bidders from participating in the auction, he answered that Gazpromneft and Baikal probably "felt very well protected, maybe by the Russian Government."[1268]

1020. Having considered all of the factors that it has reviewed, the Tribunal concludes that the price of USD 9.35 billion which Baikal paid at the auction for the 76.79 percent stake of Yukos in YNG was far below the fair value of those shares.

1021. In the opinion of the Tribunal, the imposition during the few weeks prior to the auction of massive tax liabilities on YNG (which were cancelled in the months after the acquisition of YNG by Rosneft) appear designed specifically to depress the value of YNG. The amount of the tax liabilities imposed which were subtracted from the Dresdner valuation cannot be justified. In addition, in the view of the Tribunal, the failure by YNG to pay its mineral extraction tax was inextricably linked to the asset freeze of Yukos' cash.

1022. The Tribunal also finds that the Russian authorities deliberately ignored the advice of Dresdner that haste in carrying out the auction could decrease the price. The Tribunal notes that the *Quasar* tribunal criticized Respondent's decision to hold the auction only one month after its announcement, and found that "the auction procedure was highly irregular in a number of ways that all relate to the extraordinary speed with which it was conducted."[1269]

1023. While the Tribunal accepts, as did the *RosInvestCo* and *Quasar* tribunals,[1270] that the actions of Claimants in warding off prospective buyers through a media campaign and the TRO may have deterred some potential buyers and may have resulted in a low winning bid,[1271] these actions, at

---

2004, Exh. R-649; Transcript, Day 7 at 114; *Mystery Russian Company Wins Bid on Yukos Unit— Offer of $9.37 Billion Seals Fate of Beleaguered Firm, But Many Questions Linger*, The Wall Street Journal (Europe), 20 December 2004, p. 3, Exh. C-738 ("Menatep intends to take every action available in order to protect its interest in Yukos").

[1268] Transcript, Day 7 at 100–01.

[1269] *Quasar* ¶ 117, Exh. R-3383.

[1270] *RosInvestCo* ¶ 522, Exh. C-1049 (accepting that "had Claimant not discouraged international bidders and without the bankruptcy proceedings in the United States, more bidders might have participated, and that the process seems to have been conducted within the limits of discretion awarded by Russian law"); *Quasar* ¶115, Exh. R-3383 (the tribunal was "receptive to the Respondent's argument that some of the blame associated with the poor turnout and low winning bid at the YNG auction should be attributed to the Claimants for their media campaign . . . and for initiating bankruptcy proceedings . . . that led to the TRO" and to the "argument that Yukos' actions reasonably could have deterred potential bidders from participating in the YNG auction") Both tribunals contrasted these findings with their serious doubts about the bona fide nature of the auction, stemming largely from the dubious identity of Baikal and the circumstances of its acquisition by Rosneft.

[1271] On the other hand, the Tribunal notes that the Russian Justice Minister on 14 October 2004, in a commentary on the auction price, is reported to have said that this value "takes into account the 'high risk to a potential buyer' of the

the end of the day, had no relevant impact on the bankruptcy of Yukos.[1272]  The circumstances surrounding the appearance and disappearance of Baikal make the auction process seem all the more questionable to the Tribunal.  The Tribunal now turns to these events.

### (b)   Who was Behind Baikal and were They a Front for the Russian State?

1024. In the view of the Tribunal, one of the most opaque facets of the YNG auction is the identity of Baikal, the sole and successful bidder at the auction which was acquired by State-owned Rosneft three days after its successful bid.  Baikal did not exist until less than two weeks before the YNG auction.  It was obviously a vehicle created solely for the purpose of bidding for YNG at the auction.  As noted earlier, it was incorporated with capital of USD 359.

1025. During the closing oral arguments, the Chairman told Respondent's counsel: "you still have to convince us that Baikalfinance . . . was not a sham company.  That's your challenge."[1273]

1026. Respondent sought to explain that Baikal was a special purpose vehicle established strictly for bidding at the auction.  Respondent added that "it was well known that those lying behind Baikal was [sic] Surgutneftegaz."[1274]  Respondent stated that Baikal was represented at the auction by two managers of Surgutneftegaz, Mr. Igor Minibayev and Ms. Valentina Komarova.  Ms. Valentina Davletgareeva, the person who incorporated Baikal, was also connected to companies affiliated with Surgutneftegaz.  According to Counsel for Respondent, she sold 100 percent of her interest in Baikal to Makoil, a company owned in part by a secretary to the Board of Surgutneftegaz.[1275]  Accordingly, Respondent submits that "all of those who had a connection to the company in a formal manner or who were identified with it can be identified as having significant positions or relationships with respect to Surgutneftegaz."[1276]  Baikal's Tver office was close to a subsidiary of Surgutneftegaz, which in turn was located directly across the river from YNG.[1277]  In addition, there had been reports in the media since

---

Yukos asset."  *In the Yukos Saga, Yet Another Gloomy Chapter*, The Wall Street Journal (Europe), 14 October 2004, Exh. C-713.

[1272]   *See* Chapter X.E at paragraph 1625.

[1273]   Transcript, Day 19 at 33.

[1274]   Transcript, Day 21 at 151; Rejoinder ¶¶ 36, 1002, 1007.

[1275]   Rejoinder ¶ 1002 nn.1690–91.

[1276]   Transcript, Day 21 at 151; Respondent's Closing Slides, pp. 772–80.

[1277]   *See* Transcript, Day 21 at 151, Respondent's Closing Sides, pp. 782, 790.

September 2004 that Surgutneftegaz was interested in the auction.[1278]

1027. Claimants insist that, even accepting Respondent's theory that Baikal was a front for Surgutneftegaz, the "facts in the record . . . compel the conclusion that Baikal served the interests of the State, and any involvement of Surgut, a company known to be 'friendly with the Kremlin', was solely to mask the State's involvement."[1279]

1028. The fact that Baikal was incorporated only a few weeks before the auction and had the minimum-required capital is, according to Respondent, irrelevant.  The other three entities who had antimonopoly clearance for the auction were also relatively new companies with little capital.  Respondent alleged that Baikal paid the USD 1.77 billion deposit itself after having received the financing from a third party.[1280]  Respondent submitted that Surgutneftegaz had sufficient resources to enable Baikal Finance to pay the deposit, but not the full purchase price without recourse to international capital markets.[1281]  Respondent's theory is that such financing was foreclosed on the day of the auction by the TRO, leaving Baikal (and Surgutneftegaz) with a stark choice of defaulting on the obligation to pay the balance, and lose the USD 1.77 billion deposit, or find someone else to buy the asset.[1282]  On the other hand, Respondent's counsel agreed that the transaction "turned out to be very productive for Rosneft; there's no question about it."[1283]

1029. Claimants contend that the nature and speed of events that followed the auction cannot be reconciled with Respondent's suggestion that Rosneft's acquisition of Baikal was entirely fortuitous and unplanned.  On 20 December 2004, the day after the auction, they point out that Rosneft sought and obtained, in less than a day, antimonopoly clearance to acquire Baikal.[1284]  Respondent's attempts to explain these events by pointing out that Rosneft and the authorities

---

[1278] *Surgut drops first hint of interest in Yukos assets*, AFP, 28 September 2004, Exh. C-704 (stating that "President Vladimir Putin and his entourage of secret service agents and Soviet era officials would be delighted with the transaction").

[1279] Claimants' Post-Hearing Brief ¶ 110 (footnote omitted).

[1280] Transcript, Day 19 at 34.

[1281] Transcript, Day 19 at 34–35.

[1282] Transcript, Day 19 at 34–35, 43.

[1283] Transcript, Day 19 at 35.

[1284] Rosneft's request to Federal Antimonopoly Service to approve acquisition of a 100 percent interest in Baikal, 20 December 2004, Exh. C-1162; Federal Antimonopoly Service's approval of Rosneft's acquisition of a 100 percent interest in Baikal, 20 December 2004, Exh. C-1163; Federal Antimonopoly Service's instructions with respect to Rosneft's acquisition of a 100 percent interest in Baikal, 20 December 2004, Exh. C-1164.

were familiar with such filings confirm, according to Claimants, that the authorities did not perform even a perfunctory review of the 13-page application and its 98 pages of attachments.[1285]

1030. Claimants also refer to the fact that Rosneft filed for antimonopoly clearance on a Monday, the day after the auction. Thus, Respondent's allegation that Surgutneftegaz was obliged to sell "the bid" because the TRO prevented it from accessing financing rings hollow since Surgutneftegaz would have needed to seek and be denied financing by every commercial bank on the Sunday of the auction. Claimants ask whether Baikal would have risked a deposit of USD 1.77 billion by making a bid without first having financing in place.[1286]

1031. Respondent claims Rosneft had no ownership interest in Baikal prior to the auction, and that Rosneft put together a finance package for the purchase of Baikal after the auction, on an emergency basis, and, in so doing, even breached covenants related to its prior borrowings.

1032. When Rosneft completed the acquisition of YNG on 22 December 2004, using funds borrowed from State-owned banks, the transaction was described in the Russian Press as "the State budget via a State bank help[ing] a State company acquire from the State a very profitable asset."[1287] Claimants urge the Tribunal to reach the "inescapable conclusion"[1288] that it was determined in advance that Rosneft would acquire YNG, and that the elaborate sham involving Baikal was set up to mask the State's involvement and thus reduce legal risks.

1033. Claimants also submit that the events *after* the auction speak for themselves. YNG's tax debts were reduced from USD 4 billion to less than a billion. In addition, after having filed claims by YNG of almost USD 10 billion in Yukos' bankruptcy, the net cost to Rosneft for the purchase of Yukos' jewel was, according to Claimants, less than USD 3 billion. Thus, bearing in mind that in 2006 Rosneft's IPO valued YNG at USD 55.78 billion, Rosneft's description of the

---

[1285]   Rejoinder ¶ 1004 & n.1698; *see* Approval of the Federal Antimonopoly Service regarding the acquisition by Baikal Finance of a 76.79 percent interest in YNG, 15 December 2004, Exh. R-3813; Order of the Federal Antimonopoly Service regarding the acquisition by Baikal Finance of 76.79 percent interest in YNG, 15 December 2004, Exh. R-3814.

[1286]   Claimants' Post-Hearing Brief ¶ 112.

[1287]   *From the Editors: The State Whirligig*, Vedomosti, 15 August 2005, Exh. C-764.

[1288]   Claimants' Post-Hearing Brief ¶ 113.

transaction as "the most monumental bargain in Russia's modern history" was, conclude Claimants, an understatement.[1289]

1034. The Tribunal notes that the *RosInvestCo* tribunal in reaching its conclusion that the auction was rigged observed that "the winning bidder was a completely unknown company just created before the auction and disappearing right after the auction and assigning its interests to Ru[ss]ian state-owned Rosneft."[1290]  To the *RosInvestCo* tribunal, "[t]he circumstances that this bidder was further found to have no real offices and nevertheless was able to raise the deposit in the range of US\$ 1.7 billion and then the purchase price with the apparent help of Rosneft further contribute to the impression that the scheme was set up under the control of respondent to bring Yukos' assets under Respondent's control."[1291]

1035. The identity of Baikal was also of "[p]aramount"[1292] concern for the *Quasar* tribunal, which described its unease with the circumstances of Baikal's purchase as follows:

> an unknown entity, placed a \$9.3 billion, uncontested winning bid for YNG, the largest oil production company in Russia, and was then acquired a mere three days later by state-owned Rosneft, even before payment of the purchase price was due. . . . The Respondent's argument . . . to the effect that [the] YNG auction was of a public nature, and that [Baikal] bid \$500 million above the starting price, are insufficient to remove the suspicion of collusion, particularly when [Baikal] was quickly taken over by Rosneft before payment of the purchase price was due.[1293]

1036. Having assessed the evidence with respect to the identity and role of Baikal, and the timing and nature of Rosneft's acquisition of that company, this Tribunal agrees with the conclusions of the *RosInvestCo* and *Quasar* tribunals that the YNG auction was rigged.

1037. The additional evidence placed before this Tribunal connecting Baikal to Surgutneftegez does not erase the suspicion that Baikal was created by instruments of Respondent in order to facilitate the acquisition of YNG by State-owned Rosneft.  The statement by Rosneft that the purchase was a "monumental bargain", the remarks by President Putin acknowledging that the

---

[1289]  *Ibid.* ¶ 114; *see* "Place in economy of Russia, Rosneft:  About company," Rosneft Website, p. 14, Exh. C-381.

[1290]  *RosInvestCo* ¶ 523, Exh. C-1049.

[1291]  *Ibid.*

[1292]  *Quasar* ¶ 118, Exh. R-3383.

[1293]  *Ibid.*

State had looked after the State's interest [1294] by increasing its reserves, and the good fortunes of YNG once it was in the hands of a State-owned company all support the Tribunal's conclusion that the auction of YNG was not driven by motives of tax collection but by the desire of the State to acquire Yukos' most valuable asset and bankrupt Yukos.  In short, it was in effect a devious and calculated expropriation by Respondent of YNG.

### (c)   What were Yukos' Prospects for Survival Once it Lost its Core Asset?

1038.  While the legal implications of the YNG auction will be discussed in Part X of the Award, the Tribunal will set out briefly Claimants' factual allegations that the sale of YNG dealt a "fatal blow" to the survival prospects of Yukos.[1295]  Was the sale of YNG the point of no return for the survival of Yukos?  On the basis of the totality of the evidence and, in particular, the testimony of Messrs. Misamore and Theede and Dr. Illarionov, the Tribunal answers that question in the affirmative.

1039.  Mr. Misamore testified that with the auction of YNG, "Yukos lost over 60% of its total production capacity."  This "meant a massive downsizing of the company's activities."  Mr. Misamore hoped it "was not the end of the company," and Yukos started 2005 on the basis that it would carry on operations on a smaller scale with the remaining production assets and refineries.  However, "it soon became evident there was little that Yukos' management could do to protect the company's Russian assets.  Despite our best efforts to challenge the tax reassessments, the Russian courts were biased against us.  Bankruptcy proceedings in Russia were increasingly likely and the Yuganskneftegaz auction had highlighted the real risk that company assets would be transferred to State-owned entities at substantial undervalue."[1296]

1040.  Mr. Theede considered the announcement of the auction as the point in time when "the die was finally cast" for Yukos.  The auction put an end to settlement discussions with the Russian Government.  He considered the sale of YNG at a "grossly undervalued price through a sham

---

[1294]   Press Statement and Answers to Questions Following Russian–German Bilateral Consultations, Russian President Official Website, 21 December 2004, p. 2, Exh. C-421; Press Conference with Russian and Foreign Media, Russian President Official Website, 23 December 2004, p. 4, Exh. C-422.

[1295]   ECtHR Yukos Judgment ¶ 653; *Yukos Says Asset Sale Could Prove Fatal Blow*, NY Times, 23 July 2004, Exh. R-648; *Moscow set to seize huge Yukos oil division—Investors may lose everything in tax fight, analysts warn*, International Herald Tribune, 21 July 2004, Exh. C-698.

[1296]   Misamore WS ¶¶ 58–59.

auction" to be a "clear theft by the Russian State," which became all the more obvious in the context of the IPO by Rosneft in July 2006.[1297]

1041. Dr. Illarionov described the confiscation of YNG as the "culminating point of th[e] attack" on Yukos, following which the Russian authorities took no further steps to satisfy Yukos' alleged tax debts.  Such conduct was inconsistent with a genuine attempt to collect taxes.[1298]

1042. At the time, Claimant YUL and its subsidiaries (including Hulley), as majority shareholders of Yukos, acknowledged that they had "lost the power to govern the financial and operating policies of Yukos so as to obtain benefits from its activities."[1299]  It was noted in the 2004 Annual Report for YUL that Yukos had become "incapable of operating as a business as evidenced by the forced sale of [YNG]."[1300]

1043. The effect of the auction on Yukos' prospects did not escape the attention of the ECtHR, which acknowledged that YNG had been Yukos' "only hope of survival."[1301]  It was "rather obvious" to the ECtHR that the choice of YNG as the first Yukos asset to be auctioned to satisfy Yukos' tax debts was "capable of dealing a fatal blow to its ability to survive the tax claims and to continue its existence."[1302]  This Tribunal agrees.  This Tribunal also agrees with the *Quasar* tribunal's characterization of the seizure of YNG as an extreme measure capable of "drastic" consequences for Yukos.[1303]

1044. Those "drastic" consequences will be important for the Tribunal's determination of an appropriate valuation date for purposes of calculating damages.  The dim prospects of resuscitation of Yukos after the "fatal blow" of the YNG auction are discussed in the next chapter on Bankruptcy.

---

[1297] Theede WS ¶ 25–27 (evoking the Rosneft IPO as a moment "where Rosneft was valued at approximately US $ 80 billion, with YNG accounting for 70% of its crude oil production").

[1298] Illarionov WS ¶¶ 42–43.

[1299] YUL (and its subsidiaries), Annual Report and Consolidated Financial Statements for the Year Ended 31 December 2004, p. 2, Exh. R-4229.  Deloitte, auditors of YUL, in their report on the financial statements, after referring to the auction of YNG, wrote:  "These events indicate a material uncertainty which may cast significant doubt on Yukos's ability to continue as a going concern and therefore it may be unable to realize its assets and discharge its liabilities in the normal course of business."  *Ibid.* at 3.

[1300] *Ibid.* at 2.

[1301] ECtHR Yukos Judgment ¶ 654.

[1302] *Ibid.* ¶ 653.

[1303] *Quasar* ¶ 116, Exh. R-3383.

### G.   THE BANKRUPTCY OF YUKOS

#### 1.   Introduction

1045. Claimants' case is that Yukos' bankruptcy, announced by the Moscow Arbitrazh Court on 4 August 2006 and followed by the removal of Yukos from the companies' register on 21 November 2007, was the "final act of the destruction of the Company by the Russian Federation and the expropriation of its assets for the sole benefit of the Russian State and State-owned companies Rosneft and Gazprom."[1304]   Claimants allege that Respondent "instigated" a syndicate of western banks led by Société Générale (the "**Western Banks**")[1305] to commence bankruptcy proceedings against Yukos based on Yukos' default under a loan agreement concluded between Yukos and the Western Banks for the purposes of funding the Sibneft merger.[1306]   Claimants contend that Respondent ensured, through the initiation of bankruptcy proceedings and discriminatory treatment of bankruptcy claims, that the Russian State and Rosneft would hold over 97 percent of the alleged claims against Yukos in the bankruptcy.[1307]   Having made certain that Yukos' proposed Rehabilitation Plan would be rejected at the general creditors' meeting, the Russian Federation completed its expropriation scheme by auctioning Yukos' remaining assets.   Through the bankruptcy and liquidation of Yukos, the Russian State directly received more than 60.5 percent of the bankruptcy proceeds and, indirectly, through Rosneft, received more than 39.21 percent of the bankruptcy proceeds and all of Yukos' main production assets.

1046. Respondent denies all allegations of impropriety or bias in relation to the bankruptcy proceedings.   Moreover, Respondent argues that the bankruptcy proceedings are irrelevant to the Tribunal's determination because the conduct that directly caused Yukos' liquidation—the initiation of Yukos' bankruptcy and the vote to liquidate Yukos—is either not attributable to Respondent or not an exercise of its sovereign power.   Respondent's case is that "the insolvency of the Yukos holding company was the consequence of the Oligarchs' and Yukos' management's disastrous strategy of tax evasion, resistance to and obstruction of the collection

---

[1304]   Memorial ¶¶ 411–13.

[1305]   The Western Banks included BNP Paribas S.A., Citibank N.A., Commerzbank Akziengesellschaft, Calyon S.A., Deutsche Bank A.G., Hillside Apex Fund Limited, ING Bank N.V., KBC Bank N.V., Société Générale S.A., Stark Trading, Shepherd Investments International Limited, Thames River Traditional Funds PLC (High Income Fund), UFJ (Holland) N.V., and V.R. Global Partners L.P.

[1306]   Presumably for the $3 billion Share Purchase of 20 percent of Sibneft shares.   *See* Yukos, *YukosSibneft, Greater Opportunities to Build Value*, Presentation of 8 October 2003, Exh. C-42.

[1307]   Claimant's Post-Hearing Brief ¶ 126; Memorial ¶ 439; Reply ¶ 412.

of overdue taxes, self imposition of massive non-tax and intercompany liabilities on the company, and failure to draw on Yukos' ample offshore assets."[1308]

### 2.      Chronology

#### (a)      The Initiation of the Bankruptcy

1047.   The initiation of bankruptcy proceedings against Yukos is inextricably tied up in the history of two loans connected with the Sibneft merger, one from the Western Banks ("**A Loan**") and the other from Société Générale ("**B Loan**").   It is therefore important to review the key facts relating to each of those loans.

1048.   For purposes of funding the Sibneft merger, Yukos entered into two loan agreements.   The A Loan consisted of USD 1 billion borrowed by Yukos from the Western Banks, which was secured by certain of Yukos' oil export contracts and by YNG.   This loan was entered into on 24 September 2003.[1309]

1049.   The B Loan consisted of USD 1.6 billion borrowed by Yukos from Société Générale, which was fully collateralized in cash by GML, Yukos' ultimate parent company.   This loan was entered into on 30 September 2003.[1310]

1050.   On 3 October 2003, Société Générale drew on the collateral under the B Loan, making GML the lender.   GML's rights were then assigned to Moravel, which was GML's wholly-owned indirect subsidiary in Cyprus.[1311]

1051.   On 30 June 2004, an appeal panel of the Moscow Arbitrazh Court issued an enforcement writ against Yukos for payment of the taxes assessed for the year 2000.   Following this development, the Western Banks notified Yukos that they would not demand immediate

---

[1308]   Counter-Memorial ¶ 445.

[1309]   Memorial ¶ 374, Guarantee between YNG and Société Générale, 24 May 2004, Exh. R-581.

[1310]   B Loan Agreement, 30 September 2003, Exh. R-468.

[1311]   *Yukos Oil Company Arranges 1.6 Billion Loan*, Yukos Press Release, 6 October 2003, Exh. C-653; Respondent's Closing Slides, p. 381; Memorial ¶¶ 441–44; Counter-Memorial ¶¶ 548, 578, 1531–33; Rejoinder ¶¶ 1054–56, 1136–37.

payment, but would instead rely on the security supporting the A Loan, namely payments through the proceeds of export sales of crude oil.[1312]

1052. Soon after, however, as described in the previous chapter, the tax authorities seized and auctioned YNG, depriving Yukos of its primary oil producing asset.  Claimants contend that when YNG was taken from Yukos in December 2004, YNG stopped shipping oil under the export contracts and "[i]t was thus the actions of the Russian Federation, not Yukos, which obstructed the payment of [the A Loan]."[1313]

1053. Since Yukos ceased making payments under the A Loan, the Western Banks brought a claim against Yukos for approximately USD 472.8 million, plus interest under the A Loan.  The claim was recognized by the High Court of England and Wales on 24 June 2005 ("**English Judgment**").[1314]  Respondent contends that, by this time, Yukos had already paid Moravel over USD 1 billion under the B Loan, and thus had more than enough cash to have repaid the Western Banks in full under the A Loan.

1054. During this same time period, Yukos management implemented two restructurings that transferred Yukos' non-Russian assets, previously held through Yukos' wholly-owned Dutch and Armenian subsidiaries Yukos Finance and Yukos CIS into two "stichting administratiekantoor".

1055. A stichting is a Dutch "foundation."[1315]  It does not have members or shareholders.  All management powers are vested in a board of directors, subject only to the stichting's articles of association and Dutch law.[1316]  In the case of a stichting administratiekantoor or "foundation trust," the stichting issues depository receipts for shares in exchange for shares transferred to it.[1317]  This trust-like structure separates legal ownership and beneficial ownership:  the

---

[1312]   Appeal Resolution of the Moscow Arbitrazh Court, 29 June 2004, Exh. C-121; Enforcement Writ No. 383729 of 30 June 2004, Exh. C-122; Claimant's Post-Hearing Brief ¶ 118.

[1313]   Claimant's Post-Hearing Brief ¶ 118.

[1314]   *BNP Paribas v. Yukos Oil Company*, High Court of England and Wales, Judgment, 24 June 2005, Exh. R-455 (hereinafter "English Judgment").

[1315]   Dutch Civil Code (Burgerlijk Wetboek) art. 285(2), Exh. R-709; Counter-Memorial ¶ 528.

[1316]   C. Asser, *Handleiding tot de beoefening van het Nederlands Burgerlijk Recht* (W.E.J. Tjeenk Willink, 1997) ¶ 475, Exh. R-723; ¶¶ 480, 484, Exh. R-724.

[1317]   C. Asser, *Handleiding tot de beoefening van het Nederlands Burgerlijk Recht* (Kluwer, 2009) ¶ 658, Exh. R-725.

stichting is the legal owner of the shares and the holder of the depositary receipts for shares is the beneficial owner of the shares.[1318]

1056. The first restructuring took place in April 2005 and consisted in the transfer of all of the assets of Yukos Finance to Yukos International U.K. B.V. ("**Yukos International**"), a wholly-owned Dutch subsidiary of Yukos Finance, and the subsequent transfer of Yukos Finance's shares in Yukos International to Stichting 1in exchange for depositary receipts for those shares.[1319]

1057. The second restructuring took place in September 2005 and consisted in the transfer of all the shares owned by Yukos CIS in Yukos Hydrocarbons Investments Limited ("**YHIL**") to Wincanton, a Dutch company; and the subsequent transfer of all of Wincanton's shares in YHIL to Small World Telecommunication Holding B.V. ("**Small World**"),[1320] another Dutch company wholly-owned by Wincanton.  Finally, Wincanton's shares in Small World were transferred to Stichting 2[1321] in exchange for depositary receipts for those shares.[1322]

1058. The members of the Stichtings' boards are former managers of Yukos and individuals close to Yukos.[1323]  The Stichtings hold "substantial value"[1324] and remain in place today.

1059. Articles 2.2 and 2.3 of the original Articles of Association of the Stichtings provide:

> 2.  The Foundation will exercise the rights attached to the shares in such a way as to guarantee to the best of its ability, whether or not by conducting court proceedings, the interests of the Company and the other, direct or indirect, subsidiaries of Yukos Oil Company (the "Parent Company"), which jointly constitute the group of which the Company forms a part (the "Group"), the management, executive staff and employees of the Group, the Group's legitimate creditors (including creditors with undisputed claims) and all other acknowledged stakeholders of the Group.

---

[1318] *Ibid.*

[1319] Counter-Memorial ¶ 529; Articles of Association of Stichting Administratiekantoor Yukos International (hereinafter "Stichting 1"), 14 April 2005, Exh. C-1181.

[1320] Small World Telecommunication Holding B.V. later changed its name to Financial Performance Holdings B.V. Counter-Memorial ¶ 530; *see also* Article 2.1 of the Articles of Association, Stichting Administratiekantoor Small World Telecommunications Holdings B.V. (hereinafter "Stichting 2"), 20 June 2006, Exh. R-712.

[1321] Stichting 2 later changed its name to Stichting Administratiekantoor Financial Performance Holdings. *See* Counter-Memorial ¶ 530.

[1322] Counter-Memorial ¶ 530; Articles of Association of Stichting 2, 26 September 2005, Exh. C-1182.

[1323] Counter-Memorial ¶ 532; Minutes of the Yukos Board of Directors Executive Committee, 26 October 2005, Exh. R-716; Transcript, Day 9 at 232 (cross-examination of Mr. Misamore).

[1324] Respondent's Post-Hearing Brief ¶ 120; Transcript, Day 9 at 233–34 (cross-examination of Mr. Misamore) (asserting that the maximum value held by Stichting 1 was USD 1.8 billion in 2006, and the maximum value held by Stichting 2 was around USD 500 million as of the date of the Hearing); Counter-Memorial ¶ 536.

> 3. Excluded from the Foundation's objects are the exercising of rights attached to the shares as a result of or in the implementation of an unlawful claim, judgment or transaction, including but not limited to those resulting from or related to the tax assessments imposed on Yukos Oil Company and members of the Group in the Russian Federation on or after the fourteenth of April two thousand and four, specifically including, but without prejudice to the above, any claim against, transfer of, sale of, revendication of, attachment judgment in respect of, allocation of or other applicability to, or expropriation of the shares, assets or other property of, or other imposition of charges on Yukos Oil Company and any part of the Group.[1325]

1060. Respondent asserts that the Stichtings were used to insulate assets from the reach of the Western Banks.  Respondent puts particular emphasis on proceedings in Dutch courts, where the Western Banks attempted to enforce the English Judgment.[1326]   On 15 July 2005, the Western Banks petitioned the District Court of Amsterdam to enforce the English Judgment, and to issue a judgment permitting the sale and transfer of Yukos' share interest in Yukos Finance.[1327]   The Western Banks informed the court that the creation of the Stichtings had rendered Yukos' shares in Yukos Finance, over which the Western Banks had obtained a prejudgment attachment, "worthless" and "more or less unsellable."[1328]   Respondent asserts that the Western Banks' failure to enforce the English Judgment in the Netherlands was "the death knell of Yukos' pretense of cooperation in its negotiations with the syndicate."[1329]

1061. Back in Russia, on 22 September 2005, the bailiff adopted a resolution to seize all of Yukos' assets.[1330]

1062. The Western Banks proceeded to seek to enforce the English Judgment against Yukos in Russia.  The Western Banks succeeded in the first instance, before the Moscow Arbitrazh Court, but the Court's favourable ruling (issued on 28 September 2005) was reversed on "procedural" grounds by the Federal Arbitrazh Court for the Moscow District on 5 December 2005.

---

[1325]   Articles of Association of Stichting 1, 14 April 2005, Exh. C-1181; Articles of Association of Stichting 2, 26 September 2005, Exh. C-1182.

[1326]   Rejoinder ¶¶ 1073–75; English Judgment, Exh. R-455.

[1327]   Rejoinder ¶ 1076; *BNP Paribas S.A. et al. v. OAO Yukos Oil Company et al.*, Decision of the District Court of Amsterdam, 29 September 2005 ¶ 2.1, Exh R-756.

[1328]   *BNP Paribas S.A. et al. v. OAO Yukos Oil Company et al.*, Decision of the District Court. of Amsterdam, 29 September 2005 ¶ 2.3, Exh R-756.

[1329]   Rejoinder ¶ 1083.

[1330]   Resolution of Bailiff A.V. Reydik, 22 September 2005, Exh. C-301.

1063. Following the unfavourable decision by the Federal Arbitrazh Court for the Moscow District, the Western Banks entered into a confidential sale agreement with Rosneft ("**Confidential Sale Agreement**").[1331]

1064. Pursuant to this Confidential Sale Agreement, Rosneft agreed to satisfy the outstanding debt owed by Yukos to the Western Banks (the outstanding principal being at the time USD 455,124,215.03), in exchange for the assignment of the banks' rights of claim against Yukos under the A Loan to Rosneft.[1332]

1065. Significantly, the payment of the purchase price by Rosneft was predicated upon the Western Banks agreeing to take the steps described in Schedule 8 of the Confidential Sale Agreement, entitled "Application For Bankruptcy."  Schedule 8 sets out the Western Banks' obligations under three steps:  "1. Proceedings on recognition and enforcement of the English Judgment in Russia (the 'Enforcement Case')"; "2. Execution proceedings against the Borrower [*i.e.*, Yukos] (based on the Enforcement Case) (the 'Execution Proceedings')"; and "3. Bankruptcy proceedings against the Borrower.[1333]

1066. Following the conclusion of the Confidential Sale Agreement between the Western Banks and Rosneft, the enforcement of the A Loan was back before the Russian courts.  On 21 December 2005, the Moscow Arbitrazh Court formally recognized the English Judgment against Yukos in favour of the Western Banks and issued a writ of enforcement with respect to the judgment.

1067. On 29 December 2005, the Western Banks submitted the enforcement writ to the bailiffs, who then initiated enforcement proceedings to recover from Yukos the amounts ordered under the English Judgment, namely USD 455,124,214.99 in principal and USD 9,459,143.18 in interest. These enforcement proceedings failed. Claimants assert that they were bound to fail due to the seizure of Yukos' assets, which had been imposed since July 2004.

1068. The order of the Moscow Arbitrazh Court that recognized the English Judgment was challenged by Yukos, and upheld by the Federal Arbitrazh Court of the Moscow District.  In its decision of 2 March 2006, the Federal Arbitrazh Court reasoned as follows:

---

[1331] Sale Agreement Relating To Certain Rights And Benefits Arising Under A Credit Agreement dated 24 September 2003 Between, Amongst Others, "Yukos Oil Company" and Société Générale SA, 13 December 2005, Exh. C-300 (hereinafter "Confidential Sale Agreement").

[1332] *Ibid*, p. 4.

[1333] *Ibid*., pp. 37–38.

> When re-examining the case, the Court did comply with the directions given by the cassation Resolution of December 5, 2005. The Court fully and comprehensively reviewed the circumstances of the case. Its conclusions on the application of legal rules are consistent with the established circumstances and evidence in the case.[1334]

1069. On 6 March 2006, the Western Banks petitioned the Moscow Arbitrazh Court to declare Yukos bankrupt.[1335]

1070. In an undated letter, Mr. Theede wrote in mid-March to the bailiffs requesting that the authorities "immediately release Company property from the freezing order in an amount sufficient to satisfy" the debt owed to the A Loan lenders, and thus avert the commencement of the bankruptcy proceedings.[1336]

1071. On 14 March 2006, consistent with the terms of the Confidential Sale Agreement, Rosneft paid the Western Banks the full outstanding amount of the A Loan; in exchange, the Western Banks assigned their rights of claim to Rosneft.[1337]

1072. On 24 March 2006, YNG—by then a subsidiary of Rosneft—filed a separate and parallel petition against Yukos before the Moscow Arbitrazh Court to declare Yukos bankrupt.[1338]

1073. According to Respondent, the YNG petition was based on a judgment in respect of transportation services provided while Yukos owned YNG in January through March 2004, under a January 2003 contract.[1339]

1074. The YNG petition was formally granted on 27 March 2006.[1340] Since Russian law does not allow separate bankruptcy proceedings against one company, YNG's claim was joined to the bankruptcy proceedings initiated by the Western Banks.[1341]

---

[1334] Resolution of the Federal Arbitrazh Court for the Moscow District, 2 March 2006, p. 4, Exh. C-302.

[1335] Banks' Petition to Declare Yukos Bankrupt Filed with the Moscow Arbitrazh Court, 6 March 2006, Exh. R-3885; *Creditors Petition Russian Court to Declare Yukos Bankrupt*, World Markets Analysis, 13 March 2006, Exh. R-3882.

[1336] Letter from Yukos' President S. Theede to the Head of the Interdistrict Department for Special Enforcement Proceedings of the Chief Directorate of the Federal Bailiffs Service for Moscow V.A. Savostov (undated), p. 3, Exh. C-1180; Claimant's Post-Hearing Brief ¶ 125.

[1337] Ruling of the Moscow Arbitrazh Court, 28 March 2006, p. 3, Exh. C-307; Memorial ¶ 425; Claimants' Skeleton ¶ 47.

[1338] Memorial ¶ 427; Counter-Memorial ¶ 561; Ruling of the Moscow Arbitrazh Court, 27 March 2006, p. 1, Exh. C-305.

[1339] Rejoinder ¶ 1098.

[1340] Ruling of the Moscow Arbitrazh Court, 27 March 2006, p.1, Exh. C-305.

[1341] Register of Yukos Creditors' Claims, 30 October 2007 (Claim No. 2), p. 34, and (Claim No. 3), p. 109, Exh. C-353.

1075. On 28 March 2006, the Moscow Arbitrazh Court ordered the commencement of bankruptcy proceedings, placed Yukos under supervision, appointed Mr. Rebgun as interim administrator, and formally substituted Rosneft for the Western Banks as creditor.[1342]

1076. The Tribunal recalls that around that time Mr. Theede appointed Mr. Aleksanyan to represent Yukos in connection with the bankruptcy proceedings, but that within days of his appointment, Mr. Aleksanyan was arrested on 6 April 2006 at his house by masked and armed men on charges of money laundering and embezzlement allegedly committed when he was head of Yukos' legal department.[1343]

(b)    **The Treatment of Bankruptcy Claims; the Creditors' Meeting; the Declaration of Yukos' Bankruptcy**

1077. In accordance with Russian bankruptcy law, it was for Mr. Rebgun, as interim administrator of Yukos, to convene a first meeting of Yukos' creditors.  At that meeting, Yukos' creditors would, under the options available under Russian Bankruptcy Law, vote either in favour of a Rehabilitation Plan proposed by Yukos or for the alternative of a liquidation of Yukos.

1078. In anticipation of these steps, on 1 June 2006, Yukos convened an extraordinary general shareholders' meeting and approved, by majority vote, the Rehabilitation Plan proposed by Yukos' management.[1344]  Also, the shareholders appointed Mr. Osborne as their representative in the bankruptcy proceedings.

1079. Claimants' Rehabilitation Plan was based on, *inter alia*:[1345]

    i)    The remaining assets valued at USD 31 billion exceeding the USD 29.5 billion in tax claims filed with Mr. Rebgun;

    ii)    a two year program to pay off the claims in bankruptcy;

---

[1342]   Rulings of the Moscow Arbitrazh Court, 28 March 2006, Exh. C-306 and Exh. C-307.

[1343]   *Top Yukos official Aleksanyan detained in Moscow*, RIA Novosti, 6 April 2006, Exh. C-796; *Arrest of Yukos Oil Company Executive Vice-President is a Brutal and Unjust Attack on the Company's Attempts to Secure a Fair Bankruptcy Process*, Yukos Press Release, 7 April 2006, Yukos Website, Exh. C-797; *Ioukos, un deuxième président en prison*, Libération, 8 April 2006, Exh. C-798; *Le Kremlin s'acharne contre le groupe pétrolier Youkos*, Le Figaro, 13 April 2006, Exh. C-799; Theede WS ¶ 30.

[1344]   Minutes of Extraordinary General Meeting of Yukos' Shareholders held on 1 June 2006, Exh. C-311.

[1345]   Memorial ¶ 458; Letter from Fulbright & Jaworski LLP to Chadbourne & Parke LLP, 1 June 2006, enclosing Yukos' Outline of Proposed Financial Rehabilitation Plan, Exh. C-312 (hereinafter "Rehabilitation Plan").

iii) the creation of a "Cash Pool separate from the Company," funded by constant cash flows generated by Yukos' production, refining and marketing subsidiaries (approximately USD 3–3.5 billion of annual Earnings Before Interest, Taxes, Depreciation and Amortification ("**EBITDA**");

iv) the sale of non-core assets: approximately USD 8.9 billion from the sale of Russian assets (20 percent stock of Sibneft ordinary shares, approximately USD 4.2 billion; 23.7 percent of YNG's outstanding share capital in the form of preferred shares (estimated at USD 3.6 billion); 100 percent of shares in Arctic Gas, approximately USD 1.1 billion) and approximately USD 1.5 billion from foreign assets (from the sale of its 53.7 percent stake in Lithuanian oil company Mazeikiu Nafta and 49 percent stock in Slovakian oil transport major Transpetrol); and

v) supplementing the Cash Pool with amounts awarded in pending international arbitrations and Russian litigation where Yukos was seeking approximately USD 18 billion.

1080. On the same day that the shareholders approved the Rehabilitation Plan (*i.e.*, on 1 June 2006), Yukos' counsel transmitted an "Outline of the Proposed Financial Rehabilitation Plan" to Mr. Rebgun's counsel in the U.S. (Chadbourne & Parke LLP), requesting that the Rehabilitation Plan be placed on the agenda of the first meeting of Yukos' creditors, and circulated to all of Yukos' registered creditors.

1081. On 2 June 2006, Mr. Rebgun sent to Yukos' registered creditors and to Yukos' CEO, Mr. Theede, a notice informing them that the first creditors' meeting would be held on 16 June 2006 and inviting them to consult the materials that would be discussed at the meeting in his office from 9 to 15 June 2006.[1346]

1082. In the event, the first meeting of Yukos' creditors did not take place as scheduled on 16 June 2006.  On 8 June 2006, the first meeting of Yukos' creditors was adjourned by the Moscow Arbitrazh Court pending a 14 June 2006 hearing on the admission into bankruptcy proceedings of outstanding tax claims by the Federal Taxation Service for 2000 to 2004.  Mr. Rebgun, in turn, requested a postponement of the Court's hearing on Yukos' bankruptcy.[1347]

---

[1346] Notice of the First Yukos Creditors' Meeting to be held on 16 June 2006, 2 June 2006, Exh. C-314.

[1347] Memorial ¶¶ 432–34, 454.

1083. At the hearing of 14 June 2006, a bankruptcy judge (not a tax judge) of the Moscow Arbitrazh Court ruled in favour of the Federal Taxation Service "after taking just 15 minutes to consider 127,000 pages of information submitted by Russian tax officials," admitting in their entirety as valid bankruptcy claims the tax authorities' claims based on years 2000–2003, plus 2004.  In so doing, the judge confirmed the Federal Taxation Service as Yukos' largest creditor, with registered claims of USD 13.06 billion (amounting to 60.5 percent of all registered bankruptcy claims).[1348]

1084. Some two weeks later, the Court's hearing on Yukos' bankruptcy was postponed to 1 August 2006.  The Court granted the postponement, noting that the "first meeting of creditors did not take place because not all of the creditors' claims submitted before the established deadline have been reviewed by the Court."[1349]

1085. On 28 June 2006, Mr. Rebgun sent a revised notice of the first creditors' meeting to be held on 20 July 2006 and invited registered creditors to consult the bankruptcy materials from 14 to 19 July 2006.[1350]  Claimants assert that Mr. Rebgun did not circulate the Rehabilitation Plan that had been proposed by Yukos with his original notice of 2 June 2006.[1351]  Indeed, the existence of the Rehabilitation Plan appears to have been notified to the creditors by Mr. Rebgun only in his revised notice of 28 June 2006, and made available for review between 14 and 19 July.

1086. On 17 July 2006, the Moscow Arbitrazh Court admitted into the bankruptcy proceedings four claims by YNG (now Rosneft's subsidiary) based on the sale of oil produced by YNG and sold to Yukos' trading companies in 2004.  The Court decided that Yukos, not the trading companies, was liable to pay for the purchased oil.  Thus, YNG's registered claims (Rosneft's) were USD 4.42 billion (including penalties) or 22.16 percent of the claims admitted into the bankruptcy proceedings at the time.[1352]

---

[1348]  *Judge sets speed-reading record…*, Reuters, 16 June 2006, Exh. C-809; Claimants' Summary Chart of Registered Creditors' claims, Exh. C-594 (hereinafter "Summary Chart of Creditors").

[1349]  Ruling of the Moscow Arbitrazh Court, 27 June 2006, Exh. C-315.

[1350]  Notice of the First Yukos Creditors' Meeting to be held on 20 July 2006, 28 June 2006, Exh. C-316.

[1351]  Memorial ¶ 453.

[1352]  Resolutions of the Ninth Arbitrazh Court of Appeal, 31 August 2006 and 7 September 2006, Exh. C-339 and Exh. C-340.  On 20 July 2006, a further 29 claims were admitted on behalf of YNG (by now Rosneft's subsidiary).  Summary Chart of Creditors, Exh. C-594; Claimants' Skeleton ¶ 52; Memorial ¶¶ 435–36; Reply ¶ 399.

1087. In accordance with Mr. Rebgun's revised notice of 28 June 2006, the first meeting of Yukos' creditors was held on 20 July 2006.  Creditors were offered two alternative scenarios:  (1) the Rehabilitation Plan proposed by Yukos' management; and (2) the Analysis of Yukos' Financial Situation proposed by Mr. Rebgun.  At the request of Federal Taxation Service, the meeting was adjourned to 25 July 2006 to allow Mr. Rebgun to complete his Analysis with a separate exhibit analyzing the possibility of Yukos' breakeven activities.[1353]

1088. Mr. Rebgun's Analysis did not contemplate the restoration of Yukos' financial situation.  Instead, Mr. Rebgun concluded that Yukos' remaining assets, totalling approximately USD 17.75 billion after a deduction of a 24 percent profit tax, were not sufficient to cover the USD 18.3 billion of registered bankruptcy claims.  On this basis, Mr. Rebgun recommended that Yukos be declared bankrupt and that receivership proceedings against Yukos be initiated.[1354]

1089. On 25 July 2006, when the creditors' meeting that had been adjourned resumed, the creditors voted against the Rehabilitation Plan and recommended that Yukos be declared bankrupt.  Twenty-four creditors were admitted as voting participants to the creditors' meeting.  The Tribunal notes that Respondent, through the Federal Taxation Service, and indirectly through Rosneft (which had acquired the Western Banks' claim under the A Loan) and YNG (now Rosneft's subsidiary), had 93.87% of the votes.[1355]

1090. On 4 August 2006, Yukos was declared bankrupt by the Moscow Arbitrazh Court and placed under receivership, which was to be completed within one year.[1356]

(c)     The Liquidation of Yukos' Remaining Assets

1091. On 9 October 2006, the Moscow Arbitrazh Court admitted further claims by YNG into the bankruptcy proceedings.  These claims, worth USD 5.5 billion, were for alleged "lost profits"

---

[1353]   Analysis of Yukos' Financial Situation, 2006, Exh. C-317; Summary Analysis of the Debtor's Financial Situation submitted by Mr. Rebgun to the U.S. Bankruptcy Court for the Southern District of New York in the Chapter 15 Case as Exhibit B to his Status Report of 7 August 2006, Exh. C-318; Summary Chart of Creditors, Exh. C-594; Memorial ¶¶ 458–61; Counter-Memorial ¶¶ 620–32.

[1354]   Summary Analysis of the Debtor's Financial Situation submitted by Mr. Rebgun to the U.S. Bankruptcy Court for the Southern District of New York in the Chapter 15 Case as Exhibit B to his Status Report of 7 August 2006, pp. 7–8, Exh. C-318.

[1355]   Protocol of the First Meeting of Yukos' Creditors held on 20 July 2006, 25 July 2006, Exh. C-319; Memorial ¶ 464.

[1356]   Decision of the Moscow Arbitrazh Court, 1 August 2006, Exh. C-324.

during 2000 to 2003. Thus, from July to October 2006, the Russian courts admitted over USD 9.9 billion of claims by YNG into Yukos' bankruptcy.[1357]

1092. YNG was fully consolidated into Rosneft as of 1 October 2006.[1358] As a result of this consolidation, on 9 November 2006, the Moscow Arbitrazh Court ordered that YNG be replaced by Rosneft as a bankruptcy creditor, thereby attributing to Rosneft all of the claims registered to that time in the name of YNG. Eventually, adding a few minor claims, Rosneft held USD 10.69 billion or 37.17% of all registered bankruptcy claims.[1359]

1093. Under Russian bankruptcy law, Mr. Rebgun needed to select an appraiser in connection with the liquidation of Yukos' assets. On 23 October 2006, Mr. Rebgun selected a consortium of five appraisers headed by ZAO ROSECO ("**ROSECO**").[1360]

1094. On 15 January 2007, ROSECO issued an appraisal report on Yukos' assets, including the preliminary results of an appraisal of its subsidiaries and dependent companies.[1361] There is some uncertainty, however, over what exactly the appraisers determined in respect of the value of Yukos' remaining assets.

1095. On 19 January 2007, Mr. Rebgun reportedly declared that his appraisers had valued Yukos' assets at USD 22 billion.[1362] It was also reported that Mr. Rebgun later revised his valuation of Yukos' assets to USD 25.6 and 26.8 billion and indicated that "the liquidation discount during the sale would not exceed 30 percent."[1363] Another article reported that the consortium of appraisers had valued Yukos' remaining assets at USD 33 billion.[1364]

1096. Between March and August 2007, 17 bankruptcy auctions took place. The Tribunal observes that Respondent held (directly or through Rosneft) 97.67 percent of all claims against Yukos

---

[1357] Ruling of the Moscow Arbitrazh Court, 9 October 2006, Exh. C-343; Claimants' Skeleton ¶ 52.

[1358] Rosneft 2007 U.S. GAAP Consolidated Financial Statements, p. 8, Exh. C-377; Memorial ¶ 437.

[1359] Ruling of the Moscow Arbitrazh Court, 9 November 2006, Exh. C-344 and Summary Chart of Creditors, Exh. C-594; Memorial ¶ 438.

[1360] Receiver's Report on His Activities and the Results of the Receivership for the Period from 4 August 2006 through 1 November 2007, 1 November 2007, p. 3, Exh. C-361 (hereinafter "Receiver's Report").

[1361] Ruling of the Moscow Arbitrazh Court, 12 November 2007, p. 7, Exh. C-362.

[1362] *Yukos assets valued at $22 bln – bankruptcy receiver spokesman*, RIA Novosti, 19 January 2007, Exh. C-828; Claimant's Post-Hearing Brief ¶ 129.

[1363] *21 Yukos Assets Bundled for Auction*, The Moscow Times, 5 March 2007, Exh. C-831.

[1364] *Appraisers say Yukos worth over $33 bln*, RIA Novosti, 22 January 2007, Exh. C-829; Claimant's Post-Hearing Brief ¶ 129; Memorial ¶ 469.

and received (directly or through Rosneft) approximately 99.71 percent of the bankruptcy proceeds.[1365]   The most important assets were auctioned off as follows:[1366]

- Lot 1 (27 March 2007): remainder of Yukos' stake (9.44 percent) in YNG sold to Rosneft, acting through its indirect subsidiary OOO RN-Razvitiye, for USD 7.59 billion;

- Lot 2 (4 April 2007): 20 percent minus 1 share in Gazpromneft (ex-Sibneft), Urengoil and Arctic Gas sold to OOO EniNeftegaz (the Russian subsidiary of Italian companies Eni (60 percent) and Enel (40 percent)) for USD 5.83 billion; transferred to Gazprom in 2009; immediately announced that EniNeftegaz would cede control of the assets to Gazprom under option agreements signed prior to the auction.

- Lot 5 (18 April 2007):  Manoil sold to Rosneft.

- Lot 10   (3 May   2007): Tomskneft, Achinsk, Angarsk, East Siberian and Strezhevskoy sold to Rosneft (via Neft-Aktiv) for $6.82 billion.

- Lot 11   (10 May   2007): Samaraneftegaz, Syzran, Novokuybyshevsk and Kuybyshev sold to Rosneft for USD 6.4 billion.

1097. Between August and October 2007, the Federal Taxation Service successfully applied for "late" claims, consisting chiefly of claims for 24 percent profit taxes on the proceeds arising from the bankruptcy auctions.[1367]   These claims amounted to USD 8.82 billion.[1368]

1098. On 31 October 2007, upon liquidation, Yukos still had some USD 9 billion in unsatisfied liabilities.  One third of these were tax claims.[1369]

---

[1365]   Receiver's Report, pp. 30–43, Exh. C-361.

[1366]   Claimants' Rebuttal Slides, p. 32.

[1367]   Memorial ¶¶ 490–91; Counter-Memorial ¶¶ 665–69; Reply ¶¶ 418–20; Rejoinder ¶¶ 1182–83.

[1368]   Respondent explains at Counter-Memorial ¶ 665 n.1100:

Pursuant to Art. 142(4) of the Russian Bankruptcy Law, any claim submitted after closure of the register of claims (in the case of Yukos, on Oct. 12, 2006), as well as any claim for mandatory payments arising after the commencement of receivership (irrespective of when it was filed against the debtor), is validly filed as a "late" claim and recorded on a separate list. "Late" claims are satisfied after full satisfaction of timely claims included in the register of bankruptcy claims.  See Art. 142(4) of the 2002 Russian Bankruptcy Law [Exh. R-776]."

1099. On 15 November 2007, the Moscow Arbitrazh Court formally endorsed all of Mr. Rebgun's activities as receiver, closed Yukos' receivership, and ordered that Yukos be struck off the register of legal entities.[1370]  Yukos was struck off the register of companies and its shares were legally extinguished on 21 November 2007.[1371]

### 3.    Parties' Arguments and Tribunal's Observations

1100. In broad terms, Claimants allege that the Russian Federation decided to "push Yukos into bankruptcy in order to redistribute its remaining assets."  In their Memorial, Claimants set out what they characterized as Russia's orchestrated plan to bankrupt and liquidate Yukos:

> The Russian Federation ensured, through the initiation of bankruptcy proceedings at the behest of Rosneft and using the cover of a consortium of Western banks (1), and through the biased and discriminatory conduct of the proceedings by its courts, that the Russian State and Rosneft would hold over 97% of the alleged claims against Yukos in the bankruptcy (2).  Having also made certain that Yukos' rehabilitation plan would be rejected (3), the Russian Federation completed its expropriation scheme by auctioning the Company's remaining assets.  As a result of the bankruptcy and liquidation of Yukos, the Russian State received directly more than 60.5% of the bankruptcy proceeds and, through Rosneft, more than 39.21% of the bankruptcy proceeds and all of Yukos' main production assets (4).[1372]

1101. Respondent rejects this suggestion, and argues instead that it was Yukos' management that forced the company into bankruptcy:

> [T]he bankruptcy and ultimately the liquidation of Yukos was not the aim or the result of a massive, global plot orchestrated by the Russian Government, but rather the inevitable consequence of the consistent and repeated lawless and reckless misconduct of the Oligarchs and the Yukos management they installed to conduct their—including Claimants'—investment.[1373]

1102. According to Respondent, "Claimants have failed to establish their primary contentions regarding Yukos' bankruptcy proceedings:  that the bankruptcy was instigated 'by the Russian Federation through State-owned Rosneft,' that 'the only logic behind the decision to liquidate

---

[1369]   Yukos Liquidation Balance Sheets, 31 October 2007, Exh. R-753 and Analysis of Financial Condition of Yukos Oil Company OJSC Conclusions and Actions (undated), p. 36, R-748.

[1370]   Ruling of the Moscow Arbitrazh Court, 12 November 2007, Exh. C-362.

[1371]   Certificate Recording an Entry in the Unified Register of Legal Entities, 21 November 2007, Exh. C-363.

[1372]   Memorial ¶ 412.

[1373]   Counter-Memorial ¶ 540.

Yukos was to expropriate the company,' and that the proceedings were conducted improperly so that the Russian Federation could 'take its assets.'[1374]

1103. The Parties' arguments are related to and can be organized under the following two headings: (a) why was the bankruptcy initiated and who was truly behind it?  And (b) were the bankruptcy proceedings conducted properly and fairly?

1104. The Parties' arguments and the Tribunal's observations on each of these are presented below.

### (a)  Why was the Bankruptcy Initiated and Who was Truly Behind It?

1105. It is not contested that the non-payment of the A Loan was an important factor leading to the bankruptcy of Yukos, since it was the creditor under the A Loan, the Western Banks, who initiated the bankruptcy (consistent with terms agreed with Rosneft in the Confidential Sale Agreement).  There is disagreement, however, over the following two issues related to the non-payment of the A Loan:

 i)  Who was responsible for the non-payment of the A Loan – was Yukos prevented from paying by Respondent's conduct, or did Yukos have some control over the matter?

 ii)  Was the Confidential Sale Agreement a reasonable commercial arrangement between the Western Banks, as creditor, and Rosneft, as parent of YNG, the guarantor of the A Loan, or was it imposed on the Western Banks as part of Respondent's deliberate plan (executed through or with the assistance of Rosneft) to expropriate the remaining assets of Yukos?

1106. Each of these issues is analyzed in the respective subsections below, followed by the Tribunal's observations on why the bankruptcy was initiated and who was truly behind it.

### (i)  Non-Payment of the A Loan

1107. The Parties present opposing views on the reasons for which the A Loan had not been paid off by Yukos by the end of 2005.

---

[1374]   Respondent's Post-Hearing Brief ¶ 122 (internal footnotes omitted).

1108. Respondent argues that the Western Banks were not paid simply because "Yukos adamantly refused to pay."[1375]   In other words, according to Respondent, "Yukos' dilatory and obstructionist treatment of its commercial creditors paralleled closely its treatment of its tax creditors."[1376]   Respondent advances four arguments, as summarized at paragraphs 125 to 129 of its Post-Hearing Brief.

1109. Firstly, starting in January 2004, Yukos refused the syndicate's requests for full prepayment of the loan and denied the syndicate's requests to subordinate the B Loan to the A Loan. Secondly, Yukos "re-routed" its exports and chose to leave the banks with an unsecured non-performing loan.   Thirdly, Yukos failed to satisfy the English Judgment even though it had the available resources to pay it, frustrating collection efforts in the United States and in the Netherlands.   Fourthly, Yukos engaged in "bad-faith negotiations" with the syndicate, which eventually led the syndicate to contact Rosneft and come to an agreement with it.

1110. Claimants generally argue that "Yukos worked closely with [the syndicate] to ensure payment of the debt" but that "at each step, the Russian Federation's actions impeded the Company's efforts."[1377]   Claimants submit that "[h]ad the A Lenders not received an offer from Rosneft in the interim, they too would have been paid out of the proceeds of the sale of the Dutch assets, along with Moravel."[1378]

1111. Each of Respondent's specific arguments in relation to the non-payment of the A Loan is addressed in the respective subsections below.

> (a)   *Yukos' Refusal to Fully Prepay the A Loan or to Subordinate the B Loan*

1112. Respondent argues that "[t]rouble arose almost immediately after the A Loan was funded."[1379]   It claims that the syndicate "first raised the possibility of Yukos' bankruptcy" in early 2004.[1380]

---

[1375]   Respondent's Post-Hearing Brief ¶ 124.

[1376]   Rejoinder ¶ 1052.

[1377]   Claimants' Post-Hearing Brief ¶ 117 (footnote omitted).

[1378]   Claimants' Post-Hearing Brief ¶119.   The debt of Moravel Investment Limited (hereinafter "Moravel") was paid in 2008 through the proceeds from the sale of Yukos' stake in the Lithuanian oil company Mazeikiu Nafta.  Reply ¶ 391; Transcript, Day 20 at 229 (Claimant's rebuttal):  "Indeed, Moravel would eventually be paid out from the proceeds of the sale of Mazeikiu Nafta, and pursuant to a court order, and the banks would have similarly been paid out from the proceeds of the sale of that asset had they not in the meantime received an offer that was difficult to refuse."

[1379]   Rejoinder ¶ 1057.

[1380]   *Ibid.*

In January 2004, the following options were discussed: full prepayment of the A Loan; partial acceleration of the A Loan; additional security; and subordination of the B Loan to the A Loan.[1381]   Respondent, relying on a news article, claims that the syndicate was "especially concerned" with the so-called "giga-dividend."[1382]

1113. After the syndicate served notice on Yukos of a potential event of default in April 2004,[1383] Respondent asserts that Yukos "compelled" its production subsidiaries YNG, Samaraneftegaz, and Tomskneft to provide guarantees[1384] and agreed to make pre-payments.[1385]   Respondent notes that Yukos insisted that the A Loan and the B Loan be treated *pari passu*.[1386]

1114. Respondent emphasizes that if Yukos had subordinated the B Loan, the syndicate would have been paid in full.[1387]   In response to Claimants' argument that the loans were *pari passu*,[1388] Respondent underlines that the B Loan "was nothing more and nothing less than a shareholder loan."[1389]   Therefore, according to Respondent, there is nothing that prevented Yukos (or Claimants) from agreeing to subordination.[1390]

1115. While Claimants defend the 2003 interim "giga dividend," and assert that they never favored the B Loan over the A Loan (treating the two loans *pari passu*),[1391] they do not address Respondent's argument that the B Loan was a shareholder loan and that they could have agreed to subordinate it to the A Loan.

---

[1381] *Ibid.* ¶ 1057; Société Générale Meeting Agenda, Paris, 22 January 2004, Exh. R-3823.

[1382] Rejoinder ¶ 1057.

[1383] Letter from Société Générale to Yukos Oil Company re: US$ 1.6 billion Loan Agreement dated 30 September 2003 with "Yukos Oil Company," 30 April 2004, Exh. R-3827.

[1384] Rejoinder ¶ 1058; Financial and Performance Guarantee between Yuganskneftegaz and Société Générale S.A., 24 May 2004, Exh. R-581; Financial and Performance Guarantee between Yuganskneftegaz and Société Générale S.A., 25 May 2004, Exh. R-582.

[1385] Rejoinder ¶ 1058; Yukos Oil Company Notice of Prepayment, 25 May 2004, Exh. R-3832; Yukos Oil Company Notice of Prepayment, 22 June 2004, Exh. R-3833.

[1386] Rejoinder ¶ 1058.

[1387] Counter-Memorial ¶ 557; Transcript, Day 19 at 60–63 (Respondent's closing).

[1388] Transcript, Day 20 at 227–28 (Claimants' rebuttal).

[1389] Rejoinder ¶ 1056; Transcript, Day 19 at 60 (Respondent's closing):   "Although Yukos nominally borrowed $1.6 billion from SocGen, it was fully collateralised in cash by Group Menatep. SocGen drew on the collateral before making the loan through an intermediary bank. And as a result, ultimately GML's rights in the loan were assigned to Moravel, which was its wholly owned subsidiary. So there is no doubt that this was a shareholder loan from the outset, not a commercial loan."

[1390] Transcript, Day 21 at 157 (Respondent's rebuttal).

[1391] Reply ¶¶ 384–85; Transcript, Day 20 at 227–28 (Claimants' rebuttal).

*(b)   The Export Contracts as Security for the A Loan*

1116. On 2 July 2004, the syndicate declared an Event of Default, following the bailiff's cash freeze orders.[1392]   Respondent explains that, as Yukos claimed that it was unable to pay the relevant amounts, the syndicate did not call the loan "but instead relied on the default as the basis to access funds under the export trade guarantees."[1393]

1117. The syndicate received payment through this security mechanism[1394] until the end of 2004 and recovered around half of Yukos' USD 1 billion obligation.[1395]   Respondent notes that on 27 December 2004, following the sale of YNG, Yukos notified the syndicate that it would cease payment under the A Loan.[1396]   Respondent asserts that Yukos "continued to export oil produced by its other oil production subsidiaries Samaraneftegaz and Tomskneft" but that it "simply manipulated the export stream so that the oil was not exported pursuant to the specific export agreements used to secure the A Loan."[1397]

1118. At the Hearing, Mr. Theede asserted that there was "no cash from exported oil to be used to pay the banks" because of a sweep by the tax authorities.[1398]   Respondent responds that this is "simply false,"[1399] and seeks to demonstrate that none of the funds under the export guarantee came from Yukos accounts, whether in Russia or elsewhere.[1400]

1119. Claimants argue that "with the sham auction of [YNG] in December 2004, [YNG] stopped shipping oil under the export contracts" and that therefore it was Respondent who "obstructed payment of the A Loan."[1401]

---

[1392]   Rejoinder ¶ 1059; Letter From Société Générale S.A. To Yukos Oil Company, re: Event of Default, 2 July 2004, Exh. R-3835.

[1393]   Rejoinder ¶ 1060.

[1394]   Respondent provides a detailed explanation of this mechanism at note 1771 of its Rejoinder.

[1395]   Rejoinder ¶ 1062.

[1396]   Rejoinder ¶ 1063.

[1397]   *Ibid.*; Transcript, Day 19 at 63-66 (Respondent's closing).

[1398]   Transcript, Day 10 at 103-04 (cross-examination of Mr. Theede).

[1399]   Respondent's Post-Hearing Brief ¶ 127.

[1400]   *Ibid.*, referring to Banks' Petition to Declare Yukos Bankrupt Filed with the Moscow Arbitrazh Court, 6 March 2006, Exh. R-3885.

[1401]   Claimants' Post-Hearing Brief ¶ 118; *see* Transcript, Day 20 at 228 (Claimants' rebuttal).

*(c)   The English Judgment and the Syndicate's Unsuccessful Collection Efforts*

1120.   Respondent asserts that, as a result of Yukos' re-routing of its export streams, the syndicate was left with "what had become, effectively, an unsecured loan."[1402]   The syndicate therefore reduced its claim to judgment, obtaining the English Judgment in June 2005.[1403]

1121.   Respondent faults Yukos for seeking to frustrate the syndicate's efforts to collect on the English Judgment, in the United States, the Netherlands, and Russia.[1404]   Respondent puts particular emphasis on the Dutch Stichtings.[1405]   Respondent argues that Yukos must be faulted for its use of the Stichtings to put its foreign assets out of reach of not just Rosneft or the tax authorities, but also of the Western Banks.   Respondent contends that that the creation of the Stichtings "constitutes a blatant violation of Russian bankruptcy and criminal law."[1406]   Respondent also submitted with its Rejoinder an expert report by Professor Dr. Albert Jan van den Berg (the "**Van den Berg Report**"), arguing that the creation of the Stichtings was illegal under Dutch law.[1407]

1122.   Professor Van den Berg concludes that the creation of the Stichtings was:

> illegal, as it goes against the Dutch law principle, discussed in length above, that does not permit a company, or its directors, to transfer its assets for the purpose of making it more difficult for a creditor to satisfy its claims against the company and its assets, or for the new ultimate parent company to exercise control, even when the company reacts to what it believes to be illegitimate acts.
>
> In this connection, the establishment of the Stichting-structure (including the issuance of depositary receipts) as a protective device was not valid either, as it qualifies as a permanent protective device and, in any event, was established to make it more difficult for creditors to collect on debts.[1408]

---

[1402]   Rejoinder ¶ 1064.

[1403]   Rejoinder ¶¶ 1073–75; English Judgment, Exh. R-455.

[1404]   Respondent's Post-Hearing Brief ¶ 127; Rejoinder ¶¶ 1076–92.

[1405]   Rejoinder ¶ 1076; Transcript, Day 19 at 66–67 (Respondent's closing); Transcript, Day 21 at 165 (Respondent's rebuttal).

[1406]   Counter-Memorial ¶¶ 537–38; *Criminal Code of the Russian Federation No. 63-FZ*, 13 June 1996, Article 195, Exh. R-720.

[1407]   Rejoinder ¶ 86; Van den Berg Report.

[1408]   Van den Berg Report ¶¶ 94–95.

1123. Claimants chose not to cross-examine Professor Van den Berg at the Hearing;[1409] his conclusions stand unrebutted.

1124. In response to Respondent's claim that the Stichtings were created to frustrate the syndicate's collection efforts, Claimants state that Respondent "misrepresents the purpose" of the Stichtings.[1410]   Claimants argue that the Stichtings "sought to protect certain [assets] from further attack by the Respondent and in the best interests of the Yukos group, its management, employees, shareholders and legitimate creditors."[1411]   At the Hearing, Mr. Theede asserted that the Stichtings were created to remove certain assets from the reach of Respondent:[1412]

> after [the YNG auction] happened, it became very obvious that we were not going to be able to do anything to protect our Russian assets; they were going to take them away from us, one way or another.   And of course it was going to be through taxes: that was the decided approach.

> But we were presented with a way to add some additional security to our international assets.[1413]

1125. Claimants emphasize "the big picture":  Yukos was facing tax claims in Russia and its assets were frozen.[1414]   Claimants assert that Yukos repatriated almost all of the cash it had offshore.[1415]   Claimants contend that Yukos was actively trying to sell the Dutch assets to satisfy the English Judgment, and that, had the syndicate not accepted an offer it could not refuse from Rosneft in the meanwhile, the proceeds of the sale of Mazeikiu Nafta would have been applied to the English Judgment.[1416]   Claimants claim that Respondent was actively preventing Yukos from successfully selling the Dutch assets.[1417]

---

[1409]   Letter from Claimants to the Arbitral Tribunal, 20 September 2012 (confirming Claimants' decision not to cross-examine Professor Van den Berg at the hearing).

[1410]   Reply ¶ 389.

[1411]   Reply ¶ 390.

[1412]   Transcript, Day 10 at 106–10 (cross-examination of Mr. Theede).

[1413]   Transcript, Day 10 at 108 (cross-examination of Mr. Theede).

[1414]   Transcript, Day 17 at 125–26 (Claimants' closing).

[1415]   Transcript, Day 17 at 120–24 (Claimants' closing, excerpting relevant portions of Mr. Theede's and Mr. Misamore's testimonies).

[1416]   Transcript, Day 10 at 117–18 (cross-examination of Mr. Theede); Transcript, Day 20 at 228–29 (Claimants' rebuttal); Claimants' Post-Hearing Brief ¶¶ 119, 124.

[1417]   Transcript, Day 10 at 105–106 (cross-examination of Mr. Theede).

1126. Respondent criticizes Claimant's assertion that Yukos was unable to satisfy the English Judgment because of the asset freeze.[1418]  Respondent emphasizes that counsel for Yukos in the English proceedings stated that the

> evidence would show that Yukos had assets outside Russia free from the Russian court's freezing order which could have been, and which still could be, exploited to raise money with which to make payments under the Loan Agreement as they became due.[1419]

1127. Respondent also notes that Mr. Misamore conceded at the Hearing that when Stichting 2 was formed in September 2005, it held approximately USD 500 million in cash, more than enough to satisfy the debt to the syndicate.[1420]

1128. In response to Claimants' argument that Yukos was trying to sell the Dutch assets to satisfy the judgment,[1421] Respondent claims that the proceeds were used to pay bonuses and to pay Moravel.[1422]

(d)    Yukos' Negotiations with the Syndicate

1129. Respondent submits that Yukos engaged in bad faith negotiations with the syndicate.[1423]  It notes that Yukos offered the syndicate a "poisoned chalice": seats on the board of a stichting in lieu of actual payment.[1424]  Respondent claims that once Yukos had successfully obstructed collection efforts in the Netherlands, it withdrew its settlement offer to the syndicate.[1425]

1130. Claimants assert that, had the syndicate not been paid by Rosneft, it would have eventually been paid by Yukos.[1426]

1131. Claimants also rely on an undated letter sent by Mr. Theede to the bailiff, probably between 10 and 14 March 2006.[1427]  In that letter, Mr. Theede asserts that Yukos finds itself in a

---

[1418]   Respondent's Post-Hearing Brief ¶ 129.

[1419]   English Judgment ¶ 15, Exh. R-455.

[1420]   Respondent's Post-Hearing Brief ¶ 127; Transcript, Day 9 at 223–24 (cross-examination of Mr. Misamore).

[1421]   Transcript, Day 20 at 228–29 (Claimants' rebuttal); Transcript, Day 10 at 112 (cross-examination of Mr. Theede).

[1422]   Transcript, Day 19 at 45–46 (Respondent's closing).

[1423]   Respondent's Post-Hearing Brief ¶ 128.

[1424]   Rejoinder ¶¶ 1081, 1083.

[1425]   Rejoinder ¶ 1083; Respondent's Post-Hearing Brief ¶ 128.

[1426]   Claimants' Post-Hearing Brief ¶ 119.

"straightjacket" and asks the bailiff to lift the freeze to enable Yukos to pay the syndicate.[1428] Respondent criticizes Claimants' reliance on this letter noting that the letter was sent *after* the bankruptcy petition was filed.[1429]

(ii)   **The Confidential Sale Agreement Between the Western Banks and Rosneft**

1132.   Claimants argue that, while it was the Western Banks that formally initiated the bankruptcy of Yukos, it was the Russian Federation, acting through Rosneft, that orchestrated the commencement of the bankruptcy.   In particular, Claimants place great emphasis on the Confidential Sale Agreement that was entered into between the Western Banks and Rosneft on 13 December 2005.   Pursuant to that Agreement, Rosneft agreed to satisfy the outstanding debt owed by Yukos to the Western Banks (over USD 455 million plus interest) in exchange for the Western Banks agreeing to take the steps described in Schedule 8 of the Confidential Sale Agreement, entitled "Application for Bankruptcy."

1133.   Claimants assert that each of Rosneft, on the one hand, and the Western Banks, on the other, fulfilled their respective roles under the Confidential Sale Agreement meticulously.   Thus, on 6 March 2006, having completed the other steps contemplated under the Confidential Sale Agreement, the Western Banks filed a petition with the Moscow Arbitrazh Court to declare Yukos bankrupt.[1430]   On 14 March 2006, the Moscow Arbitrazh Court formally substituted Rosneft in the place of the Western Banks for the purposes of the bankruptcy proceedings.[1431]

1134.   Respondent explains that the Confidential Sale Agreement was concluded between Rosneft and the Western Banks because of the "convergence of their commercial interests":

> The SocGen syndicate simultaneously also sought payment of the same debt from Rosneft pursuant to the 2004 loan guarantee that Yukos had foisted on YNG, which Rosneft then owned.   Although Rosneft disputed the validity of the guarantee, Rosneft required forbearance from the same banks on covenant breaches arising from the YNG acquisition, and Rosneft needed the bank's cooperation for its planned IPO.   The convergence of the syndicate's and Rosneft's commercial interests resulted in their agreeing that Rosneft

---

[1427]   Letter from Mr. Theede to Mr. Savostov (undated), Exh. C-1180; Transcript, Day 20 at 230–33 (Claimants' rebuttal); Theede WS ¶ 29.

[1428]   Letter from Mr. Theede to Mr. Savostov (undated), Exh. C-1180.

[1429]   Transcript, Day 21 at 159 (Respondent's rebuttal); Respondent's Post-Hearing Brief ¶ 128 (the letter is "typical of Yukos' consistent strategy of doing too little, too late, and then blaming others.")

[1430]   Banks' Petition to Declare Yukos Bankrupt Filed with the Moscow Arbitrazh Court, 6 March 2006, Exh. C-303.

[1431]   Ruling of the Moscow Arbitrazh Court, 28 March 2006, Exh. C-307.

would pay the syndicate in full, but only after the syndicate had pursued all legal avenues to obtain payment from Yukos, the primary obligor.  If Rosneft instead paid, the syndicate's rights under the A Loan agreement were to be assigned to Rosneft.[1432]

1135. Respondent disagrees with Claimants that the confidentiality clause in the Confidential Sale Agreement evidences a "conspiracy on the part of the SocGen syndicate to act secretly on behalf of Rosneft, which Claimants improperly equate with Respondent."  Instead, Respondent contends that the confidentiality clause was a standard commercial term "necessary to preserve the possibility that Yukos would pay the SocGen syndicate before Rosneft became unconditionally obligated to do so, and remained in effect only for so long as Yukos' payment would have discharged Rosneft's own obligations to pay the syndicate."[1433]

1136. Respondent argues that the syndicate "ha[d] been nothing if not patient during this whole process"[1434] and that, in its frustrated effort to satisfy the English Judgment, the syndicate in last resort turned to Rosneft for payment under the YNG guarantee.[1435]  After "a little bit of a dance going on between them," the syndicate and Rosneft concluded a mutually advantageous deal.[1436]

1137. Respondent asserts that the syndicate originally pressed Rosneft for payment under the YNG guarantee[1437] but eventually came to a commercially sound arrangement with it.[1438]  Respondent claims that these propositions stand unrebutted.[1439]

1138. Claimants contend that Yukos "work[ed] closely" with the syndicate until the syndicate received from Rosneft an offer it could not refuse.[1440]  In the words of Mr. Theede, "banks being banks, that was an easy, low-risk way out of this for them, and so that's what happened and that's what they did."[1441]  Having said this, Claimants note that "there is no commercial

---

[1432]   Respondent's Skeleton ¶ 58.

[1433]   Respondent's Skeleton ¶ 59.

[1434]   Respondent's Post-Hearing Brief ¶ 129, quoting *Creditors Petition Russian Court to Declare Yukos Bankrupt*, World Markets Research Centre, 13 March 2006, Exh. R-3882.

[1435]   Respondent's Post-Hearing Brief ¶ 129; Counter-Memorial ¶¶ 577–80; Rejoinder ¶¶ 1065–71; Transcript, Day 19 at 69–72 (Respondent's closing).

[1436]   Transcript, Day 19 at 69–72 (Respondent's closing); *see* Confidential Sale Agreement, Exh. C-300.

[1437]   Counter-Memorial ¶¶ 577–80; Rejoinder ¶¶ 1065–71.

[1438]   Post-Hearing Brief ¶ 129; Counter-Memorial ¶¶ 575–83; Rejoinder ¶¶ 1086–88.

[1439]   Post-Hearing Brief ¶ 129; Transcript, Day 10 at 113–14 (cross-examination of Mr. Theede).

[1440]   Claimants' Post-Hearing Brief ¶ 119; Transcript, Day 20 at 228–29 (Claimants' rebuttal).

[1441]   Transcript, Day 10 at 113 (cross-examination of Mr. Theede).

rationale for why Rosneft would insist upon the <u>further and highly unusual</u> step that the A Lenders initiate bankruptcy proceedings against Yukos, save for the sake of appearances."[1442]

1139. The Parties also disagree when it comes to the significance of the separate and parallel bankruptcy petition filed by YNG (then a subsidiary of Rosneft) on 24 March 2006.  According to Respondent, the YNG petition "alone disposes of Claimants' contention that the bankruptcy filing by the SocGen syndicate had been orchestrated by the Russian Federation so as to allow Rosneft not to 'appear as the instigator of Yukos' bankruptcy.'"[1443]

1140. According to Claimants, Rosneft had decided to "hedge its bets" by filing a separate bankruptcy petition through YNG in the event the court would reject the petition filed by the banks.[1444]  Claimants further contend that having the syndicate file its petition prior to YNG was "evidently important to Rosneft and the Kremlin's public relations efforts."[1445]  Finally, Claimants argue that the YNG petition refutes Respondent's argument that Yukos itself caused the bankruptcy by failing to pay the syndicate:  "Respondent offers no explanation as to how the Claimants suffered additional damages because it was the Société Générale syndicate who initiated the bankruptcy rather than Rosneft."[1446]

(iii)   **Tribunal's Observations**

1141. Having considered the extensive record and the maze of documents as well as the Parties' arguments, the Tribunal concludes that while it is undisputed that the Western Banks formally initiated the bankruptcy proceedings, and that Yukos is partly to blame for giving the Banks the incentive to enter into the Confidential Sale Agreement with Rosneft, the role of Rosneft and of Respondent in creating the conditions for Yukos' bankruptcy cannot be ignored.

1142. Turning firstly to the fault that Yukos bears in this matter, the Tribunal largely accepts Respondent's arguments that Yukos could have paid the A Loan in full prior to the end of 2005, whether by subordinating the B Loan to the A Loan, allowing the export contracts to continue to operate as security for the Western Banks, or indeed using assets that were placed into the

---

[1442] Claimants' Post-Hearing Brief ¶ 121 (underlining in original).

[1443] Counter-Memorial ¶ 572 (quoting Memorial ¶ 427); *see* Rejoinder ¶ 1090.

[1444] Memorial ¶ 427; *Yuganskneftegaz demands Yukos' bankruptcy over $1 million debt*, Vedomosti, 3 April 2006, Exh. C-795.

[1445] Claimant's Post-Hearing Brief ¶ 300.

[1446] *Ibid.*

Stichtings.  It can therefore be said that Yukos is not without fault in connection with the initiation of the bankruptcy, since it contributed to creating conditions that gave the Western Banks every incentive to enter into the Confidential Sale Agreement with Rosneft, and it was pursuant to that Confidential Sale Agreement that the Banks initiated bankruptcy proceedings against Yukos in exchange for payment from Rosneft under the A Loan.  As Mr. Theede testified, banks being banks, the solution presented by the Confidential Sale Agreement was "an easy, low-risk way out of this for them."[1447]

1143. However, to focus only on these narrow reasons for non-payment of the A Loan, and on the commercial considerations that drove the Western Banks to enter into the Confidential Sale Agreement, is to miss the bigger picture.  The Tribunal observes that Yukos was current in its payments to the Western Banks until December 2004, when YNG was auctioned to Rosneft.  Had YNG not been seized, therefore, it is reasonable to assume that Yukos would not have had problems repaying the A Loan.  By the same token, given the circumstances under which YNG was seized (discussed in Chapter VIII.F of this Award), it stands to reason that Yukos felt justified in forcing Respondent, through Rosneft, to pay the Western Banks under the YNG guarantee, rather than paying the debt itself.

1144. The Tribunal therefore cannot accept Respondent's argument that because Yukos, even after the seizure of YNG, *could have* paid the Western Banks under the A Loan but did not do so, there is no link to be made between Rosneft (and, indeed, Respondent) and the bankruptcy.  The big picture established by the record, including in respect of the tax assessments and the auction of YNG, suggests otherwise.

1145. The Tribunal's conclusion is also supported by two particular facts more closely related to the enforcement of the A Loan in Russia.

1146. Firstly, the Tribunal notes that the Western Banks entered into the Confidential Sale Agreement with Rosneft very soon after the Federal Arbitrazh Court for the Moscow District reversed an earlier decision that had authorized the enforcement of the English Judgment, and that the same Court ultimately allowed the Western Banks to proceed with its enforcement after it had entered into the Confidential Sale Agreement.  This suggests to the Tribunal, at best, a very happy coincidence as between the decision of the Court and the interests served by the terms presented to the Western Banks in the Confidential Sale Agreement.  It is also consistent with

---

[1447]    Transcript, Day 10 at 113 (cross-examination of Mr. Theede).

Claimants' argument that the decisions of the Court and the conduct of Rosneft were being coordinated as part of a deliberate strategy to drive Yukos into bankruptcy.

1147. Secondly, if Rosneft itself (or the State, as its owner) were not interested in orchestrating the initiation of the bankruptcy proceedings against Yukos, why was the requirement to initiate bankruptcy included in the Confidential Sale Agreement? In other words, while the Tribunal can accept both that the Western Banks had a commercial interest in getting paid by Rosneft (especially after the 5 December 2005 decision of the Federal Arbitrazh Court that reversed the enforcement of the English Judgment) and that Rosneft had a commercial interest in having the Western Banks' claim against Yukos assigned to it in exchange for such payment, the Tribunal does not see any evident commercial rationale for the inclusion in the Confidential Sale Agreement of the requirement that the Banks initiate bankruptcy in order to be paid.

1148. It thus appears to the Tribunal that the Western Banks, since Yukos was not reimbursing the loan, were actively "encouraged" to enter into the Confidential Sale Agreement in order to accomplish their objective of being paid. While, as the Tribunal said earlier, Yukos must shoulder some of the blame for not paying the Western Banks and thereby increasing its exposure to the risk that it could be petitioned into bankrupcy, it appears undeniable to the Tribunal that initiating bankruptcy was not a goal of the Western Banks, but rather the objective of Rosneft, in the interests of its owner, the Russian Federation. The Tribunal concludes that in the end the bankruptcy was initiated by the Russian Federation. The separate and parallel bankruptcy petition filed by Rosneft-controlled YNG on 24 March 2006 reinforces this conclusion.

1149. The Tribunal, in light of the evidence reviewed above, finds the following passage from Claimants' Post-Hearing Brief compelling and adopts it as its own:

> The only rational explanation for the highly unusual manner in which the bankruptcy proceedings against Yukos were initiated was to act as a cover for the Russian Federation's involvement, allowing the Russian government to keep its word—in the context of ongoing legal proceedings, including these arbitrations—that it was not interested in the bankruptcy of Yukos (and thus maintaining the appearance that it was commercial parties—not the State—that sought Yukos' bankruptcy), while achieving its desired end.[1448]

---

[1448]   Claimants' Post-Hearing Brief ¶ 123.

### (b)     Were the Bankruptcy Proceedings Conducted Properly and Fairly?

1150. Claimants paint the bankruptcy as "the final act of the destruction" of Yukos.[1449]  Claimants argue that Respondent (or entities whose conduct is attributable to Respondent)[1450] not only initiated the bankruptcy, but also (i) ensured that it monopolized the bankruptcy process by discriminatory rejection and allowance of bankruptcy claims; [1451] (ii) ensured the rejection of Yukos' proposed Rehabilitation Plan;[1452] and (iii) confiscated the residual assets of Yukos through sham auctions and Yukos' eventual liquidation.[1453]

1151. Claimants claim that Respondent monopolized the bankruptcy and, directly or indirectly, obtained 97.67 percent of all bankruptcy claims, obtained approximately 93.87 percent of the votes in the creditors' meeting, claimed USD 6 billion in profit tax on the auction proceedings, acquired over 95 percent of Yukos' remaining assets in the bankruptcy, and received as creditor approximately 99.71 percent of the bankruptcy proceeds.[1454]

### (i)     The Courts' Treatment of Bankruptcy Claims

1152. Claimants argue that the Russian courts never had the interests of Yukos or its rehabilitation in mind when conducting the bankruptcy proceedings.  Firstly, the Russian courts ensured that the Russian State would become Yukos' main creditor in the bankruptcy proceedings by postponing the date of the first meeting of Yukos' creditors to give the State "more time to prove new tax claims" against Yukos.[1455]  These tax claims comprised Yukos' outstanding alleged tax liabilities for the years 2000 to 2003.  As noted above, at the hearing of the Moscow Arbitrazh Court on 14 June 2006, the bankruptcy judge ruled in favour of the Federal Taxation Service, setting "a new speed reading record" after taking just 15 minutes to consider 127,000 pages of information submitted by Russian tax officials.[1456]  As a result of that judgment, the

---

[1449]   Memorial ¶ 411.

[1450]   For the Tribunal's discussion of attribution, see Chapter X.A of this Award.

[1451]   *Ibid*. ¶¶ 431–51.

[1452]   *Ibid*. ¶ 452–67.

[1453]   *Ibid*. ¶¶ 468–94.

[1454]   Claimants' Post-Hearing Brief ¶¶ 126–33.

[1455]   *Yukos creditors' meeting delayed by Moscow court*, Reuters, 8 June 2006, Exh. C-808.

[1456]   *Judge sets speed-reading record…*, Reuters, 16 June 2006, Exh. C-809.

Federal Taxation Service became Yukos' single largest creditor with registered claims amounting to approximately USD 13.06 billion.[1457]

1153. Secondly, Claimants contend that the Russian courts ensured that State-controlled Rosneft—of which the Russian State has been the majority shareholder since the company's privatization in the nineties—would become Yukos' second largest creditor in the bankruptcy. On 17 July 2006, the Moscow Arbitrazh Court admitted into the bankruptcy proceedings four claims by YNG, which by that that time had already become a subsidiary of Rosneft:

> The claims were based on the sale of oil produced by Yuganskneftegaz and sold to Yukos' trading companies in 2004: the Court decided that Yukos, and not the trading companies—notwithstanding that those companies were Yuganskneftegaz's counterparties under the relevant oil sale contracts—was liable to pay for the oil sold.[1458]

1154. Thirdly, in Claimants' view, the Russian courts ensured that creditor claims belonging to Yukos-related entities or to Yukos' shareholders would not be recognized in the bankruptcy proceedings. For example, in its Memorial on the Merits, Claimants explain the Russian courts' treatment of Moravel Investment Limited, a GML affiliate:

> This was the case, for example, for the claim filed by Moravel Investment Limited ("Moravel"), a GML affiliate, on the basis of an LCIA award of September 16, 2005, rendered by an arbitral tribunal comprised of Peter Leaver QC, Jonathan Hirst QC and J. William Rowley QC, Chairman. The award ordered Yukos to pay to Moravel US$ 655,725,238.60 in principal plus corresponding interest, which was outstanding under the B Loan Agreement concluded between Yukos and Société Générale in September 2003 for the purposes of Yukos' merger with Sibneft. This loan was identical, in all material aspects, to the A Loan which had been assigned to Rosneft by the Western Banks headed by Société Générale and on the basis of which Rosneft had been admitted into the bankruptcy proceedings. However, unlike Rosneft's claim, for which the Russian courts had recognized the English Judgment rendered in favor of the Western banks (later assigned to Rosneft), the courts refused the enforcement of the awards in favor of Moravel.[1459]

1155. Russian courts accorded similar treatment to the remaining Yukos affiliates with outstanding claims against Yukos, such as Yukos Capital SARL, Glendale Group Limited, OOO Yu-Mordovia, OOO Yukos Vostok Trade, ZAO Yukos-M, OOO Siberian Internet Company, OOO Trading House Yukos-M, ZAO Krasnoyarskgeofizika, ZAO Lipetsknefteprodukt, and

---

[1457]   Resolution of the Ninth Arbitrazh Court of Appeal, 11 August 2006, Exh. C-336; Decision of the Moscow Arbitrazh Court, 2 October 2006, Exh. C-201; Register of Yukos Creditors' Claims, 30 October 2007, Exh. C-353; Summary Chart of Creditors, Exh. C-594.

[1458]   Memorial ¶ 435.

[1459]   Memorial ¶ 441 (internal footnotes omitted).

OOO Alta-Trade.  As Claimants contend, "the common ground for denying the claims of these companies was the alleged lack of evidence of the existence of the claims."[1460]

### (ii)        The Rejection of Yukos' Rehabilitation Plan

1156. On 1 June 2006, Yukos' general shareholders' meeting approved Yukos' Financial Rehabilitation Plan and appointed Mr. Osborne as the shareholders' representative in the bankruptcy proceedings.[1461]  Claimants point out that according to Yukos' Rehabilitation Plan, Yukos was in a position to pay off its alleged liabilities fully within two years.[1462]  Mr. Rebgun, the appointed administrator, was required to circulate Yukos' Rehabilitation Plan to all Yukos' registered creditors.  According to Claimants, Mr. Rebgun did not do so, although Respondent alleges that Mr. Rebgun made the Rehabilitation Plan available for the creditors' review before the creditors' meeting.

1157. Mr. Rebgun's own proposal to the creditors was to sell all Yukos' assets to satisfy the creditors' claims and then liquidate the company.  At the creditors' meeting of 25 July 2006, at which the Federal Taxation Service and Rosneft held 93.87 percent of votes, Yukos' Rehabilitation Plan was rejected, and the creditors decided to liquidate Yukos, "which had the added bonus of creating an additional claim for the tax authorities of 24% profit tax on the auction proceeds, a claim on which it would collect US$ 6 billion."[1463]

1158. In their Post-Hearing Brief, Claimants further contend that:

> During the hearing, the Respondent made a limited number of unfounded attacks on Yukos' Financial Rehabilitation Plan.  For example, the Respondent alleged that Yukos' Financial Rehabilitation Plan was "highly speculative" as the "cash pool" was to be funded from "uncertain revenues" including US$ 18 billion from "litigation claims."  However, as even the most cursory review of the Plan reveals, "litigation claims" were not ascribed a value in determining the aggregate value of Yukos' assets available to pay claims and were merely intended to supplement the "cash pool", if and when anything was received.[1464]

1159. Yukos' creditors gathered for their first meeting on 20 July 2006.  Yukos' management proposed a Rehabilitation Plan[1465] and Mr. Rebgun proposed its Analysis of Yukos' Financial

---

[1460]   Memorial ¶ 448.

[1461]   Minutes of Extraordinary General Meeting of Yukos' Shareholders held on 1 June 2006, Exh. C-311.

[1462]   Claimants' Skeleton ¶ 55.

[1463]   Claimants' Post-Hearing Brief ¶ 127.

[1464]   *Ibid.* ¶ 128.

[1465]   Rehabilitation Plan, Exh. C-312.

Situation.[1466]   After the meeting was adjourned and resumed on 25 July 2006, the Federal

Taxation Service, representing together with Rosneft 93.87 percent of the votes, voted against

the Rehabilitation Plan and in favor of the liquidation of Yukos.[1467]

1160.   Claimants argue that the decision to liquidate was "preposterou[s], even from an economic

standpoint"[1468] and that "[t]he absurdity of Yukos' fate was only the flip side of the coin of the

Russian Federation's and Rosneft's fortune."[1469]   Claimants allege that there was an "obvious

conflict of interest" in the vote as the sales of Yukos' assets were subject to a 24 percent profit

tax, "which meant that liquidation would bring an enormous windfall to the Federal Taxation

Service".[1470]

1161.   Respondent denies all allegations of impropriety in relation to Mr. Rebgun's conduct of the

creditors' meeting and the rejection of Yukos' Rehabilitation Plan:

> All registered creditors and the representatives of the debtor had an opportunity to review
> the Rehabilitation Plan and the analysis of Yukos' financial situation (along with relevant
> enclosures) prepared by Mr. Rebgun at his offices during the week preceding the meeting
> (and for five full days, from July 20, 2006 until July 25, 2006).[1471]

1162.   Respondent contends that the Rehabilitation Plan was rejected because it was flawed and overly

optimistic:

> Yukos' management, actively supported by the Claimants, had the opportunity to present a
> rehabilitation claim to the meeting of creditors.  The rough outline management submitted
> was, however, legally defective and did not provide any basis for creditors to prefer
> rehabilitation to liquidation.  It was not properly presented to or approved by Yukos
> shareholders, did not meet the legal requirements that the company's tax claims be
> satisfied within six months, and did not ensure full, let alone timely, payment of Yukos'
> creditors' claims.[1472]

1163.   Respondent argues that the Rehabilitation Plan was "a blatant and untenable attempt on the part

of the Oligarchs to secure their own interests over those of the creditors" and that "the

---

[1466]   Analysis of Yukos' Financial Situation 2006, Exh. C-317; see Summary Analysis of the Debtor's Financial Situation submitted by Mr. Rebgun to the U.S. Bankruptcy Court for the Southern District of New York in the Chapter 15 Proceeding as Exhibit B to his Status Report of 7 August 2006, Exh. C-318.

[1467]   Protocol of the First Meeting of Yukos' Creditors held on 20–25 July 2006, Exh. C-319.

[1468]   Memorial ¶ 466.

[1469]   Memorial ¶ 467.

[1470]   Reply ¶ 418.

[1471]   Counter-Memorial ¶ 607.

[1472]   Respondent's Skeleton ¶ 62; see also Respondent's Post-Hearing Brief ¶ 123.

creditors' decision to reject the plan was reasonable and taken in accordance with Russian law, which vests full discretion with the creditors, consistently with international practice."[1473]

1164. Respondent underlines that in Russia, "the vote for the liquidation or rehabilitation of the debtor is within the full discretion of the creditors."[1474]

1165. On the question of the late claims, Respondent does not contest that the Federal Taxation Service claimed USD 8.82 billion in profit taxes out of the proceeds of the bankruptcy and eventually received USD 6.02 billion; it submits however, that "[t]hese are standard '*late*' claims that arise in connection with any sale generating profits, including in the context of rehabilitation proceedings"[1475] and that there is therefore nothing improper about them.

### (iii) The Declaration of Yukos' Bankruptcy

1166. On 1 August 2006, the Moscow Arbitrazh Court stated that it had "established that the debtor showed the signs of bankruptcy as defined in Article 3 of the Federal Law 'On Insolvency (Bankruptcy)'" and that Yukos had "not fulfilled its monetary obligations towards its creditors for three months from the time when these obligations should have been fulfilled," without making any reference to the difference between Yukos' liabilities and its assets.[1476]

1167. The Claimants assert that on 1 August 2006, when Yukos was declared bankrupt, "Yukos' assets exceeded its alleged liabilities, and . . . the Company was clearly solvent."[1477]   The Claimants further suggest that "there was nothing inevitable about the bankruptcy of Yukos" and that "Yukos could have avoided bankruptcy if allowed to pay off its fabricated tax debts."[1478]   To support this claim, Claimants refer to the Rehabilitation Plan proposed by Yukos' management, which proposed "to leave intact Yukos' 'core assets' as a viable ongoing company, while addressing and paying in full all valid creditors' claims."[1479]

---

[1473]   Counter-Memorial ¶ 611.

[1474]   Counter-Memorial ¶ 632.  This is consistent with international practice, *see* Counter-Memorial ¶ 1501.

[1475]   Rejoinder ¶ 1182.

[1476]   Decision of the Moscow Arbitrazh Court, 1 August 2006, Exh. C-324.

[1477]   Memorial ¶ 822.

[1478]   Memorial ¶ 825.

[1479]   Claimants' Post-Hearing Brief ¶128; *see also* Rehabilitation Plan, Exh. C-312.

1168. By contrast, Respondent points out that the insolvency test applicable to the initiation of bankruptcy proceedings against Yukos was an "illiquidity test," based on the debtor's inability to discharge a certain debt "within three months of its due date."[1480]  According to Respondent, this "illiquidity test" was satisfied when the Western Banks filed a petition for Yukos' bankruptcy.[1481]  Further, the question of whether the bankruptcy proceedings will result in the adoption of a financial rehabilitation plan and the company's survival or in the company's liquidation depends on whether the financial rehabilitation plan provides for the discharge of all the creditors' claims within certain applicable time limits.[1482]  Respondent points out that the debt repayment schedule in the Rehabilitation Plan did not do so.[1483]

1169. Respondent denies all allegations of impropriety or bias relating to the way the Russian courts conducted the bankruptcy proceedings:

> As confirmed by the Moscow Arbitrazh Court, the syndicate's petition satisfied the insolvency test under Russian bankruptcy law applicable at the time, which was based on the debtor's inability to discharge a debt exceeding US$ 3,500 within three months of its due date.
>
> Nothing in Russian law in this regard concerning the initiation of bankruptcy proceedings is at odds with international practice.  In a number of other jurisdictions, the so-called "illiquidity test: (*i.e.*, the debtor's inability to pay its debts as they become due) is sufficient to initiate bankruptcy proceedings.[1484]

1170. In any event, Respondent claims that Yukos' liabilities did exceed its assets, a position Respondent seeks to support by stressing that, after the sale of Yukos' assets, liabilities of Yukos in an amount of USD 9.2 billion remained unsatisfied.[1485]

### (iv)   The Liquidation of Yukos' Remaining Assets

1171. According to Claimants, the last stage in the "confiscation of Yukos"[1486] was the bankruptcy auctions of Yukos' remaining assets.[1487]

---

[1480]   Counter-Memorial ¶¶ 584, 1491; Article 3(2) of the Russian *Federal Law on Insolvency (Bankruptcy)*, Exh. R-776.

[1481]   Counter-Memorial ¶ 1491.

[1482]   Article 84(3) of the Russian Federal Law on Insolvency (Bankruptcy), Exh. R-776; Protocol of the First Meeting of Yukos' Creditors held on 20–25 July 2006, p. 11, Exh. C-319; Summary Analysis of the Debtor's Financial Situation submitted by Mr. Rebgun to the U.S. Bankruptcy Court for the Southern District of New York in the Chapter 15 Proceeding as Exhibit B to his Status Report of 7 August 200, p. 86, Exh. C-318.

[1483]   Counter-Memorial ¶ 623.

[1484]   Counter-Memorial ¶ 584–85; *see also* Respondent's Post-Hearing Brief ¶¶ 130–34.

[1485]   Counter-Memorial ¶ 669; Rejoinder ¶ 1161, Respondent's Post-Hearing Brief ¶ 134; Respondent's Opening Slides, p. 452.

1172. Claimants' argument regarding the auctions does not point to specific acts. While Claimants fault Rosneft for the initiation of the bankruptcy, the courts for the discriminatory rejection and allowance of claims, the Federal Taxation Service and Rosneft for the rejection of the Rehabilitation Plan, they fault "the Russian Federation" for the auctions.[1488] Claimants state "[t]he results of the auctions speak for themselves."[1489] Claimants argue that the small number of bidders, the speed of the auctions, the below-market-value resulting prices, and the overall benefits to Respondent leave no doubt about Respondent's "monopolization" of the auctions.[1490]

1173. Claimants note that Respondent as creditor in the bankruptcy was involved in the auctions in four ways. Firstly, it approved the procedure for the auctions[1491] and Mr. Rebgun's allotment of Yukos' assets into twenty lots.[1492] Secondly, it selected the Russian Federal Property Fund to organize and conduct the auctions.[1493] Thirdly, it set the starting price for the auctioned assets.[1494] Fourthly, it "actively communicated with [Mr. Rebgun] on other issues as well."[1495]

1174. Respondent underlines that this involvement was in accordance with Russian law and emphasizes that Respondent as creditor in the bankruptcy did not have the power to control the identity of the bidders, and that in each instance the starting price for the auctioned assets was at least equal to the appraised market value.[1496]

1175. Claimants assert that "[a]s creditor, the Russian Federation received, either directly or through Rosneft, approximately 99.71% of the bankruptcy proceeds."[1497] This occurred through

---

[1486] Memorial ¶ 468.

[1487] Memorial ¶¶ 468–94.

[1488] Reply ¶ 438.

[1489] Reply ¶¶ 421, 432.

[1490] Reply ¶ 425.

[1491] Counter-Memorial ¶ 633; Finalization Order, Exh. R-752; *see also* Receiver's Report, pp. 28–29, Exh. R-751.

[1492] Memorial ¶ 470.

[1493] Memorial ¶ 470; *see also* Ruling of the Moscow Arbitrazh Court, 12 November 2007, p. 8, Exh. C-362.

[1494] Reply ¶ 425.

[1495] Reply ¶ 425, citing Ruling of the Moscow Arbitrazh Court, 12 November 2007, pp. 8–9, 21, Exh. C-362.

[1496] Rejoinder ¶ 1162; Counter-Memorial ¶¶ 633–38; *see also* Procedure for the Conduct of Public Auctions in Respect of the Assets of OAO NK Yukos during the Receivership Proceedings, Clauses 2.1–2.3, 20 February 2007, Exh. R-3943 and Minutes No. 5 of the Meeting of the Creditors' Committee of OAO NK Yukos, 21 February 2007, Exh. R-3944; Russian Bankruptcy Law 2002, Articles 110(5) and 111(3), Exh. R-3892.

[1497] Claimants' Post-Hearing Brief ¶ 132.

"Rosneft [having] won 11 out of the 17 bankruptcy auctions, including acquiring Samaraneftegaz (Lot No. 11) and Tomskeneft (Lot No. 10)."[1498]

1176. In their Skeleton Argument, Claimants summarize the eleven auctions that completed the bankruptcy proceedings as follows:

> Yukos' remaining assets were transferred to the Russian State at well below their fair market value through a series of 17 auctions held between March 2006 and August 2007. Rosneft thereby directly or indirectly acquired Yukos' key remaining assets, including Samaraneftegaz (Lot No. 11) and Tomskneft (Lot No. 10), which were sold at a gross discount of approximately 37% and 33%, respectively, of their fair market value. For its part, Gazprom acquired through Eni/Enel the 20% minus 1 share stake in Sibneft that the Russian Federation had persistently refused to let Yukos sell to pay off alleged tax debts. As with the sham auction of Yuganskneftegaz, there was no genuine competition in the bankruptcy auctions and, in many instances, including those for Samaraneftegaz and Tomskneft, the only participants were Rosneft and a previously unknown entity whose sole role was to satisfy the formal requirement that there be a minimum of 2 bidders.
>
> Finally, when, by the end of July 2007, it became clear that despite the low auction prices, the bankruptcy might still generate some surplus, further claims were admitted in the bankruptcy proceedings on behalf of the Russian State, through the Federal Taxation Service and Rosneft. This ensured the completeness of Yukos' destruction and the transfer of its value and assets to the Russian State. Thus, the Russian Federation received, either directly or through State-owned Rosneft or Gazprom, approximately 99.71% of the bankruptcy proceeds and over 95% of Yukos' remaining assets, including all of Yukos' main production assets.
>
> On November 12, 2007, the Moscow Arbitrazh Court formally endorsed all the activities of Yukos' receiver Mr. Rebgun, closed the Company's receivership and ordered that Yukos be struck off the register of legal entities. The latter happened on November 21, 2007.[1499]

1177. Respondent contends that Yukos' bankruptcy auctions were held in full compliance with Russian law, and that Mr. Rebgun had secured appraisals for the fair value of the assets:

> Once Yukos' liquidation was properly approved, the company's assets were sold at auction in accordance with Russian law and international practice. Yukos' receiver obtained appraisals for the fair value of the assets, and used those appraisals to set minimum bids in the auctions, all of which were exceeded, some by very large margins. The auctions were open to domestic and foreign bidders, adequately noticed and advertised, and competitive. To the extent that any bidders may have been discouraged from participating, this was again the result of Claimants and Yukos having threatened potential bidders with legal action. While the aggregate results exceeded Yukos' own (and other) contemporaneous fair market value estimates, more than US$ 9 billion in creditor claims nonetheless remained unsatisfied.[1500]

---

[1498]   Claimants' Post-Hearing Brief ¶ 131.

[1499]   Claimants' Skeleton ¶¶ 58–60 (internal footnotes omitted).

[1500]   Respondent's Skeleton ¶ 63; *see also* Respondent's Post-Hearing Brief ¶¶ 133–34.

### (v) Tribunal's Observations

1178. The Tribunal notes Respondent's insistence that all aspects of the bankruptcy were conducted in accordance with Russian bankruptcy law. However, the Tribunal's inquiry is not limited to a mere review of the formalities of the bankruptcy. It must address and review all the substantial features of the proceedings.

1179. Thus, the Tribunal views as improper and unfair that, for example:

- All claims filed by Rosneft and the Federal Taxation Service, valued in the billions, were peremptorily accepted by the Court, while the many claims filed by Yukos' affiliated companies were rejected by the Court in a very summary way; and

- Yukos was saddled with a claim of some USD 6 billion that related only to the profit tax to be collected by the Federal Taxation Service as a result of the liquidation of Yukos' assets in the bankruptcy.[1501]

- The Tribunal is also troubled by the fact that Rosneft's acquisition of YNG (discussed in Chapter VIII.F of this Award) generated a claim of almost USD 10 billion against Yukos in the bankruptcy, including a claim based on the attribution to Yukos of debts owed to YNG by Yukos' trading companies. Since the Tribunal has already found that Rosneft's acquisition of YNG was, to say the least, questionable, in its view, this claim is equally questionable.

1180. In light of the above conclusions, the Tribunal cannot accept that it was in any sense proper or fair for the creditors' committee to reject the Rehabilitation Plan, for the court to declare Yukos bankrupt, or for Yukos to have been deprived of all of its remaining assets through a hasty and questionable liquidation process. On the contrary, it is evident to the Tribunal that the totality of the bankruptcy proceedings reviewed in this chapter were not part of a process for the collection of taxes but rather, as submitted by Claimants, indeed the "final act of the destruction of the Company by the Russian Federation and the expropriation of its assets for the sole benefit of the Russian State and State-owned companies Rosneft and Gazprom."

---

[1501] The Tribunal notes that this claim or liability was considered in determining whether Yukos should be liquidated or rehabilitated, and indeed declared bankrupt, and the Federal Taxation Service itself—which stood to benefit from that claim—had a majority vote at the creditors' meeting.

1181. The Tribunal notes that its conclusions are consistent with those of the *RosInvestCo* tribunal and the *Quasar* tribunal.

1182. With respect to the bankruptcy proceedings, the *RosInvestCo* tribunal concluded as follows:

> Though the Tribunal did not find the bankruptcy auctions to be conducted contrary to Russian law, this does not change the general impression from the evidence on file for the Tribunal, since the application for bankruptcy by the SocGen Group was also conducted by association with the State-controlled company, Rosneft, and that they fitted into the obvious general pattern and obvious intention of the totality of the scheme to deprive Yukos of its assets.[1502]

1183. The *Quasar* tribunal concluded:

> 141.   The Tribunal has carefully considered each of the Respondent's defences, but is ultimately unpersuaded by them.  The issue here is not one of the legality of the bankruptcy proceedings, nor their conformity with Russian bankruptcy regulations.  Rather, it is whether the steps that were taken can properly and fairly be characterised as part of an ordinary process of collecting taxes.  In the Tribunal's view, they cannot fairly be so characterised, particularly when viewed against the broader chronology of which they form part (as summarised later in this section).  This conclusion is not overcome by the Respondent's various technical analyses of the consortium agreement.
>
> . . .
>
> 157.   But the Tribunal also notes that, as a result of these auctions, "at the end of the day" . . . the Russian Federation has ended up with 93% of Yukos Oil Company." . . .
>
> 158.   As summarised below, the overall chronology of which the liquidation auctions form part, casts them and their outcome in a particular light.  After careful consideration of the entire record, the Tribunal concludes that, as with the preceding events, the liquidation auctions were part of the same overall scheme of confiscation.  In this regard, the Tribunal's findings are consistent with those of the *RosInvest* Tribunal. . . .  The ECHR's finding to the contrary—*i.e.*, that Yukos failed to prove that the Russian Federation "had misused those [enforcement] proceedings with a view to destroying the company and taking control of its assets"—must be understood as based on a heightened requirement of "incontrovertible and direct proof," given the "wide margin of appreciation" a State enjoys under Protocol No. 1 to the European Convention on Human Rights. . . .[1503]

## H.   THE WITHDRAWAL OF PWC'S AUDIT OPINIONS

### 1.   Introduction

1184. As noted earlier in this Award,[1504] Yukos' auditor, PwC, withdrew its audit reports for Yukos in June 2007.  This withdrawal was often mentioned, mostly by Respondent's counsel, during

---

[1502]   *RosInvestCo* ¶ 620, Exh. C-1049.

[1503]   *Quasar*, Exh. 3383.

[1504]   *See* paragraph 104 above.

these proceedings.  Although neither Party called as a witness anyone from PwC, the Tribunal has formed the view that it is essential for it to review PwC's role in the present Awards.

1185.  PwC was Yukos' auditor from 1997 to 2004.  It also played an advisory role to Yukos, consulting on the company's domestic and international structures.  On 15 June 2007, PwC formally withdrew all its prior audit reports for Yukos for the period from 31 December 1995 until 31 December 2004, stating that "new information" had led it to conclude that such reports could no longer be relied upon as trustworthy.[1505]

1186.  Claimants say that the Russian Government exerted pressure on PwC to withdraw the audits in order to bolster the legitimacy of the destruction of Yukos.  The harassment of PwC, say Claimants, took the form of searches, seizures, interrogations, criminal charges, two tax lawsuits, and the potential loss of clients and its license to do business in Russia.  Rather than risk its business and employees for the sake of a client that was "no longer a going concern," PwC chose the "only viable option," namely to cooperate with the Russian authorities by finding pretexts to withdraw its Yukos audits.[1506]

1187.  In contrast, Respondent says that PwC and Yukos had had a troubled relationship for a long time, noting that PwC refused to audit the company after 2004.  During interrogations of PwC auditor Douglas Miller in May and June 2007, PwC received credible "new" information showing that Yukos' senior management had repeatedly lied to its auditors, confirming PwC's prior suspicions on four particular issues, and causing PwC to lose confidence in the content of its audit reports.  At the time, Yukos was in bankruptcy and former executives and company records were no longer accessible.  PwC thus could not conduct satisfactory inquiries to determine how the new information affected the audited financial statements.  In the circumstances, the "only viable option" for PwC was to withdraw the audits, a move endorsed and approved by Respondent's audit expert, Mr. Ellison.[1507]

1188.  No witnesses from PwC were presented by the Parties.[1508]  PwC is not on trial before this Tribunal.  The Tribunal draws no conclusions in this Award on PwC's professional conduct.

---

[1505]  PwC's Withdrawal Letter, Exh. C-611.

[1506]  Transcript, Day 2 at 50 (Claimants' opening), quoting U.S. State Department Cable No. 07MOSCOW2159, 10 May 2007, WikiLeaks Website, Exh. C-1358.

[1507]  Respondent's Opening Slides, p. 205; Respondent's Skeleton ¶¶ 45–50; Respondent's Closing Slides, pp. 188–89; Ellison Report.

[1508]  For the names of specific individuals from PwC who potentially could have testified, see paragraph 251 above.

Nevertheless, the events surrounding PwC's withdrawal of the Yukos audits help to inform the Tribunal's view as to whether Yukos was the object of a series of politically-motivated attacks, or is now simply "blaming the Russian Federation for the consequences of its own misconduct."[1509]

### 2.   Chronology

1189. Absent direct testimony from PwC, the Tribunal must draw its conclusions from the testimony of Claimants' witnesses; correspondence amongst Yukos, PwC, external advisors and the Russian authorities; and the testimony of PwC personnel before other fora.  There are also contemporaneous U.S. State Department cables, which emerged via "Wikileaks" and reveal the "candid"[1510] and "unguarded"[1511] views of PwC's senior management.

### (a)   PwC Serves as Both Auditor and Consultant to Yukos

1190. From 1997, Yukos was one of PwC's major clients in Russia.  At the Hearing, Claimants' witnesses described a "perfectly normal", "cordial and close" business relationship in which PwC was a "permanent partner of Yukos and its subsidiaries for a long time."[1512]  PwC conducted Yukos' external audits and assisted with training Yukos' in-house accountants.  PwC played an "integral role"[1513] in developing Yukos' financial reporting system, and, according to Mr. Theede, "PwC's consulting arm was actually the architect of [the trading company] structures."[1514]

1191. Mr. Kosciusko-Morizet testified that "from 1997 to 2004, PwC was given access to the entire documentation of the whole of the Yukos group without restriction and had a very detailed and global view of the financial situation and the procedures of Yukos and its subsidiaries."[1515]  It was a consistent theme among Claimants' witnesses that PwC enjoyed full access to Yukos'

---

[1509] *See* Respondent's Skeleton ¶ 22.

[1510] Reply ¶ 507.

[1511] Transcript, Day 3 at 41 (Respondent's opening).

[1512] Transcript, Day 11 at 50 (cross-examination of Mr. Theede); Kosciusko-Morizet WS ¶ 15; Transcript, Day 6 at 28 (cross-examination of Mr. Rieger).

[1513] Misamore WS ¶ 25.

[1514] Transcript, Day 11 at 50.  *See also* the reference to PwC's consulting contract in Letter from Michael Kubena to Bruce Misamore, 15 January 2004, Exh. C-609; Rieger WS ¶¶ 15–19.

[1515] Kosciusko-Morizet WS ¶ 17.

accounts, employees and information, "including related-party transactions, shareholders, costs [and] taxation."[1516]   PwC also maintained a permanent staff presence within Yukos and performed site visits to Yukos entities.[1517]

1192. Claimants' witnesses pointed out that PwC never voiced complaints about access to the company or any of its staff.   Mr. Kosciusko-Morizet affirmed that PwC was "perfectly able to check for themselves any documentation, ask for any documentation anywhere in the group at any level."[1518]   Mr. Misamore observed that if PwC "did not have sufficient information, they should have asked for more."[1519]   It is interesting to note that in 1998 PwC initially refused to sign the Yukos financials, as it was unable to resolve which trading companies should be consolidated as "controlled by Yukos and used for tax optimization."   However, the next year, PwC did sign, as by then it had apparently been shown information sufficient to enable it to understand the control relationships.[1520]

1193. Similarly, as detailed in the next section, PwC occasionally requested additional information about certain aspects of Yukos' activities, and was provided each time with sufficient answers to enable it to certify the financial statements according to U.S. GAAP standards.

### (b)   PwC Responds to the Massive Tax Reassessments against Yukos

1194. When Mr. Lebedev was arrested in 2003 on tax-related charges, Yukos turned to PwC. Mr. Michael Kubena, a PwC partner, assured the specially-formed *ad hoc* Yukos Board committee chaired by Mr. Kosciusko-Morizet that Yukos had always complied with Russian law, including in the operation of its tax optimization structure, and that PwC did not believe that there was any possibility that the Russian authorities would attack Yukos on these issues.[1521]

1195. In December 2003, after Yukos received the 2000 Audit Report, Yukos again asked PwC for its

---

[1516]   *See e.g.*, Transcript, Day 6 at 28 (cross-examination of Mr. Rieger).

[1517]   Rieger WS ¶ 16.

[1518]   Transcript, Day 4 at 29.   Mr. Kosciusko-Morizet added that PwC "had every possibility to check whatever they wanted to check.   And if they agreed on the consolidated perimeter, that was enough for us . . . . The U.S. GAAP consolidating statements were done according to the rules . . . .   The accounts were approved by an eminent firm." Transcript, Day 4 at 52.

[1519]   Transcript, Day 9 at 249.

[1520]   Russian Federation Prosecutor General's Office, Record of Interrogation of Douglas Miller, 4 May 2007, Exh. R-137.

[1521]   Kosciusko-Morizet WS ¶ 24.

comments.  In a letter dated 15 January 2004, Mr. Kubena advised that, under the relevant Russian tax legislation, Yukos was not required to discharge the tax obligations of other taxpayers, regardless of whether they were affiliated parties.[1522]

1196. PwC's advice to Yukos was to set up a Board committee with independent legal counsel to carry out an investigation.[1523]  Mr. Kosciusko-Morizet thus resurrected the special *ad hoc* Board committee and Yukos engaged the law firm Akin Gump to examine the tax reassessments. PwC explained in a letter to Yukos of 29 January 2004 that an independent investigation of the pending charges and allegations against key Yukos personnel would enable PwC to obtain an understanding of possible illegal acts for purposes of its own auditing standards.[1524] Mr. Kosciusko-Morizet said that "to understand this letter, you have to remember the events . . . if you know that the problem was political, as everybody did . . . .  The answer is you get cold feet and you start hedging, and this letter in technical language is about hedging."[1525]  PwC's persistence about the investigation led Mr. Kosciusko-Morizet to suggest at the time that PwC was "trying to evade its responsibilities."[1526]  At the Hearing, he explained what he meant by this comment:

> You're an auditor, you're in Russia, you know it's political; you get cold feet.  What do you do?  You don't want to be involved in the matter, so you find reasons to technically withdraw from the issue.  What happened here is that we made every effort to satisfy the PwC requirements.  The effort continued.  Akin Gump was hired.  A couple of memos, interviews and so on.  And in the midst of April . . . assets of Yukos . . . were frozen.  So that was that.  At that point, any realistic hope of having PwC approving the 2003 GAAP accounts disappeared, for it was practically impossible.  Even though we had satisfied all their requirements, they would not have approved the accounts because they knew—they thought, "It's a political struggle.  What about our office?"  And they were right, because two years later they got into a problem that we all know about . . . .  They know it's political; they don't want to be in the middle of the battle, they don't want to be touched. So they will keep raising arguments, technical arguments, in order not to be dragged into the fight.[1527]

1197. In April 2004, PwC decided they would no longer audit Yukos.  Mr. Doug Miller, a PwC Moscow partner, explained several years later, in an interrogation before the Prosecutor

---

[1522]  Letter from Michael Kubena to Bruce Misamore, 15 January 2004, Exh. C-609.  An earlier draft of this letter also concluded that Yukos should not be liable for the trading shells' taxes, but did not exclude the possibility that there would be tax consequences for Yukos if the authorities and courts re-qualified its transactions and the nature of its business.  Exh. C-1064, CP12026–27.

[1523]  Letter from Donn Kingsley to Simon Kukes, 29 January 2004, Exh. C-1064, CP11726.

[1524]  Transcript, Day 4 at 154–55.

[1525]  *Ibid.*, pp. 153–54.

[1526]  E-mail from Jacques Kosciusko-Morizet to Bruce Misamore, 16 February 2004, Exh. C-1064, CP11807.

[1527]  Transcript, Day 4 at 165–66.

General of the Russian Federation, that the results of the Yukos/Akin Gump investigation "were not final for us, they did not help us, i.e. we did not obtain the confirmation or comfort that would satisfy us as auditors.  This was one of the factors which led to our refusal to audit the company in the future."[1528]

1198. The timing of PwC's April 2004 decision to cease auditing Yukos coincides with the period when, according to Mr. Rieger, harassment of PwC at the hands of the Russian authorities commenced.  PwC employees involved in Yukos' Russian accounts were interrogated.[1529]  In the spring of 2005, Mr. Miller told Mr. Rieger that he could not even meet with Yukos employees or management anymore, which Mr. Rieger understood to be a "direct result of the permanent pressure put by the Russian authorities on PwC."[1530]

### (c)  PwC Faces Mounting Pressure from the Russian Federation around the Same Time as Mr. Khodorkovsky's Second Trial Starts

1199. Pressure on PwC from the Russian authorities was sustained.  In March 2006, a court case was brought against PwC for tax violations relating to expatriate salaries.  There was speculation that the lawsuit was indirectly connected with investigations against Yukos.[1531]

1200. In December 2006, a second court case was filed against PwC by the Tax Inspectorate.  The Tax Inspectorate accused PwC of colluding with Yukos on tax evasion.  PwC categorically rejected the claims that the Yukos audit reports were defective in any professional, legal or regulatory way.[1532]  While PwC acknowledged that it had raised certain matters with Yukos, it insisted that these matters did not materially affect the company's financial statements or alter PwC's opinion in respect of the financial statements.[1533]

1201. In March 2007, PwC's Moscow offices were raided by 50 officers from the Prosecutor General's Office and the Interior Ministry.  Documents were seized and PwC was eventually

---

[1528]  Russian Federation General Prosecutor's Office, Record of Interrogation of Douglas Miller of PwC Russia, 4 May 2007, Exh. R-137 at 17.

[1529]  Rieger WS ¶ 18.

[1530]  Ibid.

[1531]  U.S. State Department Cable No. 07MOSCOW466, "Update on PWC's Russian tax issues," 2 February 2007, WikiLeaks Website, Exh. C-1352.

[1532]  "Official Position of PricewaterhouseCoopers," PwC Press Release, 25 December 2006, Exh. C-826; "Official Position of PricewaterhouseCoopers Regarding the Claims of Tax Inspectorate 5," PwC Press Release, 17 January 2007, Exh. C-827.

[1533]  Ibid.

fined.[1534]  A press report observed:

> [w]hat is clear is that the firm's association with Yukos and the fact that the oil company was paralysed and eventually bankrupted after being slapped with more than US$30 billion in back-tax claims despite financial reports approved by PwC has made the auditor a clear target for Russian tax authorities.[1535]

1202. PwC published an official statement in which it "strongly object[ed] to the seizure of such information . . . [and] strongly denie[d] any wrongdoing in either the 2002 tax case or in relation to its audits," and stated that it continued "to work to resolve both matters."[1536] Mr. Kubena told the U.S. Embassy that the treatment of PwC employees during the March 2007 raids was "shocking" and a "disgrace."[1537]  Nevertheless, he was reported as saying that he wished to limit the public profile of the case and urged restraint in discussing it until the facts were clear.  He said that, in the meantime, PwC "better not . . . raise the public profile of the case in ways that could come back to hurt the prospects for a reasonable solution."[1538]

1203. On 20 March 2007, the Moscow Arbitrazh Court found against PwC in the Yukos audit case and imposed a fine.[1539]  PwC employees, including Mr. Kubena, also faced criminal charges.[1540] Mr. Kubena expressed disappointment about the outcome to the U.S. Embassy, but again urged restraint when discussing the case in public.[1541]  PwC was anxious about the renewal of its license.  Having met with PwC representatives, the U.S. Ambassador sought reassurance from Finance Minister Kudrin, who advised the Ambassador that there was no basis for the license to be revoked.[1542]  The press still speculated, however, that PwC might risk losing the license.[1543]

---

[1534] *Russia, With Yukos Still in Sights, Raids PwC*, Wall Street Journal, 10 March 2007, Exh. C-832.

[1535] *PwC Offices Searched in Yukos-Related Tax Evasion Investigation in Russia*, Global Insight, 12 March 2007, Exh. C-835; U.S. State Department Cable No. 07MOSCOW1028, "GOR Agencies visit PwC Moscow Office March 9," 12 March 2007, Wikileaks Website, Exh. C-1353.

[1536] "PricewaterhouseCoopers' Official Statement," PwC Press Release, 12 March 2007, Exh. C-834.

[1537] U.S. State Department Cable No. 07MOSCOW1028, "GOR Agencies visit PwC Moscow Office March 9," 12 March 2007, Wikileaks Website, Exh. C-1353.

[1538] *Ibid*.

[1539] *PwC Puts On a Brave Face After Losing Case*, Moscow Times, 22 March 2007, Exh. C-838; *see also* PwC Press Release, 20 March 2007, Exh. C-836.

[1540] Letter from the Russian Federation Prosecutor General's Office to Michael Kubena, 26 June 2007 and Resolution On Denial to Initiate Prosecution against ZAO PricewaterhouseCoopers Audit, 25 June 2007, Exh. C-1243.

[1541] U.S. State Department Cable No. 07MOSCOW1210, "Russia: PWC fined in Yukos tax audit case," 21 March 2007, Wikileaks Website, Exh. C-1354.

[1542] U.S. State Department Cable No. 07MOSCOW1354, "Ambassador's 3/27 meeting with Finance Minister Kudrin," 28 March 2007, Wikileaks Website, Exh. C-1355.

[1543] *Court Blasts PricewaterhouseCoopers*, Kommersant, 2 April 2007, Exh. C-845.

In fact, the license was renewed in April 2007 but PwC continued to fear that it would be revoked long after.[1544]  Press reports in April also noted that PwC had started losing clients, including State-owned companies Transneft and Sakhalin II.[1545]

1204. While these events were unfolding, in early 2007, prosecutors filed new charges against Mr. Khodorkovsky, causing PwC to start an internal review.  According to the declaration of a PwC in-house counsel in a separate forum, PwC was at that time already considering and drafting a possible withdrawal of the audits.[1546]

1205. In April 2007, the Russian tax authorities asked the Finance Ministry to initiate a "review" of PwC's auditing practices.[1547]  On 18 April 2007, PwC received a summons from prosecutors in the second Khodorkovsky trial.  The prosecutors wanted to interrogate Mr. Miller while reprimanding PwC for failing to cooperate with earlier requests.[1548]  On 19 April 2007, PwC urgently recalled Mr. Miller from his new post in London.  They informed him that PwC was now cooperating with investigators.  Mr. Miller was instructed to attend the Prosecutor General's Office, where he was interrogated on six occasions in May and June.[1549]  During these sessions he was presented with "new" evidence obtained in connection with the Khodorkovsky prosecution.[1550]  Other PwC personnel were also interrogated in the first half of 2007.  During his last interrogation session, on 4 June 2007, Mr. Miller told the prosecutor that, in his opinion, the audit opinions issued in respect of Yukos' financial statements "starting from at least 1999 should be withdrawn."[1551]

1206. The Tribunal notes that, on 14 June 2007, the Prosecutor General's Office wrote to Mr. Kubena that, in connection with criminal investigations of Messrs. Khodorkovsky and Lebedev, "the

---

[1544]  Order of the Ministry of Finance of the Russian Federation No. 348, 19 April 2007, Exh. R-885; U.S. State Department Cable No. 07MOSCOW5403, "PWC's travails in Russia worsen," 15 November 2007, Exh. C-1360.

[1545]  *PwC loses Russia's Sakhalin-2 audit contract*, Reuters, 13 April 2007, Exh. C-855; *Russia's Transneft drops PwC as auditor, picks KPMG*, Reuters, 25 April 2007, Exh. C-858.

[1546]  In the Matter of an Application of Michael Khodorkovsky and Platon Lebedev for an Order Seeking Discovery Under 28 U.S.C. § 1782, Declaration of Laurie Endsley, 31 January 2011 ¶ 9, Exh. R-881.

[1547]  U.S. State Department Cable No. 07MOSCOW3343, "Russia: PricewaterhouseCoopers Withdraws Audits of Yukos," 9 July 2007, Exh. C-1358.

[1548]  Letter from Russian Federation Prosecutor General's Office to PwC, 18 April 2007, Exh. C-1241.

[1549]  Letter from ZAO PwC Audit to Doug Miller, 23 April 2007, Exh. C-1242.

[1550]  Russian Federation Prosecutor General's Office, Records of Interrogations of Douglas Miller of PwC Russia, 4 May 2007, Exh. R-137; 8 May 2007, Exh. R-17; 10 May 2007, Exh. R-18; 4 June 2007, Exh. R-871.

[1551]  Russian Federation Prosecutor General's Office, Records of Interrogations of Douglas Miller of PwC Russia, 4 June 2007, Exh. R-871.

investigation has at its disposal data that certain persons at the present time are relying" on PwC's audit reports for Yukos.[1552]  PwC was asked to consider whether its Yukos audit reports "ought to be relied upon" and whether PwC could confirm the reliability of the financial reports for 1995–2004 in light of "information, that had earlier been inaccessible to the auditors."[1553] The Tribunal also notes that the following day PwC withdrew its Yukos audit reports.

### (d)   PwC's "Volte-Face" in Withdrawing the Yukos Audits; Improved Treatment and Continued Pressures in the Russian Federation

1207. On 15 June 2007, in a letter from Mr. Kubena to Yukos' receiver, Mr. Rebgun, PwC withdrew all of its audit reports for Yukos for the years 1995 to 2004 on the basis of "new information" it had received that had caused it to lose confidence in Yukos' management.[1554]  Four categories of "new" information were highlighted by PwC, concerning:

- control over Behles Petroleum S.A., Baltic Petroleum Trading Limited and South Petroleum Limited (the "**BBS Companies**");

- Yukos' control over the trading companies and consequential avoidance of profit tax;

- Yukos' purchases of Bank Menatep's liabilities; and

- compensation to certain individuals who had led Yukos at the time of its privatization.[1555]

1208. Senior PwC manager Pete Gerendasi reportedly explained to the U.S. Embassy that the "new" information had been carefully reviewed and deemed credible; that PwC's U.S. headquarters had been closely consulted; and that PwC had concluded after a thorough review that, "since Yukos was no longer a going concern, the only viable option was to withdraw its audits."[1556] The Embassy observed that Mr. Gerendasi was uncomfortable discussing the sources of the "new" information but that he was "unequivocal" that the withdrawal was "a difficult call."[1557]

---

[1552]   Letter from the Russian Federation Prosecutor General's Office to PwC, 14 June 2007, Exh. C-610.

[1553]   Letter from the Russian Federation Prosecutor General's Office to PwC, 14 June 2007, Exh. C-610; *see also* In the Matter of the Application of Michael Khodorkovsky and Platon Lebedev for an Order Seeking Discovery Under 28 U.S.C. 1782, Deposition of Douglas Miller, 18 December 2009, p. 257, Exh. R-4309 (hereinafter "Miller Deposition").

[1554]   PwC's Withdrawal Letter, Exh. C-611.

[1555]   *Ibid.*

[1556]   U.S. State Department Cable, 07MOSCOW3343, "Russia: PricewaterhouseCoopers Withdraws Audits of Yukos," 9 July 2007, Wikileaks Website ¶ 3, Exh. C-1358.

[1557]   *Ibid.* ¶ 7.

As described in the Wikileaks cable, at the time, PwC was still facing: (a) a review by the Finance Ministry of its auditing practices; (b) an appeal regarding the expatriate tax case; and (c) an appeal regarding the Yukos collusion case.[1558]  While Mr. Gerendasi noted that PwC's legal counsel "was uncertain what effect PwC's decision to withdraw its Yukos audits would have on the outcome" of the Yukos collusion case, he stated that "the withdrawal would not have an adverse effect on the Finance Ministry's review of PwC's auditing practices."[1559]

1209. PwC made a public announcement of its withdrawal decision on 24 June 2007.[1560]  The *Financial Times* reported:

> PwC's sudden about face comes after a government pressure campaign that included police raids in March on its Moscow office and an ongoing criminal investigation into alleged underpayment of taxes by Yukos.  The audit firm has also risked losing its license . . . . The move will strengthen the Kremlin's case against Mikhail Khodorkovsky.[1561]

1210. The Tribunal notes that just one day after the public announcement, the criminal charges against Mr. Kubena and other PwC personnel were dropped.[1562]  In dropping the charges, the prosecutor noted that "the unjustified nature of the [audit opinions] . . .  was the result of misrepresentation by [Yukos'] major shareholders and the persons acting on their instructions."[1563]

1211. In July 2009, the *Financial Times* reported that the prosecutors had cleared PwC with respect to its Yukos audits, having found no wrongdoing by the firm.  PwC was "pleased . . . the general prosecutor ha[d] decided not to take any action against PwC Russia, its partners or employees."[1564]

1212. PwC has always denied that there was a tit-for-tat deal whereby the Russian authorities would drop their cases against PwC in return for PwC withdrawing its audits.  PwC told the *Financial Times* that "the audit firm's apparent reversal of fortune had nothing to do with its withdrawal

---

[1558]  *Ibid.* ¶¶ 4–6.

[1559]  *Ibid.* ¶ 6–7.

[1560]  "Withdrawal of Yukos Audit Reports," PwC Press Release, 24 June 2007, Exh. C-864.

[1561]  *PwC withdraws Yukos audits*, Financial Times, 25 June 2007, Exh. C-865.

[1562]  Letter from Russian Federation Prosecutor General's Office to PwC, 26 June 2007, enclosing Resolution on Denial to Initiate Prosecution against ZAO PriceWaterhouseCoopers Audit, 25 June 2007, Exh. C-1237.

[1563]  *Ibid.*

[1564]  *Moscow clears PwC over Yukos audits*, Financial Times, 19 July 2007, Exh. C-874.

of the audits . . . and nothing to do with any attempt to reduce the legal pressure."[1565]   A few years later, in a 2009 deposition conducted in the U.S. by Mr. Khodorkovsky's criminal lawyers, Mr. Miller categorically denied any connection between PwC's decision to withdraw its audits and the legal pressure against PwC:

> Q. Mr. Miller, how much did the—did the criminal investigation into PwC in 2007 impact PwC's decision to withdraw the audits?
>
> . . .
>
> THE WITNESS: I believe that the decision to withdraw was based firmly [on] the information that was shown to us . . . during the investigation.
>
> Q. And is it the same answer as to the tax claims filed against PwC?
>
> A. Yes.
>
> . . .
>
> Q. And did you receive any assurances from the investigators, including Mr. Karimov, that if PwC withdrew the audits, that the criminal investigation against PwC would be terminated?
>
> A. No.
>
> Q. Have you received any other assurances from the investigators as to treatment of PwC if you were—if PwC were to withdraw the audit letters?
>
> A. No.
>
> . . .
>
> Q. How about any of the investigators from the Russian authorities, did anybody ask you to develop reasons to withdraw the Yukos audits?
>
> A. No.
>
> Q. Are you aware of anyone from the . . . [Prosecutor General's Office] asking PwC to develop reasons to withdraw the audits?
>
> A. No, I'm not aware of that.[1566]

1213. At the same time, the Tribunal notes that an October 2007 Wikileaks cable reveals that Messrs. Kubena and Gerendasi of PwC conveyed to the U.S. Embassy "that the Yukos and expatriate salary tax cases against the auditor were politically motivated."[1567]   Mr. Kubena speculated that the case against PwC for colluding with Yukos might have been "an effort by the [Government of Russia] to prove ex post facto that its actions against Yukos had a legitimate basis."[1568]   Mr. Gerendasi drew a direct connection between the expatriate tax case

---

[1565] *Ibid*.

[1566] Miller Deposition, pp. 256–7, 264, Exh. R-4309.

[1567] U.S. State Department Cable No. 07MOSCOW5083, "Update on PWC's Yukos, Russian tax cases," 19 October 2007 ¶ 1, Exh. C-1359.

[1568] *Ibid*.

against PwC and the prosecution against Yukos' former management, saying that "tax and law enforcement authorities may be trying to cast PwC as reckless in an attempt to underscore that the [Government of Russia] rightly prosecuted Yukos senior management."[1569]   Following this meeting, the Ambassador commented that "PwC is under serious duress in Russia." [1570]

1214.  The following month, PwC told the Embassy it was worried that the criminal charges laid in the context of the expatriate tax case had "devolved into a pressure tactic against the firm."[1571]  As for the Yukos tax case, which was on appeal, Mr. Gerendasi noted that "[a]lthough the potential financial penalties in this case were only on the order of USD 500,000 . . . the real threat remained to the firm's auditing license."[1572]   The Ambassador noted that "Russia matters to PwC," and that "[d]espite the rather stark picture Gerendasi painted, he said that PwC remained bullish on Russia and intended to maintain its operations in-country . . . .  He added that in the interest of facilitating a resolution to the firm's short-term difficulties, PwC's international leadership would try to meet with senior [Russian governmental] officials in the near future."[1573]

1215.  Mr. Miller and other PwC employees then cooperated as prosecution witnesses in the second Khodorkovsky trial.  The record discloses that they consulted with the prosecutors prior to their testimony, as demonstrated by an e-mail dated 28 March 2009 from the Prosecutor General's Office, in which the prosecutors answered questions posed by Mr. Miller as follows:

> *2. For every witness, exactly on what issues and/or arguments should they dwell in their witness testimony?*
>
> - The testimony of each witness from among your company's employees should be unified, that is testify to the same thing, in the same sense and featuring the same style (offensive and aggressive with regard to the Defense) . . .
>
> *3. Can we obtain a list of approximate expected questions by the Prosecutor for each witness?*
>
> - Carefully analyze your testimony (records of interrogations) and recall our recent conversation: you will understand the general meaning of such questions. You and I should phrase specific questions ourselves once you have personally got to the bottom of the situation.[1574]

---

[1569]  *Ibid.* ¶ 5.

[1570]  *Ibid.* ¶ 6.

[1571]  U.S. State Department Cable No. 07MOSCOW5403, "PWC's travails in Russia worsen," 15 November 2007 ¶ 4, Exh. C-1360.

[1572]  Ibid. ¶ 5.

[1573]  *Ibid.* ¶ 8.

[1574]  E-mail from Sergei Mikhailov to Doug Miller, 28 March 2009, Exh. C-1244.

1216. In December 2009, the U.S. Embassy commented on the role that PwC played in the Khodorkovsky trial and related Yukos lawsuits.  It observed as follows:

> . . . if the audits were properly withdrawn, this will be a "black mark" for the [Yukos/Khodorkovsky] defense; if not, it could help the defense, but would greatly tarnish PWC's international reputation . . . .  [The Khodorkovsky trial is] applying a superficial rule-of-law gloss to a cynical system where political enemies are eliminated with impunity . . . .  There is a widespread understanding that Khodorkovskiy violated the tacit rules of the game: if you keep out of politics, you can line your pockets as much as you desire. Most Russians believe the Khodorkovskiy trial is politically motivated . . . [1575]

1217. Eventually the two court cases against PwC were resolved in PwC's favor and PwC's fines were refunded.[1576]   Meanwhile, Mr. Miller's evidence, and that of other cooperative PwC witnesses, was accepted and relied upon by the trial judge who found Mr. Khodorkovsky guilty at the conclusion of his second criminal trial.[1577]

### 3.    Parties' Arguments and Tribunal's Observations

1218. The main question the Tribunal will address is whether PwC's withdrawal of its Yukos audits was a decision brought about by pressure from the Russian Federation, as Claimants argue, or whether PwC decided to withdraw the audit opinions out of the genuine concern that they were tainted by newly-discovered misrepresentations, as Respondent argues.   There is a third possibility as well, namely, that PwC's withdrawal of its audits was a tactical response to pressure of the Russian authorities but that nevertheless PwC did have some valid grounds to believe that Yukos had made important misrepresentations to it.

### (a)    Did PwC Withdraw its Audits because it was under Pressure from the Russian Government?

1219. Claimants' witnesses were unequivocal.   In their view, PwC gave in to pressure from the Russian authorities when it withdrew the audits.   Mr. Rieger had noticed that after the attacks on Yukos began in 2003, "PwC grew much more distant from Yukos . . . .   I understood this to be the direct result of the permanent pressure put by the Russian authorities on PwC."[1578]

---

[1575]   U.S. State Department Cable No. 09MOSCOW3144, "Rule of Law Lipstick on a Political Pig: Khodorkovskiy case plods along," 30 December 2009 ¶¶ 3, 8, Exh. C-1361.

[1576]   *Tax Authorities Performed Their Duty to Yukos' Auditor*, Kommersant, 19 June 2009, Exh. R-4310.

[1577]   Verdict of the Khamovnichesky Court of Moscow in the second criminal case against Michael Khodorkovsky and Platon Lebedev, 27 December 2010, pp. 448–49, Exh. C-1057.

[1578]   Rieger WS ¶ 18.

Mr. Misamore stated at the Hearing his belief that "PwC withdrew its audit reports as a result of tremendous pressure from the Russian Government . . . ."[1579]  Mr. Kosciusko-Morizet agreed. He testified:

> Well, knowing Russia, knowing that this whole Yukos affair is basically political, with a financial dimension for some people of course, there is a complete logic here in the harassment that PwC was submitted to from December 2006; the raid on their offices, the usual methods of armed masked men with machine guns, in March; their denial again of any wrongdoing in April; and finally this letter, I would not say written but signed by Doug Miller; and then I believe that all the criminal prosecutions disappeared in a matter of days . . . . I saw this letter.  I considered that this letter was extorted from them by force.  I know and they know what happened to the Yukos personnel, Vasily Aleksanyan, . . . Svetlana Bakhmina and others; there is a long list.  And they had to face a decision between, of course, protecting their business and protecting their people, especially their Russian personnel, from dire consequences and/or insisting on no wrongdoing; that is, keeping the ethical line . . . .  But PwC, as everybody else, was familiar with the kind of treatment you could expect if you resist in that context, and they made a decision—I don't blame them for that decision—protecting their staff.  It's just unethical but realistic.  And now they have a thriving business in Moscow.[1580]

1220. Respondent did not deny that the raids, seizures and lawsuits occurred, but explained they were part of regular law enforcement activities.  Respondent pointed out, for example, that many companies (including Ernst & Young) faced lawsuits about expatriation tax issues.  It argued that auditor collusion lawsuits are standard in other countries.[1581]

1221. The record before the Tribunal is abundantly clear.  PwC's treatment improved significantly once it started to cooperate with the authorities and then withdrew its audits.  Almost overnight, charges were dropped against PwC personnel.  PwC's own legal problems started to be resolved.  At the same time, some cases took longer to resolve, and concerns by PwC over loss of its license were real.  It is clear that cooperation from PwC, once given, was expected to be enduring. This is easily understood.  Mr. Khodorkovsky's second trial was still ongoing.

1222. Respondent relies heavily on Mr. Miller's deposition to contradict Claimants' account of the events.[1582]   That deposition was taken under oath in the U.S., at the request of Mr. Khodorkovsky's own lawyers, and, according to Respondent, it is "hard to imagine a

---

[1579]   Transcript, Day 9 at 182.

[1580]   Transcript, Day 4 at 203–04. For Mr. Kosciusko-Morizet's testimony at the second Khodorkovsky trial, *see also* Verdict of the Khamovnichesky Court of Moscow, 27 December 2010, pp. 468ff, Exh. C-1057.

[1581]   Rejoinder ¶ 1283.

[1582]   *Ibid*. ¶¶ 1273–74.

clearer or more credible denial of Claimants' 'harassment' theory."[1583]

1223. Although Mr. Miller was not offered as a witness, the Tribunal does not accept his denial in another forum of any link between PwC's decision to withdraw the audits and the pressure against PwC mounted by the Russian authorities.  Mr. Miller was then subjected to six sessions of interrogation.  When he was recalled from London his superiors instructed him to cooperate with the Russian authorities. The March 2009 e-mail exchange with the prosecutor's office, suggests that he was prepared to cooperate when he testified in Mr. Khodorkovsky's second trial.  Moreover, the candid views expressed by PwC officials in the U.S. Embassy's cables published by Wikileaks confirm that PwC was under pressure.   The cables demonstrate that PwC was concerned not to aggravate its difficulties with the Government ("better not raise the public profile of the case in ways that could come back to hurt the prospects for a reasonable solution");[1584] that PwC was anxious not to lose its license or its business in Russia;[1585] that it considered the Yukos cases to be politically motivated and saw some connections between the withdrawal of the audit opinions and PwC's treatment by the Russia Government;[1586] and that it felt that criminal charges in the expatriate tax case were being used as a "pressure tactic."[1587] The Embassy considered PwC to be under duress and concluded that "the political and legal concerns that are driving the heightened scrutiny of PWC's accounting practices appear to have taken on a life of their own."[1588]

### (b)   Were the Grounds Provided by PwC in its Withdrawal Letter Contrived or Credible?

1224. As noted earlier, Claimants assert that PwC played a role in establishing and auditing Yukos' domestic and international structures, and that, at all times, PwC had access to all the

---

[1583]   *Ibid.* ¶¶ 1274–75.

[1584]   U.S. State Department Cable No. 07MOSCOW1028, "GOR Agencies visit PwC Moscow Office March 9," 12 March 2007, Wikileaks Website, Exh. C-1353.

[1585]   U.S. State Department Cable No. 07MOSCOW5403, "PwC's travails in Russia worsen," 15 November 2007 ¶ 5, Exh. C-1360.

[1586]   U.S. State Department Cable No. 07MOSCOW5083, "Update on PWC's Yukos, Russian tax cases," 19 October 2007 ¶¶ 1, 5, Exh. C-1359.

[1587]   U.S. State Department Cable No. 07MOSCOW5403, "PWC's travails in Russia worsen," 15 November 2007 ¶ 4, Exh. C-1360.

[1588]   *Ibid.* ¶ 9.

information it required.[1589]

1225. Respondent on the other hand points to "a long and troubled relationship" between Yukos and PwC, recalling that PwC had refused to continue to audit the company's U.S. GAAP statements after 2003.[1590]  Respondent asserts that in 2007 PwC withdrew its opinions in good faith, upon learning "new information" via Mr. Miller's interrogations in May and June 2007.[1591]  Respondent emphasizes "that the Tribunal is not a trier of fact as to the reliability of the information learned by PwC.  In order to rebut Claimants' unsupported harassment theory, it is sufficient that PwC had a good-faith belief in the credibility of that information. . . ."[1592]  According to Respondent, it is for Claimants to prove that Yukos never lied to PwC and that PwC's four reasons for withdrawal of the audits were a mere pretext.  Although the Tribunal agrees with Respondent that it is not a trier of facts as to the soundness of this "new information," it finds it appropriate to examine those four reasons.

### i.   Did Yukos' Management Lie to PwC about the BBS Companies Being "Related"?

1226. The first category of alleged misinformation identified in PwC's Withdrawal Letter was the following:

> Whilst we were auditing the Company, its management many times declared to us that the Company and companies to which substantial volumes of crude oil and oil products were exported, namely Behles Petroleum S.A., Baltic Petroleum Trading Limited and South Petroleum Limited (hereinafter together referred to as "BBS"), were not affiliated parties.  In the course of the Investigation, we were provided with information showing that BBS had been controlled by the shareholders of Group Menatep Limited (hereinafter "Group Menatep") and had been used to their advantage.  At the material time, Group Menatep held a controlling block of shares in the Company.[1593]

1227. It appears as if Yukos' management had repeatedly assured PwC that Yukos was not "related" to the BBS Companies (in the sense of sharing the same beneficial owners within the meaning

---

[1589] At the Hearing, Mr. Misamore stated that he did not "agree that anything was misrepresented to PwC."  In his view, "PwC had access to all the information they wanted; and if they didn't have sufficient information, they should have asked for more."  Transcript, Day 9 at 249.  Mr. Theede also testified that up until the Russian Federation's attack on PwC began, "there was never any indication of any concerns or problems or anything to me."  Transcript, Day 11 at 50.  *See also* Misamore WS ¶ 29; Rieger WS ¶ 18; Kosciusko-Morizet WS ¶ 17.

[1590] Respondent's Opening Slides, p. 205; Respondent's Post-Hearing Brief ¶ 61.

[1591] Respondent's Post-Hearing Brief ¶ 61.

[1592] *Ibid.*

[1593] PwC's Withdrawal Letter, Exh. C-611.

of GAAP standards).[1594] PwC had looked at the issue itself and expressed doubts, but concluded that even if they were related, the transactions with the BBS Companies were done under fair market conditions, and were so immaterial that they could have no impact on the financial statements and thus did not need to be disclosed.[1595] Then, in 2007, while being interrogated, Mr. Miller found out "new information," in the form of the record of an interrogation of a Mr. Anilionis, who described how the BBS Companies were set up in a structure that would enable Messrs. Khodorkovsky and Lebedev to "keep [them] under control but on the surface the structure should not belong to 'Yukos.'"[1596]   A trade office was set up in Geneva, prices were coordinated with Mr. Lebedev, and Yukos' employees were responsible for oil trading activities.   The discovery of this "lie", even though relating to an immaterial matter from a financial reporting standpoint, is said to have shattered PwC's confidence in the statements of Yukos' management and thus caused PwC to withdraw its audit opinions.[1597]   Claimants say it is simply not credible for PwC to have invoked the BBS Companies issue as an excuse to withdraw its audit opinions.[1598]   They also question the reliability of the source of "new information," the interrogation of Mr. Anilionis.[1599]

1228. When Mr. Kosciusko-Morizet was shown documents indicating that PwC had raised concerns in the past about Yukos' relationship with the BBS Companies, he emphasized that PwC had approved Yukos' G.A.A.P. accounts and thus " any problem they might have had was solved."[1600]   Mr. Misamore also confirmed the view that the BBS Companies were not related parties vis-à-vis Yukos, that the issue had been on PwC's radar, and that PwC could have caused Yukos to identify the BBS Companies as related if it were essential, but did not.[1601]

1229. Mr. Misamore denied that PwC had repeatedly recommended that Yukos disclose the ownership structure of the BBS Companies and that Yukos had refused such disclosure.   He explained that PwC had conducted a study in 2002 and that it had not been able to "reach a

---

[1594]   Mr. Misamore confirmed on cross-examination that he still believed that they were unrelated. Transcript, Day 9 at 171.

[1595]   PwC Memorandum "Matters for Partner Attention – Summary of Significant Issues," 31 December 2000, item 8, Exh. C-1232; *see also* Record of Interview of Bruce Misamore, 9 March 2009, pp. 49–50, Exh. R-3347.

[1596]   Interrogation Protocol of G.P. Anilionis, 18 January 2007, p. 15, Exh. R-3581.

[1597]   Miller Deposition, pp. 176–77, Exh. R-4309.

[1598]   Reply ¶ 457.

[1599]   Transcript, Day 20 at 203 (Claimants' closing).

[1600]   Transcript, Day 4 at 124; *see also* Transcript, Day 4 at133.

[1601]   Transcript, Day 9 at 176–77.

conclusion as to whether or not [information about Yukos' relationship with the BBS Companies] should be disclosed."[1602]   Further, he noted that PwC signed Yukos' audited financial statements without that information.  Upon being shown an internal PwC document, "Matters for Partner Attention", for year 2000, wherein PwC stated that "[t]he absence of disclosure, while not desirable, does not constitute a material omission,"[1603] Mr. Misamore said that this document too supports his view that disclosure was not so desirable as to warrant PwC insisting on its inclusion in Yukos' F-1 document.[1604]

1230. Nevertheless, the Tribunal is unconvinced by the claims that the BBS Companies, apparently the, or certainly, a, principal exporter of the oil produced by Yukos, were not controlled by or related to Yukos.  PwC's contention that it was misled in this regard may have been true.

### ii.   Did Yukos Management Lie to PwC about Yukos' Control over the Trading Companies?

1231. The second category of alleged misinformation identified in PwC's Withdrawal Letter was the following:

> Now we have information demonstrating that the management of certain Russian legal entities affiliated with the Company did not control the activities of these entities, rather these legal entities were fully controlled directly by the Company's management.  Since the management of these affiliated entities were not in control of these entities' activities, the court found that these activities were fictitious.  Consecutively, the courts found that the profit earned by these legal entities affiliated with the Company was a profit of the Company, and therefore the Company should have accrued and paid taxes on this profit.  Nevertheless, in the course of the audits, the Company's management told us that key issues of the activities of these affiliated legal entities were under supervision and control of their own management.[1605]

1232. This is an issue that was traversed at length in Chapters VIII.A and B of the present Award.

1233. Claimants argued that PwC was fully aware of the structures of the trading companies, and that in the context of the preparation of Yukos' U.S. GAAP financial statements, PwC had given specific and detailed advice to Yukos on how to demonstrate control over affiliated companies

---

[1602]   *Ibid*. at 64.

[1603]   PwC Memorandum "Matters for Partner Attention—Summary of Significant Issues," 31 December 2000, p. 6, Exh. C-1232.

[1604]   Transcript, Day 9 at 178.

[1605]   PwC's Withdrawal Letter, Exh. C-611.

so that they could be included within the consolidation umbrella.[1606]  Respondent accuses Claimants of conflating concepts of accounting (control relationships amongst various Yukos entities for consolidation purposes under the U.S. GAAP), which PwC *did* understand, with questions of tax (how much *actual* control Yukos exerted at an operational level over the trading shells from Moscow while maintaining the fiction of management in the low-tax region to avoid tax under Russian tax law), which PwC certainly did *not* appreciate, because it never audited the trading companies.[1607]  Respondent does not actually refer to any "new" information PwC learned which would have caused them concern about this in June 2007; it simply points to a series of negatives (PwC did *not* design the trading company scheme, PwC did *not* audit the trading companies).

1234.  At the hearing, Respondent referred to the August 2007 interrogation of Mr. Kubena's predecessor as PwC tax advisor in Russia, Mr. Klubnichkin, to show PwC never audited the trading companies.[1608]  While PwC was fully aware of Yukos' use of the tax optimization scheme, Mr. Klubnichkin said, it was *not* aware of any abusive elements.  Mr. Klubnichkin said that as Yukos' auditor, PwC had "never been aware of the fictitious nature of these 'operational' companies . . . .  The deceit lies in the fact that a corporation creates false appearance of normal activity, of a serious business, with respect to a fictitious business . . . .  We could only learn about such nature of these companies in case of a full audit of these companies themselves, which would include our visits to their operational premises."[1609]  The Tribunal notes that Mr. Klubnichkin's interrogation took place in August 2007, *after* the PwC withdrawal.

1235.  Respondent submits that PwC did not know about the Lesnoy assessments.  Respondent thus disputes that PwC was ever aware that the trading companies were sham entities directly controlled by Yukos from Moscow, and disputes that Yukos' tax scheme was adopted on PwC's advice or recommendation.[1610]

1236.  Claimants' response is two-fold.  Firstly, they refer to oral and documentary evidence in the

---

[1606]  *See* Reply ¶¶ 469–70, referring to PwC Memorandum "Audit Summary Points and Matters For Partner Attention—31 December 1999 and 1998," Exh. C-1230; and for 2001, Exh. C-1233.

[1607]  Respondent's Post-Hearing Brief ¶ 64.

[1608]  Respondent's Closing Slides, pp. 205, citing Interrogation of K.M. Klubnichkin, 1 August 2007, Exh. RHB-S-72 (in English)/C-1065, RP 9988-9997 (in Russian).

[1609]  Interrogation of K.M. Klubnichkin, 1 August 2007, Exh. RHB-S-72 (in English)/C-1065, RP 9988-9997 (in Russian).

[1610]  Respondent's Post-Hearing Brief ¶¶ 65–67.

record confirming PwC's participation in the Yukos tax scheme in the regions.[1611]  They point to a contemporaneous internal memo from PwC Cyprus to PwC Moscow, which discloses that PwC was familiar with the details of the group structure and the relationships of the trading companies.[1612]  In addition, Claimants underline the closeness of Yukos' relationship with PwC as shown by PwC's attendance at an "international symposium" held by Yukos in early 2002, at which tax issues, group structure, international accounting standards and related party disclosure requirements were discussed.[1613]

1237. Finally, Claimants point to a timing problem that in their view undermines the credibility of PwC's statement that it obtained "new information" only in May 2007.  The Tribunal finds much force in Claimants' submission that PwC was on notice of the Russian Federation's alleged concerns about Yukos' tax optimization structure at least as early as January 2004, when it issued its opinion on the 2000 Audit Report.  As Yukos' auditor since 1997, PwC obviously had a strong incentive in ensuring that its previous audit reports were accurate, and if there was anything new or worrying in what it had seen, it would have raised it at the time.  PwC did not withdraw the audits in 2004, 2005, or 2006 when the issues were being aired through the Russian courts and in the public domain.  Rather it waited three and a half years, and then suddenly decided that there was "new information" on the basis of which the audits should be withdrawn.

### iii.   Did Yukos' Management Lie to PwC about Transactions with Bank Menatep?

1238. The third category of alleged misinformation identified in PwC's Withdrawal Letter was the following:

> In the course of the Investigation, we were shown documents demonstrating that the Company had made significant payments to meet liabilities of the companies effectively

---

[1611]   Claimants' Post-Hearing Brief ¶¶ 135–42, citing Transcript, Day 6 at 27 (cross-examination of Mr. Rieger); Transcript, Day 4 at 27 (cross-examination of Mr. Kosciusko-Morizet).  Mr. Misamore recalled that it was PwC's recommendation to use indirect control for purposes of consolidation.  Transcript, Day 9 at 34.  Mr. Theede recalled that PwC had been the "architect" of the domestic trading companies' structure.  Transcript, Day 11 at 50.  Mr. Kosciusko-Morizet specified that Yukos, as in the case of other Russian companies, had "made use of means of tax optimization that were provided for by Russian law" and that "these means had been recommended and put in place by PwC's experts."  Morizet WS ¶ 24.  *See also* Letter from Enrique Munoz to Michel Soublin, 13 October 2000, Exh. C-1064, CP1408.

[1612]   Transcript, Day 16 at 157, citing to Letter from Chris Santis (PwC Cyprus) to Kelly Allin (PwC Moscow), 10 April 2003, Exh. R-349.

[1613]   Claimants' Post-Hearing Brief ¶ 146, citing to Minutes of Yukos Moscow International Symposium, 29–31 January 2002, Exh. C-1064, CP4146.

owned and controlled by Group Menatep before AKB Menatep Bank. Complete information about the nature of these transactions and relations was not disclosed to us in the course of the audits.[1614]

1239. This "new information" concerned transactions going back to the late 1990s, when Yukos purchased what Respondent calls "worthless claims" against Bank Menatep, which was in bankruptcy at the time.[1615]  The principal shareholders of Bank Menatep were the same as the principal shareholders of Yukos.  PwC was concerned that the purchase of claims against a bankrupt bank was undertaken to further the interests of the companies' common shareholders, using Yukos' funds and at the expense of Yukos' minority shareholders.  By May 2000, Yukos had accumulated USD 500 million in claims against Bank Menatep, but had at most USD 220 million in guarantees.

1240. During one of the 2007 interrogations, Mr. Miller was shown minutes of a May 2000 meeting, in which Yukos' managers stated that "it would be not be desirable to disclose this information since those shares were bought out from the borrowers."[1616]  The minutes then state that "[i]t is necessary to immediately demonstrate to the Company's auditors the intention to sell the excess of the purchased assets—with a book profit—to unrelated third parties. . . ."  Although Mr. Miller could not in fact remember if he worked on this issue or if the information was disclosed to PwC, he was outraged what he described as the "unacceptable manipulation of information" revealed by the minutes and by Yukos' plan to lie to the auditors about its worthless claims against Bank Menatep.[1617]

1241. Claimants assert that PwC was always fully aware of the substance of the transactions concerning the assumption of Bank Menatep's debt, and that the transactions were accounted for in Yukos' financial statements and draft F-1 forms.[1618]

---

[1614]  PwC's Withdrawal Letter, Exh. C-611.

[1615]  White & Case, Memorandum, 25 July 2001, Exh. R-3585.

[1616]  Minutes of Meeting, 31 May 2000, Exh. C-1231.

[1617]  Reply ¶ 481, citing to Russian Federation General Prosecutor's Office, Record of Interrogation of Douglas Miller, 4 June 2007, Exh. R-871.

[1618]  Yukos U.S. GAAP Consolidated Financial Statements, 31 December 1999, Exh. C-1066; for 2000, Exh. C-27; for 2001, Exh. C-28; Draft Yukos F-1 Form and Registration Statement Under the Securities Act of 1933, 19 March 2003, Exh. C-1067.

### iv.   Did Yukos' Management Lie to PwC about its Compensation Payments to Certain VPL Managers?

1242. The fourth category of alleged misinformation identified in PwC's Withdrawal Letter was the following:

> The Company failed to timely disclose to us information about certain payments made by the shareholders of Group Menatep in favor of certain individuals, who were leading executives of the Company at the time of its privatization. In the course of the Investigation, some information disclosed to us ran counter to the explanations given to us by the management and shareholders of the Company in the course of our audits with regard to the exact nature of those payments.[1619]

1243. This allegation concerned the extraordinarily generous compensation plan that had been put in place for certain persons who had been managers of Yukos at the time of its privatization.  PwC suspected that the immense sums paid to those persons could not have been for services rendered to Yukos itself.   Respondent alleges that Yukos had misrepresented to PwC the purpose of the compensation plan.  PwC's long-held suspicion about the nature of the payments was only confirmed when the Prosecutor General showed Mr. Miller statements signed by the beneficiaries of the payments to the effect that they had been made to them "not for services provided to Yukos but were . . . connected to Group Menatep's acquisition of Yukos."[1620]  Mr. Miller expressed "indignation" at the "lie" and alleged that Mr. Khodorkovsky had told him he would go to jail if forced to disclose the real reason for the payments.[1621]  This category of so-called "lies" was seen as important to PwC not in terms of material effect on the audited reports, but insofar as they undermined the credibility of Yukos' management's statements.[1622]

1244. Claimants affirm that Mr. Miller had always been familiar with the payment arrangements.  How the payments are identified in the accounts is only an accounting issue (as opined by Clifford Chance and Cleary Gottlieb at the time).[1623]   When PwC signed off on the Yukos financial statements, they were aware of the issue.  Even Mr. Miller acknowledged that the

---

[1619]   PwC's Withdrawal Letter, Exh. C-611.

[1620]   Counter-Memorial ¶¶ 724, 728, citing to Minutes of Audit Committee of the Yukos Board of Directors, 26 February 2003, Exh. R-3583.

[1621]   Russian Federation Prosecutor General's Office, Record of Interrogation of Douglas Miller, 10 May 2007, p. 8, Exh. R-18.

[1622]   Miller Deposition, pp. 176–77, Exh. R-4309.

[1623]   Reply ¶ 461, citing to E-mail from Doug Miller to Bruce Misamore, 14 August 2002, attaching PwC Memorandum "Veteran Managers' Plan and Agreement: Determination of Accounting for Plan," Exh. C-1235.

"reliability of the financial statements is not affected."[1624]  Claimants were prepared to disclose the existence and purpose of the compensation fund to the public for the ADR listing.[1625]

### (c)   Concluding Observations

1245. The Tribunal observes that there are some notable timing problems concerning the date of PwC's withdrawal following the revelation of "new" information.  For example, the fact that PwC did not audit the trading shells would have been known to Mr. Miller before June 2007. PwC would have known about alleged "sham" or "abusive" elements of the Yukos tax optimization scheme at least as early as January 2004 when it was shown the 2000 Audit Report.  It is not understandable that PwC would wait until June 2007 before determining that its audits were unreliable.  Respondent itself notes that "[a] question can be raised as to whether PwC waited too long to withdraw its audit opinions."[1626]

1246. In addition, PwC said that its withdrawal letter was drafted on the basis of "new" information that Mr. Miller learned in the course of his interrogations in May 2007.  However, it appears that a draft withdrawal letter was prepared as early as March of that year.[1627]

1247. PwC was clearly pressed by the Russian authorities to find grounds for withdrawing its audits of Yukos.  Bearing in mind the complexity of the Yukos structure, the business environment at the time it was set up, and the grey areas of Russian tax law at the time, it is not surprising that PwC could identify elements of evidence with respect to some aspects of Yukos' business practice that it affirms gave rise to credibility issues.  As far as the Tribunal can judge, Yukos may not have been candid in its representations to PwC about control of the BBS Companies and about the reasons for the immense payments Yukos undertook to make, and did make, to individuals who were involved in its privatization.

1248. However, the Tribunal cannot accept that the four issues identified in PwC's Withdrawal Letter were in fact "new" for PwC.  In addition, even if the information was new, it was not unequivocal, and could have been tested with Yukos when it was still operational.  In this

---

[1624] *Ibid*. ¶ 464, citing to Russian Federation General Prosecutor's Office, Record of Interrogation of Douglas Miller, 4 June 2007, Exh. R-871.

[1625] *Ibid*. ¶ 466, citing to Group Menatep Limited, "Information for the Management of OAO NK 'Yukos,'" Exh. C-597.

[1626] Counter-Memorial ¶ 708.

[1627] In the Matter of an Application of Michael Khodorkovsky and Platon Lebedev for an Order Seeking Discovery Under 28 U.S.C. § 1782, Declaration of Laurie Endsley, 31 January 2011 ¶ 9, Exh. R-881.

regard, the Tribunal notes that PwC did not give former Yukos senior officials an opportunity to comment on the new information before signing the withdrawal letter.  At the Hearing, Mr. Misamore testified that he stood by the following statement he made in 2009 in relation to the PwC withdrawal:

> PWC never said anything to me or, as far as I know, anyone else at Yukos, to my knowledge, about a lack of information or the refusal to provide information, other than the instance concerning the ownership interests in [the] BBS [Companies]. If PWC had asked me to intervene—and I did intervene with the BBS inquiry—I would have gone to Group Menatep shareholders or their lawyers, and would have urged the release of the requested information.[1628]

1249. According to Respondent's accounting expert, Mr. Ellison, who was not cross-examined, the U.S. Statement of Auditing Standards No. 1 sets the following standard for the "Subsequent Discovery of Facts Existing at the Date of the Auditor's Report":

> When the auditor becomes aware of information which relates to financial statements previously reported on by him, but which was not known to him at the date of his report, and which is of such a nature and from such a source that he would have investigated it had it come to his attention during the course of his audit, he should, as soon as practicable, undertake to determine whether the information is reliable and whether the facts existed at the date of his report.  In this connection, the auditor should discuss the matter with his client at whatever management levels he deems appropriate, including the board of directors, and request cooperation in whatever investigation may be necessary.[1629]
>
> [emphasis added]

1250. Similar steps are expected to be taken under international and Russian auditing standards.[1630] Mr. Ellison notes that PwC's Withdrawal Letter stated that "due to the company undergoing bankruptcy and the former company executives no longer working for the company, PwC was unable to access the information required that could lead to revision of the financial statements and was also unable to discuss the matter with management, as recommended by [the audit standards]."  Mr. Ellison concludes that under those circumstances "PwC had no option but to withdraw its audit reports."[1631]

1251. Mr. Ellison observes that when a reputable international firm withdraws an audit opinion it is an "unusual and serious" event.[1632]  In light of the seriousness of the decision to withdraw the

---

[1628] Record of Interview of Bruce Misamore, 9 March 2009, p. 51, Exh. R-3347.

[1629] U.S. Statement of Auditing Standards No. 1, Section 561(4), attached as Exh. 4 to Ellison Report.

[1630] Mr. Ellison refers to a similar obligation to "discuss the matter with management" under the International Auditing Standards ISA 560 and Russian Federal Auditing Rule No. 10.  Ellison Report ¶¶ 3.5.5, 3.5.11, 3.6.1.

[1631] *Ibid.* ¶ 3.4.28.

[1632] *Ibid.* ¶ 2.3.1.

audit opinions, and the industry standard of consulting with the audited company before taking any action, it is noteworthy that PwC made no effort to reach out to Yukos' management or ex-management to discuss the "new" information.

1252. PwC's senior executives confided to the U.S. Embassy that the withdrawal decision was a "difficult" call.[1633]  At stake for PwC on the one hand was its reputation and loyalty to a "dead" client, and on the other hand its continued viability in the Russian market.  As the cables reveal, Russia mattered to PwC.[1634]  PwC's senior executives met with the Russian Government to resolve PwC's problems.  And, as noted earlier, after PwC made its decision, criminal charges were dropped, and PwC prevailed in two lawsuits, received a refund of its fines, maintained its license and retained important Russian clients such as Gazprom.  As observed by Mr. Kosciusko-Morizet, "PwC undoubtedly opted in the end for the most pragmatic approach so as to maintain its office in Russia and protect its employees from being sued."[1635]

1253. As the Tribunal stated at the outset of this chapter, PwC is not on trial before this Tribunal, which draws no conclusion in the present Award about PwC's professional conduct.  However, the pressure mounted by the Russian authorities against Yukos' auditors, which led to PwC's eventual withdrawal of its audits and even to a PwC auditor testifying against Messrs. Khodorkovsky and Lebedev at their second trial, informs the Tribunal's view that Yukos was the object of a series of politically-motivated attacks by the Russian authorities that eventually led to its destruction, as alleged by Claimants.

## IX.   PRELIMINARY OBJECTIONS

1254. Before turning to the central question of Respondent's liability under the ECT on the basis of the extensive factual record canvassed in the preceding Part VIII, the Tribunal addresses in this Part IX three preliminary objections made by Respondent, including two that were not finally resolved in the Tribunal's Interim Awards.

1255. The Tribunal considers, in this order, Respondent's preliminary objections related to: (a) the ECT's "fork-in-the-road" provision—Article 26(3)(b)(i); (b) Claimants' allegedly "unclean

---

[1633]  U.S. State Department Cable No. 07MOSCOW3343, "Russia: PricewaterhouseCoopers Withdraws Audits of Yukos," 9 July 2007 ¶ 7, Exh. C-1358.

[1634]  U.S. State Department Cable No. 07MOSCOW5403, "PWC's travails in Russia worsen," 15 November 2007 ¶ 8, Exh. C-1360.

[1635]  Kosciusko-Morizet WS ¶ 25.

hands"; and (c) the relevance of Article 21 of the ECT.

**A.     ARE ALL OR SOME OF THE CLAIMS BARRED BY THE "FORK-IN-THE-ROAD" PROVISION OF THE ECT?**

### 1.     Introduction

1256. Article 26(3)(b)(i) of the ECT contains the ECT's "fork-in-the-road" provision.  It must be read together with the preceding paragraphs of Article 26:

*Article 26*
SETTLEMENT OF DISPUTES BETWEEN AN INVESTOR AND A CONTRACTING PARTY

(1)     Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III shall, if possible, be settled amicably.

(2)     If such disputes can not be settled according to the provisions of paragraph (1) within a period of three months from the date on which either party to the dispute requested amicable settlement, the Investor party to the dispute may choose to submit it for resolution:

(a)     to the courts or administrative tribunals of the Contracting Party party to the dispute;

(b)     in accordance with any applicable, previously agreed dispute settlement procedure; or

(c)     in accordance with the following paragraphs of this Article.

(3)     (a)     Subject only to subparagraphs (b) and (c), each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article.

(b)(i)   The Contracting Parties listed in Annex ID do not give such unconditional consent where the Investor has previously submitted the dispute under subparagraph (2)(a) or (b);

(ii)   For the sake of transparency, each Contracting Party that is listed in Annex ID shall provide a written statement of its policies, practices and conditions in this regard to the Secretariat no later than the date of the deposit of its instrument of ratification, acceptance or approval in accordance with Article 39 or the deposit of its instrument of accession in accordance with Article 41.

[. . .]

1257. Before turning to the Parties' submissions, the Tribunal recalls its dismissal in the Interim Awards of Respondent's identical Article 26(3)(b)(i) objection to jurisdiction and/or admissibility:

The Tribunal finds that Respondent's arguments are unconvincing.  Indeed, in its written submissions, Respondent did appear to concede that, as a general matter, there is ample

authority for the application of a "triple identity" test [identity of parties, cause of action and object of the dispute] in the context of a "fork-in-the-road" provision.  To that extent, there is no question that the various Russian court proceedings and applications to the European Court of Human Rights cited by Respondent fail to trigger the "fork-in-the-road provision" of the ECT.[1636]

### 2.    Parties' Positions

1258. In its Counter-Memorial, Respondent renews its objection that the Tribunal lacks jurisdiction pursuant to Article 26(3)(b)(i) of the ECT.  In its view, developments subsequent to the Interim Awards show that Claimants, as Yukos shareholders, are seeking before the ECtHR damages for the same alleged loss arising from Yukos' demise.  Accordingly, Respondent submits that the ECT arbitrations expose it to double recovery.[1637]

1259. Respondent relies on the Application for Just Satisfaction made by Yukos' former representative, Mr. Gardner, before the ECtHR, requesting damages "and, for the first time … compensation for the 'ultimate stakeholders' in Yukos through a Stichting created under Dutch law."[1638]  Respondent argues that these circumstances deprive the Tribunal of jurisdiction under Articles 26(3)(b)(i) and 26(2)(b), and Annex ID of the ECT.[1639]

1260. Respondent submits that the European Convention on Human Rights ("**ECHR**") and ECT claims share the same fundamental basis, and, accordingly, the ECT claims should be dismissed.  As previously submitted in its First Memorial on Jurisdiction and Admissibility, Respondent emphasizes that its consent to submit a dispute to international arbitration is expressly conditioned on Claimants not having already submitted the dispute to a "previously agreed dispute resolution procedure," pursuant to Article 26(3)(b)(i) read in conjunction with Article 26(2)(a) and Annex ID of the ECT.[1640]

1261. Respondent argues that the Tribunal's dismissal of this objection was premised on the "incorrect assumption" that the parties in the proceedings before the ECtHR and the present

---

[1636]   Interim Awards ¶¶ 598–600 (YUL); 609–11 (VPL); 597–99 (Hulley).

[1637]   Respondent's Counter Memorial ¶ 837.

[1638]   Rejoinder ¶ 369; Counter-Memorial ¶ 827.

[1639]   Counter-Memorial ¶ 828.  Annex ID lists the Contracting Parties that have conditioned their consent to the submission of a dispute under the Treaty to international arbitration on the condition that the Investor has not previously submitted the dispute to the courts or administrative tribunals of the Contracting Party to the dispute.  The Russian Federation is listed in Annex ID.  (Interim Awards ¶¶ 588–89 (YUL); ¶¶ 599–600 (VPL); ¶¶ 587–88 (Hulley).

[1640]   Counter-Memorial ¶ 829.

proceedings are different.[1641]  Respondent further submits that the Tribunal erred in "fail[ing] to mention the requirements of the 'triple identity test' and state which requirement was not fulfilled."[1642]  In satisfaction of the identity threshold, Respondent submits as follows:

- the Application for Just Satisfaction before the ECtHR establishes that the "'ultimate stakeholders', including Claimants, are the only Yukos interests that are represented in the EC[t]HR proceedings";[1643]

- the monetary relief requested in both proceedings for Yukos' alleged expropriation is identical;[1644] and

- the ECHR and ECT claims both aim to obtain compensation for the purported expropriation of Yukos and "have the same normative source," as Article 13(1) of the ECT and Article 1 of Protocol No. 1 ECHR do not lay down independent standards by which Respondent's conduct is to be judged.[1645]

1262. Claimants maintain their rejection of this objection, emphasizing in their Reply that "it is entirely inappropriate and an abuse of process for the Respondent now to seek to reopen this issue."[1646]

1263. Firstly, Claimants emphasize that the merits phase of these arbitrations is not an instance of appeal and, further, that the principles of *res judicata* and *ne bis in idem* are absolute bars to Respondent renewing this objection.[1647]

1264. Secondly, Claimants submit that Respondent's contention that the parties in the ECtHR proceedings and these arbitrations are the same is incorrect.  Mr. Gardner[1648] does not act on behalf of Claimants, nor did Claimants make any submissions in those proceedings.  Contrary to Respondent's characterization, Mr. Gardner was not seeking compensation "on behalf of Claimants."  Rather, Claimants say Mr. Gardner he was simply arguing that the destruction of

---

[1641]   *Ibid.* ¶ 830.

[1642]   *Ibid.*

[1643]   *Ibid.* ¶ 831.

[1644]   *Ibid.* ¶ 832.

[1645]   *Ibid.* ¶ 833.

[1646]   Reply ¶ 967.

[1647]   *Ibid.* ¶ 969.

[1648]   Yukos' counsel before the ECtHR.

the Company need not pose an obstacle to an award of just satisfaction, "because the Dutch Foundation was able to receive such an award and dispose of it in accordance with its statutes."[1649]   Claimants also highlight that Mr. Gardner's submission is dated 4 May 2009, thus preceding the Interim Awards in these arbitrations by several months.

1265. Thirdly, Claimants submit that Respondent advanced essentially the same argument previously before the ECtHR.  Claimants submit that Respondent's position in that regard was rejected by the ECtHR because the parties in the ECT arbitrations were different, and thus the matters were not substantially the same.[1650]

1266. Finally, Claimants submit that no issue of double recovery arises in these arbitrations.  They repeat the disclaimer they provided to the Tribunal on 1 April 2010, that "should any pecuniary damages be awarded to Yukos in the ECtHR proceedings, and should the Claimants receive any payments, such payments would be deducted from the amounts claimed in these arbitrations."[1651]

1267. In its Rejoinder, Respondent draws the Tribunal's attention to the 2012 decision in *Chevron v. Ecuador*,[1652] which, according to Respondent, confirms "a narrow interpretation of 'fork-in-the-road' provisions that focuses strictly on the legal bases of the claims would deprive such a clause of effective scope."[1653]

1268. Respondent also objects to Claimants' *res judicata* argument.  Respondent submits that the ECtHR proceedings, which were "formally instituted by Yukos, under Claimants' direction and control" and involve "the very same economic interests that are represented in these arbitrations, constitute a special circumstance that justifies a new examination of Respondent's Article 26(3)(b)(i) ECT objection."[1654]

1269. Respondent also alleges that Claimants admit there is privity of interest between the two proceedings.  In support of this assertion, Respondent refers to:

---

[1649] Reply ¶ 971.

[1650] *Ibid.* ¶ 972, citing ECtHR Yukos Judgment ¶¶ 524–26.

[1651] Reply ¶ 963, citing Letter from the Claimants to the Arbitral Tribunal of 1 April 2010.

[1652] *Chevron Corporation and Texaco Petroleum Company v. Republic of Ecuador*, PCA Case No. 2009–23, Third Interim Award on Jurisdiction and Admissibility, 27 February 2012 (hereinafter "*Chevron v. Ecuador*").

[1653] Rejoinder ¶ 370, citing *Chevron v. Ecuador* ¶ 4.76.

[1654] Rejoinder ¶ 374.

- the passage of the Reply (mentioned at paragraph 1266 above) where Claimants state that they will deduct any payments they receive in the ECtHR proceedings from the amounts claimed in these arbitrations; and

- the Application for Just Satisfaction (mentioned at paragraph 1261 above), where Mr. Gardner characterized Claimants in these arbitrations as the "ultimate stakeholders" in Yukos.[1655]

1270. Finally, Respondent submits that Claimants' reliance on positions that the ECtHR has already finally rejected – namely that Respondent's taxation measures against Yukos were *mala fides*, briefed extensively in its Rejoinder,[1656] "creates a risk of conflicting determinations, one of the ills that Article 26(3)(b)(i) ECT is designed to avoid."[1657]

### 3.   Tribunal's Decision

1271. Having considered the Parties' submissions and reviewed the reasons for its dismissal in the Interim Awards of Respondent's identical objection to jurisdiction pursuant to Article 26(3)(b)(i) of the ECT, the Tribunal sees no reason to reopen this issue and change its decision.

1272. Accordingly, Respondent's objection that the Tribunal lacks jurisdiction pursuant to Article 26(3)(b)(i) of the ECT is dismissed.

## B.   "UNCLEAN HANDS" (DID CLAIMANTS ACT ILLEGALLY SO AS TO DEPRIVE THEM OF PROTECTION UNDER THE ECT?)

### 1.   Introduction

1273. As its second preliminary objection, Respondent submits that Claimants have come to this Tribunal with "unclean hands," with one or many of the following consequences: (a) the Tribunal does not have jurisdiction over Claimants' claims; (b) Claimants' claims are inadmissible; and/or (c) Claimants should be deprived of the substantive protections of the ECT.  The Tribunal addresses this argument in the present chapter.

1274. Should the Tribunal reject the "unclean hands" argument as a preliminary objection,

---

[1655] *Ibid.* ¶ 369.

[1656] *Ibid.* ¶¶ 99–193.

[1657] *Ibid.* ¶ 374.

Respondent also submits that some instances of Claimants' unclean hands should be treated as contributory fault and/or a failure to mitigate on the part of Claimants, and that any damages awarded to Claimants should be discounted on the basis of their unclean hands.  These arguments are addressed in Chapters X.E and XII.C.

1275. Respondent initially made its "unclean hands" argument in the jurisdictional phase of these arbitrations.  In Paragraph 3 of its Procedural Order No. 3 dated 31 October 2006, the Tribunal decided that it would be "appropriate to defer consideration of the Parties' contentions concerning 'unclean hands' [and] Respondent's 'criminal enterprise' contention . . . to the merits phase, if any."

1276. In its Interim Awards, the Tribunal stated:

> The Tribunal is well aware of Respondent's argument that Claimant in this arbitration has "unclean hands" and that Claimant's corporate personality should be disregarded because it is an instrumentality of a "criminal enterprise."  The Tribunal recalls that it addressed these issues in its Procedural Orders Nos. 2 and 3 on 8 September and 31 October 2006.  Specifically, the Tribunal then decided to defer consideration of Respondent's arguments concerning the "unclean hands" of Claimant or Claimant being an instrumentality of a "criminal enterprise" to any merits phase of this arbitration. Accordingly, by finding, as it does, that Claimant qualifies as an Investor owning and controlling an Investment for the purposes of Articles 1(7) and (6) of the ECT, the Tribunal does not dispose of the issues argued by Respondent concerning the "unclean hands" of Claimant and Claimant being an instrumentality of a "criminal enterprise," which it will address during any merits phase of this arbitration.[1658]

1277. As anticipated in the Interim Awards, now with the benefit of a full presentation of the facts by the Parties on all aspects of the Yukos affair, the Tribunal addresses Respondent's "unclean hands" argument in this final Award.

1278. The Tribunal notes that, in their First Submission on Costs, Claimants argue that Respondent, after insisting on its "unclean hands" allegations and the assertion that Claimants are an instrumentality of a "criminal enterprise" in the jurisdictional phase of this arbitration and dedicating nearly two hundred pages of its Counter-Memorial and Rejoinder to the first of these two arguments, ultimately abandoned these arguments at the Hearing, pursuing only the allegations related to alleged abuse by Claimants of the Cyprus-Russia DTA.[1659]  In its Reply Submission on Costs, Respondent confirmed that it had not abandoned its unclean hands defense.  To the contrary, Respondent argued that Claimants had explicitly refused to join issue

---

[1658] Interim Awards ¶ 435 (Hulley); ¶ 436; (YUL); ¶ 492 (VPL).

[1659] Exh. C-916.

and submit rebuttal and Respondent had accordingly relied on its arguments as undisputed and accepted.  According to Respondent, this alleviated the need to devote substantial hearing time to these points.[1660]

1279. Claimants correctly observe that at the merits hearing (and in their Post-Hearing Brief) Respondent expanded only on the Cyprus-Russia DTA abuses part of its "unclean hands" argument, making only passing reference to other aspects of this argument.[1661]  However, in the Tribunal's view, this circumstance speaks only to Respondent's freedom to present its case as it chooses, and represents Respondent's strategic decision to focus on certain arguments instead of others in the limited time available to it at the Hearing and within the page limit for post-hearing submissions imposed by the Tribunal.  The fact that Respondent did not repeat in full all of the arguments made in previous pleadings at the Hearing and in its Post-Hearing Brief does not mean that these arguments were abandoned.

1280. Below, the Tribunal first summarizes the factual allegations constituting the foundation of Respondent's "unclean hands" argument and then the Parties' arguments regarding the impact of the alleged facts on the Tribunal's jurisdiction, the admissibility of claims and the availability of the substantive protections of the ECT to Claimants.  In the last section of this chapter, the Tribunal sets out its decision with respect to "unclean hands" as a preliminary objection.

### 2.    Claimants' Alleged "Unclean Hands"

1281. Respondent lists 28 instances of alleged "illegal and bad faith conduct" by Claimants or "attributable to" Claimants involving a variety of actors and spanning over ten years, from the privatization of Yukos in the mid-1990s to its liquidation in November 2007.  Claimants dispute that any of their conduct (or any conduct attributable to them) was illegal or in bad faith.

1282. Given the number and diversity of Respondent's allegations, the Tribunal presents them below in groups intended to facilitate its subsequent analysis.  Where facts related to Respondent's "unclean hands" allegations fall outside the scope of the analysis of the factual background set out in Part VIII above, they are briefly summarized here.

---

[1660]  Respondent's Reply Submission on Costs ¶¶ 16–18

[1661]  *See e.g.* Transcript, Day 19 at 169–74, 179; Respondent's Post-Hearing Brief ¶¶ 146, 148.

    (a)    **Conduct Related to the Acquisition of Yukos and the Subsequent Consolidation of Control over Yukos and its Subsidiaries**

1283. The first eleven items of Respondent's list of "illegal and bad faith conduct" are dedicated to conduct related to the acquisition of Yukos by Bank Menatep; and the so-called "Oligarchs" and their subsequent consolidation of control and ownership over Yukos and its subsidiaries:

      i.    Violating the legal requirements governing the loans-for-shares program that allowed Menatep to gain its controlling interest in Yukos.

      ii.    Using shell company proxies to feign competition in the loans-for-shares auction and a simultaneous investment tender for Yukos shares.

      iii.    Precluding actual competitors from bidding on Yukos shares in the loans-for-shares auction and investment tender, including through the abuse of Menatep's role as auction organizer to disqualify Russian competitors.

      iv.    Rigging a subsequent auction for the Yukos shares that were being held as collateral following the initial loans-for-shares auction, which deprived the Russian Government of substantial revenue.

      v.    Conspiring with Yukos' pre-existing managers to facilitate the unlawful acquisition of Yukos by the Oligarchs, including by entering into an agreement whereby "Yukos Universal" committed to pay them compensation consisting of 15% of Menatep's beneficial interest in Yukos, ultimately worth billions of dollars, for "services rendered to 'Yukos'".

      vi.    Colluding with others to predetermine the post-privatization ownership of Yukos.

      vii.    Skimming profits from Yukos and its production subsidiaries for their own self-enrichment.

      viii.    Abusing Russian corporate law and principles of corporate governance by squeezing out minority shareholders in Yukos' production subsidiaries through ruthless and self-enriching share dilutions, asset stripping, and transfer pricing.

      ix.    Siphoning off huge sums for the benefit of the Oligarchs from Yukos' proceeds from the sale of oil and oil products, while concealing related-party transactions from Yukos' own auditor.

      x.    Further mistreatment of minority shareholders by manipulating shareholder meetings, pressuring the Russian Federal Securities Commission not to pursue its challenges against illegal misconduct, relying on fraudulently determined stock and asset values and deceiving those minority shareholders, the government, and domestic and foreign courts about the nature and control of offshore companies that were created to benefit Claimants and their cohorts.

xi.    Manipulating Yukos' stock value to devalue and reacquire the interests of creditors
to which Yukos stock had been pledged.[1662]

1284.   As context to Respondent's allegations, it is useful to recall some of Yukos' early history.  The
Russian Federation created the company in 1993 as part of a large-scale reorganization of the
Soviet oil production and processing industry into vertically integrated oil companies.  Yukos
remained largely state-run until 1995.[1663]

1285.   Respondent recounts, based on a report by Professor Reinier Kraakman that, in March 1995, a
consortium of Russian commercial banks, including Bank Menatep (the Chairman of which
was Mr. Khodorkovsky), proposed to the Russian government that they would lend it money in
exchange for the right to hold as collateral and manage shares of major state-owned companies
such as Yukos.[1664]  A presidential decree of August 1995 provided for the auctioning of the
right to hold and manage shares of individual companies.[1665]  Once the terms of the proposed
management agreement expired, the government would have a choice between paying back the
loan and reclaiming its shares, and allowing the lender to sell the shares, with the government
keeping 70 percent of the difference between the sale price and the original amount of the
loan.[1666]  This mechanism became known as the "loans-for-shares program."

1286.   In December 1995, the Russian Government retained Bank Menatep to organize the auction for
the shares in Yukos.[1667]

1287.   Respondent alleges that Bank Menatep "completely rigged the auction" by preventing potential
competitors from participating, while using two front companies, Laguna and Regent, to
formally comply with the requirements for bids.[1668]  Respondent recounts that Laguna won the
right to hold as collateral and manage a 45 percent stake in Yukos for a USD 159 million loan
to the Russian government and an additional investment obligation of USD 200 million.
According to Respondent, Laguna acquired an additional 33 percent stake in Yukos by
pledging just over USD 150 million in investments at a simultaneously held "investment

---

[1662]   Rejoinder ¶¶ 1435–36.

[1663]   Counter-Memorial ¶ 19.

[1664]   *Ibid.*¶ 20.

[1665]   Decree of the President of the Russian Federation No. 889 On the Procedure for Putting the Federally Owned Shares
in Pledge, 31 August 1995, Exh. R-7.

[1666]   Counter-Memorial ¶ 21.

[1667]   *Ibid.* ¶ 23.

[1668]   *Ibid.* ¶¶ 27–28.

tender."[1669]   Bank Menatep acquired Laguna's rights to hold and manage Yukos shares immediately thereafter.[1670] Respondent further alleges that Bank Menatep then used "another rigged auction and another shell affiliate, named Monblan," to obtain full ownership of the stake in Yukos.[1671]   Respondent also suggests that Bank Menatep was "an insider among insiders" and used Yukos' own funds to pay for its takeover of Yukos.[1672]

1288. Respondent makes additional allegations regarding Bank Menatep's and the Oligarchs' treatment of foreign and Russian investors holding minority shares in Yukos' main production subsidiaries—YNG, Samaraneftegaz and Tomskneft—in the aftermath of the privatization.[1673] Respondent alleges that from 1996 to 1999 Bank Menatep and the Oligarchs engaged in significant profit skimming and, in 1999 and 2000, abused Russian corporate law and principles of corporate governance to "squeeze out the minority shareholders through massive share dilutions, transfer pricing, and asset stripping,"[1674] until "the minority shareholders sold or swapped their shares on the Oligarchs' terms."[1675]

1289. Claimants do not engage with the detail of Respondent's allegations.  They contend that these allegations "amount to little more than innuendo based upon a handful of sensationalized journalistic accounts."[1676]   In particular, Claimants point out that Respondent is "unable to make out any failure by Bank Menatep to comply with the terms of the loans-for-shares program"[1677] and underline that it was the Russian government itself that had the authority to preclude foreign companies and individuals from bidding and to disallow bids.[1678]  Claimants add that Respondent's "vague insinuations" as to the source of funds used to privatize Yukos do not prove that anything unlawful took place.[1679]   Claimants suggest that Respondent's argument "amounts to nothing more than an attempt to shift blame for the actions of the

---

[1669]  *Ibid.* ¶ 28.

[1670]  Kraakman Report ¶ 20.

[1671]  Counter-Memorial ¶ 29.

[1672]  *Ibid.* ¶ 33.

[1673]  *Ibid.* ¶ 45.

[1674]  *Ibid.* ¶¶ 915, 946–49; *see* Kraakman Report ¶¶ 28–42.

[1675]  Counter-Memorial ¶¶ 916, 951–61, 75; *see* Kraakman Report ¶¶ 44–62.

[1676]  Reply ¶ 1142.

[1677]  *Ibid.* ¶ 1143.

[1678]  *Ibid.* ¶¶ 1144–45.

[1679]  *Ibid.* ¶ 1146.

Russian Government itself onto Bank Menatep."[1680]

1290. As regards the manner of the consolidation of Bank Menatep's ownership over Yukos, Claimants reply that Respondent's allegations are vague and "not only irrelevant, but also moot."[1681]   Claimants point out that Respondent relies on share issuances and transfers that were ultimately cancelled and on an alleged dispute with a minority shareholder that was eventually settled.[1682]

### (b)   Conduct Related to the Cyprus-Russia DTA

1291. Next, Respondent complains of Claimants' use of the Cyprus-Russia DTA, listing the following "bad faith and illegal conduct":

> xii.   Submitting fraudulent claims under, or otherwise abusing, the Russia-Cyprus Tax Treaty to evade hundreds of millions of dollars in Russian taxes payable on dividends involving Yukos shares, thereby also violating Russian and Cypriot criminal laws.

> xiii.   Entering into hundreds of sham transactions involving the sale and repurchase of Yukos shares between Claimants and their affiliates, the sole purpose of which was to fraudulently suggest that Claimants beneficially owned dividends declared on Yukos shares, and thereby to further Claimants' fraudulent claims for favorable tax treatment under the Russia-Cyprus Tax Treaty.

> xiv.   Evading hundreds of millions of dollars in Russian taxes on profits from transactions in and profits from sales of Yukos shares.

> [. . .]

> xvi.   Diverting the proceeds of the Yukos tax evasion scheme into highly opaque Cypriot and British Virgin Islands entities and trusts to conceal the unlawful provenance of those proceeds, including through dividend distributions to undisclosed Cypriot parent companies of trading shells, thereby further abusing the Russia-Cyprus Tax Treaty.[1683]

1292. The Russia–Cyprus DTA, as stated in its preamble, serves the "avoidance of double taxation with respect to taxes on income and capital" and the promotion of "economic cooperation between the two countries."   Article 10 of the DTA provides:

---

[1680]   *Ibid*. ¶ 1147.

[1681]   *Ibid*. ¶¶ 1149, 1151–53.

[1682]   *Ibid*. ¶¶ 1149–50.

[1683]   Rejoinder ¶¶ 1435–36.

> 1.  Dividends paid by a company which is a resident of a Contracting State to a resident of the other Contracting State may be taxed in that other State.
>
> 2.  However, such dividends may also be taxed in the State of which the company paying the dividends is a resident and according to the laws of that State, but if the beneficial owner of the dividends is a resident of the other State, the tax so charged shall not exceed:
>
>> 5% of the gross amount of the dividends…."

1293. The Parties agree that Claimants Hulley and VPL obtained monetary benefits running in excess of USD 230 million under this provision by claiming the reduced withholding tax rate of 5 percent instead of the standard 15 percent rate of the Russian Federation.

1294. Respondent argues that, in so doing, Hulley and VPL fraudulently relied on the Russia–Cyprus DTA to evade Russian taxes, because they: (a) were not the "beneficial owners" of the dividend income but mere "conduits" for the Oligarchs, and (b) had a "permanent establishment" in Russia to which the dividend income was attributable.[1684]   According to Respondent, Claimants' reliance on the DTA was a "complete perversion of the Treaty's purpose," and, as stated by Professor Rosenbloom, a "blatant example of tax treaty abuse."[1685]   Respondent alleges that Claimants contrived a series of artificial sales and repurchases of Yukos shares by Hulley from YUL, and VPL parked shares in a UBS Moscow account at suspicious times, solely to benefit from the DTA.  According to Respondent, Claimants offer no justification for this practice, aside from their expert, Mr. Baker, mischaracterizing it as a "standard arrangement."[1686]

1295. Respondent submits that the beneficial ownership requirement "should be construed in light of the object and purposes of the [DTA], including avoiding double taxation and the prevention of fiscal evasion and avoidance."[1687]   According to Respondent, Hulley and VPL never had the full right to use or enjoy Yukos' dividends.  In support, Respondent refers to the following documents:

- Hulley's and VPL's bank statements from 1 January 2000 to 31 December 2004, as well as GML's statement for 2004, which purportedly establish that the

---

[1684]   Counter-Memorial ¶¶ 922–23; Rejoinder ¶ 1448.

[1685]   Counter-Memorial ¶ 165; Rosenbloom Report ¶ 77.

[1686]   Rejoinder ¶¶ 1488–90; Baker Report, ¶70.

[1687]   *Ibid.* ¶ 1449, relying on the 2011 OECD Discussion Draft for the Model Tax Convention, Exh. R-1959.

dividends paid to Hulley and VPL by Yukos only stayed in their accounts for one or two days prior to going to YUL;[1688]

- Hulley's Articles of Association, which according to Respondent reserved to the "Oligarchs" any decision concerning the disposal of Hulley's assets;[1689] and

- the Deed of Appointment of Chiltern as a custodian trustee for VPL, which, according to Respondent, provides that all dividend income from VPL's Yukos shares "shall be paid" to YUL so long Chiltern owns VPL.

1296. Respondent also argues that Claimants have contradicted their own arguments in the jurisdictional phase of these proceedings by acknowledging an "obligation to pass all future dividends" to YUL; this, argues Respondent, falls within even Claimants' narrow interpretation of the beneficial ownership limitation.[1690]

1297. Respondent further asserts that Hulley and VPL each had a "Russian permanent establishment."[1691]  Respondent interprets Claimants' admission that Hulley and VPL were holding companies to mean that any activity necessary to conduct the business of holding Yukos shares had to be carried out in Russia through a "deemed permanent establishment" (Article 5(5) of the Cyprus-Russia DTA) or a "fixed place of business" (Article 5(2) of the Cyprus-Russia DTA).[1692]  Respondent contends that Messrs. Lebedev and Kakorin, both Russian citizens and residents, carried out all the activities relating to Hulley's and VPL's Yukos shares from Russia.[1693]

1298. Respondent further submits that Claimants' alleged abuses violate both Russian and Cypriot criminal laws, as shown in the expert report of Mr. Polyviou.[1694]

1299. Finally, Respondent argues that Claimants' expert, Mr. Baker, fails to differentiate the "tolerated" practice of "treaty shopping" from the "universally condemned" practice of "round

---

[1688] *Ibid.* ¶¶ 1457–65, referring to Exhs. R-334 to R-4154.

[1689] *Ibid.* ¶¶ 1466–87, referring to Exh. R-236.

[1690] *Ibid.* ¶¶ 1478–79.

[1691] *Ibid.* ¶¶ 1491–501.

[1692] *Ibid.* ¶ 1491.

[1693] *Ibid.* ¶ 1500.

[1694] Counter-Memorial ¶ 927.

tripping," which Respondent alleges is what Claimants did.[1695]   Accordingly, Respondent submits that, "at best," Hulley and VPL "perverted" the purposes of the Cyprus-Russia DTA, even if they satisfied its "literal requirements."[1696]

1300. Claimants protest that Respondent's allegations are unsubstantiated in fact and in law.

1301. Firstly, Claimants argue that the beneficial ownership limitation set forth in Article 10(2)(a) of the Cyprus-Russia DTA is a "narrow one targeted at nominees, agents and other conduits under an obligation to pass on the amount received as a dividend to another party."[1697] Hulley and VPL in the present case had the full right to use and enjoy the dividends they received from Yukos and were under no obligation to pass them on to another entity, as is evident from Clause 117 and Article 1 of their respective Articles of Association, which provide that the power to propose the declaration and payment of dividends lies solely with the directors of the respective companies.[1698]

1302. Claimants assert that shares "transferred to a company shortly before the dividend dates and transferred back after the dividend has been paid are lawful and a common feature in stock-lending, and also in the sale and repurchase of shares ('repos')."[1699]

1303. Secondly, Claimants assert that Hulley and VPL were holding companies, and that their business as such was not carried on in Russia. [1700]   None of the cumulative conditions in Article10(4) of the DTA were made out to show that Hulley or VPL had a permanent establishment in Russia, as demonstrated by Mr. Baker's report.[1701]

1304. Thirdly, Claimants reject the fraudulent abuse analysis made by Respondent's expert Professor Rosenbloom, noting that there is no anti-abuse principle in the DTA.[1702]   Claimants emphasize

---

[1695] Rejoinder ¶ 1508.

[1696] *Ibid.* ¶ 1509.

[1697] Reply ¶ 1157.

[1698] *Ibid.* ¶ 1158.

[1699] *Ibid.* ¶ 1161.

[1700] *Ibid.* ¶ 1163.

[1701] *Ibid.* ¶¶ 1164–74.

[1702] *Ibid.* ¶ 1176.

that 'treaty shopping' to minimize tax is permissible.[1703]

1305. Finally, Claimants submit that Hulley's and VPL's claims under the Cyprus-Russia DTA were consistent with the purpose of the DTA.  Claimants recall that one purpose of double-taxation treaties is to promote the flow of investment, and argue that both countries have derived significant benefits from the DTA.[1704]

1306. In any event, Claimants submit that the claiming of benefits under a double-taxation treaty is a technical matter, for which specific mechanisms of redress are available under the treaty itself and domestic law.  Accordingly, this Tribunal is not the proper forum to hear and decide such disputes.[1705]

### (c)   Conduct Related to the Tax Optimization Scheme

1307. Three items on Respondent's list of Claimants' "illegal and bad faith" conduct relate to Claimants' use of the low-tax regions of the Russian Federation to mitigate tax burdens:

> xv.   Engineering through management installed and controlled by Claimants the massive Yukos tax evasion scheme to avoid paying hundreds of billions of rubles in Russian taxes.

> [. . .]

> xvii.  Engaging in abusive corporate restructurings to conceal Yukos' affiliation with its trading shells, thereby preventing Russian authorities from identifying and addressing Yukos' tax abuses.

> xviii.  Concealing Yukos' continued control of its trading shells by resorting to call options or other artifices and by fabricating corporate and other transactional documents.[1706]

1308. A detailed discussion of these allegations is found in Chapter VIII.A of this Award.

### (d)   Actions Taken in Hindrance of the Enforcement of Russia's Tax Claims

1309. The remaining ten items on Respondent's list of Claimants' "bad faith and illegal conduct" refer to actions allegedly taken to obstruct enforcement of Russia's tax claims against Yukos:

---

[1703] *Ibid.* ¶ 1175, citing *MIL (Investments) S.A. v. Canada* [2006] 5 CTC 2552 (Tax Court of Canada), affirmed by Federal Court of Appeal of Canada.

[1704] *Ibid.* ¶ 1177.

[1705] *Ibid.* ¶ 1189.

[1706] Rejoinder ¶¶ 1435–36.

xix. Repeatedly obstructing the conduct of the tax authorities' audits of Yukos by refusing to provide documents and information which would show the extent of Yukos' abuses, and by causing Yukos' producing subsidiaries and other related entities to be similarly obstructive.

xx. Failing to pay Yukos' tax liabilities for tax year 2000 and following years, despite having received ample notice that Yukos would be required to pay these amounts and despite the fact that Yukos had abundant resources to do so.

xxi. Dissipating assets to frustrate the Russian authorities' collection of the tax assessments, including by way of paying dividends of unprecedented amounts, making spontaneously accelerated loan "*prepayments*" to Oligarch-owned Moravel, and foisting upon YNG an upstream guarantee up to US$ 3 billion for the repayment of Yukos' alleged "*debts*" to Moravel.

xxii. Offering to the Russian authorities assets which Yukos knew to be tainted to settle its tax liabilities.

xxiii. Concealing the share registers of Yukos' subsidiaries to obstruct the bailiffs' enforcement of Yukos' tax obligations.

xxiv. Sabotaging the YNG auction through litigation threats and a spurious bankruptcy filing in the United States that effectively prevented all but one bidder from placing a bid at the auction and artificially depressed the amount of the auction proceeds.

xxv. Implementing asset-stripping measures by diverting Yukos' valuable assets to the *stichtings* managed by former Yukos officers and representatives of Claimants in anticipation of Yukos' bankruptcy.

xxvi. Failing to repay Yukos' debt to the SocGen syndicate and frustrating the banks' attempts to collect against Yukos' Dutch assets.

xxvii. In the process of all of the foregoing, lying to Yukos' auditors PwC about core aspects of their misconduct and, through PwC's certification of Yukos' financial statements based on this deception of Yukos' auditors, to Yukos' creditors and other members of the investing public who relied upon those financial statements and PwC's certification of them.

xxviii. Yukos management's shielding of Yukos' very substantial foreign assets behind the veil of two Dutch *stichtings*, to place those assets beyond the reach of Russian tax authorities, violated Dutch law.[1707]

1310. In sum, Respondent alleges that Yukos neither paid its tax debts in full immediately after these debts were assessed, nor made reasonable settlement offers; dissipated the assets it had on hand; lied to its auditors; obstructed the work of the bailiffs; and sabotaged the YNG auction. Each of these allegations is discussed by the Tribunal in Part VIII of this Award.

---

[1707] *Ibid.* ¶¶ 1435–36.

### 3. Parties' Positions Regarding the Impact of Claimants' Allegedly "Unclean Hands" on this Arbitration

1311. The Parties disagree as to whether any of the instances of alleged illegal or bad faith conduct enumerated above could serve as a complete bar to Claimants' claims under the ECT (whether as a matter of jurisdiction, admissibility or otherwise) by virtue of the application of some rule or principle of law.

1312. Between them, the Parties have dedicated to this controversy several hundreds of pages of pleadings in the merits phase alone, citing in the process dozens of arbitral awards and decisions rendered by the Permanent Court of International Justice (the "**PCIJ**"), the International Court of Justice ("**ICJ**") and mixed-claims commissions.  Below, the Tribunal does not attempt to do justice to the full breadth of the Parties' arguments, but focuses instead on their most salient points.

### (a) Respondent's Position

1313. Respondent submits that Claimants' "unclean hands" deprive the Tribunal of jurisdiction, render Claimants' claims inadmissible and/or deprive Claimants of the substantive protections of the ECT.  This submission is based on two main principles.

1314. First, Respondent argues that "the ECT protects only *bona fide* and lawful investments and Respondent's consent to arbitrate only extends to such investments."[1708]  Respondent emphasizes that, as provided by Article 31(1) of the VCLT, a treaty must be interpreted in good faith and in accordance with its object and purpose.  According to Respondent, the object and purpose of the ECT does not include the promotion and protection of illegal investments.[1709]  Rather, as stated in the Treaty's introductory note, "[t]he fundamental aim of the [ECT] is to strengthen the rule of law on energy issues."  Respondent argues that several arbitral awards, including *Phoenix Action, Ltd. v. Czech Republic* ("**Phoenix**")*, SAUR International S.A. v. The Argentine Republic* and *Plama Consortium Limited v. Bulgaria* ("**Plama**") support the proposition that, even in the absence of an express legality requirement clause in an investment treaty, illegal investments will not be protected.[1710]  With respect to *Plama*, in particular,

---

[1708]   Respondent's Post-Hearing Brief ¶ 147.

[1709]   Counter-Memorial ¶ 898.

[1710]   Rejoinder ¶¶ 1551–52, 1527, 1563, 1566, referring to *Plama Consortium Limited v. Bulgaria*, ICSID Case No. ARB/03/24, Award, 27 August 2008, Exh. C-994 (hereinafter "*Plama*"); *Phoenix Action Ltd. v. Czech Republic*,

Respondent notes that the tribunal dismissed the claimants' ECT claims in the merits phase on the grounds that: (a) the investment violated Bulgarian law and applicable principles of international law; (b) the claimant's conduct was not in good faith; and (c) to grant ECT protection would therefore have been contrary to the clean hands requirement.[1711]

1315. Second, Respondent argues that a claimant who is guilty of illegal conduct is deprived of the necessary *ius standi* to complain of corresponding illegalities by the State.[1712] This requirement of "clean hands," argues Respondent, is a "general principle of law" within the meaning of Article 38(1)(c) of the ICJ Statute.[1713] Respondent cites the ICJ's decision in the *Case Concerning the Gabčíkovo-Nagymaros Project* and various dissenting opinions by ICJ judges, as well as a number of decisions of mixed claims commissions rendered in cases of diplomatic protection.[1714] Regarding the latter set of cases, Respondent submits that the "unclean hands

---

ICSID Case No. ARB/06/5, Award, 15 April 2009, Exh. R-1078 (hereinafter "*Phoenix*"); *SAUR International S.A. v. Argentina*, ICSID Case No. ARB/04/4, Decision on Jurisdiction and Liability, 6 June 2012, Exh. R-4186 (hereinafter "*SAUR*").

[1711] *Ibid.* ¶ 1552.

[1712] Counter-Memorial ¶ 892.

[1713] *Ibid.* ¶ 893.

[1714] Counter-Memorial ¶¶ 894–95, referring to *Case Concerning the Gabčíkovo-Nagymaros Project (Hungary/Slovakia)*, Judgment, 25 September 1997, ICJ Reports 1997, p. 7 ¶ 133, Exh. C-948 (hereinafter "*Gabčíkovo-Nagymaros*"); *Samuel Brannan v. Mexico*, U.S.-Mexico Mixed Claims Commission, Opinion of the Umpire, 1868, *in* HISTORY AND DIGEST OF THE INTERNATIONAL ARBITRATIONS TO WHICH THE U.S. HAS BEEN A PARTY, Vol. 3 (John Bassett Moore, ed. 1898), p. 2757, 2758, Exh. R-1056; *The "Lawrence" Case*, U.S.-Great Britain Mixed Claims Commission, Judgment of the Umpire, 4 January 1855, Hornby's Report 397, 1856, p. 398, Exh. R-1057; *William Whitty v. The United States*, U.S.-British Claims Commission, Decision of the Commissioners, *in* HISTORY AND DIGEST OF THE INTERNATIONAL ARBITRATIONS TO WHICH THE U.S. HAS BEEN A PARTY, Vol. 3 (John Bassett Moore, ed. 1898), p. 2820, 2823, Exh. R-1058; *Frederick G. Fitch v. Mexico*, U.S.-Mexico Mixed Claims Commission, Opinion of the Umpire, 21 June 1876, *in* HISTORY AND DIGEST OF THE INTERNATIONAL ARBITRATIONS TO WHICH THE U.S. HAS BEEN A PARTY, Vol. 4 (John Bassett Moore, ed. 1898), p. 3476, 3477, Exh. R-1059; *Jarvis Case*, U.S.-Venezuela Mixed Claims Commission, Opinion of the Commissioner, UNRIAA, 1903–1905, Vol. 9, p. 208, 212, Exh. R-1060; *Cucullu's case*, U.S.-Mexico Mixed Claims Commission, Opinion of Mr. Palacio, 1868, *in* HISTORY AND DIGEST OF THE INTERNATIONAL ARBITRATIONS TO WHICH THE U.S. HAS BEEN A PARTY, Vol. 4 (John Bassett Moore, ed. 1898), p. 3477, 3480, Exh. R-1061; *Case of the Brig "Mary Lowell"*, U.S.-Spain Claims Commission, Opinion of the Umpire, 9 December 1879, Spain-U.S. Claims Commission, *in* HISTORY AND DIGEST OF THE INTERNATIONAL ARBITRATIONS TO WHICH THE U.S. HAS BEEN A PARTY, Vol. 3 (John Bassett Moore, ed. 1898), p. 2772, 2775, 2777, Exh. R-1062; *Robert Eakin v. United States*, No. 118, U.S.-Great Britain Claims Commission, PAPERS RELATING TO THE FOREIGN RELATIONS OF THE UNITED STATES, Vol. 3 (Washington Government Printing Office, 1874), p. 15, Exh. R-1063; *Clark Case ("The Medea and The Good Return")*, U.S.-Ecuador Claims Commission, 1862, Opinion of Mr. Hassaurek, *in* HISTORY AND DIGEST OF THE INTERNATIONAL ARBITRATIONS TO WHICH THE U.S. HAS BEEN A PARTY, Vol. 3 (John Bassett Moore, ed. 1898), p. 2729, 2738–39, Exh. R-1064; *Case Concerning Military and Paramilitary Activities in and against Nicaragua (Nicaragua v. United States of America)*, Merits, Judgment, 27 June 1986, Dissenting Opinion of Judge Schwebel, ICJ Reports 1986, p. 259 ¶¶ 268, 272, Exh. R-1071; *Case Concerning Arrest Warrant of 11 April 2000 (Democratic Republic of the Congo v. Belgium)*, Judgment, 14 February 2002, Dissenting Opinion of Judge van den Wyngaert, ICJ Reports 2002, p. 137 ¶ 84, Exh. R-1072; *Legal Status of Eastern Greenland (Denmark v. Norway)*, Judgment, 5 April 1933, Dissenting Opinion of Judge Anzilotti, PCIJ Series A/B No. 53, p. 76, 95, Exh. R-1073; *Interpretation of Peace Treaties with Bulgaria, Hungary and Romania*, Second Phase, Advisory Opinion, 18 July 1950, Dissenting Opinion of Judge Read, ICJ Reports 1950, p. 231, 244, Exh. R-1074. *See also* Rejoinder ¶¶ 1529–40, citing *Case Concerning the*

principle has [an even] greater role with respect to claims brought directly by private parties, including in investor-State arbitration, than in the context of diplomatic protection."[1715] Respondent also relies on *Barcelona Traction* for the proposition that in international law the corporate "veil is lifted" to "prevent the misuse of the privileges of legal personality, as in certain cases of fraud or malfeasance . . . or to prevent the evasion of legal requirements or of obligations."[1716]   Finally, Respondent argues that if the "unclean hands" doctrine was not included in the ILC Articles on State Responsibility and Articles on Diplomatic Protection of the International Law Commission, it is only "because it corresponded to the doctrine of inadmissibility" and did not fall within the projected scope of both sets of ILC Articles.[1717]

1316. With respect to Claimants' contention that the instances of "unclean hands" referred to by Respondent can have no impact on this arbitration because they are collateral illegalities unrelated to either the making of Claimants' investments or their claims in these arbitrations,[1718] Respondent argues that it is "unsupported both by the investment treaty awards on which [Claimants rely], and by common sense and good faith."[1719]

1317. With respect to post-investment conduct, Respondent submits that the awards in *Gustav FW Hamester GmbH & Co KG v. Ghana* ("***Hamester***") and *AG Frankfurt Airport Services Worldwide v. Philippines* ("***Fraport***") recognize the relevance of such misconduct to the merits of an investment treaty claim.[1720]

1318. As regards illegalities pre-dating the acquisition of the investment, Respondent relies on the award in *Anderson v. Costa Rica* ("***Anderson***").[1721]   Respondent submits that the tribunal in that

---

*Barcelona Traction Light and Power Company Limited (Belgium v. Spain) (New Application: 1962)*, Second Phase, Judgment, 5 February 1970, ICJ Reports 1970, p. 3, Exh. C-930; *Mavrommatis Palestine Concessions (Greece v. Great Britain)*, Judgment, 30 August 1924, PCIJ Series A No. 2, p. 6, 13, Exh. R-1043; ILC, Provisional Summary Record of the 2844th Meeting held 25 May 2005, A/CN.4/SR.2844, Agenda Item 2, 6 June 2005, p. 4, 7, Exh. R-4191.

[1715] Rejoinder ¶ 1538.

[1716] *Case Concerning the Barcelona Traction Light and Power Company Limited (Belgium v. Spain) (New Application: 1962)*, Second Phase, Judgment, 5 February 1970, ICJ Reports 1970, p. 3 ¶ 56, Exh. C-930.

[1717] Rejoinder ¶¶ 1543, 1545–47.

[1718] Reply ¶¶ 1134–38.

[1719] Rejoinder ¶ 1568.

[1720] *Ibid.* ¶¶ 1569–70, referring to *Gustav F W Hamester GmbH & Co KG v. Ghana*, ICSID Case No. ARB/07/24, Award, 18 June 2010, Exh. R-1079 (hereinafter "*Hamester*"); *Fraport AG Frankfurt Airport Services Worldwide v. Philippines*, ICSID Case No. ARB/03/25, Award, 16 August 2007, Exh. R- 1006 (hereinafter "*Fraport*").

[1721] Resondent's Rejoinder ¶ 1571, referring to *Anderson v. Costa Rica*, ICSID ARB(AF)/07/3, Award, 19 May 2010, Exh. R-4204 (hereinafter "*Anderson*").

case dismissed claims brought by Canadian individuals who had invested in a "Ponzi scheme" for lack of jurisdiction *ratione materiae*.  Respondent highlights that tribunal's finding that the entire underlying transaction was illegal and, by that fact, "it follows that the acquisition by each [c]laimant of the asset resulting from that transaction was also not in accordance with the law of Costa Rica."[1722]  Respondent submits that the finding of the *Anderson* tribunal applies in the present case, highlighting that:

> where an investment is simply transferred by the same ultimate owner from one investment vehicle to another, the concept of the unity of the investment requires that the process of the making and operation of the investment by the ultimate owner and the owner's investment vehicle be considered as a whole for purposes of determining the legality of the investment, even if the acquisition of the investment by the claimant, standing alone, is not illegal.[1723]

1319. To hold otherwise, argues Respondent, would extend investment treaty protection to claimants who shift investments through several layers of ownership and control in order to launder their illegal investments into legal ones qualifying for treaty protection.[1724]

1320. In response to Claimants' assertion that 'in accordance with the law' requirements should be limited to domestic laws regulating the admission of foreign investment, Respondent submits a number of counter-arguments, including the following:

- Claimants' reliance on the "isolated 2010 dictum" in *Mr. Saba Fakes v. the Republic of Turkey* ("**Saba Fakes**") to limit the substantive scope of the 'in accordance with the law' requirement is "unpersuasive and contrary to a consistent line of arbitral awards that have applied 'in accordance with the law' clauses to domestic legislation other than laws governing the admission of investments."[1725]

- the illegalities "infecting" Claimants' investments are "quintessential breaches of 'fundamental principles'" and were "central to the profitability of and dividend flow from Claimants' investments."[1726]

---

[1722] *Ibid.*, quoting *Anderson* ¶ 55.

[1723] *Ibid.* ¶ 1572.

[1724] *Ibid.*

[1725] *Ibid.* ¶ 1577, referring to *Mr Saba Fakes v. The Republic of Turkey*, ICSID ARB/07/20, Award, 17 July 2010, Exh. C-1537 (hereinafter "*Saba Fakes*").

[1726] *Ibid.* ¶ 1582.

- Claimants' attempt to exclude minor violations from the scope of 'in accordance with the law' clauses is unavailing, as none of the illegalities of which Respondent complains are minor.[1727]

1321. In response to Claimants' contention that they were not the relevant actors in the context of Respondent's allegations regarding Yukos' tax optimization scheme and the obstruction of the enforcement of tax claims against Yukos by the Russian Federation, Respondent submits that Claimants are "essential instrumentalities of illegal acts, through Claimants' control of Yukos and its management,"[1728] noting that during the relevant period, "Claimants owned a majority of Yukos shares and appointed the totality of the members of its board of directors, including . . . Mikhail Khodorkovsky."[1729]

1322. Respondent also states that it is not estopped from invoking Claimants' unclean hands in this arbitration by any failure to take prompt action.[1730]   Respondent submits that Claimants have failed to satisfy the legal standard for estoppel.[1731]   This standard, argues Respondent, was confirmed by the ICJ in the *North Sea Continental Shelf Cases*:

> [I]t appears to the Court that only the existence of a situation of estoppel could suffice to lend substance to this contention, -- that is to say if the Federal Republic were now precluded from denying the applicability of the conventional regime, by reason of part conduct, declarations, etc., <u>which</u> not only <u>clearly and consistently evinced acceptance</u> of that regime, but <u>also had caused Denmark or the Netherlands</u>, <u>in reliance on such conduct, detrimentally to change position or suffer some prejudice</u>.  Of this there is no evidence whatever in the present case.[1732]

---

[1727] *Ibid.* ¶ 1580.

[1728] Counter-Memorial ¶ 909.

[1729] *Ibid.* ¶ 933.

[1730] Rejoinder ¶ 1597.

[1731] *Ibid.* ¶¶ 1588–98.

[1732] *Ibid.* ¶ 1589, quoting *North Sea Continental Shelf (Federal Republic of Germany/Denmark and Federal Republic of Germany/Netherlands)*, Judgment, 20 February 1969, ICJ Reports 1969, p. 3 ¶ 30, Exh. R-4208; *see also* ¶¶ 1590–92, citing *Delimitation of the Maritime Boundary in the Gulf of Maine Area (Canada/U.S.)*, Judgment, 12 October 1984, ICJ Reports 1984, p. 246 ¶ 145, Exh. R-4209; *Case of the Land and Maritime Boundary (Cameroon/Nigeria)*, Preliminary Objections, Judgment, 11 June 1998, ICJ Reports 1998, p. 275 ¶ 57, Exh. R-4210; *Land, Island and Maritime Frontier Dispute (El Salvador/Honduras)*, Application by Nigeria for Permission to Intervene, Judgment, 13 September 1990, ICJ Reports 1990, p. 92 ¶ 63, Exh. R-4211; *Aerial Incident of 10 August 1999 (Pakistan v. India)*, Jurisdiction of the Court, Judgment, 21 June 2000, ICJ Reports 2000, p. 12 ¶ 45, Exh. R-4212; *Legality of Use of Force (Serbia and Montenegro v. Canada)*, Preliminary Objections, Judgment, 15 December 2004, ICJ Reports 2004, p. 429 ¶ 42, Exh. R-4213; WTO, Guatemala—Definitive Anti-Dumping Measures On Grey Portland Cement From Mexico, Report of the Panel, 24 October 2000 ¶¶ 8.23–8.24, Exh. R-4214; WTO, Argentina—Definitive Anti-Dumping Duties On Poultry From Brazil, Report of the Panel, 22 April 2003 ¶ 7.39, Exh. R-4215; *Pope & Talbot Inc. v. The Government of Canada*, UNCITRAL, Interim Award, 26 June 2000 ¶ 111, Exh. C-953.

1323. Respondent submits that Claimants have failed to identify an unequivocal representation by Respondent.  In that regard, Respondent argues that Claimants' reliance on Respondent's alleged failure to challenge illegalities earlier does not amount to an unequivocal representation.  Respondent also submits that Claimants have failed to establish that they changed their conduct to their detriment in reliance on said representation.  Particularly regarding the alleged abuses of the Cyprus-Russia DTA, Respondent contends it raised its objection to Hulley's and VPL's alleged violations in these arbitrations as early as October 2006, and thus, argues Respondent, "Claimants' further suggestion that Respondent might be estopped because it did not also raise these abuses 'in an appropriate forum' is absurd."[1733]

1324. Respondent adds that informal or *contra legem* acceptance of an investment by the host State's authorities that is illegal under the host State's domestic law, or based on covert arrangements unknown to the host State, cannot provide a basis for estoppel.  In support, Respondent relies on the *Fraport* award.[1734]

1325. Finally, Respondent rejects Claimants proportionality argument, stating that it is based on "rules governing countermeasures by an injured State in inter-State relations."[1735]  In the words of Respondent: "the legality requirement excludes illegal investments from the scope of ECT protection.  As a result it is not that a host State is not justified in breaching obligations with respect to illegal investments, but instead that it has no treaty obligations in the first instance."[1736]

(b)  **Claimants' Position**

1326. Claimants object that their "unclean hands," even if proven by Respondent, could have no impact on their claims in these arbitrations because: (a) the ECT does not contain any principle of "unclean hands"; (b) no principle of "unclean hands" has been recognized as a general principle of law; and (c) the instances of "unclean hands" alleged by Respondent are "collateral illegalities" that do not fall within the parameters of any "unclean hands" doctrine.

1327. Claimants assert that it is "impossible to find any textual basis in the [ECT] for the

---

[1733]  *Ibid.* ¶¶ 1593–95.

[1734]  *Ibid.* ¶ 1596, referring to *Fraport* ¶ 347.

[1735]  *Ibid.* ¶¶ 1584–7.

[1736]  *Ibid.* ¶ 1586.

Respondent's contention."[1737]   They add that the introductory note to the ECT—a note which Claimants contend is not an official document or interpretation of the ECT—confers an obligation to strengthen the rule of law on States parties, rather than on the investor.[1738] Claimants highlight that Respondent chose not to quote the remainder of the note, which goes on to state that the ECT's aim of strengthening the rule of law on energy issues is to be accomplished "by creating a level playing field of rules to be observed by all participating governments, thus minimising the risks associated with energy-related investments and trade."[1739]   In this regard, Claimants contend that denying a claimant access to a forum for resolving its claims altogether would violate, rather than support, the rule of law.[1740]

1328. Claimants seek to distinguish the *Phoenix* and *Hamester* ICSID awards relied upon by Respondent.   Claimants highlight that the statement relied on by Respondent to infer that a jurisdictional requirement of compliance with host State laws is implicit, even when not stated, is *obiter dictum* on account of the BIT provisions being applied by those tribunals.[1741] Similarly, Claimants submit that any reliance on the *Plama* award to insert a jurisdictional requirement of "clean hands" into the relevant treaty is incorrect. Claimants submit that in the *Plama* decision on jurisdiction, the tribunal considered and rejected an argument that the illegality of the investment could affect its capacity to hear the dispute.[1742]

1329. Further, Claimants emphasize that the bar for recognition of general principles of international law is set "extremely high".[1743]   Claimants assert that Respondent's "unclean hands" theory fails to meet this high threshold.

1330. Claimants allege that neither the PCIJ nor the ICJ have ever endorsed "unclean hands" as a general principle of law.[1744]   They also argue that the inter-state cases relied on by Respondent are inapposite to this arbitration as they concern "situations in which two sovereign States have

---

[1737] Reply ¶ 1029.

[1738] *Ibid.* ¶ 1100.

[1739] *Ibid.* ¶ 1101.

[1740] *Ibid.* ¶ 1102.

[1741] *Ibid.* ¶ 1098, referring to *Phoenix* ¶ 101, Exh. R-1078; *Hamester* ¶ 123–24, Exh. R-1079.

[1742] *Ibid.* ¶ 1099, referring to *Plama*, Exh. C-994.

[1743] *Ibid.* ¶ 1039.

[1744] *Ibid.* ¶¶ 1040–55.

assumed an identical or reciprocal obligation."[1745]   Claimants further argue that the awards of mixed claims commissions are of little guidance, as they deal mostly with diplomatic protection and are of "ancient vintage."  In support, Claimants cite the *Saba Fakes v. Turkey* ICSID award, in which the tribunal held that the "rules of customary international law applicable in the context of diplomatic protection do not apply as such to investor-State arbitration."[1746]

1331.  Claimants note that the ILC Articles on State Responsibility and Articles on Diplomatic Protection do not contain a principle of "unclean hands."[1747]  They also argue that most scholars reject the existence of an "unclean hands" general principle altogether, while its proponents argue that it should be subject to certain well-defined limits.[1748]

1332.  Claimants also submit that the investment tribunal awards relied on by Respondent in support of a general principle of "unclean hands" were decided on other grounds and that Respondent's analysis of these awards is incomplete and misleading.[1749]  According to Claimants, in each of the ICSID awards cited by Respondent—*Plama*, *Phoenix*, *Hamester* and *Inceysa Vallisoletana, S.L. v. Republic of El Salvador* ("***Inceysa***")—the tribunal's decision rested on a clause in the relevant BIT conditioning jurisdiction on compliance by the investor with the laws of the host State.[1750]

1333.  Furthermore, Claimants argue that even if Respondent can make the case for a general principle of "unclean hands" or a legality requirement under the ECT, Respondent's theory as applied to this case rests on allegations of collateral illegalities unrelated to either the making of

---

[1745]   *Ibid.* ¶¶ 1040, 1055.

[1746]   *Ibid.* ¶¶ 1056–67, referring to *Saba Fakes* ¶ 69, Exh. C-1537.

[1747]   *Ibid.* ¶¶ 1068–71.

[1748]   *Ibid.* ¶¶ 1072–77.  For scholars rejecting the principle, Claimants cite to: Jean Salmon, ed., Dictionnaire de droit international public, 2001, pp. 677–78, Exh. C-1613 ; Luis Garcia-Arias, *La doctrine des «Clean Hands» en droit international public*, 1960, 30 *Annuaire des anciens auditeurs de l'académie de droit* 14, p. 18, Exh. R-1075; ILC, Sixth report on diplomatic protection by John Dugard, Special Rapporteur, 57th Session, 2 May – 5 August 2005, U.N. Doc. A/CN.4/546 ¶ 15, Exh. C-1678; Charles Rousseau, Droit international public, tome V, Les rapports conflictuels ¶ 170, Exh. C-1612.  For proponents of the principle, with limits, Claimants cite to: Bin Cheng, General Principles of Law as Applied by International Courts and Tribunals, pp. 157–58, Exh. R-1054; Sir Gerald Fitzmaurice, *The General Principles of International Law Considered From the Standpoint of the Rule of Law*, 1957, 92 Collected Courses of the Hague Academy of International Law 1, p. 119, Exh. R-1053.

[1749]   *Ibid.* ¶ 1094.

[1750]   *Ibid.* ¶ 1094–1105, referring to *Plama*, Exh. C-994; *Inceysa Vallisoletana, S.L. v. El Salvador*, ICSID Case No. ARB/03/26, Award, 2 August 2006, Exh. R-1083 (hereinafter "*Inceysa*"); *Phoenix*, Exh. R-1078; *Hamester*, Exh. R-1079.

Claimants' investments or their claims in these arbitrations.[1751]

1334.   Claimants submit that even when interpreting treaty provisions expressly requiring compliance with host State laws as a condition of jurisdiction, investment tribunals have strictly construed such provisions.[1752]   Claimants submit that investment tribunals have only subjected the initial making of the investment to a legality test.   They also assert that the limited temporal scope employed by investment tribunals renders alleged pre-investment conduct irrelevant,[1753] and limits its substantive scope, *e.g.*, by extending only to host State laws "governing the admission of foreign investments in its territory."[1754]   Claimants emphasize that misconduct unrelated to the making of an investment, or which concerns minor violations, has been disregarded by investment tribunals.[1755]

1335.   Claimants also submit that Anglo-American jurisprudence confirms that alleged illegalities must have an "immediate" and "necessary" relation to a claimant's cause of action.[1756]

1336.   It follows, argue Claimants, that none of Respondent's allegations are covered by any principle of "unclean hands".  The actions complained of by Respondent with respect to the acquisition of Yukos pre-date Claimants' investments, depriving the Tribunal of jurisdiction *ratione temporis* over those actions.[1757]   The alleged abuses of the Cyprus-Russia DTA do not, according to Claimants, have the required "immediate" or "necessary" relation to Claimants' claims.[1758]   Claimants argue that to bar Hulley and VPL permanently from bringing claims under the ECT for having claiming benefits under the Cyprus-Russia DTA to which they were not entitled rests on an "impossibly broad interpretation" of the "unclean hands" concept.[1759]

1337.   Claimants also point out that only the allegations of DTA abuses concern the conduct of Claimants themselves, while the other 24 allegations concern the conduct of persons other than Claimants.  Claimants contend that Respondent provides no basis on which the conduct of these

---

[1751]   *Ibid.* ¶¶ 1134–38.

[1752]   *Ibid.* ¶ 1105.

[1753]   *Ibid.* ¶¶ 1106–12.

[1754]   *Ibid.* ¶¶ 1118–19.

[1755]   *Ibid.* ¶ 1120.

[1756]   *Ibid.* ¶¶ 1105, 1078, 1134.

[1757]   *Ibid.* ¶ 1135.

[1758]   *Ibid.* ¶ 1137.

[1759]   *Ibid.*

third parties could render Claimants' hands "unclean".[1760]

1338. Claimants further assert that, even if any principle of "unclean hands" is potentially applicable in the situation at hand, Respondent is estopped from raising matters in these arbitrations of which it has long been aware, but has never challenged.[1761]  Claimants argue that acquiescence, or the silence or absence of protest in circumstances which generally call for a positive reaction signifying an objection, may "in and of itself" result in estoppel, where the other elements of estoppel are not made out.[1762]

1339. In particular, Claimants reject Respondent's allegations with respect to the creation and original acquisition of Yukos in 1995.  Claimants submit that it was Respondent that "planned, organized, conducted and completed the privatization of the Russian Federation's property through the loans-for-shares program, including the privatization of Yukos."[1763]  Similarly, Claimants highlight that Respondent did not take legal action against Claimants for any of the alleged violations of the Cyprus-Russia DTA by Hulley and VPL.  Claimants underline that Respondent must have had knowledge of many, if not all, of the alleged violations "as early as October 2003, through the searches and seizures of documents at the Moscow premises of GML MS, or at least as early as October 6, 2006 when the Respondent first raised the matter in these arbitrations."[1764]

1340. Claimants also submit that, even if an "unclean hands" general principle existed, it would not confer upon States the right to violate investors' rights.[1765]  Drawing an analogy to counter-measures, Claimants refer to Articles 49 and 54 of the ILC Articles on State Responsibility and to the ILC Commentary on the provisions, which states that such measures "are not intended as a form of punishment for wrongful conduct, but as an instrument for achieving compliance with the obligations of the responsible State."[1766]

1341. The ILC Commentary further emphasizes that proportionality is a stand-alone requirement, such that even where a counter-measure is carried out for a permissible purpose, it must still be

---

[1760]   *Ibid.* ¶ 1136.

[1761]   *Ibid.* ¶ 1181.

[1762]   *Ibid.* ¶ 1183.

[1763]   *Ibid.* ¶ 1188.

[1764]   *Ibid.* ¶ 1189.

[1765]   *Ibid.* ¶ 1191.

[1766]   *Ibid.* ¶ 1194.

proportionate to the original breach.[1767]

1342. Claimants submit that the need to weigh the proportionality of Respondent's response to the illegalities it alleges against Claimants provides further reason for rejecting Respondent's "unclean hands" objection to jurisdiction/admissibility.  In Claimants' own words: "it is for the tribunal to assess such allegations . . . in its consideration of the merits of the investor's claims, bearing in mind that any response by the host State to any alleged illegality must comport with its international obligations."[1768]

### 4.    Tribunal's Decision

1343. Article 26(6) of the ECT provides that "[a] tribunal established under paragraph (4) shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law."

1344. Article 31 of the VCLT, which is widely recognized as reflecting customary international law, provides in its first paragraph that "[a] treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose."

1345. Looking first at the text of the ECT, the Tribunal observes that it does not contain any express reference to a principle of "clean hands."  Nor, unlike some other investment treaties, does the ECT contain an express requirement that investments be made in accordance with the laws of the host country.[1769]  These points are not disputed by the Parties.

1346. In the absence of any specific textual hook, the Tribunal must consider whether, given the need to interpret treaties in good faith and take account of their object and purpose, the ECT as a whole may be understood as conditioning the protection of investments on their legality, or on the good faith of the investor.  The Tribunal addresses this question in subsection (a) below.

---

[1767]  *Ibid.* ¶ 1195.

[1768]  *Ibid.* ¶ 1197.

[1769]  *See e.g.* the bilateral investment treaties applied in *Fraport*, Exh. R-1006 (Germany–Philippines BIT:  "[t]he term investment shall mean any kind of asset accepted in accordance with the respective laws and regulations of either Contracting State"); *Inceysa*, Exh. R-1083 (Spain–El Salvador BIT:  "[e]ach Contracting Party shall protect in its territory investments made, in accordance with its legislation"; "[the BIT shall] apply to investments made . . . in accordance with the laws"); *Phoenix*, Exh. RE-1078 (Israel–Czech Republic BIT:  "[t]he term 'investment' shall comprise any kinds of asset invested . . . in accordance with the respective laws and regulations."

1347. In addition to any potential limitation on the protection of investments inherent in the ECT, a principle of "clean hands" could be relevant to this arbitration pursuant to Article 26(6) of the ECT if it were an "applicable rule[. . .] or principle[. . .] of international law."  The Parties dispute whether "clean hands" exists as a "general principle of international law recognized by civilized nations" in the meaning of Article 38(1)(c) of the Statute of the ICJ.  The Tribunal addresses this question in subsection (b) below.

1348. Finally, in subsection (c) below, the Tribunal considers whether any of the 28 instances of "bad faith and illegal conduct" of which Respondent accuses Claimants fall within the scope of any "unclean hands" or similar principle applicable in the ECT context.

### (a)  Can a Clean Hands Principle or Legality Requirement be Read into the ECT?

1349. The Tribunal notes that there is support in the decisions of tribunals in investment treaty arbitrations for the notion that, even where the applicable investment treaty does not contain an express requirement of compliance with host State laws (as is the case with the ECT), an investment that is made in breach of the laws of the host State may either: (a) not qualify as an investment, thus depriving the tribunal of jurisdiction; or (b) be refused the benefit of the substantive protections of the investment treaty.

1350. The *Plama* tribunal, deciding a case under the ECT, thus stated that the "substantive protections of the ECT cannot apply to investments made contrary to law."[1770]  It acknowledged that the ECT "does not contain a provision requiring the conformity of the Investment with a particular law," but stated that "[t]his does not mean . . . that the protections provided for by the ECT cover all kinds of investments, including those contrary to domestic and international law."[1771] The tribunal explained that, in that case, granting the claimant protection would have "be[en] contrary to the principle *nemo auditor propriam turpitudinem allegans*" and "the basic notion of international public policy—that a contract obtained by wrongful means (fraudulent misrepresentation) should not be enforced by a tribunal."[1772]

1351. Other arbitral tribunals have stated in *obiter dicta* that the principle that an investment "will not be protected if it has been created in violation of national or international principles of good

---

[1770] *Plama*, Exh. C-994 ¶ 139.

[1771] *Ibid.* ¶ 138.

[1772] *Ibid.* ¶ 143.

faith" or "of the host State's law" is a "general principle[. . . ] that exist[s] independently of specific language" in an investment treaty.[1773]

1352. The Tribunal agrees with this proposition.  In imposing obligations on States to treat investors in a fair and transparent fashion, investment treaties seek to encourage legal and *bona fide* investments.  An investor who has obtained an investment in the host State only by acting in bad faith or in violation of the laws of the host state, has brought itself within the scope of application of the ECT through wrongful acts.  Such an investor should not be allowed to benefit from the Treaty.

1353. For reasons that will become apparent further in this chapter, the Tribunal does not need to decide here whether the legality requirement it reads into the ECT operates as a bar to jurisdiction or, as suggested in *Plama*, to deprive claimants of the substantive protections of the ECT.

1354. However, the Tribunal does need to address Respondent's contention that the right to invoke the ECT must be denied to an investor not only in the case of illegality in the *making* of the investment but also in its *performance*.  The Tribunal finds Respondent's contention unpersuasive.

1355. There is no compelling reason to deny altogether the right to invoke the ECT to any investor who has breached the law of the host State in the course of its investment.  If the investor acts illegally, the host state can request it to correct its behavior and impose upon it sanctions available under domestic law, as the Russian Federation indeed purports to have done by reassessing taxes and imposing fines.  However, if the investor believes these sanctions to be unjustified (as Claimants do in the present case), it must have the possibility of challenging their validity in accordance with the applicable investment treaty.  It would undermine the purpose and object of the ECT to deny the investor the right to make its case before an arbitral tribunal based on the same alleged violations the existence of which the investor seeks to dispute on the merits.

---

[1773] *Hamester* ¶¶ 123–24, Exh. R-1079. *See also Phoenix* ¶ 101, Exh. R-1078 ("it is the Tribunal's view that this condition – the conformity of the establishment of the investment with the national laws – is implicit even when not expressly stated in the relevant BIT"); *SAUR* ¶ 308, Exh. R-4186 ("[the tribunal] is aware that the finality of the investment arbitration system is to protect only lawful and bona fide investments. Whether or not the BIT between France and Argentina mentions the requirement that the investor act in conformity with domestic legislation does not constitute a relevant factor. The condition of not committing a serious violation of the legal order is a tacit condition, inherent to any BIT as, in any event, it is incomprehensible that a State offer the benefit of protection through arbitration if the investor, in order to obtain such protection, has acted contrary to the law.")

1356. Respondent has not been able to cite any apposite authority in support of its contention.  The statements of investment tribunals it relies on were all made *obiter* and are too vague to allow any certain conclusions to be drawn as to their intended meaning.  For example, the statement in *Fraport* that illegal acts in the course of an investment "might be a defense to claimed substantive violations" appears to suggest that, in some cases, the State's actions will have been justified as an appropriate response to the investor's violations of national law.[1774]  As is clear from the decision, the statement by the *Fraport* tribunal does not imply the unavailability of the substantive protections of the treaty, but rather concludes that the respondent State has not incurred any liability under the treaty.

> **(b)** **Does the "Clean Hands" Doctrine Constitute a "General Principle of Law Recognized by Civilized Nations"?**

1357. Since the Tribunal will not read into the ECT any legality requirement with respect to the conduct of the investment, it must consider Respondent's more general proposition that a claimant who comes before an international tribunal with "unclean hands" is barred from claiming on the basis of a "general principle of law."

1358. The Tribunal is not persuaded that there exists a "general principle of law recognized by civilized nations" within the meaning of Article 38(1)(c) of the ICJ Statute that would bar an investor from making a claim before an arbitral tribunal under an investment treaty because it has so-called "unclean hands."

1359. General principles of law require a certain level of recognition and consensus.  However, on the basis of the cases cited by the Parties, the Tribunal has formed the view that there is a significant amount of controversy as to the existence of an "unclean hands" principle in international law.

1360. Respondent has demonstrated that certain principles associated with the "clean hands" doctrine, such as *exceptio non adimpleti contractus* and *ex iniuria ius non oritur* have been endorsed by the PCIJ and the ICJ.[1775]  However, the Tribunal notes that Judge Simma in his separate opinion

---

[1774] *Fraport*, Exh. R-1006 ¶¶ 395, 345.  The Tribunal notes that the Chairman, Mr. Fortier, was the Chairman of the Fraport tribunal.

[1775] *See The Diversion of Water from the Meuse (Netherlands v. Belgium)*, Judgment, 28 June 1937, Individual Opinion of Judge Hudson, PCIJ Series A/B No. 70, p. 73, 77, Exh. C-1502 ("[i]t would seem to be an important principle of equity that where two parties have assumed an identical or reciprocal obligation, one party which is engaged in continuing non-performance of that obligation should not be permitted to take advantage of a similar non-performance of that obligation by the other party"); *Gabčíkovo-Nagymaros*, ¶ 133 Exh. C-948 ("[t]he Court, however, cannot

in the *Application of the Interim Accord of 13 December 1995* raises doubt as to the continuing existence of the *exceptio non adimpleti contractus* principle.[1776]

1361. With regard to the "unclean hands" doctrine proper, Respondent has referred to the dissenting opinion of Judge Schwebel (a member of this Tribunal) in the *Military and Paramilitary Activities in and against Nicaragua* ICJ case, where he concluded that Nicaragua's claims against the United States should fail because Nicaragua had "not come to Court with clean hands."[1777]   Respondent also referred to other dissenting ICJ and PCIJ opinions where the principle of "unclean hands" was invoked (albeit often without referring to it by name).[1778]

1362. However, as Claimants point out, despite what appears to have been an extensive review of jurisprudence, Respondent has been unable to cite a single majority decision where an international court or arbitral tribunal has applied the principle of "unclean hands" in an inter-State or investor-State dispute and concluded that, as a principle of international law, it operated as a bar to a claim.

1363. The Tribunal therefore concludes that "unclean hands" does not exist as a general principle of international law which would bar a claim by an investor, such as Claimants in this case.

---

disregard the fact that the Treaty has not been fully implemented by either party for years, and indeed that their acts of commission and omission have contributed to creating the factual situation that now exists. Nor can it overlook that factual situation . . . when deciding on the legal requirements for the future conduct of the Parties. This does not mean that facts—in this case, facts which flow from wrongful conduct—determine the law. The principle *ex injuria jus non oritur* is sustained by the Court's finding that the legal relationship created by the 1977 Treaty is preserved and cannot in this case be treated as voided by unlawful conduct.")

[1776] *Application of the Interim Accord of 13 December 1995 (the Former Yugoslav Republic of Macedonia v. Greece)*, Judgment, 5 December 2011, Separate Opinion of Judge Simma, ICJ Reports 2011, p. 695 ¶¶ 19–20, Exh. C-1545.

[1777] *Case Concerning Military and Paramilitary Activities in and against Nicaragua (Nicaragua v. United States of America)*, Merits, Judgment, 27 June 1986, Dissenting Opinion of Judge Schwebel, ICJ Reports 1986, p. 259 ¶ 268, Exh. R-1071.

[1778] *Legal Status of Eastern Greenland (Denmark v. Norway)*, Judgment, 5 April 1933, Dissenting Opinion of Judge Anzilotti, PCIJ Series A/B No. 53, p. 76, 95, Exh. R-1073; *Interpretation of Peace Treaties with Bulgaria, Hungary and Romania* (Second Phase), Advisory Opinion, 18 July 1950, Dissenting Opinion of Judge Read, ICJ Reports 1950, p. 231, 244, Exh. R-1074; *Case Concerning United States Diplomatic and Consular Staff in Tehran (United States of America v. Iran)*, Judgment, 24 May 1980, Dissenting Opinion of Judge Morozov, ICJ Reports 1980, p. 51 ¶ 3, Exh. R-1087; *Case Concerning Arrest Warrant of 11 April 2000 (Democratic Republic of the Congo v. Belgium)*, Judgment, 14 February 2002, Dissenting Opinion of Judge van den Wyngaert, ICJ Reports 2002, p. 137 ¶ 84, Exh. R-1072 ("The Congo did not come to the Court with clean hands").

      (c)      **Would any Instances of Claimants' Alleged "Bad Faith and Illegal" Conduct be Caught by a Legality Requirement Read into the ECT?**

1364. To summarize, the Tribunal accepts that a claimant may be barred from seeking relief under the ECT if its investment was made in bad faith or in violation of the laws of the host state.

1365. It follows that the alleged instances of "unclean hands" listed in Subsections IX.B.2(b), (c) and (d) above—specifically, the instances related to the alleged abuse of the Russia–Cyprus DTA, the tax optimization scheme and the obstruction of Russia's enforcement of tax claims against Yukos, all of which relate to actions that were taken after the making of Claimants' investment, cannot have any impact on the availability of ECT protection for Claimants.

1366. This leaves for the Tribunal's consideration Respondent's allegations of bad faith and illegal conduct in the acquisition of Yukos and the subsequent consolidation of control and ownership over Yukos and its subsidiaries, set out in Subsection IX.B.2(a) above.

1367. It is common ground between the Parties that these actions were taken before Claimants became shareholders of Yukos in 1999, 2000 and 2001 and, consequently, were not taken by Claimants themselves, but by other actors, such as Bank Menatep and the Oligarchs.[1779] Claimants submit that these actions are thus irrelevant to these arbitrations, as the conduct complained of was not that of Claimants' themselves and, in any event, pre-dates Claimants' investment.[1780]

1368. Respondent replies that, on the contrary, the process of the acquisition of the Yukos shares by Claimants should not be seen in isolation but as an integral part of the "making of the investment" by Claimants.  Respondent's argument was most convincingly put by Dr. Claudia Annacker during the Hearing.  Dr. Annacker argued as follows:

> Contrary to Claimants' position, the serious illegalities that infect the entire process of the acquisition of the Yukos shares by Claimants cannot simply be ignored because the transfer of the shares to the Claimants . . . viewed in isolation, is asserted to be legal. These illegalities cannot somehow be cured through multiple transfers within this network of the oligarchs' offshore companies from one shell company to another.
>
> Indeed, the making of an investment is often a process rather than an instantaneous act, and often comprises a number of diverse transactions. These transactions must be treated as an

---

[1779] *See* Counter-Memorial ¶¶ 910–13, explaining the alleged illegal conduct of Bank Menatep and the Oligarchs in the acquisition of Yukos shares by the Oligarchs in 1995 and 1996.

[1780] *See* Reply ¶¶ 1135–36.

> integrated whole. The transactions may have a separate legal existence, but they have a common economic aim . . .
>
> Indeed, it would be incompatible with economic reality and undermine the integrity of the legal process if serious irregularities – illegalities – infecting the process of the making of the investment would not affect the availability of investment treaty protection, whether or not a specific transaction, part of the process, if viewed in isolation, might be legal.
>
> Now, this conclusion applies a fortiori where a claimant is not unrelated to the persons or entities that committed these illegalities, but is an investment vehicle owned and controlled by the same persons who committed the illegalities . . . Otherwise, investment treaty protection could be achieved simply by shifting investments through layers of ownership and control to launder illegal investments . . .
>
> While Claimants' acquisition of their shares may be a separate legal transaction, there is a common economic aim pursued by the same oligarchs . . .[1781]

1369. The Tribunal agrees with Respondent that an examination of the legality of an investment should not be limited to verifying whether the last in a series of transactions leading up to the investment was in conformity with the law.  The making of the investment will often consist of several consecutive acts and all of these must be legal and *bona fide*.

1370. In the present case, however, Respondent has failed to demonstrate that the alleged illegalities to which it refers are sufficiently connected with the final transaction by which the investment was made by Claimants.  The transactions by which each Claimant acquired its investment were their purchases of Yukos shares.  As established in the Interim Award, these purchases were legal and occurred starting in 1999.[1782]  On the other hand, the alleged illegalities connected to the acquisition of Yukos through the loans-for-shares program occurred in 1995 and 1996, at the time of Yukos' privatization.  They involved Bank Menatep and the Oligarchs, an entity and persons separate from Claimants, one of which—Veteran—had not even come into existence.[1783]  With respect to Respondent's other allegations, regarding profit skimming and the oppression of minority shareholders, it is also clear to the Tribunal that they are not part of the transaction or transactions by which each Claimant acquired their interest in Yukos.

1371. Respondent relies on *Anderson* for the proposition that "illegalities infecting an investment that pre-date a claimant's acquisition of the investment are not irrelevant or outside the tribunal's jurisdiction *ratione temporis*."[1784]  However, the tribunal in that case examined and found to be

---

[1781]   Transcript, Day 19 at 171–174 (Respondent's closing).

[1782]   Interim Awards ¶¶ 431 (YUL); 430 (Hulley); 474 (VPL).

[1783]   VPL was incorporated in 2001 (Interim Award ¶ 44 (VPL)).

[1784]   Rejoinder ¶ 1571, referring to Anderson, Exh. R-4204.

illegal the very transaction through which the claimants obtained their investment, not any prior transactions made by other persons. [1785]

1372. While it is true that the claimants in *Anderson* were not blamed for the illegality that tainted their investment, nevertheless it is the very transaction by which their respective investments were obtained that was considered illegal by the tribunal, and led it to decline jurisdiction.

### (d)    Conclusion

1373. The Tribunal concludes that Respondent's "unclean hands" argument fails as a preliminary objection.   It does not operate to deprive the Tribunal of its jurisdiction in this arbitration, render inadmissible any of the Claimants' claims or otherwise bar Claimants' from invoking the substantive protections of the ECT.

1374. However, as will be seen in Chapter X.E and Part XII, some of the instances of Claimants' "illegal and bad faith" conduct complained of by Respondent in the context of this preliminary objection, could have an impact on the Tribunal's assessment of liability and damages.

## C.    RESPONDENT'S OBJECTIONS UNDER ARTICLE 21 OF THE ECT

### 1.    Introduction

1375. Another important threshold issue in this arbitration arises from Respondent's objection under Article 21 of the ECT.   Respondent argues that, pursuant to this complex provision (containing a "carve out" *from* the ECT for "Taxation Measures" at Article 21(1) and a "claw back" *for* Article 13 of the ECT in relation to "taxes" at Article 21(5)), the Tribunal lacks jurisdiction over claims with respect to "Taxation Measures" other than those based on expropriatory "taxes". [1786]   Claimants argue that the objection is without merit since, *inter alia*, Article 21 does not apply to actions—including expropriations—carried out "under the guise of taxation."[1787]

---

[1785]    *Ibid*.

[1786]    *See e.g.*, Respondent's Post-Hearing Brief ¶¶ 162–72.

[1787]    *See e.g.*, Claimants' Post-Hearing Brief ¶¶ 203–30.

1376. The relevant provisions of Article 21 of the ECT for present purposes are paragraphs 1 (the "carve-out"), 5 (the "claw-back") and 7 (definitions), which in the English version[1788] read as follows:

> (1) Except as otherwise provided in this Article, nothing in this Treaty shall create rights or impose obligations with respect to Taxation Measures of the Contracting Parties.  In the event of any inconsistency between this Article and any other provision of the Treaty, this Article shall prevail to the extent of the inconsistency.
>
> . . .
>
> (5)   (a)   Article 13 shall apply to taxes.
>
> (b)   Whenever an issue arises under Article 13, to the extent it pertains to whether a tax constitutes an expropriation or whether a tax alleged to constitute an expropriation is discriminatory, the following provisions shall apply:
>
> (i)   The Investor or the Contracting Party alleging expropriation shall refer the issue of whether the tax is an expropriation or whether the tax is discriminatory to the relevant Competent Tax Authority. Failing such referral by the Investor or the Contracting Party, bodies called upon to settle disputes pursuant to Article 26(2)(c) or 27(2) shall make a referral to the relevant Competent Tax Authorities;
>
> (ii)   The Competent Tax Authorities shall, within a period of six months of such referral, strive to resolve the issues so referred.  Where nondiscrimination issues are concerned, the Competent Tax Authorities shall apply the non-discrimination provisions of the relevant tax convention or, if there is no non-discrimination provision in the relevant tax convention applicable to the tax or no such tax convention is in force between the Contracting Parties concerned, they shall apply the non-discrimination principles under the Model Tax Convention on Income and Capital of the Organisation for Economic Co-operation and Development;
>
> (iii)   Bodies called upon to settle disputes pursuant to Article 26(2)(c) or 27(2) may take into account any conclusions arrived at by the Competent Tax Authorities regarding whether the tax is an expropriation.  Such bodies shall take into account any conclusions arrived at within the six-month period prescribed in subparagraph (b)(ii) by the Competent Tax Authorities regarding whether the tax is discriminatory.  Such bodies may also take into account any conclusions arrived at by the Competent Tax Authorities after the expiry of the six-month period;
>
> (iv)   Under no circumstances shall involvement of the Competent Tax Authorities, beyond the end of the six-month period referred to in subparagraph (b)(ii), lead to a delay of proceedings under Articles 26 and 27.
>
> . . .

---

[1788]   The Tribunal has taken note of Claimants' highlighting of the differences in the wording of paragraphs 5 and 7 of Article 21 in some of the other official languages of the ECT.  As will be seen from the Tribunal's findings in this chapter, the Tribunal does not need to address the relevance, if any, of these differences.

(7) For the purposes of this Article:

    (a)    The term "Taxation Measure" includes:

        (i)    any provision relating to taxes of the domestic law of the Contracting Party or of a political subdivision thereof or a local authority therein;

        and

        (ii)    any provision relating to taxes of any convention for the avoidance of double taxation or of any other international agreement or arrangement by which the Contracting Party is bound.

    (b)    There shall be regarded as taxes on income or on capital all taxes imposed on total income, on total capital or on elements of income or of capital, including taxes on gains from the alienation of property, taxes on estates, inheritances and gifts, or substantially similar taxes, taxes on the total amounts of wages or salaries paid by enterprises, as well as taxes on capital appreciation.

    (c)    A "Competent Tax Authority" means the competent authority pursuant to a double taxation agreement in force between the Contracting Parties or, when no such agreement is in force, the minister or ministry responsible for taxes or their authorized representatives.

    (d)    For the avoidance of doubt, the terms "tax provisions" and "taxes" do not include customs duties.

1377. Respondent's objection under Article 21 of the ECT was originally addressed by the Parties during the jurisdictional phase of the arbitration. In its Interim Awards, the Tribunal observed that some of the arguments raised by the Parties under Article 21 went to the heart of the merits of the dispute, in that they related to the background to and motivation behind Respondent's tax assessments, enforcement measures and other conduct, and that the Tribunal would not rule on these issues in a vacuum.[1789]  As a consequence, the Tribunal decided "to defer its definitive interpretation of Article 21, and its characterization of [Claimants'] claims for purposes of Article 21, to the next phase of the arbitration."[1790]

1378. As a consequence, the Parties had a further opportunity to develop their positions under Article 21 of the ECT during the merits phase of the present proceedings. Claimants' and Respondent's arguments are now summarized in turn.

### 2.  Claimants' Position

1379. Claimants argue that Article 21 of the ECT does not apply to the case at hand since Respondent's actions were "actions under the guise of taxation" rather than "*bona fide* taxation

---

[1789]    Interim Awards ¶¶ 583–84 (Hulley), ¶¶ 584–85 (YUL), ¶¶ 595–96 (VPL).

[1790]    Interim Awards ¶ 584 (Hulley), ¶ 585 (YUL), ¶ 596 (VPL).

actions"[1791] and merely a tool "to achieve a purpose that had nothing to do with taxation:  the elimination of a potential opponent and the appropriation of Yukos' assets."[1792]  According to Claimants, "[i]t is no answer for a state to say that its courts have used the [word] 'taxation' . . . in describing judgments by which they effect the dispossession of foreign investors.  If that were enough, investment protection through international law would likely become an illusion, as states would quickly learn to avoid responsibility by dressing up all adverse measures, perhaps expropriation first of all, as taxation."[1793]  Claimants refer in particular to the decisions of the *Quasar* and *RosInvestCo* tribunals to support their view that in a case such as this one a carve-out with regard to taxation measures cannot apply.[1794]

1380. In addition, Claimants suggest that the carve-out under Article 21 of the ECT is narrower than that in other treaties in that it only applies to the enactment of "provisions" relating to taxes, but not to the application of these provisions and the "collection and enforcement" of taxes.[1795]  Claimants refer to the ECT's *travaux préparatoires* in this regard.[1796]  In particular, they point out that during the negotiations of the ECT, the French delegation, in response to a memorandum of the Legal Sub-Group noting that "taxation measures" were identified in an illustrative manner, took the view that Article 21(7) of the ECT would constitute a definition and that, therefore, "includes" in that provision would have to be replaced by "means".[1797]

1381. Claimants say that they "have no issue with the right of the Russian Federation to enact tax provisions or with the content of Russian tax law," but only with "the manner in which Russian tax law was grossly distorted, misapplied and abused to effect the destruction of Yukos."[1798]

---

[1791]   Transcript, Day 2 at 4 (Claimants' opening); Transcript, Day 17 at 156 (Claimants' closing); Claimants' Post-Hearing Brief ¶ 204.

[1792]   Transcript, Day 17 at 170 (Claimants' closing); Claimants' Post-Hearing Brief ¶ 206.

[1793]   Transcript, Day 17 at 171 (Claimants' closing) (quoting *Quasar* ¶ 179, Exh. R-3383).

[1794]   Transcript, Day 2 at 4–8 (Claimants' opening); Transcript, Day 17 at 168–69 (Claimants' closing); Claimants' Opening Slides, pp. 219–20; Claimants' Post-Hearing Brief ¶ 207 (discussing *RosInvestCo* ¶ 628, Exh. C-1049; *Renta4 S.V.S.A. v. Russian Federation*, SCC Arbitration V024/2007, Award on Preliminary Objections, 20 March 2009 ¶ 74, Exh. C-1048).

[1795]   Transcript, Day 2 at 10 (Claimants' opening); Transcript, Day 17 at 174 (Claimants' closing); Claimants' Opening Slides, pp. 226–30; Claimants' Post-Hearing Brief ¶¶ 204, 208.

[1796]   Claimants' Post-Hearing Brief ¶ 211.

[1797]   Memorial ¶ 1034 n.1418.

[1798]   Claimants' Post-Hearing Brief ¶ 209.

Accordingly, Claimants take the view that for this reason alone Article 21 of the ECT cannot apply.[1799]

1382. Claimants also take the view that, in any event, the ECT's protection would still apply with regard to the expropriation standard under Article 13 of the ECT, due to the claw-back provision in Article 21(5) of the ECT, which they say must have the same scope as Article 21(1) of the ECT.[1800]   Claimants suggest that Respondent's interpretation (according to which the claw-back provision would be narrower in scope than the taxation carve-out) would lead to "a gaping hole in the ECT where investors would stand completely unprotected from expropriatory taxation," thus "defeat[ing] the object and purpose of the 'claw-back' and of the ECT itself."[1801]   Claimants also dispute Respondent's argument that Russian law should determine the meaning of "tax" under Article 21(5) of the ECT, since "for the interpretation of a treaty, you do not look at domestic law of one of the States parties to a treaty."[1802]

1383. In any event, Claimants argue that many of Respondent's actions that they complain of have nothing to do with taxation and thus fall outside of the scope of Article 21 of the ECT.[1803]   In this regard, Claimants state that "the attacks on Yukos and related persons involved all of the following organs and entities:  the Presidential Administration, the Russian courts, Ministry of Justice, Federal Bailiff Service, Penitentiary Service, Ministry of Natural Resources, Internal Affairs, FSB, Prosecutor General's Office, Federal Property Fund, Rosneft" and included "freezes, searches and seizures," the auctioning of YNG and the forcing of Yukos into bankruptcy, all of which would "have nothing to do with taxation."[1804]

1384. Finally, Claimants assert that referring any questions with regard to taxation measures to the Russian Federation's tax authorities as envisaged under the claw-back provision of Article 21(5) of the ECT would be an exercise in futility, as the relevant Russian authorities would already have looked at the issues, the Parties' submissions would be too voluminous to be considered by any of the relevant authorities and the Tribunal would, in any event, not be

---

[1799]   Claimants' Post-Hearing Brief ¶ 209.

[1800]   Transcript, Day 2 at 10 (Claimants' opening); Transcript, Day 17 at 192 (Claimants' closing); Claimants' Post-Hearing Brief ¶¶ 204, 214–21.

[1801]   Claimants' Post-Hearing Brief ¶ 220 (emphasis in the original); Transcript, Day 17 at 190–91 (Claimants' closing).

[1802]   Transcript, Day 17 at 195 (Claimants' closing).

[1803]   Transcript, Day 2 at 11 (Claimants' opening); Transcript, Day 17 at 207 (Claimants' closing); Claimants' Post-Hearing Brief ¶¶ 204, 222–24.

[1804]   Transcript, Day 17 at 208 (Claimants' closing).

bound by any comments of these authorities.[1805]  As a consequence, Claimants argue that, even if the Tribunal were to find that Article 21(5) of the ECT applies, it should still proceed with its examination of the case without any referral to the Russian authorities.

### 3.      Respondent's Position

1385. Respondent argues that most of the actions complained of by Claimants are outside the scope of the Tribunal's scrutiny due to the taxation carve-out provision in Article 21(1) of the ECT.

1386. Respondent points out that taxation carve-outs have a number of functions, which include preserving States' sovereignty in fiscal matters, the coordination of obligations under investment treaties and double taxation treaties, and assuring that complex tax issues are addressed with the necessary expertise.[1806]  To achieve these functions, taxation carve-outs would typically be "broad, covering all aspects of the tax regime."[1807]  Respondent refers to a number of instances where investment treaty tribunals gave effect to taxation carve-outs in international investment treaties, namely the decisions in *Duke Energy v. Ecuador*, *EnCana v. Ecuador*, *El Paso International Company v. The Argentine Republic* ("***El Paso***"), *Burlington v. Ecuador* and *Nations Energy v. Panama*.[1808]

1387. With regard to the wording of Article 21(1) of the ECT, Respondent argues that the term "measures" is given a broad meaning throughout the ECT, in contradistinction to the narrower term of "laws and regulations".[1809]  As a consequence, says Respondent, an interpretation of Article 21(1) of the ECT in accordance with recognized principles of treaty interpretation shows that the provision "covers all measures taken by the legislative, executive, and judiciary in the field of taxation, whether of general or individual application."[1810]  Respondent refers to the ICJ's judgment in *Fisheries Jurisdiction (Spain v. Canada)* to support its view that

---

[1805]   Transcript, Day 17 at 200 (Claimants' closing); Claimants' Post-Hearing Brief ¶ 229.

[1806]   Transcript, Day 3 at 156–59 (Respondent's opening); Respondent's Opening Slides, pp. 454–58.

[1807]   Transcript, Day 3 at 159 (Respondent's opening).

[1808]   Transcript, Day 3 at 161–62 (Respondent's opening) (discussing *Duke Energy v. Ecuador*, ICSID ARB/04/19, Award, 18 August 2008 ¶ 188, Exh. C-993; *EnCana v. Ecuador*, LCIA UN3481, UNCITRAL, Award, 3 February 2006 ¶ 168, Exh. C-976; *El Paso Energy International Company v. The Argentine Republic*, ICSID ARB/03/15, Award, 31 October 2011 ¶ 449, Exh. C-1544/R-4190 (hereinafter "*El Paso*"); *Burlington Resources v. Ecuador*, ICSID Case ARB/08/5, Decision on Jurisdiction, 2 June 2010 ¶ 249, Exh. R-992; *Nations Energy v. Panama*, ICSID ARB/06/19, Award, 24 November 2010 ¶ 483, Exh. R-1032); Respondent's Opening Slides, pp. 458–60.

[1809]   Transcript, Day 3 at 162 (Respondent's opening); Respondent's Opening Slides, pp. 461–62; Respondent's Post-Hearing Brief ¶ 164.

[1810]   Respondent's Post-Hearing Brief ¶ 162.

"measures" has a broad ordinary meaning and that, contrary to Claimants' suggestion that "Taxation Measures" only refer to legislative "provisions", legislation and implementing measures cannot be dissociated.[1811]   According to Respondent, such a dissociation would be absurd, since "[e]very time a contracting State enforces tax legislation that is carved out, but would be inconsistent with the treatment standards in Part III, the State would incur international responsibility for breach of Part III of the Energy Charter Treaty."[1812]

1388. Respondent disputes Claimants' argument that Article 21(7) of the ECT, properly interpreted, applies only to the enactment of "provisions" relating to taxes.  Respondent points out that the word "includes" used in Article 21(7) of the ECT stands in contrast to the word "means" used elsewhere, thus suggesting that the enumeration in that provision is not exhaustive.[1813] Respondent also argues that, if the term "Taxation Measure" were limited to provisions relating to taxes, the use of the word "includes" would not make sense, since Article 21(7) of the ECT specifically refers to both "any provision relating to taxes" in "the domestic law of the Contracting Party" and "any provision relating to taxes" in an "international agreement . . . by which the Contracting Party is bound."[1814]   Since "all provisions relating to taxes are either contained in domestic law or in international treaties," Respondent claims that there would be nothing left to add.[1815]

1389. Respondent rather suggests that "[t]he term 'Taxation Measure' has a meaning in itself" and that "it provides a benchmark to determine which measures or categories of measures, in addition to those expressly listed, constitute 'Taxation Measures' for purposes of Article 21 of the ECT."[1816]   Respondent refers to the ECT's *travaux préparatoires* to support its view that the list in Article 21(7) of the ECT is "illustrative" and "not a definition".[1817]   In particular, Respondent points out that, during the negotiations of the ECT, the Canadian delegation, in

---

[1811]   Transcript, Day 3 at 163–64, 170 (Respondent's opening) (discussing *Fisheries Jurisdiction (Spain v. Canada)*, Jurisdiction of the Court, Judgment, 4 December 1998, ICJ Reports 1998, p. 460 ¶¶ 66–67, Exh. R-1028); Respondent's Opening Slides, pp. 462–63.

[1812]   Transcript, Day 3 at 170 (Respondent's opening); Transcript, Day 21 at 173 (Respondent's rebuttal).

[1813]   Transcript, Day 21 at 171 (Respondent's rebuttal); Respondent's Opening Slides, p. 465; Respondent's Post-Hearing Brief ¶ 163.

[1814]   Transcript, Day 21 at 176 (Respondent's rebuttal).

[1815]   Transcript, Day 21 at 178 (Respondent's rebuttal).

[1816]   Transcript, Day 21 at 171–72 (Respondent's rebuttal).

[1817]   Transcript, Day 3 at 167–68 (Respondent's opening) (discussing Memorandum from the Chairman of the Legal Sub-Group to the Chairman of Working Group II, Document No. LEG-14, 5 March 1993, p. 2, Exh. R-1020); Respondent's Opening Slides, pp. 466–67.

response to a memorandum of the Legal Sub-Group noting that "taxation measures" were identified in an illustrative manner, remarked that this was intentional and that "it would be counterproductive to come up with anything more precise."[1818]  It also suggests that, while the French delegation expressed a preference for an exhaustive definition and for the word "includes" to be replaced by "means", by not proceeding with the suggested replacement, the "negotiating States chose to maintain an illustrative list."[1819]

1390. In addition, Respondent refers to Article 21(2)(b) and (3)(b) of the ECT as implying that the term "Taxation Measure" includes the generic term "measure" "as consistently used throughout the Energy Charter Treaty."[1820]  According to Respondent, "Claimants would have this Tribunal rewrite Article 21(7)(a) to read:  'The term 'Taxation Measure' only includes provisions relating to taxes.'"[1821]   In reality, according to Respondent, "[t]he purpose of Article 21, paragraph 7(a) ECT is not to replace the term 'measures' with the term 'provisions', but to clarify that the carve-out extends to both domestic and international taxation measures."[1822]  This would be in line with general treaty practice, which would show that "there is not a single taxation carve-out that is limited in scope to tax legislation."[1823]

1391. The result of this interpretation, according to Respondent, is that "the core allegations on which Claimants base their claims are squarely within the taxation carve-out of Article 21(1)" of the ECT.[1824]

1392. With regard to Claimants' argument that Article 21(1) of the ECT should be inapplicable to the present case, since the measures adopted by Respondent were taken, according to the Claimants, under the guise of taxation (rather than constituting "real" taxation measures),

---

[1818]   Transcript, Day 3 at 167 (Respondent's opening) (discussing Canada Department of Finance, Tax Policy Branch:  Fax from A. Castonguay to F. Mullen et al., 19 March 1993, p. 4, Exh. R-1010).

[1819]   Transcript, Day 3 at 168 (Respondent's opening) (discussing Memorandum from the Ministère du Budget of France to the ECT Secretariat, 19 March 1993, p. 3, Exh. C-1045).

[1820]   Transcript, Day 21 at 173 (Respondent's rebuttal).

[1821]   Transcript, Day 3 at 170–71 (Respondent's opening).

[1822]   Transcript, Day 3 at 169 (Respondent's opening).

[1823]   Transcript, Day 21 at 173 (Respondent's rebuttal).

[1824]   Transcript, Day 3 at 164 (Respondent's opening).

Respondent refers to the ECtHR Yukos Judgment to support its claim that the tax assessments against Yukos pursued a legitimate aim and were not politically motivated.[1825]

1393. In any event, Respondent claims, referring to the ICJ's *Fisheries Jurisdiction (Spain v. Canada)* judgment, that the question of legality can have no impact on the qualification of an act as a "taxation measure",[1826] and it suggests that measures "in apparent reliance" on taxation legislation, even if abusive, must be covered by a taxation carve-out.[1827]   Respondent also refers to a number of decisions of investment treaty tribunals to support this view.   In particular, Respondent quotes from the decision in *EnCana v. Ecuador*, according to which "provided a matter is sufficiently clearly connected to a taxation law or regulation (or to a procedure, requirement or practice of the taxation authorities in apparent reliance on such a law or regulation), its legality is a matter for the courts of the host State."[1828]   Similarly, Respondent quotes from the decision in *Burlington v. Ecuador* as having taken the view that the claim that a State "used its tax power in bad faith . . . challenges [that State's] tax power, and therefore raises 'matters of taxation'."[1829]

1394. In addition, Respondent avers that an exception to a substantive standard (such as the carve-out of Article 21(1)) cannot logically refer to the substantive standard (such as the expropriation standard of Article 13) to determine whether or not the exception applies.[1830]   Therefore, according to Respondent, "neither the standards under Article 13 . . . nor the standards under Article 10, paragraph 1 of the ECT can be used to determine the scope or the applicability of the taxation carve-out."[1831]   Accordingly, Respondent claims that the question of the legality of any taxation measures, including their *bona fide* nature, falls under Article 21(1) of the ECT and can be determined by an arbitral tribunal "only to the extent clawed back" pursuant to

---

[1825]   Transcript, Day 3 at 171–72 (Respondent's opening); Transcript, Day 21 at 178 (Respondent's rebuttal); Respondent's Opening Slides, pp. 468–69; ECtHR Yukos Judgment ¶¶ 8, 606, 647.

[1826]   Respondent's Opening Slides, p. 469 (quoting *Fisheries Jurisdiction (Spain v. Canada)*, Jurisdiction of the Court, Judgment, 4 December 1998, ICJ Reports 1998, p. 460 ¶ 68, Exh. R-1028).

[1827]   Transcript, Day 3 at 172–73 (Respondent's opening); Respondent's Opening Slides, pp. 470–71.

[1828]   Transcript, Day 3 at 174 (Respondent's opening); Transcript, Day 21 at 179, 183 (Respondent's rebuttal) (discussing *EnCana v. Ecuador*, LCIA UN3481, UNCITRAL, Award, 3 February 2006 ¶ 142, Exh. C-976).

[1829]   Transcript, Day 3 at 174 (Respondent's opening); Transcript, Day 21 at 182–83 (Respondent's rebuttal) (discussing *Burlington Resources v. Ecuador*, ICSID Case ARB/08/5, Decision on Jurisdiction, 2 June 2010 ¶ 207, Exh. R-992).

[1830]   Transcript, Day 21 at 180 (Respondent's rebuttal).

[1831]   Transcript, Day 21 at 182 (Respondent's rebuttal).

Article 21(5) of the ECT.[1832]  This would mean in particular that "[t]he Tribunal . . . lacks jurisdiction over Claimants' Article 10 claims, and Article 10(1) ECT is inapplicable."[1833]

1395. With regard to the claw-back provision in Article 21(5) of the ECT, Respondent argues that the reference to "taxes" rather than "taxation measures" is deliberate and implies that only "compulsory contributions to the Government" can be examined under that provision, but not "fines, interest, enforcement fees" or "other tax collection and enforcement measures."[1834]  The basis for this would be that, in its ordinary meaning, "a tax" would be "a charge or a contribution imposed by the State for public purposes," but not "tax enforcement and collection measures."[1835]

1396. To support its reading of the claw-back provision, Respondent refers to the *travaux préparatoires*, claiming that, while the claw-back provision originally referred to "Taxation Measures", in June 1993 a new version of the draft of the provision was circulated, in which these references were replaced with references to "taxes".[1836]  According to Respondent, this change "was certainly not incidental or unintentional."[1837]  Respondent also dismisses the idea that the different wording of Article 21(5) of the ECT in some of the other official languages of the ECT should be accorded any relevance, since the negotiations of the Treaty would have been conducted solely in English and translations into other languages would only have been prepared after the conclusion of the negotiations without input from the negotiating teams.[1838]  This must, according to Respondent, be taken into account as part of the circumstances surrounding the conclusion of the ECT in accordance with Article 32 of the VCLT.[1839]

1397. With regard to the meaning of "taxes", Respondent submits that, since this term "is not defined in the Energy Charter Treaty, and . . . has no autonomous meaning in international law,"[1840] it

---

[1832] Transcript, Day 3 at 173 (Respondent's opening); Respondent's Post-Hearing Brief ¶ 168.

[1833] Transcript, Day 3 at 176 (Respondent's opening).

[1834] Transcript, Day 3 at 182 (Respondent's opening); Respondent's Opening Slides, pp. 472–79; Respondent's Post-Hearing Brief ¶ 172.

[1835] Transcript, Day 3 at 179 (Respondent's opening).

[1836] Transcript, Day 3 at 177 (Respondent's opening) (discussing European Energy Charter, Conference Secretariat, Room Document 3, Plenary Session 28 June1993–2 July 1993, 28 June 1993, pp. 3–4, Exh. R-1035).

[1837] Transcript, Day 3 at 177 (Respondent's opening).

[1838] Transcript, Day 21 at 185 (Respondent's rebuttal); Respondent's Rebuttal Slides, pp. 470–73.

[1839] Transcript, Day 21 at 186 (Respondent's rebuttal).

[1840] Transcript, Day 3 at 179 (Respondent's opening).

needs to be determined pursuant to Russian law.  This would be in line with the practice under tax treaties, which generally leaves the term of "taxes" undefined, adopting the meaning of the term under the domestic law of the State that imposed the tax.[1841]  Respondent refers in this regard for instance to Article 3(2) of the OECD Model Tax Convention on Income and Capital and the Cyprus-Russia DTA, pointing out that both instruments are referenced in the claw-back provision of Article 21(5) of the ECT.[1842]

1398. More generally, Respondent argues that "in the absence of autonomous rules or concepts of international law, international law must turn for guidance to domestic law . . . as developed within the State's domestic jurisdiction."[1843]  Under Russian law, a "tax" would be defined in Article 8 of the Russian Tax Code as a "mandatory . . . payment" collected "to provide financial support to the government" for public purposes.[1844]  This would exclude "tax enforcement, [and] collection measures," including "interest, fines, [and] enforcement fees."[1845]

1399. Respondent argues that a limited claw-back would also be "very much in line with treaty practice," which would be "diverse" and variable "with respect to the type of measures that are clawed back."[1846]  In particular, Respondent refers to the Russia-Sweden BIT, which contains a carve-out with regard to "taxation matters", whilst also providing that some of its provisions shall apply to "taxes".[1847]  For Respondent, this provision constitutes proof that "States are . . . free to claw back only a subcategory of the measures they decided to exclude from the scope of the Treaty" and that "they do so".[1848]  The "deliberate choice of the ECT Contracting Parties to limit the expropriation claw-back to taxes" would in fact "represen[t] a middle ground of varying practices of the ECT Contracting Parties."[1849]

---

[1841]  Transcript, Day 3 at 180 (Respondent's opening).

[1842]  Transcript, Day 3 at 180–81 (Respondent's opening); Transcript, Day 21 at 188 (Respondent's rebuttal); 2010 OECD Model Tax Convention, Article 3(2), Exh. R-1017; Agreement between the Government of the Republic of Cyprus and the Government of the Russian Federation on the Avoidance of Double Taxation with Respect to Taxes on Income and Capital, Article 3(2), Exh. C-916.

[1843]  Transcript, Day 3 at 181 (Respondent's opening).

[1844]  Transcript, Day 3 at 182 (Respondent's opening); Russian Tax Code, Article 8, Exh. R-551.

[1845]  Transcript, Day 3 at 182 (Respondent's opening).

[1846]  Transcript, Day 3 at 178 (Respondent's opening).

[1847]  Transcript, Day 21 at 184 (Respondent's rebuttal); Agreement between the Government of the Kingdom of Sweden and the Government of the Russian Federation on the Promotion and Reciprocal Protection of Investments, 19 April 1995, Article 11(2), Exh. R-3451.

[1848]  Transcript, Day 21 at 184 (Respondent's rebuttal).

[1849]  Transcript, Day 3 at 179 (Respondent's opening).

1400. Finally, Respondent argues that, if the Tribunal were to find that both the carve-out and the claw-back provisions apply, the Tribunal would be required to make a referral to the "Competent Tax Authorities".[1850]   This would include "the Russian Ministry of Finance, the Cypriot Ministry of Finance, and the UK Inland Revenue"[1851]; and this is so "because the referral procedure replicates the dispute settlement procedures under double taxation agreements."[1852]   According to Respondent, "[t]he referral mechanism . . . forms part of the ECT Contracting Parties' consent to submit themselves to international arbitration pursuant to Article 26 ECT, and it precludes any ruling by the Tribunal whether a tax constitutes an expropriation . . . without having made referral to the tax authorities."[1853]

### 4.   Tribunal's Decision

#### (a)   Introduction

1401. As mentioned earlier, the Tribunal deferred its decision on Article 21 because the Parties' arguments in relation to this provision during the jurisdictional phase raised issues that went to the heart of the merits of the dispute and the Tribunal decided that it could not rule on these issues in a vacuum.

1402. Now, at the conclusion of the merits phase of the present proceedings, the Tribunal has the necessary context within which to evaluate the Parties' arguments, analyze and interpret Article 21, and characterize Claimants' claims for purposes of Article 21.

1403. Before turning to Article 21 itself, the Tribunal considers it helpful to recall its principal findings on those core issues relating to the merits that are particularly relevant for Article 21.

1404. In Chapter VIII.B, the Tribunal concluded, on the totality of the evidence, that the tax authorities used the "re-attribution" formula not only so as to be able to collect the revenue-based taxes against Yukos, but also so as to establish a basis for imposing on Yukos the massive VAT liability and excessive fines that followed.   In the Tribunal's view, while Yukos was vulnerable on some aspects of its tax optimization scheme, principally because of the sham-like nature of certain elements of its operations in at least some of the low-tax regions,

---

[1850]   Transcript, Day 21 at 189–90 (Respondent's rebuttal).

[1851]   Transcript, Day 21 at 191 (Respondent's rebuttal).

[1852]   Transcript, Day 21 at 191 (Respondent's rebuttal).

[1853]   Transcript, Day 21 at 192 (Respondent's rebuttal).

and could have faced some legitimate claims relating to revenue-based taxes had the Russian Federation limited itself to *bona fide* taxation measures, the State apparatus decided to take advantage of that vulnerability; it did so by launching a full assault on Yukos and its beneficial owners in order to bankrupt Yukos and appropriate its assets while, at the same time, removing Mr. Khodorkovsky from the political arena.  The Tribunal has come to these conclusions based on its review of the entire record, as detailed in the other chapters of Part VIII, above.

1405. The Tribunal now has to decide, in these circumstances, if and how Article 21 applies, and whether it deprives the Tribunal of its jurisdiction, as argued by Respondent, to consider Claimants' claims under Article 10 of the ECT (in the event the carve-out applies), and perhaps even under Article 13 of the ECT (if the carve-out applies and the claw-back does not apply).

1406. Both Parties made extensive submissions on Article 21, both in writing and orally.  Having considered the Parties' arguments, the Tribunal concludes that it has jurisdiction to rule on Claimants' claims under Article 13 of the ECT for two independent reasons, each of which in and of itself suffices to justify the jurisdiction of the Tribunal.  Firstly, the Tribunal finds that, irrespective of its findings regarding the applicability of Article 21 of the ECT to the present case, it would have "indirect" jurisdiction over claims under Article 13 of the ECT because any measures excluded by the carve-out under Article 21(1) of the ECT would be brought back within the Tribunal's jurisdiction by the claw-back of Article 21(5) of the ECT and any referral to the Competent Taxation Authorities within the meaning of this latter provision would clearly have been futile.

1407. Secondly, the Tribunal finds that, in any event, the carve-out of Article 21(1) can apply only to *bona fide* taxation actions, *i.e.*, actions that are motivated by the purpose of raising general revenue for the State.  By contrast, actions that are taken only under the guise of taxation, but in reality aim to achieve an entirely unrelated purpose (such as the destruction of a company or the elimination of a political opponent) cannot qualify for exemption from the protection standards of the ECT under the taxation carve-out in Article 21(1).  As a consequence, the Tribunal finds that it does indeed have "direct" jurisdiction over claims under Article 13 (as well as Article 10) in the extraordinary circumstances of this case.

1408. The Tribunal will now develop each of these reasons.

      (b)    **First Reason:  Assuming the Carve-Out Applies, So Does the Claw-Back, and Any Referral to the Competent Tax Authorities Would Clearly have been Futile**

1409. Firstly, the Tribunal concludes that it has jurisdiction under Article 13 of the ECT, even assuming that the carve-out in Article 21(1) of the ECT applies.  This determination is based on both the scope of the expropriation claw-back in Article 21(5) of the ECT relative to the scope of the taxation carve-out in Article 21(1) of the ECT, and the futility of any referral to the Competent Tax Authorities under Article 21(5) of the ECT.  The Tribunal will expand upon each of these points in turn.

### i.    The Scope of the Claw-Back in Article 21(5)

1410. Respondent argues that the term "Taxation Measures", used in the carve-out, should be given a broad meaning, including collection and enforcement measures, while the term "taxes", used in the claw-back, should be given a narrow meaning, which would exclude collection and enforcement measures.  The Tribunal cannot accept Respondent's arguments for the following reasons.

1411. Firstly, the Tribunal observes that the term "Taxation Measures", used in Article 21(1), is defined in Article 21(7)(a) to mean "provisions" of domestic tax law and tax treaties, while the term "taxes", used in Article 21(5), is not defined in the Treaty.

1412. Pursuant to Article 31 of the VCLT, "[a] treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose."

1413. In the view of the Tribunal, the ordinary meaning of "tax" used in Article 21(5) cannot be narrower than the meaning of "Taxation Measure" used in Article 21(1).   Respondent's interpretation of "Taxation Measures" and "taxes" would, as Claimants submit, result in a wide carve-out and a narrow claw-back, "reinstating protection from expropriation [under Article 13 of the ECT] only in relation to 'charges and payments', but not collection and enforcement measures or interests and fines."[1854]   The Tribunal agrees with Claimants that such an interpretation would lead to "<u>a gaping hole in the ECT</u> where investors would stand completely

---

[1854]    Claimants' Post-Hearing Brief ¶ 220.

unprotected from expropriatory taxation."[1855]   Such an interpretation would defeat the object and purpose of the claw-back and of the ECT itself.

1414.   Respondent refers the Tribunal to a number of treaties that contain a taxation carve-out, but that either do not contain any claw-back provision or limit the claw-back to certain substantive protection standards, and argues that its proposed interpretation of Article 21 of the ECT corresponds to a "middle ground of varying practices."   The Tribunal, having reviewed those treaties, finds those provisions of no assistance to its interpretation of Article 21 of the ECT.

1415.   In any event, the Tribunal, having found that the interpretation of Article 21 of the ECT according to the general rule of interpretation under Article 31 of the VCLT results in a meaning that is neither ambiguous nor obscure and does not lead to a result which is manifestly absurd or unreasonable, does not need to call in aid any other rule of interpretation.   Finally, the Tribunal does not find much helpful guidance in the *travaux préparatoires* of the ECT. Respondent claims that the replacement of "Taxation Measures" with "taxes" in a draft of Article 21(5) of the ECT circulated in June 1993 could not have been incidental.   However, if this replacement had been motivated by the intention of the negotiators to limit the scope of the claw-back provision in Article 21(5) of the ECT compared to the scope of the carve-out in Article 21(1) of ECT, the Tribunal would expect such a motivation to have found some additional expression in the record.

1416.   The Tribunal therefore holds that any measures falling under the taxation carve-out of Article 21(1) of the ECT are also covered by the scope of the expropriation claw-back in Article 21(5) of the ECT.

### ii.      The Referral to Competent Tax Authorities

1417.   The Tribunal recalls Article 21(5)(b), which sets out the following referral mechanism:

> (b)      Whenever an issue arises under Article 13, to the extent it pertains to whether a tax constitutes an expropriation or whether a tax alleged to constitute an expropriation is discriminatory, the following provisions shall apply:
>
>> (i)      The Investor or the Contracting Party alleging expropriation shall refer the issue of whether the tax is an expropriation or whether the tax is discriminatory to the relevant Competent Tax Authority.   Failing such referral by the Investor or the Contracting Party, bodies called upon to settle

---

[1855]      Claimants' Post-Hearing Brief ¶ 220 (emphasis in the original).

disputes pursuant to Article 26(2)(c) or 27(2) shall make a referral to the relevant Competent Tax Authorities;

(ii)    The Competent Tax Authorities shall, within a period of six months of such referral, strive to resolve the issues so referred.  Where non discrimination issues are concerned, the Competent Tax Authorities shall apply the non-discrimination provisions of the relevant tax convention or, if there is no non-discrimination provision in the relevant tax convention applicable to the tax or no such tax convention is in force between the Contracting Parties concerned, they shall apply the non-discrimination principles under the Model Tax Convention on Income and Capital of the Organisation for Economic Co-operation and Development;

(iii)    Bodies called upon to settle disputes pursuant to Article 26(2)(c) or 27(2) may take into account any conclusions arrived at by the Competent Tax Authorities regarding whether the tax is an expropriation.  Such bodies shall take into account any conclusions arrived at within the six-month period prescribed in subparagraph (b)(ii) by the Competent Tax Authorities regarding whether the tax is discriminatory.  Such bodies may also take into account any conclusions arrived at by the Competent Tax Authorities after the expiry of the six-month period;

(iv)    Under no circumstances shall involvement of the Competent Tax Authorities, beyond the end of the six-month period referred to in subparagraph (b)(ii), lead to a delay of proceedings under Articles 26 and 27.

1418.  According to Respondent, "[t]he referral mechanism . . . precludes any ruling by the Tribunal whether a tax constitutes an expropriation . . . without having made referral to the tax authorities."[1856]  Specifically, Respondent argues that Article 21(5)(b)(i) requires the Tribunal to make a referral to "the Russian Ministry of Finance, the Cypriot Ministry of Finance, and the UK Inland Revenue."[1857]

1419.  Claimants, on the other hand, take the view that a referral is not warranted, for two reasons.  Firstly, Claimants argue that the requirement is triggered only if there is an allegation that "a tax constitutes an expropriation," whereas in the present case, according to Claimants, their investments were not expropriated by "a tax", but "by a combination of many types of actions of which taxation—as labeled by the Russian Federation—was only one."[1858]  Secondly, Claimants argue that any referral made to the Russian Ministry of Finance, or the tax authorities of the United Kingdom and Cyprus for that matter, would be an exercise in futility.[1859]  According to Claimants, the Russian Ministry of Finance would effectively be asked to "be a judge in its own cause," and asking the tax authorities to review the entire file—written

---

[1856]   Transcript, Day 21 at 192 (Respondent's rebuttal).

[1857]   Transcript, Day 21 at 191 (Respondent's rebuttal).

[1858]   Claimants' Post-Hearing Brief ¶ 229.

[1859]   Claimants' Post-Hearing Brief ¶ 229.

submissions, relevant correspondence, expert reports, witness statements, hearing transcripts and over 8,000 exhibits—and to comment on it, would amount to a "useless exercise".[1860]

1420. The Tribunal does not accept Claimants' first argument, since it ignores the logic by which the Tribunal would have come to this point in its reasoning.  If the Tribunal were considering Respondent's measures under the claw-back of Article 21(5), it would be because the Tribunal would have found previously that there was no meaningful distinction between the scope of "Taxation Measures" and "taxes" for purposes of Article 21, or indeed because it would have found that even if measures "under the guise" of taxation were covered by the carve-out, then they must also be covered by the claw-back.  The referral mechanism therefore cannot be avoided on the basis of a narrow interpretation of the term "tax" in Article 21(5)(b)(i).

1421. Claimants' futility argument, however, is persuasive.  In this particular case, the Tribunal is convinced that a referral to the tax authorities of the Russian Federation, the United Kingdom and/or Cyprus would be (and, at any earlier stage of the proceedings, would have been) an exercise in futility.

1422. The record before the Tribunal is enormous.  The arguments and allegations of the Parties relating to various taxes and the reasons for which they should or should not be considered expropriatory have filled briefs adding up to thousands of pages, have relied on some 8,800 exhibits and were presented to the Tribunal in oral hearings scheduled over a six-week period.  It is inconceivable that the gist of this case, for either side, could have been reduced to a meaningful submission of a size and scope that might have been digested by the relevant tax authorities in a way that would have given them an opportunity to provide timely and pertinent guidance to the Tribunal.

1423. Thus, while the Tribunal acknowledges that the referral mechanism in the claw-back provision of Article 21(5) was designed to assist tribunals "to distinguish normal and abusive taxes," as noted by Professor Park in his "Tax Arbitration and Investor Protection" article cited by Respondent,[1861] this is simply not a case in which the Tribunal could have been assisted by referring the matter to the tax authorities.  As the Tribunal has noted at various stages in the present Award, its conclusions ultimately rest on a consideration of the totality of the evidence

---

[1860] Claimants' Post-Hearing Brief ¶ 229.

[1861] Respondent's Closing Slides, p. 849; William Park, Tax Arbitration and Investor Protection, in INVESTMENT PROTECTION AND THE ENERGY CHARTER TREATY (Graham Coop & Clarisse Ribeiro eds., 2008), p. 115, p. 131, Exh. R-3410.

presented to it.  The tax authorities, on the other hand, would necessarily need to focus on discrete taxes or discrete issues related to taxes.

1424. The requirement for an investor to make a referral under Article 21(5)(b)(i), first sentence (and, *a fortiori*, the requirement for the Tribunal to make a referral under Article 21(5)(b)(i), second sentence) cannot, in the Tribunal's view, apply in cases where such a referral would obviously be futile.  Like any provision in an international treaty, Article 21(5)(b)(i) of the ECT must be interpreted in good faith.  A good faith interpretation of the provision leads to the conclusion that a referral cannot be required if following the referral procedure would clearly be futile under the circumstances of a specific case.

1425. It has long been recognized, with regard to the exhaustion of local remedies requirement in the context of the principles on diplomatic protection,[1862] that following a prescribed procedure may be dispensed with under circumstances where doing so clearly would not produce the result that the procedure seeks to achieve.  The relevant principle is set out in Article 15(a) of the 2006 ILC Draft Articles on Diplomatic Protection, providing that "[l]ocal remedies do not need to be exhausted where . . . there are no reasonably available local remedies to provide effective redress, or the local remedies provide no reasonable possibility of such redress."[1863] Tribunals adjudicating claims of investors under international investment treaties have made similar findings with regard to the obligation of investors to observe so-called cooling-off periods[1864] or the requirement to submit a dispute to litigation in the host State's domestic courts for a certain period of time.[1865]

1426. The Tribunal is of the view that a referral must be regarded as clearly futile if there is no possibility that the relevant authorities would in fact be able to come to some timely and meaningful conclusion about the dispute or make any timely determinations that could

---

[1862] *See e.g.*, *Certain Norwegian Loans (France v. Norway)*, Judgment, 6 July 1957, ICJ Reports 1957, p. 9, Separate Opinion of Judge Lauterpacht, p. 34, at p. 39; *Barcelona Traction, Light and Power Company, Limited (Belgium v. Spain) (Second Phase)*, Judgment, 5 February 1970, ICJ Reports 1970, p. 3, Separate Opinion of Judge Tanaka, p. 114, at pp. 144–45.

[1863] Draft Articles on Diplomatic Protection, adopted by the International Law Commission at its 58th session, 2006, Article 15(a).

[1864] *See e.g.*, *Occidental Petroleum Corporation & Occidental Exploration and Production Company v. Republic of Ecuador*, ICSID Case No. ARB/06/111, Decision on Jurisdiction, 9 September 2008 ¶ 94.

[1865] *See e.g.*, *BG Group Plc. v. The Republic of Argentina*, UNCITRAL, Award, 24 December 2007 ¶ 147, Exh. R-3576; *Ambiente Ufficio S.P.A. v. The Argentine Republic*, ICSID Case No. ARB/08/9, Decision on Jurisdiction and Admissibility, 8 February 2013 ¶ 607.

potentially serve to assist the Tribunal's decision-making.  The Tribunal finds, for the reasons stated above, that no such possibility exists or existed in this case.

1427. Furthermore, the Tribunal notes that neither Party disputes that, in the event of a referral, any determinations of the Competent Tax Authorities regarding whatever discrete issues they might have been able to focus on relating to whether any tax was an expropriation would not have been binding on the Tribunal.  The wording of Article 21(5)(b)(iii) of the ECT is very clear: bodies such as the present Tribunal *may* take into account any conclusion arrived at by the Competent Tax Authorities regarding which the tax is an expropriation.[1866]

1428. In conclusion, the Tribunal holds that a referral of the dispute to the "Competent Tax Authorities" within the meaning of Article 21(5)(b)(i) of the ECT would clearly have been futile at the outset of this arbitration and was therefore not required.  It remains futile today.

### iii.   Conclusion

1429. As a consequence, assuming (for the sake of argument) that some of Respondent's measures fell within the scope of the carve-out in Article 21(1), the Tribunal would nevertheless be in a position to proceed to determine whether the relevant measures constituted a violation of Article 13 of the ECT under the claw-back.  It could do so even though it has not referred the issue of whether any tax is an expropriation to any of the Competent Tax Authorities because to do so would clearly be an exercise in futility.

### (c)   Second Reason:  The Carve-Out Does Not Apply

1430. Secondly, and independently from the above reasoning, the Tribunal concludes that it has jurisdiction to rule on Claimants' claims under Article 13 of the ECT due to the fact that the Article 21 carve-out does not apply to the Russian Federation's measures because they are not, as the Tribunal has concluded above, on the whole, a *bona fide* exercise of the Russian Federation's tax powers.

1431. This accords with Claimants' view that Article 21 of the ECT can apply only to *bona fide* taxation actions, *i.e.*, actions that are motivated for the purpose of raising general revenue for the State.  By contrast, actions that are taken only "under the guise" of taxation, but in reality

---

[1866]   Claimants' Post-Hearing Brief ¶ 229; Transcript, Day 21 at 194 (Respondent's rebuttal).

aim to achieve an entirely unrelated purpose (such as the destruction of a company or the elimination of a political opponent), argue Claimants, cannot qualify for exemption from the protection standards of the ECT under the taxation carve-out in Article 21(1).

1432. The Tribunal essentially accepts the latter interpretation of Article 21.

1433. To find otherwise would mean that the mere labelling of a measure as "taxation" would be sufficient to bring such measure within the ambit of Article 21(1) of the ECT, and produce a loophole in the protective scope of the ECT.  Since the claw-back in Article 21(5) of the ECT relates only to expropriations under Article 13 of the ECT, a State could, simply by labelling a measure as "taxation", effectively avoid the control of that measure under the ECT's other protection standards.  It would seem difficult to reconcile such an interpretation with the purpose of Part III of the ECT.

1434. The Tribunal cannot agree with Respondent that, by finding that Article 21(1) of the ECT applies only to *bona fide* taxation, the Tribunal would be conflating the requirements for the application of the taxation carve-out (representing an exception to the protection standards under the ECT) and the requirements for the application of the protection standards themselves. For example, Article 13 of the ECT could be violated through a *bona fide* taxation measure that was aimed at the raising of State revenue, but whose effect was expropriatory.  By contrast, the characterization of an incriminated action by a respondent State as a Taxation Measure for purposes of Article 21(1) of the ECT would be independent of the effects of that action, but rather depend on the motivation underlying it.

1435. The Tribunal also sees no reason to assume that it would be better for the question of the motivation underlying a particular measure to first be addressed through the "Competent Tax Authorities" (pursuant to the referral mechanism under Article 21(5) of the ECT), as the particular expertise of these authorities does not extend to the question of whether an act that on its face appears to be a taxation measure is in reality implemented for improper reasons.  To the contrary, where the tax authorities of a State have participated in measures against an investor whose true purpose is unrelated to taxation, submitting these issues to the preliminary examination of the same authorities would add little value for an arbitral tribunal.

1436. The Tribunal further observes that, by making this finding, it is in good company, and that the two eminent arbitral tribunals which have previously considered, on an admittedly more limited record, essential elements of the dispute now before it, have adopted the same view.

1437. Thus, the *RosInvestCo* tribunal concluded that:

> [I]t is generally accepted that the mere fact that measures by a host state are taken in the form of application and enforcement of its tax law, does not prevent a tribunal from examining whether this conduct of the host state must be considered, under the applicable BIT or other international treaties on investment protection, as an abuse of tax law to in fact enact an expropriation.[1867]

1438. Similarly, the *Quasar* tribunal opined that:

> It is no answer for a state to say that its courts have used the word "taxation" . . . in describing judgments by which they effect the dispossession of foreign investors.  If that were enough, investment protection through international law would likely become an illusion, as states would quickly learn to avoid responsibility by dressing up all adverse measures, perhaps expropriation first of all, as taxation.  When agreeing to the jurisdiction of international tribunals, states perforce accept that those jurisdictions will exercise their judgment, and not be stumped by the use of labels.[1868]

1439. By contrast, neither the *EnCana v. Ecuador* decision[1869] nor the *Burlington v. Ecuador* award[1870] to which Respondent refers in support of its view that any measure "adopted in apparent [reliance on] tax legislation" should fall under the taxation carve-out,[1871] in fact appears to endorse such a position.

1440. Thus, while the tribunal in *EnCana* stated that, for a measure to fall under the taxation carve-out in the treaty before it, it would have to be "sufficiently clearly connected to a taxation law or regulation (or to a procedure, requirement or practice of the taxation authorities in apparent reliance on such a law or regulation),"[1872] the emphasis in this formulation appears to have been on the "sufficiently clea[r]" connection to an existing legal provision or practice, rather than the "apparent reliance" of the authorities on the existence of a legal basis for their actions.  This is supported by another statement of the *EnCana* tribunal in the same paragraph, according to which "an arbitrary demand unsupported by any provision of the law of the host State would not qualify" for an exemption under the taxation carve-out.[1873]

---

[1867]   *RosInvestCo* ¶ 628, Exh. C-1049.

[1868]   *Quasar* ¶ 179, Exh. R-3383.

[1869]   Transcript, Day 3 at 174 (Respondent's opening); Transcript, Day 21 at 179, 183 (Respondent's rebuttal) (discussing *EnCana v. Ecuador*, LCIA UN3481, UNCITRAL, Award, 3 February 2006 ¶ 142, Exh. C-976).

[1870]   Transcript, Day 3 at 174 (Respondent's opening); Transcript, Day 21 at 182–83 (Respondent's rebuttal) (discussing *Burlington Resources v. Ecuador*, ICSID Case ARB/08/5, Decision on Jurisdiction, 2 June 2010 ¶ 207, Exh. R-992).

[1871]   Transcript, Day 3 at 174 (Respondent's opening).

[1872]   *EnCana v. Ecuador*, LCIA UN3481, UNCITRAL, Award, 3 February 2006 ¶ 142(1), Exh. C-976.

[1873]   *EnCana v. Ecuador*, LCIA UN3481, UNCITRAL, Award, 3 February 2006 ¶ 142(1), Exh. C-976.

1441. The context of the statement also makes it clear that the tribunal was only addressing minimum requirements for the application of the taxation carve-out before it, rather than expressing any views about situations in which the carve-out provision would not apply. Thus the tribunal emphasized that, for a measure to come under the treaty's carve-out, it would have to be "sufficiently clearly connected to" or supported by some taxation law, regulation or actual practice (the latter of which would in turn have to be based on a taxation law or regulation). It did, however, neither say nor imply that any measure which the authorities based on a taxation law or regulation would by definition be regarded as a taxation measure and therefore justify the application of the carve-out.

1442. It makes sense to regard a tax demand that is effectively motivated not by the aim of raising public revenue but by a purpose extraneous to taxation as an "arbitrary demand" that, in the words of the *EnCana* tribunal, cannot qualify for an exemption under a taxation carve-out.[1874] Such an interpretation is also supported by the statement of Claimants' expert Professor Crawford, who was the presiding arbitrator in the *EnCana* arbitration and according to whom the decision was not meant to imply "that anything labelled as a taxation measure is excluded" by a taxation carve-out.[1875]

1443. Neither does the *Burlington* decision referred to by Respondent support the view that a taxation carve-out would have to apply to any measure adopted by tax authorities in apparent reliance on tax legislation. In *Burlington*, the tribunal notes that "bad faith" of the respondent mentioned by the claimant rested on its allegation that Ecuador had forced the claimant to give up certain contractual rights by the use of its taxation legislation.[1876] There was no suggestion in that case that Ecuador had taken any measures against the investor for motives that were entirely unrelated to the raising of public revenue. As a consequence, the tribunal in *Burlington*, when it said that the claimant's suggestion "that Respondent used its tax power in bad faith in order to force Claimant to surrender its rights" under the contracts raised "matters of taxation",[1877] was referring to the specific situation in that case that cannot in any way be compared to the one at issue in the present proceedings.

---

[1874] *EnCana v. Ecuador*, LCIA UN3481, UNCITRAL, Award, 3 February 2006 ¶ 142(1), Exh. C-976.

[1875] Transcript, Day 17 at 161 (Claimants' closing); Further Opinion on Jurisdictional Issues by James Crawford, 3 May 2007 ¶ 5, Exh. C-613.

[1876] *Burlington Resources v. Ecuador*, ICSID Case ARB/08/5, Decision on Jurisdiction, 2 June 2010 ¶ 175, Exh. R-992.

[1877] *Burlington Resources v. Ecuador*, ICSID Case ARB/08/5, Decision on Jurisdiction, 2 June 2010 ¶ 207, Exh. R-992.

1444. It follows that Article 21(1) of the ECT, which applies only to *bona fide* taxation measures, does not find any application in this arbitration.  The tax assessments levied against Yukos by the Russian Federation, which the Tribunal has found were designed mainly to impose massive liabilities based on VAT and related fines, and were essentially aimed at paralyzing Yukos rather than collecting taxes, are not exempt from scrutiny under the ECT, as they are not captured by the carve-out of Article 21(1).

1445. Similarly, and *a fortiori*, subsequent steps in the enforcement of the tax assessments are not captured by the carve-out, because the Tribunal has found that they too were exigently pursued by means that indicate that Yukos was not just being chased to pay taxes, but was being driven into bankruptcy.

### (d)  Conclusion

1446. Based on the analysis set out in this chapter of the Award and for the two independent reasons set out above, the Tribunal has jurisdiction to consider whether the Russian Federation is liable to Claimants under Article 13 of the ECT for the measures which it has adopted and which have resulted in the evisceration of their investments and the destruction of Yukos.

1447. While the Tribunal's finding that the carve-out in Article 21(1) does not apply would in principle allow the Tribunal to consider the measures under both Articles 10 and 13 of the ECT, in the circumstances, as will be seen, it will not be necessary for the Tribunal to consider whether the expropriatory measures of Respondent are also in breach of Article 10 of the ECT.

## X.   LIABILITY

1448. Having dismissed Respondent's preliminary objections to the Tribunal's jurisdiction, the admissibility of Claimants' claims and the applicability of the ECT in the present case, the Tribunal now turns to the question of the Russian Federation's liability under the Treaty.  In Part VIII, the Tribunal canvassed the evidentiary record put before it by the Parties.  In this Part X, the Tribunal draws the legal consequences of its factual conclusions, beginning by addressing questions of attribution.

1449. As has already been mentioned, the Tribunal's eventual conclusions regarding the alleged breaches by Respondent of Article 13 (Expropriation) of the ECT will make it unnecessary for the Tribunal to consider the application of Article 10 (Promotion, Protection and Treatment of

Investments).  Nevertheless, for the sake of completeness, the Tribunal will set out the Parties'
arguments with regard to Article 10.  The Tribunal will then set out the Parties' arguments in
respect of Article 13.  Finally, the Tribunal will set out its decision regarding Respondent's
liability and Claimants' contributory fault.

## A.   ATTRIBUTION

1450. The Parties are divided on the question of whether some of the actions of which Claimants
complain are attributable to the Russian Federation.  Below, the Tribunal sets out the Parties'
submissions and its own views on this question.

### 1.   Claimants' Position

1451. Claimants summarize their position with regard to the attribution of acts said to constitute
breaches of the ECT to Respondent in their Memorial as follows:

> [T]he Russian Federation has acted through almost all of its organs, be it Executive or
> Judiciary, at all levels, including the highest, in seeking the destruction of Yukos. These
> include the <u>President of the Russian Federation</u>, the <u>Presidential Administration</u>, the <u>Tax
> Ministry</u> (later to become the <u>Federal Taxation Service</u>, a federal body of executive
> authority within the <u>Ministry of Finance</u>), the <u>Ministry of Justice</u> (under whose authority
> federal bodies of executive authority such the <u>Federal Bailiff Service</u> or the <u>Federal
> Penitentiary Service</u> are acting), the <u>Prosecutor General's Office</u> (a federal body entrusted
> with the task of execution of the laws in the name of the Russian Federation), the <u>Ministry
> of Internal Affairs</u> (responsible for the police forces), the <u>Federal Security Service</u> (also a
> federal body of executive authority, acting under the authority of the President). When not
> acting through these Executive organs or through the <u>Russian courts</u>, the Russian
> Federation was acting through <u>State-owned entities</u>, first and foremost State-owned
> company <u>Rosneft</u> . . .[1878]
>
> [emphasis added]

1452. Claimants put forward a similar view at the Hearing:

> [W]e complain of acts of the executive organs.  That's the <u>President</u>; the <u>Prime Minister</u>;
> ministries, including <u>Tax</u>, <u>Justice</u> and <u>Interior Ministries</u>; and their constituent bodies, the
> <u>Federal Bailiffs Service</u> and the <u>Federal Penitentiary Service</u> under Justice.
>
> We complain of the actions of executive bodies or agencies: that would be the <u>Prosecutor
> General's Office</u>, the <u>Federal Property Fund</u> and the <u>Federal Security Services</u>.  We also
> complain of the actions of <u>the courts</u> . . . .  These are actions of the Russian Federation
> State organs, and they are, by definition, actions of the State.[1879]
>
> [emphasis added]

---

[1878]   Memorial ¶ 551.

[1879]   Transcript, Day 20 at 252.

1453. In particular, with regard to the bankruptcy proceedings against Yukos, Claimants assert that:

> The Russian Federation initiated the bankruptcy proceedings through <u>Rosneft</u>, whilst the <u>Russian courts</u> ensured that the Russian State directly and through <u>Rosneft</u> would be the main creditor in the proceedings, systematically rejecting the claims of creditors related to Yukos or Yukos' shareholders.  Thus placed in the driving seat in these bankruptcy proceedings, the Russian State, acting through the <u>Federal Taxation Service</u> and <u>Rosneft</u>, rejected the Rehabilitation Plan proposed by Yukos' management and paved the way for itself, through <u>bankruptcy receiver (Mr. Rebgun)</u> and the <u>Russian Federal Property Fund</u> to distribute the rest of Yukos' assets by auctioning them at bargain prices. The vast majority of the proceeds went to the Russian State, with <u>Rosneft</u> acquiring Yukos' two other main production assets, Samaraneftegaz and Tomskneft, at a substantial discount."[1880]

> [emphasis added]

1454. Claimants seek to attribute the following actions of Rosneft (some of them through Rosneft-controlled YNG) to Respondent:

> Rosneft's action in acquiring Yugansk through Baikal, a special vehicle used to conceal Rosneft's involvement in the Yuganskneftegaz auction.

> Rosneft's entering into an agreement with the consortium of banks in order to initiate the bankruptcy and precipitate the liquidation of Yukos.

> . . .

> [T]he decisions made at the creditors' meeting hand in hand with the Russian Tax Ministry, namely: to vote against the rehabilitation plan; to vote against the admission of any Yukos-related creditor; and to vote for the liquidation of Yukos.[1881]

1455. Claimants take the view that "the actions of Rosneft are attributable to the Russian State"[1882] due to the latter's ownership of and control over the former, which would be "established by the fact that members of Rosneft's Board of Directors hold parallel positions in the Executive branch of the Russian Federation and that Rosneft's President is appointed by the Russian Executive."[1883]  Claimants refer to a statement made by Rosneft in the context of its IPO in July 2006, acknowledging that "the Russian Government . . . controls Rosneft and may cause Rosneft to engage in business practices that do not maximize shareholder value."[1884]  Claimants also cite a statement made by President Putin at a press conference in December 2004 and a decision rendered by the Amsterdam Court of Appeal in proceedings between Yukos Capital

---

[1880]   Reply ¶ 718; *see also* Transcript, Day 20 at 252.

[1881]   Transcript, Day 20 at 253–54.

[1882]   Reply ¶ 721.

[1883]   Memorial ¶ 551.  *See also* Transcript, Day 20 at 254–55.

[1884]   Transcript, Day 20 at 257.

and Rosneft in April 2009 as further support for the control of Rosneft's actions by Respondent.[1885]

1456. Finally, Claimants submit that Respondent's argument that, for a breach of a host State's ECT obligations to have occurred, challenged actions must have been taken by the host State in the exercise of *puissance publique* is a "nice invention."[1886]   All that matters, argue Claimants, is whether the acting entity is an organ of the State, not the capacity in which it is acting.[1887]   Claimants quote the commentary to Article 4 of the ILC Articles on State Responsibility:  "[i]t is irrelevant for the purposes of attribution that the conduct of a State organ may be classified as 'commercial' or acta iure gestionis . . . the entry into or breach of a contract by a State organ is nonetheless an act of the State for the purposes of article 4, and it might in certain circumstances amount to an internationally wrongful act."[1888]

### 2.   Respondent's Position

1457. Respondent denies that the actions of any of the following entities can be attributed to it, as none of these entities would have exercised governmental authority or acted under the instructions of, or under the direction or control of, Respondent: Sibneft, Gemini Holdings, Nimegan Trading, Rosneft, YNG.[1889]   Respondent also denies that the actions of Mr. Rebgun, Yukos' interim manager and receiver, or the actions of "the meeting and the committee of Yukos' bankruptcy creditors," can be attributed to Respondent, for the same reasons.[1890]

1458. Concerning the attribution of Mr. Rebgun's actions to the Russian Federation, Respondent points out that "[i]n most European legal systems a liquidator or bankruptcy receiver is not a State organ"[1891] and that bankruptcy managers and receivers do not "generally exercise elements of governmental authority or act under the instructions, direction or control of the

---

[1885]   Transcript, Day 20 at 257, referring to *Press Conference with Russian and Foreign Media*, President of Russia Official Web Portal, 23 December 2004, Exh. C-422; *Yukos Capital SARL v. OAO Rosneft*, Amsterdam Court of Appeal, Decision, 28 April 2009, Exh. C-484.

[1886]   Transcript, Day 1 at 157–58 (Claimants' opening).

[1887]   Transcript, Day 20 at 249 (Claimants' rebuttal).

[1888]   Transcript, Day 1 at 148 (Claimants' opening).

[1889]   Counter-Memorial ¶¶ 1442; 1472–1475; Rejoinder ¶¶ 77, 381, 1044; Respondent's Opening Slides, Vol. 6, slide 3.

[1890]   Rejoinder ¶¶ 77, 381; *see also* ¶ 1044; Respondent's Opening Slides, Vol. 6, slide 3.

[1891]   Rejoinder ¶ 389.

State."[1892]   Respondent cites several decisions of investment treaty tribunals as well as the decision of the Grand Chamber of the ECtHR in *Kotov v. Russia* to support this view.[1893]

1459. Regarding Rosneft, Respondent does not deny that it held 75.16 percent of the shares in this company, that members of the company's Board of Directors held parallel positions in the Russian Government, or that the company's President was appointed by the Russian Government.  However, Respondent insists that this is not enough to satisfy the standard of attribution under Article 8 of the ILC Articles on State Responsibility, and that Claimants must prove a link between any relevant actions of Rosneft or YNG and specific instructions given by the Russian State.[1894]  As explained by Respondent at the Hearing:

> [W]hat Claimants must establish to attribute the conduct of Rosneft under Article 8 to Respondent—but which they clearly have not proven—is that in acquiring YNG from Baikalfinance, entering into the agreement with SocGen and voting for Yukos' liquidation at the creditors' meeting, Rosneft was <u>acting pursuant to specific instructions</u> of a Russian State organ.[1895]
>
> [emphasis added]

1460. Similarly, with respect to the initiation of bankruptcy proceedings, Respondent asserts that "what Claimants must establish, but what they clearly have not proven, is that in filing the bankruptcy petitions . . . YNG were acting under the instructions or directions or control of Russian State organs."[1896]

1461. With regard to the standard applicable under Article 8 of the ILC Articles on State Responsibility, Respondent explains that:

> The commentary to Article 8 of the ILC Articles on State Responsibility notes that "it is made clear that the instructions, direction or control must relate to the conduct which is said to have amounted to an internationally wrongful act."  As regards "direction or control," the commentary states that "[s]uch conduct will be attributable to the State only if it directed or controlled the specific operation and the conduct complained of was an integral part of that operation."[1897]

---

[1892] Rejoinder ¶ 391.

[1893] Rejoinder ¶¶ 389–390, referring to *Plama* ¶ 253; *Jan Oostergetel and Theodora Laurentius v. The Slovak Republic*, UNCITRAL, Final Award, 23 April 2012 ¶ 155, Exh. R-2940 (hereinafter "*Jan Oostergetel*"); *Case of Kotov v. Russia*, ECtHR [GC], Appl. No. 54522/00, Judgment, 3 April 2012, Exh. R-3531 (hereinafter "*Kotov v. Russia*").

[1894] Rejoinder ¶ 387.

[1895] Transcript, Day 21 at 196.  *See also* Transcript, Day 19 at 116.

[1896] Transcript, Day 19 at 115–16.

[1897] Counter-Memorial ¶ 1444, referring to Commentary to ILC Articles on State Responsibility, Article 8 ¶¶ 3 and 7, Exh. C-1042.  *See also* Rejoinder ¶ 382; Transcript, Day 21 at 196.

1462. Respondent also quotes the following passage from the commentary on the ILC Articles on State Responsibility, which notes that the fact a State initially establishes a corporate entity is not a sufficient basis for the attribution to the State of the conduct of that entity, unless the entity exercises elements of governmental authority.[1898]

1463. Respondent refers to several decisions of investment treaty tribunals (in particular *Jan de Nul v. Egypt*, *White Industries v. India* and *Hamester*) as well as to the decision of the Iran–U.S. Claims Tribunal in *Flexi-Van Leasing v. Iran* to support these statements.[1899]

1464. Finally, although Respondent does not deny that the Russian Tax Ministry is a State organ, the actions of which can in principle be attributed to the State under Article 4 of the ILC Articles on State Responsibility, Respondent submits that it cannot be held liable for the actions taken by the Tax Ministry in the context of Yukos' bankruptcy because such actions were not taken in the exercise of *puissance publique*.  In particular, Respondent submits that it cannot be held liable for the Tax Ministry's vote to liquidate Yukos at the creditors' meeting.[1900]

### 3.    Tribunal's Decision on Attribution

1465. The Parties' differences in respect of attribution are centered on whether there can be attributed to Respondent actions of Rosneft in the acquisition of YNG, and in precipitating and participating in the bankruptcy proceedings.  Their differences also include whether the course of the bankruptcy proceedings and the actions in respect of them by the bankruptcy administrator, Mr. Rebgun, are, in whole or in part, attributable to the Russian Federation.

1466. The ILC Articles on State Responsibility are in point.  They and their commentary are conveniently republished in a book edited by Professor James Crawford, then the Commission's special rapporteur on the topic.[1901]   Chapter II, "Attribution of Conduct to a State," in its introductory commentary, observes that, "the general rule is that the only conduct

---

[1898]   Counter-Memorial ¶ 1473; Rejoinder ¶ 385, referring to Commentary to ILC Articles on State Responsibility, Article 8, ¶ 6 Exh. C-1042.  *See also* Respondent's Rebuttal Slides, Vol. 7, slide 50.

[1899]   Transcript, Day 21 at 197, referring to *Jan de Nul N.V. and Dredging International N.V. v. Arab Republic of Egypt*, ICSID ARB/04/13, Award, 6 November 2008 ¶ 173, Exh. C-997; *White Industries Australia Limited v. The Republic of India*, UNCITRAL, Award, 30 November 2011 ¶¶ 8.1.10 and 8.1.18, Exh. R-3545; *Hamester* ¶ 179; Counter-Memorial ¶ 1474, referring to *Flexi-Van Leasing, Inc. v. The Government of the Islamic Republic of Iran*, Iran-U.S. Claims Tribunal, Case No. 36, (1988) 12 Iran-U.S.C.T.R. 335, Award, 11 October 1986 p. 349, Exh. R-1154.

[1900]   Respondent's Post-Hearing Brief ¶ 177; Transcript, Day 19 at 119, 161–62 (Respondent's closing).

[1901]   Articles on Responsibility of States for Internationally Wrongful Acts with commentaries (Text adopted by the International Law Commission at its fifty-third session, in 2001), Articles 1–11 and 28–39, Exh. C-1042.

attributed to the State at the international level is that of its organs of government, or of others who have acted under the direction, instigation or control of those organs, i.e., as agents of the State."[1902]   Article 8, "Conduct directed or controlled by a State," provides that "[t]he conduct of a person or group of persons shall be considered an act of State under international law if the person or group of persons is in fact acting on the instructions of, or under the direction and control of, that State in carrying out the conduct."[1903]   The commentary to Article 8 observes that:

> Questions arise with respect to the conduct of companies or enterprises which are State-owned and controlled . . . .   The fact that the State initially establishes a corporate entity . . . is not a sufficient basis for the attribution to the State of the subsequent conduct of that entity . . . .   Since corporate entities, although owned by and in that sense subject to the control of the State, are considered to be separate, *prima facie* their conduct in carrying out their activities is not attributable to the State unless they are exercising elements of governmental authority . . . [and] the instructions, direction or control [of the State] must relate to the conduct which is said to have amounted to an internationally wrongful act.[1904]

1467.  The Parties agree that the actions of organs of the Russian State, whether executive, judicial or administrative, are attributable to Russia.  As noted, disagreement is essentially confined to the actions of Rosneft (and Rosneft-controlled YNG) and the actions of the bankruptcy administrator.

1468.  The Russian State owned all, or, subsequently, over 70 percent of the shares of Rosneft.  Rosneft's officers were and are appointed by the State and many of the members of Rosneft's Board of Directors concurrently occupied and occupy senior executive positions in Government, some close to President Putin.[1905]  All this however does not suffice to attribute to the Russian State the actions of which Claimants especially complain:   (a) Rosneft's collaboration with Baikal in the sale of YNG at auction and its immediate repurchase by Rosneft; (b) Rosneft's agreement with the SocGen bank creditors syndicate of Yukos to pay the debt of Yukos to those banks, the banks at the same time undertaking to petition Russian courts

---

[1902]  *Ibid.* p. 54.

[1903]  *Ibid.* p. 47.

[1904]  *Ibid.* p. 48.

[1905]  For example, Mr. Igor Sechin, the Chairman of Rosneft's Board of Directors from 2004 to 2012, was also from 2004 to 2008 Deputy Head of the Administration of the President of the Russian Federation and aide to the President, and, from 2008 to 2012, Deputy Prime Minister of the Russian Federation.  In 2011, he became President of Rosneft.  Mr. Sergei Naryshkin, now the Chairman of the State Duma, was member of the Rosneft Board of Directors from 2004 to 2009, while also holding the post, from 2004 to 2011, of Head of the Executive Office of the President of the Russian Federation (*see* Rosneft Annual Reports 2004, 2005, 2006, 2007, 2009, Exh. C-379; Rosneft Annual Report 2010, Exh. C-1265; *see also* Rosneft Annual Report 2012 (available on Rosneft's web-site).

for the bankruptcy of Yukos; and (c) Rosneft's successful bids at the bankruptcy auction for much of what was left of Yukos.

1469. That is because it would be difficult, if not impossible, to prove that Rosneft in so acting, did so at the instructions or direction, or under the control of the Russian State—but for one remarkable fortuity that bears on the auction of the shares of YNG and their acquisition by Rosneft.

1470. President Putin conducted a press conference with Russian and foreign media on 23 December 2004.[1906]  He was asked by V. Terekhov (Interfax), "in the wake of serious events that occurred tonight, when Nefteyugansk passed into the ownership of a state company.  Will you comment . . . ?"  President Putin replied:

> Now regarding the acquisition by Rosneft of the well-known asset of the company—I do not remember its exact name—is it Baikal Investment Company?  Essentially, Rosneft, a 100% state owned company, has bought the well-known asset Yuganskneftgaz.  That is the story.  In my view, everything was done according to the best market rules . . . a state owned company or, rather, companies with 100% state capital, just as any other market players, have the right to do so and, as it emerged, exercised it.  Now what would I like to say in this context?  You all know only too well how the privatization drive was carried out in this country in the early 90s and how, using all sorts of stratagems, some of them in breach even of the then current legislation, many market players received state property worth many billions.  Today, the state, resorting to absolutely legal market mechanisms, is looking after its own interests.  I consider this to be quite logical.

1471. Towards the end of this lengthy press conference, K. Eggert (BBC), noting that there had been a lot of criticism in Western press and official circles of the sale of YNG, asked for the reaction of President Putin to "this criticism and does it concern you at all?"  President Putin responded by sharply criticizing the Texas bankruptcy proceedings brought by Yukos and the responsive court ruling as "unacceptable from an international legal point of view . . . a breach of international politeness" and a manifestation of U.S. "imperium".  He concluded:  "As for the deal that took place, I think that it was carried out in strict conformity with the Russian legislation and in accordance with the norms of international law and the international commitments that Russia has taken on as part of the agreements that we have signed with our partners on the international stage.  So I do not see any real problems here."

1472. In this latter comment about agreements that Russia had signed, President Putin may have had the ECT in mind.  What at any rate is critical is his statement at the opening of the press

---

[1906]   President of Russia Official Web Portal, Press Conference with Russian and Foreign Media, 23 December 2004, Exh. C-422.

- 464 -

conference that, with regard to Rosneft's purchase of the YNG shares from Baikal, "the state, resorting to absolutely legal market mechanisms, is looking after its own interests."  He did not say that Rosneft was looking after its own interests, but that the purchase signified that the Russian State was looking after "its own interests".  In the view of the Tribunal, that statement constitutes President Putin's public acceptance and assertion that Rosneft's purchase of the YNG shares from Baikal was an action in the State's interest, the inference being that the State, then 100 percent shareholder of Rosneft, the most senior officers of which were members of President Putin's entourage, directed that purchase in the interest of the State.  It follows that that act, as well as the auction of YNG shares that underlay it, is attributable to the Russian State.

1473. Claimants have invoked as well Rosneft's press release of 27 June 2005, in which Rosneft declared that, given that it is wholly owned by the State, "Rosneft acts on its behalf."[1907]  They also noted a statement made by Rosneft in the context of its IPO in July 2006, acknowledging that "the Russian Government . . . controls Rosneft . . . ."[1908]

1474. It does not necessarily follow from the foregoing that the actions of Rosneft in contracting with the SocGen bank creditors of Yukos, and in bidding at the bankruptcy auction of Yukos itself, are attributable to Russia.  Yet it may well be that in taking those actions, Rosneft did so at the *sub rosa* direction of the Russian State, at the direction of senior officers of President Putin's entourage who concurrently ran Rosneft.  In the view of the Tribunal, it may reasonably be concluded that Rosneft was so directed.  Or, if not, that it was not because it did not need to be; Rosneft was such a creature of President Putin's entourage that it reflexively implemented his policies.  But proving that admittedly is elusive, in the absence of an inculpatory admission on behalf of the Russian State such as that of President Putin in respect of the acquisition of YNG.

1475. Are the actions of the bankruptcy administrator, Mr. Rebgun, attributable to the Russian Federation?

1476. Respondent observed in its Rejoinder that "[i]n most European legal systems a liquidator or bankruptcy receiver is not a State organ" and that bankruptcy managers and receivers do not "generally exercise elements of governmental authority or act under the instructions, direction

---

[1907]    *Rosneft Shareholders' AGM Held*, Rosneft Press Release, 27 June 2005, Rosneft Website, Exh. C-1419.

[1908]    Rosneft IPO Prospectus, 14 July 2006, Exh. C-380.

or control of the State".[1909]   Respondent cited pertinent awards of investment treaty tribunals, including *Plama*[1910] and *Oostergeel v. Slovak Republic*[1911] as well as the decision of the Grand Chamber of the ECtHR in *Kotov v. Russia*[1912] in support of this conclusion.  Those decisions are indeed supportive.

1477.   Claimants did not address these arguments at the Hearing, where they appeared to limit their complaints in the context of the bankruptcy proceedings to "the actions of the Russian courts, who appointed the interim receiver and confirmed all his actions, as well as the actions of the admitted creditors, namely the Tax Ministry and Rosneft."[1913]

1478.   Respondent has maintained that the actions of the Tax Ministry—incontestably an organ of the Russian State—in asserting and realizing its predominant claims to the assets of Yukos in the bankruptcy proceedings, nevertheless are not in breach of the ECT because the Tax Ministry there acted as a mere commercial creditor and did not exercise governmental authority.  "The votes of the Russian tax authorities are attributable to Respondent, but are not an exercise of *puissance publique.*  The tax authorities voted at the Creditors' Meeting, and, more generally, participated in Yukos' bankruptcy proceedings in their capacity as a Yukos creditor alongside other creditors, enjoyed no special prerogatives or privileges, and were subject to the same rules as private creditors, the 2002 Bankruptcy Law."[1914]   Moreover, Respondent contends that the Moscow Arbitrazh Court's "acceptance of the bankruptcy petitions and ratification of the creditors' decision to liquidate Yukos does not change this conclusion . . . [It] enforced legislation governing private-law relations, specifically, bankruptcy legislation, which imposes limitations inherent in private property.  Loss resulting from a court's enforcement of legal limitations inherent in private property is not compensable under Article 13 or 10(1) ECT, irrespective of whether the court proceedings were instituted by a State organ."[1915]

1479.   The foregoing line of argument runs up however against the ILC Articles on State Responsibility.  Article 4 provides that "[t]he conduct of any State organ shall be considered an

---

[1909]   Rejoinder ¶¶ 389–390.

[1910]   *Plama* ¶¶ 252–53.

[1911]   *Jan Oostergetel* ¶¶ 151–58.

[1912]   *Kotov v. Russia* ¶¶ 99–107.

[1913]   Transcript, Day 20 at 252.

[1914]   Respondent's Post-Hearing Brief ¶ 177.

[1915]   *Ibid.* ¶ 178.

act of that State under international law, whether the organ exercises legislative, executive, judicial or any other functions, whatever position it holds in the organization of the State . . . ." The commentary to this article specifies that "[i]t is irrelevant for the purposes of attribution that the conduct of a State organ may be classified as 'commercial' or as '*acta iure gestionis*'."[1916]

1480. In respect of attribution, the Tribunal concludes that the Russian Federation is responsible for its organs, executive, judicial and administrative, in the actions that they took against and in relation to Yukos and its stockholders; that, for the reasons stated above, the Russian Federation, speaking through its President, accepted responsibility for Rosneft's acquisition of YNG and for the auction that underlay it; and that, in respect of other actions of Rosneft that bear on the destruction of Yukos, while proof of specific State direction is lacking, it may reasonably be held that the highest officers of Rosneft who at the same time served as officials of the Russian Federation in close association with President Putin acted in implementation of the policy of the Russian Federation.  The actions of Mr. Rebgun as bankruptcy administrator are not attributable to Respondent.[1917]

## B.   ARTICLE 10 OF THE ECT

### 1.   Introduction

1481. Article 10(1) provides, in relevant part:

> *Article 10*
> PROMOTION, PROTECTION AND TREATMENT OF INVESTMENTS
>
> (1)   Each Contracting Party shall, in accordance with the provisions of this Treaty, encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area.   Such conditions shall include a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment.   Such Investments shall also enjoy the most constant protection and security and no Contracting Party shall in any way impair by unreasonable or discriminatory measures their management, maintenance, use, enjoyment or disposal.   In no case shall such Investments be accorded treatment less favourable than that required by international law, including treaty obligations. . . .

---

[1916]   ILC Aricles on State Responsibility, Articles 1–11 and 28–39, p. 40, Exh. C-1042.

[1917]   It is of interest to note that, in an interview with the Vedomosti paper in October 2006, Mr. Rebgun is alleged to have acknowledged his ties to the Russian security establishment known as the "siloviki."  *Yukos liquidator says process will be legal*, AFP World News, 10 August 2006, Exh. C-822.

1482. The Tribunal will first summarize the Parties' arguments regarding applicable legal standards under Article 10(1) of the ECT, and then turn to the Parties' arguments regarding whether Claimants have made out a breach of these standards by Respondent.

### 2.  Applicable Legal Standards under Article 10(1) of the ECT

#### (a)  Claimants' Position

1483. In respect of the obligations imposed by Article 10(1) on host States, Claimants refer, as being particularly relevant to the present case, to Respondent's obligation to accord Claimants' investments "fair and equitable treatment" and its obligation not to impair Claimants' investments by discriminatory measures.[1918]

1484. With regard to fair and equitable treatment, Claimants submit that, as a general matter, it is "a broad and widely accepted standard"[1919] encompassing such fundamental standards as "good faith, due process, non-discrimination and proportionality",[1920] "procedural propriety",[1921] "the right to be heard and to present evidence",[1922] "proper notice of administrative actions to be taken by the State"[1923] and "transparency, protection of legitimate expectations . . . and freedom from coercion and harassment".[1924]

1485. Claimants submit that fair and equitable treatment in Article 10(1) of the ECT is a "non-contingent, autonomous" standard that is broader than both the historical customary international law standard for the treatment of aliens elaborated in *Neer* (which requires "a showing of outrage, bad faith, willful neglect of duty, or 'insufficiency of governmental action so far short of international standards that every reasonable and impartial man would readily

---

[1918] Memorial ¶ 556.

[1919] *Ibid.* ¶ 558, quoting Judge Schwebel in *MTD Equity Sdn. Bhd. and MTD Chile S.A. v. Republic of Chile*, ICSID Case No. ARB/–1/07, Award, 25 May 2004 ¶ 109, Exh. C-969 (hereinafter "*MTD v. Chile*").

[1920] *Ibid.* quoting Judge Schwebel in *MTD v. Chile*, Exh. C-969 and *Saluka Investments BV v. The Czech Republic* (UNCITRAL), Partial Award, 17 March 2006 ¶ 303, Exh. C-977 (hereinafter "*Saluka*"); Reply ¶ 581.

[1921] Memorial ¶ 564.

[1922] *Ibid.* ¶ 566.

[1923] *Ibid.* ¶ 567.

[1924] *Ibid.* ¶ 558.

recognize its insufficiency'")[1925] and the current customary international law minimum standard of treatment for investments.[1926]

1486. Claimants emphasize that fair and equitable treatment is an "objective standard that does not require bad faith by the [host] State."[1927]

1487. Claimants further submit that denial of justice can constitute a breach of the fair and equitable treatment standard and refer to several awards that define the legal standard for establishing a denial of justice: *Azinian v. Mexico*, *Rumeli v. Kazakhstan*, *Chattin*, *Mondev v. United States*, *Brown v. Great Britain*, and *Petrobart v. Kyrgyz Republic*.[1928]   Claimants submit that "[i]nternational law has long accepted the responsibility of States for the actions of their courts, especially where those actions involve judicial impropriety and malfunctions in the administration of justice."[1929]   Claimants submit that a substantive denial of justice may be found in instances of gross misapplication of the law,[1930] but that most often denial of justice will be related to procedural inadequacies.[1931]   Accordingly, say Claimants, the concepts of due process and denial of justice are "closely linked", such that "a failure to allow a party due process will often result in a denial of justice."[1932]

1488. However, Claimants contend that Respondent, by arguing that the threshold for Article 10(1) is "demanding" or "high", conflates the standard for breaches of due process with the historical standard for denial of justice.[1933]   In support of their criticism, Claimants refer to the awards in *Vivendi II* and *Rumeli v. Kazakhstan* and to a recent commentary by Judge Schwebel, a member of this Tribunal, where he wrote that:

---

[1925]   Reply ¶ 584, quoting Counter-Memorial ¶ 1564.

[1926]   Reply ¶ 584–606, citing *Azurix Corp. v. Argentine Republic*, ICSID Case No. ARB/01/12, Award, 14 July 2006 ¶¶ 360–61, 372, Exh. C-979 (hereinafter *"Azurix"*).

[1927]   Transcript, Day 1 at 154, quoting *National Grid P.L.C. v. Argentine Republic* (UNCITRAL) Award, 3 November 2008 ¶ 173, Exh. C-996; *see also* Memorial ¶ 559.

[1928]   Memorial ¶¶ 618–28.

[1929]   *Ibid.* ¶ 619.

[1930]   *Ibid.* ¶ 621.

[1931]   *Ibid.* ¶ 622.

[1932]   *Ibid.* ¶ 623, quoting *Waguih Elie George Siag and Clorinda Vecchi v. The Arab Republic of Egypt*, ICSID Case No. ARB/05/15, Award, 1 June 2009 ¶ 452, Exh. C-998.

[1933]   *Ibid.* ¶¶ 607–16.

> [w]hat in another case may or may not be fair and equitable treatment by a State of foreign investment may involve procedural matters, or matters of substance, or both, far removed from the confines and criteria of a denial of justice.[1934]

1489. It follows, submit Claimants, that while investment tribunals have considered the fair and equitable treatment standard to include the manner in which an investor and its investment are treated by the host State's courts "mainly through the prism of denial of justice . . . this is by no means exhaustive of the standard."[1935]   In sum, Claimants' position is that, while denial of justice forms part of the fair and equitable treatment standard, the latter standard is not limited to the former.[1936]

1490. Claimants also submit that freedom from arbitrariness and discrimination forms part of the fair and equitable treatment standard.[1937]   In support of their submission, Claimants refer to the award in *Saluka Investments BV v. The Czech Republic* ("***Saluka***")—quoted verbatim by the *Biwater Gauff v. United Republic of Tanzania* ("***Biwater***") and *Rumeli v. Kazakhstan* tribunals—which established the proposition that the standard of reasonableness has no different meaning in this context than in that of the fair and equitable treatment standard with which it is associated.[1938]

1491. Claimants submit that the *Plama v. Bulgaria* award confirms that "unreasonable" conduct is synonymous with "arbitrary" conduct.[1939]   Claimants also contend that many tribunals, such as those in *Lemire v. Ukraine* and *Siemens A.G. v. The Argentine Republic* ("***Siemens***"), have ruled that various State actions, not "based on reason", and comparable to those alleged against Respondent were "arbitrary".[1940]

---

[1934] *Ibid.* ¶ 608, referring to Judge Stephen M. Schwebel, "Is *Neer* Far from Fair and Equitable?" (2011) 27 Arb. Int'l 555 p. 559, Exh. C-1647.

[1935] *Ibid.* ¶ 611.

[1936] *Ibid.* ¶ 615

[1937] *Ibid.* ¶ 645, citing *CMS Gas Transmission Company v. The Argentine Republic*, ICSID Case No. ARB/01/8, Award, 12 May  2005 (hereinafter "*CMS v. Argentina*").

[1938] Memorial ¶ 645, citing *Saluka*, ¶ 460, Exh. C-977; *Biwater Gauff (Tanzania) Ltd. v. United Republic of Tanzania,* ICSID Case No. ARB/05/22, Award, 24 July 2008 and Concurring and Dissenting Opinion by Gary Born ¶ 692, Exh. C-991 (hereinafter *"Biwater"*); *Rumeli Telekom A.S. and Telsim Mobil Telekomunikasyon Hizmetleri A.S. v. Republic of Kazakhstan,* ICSID Case No. ARB/05/16, Award, 29 July 2008 ¶ 679, Exh. C-992.

[1939] Memorial ¶ 646, *Plama*, Exh. C-994.

[1940] *Ibid.* ¶¶ 651–52.

1492. Claimants further submit that the principle of proportionality is an element of the fair and equitable treatment standard, as confirmed in *MTD Equity Sdn. Bhd. and MTD Chile S.A. v. Chile* ("**MTD v. Chile**")and *Vivendi v. Argentina*.[1941]

1493. Many arbitral tribunals, say Claimants, have also held that a stable legal and business environment is an essential element of fair and equitable treatment.[1942]  They refer to the concepts of consistency, transparency and treatment that does not frustrate the legitimate expectations of the investor as being essential to ensure such an environment[1943]  Claimants cite the *PSEG Global v. Turkey* award, where the tribunal stated that "the 'roller-coaster' effect of the continuing legislative changes" seriously breached the fair and equitable treatment obligation.[1944]

1494. Claimants also contend that Article 10(1) of the ECT includes a stand-alone prohibition against discrimination that is breached if the management, maintenance, use, enjoyment or disposal of the investor's investment is impaired.  The test for identifying discriminatory measures, submit Claimants, is described in *Plama* as entailing "like persons being treated in a different manner in similar circumstances without reasonable or justifiable grounds."[1945]

1495. Further, Claimants argue that the non-discrimination standard in Article 10(1) of the ECT is not limited to measures taken because of the foreign nationality of the investor.  Claimants emphasize that nothing in the wording of Article 10(1) of the ECT suggests such a limit to the standard.  This is particularly obvious when Article 10(1) is contrasted with Article 10(7) of the ECT, which contains the most-favored-nation treatment and national treatment standards.  It follows, argue Claimants, that "when the ECT's drafters intended to restrict a non-discrimination provision to nationality-based discrimination, they expressly did so."[1946]  Claimants contend that the former U.S. BIT negotiator, Mr. Vandevelde supported this interpretation:

> Nothing in the language [of the ECT] suggests that it is limited to discrimination based on nationality . . . .   Although the most common competitive disadvantages imposed on

---

[1941]  *Ibid.* ¶ 679.

[1942]  *Ibid.* ¶ 697.

[1943]  *Ibid.* ¶ 698.

[1944]  *Ibid.* ¶ 703.

[1945]  *Ibid.* ¶ 737.

[1946]  Reply ¶ 641.

foreign investments may be nationality-based, a competitive disadvantage imposed on some other basis may be just as detrimental to the investment.[1947]

1496. Claimants also rely on the awards in *Plama*, *Al-Bahloul v. Tajikistan*[1948] and *National Grid*[1949] for the proposition that arbitral tribunals interpreting the ECT and other investment protection treaties with identical or similar provisions have concluded that the non-discrimination standard is not restricted to a protection against nationality-based discrimination.[1950]

1497. Claimants contend that the authorities relied upon by Respondent for the contrary proposition either contradict Respondent's position or are inapposite.[1951]   Claimants characterize Respondent's "selective quoting" from the *LG&E Energy Corp. et al. v. The Argentine Republic* award as "unfortunate."   They say that, in fact, in the paragraph immediately following the one cited by Respondent, the Tribunal said the exact opposite.   They point out that the tribunal found that "while there was no intent to discriminate against the investments on account of the investors' nationality, there was differential treatment of similar companies."[1952]   Claimants also highlight that Respondent's reliance on declarations from the U.S. and Canada is of no assistance, as they are non-signatories to the ECT.[1953]

(b)     **Respondent's Position**

1498. Respondent submits that, in determining whether the host State's conduct is fair and equitable, an investor's legitimate and reasonable expectations are the "dominant" element.   Respondent also submits that the assessment of the reasonableness and legitimacy of an investor's expectations of fair and equitable treatment must be based on the state of the law of the host State, its political and historical conditions, and any particular conditions of treatment the State

---

[1947]   *Ibid.* ¶ 642, referring to Kenneth Vandevelde, *Bilateral Investment Treaties, History, Policy and Interpretation* (OUP 2010) pp. 213–14, Exh. C-1018.

[1948]   *Mohammad Ammar Al-Bahloul v. Republic of Tajikistan* (SCC Case No. V064/2008), Partial Award on Jurisdiction and Liability of 2 September 2009 ¶ 248, Exh. C-1531.

[1949]   *National Grid P.L.C. v. Argentine Republic* (UNCITRAL), Award, 3 November 2008 ¶ 198, Exh. C-996.

[1950]   *Ibid.* ¶¶ 644–46.

[1951]   *Ibid.* ¶¶ 647–51.

[1952]   *Ibid.* ¶ 650, referring to Counter-Memorial p. 748, n.2479; *LG&E Energy Corp et al. v. The Argentine Republic,* ICSID Case No. ARB/02/1, Decision on Liability, 3 October 2006 ¶¶ 147–48, Exh. C-981 (hereinafter *"LG&E"*).

[1953]   *Ibid.* ¶¶ 652–53.

offered the investor at the time it made its investment.[1954]   In support of these propositions, Respondent cites *Saluka* and *Duke Energy v. Ecuador*.[1955]

1499.   Respondent also refers to the award in *M.C.I. v. Ecuador* to support the proposition that the obligation to provide an investor with stable, equitable, favorable and transparent conditions cannot be construed as an obligation to refrain from enforcing existing law.[1956]   Respondent relies on Professor Dolzer's view that "[t]he pre-investment legal order forms the framework for the positive reach of the expectation which will be protected and also the scope of considerations upon which the host state is entitled to rely when it defends [itself]."[1957]

1500.   Respondent refers to the awards in *Lauder v. Czech Republic* and *Genin v. Estonia* in support of its contention that conduct cannot be in breach of the fair and equitable treatment standard if authorities are only taking the actions necessary to enforce the their laws.[1958]   Respondent also relies on the *Genin v. Estonia* award for the proposition that where a State's actions are the justified exercise of its power to enforce its laws, the procedural irregularities complained of by investors must be very severe to amount to a violation of the relevant investment treaty.[1959]

1501.   Moreover, Respondent contends that the fair and equitable treatment standard in Article 10(1) of the ECT—specifically with respect to establishing a denial of justice, or conduct that is otherwise manifestly unfair or unreasonable—corresponds to an international law minimum standard of treatment of foreign investment.[1960]   This minimum standard, submits Respondent, incorporates the customary international law minimum standard of treatment for alien property, as well as treaty obligations of the host State, but excludes decisions by international organizations, such as the ECtHR.[1961]

---

[1954]   Counter-Memorial ¶¶ 1549–50.

[1955]   *Ibid*. citing *Saluka* ¶¶ 301–302; *Duke Energy Eletroquil Partners S.A. v. Republic of Ecuador*, ICSID ARB/04/19, Award, 18 August 2008 ¶ 340, Exh. C-993.

[1956]   Counter-Memorial ¶ 1551.

[1957]   *Ibid.* ¶ 1552.

[1958]   *Ibid.* ¶ 1553, referring to *Lauder v. The Czech Republic*, UNCITRAL, Final Award, 3 September 2001 ¶¶ 296–97, Counter-Memorial ¶¶ 1566–67, referring to *Alex Genin, Eastern Credit Ltd., Inc. and A.S. Baltoil v. The Republic of Estonia*, ICSID ARB/99/2, Award, 25 June 2001, 17 ICSID Rev. 395 (2002) ¶ 367, Exh. R-1095.

[1959]   *Ibid.* ¶ 1567.

[1960]   *Ibid.* ¶ 1559.

[1961]   *Ibid.* ¶ 1561.

1502. According to Respondent, Claimants' burden for showing a violation of the minimum standard is "demanding".[1962]   Thus, some tribunals have equated the fair and equitable treatment standard with the *Neer* standard, which for allegations of due process violations by a host State's courts would require a showing of outrage, bad faith, willful neglect of duty, or "insufficiency of governmental action so far short of international standards that every reasonable and impartial man would readily recognize its insufficiency".[1963]

1503. Thus, due process violations in one or more proceedings "do not by themselves establish a treaty violation if the procedures are only part of the judicial process available to the parties."[1964]   Citing *AMTO v. Ukraine*, Respondent argues that the assessment of the conduct of national courts must include the availability of remedies in the host State's legal system and whether or not such remedies were exercised; and if they were exercised, whether they were exercised fully and wisely.[1965]   In addition, in order to prove their claim for denial of justice, Claimants must show a "clear and malicious misapplication of the law" based on the content of judicial opinions themselves.[1966]

1504. With respect to the standard of non-discrimination, Respondent submits that Article 10(1) of the ECT "only prohibits discrimination based on nationality."[1967]   Accordingly, it argues that discriminatory measures must have been "taken because of the foreign nationality of the shareholders."[1968]

1505. Part VII of the Table of Contents in Respondent's Rejoinder provides a short list of the conditions that, according to Respondent, Claimants' claims must meet in order to show a breach of Article 10(1) (in addition to showing that the conduct alleged to be in breach of Article 10(1) is attributable to Respondent and is an exercise of *puissance publique*, as discussed above in Chapter X.A):

---

[1962]   *Ibid.* ¶ 1562, referring to *AES Summit Generation Ltd. and AES-Tisza Eromu Kft v. Hungary*, ICSID ARB/07/22, Award, 23 September 2010 ¶ 9.3.40, Exh. R-1103; *see also* Counter-Memorial ¶ 1568.

[1963]   Counter-Memorial ¶ 1564, *see esp.* p. 738, n.2456; *ibid.* ¶ 1568, referring to *B.E.Chattin (U.S.) v. United Mexican States*, U.S.–Mexico General Claims Commission, Opinion of 23 July 1927, 4 U.N.R.I.A.A. 282, 295, ¶ 29, Exh. C-924.

[1964]   Counter-Memorial ¶ 1571.

[1965]   *Ibid.* citing *Limited Liability Company AMTO v. Ukraine*, SCC 080/2005, Final Award, 26 March 2008 ¶ 76, Exh. C-989.

[1966]   Counter-Memorial ¶ 1572.

[1967]   *Ibid.* ¶ 1580.

[1968]   *Ibid.* ¶¶ 1581–84.

1. Regardless of the standard of review under Article 10(1), Claimants must establish that the Russian Federation's actions interfered with Claimants' legitimate and reasonable expectations based on a full disclosure of the facts relevant to Claimants' investments and based on operation of the investments in accordance with Russian law

a) . . . Claimants must establish . . . specific, legal commitments by Respondent based on a full disclosure of the facts relevant to their investments

b) Claimants also must establish that the Russian Federation's actions interfered with their expectations that are based on an operation of their investments in accordance with Russian law

2. Claimants must establish a systemic judicial failure, or, at a minimum, that the conduct they attack is otherwise manifestly unfair or unreasonable

a) Claimants must establish that the Russian court decisions they attack constitute a denial of justice or are otherwise manifestly unfair or unreasonable

b) Specifically with respect to the taxation measures Claimants challenge, Claimants must establish a systemic judicial failure or, at a minimum, that the measures are manifestly unfair or unreasonable, and contrary to internationally recognized tax policies and practices

c) Specifically with respect to Yukos' bankruptcy proceedings, Claimants must demonstrate a systemic failure of the Russian judicial system, or, at a minimum, that the bankruptcy proceedings were manifestly unfair or unreasonable

3. To establish "unreasonable or discriminatory measures" that impaired the management, maintenance, use or enjoyment of their investments, Claimants must prove a systemic judicial failure, or, at a minimum, that the taxation measures complained of are contrary to international tax practices or treated similar cases differently on the basis of nationality, without reasonable justification.[1969]

1506. Finally, Respondent submits that in order to substantiate their claim, Claimants must prove a direct causal link between the loss of their shares and measures in breach of Article 10(1) ECT.[1970]

### 3. Did Respondent Accord Claimants' Investments the Standard of Treatment Required by Article 10(1) of the ECT?

#### (a) Claimants' Position

1507. Claimants submit that Respondent violated its obligations under Article 10(1) of the ECT by failing to accord Claimants' investments fair and equitable treatment and by impairing Claimants' investments by discriminatory measures.

1508. In terms of fair and equitable treatment, Claimants contend that Respondent's actions, both individually and collectively, constitute breaches of the most basic requirements of procedural

---

[1969]   Rejoinder, Table of Contents, pp. v–vi.

[1970]   Respondent's Post-Hearing Brief ¶ 173.

propriety and due process, as well as a denial of justice.[1971]  Claimants emphasize that their case is not limited to one of "systematic denial of justice", as Respondent maintains.[1972]

1509.  Claimants also emphasize that, in considering whether Respondent violated the fair and equitable treatment standard under Article 10(1) of the ECT, the Tribunal should not view each fact in isolation, but rather look at the totality of Respondent's actions.[1973]  Thus, Claimants state that, while some of Respondent's actions could and do, in and of themselves, constitute breaches of Articles 10(1), their position is that "the totality of the Russian Federation's actions and their cumulative effect" constitute a violation of the fair and equitable treatment standard.[1974]

1510.  Claimants offer a list of specific actions taken by Respondent, or attributable to it, which, they say, demonstrate that Respondent breached the fair and equitable treatment standard.

1511.  Firstly, Claimants contend that Respondent breached the fair and equitable treatment standard by the conduct of "over 150 raids . . . in brutal conditions from July 4, 2003 to November 18, 2004, and the innumerable searches and seizures conducted by armed and masked officers at Yukos' headquarters, the premises of affiliates or entities related to Yukos, or the offices of lawyers acting in Yukos-related cases, leaving neither a copy nor a simple list of the documents and items seized, in breach of even the most basic requirements of Russian law."[1975]  Claimants allege that these searches and seizures were part of the Russian Federation's campaign to destroy Yukos and had a major disruptive effect on the operations of Yukos, reducing the company's chances of survival in the face of the Russian Federation's attacks (and, in

---

[1971]   Memorial ¶¶ 568, 618.

[1972]   Transcript, Day 17 at 134 (Claimants' closing); *Ibid.* at 145.

[1973]   Transcript, Day 1 at 155–57 (Claimants' opening), referring to *RosInvestCo* ¶ 621, Exh. C-1049; *Quasar* ¶ 44, Exh. R-3383; Transcript, Day 17 at 149–154, referring to *Vivendi* ¶ 7.5.31 ("It is well-established under international law that even if a single act or omission by a government may not constitute a violation of an international obligation, several acts taken together can warrant finding that such obligation has been breached. The ad hoc Committee recognized this when it noted that '[i]t was open to Claimants to claim, and they did claim, that these acts taken together, or some of them, amounted to a breach of Articles 3 and/or 5 of the BIT'); *Walter Bau AG v The Kingdom of Thailand*, UNCITRAL, Award, 1 July 2009 ¶ 12.43 (hereinafter "*Walter Bau*") ("The Respondent's argument that 'creeping expropriation' only, and not breaches of FET, can be defined by a series of acts is not correct.  The Tribunal sees no reason why a breach of a FET obligation cannot be a series of cumulative acts and omissions.  One of these may not on its own be enough, but taken together, they can constitute a breach of FET obligations."); *see also* Claimants' Post-Hearing Brief ¶¶ 182–84.

[1974]   Claimants' Post-Hearing Brief, ¶ 182.

[1975]   *Ibid.* ¶ 161, referring to Memorial ¶¶ 152–66; Reply ¶¶ 74–94; Rieger WS ¶ 28; Misamore WS ¶¶ 31–32; Schmidt WS ¶ 16; *see also* Memorial ¶¶ 569–79.

particular, "the accelerated pace in which tax debts were fabricated").[1976]   As for the "campaign of harassment" on PwC, and subsequent raid, Claimants allege that it precipitated PwC's withdrawal of its certification of Yukos' audits.[1977]

1512.  Secondly, Claimants contend that Respondent did not provide proper notice of administrative actions to be taken by the State.[1978]   In that regard, Claimants submit that the Tax Ministry, the Russian courts and the bailiffs repeatedly failed to afford Yukos reasonable timeframes in which to pay or challenge the alleged tax reassessments:  just two days to voluntarily pay after issuance of the 2000 Decision, and a single day to pay after issuance of each of the 2002 and 2003 Decisions.  In addition, Claimants allege that Respondent did not wait for these short time limits to expire before filing a petition for collection with the Moscow Arbitrazh Court, which Claimants allege were swiftly "rubber-stamped" in favor of Respondent.[1979]

1513.  Thirdly, Claimants submit that Respondent did not afford them the opportunity to be heard by an impartial tribunal.  Claimants contend that Respondent instead ensured that government-friendly judges sanctioned the tax reassessments and that the three judges who failed to rule against Yukos were removed, and their rulings later overturned.  Yukos' requests for interim relief to suspend the effect of the tax reassessment decisions pending appeal on the merits were also systematically rejected.  Claimants further submit that hearings on these matters were set, and appeals ruled upon, almost immediately, and that Yukos was not given real access to case materials.[1980]

1514.  Fourthly, Claimants assert that the sale of YNG was a sham auction, orchestrated by Respondent under the pretext of satisfying Yukos' alleged tax liability for the 2000 Decision; an alleged liability that Claimants submit was fully paid prior to the auction date.[1981]   With only State-owned Gazprom and Baikal in attendance,[1982] Claimants contend that Baikal acquired YNG for a "bargain" price.  Claimant also notes that Baikal was purchased by State-owned

---

[1976]   Claimants' Post-Hearing Brief ¶¶ 159, 161–62, 165.

[1977]   Memorial ¶ 578.

[1978]   *Ibid.* ¶¶ 567, 586.

[1979]   *Ibid.* ¶¶ 582–90.

[1980]   *Ibid.* ¶¶ 581–86.

[1981]   *Ibid.* ¶ 594.

[1982]   *Ibid.* ¶¶ 595.

Rosneft shortly following the auction, and that President Putin himself admitted Baikal was used as a front company to shield the future owner – Rosneft – from legal claims.[1983]

1515. Fifthly, Claimants assert that the initiation of bankruptcy proceedings against Yukos at the behest of Rosneft, the biased conduct of those proceedings by Russian courts, and the sale of Yukos' remaining assets also violated due process requirements.[1984]

1516. Claimants submit that the following actions taken by Respondent in breach of due process amount to a denial of justice:

- the administration of justice by Russian courts with respect to all Yukos related matters did not meet generally accepted international law standards of due process, impartiality and legitimacy;[1985]

- Russian courts were unduly hasty in their decision-making, refusing to provide Yukos with sufficient time or adequate opportunity to review the evidence on which the tax reassessment payment demands were based which eventually lead to its bankruptcy;[1986] and

- the systematic removal of judges who ruled in Yukos' favor and dismissal of Yukos' challenges against judges who had previously ruled against it in tax proceedings.[1987]

1517. In their discussion of denial of justice, Claimants invited the Tribunal to note the fact that Yukos lost nearly all of its cases in 2000 against the tax authorities and the statistic put forward by Mr. Konnov that the taxpayer in Russia wins in 75 percent of the cases.[1988]

1518. Moreover, Claimants argue that even if it purported to discuss denial of justice claims, Respondent has actually failed to defend its conduct, limiting itself to misstating the standard applicable to a claim of denial of justice.[1989]  According to Claimants, Respondent has "concentrated its energies on urging the Arbitral Tribunal to impose a higher burden on

---

[1983]  *Ibid.* ¶¶ 599.

[1984]  *Ibid.* ¶¶ 601–17.

[1985]  *Ibid.* ¶ 643.

[1986]  *Ibid.* ¶ 626.

[1987]  *Ibid.* ¶ 629.

[1988]  Transcript, Day 17 at 135 (Claimants' closing).

[1989]  Reply ¶ 612.

Claimants, for the facts of the Russian Federation's conduct are devastating."[1990]   Claimants assert that Respondent's attempts to elevate the applicable threshold fail because Respondent's conduct was indefensible under any plausible interpretation of the standards contained in Article 10(1) of the ECT.[1991]

1519. Claimants also contend that Respondent's actions were arbitrary, unreasonable, disproportionate, and abusive,[1992] in their reference to the following actions of Respondent:

- Respondent's unrelenting campaign of coercion, harassment, and intimidation against Yukos and related persons and entities;[1993]

- the imposition of arbitrarily and disproportionately large payment demands by Respondent under the guise of tax reassessments, enforced within short time periods and accompanied by arbitrary freezing of assets orders;[1994] and

- Respondent's unreasonable and arbitrary rejection of Yukos' proposals to settle or resolve the alleged tax claims.[1995]

1520. Claimants submit that Respondent failed to ensure a predictable and stable legal and business framework for the Claimants' investments.[1996]   They refer as examples to:

- Respondent's reversal of its previous acceptance of Yukos' tax optimization structure as legal;

- Respondent's reversal of its approval of the Sibneft merger; and

- a general lack of transparency on the part of Respondent.[1997]

---

[1990] *Ibid.* ¶ 631.

[1991] *Ibid.*

[1992] Memorial ¶¶ 644–95.  Claimants submit that while Article 10(1) of the ECT only expressly prohibits "unreasonable or discriminatory measures", jurisprudence confirms that "unreasonable" measures have the same meaning as "arbitrary" conduct, and similarly violate the fair and equitable treatment standard (*Ibid.* ¶¶ 665–67, citing *EDF (Services) Limited v. The Republic of Romania*, ICSID Case No. ARB/05/13, Award, 8 October 2009 ¶ 303, Exh. C-1001; *Plama* ¶ 184; *Saluka* ¶ 460; *CMS v. Argentina* ¶ 290).

[1993] Memorial ¶¶ 654–77.

[1994] *Ibid.* ¶¶ 678–95.

[1995] *Ibid.* ¶¶ 689–701.

[1996] *Ibid.* ¶¶ 702–21.

1521. In support of their contention that Respondent discriminated against Claimants' investments, Claimants rely on the following facts:

- Respondent treated Yukos in a significantly different way from other comparable Russian oil companies;

- Respondent treated YNG differently before and after its acquisition by Rosneft; and

- Respondent ensured differential treatment between creditors related to Yukos or Yukos' shareholders, and State or State-related creditors in the Yukos bankruptcy proceedings.

1522. In their Reply, Claimants assert that in its Counter-Memorial Respondent does not address Claimants' claims of discrimination under Article 10(1) of the ECT, except in its assertion that Claimants' allegations with respect to the Yukos–Sibneft demerger do not involve discrimination based on nationality.[1998]   Claimants also argue that Respondent improperly invokes its domestic law in defense of its breaches of international law.[1999]

1523. Also in their Reply, Claimants argue that Respondent's only defense against the bulk of Claimants' claims under Article 10(1) is to invoke Article 21(1) ECT.  According to Claimants, in providing no other defense, Respondent has conceded that its conduct breached Article 10(1).   Claimants view Respondent's defense as resting

> squarely on the theory that Article 21(1) . . . operates as a license to ECT signatories to freely violate their treaty obligations under Article 10(1) . . . so long as they create the <u>appearance</u> that their actions have some connection, however remote and indirect, to taxation.[2000]

**(b)   Respondent's Position**

1524. Respondent's main position is that Claimants have failed to establish any violation of Article 10(1) of the ECT.

1525. In particular, Respondent submits that (a) Claimants have failed to establish that conduct, which is attributable to Respondent and an exercise of its sovereign power, proximately caused

---

[1997]   *Ibid.* ¶¶ 722–33.

[1998]   Reply ¶¶ 654–90.

[1999]   *Ibid.* ¶ 619.

[2000]   *Ibid.* ¶ 577.

the loss of Claimants' investment;[2001] (b) Claimants have failed to establish that the measures they challenge interfered with Claimants' legitimate expectations;[2002] and (c) the measures relating to the imposition and enforcement of taxes were well within the range of a State's generally accepted regulatory powers.[2003]

1526. Respondent also argues that Claimants have failed to show that the challenged measures constitute a denial of justice or are otherwise manifestly unfair or unreasonable.[2004]   In particular, Respondent argues that Claimants have failed to establish that the Moscow and Chukotka courts "clearly and maliciously" misapplied Russian law when granting the claims of Gemini Holdings and Nimegian Trading in the context of the Yukos–Sibneft merger.[2005]

1527. Respondent also asserts that the challenged measures were not discriminatory.[2006]

## C.   ARTICLE 13 OF THE ECT

### 1.   Introduction

1528. Article 13(1) of the ECT provides, in relevant part:

*Article 13*
EXPROPRIATION

(1)   Investments of Investors of a Contracting Party in the Area of any other Contracting Party shall not be nationalized, expropriated or subjected to a measure or measures having effect equivalent to nationalization or expropriation (hereinafter referred to as "Expropriation") except where such Expropriation is:

   (a)   for a purpose which is in the public interest;

   (b)   not discriminatory;

   (c)   carried out under due process of law; and

   (d)   accompanied by the payment of prompt, adequate and effective compensation.

Such compensation shall amount to the fair market value of the Investment expropriated at the time immediately before the Expropriation or impending

---

[2001]   Post-Hearing Brief ¶¶ 174–80.

[2002]   *Ibid*. ¶¶ 184–90; Counter-Memorial ¶¶ 1545, 1555–58.

[2003]   Respondent's Post-Hearing Brief ¶¶ 191–99.   Particulars of Respondent's submission are summarized in the next chapter, which deals with Article 13 of the ECT.

[2004]   Counter-Memorial ¶ 1545.

[2005]   *Ibid*. ¶ 1573.

[2006]   *See* following chapter on Article 13 ECT.

> Expropriation became known in such a way as to affect the value of the Investment (hereinafter referred to as the "Valuation Date").
>
> Such fair market value shall at the request of the Investor be expressed in a Freely Convertible Currency on the basis of the market rate of exchange existing for that currency on the Valuation Date.  Compensation shall also include interest at a commercial rate established on a market basis from the date of Expropriation until the date of payment.

1529. The Parties analyze Article 13 in two steps, first by addressing what constitutes expropriation or "measures having effect equivalent to nationalization or expropriation," and then by discussing what constitutes a legal expropriation, *i.e.*, an expropriation conducted in accordance with the four conditions set out in Article 13(1):  that the expropriation be (a) in the public interest; (b) not discriminatory; (c) carried out under due process of law; and (d) accompanied by the payment of prompt, adequate and effective compensation.  The Tribunal will summarize first the Parties' principal arguments regarding the legal standards of Article 13 and will then review the facts of the present case in the light of these standards.

### 2.     Applicable Legal Standards under Article 13 of the ECT

#### (a)     Claimants' Position

1530. Claimants note that Article 13(1) of the ECT deals with nationalization and expropriation, as well as other equivalent measures.  Claimants submit that such equivalent measures include "covert or incidental interference with the use of property which has the effect of depriving the owner . . . of the use or reasonably-to-be-expected economic benefit of property even if not necessarily to the obvious benefit of the host State."[2007]

1531. Claimants submit that the standard for expropriation is objective and that while the showing of intent to expropriate may evidence a measure to be expropriatory, it is not a requirement of expropriation.[2008]

1532. Claimants emphasize that, in considering whether Respondent expropriated Claimants' investment within the meaning of Article 13(1), the Tribunal should look at the totality of

---

[2007] Memorial ¶ 855, quoting *Metalclad Corp. v. The United Mexican States*, ICSID Case No. ARB(AF)/97/1, Award, 30 August 2000 ¶ 103, Exh. C-954.

[2008] Memorial. ¶ 856, referring to *Compañía de aguas del Aconquija S.A. and Vivendi Universal S.A. v. Argentine Republic*, ICSID Case No. ARB/97/3, Award, 20 August 2007 ¶ 7.5.20, Exh. C-986 (hereinafter *"Vivendi v. Argentina"*); *Tecmed* ¶ 116; *Waste Management, Inc. v. United Mexican States*, ICSID ARB(AF)/00/3, Award, 30 April 2004 ¶ 79, Exh. C-968; *see also* Transcript, Day 1 at 154.

Respondent's actions and not at each fact in isolation.[2009] The question is not, Claimants submit, whether each of Respondent's individual actions was lawful under Russian law, or was no different than the practice in other jurisdictions, but whether the totality of Respondent's conduct was lawful under international law.[2010]

1533. Claimants argue that, contrary to Respondent's assertion, the standard for expropriation is not limited to the investor's legitimate expectations.[2011] Respondent's reference in this regard to the treaty practice of various States is unavailing, as whether or not other treaties refer to legitimate expectations as a criterion to establish expropriation is irrelevant to the interpretation of the ECT.[2012]

1534. With regard to the requirement that expropriation be in the public interest, Claimants submit that international tribunals have emphasized that expropriation must have occurred for a "*bona fide* public purpose"[2013] and not for "purely extraneous political reasons,"[2014] "amusement and private profit"[2015] or "reprisal."[2016] Claimants submit that a State's broad discretion to determine what constitutes "public interest" is not unfettered.[2017]

---

[2009] Transcript, Day 1 at 153–56 (Claimants' opening), referring to *RosInvestCo* ¶ 621, Exh. C-1049; *Quasar* ¶ 44, Exh. R-3383; Transcript, Day 17, 149–154 (Claimants' closing), referring to *Compañía de Desarollo de Santa Elena, S.A. v. The Republic of Costa Rica*, ICSID ARB/96/1, Final Award, 17 February 2000 ¶ 76, Exh. C-952 (hereinafter "*Santa Elena*")("[i]t is clear . . . that a measure or series of measures can still eventually amount to a taking, though the individual steps in the process do not formally purport to amount to a taking or to a transfer of title"; *Tradex Hellas v. Albania*, ICSID ARB/94/2, Award, 29 April 1999 ¶ 191, Exh. R-1114; *Azurix* ¶ 308; *Biwater* ¶ 455 ("[i]n terms of what might qualify as 'expropriation', the Arbitral Tribunal accepts BGT's submission that it must consider the Republic's conduct both in terms of the effect of individual, isolated, acts complained of, as well as in terms of the cumulative effect of a series of individual and connected acts, in so far as such a cumulative effect might be to deprive the investor in whole or in material part of the use or economic benefit of its assets"; OECD Draft Convention on the Protection of Foreign Property ¶ 4(b), Exh. C-1040; *Pope & Talbot v. The Government of Canada*, UNCITRAL, Award on the Merits of Phase 2, 10 April 2001 ¶ 181, Exh. C-1518; *Ioannis Kardassopoulos and Ron Fuchs v. The Republic of Georgia*, ICSID ARB/05/18 and ARB/07/15, Award, 3 March 2010 ¶ 404, Exh. C-1533 (hereinafter "*Kardassopoulos*"); Michael Reisman & Robert Sloane, "Indirect Expropriation and its Valuation in the BIT Generation," (2003) 74 British Yearbook of International Law 115 p. 123, Exh. C-1643 ("[d]iscrete acts, analyzed in isolation rather than in the context of the overall flow of events . . . may not be expropriatory in themselves. Only in retrospect will it become evident that those acts comprised part of an accretion of deleterious acts and omissions, which in the aggregate expropriated the foreign investor's property rights."); Claimants' Post-Hearing Brief ¶¶ 182–191; Reply ¶¶ 693, 699, 700.

[2010] Reply ¶¶ 693.

[2011] Transcript, Day 20 at 248 (Claimants' rebuttal).

[2012] Transcript, Day 20 at 248–49 (Claimants' rebuttal).

[2013] Memorial ¶ 867, referring to *Liberian Easter Timber Corporation (LETCO) v. The Government of the Republic of Liberia*, ICSID ARB/83/2, Award, 31 March 1986, Exh C-937, *Walter Fletcher Smith Case* (Cuba, USA), II RIAA 917–18, Award, 2 May 1929, Exh C-926.

[2014] *Ibid.* ¶ 868, quoting *BP Exploration Company (Libya) Limited v. Government of the Libyan Arab Republic*, Award (Merits), 10 October 1973, 53 Int'l L. Rep. 297, p. 329, Exh. C-931 (hereinafter "*BP Exploration*").

[2015] *Ibid.* ¶ 870, referring to *Walter Fletcher Smith Case* (Cuba, USA), II RIAA 917–18, Award, 2 May 1929, Exh C-926.

1535. Claimants challenge Respondent's assertion that States should be afforded a particularly wide margin of discretion when seeking to collect taxes. According to Claimants, a State alleging that it has legitimately exercised its powers of taxation is not impervious to scrutiny under international law;[2018] "taxation, like the exercise of any other sovereign power, can be expropriatory."[2019]

1536. With regard to non-discrimination, Claimants assert that it is defined as the singling out of a person or group of people without a reasonable basis. Thus, Claimants submit, a finding of "unjustified differential treatment, whether in law or in fact," has been regarded as discriminatory.[2020] Claimants quote a commentary that the "expropriation of an investment because of animosity between the host-state officials and the investor or in retaliation for lawful, but politically unpopular, conduct of the investment would violate the non-discrimination condition."[2021] Claimants add that, as in the case of Article 10(1) of the ECT, discrimination under Article 13(1) refers not only to nationality-based discrimination, but to other types of unjustified discriminatory treatment as well.[2022]

1537. Claimants also maintain that, by stating that an expropriation must be "carried out under due process of law," the ECT, unlike some other investment treaties, requires that expropriations conform not only to local, but also international standards of due process.[2023] Claimants argue that due process "contains both substantive and procedural elements";[2024] implies that "whenever a State seizes property, the measures taken must be free from arbitrariness" and that the "administrative or judicial machinery used or available must correspond at least to the minimum standard required by international law;"[2025] and requires that the investor must be

---

[2016] *Ibid.*, referring to Kenneth Vandevelde, *Bilateral Investment Treaties, History, Policy and Interpretation* (OUP 2010), p. 272, Exh. C-1018.

[2017] *Ibid.*

[2018] Reply ¶ 754.

[2019] *Ibid.* ¶¶ 756, 761.

[2020] Memorial ¶ 878, citing *ADC Affiliate Limited and ADC & ADMC Management Limited v. The Republic of Hungary*, ICSID ARB/03/16, Award, 2 October 2006, Exh. C-980 (hereinafter "*ADC*"); *BP Exploration* ¶ 329, Exh. C-931.

[2021] *Ibid.* ¶ 879, citing Kenneth J. Vandevelde, *Bilateral Investment Treaties: History, Policy and Interpretation* (OUP, 2010), p. 273, Exh. C-1018.

[2022] Reply ¶¶ 637, 733.

[2023] Memorial ¶ 882.

[2024] *Ibid.* ¶ 883, quoting OECD, Draft Convention on the Protection of Foreign Property, Notes and Comments, Art. 3, 7 ILM 117, p. 126, Exh. C-1040.

[2025] *Ibid.*

given "reasonable advance notice, a fair hearing and an unbiased adjudicator to assess the actions in dispute."[2026]

1538. Finally, Claimants submit that the taking of property without compensation engages the international responsibility of States, regardless of the purpose of the taking.[2027]

**(b)    Respondent's Position**

1539. Respondent submits that the standard for expropriation under Article 13 of the ECT must not be conflated with the standard for fair and equitable treatment under Article 10(1), as otherwise the taxation carve-out of Article 21, pursuant to which a tribunal may lack jurisdiction over fair and equitable treatment claims, while retaining jurisdiction over claims of expropriation, would be rendered meaningless.[2028]

1540. Respondent also contends that the absence of one or more of the four requirements of Article 13(1) (*i.e.*, public purpose, non-discrimination, due process and compensation) "is not in itself indicative of expropriation."[2029]

1541. Respondent submits that, to show expropriation or equivalent measures under Article 13(1), Claimants must (in addition to showing that the challenged actions are attributable to Respondent and constitute an exercise of *puissance publique*), demonstrate firstly that the challenged measures "proximately" caused a total or substantial deprivation of their investment;[2030] and secondly that they  interfered with their legitimate expectations.[2031]

1542. The importance of the causal link between the challenged measures and the investors' investment, argues Respondent, has been confirmed by international tribunals in *Otis Elevator v. Iran*, *Elettronica*, *Link-Trading Joint Stock Company v. Moldova* and *El Paso v.*

---

[2026]   *Ibid.* ¶ 884, quoting *ADC* ¶ 435.

[2027]   *Ibid.* ¶ 888, citing *Santa Elena* ¶¶ 71–72.

[2028]   Transcript, Day 19 at 103–105 (Respondent's closing), referring to *Nations Energy Inc. and others v. Panama*, ICSID ARB/06/19, Award, 24 November 2010 ¶¶ 682–83, Exh. R-1032; *Fireman's Fund Insurance Company v. The United Mexican States*, ICSID ARB(AF)/02/01, Award, 17 July 2006 ¶ 208, Exh. R-1141.

[2029]   Transcript, Day 19 at 103–105 (Respondent's closing), quoting *Corn Products International Inc. v. The United Mexican States*, ICSID ARB(AF)/04/01, Decision on Responsibility, 15 January 2008 ¶ 90, Exh. R-1108.

[2030]   Counter-Memorial ¶¶ 1096–1104; Rejoinder ¶¶ 403–06; Transcript, Day 19 at 108–10 (Respondent's closing); Respondent's Post-Hearing Brief ¶ 173.

[2031]   Rejoinder ¶¶ 407–24; Transcript, Day 19 at 123–24 (Respondent's closing).

*Argentina*.[2032]  By applying the standard resulting from these precedents to the present case, Respondent submits that Claimants must prove that the loss of their shares was the "only possible, unavoidable consequence of conduct attributable to Respondent, conduct that is *iure imperii* and not excluded under Article 21 ECT."[2033]  Therefore, Claimants cannot base a claim for expropriation on damages suffered as a result of their own conduct or the conduct of their investment.[2034]

1543. As regards investors' legitimate expectations, Respondent submits that they are a "central element of claims" under Article 13(1) of the ECT.[2035]  Respondent argues that this is in accordance with the treaty practice of both ECT and non-ECT Contracting Parties, which, in turn, reflects customary international law.[2036]  Respondent then submits that:

> [P]roperty rights have inherent limitations.  The host State has the power to accept and define the rights acquired by an investor at the time of the making of the investment.  And a foreign investor acquires rights in an investment, subject to the existing regulatory framework.  So absent a specific commitment from the host State to the investor, an expropriation may occur only where the State measure does not reflect a pre-existing lawful limitation inherent in private property.[2037]

1544. Thus, argues Respondent, without a specific commitment from the host State, an investor has no right or legitimate expectation to non-enforcement or exemption from taxes and associated penalties, regardless of any earlier knowledge or tolerance of the tax authorities.[2038]  Moreover, legitimate expectations cannot be based on host State commitments when the investor has provided the State with incomplete and inaccurate information.   Nor can legitimate

---

[2032]   Transcript, Day 19 at 106–109 (Respondent's closing), referring to *Otis Elevator Company v. Iran*, Iran–United States Claims Tribunal Case No. 284, (1987) 14 I. 28, Award, 29 April 1987 ¶ 47, Exh. R-1113; *Case Concerning Elettronica Sicula S.p.A. (ELSI)*, United States v. Italy, Judgment, 20 July 1989 ¶ 119, Exh. C-942; *Link-Trading Joint Stock Company v. Moldova*, UNCITRAL, Final Award, 18 April 2002 ¶ 91, Exh. R-3533; *El Paso* ¶ 272, Exh. C-1544/R-4190.

[2033]   Transcript, Day 19 at 108.

[2034]   Counter-Memorial ¶ 1103.

[2035]   Transcript, Day 19 at 123–24 (Respondent's closing), referring to *LG&E* ¶¶ 189–90.

[2036]   Transcript, Day 19 at 124–25 (Respondent's closing), citing 2004 and 2012 U.S. Model BITs, Annex B ¶ 1, Exhs. R-3513 and R-3514; 2004 Canada Model BIT, Annex B.13(1) ¶ b, Exh. R-3512; Canada–Romania BIT, Annex B ¶ (b), Exh. R-3494; Canada–Latvia BIT, Annex B, ¶ (2), Exh. R-3491; Canada–Czech Republic BIT, Annex A, ¶ (b), Exh. R-4646; India–Latvia BIT, Protocol *ad* Articles 5, ¶ (4)(a), Exh. R-4648; Slovak Republic–India BIT ¶ 2, Exh. R-4649.

[2037]   Transcript, Day 19 at 125–26 (Respondent's closing); *see also* Counter-Memorial ¶ 982.

[2038]   Counter-Memorial ¶ 984; Transcript, Day 19 at 129–30 (Respondent's closing); *see also* Respondent's Post-Hearing Brief ¶ 184.

expectations be premised on illegal conduct.[2039]   Respondent also submits that legitimate expectations include an expectation of "the evolution of the regulatory regime, including through interpretation or application of the law, even if without precedent, and changes through legislative amendment."[2040]

1545. In addition, Respondent submits that a distinction must be made between expropriatory measures that breach a host State's obligations under the ECT and the legitimate exercise of a State's regulatory power, including for the imposition and enforcement of taxes.[2041]   Factors which distinguish one from the other include the compatibility of the measures with international and comparative standards, as well as their compatibility with national law and review by domestic courts.[2042]   Applying the latter criterion, Respondent submits that States cannot usually incur international responsibility through the actions of their tax authorities so long as domestic courts are available to resolve disputes between the tax authorities and taxpayers.[2043]

1546. Thus, in the present case, to establish a violation of Article 13(1) of the ECT, Claimants must demonstrate that the decisions of the Russian courts that upheld the challenged taxation measures, as well as the decisions issued in the context of Yukos' bankruptcy, are themselves "measures having effect equivalent to nationalization or expropriation."[2044]   Accordingly, Respondent says, Claimants must demonstrate that these decisions were the result of a systemic failure of the Russian judicial system or, at a minimum, are manifestly improper, abusive, extraordinarily excessive or arbitrary, in manifest violation of Russian law, and in violation of international and comparative standards, so as to place them outside Russia's wide margin of discretion in taxation matters.[2045]   Respondent emphasizes that this Tribunal cannot sit as an appellate court reviewing the decisions of the Russian courts.

---

[2039] Transcript, Day 19, 126–27 (Respondent's closing), referring to *International Thunderbird Gaming Corporation v. The United Mexican States*, UNCITRAL, Award, 26 January 2006 ¶ 208, Exh. R-1143.

[2040] Respondent's Post-Hearing Brief ¶ 185.

[2041] Transcript, Day 19, 133–34 (Respondent's closing); Respondent's Post-Hearing Brief ¶ 191.

[2042] Transcript, Day 19 at 136, 142 (Respondent's closing); Respondent's Post-Hearing Brief ¶¶ 192–93.

[2043] Transcript, Day 19 at 136, 141–42 (Respondent's closing).

[2044] Counter-Memorial ¶ 1107; Rejoinder ¶ 425.

[2045] Rejoinder ¶¶ 425–69.

1547. Finally, Respondent submits that Claimants must establish a violation of the requirements in Article 13(1) of the ECT.[2046]   Regarding the non-discrimination requirement, Respondent submits that Article 13(1) calls for proof that similar cases were, without reasonable justification, treated differently on the basis of nationality.   Accordingly, Claimants must allege differential treatment based on foreign ownership.[2047]

### 3.   Did Respondent's Actions Constitute Expropriation (or "Measures Having Effect Equivalent to Nationalization or Expropriation") within the Meaning of Article 13(1) of the ECT?

#### (a)   Claimants' Position

1548. According to Claimants, Respondent completely and totally deprived Claimants of their investments in Yukos through a series of "coordinated and mutually reinforcing actions," which were motivated by a political and economic agenda and not any legitimate tax collection purpose.[2048]

1549. Claimants submit that Respondent expropriated their investments by:[2049]

(a)   seizing, in October 2003, approximately 99 percent of the shares held by Hulley and YUL in Yukos, thus preventing Claimants from disposing of their shares before they lost all value;[2050]

(b)   causing the unwinding of the Yukos–Sibneft merger, allowing the State-owned company Gazprom to acquire Sibneft;[2051]

(c)   "fabricat[ing] massive tax debts" against Yukos, while simultaneously freezing or seizing the company's assets and interfering with its day-to-day management

---

[2046]   *Ibid.* ¶¶ 471–86.

[2047]   *Ibid.* ¶ 765.

[2048]   Memorial ¶¶ 801, 829–64.   The measures Claimants consider to be expropriatory are discussed at length in Part VIII.

[2049]   *Ibid.* ¶¶ 802–28.

[2050]   *Ibid.* ¶¶ 803–804.   The seizure of about 4.5 percent of Hulley's and YUL's shares in Yukos was subsequently revoked, but 94.5 percent remained frozen until the liquidation of Yukos in November 2007.

[2051]   *Ibid.* ¶¶ 805–807.   For a discussion of the unwinding of the Yukos–Sibneft merger see Chapter VIII.D.

through the harassment of executive officers, employees and other related persons, "thereby engineering the circumstance of non-payment";[2052]

(d)   selling YNG in a sham auction that allowed State-owned company Rosneft to acquire Yukos' "crown jewel" for an "absurdly low price";[2053] and

(e)   initiating and controlling the Yukos bankruptcy so as to obtain, either directly or through State-owned Rosneft, Yukos' main production assets, as well as almost all of the bankruptcy proceeds.[2054]

1550. Claimants submit that the liquidation of Yukos on 21 November 2007 "marked the final act in the expropriation of Yukos."[2055]

1551. Finally, Claimants argue that, even viewed individually, the harassment campaign against Yukos and its associates, the sale of YNG and the bankruptcy of Yukos each constitute an act of expropriation.[2056]

### (b)   Respondent's Position

1552. Respondent submits that Claimants have failed to establish that any of the challenged measures constitute expropriation or "measures having effect equivalent to nationalization or expropriation" within the meaning of Article 13(1) of the ECT.

1553. Firstly, Respondent maintains that Claimants have failed to establish that conduct that is attributable to Respondent and an exercise of its sovereign power proximately caused Claimants' total or substantial deprivation of their investment.[2057]   Respondent argues that the actions that directly caused Yukos' liquidation and the ensuing loss of Claimants' Yukos shares—the bankruptcy petition and the decision to liquidate Yukos—are either not attributable to Respondent, or not an exercise of its sovereign power.[2058]   The Moscow Arbitrazh Court's

---

[2052]  *Ibid.* ¶¶ 808–12.  For a discussion of the legitimacy of the Russian Federation's tax assessments against Yukos see Chapter VIII.B.  For a discussion of the "harassment campaign" against Yukos and related persons see Chapter VIII.C.

[2053]  *Ibid.* ¶¶ 813–19.  For a discussion of the YNG auction see Chapter VIII.F.

[2054]  *Ibid.* ¶¶ 820–25. For a discussion of the Yukos bankruptcy see Chapter VIII.G.

[2055]  *Ibid.* ¶¶ 826–27.

[2056]  *Ibid.* ¶ 858.

[2057]  *Ibid.* ¶¶ 1096–1104.

[2058]  Respondent's Post-Hearing Brief ¶ 174.

acceptance of the bankruptcy petitions and ratification of the creditors' decision to liquidate Yukos does not change this conclusion, as loss resulting from a court's enforcement of legal limitations inherent in private property is not compensable under Article 13 of the ECT, irrespective of whether the court proceedings were instituted by a State organ.[2059]

1554. According to Respondent, it is therefore not responsible for the loss of Claimants' investment unless "Claimants can prove that Respondent is responsible for Yukos' financial situation that led to its liquidation."[2060] Yet, argues Respondent, Yukos' financial situation was actually "the result of Claimants' and their owners' decision to siphon off billions of dollars from Yukos and its subsidiaries to further their own financial interests, at the expense of Yukos' creditors and minority shareholders."[2061]

1555. Respondent emphasizes that Claimants could have avoided Yukos' insolvency, which, in Respondent's view, led to Yukos' bankruptcy and eventual liquidation, by paying the taxes assessed against it for years 2000–2003 in the first quarter of 2004; filing amended VAT and other tax returns; and petitioning for a refund of any amounts paid that it believed not to be legally due.[2062]

1556. As for the criminal proceedings against Messrs. Khodorkovsky and Lebedev and certain Yukos officials, as well as the searches, seizures and arrests carried out in support of those proceedings, Respondent submits that these events did not cause Yukos' liquidation. According to Respondent, the evidence establishes that these measures did not impair Yukos' operations.[2063]

1557. Respondent further contends that Claimants have failed to establish that the measures they challenge interfered with Claimants' legitimate expectations.[2064]

1558. With regard to the tax assessments, Respondent argues that Claimants had no "legitimate expectation that the tax authorities would not apply the substance-over-form, proportionality, and bad-faith taxpayer doctrines to attribute the income nominally earned by Yukos' sham

---

[2059]  *Ibid.* ¶ 178.

[2060]  *Ibid.* ¶ 179.

[2061]  *Ibid.* ¶ 179; *see also* Rejoinder ¶ 746.

[2062]  Rejoinder ¶ 745.  For a detailed discussion, see paragraphs 679–97, 745–50, and 934–45 above.

[2063]  Respondent's Post-Hearing Brief ¶ 182.

[2064]  Counter-Memorial ¶¶ 978–1095.

trading shells to Yukos," because Respondent had never made any specific representation, based upon full disclosure, that Respondent would allow Yukos to operate its tax schemes with impunity.[2065]   Nor had Claimants ever sought or obtained a formal tax ruling on the legality of Yukos' tax scheme.[2066]   In fact, prior to the 2000 Tax Audit Report, according to Respondent, Yukos sought, but was unable to obtain, a legal opinion supporting the legality of its tax scheme.[2067]

1559. In addition, Respondent submits that Claimants had no legitimate expectation that Yukos would not be held liable for the taxes assessed.   According to Respondent, the attribution for tax purposes of revenues nominally earned by sham entities to a company that sought to evade taxes was a proper application of legal doctrines that were well-settled in Russia, and are employed by many other States.[2068]   Yukos itself, argues Respondent, was well aware that its tax schemes, if discovered or disclosed, would result in substantial tax liabilities.[2069]

1560. Respondent also argues that the Russian legislation on which the enforcement measures (including the asset freezes, fines, default interest, enforcement fees and the forced sales of Yukos' assets) were based was already extant in the 1990s.   These enforcement measures were thus foreseeable consequences of Yukos' failure to pay.[2070]

1561. Respondent then submits that the measures taken for the imposition and enforcement of taxes were well within the range of a State's generally accepted regulatory powers.[2071]   This is shown by the fact that these measures were in conformity with Russian law and were upheld by national courts, and were in accordance with international and comparable standards and practices of other countries.[2072]

1562. According to Respondent, Claimants have failed to show that the Russian courts contributed to any "measures having effect equivalent to nationalization or expropriation" through any of the

---

[2065]   Respondent's Post-Hearing Brief ¶ 187–88; *see also* Counter-Memorial ¶¶ 1030–65; Rejoinder ¶¶ 748–756.  For a discussion of the state of tax law in Russia at the relevant time see Chapters VIII.A and VIII.B.

[2066]   Respondent's Post-Hearing Brief ¶ 186.

[2067]   Respondent's Post-Hearing Brief ¶ 186.

[2068]   Respondent's Post-Hearing Brief ¶ 188 (*see* discussion in Chapters VIII.A and VIII.B).

[2069]   Counter-Memorial ¶¶ 1003–29; Rejoinder ¶¶ 584–645; Respondent's Post-Hearing Brief ¶ 189.

[2070]   Respondent's Post-Hearing Brief ¶ 189.

[2071]   *Ibid.* ¶ 191.

[2072]   *Ibid.* ¶ 192–93; *see also* Counter-Memorial ¶¶ 1106, 1120–1232.

decisions they issued in the context of the enforcement of the tax demands,[2073] the Yukos–Sibneft demerger,[2074] the criminal proceedings against Messrs. Khodorkovsky and Lebedev,[2075] or the Yukos bankruptcy proceedings.[2076]

1563. Finally, Respondent submits that the ECtHR unanimously determined that the challenged tax assessments were a legitimate exercise of Respondent's regulatory powers.[2077]  According to Respondent, given that the vast majority of the ECT Contracting States (including the Russian Federation, the United Kingdom, and Cyprus) are also ECHR Contracting States and that the ECHR enshrines the common *ordre public* of the European States in terms of democracy and the rule of law, the "ECtHR's interpretation and application of the ECHR to the measures at issue, through a final and binding judgment, must be taken into account under Article 31(3)(c) VCLT in assessing whether they are within the bounds of generally recognized regulatory powers."[2078]

### 4. If Respondent's Actions Constitute Expropriation, Has Respondent Met the Criteria for a Lawful Expropriation under Article 13(1) of the ECT?

#### (a) Claimants' Position

1564. Claimants submit that Respondent did not meet any of the four requirements under Article 13(1) of the ECT for a lawful expropriation (*i.e.*, public interest, non-discrimination, due process and adequate compensation).[2079]

1565. According to Claimants, the expropriation of Claimants' investment was not in the public interest.  In fact, "the facts of the case unmistakably show that the actions of the Russian Federation had nothing to do with the legitimate exercise of sovereign power, whether taxation, law enforcement or otherwise, but were rather a blatant confiscation of strategic assets and the

---

[2073] Counter-Memorial ¶¶ 1337–1434.

[2074] *Ibid.* ¶¶ 1435–51.

[2075] *Ibid.* ¶¶ 1452–6.

[2076] *Ibid.* ¶¶ 1457–1543.

[2077] Respondent's Post-Hearing Brief ¶¶ 194–95, referring to ECtHR Yukos Judgment ¶ 606, Exh. R-3328 (" . . . each of the Tax Assessments 2000–2003 pursued a legitimate aim of securing the payment of taxes and constituted a proportionate measure in pursuance of this aim.").

[2078] Respondent's Post-Hearing Brief ¶ 195; *see also* Transcript, Day 19 at 143–49.

[2079] Memorial ¶¶ 865–90.

elimination of a potential political opponent."[2080]   Claimants invoke the finding of the *RosInvestCo* tribunal that the Russian Federation's actions were "linked to the strategic objective to return assets to the control of the Russian State and to an effort to suppress a political opponent."[2081]   According to Claimants, Respondent's justification that it only sought to enforce its laws is without any basis.[2082]

1566.   Claimants also submit that the expropriation of their investments was discriminatory and was not carried out under due process of law.[2083]   Nor was the expropriation accompanied by compensation, let alone "prompt, adequate and effective compensation."[2084]

1567.   Claimants conclude that the Russian Federation's actions are in breach of Article 13(1) and constitute an internationally wrongful act for which Respondent is responsible.[2085]

### (b)   Respondent's Position

1568.   Even if Claimants could establish expropriation, which Respondent contends they cannot, Respondent maintains that the requirements in Article 13(1) of the ECT have not been breached.

1569.   Respondent submits that no lack of public interest has been established.[2086]   Respondent states that its actions were legitimate, as "the purposes justifying imposition and enforcement of taxes, including severe penalties, fines and other sanctions in case of non-compliance of taxpayers with their obligations to pay taxes, are firmly recognized in international law."[2087]   Respondent asserts that Claimants have not addressed the ECtHR's rejection of Yukos' "political motivation" charge.[2088]

---

[2080]   Claimants' Post-Hearing Brief ¶ 167; *see also* Memorial ¶¶ 1010–12; Reply ¶¶ 511–13.

[2081]   Reply ¶ 726.

[2082]   *Ibid.* ¶¶ 745–838.

[2083]   *Ibid.* ¶¶ 881, 885–87.

[2084]   *Ibid.* ¶ 889.

[2085]   *Ibid.* ¶ 890.

[2086]   Counter-Memorial ¶¶ 1318–36.

[2087]   *Ibid.* ¶ 1324.

[2088]   Rejoinder ¶ 764.

1570. Respondent also contends that Claimants have failed to establish discrimination under Article 13(1)(b) of the ECT because Claimants do not allege any discrimination based on foreign ownership or residence, which Respondent contends is the intended scope of the term "discriminatory" in this provision.[2089]   Respondent submits that selective tax enforcement is not discriminatory within the meaning of Article 13(1)(b) of the ECT.

1571. According to Respondent, Yukos "was a visible and logical candidate for tax assessments, penalties, and enforcement actions" as its abuses of the low-tax region policy were particularly egregious and the amounts of taxes it evaded unprecedented.[2090]   Other Russian oil companies, argues Respondent, cannot be compared.   Some companies, such as Rosneft, Tatneft and Surgutneftegaz did not resort to tax minimization schemes involving the use of low-tax regions.[2091]   While some other companies, such as Lukoil, did use such schemes, they abandoned them much earlier than Yukos.[2092]   Other companies, which continued to rely on the low-tax regions program, for example Sibneft, satisfied the "proportionality of investments" requirement of the Russian anti-avoidance rules.[2093]   Finally, tax arrears, default interest and fines were in fact assessed against some companies, including TNK-BP, Sibneft and Lukoil.[2094]

1572. Respondent also submits that Claimants have failed to establish due process violations cognizable under Article 13(1)(c) of the ECT.   For this assertion, Respondent relies on its own articulation of the requisite legal standard, namely that "administrative authorities cannot be faulted for conduct upheld by their own courts unless the court system is disavowed at the international level," which Respondent argues is not the case here.[2095]

1573. Respondent contends that in the present case most of the due process violations raised by Claimants have been reviewed by Russian courts and dismissed on the merits, while the due process arguments raised by Claimants for the first time in this arbitration are "specious."[2096]

---

[2089]   Counter-Memorial ¶¶ 1238–51.

[2090]   *Ibid.* ¶¶ 1255, 1268.

[2091]   *Ibid.* ¶ 1260.

[2092]   *Ibid.* ¶¶ 1261, 1269.

[2093]   *Ibid.* ¶ 1262.

[2094]   *Ibid.* ¶ 1264.

[2095]   *Ibid.* ¶ 1280.

[2096]   *Ibid.* ¶ 1290.

1574. Respondent specifically submits that the pace of the court proceedings that led to decisions upholding the Tax Ministry's tax demands against Yukos was in conformity with Russian procedural law and practice. Respondent notes that, pursuant to Article 215(1) of the Arbitrazh Procedure Code, first instance judgments in tax disputes must be rendered no later than two months after institution of the court proceedings.[2097] Respondent denies that Yukos was not provided with sufficient time to review documents during the collection proceedings pertaining to the 2000 Decision conducted by Judge Grechishkin.[2098] Respondent also argues that the removal of Judge Cheburashkina and the recusal of Judge Mikhailova were proper, as there was cause to doubt the impartiality of these two judges.[2099] Finally, Respondent argues that Yukos' challenges to Judges Korotenko and Dzuba (who were charged with reviewing Yukos' challenges to the 2001 Decision and 2002 Decision, respectively) on the ground that they had previously been involved in other proceedings for the collection of taxes against Yukos, were soundly rejected, as Yukos was not able to point to any rule of Russian law that would prevent a judge from hearing similar or related cases.[2100]

### D.   TRIBUNAL'S DECISION ON BREACH OF THE ECT

1575. As set out in Section X.C.2 above, the Parties are in sharp disagreement about the place and content of the legitimate expectations that Yukos had or could have had in devising and implementing its tax avoidance arrangements. Claimants maintain, as Mr. Dubov testified, that the most senior officials of the Russian Federation were informed of and approved Yukos' plans in respect of low-tax jurisdictions. Claimants point to the legislation of those jurisdictions which, while requiring a specified level of local investment by a trading company, for the most part did not refer to or require the presence of trading company personnel in the low-tax jurisdiction or specify that the activities of the trading company take place in that jurisdiction. Respondent stresses that virtually all the significant work of the trading companies was done not in the low-tax jurisdictions by a small number of low-level and uninformed functionaries but in and by Yukos' Moscow offices, facts that led two panels of the ECtHR to conclude that the trading companies were  a "sham". Respondent emphasizes that Yukos never

---

[2097]  Counter-Memorial ¶¶ 1291–92, referring to *Arbitrazh Procedure Code*, Art. 215, Exh. R-1566.

[2098]  *Ibid.* ¶¶ 1293–99.

[2099]  *Ibid.* ¶¶ 1300–1301.  For a description of the removal of Judge Cheburashkina and the recusal of Judge Mikhailova, see paragraphs 527–28, 539 above.

[2100]  *Ibid.* ¶¶ 1302–51.  For a description of the challenges to Judges Korotenko and Dzuba, see paragraphs 553, 563 above.

secured and apparently was unable to secure a legal opinion upholding the lawfulness of its tax planning arrangements and operations.

1576. The Tribunal accepts that federal legislation and the legislation of the low-tax jurisdictions did not provide, or at any rate, uniformly provide, that the trading companies actually conduct their trading operations in the territory of the low-tax jurisdictions. Such a provision in any event would have been increasingly deprived of its force in view of the advent of electronic communications. Nevertheless there are indications in the record that Yukos itself had doubts, or at least apprehensions, about the legality of aspects of its *modus operandi*. Internal Yukos communications noted above at paragraph 491 so suggest, as may the unwillingness of Mr. Khodorkovsky to sign papers required for SEC registration. Yukos was able to advance no convincing explanation for the "Lesnoy shuffle", which may well have been carried out to frustrate investigation of perceived tax improprieties. While both PwC (Yukos' tax consultants) and Mr. Pepeliaev (Yukos' tax lawyer) opined in early January 2004, after the initial tax assessment was issued, that the tax assessment against Yukos itself was not well-founded,[2101] the absence of a prior legal opinion supporting the propriety of Yukos' arrangements in the low-tax jurisdictions is striking and may be suggestive. So also is the inability of Yukos to explain immense payments to former Yukos employees and its inability to sustain the claim that certain of its primary trading companies (the BBS companies) were not controlled by it. There is also the issue of the questionable use by Claimants of the Cyprus-Russia DTA, which the Tribunal addresses in Chapter X.E on contributory fault.

1577. The Tribunal has not overlooked or discounted the foregoing and other weaknesses in the contentions of Claimants. But are they sufficient to support what the Tribunal understands to be a central contention of Respondent, namely, that Claimants should have expected that the Russian Federation would react as it did to what it claims were violations of Russian tax law and practice as its courts had interpreted that law and practice to be?

1578. In the view of the Tribunal, the expectations of Claimants may have been, and certainly should have been, that Yukos' tax avoidance operations risked adverse reaction from Russian authorities. It is common ground between the Parties that Yukos and its competitors viewed

---

[2101] *See* Letter from Michael Kubena to Bruce Misamore, 15 January 2004, Exh. C-609; Sergey Pepeliaev, Summary of the Tax Inspection of OAO NK Yukos, 5 January 2004, Exh. C-1128; Sergey Pepeliaev et al., Opinion Regarding Compliance with Legislation of Inspection Report No. 08-1/1 of 29 December 2003 issued by the Tax Ministry of Russia, 15 January 2004, Exh. C-1129 (all referring to the 2000 Audit Report, Exh. C-103). *See also* paragraphs 705, 706 and 1195 above.

positions taken by the tax authorities on issues of tax liability to be exigent, erratic and unpredictable.  The Tribunal however is unable to accept that the expectations of Yukos should have included the extremity of the actions which in the event were imposed upon it.  Not only did Mikhail Khodorkovsky not appear to expect to be arrested even after the arrest of Platon Lebedev, he and his colleagues surely could not have been expected to anticipate the rationale and immensity of the tax assessments and fines.  They could not have been expected to anticipate that their legal counsel would labor under the disabilities imposed upon them.  They could not have been expected to anticipate the sale of YNG for so low a price under such questionable circumstances.  They could not have been expected to anticipate that more than thirteen billion dollars in unpaid taxes and fines would be imposed on Yukos for unpaid VAT on oil exports when that oil had in fact been exported.  They could not have been expected to anticipate that they risked the evisceration of their investments and the destruction of Yukos.

1579. The Tribunal has earlier concluded that "the primary objective of the Russian Federation was not to collect taxes but rather to bankrupt Yukos and appropriate its valuable assets."[2102]   For the reasons that emerge in Part VIII, if the true objective were no more than tax collection, Yukos, its officers and employees, and its properties and facilities, would not have been treated, and mistreated, as in fact they were.  Among the many incidents in this train of mistreatment that are within the remit of this Tribunal, two stand out:  finding Yukos liable for the payment of more than 13 billion dollars in VAT in respect of oil that had been exported by the trading companies and should have been free of VAT and free of fines in respect of VAT; and the auction of YNG at a price that was far less than its value.  But for these actions, for which the Russian Federation for reasons set out above and in preceding chapters was responsible, Yukos would have been able to pay the tax claims of the Russian Federation justified or not; it would not have been bankrupted and liquidated (unless the Russian Federation were intent on its liquidation and found still additional grounds for achieving that end, as the second criminal trial of Messrs. Khodorkovsky and Lebedev indeed suggests).

1580. Respondent has not explicitly expropriated Yukos or the holdings of its shareholders, but the measures that Respondent has taken in respect of Yukos, set forth in detail in Part VIII, in the view of the Tribunal have had an effect "equivalent to nationalization or expropriation".  The four conditions specified in Article 13 (1) of the ECT do not qualify that conclusion.

---

[2102]   *See* paragraph 756 above.

1581. As to condition (a), whether the destruction of Russia's leading oil company and largest taxpayer was in the public interest is profoundly questionable.  It was in the interest of the largest State-owned oil company, Rosneft, which took over the principal assets of Yukos virtually cost-free, but that is not the same as saying that it was in the public interest of the economy, polity and population of the Russian Federation.

1582. As to condition (b), the treatment of Yukos and the appropriation of its assets by Rosneft (and to a much lesser extent, another State-owned corporation, Gazprom), when compared to the treatment of other Russian oil companies that also took advantage of investments in low-tax jurisdictions, may well have been discriminatory, a question that was inconclusively argued between the Parties and need not be and has not been decided by this Tribunal.

1583. As to condition (c), Yukos was subjected to processes of law, but the Tribunal does not accept that the effective expropriation of Yukos was "carried out under due process of law" for multiple reasons set out above, notably in Section VIII.C.3.  The harsh treatment accorded to Messrs. Khodorkovsky and Lebedev remotely jailed and caged in court,  the mistreatment of counsel of Yukos and the difficulties counsel encountered in reading the record and conferring with Messrs. Khodorkovsky and Lebedev, the very pace of the legal proceedings, do not comport with the due process of law.  Rather the Russian court proceedings, and most egregiously, the second trial and second sentencing of Messrs. Khodorkovsky and Lebedev on the creative legal theory of their theft of Yukos' oil production, indicate that Russian courts bent to the will of Russian executive authorities to bankrupt Yukos, assign its assets to a State-controlled company, and incarcerate a man who gave signs of becoming a political competitor.

1584. As to condition (d), what in any event is incontestable is Respondent's failure to meet its prescription, because the effective expropriation of Yukos was not "accompanied by the payment of prompt, adequate and effective compensation", or, in point of fact, any compensation whatsoever.  In order for the Russian Federation to be found in breach of its treaty obligations under Article 13 of the ECT, the foregoing violations of the conditions of Article 13 more than suffice.

1585. It follows that Respondent stands in breach of its treaty obligations under Article 13 of the ECT.  Accordingly Respondent's liability under international law for breach of treaty is established.  The Tribunal reaches this conclusion based on its consideration of the totality of the extensive evidence before it.  Having found Respondent liable under international law for

breach of Article 13 of the ECT, the Tribunal does not need to consider whether Respondent's actions are also in breach of Article 10 of the Treaty.

1586. The establishment of liability under international law is at the heart of its doctrine and jurisprudence.  The Statute of the PCIJ, in Article 36(2), referred to "(c) the existence of any fact which, if established, would constitute a breach of an international obligation; (d) the nature or extent of the reparation to be made for the breach of an international obligation".  The identical provision is found in Article 36(2) of the Statute of the ICJ.

1587. The PCIJ held in the *Factory at Chorzów* case that:

> It is a principle of international law that the breach of an engagement involves an obligation to make reparation in an adequate form.   Reparation therefore is the indispensable complement of a failure to apply a convention and there is no necessity for this to be stated in the convention itself.[2103]

1588. In a subsequent phase of the *Factory at Chorzów*  case, the Court specified the content of the obligation of reparation in the following oft-quoted terms:

> The essential principle contained in the actual notion of an illegal act—a principle which seems to be established by international practice and in particular by the decisions of arbitral tribunals—is that reparation must, so far as possible, wipe out all the consequences of the illegal act and re-establish the situation which would, in all probability, have existed if that act had not been committed.  Restitution in kind, or, if this is not possible, payment of a sum corresponding to the value which a restitution in kind would bear; the award, if need be, of damages for the loss sustained which would not be covered by restitution in kind or payment in place of it—such are the principles which should serve to determine the amount of compensation due for an act contrary to international law.[2104]

1589. The ILC Articles on State Responsibility provide, in Article 31, an article entitled "Reparation", that "[t]he responsible State is under an obligation to make full reparation for the injury caused by the internationally wrongful act."   In support of this conclusion the Articles quote the foregoing holdings in the *Factory at Chorzów* case.[2105]

1590. Article 36 of the Articles, entitled "Compensation", provides that:

---

[2103] *Case concerning the Factory at Chorzów* (Germany v. Poland), Jurisdiction, Judgment, 26 July 1927, P.C.I.J., Series A, No. 9, p. 21, Exh. C-1501.

[2104] *Case concerning the Factory at Chorzów* (Germany v. Poland), Merits, Judgment, 13 September 1928, P.C.I.J., Series A, No. 17, p. 47, Exh. C-925.

[2105] Articles on Responsibility of States for Internationally Wrongful Acts with commentaries (Text adopted by the International Law Commission at its fifty-third session, in 2001), Articles 1–11 and 28–39, p. 91, Exh. C-1042.

> 1. The State responsible for an internationally wrongful act is under an obligation to compensate for the damage caused thereby . . . .

The commentary to the Articles states that:

> the function of compensation is to address the actual losses incurred as a result of the internationally wrongful act.  Compensation corresponds to the financially assessable damage suffered . . . it is not concerned to punish . . . nor does compensation have an expressive or exemplary character."[2106]

1591. Article 13 of the ECT specifies, in the event of expropriation, that "compensation shall amount to the fair market value of the Investment expropriated at the time immediately before the Expropriation . . . the Valuation Date."

1592. Article 39 of the ILC Articles on State Responsibility, entitled "Contribution to the injury," provides that  "[i]n the determination of reparation, account shall be taken of the contribution to the injury by wilful or negligent action or omission of the injured . . . entity in relation to whom reparation is sought."  The ILC's commentary to the Articles refers to notions of "contributory negligence" and "comparative fault".[2107]

1593. The Tribunal will assess damages in the light of the foregoing accepted principles of international law.

## E.   CONTRIBUTORY FAULT

### 1.   Introduction

1594. The Tribunal now has to determine whether the damages caused to Claimants by the wrongful acts of Respondent should be reduced because, as Respondent argues, "Claimants may not recover from the Russian Federation the fruits of their own wrongdoing."[2108]

1595. In support of its submission, Respondent invokes mainly the legal principle of contributory fault.  In its Closing Statement, Respondent argued that Claimants failed to establish that their loss was caused by the Russian Federation's actions in violation of its obligations under the ECT, notably by failing to account for the effects of Claimants' own actions and of Yukos'

---

[2106] *Ibid.*, p. 99.

[2107] *Ibid.*, pp. 109–10.

[2108] Respondent's Opening Statement, Vol. 10, Slide 4.

actions.[2109]   It argued[2110] that Claimants ignored Article 39 of the ILC Articles on State Responsibility, which provides:[2111]

> Article 39. Contribution to the injury
>
> In the determination of reparation, account shall be taken of the contribution to the injury by willful or negligent action or omission of the injured State or any person or entity in relation to whom reparation is sought.

1596. Extracts of the ILC's Commentary to Article 39 are pertinent, including the following:[2112]

> Article 39 deals with the situation where damage has been caused by an internationally wrongful act of a State, which is accordingly responsible for the damage in accordance with Articles 1 and 28, but where the injured State, or the individual victim of the breach, has <u>materially contributed</u> to the damage <u>by some willful or negligent act or omission</u>.
>
> [emphasis added]

1597. The Tribunal also refers to Article 31 of the ILC Articles on State Responsibility , which states:

> Article 31. Reparation
>
> 1. The responsible State is under an obligation to make full reparation for the injury caused by the internationally wrongful act.
>
> 2. Injury includes any damage, whether material or moral, caused by the internationally wrongful act of a State.

1598. The following extract from the ILC's Commentary to Article 31 is also noted:[2113]

> It is true that cases can occur where an identifiable element of injury can properly be allocated to one of several concurrently operating causes alone. <u>But unless some part of the injury can be shown to be severable in causal terms</u> from that attributed to the responsible State, the latter is held responsible for all the consequences, not being too remote, of its wrongful conduct.
>
> [emphasis added]

1599. The Tribunal must therefore decide, on the basis of the totality of the evidence before it, whether there is a sufficient causal link between any willful or negligent act or omission of the Claimants (or of Yukos, which they controlled) and the loss Claimants ultimately suffered at the hands of the Russian Federation through the destruction of Yukos.

---

[2109]   Respondent's Closing Statement, Vol. 12, Slide 4.

[2110]   Respondent's Closing Statement, Vol. 12, Slide 5.

[2111]   Articles on Responsibility of States for Internationally Wrongful Acts with commentaries (Text adopted by the International Law Commission at its fifty-third session, in 2001), Articles 1–11 and 28–39, p. 109 Exh. C-1042.

[2112]   *Ibid.*

[2113]   *Ibid.*, p. 93.

1600. The Tribunal notes that it is not any contribution by the injured party to the damage which it has suffered which will trigger a finding of contributory fault.  The contribution must be material and significant.  In this regard, the Tribunal has a wide margin of discretion in apportioning fault.

## 2.  Contributory Fault as Applied in Other Cases

1601. Before it proceeds with its analysis of the potential contributory fault of Claimants (and Yukos) in the present case which may have contributed to the injury caused to them by the internationally wrongful act of the Russian Federation, the Tribunal has reviewed decisions of investor-state tribunals which have addressed the principle of contributory fault.

1602. This review leads the Tribunal to three conclusions which will inform its analysis.

1603. Firstly, the legal concept of contributory fault must not be confused with the investor's duty to mitigate its losses.  There are cases where the claimant's damages were reduced because the tribunal found that it failed to take some reasonable steps to minimize its losses.  In such cases, "the injured party must be held responsible for its own contribution to the loss."[2114]

1604. Secondly, there are cases where the contributory fault of the investor, while it may have increased the loss which it sustained, was unrelated to the wrongdoing of the State.[2115]  The fault of the investor in those cases contributed to the losses which flowed from the wrongful act of the State.

1605. Finally, the Tribunal identified certain decisions where the tribunals found that the victim contributed to the State's wrongful conduct.[2116]  The contributory fault of the investor in those cases provoked the wrongful conduct of the State.

1606. While there is no doctrine of precedent *stricto sensu* in international arbitration, the Tribunal has found these decisions of assistance in its analysis.

---

[2114] *EDF International S.A. and Ors v. Argentine Republic*, ICSID, ARB/03/23, Award, 11 June 2012 ¶ 1301. *See also Middle East Cement Shipping and Handling Co. S.A. v. Arab Republic of Egypt*, ICSID, ARB/99/6, Award, 12 April 2002, Exh. C-962 and *AIG Capital Partners, Inc and Anor v. Republic of Kazakhstan*, ICSID, ARB/01/6, Award, 7 October 2003, Exh. R-1110.

[2115] *MTD. v. Chile*, Exh. C-969 and *Iurii Bogdanov, Agurdino-Invest Ltd. and Agurdino-Chimia JSC v. Republic of Moldova*, SCC Rules, Award, 22 September 2005, Exh. R-1179.

[2116] *Antoine Goetz & Consorts et S.A. Affinage des Metaux v. Republique du Burundi*, ICSID, ARB/01/2, Award, 21 June 2012 and *Occidental Petroleum Corporation and Occidental Exploration and Production Company v. Republic of Ecuador*, ICSID, ARB/06/111, Award, 5 October 2012 (a case also chaired by Mr. Fortier).

### 3.    Tribunal's Analysis

1607. In Chapter IX.A above, the Tribunal reviewed some 28 instances of alleged "illegal and bad faith conduct" by Claimants or "attributable to the Claimants", which Respondent argues have contributed to Yukos' demise or should, in any event, prevent Claimants from recovering damages from the Russian Federation.  For the reasons set out in that chapter, the Tribunal has already concluded that most of these "actions or omissions" cannot be considered as having materially contributed to Yukos' demise.

1608. There are, however, four remaining instances of alleged willful or negligent conduct by Claimants and/or Yukos which, the Tribunal agrees, must be considered as potentially constituting fault that may have contributed to the destruction of Yukos, for which the Tribunal has found Respondent responsible.  These four instances are:

    i)   Yukos' conduct in some of the low-tax regions;

    ii)   Yukos' use of the Cyprus-Russia DTA;

    iii)   Yukos' conduct in connection with the YNG auction, notably the procuring of a Temporary Restraining Order by a Texas court and the published threat of a "lifetime of litigation"; and

    iv)   Yukos' conduct in connection with its bankruptcy, notably the non-payment of the A Loan.

1609. The Tribunal will now review these four instances and seek to determine whether any one of them qualifies as contributory fault as that legal principle has been interpreted in the decisions which it has reviewed earlier.

### (a)    Conduct of Yukos in Some of the Low-Tax Regions

1610. At the outset of its review, the Tribunal needs to recall that the central, indeed the only, focus of its remit with respect to the tax optimization schemes in the ZATOs and other low tax regions of Russia was the series of arrangements implemented by one Russian oil company, Yukos. These arrangements have been documented by hundreds of exhibits which the Tribunal has considered and analyzed in Chapters VIII.A and VIII.B of the present Award.

1611. While there is ample evidence in the record that nearly all Russian oil companies also availed themselves of such tax optimization arrangements which were permitted by law, [2117] there is no evidence that the operations of those other oil companies, in any respect, breached the legislation and abused the low tax regimes as the Tribunal has found Yukos did through the sham-like nature of some elements of its operations in at least some of the low-tax regions notably in the ZATOs of Lesnoy and Trekhgorny.

1612. The Tribunal also recalls its further findings, in Chapters VIII.A and VIII.B above, that this abuse by Yukos in some of the low-tax regions occurred prior to the confrontation between President Putin and Mr. Khodorkovsky in February 2003. At the February 2003 meeting, President Putin said to Mr. Khodorkovsky that, henceforth, he would no longer receive any protection from the Kremlin. Specifically, President Putin said to Mr. Khodorkovsky: "We have already discussed it with you recently, that your company, for example, has had problems with the payment of taxes."[2118]

1613. This specific reference by President Putin to Yukos' tax issues at the February 2003 meeting is significant.

1614. While the Tribunal has concluded, on the basis of the totality of the evidence, that Respondent's tax assessments and tax collection efforts against Yukos were not aimed primarily at the collection of taxes, but rather at bankrupting Yukos and facilitating the transfer of its assets to the State, it cannot ignore that Yukos' tax avoidance arrangements in some of the low-tax regions made it possible for Respondent to invoke and rely on that conduct as a justification of its actions against Mr. Khodorkovsky and Yukos.

1615. Accordingly, even though the Tribunal has found that President Putin and his administration used Yukos' tax problems as a pretextual justification for setting in motion a plan to bankrupt Yukos, as opposed to just collecting the taxes that might have been legitimately assessed

---

[2117] Transcript of Testimony of Mikhail Kasyanov before the Khamovnichesky Court of Moscow of May 24, 2010, p. 3, Exh. C-440; Statement of Prime Minister Mikhail Mikhailovich Kasyanov of 8 July 2009 in *Khodorkovsky v. Russia 1*, ¶ 40, Exh. C-446; TNK-BP's use of low tax regions was disclosed in *TNK International Limited Interim Consolidated Financial Statements*, as of 30 June 2003, p. 8, Exh. C-391; and *TNK-BP Limited Consolidated Financial Statements*, as of 31 December 2003, Exh. C-392; Lukoil's use of low tax regions was noted in *Board of the Audit Chamber of the Russian Federation, Audit Chamber Report on Yukos, Lukoil and Sibneft for 2003 and January–March 2004*, Exh. R-266, *OAO Lukoil, Securities filing, Offering Circular*, 26 November 2002, Exh. R-322, and *OAO Lukoil, Annual Report for 2001*, Exh. R-321.

[2118] Video recording and transcript of the meeting of the members of the Union of Industrialists and Entrepreneurs with President V. Putin held in the Ekaterininsky Hall, Kremlin, on 19 February 2003, Exh. C-1396.

against the trading companies on the basis of the "bad faith taxpayer" doctrine, the Tribunal concludes that there is a sufficient causal link between Yukos' abuse of the system in some of the low-tax regions and its demise which triggers a finding of contributory fault on the part of Yukos.

### (b)   Conduct of Yukos under the Cyprus-Russia DTA

1616. As detailed in the Expert Reports of Thomas Z. Lys, Yukos' "tax optimization" plan included use of the trading companies in the low-tax regions to receive proceeds from the sale of Yukos' oil and oil products, and the transfer of those proceeds to other Yukos-controlled trading and holding companies in the Russian Federation and in off-shore jurisdictions such as Cyprus and the British Virgin Islands.[2119]

1617. Respondent, relying on the expert reports of Professor H. David Rosenbloom,[2120] Professor Dr. Stef van Weeghel and Mr. Polyvios G. Polyviou, has argued that Yukos' use of the Cyprus-Russia DTA was abusive.  Claimants, relying on the Expert Report of Mr. Philip Baker QC, counter Respondent's argument and assert that the use by Yukos of the DTA was not abusive. It is noteworthy that the Parties did not call as witnesses one another's respective experts on that issue.

1618. Claimants note that, to this day, the Russian authorities "have done absolutely nothing" in respect of the alleged improper invocation of DTA benefits by Claimants, including under the specific mechanisms of review that exist under the treaty itself and/or under the domestic laws of the contracting parties.[2121]  They also submit that the first time Respondent raised any issue regarding the tax arrangements subject to the Cyprus-Russia DTA was on 6 October 2006 in the present arbitration and that Respondent "concocted [this issue] specifically for the purposes of these arbitrations."[2122]

1619. The Tribunal accepts Claimants' argument that it is incongruous for the Russian Federation to complain in these proceedings about Yukos' use of the treaty while never having invoked the

---

[2119]   Second Lys Report, , pp. 39 ff.

[2120]   Respondent's Post-Hearing Brief, ¶¶ 150–61.

[2121]   Claimants' Post-Hearing Brief, ¶¶ 192–202.

[2122]   *Ibid.* ¶¶ 198–200, referring to Respondent's Comments on Issues Raised by Procedural Order No. 2 of 8 September 2006.

mechanisms available to it to trigger the review of such use by, for example, invoking the information-sharing provisions of the treaty.[2123]

1620. At the same time, it seems clear to the Tribunal, on the facts, that Yukos' operations under the DTA were wholly conducted by Mr. Lebedev from Yukos' established offices in Moscow, that his "place of management" where he habitually concluded contracts relating to operations under the Treaty was in Moscow, which of itself demonstrates that Yukos' avoidance of hundreds of millions of dollars in Russian taxes through the Cyprus-Russia DTA, was questionable.  Hulley appears to the Tribunal to have falsely declared on Cypriot withholding tax forms that "income"—dividends from Yukos—"was not connected with activities carried on in the Russian Federation" despite Mr. Lebedev's activities in Moscow.[2124]

1621. In any event, even if there was an abuse by Yukos of that treaty, as in the Tribunal's *prima facie* view there was, such conduct would be subsumed into and enlarge the abuse by some of Yukos' trading companies in some of the low tax regions, which the Tribunal has already found amounted to contributory fault on the part of Yukos.

### (c)    Conduct of Yukos in Connection with YNG Auction

1622. The Tribunal reiterates that the abusive use of some of the low-tax regions by Yukos including its questionable use of the Cyprus-Russia DTA occurred prior to the February 2003 encounter between President Putin and Mr. Khodorkovsky and thus prior to the plan formed by the Russian Federation not simply to collect taxes from Yukos but to bankrupt the company and transfer its assets to the State.

1623. The YNG auction took place in December 2004 well after Respondent had put in motion its plan to expropriate Yukos.  It was preceded by Yukos' resort to bankruptcy proceedings in Texas, the issuance of a Temporary Restraining Order by the Texas court, and Yukos' public threats, most strikingly a full page advertisement in the *Financial Times,* warning prospective purchasers of YNG against participating in the auction.

---

[2123]   Transcript, Day 20 at 146.

[2124]   Counter-Memorial, ¶ 164, referring to Hulley Enterprises Limited, Claims for an Exemption of Passive Incomes Sourced in Russia before the Payment is Made (Form 1013DT) for 2000, 2001, Exh. R-193; Veteran Petroleum Limited, Claims for an Exemption of Passive Incomes Sourced in Russia before the Payment is Made (Form 1013DT) for 2001, 2002, Exh. R-194; Hulley Enterprises Limited, Annual Report and Financial Statements for the year ended Dec. 31, 2003, 7 April 2004, Exh. R-190; Veteran Petroleum Limited, Annual Report and Financial Statements for the year ended Dec. 31, 2003, 15 December 2006 Exh. R-192.

1624. Respondent submits that these actions discouraged prospective purchasers of YNG from taking part in the auction and depreciated the price realized at the auction.

1625. The Tribunal agrees that, but for these actions of Yukos, it is reasonable to surmise that the auction of YNG on 19 December 2004, the unlawful measure of Respondent that dealt as "fatal blow" to the survival prospects of Yukos, could have resulted in a higher bid price than the auction actually did.  However, in the view of the Tribunal, Yukos' ultimate fate would have been no different if it had not threatened a lifetime of litigation or obtained a Temporary Restraining Order from a Texas Court.  Its demise may have been postponed, or the path to its demise altered in some minor way, but it would not have been avoided.

1626. The Tribunal observes with interest that the *RosinvestCo* tribunal found that "Yukos did in some respects contribute to its own demise" and that it referred in that context to the Houston bankruptcy proceedings.[2125]

1627. In addition, before concluding its analysis of this facet of Claimants' conduct, the Tribunal needs to contrast these actions of Yukos with a series of actions of Respondent before the YNG auction which must have depreciated the auction price very significantly and thus served the Russian Federation objective of acquiring the Yukos assets at a bargain price.

1628. Those actions of Respondent include:

- The threat by Russia's Ministry of Natural Resources to withdraw YNG's operating licenses;[2126]

- The massive tax liabilities imposed on YNG in October and December 2004;[2127]

- The statement by the Russian Federation Ministry of Justice that the USD 10.4 billion valuation of YNG was "due to the high risk to a potential buyer";[2128]

---

[2125] *RosinvestCo* ¶ 634, Exh. C-1049.

[2126] *Russian Government May Revoke YUKOS Unit's Licenses*, FWN Select, 10 September 2004, Exh. C-701.

[2127] *Repeat Field Tax Audit Report No. 30-03-14/2*, 29 October 2004, Exh. C-251; *see* Decision of the Moscow Arbitrazh Court, 25 April 2006, p. 2, Exh. C-255; Memorial ¶ 271.

[2128] *In the Yukos Saga, Yet Another Gloomy Chapter*, Wall Street Journal, 14 October 2004, Exh. C-713.

- The decision by Respondent to fix the date of the auction exactly one month after the auction was announced, being the minimum length of the notice required under Russian law;[2129]

- The alleged pressure of Respondent on would be bidders from India and China not to participate in the auction.[2130]

1629. In conclusion, the Tribunal finds that the actions of Yukos which may have depreciated the auction price, do not constitute contributory fault as they did not contribute in a material way to its demise.

(d)    **Conduct of Yukos in Connection with its Bankruptcy (Non-Payment of the A Loan)**

1630. With respect to the non payment by Yukos of the A Loan and Respondent's submission that such non-payment rendered Yukos responsible for its own bankruptcy, the Tribunal accepts Respondent's contention that Yukos was in a position to pay off the balance of the A Loan and that its willful failure to do so contributed to the circumstances of its bankruptcy by leading SocGen to petition for it.  At the same time, the loan provisions contemplated that YNG oil production and sale would fuel payment of the loan, and it was understandable that, once YNG was taken over by Rosneft, Claimants should have felt that responsibility for repayment of the A Loan was not theirs or theirs alone.

1631. Moreover, in the view of the Tribunal, even if Yukos had paid off the A Loan, it represented only a fraction of the claims against Yukos which could have been used to petition the company into bankruptcy.  In view of the larger circumstances, it is difficult to conclude that, even if the A Loan had been paid, another ground for pushing Yukos into bankruptcy would not have been found.

1632. Consequently, the Tribunal concludes that, while Yukos may have been at fault in refusing to pay off the A Loan, its behavior does not rise to the level of contributory fault.

---

[2129]    In its report of 6 October 2004, Dresdner wrote that "[a] quick auction will most likely prevent the achievement of a full price since purchasers will only be able to conduct a limited audit of the financial and economic performance and accordingly will discount their valuation of the target asset." [emphasis added].    Dresdner Valuation Rpeort, Section 11.2, Exh. C-274.

[2130]    *Russia's Latest Auction Farce Eerily Familiar*, The Moscow Times, 21 December 2004, p. 1, Exh. C-739.

### 4.    Tribunal's Decision on Contributory Fault

1633. Paraphrasing the words of Article 39 of the ILC Articles on State Responsibility and its commentary, the Tribunal must now determine whether Claimants' and Yukos' tax avoidance arrangements in some of the low-tax regions, including their questionable use of the Cyprus-Russia DTA summarized above, contributed to their injury in a material and significant way, or were these minor contributory factors which, based on subsequent events such as the decision of the Russian authorities to destroy Yukos, cannot be considered, legally, as a link in the causative chain.   As the Tribunal noted earlier in this chapter, an award of damages may be reduced if the victim of the wrongful act of the respondent State also committed a fault which contributed to the prejudice it suffered and for which the trier of facts, in the exercise of its discretion, considers the claiming party should bear some responsibility.[2131]

1634. In the view of the Tribunal, Claimants should pay a price for Yukos' abuse of the low-tax regions by some of its trading entities, including its questionable use of the Cyprus-Russia DTA, which contributed in a material way to the prejudice which they subsequently suffered at the hands of the Russian Federation.

1635. In considering the extent of the contribution of Claimants' faults to their injury, the Tribunal notes that the subsequent conduct of the Russian Federation, as the Tribunal has found, was disproportionate and tantamount to expropriation of Claimants' investment in Yukos. Claimants' damages were caused by the series of events starting with the arrest of Messrs. Khodorkovsky and Lebedev, and the tax assessments, and culminating in the YNG auction, which led to the bankruptcy and liquidation of Yukos.   The Tribunal must now determine to what extent and in what proportion Claimants' and Yukos' conduct prior to 2003, including their questionable use of the Cyprus-Russia DTA, contributed so as to lessen the responsibility of Respondent.

1636. The Tribunal agrees with the ICSID Annulment Committee in the *MTD v. Chile* case that "the role of the two parties contributing to the loss [is] [ . . . ] only with difficulty commensurable

---

[2131]   *See* ruling in *MTD  v. Chile* ¶¶ 242–43 that "the Claimants should bear part of the damages suffered."  In that case, that "part" was quantified as 50 percent of the damages.  *See also Occidental Petroleum Corporation and Occidental Exploration and Production Company v. Republic of Ecuador*, ICSID, ARB/06/111, Award, 5 October 2012 ¶¶ 659–687.  In that case, that "part" was quantified as 25 percent of the damages.

and the Tribunal [has] a corresponding margin of estimation." [2132]   However, the Tribunal, as other tribunals have done, must reach a decision and it has done so on the basis of all the evidence which it has reviewed.

1637.  Having considered and weighed all the arguments which the Parties have presented to it in respect of this issue the Tribunal, in the exercise of its wide discretion, finds that, as a result of the material and significant mis-conduct by Claimants and by Yukos (which they controlled), Claimants have contributed to the extent of 25 percent to the prejudice which they suffered as a result of Respondent's destruction of Yukos.  The resulting apportionment of responsibility as between Claimants and Respondent, namely 25 percent and 75 percent, is fair and reasonable in the circumstances of the present case.

## XI.   INTEREST

1638.  As will be seen in Part XII of the Award dealing with quantification of Claimants' damages for Respondent's breach of the ECT, one of the elements factored into the Tribunal's calculation of damages will be interest.[2133]   Accordingly, the Tribunal, in the present Part XI will determine the applicable rate of such interest, whether it should be simple or compound and, if compound, the period of compounding.

### A.   CLAIMANTS' POSITION

1639.  Claimants request the Tribunal to award them pre- and post-award interest.[2134]   In their Submission on Costs, Claimants also request interest on any costs awarded to them.[2135]

1640.  According to Claimants, "payment of interest can be required to ensure full reparation."[2136]   Claimants quote the tribunal in *Vivendi v. Argentina*, which stated that the purpose of the payment of interest is "to compensate the damage resulting from the fact that, during the period of non-payment by the debtor, the creditor is deprived of the use and disposition of that sum he

---

[2132]  *MTD Equity Sdn Bhd. v. The Republic of Chile*, ICSID Case No. ARB/01/7, Decision on Annulment, 21 March 2007 ¶ 101.  *See also Occidental Petroleum Corporation and Occidental Exploration and Production Company v. Republic of Ecuador*, ICSID, ARB/06/111, Award, 5 October 2012 ¶¶ 659–87.

[2133]  In particular see paragraphs 1822–23 below on pre-award interest on the dividend streams that Claimants would have obtained in the absence of Respondent's breach.

[2134]  Memorial ¶¶ 969–70; Reply ¶¶ 859, 1199; Claimants' Post-Hearing Brief ¶ 302.

[2135]  Claimants' Submission on Costs ¶ 64.

[2136]  Memorial ¶ 959, citing to ILC Articles on State Responsibility, Art. 38, Exh. C-1042.

was supposed to receive."[2137]   Claimants submit that the Tribunal has "full discretion to determine the most appropriate rate of interest to achieve full reparation"[2138] and quote the award in *Compañía del Desarollo de Santa Elena, S.A. v. Republic of Costa Rica* ("**Santa Elena**"):

> [T]he determination of interest is a product of the exercise of judgment, taking into account all of the circumstances of the case at hand and especially considerations of fairness which must form part of the law to be applied by this Tribunal.[2139]

1641. Claimants further contend that the Tribunal may award compound interest[2140] and that compound interest has become "the norm in investment arbitration as regards full reparation."[2141]   Putting emphasis on the awards in *Santa Elena* and *Wena Hotels Limited v. Arab Republic of Egypt* ("**Wena**"), Claimants explain that compound interest should be awarded in order for the amount of compensation to reflect the additional sum that the claimant would have earned if the money had been reinvested each year at generally prevailing rates of interest.[2142]

1642. Claimants' valuation expert, Mr. Kaczmarek, analyzed three possible rates of interest:  the LIBOR plus two or four percent; the yield on Russian sovereign bonds issued in USD; and the U.S. Prime rate of interest plus two percent.[2143]

1643. According to Claimants:

> Navigant observed that the Russian Federation's breaches "have effectively turned Claimants into unwilling lenders to Russia."  The yield on Russian sovereign bonds issued

---

[2137]   *Ibid.*, citing to *Vivendi v. The Argentine Republic* ¶ 9.2.3, Exh. C-986.

[2138]   *Ibid.* ¶ 961.

[2139]   *Santa Elena* ¶ 103, Exh. C-952.

[2140]   Memorial ¶ 963, citing to *Metalclad v. Mexico*, ICSID Case No. ARB(AF)/97/1, Award, 30 August 2000 ¶ 128, Exh. C-954; *Wena Hotels Limited v. Arab Republic of Egypt*, ICSID Case No. ARB/98/4, Award, 8 December 2000 ¶ 129, Exh. C-956 (hereinafter "*Wena*"); *Santa Elena* ¶ 104, Exh. C-952; *MTD v. Chile* ¶ 251, Exh. C-969; *Azurix* ¶ 440, Exh. C-979; *Siemens* ¶¶ 399–401, Exh. C-983 (hereinafter "*Siemens*"); *ADC* ¶ 522, Exh. C-980; *Vivendi* ¶¶ 9.2.5–9.2.6, Exh. C-986; *Siag v. Egypt*, ICSID Case No. ARB/05/15, Award, 1 June 2009 ¶ 595, Exh. C-998; F.A. Mann, *Compound Interest as an Item of Damage in International Law*, 21 U.C. Davis L. Rev. 577 (1987–1988), Exh. C-1025; Stephen M. Schwebel, *Compound Interest in International Law*, 2(5) Transnational Dispute Management (2005), Exh. C-1029; John Yukio Gotanda, *Compounding Interest in Interest:  The Global Economy, Deflation, and Interest, in* CONTEMPORARY ISSUES IN INTERNATIONAL ARBITRATION AND MEDIATION. THE FORDHAM PAPERS (2009–2010), pp. 261–87, Exh. C-1024; *see also* Reply ¶ 845 n.1472, citing to *Kardassopoulos* ¶¶ 650–78, Exh. C-1533; *Gemplus S.A., SLP S.A., Gemplus et al. v. Mexico, Talsud S.A6. v. The United Mexico States*, ICSID Cases Nos. ARB (AF)/04/3 & ARB (AF)/04/4, Award, 16 June 2010 ¶¶ 16–26, Exh. C-1536 (hereinafter "*Gemplus*").

[2141]   Memorial ¶ 965.

[2142]   *Ibid.* ¶¶ 963–64, citing to *Wena* ¶ 129, Exh. C-956; *Santa Elena* ¶ 104, Exh. C-952.

[2143]   Memorial ¶ 966; First Kaczmarek Report ¶¶ 375–81; Reply ¶ 859 n.1491; Second Kaczmarek Report ¶¶ 64–65.

in U.S. dollars corresponds to the rate that the Russian Federation offers to its <u>willing</u> lenders.  Therefore, in order to be fully compensated for the Russian Federation's breaches, the Claimants should be awarded interest at a commercial rate <u>higher</u> than this latter rate. LIBOR +4% would represent such an appropriate commercial rate, which is the rate used by Navigant in its expert report.[2144]

[emphasis in the original]

1644. Claimants have requested that interest of LIBOR plus 4 percent, compounded annually, be applied pre- and post- award, including on costs.[2145]

1645. At the Hearing, Claimants presented the following table to summarize their submission on interest rates:[2146]

| Interest Rate | Description | Justification |
|---|---|---|
| Russian Cost of Debt | Cost of raising money for the Russian Government | The actions have effectively turned the Claimants into unwilling lenders to Russia. |
| U.S. Prime Rate | Rate that US banks charge their most creditworthy customers | The U.S prime rate is not widely available in the market.  A 2% premium reflects a rate that would be more broadly available. |
| LIBOR | Rate of interest that banks charge one another for loans in the money market | Historically, LIBOR + 2% has closely tracked the U.S. Prime rate of interest.  As such, LIBOR + 4% would be a commercial rate of interest on par with the U.S. Prime rate + 2% |

1646. Claimants noted that the Russian cost of debt is "a natural candidate" for interest rate.[2147]  In response to a question by the Chairman whether Claimants "still rely on LIBOR", counsel for Claimants noted that he had "avoided making any comment on the reliability of LIBOR."[2148]

B.   RESPONDENT'S POSITION

1647. Respondent submits that Claimants' request for pre- and post-award interest is "manifestly unfounded and disproportionate, and should be rejected."[2149]   Respondent refers to the

---

[2144]   Memorial ¶ 967.

[2145]   Memorial ¶ 970; Reply ¶¶ 859, 1199; Claimants' Post-Hearing Brief ¶ 309; Claimants' Submission on Costs ¶ 64.

[2146]   Transcript, Day 17 at 259 (Claimants' closing), showing Exh. C-1787.

[2147]   *Ibid.*

[2148]   *Ibid.* at 260 (Claimants' closing).

Commentary on Article 38 of the ILC Articles on State Responsibility for the proposition that there is "no automatic entitlement to the payment of interest."[2150]

1648. Respondent emphasizes that compound interest is not awarded automatically by tribunals.[2151] Respondent observes that the *RosInvestCo* tribunal used LIBOR alone, calculated annually, without any compounding.[2152]

1649. Respondent criticizes Claimants and their expert for failing to provide a justification for their preferred rate of LIBOR plus four percent.[2153] According to Respondent, awarding Claimants interest at LIBOR plus four percent compounded annually would "unduly punish" Respondent while granting Claimants a "windfall."[2154]

## C.   THE LEGAL FRAMEWORK

### 1.   Energy Charter Treaty

1650. Article 26(8) of the ECT provides that "awards of arbitration, <u>which may include an award of interest</u>, shall be final and binding upon the parties to the dispute" [emphasis added].  In the case of a lawful expropriation, Article 13(1) of the ECT directs that compensation "<u>shall</u> also include <u>interest at a commercial rate established on a market basis</u> from the date of Expropriation until the date of payment" [emphasis added].[2155]

---

[2149]   Rejoinder ¶ 1743.

[2150]   *Ibid.*, quoting Commentary on ILC Articles on State Responsibility, Article 38 ¶ 7, Exh. R-4235.

[2151]   *Ibid.*  Respondent explains that, as noted by the tribunal in *Duke Energy Electroquil Partners and Electroquil S.A. v. Republic of Ecuador*, ICSID ARB/04/19, Award, 18 August 2008 ¶ 473, Exh. C-993, "the award of compound interest is not a principle of international law."  As explained by BORZU SABAHI, COMPENSATION AND RESTITUTION IN INVESTOR-STATE ARBITRATION (2011), p. 152, Exh. R-4234, "compound interest, in international investment law, may be awarded if the aggrieved party can prove that it 'could have received compound interest . . . by placing its money in a readily available and commonly used investment vehicle . . .'."  In *RosInvestCo* ¶¶ 688–90, Exh. C-1049, the tribunal notes that the practice of awarding compound interest is "by no means unanimous" and that awarding interest at "a normal commercial rate" does not imply that the tribunal "is bound to award compound interest."  Rejoinder ¶ 1743 n.2952.

[2152]   Rejoinder ¶ 1746; *RosInvestCo* ¶¶ 684–90, Exh. C-1049.

[2153]   Rejoinder ¶ 1746.

[2154]   *Ibid.* ¶ 1747, quoting John Yukio Gotanda, *Awarding Interest in International Arbitration*, 90 Am. J. of Int'l Law 40 (1996) pp. 59–60, Exh. R-4236.

[2155]   See Subsection XII.C.1(b) below for discussion on the applicability of the Article 13 standard in lawful and unlawful expropriations.

1651. The Tribunal observes that arbitral tribunals hearing disputes under the ECT have awarded pre- and post-award interest at various rates.[2156]

### 2. ILC Articles on State Responsibility

1652. Article 38 of the ILC Articles on State Responsibility reads as follows:

> 1. Interest on any principal sum due under this chapter shall be payable when necessary in order to ensure full reparation.  The interest rate and mode of calculation shall be set so as to achieve that result.

> 2. Interest runs from the date when the principal sum should have been paid until the date the obligation to pay is fulfilled.[2157]

1653. The Commentary on Article 38 provides that "[t]he awarding of interest depends on the circumstances of each case; in particular, on whether an award of interest is necessary in order to ensure full reparation."[2158]

### 3. *RosInvestCo* and *Quasar*

1654. The *RosInvestCo* tribunal awarded pre- and post-award interest using LIBOR alone, calculated annually, without any compounding,[2159] while the *Quasar* tribunal awarded pre- and post-award interest at a rate of 6.434 percent (corresponding to the relevant average yield of medium-term Russian sovereign bonds dealt in USD) compounded annually.[2160]

### 4. Treatises

1655. Two books on the issue of damages in international investment cases have recently been published.  The Tribunal has found the chapters of these books dealing with interest very informative.[2161]

---

[2156] *See e.g. Nykomb Synergetics Technology Holding AB (Sweden) v. Latvia*, SCC, Award, 16 December 2003, p. 40 (pre-award and post-award interest at six percent, corresponding to the prevailing interest rate in Latvia), Exh. C-967; *Kardassopoulos* ¶¶ 658–68, 677–78 (pre-award and post-award interest at LIBOR plus four percent compounded semi-annually), Exh. C-1533.

[2157] Exh. C-1042.

[2158] ¶ 7, Exh. C-1042.

[2159] *RosInvestCo* ¶¶ 684–92, Exh. C-1049.

[2160] *Quasar* ¶ 226, Exh. R-3383.

[2161] SERGEY RIPINSKY & KEVIN WILLIAMS, DAMAGES IN INTERNATIONAL INVESTMENT LAW (2008), pp. 363–91 (other extracts of which constitute Exh. C-1610) (hereinafter "Ripinsky and Williams"); IRMGARD MARBOE, CALCULATION

1656. The following paragraphs summarize these authors' respective analyses and conclusions on various aspects of the issue of interest in international investment cases.

### (a)   General Issues

1657. Dr. Irmgard Marboe explains that, on the one hand, interest should compensate the temporary withholding of money:  interest should address the claimant's financial disadvantage of not being able to dispose of money, which materializes either in loss of profit from alternative investments or in costs for a loan.[2162]   On the other hand, the awarding of interest should prevent the debtor's unjust enrichment since the debtor gains a financial profit through the withholding of the money.[2163]   Additionally, post-award interest, writes Dr. Marboe, serves the purpose of creating an effective incentive for the respondent to comply with an arbitral award without delay.[2164]

1658. Dr. Sergey Ripinsky and Mr. Kevin Williams stress the well-established mantra that tribunals enjoy a wide margin of discretion in awarding interest.[2165]

### (b)   Rate

1659. Dr. Ripinsky and Mr. Williams write that choosing the rate is "perhaps the issue where one sees the greatest variety in approaches of arbitration tribunals."[2166]   They consider four different approaches.

1660. The first is the "investment alternatives" approach, adopted by the majority opinion in the Iran–U.S. Claims Tribunal case *Sylvania Technical Systems v. Iran* ("**Sylvania**") and explained in the following terms:

> [T]he Tribunal will derive a rate of interest based approximately on the amount that the successful claimant would have been in a position to have earned if it had been paid in time

---

OF COMPENSATION AND DAMAGES IN INTERNATIONAL INVESTMENT LAW (2009), pp. 317–92 (other extracts of which constitute Exh. C-1607) (hereinafter "Marboe").

[2162]   Marboe ¶ 6.05.

[2163]   *Ibid*. ¶ 6.06; *see also Santa Elena* ¶ 101, Exh. C-952 ("[the claimant] is entitled to the full present value of the compensation that it should have received at the time of the taking.  Conversely, the taking state is not entitled unjustly to enrich itself by reason of the fact that the payment of compensation has been long delayed.").

[2164]   Marboe ¶ 6.38, citing to John Yukio Gotanda, SUPPLEMENTAL DAMAGES IN PRIVATE INTERNATIONAL LAW, 1997, p. 58.

[2165]   Ripinsky and Williams, pp. 365–66.

[2166]   *Ibid*., p. 366. Dr. Marboe calls it "one of the most difficult decisions."  Marboe ¶ 6.40.

and thus had the funds available to invest in a form of commercial investment in common use in its own country.[2167]

1661. According to Dr. Ripinsky and Mr. Williams, this approach was followed in subsequent awards of the Iran–U.S. Claims Tribunal as well as by the *Santa Elena* tribunal.[2168]

1662. The second approach is the "borrowing rate" approach, which is based on borrowing rates from banks in the claimant's country.[2169]  Investment tribunals have often used the LIBOR, an inter-bank borrowing rate of interest.  Some tribunals have also added a certain percentage to the LIBOR rate to arrive at the approximate rate that international investors would have had to pay if they had been obliged to borrow the money.  According to Ripinsky and Williams, tribunals have "normally" added two percent to LIBOR.[2170]

1663. Dr. Marboe notes that Judge Holtzmann had argued in favor of a borrowing rate approach in his separately recorded view on interest in the *Sylvania* decision, because it "is reasonable to assume that most businesses habitually borrow while fewer regularly invest in certificates of deposit."[2171]  Dr. Marboe writes that the borrowing rate approach can lead to different results, such as the selection of the prime rate, the borrowing rate of the investor, the cost of capital of the investor, the borrowing rate of the State (the "coerced loan theory") or the average borrowing rate.[2172]

1664. In respect of the prime rate, Dr. Marboe writes:

> The "prime" or "base" rate plays an important role in negotiations about company loan conditions in Anglo-American countries.  As such, it seems to be an appropriate basis for the assessment of the damages incurred by a delayed payment.  However, it must be taken into account that not all enterprises can borrow money from the banks at the prime rate.  Therefore, an increase by a few percentage points might be necessary as has been the practice in the cases mentioned above.  The question then arises, of course, how many percentage points are appropriate.  It appears, therefore, that the prime rate does not really offer a viable means of ensuring adequate and consistent decisions on interest.[2173]

1665. In respect of the "coerced loan theory", she opines:

---

[2167]  Ripinsky and Williams, p. 368, quoting *Sylvania Technical Systems v. Iran*, Award, 27 June 1985, 8 Iran–U.S. Claims Tribunal Reports, 298, 320 (footnote omitted) (hereinafter "*Sylvania*").

[2168]  *Ibid.*, p. 368; *see* Marboe ¶¶ 6.107–6.120.

[2169]  Ripinsky and Williams, p. 369.

[2170]  *Ibid.*, p. 370.

[2171]  Marboe ¶ 6.82, quoting *Sylvania*, p.321 n.13.

[2172]  *Ibid.* ¶¶ 6.85–6.106.

[2173]  *Ibid.* ¶ 6.93.

According to this approach, the amount of interest has nothing to do with the claimant's actual loss, but rather depends on the respondent's risk characteristics.

This approach measures the financial effect of the delay from the perspective of the respondent. It has to be borne in mind, however, that pre-award interest in international investment cases should fulfil the function of compensation or damages. Therefore, the perspective of the claimant is decisive.

The perspective of the respondent, however, is important when it comes to the prevention of enrichment as an additional function of the interest claim. While this is only of secondary importance concerning pre-award interest, it becomes relevant with regard to post-award interest. This means that the "coerced loan theory" would better fit with the determination of post-award interest.[2174]

1666. The third approach to interest is to rely on the interest rate applicable under the host State's domestic law provisions concerned. Dr. Ripinsky and Mr. Williams observe that investment tribunals have done so,[2175] while Dr. Marboe asserts that, in international investment disputes, "national legal interest rates are not applicable and not adequate."[2176]

1667. Finally, in a number of disputes, write Dr. Ripinsky and Mr. Williams, tribunals have adopted a specific rate ranging from 5 to 10 percent, calling it "reasonable", "fair" or "appropriate".[2177] Dr. Marboe writes that "fair" rates have ranged from 5 to 17.5 percent.[2178]

1668. The Tribunal notes that, overall, Dr. Ripinsky and Mr. Williams favor the "investment alternatives" approach, with the caveat that, in situations where the debtor's actions force the claimant to borrow funds, it would be appropriate to award interest at the claimant's actual borrowing rate,[2179] whereas Dr. Marboe appears to prefer the use of inter-bank interest rates.[2180]

(c)   *Dies a quo*

1669. The authors of both treatises affirm that, in cases of expropriation, "interest has invariably been calculated from the date of the taking."[2181]

---

[2174]   *Ibid*. ¶¶ 6.101–6.103 (footnote omitted).

[2175]   Ripinsky and Williams, pp. 370–72.

[2176]   Marboe ¶¶ 6.70.

[2177]   Ripinsky and Williams, p. 372.

[2178]   Marboe ¶ 6.149; *see also* ¶¶ 6.150–6.161.

[2179]   Ripinsky and Williams, p. 373.

[2180]   *See* Marboe ¶ 6.147.

[2181]   Ripinsky and Williams, p. 375; *see ibid*. ¶ 6.163.

### (d)     Simple or Compound

1670. With respect to the important issue of whether interest awarded should be simple or compound, Dr. Ripinsky and Mr. Williams opine that "there is a trend away from only awarding simple interest to generally awarding compound interest,"[2182] while Dr. Marboe states that "compound interest as opposed to simple interest appears to be predominantly accepted as appropriate in recent international investment arbitration" because it is "regarded as better reflecting actual economic realities both for the purpose of remedying the loss actually incurred by the injured party and for the prevention of unjustified enrichment of the respondent State."[2183] Dr. Ripinsky and Mr. Williams refer to the *Santa Elena* award, issued in 2000, as "a turning point in jurisprudence."[2184]

1671. Dr. Ripinsky and Mr. Williams observe that the period of compounding has ranged from one year to one month and that annual compounding has been "predominant."[2185]

### (e)     Post-Award Interest

1672. After an extensive review of arbitral decisions, Dr. Ripinsky and Mr. Williams conclude that in the majority of cases, tribunals have not considered post-award interest separately from pre-award interest and have simply granted interest until the date of full payment of the award. This "automatically turns pre-award interest into post-award."[2186]

1673. They note that when post-award interest has been granted separately, tribunals have been more severe towards the respondent, compared to the pre-award interest granted.[2187]

1674. According to Dr. Ripinsky and Mr. Williams, "[t]hese changes can be explained by the desire of some tribunals to ensure prompt compliance with the award by adding a punitive element to

---

[2182]   Ripinsky and Williams, p. 379.

[2183]   Marboe ¶ 6.236; but see Marboe's list of exceptions ¶¶ 6.237–6.261.

[2184]   Ripinsky and Williams, p. 385.

[2185]   *Ibid.*, p. 387.

[2186]   *Ibid.*; *see also* Marboe ¶¶ 6.243–6.261.

[2187]   Ripinsky and Williams, p. 389.

interest and thereby turning the post-award interest from a purely compensatory instrument into a sanction."[2188]

1675. Dr. Ripinsky and Mr. Williams also note that some tribunals have provided for a grace period following the date of the award, during which interest does not accrue.[2189]

## D.   TRIBUNAL'S DECISION

1676. The Tribunal, having considered the Parties' submissions, the treatises of the learned authors quoted extensively above, the many decisions of tribunals which have traversed the issue of interest and, of course, the totality of the evidence in the case at hand that it considers pertinent to its determination of this facet of the present arbitrations, will now proceed with its analysis and exercise its judgment.

1677. As we saw earlier, the ECT, the relevant legal instrument, envisages an award of interest in an arbitral award.  In addition, the Treaty decrees mandatory payment of interest "at a commercial rate established on a market basis" in the case of a lawful arbitration.  In the view of the Tribunal, there can be no doubt that, *a fortiori*, in the case of an unlawful expropriation, as in the present case, Claimants are entitled to interest from Respondent in order to ensure full reparation for the injury they suffered as a result of those of Respondent's measures that the Tribunal has found to be internationally wrongful.

1678. Neither the Treaty nor the ILC Articles on State Responsibility provide specific rules regarding how interest should be determined.  In addition, as the Tribunal has found, the practice of past tribunals is varied and inconsistent and does not provide clear guidance.  Thus, as is well established, the Tribunal has a wide margin of discretion to determine the rate of interest applicable and whether it should be simple or compound.

1679. Of the three rates proposed by Claimants, the LIBOR plus two or four percent, the yield on Russian sovereign bonds issued in USD and the U.S. Prime rate plus two percent, the Tribunal has rejected outright the first two for the following brief reasons.  LIBOR, as Claimants' counsel implicitly recognized during the Hearing, has been discredited, while the yield on

---

[2188]  *Ibid.*, p. 389; *see* Marboe ¶ 6.245.

[2189]  Ripinsky and Williams, p. 390; *see also* Marboe ¶¶ 6.262–6.268.

Russian sovereign bonds issued in USD would lead, in the Tribunal's opinion, to excessive compensation for Claimants.

1680. As for the U.S. Prime rate plus two percent, the Tribunal initially saw merit in this rate which is a version of the borrowing rate approach reviewed earlier.  The Tribunal notes that this method was put forward by Judge Holtzmann in his separately recorded view on interest in the *Sylvania* Iran–U.S. Claims Tribunal case.[2190]

1681. The Tribunal has concluded however that this method should also be rejected.  It is not an appropriate basis for the assessment of the damages in this case.  There is no evidence that Claimants had to borrow money because they were not compensated at the time of the expropriation.

1682. On the other hand, the Tribunal finds apposite the following statement of the *Siemens v. Argentina* tribunal:

> The Tribunal considers that the rate of interest to be taken into account is not the rate associated with corporate borrowing but the interest rate the amount of compensation would have earned had it been paid after the expropriation.[2191]

1683. The Tribunal recalls that a rate of interest based on return of investment during the relevant period was adopted by the *Santa Elena* tribunal:

> [W]here an owner of property has at some earlier time lost the value of his asset but has not received the monetary equivalent that then became due to him, the amount of compensation should reflect, at least in part, the additional sum that his money would have earned, had it, and the income generated by it, been reinvested each year at generally prevailing rates of interest.[2192]

1684. The Tribunal observes that many investor-state tribunals have adopted this "investment alternatives approach,"[2193] using rates of U.S. debt instruments even when the claimant was not a U.S. investor.[2194]

---

[2190] *Sylvania*, p. 321 n.13.

[2191] *Siemens* ¶ 396, Exh. C-983.

[2192] *Santa Elena* ¶ 104, Exh. C-952.  The Chairman of the Tribunal was also the Chairman of the ICSID tribunal in *Santa Elena*.

[2193] Ripinsky and Williams, pp. 368–69; Marboe ¶¶ 6.107–6.119; *Sylvania*, pp. 320–21; *Santa Elena* ¶ 104, Exh. C-952; *Siemens* ¶ 396, Exh. C-983.

[2194] Ripinsky and Williams, p. 369 & n.42; *see e.g.*, *Alpha Projektholding GmbH (Austria) v. Ukraine*, ICSID Case No. ARB/07/16, Award, 8 November 2010 ¶ 514 & n.666; *EDF International S.A., SAUR International S.A. Leon*

1685. The Tribunal, in the exercise of its discretion, has concluded that it would be appropriate to award to Claimants interest on a rate based on ten-year U.S. Treasury bond rates.

1686. As will be seen in Part XII on damages, the Tribunal has ruled that Claimants' shares in Yukos should be valued as of the date of the Award.  Accordingly, there will be no pre-award interest granted to Claimants in respect of the damages representing the value of their shares.[2195]

1687. However, in order that they may be made whole, the Tribunal will grant pre-award interest to Claimants for the damages which represent the value of the dividend streams for which, as will be seen,[2196] the Tribunal has decided Claimants should be compensated.  In order to compute the pre-award interest awarded to Claimants at the rate based on ten-year U.S. Treasury bond rates, the Tribunal will use the average yield of ten-year U.S. Treasury bonds over the period from 1 January 2005 to 30 May 2014 as the applicable rate of interest, which the Tribunal has determined to be 3.389 percent.[2197]

1688. As will also be seen in Part XII on damages, the Tribunal has decided to award Claimants post-award interest on the damages of USD 50,020,867,798 for which the Tribunal has found Respondent liable.

1689. As to whether the interest awarded should be simple or compound, while the Tribunal recognizes that the awarding of compound interest under international law now represents a form of "jurisprudence constante" in investor-state expropriation cases,[2198] the Tribunal has concluded that, in the circumstances of this case, it would be just and reasonable to award Claimants simple pre-award interest and post-award interest compounded annually if Respondent fails to pay in full to Claimants the damages for which it has been held liable before the expiry of the grace period hereinafter granted.

---

*Participationes Argentinas S.A. v. The Argentine Republic*, ICSID Case No. ARB/03/23, Award, 11 June 2012 ¶ 1325ff, Exh. R-4186; *Gemplus*, Exh. C-1536.

[2195] Pre-award interest on the value of the Claimants' shares has, however, been applied in the context of calculating the amount of damages that would have to be awarded on the basis of a valuation date corresponding to the date of the expropriation of Claimants' investment.  *See* paragraph 1847 below.

[2196] *See* Subsection XII.C.4.

[2197] *See* Table T9 appended to this Award.

[2198] *Oko Pankki Oyj (formerly called OKO Osuuspankkien Keskuspankki OYJ), VTB Bank (Deutschland) AG (formerly called Ost-West Handelsbank AG) and Sampo Bank PLC v. The Republic of Estonia*, ICSID Case No. ARB/04/6), Award, 19 November 2007 ¶ 349, Exh. C-1530.

1690. The Tribunal notes that Claimants claim interest on the costs that may be awarded to them by the Tribunal at the same rate as the interest awarded to them on the damages.[2199]  In the event that Respondent fails to pay in full to Claimants the costs awarded to them in Part XIII of the present Award before the expiry of the grace period, post-award interest will accrue on any outstanding amount, compounded annually.

1691. In the circumstances of the present case, in view of the significant amount of damages which Respondent owes Claimants as a result of this Final Award, the Tribunal considers it reasonable to grant to Respondent a grace period of 180 days following the date of the Award before interest will accrue if not paid in full to Claimants by then.

1692. In order to compute any post-award interest awarded to Claimants on their damages and their costs, the Tribunal orders that the interest rate be determined as the yield on ten-year U.S. Treasury bonds as of 15 January 2015 and then the dates of compounding yearly thereafter.

## XII.   THE QUANTIFICATION OF CLAIMANTS' DAMAGES

1693. The Tribunal will now determine the damages caused to Claimants by Respondent's breach of Article 13 of the ECT.  The Parties' positions in this regard can be summarized as follows.

### A.   CLAIMANTS' POSITION

1694. Claimants assert that they are entitled to full reparation for Respondent's breach of its obligations under the ECT "through financial compensation measured at the date of expropriation or at the date of the award, whichever is the greatest"[2200] and seek damages in "an amount to be determined by the Arbitral Tribunal," but estimated at "no less than US$ 114.174 billion."[2201]  Claimants maintain that, while Article 13(1) of the ECT provides a specific rule of compensation, this rule applies only to legal expropriations (i.e., expropriations satisfying the conditions contained in Article 13(1)), and that, where one or more of the conditions of Article 13(1) have not been met, the rules of customary international law apply to the issue of

---

[2199]   Claimants' Submission on Costs ¶ 64.

[2200]   Claimants' Post-Hearing Brief ¶ 232.

[2201]   Reply ¶ 1199.  *See also* Claimants' Post-Hearing Brief ¶ 302.

reparation.[2202]   According to Claimants, in order to achieve full reparation in the event of an unlawful expropriation, an investor must be able to choose between a valuation of the damages it has suffered as at the date of the breach and a valuation as at the date of the award.[2203]

### 1.   Valuation Date

1695.   Claimants submit that there are two potentially relevant dates with regard to the assessment of damages, namely the moment when a treaty breach occurs and the moment when an award is rendered.   Claimants take the view that "an investor should be compensated in the highest amount between the valuation of the damages it has suffered as at the date of the breach and that at the date of the award."[2204]   The reason for this alternative valuation, according to Claimants, is that "to the extent the assets expropriated have increased in value during the arbitration process, this increase must accrue for the benefit of the Claimants, not to the Russian Federation."[2205]   Claimants refer to a number of legal authorities to support the conclusion that, in cases of unlawful expropriations, investors are entitled to choose between a valuation as at the date of the breach and a valuation as at the date of the award.[2206]

1696.   Claimants assert that the date of the expropriation of their investment in this case was 21 November 2007, the date on which Yukos was struck off the Russian register of legal entities.   The justification for choosing this date, according to Claimants, is that "[i]n cases involving expropriations through a series of coordinated interferences by the State, the date of expropriation corresponds to the date on which the governmental interference ripened into an irreversible deprivation of the investor's property,"[2207] and that striking Yukos from the register of legal entities constituted "a point of no return."[2208]

---

[2202]   Memorial ¶¶ 897–99; Transcript, Day 17 at 219–18.

[2203]   Memorial ¶ 917.

[2204]   *Ibid*.   *See also* ¶ 913; Claimants' Post-Hearing Brief ¶¶ 232–33.

[2205]   Memorial ¶ 913.

[2206]   Memorial ¶¶ 915–17; Reply ¶ 845.  Claimants refer in particular to *ADC*, ¶¶ 496–97, Exh. C-980; *Siemens* ¶ 352, Exh. C-983; *Kardassopoulos* ¶ 514, Exh. C-1533; *Amoco International Finance Corporation v. Iran*, Partial Award, 14 July 1987, 15 Iran–U.S. Claims Tribunal Reports, 189,  pp. 300–01, Exh. C-939 (hereinafter "*Amco*").

[2207]   Memorial ¶ 912, n.1314.  *See also* Reply ¶ 940.

[2208]   Reply ¶ 943.

### 2. Causation

1697. With regard to causation, Claimants assert that they do not need to establish a link between individual actions of Respondent and the damages suffered, but that it suffices for them to show that the sum of Respondent's actions caused those damages.  Claimants argue that:

> [T]he Russian Federation sought and achieved the dismantlement and destruction of Yukos, and the Claimants' investments therein, through a series of cumulative actions. . . . The breach, and the Respondent's responsibility, arises from the Russian Federation's actions taken as a whole and not from each and every one of these actions.  It is the cumulative effect of these acts that is criticized by the Claimants.[2209]

1698. Claimants also argue that:

> [A] causal link needs only be established between the actions of the Russian Federation taken as a whole and the Claimants' damages, namely the destruction of their investments.  This causal link is obvious . . . .[2210]

1699. According to Claimants, there is ample authority to support their position that the Tribunal need only consider "the totality of the Russian Federation's actions and their result:  the inexcusable treatment of the Claimants' investments and, ultimately, their outright expropriation."[2211]

### 3. Calculations Performed by Claimants and Mr. Kaczmarek

1700. Claimants have submitted two expert reports on damages authored by Mr. Brent Kaczmarek of Navigant Consulting, dated 15 September 2010 and 15 March 2012, together with their Memorial and their Reply, respectively.  The calculations contained in these reports and referred to in Claimants' pleadings can be summarized as follows.

#### (a) The "Scenarios" Presented by Claimants

1701. Claimants perform calculations based on three different "scenarios."  Within each of these scenarios, Claimants also differentiate between a number of sub-scenarios.

1702. The first scenario developed by Claimants is based on two fundamental assumptions, namely (a) that the tax assessments against Yukos constituted a breach of the ECT, and (b) that this

---

[2209] *Ibid.* ¶ 904.

[2210] *Ibid.* ¶ 911.

[2211] Claimants' Post-Hearing Brief ¶ 191, citing to *e.g.*, *Walter Bau* ¶ 12.43, Exh. C-1000; *Pope & Talbot v. Canada*, UNCITRAL, Award on the Merits of Phase 2 ¶ 181, Exh. C-1518; *Kardassopoulos* ¶ 451, Exh. C-1533; *El Paso* ¶ 519, Exh. C-1544/R-4190.

breach caused the merger between Yukos and Sibneft to be cancelled.  In addition, Claimants call in aid an optional assumption in the context of this scenario, namely (c) that Yukos would have had a 70 percent chance of obtaining a listing on the NYSE, which would have further increased its value.[2212]  Claimants' first scenario can thus be subdivided into two sub-scenarios: sub-scenario 1a, which is based only on assumptions (a) and (b); and sub-scenario 1b, which is based on all three assumptions (a), (b), and (c).

1703.  Claimants' second scenario is based on assumption (a) described above, namely that the tax assessments against Yukos constituted a breach of the ECT, whilst excluding assumption (b) (thus not seeking damages for the demerger between Yukos and Sibneft).  Here again two sub-scenarios can be distinguished: sub-scenario 2a is based solely on assumption (a), whereas sub-scenario 2b is based on both assumptions (a) and (c).

1704.  Claimants' third scenario assumes that the tax assessments against Yukos did not constitute a breach of the ECT, but that the subsequent enforcement of the tax claims did.  Accordingly, Claimants calculate the "damages arising out of the 2004 and 2007 auctions, regardless of the merits of the alleged tax claims imposed on Yukos."[2213]  Within this third scenario, Claimants distinguish five sub-scenarios (subsequently referred to as 3a, 3b, 3c, 3d and 3e),[2214] all of which assume that Yukos should have been allowed to settle its alleged tax debts one way or another (thus avoiding the liquidation of the company), but propose different modalities as to how this could have been done.[2215]

1705.  Sub-scenario 3a assumes that Yukos would have been allowed a grace period of five years and would then have "been able to pay off the entire amount of its alleged tax liabilities out of its operating cash-flows only by 2009."[2216]

1706.  Sub-scenario 3b assumes that Yukos would have been granted a grace period of three years and would then have been able to pay off its alleged tax liabilities with a combination of its free cash flows and the sale of non-core assets during that period.[2217]

---

[2212]   First Kaczmarek Report ¶ 20.

[2213]   Memorial ¶ 977.

[2214]   Sub-scenarios 3b and 3d were first presented in Reply ¶ 873.

[2215]   Memorial ¶ 979.

[2216]   *Ibid*. ¶ 983.  *See also* Second Kaczmarek Report ¶ 33.

[2217]   Second Kaczmarek Report ¶ 36.

1707. Sub-scenario 3c assumes that Yukos would have been granted a grace period of one year and would then been able to pay off its alleged tax liabilities with a combination of its free cash flows, the sale of non-core assets and debt financing during that period.[2218]

1708. Sub-scenario 3d also assumes that Yukos would have been granted a grace period of only one year, but then assumes (in contradistinction to sub-scenario 3c) that Yukos would have paid off its alleged tax liabilities with a combination of free cash flows, the sale of certain core assets and (limited) debt financing.[2219]

1709. Finally, sub-scenario 3e assumes that, while Yukos would have had to sell YNG to settle its alleged tax obligations, the auction "would have been conducted in a manner ensuring a fair, rather than grossly undervalued, price," generating proceeds of USD 19.703 billion,[2220] with the result that Yukos would have paid off its alleged tax liabilities with these proceeds as well as its cash flows in 2004 and 2005, while remaining a going concern.[2221]

1710. In accordance with Claimants' submissions regarding the relevant valuation dates, Claimants base their damages calculations in the first place on a valuation date of 21 November 2007. Accordingly, Claimants provide calculations for all three scenarios based on this date. In addition, Claimants also carry out a number of calculations based on the date of 1 January 2012, as a proxy for the date of the award, "for comparison purposes."[2222] Claimants provide calculations based on this date for scenarios 1 and 2, but not for scenario 3.

(b)     **Methodology Used for Calculations Based on Scenarios 1 and 2**

1711. Claimants' calculations for scenarios 1 and 2 as of November 2007 are in principle based on the following methodology: the total of the damages claimed corresponds to the sum of Claimants' share in a hypothetical Yukos entity as of the valuation date plus the hypothetical cash flows that Claimants would have received in the form of dividends based on Claimants' shareholding in Yukos from 2004 to November 2007. In addition, in scenarios 1b and 2b, Claimants also

---

[2218] *Ibid.* ¶ 34.

[2219] *Ibid.* ¶ 38.

[2220] Memorial ¶¶ 989–90.

[2221] *Ibid.* ¶ 993. *See also* Second Kaczmarek Report ¶ 30.

[2222] Second Kaczmarek Report ¶ 155; Reply ¶ 946.

include the value they attribute to the "lost chance" of listing Yukos' shares on the NYSE.[2223] The total amount thus obtained is then "brought forward" to a date close to the date of Mr. Kaczmarek's report  by adding pre-award interest.[2224]  Each one of these steps is set out in more detail below.

### i.    Value of Shares

1712. With regard to the valuation date of 21 November 2007, Claimants calculate the value of their shares in Yukos as follows:

### (a)  Valuation of Yukos

1713. As a first step, Claimants calculate the value of the relevant Yukos entity, as defined by the assets that Claimants assume Yukos would have owned in November 2007 in the absence of Respondent's alleged breaches.[2225]  The assets taken into account depend on the scenario.  For the purposes of scenario 1, both Yukos' and Sibneft's original assets are taken into account,[2226] whereas for scenario 2 the calculations are based only on Yukos' assets.[2227]  Claimants use three different methods for valuating Yukos, namely the DCF method, the comparable companies method and the comparable transactions method.[2228]

1714. With regard to the DCF method, Claimants describe their approach as an attempt to reconstruct the "pro-forma financial statements" that the relevant Yukos entity would have presented in November 2007, based on the financial and operational data published by Rosneft and Gazprom Neft, which held the majority of Yukos' assets at that point in time.[2229]  Where no such data is available, Claimants rely on "historical financial statements and operating information published by Yukos and Sibneft . . . as well as a benchmark of indicators from

---

[2223]  The total loss T under Claimants' scenario 1b based on a valuation date of November 2007 can thus be described as T = Value of Shares in November 2007 (V) + Dividends received from 2004 to 2007 (D) + Value of "lost chance" to list shares on NYSE (LC).  Memorial ¶ 920.  *See also* Claimants' Opening Slides, p. 204.

[2224]  Memorial ¶¶ 925, 969, 976.  *See also* Claimants' Opening Slides, p. 204.

[2225]  Memorial ¶ 931.

[2226]  *Ibid.*

[2227]  *Ibid.* ¶ 972.

[2228]  *Ibid.* ¶¶ 927, 972.

[2229]  *Ibid.* ¶ 931.  For scenario 2, Mr. Kaczmarek uses the Dicounted Cash Flow (hereinafter "DCF") model developed for scenario 1 with a number of adjustments.  First Kaczmarek Report ¶ 417.

Yukos' and Sibneft's industry peers in Russia."[2230]   Based on this data, Claimants estimate cash flows between 2007 and 2015 as well as a "terminal value" of the entity in 2015.[2231]   Claimants then bring the above estimates to their November 2007 value by applying a discount rate based on Yukos' cost of capital.[2232]   This operation leads them to Yukos' enterprise value as of November 2007.[2233]

1715.   Claimants also use a comparable companies approach, based on data available for a pool of Russian (Rosneft, Gazprom Neft, Lukoil, TNK-BP and Surgutneftegaz) and international (BP, Chevron, Conoco-Philips, Exxon-Mobil, Royal Dutch Shell and Total SA) oil companies.[2234] This approach identifies companies with characteristics similar to Yukos (notably in terms of production, reserves, profitability, revenue growth and financing structure), establishes the ratios between the enterprise value of these companies and relevant operating or financial metrics (EBITDA, reserves and production), and then applies these ratios to the relevant metrics of Yukos in order to estimate the latter's enterprise value.[2235]   The net income, EBITDA, reserves and production of Yukos are derived from the "pro-forma financial statements" established in the context of the DCF method.[2236]

1716.   Finally, Claimants use a comparable transactions approach based on public purchase transactions of comparable companies.[2237]   In this regard, Claimants apply a "sum of the parts valuation," in which they select transactions that are meant to match the upstream and downstream business of Yukos separately.[2238]   Here again, the operating and financial metrics of Yukos as determined in the context of the DCF method are used to calculate the value of the company.[2239]

1717.   Claimants then calculate a synthesized enterprise value of Yukos based on the results of the three approaches, weighing the DCF approach at 50 percent, the comparable companies

---

[2230]   Memorial ¶ 931.

[2231]   *Ibid.* ¶ 932.

[2232]   *Ibid.* ¶¶ 933–34.  *See also* First Kaczmarek Report ¶¶ 84, 87.

[2233]   Memorial ¶ 935.

[2234]   *Ibid.* ¶ 938.

[2235]   *Ibid.*

[2236]   First Kaczmarek Report ¶ 429.

[2237]   Memorial ¶ 940.

[2238]   *Ibid.* ¶ 941.

[2239]   *Ibid.*

approach at 40 percent and the comparable transactions approach at 10 percent.[2240]   By then subtracting Yukos' assumed debt, they arrive at Yukos' synthesized equity value.[2241]

*(b)  Calculation of the Value of Claimants' Shareholding*

1718. In a final step, for each of the scenarios considered, Claimants calculate the value of Claimants' shareholding in Yukos by multiplying the company's equity value by Claimants' share in the company—53 percent (corresponding to the dilution of Claimants' shareholding associated with the creation of YukosSibneft) for scenario 1 and 70.5 percent (corresponding to Claimants' original shareholding in Yukos) for scenario 2.[2242]

### ii.    Additional Indicators Relied on by Claimants to Confirm the Value of Yukos Shares

1719. With regard to scenario 1, Mr. Kaczmarek avers that he confirmed his valuation with a number of additional indicators.  Claimants calculate Yukos' enterprise value based on the market capitalization of Rosneft in November 2007, with a number of adjustments made in order to take into account the differences between Rosneft's assets and Yukos' (fictitious) assets as of that date.  The result of this calculation is an enterprise value that is about USD 4.5 billion lower than the enterprise value calculated on the basis of the above-described methodology.[2243]

1720. Mr. Kaczmarek  also confirms his valuation of Yukos' enterprise value as of November 2007 based on the increase of three benchmarks (Urals blend prices, the RTS Oil and Gas index and Lukoil's market capitalization) between October 2003 and November 2007.[2244]   These calculations lead to an enterprise value of Yukos that is approximately halfway between USD 14.4 billion lower (RTS Oil and Gas) and USD 46.5 billion higher (Lukoil market capitalization) than the enterprise value of Yukos calculated on the basis of Claimants' basic methodology.[2245]

---

[2240]   *Ibid.* ¶¶ 944–45.  Claimants note that they assign a low weight to the results of their comparable transactions approach, due to the "absence of a transaction involving a company similar to YukosSibneft in the years preceding the date of valuation." *Ibid.* ¶ 945.

[2241]   *Ibid.* ¶ 945.

[2242]   *Ibid.* ¶¶ 949, 972.

[2243]   Claimants' Post-Hearing Brief ¶ 263.  *See also* Memorial ¶ 946.

[2244]   Claimants' Post-Hearing Brief ¶ 260.  *See also* Exh. C-1783.

[2245]   Claimants' Post-Hearing Brief ¶ 261.  *See also* Exh. C-1783.

1721. Finally, Claimants calculate Yukos' enterprise value on the basis of a share swap involving YNG shares that would have taken place between Rosneft and Yukos in October 2006, which Claimants say implies a valuation of YNG's equity at USD 46.2 billion at that point in time.[2246] On that basis, Claimants calculate an enterprise value of Yukos as of 21 November 2007 that is approximately USD 12.8 billion lower than the value calculated on the basis of their basic methodology.[2247]

### iii.    Hypothetical Cash Flows from Dividends

1722. The second component of Claimants' damages calculation is the cash flows from dividends that Claimants argue would have been paid to them in the first and second scenarios but for Respondent's treaty breaches. Claimants assume that, without the alleged breaches of the ECT by Respondent, Yukos would have paid dividends to its shareholders between 30 September 2003 and 21 November 2007.[2248] Accordingly, Claimants say that they would have received a pro rata share of these dividends, calculated on the basis of their shareholding in the company.[2249]

### iv.    Loss of Chance

1723. The third component of Claimants' damages calculation is based on Claimants' valuation of what they refer to as the loss of a chance to obtain a listing of Yukos on the NYSE. Claimants submit that, without the breaches of Respondent, Yukos would likely have been listed on the NYSE, and that this listing would have decreased the company's costs of capital and thus increased Yukos' share value.[2250] Claimants quantify the value of the loss of this chance by multiplying the assumed increase in share value with the probability of a successful listing, which they assume to be 70 percent.[2251] This loss for Claimants is the amount thus obtained, multiplied by Claimants' shareholding in Yukos.[2252]

---

[2246]   Claimants' Post-Hearing Brief ¶ 262. *See also* Exh. C-1773.

[2247]   Claimants' Post-Hearing Brief ¶ 262. *See also* Exh. C-1784.

[2248]   Memorial ¶ 952.

[2249]   *Ibid*. ¶ 953.

[2250]   *Ibid*. ¶¶ 954–56.

[2251]   *Ibid*. ¶ 958.

[2252]   *Ibid*. ¶¶ 956, 958.

### v.    Pre-Award Interest

1724. In a final step for purposes of their calculations with regard to scenarios 1 and 2, Claimants bring forward the total amount thus obtained to a date close to the date of their last submissions,[2253] and add pre-award interest of LIBOR plus four percent on a compound basis.[2254]

### (c)    Methodology Used for Calculations Based on Scenario 3

1725. Claimants' calculations for scenarios 3a to 3d are based on their calculations for the second scenario, but are adjusted to take into account the settlement of Yukos' tax liabilities through Yukos' cash flow, the sale of certain assets and/or debt financing.[2255]  These scenarios do not assume any payment of dividends to Yukos' shareholders or the loss of a chance of obtaining a listing of Yukos on the NYSE.[2256]  Rather, Claimants determine Yukos' equity value as of November 2007 and derive the value of their ownership interest in Yukos from that figure. They then bring forward the amount thus obtained to a date close to the date of their last submissions again by adding compound pre-award interest at a rate of LIBOR plus four percent.[2257]

1726. Claimants' calculations for scenario 3e (which assumes the sale of YNG at a price higher than that achieved in the 2004 auction) are somewhat more complex.  In this scenario, Claimants estimate the enterprise value of YNG as of November 2007, and then subtract this amount from their estimate of the enterprise value of Yukos as of the same date.  This leaves Claimants with a figure for the enterprise value of Yukos' assets without YNG.[2258]  Claimants then subtract the assumed debt of this smaller Yukos entity and thus arrive at the equity value of Yukos (without YNG) in November 2007.[2259]  Claimants calculate their losses as a pro rata share (based on their 70.5 percent shareholding in Yukos) of the sum of this equity value, their estimate of free cash flows that a diminished Yukos (without YNG) would have achieved between January

---

[2253]  The date used for purposes of Mr. Kaczmarek's second report is 15 March 2012.  Second Kaczmarek Report ¶ 15.

[2254]  Memorial ¶ 969.  For Claimants' arguments on interest see Section XI.A.1 above.

[2255]  First Kaczmarek Report ¶¶ 555, 567.

[2256]  *Ibid*. ¶¶ 556, 568.

[2257]  *Ibid*.

[2258]  *Ibid*. ¶ 545.

[2259]  *Ibid*. ¶ 546.

2005 and November 2007, and pre-award interest brought forward to a date close to the date of their last submissions.[2260]

### (d)   Methodology Used for Calculations Based on 2012 Valuation Date

1727. The position of Claimants is that, because of the unlawful taking by Respondent of Yukos, they are entitled to select the evaluation of the damages either at the date of Respondent's breach or at the date of the award, whichever is the highest.[2261]   Thus, Claimants, in their Reply, also quantify their damages in scenarios 1 and 2 based on a valuation date of 1 January 2012. Claimants state they chose this date for practical purposes since it is close to the date of submission of Mr. Kaczmarek's second expert report and that, if need be, calculations "can subsequently be updated at a date closer to the award."[2262]

1728. While Mr. Kaczmarek does not set out the methodology used in this regard in any great detail,[2263] it can be inferred from some of the appendices to his second report.[2264]   In these appendices, Mr. Kaczmarek estimates Yukos' cash flows for the years 2004 to 2011 as well as the terminal value of Yukos as of 1 January 2012 for scenarios 1 and 2 and then applies pre-award interest of LIBOR plus four percent to bring these figures to the present (*i.e.*, 15 March 2012)[2265] value and thus obtain Yukos' total damages.[2266]   For scenarios 1b and 2b, Claimants also add the incremental value of the chance of obtaining a listing on the NYSE.[2267] Claimants then calculate their damages as a percentage of Yukos' damages, based on their shareholding in the relevant entity.[2268]

---

[2260]   *Ibid.* ¶ 547.

[2261]   Memorial ¶ 917.

[2262]   Claimants' Post-Hearing Brief ¶ 233 n.499.

[2263]   *See* Second Kaczmarek Report ¶ 155.

[2264]   Second Kaczmarek Report, Appendices AG to AK.

[2265]   *Ibid.*

[2266]   Second Kaczmarek Report, Appendices AG.1 and AK.1.  Claimants provide alternative computations based on pre-award interest at Russian Sovereign Cost of Debt, Prime +2 percent and LIBOR +2 percent.  Second Kaczmarek Report, Appendices AG.3 to AG.8 and AK.2 to AK.4.

[2267]   Second Kaczmarek Report, Appendices AH and AI.

[2268]   *Ibid.*, Appendices AG.1 and AI.

(e)     **Summary of Results of Claimants' Calculations**

1729. The valuation by Mr. Kaczmarek of each of the scenarios described above (including pre-award interest through 15 March 2012) is summarized in the following table (amounts in USD billion):

| Valuation date | Scenario | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 1a | 1b | 2a | 2b | 3a | 3b | 3c | 3d | 3e |
| 21 November 2007 | 106.815[2269] | 114.174[2270] | 102.015[2271] | 107.966[2272] | 67.236[2273] | 68.593[2274] | 62.763[2275] | 69.583[2276] | 33.317[2277] |
| 1 January 2012 | 91.922[2278] | 94.931[2279] | 88.737[2280] | 91.217[2281] | n.a. | n.a. | n.a. | n.a. | n.a. |

4.     **Failure of Claimants to Mitigate**

1730. In response to Respondent's contention that Claimants should promptly have paid the original taxes assessed against Yukos (as well as those Yukos should have anticipated would be imposed for succeeding years on the same grounds) to avoid massive damages, Claimants aver that there is no "duty to appease" and that "a victim of extortion is not to blame if the threats against it are carried out after it refuses to pay."[2282]

1731. Claimants also argue that Yukos had no reason to concede the validity of the Russian authorities' position with regard to the initial tax assessments "in circumstances where its objections to the December 29, 2003 Audit Report were still under consideration" and where it

---

[2269]   *Ibid.* ¶ 15.

[2270]   Reply ¶ 859.

[2271]   Second Kaczmarek Report ¶ 18.

[2272]   Reply ¶ 861.

[2273]   *Ibid.* ¶ 875.

[2274]   *Ibid.*

[2275]   *Ibid.*

[2276]   *Ibid.*

[2277]   *Ibid.* ¶ 864.

[2278]   Second Kaczmarek Report ¶ 155.

[2279]   Second Kaczmarek Report, Appendix AH.

[2280]   Second Kaczmarek Report ¶ 155 and Appendix AK.

[2281]   Second Kaczmarek Report, Appendix AI.

[2282]   Claimants' Post-Hearing Brief ¶ 275.

had received advice from its lawyers that the Audit Report was "totally inconsistent with the Russian tax law."[2283]   In any event, Claimants say that Yukos did not have enough cash to settle an alleged tax debt of USD 9 billion in the first quarter of 2004.[2284]

1732. In addition, Claimants assert that, to apply Respondent's argument, "the Tribunal would need to ignore the most salient facts—the Respondent's breaches—and assume . . . that the very same Russian authorities who committed those breaches would have acted differently if only Yukos had taken the actions specified by the Respondent."[2285]   In particular, with regard to Respondent's argument that Yukos could have significantly reduced its tax burden by filing corrected VAT returns during the first quarter of 2004, Claimants contend that the actual conduct of the Russian authorities demonstrates that any amended returns that Yukos might have submitted would, in any event, have been either ignored or rejected.[2286]

### 5.    Windfall and Double-Recovery

1733. Finally, Claimants also reject Respondent's arguments that any award of damages should avoid presenting Claimants with a windfall and take into account the risk of double-recovery. According to Claimants, these arguments of Respondent merely seek to "repackage its so-called 'unclean hands' theory in the context of damages" and Respondent, they say, "has failed to articulate any basis on which alleged collateral illegalities could . . . be relevant to an assessment of damages."[2287]   In any event, conclude Claimants, any benefits they may have received through their investments prior to Respondent's breaches of the ECT are irrelevant for the calculation of the damages in the present arbitration and, furthermore, any assets located outside Russia have been excluded from Mr. Kaczmarek's valuations.[2288]

---

[2283]   *Ibid.* ¶ 281, quoting Sergey Pepeliaev, Summary of the tax inspection of OAO NK Yukos, 5 January 2004, pp. 1, 3, Exh. C-1128.

[2284]   *Ibid.* ¶ 292.

[2285]   *Ibid.* ¶ 276.

[2286]   *Ibid.* ¶ 287.

[2287]   Reply ¶¶ 883–85.

[2288]   Reply ¶ 963.

B.   **RESPONDENT'S POSITION**

1734. Respondent argues that, even if it were held to be liable for a breach of the ECT, Claimants should not be awarded any damages in this case.[2289]   Respondent has submitted two expert reports on damages by Professor James Dow, one dated 1 April 2011 and the other 15 August 2012, with their Counter-Memorial and their Rejoinder, respectively.   These reports and Respondent's arguments with regard to Claimants' damages calculations can be summarized as follows.

1.   **Valuation Date**

1735. Respondent disagrees with both valuation dates proposed by Claimants.

1736. With regard to Claimants' valuation as of the date of expropriation, Respondent invokes the principle that "the valuation date should be when the purported substantial deprivation of the investor's investment has occurred."[2290]   Respondent objects, however, to Claimants' assessment that in this case a substantial deprivation of their investment occurred on 21 November 2007, a date which Respondent considers "arbitrary."[2291]   Respondent argues that "the hallmark of an appropriate valuation date is the loss of effective control over the investor's investment"[2292] and concludes that "Claimants have repeatedly averred that they lost control of their investment and that it lost all value long before November 21, 2007."[2293]

1737. As a result, Respondent disputes that the date of 21 November 2007 chosen by Claimants has any relevance.   As Professor Dow explained at the Hearing:

> I am very clear in stating that the 2007 date has no economic relevance, in my view.  And I say that because at the end of 2004 Yukos shares had lost essentially all of their value. Yukos was a penny stock.  It wasn't expected to recover, the market did not expect it to recover; that was reflected in the share price. . . .  So from an economic point of view, the date of delisting in 2007 is a bureaucratic event, not an event at which value was lost.[2294]

---

[2289]   Respondent's Post-Hearing Brief ¶¶ 262–63.

[2290]   Rejoinder ¶ 1666.

[2291]   Counter-Memorial ¶ 1618.

[2292]   Rejoinder ¶ 1666.

[2293]   Ibid. ¶ 1666.  *See also* Respondent's Post-Hearing Brief ¶ 238.

[2294]   Transcript, Day 12 at 14.  *See also* at 49.

1738. While Respondent does not propose any specific alternative date when Claimants lost control of their investments, Professor Dow suggested at the Hearing that such a date would, in any event, have to be before the end of 2004.[2295]

1739. Respondent also rejects Claimants' submission that the date of an award can be used as an alternative valuation date.  In this regard, Respondent argues that the "standard theoretical framework economists typically use to calculate damages is an '*ex ante*' one" where damages are assessed at the moment of the relevant breaches and then brought to present value with pre-judgment interest.[2296]  By contrast, an "*ex post*" approach would, according to Respondent, use information based on hindsight, provide no principled basis for choosing a date and therefore be vulnerable to error.[2297]  In addition, Respondent claims that, "with each passing day after the alleged takings date, it becomes increasingly speculative to value the asset taken as of some later date."[2298]

1740. In his first report, Professor Dow writes that there is a "general preference among economists for the *ex ante* approach when evaluating damages in commercial matters" and refers, in this connection, to an article published in the 1990 Journal of Accounting, Auditing and Finance.[2299]  Relying on this article, Respondent submits that "an expropriation relieves the owner not only of the value of the asset on the date of expropriation, but also of the risk associated with owning it" and that, as a consequence, "[t]he only way to recognize both aspects is to assess the value of the asset on the date of expropriation, when neither its owner nor the State knows whether the asset will increase or decrease in value."[2300]

### 2.    Causation

1741. Respondent also disagrees with Claimants with respect to causation.  In particular, Respondent emphasizes the need to establish "a sufficient causal link" between breach and damage, where

---

[2295]   *Ibid*. at 175.

[2296]   Counter-Memorial ¶ 1617.

[2297]   *Ibid*. ¶ 1618.

[2298]   Respondent's Post-Hearing Brief ¶ 239.

[2299]   First Dow Report ¶ 13, citing to Franklin M. Fisher and R. Craig Romaine, *Janis Joplin's Yearbook and the Theory of Damages*, Journal of Accounting, Auditing and Finance (1990), p. 153, Exh. R-1980.

[2300]   Respondent's Post-Hearing Brief ¶ 239.

the latter is the "proximate result" of the former.[2301]   Respondent advocates the following methodology:

> [I]f the damages are caused by a series of harmful actions . . . each violation can be treated as a new action and the corresponding incremental change can be estimated at the time of the action, . . . [t]he incremental damage figures for each violation can then be added together to obtain a total damage figure.[2302]

1742. According to Respondent, Claimants' approach to damages fails "to connect any of the alleged treaty violations to a specific amount of damages" and provides "no mechanism for determining the incremental damages allegedly caused by any specific alleged violation."[2303] As a consequence, Respondent alleges that Claimants' valuations "do not accommodate the situation where the Tribunal finds that fewer than all of the scores of alleged 'bad acts' were violations."[2304]

### 3. Specific Aspects of the Calculations Performed by Claimants Criticized by Respondent

1743. Principally, Respondent criticizes Claimants' damages claims as being "based on inherently incorrect or speculative assumptions."[2305]   According to Professor Dow, Mr. Kaczmarek's various calculations are "riddled with errors" and the obvious result of "reverse engineering to a desired result."[2306]   Respondent and its expert raise numerous arguments in support of their criticism, the most important of which are summarized below.

### (a)   Credibility of Claimants' DCF Analysis

1744. One of Respondent's main criticisms with regard to Claimants' valuation is directed at Mr. Kaczmarek's DCF analysis.   In particular, in his first expert report, Professor Dow identifies what Respondent claims are "three obvious and significant errors" regarding the valuation of YNG.[2307]   Respondent points out that, while Mr. Kaczmarek admitted to two of

---

[2301]   Counter-Memorial ¶ 1606, quoting U.S. and Germany Mixed Claims Commission, Administrative Decision No. II, 1 November 1923, 23, p. 29, Exh. R-1188.

[2302]   *Ibid.* ¶ 1617.

[2303]   *Ibid.* ¶ 1619.  *See also* ¶ 1627.

[2304]   *Ibid.* ¶ 1619.  *See also* ¶ 1628.

[2305]   *Ibid.* ¶ 1637.

[2306]   Second Dow Report ¶ 422.

[2307]   Counter-Memorial ¶ 1630.

these errors in his second expert report, the valuation of YNG remained virtually unchanged.[2308] As a consequence, Respondent claims that Mr. Kaczmarek's "main task" in his second report must have been to "find a way to make up for gaping holes in his initial valuation that he concedes were the result of readily identifiable errors that he realized had to be corrected, after Professor Dow had identified them."[2309]   Respondent points out that, while the necessary corrections identified by Professor Dow caused Claimants' expert to make adjustments of over USD 10 billion to his valuation of YNG, Mr. Kaczmarek still ended up with virtually the same figure as in his first report as a consequence of a series of simultaneous "discretionary" upward adjustments.[2310]

1745.   Respondent also claims that Claimants' expert "did the same thing in his other two DCF models, correcting mistakes that reduce his valuation of Yukos and YukosSibneft by USD 40 billion and USD 90 billion, respectively, and then adjusting other elements to bring his conclusions back up to where he started."[2311]   According to Respondent, "Mr. Kaczmarek confirmed . . . that his DCF model is simply a device for justifying an *a priori* conclusion, conceding repeatedly that his focus was not on critically analyzing the inputs to his model, but rather on whether the output met pre-conceived notions that were never disclosed in his reports."[2312]   As a result, Respondent concludes that Claimants' results have been "reverse engineered"[2313] and are "made-up numbers around which models were built."[2314]

### (b)   Claimants' Selection of Comparable Companies for Purposes of the Comparable Companies Analysis

1746.   With regard to Claimants' use of the comparable companies method, Respondent criticizes Claimants' valuation as being based on an "unsupportable decision to weigh Rosneft as 70% of the analysis, when Rosneft's market metrics never resembled Yukos' or those of other private

---

[2308]   Second Dow Report ¶ 8.  *See also* Second Kaczmarek Report ¶¶ 82–97.

[2309]   Rejoinder ¶ 1606.

[2310]   *Ibid*. ¶ 1612.

[2311]   *Ibid*. ¶ 1613.  Respondent identifies a number of errors which it says were made by Mr. Kaczmarek in his first report before being corrected in his second report.  In addition, Respondent identifies a number of errors which it says were made by Mr. Kaczmarek in his second report.  Rejoinder ¶¶ 1620–36.

[2312]   Respondent's Post-Hearing Brief ¶ 240, citing to Trancript, Day 11 at 112, 116–17, 143–44, 153–54.

[2313]   Rejoinder ¶ 1618, quoting Second Dow Report ¶ 390.

[2314]   *Ibid*. ¶ 1619.

Russian oil companies."[2315]   Professor Dow, provides a "corrected" comparable companies analysis that excludes the data with regard to Rosneft, Gazprom Neft and the international major oil companies from the analysis,[2316] and leads to an enterprise value for Yukos in 2007 that is approximately USD 32 billion lower than the enterprise value calculated by Mr. Kaczmarek based on the comparable companies method.[2317]

### (c)   Claimants' Reliance on Comparable Transactions

1747. With regard to Claimants' calculations based on comparable transactions, Respondent asserts that Claimants' expert, Mr. Kaczmarek, admits that no truly comparable transactions exist.[2318] In addition, Professor Dow criticizes Mr. Kaczmarek's selection criteria for identifying comparable upstream and downstream transactions as "indefensible from an economic perspective."[2319]

### (d)   Claimants' Calculations of Hypothetical Cash Flows from Dividends

1748. Respondent does not explicitly address Claimants' calculations of hypothetical dividends that would have been paid by Yukos to its shareholders if there had been no breach of the ECT as alleged by Claimants.   However, when criticizing Mr. Kaczmarek's calculations with regard to scenario 3, Professor Dow does comment on the free cash flows of Yukos that, according to Claimants, would have been the basis for the payment of dividends.   Thus, according to Professor Dow, the free cash flows identified by Mr. Kaczmarek in this context are "inflated because they are based on his . . . grossly erroneous[] Yukos DCF model that overstates Yukos cash flows."[2320]   Professor Dow provides an alternative set of figures that he refers to as the "corrected" cash flows from Mr. Kaczmarek's model.[2321]

---

[2315]   Respondent's Post-Hearing Brief ¶ 242.

[2316]   Second Dow Report ¶ 417.

[2317]   Second Dow Report, p. 195, Figure 73.

[2318]   Respondent's Post-Hearing Brief ¶ 242.  *See also* Second Dow Report ¶ 420.

[2319]   Second Dow Report ¶ 423.

[2320]   *Ibid.* ¶ 492.

[2321]   *Ibid.* ¶ 492 and Figure 81.

### (e)   Claimants' Calculations Based on the Loss of a Chance to Obtain a Listing on the New York Stock Exchange

1749. Professor Dow also criticizes Claimants' assumption that Yukos would have benefited from a listing on the NYSE as "thrice wrong because it assumes an event that did not happen, that was entirely within Yukos' control, and overstates the economic benefit that would be expected were the event to have come to pass."[2322]   In addition, Professor Dow states that there is no basis for the assumption that, without Respondent's actions, Yukos would have had a 70 percent chance of being listed on the NYSE.[2323]

### (f)   Claimants' Calculations Based on the Assumption of a Completed Yukos–Sibneft Merger

1750. Professor Dow criticizes Claimants' calculations based on a completed Yukos–Sibneft merger arguing that such a merger was never completed and that the valuation of a combined YukosSibneft entity is therefore utterly speculative.[2324]   In particular, Professor Dow claims that Mr. Kaczmarek's calculations largely ignore "the effects of the merger on operational costs, any impact on costs as a result of changed regulatory requirements, and the combined entity's creditworthiness and cost of borrowing."[2325]

### (g)   Claimants' Scenarios 3a to 3d

1751. With regard to Claimants' scenarios 3a to 3d, which assume payment of Yukos' tax liabilities over a period of one, three or five years, Respondent asserts that Russian law did not allow the Tax Ministry to enter into any such arrangements as postulated by Claimants[2326] and that it was, in any event, not obligated to do so.[2327]   In addition, Respondent claims that, based on the knowledge available regarding the development of oil prices in 2004, Claimants' calculations in relation to expected cash flows are not realistic.[2328]   Respondent also disputes that Claimants

---

[2322]   *Ibid.* ¶ 204.

[2323]   *Ibid.* ¶ 215.

[2324]   *Ibid.* ¶ 204.

[2325]   *Ibid.* ¶ 208.

[2326]   Counter-Memorial ¶ 1631.

[2327]   Rejoinder ¶ 1662 and n.2559.

[2328]   Counter-Memorial ¶ 1631.  *See also* Second Dow Report ¶ 492.

would have been able to negotiate a loan of USD 16 billion, as assumed in Claimants' scenario 3c.[2329]

### (h)   Claimants' Scenario 3e and the Valuation of YNG

1752. With regard to Claimants' scenario 3e (which assumes that the auctioning of YNG was necessary, but should have been realized at a fair price) and the valuation of YNG in Mr. Kaczmarek's first expert report, Respondent claims that Mr. Kaczmarek made three "obvious and significant errors" relating to the application of the inflation rate, the export duty rate and the mineral extraction tax rate.[2330]   Adjusting for these errors, the valuation of YNG would have been USD 12.5 billion,[2331] with the consequence that Yukos would not have been able to pay its taxes by the end of 2005, even if YNG had been sold at a higher price.[2332]

### (i)   Claimants' Calculation of Pre-Award Interest

1753. As described in Part XI above, Respondent submits that Claimants are not entitled to claim pre-award interest.

### 4.   Failure of Claimants to Mitigate

1754. Respondent asserts that Claimants had "repeated opportunities to mitigate the damage caused,"[2333] and that, in particular, by paying its taxes in early 2004, Yukos could have "halved the total amount to be paid"[2334] rather than "subject[ing] itself to . . . US\$ 12 billion in additional 2000–2003 Avoidable Taxes and Fees."[2335]   If Yukos had paid its taxes and filed appropriate returns during the first quarter of 2004, Respondent says it "would have survived as a going concern and still could have pursued a claim for a refund of any amounts the courts found it did not need to pay."[2336]   Accordingly, the "loss of all value of Yukos" would be "the

---

[2329]   Counter-Memorial ¶ 1632; Rejoinder ¶¶ 1655–57.

[2330]   Counter-Memorial ¶ 1630.  *See also* Respondent's Post-Hearing Brief ¶ 246; Second Dow Report ¶ 452.

[2331]   Counter-Memorial ¶ 1630; Rejoinder ¶ 1647.

[2332]   Counter-Memorial ¶ 1630.

[2333]   *Ibid.* ¶ 1602.

[2334]   Rejoinder ¶ 1729.

[2335]   *Ibid.* ¶ 1730.  *See also* Respondent's Post-Hearing Brief ¶ 220.

[2336]   Respondent's Post-Hearing Brief ¶¶ 220–22, 250.

consequence of the contributory fault and the failure to mitigate of Yukos, under the control of Claimants."[2337]

1755. Respondent claims that, as a consequence, "Claimants' maximum damage claim is for their proportion of the harm (if any) Yukos would have suffered if the assessment and payment of the 2000–2003 Unavoidable Taxes were deemed to constitute a violation of the ECT."[2338] Respondent calculates this "maximum damage" as amounting to USD 6.27 billion.[2339]

### 5.   Windfall and Double-Recovery

1756. In addition, Respondent claims that any calculation of damages should take into account any previous benefits obtained by Claimants from their investments in Russia, so as to prevent any "double-recovery."[2340]   Respondent contends that granting Claimants the damages sought "would be a massive windfall to Claimants, who have already received far more from their investment in Yukos than they would have received had they invested in a comparable Russian oil company during the same period."[2341]   Respondent also suggests that, had the market known of "Yukos' lack of transparency, its disregard of minority interests, and its failures of corporate governance, not to mention its internal documents acknowledging the civil and criminal exposure it faced from its massive tax fraud, Yukos would not have experienced the share appreciation . . . on which Claimants' damages claim depends."[2342]   As a consequence, Respondent claims that "the market metrics . . . are not fair indicators of value and cannot be relied upon by the Tribunal."[2343]

1757. Respondent concludes that "any damages award should provide for no more than a reasonable rate of return."[2344]   Since Claimants would "have already gained that return through Yukos' dividends and share repurchases, . . . hundreds of millions of dollars worth of Russian taxes

---

[2337]   *Ibid.* ¶ 250.

[2338]   Rejoinder ¶ 1732.  *See also* Respondent's Post-Hearing Brief ¶¶ 220, 233, 252.

[2339]   Respondent's Post-Hearing Brief ¶ 252.  *See also* Transcript, Day 19 at 270.

[2340]   Counter-Memorial ¶ 1648.

[2341]   Respondent's Post-Hearing Brief ¶ 232 (footnote omitted).

[2342]   *Ibid.* ¶ 261.

[2343]   *Ibid.* ¶ 261.

[2344]   *Ibid.* ¶ 233.  *See* ¶¶ 254–62.

they evaded through abuse of the [Cyprus-Russia DTA], and all the assets that were stripped from Yukos," the "proper measure of damages in this case" would in any event be "zero."[2345]

### C.   TRIBUNAL'S ANALYSIS AND DECISION

1758. Having reviewed and considered the Parties' submissions and their experts' reports, the Tribunal will now determine the damages suffered by Claimants as a result of Respondent's unlawful expropriation of Yukos' assets in breach of Article 13 of the ECT.

#### 1.   Valuation Date

1759. With regard to the date of valuation, the Tribunal needs to address two issues, namely (a) the date of the expropriation of Claimants' investment by Respondent, and (b) whether Claimants are entitled to choose between a valuation based on that date of expropriation and a valuation based on the date of the award.  Each of these questions is addressed in turn.

##### (a)   The Date of the Expropriation

1760. As noted earlier, Claimants have advanced the date of 21 November 2007, the day on which Yukos was struck off the Russian register of legal entities, as the date of the expropriation of their investment, and have performed their main damages analysis based on a valuation of their shares in Yukos as of that date.

1761. The Tribunal agrees with Respondent that the date of 21 November 2007 cannot be the date of Yukos' expropriation.  The Tribunal observes that both Parties are agreed that, in principle, in the event of an expropriation through a series of actions, the date of the expropriation is the date on which the incriminated actions first lead to a deprivation of the investor's property that crossed the threshold and became tantamount to an expropriation.[2346]  This is the date that is relevant for the determination of the Tribunal.

1762. The Tribunal finds that the threshold to the expropriation of Claimants' investment was crossed earlier than in November 2007.  On the basis of the record, it is clear to the Tribunal that a substantial and irreversible deprivation of Claimants' assets occurred on 19 December 2004,

---

[2345] *Ibid.* ¶ 262.

[2346] Memorial ¶ 912, n.1314; Reply ¶ 940; Rejoinder ¶ 1666; Respondent's Post-Hearing Brief ¶ 238.

the date of the YNG auction.  YNG was Yukos' main production asset and its loss, with the conclusion of the auction on that date, marked a substantial and irreversible diminution of Claimants' investment.[2347]  This conclusion of the Tribunal is confirmed by statements made by Claimants in December 2004 to the effect that they had "lost the power to govern the financial and operating policies of Yukos so as to obtain the benefits from its activities" and that Yukos had become "incapable of operating as a business."[2348]  The date of the expropriation of Claimants' investment is therefore determined by the Tribunal to be 19 December 2004.

### (b) The Possibility for Claimants to Choose Between a Valuation as of the Date of Expropriation and a Valuation as of the Date of the Award

1763. The Tribunal also holds that, in the case of an unlawful expropriation, as in the present case, Claimants are entitled to select either the date of expropriation or the date of the award as the date of valuation.

1764. As the Tribunal noted earlier, Respondent, relying on the opinion of its expert on damages, maintains that Claimants may not make such a choice and that there is a preference amongst economists for what he refers to as an "*ex ante*" approach to the evaluation of damages.[2349]  In support of his opinion, Professor Dow relies on a single article published in an economics journal in 1990.[2350]

1765. Neither the text of Article 13 of the ECT nor its *travaux* provide a definitive answer to the question of whether damages should be assessed as of the date of expropriation or the date of the award.  The text of Article 13, after specifying the four conditions that must be met to render an expropriation lawful, provides that for "such" an expropriation, that is, for a lawful expropriation, damages shall be calculated as of the date of the taking.  *A contrario,* the text of Article 13 may be read to import that damages for an unlawful taking need not be calculated as of the date of taking.  It follows that this Tribunal is not required by the terms of the ECT to assess damages as of the time of the expropriation. Moreover, conflating the measure of

---

[2347] *See* Subsection VIII.F.3(c) above.

[2348] YUL (and its subsidiaries), Annual Report and Consolidated Financial Statements for The Year Ended 31 December 2004, Exh. R-4229.  *See also* Rejoinder ¶ 1673.

[2349] First Dow Report ¶ 13.

[2350] Franklin M. Fisher and R. Craig Romaine, *Janis Joplin's Yearbook and the Theory of Damages*, Journal of Accounting, Auditing and Finance (1990), p. 153, Exh. R-1980.

damages for a lawful taking with the measure of damages for an unlawful taking is, on its face, an unconvincing option.

1766. In the view of the Tribunal, and in exercise of the latitude that the terms of Article 13 of the ECT afford it in this regard, the question of whether an expropriated investor is entitled to choose between a valuation as of the expropriation date and the date of an award is one best answered by considering which party should bear the risk and enjoy the benefits of unanticipated events leading to a change in the value of the expropriated asset between the time of the expropriatory actions and the rendering of an award.   The Tribunal finds that the principles on the reparation for injury as expressed in the ILC Articles on State Responsibility are relevant in this regard.   According to Article 35 of the ILC Articles, a State responsible for an illegal expropriation is in the first place obliged to make restitution by putting the injured party into the position that it would be in if the wrongful act had not taken place.   This obligation of restitution applies as of the date when a decision is rendered.   Only to the extent where it is not possible to make good the damage caused by restitution is the State under an obligation to compensate pursuant to Article 36 of the ILC Articles on State Responsibility.

1767. The consequences of the application of these principles (restitution as of the date of the decision, compensation for any damage not made good by restitution) for the calculation of damages in the event of illegal expropriation are twofold.   First, investors must enjoy the benefits of unanticipated events that increase the value of an expropriated asset up to the date of the decision, because they have a right to compensation in lieu of their right to restitution of the expropriated asset *as of that date*.   If the value of the asset increases, this also increases the value of the right to restitution and, accordingly, the right to compensation where restitution is not possible.

1768. Second, investors do not bear the risk of unanticipated events decreasing the value of an expropriated asset over that time period.   While such events decrease the value of the right to restitution (and accordingly the right to compensation in lieu of restitution), they do not affect an investor's entitlement to compensation of the damage "not made good by restitution" within the meaning of Article 36(1) of the ILC Articles on State Responsibility.   If the asset could be returned to the investor on the date where a decision is rendered, but its value had decreased since the expropriation, the investor would be entitled to the difference in value, the reason being that in the absence of the expropriation the investor could have sold the asset at an earlier date at its previous higher value.   The same analysis must also apply where the asset cannot be returned, allowing the investor to claim compensation in the amount of the asset's higher value.

1769. It follows for the several reasons stated above that in the event of an illegal expropriation an investor is entitled to choose between a valuation as of the expropriation date and as of the date of the award.  The Tribunal finds support for this conclusion in the fact that this approach has been adopted by tribunals in a number of recent decisions dealing with illegal expropriation.[2351] One of these tribunals, in *Ioannis Kardassopoulous and Ron Fuchs v. The Republic of Georgia*, so interpreted the ECT.[2352]

### 2.    Causation

1770. The Parties disagree with regard to the requirements for showing the causation of damages.[2353] The Tribunal finds it useful to address the Parties' views on this matter in two steps.  First, the Tribunal will address the requirements for showing the causation of damages where several actions are invoked at the same time.  Second, it will deal with the consequences of damage being caused by several actions, only some of which are breaches attributable to the respondent party.

### (a)    Causation and Reliance on Multiple Actions

1771. Claimants assert that "a causal link needs only be established between the actions of the Russian Federation taken as a whole and Claimants' damages" and that "[t]his causal link is obvious."[2354]  Respondent takes the view that, by simply asserting a link between the totality of a number of "bad acts" and the damage, Claimants put themselves in a position where they have to show that "all of the scores of alleged 'bad acts' were [treaty] violations."[2355]

1772. The Tribunal holds that Claimants do, in fact, establish that a specific series of actions of Respondent, consisting of the 2000–2004 tax assessments against Yukos and the subsequent enforcement measures (including the forced auction of YNG), constituted an illegal

---

[2351]   *See e.g.*, *ADC* ¶¶ 496–97, Exh. C-980; *Siemens* ¶ 352, Exh. C-983; *Amoco*, pp. 300–301, Exh. C-939.  *See also* Marboe ¶ 3.287, Exh. C-1607.

[2352]   *Kardassopoulos* ¶ 514, Exh. C-1533.

[2353]   Reply ¶ 911 (Claimants assert that "a causal link needs only be established between the actions of the Russian Federation taken as a whole and the Claimants' damages" and that "[t]his causal link is obvious.").  *See also* Claimants' Post-Hearing Brief ¶ 191.  By contrast, *see* Counter-Memorial ¶ 1619 (Respondent takes the view that, by simply asserting a link between the totality of a number of "bad acts" and a damage, Claimants put themselves in a position where they have to show that "all of the scores of alleged 'bad acts' were [treaty] violations.").  *See also* Counter-Memorial ¶ 1628

[2354]   Reply ¶ 911.  *See also* Claimants' Post-Hearing Brief ¶ 191.

[2355]   Counter-Memorial ¶ 1619.  *See also* Counter-Memorial ¶ 1628.

expropriation of Claimants' investment, and that this expropriation caused Claimants damage. In particular, the 2000–2004 tax assessments were actions that contributed to the expropriation of Claimants' investment, and without these assessments, the damage to Claimants would not have occurred.  While other actions taken by Respondent may or may not have contributed to a violation of the ECT's standards, showing that they did is not required for establishing causation with regard to the damage suffered by Claimants.  All of the heads of damage subsequently identified by the Tribunal are consequences of the 2000–2004 tax assessments that led to the expropriation of Claimants' investment, and this expropriation was clearly a breach of Article 13 ECT.

## (b)     Multiple Causes for the Same Damage

1773. The Parties also do not agree with regard to the consequences of damage being caused by several events, where only some of those events are breaches attributable to a respondent party. Respondent appears to suggest that concurrent causation of a particular line of damage by Claimants' own conduct, the conduct of third parties and conduct of Respondent that is not wrongful should exclude Respondent's responsibility for that damage,[2356] and that Claimants bear the burden of showing that no such causation exists.[2357]  The Tribunal does not agree with that argument.

1774. In this regard, the Tribunal finds it instructive to look to the ILC Articles on State Responsibility.  Article 31 of the ILC Articles provides that "[t]he responsible State is under an obligation to make full reparation for the injury caused."[2358]  The official commentary to this provision notes that "[o]ften two separate factors combine to cause damage," before pointing out that:

> Although, in such cases, the injury in question was effectively caused by a combination of factors, only one of which is to be ascribed to the responsible State, international practice and the decisions of international tribunals do not support the reduction or attenuation of reparation for concurrent causes, except in cases of contributory fault. . . .  Such a result should follow *a fortiori* in cases where the concurrent cause is not the act of another State . . . but of private individuals. . . .  [U]nless some part of the injury can be shown to

---

[2356]   Respondent's Post-Hearing Brief ¶ 234.  *See also* Counter-Memorial ¶ 1619; Rejoinder ¶ 1719.  Claimants do not specifically address this point.

[2357]   Rejoinder ¶ 1719.

[2358]   Exh. R-1031.

be severable in causal terms from that attributed to the responsible State, the latter is held responsible for all the consequences, not being too remote, of its wrongful conduct.[2359]

1775. As the commentary makes clear, the mere fact that damage was caused not only by a breach, but also by a concurrent action that is not a breach does not, as such, interrupt the relationship of causation that otherwise exists between the breach and the damage.  Rather, it falls to the Respondent to establish that a particular consequence of its actions is severable in causal terms (due to the intervening actions of Claimants or a third party) or too remote to give rise to Respondent's duty to compensate.   As the Tribunal considers that Respondent has not demonstrated this with regard to any of the heads of damage identified in the remainder of this Chapter, the Tribunal holds that causation exists between the damage and Respondent's expropriation of Claimants' investment.[2360]

### 3.    Failure of Claimants to Mitigate

1776. Respondent asserts that Claimants could have significantly mitigated their damages by taking a few simple steps in the first quarter of 2004, namely by paying the taxes then assessed against Yukos, filing amended VAT returns in Yukos' name, and filing amended tax returns for the years 2000–2002 and a tax return for 2003 recognizing all of Yukos' income without assigning it to its trading entities.  The Tribunal has considered each of the actions Respondent suggests Claimants should have taken (set out in paragraphs 679–80, 745–48 and 934–35 above) and has concluded that the suggested actions would not ultimately have made a difference to the enforcement measures subsequently taken by the Russian Federation.  As seen in Part VIII above, the measures taken by the Russian Federation demonstrate that its primary objective was to bankrupt Yukos and appropriate its assets and that it was determined to do whatever was necessary to achieve this purpose.  In light of this finding, the Tribunal cannot accept that by paying the taxes then assessed or re-filing VAT and tax returns in early 2004, Claimants could have deterred Respondent in the pursuit of its objective.

### 4.    The Methodology Followed by the Tribunal

1777. Having made these determinations in respect of the valuation dates, causation and mitigation, the Tribunal now turns to the specific methodology of establishing the damages in this

---

[2359]    *Ibid.* ¶¶ 12–13 (footnotes omitted), Exh. R-1031.

[2360]    Claimants' contributory fault and the associated reduction of the damages suffered has already been addressed above in Chapter X.E.

arbitration.  As an initial matter, the Tribunal observes that, since it has decided that Claimants are entitled to the higher of the damages determined as of the date of expropriation and as of the date of the award, the Tribunal must establish the total amount of damages caused by Respondent's actions on each of the two valuation dates identified, namely the date of the YNG auction and the date of this Award.  For purposes of the Tribunal's calculations, the date of the Award will be deemed to be 30 June 2014.  Claimants will be entitled to the higher of these two figures, subject to the deduction of 25 percent for contributory fault.[2361]

1778.  On each of these valuation dates, Claimants are entitled to the following heads of damages: (1) the value of Claimants' shares in Yukos valued as of the valuation date; (2) the value of the dividends that the Tribunal determines would have been paid to Claimants by Yukos up to the valuation date but for the expropriation of Yukos; and (3) pre-award simple interest on these amounts.

1779.  By contrast, the Tribunal considers that a potential listing of Yukos on the NYSE and the benefits that Claimants might have derived from such a listing are too uncertain to be taken into account for purposes of calculating Claimants' damages.  This element of Claimants' damages case is therefore rejected.

1780.  The Tribunal also finds that the assessment of Claimants' damages must be based on their shareholding in Yukos, without taking into account the potential effects of a completed merger between Yukos and Sibneft.  The Tribunal has not been convinced, on the balance of probabilities, that in the absence of Respondent's expropriatory actions, the envisaged merger would have been completed;[2362] indeed, the Tribunal considers that assuming a completed merger in the "but for" scenario is too speculative.  As a consequence, the Tribunal rejects Claimants' first damages scenario, notably the valuation of Claimants' share in YukosSibneft.

1781.  Before turning to the calculation of the damages components for the two relevant valuation dates, the Tribunal explains in the following subsections the methodology it has decided to adopt for valuing Yukos on each of the given dates, and the basis on which it has determined the amount of dividends that would likely have been paid to Claimants, in the "but for" scenario, prior to each of the valuation dates.

---

[2361]  *See* Chapter X.E.

[2362]  *See* Chapter VIII.D.

(a)     **Valuation of Yukos**

1782. As set out earlier in this chapter, for purposes of the damages calculation, the Tribunal has decided that the relevant valuation dates are the date of the YNG auction and the date of this Award.  However, the starting point for the Tribunal's analysis must be the calculations done by Claimants as of their suggested valuation date of 21 November 2007.  Claimants have put forward alternative valuations of Yukos as of that date calculated on the basis of various valuation methods.  These methods and the valuations of Yukos derived from them (in USD billion) are summarized in the following table:[2363]

| | |
|---|---|
| DCF method | 88.593[2364] |
| Comparable companies method | 92.924[2365] |
| Comparable transactions method | 87.620[2366] |
| Rosneft's market capitalization on 21 November 2007, adjusted | 83.07[2367] |
| Yukos' market capitalization on 24 October 2003 adjusted pursuant to development of Urals Blend price index | 104.835[2368] |
| Yukos' market capitalization on 24 October 2003 adjusted pursuant to development of RTS Oil & Gas index | 74.191[2369] |
| Yukos' market capitalization on 24 Oct 2003 adjusted pursuant to development of Lukoil's market capitalization | 129.028[2370] |
| Implied value of YNG based on share swap between Rosneft and Yukos in October 2006 (adjusted pursuant to development of RTS Oil & Gas index) and proceeds from auctions of non-YNG assets in 2007 | 75.657[2371] |

1783. Respondent has not put forward a methodology for valuating Yukos or any valuation figures of its own.  However, Professor Dow has provided a "corrected" version of Claimants' comparable companies analysis, making adjustments for what he considered to be the principal errors

---

[2363]   For any of these valuations, Claimants' respective damages (under this head of damage) would correspond to their pro rata stake in the outstanding shares of Yukos, which were 56.3 percent for Hulley, 2.6 percent for YUL and 11.6 percent for VPL (a total of 70.5 percent for Claimants taken together).  All figures are in USD.

[2364]   Second Kaczmarek Report, p. 11, Table 3; ¶ 69.

[2365]   Second Kaczmarek Report, p. 11, Table 3; p. 38, Table 24..

[2366]   Second Kaczmarek Report, p. 11, Table 3; p. 39, Table 25.

[2367]   Claimants' Post-Hearing Brief ¶ 263; Exh. C-1785.  The equity value has been obtained from the enterprise value assumed by Claimants (USD 92.3 billion) on the basis of an assumed 90/10 equity/capital structure.  *See* Exh. C-1784.

[2368]   Claimants' Post-Hearing Brief ¶ 261; Exh. C-1785.

[2369]   Claimants' Post-Hearing Brief ¶ 261; Exh. C-1785.  The RTS Oil and Gas index is built up of the prices of Russian share companies in the oil and gas sector.  Transcript, Day 12 at 68 (Professor Dow).

[2370]   Claimants' Post-Hearing Brief ¶ 261; Exh. C-1785.

[2371]   Claimants' Post-Hearing Brief ¶ 262; Exhs. C-1784, C-1785.

contained therein.[2372]   Based on these adjustments, Respondent's expert arrives—in orally advancing what "could be" a "useful" evaluation—at a "corrected" enterprise value of Yukos, as of 21 November 2007, in the amount of USD 67.862 billion.[2373]   Assuming a 90/10 equity/debt capital structure of Yukos, this corresponds to an equity value of Yukos, as of 21 November 2007, of approximately USD 61.076 billion. [2374]

1784. Having considered the extensive expert evidence presented by Mr. Kaczmarek and Professor Dow, including the written evidence in the two expert reports that each submitted (with detailed accompanying annexes and appendices), and the testimony that was elicited from them during the Hearing, the Tribunal concludes, for the reasons set out below, that the "corrected" comparable companies figure is the best available estimate for what Yukos would have been worth on 21 November 2007 but for the expropriation.

1785. The Tribunal finds that neither of the other two primary valuation methods put forward by Claimants is sufficiently reliable to ground a determination of damages for this case.   On balance, the Tribunal was persuaded by Professor Dow's analysis of Claimants' DCF model, and is compelled to agree that little weight should be given to it.   The Tribunal observes that Claimants' expert admitted at the Hearing that his DCF analysis had been influenced by his own pre-determined notions as to what would be an appropriate result.[2375]   Similarly, the Tribunal can put little stock in Claimants' calculations based on the comparable transactions method, since both Parties agree that, in fact, there were no comparable transactions,[2376] and thus no basis that would allow a useful comparison.

1786. As for the remaining valuation methods put forward by Claimants, and the valuations of Yukos generated by them, the Tribunal notes that Claimants use these secondary valuations primarily in support of their main valuation.   Moreover, some of these figures were only introduced by Claimants at a very late stage of the proceedings (through demonstrative exhibits at the Hearing and in Claimants' Post-Hearing Brief[2377]) and could therefore not be properly addressed by

---

[2372]   Second Dow Report ¶ 417.

[2373]   *Ibid*. ¶ 444; p. 182, Figure 67; p. 195, Figure 73; Appendix 16.1.  *See also* Transcript, Day 12 at 47 (Professor Dow).

[2374]   A 90/10 equity/capital structure corresponds to the assumption made by Claimants for purposes of their calculations. *See* Exh. C-1784.

[2375]   Transcript, Day 11 at 190.

[2376]   Memorial ¶ 945; Respondent's Post-Hearing Brief ¶ 242.

[2377]   Claimants' Post-Hearing Brief ¶¶ 261–63; Exh. C-1785.

Respondent.  Accordingly, the Tribunal finds that none of these secondary valuation methods can serve as a suitable independent basis for determining the value of Yukos.

1787. By contrast to all of the other methods canvassed above, the Tribunal does have a measure of confidence in the comparable companies method as a means of determining Yukos' value. While Professor Dow stated at the Hearing that he had not performed an analysis sufficient to fully endorse the figure resulting from his corrections to Claimants' comparable companies approach, he agreed that it "could be a useful valuation."[2378]  The Tribunal  for its part finds that the comparable companies method is, in the circumstances, the most tenable approach to determine Yukos' value as of 21 November 2007, and therefore the starting point for the Tribunal's further analysis.

1788. The next step for the Tribunal consists in determining the value of Yukos as of the relevant valuation dates by adjusting Yukos' value as of November 2007 on the basis of the development of a relevant index.  Having considered the various options in this regard, the Tribunal finds that the RTS Oil and Gas index is the most appropriate index for that purpose. The RTS Oil and Gas index is based on prices of trades executed in securities admitted to trading on the Moscow Stock Exchange[2379] and presently includes preferred or common shares of nine Russian oil and gas companies, the most important of which are Gazprom, Lukoil, Novatek, Rosneft and Surgutneftegas.[2380]  The methodology for establishing the index as well as its current and historical values are transparent and publicly available on the webpage of the Moscow Stock Exchange.[2381]  Both Parties have referred to the RTS Oil & Gas index as a reliable indicator reflecting the changes in the value of Russian oil and gas companies[2382] and have used it in their calculations to carry forward certain valuations from one date to another.[2383]

---

[2378]   Transcript, Day 12 at 47.

[2379]   "Methodology of the Moscow Exchange Sector Indices calculation," March 2013 ¶ 1.1, available at http://fs.moex.com/files/4032 (last accessed 4 July 2014).

[2380]   Preferred or common shares in each of these companies are weighted as 15 percent of the index's total.  *See* "Constituents of Sectoral Indices valid from December 17, 2013 to March 17, 2014," available at http://moex.com/s933 (last accessed 4 July 2014).

[2381]   http://fs.moex.com/files/4032 (last accessed 4 July 2014).

[2382]   Transcript, Day 12 at 67–68 (Professor Dow); Claimants' Post-Hearing Brief ¶ 260.

[2383]   Second Kaczmarek Report ¶ 134, n.282 (carrying forward a valuation of certain Yukos assets from November 2007 to December 2005); Second Dow Report ¶ 519 and Appendix 15.2 (carrying forward a valuation of Tomskneft and Samareneftegaz from November 2007 to May 2007); Appendix 28.3 (carrying forward a valuation of certain Yukos assets from November 2007 to December 2004).

1789. In order to determine the value of Yukos on each of the two valuation dates, the Tribunal will now adjust Yukos' value as of 21 November 2007 (USD 61.076 billion) by multiplying it by a factor that reflects the change in the RTS Oil and Gas index between 21 November 2007 and each of the two valuation dates.  This adjustment factor is calculated and applied for each of the two valuation dates in subsections 5(a) and 5(b) below.

1790. Having explained the Tribunal's methodology in respect of the first head of damage (the valuation of Yukos on each of the valuation dates), the Tribunal will now explain the basis on which it has determined the value of "lost" dividends, namely the dividends that would likely have been paid to Claimants, in the "but for" scenario, prior to each of the valuation dates.

    **(b)**    **Valuation of Lost Dividends**

1791. A second element of the damages suffered by Claimants as a result of Respondent's expropriation of their investment is the loss of dividends that would otherwise have been paid to them as Yukos shareholders.  For each valuation calculated as of the two valuation dates, the Tribunal must determine the value of the lost dividends up to each date, since the value of Yukos as of that date, while it captures the expectations of future profit, does not capture any of the past profit that the company would likely have generated.

1792. The Tribunal recalls that the two valuation dates are the date of the YNG auction (19 December 2004) and the date of this Award (deemed to be 30 June 2014 for valuation purposes).  For the first valuation date, the Tribunal must therefore determine the value of the lost dividends up to 19 December 2004; for the second valuation date, the Tribunal must determine the value of the lost dividends up to 30 June 2014.

1793. The starting point for the Tribunal's analysis are the "Yukos lost cash flows" (*i.e.*, free cash flow to equity) that Claimants' expert calculated with respect to his valuation of Claimants' damages.  In his first report, Mr. Kaczmarek values Yukos as of 21 November 2007 only, and therefore produces a model of "lost cash flows" that does not extend beyond that date.[2384]  The "lost cash flows" between 2004 and 21 November 2007 are presented as being based on actual historical information, as opposed to the cash flows included in Mr. Kaczmarek's DCF model

---

[2384] First Kaczmarek Report, Appendix J.1.

for the period 21 November 2007 through the end of 2015, which are based on forecasts and projections built up from information available prior to the period.[2385]

1794. In his second report, Mr. Kaczmarek updates his valuation of Yukos as of November 2007 (including his presentation of "lost cash flows" to that date),[2386] but also presents, for the first time, a valuation of Yukos as of 1 January 2012 (as a proxy for the valuation of Yukos as of the date of the Award).[2387]   For purposes of the valuation as of 1 January 2012, Mr. Kaczmarek produces a model of "lost cash flows" that extends from 2004 through to the end of 2011.[2388] The "lost cash flows" between 2004 and 2011 are presented as being based on actual historical information, as opposed to the cash flows included in Mr. Kaczmarek's DCF model for the period 2012 through the end of 2019, which are based on forecasts and projections built up from information available prior to the period.[2389]

1795. The Tribunal observes that no free cash flow to equity figures are provided by Claimants' expert for the years 2012 to 2014.   While Claimants offered to update their damages calculations at a date closer to the Award,[2390] the Tribunal has been able to establish the relevant figures on the basis of Mr. Kaczmarek's methodology, using data provided elsewhere in Mr. Kaczmarek's reports.   The Tribunal's calculations are set out in Tables T4 to T6, attached to the Award, and explained in greater detail in the following paragraphs.

1796. To calculate Yukos' free cash flow to equity, Mr. Kaczmarek uses the following formula: Free cash flow to equity = Free cash flow to the firm – Tax-adjusted interest payments + Change in net debt + 20 percent of Sibneft dividends.[2391]   Mr. Kaczmarek provides figures regarding the free cash flow to the firm and the tax-adjusted interest payments for the relevant time period in Appendix AJ.2 to his second report.[2392]   In addition, note (5) to Appendix AJ.1 to his second report, Mr. Kaczmarek defines Yukos' annual change in net debt as the annual change in

---

[2385]  *Ibid.*, Appendix J.2.

[2386]  Second Kaczmarek Report, Appendix J.1–updated.

[2387]  *Ibid.* ¶ 155.

[2388]  *Ibid.*, Appendix AJ.1.

[2389]  *Ibid.*, Appendix AJ.2.

[2390]  Reply ¶ 946; Second Kaczmarek Report ¶ 155.

[2391]  Second Kaczmarek Report, Appendix AJ.1.

[2392]  Tables T4 and T5 attached to the Award.

Yukos' long-term debt plus its short-term debt less its cash.[2393]   Mr. Kaczmarek provides these figures in Appendix AJ.4 to his second report.[2394]   With regard to the Sibneft dividends, Mr. Kaczmarek provides figures for years 2004 through 2011 in Appendix AJ.1 to his second report.[2395]   For the years 2012 through 2014, the Tribunal has assumed that the Sibneft dividends would have been equal to those paid in 2010, the last year for which Mr. Kaczmarek has provided an annual figure (his figure for 2011 being based on annualized third quarter figures).

1797. With these additional numbers calculated by the Tribunal, on the basis of data and formulas set out in Mr. Kaczmarek's reports, the Tribunal is able to arrive at numbers for Yukos' "lost cash flows" (*i.e.*, free cash flows to equity) for the entire period extending from 2004 through 2014. The Tribunal then, in principle, has the input it needs in order to determine the lost dividends for each of the valuation dates: for the first valuation date (the date of the YNG auction), the Tribunal can therefore arrive at a value (based on Mr. Kaczmarek's model) for the lost dividends up to 19 December 2004; and for the second valuation date (the date of the Award), the Tribunal can also arrive at a value (based on Mr. Kaczmarek's model) of the lost dividends up to 30 June 2014.   The Tribunal notes that the total amount of lost dividends, based on Mr. Kaczmarek's model, for the period from 2004 to 30 June 2014, is USD 67.213 billion.[2396]

1798. As mentioned earlier, however, Claimants' calculation of Yukos' lost cash flows is merely a starting point for the Tribunal's determination of what it views as the correct estimate of the dividends that Claimants would have earned from Yukos in the "but for" scenario.   As explained in the following paragraphs, several fundamental considerations lead the Tribunal to modify the calculations of Claimants' expert.

1799. Firstly, although Yukos' lost cash flows determined by Mr. Kaczmarek are based in part on actual historical information (*i.e.*, largely information about the performance of Yukos' former assets disclosed by Rosneft in its financial reports),[2397] the Tribunal is unable to dissociate them

---

[2393]   Table T5 attached to the Award.

[2394]   Table T6 attached to the Award.

[2395]   Second Kaczmarek Report, Appendix AJ.1.

[2396]   The relevant calculations with regard to both dividends and interest are set out in Table T3 attached to this Award.

[2397]   *See e.g.*, Second Kaczmarek Report, Appendix AJ.8, nn.6–8 (which indicate that actual tariff rates and tax expenses, as reported by Rosneft, are used for the 2004–2011 period).   *See also* Second Kaczmarek Report, Appendix AJ.9, n.2 (which indicates that "[f]or the period 2004–2011, the crude sales percentages are based on actual crude sales as reported by Rosneft and Lukoil").

from Claimants' DCF model, which was convincingly criticized by Respondent's expert and its counsel.

1800. In his second report, Professor Dow identifies and explains a "series of errors" embedded in Claimants' DCF valuation of Yukos.[2398]  His "corrections" of those errors result in a very substantial reduction (51 percent) in the valuation of Yukos generated by the DCF model. Although not all of those "corrections" apply to the cash flows discussed above, which are based in part on actual historical information (and thus are not plagued by some of the errors associated with forecasts and projections), some of the "corrections"—notably those related to the interpretation of the historical information—in the view of the Tribunal, do impact the cash flows.

1801. For example, the Tribunal accepts Professor Dow's opinion that Claimants have underestimated Yukos' transportation costs (by implicitly assuming that, in the "but for" scenario, "Yukos would have been able to capture the efficiencies of Rosneft's proprietary pipeline network").[2399] The Tribunal also accepts Professor Dow's opinion that Claimants' model overlooks certain operating expenses of Yukos, thus evidencing a "basic flaw" in Claimants' DCF model, namely that there is "no systematic attempt" to ensure that all of Yukos' costs have been accounted for.[2400]

1802. Although, for the reasons stated above, the Tribunal does not consider it appropriate to accept all of Professor Dow's "corrections" for purposes of the valuation of the dividends, the Tribunal notes that the spreadsheets submitted by Respondent's expert with his Second Report allow the Tribunal to calculate "corrected" free cash flow to equity figures for the relevant years.[2401]  While Respondent's expert has not explicitly endorsed this "corrected" version as representing his views with regard to Yukos' free cash flow to equity, it is evident to the Tribunal that it represents a figure that is more in line with his views.  According to this "corrected" methodology, Yukos' dividends in 2004 would have been USD 3.218 billion

---

[2398]   Second Dow Report ¶¶ 237–317.

[2399]   *Ibid.* ¶ 256.

[2400]   *Ibid.* ¶ 277.

[2401]   Second Dow Report, Appendix 1 (in Excel format).  The results obtained by switching the values in the "Corrected?" column on the first sheet of Appendix 1 (Appendix 1.1) from 0 to 1 (meaning that the corrections are applied) in sheets 2 and 3 (Appendix J.1 and Appendix J.2) are reproduced in Annex A1 to this Award.

(instead of USD 3.645 billion), and the sum of Yukos' dividends over the period from 2004 through the first half of 2014 would have been USD 49.293 billion (instead of USD 67.213).[2402]

1803. The Tribunal has formed the view that Professor Dow's corrections, however, do not take into account all the risks that Yukos would have had to contend with in carrying on business during the period 2004 through to the present if the company had not been expropriated.  The Tribunal agrees with Respondent that "an expropriation relieves the owner not only of the value of the asset on the date of expropriation, but also of the risk associated with owning it."[2403]  Accordingly, in any model of the cash flows that would have been generated by Yukos had it not been expropriated (*i.e.*, the cash flows in a "but for" scenario), it is necessary to take into account the risks to those cash flows that were eliminated by the expropriation.  Those risks must be factored back into the cash flow model in the "but for" scenario.

1804. The Tribunal observes that Mr. Kaczmarek's cash flow model does not factor in those risks in his calculations.  To the contrary, Mr. Kaczmarek models Yukos' financial performance after the date of expropriation based, in large measure, on the results achieved by Yukos' assets *in the hands of Rosneft*.[2404]  As Respondent rightly submits, "Mr. Kaczmarek effectively valued Yukos as if it were a State-owned strategic enterprise, which it never was."[2405]

1805. The first significant risk that, in the Tribunal's view, is not adequately accounted for in the cash flow models of either expert is the real risk of substantially higher taxes.  Since taxes other than income taxes (also referred to as "non-income taxes") consistently account for well over 50 percent of Yukos' net income from year to year,[2406] Yukos' cash flows could be significantly affected by any increases in the tariffs and rates relating to the non-income taxes.[2407]  In Mr. Kaczmarek's model, the taxes that are established annually by legislation (such as the export customs duty and domestic excise tax for refined products) are based on actual historical data (if available) and, for the forecast period, are based on the prior year's tax rate plus an adjustment to account for annual inflation.[2408]  In other words, there is no accounting for the

---

[2402] The relevant calculations with regard to both dividends and interest are set out in Table T3 attached to this Award.

[2403] Respondent's Post-Hearing Brief ¶ 239.

[2404] Second Kaczmarek Report, Appendix AJ and related Appendices.

[2405] Respondent's Post-Hearing Brief ¶ 242.

[2406] *See* line items for "taxes other than income tax" and "net income" in Second Kaczmarek Report, Appendix AJ.3.

[2407] *See* breakdown of Yukos' non-income taxes (including crude oil unified mineral extraction tax, export customs duties, and various excise taxes) and associated tariffs and rates.  Second Kaczmarek Report, Appendix AJ.8.

[2408] First Kaczmarek Report ¶ 259.

possibility—even likelihood—that had Yukos remained in private hands, the State would have increased taxes, perhaps even substantially, in order to capture a greater share of the rent earned from the exploitation of Russia's natural resources.  Yet, the record shows that this is precisely what the Russian Federation did in 2002 and 2003, when Yukos was still in private hands.  In paragraph 188 of his first report, for example, Mr. Kaczmarek explains that large tax increases in 2002 and 2003 caused surging profits at Yukos to level off during that period.[2409]

1806.  In this connection, the Tribunal notes that Yukos, in its 2002 Annual Report, disclosed the following concerns about taxation:

> We are subject to numerous taxes that have had a significant effect on our results of operations. Russian tax legislation is and has been subject to varying interpretations and frequent changes. [2410]
>
> . . .
>
> In the context of the significant regulatory changes related to Russia's transition from a centrally planned to a market economy over the past 10 years and the general instability of the new market institutions introduced in connection with this transition, taxes, tax rates and implementation of taxation in Russia have experienced numerous changes.  Although there are signs of improved political stability in Russia, further changes to the tax system may be introduced which may adversely affect the financial performance of our Company. In addition, uncertainty related to Russian tax laws exposes us to enforcement measures and the risk of significant fines and could result in a greater than expected tax burden.[2411]

1807.  The 2002 Annual Report also alerted the Yukos shareholders to risks related to the Company's dividend policy:

> Reserves available for distribution to shareholders are based on the statutory accounting reports of YUKOS Oil Company, which are prepared in accordance with Regulations on Accounting and Reporting of the Russian Federation and which differ from U.S. GAAP. Russian legislation identifies the basis of distribution as net income. For 2002, the current year statutory net income for YUKOS Oil Company as reported in the annual statutory accounting reports was RR 40,701 million.  However, current legislation and other statutory laws and regulations dealing with distribution rights are open to legal interpretation and, consequently, actual distributable reserves may differ from the amount disclosed.[2412]

1808.  Finally, and perhaps most significantly, there are the risks associated with the complex and opaque structure set up by Claimants, or by others on their behalf, in order to transfer money earned by Yukos out of the Russian Federation through a vast offshore structure.  This structure

---

[2409]  First Kaczmarek Report ¶ 188.

[2410]  Yukos Annual Report, 2002, p. 81, Exh. C-26.

[2411]  *Ibid.*, p. 84.

[2412]  *Ibid.*, p. 58.

is well documented in the reports of Professor Lys.  An organizational chart attached as an appendix to a letter from PwC Cyprus to PwC Moscow dated 10 April 2003 shows the complexity of the structure as of that date, and the fact that Yukos' control over it was established by means of call options.[2413]  With this structure, Yukos was able to consolidate the profits of the trading companies and offshore holding companies (entities within its "consolidation perimeter") into its results while remaining "free to segregate these profits from minority shareholder claims whenever it served the majority shareholders' or management's interests."[2414]

1809.  As Respondent rightly points out, Yukos' claim of corporate governance reforms, Western standards of transparency and protection of minority interests, which Mr. Kaczmarek highlighted in his first report[2415] (and which was a recurring theme heard from Claimants in this case), "was a façade."[2416]  Notably, even the company's President, Mr. Theede, testified that they had no knowledge that Yukos was using offshore structures that it did not own.[2417]

1810.  The Tribunal notes that even after the tax assessments at issue in the present arbitration were issued, Claimants and their owners were able to divert money earned by Yukos out of Yukos, and into the two Stichtings,[2418] and therefore away from the tax authorities. The Tribunal cannot exclude the possibility that, but for the expropriation, the very same mechanism would have been resorted to by Claimants under different circumstances to divert some of the money earned by Yukos.

1811.  In light of all the circumstances, and taking into account:  (a) the figures based on Mr. Kaczmarek's calculations; (b) the figures based on Professor Dow's "corrections"; and (c) the additional risks described above, which the Tribunal finds must be factored into its damages analysis, the Tribunal, in the exercise of its discretion, concludes that it is appropriate to determine and fix the dividend payments that it assumes Yukos would have paid to its

---

[2413]  Exh. R-3165, p. 5.  The Tribunal has included a copy of the chart in Annex A2 to this Award.  *See also* Second Lys Report, Appendix F.

[2414]  Respondent's Post-Hearing Brief ¶ 258.

[2415]  First Kaczmarek Report ¶ 156.

[2416]  Respondent's Post-Hearing Brief ¶ 260.

[2417]  Transcript, Day 11 at 59.  The Tribunal notes that Mr. Kosciusko-Morizet, the Chairman of the Board's Audit Committee, acknowledged that he had no opinion, and had made no enquiries, as to whether Yukos owned the low tax region entities (*see* Transcript, Day 4 at 60–61).

[2418]  Respondent's Counter-Memorial ¶¶ 528–39.  The Tribunal recalls that Claimants do not dispute that money was transferred into the Stichtings. *See* above at ¶¶ 1054–60, 1124.

shareholders in the "but for" scenario in the amounts set out in the far right column of the following table (in USD billion):

| Year | Kaczmarek | Dow | Tribunal |
|---|---|---|---|
| 2004 | 3.645 | 3.218 | 2.5 |
| 2005 | 4.796 | 4.489 | 3.5 |
| 2006 | 4.677 | 4.396 | 3.5 |
| 2007 | 8.484 | 7.670 | 6 |
| 2008 | 7.819 | 6.749 | 6 |
| 2009 | 7.642 | 5.463 | 5 |
| 2010 | 4.254 | 4.842 | 3.5 |
| 2011 | 6.285 | 4.283 | 4 |
| 2012 | 8.395 | 3.724 | 5 |
| 2013 | 7.628 | 3.148 | 4 |
| 2014 (first half) | 3.586 | 1.310 | 2 |
| Total | 67.213 | 49.293 | 45 |

1812. Accordingly, the Tribunal concludes that Yukos' dividends in 2004 would have been USD 2.5 billion, and the sum of Yukos' dividends over the period from 2004 through the first half of 2014 would have been USD 45 billion.[2419]

### 5.   Application of the Methodology Followed by the Tribunal

1813. The Tribunal, applying the methodology outlined above to the two valuation dates of 19 December 2004 and 30 June 2014, can now proceed to the valuation of the expropriated company as of those two dates.[2420]

---

[2419]   The relevant calculations with regard to both dividends and interest are set out in Table T3 attached to this Award.

[2420]   *See* Table T1 annexed to this Award.

### (a)   Calculations Based on 19 December 2004 Valuation Date

1814. The damages suffered by Claimants based on a valuation date of 19 December 2004 are determined as follows.

### i.   Valuation of Shares in Yukos

1815. As explained earlier, the Tribunal will determine the equity value of Yukos as of 19 December 2004 by adjusting what it considers, based on the Parties' submissions, to be the best available estimate of this value as of 21 November 2007, *i.e.*, an amount of USD 61.076 billion, with a factor that reflects the development of the RTS Oil and Gas index between 19 December 2004 and 21 November 2007.  The value of the RTS Oil and Gas index on 19 December 2004 was 92.85, whereas on 21 November 2007 it had a value of 267.8.  The adjustment factor to be applied to determine Yukos' value as of the earlier date is therefore x=92.85/267.8=0.3467.  By applying this factor to the amount of USD 61.076 billion, the Tribunal arrives at an equity value of Yukos as of 19 December 2004 in the amount of USD 21.176 billion.[2421]

1816. The value of Claimants' 70.5 percent share in Yukos, calculated as a pro rata share of this amount, corresponds to USD (70.5/100)*21.176=14.929 billion.

### ii.   Dividends

1817. According to the Tribunal's methodology outlined above, the dividends that would have been paid to Yukos' shareholders throughout 2004 will be assumed to be USD 2.5 billion.  Since the valuation date is 19 December 2004, there are 12 days missing for the full year which must be taken into consideration.  Accordingly, this amount must be multiplied by a factor x=(365−12)/365, corresponding to approximately 97 percent.  This gives a total amount of free cash flow to equity based on a valuation date of 19 December 2004 of USD 2.418 billion.  Claimants' share of this amount corresponds to dividends of USD (70.5/100)*2.418=1.705 billion.

---

[2421]   *See* Table T2 annexed to this Award.

### iii.    Interest

1818. By applying an annual interest rate of 3.389 percent,[2422] the total amount of interest payable on the equity value of Yukos and the dividends that would have been paid to its shareholders from 1 January 2005 to 30 June 2014 is 7.596 billion.[2423]   The total amount of interest payable to Claimants on this basis is 70.5 percent of this figure, *i.e.*, USD 5.355 billion.

### iv.    Total Damages Suffered by Claimants

1819. The damages suffered by Claimants due to the breach by Respondent of Article 13 of the ECT based on a 19 December 2004 valuation date is the sum of the Claimants' share of these components calculated above, *i.e.*, 70.5 percent of (21.176 + 2.418 + 7.596), which amounts to USD 21.988 billion.[2424]

### (b)    Calculations Based on 2014 Valuation Date

1820. The damages suffered by Claimants based on a valuation date of 30 June 2014 are determined as follows.

### i.    Valuation of Claimants' Share in Yukos

1821. As for the calculations based on the date of the expropriation, the Tribunal will determine the equity value of Yukos as of 30 June 2014 by adjusting what it considers, based on the Parties' submissions, the best available estimate of this value as of 21 November 2007, *i.e.*, the amount of USD 61.076 billion, with a factor that reflects the development of the RTS Oil and Gas index between 21 November 2007 and 30 June 2014.  For practical purposes, and in order to eliminate the effects of random fluctuations of the index on the amount to be awarded, the

---

[2422]  *See* Part XI.  The Tribunal has assumed that dividends would have been paid in each case at the end of the relevant year and that interest would have started accruing at the determined pre-award interest rate from 1 January of the year thereafter.

[2423]  To avoid unnecessarily complicating the calculations, this figure does not take into account interest for the period from 19 to 31 December 2004.  Adding this interest would not affect the Tribunal's conclusions.

[2424]  *See* Table T1 annexed to this Award.  Claimants' shareholdings in Yukos, as percentages of Yukos Issued Shares, were 48.72 percent, 2.25 percent and 10 percent for Hulley, YUL and VPL, respectively.  Interim Awards ¶ 419 (Hulley); ¶ 419 (YUL); ¶ 419 (VPL).  In absolute numbers, out of a total number of 2,236,964,578 Issued Shares, Hulley held 1,090,043,968 shares, YUL held 50,340,995 shares and VPL held 223,699,175 shares, while 302,000,000 shares were Treasury Shares.  First Kaczmarek Report, Appendix C.5.b.  This translates into a total number of 1,934,964,578 Outstanding Shares, of which 56.33405 percent, 2.60165 percent and 11.56089 percent were held by Hulley, YUL and VPL, respectively.  The exact combined share of Claimants in Yukos Outstanding Shares was 70.49659 percent.

Tribunal has chosen to use the average of the values of the index over the period from 6 January 2014 to 24 June 2014 as the basis for its calculations. This average value of the RTS Oil and Gas index is 186.90.[2425] The adjustment factor to be applied to determine Yukos' value as of the later date is therefore x=186.90/267.8=69.79 percent. By applying this factor to the amount of USD 61.076 billion the Tribunal arrives at an equity value of Yukos as of 30 June 2014 in the amount of USD 42.625 billion.[2426]

1822. The value of Claimants' 70.5 percent share in Yukos, calculated as a pro rata share of this amount, corresponds to USD (70.5/100)*42.625=30.049 billion.

### ii.    Dividends and Interest on Dividends

1823. According to the Tribunal's methodology outlined earlier, the dividends that would have been paid to Yukos' shareholders from the beginning of 2004 to 30 June 2014 will be assumed to correspond to USD 45 billion. Together with interest, the total amount for this period is USD 51.981 billion.[2427]

1824. Claimants' share of this amount corresponds to USD (70.5/100)*51.981=36.645 billion.

### iii.    Total Damages Suffered by Claimants

1825. The damages suffered by Claimants due to the breach by Respondent of Article 13 of the ECT, based on a valuation date of 30 June 2014, is the sum of the Claimants' share of the two components calculated above, *i.e.*, 70.5 percent of (42.625 + 51.981), which amounts to USD 66.694 billion.[2428]

### (c)    Comparison of the Results Based on the Two Different Valuation Dates

1826. The total amount of Claimants' damages based on a valuation date of 19 December 2004 is USD 21.988 billion, whereas the total amount of their damages based on a valuation date of 30 June 2014 is USD 66.694 billion. Since the Tribunal has concluded earlier that Claimants are entitled to the higher of these two amounts, the total amount of damages to be awarded

---

[2425]   *See* Table T8 annexed to this Award.

[2426]   *See* Table T2 annexed to this Award.

[2427]   *See* Table T3 annexed to this Award.

[2428]   *See* Table T1 annexed to this Award.

before taking into account any deductions necessary as a consequence of Claimants' contributory fault is USD 66.694 billion.

### 6. Deductions Due to Claimants' Contributory Fault

1827. As determined earlier,[2429] the Tribunal has concluded that the Claimants contributed to the extent of 25 percent to the prejudice they suffered at the hands of the Russian Federation.  As a consequence, the amount of damages to be paid by Respondent to Claimants will be reduced by 25 percent to USD 50,020,867,798 and the Tribunal so finds.[2430]

### 7. Windfall and Double Recovery

1828. The Tribunal sees no reason to make any further deductions beyond those set out above.  In particular, any advantages that Claimants may have obtained through their investments prior to Respondent's expropriatory actions can not have any impact on the damages they have suffered.  The Tribunal sees no risk of "double-recovery" in this regard.

1829. Finally, the rate of return that Claimants may realize on their original investment in Yukos as a result of the damages that the Tribunal has awarded to them for the expropriation of their shares is irrelevant.  It is the value of the expropriated investment on the date of the Award rather than the amount originally invested by Claimants that is the basis for the calculation of the damages awarded.

## XIII. COSTS

### A. INTRODUCTION

1830. The Tribunal notes that Claimants and Respondent have each requested that the opposing party be ordered to pay the full costs of the arbitration.[2431]

1831. The Tribunal observes that the Treaty contains no provisions on the allocation of the costs of arbitration in the case of a dispute between an Investor and a Contracting Party.[2432]

---

[2429]   *See* Section X.E.4.

[2430]   Claimants shall be paid this amount in proportion to their shareholdings (as to which see n.2424 above) as follows: EUR 39,971,834,360 (Hulley), EUR 1,846,000,687 (YUL) and EUR 8,203,032,751 (VPL).  As per paragraphs 1690–92 above, post-award interest will be due on any outstanding amounts not paid in full within 180 days.

[2431]   Reply ¶ 1199(5); Rejoinder ¶ 1748(v).

1832. However, Articles 38 to 40 of the UNCITRAL Rules do provide the Tribunal with guidelines with respect to the allocation of costs in arbitration.

1833. Article 38 defines the "costs of arbitration" as follows:

> The arbitral tribunal shall fix the costs of arbitration in its award.  The term "costs" includes only:
>
> (a)   The fees of the arbitral tribunal to be stated separately as to each arbitrator and to be fixed by the tribunal itself in accordance with article 39;
>
> (b)   The travel and other expenses incurred by the arbitrators;
>
> (c)   The costs of expert advice and of other assistance required by the arbitral tribunal;
>
> (d)   The travel and other expenses of witnesses to the extent such expenses are approved by the arbitral tribunal;
>
> (e)   The costs for legal representation and assistance of the successful party if such costs were claimed during the arbitral proceedings, and only to the extent that the arbitral tribunal determines that the amount of such costs is reasonable;
>
> (f)   Any fees and expenses of the appointing authority as well as the expenses of the Secretary-General of the Permanent Court of Arbitration at The Hague.

1834. Paragraphs 1 and 2 of Article 40 of the UNCITRAL Rules set out the guidelines which will inform the Tribunal in its determination of the apportionment of costs.  They read as follows:

> 1.   Except as provided in paragraph 2, the costs of arbitration shall in principle be borne by the unsuccessful party.  However, the arbitral tribunal may apportion each of such costs between the parties if it determines that apportionment is reasonable, taking into account the circumstances of the case.
>
> 2.   With respect to the costs of legal representation and assistance referred to in article 38, paragraph (e), the arbitral tribunal, taking into account the circumstances of the case, shall be free to determine which party shall bear such costs or may apportion such costs between the parties if it determines that apportionment is reasonable.

1835. On 18 March 2014, the Tribunal requested the Parties to file their claims for costs with appropriate schedules by 17 April 2014 and to submit comments on the opposing Party's claims by 6 May 2014.  The Tribunal wrote:

> The Parties are requested to present their claims with schedules showing a breakdown of costs for legal representation and assistance, including lawyers' fees, experts' fees and other costs associated with presenting their case.  The breakdown of lawyers' fees should indicate the number of attorneys (together with charge out rates) and the amount of time involved in the discrete phases of these proceedings (Phase 1 being the period up to the

---

[2432]   As opposed to the allocation of the costs of arbitration in the case of a dispute between Contracting Parties, which is addressed in Article 27(3)(j) as follows:  "The expenses of the tribunal, including the remuneration of its members, shall be borne in equal shares by the Contracting Parties parties to the dispute. The tribunal may, however, at its discretion direct that a higher proportion of the costs be paid by one of the Contracting Parties parties to the dispute."

> Interim Awards; Phase 2 being the period after the Interim Awards).  It is expected that the breakdowns should be in sufficient detail for the Tribunal to appreciate the work in respect of which the costs were incurred.

1836. As requested, the Parties filed their cost claims on 17 April 2014 and submitted comments on the opposing side's cost claims on 6 May 2014.

## B.   CLAIMANTS' POSITION

### 1.   Claimants are Entitled to Recover All Costs Incurred in Connection with these Arbitrations

1837. Claimants note that Article 40 of the UNCITRAL Rules "establishes two approaches with respect to costs."[2433]  Firstly, Article 40(1) establishes a "clear presumption" that the losing party pays all costs referred to in Article 38(a) to (d) and (f)—"loser pays" or "costs follow the event."[2434]  Secondly, Article 40(2) requires that, when allocating costs for legal representation referred to in Article 38(e), tribunals take into account "the circumstances of the case."[2435]

1838. Claimants submit that Respondent should bear all costs set out in Article 38(a) to (d) and (f), namely the fees and expenses of the Tribunal and the PCA (including those of the PCA's Secretary-General).

1839. Claimants aver that Respondent was the unsuccessful party in the jurisdiction and admissibility phase.  Claimants assert that they "prevailed on every single issue that was finally decided in the jurisdiction and admissibility phase of these arbitrations."[2436]  They consider that Respondent should bear the fees and expenses of the Tribunal and the PCA related to that phase.

1840. Claimants submit that they should prevail at the merits stage as well and that Respondent should bear the fees and expenses of the Tribunal and the PCA related to that phase.[2437]

---

[2433]   Claimants' Submission on Costs ¶ 4.

[2434]   *Ibid.* ¶ 5.

[2435]   *Ibid.* ¶ 6.

[2436]   *Ibid.* ¶ 10.

[2437]   *Ibid.* ¶ 11.

1841. According to Claimants, no circumstances in this case require the Tribunal to depart from the starting point of "costs follow the event"; to the contrary, they argue, the circumstances in this case "only further necessitate" an order of costs in favour of Claimants.[2438]

1842. Claimants submit that, taking into account the circumstances of the case—and in particular the Parties' success in the arbitrations, their conduct during the proceedings, and the actual measures of Respondent which gave rise to the dispute—Respondent should bear all of Claimants' costs of legal representation and assistance.

1843. Claimants contend that where the investor prevails in an investor-State arbitration, an order that the State pay the investor's costs of legal representation is based on the principle of reparation, which mandates that the investor be fully compensated for its losses, including those incurred as a result of having to litigate.[2439]

1844. According to Claimants:

> In the present case, the Respondent's approach to these proceedings has been to raise (and re-raise) as many objections, arguments and issues as possible, no matter how irrelevant or implausible they may be, in the hopes of delaying the proceedings and somehow burying or obfuscating the straightforward facts of the case.[2440]

1845. Claimants opine that Respondent's "obstructionist conduct" in this case should lead the Tribunal to order it to pay all costs of legal representation.[2441]

1846. Claimants submit that "in no other case has the need to take into account the underlying conduct of the host State been more relevant than in these arbitrations."[2442]   Claimants argue

---

[2438]   *Ibid.* ¶ 12.

[2439]   Claimants' Submission on Costs ¶¶ 17–19 (quoting *Gemplus* ¶¶ 17-21–17-22, Exh. C-1536; *ADC* ¶ 533, Exh. C-980; *Southern Pacific Properties (Middle East) Limited v. Arab Republic of Egypt*, ICSID Case No. ARB/84/3, Award, 20 May 1992, ¶ 207, Exh. C-945.

[2440]   Claimants' Submission on Costs ¶ 22.

[2441]   Claimants' Submission on Costs ¶¶ 22, 52–53.   Claimants list what they term Respondent's "constant attempts to extend deadlines and otherwise prolong or disrupt the proceedings" (¶¶ 23–31), "deliberate attempts to withhold evidence" (¶¶ 32–39), "manifest disregard for the Arbitral Tribunal's orders" (¶¶ 40–41), "renewed and abandoned jurisdiction and admissibility objections" (¶¶ 42–48), and "overly burdensome, disorganized and fundamentally misleading presentation of its case" (¶¶ 49–51).

[2442]   Claimants' Submission on Costs ¶ 54 (referring to *Deutsche Bank AG v. Democratic Socialist Republic of Sri Lanka* ICSID Case No. ARB/09/02, Award, 31 October 2012, ¶ 588, Exh. C-1792; *ADC* ¶ 533, Exh. C-980; *Kardassopoulos* ¶ 689, Exh. C-1533.

that Respondent's conduct "has been decried by every single court or tribunal, organization, and independent observer outside Russia" and "must be sanctioned in full."[2443]

### 2.   Claimants' Costs are Reasonable

1847. Pursuant to the Tribunal's directions, Claimants presented a summary of the costs they have incurred in connection with these arbitrations on a per-phase basis:[2444]

**Table 1: The Claimants' costs for legal representation incurred in Phase 1**
**Shearman & Sterling LLP Fees and Expenses**

| | |
|---|---:|
| 1. Legal assistants | |
| Number of legal assistants | 4 |
| Charge out rate range (USD/hour) | 160.00-200.00 |
| Total hours | 4,376.40 |
| Total legal assistant fees | USD 763,222.50 |
| 2. Attorneys | |
| Number of attorneys | 21 |
| Charge out rate range (USD/hour) | 235.00-995.00 |
| Total hours | 52,076.90 |
| Total attorney fees | USD 23,018,168.50 |
| 3. Expenses | USD 2,081,685.55 |
| 4. Total | USD 25,863,076.55 |
| **Expert Fees and Expenses** | |
| 1. Prof. James Crawford | USD 53,222.06 |
| 2. Mr. Vladimir Gladyshev | USD 1,269,662.80 |
| 3. Mr. Brian Green QC | GBP 996,962.10 |
| 4. Navigant | USD 1,052,897.49 |
| 5. Prof. W. Michael Reisman | USD 204,000.00 |
| 6. Total | USD 2,579,782.35 |
| | GBP 996,962.10 |
| **Deductions**[89] | |
| | USD 482,260.11 |
| **Grand Total (Phase 1)** | |
| | USD 27,960,598.79 |
| | GBP 996,962.10 |

---

[89]   The deducted amounts comprise: (*i*) experts' fees and expenses advanced by Shearman & Sterling LLP and subsequently reimbursed by the Claimants (deducted to avoid double-counting of those amounts); and (*ii*) the fees and expenses of persons consulted by the Claimants, but who did not tender testimony.

. . .

---

[2443]   Claimants' Submission on Costs ¶ 55.

[2444]   *Ibid.* ¶¶ 56–63.

**Table 2: The Claimants' costs for legal representation incurred in Phase 2**

| Shearman & Sterling LLP Fees and Expenses[90] | |
|---|---|
| 1. Legal assistants | |
| Number of legal assistants | 7 |
| Charge out rate range (USD/hour) | 205.00-255.00 |
| Total hours | 4,887.60 |
| Total legal assistant fees | USD 1,123,195.50 |
| 2. Attorneys | |
| Number of attorneys | 27 |
| Charge out rate range (USD/hour) | 290.00-1,065.00 |
| Total hours | 70,525.90 |
| Total attorney fees | USD 39,931,981.50 |
| 3. Expenses | USD 3,252,001.07 |
| 4. Total | USD 44,307,178.07 |
| **Expert Fees and Expenses** | |
| 1. Dr. Philip Baker QC | GBP 69,500.00 |
| 2. Dr. Sergei Kovalev | USD 70,000.00 |
| 3. Navigant | USD 7,370,493.22 |
| 4. Total | USD 7,440,493.22 |
| | GBP 69,500.00 |
| **Compensation for Witness Time and Expenses** | |
| 1. Mr. Y Schmidt | USD 70,000.00 |
| **Deductions**[91] | |
| | USD 150,214.52 |
| **Grand Total (Phase 2)** | |
| | USD 51,667,456.77 |
| | GBP 69,500.00 |

---

[90]   The Shearman & Sterling LLP Fees and Expenses for Phase 2 comprise invoices up to and inclusive of December 2012.

[91]   The deducted amounts comprise: (*i*) experts' fees and expenses advanced by Shearman & Sterling LLP and subsequently reimbursed by the Claimants (deducted to avoid double-counting of those amounts); (*ii*) the fees and expenses of persons consulted by the Claimants, but who did not tender testimony; and (*iii*) the compensation for the time and expenses of Mr. Schmidt, which were advanced by Shearman & Sterling LLP and subsequently reimbursed by the Claimants (deducted to avoid double-counting of this amount).

1848. Claimants submit that their costs in the jurisdiction and admissibility phase are reasonable given:

> (i) the large number of objections raised by the Respondent in the jurisdiction and admissibility phase, (ii) the numerous expert opinions tendered by the Respondent, (iii) the volume of procedural issues that arose in the course of the proceedings attributable solely to the Respondent, and (iv) the matters and amounts at stake in the arbitrations.[2445]

---

[2445]   Claimants' Submission on Costs ¶ 60.

1849. Claimants submit that their costs in the merits phase are reasonable given:

> (*i*) the large number of issues raised by the Respondent in the merits phase, (*ii*) the numerous expert statements tendered by the Respondent, (*iii*) the volume of procedural issues that arose in the course of the proceedings attributable solely to the Respondent, and (*iv*) the matters and amounts at stake in the arbitrations.[2446]

1850. Claimants request interest on any cost award at a rate of LIBOR + 4 percent compounded annually.[2447]

### 3.   Claimants' Comments on Respondent's Submission on Costs

1851. Claimants summarize their comments on Respondent's Submission on Costs as follows:

> Respondent has elected not to provide a "breakdown of costs", as directed by the Arbitral Tribunal. Its so-called "Schedule of Costs" cannot in any way facilitate the Tribunal's task in reaching its decision on costs, including in assessing the reasonableness of either of the Parties' claimed amounts. Moreover, the Respondent's argument that each Party should bear its own costs is based on a flawed presentation of investment treaty case law and a blatantly self-serving description of the Respondent's conduct throughout these arbitrations. At the same time, the Respondent's position speaks volumes as to its true conviction (or lack thereof) in its defenses to the Claimants' claims. Had the Respondent truly believed that the Claimants, Yukos and/or related persons and entities had engaged in large-scale criminal conduct—ranging from embezzlement and money laundering to tax fraud and even murder—it would have insisted that its full costs be shouldered by the Claimants, instead of proposing, as it has done now, that it bear its own costs in defending the Claimants' claims.[2448]

1852. Claimants assert that comparing the comprehensive presentation of their costs for legal representation with Respondent's "opaque" Schedule of Costs would be "akin to comparing apples and oranges."[2449]  Even then, Claimants maintain that their costs would still be reasonable.  In particular, Claimants note that "in ordering respondent States to bear investors' costs, investment treaty tribunals have found that it is not unusual for claimants' costs to be higher than those of respondents, given that, *inter alia*, the burden of proof generally falls on claimants."[2450]

---

[2446] Claimants' Submission on Costs ¶ 63.

[2447] *Ibid.* ¶ 64.

[2448] Claimants' Comments on Respondent's Submission on Costs dated 6 May 2014, p. 1.

[2449] *Ibid.*, p. 3.

[2450] *Ibid.*, p. 3 (referring to *ADC* ¶ 535, Exh. C-980; *Waguih Elie George Siag and Clorinda Vecchi v. The Arab Republic of Egypt*, ICSID Case No. ARB/05/15, Award, 1 June 2009, ¶ 624, Exh. C-998.

## C.   RESPONDENT'S POSITION

### 1.   Equal Apportionment is an Appropriate Exercise of the Tribunal's Discretion on Costs

1853. Respondent notes that, while Article 40(1) of the UNCITRAL Rules states that the costs referred to in Article 38(a) to (d) and (f) should "in principle be borne by the unsuccessful party," it gives the Tribunal the discretion to "apportion each of such costs between the parties if it determines that apportionment is reasonable, taking into account the circumstances of the case."  Respondent asserts that Article 40(2) grants the Tribunal "complete discretion" in its apportionment of the Parties' costs of legal representation.[2451]

1854. Respondent argues that the following factors should inform the exercise of the Tribunal's discretion:

> (a) whether the dispute involved novel and complex questions of law and a long and complex procedure such that it would be unfair to penalize a non-prevailing party for maintaining its positions with an adverse costs award;
>
> (b) the constructive and professional conduct of the parties and their positive impact on the tribunal's settlement of the dispute, which militates in favor of equal apportionment of costs;
>
> (c) any bad faith, unreasonable or unnecessarily burdensome conduct of a party for which the other party should be compensated;
>
> (d) whether the non-prevailing party succeeds in some respects during the arbitration with legal, factual or procedural arguments, making it inappropriate to award the ultimately successful party its costs; and
>
> (e) the nature of the dispute resolution mechanism and the traditional position under public international law and in investor-state arbitration that parties "bear their own costs of legal representation and assistance."[2452]

1855. Respondent submits that, in light of the above-mentioned factors, the "appropriate approach here is for each side to bear its own costs."[2453]  Further:

> If, in the exercise of its discretion, the Tribunal decides that equal apportionment of costs in these cases is not appropriate, and that the costs incurred by the prevailing party should be borne by the unsuccessful party, Respondent would then request that Claimants should bear Respondent's costs based upon the relative success of the parties in these arbitrations on issues of jurisdiction, the merits and Claimants' demand for damages.  It is clear from

---

[2451]   Respondent's Submission on Costs ¶ 3.

[2452]   *Ibid.* ¶ 4 (footnote omitted).

[2453]   *Ibid.* ¶¶ 5–8.

the Procedural Orders issued throughout the proceedings and from the Interim Awards on Jurisdiction and Admissibility that neither side has been fully successful.[2454]

### 2.    Schedule of "Types of Costs" Incurred by Respondent

1856. Respondent submits a schedule indicating the "types of costs" incurred by Respondent in defense of Claimants' claims.

#### A. Tribunal and PCA Fees and Expenses

Initial and supplemental deposits paid to the PCA

TOTAL  €3,950,000

#### B. Attorneys' Fees and Expenses

Phase 1

For the period from February 3, 2005 to November 30, 2009:

Review of Claimants' Notifications of Claim dated October 27, 2004; review of Claimants' Statements of Claim dated February 3 and February 14, 2005; preparation of Respondent's Statements of Defense dated October 15, 2005; preparation of Respondent's First Memorials on Jurisdiction and Admissibility dated February 28, 2006; review of Claimants' Counter-Memorials on Jurisdiction and Admissibility dated June 30, 2006; preparation of requests for disclosure, preparation of documents and responses to Claimants' requests for disclosure, review of documents produced by Claimants; preparation of Respondent's Second Memorials on Jurisdiction and Admissibility dated January 31, 2007; review of Claimants' Rejoinders on Jurisdiction and Admissibility dated June 1, 2007;

Correspondence and various procedural submissions with the Tribunal and Claimants' counsel;

Attendance at hearings of October 31, 2005, December 1, 2007, May 8-9, 2008 and from November 17 to December 1, 2008.

Lawyers Involved in Phase 1

Partners (5), billing range $700-900/hour, in excess of 3,500 hours

Associates (15), billing range $300-$625/hour, in excess of 12,000 hours

Paralegals/stagiaires/trainees (10), billing range $125-$225/hour, in excess of 5,000 hours

Phase 2

For the period from November 30, 2009 until the present:

Review of Claimants' Memorial on the Merits dated September 16, 2010; preparation of Respondent's Counter-Memorial on the Merits dated April 4, 2011; preparation of requests for disclosure, preparation of documents and responses to Claimants' requests for disclosure, review of documents produced by Claimants; preparation of Respondent's Short Submission on Bifurcation of Liability and Quantum and on Referral under Article 21 of the ECT dated April 29, 2011; preparation of Respondent's First and Second Submissions on Confidentiality dated January 18 and February 2, 2012; review of Claimants' Reply on the Merits dated March 15, 2012;

---

[2454]    *Ibid.* ¶ 9.

preparation of Respondent's Rejoinder on the Merits dated August 16, 2012; preparation of Respondent's Post-Hearing Brief dated December 21, 2012;

Correspondence and various procedural submissions with the Tribunal and Claimants' counsel;

Attendance at hearings of May 7, 2010, May 9, 2011 and from October 10 to November 9, 2012.

<u>Lawyers Involved in Phase 2</u>

Partners (5), billing range $775-950/hour, in excess of 7,000 hours

Associates (20), billing range $375-$675/hour, in excess of 25,000 hours

Paralegals/stagiaires/trainees (15), billing range $150-$275/hour, in excess of 10,000 hours

TOTAL  US$ 27,000,000

**C. Experts' Fees and Expenses**

For services provided by expert witnesses in connection with preparation of expert reports for submission with Respondent's First Memorials on Jurisdiction and Admissibility, Second Memorials on Jurisdiction and Admissibility, Counter-Memorial on the Merits and Rejoinder on the Merits and preparation for testimony at the hearings on jurisdiction and admissibility and the merits and remaining jurisdiction and admissibility issues, and related expenses.

TOTAL  US$ 4,500,000[2455]

### 3.   Respondent's Comments on Claimants' Submission on Costs

1857. With respect to Claimants' request for costs, Respondent says it is "plainly excessive and unprecedented in its amount" and opines that it "raises serious questions of credibility."[2456]

1858. Respondent submits that Claimants' characterization of the proceedings amounts to "outright misrepresentations rather than the actual facts."[2457]   According to Respondent, the alleged misrepresentations of Claimants include:  Claimants' "continued disregard for the ECtHR's unanimous rejections of the essential premise for Claimants' contentions here,"[2458] "misrepresentation that Respondent abandoned its unclean hands defense,"[2459] "mischaracterization of Respondent's justified requests for extensions of deadlines, alleged 'delay tactics' and approach to document production,"[2460] "meritless criticisms of Respondent's

---

[2455]    Respondent's Submission on Costs ¶ 10.

[2456]    Respondent's Comments on Claimants' Submission on Costs dated 6 May 2014 ¶ 2 n.1.

[2457]    *Ibid.* ¶ 9.

[2458]    *Ibid.* ¶¶ 10–15.

[2459]    *Ibid.* ¶¶ 16–18.

[2460]    *Ibid.* ¶¶ 19–31.

presentation of its case,"[2461] and "conspicuous silence concerning their own misconduct in these arbitrations."[2462]

**D.   TRIBUNAL'S DECISION ON COSTS**

**1.   Fixing and Allocation of Costs of the Arbitration Pursuant to Article 40(1) of the UNCITRAL Rules**

1859. The Parties deposited with the PCA a total of EUR 8,440,000 to cover the costs of the arbitration; EUR 4,240,000 by Claimants and EUR 4,200,000 by Respondent.[2463]   In determining the amount of its members' fees, the Tribunal has taken account of Article 39(1) of the UNCITRAL Rules, pursuant to which "[t]he fees and expenses of the arbitral tribunal shall be reasonable in amount, taking into account the amount in dispute, the complexity of the subject matter, the time spent by the arbitrators and any other relevant circumstances of the case."

1860. The fees of Mr. Daniel Price, the arbitrator initially appointed by Claimants, amount to EUR 103,537.50.   Mr. Price's expenses amount to EUR 3,678.99.   The fees of Dr. Charles Poncet, the arbitrator appointed by Claimants following the resignation of Mr. Price, amount to EUR 1,513,880.   Dr. Poncet's expenses amount to EUR 85,549.64.

1861. The fees of Judge Stephen M. Schwebel, the arbitrator appointed by Respondent, amount to EUR 2,011,092.66.   His expenses amount to EUR 51,927.29.

1862. The fees of The Hon. L. Yves Fortier, PC CC OQ QC, the Chairman, amount to EUR 1,732,937.50.   The Chairman's expenses amount to EUR 51,782.24.

1863. The fees of Mr. Martin J. Valasek, the Assistant to the Tribunal, amount to EUR 970,562.50.   Mr. Valasek's expenses amount to EUR 51,718.96.

1864. Pursuant to the Terms of Appointment and the agreement of the Parties, the PCA Secretary-General served as the Appointing Authority, and the International Bureau of the PCA was

---

[2461]   *Ibid.* ¶¶ 32–36.

[2462]   *Ibid.* ¶¶ 37–38.

[2463]   Over the course of the proceedings, the Parties contributed in equal shares to the deposits.   In July 2014, the Tribunal requested a final supplementary deposit of EUR 40,000 and invited either Party to cover the full amount in advance of issuance of the Final Awards, which Claimants accepted to do.

designated to act as Registry in these arbitrations.  The PCA's fees for its services amount to EUR 866,552.60.

1865. Other tribunal costs, including court reporters, interpreters, hearing rooms, meeting facilities, travel and all other expenses relating to the arbitration proceedings, amount to EUR 996,780.12.

1866. Accordingly, the costs of the arbitration, including all items set out in paragraphs (a), (b), (c), (d) and (f) of Article 38 of the UNCITRAL Rules, amount to EUR 8,440,000 for the jurisdiction and merit phases.

1867. The Tribunal recalls again the terms of Article 40(1) of the UNCITRAL Rules:

> Except as provided in paragraph 2, the costs of arbitration shall in principle be borne by the unsuccessful party.  However, the arbitral tribunal may apportion each of such costs between the parties if it determines that apportionment is reasonable, taking into account the circumstances of the case.

1868. The costs are therefore to be awarded to the successful party and against the unsuccessful party, unless the circumstances of the case justify a different approach.

1869. In the present proceedings, it is clear that Claimants have prevailed and been successful in both the jurisdiction and merits phases.  The Tribunal can see no reason why Respondent, the unsuccessful party, should not bear the costs of the arbitration, EUR 8,440,000, and it so orders Respondent to bear such costs and to reimburse the contributions that Claimants deposited in the amount of EUR 4,240,000.[2464]

1870. There is no unexpended balance on deposit.

### 2. Fixing and Allocation of Costs for Legal Representation and Assistance of the Parties Pursuant to Article 40(2) of the UNCITRAL Rules

1871. The Tribunal recalls again the terms of Article 40(2) of the UNCITRAL Rules:

> With respect to the costs of legal representation and assistance referred to in article 38, paragraph (e), the arbitral tribunal, taking into account the circumstances of the case, shall be free to determine which party shall bear such costs or may apportion such costs between the parties if it determines that apportionment is reasonable.

---

[2464]  Claimants shall be paid this amount in proportion to their shareholdings (as to which see n.2424 above) as follows: EUR 3,388,197 (Hulley), EUR 156,476 (YUL) and EUR 695,327 (VPL).  As per paragraphs 1690–92 above, post-award interest will be due on any outstanding amounts not paid in full within 180 days.

1872. Paragraph (e) of Article 38 provides that the term "costs" includes:

> The costs for legal representation and assistance of the successful party if such costs were claimed during the arbitral proceedings, and only to the extent that the arbitral tribunal determines that the amount of such costs is reasonable.

1873. The Tribunal observes that Claimants' costs for their legal representation and the assistance of their experts amount to USD 79,628,055.56 plus an additional GBP 1,066,462.10, which, Claimants submit, are "reasonable" taking into account the circumstances of the case.

1874. Respondent, on the other hand, provides the Tribunal with a schedule indicating the "types of costs" incurred by Respondent in its defence.  It presents a "total" figure of USD 27,000,000 which does not adequately assist the Tribunal in assessing the reasonableness of the Parties' respective costs.

### 3.     Conclusion on the Award of Costs

1875. It is well established that an UNCITRAL tribunal such as the present one has the unfettered discretion to fix and to decide in what proportion the costs for legal representation and assistance of the parties shall be borne by the Parties.

1876. In the present case, the Tribunal has formed the view that Claimants, the successful Party, should be awarded a significant portion of their costs of legal representation and assistance. The Tribunal now has to determine the portion which it considers reasonable.  In determining this reasonable portion, the Tribunal takes into account a number of relevant factors.  The Tribunal will now proceed to review some of the factors which it considers particularly relevant in the instant case.

1877. Claimants, in their prayer for relief, asked the Tribunal to order Respondent to pay to Claimants damages of more than USD 100 billion.

1878. The stakes were high and, if Claimants were thorough and vigorous in pressing their claims, Respondent was no less thorough and vigorous in presenting its defences.

1879. The thousands of pages of written pleadings and exhibits submitted by the Parties, the myriad requests for production of documents, the Tribunal's lengthy procedural orders, the ten days of hearings in The Hague in the fall of 2008 on Respondent's objections to jurisdiction and admissibility, the 21 days of Hearings on the Merits in The Hague in the fall of 2013, all demonstrate the importance which both sides attached to this arbitration.

1880. The Parties litigated vigorously.  Each Party was represented by eminent counsel.  The quality of the written and oral pleadings was outstanding.  Counsel of both Parties are commended for their high professionalism.

1881. In the circumstances, it is unsurprising that the cost submissions of the Parties, as to their amounts, should reflect the very considerable work which each Party was required to expend in order to, on the one hand, press its claims and, on the other hand, defend itself.

1882. It also is not surprising that Claimants' costs in this case should be higher than those of Respondent since they bore the burden of proof for their claims under the ECT and produced many fact witnesses in the Hearing on the Merits whereas Respondent produced no fact witness.

1883. However, the Tribunal agrees with Respondent that some of the fees of Claimants' experts are "plainly excessive".

1884. Another factor which the Tribunal considers relevant in fixing the costs of Claimants which should be borne by Respondent is the fact that, at the end of the day, Claimants' experts were of limited assistance to the Tribunal in its determination of Claimants' damages.

1885. Even if Claimants were successful in asserting the Tribunal's jurisdiction over Respondent, in prevailing on the liability of Respondent and being awarded an immense sum in damages, at the end of the day, as was seen in Part XII, the damages awarded to Claimants were reduced significantly by the Tribunal from the claims advanced by them.

1886. Finally, a factor which the Tribunal has considered particularly relevant in fixing the portion of their costs which Claimants should be awarded is the egregious nature of many measures of Respondent which the Tribunal has found were in breach of the ECT.

1887. Having scrutinized the costs for legal representation and assistance of Claimants and taking into consideration all the factors traversed above, the Tribunal, in the exercise of its discretion, considers that reimbursement by Respondent to Claimants of USD 60,000,000 as part of their costs would be fair and reasonable in the circumstances and it so orders.[2465]  The Tribunal notes that USD 60,000,000 is approximately 75 percent of Claimants' grand total of costs for the jurisdiction and merits phases, namely USD 79,628,055.56 and GBP 1,066,462.10.

---

[2465] Claimants shall be paid this amount in proportion to their shareholdings (as to which see n.2424 above) as follows: EUR 47,946,190 (Hulley), EUR 2,214,277 (YUL) and EUR 9,839,533 (VPL).  As per paragraphs 1690–92 above, post-award interest will be due on any outstanding amounts not paid in full within 180 days.

## XIV. DECISION

1888. For the reasons set forth above, the Tribunal unanimously:

(a)   DISMISSES the objections to jurisdiction and/or admissibility, based on Article 21 of the Energy Charter Treaty;

(b)   DISMISSES the objections to jurisdiction and/or admissibility, pertaining to Respondent's contentions concerning "unclean hands" and "illegal and bad faith conduct";

(c)   DISMISSES the renewed objections to jurisdiction and/or admissibility based on Article 26(3)(b)(i) of the Energy Charter Treaty;

(d)   HOLDS that the present dispute is admissible and within the Tribunal's jurisdiction;

(e)   DECLARES that Respondent has breached its obligations under Article 13(1) of the Energy Charter Treaty;

(f)   ORDERS Respondent to pay to Claimant Yukos Universal Limited damages in the amount of USD 1,846,000,687;

(g)   ORDERS Respondent to pay the amount of EUR 156,476 to Claimant Yukos Universal Limited as reimbursement for the costs of the arbitration;

(h)   ORDERS Respondent to pay the amount of USD 2,214,277 to Claimant Yukos Universal Limited for a portion of the costs of its legal representation and assistance in the arbitration proceedings; and

(i)   ORDERS Respondent to pay to Claimant Yukos Universal Limited, if within 180 days of the issuance of this Award Respondent fails to pay in full the amounts set forth in paragraphs (f), (g) and (h), above post-award interest on any outstanding amount starting from 15 January 2015, compounded annually. Post-award interest shall be determined as the yield on 10-year U.S. treasury bonds as of 15 January 2015 and then the dates of compounding yearly thereafter.

Done at The Hague, this 18ᵗʰ day of July , 2014.


_____
Dr. Charles Poncet
Co-arbitrator


_____
Judge Stephen M. Schwebel
Co-arbitrator


_____
The Hon. L. Yves Fortier PC CC OQ QC
Chairman

**ANNEXES**

A.    ANNEX A1:  APPENDIX 1.1, APPENDIX J.1 AND APPENDIX J.2 TO SECOND DOW REPORT
      (modified as described in note 2401 of the Award)

    (a)    Appendix 1.1

| "Updated" Yukos 2007 DCF Error Correction | Corrected? |
|---|---|
| Upstream Capex Base Year | 1 |
| US Cost of Equity | 1 |
| Refining Capex Partial Year Error | 1 |
| Missing Opex | 1 |
| Transport Cost Error | 1 |
| Forecasts-Forwards Conflation Error | 1 |
| PPP & Inflation Related Errors | 1 |

| Enterprise Value | | |
|---|---|---|
| Original | $ | 95,251,061,670 |
| New | $ | 46,461,814,366 |
| Diff. | $ | 48,789,247,303 |

Note:
Results obtained from the live (excel) version of Appendix 1 to Second Dow Report provided by Respondent together with  its Rejoinder by switching the values in the "Corrected?" column on the first sheet of the Appendix (Appendix 1.1) from 0 to 1.  The Annex shows the resulting figures for Appendix J.1 and Appendix J.2 to Second Dow Report.

**(b)   Appendix J.1 New**

| Notes and Sources | JD Notes | Calculation Logic | Component | 2003 | 2004 | 2005 | 2006 | 2007 (thru 11/21) |
|---|---|---|---|---|---|---|---|---|
| 1 | | [A] | Net Income | | 3,218,665,217 | 4,769,239,020 | 4,605,289,478 | 5,791,709,065 |
| 2 | | [B] | Tax-Adjusted Interest Payments | | 195,973,436 | 248,407,275 | 314,870,094 | 354,283,284 |
| 1 | | [C] | Depreciation | | 1,115,919,143 | 1,322,594,049 | 1,567,551,997 | 2,045,753,987 |
| 3 | | [D] | Working Current Assets | 6,162,391,781 | 6,024,533,190 | 7,377,817,999 | 8,724,114,903 | 9,724,344,823 |
| 3 | | [E] | Working Current Liabilities | 2,134,154,107 | 2,668,988,513 | 3,420,223,168 | 4,389,513,676 | 5,143,659,866 |
| Calc. | | [F] = D - E | Working Capital | 4,028,237,674 | 3,355,544,677 | 3,957,594,831 | 4,334,601,227 | 4,580,684,958 |
| Calc. | | [G] = F$_t$ - F$_{t-1}$ | Change in Working Capital | | (672,692,997) | 602,050,154 | 377,006,395 | 246,083,731 |
| 4 | | [H] | Capital Expenditures | | 2,466,678,051 | 2,397,031,851 | 2,729,804,072 | 3,506,855,747 |
| Calc. | | [I] = A + B + C - G - H  Free Cash Flow to the Firm | | | 2,736,572,742 | 3,341,158,338 | 3,380,901,101 | 4,438,806,858 |
| 2 | | [J] = -B | Tax-Adjusted Interest Payments | | (195,973,436) | (248,407,275) | (314,870,094) | (354,283,284) |
| 5 | | [K] | Change in Net Debt | | 659,445,111 | 944,541,730 | 1,209,587,786 | 1,765,630,302 |
| 6 | | [L] | 20% of Sibneft Dividends | | 18,332,400 | 452,067,800 | 120,400,000 | 367,673,425 |
| Calc. | | [M] = I + J + K + L | Free Cash Flow to Equity | | 3,218,376,817 | 4,489,360,593 | 4,396,018,793 | 6,217,827,301 |
| | | | | | | | | 5.079593664 |

**Kaczmarek Sources & Notes:**

(1) See Appendix J.3 - Updated - Yukos Income Statement

(2) Interest expense from Appendix J.3 - Updated multiplied by (1-t), where t is equal to the tax rate, found in Appendix J.14 - Updated.  Tax is deducted because FCFF should not include the tax benefits associated with interest deductions (however, the tax benefit is included in FCFE).

(3) Total current assets and total current liabilities from Appendix J.4 - Updated - Yukos Balance Sheet.  To estimate current assets and liabilities as of November 21, 2007, we prorate the growth in current assets and liabilities using the portion of the year that has passed (324 of 365 days).

(4) See Appendix J.11 - Updated - Yukos Capital Expenditures

(5) Equal to the annual change in long-term debt plus short-term debt less cash from Appendix J.4 - Updated - Yukos Balance Sheet.  To estimate Change in Net Debt through November 21, 2007, we prorated total annual Change in Net Debt using the portion of the year that has passed (324 of 365 days).

(6) 20 percent of Sibneft dividends paid in period as per Gazprom Neft 2008 Databook at "Consolidated Statement of Cash Flow" tab.  (NAV – 93)

Note that 2007 dividends through November 21, 2007 are prorated using the portion of the year that has passed (324 of 365 days).

**Sibneft Dividend Calculations:**

| | | | | | | |
|---|---|---|---|---|---|---|
| [1] | Sibneft Dividend Percent of FCFE | 0.570% | 10.070% | 2.739% | 5.913% |
| [2] | 3-year trailing average: | | | 4.459% | 6.241% |
| [3] | Original 2007 3-year trailing average | | | | 5.763% |

**JD Sources & Notes:**

[1]    I calculate the percent of Sibneft dividends out of the total Free Cash Flow to Equity

[2]    I take a 3-year trailing average of the Sibneft dividend percentage

[3]    I use the 3-year trailing average from 2007, from Mr. Kaczmarek's original Appendix J.1 - Updated, not
accounting for any of my error corrections.

(c)    **Appendix J.2 New**

| Notes and Sources | JD Notes | Calculation Logic | Component | 2007 (11/21) | 2007 (11/21-12/31) | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | [A] | Net Income | | 1,361,133,090 | 7,455,550,093 | 6,427,501,357 | 6,006,613,697 | 5,045,829,975 | 4,384,146,086 | 3,708,280,652 | 3,070,944,832 | 2,334,065,782 |
| 2 | | [B] | Tax-Adjusted Interest Payments | | 44,832,144 | 479,741,072 | 531,331,847 | 571,246,674 | 605,797,716 | 629,784,929 | 651,057,050 | 669,451,288 | 684,150,862 |
| 1 | | [C] | Depreciation | | 258,876,276 | 2,704,730,012 | 3,104,829,762 | 3,504,929,511 | 3,905,029,260 | 4,305,129,010 | 4,705,228,759 | 5,105,328,509 | 5,505,428,258 |
| 3 | | [D] | Working Current Assets | 9,724,344,823 | 9,850,917,128 | 12,177,374,651 | 12,589,339,638 | 13,407,409,267 | 13,369,206,217 | 13,408,627,169 | 13,531,800,418 | 13,703,949,405 | 13,851,885,035 |
| 3 | | [E] | Working Current Liabilities | 5,143,659,866 | 5,239,091,945 | 6,978,529,152 | 7,314,488,967 | 7,856,248,155 | 7,923,070,306 | 8,013,305,077 | 8,146,948,549 | 8,301,151,669 | 8,440,844,708 |
| Calc. | | [F] = D - E | Working Capital | 4,580,684,958 | 4,611,825,183 | 5,198,845,499 | 5,274,850,671 | 5,551,161,112 | 5,446,135,911 | 5,395,322,092 | 5,384,851,869 | 5,402,797,736 | 5,411,040,326 |
| Calc. | | [G] = F₁ - F₋₁ | Change in Working Capital | | 31,140,225 | 587,020,316 | 76,005,171 | 276,310,442 | (105,025,201) | (50,813,819) | (10,470,224) | 17,945,867 | 8,242,591 |
| 4 | | [H] | Capital Expenditures | | 443,768,783 | 4,431,646,288 | 4,875,675,642 | 5,328,869,547 | 5,477,680,110 | 5,630,784,296 | 5,788,308,596 | 5,950,383,281 | 6,117,142,509 |
| Calc. | | [I] = A + B + C - G - H | Free Cash Flow to the Firm | | 1,189,932,502 | 5,621,354,572 | 5,111,982,153 | 4,477,609,893 | 4,184,002,043 | 3,739,089,547 | 3,286,728,089 | 2,877,395,481 | 2,398,259,802 |
| 5 | | [J] | Present Value Factor | | 0.99 | 0.94 | 0.85 | 0.77 | 0.70 | 0.63 | 0.57 | 0.51 | 0.47 |
| Calc. | | [K] = I x J | 21 Nov 2007 Value of Cash Flows | | 1,183,236,882 | 5,288,134,152 | 4,349,283,009 | 3,445,414,267 | 2,911,749,015 | 2,353,394,696 | 1,870,938,602 | 1,481,365,313 | 1,116,672,182 |
| | [1] | | Tax-Adjusted Interest Payments | | (44,832,144) | (479,741,072) | (531,331,847) | (571,246,674) | (605,797,716) | (629,784,929) | (651,057,050) | (669,451,288) | (684,150,862) |
| | [2] | | Change in Net Debt | | 223,428,526 | 1,218,705,221 | 567,399,775 | 656,429,909 | 457,761,231 | 400,500,967 | 330,547,803 | 260,836,833 | 178,168,714 |
| | [3] | | 20% of Sibneft Dividends | | 83,698,156 | 388,992,116 | 314,850,715 | 279,056,857 | 246,836,495 | 214,656,963 | 181,411,623 | 150,988,716 | 115,730,221 |
| | [4] | | Free Cash Flow to Equity | 6217827301 | 1,452,227,040 | 6,749,310,837 | 5,462,900,795 | 4,841,849,986 | 4,282,802,054 | 3,724,462,548 | 3,147,630,465 | 2,619,769,742 | 2,008,007,875 |
| | | | | | 7,670,054,341 | 6,749,310,837 | 5,462,900,795 | 4,841,849,986 | 4,282,802,054 | 3,724,462,548 | 3,147,630,465 | 2,619,769,742 | 2,008,007,875 |

A-3

| Notes and Sources | JD Notes | Calculation Logic | Component | 2007 (11/21) | 2008 (11/21-12/31) | 2009 | 2010 |
|---|---|---|---|---|---|---|---|
| | | **Terminal Value Calculation:** | | | | | |
| Calc. | | $[L] = J_{2015} \times (1 + M)$ | Terminal Year FCFF | 2,482,198,895 | | | |
| 6 | | [M] | Terminal Growth Rate | 3.50% | | | |
| 7 | | [N] | WACC | 10.57% | | | |
| Calc. | | $[O] = L / (N - M)$ | Terminal Value as of 2015 | 35,114,161,268 | | | |
| Calc. | | $[P] = J_{2015}$ | Present Value Factor | 0.47 | | | |
| Calc. | | $[Q] = O \times P$ | Terminal Value as of 11/21/2007 | 16,349,774,549 | | | |
| | | **Enterprise Value Summary:** | | | | | |
| Calc. | | $[R] = \sum(K)$ | Sum of Discounted Cash Flows | 24,000,188,118 | | | |
| Calc. | | $[S] = Q$ | Discounted Terminal Value | 16,349,774,549 | | | |
| 8 | | [T] | Value of 20% of Sibneft | 6,111,851,700 | | | |
| Calc. | | $[U] = R + S + T$ | Enterprise Value as of 11/21/2007 | 46,461,814,366 | | | |

**Kaczmarek Sources & Notes:**

(1) See Appendix J.3 - Updated - Yukos Income Statement

(2) Interest expense from Appendix J.3 - Updated multiplied by (1-t), where t is equal to the tax rate, found in Appendix J.14 - Updated. Tax is deducted because FCFF should not include the tax benefits associated with interest deductions (the benefit is captured through the use of after-tax cost of debt in the WACC).

(3) Total current assets and total current liabilities from Appendix J.4 - Updated - Yukos Balance Sheet. To estimate current assets and liabilities as of November 21, 2007, we prorate the growth in current assets and liabilities using the portion of the year that has passed (324 of 365 days).

(4) See Appendix J.11 - Updated - Yukos Capital Expenditures

(5) Present value factor calculated as $1 / (1+WACC)^t$, where t = number of years from 11/21/2007 to cash flow date. We assume mid-year (June 30) cash flows in our DCF valuation.

(6) Terminal growth rate represents the perpetual growth rate for Yukos FCFF. Our estimate of 3.5% is based on analyst estimates for Yukos and Rosneft (which is comprised primarily of former Yukos assets). See HSBC. *Yukos: A potential alignment of interests* at p. 19. 25 May 2004. **(NAV – 401)**; Erste Bank. *Company Report: Yukos* at p. 9. 26 January 2004. **(NAV – 412)**; Smith Barney. *Yukos: A binary issue* at p. 3. 28 April 2004. **(NAV – 173)**; Credit Suisse. *Yukos: Increasing Concerns* at p. 18. 21 December 2004. **(NAV – 402)**; Brunswick UBS Warburg. *Yukos: The "GEM supermajor"* at p. 12. 10 April 2003. **(NAV – 398)**; Morgan Stanley. *Rosneft: All Access* at p. 31. 29 August 2006. **(NAV – 272)**; ABN Amro. *Rosneft: Outcome of Yukos auctions* at p. 18. 5 September 2007. **(NAV – 262)**; HSBC. *Rosneft OAO* at p. 8. 7 December 2007. **(NAV – 273)**; Deutsche UFG. *Rosneft: Blue-Sky's down to Earth* at p. 4. 11 July 2007. **(NAV – 259)**

(7) See Appendix J.15 - Updated - Yukos WACC Calculation

(8) Based on 20% of Sibneft adjusted market capitalization as of 21 November 2007. See Appendix F.4 - Updated.

**JD Sources & Notes:**

[1] I copy tax-adjusted interest payments from above

[2] I calculate Change in Net Debt using Mr. Kaczmarek's method from his Appendix J.1 - Updated

[3] I infer Sibneft dividends as the difference between FCFE and the non-dividend components of FCFE.

[4] I calculate Free Cash Flow to Equity using Mr. Kaczmarek's method from his Appendix J.1 - Updated. I adjust by a percentage factor to account for Sibneft dividends, equal to the percent of those dividends out of FCFE for the prior 3 years. See Appendix J.1

**B.    ANNEX A2:  YUKOS COMPANY STRUCTURE**
**(extract from Exh. R-3165, referred to in note 2413 of the Award)**



C.   TABLES T1–T9 SHOWING THE TRIBUNAL'S DAMAGES CALCULATIONS

1.   Table T1:  Calculation of Total Damages of Claimants as of 19 December 2004
(Date of Expropriation) vs. 30 June 2014 (Date of Award for Valuation Purposes)

| 19  December  2004 | |
|---|---|

| Damages component | Amount (in USD) |
|---|---|
| Yukos Equity Value | 21,175,832,823 |
| Dividends to end of 2004 | 2,417,808,219 |
| *Sum of Equity Value and Dividends* | *23,593,641,042* |
| Interest through 30 June 2014 | 7,596,090,702 |
| **Total** | **31,189,731,744** |

| | Outstanding Shares | % of Outstanding Shares | Damages (in USD) |
|---|---|---|---|
| **Yukos Total** | 1,934,964,578 | 100.00 | **31,189,731,744** |
| Claimant Hulley | 1,090,043,968 | 56.33405 | 17,570,439,964 |
| Claimant YUL | 50,340,995 | 2.60165 | 811,447,480 |
| Claimant VPL | 223,699,175 | 11.56089 | 3,605,811,362 |
| **Claimants Total** | 1,364,084,138 | 70.49659 | **21,987,698,805** |

| 30  June  2014 | |
|---|---|

| Damages component | Amount (in USD) |
|---|---|
| Yukos Equity Value | 42,625,343,615 |
| Dividends and interest (through 30 June 2014) | 51,981,340,000 |
| **Total** | **94,606,683,615** |

| | Outstanding Shares | % of Outstanding Shares | Damages (in USD) |
|---|---|---|---|
| **Yukos Total** | 1,934,964,578 | 100.00 | **94,606,683,615** |
| Claimant Hulley | 1,090,043,968 | 56.33405 | 53,295,779,147 |
| Claimant YUL | 50,340,995 | 2.60165 | 2,461,334,249 |
| Claimant VPL | 223,699,175 | 11.56089 | 10,937,377,001 |
| **Claimants Total** | 1,364,084,138 | 70.49659 | **66,694,490,398** |

| Damages After 25% Reduction | |
|---|---|
| Claimant Hulley | 39,971,834,360 |
| Claimant YUL | 1,846,000,687 |
| Claimant VPL | 8,203,032,751 |
| **Claimants Total** | **50,020,867,798** |

Note: Claimants' shareholdings and total number of Outstanding Shares
taken from Appendix C.5.b to First Kaczmarek Report

**2.    Table T2:  Equity Value of Yukos Based on Adjustments Made by Professor Dow to Mr. Kaczmarek's Comparable Companies Calculations and the Evolution of the RTS Oil & Gas Index**

| Valuation Date | RTS Oil & Gas Index | Ratio between RTS Index at given date and 21 November 2007 | Value of Yukos (in USD) |
|---|---|---|---|
| **19 December 2004** | 92.85 | 0.346713966 | 21,175,832,823 |
| **21 November 2007** | 267.8 | 1 | 61,075,800,000 |
| **30 June 2014** | 186.90* | 0.697908887 | 42,625,343,615 |

| * RTS Oil & Gas Index value corresponding to average of values over first 5 months in 2014, *see* **Table T8** |
|---|

A-7

3.   **Table T3:  Calculation of Dividends and Interest up to Valuation Date for Valuation as of 30 June 2014**

| Year | Kaczmarek FCFtE figure | Dow-adjusted Kaczmarek FCFtE figure | Tribunal's FCFtE figure | Interest to 30 June 2014 | Total |
|------|------------------------|-------------------------------------|-------------------------|--------------------------|-------|
| 2004 | 3,645,331,570 | 3,218,376,817 | 2,500,000,000 | 804,887,500 | 3,304,887,500 |
| 2005 | 4,796,449,237 | 4,489,360,593 | 3,500,000,000 | 1,008,227,500 | 4,508,227,500 |
| 2006 | 4,676,741,445 | 4,396,018,793 | 3,500,000,000 | 889,612,500 | 4,389,612,500 |
| 2007 | 8,484,005,345 | 7,670,054,341 | 6,000,000,000 | 1,321,710,000 | 7,321,710,000 |
| 2008 | 7,818,745,258 | 6,749,310,837 | 6,000,000,000 | 1,118,370,000 | 7,118,370,000 |
| 2009 | 7,642,393,629 | 5,462,900,795 | 5,000,000,000 | 762,525,000 | 5,762,525,000 |
| 2010 | 4,254,461,116 | 4,841,849,986 | 3,500,000,000 | 415,152,500 | 3,915,152,500 |
| 2011 | 6,285,189,113 | 4,282,802,054 | 4,000,000,000 | 338,900,000 | 4,338,900,000 |
| 2012 | 8,395,083,921 | 3,724,462,548 | 5,000,000,000 | 254,175,000 | 5,254,175,000 |
| 2013 | 7,627,873,208 | 3,147,630,465 | 4,000,000,000 | 67,780,000 | 4,067,780,000 |
| 2014 (to 30 June) | 3,586,359,907 | 1,309,884,871 | 2,000,000,000 | 0 | 2,000,000,000 |
| Sum | 67,212,633,749 | 49,292,652,101 | 45,000,000,000 | 6,981,340,000 | **51,981,340,000** |

Notes:
- Kaczmarek figures for 2004 to 2011 taken from Second Kaczmarek Report, Appendix AJ.1.
- Kaczmarek figures for 2012 to 2014 calculated as follows:
Free cash flow to equity (FCFTE) = Free cash flow to the firm - Tax-adjusted interest payments + Change in net debt + 20% of Sibneft dividends, see Appendix AJ.1 to Second Kaczmarek Report.
- Dow-adjusted Kaczmarek figures calculated with excel version of Appendix 1 to Second Dow Report (taking into account all of Dow's corrections).
- Interest has been applied in line with the factors stated in Table T7.

4.  **Table T4:  FCFtE for Years 2012–2014**
    **(Based on Mr. Kaczmarek's Figures)**

|  | Free cash flow to the firm | Total adjustment as calculated in Table T5 | Adjusted result |
|---|---|---|---|
| 2012 | 8,650,212,831 | -255,128,910 | 8,395,083,921 |
| 2013 | 7,838,948,724 | -211,075,516 | 7,627,873,208 |
| 2014 | 7,330,053,779 | -157,333,965 | 7,172,719,814 |

Notes:
- Free cash flow to the firm figures taken from Appendix AJ.2 to Second Kaczmarek Report.
- Total adjustment calculated in Table T5.

**5.**   **Table T5:  Total Adjustment of Free Cash Flow to the Firm**
      **(Required to Obtain FCFtE value for Years 2012–2014 for Mr. Kaczmarek)**

|  | Tax-adjusted interest payments (subtracted) | Change in net debt | 20% of Sibneft dividends | Total adjustment |
|---|---|---|---|---|
| 2012 | -381,230,527 | -19,498,383 | 145,600,000 | -255,128,910 |
| 2013 | -375,218,163 | 18,542,647 | 145,600,000 | -211,075,516 |
| 2014 | -373,949,497 | 71,015,532 | 145,600,000 | -157,333,965 |

Notes:
- Total adjustment formula taken from Appendix AJ.1 to Second Kaczmarek Report.
- Figures for tax-adjusted interest payments taken from Appendix AJ.2 to Second Kaczmarek Report.
- Change in net debt calculated in Table T6.
- For Sibneft dividends for years 2012 to 2014, it has been assumed that these were equal to the dividends paid in 2010, the last year for which Claimants have provided annual figures (the 2011 figures were based on annualized third quarter figures, see note (6) to Appendix AJ.1 to the Second Kaczmarek Report).

6.    **Table T6:  Change in Net Debt for Years 2012–2014**

|  | Change in net debt | | |
|---|---|---|---|
|  | **2012** | **2013** | **2014** |
| Long-term debt Y | 7,000,000,000 | 6,965,681,451 | 6,952,780,045 |
| Short-term debt Y | 597,731,821 | 594,801,351 | 593,699,697 |
|  |  |  |  |
| Long-term debt Y-1 | 7,189,462,610 | 7,000,000,000 | 6,965,681,451 |
| Short-term debt Y-1 | 613,910,083 | 597,731,821 | 594,801,351 |
| Difference between Sum of Long-term and Short-term debt for Y and Y-1 | -205,640,872 | -37,249,019 | -14,003,060 |
|  |  |  |  |
| Cash Y | 2,468,733,701 | 2,412,942,035 | 2,327,923,443 |
| Cash Y-1 | 2,654,876,190 | 2,468,733,701 | 2,412,942,035 |
| Difference Cash Y and Cash Y-1 | -186,142,489 | -55,791,666 | -85,018,592 |
| Difference 1 minus Difference 2 | -19,498,383 | 18,542,647 | 71,015,532 |

Note:
- Formula for change in net debt (as change in long-term debt plus short-term debt, less cash) taken from note (5) to Appendix AJ.1 to Second Kaczmarek Report and Appendix AJ.4 to Second Kaczmarek Report.

7.     **Table T7:  Interest Factors Based on Annual Rate of 3.389 percent (see Table T9)**

|  | Interest Factors |
|---|---|
| 0.5Y | 0.01695 |
| 1Y | 0.03389 |
| 1.5Y | 0.05084 |
| 2.5Y | 0.08473 |
| 3.5Y | 0.11862 |
| 4.5Y | 0.15251 |
| 5.5Y | 0.18640 |
| 6.5Y | 0.22029 |
| 7.5Y | 0.25418 |
| 8.5Y | 0.28807 |
| 9.5Y | 0.32196 |

8.    **Table T8:  RTS Oil and Gas Index Values from 1 January to 24 June 2014**

| Date | Value |
|------|-------|
| 24.06.2014 | 212.32 |
| 23.06.2014 | 204.45 |
| 20.06.2014 | 202.34 |
| 19.06.2014 | 204.35 |
| 18.06.2014 | 204.70 |
| 17.06.2014 | 201.10 |
| 16.06.2014 | 202.16 |
| 11.06.2014 | 201.74 |
| 10.06.2014 | 200.20 |
| 09.06.2014 | 198.74 |
| 06.06.2014 | 198.02 |
| 05.06.2014 | 193.64 |
| 04.06.2014 | 191.37 |
| 03.06.2014 | 191.84 |
| 02.06.2014 | 192.09 |
| 30.05.2014 | 187.51 |
| 29.05.2014 | 191.62 |
| 28.05.2014 | 190.06 |
| 27.05.2014 | 190.95 |
| 26.05.2014 | 197.69 |
| 23.05.2014 | 196.70 |
| 22.05.2014 | 195.66 |
| 21.05.2014 | 196.28 |
| 20.05.2014 | 193.19 |
| 19.05.2014 | 191.71 |
| 16.05.2014 | 188.03 |
| 15.05.2014 | 186.38 |
| 14.05.2014 | 187.74 |
| 13.05.2014 | 186.26 |
| 12.05.2014 | 184.38 |
| 08.05.2014 | 184.14 |
| 07.05.2014 | 184.98 |
| 06.05.2014 | 177.49 |
| 05.05.2014 | 173.50 |
| 02.05.2014 | 174.25 |
| 30.04.2014 | 175.39 |
| 29.04.2014 | 175.77 |
| 28.04.2014 | 173.16 |
| 25.04.2014 | 170.99 |
| 24.04.2014 | 173.90 |
| 23.04.2014 | 176.68 |

| Date | Value |
|------|-------|
| 22.04.2014 | 177.43 |
| 21.04.2014 | 178.37 |
| 18.04.2014 | 179.98 |
| 17.04.2014 | 175.73 |
| 16.04.2014 | 173.51 |
| 15.04.2014 | 172.15 |
| 14.04.2014 | 176.96 |
| 11.04.2014 | 179.60 |
| 10.04.2014 | 181.58 |
| 09.04.2014 | 177.85 |
| 08.04.2014 | 177.96 |
| 07.04.2014 | 176.97 |
| 04.04.2014 | 181.85 |
| 03.04.2014 | 178.37 |
| 02.04.2014 | 179.82 |
| 01.04.2014 | 181.96 |
| 31.03.2014 | 181.08 |
| 28.03.2014 | 175.42 |
| 27.03.2014 | 175.17 |
| 26.03.2014 | 177.70 |
| 25.03.2014 | 172.92 |
| 24.03.2014 | 167.71 |
| 21.03.2014 | 169.63 |
| 20.03.2014 | 172.14 |
| 19.03.2014 | 172.44 |
| 18.03.2014 | 172.97 |
| 17.03.2014 | 168.16 |
| 14.03.2014 | 162.30 |
| 13.03.2014 | 165.81 |
| 12.03.2014 | 168.25 |
| 11.03.2014 | 171.47 |
| 07.03.2014 | 174.78 |
| 06.03.2014 | 175.04 |
| 05.03.2014 | 177.77 |
| 04.03.2014 | 178.02 |
| 03.03.2014 | 169.50 |
| 28.02.2014 | 186.96 |
| 27.02.2014 | 186.38 |
| 26.02.2014 | 189.54 |
| 25.02.2014 | 191.17 |
| 24.02.2014 | 192.46 |
| 21.02.2014 | 191.80 |
| 20.02.2014 | 190.39 |
| 19.02.2014 | 190.63 |

| Date | Value |
|---|---|
| 18.02.2014 | 195.14 |
| 17.02.2014 | 195.39 |
| 14.02.2014 | 195.31 |
| 13.02.2014 | 192.39 |
| 12.02.2014 | 196.54 |
| 11.02.2014 | 194.62 |
| 10.02.2014 | 193.61 |
| 07.02.2014 | 193.33 |
| 06.02.2014 | 191.41 |
| 05.02.2014 | 189.33 |
| 04.02.2014 | 186.14 |
| 03.02.2014 | 186.13 |
| 31.01.2014 | 188.71 |
| 30.01.2014 | 192.36 |
| 29.01.2014 | 189.39 |
| 28.01.2014 | 192.63 |
| 27.01.2014 | 195.94 |
| 24.01.2014 | 196.68 |
| 23.01.2014 | 199.51 |
| 22.01.2014 | 200.07 |
| 21.01.2014 | 200.13 |
| 20.01.2014 | 199.53 |
| 17.01.2014 | 199.45 |
| 16.01.2014 | 199.19 |
| 15.01.2014 | 200.58 |
| 14.01.2014 | 199.51 |
| 13.01.2014 | 200.84 |
| 10.01.2014 | 199.89 |
| 09.01.2014 | 198.47 |
| 08.01.2014 | 198.14 |
| 06.01.2014 | 198.55 |
| | |
| Sum | 21680.08 |
| Average | 186.90 |

9.     **Table T9:  10-Year U.S. Sovereign Bond Rate 2005–2014**

| Date | Value |
|------|-------|
| 2005-01 | 4.22 |
| 2005-02 | 4.17 |
| 2005-03 | 4.50 |
| 2005-04 | 4.34 |
| 2005-05 | 4.14 |
| 2005-06 | 4.00 |
| 2005-07 | 4.18 |
| 2005-08 | 4.26 |
| 2005-09 | 4.20 |
| 2005-10 | 4.46 |
| 2005-11 | 4.54 |
| 2005-12 | 4.47 |
| 2006-01 | 4.42 |
| 2006-02 | 4.57 |
| 2006-03 | 4.72 |
| 2006-04 | 4.99 |
| 2006-05 | 5.11 |
| 2006-06 | 5.11 |
| 2006-07 | 5.09 |
| 2006-08 | 4.88 |
| 2006-09 | 4.72 |
| 2006-10 | 4.73 |
| 2006-11 | 4.60 |
| 2006-12 | 4.56 |
| 2007-01 | 4.76 |
| 2007-02 | 4.72 |
| 2007-03 | 4.56 |
| 2007-04 | 4.69 |
| 2007-05 | 4.75 |
| 2007-06 | 5.10 |
| 2007-07 | 5.00 |
| 2007-08 | 4.67 |
| 2007-09 | 4.52 |
| 2007-10 | 4.53 |
| 2007-11 | 4.15 |
| 2007-12 | 4.10 |
| 2008-01 | 3.74 |
| 2008-02 | 3.74 |
| 2008-03 | 3.51 |
| 2008-04 | 3.68 |
| 2008-05 | 3.88 |

| Date | Value |
|---|---|
| 2008-06 | 4.10 |
| 2008-07 | 4.01 |
| 2008-08 | 3.89 |
| 2008-09 | 3.69 |
| 2008-10 | 3.81 |
| 2008-11 | 3.53 |
| 2008-12 | 2.42 |
| 2009-01 | 2.52 |
| 2009-02 | 2.87 |
| 2009-03 | 2.82 |
| 2009-04 | 2.93 |
| 2009-05 | 3.29 |
| 2009-06 | 3.72 |
| 2009-07 | 3.56 |
| 2009-08 | 3.59 |
| 2009-09 | 3.40 |
| 2009-10 | 3.39 |
| 2009-11 | 3.40 |
| 2009-12 | 3.59 |
| 2010-01 | 3.73 |
| 2010-02 | 3.69 |
| 2010-03 | 3.73 |
| 2010-04 | 3.85 |
| 2010-05 | 3.42 |
| 2010-06 | 3.20 |
| 2010-07 | 3.01 |
| 2010-08 | 2.70 |
| 2010-09 | 2.65 |
| 2010-10 | 2.54 |
| 2010-11 | 2.76 |
| 2010-12 | 3.29 |
| 2011-01 | 3.39 |
| 2011-02 | 3.58 |
| 2011-03 | 3.41 |
| 2011-04 | 3.46 |
| 2011-05 | 3.17 |
| 2011-06 | 3.00 |
| 2011-07 | 3.00 |
| 2011-08 | 2.30 |
| 2011-09 | 1.98 |
| 2011-10 | 2.15 |
| 2011-11 | 2.01 |
| 2011-12 | 1.98 |
| 2012-01 | 1.97 |

| Date | Value |
|---|---|
| 2012-02 | 1.97 |
| 2012-03 | 2.17 |
| 2012-04 | 2.05 |
| 2012-05 | 1.80 |
| 2012-06 | 1.62 |
| 2012-07 | 1.53 |
| 2012-08 | 1.68 |
| 2012-09 | 1.72 |
| 2012-10 | 1.75 |
| 2012-11 | 1.65 |
| 2012-12 | 1.72 |
| 2013-01 | 1.91 |
| 2013-02 | 1.98 |
| 2013-03 | 1.96 |
| 2013-04 | 1.76 |
| 2013-05 | 1.93 |
| 2013-06 | 2.30 |
| 2013-07 | 2.58 |
| 2013-08 | 2.74 |
| 2013-09 | 2.81 |
| 2013-10 | 2.62 |
| 2013-11 | 2.72 |
| 2013-12 | 2.90 |
| 2014-01 | 2.86 |
| 2014-02 | 2.71 |
| 2014-03 | 2.72 |
| 2014-04 | 2.71 |
| 2014-05 | 2.56 |
| Sum | | 383.01 |
| **Average** | | **3.389** |

Note:
- Ten-year US treasury constant maturities, according to
*http://www.federalreserve.gov/releases/h15/data.htm*

# Exhibit 2(c)

COUR PERMANENTE D'ARBITRAGE  PERMANENT COURT OF ARBITRATION

## CERTIFICATION OF COPY OF
## FINAL AWARD DATED 18 JULY 2014

**RE:**   **PCA CASE N° AA 228**
**VETERAN PETROLEUM LIMITED (CYPRUS) v. THE RUSSIAN FEDERATION**

I, Judith Alexandra Levine, Senior Legal Counsel of the Permanent Court of Arbitration ("PCA") and Assistant Secretary to the Arbitral Tribunal in the above-referenced matter conducted under the auspices of the PCA pursuant to the 1994 Energy Charter Treaty and the 1976 Arbitration Rules of the United Nations Commission on International Trade Law, hereby CERTIFY that the document annexed hereto (Final Award dated 18 July 2014) is a true and authentic copy of the original document of which it purports to be a copy. I have carefully compared the said copy with the said original and found the same to agree therewith.

Signed, this ......4th........ day of ....November............. 2014, at .....The....Hague...........

Judith Levine
Senior Legal Counsel
Permanent Court of Arbitration
Peace Palace
Carnegieplein 2
2517 KJ The Hague
The Netherlands

COUR PERMANENTE D'ARBITRAGE    PERMANENT COURT OF ARBITRATION
Palais de la Paix, Carnegieplein 2, 2517 KJ La Haye, Pays-Bas    Peace Palace, Carnegieplein 2, 2517 KJ The Hague, The Netherlands
Téléphone: + 31 70 302 4165, Télécopie: + 31 70 302 4167    Telephone: + 31 70 302 4165, Facsimile: + 31 70 302 4167
Courriel: bureau@pca-cpa.org    E-mail: bureau@pca-cpa.org

PCA Case No. AA 228

## IN THE MATTER OF AN ARBITRATION BEFORE A TRIBUNAL CONSTITUTED IN ACCORDANCE WITH ARTICLE 26 OF THE ENERGY CHARTER TREATY AND THE 1976 UNCITRAL ARBITRATION RULES

- between -

## VETERAN PETROLEUM LIMITED (CYPRUS)

- and -

## THE RUSSIAN FEDERATION

_____

### FINAL AWARD

_____

### 18 July 2014

*Tribunal*
The Hon. L. Yves Fortier PC CC OQ QC, Chairman
Dr. Charles Poncet
Judge Stephen M. Schwebel

Mr. Martin J. Valasek, Assistant to the Tribunal
Mr. Brooks W. Daly, Secretary to the Tribunal
Ms. Judith Levine, Assistant Secretary to the Tribunal

*Registry*
Permanent Court of Arbitration



*Representing Claimant*:

Professor Emmanuel Gaillard
Dr. Yas Banifatemi
Ms. Jennifer Younan
SHEARMAN & STERLING LLP

*Representing Respondent*:

Dr. Claudia Annacker
Mr. Lawrence B. Friedman
Mr. David G. Sabel
Mr. Matthew D. Slater
Mr. William B. McGurn
Mr. J. Cameron Murphy
CLEARY GOTTLIEB STEEN & HAMILTON LLP

Mr. Michael S. Goldberg
Mr. Jay L. Alexander
Dr. Johannes Koepp
Mr. Alejandro A. Escobar
BAKER BOTTS LLP

**TABLE OF CONTENTS**

LIST OF DEFINED TERMS..............................................................................................xiii

INTRODUCTION ............................................................................................................... 1

I.   PROCEDURAL HISTORY ...................................................................................... 2

     A.   COMMENCEMENT OF THE ARBITRATION ................................................... 2

     B.   CONSTITUTION OF THE TRIBUNAL ............................................................ 3

     C.   PRELIMINARY PHASE ON JURISDICTION AND ADMISSIBILITY .................. 4

     D.   BIFURCATION AND OTHER SCHEDULING MATTERS.................................. 5

     E.   DOCUMENT PRODUCTION AND CONFIDENTIALITY ................................... 6

     F.   HEARING ON THE MERITS ......................................................................... 8

     G.   POST-HEARING PROCEDURES .................................................................. 11

II.  FACTUAL BACKGROUND ................................................................................. 12

     A.   THE PARTIES TO THESE PROCEEDINGS .................................................. 13

          1.   Claimants and Related Entities ................................................ 13

          2.   Respondent........................................................................... 13

     B.   OAO YUKOS OIL COMPANY .................................................................. 13

     C.   THE RUSSIAN LOW-TAX REGION PROGRAM ........................................ 14

     D.   CRIMINAL PROCEEDINGS ...................................................................... 16

     E.   ADDITIONAL MEASURES ...................................................................... 17

          1.   Alleged Frustration of Merger Between Yukos and Sibneft........ 18

          2.   Tax Reassessments for Years 2000–2004................................ 18

          3.   Auction of YNG.................................................................... 19

          4.   Bankruptcy Proceedings ....................................................... 20

          5.   Withdrawal of PwC's Audits ................................................. 20

III. PARTIES' WRITTEN SUBMISSIONS ................................................................. 20

     A.   CLAIMANTS' SKELETON ARGUMENTS.................................................... 21

     B.   RESPONDENT'S SKELETON ARGUMENTS ............................................... 34

IV.  PARTIES' REQUESTS FOR RELIEF ................................................................... 48

     A.   RELIEF REQUESTED BY CLAIMANTS ...................................................... 48

     B.   RELIEF REQUESTED BY RESPONDENT...................................................... 48

V.      APPLICABLE LAW......................................................................................49

        A.      PROCEDURAL LAW .........................................................................49

        B.      SUBSTANTIVE LAW .........................................................................49

                1.      Energy Charter Treaty .................................................................49

                2.      Vienna Convention on the Law of Treaties ...................................53

VI.     SUMMARY OF WITNESS TESTIMONY ...............................................54

        A.      CLAIMANTS' WITNESSES ................................................................55

                1.      Mr. Jacques Kosciusko-Morizet .................................................55

                2.      Mr. Vladimir Dubov ...................................................................57

                3.      Mr. Frank Rieger ........................................................................59

                4.      Dr. Andrei Illarionov ..................................................................61

                5.      Mr. Leonid Nevzlin .....................................................................64

                6.      Mr. Bruce Misamore ...................................................................67

                7.      Mr. Steven Theede ......................................................................69

                8.      Mr. Brent Kaczmarek .................................................................72

                9.      Mr. Philip Baker QC ..................................................................73

                10.     Mr. Yuri Schmidt ........................................................................74

                11.     Dr. Sergei Kovalev .....................................................................75

        B.      RESPONDENT'S WITNESSES ...........................................................76

                1.      Professor James Dow ..................................................................76

                2.      Mr. Oleg Y. Konnov ...................................................................78

                3.      Professor Reinier Kraakman ........................................................81

                4.      Professor H. David Rosenbloom ..................................................83

                5.      Professor Thomas Z. Lys ............................................................85

                6.      Ms. Felicity Cullen QC ...............................................................87

                7.      Mr. Dale Hart .............................................................................88

                8.      Mr. Polyvios Polyviou .................................................................89

                9.      Mr. John Ellison .........................................................................90

                10.     Mr. Raymond Gross ....................................................................91

                11.     Professor Dr. Albert Jan van den Berg.........................................93

12.   Professor Stef van Weeghel ................................................................. 94

C.   THE SO-CALLED "EMPTY CHAIRS" ............................................................ 95

1.   Individuals that Claimants Wished were Available for Examination ............ 96

2.   Individuals that Respondent Wished were Available for Examination ......... 97

VII.   ISSUES FOR ANALYSIS ................................................................................. 98

VIII.   ANALYSIS OF THE EVIDENTIARY RECORD ................................................. 102

A.   THE TAX OPTIMIZATION SCHEME .......................................................... 102

1.   Introduction ...................................................................................... 102

2.   The Structure of the Tax Optimization Scheme .................................. 103

3.   The Legal Framework of the Tax Optimization Scheme ...................... 105

(a)   The Low-Tax Region Program ................................................ 105

(b)   Anti-Abuse Decisions and Doctrines Promulgated by Russia's Federal Courts ................................................................... 107

4.   The History of the Yukos Trading Entities before 2003 ...................... 125

(a)   Mordovia ............................................................................. 125

(b)   Kalmykia ............................................................................. 138

(c)   Lesnoy and Trekhgorny ....................................................... 140

(d)   Sarov .................................................................................. 158

(e)   Baikonur .............................................................................. 159

(f)   Evenkia ................................................................................ 160

5.   Tribunal's Observations .................................................................... 164

B.   THE TAX ASSESSMENTS STARTING IN DECEMBER 2003 ......................... 170

1.   Introduction ...................................................................................... 170

2.   Chronology of the Tax Assessments and Related Decisions ............... 174

(a)   The 2000 Decision ............................................................... 175

(b)   The 2001 Decision ............................................................... 183

(c)   The 2002 Decision ............................................................... 186

(d)   The 2003 Decision ............................................................... 189

(e)   The 2004 Decision ............................................................... 191

(f)   Observation ......................................................................... 192

3.   The Taxes Assessed Against Yukos .................................................. 192

(a)   Profit Tax and Other Revenue-based Taxes ........................................ 192

(b)   VAT ................................................................................................... 198

4.   The Fines Assessed Against Yukos ........................................................ 201

5.   Parties' Arguments and Tribunal's Observations ................................... 203

(a)   Profit Tax and Other Revenue-Based Taxes ..................................... 204

(b)   VAT ................................................................................................... 219

(c)   Fines ................................................................................................. 239

(d)   Concluding Observations .................................................................. 255

C.   HARASSMENT, INTIMIDATION AND ARRESTS ......................................................... 257

1.   Introduction ............................................................................................ 257

2.   Chronology of Facts ............................................................................... 258

(a)   Yukos Grows; Mr. Khodorkovsky Becomes More Politically Engaged; Yukos Leaders Receive Warnings ..................................................... 258

(b)   Prosecutor General Launches Investigations Involving Searches and Seizures ............................................................................................ 260

(c)   Arrest and Trial of Mr. Khodorkovsky; Flight from Russia of His Associates .......................................................................................... 263

(d)   Complaints of Further Harassment and Intimidation of Yukos Executives, Employees, Lawyers and External Advisers ..................................... 265

(e)   Second Trial of Mr. Khodorkovsky; Allegations of Continuing Harassment and Intimidation ............................................................. 269

3.   Parties' Arguments and Tribunal's Observations ................................... 270

(a)   Are Claimants' Allegations about a Campaign of Harassment Credible? ......... 271

(b)   Were the Actions of the Russian Federation Justified as Legitimate Law Enforcement Measures? ..................................................................... 274

(c)   Did the Events Complained of Impact Claimants' Investments or was Yukos Able to Carry on Unaffected? ................................................. 276

D.   THE UNWINDING OF THE YUKOS–SIBNEFT MERGER ............................................. 279

1.   Introduction ............................................................................................ 279

2.   Chronology ............................................................................................. 281

(a)   Merger is Announced; NYSE Listing is Put on Hold; Steps are Taken to Complete Merger ............................................................................... 281

(b)   Mr. Khodorkovsky is Arrested; Yukos Continues with Merger; Sibneft has Second Thoughts ............................................................................... 283

(c)   Russian Courts Invalidate the Share Exchange Agreement ............................... 285

(d)   Russian Federation Ultimately Acquires Sibneft via Gazprom.......................... 287

3.   Parties' Arguments and Tribunal's Observations ........................................................ 287

(a)   Was Yukos' NYSE Listing Put on Hold Because of the Yukos−Sibneft Merger or Fears of Exposing Yukos' Tax Optimization Scheme? ................... 287

(b)   Was the 2003 Interim Dividend a Component of the Yukos−Sibneft Merger or a Means to Siphon Funds out of Russia? .......................................... 289

(c)   Was the Unwinding of the Merger Caused by the Russian Federation? ........... 292

E.   ATTEMPTS TO SETTLE ............................................................................................................. 298

1.   Introduction ........................................................................................................................ 298

2.   Yukos' Settlement Offers (and the Russian Federation's Replies) .............................. 300

(a)   Proposals Made to the Bailiffs .......................................................................... 302

(b)   Proposals for a Global Settlement Conveyed by Mr. Chrétien .......................... 304

(c)   Requests for a Deferral or Payment in Instalments ........................................... 306

(d)   Other Proposals .................................................................................................. 307

3.   Parties' Arguments and Tribunal's Observations ........................................................ 308

(a)   Did Yukos Contribute to its Own Demise by Failing to Discharge Tax Debt in the Amount of USD 9 Billion in the First Quarter of 2004? ................ 308

(b)   Did Yukos' Settlement Offers Constitute Real Alternatives to Enforcement? ...................................................................................................... 312

F.   THE AUCTION OF YNG ......................................................................................................... 322

1.   Introduction ........................................................................................................................ 322

2.   Chronology ......................................................................................................................... 324

(a)   Yukos' Shares in YNG are Seized and the Government Announces they will be Sold; Yukos Brings Unsuccessful Court Challenges ........................... 325

(b)   YNG is Valued for Auction while its Tax Liabilities Rapidly Escalate ............. 325

(c)   Yukos Tries to Prevent the Auction; Preparations Proceed; an Entity Named Baikal is Created to Purchase YNG...................................................... 327

(d)   After a 10-Minute Auction, the Successful Bidder Baikal is Sold to State-Owned Rosneft; a "Monumental Bargain"; the "State, Looking After its Own Interests".................................................................................................... 329

(e)   Once it is State-Owned, YNG's Fate Improves, with Reductions in Tax Liabilities and a Dramatic Increase in Value ..................................................... 330

3.   Parties' Arguments and Tribunal's Observations ........................................................ 331

|  |  | (a) | Did the Auction Price Reflect the True Value of YNG; If not, was Either Party Responsible for the Price Reduction? | 332 |
|  |  | (b) | Who was Behind Baikal and were They a Front for the Russian State? | 336 |
|  |  | (c) | What were Yukos' Prospects for Survival Once it Lost its Core Asset? | 340 |
|  | G. | THE BANKRUPTCY OF YUKOS | | 342 |
|  |  | 1. | Introduction | 342 |
|  |  | 2. | Chronology | 343 |
|  |  | (a) | The Initiation of the Bankruptcy | 343 |
|  |  | (b) | The Treatment of Bankruptcy Claims; the Creditors' Meeting; the Declaration of Yukos' Bankruptcy | 349 |
|  |  | (c) | The Liquidation of Yukos' Remaining Assets | 352 |
|  |  | 3. | Parties' Arguments and Tribunal's Observations | 355 |
|  |  | (a) | Why was the Bankruptcy Initiated and Who was Truly Behind It? | 356 |
|  |  | (b) | Were the Bankruptcy Proceedings Conducted Properly and Fairly? | 368 |
|  | H. | THE WITHDRAWAL OF PWC'S AUDIT OPINIONS | | 377 |
|  |  | 1. | Introduction | 377 |
|  |  | 2. | Chronology | 379 |
|  |  | (a) | PwC Serves as Both Auditor and Consultant to Yukos | 379 |
|  |  | (b) | PwC Responds to the Massive Tax Reassessments against Yukos | 380 |
|  |  | (c) | PwC Faces Mounting Pressure from the Russian Federation around the Same Time as Mr. Khodorkovsky's Second Trial Starts | 382 |
|  |  | (d) | PwC's "Volte-Face" in Withdrawing the Yukos Audits; Improved Treatment and Continued Pressures in the Russian Federation | 385 |
|  |  | 3. | Parties' Arguments and Tribunal's Observations | 389 |
|  |  | (a) | Did PwC Withdraw its Audits because it was under Pressure from the Russian Government? | 389 |
|  |  | (b) | Were the Grounds Provided by PwC in its Withdrawal Letter Contrived or Credible? | 391 |
|  |  | (c) | Concluding Observations | 399 |
| IX. | | | PRELIMINARY OBJECTIONS | 401 |
|  | A. | ARE ALL OR SOME OF THE CLAIMS BARRED BY THE "FORK-IN-THE-ROAD" PROVISION OF THE ECT? | | 402 |
|  |  | 1. | Introduction | 402 |

2. Parties' Positions .................................................................... 403

3. Tribunal's Decision ................................................................ 406

B. "UNCLEAN HANDS" (DID CLAIMANTS ACT ILLEGALLY SO AS TO DEPRIVE THEM OF PROTECTION UNDER THE ECT?) .............................................................. 406

1. Introduction ............................................................................ 406

2. Claimants' Alleged "Unclean Hands" ...................................... 408

   (a) Conduct Related to the Acquisition of Yukos and the Subsequent Consolidation of Control over Yukos and its Subsidiaries ................................. 409

   (b) Conduct Related to the Cyprus-Russia DTA .................................... 412

   (c) Conduct Related to the Tax Optimization Scheme ........................... 416

   (d) Actions Taken in Hindrance of the Enforcement of Russia's Tax Claims ......... 416

3. Parties' Positions Regarding the Impact of Claimants' Allegedly "Unclean Hands" on this Arbitration ............................................ 418

   (a) Respondent's Position ............................................................ 418

   (b) Claimants' Position ............................................................... 423

4. Tribunal's Decision ................................................................ 428

   (a) Can a Clean Hands Principle or Legality Requirement be Read into the ECT? ................................................................................ 429

   (b) Does the "Clean Hands" Doctrine Constitute a "General Principle of Law Recognized by Civilized Nations"? ................................................ 431

   (c) Would any Instances of Claimants' Alleged "Bad Faith and Illegal" Conduct be Caught by a Legality Requirement Read into the ECT? ............... 433

   (d) Conclusion ........................................................................ 435

C. RESPONDENT'S OBJECTIONS UNDER ARTICLE 21 OF THE ECT ........................... 435

1. Introduction ............................................................................ 435

2. Claimants' Position ................................................................ 437

3. Respondent's Position ............................................................. 440

4. Tribunal's Decision ................................................................ 446

   (a) Introduction ....................................................................... 446

   (b) First Reason:  Assuming the Carve-Out Applies, So Does the Claw-Back, and Any Referral to the Competent Tax Authorities Would Clearly have been Futile ........................................................................ 448

   (c) Second Reason:  The Carve-Out Does Not Apply ............................. 453

   (d) Conclusion ........................................................................ 457

X.  LIABILITY ....................................................................................................................... 457

    A.  ATTRIBUTION .......................................................................................................... 458

        1.  Claimants' Position .................................................................................. 458

        2.  Respondent's Position .............................................................................. 460

        3.  Tribunal's Decision on Attribution ........................................................ 462

    B.  ARTICLE 10 OF THE ECT ......................................................................................... 467

        1.  Introduction ............................................................................................. 467

        2.  Applicable Legal Standards under Article 10(1) of the ECT ..................... 468

            (a)  Claimants' Position ..................................................................... 468

            (b)  Respondent's Position ................................................................. 472

        3.  Did Respondent Accord Claimants' Investments the Standard of Treatment Required by Article 10(1) of the ECT? ........................................................ 475

            (a)  Claimants' Position ..................................................................... 475

            (b)  Respondent's Position ................................................................. 480

    C.  ARTICLE 13 OF THE ECT ......................................................................................... 481

        1.  Introduction ............................................................................................. 481

        2.  Applicable Legal Standards under Article 13 of the ECT ........................ 482

            (a)  Claimants' Position ..................................................................... 482

            (b)  Respondent's Position ................................................................. 485

        3.  Did Respondent's Actions Constitute Expropriation (or "Measures Having Effect Equivalent to Nationalization or Expropriation") within the Meaning of Article 13(1) of the ECT? ........................................................ 488

            (a)  Claimants' Position ..................................................................... 488

            (b)  Respondent's Position ................................................................. 489

        4.  If Respondent's Actions Constitute Expropriation, Has Respondent Met the Criteria for a Lawful Expropriation under Article 13(1) of the ECT? ......................... 492

            (a)  Claimants' Position ..................................................................... 492

            (b)  Respondent's Position ................................................................. 493

    D.  TRIBUNAL'S DECISION ON BREACH OF THE ECT .................................................... 495

    E.  CONTRIBUTORY FAULT ............................................................................................ 500

        1.  Introduction ............................................................................................. 500

        2.  Contributory Fault as Applied in Other Cases ........................................ 502

3. Tribunal's Analysis ..................................................................................... 503

(a) Conduct of Yukos in Some of the Low-Tax Regions ......................................... 503

(b) Conduct of Yukos under the Cyprus-Russia DTA ............................................. 505

(c) Conduct of Yukos in Connection with YNG Auction........................................ 506

(d) Conduct of Yukos in Connection with its Bankruptcy (Non-Payment of the A Loan) ............................................................................................................. 508

4. Tribunal's Decision on Contributory Fault .................................................... 509

XI. INTEREST ......................................................................................................... 510

A. CLAIMANTS' POSITION ..................................................................................... 510

B. RESPONDENT'S POSITION .................................................................................. 512

C. THE LEGAL FRAMEWORK .................................................................................. 513

1. Energy Charter Treaty .................................................................................. 513

2. ILC Articles on State Responsibility ........................................................... 514

3. *RosInvestCo* and *Quasar* ........................................................................... 514

4. Treatises ...................................................................................................... 514

(a) General Issues.................................................................................................. 515

(b) Rate ................................................................................................................. 515

(c) *Dies a quo* ...................................................................................................... 517

(d) Simple or Compound ...................................................................................... 518

(e) Post-Award Interest ........................................................................................ 518

D. TRIBUNAL'S DECISION ...................................................................................... 519

XII. THE QUANTIFICATION OF CLAIMANTS' DAMAGES ........................................ 522

A. CLAIMANTS' POSITION ..................................................................................... 522

1. Valuation Date ............................................................................................. 523

2. Causation...................................................................................................... 524

3. Calculations Performed by Claimants and Mr. Kaczmarek ........................ 524

(a) The "Scenarios" Presented by Claimants ....................................................... 524

(b) Methodology Used for Calculations Based on Scenarios 1 and 2.................... 526

(c) Methodology Used for Calculations Based on Scenario 3 ............................... 531

(d) Methodology Used for Calculations Based on 2012 Valuation Date................ 532

(e) Summary of Results of Claimants' Calculations.............................................. 533

|   |   | 4. | Failure of Claimants to Mitigate | 533 |
|   |   | 5. | Windfall and Double-Recovery | 534 |
| B. | | | RESPONDENT'S POSITION | 535 |
|   |   | 1. | Valuation Date | 535 |
|   |   | 2. | Causation | 536 |
|   |   | 3. | Specific Aspects of the Calculations Performed by Claimants Criticized by Respondent | 537 |
|   |   |   | (a) Credibility of Claimants' DCF Analysis | 537 |
|   |   |   | (b) Claimants' Selection of Comparable Companies for Purposes of the Comparable Companies Analysis | 538 |
|   |   |   | (c) Claimants' Reliance on Comparable Transactions | 539 |
|   |   |   | (d) Claimants' Calculations of Hypothetical Cash Flows from Dividends | 539 |
|   |   |   | (e) Claimants' Calculations Based on the Loss of a Chance to Obtain a Listing on the New York Stock Exchange | 540 |
|   |   |   | (f) Claimants' Calculations Based on the Assumption of a Completed Yukos–Sibneft Merger | 540 |
|   |   |   | (g) Claimants' Scenarios 3a to 3d | 540 |
|   |   |   | (h) Claimants' Scenario 3e and the Valuation of YNG | 541 |
|   |   |   | (i) Claimants' Calculation of Pre-Award Interest | 541 |
|   |   | 4. | Failure of Claimants to Mitigate | 541 |
|   |   | 5. | Windfall and Double-Recovery | 542 |
| C. | | | TRIBUNAL'S ANALYSIS AND DECISION | 543 |
|   |   | 1. | Valuation Date | 543 |
|   |   |   | (a) The Date of the Expropriation | 543 |
|   |   |   | (b) The Possibility for Claimants to Choose Between a Valuation as of the Date of Expropriation and a Valuation as of the Date of the Award | 544 |
|   |   | 2. | Causation | 546 |
|   |   |   | (a) Causation and Reliance on Multiple Actions | 546 |
|   |   |   | (b) Multiple Causes for the Same Damage | 547 |
|   |   | 3. | Failure of Claimants to Mitigate | 548 |
|   |   | 4. | The Methodology Followed by the Tribunal | 548 |
|   |   |   | (a) Valuation of Yukos | 550 |

(b)   Valuation of Lost Dividends ............................................................. 553

5.   Application of the Methodology Followed by the Tribunal ......................................... 560

(a)   Calculations Based on 19 December 2004 Valuation Date ............................... 561

(b)   Calculations Based on 2014 Valuation Date ......................................... 562

(c)   Comparison of the Results Based on the Two Different Valuation Dates ......... 563

6.   Deductions Due to Claimants' Contributory Fault .................................................... 564

7.   Windfall and Double Recovery ............................................................................... 564

XIII. COSTS ..................................................................................................................... 564

A.   INTRODUCTION ...................................................................................................... 564

B.   CLAIMANTS' POSITION ........................................................................................... 566

1.   Claimants are Entitled to Recover All Costs Incurred in Connection with these
Arbitrations ......................................................................................................... 566

2.   Claimants' Costs are Reasonable ........................................................................ 568

3.   Claimants' Comments on Respondent's Submission on Costs .............................. 570

C.   RESPONDENT'S POSITION ....................................................................................... 571

1.   Equal Apportionment is an Appropriate Exercise of the Tribunal's Discretion on
Costs ................................................................................................................... 571

2.   Schedule of "Types of Costs" Incurred by Respondent ......................................... 572

3.   Respondent's Comments on Claimants' Submission on Costs ................................ 573

D.   TRIBUNAL'S DECISION ON COSTS ........................................................................... 574

1.   Fixing and Allocation of Costs of the Arbitration Pursuant to Article 40(1) of the
UNCITRAL Rules ................................................................................................. 574

2.   Fixing and Allocation of Costs for Legal Representation and Assistance of the
Parties Pursuant to Article 40(2) of the UNCITRAL Rules ....................................... 575

3.   Conclusion on the Award of Costs ....................................................................... 576

XIV. DECISION ................................................................................................................. 578

ANNEXES ........................................................................................................................ A-1

A.   ANNEX A1:  APPENDIX 1.1, APPENDIX J.1 AND APPENDIX J.2 TO SECOND DOW REPORT
(MODIFIED AS DESCRIBED IN NOTE 2401 OF THE AWARD) .................................... A-1

(a)   Appendix 1.1 .................................................................................. A-1

(b)   Appendix J.1 New ........................................................................... A-2

(c)   Appendix J.2 New ........................................................................... A-3

B.  ANNEX A2:  YUKOS COMPANY STRUCTURE  (EXTRACT FROM EXH. R-3165, REFERRED TO IN NOTE 2413 OF THE AWARD) ................................................................ A-5

C.  TABLES T1–T9 SHOWING THE TRIBUNAL'S DAMAGES CALCULATIONS ............................ A-6

1.  Table T1:  Calculation of Total Damages of Claimants as of 19 December 2004 (Date of Expropriation) vs. 30 June 2014 (Date of Award for Valuation Purposes) ............................................................................................ A-6

2.  Table T2:  Equity Value of Yukos Based on Adjustments Made by Professor Dow to Mr. Kaczmarek's Comparable Companies Calculations and the Evolution of the RTS Oil & Gas Index .................................................... A-7

3.  Table T3:  Calculation of Dividends and Interest up to Valuation Date for Valuation as of 30 June 2014 .................................................................. A-8

4.  Table T4:  FCFtE for Years 2012–2014  (Based on Mr. Kaczmarek's Figures) ......... A-9

5.  Table T5:  Total Adjustment of Free Cash Flow to the Firm  (Required to Obtain FCFtE value for Years 2012–2014 for Mr. Kaczmarek) ............................................. A-10

6.  Table T6:  Change in Net Debt for Years 2012–2014 ................................................. A-11

7.  Table T7:  Interest Factors Based on Annual Rate of 3.389 percent (see Table T9) ......................................................................................................... A-12

8.  Table T8:  RTS Oil and Gas Index Values from 1 January to 24 June 2014 ............. A-13

9.  Table T9:  10-Year U.S. Sovereign Bond Rate 2005–2014 ....................................... A-16

## LIST OF DEFINED TERMS

| Term | Definition |
| --- | --- |
| **2000 Audit Report** | Field Tax Audit Report No. 08-1/1, dated 29 December 2003, finding that Yukos operated a tax evasion scheme |
| **2000 Decision** | Decision No. 14-3-05/1609-1, dated 14 April 2004, holding Yukos liable for a tax offense and reassessing approximately USD 3.48 billion in taxes against Yukos for the year 2000 |
| **2001 Decision** | Decision No. 30-3-15/3, dated 2 September 2004, holding Yukos liable for a tax offense and reassessing approximately USD 4.1 billion in taxes against Yukos for the year 2001 |
| **2002 Decision** | Decision No. 52/896, dated 16 November 2004, holding Yukos liable for a tax offense and reassessing approximately USD 6.7 billion in taxes against Yukos for the year 2002 |
| **2003 Decision** | Decision No. 52/985, dated 6 December 2004, holding Yukos liable for a tax offense and reassessing approximately USD 6 billion in taxes against Yukos for the year 2003 |
| **2003 Interim Dividend** | Yukos' declaration of a USD 2 billion interim dividend in November 2003 |
| **2004 Decision** | Decision No. 52/292, dated 17 March 2006, holding Yukos liable for a tax offense and reassessing approximately USD 3.9 billion in taxes against Yukos for the year 2004 |
| **ADR** | American Depositary Receipt |
| **A Loan** | USD 1 billion loan entered into on 24 September 2003 by Yukos from the Western Banks and secured by certain of Yukos' oil export contracts and by YNG |
| **April 2004 Injunction** | Ruling by the Moscow Arbitrazh Court dated 15 April 2004 prohibiting Yukos from alienating and encumbering its assets |
| **Baikal** | Baikal Finance Group, the entity which purchased YNG at auction and which was bought by Rosneft |
| **BBS Companies** | Behles Petroleum S.A., Baltic Petroleum Trading Limited and South Petroleum Limited |
| **B Loan** | USD 1.6 billion loan entered into on 30 September 2003 by Yukos from Société Générale S.A. and fully collateralized in cash by GML |

| Term | Definition |
|------|------------|
| **Chrétien letters** | Letters from Jean Chrétien to Prime Minister Fradkov, dated 6 and 15 July 2004, and to President Putin, dated 30 July 2004, 10 September 2004 and 17 November 2004 |
| **Claimants** | Hulley, VPL, and YUL |
| **Claimants' Post-Hearing Brief** | Claimants' Post-Hearing Brief, dated 21 December 2012 |
| **Claimants' Skeleton** | Claimants' Skeleton Argument, dated 1 October 2012 |
| **Confidential Sale Agreement** | Confidential sale agreement between the Western Banks and Rosneft dated 13 December 2005 |
| **Counter-Memorial** | Respondent's Counter-Memorial on the Merits, dated 4 April 2011, as corrected 29 July 2011 |
| **Cyprus-Russia DTA** | Agreement Between the Government of the Republic of Cyprus and the Government of the Russian Federation for the Avoidance of Double Taxation with Respect to Taxes on Income and on Capital, signed on 5 December 1998 |
| **DCF** | Discounted Cash Flow |
| **Dresdner** | ZAO Dresdner Bank |
| **Dresdner Summary Letter** | Dresdner Summary Valuation Opinion Letter dated 6 October 2004 |
| **Dresdner Valuation Report** | Dresdner Valuation Report of YNG dated 6 October 2004 |
| **EBITDA** | Earnings before Interest, Taxes, Depreciation and Amortization |
| **ECHR** | European Convention on Human Rights |
| **ECT (or Treaty)** | Energy Charter Treaty, 2080 UNTS 95, signed on 17 December 1994 |
| **ECtHR** | European Court of Human Rights |
| **ECtHR Yukos Judgment** | OAO Neftyanaya Kompaniya Yukos v. Russia, ECtHR, Appl. No. 14902/04, Judgment, 20 September 2011 |
| **EGM** | Extraordinary General Meeting |
| **English Judgment** | BNP Paribas S.A. v. Yukos Oil Company, High Court of England and Wales, Case No. HC 05 C0 12 19, [2005] EWHC 1321 (Ch), Judgment, 24 June 2005 |
| **GML** | GML Limited (formerly named Group Menatep Limited), a company incorporated in Gibraltar and parent company of YUL |

| Term | Definition |
|---|---|
| **Final Awards** | Final Awards in these three arbitrations (PCA Case Nos. AA226 (Hulley), AA227 (YUL) and AA228 (VPL)) (including the present Award) |
| **Hearing on the Merits (or Hearing)** | Hearing on the merits held at the Peace Palace in The Hague from 10 October to 9 November 2012 |
| **Hulley** | Hulley Enterprises Limited, a company organized under the laws of Cyprus and Claimant in PCA Case No. AA226, owned by YUL |
| **ICJ** | International Court of Justice |
| **ILC** | International Law Commission of the United Nations |
| **ILC Articles on State Responsibility** | ILC Draft Articles on Responsibility of States for Internationally Wrongful Acts, 2001 |
| **Interim Awards** | Interim Awards on Jurisdiction and Admissibility issued on 30 November 2009 in these three arbitrations (PCA Case Nos. AA226 (Hulley), AA227 (YUL) and AA228 (VPL)) |
| **Law 9-Z** | Law of the Republic of Mordovia No. 9-Z, which is the framework by which Mordovia offered tax benefits to corporate entities operating in the region |
| **Memorial** | Claimants' Memorial on the Merits, dated 15 September 2010 |
| **Moravel** | Moravel Investments Limited |
| **Notices of Arbitration and Statements of Claim** | Claimants' Notices of Arbitration and Statements of Claim by Hulley and YUL, dated 3 February 2005; and by VPL, dated 14 February 2005 |
| **NYSE** | New York Stock Exchange |
| **Oligarchs** | Respondent's style of reference to the individuals who have or had a beneficial interest in the trusts behind Claimants, namely Messrs. Khodorkovsky, Lebedev, Nevzlin, Dubov, Brudno, Shakhnovsky, and Golubovitch |
| **Parties** | Claimants and Respondent |
| **PCA** | Permanent Court of Arbitration |
| **PCIJ** | Permanent Court of International Justice |
| **PwC** | PricewaterhouseCoopers, the former auditor of Yukos |

| **Term** | **Definition** |
|---|---|
| **PwC's Withdrawal Letter** | Letter from PwC to the bankruptcy receiver, Mr. Eduard Rebgun, dated 15 June 2007, by which PwC withdrew its Yukos audits |
| *Quasar* | Quasar de Valores SICAV S.A. et al. v. The Russian Federation, SCC Arbitration, Award, 20 July 2012 |
| **Rehabilitation Plan** | Rehabilitation plan the in context of bankruptcy proceedings proposed by Yukos' management and approved by a majority vote during an EGM on 1 June 2006 |
| **Rejoinder** | Respondent's Rejoinder on the Merits, dated 16 August 2012 |
| **Reply** | Claimants' Reply on the Merits, dated 15 March 2012 |
| **Resolution No. 53** | Resolution of the Plenum of the Supreme Arbitrazh Court No. 53, dated 12 October 2006 |
| **Respondent** | The Russian Federation or Russia |
| **Respondent's Post-Hearing Brief** | Respondent's Post-Hearing Brief, dated 21 December 2012 |
| **Respondent's Skeleton** | Respondent's Skeleton Argument, dated 1 October 2012 |
| *RosInvestCo* | RosInvestCo UK Ltd. v. The Russian Federation, SCC Arbitration V (079/2005), Final Award, 12 September 2010 |
| **Rosneft** | Russian State-owned entity that bought Baikal |
| **Russian Civil Code** | Civil Code of the Russian Federation |
| **Russian Constitution** | Constitution of the Russian Federation |
| **Russian Tax Code** | Tax Code of the Russian Federation |
| **Share Exchange Agreement** | Agreement pursuant to which Yukos would acquire 72 percent (plus one share) of Sibneft shares from Sibneft's principal shareholders in exchange for 26.01 percent of the fully diluted share capital of Yukos |
| **Share Purchase Agreement** | Agreement pursuant to which Yukos would acquire 20 percent (minus one share) of Sibneft shares from Sibneft's principal shareholders for a cash consideration of USD 3 billion |
| **Sibneft** | Russia's fifth largest oil company in 2003 when it agreed to a merger with Yukos |
| **Stichting 1** | Stichting Administratiekantoor Yukos International |

| Term | Definition |
|---|---|
| **Stichting 2** | Stichting Administratiekantoor Small World Telecommunication Holdings B.V. |
| **Stichtings** | Stichting 1 and Stichting 2 |
| **TRO** | Temporary Restraining Order |
| **UNCITRAL Rules** | Arbitration Rules of the United Nations Commission on International Trade Law, 1976 |
| **U.S. GAAP** | United States' Generally Accepted Accounting Principles |
| **VAT Law** | Law of the Russian Federation governing Value Added Tax |
| **VCLT** | Vienna Convention on the Law of Treaties, 1155 UNTS 331, signed on 23 May 1969 |
| **VPL** | Veteran Petroleum Limited, a company organized under the laws of Cyprus and Claimant in PCA Case No. AA 228 |
| **Western Banks** | Syndicate of Western banks led by Société Générale S.A. and including BNP Paribas S.A., Citibank N.A., Commerzbank Akziengesellschaft, Calyon S.A., Deutsche Bank A.G., Hillside Apex Fund Limited, ING Bank N.V., KBC Bank N.V., Stark Trading, Shepherd Investments International Limited, Thames River Traditional Funds PLC (High Income Fund), UFJ (Holland) N.V. and V.R. Global Partners L.P. |
| **YNG** | Yuganskneftegaz, Yukos' core production subsidiary |
| **Yukos (or OAO Yukos Oil Company)** | OAO Yukos Oil Company, a joint stock company incorporated in Russia in 1993 |
| **Yukos CIS** | Yukos CIS Investment Limited |
| **Yukos Finance** | Yukos Finance B.V. |
| **Yukos International** | Yukos International U.K. B.V. |
| **YUL** | Yukos Universal Limited, a company organized under the laws of the Isle of Man and Claimant in PCA No. AA 227, shareholder of Yukos |
| **ZATO** | Zakrytoe Administrativno-Territorial'noe Obrazovaniye, or Closed Administrative Territorial Unit. |

**INTRODUCTION**

1. In February 2005, three controlling shareholders of **OAO Yukos Oil Company** (or "**Yukos**")—Hulley Enterprises Limited ("**Hulley**"), a company organized under the laws of Cyprus, Yukos Universal Limited ("**YUL**"), a company organized under the laws of the Isle of Man, and Veteran Petroleum Limited ("**VPL**"), a company organized under the laws of Cyprus (collectively, "**Claimants**")—initiated arbitrations against the **Russian Federation** ("**Respondent**" or "**Russia**"), which together with Claimants constitute the "**Parties**."

2. The three arbitrations were heard in parallel with the full participation of the Parties at all relevant stages of the proceedings.  Mindful of the fact that each of the three Claimants maintains separate claims in separate arbitrations that require separate awards (the "**Final Awards**"), the Tribunal nevertheless shall discuss these arbitrations as a single set of proceedings, except where circumstances distinct to particular Claimants necessitate separate treatment.

3. The Final Awards address:  (a) those of Respondent's objections to jurisdiction and admissibility that remain to be decided after the Interim Awards on Jurisdiction and Admissibility of 30 November 2009 (the "**Interim Awards**");[1] (b) Claimants' claims on the merits; and (c) quantum.

4. By any standard, and as will be seen, these have been mammoth arbitrations.  At the highest, Claimants are claiming damages from Respondent of "no less than US$ 114.174 billion."[2] Since February 2005, the Tribunal has held five procedural hearings with the Parties and issued 18 procedural orders.  In the fall of 2008, the Tribunal held a ten-day hearing on jurisdiction and admissibility in The Hague and, in November 2009, issued three Interim Awards, each over 200 pages.  A twenty-one day **Hearing on the Merits** (or "**Hearing**") took place in The Hague from 10 October to 9 November 2012.  The written submissions of the Parties span more than 4,000 pages and the transcripts of the hearings more than 2,700 pages.  Over 8,800 exhibits have been filed with the Tribunal.

---

[1]  *Hulley Enterprises Limited v. The Russian Federation*, PCA Case No. 226, Interim Award on Jurisdiction and Admissibility, 30 November 2009 (hereinafter "Interim Award (Hulley)"); *Yukos Universal Limited v. The Russian Federation*, PCA Case No. 226, Interim Award on Jurisdiction and Admissibility, 30 November 2009 (hereinafter "Interim Award (YUL)"); *Veteran Petroleum Limited v. The Russian Federation*, PCA Case No. 226, Interim Award on Jurisdiction and Admissibility, 30 November 2009 (hereinafter "Interim Award (VPL)").

[2]  Claimants' Reply on the Merits, 15 March 2012 ¶ 1199(3) (hereinafter "Reply").

5.      The facts of this dispute have been the subject of attention in the media for more than a decade, involving as they do, as central actors, Mr. Vladimir Putin, the President of the Russian Federation, and a Russian "oligarch", Mr. Mikhail Khodorkovsky, who, at the outset of the dispute, was the principal shareholder and Chief Executive Officer of Yukos, then the largest oil company in Russia and one of the largest oil companies in the world.

6.      Throughout this lengthy and heavily contested arbitration, in circumstances that were often trying and stressful, counsel for the Parties acted in a highly professional way.  The Tribunal is most grateful for their assistance.  The Tribunal particularly acknowledges the grace and acuity of the participation of Mr. Robert Greig, who was forced by ill health to retire in the midst of the proceedings.

7.      Having studied carefully the voluminous record of these three arbitrations, and having weighed the arguments of the counsel who have so ably represented the Parties, the Tribunal is now ready to deliver its Final Awards.

## I.      PROCEDURAL HISTORY

8.      The Interim Awards recount in detail the procedural history of the arbitrations from their commencement up until the date those Awards were issued.  The Tribunal has also issued 18 procedural orders, each of which contains a relevant procedural history.  In this Part of the Final Award, the Tribunal recalls only the key procedural details from the early phase of the proceedings and summarizes developments since November 2009.

### A.      COMMENCEMENT OF THE ARBITRATION

9.      On 2 November 2004, all three Claimants delivered to the President of Russia notifications of claim with respect to Russia's alleged violation of its obligations under the Energy Charter Treaty ("**ECT**" or "**Treaty**") and sought to settle the disputes amicably pursuant to Article 26(1) of the ECT.[3]

10.     Having failed to settle their disputes amicably within the three-month period prescribed under Article 26(2) of the ECT, on 3 February 2005, Hulley and YUL initiated arbitration proceedings through Notices of Arbitration and Statements of Claim against Respondent.

---

[3]     Energy Charter Treaty, Lisbon, 17 December 1994, 2080 UNTS 95 (hereinafter "ECT" or "Treaty").

Subsequently, through a Notice of Arbitration and Statement of Claim dated 14 February 2005, VPL initiated arbitration proceedings against Respondent. Claimants' requests for arbitration against Respondent were made pursuant to Article 26(4)(b) of the ECT and the Arbitration Rules of the United Nations Commission on International Trade Law, 1976 ("**UNCITRAL Rules**").

11.  Claimants alleged that Respondent had expropriated and failed to protect Claimants' investments in Yukos, resulting in "enormous losses," and sought all available relief in respect of those losses.

B.   **CONSTITUTION OF THE TRIBUNAL**

12.  The history of the constitution of the Tribunal is recounted in detail in the Interim Awards. The Tribunal is composed of Judge Stephen M. Schwebel (appointed by Respondent on 8 April 2005), Dr. Charles Poncet (appointed as a replacement arbitrator by Claimants on 24 September 2007) and The Hon. L. Yves Fortier PC CC OQ QC (appointed as Chairman on 21 July 2005 by the agreed appointing authority, the Secretary-General of the Permanent Court of Arbitration ("**PCA**")).

13.  On 1 August 2005, the Parties agreed on The Hague as the legal seat of the arbitrations.

14.  On 15 October 2005, Respondent submitted its Statements of Defense, in which it objected to the Tribunal's jurisdiction and denied Claimants' allegations of expropriation and unfair and inequitable treatment.

15.  On 31 October 2005, a preliminary procedural hearing was held in The Hague, at which the Parties and members of the Tribunal signed Terms of Appointment confirming, *inter alia*, that: (a) the members of the Tribunal had been validly appointed in accordance with the ECT and the UNCITRAL Rules; (b) the proceedings would be conducted in accordance with the UNCITRAL Rules; (c) the International Bureau of the PCA would act as registry; (d) the dispute would be decided in accordance with the ECT and applicable rules and principles of international law; (e) the language of the arbitration would be English; and (f) all pleadings, documents, testimonial evidence, deliberations and actions taken by the Tribunal would remain confidential in perpetuity, unless the Parties were to release the arbitrators from this obligation. The Tribunal also set a procedural calendar and determined that it would rule on Respondent's

plea concerning jurisdiction and the admissibility of the claim as a preliminary question.  The calendar was confirmed in **Procedural Order No. 1** on 8 November 2005.

C.   PRELIMINARY PHASE ON JURISDICTION AND ADMISSIBILITY

16.   Respondent filed its First Memorials on Jurisdiction and Admissibility on 28 February 2006 and Claimants filed their Counter-Memorials on Jurisdiction and Admissibility on 30 June 2006.

17.   On 8 September 2006, the Tribunal issued **Procedural Order No. 2** dealing with document production.  The Tribunal invited the Parties to agree on whether requests relating to the Parties' respective "unclean hands" contentions and Respondent's contention that the corporate personality of Claimants "must be disregarded" because they are "an instrumentality of a criminal enterprise" should be considered during the jurisdiction and admissibility phase or deferred to the merits phase.

18.   On 31 October 2006, the Tribunal issued **Procedural Order No. 3**, in which it deferred consideration of the Parties' contentions concerning "unclean hands" and Respondent's "criminal enterprise" contention to the merits phase.   On 3 November 2006, Claimants submitted a stipulation of facts, and on 8 November 2006, Respondent submitted its observations on the stipulation.

19.   Between November 2006 and November 2008, the Tribunal issued six further procedural orders relating to the conduct of the jurisdiction and admissibility phase of the arbitrations.  During this period the Parties exchanged two rounds of written submissions on jurisdiction and admissibility, as well as Skeleton Arguments for the hearing.  As noted in the Interim Awards, the written record in the jurisdictional phase contained detailed and extensive filings of hundreds of pages, accompanied by over a thousand exhibits and dozens of witness statements.

20.   The **hearing on jurisdiction and admissibility** was conducted at the Peace Palace in The Hague, from 17 to 21 November, 26 to 29 November and 1 December 2008.

21.   On 30 November 2009, the Tribunal rendered the **Interim Awards**, stating in operative part:

> For the reasons set forth above, the Tribunal:
>
> (a)   DISMISSES the objections to jurisdiction and/or admissibility based on Article 1(6) and 1(7), Article 17, Article 26(3)(b)(i) and Article 45 of the ECT;

(b) DEFERS its decision on the objection to jurisdiction and/or admissibility based on Article 21 of the ECT to the merits phase of the arbitration, consistent with [paragraph numbers], above;

(c) CONFIRMS that its decision on the objections to jurisdiction and/or admissibility involving the Parties' contentions concerning "unclean hands" and Respondent's contention that "Claimant's personality must be disregarded because it is an instrumentality of a criminal enterprise" is deferred to the merits phase of the arbitration, consistent with Procedural Order No. 3;

(d) HOLDS that, subject to the preceding two sub-paragraphs, the present dispute is admissible and within its jurisdiction, and that the Tribunal has jurisdiction over the Russian Federation in connection with the merits of the present dispute;

(e) RESERVES all questions concerning costs, fees and expenses, including the Parties' costs of legal representation, for subsequent determination; and

(f) INVITES the Parties to confer regarding the procedural calendar for the merits phase of the arbitration, and to report to the Tribunal in this respect within 60 days of receipt of this Interim Award.

22. On 4 February 2010, Respondent wrote to the Tribunal "to protest Claimants' counsel's publication of the [Interim Awards] in violation of applicable obligations," noting that the Interim Awards had appeared on various websites.

## D. BIFURCATION AND OTHER SCHEDULING MATTERS

23. On 24 February 2010, the Parties informed the Tribunal that they disagreed as to whether or not to bifurcate the proceedings between a liability and a damages phase, and as to the sequence and timing of document production.  Following an exchange of submissions on these issues, a hearing was held at the International Dispute Resolution Centre in London on 7 May 2010.

24. The Tribunal issued **Procedural Order No. 10** on 13 May 2010, in which it:  (a) decided that documentary discovery would take place in a single phase, after the Parties' first round of written pleadings on the merits; (b) deferred the decision on bifurcation of the proceedings between a liability and a quantum phase and on the issue of referral arising under Article 21 of the ECT until after the Parties' first round of written pleadings on the merits; and (c) fixed a procedural calendar.  The Tribunal specified that the Parties' first round of written pleadings on the merits was to address all issues, including the deferred preliminary questions, liability, quantum and the issue of referral under Article 21 of the ECT.  With respect to documentary discovery, the Tribunal confirmed that some of its earlier rulings on requests relating to "unclean hands" and "criminal enterprise" in the jurisdiction and admissibility phase had been without prejudice to the Parties' ability to restate one or more of these requests in the merits

phase.  The Parties also agreed for each filing that they would submit one brief and one set of exhibits for all three cases.

25.  In accordance with Procedural Order No. 10 (as amended by the Tribunal on 23 June 2010), Claimants filed their Memorial on the Merits ("**Memorial**") on 16 September 2010.  It spanned 424 pages and was accompanied by 1045 exhibits, nine witness statements and two expert reports (with annexures).  On 17 November 2010, further to a request by Respondent, Claimants provided an electronic copy of the appendices to the report of Claimants' damages expert.

26.  On 4 November 2010, Respondent informed the Tribunal that Baker Botts LLP was joining Cleary Gottlieb Steen & Hamilton LLP as Respondent's counsel in these arbitrations.

27.  Respondent filed its Counter-Memorial on the Merits ("**Counter-Memorial**") on 4 April 2011 and submitted a corrected version on 29 July 2011.  The Counter-Memorial spanned 787 pages and was accompanied by 2868 exhibits and eight expert reports (some with annexures).

28.  On 29 April 2011, the Parties filed their respective submissions on the bifurcation of the proceedings and the issue of referral arising under Article 21 of the ECT.  A hearing on these matters was held at the Church House Conference Centre in London on 9 May 2011.

29.  On 31 May 2011, the Tribunal issued **Procedural Order No. 11**, in which it:  (a) denied Respondent's request that the proceedings be bifurcated between a liability and a damages phase; (b) reserved its decision on referral under Article 21(5)(b)(i) of the ECT to a later stage of the proceedings, when the evidentiary record would be completed; and (c) ordered the Parties to proceed in accordance with the amended procedural calendar.

**E.  DOCUMENT PRODUCTION AND CONFIDENTIALITY**

30.  The Parties exchanged requests for documents on 17 June 2011 and the following month exchanged objections and comments on objections to the document requests.  Respondent also requested an oral hearing on disclosure issues and repeated a request for more time to file its Rejoinder.

31.  On 11 August 2011, the Tribunal ruled on certain procedural aspects of document production and the timing of submissions, and informed the Parties that it "considered then, as it does

today, that the Amended Procedural Calendar is in compliance with the requirement of due process and equality between the parties taking into account all the circumstances."

32.    On 16 September 2011, the Tribunal issued **Procedural Order No. 12**, in which it ruled on the Parties' document requests (with some rulings being "without prejudice" to a further decision after the reply rounds of written submissions).

33.    By letter of 23 September 2011, Respondent informed the Tribunal that the European Court of Human Rights ("**ECtHR**") had, on 20 September 2011, issued a judgment in *OAO Neftyanaya Kompaniya Yukos v. Russia* ("**ECtHR Yukos Judgment**"),[4] which addressed the "same circumstances" on which Claimants' claims in these arbitrations are based.

34.    On 16 December 2011, Claimants produced documents pursuant to Procedural Order No. 12. Respondent did not produce documents, but wrote to the Tribunal, expressing concern that Claimants had provided no assurance that documents collected for disclosure would be kept confidential and used only for the purposes of these arbitrations.  Respondent requested the Tribunal to issue a directive "requiring the Parties to protect the confidentiality of all documents disclosed by the other, using them solely for purposes of these arbitrations." Claimants objected to Respondent's "eleventh hour" request for a confidentiality order.

35.    On 19 December 2011, the Tribunal ordered Respondent to provide by the end of that day documents to Claimants that had been ordered to be produced in Procedural Order No. 12, requested written submissions on confidentiality and directed that until it decided the confidentiality issue, the documents produced by both Parties were to remain confidential and be used solely for purposes of these arbitrations.  Pursuant to the Tribunal's directive, Respondent produced documents on 19 December 2011.

36.    On 18 January and 2 February 2012, the Parties exchanged submissions on the scope of confidentiality of the documents produced.  From January to May 2012, the Parties exchanged extensive correspondence concerning compliance with Procedural Order No.12.

37.    On 27 February 2012, the Tribunal issued **Procedural Order No. 13**, in which it:  (a) ordered that all documents produced by a Party to the other Party and the Tribunal following an order of the Tribunal "be and remain confidential in perpetuity" and "be used solely for the purpose of

---

[4]    *OAO Neftyanaya Kompaniya Yukos v. Russia*, ECtHR, Appl. No. 14902/04, Judgment, 20 September 2011, Exh. R-3328, (hereinafter "ECtHR Yukos Judgment").

the pursuit or defense of these arbitrations and not for any other purpose;" (b) listed the persons involved in these arbitrations to whom these documents could be disclosed; and (c) invited the Parties to refrain from discussing these arbitrations in public in order not to exacerbate their dispute or otherwise compromise the integrity of these arbitration proceedings.

38.   Claimants filed their Reply on the Merits ("**Reply**") on 15 March 2012.  It spanned 474 pages and was accompanied by a further 629 exhibits and two expert reports (with annexures).

39.   On 30 April 2012, the Tribunal issued **Procedural Order No. 14**, granting some of Respondent's document production requests which had earlier been denied "without prejudice" in Procedural Order No. 12.  Claimants produced documents pursuant to Procedural Order No. 14 on 29 May 2012.  On 29 June 2012, Respondent produced additional documents "in accordance with the parties' continuing obligation to disclose requested documents as they are discovered" under Procedural Order No. 12.  Throughout June and July 2012, the Parties exchanged extensive correspondence as to whether that was in violation of Procedural Order No. 12.

40.   On 16 August 2012, Respondent filed its Rejoinder on the Merits ("**Rejoinder**").  It spanned 819 pages and was accompanied by 1739 exhibits and seven expert reports (with annexures).

### F.   HEARING ON THE MERITS

41.   On 28 August 2012, a pre-hearing telephone conference took place during which the Parties agreed on a number of issues, but disagreed on others.  For example, Respondent requested that the Tribunal set a deadline for the exchange between the Parties of witness "impeachment" evidence prior to the Hearing on the Merits, while Claimants raised several "due process" issues and requested permission to file written submissions in support of their requests.  The Parties then exchanged written comments on these issues.

42.   By exchange of letters dated 10 September 2012, Claimants provided the names and order of three Respondent witnesses they wished to cross-examine and Respondent advised the names and order of ten of Claimants' witnesses whom it wished to cross-examine.

43.   On 12 September 2012, the Tribunal issued **Procedural Order No. 15** dealing with logistical and procedural issues for the Hearing on the Merits.

44.   On 14 September 2012, the Tribunal issued **Procedural Order No. 16**, in which it determined the outstanding procedural issues for the Hearing on the Merits, *inter alia* (a) denying

Respondent's requests relating to the exchange of "impeachment" evidence (noting that "in international arbitration practice, documents used at an evidentiary hearing should generally be submitted with the Parties' written pleadings, in accordance with the established procedural calendar"); and (b) granting Claimants permission to file certain documents that would "complete the record" in relation to selected exhibits that Respondent had included in its Rejoinder.

45. Claimants filed additional exhibits on 20 September 2012.  On 25 September 2012, Respondent objected to certain of these exhibits on the grounds that they exceeded the scope of Procedural Orders No. 15 and 16.  Following an exchange of views by the Parties, the Tribunal ruled on Respondent's objection in **Procedural Order No. 17** dated 2 October 2012.

46. On 1 October 2012, the Parties submitted their respective **Skeleton Arguments** in aid of the oral arguments to be presented at the Hearing on the Merits.

47. On 4 October 2012, Respondent advised that it no longer intended to cross-examine one of Claimants' tax law experts, Mr. Philip Baker QC.  The same day Claimants withdrew the witness statement of former Russian Prime Minister, Mr. Mikhail Kasyanov, which had been submitted with the Memorial, on the ground that Mr. Kasyanov had informed Claimants' counsel that "he will not appear at the hearing in these arbitrations."

48. On 8 October 2012, Claimants advised that they no longer intended to cross-examine one of Respondent's tax law experts, Professor Rosenbloom.

49. The **Hearing on the Merits** took place at the Peace Palace, The Hague from 10 October to 9 November 2012.  Over the course of the Hearing, the following were in attendance:

**Tribunal**
The Hon. L. Yves Fortier PC CC OQ QC
Dr. Charles Poncet
Judge Stephen M. Schwebel

| **Claimants** | **Respondent** |
|---|---|
| *Counsel* | *Counsel* |
| Professor Emmanuel Gaillard | Dr. Claudia Annacker |
| Dr. Yas Banifatemi | Mr. Lawrence Friedman |
| Mr. Philippe Pinsolle | Mr. David Sabel |
| Ms. Jennifer Younan | Mr. Matthew Slater |
| Dr. Paschalis Paschalidis | Mr. William McGurn |
| Mr. Ilija Mitrev Penusliski | Mr. Jay Alexander |
| Ms. Kamalia Mehtiyeva | Mr. Samuel Cooper |
| Mr. Gueorgui Babitchev | Mr. Michael Goldberg |
| Mr. Emmanuel Jacomy | Mr. Cameron Murphy |

Mr. Scott Vesel
Ms. Ximena Herrera-Bernal
Ms. Elise Edson
Ms. Ketevan Betaneli
Ms. Coralie Darrigade
Mr. Thomas Voisin
Mr. Dimitrios Katsikis
Mr. Benjamin Siino
Mr. Jean-Marc Elsholz
Ms. Gracia Angulo Duncan
Mr. Benoit Arnauld
Ms. Nanou Leleu-Knobil

*Party Representatives*
Mr. Tim Osborne
Mr. Christopher Cook
Mr. Rodney Hodges

**Claimants' Witnesses**
*Fact Witnesses*
Mr. Vladimir Dubov
Dr. Andrei Illarionov
Mr. Jacques Kosciusko-Morizet
Mr. Bruce Misamore
Mr. Leonid Nevzlin
Mr. Frank Rieger
Mr. Steven Theede

*Expert*
Mr. Brent Kaczmarek

**Assistant to the Tribunal**
Mr. Martin Valasek

**Permanent Court of Arbitration**
Mr. Brooks W. Daly, Secretary to the Tribunal
Ms. Judith Levine, Assistant Secretary to the Tribunal
Ms. Olga Boltenko
Ms. Evgeniya Goriatcheva
Ms. Hinda Rabkin
Ms. Elsa Sardinha

**Interpreters**
Mr. Yuri Somov
Mr. Ilya Feliciano

**Court Reporter**
Mr. Trevor McGowan

Ms. Laurie Achtouk-Spivak
Ms. Marina Akchurina
Mr. Yury Babichev
Mr. Nowell Bamberger
Mr. Adam Bryan
Ms. Chiara Capalti
Ms. Ania Farren
Ms. Giulia Gosi
Mr. Michael Jacobsohn
Mr. Magnus Jones
Mr. Lorenzo Melchionda
Mr. Milo Molfa
Ms. Sara Nadeau-Seguin
Ms. Daria Pavelieva
Mr. Jacopo Roberti di Sarsina
Ms. Teale Toweill
Ms. Marina Weiss
Mr. Larry Work-Dembowski

*Party Representatives*
Mr. Konstantin Vyshkovskiy
Ms. Maria Maslyakova

**Respondent's Witnesses**
*Experts*
Professor James Dow
Mr. Oleg Y. Konnov

50.   On behalf of Claimants, oral arguments were presented by Dr. Yas Banifatemi, Professor Emmanuel Gaillard, Mr. Philippe Pinsolle and Ms. Jennifer Younan.  On behalf of Respondent, oral arguments were presented by Dr. Claudia Annacker, Mr. Lawrence Friedman, Mr. David Sabel and Mr. Matthew Slater.

51.   During the Hearing, on 14 October 2012, the Parties filed brief written submissions on a document production request made by Respondent in follow up to Procedural Order No. 14.  On 15 October 2012, the Tribunal ruled that the time for document production requests had passed, and noted that Respondent was free to ask the Tribunal to draw adverse inferences from any alleged non-compliance by Claimants with the Tribunal's document production orders.

### G.   POST-HEARING PROCEDURES

52.   At the close of the Hearing on 9 November 2012, the Tribunal directed the Parties to submit Post-Hearing Briefs of no more than 100 pages by 21 December 2012.  On 13 November 2012, the Tribunal confirmed that the Post-Hearing Briefs were to be prepared on the basis of a closed evidentiary record as at 9 November 2012.

53.   During November 2012, the Parties provided electronic copies of all additional materials relied upon during the Hearing, demonstrative exhibits and slides from arguments.  They also submitted agreed and contested corrections to the transcript to the court reporter, who in turn circulated amended transcripts on 11 December 2012.

54.   On 21 December 2012, the Parties filed their **Post-Hearing Briefs** spanning 100 pages each.

55.   On 1 August 2013, the Tribunal invited the Parties to comment on a judgment issued on 25 July 2013 by the ECtHR.[5]

56.   On 30 August 2013, the Parties submitted their comments on the ECtHR judgment.

57.   On 26 September 2013, Respondent drew the Tribunal's attention to developments in two other international arbitrations against the Russian Federation connected with Yukos.  Claimants submitted comments in response on 8 October 2013.

58.   On 10 January 2014, the Tribunal sent a letter to the Parties noting that Mr. Mikhail Khodorkovsky, former CEO of Yukos, had been pardoned and released from prison, and inviting the Parties to submit their observations on the impact, if any, of these developments on the present arbitral proceedings.  The Parties submitted their comments in response on 24 January 2014, and further observations in reply on 4 February 2014.

---

[5]   *Khodorkovskiy (2) and Lebedev (2) v. Russia*, ECtHR, Appl. Nos. 11082/06 and 13772/05, Judgment, 25 July 2013, (hereinafter "*Khodorkovsky v. Russia 2*").

59.     The Parties filed their costs claims on 17 April 2014, and submitted comments on the opposing side's costs claims on 6 May 2014.

60.     On 7 May 2014, the Tribunal formally declared the record in these arbitrations closed.

61.     On 9 June 2014, Respondent informed the Tribunal that it was prepared to agree that the Final Awards may be publicly disclosed under certain conditions.  Respondent also requested that the Tribunal modify its Procedural Order No. 13 to lift confidentiality restrictions with respect to documents disclosed in the course of these proceedings, to allow them to be used in "related proceedings" recently commenced against the Russian Federation.  Claimants submitted comments in response on 16 June 2014, and Respondent further commented on 20 June 2014.

62.     On 27 June 2014, the Tribunal issued **Procedural Order No. 18** in which it:  (a) ordered that these Final Awards remain confidential for a period of ten calendar days following electronic dispatch to the Parties, after which period the PCA would post the Final Awards to its website and so notify the Parties and the Tribunal, whereupon all confidentiality obligations in respect of the Final Awards shall terminate; and (b) modified Procedural Order No. 13 to provide for limited disclosure of documents in related proceedings.

## II.     FACTUAL BACKGROUND

63.     The disputes between the Parties to the present proceedings involve various measures taken by Respondent against Yukos and associated companies primarily in the period between July 2003 and November 2007, when Yukos had emerged after the dissolution of the Soviet Union to become the largest oil company in the Russian Federation.  The measures complained of include criminal prosecutions, harassment of Yukos, its employees and related persons and entities; massive tax reassessments, VAT charges, fines, asset freezes and other measures against Yukos to enforce the tax reassessments; the forced sale of Yukos' core oil production asset; and other measures culminating in the bankruptcy of Yukos in August 2006, the subsequent sale of its remaining assets, and Yukos being struck off the register of companies in November 2007.  Claimants contend, and Respondent denies, that Respondent failed to treat Claimants' investments in Yukos in a fair and equitable manner and on a non-discriminatory basis, in breach of Article 10(1) of the ECT, and that Respondent expropriated Claimants' investments in breach of Article 13(1) of the ECT.  Claimants seek full reparation in excess of USD 114 billion.

64.     The factual matrix of this case is complex.   A detailed exposition of the relevant facts, including specific references to the record, is set out for each part of the narrative in Part VIII (broken down into eight chapters, starting with Yukos' tax optimization scheme and the Russian Federation's tax assessments against Yukos and ending with the bankruptcy of Yukos and the withdrawal of audit opinions by PricewaterhouseCoopers ("**PwC**")).   It is also in Part VIII that the Tribunal makes determinations in respect of the many highly contested issues of fact and observations on the significance of various facts and findings.   By contrast, the purpose of the introductory overview of the facts contained in this Part II of the Award is only to provide sufficient background for what follows.

### A.     THE PARTIES TO THESE PROCEEDINGS

#### 1.     Claimants and Related Entities

65.     The three Claimants in these related cases are all part of the Yukos group of companies, which had at its center Yukos, headed by Chief Executive Officer Mr. Mikhail Khodorkovsky.

66.     Claimant in PCA Case No. AA 226, Hulley, was incorporated in the Republic of Cyprus on 17 September 1997 and was a 100 percent owned subsidiary of YUL.

67.     Claimant in PCA Case No. AA 227, YUL, was incorporated on 24 September 1997 in the Isle of Man (a Dependency of the United Kingdom).

68.     Claimant in PCA Case No. AA 228, VPL, was incorporated in the Republic of Cyprus on 7 February 2001.

69.     Hulley held approximately 56.3 percent, YUL held approximately 2.6 percent and VPL held approximately 11.6 percent of the outstanding shares in Yukos.   Collectively therefore, Claimants approximately had a 70.5 percent shareholding in Yukos.

#### 2.     Respondent

70.     Respondent in these three arbitrations is the Russian Federation.

### B.     OAO YUKOS OIL COMPANY

71.     After the dissolution of the Soviet Union, Yukos was incorporated as a joint stock company in 1993 by Presidential Decree.   Fully privatized in 1995–1996, it was a vertically integrated

group engaging in exploration, production, refining, marketing and distribution of crude oil, natural gas and petroleum products.  Its three main production subsidiaries were Yuganskneftegaz ("**YNG**"), Samaraneftegaz and, from 1997, Tomskneft.

72.  In May 2002, Yukos became the first Russian company to be ranked among the top ten largest oil and gas companies by market capitalization worldwide.  In the fourth quarter of 2002, Claimants submit that Yukos became the largest oil company in Russia in terms of daily crude oil production.

73.  At its peak in 2003, it had around 100,000 employees, six main refineries and a market capitalization estimated at over USD 33 billion.  According to Claimants, after its projected 2003 merger with then Russia's fifth largest oil company Sibneft ("**Sibneft**"), YukosSibneft would have become the fourth largest private oil producer worldwide, behind BP, Exxon and Shell.  At the time of Respondent's alleged adverse actions in the summer of 2003, Yukos was engaged in negotiations with ExxonMobil and ChevronTexaco for a merger or other form of business combination.  Claimants contend that this level of success was the result of efforts to modernize Yukos' operations and implement Western business practices.  According to Claimants, Yukos' success and the increasing social and economic influence gained by its management—including financial support given by Mr. Khodorkovsky to opposition parties— were perceived as a political threat by the Russian authorities and accordingly Yukos would fall from grace and be targeted for destruction.  Respondent, however, contends that Yukos was a "criminal enterprise", engaged in a variety of tax evasion schemes and other fraudulent activities.

## C.   THE RUSSIAN LOW-TAX REGION PROGRAM

74.  The low-tax region program was established in the 1990s to foster economic development in impoverished areas of the Russian Federation.  The Russian low-tax regions were permitted to exempt taxpayers from federal corporate profit tax for the purpose of fostering taxpayers' investments in the low-tax regions, provided the taxpayer complied with certain requirements.

75.  The Russian low-tax regions that are relevant to Yukos' "tax optimization" scheme include:

- Closed Administrative Territorial Units (known as "**ZATOs**"):  Lesnoy and Trekhgorniy; and

- Other low-tax regions:  Mordovia, Kalmykia and Evenkia.

76.   With respect to the tax benefits available in the ZATOs (Lesnoy and Trekhgorniy), in 1999, the ZATOs were permitted to exempt taxpayers fully from federal corporate profit tax.  In 2000, most ZATOs were permitted to exempt taxpayers from the portion of the federal corporate profit tax that was payable to their budget (*e.g.*, up to 19 percent).  In 2001, all ZATOs were permitted to exempt taxpayers from the portion of the federal corporate profit tax that was payable to their budget (*e.g.*, also up to 19 percent).  In 2002, however, these exemptions were revoked.

77.   With respect to the tax benefits available in other low-tax regions, in 2000 and 2001, Mordovia, Kalmykia and Evenkia were permitted to exempt taxpayers fully from the portion of the federal corporate profit tax that was payable to their budget (*e.g.*, from up to 19 percent to zero percent). From 1 July 2002 until 31 December 2003, low-tax regions were permitted to exempt taxpayers from the portion of the federal corporate profit tax payable to their budget, but only up to four percent.  An exception existed for 'grandfathered' tax investment agreements entered into prior to 1 July 2001, such that these taxpayers could still receive a zero percent profit tax rate if they fulfilled certain other conditions.  As of 1 January 2004, the existing tax investment agreements were terminated, but the Tax Code of the Russian Federation (the "**Russian Tax Code**") still allowed low-tax regions to reduce the federal corporate profit tax payable to their budget up to four percent.

78.   Respondent contends that Yukos' restructuring of its trading operations from high-tax jurisdictions, such as Moscow and Nefteyugansk, to trading companies incorporated in the low-tax jurisdictions of Lesnoy, Trekhgorny, Mordovia, Kalmykia and Evenkia was aimed at evading taxes, rather than to achieve any genuine economic result.  Respondent alleges that Yukos interposed between Yukos and its customer its "sham" trading shells registered in Russian low-tax regions.  Yukos' oil producing subsidiaries sold the extracted oil to the trading companies at a fraction of the market price.  The trading companies then sold the oil either abroad at a market price or to Yukos' refineries, and subsequently re-bought it at a reduced price and re-sold it at the market price.  Respondent asserts that prices increased step by step from sham shell to sham shell, generating artificially inflated profits through non-armslength transactions.  Those profits were then taxed at reduced rates in the low-tax regions, where the sham trading shells were registered.  Respondent contends that the tax authorities identified abuses by the Lesnoy trading shells, which resulted in further investigations and, ultimately, in the tax assessments against Yukos and related proceedings.

79.     Claimants contend that Yukos, like other Russian companies at that time, was merely taking advantage of the legislation in place in the low-tax regions. Claimants assert that any findings of "abuse" by the Russian tax authorities was a function of the arbitrary and unpredictable interpretations of the law in Russia.

80.     The details of the Russian low-tax region program and Yukos' tax optimization scheme are set out more comprehensively in Chapter VIII.A of this Award.

### D.    CRIMINAL PROCEEDINGS

81.     Starting in July 2003, a series of criminal investigations were initiated by the Russian Federation against Yukos management and activities.  According to Claimants, these actions included the "targeting" of Yukos' employees, auditor PwC, in-house counsel, lawyers involved in various Yukos-related cases, as well as searches and seizures, threats to revoke its oil licenses, and mutual legal assistance requests and extradition proceedings against Yukos management.   Claimants characterize these actions as harassment, motivated by Mr. Khodorkovsky's participation in Russian opposition politics, that were intended—together with tax reassessments—to lead to the expropriation of Yukos' assets.  Respondent contends that its actions were in response to illegal acts committed by Yukos and its officers and shareholders.

82.     Between July and October 2003, three key Yukos officers were arrested.  In July 2003, Mr. Platon Lebedev, Director of Hulley and YUL, was arrested on charges of embezzlement and fraud; he was sentenced to nine years in prison in May 2005.  In October 2003, Mr. Vasily Shakhovsky, President of Yukos-Moscow, was charged with and later convicted of tax evasion. In October 2003, Mr. Khodorkovsky himself was arrested and charged with crimes including forgery, fraud and tax evasion; he was also sentenced to a nine-year prison term in May 2005. As a result of these arrests, a number of high-ranking Yukos executives fled Russia, such as Mr. Leonid Nevzlin, Deputy Chairman of the Yukos Board of Directors until 2003.   On 2 February 2007, new charges of embezzlement and money laundering were brought against Messrs. Khodorkovsky and Lebedev, leading to further convictions in December 2010. Messrs. Khodorkovsky and Lebedev were each imprisoned for over a decade.

83.     Claimants contend that by April 2006, no fewer than 35 top managers and employees of Yukos had been interrogated, arrested or sentenced, and that lawyers acting for Yukos had been obstructed in their work.  During the same period, Russian authorities conducted searches,

seizures and interrogations of Yukos property and personnel.  Claimants contend that all of these actions amounted to harassment and intimidation, that they deprived Yukos' management of the ability to manage and control Yukos as a business, and that the underlying motive was to expropriate Yukos' assets.

84.   Respondent contends that in addition to participation in tax fraud schemes, Yukos participated in a massive transfer pricing scheme by which hundreds of millions of dollars from the sales of oil and other products were illegally siphoned off to offshore entities for the benefit of Khodorkovsky/Lebedev and other controlling Russian "Oligarchs".[6]

85.   Respondent also contends that Yukos officials have been engaged in violent crimes, such as the murder, attempted murder and assault of persons seeking to enforce Russian tax laws or otherwise perceived to threaten Yukos interests.  Claimants deny Respondent's allegations of criminal acts as well as acts of tax evasion.

86.   Respondent denies that Yukos and its officers were targeted in a discriminatory way, contending that Russian taxation measures have also applied to other offenders and that the searches and seizures were taken as part of legitimate taxation measures and conducted in accordance with normal Russian practice and the appropriate procedural protections available under Russian law.

87.   The particulars of Claimants' allegations concerning harassment, intimidation and arrests are presented in Chapter VIII.C of this Award.

E.   **ADDITIONAL MEASURES**

88.   In the period between October 2003 and December 2004, Yukos and its subsidiaries faced a series of major setbacks, including the alleged frustration of its merger with Sibneft, hefty tax reassessments, fines, VAT exactions, the freezing of shares and assets, the threatened revocation of licenses, and the forced sale of Yukos' main oil production subsidiary, YNG.  These measures were followed by the bankruptcy of Yukos in August 2006.

---

[6]   Respondent's Counter-Memorial on the Merits dated 4 April 2011, as corrected 29 July 2011, p.1 n.1 (hereinafter "Counter-Memorial"): Respondent employs the term "Oligarchs" throughout its pleadings to refer to Messrs. Khodorkovsky, Lebedev, Nevzlin, Dubov, Brudno, Shakhnovsky, Golubovitch; the individual owners standing behind Claimants (hereinafter the "Oligarchs").

### 1.     Alleged Frustration of Merger Between Yukos and Sibneft

89.    In October 2003, a merger was about to be completed between Yukos and Sibneft, Russia's fifth largest oil company.  According to Claimants, the resulting entity, YukosSibneft, would have become the world's fourth largest oil company.  In November 2003, however, after Yukos had already acquired 92 percent of Sibneft's shares as part of the merger and after the arrest of Mr. Khodorkovsky, Sibneft's controlling shareholder, Mr. Roman Abramovich, called off the merger process and the transactions were then unwound by a series of court decisions.  Further details are included in Chapter VIII.D of this Award.

### 2.     Tax Reassessments for Years 2000–2004

90.    On 28 April 2003, the Tax Ministry issued a Field Tax Audit Report for the years 2000 and 2001 that raised no questions concerning Yukos' tax optimization structure.  On 1 September, 1 October and 1 November 2003, the Tax Ministry issued certificates confirming that Yukos had no outstanding debts.

91.    On 8 December 2003, the Tax Ministry ordered a tax re-audit of Yukos for the year 2000.  On 29 December 2003, the tax authorities of the Russian Federation issued the first of five tax assessments against Yukos that were based on the alleged abuse by Yukos of its tax optimization scheme.

92.    The Tax Ministry demanded payment from Yukos for approximately USD 3.5 billion for 2000, which was largely upheld by the Moscow Arbitrazh Court.  Similarly large tax reassessments were issued in the period between 2004 and 2006 for subsequent tax years.  2001 taxes were re-assessed in the amount of approximately USD 4.1 billion, 2002 taxes in the amount of approximately USD 6.8 billion, 2003 taxes in the amount of approximately USD 6.1 billion, and 2004 taxes in the amount of approximately USD 3.7 billion.  By the time the Tax Ministry issued the last of these demands, Yukos faced a tax bill of more than USD 24 billion, of which approximately USD 10.6 billion constituted allegedly evaded revenue-based taxes (including interest and fines), and the remainder (approximately USD 13.6 billion) comprised of VAT and related, interest and fines.

93.    Respondent contends that the reassessments were a consequence of Yukos' activities relating to the tax fraud scheme.  Claimants submit, however, that the reassessments were so excessive that the Russian authorities' strategy of destroying Yukos became plain.

94.  At the same time that tax reassessments were being filed against Yukos and its subsidiaries, Russian authorities began freezing shares and other assets belonging to Yukos and related entities.  In October 2003, Russian prosecutors froze shares held by YUL and Hulley in Yukos.  Orders issued by the Moscow Arbitrazh Court in April and June 2004 prevented Yukos from disposing of its assets.  An application by Yukos in July 2004 to have sufficient assets released to meet its tax liabilities was ignored and a surcharge of approximately USD 240 million was applied for late payment of taxes.  Claimants also maintain that Yukos' numerous proposals throughout this period to settle the tax claims were ignored or rejected by the Russian authorities, despite the fact that the government settled with taxpayers in several other cases.

95.  In July 2004, Russian authorities began seizing Yukos' shares in YNG, Samaraneftegaz and Tomskneft.  YNG bank accounts were also frozen.  The Russian authorities also used mutual legal assistance treaties to affect Yukos' interests abroad.

96.  Respondent does not dispute the freezing of Yukos' assets but contends that freezing assets of a debtor, including shares owned by it, is a standard enforcement measure for tax levies and judgments.  Respondent maintains that its freezing orders did not cover all of the assets of Yukos in Russia and that Yukos remained in possession of large assets abroad.

97.  The details of the tax assessments against Yukos and of Yukos' attempts to settle the tax claims are set out in Chapters VIII.B and VIII.E, respectively.

### 3.  Auction of YNG

98.  In July 2004, the Russian Federation indicated that it intended to appraise and sell YNG to pay off Yukos' back taxes.  A valuation carried out by investment bank ZAO Dresdner Bank ("**Dresdner**") at the request of the Russian Federation valued YNG at between USD 15.7 billion and USD 18.3 billion.  A valuation carried out by JP Morgan, at the request of Yukos, valued YNG at between USD 16 billion and USD 22 billion.  The Russian Ministry of Justice announced that YNG was worth USD 10.4 billion.

99.  After Yukos' attempts to enjoin the sale of YNG by legal recourse in the United States failed, YNG was sold at auction on 19 December 2004 for USD 9.37 billion to sole bidder and newly incorporated entity, Baikal Finance Group ("**Baikal**"), which was quickly bought by Russian State-owned Rosneft ("**Rosneft**").

- 19 -

100.  Further particulars on this aspect of the case are presented in Chapter VIII.F of this Award.

### 4.     Bankruptcy Proceedings

101.  Claimants allege that the Russian Federation first reported in March 2005 that it intended to "push Yukos into bankruptcy in order to redistribute its remaining assets."  On 6 March 2006, a syndicate of foreign bank creditors of Yukos filed a bankruptcy petition before the Moscow Arbitrazh Court, pursuant to a Confidential Sale Agreement with Rosneft (the "**Confidential Sale Agreement**").  YNG—then owned by Rosneft—filed a separate bankruptcy petition against Yukos, which was subsequently joined to that of the bank syndicate.  On 28 March 2006, bankruptcy proceedings were commenced against Yukos, placing it under external supervision, and on 4 August 2006, Yukos was declared bankrupt.

102.  Yukos' remaining assets were nearly all acquired by State-owned Gazprom and Rosneft, with the bankruptcy auctions raising a total of USD 31.5 billion.  In November 2007, Yukos was liquidated and struck off the register of legal entities.

103.  The specifics relating to Yukos' bankruptcy are set out in Chapter VIII.G of this Award.

### 5.     Withdrawal of PwC's Audits

104.  In June 2007, PwC (which had served as both auditor and consultant to Yukos starting in 1997) withdrew all of its audits of Yukos from 1995 to 2004.

105.  This final aspect of the factual matrix is treated in detail in Chapter VIII.H of this Award.

## III.  PARTIES' WRITTEN SUBMISSIONS

106.  As indicated in the Procedural History above, the Parties submitted two rounds of memorials on the merits.  Each side took full advantage of the written phase of these proceedings, filing detailed and extensive written submissions.  Claimants' Memorial runs to 424 pages and was accompanied by 1045 exhibits and 12 witness statements.  Respondent's Counter-Memorial is 787 pages long, and was accompanied by 2868 exhibits and 8 witness statements.  Claimants' Reply runs to 474 pages, and was accompanied by over 600 further exhibits.  Finally, Respondent's Rejoinder runs to 819 pages, and was submitted with over 1700 further exhibits and seven witness statements.  The Parties filed Post-Hearing Briefs of over 100 pages.

Throughout the arbitration the Parties filed extensive written submissions on various procedural issues.

107.  The Tribunal studied these submissions carefully.   The Parties' principal arguments are re-stated in the Tribunal's analysis of the issues in Parts VIII to XIII below.  For the purposes of introduction, the Tribunal reproduces below *verbatim* the written "skeleton arguments" that the Parties submitted prior to the Hearing on the Merits at the Tribunal's request.

## A.   CLAIMANTS' SKELETON ARGUMENTS

108.  The text of the paragraphs below is produced directly from paragraphs 1 to 82 of Claimants' Skeleton Argument submitted on 1 October 2012 ("**Claimants' Skeleton**")( footnotes omitted).

### I.   INTRODUCTION

1.  The dispute between the Parties arises from the various actions taken by the Russian Federation against Yukos Oil Company ("Yukos" or the "Company") and related persons and entities, which culminated in the expropriation of the Company for the exclusive benefit of the Russian State and State-owned entities, thereby destroying the Claimants' investments in Yukos.  As the Claimants have demonstrated, by (i) failing to treat the Claimants' investments in Yukos in a fair and equitable manner and on a non-discriminatory basis, and (ii) expropriating the Claimants' investments therein, the Russian Federation breached its obligations under Articles 10(1) and 13(1) of the Energy Charter Treaty ("ECT"), respectively, for which the Claimants are entitled to full reparation.

2.  The Claimants' positions on the merits are described in detail in their written submissions. This skeleton argument summarizes, for the benefit of the Tribunal, the Claimants' principal arguments, with reference to key supporting materials. It does not replace or supplement those submissions, nor is it a substitute for oral argument.

### II.   FACTUAL BACKGROUND

3.  The various actions taken by the Russian Federation against Yukos, and related persons and entities, were aimed at the destruction and expropriation of the Company.  The expropriation of Yukos was achieved in 3 overlapping steps: *first*, the paralysis of the Company (A); *second*, the manufacturing of a pretext for the taking of the Company's assets, namely, the fabrication of debt (B); *finally*, the use of that pretext to take Yukos' assets piece by piece, including its most valuable asset, Yuganskneftegaz, and transfer them to the State-owned companies Rosneft and Gazprom (C).  Each of these steps was accompanied by serious due process violations.  The result was the liquidation of Yukos in November 2007, and the complete and total deprivation of the Claimants' investments therein.

#### A.   PARALYSIS OF YUKOS

4.  Prior to the Russian Federation's attack, Yukos was a flourishing oil company.  In May 2002, it was the only Russian company to be ranked among the top 10 largest oil and gas companies by market capitalization worldwide.  In the fourth quarter of 2002, it became the largest oil company in Russia in terms of daily crude oil production.  In October 2003, it completed its merger with Sibneft, another of

Russia's leading oil companies, creating the world's fourth largest private oil producer, behind BP, ExxonMobil and Shell. Yukos was also engaged in advanced discussions with American oil majors, ExxonMobil and ChevronTexaco, in relation to a merger or other form of business combination. This success was the result of concerted efforts to modernize the Company and implement Western business practices.

5.    Starting in the summer of 2003, the Russian Federation took a series of actions aimed at undermining the ability of the Company's management to run the business. These included: (i) the arrests of Messrs. Lebedev and Khodorkovsky, Yukos' CEO; (ii) the targeting, intimidation and/or prosecution of other high-ranking Yukos managers, employees and related persons; (iii) the harassment, prosecution and/or arrest of Yukos' in-house counsel and lawyers involved in various Yukos-related cases; (iv) the conduct of widespread and aggressive searches and seizures; (v) the seizure of the Claimants' shares in Yukos; (vi) the threats to revoke Yukos' oil licenses; (vii) the numerous mutual legal assistance requests and extradition proceedings to affect Yukos and entities/persons associated with the Company abroad; and (viii) the targeting and harassment of Yukos' auditor, PwC. These actions were taken in violation of the most basic standards of due process and fair treatment.

6.    Contrary to the Respondent's allegations, the actions described above deprived Yukos' management of the ability to manage and control the Company, thereby facilitating its dismantling and ultimate destruction. One early casualty of the Russian Federation's attack on Yukos was the YukosSibneft merger.

**B.    MANUFACTURING A PRETEXT — THE FABRICATION OF DEBT**

### 1.    The fabrication of massive tax claims against Yukos for the years 2000-2004

7.    In December 2003, the Russian Federation's campaign against Yukos entered into a new phase with the fabrication of massive tax claims against the Company.

8.    On December 8, 2003, 6 weeks after Mr. Khodorkovsky's arrest, the Tax Ministry ordered a tax re-audit of Yukos for the year 2000. Only 3 weeks later, it issued a Field Tax Audit Report exceeding 100 pages in length and proposing to collect from Yukos US$ 3.4 billion in alleged tax arrears, interest and fines on the purported basis that the use of regional tax incentives by Yukos trading companies constituted unlawful tax evasion by Yukos itself.

9.    The December 2003 re-audit of Yukos was extraordinary in many respects. Less than 8 months earlier, on April 28, 2003, the Tax Ministry had issued a Field Tax Audit Report for the years 2000 and 2001 that raised no questions concerning Yukos' tax optimization structure.   That audit had taken 5 months to conduct, followed by 2 months for drafting the report. On several occasions after this audit, including on September 1, October 1 and November 1, 2003, the Tax Ministry confirmed that Yukos had no outstanding tax debts.   Prior tax audits of the Mordovian trading companies likewise raised no major concerns and specifically found their use of regional tax incentives to be lawful.

10.    The Respondent alleges that the Russian authorities lacked knowledge of Yukos' tax optimization structure and only "discovered" its allegedly abusive features in the course of the 3-week audit carried out in December 2003.  This allegation is not credible.  As the record demonstrates, the Russian authorities had long been aware of Yukos' practices, and the Respondent has failed to identify a single piece of material information relevant to the alleged tax claims that it lacked prior to the December 2003 repeat audit.  In particular:

- Yukos was one of Russia's largest taxpayers and was therefore under constant scrutiny by the Russian tax authorities, who had never found any significant problems prior to the attack on Yukos.

- The use of trading companies incorporated in low-tax regions was a common practice among Russia's vertically integrated oil companies, a fact that was well known to Russian authorities.

- Several trading companies' affiliations with Yukos were reflected in their names, for instance, Yukos-M and Yu-Mordovia.

- Prior to using trading companies in Mordovia—the source of the overwhelming majority of the purported tax claims—Yukos discussed the issue with federal and regional officials, who approved Yukos' plan.  Mordovia's Government then signed investment agreements with these trading companies specifying the amounts of monthly payments.  Audits of the Mordovian trading companies confirm the tax authorities' knowledge of the factual circumstances later alleged to constitute "abuse".

- As the Respondent concedes, Yukos' financial statements disclosed that companies within Yukos' consolidation perimeter enjoyed tax benefits under the low-tax region program and the overall amounts of such benefits.

- VAT refund submissions documented the entire chain of transactions prior to export, including, in particular, the trading companies' transactions with Yukos' production companies, refineries, and the holding company.

- Yukos' monthly submissions to obtain access to export pipelines confirmed that the trading companies' tax payments were in relation to the trading of oil produced by Yukos' production subsidiaries and exported under Yukos' export quotas.

11.   The Tax Ministry went on to fabricate similar tax claims against Yukos covering the years 2001-2004. As discussed below, the timing of these claims was instrumental in carrying out the Russian Federation's expropriation plan. By the time the Tax Ministry issued the last of these demands, Yukos faced a tax bill of more than US$ 24 billion, of which only US$ 5.2 billion constituted allegedly evaded revenue-based taxes, the remainder being comprised of VAT, interest, and fines.  These payment demands dwarfed the Company's consolidated net income for the relevant periods.

### 2.   The purported tax claims were unprecedented, arbitrary and manifestly expropriatory

12.   *Purported bases for revoking regional profit tax incentives.* Yukos' tax optimization structure fully complied with the legislation in force and current practices. Indeed, the Respondent does not allege that Yukos or the trading companies failed to comply with the federal or regional legislation. Nor does it allege that the trading companies failed to fulfill the terms of the investment agreements signed with the regional governments.  Rather, it claims that the trading companies failed to satisfy additional, unwritten requirements beyond the statutory eligibility criteria, including, in particular, an alleged "proportionality of investments" requirement that directly contradicted both the legislation and the investment agreements signed by the regional governments. This justification is not credible.

13.   *Re-attribution.* The primary weapon in the expropriation of Yukos' assets was the reattribution of the alleged tax liabilities of the trading companies to Yukos. Russian law did not allow such re-attribution, and the Respondent cannot point to a single example of such a re-attribution other than the Yukos case.  Had the Russian authorities genuinely believed that the tax benefits had been improperly granted to the trading companies, which was not the case, the proper course under Russian law

would have been to pursue those companies for the allegedly underpaid taxes. Alternatively, had they genuinely believed that sales had occurred at below market prices, Russian tax law contained a specific statutory mechanism for such transfer-pricing situations. However, the Russian authorities ignored these statutory provisions. Re-attribution served 2 purposes: *first*, shifting liability to Yukos itself paved the way for the expropriation of the Company's assets; *second*, re-attribution provided the basis for massive VAT claims.

14. *VAT*. Simultaneously invoking and contradicting their own re-attribution theory, the tax authorities re-attributed to Yukos all the revenues from the trading companies' transactions, but refused to re-attribute to Yukos the trading companies' entitlements to VAT refunds for export transactions. The purported basis for denying refunds was that the paperwork, although proper and timely, had been submitted by the trading companies rather than Yukos. This enabled the tax authorities to claim an additional US$ 13.59 billion—56.20% of the total claims against Yukos—despite the uncontested fact that no VAT was owed on these transactions. Such a step was clearly confiscatory in nature. Further, the fact that, even when Yukos attempted to submit the updated VAT returns in its own name, its submissions were rejected as improper and untimely, confirms that the purported VAT claims had nothing to do with taxation. The Respondent has been unable to offer any defense whatsoever for the fundamentally contradictory way in which its re-attribution theory was deployed.

15. *Fines*. The tax authorities further inflated their claims through the unjustified imposition of fines, including by imposing fines after the statute of limitations had expired; by doubling fines for "willfulness" despite the fact that Yukos did not—and could not possibly—"know" of the alleged illegality; and by doubling fines again for "repeat offenses" despite the fact that at the time of the alleged "repeat" offenses Yukos had never been previously held liable for a similar offense. Overall, these inflated fines amounted to US$ 8.5 billion, *i.e.*, 35.13% of the total alleged tax liabilities, with the "repeat" offender fines alone amounting to US$ 3.92 billion.

16. The common thread unifying the Russian Federation's approach was an overarching desire to manufacture and inflate claims against Yukos, with a view to expropriating the Company. As Yukos' tax lawyer noted after reviewing the December 2003 audit report, "[e]ven if we assume political pressure on the court the extent of the violations committed by the Ministry for Taxes and Levies will make it impossible even for the most biased judge to support the clearly unlawful inspection act". The Russian courts proved Yukos' tax lawyer wrong, rubber-stamping the fabricated tax debts.

### 3. Due process violations in the administrative and judicial proceedings

17. The administrative and judicial proceedings with respect to the alleged tax debts were conducted in blatant disregard of Yukos' basic due process rights. This involved, *inter alia*, pressure on the courts to ensure that only Government-friendly judges would preside over Yukos' challenges—and subsequently rewarding those judges for their efforts; overly speedy proceedings, denying Yukos adequate time and facilities to prepare its defense; and arbitrary denials of Yukos' motions to join to the proceedings the trading companies and the Mordovian Government. Coupled with the harassment of Yukos' lawyers noted above, the Russian Federation ensured the hasty conclusion of these proceedings, bringing it one step closer to its objective, namely the taking of Yukos' assets.

C.     **APPROPRIATION OF YUKOS' ASSETS – SEIZING YUKOS' ASSETS AND TRANSFERRING THEM TO STATE-OWNED COMPANIES**

    1.     **Yukos was prevented from settling its alleged tax debts or discharging them in full**

18.    *The swift and manifestly disproportionate enforcement of the 2000 tax reassessment.* On April 14, 2004, the tax authorities issued their payment demands for the year 2000. Yukos was given until April 16, 2004, *i.e.*, less than 48 hours, to pay in full US$ 3.48 billion in alleged tax arrears, interest and fines.

19.    Even this symbolic "voluntary" payment period was illusory. On April 15, 2004, the very next day after the demand for payment was issued, the tax authorities obtained from the Moscow Arbitrazh Court an *ex parte* injunctive order freezing, as a purported security measure, all of Yukos' non-cash Russian assets, with the exception of oil and oil products.

20.    On June 30, 2004, following Yukos' unsuccessful appeal, an enforcement writ was issued giving the Tax Ministry 3 years to collect the 2000 tax debt. Rather than engage in discussions with the Company about the discharge of this debt within that period, the bailiffs initiated enforcement proceedings that very same day. The Company was given 5 days to pay voluntarily US$ 3.42 billion in alleged tax arrears, interest and fines for the year 2000 and threatened with a 7% enforcement fee if it failed to do so.

21.    At the same time, the bailiffs ordered the seizure of (i) monies deposited in Yukos' accounts with 16 Russian banks, and (ii) the Company's Russian non-cash assets (which had previously been the subject of a freeze). On July 1, 2004, a wave of seizures on Yukos' non-monetary assets began, culminating in the seizure on July 14, 2004 of Yukos' shares in its 3 main production subsidiaries—Yuganskneftegaz, Samaraneftegaz and Tomskneft.

22.    It should be recalled that all these seizures were conducted within the framework of the enforcement proceeding initiated on June 30, 2004 to recover from Yukos US$ 3.42 billion in alleged tax liabilities for 2000. These seizures covered virtually all of Yukos' assets, whose value was staggeringly higher.

23.    Further, within days, on July 20, 2004, the Ministry of Justice announced its intention to appraise and sell Yuganskneftegaz to satisfy the 2000 alleged tax debt.

24.    The decision to seize and sell Yuganskneftegaz, which accounted for approximately 12% of Russia's oil output and whose value on any estimation dramatically exceeded that of the alleged tax debt, can only be reconciled with a desire to destroy the Company and appropriate its core assets. This reality is confirmed by the fact that the decision was taken less than 3 weeks after the writ of execution had been issued and when all of Yukos' domestic assets remained seized and available to satisfy the 2000 tax debt.

25.    *The failure to consider Yukos' proposals of alternative means of paying the alleged debt.* Further confirmation of the Russian Federation's expropriatory intent is the systematic rejection of Yukos' numerous offers to the bailiffs, courts and other Russian authorities and officials to settle or discharge its tax debts. These included: (i) the offers of Yukos' Russian non-core assets and its stake in Sibneft, initially 34.5% and subsequently reduced to 20% minus 1 share following the seizure of the 14.5% stake in Sibneft on July 9, 2004, in the context of the Chukotka Arbitrazh Court proceedings; (ii) Yukos' petition to pay its alleged tax debt for the year 2000 in installments; (iii) Yukos' amicable proposal to the Ministry of Finance to defer the payment of the federal share of its alleged debt for 6 months or to pay it in tranches; (iv) the proposals by Mr. Jean Chrétien, former Canadian Prime Minister, to Prime Minister Fradkov and President Putin of a global settlement of the

disputes, which envisaged the payment to the Russian Federation of approximately US$ 8 billion over the course of 2 years; (v) Yukos' October 2004 full settlement proposal in the range of US$ 21 billion, which included non-core assets and Sibneft shares, as well as a concession to re-elect a new board of directors that would include people selected by the Government.

26.     Each of these offers, as well as numerous others, was either denied or, in most cases, simply ignored. The Respondent's attempts to provide *post-hoc* rationalizations for its conduct by qualifying each of Yukos' offers as unacceptable or inadequate are unfounded. In any event, the Russian authorities' failure to work with—or even respond to—the multiple offers by Yukos, one of the largest private taxpayers in Russia, or to consider other options for enforcement, confirms that the Russian Federation was not interested in collecting taxes. This is even more so in light of the fact that the Russian authorities had no difficulty entering into settlement discussions and negotiating repayment plans with other Russian oil companies, including, *inter alia*, Rosneft and Sibneft.

### 2.     The forced sale of Yukos' shares in Yuganskneftegaz

27.     *Fabrication of further debt to maintain the pretext.* Despite the effect of the seizures described above, by the time of the Yuganskneftegaz auction, Yukos had paid off the 2000 tax reassessment in its entirety, eliminating the *raison d'être* of the decision to sell Yuganskneftegaz. Recognizing this difficulty as well as the gross disparity between the alleged tax debts and the value of Yuganskneftegaz, the Tax Ministry set about fabricating new claims.

- On September 2, 2004, the Tax Ministry served Yukos with a tax reassessment for 2001 in the amount of US$ 4.1 billion. Yukos was given only 2 days to pay voluntarily this amount, with the bailiffs initiating enforcement proceedings on September 9, 2004.

- On November 16, 2004, the Tax Ministry served Yukos with a tax reassessment for 2002 in the amount of US$ 6.76 billion, the largest among the 5 tax reassessments for the years 2000-2004. Yukos was given only 1 day to pay voluntarily this amount, with the bailiffs initiating enforcement proceedings on November 18, 2004.

- On December 6, 2004, the Tax Ministry served Yukos with a tax reassessment for 2003 in the amount of US$ 6.1 billion, giving the Company 1 day to pay in full. On December 9, 2004, the bailiffs initiated enforcement proceedings.

28.     In each case, the bailiffs allowed Yukos at most 5 days for voluntary payment and charged the 7% enforcement fee for failure to comply with these unreasonably short time limits.

29.     Thus, in the 4 months from September 2004 up until the auction of Yuganskneftegaz on December 19, 2004, the Russian Federation managed to increase Yukos' alleged tax liability by approximately US$ 17 billion.

30.     *Efforts to depress the auction price of Yuganskneftegaz.* At the same time, with a view to facilitating the Russian Federation's acquisition of Yuganskneftegaz at a bargain price, the Russian Tax Ministry also fabricated claims against Yuganskneftegaz. These claims were premised on the application of statutory provisions on transfer pricing, which the tax authorities systematically refused to apply in relation to Yukos itself. Significantly, these claims concerned the same oil trading revenues that had already been re-attributed to Yukos, thus resulting in double taxation.

31.     Thus, on October 29, 2004, the tax authorities simultaneously: (i) issued a Repeat Field Tax Audit Report for 2001 requesting Yuganskneftegaz to pay US$ 2.35 billion in alleged tax arrears, interest and fines;[93] and (ii) rendered a Decision

holding Yuganskneftegaz liable for an alleged tax offense for the year 2002 and requiring payment of US$ 1.03 billion in alleged tax arrears, interest and fines.

32. On December 3, 2004, a Field Tax Audit Report was issued for the year 2003, imposing on Yuganskneftegaz an additional US$ 1.22 billion in alleged tax arrears, interest and fines.

33. In addition to fabricating these US$ 4.6 billion in additional alleged liability, the Russian authorities also began to sow doubts about the security of Yuganskneftegaz's oil licenses to depress further the Company's value.

34. That all these payments demands, imposed simultaneously on Yukos and its main production subsidiary, were issued in the run-up to the auction of Yuganskneftegaz is no coincidence.  Nor is it a coincidence that, after Yuganskneftegaz was acquired by Rosneft, the tax claims along with the oil license concerns promptly disappeared. Together with the generous payment terms accorded to Rosneft's new subsidiary but systematically denied to Yukos, these facts confirm both the discriminatory nature of the Russian Federation's treatment of Yukos, and the true purpose of the purported tax reassessments against Yuganskneftegaz, namely, to facilitate the expropriation of the Company and not to collect taxes.

35. *Sham auction of Yuganskneftegaz.* As noted above, the Ministry of Justice publicly announced its plan to sell Yuganskneftegaz on July 20, 2004, purportedly in order to satisfy the 2000 alleged tax debt.

36. On August 12, 2004, the bailiffs appointed ZAO Dresdner Bank ("Dresdner") to carry out the valuation of Yuganskneftegaz in preparation for its sale.  On October 6, 2004, Dresdner issued a confidential report valuing Yuganskneftegaz on a standalone basis at US$ 18.6 billion – 21.1 billion.

37. On November 18, 2004, the bailiffs announced that Yuganskneftegaz would be auctioned to satisfy Yukos' outstanding tax debt, with the Russian Federal Property Fund issuing the formal auction notice the following day. The opening price for 100% of the ordinary shares, or 76.79% of Yuganskneftegaz's total share capital, was set at US$ 8.65 billion, a price well below its true value. The auction date was set for December 19, 2004, which was the earliest possible date to hold the auction and only 1 month away.

38. In an attempt to prevent the auction of its core asset, Yukos filed an application with the Moscow Arbitrazh Court to declare unlawful the Bailiff's Resolution of November 18, 2004 and sought interim measures. These efforts failed.

39. Confronted, yet again, with the futility of its efforts to obtain justice before the Russian courts, on December 14, 2004, Yukos filed for Chapter 11 bankruptcy protection before the U.S. Bankruptcy Court for the Southern District of Texas. By that date, only 3 companies, Gazpromneft (the new wholly-owned subsidiary of State-owned Gazprom), First Venture and Intercom, had sought antimonopoly clearance required in anticipation of the auction.  On December 16, 2004, the U.S. Court issued a Temporary Restraining Order ("TRO") enjoining Gazpromneft, its potential lenders, First Venture and Intercom from participating in the auction of Yuganskneftegaz.

40. Nonetheless, on December 19, 2004, which was a Sunday, the Russian authorities proceeded with the auction of Yuganskneftegaz. Gazpromneft and OOO Baikalfinancegroup ("Baikal") were registered as participants. Baikal was a previously unknown company established at the address of a local bar in the provincial town of Tver on December 6, 2004. With only US$ 359 in capital, it mysteriously managed to pay a cash deposit in the amount of US$ 1.77 billion to register for the auction on December 16, 2004.

41.   At the auction, Baikal opened the bidding at US$ 9.35 billion. Gazpromneft's representative asked for a recess and left the room to make a telephone call. Upon his return, he did not make a single bid and Baikal was pronounced the winner of the auction with its opening bid of US$ 9.35 billion. The whole bidding process lasted approximately 10 minutes.

42.   The Respondent's allegation that the low price for Yugansknftegaz reflected attempts by Yukos to "sabotage" the auction is unconvincing. Neither "litigation risk" nor the TRO had a material effect on the participants or the outcome of the auction.   The reality is that, ignoring the advice of its own appraisal firm, the Russian authorities systematically acted in ways that negatively affected the ability and willingness of potential bidders to participate, as well as the price they would be willing to pay.   Market participants also understood that political support was required to participate in auctions for Yukos assets.

43.   The use of Baikal as a conduit for the eventual transfer of Yugansknftegaz to a State-owned company was confirmed when, only a few days later, on December 23, 2004, Rosneft issued a statement announcing its acquisition of Baikal.  Meeting journalists that day, President Putin confirmed his knowledge of the acquisition, stating that: "Today, the state, resorting to absolutely legal market mechanisms, is looking after its own interests. I consider this to be quite logical".  Rosneft then enabled Baikal to repay the principal and interest on its debt by granting it, on December 30, 2004, a 1-year interest-free loan.

44.   Rosneft benefited significantly from this acquisition, with Rosneft's estimated value increasing dramatically from US$ 7 billion in December 2004 to US$ 80 billion for its IPO in mid-2006. Based on the valuation disclosed by Rosneft at the time, Yugansknftegaz was worth US$ 55.78 billion.  Further, as noted above, the tax bills raised against Yugansknftegaz as a Yukos subsidiary were almost entirely set aside by the Russian courts following its acquisition by Rosneft.

45.   Looked at from any angle, the Russian Federation's approach to enforcement of the alleged tax debts, culminating in the transfer of Yugansknftegaz to Rosneft in a sham auction, confirms that the Russian Federation's real goal was to expropriate the Company, and not to collect taxes.

46.   Even after the sham auction of Yugansknftegaz, there was no legitimate reason to put Yukos into bankruptcy. There were no substantial creditors apart from the Russian Federation, and the seizure of Yukos' assets remained in place, so there was no risk of assets being dissipated and no need to resolve conflicting creditors' claims. Yukos still possessed 2 substantial production subsidiaries—Samaranftegaz and Tomskneft—as well as refining and marketing assets, and several non-core assets that it could readily have disposed of to pay off its outstanding debts and remain a going concern. However, the Russian authorities' priority was not recouping taxes; nor did they have any intention of allowing Yukos to survive as a going concern. The initiation of the bankruptcy proceedings provided a convenient way to sideline Yukos' management and to facilitate the taking of the Company's remaining assets.

47.   *Forcing Yukos into bankruptcy.* As a result of the Russian Federation's attack, Yukos defaulted on a US$ 1 billion loan granted by a syndicate of Western banks. On December 13, 2005, Rosneft entered into a confidential agreement with the syndicate under which Rosneft agreed to pay the outstanding amount owed by Yukos in exchange for the assignment to Rosneft of the syndicate's rights of claim against Yukos. *Crucially*, the payment of Yukos' debt by Rosneft was conditioned upon the initiation of Yukos' bankruptcy by the syndicate. Pursuant to that agreement, on March 6, 2006, the syndicate filed a petition with the Moscow Arbitrazh Court to declare Yukos bankrupt, and on March 14, 2006, Rosneft paid off the loan.

48. On March 28, 2006, the Moscow Arbitrazh Court ordered the commencement of bankruptcy proceedings, placed Yukos under supervision, appointed Mr. Rebgun as interim administrator, and formally substituted Rosneft for the syndicate as creditor.

49. The Respondent argues that "sound commercial interests" explain both the syndicate's sale of the loan and Rosneft's reasons for acquiring the same. However, even if that were the case, the Respondent still fails to answer the basic question: why not simply have the syndicate of banks assign their claim to Rosneft, and let Rosneft put Yukos into bankruptcy? The only plausible explanation for this elaborate stratagem was to conceal the Russian Federation's role in initiating the bankruptcy of Yukos.

50. *Ensuring the Russian State's control over the bankruptcy proceedings.* After Rosneft initiated the bankruptcy through the syndicate, the Russian courts ensured that the Russian State, either directly or through Rosneft, would become Yukos' main creditor.

51. *First*, the Russian courts bent over backwards to ensure that the tax authorities' purported claims would be admitted, by: (i) delaying a scheduled hearing in order to give "the State more time to prove new tax claims", namely, the US$ 3.9 billion in tax payment demands for 2004, which the tax authorities rushed to issue on March 17, 2006, 11 days after the bankruptcy petition was filed; (ii) merging Yukos' challenge to that payment demand into the bankruptcy proceedings; and (iii) approving all the tax authorities' purported claims against Yukos for the years 2000-2004 following a wholly perfunctory review of the voluminous case files. Consequently, the Federal Taxation Service was by far Yukos' largest creditor with 60.50% of all registered bankruptcy claims.

52. *Second*, in the period leading up to the first meeting of Yukos' registered creditors on July 20, 2006, some 29 purported claims were admitted on behalf of Yuganskneftegaz, now Rosneft's subsidiary, totaling approximately US$ 4.42 billion. Subsequently, Rosneft secured admission of an even larger claim of US$ 5.55 billion premised on an allegation that Yuganskneftegaz had suffered "lost profits" in this amount during the period 2000-2003. These purported claims of US$ 9.97 billion enabled Rosneft to more than recoup the US$ 9.35 billion paid for Yuganskneftegaz and thereby acquire the Company for free. With the admission of these and various smaller claims, Rosneft became Yukos' second largest creditor with 37.17% of all registered bankruptcy claims.

53. *Third*, while the Russian court hearing Yukos' bankruptcy showed great flexibility in admitting any and all claims to benefit the Russian State, it was intransigent and formalistic in finding pretexts not to recognize substantial claims of creditors related to Yukos or to Yukos' shareholders.

54. These combined efforts resulted in the complete monopolization of Yukos' bankruptcy proceedings by the Russian State, which held 97.67% of all bankruptcy claims, guaranteeing its control over the bankruptcy process.

55. *Rejection of Yukos' Rehabilitation Plan.* The Financial Rehabilitation Plan proposed by Yukos' management ("the Rehabilitation Plan") set out a series of concrete measures that would enable Yukos to pay off its alleged liabilities fully within 2 years, while remaining a viable going concern. This would be achieved by, among other things, creating a "cash pool" from the sale of ancillary assets, cash flows generated by Yukos' remaining core assets, and more than US$ 1.5 billion from the sale of Yukos' 53.7% stake in the Lithuanian oil company Mazeikiu Nafta and Yukos' 49% stake in Slovakian oil transport major Transpetrol.

56. By contrast, according to Mr. Rebgun, the potential proceeds from the sale of Yukos' remaining assets, which he significantly undervalued at US$ 17.75 billion (after deducting the 24% profit tax payable on auction proceeds), were not sufficient

to cover the US$ 18.3 billion of registered bankruptcy claims. Accordingly, he did not even bother to propose any measure for the Company's financial restoration but simply recommended liquidation. In the event, despite the fact that the bankruptcy auction prices represented significant markdowns from market value, the bankruptcy estate netted approximately US$ 35.55 billion—twice the amount Mr. Rebgun had put forward to argue in favor of liquidation.

57.    Ultimately, the Federal Taxation Service and Rosneft held 93.87% of votes at the meeting of Yukos' creditors of July 25, 2006. It therefore came as no surprise that they rejected the Rehabilitation Plan and voted to liquidate Yukos' assets, despite the fact that Yukos' assets exceeded its alleged liabilities, and the Company was clearly solvent.

58.    *The bankruptcy auctions.* Yukos' remaining assets were transferred to the Russian State at well below their fair market value through a series of 17 auctions held between March 2006 and August 2007. Rosneft thereby directly or indirectly acquired Yukos' key remaining assets, including Samaraneftegaz (Lot No. 11) and Tomskneft (Lot No. 10), which were sold at a gross discount of approximately 37% and 33%, respectively, of their fair market value. For its part, Gazprom acquired through Eni/Enel the 20% minus 1 share stake in Sibneft that the Russian Federation had persistently refused to let Yukos sell to pay off alleged tax debts. As with the sham auction of Yuganskneftegaz, there was no genuine competition in the bankruptcy auctions and, in many instances, including those for Samaraneftegaz and Tomskneft, the only participants were Rosneft and a previously unknown entity whose sole role was to satisfy the formal requirement that there be a minimum of 2 bidders.

59.    Finally, when, by the end of July 2007, it became clear that despite the low auction prices, the bankruptcy might still generate some surplus, further claims were admitted in the bankruptcy proceedings on behalf of the Russian State, through the Federal Taxation Service and Rosneft. This ensured the completeness of Yukos' destruction and the transfer of its value and assets to the Russian State. Thus, the Russian Federation received, either directly or through State-owned Rosneft or Gazprom, approximately 99.71% of the bankruptcy proceeds and over 95% of Yukos' remaining assets, including all of Yukos' main production assets.

60.    On November 12, 2007, the Moscow Arbitrazh Court formally endorsed all the activities of Yukos' receiver Mr. Rebgun, closed the Company's receivership and ordered that Yukos be struck off the register of legal entities. The latter happened on November 21, 2007: Yukos was removed from the register of companies, its shares were legally extinguished and so, too, were the Claimants' investments.

## D.    CONCLUSION

61.    Seen together, the Russian Federation's actions can only be reasonably understood as a deliberate and sustained effort to destroy Yukos, gain control over its assets and eliminate Mr. Khodorkovsky as a potential political opponent. Indeed, viewed any other way, they make no sense and the Respondent has been unable to provide a plausible alternative explanation for its actions.

## III.    LAW

### A.    THE RUSSIAN FEDERATION IS IN BREACH OF ITS OBLIGATIONS UNDER ART. 10(1) ECT

62.    Under Article 10(1) ECT, the Russian Federation undertook to "encourage and create stable, equitable, favorable and transparent conditions for Investors", to accord at all times "fair and equitable treatment" to investments made in its territory and not to "in any way impair by unreasonable or discriminatory measures [the]

management, maintenance, use, enjoyment or disposal" of such investments, which "shall also enjoy the most constant protection and security".

63.   The Russian Federation violated the above mentioned undertakings in the most egregious manner. In particular, it violated its obligation under Article 10(1) ECT to provide to the Claimants' investments fair and equitable treatment, by failing to meet basic requirements of procedural propriety and due process, engaging in conduct that was unreasonable, arbitrary, disproportionate and abusive, and failing to ensure a stable and transparent legal and business framework.  The Russian Federation's actions also constituted a denial of justice in breach of the fair and equitable treatment standard of Article 10(1) ECT, as demonstrated by, *inter alia*, the removal of judges refusing to rule in the Russian State's favor and the lack of independence and impartiality of judges hearing Yukos' cases.

64.   The Russian Federation also breached Article 10(1) ECT by discriminating against the Claimants' investments.  In particular, it (i) singled out Yukos and treated it in a markedly different manner from other similar oil companies in Russia, (ii) treated Yuganskneftegaz differently before and after its acquisition by State-owned Rosneft, in the hands of which the former Yukos subsidiary's alleged tax liabilities all but disappeared, and (iii) ensured a differential treatment in the bankruptcy proceedings between creditors related to Yukos, on the one hand, and State-related creditors, on the other.

65.   The Respondent's primary defense is to invoke Article 21 ECT to argue that the Claimants' claims should be dismissed on the ground that they are "based exclusively on measures '*with respect to Taxation Measures.*'"  As discussed below, not only is the Respondent's interpretation of Article 21 ECT untenable, but the Russian Federation's conduct had nothing to do with the genuine exercise of its taxation power and is thus not covered by Article 21 ECT.

66.   The Respondent has moreover attempted to restrict the scope of its treaty obligations by misrepresenting the content of the fair and equitable treatment and discrimination standards in Article 10(1) ECT.  Such attempts are groundless and should be rejected.

**B.   THE RUSSIAN FEDERATION IS IN BREACH OF ITS OBLIGATIONS UNDER ART. 13(1) ECT**

67.   The Russian Federation expropriated the Claimants' investments in breach of Article 13(1) ECT.

68.   As of October 2003, Yukos was one of the largest oil companies in the world. It held 92% of Sibneft, 3 core production subsidiaries (Yuganskneftegaz, Samaraneftegaz and Tomskneft), as well as refining and marketing subsidiaries. As of November 21, 2007, it ceased to exist as a company, owing to a series of actions by which the Russian Federation seized its assets and transferred their title to State-owned Rosneft and Gazprom. The only plausible explanation for the Russian Federation's actions is the twin desire of dismantling the Company and transferring its assets to the State and the removal of Mr. Khodorkovsky as a potential political opponent. The result of those actions was a complete and total deprivation of the Claimants' investments therein.

69.   The Russian Federation moreover failed to satisfy any of the 4 conditions set out in Article 13(1) ECT. The expropriation of the Claimants' investments was manifestly: (i) not in the public interest; (ii) discriminatory; (iii) carried out without due process of law; and (iv) not accompanied by the payment of any compensation, let alone prompt, adequate and effective compensation.

70.   Unable to deny the total deprivation of the Claimants' investments and the transfer of title of Yukos' assets to State-owned Rosneft and Gazprom, the Respondent

disaggregates its actions and argues that, when taken in isolation, each of them was, under Russian law, a proper response to Yukos' alleged conduct. While, in fact, many of those actions amounted to a gross distortion or abuse of Russian law, lawfulness under domestic law is not, in any event, the proper inquiry under Article 13(1) ECT. Under the applicable international law standards, the actions of the Russian Federation, in their totality, constitute an expropriation of the Claimants' investments in breach of Article 13(1) ECT for which compensation is due.

## IV.   DAMAGES

71.   The Russian Federation is under an obligation to make full reparation to the Claimants for the financial consequences of its breaches of Articles 10(1) and 13(1) ECT. This standard of reparation is not challenged by the Respondent.

72.   The magnitude of these financial consequences cannot be underestimated. As a result of the Respondent's actions, the Claimants have lost the entire value of their investments in YukosSibneft, as well as the benefits they should have received from those investments.  The Claimants' valuation expert, Navigant, has quantified the Claimants' damages for the loss of their investments in YukosSibneft at US$ 114.174 billion.

73.   Navigant has also quantified the Claimants' damages for the loss of their investments in YukosSibneft in 3 alternative scenarios, assuming that: (i) the Respondent does not bear responsibility for the demerger between Yukos and Sibneft, which it does; (ii) further, all tax reassessments were legitimate, which they were not; and (iii) in addition, the sale of Yuganskneftegaz was legitimate, which it was not, and assessing the Claimants' damages at US$ 107.966 billion, US$ 69.583 billion, and US$ 33.317 billion, respectively.

74.   In its Counter-Memorial, the Respondent chose not to challenge Navigant's valuation of the Claimants' expropriated investments underlying their principal claims for damages, instead seeking to divert the Tribunal's attention through a series of flawed objections.  When the Respondent did make an effort to address the subject, in its Rejoinder, its arguments were inaccurate and entirely divorced from historical data and contemporaneous valuations of YukosSibneft's assets.

75.   Navigant has provided the only reliable and methodologically sound model for calculating the compensation due to the Claimants by the Russian Federation for the expropriation of their investments in breach of Articles 10(1) and 13(1) ECT.

## V.   THE RESPONDENT'S OBJECTIONS SHOULD BE REJECTED

76.   *The Respondent's rehashed 'fork-in-the-road' objection is both* res judicata *and groundless.* The Respondent contends that the Tribunal lacks jurisdiction over the Claimants' claims because the Claimants are allegedly pursuing identical claims before the ECtHR. This very same objection was first raised in the jurisdiction and admissibility phase of these arbitrations and unequivocally dismissed by the Tribunal. It is entirely inappropriate for the Respondent to reopen this issue, which is *res judicata*, on the basis that it was allegedly poorly decided. Further, the Respondent's allegations that the Interim Awards were based on an "incorrect assumption" or that there are "special circumstances" justifying a new examination of the issue are unfounded. The Respondent's objection based on Article 26(3)(b)(i) ECT is manifestly without merit and must fail.

77.   *The Respondent's attempt to rely on Article 21 ECT is misguided.* The issues arising in relation to Article 21 ECT have already been briefed at length in the jurisdiction and admissibility phase of these arbitrations. In deferring the Respondent's objection based on Article 21 ECT to the merits phase, the Tribunal indicated that it did not wish to rule in a vacuum on the issue of the background to, and motivation behind, the Russian Federation's actions. In light of the Parties' pleadings on the

merits, it is clear that those actions had nothing whatsoever to do with the genuine exercise of the Russian Federation's taxation powers, but were rather solely intended to destroy Yukos and gain control of its assets. Article 21 ECT clearly was not meant to shield a Contracting Party from such egregious conduct.

78.   Even assuming, however, that the Russian Federation's actions were a genuine exercise of its taxation powers, which they were not, those actions would nonetheless fall outside the scope of Article 21 ECT, which is limited to the enactment of tax provisions. Further, even if Article 21 ECT were applicable, which it is not, Article 21(5) ECT ensures that Article 13(1) ECT's substantive protection from expropriation remains fully intact. Finally, under any interpretation of Article 21 ECT, many of the Russian Federation's actions had nothing to do with taxation and thus fall outside the ambit of Article 21 ECT altogether.

79.   Conversely, under the Respondent's interpretation of Article 21 ECT, save for expropriatory "charges or payments, to the exclusion of enforcement and collection measures, including interest and fines", investors would stand unprotected from any and all State actions, so long as the respondent State in an arbitration labels its actions as "taxation"—regardless of whether such actions had anything to do with taxation, or were being pursued with the sole aim of expropriating or otherwise harming an investor's investment. Such an interpretation, which would turn Article 21 ECT into a gaping hole in one of the key multilateral treaties on investment protection, is clearly untenable and should be rejected.

80.   *The Respondent's so-called "unclean hands" theory is without merit.* The Respondent argues that over a period of approximately 12 years, an array of actors engaged in a variety of allegedly "illegal and bad faith misconduct" that somehow deprive the Claimants' investments of ECT protection. The Respondent's position is fundamentally unfounded for several reasons. *First*, the so-called "unclean hands" theory finds no support in the text of the ECT, customary international law, or investment treaty jurisprudence. *Second*, even assuming the existence of such a general principle of international law, which the Claimants deny, its scope would be dramatically more limited than the Respondent contends, such that the Respondent has not alleged any facts that could establish its applicability in the present case. As demonstrated by the Claimants, the Respondent's theory is premised almost exclusively on allegations of collateral illegalities, unrelated either to the making of the Claimants' investments, or to the Claimants' claims in these arbitrations, and all but one of which assert misconduct by third parties. *Third*, and in any event, the Respondent has failed utterly to substantiate any of its allegations. *Finally*, the principles of estoppel and proportionality prevent the Respondent from invoking such alleged illegalities in an attempt to escape liability for its violations of the ECT.

81.   In its Rejoinder, while recounting its laundry list of alleged misconduct, the Respondent devotes attention solely to its allegation concerning the application of the 1998 Russia-Cyprus Double Taxation Agreement ("DTA"). Apart from the fact that:  (i) this allegation has no bearing on the merits of these arbitrations; and (ii) these arbitrations are not the appropriate forum to hear and decide an alleged dispute on the application of the DTA, the Claimants have, in any event, demonstrated that this allegation is baseless. The Respondent's so-called "unclean hands" objection is thus without merit and must fail.

## VI.   REQUEST FOR RELIEF

82.   For the reasons set out above, the Claimants respectfully request the Arbitral Tribunal to render an Award granting the relief set out in paragraph 1199 of the Claimants' Reply.

### B.   RESPONDENT'S SKELETON ARGUMENTS

109.   The text of the paragraphs below is produced directly from paragraphs 1 to 104 of Respondent's Skeleton Argument submitted on 1 October 2012 ("**Respondent's Skeleton**") (annexes omitted).

### I.   The Russian Federation Properly Assessed Taxes And Fines Against Yukos

1.   Yukos fraudulently evaded billions of dollars of Russian corporate profit tax from 1999 to 2004, abusing the program authorized by the Russian Government in the early 1990s to foster economic development in designated economically underdeveloped areas. Under this program, corporate profits in the low-tax regions were taxed at substantially reduced rates if the taxpayer complied with the applicable legal rules, including Russia's anti-tax abuse principles.

2.   In order to properly avail itself of the benefits available in a low-tax region, Yukos was required to comply with three legal regimes: (a) the federal statute authorizing the low-tax region program and the region's own statutes; (b) Yukos' agreements with the regional authorities; and (c) Russia's federal anti-tax abuse "bad faith taxpayer" doctrine.

3.   The federal bad faith taxpayer doctrine is rooted in Russia's federal Constitution, and has been applied by Russian tax authorities and courts in thousands of cases since the mid-1990s to condemn abusive transactions that, in substance, constitute unlawful tax evasion. As described by Yukos' own tax lawyers in commentaries they published before the assessments at issue in these arbitrations, this doctrine condemns as tax evasion transactions in which "the taxpayer's actions were aimed solely to reduce the amount of its tax payments rather than to achieve an economic result, [as] this would demonstrate that the relevant transaction was inconsistent with law because the motive underlying such transaction was to avoid tax […]. A person's actions aimed solely at tax evasion may not be regarded as actions made in good faith."

4.   Yukos abused the low-tax region program, and evaded Russian corporate profit tax in violation of the bad faith taxpayer doctrine, by implementing what Yukos referred to internally as its "tax optimization" scheme. Pursuant to this scheme, Yukos established dozens of sham "trading companies" in low-tax regions that had no business purpose, and then shifted its own profits to the sham trading companies. These sham trading shells had no genuine economic substance and served no purpose other than to reduce Yukos' tax liabilities, an arrangement described by Yukos' own lawyers as constituting unlawful tax evasion.

5.   The European Court of Human Rights ("ECtHR") unanimously rejected Yukos' challenge of the tax assessments that are at issue here, on the basis of the same core principles that underlie these arbitrations. The ECtHR found that Yukos' "tax optimization" scheme consisted of "switching the tax burden from [Yukos] and its production and service units to letter-box companies in domestic tax havens in Russia," and that these "letter box companies" had "no assets, employees or operations of their own [and] were nominally owned and managed by third parties, although in reality they were set up and run by [Yukos] itself."

6.   According to the ECtHR, the "letter-box companies" (a) purchased oil and oil products from Yukos' production companies at a fraction of their true market prices, (b) "acting in cascade, then sold the oil either abroad, this time at market price or to [Yukos'] refineries and subsequently re-bought it at a reduced price and re-sold it at the market price," (c) thereby accumulated most of Yukos' profits in the low-tax regions, resulting in Yukos paying substantially lower taxes on those

- 34 -

profits, and (d) then unilaterally transferred to Yukos, as a gift or in purported repayment of sham loans, the profits that had been improperly taxed at reduced rates in the low-tax regions. The ECtHR unanimously concluded that this scheme "was obviously aimed at evading the general requirements of the Tax Code […]."

7.     The Russian tax authorities concluded that Yukos' "tax optimization" scheme constituted unlawful tax evasion under the bad faith taxpayer doctrine. In particular, the Russian tax authorities found, and the Russian courts later agreed, that Yukos had abused the low-tax region program because its trading shells (a) did not engage in any genuine business activities in the low-tax regions, but were instead controlled by Yukos from Moscow, (b) purchased oil and oil products at below-market prices solely to artificially concentrate Yukos' profits in low-tax regions, and (c) made only paltry investments in the low-tax regions that were dwarfed by the tax benefits they claimed, thereby failing to fulfill the purpose of the low-tax region program.

8.     Yukos did not then -- or later -- offer any rationale for selling Yukos' oil through its network of low tax region trading companies other than reducing Yukos' own tax liabilities, nor have Claimants done so in these arbitrations.

9.     Yukos was aware of the bad faith taxpayer doctrine and the risk that its scheme would result in substantial tax assessments if the Russian authorities were ever to learn of it. Among other things, (a) Yukos knew that the authorities had previously denied the low-tax region benefits claimed by several sham trading shells in the Lesnoy region and Sibirskaya based on the same Russian anti-abuse rules that were later applied to Yukos (the Russian authorities only later learned that Yukos exercised *de facto* control over and management of Sibirskaya and the Lesnoy trading shells, and that Yukos surreptitiously liquidated the latter in order to prevent the collection of their overdue taxes), (b) Yukos managers had expressly warned the company's senior executives in internal memoranda that public disclosure of the scheme "will result in substantial tax claims against the Company," (c) as Yukos' former deputy general counsel later conceded, none of the company's external lawyers was willing to render an opinion endorsing its scheme (to the contrary, in refusing to render a "clean" opinion, one cited the need to comply with the same bad faith taxpayer doctrine that later led the Russian tax authorities and courts to find that Yukos was guilty of tax evasion), and (d) Yukos had access to the numerous court decisions applying the bad faith taxpayer doctrine to abusive tax schemes -- including those finding Lukoil, one of Yukos' major competitors, liable for substantial additional amounts for having abused the low-tax region program -- and to the published legal commentaries discussing the bad faith taxpayer doctrine and its requirements, including those written by its own tax lawyers.

10.   Yukos' knowledge that its "tax optimization" scheme was unlawful is further confirmed by Yukos' repeated lies to the tax authorities, the Russian courts, the ECtHR, and Yukos' own external auditors, including Yukos' knowingly false assertion that it was not affiliated with (and did not control) the sham trading shells, a point now conceded even by Claimants. Yukos' repeated false denial of its affiliation with the sham trading shells can only be explained by the company's awareness of the illegality of its scheme.

11.   Yukos' tax evasion was not victimless. The billions of dollars in tax benefits it wrongfully claimed caused commensurate damage to the regional budget of Moscow, where Yukos, as the real party in interest, should have paid profit tax at the full rate.

12.   Claimants' claims that the Russian authorities' measures were expropriatory and unfair are meritless. First, Claimants' contention that the legal principles applied by the Russian courts were "novel" or "vague" is, as the ECtHR unanimously found, refuted by the numerous Russian court decisions that applied these principles and similar ones to hold taxpayers liable for tax evasion since the mid-1990s, including

their abuse of the low-tax region program. Moreover, the published legal commentaries, including the guidance published by Yukos' own tax counsel, describe those principles in the same terms as they were applied to Yukos. The relevant Russian judicial precedents include those compiled for the Tribunal by Russian tax law expert Oleg Konnov, whose description of the history and content of the bad faith taxpayer doctrine Claimants have not sought to rebut with any expert testimony.

13. Mr. Konnov shows that the fines assessed against Yukos were also proper because, among other reasons, no taxpayer -- in Russia or elsewhere -- could legitimately claim to be surprised that it may not invoke a limitations period that has expired only because of its own obstruction of tax audits.

14. Claimants also ignore the extensive international precedents demonstrating that the principles applied by the Russian authorities and the actions they took against Yukos' tax evasion were consistent with those of ECT signatories and other nations worldwide.

15. <u>Second</u>, Claimants' attack on Yukos' VAT assessments -- holding Yukos liable for the VAT due on revenues nominally realized by the sham trading shells but properly attributable to Yukos itself -- is also meritless. As the ECtHR unanimously held, the Russian authorities acted properly in disregarding Yukos' sham trading shells for profit tax purposes and denying Yukos the benefit of the shells' 0% VAT filings. Claimants also ignore Yukos' still unexplained failure to submit proper 0% VAT returns in its own name after it received its December 29, 2003 tax audit report. It is not disputed that Yukos could have filed proper VAT returns -- nothing prevented it from doing so -- or that had it done so, it would have avoided more than half of its challenged tax liabilities.

16. <u>Third</u>, Claimants' assertion that the tax assessments were discriminatory is contradicted by the facts. The ECtHR unanimously rejected this charge. Several large Russian companies, including a number of Yukos' principal competitors, were also held liable for tax evasion and assessed substantial amounts of tax on grounds similar to those relied on by the Russian authorities and courts in dealing with Yukos. But unlike Yukos, these other companies promptly paid their taxes and, in the case of Lukoil, publicly abandoned its own "tax optimization" scheme.

17. There were also numerous material differences between Yukos' conduct and that of many other Russian oil companies: (a) no other Russian oil company committed abuses that were as egregious as those of Yukos, (b) none did so for as long as Yukos, (c) none attempted to conceal its abuses as did Yukos (to the extent of lying about them to the tax authorities, the courts, and even its own auditors), (d) none obstructed their tax audits as did Yukos, including by sending documents and employees to distant locations before they could be reviewed and interviewed, (e) none made investments in the low-tax regions that were so miniscule in comparison to the tax benefits they claimed, (f) none diverted billions of dollars offshore to prevent the collection of overdue taxes, and (g) none refused to pay their assessed taxes when ultimately required to do so.

18. <u>Fourth</u>, Claimants' contention that the Russian authorities knew and approved of Yukos' scheme is completely unsupported by any credible evidence, as the ECtHR again unanimously found. Claimants' contention cannot be reconciled with Yukos' unflagging efforts to conceal its scheme from the Russian authorities. Yukos would obviously have had no reason to hide its scheme if it believed the authorities were already aware of it, let alone had approved it, or if it thought its scheme was lawful and its disclosure would not lead to substantial tax claims. Yukos' efforts to conceal its scheme are reflected in (a) the company's convoluted offshore structures, serving no purpose other than to mask Yukos' affiliation with its sham trading shells, (b) Yukos' *seriatim* restructuring of its Lesnoy trading shells after their abuse of that

region's low tax program was discovered, (c) Yukos' management's internal warnings that disclosure of its scheme "will result in substantial tax claims against the Company," (d) Yukos' failure to disclose its scheme in its purportedly "transparent" financial statements, and (e) Yukos' repeated lies about its scheme to the tax authorities, the courts, the ECtHR, and its own auditors.

19. In any event, as a matter of Russian law and as Claimants concede, even if the tax authorities had known of Yukos' scheme -- and there is no evidence they did -- they would not have been estopped from later challenging it.

20. **Fifth**, Claimants' contention that the assessments against Yukos were fabricated as part of a politically motivated campaign to dismantle Yukos – an allegation on which Claimants have unambiguously staked their claims, contending that the assessments "cannot be explained in any other way" -- is, as the ECtHR again unanimously found, unsupported by any credible evidence. If the assessments were, as Claimants insist, the product of a massive political conspiracy spanning several years and involving numerous government agencies, engineered and implemented by hundreds if not thousands of officials, including no fewer than 60 judges at four different levels of courts, along with a large cast of third parties around the globe, then surely after nearly a decade of challenges -- by Yukos, its minority shareholders, and now Claimants -- at least one internal government memorandum, instruction or minute of a meeting evidencing or referring to the grand conspiracy alleged by Claimants would have surfaced, or one disgruntled former Government official would have reported having participated in a meeting or telephone call where the alleged conspiracy was discussed. Instead, Claimants rely solely on double and triple hearsay renditions of purported conversations by vocal opponents of the Russian Government, inaccurate and uninformed reports by political commentators, and sheer innuendo, none of which, even as proffered, competently supports Claimants' conspiracy allegations.

21. Claimants' failure to prove the supposed vast conspiracy confirms that it is merely one more sham perpetrated by the Oligarchs who controlled Yukos and were ultimately responsible for its demise.

22. Yukos' dealings with PricewaterhouseCoopers ("PwC") provide yet another example of Yukos' blaming the Russian Federation for the consequences of its own misconduct.

23. PwC withdrew all of its Yukos audit opinions in June 2007 (after refusing to continue to audit the company's U.S. GAAP financial statements in 2003, itself an extraordinary event for a supposedly "transparent" company), following confirmation that Yukos' senior managers had repeatedly lied to PwC about, among other things, Yukos' *de facto* control over the management of its sham trading shells -- an essential element in the company's "tax optimization" scheme.

24. Claimants' attempt to blame the Russian Federation for PwC's withdrawal of the firm's audit opinions finds no support in the record. To the contrary, both PwC's senior Russian representative at the time (in a contemporaneous private conversation with U.S. Embassy officials in Moscow) and PwC's senior Yukos auditor (in sworn U.S. deposition testimony) confirm that PwC, in withdrawing its audit opinions, acted in accordance with applicable auditing standards, a conclusion supported by Mr. John Ellison, a former KPMG LLP partner, in his unchallenged expert report. The U.S. deposition testimony of Mr. Douglas Miller, the PwC partner in charge of auditing Yukos, is especially relevant, because (a) it was sought by counsel for Messrs. Khodorkovsky and Lebedev on the grounds that it would provide the best opportunity to obtain a truthful account of the reasons for PwC's actions, and (b) Mr. Miller repeatedly rejected Claimants' "harassment" theory.

25. On all of these points, the *RosInvestCo* and *Rovime* awards are inconsistent with the facts and Russian law, and ignore a wealth of uncontested international practice.

II.    **The Russian Federation Is Not Responsible For And Did Not Cause The Unwinding Of The Sibneft Merger**

26.    The Russian Federation is not responsible for the unwinding of Yukos' proposed merger with Sibneft because Claimants do not allege -- let alone establish -- that Sibneft was then exercising governmental authority or acting under the instructions of Russian State organs. Nor was the Russian Federation the cause of the unwinding of the merger. To the contrary, the Russian Federation repeatedly supported the proposed merger, and Claimants themselves acknowledge that the Russian Federation provided all of the approvals necessary for the merger, including approvals granted long after the Russian Federation's supposed attack on Yukos.

27.    The merger in fact collapsed because Yukos refused to accommodate Sibneft's request that Mr. Khodorkovsky, following his resignation from Yukos' management, be replaced by a Sibneft nominee as head of the to-be merged company. Sibneft's proposal would have left Yukos representatives in all of the surviving company's other senior management positions.

28.    Documents that Claimants were ordered to produce in these proceedings (over their objection) show that Claimants and Sibneft's principal shareholders agreed to unwind the merger without the payment of additional compensation by either side, an agreement fatal to Claimants' request for damages relating to the proposed merger. The same documents also reveal that Yukos' management proposed its own plan to unwind the merger without the payment of additional compensation, and that this plan contemplated the initiation of a "sham" lawsuit challenging the previously-completed exchange of Yukos and Sibneft shares. The contemplated lawsuit bears a striking resemblance to the actual lawsuit (challenged by Yukos in these arbitrations) that was brought by two of Yukos' shareholders and ultimately led to the legal unwinding of the merger without the payment of additional compensation.

29.    Claimants' assertion that the US$ 2 billion giga-dividend was required by the Sibneft merger is patently untrue. The record shows that the giga-dividend was approved on November 28, 2003 (and not on September 25, 2003, as Claimants falsely asserted in their Reply), one day after Yukos was informed that the Sibneft merger would not proceed. At the Extraordinary General Meeting of Yukos' shareholders held on November 28, Claimants voted against all the other shareholder proposals linked to the completion of the Sibneft merger, but supported payment of the giga-dividend "for Yukos" (that is, for Claimants to the extent of 70% of the dividend).

III    **Yukos Bears Sole Responsibility For The Consequences Of The Assessments Properly Made Against It, Because It Could Have Avoided Those Consequences -- And Reduced Its Liability By Well More Than Half – By Paying The Amounts Due During The First Quarter Of 2004, While Continuing To Challenge The Assessments In Full**

30.    During the first quarter of 2004, Yukos could have avoided well more than half of its ultimate tax exposure by paying its corporate profit taxes and the interest then due and by filing proper amended VAT returns in its own name. Had Yukos taken these few simple steps -- abiding by its own tax counsel's published advice as to how a taxpayer should mitigate its tax liabilities -- it would also have avoided all of the subsequent enforcement measures about which Claimants complain, and still preserved its right to seek a refund of all the taxes it paid.

31.    If Yukos had mitigated its liabilities in this way, its total exposure under the Russian court rulings that Claimants challenge in these arbitrations would have been capped at less than US$ 9.8 billion, rather than the US$ 25.8 billion that was ultimately assessed.

32.     Yukos had more than ample resources in the first quarter of 2004 to cap its tax exposure at less than US$ 9.8 billion and to satisfy that liability, even after paying its unprecedented US$ 2 billion giga-dividend, but it elected not to do so.

33.     Instead, Yukos pursued an irrational and ultimately self-destructive course of action, for which only the managers of Yukos, installed and controlled by Claimants, are to blame. This course of action included (a) Yukos' continuing denial of any liability for its assessed taxes, (b) Yukos' now acknowledged false denial that it controlled the sham trading shells, (c) Yukos' repeated obstruction of the actions taken by the Russian authorities to enforce and collect the company's overdue taxes, (d) Yukos' dissipation of its own assets and those of the companies it controlled, to frustrate the collection of the taxes it owed, and (e) Yukos' attempt to put pressure on the Russian Government by mounting an aggressive international lobbying and disinformation campaign that sought to politicize what, for the Russian authorities, was always a matter of tax evasion and collection.

34.     All of the subsequent enforcement proceedings and other measures about which Claimants now complain were thus the result of Yukos' own adamant refusal to acknowledge or mitigate its tax liabilities, and its repeated attempts to dissipate and conceal its assets and to frustrate the enforcement and collection of its overdue taxes. Had Yukos not persisted in this self-destructive course of action, there would have been no April injunction (discussed below), and YNG would not have been sold.

35.     Permitting Claimants to benefit from Yukos' self-inflicted wounds would contravene basic legal principles, and provide Claimants with a windfall -- beyond the billions of dollars they have already extracted from Yukos, including by way of dividends, share sales, and *stichting* assets -- to which they are not entitled.

**IV.     The Russian Federation Acted Properly In Enforcing The Tax Assessments Against Yukos, Including By Auctioning YNG**

36.     The tax assessments were enforced against Yukos in compliance with Russian law and after ample notice to Yukos. As the ECtHR unanimously concluded, there is "no reason to doubt that throughout the proceedings the actions of various authorities had a lawful basis and that the legal provisions in question were sufficiently precise and clear." The enforcement actions were also measured and appropriate in the circumstances and entirely consistent with international practice.

37.     Claimants' and Yukos' contention that Yukos was "surprised" by the timing of the assessment for 2000 and the need to make prompt payment is false and indicative of Yukos' lack of good faith. Promptly upon receipt of the December 29, 2003 audit report, Yukos' internal and external counsel advised Yukos that, under established Russian law and practice, it should expect to receive a final tax assessment within about a month, and that this assessment would require Yukos to make full payment promptly, most likely within one day. In the event, the tax assessment for 2000 was issued on April 14, 2004, more than two months later than Yukos' advisors had expected, and required payment in two days, not one.

38.     Although Yukos had ample notice of when and how much it would be required to pay, it made no effort to marshal the necessary assets, instead claiming that it was not able to pay, even though Claimants now acknowledge that Yukos had sufficient resources to pay all of its 2000 taxes.

39.     By the time of Yukos' April 2004 assessment, the tax authorities had learned that Yukos controlled the Lesnoy shell companies and had sought to prevent the payment of their overdue taxes by dissolving them. The tax authorities thus understandably applied to the Moscow Arbitrazh Court in April 2004 for enforcement of Yukos' 2000 tax liability and for an injunction prohibiting Yukos from selling or encumbering the company's shareholdings in its Russian subsidiaries.

40.     As the ECtHR held, the authorities' actions were neither arbitrary nor unfair:

"[T]he Ministry's action was lodged under the rule which made it unnecessary to wait until the end of the grace period if there was evidence that the dispute was insoluble and, regard being had to the circumstances of the case, [the Court] finds no indication of arbitrariness or unfairness […] in this connection." [emphases added]

41.     The April injunction did not affect Yukos' use of its substantial on- and off-shore cash resources, and did not affect Yukos' offshore assets at all. Yukos nonetheless falsely claimed that the injunction prevented Yukos from paying its taxes, again evidencing its lack of good faith and credibility.

42.     No further enforcement efforts were taken for more than two months. During this period, Yukos continued to generate close to US$ 2 billion each month in gross receipts that Yukos partly transferred off-shore and partly used to voluntarily pay its loan to GML's Moravel shell subsidiary -- but not to pay its tax liabilities.

43.     Yukos also began a pattern of diminishing the value of its assets, often to the benefit of Claimants and the Oligarchs whose interests they represented. For example, Yukos forced its production subsidiaries to guarantee Yukos' already outstanding US$ 1.6 billion loan from Moravel, corroborating the concerns that had led the authorities to obtain the April injunction.

44.     Following Yukos' failure to make (or even to promise to make) any tax payments, as well as its dissipation of substantial assets, Russia's bailiffs finally attached a number of Yukos' on-shore bank accounts at the end of June 2004 -- ten weeks after the April tax assessment and 26 weeks after Yukos' legal advisors advised that it needed to be prepared to pay promptly. It was only then that Yukos began to pay some, but not all, of its taxes.

45.     The authorities also sought to seize Yukos' shares in its production subsidiaries to prevent Yukos from encumbering them. True to form, Yukos attempted to frustrate the bailiffs' efforts by terminating the share registry company contract for its production subsidiaries and concealing their registries, directing that they be sent from central Moscow to remote locations around the country.

46.     Yukos also took steps to reduce the value of its largest production subsidiary, YNG. First, Yukos caused YNG to stop paying its mineral extraction taxes, imperiling its production licenses. Second, Yukos and its trading shells stopped paying YNG for its crude oil, leaving YNG with more than US$ 4 billion in unpaid invoices. And third, Yukos continued to divert funds to GML, its majority shareholder, arranging for the payment of more than US$ 700 million to Moravel, even after the cash freeze orders were in place.

47.     Yukos also made a series of bad faith offers to "settle" a portion of its tax liabilities, repeatedly offering Sibneft shares as a partial payment or as security for proposed future payment, even though Russian law did not allow payment in kind, Yukos' title to the proffered shares had been challenged by a third-party, and an injunction had been issued (at the request of the third-party) prohibiting their sale or encumbrance.

48.     During this entire period, nothing prevented Yukos from selling its assets subject to the bailiffs' approval and using the proceeds to pay its tax obligations.

49.     Thus, the authorities found themselves confronted by a company that was fiercely resisting the payment of its overdue taxes, that had previously obstructed its tax audit, lied to the tax authorities and courts, and attempted to make itself and its subsidiaries judgment proof, and that was now burdening the tax authorities' principal security -- YNG -- with new liabilities. In these circumstances, the bailiffs understandably decided to sell a majority of YNG's shares -- the only

realistic way to timely collect Yukos' unpaid taxes. Despite criticizing the bailiffs for not adequately documenting their decision-making process, the ECtHR concluded that the bailiffs' actions were not unreasonable. It is commonplace in other countries too for tax collection authorities to sell first the assets that best ensure payment.

50.     The sale of the YNG shares was carried out in accordance with Russian law and consistent with international practice. The authorities could have sold the shares to a designated purchaser in a directly negotiated transaction, but instead granted Yukos' request that the shares be auctioned. A formal and careful appraisal was conducted by DKW, and the starting price for the auction was set at a level consistent with DKW's appraisal, taking account of the fact that only 76.79% of the company's shares were sold and that YNG had its own outstanding tax liabilities. All bidders, foreign or domestic, were welcome to participate.

51.     Claimants and Yukos did all they could to prevent the auction from succeeding, threatening a "lifetime of litigation" against anyone who participated in or facilitated the sale. Yukos also initiated sham bankruptcy proceedings in Houston, obtaining a temporary restraining order ("TRO") that prevented all the previously announced bidders and all of their banks from participating in the auction. If the price achieved was lower than it might otherwise have been, the fault lies solely with Claimants and Yukos.

52.     The YNG auction achieved a price of approximately US$ 9.4 billion, US$ 500 million more than the starting price. This result was consistent with the shares' appraised value and contemporaneous fair market value estimates.

53.     The evidence does not support Claimants' contention that the winning bidder, Baikal Finance, conspired with Rosneft. Rather, Baikal Finance found itself unable to finance its winning bid because of the Houston court's TRO, and thus at risk of losing its US$ 1.7 billion deposit unless a substitute purchaser, not dependent on immediate bank financing, could be found on very short notice. Rosneft simply seized a commercial opportunity that presented itself as a result of Claimants' misconduct.

54.     The net proceeds of the YNG sale were not sufficient to meet all of Yukos' tax obligations. The Russian authorities nonetheless gave Yukos ample time to pay the remaining balance, but it declined to do so, making clear that its priority was to place assets behind the shield of the Dutch *stichtings*.

**V.     The Russian Federation Acted Properly In Connection With Yukos' Bankruptcy, Which Was Precipitated By Yukos' Failure To Pay Its Debts To The SocGen Syndicate, And Is Not Attributable To The Russian Federation**

55.     Claimants' bankruptcy-related claims fail because critical conduct essential to these claims was taken by actors for which the Russian Federation is not responsible, including the SocGen syndicate, YNG, Rosneft, the Federal Tax Service acting as creditor, the meeting and committee of Yukos' creditors, Yukos' interim manager and bankruptcy receiver, the participants in Yukos' bankruptcy auctions, and the purchasers of the auctioned assets sold. In taking the actions complained of by Claimants, none of these actors was exercising sovereign authority or acting pursuant to the direction or control of sovereign authority. Claimants have provided no evidence on which the Tribunal could make a contrary finding.

56.     Yukos' dilatory and obstructionist treatment of its commercial creditors paralleled closely its treatment of the tax authorities. In both instances, Yukos (a) falsely claimed it was unable to meet its obligations, (b) forced its creditors to pursue their claims in multiple court proceedings where Yukos presented unsubstantiated defenses, (c) offered to negotiate with its creditors only when they were close to collecting their claims, (d) made unrealistic settlement proposals that were

subsequently withdrawn, and (e) together with its controlling shareholders, strenuously resisted all collection efforts, prompting more aggressive action on the part of its creditors.

57.   Both sides agree that Yukos' bankruptcy was initiated by the SocGen syndicate, based upon Yukos' failure to pay an outstanding English court judgment after it was recognized in Russia.

58.   The SocGen syndicate simultaneously also sought payment of the same debt from Rosneft pursuant to the 2004 loan guarantee that Yukos had foisted on YNG, which Rosneft then owned. Although Rosneft disputed the validity of the guarantee, Rosneft required forbearance from the same banks on covenant breaches arising from the YNG acquisition, and Rosneft needed the banks' cooperation for its planned IPO.   The convergence of the syndicate's and Rosneft's commercial interests resulted in their agreeing that Rosneft would pay the syndicate in full, but only after the syndicate had pursued all legal avenues to obtain payment from Yukos, the primary obligor. If Rosneft instead paid, the syndicate's rights under the loan agreement were to be assigned to Rosneft.

59.   Claimants acknowledge that this agreement was commercially-motivated and on commercial terms, but contend that its confidentiality clause evidences a conspiracy on the part of the SocGen syndicate to act secretly on behalf of Rosneft, which Claimants improperly equate with Respondent. The confidentiality clause, however, was itself a standard commercial term necessary to preserve the possibility that Yukos would pay the SocGen syndicate before Rosneft became unconditionally obligated to do so, and remained in effect only for so long as Yukos' payment would have discharged Rosneft's own obligation to pay the syndicate.

60.   Yukos satisfied the criteria for bankruptcy under Russian law due to its persistent failure to pay its commercial creditors, and was insolvent long before the proceedings were commenced. This is also undisputed.

61.   The proceedings were conducted in compliance with Russian law and international practice. The courts properly allowed the Federal Tax Service's, Rosneft's and YNG's claims, and substantial amounts of YNG's claims were never disputed by Yukos. Belying Claimants' discrimination charge, the courts also allowed some Yukos related-party claims, but properly rejected other abusive claims, such as the Moravel loan, a barely disguised attempt to turn equity into debt.

62.   Yukos' management, actively supported by Claimants, had the opportunity to present a rehabilitation plan to the meeting of creditors. The rough outline management submitted was, however, legally defective and did not provide any basis for creditors to prefer rehabilitation to liquidation. It was not properly presented to or approved by Yukos' shareholders, did not meet the legal requirement that the company's tax claims be satisfied within six months, and did not ensure full, let alone timely, payment of Yukos' creditors' claims.

63.   Once Yukos' liquidation was properly approved, the company's assets were sold at auction in accordance with Russian law and international practice. Yukos' receiver obtained appraisals for the fair value of the assets, and used those appraisals to set minimum bids in the auctions, all of which were exceeded, some by very large margins. The auctions were open to domestic and foreign bidders, adequately noticed and advertised, and competitive. To the extent that any bidders may have been discouraged from participating, this was again the result of Claimants and Yukos having threatened potential bidders with legal action. While the aggregate results exceeded Yukos' own (and other) contemporaneous fair market value estimates, more than US$ 9 billion in creditor claims nonetheless remained unsatisfied.

**VI.   Claimants Have Failed To Establish *Sine Qua Non* Elements Of Their Article 13 And 10(1) ECT Claims**

**A.   Article 21 ECT**

64.   First, as an initial matter, Claimants' claims must be based on measures outside the taxation carve-out of Article 21(1) ECT or, alternatively, within Article 21(1) ECT, but subject to one of the claw-backs of Article 21(2) to (5) ECT.

65.   Taxation carve-outs such as this one fulfill plainly legitimate functions. They (a) preserve the Contracting Parties' sovereign power in the field of taxation, which is of critical importance to the very existence of a State, (b) delineate the extensive network of investment treaties from the even broader network of taxation treaties, (c) pay due regard to the complexity of tax matters, and, in many cases, preserve the coordination role of the competent tax authorities under double taxation treaties.

66.   To fulfill these functions, taxation carve-outs are typically broad, covering all aspects of tax regimes, including tax enforcement measures.

67.   Article 21(1) ECT, under its plain meaning, covers the whole range of measures taken by all branches of government in the field of taxation. Tax legislation and enforcement measures are inextricably linked, and it is not possible to meaningfully dissociate them in the context of Article 21(1) ECT.

68.   The core allegations on which Claimants base their claims are squarely within the scope of Article 21(1) ECT: tax audits, tax assessments, interest and fines provoked by Yukos' failure to pay its assessed taxes, measures to ensure the effective collection of its taxes, and the sale of Yukos' assets to satisfy its tax liabilities.

69.   Claimants seek to avoid Article 21 ECT on two grounds, that Article 21(7)(a) ECT limits the scope of the taxation carve-out to tax legislation and tax treaties and does not apply to *mala fide* taxation measures. These arguments are baseless.

70.   Article 21(7)(a) ECT contains an illustrative list of taxation measures that does not replace the term "measures" with the term "provisions," but underscores that the term "Taxation Measures" covers all aspects of the tax regime, including international and domestic measures.

71.   Claimants' position that Article 21(1) ECT is inapplicable to the taxation measures they complain about fails as a matter of fact and law. The record shows that the taxation measures at issue were a justified response to Yukos' massive tax fraud and its willful strategy to obstruct efforts to collect the taxes due. As a matter of law, Claimants mix two issues, the concept and definition of "Taxation Measures," on the one hand, and their legality, on the other. Legality is determined under Part III of the ECT, but only to the extent of the claw-backs pursuant to Article 21(2) to (5) ECT.

72.   Article 21 ECT contains no claw-back for Article 10(1) ECT, and the Tribunal therefore lacks jurisdiction over core allegations of Claimants' Article 10(1) ECT claims.

73.   Article 21(5) ECT contains a claw-back for Article 13 ECT claims, but is applicable only to "taxes," and is combined with a mandatory referral to the competent tax authorities, a procedure invoked by Respondent in these proceedings. The expropriation claw-back, in its ordinary meaning, supported by the *travaux préparatoires*, applies to charges imposed by the State for public purposes, excluding tax enforcement and collection measures. When compared to the varying practices with respect to clawbacks in taxation carve-outs, the deliberate choice of the ECT negotiating States to reinstate expropriatory "taxes" represents a middle ground, which must be respected.

**B.     Article 13(1) ECT**

74.     In order to establish their claim for a breach of Article 13(1) ECT, Claimants must show that, in addition to being outside the scope of the taxation carveout of Article 21(1) ECT -- or within Article 21(1) ECT, but **reinstated** by Article 21(5) ECT -- the measures complained of must be "measures having effect equivalent to nationalization or expropriation."

75.     <u>First</u>, Claimants have failed to establish that conduct not carved-out by Article 21 ECT that is (a) attributable to Respondent, and (b) an exercise of its sovereign power caused a total or near total deprivation of Claimants' investment. Critically, the core allegations of Claimants' claims are outside the scope of Article 13(1) ECT by virtue of Article 21 ECT. Moreover, Yukos itself engaged in conduct -- by refusing to pay the assessments against it when due, while preserving its right to challenge them – that directly resulted in the company's demise and the ensuing loss of Claimants' investments. Finally, conduct that was essential to Yukos' liquidation, including in particular the filing of the bankruptcy petition by the SocGen syndicate, and the creditors' meeting decision to liquidate Yukos, is not expropriatory because it is not attributable to Respondent under the rules of State responsibility, or does not involve an exercise of sovereign power.

76.     <u>Second</u>, Claimants have failed to establish that the measures complained of frustrated distinct, reasonable, investment-backed expectations, an important element in assessing whether regulatory measures amount to "measures having effect equivalent to nationalization or expropriation." Claimants had no right or legitimate expectation to operate Yukos in violation of Russian law, and no right or legitimate expectation that Respondent would exempt Yukos from the tax enforcement and collection measures about which Claimants complain if Yukos failed to pay its taxes and obstructed the collection of taxes due.

77.     In particular, Claimants have failed to establish that Respondent at any time made a representation, based upon complete disclosure, that it would allow Yukos to operate its fraudulent tax evasion scheme or refrain from enforcing and collecting the taxes Yukos owed. Yukos' tax evasion scheme was illegal under Russian law when Claimants made their investments, and the tax enforcement and collection measures taken against Yukos were all provided for by Russian law at that time. The bad faith taxpayer anti-abuse doctrine that Respondent's tax authorities and courts applied to counter Yukos' tax evasion  dates back to the mid 1990s, well before Claimants acquired their Yukos shares.

78.     <u>Third</u>, putting aside the other elements required to establish "measures having effect equivalent to nationalization or expropriation," the executive and judicial measures at issue, in any event, constitute a legitimate exercise of Respondent's regulatory power.

79.     The measures alleged to be expropriatory are well within the range of what is generally accepted as a legitimate exercise of States' police powers. First, Respondent has established that the measures complained of accord in all material respects with international and comparative standards.

80.     Second, the measures challenged by Claimants conform with Russian law, which in turn accords with international standards, and have been reviewed and upheld by multiple levels of Respondent's judiciary, including the Russian Supreme Court.

81.     Third, the European Court of Human Rights has found that the very same measures Claimants allege to be expropriatory were a legitimate exercise of Respondent's regulatory power.

82.     Fourth, the measures complained of must be assessed in their proper context -- Yukos' massive tax evasion, compounded by its illegal and deliberate strategy to frustrate any effort by the authorities to collect the company's overdue taxes.

83.     Contrary to Claimants' perception, respect for the rule of law is not a one-way-street. Foreign investors have a duty to abide by the law, pay taxes, provide required disclosures of their activities in the host State, and cooperate with the authorities.

84.     Measures taken to combat illegal conduct may legitimately result in the loss of an investment. Yukos' tax evasion scheme violated Russian law, and the assessment of the evaded taxes was a legitimate measure to combat Yukos' fraud. The resulting tax enforcement and collection measures were completely justified in light of Yukos' failure to pay the assessed taxes and its willful obstruction of Respondent's collection efforts. Indeed, none of the subsequent enforcement measures, including the auction of YNG, would have occurred, and Yukos would not have been liquidated, had Yukos acted as a responsible taxpayer should have done.

### C.     Article 10(1) ECT

85.     Claimants' Article 10(1) ECT claims fail for many of the same reasons as their expropriation claim. At the threshold, the core allegations on which Claimants base their Article 10(1) ECT claims are within the taxation carve-out of Article 21(1) ECT. The Tribunal therefore lacks jurisdiction over these claims and Article 10(1) ECT is inapplicable.

86.     Again, at the threshold, critical conduct alleged to be unlawful under Article 10(1) ECT is not attributable to Respondent or not an exercise of sovereign authority. The harm attributed to Respondent's alleged breaches of Article 10(1) ECT, the loss of Claimants' Yukos shares, was caused by Yukos' own misconduct and conduct of third parties not attributable to Respondent. Claimants have failed to show that any of the irregularities they allege in the administrative and judicial proceedings at issue affected the outcome of the case, the liquidation of Yukos, and the ensuing loss of Claimants' shares.

87.     In any event, Claimants have failed to establish that the challenged measures interfered with their legitimate expectations at the time they made their investment or were not taken in the proper exercise of the authorities' statutory duties. The contested measures (a) accord with international and comparative standards, (b) were reviewed and upheld by the Russian courts, and (c) have been assessed by the ECtHR to be a legitimate exercise of Respondent's taxation power.

88.     Finally, but no less important, the host State's conduct under Article 10(1) ECT cannot be assessed in isolation from that of the investor or its investment. Yukos' massive tax fraud and illegal obstruction of the efforts to collect the taxes it owed provoked the measures complained of, which were justified responses to combat Yukos' illegal conduct and enforce overdue taxes. None of the measures at issue can therefore be said to be arbitrary, unfair, or inequitable for purposes of Article 10(1) ECT.

89.     Nor are such measures discriminatory within the meaning of Article 10(1) ECT. Article 10(1) ECT does not establish a right of impunity based on the host State's authorities' alleged failure to enforce mandatory legal requirements, and Claimants have in any event failed to show nationality-based discrimination, or unjustified differential treatment of similar cases.

### VII.   The Tribunal Lacks Jurisdiction Over Claimants' Claims Concerning The Alleged Mistreatment Of Messrs. Khodorkovsky And Lebedev And Other Yukos Officials, And In Any Event, These Claims, And Claims Concerning Searches Of Yukos Records, Are Unsupported

90.     The Tribunal should reject Claimants' attempt to distract its attention from the only matter that is genuinely at issue in these arbitrations -- Claimants' investments in Yukos, and the consequences for those investments of Yukos' tax evasion scheme -

- with extensive allegations concerning the arrests and prosecution of Yukos officials and searches and seizures of the company's records.

91.     First, the Tribunal cannot assert jurisdiction under Article 26 ECT to address alleged violations of the rights of Yukos officials, because Claimants have not proven that any such violations directly impaired Claimants' management or control of their investments. To the contrary, Yukos expressly confirmed after Mr. Khodorkovsky's arrest and subsequent resignation that they had "no impact whatsoever on [its] operations," and Mr. Lebedev did not even hold a position with Yukos at that time. The prosecutions of Messrs. Khodorkovsky and Lebedev likewise did not impair Yukos' performance, which the company informed its investors in 2005 "was extremely healthy."

92.     Claimants have also failed to establish that the prosecutions of any Yukos officials reflect a systemic failure of the Russian judicial system or, at a minimum, were fundamentally unjustified or groundless. To the contrary, all were reviewed by the Russian courts at multiple levels, and by the ECtHR (with respect to the initiation of Mr. Khodorkovsky's prosecution), and were found to be in accord with Russian law and international standards. Tellingly, Claimants have never disputed that Mr. Khodorkovsky, Mr. Lebedev, or any of the other Yukos officials who were convicted of crimes related to their management of Yukos, actually committed those crimes, relying instead on conclusory complaints about various procedural matters, based on mischaracterizations of the pertinent facts.

93.     Finally, Claimants have not established that the searches of certain of Yukos' offices and the seizure of certain of its records pursuant to the official investigations of its misconduct were expropriatory, evidence a systemic judicial failure, or were otherwise fundamentally unjustified or groundless. This allegation is at best ironic, in light of Yukos' unrelenting obstruction of those investigations. It is also unsustainable. All of these procedures conformed to Russian law, and Yukos' own contemporaneous public statements and internal documents confirm that Yukos itself did not believe they had any significant impact on the company.

**VIII.    The Tribunal Lacks Jurisdiction Over Claimants' Claims, Or Must Dismiss Them, Because They Are Based On Illegal Conduct By Claimants And The Yukos Managers They Installed And Controlled**

94.     The Oligarchs who controlled Claimants acquired and consolidated their investments in Yukos through illegal acts and bad faith conduct, and thereafter perpetrated -- either directly or through the Yukos managers they installed and controlled -- a long series of illegal acts, including the tax evasion that is at the heart of these arbitrations.

95.     Claimants contend that these illegalities are "collateral" or "unrelated to" their investments, even though they relate to the acquisition or enhancement of the value of Yukos, or to Claimants' own unlawful abuse of the Russia-Cyprus Tax Treaty. Through that abuse, Claimants themselves fraudulently evaded -- in violation of both Russian and Cypriot criminal laws -- more than US$ 230 million in Russian withholding taxes, and more than triple that amount in Russian profit taxes.

96.     This history of repeated illegal conduct by Claimants -- culminating in the diversion of assets worth billions of dollars to the illegally-created Dutch *stichtings*, placing those assets beyond the reach of the Russian tax authorities -- deprives the Tribunal of jurisdiction over Claimants' claims, because ECT protection does not extend to illegal investments, or requires that the Tribunal dismiss those claims under the principle of unclean hands. The Tribunal should reject Claimants' attack on the existence of the principle of unclean hands in international law, as well as their baseless charge that Respondent is estopped from raising Claimants' illegalities.

- 46 -

### IX.   Claimants Have Failed To Establish Any Entitlement To Damages

97.   Claimants are not entitled to any compensation, in light of (a) their own illegal conduct, including their and the Oligarchs' illegal acquisition and consolidation of their ownership and control of Yukos, their abuse of the Russia-Cyprus Tax Treaty, and their implementation of Yukos' tax evasion scheme, and (b) Yukos' failure to mitigate its tax liability, and Yukos' and Claimants' actions to prevent the collection of Yukos' overdue taxes.

98.   Claimants are not entitled to any compensation for acts of the Russian Federation that are within the carve-out of Article 21(1) ECT and not within the clawback of Article 21(5) ECT.

99.   Claimants also are not entitled to any compensation based on Yukos' claimed value at any given point in time, because they have failed to demonstrate any causal link between any diminution in Yukos' then-supposed value and specific violations of the ECT. Claimants' "all-or-nothing" approach does not provide a means by which the Tribunal can (a) assess whether the Russian Federation's actions constituted an "expropriation," or (b) quantify the damages, if any, arising in the event some, but not all, of the measures Claimants complain about are found to violate the ECT. This is the inevitable result of Claimants' failure to present a damages measure, but instead a static valuation, devoid of any causation analysis.

100.   Claimants' valuations also fail on their own terms, because they are entirely dependent on Claimants' unsustainable valuation date of November 21, 2007.

101.   Claimants and their expert concede that the valuations presented in their opening submissions are infected by numerous material errors. These errors fatally undermine Claimants' core assertions and render Claimants' evidence unreliable for any purpose. The revised valuations submitted in Claimants' Reply are likewise riddled with errors and are manifestly result-driven, leaving Claimants with no competent evidence of damages at all. This is true, too, of their "method of collection" scenarios, which are unsupportable and fail of their own terms.

102.   Once Yukos chose not to mitigate its tax liability during the first quarter of 2004 -- by paying no more than US$ 9.8 billion, capping its tax exposure at that amount and avoiding all of the subsequent enforcement measures -- there was no realistic means by which Yukos could have paid all of its liabilities, let alone continued in business as a going concern. Claimants' failure to mitigate is a further reason why their damages model, based on the claimed value of Yukos as of a given date, does not provide a meaningful measure of damages. Thus, even if the Tribunal were to conclude that an award of damages is warranted, it must be capped at Claimants' proportionate interest in the amount, if any, of Yukos' unavoidable liabilities -- not more than US$ 9.8 billion -- that the Tribunal concludes were improperly assessed.

103.   Claimants' damages claim represents a 58% compound annual rate of return on their investment in Yukos. Claimants' requested rate of return fails to take account of Claimants', the Oligarchs', and Yukos' unlawful misconduct and is well beyond that which any legitimate investor would have earned.

104.   Measured against a reasonable return on investment, and after taking account of the returns on their investment in Yukos that Claimants have already received (not to mention the fruits of their ill-gotten gains and assets secreted offshore), Claimants have not incurred any damages at all.

## IV.   PARTIES' REQUESTS FOR RELIEF

### A.   RELIEF REQUESTED BY CLAIMANTS

110.   Claimants request that the Tribunal render an Award:

    (1)   Declaring that the Respondent has breached its obligations under Article 10(1) of the Energy Charter Treaty;

    (2)   Declaring that the Respondent has breached its obligations under Article 13(1) of the Energy Charter Treaty;

    (3)   Ordering the Respondent to pay to the Claimants, in full reparation of their damages, an amount to be determined by the Arbitral Tribunal, estimated by the Claimants at no less than US$ 114.174 billion, to be shared between the Claimants in the following proportions:

        ▪   Hulley Enterprises Limited    US$ 93.229 billion

        ▪   Yukos Universal Limited    US$ 4.666 billion

        ▪   Veteran Petroleum Limited    US$ 16.279 billion

    (4)   Ordering the Respondent to pay post-award interest on the above sums to the Claimants at the rate of Libor + 4% compounded annually from the date of the Award until the date of full payment;

    (5)   Ordering the Respondent to pay to the Claimants the full costs of these arbitrations, including, without limitation, arbitrators' fees, administrative costs of the PCA, counsel fees, expert fees and all other costs associated with these proceedings;

    (6)   Dismissing all of the Respondent's defenses;

    (7)   Ordering any such further relief as it may deem appropriate.[7]

### B.   RELIEF REQUESTED BY RESPONDENT

111.   Respondent requests that the Tribunal render an Award:

    (a)   Dismissing Claimants' claims on the ground that the Tribunal lacks jurisdiction to entertain them;

    (b)   In the alternative, dismissing Claimants' claims on the ground that they are inadmissible;

    (c)   In the alternative, dismissing Claimants' claims on the merits in their entirety;

    (d)   In the alternative, declaring that Claimants are not entitled to the damages they seek, or to any damages;

    (e)   Ordering Claimants to pay the Russian Federation's costs, expenses, and attorney's fees;

---

[7]   Reply ¶ 1199.  *See also* Claimants' Memorial on the Merits, 15 September 2010 (hereinafter "Memorial") ¶ 1056; Claimants' Post-Hearing Brief, 21 December 2012 (hereinafter "Claimants' Post-Hearing Brief") ¶ 302.

(f)     Granting such further relief against the Claimants as the Tribunal deems fit and proper.[8]

## V.     APPLICABLE LAW

### A.     PROCEDURAL LAW

112.   The procedural law to be applied by the Tribunal consists of the procedural provisions of the ECT (particularly Article 26), the UNCITRAL Rules of 1976, and, because The Hague is the place of arbitration, any mandatory provisions of Dutch arbitration law.  The Final Awards are made pursuant to Article 1049 of the *Netherlands Arbitration Act 1986.*

### B.     SUBSTANTIVE LAW

113.   The substantive law to be applied by the Tribunal consists of the substantive provisions of the ECT, the Vienna Convention on the Law of Treaties ("**VCLT**"),[9] and applicable rules and principles of international law, including those authoritatively set out in the Articles on Responsibility of States for Internationally Wrongful Acts of the International Law Commission of the United Nations ("**ILC Articles on State Responsibility**").[10]  In addition to the foregoing sources, the national law of the Russian Federation is relevant with regard to certain issues.

#### 1.     Energy Charter Treaty

114.   Throughout this Award, the Tribunal refers to and analyzes specific provisions of the ECT.  For ease of reference, the key relevant provisions are also collected and reproduced below, in the order in which they appear in the Treaty:

---

[8]     Counter-Memorial ¶ 1654; Respondent's Rejoinder on the Merits, 16 August 2012 (hereinafter "Rejoinder") ¶ 1748; Respondent's Post-Hearing Brief, 21 December 2012 (hereinafter "Respondent's Post-Hearing Brief") ¶ 263.

[9]     Vienna Convention on the Law of Treaties, Vienna, 23 May 1969, 1155 UNTS 331.

[10]    Draft Articles on Responsibility of States for Internationally Wrongful Acts with commentaries (Text adopted by the International Law Commission at its fifty-third session, in 2001), Arts. 1–11 and 28–39, Exh. C-1042; Arts. 49–54, Exh. C-1681 (hereinafter "ILC Articles on State Responsibility").  The full text of the ILC Articles, along with parts of the official commentary, was also submitted by Respondent.  *See* Exhs. R-1031 and R-4235.  The Tribunal is aware that Part II of the ILC Articles on State Responsibility, which sets out the consequences of internationally wrongful acts, is concerned with claims between States and may not directly apply to cases involving persons or entities other than States.  That being said, the ILC Articles reflect customary international law in the matter of state responsibility, and to the extent that a matter is not ruled by the ECT and there are no circumstances commanding otherwise, the Tribunal will turn to the ILC Articles on State Responsibility for guidance.  The Tribunal further notes that both Parties have cited to and relied on Parts I and II of the ILC Articles on State Responsibility in their submissions.

*Article 10*
PROMOTION, PROTECTION AND TREATMENT OF INVESTMENTS

(1)   Each Contracting Party shall, in accordance with the provisions of this Treaty, encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area.  Such conditions shall include a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment.  Such Investments shall also enjoy the most constant protection and security and no Contracting Party shall in any way impair by unreasonable or discriminatory measures their management, maintenance, use, enjoyment or disposal.  In no case shall such Investments be accorded treatment less favourable than that required by international law, including treaty obligations.

[. . .]

*Article 13*
EXPROPRIATION

(1)   Investments of Investors of a Contracting Party in the Area of any other Contracting Party shall not be nationalized, expropriated or subjected to a measure or measures having effect equivalent to nationalization or expropriation (hereinafter referred to as "Expropriation") except where such Expropriation is:

(a)   for a purpose which is in the public interest;

(b)   not discriminatory;

(c)   carried out under due process of law; and

(d)   accompanied by the payment of prompt, adequate and effective compensation.

Such compensation shall amount to the fair market value of the Investment expropriated at the time immediately before the Expropriation or impending Expropriation became known in such a way as to affect the value of the Investment (hereinafter referred to as the "Valuation Date").

Such fair market value shall at the request of the Investor be expressed in a Freely Convertible Currency on the basis of the market rate of exchange existing for that currency on the Valuation Date.  Compensation shall also include interest at a commercial rate established on a market basis from the date of Expropriation until the date of payment.

[. . .]

*Article 21*
TAXATION

(1)   Except as otherwise provided in this Article, nothing in this Treaty shall create rights or impose obligations with respect to Taxation Measures of the Contracting Parties.  In the event of any inconsistency between this Article and any other provision of the Treaty, this Article shall prevail to the extent of the inconsistency.

[. . .]

(5)   (a)   Article 13 shall apply to taxes.

(b)    Whenever an issue arises under Article 13, to the extent it pertains to whether a tax constitutes an expropriation or whether a tax alleged to constitute an expropriation is discriminatory, the following provisions shall apply:

    (i)    The Investor or the Contracting Party alleging expropriation shall refer the issue of whether the tax is an expropriation or whether the tax is discriminatory to the relevant Competent Tax Authority. Failing such referral by the Investor or the Contracting Party, bodies called upon to settle disputes pursuant to Article 26(2)(c) or 27(2) shall make a referral to the relevant Competent Tax Authorities;

    (ii)    The Competent Tax Authorities shall, within a period of six months of such referral, strive to resolve the issues so referred. Where nondiscrimination issues are concerned, the Competent Tax Authorities shall apply the non-discrimination provisions of the relevant tax convention or, if there is no non-discrimination provision in the relevant tax convention applicable to the tax or no such tax convention is in force between the Contracting Parties concerned, they shall apply the non-discrimination principles under the Model Tax Convention on Income and Capital of the Organisation for Economic Co-operation and Development;

    (iii)    Bodies called upon to settle disputes pursuant to Article 26(2)(c) or 27(2) may take into account any conclusions arrived at by the Competent Tax Authorities regarding whether the tax is an expropriation. Such bodies shall take into account any conclusions arrived at within the six-month period prescribed in subparagraph (b)(ii) by the Competent Tax Authorities regarding whether the tax is discriminatory. Such bodies may also take into account any conclusions arrived at by the Competent Tax Authorities after the expiry of the six-month period;

    (iv)    Under no circumstances shall involvement of the Competent Tax Authorities, beyond the end of the six-month period referred to in subparagraph (b)(ii), lead to a delay of proceedings under Articles 26 and 27.

[. . .]

(7)    For the purposes of this Article:

(a)    The term "Taxation Measure" includes:

    (i)    any provision relating to taxes of the domestic law of the Contracting Party or of a political subdivision thereof or a local authority therein; and

    (ii)    any provision relating to taxes of any convention for the avoidance of double taxation or of any other international agreement or arrangement by which the Contracting Party is bound.

(b)    There shall be regarded as taxes on income or on capital all taxes imposed on total income, on total capital or on elements of income or of capital, including taxes on gains from the alienation of property, taxes on estates, inheritances and gifts, or substantially similar taxes, taxes on the total amounts of wages or salaries paid by enterprises, as

well as taxes on capital appreciation.

(c)    A "Competent Tax Authority" means the competent authority pursuant to a double taxation agreement in force between the Contracting Parties or, when no such agreement is in force, the minister or ministry responsible for taxes or their authorized representatives.

(d)    For the avoidance of doubt, the terms "tax provisions" and "taxes" do not include customs duties.

[. . .]

*Article 26*
SETTLEMENT OF DISPUTES BETWEEN AN INVESTOR AND A CONTRACTING PARTY

(1)    Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III shall, if possible, be settled amicably.

(2)    If such disputes can not be settled according to the provisions of paragraph (1) within a period of three months from the date on which either party to the dispute requested amicable settlement, the Investor party to the dispute may choose to submit it for resolution:

[. . .]

(c)    in accordance with the following paragraphs of this Article.

(3)    (a)    Subject only to subparagraphs (b) and (c), each Contracting Party hereby    gives its unconditional consent to the submission of a dispute to international    arbitration or conciliation in accordance with the provisions of this Article.

[. . .]

(4)    In the event that an Investor chooses to submit the dispute for resolution under subparagraph (2)(c), the Investor shall further provide its consent in writing for the dispute to be submitted to:

[. . .]

(b)    a sole arbitrator or ad hoc arbitration tribunal established under the Arbitration Rules of the United Nations Commission on International Trade Law (hereinafter referred to as "UNCITRAL");

[. . .]

(6)    A tribunal established under paragraph (4) shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law.

[. . .]

(8)    The awards of arbitration, which may include an award of interest, shall be final and binding upon the parties to the dispute.  An award of arbitration concerning a measure of a sub-national government or authority of the disputing Contracting Party shall provide that the Contracting Party may pay monetary damages in lieu of any other remedy granted.  Each Contracting Party shall carry out without delay any such award and shall make provision for the effective enforcement in its Area of such awards.

**2.   Vienna Convention on the Law of Treaties**

115.  Relevant provisions of the VCLT are as follows:

*Article 31*
*General rule of interpretation*

1.  A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose

2.  The context for the purpose of the interpretation of a treaty shall comprise, in addition to the text, including its preamble and annexes:

   *(a)*  any agreement relating to the treaty which was made between all the parties in connection with the conclusion of the treaty;

   *(b)*  any instrument which was made by one or more parties in connection with the conclusion of the treaty and accepted by the other parties as an instrument related to the treaty.

3.  There shall be taken into account, together with the context:

   *(a)*  any subsequent agreement between the parties regarding the interpretation of the treaty or the application of its provisions;

   *(b)*  any subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation;

   *(c)*  any relevant rules of international law applicable in the relations between the parties.

4.  A special meaning shall be given to a term if it is established that the parties so intended.

*Article 32*
*Supplementary means of interpretation*

1.  Recourse may be had to supplementary means of interpretation, including the preparatory work of the treaty and the circumstances of its conclusion, in order to confirm the meaning resulting from the application of article 31, or to determine the meaning when the interpretation according to article 31:

   *(a)*  leaves the meaning ambiguous or obscure; or

   *(b)*  leads to a result which is manifestly absurd or unreasonable.

*Article 33*
*Interpretation of treaties authenticated in two or more langauges*

1.  When a treaty has been authenticated in two or more languages, the text is equally authoritative in each language, unless the treaty provides or the parties agree that, in case of divergence, a particular text shall prevail.

2.  A version of the treaty in a language other than one of those in which the text was authenticated shall be considered an authentic text only if the treaty so provides or the parties so agree.

3.  The terms of the treaty are presumed to have the same meaning in each authentic text.

4.  Except where a particular text prevails in accordance with paragraph 1, when a comparison of the authentic texts discloses a difference of meaning which

the application of articles 31 and 32 does not remove, the meaning which best reconciles the texts, having regard to the object and purpose of the treaty, shall be adopted.

116. Where appropriate, provisions of the ILC Articles on State Responsibility and Russian law are set out in relevant parts of the Award.  Additionally, where appropriate, the Tribunal cites to decisions of other international courts and tribunals and legal commentaries which the Parties have submitted as relevant sources to consider in deciding the arbitrations.

## VI.   SUMMARY OF WITNESS TESTIMONY

117. In the merits phase of these proceedings, Claimants and Respondent each submitted statements or opinions from 11 witnesses.[11]  In all, the Tribunal has reviewed over 1,400 pages of written testimony, as well as thousands of exhibits to the witness statements and opinions.

118. The purpose of the present part of the Award is to provide an overview of the witnesses' evidence.  It is not meant to be exhaustive.  Rather, it serves as a summary of the vast evidentiary foundation on which the Tribunal has reached its conclusions.  Additional references to witness testimony, including specific extracts of their oral examinations, are set out in the relevant portions of the Tribunal's analysis of the evidentiary record.[12]

119. The Tribunal has considered the evidence of those witnesses that were cross-examined, as well as those witnesses who submitted written statements but were not called to the Hearing.  With respect to this latter category, the Tribunal has kept in mind that these witnesses were not

---

[11]   Having initially submitted statements or opinions from 12 witnesses, on 4 October 2012, shortly before the Hearing on the Merits, Claimants notified the Tribunal that one of their witnesses, the former Prime Minister of the Russian Federation, Mr. Mikhail Kasyanov, had informed them that he would not appear at the Hearing and that, in the circumstances, Claimants would withdraw his witness statement.  Mr. Kasyanov's witness statement has been filed on 3 September 2010 and consisted of a two-paragraph confirmation of the contents of the following documents: Transcript of Mr. Kasyanov's Testimony before the Khamovnichesky Court of Moscow in the second criminal case against Messrs. Khodorkovsky and Lebedev, 24 May 2010, Exh. C-440; *Mikhail Borisovich Khodorkovskiy v. The Russian Federation*, ECtHR, Appls. Nos. 5829/04, 11082/06 and 51111/07, Witness Statement of Mr. Kasyanov, 8 July 2009, Exh. C-446; Mikhail Kasyanov, *Without Putin: Political Dialogues with Evgeny Kiselev*, Novaya Gazeta. 2009 (excerpts), Exh. C-574; Video recording and transcript of interview of Mr. Kasyanov on 24 May 2010 after his testimony in the Khamovnichesky Court of Moscow; Video recording and transcript of interview of Mr. Kasyanov on 24 May 2010 at the Press Center, Exh. C-591; Alexander Bekker & Vladimir Fedorin, *Interview: Mikhail Kasyanov, Prime Minister of the Russian Federation*, Vedomosti, 12 January 2004, Exh. C-677.  These documents were submitted as independently-numbered exhibits with the Memorial.  Respondent's position at the Hearing was that the documents annexed to Mr. Kasyanov's witness statement could not be considered by the Tribunal (Transcript, Day 18 at 19–21).  Claimants maintained that the exhibits stood on their own as part of the record in these arbitrations.  The Tribunal has decided that while Mr. Kasyanov's witness statement itself was withdrawn and thus no longer forms part of the record, the documents annexed to the statement, which have come into the record as independent exhibits to the Memorial, and include statements made by Mr. Kasyanov prior to these proceedings, continue to form part of the record of these arbitrations.

[12]   *See* Part VIII below.

subject to cross-examination.

A.   CLAIMANTS' WITNESSES

120. At the Hearing on the Merits, Respondent called 8 of Claimants' 11 witnesses for examination. They were, in the order in which they testified:

> 1) Mr. Jacques Kosciusko-Morizet;
> 2) Mr. Vladimir Dubov;
> 3) Mr. Frank Rieger;
> 4) Dr. Andrei Illarionov;
> 5) Mr. Leonid Nevzlin;
> 6) Mr. Bruce Misamore;
> 7) Mr. Steven Theede; and
> 8) Mr. Brent Kaczmarek CFA.

121. Claimants' other witnesses, who did not appear for cross-examination, were:

> 9) Mr. Philip Baker QC;
> 10) Mr. Yuri Schmidt; and
> 11) Dr. Sergei Kovalev.

122. The following summary first addresses the testimony of Claimants' eight witnesses who appeared before the Tribunal, in order of appearance. It then reviews the evidence from Claimants' three witnesses whom Respondent chose not to cross-examine.

### 1.   Mr. Jacques Kosciusko-Morizet

123. Mr. Jacques Kosciusko-Morizet[13] was a Member of the Board of Directors of Yukos and the Chairman of the Board's Audit Committee from June 2000 to December 2004. In his witness statement, Mr. Kosciusko-Morizet describes Mr. Khodorkovsky's plans in the late 1990s "to modernize Yukos and to break the company's ties with the Soviet traditions" through a Western board and consolidation of Yukos' accounts. According to Mr. Kosciusko-Morizet, the reforms brought success: Yukos' shares increased in value by 50 percent after it published U.S. Generally Accepted Account Principles ("**U.S. GAAP**") consolidated financial statements in July 2000, and its leadership in transparency and corporate governance brought the verb

---

[13] Witness Statement of Jacques Kosciusko-Morizet, 3 September 2010 (hereinafter "Kosciusko-Morizet WS") (original in French, translated into English) submitted with Memorial. Mr. Kosciusko-Morizet appeared for examination (testifying in English) on 15 October 2012, Transcript, Day 4 at 4–235. References to Mr. Kosciusko-Morizet's testimony appear in Chapters VIII.C (Harrassment, Intimidation and Arrests), VIII.D (The Unwinding of the Yukos–Sibneft Merger) and VIII.H (The Withdrawal of PwC Audit Opinions).

"to Yukosize" into common parlance in Russian business circles.

124. Mr. Kosciusko-Morizet's statement also deals with the relationship with PwC, which he describes as "cordial and close" while he was Chairman of the Audit Committee.  Yukos was one of PwC's major clients; PwC conducted Yukos' external audits and assisted with training Yukos' in-house accountants and with designing and implementing procedures.  Thus, he testifies, "from 1997 to 2004, PwC was given access to the entire documentation of the whole of Yukos without restriction and had a very detailed and global view of the financial situation and the procedures of Yukos and its subsidiaries."[14]

125. After the arrest of Mr. Platon Lebedev in July 2003, Mr. Kosciusko-Morizet chaired a temporary ad hoc committee set up to assess the situation through interviews with individual managers at Yukos and PwC.  He states that Mr. Michael Kubena, a PwC partner, assured the committee that Yukos had always complied with Russian law, including in its tax optimization structure, and that "PwC did not consider that there was any possibility for the Russian authorities to attack Yukos on these issues."[15]  Mr.Kosciusko-Morizet referred to this advice several times during his oral testimony.  Thus, according to Mr. Kosciusko-Morizet, the "late and spectacular volte-face of PwC," including the withdrawal of the certification of Yukos' accounts that took place on 15 June 2007, was "in blatant contradiction" to his relationship with PwC, was "questionable and damaging to [PwC's] reputation," and can only be explained by Respondent's pressure on PwC's Moscow office from December 2006 onwards.

126. Mr. Kosciusko-Morizet appeared before the Tribunal on 15 October 2012.  He was cross-examined about, *inter alia*:   (a) his responsibilities as the Chairman of Yukos' Audit Committee; (b) the relationship between Yukos and PwC including as to disclosures about Behles Petroleum S.A., Baltic Petroleum Trading Limited and South Petroleum Limited (known collectively as the "**BBS Companies**"); (c) the Yukos consolidation perimeter for purposes of U.S. GAAP; (d) the abandoned plans to list Yukos on the New York Stock Exchange ("**NYSE**") due to the Yukos–Sibneft merger; and (e) his knowledge of Yukos' tax optimization structures and the tax assessments against regional Yukos trading entities (in which context he remarked that "[t]rying to minimise tax is good management . . . within the

---

[14]   Kosciusko-Morizet WS ¶ 17.

[15]   Kosciusko-Morizet WS ¶ 24.

legislation applicable.")[16]

127. Mr. Kosciusko-Morizet was also given the opportunity to recount to the Tribunal a story that Mr. Khodorkovsky had conveyed to him in August 2003 about threats from the Russian authorities and their potential impact on Yukos.[17]

### 2. Mr. Vladimir Dubov

128. Mr. Vladimir Dubov[18] held various senior positions in Bank Menatep and Yukos entities, including on the Yukos Board from 1998 to 1999. He was elected as a State Duma Deputy in December 1999 (representing a region encompassing Mordovia) and was Chairman of the Tax Sub-Committee of the State Duma from February 2000 to October 2003. From 1997 he was a shareholder, and then a beneficiary of trusts holding shares in GML Limited ("**GML**") (the parent company of YUL). He first met Mr. Khodorkovsky in the late 1980s. In his witness statement, Mr. Dubov makes three key assertions: (a) Respondent was aware of, and approved Yukos' trading structure and tax optimization scheme; (b) Yukos' trading companies significantly contributed to the social and economic development of the regions in which they operated; and (c) Respondent's tax claims were aimed at appropriating Yukos' assets and removing Mr. Khodorkovsky as a "potential political threat".

129. Mr. Dubov explains in his statement that, given that Yukos' tax payments accounted for approximately four percent of the country's 2003 budget, the company was under "constant supervision and control of the Russian tax authorities."[19] Before 2003 there was never "any suggestion that Yukos' trading structure was other than in compliance with legal requirements and appropriate."[20] The authorities were extensively consulted and approved Yukos' practice of operating through trading companies in low-tax regions like the Republic of Mordovia. Yukos' trading companies significantly contributed to the local economy. Yukos' trading companies' VAT refunds were also closely monitored. According to Mr. Dubov, all four major

---

[16] Transcript, Day 4 at 65.

[17] *See* paragraph 775 below.

[18] Witness Statement of Mr. Vladimir Dubov, 8 September 2010 (hereinafter "Dubov WS") (original in Russian, translated into English), submitted with Memorial. Mr. Dubov appeared for examination (testifying in Russian through English interpretation) on 16 October 2012, Transcript, Day 5 at 2–191. References to Mr. Dubov's testimony appear in Chapters VIII.A (The Tax Optimization Scheme), VIII.B (The Tax Assessments Starting in December 2003) and VIII.C (Harrassment, Intimidation and Arrests).

[19] Dubov WS ¶ 11.

[20] *Ibid.* ¶ 54.

Russian oil companies (Lukoil, Sibneft, TNK, Yukos) engaged in tax optimization.  Their taxes were closely supervised.  Access to pipelines was conditioned on payment of taxes.  This involved liaising with officials and opening up records to inspection.[21]

130.  Mr. Dubov describes how he and Mr. Khodorkovsky became increasingly involved in social and political activities to build a civil society based on "liberal, open and democratic values" and in 2001 co-founded Open Russia to manage and fund projects to foster a "social and liberal ethos."[22]  Mr. Khodorkovsky's funding of political parties openly and legally "put pressure on other political parties to be more transparent."  These efforts "sent shockwaves through the entire Russian political system."[23]

131.  Mr. Dubov expresses "no doubt that the alleged tax claims and the other trumped-up charges brought against Yukos, Khodorkovsky and his associates, were merely a pretext to remove Khodorkovsky as a potential political threat and to destroy Yukos with a view to taking its assets."[24]  According to Mr. Dubov's statement, as the 2004 presidential elections approached, the Administration shifted attention to seizing Yukos' assets.  At a meeting of the Russian Union of Industrialists and Entrepreneurs with President Putin at the Kremlin in February 2003, Mr. Khodorkovsky raised questions about official corruption.  President Putin rebuked him and suggested that Yukos be scrutinized.  At an April 2003 meeting, President Putin approved the Sibneft merger but warned that Mr. Khodorkovsky should restrict his political activities and not finance the Communist Party.  In October 2003, Mr. Khodorkovsky was arrested just before a planned meeting with opposition parties.[25]

132.  Mr. Dubov testifies that, on 27 October 2003, he learned his name had been removed as a Duma candidate.  He was advised to leave Russia and was told by a Kremlin official that President Putin "had gone absolutely berserk over Khodorkovsky."[26]  He left that night and has not returned since.  In January 2004, the financial support of Messrs. Dubov and Nevzlin to an opposition presidential candidate was announced.  The next day, international arrest warrants

---

[21]  *Ibid.* ¶ 42–53.

[22]  *Ibid.* ¶¶ 55, 61.

[23]  *Ibid.* ¶ 64.

[24]  *Ibid.* ¶ 58.

[25]  *Ibid.* ¶¶ 55–64.

[26]  *Ibid.* ¶ 80.

were issued against both men on "entirely unfounded and politically motivated" charges.  They were both found guilty *in absentia*.[27]

133.  Mr. Dubov appeared before the Tribunal for examination on 16 October 2012.  He was cross-examined about his financial interest in the case, being the beneficiary of the Draco Trust, in which had made an initial investment of around USD 10,000 and which now has a seven percent interest in GML.[28]  He was also extensively cross-examined about the extent of disclosures he made to Russian government officials about Yukos' tax scheme in Mordovia and his knowledge and understanding about the Yukos trading entities in the ZATOs and the tax assessments leveled against them.[29]

134.  Mr. Dubov stated his belief, held since he heard about the tax assessments against Yukos in 2004 from media reports, that the tax claims were being used by Respondent as an instrument of confiscation.[30]  When asked by the Tribunal to elaborate on what information at the time led him to that conclusion, he testified:

> I had a personal relationship with the Deputy Head of Staff of the President, Mr. Vladislav Surkov . . . .  [O]n the first business day following Khodorkovsky's arrest, Surkov asked me to come see him in the Kremlin . . . .  He told me that he was asking for my forgiveness . . . .  I had been struck from the list upon petition from the Prosecutor General by the council of the party without leveling any charges against me. . . .  And I remember asking, "What will happen to Yukos?"  And he said—and I am quoting him verbatim; I remember it very well—he said, "Yukos will be taken away from . . . you gentlemen." . . . And I also had a longstanding good relationship with yet another Deputy Head of the Staff of the President who, in late November of that year, told us . . . there would be criminal claims against every single shareholder.  He said that an instruction had been issued to commence criminal cases against us and to take Yukos from us.[31]

### 3.  Mr. Frank Rieger

135.  Mr. Frank Rieger[32] is the former Acting CFO of Yukos, and held various positions with Yukos and its subsidiaries from 2000 until 2006.  He resigned on 26 March 2006, due to the

---

[27]  *Ibid.* ¶¶ 65–72.

[28]  Transcript, Day 5 at 29–36.

[29]  Transcript, Day 5 at 81–84, 101–102, 149–50, 152–54.

[30]  Transcript, Day 5 at 52.

[31]  *Ibid.* at 181–82.

[32]  Witness Statement of Mr. Frank Rieger, 9 September 2010 (hereinafter "Rieger WS") submitted with Memorial.  Mr. Rieger appeared for examination on 17 October 2012, Transcript, Day 6 at 1–235.  References to Mr. Rieger's testimony appear in Chapters VIII.A (The Tax Optimization Scheme), VIII.B (The Tax Assessments Starting in December 2003), VIII.C (Harrasment, Intimidation and Arrests), VIII.E (Attempts to Settle), VIII.G (The Bankruptcy of Yukos) and VIII.H (The Withdrawal of the PwC Audit Opinions).

"deepening crisis surrounding the company and the persecution of its management."  In his witness statement, Mr. Rieger recounts that under Mr. Khodorkovsky's leadership, Yukos acted as a "trail-blazer" in corporate governance in Russia.  When Mr. Rieger joined Yukos in 2000 from Roland Berger Consulting, he was directed by Mr. Khodorkovsky to "apply the same benchmark of Western corporate accountability and responsibility."  Yukos modernized its production process, disclosed the company's shareholding details, and implemented international accounting and reporting procedures.  Mr. Rieger states that Yukos "set a new standard for corporate social responsibility in Russia" but its achievements provoked concern amongst competitors.

136.   According to Mr. Rieger, the Russian authorities targeted and harassed Yukos' auditor, PwC.  Yukos engaged PwC as its external auditor and gave it "unrestricted access" to its "personnel, management, the Board of Directors, books and accounts."  Mr. Rieger's "personal involvement with PwC was extensive."  After PwC employees began to be questioned by the Prosecutor General's Office, PwC ceased to have further contact with Yukos.  Mr. Rieger learned about PwC's withdrawal of its Yukos audits from 1995 to 2004 from the media.  The suggestion that PwC did not have full access to information or that Yukos deliberately withheld information "defies credibility"; PwC raised no such concerns until its June 2007 withdrawal letter ("**PwC's Withdrawal Letter**").

137.   According to Mr. Rieger, Yukos made numerous attempts to settle the alleged tax claims against it, including through negotiations and significant payments.  However, the Russian authorities did not respond to Yukos' various proposals, and refused to provide written confirmation of the payments.  It became clear to Mr. Rieger that "this was a political case, not a tax case, aimed at the destruction and expropriation of the company itself."

138.   Mr. Rieger claims that Respondent conducted a campaign of harassment against Yukos, including illegal raids by armed masked men, searches and seizures of up to 70 percent of the Accounting Department's documents.  In addition, numerous Yukos employees were questioned by the Prosecutor General's Office.  Mr. Rieger himself was detained and interrogated at Moscow's airport in May 2006.

139.   Mr. Rieger appeared before the Tribunal for examination on 17 October 2012.  He was cross-examined about, *inter alia*:  (a) his role at Yukos and understanding of its related entities; (b) Yukos' accounting structure including the extent to which it was designed by PwC; (c) the timing and process of Yukos' identification of assets for payment of taxes; (d) Yukos'

settlement offers, the responses from the Russian authorities and the legal limits within which the authorities were operating; (e) the repayment of the SocGen and Moravel Investments Limited ("**Moravel**") loans, relevant to the bankruptcy; (f) dividend payments via the "Laurel" group of Yukos companies; and (g) his awareness and understanding of tax assessment of Yukos entities in the ZATOs.

140.   Mr. Rieger was also given an opportunity to describe to the Tribunal how in 2006 he was asked a series of questions at the General Prosecutor Office for which the investigator had already prepared his answers, a situation he said he "couldn't believe" had he not experienced it himself.  He refused to sign the pre-prepared answers and gave his own version instead.[33]

### 4.   Dr. Andrei Illarionov

141.   Dr. Andrei Illarionov[34] served as Chief Economic Advisor to President Putin from April 2000 until his resignation in December 2005.  He was also President Putin's personal representative ("sherpa") to the G-8.  He is currently a Senior Fellow at the Cato Institute's Center for Global Liberty and Prosperity in Washington, D.C., as well as the President of the Institute of Economic Analysis in Moscow, which he founded.  Dr. Ilarionov maintains a residence in Moscow and visits approximately five times a year.[35]  In his witness statement, Dr. Illarionov recounts the evolution of Yukos since its establishment by government decree in 1993 following the dissolution of the USSR and the restructuring of the oil industry.  Yukos saw remarkable growth and improvements in performance after its privatization in 1995–96, as a result of substantial investment, the employment of foreign engineers and managers, and the use of Western technology.  Some officials viewed such reforms negatively.  Yukos' public revelation, in 2002, of details of its shareholding, including the structure of GML, "had the effect of an earthquake on the Russian business community."  It contrasted with the traditionally secretive manner of doing business and was viewed as setting a "harmful"

---

[33]   Transcript, Day 6 at 69–70.

[34]   Witness Statement of Dr. Andrei Illarionov, 11 September 2010 (hereinafter "Illarionov WS") submitted with Memorial.  Dr. Illarionov appeared for examination on 18 October 2012, Transcript, Day 7 at 3–176.  References to Dr. Illarionov's testimony appear in Chapters VIII.B (The Tax Assessments Starting in December 2003), VIII.C (Harassment, Intimidation and Arrests) and VIII.F (The Auction of YNG).

[35]   Transcript, Day 7 at 5.

precedent.  In Dr. Illarionov's words, Yukos was "one of the most dangerous enemies for those who did not want to see Russia a free country."[36]

142.  According to Dr. Illarionov, the arrests of Messrs. Khodorkovsky and Lebedev and the dismantlement of Yukos were politically and economically motivated.  Yukos' intended merger with Western oil majors was seen as a national betrayal and a hurdle to expropriation. Dr. Illarionov describes the 19 February 2003 meeting at the Kremlin between President Putin and business leaders, at which Mr. Khodorkovsky made a presentation on corruption, to which President Putin responded that everyone knew how various assets, including Yukos, were acquired, and told Mr. Khodorkovsky:  "I return the ball in your corner."  The tone of the meeting became "steely and menacing" as if something had gone "really wrong."  It signaled the "gloves [had come] off," and that Mr. Khodorkovsky was no longer tolerated.  From then on, according to Dr. Illarionov, "a case needed to be fabricated to launch the Government attack under the guise of 'legitimate' court proceedings" and a special unit was set up to fabricate evidence against Yukos.  In October 2003, the "dramatic arrest" of Mr. Khodorkovsky at the airport signaled Yukos could be attacked.  Few dared to voice support, and Prime Minister Mikhail Kasyanov, among others, was dismissed for doing so.[37]

143.  Dr. Illarionov's statement further recounts that the campaign against Yukos culminated in the confiscation of YNG.  While it was independently valued at USD 14.7–17.3 billion, the Russian authorities sold YNG for USD 9.3 billion—"a price well below even the most conservative estimates prepared by experts"—on a Sunday, at a forced auction attended by two participants, to an unknown company (Baikal) which was registered at an address above a local bar and had a charter capital of USD 350.  President Putin said he knew the individuals behind the company and they were "well-established in the oil business."  Four days later, Rosneft purchased Baikal with funds from State banks.  According to Dr. Illarionov, the auction "sent shockwaves" and was internationally condemned.  This "scam" was "one of the low points in Russia's recent history."  The dismantling of Yukos was contrary to "basic principles of due process," and led Dr. Illarionov to resign as sherpa in 2004 and as the President's Chief Economic Advisor in December 2005.[38]

144.  Dr. Illarionov appeared before the Tribunal for examination on 18 October 2012.  Respondent

---

[36]  Illarionov WS ¶¶ 5–16.

[37]  Illarionov WS ¶¶ 17–41.

[38]  Illarionov WS ¶¶ 42–52.

sought to undermine his credibility by showing he is now a vocal critic of the Russian Government, and that he has taken extreme positions against climate change regulation.[39] Respondent also challenged his assertion that Yukos' financial statements had complied with U.S. GAAP, on the basis that Dr. Illarionov lacked an understanding of GAAP and had not read Yukos' financial statements in full.   Dr. Illarionov was cross-examined mostly about his claimed knowledge and understanding of the valuation of YNG and the auction process.[40]

145.   The Tribunal asked Dr. Illarionov whether he had ever felt able to discuss with President Putin the arrest of Mr. Khodorkovsky and the measures of the Russian Government in respect of Yukos.[41]   He replied:

> the most important conversation that I had with Mr. Putin was several days after Mr. Khodorkovsky had been arrested . . . .  Mr. Putin has said that Mr. Khodorkovsky has made mistakes and behaved pretty badly . . . .   And for a long time Mr. Putin himself was protecting Mr. Khodorkovsky from these attacks of his friends, of Mr. Putin's friends, but unfortunately Mr. Khodorkovsky continued to behave badly, and not cooperatively... One thing, he said that Mr. Khodorkovsky lied to us because he was in negotiations with American oil company about possible merger. Another issue he has mentioned: that Mr. Khodorkovsky joined Communist Party in preparation to the parliamentary election of year 2003... That is not something that "mi dogovarivalis"—I will try, "we had an agreement on."  So he said . . .

> So he said that after protecting Mr Khodorkovsky for some time—now it's almost a quotation—"I decided and I stepped aside to allow Mr Khodorkovsky to solve his problems with the boys by himself." . . . ."so Mr Khodorkovsky has chosen to fight. Okay," said Mr Putin, "if he has chosen to fight, let him to fight and we'll see what will happen."[42]

146.   The Tribunal also asked Dr. Illarionov about the 50-person special unit that, according to paragraph 35 of his statement, was set up at the Russian General Prosecutor's office to work exclusively on "fabricating" evidence against Mr. Khodorkovsky and Yukos and, in particular, whether he could identify the sources on which he relied for that statement.  He could not disclose the identity of his source—due to that individual still residing in Moscow and thus facing "serious risks" but his source was a "very high-placed official in the Russian administration at the time" and was very reliable.[43]  Dr. Illarionov testified that the official had told him that the targeting of Yukos was "a big mistake … but it is a mistake that would be

---

[39]   Transcript, Day 7 at 12–50.

[40]   For further specific references to the transcript, see discussion in Chapter VIII.F at paragraphs 1013 and 1019.

[41]   Transcript, Day 7 at 153 (referring to Illarionov WS ¶¶ 39–41).

[42]   *Ibid.* at 153–56.

[43]   *Ibid.* at 156–57.  Upon further cross-examination, Dr. Illarionov said he had only ever discussed this special unit with his source and with Claimants' lawyers in these arbitrations. *Ibid.* at 164–65.

impossible to stop . . . .  This unit has been created to 'zanyatsa' Khodorkovsky, [meaning to] 'take care of' Khodorkovsky . . . which means one day . . . security services and officers did receive an order so-called to solve the problem."[44]

147.   Dr. Illarionov elaborated on his assertion, at paragraph 41 of his statement, that Russian Prime Minister Mikhail Kasyanov had "expressed his disapproval of Mr. Khodorkovsky's arrest and the mounting attack on Yukos", and explained that after Mr. Khodorkovsky's arrest:

> there was public outrage in mass media . . . .  From the Government ranks, I cannot recall any person who would express disapproval of the arrest . . . with the exception of Mr. Kasyanov . . . .  And after making such a statement, Mr. Putin publicly made a very rude statement that you can find recorded in video . . . that, "I would ask everybody in the Government to shut up on Mr. Khodorkovsky's arrest." And it was very clear that this comment was addressed to Mr. Kasyanov, and later Mr. Kasyanov . . . [was] removed from his position.'[45]

### 5.   Mr. Leonid Nevzlin

148.   Mr. Leonid Nevzlin[46] is a long-standing friend and close business colleague of Mr. Khodorkovsky.  They first met at a research centre in 1987.  Mr. Nevzlin held various high level positions in Bank Menatep and Yukos, including as Vice-President of Yukos responsible for public relations, and as First Deputy Chairman of the Yukos Board of Directors. Mr Nevzlin helped found Open Russia in 2001.  He also later served as a senator representing Mordovia until March 2003.  He is a beneficiary of three of the trusts that hold ownership shares in GML.  He now resides in Israel, working in philanthropy.

149.   In his witness statement of 15 September 2010, Mr. Nevzlin testifies that his support for democratic causes led the Russian authorities to target him for persecution.  For example, after he announced his financial support for an opposition presidential candidate in January 2004, the Prosecutor General's Office brought "entirely unfounded and politically motivated" charges against him for tax evasion and embezzlement.  "Ludicrous" murder charges were added in

---

[44]   *Ibid*. at 158.

[45]   *Ibid*. at 159–60.

[46]   Witness Statement of Mr. Leonid Nevzlin, 29 August 2010 (hereinafter "Nevzlin WS") (original in Russian, translated into English), submitted with Memorial.  Mr. Nevzlin appeared for examination on 18 and 19 October 2012 (testifying in Russian, through English interpretation), Transcript, Day 7 at 176–224 and Day 8 at 1–43.  References to Mr. Nevzlin's testimony appear in Chapters VIII.C (Harassment, Intimidation and Arrests) and VIII.D (The Unwinding of the Yukos–Sibneft Merger).

2004 and 2005.  Israel refused to extradite him to Russia but after a "show trial" in 2008, he was sentenced *in absentia* to life imprisonment.[47]

150.  Mr. Nevzlin explains that Mr. Khodorkovsky was perceived by the Kremlin as a political threat and a potential presidential candidate.  According to Mr. Nevzlin, the attacks on Yukos were motivated by the objectives "to remove Mr. Khodorkovsky as a potential political threat," "to punish and make an example of" Yukos leaders, and to "expropriate Yukos without compensation."  Mr. Nevzlin received warnings of the attacks on Yukos, including at a meeting with the Media Minister in Spring 2003, who told him that Mr. Khodorkovsky risked losing everything, including his liberty, if he did not immediately stop criticism of President Putin.  He was told that President Putin was "furious" about Mr. Khodorkovsky's media coverage.[48]

151.  With regard to the Yukos–Sibneft merger, Mr. Nevzlin testifies that he understood that "everything that happened with Sibneft was approved by President Putin."  At a meeting with Mr. Khodorkovsky, President Putin cautioned against a U.S. oil major acquiring more than 25 percent of YukosSibneft.  The merger was completed in October 2003, but Mr. Abramovich "abruptly changed his mind and sought to unwind the merger" after it "became apparent that Khodorkovsky was being targeted by the Kremlin."   Mr. Nevzlin testifies that shortly after Mr. Khodorkovsky's arrest in October 2003, Mr. Abramovich approached Mr. Nevzlin in Tel Aviv to convey that the Yukos–Sibneft merger could only be preserved if Sibneft was given management of the merged company.  The companies were not integrated and eventually de-merged.[49]

152.  Mr. Nevzlin appeared before the Tribunal for examination on 18 and 19 October 2012.  Respondent highlighted his lack of banking experience when he rose to the top of Bank Menatep.  Mr. Nevzlin pointed out that "there had not been any commercial banks in the Soviet Union, and not a single person in the Soviet Union worked in a commercial bank prior to 1988;" and further that "the position of bank president did not mean that [he] in fact was responsible for banking operations; it was a position that was established specifically for someone who engaged in public relations."[50]

---

[47]   Nevzlin WS ¶¶ 14, 22.

[48]   *Ibid.* ¶¶ 22, 28–36.

[49]   *Ibid.* ¶¶ 24–27.

[50]   Transcript, Day 7 at 180–82.

153. Mr. Nevzlin was cross-examined on his interest in GML, his motives for testifying in these arbitrations, and a recent UK court case relating to individuals involved in the Yukos–Sibneft merger.  He acknowledged that the trusts in which he has beneficial interests (the Pictor Trust, the Southern Cross Trust and the Palmus Trust) hold a total of approximately 67 percent of GML, and thus that he would benefit financially if the outcome of these arbitrations was favourable to Claimants.[51]  Mr. Nevzlin testified that he had not paid anything for his interests in the trusts and confirmed also that Messrs. Brudno, Lebedev and Shakhnovsky had not paid any consideration for their beneficial interests in the Palmus Trust.  Amidst this line of questioning, Mr. Nevzlin pointed out:

> everything I own, just like my partners used to own, was earned through extremely hard work, starting, as you will know from . . . in 1987 . . . .  [V]irtually all the business revenue, except for what was paid to charity or used for personal needs, was reinvested in the business . . . .  So all the money, all the shares that we owned we earned through our titanic—if you will—efforts that had spread over a long period of time.[52]

154. Mr. Nevzlin confirmed that he knew about the 2004 tax assessments soon after they were issued, but by that point he had "already realised that Putin will not stop, and will take away the company anyway.  So I was not surprised by tax claims in this size and consequent actions by the Russian Federation."  He also confirmed his long-held belief that the tax assessments were improper, as were the  Russian authorities' enforcement actions, claiming:

> Yukos was led into bankruptcy . . .  They [the Russian authorities] did everything in order to prevent Yukos from paying off its debts.  The company was in perfect shape, with a lot of cash, with the best rating in the country, with a good market capitalisation, but it took about two years for Putin and Sechin . . . to destroy this company completely.[53]

When asked whether he had hoped Yukos would prevail and defeat the assessments, he replied that "[t]hose proceedings took place in the Russian Federation, and the outcomes, the decisions were made in the Kremlin.  The decisions were not made in the courtroom . . . .  We are not talking about a democratic country; we are talking about a dictatorship."[54]

155. Mr. Nevzlin was questioned about why he had waited until 2010, when providing his witness statement in these proceedings, to disclose that in 2003 Mr. Abramovich told him that

---

[51]   *Ibid.* at 187–92, 207.

[52]   *Ibid.* at 196–99.

[53]   *Ibid.* at 209–13.

[54]   *Ibid.* at 217–18.

Mr. Khodorkovsky "had been targeted because of his involvement in politics."[55]   He was also asked why he had not included this evidence in his 6 August 2006 witness statement in the ECtHR proceedings, nor in any of the Russian criminal cases against Mr. Khodorkovsky.   He explained:

> if I had spread the information about Abramovich and Putin fairly broadly, and if it had become available to the public, then from the perspective of Khodorkovsky, who is in Russian prison, I would have damaged him.
>
> . . . I would have caused him tremendous amounts of harm . . . in the other corner facing him were Putin, Sechin and others; but I also would have turned Abramovich into an enemy of Khodorkovsky's by disclosing this information.
>
> . . .   [A]fter . . . things moved to a second absurd set of charges and a second trial, Khodorkovsky's position changed radically.   He was no longer wary of a political . . . confrontation with Putin's regime because he realised that he was not going to be able to find truth in a Russian court if he tried to defend himself based on the laws.
>
> . . . Russian courts have no interest in my position:   it would be either ignored or rejected by them . . . .Because it's not a judge who makes decision on Khodorkovsky and Lebedev; the judge just rubber-stamps decisions that are made by investigative committee and Prosecutor's Office . . . .The fact that I trust this court and tell this court a lot more than I've ever said on the matter, this is a typical position for me, because . . . if we're able to defend our interests, that would be either in courts in free countries or international courts.[56]

156.   Mr. Nevzlin was cross-examined about his May 2011 witness statement to the High Court of Justice in England in a case brought by Mr. Berezovsky against Mr. Abramovich.   Mr. Nevzlin was shown the English judge's decision, in which the judge declined to attach significant weight to Mr. Nevzlin's evidence, as she found him to be "tendentious," that he "expressed opinions about matters in respect of which he had no knowledge," and that she had "the impression that Mr. Nevzlin had crafted his evidence to suit Mr. Berezovsky's case." Mr. Nevzlin observed the judge was "entitled to her opinion" and he "only told her the truth."[57]

### 6.   Mr. Bruce Misamore

157.   Mr. Bruce Misamore[58] was Chief Financial Officer of Yukos and a Member of its Management

---

[55]   Transcript, Day 8 at 4–5, referencing Nevzlin WS ¶ 35.

[56]   *Ibid.* at 17–25

[57]   *Ibid.* at 34, 37, 39–40.   Extract from *Berezovsky v. Abramovich*, 31 August 2012 ¶¶ 485–86, Exh. R-4654.

[58]   Witness Statement of Mr. Bruce Misamore, 28 July 2010 (hereinafter "Misamore WS") submitted with Memorial.   Mr. Misamore appeared for examination on 22 October 2012, Transcript, Day 9 at 1–268.   References to Mr. Misamore's testimony appear in Chapters VIII.A (The Tax Optimization Scheme), VIII.B (The Tax Assessments Starting in December 2003), VIII.C (Harrassment, Intimidation and Arrests), VIII.D (The Unwinding of the Yukos–Sibneft Merger), VIII.E (Attempts to Settle) and VIII.H (The Withdrawal of PwC's Audit Opinions).

Committee from April 2001 to December 2005.  He was a Member of the Executive Committee of the Yukos Board commencing in 2005.  He has 38 years experience in financial and executive roles in the oil industry.  In his witness statement, Mr. Misamore explains that as CFO, he was to ensure that Yukos met international best practices in financial management. He describes how, by 2003, Yukos had become an industry leader in transparency, corporate governance and production and that, "[c]ontemplating significant expansion and growth" Yukos closed its merger with Sibneft on 3 October 2003 and was in talks with Western oil majors.[59]

158. Mr. Misamore testifies that PwC played an "integral role" in developing Yukos' financial reporting system and was given full access to Yukos' books, accounts, and employees, and was "very knowledgeable about and had full access to Yukos' principal subsidiaries."  He considers PwC's withdrawal of the Yukos audit reports as having been "motivated by the continuing attack . . . on Yukos and persons associated with the company" and that it was "highly questionable professionally."[60]

159. According to Mr. Misamore, the campaign by the Russian authorities to dismantle Yukos began in earnest in the summer of 2003 with arrests, raids, searches, and seizures.  In July 2003, Russian authorities raided Yukos' Moscow offices "in an incredible scene full of armed, masked officers" and "trawled through [the company's] computer records for approximately 17 hours."  Large volumes of documents and electronic files were seized, with no copies or record left."  In August 2006, "baseless, politically motivated" criminal investigations were announced against Mr. Misamore and others.[61]

160. According to Mr. Misamore, Russian authorities also interfered with the Yukos–Sibneft merger; Sibneft put the merger "on hold," and refused to negotiate the demerger.[62]  Russian authorities then imposed a series of "huge fabricated tax reassessments" on Yukos "designed to financially cripple the company" and to "serve as a pretext under which the Government broke up the company and expropriated its assets."  Yukos made numerous efforts to negotiate and to pay its tax bills; these were rejected, "stifle[d]," or went unanswered.[63]  He described how on

---

[59]  Misamore WS ¶¶ 22–24.

[60]  *Ibid.* ¶¶ 26–29.

[61]  *Ibid.* ¶¶ 30–33.

[62]  *Ibid.* ¶¶ 36–37.

[63]  *Ibid.* ¶¶ 38–51.

19 December 2004, the Russian authorities held an auction for YNG.  As one of only two bidders, Baikal won the auction, in ten minutes, for USD 9.35 billion.  Baikal was immediately sold to State-owned Rosneft.  In 2007, the court-appointed receiver in the bankruptcy proceedings, Mr. Eduard Rebgun, liquidated the remaining 40 percent of the company in auctions won by State-owned entities at prices well below market value.[64]

161.   Mr. Misamore appeared for examination on 22 October 2012.  He was cross-examined on a wide range of issues encompassing, *inter alia*:  (a) the Yukos–Sibneft merger including the dividend payment and the unwinding of the merger; (b) PwC and its role in developing the concepts of golden shares and call options which allowed Yukos to consolidate the financial performance of companies that it did not own, but for which it had call options; (c) Mr. Misamore's knowledge and understanding of Yukos' domestic offshore trading entities and the tax assessments levied against some of them; (d) the responses to the tax assessments and use of proceeds from the sale of Yukos assets; and (e) the creation of two Dutch foundations, namely Stichting Administratiekantoor Yukos International ("**Stichting 1**") and Stichting Administratiekantoor Small World Telecommunication Holdings B.V. ("**Stichting 2**," together with Stichting 1, the "**Stichtings**").

162.   The Tribunal also asked Mr. Misamore whether he was aware of any written legal opinion that concluded that Yukos' tax optimization scheme was lawful under Russian law.  He replied that upon receiving the tax assessment in December 2003, Yukos requested opinions from Mr. Sergey Pepeliaev, a tax expert and regular advisor to Yukos, and PwC.  Mr. Misamore stated that "[b]oth of those opinions basically said what Yukos was doing was completely legal," but he could not recall if Yukos' tax structure had received the blessing of a lawyer or an accounting firm in writing prior to December 2003. He added that he "was informed consistently, throughout the entire time [he] was at Yukos, that everything Yukos did with respect to these things was entirely in accordance with Russian law."[65]

### 7.   Mr. Steven Theede

163.   Mr. Steven Theede[66] joined Yukos as its Chief Operating Officer in August 2003, after a

---

[64]   *Ibid.* ¶¶ 51–60.

[65]   Transcript, Day 9 at 250–52.

[66]   Witness Statement of Mr. Steven Theede, 26 August 2010 (hereinafter "Theede WS") submitted with Memorial. Mr. Theede appeared for examination on 23 and 24 October 2012, Transcript, Day 10 at 1–133, Day 11 at 1–59. References to Mr. Theede's testimony appear in Chapters VIII.A (The Tax Optimization Scheme), VIII.B (The Tax

30 year career with ConocoPhilips.  From June 2004 until February 2005, he served as CEO of Yukos.  Upon the advice of the U.S. State Department, in November 2004 he decided not to return to Russia.  From May 2005 until resigning in August 2006, Mr. Theede was President of Yukos.  In his witness statement, Mr. Theede testifies that within a few years he saw "one of the largest oil companies in the world . . . managed in accordance with the highest international standards" be "brought to its knees through the orchestrated attacks of the Russian authorities."[67]

164. Mr. Theede states that he was involved in many attempts by Yukos to discharge or settle its alleged tax liabilities.  While Yukos did not accept the validity of the tax claims, it nonetheless tried to discharge or settle them, only to be prevented from doing so by Respondent.  For instance, in April 2004, Yukos was told to pay USD 3.4 billion within two days, but the next day was prohibited by the Moscow Arbitrazh Court from alienating assets.  This "impossible situation" of demanding that Yukos pay but depriving it of any means to pay, became a pattern that led to "a state of paralysis."[68]

165. According to Mr. Theede's statement, Yukos made about 80 proposals and communications to various Russian authorities but "all our efforts were in vain."  For example, he states that in July 2004, an offer by Yukos to relinquish its stake in Sibneft to satisfy the alleged debt was ignored.  Yukos retained former Canadian Prime Minister Jean Chrétien to seek a global settlement, but his proposals went unanswered.  Meanwhile, the tax bill kept increasing and Yukos paid taxes nearly equal to its total revenue.  In October 2004, Mr. Theede testifies that Yukos submitted a "full settlement proposal" in the range of USD 21 billion, but negotiations "came to an abrupt end" when Yukos' principal negotiator, Yukos Vice-President Alexander Temerko was advised to leave Russia to avoid arrest.  In December 2004, YNG, Yukos' core asset, was sold for a "grossly undervalued price" of USD 9.35 billion in a "sham auction" to an "unknown company."  After that, there were no more settlement discussions.  Mr. Theede stated that the undervaluation of YNG became obvious when in 2006 Rosneft valued it at approximately USD 80 billion.[69]

---

Assessments Starting in December 2003), VIII.C (Harrassment, Intimidation and Arrests), VIII.D (The Unwinding of the Yukos–Sibneft Merger), VIII.E (Attempts to Settle), VIII.G (The Bankruptcy of Yukos) and VIII.H (The Withdrawal of PwC's Audit Opinions).

[67] Theede WS ¶¶ 1–9, 36.

[68] *Ibid.* ¶¶ 10–11, 28.

[69] *Ibid.* ¶¶ 9, 24–26.

166.   According to Mr. Theede's statement, in March 2006, a consortium of Western banks that had obtained a judgment in England against Yukos filed a bankruptcy petition with the Moscow Arbitrazh Court.   Mr. Theede states that his urgent letter to the Chief Bailiff, requesting that assets be released to satisfy the debt, went unanswered.   He further describes how, in a confidential agreement, Rosneft agreed to purchase Yukos' debt to the consortium upon the initiation of bankruptcy proceedings, which began in March 2006.   Respondent was thus the only creditor of significance.   Mr. Theede testifies that in July 2006, Mr. Rebgun produced a report concluding that Yukos was insolvent, and at the 20 July 2006 creditors' meeting, he recommended Yukos be declared bankrupt.   By contrast, Yukos had submitted a rehabilitation plan in June 2006 (the "**Rehabilitation Plan**"), which valued the company at USD 31 billion, and would have seen Yukos pay its creditors in two years.   The Rehabilitation Plan was not mentioned in Mr. Regbun's report.   Not wanting to lend credibility to a "charade", Mr. Theede did not attend the 20 July 2006 creditors' meeting and, feeling there was nothing more to do to protect the company's assets, he resigned with effect from 1 August 2006.[70]

167.   Mr. Theede appeared before the Tribunal for examination on 23 and 24 October 2012. Mr. Theede was cross-examined about, *inter alia*:  (a) the 15 April 2004 injunction ("**April 2004 Injunction**") and its effect on Yukos' control over certain assets; (b) Yukos' perception of the tax assessments as politically motivated; (c) the nature, adequacy and legitimacy of various settlement proposals offered by Yukos to pay off its tax debts; (d) the bankruptcy proceedings and proceeds from asset sales; and (e) the establishment of the Stichtings.

168.   Upon cross-examination, Mr. Theede confirmed that, in light of Yukos' strong performance in 2004, "[d]espite the ongoing external pressure," Yukos' Board approved approximately USD 50 million in bonuses.   Mr. Theede himself received a USD 5 million bonus.   The decision to issue bonuses was motivated by Yukos' acute concerns about employee retention and "hiring others was going to be almost impossible, because . . . it was a scary place to be."[71] He recalled the exceptional hire of Mr. Aleksanyan as executive vice-president of Yukos because the bankruptcy administrator, Mr. Rebgun, wanted a Yukos executive in Moscow with whom he could work directly.   Mr. Theede recounted that Mr. Aleksanyan "went and met with Mr. Rebgun and explained to him that we were in a difficult situation but we wanted to cooperate, and we really felt that we could find a way to survive."   Within three days, police

---

[70]   *Ibid.* ¶¶ 29–34.

[71]   Transcript, Day 11 at 14–16, 21–23.

stormed Mr. Aleksanyan's house and he was held in jail without a hearing for three years and only released as a result of a ECtHR ruling.[72]  He died a year later from an illness contracted in jail.

169.  In response to a Tribunal question, Mr. Theede testified that he met with PwC at least quarterly, but he did not recall that the trading companies ever came up in their discussions.  He never asked PwC for a written opinion on the structure of the trading companies, and he "was told that PwC's consulting arm was actually the architect of those structures."  He did not discuss any of the tax reassessments with either Messrs. Kubena or Miller of PwC.[73]

### 8.   Mr. Brent Kaczmarek

170.  Mr. Brent C. Kaczmarek CFA[74] is Managing Director of Navigant Consulting, Inc. and has served as a financial, valuation and damages expert in more than 40 international investment arbitrations.  Mr. Kaczmarek was retained by Claimants as a damages expert to calculate Claimants' losses result from a "series of acts which resulted in the demerger of Yukos Sibneft, the piece-by-piece sale of Yukos' assets, and eventually the destruction of Yukos," which he defines as "the Actions."

171.  Mr. Kaczmarek's two expert reports and oral testimony are summarized in Part XII of the Award.   In essence he concludes that, assuming the underlying tax assessments and all subsequent Actions were violations of the ECT, Claimants should be compensated for the value of their shareholding in a hypothetical Yukos entity (as merged with Sibneft and listed on the NYSE) as at the date of 21 November 2007, as well as any dividends that would have been paid to them up to that point in time, plus interest.  The total amount of damages calculated on this basis would be USD 114.174 billion.  Mr. Kaczmarek relies on a number of techniques in support of this figure, including valuations of Yukos' assets, a Discounted Cash Flow ("**DCF**") analysis, a comparable companies approach and a comparable transactions approach.  Mr. Kaczmarek also offers valuations in scenarios where there is no merger with Sibneft and no listing on the NYSE.  He additionally makes assessments of the damages which would be due

---

[72]   *Ibid.* at 38–39.  *See also* Theede WS ¶ 30.

[73]   *Ibid.* at 50–51, 54.

[74]   First Expert Report of Mr. Brent C. Kaczmarek, CFA, 15 September 2010, filed with Memorial (hereinafter "First Kaczmarek Report"); Second Expert Report of Mr. Brent C. Kaczmarek, 15 March 2012, filed with Reply (hereinafter "Second Kaczmarek Report").  Mr. Kaczmarek appeared for examination on 24 October 2012, Transcript, Day 11 at 60–196.  References to Mr. Kaczmarek's testimony appear in Part XII of the Award (The Quantification of Claimants' Damages).

to compensate Yukos were the Tribunal to find that the original tax assessments did not breach the ECT but that the subsequent enforcement of the tax claims did. His damages calculations for the latter scenario range between USD 33 billion and USD 67 billion.

172. Mr. Kaczmarek was cross-examined about (a) revisions he made between his first and second reports; (b) errors made with respect to the crude oil export tariff rate, the mineral extraction tax rate, inflation rates, the use of the U.S. Consumer Price Index, an erroneous conversion of tons to barrels, (c) assumptions about Yukos' borrowing capacity, and (d) various reasonableness tests. The Tribunal also questioned him about the choice of valuation dates.[75]

### 9.    Mr. Philip Baker QC

173. Mr. Philip Baker QC[76] practices at Gray's Inn Tax Chambers in London and is presently a senior research fellow at the University of London. Claimants presented him as an expert on international tax law to counter claims made by Respondent's expert Professor Rosenbloom, regarding the benefits claimed by Hulley and VPL under the Agreement between Cyprus and the Russian Federation for the Avoidance of Double Taxation with Respect to Taxes on Income and Capital, signed on 5 December 1998 ("**Cyprus-Russia DTA**"). For reasons explained in more detail in Chapter IX.B of this Award (on "Unclean Hands"), Mr. Baker disagrees with Professor Rosenbloom's conclusion that the claims to benefit from the Cyprus-Russia DTA were not appropriate, were vitiated by tax treaty abuse and were not justified by the provisions of the DTA.

174. In essence, Mr. Baker firstly maintains that the benefits that Hulley and VPL received under the Cyprus-Russia DTA are consistent with its purpose. Secondly, Mr. Baker opines that the abuse of law doctrine is found in the domestic law of certain countries, but is not universal and, where it applies, it is for that domestic jurisdiction to resolve whether the doctrine applies to international obligations such as double taxation conventions. Thirdly, Mr. Baker maintains that Hulley and VPL were the beneficial owners of the dividends received from Yukos in the sense of Article 10 of the Cyprus-Russia DTA. Hulley and VPL were acknowledged investment companies holding shares in Russian companies and did not have a permanent

---

[75]    Transcript, Day 11 at 192–93.

[76]    Expert Report of Mr. Philip Baker QC, 14 March 2012, filed with Reply. Initially Mr. Baker was expected to appear before the Tribunal, but on 4 October 2012, Respondent informed the Tribunal it no longer wished to cross-examine him. References to his report appear in Chapter IX.B (Unclean Hands).

establishment in Russia under Article 10(4).

### 10.    Mr. Yuri Schmidt

175.   Mr. Yuri Schmidt[77] was Mr. Khodorkovsky's defense lawyer in his 2004 and 2007 criminal trials, prior to which Mr. Schmidt had no previous dealings with Mr. Khodorkovsky or with Yukos.  In his witness statement, Mr. Schmidt recounts that Russian authorities systematically intimidated and harassed Yukos' lawyers and personnel.  Illegal and aggressive raids and seizures were "meticulously calculated to correspond to the critical stages in the dismantlement of Yukos."  Russian authorities also engaged in physical attacks and other provocation, including long and abusive interrogations and beatings.  In February 2007, defense lawyers were illegally and invasively searched at the airport while en route to visit Mr. Khodorkovsky in Siberia.  Russian authorities also (unsuccessfully) brought libel proceedings against and attempted to disbar Mr. Schmidt.  Respondent chose not to call him for cross-examination.

176.   Mr. Schmidt testifies that in the criminal cases against Messrs. Khodorkovsky and Lebedev, Russian authorities violated basic standards of due process and fair trial.  In 50 years of legal practice in Russia, Mr. Schmidt had "never seen breaches of due process so flagrant and so egregious," nor had he ever, even in the "darkest hours of the Soviet regime," "seen the Russian State undertake such coordinated, systematic and intense efforts, and deploy such huge resources, against a person accused of an alleged economic offense."  The raids resulted in the "massive confiscation" of documents that were not returned.  In December 2006, the defendants were transferred to a "pre-trial detention isolator" in Chita and Siberia.  Mr. Schmidt recounts that during the trials, seized documents were presented out of context; the defendants sat in metal and glass cages that were equipped with hidden microphones; criminal charges were brought against defense witnesses; and prosecution motions were systematically granted, while defense motions were refused.

177.   According to Mr. Schmidt, the goal of destroying Yukos and confiscating its assets was carried out by the coordinated actions of all branches of the Russian State.  The judiciary blocked Mr. Khodorkovsky's registration of candidacy for the 2005 parliamentary elections by accelerating his appeal.  The administration transferred Messrs. Khodorkovsky and Lebedev to

---

[77]    Witness Statement of Mr. Yuri Schmidt, 6 September 2010 (hereinafter "Schmidt WS") (original in Russian, translated into English), submitted with Memorial.  References to Mr. Schmidt's testimony appear in Chapter VIII.C (Harassment, Intimidation and Arrests).

the "most inaccessible penal colonies in Russia," "in blatant violation of Russian law."  The legislature amended legislation to permit the transfer and amended the law on NGOs to force the closure of Open Russia.

**11.  Dr. Sergei Kovalev**

178.  Dr. Sergei Kovalev[78] is a Russian human rights activist, former politician, Soviet dissident and political prisoner.  From 1993 to 2003 he served as an elected State Duma Deputy.  He has been nominated for the Nobel Peace Prize.  Dr. Kovalev's expert opinion is on the independence of the Russian judiciary in cases with a political element or representing a particular interest to Russian authorities.  Dr. Kovalev concludes that the Russian judicial system was not, and is still not, independent.  According to Dr. Kovalev, where cases implicate the interests of the State, trials are political and decisions dictated by extralegal motives.  There exists "absolute submission of the Russian judiciary to the executive power."  Respondent did not call him for cross-examination.

179.  Dr. Kovalev opines that the normative regulation of the Russian judiciary ensures its dependence, including through the role of the executive branch of government in the appointment of judges.  Court Presidents have "excessive powers," courts are under-funded, judges earn bonuses for "exemplary behavior" (as defined by the regime), and disciplinary action is taken against disobedient judges.

180.  Dr. Kovalev's answer to the question of whether the Russian judiciary was independent of the executive branch in the Yukos and Khodorkovsky/Lebedev cases, is "unequivocal and definitely negative," because of the "clearly political nature" of the cases.  The political motive was "to dispose of Mikhail Khodorkovsky," whom the Putin administration saw as an "unmistakable political opponent."  According to Dr. Kovalev, the attacks on Yukos also had economic motives, as evidenced by President Putin's vouching for the unknown last minute purchasers of YNG.  Pressure (including the imprisonment of Yukos lawyer Vasiliy Aleksanyan) was exerted on other Yukos associates to obtain testimony.  Dr. Kovalev lists "egregious due process violations" against Messrs. Khodorkovsky and Lebedev, including: (a) a pretrial investigation that was conducted without the defendants' participation; (b) the

---

[78]  Expert Report of Dr. Sergei Kovalev, 2 September 2010 (hereinafter "Kovalev Report") (original in Russian, translated into English), submitted with Memorial.  References to Dr. Kovalev's testimony appear in Chapter VIII.C (Harassment, Intimidation and Arrests).

dismissal by the Court of every defense petition; and (c) the refusal by the Court to allow the defense attorneys to question Prosecution expert witnesses.

**B.    RESPONDENT'S WITNESSES**

181.   Respondent submitted no testimony from fact witnesses.  Respondent submitted 11 expert opinions.  At the Hearing on the Merits, Claimants chose to cross-examine only:[79]

> 1)   Professor James Dow PhD; and
> 2)   Mr. Oleg Y. Konnov

182.   Respondent's other witnesses, who did not appear for cross-examination, were:

> 3)   Professor Reinier Kraakman;
> 4)   Professor H. David Rosenbloom;
> 5)   Professor Thomas Z. Lys PhD;
> 6)   Ms. Felicity Cullen QC;
> 7)   Mr. Dale Hart;
> 8)   Mr. Polyvios G. Polyviou;
> 9)   Mr. John Ellison FCA;
> 10)  Mr. Raymond Gross CPA; and
> 11)  Professor Dr. Albert Jan van den Berg

183.   The following summary first addresses the testimony of Respondent's two witnesses who appeared before the Tribunal, in order of appearance.  It then reviews the evidence from Respondent's nine witnesses whom Claimants chose not to cross-examine as well as the evidence provided by Professor Stef van Weeghel during the jurisdictional phase of this case.

**1.    Professor James Dow**

184.   Professor James Dow[80] is Professor of Finance at London Business School, where he has taught valuation since 1989.  He has a PhD from Princeton University and economics degrees from Cambridge University.  Professor Dow was retained by Respondent as a damages expert to respond to the reports of Claimants' expert, Mr. Kaczmarek.

---

[79]   Initially, Claimants intended to also cross-examine Professor H. David Rosenbloom.  However, they decided not to after Respondent, shortly before the Hearing on the Merits, advised that it did not wish to cross-examine Claimants' international tax law expert, Mr. Philip Baker QC.

[80]   First Expert Report of Professor James Dow, 1 April 2011, filed with Respondent's Counter Memorial, Second Expert Report of Professor James Dow, 15 August 2012, filed with Rejoinder.  Professor Dow appeared for examination on 25 October 2012, Transcript, Day 12 at 1–202.  References to Professor Dow's testimony appear in Part XII (The Quantification of Claimants' Damages).

185. Professor Dow's two expert reports and oral testimony are summarized in Part XII of the Award.  Professor Dow acknowledges focusing on "explaining why the Kaczmarek Report is not useful for calculating damages in this matter."  His reports contain no alternative valuation of his own.  He basically describes a series of flaws in the analysis of Mr. Kaczmarek, highlighting his choice of a valuation date which, he says, is arbitrary and unjustifiably inflates damages.  He also criticizes Mr. Kaczmarek for ignoring causation and the extent to which Yukos' own actions might have contributed to the loss.  Professor Dow identifies a number of errors in Claimants' DCF analysis and questions the way in which Mr. Kaczmarek sought to correct them without impacting the ultimate valuation.  He also articulates problems with Claimants' comparable companies method and the assumptions underlying the "alternative collection scenarios" whereby Claimants would have been given an opportunity to make arrangements to pay off legitimate tax assessments.  He identifies some "obvious and significant errors" relating to the application of the inflation rate, the export duty rate and the mineral extract tax rate.  He also criticizes any valuation based on an American Depository Receipt ("**ADR**") listing on the NYSE as too speculative.  Professor Dow was cross-examined about these issues.

186. At the Hearing, Professor Dow testified that he would be prepared to put some weight on Mr. Kaczmarek's analysis for YNG with corrections (USD 17.1 billion for the comparable companies approach and USD 17.2 billion for the comparable transactions approach); which represented a "reasonable stab".[81]  Professor Dow was asked if his corrected figures for Yukos and YukosSibneft valuations resulting from the comparable companies analysis (of USD 67.8 billion and US 93.7 billion respectively) could provide "a valid result in terms of valuation in the same manner as for YNG," to which he answered that:  "They are not presented in that context, but I think I'd have to agree that they could be a useful valuation, yes."[82]  He qualified this answer by noting he had not done enough analysis, for example by accounting for changes in oil prices.  Claimants' counsel also challenged Professor Dow on his criticisms of Claimants' comparable companies approach.  With respect to the proper valuation date, from an economic standpoint, he considered that the end of 2004 was the appropriate valuation date, since that is when the loss of value in Yukos had taken place and the market thought, based on the share price, that the company's fortunes had no chance of being reversed.  Professor Dow opined that

---

"it's indisputable that there was no value by the end of 2004.[83]   By the end of 2004, Yukos' share price had plummeted, it was a penny stock, and in the three years that followed there was no recovery in the share price."[84]

### 2.   Mr. Oleg Y. Konnov

187.   Mr. Oleg Y. Konnov[85] is a partner at Herbert Smith LLP and head of its Russian tax group based in Moscow.  He has practiced tax law for 17 years and taught at the Law Faculty of Moscow State University.   Respondent retained him as an expert on Russian tax law. Mr. Konnov was the only Russian tax lawyer who appeared as a witness before the Tribunal. Extensive extracts from his testimony are set out in the Analysis portion of the Award, especially the chapters dealing with Yukos' tax optimization scheme and the tax assessments. Accordingly, his testimony is not reproduced here in any detail.

188.   His first expert report describes the tax optimization scheme adopted by Yukos using domestic offshore companies and sets out some basic principles of the Russian federal tax legislation at the relevant times.  He then addresses seven specific questions.

189.   The first question is whether the tax authorities acted in accordance with applicable law and practice when assessing profit tax on Yukos with respect to sales by the domestic offshore companies.  Mr. Konnov answers affirmatively and opines that the actions of the Russian tax authorities against Yukos were consistent with pronouncements by Russian courts on the "anti-abuse doctrine", which according to Mr. Konnov, was "accepted and consistently applied" by Russian courts before and after the Yukos tax cases.[86]

190.   The second question is whether Yukos was automatically entitled to a zero percent VAT rate in connection with exports declared by domestic offshore companies.  Mr. Konnov answers no, because the application of a zero percent VAT rate was "strictly conditioned" on the taxpayer's

---

[83]   *Ibid.* at 176.

[84]   *Ibid.* at 47.

[85]   Mr. Konnov submitted two expert reports for these proceedings.  First Expert Report of Mr. Oleg Konnov, 4 April 2011 (hereinafter "First Konnov Report"); Second Expert Report of Mr. Oleg Konnov, 15 August 2012 (hereinafter "Second Konnov Report").  Mr. Konnov appeared for examination on 29–31 October 2012; Transcript, Day 13 at 1– 257; Day 14 at 1–261; Day 15 at 1–256.  References to Mr. Konnov's testimony appear Chapters VIII.A (The Tax Optimization Scheme), VIII.B (The Tax Assessments Starting in December 2003), VIII.E (Attempts to Settle) and VIII.F (The Auction of YNG).

[86]   First Konnov Report ¶¶ 31–52.

filing of a "special" zero percent monthly VAT return.  According to Mr. Konnov, Yukos should have complied with the specific procedures because the courts and the tax authorities established that Yukos was "the actual owner and exporter of goods."[87]

191.   The third question is whether Yukos had disclosed to the Russian tax authorities prior to the commencement of the 2003 tax audit its tax minimization practices involving the use of domestic offshore companies registered in domestic low-tax jurisdictions.  Mr. Konnov saw nothing in the record indicating that Yukos "made any significant disclosure of its tax scheme," but even so, illegal tax practices may not be legitimized through a tax offender's disclosure.[88]

192.   The fourth question is whether the Russian Tax Ministry complied with applicable law in appointing and conducting a tax audit of Yukos in December 2003.  Mr. Konnov answers affirmatively.[89]

193.   The fifth question is whether the Russian tax authorities and courts complied with applicable law in imposing fines on Yukos.  Mr. Konnov explains that the base fine under Russian tax law is 20 percent, which can be increased to 40 percent if non-payment results from the willful acts of a taxpayer, which in turn may be doubled for repeat offenders.  Mr. Konnov concludes that the imposition of fines on Yukos was justified and accorded with prevailing court practice.[90]

194.   The sixth question concerns actions that Yukos could have taken after receiving the 2000 Tax Audit Report in December 2003 to reduce its tax liability.  Mr. Konnov explains that Yukos could have:  (a) voluntarily paid all tax arrears and accrued interest and reserved cash for fines; (b) filed amended tax returns, and paid tax and interest due for 2001–2003; (c) complied with the legal requirements for claiming the zero percent VAT rate; and (d) discontinued as of 1 January 2004 the use of domestic offshore companies.[91]

195.   The seventh question is whether the tax treatment of YNG changed after its sale to Rosneft.  Mr. Konnov concludes that the treatment of YNG before and after its sale to Rosneft "was

---

[87]   *Ibid.* ¶ 53–59.

[88]   *Ibid.* ¶¶ 59–64.

[89]   *Ibid.* ¶¶ 65–70.

[90]   *Ibid.* ¶¶ 71–82.

[91]   *Ibid.* ¶¶ 83–85.

consistent with then current practice of the Russian tax authorities and courts, and does not suggest any irregularity."[92]

196. Mr. Konnov's second report responds to alleged misstatements of Russian tax law found in the Reply, including with respect to the "anti-abuse doctrine" under Russian tax law,[93] "re-attribution," and the "bad-faith taxpayer" doctrine.[94]   Mr. Konnov also addresses Claimants' arguments about proportionality between tax benefits claimed and investments made in the low-tax regions, Yukos' awareness that its tax optimization scheme was not fully compliant with the law, the application of the Law of the Russian Federation governing Value Added Tax ("**VAT Law**"), and fines on Yukos.[95]

197. Mr. Konnov appeared before the Tribunal for examination on 29, 30 and 31 October 2012.  He was cross-examined on a range of documents from the record, legal authorities and their application to Yukos and its domestic offshore companies.  Issues canvassed in the cross-examination included, *inter alia*:  (a) the factual record underlying his views expressed about alleged improprieties in Yukos' domestic offshore companies; (b) whether oil products must be physically stored or moved from the premises of trading companies; (c) the re-attribution theory applied to Yukos and the existence of legal precedents for the theory at the relevant time; (d) provisions in the regional tax legislation in Mordovia and elsewhere; (e) the investment agreements concluded between the domestic offshore trading companies and Mordovian authorities; (f) the existence of the anti-abuse doctrine at relevant times; (g) fines and penalties; (h) prior audits conducted by local and regional authorities on Yukos' domestic offshore trading companies and the extent to which they demonstrate familiarity with and tolerance of the tax optimization scheme; (i) audit inspection practices; (j) the meaning of "interrelatedness" in the context of Russian tax legislation; (k) the consequences of the reattribution theory on entitlement to VAT refunds and the formalities required to enjoy VAT exemption; (l) the evolution of the ZATO tax laws and certain internal memoranda within ZATO tax inspectorates; and (m) timing for enforcement of tax assessments.[96]

---

[92]   *Ibid*. ¶¶ 89–92.

[93]   Second Konnov Report, ¶¶ 7–17.

[94]   *Ibid*. ¶ 26–41.

[95]   *Ibid*. ¶¶ 84–121.

[96]   Transcript, Day 13 at 49–52, 70–80, 114–20, 151–52; Transcript, Day 14 at 61–68.

198. Mr. Konnov also answered questions from the Tribunal, including about the principle of resolving doubts in favor of the taxpayer.[97]  He was asked why, in the interests of justice the Russian courts did not treat the filings for VAT by the trading companies as filings by Yukos.[98]  When he emphasized the formalities required for filing for VAT, he was further asked whether the trustee in bankruptcy (Mr Rebgun), who was charged with maximizing the resources available for creditors, himself could have filed the monthly forms for VAT return. Mr. Konnov answered that he could have done so, subject to the three-year limitation period, *i.e.*, he could have re-filed for the three years preceding his appointment as trustee.[99]  The Tribunal also asked Mr. Konnov how the tax authorities determine the motivation of a taxpayer in making use of a low-tax region and about his experience in advising clients with respect to tax minimization.[100]

199. Mr. Konnov was asked about a comment made by him as an expert witness in the *RosInvestCo UK Ltd. v. The Russian Federation* arbitration ("***RosInvestCo***"), to the effect that "sometimes Russian courts [do not] have an excellent reputation."  Mr. Konnov responded that he had not come across corruption or irregularities in tax cases.[101]  He was invited to share his views on the tax evasion aspects of the convictions of Messrs. Khodorkovsky and Lebedev.  The parts of the judgment dealing with tax elements of the ZATOs and issues of personal income tax avoidance seemed to him to make sense, but he could not comment on other parts of the judgment.[102]

### 3.    Professor Reinier Kraakman

200. Professor Reinier Kraakman[103] is a Harvard law professor specializing in comparative corporate law and governance.  Claimants chose not to call him for cross-examination.  His expert report concerns the activities of Bank Menatep, Mikhail Khodorkovsky and his "tight-knit group of confederates" (the "**Khodorkovsky Group**"), Yukos Oil Company, and Yukos' subsidiaries

---

[97]    Transcript, Day 15 at 37–42 (Dr. Poncet referring to the principle *in dubio contra fiscum*).

[98]    *Ibid*. at 232.

[99]    *Ibid*. at 234–35.

[100]   *Ibid*. at 237–41

[101]   *Ibid*. at 251–56.  Referring to the case of *RosInvestCo UK Ltd. v. The Russian Federation*, SCC Arbitration V (079/2005), Final Award, 12 September 2010, Exh. C-1049 (hereinafter "*RosInvestCo*").

[102]   *Ibid*. at 249–55.

[103]   Expert Report of Professor Reinier Kraakman, 1 April 2011, filed with Counter-Memorial.  References to his expert report appear in Chapter IX.B (Unlean Hands).

from the period 1995–1999.  He addresses provisions of the Russian Civil Law, Joint Stock Company Law ("**JSC Law**") and privatization law.

201.  Professor Kraakman maintains that Mr. Khodorkovsky, his Group, and Bank Menatep acted in bad faith and "probably illegally" in violation of the spirit and letter of Presidential Decree No. 889, which was the legal foundation of the Loans-For-Shares ("**LFS**") Program.  At stake in the initial auction of Yukos shares in December 1996 were (i) the right to lend funds to the Russian Federation secured by a pledge of 45 percent of Yukos stock, and (ii) the right to purchase a block of 33 percent of Yukos Stock in a so-called "Investment Tender".  Bank Menatep held shares pledged by the State and sold those shares to their close affiliates, a "tactic" that "allowed the Khodorkovsky Group to gain title to the pledged shares while avoiding Bank Menatep's agency duty to maximize their value," thus violating "the intent of Decree 889, while making a gesture toward formal compliance."

202.  According to Professor Kraakman, secondary sources, and some primary documentation, support "a reasonable inference" that, prior to the Russian Federation's sovereign debt crisis in late 1998, the Khodorkovsky Group systematically skimmed revenue from Yukos' partially-held operating subsidiaries—YNG, Samarneftegaz, and Tomskneft—in bad faith and in violation of the JSC Law's regulations on self-dealing transactions.  Circumstantial evidence indicates that the Khodorkovsky Group skimmed revenue directly from Yukos from mid-1996 until 1999, and transferred it to offshore companies around the world that were controlled or beneficially owned by members of the Khodorkovsky Group.

203.  He testifies that following the Russian sovereign debt crisis, Yukos and the Khodorkovsky Group largely succeeded in squeezing out minority shareholders from Yukos' operating subsidiaries.  Yukos managed this by committing serious violations of the provisions in the JSC Law intended to protect minority shareholders.  Yukos exhibited egregious bad faith by blocking minority shareholders from participating in extraordinary shareholders meetings called in March 1999.  He claims:  "As a professor of corporate law with a particular interest in the JSC Law, I have never read—or read about—anything more chilling in a professional sense than the documents and manipulative behavior surrounding the March 1999 EGMs [Extraordinary General Meetings] held for YNG, Samarneftegaz, and Tomskneft."  In Professor Kraakman's opinion, Yukos and the Khodorkovsky Group opportunistically devalued Yukos shares, which Bank Menatep—the Group's financial arm—had previously pledged to Western banks in order to finance Yukos' efforts to gain control of Tomskneft.

### 4. Professor H. David Rosenbloom

204. Professor H. David Rosenbloom[104] is a practicing attorney, a consultant and NYU law professor specializing in international taxation. He has worked for the U.S. Government on international tax matters. Respondent retained him as an international tax law expert. He opines on the appropriateness of the actions from 2000–2003 by four Cypriot entities—Hulley, VPL, Dunsley Limited, and Nassaubridge Management Limited—in claiming a reduced Russian Federation tax on dividends paid by Yukos and affiliates, under the Cyprus-Russia DTA.

205. Professor Rosenbloom concludes that each of the four entities is a "paper entity", with "total control" and "ultimate ownership" exercised by Russian individuals operating solely within Russia and enjoying all economic benefits. According to Professor Rosenbloom, the invocation of the Cyprus-Russia DTA under these circumstances was a "blatant example of tax treaty abuse." Professor Rosenbloom refers to pervasive recognition of the international "abuse of law" doctrine, to the OECD Commentaries (the DTA follows the OECD Model), and to the VCLT to assert that: (a) taxpayers must act in good faith to benefit from an income tax treaty; and (b) the employment of entities in one State party to a tax treaty exclusively to reduce taxes otherwise applicable under the laws of the other State party constitutes tax treaty abuse.

206. For reasons described in more detail in Chapter IX.B (on "Unclean Hands"), Professor Rosenbloom concludes that the benefits claimed were not justified by Article 10 of the Cyprus-Russia DTA, which limits the tax charged by one State on dividends paid from a company in that State to beneficial owners of the stock resident in the other State, provided they do not operate through a "permanent establishment" in the first State, to which the dividends are attributable. Firstly, he opines, the Cypriot entities were not beneficial owners of the dividends received on Yukos shares, and the beneficial owners were not residents of Cyprus. Secondly, in his view, the entities were not eligible for the claimed benefits because they operated through permanent establishments in the Russian Federation, to which the dividends were attributable. In sum, according to Professor Rosenbloom, the claims under the Cyprus-Russia DTA on behalf of the Cypriot entities were unjustified. They were not only abusive, but without merit.

---

[104] First Expert Report of Professor H. David Rosenbloom, 1 April 2011, filed with Counter-Memorial, Second Expert Report of Professor H. David Rosenbloom, 15 August 2012, filed with Rejoinder. Initially Claimants intended to cross-examine Professor Rosenbloom, but decided not to after Respondent advised it would not be cross-examining Mr. Philip Baker QC. References to Professor Rosenbloom's reports appear in Chapter IX.B (Unclean Hands).

207.   In his second expert report, Professor Rosenbloom replies to the opinion of Claimants' tax law expert, Mr. Baker, which he describes as "long on law and history" but "short, very short, on the facts."   The facts here, according to Professor Rosenbloom, involve Russian nationals and residents earning Russian source income and claiming a treaty-based reduction of normal Russian tax by reason of a "wafer-thin Cypriot corporate veneer managed from Russian soil." Neither the DTA nor any other income tax treaty would condone such a structure and no rational country would endorse it as sound policy.   Professor Rosenbloom then sets out in further detail facts pertaining to several Yukos-related entities which inappropriately claimed benefits under the Cyprus-Russia DTA.

208.   Professor Rosenbloom opines that the primary purpose of a tax treaty is to eliminate or at least mitigate international double taxation and none of the authorities in Mr. Baker's report deal with a country using treaties to reduce tax on its own residents but rather discuss third-country investors.   Interpreting the Cyprus-Russia DTA as an instrument to attract foreign direct investment into Russia without regard to tax revenue loss exceeds the limited scope of OECD-based treaties and undermines the purpose of tax avoidance and evasion.   Professor Rosenbloom also accuses Mr. Baker of failing to differentiate between treaty shopping and "round tripping".   Russia's inaction to insist on strict limitation on benefit or its failure to terminate the Cyprus-Russia DTA does not establish Russia's endorsement of round tripping.

209.   Finally, Professor Rosenbloom refers to documents provided after the filing of his first report, which he says confirm that neither Hulley nor VPL beneficially owned dividends received from Yukos.   Even if Hulley and VPL were considered beneficial owners of the Yukos dividends on the transferred shares, the related-party "repos" or stock-lending agreements, which had no purpose other than to enable claims of treaty benefits, are an improper use of the DTA.

210.   According to Professor Rosenbloom, even if the Yukos structure and transactions with the Cypriot entities were not abusive, dividend distributions by Yukos and its affiliates to Hulley, VPL and the other Cypriot entities did not qualify under the DTA for reduced tax in Russia since they should have been taxed as "business profits" under Article 10(4) of the DTA.   The facts also confirm that all the Laurel subsidiaries had permanent establishments in Russia to which the dividends received from their Russian subsidiaries were attributable.   According to Professor Rosenbloom, it is not necessary to adopt a complicated "economic substance" or "substance-over-form" analysis to see that the Yukos structure cannot be defended as within the scope of the Cyprus-Russia DTA or legitimate tax planning.   Had Mr. Baker and Claimants "focused on the facts presented" they could not reasonably have come to any other conclusion.

### 5.     Professor Thomas Z. Lys

211.   Professor Thomas Lys[105] is a professor of accounting at Kellogg School of Management, Northwestern University in Chicago.  He has a PhD in accounting and finance from the University of Rochester and an economics degree from the University of Berne, Switzerland. He has served as a consultant to several companies.  He was retained by Respondent to expound in detail various financial transactions and operations of Yukos.  Claimants chose not to call him for cross-examination.  The appendices attached to Professor Lys' Reports were used at various times throughout the Hearing to help illustrate Yukos' structure and activities.

212.   Professor Lys recounts Yukos' incorporation in 1993, privatization in 1995 and public sale of shares in 1996.  He describes Yukos' structure and activities and the role of the various producing subsidiaries, trading entities and off-shore entities, and the structure and flow of funds originating in the trading companies into "offshore and Yukos entities."

213.   Professor Lys explains that starting in 1999, the majority of Yukos shares were owned by subsidiaries of GML, an entity whose major interest was held by Mr. Khodorkovsky, the CEO and Chairman of the Executive Committee of the Board of Directors of Yukos.   Other shareholders of GML also had senior management positions in Yukos.  In several instances, shares of Yukos stock were transferred between various entities under the control of GML. Many such transactions placed the Yukos shares temporarily, sometimes for less than a week, under nominal ownership of Cypriot entities on dates that established record ownership for purposes of Yukos dividend distributions, apparently in an effort to reduce Russian taxes on these dividends.  YUL was a wholly-owned subsidiary of GML.  Hulley was a wholly-owned subsidiary of YUL.  Although VPL did not fall under the ownership structure of GML, it was a subsidiary of the Veteran Petroleum Trust (a Jersey trust), of which YUL controlled at least three quarters of the voting rights.

214.   Professor Lys describes and details how there were hundreds of transactions of Yukos shares among the above-described entities and their affiliates; in some instances multiple transactions occurred on a single day.  Many appear to Professor Lys to "have been structured to place Yukos shares temporarily in the hands of Hulley and a specific account held in the name of VPL, both of which are Cypriot entities, as of the record dates of Yukos dividend payments."

---

[105]   First Expert Report of Thomas Z. Lys, 1 April 2011, filed with Counter-Memorial, Supplemental Expert Report of Professor Thomas Z. Lys, 15 August 2012, filed with Rejoinder.  References to Professor Lys' Reports appear in Chapters VIII.A (The Tax Optimization Scheme) and X.E (Contributory Fault).

He states that "they appear to have been performed to allow the Cypriot entities to claim beneficial ownership of these shares to reduce the Russian withholding taxes on the dividends Yukos paid on these shares, pursuant to the [Cyprus-Russia DTA]." Given their timing, Professor Lys sees no apparent business purpose for these transactions.

215.   Professor Lys also describes Yukos' dividend flows through YUL, Hulley, VPL, and GML. He concludes that YUL, and its beneficiary GML, not only received the economic benefit of the dividends paid on the Yukos shares owned by Hulley, but also received the benefit of the gains Hulley reported from the sales of Yukos shares to YUL. In other words, the profits earned on those sales were effectively "returned" through the dividend. YUL (and GML) were also the beneficiaries of dividends paid on Yukos shares owned by VPL.

216.   Professor Lys describes how from 2000 to 2003, groups of Yukos-related entities "moved funds in a common pattern from Russia's low-tax regions out of Russia, into off-shore entities." He details the flow structures of profits through the Fargoil and Ratibor structures. He sets out the Mega Alyans flow structure, showing the ultimate ownership of trading entities by Laurel, a BVI entity, and its sole shareholder, Stephen Curtis. He describes how Yukos had a call option to acquire all of Mr. Curtis' Laurel shares for one rouble.

217.   He also details the flow structures in 2000–2001 of the trading companies registered in the ZATOs of Lesnoy and Trekhgorny (Business-Oil, Flander, Forest-Oil, Greis, Kolkrein, Kverkus, Mitra, Muscron, Nortkes, and Vald Oil). He explains how the Lesnoy and Trekgorny trading companies passed funds through two Russian entities—Neftetrade and Neftemarket—to a number of Cypriot companies, which in turn passed the funds on through Laurel to Halsley and Belmont, two BVI entities owned by Brill.

218.   Finally, Professor Lys describes loans made by and to Yukos Capital (incorporated in Luxembourg in 2003). Yukos Capital's 2005 financial statements show that it borrowed extensively from and lent extensively to other Yukos entities. Professor Lys details loan transactions where the exact amount borrowed by Yukos Capital was then lent by Yukos Capital to other Yukos-related entities.

### 6.    Ms. Felicity Cullen QC

219.  Ms. Felicity Cullen QC[106] is a barrister specializing in United Kingdom tax law.  Respondent asked Ms. Cullen to opine on rules concerning the assessment, collection, and enforcement of tax in the UK, in the context of showing that "[t]he treatment by the Russian tax authorities of Yukos' tax evasion scheme is entirely consistent with the positions that would have been taken by the tax authorities of virtually every other country [including the UK]."[107]  Claimants chose not to call her for cross-examination.

220.  Ms. Cullen was asked to give her opinion on the basis of a number of assumptions about a large corporate taxpayer who has entered into transactions to reduce its tax liability.  She was asked to assume that the transactions are considered by tax authorities to involve avoidance and/or criminal evasion of tax, to lack genuine commerciality, and to have been carried out on non-arm's length terms.  The same taxpayer is assumed to have deliberately concealed the true character of its transactions, to have been deliberately uncooperative in tax investigations and to have dissipated assets otherwise available to satisfy potential tax liabilities.  In such assumed circumstances, Ms. Cullen describes the investigation and enforcement options open to an officer of Her Majesty's Revenue and Customs ("**HMRC**") during an enquiry into a tax return.  For example, HMRC can amend a company's self-assessment if its suspected of understating the company's true tax liability and there is a real risk of substantial loss of tax to the government.  Under a discovery process, HMRC is allowed to re-open returns for periods otherwise considered closed when there has been careless or deliberate conduct leading to loss of revenue.

221.  With respect to penalities, Ms. Cullen notes that under the current UK civil tax penalty regime may vary from 30  to 100 percent of the potential lost revenue (depending on whether there was deliberate concealment).   She further describes the considerable methods of enforcement available to HMRC, which include proceedings in English courts, freezing orders, and pursuit of insolvency proceedings.  Criminal action may, according to Ms. Cullen, be pursued where appropriate, in which case HMRC will often conduct a form of "dawn raid", require production of documents, seize items like computers and make arrests.

---

[106]    Expert Report of Ms. Felicity Cullen QC, 4 April 2011.

[107]    Counter-Memorial ¶ 1135.

222. Ms Cullen observes that traditionally, tax legislation in the UK was construed literally but today, it is construed purposively, which has facilitated challenging and countering tax avoidance schemes.

### 7.   Mr. Dale Hart

223. Mr. Dale Hart[108] is a retired executive of the U.S. Internal Revenue Service ("**IRS**"). Respondent retained Mr. Hart to describe the U.S. legal framework against tax abuse and evasion and enforcement powers of the IRS, in the context of Respondent's claim that "tax administrations around the world [including the U.S.] would have been at least as firm as the Russian Federation in dealing with abuses of the kind perpetrated by Yukos."[109]  Claimants chose not to call him for cross-examination.

224. Mr. Hart testifies that under U.S. law, abusive or fraudulent tax shelters are broadly defined to include investment schemes that reduce tax income without changing the value of the business. To combat them, the IRS relies on a legal framework that provides the authority to reallocate income and deductions to properly reflect income.  The framework includes the judicial doctrines of economic substance, business purpose, sham transactions, substance over form and step transactions.  The IRS has extensive civil and criminal enforcement powers, which according to Mr. Hart, it uses "aggressively".  It has broad discretion in determining which tax returns and taxpayers to select for audit and it tailors the scope of its audit to the taxpayer's financial and tax situation.  If evidence of fraud is revealed, the civil audit is discontinued and a criminal investigation may be launched.  Mr. Hart notes that the typical three-year limitation period may be extended for fraud or other misconduct.

225. With respect to penalties, Mr. Hart describes how U.S. law imposes "heavy" penalties on fraudulently underpaid tax, including failure to pay and failure to file penalties, accuracy-related penalties on underpayments and a civil fraud penalty of 75 percent.  The collection process begins with a formal notice of assessment requesting payment.  According to Mr. Hart, a deferred payment arrangement is only ever considered when the taxpayer is unable to pay in full.  Mr. Hart describes the "strong arsenal" of administrative enforcement collection tools at the disposal of the IRS, including a federal tax lien, a notice of levy and the sale of property by

---

[108]   Expert Report of Mr. Dale Hart, 4 April 2011.

[109]   Counter-Memorial ¶ 1135.

public auction or public sale after determination a minimum bid price that need not be based on fair market value.

### 8.   Mr. Polyvios Polyviou

226.   Mr. Polyvios Polyviou[110] of Chryssafinis & Polyviou LLC in Nicosia is a lawyer practicing Cypriot law.  Respondent retained him as an expert to show that Claimants' alleged abuses of the Cyprus-Russia DTA also violated the criminal laws of Cyprus.  Claimants chose not to call him for cross-examination.

227.   Mr. Polyviou's report is based on the following assumptions:  (a) that for purposes of the Cyprus-Russia DTA, Hulley and Veteran were "residents" of Cyprus and Yukos was a "resident" of Russia; (b) that in reliance on the Cyprus-Russia DTA, Hulley and Veteran paid a reduced five percent withholding tax to Russia on dividends received from Yukos; (c) that Hulley and Veteran had no right to take the benefit of the Cyprus-Russia DTA because the relevant dividends *were* connected with activities carried out in Russia and/or because Hulley and Veteran were not the beneficial owners of the relevant dividends; (d) that the natural persons who declared/confirmed on forms submitted by Hulley and Veteran to Cypriot tax authorities that the relevant dividends received from Yukos were *not* connected with activities carried out in Russia and that Hulley/Veteran was the beneficial owner of the relevant dividends were authorized to do so on Hulley/Veteran's behalf; and (e) that at the time of making the declarations/confirmations, these natural persons *knew* that the dividends from Yukos *were* connected with activities carried out in Russia or that Hulley/Veteran was *not* the beneficial owner and intended for the forms to be submitted to the Cypriot authorities so as to obtain completion, dating, signing and stamping of Box 4 (the "Note of the foreign Tax authority") on the forms.  On the basis of these assumptions, Mr. Polyviou was asked to address two questions, as described below.

228.   The first question was:  "Did the circumstances under which Hulley and Veteran obtained the completion, dating, signing and stamping of certain tax forms by the Cypriot tax authorities give rise to criminal offences under the Criminal Code of Cyprus?"  Mr. Polyviou answers "Yes" under sections 297 (false pretences), 305 (willfully obtaining a "certificate" by false pretences) and 341 (willfully procuring execution of documents by false pretences) of Cap. 154

---

[110]   Expert Report of Mr. Polyvios G. Polyviou, 1 April 2011 (hereinafter "Polyviou Report").   References to Mr. Polyviou's  report appear in Chapters IX.B (Unclean Hands) and X.E (Contributory Fault).

of the Criminal Code.   According to Mr. Polyviou, but for the false pretence, Cypriot tax authorities would have rejected the request to complete, date, sign and stamp the forms as it would have been pointless and tantamount to assisting an abuse of the Cyprus-Russia DTA.

229.   The second question was:  "Were criminal offences committed under the Criminal Code and/or the Companies Law of Cyprus?", assuming that during the period 1 January 2000 to 28 October 2003:  (a) in reliance upon the Cyprus-Russia DTA Hulley and Veteran paid a reduced five percent withholding tax to Russia on dividends received from Yukos; (b) neither Hulley nor Veteran had the right to take the benefit of the Cyprus-Russia DTA, at least vis-à-vis Yukos' above-mentioned dividends; and (c) neither Hulley nor Veteran disclosed point (b) in their annual accounts for financial years 2000–2002?   Mr. Polyviou answered "Yes" under section 311(b)(iii) (directors and officers of corporations keeping fraudulent accounts or falsifying books or accounts) of Cap. 154 and section 143(6) (contents and forms of accounts) of Cap. 113 of the Criminal Code.

### 9.   Mr. John Ellison

230.   Mr. John Ellison[111] is a consultant at KPMG in London, having retired as a senior partner in 2010.   His report concerns the withdrawal by PwC of its audit opinions on Yukos' financial statements for the years 1995–2004.  Claimants chose not to cross-examine him.[112]

231.   Mr. Ellison opines that for a reputable international firm such as KPMG to withdraw an audit opinion is an "unusual and serious" event, of which he knows of only a handful of cases.  At KPMG, whether in the UK, the U.S., or Russia, such decision would necessarily be preceded by extensive consultations with several senior partners of the firm together with its technical departments and legal counsel.  According to Mr. Ellison, PwC's procedures were similar, as shown by a declaration (appended to the Ellison Report) from Ms. Laurie Endsley, PwC's in-house counsel who worked on the Yukos matter at the time of withdrawing the audits.

232.   Mr. Ellison analyzes PwC's letter of 15 June 2007,[113] in which PwC announced the withdrawal of its audit opinions of Yukos' financial statements, explaining that it had acquired new information that caused it to question the reliability of the representations made by Yukos'

---

[111]   Expert Accountant's Report to the Tribunal by John Ellison, FCA, 14 August 2012 (hereinafter "Ellison Report"). References to Mr. Ellison's expert report appear in Chapter VIII.H (The Withdrawal of PwC's Audit Opinions).

[112]   *See* Chapter VI.C (The So-Called "Empty Chairs").

[113]   Letters from ZAO PwC Audit to Mr. Rebgun, 15 June 2007, Exh. C-611 (hereinafter "PwC's Withdrawal Letter").

management during the audits.  Assuming the veracity of the contents of the letter, Mr. Ellison concludes that in withdrawing its audit opinions, PwC acted in accordance with the auditing standards generally accepted in the U.S., Russia and internationally.

233.  Mr. Ellison notes that under U.S. Statement of Auditing Standards No. 1, Section 333, when an auditor after issuing its report becomes aware of facts that existed at the time the report was being compiled, believes there are persons relying or likely to rely on his report and considers that the new facts are material to his report, or shake his confidence in the overall veracity of representations made by management, the auditor must advise his client to disclose the new facts and possibly revise its financial statements.  Mr. Ellison refers to PwC's claim that in light of the bankruptcy of Yukos, PwC "was unable to access the information required that could lead to revision of the financial statements and was also unable to discuss the matter with management, as recommended by [U.S. Auditing standards] AU Section 561."  Mr. Ellison accepts that in those circumstances, PwC "had no option but to withdraw its audit reports."

234.  Under International Standard on Auditing 560 and Russian Federal Auditing Rule 10, when new material facts become known to the auditor after issuance of the audit report, the auditor should consider revising the company's financial statements, discuss the matter with the company's management and "take the action appropriate in the circumstances" or "take steps necessary in the circumstances."  In Mr. Ellison's view, PwC did take the appropriate steps.

**10.  Mr. Raymond Gross**

235.  Mr. Raymond Gross[114] is a partner of KPMG's U.S. Accounting & Reporting Group in London. Claimants chose not to cross-examine him.  Respondent asked Mr. Gross to review what Yukos' consolidated financial statements prepared under U.S. GAAP revealed with respect to: (a) Yukos' tax optimization scheme, including its use of trading companies in low-tax regions of Russia to buy oil and oil products from production subsidiaries and transfer the proceeds to offshore companies established or controlled by Yukos; (b) the Jurby Lake structure, a group of offshore trading companies controlled by Yukos or its former Russian majority shareholders and comprising Jurby Lake Limited (Ireland) and the BBS Companies; and (c) the taxes assessed against Yukos' trading companies in the ZATO of Lesnoy for tax years 1999 and 2000.

---

[114]  Expert Accountant's Report to the Tribunal by Raymond Gross, CPA, 14 August 2012.

236.  Mr. Gross was instructed to assume that the statements would have "put a reader on notice of facts relevant to the nature and legality of Yukos' use of the Tax Optimization Scheme" if they had included:  (a) identification of the involved trading and offshore companies (listed in the exhibits to the Report); (b) the monetary value of the investments made and tax savings achieved by Yukos through the scheme; (c) details of the extent of the trading companies' investments in Russia's low-tax regions; (d) details the extent of Yukos' direction of and control over the trading companies; (e) details of the flow of funds from the trading companies to Yukos; (f) details about the taxes assessed against Yukos' trading companies in the ZATO of Lesnoy in 1999 and 2000 and the Republic of Kalmykia in 2001 due to improperly received tax benefits; and (g) disclosure of the possible financial impact on Yukos if the tax optimization scheme was disallowed by the Russian authorities.

237.  Mr. Gross concludes that the statements for the years 2000–2002 and the first three quarters of 2003 were not transparent with regard to Yukos' tax optimization scheme, as they disclosed none of the above-listed information necessary to put a reader on notice.  While the statements showed that Yukos' effective tax level was lower than the statutory tax level, they failed to explain the nature of the difference.  The statements also failed, according to Mr. Gross, to identify the companies composing the Jurby Lake structure.

238.  Mr. Gross also concludes that the 2001–2002 statements were not transparent and not consistent with the U.S. GAAP in that they failed to disclose as contingent liabilities the taxes assessed against the trading companies of the ZATO of Lesnoy for 1999 and 2000, despite the fact that these tax assessments were material to the statements.  Under the U.S. GAAP, Yukos could omit these assessments from the statements if it determined that the probability of loss was remote; however, the written support of outside legal counsel or another competent authority which would usually be required for such a determination was not obtained in this case.  Mr. Gross opines that Yukos should have disclosed that the validity of the tax optimization scheme had been called into question and discussed the risk involved in continuing with the scheme.

### 11.   Professor Dr. Albert Jan van den Berg

239.   Professor Dr. Albert Jan van den Berg[115] of Hanotiau & van den Berg in Brussels, specializes in international arbitration.   He was previously in private practice in the Netherlands and is a professor at Erasmus University in Rotterdam.   Respondent retained Professor Van den Berg to provide an expert opinion addressing the legality under Dutch law of the 2005 transfer of Yukos' foreign assets into the Stichtings.   Claimants chose not to cross-examine Professor Van den Berg.

240.   Professor Van den Berg was provided with a 12-page Statement of Assumed Facts on which to base his opinion.   These assumed facts may be summarized as follows.   Before the auction of YNG in December 2004, Yukos' assets outside the Russian Federation (the "**Foreign Assets**") were held by two wholly-owned subsidiaries of Yukos, Yukos Finance B.V. ("**Yukos Finance**") and Yukos CIS Investment Limited ("**Yukos CIS**").   After the auction, Yukos management transferred the Foreign Assets to the two Stichtings, which issued depositary receipts in return to Yukos Finance and Wincanton Holding BV ("**Wincanton**"), a Dutch subsidiary of Yukos CIS.   This restructuring had the "stated purpose . . . to prevent the non-Russian assets of Yukos Oil from being used to satisfy the tax debts that Russian courts had found Yukos Oil to owe, and, more broadly, to prevent the non-Russian assets from being available to satisfy claims of Yukos' Russian creditors."

241.   Under the Articles of Association of the Stichtings (amended in 2008), the management board, including former Yukos managers David Godfrey, Bruce Misamore and Steven Theede, manages the Foreign Assets in the interests of Yukos, its subsidiaries, shareholders, employees and "legitimate" creditors.   As a result of the restructuring:   (a) even after Yukos CIS and Yukos Finance were sold in Yukos' bankruptcy auction, the former Yukos managers have continued to manage and control the Foreign Assets; (b) the lending group under a USD 1 billion loan was unable to enforce an English judgment against Yukos Finance's assets; and (c) Moravel, whose loan had been held to be unenforceable by Russian courts because of its status as a subsidiary of Yukos, was able to negotiate the repayment of its loan from one of the Stichtings.

242.   Based on the above-described assumed facts, Professor Van den Berg opines that the restructuring of Yukos Finance and Yukos CIS was illegal, as Dutch law does not permit a

---

[115]   Legal Opinion on the Validity of Restructuring Devices under Dutch Law by Professor Dr. Albert Jan van den Berg, 14 August 2012 (hereinafter "Van den Berg Report").   References to Professor Van den Berg's legal opinion appear in Chapter VIII.G (The Bankruptcy of Yukos).

company to transfer its assets for the purpose of making it more difficult for a creditor to satisfy its claims, or for the new ultimate parent company to exercise control.  This is so even when a company believes the claims against it are illegitimate.  The company is not entitled to exercise self-help.

243.    According to Professor Van den Berg, this illegality gave rise to the directors' "internal liability" (liability of the directors to the company itself) pursuant to Articles 2:8 and 2:9 of the Dutch Civil Code (the "**DCC**") and to the directors' "external liability" (liability of the directors to creditors) as well as "company liability" (liability of the company to creditors) pursuant to Article 6:162 of the DCC.  Further, this illegality renders the board decisions regarding the restructuring voidable pursuant to Articles 2:8 and 2:15(1)(b) of the DCC (as contrary to the principles of reasonableness and fairness) and pursuant to Article 3:40(1) of the DCC (as contrary to "good morals").  Professor Van den Berg opines that the Stichtings are also disallowed as invalid permanent protective devices; even if they are treated as temporary protective devices, the requirements to uphold such temporary devices are not met in this case.

## 12.    Professor Stef van Weeghel

244.    The Tribunal recalls that Respondent had raised the question of "unclean hands" in the jurisdictional phase of the case, an issue which the Tribunal decided to defer for consideration until the merits phase of the arbitration.[116]   During the jurisdictional phase of the case, Respondent had adduced expert testimony from Professor Stef van Weeghel,[117] a professor of international tax law at the University of Amsterdam and a tax law partner at Stibbe.  In his expert report, Professor Van Weeghel reached three main conclusions about Claimants and taxation law, as summarized in the Interim Awards.[118]  The Parties did not reference his report in their pleadings in the merits phase of the case and he was not cross-examined at the Hearing on the Merits.  The Tribunal has decided to include in the Final Awards the summary of Professor Van Weeghel's expert evidence.

245.    According to Professor Van Weeghel, Hulley was not entitled to obtain the taxation benefits contained in the Cyprus-Russia DTA in respect of the Yukos dividends because:  (a) Hulley

---

[116]    Interim Award, Hulley ¶ 435.  *See also* Procedural Orders Nos. 2 and 3 of 8 September and 31 October 2006.

[117]    Expert Report of Professor Stef van Weeghel, 29 January 2007, filed with Counter-Memorial on Jurisdiction.  References to Professor Van Weeghel's Expert Report appear in Part X.E (Contributory Fault).

[118]    Interim Awards, Hulley ¶¶ 191–97.

had a permanent establishment in Russia under Article 10(4) of the Cyprus-Russia DTA) as it either had a place of management in Russia, or it had an agent in Russia; and (b) those dividends were attributable to the permanent establishment in Russia.  He also opines that VPL was similarly not entitled to obtain the taxation benefits contained in the Cyprus-Russia DTA because it was not the beneficial owner of the Yukos dividends within the meaning of Article 10(2) of the Cyprus-Russia DTA.

246.  According to Professor Van Weeghel, the Yukos holding structure is a sham or otherwise abusive under general principles of international tax law and designed specifically to avoid taxation obligations.  Therefore rights to tax benefits under the Cyprus-Russia DTA should be denied.  Tax authorities do not always have to accept artificial legal constructions.  Anti-abuse doctrines to counter artificial legal constructions have developed in and are common to many countries including the Russian Federation and Cyprus.  Professor Van Weeghel refers to the example of the Swiss Federal Court denying the benefits of a double taxation treaty to a Danish company in circumstances analogous to the Yukos holding structure.  He refers to international efforts to control the use of tax havens and notes that the OECD Forum on Harmful Tax Practices in its 2000 Progress Report identified 35 tax havens which included the Isle of Man, Gibraltar, Jersey and the British Virgin Islands.  Professor Van Weeghel examines the Yukos holding structure, and notes that at the bottom of the structure is the successful and profitable Russian oil company developing and exploiting natural energy resources in Russia, while at the top of the structure are a small number of Russian individual shareholders.  He concludes that it is "hardly perceivable" that the Russian individual shareholders, in setting up the Yukos holding structure, had any other goal in mind than low taxation and lack of transparency in respect of the ownership of Yukos shares.  Such a structure would normally fall within the scope of international efforts to counter the harmful use of tax havens.

### C.    THE SO-CALLED "EMPTY CHAIRS"

247.  At the Hearing on the Merits, each side accused the other of leaving conspicuous "empty chairs" in its presentation of witness evidence.  Each side asked the Tribunal to draw adverse inferences against the other from the absence of the persons who should have filled the empty chairs.[119]

---

[119]   *See e.g.*, Transcript Day 2 at 98 (Claimants' opening); Respondent's Rebuttal Slides, p. 650 & ff; *see also* Respondent's Post-Hearing Brief ¶ 135.

### 1.      Individuals that Claimants Wished were Available for Examination

248.   At the Hearing, Claimants submitted that the following individuals should have been called as witnesses by Respondent as they could have been cross-examined in respect of the knowledge of Yukos' tax structure by high-ranking Russian officials:

- Aleksei Kudrin, First Deputy Minister of Finance, including in particular on the January 2000 meeting with Mr. Dubov at which the establishment of Yukos' trading companies in Mordovia was discussed;

- Vladimir Gusev, First Deputy Minister in charge of VAT, including in particular on the meeting with Mr. Dubov at which Yukos' VAT refunds in Mordovia were discussed;

- Alexander Pochinok, Tax Minister, including in particular on the December 1999 meeting with Mr. Dubov at which Yukos' plan to use trading companies in Mordovia was discussed;

- Alexander Smirnov, First Deputy Minister of Tax, including in particular on the December 1999 meeting with Mr. Dubov; and

- Nicolai Merkushkin, Head of the Republic of Mordovia, including in particular on the December 1999 meeting.[120]

249.   Claimants also argued that they should have had the opportunity to hear from and examine the following individuals in respect of their knowledge of Yukos' tax structure derived from the audits of Yukos' trading companies:

- P. A. Puschin, Senior Tax Inspector of Russian Tax Ministry's Interregional Inspectorate for major Taxpayer No. 1; and

- A.V. Ivushkina, Senior Tax Inspector of Russian Tax Ministry's Interregional Inspectorate for major Taxpayer No. 1.[121]

250.   In addition, Claimants complained that they did not have the opportunity to hear from and examine Sergei Bogdanchikov, the President of Rosneft, on the circumstances of Rosneft's acquisition of Baikal in December 2004 and Rosneft's agreement with a syndicate of Western banks led by Société Générale S.A. (the "**Western Banks**") regarding the initiation of Yukos' bankruptcy.[122]

---

[120]   Claimants' Opening Slides, p. 300; Claimants' Closing Slides, p. 14.

[121]   *Ibid.*

[122]   *Ibid.*

251. Finally, Claimants argued that they should have had the opportunity to hear from and examine the following individuals in respect of PwC's audit of Yukos and the circumstances of the withdrawal of PwC's audit reports:

- Douglas Miller, Director, ZAO PwC Audit, including in particular regarding the work conducted for the purposes of the certification of Yukos' accounts for years 1998–2003 and the circumstances of the withdrawal of the reports in 2007; and

- Michael Kubena, General Director, ZAO PwC Audit, including in particular regarding the establishment of Yukos' tax optimization structure and its legality.[123]

**2.    Individuals that Respondent Wished were Available for Examination**

252. At the Hearing, Respondent argued that the following individuals should have been made available for questioning with respect to:  (a) the establishment and history of Yukos' "tax optimization" schemes and Yukos' understanding of their legality; (b) Yukos' relationship with its Lesnoy, Mordovian, and other "sham" trading shells; and (c) Yukos' reaction to the assessments against and criminal investigation of the Lesnoy and Trekhgorniy trading shells, including the restructurings and liquidations, the instructions to destroy documents, and other apparent attempts at obstruction:

- Dmitry Gololobov, Yukos' former Deputy General Counsel;

- Irina Golub, Yukos' former Chief Accountant;

- Dmitry Maruev, former head of the Financial Engineering Section of Yukos Treasury Department (Deputy Chief Accountant);

- Alexey Smirnov, former head of Yukos' Tax Department;

- Vasily Shakhnovsky, GML shareholder/beneficiary and former President of Yukos-Moscow; and

- Mikhail Brudno, GML shareholder/beneficiary.[124]

253. According to Respondent, Mr. Gololobov, together with Mr. Sergey Pepeliaev, Yukos' tax counsel, could also have addressed the following issues:  (a) Yukos' unsuccessful attempts to obtain a legal opinion approving its "tax optimization" schemes, including why Mr. Pepeliaev did not provide a legal opinion to Yukos on the schemes prior to the 29 December 2003 tax

---

[123]    *Ibid.*

[124]    Respondent's Rebuttal Slides, pp. 655–56; *see also* Respondent's Post-Hearing Brief ¶ 136.

audit report; (b) the bases for Yukos' responses and reactions to the 29 December 2003 tax audit report, and the bases on which outside counsel prepared its post-hoc opinions for Yukos on the "tax optimization" schemes; and (c) the reasons why Yukos tried to file "annual" amended VAT returns, and did not submit proper amended monthly VAT returns after the "annual" ones were rejected.[125]

254.  Respondent also argued that on the issue of Yukos' consideration of an enhanced ADR listing, including warnings that were provided to Yukos' senior management concerning the substantial risks of disclosing Yukos' "tax optimization" schemes in connection with such a listing, the failure to disclose Messrs. Khodorkovsky's and Lebedev's relationship to the BBS Companies, and Mr. Khodorkovsky's concerns for his own personal liability if he signed Yukos' F-1 Registration Statement, Claimants should have made available for testimony:

- Pavel Malyi, former Deputy Head of Yukos' Corporate Finance Department; and

- Oleg Sheiko, former Vice President/Director of Yukos' Corporate Finance Department.[126]

255.  On issues relating to the understanding by Yukos' Russian management of the legality of Yukos' "tax optimization" scheme, Respondent complained about the absence of:

- Yury Beilin, Yukos' former Deputy CEO; and

- Simon Kukes, Yukos' former CEO.[127]

256.  Finally, with respect to GML's "sustained and aggressive threats that deterred broader participation in the YNG and bankruptcy auctions," Respondent wished they could have heard from and examined Mr. Tim Osborne, GML Director and member of the Stichtings' boards.[128]

## VII.  ISSUES FOR ANALYSIS

257.  In this second phase of the present arbitrations, the Parties presented their arguments and evidence on the many substantive issues related directly to the merits of the case under Articles 10 and 13 of the ECT.  In addition, the Parties presented extensive argument on the

---

[125]  Respondent's Rebuttal Slides, pp. 656–57; *see also* Respondent's Post-Hearing Brief ¶ 136.

[126]  Respondent's Rebuttal Slides, pp. 658; *see also* Respondent's Post-Hearing Brief ¶ 136.

[127]  *Ibid.*

[128]  Respondent's Rebuttal Slides, pp. 659; *see also* Respondent's Post-Hearing Brief ¶ 136.

two preliminary objections that the Tribunal had decided to defer to the merits phase, namely the objection based on Claimants' alleged "unclean hands" and the objection based on Article 21 of the ECT.

258. The deferred preliminary objections—like the merits issues—require the Tribunal to untangle the complex factual matrix underlying Claimant's claims.  Indeed, the Tribunal had decided to defer the preliminary objections relating to alleged "unclean hands" and Article 21 to avoid making findings on these important questions in a vacuum.

259. This Award therefore begins, in Part VIII, with the Tribunal's analysis of the factual issues. Guided in large measure by the Parties' presentations of the issues, the Tribunal considers it convenient to analyze the evidentiary record under the following eight headings

    A.    Yukos' Tax Optimization Scheme

    B.    The Russian Federation's Tax Assessments

    C.    Harassment, Intimidation and Arrests

    D.    Unwinding of the Yukos–Sibneft Merger

    E.    Yukos' Attempts to Settle its Tax Liabilities

    F.    Auction of YNG

    G.    The Bankruptcy of Yukos

    H.    The Withdrawal of PwC's Audit Opinions

260. As mentioned previously, the Tribunal, in Part VIII, makes determinations in respect of the many highly contested issues of fact and observations on the significance of various facts and findings.

261. Next, in Part IX of this Award, the Tribunal turns to Respondent's preliminary objections. Specifically, the Tribunal considers:

    A.    whether all or some of Claimants' claims are barred by the "fork-in-the-road" provision in Article 26(3)(b)(i) of the ECT (the Tribunal dismissed this objection in the Interim Awards, but Respondent has renewed the objection in this merits phase);

B.  whether Claimants' conduct—their alleged "unclean hands"—deprives Claimants of protection under the ECT (in the Interim Awards, the Tribunal confirmed the deferral of its decision on this objection to the merits phase of this arbitration, consistent with Procedural Order No. 3); and/or

C.  whether Article 21 of the ECT, which contains a "carve out" for "Taxation Measures", bars the Claimants' claims either as a matter of jurisdiction or admissibility (in the Interim Awards, the Tribunal decided to defer these issues to the merits phase, to avoid ruling on them in a vacuum).

262.  Since the Tribunal dismisses each of Respondent's preliminary objections, thereby confirming that it has jurisdiction over Claimants' claims under the ECT, it next addresses Respondent's liability under the ECT.  This analysis is undertaken in Part X of the Award.

263.  Claimants allege that Respondent, by conducting investigations and legal proceedings against Yukos, its subsidiaries, and their management, has failed to accord Claimants' investments fair and equitable treatment.  In particular, Claimants allege Respondent failed to refrain from impairing the management, maintenance, use, enjoyment and disposal of Claimants' investments by unreasonable or discriminatory measures, in contravention of Article 10 of the ECT.  Claimants maintain that the treatment of Yukos was discriminatory as compared to other Russian oil companies.

264.  Claimants further submit that Respondent's actions amount to an expropriation of the Claimants' investments, in breach of Article 13 of the ECT.  According to Claimants, the alleged interventions of Respondent, and other entities directed and controlled by it—including in the Sibneft demerger, the sale of YNG at a cost alleged to be much lower than its real value to Baikal (a special purpose company that was quickly bought by the State-owned oil company Rosneft) and the pursuit of Yukos' bankruptcy proceedings—resulted in the total loss of value of Claimants' investments.

265.  Claimants contend that Respondent's actions were politically and economically motivated, rather than aimed at legitimate tax enforcement.  In that regard, Claimants purport to establish that Respondent acted through almost all its organs, at all levels, in seeking the destruction of Yukos.

266. In response, Respondent contends that Claimants have failed to establish a violation under either Articles 10 or 13 of the ECT.  For Respondent, this case is about Yukos' tax evasion,[129] and therefore about Yukos' self-inflicted demise:  Respondent contends that any losses suffered by Claimants are attributable to their own actions, those of the Yukos managers they installed and allegedly controlled, and of Messrs. Khodorkovsky, Lebedev, Nevzlin, Dubov, Brudno, Shakhnovsky and Golubovitch (the so-called "**Oligarchs**").  It follows, argues Respondent, that Claimants had no legitimate expectation that Russian tax law would not be applied to them and their investment when Yukos breached its tax obligations.

267. In addition to lacking the factual predicate for an expropriation claim under Article 13 of the ECT, Respondent also contends that Claimants' claims fail because the assessment and collection of taxes is in the public interest, as to which States are afforded a wide margin of discretion.  Respondent maintains that its conduct in this regard did not radically depart from either Russian law or international norms.

268. To the extent that Claimants allege discriminatory taxation compared to other Russian oil companies—in contravention of the fair and equitable treatment in Article 10 of the ECT, as well as one of Article 13's four conditions for a lawful expropriation—Respondent answers that these claims fail because Claimants do not contend that their investment was subjected to discrimination based on foreign ownership.  Respondent also disputes the facts presented by Claimants in support of their allegations of discrimination.

269. Respondent further contends that Claimants' allegations of due process violations with respect to tax, tax enforcement, the sale of YNG and Yukos' bankruptcy proceedings are equally meritless, and, in any event, did not affect the management and operations of Yukos.

270. The Tribunal's conclusions on these liability issues, in Part X, follow necessarily as the legal consequences of its factual conclusions in Part VIII.  The Tribunal includes in Part X its decision on the attribution of the conduct of various actors to the Russian Federation, and its findings in relation to Claimant's contributory fault.

271. Finally, in Parts XI, XII and XIII of this Award, respectively, the Tribunal decides the issues relating to interest, the quantification of damages, and the allocation of costs.

---

[129]   Rejoinder ¶ 1.

## VIII.     ANALYSIS OF THE EVIDENTIARY RECORD

### A.     THE TAX OPTIMIZATION SCHEME

#### 1.     Introduction

272.    In the latter years of the twentieth century and in the early years of the twenty first, oil companies in the Russian Federation were growing, consolidating and becoming large corporate entities.  By the end of 2000, there were nine major oil companies in Russia.  Yukos was the largest, followed by Lukoil.  During that period, all nine major oil companies operated in a similar fashion.  The key features of their operations were firstly vertical integration; secondly transfer pricing; and thirdly the use of low-tax regions to mitigate tax burdens.[130]  In relation to the third element, one-time Prime Minister of Russia, Mikhail Kasyanov stated that "the tax havens in the ZATOs had been used by every oil company."[131]  In fact,

> [t]housands of companies took advantage of the low-tax regimes available in Russian tax havens zones, including businesses engaged in construction, services, the sale of oil products, investments, as well as holding companies and groups of companies involved in financing and taxation arrangements.  This activity was well known to the Russian government, including the Federal Tax Ministry.[132]

273.    Respondent acknowledges that the majority of large Russian oil companies operated in a way similar to Yukos and did "use low-tax regions to evade taxes."  At the same time, Respondent alleges that those companies did so "on a much more modest scale in comparison to Yukos."[133]

274.    In this sense, Yukos was a typical Russian oil company, as it also used the low-tax regions as part of its tax optimization strategy.  A central disputed issue in this arbitration concerns the legality, under Russian law, of the modalities of Yukos' use of the low-tax regions.  Was Yukos merely taking advantage of the legislative arrangements in place to minimize its taxes, or was there an element of abuse in its scheme?  A related disputed issue concerns the legitimacy of

---

[130]   Transcript of Mikhail Kasyanov before the Khamovnichesky Court of Moscow in the Second Criminal Case Brought Against Mikhail Khodorkovsky and Platon Lebedev, 24 May 2010, p. 3, Exh. C-440.  *See also* Statement of Prime Minister Mikhail Mikhailovich Kasyanov to the ECtHR, 8 July 2009, in *Khodorkovskiy v. Russia* (Application Nos. 5829/05, 11082/06 and 51111/07) ¶¶ 10–12, Exh. C-446.  As noted earlier in paragraph 47 and n.11 above, Claimants withdrew Mr. Kasyanov's witness statement in these arbitrations because he did not appear at the Hearing and was not subject to cross examination.  However, the Tribunal has taken notice of his testimony in other proceedings, which forms part of the record in the present proceedings.

[131]   Statement of Prime Minister Mikhail Mikhailovich Kasyanov to the ECtHR, 8 July 2009, in *Khodorkovskiy v. Russia* (Application Nos. 5829/05, 11082/06 and 51111/07) ¶ 34, Exh. C-446.

[132]   Vladimir Samoylenko, *Government Policies in Regard to Internal Tax Havens in Russia*, Publication of International Tax & Investment Center, December 2003, p.1, Exh. C-577.

[133]   Counter-Memorial ¶ 12.

the tax assessments against Yukos that began in December 2003.  Was the Russian Federation merely enforcing its tax laws, or rather was it carrying out a punitive campaign against Yukos and its principal beneficial owners?  Were the other Russian oil companies subjected to the same tax enforcement actions by the Russian Federation, or was Yukos discriminated against and specifically targeted by the Russian Federation?  Before turning to the question of the legitimacy of those tax assessments, which the Tribunal does in the next chapter of the Award, the Tribunal considers it important to address the first question: were Yukos' practices in the low-tax regions, and specifically the practices of Yukos' trading companies in those regions, lawful?

275.   In sections 2 and 3 of this chapter, the Tribunal summarizes the evidence that was presented by the Parties regarding the structure and legal framework of Yukos' tax optimization scheme.  In section 4, the Tribunal distills, as best it can from the massive documentary record, the complex and extensive background relating to the activities and audits of the Yukos trading entities before December 2003.  Finally, in section 5, the Tribunal reviews, on the basis of this complex record, the legality of Yukos' tax optimization scheme under Russian law.

276.   The Tribunal observes that it considers the question of the legality of the tax optimization scheme to be a matter of fact in the present arbitration.  It is not the role of the Tribunal in the present proceedings to review and determine, as if it were a Russian court of appeal, the decisions made pursuant to Russian law in respect of the legality of this scheme.  However, even in considering the issue as a matter of fact, the Tribunal's observations on the legality of Yukos' tax optimization scheme based on what the record reveals will inform its decision on the principal legal questions facing the Tribunal under the ECT.

### 2.   The Structure of the Tax Optimization Scheme

277.   The Tribunal has been presented with an enormous volume of material relating to Yukos' structure and tax optimization scheme.  In short, Yukos' tax optimization scheme consisted of using "trading companies" located in the low-tax regions as intermediaries in the chain of transactions between Yukos' core oil-producing entities YNG, Samaraneftegaz and Tomskneft at one end, and its customers at the other.  The trading companies at issue were established in three types of low-tax regions.  The first type was closed administrative territories, or ZATOs (Lesnoy, Trekhgorny, Sarov).  ZATOs are territories established in the former Soviet Union as defense and nuclear sites, or as sites with sensitive military, scientific or industrial significance which faced economic catastrophe at the end of the Cold War.  For this reason, special tax

regimes were instituted in those territories aimed at boosting economic activity.[134]  The second type was "domestic-offshore territories", regions that faced significant economic challenges and where the Russian Federation wanted to facilitate investment (Mordovia, Evenkia, Kalmykia).[135]  The third low-tax region was Baikonur, a former spaceport, which was treated as a ZATO but is on the territory of Kazakhstan.[136]

278.  The names of the trading entities of particular relevance in this arbitration and the regions or ZATOs in which they were located are set out in the following table:

| Region or ZATO | Company |
| --- | --- |
| **Mordovia** | Alta-Trade<br>Fargoil<br>Macro-Trade<br>Mars-XII (Energotrage)<br>Ratmir<br>Yukos-M<br>Yu-Mordovia |
| **Evenkia** | Evoil<br>Internet<br>Petroleum-Trading<br>Ratibor<br>Yukos Vostok Trade |
| **Kalmykia** | Siberian Transportation Company |
| **Baikonur** | Mega-Alliance |
| **ZATO Lesnoy** | Business-Oil<br>Mitra<br>Vald-Oil<br>Forest Oil |
| **ZATO Sarov** | Yuksar |
| **ZATO Trekhgorny** | Grace<br>Muskron |

---

[134]  Counter-Memorial ¶ 226, n.274.  *Law of the Russian Federation No. 3297–1* of July 14, 1992, "On Closed Administrative Territorial Entity," Exh. C-404.

[135]  Counter-Memorial ¶ 226, n.274.  Article 1, *Law of the Republic of Mordovia No. 9-Z on the Conditions of the Efficient Use of the Social and Economic Potential of the Republic of Mordovia*, 9 March 1999, Exh. C-414  (hereinafter "*Law 9-Z*"); Article 1, *Law of the Republic of Kalmykia No. 197-II-3* of 12 March 1999, "On Tax Benefits Granted to Enterprises Making Investments in the Economy of the Republic of Kalmykia," Exh. C-413; Article 1, *Law of the Evenkiysky Autonomous District No. 108* of 24 September 1998, "On the Particularities of the Tax System in Evenkiysky Autonomous District," Exh. C-412.

[136]  During his cross-examination, Mr. Konnov clarified the position of Baikonur as having "a special status, [it] is leased by the Russian Federation . . . .  So there are three categories [of low-tax region]." Transcript, Day 14 at 54.  *See also*, Decision of the Government of the Russian Federation No. 747, 25 October 2001, Exh. C-411.

| Region or ZATO | Company |
|---|---|
|  | Norteks<br>Kverkus<br>Colrain<br>Virtus |

279. In 2000, sales were conducted by at least 16 of these companies. From 2001 to 2003, Yukos employed at least eight such companies, and in 2004 at least three of them. Through this structure, Yukos was able to capture much of the profit from the sale of crude oil to its customers on the books of the entities in the low-tax regions, thus benefiting from substantial tax savings. Some of these after-tax profits, in turn, left the Russian Federation through dividends to the off-shore holding companies that Yukos controlled (for U.S. GAAP consolidation purposes) through trusts and call options.[137]

### 3.     The Legal Framework of the Tax Optimization Scheme

#### (a)     The Low-Tax Region Program

280. The low-tax region program was established in the 1990s to foster economic development in impoverished areas of the Russian Federation. The Russian low-tax regions were allowed to exempt taxpayers from federal corporate profit tax for the purpose of encouraging taxpayers' investments in their regions, provided the taxpayers complied with certain requirements. There is no dispute between the Parties as to the source of the formal requirements; it is agreed that they are to be found in the low-tax regions' legislation, any applicable tax investment agreements, and the applicable federal legislation, including the Russian Tax Code. More controversial, and contested by Claimants, is the existence and significance of various so-called "anti-abuse" doctrines which, according to Respondent, have been established and applied in decisions of Russia's federal courts. The Tribunal addresses these doctrines and the relevant jurisprudence in the next subsection.

281. The benefits provided in the low-tax regions were related to profit tax, which was described by Mr. Konnov in his first report as follows:

> 29.     Profit tax is a federal tax, however tax revenues are shared between the federal, regional and (in certain years) local budgets. Through the end of 2001, profit tax was governed by the Law of the Russian Federation No. 2116-1 "On Tax on Profit

---

[137]     *See* Lys Reports.

of Enterprises and Organisations" dated December 27, 1991 (the "Profit Tax Law")
and subsequently by Chapter 25 of the Tax Code.  In 1999-2006, profit tax rates
applicable to Russian entities and foreign entities having a permanent establishment
in Russia (with respect to income attributable to such permanent establishments)
were as follows:

| Year | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|---|---|---|
| Rate of profit tax total, including: | 35% (30% after April 1) | 30% | 35% | 24% | 24% | 24% | 24% | 24% |
| Rate of profit tax to the federal budget | 13% (11% after April 1) | 11% | 11% | 7.5% | 6% | 5% | 6.5% | 6.5% |
| Rate of profit tax to the regional budget | 22% (19% after April 1) | 19% | 19% | 14.5% | 16% | 17% | 17.5% | 17.5% |
| Rate of profit tax to the local budget | – | – | 5% | 2% | 2% | 2% | – | – |

282. With respect to the tax benefits available in the ZATOs (*e.g.*, Lesnoy and Trekhgorny), in 1999,
the ZATOs were allowed to fully exempt taxpayers from federal corporate profit tax.  In 2000,
most ZATOs were allowed to exempt taxpayers from the portion of the federal corporate profit
tax that was payable to their budget (*i.e.*, up to 19 percent).  In 2001, all ZATOs were permitted
to exempt taxpayers from the portion of the federal corporate profit tax that was payable to their
budget (*i.e.*, also up to 19 percent).  In 2002, however, these exemptions were revoked.

283. With respect to the tax benefits available in other low-tax regions (*e.g.*, Mordovia, Kalmykia
and Evenkia), in 2000 and 2001, such regions were allowed to fully exempt taxpayers from the
portion of the federal corporate profit tax that was payable to their budget (*i.e.*, up to
19 percent).   From 1 July 2002 until 31 December 2003, low-tax regions were allowed to
exempt taxpayers from the portion of the federal corporate profit tax payable to their budget,
but only up to four percent.   An exception existed for "grandfathered" tax investment
agreements entered into prior to 1 July 2001, and these taxpayers could still receive a zero
percent tax rate on the relevant portion of the profit tax if they fulfilled certain other conditions.
As of 1 January 2004, the existing tax investment agreements were terminated, but the Russian
Tax Code still allowed low-tax regions to reduce the federal corporate profit tax payable to
their budget up to four percent.

(b)     **Anti-Abuse Decisions and Doctrines Promulgated by Russia's Federal Courts**

284.    Before considering the individual court decisions in which the anti-abuse doctrines are said to have been developed and applied, the Tribunal will describe the different courts within the judicial system of the Russian Federation.[138]

285.    The Russian court system is based on four types of distinct judicial procedures—constitutional, civil, administrative and criminal.[139]  Each area has created its own court structure.  For its civil procedure, Russia created a system of commercial, or "arbitrazh" courts.  The arbitrazh courts have jurisdiction over general commercial disputes and disputes directly relating to commercial matters, such as tax disputes.  At the first instance, there are 81 arbitrazh courts, located in and for the constituent entities of the Russian Federation.[140]  At the next level, the appellate instance, there are 20 appellate arbitrazh courts.  Then, at the "cassation instance," there are ten federal arbitrazh courts.[141]  At the apex of the Russian commercial courts system is the Supreme Arbitrazh Court of the Russian Federation.[142]

286.    The Constitutional Court of the Russian Federation and the local constitutional courts of its constituent entities are the courts created for Russia's constitutional procedure.  Among its other functions, the Constitutional Court plays a supervisory role over all four Russian judicial procedures at the federal level; the local constitutional courts play the same role at the level of the constituent entities.  The task of the Constitutional Court is to ensure compliance of the judiciary with the Constitution of the Russian Federation ("**Russian Constitution**").[143]  In this

---

[138]    This information is derived from the Constitution of the Russian Federation, Exh. C-1698 (hereinafter "Russian Constitution") and other particulars in the public domain of interest to narration of the many decisions of the courts of the Russian Federation which the Tribunal reviews.

[139]    Russian Constitution, Article 118(2), Exh. C-1698.

[140]    Russia as a federation consists of 83 "constituent entities"—relatively autonomous territorial and political units.  Most of them have their own constitutions, local laws, presidents, governments, parliaments, and court systems.  Mordovia, for example, is a "constituent entity".  The judicial districts usually match up with these autonomous territorial and political units, but there are several "mismatches": there are 83 "constituent entities" and only 81 first-instance arbitrazh courts.

[141]    In 2000, the Russian Federation created "federal districts", which are administrative units that group several "constituent entities."  Currently there are eight federal districts.  Since there are ten federal arbitrazh courts but only eight federal districts, there is a "mismatch" there too.  For example, the Siberian Federal District has two federal arbitrazh courts, which are the Federal Arbitrazh Court of the East Siberian District and the Federal Arbitrazh Court of the West Siberian District.

[142]    In late 2013, the Ministry of Justice of the Russian Federation announced a judicial reform which would result in merging the Supreme Arbitrazh Court of the Russian Federation with the Supreme Court, which is the apex of the general jurisdiction courts.  The reform has not yet been finalized.

[143]    Exh. C-1698.  The Russian Constitution defines the level of autonomy of the "constituent entities" by assigning certain governance matters of federal importance to the federal bodies while allowing the remaining matters to be

capacity, the Constitutional Court is the court of last resort, which decides whether a particular law applied by the courts of lower instance is constitutional.  For example, an individual or a company may apply to the Constitutional Court in a tax matter when the individual or company considers that a particular provision of the Russian Tax Code applied by an arbitrazh court is not incompliance with the Russian Constitution.  The decisions of the Constitutional Court are not subject to appeal.

287.  The Tribunal turns now to the anti-abuse principle under Russian law.

288.  Respondent's expert on Russian law, Mr. Oleg Konnov, introduced the anti-abuse principle as follows:

> It is essential to distinguish clearly between the legitimate use of the tax benefits and abuse of tax law.  Russian law generally prohibits abuse of law.  The constitutional anti-abuse principle has been incorporated in some branches of law (e.g. civil law).  However, it has been consistently applied even in branches of law where no explicit provisions have been included in the text of the law, e.g. labour law and tax law.  In these instances, Russian courts have themselves developed anti-abuse doctrines.  In the tax area, anti-abuse doctrines have been used to combat aggressive tax planning and abuse.
>
> One should not be misled by the terminology.  Even though the term "substance over form" is not commonly used in Russia, the terms "bad faith," "abuse of rights," "proportionality" and "business substance" are used to achieve the same result as the "substance over form" notion in other countries.
>
> Courts (including the highest courts of Russia) accepted and consistently applied anti-abuse measures both before and after the YUKOS tax cases.  The anti-abuse doctrines have been evolving over the time.  In some cases, the tax authorities challenged the abusive transactions based on the application of civil law principles ("sham" and "fictitious" transactions and transactions "deliberately contrary to fundamentals of civil law and morality"), and in others they applied the notions of "bad faith" and "unjustified tax benefit" developed by court practice.  There were also cases in which the tax authorities used a combination of legal principles to challenge tax avoidance misconduct.[144]

---

decided by the "entities".  At the same time, the Russian Constitution does not allow the "entities" to act contrary to the Russian Federation even within the "entity'" assigned autonomy.  For example, one of the tasks of the Constitutional Court is to ensure that the local laws of the "entities" are in compliance with the Russian Constitution and the federal laws.

[144]   First Konnov Report ¶¶ 45–47.  Mr. Konnov cites:  Article 17(3) of the Russian Constitution, Exh. R-2211; Resolution of the Constitutional Court of the Russian Federation No. 3-P, 15 March 2005, section 4.3, Exh. R-2217 (as support for the proposition that the Constitutional Court describes non-abuse of law as a general legal principle); an assistant professor of the faculty of law of the Higher School of Economics Mr. Kurbatov, who writes: "In general terms, anti-abuse principle is set forth in Article 17 (3) of the Russian Constitution according to which exercise of rights and freedoms by citizens and individuals may not violate rights and freedoms of other persons.  This principle is set forth in Chapter 2 of the Russian Constitution governing rights and freedoms of citizens and individuals. However these rights and freedoms may be applied to legal persons to the extent their nature permits so (see, for instance, para. 1 Section 4 of dicta of the Constitutional Court Ruling No. 20-P dated December 17, 1996, para. 4 Section 2 of dicta of the Constitutional Court Ruling No. 24-P dated October 12, 1998)." (A. Ya, Kurbatov, ABUSE OF LAW: THEORY AND COURT PRACTICE (Consultant Plus, 2009), Exh. R-2214).  Mr. Kurbatov also writes:  "It would be fundamentally wrong to consider anti-abuse as only civil law (branch) principle. It may, however, be set in provisions of specific branches of law"); Resolution of the Plenum of the Supreme Court of the Russian Federation No. 2, 17 March 2004, at

289.  In support of his assertion that the various anti-abuse doctrines are part of Russian law, Mr. Konnov relies on a series of decisions issued by various Russian courts, starting with the decision of the Supreme Arbitrazh Court No. 367/96 on 17 September 1996 ("**Sibservice**") and including recent cases such as the 2010 *Novozlatoustovskoye* decision of the same court. Between these bookends, particular reliance is placed on Constitutional Court Ruling 138-0 of 25 July 2001 (which introduced the concept of "bad-faith taxpayer") and on Resolution No. 53 dated 12 October 2006 of the Plenum of the Russian Supreme Arbitrazh Court ("**Resolution No. 53**")(which linked the concepts of "unjustified tax benefit", "actual economic substance" of a transaction and the "business purpose" of a taxpayer's actions).

290.  According to Mr. Konnov, the cases upholding the tax assessments against Yukos (*i.e.*, confirming the tax authorities' position that Yukos' tax optimization scheme was abusive) were "an integral part of the evolution of the 'business substance' doctrine which eventually resulted in adoption by the Russian Supreme Arbitrazh Court on 12 October 2006 of Resolution No. 53."[145]

291.  Claimants argue that the "business purpose" doctrine could not possibly have played any role in the tax assessments against Yukos, since "it did not exist in Russian law at the time, having only been introduced into Russian law in 2006"[146] (in Resolution No. 53 of the Plenum of the Russian Supreme Arbitrazh Court).  Indeed, Claimants note, "the notion of business purpose was never mentioned in the December 29, 2003 Audit Report and played no role in the tax assessments against Yukos."[147]

292.  The Tribunal's task in evaluating the Parties' arguments is a difficult one.  As with many aspects of this case, the record is voluminous and, in certain respects, contradictory.  Moreover, regarding issues of Russian tax law, the Tribunal heard only from Mr. Konnov; Claimants put forward no testimony challenging Mr. Konnov's interpretation of the relevant cases from an

---

clause 27, Exh. R-2213 ("If a court establishes the fact that the employee abused his rights, the court can dismiss his claim on reinstatement in a job ... since in the specified case the employer should not be responsible for the adverse consequences resulting from the employee' bad faith actions.").  *See also* V.V. Arkhipov, *Abuse of Rights in Labor Relations: Wilful Hoax or Honest Mistake?*, Zakonodatelstvo i Ekonomika, No. 2, 2008, Exh. R-2215; Civil Code of the Russian Federation, entered into force on 1 January 1995, Articles 10, 169, 170, Exh. R-909 (hereinafter "Russian Civil Code").  Mr. Konnov notes that in a number of cases Article 170 of the Civil Code was applied jointly with Article 169 of the Russian Civil Code.

[145]  First Konnov Report ¶ 49(p).

[146]  Claimants' Post-Hearing Brief ¶ 29.

[147]  *Ibid.*

expert on the subject. And, as discussed further below, Claimants' counsel chose not to cross-examine Mr. Konnov on the existence or evolution of the anti-abuse doctrines. At the same time, in argument, Claimants have challenged almost every aspect of Mr. Konnov's testimony, including on the existence and evolution of the anti-abuse doctrine.

293. Therefore the Tribunal has had to delve into the voluminous record, including the translations of dozens of Russian court decisions and commentaries thereon, to come to its own view on what anti-abuse principles may have existed during the period relevant for an analysis of Yukos' tax optimization scheme.

294. The earliest cases relied upon by Respondent, from the mid-1990s, appear to rely on a "substance over form" doctrine. These cases include *Sibservice* and the Resolution of the Presidium of the Supreme Arbitrazh Court No. 3661/96 on 21 January 1997 ("***Yekaterinburg Telephone***").

295. Mr. Konnov summarizes these cases as follows:

a. As early as in 1996, the Russian Supreme Arbitrazh Court reviewed a case involving the Russia-Austrian joint venture Sibservice. Sibservice was assembling and selling computers. Its sales of computers were subject to VAT. In order to defer or avoid VAT payment, Sibservice entered into loan agreements with customers under which the customers purportedly loaned funds to Sibservice, and Sibservice purportedly repaid the loans by transferring computers to the customers. Based on the letter of the law, the making of the loan and the repayment of the loan (unlike sale of computers) were exempt from VAT. The Supreme Arbitrazh Court focused on substance of the transactions between Sibservice and its customers and ruled that the sale of computers had been artificially structured using the loan agreements, thereby supporting the position of the tax authorities. Specifically, the Supreme Arbitrazh Court noted that:

> "The conclusion of the state tax inspectorate that Joint Venture Sibservice supplied the goods on the condition of the prepayment of their price [is justified] since the relations with the customers (buyers) were actually developed that way (supply, contractor relationships) regardless of the name of the agreement."

b. One year later, in 1997, the Russian Supreme Arbitrazh Court reviewed a case involving the state-owned enterprise *Yekaterinburg City Telephone Network*. In 1994, the state-owned enterprise had concluded what they claimed to be several joint venture agreements with private persons and legal entities according to which the participants allegedly agreed to cooperate for the purposes of developing the telephone network of the city of Yekaterinburg. The private persons and legal entities made what purported to be joint venture financing contributions to the state enterprise which they claimed were exempt from VAT and VAT surtax under the then applicable law. The tax authorities conducted a tax audit of the state enterprise and concluded that in practice no true joint venture activity had been conducted and, therefore, VAT and VAT surtax had to apply. The Presidium of the Russian Supreme Arbitrazh Court supported this conclusion:

> "In fact, those transactions have been made in order to raise financing from the relevant entities and individuals in order to finance the claimant's business."

With reference to this case, a group of prominent Russian scholars noted later that Russian tax law required that the tax consequences of a transaction or other arrangement be determined according to its substance rather than its form:

> ". . . Therefore, the arbitrazh courts as well as the tax authorities currently follow the principle of "substance of contract over its name (form)". Thus, any attempts to conceal the real substance of an agreement by using a name of a different contract will most likely be fruitless."[148]

296.   Respondent also refers to Constitutional Court Resolution No. 14-P, 28 October 1999 ("***Energomashbank***"), which, according to Respondent, "reiterated the notion that when looking at the tax aspects of a particular transaction, Russian courts should be mindful of its substance, and not merely its form."   Mr. Konnov describes the case as follows in his First Expert Report:

> d.   Likewise in 1999 the Russian Constitutional Court in the *Energomashbank* case advised Russian courts to analyze the substance of transactions rather than their form:
>
> ". . .  in instances when the courts while examining a case fail to investigate in essence actual facts thereof but limit themselves to the establishment of formal conditions of the application of the law only, the right to judicial defence envisaged by Part 1 of Article 46 of the Constitution of the Russian Federation is found to be substantially infringed."[149]

297.   In their Reply, Claimants write that the *Sibservice* and *Yekaterinburg Telephone* cases:

> involved the application of the principles enshrined in Article 170 of the Russian Civil Code, which allows the tax authorities, in certain well-defined circumstances, to disregard the form of a particular transaction and to impose taxes based on the actual facts (*i.e.*, based on the actual transaction which occurred, or the fact that no such transaction occurred).  Such cases can obviously offer no support to the Respondent's re-attribution theory.  Neither at the time nor in these arbitrations has the Respondent sought to rely on Article 170.  Moreover, as the Accounts Chamber emphasized in its 2002 report on Sibneft, apart from the transfer pricing rules under Articles 20 and 40 of the Russian Tax Code (which were also not used against Yukos), Article 170 is the only basis under Russian law to challenge relations or transactions between companies as being "shams" or

---

[148]   First Konnov Report ¶49(a)-(b) (citing Resolution of the Presidium of the Supreme Arbitrazh Court of the Russian Federation No. 367/96, 17 September 1996, Exh. R-288 (hereinafter "*Sibservice*"); Resolution of the Presidium of the Supreme Arbitrazh Court of the Russian Federation No. 3661/96, 21 January 1997, Exh. R-289 (hereinafter "*Yekaterinburg Telephone*"); for the group of Russian scholars, A.V. Bryzgalin, V.R. Bernik, A.N. Golovkin, *Collection of Economic Agreements and Documents for Companies with Legal, Arbitrazh and Tax Commentaries*, Nalogi i Finansovoe Pravo, 2004, Exh. R-290).

[149]   First Konnov Report ¶ 49(d) (citing Resolution of the Constitutional Court of the Russian Federation No. 14-P, 28 October 1999, Exh. R-293 (hereinafter "*Energomashbank*")).

"fictitious", refuting the Respondent's claim that such theories as the "bad faith taxpayer" concept conferred authority to re-attribute revenues between companies.[150]

298.   Claimants also challenge the relevance of the *Energomashbank* ruling:

> If that case has any relevance to these arbitrations, it is as a wholesale condemnation of the tax authorities' formalistic approach to VAT, divorced from the actual facts, as in breach of Yukos' constitutional rights.  The constitutional issue in the case was the taxpayer's right to a fair opportunity to defend itself against tax claims by the State before a court, and the Constitutional Court held that respect for this right meant that courts could not limit their inquiry to purely "formal conditions", but rather must examine the actual facts.[151]

299.   Putting aside, for the moment, the *remedy* of re-attribution in the case of a finding of abuse, which the Tribunal considers in Chapter VIII.B of the present Award (in connection with the tax assessments themselves), the question here is whether the decisions cited by Respondent support the *existence* of a judicial anti-abuse doctrine in tax cases.

300.   Respondent insists that they do.  Focusing specifically on the *Sibservice* and *Yekaterinburg Telephone* cases, Respondent characterizes these decisions of the Supreme Arbitrazh Court as demonstrating that Russian courts have recognized and applied anti-abuse rules in the tax area to combat aggressive tax planning and abuse since at least 1996.[152]   In its Rejoinder, Respondent dismisses Claimants' comments on these cases as "misleading":

> Claimants misleadingly suggest that Respondent's reliance on the 1996 *Sibservice* decision and the 1997 *Yekaterinburg City Telephone Network* decision *"involve[s] the application of principles enshrined in Article 170 of the Russian Civil Code"* . . . .  But nowhere in these decisions do the courts rely on, or even mention, Article 170 of the Civil Code.  Rather, in both the Supreme Arbitrazh Court upheld the tax authorities' assessments by looking at the substance of the challenged transaction, as opposed to its form.[153]

301.   Based on its review of these cases, the Tribunal observes that Respondent's submission appears to be well-founded.  Article 170 of the Russian Civil Code provides as follows:

> Article 170. Invalidity of Mock and Sham Transactions
>
> 1.    A mock transaction, i.e., a transaction made only for appearances without an intent to create the legal consequences corresponding to it, is void.

---

[150]   Reply ¶ 234 (citing Russian Civil Code, Part I, Article 170, Exh. C-1270; *Sibservice*, Exh. R-288; *Yekaterinburg Telephone*, Exh. R-289; and Accounts Chamber Report on the Results of its Audit of OAO Sibneft, December 2002, Conclusions, (finding that transactions involving Sibneft's trading companies complied with Article 170 and that "under current legislation there is no other basis for considering such interrelationships (or transactions) as fictitious and invalid.") (emphasis added), Exh. C-1282).

[151]   Reply ¶ 236. (Original footnote omitted.)

[152]   Rejoinder ¶ 648.

[153]   Rejoinder ¶ 648, n.987.

2.   A sham transaction, i.e., a transaction that is made for the purpose of hiding another transaction, is void.  The rules relating to the transaction that the parties actually had in mind, shall be applied, taking into account the nature of the case.

However, there is no mention of Article 170 of the Russian Civil Code in either of the *Sibservice* or *Yekaterinburg* decisions in the record of this arbitration.[154]  Based on this record, it appears to the Tribunal that the Supreme Arbitrazh Court is relying in these cases on a general doctrine of substance over form.  The Tribunal further observes that such a doctrine seems entirely consistent with the principles enshrined in Article 170 of the Russian Civil Code.  It also seems consistent, in a general way, with the anti-abuse principle that Mr. Konnov says existed in the Russian Constitution, even though the Tribunal notes that no authority was brought to its attention in which this principle was expressly extended into the area of tax.[155]

302.   On the other hand, the Tribunal is of the view that Respondent cannot draw much support from the *Energomashbank* decision.  It appears to the Tribunal that, while the Constitutional Court referred to the importance of investigating the "actual facts" of a case as opposed to confirming "the establishment of formal conditions of the application of the law only," it did so in the context of highlighting substance over form as an important feature of "the right to judicial defense" of a taxpayer against the claims of the tax authorities, not as a basis for tax authorities to challenge taxpayers.  At the same time, the Tribunal notes that the *Energomashbank* decision is not inconsistent with the application of the substance over form doctrine by the tax authorities against a taxpayer's scheme.

303.   Another doctrine invoked by Respondent is known as the "bad-faith taxpayer" doctrine, or sometimes as the "good faith taxpayer" doctrine.  This doctrine, submits Respondent, is rooted in the jurisprudence of the Russian Constitutional Court, notably Constitutional Court Ruling No. 24-P of 12 October 1998[156] and Constitutional Court Ruling 138-O of 25 July 2001.[157]  In his First Expert Report, Mr. Konnov summarizes the significance of these cases as follows:

c.   In 1998, the Russian Constitutional Court introduced the concept of good/bad faith taxpayers.  In 2001, the Russian Constitutional Court held that bad faith taxpayers

---

[154]   The Tribunal observes that there appear to be at least six other decisions in the procedural history of these two cases, and that these are not in the record.

[155]   The authorities cited by Mr. Konnov demonstrate only that the constitutional anti-abuse principle (*i.e.*, persons should not violate other persons' rights and freedoms in exercising their own rights and freedoms) has been extended to the area of labour law.  *See generally* First Konnov Report ¶ 45, n.64, 66 (authorities cited therein).

[156]   Ruling of the Constitutional Court of the Russian Federation No. 24-P, 12 October 1998, Exh. R-2212.

[157]   Ruling of the Constitutional Court of the Russian Federation No. 138-O, 25 July 2001, Exh. R-307.

would not be entitled to the same level of protection as good faith taxpayers. Mr. Savseris in his book "Bad Faith Category In Tax Law" states:

> "The criterion of bad faith taxpayer was chosen by the Constitutional Court of the Russian Federation in order to distinguish legitimate tax planning and illegal tax evasion.
>
> . . .
>
> Since the adoption of the Ruling of the Constitutional Court of the Russian Federation No. 138-0 the criterion of bad faith has become an independent criterion for settlement of disputes on many categories of cases."[158]

304.  Claimants do not deny the existence of the "bad-faith taxpayer" doctrine,[159] but argue that its origins and subsequent application by the Russian courts suggest that it has only a "limited role" in Russian law.[160]  The Tribunal considers it important to set out Claimants' position, as articulated at paragraphs 218 to 224 of their Reply, in full:

> 218.  The phrase "good faith taxpayer" first appeared in the inoperative part of a decision of the Constitutional Court arising out of the 1998 financial crisis, during which many tax payments never reached the Treasury because the banks through which such payments were sent had become insolvent.  When the funds did not arrive, the tax authorities simply confiscated the unreceived payments directly from the taxpayers' accounts.  The Court concluded that the constitutional obligation to pay taxes is fulfilled and the tax is deemed "paid" at the moment when the funds are debited from the taxpayer's account and that it would be improper to hold the taxpayer liable for the banks' failure to retransmit those funds to the State.  In these circumstances, the Court held that a second collection of these "paid" taxes would be inconsistent with constitutionally protected property rights.

---

[158]  First Konnov Report ¶ 49(c) (citing Ruling of the Constitutional Court of the Russian Federation No. 24-P, 12 October 1998, at Exh. R-2212; Resolution of the Constitutional Court of the Russian Federation No. 138-0, 25 July 2001, Exh. R-307; S.V. Savseris, *Bad Faith Category in Tax Law*, Statut, 2007, pp. 42, 46, Exh. R-2218. He also refers to another illustration offered by Professor D.V Vinnitsky, *The Principle of Good Faith and Abuse of Right in Taxation*, Pravo i Ekonomika, No. 1, January 2003, Exh. R-2219 ("the tax legislation does not directly use the notion "good faith" as a necessary criterion for assessing activity of tax relations party.  However, this is not to say that tax law is indifferent to this principle. In contrast, for this branch of law "good faith" is a fundamental principle to be used in the resolution of disputes and execution of certain tax law provisions.").  Mr. Konnov notes that bad faith is one of the anti-abuse doctrines which was applied either on a stand-alone basis or together with other doctrines in the Yukos case.  In many cases, the term "bad faith" was used along with other anti-abuse terms, such as "proportionality", "unjustified tax benefit" or "abuse of rights."  According to Mr. Konnov, during the period in question there were a number of non-Yukos cases where the tax authorities applied the concept of bad faith to disallow tax benefits, and the courts upheld their actions.  Specifically, between 2001 and 2005 the concept of bad faith was applied in the following number of court cases: (i) 2001—262 court cases; (ii) 2002—644 court cases; (iii) 2003—1.189 court cases; (iv) 2004—2.235 court cases; (v) 2005—3.737 court cases. (citing also S.V. Savseris, *Bad Faith Category in Tax Law*, Statut, 2007 p. 47, Exh. R-310).  According to Mr. Konnov, another prominent Russian scholar Arkady Bryzgalin in 2001 distinguished four methods which could be applied by the state to combat tax evasion, including doctrines of "substance over form" and "business substance." (citing *Methodology of Tax optimization*, Tax and Tax Law Journal, 2001, No. 1, at p. 26, Exh. R-2283).

[159]  Reply ¶ 217, n.368.

[160]  *Ibid* at ¶ 217.

219.   In 2001, the Tax Ministry asked the Constitutional Court to clarify its earlier decision, in particular, whether the rule (that a taxpayer's constitutional duty to pay taxes ceases when the funds are debited from its account) applied even if the taxpayer deliberately contrived, in bad faith, to use an insolvent bank in order to evade taxes.  In the resulting decision, the Russian Constitutional Court held that "the conclusions which are contained in the motivational and operative parts of the [1998] Ruling do not extend to the dishonest taxpayers, and recovery by enforcement in the manner established by law from dishonest taxpayers of taxes not coming into the budget does not violate the constitutional guarantees of the right of private ownership".  This decision introduced the concept of "bad faith taxpayer" into Russian law.

220.   Since introducing this novel doctrine, the Constitutional Court has been called on to address its proper scope on a few occasions, and has consistently imposed limits.

221.   In its decision of October 16, 2003, for example, the Court for the first time recognized the possibility of the doctrine's application in a context other than tax payments through failed banks, in particular, in relation to claims for VAT refunds for exports.  However, the Court emphasized the limited nature of this extension, recalling that, under Article 57 of the Russian Constitution and Article 3(7) of the Tax Code, "law enforcement authorities may not construe the concept of 'good faith tax payer' as imposing on the tax payer additional obligations which are not provided for in the legislation".  The Russian Constitutional Court reiterated this limiting principle in a 2005 decision and specifically criticized the Moscow Arbitrazh Court's sweeping attempt to "universalize" the concept so as to circumvent express statutory provisions in the context of the Yukos case.

222.   In sum, in its limited endorsement of a "bad faith taxpayer" doctrine, the Russian Constitutional Court has at all times clearly indicated that any such doctrine was subordinate to, and controlled by, relevant Constitutional and statutory provisions.

223.   The primacy and supremacy of Constitutional and statutory provisions over the "bad faith taxpayer" concept have since been reaffirmed by the Presidium of the Highest Arbitrazh Court in a decision wholly rejecting, in circumstances unrelated to the Yukos affair but involving tax claims against another oil company, the approach of the Moscow Arbitrazh Courts in the Yukos cases and emphasizing that "courts should assess arguments of tax authorities with respect to underpayment of taxes with consideration of specific statutory provisions rather than such subjective concepts as 'bad-faith taxpayer'".

224.   Accordingly, there was nothing in the "bad faith taxpayer" concept introduced by the Russian Constitutional Court that could have permitted the tax authorities to re-attribute revenues between taxpayers or otherwise disregard directly applicable statutory provisions and impose additional, unwritten obligations beyond those contained in the legislation.[161]

305.   In its Rejoinder, Respondent dismisses Claimants' suggestion that the Constitutional Court has limited the application of the doctrine since it arose in 1998, notably through its decisions since 2003:

661.   Contrary to Claimants' allegations, the Constitutional Court in 2003 was not "called on to address" the "scope" of the bad-faith taxpayer doctrine, much less to "limit[]" it, but rather to adjudicate a complaint that had been raised in connection with the

---

[161]   Reply ¶¶ 218–24 (footnotes omitted; emphasis in original).

tax authorities' denial of a refund of input VAT based on the taxpayer's bad-faith conduct.  Thus, the Constitutional Court confirmed its earlier holdings, including its 1998 ruling, reiterating that "in the sphere of fiscal relations, there shall be a presumption of good faith" in favor of taxpayers, which the authorities bear the burden of rebutting.  The Court also noted that the authorities "may not construe the concept of 'good-faith taxpayer' as imposing on the taxpayer additional obligations which are not provided for in the legislation."

662.   Claimants' self-serving reliance on this quotation -- which they extract from its all-important context -- is misplaced.  It is clear from this ruling that the Court did not at all intend to "limit" the scope of the bad-faith taxpayer doctrine, but rather to clarify that a taxpayer's good or bad faith must be determined on a case-by-case basis, upon "review of all the circumstances of the particular case."  That is exactly what the tax authorities and courts did with respect to Yukos.  Specifically, the Constitutional Court explained that:

"[t]he determination of the complainant's good or bad faith in the performance of its tax obligations and realisation of its rights to the reimbursement of amounts of tax deductions is connected with the establishment and review of the factual circumstances of the particular case and falls under the jurisdiction of the arbitrazh courts."

663.   That the Court did not intend to limit the scope of the doctrine as formulated in its earlier jurisprudence is also apparent from its actual holding:

"Based on the above [...] the Constitutional Court of the Russian Federation ruled: 1. The complaint of OOO Export-Service shall not be accepted for examination because the subject matter of the application to the Constitutional Court of the Russian Federation was earlier clarified in a decision which is still in force."

664.   In sum, neither in this nor in other later rulings has the "Constitutional Court [...] suggested that the bad faith-taxpayer doctrine could not be used to combat abusive arrangements such as those used by YUKOS."[162]

306.   The Tribunal has read and reviewed the many Constitutional Court decisions that form the backbone of the "bad faith taxpayer" doctrine in Russian law as well as papers of various Russian legal scholars.  The Tribunal has formed the view that, during the period relevant for the tax assessments against Yukos from 2003 to 2004, the doctrine consisted mainly of the following principles:

- the good faith (honesty) of the taxpayer is presumed;[163]

- the tax authorities have the burden of proving the taxpayer's bad faith (dishonesty), and in doing so "may not construe the concept of 'good faith taxpayer' as imposing

---

[162]   Rejoinder ¶¶ 661–64 (footnotes omitted; emphasis in original).

[163]   Constitutional Court Ruling of the Constitutional Court of the Russian Federation No. 138-O ¶ 2 of the Motivational Part, 25 July 2001, Exh. R-307; Constitutional Court Ruling No. 329-O ¶ 2 of the Motivational Part, 16 October 2003, Exh. R-3238.

on the taxpayer additional obligations which are not provided for in the legislation";[164]

- in the case of a bad-faith (dishonest) taxpayer, the tax authorities have an "obligation . . . [to] ensure protection of the State's interests, including using mechanisms of judicial protection";[165] and

- the determination of the taxpayer's good or bad faith in the performance of its tax obligations and realization of its rights to the reimbursement of amounts of tax deductions is connected with the establishment and review of the factual circumstances of the particular case and falls under the jurisdiction of the arbitrazh courts.[166]

307.  It is the Tribunal's opinion that Claimants cannot persuasively maintain that the "bad faith taxpayer" doctrine is subordinated to, and controlled by, not just the Russian Constitution (which must be the case), but also statutory provisions.[167]  It seems evident that if the tax authorities establish dishonesty (bad faith) by the taxpayer in a particular case, based on specific factual circumstances, then the taxpayer may lose certain statutory benefits such as tax deductions or exemptions provided in the legislation.  However, even a bad-faith taxpayer cannot be deprived of its *constitutional* rights or of statutory rights *that guarantee* the taxpayer's constitutional rights.[168]

308.  Having reviewed and stated its observations on the important Constitutional Court cases, the Tribunal turns now to the Parties' arguments based on the principal arbitrazh court cases on

---

[164]   Constitutional Court Ruling of the Constitutional Court of the Russian Federation No. 329-O ¶ 2 of the Motivational Part, 16 October 2003, Exh. R-3238.

[165]   Constitutional Court Ruling of the Constitutional Court of the Russian Federation No. 138-O ¶ 2 of the Operational Part, 25 July 2001, Exh. R-307

[166]   Constitutional Court Ruling of the Constitutional Court of the Russian Federation No. 329-O ¶ 2 of the Motivational Part, 16 October 2003, Exh. R-3238.

[167]   Reply ¶ 222.

[168]   Constitutional Court Ruling of the Constitutional Court of the Russian Federation No. 36-O of 18 January 2005 ¶ 3 of the Motivational Part, Exh. C-1140.  In that case, at issue was Yukos' complaint that the Moscow Arbitrazh Court had failed to grant Yukos the benefit of the statute of limitations (contained in Article 113 of the Tax Code of the Russian Federation (hereinafter "Russian Tax Code")) on the basis that Yukos was a "bad-faith taxpayer".  The Constitutional Court dismissed Yukos' complaint on jurisdictional grounds, but opined in *dicta* that Ruling No. 138-O "cannot serve as a ground for depriving the applicant of the guarantees established by Article 113 of the Tax Code of the Russian Federation."  Earlier in its decision, the court had noted that Article 113 is a guarantee of a taxpayer's constitutional rights.

which Respondent relies.  Although Mr. Konnov refers to dozens of other specific cases,[169] and alludes generally to "thousands of bad faith cases adjudicated in the relevant period,"[170] Respondent places particular emphasis on the *Sibirskaya* case[171] and Resolution No. 53 of the Supreme Arbitrazh Court.[172]  Claimants, for their part, emphasize a Resolution of the Federal Arbitrazh Court for the North-Western District of 5 June 2002 (the "***Pribrezhnoye***" case).[173] The Tribunal considers this case in the next chapter of its Award since it relates more directly to the application of any anti-abuse doctrine to circumstances similar to those that are at issue in the present case, rather than to the existence of any anti-abuse doctrine.

309.    Mr. Konnov describes the *Sibirskaya* case as follows:

i.      In May 2002, OOO *Sibirskaya Transportnaya Kompaniya* ("Sibirskaya"), which was later found to be a Domestic Offshore Company, lost a cassation appeal before the Federal Arbitrazh Court for the North-Caucasian District.  Like YUKOS two years later, Sibirskaya argued that it had complied with the letter of the Kalmykian law.  The tax authorities and courts, however, concluded that Sibirskaya was a bad faith taxpayer and that the tax benefits granted to it were manifestly disproportionate (0.4%) to the amount of investment made by Sibirskaya:

"Such investments neither have any effect on the economy nor cover any of the losses of the budget relating to the granting of tax incentives to taxpayers.  On the contrary, those investments result in unjust enrichment (saving) of funds at the expense of budgetary funds. Therefore, being aware of a clear disproportion between the amount of investment and the amount of the tax incentives applied, the claimant has abused its right, i.e., the claimant acted in bad faith."[174]

The Tribunal notes that no further appeals appear to have been made in this case.  During his cross-examination, Mr. Konnov observed that the amount at stake in *Sibirskaya* (around USD 200,000) "was peanuts."[175]

---

[169]   First Konnov Report ¶ 49(e)–(s).

[170]   Second Konnov Report ¶ 13.

[171]   *Sibirskaya*, Federal Arbitrazh Court for the North-Caucasian District, Case No. F08-1678/2002-614A, 20 May 2002, Exh. R-311.

[172]   Resolution of the Plenum of the Supreme Arbitrazh Court of the Russian Federation No. 53, 12 October 2006, Exh. R-1475.

[173]   Resolution of the Federal Arbitrazh Court for the North-Western District No. A42-6604/00-15-8-818/01, 5 June 2002, Exh. C-1278 (hereinafter "*Pribrezhnoye*").  See also discussion at paragraph 645 below.

[174]   First Konnov Report ¶ 49(i) (citing Resolution of Federal Arbitrazh Court of North-Caucasian District No. F08-1678/2002-614A, 20 May 2002, at Exh. R-311).

[175]   Transcript, Day 14 at 214. Mr. Konnov further speculated when he testified that Yukos may have "preferred, after having the loss, [to] immediately make the payment and not to take this case forward." Transcript, Day 14 at 214.

310.   Respondent argues that the *Sibirskaya* case is one of "numerous cases [in which] the courts ruled against taxpayers on the basis that disproportion between the tax benefits granted to the taxpayer and amounts of investment into the relevant low-tax region economy is an indication of an abuse of rights and evidence of the bad faith of the taxpayer."[176]   Although *Sibirskaya* involved a Yukos-related entity, Sibirskaya Transportnaya Kompaniya, Respondent argues that "the tax authorities did not realize the connection of that company with Yukos at the time."[177]

311.   Claimants challenge the assertion that the authorities did not know that the company was related to Yukos.[178]   Furthermore, and of direct relevance to the topic at issue here, Claimants contest the validity of the "purported 'proportionality' requirement" imposed by the court on the basis of the "bad faith taxpayer" doctrine:

> Not only was the Court's reliance on the "bad faith taxpayer" doctrine improper . . . the purported "proportionality" requirement it sought to introduce was wholly arbitrary and contravened other statutory and Constitutional provisions as well as basic principles of the rule of law.[179]

312.   The Tribunal cannot accept Respondent's submission that the *Sibirskaya* case is an authority for the proposition that proportionality, standing alone, is a sufficient criterion for a finding of abuse.   The decision does appear indeed to stand alone and, as far as the Tribunal can tell, was not followed subsequently.   Moreover, contrary to Mr. Konnov's opinion, it was not Sibirskaya Transportnaya Kompaniya that "lost" an appeal at the cassation level of the arbitrazh court, suggesting that the tax authorities had been successful at all other levels.   In fact, the company had actually prevailed in the earlier decisions on this issue.[180]   Those judgments are not in the record.   In addition, Claimants underline that, during his expert testimony in the *Quasar de*

---

[176]   Counter-Memorial, ¶ 997, n.1561 (citing Resolutions of Federal Arbitrazh Court of the North-Caucasian District, Case No. F08–1682/2002–623A, 21 May 2002, Exh. R-313; Case No. F08–1674/2002–627A, 21 May 2002, Exh. R-314;, Case No. F08-1793/2002, 28 May 2002, Exh. R-316; Case No. F08–3949/2002–1374A, 22 October 2002, Exh. R-317; Resolution of Federal Arbitrazh Court of the Moscow District, Case No. KA–A41/6270–03, 10 October 2003, Exh. R-319; Decision of the Moscow Arbitrazh Court, Case No. A41-K2-10055/02, 17 November 2004, Exh. R-320).

[177]   *Ibid.* ¶ 291.

[178]   Reply ¶ 227.

[179]   *Ibid.* ¶ 228.

[180]   Resolution of the Federal Arbitrazh Court of the North-Caucasian District No. F08-1678/2002–614A, 20 May 2002 p. 1, Exh. R-311.

*Valores SICAV S.A. et al. v. The Russian Federation* ("**Quasar**") arbitration proceedings, Mr. Konnov disclaimed reliance on the "proportionality" requirement.[181]

313.   As is apparent from the many cases reviewed above, Russian courts did consider and rule on tax-related cases before they were seized of the dispute involving the tax assessments against Yukos, including in the "anti-abuse" area.

314.   Respondent also raised a 2006 ruling of the Supreme Arbitrazh Court known as Resolution No. 53.   In principle cases decided *after* the Yukos tax assessments and decisions should not be relevant for ascertaining the state of the law at the time of those assessments and decisions. However, in view of Respondent's argument that Resolution No. 53 represents the end point of the *evolution* of the anti-abuse doctrine in the Russian courts, the decision is of interest to the Tribunal in ascertaining the state of the law on the anti-abuse doctrines not only after, but also before and during the Yukos tax assessments.

315.   In Resolution No. 53, the Supreme Arbitrazh Court set out to ensure greater uniformity in its evaluation of the "justifiability" of tax benefits received by the taxpayer by setting out straightforward interpretations of certain doctrines.   As a starting point, it reaffirmed that the good faith of the taxpayer was presumed and that the tax authority had the burden to prove the facts upon which it relies in making its determinations.   It noted that benefits may be considered unjustified when transactions are recorded without reflecting their true nature or are concluded without a business purpose or connection to economic activity.   In such situations, the court would determine the rights and obligations of the taxpayer on the basis of the actual economic substance of a transaction.   The Supreme Arbitrazh Court noted, however, that no adverse inference should be drawn from the fact that there was another, less beneficial way to conduct a transaction.   It laid out four scenarios which may "point to" an unjustified tax benefit, and nine factors which, taken by themselves, may not constitute grounds to find a tax benefit unjustified.   However, taken in concert with other factors, they may be considered as evidence of an improperly obtained benefit.   Finally, it stated that a court should "establish the existence of economic or other reasons (business purpose) in the taxpayer's actions subject to evaluation of circumstances evidencing its intent to obtain an economic effect as a result of actual business or economic activity."   It held that the tax benefit itself could not be considered an independent business purpose:   "Therefore, if the court determines that the main purpose pursued by the

---

[181]   Claimants' Post-Hearing Brief ¶ 32, n.67.   *Quasar de Valores SICAV S.A. et al. v. The Russian Federation*, SCC Arbitration, Award, 20 July 2012, Exh. R-3383 (hereinafter "*Quasar*").

taxpayer was obtaining of income exclusively or predominantly out of the tax benefit and there was no intention to carry out actual economic activity, the tax benefit may be disallowed."[182]

316.   Many articles on Resolution No. 53 have been written by Russian tax scholars and practitioners.   Two in particular are cited by Mr. Konnov.[183]   Both articles underline the importance of Resolution No. 53, although they reach different conclusions regarding the novelty of its content.   One article by Mr. Y.M. Lermontov concludes that Resolution No. 53 was an innovation in Russian tax law: "[t]he concept of the 'bad-faith' of the taxpayer has been eliminated by Resolution No. 53," and instead other doctrines have been "incorporated into the regulatory framework."[184]   Mr. Lermontov notes that in the past, "the judicial practice concerning the treatment of taxpayers as those of good faith and of bad faith in these matters used to be inconsistent," and that as a result of Resolution No. 53, more specific doctrines such as "business purpose", "substance over form" and "economic justifiability" were substituted in its place.[185]

317.   The other commentary was written by Messrs. A.V. Bryzgalin and V.V. Goryunov. [186] For these authors, the doctrine affirmed in Resolution No. 53 represents less of a break with the bad-faith taxpayer doctrine that existed at the time of the Yukos assessments.   Instead, they see Resolution No. 53 as *linking* the "business purpose" doctrine to the "bad-faith taxpayer" doctrine.   The authors note that bad faith of the taxpayer was "considered for the first time . . . [in] N 138-0 regarding dubious schemes for payment of taxes through 'problem banks.'" The authors further note that since the doctrine had not been "directly provided for in the law," it created "uncertainty" leading to "considerable complications for . . . taxpayers, but also for the judges."   Prior to Resolution No. 53, the authors write, "no criteria in this area existed at all, and the question of bad faith was completely dominated by judicial discretion."   For the authors, Resolution No. 53 represents a "positive step" in which the Supreme Arbitrazh Court "attempted to establish specific indications of bad faith of taxpayers, characteristic features and approximate examples of permissible and impermissible conduct."   The authors suggest that the

---

[182]   Resolution of the Plenum of the Supreme Arbitrazh Court of the Russian Federation No. 53, 12 October 2006, p. 3, Exh. R-1475 (hereinafter "Resolution No. 53").

[183]   Second Konnov Report ¶ 80, n.133.

[184]   Y.M. Lermontov, *Commentary to the Resolution of the Plenum of the Supreme Arbitrazh Court No. 53*, Exh. R-3266.

[185]   *Ibid*.

[186]   A.V. Bryzgalin and V.V. Goryunov, *Commentary on Resolution No. 53 of the Plenum of the Supreme Arbitrazh Court of the Russian Federation*, Exh. R-3267.

change from "bad faith" to "unjustified tax benefit" is more a matter of terminology than doctrine. The authors write that "despite the substitution of terms . . . the concept of an unjustified tax benefit is illustrated in Resolution N[o]. 53 by what used to be called bad-faith behavior of taxpayers."

318. The link between these doctrines was made, as early as 2002, in a commentary on Constitutional Court Ruling 138-O that was published in 2002 by Mr. Sergey Pepeliaev, who would later be retained by Yukos in the Russian tax litigation.[187]    In his commentary, Mr. Pepeliaev wrote as follows:

> In this Ruling the court considers the issue of limitations on tax planning, which implies the recognition of the right of each taxpayer to use the means, ways and methods permitted by law to reduce such taxpayer's tax liabilities to the maximum extent possible. However, sometimes tax planning goes beyond the permitted limits and results in tax evasion. The boundaries between the tax planning and tax evasion [are] determined by reference [to] the taxpayer's purposes. If tax savings are only ancillary to the relevant economic result, then the relevant tax consequences shall be determined by reference to the form of the relevant transaction. However, where the taxpayer's actions were aimed solely to reduce the amount of its tax payments rather than to achieve an economic result, this would demonstrate that the relevant transaction was inconsistent with law because the motive underlying such transaction was to avoid tax.
>
> . . .
>
> The expression "good faith of the parties to a transaction" is closely related to the expression "good faith taxpayer" which was used by the Constitutional Court of the Russian Federation twice in the opinion section of Resolution No. 24-P dated 12 October 1998. In other words, in the context of the Resolution, the expression "good faith of the parties to a transaction" was used in its public legal meaning. A person's actions aimed solely at tax evasion may not be regarded as actions made in good faith.
>
> . . .
>
> If the parties to a transaction act reasonably, i.e., if they aim to achieve the actual business result and also choose such line of action which leads to minimal tax loss, then the parties' tax liabilities should be determined formally.
>
> . . .
>
> lf it appears that parties act both unreasonably and not in good faith then this constitutes a ground for reassessment of the parties' tax liabilities for which various mechanisms can be used. Upon a claim brought by the tax authorities the actual relations between the parties may be assessed by court[s]. The substance of such court proceedings would be an examination of whether the actions of the relevant parties were aimed at achievement of business (economic) results or whether the idea of tax saving was the prevailing idea. . . .[188]

---

[187]    Second Konnov Report ¶ 12(c).

[188]    S.G. Pepeliaev, *Commentary to the Ruling of the Constitutional Court Ruling of the Russian Federation No. 138-O of July 25, 2001*, Exh. R-352.

319. The Tribunal concludes that, in respect of the period relevant for the Yukos tax assessments and decisions, while the "bad faith taxpayer" doctrine had not yet gelled in the way that it did in 2006, in Resolution No. 53, it had already been recognized and applied in some Russian court decisions. This conclusion, while based primarily on the Tribunal's review of the cases,[189] is also supported by the cross-examination of Mr. Konnov at the Hearing, as explained in the following paragraphs.

320. In his cross-examination of Mr. Konnov, Professor Gaillard focused on the sanction that the Russian Federation imposed on Yukos in the present case, rather than on the existence of any anti-abuse doctrine *per se*.

321. Mr. Friedman emphasized the limited scope of Claimants' cross-examination of Mr. Konnov during his re-direct examination of the witness:

> MR FRIEDMAN: Just to make sure I am clear, Mr Konnov, you understood the questions yesterday to be about the remedy that's applied based on the anti-abuse doctrine, as opposed to the substance of the anti-abuse doctrine?
>
> A.    I thought that Professor Gaillard limited his question—and the Tribunal did the same thing—very specifically to the attribution; which I explained—and I think the record said that—that I don't view that as a separate instrument.  But I was nevertheless asked the question about court cases with respect to attribution.[190]

322. As Claimants had stipulated to the existence of the bad-faith taxpayer doctrine (while contesting the scope and manner of its application), they instead implied in their argument that any such doctrine was irrelevant, since formal compliance with the legislation governing the low-tax benefits in the respective regions, including fulfilment of the terms of any applicable investment agreements, was sufficient to claim the tax benefits.[191]

323. Accordingly, in his cross-examination of Mr. Konnov, Professor Gaillard stressed the compliance of Yukos' tax scheme with the existing legislative framework.  In his answer, Mr. Konnov, while acknowledging that the formal requirements of the law may have been met, reiterated the relevance of the anti-abuse doctrine:

---

[189]    The Tribunal also observes that the ECtHR, in its separate judgments relating to the claims against the Russian Federation brought by Yukos and Messrs. Khodorkovsky and Lebedev, respectively, considered the relevant domestic (*i.e.*, Russian) law and practice, including the Russian courts' case-law on substance over form and related doctrines. *See* ECtHR Yukos Judgment ¶¶ 428–68; *Khodorkovsky v. Russia (2)* ¶¶ 422–28.

[190]    Transcript, Day 15 at 193–94.

[191]    Reply ¶¶ 148–64.

Q.   So what you are saying is that the Law is not a good law, right?  The Law which gives the regions the power to negotiate their taxes downwards in exchange for contributions to their fund is not a good law?  The system is not good, as far as—

A.   No, I am not saying that at all. I am not saying that at all.  I am saying that what was done in this case, it was an abuse of law.  So the Law was applied by Yukos in such an abusive manner so that, in violation of the constitutional principles which I've summarized in my report, Yukos did not pay taxes duty  in Moscow.  It used this whole fraudulent sham arrangement, with the use of the Mordovian companies, to evade taxes in Moscow.[192]

324.   Mr. Konnov's insistence on the relevance of the anti-abuse doctrine, notwithstanding Yukos' compliance with the strict letter of the law, can also be seen in the following extract of his cross-examination by Professor Gaillard:

Q.   What do you call the proportionality principle? Is it the proportionality between the investment and the benefits?

A.   Correct.

Q.   Right.   Is this—I will use the words "proportionality principle" within your meaning, what you just said, right?  Is this proportionality principle found in the black letter of the Law of Mordovia; yes or no?

A.   No. As I said—

Q.   Okay.

A.   —neither in Mordovia, nor in Kalmykia, nor in any other jurisdictions.

Q.   Fine.  And we have seen that in the agreements regarding the ZATOs, the trading companies had agreed to contribute to a fund 5% of their tax benefits.  We have seen that earlier, yesterday or this morning, right?

A.   Right.

Q.   Okay.  Now, going back to the Sibirskaya case, in the Sibirskaya case we have a decision of first instance where the taxpayer won; correct?

A.   As I recall, correct.

Q.   Right.  And in the Court of Appeal the taxpayer lost, and it had to do with the Law of Kalmykia; correct?

A.   No.  No.  There was no—again—

Q.   But it was a Kalmykian company

. . .

A.   No, it was not based on the Kalmykian Law.  Obviously Sibirskaya was governed by Kalmykian Law; obviously Kalmykian Law did apply to it, to the same extent Mordovian Law applied to companies registered in Mordovia.  But the assessment was based on the proportionality principle, which, as we discussed, is not found—I think you used the words—in the black letters of the Law.[193]

---

[192]   Transcript, Day 13 at 151–52.

[193]   Transcript, Day 14 at 218–220.

325. Having completed its review of what it considers to be the central evidence in the record in respect of the legal framework applicable to the Yukos tax optimization scheme under Russian law, the Tribunal now turns to the complex factual matrix involving Yukos' trading entities in the low-tax regions.

### 4.   The History of the Yukos Trading Entities before 2003

326. In the present proceedings, the Parties vigorously debated the significance of the history of the Yukos trading companies, including various tax audits that took place before 2003.   The pertinent activities of Yukos' trading companies took place in the regions of Mordovia and Kalmykia, as well as in the ZATOs of Lesnoy and Trekhgorny.   The Tribunal will now summarize these activities and the results of the many tax audits which were issued.

### (a)   Mordovia

327. Mordovia is a region within the Russian Federation.   Sometimes referred to as a "domestic offshore territory", in the late 1990s it was granted some autonomy as regards taxation, which made it a more attractive destination for investment and business operations.[194]   This was part of a broader plan by the Russian Government in the 1990s to foster economic development in areas designated as "economically underdeveloped".[195]   As noted earlier, the special exemption plan for domestic offshore territories was largely repealed as of 1 January 2004.[196]

328. On 9 March 1999, the *Law of the Republic of Mordovia No. 9-Z* ("*Law 9-Z*") was enacted.[197] *Law 9-Z* was the framework which allowed Mordovia to offer tax benefits to corporate entities operating in the region.   Article 4.4 of the law states that "[t]he Government of the Republic of Mordovia shall determine the order and terms and conditions of granting the tax benefit under this Law, as well as the order of keeping reports and records to be able to obtain the tax benefits listed in this Law."[198]

---

[194]   Transcript, Day 1 at 45–48.

[195]   Respondent Opening Statement, Day 2 at 109.

[196]   *See* paragraphs 77 and 283 above; First Konnov Report ¶ 33.

[197]   *Law 9-Z*, Exh. C-414.

[198]   *Ibid*.

329. Mr. Vladimir Dubov, a member of the Yukos management board[199] and later a member of the State Duma for the Upper Volga region (which includes Mordovia), was the primary point of contact between Yukos and the regional and federal taxation authorities in Mordovia.  He appeared as a witness on behalf of Claimants.

330. In his witness statement, Mr. Dubov stated the following:

- On 20 December 1999, he attended meetings in Mordovia to explain Yukos' plan to operate through trading companies in Mordovia.  He met with Mr. Nicolai Merkushkin, the head of the Republic of Mordovia; Mordovian Prime Minister Vladimir Volkov,; and Mordovian Deputy Prime Minister Vladimir Ruzhenkov, who was also Head of the Administration of the Government of Mordovia.  Mr. Dubov swears that "[a]ll terms and conditions associated with the use of trading companies in the Republic of Mordovia were discussed and agreed at the meeting, including that Yukos' trading companies would pay [80 million rubles] per month to the Republic."  He stated that the Mordovian authorities "fully approved" of the plan.[200]

- In late December 1999, he met with the Tax Minister of the Russian Federation, Mr. Alexander Pochinok, and Mr. Alexander Smirnov, one of Mr. Pochinok's deputy ministers, to discuss Yukos' plan to use trading companies in the Republic of Mordovia.  Mr. Smirnov was very interested and called the head of the Special Inspectorate for Major Taxpayers, Mr. Aslambek Pasckachev, and the head of the Oil Department within the special inspectorate, Ms. Lydia Smirnova, into the in the meeting, to ask them to analyze the beneficial taxation plan.[201]

- After that meeting, he spoke with Mr. Gusev, First Deputy Minister in charge of the VAT Department, to discuss Yukos' plan.  He thought this important as "it was obvious to me that any trading companies established in Mordovia would be claiming significant VAT refunds on the export of oil and oil products."[202]  He also spoke with Ms. Olga Serdiuk,

---

[199]   Transcript, Day 5 at 14.

[200]   Dubov WS ¶¶ 20–21.

[201]   *Ibid.* ¶¶ 22–23.

[202]   *Ibid.* ¶ 24.

then Deputy Head of the Indirect Taxes Department and one of the three deputy First Ministers, Mr. Kirill Ugolnikov.[203]

- Around late December 1999 or January 2000, he met with each of the deputy First Ministers at the Tax Ministry and at the Menatep office on Kolpachniy Lane to outline the plan for the Mordovian companies. Following these meetings, Mr. Smirnov called the Head of the Regional Department of the Tax Ministry in Mordovia, Mr. Aleksey Averiasov, in Mr. Dubov's presence, to inform him that such discussions had taken place and that Yukos had been "given the green light at the Ministry level for the use of trading companies in the region."[204]

- He met with the then First Deputy Minister of Finance (later Minister of Finance and Deputy Prime Minister), Mr. Alexei Kudrin at the Ministry of Finance in January 2000. They discussed establishing Yukos trading companies in Mordovia so that Yukos could take advantage of tax benefits available in the region and that Yukos' trading companies would be able to contribute to the regional economy through fixed monthly payments. Mr. Dubov recalls that "Alexei Kudrin consented to Yukos' proposal, with the proviso that Yukos' overall tax burden should essentially remain the same."[205]

331. When he was cross-examined, Mr. Dubov repeated his statement that he told Mr. Kudrin that Yukos was planning to work in Mordovia through trading companies, as well as "which taxes it will pay in each level of national budget, which preferences would the budgets provide for Yukos, what benefits Yukos would reap from these preferences and what amounts would be paid in[to] the federal budget, and if there were any issues, how they were going to be resolved."[206]

332. Mr. Dubov concludes in his witness statement that, after these meetings, "[i]t follows that all the relevant authorities, both federal and regional, including the Minister of Taxation, his first Deputies, and the First Deputy Minister of Finance were aware of, cooperated with and approved of Yukos' plan to operate through the trading companies in the Republic of Mordovia

---

[203]   *Ibid.*

[204]   *Ibid.* ¶ 25.

[205]   *Ibid.* ¶ 26. It is common ground between Claimants and Respondent (hereinafter "the Parties") that the point of Yukos' tax arrangements was to lower its tax burden, not to keep it at the level it would have been at without resort to them.

[206]   Transcript, Day 5 at 84.

to take advantage of the favorable tax climate."[207]  In Mr. Dubov's view, this was favorable both for Mordovia and the Russian Federation, as any improvement in the financial situation of Mordovia would decrease the burden it placed on the federal budget.  According to Mr. Dubov, "[t]he Russian Federation was clearly interested in decreasing the significant disparities in well-being between the regions [of the Federation]."[208]

333.    The record reveals that, as the trading companies began operations, VAT refunds to the companies were very significant.  In fact, VAT refunds to the trading companies often exceeded the total amount of VAT collected in Mordovia from all the other companies operating on its territory.  The regional section of the Federal Treasury therefore had to transfer the necessary funds to the Tax Ministry's regional VAT Department.  This decision to transfer funds, according to Mr. Dubov, had to be taken at the federal level, including obtaining the approval of the Ministry of Finance.

334.    During his cross-examination, Mr. Dubov explained that "[w]hen, as a result of the operations of the trading companies, the VAT refunds increased many times over, many fold, by many hundreds of per cent, the Tax Ministry department asked the question why[;] the Tax Ministry, the Tax and Charges Ministry for Mordovia replied that we have Yukos trading entities incorporated here, these have to do with the Yukos exports; that is why the VAT refunds are so high."[209]  He also stated that "[t]his is exactly why, before the scheme became operational, I had cleared [it] with the head of the department and the First Deputy Minister who was in charge of this department."[210]

335.    In addition, in his witness statement, Mr. Dubov affirms that the funds paid into the Mordovian budget were used to fund various projects, such as Internet House, an internet-training center, and the rebuilding of the Saransk Airport.  In 2001, according to Mr. Dubov, several dignitaries, including President Vladimir Putin, repeatedly visited the area (using the airport) and discussed the trading companies' work in the region.  Mr. Dubov states:  "During such visits, President Putin was told by Nicolai Merkushkin, the Head of the Republic of Mordovia, and other representatives of the Republic of Mordovia, about the social, cultural and industrial projects that had been developed in the region in the previous year through the support and

---

[207]    Dubov WS ¶ 27.

[208]    *Ibid.* ¶ 29.

[209]    Transcript, Day 5 at 149–50.

[210]    Transcript, Day 5 at 150.

cooperation of Yukos."[211]   Mr. Dubov also recalls that President Putin had been told about several other improvement projects funded by Yukos' support, such as the building of plants for machinery construction, construction materials and the production of optic fiber; the realization of a number of environmental projects such as the recycling of rotten wood and raw materials; the rehabilitation of the meat industry; reconstruction of the Saransk Theatre and Saransk Art Museum; the construction of two asphalt plants just outside of Saransk; and the reconstruction of the Saransk-Moscow highway.[212]

336.   Mr. Dubov concludes that "[i]t follows that the federal authorities, who had to authorize the VAT refund, as well as any subsequent transfer of funds, were fully aware of Yukos' trading structure, including the activities of the production and trading companies and the transactions between them."[213]

337.   The Tribunal notes that during his cross-examination, Mr. Dubov could not confirm that the VAT forms submitted by the trading companies to the Tax Ministry contained the full particulars as to how the tax optimization scheme was being implemented by Yukos.  This was because, as he said, he was not familiar with the specifics of the VAT submissions although he knew that they would be submitted to the Leninsky district of Saransk (Mordovia) and they were likely to be very large.[214]   It seems unlikely to the Tribunal that such information would have been disclosed in the VAT forms, as the tax benefits of the low-tax regions did not extend to VAT.

338.   During his cross-examination, Mr. Dubov affirmed that he only discussed with Mr. Kudrin "the general scheme", not the formalities or the details of the activities of the trading companies.[215] The Tribunal further notes that in his witness statement, Mr. Dubov asserts that "[p]rior to the attacks on Yukos, which began in the Summer of 2003, the Russian authorities never challenged the legality of this structure or the materiality of the facts underlying this structure."[216]   During his cross-examination before the Tribunal, he stated that he had no

---

[211]   Dubov WS ¶ 33.

[212]   *Ibid.* ¶ 33; Memorial ¶ 711.

[213]   Dubov WS ¶ 44.

[214]   Transcript, Day 5 at 152–54.

[215]   Transcript, Day 5 at 81–83.

[216]   Dubov WS ¶ 12.

knowledge of the use of the ZATO Lesnoy companies,[217] and in light of such testimony, Mr. Dubov's evidence must be understood as being limited to Yukos' activities in Mordovia.

339.  In the following subsections, the Tribunal will review the detailed information that was presented to it regarding the trading companies incorporated in Mordovia.

### i.    Alta-Trade (Mercury XXIII)

340.  Alta-Trade was incorporated on 17 December 1999 as Mercury XXIII pursuant to the resolution of a meeting of the company's founders, Polikant ZAO and A-Trust OOO, each with a 50 percent [RUR 5,000] stake in the share capital.  In March 2001, Nefteinvest OOO became a shareholder, taking a 2 percent (RUR 200) share in the company's share capital.[218]  In August 2001, Yukos-Import OOO acquired the shares of Polikant ZAO and A-Trust OOO, and became the owner of 98 percent of the share capital (RUR 9,800).[219]

341.  On 27 June 2001, Alta-Trade concluded an investment agreement with Mordovia, which was supplemented in March 2002.[220]

342.  The record reveals two decisions by the Saransk Tax Inspectorate in 2001 where Alta-Trade was denied the right to offset the VAT in respect of some of its activities.  The decision of 15 June 2001 notes that Alta-Trade is "an enterprise producing oil products and selling its output domestically and [abroad]," that it purchases crude oil from Yu-Mordovia, and that sales are made through OAO NK Yukos and ZAO Trading House Angarsk-Nefto as  commission agents.[221]  The decision of 29 October 2001 refers to transactions with, for example, Siberian Transportation Company and noted that the commission agent was Yukos Export Trade.[222]  Thus, this information pertinent to the activities of Alta-Trade in Mordovia and linking Alta-Trade to the Yukos "family" was known to the authorities as early as 2001.

---

[217]  Transcript, Day 5 at 101–102.

[218]  Field Tax Audit Report No. 08-1/1 of OAO Yukos Oil Company, 29 December 2003 p. 34, Exh. C-103 (hereinafter "2000 Audit Report").

[219]  *Ibid*. pp. 34–35.

[220]  Investment Agreement No. 5, 27 June 2001, as supplemented, Exh. C-1114.

[221]  Decision of the Inspectorate of the Ministry of Taxes and Levies of the Russian Federation for the Leninsky District of Saransk No. 23, 15 June 2001, Exh. C-1110.

[222]  Decision of the Inspectorate of the Ministry of Taxes and Levies of the Russian Federation for the Leninsky District of Saransk No. 48, 29 October 2001, Exh. C-1116.

343. In April 2002, Alta-Trade's first ever field tax audit was conducted. It covered the year 2000.[223] The report from that audit noted the tax-benefit structure under Law 9-Z and the investment agreement between Mordovia and Alta-Trade. It noted that Alta-Trade was engaged in "crude oil refining [through intermediaries], sale of crude oil and oil products in the domestic market, as well as for export."[224] It noted the tax benefit structure under Law 9-Z,[225] and that the company had no capital assets on its balance sheet.[226] It also noted that Alta-Trade's accounting and tax services were completed by Yukos Invest.[227] The Audit Report found no violation of any tax laws.[228]

344. As will be seen in the next chapter, tax reassessments would eventually be made against Yukos for Alta-Trade for the years 2000,[229] 2001,[230] 2002[231] and 2003,[232] totaling RUR 7,143,036,557 (approximately. USD 238,101,219).[233]

ii.     Fargoil

345. Fargoil was registered with state authorities on 23 May 2001. The sole founder of Fargoil was Mikhail Nikolayevich Silayev, who owned 100 percent of the share capital (RUR 10,000). On 25 May 2001, he transferred full ownership of the shares to Nassaubridge Management Limited, a company incorporated in Cyprus, for RUR 11,000.[234]

346. According to the Ministry of Taxation, "[i]n order to get the opportunity to have dividends taxed at a 5% rate, Nassaubridge Management Limited, pursuant to Article 10 of the

---

[223]   Field Tax Audit Report No. 02-52 of OOO Alta Trade, 19 April 2002 ¶ 2.3, Exh. C-1120.

[224]   *Ibid.* ¶ 1.7.

[225]   *Ibid.* ¶ 2.8.

[226]   *Ibid.* ¶ 2.5.

[227]   *Ibid.* ¶ 2.2.

[228]   *Ibid.* ¶ 2.5.  However, there was a 500 ruble (Approx. USD 17) fine for Alta Trade's Director because of incomplete presentation of all required documents.

[229]   Decision No. 14-3-05/1609-1, 14 April 2004 pp. 26–27, Exh. C-104 (hereinafter "2000 Decision").

[230]   Decision No. 30-3-15/3, 2 September 2004 p. 55, Exh. C-155 (hereinafter "2001 Decision").

[231]   Decision No. 52/896, 16 November 2004 p. 101, Exh. C-175 (hereinafter "2002 Decision").

[232]   Decision No. 52/95, 6 December 2004 p. 56, Exh. C-190 (hereinafter "2003 Decision").

[233]   Fiscal Years 2000–2004, Breakdown of the tax reassessments against Yukos by region or ZATO and company, excluding interest and fines p. 6, Exh. C-1752 (hereinafter "Yukos Tax Reassessment Breakdown").  The RUR to USD exchange rate is approximate, based on a rate of 30:1.

[234]   2002 Decision, p. 106, Exh. C-175.

Agreement between the Government of the Russian Federation and the Government of the Republic of Cyprus on Avoidance of Double Taxation of Income and Capital of 5 December 1998, made a direct investment in Fargoil OOO capital, equivalent to USD 120,000 (Bank Payment Order No. 1 of 7 February 2002, issued by Nassaubridge Management Limited, worth 3,590,000 paid as a share capital contribution based on an application of 31 January 2002)."[235] Fargoil's accounts were prepared by Yukos Financial Accounting Centre OOO.[236]

347. An investment agreement was concluded between Fargoil and Mordovia on 27 June 2001, and supplemented on 26 March 2002.[237]   In April 2002, a report of the Directorate on Implementation of the special-development program was issued pursuant to that agreement, which indicated that Fargoil had contributed over RUR 102 Million to the region.[238]

348. In September 2003, a Field Tax Audit Report for 2001 to 2002 was issued.  It found no violation of Article 40 of the Russian Tax Code; but did find some underpayments, resulting in an order to Fargoil to pay additional road tax and income tax in the amount of RUR 590,847,939 (USD 19.7 Million).  Notably, the report concluded that "Fargoil lawfully used exemptions applicable to all taxes under review."[239]

349. Tax reassessments would eventually be made against Yukos for Fargoil for the years 2001,[240] 2002[241] and 2003,[242] totaling RUR 130,243,731,762 (approximately USD 4,341,457,725).[243] The Tribunal notes this was by far the largest of the tax reassessments levied against any one of the trading companies.

---

[235]  *Ibid.*

[236]  *Ibid.* p. 107.

[237]  Investment Agreement No. 9, 27 June 2001, as supplemented, Exh. C-1142.

[238]  Report of the Directorate on Implementation of the Republic's Special-Purpose Development Program of the Republic of Mordovia for 2001–2005 on the Use of Investments Received from OOO Fargoil under Investment Agreement No. 9 of June 27, 2001 for the Year 2001, 15 April 2002, Exh. C-1118.

[239]  Field Tax Audit Report No. 02-105 of OOO Fargoil, 3 September 2003 ¶ 2.16, Exh. C-1124.

[240]  2001 Decision, pp. 110–11, Exh. C-155.

[241]  2002 Decision, pp. 123–24, Exh. C-175.

[242]  2003 Decision, pp. 76–77, Exh. C-190.

[243]  Yukos Tax Reassessment Breakdown p. 6, Exh. C-1752. The RUR to USD exchange rate used here is based on a rate of 30:1.

### iii.    Macro-Trade

350.  Macro-Trade was incorporated on 14 May 2001.  The sole founder and chief accountant of Macro-Trade was Ms. Gulnura Karimovna Zhukova, who was also the founder and director of Mega-Alliance OOO.  Pursuant to a resolution of 24 May 2002 and amendments to the charter of Macro-Trade on 22 October 2002, her shareholding was transferred, in equal 50 percent shares, to Conbrook Limited (LLC) and Silverdale Trading Limited (LLC), both registered in Cyprus.  On 16 December 2002, Macro-Trade's share capital was increased to RUR 7,700,000 and "was formed by a deposit of cash assets into the entity's current account from an account at Trust and Investment Bank JSCB on 20 December 2001 [*sic*]."[244]

351.  Ms. Zhukova submitted a statement in court proceedings in Moscow in May of 2005 in which she alleged that she knew nothing about becoming a director of Macro-Trade and that her name was on the books of the company as a result of a fraud.  She stated that in December 1998 or early 1999, her purse with her passport had been stolen.  She stated that she did not report the theft because the passport was returned at the end of January 1999.[245]  Mr. Konnov, in his first expert report, referred to Ms. Zukhova's statement.[246]  When Professor Gaillard cross-examined Mr. Konnov on this "story", Professor Gaillard pointed out that Macro-Trade was incorporated in May 2001, more than two years *after* Ms. Zukhova's passport was returned to her.[247]

352.  An investment agreement was concluded between Macro-Trade and Mordovia, exempting the company from paying property tax and corporation profit tax payable to the republican and local budgets of the Republic of Mordovia.[248]

353.  Tax reassessments would eventually be made against Yukos for Macro-Trade for the years 2003[249] and 2004,[250] totaling RUR 841,582,281 (approximately USD 28,052,743).[251]

---

[244]  2003 Decision, p. 93, Exh. C-190.

[245]  Application by the Russian Federal Tax Service's Inter-District Inspectorate No. 1 for Major Taxpayers to the Federal Arbitrazh Court for the Moscow District, 4 May 2005 pp. 15–16, Exh. R-257; Transcript, Day 13 at 38.

[246]  First Konnov Report ¶ 20, n.20.

[247]  Transcript, Day 13 at 39.

[248]  2003 Decision, p. 100, Exh. C-190.

[249]  *Ibid*. pp. 100–01.

[250]  Decision No. 52/292, 17 March 2006, p. 86, Exh. R-1539 (hereinafter "2004 Decision").

[251]  Yukos Tax Reassessment Breakdown, p. 6, Exh. C-1752.  The RUR to USD exchange rate used here is approximate, based on a rate of 30:1.

### iv.   Mars XXII (Energotrade)

354. Mars XXII was incorporated on 17 December 1999.  The founders were OOO Akra, registered in the Kaluga Region, and Renmet ZAO, registered in Moscow, both with equal shares of 50 percent (RUR 5,000).[252]  Renmet ZAO is also a founder of Elbrus OOO, which had a 20 percent holding in the share capital of Yu-Mordovia and Yukos-M. Ms. Tatiana Subbotina was one of the directors of Mars XXII.  In a witness statement of 18 May 2004, Ms. Subbotina affirmed that, while she was formally in charge of the company, she only signed documents and did not know whether any investment agreements were concluded by Mars-XXII.[253]  According to its charter, the main activities of Mars XXII were the production and wholesale sale of oil products in the internal market and for export.[254]

355. The Tribunal notes that an investment agreement was concluded between Mars XXII and Mordovia on 27 June 2001, and supplemented on 26 March 2002.[255]

356. On 27 December 2001, a decision was issued by the Saransk Tax Inspectorate on "a Partial Refusal to Refund (Offset) VAT Amounts."  The decision notes that the commission agent for the export transactions is OAO NK Yukos.  The decision refers to oil prices as well as a chain of VAT transactions, and notes that the suppliers of the crude oil at issue were Ratmir and Norteks.[256]  Again, this information linking Mars XXII to the Yukos "family" was known to the authorities as early as 2001.

357. In October 2003, a Field Tax Audit Report was issued for 2000 to 2002.  It specifically stated that the "terms and conditions for applying the special taxation procedure have been complied with."[257]  Some minor violations were found, however, with respect to personal income and profit taxes.  The decision specifically noted that Mars XXII used Yukos FBTs for all of their accounting services.[258]

---

[252]   2000 Audit Report, p. 20, Exh. C-103.

[253]   First Konnov Report ¶ 20, n.20 (citing Witness Statement of Subbotina T.G. (Protocol No. 431la, 18 May 2004), Exh. R-258)

[254]   2000 Audit Report, p. 21, Exh. C-103.

[255]   Investment Agreement between Mars XII and Mordovia, 27 June 2011, Exh. C-1111.

[256]   Decision of the Inspectorate of the Ministry of Taxes and Levies of the Russian Federation for the Leninsky District of Saransk No. 53, 27 December 2001, Exh. C-1117.

[257]   Field Tax Audit Report No. 02-126 of Mars XXII, 22 October 2003, p. 4, Exh. C-1125.

[258]   *Ibid*. p. 2.

358. Tax reassessments would eventually be made against Yukos for Mars XXII (Energotrade) for the years 2000,[259] 2001,[260] 2003[261] and 2004,[262] totaling RUR 55,959,738,409 (approximately USD 1,865,324,614).[263]

### v.   Ratmir (Pluton XXVI)

359. Ratmir was incorporated on 17 December 1999.  Ratmir was originally incorporated under the name of Pluton XXVI OOO.  The founders of Ratmir were Gem OOO, with an 18 percent share (RUR 1,800); Sonata OOO, with an 80 percent share (RUR 8,000); and Nefteinvest OOO with a 2 percent (RUR 200).[264]  All of the founders were registered outside of Mordovia..[265]  Sonata also founded Yu-Mordovia, and maintained a 20 percent stake in that company.

360. Ratmir's accounts were managed by Yukos-Invest.[266]  According to the Tax Ministry, "Ratmir OOO bought and sold crude oil, gas condensate, oil products, petrochemical products, and subsequently sold oil products and petrochemical products for export."[267]

361. An investment agreement was concluded between Ratmir and Mordovia on 27 June 2001 and was supplemented on 26 March 2002.[268]

362. In April 2002, a Field Tax Audit Report was issued for the year 2000.[269]  It noted that there were no capital assets on the balance sheet (no physical facilities to store oil); and that Ratmir was exempt from property and profit tax pursuant to *Law 9-Z*.[270]  It found only a few minor

---

[259]  2000 Decision, , p. 14, Exh. C-104.

[260]  2001 Decision, pp. 122–23, Exh. C-155.

[261]  2003 Decision, pp. 91–92, Exh. C-190.

[262]  2004 Decision, pp. 80–81, Exh. R-1539.

[263]  Yukos Tax Reassessment Breakdown, p. 6, Exh. C-1752.  The RUR to USD exchange rate used here is approximate, based on a rate of 30:1.

[264]  2000 Audit Report, p. 55, Exh. C-103.

[265]  *Ibid*.

[266]  *Ibid*. p. 56.

[267]  *Ibid*.

[268]  Investment Agreement No. 26 between Mordovia and OOO Ratmir, 27 June 2001, as supplemented, Exh. C-1115.

[269]  Field Tax Audit Report No. 02-51, 19 April 2002, Exh. C-1119.

[270]  *Ibid*. pp. 2, 4, 5.

violations and ordered the company to pay RUR 43,299 (approximately USD 1,440) in relation to the profit tax[271]

363.   In October 2002, a Field Tax Audit Report was issued for the year 2001.  It noted that Ratmir was enjoying benefits under the Mordovian tax law, including the exact amounts involved. It found no violations of any tax laws.  The report also noted that Ratmir's accounting reports were managed by Yukos FBTs.[272]  This information linking Ratmir to the Yukos "family" was known to the authorities in 2002.

364.   Tax reassessments would eventually be made against Yukos for Ratmir for the years 2000,[273] 2001,[274] 2002,[275] and 2003,[276] totaling RUR 12,373,090,752 (approximately USD 412,436,359).[277]

### vi.   Yukos-M

365.   Yukos-M was incorporated on 20 January 2000 and registered on 24 January 2000.  When it was founded, its share capital was divided into 24 ordinary, registered shares, each with a nominal value of RUR 400 (96 percent of the company's share capital) and 1 registered preference share with a nominal value of RUR 400 (4 percent of the company's share capital).  Elbrus owned 23 ordinary registered shares, totaling RUR 9,200 or 92 percent of the share capital. OAO Yukos Oil Company owned one registered preference share with a nominal value of RUR 400 or 4 percent of the share capital and one ordinary registered share with a nominal value of RUR 400 or 4 percent  of the share capital (for a total of 8 percent of the share capital). The Tribunal notes that Elbrus and Yukos Oil Company were also co-founders of Yu-Mordovia OOO, each with 20 percent of the share capital.[278]  On 22 December 2000, "OAO Yukos Oil Company became the company's sole shareholder (owner of 100% of the company's ordinary and preference shares)".[279]  Yukos-M's accounts were managed by Yukos-Invest.[280]  According

---

[271]   *Ibid*. p. 8.  The RUR to USD exchange rate used here is approximate based on a rate of 30:1.

[272]   Field Tax Audit Report No. 02–144 of OOO Ratmir ¶ 2.1, 16 October 2002, Exh. C-1121.

[273]   2000 Decision, p. 49, Exh. C-104.

[274]   2001 Decision, pp. 42–43, Exh. C-155.

[275]   2002 Decision, p. 105, Exh. C-175.

[276]   2003 Decision, pp. 60–61, Exh. C-190.

[277]   Yukos Tax Reassessment Breakdown, p. 6, Exh. C-1752.  The RUR to USD exchange rate used here is approximate, based on a rate of 30:1.

[278]   2000 Audit Report, p. 41, Exh. C-103.

[279]   *Ibid*.

to the charter documents, in the year 2000, the company was engaged in the sale of crude oil on the domestic and export markets.[281]

366.  Yukos-M and Mordovia entered into an investment agreement on 27 June 2001, which was later supplemented on 26 March 2002.[282]

367.  In April 2002, a Field Tax Audit Report was issued for the year 2000, but this document is not in the record.  In October 2002, a Field Tax Audit Report was issued for 2001.  It noted the tax benefits accruing to Yukos-M under *Law 9-Z* and the investment agreement between Mordovia and Yukos-M.  It specifically mentioned that for the period under review, Yukos-M engaged in domestic and export sales of crude oil as well as other activities, and found no violation of any tax law.[283]

368.  Tax reassessments would eventually be made against Yukos for Yukos-M for the years 2000,[284] 2001,[285] 2002[286] and 2003,[287] totaling RUR 29,519,084,452 (approximately USD 983,969,482).[288]

### vii.  Yu-Mordovia

369.  Yu-Mordovia was incorporated on 2 December 1999 and registered on 17 December 1999.  The sole founder of Yu-Mordovia OOO was OAO Yukos Oil Company.[289]  On 17 January 2000, amendments were made to Yu-Mordovia's charter regarding the identity of the founders, the value of the share capital and the number of shares.  The following each had a 20 percent (2.0) share in the share capital:  OAO Yukos Oil Company, Sonata OOO, Elbrus OOO, Stekloprommash ZAO and A-Trust OOO.[290]  The shareholders were registered outside

---

[280]  *Ibid*.

[281]  *Ibid*. p. 42.

[282]  Investment Agreement Between Mordovia and Yukos-M, 27 June 2001, as supplemented, Exh. C-1112.

[283]  Field Tax Audit Report No. 02-145 of ZAO Yukos-M, 16 October 2002, pp. 2–4 Exh. C-1122.

[284]  2000 Decision, , p. 35, Exh. C-104.

[285]  2001 Decision, pp. 64–65, Exh. C-155.

[286]  2002 Decision, pp. 96–98, Exh. C-175.

[287]  2003 Decision, pp. 48–49, Exh. C-190.

[288]  Yukos Tax Reassessment Breakdown, p. 6, Exh. C-1752.  The RUR to USD exchange rate used here is approximate, based on a rate of 30:1.

[289]  2000 Audit Report, p. 51, Exh. C-103.  According to Exhibit C-103, the incorporation of Yu-Mordovia OOO was authorized at the meeting of the Board of Directors of OAO Yukos Oil Company by Resolution No. 120/1-19 of 2 December 1999.

[290]  *Ibid*. pp. 51–52.

Mordovia, either in the Tyumen Region (OAO Yukos Oil Company) or Moscow (the remaining four shareholders).[291]   Yu-Mordovia and Mordovia entered into an investment agreement on 27 June 2001, which was later supplemented on 26 March 2002.[292]

370.   The company's tax assessment, sent to the tax authorities in Saransk, Mordovia on 30 July 2001, described the details of the tax arrangement between Yu-Mordovia and Mordovia, including the tax on actual profit for the first half of 2001, with precise amounts of the benefits enjoyed and amounts paid under the Mordovian law.[293]

371.   Tax reassessments would eventually be made against Yukos for Yu-Mordovia for the years 2000,[294] 2001,[295] 2002[296] and 2003,[297] totaling RUR 21,018,327,538 (approximately USD 700,610,918).[298]

   **(b)   Kalmykia**

372.   Kalmykia is a low-tax region in Russia.  Only one trading company was based there, Siberian Transportation Company (Sibirskaya), registered in 1998.  Kalmykia was authorized to offer tax benefits under the *Law of the Republic of Kalmykia No. 12-II-Z on Tax Benefits Granted to Enterprises Making Investments in the Economy of the Republic of Kalmykia* of 12 March 1999.[299]  Aimed at "further enhancement of the investment climate" in the region, the law was designed to offer exemptions from certain local taxes and corporate taxes to companies making investments in the region.[300]

---

[291]   *Ibid*. p. 52.

[292]   Investment Agreement No. 24 Between Mordovia and OOO Yu Mordovia, 27 June 2001, Exh. C-1113.

[293]   Attachment No. 9 to Instruction of the Ministry of Taxes and Levies of the Russian Federation No. 62 of 15 June 2000, 30 July 20001, Exh. C-1747.

[294]   2000 Decision, pp. 44–45, Exh. C-104.

[295]   2001 Decision, pp. 80–81, Exh. C-155.

[296]   2002 Decision, p. 90, Exh. C-175.

[297]   2003 Decision, p. 43, Exh. C-190.

[298]   Yukos Tax Reassessment Breakdown, p. 6, Exh. C-1752.  The RUR to USD exchange rate used here is approximate, based on a rate of 30:1.

[299]   *Law of the Republic of Kalmykia No. 12-II-Z On Tax Benefits Granted to Enterprises Making Investments in the Economy of the Republic of Kalmykia*, 12 March 1999, Exh. C-413.

[300]   *Ibid*.

i.      **Siberian Transportation Company (Sibirskaya)**

373.  Sibirskaya was founded by Step ZAO, registered in Kaluzhskaya Region, and Polinep ZAO, registered in Moscow, both holding 50 percent shares.[301]  The Tribunal notes that Polinep ZAO was also a founder of Sonata OOO and Elbrus OOO, which were founders of Yu-Mordovia OOO and Yukos-M ZAO.[302]

374.  Sibirskaya received tax benefits under the *Law of the Republic of Kalmykia No. 12-II-Z* of 12 March 1999 referred to above and the *Resolution of the Elista Municipal Assembly No. 7* of 25 January 2001.[303]

375.  In September 2001, a resolution was issued by the Inspectorate of the Ministry of Taxes and Levies of Russia (Elista).  It found that the Siberian Transportation Company was ineligible for the tax benefits applied to it in the autonomous region.[304]  On the same day, a tax payment demand was issued to recoup the costs of the inappropriately applied benefits, in the amount of RUR 6,918,617 (approximately USD 230,000).[305]

376.  In December 2001, the Arbitrazh Court of the Republic of Kalmykia ruled that the tax incentives were, in fact, *lawfully* applied to the Siberian Transportation Company and the resolution and payment demand were declared invalid.  In addition, the court specifically stated that it had not found any evidence that the company had acted in bad faith or that it abused its rights.[306]  The Inspectorate of the Ministry of Taxes and Levies of Russia (Elista) appealed the December 2001 judgment.  The court of appeal upheld the decision of the lower court,

---

[301]  2000 Decision, p. 8, Exh. C-104.

[302]  *Ibid*.

[303]  *Law of the Republic of Kalmykia No. 12-II-Z*, 12 March 1999, Exh. C-413.  The resolution is referred to in Exh. R-311.  As is the case with many of the documents referred to below, although the existence of this particular document (the resolution) is evidenced by a reference in an exhibit that is in the record, the resolution itself is not in the record.  Claimants have criticized Respondent for failing to provide a complete record of the pre-2003 audits and related documents.

[304]  Resolution of the Federal Arbitrazh Court of the North-Caucasian District, Case No. F08-1678/2002-614A, 20 May 2002, Exh. R-311 (referring to Resolution No. 01-24/2261 of the Inspectorate of the Ministry of Taxes and Levies of Russia, 25 September 2001).

[305]  *Ibid*. (referring to *Tax payment demand No. 01-23/2261*, 25 September 2001).  The RUR to USD exchange rate used here is approximate, based on a rate of 30:1.

[306]  *Ibid*. (referring to Decision of the Arbitrazh Court of the Republic of Kalmykia, Case No. A22-1306/2001-6/129, 5 December 2001).

affirming that the resolution and the payment demand were invalid.  The court of appeal found no bad faith on the part of the Siberian Transportation Company.[307]

377.  The Inspectorate of the Ministry of Taxes and Levies of Russia (Elista) appealed this decision to the Federal Arbitrazh Court of the North-Caucasian District.  The Federal Arbitrazh Court reversed the decisions of the lower courts and ruled that the Siberian Transportation Company was not eligible for the benefits and that the company had acted in bad faith.  The resolution and the payment demand therefore became valid once again and were reinstated.[308]  The Federal Arbitrazh Court held that the tax benefits granted to the company were disproportionate to the investment it had made in Kalmykia.  It found that the amount invested was 0.4 percent of the amount of tax benefits.  There is no further information in the record as to any further steps in those proceedings, and, in particular, no evidence that the company appealed the decision of the Federal Arbitrazh Court to the Supreme Arbitrazh Court.

378.  Tax reassessments would eventually be made against Yukos for the Siberian Transportation Company for the year 2000,[309] totaling RUR 240,437,174 (approximately USD 8,014,572).[310]

(c)    **Lesnoy and Trekhgorny**

379.  Lesnoy and Trekhgorny are ZATOs.  As noted earlier, ZATOs or "Closed Adminstrative Territorial Units" are restricted-access territories "established in the former Soviet Union from the late 1940s as defense and nuclear power plant cities, which included communities with sensitive military, industrial or scientific facilities, such as arms plants or nuclear research sites."[311]  Due to the fact that their local economies were particularly dependent on increasingly obsolete military or nuclear functions, the ZATOs faced economic collapse at the end of the Cold War.  To address the problem, in 1992, the Russian State Duma "enacted a federal law to define the special tax regime of the ZATOs and the financing of these territories by the federal government, and guaranteed the ZATOs' residents certain social and health benefits."[312]  The number of restricted access jurisdictions in Russia is unknown, and it was not until the late

---

[307]    *Ibid.* (referring to the Resolution of the appellate court, Case No. A22-1306/2001-6/129, 12 March 2002).

[308]    *Ibid.*

[309]    2000 Decision, p. 11, Exh. C-104.

[310]    Yukos Tax Reassessment Breakdown, p. 6, Exh. C-1752.  The RUR to USD exchange rate used here is approximate, based on a rate of 30:1.

[311]    Counter-Memorial ¶ 226, n.274.

[312]    *Ibid.*

1990s that the territories were even named or mapped.[313]   In 1996, about half of the ZATOs were declassified of ZATO status.

### i.    Lesnoy

380.   At the end of 1997, four trading companies were established by Yukos in Lesnoy:  Business-Oil, Forest-Oil, Mitra, and Vald-Oil.   In early 1998, the trading companies entered into agreements with the Lesnoy Town Administration to make investments in the region that would entitle them to certain tax benefits.[314]   These were renewed in 2000.[315]

381.   In January 1999, the trading companies based in Lesnoy and the Lesnoy Administration agreed to allow the companies to use interest-bearing promissory notes of OAO Yukos Oil Company in order to pay their taxes.[316]   This agreement was later formalized in a decision by the head of ZATO Lesnoy.[317]

382.   In 1999, the Lesnoy Administration also entered into several other agreements with the trading companies.   Resolution 189 of the Duma of Lesnoy referred to joint investment activity within the framework of a partnership "between the Lesnoy administration and YUKOS OC OJSC."[318] The investments included construction and reconstruction of gas stations based on joint-activity agreements entered into "for a total of [RUR] 2,730 Million."[319]   In late 1999, three of the four

---

[313]   Vladimir Samoylenko, *Government Policies in Regard to Internal Tax Havens in Russia*, Publication of International Tax & Investment Center, December 2003, p. 10, Exh. C-577.

[314]   2000 Decision, Exh. C-104 (referring to Agreement No. 10, 9 February 1998 and Agreement No. 4, 28 January 2000 (Business-Oil); Agreement No. 3, 28 January 2000 (Mitra); Agreement No. 2, 28 January 2000 and Agreement No. [unknown] (Vald-Oil)); Memorandum on the results of the audit of the legality of additional tax incentives granted to Mitra, Business-Oil and Forest-Oil in Lesnoy for 1998 and 9 months of 1999 p. 5, Exh. R-294 (referring to Agreement No. 11, 9 February 1998 (Forest Oil)).

[315]   2000 Decision, Exh. C-104 (referring to Agreement No. 4 between the Lesnoy Administration and Business-Oil, 28 January 2000; Agreement No. 3 between the Lesnoy Administration and Mitra, 28 January 2000; Agreement No. 2 between the Lesnoy Administration and Vald-Oil, 28 January 2000.  There is no information on a renewal in favour of Forest-Oil, though it seems likely there was one.

[316]   Report No. 04-14/11-1, 22 February 2002 pp. 7, 9, 11, 12, Exh. R-304 (referring to agreements of 6 January 1999 allowing the use of OAO NK Yukos promissory notes for tax payments by the four trading companies).  *See also* Claimants' Rebuttal, Transcript, Day 20 at 50 for further context.

[317]   Report No. 04-14/11-1, 22 February 2002 pp. 7, 9, 11, 12, Exh. R-304 (referring to Decision No. 1734a of Head of Lesnoy Administration to allow the trading companies to pay taxes for 1999 with OAO NK Yukos promissory notes of OAO NK Yukos, 21 December 1999).

[318]   Decree of the Investigation Committee of the Russian Federation, 16 January 2002, p. 2, Exh. R-377 (referring to *Resolution 189 of the Duma of Lesnoy*, 15 December 1999).

[319]   *Ibid.*

trading companies were subjected to "desk audits", which "confirmed the validity in application of additional tax incentives granted."[320]

383.  On 3 December 1999, the Minister of Taxes of the Russian Federation instructed the Interregional State Tax Inspectorate for Operational Control over Problem Taxpayers to audit the legality of tax incentives granted in the Lesnoy ZATO to Mitra, Business Oil and Forest Oil.[321]

384.  There is in the record an undated Internal Tax Ministry "Memorandum on the results of the audit" initiated on 3 December 1999.[322]  The Tribunal recalls that this memorandum has been the subject of extensive representations by the Parties.

385.  The Tribunal notes that, in essence, the memorandum concludes that while each entity has the *formal* right to receive the "additional tax incentives under Law of the Russian Federation No. 67-FZ of 2 April 1999"[323] based on an examination of the entity's operations, it was established during the interrogation of a witness, in respect of each entity, that "the employees residing on the ZATO territory are not involved in the work related to the main activity of the company."[324]

386.  Respondent submitted that this memorandum and the investigation which preceded it "put Yukos on notice" of the tax authorities' investigations into the legality of the use of the ZATOs. On the other hand, Claimants replied that the memorandum was a document internal to the tax ministry.[325]  Claimants also aver that contemporaneous field tax audits conducted in March and

---

[320]  Memorandum on the results of the audit of the legality of additional tax incentives granted to Mitra, Business-Oil and Forest-Oil in Lesnoy for 1998 and 9 months of 1999 pp. 1, 3, 5, Exh. R-294 (referring to Desk Audit Report No. 4 for Mitra, 29 October 1999; Desk Audit Report No. 3 for Business Oil, 1 November 1999; Desk Audit Report No. 5 for Forest Oil, 1 November 1999).

[321]  *Ibid.*, p. 1.

[322]  *Ibid.*  The memorandum is undated but considered to be from early-to-mid 2000 on the basis of the documents referenced in it.  It appears that the audit report, whose findings were summarized in this undated memorandum, was issued on 7 March 2000.  *See* Statement No. 6 on the legality of the use by OOO Business-Oil in 1999 and 2000 of additional tax incentives granted by the head of the municipal formation of Town of Lesnoy No. 6, 29 June 2001, p. 4, Exh. R-295.

[323]  Memorandum on the results of the audit of the legality of additional tax incentives granted to Mitra, Business-Oil and Forest-Oil in Lesnoy for 1998 and 9 months of 1999 pp. 2, 4, 6, Exh. R-294

[324]  *Ibid.*, pp. 3, 4, 6.

[325]  Respondent's Opening Slides, p. 48; Claimants' Post-Hearing Brief ¶¶ 57–58; *see also* Transcript, Day 14 at 86.

May 2000 found no violations of any tax law by Business Oil, Forest Oil or Mitra in relation to the application of these taxation arrangements.[326]

387.   At approximately the same time, Yukos undertook a series of corporate restructurings which resulted in the merger of the audited Lesnoy companies (*i.e.*, Business-Oil, Forest-Oil, Mitra, and Vald-Oil) into another, new company, OOO Perspektiva Optimum, that was registered in the Aginsky Buryatsky Autonomous Okrug (**"ABAO"**) in the Chita Region, which is located thousands of miles from the ZATO of Lesnoy.

388.   Concurrently, a similar restructuring was carried out with respect to a number of other trading entities established in the ZATO of Trekhgorny (*i.e.*, OOO Alebra, OOO Flander, OOO Grace, OOO Kolrein, OOO Kverkus, OOO Muskron, and OOO Norteks), which Yukos merged into still another newly created company also registered in ABAO by the name of OOO Trading Company Alkhanay.

389.   As a result of these restructurings, on 21 May 2001, the Lesnoy and the Trekhgorny trading entities, as well as the subsequently merged successor entities (OOO Perspektiva Optimum and OOO Trading Company Alkhanay), were liquidated.   The new entity that emerged was named OOO Investproekt and was registered in the Kirov region.   In August 2001, Investproekt moved across Russia to the Chita Region.

390.   These restructurings and movements by Yukos—referred to collectively by Respondent as the "**Lesnoy Shuffle**"—are seen differently by the Parties.   According to Claimants, they were merely a simplification of the corporate group of "hundreds of companies."[327]   Claimants also noted that the restructurings occurred before any Tax Ministry decisions were rendered against it.[328]   Respondent, on the other hand, submitted that they were indicative of a pattern of behavior on the part of Yukos that shows an intent to frustrate the taxation authorities.[329]   While the Tribunal need not determine why these restructurings took place at this time, it has formed

---

[326]   These documents are not in the record but see Statement No. 6 on the legality of the use by OOO Business-Oil in 1999 and 2000 of additional tax incentives granted by the head of the municipal formation of Town of Lesnoy No. 6, 29 June 2001, Exh. R-295 (referring to Field Tax Audit Report No. 31 on Business-Oil, 7 March 2000); Decision No. 36, 8 June 2000, Exh. R-2260 (referring to Field Tax Audit Report Act No. 36 on Forest-Oil, 5 May 2000); Statement No. 8 on the audit of OOO Mitra, 11 June 2001, Exh. R-297 (referring to Field Tax Audit Report Act No. 249 on Mitra, 5 May 2000).

[327]   Transcript, Day 20 at 43.

[328]   Claimants' Post-Hearing Brief ¶ 64.

[329]   Transcript, Day 21 at 57–60.

the view that the simplification claim is a simplification.  No persuasive argument has been advanced by Claimants to explain why the series of mergers occurred at this precise time.[330]  At the same time, the Tribunal notes that the tax authorities were then slowly moving away from the taxation autonomy previously given to the ZATOs and that, on 1 January 2002, the right of the ZATOs to grant any tax incentives was removed from the law completely.[331]

391. In late June and early July 2001, the Tax Ministry circulated internally several memoranda (or "statements") relating to the tax benefits granted to the Lesnoy companies.[332]  The memoranda examined the lawfulness of the benefits granted between 1 January 1999 and March 2001. Internal Tax Ministry Statement No. 6, which examined the benefits granted to Business-Oil, found that the tax incentives were actually not in accordance with the law on ZATOs and not approved by the Ministry of Finance.  It also found a violation due to payment of taxes with promissory notes.  It assessed taxes of approximately RUR 2.8 Billion (USD 98 Million) for the whole period.  The memorandum also notes specifically that the Lesnoy entities were enterprises of OAO NK Yukos.[333]

392. Internal Tax Ministry Statement No. 7, which examined the benefits granted to Forest-Oil, found that the company's employees residing in Lesnoy were not engaged in trading, and also found violations due to payment of taxes with Yukos promissory notes and assessed approximately RUR 671 Million (USD 22 Million) in taxes that were not paid in cash.[334]

393. Benefits granted to Mitra were examined in Internal Tax Ministry Statement No. 8, which found that Lesnoy unlawfully granted tax incentives, found a violation due to payment of taxes

---

[330] Respondent's Closing Slides, pp. 8–12 (chronicling the series of moves that were taken "for no stated business reason".)

[331] First Konnov Report ¶ 33.  This change did not affect other types of low-tax regions at this time, although some of their powers to grant incentives were also curbed.

[332] Statement No. 6 on the legality of the use by OOO Business-Oil in 1999 and 2000 of additional tax incentives granted by the head of the municipal formation of Town of Lesnoy No. 6, 29 June 2001, Exh. R-295; Statement No. 7 on the audit of OOO Forest-Oil), 11 July 2001, Exh. R-296; Statement No. 8 on the audit of OOO Mitra, 11 July 2001, Exh. R-297; Statement No. 9 on the audit of Vald-Oil, 11 July 2001, Exh. R-298.

[333] Statement No. 6 on the legality of the use by OOO Business-Oil in 1999 and 2000 of additional tax incentives granted by the head of the municipal formation of Town of Lesnoy No. 6, 29 June 2001 pp. 14–18, Exh. R-295.  Contrast the Respondent's submission that the Russian Federation didn't know about the Lesnoy companies' association with Yukos until 2003.  *See*  Transcript, Day 18 at 29–31 (Respondent's closing).  The RUR to USD exchange rate used here is approximate, based on a rate of 30:1.

[334] Statement No. 7 on the audit of OOO Forest-Oil, 11 July 2001, Exh. R-296.  The RUR to USD exchange rate used here is approximate, based on a rate of 30:1.

by Yukos promissory notes and assessed approximately RUR 783 Million (USD 26 Million) in taxes paid with promissory notes.[335]

394.   Internal Tax Ministry Statement No. 9 examined benefits granted to Vald-Oil. It found that Lesnoy could not grant incentives for 2000 and assessed that RUR 986 Million (USD 33 Million) was owed. It also found fault on the basis of a substance over form analysis, and a violation due to payment of taxes by Yukos promissory notes in the amount of RUR 1.8 Billion (USD 60 Million).[336]

395.   In September 2001, a criminal investigation was initiated to look into whether the managers of the Lesnoy trading companies were involved in tax evasion.[337]

396.   In October 2001, a decision was taken to conduct a repeat field tax audit of Investproekt,[338] and a request was made that the company release the accounting documents of Forest-Oil, Mitra, and Vald-Oil.[339]   The repeat Field Tax Audit Report was issued in November 2001 with respect to the legality of the use of the additional tax incentives by the trading companies in the year 1999.[340]

397.   Later in November 2001, Ms. Irina Golub, Yukos' Chief Accountant, received an e-mail from Mr. V.N. Kartashov, a general director of Yukos.  The e-mail contained a document itemizing in tabular format, all of the information that Mr. Kartashov had regarding investigations into trading companies across the ZATOs and other low-tax regions.[341]   It identified, in a column entitled "Risks", a criminal case "in connection with tax evasion" for the four Lesnoy entities and nine Trekhgorny entities.  The document also noted that office personnel in all 13 of those firms had been interrogated, including the general directors of some of the Lesnoy companies. The entries for the Lesnoy entities also noted that some documents had been seized.

---

[335]   Statement No. 8 on the audit of OOO Mitra, 11 July 2001, Exh. R-297.  The RUR to USD exchange rate used here is approximate, based on a rate of 30:1.

[336]   *Internal Tax Ministry Statement No. 8* (Vald-Oil), 11 July 2001, Exh. R-298.  The RUR to USD exchange rate used here is based on a rate of 30:1.

[337]   Decree on institution and initiation of criminal proceedings (against Managers of Business Oil, Forest Oil, Mitra, and Vald-Oil in relation to payment of taxes by Yukos promissory notes), 3 September 2001, Exh. R-376.

[338]   Report No. 04-14/11-1, 22 February 2002, Exh. R-304 (referring to Decision No. 04-14/11 on the conduct of a repeat field tax audit of Investproekt, 13 October 2001).

[339]   Report No. 04-14/11-1, 22 February 2002 ¶ 2.3.1, Exh. R-304 (referring to request of 16 October 2001 from tax authorities to Investproekt for accounting documents of Forest-Oil, Mitra, and Vald-Oil).

[340]   Repeat Field Tax Audit Report No. 04-14/11 of OOO Investproekt, 9 November 2001, Exh. R-2250.

[341]   E-mail from Ms. Golub to Mr. Kartashov, 23 November 2001, Exh. R-3338.

398. In December 2001, Ms. Golub drafted a letter to be used as a template by one or more of the directors of the Lesnoy trading companies regarding the investigation into the use of promissory notes and sent it to Mr. D.V. Gololobov, Deputy Head of Yukos' Legal Department.[342]  Later, Mr. V.G. Aleksanyan, the Head of the Legal Department, wrote to Ms. Golub regarding her draft letter, asking that in correspondence with the authorities, no reference be made to the tax incentives granted by Lesnoy.[343]  Respondent argued during the Hearing that this demonstrates knowledge of and intent to conceal wrongdoing by Yukos.[344] Claimants answered that the document merely notes that the tax incentives were not at issue in the investigation (only the use of promissory notes to pay taxes was), and that Mr. Aleksanyan was simply asking Ms. Golub not to bring up an issue that was not being investigated.[345]

399. In December 2001, the tax authorities decided "to conduct additional control activities in respect of Investproekt."[346]

400. In January 2002, the criminal investigation of the directors of the Lesnoy trading companies was terminated because the investigation had not determined that a crime was committed.  The report stated that "there is no constitution of a crime," and "tax payments in non-monetary form cannot indicate the intention of tax evasion."[347]  The document also concludes that the head of the Lesnoy Administration, Mr. A.I. Ivannikov, believed at the time that tax payments by promissory notes were legal and that his actions and the actions of Lesnoy officials relating to granting of tax benefits should be considered as exceeding their authority and as negligent.[348]

401. However, a few days later, that decision was reversed.[349]  The reason then given was that no "legal assessment was conducted during the preliminary investigation as to whether the selection by the [trading companies] of such a knowingly illegal method of tax payment involving intentional overpayment of charged taxes and subsequent refund of surplus sums to

---

[342] Draft letter regarding investigation into use of promissory notes, undated, Exh. R-415.

[343] E-mail from Mr. Aleksanyan to Ms. Golub, 14 December 2001, Exh. R-3244.

[344] Transcript, Day 18 at 34–35.

[345] Transcript, Day 20 at 61.

[346] Report No. 14/11-1, 22 February 2002, Exh. R-304 (referring to Decision No. 04-15/10 to conduct additional control activities on Investproekt, 17 December 2001).

[347] Decree on termination of criminal case no. 135070 (in part), 16 January 2002, Exh. R-377.

[348] *Ibid*.

[349] Decree on the Reversal of the Decree to Discontinue Criminal Case No. 135070, 1 February 2002, Exh. R-381.

the accounts of these same companies in real monetary form could be considered as 'another method' of tax avoidance . . . ."[350]

402.  Ultimately though, the Tribunal notes that the investigation was suspended because, in the words of the resolution, "all possible investigative actions have been taken in the absence of an accused."[351]   The resolution noted that "this type of tax crime should be assessed as a tax evasion scheme by making advance payments for taxes of future periods," and that "[h]ere a mandatory condition is the fact that the advance payment is made in non-monetary form."[352] The resolution concluded that it was not possible to determine who among the directors of the trading companies or who in the Municipal Department of the City of Lesnoy actually committed a crime.[353]   Claimants stressed, in their Closing Statement, that no further action was taken.[354]   In this connection, the Tribunal recalls that Mr. Khodorkovsky and Mr. Lebedev were ultimately convicted, *inter alia*, for tax evasion, including in relation to the trading companies' use of promissory notes to pay taxes in Lesnoy.[355]

403.  In the period between the reversal and the suspension of the criminal case regarding the promissory notes, the report on additional control measures against Investproekt for 1999 was released.[356]   It considered that Business-Oil was not entitled to tax benefits in 1999, as it "was carrying out its business within ZATO Lesnoy as a matter of form only."[357]   The report also considered that the other Lesnoy companies were not entitled to tax benefits in 1999.  The report estimated their tax liabilities on the basis of Business-Oil as a "similar taxpayer".[358]

404.  The report assessed the value of the tax benefits that it concluded had been improperly granted at approximately RUR 5.3 Billion (USD 177 Million).  However, no assessment or decision

---

[350]  *Ibid.*, p. 3.

[351]  Resolution on Suspension of a Preliminary Investigation Due to Failure to Establish an Individual to be Accused, 4 March 2002, Exh. R-378.

[352]  *Ibid.*

[353]  *Ibid.*

[354]  Transcript, Day 16 at 224 ("There was no court decision issued on any of these, to our knowledge; and nothing has been filed by the Respondent to the contrary. . . In particular, none of the directors or the officials of the City of Lesnoy were convicted, in absentia or otherwise. So these are just the decrees rendered by the prosecution in relation to these facts in relation to the investigation.")

[355]  Judgment in the Name of the Russian Federation, Meshchansky District Court of the City of Moscow, 16 May 2005, p. 57, Exh. R-379.

[356]  Report No. 04-14/11-1, 22 February 2002, Exh. R-304.

[357]  *Ibid.*, p. 2.

[358]  *Ibid.*, p. 4.

was issued on the basis of this report to recoup the funds, which could have occurred any time up until 31 December 2002, before becoming time barred.[359]  No assessment was issued during the subsequent ten-month period against Investproekt.

405.  The Tribunal notes that, in March 2002, Mr. Dmitry Maruev, Yukos' Deputy Financial Manager, e-mailed M. U. Barbarovich and V. M. Zhuravlev and asked that they clean their e-mail folders and servers of references to a number of companies, some of which ("Alebra, Greis, Business Oil, Vald Oil, Kverkys [sic], Kolrein, Mitra, Muskorn, Nortex") had been merged into Investproekt.[360]

406.  Around this time, a demand requesting enforcement of a tax debt against Investproekt in the amount of RUR 25 Million (USD 833,000) was sent by the Ministry of Taxes and Levies for Chernyshevsk District to Bailiffs in the Chita region.  It was returned by the bailiffs who considered this matter to be outside of their jurisdiction since, when the debt was incurred, the company was located in Kirov.  The bailiffs also noted that Investproekt's executive S. A. Verketin still resided in Kirov, and supplied his address.[361]

407.  In April 2002, a decision was issued not to hold Investproekt liable for tax offenses in 2000.  Rather, it proposed to collect taxes but not fines as offenses were "discovered after the completion of their reorganization."[362]  It assessed the taxes owed at RUR 11.985 Billion (approximately USD 400 Million).[363]  Two months later, a decision was issued by the Federal Arbitrazh Court for the North West District in the *Pribrezhnoye* case, which found (on nearly identical facts to those relied upon in the decision against Investproekt) that the tax authorities had acted in breach of the Russian Tax Code.[364]  Claimants argued that this decision explains, at least in part, the reason why the tax assessment against Investproekt was never collected.  In

---

[359]  *Ibid.*; *see also* Claimants' Post-Hearing Brief ¶ 63, n.136.

[360]  D. L. Maruev e-mail to M. U. Barbarovich and V.M. Zhuravlev, 15 March 2002, Exh. R-4040.  The e-mail listed the following companies:  Alebra, Belz, Business-Oil, Vald-Oil, Greis, Kverkys, Kolrein, Mitra, Muksar, Muskron, Nortex and Flander.

[361]  Letter from Acting Senior Court Bailiff L.M. Lobanova to the Head of the Interdistrict Inspectorate No. 4 of the Ministry of Taxes and Levies for Chernyshersk District, Exh. R-306.

[362]  Decision No. 02-11/1/1, 2 April 2002 p. 8, Exh. R-303.

[363]  *Ibid.* p. 7.

[364]  *Pribrezhnoye,*, Exh. C-1278.  *See also* Claimants' Post-Hearing Brief ¶¶ 68–70.

their Post-Hearing Brief, Claimants submit that "in the non-political circumstances that prevailed in 2002, the assessment would not have survived court review."[365]

408. However, in August 2003, a decision was issued relating to the activities of the Investproekt companies in the year 2000. The taxes owing were assessed at RUR 11.985 Billion (USD 400 Million); and this time, the authorities decided that they would also fine Investproekt, adding an additional approximate amount of RUR 2.4 Billion (USD 84 Million).[366] It is not clear to the Tribunal as to whether this assessment was ever paid.[367] The Tribunal notes that the basis for reversing the April 2002 decision (*i.e.*, the decision not to hold the company liable) was not explained in the August 2003 decision.

*Business-Oil*

409. Business-Oil was registered by order of the head of the Administration of the Town of Lesnoy, on 30 December 1997, with RUR 10,000 capital. It was founded by Special Project OOO (holding 5 percent of the shares) and Rasin OOO (holding 95 percent of the shares).

410. In February 1998, Business-Oil and the Lesnoy Town Administration concluded an investment agreement, which granted incentives in relation to 17 different types of taxes and required payment of 5 percent of tax benefits granted by the administration to an off-budgetary fund.[368] This agreement was later supplemented in 2000, and provided additional incentives in relation to eight additional taxes.[369]

411. In November 1999, a desk audit was conducted. The audit report confirmed the validity of the application of the additional tax incentives granted.[370] The following month, a resolution of the tax authorities was issued which lead to an audit regarding compliance with the tax laws of the

---

[365] Claimants' Post-Hearing Brief ¶ 69.

[366] Decision No. 2.6-23 of the Department of the Ministry of Taxes and Levies of the Russian Federation for the Chita Region and Agynsky Butyatsky Autonomous District, 8 August 2003, Exh. R-305. The RUR to USD exchange rate used here is approximate, based on a rate of 30:1.

[367] Transcript, Day 20 at 85.

[368] Memorandum on the results of the audit of the legality of additional tax incentives granted to Mitra, Business-Oil and Forest-Oil in Lesnoy for 1998 and 9 months of 1999, Exh. R-294 and 2000 Decision, Exh. C-104 (referring to Agreement No. 10 Between the Lesnoy Town Administration and OOO Business-Oil, 9 February 1998).

[369] 2000 Decision, Exh. C-104 (referring to Agreement No. 4 Between the Lesnoy Town Administration and OOO Business-Oil, 28 January 2000).

[370] Memorandum on the results of the audit of the legality of additional tax incentives granted to Mitra, Business-Oil and Forest-Oil in Lesnoy for 1998 and 9 months of 1999 p. 5, Exh. R-294 (referring to a desk audit report No. 3, 1 November 1999).

Russian Federation and a verification of the terms and conditions under which additional tax incentives were granted between 1 January 1998 and 1 October 1999.[371]   In March 2000, a Field Tax Audit Report was issued regarding the lawfulness of the additional incentives for 1998 and nine months of 1999.   The report concluded that "no infringement of the tax legislation was established."[372]

412.   As set out above, however, an internal memorandum of the Tax Ministry questioned the entitlement of Business-Oil to the tax benefits, on the basis that it might not have been fulfilling the requirements of the legislation in substance (as opposed to form).   This, and other concerns about the entity's conduct, led to a criminal investigation inquiring into whether the managers of the Lesnoy entities were involved in tax evasion.   The investigation was ultimately suspended, but charges relating to the Lesnoy entities figured in the case by the Russian prosecutor against Messrs. Lebedev and Khodorkovsky in 2003.

413.   On 5 March 2001, Business-Oil was merged into Perspektiva Optimum, which later merged with Alkhanai Trading to become Investproekt.

414.   Tax reassessments would ultimately be made against Yukos for Business-Oil for the year 2000,[373] totaling RUR 1,620,951,772 (approximately USD 56,698,046).[374]

*Forest-Oil*

415.   Forest-Oil was registered by Resolution 1409 of the Lesnoy Town Administration on 31 December 1997.   In February 1998, Forest-Oil and the Lesnoy Town Administration concluded an investment agreement which granted incentives in relation to 16 different types of taxes and required payment of 5 percent of tax benefits to an off-budgetary fund.[375]

---

[371]   *Ibid*. (referring to Resolution No. 175, 16 December 1999).

[372]   *See* Statement No. 6 on the legality of the use by OOO Business-Oil in 1999 and 2000 of additional tax incentives granted by the head of the municipal formation of Town of Lesnoy No. 6, 29 June 2001, p. 4, Exh. R-295 (referring to Field Tax Audit Report No. 31, 7 March 2000).

[373]   2000 Decision, p. 65, Exh. C-104.

[374]   Yukos Tax Reassessment Breakdown, p. 6, Exh. C-1752.  RUR to USD calculated at 28.5892:1, the official exchange rate on 14 April 2004

[375]   Memorandum on the results of the audit of the legality of additional tax incentives granted to Mitra, Business-Oil and Forest-Oil in Lesnoy for 1998 and 9 months of 1999, p. 5, Exh. R-294 (referring to Agreement No. 11 Between the Lesnoy Town Administration and OOO Forest-Oil, 9 February 1998).

416. In November 1999, a desk audit was performed which confirmed the validity of the additional tax incentives granted.[376]

417. In December 1999, a resolution of the tax authorities was issued leading to a field tax audit for 1 January 1998 to 1 October 1999, in order "to inspect its compliance with the tax laws of the Russian Federation and check the terms and conditions under which additional tax incentives were granted."[377]  In May 2000, a Field Tax Audit Report was issued, which found no violation in relation to tax incentives, but found a VAT shortfall of RUR 107,142 [USD 3,500].[378]  In June 2000, a decision in relation to that report held Forest-Oil liable for a 20% fine of RUR 21,428 (USD 700).[379]

418. As set out above, however, an internal memorandum of the Tax Ministry questioned the entitlement of Forest Oil to the tax benefits because it might not have been fulfilling the requirements of the legislation in substance (as opposed to form).  This, and other concerns about the entity's conduct, led to a criminal investigation inquiring into whether the managers of the Lesnoy entities were involved in tax evasion.  The investigation was ultimately suspended, but, as noted earlier, charges relating to the Lesnoy entities figured in the case by the Russian prosecutor against Messrs. Lebedev and Khodorkovsky in 2003.

419. On 5 March 2001, Forest-Oil was merged into Perspektiva Optimum, which later merged into Investproekt.

420. No tax reassessments would be made against Yukos for Forest-Oil.

*Mitra*

421. Mitra was registered by Resolution 1355 of the Lesnoy Town Administration on 22 December 1997.  It was founded by OOO Alan, with registered address in Kaluga and a 95 percent shareholding, and OOO Special Project, with registered address in Lesnoy and a 5 percent shareholding.  As of 15 June 2000, OOO Neftemarket-2000, with registered address in Moscow

---

[376] *Ibid*. p. 3 (referring to Desk Audit Report No. 5, 1 November 1999).

[377] *Ibid*. (referring to Resolution No. 174, 6 December 1999).

[378] Decision No. 36, 8 June 2000, Exh. R-2260 (referring to Field Tax Audit Report No. 36, 5 May 2000).  The RUR to USD exchange rate used here is approximate, based on a rate of 30:1.

[379] *Ibid*.  The RUR to USD exchange rate used here is approximate, based on a rate of 30:1.

(and itself 100% owned by OAO Yukos Oil Company) held 100 percent of the shares in Mitra.[380]

422.   In February 1998, Mitra and the Lesnoy Town Administration concluded an investment agreement,[381] which was supplemented in a further agreement in January of 2000, in which the administration provided additional incentives in respect of 8 types of taxes.[382]

423.   In October 1999, a Field Tax Audit Report was issued,[383] followed by a desk audit report[384] which confirmed the validity of the additional tax incentives granted.  In December 1999, a resolution of the tax authorities was issued which led to the conduct of a field tax audit for 1 January 1998 to 1 October 1999 "to inspect its compliance with the tax laws of the Russian Federation and check the terms and conditions under which additional tax incentives were granted."[385]  In May 2000, the Field Tax Audit Report was released.  It found no violation in relation to tax incentives and only a profit tax error in the amount of RUR 3,122,000 (USD 105,000).[386]

424.   As set out above, however, an internal memorandum of the Tax Ministry questioned the entitlement of Mitra to the tax benefits, on the basis that it might not have been fulfilling the requirements of the legislation in substance (as opposed to form).  This, and other concerns about the entity's conduct, led to a criminal investigation inquiring into whether the managers of the Lesnoy entities were involved in tax evasion.  The investigation was ultimately suspended, but, as noted earlier, charges relating to the Lesnoy entities figured in the case by the Russian prosecutor against Messrs. Lebedev and Khodorkovsky in 2003.

425.   On 5 March 2001, Mitra was merged into Perspektiva Optimum, which later merged into Investproekt.

---

[380]   2000 Decision, pp. 72–73, Exh. C-104.

[381]   Memorandum on the results of the audit of the legality of additional tax incentives granted to Mitra, Business-Oil and Forest-Oil in Lesnoy for 1998 and 9 months of 1999, p. 1, Exh. R-294 (referring to Agreement No. 7, 3 February 1998).

[382]   2000 Decision, pp. 73–74, Exh. C-104 (referring to Agreement No. 3, 28 January 2000)

[383]   *Ibid*. p. 1 (referring to Field Tax Audit Report No. 76, 8 October 1999).

[384]   *Ibid*. (referring to Desk Audit Report No. 4, 29 October 1999).

[385]   *Ibid*. (referring to Resolution No. 249, 16 December 1999).

[386]   Statement No. 8 on the audit of OOO Mitra (referring to Field Tax Audit Report No. 249, 5 May 2000).

426. Tax reassessments would later be made against Yukos for Mitra for the year 2000,[387] totaling RUR 27,124,001 (USD 948,750).[388]

*Vald-Oil*

427. Vald-Oil was registered by Resolution 1441 of the Lesnoy Town Administration on 30 December 1997.  It was founded by OOO Neftemarket, holding 5 percent of the shares, and OOO Al-Gem holding 95 percent of the shares.

428. In February 1998, Vald-Oil and the Lesnoy Town Administration apparently concluded an investment agreement[389] which granted incentives in relation to 16 different types of taxes and required payment of 5% of the value of the tax benefits to an off-budgetary fund.  It was supplemented by a further agreement in January of 2000.[390]

429. As set out above, however, concerns that Vald Oil might not have been fulfilling the requirements of the legislation in substance (as opposed to form), and other concerns about the entity's conduct, led to a criminal investigation inquiring into whether the managers of the Lesnoy entities were involved in tax evasion.  The investigation was ultimately suspended, but, as noted earlier, charges relating to the Lesnoy entities figured in the case by the Russian prosecutor against Messrs. Lebedev and Khodorkovsky in 2003.

430. On 5 March 2001, Vald-Oil was merged into Perspektiva Optimum, which later merged into Investproekt.

431. Tax reassessments would eventually be made against Yukos for Vald-Oil for the year 2000,[391] totaling RUR 1,362,216,581 (USD 47,647,943).[392]

---

[387] 2000 Decision, p. 76, Exh. C-104.

[388] Yukos Tax Reassessment Breakdown, p. 6, Exh. C-1752.  RUR to USD calculated at 28.5892:1, the official exchange rate on 14 April 2004, Exh. R-334.

[389] 2000 Decision, p. 6, Exh. C-104 (referring to investment agreements with, among others, Vald Oil).

[390] 2000 Decision, p. 80, Exh. C-104 (referring to Agreement No. 2, 28 January 2000).

[391] *Ibid.*, p. 83.

[392] Yukos Tax Reassessment Breakdown, p. 6, Exh. C-1752.  RUR to USD calculated at 28.5892:1, the official exchange rate on 14 April 2004, Exh. R-334.

### ii.    Trekhgorny

432.    Far less information is available to the Tribunal regarding the activities of the trading companies in the Trekhgorny ZATO than is available for those in Lesnoy.  What the Tribunal has gleaned from the record is that in March 2001, some of the companies based in Trekhgorny ("Greys", "Nortex", "Alebra", "Muskron", "Flander", "Kolrein" and "Kverkus") merged into Torgovaya Kompaniya Alkhanay or Alkhanai Trading on 16 March 2001, a company registered in Aginskoye, in the Aginsko-Buryatsky region.[393]  Two months later, in May 2001, Alkhanai Trading merged with Perspektiva Optimum (the company created from the Lesnoy trading companies) into Investproekt, a company initially based in Kirov, but which then moved to the Chita Autonomous Region as of August 2001.[394]

#### *Grace*

433.    Grace was registered by Order 1316 of the Trekhgorny Municipal Administration on 25 July 1997.   On 15 March 2001, it merged into Alkhanai Trading, which later merged into Investproekt.  Grace was founded by ZAO Trigor (holding 5 percent of the shares) and OOO Bark (holding 95 percent).[395]

434.    On 11 March 1998, Grace and the Trekhgorny Municipal Administration concluded an investment agreement, supplemented by another agreement on 21 January 2000, under which incentives in relation to 17 different types of taxes were granted.[396]

435.    Tax reassessments would eventually be made against Yukos for Grace for the year 2000,[397] totaling RUR 20,247,201 (USD 708,212).[398]

---

[393]    Judgment in the Name of the Russian Federation, Meshchansky District Court of the City of Moscow, 16 May 2005, p. 48, Exh. R-379.

[394]    *See* various documents on Alkhanay and Perspektiva Optimum, 20 May 2001, Exh. R-302; *see also* Information letter from the Inspectorate of the Ministry of Taxes and Levies of the Russian Federation for Shabalinskiy District, 20 August 2001, Exh. R-301 (noting Investproekt's change of address to the Chita Region).  For further information as to Investproekt, see paragraphs 389–408 above.

[395]    2000 Decision, p. 27, Exh. C-104.

[396]    *Ibid.*, pp. 29–30 (referring to Tax Agreement No. 95, 11 March 1998 and a supplementary tax agreement dated 21 November 2000).

[397]    *Ibid.* pp. 30–31.

[398]    Yukos Tax Reassessment Breakdown, p. 6, Exh. C-1752.  RUR to USD calculated at 28.5892:1, the official exchange rate on 14 April 2004.

*Muskron*

436. Muskron was registered by Order 1433 of the Municipality of Trekhgorny on 12 August 1997. It was founded by Trigor ZAO, with an address in Trekhgorny and a 5 percent shareholding, as well as Vokit OOO, with an address in Moscow and a 95 percent shareholding.  Vokit bought out Trigor in April of 2000, before selling a 2 percent stake to Neftetrade (itself wholly owned by OAO Yukos Oil Company at the time of Neftetrade's incorporation).   As of September 2000, Neftetrade had acquired 100 percent of Muskron's shareholding.[399]

437. On 12 July 1998, Muskron and the Trekhgorny Municipal Administration concluded an investment agreement, with a supplementary agreement on 12 January 2000, which granted incentives in relation to eight different types of taxes.[400]

438. On 15 March 2001, Muskron was merged into Alkhanai Trading, which then merged into Investproekt.[401]

439. Tax reassessments would eventually be made against Yukos for Muskron for the year 2000,[402] totaling RUR 7,398,094 (USD 258,772).[403]

*Norteks (aka Nortex)*

440. Norteks was registered by Order 1435 of the Municipality of Trekhgorny 12 August 1997.[404]  It was founded by Trigor ZAO, with an address in Trekhgorny and a 5 percent shareholding, as well as OOO Corvet, with an address in Kaluga and   a 95 percent shareholding.   OOO Neftetrade bought Trigor's shares in Norteks in June of 2000.[405]

441. On 6 February 1998, Norteks and the Trekhgorny Municipal Administration concluded an investment agreement, supplemented by another agreement on 21 January 2000, granting

---

[399]  2000 Decision, p. 36–37, Exh. C-104.

[400]  *Ibid*. pp. 39–40 (referring to Tax Agreement No. 67, 12 July 1998 and a supplementary tax agreement dated 12 January 2000).

[401]  *Ibid*., p. 35.

[402]  *Ibid*., p. 41.

[403]  Yukos Tax Reassessment Breakdown, p. 6, Exh. C-1752.  RUR to USD calculated at 28.5892:1, the official exchange rate on 14 April 2004.

[404]  2000 Decision, p. 14, Exh. C-104.

[405]  *Ibid*., p. 15.

incentives in relation to eight different types of taxes and requiring payment of five percent of tax benefits into administration's account.[406]

442. On 15 March 2001, Norteks was merged into Alkhanai Trading, which then merged into Investproekt.[407]

443. Tax reassessments would eventually be made against Yukos for Norteks for the year 2000,[408] totaling RUR 3,152,537,572 (USD 110 Million).[409]

*Kverkus (aka Quercus)*

444. Kverkus was registered by Order 1315 of the Administration of the Municipality of Trekhgorny on 25 July 1997.[410]  It was founded by Trigor ZAO, with an address in Trekhgorny and a 5 percent shareholding, as well as OOO Cadet, with an in Kaluga and a 95 percent shareholding.  OOO Neftetrade bought out Trigor's shares in Kverkus in June of 2000.[411]

445. On 26 August 1997, Kverkus and the Trekhgorny Municipal Administration concluded an agreement granting tax benefits to the trading companies.[412]  On 11 March 1998, a second investment agreement was concluded,[413] which was supplemented on 21 January 2000,[414] granting incentives in relation to eight types of taxes.

446. On 15 March 2001, Kverkus was merged into Alkhanai Trading, which then merged into Investproekt.

---

[406] *Ibid.*, pp. 17–18 (referring to Tax Agreement No. 9, 6 February 1998 and a supplementary tax agreement dated 21 January 2000).

[407] *Ibid.*, p. 14.

[408] *Ibid.*, p. 19.

[409] Yukos Tax Reassessment Breakdown, p. 6, Exh. C-1752.  RUR to USD calculated at 28.5892:1, the official exchange rate on 14 April 2004, Exh. R-334.

[410] 2000 Decision, p. 49, Exh. C-104.

[411] *Ibid.*, p. 50.

[412] *Ibid.*, p. 52 (referring to Tax Agreement No. 51, 26 August 1997).

[413] *Ibid.* (referring to Tax Agreement No. 103, 11 March 1998).

[414] *Ibid.* (referring to supplementary tax agreement, 21 January 2000).

447. Tax reassessments would eventually be made against Yukos for Kverkus for the year 2000,[415] totaling RUR 3,031,422,237 (USD 106,033,825).[416]

*Colrain (aka Kolrein)*

448. Colrain was registered by Order 1431 of the Municipality of Trekhgorny on 12 August 1997.[417] It was founded by Trigor ZAO, with an address in Trekhgorny and a 5 percent shareholding, as well as OOO Bark, with an address in Kaluga and a 95 percent shareholding.[418]  In November 1999, Trigor sold its five percent share in Colrain to Polinep ZAO.[419]  Neftetrade then bought that five percent share in June 2000.[420]

449. In August 1997, Colrain and the Trekhgorny Municipal Administration concluded an agreement granting tax benefits to the company.[421]  In February 1998, a second investment agreement was concluded,[422] which was amended once in 1999[423] and supplemented in January 2000,[424] granting incentives in relation to eight types of taxes.

450. On 15 March 2001, Colrain merged into Alkhanai Trading, which then merged into Investproekt.[425]

451. No tax reassessments would be made against Yukos for Colrain.

*Virtus*

452. Virtus was registered by Order 1116 of the Head of the Municipality of Trekhgorny on 27 June 1997.[426]  It was founded by OOO Akra OOO, with an address in Kaluga and a 90 percent

---

[415]   *Ibid.*, p. 55.

[416]   Yukos Tax Reassessment Breakdown, p. 6, Exh. C-1752.  RUR to USD calculated at 28.5892:1, the official exchange rate on 14 April 2004.

[417]   2000 Decision, p. 57, Exh. C-104.

[418]   *Ibid.*, p. 58.

[419]   *Ibid.*

[420]   *Ibid.*

[421]   *Ibid.*, p. 59 (referring to Tax Agreement No. 44, 20 August 1997).

[422]   *Ibid.* (referring to Tax Agreement No. 8, 6 February 1998).

[423]   *Ibid.* (referring to amendments on 12 July 1999).

[424]   *Ibid.* (referring to a supplementary tax agreement, 21 January 2000).

[425]   *Ibid.*, p. 58.

shareholding, OOO Depor with an address in Moscowand a 5 percent shareholding, and Trigor ZAO, with an address in Trekhgorny and a 5% shareholding. Akra bought Trigor's shares in Virtus in March of 2000.[427]

453. On 6 February 1998, Virtus and Trekhgorny Municipal Administration concluded an investment agreement,[428] which was supplemented on 21 January 2000.[429] It granted incentives to the company in relation to eight different types of taxes, and required payment of five percent of tax benefits into the administration's account.

454. Tax reassessments would eventually be made against Yukos for Virtus for the year 2000,[430] totaling RUR 2,359,700 (USD 82,538).[431]

    **(d)   Sarov**

455. Sarov is a ZATO in the Russian Federation.

### i. Yuksar

456. Yuksar was registered by the Sarov Municipal Administration on 13 October 1997.[432] Yuksar was founded by Yukos with a 49 percent shareholding and YNG with a 51 percent shareholding.[433] Yuksar was ultimately liquidated.[434]

457. On 23 October 1997, Yuksar and the Sarov Municipal Council concluded an agreement granting tax incentives to the company.[435] It was supplemented on 12 March 1998.[436]

---

[426] 2000 Decision, p. 68, Exh. C-104.

[427] *Ibid.* pp. 67–68.

[428] *Ibid.*, pp. 68–69 (referring to Tax Agreement No. 7, 6 February 1998).

[429] *Ibid.*, p. 69 (referring to supplementary tax agreement, 21 January 2000).

[430] *Ibid.*, p. 69.

[431] Yukos Tax Reassessment Breakdown, p. 6, Exh. C-1752. RUR to USD calculated at 28.5892:1, the official exchange rate on 14 April 2004.

[432] 2000 Decision, p. 20, Exh. C-104

[433] *Ibid.*

[434] *Ibid* (referring to extract from Unified State Register of Legal Entities on 3 November 2003).

[435] *Ibid.*, p. 22 (referring to Tax Agreement No. 74/01-17, 23 October 1997).

[436] *Ibid.* (referring to supplementary tax agreement, 12 March 1998).

458. Tax reassessments would ultimately be made against Yukos for Yuksar for the year 2000,[437] totaling RUR 95,875,131 (USD 3,353,544).[438]

      **(e)   Baikonur**

459. As noted earlier, Baikonur is a low-tax region, leased by the Russian Federation from Kazakhstan during the Soviet era for use as a spaceport and aerospace facility.[439]

### i.   Mega-Alliance (aka Mega-Alyans)

460. Mega-Alliance was registered by Order 00411 of the Administration of Baikonur on 21 December 2000.[440]  The sole founder of the company was Ms. Gulnara Karimovna Zhukova, who was also a founder of Macro-Trade.  The share capital of the company was RUR 8,350.  On 28 April 2001, amendments were made to the Charter of Mega-Alliance OOO under which the sole shareholder of Mega-Alliance became Dorchestergate Trading Limited, a company registered in Cyprus.[441]

461. As noted in paragraph 351 above, Ms. Zhukova later denied any connection to Mega-Alliance or Macro-Trade, both of which she was alleged to have founded.  A letter dated 24 October 2003 from the Russian Federation Federal Security Service's Directorate for Moscow Space Forces indicated that Ms. Zhukova had denied any connection with Mega-Alliance and reiterated her story about the theft of her passport.[442]

462. In 2001, Mega-Alliance and the Administration of Baikonur entered into a tax agreement.[443]  It granted benefits to the company in relation to four types of taxes and required payments to the value of three percent of their tax benefits into the "target funds" for the development of the region of Baikonur.

---

[437] *Ibid.*, p. 23.

[438] Yukos Tax Reassessment Breakdown, p. 6, Exh. C-1752.  RUR to USD calculated at 28.5892:1, the official exchange rate on 14 April 2004.

[439] Transcript, Day 14 at 54.

[440] 2001 Decision, p. 112, Exh. C-155.

[441] *Ibid.*

[442] 2001 Decision, p. 112, Exh. C-155 (referring to Letter No. 31/4664 from the Russian Federation Federal Security Service's Directorate for Moscow Space Forces, 24 October 2003).

[443] *Ibid.*, p. 114 (referring to contract between the Administration of Baikonur and Mega-Alliance, 24 October 2003).

463. Later that year, the decision of the Government of the Russian Federation No. 747 on the Approval of the Rules for the Granting of Tax Privileges to Organisations and Individual Businessmen Registered on the Territory of the City of Baikonur was issued.[444]  It granted permission to the head of the Administration of Baikonur to grant tax privileges, provided that the individual businessman or organization had "the presence of premises, of property, industrial or other complexes necessary for the manufacture of goods, works or services and situated on the territory of the city of Baikonur (including the Baikonur Spaceport); [and] the realisation of the products, works or services on the territory of the city of Baikonur (including the Baikonur Spaceport)."[445]  It also cautioned that previously offered tax benefits that conflicted with the decision would be considered terminated from the date the decision entered into force.[446]

464. In 2002, Mega-Alliance merged into Regionalniy Finansoviy Tsentr or Regional Finance Center.[447]  Regional Finance Center was liquidated in July of that year.[448]

465. Tax reassessments would later be made against Yukos for Mega Alliance for the year 2001,[449] totaling RUR 1,276,878,700 (USD 43,646,213).[450]

(f)   Evenkia

466. The Evenkia autonomous district is located in Eastern Siberia.[451]  At the time that the trading companies were established in Evenkia, the district had a federally financed budget, fuel supplies were difficult to secure, and unemployment was very high.[452]  Of all the regions of the

---

[444]   Decision of the Government of the Russian Federation No. 747, 25 October 2001, Exh. C-411.

[445]   *Ibid.*

[446]   *Ibid.*

[447]   Notice on record with the unified state register of legal entities of entry on dissolution of legal entity, 19 April 2002, Exh. R-3158.

[448]   Information Extract No. 29170, 27 March 2012, Exh. R-3159.

[449]   2001 Decision, p. 115, Exh. C-155.

[450]   Yukos Tax Reassessment Breakdown, p. 6, Exh. C-1752.  RUR to USD calculated at 29.2552:1, the official exchange rate on 2 September 2004.

[451]   *Yukos Review*, Issue # 3, May–June 2001, p. 8, Exh. C-9.

[452]   *Ibid.*, p. 5.

Russian Federation, Evenkia ranked last in average per capita volume of industrial production, and 69th (out of 89) in terms of per capita income.[453]

467.  In September 1998, Law No. 108 of the Evenkia Autonomous Region "On the Particularities of the Tax System in the Evenkiysky Autonomous District" was enacted,[454] which offered incentives to investors in the region.  Pursuant to Article 6(1)(d) of the law, preferential tax rates were offered to participants in investment projects on the territory of the Evenkiysky Autonomous District. Pursuant to Article 5(1) of the Law, commercial and noncommercial entities were deemed participants of investment projects which are created in the territory of the region, regardless of the origin of their capital, and can include those with foreign legal entities as shareholders, so long as they were participants in programs for the social and economic development of the region and investment projects.

468.  In May 2001, Mr. Boris Zolotarev, the former head of Yukos R&M, became governor of Evenkia.  After his election, he spoke about the positive effects he hoped Yukos investment could have on the region.[455]

### i.   Evoil

469.  Evoil was registered by Order 158 of Administration of Ilimpiisk District of Evenkia on 23 May 2002.[456]  It was founded by Fiana Ltd., a limited liability company registered in Cyprus.[457]

470.  In June 2001, pursuant to an order of the Administration of the Evenkiysky Autonomous District, "On Application of Special Tax Regime," Evoil was granted targeted tax benefits.[458]  It also enjoyed benefits under Law 108 of 24 September 1998, including corporate profit tax payable at a reduced rate of 10.5 percent and a property tax rate of 0 percent.[459]

---

[453]  *Ibid.*, p. 8.

[454]  Law of the Evenkiysky Autonomous District No. 108, 24 September 1998, Exh. C-412.

[455]  *Yukos Review*, Issue # 3, May–June 2001, p. 5, Exh. C-9.

[456]  2002 Decision, p. 146, Exh. C-175.

[457]  *Ibid*.

[458]  Resolution of the Federal Arbitrazh Court for the Moscow District No. KA-A40/3222-05, p. 30, Exh. C-184 (referring to Order No. 53 of the Administration of the Evenkiysky Autonomous District, 29 June 2001).

[459]  2002 Decision, p. 154, Exh. C-175.

471. Tax reassessments would later be made against Yukos for Evoil for the years 2002[460] and 2003,[461] totaling RUR 203,629,769 (approximately USD 6,787,659).[462]

### ii.     Interneft

472. Interneft was registered by Order 333 of Administration of Ilimpiisk District of Evenkia on 23 October 1998.[463]   The sole founder of Interneft is OOO Netax Advertising Agency, registered in Kalmykia.[464]   It was founded with an initial capital of RUR 8,400, split into 100 ordinary registered shares with nominal value of RUR 84.[465]

473. On 26 July 1999, Interneft was awarded a "Certificate of assignment of the status of Participant in the investment programs of the Evenki Autonomous Region."[466]

474. Tax reassessments would later be made against Yukos for Interneft for the year 2000,[467] totaling RUR 224,642 (USD 7,858).[468]

### iii.    Petroleum-Trading (Trion)

475. Petroleum-Trading was registered under the name Trion by Order 146-p of the Administration of Ilimpiisk District of Evenkia on 25 April 2000.  Its new name was registered by Order 193 of Administration of Ilimpiisk District of Evenkia on 31 May 2000.[469]   Petroleum-Trading was founded   by   Neftepromstroiservice   ZAO   and   Neftepromburservice   ZAO,   each   holding

---

[460]   *Ibid*. pp. 154–55.

[461]   2003 Decision, p. 142, Exh. C-190.

[462]   Yukos Tax Reassessment Breakdown, p. 6, Exh. C-1752.  The RUR to USD exchange rate used here is approximate, based on a rate of 30:1.

[463]   2000 Decision, p. 76, Exh. C-104

[464]   *Ibid*.

[465]   *Ibid*.

[466]   *Ibid*., p. 77.

[467]   *Ibid*., p. 78.

[468]   Yukos Tax Reassessment Breakdown, p. 6, Exh. C-1752.  RUR to USD calculated at 28.5892:1, the official exchange rate on 14 April 2004.

[469]   2000 Decision, p. 55, Exh. C-104.

50 percent of the share capital.  Both parent companies were registered in Kalmykia.[470]  The founding capital was RUR 8,400.

476.   Pursuant to Order No. 53 of the Administration of the Evenkiysky Autonomous District of 29 June 2001, "On Application of Special Tax Regime," Petroleum-Trading was granted targeted tax benefits.[471]

477.   Tax reassessments would be later made against Yukos for Petroleum-Trading for the years 2000[472] and 2002[473] totaling RUR 90,943,100 (approximately USD 3,031,437).[474]

### iv.   Ratibor

478.   Ratibor was registered by Order 168-p of the Administration of the Evenkiysky Autonomous District on 21 July 2000.  It was registered with tax authorities and state authorities on 14 February 2001.[475]  It was founded by Ms. Svetlana Ivanovna Vorobyeva, with a share capital of RUR 10,000.[476]  On 25 May 2001, 100 percent of the share capital of Ratibor OOO was transferred to Dunsley Limited, a company registered in Cyprus.  Dunsley was, in turn, owned by Doluen Limited, with 99.9 percent of the shares, registered in Cyprus, and Abakus (Nominis) Limited, with 0.1 percent of the shares, also registered in Cyprus.[477]

479.   Pursuant to Order No. 53 of the Administration of the Evenkiysky Autonomous District of June 2001, "On the application of the Special Taxation Procedure," Ratibor was granted targeted tax benefits.[478]

480.   Tax reassessments would later be made against Yukos for Ratibor for the years 2001[479] and 2002,[480] totaling RUR 13,870,285,714 (approximately USD 462,342,857).[481]

---

[470]   *Ibid.*, p. 55–56.

[471]   Resolution of the Federal Arbitrazh Court for the Moscow District No. KA-A40/3222-05 p. 30, Exh. C-184 (referring to Order No. 53 of the Administration of the Evenkiysky Autonomous District, 29 June 2001).

[472]   2000 Decision, p. 57, Exh. C-104.

[473]   2002 Decision, p. 163–64, Exh. C-175.

[474]   Yukos Tax Reassessment Breakdown, p. 6, Exh. C-1752.  The RUR to USD exchange rate used here is approximate, based on a rate of 30:1.

[475]   2001 Decision, p. 82, Exh. C-155.

[476]   *Ibid.*

[477]   *Ibid.*

[478]   *Ibid.*, p. 99.

v.      **Yukos Vostok Trade**

481.    Yukos Vostok Trade was registered by Decision 36 of the Interdistrict Inspectorate of the Russian Ministry of Taxes and Levies No. 3 for the Evenki Autonomous District, 9 February 2004.[482]  It was founded by OAO Yukos Oil Company with 70 percent of the shareholding and Yukos-Import with 30 percent of the shareholding.[483]

482.    While there is no reference to any tax agreements on the record, the Tribunal notes that Field Tax Audit Report No. 52/996 refers to Yukos Vostok Trade making use of the beneficial tax system in Law 108 of 24 September 1998, with a preferential income tax rate reduced to 13 percent and a preferential property tax rate of 0 percent.[484]

483.    Tax reassessments would later be made against Yukos for Yukos Vostok Trade for 2004,[485] totaling RUR 8,660,507,192 (USD 311,337,530).[486]

5.      **Tribunal's Observations**

484.    Having set out the evidence regarding Yukos' tax optimization scheme, the Tribunal now returns to the question posed at the beginning of this chapter:  does the record which it has reviewed at length demonstrate that Yukos was merely taking advantage of the legislation in place in the low-tax regions of the Russian Federation to minimize its taxes, or was there an element of abuse in its activities that made them illegal under Russian law?

485.    The Tribunal first reiterates that the evidence reveals—indeed, the Parties are agreed—that the Russian Federation had enacted (in the late 1990s and early 2000s) a legislative structure to encourage investment in some of its low-tax regions, and that Yukos (as did many other Russian companies, including other oil companies) sought to take advantage of that legislative

---

[479]   *Ibid.*, pp. 99–100.

[480]   2002 Decision, p. 146, Exh. C-175.

[481]   Yukos Tax Reassessment Breakdown, p. 6, Exh. C-1752.  The RUR to USD exchange rate used here is approximate, based on a rate of 30:1.

[482]   2004 Decision, p. 86, Exh. R-1539.

[483]   *Ibid.*

[484]   Field Tax Audit Report No. 52/996, p. 84, 27 December 2005.

[485]   2004 Decision, pp. 90–91, Exh. R-1539.

[486]   Yukos Tax Reassessment Breakdown, p. 6, Exh. C-1752.  RUR to USD calculated at 27.8171:1, the official exchange rate on 17 March 2006.

structure.  As a result, Yukos set up trading companies in various low-tax regions and, where required, entered into investment agreements with the local authorities.

486.  There is evidence in the record that Mr. Dubov informed the authorities, at least in respect of the Yukos trading companies in Mordovia, that Yukos was using the legislative arrangements in place to minimize its taxes, and that none of his interlocutors, including the then First Deputy of Finance, Alexei Kudrin, formulated any objection.  Finally, the Tribunal recalls that few of the audits of the trading companies conducted in the regions prior to 2003 ever resulted in any tax assessments, and, when they did, the transgressions were generally minor and the assessments insignificant.

487.  In this connection, the Tribunal notes that Respondent chose not to call any fact witnesses to challenge Claimants' fact witnesses.  That is unfortunate.  The Tribunal would have been assisted, for example, by the evidence of Mr. Kudrin who, after his meeting with Mr. Dubov, became Minister of Finance and Deputy Prime Minister of the Russian Federation.  Instead, Respondent has relied solely on the documentary record to build its case that Yukos' activities in the low-tax regions were abusive and illegal.  As Claimants pointed out during the Hearing, and as the Tribunal found out for itself, the documentary record compiled and presented by Respondent to the Tribunal, while significant, is selective and unfortunately incomplete.

488.  The record does reveal, however, that Yukos had some concerns about the legality of its trading operations in certain low-tax regions, notably in Lesnoy and Trekhgorny.  As recorded in the previous section of the present chapter, there were audit reports and memoranda that attest to an investigation of whether the practices of some of the Yukos trading companies in those regions were abusing the system, since those companies were acting in conformity with the relevant legislation in form only and not in substance.

489.  The Tribunal recalls that, in November 2001, after an extensive corporate restructuring had taken place (as a result of which the trading entities in Lesnoy and Trekhgorny ceased to exist, and were merged into entities created in other regions), Ms. Irina Golub, the Chief Accountant of Yukos, received a document by e-mail from Mr.  Kartashov, a general director of Yukos.  That document referred specifically to the ongoing investigations in Lesnoy and Trekhgorny by the Federal Tax Police Service of Sverdlovsk as part of a criminal case "in connection with tax evasion" by the Yukos entities and to the fact that office personnel in Lesnoy and Trekhgorny (including, in the case of the Lesnoy entities, the General Directors) had been interrogated by tax authorities.

490. The Tribunal notes here that the Investigation Group of the Russian Federation's Federal Tax Police Agency for the Sverdlovsk Region was the organization that had issued the "Decree on the institution and initiation of criminal proceedings"[487]—looking into the payment of taxes with promissory notes—three weeks earlier.

491. During the Hearing and in its Post-Hearing Brief, Respondent referred many times to the Kartashov e-mail, as well as the following evidence, which, it argued, demonstrated that Yukos knew that its scheme was unlawful and "took pains to conceal its scheme from the authorities":[488]

- Firstly, the 22 April 2002 memorandum from Mr. Maly, in which he expressed his concern that if Yukos' affiliation with the trading entities were included in the SEC filing, that information "may be used by the Russian tax authorities to challenge [Yukos'] approach to certain transactions and, consequently, will result in substantial tax claims against the [c]ompany";[489]

- Secondly, the e-mail from Mr. Maruev (from the Treasury Department) to employees in 2002 to "clean your folders" of references to the Lesnoy trading companies;[490]

- Thirdly, the internal memorandum from Yukos' General Counsel Mr. Aleksanyan advising Ms. Golub not to draw the attention of the authorities to the use of tax incentives in the ZATO Lesnoy, since "an investigation into the legality of the use of the incentives . . . entails substantial risks, including under criminal law";[491]

---

[487] Decree on the institution and initiation of criminal proceedings of the Investigation Group of the Russian Federation's Federal Tax Police Agency for the Sverdlovsk Region, 3 September 2001, Exh. R-376.

[488] Respondent's Post-Hearing Brief ¶¶ 29, 38.

[489] E-mail from P.N. Maly to O.V. Sheyko, 14 May 2002, Exh. R-184.

[490] E-mail from D.L. Maruev to M.U. Barbarovich and V.M. Zuravlev, 15 March 2002, cc'ing V.A. Podzarov, Exh. R-4040.

[491] Letter from V.G. Aleksanyan to I.Y. Golub dated 14 December 2001. Exh. R-3244. Professor Gaillard argued during the hearing that Mr. Aleksanyan was simply saying "don't …rub an issue which has not been opened." Transcript, Day 20 at 61. The full discussion can be found at Transcript, Day 20 at 57–62. Professor Gaillard suggested that Ms. Golub:

"…receives a letter from Aleksanyan, who is the boss two steps above her. . . which says, 'You'—I summarise it, and then we will go to the details.  Basically it says, 'You stupid, you don't understand that it's not about the tax incentives, it's about the promissory notes. So why do you prepare a letter talking about tax incentives? That's not at issue here.'" Transcript, Day 20 at 58–59.

- Fourthly, Mr. Khodorkovsky's refusal in early 2003 to sign Yukos' registration statement (for a confidential SEC filing) over concerns for his "personal risks";[492] and

- Fifthly, a "blackline" version of Yukos' draft filing for the SEC sent on 23 July 2002 by Natalia Kuznetsova of PwC to Stephen Wilson (at that time Yukos' international tax director), proposing that the following be deleted from an earlier draft: "We use tax optimization mechanisms that may be challenged by the tax authorities" and "If a number of regional tax incentives we have used to reduce our tax burden are successfully challenged by the Russian tax authorities, we will face significant losses associated with the additionally assessed amount of tax and related interest and penalties."[493]

492. In their reply to the evidence regarding concern over potential tax liabilities, Claimants submit that the Russian tax authorities "were notorious for displaying arbitrary and unpredictable interpretations of law generating significant and unquantifiable risks for taxpayers[,] risks that Yukos and other Russian oil companies . . . disclosed in their financial statements."[494]   They conclude that references by Yukos' management to such risks "[could not] reasonably be construed as evidencing 'knowledge' or 'belief' that Yukos' tax structure was unlawful."[495]   Claimants also argue that Respondent's reliance on Mr. Maly's e-mail was "much ado about nothing," and that "it is clear that any risks were neither a problem, nor an obstacle, to Yukos pursuing the NYSE listing because Yukos continued to draft its Form F-1 into mid-March 2003, nearly a year after this memo."[496]   Claimants also note that, in respect of the blackline filing that it "in fact states—in a sentence the Respondent omits to quote—that Yukos' management 'believe the tax mechanisms used by us comply.'"[497]

---

[492]   E-mail from M.B. Khodorkovsky to O.V. Sheiko, 20 February 2003, Exh. R-3611.

[493]   Facsimile transmission from Natalia Kusnetsova to Stephen Wilson dated 23 July 2002, pp. 133–34, Exh. R-1477.

[494]   Claimants' Post-Hearing Brief ¶ 15.

[495]   *Ibid*.

[496]   Reply ¶ 111.

[497]   Reply ¶ 199 (emphasis in original).  As Claimants note, the full paragraph reads:

"Our results of operation have historically benefited significantly from the use of tax [illegible] mechanisms.  We believe that the tax mechanisms used by us comply with relevant [illegible].  If, however, we phase out all of our current tax optimization mechanisms due to changes to the tax regime or other reasons, we may have to pay significantly higher taxes in the future, and our result of operation may be adversely affected.  In addition, if the various initiatives we have used to reduce our tax burden are successfully challenged by the Russian tax authorities we may face significant losses associated with the assessed amount of tax underpaid and related interest and penalties, which would have a material impact on our financial condition and results of operation."

*Ibid*. n.337.

493. In fact, the record before the Tribunal reveals that Lukoil, Rosneft, Sibneft and TNK, in their financial statements in those years, all referred to the significant risks associated with the varying interpretation by the Russian tax authorities of the Russian tax legislation.[498]

494. Although the Yukos entities in Lesnoy and Trekhgorny were only a small part of Yukos' tax optimization scheme,[499] it is clear to the Tribunal that these entities were being investigated as of late 1999 by the tax authorities in these regions, and were suspected of being "shams". It is the view of the Tribunal that the legal basis for this scrutiny was the jurisprudential "good faith taxpayer" doctrine ("substance over form" or "anti-abuse" doctrine) and that, within the senior management of Yukos, there were a number of persons who were aware that Yukos was vulnerable in respect of certain facets of its tax optimization scheme.

495. As for the existence of the "good faith taxpayer" doctrine in Russia at that time, the Tribunal has reviewed the evidence of Mr. Konnov, the only expert on Russian tax law to give evidence in these proceedings, who appeared on behalf of Respondent. Although Claimants elected not

---

[498] *See* Consolidated Financial Statements of OAO Lukoil, 30 May 2003, Exh. C-371; Consolidated Financial Statements of OJSC Rosneft Oil Company (hereinafter "Rosneft"), 24 June 2005, C-373; Consolidated Financial Statements of AO Siberian Oil Company, 21 June 2002, C-384;and Consolidated Financial Statements of TNK International Limited, 15 May 2003, C-390. To illustrate, the following is the warning contained in Lukoil's financial statements for the period ending 31 December 2002

"The taxation systems in the Russian Federation and other emerging markets where Group companies operate are relatively new and are characterized by numerous taxes and changing legislation, which may be applied retroactively and is sometimes unclear, contradictory, and subject to interpretation. Often, differing interpretations exist among different tax authorities within the same jurisdictions and among taxing authorities in different jurisdictions. Taxes are subject to review and investigation by a number of authorities, which are enabled by law to impose severe fines, penalties and interest charges. Such factors may create taxation risks in the Russian Federation and other countries where Group companies operate substantially more significant than those in other countries where taxation regimes have been subject to development and clarification over long periods.

. . .

The regional organizational structure of the Russian Federation tax authorities and the regional judicial system can mean that taxation issues successfully defended in one region may be unsuccessful in another region. <u>The tax authorities in each region may have a different interpretation of similar taxation issues.</u> There is however some degree of direction provided from the central authority based in Moscow on particular taxation issues.

The Group has implemented tax planning and management strategies based on existing legislation at the time of implementation. The Group is subject to tax authority audits on an ongoing basis, as is normal in the Russian environment, and, at times, the authorities have attempted to impose additional significant taxes on the Group. Management believes that it has adequately met and provided for tax liabilities based on its interpretation of existing tax legislation. However, the relevant tax authorities may have differing interpretations and the effects could be significant."

Exh. C-371, pp. 30–31 (emphasis added).

[499] The tax assessments levied against Yukos in connection with the trading entities in Lesnoy and Trekhgorny, which related only to the 2000 tax year (since the entities ceased to exist in early 2001), represented approximately 19 percent of the total tax assessment against Yukos for 2000, and represented under 3 percent of the total of all tax assessments against Yukos (for the years 2000–2003). *See* Yukos Tax Reassessment Breakdown, Exh. C-1752.

to present their own expert on Russian tax law,[500] in their written submissions, they referred to and criticized various Russian court decisions, which they contended did not support Respondent's interpretation.   As noted earlier in the present chapter, the Tribunal has considered Claimant's submissions.

496.   The Tribunal has also considered the lengthy cross-examination of Mr. Konnov by Professor Gaillard.  The Tribunal recalls again that Professor Gaillard did not challenge Mr. Konnov on the existence of the anti-abuse doctrine but rather sought Respondent's expert's acknowledgement that the Yukos tax optimization scheme complied with the existing legislative framework in Russia as well as in the regions.  The Tribunal notes in this context that Claimants stipulate to the existence of the "bad-faith taxpayer" doctrine in their Reply, but argue that "neither it nor any other alleged judicial doctrine had previously been applied as in the Yukos case."[501]

497.   As a matter of background fact, the record before the Tribunal is clear that, at the time of the issuance on 29 December 2003 of the Field Tax Audit Report, the "bad faith taxpayer" doctrine, although it had not yet gelled in the way that it did in 2006 in the ruling of the Supreme Arbitrazh Court in Resolution No. 53, had been recognized and applied in some Russian court decisions.

498.   The Tribunal recalls that the eminent Russian tax lawyer, Mr. Sergey Pepeliaev, who later represented Yukos in the Russian tax litigation, wrote in 2002 that the doctrine existed and that "[i]f it appears that parties act both unreasonably and not in good faith then this constitutes a ground for reassessment of the parties' tax liabilities . . . ."[502]

499.   Beyond this conclusion, which the Tribunal considers a matter of fact, the Tribunal does not need to determine, as a matter of Russian law, whether any of the activities of the Yukos

---

[500]   The Tribunal notes that in the *RosInvestCo* arbitration, the claimant presented a Russian tax law expert, Professor Maggs. The Russian Federation relied on Mr. Konnov.  The *RosInvestCo* tribunal stated that it found Professor Maggs' evidence more persuasive, but it also acknowledged that Professor Maggs did not dispute the existence of the "bad faith taxpayer" doctrine.  *See RosInvestCo* ¶¶ 432, 495, Exh. C-1049. Similarly, in the *Quasar* arbitration, claimants presented a Russian tax law expert, Professor Stephan, as well as an expert on the *Russian Civil Code*, Professor Mozolin, who opined, *inter alia*, on the distinction between good and bad faith taxpayers. *See Quasar*, ¶ 66, 77–78, Exh. R-3383.  As in this arbitration, and the *RosInvestCo* arbitration, the Russian Federation's expert on Russian law was Mr. Konnov.  As in the *RosInvestCo* case, the debate turned primarily on the application to Yukos of the anti-abuse doctrine, as opposed to the existence of the anti-abuse doctrine.

[501]   Reply ¶ 217, n.368.

[502]   S.G. Pepeliaev, *Commentary to the Ruling of the Constitutional Court Ruling of the Russian Federation No. 138-O of July 25, 2001*, Exh. R-352.

trading companies in the low tax regions in 2000, 2001, 2002, and 2003 in the implementation of its tax optimization scheme were in violation of this doctrine. As noted in the introduction to the present chapter, it is not the role of the Tribunal in the present arbitrations to sit as a court applying Russian law.

500. However, the Tribunal does note that that, in using the available tax benefit legislation in the Russian Federation, the Yukos group principally availed itself of facilities under the laws of Mordovia, the region which represents approximately 78 percent of the 2000 to 2004 tax reassessments against Yukos. Another significant portion of the reassessments relates to Evenkia, while the tax reassessments in ZATO Lesnoy and Trekhgorny represent less than three percent of the total. It is important for the Tribunal to stress that the bad faith doctrine was never used against Yukos prior to December 2003.

501. The Tribunal will now turn in the next chapter of its Award to the central question which it posed at the beginning of the present chapter: were the December 2003 and the subsequent tax assessments a legitimate exercise by the Russian Federation of its prerogative to enforce its tax laws or were they, as Claimants argued, a mere fabrication of massive tax claims against Yukos serving as instruments which allowed the premeditated expropriation of all Yukos assets by the State after the arrest of Mr. Lebedev and Mr. Khodorkovsky.

502. As will be seen, a crucial consideration for the Tribunal concerns the remedy or sanction of "re-attribution", and the application of the "re-attribution" remedy to revenues (for purposes of profit tax) without a corresponding "re-attribution" of tax filings for purposes of VAT. Also considered in the next chapter is the legitimacy of associated fines levied against Yukos, notably the "willful offender" and "repeat offender" fines.

### B.    THE TAX ASSESSMENTS STARTING IN DECEMBER 2003

#### 1.    Introduction

503. This chapter addresses the next crucial facet in the factual narrative of the present arbitration, namely the tax assessments that were issued against Yukos starting in December 2003, the manner in which those assessments were made and how they were reasoned and, eventually, enforced.

504. This important review will lead the Tribunal to consider a central question in this case: were the December 2003 and subsequent tax assessments covering the tax years 2000 to 2004 a

legitimate exercise by the Russian Federation of its prerogative to enforce its tax laws (Respondent's position), or were they a fabrication of massive tax claims against Yukos that allowed the premeditated expropriation of all Yukos assets by the State (Claimants' position)? Or does the record rather suggest that the truth lies somewhere between these two positions: could certain taxes in the assessments have legitimately been imposed while others plainly not, and were the consequential sanctions inexorably exacted by Russian authorities so excessively disproportionate as to require an answer to the question described as key by counsel for the claimant in *Quasar*, Mr. O.T. Johnson:  "Why would Russia have treated Yukos as it did if its purpose was to collect taxes?"[503]

505.  A closely related question concerns the arrests in 2003 of Messrs. Lebedev and Khodorkovsky: were the arrests and the subsequent convictions of Messrs. Lebedev and Khodorkovsky (not once but twice), again, a legitimate exercise by the Russian Federation of its prerogative to enforce its criminal and tax laws (Respondent's position), or were they a politically motivated attack on these individuals as part of a broader campaign to confiscate the rich assets of Yukos (Claimants' position)?

506.  The issues raised by the arrests and convictions of Messrs. Lebedev and Khodorkovsky, and of other individuals connected with Yukos, and the alleged harassment of  Yukos management, are addressed in detail in Chapter VIII.C of the present Award.  The Tribunal considers it opportune however at this time to comment upon some of the circumstances surrounding those arrests.

507.  Claimants have argued that the arrests, and the broader campaign of harassment and intimidation of the leading officers and employees of Yukos, were prompted by President Putin's desire to retaliate against Mr. Khodorkovsky and Yukos for Mr. Khodorkovsky's political and social activism, which Claimants allege became intolerable for President Putin subsequent to a public encounter between the two men in February 2003.

508.  Specifically, on 19 February 2003, in the context of a meeting between President Putin and a group of the country's most powerful businessmen, a televised confrontation between President Putin and Mr. Khodorkovsky took place.[504]  According to the testimony of Dr. Illarionov,

---

[503]  *Quasar* ¶ 41, Exh. R-3383.

[504]  Video recording and transcript of the meeting of the members of the Union of Industrialists and Entrepreneurs with President V. Putin held in the Ekaterininsky Hall, Kremlin, 19 February 2003, Exh. C-1396.

President Putin had scheduled regular meetings between himself and the business leaders, facilitated by the Russian Union of Industrialists and Entrepreneurs headed by Mr. Arkady Volsky.[505]

509. At the meeting, which would, according to Dr. Illarionov, turn out to be the last of its kind, Mr. Khodorkovsky made a presentation on the topic of corruption.  In his presentation, he asserted that corruption in Russia was rife, and that it was "rotting the Russian Government and the Presidential Administration."[506]  While no names were mentioned, relates Dr. Illarionov, President Putin did discuss the acquisition of Severnaya Neft by Rosneft, for which Rosneft had paid approximately USD 622 million.  Dr. Illarionov states that "[i]t was widely considered that the price was exaggerated and that a portion of the price represented kickbacks to State officials."[507]

510. Dr. Illarionov concludes as follows in relation to his understanding of the significance of that encounter:

> During his closing remarks, the President turned to Mr. Khodorkovsky and stated that everyone knew how various assets, including Yukos, were acquired.  The President indicated to Khodorkovsky that "I return the ball in your corner" . . . .  Later, it became clear that this was a signal to the governing elites that Mr. Khodorkovsky could be attacked and he was no longer tolerated.[508]

511. At the same time, the Tribunal's findings in the previous chapter of the present Award suggest that well before the clash between President Putin and Mr. Khodorkovsky at the February 2003 meeting, the tax authorities of the Russian Federation were challenging the tax benefits claimed by some Yukos entities (in ZATO Lesnoy) and, in a few cases, had made findings adverse to those trading companies.  Moreover, the Tribunal recalls, as it did in the previous chapter, that Messrs. Khodorkovsky and Lebedev were ultimately convicted, *inter alia*, for tax evasion in relation to Yukos' activities in Lesnoy, in which (the record revealed) the authorities had suspended an investigation into the commission of tax crimes because, according to the conclusions in the relevant Resolution, it was not then possible to determine who actually committed the crimes.

---

[505] Illarionov WS ¶ 23.

[506] *Ibid.* ¶ 29.

[507] *Ibid.* (citation omitted).

[508] *Ibid.* ¶ 31.

512.     Respondent emphasized Yukos' earlier tax problems in its comments on the February 2003 meeting.   Respondent noted in its Closing Statement that President Putin publicly told Mr. Khodorkovsky that the political protection or assistance he was allegedly receiving from the Kremlin until that meeting would be removed, and he added that "we've talked about taxes before."[509]

513.     Based on the extensive record that was presented to it, the Tribunal is unable to accept the proposition that the February 2003 confrontation created Yukos' tax problems and that, but for such a confrontation, Yukos would have avoided any and all tax reassessments against it. While this meeting may well have marked a turning point in the relations between Yukos and the Russian Federation, as the Tribunal observed in the previous chapter, within the senior management of Yukos, and well before February 2003, there were individuals who were aware that the company's tax optimization mechanisms were vulnerable and could be challenged by the tax authorities.   Some of the evidence presented to the Tribunal also revealed that there was at least some awareness within Yukos that a successful challenge to the Yukos tax structure would result in "substantial tax claims"[510] or "significant losses associated with the additional assessed amount of tax and related interest and penalties"[511] and possibly even criminal liability.   At the same time, the Tribunal notes that the tax assessments and decisions against Yukos led not just to "substantial tax claims" or to "significant losses" but to its bankruptcy and destruction, and to the transfer of the principal assets of Yukos to Rosneft, a company controlled by the Russian Federation.

514.     The crucial question addressed in this chapter of the Award, therefore, is whether Claimants have discharged their burden of proof and established that the tax assessments, and the enforcement processes of the Russian Federation which followed, are more consistent with the conclusion that they evidence a punitive campaign against Yukos and its principal beneficial owners with sanctions entirely disproportionate to the company's tax liability, rather than with the conclusion that they were a legitimate exercise of tax enforcement.

---

[509]   Transcript, Day 18 at 113.   Counsel for Respondent interprets this as "I am not going to protect Mr. Khodorkovsky anymore.   He is on his own."   *Ibid*.   The full quote of the President's remark is:   "We have already discussed it with you recently, that your company, for example, has had problems with the payment of taxes."   Transcript of the 19 February 2003 Meeting, Exh. C-1396.

[510]   E-mail from P.N. Maly to O.V. Sheyko, 14 May 2002, Exh. R-184.   *See* paragraph 491 above.

[511]   Facsimile transmission from Natalia Kuznetsova to Stephen Wilson, 23 July 2002 p.134, Exh. R-1477.   *See* paragraph 491 above.

515.   In the Tribunal's view, it may well be that, while Yukos was vulnerable on some aspects of its tax optimization scheme, and possibly even would have faced "substantial tax claims" that might have resulted in "significant losses," principally because of the sham-like nature of some elements of its operations in at least some of the low-tax regions, the State apparatus decided to take advantage of that vulnerability by launching a full assault on Yukos and its beneficial owners in order to bankrupt Yukos and appropriate its assets while, at the same time, removing Mr. Khodorkovsky from the political arena.

516.   Dr. Illarionov asserts in his witness statement that "various possible justifications for Mr. Khodorkovsky's arrest and Yukos' dismantlement were tested in the Fall of 2003."[512]  He then goes on to list fifteen "theories" that, he says, "were gradually created as a smoke screen and advanced for public consumption," including "tax evasion schemes."[513]  In other words, Yukos' tax arrangements in certain low-tax regions (some of which, notably in ZATO Lesnoy, as related in Chapter VIII.A, were being scrutinized as of 1999 by the tax authorities and were suspected of being "shams") may have served as a plausible pretext for the State apparatus to crush Mr. Khodorkovsky and expropriate Yukos.   In this chapter, the Tribunal considers evidence that is crucial to its determination of this central issue in the present proceedings.  The Tribunal observes again that its conclusions in this chapter are only concerned with factual findings.  The determination of the relevant legal issues under the provisions of the ECT will be considered later, in Part X of the Award.

### 2.      Chronology of the Tax Assessments and Related Decisions

517.   On 29 December 2003, the tax authorities of the Russian Federation issued the first of five tax assessments against Yukos based on the alleged abuse by Yukos of its tax optimization scheme. These five assessments were:

---

[512]   Illarionov WS ¶ 36.

[513]   *Ibid.*

| Tax Year | Date of Tax Audit Report | Date of Tax Decision | Total Amount Assessed (USD billion) |
|---|---|---|---|
| **2000** | 29 Dec. 2003 (Exh. C-103) | 14 Apr. 2004 (Exh. C-104) | 3.48 |
| **2001** | 30 June 2004 (Exh. R-345) | 2 Sept. 2004 (Exh. C-155) | 4.10 |
| **2002** | 29 Oct. 2004 (Exh. R-346) | 16 Nov. 2004 (Exh. C-175) | 6.76 |
| **2003** | 19 Nov. 2004 (Exh. R-1583) | 6 Dec. 2004 (Exh. C-190) | 6.10 |
| **2004** | 27 Dec. 2005 (Exh. C-200) | 17 Mar. 2006 (Exh. R-1539) | 3.74 |
| **Total for Tax Years 2000–2004** | | | **24.18** |

518. For each year that the Tax Ministry re-assessed Yukos a Repeat/Field Tax Audit Report and a Decision were issued. For ease of reference, in this chapter, each Audit Report and Decision will be referred to by the tax year to which it relates. For example, the Tax Ministry audited Yukos' activities in the year 2000. It issued Field Tax Audit Report No. 08-1/1 on 29 December 2003 ("**2000 Audit Report**"). It issued Decision No. 14-3-05/1609-1 to hold the taxpayer fiscally liable for a tax offense on 14 April 2004 ("**2000 Decision**").

519. In the subsections below, the Tribunal records, for each tax year, the extensive chronology of tax assessments and related decisions of the tax authorities, bailiffs and Russian courts. These events as such are not disputed by the Parties.

(a) **The 2000 Decision**

520. As noted above, on 29 December 2003, the 2000 Audit Report, was issued.[514] It was followed, on 14 April 2004, by the 2000 Decision holding the taxpayer liable for a tax offense.[515] It levied the following amounts in tax arrears:

---

[514] 2000 Audit Report, Exh. C-103.

[515] 2000 Decision, Exh. C-104.

| COMPANY | TAX BENEFITS | VAT | TOTAL |
|---|---|---|---|
| **Alta Trade** | RUR 2,491,817,840 | RUR 467,486,102 | RUR 2,959,303,942 (USD 104 Million) |
| **Mars XXII** | RUR 18,393,165 | | RUR 18,393,165 (USD 643,361) |
| **Ratmir** | RUR 4,336,209,757 | RUR 1,770,256,037 | RUR 6,106,465,794 (USD 213,593,448) |
| **Yukos-M** | RUR 14,456,555,351 | RUR 9,697,309,558 | RUR 24,153,864,909 (USD 845 Million) |
| **Yu-Mordovia** | RUR 2,210,007,592 | RUR 2,045,653,454 | RUR 4,255,661,046 (USD 149 Million) |
| **Sibirskaya** | RUR 240,437,174 | | RUR 240,437,174 (USD 8.4 Million) |
| **Business-Oil** | RUR 1,584,766,950 PN:* RUR 36,184,822 | | RUR 1,620,951,772 (USD 56.7 Million) |
| **Mitra** | RUR 27,124,001 | | RUR 27,124,001 (USD 948,750) |
| **Vald-Oil** | RUR 1,304,431,717 PN:* RUR 57,784,864 | | RUR 1,362,216,581 (USD 47,647,943) |
| **Grace** | RUR 20,247,201 | | RUR 20,247,201 (USD 708,212) |
| **Muskron** | RUR 7,398,094 | | RUR 7,398,094 (USD 258,772) |
| **Nortex** | RUR 3,152,537,572 | | RUR 3,152,537,572 (USD 110 Million) |
| **Quercus** | RUR 3,031,422,237 | | RUR 3,031,422,237 (USD 106,033,825) |
| **Virtus** | RUR 2,359,700 | | RUR 2,359,700 (USD 82,538) |
| **Yuksar** | RUR 95,875,131 | | RUR 95,875,131 (USD 3. 353,544) |

| COMPANY | TAX BENEFITS | VAT | TOTAL |
|---|---|---|---|
| **Internft** | RUR 224,642 | | RUR 224,642 (USD 7,858)** |
| **Petroleum-Trading** | RUR 23,333,365 | | RUR 23,333,365 (USD 816,160) |

\*    "PN" indicates taxes considered unpaid as they were paid with promissory notes.

\*\*   Internft is ultimately removed from this list by the Decision of 26 May 2004, for not being legally "interdependent."[516]

521.   On the same day, 14 April 2004, a tax payment demand was issued to Yukos in the amount of RUR 80,179,841,454 (USD 2.8 billion).[517]   Payment was due just two days later, on 16 April 2004.   Also on 14 April 2004, a related fine was issued, imposing penalties in the amount of RUR 19,195,696,780 (USD 671 million).[518]   Payment of this sum was also due on 16 April 2004.   The total amount payable within two days by Yukos was thus approximately USD 3.48 billion.

522.   On 15 April 2004, the Tax Ministry registered its claim with the Moscow Arbitrazh Court.[519]   On the same day, a ruling of the Moscow Arbitrazh Court prohibiting Yukos from alienating and encumbering "in any way" its assets, including shares and other securities, was issued.[520]   Writs of enforcement were also issued.[521]   On 16 April 2004, a resolution of the bailiffs was issued and enforcement proceedings were commenced.[522]

523.   Yukos began parallel proceedings to those initiated by the Tax Ministry, challenging the 2000 Decision as unlawful.   On 19 May 2004, Judge Cheburashkina granted interim relief *suspending* the effect of the 2000 Decision, pending a judgment on the merits of Yukos'

---

[516]   Decision of the Moscow Arbitrazh Court, Case No. A40-17699-04-09-241, 26 May 2004, Exh. C-116.

[517]   Tax Payment Demand No. 14-3-05/1610-8, 14 April 2004, Exh. C-105.

[518]   Tax Penalty Payment Demand No. 14-3-05/1611-1, 14 April 2004, Exh. C-106.

[519]   Ruling of the Moscow Arbitrazh Court to proceed with a claim, to prepare the case for hearing, and to schedule preliminary hearing, Case No. A40-17669/04-109-241, 15 April 2004, Exh. C-107.

[520]   Ruling of the Moscow Arbitrazh Court on adoption of interim measures, 15 April 2004, Exh. C-108 (hereainfter "April 2004 Injunction").

[521]   Enforcement Writs of the Moscow Arbitrazh Court Nos. 370735, 16 April 2004; 370738, 15 April 2004; 370739, 16 April 2004; 370740, 16 April 2004, Exh. C-109.

[522]   Resolution of Bailiff D.A. Borisoff to initiate enforcement proceeding No. 11/5975, 16 April 2004, Exh. C-110.

petition in respect of the lawfulness of the 2000 Decision.[523]   In her decision, Judge Cheburashkina wrote that the seizure of such assets would "cause significant damage to the Applicant's activities and make it impossible to execute the judicial act" and that "the Applicant has presented evidence demonstrating that the consequences indicated in Article 90(2) of the RF Arbitrazh Procedure Code might arise, and that serious damage and disruption might be caused to production activities."[524]

524.   On 26 May 2004, Yukos made a motion in the collection proceedings (those initiated by the Tax Ministry) to join the Republic of Mordovia in those proceedings.[525]   The motion was not successful.   Presumably, Yukos sought the joinder of Mordovia, by far the major focus of its trading companies' activities and investments, in the expectation that Mordovian officials would support the legitimacy of Yukos' tax optimization procedures and attest to the value of Yukos' substantial investments in Mordovia.

525.   In the collection proceedings, the court had also denied Yukos' motion to stay the proceedings.[526]   In a decision dated 26 May 2004 and released on 28 May 2004, Judge Grechishkin of the Moscow Arbitrazh Court granted the Tax Ministry's petition, allowing the collection of tax arrears, interest and fines in the amount of RUR 99,375,110,548 (USD 3.48 billion) pertaining to the 2000 Decision.[527]

526.   Judge Grechishkin found that Yukos had acted in bad faith,[528] that the use by the trading companies of tax benefits was illegal because it was "not aimed at strengthening the economy of the Republic of Mordovia" but rather was used to "evade payment of taxes."[529]   The judge adopted the same reasoning as the Tax Ministry on the VAT issue, writing that:   "In order to use its right to the benefit, the taxpayer had to declare its right and confirm its right by documents in accordance with the current legislation. . . .   The taxpayer—OAO Yukos Oil Company—did not declare its desire to use its benefit either in 2000 or later."[530]   However, this

---

[523]   Ruling of the Moscow Arbitrazh Court to suspend the effect of Decision No. 14-3-05/1609-1 of 14 April 2004, Case No. A40-21839/04-75-276 p. 2, 19 May 2004, Exh. C-112.

[524]   *Ibid.*

[525]   Motion to join a third party to the proceeding, Case No. A40-17699-04-09-241, 26 May 2004, Exh. C-115.

[526]   Ruling of the Moscow Arbitrazh Court, Case No. A40-17699-04-09-241, 14 May, 2004, Exh. C-111.

[527]   Decision of the Moscow Arbitrazh Court, Case No. A40-17699-04-09-241, 26 May 2004, Exh. C-116.

[528]   *Ibid.*, p. 14.

[529]   *Ibid.*, p. 15.

[530]   *Ibid.*, p. 19.

judgment could not be executed by the Tax Ministry as the interim relief in the parallel proceedings prevented enforcement until a determination of the lawfulness of the 2000 Decision was made.

527.   On 11 June 2004, Judge Cheburashkina, the presiding judge in the case brought by Yukos against the lawfulness of the 2000 Decision, was challenged by the Tax Ministry for bias towards Yukos in the granting of interim relief on 19 May 2004.[531]   The Tax Ministry cited several reasons as a basis for her removal for bias towards Yukos, including:  the allegation that the interim measures "did not comply with the principles of justice in a democratic constitutional State";[532] the allegation that the judge granted a "recess solely for OAO Yukos Oil Company to file a petition to stay proceedings in the [parallel] case to collect tax arrears, interest and fines," which the Tax Ministry saw as "evidence of the Judge's interest in the outcome of the proceedings in favor of the taxpayer";[533] her "behavior" in the preliminary court proceedings;[534] the allegation that the judge declined the petition of the Tax Ministry to abandon these proceedings in favour of the other set of collection proceedings initiated by the Tax Ministry;[535] and the allegation that the Tax Ministry was not granted extra time to copy documents to bring to court.[536]   The challenge was upheld by the Moscow Arbitrazh Court the same day.

528.   On 15 June 2004, Judge O.R. Mikhailova, a deputy chair of the Moscow Arbitrazh Court, was appointed to replace Judge Cheburashkina.[537]   On 22 June 2004, Judge Mikhailova set the date of 19 July 2004 for the hearing of the merits phase of the case on the lawfulness of the 2000 Decision.  She also directed the Tax Ministry to provide originals of the documents rather than photocopies and to organize the documents, including explanations "in order to confirm which circumstances they support."[538]

---

[531]   Russian Federation Ministry of Taxes and Levies, Challenge to Judge N.P. Cheburashkina, Moscow Arbitrazh Court, Case No. 21839/04-76-276, 11 June 2004, Exh. C-117.

[532]   *Ibid.*, p. 2 (emphasis in original omitted).

[533]   *Ibid.* (emphasis in original omitted).

[534]   *Ibid.*

[535]   *Ibid.*, p. 3.

[536]   *Ibid.*, pp. 3–4.

[537]   Ruling of the Moscow Arbitrazh Court, Case No. 21839/04-76-276 p. 1, 22 June 2004, Exh. C-119.

[538]   *Ibid.*

529.  In the proceedings to initiate collection of the taxes assessed in the 2000 Decision, on 29 June 2004, a resolution of the Moscow Arbitrazh Court reduced the amount to be collected to approximately USD 3.42 billion.[539]

530.  In a decision dated 23 June 2004 but published on 30 June 2004, the interim measures granted by Judge Cheburashkina were annulled by an appeal panel of the Moscow Arbitrazh Court.[540] The court reasoned that as the Tax Ministry had not, at the time of the filing of the request, placed any direct collection orders in accordance with Article 46(4) of the Russian Tax Code on Yukos' bank accounts, the interim measures had been granted without the proper basis in law.[541] It also concluded that there were other specific procedures that could be followed under Article 91(1)(5) (in lieu of the interim relief granted under Article 90(2)) that did not require interim measures.[542]

531.  Also on 30 June 2004, a resolution of Bailiff Solovyova was issued initiating enforcement proceedings.[543] The bailiff then issued several more resolutions freezing cash in 16 Yukos bank accounts up to the total amount of taxes then due.[544]

532.  On 30 June 2004, the Tax Ministry obtained the reversal of the interim measures and initiated enforcement proceedings. On the same day, the Field Tax Audit Report for 2001 was released.[545] It assessed taxes, interest, and fines totaling approximately USD 4.1 billion.[546]

533.  On 1 July 2004, another resolution was issued by Bailiff Solovyova limiting Yukos' rights pertaining to securities of 37 production, refining, and research subsidiaries.[547]

---

[539]  Appeal Resolution of the Moscow Arbitrazh Court, Case No. A40-17699/04-109-241, 29 June 2004, Exh. C-121.

[540]  Appeal Resolution of the Moscow Arbitrazh Court, Case No. A40-21839/04-76-276, 23 June 2004, Exh. C-120.

[541]  *Ibid.*, p. 4.

[542]  *Ibid.*

[543]  Resolution of Bailiff I.D. Soloyvova to initiate enforcement proceeding No. 10249/21/04, 30 June 2004, Exh. C-123.

[544]  Resolution of Bailiff I.D. Soloyvova to seize monies No. 10249/21/04, 30 June 2004, Exh. C-124.

[545]  Repeat Field Tax Audit Report No. 30-3-14/1 (2001), 30 June 2004, Exh. R-345.

[546]  *Ibid.* at 132–33. The results of the audit will be discussed below at paragraphs 545–56, in connection with the Tax Ministry decision to which it relates.

[547]  Resolution of Bailiff I.D. Soloyvova to restrict the rights of the securities owner, 1 July 2004, Exh. C-125; *see also* Memorial ¶ 341.

534.  On 9 July 2004, Bailiff Solovyova issued a resolution for a seven percent enforcement fee for the proceedings relating to the 2000 Decision.[548]  The fee amounted to approximately more than RUR 6.8 billion (approximately USD 240 million).

535.  On 13 July 2004, further resolutions were issued by the bailiffs to seize Yukos' 14.5 percent stake in Sibneft which had been ordered by the Chukotka Arbitrazh Court as an interim measure in those proceedings.[549]  The Chukotka proceedings had been initiated by Mr. Roman Abramovich and they related to disputes following the Yukos–Sibneft aborted merger.  The Tribunal notes that while this seizure was not directly related to Yukos' trading companies, as will be seen later, it limited the options available to Yukos to satisfy the payment demands it was facing.

536.  On 14 July 2004, pursuant to another resolution of the bailiffs, 43 ordinary shares and 13 preferred shares of Yukos in YNG were seized.[550]  At the same time, a resolution to restrict the rights of the securities owner with respect to those shares was issued.[551]

537.  On 16 July 2004, Mr. Steven Theede sent a letter signed by Mr. Bruce Misamore to Mr. Alexei Kudrin, then Minister of Finance. In the letter, Yukos petitioned the Ministry, "[i]n consideration of the unprecedented nature of the sum that is subject to collection from OAO Yukos Oil Company" for deferral of, or the opportunity to pay in installments, the amount imposed by the collection decision of the Moscow Arbitrazh Court issued on 28 May 2004.[552]  When he gave evidence, Mr. Theede acknowledged that the letter was not perfect (the proposals did not have a great deal of detail) but he described the letter as an attempt "to create a dialogue [between Yukos and the Russian Federation]."[553]

538.  In the days leading to the Hearing on the Merits in the case brought by Yukos against the lawfulness of the 2000 Decision, certain statements were made "in the mass media relat[ing] to

---

[548]  Resolution of Bailiff I.D. Solovyova No. 10249/21/04 to collect an enforcement fee, 9 July 2004, Exh. C-132;

[549]  Resolutions of Bailiff A.Yu. Seregin to initiate enforcement proceedings Nos. 10599/10/04, 10603/10/04, 10606/10/04, 10607/10/04 and 10608/10/04, 13 July 2004, Exh. C-133; *see also* Memorial ¶¶ 225–28

[550]  Decision of the Moscow Arbitrazh Court, Case No. A40-36718/04-79-445, 6 August 2004, p. 2, Exh. C-141 (referring to 14 July 2004 seizure of Yukos' shares in Yuganskneftegaz (hereinafter "YNG").

[551]  *Ibid.*, p. 1.

[552]  Letter from Steven Theede to Alexei Kudrin, signed by Bruce Misamore, 16 July 2004, Exh. C-138.

[553]  Transcript, Day 10 at 53–55.

the [Yukos] case."[554]   The statements apparently included charges of bias against Judge Mikhailova because she had previously written articles for a magazine edited by one of Yukos' lawyers, Mr. Sergey Pepeliaev.[555]   While Judge Mikhailova denied the accusations of bias, she nonetheless asked to be recused.[556]   On 19 July 2004, the day Judge Mikhailova had originally scheduled a hearing on the lawfulness of the 2000 Decision, the Moscow Arbitrazh Court granted her request to resign.[557]

539.   On 6 August 2004, Yukos in-house counsel, Mr. Gololobov, sent a letter to the Chief Bailiff of the Russian Federation renewing Yukos' request to give priority to its 20 percent stake in Sibneft above other assets.   The same day, the Moscow Arbitrazh Court found that a 14 July 2004 bailiff's resolution to seize shares of YNG was issued in error and that, instead, Yukos' 20 percent stake in Sibneft should have been seized.[558]   The court ruled that federal law on enforcement proceedings outlines a priority order for enforcement against a debtor's assets and enforcement against lower assets is only possible when the higher assets are insufficient to settle the debts.[559]   Since the shares in YNG were of a lower priority than the more liquid Sibneft shares, they should not have been seized before the Sibneft shares.[560]   Claimants consider this to be a "rare victory" by Yukos before the Russian courts.[561]

540.   On 12 August 2004, a ruling of the Moscow Arbitrazh Court denied Yukos' petition to pay by installments the amount levied by the Moscow Arbitrazh Court on 28 May 2004.[562]   Five days later, the same court denied Yukos' application that the bailiffs undertake enforcement against its 34.5 percent stake in Sibneft before enforcement against other assets.[563]

541.   In a decision of 18 August 2004 released on 23 August 2004, Yukos' "rare victory" was overturned by the Ninth Arbitrazh Court of Appeal.   The court quashed the 6 August 2004

---

[554]   Ruling of the Moscow Arbitrazh Court, Case No. A40-21839/04 76-276, p. 1, 19 July 2004, Exh. C-139 (emphasis in original omitted).

[555]   *Ibid.*, p. 3.

[556]   *Ibid.*, p. 4.

[557]   *Ibid.*

[558]   Decision of the Moscow Arbitrazh Court, Case No. A40-36718/04-79-445, p. 26, 6 August 2004, Exh. C-141

[559]   *Ibid.*

[560]   *Ibid.*

[561]   Memorial ¶ 349.

[562]   Ruling of the Moscow Arbitrazh Court, Case No. A40-1397/04ip-109, 12 August 2004, Exh. C-142.

[563]   Decision of the Moscow Arbitrazh Court, Case No. A40-34962/04-94-425, 17 August 2004, Exh. C-143.

decision to give priority to enforcement against the 20 percent stake in Sibneft.  The court found that, as the shares in YNG had been issued by YNG after its privatization, they were not related to primary production and thus could be considered as a higher priority.[564]  As Yukos had not discharged its debt "voluntarily," the court found that the YNG shares were part of an inventory legally open to seizure by the bailiffs.[565]

542.  On 30 August 2004, the Tax Ministry sent a letter to Yukos, denying its request for deferred payment or payment by installments.[566]  This letter was in response to the letter intended to "create a dialogue" between Yukos and the Russian Federation sent more than a month earlier to the Finance Ministry by Messrs. Theede and Misamore.

543.  On 9 September 2004, five days after a decision reassessing taxes against Yukos for 2001, a letter from the Deputy Head of the Bailiffs Department notified the company that the arbitrazh courts had approved seizures against YNG and other production subsidiaries.[567]

544.  On 23 November 2004, the resolution of the Ninth Arbitrazh Court of Appeal of 16 November 2004 was issued.  It affirmed the lawfulness of the 2000 Decision.[568]

      **(b)**    **The 2001 Decision**

545.  On 2 September 2004, Decision No. 30-3-15/3 holding the taxpayer fiscally liable for a tax offense ("**2001 Decision**") was issued.[569]  It imposed the following taxes:

| COMPANY | TAX BENEFITS | VAT | TOTAL |
|---|---|---|---|
| **Alta-Trade** | RUR 1,271,988,200 | RUR 1,841,854,300 | RUR 3,113,842,500 (USD 106,437,232) |
| **Fargoil** | RUR 1,907,396,200 | RUR 3,170,995,300 | RUR 5,078,391,500 (USD 173,589,362) |

---

[564]   Resolution of the Ninth Arbitrazh Court of Appeal, Case No. 09AP-1554/04-AK, p. 4, 23 August 2004, Exh. C-144.

[565]   *Ibid.*, pp.4–5.

[566]   Letter from the Russian Tax Ministry to Yukos, 30 August 2004, Exh. C-145.

[567]   Letter from the Russian Ministry of Justice to Yukos, 9 September 2004, Exh. C-146.

[568]   Resolution of the Ninth Arbitrazh Court of Appeal, Case No. 09 AP-4078/04-AK, 23 November 2004, Exh. C-147.

[569]   2001 Decision, Exh. C-155.

| COMPANY | TAX BENEFITS | VAT | TOTAL |
|---|---|---|---|
| **Mars XXII (Energotrade)** | RUR 3,056,000 | RUR 18,009,000 | RUR 21,065,000 (USD 720,043) |
| **Ratmir** | RUR 1,787,339,500 | RUR 4,303,815,200 | RUR 6,091,154,700 (USD 208,207,590) |
| **Yukos-M** | RUR 1,723,009,600 | RUR 3,220,911,200 | RUR 4,943,920,800 (USD 168,992,890) |
| **Yu-Mordovia** | RUR 8,153,611,600 | RUR 8,470,436,200 | RUR 16,624,047,800 (USD 568,242,494) |
| **Mega-Alliance** | RUR 1,276,878,700 | | RUR 1,276,878,700 (USD 43,646,213) |
| **Ratibor** | RUR 5,729,645,900 | RUR 7,880,489,700 | RUR 13,610,135,600 (USD 465,221,075) |

546. It also assessed penalties and fines.

547. On the same day, a tax payment demand with respect to the 2001 Decision was issued in the amount of RUR 79,279,641,154 (approximately USD 2.7 billion).  Again, payment was due two days later, on 4 September 2004.[570]  A tax penalty was issued in the amount of RUR 40,607,549,520 (approximately USD 1.3 billion), which was also due on 4 September 2004.[571]  The total due by 4 September was thus approximately USD 4.1 billion.

548. On 3 September 2004, the petition of the Tax Ministry to collect tax penalties of RUR 40,607,549,600 (approximately USD 1.3 billion) was served on Yukos.[572]

549. On 6 September 2004, a decision was issued by the Interregional Inspectorate of the Tax Ministry.[573]  It ordered the automatic collection of the tax payment demand (approximately USD 2.7 billion) from Yukos bank accounts.  Three days later, on 9 September 2004, a resolution of Bailiff Borisov to initiate enforcement proceedings was issued.[574]  On the same

---

[570]  Tax Payment Demand No. 133, 2 September 2004, Exh. C-156.

[571]  Tax Penalty Payment Demand No. 133, 2 September 2004, Exh. C-157.

[572]  Russian Tax Ministry Petition to collect tax Penalties, 3 September 2004, Exh. C-158.

[573]  Decision No. 52/595, 6 September 2004, Exh. C-159.

[574]  Resolution of Bailiff D.A. Borisov to initiate enforcement proceeding No. 13022/11/04, 9 September 2004, Exh. C-161.

day, there was another resolution of Bailiff Borisov to join the enforcement proceedings for the 2000 Decision and the 2001 Decision.[575]

550.   On 16 September 2004, Yukos reiterated its petition for voluntary enforcement by the bailiffs against its holdings in Sibneft and non-core subsidiaries.[576]   No response was received from the bailiffs.[577]   The next communication received from the bailiffs was on 20 September 2004, when they issued a resolution to collect a seven percent enforcement fee— RUR 5,549,574,880.78 (approximately USD 190 million) for the 2001 Decision.[578]

551.   As it had done in respect of the 2000 Decision, Yukos challenged the lawfulness of the 2001 Decision.   Parallel proceedings were filed by the Tax Ministry for collection of the 2001 Decision.   Judge Dzuba ruled in favour of the Tax Ministry.[579]

552.   On 29 October 2004, a Field Tax Audit Report for 2002 was released.[580]   It assessed tax arrears, interest, and fines of approximately USD 6.8 billion.[581]

553.   On 12 November 2004, Yukos sent a letter to the Judicial Collegium of the Russian Federation complaining that its challenge to Judge Korotenko in the proceedings concerning the lawfulness of the 2001 Decision had not been heard.[582]   Yukos had challenged Judge Korotenko for bias, on the ground that he had presided over the appeal panel of the Moscow Arbitrazh Court which had made a decision in favour of the Tax Ministry in respect of the 2000 Decision.

---

[575]   Resolution of Bailiff D.A. Borisov to join into consolidated enforcement proceedings, 9 September 2004, Exh. C-162. The consolidated enforcement proceeding is No. 10249/21/04.

[576]   Yukos' petition for voluntary enforcement of Resolution of 09.09.2004 to initiate an enforcement proceeding and Demand of 30.06.2004, Exh. C-163.

[577]   Memorial ¶ 354.

[578]   Resolution of the Bailiffs, 20 September 2004, Exh. C-164. RUR to USD is approximate, based on an exchange rate of 29.2552:1, the exchange rate on 2 September 2004, the date that the payment demand was issued.

[579]   Memorial ¶ 261.

[580]   Field Tax Audit Report No. 52/852, 29 October 2004, Exh. R-346.

[581]   The results of the audit will be discussed below at paragraphs 557–65, in connection with the Tax Ministry decision to which it relates.   RUR to USD is approximate, based on a ratio of 28.6696:1, the exchange rate on 16 November 2004, the date the Payment Demand was issued for the 2002 Decision.

[582]   Letter from Yukos to Highest Judicial Qualification Collegium of the Russian Federation, 12 November 2004, Exh. C-165.

554.   In a hearing on 16-17 November 2004, Judge Korotenko denied Yukos' request to join the trading companies as third parties in the case against the 2001 Decision.[583]   Judge Korotenko also denied Yukos' motion to obtain an expert opinion on market prices of oil.[584]

555.   On 18 November 2004, the Moscow Arbitrazh Court, Judge Korotenko presiding, affirmed the legality of the two-day time limits set forth in the previous payment demands.[585]   The court also rejected the arguments relating to the "massive" amounts assessed and the short time granted for voluntary payment.   The court stated that "[t]he tax legislation does not stipulate any deadline for voluntary fulfillment by the taxpayer of the demand to pay taxes.   Upon issue of the Claim, the Inspectorate is entitled to stipulate a time period for its voluntary execution."[586]   This decision of the Moscow Arbitrazh Court was announced on the same day as a *one*-day payment demand, relating to Decision No. 52/896 holding the taxpayer liable for a tax offense ("**2002 Decision**"), became due.   It also affirmed the lawfulness of the 2001 Decision.

556.   Later, on 16 February 2005, a resolution of the Ninth Arbitrazh Court of Appeal of 9 February 2005, was issued.   It reduced the overall amount payable for 2001 by approximately USD 150 million.[587]   On 15 November 2005, the Federal Arbitrazh Court for the Moscow District also reduced, slightly, the amount of fines payable for 2001.[588]

     (c)     **The 2002 Decision**

557.   On 16 November 2004, the 2002 Decision was issued.[589]   It levied the following taxes:

| COMPANY | TAX BENEFITS | VAT | TOTAL |
|---|---|---|---|
| **Alta-Trade** | RUR 64,129,180 | | RUR 64,129,180 (USD 2,236,836) |

---

[583]   Moscow Arbitrazh Court, Transcript of the Hearing of 16–17 November 2004 in Moscow, Exh. C-166.

[584]   *Ibid*.

[585]   Decision of the Moscow Arbitrazh Court, Case Nos. A40-51085/04-143-92 and A40-54628/04-143-134, 17 November 2004, Exh. R-252.

[586]   *Ibid*. at 15.

[587]   Resolution of the Ninth Arbitrazh Court of Appeal, 16 February 2005, Exh. C-167.

[588]   Resolution of the Federal Arbitrazh Court for the Moscow District, Case No. A40-45410/04-141-34, 15 November 2005, Exh. C-168; *see* Memorial ¶ 257.

[589]   2002 Decision, Exh. C-175.

| COMPANY | TAX BENEFITS | VAT | TOTAL |
|---|---|---|---|
| **Fargoil** | RUR 20,705,417,918 | RUR 34,812,409,914 | RUR 55,517,827,832 (USD 1,936,470,262) |
| **Ratmir** | RUR 167,135,313 | | RUR 167,135,313 (USD 5,829,705) |
| **Yukos-M** | RUR 25,947,077 | RUR 260,150,323 | RUR 286,097,400 (USD 9,979,121) |
| **Yu-Mordovia** | RUR 104,408,575 | | RUR 104,408,575 (USD 3,641,787) |
| **Evoil** | RUR 29,678,098 | | RUR 29,678,098 (USD 1,035,177) |
| **Petroleum-Trading** | RUR 8,145,551 | RUR 59,464,184 | RUR 67,609,735 (USD 2,358,238) |
| **Ratibor** | RUR 260,150,114 | | RUR 260,150,114 (USD 9,074,076) |
| **OAO Yukos Oil Company** | | | RUR 33,789,516,238 |

558.   It also assessed penalties and fines.

559.   On 16 November 2004, a tax payment demand was issued in the amount of RUR 121,771,662,841 (USD 4.2 billion).  Payment was due on 17 November 2004—*one* day later.[590]  Similarly, on 16 November a tax penalty payment demand was issued in the amount of RUR 72,040,907,796 (USD 2.5 billion).  Payment was also due on 17 November 2004.[591]  The total amount due in one day was approximately USD 6.7 billion.

560.   On 18 November 2004, a decision was issued by the Tax Ministry to enforce and collect taxes and interest against the assets of Yukos.[592]  On the same day, Bailiff I.V. Kochergin initiated

---

[590]   Tax Payment Demand No. 175, 16 November 2004, Exh. C-176.

[591]   Tax Penalty Payment Demand No. 175/1, 16 November 2004, Exh. C-177.

[592]   Decision No. 52/900, 18 November 2004, Exh. C-178.

enforcement proceedings and joined these proceedings to the two earlier proceedings for 2000 and 2001.[593]

561.   On 19 November 2004, Field Audit Report No. 52/907 for 2003 was issued.[594]  It assessed tax arrears, interest and fines of approximately USD 5.9 billion.[595]

562.   On 24 November 2004, Yukos filed a petition for voluntary enforcement of the resolution of 18 November 2004.[596]  No response was received from the bailiffs.

563.   In relation to the 2002 Decision, there were no parallel proceedings:  only a single proceeding which addressed both the lawfulness and the collection of the 2002 Decision.  In a hearing on 8-9 December 2004, Yukos challenged Judge D.I. Dzuba, because, it submitted, the judge had "already formed a subjective negative opinion about OAO Yukos Oil Company as the guilty party" since he had presided over the collections case relating to the 2001 Decision.  The challenge was never heard by the court.[597]  On 16 December 2004, Judge Dzuba denied Yukos' request to obtain an expert opinion on oil market prices.[598]

564.   Between these events, on 9 December 2004, a resolution of the bailiffs to collect a 7 percent enforcement fee, RUR 2,737,919,857.85, was issued.[599]   On 23 December 2004, the court upheld the lawfulness of the 2002 Decision.

565.   On 30 June 2005, a resolution of the Federal Arbitrazh Court was issued, upholding earlier court decisions and reducing the overall amount payable for 2002 by USD 45.70 million.[600]

---

[593]   Resolution of Bailiff I.V. Kochergin to initiate enforcement proceeding No. 15315/4/04 and join it to consolidated enforcement proceeding No. 10249/21/04, 18 November 2004, Exh. C-179.

[594]   Field Audit Report No. 52/907, 19 November 2004, Exh. R-1583.  The results of the audit will be discussed below at paragraphs 566–74, in connection with the Tax Ministry decision to which it relates.

[595]   RUR to USD is approximate, based on a ratio of 27.8171:1, the exchange rate on 6 December 2004, the date the Payment Demand was issued for the 2003 Decision.

[596]   Yukos' petition for voluntary enforcement of Resolution 19.11.2004 to initiate an enforcement proceeding, Exh. C-180.

[597]   Transcripts of the Preliminary Hearing of the Moscow Arbitrazh Court, Case Nos. A40-61058/04-141-151 and A40-63472/04-141-162, Exh. C-181 and Exh. C-183.

[598]   Transcript of the Preliminary Hearing of the Moscow Arbitrazh Court, Case Nos. A40-61058/04-141-151 and A40-63472/04-141-162 p. 22, Exh. C-183.

[599]   Resolution of Bailiff I.V. Kochergin to collect a seven percent enforcement fee, 9 December 2004, Exh. C-182.

[600]   Resolution of the Federal Arbitrazh Court No. KA-A40/3222-5, Case Nos. A40-61058/04-141-151 and A40-63472/04-141-162, 30 June 2005, Exh. C-184. See also Memorial ¶ 260 n.384.

(d)     The 2003 Decision

566.   On 6 December 2004, Decision No. 52/985 holding the taxpayer fiscally liable for a tax offense was issued ("**2003 Decision**").[601]  It levied the following taxes:

| COMPANY | TAX BENEFITS | VAT | TOTAL |
|---|---|---|---|
| **Alta-Trade** | RUR 26,192,854 | | RUR 26,192,854 (USD 937,901) |
| **Fargoil** | RUR 22,549,425,143 | RUR 47,098,087,287 | RUR 69,647,512,430 (USD 2,458,096,703) |
| **Macro-Trade** | RUR 408,084,717 | RUR 46,810,044 | RUR 454,894,761 (USD 16,288,650) |
| **Energotrade (formerly Mars XXII)** | RUR 7,147,772,476 | RUR 6,826,447,412 | RUR 13,974,219,888 (USD 500,382,062) |
| **Ratmir** | RUR 8,345,945 | | RUR 8,345,945 (USD 298,848) |
| **Yukos-M** | RUR 135,201,343 | | RUR 135,201,343 (USD 4,841,224) |
| **Yu-Mordovia** | RUR 34,210,117 | | RUR 34,210,117 (USD 1,224,979) |
| **Evoil** | RUR 173,951,671 | | RUR 173,951,671 (USD 6,228,777) |
| **OAO Yukos Oil Company** | | | RUR 1,773,658,844 |

567.   It also assessed penalties and fines.

568.   On 6 December 2004, a tax payment demand was issued in the amount of RUR 101,464,118,510 (USD 3.6 billion).[602]  Payment was due one day later, on 7 December 2004.  A tax penalty payment demand was also issued on 6 December 2004, in the amount of RUR 68,939,326,976 (USD 2.4 billion).[603]  Payment of this amount was also due one day later,

---

[601]   2003 Decision, Exh. C-190.

[602]   Tax Payment Demand No. 186, 6 December 2004, Exh. C-191.

[603]   Tax Penalty Payment Demand No. 186/1, 6 December 2004, Exh. C-192.

on 7 December 2004.  The total due one day after the payment demands were issued was approximately USD 6 billion.

569.   On 8 December 2004, a resolution of the Tax Ministry was issued to enforce and collect taxes and interest against Yukos' assets.[604]  The following day, Bailiff Kochergin issued a resolution which initiated enforcement proceedings, and joined them to the previous enforcement proceedings.[605]

570.   On 16 December 2004, Yukos again petitioned for voluntary enforcement only against assets of first priority, and requested that the bailiffs not collect an enforcement fee.[606]

571.   The Tribunal notes that, on 31 January 2005, an Interpol "Red Notice" was issued against Mr. Vladimir Dubov, who at this time was living in Israel.  It noted that he was "accused of budgetary funds misappropriation."[607]

572.   On 28 April 2005, the decision was issued by the Moscow Arbitrazh Court[608] reducing the overall amount payable for 2003 by approximately USD 2.6 million.

573.   The Tribunal also notes that, on 16 May 2005, in another Russian court Messrs. Khodorkovsky and Lebedev were convicted of tax evasion and embezzlement.[609]

574.   On 5 December 2005, the Federal Arbitrazh Court for Moscow issued a resolution affirming a small reduction of fines for 2003 by a lower court.[610]

---

[604]   Resolution No. 52/999 of the Tax Ministry's Interregional Inspectorate for Major Taxpayers No. 1, 8 December 2004, Exh. C-193.

[605]   Resolution of Bailiff I.V. Kochergin to initiate enforcement proceeding No. 16305/4/04 and join it to consolidated enforcement proceeding No. 10249/21/04, 9 December 2004, Exh. C-194.

[606]   Yukos' petition for voluntary enforcement of the Resolution of 9 December 2004 to initiate an enforcement proceeding, 16 December 2004, Exh. C-195.

[607]   *Interpol Wants YUKOS V. Dubov and M. Brudno*, Kommersant, 31 January 2005, Exh. C-749.

[608]   Decision of the Moscow Arbitrazh Court, Case Nos. A40-4338/05-107-9 and A40-7780/05-98-90, 28 April 2005, Exh. C-196.

[609]   Judgment of the Meshchansky District Court for the City of Moscow, 16 May 2005, Exh. R-379.

[610]   Resolution of the Federal Arbitrazh Court for Moscow District, Case Nos. A40-4338/05-107-9 and A40-7780/05-98-90, 5 December 2005, Exh. C-197.  *See also* Memorial ¶ 264, n.393.

(e)   **The 2004 Decision**

575.   On 27 December 2005, a Field Tax Audit Report for 2004 was issued.[611] It assessed tax arrears, interest, and fines against Yukos at approximately USD 3.9 billion.[612]

576.   On 17 March 2006, Decision No. 52/292 was issued holding Yukos fiscally liable for the commission of a tax offence, ("**2004 Decision**").[613]   It levied the following taxes:

| COMPANY | TAX BENEFITS | VAT | TOTAL |
|---|---|---|---|
| **Macro-Trade** | | RUR 386,687,520 | RUR 386,687,520 (USD 13,901,072) |
| **Energotrade (formerly Mars XXII)** | | RUR 41,946,060,356 | RUR 41,946,060,356 (USD 1,507,923,556) |
| **Yukos Vostok Trade** | RUR 1,224,013,181 | RUR 7,436,494,011 | RUR 8,660,507,192 (USD 311,337,530) |
| **OAO Yukos Oil Company** | | | RUR 3,105,399,900 |

577.   The Tribunal notes that there are no documents in the record evidencing a tax payment demand or a tax penalty payment demand issued in respect of the 2004 Decision.

578.   However, on 21 June 2006, the Moscow Arbitrazh Court issued a decision[614] confirming the lawfulness of the Tax Ministry's claims relating to the arrears claimed in the 2004 Decision in the amount of RUR 66,391,719,284 (USD 2.4 billion).   On 18 August 2004, the Ninth Arbitrazh Court of Appeal issued a resolution, ordering a determination of the lawfulness of the 2004 fines in the amount of RUR 42,036,873,518 (USD 1.7 billion) in separate proceedings.[615]

---

[611]   Field Tax Audit Report No. 52/996, 27 December 2005, Exh. C-200.

[612]   RUR to USD is approximate, based on a ratio of 27.8171:1, the exchange rate on 17 March 2006—the date of the 2004 Decision.

[613]   2004 Decision, Exh. R-1539.

[614]   Decision of the Moscow Arbitrazh Court, Case No. A40-11836/06-88-35 "B", 21 June 2006, Exh. R-538.

[615]   Resolution of the Ninth Arbitrazh Court of Appeal No. 09AP-8628/2006 GK, 18 August 2006, Exh. C-336.

The lawfulness of the fines was eventually affirmed by the Moscow Arbitrazh Court on 6 October 2006.[616]

### (f)    Observation

579.   This chronology of the five tax assessments against Yukos for the years 2000–2004 and related decisions of the Tax Ministry, the Russian courts and the bailiffs is lengthy and tedious.  But it is very much part of the factual matrix which will inform the Tribunal when it answers the question posed at the outset of the chapter:  "Why would Russia have treated Yukos as it did if its purpose was to collect taxes?"

### 3.    The Taxes Assessed Against Yukos

580.   The principal taxes assessed against Yukos were profit tax and VAT.  Together they account for over 95 percent of the total amount of more than USD 24 billion including related fines and interest.  Details in relation to profit tax and certain other revenue-based taxes are provided in Subsection (a) below.  Details in relation to VAT are set out in Subsection (b) below.

### (a)    Profit Tax and Other Revenue-based Taxes

581.   As shown in the table below, for the tax years 2000 to 2004, the tax authorities imposed a demand for the payment of profit tax (including interest and fines) ranging from USD 261 million to USD 4 billion per year, for a total of **USD 9.5 billion**.  This represents some 39 percent of the total tax claims levied against Yukos in the reassessments for those years.  Other revenue-based taxes (also including interest and fines) assessed against Yukos added approximately USD 1 billion to the total.  The breakdown by individual tax year is as follows:[617]

| (IN USD BILLION) | 2000 | 2001 | 2002 | 2003 | 2004 | Total | % |
|---|---|---|---|---|---|---|---|
| Profit tax | 1.356 | 1.695 | 4.005 | 2.184 | 0.261 | 9.502 | 39.3 |
| Property tax | 0.006 | 0.010 | 0.009 | 0.013 | 0.003 | 0.039 | 0.2 |
| Road users tax | 0.258 | 0.002 | 0.001 | – | – | 0.261 | 1.1 |

---

[616]   Decision of the Moscow Arbitrazh Court, Case Nos. A40-37697/06-141-233 and A40-49860/06-127-206, 6 October 2006, Exh. C-201.

[617]   Figures derived from Details of Yukos' Alleged Tax Reassessments, Exh. C-593; *see also* Claimants' Opening Slides, pp. 62–63.

| (IN USD BILLION) | 2000 | 2001 | 2002 | 2003 | 2004 | Total | % |
|---|---|---|---|---|---|---|---|
| Tax for the maintenance of housing, social and culture facilities | 0.209 | – | – | – | – | 0.209 | 0.9 |
| Tax on sales of combustibles and lubricants | 0.570 | – | – | – | – | 0.570 | 2.4 |
| Advertisement tax | – | – | – | 0.006 | 0.002 | 0.008 | 0.03 |
| **Total** | **2.399** | **1.707** | **4.015** | **2.203** | **0.266** | **10.589** | **43.93** |

582. The reasoning by the tax authorities for the imposition of profit tax and the other sundry revenue-based taxes did not vary substantively from year to year.  For purposes of the present chapter, the Tribunal will therefore consider the documents relating to the 2000 tax year.

583. The 2000 Audit Report concludes that, during the year 2000, Yukos knowingly and deliberately operated a tax evasion scheme through the use of "sham dependent entities".  The Audit Report describes the "discovery"[618] of the scheme as follows:

> During the field tax audit, non-payment by OAO Yukos Oil Company of corporate profit tax, road users tax, property tax and housing support tax, arising from the use of an unlawful scheme involving evasion of tax through artificial creation of sham companies in the oil and oil product movement chain, which were registered in territories with a beneficial tax regime, was discovered.
>
> The aim of using this scheme was non-payment of taxes on the sum of revenue (income) received from the sale of oil and oil products.  For this purpose OAO Yukos Oil Company created sham dependent entities, which functioned as oil and oil product owners (hereinafter – the "owners").  These entities were registered in territories in which a beneficial tax regime applied (Closed administrative-territorial formations) [CATF], regions of the Russian Federation, providing tax benefits on investments).  OAO Yukos Oil Company had control over the operations, conducted by the oil and oil product "owners", by participating in the transactions as an intermediary (confirmed by documents shown in Attachment No. *14* to the field tax audit document) or by bringing in other entities dependent on OAO Yukos Oil Company to participate in transactions as an intermediary.[619]

584. The 2000 Audit Report continues:

---

[618]   According to Mr. Konnov the use of the term "discovered" at the end of the first paragraph of the cited passage of the Audit Report ("[…] non-payment […] of corporate profit tax […] arising from the use of an unlawful scheme involving evasion of taxes […] was discovered.") is a mistranslation.  Mr. Konnov suggested that the original wording in Russian is better translated as "the audit concluded or established that […]."  Transcript, Day 13 at 167; *see also* Respondent's Closing Slides, p. 97.

[619]   2000 Audit Report, pp. 7–8, Exh. C-103.

The audit established that the actual owner of the oil and oil products was OAO Yukos Oil Company. The oil was in fact acquired and transferred for refining, and the oil and oil products sold, by OAO Yukos Oil Company, as evidenced by the actual movement of oil and oil products from production entities to oil refineries or to oil bases controlled by OAO Yukos Oil Company, as confirmed in the trade and transport documents, and also the direct participation by OAO Yukos Oil Company in all the operations. The following also provides proof that the oil and oil products actually belonged to OAO Yukos Oil Company [*sic*] and that the tax evasion scheme applied by them was illegal:

- interdependence of persons participating in the transactions and their control by OAO Yukos Oil Company;

- registration of the "owners" in territories with beneficial tax regimes;

- non-activity by the "owners" in their places of registration;

- the fictitious commission payments to OAO Yukos Oil Company, which are much smaller than the actual payments made on the intermediary market;

- the understated prices of acquisition of oil from production entities and from other sham companies;

- the conduct of accounting in all the entities by OOO Yukos-Invest, or by Yukos-FBTs OOO, which are dependent on OAO Yukos Oil Company;

- the opening of accounts for all the entities in the same banks, which are dependent on OAO Yukos Oil Company;

- the utilisation of promissory note settlements between the entities, or settlements by means of mutual set-off.[620]

585.   The 2000 Audit Report goes into great detail in explaining the tax benefits that were claimed by each of the trading entities. The Audit Reports for subsequent tax years generally follow the same form. They audit OAO Yukos Oil Company and the trading companies. They are divided into separate sections for each trading company; some of the later reassessments also include sums assessed directly against OAO Yukos Oil Company. The sections on the trading companies generally begin with an overview of the incorporation, ownership, and capital of the company. They then affirm that the directors of the company and its operations are not based in the region in which it had been incorporated, which according to the authors of the Audit Reports, shows that the company could not benefit from preferential taxation agreements offered to companies operating in the low-tax regions. The reassessments then assert that the trading companies are "interrelated" and thus "dependent" on OAO Yukos Oil Company, thereby allowing OAO Yukos Oil Company to fraudulently claim taxation benefits.

586.   The 2000 Audit Report concludes in relation to the tax evasion by Yukos as follows:

The tax evasion by OAO Yukos Oil Company, through registration of sham companies in territories with preferential tax rates, with the exclusive aim of evading tax, and

---

[620]   *Ibid.*, pp. 8–9.

which . . . did not actually trade or engage in any activity in those territories or indeed anywhere else, or invest any money in the economies of the relevant constituent entities of the Russian Federation, and which, therefore, illegally applied the additional tax benefits, indicates that OAO Yukos Oil Company acted in bad faith.

According to the Russian Federation Constitutional Court's 25 July 2001 Ruling No. 138-O interpreting the provision contained in Article 3(7) of the RF Tax Code, in the area of taxation there is a presumption of good faith on the part of taxpayers.

As is evident from the above-mentioned Ruling, the presumption of taxpayer good faith, enshrined in the RF Tax Code, presupposes an obligation on the tax authorities to prove any bad faith on the part of taxpayers in the manner set out by the Russian Federation Tax Code, and to conduct the necessary audits in order to establish such bad faith with the aim of ensuring a balance between state and private interests.

Similar provisions are contained in RF Constitutional Court Rulings Nos. 4-O dated 10.01.2002 and 108-O dated 14.05.2002.

The Judgements of the Presidium of the RF Supreme Court of Arbitration Nos. 9408/00 dated 18.09.2001, 7374/01 dated 18.06.2002, 6294/01 dated 05.11.2002 and 11259/02 dated 17.12.2002, and a letter from the Deputy President of the RF Supreme Court of Arbitration No. S5-5/up-342 dated 17.04.2002, also point out the need to examine the question of bad faith on the part of taxpayers, that is, their commission of deliberate acts aimed at not fulfilling the constitutional obligation to pay taxes.

The above-mentioned circumstances, namely OAO Yukos Oil Company carrying out operations involving the purchase and sale of oil and oil products, indicate Yukos Oil Company's OAO bad faith, which evidences its deliberate actions in evading payment of taxes through the application of illegal schemes.

. . . According to the Regulations of 01.01.2000 on the accounting policy for the year 2000, in OAO Yukos Oil Company for purposes of taxation (in order to calculate corporate profit tax, value added tax, Road users tax and housing support tax) revenue from the sale of products and goods (work, services) was determined on the basis of actual payments.

For purposes of taxation revenue was indicated by the entity in the accounts in the line 010 of the account using form No. 2 "Profit and Loss Account" taking into account the Information on the procedure for determination of data indicated in line 1 of "Calculation of tax on actual profit" in a sum of RUR 36,396,312,000 (RUR 36,264,009,000 in Form No. 2, "Profit and Loss Account" + RUR 132,303,000 according to the Information on the procedure for determination of data indicated in p. 1 of "Calculation of tax on actual profit").

According to the data of the audit, revenue from the sale of goods (work, services) amounted to RUR 245,907,712,162.

Thus, the revenue from the sale of goods (work, services) in the sum of RUR 209,511,400,162 was understated as a result of non-indication in the accounting registers of the revenue which had been received as a result of utilising a scheme with the participation of sham entities which were dependent on OAO Yukos Oil Company and which had been created for the purpose of tax evasion on the part of OAO Yukos Oil Company . . . .[621]

587.   The 16 November 2004 decision of the Ninth Arbitrazh Court of Appeal upheld the 2000 Decision to hold Yukos liable for all these taxes.  The English translation of the judgment is 25 pages long.  The key passages, which the Tribunal believes should be set out so as to give

---

[621]   *Ibid.*, pp. 14–15.

visibility to the court's reasoning (which the Tribunal will consider later as part of the totality of the evidence), follow:

> OAO Yukos Oil Company did not agree with the decision of the Court and filed an appeal requesting that the decision of the Court of First Instance be quashed and that the presented claim be granted in full: to declare unlawful the Russian Federation Ministry of Taxes and Levies Decision No. 14-3-05/1609-1 of 14.04.2004 to Hold the Taxpayer Fiscally Liable for a Tax Offense.

> . . . The interested party, the Russian Federation Ministry of Taxes and Levies, argues that the Court of First Instance legally and justifiably found that the decision and resolution issued in Case No. A40-17669/04-109-241 [*i.e.*, the 26 May 2004 decision], which involves the same parties as Case No. A40-21839/04-76-276 [*i.e.*, the case before the Court of Appeal], established the legality and validity of the disputed RF Tax Ministry Decision, the circumstances surrounding OAO Yukos Oil Company's performance of actions aimed at evading taxes through the artificial formation of entities registered in territories with preferential tax rates and their "participation" in the chain of movement of oil and oil products, and the illegality and invalidity of OAO Yukos Oil Company's arguments regarding the illegality of the RF Tax Ministry's disputed Decision.

> . . .

> Pursuant to Article 69(2) of the RF Arbitrazh Procedure Code, facts established by the legally effective judicial act of an arbitrazh court in connection with a previously heard case do not need to be proven again when the arbitrazh court hears another case involving the same parties.

> The Court Decision of 26.05.2004 in Case No. A40-17669/ 04-109-241 established that the tax authority did not breach the requirements of Article 87 of the RF Tax Code when issuing Decision No. 14-3-05/1609-1 of 14.04.2004.   The Court found that RF Tax Ministry Decision No. 14-3-05/1609-1 of 14.04.2004 is consistent with the Russian Federation Tax Code, federal laws adopted pursuant to the RF Tax Code, and other tax laws that were in effect during the audit period.

> . . . The Court found that the entities registered in territories with preferential tax rates and named in the RF Tax Ministry's Decision (Yu-Mordovia OOO, Alta-Trade OOO, Ratmir OOO, Mars XXII OOO, Jupiter XXIV OOO, ZAO Yukos-M, Saturn XXV OOO, Yuksar OOO, Siberian Transportation Company OOO, Quercus OOO, Muskron OOO, Nortex OOO, Grace OOO, Colrain OOO, Virtus OOO, Plast OOO, Mitra OOO, Vald-Oil OOO, Business-Oil OOO, Staf OOO, Petroleum-Trading OOO) were related to each other and dependent on OAO Yukos Oil Company.   The relationship of all the entities and their dependence on OAO Yukos Oil Company, as one of the items of evidence of bad faith on the part of the Applicant which applied the illegal tax evasion scheme is also confirmed by the fact that the same individuals were the founders and (or) officers in the aforementioned entities.

> . . . The Court rightly found that control of the oil and oil-product transactions performed by the entities registered in territories with preferential tax rates was exercised OAO Yukos Oil Company by means of participation in the transactions as an intermediary or by means of involvement of other entities, dependent on OAO Yukos Oil Company, as intermediaries in the transactions.  The entities registered in territories with preferential tax rates concluded agency agreements for the purchase of crude oil with OAO Yukos Oil Company.  In turn, OAO Yukos Oil Company, acting on behalf of entities registered in territories with preferential tax rates, purchased oil from producing entities or from other suppliers.  Thereafter, the crude oil purchased via the agent (OAO Yukos Oil Company) was sold to buyers (Russian or foreign) via this same OAO Yukos Oil Company (as the commission agent or the agent) or transferred for refining to refineries which were subsidiaries of OAO Yukos Oil Company.  Apart from agency agreements, purchase and

sale agreements were drawn up for purchase of oil, according to conditions thereof, OAO Yukos Oil Company "sold" oil from the resources of its producing entities – OAO Yuganskneftegaz, OAO Samaraneftegaz, and OAO Tomskneft.  Unlike OAO Yukos Oil Company and its producing companies, which according to the customs cargo declarations were shippers, the entities registered in regions with preferential tax rates were not mentioned in the export documents.

The dependence of entities, registered in territories with preferential tax rates, on OAO Yukos Oil Company and the control by OAO Yukos Oil Company of all transactions is also confirmed by the fact that the records of all transactions associated with the purchase and transfer of oil for refining, as well as with the sale of oil and oil products (including accounting records) were kept by Yukos-Invest OOO and Yukos-FBTs, which are dependent on OAO Yukos Oil Company.  Furthermore, the entities registered in territories with preferential tax rates entered into production management service contracts with OOO Yukos RM, which is also dependent on OAO Yukos Oil Company.  The financial statements and tax filings were submitted to the tax authorities by post from the address at which OAO Yukos Oil Company was located according to the invoices.  Furthermore, this address was the mailing address of OOO Yukos-Moscow, which is the executive body of OAO Yukos Oil Company.

The accounts of all entities are opened with the same banks, i.e. OAO Trust Investment Bank, OAO Bank Menatep St. Petersburg and Bank Solidarnost, where OAO Yukos Oil Company was a shareholder.

In addition to concluding agreements on the purchase and sale of oil and oil products, these entities also conducted activities involving the purchase and sale of promissory notes, which they used in settlements with one another and with OAO Yukos Oil Company for oil and oil products.  Or by purchasing and selling promissory notes, these entities returned to OAO Yukos Oil Company funds supposedly earned for oil they sold.  Therefore, the business of these entities related to the purchase and sale of promissory notes is a business related to the purchase and sale of oil and oil products.  Therefore, the Court lawfully and justifiably rejected the Applicant's argument that the entities registered in territories with preferential tax rates engaged in business activities other than the sale of oil and oil products.

The Applicant's assertion that the determination of bad faith is possible exclusively in the instances of payment of taxes through insolvent banks is unfounded, as the finding that it is necessary for the tax authorities to conduct audits and determine bad faith was made by the Constitutional Court of the Russian Federation based on the interpretation of Article 3(7) of the RF Tax Code, i.e. the presumption of the taxpayers' good faith. From this follows the obligation of taxpayers to act in good faith when conducting any actions associated with the discharge of their tax liability and the right of the tax authorities to determine bad faith on the part of taxpayers committing actions (inaction) intentionally aimed at tax evasion.

In light of the foregoing circumstances, the Court rightly found that the owner of the oil and oil products was OAO Yukos Oil Company.  The purchase and transfer of the oil for refining and the sale of oil and oil products were actually carried out by OAO Yukos Oil Company as the owner.

. . . The Constitutional Court of the Russian Federation, in Ruling No. 138-O of 25.07.2001, points out that, according to the tenor of Article 3(7) of the RF Tax Code, the presumption of good faith on the part of taxpayers is in effect in the area of tax relations. For the purpose of determination of bad faith on the part of taxpayers, the tax authorities have the right—in order to ensure a balance between State and private interests—to carry out the necessary audit and to file with the arbitrazh courts claims that ensure the receipt of taxes into the budget.  In light of the above, in order to ensure a balance between State and private interests, the tax authorities have the right to conduct audits for the purpose of

> determination of the actual owner of sold property and for determination of bad faith on the part thereof, expressed in the application of a tax evasion scheme.
>
> The fact that OAO Yukos Oil Company had the rights of possession, use and disposal with respect to the oil and oil products, and at its own discretion performed with respect thereto any actions, including alienation, transfer for processing, etc. through sham entities dependent on OAO Yukos Oil Company was established by the legally effective judicial acts in Case No. A40-17669/04-109-241.
>
> The Court therefore rightly does not accept the argument of the Applicant and the third party regarding the non-compliance with law and the factual circumstances of the assessment of taxes to OAO Yukos Oil Company as the owner of the oil and oil products.
>
> . . .The circumstances established by the Court concerning the transactions of OAO Yukos Oil Company associated with the purchase and sale of oil and oil products and in their interconnection and collectively indicate bad faith on the part of OAO Yukos Oil Company, which is reflected in the intentional actions aimed at tax evasion by means of application of illegal schemes, as a result of which the RF Tax Ministry lawfully held OAO Yukos Oil Company liable pursuant to Article 122(3) of the Russian Federation Tax Code, for the intentional failure to pay or an incomplete payment of tax as a result of reduction of the tax base, other incorrect tax calculations, or other unlawful actions (inaction), in the form of a fine in the amount of 40 percent of the unpaid tax amount, as established by the judicial acts in Case No. A40-17669/04-109-241.
>
> . . .Therefore, the Moscow Arbitrazh Court in its decision legally and justifiably found that RF Tax Ministry Decision No. 14-3-05/1609-1 of 14.04.2004 to Hold the Taxpayer Fiscally Liable for a Tax Offense is legal and well-founded in part and complies with the Russian Federation Tax Code, federal laws adopted pursuant to the RF Tax Code, and other tax laws that were in effect during the audit period (the Russian Federation Law No. 2116-1 of 27.12.91 "On Corporate Profit Tax", the Russian Federation Law No. 1759-1 of 18.10.1991 "On Road Funds in the Russian Federation", the Russian Federation Law No. 2118-1 of 27.12.1991 "On Fundamentals of the Tax System", the Russian Federation Law No. 2030-1 of 13.12.1991 "On Corporate Property Tax" and the Russian Federation Law No. 1992-1 of 06.12.1991 "On Value Added Tax").[622]
>
> [emphasis added]

588. The Tribunal will discuss the key elements of this decision, notably its endorsement of the assessment of taxes against Yukos on the basis that Yukos was the "actual owner" of the oil and oil products, in Section VIII.B.5 below.

    **(b)**    **VAT**

589. As shown in the table below, for the tax years 2000 to 2004, the tax authorities imposed a demand for the payment of VAT (including interest and fines) ranging from USD 1 billion to USD 4 billion per year, for a total of **USD 13.59 billion**. This represents some 56 percent of

---

[622]    Resolution of the Ninth Arbitrazh Court of Appeal, Case No. 09AP-4078/04-AK, 16 November 2004, Exh. C-147.

the total tax claims levied against Yukos in the reassessments for those years.  The breakdown by individual tax year is as follows:[623]

| | | 2000 | 2001 | 2002 | 2003 | 2004 | Total | % |
|---|---|---|---|---|---|---|---|---|
| **VAT** | Tax Arrears | 0.49 | 0.99 | 1.24 | 1.93 | 1.73 | 6.38 | 26.39 |
| | Interest & Fines | 0.59 | 1.40 | 1.50 | 1.97 | 1.75 | 7.21 | 29.82 |
| | **Sub-total** | **1.08** | **2.39** | **2.74** | **3.90** | **3.48** | **13.59** | **56.2** |
| Other taxes | Tax Arrears | 1.19 | 0.75 | 1.91 | 1.16 | 0.16 | 5.17 | 21.38 |
| | Interest & Fines | 1.21 | 0.96 | 2.11 | 1.05 | 0.10 | 5.42 | 22.46 |
| | Sub-total | 2.40 | 1.71 | 4.02 | 2.21 | 0.26 | 10.59 | 43.8 |
| | TOTAL | 3.48 | 4.10 | 6.76 | 6.11 | 3.74 | 24.18 | 100 |

590.   The reasoning of the tax authorities for the imposition of VAT payments did not change from year to year.  For purposes of this chapter, the Tribunal will therefore consider solely the documents relating to the 2000 tax year.

591.   But before turning to the reasoning for the imposition of VAT payments on Yukos, the Tribunal will review some features of the VAT regulations of the Russian Federation.

592.   In Russia, VAT is a federal tax levied at uniform rates throughout the Federation. As a result, all companies pay VAT regardless of the region where they are registered, under identical terms and conditions.  There are accordingly no additional VAT benefits for companies incorporated in low-tax regions.  The applicable rate of VAT to oil and oil products was 20% in 2000 to 2003 and 18 percent in 2004.[624]

593.   If the products were exported, they were either exempt from VAT (2000) or subject to a zero percent VAT rate (2001 onwards).[625]  The zero percent rate is not automatic, but available when the taxpayer files a monthly or quarterly VAT return.[626]  It is common ground between the

---

[623]   Figures derived from Details of Yukos' Alleged Tax Reassessments, Exh. C-593; *see also* Claimants' Opening Slides, pp. 62–63.

[624]   First Konnov Report ¶ 56.  *See also* Articles 165(9) and 164(3), Russian Tax Code, Exhs. R-1484 and R-1483.

[625]   As a result, exporting companies did not charge VAT to their foreign customers and were entitled to the refunds on the VAT charged by their own suppliers.  *See* Dubov WS ¶ 37; *see also* Memorial ¶ 319.

[626]   First Konnov Report ¶¶ 53–58.

Parties that, in the years 1999 to 2003, the Yukos trading companies filed the VAT returns for their exports of oil.[627]

594.  The 2000 Decision notes that Yukos failed to reflect revenue from the sale of products "arising from the use of an unlawful scheme involving evasion of tax through artificial creation of sham companies in the oil and oil product movement chain, which were registered in territories with a beneficial tax regime."[628]  The 2000 Decision then states:

> The aim of using this scheme was non-payment of corporate profit tax value added tax, road users tax, tax on sales of fuel and lubricants (hereinafter referred to as F&L) and housing support tax on the sum of revenue (income) received from the sale of oil and oil products.[629]

595.  The VAT at issue was the VAT in relation to which the Yukos trading companies had already obtained an exemption or zero percent rate, not VAT that could be said to arise from new or additional transactions or from a finding that the oil or oil products had not actually been exported.   During his cross-examination at the Hearing, Mr. Konnov explained that the reasoning behind the imposition of VAT on Yukos is very clear from the original Russian-language version of the decision.  The 2000 Decision states (in the Russian language original) that it is Yukos, as the actual exporter, which must file the VAT return in order to get the VAT tax benefit which had earlier been granted to its trading entities. Mr. Konnov explained:

> A.    And then there is a sentence which I don't see in the English text, which says:
>
> > "Based on the foregoing, the actual export operations were conducted by OAO NK Yukos and tax claim were provided to ZAO Yukos-M."
>
> And that's the sentence on the point; for some reason it's not in the English text.
>
> So I agree maybe it's not a detailed sentence, but what it clearly tells to any tax lawyer, or to Yukos, I think: that Yukos – sorry, Yukos-M claimed the tax benefits and was provided the tax benefits, and the actual exporter who must file the return is Yukos.[630]

596.  In other words, while it was the trading companies that were set up in Yukos' tax structure as the entities exporting oil and oil products to purchasers abroad that filed VAT returns to claim the exemption or zero percent rate that applies to export transactions, and in spite of the fact

---

[627]   Memorial ¶¶ 320–21.  *See also* Decision No. 23 on partial refusal to refund/offset VAT (Alta-Trade), 15 June 2000, Exh. C-1110; Decision No. 48 to deny refunding (offset) VAT (Alta-Trade), 29 October 2001, Exh. C-1116; Decision No. 53 on partial refusal to refund/offset VAT (Mars XXII), 27 December 2004, Exh. C-1117.

[628]   2000 Decision, p. 1, Exh. C-104.

[629]   *Ibid*.

[630]   Transcript, Day 14 at 236.

that the trading companies had already qualified for the exemption or zero percent rate on the basis of duly submitted VAT returns, the tax authorities subsequently determined that Yukos itself was the "actual exporter", and that it was Yukos, instead of the trading entities, that had to qualify for the exemption or zero percent rate. Since Yukos had not filed the returns itself, it was deemed to have failed to file the VAT returns required to benefit from the exemption or zero percent rate.

597. The judgment of the Moscow Arbitrazh Court that confirmed the decision for the 2000 tax year rejected Yukos' appeal against the VAT assessments:

> The court does not accept the arguments of OAO Yukos Oil Company regarding unlawfulness of the RF Tax Ministry Decision No. 14-3-05/1609-1 of 14.04.2004 relating to assessment of the value added tax.  It follows from the RF Tax Ministry Decision that the tax authority assessed VAT reimbursed to entities registered in the territories with preferential tax rates upon their applications on export transactions.  Pursuant to Law No. 1992-1 of 06.12.1991 "On Value-Added Tax," effective during that period, exemption from payment of value-added tax when exporting goods (work, services) was a benefit. <u>In order to use its right to the benefit, the taxpayer had to declare its right and confirm its right by documents in accordance with the current legislation.  The taxpayer – OAO Yukos Oil Company – did not declare its desire to use its benefit either in 2000 or later.</u>[631]

> [emphasis added]

598. At the Hearing, Mr. Konnov described as follows "the essence" of the reasoning in the decision and subsequent judgment:

> [T]hat Yukos did not file tax return, and in the absence of the tax return it is not eligible for a 0% VAT rate.[632]

Mr. Konnov also confirmed at the Hearing that the same reasoning was applied for subsequent tax years.[633]

### 4. The Fines Assessed Against Yukos

599. As shown in the table below, for the tax years 2000–2004, the tax authorities imposed fines against Yukos ranging from USD 670 million to USD 2.5 billion per year, for a total of

---

[631] Decision of the Moscow Arbitrazh Court, Case No. A40-17669/04-109-241, 26 May 2004, p. 19, Exh. C-116.

[632] Transcript, Day 14 at 240.

[633] *Ibid.* at 240–51.

- 201 -

**USD 8.5 billion**.  This represents some 35% of the total tax claims levied against Yukos in the reassessments for those years.  The breakdown by individual tax year is as follows:[634]

|            | 2000 | 2001 | 2002 | 2003 | 2004 | Total | %     |
|------------|------|------|------|------|------|-------|-------|
| Tax Arrears | 1.68 | 1.74 | 3.15 | 3.09 | 1.90 | 11.55 | 47.73 |
| Interest   | 1.13 | 0.97 | 1.10 | 0.54 | 0.38 | 4.13  | 17.14 |
| **Fines**  | **0.67** | **1.39** | **2.51** | **2.47** | **1.46** | **8.50** | **35.13** |
| TOTAL      | 3.48 | 4.10 | 6.76 | 6.10 | 3.74 | 24.18 | 100   |

600. Article 122 of the Russian Tax Code establishes a taxpayer's liability for "non-payment or underpayment of taxes."  Pursuant to paragraph 1 of this provision, the sanction is a 20 percent fine on the unpaid amount of taxes.  Under paragraph 3 of this provision, this fine can be increased to 40 percent of the unpaid amount if the offense is committed intentionally. This fine has been referred to in this case as the "willful offender" fine. Under Articles 110(2) and 110(4) of the Russian Tax Code, the intention of a company requires, *inter alia*, that the awareness of the company's executives of the unlawful nature of their actions (or failure to act) be established.  Finally, under Articles 112(2) and 114(4) of the Russian Tax Code, the fines can be increased to 80 percent, concretely, be doubled, in cases of so-called "repeat" offenses, *i.e.* offenses committed by "a person, which has been previously held liable for a similar tax offense."[635]  This fine has been referred to in this case as the "repeat offender" fine.

601. Yukos was assessed both the "willful offender" and the "repeat offender" fines by the authorities.

602. The Tax Ministry, referring to Article 110(2) of the Russian Tax Code, claimed that for the year 2000, "[Yukos] deliberately committed the acts aimed at evading payment of taxes, and its officers were aware of the unlawful nature of such actions."[636]  On this basis, the fines on

---

[634]   Figures (in USD billions) derived from Details of Yukos' Alleged Tax Reassessments, Exh. C-593.  The fines levied in relation to unpaid VAT alone account for a total of some USD 4.8 billion for the tax years 2000–2004, with the balance of USD 3.7 billion levied in relation to all of the other types of taxes (the majority—USD 3.3 billion—of the remaining amount being levied in relation to profit tax).

[635]   Russian Tax Code, Part I, Exh. C-401.

[636]   2000 Decision, p. 8, Exh. C-104.

Yukos were doubled from the standard rate of 20 percent to 40 percent. Yukos was thus charged, by reference to Article 122(3), with a 40 percent fine on the amount of its alleged tax arrears.[637] The same reasoning was used by the tax authorities to impose fines on Yukos for the years 2001–2004.[638]

603.   The Tax Ministry then doubled the fines once more for the years 2001 to 2004 (the year 2000 being considered as the first "offense"), in order to reach an 80 percent fine on the alleged tax arrears. This was done on the basis of Articles 112(2) and 114(4) of the Russian Tax Code regarding repeat tax offenses.[639]

### 5.   Parties' Arguments and Tribunal's Observations

604.   In Chapter VIII.A of the present Award, the Tribunal has found that Yukos had run afoul of the tax authorities prior to December 2003 in some of the low-tax regions, notably in the ZATOs (Lesnoy and Trekhgorny) and in Kalmykia. The Tribunal noted earlier that Yukos had wound up its trading entities in Lesnoy and Trekhgorny, and merged them into two separate companies based outside of the ZATOs. These companies later merged to form Investproekt, based in yet another region of Russia. The shuffling of these companies, as the Tribunal observed in Chapter VIII.A, while completed before any decisions were issued against the companies for being shams and for their use of promissory notes to pay (and even overpay) its tax bills, does raise troubling questions which were never answered to the satisfaction of the Tribunal. It suggests that Yukos was aware of the vulnerability of its tax optimization scheme and took steps to minimize its exposure when elements of the scheme were being investigated. This evidence has been thoroughly reviewed and commented upon by the Tribunal in Chapter VIII.A.

605.   In principle, therefore, both Yukos and members of its management were exposed to further findings of civil and/or criminal liability in connection with these activities as there is no evidence in the record that any tax payable as a result of the investigation of the trading entities in the ZATOs was ever paid. It is in this context that the Russian Federation charged

---

[637]   *Ibid.*

[638]   2001 Decision, p. 157, Exh. C-155; 2002 Decision, p. 166, Exh. C-175; 2003 Decision, p. 144, Exh. C-190; 2004 Decision, pp. 89–90, Exh. C-200.

[639]   2001 Decision, pp. 163–64, Exh. C-155; 2002 Decision, pp. 165–66, Exh. C-175; 2003 Decision, p. 144, Exh. C-190; 2004 Decision, p. 89, Exh. C-200.

Messrs. Khodorkovsky and Lebedev with tax offenses, and reassessed taxes against Yukos as of December 2003.

606. In this section, the Tribunal considers the Parties' specific arguments in respect of each element of the tax assessments that began in December 2003 and continued at a very rapid pace throughout 2004 (covering the tax years 2000 through 2004). As described in the earlier subsections of the present chapter, these elements included assessments for profit tax and other revenue-based taxes, VAT and fines. While the Tribunal considers the Parties' arguments for each discrete element of the tax assessments, ultimately its conclusions are based on a consideration of the tax assessments as a whole as well as the two trials and convictions of Messrs. Khodorkovsky and Lebedev. The Tribunal adopts this totality-of-the-evidence approach for several reasons.

607. Firstly, the Parties' arguments regarding the tax assessments rest on all-or-nothing propositions. On the one hand, Claimants argue that the tax assessments *as a whole* were conceived and crafted to fabricate debt "under the guise of taxes," and in amounts deliberately large enough to bankrupt Yukos. Respondent, on the other hand, insists that the tax assessments were *entirely* legitimate, and that Yukos' demise was self-inflicted.

608. Secondly, the discrete elements of the tax assessments are, in fact and in law, closely intertwined. For example, as explained in greater detail below, the enormous liability imposed on Yukos for non-payment of VAT (and for the multiple fines associated with their non-payment) was made possible only because the revenues of Yukos' trading entities were "re-attributed" to Yukos itself. It would therefore be artificial to deal with the complexity of this case by deconstructing the various elements of the tax assessments without, in the end, taking the broader perspective that is required to properly appreciate each one of them.

### (a) Profit Tax and Other Revenue-Based Taxes

#### i. Introduction

609. Claimants submit that the revocation of regional tax benefits on revenue-based taxes (principally the regional and local shares of profit tax) was the first step in the Russian Federation's fabrication of taxes targeting Yukos. Claimants argue that the revocation of these benefits was arbitrary because (a) such benefits were expressly provided for in Russian federal and regional legislation with which the Yukos entities complied, and (b) the tax benefits were

known to and approved by the relevant authorities (with whom, in some cases the trading entities entered into tax investment agreements).[640]

610. Respondent submits that the Russian Federation's revocation of the tax benefits was a legitimate and appropriate response to Yukos' tax optimization scheme under Russia's anti-abuse doctrine.  Respondent contends that all of the Yukos trading entities were sham letter-box companies, with no assets, employees or operations of their own, that were managed by Yukos itself.[641]

### ii. Was the "Bad-Faith Taxpayer" Doctrine Available at the Time of the Yukos Tax Assessments to Challenge a Tax Evasion Scheme?

611. As an initial matter, the Tribunal notes that it has already confirmed, in Chapter VIII.A of the present Award, that the "bad-faith taxpayer doctrine" existed in the Russian Federation at the time of the issuance of the 2000 Tax Audit in December 2003 and, therefore, at the time of subsequent audits as well.[642]  Indeed, even Claimants acknowledged the existence of the doctrine.[643]

612. Claimants cannot, therefore, impugn the Russian Federation's revocation of the benefits related to profit tax solely on the basis that the low-tax regions were competent to grant such tax benefits under that applicable legislation, and that "no breach of that legislation has been alleged."[644]  However, such an argument does not seem to take account of the impact of Russia's anti-abuse doctrine or "bad-faith taxpayer" doctrine which, as the Tribunal has already concluded, may constitute a ground for the reassessment of a party's tax liabilities.

613. The Tribunal recalls however that, at the time of the tax assessments against Yukos, the "business purpose" doctrine (a variant of the "substance over form" and "bad faith taxpayer" doctrines) had not yet been explicitly adopted into Russian law.  As noted earlier in Chapter VIII.A, the "business purpose" doctrine was not adopted until October 2006, in Resolution No. 53 dated 12 October 2006 of the Plenum of the Russian Supreme Arbitrazh Court.  As also mentioned in Chapter VIII.A, Russian tax scholars and practitioners appear

---

[640]   Claimants' Opening Statement, pp.  49–80; Claimants' Post-Hearing Brief ¶¶ 7–11.

[641]   Respondent's Opening Statement,  pp. 11–22.

[642]   *See* above at paragraph 497.

[643]   Reply ¶¶ 219–28.

[644]   Claimants' Post-Hearing Brief ¶ 7.

divided as to whether Resolution No. 53 represented a break with the doctrines that existed at the time of the Yukos assessments, or was a natural evolution of those doctrines.

614.   The Tribunal, recalling that Mr. Pepeliaev alluded to something akin to the "business purpose" doctrine in his commentary on Constitutional Court Ruling 138-O (published in 2002), is of the view that it was open to the Russian authorities and the courts to rely on the "bad faith taxpayer" doctrine to challenge a tax evasion scheme at the time of the Yukos tax assessments, whether based on "substance over form" or "business purpose."  Although this was an area of the law that was evolving at the time, this alone cannot be determinative.  Indeed, the anti-abuse doctrine was a judicial doctrine, and the Tribunal does not consider it appropriate to criticize the Russian Federation only because such a doctrine had not yet fully crystallized.  To the contrary, the circumstances surrounding Yukos' tax optimization scheme suggest to the Tribunal that this is precisely the kind of case in which the doctrine could be relied upon by the authorities and the judiciary.  Nevertheless, Claimants argue that the decision to revoke the profit tax benefits was illegitimate because of the manner in which the "bad-faith taxpayer" doctrine was applied.  In particular, Claimants submit that the "re-attribution" of the trading companies' revenue to Yukos was unprecedented and had no basis in law.  Further, Claimants submit that there were glaring violations of due process throughout the tax assessment and tax enforcement proceedings.  The Tribunal addresses each of those arguments in turn.

### iii.   Was "Re-attribution" an Appropriate Remedy to Apply to Yukos?

615.   Claimants argue that the authorities should have applied the transfer-pricing rules of Articles 20 and 40 of the Russian Tax Code to address any concerns about Yukos' avoidance of tax in the low-tax regions.  Instead, the authorities "re-attributed" to Yukos the revenues of all of its trading companies.  According to Claimants, this remedy was unprecedented, had no basis in law and was obviously another ploy in the Russian Federation's fabrication of taxes against Yukos.[645]

616.   As mentioned, Claimants submit that the proper decision, and indeed the only decision, that the tax authorities should have issued would have been to apply the transfer-pricing provisions of Articles 20 and 40 of the Russian Tax Code.  In this context, in their Post-Hearing Brief, Claimants argue as follows:

---

[645]   Claimants' Opening Slides, p. 60.

11.   Similarly, the Respondent's attempt to dismiss the relevance of the ubiquitous references to Yukos in the tax authorities' documentation relating to the trading companies ignores the realities of the Russian context.  There was no domestic market for crude oil in Russia, and as Dresdner observed, "[o]il sales on the Russian internal market consist[ed] mainly of internal sales between the sister companies of the large integrated Russian oil companies".  In this context, when conducting a tax audit of a company whose activities consisted of trading crude oil produced by Yukos' production companies, it would have been natural for the tax authorities to examine whether the trading company and the production company were "interdependent" under Article 20 of the Tax Code, and if so, whether the sales transactions complied with the transfer pricing provisions of Article 40. This is precisely what the tax authorities did, finding no violations of Article 40 prior to the December 2003 Audit Report.[646]

617.  Claimants add:

Mr. Konnov has conceded that the transfer pricing provisions of Articles 20 and 40 were available to the tax authorities and, although cumbersome to apply, could have fully dealt with any allegedly improper tax savings, yet as he has confirmed, the tax authorities never offered any explanation as to why they did not use Article 40 and instead invented a re-attribution theory.  As Mr. Savseris has written, referring specifically to the Yukos case, it was wholly inappropriate for the tax authorities to resort to judicial doctrines to address a situation covered by these express statutory provisions, noting that "[i]f the generally established principles in the West for the application of judicial doctrines were respected, this would have been impossible".[647]

618.  During the Hearing, Respondent asserted that re-attribution "is an entirely appropriate application of the 'substance over form' anti-abuse doctrine."[648]  Respondent referred to what it called "pre-December 30, 2003 cases" (*Bashkirian refineries* case (2003–2005); Lukoil (2002) and VAT cases) as well as what it called "post-Yukos authorities" (*Korus-Holding* (2005–2006), *MIAN* (2007–2008) and *Syktyvkarsky Milk Factory* (2008–2009)).[649]

619.  However, Mr. Konnov, when asked a specific question by the Chairman of the Tribunal, had great difficulty in explaining the existence of a pre-Yukos precedent for the re-attribution that was imposed on Yukos with the assessments.  Claimants recall this incident in their Post-Hearing Brief in the following words:

---

[646]   Claimant's Post-Hearing Brief ¶ 11 (citing Transcript, Day 15 (Konnov) at 177:6-180:7; Accounts Chamber of the Russian Federation, Analytical Note "On the Economic and Financial Situation of Natural Monopolies", 2003, p. 183 (noting "the absence of a full-fledged domestic market of crude oil in the Russian Federation"), Exh. C-416; ZAO Dresdner Bank Valuation Report of Yuganskneftegaz, 6 October 2004, p. 95, Exh. C-274 (hereinafter "Dresdner Valuation Report"); Table:  Field tax audits of Yukos' trading companies in Mordovia, April 2002–October 2003 (noting that audits of Fargoil and Mars XXII in 2003 found no violations of Art. 40), Exh. C-1758).

[647]   Claimant's Post-Hearing Brief ¶ 40 (citing Transcript of Mr. Konnov's cross-examination in the *Quasar* arbitration, 24 October 2011, pp. 55–56, 58–59, Exh. C-1697; S.V. Savseris, "Bad Faith of the Taxpayer as Judicial Doctrine Against Tax Evasion" (2005), p. 5, Exh. C-1748).

[648]   Respondent's Closing Slides, p. 105.

[649]   *Ibid.* pp. 105–15.  *See also* First Konnov Report ¶¶ 50–51.

> *First*, as the Tribunal will recall, when asked point blank by the President to identify a precedent for reattribution, Mr. Konnov was unable to do so. The next day Mr. Konnov sought to "correct" this answer by referring to cases involving the "Bashkirian oil refineries" and a Lukoil assessment that never went to court. However, Mr. Konnov then corrected the correction by noting, with respect to the Bashkirian cases, that "the court decisions . . . are not particularly helpful because the lower court decided in favour of the taxpayer, and only in 2005 the court decided in favour of the tax authorities."[650]

620. Having reviewed the decisions cited by Respondent, the Tribunal concludes that none of them is truly apposite to Respondent's argument:

(1) the "*Bashkirian refineries* case": in this case (cases, actually), the tax authorities did "re-attribute" sales revenue from a Baikonur entity to the three selling oil refineries, and they did so by assessments dated 16 July 2003. However, these assessments were overturned, in each of the three cases, by the first instance arbitrazh court in November 2003, and the tax authorities' appeals in early 2004 were initially unsuccessful. It was only in 2005 that the Supreme Arbitrazh Court overturned the lower court decisions, and upheld the July 2003 assessments (Exhibits R-1488, 1489, and 1490). Thus, this case cannot serve as a pre-Yukos precedent.

(2) the "*Lukoil* case": this case involved the invalidation of a lease between OAO Lukoil-Ukhtan'eftepererabotka and a Baikonur shell, and the resulting claim against the former for taxes. While the court decisions (first instance, appellate and cassation levels) all date back to 2002, they do not show that the taxes of the Lukoil entity were "re-attributed" to Lukoil. In the view of the Tribunal, therefore, this case does not support Respondent's re-attribution theory.

(3) the "VAT cases": Respondent argues that "[b]oth before and after the Yukos assessments, the Russian tax authorities routinely assessed VAT on purchasers with respect to revenues representing value that had been added by their suppliers, rather than the purchasers themselves."[651] Respondent points to one pre-Yukos example in the record, a decision that dates from 22 September 2003 (Exhibit R-3372). On the Tribunal's reading of this decision, it is difficult to make out the re-attribution from seller to purchaser, since the

---

[650] Claimant's Post-Hearing Brief, ¶ 38 (citing Transcript, Day 14 at 221–23 (Mr. Konnov) ("I don't think I can give you any reference to the pre-Yukos precedent where attribution was applied in an identical way."); Transcript, Day 15 at 83–84 (Mr. Konnov); Transcript, Day 15 at 215 (Mr. Konnov)). Claimants cite their Reply ¶ 233 to note that: "Moreover, these alleged precedents involved alleged evasion of excise taxes rather than alleged abuses of profit tax incentives, and were decided on entirely different legal grounds." *Ibid.* n.85.

[651] Respondent's Closing Slides, p. 110.

Court's attention is quite definitely on the purchaser in its analysis of the transaction. In any event, it is not a situation which is at all analogous to the Yukos case.

621. By contrast, the *Korus-Holding* case appears to be on all fours with the Yukos case, in terms of the re-attribution remedy, but it was decided in 2006, well after the assessments against Yukos in 2003 and 2004.

622. The Tribunal notes another factor that supports Claimants' position, namely the contrast between the first and second decisions involving Investproekt. In the first decision, dated 2 April 2002,[652] the tax authorities refused to impose any tax liability on Investproekt for the past tax offenses of Business-Oil, Vald-Oil, Forest-Oil and Mitra. In the second decision, dated 8 August 2003,[653] Investproekt was held liable for those offenses. The Tribunal observes that the basis for reversing, in August 2003, the earlier decision of April 2002, was not explained in the August 2003 decision,[654] and the latter decision followed soon after the arrest of Mr. Lebedev on 2 July 2003. Moreover, neither of these earlier assessments purported to re-attribute the tax burden to Yukos, but rather to the successor entity of the trading companies— Investproekt.

623. Regarding the transfer-pricing provisions of the Russian Tax Code as a proposed alternative remedy for whatever mischief is connected to the use of the Yukos trading entities, Respondent in its Rejoinder argues:

> 701. Claimants suggest that the "proper course of action" for the authorities "would have been to pursue" Yukos' trading shells as opposed to Yukos. But the tax authorities looked to the economic substance and concluded that Yukos was the real taxpayer. That was both legally and practically sensible. As illustrated by the authorities' inability to collect unpaid taxes from the Lesnoy trading shells, Yukos deliberately engineered its scheme so that its trading shells, if they were ever audited and reassessed, would have no assets with which to pay any such assessment, with the result that Yukos' fraudulent scheme would have enjoyed *de facto* impunity. Yukos was at all times the real party in interest in the challenged transactions. It was thus entirely appropriate for the tax authorities to pursue their claims against it, instead of the trading shells it had created to evade taxes.
>
> 702. Equally unavailing is Claimants' reliance on Article 40 of the Tax Code. The Yukos "tax optimization" scheme was not an ordinary "transfer pricing" scheme, but rather a tax evasion scheme involving the abusive exploitation of the low-tax region program through dozens of sham entities which had no genuine business operations. It was therefore entirely appropriate for the authorities to challenge that scheme by reference to anti-abuse rules, rather than the transfer pricing rules set forth in Article 40, insofar as

---

[652] Decision No. 02-11/1/1, 2 April 2002, Exh. R-303.

[653] Decision No. 2.6-23, 8 August 2003, Exh. R-305.

[654] *Ibid*.

> Yukos had deliberately constructed its tax evasion scheme so as to circumvent the application of Article 40, including by (a) using chains of shells which increased the likelihood that, if audited, each link in the chain could avoid an assessment under the 20% "safe harbor," and (b) owning most of the trading shells through call options, offshore companies, and other devices, which would make it more difficult for the authorities to establish an "interdependence" within the technical meaning of Article 40 between Yukos and its trading shells.[655]

624. During the Hearing, Respondent argued that the "substance over form" doctrine would be illusory if re-attribution were precluded, since it would permit tax evasion with impunity as the taxpayer could simply cause the relevant income or revenues to be recorded, on paper, in the books of a judgment proof domestic affiliate or a foreign affiliate that was solvent but territorially beyond the reach of any enforcement measure.[656]  Respondent also referred to other jurisdictions where a "general anti-avoidance provision" allows the tax authorities to allocate "any income" to "any person" in connection with "an avoidance transaction".[657]

625. The Tribunal sees some merit, in principle, to Respondent's argument that the "anti-abuse" doctrine would be eviscerated if the tax authorities were unable to attribute income to the person responsible for the wrongdoing.  The Tribunal also notes with interest Respondent's reference to the anti-avoidance provisions of other countries, such as the United States, France, Germany, Canada and Australia, which grant the taxation authorities similar powers, as well as to some decisions from other jurisdictions.[658]  In the Russian context, however, it is clear to the

---

[655]    Rejoinder ¶¶ 701–702 (citing ¶¶ 599, 597–600 of Rejoinder; Second Konnov Report ¶¶ 19, 24–25 and 63). Respondent also notes:  "This also confirms the lack of merit in Claimants' contention that Respondent's "multiple allegations about non-arm's length pricing […] contradict" Respondent's "concession that Yukos' alleged tax liabilities [are] not premised on any violation of transfer pricing rules" [citing Reply ¶ 214].  In reality, there is no such contradiction, because it is well-settled in Russian tax law that the transfer pricing rules set forth in Article 40 of the Tax Code are not the exclusive remedy available to the Russian tax authorities to combat abusive tax practices based on price manipulations (see First Konnov Report ¶¶ 40–44).  In other countries too, the general view is that the existence of specific statutory anti-avoidance rules does not prevent the authorities from deploying their anti-abuse arsenal, including general anti-avoidance rules, whether enacted by statute (as is the case, for instance, in Germany) or developed by the judiciary (as is the case, for instance, in the United States) . . . .

In the Yukos case, the authorities' reliance on alternative theories of liability was not only proper but particularly appropriate, because the Yukos tax evasion scheme was deliberately engineered so that Yukos, through its trading shells, could circumvent the transfer pricing rules, which require an under- or over-statement of prices of more than 20 percent of the market price.  Yukos evaded those rules by running inventories through chains of multiple trading shells in a series of nominally independent transactions, none of which individually exceeded the 20 percent threshold. See Protocol of Witness Interrogation of Vladislav P. Brazhkov (15 February 2008), 4, 6 (Exh. R-3370)." Ibid. n.1098

Respondent further notes:  "Yukos' internal communications confirm that it was a "headache" for Yukos' employees to ensure that the transactions among the trading shells were structured to prevent detection of the scheme by the tax authorities. [citing Counter-Memorial ¶ 304 and e-mail from A.V. Brazhkov to A.P Kuchusheva, 9 October 2001, Exh. R-325]." Ibid. n.1099.

[656]    Respondent's Closing Slides, p. 115.

[657]    Ibid. p. 118.

[658]    Respondent's Opening Slides, pp. 95–103.

Tribunal that there was no precedent for re-attribution at the time that the tax assessments and related decisions were issued in respect of Yukos.

626. Moreover, the Tribunal could have been persuaded to accept Respondent's argument if the tax authorities had only imposed revenue-based taxes against Yukos on the basis of re-attribution. However, and as already noted, the tax authorities attributed to Yukos the trading companies' revenues while, at the same time, refusing to attribute to Yukos the trading companies' VAT refunds and it did so for purely technical reasons.  This leads the Tribunal to the conclusion that the authorities used the "re-attribution" formula not only so as to be able to collect the revenue-based taxes, but also so as to establish a basis for imposing the massive VAT liability and excessive fines that followed.

627. In short, the Tribunal accepts the following conclusion, as expressed in paragraph 41 of Claimants' Post-Hearing Brief:

> The obvious explanation for the Respondent's use of a novel and arbitrary re-attribution theory rather than correctly applying existing law on interdependence and transfer pricing is that this was not a *bona fide* exercise of taxation powers; instead, the novel re-attribution theory provided a pretext to impose US$ 13.59 billion in VAT claims that, as Mr. Konnov confirmed, could not have been made in the absence of the unprecedented re-attribution of revenues.[659]

### iv.    Did the Russian Federation Violate Due Process?

628. Claimants submit that the Russian Federation violated due process by (a) ensuring that the courts were obedient and did not question the legality of the tax assessments; (b) ensuring that Yukos could not present its case; and (c) ensuring that neither the trading companies nor the Mordovian authorities could participate in the proceedings.

629. Regarding the legality and legitimacy of the tax assessments which Claimants say the courts should have scrutinized, the Tribunal recalls its finding in Chapter VIII.A that, during the period relevant for the tax assessments against Yukos (2003–2004), the "bad faith taxpayer" doctrine included the following principles:

- The good faith (honesty) of the taxpayer is presumed.
- The tax authorities have the burden to prove the taxpayer's bad faith (dishonesty), and in doing so "may not construe the concept of 'good faith taxpayers' as imposing on the taxpayer additional obligations which are not provided for in the legislation."

---

[659]    Claimant's Post-Hearing Brief ¶ 41 (citing Transcript, Day 15 at 94–95).

630.   In the view of the Tribunal, questions can be asked about whether the tax assessments disclose a record establishing that the tax authorities discharged their burden of proving Yukos' bad faith in respect of all the trading entities said to be an integral part of its tax evasion scheme. Some of these questions were raised by Yukos' tax lawyers immediately after the 2000 tax assessment was issued.  They commented:

> The act of inspection of OAO NK YUKOS contains the amounts of revenues of each company however it is absolutely unclear what control actions produced this information and what documents confirm it, etc.[660]

631.   This question was developed in the Objections against the tax assessment filed by Yukos on 12 January 2004.  Under objection no. 6 ("Breach of the procedure for conducting an audit"), Yukos complained that the auditors referred to materials from the criminal case, but did not indicate "what specific documents of the criminal case confirm the fault of the taxpayer."[661] Yukos' detailed objection continued:

> Attention should also be paid to the failure to analyze and indicate taxation objects on additionally assessed taxes for all re-assessments under 17 companies.  Furthermore, audit materials do not contain any source documents (waybills, statements, commercial invoices, etc.) and does not contain contracts for sale and purchase of goods and information about payment for goods.  At the same time the auditors concentrated only on the matter of unlawfulness of tax benefits' application, although does not review at all the basic matter that shall be proved in the course of tax audit - the value of taxation objects of these 17 companies.  It should be mentioned that it is impossible to state the fact of non-payment of taxes without analysis of business operations and economic results obtained thereunder (revenues, profits).  However, the auditors do not bother themselves with study of business operations, under which billions of Rubles are imputed to OAO NK YUKOS for payment.
>
> This directly contradict to Article 100 of the Tax Code of the Russian Federation, which indicates that the Audit Report must contain information about tax confirmed by the documents and Instruction of the Ministry of Taxes and Levies the Russian Federation No. 60 of 10.04.2000 "On Procedure for Compilation of Field Tax Audit Report and Proceedings in the Case of Violation of the Legislation on Taxes and Levies", according to which the Audit Report must contain references to source accounting documents (with indication, in case of necessity, according transactions and order for reflection the respective operations in the accounting registers) and other evidences confirming the fact of violation.  The Instruction also stipulates that the Report must be based on results of audit of <u>all</u> documents that may be related to the stated facts, and on results of performance of all other actions necessary for exercising tax control.
>
> According to this Instruction, the following must be attached to the Audit Report:
>
> • clarified calculations by types of taxes (levies) drawn up by the auditors in connection with the discovered tax offence (except for the cases when the specified calculations are presented in the body text of the report).  Calculations must be signed by the

---

[660]   S. Pepeliaev, *Summary of the tax inspection of OAO NK Yukos*, p. 2, 5 January 2004, Exh. C-1128.

[661]   Objections against Report No. 08-1, p. 13, 12 January 2004, Exh. R-335.

auditor (the auditors), the head of the company or private entrepreneur or their representatives; and

- materials of cross audits (in case these were performed).

However, these requirements are not met and source documents and tax returns of 17 companies mentioned in the Report are not attached to the Report, which virtually deprives OAO NK YUKOS of opportunity to assess accusations of tax offence brought against it.

It is also necessary to mention that in violation of the requirements of the abovementioned Instruction about fairness and reasonableness of the reflected facts, the Audit Report was written in obviously biased manner, with accusative tendency and starts with conclusions on presence of a certain tax evasion "scheme". The obvious prejudice of the auditors does not allow to consider the Audit Report as the evidence of committed tax offence.[662]

632.  The Tribunal notes that Article 100(2) of the Russian Tax Code requires a tax audit to contain "documentarily attested references to facts of tax offenses revealed during the audit . . . ."[663]

633.  The Russian Tax Code also requires the Director of the Tax Authority to consider the taxpayer's objections prior to issuing a decision (which may hold, or not hold, the taxpayer liable for a tax offense, or direct further tax control measures).[664]  Article 101(3) provides:

3.   The decision to hold the taxpayer liable for a tax offense shall indicate the circumstances of the committed tax offence, how they were established by the audit, the documents and other evidence, which attest to these circumstances, arguments presented by the taxpayer for his defense and the results of their verification, the decision to hold the taxpayer for specific tax offenses with a reference to the articles of this Code providing for such tax offenses and liability incurred.[665]

634.  The 2000 Decision summarizes Yukos' objections, but selectively so. Notably, Yukos' specific objection regarding the tax authorities' failure to document the facts allegedly underpinning the conclusions in the tax audit is omitted from the description in the Decision of Yukos' objection no. 6.[666]  Moreover, while the decision contains responses or comments regarding some of Yukos' other objections, it does not contain any response to this specific objection.[667]

635.  The court decisions that affirmed the legality of the decision, both in first instance and on appeal, used similar wording to dismiss Yukos' objection based on breach of procedure for conducting an audit:

---

[662]  *Ibid*. at 14–15.

[663]  Art. 100(2), Russian Tax Code, Exh. C-1704.

[664]  Art. 101(1) and (2), Russian Tax Code, Exh. C-1704.

[665]  Art. 101(3), Russian Tax Code, Exh. C-1704.

[666]  2000 Decision, pp. 86–87, Exh. C-104.

[667]  *Ibid*., pp. 87–90.

> Results of the audit and the Decision were formalized in compliance with requirements of Articles 100 and 101 of the Russian Federation Tax Code.  The Decision indicates its subject, essence and features of the tax offense imputed to the taxpayer, with reference to Article 122(3) of the Russian Federation Tax Code.  Demand for the payment of tax arrears, interest and fines indicated in the Decision of the Russian Federation Ministry of Taxes and Levies No. 14-3-05/1609-1 of 14.04.2004 are well-founded, comply with the current legislation and are supported by the primary documents of audit materials, presented by the Russian Federation Ministry of Taxes and levies to the Court for substantiation of its claim.[668]

636.  The Ninth Arbitrazh Court of Appeal added that "[Yukos'] reference to a lack of documents and information confirming bad faith on the part of the taxpayer is unfounded."[669]  The Tribunal observes, however, that neither court identifies any specific documents in coming to these conclusions; nor did Respondent submit to the Tribunal the record that was before those courts, or present a witness who could attest to it.  This makes it impossible for the Tribunal to assess whether the tax authorities did indeed discharge their burden against Yukos in issuing and defending their tax assessments.

637.  Claimants sum up their argument on this important point in their Post-Hearing Brief with the following submission.  The Tribunal notes that these crucial allegations of Claimants were never rebutted by Respondent:

> In addition, the December 29, 2003 Audit Report did not comply with the requirements of the Russian Tax Code, including, in particular, by failing to document the factual allegations made and by relying on unidentified and undisclosed documents from the criminal investigation against Mr. Khodorkovsky.  Continuing this flagrant breach of due process, the tax authorities refused to allow Yukos access to the documents upon which the purported claims were based, making it impossible for Yukos to defend itself.  Notwithstanding the fact that the results of the court cases were determined in the Kremlin and it therefore could not possibly have made any difference how Yukos presented its defense, this refusal even to subject the purported claims to the scrutiny of Yukos' lawyers attests to the Russian authorities' complete lack of belief in the validity of those claims and their determination to destroy the company at a rapid pace.[670]

638.  Respondent avers that "the unbroken thread of Yukos' tax evasion" demonstrates that the Russian Federation's assessments against Yukos were entirely proper, and marshalled a

---

[668]   Resolution of the Ninth Arbitrazh Court of Appeal, Case No. 09AP-4078/04-AK, 23 November 2004, p. 5, Exh. C-147; *see also* Decision of the Moscow Arbitrazh Court, Case No. A40-17669/04-109-241, 26 May 2004, p. 21, Exh. C-116.

[669]   *Ibid.*, p. 9.

[670]   Claimants' Post-Hearing Brief ¶ 24.

substantial amount of evidence that suggests that Yukos was abusing at least some of the low tax regions prior to 2003.[671]

639. However, the Tribunal observes that nearly all of the evidence on this point relates to the entities in Lesnoy and Trekhgorny.  The Tribunal has not found any evidence in the massive record that would support Respondent's submission that there was a basis for the Russian authorities to conclude that the entities in Mordovia, for example, were "shams".  Indeed, instead of pointing to any specific evidence on which the tax authorities might have based their finding that the Mordovian entities were shams, Respondent reversed the burden and asserted that "there is no evidence that the Mordovian shells ever had any greater substance than the Lesnoy shells";[672] and that "[f]actually, Yukos did not even attempt to demonstrate that any genuine trading activities had ever been conducted in Mordovia."[673]  While the incomplete record before the Tribunal may not, in point of fact, establish that the Mordovian trading companies conducted genuine trading activities in Mordovia, the Tribunal notes that the Russian courts systematically denied Yukos' motions to join to the proceedings its trading companies and the Government of the Republic of Mordovia.  This leads the Tribunal to conclude that the Russian courts may have prevented Yukos from adducing evidence bearing on the nature of its activities in Mordovia.[674]  The record, insofar as the Tribunal has been able to find, does not reveal reasons, still less persuasive reasons, for denial by the Russian courts of joinder of the Mordovian government and the trading companies.

640. In the specific context of determining whether, in relation to the tax assessments against Yukos, the tax authorities discharged their own burden of proving Yukos' bad faith so as to be able to rely on the "bad-faith taxpayer" doctrine, the Tribunal makes two observations.  Firstly, the tax authorities failed to address at the time of the 2000 Decision, Yukos' reasoned objection based on the absence of specific documents in the tax audit.  Secondly, Respondent failed to identify during the Hearing any satisfactory evidence that the abuses found in the trading firms operating in Lesnoy and Trekhgorny were also found in the trading companies operating in Mordovia and all the other low-tax regions where Yukos entities were present.  While it is true, and suggestive, that Claimants did not introduce evidence at the Hearing showing that trading

---

[671]   Respondent's Closing Slides, pp. 3–35.

[672]   *Ibid.* p. 33.

[673]   *Ibid.* p. 98.

[674]   *See* Reply ¶ 286.

companies which operated in Mordovia were not "shams", it is first and foremost the conduct of the tax authorities that the Tribunal must examine in the context of the tax assessments that these authorities imposed on Yukos.  Focusing exclusively on Claimants' failure to demonstrate that the Mordovian entities were not "shams" would empty of meaning the important principle that the tax authorities had the burden of proving the taxpayer's bad faith under Russian law. On this point, the following extract from the *Pribrezhnoye* decision issued by the Federal Arbitrazh Court for the North-Western District on 5 June 2002 (well before the tax assessments against Yukos) is instructive:

> In addition, the IMNS's reference to the absence of presentation of evidence by the Company on the conduct of its business in the ZATO territory, which was supported by the court, is erroneous.
>
> Pursuant to Article 53 (part one) of the Arbitrazh Procedure Code of the Russian Federation in considering disputes on the invalidity of acts of State authorities, local self-government authorities and other authorities; it is up to the relevant authority to prove the circumstances, which provided the grounds for issuing the said acts.  Due to the fact that the disputed tax benefit had been granted to the defendant by a competent ZATO authority, and that the IMNS issuing the challenged non-regulatory decision found the granting of the benefit unlawful, <u>the courts erroneously imposed the burden of proof on the Company</u>.[675]

[emphasis added]

641. Looking at the tax assessments themselves, the Tribunal observes that, if there is an "unbroken thread" running through the tax authorities' analysis of Yukos' tax optimization scheme, it is the consistent and uniform finding that each trading entity is "interdependent" with Yukos.  But that interdependence in the view of the Tribunal of itself does not establish bad faith on the part of all the trading entities.

642. In its objections to the Tax Audit (objection No. 1: "Illegal conclusions concerning legal definition of interdependent persons"), Yukos complained about the authorities' reliance on interdependence as the principal factor motivating their conclusion that Yukos' tax optimization scheme was a tax evasion scheme, noting that interdependence has a specific meaning under the Russian Tax Code (in Article 20), and with strictly determined legal consequences (under Article 40).[676]  These provisions allow authorities to disregard prices used in transactions between interdependent persons when those prices deviate by more than 20 percent from the market price, and to assess additional taxes and interest calculated as if the

---

[675] *Pribrezhnoye*, p. 5, Exh. C-1278.

[676] Objections against Report No. 08-1, pp. 1–5, 12 January 2004, Exh. R-335.

transactions were concluded at the market price.  Again, the Tribunal notes that this objection was not directly addressed in the 2000 Decision.[677]

643.   The Tribunal notes that the relevant audit reports and decisions do refer generally to various factors that would seem to be relevant to a finding that the legislation in low-tax regions was being abused by Yukos.  For example, they refer to the absence of trading activity in the regions and the absence of sufficient or even of any investment by the trading entities in the low tax regions.  However, a close analysis of the tax assessment for 2000, for example, reveals that it was not established by the tax authorities that each of the trading entities which it labelled as a "sham" had no trading activity whatsoever, as opposed to just being "interdependent" on Yukos or not having physical facilities to handle oil and oil refining.

644.   The Tribunal agrees with Claimants (and apparently also with Mr. Konnov) that it is nonsense to require a trading company to demonstrate physical interaction with the goods or commodities that it is trading, especially in the era of electronic communications.  In this sense, the Tribunal is highly skeptical of the reasoning in the 2000 Audit Report (and subsequent reports) that the absence of physical movement of oil in and out of the low-tax region where the respective trading entity is located is evidence of a sham.  The Tribunal observes that the reasoning on this point in the 2000 Audit Report is also inconsistent with the decision in the *Pribrezhnoye* case.

645.   In that case, the Federal Arbitrazh Court for the North-Western District reversed decisions of lower courts that had accepted the tax authorities' efforts to impose additional eligibility requirements on a ZATO-based oil trading company beyond those laid out in the ZATO law.  It explicitly noted that:

> Under these circumstances the examination of whether the Company had fixed assets for oil products storage and transportation in the ZATO territory is beyond the scope of this case, because operations of trade in oil products, i.e. conclusion of contracts of sale, do not require the Company to own such fixed assets or for the oil products to be present within the ZATO territory.[678]

---

[677]   2000 Decision, pp. 87–90, Exh. C-104. There is also only a minor reference to the objection in the Decision of the Moscow Arbitrazh Court, Case No. A40-17669/04-109-241, 26 May 2004, p. 19, Exh. C-116. ("The court considers unfounded the Respondents' arguments that the status of interdependent entities has legal importance solely for the possibility of applying market prices to determine the results of the transactions for tax purposes.  Interdependence of entities in this case is one of the circumstances by which the tax authority substantiates bad faith of the taxpayer.").

[678]   *Pribrezhnoye*, p. 3, Exh. C-1278

646.  The court added

> The references by the courts to the facts that transfer and acceptance of crude oil occurred outside the ZATO territory; that [the manager of a customer company was in a different ZATO when the transfer was signed]; that the phone numbers of the rented office premises are recorded to the name of a person other than the Company; and that the defendant had not paid the office electricity bills are equally unfounded.  <u>The said circumstances per se do not refute the fact that the Company was doing business as a trade company in the territory of the ZATO, and they have no relevance for the case because they are not taken into account by tax legislation in determining eligibility for tax benefits.</u>
>
> The examination of the said circumstances by the first instance court and the court of appeal reveals their misinterpretation of Article 5(1) of the ZATO Law, in that the court went beyond the eligibility criteria for tax benefits that are explicitly set forth in this provision.  In violation of Article 3(7) of the TC, the first instance court and the court of appeal regarded the absence of any criteria on doing business in ZATO territory other than fixed assets, workers on payroll and salary payments as grounds for the independent establishment of such criteria by a tax authority or a court.[679]

[emphasis added]

647.  Finally, the Tribunal agrees with Claimants that the criterion of "proportionality" seems to be difficult to apply as a stand-alone basis to invalidate the structure in the low-tax regions.  This is due to the fact that the proportion between the tax savings and the investment in the low-tax region should have been readily apparent to the tax authorities on the face of the tax filings and related tax documents.   On the other hand, where properly evidenced, a grossly disproportionate arrangement combined with an "empty shell" structure could, in the Tribunal's view, validly attract the attention of the authorities under the "anti-abuse" doctrine.

648.  To conclude, it thus appears to the Tribunal that the Tax Ministry, in its assessments against Yukos, painted all of the Yukos' entities in the low tax regions with the same brush, even though it marshalled little, if any, documented evidence that all, and not only some, of the trading entities were abusing the low tax regime in which they had respectively been constituted.  On the one hand, the Tribunal accepts that, if Claimants had evidence of genuine business activity of the trading companies in the low-tax regions, they would have introduced it or referred to it orally.  Accordingly, resolution of these critical issues is not free from doubt.  But on the other hand, and on balance, where neither side was able to demonstrate the facts, but where Yukos' files were in the hands of Respondent, the Tribunal feels justified in holding Respondent bound by the burden of proof.  Respondent failed to meet that burden.  Moreover, it refused to join Mordovian authorities and the trading companies to the litigation.  Furthermore, the re-attribution remedy was unprecedented at that time in the Russian

---

[679]   *Ibid.*, p. 4.

Federation.  Respondent's resort to re-attribution appears to be linked to its determination to impose a massive VAT liability on Yukos.

    (b)    **VAT**

        i.    **Introduction**

649.  Claimants argue that the imposition of VAT by the tax authorities, and more specifically their refusal to attribute to Yukos the trading companies' VAT returns and refunds, is arbitrary because (a) it is undisputed that the goods at issue in the underlying transactions were exported and that the trading entities timely and duly filed VAT returns (and thus that the transactions benefited from the exemption from VAT or zero percent rating, depending on the year);[680] (b) the refusal to attribute the trading companies' VAT returns and refunds to Yukos is inconsistent with Respondent's attribution to Yukos of the trading companies' revenues for purposes of calculation of tax (be it profit tax or VAT or any of the other taxes); and (c) Yukos' refilings of VAT returns were rejected on the basis of technicalities, thus demonstrating that Respondent had no intention of treating Yukos in good faith.[681]

650.  Respondent takes the position that the VAT assessments against Yukos were perfectly proper, and consistent with the corporate profit tax assessments.  In both cases, Respondent argues, the assessments were based on the application of Russian tax law to the true situation, established by the tax authorities, that Yukos was the "real taxpayer" and "actual exporter" in the various transactions that the trading companies had entered into. Respondent's position is also based on its assertions that under Russian law, the granting of a zero percent VAT rate is subject to compliance with stringent documentary requirements; and that it is undisputed that Yukos itself never filed regular VAT returns or proper amended VAT returns in relation to the transactions in question.[682]

651.  The Tribunal observes that there was no element in Yukos' tax scheme that enabled Yukos to benefit improperly or illegally from a VAT exemption or a zero percent rating.  As noted earlier

---

[680]  *See* Second Konnov Report ¶ 84, n.137.  Mr. Konnov explains:  "Prior to entry into force on January 1, 2001 of Chapter 21 of the Russian Tax Code governing VAT, VAT was governed by Law of the Russian Federation No. 1992-1, On the Value Added Tax, December 6, 1991 (the 'VAT Law').  Under the terminology of the VAT Law, exports were 'exempt' from VAT whilst under the Russian Tax Code they are subject to 0% VAT rate.  In substance, exemption from VAT on exports was similar to the 0% tax regime." *Ibid.*

[681]  Claimants' Opening Slides, p. 63.

[682]  Respondent's Opening Slides, p. 111.

in this Award, VAT is a uniform federal tax that benefits from an exemption or a zero percent rating if the transaction involves an export to a foreign purchaser.  In other words, even if Yukos' tax scheme was entirely unlawful (or unlawful in some respects), and the authorities were justified in attributing the trading companies' revenues to Yukos for tax purposes, there is no suggestion by Respondent that the trading companies (or Yukos) did anything "wrong" vis-à-vis VAT with their tax scheme. The Tribunal must consider the propriety of the multibillion dollar VAT assessments against Yukos in this context.

652.   The Tribunal addresses the specific questions arising on the topic of the VAT assessments in the following subsections.

### ii.   Was the Imposition of VAT Payments on Yukos Inconsistent with the Attribution to Yukos of the Trading Companies' Revenues?

653.   Claimants assert that when the Russian Tax Ministry reattributed to Yukos all of the revenues (including the export revenues) of its trading companies, it should have attributed to Yukos the VAT refunds previously obtained by the trading companies with respect to their exports. Instead, in what Claimants characterize as a "contradiction with its own theory," the Tax Ministry chose to impose the amounts on Yukos, justifying the VAT payment demands on the failure by Yukos, as the "real taxpayer", to file on time "the documentation required to validate the VAT exemption or the 0% VAT rate".[683]

654.   Claimants sum up their argument in their Memorial as follows:

> This formalistic position, systematically challenged by Yukos before the arbitrazh courts, but endorsed without any thorough analysis by these courts, was obviously circular: the trading companies, not Yukos, had exported oil and oil products and filed all the necessary documentation; under the applicable laws, Yukos did not have to file and could not have filed such documentation at the relevant times.  The fact that, even when Yukos attempted to submit the updated VAT returns in its own name to satisfy the Tax Ministry, its submissions were simply rejected as improper and untimely, amply shows the Tax Ministry's bad faith and true intentions.[684]

---

[683]   Memorial ¶ 321–22.

[684]   Memorial ¶ 322 (citing as regards Yukos' tax reassessment for the year 2000, Decision of the Moscow Arbitrazh Court of 26 May 2004, 28 May 2004, p. 19 of the Russian original, Exh. C-116; as regards Yukos' tax reassessment for the year 2001, Resolution of the Ninth Arbitrazh Court of Appeal of 9 February 2005, 16 February 2005, p. 23 of the Russian original, Exh. C-167; as regards Yukos' tax reassessment for the year 2003, Decision of the Moscow Arbitrazh Court of 21 April 2005, 28 April 2005, p. 59 of the Russian original, Exh. C-196, and Resolution of the Federal Arbitrazh Court for the Moscow District of 18 November 2005, 5 December 2005, p. 17 of the Russian original, Exh. C-197; as regards Yukos' tax reassessment for the year 2004, Resolution of the Ninth Arbitrazh Court of Appeal of 11 August 2006, 18 August 2006, p. 35 of the Russian original, Exh. C-336; as regards Yukos' tax reassessment for the year 2002, Transcript of the hearing held at the Moscow Arbitrazh Court on 14–16 December

655.   In its Counter-Memorial, Respondent asserts that the tax authorities were justified to treat Yukos itself as the real party in interest, "which for VAT purposes, meant treating it as the real exporter.  This approach simply reflected reality."[685]  As such, Respondent argues, Yukos could have benefited from exemption (or "zero-rating") only if, as "the true exporter", it had timely filed "the requisite documentation in the correct manner."[686]

656.   Claimants reaffirm their position in their Reply, stating that Respondent's position on VAT "was wholly inconsistent with the entire re-attribution theory upon which all of the other purported tax claims were premised."[687]  In short, Claimants argue that "it was arbitrary and contradictory for the authorities to re-attribute the trading companies' oil, revenues, profits, tax liabilities and activities to Yukos but to refuse to re-attribute to Yukos those companies' entitlement to VAT refunds."[688]

657.   More specifically, Claimants note that "there is no support in Russian law for the tax authorities to conclude that the 'true exporter' could be someone other than the legal owner as reflected in the relevant documentation."[689]  In particular, Claimants assert that neither Article 165 of the Russian Tax Code nor the decision of the Constitutional Court[690] affirming the constitutionality of Article 165, on which Respondent relies, say anything about "true exporters".[691]

658.   The Tribunal notes that, in audit reports and decisions prior to the reassessments in December 2003, there are frequent references to the trading companies' use of export agents.  For example, in Decision No. 23 in respect of Alta-Trade, the decision notes that "Oil products are being exported through commission agent OAO NK Yukos and ZAO Trading House Angarsk-Nefto."[692]  To prove that exports in fact took place, more than ten commission agreements were provided to the authorities, along with

---

2004, p. 21 of the Russian original, Exh. C-183; as regards Yukos' tax reassessment for the year 2003, Decision of the Moscow Arbitrazh Court of 21 April 2005, 28 April 2005, p. 59 of the Russian original, Exh. C-196).

[685]   Counter-Memorial ¶ 1073.

[686]   *Ibid*. ¶ 1074.

[687]   Reply ¶ 244.

[688]   *Ibid*.

[689]   Reply ¶ 245.

[690]   Resolution of the Constitutional Court of the Russian Federation No. 12-P, 14 July 2003, Exh. R-1501.

[691]   Reply ¶ 246.

[692]   Decision No. 23 on partial refusal to refund/offset VAT (Alta-Trade), 15 June 2000, p. 1, Exh. C-1110

> "certificates of transactions entered into by the commission agent, bank statements evidencing crediting of funds to the commission agent's accounts, bank statements evidencing crediting of funds to OOO Alta-Trade's accounts, commission agents reports, copies of complete custom freight declarations and shipping documents confirming export of goods by sea outside the CIS member states[,] . . . complete customs freight declarations [with] the necessary notes made by customs authorities – "clearance allowed", "goods exported", and also notes made on shipping documents – "loading allowed" on loading instructions, notes made on marine bills of lading concerning acceptance of cargos for transportation.[693]

659.   The Tribunal also notes that, in these audits, the taxation authorities did not appear to be concerned with these relationships.  Several other audit reports and decisions also mention the use of export agents.[694]

660.   In its Rejoinder, Respondent maintains its position regarding the propriety of the VAT assessments and their consistency with the profit tax assessments against Yukos.  Respondent explains why Claimants are wrong, in its view, for characterizing the VAT assessments as being arbitrary and contradictory:

> Once again, Claimants are wrong.  The authorities' approach with respect to Yukos' VAT liability was consistent with their approach to Yukos' corporate profit tax liability.  In both instances, they treated Yukos as the actual owner and exporter of the oil and oil products, and therefore the actual entity responsible for both profit tax and VAT.  Thus, the authorities found that:
>
> (i)   Yukos was the real party in interest in the challenged transactions.
>
> (ii)   The profit generated through those transactions was Yukos' own profit, which Yukos had fictitiously allocated to the trading shells for no purpose other than to evade taxes which it otherwise was obligated to pay.
>
> (iii)   Yukos, not its trading shells, was the real exporter of the oil and oil products that were the subject matter of those transactions.
>
> The inescapable conclusion from these findings is that Yukos, not its trading shells, should have filed the requisite documents to claim a 0% VAT rate, which as discussed below Yukos did not do properly.  The VAT was thus due from Yukos and the Yukos VAT assessments were proper.[695]

661.   Claimants sum up their position in their Post Hearing Brief:

---

[693]   *Ibid.*

[694]   *See* Decision No. 48 to deny refunding (offset) VAT (Alta-Trade), 29 October 2001, p. 1, Exh. C-1116; Decision No. 53 on partial refusal to refund/offset VAT (Mars XXII), 27 December 2004, p. 1, Exh. C-1117; Field Tax Audit Report No. 02-52, 19 April 2002 ¶ 1.7, Exh. C-1120; Field Tax Audit Report No. 02/105, 3 March 2003 ¶ 1.10, Exh. C-1124; Field Tax Audit Report No. 02-126, 22 October 2003, p. 3, Exh. C-1125; and Exh. C-1121, p. 3, which notes Article 165 of the Russian Tax Code, and states "No offense were discovered during the audit as to whether the value added tax actually paid to suppliers for materials acquired/booked, work performed or services provided, to the extent they were used to produce export goods, has been properly refunded/credited; whether OOO Ratmir had documents to support actual exports of such goods, and whether it properly assessed tax on domestic sales of goods."

[695]   Rejoinder ¶¶ 706–7.

> If the tax authorities had authority to reassign items from the debit side of the trading companies' taxpayer accounts to the debit side of Yukos' taxpayer account, then they must also have had the corresponding authority to transfer the entries on the credit side – particularly in light of the tax authorities' own prior determinations that the 0% export VAT rate applied to all of the transactions in question.[696]

662. During his cross-examination of Mr. Konnov, Professor Gaillard recalled that the revenue of the trading companies was attributed to Yukos:

> Q.   So can we agree that the revenues were found in the books of separate legal entities, which were the trading companies; can we agree on that?
>
> A.   I think you already asked that question, and I said that, yes, the tax authorities used the books of the domestic offshore companies to get the figures.
>
> Q.   Right. And they took this amount and deemed this amount to be revenues of the Yukos; correct?
>
> A.   That is correct: they treated that revenue as revenue of Yukos.[697]

663. Similarly, Mr. Konnov confirmed that if there had been no attribution of revenue to Yukos the VAT issue would not have arisen:

> Q.   I may disagree with you on some aspects of that, but I'm not reopening that. I am just talking about VAT.
>
> If the tax authorities had decided that the trading companies themselves had violated, say, the Mordovian Law, or the Law which is applicable to them, or the Federal Anti-Abuse Law, or whatever Law, but they have violated that Law; and if the tax authorities had said, "Okay, they abused, so all these tax benefits which they had, they should never have had these benefits, because there is no proportionality, because it's form over substance", whatever reason, "So they should pay, they should reimburse all these benefits", and possibly pay interest, fines, whatever -- okay? -- if that had been the case, would the VAT issue have arisen at all?
>
> A.   No.
>
> Q.   You are with me on that?
>
> A.   Yes.
>
> Q.   So it would not.  And the VAT issue arises only because it's Yukos which has been deemed to be the person having the revenues, and hence not having declared those revenues, and hence not having paid the VAT corresponding to the sales which generated those revenues; correct?
>
> A.   To be more specific, the VAT issue arises because VAT returns were not refiled.
>
> Q.   No, because they were not filed in the first place, right?
>
> A.   No, because they were not refiled by Yukos.  So the basis is not attribution; the basis is failure to file VAT returns.

---

[696]   Claimant's Post-Hearing Brief ¶ 43 (citations omitted).

[697]   Transcript, Day 13 at 85–86.

THE CHAIRMAN: That's not the question.  If there had been no reattribution, if the trading companies had been assessed the profit tax, et cetera, there would not have been a VAT issue.

A.      Right.  But I think I responded to that.

THE CHAIRMAN: Yes.

A.      I responded to that.  That's correct.[698]

664.    Mr. Konnov acknowledged that the trading companies had filed their VAT returns and had claimed the VAT refunds as required:

> Q.      Right.  Do you agree with me that it's not disputed that the trading companies themselves have filed properly the VAT returns, and have requested and they have been granted the 0% rate because the goods were exported?  Correct?  Do we agree on that?
>
> A.      I agree, they were.  As we discussed earlier today, there were a few minor issues. But apart from these minor issues, this is correct: the domestic companies filed VAT returns, claimed refund, and obtained refund.[699]

665.    Mr. Konnov confirmed that Yukos was assessed the massive VAT liability because it failed to file in its own name VAT returns in respect of the trading entities' exports, since it had been found by the tax authorities to be the true exporter:

> PROFESSOR GAILLARD: Okay, the next question is: is it your understanding of what happened that when the VAT issue did arise for Yukos, because Yukos was deemed to be the person having received the revenues from the sales, when it did arise, is it your understanding of the case that the reason why they had to pay this massive amount of VAT is from the outset because they were criticised for not having submitted themselves the tax returns in time?  Is that your understanding of what happened?
>
> A.      Right: VAT returns primarily, and the documents that need to be attached to that. But the main issue relates to the failure of Yukos to file the VAT returns with respect to these exports.
>
> . . .
>
> A.      I thought I had responded to that in my reports.  But in essence the Tax Code requires VAT returns to be filed by the exporter.  There is a formalistic procedure. Tax authorities have historically applied the law very formally.  They said that Yukos had to refile.  There is nothing difficult in refiling, and Yukos did not refile.
>
> So therefore the basis for VAT assessment is not failure of Yukos to export, as we agreed;  but the basis is failure of Yukos to file the documentation in its own name.[700]

[emphasis added]

---

[698]    Transcript, Day 14 at 227–28.

[699]    *Ibid.* at 230.

[700]    *Ibid.* at 229 and at 230–31.

666. However, Mr. Konnov did not perceive any inconsistency between the attribution of revenue to Yukos and the position of the tax authorities and the courts that Yukos itself needed to file the VAT returns:

> Q.    Do we agree that for the revenues themselves, the authorities applied a substance over form principle?  Do we agree on that?
>
> A.    The tax authorities applied substance over form for both profits tax and VAT purposes.[701]

667. In his First Report, Mr. Konnov explains his position in the following terms:

> At the outset, I should note that the tax authorities and courts were fully consistent in treating YUKOS for profit tax and VAT purposes.  Revenue of the Domestic Offshore Companies was recognized as revenue of YUKOS for both profit tax and VAT purposes.[702]

668. The Tribunal observes that while the approach taken by the Tax Ministry was consistent in the sense that revenue was recognized as revenue of Yukos for both profit tax and VAT purposes, it was inconsistent in that, while the burden of the substance over form doctrine was imposed on Yukos, its corresponding benefit was not.  Put another way, while technicalities and formalism are said to preclude the attribution of the VAT filings of the trading entities to Yukos, it does not appear that the Tax Ministry was concerned with technicalities and formalism when it came time to attribute their revenue to Yukos.

669. A member of the Tribunal put the pertinent question to Mr. Konnov.  The following exchange with the witness is important:

> JUDGE SCHWEBEL: In substance, Russian courts treated the activities of the trading companies as the activities of Yukos itself, while at the same time they did not attribute to Yukos a critical element of those activities, namely their filing for VAT refunds.
>
> In the interests of obvious justice, why did not the Russian courts treat the filings for VAT by the trading companies as filings by Yukos?
>
> A.    If I may, I see two aspects in your question.  First, I do not think that Russian tax authorities -- as I think was suggested in your question -- treated the activities of trading companies as the activities of Yukos.  I think it would be more correct, if I may, to say that they established that trading companies conducted no activity, and therefore they simply ignored that for tax purposes.
>
> As regards . . .  the substance of your question, the reason is very simple: is that, as I mentioned, in order to get the tax benefit, you need to comply with the substance and with the documents.  And here the documentary requirement was not burdensome; it was not difficult to refile the VAT return.  The tax authorities did

---

[701]   *Ibid.* at 231.

[702]   First Konnov Report ¶ 54

> look at the substance, but simply said, "You need to comply with the documentary requirement," and consistently Yukos failed to comply with that.
>
> So I don't see contradiction.[703]

670.    Respondent relies on both Article 165 of the Russian Tax Code and Constitutional Court Resolution No. 12-P.  Neither of these texts, however, appears to the Tribunal to provide a clear basis for the authorities' refusal to attribute to Yukos the VAT filings that had been made by the trading entities when they were considered the taxpayer.  On the other hand, they do support the basic proposition that the Russian Tax Code requires the VAT return to be filed by the "taxpayer."[704]

671.    In the view of the Tribunal, the jurisprudence of the Russian courts does not support the imposition of VAT payments on Yukos as happened in this case.  In particular, the *Energomashbank* decision of the Russian Constitutional Court stands for the proposition that courts must not limit themselves to a purely formalistic analysis in assessing tax claims by the State, but rather must examine the actual facts in order to respect the taxpayer's right to a fair opportunity to defend itself against the claim.[705]

**iii.    Would any Illicit Conduct by a Taxpayer Justify the Denial of a VAT Exemption, Irrespective of Whether the Illicit Conduct was Connected to VAT, and without any Regard to Proportionality?**

672.    In its Counter-Memorial, Respondent raises an additional argument in support of the authorities' denial of the VAT exemption to Yukos.  Respondent asserts that, in any event, "the denial of [a] VAT exemption is appropriate when the exporter, like Yukos, has been involved in flagrantly illicit conduct."[706]   In support of its argument, Respondent relies on what it characterizes as the practice in many countries to deny "the benefit of exemption or 0% rating, even where documentary requirements have been punctually satisfied, if the relevant export transaction is tainted by illegality (as was the case with Yukos) or even simply by

---

[703]    Transcript, Day 15 at 231–32.

[704]    Second Konnov Report ¶ 89.

[705]    Resolution of the Russian Constitutional Court No. 14–P ¶ 4, 28 October 1999, Exh. R-293 (the right to judicial defense is infringed when courts fail to investigate actual facts and limit themselves to establishing "formal conditions for the application of the law").  *See also* Reply ¶ 236 and Second Konnov Report ¶ 72.

[706]    Counter-Memorial ¶ 1076.

impropriety."[707]     In particular, Respondent relies on the decision of the ECJ in
*R. v. Germany*.[708]

673.  Respondent summarizes the *R. v. Germany* decision as follows in its Counter-Memorial:

> More recently, the European Court of Justice, in the case of R. v. Germany, upheld the
> imposition of VAT by the German tax authorities on export transactions that had been
> carried out by an individual who had made fraudulent misrepresentations in his
> applications for exemption from German VAT, notwithstanding the fact that the fraud had
> not deprived Germany of any tax revenues, since the goods in question had effectively
> been exported out of Germany and therefore—but for the fraud in the attendant
> documentation—would have been unquestionably entitled to full exemption from German
> VAT.  The ECJ rejected the argument that imposition of VAT on the exporter would
> violate "principles of fiscal neutrality or legal certainty, or . . . legitimate expectations,"
> holding that none of those principles can "legitimately be invoked by a taxable person who
> has intentionally participated in tax evasion. . ."  This was true, the court held, even though
> the tax evaded was not one that the taxpayer himself would normally have had to pay, and
> even though the result was that Germany ended up with a windfall, collecting a tax that, in
> the absence of fraud, it would never have been able to assess.[709]

674.  In their Reply, Claimants contend that this decision is of no assistance to Respondent, because
it "does not suggest that the tax authorities may deny VAT exemptions because of allegations
of illegality unrelated to actual compliance with the VAT law."[710]  Indeed, contrary to the *R. v.
Germany* decision (in which, Claimants assert, the ECJ expressly rejected a punitive approach),
Claimants argue that the "staggering demands for VAT payment—plus fines and interest—
made by the Tax Ministry"[711] constitute an entirely disproportionate response to the alleged

---

[707]   *Ibid.* ¶ 1206.

[708]   *R. v. Germany*, ECJ, Case C-285/09, Judgment, 7 December 2010, Exh. R-1401 (hereinafter "*R. v. Germany*").

[709]   Counter-Memorial ¶ 1208 (citing *R. v. Germany* ¶ 22).  Respondent notes: "In fact, as made clear by the ECJ, the
German taxpayer had not himself evaded any tax for which he might have been liable, because the sole purpose and
effect of his fraudulent conduct had been to assist unrelated third parties—his foreign customers—to evade taxes in
their home country of Portugal." *Ibid.* n.1878.

Respondent adds further:  "The ECJ stated that "[t]hose principles cannot legitimately be invoked by a taxable person
who has intentionally participated in tax evasion and who has jeopardized the operation of the common system on
VAT". *Ibid.* ¶ 54.  The ECJ also summarily dismissed the argument that imposition of VAT on an exporter (who, as
had been pointed out by the Advocate General, would probably never be able to recover it from his customer) would
violate the general EU principle of proportionality.  The court held that the exporter's involvement in the third party's
tax evasion scheme was "decisive" in this regard. Specifically the court stated that "[a]s regards the principle of
proportionality, it must be observed that this does not preclude a supplier who participates in tax evasion from being
obliged to pay VAT subsequently on this intra-community supply, inasmuch as his involvement in the evasion is a
decisive factor to be taken into account in an assessment of the proportionality of a national measure. . . .") *Ibid.*
n.1879.

[710]   Reply ¶ 248.

[711]   *Ibid.* ¶ 249.

defects in the paperwork submitted by Yukos, and are evidence of "the tax authorities' manifest bad faith on this issue."[712]

675. According to Respondent, however, the decision is directly applicable to the present case because, in that case, the ECJ held "that it is entirely appropriate for a State to deny VAT refunds (or exemptions) to an exporting company whose conduct, like Yukos', involves '*evasion, avoidance or abuse,*' even though the scheme did not deprive that State of any VAT or other revenues."[713]   Respondent asserts that Claimants' attempt to distinguish the *R. v. Germany* decision on the grounds that, in that case, the scheme involved an attempt to evade VAT charges, whereas Yukos' fraud was designed to evade a tax on profits, is "sophistic."[714] Respondent explains:

> What makes the European Court of Justice's decision relevant to these arbitrations is its holding that, because the export transactions in that case were part of an abusive scheme, Germany was entitled to levy VAT on those exports, notwithstanding the fact that no German tax (of any kind) had been evaded.  Reasoning by analogy, Russia's VAT assessments against Yukos were appropriate *a fortiori*, since Yukos' fraudulent scheme— unlike the one in *R v. Germany*—most assuredly involved a revenue loss for Russia, to wit, the loss of huge amounts of corporate profit tax that the Yukos tax evasion scheme was engineered to evade.[715]

676. In its Post-Hearing Brief, Respondent again invokes the ECJ's decision in *R. v. Germany*.[716] Claimants, in their own Post-Hearing Brief, reiterated that "Yukos' tax optimization structure was not aimed at,  and indeed could not possibly achieve, any reduction in VAT liabilities."[717] Claimants conclude that this decision is of no assistance to the Tribunal.

677. The Tribunal is not persuaded that the Russian Federation's imposition of massive VAT liabilities on Yukos can be excused or justified on the basis of the *R. v. Germany* decision. Firstly, no element of Yukos' tax optimization scheme could be said to constitute an abuse of the VAT system.  In the *R. v. Germany* case, however, the taxpayer who was denied the VAT exemption was convicted on two counts of tax evasion by means of which he had evaded more that €1 million of VAT in 2002 and more than €1.5 million of VAT in 2003.  Secondly, the Tribunal considers the imposition of VAT on Yukos to be a disproportionate response to

---

[712]   *Ibid*. ¶ 252.

[713]   Rejoinder ¶ 709 (emphasis in original) (citing *R. v. Germany* ¶ 51, Exh. R-1401).

[714]   Rejoinder ¶ 710.

[715]   *Ibid*.

[716]   Respondent's Post-Hearing Brief ¶ 42.

[717]   Claimants Post-Hearing Brief ¶ 42.

whatever abuse took place in the low-tax regions, considering that the tax authorities had already imposed all of the revenue-based taxes deemed to be owed by the trading entities on Yukos.  In the *R. v. Germany* decision, the ECJ reminded Member States that they

> must observe the general principles of law that form part of the European Union legal order, which include, in particular, the principles of legal certainty and proportionality and the principle of protection of legitimate expectations (see, to that effect, Joined Cases C-286/94, C-340/95, C-401/95 and C-47/96 *Molenheide and Others* [1977] ECR 1-7281, paragraph 48; Case C-384/04 *Federation of Technological Industries and* others [2006] ECR 1-4191, paragraphs 29 and 30; and Case C-271/06 *Netto Supermarkt* [2008] ECR 1-771, paragraph 18).  As regards, in particular, the principle of proportionality, the Court has already held that, in accordance with that principle, the measures which the Member States may thus adopt must not go further than is necessary to attain the objectives of ensuring the correct levying and collection of the tax and the prevention of tax evasion (see, in particular, Case C-188/09 *Profaktor Kulesza, Frankowski Jóźwiak, Orlowski* [2010] ECR 1-0000, paragraph 26).[718]

678.  In the present case, with respect to the denial by the Russian tax authorities of the VAT exemption to Yukos, the Tribunal finds that the Russian Federation did go much further than was necessary to attain a legitimate objective of collecting taxes.

### iv.  Did Yukos Contribute to its Own Demise by Failing to File Proper VAT documentation, or Does the Evidence Suggest that Any Efforts by Yukos to Minimize its Liability would have been Thwarted by the Authorities?

679.  In its Counter-Memorial, Respondent also contends that Yukos acted self-destructively in relation to VAT, in as much as:

(a)  Yukos could have avoided further VAT assessments "easily and at no cost, simply by having Yukos itself (or one of the other genuine companies of the Yukos group) acknowledge its status as the real exporter and file the requisite documentation itself".[719]

(b)  Yukos, when it belatedly filed amended VAT returns for some prior periods, "submitted those returns in a format that was incapable of being processed by the authorities' computer, with the result that, as any tax expert would have predicted, they were rejected."[720]

---

[718]   *R. v. Germany* ¶ 45, Exh. R-1401.

[719]   Counter-Memorial ¶ 1078.

[720]   *Ibid*. ¶ 1079.

680. In relation to the format for filing the VAT returns, Respondent, in its Counter-Memorial, wrote:

> For an unexplained reason, Yukos belatedly filed <u>yearly</u> VAT returns, whereas quarterly or monthly returns were required. See Konnov Report, ¶ 58. See Article 163 of the Tax Code, providing with respect to VAT that "1. Tax period shall be established as a calendar month, unless otherwise provided by paragraph 2 of this Article (this applies to taxpayers performing the obligations of tax agents, hereinafter referred to as tax agents). 2. For taxpayers (tax agents) whose monthly revenues from the sale of goods (works, services) within a quarter, excluding the tax and sales tax, do not exceed one million rubles, the tax period shall be established as a quarter."  With effect from Jan. 1, 2004, Article 163 was amended to read: "1. Tax period shall be established as a calendar month, unless otherwise provided by paragraph 2 of this Article (this applies to taxpayers performing the obligations of tax agents, hereinafter referred to as tax agents). 2. For taxpayers (tax agents) whose monthly revenues from the sale of goods (works, services) within a quarter, excluding the tax, do not exceed one million rubles, the tax period shall be established as a quarter." [Exh. R-1502].  Not surprisingly, the courts have rejected such returns. See, e.g., Decision of the Moscow Arbitrazh Court, Case No. A40-4338/05-107-9/ A40-7780/05-98-90 (Apr. 28, 2005), 59 [Exh. C-196] ("The <u>tax return</u> submitted by OAO Yukos Oil Company for value added tax for 2003 cannot be considered, since it <u>does not meet the requirements</u> of tax legislation regarding submission of a VAT tax return <u>for each tax period, which is a month or quarter</u>").[721]
>
> [emphasis added by Respondent]

681. For Claimants, the particular format of the VAT filings was just a pretext by the tax authorities for refusing to credit Yukos for the VAT refunds obtained by the trading companies:

> The Respondent accuses Yukos of having "acted self-destructively" by filing yearly VAT returns instead of quarterly or monthly returns and, by way of support, refers to the Decision of the Moscow Arbitrazh Court regarding the alleged tax reassessment for the year 2003.  However, the monthly reporting requirement relates solely to the periodicity at which, in the ordinary course of events, companies are required to file VAT returns.  In circumstances where the documentation was being submitted <u>four years after the fact</u>, it would have made no sense—and would likely have generated unnecessary additional work for the tax authorities—to disaggregate the annual information into monthly data.[722]
>
> [emphasis in original]

---

[721] Counter-Memorial ¶ 1079, n.1707.

[722] Reply ¶ 250. Claimants note that:  "The Respondent is unable to make up its mind as to whether the documents needed to be filed on a monthly or quarterly basis or whether either is permissible, a position whose vagueness cannot be reconciled with the purported certainty with which it affirms that yearly submissions were improper.  [citing Counter-Memorial ¶ 1079, n.1707.]" *Ibid*. n.440.

Claimants add further:  "The Respondent offers no support for its assertion that the returns submitted by Yukos were "incapable of being processed by the authorities' computer", an assertion which is implausible on its face, particularly in light of the Respondent's own uncertainty as to whether monthly or quarterly submissions were required, and was in any event not relied on as a basis for the original rejection." *Ibid*. n.442.

682. Claimants add in their Reply that "the text of Article 165 of the Russian Tax Code seriously undermines this pretext in that it imposes no timing restrictions whatsoever in relation to the submission of the required documentation for obtaining a VAT refund."[723]

683. Respondent disagrees:

> Equally meritless is the allegation that the "monthly reporting requirement relates solely to the periodicity at which, in the ordinary course of events, companies are required to file VAT returns" and is not applicable when "the documentation is being submitted four years after the fact." Contrary to Claimants' suggestion, the Russian Tax Code does not contemplate any exception for non-"ordinary course" filings, and in particular allows no derogation from the requirement that filings be made on a monthly (or, in cases not relevant to Yukos, quarterly) basis. Rather, it clearly provides what a taxpayer must file to claim a 0% VAT rate on exports, and neither Yukos nor any other taxpayer is entitled to decide for itself whether or not to comply with the law based on "convenience".[724]

684. In his Second Expert Report, Mr. Konnov refers to the strict formalism of Russian tax legislation with respect to VAT and cites, in support of the decision of the tax authorities, a decision of the Russian Supreme Arbitrazh Court issued in 2011:

> 86.    The strict formalism of Russian tax legislation with respect to VAT was recently confirmed in the *Forward* VAT case (unrelated to YUKOS) which has reached the Russian Supreme Arbitrazh Court. *Forward* was a construction company. In relation to the construction of a residential building in the city of Bryansk, it was collecting investment contributions. *Forward* failed to assess VAT on its remuneration when due. Based on a field audit, the tax authorities assessed VAT (and profit tax) on *Forward*. The taxpayer claimed input VAT credit in court. Neither the amounts of input VAT, nor the payment made by the suppliers was disputed by the tax authorities. The taxpayer submitted to the court documents evidencing input VAT, but failed to file an amended VAT return claiming the respective amounts of input VAT. Even though the amount of the input VAT paid by the taxpayer was undisputed, the court denied the input VAT credit solely on the basis that the taxpayer failed to file an amended VAT return.

> 87.    The Supreme Arbitrazh Court concluded that, in accordance with the Russian Tax Code and the prevailing court practice, input VAT credit had to be claimed by a taxpayer in accordance with the relevant provisions of the Russian Tax Code, and that the tax authorities were not obliged to identify and credit undeclared input VAT on their own:

>> "The fact that documents confirming, in the taxpayer's opinion, a right for tax credit are available without reflecting (showing, claiming) the amount of the tax credit in a tax return is not a ground for reduction of VAT payable to the

---

[723]    Reply ¶ 251 (citing Russian Tax Code, Article 165, Exh. R-1484 ("In the event that no documents (copies thereof) referred above are provided by the taxpayer within 180 days after the expiry of 180 days of the date of the release by the regional customs authority under export or transit customs procedure, said transactions involving the sale of goods (performance of works, provision of services) shall be taxed at a rate of 10 percent or 18 percent accordingly. In the event that subsequently the taxpayer submits to the tax authorities any documents (copies thereof) proving eligibility of the zero percent tax rate application, the tax paid shall be refunded to the taxpayer in the manner and on terms and conditions expressly provided by article 176 of this Code.").

[724]    Rejoinder ¶ 719(iii) (citing Reply ¶ 250–51, stating that "Claimants also rely on Article 165 of the Tax Code in making this argument, but Article 165 had nothing to do with the period (*i.e.*, monthly or annual) that Yukos' VAT filing should have covered." and also citing Second Konnov Report ¶ 93).

> budget for a tax period. Availability of documents confirming the right for VAT credit does not replace an obligation to claim it in a tax return."

> 88.    The Supreme Arbitrazh Court unequivocally confirmed that, as concerns VAT, Russian tax legislation is very formal and no VAT benefit can be allowed if it was not properly claimed by a taxpayer in a tax return.[725]

685.   When he gave evidence, Mr. Konnov also offered a practical justification for the monthly/quarterly requirement:

> But secondly, you cannot simply amend VAT law to allow annual return, because there are a few corresponding provisions. For instance, there is a provision on the chamber audit, on which I was questioned by Professor Gaillard: it is three months. And what that means: that if one taxpayer is on a monthly VAT return and the other one is on a quarterly return, the three months are sufficient for the tax authorities to do a counter-audit with respect to all the suppliers and other interested parties.

> If, however, you simply introduce annual return, and without corresponding changes to other provisions in the Tax Code, the tax authorities -- basically the VAT law will not function properly. So you can do that, but that would mean not only allowing acceptance of annual return, but redrafting the whole VAT chapter of the Tax Code to work it properly.[726]

686.   The Tribunal observes that while this practical justification does seem to support the monthly/quarterly filing requirement when the tax authorities are auditing the underlying transactions, it is more difficult to understand how that justification applied to Yukos' attempts to obtain credit for the trading companies' VAT refunds, in a situation where those VAT refunds had already been vetted and approved by the authorities at the time they had been claimed (for the first time) by the trading entities.

687.   In their Reply, Claimants assert that there was no reason to believe that, if Yukos had disaggregated the VAT data into monthly submissions as Respondent suggests it should have done the tax authorities would have accepted the filings:

> Indeed, the Claimants note that if such resubmissions were a genuinely available option, the Respondent offers no explanation as to why, once Yukos' allegedly self-destructive management had been replaced with a bankruptcy receiver, that receiver, Mr. Rebgun, failed to resubmit the VAT returns in the allegedly required format, given that if such an option had existed, Mr. Rebgun's fiduciary duties to the creditors would have required him to take advantage of it.[727]

---

[725]    Second Konnov Report ¶¶ 86–88 (citing Resolution of the Presidium of the Supreme Arbitrazh Court of the Russian Federation No. 23/11, 26 April 2011, Exh. R-3270).

[726]    Transcript, Day 15 at 199.

[727]    Reply ¶ 252 (citing Counter-Memorial ¶¶ 1079, 1105(viii), 1237(vii), 1272, 1279(vii), 1322(vii)).

688.   In respect of this point, Professor Gaillard opined that the Russian authorities, including the courts, would certainly have found another reason to deny Yukos the VAT exemption if Yukos had filed monthly amended returns.  Professor Gaillard referred Mr. Konnov to the following extract from the Moscow Arbitrazh Court's decision relating to the 2003 tax year:

> "The tax return submitted by … Yukos Oil Company for value added tax for 2003 cannot be considered, since it does not meet the requirements of tax legislation regarding submission of a VAT tax return for each tax period, which is a month or quarter, and documents were not submitted at these times confirming the sale of goods for export and tax deductions . . . "[728]

689.   Professor Gaillard then put the following question to Respondent's expert:

> Q.   Simply, Mr Konnov, when you look at this sentence which the Chairman directed you to, do you also see that the court says that the tax return cannot be considered because:
>
> "... documents were not submitted at these times …"
>
> Do you see that?
>
> A.   Yes, I do.
>
> Q.   So the reason the court is articulating is that: (1) it's not monthly or quarterly; and (2) it was not submitted at the right time. Correct?[729]

690.   Mr. Konnov disagreed with Professor Gaillard's interpretation:

> No, no. It says that you need to submit supporting documents, which are in Article 165, with your VAT return. Article 165 says VAT return and supporting documents.[730]

691.   Earlier in his evidence, Mr. Konnov had also supported the court's reasoning in the following words:

> And this is exactly the reason I explain in my report, I believe, that Yukos had to file monthly returns, and there is no such thing as an annual return.  And the document that is in the record suggests that Yukos filed an annual return by even using a pen, I believe, or one way or another just crossing out and filling in the form the way it electronically cannot be done.  And the court addresses it here, and says that, "What you filed is not a proper VAT return."[731]

692.   The Tribunal finds the following exchange between Professor Gaillard and Mr. Konnov of particular interest.  Professor Gaillard asked Mr. Konnov for his reaction to another reason

---

[728]   Transcript, Day 14 at 259 (referring to Decision of the Moscow Arbitrazh Court, Case Nos. A40-4338/05-107-9 and A40-7780/05-98-90, 28 April 2005, p. 59, Exh. C-196).

[729]   *Ibid.* at 260.

[730]   *Ibid.* at 261.

[731]   *Ibid.* at 259.

which could have been invoked by the Russian authorities/courts to deny the VAT refunds to Yukos even if it had filed "proper" monthly VAT returns:

> Q.  Okay.  Do you see the sentence pursuant to which the court [the Moscow Arbitrazh Court rejecting Yukos's VAT argument in relation to the 2002 tax year] says:
>
>> "The court did not accept the argument of … YUKOS [Oil Company] that tax returns submitted to tax authorities by the said organisations [*i.e.*, the trading entities] shall be deemed as tax returns of … YUKOS [Oil Company] since such returns were signed by persons who had no powers to submit tax returns on behalf of … YUKOS [Oil Company]."
>
> Do you see that?
>
> A.  Right.
>
> . . .
>
> PROFESSOR GAILLARD: So what interests me is this sentence which we read, the court saying that they:
>
>> "... did not accept the argument of … Yukos that tax returns submitted … by the [trading companies] shall be deemed as tax returns of … YUKOS [Oil Company] since such tax returns were signed by persons who had no powers to submit tax returns on behalf of … YUKOS [Oil Company]."
>
> Can you confirm that this is a correct translation of the Russian original?
>
> A.  I think it is.  And I think, again, as you have read out, the court responds to "the argument of … Yukos".  So this sentence suggests that Yukos argued that they should be deemed as if they were filed by Yukos.  And probably the question was: how can someone act on behalf of Yukos?  And the court said, "Look, they cannot be accepted as Yukos tax returns, at least because someone who signed them, in the name of Yukos-M here, could not act on behalf of Yukos."
>
> Q.  But conversely the papers themselves would say that Ratibor -- or Yukos-M, in this example -- is the exporter.  The documentation they could file would say Yukos-M, Ratibor, Fargoil, whatever, has sold abroad.  So the documents are not going to bear the name of Yukos, are they?
>
> A.  Absolutely.
>
> Q.  Right.  So Yukos loses one way or the other, because either the documents do not say that they are the exporter, or they are not deemed to be the beneficiaries of the revenues, right?
>
> A.  No, Yukos wins one way: it simply refiles.[732]

693.  According to Respondent, Claimants' submission that there was no reason to believe that, had Yukos made proper filings, the tax authorities would have accepted them, is "gratuitously self-

---

[732]  *Ibid.* at 248–250.

serving".[733]   According to Respondent, "Russian law clearly indicates what Yukos should have done, but inexplicably failed to do."[734]

694.   The Tribunal is of the view, having considered the evidence and arguments canvassed above, that the Russian Federation was determined to impose the VAT liability on Yukos, and would have done whatever was necessary to ensure that the VAT liability was imposed on Yukos. The Tribunal observes that this determination of the Russian Federation to do whatever it deemed necessary to impose massive tax liabilities on Yukos is also evidenced by the second trial and conviction of Mikhail Khodorkovsky.   After having been convicted of various tax-related crimes in May 2005,[735] largely stemming from his leadership of Yukos, for which he was sentenced to a term of nine years of imprisonment, Mr. Khodorkovsky was implausibly convicted of money laundering and theft of oil in December 2010.[736]   This second verdict, for which Mr. Khodorkovsky was sentenced to an additional thirteen years and six months in prison, was based on essentially the same circumstances surrounding Yukos that led to the original conviction for tax evasion.   This shows how far the Russian Federation was willing to go to keep Mr. Khodorkovsky imprisoned, and supports the Tribunal's conclusion that it was Respondent's intent to impose VAT liability on Yukos no matter what Yukos did.

695.   The Tribunal also heard submissions from the Parties on the responsibility of the bankruptcy trustee (Mr. Rebgun) for his failure to file VAT forms in the proper format.

696.   On this issue, Respondent contends as follows:

> Finally, while the Russian Federation does not speak for Mr. Rebgun or know the circumstances of his treatment of the VAT issue, it is specious for Claimants to attempt to blame Mr. Rebgun for Yukos' failure to file proper amended VAT returns for 2000-2003 (or any amended VAT return at all for 2004).   Mr. Rebgun took office only in August 2006. Until then, Yukos had been managed by a team that Claimants themselves had appointed.   That team, as noted above, had submitted non-processable amended VAT filings for years 2000-2003 in August 2004, and had done nothing in the ensuing two-year

---

[733]   Rejoinder ¶ 719(iv).

[734]   *Ibid.* (citing Decision of the Moscow Arbitrazh Court, Case No. A40-4338/05-107-9 and A-40-7780/05-98-90, 28 April 2005, p. 59, Exh. C-196 ("The tax return submitted by OAO Yukos Oil Company for value added tax for 2003 cannot be considered, since it does not meet the requirements of tax legislation regarding submission of a VAT tax return for each tax period, which is a month or quarter[.]"); Resolution of the Ninth Arbitrazh Appellate Court, Case No. 09AP-7979/05-AK, 16 August 2005, p. 60, Exh. R-251 ("The court legally and reasonably indicated that the value added tax return of OAO NK YUKOS for 2003 provided by OAO NK YUKOS shall not be accepted as it did not comply with the requirements of the tax legislation connected with filing of VAT returns for each tax period which was a month or a quarter.").

[735]   Judgment of the Meshchansky District Court for the City of Moscow, 16 May 2005, Exh. R-379.

[736]   Verdict of the Khamovnichesky Court of Moscow, Case No. 1-23/10, 27 December 2010, Exh. C-1057.

period to correct those errors. As for the 2004 tax year, the managers appointed by Claimants failed to submit any amended returns at all. Accordingly, Claimants and their appointees bear sole responsibility for Yukos' mishandling of the VAT filings. Mr. Rebgun cannot be blamed, if only because by the time he finally took office (a) the 2000-2004 tax assessments had already been issued and become due and payable for all five of the relevant years, (b) the court rulings that had upheld the 2000-2003 tax assessments had become *res judicata*, and (c) in any event, the three-year time limits to file amended VAT returns had already expired for the whole of the 2000, 2001, and 2002 tax years, as well as for more than half of the 2003 tax year. In any event, as established at paragraphs 388-395 above, it is clear as a matter of public international law that the Russian Federation is not responsible for acts or omissions of bankruptcy receivers such as Mr. Rebgun.[737]

697. To conclude this subsection, the Tribunal will now quote the following exchange between a member of the Tribunal and Respondent's expert Mr. Konnov, in respect of Yukos' VAT liability.

> JUDGE SCHWEBEL: Is it right, then, to infer from your testimony—particularly what you've just said—that the management of Yukos, or its counsel, in not filing full VAT returns monthly, committed an astounding error worth more than $13 billion?
>
> A.   Right. It's absolutely clear to me—whether you call it "error" or whether that was intentional action, I don't know—but the defect in the VAT return was so apparent for not only a professional tax advisor and not only for Yukos, which, as we know, had a big tax team and was filing and processing this VAT return on a routine basis, but we also -- I think I referred to documents, correspondence by Golub where she admitted that it should be monthly and they required it monthly.
>
> So I think I have absolutely no doubt that they perfectly understood that the amended returns cannot and will not be accepted.
>
> JUDGE SCHWEBEL: And can you find any rational explanation for such behaviour?

---

[737] Rejoinder ¶ 719(v) (citing Reply ¶ 252; Second Konnov Report ¶ 95; *Kotov v. Russia*, ECtHR, Appl. No. 54522/00, Judgment (3 April 2012) ¶ 107, Exh. R-3371, noting that: "It would appear that the liquidator, at the relevant time, enjoyed a considerable amount of operational and institutional independence, as State authorities did not have the power to give instructions to him and therefore could not directly interfere with the liquidation process as such. The State's involvement in the liquidation procedure resulted only from its role in establishing the legislative framework for such procedures, in defining the functions and the powers of the creditors' body and of the liquidator, and in overseeing observance of the rules. It follows that the liquidator did not act as a State agent. Consequently, the respondent State cannot be held directly responsible for his wrongful acts in the present case. The fact that a court was entitled to review the lawfulness of the liquidator's actions does not alter this analysis.")

Respondent further notes: "In particular: (a) the 2000 tax assessment became final and irreversible on 30 December 2005, when the Federal Arbitrazh Court of the Moscow District dismissed Yukos' appeal of the 2000 tax assessment. *See* Resolution of the Federal Arbitrazh Court of the Moscow District, Case No. KA-A40/12571-04, 30 December 2005, Exh. R-1555; (b) the 2001 tax assessment became final and irreversible on 20 February 2006, when the panel of three judges of the Supreme Arbitrazh Court dismissed Yukos' application for supervisory review of the 2001 tax assessments. *See* Ruling of the Supreme Arbitrazh Court, Case No. 7801/05, 20 February 2006, Exh. R-589; (c) the 2002 tax assessment became final and irreversible on 12 October 2005, when the panel of three judges of the Supreme Arbitrazh Court dismissed Yukos' application for supervisory review of the 2002 executive enforcement proceedings. *See* Ruling of the Supreme Arbitrazh Court, Case No. 11868/05, 12 October 2005, Exh. R-593; and (d) the 2003 tax assessment became final and irreversible on 22 February 2006, when the Supreme Arbitrazh Court dismissed Yukos' application for supervisory review of the 2003 tax assessment. *See* Ruling of the Supreme Arbitrazh Court, Case No. 12304, 22 February 2006, Exh. R-1565." *Ibid*. n.1134.

A.   I have difficulties finding the rational behaviour, and there is nothing in the record. My only guess, and that would only be a guess: that what Yukos was trying to do, it was trying to take a position that in its view will not compromise its position with respect to the profits tax.

In other words, if Yukos—Yukos clearly would not follow my advice, and my advice, as you have seen, will be to refile both.  If they refiled proper VAT return without refiling—sorry, if they refiled proper—if they refiled proper VAT returns without refiling proper profit tax return, I think they were—my guess, my speculation, is they thought that court would look at that and would see that as them taking an inconsistent position for VAT and profits tax purposes.

So therefore my guess, again, is that they filed something—which I would not call even maybe a VAT return, but something that they knew was apparently not acceptable—just to take procedural actions.  But, as came during the cross-examination by Professor Gaillard, I think I mentioned that they file in August and they don't even refer to these returns till the—till late 2005—till 2005.

So that's my only guess: that they tried to put in—to file something with the tax service which could later on be used in argument, but would not compromise, in their view, their position on the profits tax.

JUDGE SCHWEBEL: Could the Trustee in Bankruptcy, who was charged with maximising the resources available for creditors, himself have filed the monthly forms for VAT return?

A.   Yes, he could have refiled, subject to the three-year limitation that I referred to previously.  So you look at the date when he came to power, if I may say, and for the previous three years he could have refiled.

…

THE CHAIRMAN: Should he be criticised for that?

A.   I would say so.  But it's easy now to criticise, when I look back.  So I would say I would—

Yes, I would say I would criticise him [738]

### v.    Extracts from Other Yukos-Related Awards

698.   The *Quasar* tribunal, citing the *RosInvestCo* tribunal's holding, traversed the VAT issue in the following words and concluded without any hesitation that Respondent's position on this issue was indefensible:

### D)    The rejection of the VAT refund

80.   The unattractiveness of the Respondent's position in this connection is readily apparent. The amounts involved were vast – in excess of $13.5 billion.  The export sales in question undoubtedly qualified for VAT refunds.  The trading company sellers had duly applied for them.  But once the tax authorities had invalidated the transactions by which the sellers had come into possession of the goods, they concluded that Yukos was the true original owner and therefore should be deemed to be the true export seller.  If this was so, one would expect that by a parity of reasoning under their basic premise, the tax authorities should have held that the true applicant for the refund was also Yukos – and that Yukos

---

[738]   Transcript, Day 15 at 232–35.

was therefore entitled to the VAT credit in the same way as it was assigned the debit for the profit tax.  To try to have it both ways would surely bespeak unprincipled hostility towards the taxpayer.

81.    Yet that is precisely what the tax officials did – with the subsequent endorsement of the courts.

82.    Unsurprisingly, *RosInvest* viewed this conduct in the harsh light it deserves:

> "The extremely formalistic interpretation of the VAT lax law regarding Yukos and its trading companies to the effect that, though exports were undisputedly not subject to VAT, the documentation also undisputedly submitted by the trading companies could not be used in relation to Yukos and thus Yukos was liable far more than US$ 13.5 billion in VAT related taxes is difficult to accept as a justification for a tax liability the size of which was sufficient to lead Yukos into bankruptcy." (¶452)

The present Tribunal entirely endorses this conclusion, and agrees with the Claimants that the ECHR appears, in ¶¶601-602, to have entirely missed the point being made, namely that if the tax authorities were going to attribute to Yukos the transactions carried out in the names of its trading companies, they should also have attributed to Yukos the submission of normal VAT documentation by the trading companies.  Given that the export transactions in question were indisputably zero-rated for VAT purposes, <u>the refusal to do so can only seem confiscatory to a degree which comes close to validating the claims in their entirety on this basis alone.</u>[739]

[emphasis added]

699.   The following extract from the judgment of the ECtHR, which found in favour of the Russian Federation on this issue is of interest:

> 601.   The Court notes that both Section 5 of Law no. 1992-1 of 6 December 1991 "On Value-Added Tax" governing the relevant sphere until 1 January 2001 as well as Article 165 of the Tax Code applicable to the subsequent period provided unequivocally that a zero rate of value-added tax in respect of exported goods and its refund could by no means be applied automatically, and that the company was required to claim the tax exemptions or refunds under its own name under the procedure set out initially in Letter no. B3-8-05/848, 04-03-08 of the State Tax Service of Russia and the Ministry of Finance and subsequently in Article 176 of the Tax Code to substantiate the requests in order to obtain the impugned refunds (see paragraphs 326-336).  In view of the above, the Court finds that the relevant rules made the procedure for VAT refunds sufficiently clear and accessible for the applicant company to able to comply with it.

> 602.   Having examined the case file materials and the parties' submissions, including the company's allegation made at the hearing on 4 March 2010 that it had filed the VAT exemption forms for each of the years 2000 to 2003 on 31 August 2004, the Court finds that the applicant company failed to submit any proof that it had made a properly substantiated filing in accordance with the established procedure, and not simply raised it as one of the arguments in the Tax Assessment proceedings, and that it had then contested any refusal by the tax authorities before the competent domestic courts (see paragraphs 49 and 171, 196, 196 and 216).  The Court concludes that the applicant company did not receive any adverse treatment in this respect.[740]

---

[739]    *Quasar* ¶¶ 80–82, R-3383.

[740]    ECtHR Yukos Judgment ¶¶ 601–602, Exh. R-3328.

700.  In the view of this Tribunal however, far from not receiving "any adverse treatment in this respect" as the ECtHR held, Yukos received some thirteen billion dollars worth of adverse treatment by reason of the imposition on it of VAT liabilities earlier excluded by the undisputed export of the oil in question.

### (c)  Fines

#### i.  Introduction

701.  Claimants contend that neither the "willful offender" nor the "repeat offender" fines should have been assessed, and that "the animating, confiscatory purpose behind the Respondent's actions is palpable."[741]  Claimants also assert that the imposition of fines for the year 2000 was barred by the statute of limitations, and that the authorities' reliance on what Claimants characterize as a new, retroactive, and judicially-created exception to the statute is further demonstration of its expropriatory intent.[742]

702.  Respondent insists that the authorities' conduct was proper, that the Russian courts properly rejected Yukos' arguments against the fines, and that the Tribunal should do the same here in the present arbitration.

703.  The following questions with respect to fines arise from a review of the Parties' written and oral submissions:

- Were the fines levied in relation to the 2000 tax year barred by the statute of limitations?;

- Were the "willful offender" fines properly imposed?;

- Were the "repeat offender" fines properly imposed?;

- Could Yukos have avoided the fines?; and

- Was the quantum of the fines reasonable, in terms of both the rate and the absolute amount?

---

[741]  Claimants' Post-Hearing Brief ¶ 47.

[742]  *Ibid*. ¶ 45.

ii.   **Were Fines Levied in Relation to the 2000 Tax Year Barred by the Statute of Limitations?**

704.   Article 113 of the Russian Tax Code establishes a three-year statute of limitations for all tax offenses.[743]  In respect of the 2000 tax year, Yukos had argued before the Russian courts that it was improper for the authorities to levy any fine because their assessment was not issued until 14 April 2004, *i.e.*, a few months after the posited expiration of the statute of limitations for fines. Yukos' argument was considered by Russia's courts and ultimately rejected on the ground that the statute of limitations had been tolled by Yukos' "interference" with the authorities' following the December 2003 tax audit.

705.   The Tribunal notes that after the 2000 Audit Report was issued, Mr. Pepeliaev, in his first opinion to his client Yukos, on 5 January 2004, concluded that:

> The Russian tax law envisages a legal process to collect fines. However the fine cannot be actually collected in 2004 due to the expiration of the 3-year limitation period.[744]

706.   In a later opinion, Mr. Pepeliaev wrote:

> In accordance with the currently applicable procedure set out in Art. 101 of the Tax Code of the Russian Federation, a decision to hold the company liable pursuant to the Inspection Report of December 29, 2003 may be passed no earlier than in 2004. Moreover, by virtue of art. 113 of the Tax Code of the Russian Federation no one may be held liable for a tax offence if three years have expired (limitation period) from the date of this tax offence or from the date following the end date of the tax period in which this offence was committed. In breach of this rule of law, the Inspection Report says that YUKOS should be held liable for the activities of 17 companies that took place in 2000.[745]

707.   Respondent, in its Counter-Memorial, objects that Claimants did not raise the statute of limitations argument in their Memorial.  In any event, Respondent submits, the argument is meritless.  Respondent adopts the reasoning of the Russian Courts.[746]  Respondent adds: "[T]he statute of limitations provided a windfall to Yukos, insofar as the tax authorities never disturbed

---

[743]   Russian Tax Code, Article 11(1), Exh. C-1276.  Mr. Konnov opines, in his Second Expert Report, that, under Russian law, the statute of limitations applies to fines only, and does not apply to tax arrears or default interest.  Second Konnov Report, ¶ 109.

[744]   S. Pepeliaev, *Summary of the tax inspection of OAO NK Yukos*, p. 1, 5 January 2004, Exh. C-1128.

[745]   S. Pepeliaev et al., Opinion regarding compliance with legislation of Inspection Report No. 08-1/1 of 20 December 2003 issued by the Tax Ministry of Russia, 15 January 2004, p. 3, Exh. C-1129.

[746]   *See also* Respondent's Skeleton Argument, 1 October 2012 ¶ 13 (hereinafter, "Respondent's Skeleton") ("no taxpayer—in Russia or elsewhere—could legitimately claim to be surprised that it may not invoke a limitations period that has expired only because of its own obstruction of tax audits.").

Yukos' abuses of the low-tax region regime prior to 2000.  Yukos thus obtained a 'free ride' for the frauds it perpetrated in 1999, which involved significant amounts."[747]

708.  In their Reply, Claimants invoked the limitations period.  They argue that it was unlawful for the tax authorities to seek to collect fines in relation to 2000 because "the decision of the Russian tax authorities to hold Yukos liable in respect of alleged tax offenses committed in 2000 was issued on 14 April 2004, several months after the three-year statute of limitations had expired in relation to the year 2000 (i.e., after 31 December 2003)."[748]

709.  Claimants respond to Respondent's reliance on the decisions of the Russian courts in the following words:

> The Respondent's assertion (see Respondent's Counter-Memorial on the Merits, April 4, 2011, footnote 1708) that the Russian courts approved its circumvention of the statute of limitations against Yukos is unavailing given that, as discussed below, the ECtHR has found the Russian courts' decisions to violate the principle of legality embodied in Article 1 of Protocol No. 1 to the European Convention on Human Rights, notwithstanding the extraordinary broad deference it accords to States under that provision.[749]

710.  Claimants assert that the tax authorities were able to circumvent the statute of limitations only because the Constitutional Court "creat[ed] for the first time an exception to the statute of limitations for any taxpayer who 'resisted' tax inspection, so long as an audit report was issued before the end of the limitations period."[750]

711.  Respondent resists Claimants' submission that the Constitutional Court's resolution allowing tolling of the statute of limitations in cases of taxpayer obstruction was "*tailor-made*" for Yukos.[751]  In its Rejoinder, Respondent argues that Claimants' submission is unsupported by any evidence and contradicted by the fact that this exception has been applied to numerous taxpayers, all unrelated to Yukos.[752]  As to the specific Constitutional Court Resolution No. 9 P,

---

[747]  Counter-Memorial ¶ 1081, n.1708.  Claimants reply that the 1999 audit report relating to Investproekt (Exh. R-304) was issued with ten months remaining on the statute of limitations, but that no Decision or Tax Payment Demand was issued (or, at least, none is in the record of this arbitration).  *See* Claimants' Post-Hearing Brief ¶ 63, n.36.

[748]  Reply at ¶ 258 (emphasis in original).

[749]  *Ibid.*, n.453

[750]  *Ibid.* (referring to Resolution of the Russian Constitutional Court No. 9–P, Exh. C-1141).

[751]  *Ibid.*

[752]  Rejoinder ¶ 725.

Respondent says that it was issued in response to two different complaints, only one of which was related to Yukos.[753]

712.   In his Second Expert Report, Mr. Konnov explains that the Constitutional Court ruled, in Resolution No. 9-P, as follows:

   a.   if a taxpayer obstructs tax control and tax audits, the arbitrazh court may rule that the tax authority was justified in acting after expiration of the limitations period; and

   b.   in any event, the limitations period for tax offenses ends at the moment of execution of a tax audit report summarising documented facts of tax offenses identified in the course of the audit.[754]

713.   Mr. Konnov addresses Claimants' argument on this point:

   The Claimants' allegation (Claimants' Reply on the Merits, para. 258) that the Russian Constitutional Court created an "exception to the statute of limitations for any taxpayer who "resisted" tax inspection, so long as an audit report was issued before the end of the limitations period" is misleading (emphasis added).  The Constitutional Court made two separate conclusions not dependent on each other.  The Claimants' contention that the "tax audit report" rule was "tailor-made" for YUKOS is not correct either.  The tax authorities would have nonetheless been deemed within the statute of limitations period under the obstruction of the audit limb of the Resolution.[755]

   [emphasis in original]

714.   Mr. Konnov also adds:

   The ruling of the Constitutional Court issued in July 2005 is described by the Claimants as "tailor-made" to YUKOS and in conflict with the ruling of the Constitutional Court issued in January 2005. I cannot agree.  There is no inconsistency between these two rulings.  Rather, in the July 2005 ruling, the Constitutional Court analyzed, in particular, the impact on the limitations period resulting from obstruction of the audit, an issue which was not addressed in any way in the January 2005 ruling.

   The Claimants' reliance on the dissenting opinions in the July 2005 ruling is incomplete.  The Claimants refer only to two dissenting opinions relating to the July 2005 ruling.  However, they fail to mention the third dissenting opinion to the same ruling in which Judge G.A. Gadzhiev has taken an approach which, in my opinion, is even harsher than the approach taken by the Constitutional Court.  In the view of Judge G.A. Gadzhiev, the statute of limitations should be applied differently depending on the amount of the tax arrears at issue.  He believes that the non-differentiated statute of limitation, as it is provided in the tax legislation, contradicts the constitutional principle of equality before the law.[756]

---

[753]   *Ibid. ¶* 724, n.1151.

[754]   Second Konnov Report ¶ 111.

[755]   *Ibid.*, n.177.

[756]   *Ibid.* ¶¶ 112–13.

715.   Finally, Respondent adds in its Rejoinder on this point:

> It is also worth reiterating that, as noted above, the Russian authorities' long-standing position, including when the Yukos cases were being argued in the Russian courts, has been that the three-year limitation period runs from the end of the taxable period in which <u>payment</u> was due (because this is the period when the tax offense actually occurred), and not from the end of the taxable period in which the relevant income or revenue accrued (and therefore, here, that the statute of limitations expired on December 31, 2004 rather than December 31, 2003).  While this position was rejected by the courts in the Yukos case, it was upheld in other cases, and ultimately endorsed by the Supreme Arbitrazh Court.  As a result, if the Yukos case were before the Russian courts today, it would be undisputable that the fines for tax year 2000 were assessed in a timely manner.[757]

716.   In their Post-Hearing Brief, Claimants assert that "it is factually untrue that alleged obstruction by Yukos caused the tax authorities to miss the statute of limitations: the audit was completed in just 3 weeks and <u>before</u> the limitations period had expired."[758]

717.   In its Post-Hearing Brief, Respondent asserts that "Yukos unquestionably obstructed the field tax audit leading to the 2000 assessment, and it was completely foreseeable that Russian law would not allow Yukos to invoke a limitations period so as to benefit from its own obstruction."[759]

718.   The Tribunal concludes, on the basis of the record, that Respondent has made a credible argument regarding Yukos' obstruction of the field tax audit leading to the 2000 assessment.[760]  However, the Tribunal agrees with Claimants, and with the ECtHR, that the retroactive application of Resolution 9–P violated a fundamental principle of legality.[761]  The Tribunal concludes that the fines levied in relation to the 2000 tax year were therefore barred by the statute of limitations.

---

[757]   Rejoinder ¶ 731 (citing Resolution of the Presidium of the Supreme Arbitrazh Court No. 4134/11, 27 September 2011, Exh. R-3298, interpreting a rule on calculation of the statute of limitations in Article 113 that was identical to the one in effect in 2003–2004.  As Mr. Konnov points out "the panel of three judges when transferring the case to the Presidium of the Russian Supreme Arbitrazh Court noted that courts had previously issued inconsistent rulings on this subject."; Second Konnov Report ¶ 121).

[758]   Claimants' Post-Hearing Brief ¶ 45 (emphasis in original).

[759]   Respondent's Post-Hearing Brief ¶ 45 (citations omitted).

[760]   Counter-Memorial ¶ 355; Rejoinder ¶¶ 723–30

[761]   Reply ¶ 258; ECtHR Yukos Judgment, Exh. R-3328.

### iii.   Were the "Willful Offender" Fines Properly Imposed?

719.   Claimants contest the imposition of the "willful offender" fines for the years 2000 through 2003 because "for Yukos' executives to be 'aware of the unlawful nature of such actions', there must have existed an enforceable decision of the tax authorities to that effect."[762]   Such a decision, Claimants note, did not come until 14 April 2004, and thus only *after* Yukos filed its tax returns for the years 2000, 2001, 2002 and 2003.[763]   Consequently, for the years 2000 through 2003, Yukos' executives could not have been "aware" of the alleged "unlawful nature of the[ir] actions."[764]

720.   In respect of the 2004 tax year, Claimants have a different argument:

> As regards the 2004 tax reassessment, the regional and local tax benefits that these companies had enjoyed were significantly reduced by the federal legislator as from January 1, 2004.  With the change in legislation, the alleged tax offenses for which Yukos was held liable with respect to the year 2004 could therefore not have been considered similar to those which had allegedly been committed by Yukos in 2000-2003 under the former legislation. In this context, the reference made by the Moscow Arbitrazh Court in 2006 to the 2000, 2001, 2002 and 2003 Decisions in order to justify the 40% fines for the year 2004 appear to be nothing less than a manifest misapplication of the law to Yukos.[765]

721.   In response, Respondent asserts, in its Counter-Memorial, that "'willfulness' does not require criminal *mens rea*: it is sufficient that the taxpayer's underassessment indicate a degree of awareness of the potential unlawfulness of its conduct."[766]   Nor does Respondent accept Claimants' argument that, in order for a violation to be deemed "willful", the taxpayer must already have been found liable. Respondent counters that:

> Even if Yukos, *quod non*, had been transparent and subjectively in good faith with respect to its "tax optimization" scheme, the very complexity of its scheme made it unavoidable that it would, at a minimum, be deemed "willful": one does not create a network of trading companies carelessly or as a result of honest mistake.  In any event, . . . Yukos' managers knew perfectly well that their scheme was illegal when they first implemented it -- an aggravated form of "willfulness."[767]

---

[762]   Memorial ¶ 330.

[763]   *Ibid*.

[764]   *Ibid*.

[765]   *Ibid*. ¶ 331 (citing   Decision of the Moscow Arbitrazh Court of 2 October 2006, 4 October 2006, confirming lawfulness of fines imposed on Yukos with respect to its tax reassessment for the year 2004, p. 31, Exh. C-201). Claimants note that "[a]s from 1 January 2004, the benefits on corporate profit tax that the regions were authorized to grant to taxpayers out of the regional and local shares of this tax were limited to four percent."

[766]   Counter-Memorial ¶ 1082.  *See* Konnov Report ¶ 72.

[767]   Counter-Memorial ¶ 1082.

722.  Mr. Konnov supported Respondent's position with the following observations in his First Report:

> At the time, YUKOS was one of the major Russian companies with substantial tax, legal and accounting departments.  It knew that: (i) its tax minimization practices in ZATO Lesnoy had been investigated and challenged since late 1999; and (ii) its Sibirskaya Domestic Trading Company had been challenged by the tax authorities in 2001 and had lost its tax case in 2002.  It also must have known that Russian authorities have been regularly challenging transactions involving other taxpayers aimed at tax evasion, including by means of abuses of companies registered in low-tax jurisdictions, and that Russian highest courts had introduced anti-abuse doctrines, including "bad faith."  Accordingly, in my view, YUKOS was a clear target for assessment of a "wilful offender fine," which would have been justified even under far less extreme circumstances.[768]

723.  In their Reply, Claimants argue that Respondent is wrong in its contention that the Tax Ministry was merely required to show a "degree of awareness of the potential unlawfulness of Yukos' conduct."[769]  Claimants contend that Respondent's theory is "refuted by the plain text of the provision itself as well as the Respondent's own expert, who accepts that the statute requires the Authorities to prove that the offender 'was aware of the unlawful nature of his action (or inaction)'."[770]  Claimants contend that Respondent's position requires it to "attempt to rewrite the statute."[771]

724.  Claimants take particular issue with the imposition of fines in respect of the VAT refunds:

> [A]s a general point, the imposition of fines in circumstances where no violation of statutory law has been alleged is a matter of dubious legitimacy.  Particularly improper was the imposition of fines in relation to the revocation of VAT refunds.  In circumstances where it was not alleged that any tax was owed, much less unpaid or underpaid, there was no statutory basis for such fines.[772]

725.  Claimants elaborate this argument in their Post-Hearing Brief:

> Particularly egregious is the imposition of such inflated fines in relation to VAT, where it is not even alleged that there was any intent to evade VAT nor any actual evasion of VAT.  In any case, as set out above, Yukos was not, and could not possibly be "aware of the unlawful nature of its actions".[773]

---

[768]  First Konnov Report ¶ 76 (citations omitted).

[769]  Reply ¶ 260

[770]  *Ibid.* (citing First Konnov Report ¶ 72).

[771]  Reply ¶ 260.

[772]  *Ibid.* ¶ 257 (citations omitted).

[773]  Claimants' Post-Hearing Brief ¶ 46 (citations omitted).

726.  In its Rejoinder, Respondent reiterates its argument that the relevant inquiry for purposes of the "willful offender" fine is whether Yukos' management was aware of the illegality of its tax scheme.[774]  Respondent states that Yukos did not implement the tax optimization scheme by accident, and that it knew that the scheme was unlawful.  In support of its submission, Respondent raised several arguments:

- Yukos masked its affiliation with the trading shells and falsely denied to the Russian authorities and courts that it had any knowledge of their documents or officers

- Yukos knew from its experience with its sham Lesnoy trading shells that its scheme was unlawful

- Yukos's senior management was warned at least twice that the authorities would have challenged Yukos' "tax optimization" scheme if they had known the names and details of Yukos' trading shells and their affiliation with Yukos

- No legal counsel ever provided Yukos with an opinion that its "tax optimization" scheme was lawful

- Yukos lied about its affiliation with its sham trading companies to the Russian tax authorities and courts, the ECtHR, and PwC

- Yukos had access to the case law and commentaries published by its own tax counsel, which confirmed its scheme was unlawful.[775]

727.  Finally, Respondent argues:

> The Tribunal should reject Claimants' contention that the willful offender fines were improper because Yukos' tax practices were purportedly based on the trading shells' investment agreements with local tax authorities, which as Mr. Konnov opined - without contradiction - were not sufficient to establish compliance with federal anti-abuse doctrines.[776]

728.  The Tribunal is of the view that the willful offender fines were clearly improper insofar as they related to VAT.  This follows necessarily from the Tribunal's findings that there was no valid basis to impose the VAT liability on Yukos.

729.  On the totality of the evidence, the Tribunal is also of the view that the willful offender fines as they related to the revenue-based taxes were improperly assessed against Yukos.  The Tribunal recalls its findings, above, that those taxes, considering all of the evidence, were not properly assessed against Yukos.

---

[774]  Rejoinder ¶ 734.

[775]  Respondent's Opening Slides, p. 130.

[776]  Respondent's Post-Hearing Brief ¶ 44 (citations omitted).

730. Moreover, while he did not appear at the Hearing, the contemporaneous quote from Mr. Kasyanov to journalists in January 2004 shows just how unlikely it was that Yukos could have been certain that its tax optimization plan was illegal:

> [Question:] The Tax Ministry claimed from Yukos to pay an additional 98 billion rubles, which the company allegedly saved on taxes in 2000 with the help of the schemes, which was also used by other companies. Until autumn 2003, neither the Ministry of Finance nor the Tax Ministry, though criticizing the schemes, had challenged their legality.  How do you react to the fact that the tax optimization is retroactively declared unlawful?

> [Answer:] If lawful actions for tax optimization are declared unlawful retroactively, then I react to that negatively.  For the simple reason that there were loopholes in the law allowing the optimization of payments.  The Tax Code did not forbid Yukos and other companies to conduct transactions through domestic offshore zones.[777]

> [emphasis added]

731. The opinion of Mr. Kasyanov, the Prime Minister at the time the assessment was made, is persuasive.  It confirms the conclusion of the Tribunal that, even if the legality of Yukos' tax optimization scheme was, in certain regions and respects, questionable and vulnerable to attack by the tax authorities, it could not be characterized as a "willful offense".

732. The Tribunal also recalls Claimants' position as to the governing statutory provision in the Russian Tax Code:

> Whereas the Tax Code clearly provides that fines may be increased for willfulness only "if the person who committed it was aware of the unlawful nature of his actions (inaction) and intended or consciously allowed the harmful consequences of such actions (inaction)" the Respondent claimed that such fines could be imposed if the taxpayer had "a degree of awareness of the potential unlawfulness of its conduct".  The Respondent's position is obviously not the law.[778]

> [emphasis in original]

733. The Tribunal agrees.  Respondent's interpretation of the standard is inconsistent with the Russian Tax Code.  The strict language of the Russian Tax Code makes it difficult for the Tribunal to conclude that Yukos should have been assessed the willful offender fines, even if there were a basis to conclude (as the Tribunal has held earlier) that some of the revenue-based taxes could legitimately have been imposed against Yukos.

---

[777]    Memorial ¶ 330 (quoting Alexander Bekker, Vladimir Fedorin, *Interview:  Mikhail Kasyanov, Prime Minister of the Russian Federation*, Vedomosti, 12 January 2004, p. 5, Exh. C-677).

[778]    Claimants' Post Hearing Brief ¶ 46 (citations omitted).

#### iv.    Were the "Repeat Offender" Fines Properly Imposed?

734.    Claimants contend that the 100 percent increase of the fines imposed on the basis of the "Repeat Offender" provision of the Russian Tax Code was even less justified than the imposition of the "Willful Offender" fine:

> [T]he plain wording of Article 112(2) of the Russian Tax Code directs that such increase be only permitted in cases in which a taxpayer has been held liable for a similar tax offense *prior* to the commission of the disputed offense.  The Presidium of Highest Arbitrazh Court of the Russian Federation has been unequivocal in considering that the previous similar offense must not only be committed, but also be *detected and sanctioned*.  No such sanction came before April 14, 2004.  As a result, in declaring that the tax offenses allegedly committed by Yukos in 2001, 2002 and 2003 were repeat offenses triggering a further 100% increase, both the Russian tax authorities and the Russian courts grossly misapplied Article 112(2).  As regards the 2004 fines, their 100% increase was all the more egregious that the tax offenses purportedly committed by Yukos in 2004 were not similar to those allegedly committed in 2000-2003.[779]

735.    Claimants also rely on the Resolution of the Presidium of the Highest Arbitrazh Court of the Russian Federation No. 15557/07 of 1 April 2008 (Annex (Merits) C 415) for the proposition that, in order for a taxpayer to be considered a "Repeat Offender", the taxpayer's previous similar offence must have been "detected and sanctioned" before the commission of the repeat offence.  Respondent takes issue with Claimants' reliance on this decision adopted in 2008, "years after Yukos' appeals against the assessments at issue had run their course."[780] Respondent contends that the jurisprudence prior to 2008, at the time that the authorities imposed the "Repeat Offender" fines, supported the authorities' approach:

> Prior to the issuance of the 2008 Resolution, there had been a number of cases, unrelated to Yukos, in which the courts had upheld the assessment of repeat offender fines in the same manner as was done in the Yukos cases.  Thus, when the tax authorities levied repeat offender fines against Yukos -- an egregious repeat offender if there ever was one -- they were not deviating from established practice but rather, applying one of the interpretations of the relevant statute that was in current use at the time.  As much was effectively conceded by Yukos' own lawyer who, while urging that Yukos not be assessed a repeat offender fine, noted the "unclarity" of the law.[781]

---

[779]    Memorial ¶ 332 (citing Resolution of the Presidium of the Highest Arbitrazh Court of the Russian Federation No. 15557/07, 1 April 2008, Exh. C-415).

[780]    Counter-Memorial ¶ 1084.

[781]    *Ibid*. (citing First Konnov Report ¶¶ 77–82; Article 112(2) of the Russian Tax Code, Exh. R-2248).  Respondent also points to the following in support of its position:  First Konnov Report ¶¶ 79–80; Resolution of the Federal Arbitrazh Court of the Far-Eastern District, Case No. F-03-A73/05-2/244, 14 March 2005, Exh. R-1506; Resolution of the Federal Arbitrazh Court of the Povolzhsky District, Case No. A65-7415/04-CA1-32, 5 October 2004, Exh. R-1504); Resolution of the Federal Arbitrazh Court of the North-Western District, Case No. A44-498/ 2006-8, 21 August 2006, Exh. R-3282; Resolution of the Federal Arbitrazh Court of West-Siberian District, Case No. F04-5193/2007 (36847-A75-43), 3 August 2007, Exh. R-3377; Resolution of the Federal Arbitrazh Court of the West-Siberian District, Case No. F04-1778/2008 (2088-A27-25), 12 March 2008, Exh. R-1505.

736. Claimants contend, in their Reply, that Respondent's argument should be rejected.  According to Claimants, Respondent does not contest the existence and significance of the 2008 decision, but merely contends that because this decision came in 2008, it should not be considered by the Tribunal.  Claimants conclude:

> In other words, while the Respondent concedes that the repeat offender fines were unlawful under the correct interpretation of the provision, it seeks to justify the fines on the basis of an alleged uncertainty about the correctness of that interpretation.[782]

737. In their Post-Hearing Brief, Claimants also criticize Respondent's reliance on the pre-2008 jurisprudence:

> The Respondent and its expert concede that the imposition of repeat offender fines against Yukos was contrary to the interpretation of the Highest Arbitrazh Court issued in 2008.  The Respondent's only defense is to argue that some other courts had previously applied the statute in the same (incorrect) way.  Thus, notwithstanding the requirement in Article 3(7) of the Tax Code to resolve doubts in favor of the taxpayer, the Respondent insists it was appropriate for the tax authorities to apply an interpretation that was both incorrect and nearly US$ 4 billion less favorable to the taxpayer.  The animating, confiscatory purpose behind the Respondent's actions is palpable.[783]

738. Mr. Konnov was cross-examined at length about the 2008 Arbitrazh Court decision.[784]  Throughout, he maintained his support for the authorities' treatment of Yukos, prior to the 2008 decision.  He did not concede that it was incorrect, but merely that it was a function of the uncertainty inherent in the provision.

739. Mr. Konnov had indeed referred to the "uncertainty" or ambiguity surrounding Article 112(2) of the Russian Tax Code in his First Expert Report:

> 77.    The Claimants argue that the imposition of repeat offender fines on YUKOS was unjustified and ignored the plain language of the governing law and the Supreme Arbitrazh Court guidance. I cannot agree with the suggestion by the Claimants that the language of Article 112(2) of the Tax Code was "*plain*" and that there is only one possible interpretation of that provision. The relevant provision of the Tax Code reads as follows:
>
> > "Aggravating circumstance means commitment of a tax offence by a person previously held liable for an analogous violation".
>
> 78.    YUKOS itself admitted during the court hearings related to the 2000 tax year there was more than one possible reading of Article 112(2) of the Tax Code.  The minutes of the court hearing read as follows:

---

[782] Reply ¶ 261.

[783] Claimant's Post-Hearing Brief ¶ 47 (citing Transcript, Day 15 at 20–23 (Mr. Konnov); Transcript, Day 18 at 101 (Respondent's closing)).

[784] *See* Transcript, Day 15 at 5–23.

> [A representative of YUKOS] ". . . believes that there is unclarity in interpretation of Article 112 of the Russian Tax Code."[785]

740. Claimants assert that Respondent's position is untenable, given that "Article 3(7) of the Tax Code requires doubts as to the proper interpretation of its provisions to be resolved in favor of the taxpayer."[786]

741. In relation to Article 3(7) of the Russian Tax Code, Respondent makes the following final argument in its Post-Hearing Brief:

> Claimants' contention that purported ambiguities in the statute governing repeat offender fines had to be resolved in Yukos' favor is baseless (Claim. Reb., Day 20 Tr. 196:18:23; Konn. Test., Day 15 Tr. 33:14-33:25, 34:25-35:8). As Mr. Konnov explained without contradiction (Konn. Test., Day 15 Tr. 34:1-34:24), and as is confirmed in a 2004 article written by Mr. Zaripov (Exh. R-3223), only those doubts that courts cannot resolve must be decided in favor of the taxpayer. Here, however, the relevant Tax Code provision was interpreted consistently with prior caselaw, confirming that it did not give rise to any irresolvable doubts. Konn. Rep. 1, ¶ 79; Konn. Rep. 2, ¶ 102.[787]

742. Respondent has another defense for the "repeat offender" fines, namely that Yukos would have been deemed a repeat tax offender even under the approach adopted by the 2008 Resolution, because it had been subjected to fines for underpayment of taxes well before any of the assessments was issued. Respondent refers in this connection to paragraphs 81 and 82 of the First Konnov Report, which reads as follows:

> 81. Furthermore, there could have been additional grounds for imposition of repeat offender fines on YUKOS. Based on my experience, any Russian company of a size comparable to that of YUKOS at the end of 1990s and the beginning of this decade was regularly subject to tax audits. Almost all of these audits resulted in discovery of tax violations and imposition of fines, even though in some instances the amounts were relatively insignificant. The Nefteyugansk Tax Inspectorate imposed fines on YUKOS pursuant to Decision No. 289 dated June 9, 2003. Even before that, the tax authorities conducted a tax audit of YUKOS. The Report of the Nefteyugansk Tax Inspectorate No. 66, dated April 28, 2003, notes that on April 16, 2001 the Inter-Regional Inspectorate of the Tax Ministry for Operational Oversight of Problem Taxpayers issued a report No. 34-03-10/6. Although I have not been able to review that act, it would not be unreasonable to assume that fines were imposed on YUKOS based on that act. Moreover, the US GAAP financials produced by YUKOS suggest that in each of 1998, 1999, 2000, 2001, 2002 and 2003, YUKOS was subject to substantial fines and interest for tax violations.

> 82. In accordance with the prevailing court practice, a repeat offender fine may be levied so long as the prior fine involved the same provision of the Tax Code with respect to

---

[785] First Konnov Report ¶¶ 77–78.

[786] Reply ¶ 261 (citing Russian Tax Code, Article 3(7), Exh. C-1276; Reply ¶ 231 and n.250).

[787] Respondent's Post-Hearing Brief ¶ 46, n.140. For the exchange between Dr. Poncet and Mr. Konnov on the principle "*in dubio contra fiscum*," *see* Transcript, Day 15 at 37–42.

the same taxes, even if the nature and the amount of the violations were different. Accordingly, even minor violations with respect to the same taxes imposed in connection with different arrangements would have sufficed to justify the repeat offender fines even under the approach taken by the 2008 Resolution.[788]

743.   Claimants counter Respondent's alternative argument as follows:

The Respondent's alternative theory, according to which any previous violation on profit tax, on whatever basis and in whatever amount, would be sufficient to justify these US$ 3.92 billion in repeat offender fines is far-fetched to say the least, relying on Mr. Konnov's dubious assertion as to the content of "prevailing court practice", his speculation that Yukos may had a previous violation at some point in time and his assumption that that hypothetical violation involved the same provision of the Tax Code with respect to the same taxes.  In any event, since by the Respondent's own admission its tax claims were not premised on alleged violations of any provision of the Tax Code, Mr. Konnov's theory has no conceivable application in relation to Yukos.[789]

744.   On the issue of the "repeat offender" fines, the Tribunal is persuaded by Claimants' argument that these fines should not have been imposed.

### v.   Could Yukos Have Avoided the Fines?

745.   In its Counter-Memorial, Respondent draws the attention of the Tribunal to Article 81(4) of the Russian Tax Code which allows taxpayers to avoid <u>all</u> penalties for past misdeeds provided only that they file amended tax returns before being formally notified of the onset of the audit relating to the relevant tax years.  If the taxpayer takes advantage of Article 81(4) in a timely fashion, it needs to pay only the tax previously evaded (and interest), but no fine.  This provision, combined with the Russian practice (followed in the Yukos case) of auditing "open" tax years (*i.e.,* tax years not time-barred by the statute of limitations) one after the other, rather than simultaneously, gives tax offenders an opportunity to eliminate their exposure to fines by filing last-minute amended returns.[790]

746.   On the basis of this provision, Respondent contends that Yukos could have easily avoided the fines associated with the assessments for tax years 2001, 2002 and 2003, if only it had taken advantage of Article 81(4) of the Russian Tax Code:

In Yukos' case, the authorities had made clear their complete condemnation of Yukos' scheme when they delivered their audit report for 2000 to Yukos, *i.e.,* on December 29, 2003.  They did not, however, announce commencement of their audit of the next year

---

[788]   First Konnov Report ¶¶ 81–82 (citations omitted).

[789]   Reply ¶ 262 (citing Counter-Memorial ¶¶ 993, 1085).

[790]   Counter-Memorial ¶ 1087 (citing First Konnov Report ¶¶ 83–85).

(2001) until March 23, 2004, *i.e.*, 84 days later.  As a result, Yukos had a window of opportunity of nearly three months duration in which it could have legally avoided any penalty whatsoever for tax year 2001 (including a willful offender fine and a repeat offender fine), simply by filing amended returns and paying the respective taxes and interest.  The authorities' audit for 2002 and 2003 did not start until August 9, 2004  and October 28, 2004, respectively, and Yukos could likewise have avoided all penalties simply by filing amended returns for 2002 and 2003 before those dates and paying the overdue taxes and interest.  Instead, Yukos' managers recklessly squandered this opportunity.[791]

747.  As an additional point for the tax year 2003, Respondent asserts that Yukos had only itself to blame "for filing a fraudulent annual return for that year, which ended on or around 28 March 2004, the filing deadline."[792]  It is Respondent's position that instead of continuing to pretend that its scheme was lawful, some three months after the December 2003 audit, Yukos could have filed an amended return.[793]

748.  Similarly, Respondent submits that Yukos could have filed a "lawful tax return" for the 2004 tax year.  On the basis of this reasoning, Respondent sums up its position as follows:

> Had Yukos filed lawful tax returns beginning as of January 1, 2004 (*i.e.*, after its receipt of the December 29, 2003 tax audit report) and exercised in timely fashion its right to file amended returns for years 2001 and 2002, and paid the respective taxes and default interest, it would have reduced its overall tax liabilities in an amount that would have ensured that Yukos would have not faced bankruptcy proceedings, and that would in all likelihood also have avoided the need for the YNG auction.[794]

749.  Claimants reject Respondent's suggestion that Yukos should have pre-emptively conceded the validity of the December 2003 tax audit for the 2000 tax year and filed amended tax returns for subsequent years prior to being notified of the audits for those years.  Claimants assert that Respondent's position "confirms the Russian authorities' complete disregard for due process and fundamental rights of taxpayers."[795]  According to Claimants, Yukos had every right to avail itself of its rights under Russian law to challenge these unlawful tax reassessments and fines in court, or even await the results of the tax authorities' own review of Yukos' objections and declaration of their final position in the decision to hold Yukos liable with respect to the

---

[791]   Counter-Memorial ¶ 1088 (citing Field Tax Audit Report No. 30-3-14/1, 30 June 2004, p. 3, Exh. R-345; Field Tax Audit Report No. 52/852, 29 October 2004, p. 3 Exh. R-346; Field Tax Audit Report No. 52/907, 19 November 2004, p. 2, Exh. R-260; Counter-Memorial ¶¶ 353–65).

[792]   Counter-Memorial ¶ 1089.

[793]   *Ibid*.

[794]   *Ibid*. ¶ 1090.

[795]   Reply ¶ 264.

year 2000.[796]  Claimants note that Respondent decided to carry out additional control measures and to review the 29 December 2003 audit report in light of Yukos' objections but communicated no information about this review prior to issuing its Decision to hold Yukos liable on 14 April 2004 when it dismissed Yukos' objections.[797]

750.   The Tribunal does not accept that, if Yukos had acted as Respondent maintains, it would have been able to escape the imposition of fines.  As with the issue of VAT liability, the Tribunal is convinced that had Yukos done so, the Russian Federation would still have found a way or a reason to impose the fines on Yukos.

### vi.   Was the Quantum of the Fines Reasonable, in Terms of Both the Rate and the Absolute Amount?

751.   In its Counter-Memorial, Respondent compares the regime for fines in the Russian Federation with those that exist in other countries.  Respondent notes that fines for taxpayers that have underpaid their taxes, whether or not associated with tax evasion, can lead to fines at rates ranging up to 300 percent of the evaded tax (this highest rate applies, according to Respondent, in Austria, the Netherlands, and Switzerland).  On this basis, Respondent concludes: "It is clear from the foregoing that the fines levied on Yukos were not excessive by international standards."[798]

752.   The Tribunal notes that Claimants did not address this last submission of Respondent.  In any event, given the Tribunal's conclusions regarding the legitimacy of the willful and repeat offender fines imposed by the tax authorities on Yukos, it is unnecessary for the Tribunal to deal with this contention.

### vii.   Extracts from Other Yukos-Related Awards

753.   In respect of the limitations period as it applied to the 2000 tax year, the ECtHR found, "notwithstanding the State's margin of appreciation", against the Russian Federation:

> 571.   Turning to the facts of the case, the Court would note firstly that the rule which, in the present case, underwent changes as a result of the decision of 14 July 2005, was contained in Article 113 of Chapter 15 "General provisions concerning the liability for tax

---

[796]   *Ibid*.

[797]   *Ibid*., n.475.

[798]   Counter-Memorial ¶ 1224.

offences" of the Tax Code (see paragraph 403) and thus formed a part of the domestic substantive law.  Even though the rule in itself did not describe the substantive elements of the offence and the applicable penalty, it nevertheless constituted a *sine qua non* condition with which the authorities had to comply in order to be able to prosecute the relevant taxpayers in connection with the alleged tax offences.  Accordingly, Article 113 of the Tax Code defined a crime for the purposes of the Court's analysis of lawfulness.  It remains to be determined whether in the circumstances the decision of 14 July 2005 could be seen as a gradual clarification of the rules on criminal liability which "[was] consistent with the essence of the offence and could reasonably be foreseen" (see *Kafkaris*, cited above, § 141).

572.   In this connection the Court may accept that the change in question did not change the substance of the offence.  The Constitutional Court interpreted the existing rules on time-limits in relation to taxpayers who acted abusively.  At the same time, the Court is not persuaded that the change in question could have been reasonably foreseen.

573.   It observes that the decision of 14 July 2005 had changed the rules applicable at the relevant time by creating an exception from a rule which had had no previous exceptions (see paragraphs 86 and 88).  The decision represented a reversal and departure from the well-established practice directions of the Supreme Commercial Court (see, by contrast, *Achour*, cited above, § 52) and the Court finds no indication in the cases submitted by the parties suggesting a divergent practice or any previous difficulty in connection with the application of Article 113 of the Tax Code at the domestic level (see paragraphs 407-408).  Although the previous jurisprudence of the Constitutional Court contained some general references to unfavourable legal consequences which taxpayers acting in bad faith could face in certain situations, these indications, as such, were insufficient to provide a clear guidance to the applicant company in the circumstances of the present case.

574.   Overall, notwithstanding the State's margin of appreciation in this sphere, the Court finds that there has been a violation of Article 1 of Protocol No. 1 on account of the change in interpretation of the rules on the statutory time-bar resulting from the Constitutional Court's decision of 14 July 2005 and the effect of this decision on the outcome of the Tax Assessment 2000 proceedings.

575.   Since the applicant company's conviction under Article 122 of the Tax Code in the 2000 Tax Assessment proceedings laid the basis for finding the applicant company liable for a repeated offence with a 100% increase in the amount of the penalties due in the 2001 Tax Assessment proceedings, the Court also finds that the 2001 Tax Assessment in the part ordering the applicant company to pay the double fines was not in accordance with the law, as required by Article 1 of Protocol No. 1.[799]

754. On the issue of the "repeat offender" fines, the *RosInvestCo* tribunal held as follows against the

Russian Federation:

> From the evidence on file, the Tribunal concludes that the interpretation of Articles 122 and 114 of the Tax Code used on Yukos was not used before or thereafter in any comparable cases.  Again, this resulted in an extremely large liability in the range of US$ 3.8 billion.[800]
>
> . . .
>
> **Repeat offender fines:** The US$ 3.8 billion repeat offender fines on the basis of conduct pre-dating the tax audit again appears to the Tribunal as a departure from practice applied

---

[799]   ECtHR Yukos Judgment, ¶¶ 571–75, Exh. R-3328.

[800]   *RosInvestCo* ¶ 454, Exh. C-1049.

earlier and from that granted to other companies and thus to be one part of a cumulative effort to prevent Yukos' ongoing existence.[801]

**(d)      Concluding Observations**

755.    The Tribunal recalls that, at the outset of this chapter, it referred to the question put by Counsel for the claimant to the arbitral tribunal in the *Quasar* arbitration.   "Why would Russia have treated Yukos as it did if its purpose was to collect taxes?"[802]

756.    After having now traversed, at some length, the treatment of Yukos by Russian tax authorities, the bailiffs and the courts, and having considered the totality of the evidence, especially the VAT evidence, the Tribunal has concluded that the primary objective of the Russian Federation was not to collect taxes but rather to bankrupt Yukos and appropriate its valuable assets.

757.    The principal reasons, discussed in this chapter, which lead the Tribunal to this conclusion include:

i)      the attribution to Yukos of the revenues earned by its trading companies, even though there was no precedent in Russia for such attribution based on the theory of "actual owner", and the refusal at the same time to give Yukos any of the benefits of the VAT filings made by the trading companies, with the result that Yukos was assessed USD 13.5 billion or 56 percent of the total tax claims levied against Yukos;

ii)      the imposition on Yukos of the "willful offender" fines, at the very least as they related to VAT;

iii)      the refusal of the tax authorities to give Yukos the benefit of Article 3(7) of the Russian Tax Code to resolve doubts as to the interpretation of Article 112(2) of the Russian Tax Code in favor of the taxpayer, with the resulting imposition of nearly USD 4 billion in "repeat offender" fines; and

iv)      the imposition of "repeat offender" fines on Yukos when the conduct that was punished occurred prior to the determination by the courts that the conduct was wrongful; for example, the "repeat offender" fine assessed against Yukos for the

---

[801]      *Ibid*. ¶ 620(c).

[802]      *See* above at paragraphs 504 and 579.

2001 tax year is based on the finding by the courts in 2004 that the conduct in 2000 was wrongful.

758. In reaching its conclusion, the Tribunal has also taken into account the fact that, in February 2007, before Messrs. Khodorkovsky and Lebedev had served half of their prison terms, the Prosecutor General's Office levelled new charges against them, this time for theft of oil and funds from Yukos, embezzlement and money laundering.

759. As will be seen in subsequent chapters of this Part VIII of the Award which now follow, the Tribunal is sustained in this central and all important conclusion by its analysis of other disturbing facets of the Yukos saga, including:

   i)   the campaign of harassment carried out by the Russian authorities under the cloak of "investigative activities" including arrests, interrogations, searches and seizures against Yukos senior executives, mid-level employees, in-house counsel, external lawyers and related entities;[803]

   ii)  Yukos' repeated, reasonable attempts to settle its tax debts with the Russian Federation, all of which proved futile;[804]

   iii) the seizure of YNG, Yukos' main production subsidiary, and its auction in questionable circumstances for an inadequate price;[805]

   iv)  the way in which Yukos' bankruptcy proceedings were initiated and conducted;[806] and

   v)   the pressure brought to bear by the Russian authorities on PwC, which ultimately conduced to the withdrawal of PwC's audits of Yukos' financial statements.[807]

760. The Tribunal will determine later in this Award how these conclusions impact the liability of Respondent under the ECT.

---

[803]   *See* Chapter VIII.C.

[804]   *See* Chapter VIII.E.

[805]   *See* Chapter VIII.F.

[806]   *See* Chapter VIII.G.

[807]   *See* Chapter VIII.H.

### C.   HARASSMENT, INTIMIDATION AND ARRESTS

#### 1.   Introduction

761.   Claimants allege that Respondent carried out a campaign of harassment and intimidation of Yukos, its management, employees, external advisers and associates with a view to destroying the company and removing Mr. Khodorkovsky as a political threat:

> In what has been described as "a literal orgy of lawlessness", the Russian Federation instigated and conducted a campaign of terror aimed at depriving Yukos of its ability to run its business, and thus facilitating the destruction of the company.  This was achieved through an escalating process of arrests, intimidation, harassment, searches and seizures. The breadth of the campaign, which targeted not only Yukos and its management but also entities and individuals associated with the company, and the flagrant violations of due process that characterized the actions of the Russian Federation, underscore both the ruthlessness with which the Russian Federation sought the destruction of Yukos and the coordinated nature of the attack.

> The undeniable effect of the actions described below was to undermine the viability of Yukos, placing the Russian Federation in a position to carry out the dismantling of the Company.[808]

762.   Claimants allege that Respondent's harassment campaign has "continued throughout the time period at issue in these arbitrations and continues even today," most notably with a second round of charges in 2007 against Messrs. Khodorkovsky and Lebedev leading to a trial described as a "travesty of justice" that resulted in a sentence of a further thirteen and a half years in prison.[809]

763.   Respondent for the most part does not question the facts underlying Claimants' allegations, though it does question the credibility of some of Claimants' witness accounts.  Rather, the events described by Claimants as constituting a campaign of "harassment and intimidation" are, according to Respondent, better characterized as legitimate acts of law enforcement undertaken in full compliance with Russian law and Russian practices as well as standards of other countries.[810]

764.   In any event, Respondent considers the events complained of to be largely irrelevant to the Tribunal's enquiry in these arbitrations.  That is because Article 26 of the ECT limits the Tribunal's jurisdiction to disputes alleging the breach of an obligation under Part III of the ECT, of which Articles 10(1) and 13 are directed only to investments, and afford no personal

---

[808]   Memorial ¶¶ 106–7.  *See also* Memorial ¶¶ 65, 83–197; Reply ¶¶ 17–94; Claimants' Post-Hearing Brief ¶¶ 156–65.

[809]   Reply ¶¶ 17, 41.

[810]   *See* Counter-Memorial ¶ 673; Transcript, Day 18 at 113–21 (Respondent's closing).

protection for nationals.  Respondent observes that "the alleged violations of the human rights of Messrs. Khodorkovsky, Lebedev and others . . . are outside the scope of this Tribunal's jurisdiction, unless Claimants can establish that any such violations directly impaired the management or operation of their investments."[811]  Respondent argues Claimants have failed to do so,[812] and that the prosecutions of Messrs. Khodorkovsky and Lebedev did not destroy Yukos.  To the contrary, Yukos exceeded its 2003 performance in 2004.[813]

765.  The Tribunal recognizes that it is not a human rights court.  Nevertheless, it is within the scope of the Tribunal's jurisdiction to consider the allegations of harassment and intimidation as they form part of the factual matrix of Claimants' complaints that the Russian Federation violated its obligations under Part III of the ECT.  The Tribunal's task includes determining whether the Russian Federation "in any way impair[ed] by unreasonable or discriminatory measures [Claimants'] management, maintenance, use, enjoyment or disposal" of its investment, or subjected Claimants' investment to measures having the effect equivalent to an expropriation. In the context of that inquiry, the Tribunal will set out the evidentiary record with respect to the alleged "campaign of harassment and intimidation."

### 2.  Chronology of Facts

#### (a)  Yukos Grows; Mr. Khodorkovsky Becomes More Politically Engaged; Yukos Leaders Receive Warnings

766.  Claimants allege that by early 2003 "Mikhail Khodorkovsky's participation in the social policy and political spheres in Russia, coupled with Yukos' growing economic power, came to be perceived as a threat by the Russian authorities."[814]

767.  As already noted in Chapter VIII.B above, President Putin's former Chief Economic Advisor, Dr. Illarionov alleged in his witness statement that around late 2002, a "special unit was set up at the General Prosecutor's office, comprised of approximately 50 people and working exclusively on fabricating evidence against Mr. Khodorkovsky and Yukos."[815]  The special unit

---

[811]   Rejoinder ¶ 1335.

[812]   *Ibid*. ¶ 1331.

[813]   *Russia's Yukos says interim oil output up 5.3% on year in 2004*, Prime–TASS Energy Service (Russia), 21 March 2005, Exh. R-509.

[814]   Memorial ¶ 63.

[815]   Illarionov WS ¶¶ 35–36.

came up with approximately 15 possible theories to justify Mr. Khodorkovsky's arrest, amongst them "tax evasion schemes allegedly set up either for Mr. Khodorkovsky's personal benefit or for the benefit of Yukos."[816]   Upon cross-examination, Dr. Illarionov declined to identify his source, a "high-placed official in the Russian Administration at the time" who still lives in Moscow, out of concerns for the official's safety.[817]   Dr. Illarionov testified that the official told him the unit had "been created to 'zanyatsa' Khodorkovsky. . . 'take care of' Khodorkovsky . . which means one day some kind of security services and officers did receive an order so-called to solve the problem."[818]

768.   The turning point, according to Claimants, was a meeting at the Kremlin between President Putin and the Russian Union of Industrialists and Entrepreneurs on 19 February 2003, to which the Tribunal has referred earlier, at which Mr. Khodorkovsky delivered a speech about corruption in Russia.[819]   President Putin responded by alluding to some companies, including Yukos, having accumulated considerable wealth from non-payment of tax, and thus told Mr. Khodorkovsky that he was "passing the puck back to you."[820]   At this point, according to Dr. Illarionov, the tone became "steely and menacing,"[821] and from then on, the "gloves were off."[822]   The Tribunal has observed earlier in this Award that the Russian authorities, particularly in the ZATOs, were questioning the legality of Yukos' tax optimization scheme prior to the February 2003 meeting and that this meeting was not a "turning point" in terms of being the catalyst for challenging the Yukos tax scheme.[823]   Nevertheless the record does show that from around the time of the February 2003 meeting, the Russian authorities escalated the intensity and extent of their investigations into Yukos and associated individuals and entities.

769.   In the months following the February 2003 meeting, Mr. Khodorkovsky's financial support for

---

[816]   *Ibid.*

[817]   Transcript, Day 7 at 156–57.

[818]   *Ibid.* at 158.  As discussed below in Subsection 3(a), Respondent describes Dr. Illarionov's evidence as "rank hearsay" and a "lie", Transcript, Day 18 at 114–16.

[819]   Memorial ¶¶ 63, 86–91.

[820]   Excerpt of Television Report "Un milliardaire en Sibérie" broadcast on TF1 on 1 October 2006, Exh. C-590; Video recording and transcript of the meeting of the members of the Union of Industrialists and Entrepreneurs with President V. Putin held in the Ekaterininsky Hall, Kremlin, on 19 February 2003, Exh. C-1396.

[821]   Illarionov WS ¶¶ 31–32.

[822]   *Ibid.*  Memorial ¶¶ 86–91.  *See also* Statement of Prime Minister Mikhail Mikhailovich Kasyanov to the ECtHR, 8 July 2009, in *Khodorkovskiy v. The Russian Federation* (Application Nos. 5829/05, 11082/06 and 51111/07) ¶¶ 10–12, Exh. C-446.; Kovalev Report ¶ 53.

[823]   *See* above at paragraph 513.

opposition parties, including the Communist party, apparently was increasingly of concern to President Putin.   For example, Mr. Dubov testified that President Putin had advised Mr. Khodorkovsky in April 2003 to restrict his political activities and not to finance the Communists.[824]   Similarly, former Prime Minister Kasyanov testified to the ECtHR that a conversation with President Putin had left him in no doubt that "by funding the communists Khodorkovsky had crossed a line so far as Putin was concerned and that the criminal prosecution case of Yukos employees was started exactly because of the funding of political parties not sanctioned by Putin."[825]

770.   Mr. Khodorkovsky's close business associate, Mr. Leonid Nevzlin, testified that in the Spring of 2003 the then Media Minister met him for lunch and informed him that "the decision had been taken to seize Yukos, and that [President Putin's deputy chiefs of staff] would not stop at anything in order to achieve that end, including arresting Khodorkovsky."[826]   From this, Mr. Nevzlin received the message that Mr. Khodorkovsky should put an end to his criticism of President Putin and his administration, "otherwise he could lose everything."   Mr. Nevzlin reported warnings from other sources at the time, including Sibneft's Roman Abramovich saying President Putin told him he "would like to see Mr. Khodorkovsky's bottom on a prison bench" and Federation Council members telling Mr. Nevzlin that Mr. Khodorkovsky "could face problems should he stay in Russia."[827]

### (b)    Prosecutor General Launches Investigations Involving Searches and Seizures

771.   From June 2003, the Office of the Prosecutor General of the Russian Federation launched a series of investigations against various members of Yukos' management, most prominently among them Mr.  Khodorkovsky and Mr. Platon Lebedev (GML director and close associate of Mr. Khodorkovsky).[828]   Mr. Lebedev was arrested on his hospital bed on 2 July 2003 on charges of fraud, embezzlement and tax evasion.[829]   Two days later, Messrs. Khodorkovsky and

---

[824]   Dubov WS ¶ 69.

[825]   Statement of Prime Minister Mikhail Mikhailovich Kasyanov to the ECtHR, 8 July 2009, in *Khodorkovskiy v. The Russian Federation* (Application Nos. 5829/05, 11082/06 and 51111/07) ¶¶ 17–19, Exh. C-446.

[826]   Nevzlin WS ¶ 30.

[827]   *Ibid*. ¶¶ 31–33.

[828]   Memorial ¶ 108;  'Chronology', *Attack on Yukos*, Yukos Review, Special Issue, 2003, p. 5, Exh. C-22.

[829]   *Attack on Yukos*, Yukos Review, Special Issue, 2003, Exh. C-22; *Oil Executive is Arrested, and Russians Look for Putin's Role*, NY Times, 3 July 2003, Exh. C-637; *Yukos oil oligarch arrested in raid*, The Washington Times, 26 October 2003, Exh. C-658.  Respondent points out that the ECtHR dismissed a complaint by Mr. Lebedev that the

Nevzlin were summoned for questioning in what Mr. Nevzlin described as an "absurd" investigation.[830]   That same day, the Russian authorities raided the office of the registrar of Yukos' shares and confiscated documents.[831]

772.   On 11 July 2003, the Russian authorities conducted the first large-scale raid on Yukos.  Yukos' then Chief Financial Officer, Mr. Bruce Misamore, describes it as:

> an incredible scene full of armed, masked officers—during which they trawled through our computer records for approximately 17 hours.  This was to begin a wave of raids on Yukos' Moscow headquarters and other companies affiliated with Yukos by investigative officers . . . sometimes accompanied by . . . heavily armed police officers.[832]

773.   Yukos group Financial Controller, Mr. Frank Rieger, also recounts the raids on the accounting department, which started from July 2003.  He describes how the staff was forced to stop work during the raid, that a Deputy Chief Accountant had been told by the authorities that they "knew that she had grandchildren, a dacha *etc* and that she had better tell them what they wanted to hear," another staff member resigned having been told by the prosecutors it would be best for him, and that the authorities regularly seized "lorry loads of documents" in an unsystematic fashion, without leaving copies or any record of the documents seized.[833]

774.   According to Mr. Misamore, the loss of key documents "created great difficulties not only in managing the company, but in preparing the annual financial statements."[834]  Mr. Misamore elaborated that "these raids with the guys in their balaclavas and their AK47s coming in and harassing our employees, taking original documents away from our offices, not leaving us with any copies, we couldn't even accomplish accounting . . . .  We lost our entire U.S. GAAP consolidation accounting group by the end of 2004:  they all left the company because they didn't want to be harassed."[835]  Steven Theede, who joined Yukos as Chief Operating Office in August 2003 noted that by the end of 2003:

---

Russian Federation violated its human rights obligations with respect to his health in detention conditions, *Lebedev v. The Russian Federation* (No. 1) (Application No. 4493/04), ECtHR Decision of 18 May 2006, Exh. R-4000.

[830]   Nevzlin WS ¶ 34.

[831]   "Yukos Repurchases its Shares," Vedomosti, 7 July 2003, Exh. C-638.

[832]   Misamore WS ¶ 31.  *See also* "Police raid Russian oil giant," BBC News, 11 July 2003, Exh. C-640; "Prosecutors Search Yukos Office for 17 Hours," The Moscow Times, 14 July 2003, Exh. C-641.

[833]   Rieger WS ¶¶ 27–28.  *See also* Misamore WS ¶ 32.

[834]   Misamore WS ¶ 32.

[835]   Transcript, Day 4 at 244–45.

> It was obvious that . . . the Government was out to get us; it was that simple.  The number of raids we had in the office, police coming and charging through our accounting department, knocking computers off desks, . . . tipping desks up on their side.  I had four men in black masks outside my office with machine guns once, trying to get in.[836]

775. Following the arrest of Mr. Lebedev, the Board of Directors of Yukos set up a temporary *ad hoc* committee to assess the situation and potential risks related to the arrest, which was chaired by Mr. Jacques Kosciusko-Morizet, then chair of the Board's Audit Committee.[837]  Mr. Kosciusko-Morizet testified (over Respondent's objection) about Mr. Khodorkovsky's appearance before the *ad hoc* committee in August 2003.[838]  Although Mr. Khodorkovsky initially assured the Board that "everything is fine," Mr. Kosciusko-Morizet pressed him for "some explanation" and recounted his response to the Tribunal:

> He said the following, 'I'm in touch with generals from the FSB' [the successor of the KGB] . . . 'They want a kompromat.' . . . 'kompromat', which is a Soviet word . . . A kompromat is a document which gives you leverage on somebody, and practically forces him or her to follow whatever instructions he or she is given.  And we asked, 'What kind of kompromat do they mean?' 'Well', he said, 'all I have to do is write two lines: I committed criminal deeds.' And then I said, 'And what will happen if you sign such a kompromat?' He said, 'Nothing. They will just keep it, and from time to time I'll receive a phone call asking me for some favour.' And I asked again, 'But for Yukos—so will you sign it?' . . . He said, 'No, I don't want to live like that with my children.' And then I said, 'But under the assumption that you would sign it, what would happen?' And his words were, 'Well, if I would sign such a two-line letter, the problems of Yukos would disappear faster than it takes to switch off the light in this room.' . . . And I did not leave this meeting in a very optimistic mood on future events. And indeed two months later he was in jail, in pre-trial detention. He did not sign the kompromat.[839]

776. Dr. Illarionov testifies that in September 2003 he met with Mr. Khodorkovsky to tell him he was in danger and it would be preferable for him to leave Russia.  Mr. Khodorkovsky reportedly replied that he did not feel he had committed any offence and did not want to leave Russia.[840]

777. In early October 2003, the authorities conducted raids at the home of Mr. Lebedev, the offices of GML Management Services SA, and a boarding school for disadvantaged children sponsored by Yukos.[841]  Further raids were conducted in the office of Mr. Lebedev's lawyer, a

---

[836]   *Ibid*. at 9.

[837]   Kosciusko-Morizet WS ¶ 23.

[838]   Transcript, Day 4 at 226–28.

[839]   *Ibid*.

[840]   Illarionov WS ¶ 39.

[841]   Memorial ¶ 161, *Attack on Yukos*, Yukos Review, Special Issue, 2003, Exh. C-22; *Yukos Targeted in Three New Raids*, The Moscow Times, 6 October 2003, Exh. C-652.

move criticized by the Moscow Bar Association at the time.[842]

### (c)   Arrest and Trial of Mr. Khodorkovsky; Flight from Russia of His Associates

778.   On 25 October 2003, Mr. Khodorkovsky was arrested at gunpoint by an armed special forces unit in a Siberian airport, and taken to Moscow where he was charged with economic crimes including fraud, tax evasion and embezzlement.[843]   He was detained for over ten years until his much publicized release on 20 December 2013.[844]   According to Claimants, the arrest "paved the way for the subsequent actions of the Russian Federation, which eventually resulted in the dismantling of Yukos."[845]   The ECtHR, in its judgment of 31 May 2011, criticized the manner of Mr. Khodorkovsky's arrest, the denial of bail, violations of due process and attorney-client privilege, and the subjection of Mr. Khodorkovsky to inhuman and degrading treatment in his pre-trial detention.[846]

779.   Mr. Yuri Schmidt, a criminal lawyer who has acted for Mr. Khodorkovsky, testifies that never before in his 50 years of experience had he "seen the Russian State undertake such coordinated, systematic and intense efforts, and deploy such huge resources, against a person accused of an alleged economic offense."[847]   Respondent chose not to cross-examine Mr. Schmidt.

780.   In response to a question from a member of the Tribunal, Dr. Illarionov testified about a conversation he had with President Putin shortly after the arrest of Mr. Khodorkovsky. According to Dr. Illarionov, President Putin explained that Mr. Khodorkovsky had "behave[d] badly" and stopped "cooperating," for example by negotiating with an American oil company about a possible merger and supporting the Communist Party in advance of the Duma elections.

---

Memorial ¶ 161, *Lawyer Outcry: Yukos Raids Illegal*, The St. Petersburg Times, 14 October 2003, Exh. C-657.

[843]   Memorial ¶ 112, *Attack on Yukos*, Yukos Review, Special Issue, 2003, Exh. C-22; *Yukos oil oligarch arrested in raid*, The Washington Times, 26 October 2003, Exh. C-658.

[844]   The Parties agree that Mr. Khodorkovsky's release has no impact whatsoever on the present arbitration proceedings. *See* Claimants' Letter to the Tribunal of 24 January 2014 ("The Claimants submit that Mr. Khodorkovsky's pardon by the President of the Russian Federation and his release from prison . . . have no impact whatsoever on the present proceedings"); and Respondent's Letter to the Tribunal of 24 January 2014 ("Mr. Khodorkovsky's pardon itself has no effect on these proceedings").   Claimants further point out that the pardon entailed no admission of guilt by Mr. Khodorkovsky.   Respondent further points out that the pardon had no effect on Mr. Khodorkovsky's criminal convictions or the findings by Russian courts with respect to tax evasion by Yukos.   The Tribunal also notes that Mr. Lebedev was released after his sentence was reduced by the Russian Supreme Court on 23 January 2014.   *See* Respondent's Letter to the Tribunal of 24 January 2014.

[845]   Memorial ¶ 122.

[846]   Reply ¶¶ 25–28.  ECtHR, *Khodorkovskiy v. Russia* (Application No. 5829/04), Judgment of 31 May 2011 ¶¶ 193–95, (hereinafter "*Khodorkovsky v. Russia I*", Exh. C-1300.

[847]   Schmidt WS ¶ 59.

Following these actions, President Putin decided to "step aside" and allow Mr. Khodorkovsky to fend for himself against "the boys."[848]  Dr. Illarianov also recalled that there was wide "public outrage" in the mass media.  The then Prime Minister, Mr. Mikhail Kasyanov, publicly disapproved of the arrest. Dr. Illarionov referred to President Putin's order that "I would ask everybody in the Government to shut up on Mr. Khodorkovsky's arrest," and it was very clear to him that this comment was addressed to Mr. Kasyanov, who was later removed from his position.[849]

781.  Mr. Dubov testifies that a Kremlin official informed him on 27 October 2003 that his name had been struck off the list of candidates running for the Duma, at the direction of President Putin.[850]  At the Hearing Mr. Dubov elaborated on the conversation he had with the Kremlin official, to whom he had asked "What will happen to Yukos?"  Mr. Dubov received the answer "Yukos will be taken away from you gentlemen" and that there would be criminal claims against every single shareholder.[851]  He was told President Putin had "gone berserk over Khodorkovsky."  Upon advice from the official, Mr. Dubov left Russia that night and has never returned.   Mr. Nevzlin also left Russia late in 2003 and has not returned since. Shortly thereafter Mr. Dubov, Mr. Nevzlin and Mr. Brudno were charged with embezzlement and money laundering.[852]   International arrest warrants were issued in January 2004 for Messrs. Nevzlin and Dubov, the day after Mr. Nevzlin announced their joint support for a presidential candidate opposing President Putin.[853]

782.  On 3 November 2003, Mr. Khodorkovsky resigned as CEO of Yukos.  In that connection, Respondent submits that he resigned voluntarily and that, shortly thereafter, Yukos confirmed that it had "a strong management team in place", that it was "continuing to operate" and that it was "business as usual" following Mr. Khodorkovsky's resignation.[854]  However, raids and arrests at the offices and homes of Yukos-connected personnel continued over the ensuing

---

[848]   Transcript, Day 7 at 155.

[849]   *Ibid*. at 159–60.

[850]   Dubov WS ¶ 79.

[851]   Transcript, Day 5 at 182.

[852]   Decision to Deny Extradition of Mikhail Brudno to the Russian Federation, Prosecutor General's Office of Lithuania, 24 August 2007, Exh. C-469; Memorial ¶ 123;  Dubov WS ¶¶ 79–81, Nevzlin WS ¶ 14.

[853]   Memorial ¶ 123, Nevzlin WS ¶ 14.

[854]   *Yukos Conference Call on Recent Developments – Final*, Financial Disclosure Wire, 5 November 2003 Exh. R-3991.

years, including on NGOs and service providers connected with Yukos.[855]   Claimants also allege that Yukos' auditors, PwC, were targeted and harassed because of their association with Yukos,[856] an issue discussed in more detail below in Chapter VIII.H.

### (d)   Complaints of Further Harassment and Intimidation of Yukos Executives, Employees, Lawyers and External Advisers

783.   Claimants have also referred the Tribunal to the interrogations and arrests of in-house and external lawyers for Yukos and Messrs. Khodorkovsky and Lebedev.[857] Their telephones were put under surveillance. In his witness statement, Mr. Schmidt recounts that the treatment of some lawyers acting for Yukos personnel included threats, harsh interrogations and beatings requiring hospitalization, leading some local and international bar associations to voice their deep concerns.[858]   Mr. Schmidt himself recounts incidents of intimidation against him, including disbarment and libel suits.[859]

784.   Mr. Schmidt observes that "the timing of the attacks on the lawyers acting for Messrs. Khodorkovsky and Lebedev and on Yukos' lawyers and personnel was always meticulously calculated to correspond to the critical stages in the dismantlement of Yukos."[860] Thus, at a time when Yukos was deeply engaged in its defense of tax proceedings brought against it, the Head of Yukos' Legal Department, Mr. Gololobov, was arrested and his computers and documents confiscated.   In July 2004, at the time of the enforcement

---

[855]   *Special forces raid Russian oil firm's headquarters*, The Daily Telegraph, 4 July 2004 Exh. C-690; *Yukos raided, banks declare it in default*, Gazeta, 5 July 2004, Exh. C-691; *Police Surround Yukos Headquarters*, The Moscow Times, 5 July 2004, Exh. C-692; *Police raid threatens Yukos oil production*, The Guardian, 5 July 2004, Exh. C-693; *Top Yukos executives flee threat of arrest*, The Financial Times, 25 November 2004, Exh. C-725; *Prosecutor General Gets Busy with Yukos Staff*, Kommersant, 17 December 2004, Exh. C-733.

[856]   Memorial ¶¶ 143–51.

[857]   *Russia Seeks To Prosecute Two More At Yukos*, NY Times, 19 November 2004 Exh. C-723; *Prosecutor General Gets Busy with Yukos Staff*, Kommersant, 17 December 2004 Exh. C-733; *Yukos Lawyer Shows Signs of Three Crimes*, Kommersant, 12 January 2005 Exh. C-747; *Moscow court upholds arrest warrant for Yukos lawyer*, RIA Novosti, 26 December 2005 Exh. C-788; *Yukos Lawyer, a Mother of Two, Gets 7 Years*, The Washington Post, 20 April 2006 Exh. C-800.   *See also*, more recently, *Khodorkovsky v. Russia 2* ¶¶ 634–48, 931–32 and the Parties' respective submissions of 30 August 2013 on that judgment.

[858]   Schmidt WS ¶¶ 16–18; *Striving for Judicial Independence:  A Report into Proposed Changes to the Judiciary in Russia*, International Bar Association Human Rights Institute Report, June 2005 Exh. C-601; Letter from the IBA Executive Director to General Procurator of the Russian Federation (undated) Exh. C-604; Witness Statement of Pavel Petrovich Ivlev of 15 March 2006 in *Mikhail Borisovich Khodorkovsky v. The Russian Federation*, ECtHR, (Application No. 11082/06), Exh. C-441; *Family of Yukos Lawyer Detained*, Kommersant, 9 February 2005, Exh. C-750.

[859]   Schmidt WS ¶¶ 20–22.

[860]   *Ibid*. ¶¶ 16(3) and 17.

proceedings by the court bailiffs for the tax assessments and the service by the Tax Ministry of the Field Tax Audit Report for 2001, an estimated 100 officials raided Yukos' headquarters on a Saturday afternoon, confiscating computer servers.  At the time of the forced sale of YNG in December 2004, there were further raids on Yukos offices and personnel.[861]  Searches were carried out in the offices of Yukos' external lawyers, ALM Feldmans, who also faced an extensive audit of their own after the search.

785.  On 31 May 2005, the Meshchansky Court of the city of Moscow sentenced Messrs. Khodorkovsky and Lebedev to nine years in prison on charges of fraud and tax evasion, following a trial that was widely criticized for its lack of due process.[862]  Mr. Schmidt, himself intimately involved with the trial, stated he had never seen "such a mockery of justice and violations of the most basic standards of due process and fundamental rights, including the right to a fair trial, at all stages of a case."[863]  Similar observations were made by Russian and international media outlets and opposition parties within Russia.[864]  Messrs. Khodorkovsky and Lebedev were transferred to Siberia to serve their sentences in remote penal colonies, and their sentences were reduced on appeal to 8 years, which Claimants maintain was in violation of Russian law at the time.[865]

786.  Meanwhile, a number of Yukos associates who had fled Russia were subject to extradition requests from the Russian Federation, none of which were granted by the courts of the countries where they were residing.  Mr. Nevzlin mentioned his trial *in absentia* and Israel's refusal to extradite him to Russia.[866]  In 2005 and 2007, courts in the United Kingdom refused to extradite former financial and business managers of Yukos, on the basis that the prosecutions were "so politically motivated that there is a substantial risk that the Judges of the Moscow City court would succumb to political interference in a way which would call into question their independence."[867]  Courts in Lithuania, Cyprus and the Czech Republic also refused to extradite

---

[861]  Memorial ¶ 155.

[862]  Memorial ¶ 520–47, Reply ¶ 30.

[863]  Schmidt WS ¶¶ 16(4)(5), 23, 26.  He recounted how Mr. Khodorkovsky's lawyers were denied the opportunity to meet with him in crucial weeks to prepare for the defence.

[864]  *Yukos verdict alarms Russia press*, BBC News, 1 June 2005, Exh. C-753; *Khodorkovsky sentenced, Russia Guilty*, International Herald Tribunal, 2 June 2005, Exh. C-754.

[865]  Reply ¶¶ 39–40.

[866]  Nevzlin WS ¶ 14, Transcript, Day 8 at 28.

[867]  Memorial ¶¶ 189–92, *The Government of the Russian Federation v. Dmitry Maruev and Natalya Chernysheva*, Bow Street Magistrates' Court, 18 March 2005, Exh. C-462.  *See also The Government of the Russian Federation v. Alexander Vikotrovich Temerko*, Bow Street Magistrates' Court, 23 December 2005, Exh. C-464; *The Government of*

former Yukos managers or former Yukos service providers on the basis of the political dimensions of the underlying requests.[868]

787.   In late 2003, most of the shares in Yukos held by Claimants Hulley and YUL were seized by the Russian courts and remained frozen until the liquidation of Yukos in November 2007.[869] The shares owned by Claimant Veteran, which were held in a Swiss bank account, were also subject to an asset freeze following a request for mutual legal assistance from the Russian Federation to Switzerland.  However, in June 2004, the Swiss Federal Tribunal overturned the freeze orders and released the shares.  Over the following years, the Swiss courts were also engaged in mutual legal assistance requests for searches and seizures of documents of various Yukos-related entities, culminating in the Swiss Federal Tribunal expressing the view that the case against Mr. Khodorkovsky was politically motivated and "orchestrated by the regime in power with a view to subordinating the class of rich 'oligarchs' and eliminating potential or sworn political opponents."[870]

788.   By late 2004, many mid-level Yukos managers and employees had been arrested, questioned or put on wanted lists, generating an atmosphere of pressure.  Several of the remaining senior executives decided not to return to Russia.[871]  In August 2006, the Russian Prosecutor General's office announced criminal investigations against senior level executives, including Messrs. Misamore and Theede.  Mr. Misamore, noting he had never been formally notified of the charges, considers that they were part of a "general campaign to intimidate those associated with Yukos."[872]  Mr. Rieger also testified about being interrogated by the Russian Prosecutor General's Office, when he was presented with a series of questions for which the investigator had already prepared his answers.  He described this as:

---

*the Russian Federation v. Ramil Raisovich Bourganov and Alexander Gorbachev*, Bow Street Magistrates' Court, 17 August 2005, Exh. C-463; *The Government of the Russian Federation v. Andrei Borisovich Azarov*, City of Westminster Magistrates' Court, 19 December 2007, Exh. C-465.

[868]   Memorial ¶¶ 193–97, In the matter of the Application by the Russian Federation for the extradition of Kartashov Vlatislav Nicolay, Nicosia District Court, Cyprus, Judgment, 10 April 2008, Exh. C-460; Decision to Deny Extradition of Elena Vybornova to the Russian Federation, High Court of Olomouc, Czech Republic, 31 July 2007, Exh. C-461; Decision to Grant Refugee Status to Igor Babenko, Supreme Administrative Court of Lithuania, 16 October 2006, Exh. C-468; Decision to Deny Extradition of Mikhail Brudno to the Russian Federation, Prosecutor General's Office of Lithuania, 24 August 2007, Exh. C-469.

[869]   Memorial ¶ 167.

[870]   Judgment of the Swiss Federal Tribunal, 13 August 2007, *Mikhail Khodorokovsky v. Swiss Federal Prosecutor's Office* ¶ 4, Exh. C-477.  For similar conclusions reached by courts in other mutual legal assistance cases, see Exhs. C-478–82.

[871]   Memorial ¶ 123.

[872]   Misamore WS ¶ 35.

> a kind of never expected story. And if I wouldn't have been the witness of such an event, I couldn't believe this: being called as a witness, arriving, and seeing, "Here, Mr Rieger, we'd like to talk to you today. These are the questions, and wouldn't you mind to look at this document? . . . . I think this is what you'd like to say to us."[873]

Mr. Rieger refused to sign and was kept for eight hours of questioning. The next morning, the German Embassy advised him to leave the country. He has not returned to Russia since May 2006.[874] Similarly, Mr. Theede was advised by the U.S. State Department that it was not safe for him to return to Russia.[875]

789. By the time bankruptcy proceedings had started against Yukos at the end of March 2006, approximately 35 senior managers, employees and in-house counsel of Yukos had been interrogated, arrested and/or sentenced.[876] At that time, Mr. Theede appointed Vasily Aleksanyan as Executive Vice President of Yukos to serve as the main point of contact for the bankruptcy.[877] Shortly afterwards, on 6 April 2006, Mr. Aleksanyan was arrested at home by masked and armed men and charged with embezzlement allegedly committed when he was head of the Yukos legal department.[878] A few months after his detention, he was diagnosed with lymphoma and AIDS. It is alleged that he was offered medical treatment and freedom in return for evidence against Messrs. Khodorkovsky and Lebedev, an offer which he refused.[879] He remained in pre-trial detention for almost three years in conditions described by Russia's own human rights council as "simply monstrous."[880] His treatment was criticized by the ECtHR, whose initial interim measures were ignored by the Russian Federation, but after the ECtHR issued a final judgment, the authorities released Mr. Aleksanyan on bail (for USD 1.8 million) and finally dropped charges against him due to the statute of limitations.[881] Claimants' expert witness on the independence of the Russian judiciary, Dr. Sergei Kovalev, whom

---

[873]  Transcript, Day 6 at 69.

[874]  Rieger WS ¶¶ 32–35.

[875]  Transcript, Day 11 at 16.

[876]  *Ioukos, un deuxième président en prison*, Libération, 8 April 2006, Exh. C-798.

[877]  Theede WS ¶ 30.

[878]  *Top Yukos official Aleksanyan detained in Moscow*, RIA Novosti, 6 April 2006, Exh. C-796; *Arrest of Yukos Oil Company Executive Vice-President is a Brutal and Unjust Attack on the Company's Attempts to Secure a Fair Bankruptcy Process*, Yukos Press Release, 7 April 2006, Exh. C-797; *Ioukos, un deuxième président en prison*, Libération, 8 April 2006, Exh. C-798.

[879]  As described in his testimony to the Supreme Court of the Russian Federation, 22 January 2008, Exh. C-598.

[880]  Jonas Bernstein, *Aleksanyan's Plight: a case of the 'Legal Nihilism' Medvedev has vowed to fight?*, Eurasia Daily Monitor, Volume 5, Issue 21, 4 February 2008, Exh. C-880.

[881]  ECtHR, *Aleksanyan v. Russia* (Application No. 46468/06), Judgment, 22 December 2008, Exh. C-449.

Respondent chose not to cross-examine, described Mr. Aleksanyan's treatment as "[o]ne of the most glaring examples of pressure exerted on individuals associated with Mikhail Khodorkovsky and Yukos."[882]  Mr. Theede testified that the plight of Mr. Aleksanyan (who after his release from prison died at age 39)[883] demonstrated the severe risks which other persons in Russia associated with Yukos faced constantly and stated that it had become extremely difficult to manage the company.[884]

### (e)   Second Trial of Mr. Khodorkovsky; Allegations of Continuing Harassment and Intimidation

790.  In February 2007, before Messrs. Khodorkovsky and Lebedev had served half of their prison terms, the Prosecutor-General's Office levelled new charges against them, this time for theft of oil and funds from Yukos, embezzlement and money laundering.[885]

791.  Claimants describe the second trial as a "travesty of justice," a view shared by international organizations and human rights NGOs such as the International Bar Association and Amnesty International.[886]  Before the verdict was issued, President Putin responded to a question during his annual televised address that: "It is my conviction that a 'thief should be in jail.' . . .  we must start from the fact that Khodorkovsky's guilt has been proved in court."[887]

792.  On 27 December 2010, Judge Danilkin issued his verdict finding Messrs. Khodorkovsky and Lebedev guilty of charges of embezzlement and money laundering.  He sentenced them to the maximum penalty requested by the prosecution, thirteen and a half years.  The verdicts were

---

[882]   Kovalev Report ¶ 60.

[883]   Reply ¶ 61.

[884]   Transcript, Day 11 at 39. *See also* Speech of Vasily Aleksanyan before the Supreme Court of the Russian Federation, 22 January 2008, www.khodorkovksy.ru, Exh. C-598; *Russia Closes Criminal Case Against Yukos Executive Aleksanyan*, Business Week, 24 June 2010, Exh. C-893; *Aleksanyan's Death 'Practically Murder'*, The Moscow Times, 5 October 2011, Exh. C-1458.

[885]   *Procuracy-General of the Russian Federation completes investigation of criminal case with respect to Mikhail Khodorkovsky and Platon Lebedev*, News, 16 February 2007, The Procuracy-General of the Russian Federation Website, Exh. C-423.

[886]   Reply ¶ 42.  *The Khodorkovsky trial:  A report on the observation of the criminal trial of Mikhail Borisovich Khodorkovsky and Platon Leonidovich Lebedev*, International Bar Association Human Rights Institute, March 2009 to December 2010, September 2011, Exh. C-1334.  *Unfair trial concerns cast doubt on the integrity of the conviction of Mikhail Khodorkovsky and Platon Lebedev*, Amnesty International, Public Statement of 27 December 2010, Exh. C-1330.

[887]   *Transcript of a Conversation with Vladimir Putin*, 16 December 2010, Official Site of the Prime Minister of the Russian Federation, Exh. C-1435.  Respondent avers that the comments were taken out of context and referred to the convictions after the first trial.  *See* Rejoinder ¶ 1381.

widely criticized.[888]   Judge Danilkin questioned over 90 fact witnesses and reviewed an extensive documentary record.  His verdict focused on a holding that in the period 1996–2003, Messrs. Khodorkovsky and Lebedev "stole" the entire oil output of the Yukos production entities, concealed the fact that the oil was "stolen" both from Yukos' shareholders and the Russian tax authorities, orchestrated the "theft" through Lesnoy and Trekhgorny entities, which led to tax evasion, and then "laundered" the proceeds of the "theft."  Judge Danilkin rejected all of Mr. Khodorkovsky's arguments, including those relating to double jeopardy.[889]

793.   Within a few months, the 689-page verdict was upheld on appeal, a decision noted with concern by the European Parliament, which condemned "political interference with the trial."[890]  Russia's own Human Rights Council reviewed the second criminal case at the request of then President Medvedev.  The Council issued a report in December 2011 which concluded that the trial was unlawful and should be annulled.  The author of the report told local media there was "no evidence or substance behind the accusations of embezzlement," and that Messrs. Khodorkovsky and Lebedev had received "punishment for carrying out legal activities."[891]   Other members of the Council described the verdict as "profoundly unjust," "contradictory, arbitrary and malicious," "illegal," containing "numerous legal errors and inaccuracies" and selectively prosecuted.[892]

### 3.   Parties' Arguments and Tribunal's Observations

794.   As demonstrated above, the record of this case is replete with evidence pertaining to the events underlying the so-called campaign of harassment and intimidation.   The following section

---

[888]   Reply ¶ 48.   Verdict of the Khamovnichesky Court of Moscow in the second criminal case against Messrs. Khodorkovsky and Lebedev, 27 December 2010, Exh. C-1057.

[889]   Verdict of the Khamovnichesky Court of Moscow in the second criminal case against Messrs. Khodorkovsky and Lebedev, 27 December 2010, p. 494, Exh. C-1057 ("Arguments of the defence that the charges of embezzlement of oil and tax evasion are the same crimes because taxes, as per their theory, were paid on the stolen oil, are unsustainable. Taxes were paid on profit, and the organized group participants stole property in the form of oil. Profit is not property because it is a calculated accounting value which is a difference between income and expenses. It is impossible to steal figures, which exist in accounting records, but it is possible to commit theft of oil, which is a material value, which is property. Relations concerning the making of tax payments (taxes) to the budget are the object of a tax offence (crime) . . . While relations concerning right, title, and interest in certain property are the object of embezzlement (theft) . . .").

[890]   European Parliament, Resolution of 9 June 2011 on the EU-Russia summit ¶ 16, Exh. C-1315.

[891]   *Rights Council:  Free Khodorkovsky*, The Moscow Times, 22 December 2011, Exh. C-1463.

[892]   Report on the Results of Public and Scientific Analysis of the Materials of the Criminal Case against M. Khodorkovsky and P. Lebedev (Judged by the Khamovnichesky Court of Moscow, Which Rendered the Corresponding Verdict on 27 December 2010) (Unanimously approved by the Russian Presidential Council for Civil Society and Human Rights on 21 December 2011), Exh. C-1290.   As to Respondent's position with respect to Mr. Aleksanyan, see paragraph 806 below.

addresses (a) the credibility of Claimants' allegations of a campaign of harassment and intimidation, (b) the characterization of such events in the context of the Russian Federation's law enforcement efforts against Yukos' tax optimization scheme and (c) the actual impact of the events on Claimants' investment.

(a)     Are Claimants' Allegations about a Campaign of Harassment Credible?

795.    Respondent does not deny that the investigations, searches, seizures, arrests, interrogations and criminal trials took place.  Respondent's main defence to the allegations is not that they are not true, but that the events complained of were legitimate and justified for purposes of law enforcement, that they were in line with practice in Russia and other countries, and that in any event they were not expropriatory and did not impair Claimants' investment.[893]

796.    There are, however, some portions of the witness testimony with which Respondent takes issue. Respondent contends that Claimants' "conspiracy theory relies heavily on circumstantial evidence and sheer innuendo, attributable to the Oligarchs' public relations and lobbying campaign."[894]  Respondent argues that:

> if the assessments and the subsequent enforcement measures were the product of a massive political conspiracy spanning several years and implemented by hundreds if not thousands of officials, including no fewer than 60 judges at four different levels of courts, along with a large cast of third parties worldwide, then surely, after nearly a decade of vigorous challenges, at least one document referring to this purported conspiracy would have surfaced, or one disgruntled conspirator would have reported having participated in it. Conspicuously, Claimants have offered no such evidence at all.  To the contrary, they rely on double and triple hearsay renditions of purported conversations, provided by vocal opponents of the Russian Government, inaccurate and uninformed reports by political commentators, and mere speculation.[895]

797.    Respondent also argues that "Claimants' hearing testimony on this issue is not credible, in light of its reliance on those who stand to gain billions of dollars if Claimants prevail."[896]

798.    For example, Respondent decries Dr. Illarionov's testimony about a special unit established to come up with a theory to put Mr. Khodorkovsky away as "rank hearsay of the most grotesque

---

[893]    Transcript, Day 3 at 184–85.

[894]    Counter-Memorial ¶¶ 777–823; Respondent's Post-Hearing Brief ¶ 56.

[895]    Respondent's Post-Hearing Brief ¶ 57, citing Transcript, Day 2 at 104–7 (Respondent's opening); Respondent's Closing Slides, pp. 282–92, 723–24.

[896]    Respondent's Post-Hearing Brief n.163, citing Respondent's Closing Slides, pp. 282–92.

sort, because Dr. Illarionov declined to identify the person who supposedly told him that."[897] Respondent described Dr. Illarionov's report as "manifestly not credible" because he had said nothing about it for seven years, and because he continued to serve President Putin for more than two years after hearing that report."[898]

799.   The Tribunal found Dr. Illarionov to be a credible and convincing witness.   He offered a satisfactory explanation for protecting the source of his information about the special unit.   The Tribunal does not consider his evidence impeached merely because he had not come forward earlier with his evidence about the special unit nor that he stayed for a certain period in his position working for the President.

800.   Similarly, Respondent attacks the credibility of Mr. Nevzlin's testimony on the basis that he had waited until 2010 to disclose certain facts, such as what Mr. Abramovich had told him about Mr. Khodorkovsky being targeted for political reasons.[899]   When pressed as to why he had not disclosed the information in the earlier Russian criminal proceedings or the ECtHR proceedings, Mr. Nevzlin gave the following explanations: [900]

> [I]f I had spread the information about Abramovich and Putin fairly broadly, and if it had become available to the public, then from the perspective of Khodorkovsky, who is in Russian prison, I would have damaged him. . . .   I would have caused him tremendous amounts of harm. . . . in the other corner facing him were Putin, Sechin and others; but I also would have turned Abramovich into an enemy of Khodorkovsky by disclosing this information.
>
> . . .
>
> [After] things moved to a second absurd set of charges and a second trial, Khodorkovsky's position changed radically.   He was no longer wary of a political . . . confrontation with Putin's regime because he realised that he was not going to be able to find truth in a Russian court if he tried to defend himself based on the laws . . .
>
> . . .
>
> Russian courts have no interest in my position: it would be either ignored or rejected by them.   Because it's not a judge who makes decision on Khodorkovsky and Lebedev; the judge just rubber-stamps decisions that are made by investigative committee and Prosecutor's Office. . . . The fact that I trust this court and tell this court a lot more than I've ever said on the matter, this is a typical position for me, because . . . if we're able to defend our interests, that would be either in courts in free countries or international courts.

---

[897]   Transcript, Day 18 at 114.

[898]   Transcript, Day 18 at 114–15 (Respondent's closing).   For the explanation from Dr. Illarionov about safety concerns for his source, see Transcript, Day 7 at 156.

[899]   Nevzlin WS ¶ 35; Transcript, Day 8 at 4–5. The Tribunal notes that in the judgment issued by the High Court in London, Mrs. Justice Gloster DBE was "not impressed" by Mr. Nevzlin as a witness (*Berezovsky v Abramovich, Berezovsky v Hine & Others* [2012] EWHC 2463 (Comm) ¶¶ 485–90, Exh. R-4654; *see also* Transcript, Day 8 at 39–40).

[900]   Transcript, Day 8 at 17–25.

801. The Tribunal accepts Mr. Nevzlin's explanations.  The Tribunal notes again that the Russian Federation called no fact witnesses of their own to contradict or weaken the testimony of Claimants' fact witnesses.  Respondent chose not to cross-examine Mr. Schmidt, simply noting instead that as he was Mr. Khodorkovsky's criminal lawyer his statement is "special pleading."[901]   Respondent also chose not to cross-examine Dr. Kovalev, whose evidence, accordingly, also stands unchallenged.

802. During the Hearing on the Merits, the Chairman of the Tribunal invited Respondent's counsel:[902]

> to address the allegations of harassment:  Rieger being presented by the Prosecutor's Office with a statement, "Just sign here on the bottom line"; the number of Yukos employees who were detained; Misamore, who was told "You shouldn't go back to Russia"; the campaign to make life impossible for Yukos-related officials, officers? That stands uncontradicted on the record right now.  And it bothers us, my colleagues and me, and we would like to hear from the Respondent in respect of these matters.

803. With respect to Mr. Rieger, Respondent's counsel pointed out that the incident had occurred in 2006, several years after the arrest of Mr. Khodorkovsky and that "it's not atypical that an investigatory agency would have an idea of what they think a witness does or doesn't know, and might suggest to that [witness] what that evidence is and then find out from the witness whether they agree with it or disagree with it.  Mr. Rieger said he didn't agree, and he didn't sign it."  The Chairman recalled:  "He was threatened, he was detained at the airport.  This is background that speaks about the atmosphere.  The Russian authorities are seen as being out to get Yukos."  Respondent's counsel explained that: "I think that what you are seeing is the authorities having established that there was quite substantial fraud at many, many different levels of activity within a large company."[903]

804. The Tribunal accepts the evidence of Claimants' witnesses who testified with respect to the campaign of harassment and intimidation conducted by Respondent against Yukos.  The Tribunal will now turn to the nature and consequences of the events described above.

---

[901] Counter-Memorial ¶ 696.

[902] Transcript, Day 19 at 46 (Respondent's closing).

[903] *Ibid*. at 47.

(b)     Were the Actions of the Russian Federation Justified as Legitimate Law Enforcement Measures?

805.    Respondent explains that its actions were consistent with a legitimate wide-scale investigation as part of "an attempt to enforce and try to understand what turned out to be one of the largest frauds in the experience of the modern Russian State."[904]  Thus, in response to Mr. Kosciusko-Morizet's evidence recounting Mr. Khodorkovsky's *kompromat*, Respondent observes that this "is absolutely consistent with the fact that the authorities had valid grounds to bring criminal charges against Mr. Khodorkovsky."[905]   Likewise, Respondent describes as "no surprise" that Mr. Dubov would have been advised to leave the country and warned that every shareholder of Yukos would face criminal charges.  Respondent states that this is "not inconsistent with the unbroken thread of tax evasion in which Yukos engaged and for which it was held to account."[906]

806.    In a similar vein, while acknowledging the unfortunate circumstances surrounding Mr. Aleksanyan's illness, Respondent remarked that "it is not shocking" that the Russian authorities were interested in Mr. Aleksanyan, given his role since 2001 in suppressing information about vulnerabilities of Yukos in the low-tax regions.[907]

807.    Respondent argues that the "searches of Yukos offices and the seizures of its records as part of Russian law enforcement authorities' investigations have parallels in other countries as proper instruments of law enforcement, especially when those authorities are faced with the types of egregious violations in which Yukos engaged."   Respondent cites the EU and the U.S. as jurisdictions that authorize expansive and aggressive, even armed, searches and seizures to combat financial crimes.[908]

---

[904]   *Ibid.* at 49–52.

[905]   Transcript, Day 18 at 118–19 (Respondent's closing); Respondent's Post-Hearing Brief ¶ 205(iv).

[906]   Transcript, Day 18 at 116–17 (Respondent's closing); Respondent's Post-Hearing Brief ¶ 205(ii).

[907]   Transcript, Day 19 at 50 (Respondent's closing).

[908]   Respondent's Post-Hearing Brief ¶ 209–10.  For example, in the European Union, companies are often subjected to "dawn raids", in which EU officials, without prior judicial authorization, conduct searches and seizures.  *See* Transcript, Day 19 at 49–50 (Respondent's closing) ("[I]n the United States a search warrant is never executed unarmed; it's always executed by armed officers, sometimes wearing other gear that suggests something  more than a simple commercial exercise.  That's the way it happens.  In Russia, that's the way it's always done. It's just their practice.  It doesn't reflect or project anything unique to Yukos.").  Claimants however point to the "very exacting standard of proof" at the ECtHR requiring "incontrovertible and direct" evidence, but that the ECtHR nevertheless accepted that "the circumstances surrounding the applicants' criminal case may be interpreted as supporting the applicants' claim of improper motives" and that "it is clear that the authorities were trying to reduce political influence

808.  As for the convictions of Messrs. Khodorkovsky and Lebedev in 2005, Respondent asserts that Claimants have not criticized the conduct of the Russian appellate judges who upheld the convictions.[909]   Respondent points to the ECtHR as having "rejected the central premise of Claimants' argument that Mr. Khodorkovsky was prosecuted in 2005 for political or other improper reasons."[910]

809.  With respect to the second criminal trial of Messrs. Khodorkovsky and Lebedev, Respondent notes that it "had no effect on the investments at issue in these arbitrations and that, regardless, Claimants have not contested the factual bases of the charges in that trial.  Their attempt to portray the charges as concerning the physical theft of oil, rather than complicated schemes of corporate abuse and sham auctions to secure underpayments of oil purchased from Yukos' subsidiaries for the Oligarchs' benefit, is manifestly baseless."[911]  Respondent contends that the IBA Report was prepared without access to the full court file and without any knowledge of Russian criminal law, and that other criticisms reported by Claimants were biased and ill-informed.

810.  Respondent also contends that its actions were necessary due to Yukos' attempts to obstruct Russia's investigative efforts.[912]  Claimants deny that Yukos was obstructing the investigation, and note that most of the evidence relied upon by Respondent was based on interrogation records of individuals that Respondent has failed to put forward as witnesses.  Claimants urge the Tribunal to treat the interrogation records with skepticism, "[g]iven the campaign of terror being waged against persons associated with Yukos and the relentless pressure deployed by the prosecutors to get Yukos' former employees or other Yukos-related persons to give false incriminating evidence against Yukos and Yukos' management."[913]

811.  The Tribunal accepts that the Russian Federation had the power to conduct searches and seizures in Yukos' premises during the ongoing criminal investigations.  Nevertheless, having reviewed the record, the Tribunal finds that the investigation of Yukos was carried out by the

---

of 'oligarchs' and that the State was one of the main beneficiaries of the dismantlement of Yukos."  *See Khodorkovsky v. Russia 2* ¶¶ 634–48, 931–32; and Claimants' submissions dated 30 August 2013 ¶ 47 concerning that judgment.

[909]   Respondent's Post-Hearing Brief ¶¶ 204, 206.

[910]   *Khodorkovsky v. Russia 1*; Rejoinder ¶ 1334.

[911]   Respondent's Post-Hearing Brief n.484.  *See also* Rejoinder ¶¶ 1371–86.

[912]   Counter-Memorial ¶¶ 674–79.

[913]   Reply ¶¶ 77.

Russian Federation with excessive harshness.  Respondent's counsel acknowledged that in the context of the large-scale fraud investigation "not everything is pretty in those circumstances, and we may each of us have circumstances that we would regret or have done differently."[914]  The Tribunal considers "not pretty" to be an understatement in this case.  The treatment of Yukos senior executives, mid-level employees, in-house counsel, external lawyers and related entities as described in this chapter support Claimants' central submission that the Russian authorities were conducting a "ruthless campaign to destroy Yukos, appropriate its assets and eliminate Mr. Khodorkovsky as a political opponent."[915]  The legal consequences of Claimants' submission will be analyzed later in Part X of this Award when the Tribunal considers the alleged violations of Chapter III of the ECT.

812. The Tribunal will now examine the effect on Yukos, as a matter of fact, of the campaign of harassment and intimidation waged against it by Respondent.

### (c)    Did the Events Complained of Impact Claimants' Investments or was Yukos Able to Carry on Unaffected?

813. Having noted that the record is replete with evidence of intimidation and harassment of Yukos personnel by the Russian authorities, the key question for the Tribunal is whether such intimidation and harassment actually disrupted Yukos' operations and thus adversely affected Claimants' investment.

814. Claimants maintain that the harassment and intimidation campaign "crippled" Yukos by prosecuting its management and paralyzing its operations through massive raids and seizures with a view to undermining the viability of Yukos.

815. Claimants' witnesses spoke of the impact that the searches, seizures and, generally, the campaign of intimidation had on the company.  As noted earlier, Mr. Misamore testified that the loss of key documents created difficulties in running the company and preparing the annual financial statements.[916]  Mr. Rieger stated that 60 to 70 percent of the accounting department's documents were confiscated.  He explained in his witness statement: "[w]hen you take into account the fact that all the day to day business operations of the company were reflected in

---

[914]   Transcript, Day 19 at 51 (Respondent's closing).

[915]   Claimants' Post-Hearing Brief, ¶ 165.

[916]   Misamore WS ¶ 32.

paperwork, such as invoices, bills, *etc.*, we soon reached a stage where Yukos employees didn't have access to the basic data they needed to perform their functions."  He recalled that "[t]he constant threats and harassment caused many of my former colleagues to leave the company and, in the worst case, the country; a fate that I would soon share."[917]

816.  Mr. Misamore described how staff retention became extremely difficult for Yukos.  For example, he said that in the GAAP section of the accounting department "they all left the company because they didn't want to be harassed."[918]  Similarly, in defending the company's decision to pay bonuses in 2004, Mr. Theede testified that:

> [I]t was a Stalinesque-type of environment there. It was a fearful kind of a place to have to work. We never knew when we were going to have another raid, and people would come in and, as I said yesterday, knock computers off the desks, tip desks over, and just roughneck through the place; or when someone would be called in for questioning to the Prosecutor's Office with totally unknown and illogical results.  And in that kind of an environment, Yukos was not a particularly friendly place to work.  We had huge concerns about retaining our employees.  And if we didn't meet contractual obligations to them to pay the bonuses, it was our view that they would begin to leave.  And so it was in that light that we felt it was really very important that we lived up to the obligations we had to these people, just so we could retain them and so that we could continue to operate the company. Because if we lost those people, hiring others was going to be almost impossible, because people just—it was a scary place to be, and to bring new people in—in fact, I don't really recall us being able to hire any new employees after the attack started . . .[919]

817.  Respondent denies that Claimants have proven, as a matter of fact, that the harassment campaign impaired their investment.[920]  As mentioned earlier, Respondent notes for example that Mr. Khodorkovsky resigned voluntarily, that Yukos' revenues in 2003 and 2004 were higher than before the arrests of Mr. Khodorkovsky and Mr. Lebedev, and that Yukos issued public statements following the arrest of Mr. Khodorkovsky to the effect that Yukos' operations were proceeding normally.

818.  Respondent argues that Mr. Misamore's claims in his witness statement, seven years after the fact, about the disruptive effect of the raids, are not credible as they are contradicted by his contemporaneous statements to his colleagues, the audit committee and the board of directors in

---

[917]  Rieger WS ¶¶ 28–29.

[918]  Transcript, Day 9 at 244–45.

[919]  Transcript, Day 11 at 15–16.

[920]  Rejoinder ¶¶ 1338–45, ¶¶ 1387–99; ¶¶ 1400–34.   Respondent's Post-Hearing Brief ¶¶ 200–206.   *See also* Respondent's submissions of 30 August 2013 ¶ 7, concerning *Khodorkovsky v. Russia 2*.

2003.[921]  Respondent points to the following evidence in the record:

- The working group set up to deal study the effect of the government's actions confirmed that as at August 2003, despite the searches and seizures, "[o]perational activities [were] proceeding normally" and as at September 2003 "there had been no new adverse developments" and it was "business as usual"[922]

- Yukos stated on a conference call with financial analysts in November 2003 that Mr. Khodorkovsky's arrest and subsequent resignation had "no impact whatsoever on [its] operations"[923]

- Some 16 months later, Yukos stated to investors and the press that it "was extremely healthy."[924]

- The January–March 2004 internal Yukos newsletter publishing 2003 operational results of Yukos shows that the Company was not disrupted.[925]

819.  The Tribunal views these statements of Yukos officers pertaining to the well-being of the company as an attempt by Yukos to project to its investors an image of stability and thus maintain their confidence.  It is obvious to the Tribunal that a company which was targeted in the way Yukos was during those many years had to be severely affected and that its operations could not be managed by its officers and other employees in the normal and usual manner.  In short, the Tribunal agrees with Claimants that, as a matter of fact, Respondent's aggressive campaign against Yukos impacted significantly the management of the company.

820.  Having reviewed the abundant evidence in the record of the intimidation and harassment of Yukos' senior executives, mid-level employees, in-house counsel and external lawyers by the Russian authorities, the Tribunal is convinced that such intimidation and harassment not only disrupted the operations of Yukos but also contributed to its demise and thereby damaged Claimants' investment.

---

[921]  Transcript, Day 19 at 87–88,

[922]  Rejoinder ¶ 1422, Respondent's Post-Hearing Brief ¶ 207, Report of Working Group, 25 September 2003, Exh. R-4102.

[923]  *Yukos Conference Call on Recent Developments – Final,* Financial Disclosure Wire, 5 November 2003, Exh. R-3991.

[924]  *Russia's Yukos says interim oil output up 5.3% on year in 2004,* Prime-TASS Energy Service, 21 March 2005, Exh. R-509.

[925]  Yukos Review, January–February–March 2004, Exh. C-23.

821.   The Tribunal will now turn its attention to another chapter in Claimants' litany of conduct by the Russian Federation alleged to have negatively impacted their investment.

**D.     THE UNWINDING OF THE YUKOS–SIBNEFT MERGER**

### 1.     Introduction

822.   In April 2003, Yukos, which was then Russia's largest oil company, announced plans to merge with Sibneft, then Russia's fourth largest oil company, into a new entity that would be called YukosSibneft Oil Company and constitute the world's fourth largest private oil producer.

823.   Steps were taken to effectuate the merger between April and October 2003.  By 3 October 2003, the main components of the transaction (a share purchase and a share exchange between Yukos' and Sibneft's principal shareholders) had been completed.  An Extraordinary General Meeting ("**EGM**") of Yukos' shareholders was scheduled for 28 November 2003 for the approval of the merger's final details.[926]  However, shortly before the scheduled meeting, the Sibneft shareholders announced their intention to halt the merger process.[927]

824.   Ultimately, the share exchange component of the merger was invalidated through a series of court cases in Moscow and the Russian Far Eastern province of Chukotka,[928] and Sibneft was acquired by the Russian Federation through the State-owned company Gazprom.[929]

825.   Claimants submit that Respondent was responsible for the unwinding of the merger, making it "one of the first casualties" of the Russian Federation's assault on Yukos.[930]  According to Claimants, Sibneft's decision to halt the merger process was the direct result of Mr. Khodorkovsky's arrest.  The arrest led Sibneft to insist on a change of the senior executives of the merged entity.  This request was not acceptable to Yukos and the deal was aborted. Claimants also argue that the Russian courts were then "only too happy to lend their assistance" by invalidating parts of the merger on spurious grounds, paving the way for the Russian

---

[926]   Minutes No. 120/1-21 of the Board of Directors of Yukos, 25 September 2003, pp. 8–9, Item 11, Exh. C-1103.

[927]   Misamore WS ¶ 37; Memorial ¶ 208; Counter-Memorial ¶ 326.

[928]   Appeal Resolution of the Moscow Arbitrazh Court of 31 May 2004, Exh. C-72; Resolution of the Federal Arbitrazh Court for the Moscow District of 26 August 2004, Exh. C-73; Resolution of the Federal Arbitrazh Court for the Far-East District, 25 April 2006, Exh. C-78.

[929]   Memorial ¶¶ 231−37.

[930]   *Ibid.* ¶ 199; Reply ¶ 95.

Federation's acquisition of Sibneft.[931]   Claimants' primary damages claim of USD 114.174 billion reflects the value of YukosSibneft as a successfully merged entity.   Alternatively, Claimants submit that if the Tribunal does not hold Respondent responsible for the unwinding of the merger, the damages claim should be reduced by approximately USD 6 billion.[932]

826.   Respondent denies any responsibility for the unwinding of the merger.   Sibneft, Respondent argues, was neither exercising governmental authority nor acting under the instructions of Russian state organs.   The Russian Government in fact supported the merger.   Moreover, Sibneft's leaders had every right to insist on changes to the management of the merged entity due to concerns about Mr. Khodorkovsky's arrest and charges of criminal activities against him; in so doing, they were acting "in the pursuit of their own legitimate commercial interests."[933]   As for the Moscow and Chukotka courts, Respondent submits that they acted in accordance with Russian company law.   Respondent also suggests that Yukos acquiesced in the court proceedings as they allowed Yukos to cancel the merger without obtaining the approval of minority shareholders and thus risking further claims being brought against it.[934]

827.   In this chapter, the Tribunal will consider the circumstances of the Yukos−Sibneft merger and seek to determine whether the Russian Federation is responsible for the unwinding of the merger.   The Tribunal's view on this issue may have an impact on the quantum of damages the Tribunal may ultimately award Claimants.   The Tribunal will also consider in this chapter whether the merger was an important factor, as Claimants submit, in Yukos' decision not to pursue its ADR listing on the NYSE.   The Tribunal recalls that Respondent argues that Yukos' decision was taken because the company had concerns about elements of its tax optimization scheme.   The Tribunal will also consider Yukos' declaration of a USD 2 billion interim dividend in November 2003 ("**2003 Interim Dividend**"), which Respondent argues was intended to shield this sum from the reach of the Russian tax authorities.[935]

---

[931]   Reply ¶¶ 135−37.

[932]   *Ibid.* ¶¶ 859, 861; Second Expert Report of Brent Kaczmarek, 15 March 2012 ¶¶ 65; 75−76.

[933]   Counter-Memorial ¶¶ 322–30; Rejoinder ¶¶ 776–79.

[934]   Rejoinder ¶¶ 805−06.

[935]   *Ibid.* ¶¶ 809−23.

### 2.      Chronology

828.   In the context of arguments about the Yukos−Sibneft merger, Respondent has accused Claimants of fighting a "losing battle with the calendar,"[936] while Claimants have accused Respondent of attempting "to rewrite history".[937]  The Tribunal therefore considers it useful to lay out a short chronology of key events.

### (a)      Merger is Announced; NYSE Listing is Put on Hold; Steps are Taken to Complete Merger

829.   On 22 April 2003, Yukos and Sibneft announced their merger in a press release describing the principal features of the transaction.[938]  The merger would be achieved in two parts.  Firstly, Yukos would acquire 20 percent (minus one share) of Sibneft shares from Sibneft's principal shareholders for a cash consideration of USD 3 billion pursuant to a Share Purchase Agreement ("**Share Purchase Agreement**").  Secondly, Yukos would acquire 72 percent (plus one share) of Sibneft shares from Sibneft's principal shareholders in exchange for 26.01 percent of the fully diluted share capital of Yukos pursuant to a Share Exchange Agreement (the "**Share Exchange Agreement**").[939]

830.   A few days after the merger was announced, President Putin stated that he had approved the transaction in a meeting with Mr. Khodorkovsky, Mr. Roman Abramovich (a Board member and significant shareholder of Sibneft) and Mr. Evgeny Shvidler (Sibneft's CEO).[940]

831.   Concurrently with this announcement, the proposed listing of Yukos on the NYSE, which Yukos and a team of external advisers had been preparing for over a year, was put on hold.  By then, Yukos and its advisers had conducted an extensive review of the company's operations

---

[936]   Transcript, Day 3 at 18 (Respondent's opening).

[937]   Transcript, Day 17 at 11 (Claimants' closing).

[938]   *Yukos and Sibneft Agree in Principle to Merger*, Yukos Press Release and Sibneft Press Release, 22 April 2003, Exh. C-629.

[939]   Memorial ¶ 47 & n.61.

[940]   Nevzlin WS ¶ 26; Dubov WS ¶ 69; *Sibneft President Eugene Shvidler comments on upcoming merger with Yukos to create YukosSibneft, a new international energy super major*, BusinessWeek Online, 21 May 2003, Exh. C-634.

for purposes of drafting the required SEC form.[941]   A first draft had been circulated in June
2002 and a near final draft had been circulated on 19 March 2003.[942]

832.   From April to October 2003, steps were taken to complete the merger.   On 30 April 2003,
Yukos and Sibneft's principal shareholders signed the Share Purchase Agreement[943] and the
Share Exchange Agreement.[944]   The share exchange component of the merger was broken down
into two tranches:   the exchange of 57.5 percent of Sibneft shares for newly issued shares in
Yukos representing 17.2 percent of Yukos' fully diluted share capital and the exchange of
14.5 percent of Sibneft shares for 8.8 percent of Yukos shares (consisting of a mixture of newly
issued shares, treasury shares and shares acquired through a share buy-back).[945]

833.   On 1 May 2003, Yukos' and Sibneft's principal shareholders signed a Shareholders'
Agreement, which specified, *inter alia*, that the Yukos shareholder group would nominate the
"Senior Management Positions."[946]   On 27 May 2003, Yukos' shareholders approved the
merger.[947]

834.   On 30 May 2003, Yukos made a first cash payment of USD 1.25 billion pursuant to the Share
Purchase Agreement.[948]   On 30 June, the Yukos Board of Directors adopted resolutions

---

[941]   *See* Memorandum from Mr. Maly to Mr. Sheyko, 22 April 2002, Exh. R-184.

[942]   Reply ¶¶ 101–02; Draft Yukos F-1 Form and Registration Statement Under the Securities Act of 1933, 19 March
2003, Exh. C-1067.

[943]   Deed of Share Purchase between Kravin Investments Limited, White Pearl Investments Limited, Marthacello Co
Limited, N.P. Gemini Holdings Limited, Heflinham Holdings Limited and Kindselia Holdings Limited, and Yukos Oil
Company, 30 April 2003, Exh. C-1101 (hereinafter the "Share Purchase Agreement").   In another arbitration, Yukos'
lawyers described the Sibneft shareholders party to the Share Purchase Agreement as "companies incorporated under the
laws of Cyprus . . . [and] ultimately controlled by Roman Abramovich, the owner of Chelsea Football Club and Governor
of Chukotka."  *See Yukos Oil Company v. Kravin Investments and others*, LCIA Arbitration No. 4589, Statement of Case, 2
May 2005, ¶¶ 10−12, Exh. R-3601.

[944]   Deed of Share Exchange between Kravin Investments Limited, White Pearl Investments Limited, Marthacello Co
Limited, N.P. Gemini Holdings Limited, Heflinham Holdings Limited and Kindselia Holdings Limited, and Yukos Oil
Company, 30 April 2003, Exh. C-1100 (hereinafter the "Share Exchange Agreement").

[945]   *Ibid*; *see* Memorial ¶ 47.

[946]   Shareholders' Agreement in respect of Yukos Oil Company among Yukos Universal Limited (hereinafter "YUL"),
Hulley Enterprises Limited (hereainfter "Hulley"), White Pearl Investments Limited, N.P. Gemini Holdings Limited,
Marthacello Co. Limited, Kindselia Holdings Limited, Heflinham Holdings Limited and Kravin Investments Limited, 1
May 2003, Article 6.1, Exh. C-1102.

[947]   Minutes No. 2 of the Extraordinary General Meeting of Yukos Shareholders, 27 May 2003, Exh. C-50; *Extraordinary
meeting of YUKOS shareholders adopts decision associated with realization of transaction with Sibneft*, Yukos Press
Release, 28 May 2003, Exh. C-635.

[948]   Receipt from Kravin Investments Limited, 30 May 2003, Exh. C-54; *see* Yukos Oil Company U.S. GAAP Interim
Condensed Consolidated Financial Statements, 30 June 2003, p. 9, Exh. C-30.

with respect to the merger.[949]  In July and August 2003, regulatory approvals were obtained for the merger.[950]  On 28 August 2003, Yukos made a further cash payment of USD 500 million pursuant to the Share Purchase Agreement.[951]

835.   On 25 September 2003, the Yukos Board of Directors set 28 November 2003 as the date for the EGM at which final details for the merger would be submitted to shareholders.[952]

836.   On 2 October 2003, Yukos made a final cash payment of USD 1.25 billion pursuant to the Share Purchase Agreement.[953]

837.   On 3 October 2003, Yukos acquired 72 percent plus one share of Sibneft shares, in exchange for 26.01 percent of Yukos shares, pursuant to the Share Exchange Agreement.[954]

838.   Thus, by 3 October 2003, with both the share purchase and share exchange components of the transaction complete, Yukos had acquired 92 percent of Sibneft.  The remaining steps for implementing the merger included the "full operational integration" of the two companies, changing the name of Yukos to YukosSibneft and electing a new board of directors.[955]

      (b)    **Mr. Khodorkovsky is Arrested; Yukos Continues with Merger; Sibneft has Second Thoughts**

839.   The Tribunal recalls that Mr. Khodorkovsky was arrested on 25 October 2003.

---

[949]   *Board of Directors of YUKOS Oil Company approves issuance of up to 1 billion shares*, Yukos Press Release, 7 July 2003, Exh. C-639.

[950]   Notification of the State registration of the additional share issue by the Federal Commission for the Securities Market, 23 July 2003, Exh. C-51; Opinion and Directive issued by the Ministry for Antimonopoly Policies and Support to Entrepreneurship, 14 August 2003, Exh. C-52.

[951]   Receipt from Kravin Investments Limited, 28 August 2003, Exh. C-55; *see* Yukos Oil Company U.S. GAAP Interim Condensed Consolidated Financial Statements, 30 June 2003, p. 9, Exh. C-30.

[952]   Minutes No. 120/1-21 of the Board of Directors of Yukos, 25 September 2003, pp. 8–9, Item 11, Exh. C-1103.

[953]   Receipt from Kravin Investments Limited, 2 October 2003, and account statement evidencing payment of USD 1.25 billion under the Share Purchase Agreement, Exh. C-57; *see* Yukos Oil Company U.S. GAAP Interim Condensed Consolidated Financial Statements, 30 June 2003, p. 9, Exh. C-30.

[954]   Account statements evidencing transfer of 57.5 percent of Sibneft (2,724,362,618 shares) to Yukos under the Share Exchange Agreement, 3 October 2003, Exh. C-58; Notices of transaction and account statements evidencing transfer of 17.2 percent of Yukos (463,517,826 shares) to Sibneft's principal shareholders under the Share Exchange Agreement, 3 October 2003, Exh. C-59; Account statements evidencing transfer of 14.5 percent of Sibneft (689,373,122 shares) to Carenet under the Share Exchange Agreement, 10 October 2003, Exh. C-60; Account statements evidencing transfer of 8.8 percent of Yukos (238,879,333 shares) to Sibneft's principal shareholders under the Share Exchange Agreement, 10 October 2003, Exh. C-61; Yukos Oil Company U.S. GAAP Interim Condensed Consolidated Financial Statements, 30 June 2003, p. 9, Exh. C-30.

[955]   Memorial ¶¶ 54, 208; *Sibneft Principal Shareholders and Yukos Oil Company Finalize Merger Transaction*, Yukos Press Release and Sibneft Press Release, 3 October 2003, Exh. C-648.

840. On 28 October 2003, the Yukos Board of Directors recommended, in view of the capital restructuring of the company in anticipation of the merger, that shareholders approve the 2003 Interim Dividend of USD 2 billion to all shareholders of record as at 25 September 2003.[956] Mr. Khodorkovsky resigned as CEO of Yukos on 3 November 2003.  Yukos then issued a press release which named the persons it would nominate to the new management board of the merged YukosSibneft entity.[957]   Mr Khodorkovsky was not on that list.   On 21 and 22 November 2003, Yukos and Sibneft senior executives met to discuss the logistics of the merger.[958]

841. In late November, the media reported that Mr. Abramovich had met with President Putin to discuss the Yukos–Sibneft merger.   Reference was made to the fact that "Abramovich is understood to have raised the prospect of changing the management team of the combined company with Putin, who welcomed the idea."[959]

842. In his witness statement, Mr. Nevzlin narrates that he had met with Mr. Abramovich in "late 2003" in Tel Aviv and that he had been told that

> YukosSibneft could be saved if the management of the merged company was transferred to his team . . . President Putin had told Roman Abramovich that Mikhail Khodorkovsky had been targeted because of his involvement in politics and . . . was too angry with Mikhail Khodorkovsky to even discuss his release.[960]

843. Shortly before the Yukos EGM scheduled for 28 November 2003, representatives of Sibneft's principal shareholders summoned representatives of Yukos' principal shareholders and advised them that they no longer wished to proceed with the merger.  They asked that steps be taken to unwind the merger.[961]  However, the EGM was held as scheduled.  The agenda included: (a) early termination of the powers of board members and election of a new board; (b) approval of new articles of association (including a name change to YukosSibneft); and (c) payment of

---

[956] Abstract from Minutes No. 120/1-24 of the Meeting of the Board of Directors of Yukos, 28 October 2003, Exh. R-3605.

[957] *YukosSibneft Proposed Management Board*, Yukos Press Release, 4 November 2003, Exh. C-666.

[958] Agenda, material and list of attendees for 21−22 November 2003 meeting, Exh. C-62.

[959] *Abramovich met Putin before vetoing Yukos−Sibneft merger*, The Sunday Telegraph, 30 November 2003, Exh. C-669.

[960] Nevzlin WS ¶¶ 27, 35.

[961] Memorial ¶ 208; Counter-Memorial ¶ 326; *see Yukos Oil Company v. Kravin Investments and others*, LCIA Arbitration No. 4589, Statement of Case, 2 May 2005, Exh. R-3601.  Around the same time as Sibneft advised Yukos it was pulling out of the merger, the media reported that an economic and tax crimes unit of Russia's interior ministry had announced it had no questions for Mr. Abramovich. *Kremlin seen as a deep well of influence*, The Financial Times, 29−30 November 2003, Exh. C-668.

the 2003 Interim Dividend.  Claimants voted against the election of Sibneft's nominees to the Yukos Board of Directors, abstained on the vote to change the company's name to YukosSibneft and voted to approve the dividend.[962]

844.  After the EGM, Yukos' principal shareholders proceeded as if the merger was still going forward.  For example, on 2 December 2003, GML issued a press release stating that the merger agreements remained in full effect.[963]  On 8 December 2003, Claimant Hulley received payment for the 2003 Interim Dividend.[964]   At the same time, Yukos and its principal shareholders were exploring options to negotiate the unwinding of the merger with Sibneft.[965]  Yukos continued to resist Sibneft's proposal to appoint Sibneft nominees as members of the merged entity.[966]

### (c)     Russian Courts Invalidate the Share Exchange Agreement

845.  On 19 January 2004, a few weeks after Yukos received the 2000 Tax Audit Report, NP Gemini Holdings Limited and Nimegan Trading Limited, two former Sibneft shareholders,[967] applied to a Moscow court to have the issue of Yukos shares carried out in the context of the first tranche of the share exchange declared invalid.[968]   On 1 March 2004, the Moscow Arbitrazh Court annulled the share issue.[969]  The decision was upheld on appeal on 31 May 2004 and confirmed

---

[962]   Agenda for the Extraordinary General Shareholders' Meeting of Yukos Oil Company, 28 November 2003, Exh. R-3606; *Yukos Oil Company v. Kravin Investments and others*, LCIA Arbitration No. 4589, Statement of Case, 2 May 2005, Exh. R-3601; Misamore WS ¶¶ 22, 37; *Completion of Yukos−Sibneft Merger Suspended*, Interfax, 28 November 2003, Exh. R-3609 (quoting Mr. Nevzlin as saying:  "The Sibneft shareholders came to us this week and told us some technical difficulties had emerged.  They asked for Yukos charter amendments to be taken off the agenda at today's meeting and to leave the board of directors intact.  We coordinated our voting with [the Sibneft shareholders].  As for the Yukos dividends, we voted for Yukos"); *see also Yukos Oil Company Shareholders' Meeting approves dividend of about $2 billion*, Yukos Press Release, 28 November 2003, Exh. C-666.

[963]   *Yukos Sibneft Merger*, Company News, Group Menatep Website, 2 December 2003, Exh. C-670.

[964]   Transcript, Day 9 at 22−24 (cross-examination of Mr. Misamore).

[965]   *Statement on the Status of Negotiations with Representatives of Former Principal Shareholders of Sibneft*, Yukos Press Release, 17 December 2003, Exh. C-672.

[966]   *Yukos Oil Company retains consultants for negotiations with former Sibneft core shareholders*, Yukos Press Release, 2 February 2004, Exh. C-680; Misamore WS ¶ 37.

[967]   At the time of the application, the two petitioners were Yukos shareholders.  NP Gemini Holding Limited was a former principal shareholder of Sibneft and had participated in all the steps of the merger.  Nimegan Trading Limited was already a shareholder of Yukos when the Share Exchange Agreement was signed, with less than 0.001 percent of Yukos shares.  According to Claimants, both companies were linked to Mr. Abramovich through Millhouse Capital, an investment company that manages Mr. Abramovich's assets.  Memorial ¶¶ 216–19.

[968]   Petition to declare the FCSM (Federal Commission for the Securities Market) decision to register the issuance of securities unlawful, and to declare as null and void the issuance of the securities, 19 January 2004, Exh. C-71.

[969]   Decision of the Moscow Arbitrazh Court, Case No. A40–2353/04–92–35, 1 March 2004, Exh. R-549.

by the Federal Arbitrazh Court on 26 August 2004.[970]  Accordingly, in September 2004, Yukos returned to Sibneft's shareholders the 57.5 percent shareholding in Sibneft it had received in exchange for its newly issued shares.  Yukos' shareholding in Sibneft was then reduced to 34.5 percent.[971]

846.  On 6 July 2004, Nimegan Trading Limited commenced legal proceedings against Yukos and others before the Arbitrazh Court of Chukotka, the Russian Far Eastern province where Mr. Abramovich was governor, seeking to have the second tranche of the share exchange (concerning a 14.5 percent stake in Sibneft) declared invalid.  In order to confer jurisdiction to the Chukotka Court, a defendant related to Mr. Abramovich had opened a bank account in the Chukotka province on the day that Nimegan paid the filing fee.  The other nominal defendants all supported the court action.[972]  The Chukotka Arbitrazh Court invalidated the second tranche of the share exchange on 14 September 2004.  After a series of appeals, this decision was ultimately confirmed by the Federal Arbitrazh Court for the Far-East District in April 2006,[973] following which Yukos returned the 14.5 percent shareholding in Sibneft obtained through the second tranche of the share exchange to Sibneft's shareholders.  Yukos' shareholding in Sibneft was then reduced to the 20 percent minus one share acquired pursuant to the Share Purchase Agreement.

847.  On 30 September 2004, Yukos commenced an LCIA arbitration against the former principal shareholders of Sibneft, seeking an injunction prohibiting the respondents from initiating, continuing or encouraging any proceedings in the Russian courts to invalidate the share exchange.[974]  Ultimately, the arbitration would be discontinued by Yukos' Russian bankruptcy receiver, Mr. Eduard Rebgun.[975]

---

[970]  Appeal Resolution of the Moscow Arbitrazh Court, 31 May 2004, Exh. C-72; Resolution of the Federal Arbitrazh Court for the Moscow District, 26 August 2004, Exh. C-73.

[971]  Yukos' withdrawal instructions to Custody Department of Deutsch Bank, 24 September 2004, Exh. C-74.

[972]  Payment Order for filing fee for the Chukotka proceedings, 27 May 2004, Exh. C-75; Petition to Declare Invalid an Interested Party Transaction and to Apply the Consequences of the Invalidity of the Transaction, 6 July 2004, Exh. C-76; Documents relating to the opening of Marthacello's bank accounts in Chukotka, 8 July 2004, Exh. C-77.

[973]  Resolution of the Federal Arbitrazh Court for the Far-East District, 25 April 2006, Exh. C-78.

[974]  *Yukos Oil Company v. Kravin Investments and others*, LCIA Arbitration No. 4589, Request for Arbitration, 30 September 2004, Exh. R-3600; *Yukos Oil Company v. Kravin Investments and others*, LCIA Arbitration No. 4589, Statement of Case, 2 May 2005, Exh. R-3601.

[975]  Misamore WS ¶ 37.

(d)     **Russian Federation Ultimately Acquires Sibneft via Gazprom**

848.   In 2005, the Russian State-owned company Gazprom acquired 75.68 percent of Sibneft shares from Sibneft's principal shareholders for around USD 15 billion.[976]   In May 2006, Sibneft changed its name to OAO GazpromNeft.[977]

849.   The Tribunal notes that the 20 percent minus one shareholding in Sibneft that Yukos had acquired under the Share Purchase Agreement was sold in Yukos' bankruptcy auctions in April 2007 to EniNeftegaz, an Italian company,[978] and that in 2009, Gazprom exercised a call option (which had been in place since April 2007) to purchase the Sibneft shares from EniNeftegaz for the sum of USD 4.1 billion.[979]

3.     **Parties' Arguments and Tribunal's Observations**

(a)     **Was Yukos' NYSE Listing Put on Hold Because of the Yukos−Sibneft Merger or Fears of Exposing Yukos' Tax Optimization Scheme?**

850.   Claimants maintain that Yukos' proposed NYSE listing was put on hold in April 2003 as a result of the proposed Yukos−Sibneft merger and the need to conduct further due diligence.[980]

851.   In his witness statement, Mr. Misamore stated that

> Yukos' plan to obtain a Level 2 or 3 ADR listing on the NYSE was put on hold because of the decision in the beginning of 2003 to merge with Sibneft . . . and the need for further due diligence with respect to Sibneft to ensure complete transparency and financial statement accuracy before proceeding with any kind of listing of the merged company.[981]

852.   Mr. Misamore confirmed this statement in his re-direct examination before the Tribunal:

---

[976]   Gazprom 2005 Annual Report (excerpts), Exh. C-370; *Shares and Registrar*, Gazprom Neft Website, Exh. C-389; *Gazprom and Millhouse Capital Sign Legally Binding Documents for Purchase/Sale of 72.663 percent Stake in Sibneft*, Gazprom Press Release, 28 September 2005, Exh. C-771; *Management Committee Approves Gazprom's Buying into Sibneft*, Gazprom Press Release, 28 September 2005, Exh. C-772; *Gazprom agrees $13bn deal with Abramovich*, The Financial Times, 29 September 2005, Exh. C-773.

[977]   *Sibneft Changes Name to Gazprom Neft*, The Moscow Times, 16 May 2006, Exh. C-803.

[978]   *Gazprom, indirectly, wins assets of Yukos*, NY Times, 4 April 2007, Exh. C-847; *Eni announces $5.83 bn acquisition of Yukos assets. Major first step into Russian upstream market*, Eni Press Release, 4 April 2007, Exh. C-849; *A Yukos Auction With a 2nd Act*, The Washington Post, 5 April 2007, Exh. C-851; *On Working Meeting Between Alexey Miller and Paolo Scaroni*, Gazprom Press Release, 17 September 2007, Exh. C-877; *Eni to keep Gazprom Neft stake until 2009*, Reuters, 9 November 2007, Exh. C-878.

[979]   *How Putin Put Kremlin Back on Top*, The Moscow Times, 1 February 2008, Exh. C-879.

[980]   *See* Reply ¶ 104.

[981]   Misamore WS ¶ 20.

> Mr. Khodorkovsky informed me early in 2003 that he was working on a significant transaction—that turned out to be Sibneft—and he asked me to put the F-1 registration process on hold.  Certainly I could not have gone ahead with an F-1 in a significant transaction mode anyway.  So we put it on hold solely as a result of what subsequently became the Sibneft transaction.[982]

853.   Mr. Kosciusko-Morizet also confirmed this explanation when he testified.  After referring to the considerable work done in preparation for the NYSE listing and the extensive disclosure involved, he said:

> So work was pursued during and until the end of the year and the beginning of 2003, and then in April it was interrupted by the prospect of the Sibneft-Yukos merger, which obviously was material to any filing.  So negotiations were going on, and that prevented the filing of an ADR 3.[983]

854.   The Tribunal notes that, in the April−June 2003 edition of the *Yukos Review*, it was reported that the merger plans were "likely to push back Yukos' listing on the New York stock exchange from later this year into 2004."[984]

855.   Claimants also refer to an e-mail of 29 April 2003 from a lawyer at Akin Gump—the firm advising Yukos on its proposed NYSE listing—to Mr. Misamore reporting that the lawyer had spoken to an SEC official "to let him know about the proposed merger . . . and to tell him that although the timetable for the listing has been extended due to the merger, the company still intends to pursue a listing after the merger . . . ."[985]

856.   Respondent, however, maintains that the NYSE listing project was "abandoned" not because of the merger but because of "fears that, as a result of the extensive disclosures required by the [SEC], the process would publicly reveal Yukos' 'tax optimization' program, and this in turn would lead to major tax reassessments."[986]  According to Respondent:

> Whatever excuse Yukos may have provided to the SEC in March 2003 for halting its proposed NYSE listing, the possibility of a 2003 listing was in fact called off in February of that year as the result of Mr. Khodorkovsky's refusal to sign the company's registration statement out of an understandable concern for his own personal liability.[987]

---

[982]   Transcript, Day 9 at 240.

[983]   Transcript, Day 4 at 72–73.

[984]   Yukos Review, Issue 13, April−June 2003, p. 79, Exh. C-19.

[985]   E-mail from Mr. Robert Langer to Mr. Bruce Misamore, 29 April 2003, Exh. C-1384.

[986]   Counter-Memorial ¶ 1019.

[987]   Respondent's Post-Hearing Brief ¶ 77.

857.  In support of its submission, Respondent refers to an exchange of e-mails of 19 and 20 February 2004 between Mr. Oleg Sheiko, Yukos' Director of Corporate Finance, and Mr. Khodorkovsky, in which Mr. Sheiko notes that Mr. Misamore had been asked by Mr. Khodorkovsky to delay the NYSE, and Mr. Khodorkovsky replies:

> If the lawyers do not confirm to me that my personal risks are limited by a reasonable period of time, I will not sign the form, because if my political career develops in 5 years, the American hook will become dangerous.  I warned about this.[988]

858.  Claimants did not comment on this e-mail.  In the Tribunal's view, this e-mail is consistent with Mr. Misamore's testimony that, in "early 2003", Mr. Khodorkovsky had asked him to put the listing on hold due to a substantial transaction, which turned out to be the merger with Sibneft.

859.  Respondent also relies on a "blackline" version of Yukos' draft filing for the SEC sent by PwC to Yukos on 23 July 2002.[989]  As telling as that document may be with respect to Yukos' awareness of its tax risks,[990] the Tribunal notes that this document pre-dates by more than 9 months Yukos' decision to suspend the NYSE listing.

860.  In conclusion, the Tribunal finds that Yukos' decision to put the NYSE listing project on hold in the spring of 2003 appears to have been motivated by the anticipated Yukos–Sibneft merger.

### (b)  Was the 2003 Interim Dividend a Component of the Yukos−Sibneft Merger or a Means to Siphon Funds out of Russia?

861.  Claimants submit that the timing and amount of the 2003 Interim Dividend were solely related to and dictated by the Yukos−Sibneft merger.  They write:

> Yukos and Sibneft had agreed to target specific levels of net debt intended to reflect the relative values of the individual companies prior to the completion of the merger.  At that time, Yukos was substantially underleveraged as compared to Sibneft, with significant cash reserves.  It was therefore agreed that in order to leverage up and meet its target net debt level, Yukos would undertake the payment of dividends, a share buy-back and/or the taking out of a loan.  The 2003 interim dividend was therefore part of the Company's efforts to match the capital structure of Yukos and Sibneft, and return value to its shareholders prior to the completion of the merger, as is confirmed by the contemporaneous documentation.[991]

---

[988]   E-mail from Mr. Oleg Sheiko to Mr. Mikhail Khodorkovsky, 19 February 2003 and reply e-mail from Mr. Mikhail Khodorkovsky to Mr. Oleg Sheiko, 20 February 2003, Exh. R-3611.

[989]   Extract from Yukos' Draft F-1 Form, 23 July 2002, Exh. R-1477.

[990]   As to which, see paragraph 491 above.

[991]   Reply ¶ 115 (footnote omitted); *see* Transcript, Day 17 at 7–11 (Claimants' closing).

862. With respect to the "contemporaneous documentation", Claimants refer to Yukos' press release of 22 April 2003 announcing the merger, which stated that

> [p]rior to completing the transaction, YUKOS intends to increase its leverage and is considering, among other things, cash distributions to its shareholders in the form of dividends and share buybacks.  It is expected that after such capital restructuring and the completion of the transaction, YukosSibneft will have a moderate level of leverage and a strong working capital position.[992]

863. Claimants also refer to analysts' reports from the same period, which are all consistent with their submission.  For example, a Brunswick UBS Report dated 23 April 2003 stated that "Yukos has every reason to leverage up further—if its leverage reached levels similar to Sibneft . . ., implying \$3.75 bn of new debt, Yukos could return \$5.15 bn to shareholders . . . *before* the deal."[993]  An internal Yukos PowerPoint presentation about the merger also referred to the plan to declare a dividend in order to achieve the targeted net debt level.[994]  Mr. Misamore testified that the 2003 Interim Dividend was "an integral part" of the merger transaction:

> [The approval and payment of the dividend] was entirely related to the Sibneft transaction . . . [A]s part of the Sibneft transaction it was a desire of both of the shareholder groups to have a capital structure in YukosSibneft which did not disadvantage either of the two shareholder groups.  And therefore there were a series of transactions in association with the Sibneft merger/acquisition that were undertaken, including share repurchases, the bank debt, the payment of the dividend . . . and that was the reason for the dividend[, it] was the very last step in the consummation of the Sibneft transaction.[995]

864. Claimants explain that the decision to pay the 2003 Interim Dividend was taken in three steps.[996]  Firstly, on 25 September 2003, when the Yukos Board of Directors scheduled for 28 November 2003 an EGM of Yukos' shareholders for purposes of approving the merger, the agenda included as an item "payment of dividend for 9 months of 2003."[997]  Secondly, on 28 October 2003, the Yukos Board of Directors set the amount of and process for approving and

---

[992]   *Yukos and Sibneft Agree in Principle to Merger*, Yukos Press Release and Sibneft Press Release, 22 April 2003, Exh. C-629.

[993]   Brunswick UBS Report "YukosSibneft", 23 April 2003, p. 9, Exh. C-1370 (emphasis in the original).  *See also* a Credit Suisse First Boston Report which predicted a dividend distribution in excess of USD 1.7 billion to shareholders as a means for Yukos to increase its net debt in the context of the merger. Credit Suisse First Boston Report "Yukos and Sibneft merge to form a GEM supermajor," 24 April 2003, p. 4, Exh. C-1371.

[994]   "YukosSibneft, Detailed transaction plan and Major Issues," Yukos PowerPoint Presentation, 18 June 2003, Exh. C-1068.

[995]   Transcript, Day 9 at 21, 236.

[996]   For a description of these steps, see Joint Stock Companies Law of the Russian Federation, Arts. 42–43, Exh. R-3604.

[997]   Minutes No. 120/1-21 of the Board of Directors of Yukos, 25 September 2003, p. 8, Item 11, Exh. C-1103.

paying the dividend.[998]  Thirdly, Yukos shareholders approved the 2003 Interim Dividend at the EGM on 28 November 2003.  According to Claimants, this sequence of events undermines Respondent's argument that the 2003 Interim Dividend was declared with unprecedented haste as a "clever", "eleventh hour" ploy to siphon funds out of Russia.[999]

865.  In its Counter-Memorial, Respondent argues that the 2003 Interim Dividend "betrays an unusual sense of urgency on the part of those who proposed it . . . who evidently sensed the gathering storm, wanted to get as much money as possible, as quickly as possible, out of the company, and out of Russia, and into their pockets."[1000]  In its Rejoinder, Respondent argues that, while the dividend might have had its origins in the Yukos−Sibneft merger, "by the time the dividend was actually declared, on November 28, 2003, the Sibneft merger had been halted and there was no longer any merger-related reason for the dividend."[1001]  Respondent recalls that Sibneft's principal shareholders informed Claimants before the EGM that they no longer wished to proceed with the merger, and points out that Claimants agreed with the Sibneft shareholders not to vote for items 1 and 2 of the EGM's agenda (changes to the board and the company's articles of association), but proceeded to vote in favour of the dividend.  Thus, Respondent argues, "the giga-dividend can only be explained by Claimants' desire to transfer outside the reach of the Russian authorities US$ 2 billion that could otherwise have been used to pay Yukos' taxes and other liabilities."[1002]

866.  During the hearing, in response to a question from the Tribunal regarding the fact that the 2003 Interim Dividend had been planned since the spring of 2003, counsel for Respondent explained that, between this planning stage and the declaration of the dividend, "the world had changed," Mr. Khodorkovsky had been arrested and Sibneft had called off the merger, so that the "link between the declaration of the dividend and the Sibneft merger had been severed, and any prudent company, frankly, would have marshaled its resources rather than declared and paid a dividend that was unprecedented in size, at a time when it was under considerable financial pressure."[1003]

---

[998]   Agenda for the Extraordinary General Shareholders' Meeting of Yukos Oil Company, 28 November 2003, Exh. R-3606.

[999]   Counter-Memorial ¶ 351.

[1000]   Counter-Memorial ¶ 350.

[1001]   Rejoinder ¶ 821.

[1002]   *Ibid*.

[1003]   Transcript, Day 18 at 162 (Respondent's closing).

867. It is not entirely clear to the Tribunal when Yukos' shareholders found out about the decision of Sibneft's shareholders to withdraw from the merger.[1004]   However, the exact timing does not matter.   The Tribunal accepts that Sibneft's decision was communicated to Yukos shortly before the EGM, but in time for Yukos' shareholders to agree with Sibneft's principal shareholders not to vote on the first two items of the agenda.

868. Mr. Misamore testified that the Sibneft shareholders, Hulley and YUL "agreed between themselves to agree to vote for the dividend" because it was "an integral part of that [merger] transaction," although one of the parties had, at that point, changed its mind.[1005]   Claimants submit that, after the Sibneft announcement, as at 28 November 2003, the completed merger transaction was still in place and the 2003 Interim Dividend was a final step in consummating the merger.   The status of the transaction was not affected and there were ongoing negotiations to resolve outstanding issues with Sibneft.[1006]   In fact, in an announcement by GML in December 2003, it was stated that the merger agreement remained in full effect.[1007]

869. In conclusion, the Tribunal finds that the decision to approve the 2003 Interim Dividend at the EGM on 28 November 2003 was an integral part of the merger process, which was still legally alive at the date of the EGM.   Whether it was practically still alive is questionable.   On balance, the evidence does not support Respondent's contention that the dividend was simply an "eleventh hour" device to siphon funds out of Russia for improper purposes.   Nevertheless the Tribunal sees some force in Respondent's contention that Yukos' stockholders might have more prudently acted to conserve Yukos' resources rather than to proceed with a massive dividend whose essential rationale was evaporating.

(c)   Was the Unwinding of the Merger Caused by the Russian Federation?

870. As noted earlier, the Russian Federation initially supported the Yukos−Sibneft merger. President Putin expressed his approval of the transaction in a meeting with Mr. Khodorkovsky

---

[1004]   Some sources suggest that the announcement was made on the day of the EGM (*e.g.*, Misamore WS ¶ 37), while others state it took place on the eve of the meeting (*e.g.*, *Yukos Oil Company v. Kravin Investments and others*, LCIA Arbitration No. 4589, Statement of Case, 2 May 2005, Exh. R-3601).

[1005]   Transcript, Day 9 at 20 (cross-examination of Mr. Misamore).  However, as Respondent pointed out in its closing statement, Sibneft shareholders were not yet Yukos shareholders of record and could therefore not have voted for the dividend. S*ee* Transcript, Day 18 at 147–48.

[1006]   *See e.g.*, Yukos Review, Issue 16, January–February–March 2004, p. 58, Exh. C-23.

[1007]   *Yukos Sibneft Merger*, Company News, Group Menatep Website, 2 December 2003, Exh. C-670.

and Messrs. Abramovich and Shvidler in April 2003.[1008]  In May 2003, Mr. Shvidler stated in an interview that President Putin and Prime Minister Kasyanov had encouraged him to promote the merged YukosSibneft entity as a "national-champion".[1009]  On 22 July 2003, the Russian Federal Commission for the Securities Market approved the registration of new Yukos shares to be issued in connection with the merger.[1010]  On 14 August 2003, the Russian Ministry for Antimonopoly Policies and Support to Entrepreneurship approved Yukos' acquisition of the Sibneft shares.[1011]

871.  Following the arrest of Mr. Khodorkovsky in October 2003, Sibneft declared that it would halt the merger process unless the management team was changed.

872.  Claimants argue that the Russian Federation is responsible for the unwinding of the Yukos–Sibneft merger, despite its initial support for the transaction.  Claimants frame the question as one of causation.  As Claimants' counsel put it:  "[B]ut for the Russian Federation's attack on Yukos, the Yukos–Sibneft merger would never have been unwound.  And that point is not seriously challenged by the Respondent."[1012]  Claimants describe the arrest of Mr. Khodorkovsky as having "marked a radical escalation in the Russian Federation's attack on Yukos and . . . also marked the beginning of the end for the YukosSibneft merger."[1013]  According to Mr. Theede:

> [A]fter [Sibneft] saw what the Russian Federation was doing to Yukos, . . . saw it being destroyed . . . and in my opinion it was a direct result of that that caused Sibneft to want to detach itself from Yukos . . . .  I knew Sibneft was doing everything they could to get out of this, and they were fairly panicked because they wanted to get out before the Government destroyed our company . . .  [A]s soon as Sibneft saw and learned what was happening to Yukos, they wanted out of the deal . . . .  [W]e had completed the merger, we were moving ahead with it; everything was really going along quite smoothly, and I think we were all excited about it.  But Mr. Khodorkovsky's arrest and the political fallout from that, and then the subsequent attack on the company that was related to

---

[1008]  Nevzlin WS ¶ 26; Dubov WS ¶ 69; President of Russia, Official Web Portal, 24 April 2003, Exh. C-1053.

[1009]  *Sibneft President Eugene Shvidler comments on upcoming merger with Yukos to create YukosSibneft, a new international energy super major*, BusinessWeek Online, 21 May 2003, Exh. C-634.

[1010]  Notification of the State registration of the additional share issue by the Federal Commission for the Securities Market, 23 July 2003, Exh. C-51.

[1011]  Opinion and Directive issued by the Ministry for Antimonopoly Policies and Support to Entrepreneurship, 14 August 2003, Exh. C-52.  Respondent points out that some of these approvals were given *after* the arrest of Mr. Lebedev and Mr. Nevzlin's flight to Israel. Rejoinder ¶ 792.

[1012]  Transcript, Day 17 at 16 (Claimants' closing).

[1013]  Reply ¶ 127.

> Mr. Khodorkovsky's arrest, scared Sibneft off.  And there's no question in my mind that they were afraid that the attack on Yukos was going to carry over to them . . . .[1014]

873.   Mr. Nevzlin also testified that "[a]fter it became apparent that Mikhail Khodorkovsky was being targeted by the Kremlin, Roman Abramovich abruptly changed his mind and sought to unwind the merger."[1015]

874.   In support of their submission, Claimants mention that Mr. Abramovich met with President Putin only a few days before Sibneft's announcement of its decision to cancel the merger.[1016]

875.   Respondent does not dispute that concerns over Mr. Khodorkovsky's arrest led Sibneft to change its mind about the merger.  Respondent says that Sibneft's decision

> was not at all surprising, as Messrs. Khodorkovsky and Lebedev, Yukos' two leading Directors, had recently been arrested and charged with various criminal acts . . . .  [Their] future leadership of the company was thus in serious doubt, and any proposed partner would have understandably been concerned . . . .[1017]

876.   One London newspaper speculated that "[a]nalysts believe Mr. Abramovich's decision to cut ties with Yukos is an attempt to insulate himself from an apparently politically motivated campaign by the Kremlin against Mr. Khodorkovsky and Yukos."[1018]

877.   However, Respondent forcefully denies that Mr. Abramovich's decision was made "at the behest" of President Putin.  It writes in its Counter-Memorial that

> Mr. Abramovich did not need the President of the Russian Federation to tell him that Sibneft's proposed merger partner was the subject of a contentious tax dispute . . . .  In the circumstances, any reasonable company would have sought to extricate itself from the planned merger, or at least to ensure that the new company was not led by two executives recently indicted for tax evasion.[1019]

---

[1014]   Transcript, Day 10 at 39–41, 46.

[1015]   Nevzlin WS ¶ 27.

[1016]   Memorial ¶ 211 (citing *Abramovich met Putin before vetoing Yukos−Sibneft merger*, The Sunday Telegraph, 30 November 2003, Exh. C-669).

[1017]   Counter-Memorial ¶ 326.

[1018]   *Abramovich pulls out of $11bn merger with Yukos*, The Independent, 29 November 2003, Exh. C-667.

[1019]   Counter-Memorial ¶ 767(iv); *see* Rejoinder ¶ 786.

878.  According to Respondent, the meeting between Mr. Abramovich and President Putin, if at all relevant, only demonstrates that the Russian President welcomed Sibneft's proposal of a change in the management of the merged entity.[1020]

879.  The Tribunal notes that the Parties agree that Sibneft was firmly of the view that the only way for the merger to be saved would be if there was a change in the senior management of the merged company, *i.e.*, if Mr Shvidler was appointed as President.   Yukos was equally "adamant" that management issues were "not negotiable."[1021]   As the BBC reported on 28 November 2003, the "breaking point [of the merger] came when Yukos was not ready to hand over management of the company."[1022]

880.  Claimants characterize Mr. Abramovich's insistence on a change of management as "a manifestly unreasonable proposal which sought to turn the agreed terms of the merger upside-down."[1023]   They refer to the terms of the initial merger agreement which provided that Yukos would nominate the "Senior Management Positions" including the President,[1024] and to the 22 April 2003 press release which announced that Mr. Khodorkovsky would be CEO.[1025] Claimants contend that Yukos' refusal to change the agreed terms of the merger was "hardly surprising" and that Respondent's "attempt to rely on such refusal to exonerate itself from responsibility for the consequences of its own actions should be rejected."[1026]

881.  Respondent replies that Yukos "could and should have accommodated" the entirely reasonable concerns of Sibneft.[1027]   Respondent points out that Yukos would still have nominated the other senior managers and that the CEO Yukos suggested in replacement of Mr. Khodorkovsky (Mr. Simon Kukes), was a relatively unknown figure.   With respect to causation, Respondent argues that it was "Yukos' stubborn refusal to consider Sibneft's change-in-management proposal—

---

[1020]   Counter-Memorial ¶ 328.

[1021]   *Abramovich met Putin before vetoing Yukos–Sibneft merger*, The Sunday Telegraph, 30 November 2003, Exh. C-669.

[1022]   *Yukos–Sibneft Merger Called Off*, BBC News, 28 November 2003, Exh. R-397 (quoting Mr. Boris Berezovsky).

[1023]   Reply ¶ 134.

[1024]   Shareholders' Agreement in respect of Yukos Oil Company among YUL, Hulley, White Pearl Investments Limited, N.P. Gemini Holdings Limited, Marthacello Co. Limited, Kindselia Holdings Limited, Heflinham Holdings Limited and Kravin Investments Limited, 1 May 2003, Article 6.1, Exh. C-1102.

[1025]   *Yukos and Sibneft Agree in Principle to Merger*, Yukos Press Release and Sibneft Press Release, 22 April 2003, Exh. C-629.

[1026]   Reply ¶ 134.

[1027]   Rejoinder ¶ 786.

and not any action on the part of the Russian Federation—that ultimately doomed the Yukos–Sibneft merger."[1028]

882.   Respondent also argues that it cannot bear any responsibility for the unwinding of the merger because Claimants and/or Yukos voluntarily agreed to it.  It is a matter of public record that, in early 2004, Yukos retained external advisers for negotiations with Sibneft.[1029]  Respondent also alleges that Claimants signed two protocols dated December 2003 and February 2004 to unwind the merger.[1030]  The Tribunal notes that these protocols are not in the record of this arbitration.   Under cross-examination, Mr. Misamore stated that he did not recall ever seeing the protocols.[1031]

883.   Claimants acknowledge that, "[a]lthough under no obligation to do so, Yukos and its majority shareholders agreed to enter into formal discussions with the former principal shareholders of Sibneft to consider a possible unwind of the transaction."[1032]  Claimants add however that Yukos and its majority shareholders made it clear that unless an acceptable agreement was reached and approved by the Yukos Board of Directors and its shareholders, Yukos would maintain the existing agreements and proceed with its merger with Sibneft.[1033]

884.   The Tribunal observes that, in the end, the decisions of the Moscow and Chukotka Arbitrazh Courts, although criticized by Claimants, effectively put an end to the merger.  There never was a consensual negotiated solution.[1034]

885.   Respondent speculates that it could have been Yukos that instigated the two court cases in order to achieve the demerger without having to seek the approval of minority shareholders.[1035]  Respondent refers to an e-mail of 13 February 2004 where Yukos' counsel Mr. Gololobov

---

[1028]   Counter-Memorial ¶ 330.

[1029]   *Yukos Oil Company retains consultants for negotiations with former Sibneft core shareholders*, Yukos Press Release, 2 February 2004, Exh. C-680.

[1030]   Respondent's Post-Hearing Brief ¶ 75 n.193 (citing *Yukos Oil Company v. Kravin Investments and others*, LCIA Arbitration No. 4589, Statement of Case, 2 May 2005, Exh. R-3601 ¶¶ 41, 44, 50).

[1031]   Transcript, Day 9 at 11–12.

[1032]   Memorial ¶ 212.

[1033]   *Yukos Sibneft Merger*, Company News, Group Menatep Website, 2 December 2003, Exh. C-670; *Statement on the Status of Negotiations with Representatives of Former Principal Shareholders of Sibneft*, Yukos Press Release, 17 December 2003, Exh. C-672.

[1034]   *See* Transcript, Day 17 at 25.

[1035]   Rejoinder ¶¶ 797–806.

proposed a five-part "Scheme of Actions for Unwinding Transaction."[1036]   The first step was a "[s]uit to have issuance of shares declared invalid,"[1037] which, Respondent argues, bears a striking resemblance to the lawsuit brought in January 2004 by NP Gemini Holdings Limited and Nimegan Trading Limited before the Moscow Arbitrazh Court.

886.   The Tribunal notes that this e-mail was sent after the commencement of the Moscow lawsuit. Respondent's theory is also inconsistent with the fact that Yukos applied to an LCIA tribunal to prevent the former Sibneft shareholders from pursuing actions for the invalidation of the share issuance before the Moscow and Chukotka courts.   The Tribunal finds this argument of Respondent unpersuasive.

887.   The central question remains.   Did the Russian Federation cause the demerger?   In the view of the Tribunal, it did not.   It is abundantly clear that Sibneft wanted out of the merger after the arrest of Mr. Khodorkovsky.   It was perfectly understandable for Sibneft to have second thoughts about the merger under the leadership of a CEO who was under arrest and embroiled in controversy.[1038]   The Tribunal does not see the fingerprints of Respondent in Sibneft's decision to insist upon a change in management after the arrest of Mr. Khodorkovsky or in Sibneft's subsequent announcement that it would not proceed with the merger.

888.   The Tribunal therefore concludes that Claimants have not established any basis which would allow them to claim damages based on the assumption that the merged YukosSibneft company would have been successful.[1039]

889.   However, the circumstances of the Yukos−Sibneft merger are instructive in evaluating Yukos' attempts to settle its tax debts with the Russian authorities, which will be discussed in the next chapter.

890.   The Tribunal will now review the attempts by Yukos to settle its tax debts and the reaction of the Russian authorities to Yukos' offers.

---

[1036]   E-mail from Mr. Dmitry Gololobov to Mr. Yuriy Beilin attaching "Scheme of Actions for the Unwinding Transaction," 13 February 2004, Exh. R-3602.

[1037]   *Ibid.*, Flowchart.

[1038]   The Tribunal notes that Sibneft's position was not inconsistent with the spirit of the Shareholders' Agreement, which contained a provision allowing the Sibneft shareholder group to remove any Yukos-appointed senior managers if they committed fraud or embezzlement.   Shareholders' Agreement in respect of Yukos Oil Company among YUL, Hulley, White Pearl Investments Limited, N.P. Gemini Holdings Limited, Marthacello Co. Limited, Kindselia Holdings Limited, Heflinham Holdings Limited and Kravin Investments Limited, 1 May 2003, Article 6.1, Exh. C-1102.

[1039]   *See* Part XII on Quantification of Damages at paragraph 1779.

E.   ATTEMPTS TO SETTLE

**1.   Introduction**

891.   In the second half of 2004, Yukos made several proposals to the Russian authorities for the settlement of its tax debts.  None of these proposals was accepted by the Russian Federation, which moved to auction off YNG in December 2004 in spite of Yukos' protests.

892.   This chapter examines the context of Yukos' settlement offers, their content and the Russian Federation's reaction to them, with a view to determining whether the conduct of the Russian Federation was more consistent with the goal of collecting taxes or, as Claimants argue, with the aim of leading Yukos to bankruptcy and appropriating its most valuable assets.

893.   Claimants submit that, through its settlement offers, Yukos sought to initiate a dialogue with the Russian Federation that could lead to Yukos paying its tax debts while "preserv[ing] the company as a going concern."[1040]   However, the settlement offers were met with a "complete lack of responsiveness" and utter inflexibility from the Russian Federation.[1041]   For Claimants, this reaction is "one of the strongest testaments" to the fact that Respondent was not interested in tax collection, but only the destruction of Yukos.[1042]   As put by Claimants' counsel at the Hearing:

> the bottom line is: if the Russian Federation was interested in collecting taxes, it would have responded to Yukos; it would have worked with Yukos to try and find a way for the company to pay its alleged tax debt. . . . And we say that this is consistent and supports the Claimants' conclusion that this was not about paying taxes but was about the expropriation of the company.[1043]

894.   Claimants add that the Russian Federation's real intent with respect to Yukos is also revealed by the fact that it did settle the tax debts of other oil companies, such as Rosneft, Sibneft and TNK-BP.[1044]

895.   Claimants also submit that, in addition to rejecting Yukos' settlement offers, the Russian authorities actively prevented Yukos from discharging its tax liabilities by freezing and seizing

---

[1040]   Theede WS ¶ 9; *see also* Transcript, Day 17 at 126.

[1041]   Reply ¶ 321.

[1042]   Transcript, Day 20 at 216 (Claimants' closing); *see also* Rieger WS ¶ 24.

[1043]   Transcript, Day 17 at 105 (Claimants' closing).

[1044]   Claimants' Skeleton Argument, 1 October 2012 ¶ 26 (hereinafter "Claimants' Skeleton").

Yukos' assets (through the April 2004 injunction of the Moscow Arbitrazh Court and the bailiffs' resolutions of June and July 2004).[1045]   As a result, Yukos could only pay its tax debts from the proceeds of the business operations of its subsidiaries, which did not suffice to meet Yukos' liabilities in the short time allowed by the Russian authorities.[1046]

896.   For its part, Respondent submits that the Russian authorities responded to each of Yukos' offers[1047] and, moreover, were entitled to reject these offers because none of them amounted to a serious proposal.[1048]   From Respondent's perspective, Yukos' settlement offers were a mere posturing exercise intended to give "an appearance of cooperation, while fostering the image—embellished by their public relations machines—that Yukos was a victim of the authorities' conduct."[1049]   Yukos' offers were "invariably unacceptable, either because they were contrary to Russian law, or because they involved impaired assets, or because they were otherwise inadequate."[1050]

897.   Respondent further submits that, by the second half of 2004, "Yukos' management faced a serious credibility problem, among other things because it had made manifestly false claims that it was unable to pay any of its tax bills."[1051]   Given Yukos' bad faith, the Russian authorities' refusal to negotiate was reasonable.[1052]   Respondent concludes that Yukos caused its own demise by failing to pay its tax debts in full in the first quarter of 2004 (instead making disingenuous and inadequate settlement proposals), thereby attracting mounting interest and fines.[1053]

898.   The Tribunal recalls that the *Quasar* tribunal found that the Russian Federation's failure "even to respond" to the offers made by Yukos, "the largest private taxpayer in Russia" and a major

---

[1045]   Memorial ¶ 351.

[1046]   *Ibid.* ¶¶ 351, 353.

[1047]   Respondent's Closing Slides, p. 895; *see also* Rejoinder ¶ 893.

[1048]   Counter-Memorial ¶ 419.

[1049]   Rejoinder ¶ 897.

[1050]   Counter-Memorial ¶ 419; *see also* Rejoinder ¶ 893.

[1051]   Counter-Memorial ¶ 418.

[1052]   Respondent's Closing Slides, pp. 804–806.

[1053]   Respondent's Post-Hearing Brief ¶¶ 220–21.

force of the national economy, raised "significant doubts as to whether the Respondent acted in good faith in attempting to resolve its tax dispute with Yukos."[1054]

### 2.   Yukos' Settlement Offers (and the Russian Federation's Replies)

899.  To place the settlement offers in context, it is helpful to recall the dates of some key events.[1055]

900.  The 2000 Audit Report, the first audit report to assess tax arrears against Yukos, was issued on 29 December 2003.[1056]  The 2000 Decision holding Yukos fiscally liable for a tax offense and concluding that an amount of approximately USD 3.48 billion was due within two days, was issued on 14 April 2004.[1057]

901.  On 15 April 2004, the Moscow Arbitrazh Court, upon application by the Tax Ministry, issued the 2004 Injunction prohibiting Yukos "from alienation and encumbrance in any way of its assets, including shares (including prohibition from the transfer of securities to a nominee holder and in trust management), interests in the charter capital of other legal entities, securities, excluding main types of products manufactured by [it]."[1058]

902.  In a decision dated 23 June 2004 and published on 30 June 2004, the Appeal Panel of the Moscow Arbitrazh Court reversed a 19 May 2004 ruling that had provisionally suspended the effect of the 2000 Decision.[1059]

903.  On 29 June 2004, an appeal resolution of the Moscow Arbitrazh Court upheld a first instance decision allowing the Tax Ministry to collect "tax arrears, interest, and fines" from Yukos in an amount of USD 3.42 billion.[1060]  On 30 June 2004, the Moscow Arbitrazh Court issued an enforcement writ for this amount.[1061]

---

[1054]  *Quasar* ¶ 102, Exh. R-3383.

[1055]  For a complete narrative, *see* Chapter VIII.B of this Award.

[1056]  2000 Audit Report, Exh. C-103.

[1057]  2000 Decision, Exh. C-104.

[1058]  April 2004 Injunction, Exh. C-108.

[1059]  Decision of Judge Cheburashkina to Suspend the Effect of Decision No. 14-3-05/1609-1 of 14 April 2004, Exh. C-112; Moscow Arbitrazh Court, Appeal Resolution in the name of the Russian Federation, 23 June 2004, Exh. C-120.

[1060]  Decision of the Moscow Arbitrazh Court, 26 May 2004, Exh. C-116; Moscow Arbitrazh Court, Appeal Resolution, 29 June 2004, Exh. C-121.

[1061]  Enforcement Writ No. 383729, 30 June 2004, Exh. C-122.

904.    On the same day, Bailiff Solovyova issued a resolution to initiate an enforcement proceeding. The resolution granted Yukos a 5-day period for voluntary payment of the full amount due, failing which the Bailiff would consider imposing a 7 percent enforcement fee.[1062]  The Bailiff then issued several more resolutions, freezing cash in 16 Yukos bank accounts.[1063]

905.    The 2001 Tax Audit, assessing USD 4.1 billion in taxes, interest and fines against Yukos, was released on 30 June 2004.[1064]

906.    During July 2004, Bailiffs Solovyova and Borisov issued further resolutions restricting Yukos' access to its assets and imposing the collection of a 7 percent enforcement fee.[1065]

907.    On 9 July 2004, the Chukotka Arbitrazh Court issued interim measure orders in proceedings between former shareholders of Sibneft and Yukos, attaching 72 percent of Sibneft's share capital and thus shrinking Yukos' alienable stake in Sibneft to 20 percent minus one share (the "**Chukotka Injunctions**").[1066]

908.    On 6 July 2004, Yukos began making cash payments against its tax debts from the proceeds of the business operations of its subsidiaries.[1067]  By 16 November 2004, Yukos had paid USD 3.47 billion—a little more than the amount of its tax liability for the year 2000.[1068]

909.    However, Yukos' tax liabilities increased with the 2001 Decision, the 2002 Decision and the 2003 Decision, which were issued on 2 September, 16 November and 6 December 2004, respectively, and required payment by Yukos of tax arrears, fines and interest in the amounts of USD 4.1, 6.7 and 6 billion.[1069]

910.    YNG was auctioned on 19 December 2004.[1070]

---

[1062]   Resolution of the bailiff to initiate enforcement proceeding 10249/21/04, 30 June 2004, Exh. C-123.

[1063]   Resolutions of the bailiffs to seize monies, 30 June 2004, Exh. C-124.

[1064]   Repeat Field Tax Audit Report No. 30-3-14/1 (2001), 30 June 2004, Exh. R-345.

[1065]   Resolution to restrict the rights of the securities owner, 1 July 2004, Exh. C-125; Resolution No. 10249/21/04 to Collect an Enforcement Fee, 9 July 2004, Exh. C-132.

[1066]   Rulings of the Arbitrazh Court of the Chukotka Autonomous District, Case No. A80- 141/2004, 9 July 2004, Exh. R-553.

[1067]   Reply ¶ 320, referring to Exhs. C-212 to C-238.

[1068]   Memorial ¶ 358, referring to Exh. C-234.

[1069]   2001 Decision, Exh. C-155; 2002 Decision, Exh. C-175; 2003 Decision, Exh. C-190.

[1070]   Protocol of the results of the auction to sell shares in OAO Yuganskneftegaz, 19 December 2004, Exh. C-290.

911.   Between 29–30 June 2004—when one appeals decision lifted the provisional suspension of the effect of the 2000 Decision and another confirmed the Tax Ministry's USD 3.42 billion claim against Yukos—and December 2004—when the YNG auction took place—Yukos made several proposals to the Russian authorities to settle its tax debts.  These proposals may be classified in four categories: (a) proposals made to the bailiffs, requesting enforcement against specific assets; (b) proposals for a global settlement conveyed by the Right Honourable Jean Chrétien, PC, OM, CC, QC, former Prime Minister of Canada; (c) requests for a deferral or payment in instalments; and (d) other proposals (which are not in the documentary record in this arbitration).  The Rehabilitation Plan, proposed by Yukos' management in the bankruptcy proceedings and discussed in greater detail in Chapter VIII.G of this Award, can be seen as Yukos' final attempt to discharge its tax liabilities while continuing as a going concern.

### (a)   Proposals Made to the Bailiffs

912.   On 2 July 2004, Mr. Gololobov, Yukos' legal counsel, wrote to Bailiff Solovyeva, explaining that the April 2004 Injunction and the Bailiff's 30 June 2004 seizure of 16 Yukos bank accounts prevented Yukos from voluntarily complying with the 30 June 2004 enforcement resolution and requesting that Bailiff Solovyeva accept, by way of voluntary enforcement, the transfer of a 34.5 percent stake in Sibneft, corresponding to the 20 percent minus one share stake obtained by Yukos under the Share Purchase Agreement plus the 14.5 percent stake obtained by Yukos as the second tranche under the Share Exchange Agreement.[1071] Mr. Gololobov's letter stated that the value of the 34.5 percent stake in Sibneft was approximately USD 4 billion.

913.   On 9 July 2004, Mr. Gololobov again requested Bailiff Solovyeva to accept Yukos' 34.5 percent stake in Sibneft in payment of Yukos' tax debts.[1072]  Respondent has described this request dated 13 July 2004 as being "in clear violation of the Chukotka [I]njunctions."[1073] However, Claimants correctly point out that, while 13 July 2004 may have been the date when the letter was received by the Bailiff, the letter itself is dated 9 July 2004.[1074]

---

[1071]   Petition for voluntary enforcement of the Resolution of 30 June 2004 to initiate enforcement proceedings and the Demand of 30 June 2004, 2 July 2004, Exh. C-126.

[1072]   Application on the procedure of performance of the Resolution on commencement of enforcement proceedings dated 30 June 2004 and the Demand dated 3 June 2004, 9 July 2004, Exh. R-554.

[1073]   Counter-Memorial ¶ 425.

[1074]   Reply ¶ 328 n.630.

914.   On 14 July 2004, Mr. Gololobov amended Yukos' previous requests and lowered the offer to a 20 percent minus one share stake in Sibneft ostensibly to take account of the Chukotka Injunctions dated 9 July 2004.[1075]  Mr. Gololobov indicated that the 20 percent minus one share stake in Sibneft was worth between USD 2.3 and 2.5 billion.[1076]

915.   On 6 August 2004, Mr. Gololobov wrote to Chief Bailiff Melnikov, requesting that the 20 percent minus one share stake in Sibneft, as well as Yukos' holdings in 15 other companies with a purported value of approximately USD 1.1 billion, be used for enforcement purposes as a matter of priority.[1077]   The letter incorrectly stated that the 20 percent stake comprised 1,637,633,048 shares (a number that in fact corresponds to a 34.5 percent stake), prompting Respondent to argue that Yukos sought to conceal from the bailiffs that at least a 14.5 percent stake in Sibneft was encumbered pursuant to the Chukotka Injunctions.[1078]   The letter also stated that the total value of the assets offered in payment was USD 3.4 billion.[1079]   But, the annex to the letter valued the shareholdings in Sibneft at USD 2.351 billion, which corresponds to the value of a 20 percent minus one share stake (as stated in Yukos' letter of 14 July 2004), and all the assets offered at USD 3.4 billion.[1080]   It is obvious that the letter contained some errors, which could have been corrected by the bailiffs by comparing it to its annex and the letter of 14 July 2004.

916.   On 16 September, 24 November and 16 December 2004, Yukos wrote further letters to the bailiffs (in response to the issuance of the 2001, 2002 and 2003 Decisions),[1081] again proposing that enforcement be made as a matter of priority against its stake in Sibneft and 15 other entities.[1082]   These proposals did not specify the number or percentage of Sibneft shares that Yukos was offering, but the total value of the assets offered in each case was said to be USD 3.407 billion.   This figure is identical to the total amount of assets referred to in the annex

---

[1075]   Addendum to petition regarding the process of enforcement of the Resolution of June 30, 2004 to initiate enforcement proceedings and the Demand of June 30, 2004, 14 July 2004, Exh. C-137.

[1076]   *Ibid.*

[1077]   Letter from Mr. Gololobov to Chief Bailiff A.T. Melnikov, 6 August 2004, Exh. C-140.

[1078]   Counter-Memorial ¶ 427, n.636.

[1079]   Letter from Mr. Gololobov to Chief Bailiff A.T. Melnikov, 6 August 2004, Exh. C-140.

[1080]   *Ibid.*

[1081]   Memorial ¶¶ 354, 356.

[1082]   Petition for voluntary enforcement of Resolution of 09.09.2004 to initiate an enforcement proceeding and Demand of 30.06.2004, 16 September 2004, Exh. C-163; Petition for voluntary enforcement of Resolution 19 November 2004 to initiate an enforcement proceeding, 24 November 2004, Exh. C-180; Petition for voluntary enforcement of the Resolution of 09.12.2004 to initiate an enforcement proceeding, 16 December 2004, Exh. C-195.

to the 6 August 2004 letter, and it appears to have been calculated on the basis of a 20 percent minus one share stake in Sibneft.[1083]

917.   The bailiffs did not respond to the proposals made by Mr. Gololobov in July 2004.  Yukos challenged the bailiffs' silence before the Moscow Arbitrazh Court, which found, in a decision dated 17 August 2004, that the bailiffs had acted lawfully because both the 14.5 percent stake in Sibneft, which was attached pursuant to the Chukotka Injunctions, and the remaining 20 percent minus one share stake in Sibneft, were disputed by Sibneft's former shareholders.[1084]

918.   The Department of Bailiffs within the Russian Ministry of Justice responded to Yukos' 6 August 2004 letter on 9 September 2004, referring in particular to the decision of the Moscow Arbitrazh Court of 17 August 2004 and concluding that the Russian judiciary had "affirmed the right of the bailiff to make the final decision regarding the sequence for seizures."[1085]

919.   The bailiffs did not respond to Yukos' letters of 16 September, 24 November and 16 December 2004.  Respondent submits that the bailiffs did not need to respond as, by then, Yukos had already been put on notice by the 17 July 2004 decision of the Moscow Arbitrazh Court that its offers of Sibneft shares were unacceptable.[1086]  The Tribunal notes, however, that the bailiffs also failed to react to Yukos' offer of shares in companies other than Sibneft, in respect of which the Moscow Arbitrazh Court had not commented.

(b)   **Proposals for a Global Settlement Conveyed by Mr. Chrétien**

920.   Mr. Chrétien wrote to Prime Minister Fradkov on behalf of Yukos for the first time on 6 July 2004, offering a "global settlement" of USD 8 billion for the taxes assessed against Yukos in 2000–2003, with 2 billion to be paid in cash in July 2004 and two more tranches to be paid in

---

[1083]   With respect to the Sibneft shares, in addition to the proposals listed here, Yukos also applied on 22 April 2004 to the Moscow Arbitrazh Court for a replacement of the April 2004 Injunction with a new injunction that would instead freeze Yukos' 57.5 percent stake in Sibneft (*see* Exhs. R-476 and R-477).  Yukos' application was rejected the following day (Exh. R-452).  Respondent discussed this application in the context of Yukos' settlement offers (Counter-Memorial ¶ 420).  However, since the purpose of the application was the unfreezing of Yukos' assets in the context of interim measures ordered against it, rather than a final settlement of the tax claims, the Tribunal considers that this application cannot properly be characterized as a settlement proposal.

[1084]   Decision of the Moscow Arbitrazh Court, 17 August 2004, Exh. C-143.

[1085]   Letter from Mr. Sazanov, Deputy Head of the Bailiffs Department to Mr. Gololobov, 9 September 2004, Exh. C-146. *See also* Memorial ¶ 350.

[1086]   Rejoinder ¶ 893(c).

July 2005 and July 2006.[1087]   As security for the payment of the July 2005 tranche, Yukos offered its 35 percent stake in Sibneft.[1088]

921.   Having received no reply, Mr. Chrétien reiterated the global settlement proposal in another letter to Prime Minister Fradkov dated 15 July 2004 and in letters addressed to President Putin dated 30 July, 10 September and 17 November 2004.[1089]

922.   Noting that Mr. Chrétien's letter of 30 July 2004 offered an "uncontested" 35 percent stake in Sibneft as collateral, Respondent again argues that Yukos sought to conceal from Respondent that at that time at least a 14.5 percent stake in Sibneft was encumbered pursuant to the Chukotka Injunctions.   However, as Mr. Chrétien's letter in this respect contradicted Mr. Gololobov's letter to the bailiffs of 14 July 2004, the Tribunal views the reference to the uncontested stake in Sibneft as a mistake rather than a deliberate attempt by Yukos to mislead the Russian authorities.

923.   Referring to Mr. Chrétien's letters of 30 July 2004 and 17 November 2004, Respondent submits that, while Prime Minister Fradkov and President Putin did not respond to Mr. Chrétien in writing, they did discuss with him the tax claims against Yukos.[1090]

924.   In his letter of 30 July 2004, Mr. Chrétien refers to a discussion with President Putin during a "meeting in July."[1091]   In his letter of 17 November 2004, he describes a meeting with President Putin as follows:

> [w]hen we last met in Moscow, you told me that I could take the mandate to represent the interests of Group Menatep, and possibly other minority shareholders of Yukos, to find a solution to the tax problems confronting them. . . . When you and I last spoke after our meeting, you asked for a letter outlining our proposal to settle this matter and you assured me that a response from the Minister responsible for this file would be forthcoming.  I sent you the letter at the end of July, but have received no communications from your government as yet.[1092]

---

[1087]   Letters from Jean Chrétien to Prime Minister Fradkov of 6 and 15 July 2004, and to President Putin of 30 July 2004, 10 September 2004 and 17 November 2004, Exh. C-129 (hereinafter "Chrétien letters").

[1088]   *Ibid.*

[1089]   *Ibid.*

[1090]   Respondent's Closing Slides, pp. 302, 324.

[1091]   Chrétien letters, Exh. C-129.

[1092]   *Ibid.*

925. From these excerpts, it appears that President Putin initially encouraged the overture of a dialogue regarding Yukos' tax liability, but that neither he nor any other Russian authority ever responded to the concrete proposal made by Mr. Chrétien on Yukos' behalf.

926. Under cross-examination at the Hearing, Mr. Theede expressed Yukos' frustration with the lack of response from the Russian Federation:

> By this time it was really becoming obvious that Mr. Chrétien's, you know, admirable efforts just weren't going to get us where we needed to go, because he had been made—a lot of promises had been made to him about 'All I want Yukos to do is pay taxes, you know? That's all I want out of them: I just want them to pay taxes. And if you can get them to do that, then send me a proposal and it will work.'
>
> And he did all that, and never got a response. And it's now several months after the original proposal. I suppose—I suppose, you know, no question in my mind—the authorities probably already by July had in mind the amount of money that they were going to rack up against us in tax liabilities. They probably knew that they were going for something in the order of $30 billion, and so to them the $8 billion was low. And of course, they couldn't come back and say, 'Look, our plan is to tax you $30 billion, and so you guys are well off the mark.' They couldn't say that, because it would have blown their cover.
>
> But we were trying, and thought Mr Chrétien was a very credible way to open the dialogue I've been talking about all afternoon. But by this time, I don't—I had pretty much lost hope, and was, I guess, impressed that Mr Chrétien was continuing to try, but to no avail.[1093]

### (c)     Requests for a Deferral or Payment in Instalments

927. On 16 July 2004, Mr. Steven Theede sent a letter signed by Mr. Bruce Misamore to the Minister of Finance, Mr. Kudrin, then Minister of Finance, requesting a six-month deferral or payment in instalments of the tax arrears and interest for the year 2000.[1094] The letter referred to the "unprecedented nature" of the sum subject to collection and the potentially negative consequences of rapid enforcement on Yukos' production operations and the Russian budget.[1095] During the Hearing, Mr. Theede acknowledged that the letter was not perfect (the proposals were not detailed) but he described the letter as an attempt to "create a dialogue" between Yukos and the Russian Federation.[1096] The Ministry of Finance rejected Mr. Theede's request by letter dated 30 August 2004, relying on Art. 62(1)(2) of the Russian Tax Code,

---

[1093]   Transcript, Day 10 at 100–101.

[1094]   Petition for deferral or payment in instalments, 16 July 2004, Exh. C-138.

[1095]   *Ibid.*

[1096]   Transcript, Day 10 at 54.

which provides that the term for the payment of tax cannot be changed if the entity applying for such a change is the subject of proceedings for a tax offence.[1097]

928.   On 12 August 2004, Yukos petitioned the Moscow Arbitrazh Court for the right to pay its tax debt for the year 2000 in 15 monthly instalments of USD 143.96 million.   Judge Grechishkin denied the petition, stating that while he had discretion under the law to order payment in instalments, in this case the circumstances did not justify such an order.[1098]

### (d)   Other Proposals

929.   Claimants submit that the settlement offers described above are "just a sample" of the "roughly 80 proposals and attempts to communicate with various authorities" made by Yukos.[1099]   They say that other settlement proposals were made, but did not leave a paper trail.

930.   For example, Mr. Rieger recounts in his witness statement that, in the summer of 2004, he and Mr. Gololobov had a meeting with Chief Bailiff Belyakov during which they "explained that Yukos could start selling off its assets within a month in order to pay off its alleged tax debts" and "left a two-page letter for the Russian authorities setting out Yukos' settlement proposal." Mr. Rieger adds that the authorities did not respond to this proposal.[1100]   Noting that Mr. Rieger could not recall the exact terms of the proposal, Respondent suggests that, in the light of the timing, there is no reason to believe that the proposal differed from that made in Mr. Golobolov's 6 August 2004 letter (described in paragraph 915 above).[1101]

931.   In their respective witness statements, Messrs. Theede and Misamore also recount that, in October 2004, "the company put everything it could into a last settlement effort" and presented to the Russian authorities a USD 21 billion settlement proposal that included Yukos shares, Sibneft shares, non-core assets and "a concession to re-elect a new board of directors that would include a number of people selected by the Government."[1102]   While Yukos was initially

---

[1097]   Letter from the Tax Ministry to Yukos, 30 August 2004, Exh. C-145, referring to Russian Tax Code, Article 62, Exh. R-557.

[1098]   Ruling of the Moscow Arbitrazh Court, 12 August 2004, Exh. C-142.

[1099]   Transcript, Day 17 at 105 (Claimants' closing), referring to Theede WS ¶ 9.

[1100]   Rieger WS ¶¶ 21–23.

[1101]   Respondent's Closing Slides, p. 319, referring to Transcript, Day 6 at 130 (cross-examination of Mr. Rieger).

[1102]   Misamore WS ¶ 47; Theede WS ¶ 21.

"cautiously optimistic", the negotiations ended abruptly when Mr. Temerko, Yukos' chief negotiator in the process, was threatened with arrest and fled Russia.[1103]

932. Respondent emphasizes that there is no written record of this proposal and no witness statement by Mr. Temerko. Respondent also contends that "[i]f there were such a proposal in any amount, there is no rational basis for believing it totalled US $21 billion, because after it was allegedly made in October 2004, Yukos continued to make proposals it valued at US$ 3.4 billion, and Mr. Chrétien kept reiterating his 'global settlement' proposal of US$ 8 billion."[1104]

933. When asked in cross-examination whether there was a record of this offer, Mr. Theede replied "[y]ou have no record, but you do have my word.  And I believe certainly Bruce Misamore and I have exactly the same recollection."[1105]  Mr. Misamore was not cross-examined regarding this settlement proposal.

### 3.    Parties' Arguments and Tribunal's Observations

### (a)    Did Yukos Contribute to its Own Demise by Failing to Discharge Tax Debt in the Amount of USD 9 Billion in the First Quarter of 2004?

934. As discussed in paragraphs 679–80 and 745–48 above, Respondent submits that Yukos could have avoided some of the taxes, fines and interest eventually assessed against it, in the first quarter of 2004, by filing amended VAT returns in its own name, amended tax returns for 2000–2002 and a tax return for 2003 recognizing all of Yukos' income without assigning it to its trading entities.  According to Respondent, had Yukos taken these steps, it would have faced only USD 9 billion in unavoidable tax debt, comprising the full amount assessed against it for the year 2000 and the amounts assessed against it for 2001–2003 minus VAT, willful and repeat offender fines and a part of the default interest accrued on the taxes for those years.[1106]

935. Respondent also contends that Yukos could have paid this amount—USD 9 billion—in the first quarter of 2004.  At that time, Respondent argues, Yukos had both the ability to calculate its tax liabilities for 2001–2003 based on the amounts assessed against it for the year 2000 and

---

[1103]   Theede WS ¶¶ 22–23; Misamore WS ¶ 48.

[1104]   Respondent's Post-Hearing Brief ¶ 102(iii).

[1105]   Transcript, Day 10 at 75.

[1106]   Respondent's Closing Slides, p. 228.

sufficient funds.[1107]  Specifically, Respondent submits that Yukos had "unrestricted access" to: (a) over USD 6.8 billion in cash, constituting revenue from Yukos' trading entities paid out in dividends to Brittany Ltd., a British Virgin Islands indirect subsidiary of Yukos;[1108] (b) USD 3 billion in cash, which Yukos was entitled to receive in the context of the unwinding of the Sibneft merger for the 20 percent minus one share stake it had acquired under the Share Purchase Agreement;[1109] (c) over USD 1.1 billion in cash generated by Yukos' continuing operations;[1110] (d) the USD 2 billion "giga-dividend" Yukos paid out to its shareholders in December 2003 and January 2004;[1111] and (e) at least USD 1.55 billion in offshore non-monetary assets.[1112]  Respondent also points out that, until the April 2004 Injunction, all of Yukos' assets in Russia were available to it to pay its tax debts.[1113]

936.  Respondent submits that, by re-filing its VAT and tax returns and paying USD 9 billion in the first quarter of 2004, Yukos could have avoided the 7 percent enforcement fee imposed by the bailiffs and "all of the enforcement measures about which Claimants complain, including the April 14, 2004 injunction, the June 30, 2003 cash freeze orders, the seizures of shares, and the YNG auction."[1114]  Yukos would thus "have survived as a going concern and still could have pursued a claim for a refund of any amounts the courts found it did not need to pay."[1115]

937.  Respondent insists that, as Mr Konnov stated in his second expert report, "[t]he filing of tax returns and the payment of the tax would not have prejudiced Yukos' appeal rights."[1116]  According to Respondent, Mr Konnov's opinion is confirmed by Yukos' counsel Mr Pepeliaev who, in a commentary published in 2002, wrote:

---

[1107]  Respondent's Closing Slides, p. 247, referring to Exh. C-1756.

[1108]  Respondent's Post-Hearing Brief ¶ 79, n.199; Rejoinder ¶¶ 838–41.  For a description of Brittany's place in the Yukos corporate structure and revenue flow structure see Supplemental Expert Report of Thomas Z. Lys, 15 August 2012, ¶¶ 105, 114, 130–37 and Appendix I.

[1109]  Respondent's Post-Hearing Brief ¶ 79, n.199; Rejoinder ¶ 842.

[1110]  Ibid.; Rejoinder ¶¶ 843–44.

[1111]  Ibid.; Rejoinder ¶ 845.

[1112]  Ibid.; Counter-Memorial ¶ 372, n.500.

[1113]  Respondent's Closing Slides, p. 267.

[1114]  Rejoinder ¶ 834.  Respondent adds that even if Yukos had waited until after the 2000 Decision was issued in April 2004, it could have avoided all enforcement measures by paying only USD 10.8 billion (Respondent's Post-Hearing Brief ¶ 84).

[1115]  Respondent's Post-Hearing Brief ¶ 250.

[1116]  Respondent's Closing Slides, p. 248, referring to Second Konnov Report ¶ 104.

> We often recommend for the sake of a client's safety to pay tax for a short period (a month) in a maximum amount which can possibly be inferred from interpretation of the relevant provision.   And immediately thereafter we file an application to the tax inspectorate requesting a refund or offset of an overpaid amount.  It basically reads, 'Hey! We used to interpret this norm this way but our consultants tell us that we overpaid tax, so please refund it.'  Of course, the inspectorate refuses to refund implying that we paid correctly – the more the better.   Then a court claim is filed and it is up to court to decide. As a result a precedent is established.[1117]

938.    However, Respondent submits, despite this possibility to discharge the totality of its tax debt at an early stage for a fraction of the amounts eventually assessed against it, Yukos "failed to use the time and its resources to pay its tax debt," its managers choosing to "ignore that payment was due as provided in the assessment, not months later."[1118]   Instead, Yukos only started making payments and considering a payment plan in July 2004.[1119]

939.    Respondent submits that, in the light of Yukos' conduct, the Russian authorities were entitled to view Yukos' settlement offers with "caution and scepticism".[1120]  In addition, by the time of the first settlement offers, Yukos' untrustworthiness had become manifest in other ways, particularly when Yukos: (a) accused the Russian authorities of running a "tax racket"; (b) denied affiliation with, or the ability to get information about, its trading entities; (c) asked that the April 2004 Injunction be substituted with an injunction against already-encumbered Sibneft shares; and (d) engaged in serial corporate dissolution to frustrate tax collection.[1121]

940.    Respondent concludes that the destruction of Yukos is therefore "the consequence of the contributory fault and failure to mitigate of Yukos, under the control of Claimants."[1122]

941.    Claimants reject the argument that they could have avoided enforcement of the tax assessments by the Russian Federation and the bankruptcy of Yukos by paying USD 9 billion in the first quarter of 2004, asserting that, to be convinced by this argument, "the Tribunal would need to ignore the most salient facts—the Respondent's breaches—and assume . . . that the very same Russian authorities who committed those breaches would have acted differently if only Yukos had taken the actions specified by the Respondent."[1123]  Claimants argue that there is no "duty

---

[1117]   Rejoinder ¶ 849, referring to S.G. Pepeliaev, *Tax Law Should Be Understandable*, Raschet, No. 4, 2002, Exh. R-3287.

[1118]   Respondent's Closing Slides, p. 292.

[1119]   *Ibid.*, pp. 264–65, referring to Transcript, Day 10 at 21 (cross-examination of Mr. Theede).

[1120]   Transcript, Day 18 at 265.

[1121]   Transcript, Day 18 at 265.

[1122]   Respondent's Post-Hearing Brief ¶ 250.

[1123]   Claimants' Post-Hearing Brief ¶ 276.

to appease" and that "a victim of extortion is not to blame if the threats against it are carried out after it refuses to pay."[1124]

942.  In addition, Claimants are of the view that taking the steps suggested by Respondent would have prejudiced Yukos' position for subsequent litigation.[1125]   As Mr. Theede stated at the Hearing, "you don't run a business by talking about paying taxes until they become an official tax."[1126]

943.  Moreover, Claimants submit that, as a matter of fact, Yukos "did everything it could to pay off the tax assessments as soon as they became due."[1127]   The obligation to pay arose on 16 April 2004,[1128] and Yukos made its first payment shortly thereafter on 6 July 2004.   However, contrary to Respondent's contention, Yukos did not have enough cash available to settle an alleged tax debt of USD 9 billion in the first quarter of 2004.  Mr. Theede explained at the Hearing that the USD 6.8 billion on the balance sheet of Brittany Ltd. "were basically loans of cash that had already been repatriated into Russia to fund our capital programs and operating expenses and so forth" and thus represented a "zero-sum" game.[1129]   The offer by the former Sibneft shareholders to buy back the 20 percent minus one share stake in Sibneft that Yukos had acquired pursuant to the Share Purchase Agreement for USD 3 billion was only made in October 2004 (and was rejected because it significantly undervalued the shares).[1130]   The 2 billion dividend could not be reversed and the sale of Yukos' offshore assets would have taken longer than three months to realize.[1131]   As for Yukos' assets in Russia, Yukos was prevented from using them by the April 2004 Injunction, which was "grossly disproportionate" to the debt it was intended to secure, and subsequent seizures.[1132]

944.  Thus, according to Claimants, by adding the "wide-ranging freeze and seizures" of the company's non-cash assets to the "massive payment demands" and "impossibly short

---

[1124]  *Ibid.* ¶ 275.

[1125]  *Ibid.* ¶¶ 280–281.

[1126]  Transcript, Day 10 at 21.

[1127]  Claimants' Post-Hearing Brief ¶ 83.

[1128]  Transcript, Day 20 at 112–13.

[1129]  Transcript, Day 11 at 41–42.

[1130]  Claimants' Post-Hearing Brief ¶ 291.

[1131]  *Ibid.*

[1132]  *Ibid.* ¶¶ 85–86, 91.

deadlines," the Russian Federation itself "engineer[ed] the circumstances of non-payment."[1133] In the circumstances, "it was evident that Yukos would not be able [to] settle its alleged tax debts or discharge them in full without the cooperation of the Russian authorities."[1134]

945. In the Tribunal's view, Yukos cannot be held responsible (even in part) for the rejection of its settlement offers and the enforcement measures subsequently taken by the Russian Federation merely because it did not pay USD 9 billion in the first quarter of 2004.  Although the 2000 Audit Report was issued at the end of 2003, Yukos' obligation to pay its tax debt for the year 2000 did not arise until the 2000 Decision was issued in April 2004.  Similarly, Yukos' obligation to pay its tax debts for 2001–2003 arose only with the issuance of the 2001, 2002 and 2003 Decisions in September–December 2004.  Although some of the amounts that became due under these decisions could have been estimated based on the findings set out in the 2000 Audit Report, the Tribunal does not see why Yukos, at a time when it considered the tax assessments to be ill-founded, should have made any payments before a legal obligation to pay the tax arose.  The Tribunal notes that Yukos began making payments toward its tax debts on 6 July 2004, less than a week after the issuance of the appeals decisions in its challenge proceedings against the 2000 Decision and the enforcement proceedings initiated by the Russian Federation.  In the circumstances, the Tribunal does not consider it unreasonable for Yukos to have delayed payment of its tax debts until these decisions were issued.

### (b) Did Yukos' Settlement Offers Constitute Real Alternatives to Enforcement?

946. Respondent invokes several reasons why Yukos' settlement offers could not be accepted by the Russian Federation, all of which are disputed by Claimants.  Principally, the Parties disagree as to whether (i) all the Sibneft shares were either encumbered or disputed; (ii) Yukos sought to enter into negotiations that are not permissible under Russian law; and (iii) Russian law permits payment in kind of tax arrears.

947. For Respondent, because of the flaws in Yukos' offers, the Russian authorities were justified in doubting the sincerity of Yukos' intention to pay.  This justified distrust explains why the Russian authorities did not respond to each one of Yukos' offers (although, according to Respondent, they did respond to all the sound offers).

---

[1133] *Ibid.* ¶ 88.

[1134] *Ibid.* ¶ 84.

948. Disputing that Yukos' offers suffered from any insurmountable defects, Claimants repeat that it was Yukos' genuine intention to commence a dialogue with the Russian Federation aimed at finding a workable solution to pay off its tax debts.

949. In this section, the Tribunal first addresses the specific areas of disagreement between the Parties and then makes some general observations regarding Yukos' settlement offers and the Russian Federation's responses.

### i.  Whether all the Sibneft Shares were Either Encumbered or Disputed

950. Respondent submits that the Sibneft shares could not be accepted in payment of Yukos' tax debts because Yukos' ownership of these shares was disputed by Sibneft's former shareholders.[1135]  This defect, says Respondent, affected all the offers made to the bailiffs, all the offers conveyed by Mr. Chrétien to Prime Minister Fradkov and President Putin, as well as the USD 21 billion settlement proposal allegedly made by Yukos in October 2004.

951. Claimants recognize that Yukos' ownership of the 14.5 percent stake in Sibneft corresponding to the second tranche under the Share Exchange Agreement was challenged by Nimegan Trading Limited before the Chukotka Arbitrazh Court in proceedings initiated on 6 July 2004 and that those shares were attached by the Chukotka Injunctions of 9 July 2004, pending resolution of the merits of the dispute.  Claimants assert, however, that the 20 percent minus one share stake in Sibneft acquired by Yukos under the Share Purchase Agreement was never encumbered or challenged in any legal proceeding.[1136]

952. As explained in paragraphs 2–915 and 922 above, the Tribunal considers that, although Yukos initially offered a 34.5 percent stake in Sibneft in payment of its tax debts to the bailiffs, after the Chukotka Injunctions it sought only to offer in payment the 20 percent minus one share stake in Sibneft that was not the object of the Injunctions.

953. As for this 20 percent stake, the Tribunal notes that a number of Sibneft's original shareholders wrote to the Russian authorities in July and August 2004, opposing Yukos' proposals to use Sibneft shares to settle its tax debts, since the shares' ownership was disputed between them

---

[1135]  Counter-Memorial ¶¶ 420–30; Respondent's Skeleton ¶ 47.

[1136]  Memorial ¶ 229; Claimants' Post-Hearing Brief ¶ 92, referring to Transcript, Day 6 at 95–97, 112, 116 (Mr. Rieger); Transcript, Day 9 at 242–43 (Mr. Misamore); Transcript, Day 9 at 36–39, 44–45, 48–49, 71, 74, 92–93 (Mr. Theede); Day 17 at 106–12 (Claimants' closing).

and Yukos.  Thus, on 6 July 2004, these former shareholders wrote to the bailiffs, claiming that "rights to the shares of OAO Sibneft held by OAO NK YUKOS are the subject of the dispute and OAO NK YUKOS is unable to exercise its ownership rights to such shares."[1137]  On 13 July 2004, the same former shareholders wrote to the Deputy Minister for Taxes, stating that "OAO NK YUKOS is not entitled to use the whole block of shares in OAO Sibneft held by it for settlements with its creditors, including with respect to tax liabilities."[1138]  In a further letter dated 16 August 2004, the former shareholders specifically asserted that the Share Purchase Agreement and the Share Exchange Agreement constituted "a single transaction" and that "all 92 percent of shares in [Sibneft] that were transferred to [Yukos] under both agreements are in dispute."[1139]

954.  Despite these allegations, it is clear to the Tribunal that the Share Purchase Agreement was never formally challenged.  The 6 July 2004 letter refers to an LCIA proceeding; yet, the only LCIA proceeding related to Sibneft shares that is in the record in this arbitration is LCIA Arbitration No. 4589, in the context of which Yukos sought damages arising out of the purported termination of the Share Exchange Agreement, but made no claim in relation to the Share Purchase Agreement.[1140]

955.  In light of these findings, the Tribunal considers the bailiffs' failure to respond in July 2004 to Yukos' settlement offers to be inexcusable.  On 2 July 2004, when Yukos first wrote to the bailiffs to request enforcement against its 34.5 percent shareholding in Sibneft, its ownership of these shares had not yet been challenged.  The Chukotka court proceedings (challenging the transfer of the 14.5 percent stake) were commenced four days later, on 6 July 2004.  This was also the date on which the former Sibneft shareholders, for the first time, wrote to the bailiffs claiming that Yukos was "unable to exercise its ownership rights" to the Sibneft shares.  For four days, therefore, the bailiffs had no reason to believe that ownership of these shares by

---

[1137]   Application of White Pearl Investments Limited, Kindselia Holdings Limited, Heflinham Holdings Limited, Marthacello Co. Limited and N.P. Gemini Holdings Limited to the Chief Bailiff of the First Interdistrict Department of the Bailiff Service for the Central Administrative District of Moscow, 6 July 2004, Exh. R-552.

[1138]   Letter from White Pearl Investments Limited, Kindselia Holdings Limited, Heflinham Holdings Limited, Marthacello Co. Limited and N.P. Gemini Holdings Limited to the Deputy Minister of Taxes and Levies of the Russian Federation, 13July 2004, Exh. R-555.

[1139]   Letter from N.P. Gemini Holdings Limited, Heflinham Holdings Limited, White Pearl Investments Limited, Kindselia Holdings Limited and Marthacello Co. Limited to the Deputy Minister of Taxes and Levies of the Russian Federation, 16 August 2004, Exh. R-559.

[1140]   LCIA Arbitration No. 4589:  *Yukos Oil Company v. Kravin Investments and others*, Statement of Case ¶ 94, Exh. R-3645.

Yukos was disputed.  Yet the bailiffs did not respond to Yukos' offer during that period or at any time thereafter.

956.    In addition, after Yukos, on 14 July 2004, reduced its offer to the 20 percent minus one share holding in Sibneft, the only basis for Respondent's assertion that "the bailiffs had reason to believe that Yukos' title to even this block of proffered shares was in dispute"[1141] were the "warnings" received from the former Sibneft shareholders.  The Tribunal is not persuaded that mere letters to the bailiffs from a third party asserting a claim to an asset held by the debtor (without asserting this claim vis-à-vis the debtor itself) can constitute a sufficient reason for the bailiffs to disregard the debtor's request to use this asset for enforcement purposes.

### ii.    Whether Yukos Sought to Enter into Negotiations that are Not Permissible under Russian Law

957.    According to Respondent, Yukos management believed erroneously that tax assessments provided an opportunity for a "business negotiation" that could end in a "compromise".[1142] Such negotiations, says Respondent, seeking a reduction, deferral or payment in instalments of tax arrears, are not permitted under Russian law.[1143]  Specifically, Respondent contends that, once "a resolution of the highest tax authority or a court judgment has entered into force, the tax authorities and bailiffs cannot reduce the amount of the tax that's due."[1144]  Nor, avers Respondent, can the tax authorities agree to a delay for payment of more than 6 months, or change the term for payment when the entity applying for such a change is the subject of proceedings for a tax offence.[1145]  Moreover, adds Respondent, the Moscow Arbitrazh Court was justified in rejecting Yukos' request for payment in instalments of its tax arrears due to the absence of exceptional circumstances.[1146]

958.    Respondent maintains that a major problem with Yukos' settlement proposals was that the amounts offered were insufficient to cover the tax arrears, fines and interest assessed against

---

[1141]    Counter-Memorial ¶ 426.

[1142]    Respondent's Post-Hearing Brief ¶ 101, referring to Transcript, Day 10 at 7 (cross-examination of Mr. Theede); Transcript, Day 6 at 110–11 (cross-examination of Mr. Rieger).

[1143]    Respondent's Post-Hearing Brief ¶ 101.

[1144]    Transcript, Day 18 at 270; *see also* Respondent's Closing Slides, p. 299.

[1145]    Transcript, Day 18 at 270–71; Respondent's Closing Slides, p. 315.

[1146]    Respondent's Closing Slides, pp. 316–18, referring to Decision of the Moscow Arbitrazh Court, 12 August 2004, Exh. C-142.

Yukos at that time and thus demonstrated that Yukos never intended to pay its tax debts in full.[1147]

959.   Respondent contends that, even if it accepted that Yukos' 20 percent minus one shareholding in Sibneft was formally unencumbered, its value was nevertheless uncertain, since Yukos was unable to offer a controlling block of shares and the public controversy with respect to the shares could affect their market value.[1148]   The fact that Yukos did not itself sell the Sibneft shares is also proof of their illiquidity.[1149]   Respondent notes that Yukos' Board, when authorising the sale of the shares in August 2004, expressly acknowledged that "certain terms of the sale of these stakes may differ from the existing market terms because of the need to sell the assets as soon as possible in order to discharge the Company's tax liabilities."[1150]   When the 20 percent minus one shareholding in Sibneft was tendered on 14 July 2004, it was valued by Yukos at USD 2.3 billion, which was insufficient to cover Yukos' liabilities for the year 2000. The value of the Sibneft shares plus the shares in the other 15 companies offered by Yukos in its letters of 16 September, 24 November and 16 December was also insufficient having regard to Yukos' tax debt assessed in the 2001, 2002 and 2003 Decisions.[1151]

960.   As for Mr. Chrétien's offer of USD 8 billion to settle the claims for the years 2000–2003, asserts Respondent, it would have covered only about half the amount then assessed against Yukos.[1152]   The USD 21 billion settlement offer allegedly made by Yukos in October 2004 was also insufficient, submits Respondent, since Yukos' tax liabilities for the years 2000–2004 totalled USD 24.2 billion.[1153]

961.   Claimants deny that Yukos was asking the authorities for a reduction in the amount of the tax arrears that were due.[1154]   As Mr. Theede testified at the Hearing, Yukos "never tried to make any kind of proposal that was less than the tax that was due . . . we didn't try to negotiate the

---

[1147]   Respondent's Closing Slides, p. 292.

[1148]   Counter-Memorial ¶ 423.

[1149]   Respondent's Closing Slides, pp. 216, 313.

[1150]   Respondent's Closing Slides, p. 295, referring to Minutes No.120–18 of Meeting of Yukos' Board of Directors, 19 August 2004, Exh. C-210.

[1151]   Respondent's Closing Slides, pp. 308–309.

[1152]   Respondent's Closing Slides, p. 296.

[1153]   Rejoinder ¶ 896, n.1425.

[1154]   Transcript, Day 20 at 215; Claimants' Post-Hearing Brief ¶ 93.

amount; we were willing to pay all the taxes back."[1155]  Mr. Theede further observed that Yukos "could never in a million years have anticipated the level of taxes that would ultimately be presented to the company; and fines and VAT."[1156]  Claimants submit that the Russian authorities could have ascertained the sincerity of Yukos' intention if only they had bothered to discuss the settlement offers.[1157]

962.    A dialogue, say Claimants, was necessary given the enormous amounts assessed against Yukos. During the Hearing, when asked by a member of the Tribunal: "when a State assesses taxes and the taxpayer has exhausted administrative and judicial recourse in respect of the assessments, is it normal for the State to enter into a dialogue to negotiate a settlement of the assessments with the taxpayer?," Mr. Theede replied that while he was not "sure what is normal . . . , there was no way that we would have been able to pay the taxes without being able to talk to the authorities and come to some agreement.  We felt like our feet were nailed to the floor and we were being asked to jump.  It was very frustrating."[1158]

963.    Concerning the value of the Sibneft shares, Claimants assert that they were Yukos' most liquid asset.[1159]  Yukos' assessment of the value of its 20 percent minus one shareholding at USD 2.3 billion in its letters to the bailiffs was not exaggerated since, as stated above, in the bankruptcy proceedings in 2006, Gazprom acquired these shares for USD 4.1 billion.[1160]  Under cross-examination at the Hearing, Mr. Theede acknowledged that Yukos did not try to sell the Sibneft shares itself.[1161]  He explained that Yukos did not know what the Russian authorities wanted.  He testified that if the bailiffs had said to Yukos "'[w]e don't want the shares, but we will take the $3 billion.  You can sell the Sibneft stock without any interference,' [Yukos] would have done that in a second."[1162]

964.    Claimants also note that the settlement offers conveyed by Mr. Chrétien in July 2004 were well in excess of the tax debt that had been assessed at that time—USD 3.42 billion for the year

---

[1155]   Transcript, Day 10 at 8–12.

[1156]   *Ibid.* at 9.

[1157]   Claimants' Post-Hearing Brief ¶ 93.

[1158]   Transcript, Day 10 at 40.

[1159]   Claimants' Post-Hearing Brief ¶ 92.

[1160]   *Ibid.*

[1161]   Transcript, Day 11 at 49–50.

[1162]   *Ibid.* at 48.

2000.[1163]  At the Hearing, Mr. Theede explained that the USD 8 billion figure was arrived at by considering the 2000 tax assessment of USD 3.4 billion and scaling it back for subsequent years to account for the shorter period over which interest would be calculated.[1164]  In terms of Yukos' ability to honor the proposal, Mr. Theede confirmed that Yukos would have been in a position to pay the first installment of USD 2 billion in July 2004, and states that, despite the absence of a response from the Tax Ministry, Yukos "did take immediate action to start accumulating the offshore cash … within a day or two of this letter."[1165]  When asked to explain why the settlement offer remained at the level of USD 8 billion in the proposal of 10 September 2004, when the amount of taxes assessed against Yukos (for 2000 and 2001) had reached USD 7.5 billion, Mr. Theede stated as follows:

> [W]hat [the 10 September proposal] is saying is: with what we've already paid, plus the [VAT] that you haven't refunded us, we've nearly paid our 2000 tax arrears.  I think it's important to maybe explain . . . this [VAT], because by the end of the attack that . . . unrefunded [VAT] amounted to nearly [USD] 5 billion of the total assessment against the company.  And what it was is: when you sell oil in Russia, you pay a [VAT] on it; and then, if you export it, you automatically get that [VAT] back.[1166]

965.  And Mr. Theede testified that in October 2004 Yukos made a USD 21 billion offer. Mr. Theede's evidence on this alleged offer was confirmed by Mr. Misamore.  However, the Tribunal notes that there is no documentary evidence of this offer in the record.

966.  As for Respondent's argument that the amounts and payment modalities of tax arrears cannot be negotiated under Russian law, Claimants submit that it is disingenuous, since the Russian Federation has entered into negotiations and agreed settlements of tax assessments with other Russian and international oil companies such as Sibneft, TNK-BP and Rosneft.[1167]

967.  The Tribunal observes that according to press reports submitted by Claimants Sibneft was able to settle a 1 billion tax arrears claim by paying only 300 million,[1168] while the one billion tax arrears claim against TNK-BP was reduced by "hundreds of million of dollars," after a meeting

---

[1163]  Claimants' Post-Hearing Brief ¶ 92.

[1164]  Transcript, Day 10 at 82–85.

[1165]  *Ibid.* at 89.

[1166]  *Ibid.* at 96.

[1167]  Claimants' Post-Hearing Brief ¶ 93.

[1168]  *Sibneft Pays Off Tax Claim*, The Moscow Times, 19 April 2005, Exh. C-1418; "Sibneft 'settles its tax demand'," BBC News, 18 April 2005, Exh. C-752.

took place between Lord Browne, BP's chief executive, and President Putin.[1169]   As for Rosneft, the Tribunal notes that its financial statements reveal that, after Rosneft purchased YNG, the Russian authorities approved a restructuring plan allowing it to pay the tax arrears that had been assessed against YNG in February and October 2004 in quarterly payments over a period of 5 years starting in March 2008.[1170]

968.   Claimants also affirm that Rosneft received a concession from Respondent in the guise of an 83 percent reduction in the amount of YNG's tax arrears and a corresponding 89 percent reduction in fines.[1171]

969.   Respondent answers that Yukos' case is "totally different" from those of Sibneft or TNK-BP, because there is no evidence that these companies, contrary to Yukos, engaged in "knowing and longstanding tax evasion" and lied to the courts and tax authorities.  From the limited record available in this arbitration in this respect, it does appear as if these companies cooperated with the tax authorities in order to settle the amount due.  Moreover, there is no evidence that the authorities compromised after having reached a final assessment of liability.[1172]   For Respondent, "considering the flagrancy of Yukos' violation, the not[o]riety of its failure to accept responsibility and indeed its efforts to undermine tax enforcement, common sense and straightforward deterrent interest would dictate different results."[1173]

970.   Regarding Rosneft, Respondent explains that, unlike Yukos, it was eligible for a "tax restructuring process" because it had, also unlike Yukos, been designated as a "strategic company" by the Russian Government.  According to Mr. Konnov's first expert report, Article 191 of the *Federal Law on Insolvency* "contemplates a possibility to restructure federal tax debt of certain 'strategic' companies in order to prevent their bankruptcy."[1174]   A list of

---

[1169]   *TNK-BP Tax Bill Slashed by Moscow*, Financial Times, 11 August 2005, Exh. C-762.

[1170]   Rosneft Consolidated Financial Statements as of December 31, 2007 and 2006 and for the years ended 31 December 2007, 2006 and 2005, p. 50, Exh. C-377; Management's Discussion and Analysis of Financial Condition and Results of Operations for the three and nine months ended 30 September 2007 and 2006, p. 38, Exh. C-378.

[1171]   Memorial ¶ 278.

[1172]   Respondent's Closing Slides, p. 326.

[1173]   *Ibid.*, p. 327.

[1174]   First Konnov Report ¶ 91.

"strategic" companies was approved in early 2004, and Rosneft (contrary to Yukos) was eligible for inclusion on the list given its status as a state-owned company.[1175]

971.  At the Hearing, counsel for Respondent provided the following explanation as to the requirements for a "strategic" company:

> It was necessary to be State-owned.  It was necessary that one of the ministries request that the company qualify to be a strategic company and to undertake responsibilities of a strategic company, and ultimately to be approved by the relevant federal agency, which involved the defence services; and in the case of Rosneft involved committing to supply petroleum products to the Ministry of Defence of the Russian Federation.  So these were all things that were not open to Yukos.[1176]

972.  While Claimants appeared to suggest at the Hearing that, since "it's the Government that decides which company is strategic," it would have been "fairly easy" for Respondent to accept Yukos as a strategic company.  The Tribunal notes that no specific requirements for purposes of designating a strategic company were proffered by either side.[1177]

### iii.    Whether Russian Law Permits Payment in Kind of Tax Arrears

973.  Respondent submits that the Russian Federation could not accept Yukos' shares in Sibneft and other companies as payment because Russian law does not allow a taxpayer to settle its liabilities in kind.[1178]  Specifically, Article 45(3) of the Russian Tax Code stipulates that "[t]he obligation to pay taxes/duties shall be executed in the currency of the Russian Federation."[1179]  This defect affected all of Yukos' settlement offers with the exception of those conveyed by Mr. Chrétien.

974.  Claimants reply that Respondent misrepresents "both the legal context and the substance of Yukos' settlement proposals."[1180]  While Article 45(3) of the Russian Tax Code requires the payment of taxes in Russian rubles, Article 45(1) expressly provides that in case of late or incomplete payments, outstanding taxes may be collected through a forced sale of the taxpayer's assets other than cash, as provided for in Articles 47 and 48 of the Russian Tax Code

---

[1175]   *Ibid*.

[1176]   Transcript, Day 19 at 30.

[1177]   Transcript, Day 17 at 253.

[1178]   Counter-Memorial ¶ 423.

[1179]   Russian Tax Code, Article 45, Exh. R-550.

[1180]   Reply ¶ 326.

and Article 46 of the *Federal Law "On Enforcement Proceedings"*.[1181]  Respondent itself relies on the latter provision for the proposition that, for the purposes of the settlement of Yukos' alleged tax liabilities, the company's assets seized by the bailiffs were subject to a coercive sale.

### iv.   Concluding Observations

975.   Having reviewed the totality of the evidence and the Parties' representations, the Tribunal is of the view that Yukos' settlement offers represented a good faith attempt by the company to initiate a dialogue with the Russian Federation regarding the payment of Yukos' tax arrears. While it is true that these offers were for less than the total amount of taxes, fines and arrears assessed against Yukos, the Tribunal observes that, at the time when each offer was made, it either would have been sufficient to cover the amounts for which decisions had been issued by the Tax Ministry at the time, or was close enough to those amounts to allow the Russian Federation to assume that Yukos did indeed intend to discharge its tax liabilities.  As for Yukos' offer of its 20 percent minus one share holding of Sibneft shares, in the opinion of the Tribunal, since this shareholding was never formally disputed, it should have convinced the Russian Tax authorities that Yukos was serious in wishing to settle its tax liabilities.

976.   Respondent's argument that the Russian Federation does not negotiate tax liabilities is belied by the fact that it agreed to tax settlements with other companies.  Given the paucity of evidence before this Tribunal regarding the settlements actually reached by Sibneft and TNK-BP, the Tribunal cannot judge the extent to which their situations were similar to that of Yukos. However, the simple fact that these companies were able to negotiate the reduction of tax arrears initially claimed by the tax authorities suggests to the Tribunal that such negotiations can in fact take place under Russian law and practice.

977.   Thus, even if Yukos' settlement offers may not have resolved definitively all of its tax liabilities, the Tribunal sees no valid reason why the Russian Federation, if it sought only to collect taxes (and, presumably, to allow its largest taxpayer to continue in business) would not have reacted more positively to Yukos' settlement offers at the very least to the extent of engaging constructively in discussion.

---

[1181]   *Ibid.*, referring to Federal Law No. 119-FZ of 21 July 1997 "On Enforcement Proceedings" (as amended), Article 46, Exh. C-1274.

978. The Russian Federation never showed any interest in Yukos' offers.  With the exception of the letter of 9 September 2004, the bailiffs never replied to Yukos, never even troubling to explain why they considered its offers inadequate.  The Tribunal finds this silence very revealing, particularly in circumstances where the bailiffs' views as to the unacceptability of the offers were based in part on correspondence they had received from a third party (the former Sibneft shareholders), which had not even been copied to Yukos.  The settlement offers conveyed by Mr. Chrétien, at the end of the day, were also met with silence.

979. When the Russian authorities did provide responses to Yukos' proposals, these were in the nature of blanket rejections.  It is manifest that the authorities never seriously considered any one of Yukos' proposals.  The only letter from the bailiffs to Yukos (dated 9 September 2004) relies on the decision of the Moscow Arbitrazh Court of 17 July 2004, which merely addressed the issue of the Sibneft shares, but fails to explain why the shares in the other 15 companies offered by Yukos could not be accepted in payment.  The Tribunal notes that the letter has a ring of finality to it, emphasizing as it does "the right of the bailiff to make the final decision."[1182]  In the entire period from July to December 2004, the Russian authorities did not make a single counter-proposal to Yukos or even state that they were prepared to engage with the taxpayer.  Mr. Rieger testified at the Hearing that "it was like a one way road:  making proposals, talking, offering, and . . . no substantial feedback . . . no sitting down and willing to discuss."[1183]  This statement aptly describes the impression that the Tribunal garners from the record.

980. In conclusion, Respondent's total failure to engage with any of Yukos' settlement proposals raises significant doubts in the Tribunal's mind as to whether Respondent's true and sole concern in its dealings with Yukos after the tax assesments were issued was the collection of taxes.

## F.    THE AUCTION OF YNG

### 1.    Introduction

981. After having reviewed these futile attempts by Yukos to settle its tax debts to the State, the Tribunal comes to one of the most striking episodes in the saga of Yukos' demise, the

---

[1182]    Letter from Mr. Sazanov, Deputy Head of the Bailiffs Department to Mr. Gololobov, 9 September 2004, Exh. C-146.

[1183]    Transcript, Day 6 at 40.

December 2004 auction of its core asset, the oil production company Yuganskneftegaz ("**YNG**") and the subsequent acquisition of YNG by State-owned Rosneft.

982. Claimants argue that the auction was a sham, "carefully orchestrated to achieve the transfer of Yukos' crown jewel to the State at the lowest price that could be achieved while maintaining a façade of legality."[1184]  Claimants accuse Respondent of having depressed the value of YNG by fabricating USD 4.6 billion in tax claims against the company.  They argue that Respondent set a low starting price which ignored both a valuation by Dresdner and Dresdner's advice on how to conduct the auction in order to maximize the sale price.  Claimants deny that their own actions contributed to the low price achieved at the auction.  They maintain that the sole bidder at the auction, a previously unknown entity called Baikal Finance Group ("**Baikal**"), was a dummy that was used to mask the Russian State's interest and involvement in the process.[1185]

983. Respondent answers that the decision to sell YNG to satisfy Yukos' massive debt was a direct consequence of Yukos' misconduct and the only realistic way to collect Yukos' unpaid taxes in circumstances where Yukos had fiercely obstructed audits, resisted payment and attempted to make itself judgment proof.[1186]  Although YNG was sold during a 10-minute auction attended by two bidders on a Sunday afternoon in the outskirts of Moscow, Respondent observes that it was done in compliance with Russian law.  Respondent avers that the price realized— USD 9.35 billion—was consistent with the formal appraisal conducted by Dresdner and other market estimates, and notes that this price reflected YNG's own tax liabilities.[1187]  If the price was lower than it might otherwise have been, says Respondent, the fault lies solely with Claimants and Yukos, who sabotaged the auction through a sham bankruptcy proceeding in Texas and published threats of "a lifetime of litigation" which kept potential bidders away.  Respondent rejects Claimants' theory that Baikal was a veneer for the Russian Government.  Rather, Respondent submits that it was a special purpose vehicle associated with Surgutneftegaz.  When Baikal suddenly found itself unable to finance its purchase (due to the Temporary Restraining Order ("**TRO**") obtained by Yukos in Texas), Rosneft simply seized a

---

[1184]   Claimants' Post-Hearing Brief ¶ 97; *see* Press Conference with Russian and Foreign Media, 23 December 2004, Russian President Official Website, Exh. C-422; *see also* Memorial ¶¶ 334, 409; Reply ¶ 293; Claimants' Skeleton ¶ 45.

[1185]   Claimants' Post-Hearing Brief ¶¶ 110–14; Memorial ¶¶ 386–95; Reply ¶¶ 370–76; Claimants' Skeleton ¶¶ 40–43.

[1186]   Respondent's Post-Hearing Brief ¶¶ 87–121; Counter-Memorial ¶¶ 450–527; Rejoinder ¶¶ 951–1008; Respondent's Skeleton ¶¶ 36–54.

[1187]   *See, e.g.*, Deutsche Bank, Project Chekov, December 2004, Slide 6, Exh. C-284.

- 323 -

commercial opportunity that presented itself as a result of Claimants' misconduct.[1188]

984. At the outset of its analysis, the Tribunal will recall that during the February 2003 meeting with the Union of Industrialists and Entrepreneurs Industrialists attended by Michael Khordokovsky and referred to earlier in this Award, President Putin made this seemingly prescient observation:

> [C]ertain things are obviously clear.   [Rosneft] is a State-owned company.   It has insufficient reserves and should increase them.  Some other oil companies, such as Yukos, have a surplus of reserves.[1189]

985. As will be seen, after having reviewed the totality of the circumstances leading to the YNG auction and the auction itself, the Tribunal concludes that this episode provides yet more compelling evidence that the Russian Federation was not engaged in a true, good faith tax collection exercise but rather was intent on confiscating the most valuable asset of Yukos and effectively transferring it to the Russian State.

986. The Tribunal notes that its findings are consistent with those of the *RosInvestCo* and *Quasar* tribunals, which found "many aspects of the YNG auction more than suspect"[1190] and concluded that "the auction of YNG was rigged."[1191]

### 2.   Chronology

987. As is evident from the chronology of events recounted in Chapter VIII.B, and as observed by the ECtHR, the Russian authorities "were unyieldingly inflexible as to the pace of the enforcement proceedings, acting very swiftly."[1192]  This chronology reviews the key events as of the date when the sale of YNG was announced to the auction itself on 19 December 2004, and the transfer of the YNG shares to the Russian State-owned Rosneft three days later on 22 December.

---

[1188] *See* Respondent's Skeleton ¶¶ 46–52; Respondent's Closing Slides, pp. 327–70.

[1189] Video recording and transcript of meeting of the members of the Union of Industrialists and Entrepreneurs with President V. Putin held in the Ekaterininsky Hall, Kremlin, 19 February 2003, Exh. C-1396.

[1190] *Quasar* ¶ 116, Exh. R-3383.

[1191] *RosInvestCo* ¶ 620(d), Exh. C-1049.

[1192] ECtHR Yukos Judgment ¶ 656, Exh. R-3328; Chapter VIII.B.

(a)     **Yukos' Shares in YNG are Seized and the Government Announces they will be Sold; Yukos Brings Unsuccessful Court Challenges**

988.   On 20 July 2004, the Ministry of Justice announced its plan to sell YNG in order to satisfy Yukos' tax debt for the year 2000.[1193]   Mr. Misamore testified that at the time of this announcement the only tax levied against Yukos and confirmed by the courts was for the year 2000, in the amount of approximately USD 3.42 billion, which Yukos had already started to pay.[1194]   In the circumstances, he viewed the seizure of YNG as disproportionate and unjustified.

989.   Industry analysts interpreted the bailiff's plans to sell "Yukos's most valuable asset" as "a clear sign the authorities are going in for the kill," observing that the move "leaves little doubt the authorities' final goal is for Yukos to cease to exist in its current form, materially erasing most, if not all, shareholder value in the process." [1195]

990.   On 23 July 2004, GML director Tim Osborne declared that any purchaser of YNG would be "buying a whole heap of trouble."[1196]

991.   Yukos applied to the Russian courts to prevent the sale from proceeding, but to no avail.[1197]   In a letter to the Chief Bailiff of the Russian Federation dated 6 August 2004, Yukos requested that any sale of YNG be conducted by public auction.  This request was granted.[1198]

(b)     **YNG is Valued for Auction while its Tax Liabilities Rapidly Escalate**

992.   On 12 August 2004, the bailiffs appointed Dresdner to carry out the valuation of YNG.[1199]

---

[1193]   *Moscow set to seize huge Yukos oil division—Investors may lose everything in tax fight, analysts warn*, International Herald Tribune, 21 July 2004, Exh. C-698.

[1194]   Misamore WS ¶ 52.

[1195]   *Moscow set to seize huge Yukos oil division—Investors may lose everything in tax fight, analysts warn*, International Herald Tribune, 21 July 2004, Exh. C-698 (quoting Mr. Steven Dashevsky).

[1196]   *Yukos Says Asset Sale Could Prove Fatal Blow*, NY Times, 23 July 2004, Exh. R-648.

[1197]   Ruling of Moscow Arbitrazh Court, 29 November 2004, Exh. C-283.

[1198]   Letter from Yukos' counsel D.V. Gololobov to the Chief Bailiff of the Russian Federation A.T. Melnikov, 6 August 2004, Exh. C-140; *Moscow set to seize huge Yukos oil division—Investors may lose everything in tax fight, analysts warn*, International Herald Tribune, 21 July 2004, Exh. C-698.  Respondent points out that the sale of the YNG shares could, instead, have been negotiated with a designated purchaser.  Rejoinder ¶¶ 978, 984; Transcript, Day 3 at 115 (Respondent's opening).

[1199]   Resolution of Moscow Court Bailiff D.A. Borisov, 12 August 2004, Exh. C-270.

993.    Dresdner issued its valuation report on 6 October 2004; it valued YNG as a stand-alone enterprise at USD 18.6 to 21.1 billion.[1200]  Dresdner noted in the summary of its Report that this amount could be reduced by tax and other liabilities, which would lower the value to USD 14.7 to 17.3 billion.[1201]   In its report, Dresdner observed that "[t]he sales process usually has a significant impact on the revenue from the sale" and that "[a] quick auction will most likely prevent the achievement of a full price."[1202]  Dresdner added that "[i]f access to full information is not provided to potential purchasers, this will lead to a significant reduction in the number of parties interested in YNG and also in their ability to offer the full price."[1203]

994.    A few days after Dresdner delivered its report, on 11 October 2004, the bailiffs recommended a minimum sale price for the YNG shares that reflected a 60 percent discount of the value determined by Dresdner.[1204]   The bailiffs' declaration caused Yukos shares to fall "so far so fast . . . that trading had to be halted twice on MICEX."[1205]

995.    On 13 October 2004, GML's Tim Osborne reiterated his earlier threat, and said that "[w]hoever buys [YNG] is going to be buying themselves a lifetime of litigation."[1206]

996.    On 29 October 2004, following an audit that began on 23 September 2004, YNG received a tax reassessment for transfer pricing violations, in the amount of USD 2.35 billion for the year 2001.[1207]  On the same day, following an audit that began on 1 October 2004, the tax authorities issued a decision finding YNG liable for a tax offense for the year 2002 in the amount of

---

[1200]    Dresdner Valuation Report, Exh. C-274, ZAO Dresdner Bank Summary Valuation Opinion Letter, 6 October 2004, Exh. C-273 (hereinafter "Dresdner Summary Letter").

[1201]    Dresdner Summary Letter, 6 October 2004, p. 6, Exh. C-273.

[1202]    Dresdner Valuation Report ¶ 11.2.

[1203]    *Ibid*. ¶ 12.8.

[1204]    Resolution of Moscow Court Bailiff D.A. Borisov, 11 October 2004, Exh. C-1160; *see Basic Yukos asset valued merely at $10.4 billion*, RIA Novosti, 12 October 2004, Exh. C-710; *Russia to press on with Yukos sell-off*, The Financial Times, 13 October 2004, Exh. C-711; *Low valuation for Yukos unit sale*, NY Times, 14 October 2004, Exh. C-712.

[1205]    *Yukos Unit Up for Sale at Discount Price*, Moscow Times, 13 October 2004, Exh. R-625.  Dresdner, on 14 October 2004, released, "in the interests of transparency" and "with the permission of the Ministry of Justice," a summary of the valuation report on its own website, including the USD 14.7 to 17.3 billion range Dresdner had estimated for YNG post-liabilities.  Summary valuation opinion letter on Yuganskneftegaz, Dresdner Bank Corporate Website, 14 October 2004, Exh. C-275, with link to Dresdner Summary Letter.  Claimants characterize Dresdner's decision to do so as an extraordinary reaction taken to correct the public record.  Memorial ¶ 370; Counter-Memorial ¶ 458 & n.686.)

[1206]    *Yukos Unit Up for Sale at Discount Price*, Moscow Times, 13 October 2004, Exh. R-625.

[1207]    Repeat Field Tax Audit Report No. 30–13–14/2, 29 October 2004, Exh. C-251; Memorial ¶ 271; Counter-Memorial ¶ 482; Reply ¶¶ 360–61; Rejoinder ¶¶ 959–60.  As explained in the First Konnov Report, "under the transfer pricing rules, the tax authorities were permitted to substitute the contract price with the market price," but they "could do this . . . only if the market price deviated from the contract price by more than 20%."  First Konnov Report ¶ 87.

USD 1.03 billion.[1208]   A further tax audit on YNG was commenced on 12 October 2004, resulting in a tax assessment on 3 December 2004 of USD 1.22 billion for the year 2003.[1209] According to Claimants, these three successive tax assessments over a period of less than five weeks on the eve of the YNG auction amounted to double-taxation and were part of the Russian Federation's strategy to depress the auction price of YNG and destroy Yukos.[1210]

997.   By mid-November, Yukos' settlement proposals were continuing to fall on deaf ears.[1211]   On 18 November 2004, the bailiffs announced that YNG would be auctioned and the Ministry of Justice appointed the Russian Federal Property Fund to handle the auction.[1212]   The Russian Federal Property Fund issued the formal auction notice the next day and fixed the auction date for 19 December 2004.[1213]   This was a Sunday, and the earliest possible date to hold the auction under the relevant regulations.[1214]   The opening price for 100 percent of the ordinary shares (or 76.79 percent of YNG's total share capital) was set at USD 8.65 billion.

998.   Yukos applied to the Moscow Arbitrazh Court for a declaration that this decision was unlawful and sought interim measures.  Both applications were swiftly denied.[1215]

(c)     **Yukos Tries to Prevent the Auction; Preparations Proceed; an Entity Named Baikal is Created to Purchase YNG**

999.   On 6 December 2004, Baikal was incorporated in the town of Tver by a sole founder, Ms. Valentina Davletgareeva, with capital of USD 359.[1216]   A few days later, Ms. Davletgareeva sold her stake in Baikal to a company called Makoil.[1217]

---

[1208]   Memorial ¶ 271; Decision of Moscow Arbitrazh Court, 25 April 2006, p. 2, Exh. C-255.

[1209]   Field Tax Audit Report No. 52/975, 3 December 2004, Exh. C-252; *but see* Decision of the Moscow Arbitrazh Court, 21 April 2006, Exh. C-256.

[1210]   Claimants' Post-Hearing Brief ¶¶ 84, 98–100.

[1211]   *See* Chapter VIII.E.

[1212]   Resolution of Bailiff I.V. Kochergin to appoint a seller, 18 November 2004, Exh. C-279; Agreement No. 4-UYu/2–1/1772–1 between Ministry of Justice and Russian Federal Property Fund, 18 November 2004, Exh. R-623.

[1213]   Notice of auction published by the Russian Federal Property Fund, 19 November 2004, Exh. C-280.

[1214]   *See* YNG Auction Regulation (RP11197–221), 18 November 2004, Exh. R-3764.

[1215]   Memorial ¶ 382; Ruling of the Moscow Arbitrazh Court, 29 November 2004, Exh. C-283; Resolution of the Federal Arbitrazh Court for the Moscow District, 3 May 2005, Exh. C-292; Resolution of Bailiff D.A. Borisov, 31 December 2004, Exh. C-291.

[1216]   Baikalfinancegroup Limited Liability Company, Charter, 2 December 2004, Exh. R-672; Certificate of registration of OOO Baikalfinancegroup as a legal entity, 6 December 2004, Exh. C-286.

[1217]   Baikalfinancegroup Limited Liability Company, Charter (amended version), 9 December 2004, Exh. R-674.

1000. On 10 December 2004, the Federal Antimonopoly Service reported that three entities—Gazpromneft, ZAO Intercom and OOO First Venture Company—had filed for clearance to participate in the auction.  While Gazpromneft did eventually register for the auction, the other two companies did not.[1218]

1001. Having failed to convince the Russian courts to prevent the auction from proceeding, Yukos, in its own words, sought "to obtain justice"[1219] elsewhere.  On 13 December 2004, GML posted a full-page advertisement entitled "Buyer Beware" in the Financial Times.[1220]  The next day, Yukos filed for Chapter 11 bankruptcy protection in Texas.[1221]  On 16 December 2004, the U.S. court granted Yukos' request for a TRO enjoining registered and prospective bidders from participating in the YNG auction.[1222]

1002. Meanwhile, on 14 December 2004, Baikal applied for antimonopoly clearance in order to participate in the auction.[1223]  Two days later it registered for the auction and made a deposit of USD 1.77 billion.[1224]  The only other company to register for the auction was State-owned Gazpromneft on 16 December 2004.[1225]  Gazpromneft challenged the TRO on an emergency basis on 18 December 2004, but its appeal was denied that night, about ten hours before the auction was scheduled to commence in Moscow.[1226]

---

[1218] *FAS of Russia Received Three Applications to Participate in the Auction for the Sale of Yuganskneftegaz*, Press Release, 10 December 2004, Exh. R-684.

[1219] Memorial ¶ 383.

[1220] *Buyer Beware*, Advertisement, Financial Times, 13 December 2004, Exh. R-649.

[1221] *In re Yukos Oil Co.*, U.S. Bankruptcy Court for the Southern District of Texas, Case No. 04–47742–H3–11, Yukos' Original Complaint for Injunctive Relief, 14 December 2004, Exh. R-656 (hereinafter "U.S. Bankruptcy Complaint"); *In re Yukos Oil Co.*, U.S. Bankruptcy Court for the Southern District of Texas, Case No. 04–47742–H3–11, Yukos' Verified Emergency Motion for Temporary Restraining Order and Preliminary Injunction, 14 December 2004, Exh. R-629; *In re Yukos Oil Co.*, U.S. Bankruptcy Court for the Southern District of Texas, Case No. 04–47742–H3–11, Yukos' Voluntary Petition, 14 December 2004, Exh. R-658; Yukos-Moscow Limited, Resolution No. 1 of Management Board, 10 December 2004, Exh. R-657.

[1222] *In re Yukos Oil Co.*, U.S. Bankruptcy Court for the Southern District of Texas, Case No. 04–47742–H3–11, Temporary Restraining Order, 16 December 2004, Exh. C-287.

[1223] Application to Federal Antimonopoly Service regarding approval of acquisition by Baikal Finance (hererinafter "Baikal") of 76.79 percent interest in YNG, 14 December 2004, Exh. R-3793.

[1224] Application to Participate in the Auction for the Sale of Seized Shares in OAO Yuganskneftegaz filed by Baikal Finance, 16 December 2004, Exh. R-3805.

[1225] Protocol of the Results of an Auction to Sell Shares in OAO Yuganzkneftegaz, 19 December 2004, Exh. C-290.

[1226] *Yukos Oil Co. v. OOO Gazpromneft*, U.S. District Court for the Southern District of Texas, Case No. 04cv4756, Hearing Minutes and Orders, 18 December 2004, Exh. R-697.

(d)     **After a 10-Minute Auction, the Successful Bidder Baikal is Sold to State-Owned Rosneft; a "Monumental Bargain"; the "State, Looking After its Own Interests"**

1003.  The auction of YNG took place on 19 December 2004 at 4:00 p.m.  Baikal opened the bidding at USD 9.35 billion.  Gazpromneft's representative then asked for a recess and left the room to make a call.  Upon his return, Baikal was declared the winner with its opening bid.  The bidding process was over within ten minutes.[1227]

1004.  One press article reported that the Baikal bidders worked for Surgutneftegaz and had "hastily departed for vacations abroad as soon as the auction ended."[1228]   At a press conference on 21 December 2004, President Putin was invited to comment on the perception that "a state company is in fact behind the organisation Baikal Finance Group" and responded as follows:

> As is well known, the shareholders of this company are all private individuals, but they are individuals who have been involved in business in the energy sphere for many years.  They intend, as far as I am informed, to establish relations with other energy companies in Russia which have an interest in their company.  And within the framework of current legislation, the participants of this process have the right to work with this company after the auction is held.  For us, it is only important that all these actions, as I already said, are within strict accordance with the current legislation of Russia. I hope that this is the way it will be.  As for the ability of state company to buy these assets, they of course have this right, just like other market participants.[1229]

1005.  What was not public knowledge at the time President Putin gave his press conference was the fact that, the previous day, the State-owned company Rosneft had sought and obtained antimonopoly clearance to acquire Baikal.[1230]

1006.  On 22 December 2004, Rosneft purchased Baikal, before it had paid the balance of the purchase price for the YNG shares.[1231]   Rosneft's purchase was announced publicly the

---

[1227]   *See* Protocol of the Results of an Auction to Sell Shares in OAO Yuganzkneftegaz, 19 December 2004, Exh. C-290.

[1228]   *Yugansk Was Purchased by Surgutneftegaz Employees*, OilCapital.ru, 21 December 2004, Exh. R-3789.

[1229]   Press Statement and Answers to Questions Following Russian–German Bilateral Consultations, Russian President Official Website, 21 December 2004, p. 2, Exh. C-421.

[1230]   Rosneft's request to Federal Antimonopoly Service to approve acquisition of a 100 percent interest in Baikal, 20 December 2004, Exh. C-1162; Federal Antimonopoly Service's approval of Rosneft's acquisition, 20 December 2004, Exh. C-1163.

[1231]   *See* Rosneft IPO Prospectus, 14 July 2006, pp. 75–76, Exh. C-380.

following day.[1232]   During another press conference, on 23 December 2004, President Putin
said:

> Now regarding the acquisition by Rosneft of the well-known asset of the company—I do
> not remember its exact name—is it Baikal Investment Company?  Essentially, Rosneft, a
> 100% state owned company, has bought the well-known asset Yuganskneftegaz.  That is
> the story.  In my view, everything was done according to the best market rules.  As I have
> said, I think it was at a press conference in Germany, a state-owned company or, rather
> companies with 100% state capital, just as any other market players, have the right to do so
> and, as it emerged, exercised it.
>
> Now what would I like to say in this context?  You all know only too well how the
> privatisation drive was carried out in this country in the early 90s and, how, using all sorts of
> stratagems, some of them in breach even of the then current legislation, many market players
> received state property worth many billions.  <u>Today, the state, resorting to absolutely legal
> market mechanisms, is looking after its own interests</u>.  I consider this to be quite logical.[1233]

[emphasis added]

### (e)    Once it is State-Owned, YNG's Fate Improves, with Reductions in Tax
Liabilities and a Dramatic Increase in Value

1007. The Tribunal notes that, as at 31 December 2004, ten days after Baikal purchased YNG for
USD 9.35 billion, Rosneft stated in its consolidated financial statements that "negative
goodwill" in the amount of USD 7.052 billion arose in the context of its acquisition of YNG "as
a result of excess of the net assets measured at fair value, over the purchase price."[1234]
Rosneft's total revenues increased from USD 5.28 billion in 2004 to USD 23.95 billion in 2005,
while its net income increased from USD 0.84 billion to USD 4.16 billion over the same
period.[1235]   At the time of its IPO in mid-2006, Rosneft's share capital was USD 79.8
billion;[1236] YNG alone was then valued at USD 55.78 billion.[1237]   Rosneft itself described the
YNG acquisition as "the most monumental bargain in Russia's modern history."[1238]

1008. Subsequent to the YNG auction, Yukos continued its efforts to have the sale invalidated in the

---

[1232]   *OJSC 'OC 'Rosneft' Buys 100% Share of 'Baykalfinancegroup' LLC And Becomes the Owner of Its Assets—76.6%
Yuganskneftegas Shares*, Rosneft Press Release, 23 December 2004, Exh. C-741.

[1233]   Press Conference with Russian and Foreign Media, Russian President Official Website, 23 December 2004, p. 4,
Exh. C-422.

[1234]   Rosneft's Consolidated Financial Statements as of 31 December 2003 and 2004, p. 24, NAV-213.

[1235]   Rosneft IPO Prospectus, 14 July 2006, p. 16, Exh. C-380.

[1236]   Rosneft Website, p. 16, Exh. C-381.

[1237]   Rosneft IPO Prospectus, 14 July 2006, Table 40, Exh. C-380.

[1238]   Place in economy of Russia, Rosneft:  About company, Rosneft Website, p. 14, Exh. C-381.

Russian courts, but all its claims were dismissed.[1239]

1009. The Tribunal notes with interest that very soon after it was acquired by Rosneft, a significant portion of the tax assessments levied against YNG were set aside or vastly reduced by Russian courts.[1240]   According to Mr. Konnov, after YNG contested the assessments, "the court-appointed experts who calculated the market prices" found in a number of cases "that the price deviation was within the 20% 'safe harbour' [for transfer pricing]."[1241]   As a consequence, "large parts of the assessments against YNG were overturned by the courts."[1242] Claimants, while not explicitly disputing the "supposed technicality" of the provisions on transfer pricing,[1243] insist that, given the "scale of the reduction . . . the purported tax reassessments against Yuganskneftegaz lacked any credibility in the first place."[1244]

1010. As for YNG's remaining debts, Rosneft, according to Mr. Konnov, as a "strategic company" owned by the State and supplying the State with petroleum, was able to "restructure[e]" them through a series of negotiations.[1245]

### 3.    Parties' Arguments and Tribunal's Observations

1011. The Tribunal now returns to the Parties' central arguments in respect of the YNG auction which it summarized at the outset of this Chapter and will seek to determine whether the events which

---

[1239]   *See* Memorial ¶ 382 n.578; Resolution of the Federal Arbitrazh Court for the Moscow District, 12 October 2007, Exh. C-294.

[1240]   On 16 February 2005, the Federal Arbitrazh Court granted YNG's cassation complaint and referred for re-examination YNG's challenge of the 1999 tax reassessment.  Resolution of the Federal Arbitrazh Court for the Moscow District, 16 February 2005, Exh. C-253; *Yugansk's New Victory*, Vedomosti, 11 October 2005, Exh. C-784; *but see* First Konnov Report ¶¶ 86–92.  On 10 October 2005, the Moscow Arbitrazh Court found that the 1999 reassessment against YNG violated the three-year limitation period under Article 87 of the Russian Tax Code.  Decision of the Moscow Arbitrazh Court, 12 October 2005, Exh. C-254; *Yugansk's New Victory*, Vedomosti, 11 October 2005, Exh. C-784.  On 16 April 2006, the Moscow Arbitrazh Court reduced YNG's alleged tax arrears for 2002 by 83 percent and the corresponding fines by 89 percent (to USD 760 million).  Decision of the Moscow Arbitrazh Court, 25 April 2006, Exh. C-255; Rosneft 2005 U.S. GAAP Consolidated Financial Statements, p.59, Exh. C-374.  In December 2007, having agreed in May–June 2007 that Rosneft was eligible for a tax restructuring process and that the total amounts of its tax debts (including that of YNG) could be restructured, the State approved the restructuring of Rosneft's tax debt, allowing for quarterly repayment of outstanding tax over five years, starting in March 2008.  Memorial ¶ 283; Rosneft 2007 U.S. GAAP Consolidated Financial Statements, p. 50, Exh. C-377; Rosneft Management's Discussion and Analysis of Financial Condition and Results of Operations for 2007 and 2006, p. 38, Exh. C-378.

[1241]   First Konnov Report ¶ 88.

[1242]   *Ibid*.  Mr. Konnov refers to a total of 16 decisions of various courts in this regard, First Konnov Report ¶¶ 88–89 nn.161–69.

[1243]   Reply ¶ 360.

[1244]   *Ibid.* ¶ 361.

[1245]   First Konnov Report ¶ 91; Transcript, Day 19 at 30–31.

it has traversed are consistent with a genuine attempt by the Russian Federation to collect taxes, or whether they disclose that the auction was rigged so as to enable YNG to fall into the hands of the State through the veneer of a legitimate process.  The Tribunal will review, in turn, (a) the fairness of the price achieved at the auction, (b) the role of Baikal and its acquisition by Rosneft, and (c) the impact of the YNG auction on the future of Yukos.

(a)    **Did the Auction Price Reflect the True Value of YNG; If not, was Either Party Responsible for the Price Reduction?**

1012. The Parties have different views as to whether the sale price of USD 9.35 billion reflected the fair value of YNG.  Claimants argue that if the purpose of the auction had been to collect revenues in order to pay legitimate tax debts, the Russian Federation would have been expected to make every effort to maximize the proceeds.  Instead, Claimants allege that Russia took steps to reduce the price so that it could, via Rosneft, acquire YNG for a derisory amount, and still be able to enforce the remaining tax liabilities against other Yukos assets.[1246]  Respondent maintains that the price for which YNG was acquired was not a "knock down" price but, to the extent it was, only Yukos was to blame.[1247]

1013. Claimants complain that the auction price paid by Baikal represented less than half of the enterprise value of YNG, which the Dresdner Valuation Report had assessed to be in the range of USD 18.6–21.1 billion.  Respondent answers that other contemporaneous valuations, including Morgan Stanley's, estimated a much lower value (USD 8.9 billion).[1248]  Respondent also recalls that it was necessary to adjust the value of the enterprise to account for the fact that only the 76.79 percent stake of Yukos in YNG was being auctioned.  Respondent put these issues to Dr. Illarionov, when challenging his claim that the price achieved was "well below even the most conservative estimates prepared by experts."[1249]  Dr. Illarionov admitted that his figure of USD 14.7–17.3 billion was based on a full enterprise value that did not take into account the tax liabilities.[1250]  At the end of his cross-examination, however, Dr. Illarionov maintained that he did not think "this discount rate of 60% that has been applied by the Russian

---

[1246]  Claimants' Post-Hearing Brief ¶ 101.

[1247]  Respondent's Closing Sides, pp. 354–65.

[1248]  *See* Dresdner Valuation Report; *see also YNG Sale:  A Shock and Awe Negotiating Tactic?,* Morgan Stanley Equity Research Report on Yukos, 22 July 2004, Exh. R-632.

[1249]  Illarionov WS ¶ 44; *see* Transcript, Day 7 at 85–86 (cross-examination of Dr. Illarionov).

[1250]  Transcript, Day 7 at 53–56, 77, 80–81 (cross-examination of Dr. Illarionov); *but see* Transcript, Day 17 at 255–56 (Claimants' closing, arguing that the demonstrative charts put to Dr. Illarionov during the cross-examination were not entirely accurate).

authorities produces a number that [he] would consider . . . a legitimate valuation."[1251]

1014. Respondent points out that Dresdner's valuation did not take into account outstanding tax liabilities in the amount of USD 4.6 billion, and that "[i]f this were to be judicially upheld, the estimate of net debt and other liabilities would increase by a corresponding amount."[1252] Claimants reply that these tax liabilities were fabricated by the Russian authorities in the period from October to December 2004 in order to depress the price of YNG.  The tax liabilities, say Claimants, related to transfer pricing and were applied to oil trading revenue that had already been re-attributed to Yukos, thus resulting in double taxation.[1253]  Respondent argues that YNG's transfer pricing issues had arisen over many years and that the allegation of double taxation was misconceived.  Respondent says the assessments were made in accordance with Russian law, since Yukos had forced YNG to sell oil to the trading companies at very low prices which exposed it to liability.[1254]

1015. Claimants also argue that the sale price was affected by the nature and speed of the process adopted by the Russian authorities.  While it is common ground that the time frame for the auction was within the minimum statutory requirements, Claimants recall that the Government ignored Dresdner's recommendation for a two-stage auction process to allow for proper due diligence, and its warning that failure to provide access to full information could lead to a reduction in the number of potential purchasers and the price they would be willing to pay.[1255]  No due diligence was provided beyond a "data room" that consisted of the report itself, auction rules and 89 pages of additional documents.  Respondent answers that Russian law requires no due diligence, that Gazpromneft was still able to undertake a thorough assessment, and that any due diligence issue was due to Yukos' lack of cooperation with Dresdner.[1256]

1016. The bare minimum time frame meant that the auction was conducted on a Sunday, which Dr. Illarionov described as "highly unusual . . . since the Russian Government agencies are closed on Saturdays and Sundays."[1257]  Respondent's suggestion at the Hearing that Sunday

---

[1251] Transcript, Day 7 at 87.

[1252] Dresdner Summary Letter, p. 6.

[1253] Memorial ¶¶ 269–75; Reply ¶ 266.

[1254] Rejoinder ¶¶ 958–60; First Konnov Report ¶¶ 86–92.

[1255] Dresdner Valuation Report ¶¶ 11.2, 12.8.

[1256] Rejoinder ¶¶ 978–81.

[1257] Illarionov WS ¶ 43.

was chosen to reduce the impact of Moscow's traffic was scoffed at by Claimants as "absurd."[1258]

1017. Claimants conclude that by any measure "the auction process was perfunctory and did not involve genuine competition."[1259]   Although the auction process complied with the letter of Russian legislation,[1260] Claimants insist that it is not a defence to an expropriation claim under international law that the State complied with its own domestic law.

1018. Respondent accuses Yukos of turning YNG into a "wasting asset"[1261] by foisting upon it "upstream guarantees"[1262] for its loan in favour of Moravel and forcing YNG to borrow USD 485 million from affiliate Yukos Capital.  Respondent adds that Yukos caused YNG to default on at least USD 586 million of mineral extraction tax, imperilling its oil licenses.  Yukos' press service issued a statement on 11 October 2004 attributing the non-payment of mineral extraction tax to YNG's accounts having been frozen.[1263]

1019. Respondent alleges that the low turn-out at the auction was attributable to Claimants' own acts of sabotage, namely their "intimidation campaign"[1264] and Yukos' "spurious bankruptcy filing in the United States"[1265] the purpose of which was to block the YNG auction by targeting both the companies that had expressed an interest in bidding as well as their banks.[1266]  According to Respondent, the TRO led banks to withdraw their financing, drove two of the companies that had applied for antimonopoly clearance not to register for the auction and resulted in Gazpromneft not submitting a bid.  Dr. Illarionov was cross-examined about Claimants' media campaigns aimed at warding off prospective bidders from the auction.[1267]  When he was asked

---

[1258]  Claimants' Post-Hearing Brief ¶ 104; *see* Transcript, Day 7 at 137–40.

[1259]  *Ibid*. ¶109.

[1260]  A point also noted in the ECtHR Yukos Judgment.  *See* ECtHR Yukos Judgment ¶ 647, Exh. R-3328.

[1261]  Rejoinder ¶ 955.

[1262]  *Ibid*. ¶ 966.

[1263]  *Yuganskneftegaz may lose licenses in three months*, RIA Novosti, 11 October 2004, Exh. C-709.

[1264]  Rejoinder ¶ 982; *see Yukos Says Asset Sale Could Prove Fatal Blow*, NY Times, 23 July 2004, Exh. R-648; *Buyer Beware*, Advertisement, Financial Times, 13 December 2004, Exh. R-649.

[1265]  Rejoinder ¶ 982.

[1266]  *See* Yukos-Moscow Limited, Resolution No. 1 of Management Board, 10 December 2004, Exh. R-657.  In the circumstances, the Tribunal wonders why Gazpromneft attended the auction at all, except that two participants were required for the auction to proceed.

[1267]  Transcript, Day 7 at 90–91; *Yukos Says Asset Sale Could Prove Fatal Blow*, NY Times, 23 July 2004, p. 3, Exh. R-648 (quoting Mr. Tim Osborne stating that "[a]nyone that buys those assets [referring to the YNG auction] is buying a whole heap of trouble"); Transcript, Day 7 at 98–99; *Buyer Beware*, Advertisement, Financial Times, 13 December

whether these statements likely encouraged or discouraged bidders from participating in the auction, he answered that Gazpromneft and Baikal probably "felt very well protected, maybe by the Russian Government."[1268]

1020. Having considered all of the factors that it has reviewed, the Tribunal concludes that the price of USD 9.35 billion which Baikal paid at the auction for the 76.79 percent stake of Yukos in YNG was far below the fair value of those shares.

1021. In the opinion of the Tribunal, the imposition during the few weeks prior to the auction of massive tax liabilities on YNG (which were cancelled in the months after the acquisition of YNG by Rosneft) appear designed specifically to depress the value of YNG.  The amount of the tax liabilities imposed which were subtracted from the Dresdner valuation cannot be justified.   In addition, in the view of the Tribunal, the failure by YNG to pay its mineral extraction tax was inextricably linked to the asset freeze of Yukos' cash.

1022. The Tribunal also finds that the Russian authorities deliberately ignored the advice of Dresdner that haste in carrying out the auction could decrease the price.  The Tribunal notes that the *Quasar* tribunal criticized Respondent's decision to hold the auction only one month after its announcement, and found that "the auction procedure was highly irregular in a number of ways that all relate to the extraordinary speed with which it was conducted."[1269]

1023. While the Tribunal accepts, as did the *RosInvestCo* and *Quasar* tribunals,[1270] that the actions of Claimants in warding off prospective buyers through a media campaign and the TRO may have deterred some potential buyers and may have resulted in a low winning bid,[1271] these actions, at

---

2004, Exh. R-649; Transcript, Day 7 at 114; *Mystery Russian Company Wins Bid on Yukos Unit— Offer of $9.37 Billion Seals Fate of Beleaguered Firm, But Many Questions Linger*, The Wall Street Journal (Europe), 20 December 2004, p. 3, Exh. C-738 ("Menatep intends to take every action available in order to protect its interest in Yukos").

[1268]  Transcript, Day 7 at 100–01.

[1269]  *Quasar* ¶ 117, Exh. R-3383.

[1270]  *RosInvestCo* ¶ 522, Exh. C-1049 (accepting that "had Claimant not discouraged international bidders and without the bankruptcy proceedings in the United States, more bidders might have participated, and that the process seems to have been conducted within the limits of discretion awarded by Russian law"); *Quasar* ¶115, Exh. R-3383 (the tribunal was "receptive to the Respondent's argument that some of the blame associated with the poor turnout and low winning bid at the YNG auction should be attributed to the Claimants for their media campaign . . . and for initiating bankruptcy proceedings . . . that led to the TRO" and to the "argument that Yukos' actions reasonably could have deterred potential bidders from participating in the YNG auction")  Both tribunals contrasted these findings with their serious doubts about the bona fide nature of the auction, stemming largely from the dubious identity of Baikal and the circumstances of its acquisition by Rosneft.

[1271]  On the other hand, the Tribunal notes that the Russian Justice Minister on 14 October 2004, in a commentary on the auction price, is reported to have said that this value "takes into account the 'high risk to a potential buyer' of the

the end of the day, had no relevant impact on the bankruptcy of Yukos.[1272]   The circumstances surrounding the appearance and disappearance of Baikal make the auction process seem all the more questionable to the Tribunal.   The Tribunal now turns to these events.

### (b)   Who was Behind Baikal and were They a Front for the Russian State?

1024.   In the view of the Tribunal, one of the most opaque facets of the YNG auction is the identity of Baikal, the sole and successful bidder at the auction which was acquired by State-owned Rosneft three days after its successful bid.   Baikal did not exist until less than two weeks before the YNG auction.   It was obviously a vehicle created solely for the purpose of bidding for YNG at the auction.   As noted earlier, it was incorporated with capital of USD 359.

1025.   During the closing oral arguments, the Chairman told Respondent's counsel: "you still have to convince us that Baikalfinance . . . was not a sham company.   That's your challenge."[1273]

1026.   Respondent sought to explain that Baikal was a special purpose vehicle established strictly for bidding at the auction.   Respondent added that "it was well known that those lying behind Baikal was [sic] Surgutneftegaz."[1274]   Respondent stated that Baikal was represented at the auction by two managers of Surgutneftegaz, Mr. Igor Minibayev and Ms. Valentina Komarova. Ms. Valentina Davletgareeva, the person who incorporated Baikal, was also connected to companies affiliated with Surgutneftegaz.   According to Counsel for Respondent, she sold 100 percent of her interest in Baikal to Makoil, a company owned in part by a secretary to the Board of Surgutneftegaz.[1275]   Accordingly, Respondent submits that "all of those who had a connection to the company in a formal manner or who were identified with it can be identified as having significant positions or relationships with respect to Surgutneftegaz."[1276]   Baikal's Tver office was close to a subsidiary of Surgutneftegaz, which in turn was located directly across the river from YNG.[1277]   In addition, there had been reports in the media since

---

Yukos asset."   *In the Yukos Saga, Yet Another Gloomy Chapter*, The Wall Street Journal (Europe), 14 October 2004, Exh. C-713.

[1272]   *See* Chapter X.E at paragraph 1625.

[1273]   Transcript, Day 19 at 33.

[1274]   Transcript, Day 21 at 151; Rejoinder ¶¶ 36, 1002, 1007.

[1275]   Rejoinder ¶ 1002 nn.1690–91.

[1276]   Transcript, Day 21 at 151; Respondent's Closing Slides, pp. 772–80.

[1277]   *See* Transcript, Day 21 at 151, Respondent's Closing Sides, pp. 782, 790.

September 2004 that Surgutneftegaz was interested in the auction.[1278]

1027. Claimants insist that, even accepting Respondent's theory that Baikal was a front for Surgutneftegaz, the "facts in the record . . . compel the conclusion that Baikal served the interests of the State, and any involvement of Surgut, a company known to be 'friendly with the Kremlin', was solely to mask the State's involvement."[1279]

1028. The fact that Baikal was incorporated only a few weeks before the auction and had the minimum-required capital is, according to Respondent, irrelevant.  The other three entities who had antimonopoly clearance for the auction were also relatively new companies with little capital.  Respondent alleged that Baikal paid the USD 1.77 billion deposit itself after having received the financing from a third party.[1280]  Respondent submitted that Surgutneftegaz had sufficient resources to enable Baikal Finance to pay the deposit, but not the full purchase price without recourse to international capital markets.[1281]  Respondent's theory is that such financing was foreclosed on the day of the auction by the TRO, leaving Baikal (and Surgutneftegaz) with a stark choice of defaulting on the obligation to pay the balance, and lose the USD 1.77 billion deposit, or find someone else to buy the asset.[1282]  On the other hand, Respondent's counsel agreed that the transaction "turned out to be very productive for Rosneft; there's no question about it."[1283]

1029. Claimants contend that the nature and speed of events that followed the auction cannot be reconciled with Respondent's suggestion that Rosneft's acquisition of Baikal was entirely fortuitous and unplanned.  On 20 December 2004, the day after the auction, they point out that Rosneft sought and obtained, in less than a day, antimonopoly clearance to acquire Baikal.[1284]  Respondent's attempts to explain these events by pointing out that Rosneft and the authorities

---

[1278] *Surgut drops first hint of interest in Yukos assets*, AFP, 28 September 2004, Exh. C-704 (stating that "President Vladimir Putin and his entourage of secret service agents and Soviet era officials would be delighted with the transaction").

[1279] Claimants' Post-Hearing Brief ¶ 110 (footnote omitted).

[1280] Transcript, Day 19 at 34.

[1281] Transcript, Day 19 at 34–35.

[1282] Transcript, Day 19 at 34–35, 43.

[1283] Transcript, Day 19 at 35.

[1284] Rosneft's request to Federal Antimonopoly Service to approve acquisition of a 100 percent interest in Baikal, 20 December 2004, Exh. C-1162; Federal Antimonopoly Service's approval of Rosneft's acquisition of a 100 percent interest in Baikal, 20 December 2004, Exh. C-1163; Federal Antimonopoly Service's instructions with respect to Rosneft's acquisition of a 100 percent interest in Baikal, 20 December 2004, Exh. C-1164.

were familiar with such filings confirm, according to Claimants, that the authorities did not perform even a perfunctory review of the 13-page application and its 98 pages of attachments.[1285]

1030. Claimants also refer to the fact that Rosneft filed for antimonopoly clearance on a Monday, the day after the auction.  Thus, Respondent's allegation that Surgutneftegaz was obliged to sell "the bid" because the TRO prevented it from accessing financing rings hollow since Surgutneftegaz would have needed to seek and be denied financing by every commercial bank on the Sunday of the auction.  Claimants ask whether Baikal would have risked a deposit of USD 1.77 billion by making a bid without first having financing in place.[1286]

1031. Respondent claims Rosneft had no ownership interest in Baikal prior to the auction, and that Rosneft put together a finance package for the purchase of Baikal after the auction, on an emergency basis, and, in so doing, even breached covenants related to its prior borrowings.

1032. When Rosneft completed the acquisition of YNG on 22 December 2004, using funds borrowed from State-owned banks, the transaction was described in the Russian Press as "the State budget via a State bank help[ing] a State company acquire from the State a very profitable asset."[1287]  Claimants urge the Tribunal to reach the "inescapable conclusion"[1288] that it was determined in advance that Rosneft would acquire YNG, and that the elaborate sham involving Baikal was set up to mask the State's involvement and thus reduce legal risks.

1033. Claimants also submit that the events *after* the auction speak for themselves.  YNG's tax debts were reduced from USD 4 billion to less than a billion.  In addition, after having filed claims by YNG of almost USD 10 billion in Yukos' bankruptcy, the net cost to Rosneft for the purchase of Yukos' jewel was, according to Claimants, less than USD 3 billion.  Thus, bearing in mind that in 2006 Rosneft's IPO valued YNG at USD 55.78 billion, Rosneft's description of the

---

[1285]   Rejoinder ¶ 1004 & n.1698; *see* Approval of the Federal Antimonopoly Service regarding the acquisition by Baikal Finance of a 76.79 percent interest in YNG, 15 December 2004, Exh. R-3813; Order of the Federal Antimonopoly Service regarding the acquisition by Baikal Finance of 76.79 percent interest in YNG, 15 December 2004, Exh. R-3814.

[1286]   Claimants' Post-Hearing Brief ¶ 112.

[1287]   *From the Editors:  The State Whirligig*, Vedomosti, 15 August 2005, Exh. C-764.

[1288]   Claimants' Post-Hearing Brief ¶ 113.

transaction as "the most monumental bargain in Russia's modern history" was, conclude Claimants, an understatement.[1289]

1034. The Tribunal notes that the *RosInvestCo* tribunal in reaching its conclusion that the auction was rigged observed that "the winning bidder was a completely unknown company just created before the auction and disappearing right after the auction and assigning its interests to Ru[ss]ian state-owned Rosneft."[1290]  To the *RosInvestCo* tribunal, "[t]he circumstances that this bidder was further found to have no real offices and nevertheless was able to raise the deposit in the range of US$ 1.7 billion and then the purchase price with the apparent help of Rosneft further contribute to the impression that the scheme was set up under the control of respondent to bring Yukos' assets under Respondent's control."[1291]

1035. The identity of Baikal was also of "[p]aramount"[1292] concern for the *Quasar* tribunal, which described its unease with the circumstances of Baikal's purchase as follows:

> an unknown entity, placed a $9.3 billion, uncontested winning bid for YNG, the largest oil production company in Russia, and was then acquired a mere three days later by state-owned Rosneft, even before payment of the purchase price was due. . . . The Respondent's argument . . . to the effect that [the] YNG auction was of a public nature, and that [Baikal] bid $500 million above the starting price, are insufficient to remove the suspicion of collusion, particularly when [Baikal] was quickly taken over by Rosneft before payment of the purchase price was due.[1293]

1036. Having assessed the evidence with respect to the identity and role of Baikal, and the timing and nature of Rosneft's acquisition of that company, this Tribunal agrees with the conclusions of the *RosInvestCo* and *Quasar* tribunals that the YNG auction was rigged.

1037. The additional evidence placed before this Tribunal connecting Baikal to Surgutneftegez does not erase the suspicion that Baikal was created by instruments of Respondent in order to facilitate the acquisition of YNG by State-owned Rosneft.  The statement by Rosneft that the purchase was a "monumental bargain", the remarks by President Putin acknowledging that the

---

[1289]  *Ibid.* ¶ 114; *see* "Place in economy of Russia, Rosneft:  About company," Rosneft Website, p. 14, Exh. C-381.

[1290]  *RosInvestCo* ¶ 523, Exh. C-1049.

[1291]  *Ibid.*

[1292]  *Quasar* ¶ 118, Exh. R-3383.

[1293]  *Ibid.*

State had looked after the State's interest [1294] by increasing its reserves, and the good fortunes of YNG once it was in the hands of a State-owned company all support the Tribunal's conclusion that the auction of YNG was not driven by motives of tax collection but by the desire of the State to acquire Yukos' most valuable asset and bankrupt Yukos.  In short, it was in effect a devious and calculated expropriation by Respondent of YNG.

(c)     **What were Yukos' Prospects for Survival Once it Lost its Core Asset?**

1038.  While the legal implications of the YNG auction will be discussed in Part X of the Award, the Tribunal will set out briefly Claimants' factual allegations that the sale of YNG dealt a "fatal blow" to the survival prospects of Yukos.[1295]  Was the sale of YNG the point of no return for the survival of Yukos?  On the basis of the totality of the evidence and, in particular, the testimony of Messrs. Misamore and Theede and Dr. Illarionov, the Tribunal answers that question in the affirmative.

1039.  Mr. Misamore testified that with the auction of YNG, "Yukos lost over 60% of its total production capacity."  This "meant a massive downsizing of the company's activities."  Mr. Misamore hoped it "was not the end of the company," and Yukos started 2005 on the basis that it would carry on operations on a smaller scale with the remaining production assets and refineries.  However, "it soon became evident there was little that Yukos' management could do to protect the company's Russian assets.  Despite our best efforts to challenge the tax reassessments, the Russian courts were biased against us.  Bankruptcy proceedings in Russia were increasingly likely and the Yuganskneftegaz auction had highlighted the real risk that company assets would be transferred to State-owned entities at substantial undervalue."[1296]

1040.  Mr. Theede considered the announcement of the auction as the point in time when "the die was finally cast" for Yukos.  The auction put an end to settlement discussions with the Russian Government.  He considered the sale of YNG at a "grossly undervalued price through a sham

---

[1294]   Press Statement and Answers to Questions Following Russian–German Bilateral Consultations, Russian President Official Website, 21 December 2004, p. 2, Exh. C-421; Press Conference with Russian and Foreign Media, Russian President Official Website, 23 December 2004, p. 4, Exh. C-422.

[1295]   ECtHR Yukos Judgment ¶ 653; *Yukos Says Asset Sale Could Prove Fatal Blow*, NY Times, 23 July 2004, Exh. R-648; *Moscow set to seize huge Yukos oil division—Investors may lose everything in tax fight, analysts warn*, International Herald Tribune, 21 July 2004, Exh. C-698.

[1296]   Misamore WS ¶¶ 58–59.

auction" to be a "clear theft by the Russian State," which became all the more obvious in the context of the IPO by Rosneft in July 2006.[1297]

1041.  Dr. Illarionov described the confiscation of YNG as the "culminating point of th[e] attack" on Yukos, following which the Russian authorities took no further steps to satisfy Yukos' alleged tax debts.  Such conduct was inconsistent with a genuine attempt to collect taxes.[1298]

1042.  At the time, Claimant YUL and its subsidiaries (including Hulley), as majority shareholders of Yukos, acknowledged that they had "lost the power to govern the financial and operating policies of Yukos so as to obtain benefits from its activities."[1299]  It was noted in the 2004 Annual Report for YUL that Yukos had become "incapable of operating as a business as evidenced by the forced sale of [YNG]."[1300]

1043.  The effect of the auction on Yukos' prospects did not escape the attention of the ECtHR, which acknowledged that YNG had been Yukos' "only hope of survival."[1301]  It was "rather obvious" to the ECtHR that the choice of YNG as the first Yukos asset to be auctioned to satisfy Yukos' tax debts was "capable of dealing a fatal blow to its ability to survive the tax claims and to continue its existence."[1302]  This Tribunal agrees.  This Tribunal also agrees with the *Quasar* tribunal's characterization of the seizure of YNG as an extreme measure capable of "drastic" consequences for Yukos.[1303]

1044.  Those "drastic" consequences will be important for the Tribunal's determination of an appropriate valuation date for purposes of calculating damages.   The dim prospects of resuscitation of Yukos after the "fatal blow" of the YNG auction are discussed in the next chapter on Bankruptcy.

---

[1297]  Theede WS ¶ 25–27 (evoking the Rosneft IPO as a moment "where Rosneft was valued at approximately US $ 80 billion, with YNG accounting for 70% of its crude oil production").

[1298]  Illarionov WS ¶¶ 42–43.

[1299]  YUL (and its subsidiaries), Annual Report and Consolidated Financial Statements for the Year Ended 31 December 2004, p. 2, Exh. R-4229.  Deloitte, auditors of YUL, in their report on the financial statements, after referring to the auction of YNG, wrote:  "These events indicate a material uncertainty which may cast significant doubt on Yukos's ability to continue as a going concern and therefore it may be unable to realize its assets and discharge its liabilities in the normal course of business."  *Ibid.* at 3.

[1300]  *Ibid.* at 2.

[1301]  ECtHR Yukos Judgment ¶ 654.

[1302]  *Ibid.* ¶ 653.

[1303]  *Quasar* ¶ 116, Exh. R-3383.

G.   THE BANKRUPTCY OF YUKOS

   1.   **Introduction**

1045. Claimants' case is that Yukos' bankruptcy, announced by the Moscow Arbitrazh Court on 4 August 2006 and followed by the removal of Yukos from the companies' register on 21 November 2007, was the "final act of the destruction of the Company by the Russian Federation and the expropriation of its assets for the sole benefit of the Russian State and State-owned companies Rosneft and Gazprom."[1304]  Claimants allege that Respondent "instigated" a syndicate of western banks led by Société Générale (the "**Western Banks**")[1305] to commence bankruptcy proceedings against Yukos based on Yukos' default under a loan agreement concluded between Yukos and the Western Banks for the purposes of funding the Sibneft merger.[1306]  Claimants contend that Respondent ensured, through the initiation of bankruptcy proceedings and discriminatory treatment of bankruptcy claims, that the Russian State and Rosneft would hold over 97 percent of the alleged claims against Yukos in the bankruptcy.[1307] Having made certain that Yukos' proposed Rehabilitation Plan would be rejected at the general creditors' meeting, the Russian Federation completed its expropriation scheme by auctioning Yukos' remaining assets.  Through the bankruptcy and liquidation of Yukos, the Russian State directly received more than 60.5 percent of the bankruptcy proceeds and, indirectly, through Rosneft, received more than 39.21 percent of the bankruptcy proceeds and all of Yukos' main production assets.

1046. Respondent denies all allegations of impropriety or bias in relation to the bankruptcy proceedings.  Moreover, Respondent argues that the bankruptcy proceedings are irrelevant to the Tribunal's determination because the conduct that directly caused Yukos' liquidation—the initiation of Yukos' bankruptcy and the vote to liquidate Yukos—is either not attributable to Respondent or not an exercise of its sovereign power.  Respondent's case is that "the insolvency of the Yukos holding company was the consequence of the Oligarchs' and Yukos' management's disastrous strategy of tax evasion, resistance to and obstruction of the collection

---

[1304]   Memorial ¶¶ 411–13.

[1305]   The Western Banks included BNP Paribas S.A., Citibank N.A., Commerzbank Akziengesellschaft, Calyon S.A., Deutsche Bank A.G., Hillside Apex Fund Limited, ING Bank N.V., KBC Bank N.V., Société Générale S.A., Stark Trading, Shepherd Investments International Limited, Thames River Traditional Funds PLC (High Income Fund), UFJ (Holland) N.V., and V.R. Global Partners L.P.

[1306]   Presumably for the $3 billion Share Purchase of 20 percent of Sibneft shares.  *See* Yukos, *YukosSibneft, Greater Opportunities to Build Value*, Presentation of 8 October 2003, Exh. C-42.

[1307]   Claimant's Post-Hearing Brief ¶ 126; Memorial ¶ 439; Reply ¶ 412.

of overdue taxes, self imposition of massive non-tax and intercompany liabilities on the company, and failure to draw on Yukos' ample offshore assets."[1308]

## 2.      Chronology

### (a)      The Initiation of the Bankruptcy

1047.  The initiation of bankruptcy proceedings against Yukos is inextricably tied up in the history of two loans connected with the Sibneft merger, one from the Western Banks ("**A Loan**") and the other from Société Générale ("**B Loan**").   It is therefore important to review the key facts relating to each of those loans.

1048.  For purposes of funding the Sibneft merger, Yukos entered into two loan agreements.   The A Loan consisted of USD 1 billion borrowed by Yukos from the Western Banks, which was secured by certain of Yukos' oil export contracts and by YNG.  This loan was entered into on 24 September 2003.[1309]

1049.  The B Loan consisted of USD 1.6 billion borrowed by Yukos from Société Générale, which was fully collateralized in cash by GML, Yukos' ultimate parent company.  This loan was entered into on 30 September 2003.[1310]

1050.  On 3 October 2003, Société Générale drew on the collateral under the B Loan, making GML the lender.   GML's rights were then assigned to Moravel, which was GML's wholly-owned indirect subsidiary in Cyprus.[1311]

1051.  On 30 June 2004, an appeal panel of the Moscow Arbitrazh Court issued an enforcement writ against Yukos for payment of the taxes assessed for the year 2000.   Following this development, the Western Banks notified Yukos that they would not demand immediate

---

[1308]    Counter-Memorial ¶ 445.

[1309]    Memorial ¶ 374, Guarantee between YNG and Société Générale, 24 May 2004, Exh. R-581.

[1310]    B Loan Agreement, 30 September 2003, Exh. R-468.

[1311]    *Yukos Oil Company Arranges 1.6 Billion Loan*, Yukos Press Release, 6 October 2003, Exh. C-653; Respondent's Closing Slides, p. 381; Memorial ¶¶ 441–44; Counter-Memorial ¶¶ 548, 578, 1531–33; Rejoinder ¶¶ 1054–56, 1136–37.

payment, but would instead rely on the security supporting the A Loan, namely payments through the proceeds of export sales of crude oil.[1312]

1052. Soon after, however, as described in the previous chapter, the tax authorities seized and auctioned YNG, depriving Yukos of its primary oil producing asset.  Claimants contend that when YNG was taken from Yukos in December 2004, YNG stopped shipping oil under the export contracts and "[i]t was thus the actions of the Russian Federation, not Yukos, which obstructed the payment of [the A Loan]."[1313]

1053. Since Yukos ceased making payments under the A Loan, the Western Banks brought a claim against Yukos for approximately USD 472.8 million, plus interest under the A Loan.  The claim was recognized by the High Court of England and Wales on 24 June 2005 ("**English Judgment**").[1314]  Respondent contends that, by this time, Yukos had already paid Moravel over USD 1 billion under the B Loan, and thus had more than enough cash to have repaid the Western Banks in full under the A Loan.

1054. During this same time period, Yukos management implemented two restructurings that transferred Yukos' non-Russian assets, previously held through Yukos' wholly-owned Dutch and Armenian subsidiaries Yukos Finance and Yukos CIS into two "stichting administratiekantoor".

1055. A stichting is a Dutch "foundation."[1315]  It does not have members or shareholders.  All management powers are vested in a board of directors, subject only to the stichting's articles of association and Dutch law.[1316]  In the case of a stichting administratiekantoor or "foundation trust," the stichting issues depository receipts for shares in exchange for shares transferred to it.[1317]  This trust-like structure separates legal ownership and beneficial ownership:  the

---

[1312]   Appeal Resolution of the Moscow Arbitrazh Court, 29 June 2004, Exh. C-121; Enforcement Writ No. 383729 of 30 June 2004, Exh. C-122; Claimant's Post-Hearing Brief ¶ 118.

[1313]   Claimant's Post-Hearing Brief ¶ 118.

[1314]   *BNP Paribas v. Yukos Oil Company*, High Court of England and Wales, Judgment, 24 June 2005, Exh. R-455 (hereinafter "English Judgment").

[1315]   Dutch Civil Code (Burgerlijk Wetboek) art. 285(2), Exh. R-709; Counter-Memorial ¶ 528.

[1316]   C. Asser, *Handleiding tot de beoefening van het Nederlands Burgerlijk Recht* (W.E.J. Tjeenk Willink, 1997) ¶ 475, Exh. R-723; ¶¶ 480, 484, Exh. R-724.

[1317]   C. Asser, *Handleiding tot de beoefening van het Nederlands Burgerlijk Recht* (Kluwer, 2009) ¶ 658, Exh. R-725.

stichting is the legal owner of the shares and the holder of the depositary receipts for shares is the beneficial owner of the shares.[1318]

1056. The first restructuring took place in April 2005 and consisted in the transfer of all of the assets of Yukos Finance to Yukos International U.K. B.V. ("**Yukos International**"), a wholly-owned Dutch subsidiary of Yukos Finance, and the subsequent transfer of Yukos Finance's shares in Yukos International to Stichting 1in exchange for depositary receipts for those shares.[1319]

1057. The second restructuring took place in September 2005 and consisted in the transfer of all the shares owned by Yukos CIS in Yukos Hydrocarbons Investments Limited ("**YHIL**") to Wincanton, a Dutch company; and the subsequent transfer of all of Wincanton's shares in YHIL to Small World Telecommunication Holding B.V. ("**Small World**"),[1320] another Dutch company wholly-owned by Wincanton.  Finally, Wincanton's shares in Small World were transferred to Stichting 2[1321] in exchange for depositary receipts for those shares.[1322]

1058. The members of the Stichtings' boards are former managers of Yukos and individuals close to Yukos.[1323]  The Stichtings hold "substantial value"[1324] and remain in place today.

1059. Articles 2.2 and 2.3 of the original Articles of Association of the Stichtings provide:

> 2.  The Foundation will exercise the rights attached to the shares in such a way as to guarantee to the best of its ability, whether or not by conducting court proceedings, the interests of the Company and the other, direct or indirect, subsidiaries of Yukos Oil Company (the "Parent Company"), which jointly constitute the group of which the Company forms a part (the "Group"), the management, executive staff and employees of the Group, the Group's legitimate creditors (including creditors with undisputed claims) and all other acknowledged stakeholders of the Group.

---

[1318]   *Ibid.*

[1319]   Counter-Memorial ¶ 529; Articles of Association of Stichting Administratiekantoor Yukos International (hereinafter "Stichting 1"), 14 April 2005, Exh. C-1181.

[1320]   Small World Telecommunication Holding B.V. later changed its name to Financial Performance Holdings B.V. Counter-Memorial ¶ 530; *see also* Article 2.1 of the Articles of Association, Stichting Administratiekantoor Small World Telecommunications Holdings B.V. (hereinafter "Stichting 2"), 20 June 2006, Exh. R-712.

[1321]   Stichting 2 later changed its name to Stichting Administratiekantoor Financial Performance Holdings. *See* Counter-Memorial ¶ 530.

[1322]   Counter-Memorial ¶ 530; Articles of Association of Stichting 2, 26 September 2005, Exh. C-1182.

[1323]   Counter-Memorial ¶ 532; Minutes of the Yukos Board of Directors Executive Committee, 26 October 2005, Exh. R-716; Transcript, Day 9 at 232 (cross-examination of Mr. Misamore).

[1324]   Respondent's Post-Hearing Brief ¶ 120; Transcript, Day 9 at 233–34 (cross-examination of Mr. Misamore) (asserting that the maximum value held by Stichting 1 was USD 1.8 billion in 2006, and the maximum value held by Stichting 2 was around USD 500 million as of the date of the Hearing); Counter-Memorial ¶ 536.

> 3. Excluded from the Foundation's objects are the exercising of rights attached to the shares as a result of or in the implementation of an unlawful claim, judgment or transaction, including but not limited to those resulting from or related to the tax assessments imposed on Yukos Oil Company and members of the Group in the Russian Federation on or after the fourteenth of April two thousand and four, specifically including, but without prejudice to the above, any claim against, transfer of, sale of, revendication of, attachment judgment in respect of, allocation of or other applicability to, or expropriation of the shares, assets or other property of, or other imposition of charges on Yukos Oil Company and any part of the Group.[1325]

1060. Respondent asserts that the Stichtings were used to insulate assets from the reach of the Western Banks.  Respondent puts particular emphasis on proceedings in Dutch courts, where the Western Banks attempted to enforce the English Judgment.[1326]  On 15 July 2005, the Western Banks petitioned the District Court of Amsterdam to enforce the English Judgment, and to issue a judgment permitting the sale and transfer of Yukos' share interest in Yukos Finance.[1327]  The Western Banks informed the court that the creation of the Stichtings had rendered Yukos' shares in Yukos Finance, over which the Western Banks had obtained a prejudgment attachment, "worthless" and "more or less unsellable."[1328]  Respondent asserts that the Western Banks' failure to enforce the English Judgment in the Netherlands was "the death knell of Yukos' pretense of cooperation in its negotiations with the syndicate."[1329]

1061. Back in Russia, on 22 September 2005, the bailiff adopted a resolution to seize all of Yukos' assets.[1330]

1062. The Western Banks proceeded to seek to enforce the English Judgment against Yukos in Russia.  The Western Banks succeeded in the first instance, before the Moscow Arbitrazh Court, but the Court's favourable ruling (issued on 28 September 2005) was reversed on "procedural" grounds by the Federal Arbitrazh Court for the Moscow District on 5 December 2005.

---

[1325]   Articles of Association of Stichting 1, 14 April 2005, Exh. C-1181; Articles of Association of Stichting 2, 26 September 2005, Exh. C-1182.

[1326]   Rejoinder ¶¶ 1073–75; English Judgment, Exh. R-455.

[1327]   Rejoinder ¶ 1076; *BNP Paribas S.A. et al. v. OAO Yukos Oil Company et al.*, Decision of the District Court of Amsterdam, 29 September 2005 ¶ 2.1, Exh R-756.

[1328]   *BNP Paribas S.A. et al. v. OAO Yukos Oil Company et al.*, Decision of the District. of Amsterdam, 29 September 2005 ¶ 2.3, Exh R-756.

[1329]   Rejoinder ¶ 1083.

[1330]   Resolution of Bailiff A.V. Reydik, 22 September 2005, Exh. C-301.

1063. Following the unfavourable decision by the Federal Arbitrazh Court for the Moscow District, the Western Banks entered into a confidential sale agreement with Rosneft ("**Confidential Sale Agreement**").[1331]

1064. Pursuant to this Confidential Sale Agreement, Rosneft agreed to satisfy the outstanding debt owed by Yukos to the Western Banks (the outstanding principal being at the time USD 455,124,215.03), in exchange for the assignment of the banks' rights of claim against Yukos under the A Loan to Rosneft.[1332]

1065. Significantly, the payment of the purchase price by Rosneft was predicated upon the Western Banks agreeing to take the steps described in Schedule 8 of the Confidential Sale Agreement, entitled "Application For Bankruptcy."   Schedule 8 sets out the Western Banks' obligations under three steps:  "1. Proceedings on recognition and enforcement of the English Judgment in Russia  (the  'Enforcement Case')";  "2. Execution  proceedings  against  the  Borrower [*i.e.*, Yukos] (based on the Enforcement Case) (the 'Execution Proceedings')"; and "3. Bankruptcy proceedings against the Borrower.[1333]

1066. Following the conclusion of the Confidential Sale Agreement between the Western Banks and Rosneft, the enforcement of the A Loan was back before the Russian courts.  On 21 December 2005, the Moscow Arbitrazh Court formally recognized the English Judgment against Yukos in favour of the Western Banks and issued a writ of enforcement with respect to the judgment.

1067. On 29 December 2005, the Western Banks submitted the enforcement writ to the bailiffs, who then initiated enforcement proceedings to recover from Yukos the amounts ordered under the English Judgment, namely USD 455,124,214.99 in principal and USD 9,459,143.18 in interest. These enforcement proceedings failed. Claimants assert that they were bound to fail due to the seizure of Yukos' assets, which had been imposed since July 2004.

1068. The order of the Moscow Arbitrazh Court that recognized the English Judgment was challenged by Yukos, and upheld by the Federal Arbitrazh Court of the Moscow District.  In its decision of 2 March 2006, the Federal Arbitrazh Court reasoned as follows:

---

[1331] Sale Agreement Relating To Certain Rights And Benefits Arising Under A Credit Agreement dated 24 September 2003 Between, Amongst Others, "Yukos Oil Company" and Société Générale SA, 13 December 2005, Exh. C-300 (hereinafter "Confidential Sale Agreement").

[1332] *Ibid*, p. 4.

[1333] *Ibid*., pp. 37–38.

> When re-examining the case, the Court did comply with the directions given by the cassation Resolution of December 5, 2005. The Court fully and comprehensively reviewed the circumstances of the case. Its conclusions on the application of legal rules are consistent with the established circumstances and evidence in the case.[1334]

1069. On 6 March 2006, the Western Banks petitioned the Moscow Arbitrazh Court to declare Yukos bankrupt.[1335]

1070. In an undated letter, Mr. Theede wrote in mid-March to the bailiffs requesting that the authorities "immediately release Company property from the freezing order in an amount sufficient to satisfy" the debt owed to the A Loan lenders, and thus avert the commencement of the bankruptcy proceedings.[1336]

1071. On 14 March 2006, consistent with the terms of the Confidential Sale Agreement, Rosneft paid the Western Banks the full outstanding amount of the A Loan; in exchange, the Western Banks assigned their rights of claim to Rosneft.[1337]

1072. On 24 March 2006, YNG—by then a subsidiary of Rosneft—filed a separate and parallel petition against Yukos before the Moscow Arbitrazh Court to declare Yukos bankrupt.[1338]

1073. According to Respondent, the YNG petition was based on a judgment in respect of transportation services provided while Yukos owned YNG in January through March 2004, under a January 2003 contract.[1339]

1074. The YNG petition was formally granted on 27 March 2006.[1340] Since Russian law does not allow separate bankruptcy proceedings against one company, YNG's claim was joined to the bankruptcy proceedings initiated by the Western Banks.[1341]

---

[1334] Resolution of the Federal Arbitrazh Court for the Moscow District, 2 March 2006, p. 4, Exh. C-302.

[1335] Banks' Petition to Declare Yukos Bankrupt Filed with the Moscow Arbitrazh Court, 6 March 2006, Exh. R-3885; *Creditors Petition Russian Court to Declare Yukos Bankrupt*, World Markets Analysis, 13 March 2006, Exh. R-3882.

[1336] Letter from Yukos' President S. Theede to the Head of the Interdistrict Department for Special Enforcement Proceedings of the Chief Directorate of the Federal Bailiffs Service for Moscow V.A. Savostov (undated), p. 3, Exh. C-1180; Claimant's Post-Hearing Brief ¶ 125.

[1337] Ruling of the Moscow Arbitrazh Court, 28 March 2006, p. 3, Exh. C-307; Memorial ¶ 425; Claimants' Skeleton ¶ 47.

[1338] Memorial ¶ 427; Counter-Memorial ¶ 561; Ruling of the Moscow Arbitrazh Court, 27 March 2006, p. 1, Exh. C-305.

[1339] Rejoinder ¶ 1098.

[1340] Ruling of the Moscow Arbitrazh Court, 27 March 2006, p.1, Exh. C-305.

[1341] Register of Yukos Creditors' Claims, 30 October 2007 (Claim No. 2), p. 34, and (Claim No. 3), p. 109, Exh. C-353.

1075. On 28 March 2006, the Moscow Arbitrazh Court ordered the commencement of bankruptcy proceedings, placed Yukos under supervision, appointed Mr. Rebgun as interim administrator, and formally substituted Rosneft for the Western Banks as creditor.[1342]

1076. The Tribunal recalls that around that time Mr. Theede appointed Mr. Aleksanyan to represent Yukos in connection with the bankruptcy proceedings, but that within days of his appointment, Mr. Aleksanyan was arrested on 6 April 2006 at his house by masked and armed men on charges of money laundering and embezzlement allegedly committed when he was head of Yukos' legal department.[1343]

### (b)   The Treatment of Bankruptcy Claims; the Creditors' Meeting; the Declaration of Yukos' Bankruptcy

1077. In accordance with Russian bankruptcy law, it was for Mr. Rebgun, as interim administrator of Yukos, to convene a first meeting of Yukos' creditors.  At that meeting, Yukos' creditors would, under the options available under Russian Bankruptcy Law, vote either in favour of a Rehabilitation Plan proposed by Yukos or for the alternative of a liquidation of Yukos.

1078. In anticipation of these steps, on 1 June 2006, Yukos convened an extraordinary general shareholders' meeting and approved, by majority vote, the Rehabilitation Plan proposed by Yukos' management.[1344]  Also, the shareholders appointed Mr. Osborne as their representative in the bankruptcy proceedings.

1079. Claimants' Rehabilitation Plan was based on, *inter alia*:[1345]

   i)   The remaining assets valued at USD 31 billion exceeding the USD 29.5 billion in tax claims filed with Mr. Rebgun;

   ii)   a two year program to pay off the claims in bankruptcy;

---

[1342]   Rulings of the Moscow Arbitrazh Court, 28 March 2006, Exh. C-306 and Exh. C-307.

[1343]   *Top Yukos official Aleksanyan detained in Moscow*, RIA Novosti, 6 April 2006, Exh. C-796; *Arrest of Yukos Oil Company Executive Vice-President is a Brutal and Unjust Attack on the Company's Attempts to Secure a Fair Bankruptcy Process*, Yukos Press Release, 7 April 2006, Yukos Website, Exh. C-797; *Ioukos, un deuxième président en prison*, Libération, 8 April 2006, Exh. C-798; *Le Kremlin s'acharne contre le groupe pétrolier Youkos*, Le Figaro, 13 April 2006, Exh. C-799; Theede WS ¶ 30.

[1344]   Minutes of Extraordinary General Meeting of Yukos' Shareholders held on 1 June 2006, Exh. C-311.

[1345]   Memorial ¶ 458; Letter from Fulbright & Jaworski LLP to Chadbourne & Parke LLP, 1 June 2006, enclosing Yukos' Outline of Proposed Financial Rehabilitation Plan, Exh. C-312 (hereinafter "Rehabilitation Plan").

iii)   the creation of a "Cash Pool separate from the Company," funded by constant cash flows generated by Yukos' production, refining and marketing subsidiaries (approximately USD 3–3.5 billion of annual Earnings Before Interest, Taxes, Depreciation and Amortification ("**EBITDA**");

iv)   the sale of non-core assets: approximately USD 8.9 billion from the sale of Russian assets (20 percent stock of Sibneft ordinary shares, approximately USD 4.2 billion; 23.7 percent of YNG's outstanding share capital in the form of preferred shares (estimated at USD 3.6 billion); 100 percent of shares in Arctic Gas, approximately USD 1.1 billion) and approximately USD 1.5 billion from foreign assets (from the sale of its 53.7 percent stake in Lithuanian oil company Mazeikiu Nafta and 49 percent stock in Slovakian oil transport major Transpetrol); and

v)   supplementing the Cash Pool with amounts awarded in pending international arbitrations and Russian litigation where Yukos was seeking approximately USD 18 billion.

1080. On the same day that the shareholders approved the Rehabilitation Plan (*i.e.*, on 1 June 2006), Yukos' counsel transmitted an "Outline of the Proposed Financial Rehabilitation Plan" to Mr. Rebgun's counsel in the U.S. (Chadbourne & Parke LLP), requesting that the Rehabilitation Plan be placed on the agenda of the first meeting of Yukos' creditors, and circulated to all of Yukos' registered creditors.

1081. On 2 June 2006, Mr. Rebgun sent to Yukos' registered creditors and to Yukos' CEO, Mr. Theede, a notice informing them that the first creditors' meeting would be held on 16 June 2006 and inviting them to consult the materials that would be discussed at the meeting in his office from 9 to 15 June 2006.[1346]

1082. In the event, the first meeting of Yukos' creditors did not take place as scheduled on 16 June 2006.  On 8 June 2006, the first meeting of Yukos' creditors was adjourned by the Moscow Arbitrazh Court pending a 14 June 2006 hearing on the admission into bankruptcy proceedings of outstanding tax claims by the Federal Taxation Service for 2000 to 2004.  Mr. Rebgun, in turn, requested a postponement of the Court's hearing on Yukos' bankruptcy.[1347]

---

[1346]   Notice of the First Yukos Creditors' Meeting to be held on 16 June 2006, 2 June 2006, Exh. C-314.

[1347]   Memorial ¶¶ 432–34, 454.

1083. At the hearing of 14 June 2006, a bankruptcy judge (not a tax judge) of the Moscow Arbitrazh Court ruled in favour of the Federal Taxation Service "after taking just 15 minutes to consider 127,000 pages of information submitted by Russian tax officials," admitting in their entirety as valid bankruptcy claims the tax authorities' claims based on years 2000–2003, plus 2004.  In so doing, the judge confirmed the Federal Taxation Service as Yukos' largest creditor, with registered claims of USD 13.06 billion (amounting to 60.5 percent of all registered bankruptcy claims).[1348]

1084. Some two weeks later, the Court's hearing on Yukos' bankruptcy was postponed to 1 August 2006.  The Court granted the postponement, noting that the "first meeting of creditors did not take place because not all of the creditors' claims submitted before the established deadline have been reviewed by the Court."[1349]

1085. On 28 June 2006, Mr. Rebgun sent a revised notice of the first creditors' meeting to be held on 20 July 2006 and invited registered creditors to consult the bankruptcy materials from 14 to 19 July 2006.[1350]  Claimants assert that Mr. Rebgun did not circulate the Rehabilitation Plan that had been proposed by Yukos with his original notice of 2 June 2006.[1351]  Indeed, the existence of the Rehabilitation Plan appears to have been notified to the creditors by Mr. Rebgun only in his revised notice of 28 June 2006, and made available for review between 14 and 19 July.

1086. On 17 July 2006, the Moscow Arbitrazh Court admitted into the bankruptcy proceedings four claims by YNG (now Rosneft's subsidiary) based on the sale of oil produced by YNG and sold to Yukos' trading companies in 2004.  The Court decided that Yukos, not the trading companies, was liable to pay for the purchased oil.  Thus, YNG's registered claims (Rosneft's) were USD 4.42 billion (including penalties) or 22.16 percent of the claims admitted into the bankruptcy proceedings at the time.[1352]

---

[1348] *Judge sets speed-reading record…*, Reuters, 16 June 2006, Exh. C-809; Claimants' Summary Chart of Registered Creditors' claims, Exh. C-594 (hereinafter "Summary Chart of Creditors").

[1349] Ruling of the Moscow Arbitrazh Court, 27 June 2006, Exh. C-315.

[1350] Notice of the First Yukos Creditors' Meeting to be held on 20 July 2006, 28 June 2006, Exh. C-316.

[1351] Memorial ¶ 453.

[1352] Resolutions of the Ninth Arbitrazh Court of Appeal, 31 August 2006 and 7 September 2006, Exh. C-339 and Exh. C-340.  On 20 July 2006, a further 29 claims were admitted on behalf of YNG (by now Rosneft's subsidiary). Summary Chart of Creditors, Exh. C-594; Claimants' Skeleton ¶ 52; Memorial ¶¶ 435–36; Reply ¶ 399.

1087. In accordance with Mr. Rebgun's revised notice of 28 June 2006, the first meeting of Yukos' creditors was held on 20 July 2006.  Creditors were offered two alternative scenarios:  (1) the Rehabilitation Plan proposed by Yukos' management; and (2) the Analysis of Yukos' Financial Situation proposed by Mr. Rebgun.  At the request of Federal Taxation Service, the meeting was adjourned to 25 July 2006 to allow Mr. Rebgun to complete his Analysis with a separate exhibit analyzing the possibility of Yukos' breakeven activities.[1353]

1088. Mr. Rebgun's Analysis did not contemplate the restoration of Yukos' financial situation.  Instead, Mr. Rebgun concluded that Yukos' remaining assets, totalling approximately USD 17.75 billion after a deduction of a 24 percent profit tax, were not sufficient to cover the USD 18.3 billion of registered bankruptcy claims.  On this basis, Mr. Rebgun recommended that Yukos be declared bankrupt and that receivership proceedings against Yukos be initiated.[1354]

1089. On 25 July 2006, when the creditors' meeting that had been adjourned resumed, the creditors voted against the Rehabilitation Plan and recommended that Yukos be declared bankrupt.  Twenty-four creditors were admitted as voting participants to the creditors' meeting.  The Tribunal notes that Respondent, through the Federal Taxation Service, and indirectly through Rosneft (which had acquired the Western Banks' claim under the A Loan) and YNG (now Rosneft's subsidiary), had 93.87% of the votes.[1355]

1090. On 4 August 2006, Yukos was declared bankrupt by the Moscow Arbitrazh Court and placed under receivership, which was to be completed within one year.[1356]

(c)     The Liquidation of Yukos' Remaining Assets

1091. On 9 October 2006, the Moscow Arbitrazh Court admitted further claims by YNG into the bankruptcy proceedings.  These claims, worth USD 5.5 billion, were for alleged "lost profits"

---

[1353]  Analysis of Yukos' Financial Situation, 2006, Exh. C-317; Summary Analysis of the Debtor's Financial Situation submitted by Mr. Rebgun to the U.S. Bankruptcy Court for the Southern District of New York in the Chapter 15 Case as Exhibit B to his Status Report of 7 August 2006, Exh. C-318; Summary Chart of Creditors, Exh. C-594; Memorial ¶¶ 458–61; Counter-Memorial ¶¶ 620–32.

[1354]  Summary Analysis of the Debtor's Financial Situation submitted by Mr. Rebgun to the U.S. Bankruptcy Court for the Southern District of New York in the Chapter 15 Case as Exhibit B to his Status Report of 7 August 2006, pp. 7–8, Exh. C-318.

[1355]  Protocol of the First Meeting of Yukos' Creditors held on 20 July 2006, 25 July 2006, Exh. C-319; Memorial ¶ 464.

[1356]  Decision of the Moscow Arbitrazh Court, 1 August 2006, Exh. C-324.

during 2000 to 2003. Thus, from July to October 2006, the Russian courts admitted over USD 9.9 billion of claims by YNG into Yukos' bankruptcy.[1357]

1092. YNG was fully consolidated into Rosneft as of 1 October 2006.[1358] As a result of this consolidation, on 9 November 2006, the Moscow Arbitrazh Court ordered that YNG be replaced by Rosneft as a bankruptcy creditor, thereby attributing to Rosneft all of the claims registered to that time in the name of YNG. Eventually, adding a few minor claims, Rosneft held USD 10.69 billion or 37.17% of all registered bankruptcy claims.[1359]

1093. Under Russian bankruptcy law, Mr. Rebgun needed to select an appraiser in connection with the liquidation of Yukos' assets. On 23 October 2006, Mr. Rebgun selected a consortium of five appraisers headed by ZAO ROSECO ("**ROSECO**").[1360]

1094. On 15 January 2007, ROSECO issued an appraisal report on Yukos' assets, including the preliminary results of an appraisal of its subsidiaries and dependent companies.[1361] There is some uncertainty, however, over what exactly the appraisers determined in respect of the value of Yukos' remaining assets.

1095. On 19 January 2007, Mr. Rebgun reportedly declared that his appraisers had valued Yukos' assets at USD 22 billion.[1362] It was also reported that Mr. Rebgun later revised his valuation of Yukos' assets to USD 25.6 and 26.8 billion and indicated that "the liquidation discount during the sale would not exceed 30 percent."[1363] Another article reported that the consortium of appraisers had valued Yukos' remaining assets at USD 33 billion.[1364]

1096. Between March and August 2007, 17 bankruptcy auctions took place. The Tribunal observes that Respondent held (directly or through Rosneft) 97.67 percent of all claims against Yukos

---

[1357] Ruling of the Moscow Arbitrazh Court, 9 October 2006, Exh. C-343; Claimants' Skeleton ¶ 52.

[1358] Rosneft 2007 U.S. GAAP Consolidated Financial Statements, p. 8, Exh. C-377; Memorial ¶ 437.

[1359] Ruling of the Moscow Arbitrazh Court, 9 November 2006, Exh. C-344 and Summary Chart of Creditors, Exh. C-594; Memorial ¶ 438.

[1360] Receiver's Report on His Activities and the Results of the Receivership for the Period from 4 August 2006 through 1 November 2007, 1 November 2007, p. 3, Exh. C-361 (hereinafter "Receiver's Report").

[1361] Ruling of the Moscow Arbitrazh Court, 12 November 2007, p. 7, Exh. C-362.

[1362] *Yukos assets valued at $22 bln – bankruptcy receiver spokesman*, RIA Novosti, 19 January 2007, Exh. C-828; Claimant's Post-Hearing Brief ¶ 129.

[1363] *21 Yukos Assets Bundled for Auction*, The Moscow Times, 5 March 2007, Exh. C-831.

[1364] *Appraisers say Yukos worth over $33 bln*, RIA Novosti, 22 January 2007, Exh. C-829; Claimant's Post-Hearing Brief ¶ 129; Memorial ¶ 469.

and received (directly or through Rosneft) approximately 99.71 percent of the bankruptcy proceeds.[1365]  The most important assets were auctioned off as follows:[1366]

- Lot 1 (27 March 2007): remainder of Yukos' stake (9.44 percent) in YNG sold to Rosneft, acting through its indirect subsidiary OOO RN-Razvitiye, for USD 7.59 billion;

- Lot 2 (4 April 2007): 20 percent minus 1 share in Gazpromneft (ex-Sibneft), Urengoil and Arctic Gas sold to OOO EniNeftegaz (the Russian subsidiary of Italian companies Eni (60 percent) and Enel (40 percent)) for USD 5.83 billion; transferred to Gazprom in 2009; immediately announced that EniNeftegaz would cede control of the assets to Gazprom under option agreements signed prior to the auction.

- Lot 5 (18 April 2007):  Manoil sold to Rosneft.

- Lot 10  (3 May  2007): Tomskneft, Achinsk, Angarsk, East Siberian and Strezhevskoy sold to Rosneft (via Neft-Aktiv) for $6.82 billion.

- Lot 11  (10 May  2007): Samaraneftegaz, Syzran, Novokuybyshevsk and Kuybyshev sold to Rosneft for USD 6.4 billion.

1097. Between August and October 2007, the Federal Taxation Service successfully applied for "late" claims, consisting chiefly of claims for 24 percent profit taxes on the proceeds arising from the bankruptcy auctions.[1367]  These claims amounted to USD 8.82 billion.[1368]

1098. On 31 October 2007, upon liquidation, Yukos still had some USD 9 billion in unsatisfied liabilities.  One third of these were tax claims.[1369]

---

[1365]   Receiver's Report, pp. 30–43, Exh. C-361.

[1366]   Claimants' Rebuttal Slides, p. 32.

[1367]   Memorial ¶¶ 490–91; Counter-Memorial ¶¶ 665–69; Reply ¶¶ 418–20; Rejoinder ¶¶ 1182–83.

[1368]   Respondent explains at Counter-Memorial ¶ 665 n.1100:

   Pursuant to Art. 142(4) of the Russian Bankruptcy Law, any claim submitted after closure of the register of claims (in the case of Yukos, on Oct. 12, 2006), as well as any claim for mandatory payments arising after the commencement of receivership (irrespective of when it was filed against the debtor), is validly filed as a "late" claim and recorded on a separate list. "Late" claims are satisfied after full satisfaction of timely claims included in the register of bankruptcy claims.  *See* Art. 142(4) of the 2002 Russian Bankruptcy Law [Exh. R-776]."

1099. On 15 November 2007, the Moscow Arbitrazh Court formally endorsed all of Mr. Rebgun's activities as receiver, closed Yukos' receivership, and ordered that Yukos be struck off the register of legal entities.[1370]   Yukos was struck off the register of companies and its shares were legally extinguished on 21 November 2007.[1371]

### 3.  Parties' Arguments and Tribunal's Observations

1100. In broad terms, Claimants allege that the Russian Federation decided to "push Yukos into bankruptcy in order to redistribute its remaining assets."   In their Memorial, Claimants set out what they characterized as Russia's orchestrated plan to bankrupt and liquidate Yukos:

> The Russian Federation ensured, through the initiation of bankruptcy proceedings at the behest of Rosneft and using the cover of a consortium of Western banks (1), and through the biased and discriminatory conduct of the proceedings by its courts, that the Russian State and Rosneft would hold over 97% of the alleged claims against Yukos in the bankruptcy (2).   Having also made certain that Yukos' rehabilitation plan would be rejected (3), the Russian Federation completed its expropriation scheme by auctioning the Company's remaining assets.   As a result of the bankruptcy and liquidation of Yukos, the Russian State received directly more than 60.5% of the bankruptcy proceeds and, through Rosneft, more than 39.21% of the bankruptcy proceeds and all of Yukos' main production assets (4).[1372]

1101. Respondent rejects this suggestion, and argues instead that it was Yukos' management that forced the company into bankruptcy:

> [T]he bankruptcy and ultimately the liquidation of Yukos was not the aim or the result of a massive, global plot orchestrated by the Russian Government, but rather the inevitable consequence of the consistent and repeated lawless and reckless misconduct of the Oligarchs and the Yukos management they installed to conduct their—including Claimants'—investment.[1373]

1102. According to Respondent, "Claimants have failed to establish their primary contentions regarding Yukos' bankruptcy proceedings:  that the bankruptcy was instigated 'by the Russian Federation through State-owned Rosneft,' that 'the only logic behind the decision to liquidate

---

[1369]   Yukos Liquidation Balance Sheets, 31 October 2007, Exh. R-753 and Analysis of Financial Condition of Yukos Oil Company OJSC Conclusions and Actions (undated), p. 36, R-748.

[1370]   Ruling of the Moscow Arbitrazh Court, 12 November 2007, Exh. C-362.

[1371]   Certificate Recording an Entry in the Unified Register of Legal Entities, 21 November 2007, Exh. C-363.

[1372]   Memorial ¶ 412.

[1373]   Counter-Memorial ¶ 540.

Yukos was to expropriate the company,' and that the proceedings were conducted improperly so that the Russian Federation could 'take its assets.'[1374]

1103. The Parties' arguments are related to and can be organized under the following two headings: (a) why was the bankruptcy initiated and who was truly behind it?  And (b) were the bankruptcy proceedings conducted properly and fairly?

1104. The Parties' arguments and the Tribunal's observations on each of these are presented below.

### (a)  Why was the Bankruptcy Initiated and Who was Truly Behind It?

1105. It is not contested that the non-payment of the A Loan was an important factor leading to the bankruptcy of Yukos, since it was the creditor under the A Loan, the Western Banks, who initiated the bankruptcy (consistent with terms agreed with Rosneft in the Confidential Sale Agreement).  There is disagreement, however, over the following two issues related to the non-payment of the A Loan:

    i)  Who was responsible for the non-payment of the A Loan – was Yukos prevented from paying by Respondent's conduct, or did Yukos have some control over the matter?

    ii)  Was the Confidential Sale Agreement a reasonable commercial arrangement between the Western Banks, as creditor, and Rosneft, as parent of YNG, the guarantor of the A Loan, or was it imposed on the Western Banks as part of Respondent's deliberate plan (executed through or with the assistance of Rosneft) to expropriate the remaining assets of Yukos?

1106. Each of these issues is analyzed in the respective subsections below, followed by the Tribunal's observations on why the bankruptcy was initiated and who was truly behind it.

### (i)  Non-Payment of the A Loan

1107. The Parties present opposing views on the reasons for which the A Loan had not been paid off by Yukos by the end of 2005.

---

[1374]  Respondent's Post-Hearing Brief ¶ 122 (internal footnotes omitted).

1108. Respondent argues that the Western Banks were not paid simply because "Yukos adamantly refused to pay."[1375]   In other words, according to Respondent, "Yukos' dilatory and obstructionist treatment of its commercial creditors paralleled closely its treatment of its tax creditors."[1376]   Respondent advances four arguments, as summarized at paragraphs 125 to 129 of its Post-Hearing Brief.

1109. Firstly, starting in January 2004, Yukos refused the syndicate's requests for full prepayment of the loan and denied the syndicate's requests to subordinate the B Loan to the A Loan. Secondly, Yukos "re-routed" its exports and chose to leave the banks with an unsecured non-performing loan.  Thirdly, Yukos failed to satisfy the English Judgment even though it had the available resources to pay it, frustrating collection efforts in the United States and in the Netherlands.  Fourthly, Yukos engaged in "bad-faith negotiations" with the syndicate, which eventually led the syndicate to contact Rosneft and come to an agreement with it.

1110. Claimants generally argue that "Yukos worked closely with [the syndicate] to ensure payment of the debt" but that "at each step, the Russian Federation's actions impeded the Company's efforts."[1377]   Claimants submit that "[h]ad the A Lenders not received an offer from Rosneft in the interim, they too would have been paid out of the proceeds of the sale of the Dutch assets, along with Moravel."[1378]

1111. Each of Respondent's specific arguments in relation to the non-payment of the A Loan is addressed in the respective subsections below.

(a)   *Yukos' Refusal to Fully Prepay the A Loan or to Subordinate the B Loan*

1112. Respondent argues that "[t]rouble arose almost immediately after the A Loan was funded."[1379]   It claims that the syndicate "first raised the possibility of Yukos' bankruptcy" in early 2004.[1380]

---

[1375]   Respondent's Post-Hearing Brief ¶ 124.

[1376]   Rejoinder ¶ 1052.

[1377]   Claimants' Post-Hearing Brief ¶ 117 (footnote omitted).

[1378]   Claimants' Post-Hearing Brief ¶119.  The debt of Moravel Investment Limited (hereinafter "Moravel") was paid in 2008 through the proceeds from the sale of Yukos' stake in the Lithuanian oil company Mazeikiu Nafta.  Reply ¶ 391; Transcript, Day 20 at 229 (Claimant's rebuttal):  "Indeed, Moravel would eventually be paid out from the proceeds of the sale of Mazeikiu Nafta, and pursuant to a court order, and the banks would have similarly been paid out from the proceeds of the sale of that asset had they not in the meantime received an offer that was difficult to refuse."

[1379]   Rejoinder ¶ 1057.

[1380]   *Ibid.*

In January 2004, the following options were discussed: full prepayment of the A Loan; partial acceleration of the A Loan; additional security; and subordination of the B Loan to the A Loan.[1381]   Respondent, relying on a news article, claims that the syndicate was "especially concerned" with the so-called "giga-dividend."[1382]

1113. After the syndicate served notice on Yukos of a potential event of default in April 2004,[1383] Respondent asserts that Yukos "compelled" its production subsidiaries YNG, Samaraneftegaz, and Tomskneft to provide guarantees[1384] and agreed to make pre-payments.[1385]   Respondent notes that Yukos insisted that the A Loan and the B Loan be treated *pari passu*.[1386]

1114. Respondent emphasizes that if Yukos had subordinated the B Loan, the syndicate would have been paid in full.[1387]   In response to Claimants' argument that the loans were *pari passu*,[1388] Respondent underlines that the B Loan "was nothing more and nothing less than a shareholder loan."[1389]   Therefore, according to Respondent, there is nothing that prevented Yukos (or Claimants) from agreeing to subordination.[1390]

1115. While Claimants defend the 2003 interim "giga dividend," and assert that they never favored the B Loan over the A Loan (treating the two loans *pari passu*),[1391] they do not address Respondent's argument that the B Loan was a shareholder loan and that they could have agreed to subordinate it to the A Loan.

---

[1381]   *Ibid.* ¶ 1057; Société Générale Meeting Agenda, Paris, 22 January 2004, Exh. R-3823.

[1382]   Rejoinder ¶ 1057.

[1383]   Letter from Société Générale to Yukos Oil Company re: US$ 1.6 billion Loan Agreement dated 30 September 2003 with "Yukos Oil Company," 30 April 2004, Exh. R-3827.

[1384]   Rejoinder ¶ 1058; Financial and Performance Guarantee between Yuganskneftegaz and Société Générale S.A., 24 May 2004, Exh. R-581; Financial and Performance Guarantee between Yuganskneftegaz and Société Générale S.A., 25 May 2004, Exh. R-582.

[1385]   Rejoinder ¶ 1058; Yukos Oil Company Notice of Prepayment, 25 May 2004, Exh. R-3832; Yukos Oil Company Notice of Prepayment, 22 June 2004, Exh. R-3833.

[1386]   Rejoinder ¶ 1058.

[1387]   Counter-Memorial ¶ 557; Transcript, Day 19 at 60–63 (Respondent's closing).

[1388]   Transcript, Day 20 at 227–28 (Claimants' rebuttal).

[1389]   Rejoinder ¶ 1056; Transcript, Day 19 at 60 (Respondent's closing):   "Although Yukos nominally borrowed $1.6 billion from SocGen, it was fully collateralised in cash by Group Menatep. SocGen drew on the collateral before making the loan through an intermediary bank. And as a result, ultimately GML's rights in the loan were assigned to Moravel, which was its wholly owned subsidiary. So there is no doubt that this was a shareholder loan from the outset, not a commercial loan."

[1390]   Transcript, Day 21 at 157 (Respondent's rebuttal).

[1391]   Reply ¶¶ 384–85; Transcript, Day 20 at 227–28 (Claimants' rebuttal).

*(b)      The Export Contracts as Security for the A Loan*

1116. On 2 July 2004, the syndicate declared an Event of Default, following the bailiff's cash freeze orders.[1392]  Respondent explains that, as Yukos claimed that it was unable to pay the relevant amounts, the syndicate did not call the loan "but instead relied on the default as the basis to access funds under the export trade guarantees."[1393]

1117. The syndicate received payment through this security mechanism[1394] until the end of 2004 and recovered around half of Yukos' USD 1 billion obligation.[1395]  Respondent notes that on 27 December 2004, following the sale of YNG, Yukos notified the syndicate that it would cease payment under the A Loan.[1396]  Respondent asserts that Yukos "continued to export oil produced by its other oil production subsidiaries Samaraneftegaz and Tomskneft" but that it "simply manipulated the export stream so that the oil was not exported pursuant to the specific export agreements used to secure the A Loan."[1397]

1118. At the Hearing, Mr. Theede asserted that there was "no cash from exported oil to be used to pay the banks" because of a sweep by the tax authorities.[1398]  Respondent responds that this is "simply false,"[1399] and seeks to demonstrate that none of the funds under the export guarantee came from Yukos accounts, whether in Russia or elsewhere.[1400]

1119. Claimants argue that "with the sham auction of [YNG] in December 2004, [YNG] stopped shipping oil under the export contracts" and that therefore it was Respondent who "obstructed payment of the A Loan."[1401]

---

[1392]  Rejoinder ¶ 1059; Letter From Société Générale S.A. To Yukos Oil Company, re: Event of Default, 2 July 2004, Exh. R-3835.

[1393]  Rejoinder ¶ 1060.

[1394]  Respondent provides a detailed explanation of this mechanism at note 1771 of its Rejoinder.

[1395]  Rejoinder ¶ 1062.

[1396]  Rejoinder ¶ 1063.

[1397]  *Ibid.*; Transcript, Day 19 at 63-66 (Respondent's closing).

[1398]  Transcript, Day 10 at 103-04 (cross-examination of Mr. Theede).

[1399]  Respondent's Post-Hearing Brief ¶ 127.

[1400]  *Ibid.*, referring to Banks' Petition to Declare Yukos Bankrupt Filed with the Moscow Arbitrazh Court, 6 March 2006, Exh. R-3885.

[1401]  Claimants' Post-Hearing Brief ¶ 118; *see* Transcript, Day 20 at 228 (Claimants' rebuttal).

*(c)*    *The English Judgment and the Syndicate's Unsuccessful Collection Efforts*

1120. Respondent asserts that, as a result of Yukos' re-routing of its export streams, the syndicate was left with "what had become, effectively, an unsecured loan."[1402]   The syndicate therefore reduced its claim to judgment, obtaining the English Judgment in June 2005.[1403]

1121. Respondent faults Yukos for seeking to frustrate the syndicate's efforts to collect on the English Judgment, in the United States, the Netherlands, and Russia.[1404]   Respondent puts particular emphasis on the Dutch Stichtings.[1405]   Respondent argues that Yukos must be faulted for its use of the Stichtings to put its foreign assets out of reach of not just Rosneft or the tax authorities, but also of the Western Banks.   Respondent contends that that the creation of the Stichtings "constitutes a blatant violation of Russian bankruptcy and criminal law."[1406]   Respondent also submitted with its Rejoinder an expert report by Professor Dr. Albert Jan van den Berg (the "**Van den Berg Report**"), arguing that the creation of the Stichtings was illegal under Dutch law.[1407]

1122. Professor Van den Berg concludes that the creation of the Stichtings was:

> illegal, as it goes against the Dutch law principle, discussed in length above, that does not permit a company, or its directors, to transfer its assets for the purpose of making it more difficult for a creditor to satisfy its claims against the company and its assets, or for the new ultimate parent company to exercise control, even when the company reacts to what it believes to be illegitimate acts.
>
> In this connection, the establishment of the Stichting-structure (including the issuance of depositary receipts) as a protective device was not valid either, as it qualifies as a permanent protective device and, in any event, was established to make it more difficult for creditors to collect on debts.[1408]

---

[1402]   Rejoinder ¶ 1064.

[1403]   Rejoinder ¶¶ 1073–75; English Judgment, Exh. R-455.

[1404]   Respondent's Post-Hearing Brief ¶ 127; Rejoinder ¶¶ 1076–92.

[1405]   Rejoinder ¶ 1076; Transcript, Day 19 at 66–67 (Respondent's closing); Transcript, Day 21 at 165 (Respondent's rebuttal).

[1406]   Counter-Memorial ¶¶ 537–38; *Criminal Code of the Russian Federation No. 63-FZ*, 13 June 1996, Article 195, Exh. R-720.

[1407]   Rejoinder ¶ 86; Van den Berg Report.

[1408]   Van den Berg Report ¶¶ 94–95.

1123. Claimants chose not to cross-examine Professor Van den Berg at the Hearing;[1409] his conclusions stand unrebutted.

1124. In response to Respondent's claim that the Stichtings were created to frustrate the syndicate's collection efforts, Claimants state that Respondent "misrepresents the purpose" of the Stichtings.[1410]   Claimants argue that the Stichtings "sought to protect certain [assets] from further attack by the Respondent and in the best interests of the Yukos group, its management, employees, shareholders and legitimate creditors."[1411]   At the Hearing, Mr. Theede asserted that the Stichtings were created to remove certain assets from the reach of Respondent:[1412]

> after [the YNG auction] happened, it became very obvious that we were not going to be able to do anything to protect our Russian assets; they were going to take them away from us, one way or another.   And of course it was going to be through taxes: that was the decided approach.
>
> But we were presented with a way to add some additional security to our international assets.[1413]

1125. Claimants emphasize "the big picture":  Yukos was facing tax claims in Russia and its assets were frozen.[1414]   Claimants assert that Yukos repatriated almost all of the cash it had offshore.[1415]   Claimants contend that Yukos was actively trying to sell the Dutch assets to satisfy the English Judgment, and that, had the syndicate not accepted an offer it could not refuse from Rosneft in the meanwhile, the proceeds of the sale of Mazeikiu Nafta would have been applied to the English Judgment.[1416]   Claimants claim that Respondent was actively preventing Yukos from successfully selling the Dutch assets.[1417]

---

[1409]   Letter from Claimants to the Arbitral Tribunal, 20 September 2012 (confirming Claimants' decision not to cross-examine Professor Van den Berg at the hearing).

[1410]   Reply ¶ 389.

[1411]   Reply ¶ 390.

[1412]   Transcript, Day 10 at 106–10 (cross-examination of Mr. Theede).

[1413]   Transcript, Day 10 at 108 (cross-examination of Mr. Theede).

[1414]   Transcript, Day 17 at 125–26 (Claimants' closing).

[1415]   Transcript, Day 17 at 120–24 (Claimants' closing, excerpting relevant portions of Mr. Theede's and Mr. Misamore's testimonies).

[1416]   Transcript, Day 10 at 117–18 (cross-examination of Mr. Theede); Transcript, Day 20 at 228–29 (Claimants' rebuttal); Claimants' Post-Hearing Brief ¶¶ 119, 124.

[1417]   Transcript, Day 10 at 105–106 (cross-examination of Mr. Theede).

1126. Respondent criticizes Claimant's assertion that Yukos was unable to satisfy the English Judgment because of the asset freeze.[1418]  Respondent emphasizes that counsel for Yukos in the English proceedings stated that the

> evidence would show that Yukos had assets outside Russia free from the Russian court's freezing order which could have been, and which still could be, exploited to raise money with which to make payments under the Loan Agreement as they became due.[1419]

1127. Respondent also notes that Mr. Misamore conceded at the Hearing that when Stichting 2 was formed in September 2005, it held approximately USD 500 million in cash, more than enough to satisfy the debt to the syndicate.[1420]

1128. In response to Claimants' argument that Yukos was trying to sell the Dutch assets to satisfy the judgment,[1421] Respondent claims that the proceeds were used to pay bonuses and to pay Moravel.[1422]

*(d)    Yukos' Negotiations with the Syndicate*

1129. Respondent submits that Yukos engaged in bad faith negotiations with the syndicate.[1423]  It notes that Yukos offered the syndicate a "poisoned chalice": seats on the board of a stichting in lieu of actual payment.[1424]  Respondent claims that once Yukos had successfully obstructed collection efforts in the Netherlands, it withdrew its settlement offer to the syndicate.[1425]

1130. Claimants assert that, had the syndicate not been paid by Rosneft, it would have eventually been paid by Yukos.[1426]

1131. Claimants also rely on an undated letter sent by Mr. Theede to the bailiff, probably between 10 and 14 March 2006.[1427]  In that letter, Mr. Theede asserts that Yukos finds itself in a

---

[1418]   Respondent's Post-Hearing Brief ¶ 129.

[1419]   English Judgment ¶ 15, Exh. R-455.

[1420]   Respondent's Post-Hearing Brief ¶ 127; Transcript, Day 9 at 223–24 (cross-examination of Mr. Misamore).

[1421]   Transcript, Day 20 at 228–29 (Claimants' rebuttal); Transcript, Day 10 at 112 (cross-examination of Mr. Theede).

[1422]   Transcript, Day 19 at 45–46 (Respondent's closing).

[1423]   Respondent's Post-Hearing Brief ¶ 128.

[1424]   Rejoinder ¶¶ 1081, 1083.

[1425]   Rejoinder ¶ 1083; Respondent's Post-Hearing Brief ¶ 128.

[1426]   Claimants' Post-Hearing Brief ¶ 119.

"straightjacket" and asks the bailiff to lift the freeze to enable Yukos to pay the syndicate.[1428] Respondent criticizes Claimants' reliance on this letter noting that the letter was sent *after* the bankruptcy petition was filed.[1429]

        **(ii)**    **The Confidential Sale Agreement Between the Western Banks and Rosneft**

1132. Claimants argue that, while it was the Western Banks that formally initiated the bankruptcy of Yukos, it was the Russian Federation, acting through Rosneft, that orchestrated the commencement of the bankruptcy. In particular, Claimants place great emphasis on the Confidential Sale Agreement that was entered into between the Western Banks and Rosneft on 13 December 2005. Pursuant to that Agreement, Rosneft agreed to satisfy the outstanding debt owed by Yukos to the Western Banks (over USD 455 million plus interest) in exchange for the Western Banks agreeing to take the steps described in Schedule 8 of the Confidential Sale Agreement, entitled "Application for Bankruptcy."

1133. Claimants assert that each of Rosneft, on the one hand, and the Western Banks, on the other, fulfilled their respective roles under the Confidential Sale Agreement meticulously. Thus, on 6 March 2006, having completed the other steps contemplated under the Confidential Sale Agreement, the Western Banks filed a petition with the Moscow Arbitrazh Court to declare Yukos bankrupt.[1430] On 14 March 2006, the Moscow Arbitrazh Court formally substituted Rosneft in the place of the Western Banks for the purposes of the bankruptcy proceedings.[1431]

1134. Respondent explains that the Confidential Sale Agreement was concluded between Rosneft and the Western Banks because of the "convergence of their commercial interests":

> The SocGen syndicate simultaneously also sought payment of the same debt from Rosneft pursuant to the 2004 loan guarantee that Yukos had foisted on YNG, which Rosneft then owned. Although Rosneft disputed the validity of the guarantee, Rosneft required forbearance from the same banks on covenant breaches arising from the YNG acquisition, and Rosneft needed the bank's cooperation for its planned IPO. The convergence of the syndicate's and Rosneft's commercial interests resulted in their agreeing that Rosneft

---

[1427] Letter from Mr. Theede to Mr. Savostov (undated), Exh. C-1180; Transcript, Day 20 at 230–33 (Claimants' rebuttal); Theede WS ¶ 29.

[1428] Letter from Mr. Theede to Mr. Savostov (undated), Exh. C-1180.

[1429] Transcript, Day 21 at 159 (Respondent's rebuttal); Respondent's Post-Hearing Brief ¶ 128 (the letter is "typical of Yukos' consistent strategy of doing too little, too late, and then blaming others.")

[1430] Banks' Petition to Declare Yukos Bankrupt Filed with the Moscow Arbitrazh Court, 6 March 2006, Exh. C-303.

[1431] Ruling of the Moscow Arbitrazh Court, 28 March 2006, Exh. C-307.

would pay the syndicate in full, but only after the syndicate had pursued all legal avenues to obtain payment from Yukos, the primary obligor.  If Rosneft instead paid, the syndicate's rights under the A Loan agreement were to be assigned to Rosneft.[1432]

1135. Respondent disagrees with Claimants that the confidentiality clause in the Confidential Sale Agreement evidences a "conspiracy on the part of the SocGen syndicate to act secretly on behalf of Rosneft, which Claimants improperly equate with Respondent."  Instead, Respondent contends that the confidentiality clause was a standard commercial term "necessary to preserve the possibility that Yukos would pay the SocGen syndicate before Rosneft became unconditionally obligated to do so, and remained in effect only for so long as Yukos' payment would have discharged Rosneft's own obligations to pay the syndicate."[1433]

1136. Respondent argues that the syndicate "ha[d] been nothing if not patient during this whole process"[1434] and that, in its frustrated effort to satisfy the English Judgment, the syndicate in last resort turned to Rosneft for payment under the YNG guarantee.[1435]  After "a little bit of a dance going on between them," the syndicate and Rosneft concluded a mutually advantageous deal.[1436]

1137. Respondent asserts that the syndicate originally pressed Rosneft for payment under the YNG guarantee[1437] but eventually came to a commercially sound arrangement with it.[1438]  Respondent claims that these propositions stand unrebutted.[1439]

1138. Claimants contend that Yukos "work[ed] closely" with the syndicate until the syndicate received from Rosneft an offer it could not refuse.[1440]  In the words of Mr. Theede, "banks being banks, that was an easy, low-risk way out of this for them, and so that's what happened and that's what they did."[1441]  Having said this, Claimants note that "there is no commercial

---

[1432]  Respondent's Skeleton ¶ 58.

[1433]  Respondent's Skeleton ¶ 59.

[1434]  Respondent's Post-Hearing Brief ¶ 129, quoting *Creditors Petition Russian Court to Declare Yukos Bankrupt*, World Markets Research Centre, 13 March 2006, Exh. R-3882.

[1435]  Respondent's Post-Hearing Brief ¶ 129; Counter-Memorial ¶¶ 577–80; Rejoinder ¶¶ 1065–71; Transcript, Day 19 at 69–72 (Respondent's closing).

[1436]  Transcript, Day 19 at 69–72 (Respondent's closing); *see* Confidential Sale Agreement, Exh. C-300.

[1437]  Counter-Memorial ¶¶ 577–80; Rejoinder ¶¶ 1065–71.

[1438]  Post-Hearing Brief ¶ 129; Counter-Memorial ¶¶ 575–83; Rejoinder ¶¶ 1086–88.

[1439]  Post-Hearing Brief ¶ 129; Transcript, Day 10 at 113–14 (cross-examination of Mr. Theede).

[1440]  Claimants' Post-Hearing Brief ¶ 119; Transcript, Day 20 at 228–29 (Claimants' rebuttal).

[1441]  Transcript, Day 10 at 113 (cross-examination of Mr. Theede).

rationale for why Rosneft would insist upon the <u>further and highly unusual</u> step that the A Lenders initiate bankruptcy proceedings against Yukos, save for the sake of appearances."[1442]

1139. The Parties also disagree when it comes to the significance of the separate and parallel bankruptcy petition filed by YNG (then a subsidiary of Rosneft) on 24 March 2006.  According to Respondent, the YNG petition "alone disposes of Claimants' contention that the bankruptcy filing by the SocGen syndicate had been orchestrated by the Russian Federation so as to allow Rosneft not to 'appear as the instigator of Yukos' bankruptcy.'"[1443]

1140. According to Claimants, Rosneft had decided to "hedge its bets" by filing a separate bankruptcy petition through YNG in the event the court would reject the petition filed by the banks.[1444]  Claimants further contend that having the syndicate file its petition prior to YNG was "evidently important to Rosneft and the Kremlin's public relations efforts."[1445]  Finally, Claimants argue that the YNG petition refutes Respondent's argument that Yukos itself caused the bankruptcy by failing to pay the syndicate:  "Respondent offers no explanation as to how the Claimants suffered additional damages because it was the Société Générale syndicate who initiated the bankruptcy rather than Rosneft."[1446]

### (iii)    Tribunal's Observations

1141. Having considered the extensive record and the maze of documents as well as the Parties' arguments, the Tribunal concludes that while it is undisputed that the Western Banks formally initiated the bankruptcy proceedings, and that Yukos is partly to blame for giving the Banks the incentive to enter into the Confidential Sale Agreement with Rosneft, the role of Rosneft and of Respondent in creating the conditions for Yukos' bankruptcy cannot be ignored.

1142. Turning firstly to the fault that Yukos bears in this matter, the Tribunal largely accepts Respondent's arguments that Yukos could have paid the A Loan in full prior to the end of 2005, whether by subordinating the B Loan to the A Loan, allowing the export contracts to continue to operate as security for the Western Banks, or indeed using assets that were placed into the

---

[1442] Claimants' Post-Hearing Brief ¶ 121 (underlining in original).

[1443] Counter-Memorial ¶ 572 (quoting Memorial ¶ 427); *see* Rejoinder ¶ 1090.

[1444] Memorial ¶ 427; *Yuganskneftegaz demands Yukos' bankruptcy over $1 million debt*, Vedomosti, 3 April 2006, Exh. C-795.

[1445] Claimant's Post-Hearing Brief ¶ 300.

[1446] *Ibid.*

Stichtings.  It can therefore be said that Yukos is not without fault in connection with the initiation of the bankruptcy, since it contributed to creating conditions that gave the Western Banks every incentive to enter into the Confidential Sale Agreement with Rosneft, and it was pursuant to that Confidential Sale Agreement that the Banks initiated bankruptcy proceedings against Yukos in exchange for payment from Rosneft under the A Loan.  As Mr. Theede testified, banks being banks, the solution presented by the Confidential Sale Agreement was "an easy, low-risk way out of this for them."[1447]

1143. However, to focus only on these narrow reasons for non-payment of the A Loan, and on the commercial considerations that drove the Western Banks to enter into the Confidential Sale Agreement, is to miss the bigger picture.  The Tribunal observes that Yukos was current in its payments to the Western Banks until December 2004, when YNG was auctioned to Rosneft. Had YNG not been seized, therefore, it is reasonable to assume that Yukos would not have had problems repaying the A Loan.  By the same token, given the circumstances under which YNG was seized (discussed in Chapter VIII.F of this Award), it stands to reason that Yukos felt justified in forcing Respondent, through Rosneft, to pay the Western Banks under the YNG guarantee, rather than paying the debt itself.

1144. The Tribunal therefore cannot accept Respondent's argument that because Yukos, even after the seizure of YNG, *could have* paid the Western Banks under the A Loan but did not do so, there is no link to be made between Rosneft (and, indeed, Respondent) and the bankruptcy. The big picture established by the record, including in respect of the tax assessments and the auction of YNG, suggests otherwise.

1145. The Tribunal's conclusion is also supported by two particular facts more closely related to the enforcement of the A Loan in Russia.

1146. Firstly, the Tribunal notes that the Western Banks entered into the Confidential Sale Agreement with Rosneft very soon after the Federal Arbitrazh Court for the Moscow District reversed an earlier decision that had authorized the enforcement of the English Judgment, and that the same Court ultimately allowed the Western Banks to proceed with its enforcement after it had entered into the Confidential Sale Agreement.  This suggests to the Tribunal, at best, a very happy coincidence as between the decision of the Court and the interests served by the terms presented to the Western Banks in the Confidential Sale Agreement.  It is also consistent with

---

[1447]   Transcript, Day 10 at 113 (cross-examination of Mr. Theede).

Claimants' argument that the decisions of the Court and the conduct of Rosneft were being coordinated as part of a deliberate strategy to drive Yukos into bankruptcy.

1147. Secondly, if Rosneft itself (or the State, as its owner) were not interested in orchestrating the initiation of the bankruptcy proceedings against Yukos, why was the requirement to initiate bankruptcy included in the Confidential Sale Agreement?  In other words, while the Tribunal can accept both that the Western Banks had a commercial interest in getting paid by Rosneft (especially after the 5 December 2005 decision of the Federal Arbitrazh Court that reversed the enforcement of the English Judgment) and that Rosneft had a commercial interest in having the Western Banks' claim against Yukos assigned to it in exchange for such payment, the Tribunal does not see any evident commercial rationale for the inclusion in the Confidential Sale Agreement of the requirement that the Banks initiate bankruptcy in order to be paid.

1148. It thus appears to the Tribunal that the Western Banks, since Yukos was not reimbursing the loan, were actively "encouraged" to enter into the Confidential Sale Agreement in order to accomplish their objective of being paid.  While, as the Tribunal said earlier, Yukos must shoulder some of the blame for not paying the Western Banks and thereby increasing its exposure to the risk that it could be petitioned into bankrupcy, it appears undeniable to the Tribunal that initiating bankruptcy was not a goal of  the Western Banks, but rather the objective of Rosneft, in the interests of its owner, the Russian Federation.  The Tribunal concludes that in the end the bankruptcy was initiated by the Russian Federation.  The separate and parallel bankruptcy petition filed by Rosneft-controlled YNG on 24 March 2006 reinforces this conclusion.

1149. The Tribunal, in light of the evidence reviewed above, finds the following passage from Claimants' Post-Hearing Brief compelling and adopts it as its own:

> The only rational explanation for the highly unusual manner in which the bankruptcy proceedings against Yukos were initiated was to act as a cover for the Russian Federation's involvement, allowing the Russian government to keep its word—in the context of ongoing legal proceedings, including these arbitrations—that it was not interested in the bankruptcy of Yukos (and thus maintaining the appearance that it was commercial parties—not the State—that sought Yukos' bankruptcy), while achieving its desired end.[1448]

---

[1448]   Claimants' Post-Hearing Brief ¶ 123.

### (b)   Were the Bankruptcy Proceedings Conducted Properly and Fairly?

1150. Claimants paint the bankruptcy as "the final act of the destruction" of Yukos.[1449]   Claimants argue that Respondent (or entities whose conduct is attributable to Respondent)[1450] not only initiated the bankruptcy, but also (i) ensured that it monopolized the bankruptcy process by discriminatory rejection and allowance of bankruptcy claims;[1451] (ii) ensured the rejection of Yukos' proposed Rehabilitation Plan;[1452] and (iii) confiscated the residual assets of Yukos through sham auctions and Yukos' eventual liquidation.[1453]

1151. Claimants claim that Respondent monopolized the bankruptcy and, directly or indirectly, obtained 97.67 percent of all bankruptcy claims, obtained approximately 93.87 percent of the votes in the creditors' meeting, claimed USD 6 billion in profit tax on the auction proceedings, acquired over 95 percent of Yukos' remaining assets in the bankruptcy, and received as creditor approximately 99.71 percent of the bankruptcy proceeds.[1454]

### (i)   The Courts' Treatment of Bankruptcy Claims

1152. Claimants argue that the Russian courts never had the interests of Yukos or its rehabilitation in mind when conducting the bankruptcy proceedings.   Firstly, the Russian courts ensured that the Russian State would become Yukos' main creditor in the bankruptcy proceedings by postponing the date of the first meeting of Yukos' creditors to give the State "more time to prove new tax claims" against Yukos.[1455]   These tax claims comprised Yukos' outstanding alleged tax liabilities for the years 2000 to 2003.   As noted above, at the hearing of the Moscow Arbitrazh Court on 14 June 2006, the bankruptcy judge ruled in favour of the Federal Taxation Service, setting "a new speed reading record" after taking just 15 minutes to consider 127,000 pages of information submitted by Russian tax officials.[1456]   As a result of that judgment, the

---

[1449]   Memorial ¶ 411.

[1450]   For the Tribunal's discussion of attribution, see Chapter X.A of this Award.

[1451]   *Ibid*. ¶¶ 431–51.

[1452]   *Ibid*. ¶ 452–67.

[1453]   *Ibid*. ¶¶ 468–94.

[1454]   Claimants' Post-Hearing Brief ¶¶ 126–33.

[1455]   *Yukos creditors' meeting delayed by Moscow court*, Reuters, 8 June 2006, Exh. C-808.

[1456]   *Judge sets speed-reading record…*, Reuters, 16 June 2006, Exh. C-809.

Federal Taxation Service became Yukos' single largest creditor with registered claims amounting to approximately USD 13.06 billion.[1457]

1153. Secondly, Claimants contend that the Russian courts ensured that State-controlled Rosneft—of which the Russian State has been the majority shareholder since the company's privatization in the nineties—would become Yukos' second largest creditor in the bankruptcy.   On 17 July 2006, the Moscow Arbitrazh Court admitted into the bankruptcy proceedings four claims by YNG, which by that that time had already become a subsidiary of Rosneft:

> The claims were based on the sale of oil produced by Yuganskneftegaz and sold to Yukos' trading companies in 2004:   the Court decided that Yukos, and not the trading companies—notwithstanding that those companies were Yuganskneftegaz's counterparties under the relevant oil sale contracts—was liable to pay for the oil sold.[1458]

1154. Thirdly, in Claimants' view, the Russian courts ensured that creditor claims belonging to Yukos-related entities or to Yukos' shareholders would not be recognized in the bankruptcy proceedings.   For example, in its Memorial on the Merits, Claimants explain the Russian courts' treatment of Moravel Investment Limited, a GML affiliate:

> This was the case, for example, for the claim filed by Moravel Investment Limited ("Moravel"), a GML affiliate, on the basis of an LCIA award of September 16, 2005, rendered by an arbitral tribunal comprised of Peter Leaver QC, Jonathan Hirst QC and J. William Rowley QC, Chairman.   The award ordered Yukos to pay to Moravel US$ 655,725,238.60 in principal plus corresponding interest, which was outstanding under the B Loan Agreement concluded between Yukos and Société Générale in September 2003 for the purposes of Yukos' merger with Sibneft.   This loan was identical, in all material aspects, to the A Loan which had been assigned to Rosneft by the Western Banks headed by Société Générale and on the basis of which Rosneft had been admitted into the bankruptcy proceedings.   However, unlike Rosneft's claim, for which the Russian courts had recognized the English Judgment rendered in favor of the Western banks (later assigned to Rosneft), the courts refused the enforcement of the awards in favor of Moravel.[1459]

1155. Russian courts accorded similar treatment to the remaining Yukos affiliates with outstanding claims against Yukos, such as Yukos Capital SARL, Glendale Group Limited, OOO Yu-Mordovia, OOO Yukos Vostok Trade, ZAO Yukos-M, OOO Siberian Internet Company, OOO Trading House Yukos-M, ZAO Krasnoyarskgeofizika, ZAO Lipetsknefteprodukt, and

---

[1457]   Resolution of the Ninth Arbitrazh Court of Appeal, 11 August 2006, Exh. C-336; Decision of the Moscow Arbitrazh Court, 2 October 2006, Exh. C-201; Register of Yukos Creditors' Claims, 30 October 2007, Exh. C-353; Summary Chart of Creditors, Exh. C-594.

[1458]   Memorial ¶ 435.

[1459]   Memorial ¶ 441 (internal footnotes omitted).

OOO Alta-Trade. As Claimants contend, "the common ground for denying the claims of these companies was the alleged lack of evidence of the existence of the claims."[1460]

### (ii)    The Rejection of Yukos' Rehabilitation Plan

1156. On 1 June 2006, Yukos' general shareholders' meeting approved Yukos' Financial Rehabilitation Plan and appointed Mr. Osborne as the shareholders' representative in the bankruptcy proceedings.[1461] Claimants point out that according to Yukos' Rehabilitation Plan, Yukos was in a position to pay off its alleged liabilities fully within two years.[1462] Mr. Rebgun, the appointed administrator, was required to circulate Yukos' Rehabilitation Plan to all Yukos' registered creditors. According to Claimants, Mr. Rebgun did not do so, although Respondent alleges that Mr. Rebgun made the Rehabilitation Plan available for the creditors' review before the creditors' meeting.

1157. Mr. Rebgun's own proposal to the creditors was to sell all Yukos' assets to satisfy the creditors' claims and then liquidate the company. At the creditors' meeting of 25 July 2006, at which the Federal Taxation Service and Rosneft held 93.87 percent of votes, Yukos' Rehabilitation Plan was rejected, and the creditors decided to liquidate Yukos, "which had the added bonus of creating an additional claim for the tax authorities of 24% profit tax on the auction proceeds, a claim on which it would collect US$ 6 billion."[1463]

1158. In their Post-Hearing Brief, Claimants further contend that:

> During the hearing, the Respondent made a limited number of unfounded attacks on Yukos' Financial Rehabilitation Plan. For example, the Respondent alleged that Yukos' Financial Rehabilitation Plan was "highly speculative" as the "cash pool" was to be funded from "uncertain revenues" including US$ 18 billion from "litigation claims." However, as even the most cursory review of the Plan reveals, "litigation claims" were not ascribed a value in determining the aggregate value of Yukos' assets available to pay claims and were merely intended to supplement the "cash pool", if and when anything was received.[1464]

1159. Yukos' creditors gathered for their first meeting on 20 July 2006. Yukos' management proposed a Rehabilitation Plan[1465] and Mr. Rebgun proposed its Analysis of Yukos' Financial

---

[1460]    Memorial ¶ 448.

[1461]    Minutes of Extraordinary General Meeting of Yukos' Shareholders held on 1 June 2006, Exh. C-311.

[1462]    Claimants' Skeleton ¶ 55.

[1463]    Claimants' Post-Hearing Brief ¶ 127.

[1464]    *Ibid.* ¶ 128.

[1465]    Rehabilitation Plan, Exh. C-312.

Situation.[1466]   After the meeting was adjourned and resumed on 25 July 2006, the Federal Taxation Service, representing together with Rosneft 93.87 percent of the votes, voted against the Rehabilitation Plan and in favor of the liquidation of Yukos.[1467]

1160.   Claimants argue that the decision to liquidate was "preposterou[s], even from an economic standpoint"[1468] and that "[t]he absurdity of Yukos' fate was only the flip side of the coin of the Russian Federation's and Rosneft's fortune."[1469]   Claimants allege that there was an "obvious conflict of interest" in the vote as the sales of Yukos' assets were subject to a 24 percent profit tax, "which meant that liquidation would bring an enormous windfall to the Federal Taxation Service".[1470]

1161.   Respondent denies all allegations of impropriety in relation to Mr. Rebgun's conduct of the creditors' meeting and the rejection of Yukos' Rehabilitation Plan:

> All registered creditors and the representatives of the debtor had an opportunity to review the Rehabilitation Plan and the analysis of Yukos' financial situation (along with relevant enclosures) prepared by Mr. Rebgun at his offices during the week preceding the meeting (and for five full days, from July 20, 2006 until July 25, 2006).[1471]

1162.   Respondent contends that the Rehabilitation Plan was rejected because it was flawed and overly optimistic:

> Yukos' management, actively supported by the Claimants, had the opportunity to present a rehabilitation claim to the meeting of creditors.   The rough outline management submitted was, however, legally defective and did not provide any basis for creditors to prefer rehabilitation to liquidation.   It was not properly presented to or approved by Yukos shareholders, did not meet the legal requirements that the company's tax claims be satisfied within six months, and did not ensure full, let alone timely, payment of Yukos' creditors' claims.[1472]

1163.   Respondent argues that the Rehabilitation Plan was "a blatant and untenable attempt on the part of the Oligarchs to secure their own interests over those of the creditors" and that "the

---

[1466]   Analysis of Yukos' Financial Situation 2006, Exh. C-317; see Summary Analysis of the Debtor's Financial Situation submitted by Mr. Rebgun to the U.S. Bankruptcy Court for the Southern District of New York in the Chapter 15 Proceeding as Exhibit B to his Status Report of 7 August 2006, Exh. C-318.

[1467]   Protocol of the First Meeting of Yukos' Creditors held on 20–25 July 2006, Exh. C-319.

[1468]   Memorial ¶ 466.

[1469]   Memorial ¶ 467.

[1470]   Reply ¶ 418.

[1471]   Counter-Memorial ¶ 607.

[1472]   Respondent's Skeleton ¶ 62; see also Respondent's Post-Hearing Brief ¶ 123.

creditors' decision to reject the plan was reasonable and taken in accordance with Russian law, which vests full discretion with the creditors, consistently with international practice."[1473]

1164. Respondent underlines that in Russia, "the vote for the liquidation or rehabilitation of the debtor is within the full discretion of the creditors."[1474]

1165. On the question of the late claims, Respondent does not contest that the Federal Taxation Service claimed USD 8.82 billion in profit taxes out of the proceeds of the bankruptcy and eventually received USD 6.02 billion; it submits however, that "[t]hese are standard 'late' claims that arise in connection with any sale generating profits, including in the context of rehabilitation proceedings"[1475] and that there is therefore nothing improper about them.

### (iii)   The Declaration of Yukos' Bankruptcy

1166. On 1 August 2006, the Moscow Arbitrazh Court stated that it had "established that the debtor showed the signs of bankruptcy as defined in Article 3 of the Federal Law 'On Insolvency (Bankruptcy)'" and that Yukos had "not fulfilled its monetary obligations towards its creditors for three months from the time when these obligations should have been fulfilled," without making any reference to the difference between Yukos' liabilities and its assets.[1476]

1167. The Claimants assert that on 1 August 2006, when Yukos was declared bankrupt, "Yukos' assets exceeded its alleged liabilities, and . . . the Company was clearly solvent."[1477]   The Claimants further suggest that "there was nothing inevitable about the bankruptcy of Yukos" and that "Yukos could have avoided bankruptcy if allowed to pay off its fabricated tax debts."[1478]   To support this claim, Claimants refer to the Rehabilitation Plan proposed by Yukos' management, which proposed "to leave intact Yukos' 'core assets' as a viable ongoing company, while addressing and paying in full all valid creditors' claims."[1479]

---

[1473]   Counter-Memorial ¶ 611.

[1474]   Counter-Memorial ¶ 632.  This is consistent with international practice, *see* Counter-Memorial ¶ 1501.

[1475]   Rejoinder ¶ 1182.

[1476]   Decision of the Moscow Arbitrazh Court, 1 August 2006, Exh. C-324.

[1477]   Memorial ¶ 822.

[1478]   Memorial ¶ 825.

[1479]   Claimants' Post-Hearing Brief ¶128; *see also* Rehabilitation Plan, Exh. C-312.

1168. By contrast, Respondent points out that the insolvency test applicable to the initiation of bankruptcy proceedings against Yukos was an "illiquidity test," based on the debtor's inability to discharge a certain debt "within three months of its due date."[1480]  According to Respondent, this "illiquidity test" was satisfied when the Western Banks filed a petition for Yukos' bankruptcy.[1481]  Further, the question of whether the bankruptcy proceedings will result in the adoption of a financial rehabilitation plan and the company's survival or in the company's liquidation depends on whether the financial rehabilitation plan provides for the discharge of all the creditors' claims within certain applicable time limits.[1482]  Respondent points out that the debt repayment schedule in the Rehabilitation Plan did not do so.[1483]

1169. Respondent denies all allegations of impropriety or bias relating to the way the Russian courts conducted the bankruptcy proceedings:

> As confirmed by the Moscow Arbitrazh Court, the syndicate's petition satisfied the insolvency test under Russian bankruptcy law applicable at the time, which was based on the debtor's inability to discharge a debt exceeding US\$ 3,500 within three months of its due date.
>
> Nothing in Russian law in this regard concerning the initiation of bankruptcy proceedings is at odds with international practice.  In a number of other jurisdictions, the so-called "illiquidity test: (*i.e.*, the debtor's inability to pay its debts as they become due) is sufficient to initiate bankruptcy proceedings.[1484]

1170. In any event, Respondent claims that Yukos' liabilities did exceed its assets, a position Respondent seeks to support by stressing that, after the sale of Yukos' assets, liabilities of Yukos in an amount of USD 9.2 billion remained unsatisfied.[1485]

### (iv)   The Liquidation of Yukos' Remaining Assets

1171. According to Claimants, the last stage in the "confiscation of Yukos"[1486] was the bankruptcy auctions of Yukos' remaining assets.[1487]

---

[1480]   Counter-Memorial ¶¶ 584, 1491; Article 3(2) of the Russian *Federal Law on Insolvency (Bankruptcy)*, Exh. R-776.

[1481]   Counter-Memorial ¶ 1491.

[1482]   Article 84(3) of the Russian Federal Law on Insolvency (Bankruptcy), Exh. R-776; Protocol of the First Meeting of Yukos' Creditors held on 20–25 July 2006, p. 11, Exh. C-319; Summary Analysis of the Debtor's Financial Situation submitted by Mr. Rebgun to the U.S. Bankruptcy Court for the Southern District of New York in the Chapter 15 Proceeding as Exhibit B to his Status Report of 7 August 200, p. 86, Exh. C-318.

[1483]   Counter-Memorial ¶ 623.

[1484]   Counter-Memorial ¶ 584–85; *see also* Respondent's Post-Hearing Brief ¶¶ 130–34.

[1485]   Counter-Memorial ¶ 669; Rejoinder ¶ 1161, Respondent's Post-Hearing Brief ¶ 134; Respondent's Opening Slides, p. 452.

1172. Claimants' argument regarding the auctions does not point to specific acts. While Claimants fault Rosneft for the initiation of the bankruptcy, the courts for the discriminatory rejection and allowance of claims, the Federal Taxation Service and Rosneft for the rejection of the Rehabilitation Plan, they fault "the Russian Federation" for the auctions.[1488] Claimants state "[t]he results of the auctions speak for themselves."[1489] Claimants argue that the small number of bidders, the speed of the auctions, the below-market-value resulting prices, and the overall benefits to Respondent leave no doubt about Respondent's "monopolization" of the auctions.[1490]

1173. Claimants note that Respondent as creditor in the bankruptcy was involved in the auctions in four ways. Firstly, it approved the procedure for the auctions[1491] and Mr. Rebgun's allotment of Yukos' assets into twenty lots.[1492] Secondly, it selected the Russian Federal Property Fund to organize and conduct the auctions.[1493] Thirdly, it set the starting price for the auctioned assets.[1494] Fourthly, it "actively communicated with [Mr. Rebgun] on other issues as well."[1495]

1174. Respondent underlines that this involvement was in accordance with Russian law and emphasizes that Respondent as creditor in the bankruptcy did not have the power to control the identity of the bidders, and that in each instance the starting price for the auctioned assets was at least equal to the appraised market value.[1496]

1175. Claimants assert that "[a]s creditor, the Russian Federation received, either directly or through Rosneft, approximately 99.71% of the bankruptcy proceeds."[1497] This occurred through

---

[1486] Memorial ¶ 468.

[1487] Memorial ¶¶ 468–94.

[1488] Reply ¶ 438.

[1489] Reply ¶¶ 421, 432.

[1490] Reply ¶ 425.

[1491] Counter-Memorial ¶ 633; Finalization Order, Exh. R-752; *see also* Receiver's Report, pp. 28–29, Exh. R-751.

[1492] Memorial ¶ 470.

[1493] Memorial ¶ 470; *see also* Ruling of the Moscow Arbitrazh Court, 12 November 2007, p. 8, Exh. C-362.

[1494] Reply ¶ 425.

[1495] Reply ¶ 425, citing Ruling of the Moscow Arbitrazh Court, 12 November 2007, pp. 8–9, 21, Exh. C-362.

[1496] Rejoinder ¶ 1162; Counter-Memorial ¶¶ 633–38; *see also* Procedure for the Conduct of Public Auctions in Respect of the Assets of OAO NK Yukos during the Receivership Proceedings, Clauses 2.1–2.3, 20 February 2007, Exh. R-3943 and Minutes No. 5 of the Meeting of the Creditors' Committee of OAO NK Yukos, 21 February 2007, Exh. R-3944; Russian Bankruptcy Law 2002, Articles 110(5) and 111(3), Exh. R-3892.

[1497] Claimants' Post-Hearing Brief ¶ 132.

"Rosneft [having] won 11 out of the 17 bankruptcy auctions, including acquiring Samaraneftegaz (Lot No. 11) and Tomskeneft (Lot No. 10)."[1498]

1176. In their Skeleton Argument, Claimants summarize the eleven auctions that completed the bankruptcy proceedings as follows:

> Yukos' remaining assets were transferred to the Russian State at well below their fair market value through a series of 17 auctions held between March 2006 and August 2007. Rosneft thereby directly or indirectly acquired Yukos' key remaining assets, including Samaraneftegaz (Lot No. 11) and Tomskneft (Lot No. 10), which were sold at a gross discount of approximately 37% and 33%, respectively, of their fair market value. For its part, Gazprom acquired through Eni/Enel the 20% minus 1 share stake in Sibneft that the Russian Federation had persistently refused to let Yukos sell to pay off alleged tax debts. As with the sham auction of Yuganskneftegaz, there was no genuine competition in the bankruptcy auctions and, in many instances, including those for Samaraneftegaz and Tomskneft, the only participants were Rosneft and a previously unknown entity whose sole role was to satisfy the formal requirement that there be a minimum of 2 bidders.
>
> Finally, when, by the end of July 2007, it became clear that despite the low auction prices, the bankruptcy might still generate some surplus, further claims were admitted in the bankruptcy proceedings on behalf of the Russian State, through the Federal Taxation Service and Rosneft. This ensured the completeness of Yukos' destruction and the transfer of its value and assets to the Russian State. Thus, the Russian Federation received, either directly or through State-owned Rosneft or Gazprom, approximately 99.71% of the bankruptcy proceeds and over 95% of Yukos' remaining assets, including all of Yukos' main production assets.
>
> On November 12, 2007, the Moscow Arbitrazh Court formally endorsed all the activities of Yukos' receiver Mr. Rebgun, closed the Company's receivership and ordered that Yukos be struck off the register of legal entities. The latter happened on November 21, 2007.[1499]

1177. Respondent contends that Yukos' bankruptcy auctions were held in full compliance with Russian law, and that Mr. Rebgun had secured appraisals for the fair value of the assets:

> Once Yukos' liquidation was properly approved, the company's assets were sold at auction in accordance with Russian law and international practice. Yukos' receiver obtained appraisals for the fair value of the assets, and used those appraisals to set minimum bids in the auctions, all of which were exceeded, some by very large margins. The auctions were open to domestic and foreign bidders, adequately noticed and advertised, and competitive. To the extent that any bidders may have been discouraged from participating, this was again the result of Claimants and Yukos having threatened potential bidders with legal action. While the aggregate results exceeded Yukos' own (and other) contemporaneous fair market value estimates, more than US$ 9 billion in creditor claims nonetheless remained unsatisfied.[1500]

---

[1498]  Claimants' Post-Hearing Brief ¶ 131.

[1499]  Claimants' Skeleton ¶¶ 58–60 (internal footnotes omitted).

[1500]  Respondent's Skeleton ¶ 63; *see also* Respondent's Post-Hearing Brief ¶¶ 133–34.

### (v)    Tribunal's Observations

1178. The Tribunal notes Respondent's insistence that all aspects of the bankruptcy were conducted in accordance with Russian bankruptcy law.  However, the Tribunal's inquiry is not limited to a mere review of the formalities of the bankruptcy.  It must address and review all the substantial features of the proceedings.

1179. Thus, the Tribunal views as improper and unfair that, for example:

- All claims filed by Rosneft and the Federal Taxation Service, valued in the billions, were peremptorily accepted by the Court, while the many claims filed by Yukos' affiliated companies were rejected by the Court in a very summary way; and

- Yukos was saddled with a claim of some USD 6 billion that related only to the profit tax to be collected by the Federal Taxation Service as a result of the liquidation of Yukos' assets in the bankruptcy.[1501]

- The Tribunal is also troubled by the fact that Rosneft's acquisition of YNG (discussed in Chapter VIII.F of this Award) generated a claim of almost USD 10 billion against Yukos in the bankruptcy, including a claim based on the attribution to Yukos of debts owed to YNG by Yukos' trading companies.  Since the Tribunal has already found that Rosneft's acquisition of YNG was, to say the least, questionable, in its view, this claim is equally questionable.

1180. In light of the above conclusions, the Tribunal cannot accept that it was in any sense proper or fair for the creditors' committee to reject the Rehabilitation Plan, for the court to declare Yukos bankrupt, or for Yukos to have been deprived of all of its remaining assets through a hasty and questionable liquidation process.  On the contrary, it is evident to the Tribunal that the totality of the bankruptcy proceedings reviewed in this chapter were not part of a process for the collection of taxes but rather, as submitted by Claimants, indeed the "final act of the destruction of the Company by the Russian Federation and the expropriation of its assets for the sole benefit of the Russian State and State-owned companies Rosneft and Gazprom."

---

[1501]   The Tribunal notes that this claim or liability was considered in determining whether Yukos should be liquidated or rehabilitated, and indeed declared bankrupt, and the Federal Taxation Service itself—which stood to benefit from that claim—had a majority vote at the creditors' meeting.

1181. The Tribunal notes that its conclusions are consistent with those of the *RosInvestCo* tribunal and the *Quasar* tribunal.

1182. With respect to the bankruptcy proceedings, the *RosInvestCo* tribunal concluded as follows:

> Though the Tribunal did not find the bankruptcy auctions to be conducted contrary to Russian law, this does not change the general impression from the evidence on file for the Tribunal, since the application for bankruptcy by the SocGen Group was also conducted by association with the State-controlled company, Rosneft, and that they fitted into the obvious general pattern and obvious intention of the totality of the scheme to deprive Yukos of its assets.[1502]

1183. The *Quasar* tribunal concluded:

> 141.   The Tribunal has carefully considered each of the Respondent's defences, but is ultimately unpersuaded by them.  The issue here is not one of the legality of the bankruptcy proceedings, nor their conformity with Russian bankruptcy regulations.  Rather, it is whether the steps that were taken can properly and fairly be characterised as part of an ordinary process of collecting taxes.  In the Tribunal's view, they cannot fairly be so characterised, particularly when viewed against the broader chronology of which they form part (as summarised later in this section).  This conclusion is not overcome by the Respondent's various technical analyses of the consortium agreement.
>
> . . .
>
> 157.   But the Tribunal also notes that, as a result of these auctions, "at the end of the day" . . . the Russian Federation has ended up with 93% of Yukos Oil Company." . . .
>
> 158.   As summarised below, the overall chronology of which the liquidation auctions form part, casts them and their outcome in a particular light.  After careful consideration of the entire record, the Tribunal concludes that, as with the preceding events, the liquidation auctions were part of the same overall scheme of confiscation.  In this regard, the Tribunal's findings are consistent with those of the *RosInvest* Tribunal. . . .  The ECHR's finding to the contrary—*i.e.*, that Yukos failed to prove that the Russian Federation "had misused those [enforcement] proceedings with a view to destroying the company and taking control of its assets"—must be understood as based on a heightened requirement of "incontrovertible and direct proof," given the "wide margin of appreciation" a State enjoys under Protocol No. 1 to the European Convention on Human Rights. . . .[1503]

## H.   THE WITHDRAWAL OF PWC'S AUDIT OPINIONS

### 1.   Introduction

1184. As noted earlier in this Award,[1504] Yukos' auditor, PwC, withdrew its audit reports for Yukos in June 2007.  This withdrawal was often mentioned, mostly by Respondent's counsel, during

---

[1502]   *RosInvestCo* ¶ 620, Exh. C-1049.

[1503]   *Quasar*, Exh. 3383.

[1504]   *See* paragraph 104 above.

these proceedings.  Although neither Party called as a witness anyone from PwC, the Tribunal has formed the view that it is essential for it to review PwC's role in the present Awards.

1185. PwC was Yukos' auditor from 1997 to 2004.  It also played an advisory role to Yukos, consulting on the company's domestic and international structures.  On 15 June 2007, PwC formally withdrew all its prior audit reports for Yukos for the period from 31 December 1995 until 31 December 2004, stating that "new information" had led it to conclude that such reports could no longer be relied upon as trustworthy.[1505]

1186. Claimants say that the Russian Government exerted pressure on PwC to withdraw the audits in order to bolster the legitimacy of the destruction of Yukos.  The harassment of PwC, say Claimants, took the form of searches, seizures, interrogations, criminal charges, two tax lawsuits, and the potential loss of clients and its license to do business in Russia.  Rather than risk its business and employees for the sake of a client that was "no longer a going concern," PwC chose the "only viable option," namely to cooperate with the Russian authorities by finding pretexts to withdraw its Yukos audits.[1506]

1187. In contrast, Respondent says that PwC and Yukos had had a troubled relationship for a long time, noting that PwC refused to audit the company after 2004.  During interrogations of PwC auditor Douglas Miller in May and June 2007, PwC received credible "new" information showing that Yukos' senior management had repeatedly lied to its auditors, confirming PwC's prior suspicions on four particular issues, and causing PwC to lose confidence in the content of its audit reports.  At the time, Yukos was in bankruptcy and former executives and company records were no longer accessible.  PwC thus could not conduct satisfactory inquiries to determine how the new information affected the audited financial statements.  In the circumstances, the "only viable option" for PwC was to withdraw the audits, a move endorsed and approved by Respondent's audit expert, Mr. Ellison.[1507]

1188. No witnesses from PwC were presented by the Parties.[1508]  PwC is not on trial before this Tribunal.  The Tribunal draws no conclusions in this Award on PwC's professional conduct.

---

[1505] PwC's Withdrawal Letter, Exh. C-611.

[1506] Transcript, Day 2 at 50 (Claimants' opening), quoting U.S. State Department Cable No. 07MOSCOW2159, 10 May 2007, WikiLeaks Website, Exh. C-1358.

[1507] Respondent's Opening Slides, p. 205; Respondent's Skeleton ¶¶ 45–50; Respondent's Closing Slides, pp. 188–89; Ellison Report.

[1508] For the names of specific individuals from PwC who potentially could have testified, see paragraph 251 above.

Nevertheless, the events surrounding PwC's withdrawal of the Yukos audits help to inform the Tribunal's view as to whether Yukos was the object of a series of politically-motivated attacks, or is now simply "blaming the Russian Federation for the consequences of its own misconduct."[1509]

### 2.   Chronology

1189. Absent direct testimony from PwC, the Tribunal must draw its conclusions from the testimony of Claimants' witnesses; correspondence amongst Yukos, PwC, external advisors and the Russian authorities; and the testimony of PwC personnel before other fora.  There are also contemporaneous U.S. State Department cables, which emerged via "Wikileaks" and reveal the "candid"[1510] and "unguarded"[1511] views of PwC's senior management.

### (a)   PwC Serves as Both Auditor and Consultant to Yukos

1190. From 1997, Yukos was one of PwC's major clients in Russia.  At the Hearing, Claimants' witnesses described a "perfectly normal", "cordial and close" business relationship in which PwC was a "permanent partner of Yukos and its subsidiaries for a long time."[1512]  PwC conducted Yukos' external audits and assisted with training Yukos' in-house accountants.  PwC played an "integral role"[1513] in developing Yukos' financial reporting system, and, according to Mr. Theede, "PwC's consulting arm was actually the architect of [the trading company] structures."[1514]

1191. Mr. Kosciusko-Morizet testified that "from 1997 to 2004, PwC was given access to the entire documentation of the whole of the Yukos group without restriction and had a very detailed and global view of the financial situation and the procedures of Yukos and its subsidiaries."[1515]  It was a consistent theme among Claimants' witnesses that PwC enjoyed full access to Yukos'

---

[1509]   *See* Respondent's Skeleton ¶ 22.

[1510]   Reply ¶ 507.

[1511]   Transcript, Day 3 at 41 (Respondent's opening).

[1512]   Transcript, Day 11 at 50 (cross-examination of Mr. Theede); Kosciusko-Morizet WS ¶ 15; Transcript, Day 6 at 28 (cross-examination of Mr. Rieger).

[1513]   Misamore WS ¶ 25.

[1514]   Transcript, Day 11 at 50.  *See also* the reference to PwC's consulting contract in Letter from Michael Kubena to Bruce Misamore, 15 January 2004, Exh. C-609; Rieger WS ¶¶ 15–19.

[1515]   Kosciusko-Morizet WS ¶ 17.

accounts, employees and information, "including related-party transactions, shareholders, costs [and] taxation."[1516]   PwC also maintained a permanent staff presence within Yukos and performed site visits to Yukos entities.[1517]

1192. Claimants' witnesses pointed out that PwC never voiced complaints about access to the company or any of its staff.  Mr. Kosciusko-Morizet affirmed that PwC was "perfectly able to check for themselves any documentation, ask for any documentation anywhere in the group at any level."[1518]  Mr. Misamore observed that if PwC "did not have sufficient information, they should have asked for more."[1519]  It is interesting to note that in 1998 PwC initially refused to sign the Yukos financials, as it was unable to resolve which trading companies should be consolidated as "controlled by Yukos and used for tax optimization."  However, the next year, PwC did sign, as by then it had apparently been shown information sufficient to enable it to understand the control relationships.[1520]

1193. Similarly, as detailed in the next section, PwC occasionally requested additional information about certain aspects of Yukos' activities, and was provided each time with sufficient answers to enable it to certify the financial statements according to U.S. GAAP standards.

### (b)   PwC Responds to the Massive Tax Reassessments against Yukos

1194. When Mr. Lebedev was arrested in 2003 on tax-related charges, Yukos turned to PwC.  Mr. Michael Kubena, a PwC partner, assured the specially-formed *ad hoc* Yukos Board committee chaired by Mr. Kosciusko-Morizet that Yukos had always complied with Russian law, including in the operation of its tax optimization structure, and that PwC did not believe that there was any possibility that the Russian authorities would attack Yukos on these issues.[1521]

1195. In December 2003, after Yukos received the 2000 Audit Report, Yukos again asked PwC for its

---

[1516]   *See e.g.*, Transcript, Day 6 at 28 (cross-examination of Mr. Rieger).

[1517]   Rieger WS ¶ 16.

[1518]   Transcript, Day 4 at 29.  Mr. Kosciusko-Morizet added that PwC "had every possibility to check whatever they wanted to check.  And if they agreed on the consolidated perimeter, that was enough for us . . . . The U.S. GAAP consolidating statements were done according to the rules . . . .  The accounts were approved by an eminent firm." Transcript, Day 4 at 52.

[1519]   Transcript, Day 9 at 249.

[1520]   Russian Federation Prosecutor General's Office, Record of Interrogation of Douglas Miller, 4 May 2007, Exh. R-137.

[1521]   Kosciusko-Morizet WS ¶ 24.

comments.  In a letter dated 15 January 2004, Mr. Kubena advised that, under the relevant Russian tax legislation, Yukos was not required to discharge the tax obligations of other taxpayers, regardless of whether they were affiliated parties.[1522]

1196. PwC's advice to Yukos was to set up a Board committee with independent legal counsel to carry out an investigation.[1523]  Mr. Kosciusko-Morizet thus resurrected the special *ad hoc* Board committee and Yukos engaged the law firm Akin Gump to examine the tax reassessments. PwC explained in a letter to Yukos of 29 January 2004 that an independent investigation of the pending charges and allegations against key Yukos personnel would enable PwC to obtain an understanding of possible illegal acts for purposes of its own auditing standards.[1524] Mr. Kosciusko-Morizet said that "to understand this letter, you have to remember the events . . . if you know that the problem was political, as everybody did . . . .  The answer is you get cold feet and you start hedging, and this letter in technical language is about hedging."[1525]  PwC's persistence about the investigation led Mr. Kosciusko-Morizet to suggest at the time that PwC was "trying to evade its responsibilities."[1526]  At the Hearing, he explained what he meant by this comment:

> You're an auditor, you're in Russia, you know it's political; you get cold feet.  What do you do?  You don't want to be involved in the matter, so you find reasons to technically withdraw from the issue.  What happened here is that we made every effort to satisfy the PwC requirements.  The effort continued.  Akin Gump was hired.  A couple of memos, interviews and so on.  And in the midst of April . . . assets of Yukos . . . were frozen.  So that was that.  At that point, any realistic hope of having PwC approving the 2003 GAAP accounts disappeared, for it was practically impossible.  Even though we had satisfied all their requirements, they would not have approved the accounts because they knew—they thought, "It's a political struggle.  What about our office?"  And they were right, because two years later they got into a problem that we all know about . . . .  They know it's political; they don't want to be in the middle of the battle, they don't want to be touched. So they will keep raising arguments, technical arguments, in order not to be dragged into the fight.[1527]

1197. In April 2004, PwC decided they would no longer audit Yukos.  Mr. Doug Miller, a PwC Moscow partner, explained several years later, in an interrogation before the Prosecutor

[1522]   Letter from Michael Kubena to Bruce Misamore, 15 January 2004, Exh. C-609.  An earlier draft of this letter also concluded that Yukos should not be liable for the trading shells' taxes, but did not exclude the possibility that there would be tax consequences for Yukos if the authorities and courts re-qualified its transactions and the nature of its business.  Exh. C-1064, CP12026–27.

[1523]   Letter from Donn Kingsley to Simon Kukes, 29 January 2004, Exh. C-1064, CP11726.

[1524]   Transcript, Day 4 at 154–55.

[1525]   *Ibid.*, pp. 153–54.

[1526]   E-mail from Jacques Kosciusko-Morizet to Bruce Misamore, 16 February 2004, Exh. C-1064, CP11807.

[1527]   Transcript, Day 4 at 165–66.

General of the Russian Federation, that the results of the Yukos/Akin Gump investigation "were not final for us, they did not help us, i.e. we did not obtain the confirmation or comfort that would satisfy us as auditors.  This was one of the factors which led to our refusal to audit the company in the future."[1528]

1198. The timing of PwC's April 2004 decision to cease auditing Yukos coincides with the period when, according to Mr. Rieger, harassment of PwC at the hands of the Russian authorities commenced.  PwC employees involved in Yukos' Russian accounts were interrogated.[1529]  In the spring of 2005, Mr. Miller told Mr. Rieger that he could not even meet with Yukos employees or management anymore, which Mr. Rieger understood to be a "direct result of the permanent pressure put by the Russian authorities on PwC."[1530]

###   (c)    PwC Faces Mounting Pressure from the Russian Federation around the Same Time as Mr. Khodorkovsky's Second Trial Starts

1199. Pressure on PwC from the Russian authorities was sustained.  In March 2006, a court case was brought against PwC for tax violations relating to expatriate salaries.  There was speculation that the lawsuit was indirectly connected with investigations against Yukos.[1531]

1200. In December 2006, a second court case was filed against PwC by the Tax Inspectorate.  The Tax Inspectorate accused PwC of colluding with Yukos on tax evasion.  PwC categorically rejected the claims that the Yukos audit reports were defective in any professional, legal or regulatory way.[1532]  While PwC acknowledged that it had raised certain matters with Yukos, it insisted that these matters did not materially affect the company's financial statements or alter PwC's opinion in respect of the financial statements.[1533]

1201. In March 2007, PwC's Moscow offices were raided by 50 officers from the Prosecutor General's Office and the Interior Ministry.  Documents were seized and PwC was eventually

---

[1528] Russian Federation General Prosecutor's Office, Record of Interrogation of Douglas Miller of PwC Russia, 4 May 2007, Exh. R-137 at 17.

[1529] Rieger WS ¶ 18.

[1530] *Ibid.*

[1531] U.S. State Department Cable No. 07MOSCOW466, "Update on PWC's Russian tax issues," 2 February 2007, WikiLeaks Website, Exh. C-1352.

[1532] "Official Position of PricewaterhouseCoopers," PwC Press Release, 25 December 2006, Exh. C-826; "Official Position of PricewaterhouseCoopers Regarding the Claims of Tax Inspectorate 5," PwC Press Release, 17 January 2007, Exh. C-827.

[1533] *Ibid.*

fined.[1534]  A press report observed:

> [w]hat is clear is that the firm's association with Yukos and the fact that the oil company was paralysed and eventually bankrupted after being slapped with more than US$30 billion in back-tax claims despite financial reports approved by PwC has made the auditor a clear target for Russian tax authorities.[1535]

1202. PwC published an official statement in which it "strongly object[ed] to the seizure of such information . . . [and] strongly denie[d] any wrongdoing in either the 2002 tax case or in relation to its audits," and stated that it continued "to work to resolve both matters."[1536] Mr. Kubena told the U.S. Embassy that the treatment of PwC employees during the March 2007 raids was "shocking" and a "disgrace."[1537]  Nevertheless, he was reported as saying that he wished to limit the public profile of the case and urged restraint in discussing it until the facts were clear.  He said that, in the meantime, PwC "better not . . . raise the public profile of the case in ways that could come back to hurt the prospects for a reasonable solution."[1538]

1203. On 20 March 2007, the Moscow Arbitrazh Court found against PwC in the Yukos audit case and imposed a fine.[1539]  PwC employees, including Mr. Kubena, also faced criminal charges.[1540] Mr. Kubena expressed disappointment about the outcome to the U.S. Embassy, but again urged restraint when discussing the case in public.[1541]  PwC was anxious about the renewal of its license.  Having met with PwC representatives, the U.S. Ambassador sought reassurance from Finance Minister Kudrin, who advised the Ambassador that there was no basis for the license to be revoked.[1542]  The press still speculated, however, that PwC might risk losing the license.[1543]

---

[1534]   *Russia, With Yukos Still in Sights, Raids PwC*, Wall Street Journal, 10 March 2007, Exh. C-832.

[1535]   *PwC Offices Searched in Yukos-Related Tax Evasion Investigation in Russia*, Global Insight, 12 March 2007, Exh. C-835; U.S. State Department Cable No. 07MOSCOW1028, "GOR Agencies visit PwC Moscow Office March 9," 12 March 2007, Wikileaks Website, Exh. C-1353.

[1536]   "PricewaterhouseCoopers' Official Statement," PwC Press Release, 12 March 2007, Exh. C-834.

[1537]   U.S. State Department Cable No. 07MOSCOW1028, "GOR Agencies visit PwC Moscow Office March 9," 12 March 2007, Wikileaks Website, Exh. C-1353.

[1538]   *Ibid.*

[1539]   *PwC Puts On a Brave Face After Losing Case*, Moscow Times, 22 March 2007, Exh. C-838; *see also* PwC Press Release, 20 March 2007, Exh. C-836.

[1540]   Letter from the Russian Federation Prosecutor General's Office to Michael Kubena, 26 June 2007 and Resolution On Denial to Initiate Prosecution against ZAO PricewaterhouseCoopers Audit, 25 June 2007, Exh. C-1243.

[1541]   U.S. State Department Cable No. 07MOSCOW1210, "Russia: PWC fined in Yukos tax audit case," 21 March 2007, Wikileaks Website, Exh. C-1354.

[1542]   U.S. State Department Cable No. 07MOSCOW1354, "Ambassador's 3/27 meeting with Finance Minister Kudrin," 28 March 2007, Wikileaks Website, Exh. C-1355.

[1543]   *Court Blasts PricewaterhouseCoopers*, Kommersant, 2 April 2007, Exh. C-845.

In fact, the license was renewed in April 2007 but PwC continued to fear that it would be revoked long after.[1544]   Press reports in April also noted that PwC had started losing clients, including State-owned companies Transneft and Sakhalin II.[1545]

1204. While these events were unfolding, in early 2007, prosecutors filed new charges against Mr. Khodorkovsky, causing PwC to start an internal review.   According to the declaration of a PwC in-house counsel in a separate forum, PwC was at that time already considering and drafting a possible withdrawal of the audits.[1546]

1205. In April 2007, the Russian tax authorities asked the Finance Ministry to initiate a "review" of PwC's auditing practices.[1547]   On 18 April 2007, PwC received a summons from prosecutors in the second Khodorkovsky trial.   The prosecutors wanted to interrogate Mr. Miller while reprimanding PwC for failing to cooperate with earlier requests.[1548]   On 19 April 2007, PwC urgently recalled Mr. Miller from his new post in London.   They informed him that PwC was now cooperating with investigators.   Mr. Miller was instructed to attend the Prosecutor General's Office, where he was interrogated on six occasions in May and June.[1549]   During these sessions he was presented with "new" evidence obtained in connection with the Khodorkovsky prosecution.[1550]   Other PwC personnel were also interrogated in the first half of 2007.   During his last interrogation session, on 4 June 2007, Mr. Miller told the prosecutor that, in his opinion, the audit opinions issued in respect of Yukos' financial statements "starting from at least 1999 should be withdrawn." [1551]

1206. The Tribunal notes that, on 14 June 2007, the Prosecutor General's Office wrote to Mr. Kubena that, in connection with criminal investigations of Messrs. Khodorkovsky and Lebedev, "the

---

[1544]   Order of the Ministry of Finance of the Russian Federation No. 348, 19 April 2007, Exh. R-885; U.S. State Department Cable No. 07MOSCOW5403, "PWC's travails in Russia worsen," 15 November 2007, Exh. C-1360.

[1545]   *PwC loses Russia's Sakhalin-2 audit contract*, Reuters, 13 April 2007, Exh. C-855; *Russia's Transneft drops PwC as auditor, picks KPMG,* Reuters, 25 April 2007, Exh. C-858.

[1546]   In the Matter of an Application of Michael Khodorkovsky and Platon Lebedev for an Order Seeking Discovery Under 28 U.S.C. § 1782, Declaration of Laurie Endsley, 31 January 2011 ¶ 9, Exh. R-881.

[1547]   U.S. State Department Cable No. 07MOSCOW3343, "Russia: PricewaterhouseCoopers Withdraws Audits of Yukos," 9 July 2007, Exh. C-1358.

[1548]   Letter from Russian Federation Prosecutor General's Office to PwC, 18 April 2007, Exh. C-1241.

[1549]   Letter from ZAO PwC Audit to Doug Miller, 23 April 2007, Exh. C-1242.

[1550]   Russian Federation Prosecutor General's Office, Records of Interrogations of Douglas Miller of PwC Russia, 4 May 2007, Exh. R-137; 8 May 2007, Exh. R-17; 10 May 2007, Exh. R-18; 4 June 2007, Exh. R-871.

[1551]   Russian Federation Prosecutor General's Office, Records of Interrogations of Douglas Miller of PwC Russia, 4 June 2007, Exh. R-871.

investigation has at its disposal data that certain persons at the present time are relying" on PwC's audit reports for Yukos.[1552]  PwC was asked to consider whether its Yukos audit reports "ought to be relied upon" and whether PwC could confirm the reliability of the financial reports for 1995–2004 in light of "information, that had earlier been inaccessible to the auditors."[1553] The Tribunal also notes that the following day PwC withdrew its Yukos audit reports.

> **(d)   PwC's "Volte-Face" in Withdrawing the Yukos Audits; Improved Treatment and Continued Pressures in the Russian Federation**

1207. On 15 June 2007, in a letter from Mr. Kubena to Yukos' receiver, Mr. Rebgun, PwC withdrew all of its audit reports for Yukos for the years 1995 to 2004 on the basis of "new information" it had received that had caused it to lose confidence in Yukos' management.[1554]  Four categories of "new" information were highlighted by PwC, concerning:

- control over Behles Petroleum S.A., Baltic Petroleum Trading Limited and South Petroleum Limited (the "**BBS Companies**");
- Yukos' control over the trading companies and consequential avoidance of profit tax;
- Yukos' purchases of Bank Menatep's liabilities; and
- compensation to certain individuals who had led Yukos at the time of its privatization.[1555]

1208. Senior PwC manager Pete Gerendasi reportedly explained to the U.S. Embassy that the "new" information had been carefully reviewed and deemed credible; that PwC's U.S. headquarters had been closely consulted; and that PwC had concluded after a thorough review that, "since Yukos was no longer a going concern, the only viable option was to withdraw its audits."[1556] The Embassy observed that Mr. Gerendasi was uncomfortable discussing the sources of the "new" information but that he was "unequivocal" that the withdrawal was "a difficult call."[1557]

---

[1552]   Letter from the Russian Federation Prosecutor General's Office to PwC, 14 June 2007, Exh. C-610.

[1553]   Letter from the Russian Federation Prosecutor General's Office to PwC, 14 June 2007, Exh. C-610; *see also* In the Matter of the Application of Michael Khodorkovsky and Platon Lebedev for an Order Seeking Discovery Under 28 U.S.C. 1782, Deposition of Douglas Miller, 18 December 2009, p. 257, Exh. R-4309 (hereinafter "Miller Deposition").

[1554]   PwC's Withdrawal Letter, Exh. C-611.

[1555]   *Ibid.*

[1556]   U.S. State Department Cable, 07MOSCOW3343, "Russia: PricewaterhouseCoopers Withdraws Audits of Yukos," 9 July 2007, Wikileaks Website ¶ 3, Exh. C-1358.

[1557]   *Ibid.* ¶ 7.

As described in the Wikileaks cable, at the time, PwC was still facing: (a) a review by the Finance Ministry of its auditing practices; (b) an appeal regarding the expatriate tax case; and (c) an appeal regarding the Yukos collusion case.[1558]  While Mr. Gerendasi noted that PwC's legal counsel "was uncertain what effect PwC's decision to withdraw its Yukos audits would have on the outcome" of the Yukos collusion case, he stated that "the withdrawal would not have an adverse effect on the Finance Ministry's review of PwC's auditing practices."[1559]

1209. PwC made a public announcement of its withdrawal decision on 24 June 2007.[1560]  The *Financial Times* reported:

> PwC's sudden about face comes after a government pressure campaign that included police raids in March on its Moscow office and an ongoing criminal investigation into alleged underpayment of taxes by Yukos.  The audit firm has also risked losing its license . . . .  The move will strengthen the Kremlin's case against Mikhail Khodorkovsky.[1561]

1210. The Tribunal notes that just one day after the public announcement, the criminal charges against Mr. Kubena and other PwC personnel were dropped.[1562]  In dropping the charges, the prosecutor noted that "the unjustified nature of the [audit opinions] . . .  was the result of misrepresentation by [Yukos'] major shareholders and the persons acting on their instructions."[1563]

1211. In July 2009, the *Financial Times* reported that the prosecutors had cleared PwC with respect to its Yukos audits, having found no wrongdoing by the firm.  PwC was "pleased . . . the general prosecutor ha[d] decided not to take any action against PwC Russia, its partners or employees."[1564]

1212. PwC has always denied that there was a tit-for-tat deal whereby the Russian authorities would drop their cases against PwC in return for PwC withdrawing its audits.  PwC told the *Financial Times* that "the audit firm's apparent reversal of fortune had nothing to do with its withdrawal

---

[1558]  *Ibid.* ¶¶ 4–6.

[1559]  *Ibid.* ¶ 6–7.

[1560]  "Withdrawal of Yukos Audit Reports," PwC Press Release, 24 June 2007, Exh. C-864.

[1561]  *PwC withdraws Yukos audits*, Financial Times, 25 June 2007, Exh. C-865.

[1562]  Letter from Russian Federation Prosecutor General's Office to PwC, 26 June 2007, enclosing Resolution on Denial to Initiate Prosecution against ZAO PriceWaterhouseCoopers Audit, 25 June 2007, Exh. C-1237.

[1563]  *Ibid.*

[1564]  *Moscow clears PwC over Yukos audits*, Financial Times, 19 July 2007, Exh. C-874.

of the audits . . . and nothing to do with any attempt to reduce the legal pressure."[1565]   A few years later, in a 2009 deposition conducted in the U.S. by Mr. Khodorkovsky's criminal lawyers, Mr. Miller categorically denied any connection between PwC's decision to withdraw its audits and the legal pressure against PwC:

> Q. Mr. Miller, how much did the—did the criminal investigation into PwC in 2007 impact PwC's decision to withdraw the audits?
>
> . . .
>
> THE WITNESS: I believe that the decision to withdraw was based firmly [on] the information that was shown to us . . . during the investigation.
>
> Q. And is it the same answer as to the tax claims filed against PwC?
>
> A. Yes.
>
> . . .
>
> Q. And did you receive any assurances from the investigators, including Mr. Karimov, that if PwC withdrew the audits, that the criminal investigation against PwC would be terminated?
>
> A. No.
>
> Q. Have you received any other assurances from the investigators as to treatment of PwC if you were—if PwC were to withdraw the audit letters?
>
> A. No.
>
> . . .
>
> Q. How about any of the investigators from the Russian authorities, did anybody ask you to develop reasons to withdraw the Yukos audits?
>
> A. No.
>
> Q. Are you aware of anyone from the . . . [Prosecutor General's Office] asking PwC to develop reasons to withdraw the audits?
>
> A. No, I'm not aware of that.[1566]

1213. At the same time, the Tribunal notes that an October 2007 Wikileaks cable reveals that Messrs. Kubena and Gerendasi of PwC conveyed to the U.S. Embassy "that the Yukos and expatriate salary tax cases against the auditor were politically motivated."[1567]   Mr. Kubena speculated that the case against PwC for colluding with Yukos might have been "an effort by the [Government of Russia] to prove ex post facto that its actions against Yukos had a legitimate basis."[1568]   Mr. Gerendasi drew a direct connection between the expatriate tax case

---

[1565]   *Ibid.*

[1566]   Miller Deposition, pp. 256–7, 264, Exh. R-4309.

[1567]   U.S. State Department Cable No. 07MOSCOW5083, "Update on PWC's Yukos, Russian tax cases," 19 October 2007 ¶ 1, Exh. C-1359.

[1568]   *Ibid.*

against PwC and the prosecution against Yukos' former management, saying that "tax and law enforcement authorities may be trying to cast PwC as reckless in an attempt to underscore that the [Government of Russia] rightly prosecuted Yukos senior management."[1569]   Following this meeting, the Ambassador commented that "PwC is under serious duress in Russia." [1570]

1214.   The following month, PwC told the Embassy it was worried that the criminal charges laid in the context of the expatriate tax case had "devolved into a pressure tactic against the firm."[1571]   As for the Yukos tax case, which was on appeal, Mr. Gerendasi noted that "[a]lthough the potential financial penalties in this case were only on the order of USD 500,000 . . . the real threat remained to the firm's auditing license."[1572]   The Ambassador noted that "Russia matters to PwC," and that "[d]espite the rather stark picture Gerendasi painted, he said that PwC remained bullish on Russia and intended to maintain its operations in-country . . . .   He added that in the interest of facilitating a resolution to the firm's short-term difficulties, PwC's international leadership would try to meet with senior [Russian governmental] officials in the near future."[1573]

1215. Mr. Miller and other PwC employees then cooperated as prosecution witnesses in the second Khodorkovsky trial.  The record discloses that they consulted with the prosecutors prior to their testimony, as demonstrated by an e-mail dated 28 March 2009 from the Prosecutor General's Office, in which the prosecutors answered questions posed by Mr. Miller as follows:

> *2. For every witness, exactly on what issues and/or arguments should they dwell in their witness testimony?*
>
> - The testimony of each witness from among your company's employees should be unified, that is testify to the same thing, in the same sense and featuring the same style (offensive and aggressive with regard to the Defense) . . .
>
> *3. Can we obtain a list of approximate expected questions by the Prosecutor for each witness?*
>
> - Carefully analyze your testimony (records of interrogations) and recall our recent conversation: you will understand the general meaning of such questions. You and I should phrase specific questions ourselves once you have personally got to the bottom of the situation.[1574]

---

[1569]   *Ibid.* ¶ 5.

[1570]   *Ibid.* ¶ 6.

[1571]   U.S. State Department Cable No. 07MOSCOW5403, "PWC's travails in Russia worsen," 15 November 2007 ¶ 4, Exh. C-1360.

[1572]   Ibid. ¶ 5.

[1573]   *Ibid.* ¶ 8.

[1574]   E-mail from Sergei Mikhailov to Doug Miller, 28 March 2009, Exh. C-1244.

1216. In December 2009, the U.S. Embassy commented on the role that PwC played in the Khodorkovsky trial and related Yukos lawsuits.  It observed as follows:

> . . . if the audits were properly withdrawn, this will be a "black mark" for the [Yukos/Khodorkovsky] defense; if not, it could help the defense, but would greatly tarnish PWC's international reputation . . . .  [The Khodorkovsky trial is] applying a superficial rule-of-law gloss to a cynical system where political enemies are eliminated with impunity . . . .  There is a widespread understanding that Khodorkovskiy violated the tacit rules of the game: if you keep out of politics, you can line your pockets as much as you desire.  Most Russians believe the Khodorkovskiy trial is politically motivated . . .[1575]

1217. Eventually the two court cases against PwC were resolved in PwC's favor and PwC's fines were refunded.[1576]  Meanwhile, Mr. Miller's evidence, and that of other cooperative PwC witnesses, was accepted and relied upon by the trial judge who found Mr. Khodorkovsky guilty at the conclusion of his second criminal trial.[1577]

### 3. Parties' Arguments and Tribunal's Observations

1218. The main question the Tribunal will address is whether PwC's withdrawal of its Yukos audits was a decision brought about by pressure from the Russian Federation, as Claimants argue, or whether PwC decided to withdraw the audit opinions out of the genuine concern that they were tainted by newly-discovered misrepresentations, as Respondent argues.  There is a third possibility as well, namely, that PwC's withdrawal of its audits was a tactical response to pressure of the Russian authorities but that nevertheless PwC did have some valid grounds to believe that Yukos had made important misrepresentations to it.

### (a) Did PwC Withdraw its Audits because it was under Pressure from the Russian Government?

1219. Claimants' witnesses were unequivocal.  In their view, PwC gave in to pressure from the Russian authorities when it withdrew the audits.  Mr. Rieger had noticed that after the attacks on Yukos began in 2003, "PwC grew much more distant from Yukos . . . .  I understood this to be the direct result of the permanent pressure put by the Russian authorities on PwC."[1578]

---

[1575]   U.S. State Department Cable No. 09MOSCOW3144, "Rule of Law Lipstick on a Political Pig: Khodorkovskiy case plods along," 30 December 2009 ¶¶ 3, 8, Exh. C-1361.

[1576]   *Tax Authorities Performed Their Duty to Yukos' Auditor*, Kommersant, 19 June 2009, Exh. R-4310.

[1577]   Verdict of the Khamovnichesky Court of Moscow in the second criminal case against Michael Khodorkovsky and Platon Lebedev, 27 December 2010, pp. 448–49, Exh. C-1057.

[1578]   Rieger WS ¶ 18.

Mr. Misamore stated at the Hearing his belief that "PwC withdrew its audit reports as a result of tremendous pressure from the Russian Government . . . ."[1579]  Mr. Kosciusko-Morizet agreed. He testified:

> Well, knowing Russia, knowing that this whole Yukos affair is basically political, with a financial dimension for some people of course, there is a complete logic here in the harassment that PwC was submitted to from December 2006; the raid on their offices, the usual methods of armed masked men with machine guns, in March; their denial again of any wrongdoing in April; and finally this letter, I would not say written but signed by Doug Miller; and then I believe that all the criminal prosecutions disappeared in a matter of days . . . . I saw this letter.  I considered that this letter was extorted from them by force.  I know and they know what happened to the Yukos personnel, Vasily Aleksanyan, . . . Svetlana Bakhmina and others; there is a long list. And they had to face a decision between, of course, protecting their business and protecting their people, especially their Russian personnel, from dire consequences and/or insisting on no wrongdoing; that is, keeping the ethical line . . . .  But PwC, as everybody else, was familiar with the kind of treatment you could expect if you resist in that context, and they made a decision—I don't blame them for that decision—protecting their staff.  It's just unethical but realistic.  And now they have a thriving business in Moscow. [1580]

1220. Respondent did not deny that the raids, seizures and lawsuits occurred, but explained they were part of regular law enforcement activities.  Respondent pointed out, for example, that many companies (including Ernst & Young) faced lawsuits about expatriation tax issues.  It argued that auditor collusion lawsuits are standard in other countries.[1581]

1221. The record before the Tribunal is abundantly clear.  PwC's treatment improved significantly once it started to cooperate with the authorities and then withdrew its audits.  Almost overnight, charges were dropped against PwC personnel.  PwC's own legal problems started to be resolved.  At the same time, some cases took longer to resolve, and concerns by PwC over loss of its license were real.  It is clear that cooperation from PwC, once given, was expected to be enduring. This is easily understood.  Mr. Khodorkovsky's second trial was still ongoing.

1222. Respondent relies heavily on Mr. Miller's deposition to contradict Claimants' account of the events.[1582]   That deposition was taken under oath in the U.S., at the request of Mr. Khodorkovsky's own lawyers, and, according to Respondent, it is "hard to imagine a

---

[1579]   Transcript, Day 9 at 182.

[1580]   Transcript, Day 4 at 203–04. For Mr. Kosciusko-Morizet's testimony at the second Khodorkovsky trial, *see also* Verdict of the Khamovnichesky Court of Moscow, 27 December 2010, pp. 468ff, Exh. C-1057.

[1581]   Rejoinder ¶ 1283.

[1582]   *Ibid*. ¶¶ 1273–74.

clearer or more credible denial of Claimants' 'harassment' theory."[1583]

1223. Although Mr. Miller was not offered as a witness, the Tribunal does not accept his denial in another forum of any link between PwC's decision to withdraw the audits and the pressure against PwC mounted by the Russian authorities.  Mr. Miller was then subjected to six sessions of interrogation.  When he was recalled from London his superiors instructed him to cooperate with the Russian authorities. The March 2009 e-mail exchange with the prosecutor's office, suggests that he was prepared to cooperate when he testified in Mr. Khodorkovsky's second trial.  Moreover, the candid views expressed by PwC officials in the U.S. Embassy's cables published by Wikileaks confirm that PwC was under pressure.  The cables demonstrate that PwC was concerned not to aggravate its difficulties with the Government ("better not raise the public profile of the case in ways that could come back to hurt the prospects for a reasonable solution");[1584] that PwC was anxious not to lose its license or its business in Russia;[1585] that it considered the Yukos cases to be politically motivated and saw some connections between the withdrawal of the audit opinions and PwC's treatment by the Russia Government;[1586] and that it felt that criminal charges in the expatriate tax case were being used as a "pressure tactic."[1587] The Embassy considered PwC to be under duress and concluded that "the political and legal concerns that are driving the heightened scrutiny of PWC's accounting practices appear to have taken on a life of their own."[1588]

### (b)    Were the Grounds Provided by PwC in its Withdrawal Letter Contrived or Credible?

1224. As noted earlier, Claimants assert that PwC played a role in establishing and auditing Yukos' domestic and international structures, and that, at all times, PwC had access to all the

---

[1583] *Ibid*. ¶¶ 1274–75.

[1584] U.S. State Department Cable No. 07MOSCOW1028, "GOR Agencies visit PwC Moscow Office March 9," 12 March 2007, Wikileaks Website, Exh. C-1353.

[1585] U.S. State Department Cable No. 07MOSCOW5403, "PwC's travails in Russia worsen," 15 November 2007 ¶ 5, Exh. C-1360.

[1586] U.S. State Department Cable No. 07MOSCOW5083, "Update on PWC's Yukos, Russian tax cases," 19 October 2007 ¶¶ 1, 5, Exh. C-1359.

[1587] U.S. State Department Cable No. 07MOSCOW5403, "PWC's travails in Russia worsen," 15 November 2007 ¶ 4, Exh. C-1360.

[1588] *Ibid*. ¶ 9.

information it required.[1589]

1225. Respondent on the other hand points to "a long and troubled relationship" between Yukos and PwC, recalling that PwC had refused to continue to audit the company's U.S. GAAP statements after 2003.[1590]  Respondent asserts that in 2007 PwC withdrew its opinions in good faith, upon learning "new information" via Mr. Miller's interrogations in May and June 2007.[1591] Respondent emphasizes "that the Tribunal is not a trier of fact as to the reliability of the information learned by PwC.  In order to rebut Claimants' unsupported harassment theory, it is sufficient that PwC had a good-faith belief in the credibility of that information. . . ."[1592] According to Respondent, it is for Claimants to prove that Yukos never lied to PwC and that PwC's four reasons for withdrawal of the audits were a mere pretext.  Although the Tribunal agrees with Respondent that it is not a trier of facts as to the soundness of this "new information," it finds it appropriate to examine those four reasons.

### i.    Did Yukos' Management Lie to PwC about the BBS Companies Being "Related"?

1226. The first category of alleged misinformation identified in PwC's Withdrawal Letter was the following:

> Whilst we were auditing the Company, its management many times declared to us that the Company and companies to which substantial volumes of crude oil and oil products were exported, namely Behles Petroleum S.A., Baltic Petroleum Trading Limited and South Petroleum Limited (hereinafter together referred to as "BBS"), were not affiliated parties. In the course of the Investigation, we were provided with information showing that BBS had been controlled by the shareholders of Group Menatep Limited (hereinafter "Group Menatep") and had been used to their advantage.  At the material time, Group Menatep held a controlling block of shares in the Company.[1593]

1227. It appears as if Yukos' management had repeatedly assured PwC that Yukos was not "related" to the BBS Companies (in the sense of sharing the same beneficial owners within the meaning

---

[1589]   At the Hearing, Mr. Misamore stated that he did not "agree that anything was misrepresented to PwC."  In his view, "PwC had access to all the information they wanted; and if they didn't have sufficient information, they should have asked for more."  Transcript, Day 9 at 249.  Mr. Theede also testified that up until the Russian Federation's attack on PwC began, "there was never any indication of any concerns or problems or anything to me."  Transcript, Day 11 at 50.  *See also* Misamore WS ¶ 29; Rieger WS ¶ 18; Kosciusko-Morizet WS ¶ 17.

[1590]   Respondent's Opening Slides, p. 205; Respondent's Post-Hearing Brief ¶ 61.

[1591]   Respondent's Post-Hearing Brief ¶ 61.

[1592]   *Ibid*.

[1593]   PwC's Withdrawal Letter, Exh. C-611.

of GAAP standards).[1594] PwC had looked at the issue itself and expressed doubts, but concluded that even if they were related, the transactions with the BBS Companies were done under fair market conditions, and were so immaterial that they could have no impact on the financial statements and thus did not need to be disclosed.[1595] Then, in 2007, while being interrogated, Mr. Miller found out "new information," in the form of the record of an interrogation of a Mr. Anilionis, who described how the BBS Companies were set up in a structure that would enable Messrs. Khodorkovsky and Lebedev to "keep [them] under control but on the surface the structure should not belong to 'Yukos.'"[1596]   A trade office was set up in Geneva, prices were coordinated with Mr. Lebedev, and Yukos' employees were responsible for oil trading activities.   The discovery of this "lie", even though relating to an immaterial matter from a financial reporting standpoint, is said to have shattered PwC's confidence in the statements of Yukos' management and thus caused PwC to withdraw its audit opinions.[1597]   Claimants say it is simply not credible for PwC to have invoked the BBS Companies issue as an excuse to withdraw its audit opinions.[1598]   They also question the reliability of the source of "new information," the interrogation of Mr. Anilionis.[1599]

1228. When Mr. Kosciusko-Morizet was shown documents indicating that PwC had raised concerns in the past about Yukos' relationship with the BBS Companies, he emphasized that PwC had approved Yukos' G.A.A.P. accounts and thus " any problem they might have had was solved."[1600]   Mr. Misamore also confirmed the view that the BBS Companies were not related parties vis-à-vis Yukos, that the issue had been on PwC's radar, and that PwC could have caused Yukos to identify the BBS Companies as related if it were essential, but did not.[1601]

1229. Mr. Misamore denied that PwC had repeatedly recommended that Yukos disclose the ownership structure of the BBS Companies and that Yukos had refused such disclosure.   He explained that PwC had conducted a study in 2002 and that it had not been able to "reach a

---

[1594]   Mr. Misamore confirmed on cross-examination that he still believed that they were unrelated. Transcript, Day 9 at 171.

[1595]   PwC Memorandum "Matters for Partner Attention – Summary of Significant Issues," 31 December 2000, item 8, Exh. C-1232; see also Record of Interview of Bruce Misamore, 9 March 2009, pp. 49–50, Exh. R-3347.

[1596]   Interrogation Protocol of G.P. Anilionis, 18 January 2007, p. 15, Exh. R-3581.

[1597]   Miller Deposition, pp. 176–77, Exh. R-4309.

[1598]   Reply ¶ 457.

[1599]   Transcript, Day 20 at 203 (Claimants' closing).

[1600]   Transcript, Day 4 at 124; see also Transcript, Day 4 at133.

[1601]   Transcript, Day 9 at 176–77.

conclusion as to whether or not [information about Yukos' relationship with the BBS Companies] should be disclosed."[1602]   Further, he noted that PwC signed Yukos' audited financial statements without that information.  Upon being shown an internal PwC document, "Matters for Partner Attention", for year 2000, wherein PwC stated that "[t]he absence of disclosure, while not desirable, does not constitute a material omission,'"[1603] Mr. Misamore said that this document too supports his view that disclosure was not so desirable as to warrant PwC insisting on its inclusion in Yukos' F-1 document.[1604]

1230. Nevertheless, the Tribunal is unconvinced by the claims that the BBS Companies, apparently the, or certainly, a, principal exporter of the oil produced by Yukos, were not controlled by or related to Yukos.  PwC's contention that it was misled in this regard may have been true.

### ii.    Did Yukos Management Lie to PwC about Yukos' Control over the Trading Companies?

1231. The second category of alleged misinformation identified in PwC's Withdrawal Letter was the following:

> Now we have information demonstrating that the management of certain Russian legal entities affiliated with the Company did not control the activities of these entities, rather these legal entities were fully controlled directly by the Company's management.  Since the management of these affiliated entities were not in control of these entities' activities, the court found that these activities were fictitious.  Consecutively, the courts found that the profit earned by these legal entities affiliated with the Company was a profit of the Company, and therefore the Company should have accrued and paid taxes on this profit.  Nevertheless, in the course of the audits, the Company's management told us that key issues of the activities of these affiliated legal entities were under supervision and control of their own management.[1605]

1232. This is an issue that was traversed at length in Chapters VIII.A and B of the present Award.

1233. Claimants argued that PwC was fully aware of the structures of the trading companies, and that in the context of the preparation of Yukos' U.S. GAAP financial statements, PwC had given specific and detailed advice to Yukos on how to demonstrate control over affiliated companies

[1602] *Ibid*. at 64.

[1603] PwC Memorandum "Matters for Partner Attention—Summary of Significant Issues," 31 December 2000, p. 6, Exh. C-1232.

[1604] Transcript, Day 9 at 178.

[1605] PwC's Withdrawal Letter, Exh. C-611.

so that they could be included within the consolidation umbrella.[1606]  Respondent accuses Claimants of conflating concepts of accounting (control relationships amongst various Yukos entities for consolidation purposes under the U.S. GAAP), which PwC *did* understand, with questions of tax (how much *actual* control Yukos exerted at an operational level over the trading shells from Moscow while maintaining the fiction of management in the low-tax region to avoid tax under Russian tax law), which PwC certainly did *not* appreciate, because it never audited the trading companies.[1607]  Respondent does not actually refer to any "new" information PwC learned which would have caused them concern about this in June 2007; it simply points to a series of negatives (PwC did *not* design the trading company scheme, PwC did *not* audit the trading companies).

1234.  At the hearing, Respondent referred to the August 2007 interrogation of Mr. Kubena's predecessor as PwC tax advisor in Russia, Mr. Klubnichkin, to show PwC never audited the trading companies.[1608]  While PwC was fully aware of Yukos' use of the tax optimization scheme, Mr. Klubnichkin said, it was *not* aware of any abusive elements.  Mr. Klubnichkin said that as Yukos' auditor, PwC had "never been aware of the fictitious nature of these 'operational' companies . . . .  The deceit lies in the fact that a corporation creates false appearance of normal activity, of a serious business, with respect to a fictitious business . . . . We could only learn about such nature of these companies in case of a full audit of these companies themselves, which would include our visits to their operational premises."[1609]  The Tribunal notes that Mr. Klubnichkin's interrogation took place in August 2007, *after* the PwC withdrawal.

1235.  Respondent submits that PwC did not know about the Lesnoy assessments.  Respondent thus disputes that PwC was ever aware that the trading companies were sham entities directly controlled by Yukos from Moscow, and disputes that Yukos' tax scheme was adopted on PwC's advice or recommendation.[1610]

1236.  Claimants' response is two-fold.  Firstly, they refer to oral and documentary evidence in the

---

[1606]  *See* Reply ¶¶ 469–70, referring to PwC Memorandum "Audit Summary Points and Matters For Partner Attention—31 December 1999 and 1998," Exh. C-1230; and for 2001, Exh. C-1233.

[1607]  Respondent's Post-Hearing Brief ¶ 64.

[1608]  Respondent's Closing Slides, pp. 205, citing Interrogation of K.M. Klubnichkin, 1 August 2007, Exh. RHB-S-72 (in English)/C-1065, RP 9988-9997 (in Russian).

[1609]  Interrogation of K.M. Klubnichkin, 1 August 2007, Exh. RHB-S-72 (in English)/C-1065, RP 9988-9997 (in Russian).

[1610]  Respondent's Post-Hearing Brief ¶¶ 65–67.

record confirming PwC's participation in the Yukos tax scheme in the regions.[1611]  They point to a contemporaneous internal memo from PwC Cyprus to PwC Moscow, which discloses that PwC was familiar with the details of the group structure and the relationships of the trading companies.[1612]  In addition, Claimants underline the closeness of Yukos' relationship with PwC as shown by PwC's attendance at an "international symposium" held by Yukos in early 2002, at which tax issues, group structure, international accounting standards and related party disclosure requirements were discussed.[1613]

1237. Finally, Claimants point to a timing problem that in their view undermines the credibility of PwC's statement that it obtained "new information" only in May 2007.  The Tribunal finds much force in Claimants' submission that PwC was on notice of the Russian Federation's alleged concerns about Yukos' tax optimization structure at least as early as January 2004, when it issued its opinion on the 2000 Audit Report.  As Yukos' auditor since 1997, PwC obviously had a strong incentive in ensuring that its previous audit reports were accurate, and if there was anything new or worrying in what it had seen, it would have raised it at the time.  PwC did not withdraw the audits in 2004, 2005, or 2006 when the issues were being aired through the Russian courts and in the public domain.  Rather it waited three and a half years, and then suddenly decided that there was "new information" on the basis of which the audits should be withdrawn.

### iii.   Did Yukos' Management Lie to PwC about Transactions with Bank Menatep?

1238. The third category of alleged misinformation identified in PwC's Withdrawal Letter was the following:

> In the course of the Investigation, we were shown documents demonstrating that the Company had made significant payments to meet liabilities of the companies effectively

---

[1611]   Claimants' Post-Hearing Brief ¶¶ 135–42, citing Transcript, Day 6 at 27 (cross-examination of Mr. Rieger); Transcript, Day 4 at 27 (cross-examination of Mr. Kosciusko-Morizet).  Mr. Misamore recalled that it was PwC's recommendation to use indirect control for purposes of consolidation.  Transcript, Day 9 at 34.  Mr. Theede recalled that PwC had been the "architect" of the domestic trading companies' structure.  Transcript, Day 11 at 50.  Mr. Kosciusko-Morizet specified that Yukos, as in the case of other Russian companies, had "made use of means of tax optimization that were provided for by Russian law" and that "these means had been recommended and put in place by PwC's experts."  Morizet WS ¶ 24.  *See also* Letter from Enrique Munoz to Michel Soublin, 13 October 2000, Exh. C-1064, CP1408.

[1612]   Transcript, Day 16 at 157, citing to Letter from Chris Santis (PwC Cyprus) to Kelly Allin (PwC Moscow), 10 April 2003, Exh. R-349.

[1613]   Claimants' Post-Hearing Brief ¶ 146, citing to Minutes of Yukos Moscow International Symposium, 29–31 January 2002, Exh. C-1064, CP4146.

owned and controlled by Group Menatep before AKB Menatep Bank. Complete information about the nature of these transactions and relations was not disclosed to us in the course of the audits.[1614]

1239. This "new information" concerned transactions going back to the late 1990s, when Yukos purchased what Respondent calls "worthless claims" against Bank Menatep, which was in bankruptcy at the time.[1615]  The principal shareholders of Bank Menatep were the same as the principal shareholders of Yukos.  PwC was concerned that the purchase of claims against a bankrupt bank was undertaken to further the interests of the companies' common shareholders, using Yukos' funds and at the expense of Yukos' minority shareholders.  By May 2000, Yukos had accumulated USD 500 million in claims against Bank Menatep, but had at most USD 220 million in guarantees.

1240. During one of the 2007 interrogations, Mr. Miller was shown minutes of a May 2000 meeting, in which Yukos' managers stated that "it would be not be desirable to disclose this information since those shares were bought out from the borrowers."[1616]  The minutes then state that "[i]t is necessary to immediately demonstrate to the Company's auditors the intention to sell the excess of the purchased assets—with a book profit—to unrelated third parties. . . ."  Although Mr. Miller could not in fact remember if he worked on this issue or if the information was disclosed to PwC, he was outraged what he described as the "unacceptable manipulation of information" revealed by the minutes and by Yukos' plan to lie to the auditors about its worthless claims against Bank Menatep.[1617]

1241. Claimants assert that PwC was always fully aware of the substance of the transactions concerning the assumption of Bank Menatep's debt, and that the transactions were accounted for in Yukos' financial statements and draft F-1 forms.[1618]

---

[1614]  PwC's Withdrawal Letter, Exh. C-611.

[1615]  White & Case, Memorandum, 25 July 2001, Exh. R-3585.

[1616]  Minutes of Meeting, 31 May 2000, Exh. C-1231.

[1617]  Reply ¶ 481, citing to Russian Federation General Prosecutor's Office, Record of Interrogation of Douglas Miller, 4 June 2007, Exh. R-871.

[1618]  Yukos U.S. GAAP Consolidated Financial Statements, 31 December 1999, Exh. C-1066; for 2000, Exh. C-27; for 2001, Exh. C-28; Draft Yukos F-1 Form and Registration Statement Under the Securities Act of 1933, 19 March 2003, Exh. C-1067.

### iv. Did Yukos' Management Lie to PwC about its Compensation Payments to Certain VPL Managers?

1242. The fourth category of alleged misinformation identified in PwC's Withdrawal Letter was the following:

> The Company failed to timely disclose to us information about certain payments made by the shareholders of Group Menatep in favor of certain individuals, who were leading executives of the Company at the time of its privatization. In the course of the Investigation, some information disclosed to us ran counter to the explanations given to us by the management and shareholders of the Company in the course of our audits with regard to the exact nature of those payments.[1619]

1243. This allegation concerned the extraordinarily generous compensation plan that had been put in place for certain persons who had been managers of Yukos at the time of its privatization. PwC suspected that the immense sums paid to those persons could not have been for services rendered to Yukos itself. Respondent alleges that Yukos had misrepresented to PwC the purpose of the compensation plan. PwC's long-held suspicion about the nature of the payments was only confirmed when the Prosecutor General showed Mr. Miller statements signed by the beneficiaries of the payments to the effect that they had been made to them "not for services provided to Yukos but were . . . connected to Group Menatep's acquisition of Yukos."[1620] Mr. Miller expressed "indignation" at the "lie" and alleged that Mr. Khodorkovsky had told him he would go to jail if forced to disclose the real reason for the payments.[1621] This category of so-called "lies" was seen as important to PwC not in terms of material effect on the audited reports, but insofar as they undermined the credibility of Yukos' management's statements.[1622]

1244. Claimants affirm that Mr. Miller had always been familiar with the payment arrangements. How the payments are identified in the accounts is only an accounting issue (as opined by Clifford Chance and Cleary Gottlieb at the time).[1623] When PwC signed off on the Yukos financial statements, they were aware of the issue. Even Mr. Miller acknowledged that the

---

[1619] PwC's Withdrawal Letter, Exh. C-611.

[1620] Counter-Memorial ¶¶ 724, 728, citing to Minutes of Audit Committee of the Yukos Board of Directors, 26 February 2003, Exh. R-3583.

[1621] Russian Federation Prosecutor General's Office, Record of Interrogation of Douglas Miller, 10 May 2007, p. 8, Exh. R-18.

[1622] Miller Deposition, pp. 176–77, Exh. R-4309.

[1623] Reply ¶ 461, citing to E-mail from Doug Miller to Bruce Misamore, 14 August 2002, attaching PwC Memorandum "Veteran Managers' Plan and Agreement: Determination of Accounting for Plan," Exh. C-1235.

"reliability of the financial statements is not affected."[1624]  Claimants were prepared to disclose the existence and purpose of the compensation fund to the public for the ADR listing.[1625]

### (c)    Concluding Observations

1245. The Tribunal observes that there are some notable timing problems concerning the date of PwC's withdrawal following the revelation of "new" information.  For example, the fact that PwC did not audit the trading shells would have been known to Mr. Miller before June 2007. PwC would have known about alleged "sham" or "abusive" elements of the Yukos tax optimization scheme at least as early as January 2004 when it was shown the 2000 Audit Report.  It is not understandable that PwC would wait until June 2007 before determining that its audits were unreliable.  Respondent itself notes that "[a] question can be raised as to whether PwC waited too long to withdraw its audit opinions."[1626]

1246. In addition, PwC said that its withdrawal letter was drafted on the basis of "new" information that Mr. Miller learned in the course of his interrogations in May 2007.  However, it appears that a draft withdrawal letter was prepared as early as March of that year.[1627]

1247. PwC was clearly pressed by the Russian authorities to find grounds for withdrawing its audits of Yukos.  Bearing in mind the complexity of the Yukos structure, the business environment at the time it was set up, and the grey areas of Russian tax law at the time, it is not surprising that PwC could identify elements of evidence with respect to some aspects of Yukos' business practice that it affirms gave rise to credibility issues.  As far as the Tribunal can judge, Yukos may not have been candid in its representations to PwC about control of the BBS Companies and about the reasons for the immense payments Yukos undertook to make, and did make, to individuals who were involved in its privatization.

1248. However, the Tribunal cannot accept that the four issues identified in PwC's Withdrawal Letter were in fact "new" for PwC.  In addition, even if the information was new, it was not unequivocal, and could have been tested with Yukos when it was still operational.  In this

---

[1624]   *Ibid*. ¶ 464, citing to Russian Federation General Prosecutor's Office, Record of Interrogation of Douglas Miller, 4 June 2007, Exh. R-871.

[1625]   *Ibid*. ¶ 466, citing to Group Menatep Limited, "Information for the Management of OAO NK 'Yukos,'" Exh. C-597.

[1626]   Counter-Memorial ¶ 708.

[1627]   In the Matter of an Application of Michael Khodorkovsky and Platon Lebedev for an Order Seeking Discovery Under 28 U.S.C. § 1782, Declaration of Laurie Endsley, 31 January 2011 ¶ 9, Exh. R-881.

regard, the Tribunal notes that PwC did not give former Yukos senior officials an opportunity to comment on the new information before signing the withdrawal letter.  At the Hearing, Mr. Misamore testified that he stood by the following statement he made in 2009 in relation to the PwC withdrawal:

> PWC never said anything to me or, as far as I know, anyone else at Yukos, to my knowledge, about a lack of information or the refusal to provide information, other than the instance concerning the ownership interests in [the] BBS [Companies]. If PWC had asked me to intervene—and I did intervene with the BBS inquiry—I would have gone to Group Menatep shareholders or their lawyers, and would have urged the release of the requested information.[1628]

1249. According to Respondent's accounting expert, Mr. Ellison, who was not cross-examined, the U.S. Statement of Auditing Standards No. 1 sets the following standard for the "Subsequent Discovery of Facts Existing at the Date of the Auditor's Report":

> When the auditor becomes aware of information which relates to financial statements previously reported on by him, but which was not known to him at the date of his report, and which is of such a nature and from such a source that he would have investigated it had it come to his attention during the course of his audit, he should, as soon as practicable, undertake to determine whether the information is reliable and whether the facts existed at the date of his report.  In this connection, the auditor should discuss the matter with his client at whatever management levels he deems appropriate, including the board of directors, and request cooperation in whatever investigation may be necessary.[1629]
>
> [emphasis added]

1250. Similar steps are expected to be taken under international and Russian auditing standards.[1630] Mr. Ellison notes that PwC's Withdrawal Letter stated that "due to the company undergoing bankruptcy and the former company executives no longer working for the company, PwC was unable to access the information required that could lead to revision of the financial statements and was also unable to discuss the matter with management, as recommended by [the audit standards]."  Mr. Ellison concludes that under those circumstances "PwC had no option but to withdraw its audit reports."[1631]

1251. Mr. Ellison observes that when a reputable international firm withdraws an audit opinion it is an "unusual and serious" event.[1632]  In light of the seriousness of the decision to withdraw the

---

[1628]   Record of Interview of Bruce Misamore, 9 March 2009, p. 51, Exh. R-3347.

[1629]   U.S. Statement of Auditing Standards No. 1, Section 561(4), attached as Exh. 4 to Ellison Report.

[1630]   Mr. Ellison refers to a similar obligation to "discuss the matter with management" under the International Auditing Standards ISA 560 and Russian Federal Auditing Rule No. 10.  Ellison Report ¶¶ 3.5.5, 3.5.11, 3.6.1.

[1631]   *Ibid.* ¶ 3.4.28.

[1632]   *Ibid.* ¶ 2.3.1.

audit opinions, and the industry standard of consulting with the audited company before taking any action, it is noteworthy that PwC made no effort to reach out to Yukos' management or ex-management to discuss the "new" information.

1252. PwC's senior executives confided to the U.S. Embassy that the withdrawal decision was a "difficult" call.[1633]  At stake for PwC on the one hand was its reputation and loyalty to a "dead" client, and on the other hand its continued viability in the Russian market.  As the cables reveal, Russia mattered to PwC.[1634]  PwC's senior executives met with the Russian Government to resolve PwC's problems.  And, as noted earlier, after PwC made its decision, criminal charges were dropped, and PwC prevailed in two lawsuits, received a refund of its fines, maintained its license and retained important Russian clients such as Gazprom.  As observed by Mr. Kosciusko-Morizet, "PwC undoubtedly opted in the end for the most pragmatic approach so as to maintain its office in Russia and protect its employees from being sued."[1635]

1253. As the Tribunal stated at the outset of this chapter, PwC is not on trial before this Tribunal, which draws no conclusion in the present Award about PwC's professional conduct.  However, the pressure mounted by the Russian authorities against Yukos' auditors, which led to PwC's eventual withdrawal of its audits and even to a PwC auditor testifying against Messrs. Khodorkovsky and Lebedev at their second trial, informs the Tribunal's view that Yukos was the object of a series of politically-motivated attacks by the Russian authorities that eventually led to its destruction, as alleged by Claimants.

## IX.   PRELIMINARY OBJECTIONS

1254. Before turning to the central question of Respondent's liability under the ECT on the basis of the extensive factual record canvassed in the preceding Part VIII, the Tribunal addresses in this Part IX three preliminary objections made by Respondent, including two that were not finally resolved in the Tribunal's Interim Awards.

1255. The Tribunal considers, in this order, Respondent's preliminary objections related to: (a) the ECT's "fork-in-the-road" provision—Article 26(3)(b)(i); (b) Claimants' allegedly "unclean

---

[1633]   U.S. State Department Cable No. 07MOSCOW3343, "Russia: PricewaterhouseCoopers Withdraws Audits of Yukos," 9 July 2007 ¶ 7, Exh. C-1358.

[1634]   U.S. State Department Cable No. 07MOSCOW5403, "PWC's travails in Russia worsen," 15 November 2007 ¶ 8, Exh. C-1360.

[1635]   Kosciusko-Morizet WS ¶ 25.

hands"; and (c) the relevance of Article 21 of the ECT.

**A.     ARE ALL OR SOME OF THE CLAIMS BARRED BY THE "FORK-IN-THE-ROAD" PROVISION OF THE ECT?**

**1.     Introduction**

1256. Article 26(3)(b)(i) of the ECT contains the ECT's "fork-in-the-road" provision.  It must be read together with the preceding paragraphs of Article 26:

> *Article 26*
> SETTLEMENT OF DISPUTES BETWEEN AN INVESTOR AND A CONTRACTING PARTY

> (1)   Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III shall, if possible, be settled amicably.

> (2)   If such disputes can not be settled according to the provisions of paragraph (1) within a period of three months from the date on which either party to the dispute requested amicable settlement, the Investor party to the dispute may choose to submit it for resolution:

> (a)   to the courts or administrative tribunals of the Contracting Party party to the dispute;

> (b)   in accordance with any applicable, previously agreed dispute settlement procedure; or

> (c)   in accordance with the following paragraphs of this Article.

> (3)   (a)   Subject only to subparagraphs (b) and (c), each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article.

> (b)(i)   The Contracting Parties listed in Annex ID do not give such unconditional consent where the Investor has previously submitted the dispute under subparagraph (2)(a) or (b);

> (ii)   For the sake of transparency, each Contracting Party that is listed in Annex ID shall provide a written statement of its policies, practices and conditions in this regard to the Secretariat no later than the date of the deposit of its instrument of ratification, acceptance or approval in accordance with Article 39 or the deposit of its instrument of accession in accordance with Article 41.

> [. . .]

1257. Before turning to the Parties' submissions, the Tribunal recalls its dismissal in the Interim Awards of Respondent's identical Article 26(3)(b)(i) objection to jurisdiction and/or admissibility:

> The Tribunal finds that Respondent's arguments are unconvincing.  Indeed, in its written submissions, Respondent did appear to concede that, as a general matter, there is ample

authority for the application of a "triple identity" test [identity of parties, cause of action and object of the dispute] in the context of a "fork-in-the-road" provision.  To that extent, there is no question that the various Russian court proceedings and applications to the European Court of Human Rights cited by Respondent fail to trigger the "fork-in-the-road provision" of the ECT.[1636]

### 2.    Parties' Positions

1258. In its Counter-Memorial, Respondent renews its objection that the Tribunal lacks jurisdiction pursuant to Article 26(3)(b)(i) of the ECT.  In its view, developments subsequent to the Interim Awards show that Claimants, as Yukos shareholders, are seeking before the ECtHR damages for the same alleged loss arising from Yukos' demise.  Accordingly, Respondent submits that the ECT arbitrations expose it to double recovery.[1637]

1259. Respondent relies on the Application for Just Satisfaction made by Yukos' former representative, Mr. Gardner, before the ECtHR, requesting damages "and, for the first time … compensation for the 'ultimate stakeholders' in Yukos through a Stichting created under Dutch law."[1638]  Respondent argues that these circumstances deprive the Tribunal of jurisdiction under Articles 26(3)(b)(i) and 26(2)(b), and Annex ID of the ECT.[1639]

1260. Respondent submits that the European Convention on Human Rights ("**ECHR**") and ECT claims share the same fundamental basis, and, accordingly, the ECT claims should be dismissed.  As previously submitted in its First Memorial on Jurisdiction and Admissibility, Respondent emphasizes that its consent to submit a dispute to international arbitration is expressly conditioned on Claimants not having already submitted the dispute to a "previously agreed dispute resolution procedure," pursuant to Article 26(3)(b)(i) read in conjunction with Article 26(2)(a) and Annex ID of the ECT.[1640]

1261. Respondent argues that the Tribunal's dismissal of this objection was premised on the "incorrect assumption" that the parties in the proceedings before the ECtHR and the present

---

[1636]    Interim Awards ¶¶ 598–600 (YUL); 609–11 (VPL); 597–99 (Hulley).

[1637]    Respondent's Counter Memorial ¶ 837.

[1638]    Rejoinder ¶ 369; Counter-Memorial ¶ 827.

[1639]    Counter-Memorial ¶ 828.  Annex ID lists the Contracting Parties that have conditioned their consent to the submission of a dispute under the Treaty to international arbitration on the condition that the Investor has not previously submitted the dispute to the courts or administrative tribunals of the Contracting Party to the dispute.  The Russian Federation is listed in Annex ID.  (Interim Awards ¶¶ 588–89 (YUL); ¶¶ 599–600 (VPL); ¶¶ 587–88 (Hulley).

[1640]    Counter-Memorial ¶ 829.

proceedings are different.[1641]  Respondent further submits that the Tribunal erred in "fail[ing] to mention the requirements of the 'triple identity test' and state which requirement was not fulfilled."[1642]  In satisfaction of the identity threshold, Respondent submits as follows:

- the Application for Just Satisfaction before the ECtHR establishes that the "'ultimate stakeholders', including Claimants, are the only Yukos interests that are represented in the EC[t]HR proceedings";[1643]

- the monetary relief requested in both proceedings for Yukos' alleged expropriation is identical;[1644] and

- the ECHR and ECT claims both aim to obtain compensation for the purported expropriation of Yukos and "have the same normative source," as Article 13(1) of the ECT and Article 1 of Protocol No. 1 ECHR do not lay down independent standards by which Respondent's conduct is to be judged.[1645]

1262. Claimants maintain their rejection of this objection, emphasizing in their Reply that "it is entirely inappropriate and an abuse of process for the Respondent now to seek to reopen this issue."[1646]

1263. Firstly, Claimants emphasize that the merits phase of these arbitrations is not an instance of appeal and, further, that the principles of *res judicata* and *ne bis in idem* are absolute bars to Respondent renewing this objection.[1647]

1264. Secondly, Claimants submit that Respondent's contention that the parties in the ECtHR proceedings and these arbitrations are the same is incorrect.  Mr. Gardner[1648] does not act on behalf of Claimants, nor did Claimants make any submissions in those proceedings.  Contrary to Respondent's characterization, Mr. Gardner was not seeking compensation "on behalf of Claimants."  Rather, Claimants say Mr. Gardner he was simply arguing that the destruction of

---

[1641] *Ibid.* ¶ 830.

[1642] *Ibid.*

[1643] *Ibid.* ¶ 831.

[1644] *Ibid.* ¶ 832.

[1645] *Ibid.* ¶ 833.

[1646] Reply ¶ 967.

[1647] *Ibid.* ¶ 969.

[1648] Yukos' counsel before the ECtHR.

the Company need not pose an obstacle to an award of just satisfaction, "because the Dutch Foundation was able to receive such an award and dispose of it in accordance with its statutes."[1649]  Claimants also highlight that Mr. Gardner's submission is dated 4 May 2009, thus preceding the Interim Awards in these arbitrations by several months.

1265. Thirdly, Claimants submit that Respondent advanced essentially the same argument previously before the ECtHR.  Claimants submit that Respondent's position in that regard was rejected by the ECtHR because the parties in the ECT arbitrations were different, and thus the matters were not substantially the same.[1650]

1266. Finally, Claimants submit that no issue of double recovery arises in these arbitrations.  They repeat the disclaimer they provided to the Tribunal on 1 April 2010, that "should any pecuniary damages be awarded to Yukos in the ECtHR proceedings, and should the Claimants receive any payments, such payments would be deducted from the amounts claimed in these arbitrations."[1651]

1267. In its Rejoinder, Respondent draws the Tribunal's attention to the 2012 decision in *Chevron v. Ecuador*,[1652] which, according to Respondent, confirms "a narrow interpretation of 'fork-in-the-road' provisions that focuses strictly on the legal bases of the claims would deprive such a clause of effective scope."[1653]

1268. Respondent also objects to Claimants' *res judicata* argument.  Respondent submits that the ECtHR proceedings, which were "formally instituted by Yukos, under Claimants' direction and control" and involve "the very same economic interests that are represented in these arbitrations, constitute a special circumstance that justifies a new examination of Respondent's Article 26(3)(b)(i) ECT objection."[1654]

1269. Respondent also alleges that Claimants admit there is privity of interest between the two proceedings.  In support of this assertion, Respondent refers to:

---

[1649] Reply ¶ 971.

[1650] *Ibid.* ¶ 972, citing ECtHR Yukos Judgment ¶¶ 524–26.

[1651] Reply ¶ 963, citing Letter from the Claimants to the Arbitral Tribunal of 1 April 2010.

[1652] *Chevron Corporation and Texaco Petroleum Company v. Republic of Ecuador*, PCA Case No. 2009–23, Third Interim Award on Jurisdiction and Admissibility, 27 February 2012 (hereinafter "*Chevron v. Ecuador*").

[1653] Rejoinder ¶ 370, citing *Chevron v. Ecuador* ¶ 4.76.

[1654] Rejoinder ¶ 374.

- the passage of the Reply (mentioned at paragraph 1266 above) where Claimants state that they will deduct any payments they receive in the ECtHR proceedings from the amounts claimed in these arbitrations; and

- the Application for Just Satisfaction (mentioned at paragraph 1261 above), where Mr. Gardner characterized Claimants in these arbitrations as the "ultimate stakeholders" in Yukos.[1655]

1270. Finally, Respondent submits that Claimants' reliance on positions that the ECtHR has already finally rejected – namely that Respondent's taxation measures against Yukos were *mala fides*, briefed extensively in its Rejoinder,[1656] "creates a risk of conflicting determinations, one of the ills that Article 26(3)(b)(i) ECT is designed to avoid."[1657]

### 3. Tribunal's Decision

1271. Having considered the Parties' submissions and reviewed the reasons for its dismissal in the Interim Awards of Respondent's identical objection to jurisdiction pursuant to Article 26(3)(b)(i) of the ECT, the Tribunal sees no reason to reopen this issue and change its decision.

1272. Accordingly, Respondent's objection that the Tribunal lacks jurisdiction pursuant to Article 26(3)(b)(i) of the ECT is dismissed.

## B. "UNCLEAN HANDS" (DID CLAIMANTS ACT ILLEGALLY SO AS TO DEPRIVE THEM OF PROTECTION UNDER THE ECT?)

### 1. Introduction

1273. As its second preliminary objection, Respondent submits that Claimants have come to this Tribunal with "unclean hands," with one or many of the following consequences: (a) the Tribunal does not have jurisdiction over Claimants' claims; (b) Claimants' claims are inadmissible; and/or (c) Claimants should be deprived of the substantive protections of the ECT. The Tribunal addresses this argument in the present chapter.

1274. Should the Tribunal reject the "unclean hands" argument as a preliminary objection,

---

[1655] *Ibid.* ¶ 369.

[1656] *Ibid.* ¶¶ 99–193.

[1657] *Ibid.* ¶ 374.

Respondent also submits that some instances of Claimants' unclean hands should be treated as contributory fault and/or a failure to mitigate on the part of Claimants, and that any damages awarded to Claimants should be discounted on the basis of their unclean hands. These arguments are addressed in Chapters X.E and XII.C.

1275. Respondent initially made its "unclean hands" argument in the jurisdictional phase of these arbitrations. In Paragraph 3 of its Procedural Order No. 3 dated 31 October 2006, the Tribunal decided that it would be "appropriate to defer consideration of the Parties' contentions concerning 'unclean hands' [and] Respondent's 'criminal enterprise' contention . . . to the merits phase, if any."

1276. In its Interim Awards, the Tribunal stated:

> The Tribunal is well aware of Respondent's argument that Claimant in this arbitration has "unclean hands" and that Claimant's corporate personality should be disregarded because it is an instrumentality of a "criminal enterprise." The Tribunal recalls that it addressed these issues in its Procedural Orders Nos. 2 and 3 on 8 September and 31 October 2006. Specifically, the Tribunal then decided to defer consideration of Respondent's arguments concerning the "unclean hands" of Claimant or Claimant being an instrumentality of a "criminal enterprise" to any merits phase of this arbitration. Accordingly, by finding, as it does, that Claimant qualifies as an Investor owning and controlling an Investment for the purposes of Articles 1(7) and (6) of the ECT, the Tribunal does not dispose of the issues argued by Respondent concerning the "unclean hands" of Claimant and Claimant being an instrumentality of a "criminal enterprise," which it will address during any merits phase of this arbitration.[1658]

1277. As anticipated in the Interim Awards, now with the benefit of a full presentation of the facts by the Parties on all aspects of the Yukos affair, the Tribunal addresses Respondent's "unclean hands" argument in this final Award.

1278. The Tribunal notes that, in their First Submission on Costs, Claimants argue that Respondent, after insisting on its "unclean hands" allegations and the assertion that Claimants are an instrumentality of a "criminal enterprise" in the jurisdictional phase of this arbitration and dedicating nearly two hundred pages of its Counter-Memorial and Rejoinder to the first of these two arguments, ultimately abandoned these arguments at the Hearing, pursuing only the allegations related to alleged abuse by Claimants of the Cyprus-Russia DTA.[1659] In its Reply Submission on Costs, Respondent confirmed that it had not abandoned its unclean hands defense. To the contrary, Respondent argued that Claimants had explicitly refused to join issue

---

[1658] Interim Awards ¶ 435 (Hulley); ¶ 436; (YUL); ¶ 492 (VPL).

[1659] Exh. C-916.

and submit rebuttal and Respondent had accordingly relied on its arguments as undisputed and accepted.  According to Respondent, this alleviated the need to devote substantial hearing time to these points.[1660]

1279. Claimants correctly observe that at the merits hearing (and in their Post-Hearing Brief) Respondent expanded only on the Cyprus-Russia DTA abuses part of its "unclean hands" argument, making only passing reference to other aspects of this argument.[1661]  However, in the Tribunal's view, this circumstance speaks only to Respondent's freedom to present its case as it chooses, and represents Respondent's strategic decision to focus on certain arguments instead of others in the limited time available to it at the Hearing and within the page limit for post-hearing submissions imposed by the Tribunal.  The fact that Respondent did not repeat in full all of the arguments made in previous pleadings at the Hearing and in its Post-Hearing Brief does not mean that these arguments were abandoned.

1280. Below, the Tribunal first summarizes the factual allegations constituting the foundation of Respondent's "unclean hands" argument and then the Parties' arguments regarding the impact of the alleged facts on the Tribunal's jurisdiction, the admissibility of claims and the availability of the substantive protections of the ECT to Claimants.  In the last section of this chapter, the Tribunal sets out its decision with respect to "unclean hands" as a preliminary objection.

## 2.    Claimants' Alleged "Unclean Hands"

1281. Respondent lists 28 instances of alleged "illegal and bad faith conduct" by Claimants or "attributable to" Claimants involving a variety of actors and spanning over ten years, from the privatization of Yukos in the mid-1990s to its liquidation in November 2007.  Claimants dispute that any of their conduct (or any conduct attributable to them) was illegal or in bad faith.

1282. Given the number and diversity of Respondent's allegations, the Tribunal presents them below in groups intended to facilitate its subsequent analysis.  Where facts related to Respondent's "unclean hands" allegations fall outside the scope of the analysis of the factual background set out in Part VIII above, they are briefly summarized here.

---

[1660]   Respondent's Reply Submission on Costs ¶¶ 16–18

[1661]   *See e.g.* Transcript, Day 19 at 169–74, 179; Respondent's Post-Hearing Brief ¶¶ 146, 148.

(a)     **Conduct Related to the Acquisition of Yukos and the Subsequent Consolidation of Control over Yukos and its Subsidiaries**

1283. The first eleven items of Respondent's list of "illegal and bad faith conduct" are dedicated to conduct related to the acquisition of Yukos by Bank Menatep; and the so-called "Oligarchs" and their subsequent consolidation of control and ownership over Yukos and its subsidiaries:

i.      Violating the legal requirements governing the loans-for-shares program that allowed Menatep to gain its controlling interest in Yukos.

ii.     Using shell company proxies to feign competition in the loans-for-shares auction and a simultaneous investment tender for Yukos shares.

iii.    Precluding actual competitors from bidding on Yukos shares in the loans-for-shares auction and investment tender, including through the abuse of Menatep's role as auction organizer to disqualify Russian competitors.

iv.     Rigging a subsequent auction for the Yukos shares that were being held as collateral following the initial loans-for-shares auction, which deprived the Russian Government of substantial revenue.

v.      Conspiring with Yukos' pre-existing managers to facilitate the unlawful acquisition of Yukos by the Oligarchs, including by entering into an agreement whereby "Yukos Universal" committed to pay them compensation consisting of 15% of Menatep's beneficial interest in Yukos, ultimately worth billions of dollars, for "services rendered to 'Yukos'".

vi.     Colluding with others to predetermine the post-privatization ownership of Yukos.

vii.    Skimming profits from Yukos and its production subsidiaries for their own self-enrichment.

viii.   Abusing Russian corporate law and principles of corporate governance by squeezing out minority shareholders in Yukos' production subsidiaries through ruthless and self-enriching share dilutions, asset stripping, and transfer pricing.

ix.     Siphoning off huge sums for the benefit of the Oligarchs from Yukos' proceeds from the sale of oil and oil products, while concealing related-party transactions from Yukos' own auditor.

x.      Further mistreatment of minority shareholders by manipulating shareholder meetings, pressuring the Russian Federal Securities Commission not to pursue its challenges against illegal misconduct, relying on fraudulently determined stock and asset values and deceiving those minority shareholders, the government, and domestic and foreign courts about the nature and control of offshore companies that were created to benefit Claimants and their cohorts.

xi.   Manipulating Yukos' stock value to devalue and reacquire the interests of creditors
to which Yukos stock had been pledged.[1662]

1284.  As context to Respondent's allegations, it is useful to recall some of Yukos' early history.  The
Russian Federation created the company in 1993 as part of a large-scale reorganization of the
Soviet oil production and processing industry into vertically integrated oil companies.  Yukos
remained largely state-run until 1995.[1663]

1285.  Respondent recounts, based on a report by Professor Reinier Kraakman that, in March 1995, a
consortium of Russian commercial banks, including Bank Menatep (the Chairman of which
was Mr. Khodorkovsky), proposed to the Russian government that they would lend it money in
exchange for the right to hold as collateral and manage shares of major state-owned companies
such as Yukos.[1664]  A presidential decree of August 1995 provided for the auctioning of the
right to hold and manage shares of individual companies.[1665]  Once the terms of the proposed
management agreement expired, the government would have a choice between paying back the
loan and reclaiming its shares, and allowing the lender to sell the shares, with the government
keeping 70 percent of the difference between the sale price and the original amount of the
loan.[1666]  This mechanism became known as the "loans-for-shares program."

1286.  In December 1995, the Russian Government retained Bank Menatep to organize the auction for
the shares in Yukos.[1667]

1287.  Respondent alleges that Bank Menatep "completely rigged the auction" by preventing potential
competitors from participating, while using two front companies, Laguna and Regent, to
formally comply with the requirements for bids.[1668]  Respondent recounts that Laguna won the
right to hold as collateral and manage a 45 percent stake in Yukos for a USD 159 million loan
to the Russian government and an additional investment obligation of USD 200 million.
According to Respondent, Laguna acquired an additional 33 percent stake in Yukos by
pledging just over USD 150 million in investments at a simultaneously held "investment

---

[1662]  Rejoinder ¶¶ 1435–36.

[1663]  Counter-Memorial ¶ 19.

[1664]  *Ibid.*¶ 20.

[1665]  Decree of the President of the Russian Federation No. 889 On the Procedure for Putting the Federally Owned Shares
in Pledge, 31 August 1995, Exh. R-7.

[1666]  Counter-Memorial ¶ 21.

[1667]  *Ibid.* ¶ 23.

[1668]  *Ibid.* ¶¶ 27–28.

tender."[1669]    Bank Menatep acquired Laguna's rights to hold and manage Yukos shares immediately thereafter.[1670] Respondent further alleges that Bank Menatep then used "another rigged auction and another shell affiliate, named Monblan," to obtain full ownership of the stake in Yukos.[1671]    Respondent also suggests that Bank Menatep was "an insider among insiders" and used Yukos' own funds to pay for its takeover of Yukos.[1672]

1288. Respondent makes additional allegations regarding Bank Menatep's and the Oligarchs' treatment of foreign and Russian investors holding minority shares in Yukos' main production subsidiaries—YNG, Samaraneftegaz and Tomskneft—in the aftermath of the privatization.[1673] Respondent alleges that from 1996 to 1999 Bank Menatep and the Oligarchs engaged in significant profit skimming and, in 1999 and 2000, abused Russian corporate law and principles of corporate governance to "squeeze out the minority shareholders through massive share dilutions, transfer pricing, and asset stripping,"[1674] until "the minority shareholders sold or swapped their shares on the Oligarchs' terms."[1675]

1289. Claimants do not engage with the detail of Respondent's allegations.  They contend that these allegations "amount to little more than innuendo based upon a handful of sensationalized journalistic accounts."[1676]    In particular, Claimants point out that Respondent is "unable to make out any failure by Bank Menatep to comply with the terms of the loans-for-shares program"[1677] and underline that it was the Russian government itself that had the authority to preclude foreign companies and individuals from bidding and to disallow bids.[1678]    Claimants add that Respondent's "vague insinuations" as to the source of funds used to privatize Yukos do not prove that anything unlawful took place.[1679]    Claimants suggest that Respondent's argument "amounts to nothing more than an attempt to shift blame for the actions of the

---

[1669]   *Ibid.* ¶ 28.

[1670]   Kraakman Report ¶ 20.

[1671]   Counter-Memorial ¶ 29.

[1672]   *Ibid.* ¶ 33.

[1673]   *Ibid.* ¶ 45.

[1674]   *Ibid.* ¶¶ 915, 946–49; *see* Kraakman Report ¶¶ 28–42.

[1675]   Counter-Memorial ¶¶ 916, 951–61, 75; *see* Kraakman Report ¶¶ 44–62.

[1676]   Reply ¶ 1142.

[1677]   *Ibid.* ¶ 1143.

[1678]   *Ibid.* ¶¶ 1144–45.

[1679]   *Ibid.* ¶ 1146.

Russian Government itself onto Bank Menatep."[1680]

1290. As regards the manner of the consolidation of Bank Menatep's ownership over Yukos, Claimants reply that Respondent's allegations are vague and "not only irrelevant, but also moot."[1681]   Claimants point out that Respondent relies on share issuances and transfers that were ultimately cancelled and on an alleged dispute with a minority shareholder that was eventually settled.[1682]

### (b)   Conduct Related to the Cyprus-Russia DTA

1291. Next, Respondent complains of Claimants' use of the Cyprus-Russia DTA, listing the following "bad faith and illegal conduct":

> xii.   Submitting fraudulent claims under, or otherwise abusing, the Russia-Cyprus Tax Treaty to evade hundreds of millions of dollars in Russian taxes payable on dividends involving Yukos shares, thereby also violating Russian and Cypriot criminal laws.

> xiii.   Entering into hundreds of sham transactions involving the sale and repurchase of Yukos shares between Claimants and their affiliates, the sole purpose of which was to fraudulently suggest that Claimants beneficially owned dividends declared on Yukos shares, and thereby to further Claimants' fraudulent claims for favorable tax treatment under the Russia-Cyprus Tax Treaty.

> xiv.   Evading hundreds of millions of dollars in Russian taxes on profits from transactions in and profits from sales of Yukos shares.

> [. . .]

> xvi.   Diverting the proceeds of the Yukos tax evasion scheme into highly opaque Cypriot and British Virgin Islands entities and trusts to conceal the unlawful provenance of those proceeds, including through dividend distributions to undisclosed Cypriot parent companies of trading shells, thereby further abusing the Russia-Cyprus Tax Treaty.[1683]

1292. The Russia–Cyprus DTA, as stated in its preamble, serves the "avoidance of double taxation with respect to taxes on income and capital" and the promotion of "economic cooperation between the two countries."   Article 10 of the DTA provides:

---

[1680]   *Ibid*. ¶ 1147.

[1681]   *Ibid*. ¶¶ 1149, 1151–53.

[1682]   *Ibid*. ¶¶ 1149–50.

[1683]   Rejoinder ¶¶ 1435–36.

     1.      Dividends paid by a company which is a resident of a Contracting State to a resident of the other Contracting State may be taxed in that other State.

     2.      However, such dividends may also be taxed in the State of which the company paying the dividends is a resident and according to the laws of that State, but if the beneficial owner of the dividends is a resident of the other State, the tax so charged shall not exceed:

          5% of the gross amount of the dividends…."

1293. The Parties agree that Claimants Hulley and VPL obtained monetary benefits running in excess of USD 230 million under this provision by claiming the reduced withholding tax rate of 5 percent instead of the standard 15 percent rate of the Russian Federation.

1294. Respondent argues that, in so doing, Hulley and VPL fraudulently relied on the Russia–Cyprus DTA to evade Russian taxes, because they: (a) were not the "beneficial owners" of the dividend income but mere "conduits" for the Oligarchs, and (b) had a "permanent establishment" in Russia to which the dividend income was attributable.[1684]   According to Respondent, Claimants' reliance on the DTA was a "complete perversion of the Treaty's purpose," and, as stated by Professor Rosenbloom, a "blatant example of tax treaty abuse."[1685]   Respondent alleges that Claimants contrived a series of artificial sales and repurchases of Yukos shares by Hulley from YUL, and VPL parked shares in a UBS Moscow account at suspicious times, solely to benefit from the DTA.  According to Respondent, Claimants offer no justification for this practice, aside from their expert, Mr. Baker, mischaracterizing it as a "standard arrangement."[1686]

1295. Respondent submits that the beneficial ownership requirement "should be construed in light of the object and purposes of the [DTA], including avoiding double taxation and the prevention of fiscal evasion and avoidance."[1687]   According to Respondent, Hulley and VPL never had the full right to use or enjoy Yukos' dividends.  In support, Respondent refers to the following documents:

- Hulley's and VPL's bank statements from 1 January 2000 to 31 December 2004, as well as GML's statement for 2004, which purportedly establish that the

---

[1684]    Counter-Memorial ¶¶ 922–23; Rejoinder ¶ 1448.

[1685]    Counter-Memorial ¶ 165; Rosenbloom Report ¶ 77.

[1686]    Rejoinder ¶¶ 1488–90; Baker Report, ¶70.

[1687]    *Ibid.* ¶ 1449, relying on the 2011 OECD Discussion Draft for the Model Tax Convention, Exh. R-1959.

dividends paid to Hulley and VPL by Yukos only stayed in their accounts for one or two days prior to going to YUL;[1688]

- Hulley's Articles of Association, which according to Respondent reserved to the "Oligarchs" any decision concerning the disposal of Hulley's assets;[1689] and

- the Deed of Appointment of Chiltern as a custodian trustee for VPL, which, according to Respondent, provides that all dividend income from VPL's Yukos shares "shall be paid" to YUL so long as Chiltern owns VPL.

1296. Respondent also argues that Claimants have contradicted their own arguments in the jurisdictional phase of these proceedings by acknowledging an "obligation to pass all future dividends" to YUL; this, argues Respondent, falls within even Claimants' narrow interpretation of the beneficial ownership limitation.[1690]

1297. Respondent further asserts that Hulley and VPL each had a "Russian permanent establishment."[1691]  Respondent interprets Claimants' admission that Hulley and VPL were holding companies to mean that any activity necessary to conduct the business of holding Yukos shares had to be carried out in Russia through a "deemed permanent establishment" (Article 5(5) of the Cyprus-Russia DTA) or a "fixed place of business" (Article 5(2) of the Cyprus-Russia DTA).[1692]  Respondent contends that Messrs. Lebedev and Kakorin, both Russian citizens and residents, carried out all the activities relating to Hulley's and VPL's Yukos shares from Russia.[1693]

1298. Respondent further submits that Claimants' alleged abuses violate both Russian and Cypriot criminal laws, as shown in the expert report of Mr. Polyviou.[1694]

1299. Finally, Respondent argues that Claimants' expert, Mr. Baker, fails to differentiate the "tolerated" practice of "treaty shopping" from the "universally condemned" practice of "round

---

[1688] *Ibid.* ¶¶ 1457–65, referring to Exhs. R-334 to R-4154.

[1689] *Ibid.* ¶¶ 1466–87, referring to Exh. R-236.

[1690] *Ibid.* ¶¶ 1478–79.

[1691] *Ibid.* ¶¶ 1491–501.

[1692] *Ibid.* ¶ 1491.

[1693] *Ibid.* ¶ 1500.

[1694] Counter-Memorial ¶ 927.

tripping," which Respondent alleges is what Claimants did.[1695]   Accordingly, Respondent submits that, "at best," Hulley and VPL "perverted" the purposes of the Cyprus-Russia DTA, even if they satisfied its "literal requirements."[1696]

1300. Claimants protest that Respondent's allegations are unsubstantiated in fact and in law.

1301. Firstly, Claimants argue that the beneficial ownership limitation set forth in Article 10(2)(a) of the Cyprus-Russia DTA is a "narrow one targeted at nominees, agents and other conduits under an obligation to pass on the amount received as a dividend to another party."[1697] Hulley and VPL in the present case had the full right to use and enjoy the dividends they received from Yukos and were under no obligation to pass them on to another entity, as is evident from Clause 117 and Article 1 of their respective Articles of Association, which provide that the power to propose the declaration and payment of dividends lies solely with the directors of the respective companies.[1698]

1302. Claimants assert that shares "transferred to a company shortly before the dividend dates and transferred back after the dividend has been paid are lawful and a common feature in stock-lending, and also in the sale and repurchase of shares ('repos')."[1699]

1303. Secondly, Claimants assert that Hulley and VPL were holding companies, and that their business as such was not carried on in Russia.[1700]   None of the cumulative conditions in Article 10(4) of the DTA were made out to show that Hulley or VPL had a permanent establishment in Russia, as demonstrated by Mr. Baker's report.[1701]

1304. Thirdly, Claimants reject the fraudulent abuse analysis made by Respondent's expert Professor Rosenbloom, noting that there is no anti-abuse principle in the DTA.[1702]   Claimants emphasize

---

[1695]   Rejoinder ¶ 1508.

[1696]   *Ibid.* ¶ 1509.

[1697]   Reply ¶ 1157.

[1698]   *Ibid.* ¶ 1158.

[1699]   *Ibid.* ¶ 1161.

[1700]   *Ibid.* ¶ 1163.

[1701]   *Ibid.* ¶¶ 1164–74.

[1702]   *Ibid.* ¶ 1176.

that 'treaty shopping' to minimize tax is permissible.[1703]

1305. Finally, Claimants submit that Hulley's and VPL's claims under the Cyprus-Russia DTA were consistent with the purpose of the DTA.  Claimants recall that one purpose of double-taxation treaties is to promote the flow of investment, and argue that both countries have derived significant benefits from the DTA.[1704]

1306. In any event, Claimants submit that the claiming of benefits under a double-taxation treaty is a technical matter, for which specific mechanisms of redress are available under the treaty itself and domestic law.  Accordingly, this Tribunal is not the proper forum to hear and decide such disputes.[1705]

### (c)    Conduct Related to the Tax Optimization Scheme

1307. Three items on Respondent's list of Claimants' "illegal and bad faith" conduct relate to Claimants' use of the low-tax regions of the Russian Federation to mitigate tax burdens:

> xv.    Engineering through management installed and controlled by Claimants the massive Yukos tax evasion scheme to avoid paying hundreds of billions of rubles in Russian taxes.
>
> [. . .]
>
> xvii.   Engaging in abusive corporate restructurings to conceal Yukos' affiliation with its trading shells, thereby preventing Russian authorities from identifying and addressing Yukos' tax abuses.
>
> xviii.  Concealing Yukos' continued control of its trading shells by resorting to call options or other artifices and by fabricating corporate and other transactional documents.[1706]

1308. A detailed discussion of these allegations is found in Chapter VIII.A of this Award.

### (d)    Actions Taken in Hindrance of the Enforcement of Russia's Tax Claims

1309. The remaining ten items on Respondent's list of Claimants' "bad faith and illegal conduct" refer to actions allegedly taken to obstruct enforcement of Russia's tax claims against Yukos:

---

[1703]  *Ibid.* ¶ 1175, citing *MIL (Investments) S.A. v. Canada* [2006] 5 CTC 2552 (Tax Court of Canada), affirmed by Federal Court of Appeal of Canada.

[1704]  *Ibid.* ¶ 1177.

[1705]  *Ibid.* ¶ 1189.

[1706]  Rejoinder ¶¶ 1435–36.

xix.   Repeatedly obstructing the conduct of the tax authorities' audits of Yukos by refusing to provide documents and information which would show the extent of Yukos' abuses, and by causing Yukos' producing subsidiaries and other related entities to be similarly obstructive.

xx.   Failing to pay Yukos' tax liabilities for tax year 2000 and following years, despite having received ample notice that Yukos would be required to pay these amounts and despite the fact that Yukos had abundant resources to do so.

xxi.   Dissipating assets to frustrate the Russian authorities' collection of the tax assessments, including by way of paying dividends of unprecedented amounts, making spontaneously accelerated loan "*prepayments*" to Oligarch-owned Moravel, and foisting upon YNG an upstream guarantee up to US$ 3 billion for the repayment of Yukos' alleged "*debts*" to Moravel.

xxii.   Offering to the Russian authorities assets which Yukos knew to be tainted to settle its tax liabilities.

xxiii.   Concealing the share registers of Yukos' subsidiaries to obstruct the bailiffs' enforcement of Yukos' tax obligations.

xxiv.   Sabotaging the YNG auction through litigation threats and a spurious bankruptcy filing in the United States that effectively prevented all but one bidder from placing a bid at the auction and artificially depressed the amount of the auction proceeds.

xxv.   Implementing asset-stripping measures by diverting Yukos' valuable assets to the *stichtings* managed by former Yukos officers and representatives of Claimants in anticipation of Yukos' bankruptcy.

xxvi.   Failing to repay Yukos' debt to the SocGen syndicate and frustrating the banks' attempts to collect against Yukos' Dutch assets.

xxvii.   In the process of all of the foregoing, lying to Yukos' auditors PwC about core aspects of their misconduct and, through PwC's certification of Yukos' financial statements based on this deception of Yukos' auditors, to Yukos' creditors and other members of the investing public who relied upon those financial statements and PwC's certification of them.

xxviii.   Yukos management's shielding of Yukos' very substantial foreign assets behind the veil of two Dutch *stichtings*, to place those assets beyond the reach of Russian tax authorities, violated Dutch law.[1707]

1310. In sum, Respondent alleges that Yukos neither paid its tax debts in full immediately after these debts were assessed, nor made reasonable settlement offers; dissipated the assets it had on hand; lied to its auditors; obstructed the work of the bailiffs; and sabotaged the YNG auction. Each of these allegations is discussed by the Tribunal in Part VIII of this Award.

---

[1707]   *Ibid.* ¶¶ 1435–36.

### 3. Parties' Positions Regarding the Impact of Claimants' Allegedly "Unclean Hands" on this Arbitration

1311. The Parties disagree as to whether any of the instances of alleged illegal or bad faith conduct enumerated above could serve as a complete bar to Claimants' claims under the ECT (whether as a matter of jurisdiction, admissibility or otherwise) by virtue of the application of some rule or principle of law.

1312. Between them, the Parties have dedicated to this controversy several hundreds of pages of pleadings in the merits phase alone, citing in the process dozens of arbitral awards and decisions rendered by the Permanent Court of International Justice (the "**PCIJ**"), the International Court of Justice ("**ICJ**") and mixed-claims commissions. Below, the Tribunal does not attempt to do justice to the full breadth of the Parties' arguments, but focuses instead on their most salient points.

### (a) Respondent's Position

1313. Respondent submits that Claimants' "unclean hands" deprive the Tribunal of jurisdiction, render Claimants' claims inadmissible and/or deprive Claimants of the substantive protections of the ECT. This submission is based on two main principles.

1314. First, Respondent argues that "the ECT protects only *bona fide* and lawful investments and Respondent's consent to arbitrate only extends to such investments."[1708] Respondent emphasizes that, as provided by Article 31(1) of the VCLT, a treaty must be interpreted in good faith and in accordance with its object and purpose. According to Respondent, the object and purpose of the ECT does not include the promotion and protection of illegal investments.[1709] Rather, as stated in the Treaty's introductory note, "[t]he fundamental aim of the [ECT] is to strengthen the rule of law on energy issues." Respondent argues that several arbitral awards, including *Phoenix Action, Ltd. v. Czech Republic* ("**Phoenix**")*, SAUR International S.A. v. The Argentine Republic* and *Plama Consortium Limited v. Bulgaria* ("**Plama**") support the proposition that, even in the absence of an express legality requirement clause in an investment treaty, illegal investments will not be protected.[1710] With respect to *Plama*, in particular,

---

[1708] Respondent's Post-Hearing Brief ¶ 147.

[1709] Counter-Memorial ¶ 898.

[1710] Rejoinder ¶¶ 1551–52, 1527, 1563, 1566, referring to *Plama Consortium Limited v. Bulgaria,* ICSID Case No. ARB/03/24, Award, 27 August 2008, Exh. C-994 (hereinafter "*Plama*"); *Phoenix Action Ltd. v. Czech Republic,*

Respondent notes that the tribunal dismissed the claimants' ECT claims in the merits phase on the grounds that: (a) the investment violated Bulgarian law and applicable principles of international law; (b) the claimant's conduct was not in good faith; and (c) to grant ECT protection would therefore have been contrary to the clean hands requirement.[1711]

1315. Second, Respondent argues that a claimant who is guilty of illegal conduct is deprived of the necessary *ius standi* to complain of corresponding illegalities by the State.[1712] This requirement of "clean hands," argues Respondent, is a "general principle of law" within the meaning of Article 38(1)(c) of the ICJ Statute.[1713]   Respondent cites the ICJ's decision in the *Case Concerning the Gabčíkovo-Nagymaros Project* and various dissenting opinions by ICJ judges, as well as a number of decisions of mixed claims commissions rendered in cases of diplomatic protection.[1714]   Regarding the latter set of cases, Respondent submits that the "unclean hands

---

ICSID Case No. ARB/06/5, Award, 15 April 2009, Exh. R-1078 (hereinafter "*Phoenix*"); *SAUR International S.A. v. Argentina*, ICSID Case No. ARB/04/4, Decision on Jurisdiction and Liability, 6 June 2012, Exh. R-4186 (hereinafter "*SAUR*").

[1711]   *Ibid.* ¶ 1552.

[1712]   Counter-Memorial ¶ 892.

[1713]   *Ibid.* ¶ 893.

[1714]   Counter-Memorial ¶¶ 894–95, referring to *Case Concerning the Gabčíkovo-Nagymaros Project (Hungary/Slovakia)*, Judgment, 25 September 1997, ICJ Reports 1997, p. 7 ¶ 133, Exh. C-948 (hereinafter "*Gabčíkovo-Nagymaros*"); *Samuel Brannan v. Mexico*, U.S.-Mexico Mixed Claims Commission, Opinion of the Umpire, 1868, *in* HISTORY AND DIGEST OF THE INTERNATIONAL ARBITRATIONS TO WHICH THE U.S. HAS BEEN A PARTY, Vol. 3 (John Bassett Moore, ed. 1898), p. 2757, 2758, Exh. R-1056; *The "Lawrence" Case*, U.S.-Great Britain Mixed Claims Commission, Judgment of the Umpire, 4 January 1855, Hornby's Report 397, 1856, p. 398, Exh. R-1057; *William Whitty v. The United States*, U.S.-British Claims Commission, Decision of the Commissioners, *in* HISTORY AND DIGEST OF THE INTERNATIONAL ARBITRATIONS TO WHICH THE U.S. HAS BEEN A PARTY, Vol. 3 (John Bassett Moore, ed. 1898), p. 2820, 2823, Exh. R-1058; *Frederick G. Fitch v. Mexico*, U.S.-Mexico Mixed Claims Commission, Opinion of the Umpire, 21 June 1876, *in* HISTORY AND DIGEST OF THE INTERNATIONAL ARBITRATIONS TO WHICH THE U.S. HAS BEEN A PARTY, Vol. 4 (John Bassett Moore, ed. 1898), p. 3476, 3477, Exh. R-1059; *Jarvis Case*, U.S.-Venezuela Mixed Claims Commission, Opinion of the Commissioner, UNRIAA, 1903–1905, Vol. 9, p. 208, 212, Exh. R-1060; *Cucullu's case*, U.S.-Mexico Mixed Claims Commission, Opinion of Mr. Palacio, 1868, *in* HISTORY AND DIGEST OF THE INTERNATIONAL ARBITRATIONS TO WHICH THE U.S. HAS BEEN A PARTY, Vol. 4 (John Bassett Moore, ed. 1898), p. 3477, 3480, Exh. R-1061; *Case of the Brig "Mary Lowell"*, U.S.-Spain Claims Commission, Opinion of the Umpire, 9 December 1879, Spain-U.S. Claims Commission, *in* HISTORY AND DIGEST OF THE INTERNATIONAL ARBITRATIONS TO WHICH THE U.S. HAS BEEN A PARTY, Vol. 3 (John Bassett Moore, ed. 1898), p. 2772, 2775, 2777, Exh. R-1062; *Robert Eakin v. United States*, No. 118, U.S.-Great Britain Claims Commission, PAPERS RELATING TO THE FOREIGN RELATIONS OF THE UNITED STATES, Vol. 3 (Washington Government Printing Office, 1874), p. 15, Exh. R-1063; *Clark Case ("The Medea and The Good Return")*, U.S.-Ecuador Claims Commission, 1862, Opinion of Mr. Hassaurek, *in* HISTORY AND DIGEST OF THE INTERNATIONAL ARBITRATIONS TO WHICH THE U.S. HAS BEEN A PARTY, Vol. 3 (John Bassett Moore, ed. 1898), p. 2729, 2738–39, Exh. R-1064; *Case Concerning Military and Paramilitary Activities in and against Nicaragua (Nicaragua v. United States of America)*, Merits, Judgment, 27 June 1986, Dissenting Opinion of Judge Schwebel, ICJ Reports 1986, p. 259 ¶¶ 268, 272, Exh. R-1071; *Case Concerning Arrest Warrant of 11 April 2000 (Democratic Republic of the Congo v. Belgium)*, Judgment, 14 February 2002, Dissenting Opinion of Judge van den Wyngaert, ICJ Reports 2002, p. 137 ¶ 84, Exh. R-1072; *Legal Status of Eastern Greenland (Denmark v. Norway)*, Judgment, 5 April 1933, Dissenting Opinion of Judge Anzilotti, PCIJ Series A/B No. 53, p. 76, 95, Exh. R-1073; *Interpretation of Peace Treaties with Bulgaria, Hungary and Romania*, Second Phase, Advisory Opinion, 18 July 1950, Dissenting Opinion of Judge Read, ICJ Reports 1950, p. 231, 244, Exh. R-1074.   *See also* Rejoinder ¶¶ 1529–40, citing *Case Concerning the*

principle has [an even] greater role with respect to claims brought directly by private parties, including in investor-State arbitration, than in the context of diplomatic protection."[1715] Respondent also relies on *Barcelona Traction* for the proposition that in international law the corporate "veil is lifted" to "prevent the misuse of the privileges of legal personality, as in certain cases of fraud or malfeasance . . . or to prevent the evasion of legal requirements or of obligations."[1716]   Finally, Respondent argues that if the "unclean hands" doctrine was not included in the ILC Articles on State Responsibility and Articles on Diplomatic Protection of the International Law Commission, it is only "because it corresponded to the doctrine of inadmissibility" and did not fall within the projected scope of both sets of ILC Articles.[1717]

1316. With respect to Claimants' contention that the instances of "unclean hands" referred to by Respondent can have no impact on this arbitration because they are collateral illegalities unrelated to either the making of Claimants' investments or their claims in these arbitrations,[1718] Respondent argues that it is "unsupported both by the investment treaty awards on which [Claimants rely], and by common sense and good faith."[1719]

1317. With respect to post-investment conduct, Respondent submits that the awards in *Gustav FW Hamester GmbH & Co KG v. Ghana* ("**Hamester**") and *AG Frankfurt Airport Services Worldwide v. Philippines* ("**Fraport**") recognize the relevance of such misconduct to the merits of an investment treaty claim.[1720]

1318. As regards illegalities pre-dating the acquisition of the investment, Respondent relies on the award in *Anderson v. Costa Rica* ("**Anderson**").[1721]   Respondent submits that the tribunal in that

*Barcelona Traction Light and Power Company Limited (Belgium v. Spain) (New Application: 1962)*, Second Phase, Judgment, 5 February 1970, ICJ Reports 1970, p. 3, Exh. C-930; *Mavrommatis Palestine Concessions (Greece v. Great Britain)*, Judgment, 30 August 1924, PCIJ Series A No. 2, p. 6, 13, Exh. R-1043; ILC, Provisional Summary Record of the 2844th Meeting held 25 May 2005, A/CN.4/SR.2844, Agenda Item 2, 6 June 2005, p. 4, 7, Exh. R-4191.

[1715]   Rejoinder ¶ 1538.

[1716]   *Case Concerning the Barcelona Traction Light and Power Company Limited (Belgium v. Spain) (New Application: 1962)*, Second Phase, Judgment, 5 February 1970, ICJ Reports 1970, p. 3 ¶ 56, Exh. C-930.

[1717]   Rejoinder ¶¶ 1543, 1545–47.

[1718]   Reply ¶¶ 1134–38.

[1719]   Rejoinder ¶ 1568.

[1720]   *Ibid.* ¶¶ 1569–70, referring to *Gustav F W Hamester GmbH & Co KG v. Ghana*, ICSID Case No. ARB/07/24, Award, 18 June 2010, Exh. R-1079 (hereinafter "*Hamester*"); *Fraport AG Frankfurt Airport Services Worldwide v. Philippines*, ICSID Case No. ARB/03/25, Award, 16 August 2007, Exh. R- 1006 (hereinafter "*Fraport*").

[1721]   Resondent's Rejoinder ¶ 1571, referring to *Anderson v. Costa Rica*, ICSID ARB(AF)/07/3, Award, 19 May 2010, Exh. R-4204 (hereinafter "*Anderson*").

case dismissed claims brought by Canadian individuals who had invested in a "Ponzi scheme" for lack of jurisdiction *ratione materiae*.  Respondent highlights that tribunal's finding that the entire underlying transaction was illegal and, by that fact, "it follows that the acquisition by each [c]laimant of the asset resulting from that transaction was also not in accordance with the law of Costa Rica."[1722]  Respondent submits that the finding of the *Anderson* tribunal applies in the present case, highlighting that:

> where an investment is simply transferred by the same ultimate owner from one investment vehicle to another, the concept of the unity of the investment requires that the process of the making and operation of the investment by the ultimate owner and the owner's investment vehicle be considered as a whole for purposes of determining the legality of the investment, even if the acquisition of the investment by the claimant, standing alone, is not illegal.[1723]

1319. To hold otherwise, argues Respondent, would extend investment treaty protection to claimants who shift investments through several layers of ownership and control in order to launder their illegal investments into legal ones qualifying for treaty protection.[1724]

1320. In response to Claimants' assertion that 'in accordance with the law' requirements should be limited to domestic laws regulating the admission of foreign investment, Respondent submits a number of counter-arguments, including the following:

- Claimants' reliance on the "isolated 2010 dictum" in *Mr. Saba Fakes v. the Republic of Turkey* ("**Saba Fakes**") to limit the substantive scope of the 'in accordance with the law' requirement is "unpersuasive and contrary to a consistent line of arbitral awards that have applied 'in accordance with the law' clauses to domestic legislation other than laws governing the admission of investments."[1725]

- the illegalities "infecting" Claimants' investments are "quintessential breaches of 'fundamental principles'" and were "central to the profitability of and dividend flow from Claimants' investments."[1726]

---

[1722] *Ibid.*, quoting *Anderson* ¶ 55.

[1723] *Ibid.* ¶ 1572.

[1724] *Ibid.*

[1725] *Ibid.* ¶ 1577, referring to *Mr Saba Fakes v. The Republic of Turkey*, ICSID ARB/07/20, Award, 17 July 2010, Exh. C-1537 (hereinafter "*Saba Fakes*").

[1726] *Ibid.* ¶ 1582.

- Claimants' attempt to exclude minor violations from the scope of 'in accordance with the law' clauses is unavailing, as none of the illegalities of which Respondent complains are minor.[1727]

1321. In response to Claimants' contention that they were not the relevant actors in the context of Respondent's allegations regarding Yukos' tax optimization scheme and the obstruction of the enforcement of tax claims against Yukos by the Russian Federation, Respondent submits that Claimants are "essential instrumentalities of illegal acts, through Claimants' control of Yukos and its management,"[1728] noting that during the relevant period, "Claimants owned a majority of Yukos shares and appointed the totality of the members of its board of directors, including . . . Mikhail Khodorkovsky."[1729]

1322. Respondent also states that it is not estopped from invoking Claimants' unclean hands in this arbitration by any failure to take prompt action.[1730]   Respondent submits that Claimants have failed to satisfy the legal standard for estoppel.[1731]   This standard, argues Respondent, was confirmed by the ICJ in the *North Sea Continental Shelf Cases*:

> [I]t appears to the Court that only the existence of a situation of estoppel could suffice to lend substance to this contention, -- that is to say if the Federal Republic were now precluded from denying the applicability of the conventional regime, by reason of part conduct, declarations, etc., <u>which</u> not only <u>clearly and consistently evinced acceptance</u> of that regime, but <u>also had caused Denmark or the Netherlands</u>, <u>in reliance on such conduct, detrimentally to change position or suffer some prejudice</u>.  Of this there is no evidence whatever in the present case.[1732]

---

[1727]   *Ibid*. ¶ 1580.

[1728]   Counter-Memorial ¶ 909.

[1729]   *Ibid*. ¶ 933.

[1730]   Rejoinder ¶ 1597.

[1731]   *Ibid*. ¶¶ 1588–98.

[1732]   *Ibid*. ¶ 1589, quoting *North Sea Continental Shelf (Federal Republic of Germany/Denmark and Federal Republic of Germany/Netherlands)*, Judgment, 20 February 1969, ICJ Reports 1969, p. 3 ¶ 30, Exh. R-4208; *see also* ¶¶ 1590–92, citing *Delimitation of the Maritime Boundary in the Gulf of Maine Area (Canada/U.S.)*, Judgment, 12 October 1984, ICJ Reports 1984, p. 246 ¶ 145, Exh. R-4209; *Case of the Land and Maritime Boundary (Cameroon/Nigeria)*, Preliminary Objections, Judgment, 11 June 1998, ICJ Reports 1998, p. 275 ¶ 57, Exh. R-4210; *Land, Island and Maritime Frontier Dispute (El Salvador/Honduras)*, Application by Nigeria for Permission to Intervene, Judgment, 13 September 1990, ICJ Reports 1990, p. 92 ¶ 63, Exh. R-4211; *Aerial Incident of 10 August 1999 (Pakistan v. India)*, Jurisdiction of the Court, Judgment, 21 June 2000, ICJ Reports 2000, p. 12 ¶ 45, Exh. R-4212; *Legality of Use of Force (Serbia and Montenegro v. Canada)*, Preliminary Objections, Judgment, 15 December 2004, ICJ Reports 2004, p. 429 ¶ 42, Exh. R-4213; WTO, Guatemala—Definitive Anti-Dumping Measures On Grey Portland Cement From Mexico, Report of the Panel, 24 October 2000 ¶¶ 8.23–8.24, Exh. R-4214; WTO, Argentina—Definitive Anti-Dumping Duties On Poultry From Brazil, Report of the Panel, 22 April 2003 ¶ 7.39, Exh. R-4215; *Pope & Talbot Inc. v. The Government of Canada*, UNCITRAL, Interim Award, 26 June 2000 ¶ 111, Exh. C-953.

1323. Respondent submits that Claimants have failed to identify an unequivocal representation by Respondent.  In that regard, Respondent argues that Claimants' reliance on Respondent's alleged failure to challenge illegalities earlier does not amount to an unequivocal representation.  Respondent also submits that Claimants have failed to establish that they changed their conduct to their detriment in reliance on said representation.  Particularly regarding the alleged abuses of the Cyprus-Russia DTA, Respondent contends it raised its objection to Hulley's and VPL's alleged violations in these arbitrations as early as October 2006, and thus, argues Respondent, "Claimants' further suggestion that Respondent might be estopped because it did not also raise these abuses 'in an appropriate forum' is absurd."[1733]

1324. Respondent adds that informal or *contra legem* acceptance of an investment by the host State's authorities that is illegal under the host State's domestic law, or based on covert arrangements unknown to the host State, cannot provide a basis for estoppel.  In support, Respondent relies on the *Fraport* award.[1734]

1325. Finally, Respondent rejects Claimants proportionality argument, stating that it is based on "rules governing countermeasures by an injured State in inter-State relations."[1735]  In the words of Respondent: "the legality requirement excludes illegal investments from the scope of ECT protection.  As a result it is not that a host State is not justified in breaching obligations with respect to illegal investments, but instead that it has no treaty obligations in the first instance."[1736]

### (b)  Claimants' Position

1326. Claimants object that their "unclean hands," even if proven by Respondent, could have no impact on their claims in these arbitrations because: (a) the ECT does not contain any principle of "unclean hands"; (b) no principle of "unclean hands" has been recognized as a general principle of law; and (c) the instances of "unclean hands" alleged by Respondent are "collateral illegalities" that do not fall within the parameters of any "unclean hands" doctrine.

1327. Claimants assert that it is "impossible to find any textual basis in the [ECT] for the

---

[1733] *Ibid.* ¶¶ 1593–95.

[1734] *Ibid.* ¶ 1596, referring to *Fraport* ¶ 347.

[1735] *Ibid.* ¶¶ 1584–7.

[1736] *Ibid.* ¶ 1586.

Respondent's contention."[1737]   They add that the introductory note to the ECT—a note which Claimants contend is not an official document or interpretation of the ECT—confers an obligation to strengthen the rule of law on States parties, rather than on the investor.[1738] Claimants highlight that Respondent chose not to quote the remainder of the note, which goes on to state that the ECT's aim of strengthening the rule of law on energy issues is to be accomplished "by creating a level playing field of rules to be observed by all participating governments, thus minimising the risks associated with energy-related investments and trade."[1739]   In this regard, Claimants contend that denying a claimant access to a forum for resolving its claims altogether would violate, rather than support, the rule of law.[1740]

1328. Claimants seek to distinguish the *Phoenix* and *Hamester* ICSID awards relied upon by Respondent.   Claimants highlight that the statement relied on by Respondent to infer that a jurisdictional requirement of compliance with host State laws is implicit, even when not stated, is *obiter dictum* on account of the BIT provisions being applied by those tribunals.[1741] Similarly, Claimants submit that any reliance on the *Plama* award to insert a jurisdictional requirement of "clean hands" into the relevant treaty is incorrect. Claimants submit that in the *Plama* decision on jurisdiction, the tribunal considered and rejected an argument that the illegality of the investment could affect its capacity to hear the dispute.[1742]

1329. Further, Claimants emphasize that the bar for recognition of general principles of international law is set "extremely high".[1743]   Claimants assert that Respondent's "unclean hands" theory fails to meet this high threshold.

1330. Claimants allege that neither the PCIJ nor the ICJ have ever endorsed "unclean hands" as a general principle of law.[1744]   They also argue that the inter-state cases relied on by Respondent are inapposite to this arbitration as they concern "situations in which two sovereign States have

---

[1737]   Reply ¶ 1029.

[1738]   *Ibid.* ¶ 1100.

[1739]   *Ibid.* ¶ 1101.

[1740]   *Ibid.* ¶ 1102.

[1741]   *Ibid.* ¶ 1098, referring to *Phoenix* ¶ 101, Exh. R-1078; *Hamester* ¶ 123–24, Exh. R-1079.

[1742]   *Ibid.* ¶ 1099, referring to *Plama*, Exh. C-994.

[1743]   *Ibid.* ¶ 1039.

[1744]   *Ibid.* ¶¶ 1040–55.

assumed an identical or reciprocal obligation."[1745]   Claimants further argue that the awards of mixed claims commissions are of little guidance, as they deal mostly with diplomatic protection and are of "ancient vintage."  In support, Claimants cite the *Saba Fakes v. Turkey* ICSID award, in which the tribunal held that the "rules of customary international law applicable in the context of diplomatic protection do not apply as such to investor-State arbitration."[1746]

1331. Claimants note that the ILC Articles on State Responsibility and Articles on Diplomatic Protection do not contain a principle of "unclean hands."[1747]  They also argue that most scholars reject the existence of an "unclean hands" general principle altogether, while its proponents argue that it should be subject to certain well-defined limits.[1748]

1332. Claimants also submit that the investment tribunal awards relied on by Respondent in support of a general principle of "unclean hands" were decided on other grounds and that Respondent's analysis of these awards is incomplete and misleading.[1749]  According to Claimants, in each of the ICSID awards cited by Respondent—*Plama*, *Phoenix*, *Hamester* and *Inceysa Vallisoletana, S.L. v. Republic of El Salvador* ("**Inceysa**")—the tribunal's decision rested on a clause in the relevant BIT conditioning jurisdiction on compliance by the investor with the laws of the host State.[1750]

1333. Furthermore, Claimants argue that even if Respondent can make the case for a general principle of "unclean hands" or a legality requirement under the ECT, Respondent's theory as applied to this case rests on allegations of collateral illegalities unrelated to either the making of

---

[1745] *Ibid.* ¶¶ 1040, 1055.

[1746] *Ibid.* ¶¶ 1056–67, referring to *Saba Fakes* ¶ 69, Exh. C-1537.

[1747] *Ibid.* ¶¶ 1068–71.

[1748] *Ibid.* ¶¶ 1072–77.  For scholars rejecting the principle, Claimants cite to: Jean Salmon, ed., Dictionnaire de droit international public, 2001, pp. 677–78, Exh. C-1613 ; Luis Garcia-Arias, *La doctrine des «Clean Hands» en droit international public*, 1960, 30 *Annuaire des anciens auditeurs de l'académie de droit* 14, p. 18, Exh. R-1075; ILC, Sixth report on diplomatic protection by John Dugard, Special Rapporteur, 57th Session, 2 May – 5 August 2005, U.N. Doc. A/CN.4/546 ¶ 15, Exh. C-1678; Charles Rousseau, Droit international public, tome V, Les Rapports conflictuels ¶ 170, Exh. C-1612.  For proponents of the principle, with limits, Claimants cite to: Bin Cheng, General Principles of Law as Applied by International Courts and Tribunals, pp. 157–58, Exh. R-1054; Sir Gerald Fitzmaurice, *The General Principles of International Law Considered From the Standpoint of the Rule of Law*, 1957, 92 Collected Courses of the Hague Academy of International Law 1, p. 119, Exh. R-1053.

[1749] *Ibid.* ¶ 1094.

[1750] *Ibid.* ¶ 1094–1105, referring to *Plama*, Exh. C-994; *Inceysa Vallisoletana, S.L. v. El Salvador*, ICSID Case No. ARB/03/26, Award, 2 August 2006, Exh. R-1083 (hereinafter "*Inceysa*"); *Phoenix*, Exh. R-1078; *Hamester*, Exh. R-1079.

Claimants' investments or their claims in these arbitrations.[1751]

1334. Claimants submit that even when interpreting treaty provisions expressly requiring compliance with host State laws as a condition of jurisdiction, investment tribunals have strictly construed such provisions.[1752]   Claimants submit that investment tribunals have only subjected the initial making of the investment to a legality test.   They also assert that the limited temporal scope employed by investment tribunals renders alleged pre-investment conduct irrelevant,[1753] and limits its substantive scope, *e.g.*, by extending only to host State laws "governing the admission of foreign investments in its territory."[1754]   Claimants emphasize that misconduct unrelated to the making of an investment, or which concerns minor violations, has been disregarded by investment tribunals.[1755]

1335. Claimants also submit that Anglo-American jurisprudence confirms that alleged illegalities must have an "immediate" and "necessary" relation to a claimant's cause of action.[1756]

1336. It follows, argue Claimants, that none of Respondent's allegations are covered by any principle of "unclean hands".   The actions complained of by Respondent with respect to the acquisition of Yukos pre-date Claimants' investments, depriving the Tribunal of jurisdiction *ratione temporis* over those actions.[1757]   The alleged abuses of the Cyprus-Russia DTA do not, according to Claimants, have the required "immediate" or "necessary" relation to Claimants' claims.[1758]   Claimants argue that to bar Hulley and VPL permanently from bringing claims under the ECT for having claiming benefits under the Cyprus-Russia DTA to which they were not entitled rests on an "impossibly broad interpretation" of the "unclean hands" concept.[1759]

1337. Claimants also point out that only the allegations of DTA abuses concern the conduct of Claimants themselves, while the other 24 allegations concern the conduct of persons other than Claimants.   Claimants contend that Respondent provides no basis on which the conduct of these

---

[1751]   *Ibid.* ¶¶ 1134–38.

[1752]   *Ibid.* ¶ 1105.

[1753]   *Ibid.* ¶¶ 1106–12.

[1754]   *Ibid.* ¶¶ 1118–19.

[1755]   *Ibid.* ¶ 1120.

[1756]   *Ibid.* ¶¶ 1105, 1078, 1134.

[1757]   *Ibid.* ¶ 1135.

[1758]   *Ibid.* ¶ 1137.

[1759]   *Ibid.*

third parties could render Claimants' hands "unclean".[1760]

1338. Claimants further assert that, even if any principle of "unclean hands" is potentially applicable in the situation at hand, Respondent is estopped from raising matters in these arbitrations of which it has long been aware, but has never challenged.[1761]  Claimants argue that acquiescence, or the silence or absence of protest in circumstances which generally call for a positive reaction signifying an objection, may "in and of itself" result in estoppel, where the other elements of estoppel are not made out.[1762]

1339. In particular, Claimants reject Respondent's allegations with respect to the creation and original acquisition of Yukos in 1995.  Claimants submit that it was Respondent that "planned, organized, conducted and completed the privatization of the Russian Federation's property through the loans-for-shares program, including the privatization of Yukos."[1763]  Similarly, Claimants highlight that Respondent did not take legal action against Claimants for any of the alleged violations of the Cyprus-Russia DTA by Hulley and VPL.  Claimants underline that Respondent must have had knowledge of many, if not all, of the alleged violations "as early as October 2003, through the searches and seizures of documents at the Moscow premises of GML MS, or at least as early as October 6, 2006 when the Respondent first raised the matter in these arbitrations."[1764]

1340. Claimants also submit that, even if an "unclean hands" general principle existed, it would not confer upon States the right to violate investors' rights.[1765]  Drawing an analogy to counter-measures, Claimants refer to Articles 49 and 54 of the ILC Articles on State Responsibility and to the ILC Commentary on the provisions, which states that such measures "are not intended as a form of punishment for wrongful conduct, but as an instrument for achieving compliance with the obligations of the responsible State."[1766]

1341. The ILC Commentary further emphasizes that proportionality is a stand-alone requirement, such that even where a counter-measure is carried out for a permissible purpose, it must still be

---

[1760] *Ibid.* ¶ 1136.

[1761] *Ibid.* ¶ 1181.

[1762] *Ibid.* ¶ 1183.

[1763] *Ibid.* ¶ 1188.

[1764] *Ibid.* ¶ 1189.

[1765] *Ibid.* ¶ 1191.

[1766] *Ibid.* ¶ 1194.

proportionate to the original breach.[1767]

1342. Claimants submit that the need to weigh the proportionality of Respondent's response to the illegalities it alleges against Claimants provides further reason for rejecting Respondent's "unclean hands" objection to jurisdiction/admissibility.  In Claimants' own words: "it is for the tribunal to assess such allegations . . . in its consideration of the merits of the investor's claims, bearing in mind that any response by the host State to any alleged illegality must comport with its international obligations."[1768]

### 4.  Tribunal's Decision

1343. Article 26(6) of the ECT provides that "[a] tribunal established under paragraph (4) shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law."

1344. Article 31 of the VCLT, which is widely recognized as reflecting customary international law, provides in its first paragraph that "[a] treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose."

1345. Looking first at the text of the ECT, the Tribunal observes that it does not contain any express reference to a principle of "clean hands."  Nor, unlike some other investment treaties, does the ECT contain an express requirement that investments be made in accordance with the laws of the host country.[1769]  These points are not disputed by the Parties.

1346. In the absence of any specific textual hook, the Tribunal must consider whether, given the need to interpret treaties in good faith and take account of their object and purpose, the ECT as a whole may be understood as conditioning the protection of investments on their legality, or on the good faith of the investor.  The Tribunal addresses this question in subsection (a) below.

---

[1767]  *Ibid.* ¶ 1195.

[1768]  *Ibid.* ¶ 1197.

[1769]  *See e.g.* the bilateral investment treaties applied in *Fraport*, Exh. R-1006 (Germany–Philippines BIT:  "[t]he term investment shall mean any kind of asset accepted in accordance with the respective laws and regulations of either Contracting State"); *Inceysa*, Exh. R-1083 (Spain–El Salvador BIT:  "[e]ach Contracting Party shall protect in its territory investments made, in accordance with its legislation"; "[the BIT shall] apply to investments made . . . in accordance with the laws"); *Phoenix*, Exh. RE-1078 (Israel–Czech Republic BIT:  "[t]he term 'investment' shall comprise any kinds of asset invested . . . in accordance with the respective laws and regulations."

1347. In addition to any potential limitation on the protection of investments inherent in the ECT, a principle of "clean hands" could be relevant to this arbitration pursuant to Article 26(6) of the ECT if it were an "applicable rule[. . .] or principle[. . .] of international law."  The Parties dispute whether "clean hands" exists as a "general principle of international law recognized by civilized nations" in the meaning of Article 38(1)(c) of the Statute of the ICJ.  The Tribunal addresses this question in subsection (b) below.

1348. Finally, in subsection (c) below, the Tribunal considers whether any of the 28 instances of "bad faith and illegal conduct" of which Respondent accuses Claimants fall within the scope of any "unclean hands" or similar principle applicable in the ECT context.

### (a)    Can a Clean Hands Principle or Legality Requirement be Read into the ECT?

1349. The Tribunal notes that there is support in the decisions of tribunals in investment treaty arbitrations for the notion that, even where the applicable investment treaty does not contain an express requirement of compliance with host State laws (as is the case with the ECT), an investment that is made in breach of the laws of the host State may either: (a) not qualify as an investment, thus depriving the tribunal of jurisdiction; or (b) be refused the benefit of the substantive protections of the investment treaty.

1350. The *Plama* tribunal, deciding a case under the ECT, thus stated that the "substantive protections of the ECT cannot apply to investments made contrary to law."[1770]  It acknowledged that the ECT "does not contain a provision requiring the conformity of the Investment with a particular law," but stated that "[t]his does not mean . . . that the protections provided for by the ECT cover all kinds of investments, including those contrary to domestic and international law."[1771] The tribunal explained that, in that case, granting the claimant protection would have "be[en] contrary to the principle *nemo auditor propriam turpitudinem allegans*" and "the basic notion of international public policy—that a contract obtained by wrongful means (fraudulent misrepresentation) should not be enforced by a tribunal."[1772]

1351. Other arbitral tribunals have stated in *obiter dicta* that the principle that an investment "will not be protected if it has been created in violation of national or international principles of good

---

[1770]   *Plama*, Exh. C-994 ¶ 139.

[1771]   *Ibid.* ¶ 138.

[1772]   *Ibid. ¶* 143.

faith" or "of the host State's law" is a "general principle[. . . ] that exist[s] independently of specific language" in an investment treaty.[1773]

1352. The Tribunal agrees with this proposition.  In imposing obligations on States to treat investors in a fair and transparent fashion, investment treaties seek to encourage legal and *bona fide* investments.  An investor who has obtained an investment in the host State only by acting in bad faith or in violation of the laws of the host state, has brought itself within the scope of application of the ECT through wrongful acts.  Such an investor should not be allowed to benefit from the Treaty.

1353. For reasons that will become apparent further in this chapter, the Tribunal does not need to decide here whether the legality requirement it reads into the ECT operates as a bar to jurisdiction or, as suggested in *Plama*, to deprive claimants of the substantive protections of the ECT.

1354. However, the Tribunal does need to address Respondent's contention that the right to invoke the ECT must be denied to an investor not only in the case of illegality in the *making* of the investment but also in its *performance*.   The Tribunal finds Respondent's contention unpersuasive.

1355. There is no compelling reason to deny altogether the right to invoke the ECT to any investor who has breached the law of the host State in the course of its investment.  If the investor acts illegally, the host state can request it to correct its behavior and impose upon it sanctions available under domestic law, as the Russian Federation indeed purports to have done by reassessing taxes and imposing fines.  However, if the investor believes these sanctions to be unjustified (as Claimants do in the present case), it must have the possibility of challenging their validity in accordance with the applicable investment treaty.  It would undermine the purpose and object of the ECT to deny the investor the right to make its case before an arbitral tribunal based on the same alleged violations the existence of which the investor seeks to dispute on the merits.

---

[1773] *Hamester* ¶¶ 123–24, Exh. R-1079. *See also Phoenix* ¶ 101, Exh. R-1078 ("it is the Tribunal's view that this condition – the conformity of the establishment of the investment with the national laws – is implicit even when not expressly stated in the relevant BIT"); *SAUR* ¶ 308, Exh. R-4186 ("[the tribunal] is aware that the finality of the investment arbitration system is to protect only lawful and bona fide investments. Whether or not the BIT between France and Argentina mentions the requirement that the investor act in conformity with domestic legislation does not constitute a relevant factor. The condition of not committing a serious violation of the legal order is a tacit condition, inherent to any BIT as, in any event, it is incomprehensible that a State offer the benefit of protection through arbitration if the investor, in order to obtain such protection, has acted contrary to the law.")

1356. Respondent has not been able to cite any apposite authority in support of its contention.  The statements of investment tribunals it relies on were all made *obiter* and are too vague to allow any certain conclusions to be drawn as to their intended meaning.  For example, the statement in *Fraport* that illegal acts in the course of an investment "might be a defense to claimed substantive violations" appears to suggest that, in some cases, the State's actions will have been justified as an appropriate response to the investor's violations of national law.[1774]  As is clear from the decision, the statement by the *Fraport* tribunal does not imply the unavailability of the substantive protections of the treaty, but rather concludes that the respondent State has not incurred any liability under the treaty.

> (b)   Does the "Clean Hands" Doctrine Constitute a "General Principle of Law Recognized by Civilized Nations"?

1357. Since the Tribunal will not read into the ECT any legality requirement with respect to the conduct of the investment, it must consider Respondent's more general proposition that a claimant who comes before an international tribunal with "unclean hands" is barred from claiming on the basis of a "general principle of law."

1358. The Tribunal is not persuaded that there exists a "general principle of law recognized by civilized nations" within the meaning of Article 38(1)(c) of the ICJ Statute that would bar an investor from making a claim before an arbitral tribunal under an investment treaty because it has so-called "unclean hands."

1359. General principles of law require a certain level of recognition and consensus.  However, on the basis of the cases cited by the Parties, the Tribunal has formed the view that there is a significant amount of controversy as to the existence of an "unclean hands" principle in international law.

1360. Respondent has demonstrated that certain principles associated with the "clean hands" doctrine, such as *exceptio non adimpleti contractus* and *ex iniuria ius non oritur* have been endorsed by the PCIJ and the ICJ.[1775]  However, the Tribunal notes that Judge Simma in his separate opinion

---

[1774] *Fraport*, Exh. R-1006 ¶¶ 395, 345.  The Tribunal notes that the Chairman, Mr. Fortier, was the Chairman of the Fraport tribunal.

[1775] *See The Diversion of Water from the Meuse (Netherlands v. Belgium)*, Judgment, 28 June 1937, Individual Opinion of Judge Hudson, PCIJ Series A/B No. 70, p. 73, 77, Exh. C-1502 ("[i]t would seem to be an important principle of equity that where two parties have assumed an identical or reciprocal obligation, one party which is engaged in continuing non-performance of that obligation should not be permitted to take advantage of a similar non-performance of that obligation by the other party"); *Gabčíkovo-Nagymaros*, ¶ 133 Exh. C-948 ("[t]he Court, however, cannot

in the *Application of the Interim Accord of 13 December 1995* raises doubt as to the continuing existence of the *exceptio non adimpleti contractus* principle.[1776]

1361. With regard to the "unclean hands" doctrine proper, Respondent has referred to the dissenting opinion of Judge Schwebel (a member of this Tribunal) in the *Military and Paramilitary Activities in and against Nicaragua* ICJ case, where he concluded that Nicaragua's claims against the United States should fail because Nicaragua had "not come to Court with clean hands."[1777]   Respondent also referred to other dissenting ICJ and PCIJ opinions where the principle of "unclean hands" was invoked (albeit often without referring to it by name).[1778]

1362. However, as Claimants point out, despite what appears to have been an extensive review of jurisprudence, Respondent has been unable to cite a single majority decision where an international court or arbitral tribunal has applied the principle of "unclean hands" in an inter-State or investor-State dispute and concluded that, as a principle of international law, it operated as a bar to a claim.

1363. The Tribunal therefore concludes that "unclean hands" does not exist as a general principle of international law which would bar a claim by an investor, such as Claimants in this case.

---

disregard the fact that the Treaty has not been fully implemented by either party for years, and indeed that their acts of commission and omission have contributed to creating the factual situation that now exists. Nor can it overlook that factual situation . . . when deciding on the legal requirements for the future conduct of the Parties.  This does not mean that facts—in this case, facts which flow from wrongful conduct—determine the law. The principle *ex injuria jus non oritur* is sustained by the Court's finding that the legal relationship created by the 1977 Treaty is preserved and cannot in this case be treated as voided by unlawful conduct.")

[1776]   *Application of the Interim Accord of 13 December 1995 (the Former Yugoslav Republic of Macedonia v. Greece)*, Judgment, 5 December 2011, Separate Opinion of Judge Simma, ICJ Reports 2011, p. 695 ¶¶ 19–20, Exh. C-1545.

[1777]   *Case Concerning Military and Paramilitary Activities in and against Nicaragua (Nicaragua v. United States of America)*, Merits, Judgment, 27 June 1986, Dissenting Opinion of Judge Schwebel, ICJ Reports 1986, p. 259 ¶ 268, Exh. R-1071.

[1778]   *Legal Status of Eastern Greenland (Denmark v. Norway)*, Judgment, 5 April 1933, Dissenting Opinion of Judge Anzilotti, PCIJ Series A/B No. 53, p. 76, 95, Exh. R-1073; *Interpretation of Peace Treaties with Bulgaria, Hungary and Romania* (Second Phase), Advisory Opinion, 18 July 1950, Dissenting Opinion of Judge Read, ICJ Reports 1950, p. 231, 244, Exh. R-1074; *Case Concerning United States Diplomatic and Consular Staff in Tehran (United States of America v. Iran)*, Judgment, 24 May 1980, Dissenting Opinion of Judge Morozov, ICJ Reports 1980, p. 51 ¶ 3, Exh. R-1087; *Case Concerning Arrest Warrant of 11 April 2000 (Democratic Republic of the Congo v. Belgium)*, Judgment, 14 February 2002, Dissenting Opinion of Judge van den Wyngaert, ICJ Reports 2002, p. 137 ¶ 84, Exh. R-1072 ("The Congo did not come to the Court with clean hands").

(c)     **Would any Instances of Claimants' Alleged "Bad Faith and Illegal" Conduct be Caught by a Legality Requirement Read into the ECT?**

1364. To summarize, the Tribunal accepts that a claimant may be barred from seeking relief under the ECT if its investment was made in bad faith or in violation of the laws of the host state.

1365. It follows that the alleged instances of "unclean hands" listed in Subsections IX.B.2(b), (c) and (d) above—specifically, the instances related to the alleged abuse of the Russia–Cyprus DTA, the tax optimization scheme and the obstruction of Russia's enforcement of tax claims against Yukos, all of which relate to actions that were taken after the making of Claimants' investment, cannot have any impact on the availability of ECT protection for Claimants.

1366. This leaves for the Tribunal's consideration Respondent's allegations of bad faith and illegal conduct in the acquisition of Yukos and the subsequent consolidation of control and ownership over Yukos and its subsidiaries, set out in Subsection IX.B.2(a) above.

1367. It is common ground between the Parties that these actions were taken before Claimants became shareholders of Yukos in 1999, 2000 and 2001 and, consequently, were not taken by Claimants themselves, but by other actors, such as Bank Menatep and the Oligarchs.[1779] Claimants submit that these actions are thus irrelevant to these arbitrations, as the conduct complained of was not that of Claimants' themselves and, in any event, pre-dates Claimants' investment.[1780]

1368. Respondent replies that, on the contrary, the process of the acquisition of the Yukos shares by Claimants should not be seen in isolation but as an integral part of the "making of the investment" by Claimants.  Respondent's argument was most convincingly put by Dr. Claudia Annacker during the Hearing.  Dr. Annacker argued as follows:

> Contrary to Claimants' position, the serious illegalities that infect the entire process of the acquisition of the Yukos shares by Claimants cannot simply be ignored because the transfer of the shares to the Claimants . . . viewed in isolation, is asserted to be legal. These illegalities cannot somehow be cured through multiple transfers within this network of the oligarchs' offshore companies from one shell company to another.
>
> Indeed, the making of an investment is often a process rather than an instantaneous act, and often comprises a number of diverse transactions. These transactions must be treated as an

---

[1779]   *See* Counter-Memorial ¶¶ 910–13, explaining the alleged illegal conduct of Bank Menatep and the Oligarchs in the acquisition of Yukos shares by the Oligarchs in 1995 and 1996.

[1780]   *See* Reply ¶¶ 1135–36.

integrated whole. The transactions may have a separate legal existence, but they have a common economic aim . . .

Indeed, it would be incompatible with economic reality and undermine the integrity of the legal process if serious irregularities – illegalities – infecting the process of the making of the investment would not affect the availability of investment treaty protection, whether or not a specific transaction, part of the process, if viewed in isolation, might be legal.

Now, this conclusion applies a fortiori where a claimant is not unrelated to the persons or entities that committed these illegalities, but is an investment vehicle owned and controlled by the same persons who committed the illegalities . . . Otherwise, investment treaty protection could be achieved simply by shifting investments through layers of ownership and control to launder illegal investments . . .

While Claimants' acquisition of their shares may be a separate legal transaction, there is a common economic aim pursued by the same oligarchs . . .[1781]

1369. The Tribunal agrees with Respondent that an examination of the legality of an investment should not be limited to verifying whether the last in a series of transactions leading up to the investment was in conformity with the law. The making of the investment will often consist of several consecutive acts and all of these must be legal and *bona fide*.

1370. In the present case, however, Respondent has failed to demonstrate that the alleged illegalities to which it refers are sufficiently connected with the final transaction by which the investment was made by Claimants. The transactions by which each Claimant acquired its investment were their purchases of Yukos shares. As established in the Interim Award, these purchases were legal and occurred starting in 1999.[1782] On the other hand, the alleged illegalities connected to the acquisition of Yukos through the loans-for-shares program occurred in 1995 and 1996, at the time of Yukos' privatization. They involved Bank Menatep and the Oligarchs, an entity and persons separate from Claimants, one of which—Veteran—had not even come into existence.[1783] With respect to Respondent's other allegations, regarding profit skimming and the oppression of minority shareholders, it is also clear to the Tribunal that they are not part of the transaction or transactions by which each Claimant acquired their interest in Yukos.

1371. Respondent relies on *Anderson* for the proposition that "illegalities infecting an investment that pre-date a claimant's acquisition of the investment are not irrelevant or outside the tribunal's jurisdiction *ratione temporis*."[1784] However, the tribunal in that case examined and found to be

---

[1781]   Transcript, Day 19 at 171–174 (Respondent's closing).

[1782]   Interim Awards ¶¶ 431 (YUL); 430 (Hulley); 474 (VPL).

[1783]   VPL was incorporated in 2001 (Interim Award ¶ 44 (VPL)).

[1784]   Rejoinder ¶ 1571, referring to Anderson, Exh. R-4204.

illegal the very transaction through which the claimants obtained their investment, not any prior transactions made by other persons. [1785]

1372. While it is true that the claimants in *Anderson* were not blamed for the illegality that tainted their investment, nevertheless it is the very transaction by which their respective investments were obtained that was considered illegal by the tribunal, and led it to decline jurisdiction.

### (d) Conclusion

1373. The Tribunal concludes that Respondent's "unclean hands" argument fails as a preliminary objection.  It does not operate to deprive the Tribunal of its jurisdiction in this arbitration, render inadmissible any of the Claimants' claims or otherwise bar Claimants' from invoking the substantive protections of the ECT.

1374. However, as will be seen in Chapter X.E and Part XII, some of the instances of Claimants' "illegal and bad faith" conduct complained of by Respondent in the context of this preliminary objection, could have an impact on the Tribunal's assessment of liability and damages.

### C. RESPONDENT'S OBJECTIONS UNDER ARTICLE 21 OF THE ECT

#### 1. Introduction

1375. Another important threshold issue in this arbitration arises from Respondent's objection under Article 21 of the ECT.  Respondent argues that, pursuant to this complex provision (containing a "carve out" *from* the ECT for "Taxation Measures" at Article 21(1) and a "claw back" *for* Article 13 of the ECT in relation to "taxes" at Article 21(5)), the Tribunal lacks jurisdiction over claims with respect to "Taxation Measures" other than those based on expropriatory "taxes". [1786]  Claimants argue that the objection is without merit since, *inter alia*, Article 21 does not apply to actions—including expropriations—carried out "under the guise of taxation." [1787]

---

[1785] *Ibid.*

[1786] *See e.g.*, Respondent's Post-Hearing Brief ¶¶ 162–72.

[1787] *See e.g.*, Claimants' Post-Hearing Brief ¶¶ 203–30.

- 435 -

1376. The relevant provisions of Article 21 of the ECT for present purposes are paragraphs 1 (the "carve-out"), 5 (the "claw-back") and 7 (definitions), which in the English version[1788] read as follows:

> (1) Except as otherwise provided in this Article, nothing in this Treaty shall create rights or impose obligations with respect to Taxation Measures of the Contracting Parties.  In the event of any inconsistency between this Article and any other provision of the Treaty, this Article shall prevail to the extent of the inconsistency.
>
> . . .
>
> (5)   (a)   Article 13 shall apply to taxes.
>
> (b)   Whenever an issue arises under Article 13, to the extent it pertains to whether a tax constitutes an expropriation or whether a tax alleged to constitute an expropriation is discriminatory, the following provisions shall apply:
>
> (i)   The Investor or the Contracting Party alleging expropriation shall refer the issue of whether the tax is an expropriation or whether the tax is discriminatory to the relevant Competent Tax Authority. Failing such referral by the Investor or the Contracting Party, bodies called upon to settle disputes pursuant to Article 26(2)(c) or 27(2) shall make a referral to the relevant Competent Tax Authorities;
>
> (ii)   The Competent Tax Authorities shall, within a period of six months of such referral, strive to resolve the issues so referred.  Where nondiscrimination issues are concerned, the Competent Tax Authorities shall apply the non-discrimination provisions of the relevant tax convention or, if there is no non-discrimination provision in the relevant tax convention applicable to the tax or no such tax convention is in force between the Contracting Parties concerned, they shall apply the non-discrimination principles under the Model Tax Convention on Income and Capital of the Organisation for Economic Co-operation and Development;
>
> (iii)   Bodies called upon to settle disputes pursuant to Article 26(2)(c) or 27(2) may take into account any conclusions arrived at by the Competent Tax Authorities regarding whether the tax is an expropriation.  Such bodies shall take into account any conclusions arrived at within the six-month period prescribed in subparagraph (b)(ii) by the Competent Tax Authorities regarding whether the tax is discriminatory.  Such bodies may also take into account any conclusions arrived at by the Competent Tax Authorities after the expiry of the six-month period;
>
> (iv)   Under no circumstances shall involvement of the Competent Tax Authorities, beyond the end of the six-month period referred to in subparagraph (b)(ii), lead to a delay of proceedings under Articles 26 and 27.
>
> . . .

---

[1788]   The Tribunal has taken note of Claimants' highlighting of the differences in the wording of paragraphs 5 and 7 of Article 21 in some of the other official languages of the ECT.  As will be seen from the Tribunal's findings in this chapter, the Tribunal does not need to address the relevance, if any, of these differences.

(7) For the purposes of this Article:

    (a)    The term "Taxation Measure" includes:

        (i)    any provision relating to taxes of the domestic law of the Contracting Party or of a political subdivision thereof or a local authority therein;

        and

        (ii)    any provision relating to taxes of any convention for the avoidance of double taxation or of any other international agreement or arrangement by which the Contracting Party is bound.

    (b)    There shall be regarded as taxes on income or on capital all taxes imposed on total income, on total capital or on elements of income or of capital, including taxes on gains from the alienation of property, taxes on estates, inheritances and gifts, or substantially similar taxes, taxes on the total amounts of wages or salaries paid by enterprises, as well as taxes on capital appreciation.

    (c)    A "Competent Tax Authority" means the competent authority pursuant to a double taxation agreement in force between the Contracting Parties or, when no such agreement is in force, the minister or ministry responsible for taxes or their authorized representatives.

    (d)    For the avoidance of doubt, the terms "tax provisions" and "taxes" do not include customs duties.

1377. Respondent's objection under Article 21 of the ECT was originally addressed by the Parties during the jurisdictional phase of the arbitration.  In its Interim Awards, the Tribunal observed that some of the arguments raised by the Parties under Article 21 went to the heart of the merits of the dispute, in that they related to the background to and motivation behind Respondent's tax assessments, enforcement measures and other conduct, and that the Tribunal would not rule on these issues in a vacuum.[1789]  As a consequence, the Tribunal decided "to defer its definitive interpretation of Article 21, and its characterization of [Claimants'] claims for purposes of Article 21, to the next phase of the arbitration."[1790]

1378. As a consequence, the Parties had a further opportunity to develop their positions under Article 21 of the ECT during the merits phase of the present proceedings.  Claimants' and Respondent's arguments are now summarized in turn.

### 2.    Claimants' Position

1379. Claimants argue that Article 21 of the ECT does not apply to the case at hand since Respondent's actions were "actions under the guise of taxation" rather than "*bona fide* taxation

---

[1789]    Interim Awards ¶¶ 583–84 (Hulley), ¶¶ 584–85 (YUL), ¶¶ 595–96 (VPL).

[1790]    Interim Awards ¶ 584 (Hulley), ¶ 585 (YUL), ¶ 596 (VPL).

actions"[1791] and merely a tool "to achieve a purpose that had nothing to do with taxation: the elimination of a potential opponent and the appropriation of Yukos' assets."[1792]  According to Claimants, "[i]t is no answer for a state to say its courts have used the [word] 'taxation' . . . in describing judgments by which they effect the dispossession of foreign investors.  If that were enough, investment protection through international law would likely become an illusion, as states would quickly learn to avoid responsibility by dressing up all adverse measures, perhaps expropriation first of all, as taxation."[1793]  Claimants refer in particular to the decisions of the *Quasar* and *RosInvestCo* tribunals to support their view that in a case such as this one a carve-out with regard to taxation measures cannot apply.[1794]

1380.  In addition, Claimants suggest that the carve-out under Article 21 of the ECT is narrower than that in other treaties in that it only applies to the enactment of "provisions" relating to taxes, but not to the application of these provisions and the "collection and enforcement" of taxes.[1795]  Claimants refer to the ECT's *travaux préparatoires* in this regard.[1796]  In particular, they point out that during the negotiations of the ECT, the French delegation, in response to a memorandum of the Legal Sub-Group noting that "taxation measures" were identified in an illustrative manner, took the view that Article 21(7) of the ECT would constitute a definition and that, therefore, "includes" in that provision would have to be replaced by "means".[1797]

1381.  Claimants say that they "have no issue with the right of the Russian Federation to enact tax provisions or with the content of Russian tax law," but only with "the manner in which Russian tax law was grossly distorted, misapplied and abused to effect the destruction of Yukos."[1798]

---

[1791]   Transcript, Day 2 at 4 (Claimants' opening); Transcript, Day 17 at 156 (Claimants' closing); Claimants' Post-Hearing Brief ¶ 204.

[1792]   Transcript, Day 17 at 170 (Claimants' closing); Claimants' Post-Hearing Brief ¶ 206.

[1793]   Transcript, Day 17 at 171 (Claimants' closing) (quoting *Quasar* ¶ 179, Exh. R-3383).

[1794]   Transcript, Day 2 at 4–8 (Claimants' opening); Transcript, Day 17 at 168–69 (Claimants' closing); Claimants' Opening Slides, pp. 219–20; Claimants' Post-Hearing Brief ¶ 207 (discussing *RosInvestCo* ¶ 628, Exh. C-1049; *Renta4 S.V.S.A. v. Russian Federation*, SCC Arbitration V024/2007, Award on Preliminary Objections, 20 March 2009 ¶ 74, Exh. C-1048).

[1795]   Transcript, Day 2 at 10 (Claimants' opening); Transcript, Day 17 at 174 (Claimants' closing); Claimants' Opening Slides, pp. 226–30; Claimants' Post-Hearing Brief ¶¶ 204, 208.

[1796]   Claimants' Post-Hearing Brief ¶ 211.

[1797]   Memorial ¶ 1034 n.1418.

[1798]   Claimants' Post-Hearing Brief ¶ 209.

Accordingly, Claimants take the view that for this reason alone Article 21 of the ECT cannot apply.[1799]

1382. Claimants also take the view that, in any event, the ECT's protection would still apply with regard to the expropriation standard under Article 13 of the ECT, due to the claw-back provision in Article 21(5) of the ECT, which they say must have the same scope as Article 21(1) of the ECT.[1800]   Claimants suggest that Respondent's interpretation (according to which the claw-back provision would be narrower in scope than the taxation carve-out) would lead to "a gaping hole in the ECT where investors would stand completely unprotected from expropriatory taxation," thus "defeat[ing] the object and purpose of the 'claw-back' and of the ECT itself."[1801]   Claimants also dispute Respondent's argument that Russian law should determine the meaning of "tax" under Article 21(5) of the ECT, since "for the interpretation of a treaty, you do not look at domestic law of one of the States parties to a treaty."[1802]

1383. In any event, Claimants argue that many of Respondent's actions that they complain of have nothing to do with taxation and thus fall outside of the scope of Article 21 of the ECT.[1803]   In this regard, Claimants state that "the attacks on Yukos and related persons involved all of the following organs and entities:  the Presidential Administration, the Russian courts, Ministry of Justice, Federal Bailiff Service, Penitentiary Service, Ministry of Natural Resources, Internal Affairs, FSB, Prosecutor General's Office, Federal Property Fund, Rosneft" and included "freezes, searches and seizures," the auctioning of YNG and the forcing of Yukos into bankruptcy, all of which would "have nothing to do with taxation."[1804]

1384. Finally, Claimants assert that referring any questions with regard to taxation measures to the Russian Federation's tax authorities as envisaged under the claw-back provision of Article 21(5) of the ECT would be an exercise in futility, as the relevant Russian authorities would already have looked at the issues, the Parties' submissions would be too voluminous to be considered by any of the relevant authorities and the Tribunal would, in any event, not be

---

[1799]   Claimants' Post-Hearing Brief ¶ 209.

[1800]   Transcript, Day 2 at 10 (Claimants' opening); Transcript, Day 17 at 192 (Claimants' closing); Claimants' Post-Hearing Brief ¶¶ 204, 214–21.

[1801]   Claimants' Post-Hearing Brief ¶ 220 (emphasis in the original); Transcript, Day 17 at 190–91 (Claimants' closing).

[1802]   Transcript, Day 17 at 195 (Claimants' closing).

[1803]   Transcript, Day 2 at 11 (Claimants' opening); Transcript, Day 17 at 207 (Claimants' closing); Claimants' Post-Hearing Brief ¶¶ 204, 222–24.

[1804]   Transcript, Day 17 at 208 (Claimants' closing).

bound by any comments of these authorities.[1805]   As a consequence, Claimants argue that, even if the Tribunal were to find that Article 21(5) of the ECT applies, it should still proceed with its examination of the case without any referral to the Russian authorities.

### 3.    Respondent's Position

1385. Respondent argues that most of the actions complained of by Claimants are outside the scope of the Tribunal's scrutiny due to the taxation carve-out provision in Article 21(1) of the ECT.

1386. Respondent points out that taxation carve-outs have a number of functions, which include preserving States' sovereignty in fiscal matters, the coordination of obligations under investment treaties and double taxation treaties, and assuring that complex tax issues are addressed with the necessary expertise.[1806]   To achieve these functions, taxation carve-outs would typically be "broad, covering all aspects of the tax regime."[1807]   Respondent refers to a number of instances where investment treaty tribunals gave effect to taxation carve-outs in international investment treaties, namely the decisions in *Duke Energy v. Ecuador*, *EnCana v. Ecuador*, *El Paso International Company v. The Argentine Republic* ("*El Paso*"), *Burlington v. Ecuador* and *Nations Energy v. Panama*.[1808]

1387. With regard to the wording of Article 21(1) of the ECT, Respondent argues that the term "measures" is given a broad meaning throughout the ECT, in contradistinction to the narrower term of "laws and regulations".[1809]   As a consequence, says Respondent, an interpretation of Article 21(1) of the ECT in accordance with recognized principles of treaty interpretation shows that the provision "covers all measures taken by the legislative, executive, and judiciary in the field of taxation, whether of general or individual application."[1810]   Respondent refers to the ICJ's judgment in *Fisheries Jurisdiction (Spain v. Canada)* to support its view that

---

[1805]   Transcript, Day 17 at 200 (Claimants' closing); Claimants' Post-Hearing Brief ¶ 229.

[1806]   Transcript, Day 3 at 156–59 (Respondent's opening); Respondent's Opening Slides, pp. 454–58.

[1807]   Transcript, Day 3 at 159 (Respondent's opening).

[1808]   Transcript, Day 3 at 161–62 (Respondent's opening) (discussing *Duke Energy v. Ecuador*, ICSID ARB/04/19, Award, 18 August 2008 ¶ 188, Exh. C-993; *EnCana v. Ecuador*, LCIA UN3481, UNCITRAL, Award, 3 February 2006 ¶ 168, Exh. C-976; *El Paso Energy International Company v. The Argentine Republic*, ICSID ARB/03/15, Award, 31 October 2011 ¶ 449, Exh. C-1544/R-4190 (hereinafter "*El Paso*"); *Burlington Resources v. Ecuador*, ICSID Case ARB/08/5, Decision on Jurisdiction, 2 June 2010 ¶ 249, Exh. R-992; *Nations Energy v. Panama*, ICSID ARB/06/19, Award, 24 November 2010 ¶ 483, Exh. R-1032); Respondent's Opening Slides, pp. 458–60.

[1809]   Transcript, Day 3 at 162 (Respondent's opening); Respondent's Opening Slides, pp. 461–62; Respondent's Post-Hearing Brief ¶ 164.

[1810]   Respondent's Post-Hearing Brief ¶ 162.

"measures" has a broad ordinary meaning and that, contrary to Claimants' suggestion that "Taxation Measures" only refer to legislative "provisions", legislation and implementing measures cannot be dissociated.[1811]   According to Respondent, such a dissociation would be absurd, since "[e]very time a contracting State enforces tax legislation that is carved out, but would be inconsistent with the treatment standards in Part III, the State would incur international responsibility for breach of Part III of the Energy Charter Treaty."[1812]

1388. Respondent disputes Claimants' argument that Article 21(7) of the ECT, properly interpreted, applies only to the enactment of "provisions" relating to taxes.  Respondent points out that the word "includes" used in Article 21(7) of the ECT stands in contrast to the word "means" used elsewhere, thus suggesting that the enumeration in that provision is not exhaustive.[1813] Respondent also argues that, if the term "Taxation Measure" were limited to provisions relating to taxes, the use of the word "includes" would not make sense, since Article 21(7) of the ECT specifically refers to both "any provision relating to taxes" in "the domestic law of the Contracting Party" and "any provision relating to taxes" in an "international agreement . . . by which the Contracting Party is bound."[1814]   Since "all provisions relating to taxes are either contained in domestic law or in international treaties," Respondent claims that there would be nothing left to add.[1815]

1389. Respondent rather suggests that "[t]he term 'Taxation Measure' has a meaning in itself" and that "it provides a benchmark to determine which measures or categories of measures, in addition to those expressly listed, constitute 'Taxation Measures' for purposes of Article 21 of the ECT."[1816]   Respondent refers to the ECT's *travaux préparatoires* to support its view that the list in Article 21(7) of the ECT is "illustrative" and "not a definition".[1817]   In particular, Respondent points out that, during the negotiations of the ECT, the Canadian delegation, in

---

[1811]   Transcript, Day 3 at 163–64, 170 (Respondent's opening) (discussing *Fisheries Jurisdiction (Spain v. Canada)*, Jurisdiction of the Court, Judgment, 4 December 1998, ICJ Reports 1998, p. 460 ¶¶ 66–67, Exh. R-1028); Respondent's Opening Slides, pp. 462–63.

[1812]   Transcript, Day 3 at 170 (Respondent's opening); Transcript, Day 21 at 173 (Respondent's rebuttal).

[1813]   Transcript, Day 21 at 171 (Respondent's rebuttal); Respondent's Opening Slides, p. 465; Respondent's Post-Hearing Brief ¶ 163.

[1814]   Transcript, Day 21 at 176 (Respondent's rebuttal).

[1815]   Transcript, Day 21 at 178 (Respondent's rebuttal).

[1816]   Transcript, Day 21 at 171–72 (Respondent's rebuttal).

[1817]   Transcript, Day 3 at 167–68 (Respondent's opening) (discussing Memorandum from the Chairman of the Legal Sub-Group to the Chairman of Working Group II, Document No. LEG-14, 5 March 1993, p. 2, Exh. R-1020); Respondent's Opening Slides, pp. 466–67.

response to a memorandum of the Legal Sub-Group noting that "taxation measures" were identified in an illustrative manner, remarked that this was intentional and that "it would be counterproductive to come up with anything more precise."[1818]  It also suggests that, while the French delegation expressed a preference for an exhaustive definition and for the word "includes" to be replaced by "means", by not proceeding with the suggested replacement, the "negotiating States chose to maintain an illustrative list."[1819]

1390.  In addition, Respondent refers to Article 21(2)(b) and (3)(b) of the ECT as implying that the term "Taxation Measure" includes the generic term "measure" "as consistently used throughout the Energy Charter Treaty."[1820]  According to Respondent, "Claimants would have this Tribunal rewrite Article 21(7)(a) to read:  'The term 'Taxation Measure' only includes provisions relating to taxes.'"[1821]   In reality, according to Respondent, "[t]he purpose of Article 21, paragraph 7(a) ECT is not to replace the term 'measures' with the term 'provisions', but to clarify that the carve-out extends to both domestic and international taxation measures."[1822]  This would be in line with general treaty practice, which would show that "there is not a single taxation carve-out that is limited in scope to tax legislation."[1823]

1391.  The result of this interpretation, according to Respondent, is that "the core allegations on which Claimants base their claims are squarely within the taxation carve-out of Article 21(1)" of the ECT.[1824]

1392.  With regard to Claimants' argument that Article 21(1) of the ECT should be inapplicable to the present case, since the measures adopted by Respondent were taken, according to the Claimants, under the guise of taxation (rather than constituting "real" taxation measures),

---

[1818]   Transcript, Day 3 at 167 (Respondent's opening) (discussing Canada Department of Finance, Tax Policy Branch:  Fax from A. Castonguay to F. Mullen et al., 19 March 1993, p. 4, Exh. R-1010).

[1819]   Transcript, Day 3 at 168 (Respondent's opening) (discussing Memorandum from the Ministère du Budget of France to the ECT Secretariat, 19 March 1993, p. 3, Exh. C-1045).

[1820]   Transcript, Day 21 at 173 (Respondent's rebuttal).

[1821]   Transcript, Day 3 at 170–71 (Respondent's opening).

[1822]   Transcript, Day 3 at 169 (Respondent's opening).

[1823]   Transcript, Day 21 at 173 (Respondent's rebuttal).

[1824]   Transcript, Day 3 at 164 (Respondent's opening).

Respondent refers to the ECtHR *Yukos Judgment* to support its claim that the tax assessments against Yukos pursued a legitimate aim and were not politically motivated.[1825]

1393. In any event, Respondent claims, referring to the ICJ's *Fisheries Jurisdiction (Spain v. Canada)* judgment, that the question of legality can have no impact on the qualification of an act as a "taxation measure",[1826] and it suggests that measures "in apparent reliance" on taxation legislation, even if abusive, must be covered by a taxation carve-out.[1827]   Respondent also refers to a number of decisions of investment treaty tribunals to support this view.   In particular, Respondent quotes from the decision in *EnCana v. Ecuador*, according to which "provided a matter is sufficiently clearly connected to a taxation law or regulation (or to a procedure, requirement or practice of the taxation authorities in apparent reliance on such a law or regulation), its legality is a matter for the courts of the host State."[1828]   Similarly, Respondent quotes from the decision in *Burlington v. Ecuador* as having taken the view that the claim that a State "used its tax power in bad faith . . . challenges [that State's] tax power, and therefore raises 'matters of taxation'."[1829]

1394. In addition, Respondent avers that an exception to a substantive standard (such as the carve-out of Article 21(1)) cannot logically refer to the substantive standard (such as the expropriation standard of Article 13) to determine whether or not the exception applies.[1830]   Therefore, according to Respondent, "neither the standards under Article 13 . . . nor the standards under Article 10, paragraph 1 of the ECT can be used to determine the scope or the applicability of the taxation carve-out."[1831]   Accordingly, Respondent claims that the question of the legality of any taxation measures, including their *bona fide* nature, falls under Article 21(1) of the ECT and can be determined by an arbitral tribunal "only to the extent clawed back" pursuant to

---

[1825]   Transcript, Day 3 at 171–72 (Respondent's opening); Transcript, Day 21 at 178 (Respondent's rebuttal); Respondent's Opening Slides, pp. 468–69; ECtHR Yukos Judgment ¶¶ 8, 606, 647.

[1826]   Respondent's Opening Slides, p. 469 (quoting *Fisheries Jurisdiction (Spain v. Canada)*, Jurisdiction of the Court, Judgment, 4 December 1998, ICJ Reports 1998, p. 460 ¶ 68, Exh. R-1028).

[1827]   Transcript, Day 3 at 172–73 (Respondent's opening); Respondent's Opening Slides, pp. 470–71.

[1828]   Transcript, Day 3 at 174 (Respondent's opening); Transcript, Day 21 at 179, 183 (Respondent's rebuttal) (discussing *EnCana v. Ecuador*, LCIA UN3481, UNCITRAL, Award, 3 February 2006 ¶ 142, Exh. C-976).

[1829]   Transcript, Day 3 at 174 (Respondent's opening); Transcript, Day 21 at 182–83 (Respondent's rebuttal) (discussing *Burlington Resources v. Ecuador*, ICSID Case ARB/08/5, Decision on Jurisdiction, 2 June 2010 ¶ 207, Exh. R-992).

[1830]   Transcript, Day 21 at 180 (Respondent's rebuttal).

[1831]   Transcript, Day 21 at 182 (Respondent's rebuttal).

Article 21(5) of the ECT.[1832]  This would mean in particular that "[t]he Tribunal . . . lacks jurisdiction over Claimants' Article 10 claims, and Article 10(1) ECT is inapplicable."[1833]

1395. With regard to the claw-back provision in Article 21(5) of the ECT, Respondent argues that the reference to "taxes" rather than "taxation measures" is deliberate and implies that only "compulsory contributions to the Government" can be examined under that provision, but not "fines, interest, enforcement fees" or "other tax collection and enforcement measures."[1834]  The basis for this would be that, in its ordinary meaning, "a tax" would be "a charge or a contribution imposed by the State for public purposes," but not "tax enforcement and collection measures."[1835]

1396. To support its reading of the claw-back provision, Respondent refers to the *travaux préparatoires*, claiming that, while the claw-back provision originally referred to "Taxation Measures", in June 1993 a new version of the draft of the provision was circulated, in which these references were replaced with references to "taxes".[1836]  According to Respondent, this change "was certainly not incidental or unintentional."[1837]  Respondent also dismisses the idea that the different wording of Article 21(5) of the ECT in some of the other official languages of the ECT should be accorded any relevance, since the negotiations of the Treaty would have been conducted solely in English and translations into other languages would only have been prepared after the conclusion of the negotiations without input from the negotiating teams.[1838]  This must, according to Respondent, be taken into account as part of the circumstances surrounding the conclusion of the ECT in accordance with Article 32 of the VCLT.[1839]

1397. With regard to the meaning of "taxes", Respondent submits that, since this term "is not defined in the Energy Charter Treaty, and . . . has no autonomous meaning in international law,"[1840] it

---

[1832]   Transcript, Day 3 at 173 (Respondent's opening); Respondent's Post-Hearing Brief ¶ 168.

[1833]   Transcript, Day 3 at 176 (Respondent's opening).

[1834]   Transcript, Day 3 at 182 (Respondent's opening); Respondent's Opening Slides, pp. 472–79; Respondent's Post-Hearing Brief ¶ 172.

[1835]   Transcript, Day 3 at 179 (Respondent's opening).

[1836]   Transcript, Day 3 at 177 (Respondent's opening) (discussing European Energy Charter, Conference Secretariat, Room Document 3, Plenary Session 28 June1993–2 July 1993, 28 June 1993, pp. 3–4, Exh. R-1035).

[1837]   Transcript, Day 3 at 177 (Respondent's opening).

[1838]   Transcript, Day 21 at 185 (Respondent's rebuttal); Respondent's Rebuttal Slides, pp. 470–73.

[1839]   Transcript, Day 21 at 186 (Respondent's rebuttal).

[1840]   Transcript, Day 3 at 179 (Respondent's opening).

needs to be determined pursuant to Russian law.  This would be in line with the practice under tax treaties, which generally leaves the term of "taxes" undefined, adopting the meaning of the term under the domestic law of the State that imposed the tax.[1841]  Respondent refers in this regard for instance to Article 3(2) of the OECD Model Tax Convention on Income and Capital and the Cyprus-Russia DTA, pointing out that both instruments are referenced in the claw-back provision of Article 21(5) of the ECT.[1842]

1398. More generally, Respondent argues that "in the absence of autonomous rules or concepts of international law, international law must turn for guidance to domestic law . . . as developed within the State's domestic jurisdiction."[1843]  Under Russian law, a "tax" would be defined in Article 8 of the Russian Tax Code as a "mandatory . . . payment" collected "to provide financial support to the government" for public purposes.[1844]  This would exclude "tax enforcement, [and] collection measures," including "interest, fines, [and] enforcement fees."[1845]

1399. Respondent argues that a limited claw-back would also be "very much in line with treaty practice," which would be "diverse" and variable "with respect to the type of measures that are clawed back."[1846]  In particular, Respondent refers to the Russia-Sweden BIT, which contains a carve-out with regard to "taxation matters", whilst also providing that some of its provisions shall apply to "taxes".[1847]  For Respondent, this provision constitutes proof that "States are . . . free to claw back only a subcategory of the measures they decided to exclude from the scope of the Treaty" and that "they do so".[1848]  The "deliberate choice of the ECT Contracting Parties to limit the expropriation claw-back to taxes" would in fact "represen[t] a middle ground of varying practices of the ECT Contracting Parties."[1849]

---

[1841]  Transcript, Day 3 at 180 (Respondent's opening).

[1842]  Transcript, Day 3 at 180–81 (Respondent's opening); Transcript, Day 21 at 188 (Respondent's rebuttal); 2010 OECD Model Tax Convention, Article 3(2), Exh. R-1017; Agreement between the Government of the Republic of Cyprus and the Government of the Russian Federation on the Avoidance of Double Taxation with Respect to Taxes on Income and Capital, Article 3(2), Exh. C-916.

[1843]  Transcript, Day 3 at 181 (Respondent's opening).

[1844]  Transcript, Day 3 at 182 (Respondent's opening); Russian Tax Code, Article 8, Exh. R-551.

[1845]  Transcript, Day 3 at 182 (Respondent's opening).

[1846]  Transcript, Day 3 at 178 (Respondent's opening).

[1847]  Transcript, Day 21 at 184 (Respondent's rebuttal); Agreement between the Government of the Kingdom of Sweden and the Government of the Russian Federation on the Promotion and Reciprocal Protection of Investments, 19 April 1995, Article 11(2), Exh. R-3451.

[1848]  Transcript, Day 21 at 184 (Respondent's rebuttal).

[1849]  Transcript, Day 3 at 179 (Respondent's opening).

1400. Finally, Respondent argues that, if the Tribunal were to find that both the carve-out and the claw-back provisions apply, the Tribunal would be required to make a referral to the "Competent Tax Authorities".[1850]   This would include "the Russian Ministry of Finance, the Cypriot Ministry of Finance, and the UK Inland Revenue"[1851]; and this is so "because the referral procedure replicates the dispute settlement procedures under double taxation agreements."[1852]   According to Respondent, "[t]he referral mechanism . . . forms part of the ECT Contracting Parties' consent to submit themselves to international arbitration pursuant to Article 26 ECT, and it precludes any ruling by the Tribunal whether a tax constitutes an expropriation . . . without having made referral to the tax authorities."[1853]

### 4.    Tribunal's Decision

#### (a)    Introduction

1401. As mentioned earlier, the Tribunal deferred its decision on Article 21 because the Parties' arguments in relation to this provision during the jurisdictional phase raised issues that went to the heart of the merits of the dispute and the Tribunal decided that it could not rule on these issues in a vacuum.

1402. Now, at the conclusion of the merits phase of the present proceedings, the Tribunal has the necessary context within which to evaluate the Parties' arguments, analyze and interpret Article 21, and characterize Claimants' claims for purposes of Article 21.

1403. Before turning to Article 21 itself, the Tribunal considers it helpful to recall its principal findings on those core issues relating to the merits that are particularly relevant for Article 21.

1404. In Chapter VIII.B, the Tribunal concluded, on the totality of the evidence, that the tax authorities used the "re-attribution" formula not only so as to be able to collect the revenue-based taxes against Yukos, but also so as to establish a basis for imposing on Yukos the massive VAT liability and excessive fines that followed.   In the Tribunal's view, while Yukos was vulnerable on some aspects of its tax optimization scheme, principally because of the sham-like nature of certain elements of its operations in at least some of the low-tax regions,

---

[1850]   Transcript, Day 21 at 189–90 (Respondent's rebuttal).

[1851]   Transcript, Day 21 at 191 (Respondent's rebuttal).

[1852]   Transcript, Day 21 at 191 (Respondent's rebuttal).

[1853]   Transcript, Day 21 at 192 (Respondent's rebuttal).

and could have faced some legitimate claims relating to revenue-based taxes had the Russian Federation limited itself to *bona fide* taxation measures, the State apparatus decided to take advantage of that vulnerability; it did so by launching a full assault on Yukos and its beneficial owners in order to bankrupt Yukos and appropriate its assets while, at the same time, removing Mr. Khodorkovsky from the political arena.  The Tribunal has come to these conclusions based on its review of the entire record, as detailed in the other chapters of Part VIII, above.

1405. The Tribunal now has to decide, in these circumstances, if and how Article 21 applies, and whether it deprives the Tribunal of its jurisdiction, as argued by Respondent, to consider Claimants' claims under Article 10 of the ECT (in the event the carve-out applies), and perhaps even under Article 13 of the ECT (if the carve-out applies and the claw-back does not apply).

1406. Both Parties made extensive submissions on Article 21, both in writing and orally.  Having considered the Parties' arguments, the Tribunal concludes that it has jurisdiction to rule on Claimants' claims under Article 13 of the ECT for two independent reasons, each of which in and of itself suffices to justify the jurisdiction of the Tribunal.  Firstly, the Tribunal finds that, irrespective of its findings regarding the applicability of Article 21 of the ECT to the present case, it would have "indirect" jurisdiction over claims under Article 13 of the ECT because any measures excluded by the carve-out under Article 21(1) of the ECT would be brought back within the Tribunal's jurisdiction by the claw-back of Article 21(5) of the ECT and any referral to the Competent Taxation Authorities within the meaning of this latter provision would clearly have been futile.

1407. Secondly, the Tribunal finds that, in any event, the carve-out of Article 21(1) can apply only to *bona fide* taxation actions, *i.e.*, actions that are motivated by the purpose of raising general revenue for the State.  By contrast, actions that are taken only under the guise of taxation, but in reality aim to achieve an entirely unrelated purpose (such as the destruction of a company or the elimination of a political opponent) cannot qualify for exemption from the protection standards of the ECT under the taxation carve-out in Article 21(1).  As a consequence, the Tribunal finds that it does indeed have "direct" jurisdiction over claims under Article 13 (as well as Article 10) in the extraordinary circumstances of this case.

1408. The Tribunal will now develop each of these reasons.

(b)   **First Reason:  Assuming the Carve-Out Applies, So Does the Claw-Back, and Any Referral to the Competent Tax Authorities Would Clearly have been Futile**

1409. Firstly, the Tribunal concludes that it has jurisdiction under Article 13 of the ECT, even assuming that the carve-out in Article 21(1) of the ECT applies.  This determination is based on both the scope of the expropriation claw-back in Article 21(5) of the ECT relative to the scope of the taxation carve-out in Article 21(1) of the ECT, and the futility of any referral to the Competent Tax Authorities under Article 21(5) of the ECT.  The Tribunal will expand upon each of these points in turn.

i.   **The Scope of the Claw-Back in Article 21(5)**

1410. Respondent argues that the term "Taxation Measures", used in the carve-out, should be given a broad meaning, including collection and enforcement measures, while the term "taxes", used in the claw-back, should be given a narrow meaning, which would exclude collection and enforcement measures.  The Tribunal cannot accept Respondent's arguments for the following reasons.

1411. Firstly, the Tribunal observes that the term "Taxation Measures", used in Article 21(1), is defined in Article 21(7)(a) to mean "provisions" of domestic tax law and tax treaties, while the term "taxes", used in Article 21(5), is not defined in the Treaty.

1412. Pursuant to Article 31 of the VCLT, "[a] treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose."

1413. In the view of the Tribunal, the ordinary meaning of "tax" used in Article 21(5) cannot be narrower than the meaning of "Taxation Measure" used in Article 21(1).  Respondent's interpretation of "Taxation Measures" and "taxes" would, as Claimants submit, result in a wide carve-out and a narrow claw-back, "reinstating protection from expropriation [under Article 13 of the ECT] only in relation to 'charges and payments', but not collection and enforcement measures or interests and fines."[1854]  The Tribunal agrees with Claimants that such an interpretation would lead to "a gaping hole in the ECT where investors would stand completely

---

[1854]   Claimants' Post-Hearing Brief ¶ 220.

unprotected from expropriatory taxation."[1855]  Such an interpretation would defeat the object and purpose of the claw-back and of the ECT itself.

1414. Respondent refers the Tribunal to a number of treaties that contain a taxation carve-out, but that either do not contain any claw-back provision or limit the claw-back to certain substantive protection standards, and argues that its proposed interpretation of Article 21 of the ECT corresponds to a "middle ground of varying practices."  The Tribunal, having reviewed those treaties, finds those provisions of no assistance to its interpretation of Article 21 of the ECT.

1415. In any event, the Tribunal, having found that the interpretation of Article 21 of the ECT according to the general rule of interpretation under Article 31 of the VCLT results in a meaning that is neither ambiguous nor obscure and does not lead to a result which is manifestly absurd or unreasonable, does not need to call in aid any other rule of interpretation.  Finally, the Tribunal does not find much helpful guidance in the *travaux préparatoires* of the ECT.  Respondent claims that the replacement of "Taxation Measures" with "taxes" in a draft of Article 21(5) of the ECT circulated in June 1993 could not have been incidental.  However, if this replacement had been motivated by the intention of the negotiators to limit the scope of the claw-back provision in Article 21(5) of the ECT compared to the scope of the carve-out in Article 21(1) of ECT, the Tribunal would expect such a motivation to have found some additional expression in the record.

1416. The Tribunal therefore holds that any measures falling under the taxation carve-out of Article 21(1) of the ECT are also covered by the scope of the expropriation claw-back in Article 21(5) of the ECT.

### ii.    The Referral to Competent Tax Authorities

1417. The Tribunal recalls Article 21(5)(b), which sets out the following referral mechanism:

> (b)    Whenever an issue arises under Article 13, to the extent it pertains to whether a tax constitutes an expropriation or whether a tax alleged to constitute an expropriation is discriminatory, the following provisions shall apply:
>
> > (i)    The Investor or the Contracting Party alleging expropriation shall refer the issue of whether the tax is an expropriation or whether the tax is discriminatory to the relevant Competent Tax Authority.  Failing such referral by the Investor or the Contracting Party, bodies called upon to settle

---

[1855]   Claimants' Post-Hearing Brief ¶ 220 (emphasis in the original).

        disputes pursuant to Article 26(2)(c) or 27(2) shall make a referral to the relevant Competent Tax Authorities;

(ii)    The Competent Tax Authorities shall, within a period of six months of such referral, strive to resolve the issues so referred.  Where non discrimination issues are concerned, the Competent Tax Authorities shall apply the non-discrimination provisions of the relevant tax convention or, if there is no non-discrimination provision in the relevant tax convention applicable to the tax or no such tax convention is in force between the Contracting Parties concerned, they shall apply the non-discrimination principles under the Model Tax Convention on Income and Capital of the Organisation for Economic Co-operation and Development;

(iii)   Bodies called upon to settle disputes pursuant to Article 26(2)(c) or 27(2) may take into account any conclusions arrived at by the Competent Tax Authorities regarding whether the tax is an expropriation.  Such bodies shall take into account any conclusions arrived at within the six-month period prescribed in subparagraph (b)(ii) by the Competent Tax Authorities regarding whether the tax is discriminatory.  Such bodies may also take into account any conclusions arrived at by the Competent Tax Authorities after the expiry of the six-month period;

(iv)   Under no circumstances shall involvement of the Competent Tax Authorities, beyond the end of the six-month period referred to in subparagraph (b)(ii), lead to a delay of proceedings under Articles 26 and 27.

1418. According to Respondent, "[t]he referral mechanism . . . precludes any ruling by the Tribunal whether a tax constitutes an expropriation . . . without having made referral to the tax authorities."[1856]  Specifically, Respondent argues that Article 21(5)(b)(i) requires the Tribunal to make a referral to "the Russian Ministry of Finance, the Cypriot Ministry of Finance, and the UK Inland Revenue."[1857]

1419. Claimants, on the other hand, take the view that a referral is not warranted, for two reasons. Firstly, Claimants argue that the requirement is triggered only if there is an allegation that "a tax constitutes an expropriation," whereas in the present case, according to Claimants, their investments were not expropriated by "a tax", but "by a combination of many types of actions of which taxation—as labeled by the Russian Federation—was only one."[1858]  Secondly, Claimants argue that any referral made to the Russian Ministry of Finance, or the tax authorities of the United Kingdom and Cyprus for that matter, would be an exercise in futility.[1859] According to Claimants, the Russian Ministry of Finance would effectively be asked to "be a judge in its own cause," and asking the tax authorities to review the entire file—written

---

[1856]   Transcript, Day 21 at 192 (Respondent's rebuttal).

[1857]   Transcript, Day 21 at 191 (Respondent's rebuttal).

[1858]   Claimants' Post-Hearing Brief ¶ 229.

[1859]   Claimants' Post-Hearing Brief ¶ 229.

submissions, relevant correspondence, expert reports, witness statements, hearing transcripts and over 8,000 exhibits—and to comment on it, would amount to a "useless exercise".[1860]

1420. The Tribunal does not accept Claimants' first argument, since it ignores the logic by which the Tribunal would have come to this point in its reasoning. If the Tribunal were considering Respondent's measures under the claw-back of Article 21(5), it would be because the Tribunal would have found previously that there was no meaningful distinction between the scope of "Taxation Measures" and "taxes" for purposes of Article 21, or indeed because it would have found that even if measures "under the guise" of taxation were covered by the carve-out, then they must also be covered by the claw-back. The referral mechanism therefore cannot be avoided on the basis of a narrow interpretation of the term "tax" in Article 21(5)(b)(i).

1421. Claimants' futility argument, however, is persuasive. In this particular case, the Tribunal is convinced that a referral to the tax authorities of the Russian Federation, the United Kingdom and/or Cyprus would be (and, at any earlier stage of the proceedings, would have been) an exercise in futility.

1422. The record before the Tribunal is enormous. The arguments and allegations of the Parties relating to various taxes and the reasons for which they should or should not be considered expropriatory have filled briefs adding up to thousands of pages, have relied on some 8,800 exhibits and were presented to the Tribunal in oral hearings scheduled over a six-week period. It is inconceivable that the gist of this case, for either side, could have been reduced to a meaningful submission of a size and scope that might have been digested by the relevant tax authorities in a way that would have given them an opportunity to provide timely and pertinent guidance to the Tribunal.

1423. Thus, while the Tribunal acknowledges that the referral mechanism in the claw-back provision of Article 21(5) was designed to assist tribunals "to distinguish normal and abusive taxes," as noted by Professor Park in his "Tax Arbitration and Investor Protection" article cited by Respondent,[1861] this is simply not a case in which the Tribunal could have been assisted by referring the matter to the tax authorities. As the Tribunal has noted at various stages in the present Award, its conclusions ultimately rest on a consideration of the totality of the evidence

---

[1860] Claimants' Post-Hearing Brief ¶ 229.

[1861] Respondent's Closing Sides, p. 849; William Park, Tax Arbitration and Investor Protection, in INVESTMENT PROTECTION AND THE ENERGY CHARTER TREATY (Graham Coop & Clarisse Ribeiro eds., 2008), p. 115, p. 131, Exh. R-3410.

presented to it.  The tax authorities, on the other hand, would necessarily need to focus on discrete taxes or discrete issues related to taxes.

1424. The requirement for an investor to make a referral under Article 21(5)(b)(i), first sentence (and, *a fortiori*, the requirement for the Tribunal to make a referral under Article 21(5)(b)(i), second sentence) cannot, in the Tribunal's view, apply in cases where such a referral would obviously be futile.  Like any provision in an international treaty, Article 21(5)(b)(i) of the ECT must be interpreted in good faith.  A good faith interpretation of the provision leads to the conclusion that a referral cannot be required if following the referral procedure would clearly be futile under the circumstances of a specific case.

1425. It has long been recognized, with regard to the exhaustion of local remedies requirement in the context of the principles on diplomatic protection,[1862] that following a prescribed procedure may be dispensed with under circumstances where doing so clearly would not produce the result that the procedure seeks to achieve.  The relevant principle is set out in Article 15(a) of the 2006 ILC Draft Articles on Diplomatic Protection, providing that "[l]ocal remedies do not need to be exhausted where . . . there are no reasonably available local remedies to provide effective redress, or the local remedies provide no reasonable possibility of such redress."[1863] Tribunals adjudicating claims of investors under international investment treaties have made similar findings with regard to the obligation of investors to observe so-called cooling-off periods[1864] or the requirement to submit a dispute to litigation in the host State's domestic courts for a certain period of time.[1865]

1426. The Tribunal is of the view that a referral must be regarded as clearly futile if there is no possibility that the relevant authorities would in fact be able to come to some timely and meaningful conclusion about the dispute or make any timely determinations that could

---

[1862] *See e.g.*, *Certain Norwegian Loans (France v. Norway)*, Judgment, 6 July 1957, ICJ Reports 1957, p. 9, Separate Opinion of Judge Lauterpacht, p. 34, at p. 39; *Barcelona Traction, Light and Power Company, Limited (Belgium v. Spain) (Second Phase)*, Judgment, 5 February 1970, ICJ Reports 1970, p. 3, Separate Opinion of Judge Tanaka, p. 114, at pp. 144–45.

[1863] Draft Articles on Diplomatic Protection, adopted by the International Law Commission at its 58th session, 2006, Article 15(a).

[1864] *See e.g.*, *Occidental Petroleum Corporation & Occidental Exploration and Production Company v. Republic of Ecuador*, ICSID Case No. ARB/06/111, Decision on Jurisdiction, 9 September 2008 ¶ 94.

[1865] *See e.g.*, *BG Group Plc. v. The Republic of Argentina*, UNCITRAL, Award, 24 December 2007 ¶ 147, Exh. R-3576; *Ambiente Ufficio S.P.A. v. The Argentine Republic*, ICSID Case No. ARB/08/9, Decision on Jurisdiction and Admissibility, 8 February 2013 ¶ 607.

potentially serve to assist the Tribunal's decision-making.  The Tribunal finds, for the reasons stated above, that no such possibility exists or existed in this case.

1427. Furthermore, the Tribunal notes that neither Party disputes that, in the event of a referral, any determinations of the Competent Tax Authorities regarding whatever discrete issues they might have been able to focus on relating to whether any tax was an expropriation would not have been binding on the Tribunal.  The wording of Article 21(5)(b)(iii) of the ECT is very clear: bodies such as the present Tribunal *may* take into account any conclusion arrived at by the Competent Tax Authorities regarding which the tax is an expropriation.[1866]

1428. In conclusion, the Tribunal holds that a referral of the dispute to the "Competent Tax Authorities" within the meaning of Article 21(5)(b)(i) of the ECT would clearly have been futile at the outset of this arbitration and was therefore not required.  It remains futile today.

### iii.    Conclusion

1429. As a consequence, assuming (for the sake of argument) that some of Respondent's measures fell within the scope of the carve-out in Article 21(1), the Tribunal would nevertheless be in a position to proceed to determine whether the relevant measures constituted a violation of Article 13 of the ECT under the claw-back.  It could do so even though it has not referred the issue of whether any tax is an expropriation to any of the Competent Tax Authorities because to do so would clearly be an exercise in futility.

### (c)    Second Reason:  The Carve-Out Does Not Apply

1430. Secondly, and independently from the above reasoning, the Tribunal concludes that it has jurisdiction to rule on Claimants' claims under Article 13 of the ECT due to the fact that the Article 21 carve-out does not apply to the Russian Federation's measures because they are not, as the Tribunal has concluded above, on the whole, a *bona fide* exercise of the Russian Federation's tax powers.

1431. This accords with Claimants' view that Article 21 of the ECT can apply only to *bona fide* taxation actions, *i.e.*, actions that are motivated for the purpose of raising general revenue for the State.  By contrast, actions that are taken only "under the guise" of taxation, but in reality

---

[1866]    Claimants' Post-Hearing Brief ¶ 229; Transcript, Day 21 at 194 (Respondent's rebuttal).

aim to achieve an entirely unrelated purpose (such as the destruction of a company or the elimination of a political opponent), argue Claimants, cannot qualify for exemption from the protection standards of the ECT under the taxation carve-out in Article 21(1).

1432. The Tribunal essentially accepts the latter interpretation of Article 21.

1433. To find otherwise would mean that the mere labelling of a measure as "taxation" would be sufficient to bring such measure within the ambit of Article 21(1) of the ECT, and produce a loophole in the protective scope of the ECT.  Since the claw-back in Article 21(5) of the ECT relates only to expropriations under Article 13 of the ECT, a State could, simply by labelling a measure as "taxation", effectively avoid the control of that measure under the ECT's other protection standards.  It would seem difficult to reconcile such an interpretation with the purpose of Part III of the ECT.

1434. The Tribunal cannot agree with Respondent that, by finding that Article 21(1) of the ECT applies only to *bona fide* taxation, the Tribunal would be conflating the requirements for the application of the taxation carve-out (representing an exception to the protection standards under the ECT) and the requirements for the application of the protection standards themselves.  For example, Article 13 of the ECT could be violated through a *bona fide* taxation measure that was aimed at the raising of State revenue, but whose effect was expropriatory.  By contrast, the characterization of an incriminated action by a respondent State as a Taxation Measure for purposes of Article 21(1) of the ECT would be independent of the effects of that action, but rather depend on the motivation underlying it.

1435. The Tribunal also sees no reason to assume that it would be better for the question of the motivation underlying a particular measure to first be addressed through the "Competent Tax Authorities" (pursuant to the referral mechanism under Article 21(5) of the ECT), as the particular expertise of these authorities does not extend to the question of whether an act that on its face appears to be a taxation measure is in reality implemented for improper reasons.  To the contrary, where the tax authorities of a State have participated in measures against an investor whose true purpose is unrelated to taxation, submitting these issues to the preliminary examination of the same authorities would add little value for an arbitral tribunal.

1436. The Tribunal further observes that, by making this finding, it is in good company, and that the two eminent arbitral tribunals which have previously considered, on an admittedly more limited record, essential elements of the dispute now before it, have adopted the same view.

1437. Thus, the *RosInvestCo* tribunal concluded that:

> [I]t is generally accepted that the mere fact that measures by a host state are taken in the form of application and enforcement of its tax law, does not prevent a tribunal from examining whether this conduct of the host state must be considered, under the applicable BIT or other international treaties on investment protection, as an abuse of tax law to in fact enact an expropriation.[1867]

1438. Similarly, the *Quasar* tribunal opined that:

> It is no answer for a state to say that its courts have used the word "taxation" . . . in describing judgments by which they effect the dispossession of foreign investors.  If that were enough, investment protection through international law would likely become an illusion, as states would quickly learn to avoid responsibility by dressing up all adverse measures, perhaps expropriation first of all, as taxation.  When agreeing to the jurisdiction of international tribunals, states perforce accept that those jurisdictions will exercise their judgment, and not be stumped by the use of labels.[1868]

1439. By contrast, neither the *EnCana v. Ecuador* decision[1869] nor the *Burlington v. Ecuador* award[1870] to which Respondent refers in support of its view that any measure "adopted in apparent [reliance on] tax legislation" should fall under the taxation carve-out,[1871] in fact appears to endorse such a position.

1440. Thus, while the tribunal in *EnCana* stated that, for a measure to fall under the taxation carve-out in the treaty before it, it would have to be "sufficiently clearly connected to a taxation law or regulation (or to a procedure, requirement or practice of the taxation authorities in apparent reliance on such a law or regulation),"[1872] the emphasis in this formulation appears to have been on the "sufficiently clea[r]" connection to an existing legal provision or practice, rather than the "apparent reliance" of the authorities on the existence of a legal basis for their actions.  This is supported by another statement of the *EnCana* tribunal in the same paragraph, according to which "an arbitrary demand unsupported by any provision of the law of the host State would not qualify" for an exemption under the taxation carve-out.[1873]

---

[1867]  *RosInvestCo* ¶ 628, Exh. C-1049.

[1868]  *Quasar* ¶ 179, Exh. R-3383.

[1869]  Transcript, Day 3 at 174 (Respondent's opening); Transcript, Day 21 at 179, 183 (Respondent's rebuttal) (discussing *EnCana v. Ecuador*, LCIA UN3481, UNCITRAL, Award, 3 February 2006 ¶ 142, Exh. C-976).

[1870]  Transcript, Day 3 at 174 (Respondent's opening); Transcript, Day 21 at 182–83 (Respondent's rebuttal) (discussing *Burlington Resources v. Ecuador*, ICSID Case ARB/08/5, Decision on Jurisdiction, 2 June 2010 ¶ 207, Exh. R-992).

[1871]  Transcript, Day 3 at 174 (Respondent's opening).

[1872]  *EnCana v. Ecuador*, LCIA UN3481, UNCITRAL, Award, 3 February 2006 ¶ 142(1), Exh. C-976.

[1873]  *EnCana v. Ecuador*, LCIA UN3481, UNCITRAL, Award, 3 February 2006 ¶ 142(1), Exh. C-976.

1441. The context of the statement also makes it clear that the tribunal was only addressing minimum requirements for the application of the taxation carve-out before it, rather than expressing any views about situations in which the carve-out provision would not apply.  Thus the tribunal emphasized that, for a measure to come under the treaty's carve-out, it would have to be "sufficiently clearly connected to" or supported by some taxation law, regulation or actual practice (the latter of which would in turn have to be based on a taxation law or regulation).  It did, however, neither say nor imply that any measure which the authorities based on a taxation law or regulation would by definition be regarded as a taxation measure and therefore justify the application of the carve-out.

1442. It makes sense to regard a tax demand that is effectively motivated not by the aim of raising public revenue but by a purpose extraneous to taxation as an "arbitrary demand" that, in the words of the *EnCana* tribunal, cannot qualify for an exemption under a taxation carve-out.[1874] Such an interpretation is also supported by the statement of Claimants' expert Professor Crawford, who was the presiding arbitrator in the *EnCana* arbitration and according to whom the decision was not meant to imply "that anything labelled as a taxation measure is excluded" by a taxation carve-out.[1875]

1443. Neither does the *Burlington* decision referred to by Respondent support the view that a taxation carve-out would have to apply to any measure adopted by tax authorities in apparent reliance on tax legislation.  In *Burlington*, the tribunal notes that "bad faith" of the respondent mentioned by the claimant rested on its allegation that Ecuador had forced the claimant to give up certain contractual rights by the use of its taxation legislation.[1876]  There was no suggestion in that case that Ecuador had taken any measures against the investor for motives that were entirely unrelated to the raising of public revenue.  As a consequence, the tribunal in *Burlington*, when it said that the claimant's suggestion "that Respondent used its tax power in bad faith in order to force Claimant to surrender its rights" under the contracts raised "matters of taxation",[1877] was referring to the specific situation in that case that cannot in any way be compared to the one at issue in the present proceedings.

---

[1874]   *EnCana v. Ecuador*, LCIA UN3481, UNCITRAL, Award, 3 February 2006 ¶ 142(1), Exh. C-976.

[1875]   Transcript, Day 17 at 161 (Claimants' closing); Further Opinion on Jurisdictional Issues by James Crawford, 3 May 2007 ¶ 5, Exh. C-613.

[1876]   *Burlington Resources v. Ecuador*, ICSID Case ARB/08/5, Decision on Jurisdiction, 2 June 2010 ¶ 175, Exh. R-992.

[1877]   *Burlington Resources v. Ecuador*, ICSID Case ARB/08/5, Decision on Jurisdiction, 2 June 2010 ¶ 207, Exh. R-992.

1444. It follows that Article 21(1) of the ECT, which applies only to *bona fide* taxation measures, does not find any application in this arbitration. The tax assessments levied against Yukos by the Russian Federation, which the Tribunal has found were designed mainly to impose massive liabilities based on VAT and related fines, and were essentially aimed at paralyzing Yukos rather than collecting taxes, are not exempt from scrutiny under the ECT, as they are not captured by the carve-out of Article 21(1).

1445. Similarly, and *a fortiori*, subsequent steps in the enforcement of the tax assessments are not captured by the carve-out, because the Tribunal has found that they too were exigently pursued by means that indicate that Yukos was not just being chased to pay taxes, but was being driven into bankruptcy.

### (d) Conclusion

1446. Based on the analysis set out in this chapter of the Award and for the two independent reasons set out above, the Tribunal has jurisdiction to consider whether the Russian Federation is liable to Claimants under Article 13 of the ECT for the measures which it has adopted and which have resulted in the evisceration of their investments and the destruction of Yukos.

1447. While the Tribunal's finding that the carve-out in Article 21(1) does not apply would in principle allow the Tribunal to consider the measures under both Articles 10 and 13 of the ECT, in the circumstances, as will be seen, it will not be necessary for the Tribunal to consider whether the expropriatory measures of Respondent are also in breach of Article 10 of the ECT.

## X.   LIABILITY

1448. Having dismissed Respondent's preliminary objections to the Tribunal's jurisdiction, the admissibility of Claimants' claims and the applicability of the ECT in the present case, the Tribunal now turns to the question of the Russian Federation's liability under the Treaty. In Part VIII, the Tribunal canvassed the evidentiary record put before it by the Parties. In this Part X, the Tribunal draws the legal consequences of its factual conclusions, beginning by addressing questions of attribution.

1449. As has already been mentioned, the Tribunal's eventual conclusions regarding the alleged breaches by Respondent of Article 13 (Expropriation) of the ECT will make it unnecessary for the Tribunal to consider the application of Article 10 (Promotion, Protection and Treatment of

Investments).  Nevertheless, for the sake of completeness, the Tribunal will set out the Parties' arguments with regard to Article 10.  The Tribunal will then set out the Parties' arguments in respect of Article 13.  Finally, the Tribunal will set out its decision regarding Respondent's liability and Claimants' contributory fault.

## A.   ATTRIBUTION

1450. The Parties are divided on the question of whether some of the actions of which Claimants complain are attributable to the Russian Federation.  Below, the Tribunal sets out the Parties' submissions and its own views on this question.

### 1.   Claimants' Position

1451. Claimants summarize their position with regard to the attribution of acts said to constitute breaches of the ECT to Respondent in their Memorial as follows:

> [T]he Russian Federation has acted through almost all of its organs, be it Executive or Judiciary, at all levels, including the highest, in seeking the destruction of Yukos. These include the <u>President of the Russian Federation</u>, the <u>Presidential Administration</u>, the <u>Tax Ministry</u> (later to become the <u>Federal Taxation Service</u>, a federal body of executive authority within the <u>Ministry of Finance</u>), the <u>Ministry of Justice</u> (under whose authority federal bodies of executive authority such as the <u>Federal Bailiff Service</u> or the <u>Federal Penitentiary Service</u> are acting), the <u>Prosecutor General's Office</u> (a federal body entrusted with the task of execution of the laws in the name of the Russian Federation), the <u>Ministry of Internal Affairs</u> (responsible for the police forces), the <u>Federal Security Service</u> (also a federal body of executive authority, acting under the authority of the President). When not acting through these Executive organs or through the <u>Russian courts</u>, the Russian Federation was acting through <u>State-owned entities</u>, first and foremost State-owned company <u>Rosneft</u> . . .[1878]
>
> [emphasis added]

1452. Claimants put forward a similar view at the Hearing:

> [W]e complain of acts of the executive organs.  That's the <u>President</u>; the <u>Prime Minister</u>; ministries, including <u>Tax</u>, <u>Justice</u> and <u>Interior Ministries</u>; and their constituent bodies, the <u>Federal Bailiffs Service</u> and the <u>Federal Penitentiary Service</u> under Justice.
>
> We complain of the actions of executive bodies or agencies: that would be the <u>Prosecutor General's Office</u>, the <u>Federal Property Fund</u> and the <u>Federal Security Services</u>.  We also complain of the actions of <u>the courts</u> . . . .  These are actions of the Russian Federation State organs, and they are, by definition, actions of the State.[1879]
>
> [emphasis added]

---

[1878]  Memorial ¶ 551.

[1879]  Transcript, Day 20 at 252.

1453. In particular, with regard to the bankruptcy proceedings against Yukos, Claimants assert that:

> The Russian Federation initiated the bankruptcy proceedings through <u>Rosneft</u>, whilst the <u>Russian courts</u> ensured that the Russian State directly and through <u>Rosneft</u> would be the main creditor in the proceedings, systematically rejecting the claims of creditors related to Yukos or Yukos' shareholders.   Thus placed in the driving seat in these bankruptcy proceedings, the Russian State, acting through the <u>Federal Taxation Service</u> and <u>Rosneft</u>, rejected the Rehabilitation Plan proposed by Yukos' management and paved the way for itself, through <u>bankruptcy receiver (Mr. Rebgun)</u> and the <u>Russian Federal Property Fund</u> to distribute the rest of Yukos' assets by auctioning them at bargain prices. The vast majority of the proceeds went to the Russian State, with <u>Rosneft</u> acquiring Yukos' two other main production assets, Samaraneftegaz and Tomskneft, at a substantial discount."[1880]

> [emphasis added]

1454. Claimants seek to attribute the following actions of Rosneft (some of them through Rosneft-controlled YNG) to Respondent:

> Rosneft's action in acquiring Yugansk through Baikal, a special vehicle used to conceal Rosneft's involvement in the Yuganskneftegaz auction.

> Rosneft's entering into an agreement with the consortium of banks in order to initiate the bankruptcy and precipitate the liquidation of Yukos.

> . . .

> [T]he decisions made at the creditors' meeting hand in hand with the Russian Tax Ministry, namely: to vote against the rehabilitation plan; to vote against the admission of any Yukos-related creditor; and to vote for the liquidation of Yukos.[1881]

1455. Claimants take the view that "the actions of Rosneft are attributable to the Russian State"[1882] due to the latter's ownership of and control over the former, which would be "established by the fact that members of Rosneft's Board of Directors hold parallel positions in the Executive branch of the Russian Federation and that Rosneft's President is appointed by the Russian Executive."[1883]   Claimants refer to a statement made by Rosneft in the context of its IPO in July 2006, acknowledging that "the Russian Government . . . controls Rosneft and may cause Rosneft to engage in business practices that do not maximize shareholder value."[1884]   Claimants also cite a statement made by President Putin at a press conference in December 2004 and a decision rendered by the Amsterdam Court of Appeal in proceedings between Yukos Capital

---

[1880]   Reply ¶ 718; *see also* Transcript, Day 20 at 252.

[1881]   Transcript, Day 20 at 253–54.

[1882]   Reply ¶ 721.

[1883]   Memorial ¶ 551.  *See also* Transcript, Day 20 at 254–55.

[1884]   Transcript, Day 20 at 257.

and Rosneft in April 2009 as further support for the control of Rosneft's actions by Respondent.[1885]

1456. Finally, Claimants submit that Respondent's argument that, for a breach of a host State's ECT obligations to have occurred, challenged actions must have been taken by the host State in the exercise of *puissance publique* is a "nice invention."[1886]  All that matters, argue Claimants, is whether the acting entity is an organ of the State, not the capacity in which it is acting.[1887]  Claimants quote the commentary to Article 4 of the ILC Articles on State Responsibility:  "[i]t is irrelevant for the purposes of attribution that the conduct of a State organ may be classified as 'commercial' or acta iure gestionis . . . the entry into or breach of a contract by a State organ is nonetheless an act of the State for the purposes of article 4, and it might in certain circumstances amount to an internationally wrongful act."[1888]

## 2.    Respondent's Position

1457. Respondent denies that the actions of any of the following entities can be attributed to it, as none of these entities would have exercised governmental authority or acted under the instructions of, or under the direction or control of, Respondent: Sibneft, Gemini Holdings, Nimegan Trading, Rosneft, YNG.[1889]  Respondent also denies that the actions of Mr. Rebgun, Yukos' interim manager and receiver, or the actions of "the meeting and the committee of Yukos' bankruptcy creditors," can be attributed to Respondent, for the same reasons.[1890]

1458. Concerning the attribution of Mr. Rebgun's actions to the Russian Federation, Respondent points out that "[i]n most European legal systems a liquidator or bankruptcy receiver is not a State organ"[1891] and that bankruptcy managers and receivers do not "generally exercise elements of governmental authority or act under the instructions, direction or control of the

---

[1885]    Transcript, Day 20 at 257, referring to *Press Conference with Russian and Foreign Media*, President of Russia Official Web Portal, 23 December 2004, Exh. C-422; *Yukos Capital SARL v. OAO Rosneft*, Amsterdam Court of Appeal, Decision, 28 April 2009, Exh. C-484.

[1886]    Transcript, Day 1 at 157–58 (Claimants' opening).

[1887]    Transcript, Day 20 at 249 (Claimants' rebuttal).

[1888]    Transcript, Day 1 at 148 (Claimants' opening).

[1889]    Counter-Memorial ¶¶ 1442; 1472–1475; Rejoinder ¶¶ 77, 381, 1044; Respondent's Opening Slides, Vol. 6, slide 3.

[1890]    Rejoinder ¶¶ 77, 381; *see also* ¶ 1044; Respondent's Opening Slides, Vol. 6, slide 3.

[1891]    Rejoinder ¶ 389.

State."[1892]   Respondent cites several decisions of investment treaty tribunals as well as the decision of the Grand Chamber of the ECtHR in *Kotov v. Russia* to support this view.[1893]

1459. Regarding Rosneft, Respondent does not deny that it held 75.16 percent of the shares in this company, that members of the company's Board of Directors held parallel positions in the Russian Government, or that the company's President was appointed by the Russian Government.  However, Respondent insists that this is not enough to satisfy the standard of attribution under Article 8 of the ILC Articles on State Responsibility, and that Claimants must prove a link between any relevant actions of Rosneft or YNG and specific instructions given by the Russian State.[1894]  As explained by Respondent at the Hearing:

> [W]hat Claimants must establish to attribute the conduct of Rosneft under Article 8 to Respondent—but which they clearly have not proven—is that in acquiring YNG from Baikalfinance, entering into the agreement with SocGen and voting for Yukos' liquidation at the creditors' meeting, Rosneft was <u>acting pursuant to specific instructions</u> of a Russian State organ.[1895]

> [emphasis added]

1460. Similarly, with respect to the initiation of bankruptcy proceedings, Respondent asserts that "what Claimants must establish, but what they clearly have not proven, is that in filing the bankruptcy petitions . . . YNG were acting under the instructions or directions or control of Russian State organs."[1896]

1461. With regard to the standard applicable under Article 8 of the ILC Articles on State Responsibility, Respondent explains that:

> The commentary to Article 8 of the ILC Articles on State Responsibility notes that "it is made clear that the instructions, direction or control must relate to the conduct which is said to have amounted to an internationally wrongful act."  As regards "direction or control," the commentary states that "[s]uch conduct will be attributable to the State only if it directed or controlled the specific operation and the conduct complained of was an integral part of that operation."[1897]

---

[1892]   Rejoinder ¶ 391.

[1893]   Rejoinder ¶¶ 389–390, referring to *Plama* ¶ 253; *Jan Oostergetel and Theodora Laurentius v. The Slovak Republic*, UNCITRAL, Final Award, 23 April 2012 ¶ 155, Exh. R-2940 (hereinafter "*Jan Oostergetel*"); *Case of Kotov v. Russia*, ECtHR [GC], Appl. No. 54522/00, Judgment, 3 April  2012, Exh. R-3531 (hereinafter "*Kotov v. Russia*").

[1894]   Rejoinder ¶ 387.

[1895]   Transcript, Day 21 at 196.  *See also* Transcript, Day 19 at 116.

[1896]   Transcript, Day 19 at  115–16.

[1897]   Counter-Memorial ¶ 1444, referring to Commentary to ILC Articles on State Responsibility, Article 8 ¶¶ 3 and 7, Exh. C-1042.  *See also* Rejoinder ¶ 382; Transcript, Day 21 at 196.

1462. Respondent also quotes the following passage from the commentary on the ILC Articles on State Responsibility, which notes that the fact a State initially establishes a corporate entity is not a sufficient basis for the attribution to the State of the conduct of that entity, unless the entity exercises elements of governmental authority.[1898]

1463. Respondent refers to several decisions of investment treaty tribunals (in particular *Jan de Nul v. Egypt*, *White Industries v. India* and *Hamester*) as well as to the decision of the Iran–U.S. Claims Tribunal in *Flexi-Van Leasing v. Iran* to support these statements.[1899]

1464. Finally, although Respondent does not deny that the Russian Tax Ministry is a State organ, the actions of which can in principle be attributed to the State under Article 4 of the ILC Articles on State Responsibility, Respondent submits that it cannot be held liable for the actions taken by the Tax Ministry in the context of Yukos' bankruptcy because such actions were not taken in the exercise of *puissance publique*.  In particular, Respondent submits that it cannot be held liable for the Tax Ministry's vote to liquidate Yukos at the creditors' meeting.[1900]

### 3.    Tribunal's Decision on Attribution

1465. The Parties' differences in respect of attribution are centered on whether there can be attributed to Respondent actions of Rosneft in the acquisition of YNG, and in precipitating and participating in the bankruptcy proceedings.  Their differences also include whether the course of the bankruptcy proceedings and the actions in respect of them by the bankruptcy administrator, Mr. Rebgun, are, in whole or in part, attributable to the Russian Federation.

1466. The ILC Articles on State Responsibility are in point.  They and their commentary are conveniently republished in a book edited by Professor James Crawford, then the Commission's special rapporteur on the topic.[1901]   Chapter II, "Attribution of Conduct to a State," in its introductory commentary, observes that, "the general rule is that the only conduct

---

[1898]   Counter-Memorial ¶ 1473; Rejoinder ¶ 385, referring to Commentary to ILC Articles on State Responsibility, Article 8, ¶ 6 Exh. C-1042.  *See also* Respondent's Rebuttal Slides, Vol. 7, slide 50.

[1899]   Transcript, Day 21 at 197, referring to *Jan de Nul N.V. and Dredging International N.V. v. Arab Republic of Egypt*, ICSID ARB/04/13, Award, 6 November 2008 ¶ 173, Exh. C-997; *White Industries Australia Limited v. The Republic of India*, UNCITRAL, Award, 30 November 2011 ¶¶ 8.1.10 and 8.1.18, Exh. R-3545; *Hamester* ¶ 179; Counter-Memorial ¶ 1474, referring to *Flexi-Van Leasing, Inc. v. The Government of the Islamic Republic of Iran*, Iran-U.S. Claims Tribunal, Case No. 36, (1988) 12 Iran-U.S.C.T.R. 335, Award, 11 October 1986 p. 349, Exh. R-1154.

[1900]   Respondent's Post-Hearing Brief ¶ 177; Transcript, Day 19 at 119, 161–62 (Respondent's closing).

[1901]   Articles on Responsibility of States for Internationally Wrongful Acts with commentaries (Text adopted by the International Law Commission at its fifty-third session, in 2001), Articles 1–11 and 28–39, Exh. C-1042.

attributed to the State at the international level is that of its organs of government, or of others who have acted under the direction, instigation or control of those organs, i.e., as agents of the State."[1902]   Article 8, "Conduct directed or controlled by a State," provides that "[t]he conduct of a person or group of persons shall be considered an act of State under international law if the person or group of persons is in fact acting on the instructions of, or under the direction and control of, that State in carrying out the conduct."[1903]   The commentary to Article 8 observes that:

> Questions arise with respect to the conduct of companies or enterprises which are State-owned and controlled . . . .  The fact that the State initially establishes a corporate entity . . . is not a sufficient basis for the attribution to the State of the subsequent conduct of that entity . . . .  Since corporate entities, although owned by and in that sense subject to the control of the State, are considered to be separate, *prima facie* their conduct in carrying out their activities is not attributable to the State unless they are exercising elements of governmental authority . . . [and] the instructions, direction or control [of the State] must relate to the conduct which is said to have amounted to an internationally wrongful act.[1904]

1467. The Parties agree that the actions of organs of the Russian State, whether executive, judicial or administrative, are attributable to Russia.  As noted, disagreement is essentially confined to the actions of Rosneft (and Rosneft-controlled YNG) and the actions of the bankruptcy administrator.

1468. The Russian State owned all, or, subsequently, over 70 percent of the shares of Rosneft.  Rosneft's officers were and are appointed by the State and many of the members of Rosneft's Board of Directors concurrently occupied and occupy senior executive positions in Government, some close to President Putin.[1905]  All this however does not suffice to attribute to the Russian State the actions of which Claimants especially complain:   (a) Rosneft's collaboration with Baikal in the sale of YNG at auction and its immediate repurchase by Rosneft; (b) Rosneft's agreement with the SocGen bank creditors syndicate of Yukos to pay the debt of Yukos to those banks, the banks at the same time undertaking to petition Russian courts

---

[1902] *Ibid.* p. 54.

[1903] *Ibid.* p. 47.

[1904] *Ibid.* p. 48.

[1905] For example, Mr. Igor Sechin, the Chairman of Rosneft's Board of Directors from 2004 to 2012, was also from 2004 to 2008 Deputy Head of the Administration of the President of the Russian Federation and aide to the President, and, from 2008 to 2012, Deputy Prime Minister of the Russian Federation.  In 2011, he became President of Rosneft.  Mr. Sergei Naryshkin, now the Chairman of the State Duma, was member of the Rosneft Board of Directors from 2004 to 2009, while also holding the post, from 2004 to 2011, of Head of the Executive Office of the President of the Russian Federation (*see* Rosneft Annual Reports 2004, 2005, 2006, 2007, 2009, Exh. C-379; Rosneft Annual Report 2010, Exh. C-1265; *see also* Rosneft Annual Report 2012 (available on Rosneft's web-site).

for the bankruptcy of Yukos; and (c) Rosneft's successful bids at the bankruptcy auction for much of what was left of Yukos.

1469. That is because it would be difficult, if not impossible, to prove that Rosneft in so acting, did so at the instructions or direction, or under the control of the Russian State—but for one remarkable fortuity that bears on the auction of the shares of YNG and their acquisition by Rosneft.

1470. President Putin conducted a press conference with Russian and foreign media on 23 December 2004.[1906]  He was asked by V. Terekhov (Interfax), "in the wake of serious events that occurred tonight, when Nefteyugansk passed into the ownership of a state company.  Will you comment . . . ?"  President Putin replied:

> Now regarding the acquisition by Rosneft of the well-known asset of the company—I do not remember its exact name—is it Baikal Investment Company?  Essentially, Rosneft, a 100% state owned company, has bought the well-known asset Yuganskneftgaz.  That is the story.  In my view, everything was done according to the best market rules . . . a state owned company or, rather, companies with 100% state capital, just as any other market players, have the right to do so and, as it emerged, exercised it.  Now what would I like to say in this context?  You all know only too well how the privatization drive was carried out in this country in the early 90s and how, using all sorts of stratagems, some of them in breach even of the then current legislation, many market players received state property worth many billions.  Today, the state, resorting to absolutely legal market mechanisms, is looking after its own interests.  I consider this to be quite logical.

1471. Towards the end of this lengthy press conference, K. Eggert (BBC), noting that there had been a lot of criticism in Western press and official circles of the sale of YNG, asked for the reaction of President Putin to "this criticism and does it concern you at all?"  President Putin responded by sharply criticizing the Texas bankruptcy proceedings brought by Yukos and the responsive court ruling as "unacceptable from an international legal point of view . . . a breach of international politeness" and a manifestation of U.S. "imperium".  He concluded:  "As for the deal that took place, I think that it was carried out in strict conformity with the Russian legislation and in accordance with the norms of international law and the international commitments that Russia has taken on as part of the agreements that we have signed with our partners on the international stage.  So I do not see any real problems here."

1472. In this latter comment about agreements that Russia had signed, President Putin may have had the ECT in mind.  What at any rate is critical is his statement at the opening of the press

---

[1906]   President of Russia Official Web Portal, Press Conference with Russian and Foreign Media, 23 December 2004, Exh. C-422.

conference that, with regard to Rosneft's purchase of the YNG shares from Baikal, "the state, resorting to absolutely legal market mechanisms, is looking after its own interests."  He did not say that Rosneft was looking after its own interests, but that the purchase signified that the Russian State was looking after "its own interests".  In the view of the Tribunal, that statement constitutes President Putin's public acceptance and assertion that Rosneft's purchase of the YNG shares from Baikal was an action in the State's interest, the inference being that the State, then 100 percent shareholder of Rosneft, the most senior officers of which were members of President Putin's entourage, directed that purchase in the interest of the State.  It follows that that act, as well as the auction of YNG shares that underlay it, is attributable to the Russian State.

1473. Claimants have invoked as well Rosneft's press release of 27 June 2005, in which Rosneft declared that, given that it is wholly owned by the State, "Rosneft acts on its behalf."[1907]  They also noted a statement made by Rosneft in the context of its IPO in July 2006, acknowledging that "the Russian Government . . . controls Rosneft . . . ."[1908]

1474. It does not necessarily follow from the foregoing that the actions of Rosneft in contracting with the SocGen bank creditors of Yukos, and in bidding at the bankruptcy auction of Yukos itself, are attributable to Russia.  Yet it may well be that in taking those actions, Rosneft did so at the *sub rosa* direction of the Russian State, at the direction of senior officers of President Putin's entourage who concurrently ran Rosneft.  In the view of the Tribunal, it may reasonably be concluded that Rosneft was so directed.  Or, if not, that it was not because it did not need to be; Rosneft was such a creature of President Putin's entourage that it reflexively implemented his policies.  But proving that admittedly is elusive, in the absence of an inculpatory admission on behalf of the Russian State such as that of President Putin in respect of the acquisition of YNG.

1475. Are the actions of the bankruptcy administrator, Mr. Rebgun, attributable to the Russian Federation?

1476. Respondent observed in its Rejoinder that "[i]n most European legal systems a liquidator or bankruptcy receiver is not a State organ" and that bankruptcy managers and receivers do not "generally exercise elements of governmental authority or act under the instructions, direction

---

[1907]   *Rosneft Shareholders' AGM Held*, Rosneft Press Release, 27 June 2005, Rosneft Website, Exh. C-1419.

[1908]   Rosneft IPO Prospectus, 14 July 2006, Exh. C-380.

or control of the State".[1909]   Respondent cited pertinent awards of investment treaty tribunals, including *Plama*[1910] and *Oostergeel v. Slovak Republic*[1911] as well as the decision of the Grand Chamber of the ECtHR in *Kotov v. Russia*[1912] in support of this conclusion.  Those decisions are indeed supportive.

1477.   Claimants did not address these arguments at the Hearing, where they appeared to limit their complaints in the context of the bankruptcy proceedings to "the actions of the Russian courts, who appointed the interim receiver and confirmed all his actions, as well as the actions of the admitted creditors, namely the Tax Ministry and Rosneft."[1913]

1478.   Respondent has maintained that the actions of the Tax Ministry—incontestably an organ of the Russian State—in asserting and realizing its predominant claims to the assets of Yukos in the bankruptcy proceedings, nevertheless are not in breach of the ECT because the Tax Ministry there acted as a mere commercial creditor and did not exercise governmental authority.  "The votes of the Russian tax authorities are attributable to Respondent, but are not an exercise of *puissance publique.*  The tax authorities voted at the Creditors' Meeting, and, more generally, participated in Yukos' bankruptcy proceedings in their capacity as a Yukos creditor alongside other creditors, enjoyed no special prerogatives or privileges, and were subject to the same rules as private creditors, the 2002 Bankruptcy Law."[1914]   Moreover, Respondent contends that the Moscow Arbitrazh Court's "acceptance of the bankruptcy petitions and ratification of the creditors' decision to liquidate Yukos does not change this conclusion . . . [It] enforced legislation governing private-law relations, specifically, bankruptcy legislation, which imposes limitations inherent in private property.  Loss resulting from a court's enforcement of legal limitations inherent in private property is not compensable under Article 13 or 10(1) ECT, irrespective of whether the court proceedings were instituted by a State organ."[1915]

1479.   The foregoing line of argument runs up however against the ILC Articles on State Responsibility.  Article 4 provides that "[t]he conduct of any State organ shall be considered an

---

[1909]   Rejoinder ¶¶ 389–390.

[1910]   *Plama* ¶¶ 252–53.

[1911]   *Jan Oostergetel* ¶¶ 151–58.

[1912]   *Kotov v. Russia* ¶¶ 99–107.

[1913]   Transcript, Day 20 at 252.

[1914]   Respondent's Post-Hearing Brief ¶ 177.

[1915]   *Ibid.* ¶ 178.

act of that State under international law, whether the organ exercises legislative, executive, judicial or any other functions, whatever position it holds in the organization of the State . . . ." The commentary to this article specifies that "[i]t is irrelevant for the purposes of attribution that the conduct of a State organ may be classified as 'commercial' or as '*acta iure gestionis*'."[1916]

1480. In respect of attribution, the Tribunal concludes that the Russian Federation is responsible for its organs, executive, judicial and administrative, in the actions that they took against and in relation to Yukos and its stockholders; that, for the reasons stated above, the Russian Federation, speaking through its President, accepted responsibility for Rosneft's acquisition of YNG and for the auction that underlay it; and that, in respect of other actions of Rosneft that bear on the destruction of Yukos, while proof of specific State direction is lacking, it may reasonably be held that the highest officers of Rosneft who at the same time served as officials of the Russian Federation in close association with President Putin acted in implementation of the policy of the Russian Federation.  The actions of Mr. Rebgun as bankruptcy administrator are not attributable to Respondent.[1917]

## B.   ARTICLE 10 OF THE ECT

### 1.   Introduction

1481. Article 10(1) provides, in relevant part:

> *Article 10*
> PROMOTION, PROTECTION AND TREATMENT OF INVESTMENTS
>
> (1)   Each Contracting Party shall, in accordance with the provisions of this Treaty, encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area.  Such conditions shall include a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment.  Such Investments shall also enjoy the most constant protection and security and no Contracting Party shall in any way impair by unreasonable or discriminatory measures their management, maintenance, use, enjoyment or disposal.  In no case shall such Investments be accorded treatment less favourable than that required by international law, including treaty obligations. . . .

---

[1916]   ILC Aricles on State Responsibility, Articles 1–11 and 28–39, p. 40, Exh. C-1042.

[1917]   It is of interest to note that, in an interview with the Vedomosti paper in October 2006, Mr. Rebgun is alleged to have acknowledged his ties to the Russian security establishment known as the "siloviki."  *Yukos liquidator says process will be legal*, AFP World News, 10 August 2006, Exh. C-822.

1482. The Tribunal will first summarize the Parties' arguments regarding applicable legal standards under Article 10(1) of the ECT, and then turn to the Parties' arguments regarding whether Claimants have made out a breach of these standards by Respondent.

### 2.   Applicable Legal Standards under Article 10(1) of the ECT

#### (a)   Claimants' Position

1483. In respect of the obligations imposed by Article 10(1) on host States, Claimants refer, as being particularly relevant to the present case, to Respondent's obligation to accord Claimants' investments "fair and equitable treatment" and its obligation not to impair Claimants' investments by discriminatory measures.[1918]

1484. With regard to fair and equitable treatment, Claimants submit that, as a general matter, it is "a broad and widely accepted standard"[1919] encompassing such fundamental standards as "good faith, due process, non-discrimination and proportionality",[1920] "procedural propriety",[1921] "the right to be heard and to present evidence",[1922] "proper notice of administrative actions to be taken by the State"[1923] and "transparency, protection of legitimate expectations . . . and freedom from coercion and harassment".[1924]

1485. Claimants submit that fair and equitable treatment in Article 10(1) of the ECT is a "non-contingent, autonomous" standard that is broader than both the historical customary international law standard for the treatment of aliens elaborated in *Neer* (which requires "a showing of outrage, bad faith, willful neglect of duty, or 'insufficiency of governmental action so far short of international standards that every reasonable and impartial man would readily

---

[1918]   Memorial ¶ 556.

[1919]   *Ibid.* ¶ 558, quoting Judge Schwebel in *MTD Equity Sdn. Bhd. and MTD Chile S.A. v. Republic of Chile*, ICSID Case No. ARB/–1/07, Award, 25 May 2004 ¶ 109, Exh. C-969 (hereinafter "*MTD v. Chile*").

[1920]   *Ibid.* quoting Judge Schwebel in *MTD v. Chile*, Exh. C-969 and *Saluka Investments BV v. The Czech Republic* (UNCITRAL), Partial Award, 17 March 2006 ¶ 303, Exh. C-977 (hereinafter "*Saluka*"); Reply ¶ 581.

[1921]   Memorial ¶ 564.

[1922]   *Ibid.* ¶ 566.

[1923]   *Ibid.* ¶ 567.

[1924]   *Ibid.* ¶ 558.

recognize its insufficiency'")[1925] and the current customary international law minimum standard of treatment for investments.[1926]

1486. Claimants emphasize that fair and equitable treatment is an "objective standard that does not require bad faith by the [host] State."[1927]

1487. Claimants further submit that denial of justice can constitute a breach of the fair and equitable treatment standard and refer to several awards that define the legal standard for establishing a denial of justice: *Azinian v. Mexico*, *Rumeli v. Kazakhstan*, *Chattin*, *Mondev v. United States*, *Brown v. Great Britain*, and *Petrobart v. Kyrgyz Republic*.[1928]   Claimants submit that "[i]nternational law has long accepted the responsibility of States for the actions of their courts, especially where those actions involve judicial impropriety and malfunctions in the administration of justice."[1929]   Claimants submit that a substantive denial of justice may be found in instances of gross misapplication of the law,[1930] but that most often denial of justice will be related to procedural inadequacies.[1931]   Accordingly, say Claimants, the concepts of due process and denial of justice are "closely linked", such that "a failure to allow a party due process will often result in a denial of justice."[1932]

1488. However, Claimants contend that Respondent, by arguing that the threshold for Article 10(1) is "demanding" or "high", conflates the standard for breaches of due process with the historical standard for denial of justice.[1933]   In support of their criticism, Claimants refer to the awards in *Vivendi II* and *Rumeli v. Kazakhstan* and to a recent commentary by Judge Schwebel, a member of this Tribunal, where he wrote that:

---

[1925]   Reply ¶ 584, quoting Counter-Memorial ¶ 1564.

[1926]   Reply ¶ 584–606, citing *Azurix Corp. v. Argentine Republic*, ICSID Case No. ARB/01/12, Award, 14 July 2006 ¶¶ 360–61, 372, Exh. C-979 (hereinafter *"Azurix"*).

[1927]   Transcript, Day 1 at 154, quoting *National Grid P.L.C. v. Argentine Republic* (UNCITRAL) Award, 3 November 2008 ¶ 173, Exh. C-996; *see also* Memorial ¶ 559.

[1928]   Memorial ¶¶ 618–28.

[1929]   *Ibid.* ¶ 619.

[1930]   *Ibid.* ¶ 621.

[1931]   *Ibid.* ¶ 622.

[1932]   *Ibid.*¶ 623, quoting *Waguih Elie George Siag and Clorinda Vecchi v. The Arab Republic of Egypt*, ICSID Case No. ARB/05/15, Award, 1 June 2009 ¶ 452, Exh. C-998.

[1933]   *Ibid.* ¶¶ 607–16.

> [w]hat in another case may or may not be fair and equitable treatment by a State of foreign investment may involve procedural matters, or matters of substance, or both, far removed from the confines and criteria of a denial of justice.[1934]

1489. It follows, submit Claimants, that while investment tribunals have considered the fair and equitable treatment standard to include the manner in which an investor and its investment are treated by the host State's courts "mainly through the prism of denial of justice . . . this is by no means exhaustive of the standard."[1935]   In sum, Claimants' position is that, while denial of justice forms part of the fair and equitable treatment standard, the latter standard is not limited to the former.[1936]

1490. Claimants also submit that freedom from arbitrariness and discrimination forms part of the fair and equitable treatment standard.[1937]   In support of their submission, Claimants refer to the award in *Saluka Investments BV v. The Czech Republic* ("**Saluka**")—quoted verbatim by the *Biwater Gauff v. United Republic of Tanzania* ("**Biwater**") and *Rumeli v. Kazakhstan* tribunals—which established the proposition that the standard of reasonableness has no different meaning in this context than in that of the fair and equitable treatment standard with which it is associated.[1938]

1491. Claimants submit that the *Plama v. Bulgaria* award confirms that "unreasonable" conduct is synonymous with "arbitrary" conduct.[1939]   Claimants also contend that many tribunals, such as those in *Lemire v. Ukraine* and *Siemens A.G. v. The Argentine Republic* ("**Siemens**"), have ruled that various State actions, not "based on reason", and comparable to those alleged against Respondent were "arbitrary".[1940]

---

[1934] *Ibid.* ¶ 608, referring to Judge Stephen M. Schwebel, "Is *Neer* Far from Fair and Equitable?" (2011) 27 Arb. Int'l 555 p. 559, Exh. C-1647.

[1935] *Ibid.* ¶ 611.

[1936] *Ibid.* ¶ 615

[1937] *Ibid.* ¶ 645, citing *CMS Gas Transmission Company v. The Argentine Republic*, ICSID Case No. ARB/01/8, Award, 12 May  2005 (hereinafter "*CMS v. Argentina*").

[1938] Memorial ¶ 645, citing *Saluka*, ¶ 460, Exh. C-977; *Biwater Gauff (Tanzania) Ltd. v. United Republic of Tanzania*, ICSID Case No. ARB/05/22, Award, 24 July 2008 and Concurring and Dissenting Opinion by Gary Born ¶ 692, Exh. C-991 (hereinafter *"Biwater"*); *Rumeli Telekom A.S. and Telsim Mobil Telekomunikasyon Hizmetleri A.S. v. Republic of Kazakhstan*, ICSID Case No. ARB/05/16, Award, 29 July 2008 ¶ 679, Exh. C-992.

[1939] Memorial ¶ 646, *Plama*, Exh. C-994.

[1940] *Ibid.* ¶¶ 651–52.

1492. Claimants further submit that the principle of proportionality is an element of the fair and equitable treatment standard, as confirmed in *MTD Equity Sdn. Bhd. and MTD Chile S.A. v. Chile* ("**MTD v. Chile**")and *Vivendi v. Argentina*.[1941]

1493. Many arbitral tribunals, say Claimants, have also held that a stable legal and business environment is an essential element of fair and equitable treatment.[1942]  They refer to the concepts of consistency, transparency and treatment that does not frustrate the legitimate expectations of the investor as being essential to ensure such an environment[1943]  Claimants cite the *PSEG Global v. Turkey* award, where the tribunal stated that "the 'roller-coaster' effect of the continuing legislative changes" seriously breached the fair and equitable treatment obligation.[1944]

1494. Claimants also contend that Article 10(1) of the ECT includes a stand-alone prohibition against discrimination that is breached if the management, maintenance, use, enjoyment or disposal of the investor's investment is impaired.  The test for identifying discriminatory measures, submit Claimants, is described in *Plama* as entailing "like persons being treated in a different manner in similar circumstances without reasonable or justifiable grounds."[1945]

1495. Further, Claimants argue that the non-discrimination standard in Article 10(1) of the ECT is not limited to measures taken because of the foreign nationality of the investor.  Claimants emphasize that nothing in the wording of Article 10(1) of the ECT suggests such a limit to the standard.  This is particularly obvious when Article 10(1) is contrasted with Article 10(7) of the ECT, which contains the most-favored-nation treatment and national treatment standards.  It follows, argue Claimants, that "when the ECT's drafters intended to restrict a non-discrimination provision to nationality-based discrimination, they expressly did so."[1946]  Claimants contend that the former U.S. BIT negotiator, Mr. Vandevelde supported this interpretation:

> Nothing in the language [of the ECT] suggests that it is limited to discrimination based on nationality . . . .   Although the most common competitive disadvantages imposed on

---

[1941]  *Ibid.* ¶ 679.

[1942]  *Ibid.* ¶ 697.

[1943]  *Ibid.* ¶ 698.

[1944]  *Ibid.* ¶ 703.

[1945]  *Ibid.* ¶ 737.

[1946]  Reply ¶ 641.

foreign investments may be nationality-based, a competitive disadvantage imposed on some other basis may be just as detrimental to the investment.[1947]

1496. Claimants also rely on the awards in *Plama*, *Al-Bahloul v. Tajikistan*[1948] and *National Grid*[1949] for the proposition that arbitral tribunals interpreting the ECT and other investment protection treaties with identical or similar provisions have concluded that the non-discrimination standard is not restricted to a protection against nationality-based discrimination.[1950]

1497. Claimants contend that the authorities relied upon by Respondent for the contrary proposition either contradict Respondent's position or are inapposite.[1951]   Claimants characterize Respondent's "selective quoting" from the *LG&E Energy Corp. et al. v. The Argentine Republic* award as "unfortunate."   They say that, in fact, in the paragraph immediately following the one cited by Respondent, the Tribunal said the exact opposite.   They point out that the tribunal found that "while there was no intent to discriminate against the investments on account of the investors' nationality, there was differential treatment of similar companies."[1952]   Claimants also highlight that Respondent's reliance on declarations from the U.S. and Canada is of no assistance, as they are non-signatories to the ECT.[1953]

(b)   **Respondent's Position**

1498. Respondent submits that, in determining whether the host State's conduct is fair and equitable, an investor's legitimate and reasonable expectations are the "dominant" element.   Respondent also submits that the assessment of the reasonableness and legitimacy of an investor's expectations of fair and equitable treatment must be based on the state of the law of the host State, its political and historical conditions, and any particular conditions of treatment the State

---

[1947]   *Ibid.* ¶ 642, referring to Kenneth Vandevelde, *Bilateral Investment Treaties, History, Policy and Interpretation* (OUP 2010) pp. 213–14, Exh. C-1018.

[1948]   *Mohammad Ammar Al-Bahloul v. Republic of Tajikistan* (SCC Case No. V064/2008), Partial Award on Jurisdiction and Liability of 2 September 2009 ¶ 248, Exh. C-1531.

[1949]   *National Grid P.L.C. v. Argentine Republic* (UNCITRAL), Award, 3 November 2008 ¶ 198, Exh. C-996.

[1950]   *Ibid.* ¶¶ 644–46.

[1951]   *Ibid.* ¶¶ 647–51.

[1952]   *Ibid.* ¶ 650, referring to Counter-Memorial p. 748, n.2479; *LG&E Energy Corp et al. v. The Argentine Republic,* ICSID Case No. ARB/02/1, Decision on Liability, 3 October 2006 ¶¶ 147–48, Exh. C-981 (hereinafter *"LG&E"*).

[1953]   *Ibid.* ¶¶ 652–53.

offered the investor at the time it made its investment.[1954]   In support of these propositions, Respondent cites *Saluka* and *Duke Energy v. Ecuador*.[1955]

1499.   Respondent also refers to the award in *M.C.I. v. Ecuador* to support the proposition that the obligation to provide an investor with stable, equitable, favorable and transparent conditions cannot be construed as an obligation to refrain from enforcing existing law.[1956]   Respondent relies on Professor Dolzer's view that "[t]he pre-investment legal order forms the framework for the positive reach of the expectation which will be protected and also the scope of considerations upon which the host state is entitled to rely when it defends [itself]."[1957]

1500.   Respondent refers to the awards in *Lauder v. Czech Republic* and *Genin v. Estonia* in support of its contention that conduct cannot be in breach of the fair and equitable treatment standard if authorities are only taking the actions necessary to enforce the their laws.[1958]   Respondent also relies on the *Genin v. Estonia* award for the proposition that where a State's actions are the justified exercise of its power to enforce its laws, the procedural irregularities complained of by investors must be very severe to amount to a violation of the relevant investment treaty.[1959]

1501.   Moreover, Respondent contends that the fair and equitable treatment standard in Article 10(1) of the ECT—specifically with respect to establishing a denial of justice, or conduct that is otherwise manifestly unfair or unreasonable—corresponds to an international law minimum standard of treatment of foreign investment.[1960]   This minimum standard, submits Respondent, incorporates the customary international law minimum standard of treatment for alien property, as well as treaty obligations of the host State, but excludes decisions by international organizations, such as the ECtHR.[1961]

---

[1954]   Counter-Memorial ¶¶ 1549–50.

[1955]   *Ibid*. citing *Saluka* ¶¶ 301–302; *Duke Energy Eletroquil Partners S.A. v. Republic of Ecuador*, ICSID ARB/04/19, Award, 18 August 2008 ¶ 340, Exh. C-993.

[1956]   Counter-Memorial ¶ 1551.

[1957]   *Ibid*. ¶ 1552.

[1958]   *Ibid*. ¶ 1553, referring to *Lauder v. The Czech Republic*, UNCITRAL, Final Award, 3 September 2001 ¶¶ 296–97, Counter-Memorial ¶¶ 1566–67, referring to *Alex Genin, Eastern Credit Ltd., Inc. and A.S. Baltoil v. The Republic of Estonia*, ICSID ARB/99/2, Award, 25 June 2001, 17 ICSID Rev. 395 (2002) ¶ 367, Exh. R-1095.

[1959]   *Ibid*. ¶ 1567.

[1960]   *Ibid*. ¶ 1559.

[1961]   *Ibid*. ¶ 1561.

1502. According to Respondent, Claimants' burden for showing a violation of the minimum standard is "demanding".[1962]   Thus, some tribunals have equated the fair and equitable treatment standard with the *Neer* standard, which for allegations of due process violations by a host State's courts would require a showing of outrage, bad faith, willful neglect of duty, or "insufficiency of governmental action so far short of international standards that every reasonable and impartial man would readily recognize its insufficiency".[1963]

1503. Thus, due process violations in one or more proceedings "do not by themselves establish a treaty violation if the procedures are only part of the judicial process available to the parties."[1964]   Citing *AMTO v. Ukraine*, Respondent argues that the assessment of the conduct of national courts must include the availability of remedies in the host State's legal system and whether or not such remedies were exercised; and if they were exercised, whether they were exercised fully and wisely.[1965]   In addition, in order to prove their claim for denial of justice, Claimants must show a "clear and malicious misapplication of the law" based on the content of judicial opinions themselves.[1966]

1504. With respect to the standard of non-discrimination, Respondent submits that Article 10(1) of the ECT "only prohibits discrimination based on nationality."[1967]   Accordingly, it argues that discriminatory measures must have been "taken because of the foreign nationality of the shareholders."[1968]

1505. Part VII of the Table of Contents in Respondent's Rejoinder provides a short list of the conditions that, according to Respondent, Claimants' claims must meet in order to show a breach of Article 10(1) (in addition to showing that the conduct alleged to be in breach of Article 10(1) is attributable to Respondent and is an exercise of *puissance publique*, as discussed above in Chapter X.A):

---

[1962]   *Ibid.* ¶ 1562, referring to *AES Summit Generation Ltd. and AES-Tisza Eromu Kft v. Hungary*, ICSID ARB/07/22, Award, 23 September 2010 ¶ 9.3.40, Exh. R-1103; *see also* Counter-Memorial ¶ 1568.

[1963]   Counter-Memorial ¶ 1564, *see esp.* p. 738, n.2456; *ibid.* ¶ 1568, referring to *B.E.Chattin (U.S.) v. United Mexican States*, U.S.–Mexico General Claims Commission, Opinion of 23 July 1927, 4 U.N.R.I.A.A. 282, 295, ¶ 29, Exh. C-924.

[1964]   Counter-Memorial ¶ 1571.

[1965]   *Ibid.* citing *Limited Liability Company AMTO v. Ukraine*, SCC 080/2005, Final Award, 26 March 2008 ¶ 76, Exh. C-989.

[1966]   Counter-Memorial ¶ 1572.

[1967]   *Ibid.* ¶ 1580.

[1968]   *Ibid.* ¶¶ 1581–84.

1. Regardless of the standard of review under Article 10(1), Claimants must establish that the Russian Federation's actions interfered with Claimants' legitimate and reasonable expectations based on a full disclosure of the facts relevant to Claimants' investments and based on operation of the investments in accordance with Russian law

a) . . . Claimants must establish . . . specific, legal commitments by Respondent based on a full disclosure of the facts relevant to their investments

b) Claimants also must establish that the Russian Federation's actions interfered with their expectations that are based on an operation of their investments in accordance with Russian law

2. Claimants must establish a systemic judicial failure, or, at a minimum, that the conduct they attack is otherwise manifestly unfair or unreasonable

a) Claimants must establish that the Russian court decisions they attack constitute a denial of justice or are otherwise manifestly unfair or unreasonable

b) Specifically with respect to the taxation measures Claimants challenge, Claimants must establish a systemic judicial failure or, at a minimum, that the measures are manifestly unfair or unreasonable, and contrary to internationally recognized tax policies and practices

c) Specifically with respect to Yukos' bankruptcy proceedings, Claimants must demonstrate a systemic failure of the Russian judicial system, or, at a minimum, that the bankruptcy proceedings were manifestly unfair or unreasonable

3. To establish "unreasonable or discriminatory measures" that impaired the management, maintenance, use or enjoyment of their investments, Claimants must prove a systemic judicial failure, or, at a minimum, that the taxation measures complained of are contrary to international tax practices or treated similar cases differently on the basis of nationality, without reasonable justification.[1969]

1506. Finally, Respondent submits that in order to substantiate their claim, Claimants must prove a direct causal link between the loss of their shares and measures in breach of Article 10(1) ECT.[1970]

### 3. Did Respondent Accord Claimants' Investments the Standard of Treatment Required by Article 10(1) of the ECT?

#### (a) Claimants' Position

1507. Claimants submit that Respondent violated its obligations under Article 10(1) of the ECT by failing to accord Claimants' investments fair and equitable treatment and by impairing Claimants' investments by discriminatory measures.

1508. In terms of fair and equitable treatment, Claimants contend that Respondent's actions, both individually and collectively, constitute breaches of the most basic requirements of procedural

---

[1969]   Rejoinder, Table of Contents, pp. v–vi.

[1970]   Respondent's Post-Hearing Brief ¶ 173.

propriety and due process, as well as a denial of justice.[1971]  Claimants emphasize that their case is not limited to one of "systematic denial of justice", as Respondent maintains.[1972]

1509. Claimants also emphasize that, in considering whether Respondent violated the fair and equitable treatment standard under Article 10(1) of the ECT, the Tribunal should not view each fact in isolation, but rather look at the totality of Respondent's actions.[1973]  Thus, Claimants state that, while some of Respondent's actions could and do, in and of themselves, constitute breaches of Articles 10(1), their position is that "the totality of the Russian Federation's actions and their cumulative effect" constitute a violation of the fair and equitable treatment standard.[1974]

1510. Claimants offer a list of specific actions taken by Respondent, or attributable to it, which, they say, demonstrate that Respondent breached the fair and equitable treatment standard.

1511. Firstly, Claimants contend that Respondent breached the fair and equitable treatment standard by the conduct of "over 150 raids . . . in brutal conditions from July 4, 2003 to November 18, 2004, and the innumerable searches and seizures conducted by armed and masked officers at Yukos' headquarters, the premises of affiliates or entities related to Yukos, or the offices of lawyers acting in Yukos-related cases, leaving neither a copy nor a simple list of the documents and items seized, in breach of even the most basic requirements of Russian law."[1975]  Claimants allege that these searches and seizures were part of the Russian Federation's campaign to destroy Yukos and had a major disruptive effect on the operations of Yukos, reducing the company's chances of survival in the face of the Russian Federation's attacks (and, in

---

[1971]   Memorial ¶¶ 568, 618.

[1972]   Transcript, Day 17 at 134 (Claimants' closing); *Ibid.* at 145.

[1973]   Transcript, Day 1 at 155–57 (Claimants' opening), referring to *RosInvestCo* ¶ 621, Exh. C-1049; *Quasar* ¶ 44, Exh. R-3383; Transcript, Day 17 at 149–154, referring to *Vivendi* ¶ 7.5.31 ("It is well-established under international law that even if a single act or omission by a government may not constitute a violation of an international obligation, several acts taken together can warrant finding that such obligation has been breached. The ad hoc Committee recognized this when it noted that '[i]t was open to Claimants to claim, and they did claim, that these acts taken together, or some of them, amounted to a breach of Articles 3 and/or 5 of the BIT"); *Walter Bau AG v The Kingdom of Thailand*, UNCITRAL, Award, 1 july 2009 ¶ 12.43 (hereinafter "*Walter Bau*") ("The Respondent's argument that 'creeping expropriation' only, and not breaches of FET, can be defined by a series of acts is not correct.  The Tribunal sees no reason why a breach of a FET obligation cannot be a series of cumulative acts and omissions.  One of these may not on its own be enough, but taken together, they can constitute a breach of FET obligations."); *see also* Claimants' Post-Hearing Brief ¶¶ 182–84.

[1974]   Claimants' Post-Hearing Brief, ¶ 182.

[1975]   *Ibid.* ¶ 161, referring to Memorial ¶¶ 152–66; Reply ¶¶ 74–94; Rieger WS ¶ 28; Misamore WS ¶¶ 31–32; Schmidt WS ¶ 16; *see also* Memorial ¶¶ 569–79.

particular, "the accelerated pace in which tax debts were fabricated").[1976]   As for the "campaign of harassment" on PwC, and subsequent raid, Claimants allege that it precipitated PwC's withdrawal of its certification of Yukos' audits.[1977]

1512. Secondly, Claimants contend that Respondent did not provide proper notice of administrative actions to be taken by the State.[1978]   In that regard, Claimants submit that the Tax Ministry, the Russian courts and the bailiffs repeatedly failed to afford Yukos reasonable timeframes in which to pay or challenge the alleged tax reassessments:  just two days to voluntarily pay after issuance of the 2000 Decision, and a single day to pay after issuance of each of the 2002 and 2003 Decisions.  In addition, Claimants allege that Respondent did not wait for these short time limits to expire before filing a petition for collection with the Moscow Arbitrazh Court, which Claimants allege were swiftly "rubber-stamped" in favor of Respondent.[1979]

1513. Thirdly, Claimants submit that Respondent did not afford them the opportunity to be heard by an impartial tribunal.  Claimants contend that Respondent instead ensured that government-friendly judges sanctioned the tax reassessments and that the three judges who failed to rule against Yukos were removed, and their rulings later overturned.  Yukos' requests for interim relief to suspend the effect of the tax reassessment decisions pending appeal on the merits were also systematically rejected.  Claimants further submit that hearings on these matters were set, and appeals ruled upon, almost immediately, and that Yukos was not given real access to case materials.[1980]

1514. Fourthly, Claimants assert that the sale of YNG was a sham auction, orchestrated by Respondent under the pretext of satisfying Yukos' alleged tax liability for the 2000 Decision; an alleged liability that Claimants submit was fully paid prior to the auction date.[1981]   With only State-owned Gazprom and Baikal in attendance,[1982] Claimants contend that Baikal acquired YNG for a "bargain" price.  Claimant also notes that Baikal was purchased by State-owned

---

[1976]   Claimants' Post-Hearing Brief ¶¶ 159, 161–62, 165.

[1977]   Memorial ¶ 578.

[1978]   *Ibid.* ¶¶ 567, 586.

[1979]   *Ibid.* ¶¶ 582–90.

[1980]   *Ibid.* ¶¶ 581–86.

[1981]   *Ibid.* ¶ 594.

[1982]   *Ibid.* ¶¶ 595.

Rosneft shortly following the auction, and that President Putin himself admitted Baikal was used as a front company to shield the future owner – Rosneft – from legal claims.[1983]

1515. Fifthly, Claimants assert that the initiation of bankruptcy proceedings against Yukos at the behest of Rosneft, the biased conduct of those proceedings by Russian courts, and the sale of Yukos' remaining assets also violated due process requirements.[1984]

1516. Claimants submit that the following actions taken by Respondent in breach of due process amount to a denial of justice:

- the administration of justice by Russian courts with respect to all Yukos related matters did not meet generally accepted international law standards of due process, impartiality and legitimacy;[1985]

- Russian courts were unduly hasty in their decision-making, refusing to provide Yukos with sufficient time or adequate opportunity to review the evidence on which the tax reassessment payment demands were based which eventually lead to its bankruptcy;[1986] and

- the systematic removal of judges who ruled in Yukos' favor and dismissal of Yukos' challenges against judges who had previously ruled against it in tax proceedings.[1987]

1517. In their discussion of denial of justice, Claimants invited the Tribunal to note the fact that Yukos lost nearly all of its cases in 2000 against the tax authorities and the statistic put forward by Mr. Konnov that the taxpayer in Russia wins in 75 percent of the cases.[1988]

1518. Moreover, Claimants argue that even if it purported to discuss denial of justice claims, Respondent has actually failed to defend its conduct, limiting itself to misstating the standard applicable to a claim of denial of justice.[1989]   According to Claimants, Respondent has "concentrated its energies on urging the Arbitral Tribunal to impose a higher burden on

---

[1983]   *Ibid.* ¶¶ 599.

[1984]   *Ibid.* ¶¶ 601–17.

[1985]   *Ibid.* ¶ 643.

[1986]   *Ibid.* ¶ 626.

[1987]   *Ibid.* ¶ 629.

[1988]   Transcript, Day 17 at 135 (Claimants' closing).

[1989]   Reply ¶ 612.

Claimants, for the facts of the Russian Federation's conduct are devastating."[1990]   Claimants assert that Respondent's attempts to elevate the applicable threshold fail because Respondent's conduct was indefensible under any plausible interpretation of the standards contained in Article 10(1) of the ECT.[1991]

1519.   Claimants also contend that Respondent's actions were arbitrary, unreasonable, disproportionate, and abusive,[1992] in their reference to the following actions of Respondent:

- Respondent's unrelenting campaign of coercion, harassment, and intimidation against Yukos and related persons and entities;[1993]

- the imposition of arbitrarily and disproportionately large payment demands by Respondent under the guise of tax reassessments, enforced within short time periods and accompanied by arbitrary freezing of assets orders;[1994] and

- Respondent's unreasonable and arbitrary rejection of Yukos' proposals to settle or resolve the alleged tax claims.[1995]

1520.   Claimants submit that Respondent failed to ensure a predictable and stable legal and business framework for the Claimants' investments.[1996]   They refer as examples to:

- Respondent's reversal of its previous acceptance of Yukos' tax optimization structure as legal;

- Respondent's reversal of its approval of the Sibneft merger; and

- a general lack of transparency on the part of Respondent.[1997]

---

[1990]   *Ibid.* ¶ 631.

[1991]   *Ibid.*

[1992]   Memorial ¶¶ 644–95.  Claimants submit that while Article 10(1) of the ECT only expressly prohibits "unreasonable or discriminatory measures", jurisprudence confirms that "unreasonable" measures have the same meaning as "arbitrary" conduct, and similarly violate the fair and equitable treatment standard (*Ibid.* ¶¶ 665–67, citing *EDF (Services) Limited v. The Republic of Romania*, ICSID Case No. ARB/05/13, Award, 8 October 2009 ¶ 303, Exh. C-1001; *Plama* ¶ 184; *Saluka* ¶ 460; *CMS v. Argentina* ¶ 290).

[1993]   Memorial ¶¶ 654–77.

[1994]   *Ibid.* ¶¶ 678–95.

[1995]   *Ibid.* ¶¶ 689–701.

[1996]   *Ibid.* ¶¶ 702–21.

1521. In support of their contention that Respondent discriminated against Claimants' investments, Claimants rely on the following facts:

- Respondent treated Yukos in a significantly different way from other comparable Russian oil companies;

- Respondent treated YNG differently before and after its acquisition by Rosneft; and

- Respondent ensured differential treatment between creditors related to Yukos or Yukos' shareholders, and State or State-related creditors in the Yukos bankruptcy proceedings.

1522. In their Reply, Claimants assert that in its Counter-Memorial Respondent does not address Claimants' claims of discrimination under Article 10(1) of the ECT, except in its assertion that Claimants' allegations with respect to the Yukos–Sibneft demerger do not involve discrimination based on nationality.[1998]   Claimants also argue that Respondent improperly invokes its domestic law in defense of its breaches of international law.[1999]

1523. Also in their Reply, Claimants argue that Respondent's only defense against the bulk of Claimants' claims under Article 10(1) is to invoke Article 21(1) ECT.  According to Claimants, in providing no other defense, Respondent has conceded that its conduct breached Article 10(1).   Claimants view Respondent's defense as resting

> squarely on the theory that Article 21(1) . . . operates as a license to ECT signatories to freely violate their treaty obligations under Article 10(1) . . . so long as they create the <u>appearance</u> that their actions have some connection, however remote and indirect, to taxation.[2000]

**(b)   Respondent's Position**

1524. Respondent's main position is that Claimants have failed to establish any violation of Article 10(1) of the ECT.

1525. In particular, Respondent submits that (a) Claimants have failed to establish that conduct, which is attributable to Respondent and an exercise of its sovereign power, proximately caused

---

[1997]   *Ibid.* ¶¶ 722–33.

[1998]   Reply ¶¶ 654–90.

[1999]   *Ibid.* ¶ 619.

[2000]   *Ibid. ¶* 577.

the loss of Claimants' investment;[2001] (b) Claimants have failed to establish that the measures they challenge interfered with Claimants' legitimate expectations;[2002] and (c) the measures relating to the imposition and enforcement of taxes were well within the range of a State's generally accepted regulatory powers.[2003]

1526. Respondent also argues that Claimants have failed to show that the challenged measures constitute a denial of justice or are otherwise manifestly unfair or unreasonable.[2004]   In particular, Respondent argues that Claimants have failed to establish that the Moscow and Chukotka courts "clearly and maliciously" misapplied Russian law when granting the claims of Gemini Holdings and Nimegian Trading in the context of the Yukos–Sibneft merger.[2005]

1527. Respondent also asserts that the challenged measures were not discriminatory.[2006]

## C.   ARTICLE 13 OF THE ECT

### 1.   Introduction

1528. Article 13(1) of the ECT provides, in relevant part:

*Article 13*
EXPROPRIATION

(1)   Investments of Investors of a Contracting Party in the Area of any other Contracting Party shall not be nationalized, expropriated or subjected to a measure or measures having effect equivalent to nationalization or expropriation (hereinafter referred to as "Expropriation") except where such Expropriation is:

(a)   for a purpose which is in the public interest;

(b)   not discriminatory;

(c)   carried out under due process of law; and

(d)   accompanied by the payment of prompt, adequate and effective compensation.

Such compensation shall amount to the fair market value of the Investment expropriated at the time immediately before the Expropriation or impending

---

[2001]   Post-Hearing Brief ¶¶ 174–80.

[2002]   *Ibid.* ¶¶ 184–90; Counter-Memorial ¶¶ 1545, 1555–58.

[2003]   Respondent's Post-Hearing Brief ¶¶ 191–99.   Particulars of Respondent's submission are summarized in the next chapter, which deals with Article 13 of the ECT.

[2004]   Counter-Memorial ¶ 1545.

[2005]   *Ibid.* ¶ 1573.

[2006]   *See* following chapter on Article 13 ECT.

Expropriation became known in such a way as to affect the value of the Investment (hereinafter referred to as the "Valuation Date").

Such fair market value shall at the request of the Investor be expressed in a Freely Convertible Currency on the basis of the market rate of exchange existing for that currency on the Valuation Date.  Compensation shall also include interest at a commercial rate established on a market basis from the date of Expropriation until the date of payment.

1529. The Parties analyze Article 13 in two steps, first by addressing what constitutes expropriation or "measures having effect equivalent to nationalization or expropriation," and then by discussing what constitutes a legal expropriation, *i.e.*, an expropriation conducted in accordance with the four conditions set out in Article 13(1):  that the expropriation be (a) in the public interest; (b) not discriminatory; (c) carried out under due process of law; and (d) accompanied by the payment of prompt, adequate and effective compensation.  The Tribunal will summarize first the Parties' principal arguments regarding the legal standards of Article 13 and will then review the facts of the present case in the light of these standards.

## 2.    Applicable Legal Standards under Article 13 of the ECT

### (a)    Claimants' Position

1530. Claimants note that Article 13(1) of the ECT deals with nationalization and expropriation, as well as other equivalent measures.  Claimants submit that such equivalent measures include "covert or incidental interference with the use of property which has the effect of depriving the owner . . . of the use or reasonably-to-be-expected economic benefit of property even if not necessarily to the obvious benefit of the host State."[2007]

1531. Claimants submit that the standard for expropriation is objective and that while the showing of intent to expropriate may evidence a measure to be expropriatory, it is not a requirement of expropriation.[2008]

1532. Claimants emphasize that, in considering whether Respondent expropriated Claimants' investment within the meaning of Article 13(1), the Tribunal should look at the totality of

---

[2007] Memorial ¶ 855, quoting *Metalclad Corp. v. The United Mexican States*, ICSID Case No. ARB(AF)/97/1, Award, 30 August 2000 ¶ 103, Exh. C-954.

[2008] Memorial. ¶ 856, referring to *Compañía de aguas del Aconquija S.A. and Vivendi Universal S.A. v. Argentine Republic*, ICSID Case No. ARB/97/3, Award, 20 August 2007 ¶ 7.5.20, Exh. C-986 (hereinafter *"Vivendi v. Argentina"*); *Tecmed* ¶ 116; *Waste Management, Inc. v. United Mexican States*, ICSID ARB(AF)/00/3, Award, 30 April 2004 ¶ 79, Exh. C-968; *see also* Transcript, Day 1 at 154.

Respondent's actions and not at each fact in isolation.[2009]   The question is not, Claimants submit, whether each of Respondent's individual actions was lawful under Russian law, or was no different than the practice in other jurisdictions, but whether the totality of Respondent's conduct was lawful under international law.[2010]

1533. Claimants argue that, contrary to Respondent's assertion, the standard for expropriation is not limited to the investor's legitimate expectations.[2011]   Respondent's reference in this regard to the treaty practice of various States is unavailing, as whether or not other treaties refer to legitimate expectations as a criterion to establish expropriation is irrelevant to the interpretation of the ECT.[2012]

1534. With regard to the requirement that expropriation be in the public interest, Claimants submit that international tribunals have emphasized that expropriation must have occurred for a "*bona fide* public purpose"[2013] and not for "purely extraneous political reasons,"[2014] "amusement and private profit"[2015] or "reprisal."[2016]   Claimants submit that a State's broad discretion to determine what constitutes "public interest" is not unfettered.[2017]

---

[2009]   Transcript, Day 1 at 153–56 (Claimants' opening), referring to *RosInvestCo* ¶ 621, Exh. C-1049; *Quasar* ¶ 44, Exh. R-3383; Transcript, Day 17, 149–154 (Claimants' closing), referring to *Compañía de Desarollo de Santa Elena, S.A. v. The Republic of Costa Rica*, ICSID ARB/96/1, Final Award, 17 February 2000 ¶ 76, Exh. C-952 (hereinafter "*Santa Elena*")("[i]t is clear . . . that a measure or series of measures can still eventually amount to a taking, though the individual steps in the process do not formally purport to amount to a taking or to a transfer of title"; *Tradex Hellas v. Albania*, ICSID ARB/94/2, Award, 29 April 1999 ¶ 191, Exh. R-1114; *Azurix* ¶ 308; *Biwater* ¶ 455 ("[i]n terms of what might qualify as 'expropriation', the Arbitral Tribunal accepts BGT's submission that it must consider the Republic's conduct both in terms of the effect of individual, isolated, acts complained of, as well as in terms of the cumulative effect of a series of individual and connected acts, in so far as such a cumulative effect might be to deprive the investor in whole or in material part of the use or economic benefit of its assets"; OECD Draft Convention on the Protection of Foreign Property ¶ 4(b), Exh. C-1040; *Pope & Talbot v. The Government of Canada*, UNCITRAL, Award on the Merits of Phase 2, 10 April 2001 ¶ 181, Exh. C-1518; *Ioannis Kardassopoulos and Ron Fuchs v. The Republic of Georgia*, ICSID ARB/05/18 and ARB/07/15, Award, 3 March 2010 ¶ 404, Exh. C-1533 (hereinafter "*Kardassopoulos*"); Michael Reisman & Robert Sloane, "Indirect Expropriation and its Valuation in the BIT Generation," (2003) 74 British Yearbook of International Law 115 p. 123, Exh. C-1643 ("[d]iscrete acts, analyzed in isolation rather than in the context of the overall flow of events . . . may not be expropriatory in themselves.   Only in retrospect will it become evident that those acts comprised part of an accretion of deleterious acts and omissions, which in the aggregate expropriated the foreign investor's property rights."); Claimants' Post-Hearing Brief ¶¶ 182–191; Reply ¶¶ 693, 699, 700.

[2010]   Reply ¶¶ 693.

[2011]   Transcript, Day 20 at 248 (Claimants' rebuttal).

[2012]   Transcript, Day 20 at 248–49 (Claimants' rebuttal).

[2013]   Memorial ¶ 867, referring to *Liberian Easter Timber Corporation (LETCO) v. The Government of the Republic of Liberia*, ICSID ARB/83/2, Award, 31 March 1986, Exh C-937, *Walter Fletcher Smith Case* (Cuba, USA), II RIAA 917–18, Award, 2 May 1929, Exh C-926.

[2014]   *Ibid.* ¶ 868, quoting *BP Exploration Company (Libya) Limited v. Government of the Libyan Arab Republic*, Award (Merits), 10 October 1973, 53 Int'l L. Rep. 297, p. 329, Exh. C-931 (hereinafter "*BP Exploration*").

[2015]   *Ibid.* ¶ 870, referring to *Walter Fletcher Smith Case* (Cuba, USA), II RIAA 917–18, Award, 2 May 1929, Exh C-926.

1535. Claimants challenge Respondent's assertion that States should be afforded a particularly wide margin of discretion when seeking to collect taxes. According to Claimants, a State alleging that it has legitimately exercised its powers of taxation is not impervious to scrutiny under international law;[2018] "taxation, like the exercise of any other sovereign power, can be expropriatory."[2019]

1536. With regard to non-discrimination, Claimants assert that it is defined as the singling out of a person or group of people without a reasonable basis. Thus, Claimants submit, a finding of "unjustified differential treatment, whether in law or in fact," has been regarded as discriminatory.[2020] Claimants quote a commentary that the "expropriation of an investment because of animosity between the host-state officials and the investor or in retaliation for lawful, but politically unpopular, conduct of the investment would violate the non-discrimination condition."[2021] Claimants add that, as in the case of Article 10(1) of the ECT, discrimination under Article 13(1) refers not only to nationality-based discrimination, but to other types of unjustified discriminatory treatment as well.[2022]

1537. Claimants also maintain that, by stating that an expropriation must be "carried out under due process of law," the ECT, unlike some other investment treaties, requires that expropriations conform not only to local, but also international standards of due process.[2023] Claimants argue that due process "contains both substantive and procedural elements";[2024] implies that "whenever a State seizes property, the measures taken must be free from arbitrariness" and that the "administrative or judicial machinery used or available must correspond at least to the minimum standard required by international law;"[2025] and requires that the investor must be

---

[2016] *Ibid.*, referring to Kenneth Vandevelde, *Bilateral Investment Treaties, History, Policy and Interpretation* (OUP 2010), p. 272, Exh. C-1018.

[2017] *Ibid.*

[2018] Reply ¶ 754.

[2019] *Ibid.* ¶¶ 756, 761.

[2020] Memorial ¶ 878, citing *ADC Affiliate Limited and ADC & ADMC Management Limited v. The Republic of Hungary*, ICSID ARB/03/16, Award, 2 October 2006, Exh. C-980 (hereinafter "*ADC*"); *BP Exploration* ¶ 329, Exh. C-931.

[2021] *Ibid.* ¶ 879, citing Kenneth J. Vandevelde, *Bilateral Investment Treaties: History, Policy and Interpretation* (OUP, 2010), p. 273, Exh. C-1018.

[2022] Reply ¶¶ 637, 733.

[2023] Memorial ¶ 882.

[2024] *Ibid.* ¶ 883, quoting OECD, Draft Convention on the Protection of Foreign Property, Notes and Comments, Art. 3, 7 ILM 117, p. 126, Exh. C-1040.

[2025] *Ibid.*

given "reasonable advance notice, a fair hearing and an unbiased adjudicator to assess the actions in dispute."[2026]

1538. Finally, Claimants submit that the taking of property without compensation engages the international responsibility of States, regardless of the purpose of the taking.[2027]

### (b) Respondent's Position

1539. Respondent submits that the standard for expropriation under Article 13 of the ECT must not be conflated with the standard for fair and equitable treatment under Article 10(1), as otherwise the taxation carve-out of Article 21, pursuant to which a tribunal may lack jurisdiction over fair and equitable treatment claims, while retaining jurisdiction over claims of expropriation, would be rendered meaningless.[2028]

1540. Respondent also contends that the absence of one or more of the four requirements of Article 13(1) (*i.e.*, public purpose, non-discrimination, due process and compensation) "is not in itself indicative of expropriation."[2029]

1541. Respondent submits that, to show expropriation or equivalent measures under Article 13(1), Claimants must (in addition to showing that the challenged actions are attributable to Respondent and constitute an exercise of *puissance publique*), demonstrate firstly that the challenged measures "proximately" caused a total or substantial deprivation of their investment;[2030] and secondly that they interfered with their legitimate expectations.[2031]

1542. The importance of the causal link between the challenged measures and the investors' investment, argues Respondent, has been confirmed by international tribunals in *Otis Elevator v. Iran*, *Elettronica*, *Link-Trading Joint Stock Company v. Moldova* and *El Paso v.*

---

[2026] *Ibid.* ¶ 884, quoting *ADC* ¶ 435.

[2027] *Ibid.* ¶ 888, citing *Santa Elena* ¶¶ 71–72.

[2028] Transcript, Day 19 at 103–105 (Respondent's closing), referring to *Nations Energy Inc. and others v. Panama*, ICSID ARB/06/19, Award, 24 November 2010 ¶¶ 682–83, Exh. R-1032; *Fireman's Fund Insurance Company v. The United Mexican States*, ICSID ARB(AF)/02/01, Award, 17 July 2006 ¶ 208, Exh. R-1141.

[2029] Transcript, Day 19 at 103–105 (Respondent's closing), quoting *Corn Products International Inc. v. The United Mexican States*, ICSID ARB(AF)/04/01, Decision on Responsibility, 15 January 2008 ¶ 90, Exh. R-1108.

[2030] Counter-Memorial ¶¶ 1096–1104; Rejoinder ¶¶ 403–06; Transcript, Day 19 at 108–10 (Respondent's closing); Respondent's Post-Hearing Brief ¶ 173.

[2031] Rejoinder ¶¶ 407–24; Transcript, Day 19 at 123–24 (Respondent's closing).

*Argentina*.[2032]  By applying the standard resulting from these precedents to the present case, Respondent submits that Claimants must prove that the loss of their shares was the "only possible, unavoidable consequence of conduct attributable to Respondent, conduct that is *iure imperii* and not excluded under Article 21 ECT."[2033]  Therefore, Claimants cannot base a claim for expropriation on damages suffered as a result of their own conduct or the conduct of their investment.[2034]

1543. As regards investors' legitimate expectations, Respondent submits that they are a "central element of claims" under Article 13(1) of the ECT.[2035]  Respondent argues that this is in accordance with the treaty practice of both ECT and non-ECT Contracting Parties, which, in turn, reflects customary international law.[2036]  Respondent then submits that:

> [P]roperty rights have inherent limitations.  The host State has the power to accept and define the rights acquired by an investor at the time of the making of the investment.  And a foreign investor acquires rights in an investment, subject to the existing regulatory framework.  So absent a specific commitment from the host State to the investor, an expropriation may occur only where the State measure does not reflect a pre-existing lawful limitation inherent in private property.[2037]

1544. Thus, argues Respondent, without a specific commitment from the host State, an investor has no right or legitimate expectation to non-enforcement or exemption from taxes and associated penalties, regardless of any earlier knowledge or tolerance of the tax authorities.[2038]  Moreover, legitimate expectations cannot be based on host State commitments when the investor has provided the State with incomplete and inaccurate information.   Nor can legitimate

---

[2032]  Transcript, Day 19 at 106–109 (Respondent's closing), referring to *Otis Elevator Company v. Iran*, Iran–United States Claims Tribunal Case No. 284, (1987) 14 I. 28, Award, 29 April 1987 ¶ 47, Exh. R-1113; *Case Concerning Elettronica Sicula S.p.A. (ELSI)*, United States v. Italy, Judgment, 20 July 1989 ¶ 119, Exh. C-942; *Link-Trading Joint Stock Company v. Moldova*, UNCITRAL, Final Award, 18 April 2002 ¶ 91, Exh. R-3533; *El Paso* ¶ 272, Exh. C-1544/R-4190.

[2033]  Transcript, Day 19 at 108.

[2034]  Counter-Memorial ¶ 1103.

[2035]  Transcript, Day 19 at 123–24 (Respondent's closing), referring to *LG&E* ¶¶ 189–90.

[2036]  Transcript, Day 19 at 124–25 (Respondent's closing), citing 2004 and 2012 U.S. Model BITs, Annex B ¶ 1, Exhs. R-3513 and R-3514; 2004 Canada Model BIT, Annex B.13(1) ¶ b, Exh. R-3512; Canada–Romania BIT, Annex B ¶ (b), Exh. R-3494; Canada–Latvia BIT, Annex B, ¶ (2), Exh. R-3491; Canada–Czech Republic BIT, Annex A, ¶ (b), Exh. R-4646; India–Latvia BIT, Protocol *ad* Articles 5, ¶ (4)(a), Exh. R-4648; Slovak Republic–India BIT ¶ 2, Exh. R-4649.

[2037]  Transcript, Day 19 at 125–26 (Respondent's closing); *see also* Counter-Memorial ¶ 982.

[2038]  Counter-Memorial ¶ 984; Transcript, Day 19 at 129–30 (Respondent's closing); *see also* Respondent's Post-Hearing Brief ¶ 184.

expectations be premised on illegal conduct.[2039]   Respondent also submits that legitimate expectations include an expectation of "the evolution of the regulatory regime, including through interpretation or application of the law, even if without precedent, and changes through legislative amendment."[2040]

1545. In addition, Respondent submits that a distinction must be made between expropriatory measures that breach a host State's obligations under the ECT and the legitimate exercise of a State's regulatory power, including for the imposition and enforcement of taxes.[2041]   Factors which distinguish one from the other include the compatibility of the measures with international and comparative standards, as well as their compatibility with national law and review by domestic courts.[2042]   Applying the latter criterion, Respondent submits that States cannot usually incur international responsibility through the actions of their tax authorities so long as domestic courts are available to resolve disputes between the tax authorities and taxpayers.[2043]

1546. Thus, in the present case, to establish a violation of Article 13(1) of the ECT, Claimants must demonstrate that the decisions of the Russian courts that upheld the challenged taxation measures, as well as the decisions issued in the context of Yukos' bankruptcy, are themselves "measures having effect equivalent to nationalization or expropriation."[2044]   Accordingly, Respondent says, Claimants must demonstrate that these decisions were the result of a systemic failure of the Russian judicial system or, at a minimum, are manifestly improper, abusive, extraordinarily excessive or arbitrary, in manifest violation of Russian law, and in violation of international and comparative standards, so as to place them outside Russia's wide margin of discretion in taxation matters.[2045]   Respondent emphasizes that this Tribunal cannot sit as an appellate court reviewing the decisions of the Russian courts.

---

[2039] Transcript, Day 19, 126–27 (Respondent's closing), referring to *International Thunderbird Gaming Corporation v. The United Mexican States*, UNCITRAL, Award, 26 January 2006 ¶ 208, Exh. R-1143.

[2040] Respondent's Post-Hearing Brief ¶ 185.

[2041] Transcript, Day 19, 133–34 (Respondent's closing); Respondent's Post-Hearing Brief ¶ 191.

[2042] Transcript, Day 19 at 136, 142 (Respondent's closing); Respondent's Post-Hearing Brief ¶¶ 192–93.

[2043] Transcript, Day 19 at 136, 141–42 (Respondent's closing).

[2044] Counter-Memorial ¶ 1107; Rejoinder ¶ 425.

[2045] Rejoinder ¶¶ 425–69.

1547. Finally, Respondent submits that Claimants must establish a violation of the requirements in Article 13(1) of the ECT.[2046]   Regarding the non-discrimination requirement, Respondent submits that Article 13(1) calls for proof that similar cases were, without reasonable justification, treated differently on the basis of nationality.   Accordingly, Claimants must allege differential treatment based on foreign ownership.[2047]

### 3. Did Respondent's Actions Constitute Expropriation (or "Measures Having Effect Equivalent to Nationalization or Expropriation") within the Meaning of Article 13(1) of the ECT?

#### (a) Claimants' Position

1548. According to Claimants, Respondent completely and totally deprived Claimants of their investments in Yukos through a series of "coordinated and mutually reinforcing actions," which were motivated by a political and economic agenda and not any legitimate tax collection purpose.[2048]

1549. Claimants submit that Respondent expropriated their investments by:[2049]

(a) seizing, in October 2003, approximately 99 percent of the shares held by Hulley and YUL in Yukos, thus preventing Claimants from disposing of their shares before they lost all value;[2050]

(b) causing the unwinding of the Yukos–Sibneft merger, allowing the State-owned company Gazprom to acquire Sibneft;[2051]

(c) "fabricat[ing] massive tax debts" against Yukos, while simultaneously freezing or seizing the company's assets and interfering with its day-to-day management

---

[2046]   *Ibid.* ¶¶ 471–86.

[2047]   *Ibid.* ¶ 765.

[2048]   Memorial ¶¶ 801, 829–64.  The measures Claimants consider to be expropriatory are discussed at length in Part VIII.

[2049]   *Ibid.* ¶¶ 802–28.

[2050]   *Ibid.* ¶¶ 803–804.  The seizure of about 4.5 percent of Hulley's and YUL's shares in Yukos was subsequently revoked, but 94.5 percent remained frozen until the liquidation of Yukos in November 2007.

[2051]   *Ibid.* ¶¶ 805–807.  For a discussion of the unwinding of the Yukos–Sibneft merger see Chapter VIII.D.

through the harassment of executive officers, employees and other related persons, "thereby engineering the circumstance of non-payment";[2052]

(d)    selling YNG in a sham auction that allowed State-owned company Rosneft to acquire Yukos' "crown jewel" for an "absurdly low price";[2053] and

(e)    initiating and controlling the Yukos bankruptcy so as to obtain, either directly or through State-owned Rosneft, Yukos' main production assets, as well as almost all of the bankruptcy proceeds.[2054]

1550. Claimants submit that the liquidation of Yukos on 21 November 2007 "marked the final act in the expropriation of Yukos."[2055]

1551. Finally, Claimants argue that, even viewed individually, the harassment campaign against Yukos and its associates, the sale of YNG and the bankruptcy of Yukos each constitute an act of expropriation.[2056]

### (b)    Respondent's Position

1552. Respondent submits that Claimants have failed to establish that any of the challenged measures constitute expropriation or "measures having effect equivalent to nationalization or expropriation" within the meaning of Article 13(1) of the ECT.

1553. Firstly, Respondent maintains that Claimants have failed to establish that conduct that is attributable to Respondent and an exercise of its sovereign power proximately caused Claimants' total or substantial deprivation of their investment.[2057]    Respondent argues that the actions that directly caused Yukos' liquidation and the ensuing loss of Claimants' Yukos shares—the bankruptcy petition and the decision to liquidate Yukos—are either not attributable to Respondent, or not an exercise of its sovereign power.[2058]    The Moscow Arbitrazh Court's

---

[2052]   *Ibid.* ¶¶ 808–12.  For a discussion of the legitimacy of the Russian Federation's tax assessments against Yukos see Chapter VIII.B.  For a discussion of the "harassment campaign" against Yukos and related persons see Chapter VIII.C.

[2053]   *Ibid.* ¶¶ 813–19.  For a discussion of the YNG auction see Chapter VIII.F.

[2054]   *Ibid.* ¶¶ 820–25. For a discussion of the Yukos bankruptcy see Chapter VIII.G.

[2055]   *Ibid.* ¶¶ 826–27.

[2056]   *Ibid.* ¶ 858.

[2057]   *Ibid.* ¶¶ 1096–1104.

[2058]   Respondent's Post-Hearing Brief ¶ 174.

acceptance of the bankruptcy petitions and ratification of the creditors' decision to liquidate Yukos does not change this conclusion, as loss resulting from a court's enforcement of legal limitations inherent in private property is not compensable under Article 13 of the ECT, irrespective of whether the court proceedings were instituted by a State organ.[2059]

1554. According to Respondent, it is therefore not responsible for the loss of Claimants' investment unless "Claimants can prove that Respondent is responsible for Yukos' financial situation that led to its liquidation."[2060]  Yet, argues Respondent, Yukos' financial situation was actually "the result of Claimants' and their owners' decision to siphon off billions of dollars from Yukos and its subsidiaries to further their own financial interests, at the expense of Yukos' creditors and minority shareholders."[2061]

1555. Respondent emphasizes that Claimants could have avoided Yukos' insolvency, which, in Respondent's view, led to Yukos' bankruptcy and eventual liquidation, by paying the taxes assessed against it for years 2000–2003 in the first quarter of 2004; filing amended VAT and other tax returns; and petitioning for a refund of any amounts paid that it believed not to be legally due.[2062]

1556. As for the criminal proceedings against Messrs. Khodorkovsky and Lebedev and certain Yukos officials, as well as the searches, seizures and arrests carried out in support of those proceedings, Respondent submits that these events did not cause Yukos' liquidation. According to Respondent, the evidence establishes that these measures did not impair Yukos' operations.[2063]

1557. Respondent further contends that Claimants have failed to establish that the measures they challenge interfered with Claimants' legitimate expectations.[2064]

1558. With regard to the tax assessments, Respondent argues that Claimants had no "legitimate expectation that the tax authorities would not apply the substance-over-form, proportionality, and bad-faith taxpayer doctrines to attribute the income nominally earned by Yukos' sham

---

[2059]  *Ibid.* ¶ 178.

[2060]  *Ibid.* ¶ 179.

[2061]  *Ibid.* ¶ 179; *see also* Rejoinder ¶ 746.

[2062]  Rejoinder ¶ 745.  For a detailed discussion, see paragraphs 679–97, 745–50, and 934–45 above.

[2063]  Respondent's Post-Hearing Brief ¶ 182.

[2064]  Counter-Memorial ¶¶ 978–1095.

trading shells to Yukos," because Respondent had never made any specific representation, based upon full disclosure, that Respondent would allow Yukos to operate its tax schemes with impunity.[2065]   Nor had Claimants ever sought or obtained a formal tax ruling on the legality of Yukos' tax scheme.[2066]   In fact, prior to the 2000 Tax Audit Report, according to Respondent, Yukos sought, but was unable to obtain, a legal opinion supporting the legality of its tax scheme.[2067]

1559. In addition, Respondent submits that Claimants had no legitimate expectation that Yukos would not be held liable for the taxes assessed.   According to Respondent, the attribution for tax purposes of revenues nominally earned by sham entities to a company that sought to evade taxes was a proper application of legal doctrines that were well-settled in Russia, and are employed by many other States.[2068]   Yukos itself, argues Respondent, was well aware that its tax schemes, if discovered or disclosed, would result in substantial tax liabilities.[2069]

1560. Respondent also argues that the Russian legislation on which the enforcement measures (including the asset freezes, fines, default interest, enforcement fees and the forced sales of Yukos' assets) were based was already extant in the 1990s.   These enforcement measures were thus foreseeable consequences of Yukos' failure to pay.[2070]

1561. Respondent then submits that the measures taken for the imposition and enforcement of taxes were well within the range of a State's generally accepted regulatory powers.[2071]   This is shown by the fact that these measures were in conformity with Russian law and were upheld by national courts, and were in accordance with international and comparable standards and practices of other countries.[2072]

1562. According to Respondent, Claimants have failed to show that the Russian courts contributed to any "measures having effect equivalent to nationalization or expropriation" through any of the

---

[2065]   Respondent's Post-Hearing Brief ¶ 187–88; *see also* Counter-Memorial ¶¶ 1030–65; Rejoinder ¶¶ 748–756.  For a discussion of the state of tax law in Russia at the relevant time see Chapters VIII.A and VIII.B.

[2066]   Respondent's Post-Hearing Brief ¶ 186.

[2067]   Respondent's Post-Hearing Brief ¶ 186.

[2068]   Respondent's Post-Hearing Brief ¶ 188 (*see* discussion in Chapters VIII.A and VIII.B).

[2069]   Counter-Memorial ¶¶ 1003–29; Rejoinder ¶¶ 584–645; Respondent's Post-Hearing Brief ¶ 189.

[2070]   Respondent's Post-Hearing Brief ¶ 189.

[2071]   *Ibid.* ¶ 191.

[2072]   *Ibid.* ¶ 192–93; *see also* Counter-Memorial ¶¶ 1106, 1120–1232.

decisions they issued in the context of the enforcement of the tax demands,[2073]  the Yukos–Sibneft demerger,[2074] the criminal proceedings against Messrs. Khodorkovsky and Lebedev,[2075] or the Yukos bankruptcy proceedings.[2076]

1563. Finally, Respondent submits that the ECtHR unanimously determined that the challenged tax assessments were a legitimate exercise of Respondent's regulatory powers.[2077]  According to Respondent, given that the vast majority of the ECT Contracting States (including the Russian Federation, the United Kingdom, and Cyprus) are also ECHR Contracting States and that the ECHR enshrines the common *ordre public* of the European States in terms of democracy and the rule of law, the "ECtHR's interpretation and application of the ECHR to the measures at issue, through a final and binding judgment, must be taken into account under Article 31(3)(c) VCLT in assessing whether they are within the bounds of generally recognized regulatory powers."[2078]

### 4. If Respondent's Actions Constitute Expropriation, Has Respondent Met the Criteria for a Lawful Expropriation under Article 13(1) of the ECT?

#### (a)   Claimants' Position

1564. Claimants submit that Respondent did not meet any of the four requirements under Article 13(1) of the ECT for a lawful expropriation (*i.e.*, public interest, non-discrimination, due process and adequate compensation).[2079]

1565. According to Claimants, the expropriation of Claimants' investment was not in the public interest.  In fact, "the facts of the case unmistakably show that the actions of the Russian Federation had nothing to do with the legitimate exercise of sovereign power, whether taxation, law enforcement or otherwise, but were rather a blatant confiscation of strategic assets and the

---

[2073]   Counter-Memorial ¶¶ 1337–1434.

[2074]   *Ibid.* ¶¶ 1435–51.

[2075]   *Ibid.* ¶¶ 1452–6.

[2076]   *Ibid.* ¶¶ 1457–1543.

[2077]   Respondent's Post-Hearing Brief ¶¶ 194–95, referring to ECtHR Yukos Judgment ¶ 606, Exh. R-3328 (". . . each of the Tax Assessments 2000–2003 pursued a legitimate aim of securing the payment of taxes and constituted a proportionate measure in pursuance of this aim.").

[2078]   Respondent's Post-Hearing Brief ¶ 195; *see also* Transcript, Day 19 at 143–49.

[2079]   Memorial ¶¶ 865–90.

elimination of a potential political opponent."[2080]   Claimants invoke the finding of the *RosInvestCo* tribunal that the Russian Federation's actions were "linked to the strategic objective to return assets to the control of the Russian State and to an effort to suppress a political opponent."[2081]   According to Claimants, Respondent's justification that it only sought to enforce its laws is without any basis.[2082]

1566.  Claimants also submit that the expropriation of their investments was discriminatory and was not carried out under due process of law.[2083]   Nor was the expropriation accompanied by compensation, let alone "prompt, adequate and effective compensation."[2084]

1567.  Claimants conclude that the Russian Federation's actions are in breach of Article 13(1) and constitute an internationally wrongful act for which Respondent is responsible.[2085]

(b)   **Respondent's Position**

1568.  Even if Claimants could establish expropriation, which Respondent contends they cannot, Respondent maintains that the requirements in Article 13(1) of the ECT have not been breached.

1569.  Respondent submits that no lack of public interest has been established.[2086]   Respondent states that its actions were legitimate, as "the purposes justifying imposition and enforcement of taxes, including severe penalties, fines and other sanctions in case of non-compliance of taxpayers with their obligations to pay taxes, are firmly recognized in international law."[2087]   Respondent asserts that Claimants have not addressed the ECtHR's rejection of Yukos' "political motivation" charge.[2088]

---

[2080]   Claimants' Post-Hearing Brief ¶ 167; *see also* Memorial ¶¶ 1010–12; Reply ¶¶ 511–13.

[2081]   Reply ¶ 726.

[2082]   *Ibid.* ¶¶ 745–838.

[2083]   *Ibid.* ¶¶ 881, 885–87.

[2084]   *Ibid.* ¶ 889.

[2085]   *Ibid.* ¶ 890.

[2086]   Counter-Memorial ¶¶ 1318–36.

[2087]   *Ibid.* ¶ 1324.

[2088]   Rejoinder ¶ 764.

1570. Respondent also contends that Claimants have failed to establish discrimination under Article 13(1)(b) of the ECT because Claimants do not allege any discrimination based on foreign ownership or residence, which Respondent contends is the intended scope of the term "discriminatory" in this provision.[2089]   Respondent submits that selective tax enforcement is not discriminatory within the meaning of Article 13(1)(b) of the ECT.

1571. According to Respondent, Yukos "was a visible and logical candidate for tax assessments, penalties, and enforcement actions" as its abuses of the low-tax region policy were particularly egregious and the amounts of taxes it evaded unprecedented.[2090]   Other Russian oil companies, argues Respondent, cannot be compared.   Some companies, such as Rosneft, Tatneft and Surgutneftegaz did not resort to tax minimization schemes involving the use of low-tax regions.[2091]   While some other companies, such as Lukoil, did use such schemes, they abandoned them much earlier than Yukos.[2092]   Other companies, which continued to rely on the low-tax regions program, for example Sibneft, satisfied the "proportionality of investments" requirement of the Russian anti-avoidance rules.[2093]   Finally, tax arrears, default interest and fines were in fact assessed against some companies, including TNK-BP, Sibneft and Lukoil.[2094]

1572. Respondent also submits that Claimants have failed to establish due process violations cognizable under Article 13(1)(c) of the ECT.   For this assertion, Respondent relies on its own articulation of the requisite legal standard, namely that "administrative authorities cannot be faulted for conduct upheld by their own courts unless the court system is disavowed at the international level," which Respondent argues is not the case here.[2095]

1573. Respondent contends that in the present case most of the due process violations raised by Claimants have been reviewed by Russian courts and dismissed on the merits, while the due process arguments raised by Claimants for the first time in this arbitration are "specious."[2096]

---

[2089]   Counter-Memorial ¶¶ 1238–51.

[2090]   *Ibid.* ¶¶ 1255, 1268.

[2091]   *Ibid.* ¶ 1260.

[2092]   *Ibid.* ¶¶ 1261, 1269.

[2093]   *Ibid.* ¶ 1262.

[2094]   *Ibid.* ¶ 1264.

[2095]   *Ibid.* ¶ 1280.

[2096]   *Ibid.* ¶ 1290.

1574. Respondent specifically submits that the pace of the court proceedings that led to decisions upholding the Tax Ministry's tax demands against Yukos was in conformity with Russian procedural law and practice.  Respondent notes that, pursuant to Article 215(1) of the Arbitrazh Procedure Code, first instance judgments in tax disputes must be rendered no later than two months after institution of the court proceedings.[2097]  Respondent denies that Yukos was not provided with sufficient time to review documents during the collection proceedings pertaining to the 2000 Decision conducted by Judge Grechishkin.[2098]  Respondent also argues that the removal of Judge Cheburashkina and the recusal of Judge Mikhailova were proper, as there was cause to doubt the impartiality of these two judges.[2099]  Finally, Respondent argues that Yukos' challenges to Judges Korotenko and Dzuba (who were charged with reviewing Yukos' challenges to the 2001 Decision and 2002 Decision, respectively) on the ground that they had previously been involved in other proceedings for the collection of taxes against Yukos, were soundly rejected, as Yukos was not able to point to any rule of Russian law that would prevent a judge from hearing similar or related cases.[2100]

### D.   TRIBUNAL'S DECISION ON BREACH OF THE ECT

1575. As set out in Section X.C.2 above, the Parties are in sharp disagreement about the place and content of the legitimate expectations that Yukos had or could have had in devising and implementing its tax avoidance arrangements.  Claimants maintain, as Mr. Dubov testified, that the most senior officials of the Russian Federation were informed of and approved Yukos' plans in respect of low-tax jurisdictions.  Claimants point to the legislation of those jurisdictions which, while requiring a specified level of local investment by a trading company, for the most part did not refer to or require the presence of trading company personnel in the low-tax jurisdiction or specify that the activities of the trading company take place in that jurisdiction.  Respondent stresses that virtually all the significant work of the trading companies was done not in the low-tax jurisdictions by a small number of low-level and uninformed functionaries but in and by Yukos' Moscow offices, facts that led two panels of the ECtHR to conclude that the trading companies were  a "sham".  Respondent emphasizes that Yukos never

---

[2097]   Counter-Memorial ¶¶ 1291–92, referring to *Arbitrazh Procedure Code*, Art. 215, Exh. R-1566.

[2098]   *Ibid.* ¶¶ 1293–99.

[2099]   *Ibid.* ¶¶ 1300–1301.  For a description of the removal of Judge Cheburashkina and the recusal of Judge Mikhailova, see paragraphs 527–28, 539 above.

[2100]   *Ibid.* ¶¶ 1302–51.  For a description of the challenges to Judges Korotenko and Dzuba, see paragraphs 553, 563 above.

secured and apparently was unable to secure a legal opinion upholding the lawfulness of its tax planning arrangements and operations.

1576. The Tribunal accepts that federal legislation and the legislation of the low-tax jurisdictions did not provide, or at any rate, uniformly provide, that the trading companies actually conduct their trading operations in the territory of the low-tax jurisdictions.  Such a provision in any event would have been increasingly deprived of its force in view of the advent of electronic communications.  Nevertheless there are indications in the record that Yukos itself had doubts, or at least apprehensions, about the legality of aspects of its *modus operandi*.  Internal Yukos communications noted above at paragraph 491 so suggest, as may the unwillingness of Mr. Khodorkovsky to sign papers required for SEC registration.  Yukos was able to advance no convincing explanation for the "Lesnoy shuffle", which may well have been carried out to frustrate investigation of perceived tax improprieties.  While both PwC (Yukos' tax consultants) and Mr. Pepeliaev (Yukos' tax lawyer) opined in early January 2004, after the initial tax assessment was issued, that the tax assessment against Yukos itself was not well-founded,[2101] the absence of a prior legal opinion supporting the propriety of Yukos' arrangements in the low-tax jurisdictions is striking and may be suggestive.  So also is the inability of Yukos to explain immense payments to former Yukos employees and its inability to sustain the claim that certain of its primary trading companies (the BBS companies) were not controlled by it.  There is also the issue of the questionable use by Claimants of the Cyprus-Russia DTA, which the Tribunal addresses in Chapter X.E on contributory fault.

1577. The Tribunal has not overlooked or discounted the foregoing and other weaknesses in the contentions of Claimants.  But are they sufficient to support what the Tribunal understands to be a central contention of Respondent, namely, that Claimants should have expected that the Russian Federation would react as it did to what it claims were violations of Russian tax law and practice as its courts had interpreted that law and practice to be?

1578. In the view of the Tribunal, the expectations of Claimants may have been, and certainly should have been, that Yukos' tax avoidance operations risked adverse reaction from Russian authorities.  It is common ground between the Parties that Yukos and its competitors viewed

---

[2101] *See* Letter from Michael Kubena to Bruce Misamore, 15 January 2004, Exh. C-609; Sergey Pepeliaev, Summary of the Tax Inspection of OAO NK Yukos, 5 January 2004, Exh. C-1128; Sergey Pepeliaev et al., Opinion Regarding Compliance with Legislation of Inspection Report No. 08-1/1 of 29 December 2003 issued by the Tax Ministry of Russia, 15 January 2004, Exh. C-1129 (all referring to the 2000 Audit Report, Exh. C-103).  *See also* paragraphs 705, 706 and 1195 above.

positions taken by the tax authorities on issues of tax liability to be exigent, erratic and unpredictable.  The Tribunal however is unable to accept that the expectations of Yukos should have included the extremity of the actions which in the event were imposed upon it.  Not only did Mikhail Khodorkovsky not appear to expect to be arrested even after the arrest of Platon Lebedev, he and his colleagues surely could not have been expected to anticipate the rationale and immensity of the tax assessments and fines.  They could not have been expected to anticipate that their legal counsel would labor under the disabilities imposed upon them.  They could not have been expected to anticipate the sale of YNG for so low a price under such questionable circumstances.  They could not have been expected to anticipate that more than thirteen billion dollars in unpaid taxes and fines would be imposed on Yukos for unpaid VAT on oil exports when that oil had in fact been exported.  They could not have been expected to anticipate that they risked the evisceration of their investments and the destruction of Yukos.

1579. The Tribunal has earlier concluded that "the primary objective of the Russian Federation was not to collect taxes but rather to bankrupt Yukos and appropriate its valuable assets."[2102]   For the reasons that emerge in Part VIII, if the true objective were no more than tax collection, Yukos, its officers and employees, and its properties and facilities, would not have been treated, and mistreated, as in fact they were.  Among the many incidents in this train of mistreatment that are within the remit of this Tribunal, two stand out:  finding Yukos liable for the payment of more than 13 billion dollars in VAT in respect of oil that had been exported by the trading companies and should have been free of VAT and free of fines in respect of VAT; and the auction of YNG at a price that was far less than its value.  But for these actions, for which the Russian Federation for reasons set out above and in preceding chapters was responsible, Yukos would have been able to pay the tax claims of the Russian Federation justified or not; it would not have been bankrupted and liquidated (unless the Russian Federation were intent on its liquidation and found still additional grounds for achieving that end, as the second criminal trial of Messrs. Khodorkovsky and Lebedev indeed suggests).

1580. Respondent has not explicitly expropriated Yukos or the holdings of its shareholders, but the measures that Respondent has taken in respect of Yukos, set forth in detail in Part VIII, in the view of the Tribunal have had an effect "equivalent to nationalization or expropriation".  The four conditions specified in Article 13 (1) of the ECT do not qualify that conclusion.

---

[2102]   *See* paragraph 756 above.

1581. As to condition (a), whether the destruction of Russia's leading oil company and largest taxpayer was in the public interest is profoundly questionable.  It was in the interest of the largest State-owned oil company, Rosneft, which took over the principal assets of Yukos virtually cost-free, but that is not the same as saying that it was in the public interest of the economy, polity and population of the Russian Federation.

1582. As to condition (b), the treatment of Yukos and the appropriation of its assets by Rosneft (and to a much lesser extent, another State-owned corporation, Gazprom), when compared to the treatment of other Russian oil companies that also took advantage of investments in low-tax jurisdictions, may well have been discriminatory, a question that was inconclusively argued between the Parties and need not be and has not been decided by this Tribunal.

1583. As to condition (c), Yukos was subjected to processes of law, but the Tribunal does not accept that the effective expropriation of Yukos was "carried out under due process of law" for multiple reasons set out above, notably in Section VIII.C.3.  The harsh treatment accorded to Messrs. Khodorkovsky and Lebedev remotely jailed and caged in court,  the mistreatment of counsel of Yukos and the difficulties counsel encountered in reading the record and conferring with Messrs. Khodorkovsky and Lebedev, the very pace of the legal proceedings, do not comport with the due process of law.  Rather the Russian court proceedings, and most egregiously, the second trial and second sentencing of Messrs. Khodorkovsky and Lebedev on the creative legal theory of their theft of Yukos' oil production, indicate that Russian courts bent to the will of Russian executive authorities to bankrupt Yukos, assign its assets to a State-controlled company, and incarcerate a man who gave signs of becoming a political competitor.

1584. As to condition (d), what in any event is incontestable is Respondent's failure to meet its prescription, because the effective expropriation of Yukos was not "accompanied by the payment of prompt, adequate and effective compensation", or, in point of fact, any compensation whatsoever.  In order for the Russian Federation to be found in breach of its treaty obligations under Article 13 of the ECT, the foregoing violations of the conditions of Article 13 more than suffice.

1585. It follows that Respondent stands in breach of its treaty obligations under Article 13 of the ECT.  Accordingly Respondent's liability under international law for breach of treaty is established.  The Tribunal reaches this conclusion based on its consideration of the totality of the extensive evidence before it.  Having found Respondent liable under international law for

breach of Article 13 of the ECT, the Tribunal does not need to consider whether Respondent's actions are also in breach of Article 10 of the Treaty.

1586. The establishment of liability under international law is at the heart of its doctrine and jurisprudence.  The Statute of the PCIJ, in Article 36(2), referred to "(c) the existence of any fact which, if established, would constitute a breach of an international obligation; (d) the nature or extent of the reparation to be made for the breach of an international obligation".  The identical provision is found in Article 36(2) of the Statute of the ICJ.

1587. The PCIJ held in the *Factory at Chorzów* case that:

> It is a principle of international law that the breach of an engagement involves an obligation to make reparation in an adequate form.  Reparation therefore is the indispensable complement of a failure to apply a convention and there is no necessity for this to be stated in the convention itself.[2103]

1588. In a subsequent phase of the *Factory at Chorzów* case, the Court specified the content of the obligation of reparation in the following oft-quoted terms:

> The essential principle contained in the actual notion of an illegal act—a principle which seems to be established by international practice and in particular by the decisions of arbitral tribunals—is that reparation must, so far as possible, wipe out all the consequences of the illegal act and re-establish the situation which would, in all probability, have existed if that act had not been committed.  Restitution in kind, or, if this is not possible, payment of a sum corresponding to the value which a restitution in kind would bear; the award, if need be, of damages for the loss sustained which would not be covered by restitution in kind or payment in place of it—such are the principles which should serve to determine the amount of compensation due for an act contrary to international law.[2104]

1589. The ILC Articles on State Responsibility provide, in Article 31, an article entitled "Reparation", that "[t]he responsible State is under an obligation to make full reparation for the injury caused by the internationally wrongful act."   In support of this conclusion the Articles quote the foregoing holdings in the *Factory at Chorzów* case.[2105]

1590. Article 36 of the Articles, entitled "Compensation", provides that:

---

[2103] *Case concerning the Factory at Chorzów* (Germany v. Poland), Jurisdiction, Judgment, 26 July 1927, P.C.I.J., Series A, No. 9, p. 21, Exh. C-1501.

[2104] *Case concerning the Factory at Chorzów* (Germany v. Poland), Merits, Judgment, 13 September 1928, P.C.I.J., Series A, No. 17, p. 47, Exh. C-925.

[2105] Articles on Responsibility of States for Internationally Wrongful Acts with commentaries (Text adopted by the International Law Commission at its fifty-third session, in 2001), Articles 1–11 and 28–39, p. 91, Exh. C-1042.

> 1. The State responsible for an internationally wrongful act is under an obligation to compensate for the damage caused thereby . . . .

The commentary to the Articles states that:

> the function of compensation is to address the actual losses incurred as a result of the internationally wrongful act.  Compensation corresponds to the financially assessable damage suffered . . . it is not concerned to punish . . . nor does compensation have an expressive or exemplary character."[2106]

1591. Article 13 of the ECT specifies, in the event of expropriation, that "compensation shall amount to the fair market value of the Investment expropriated at the time immediately before the Expropriation . . . the Valuation Date."

1592. Article 39 of the ILC Articles on State Responsibility, entitled "Contribution to the injury," provides that  "[i]n the determination of reparation, account shall be taken of the contribution to the injury by wilful or negligent action or omission of the injured . . . entity in relation to whom reparation is sought."  The ILC's commentary to the Articles refers to notions of "contributory negligence" and "comparative fault".[2107]

1593. The Tribunal will assess damages in the light of the foregoing accepted principles of international law.

### E.   CONTRIBUTORY FAULT

#### 1.   Introduction

1594. The Tribunal now has to determine whether the damages caused to Claimants by the wrongful acts of Respondent should be reduced because, as Respondent argues, "Claimants may not recover from the Russian Federation the fruits of their own wrongdoing."[2108]

1595. In support of its submission, Respondent invokes mainly the legal principle of contributory fault.  In its Closing Statement, Respondent argued that Claimants failed to establish that their loss was caused by the Russian Federation's actions in violation of its obligations under the ECT, notably by failing to account for the effects of Claimants' own actions and of Yukos'

---

[2106]   *Ibid.*, p. 99.

[2107]   *Ibid.*, pp. 109–10.

[2108]   Respondent's Opening Statement, Vol. 10, Slide 4.

actions.[2109]   It argued[2110] that Claimants ignored Article 39 of the ILC Articles on State Responsibility, which provides:[2111]

> Article 39. Contribution to the injury
>
> In the determination of reparation, account shall be taken of the contribution to the injury by willful or negligent action or omission of the injured State or any person or entity in relation to whom reparation is sought.

1596. Extracts of the ILC's Commentary to Article 39 are pertinent, including the following:[2112]

> Article 39 deals with the situation where damage has been caused by an internationally wrongful act of a State, which is accordingly responsible for the damage in accordance with Articles 1 and 28, but where the injured State, or the individual victim of the breach, has <u>materially contributed</u> to the damage <u>by some willful or negligent act or omission</u>.
>
> [emphasis added]

1597. The Tribunal also refers to Article 31 of the ILC Articles on State Responsibility , which states:

> Article 31. Reparation
>
> 1. The responsible State is under an obligation to make full reparation for the injury caused by the internationally wrongful act.
>
> 2. Injury includes any damage, whether material or moral, caused by the internationally wrongful act of a State.

1598. The following extract from the ILC's Commentary to Article 31 is also noted:[2113]

> It is true that cases can occur where an identifiable element of injury can properly be allocated to one of several concurrently operating causes alone. <u>But unless some part of the injury can be shown to be severable in causal terms</u> from that attributed to the responsible State, the latter is held responsible for all the consequences, not being too remote, of its wrongful conduct.
>
> [emphasis added]

1599. The Tribunal must therefore decide, on the basis of the totality of the evidence before it, whether there is a sufficient causal link between any willful or negligent act or omission of the Claimants (or of Yukos, which they controlled) and the loss Claimants ultimately suffered at the hands of the Russian Federation through the destruction of Yukos.

---

[2109]   Respondent's Closing Statement, Vol. 12, Slide 4.

[2110]   Respondent's Closing Statement, Vol. 12, Slide 5.

[2111]   Articles on Responsibility of States for Internationally Wrongful Acts with commentaries (Text adopted by the International Law Commission at its fifty-third session, in 2001), Articles 1–11 and 28–39, p. 109 Exh. C-1042.

[2112]   *Ibid.*

[2113]   *Ibid.*, p. 93.

1600. The Tribunal notes that it is not any contribution by the injured party to the damage which it has suffered which will trigger a finding of contributory fault.  The contribution must be material and significant.  In this regard, the Tribunal has a wide margin of discretion in apportioning fault.

### 2.    Contributory Fault as Applied in Other Cases

1601. Before it proceeds with its analysis of the potential contributory fault of Claimants (and Yukos) in the present case which may have contributed to the injury caused to them by the internationally wrongful act of the Russian Federation, the Tribunal has reviewed decisions of investor-state tribunals which have addressed the principle of contributory fault.

1602. This review leads the Tribunal to three conclusions which will inform its analysis.

1603. Firstly, the legal concept of contributory fault must not be confused with the investor's duty to mitigate its losses.  There are cases where the claimant's damages were reduced because the tribunal found that it failed to take some reasonable steps to minimize its losses.  In such cases, "the injured party must be held responsible for its own contribution to the loss."[2114]

1604. Secondly, there are cases where the contributory fault of the investor, while it may have increased the loss which it sustained, was unrelated to the wrongdoing of the State.[2115]  The fault of the investor in those cases contributed to the losses which flowed from the wrongful act of the State.

1605. Finally, the Tribunal identified certain decisions where the tribunals found that the victim contributed to the State's wrongful conduct.[2116]  The contributory fault of the investor in those cases provoked the wrongful conduct of the State.

1606. While there is no doctrine of precedent *stricto sensu* in international arbitration, the Tribunal has found these decisions of assistance in its analysis.

---

[2114] *EDF International S.A. and Ors v. Argentine Republic*, ICSID, ARB/03/23, Award, 11 June 2012 ¶ 1301. *See also Middle East Cement Shipping and Handling Co. S.A. v. Arab Republic of Egypt*, ICSID, ARB/99/6, Award, 12 April 2002, Exh. C-962 and *AIG Capital Partners, Inc and Anor v. Republic of Kazakhstan*, ICSID, ARB/01/6, Award, 7 October 2003, Exh. R-1110.

[2115] *MTD. v. Chile*, Exh. C-969 and *Iurii Bogdanov, Agurdino-Invest Ltd. and Agurdino-Chimia JSC v. Republic of Moldova*, SCC Rules, Award, 22 September 2005, Exh. R-1179.

[2116] *Antoine Goetz & Consorts et S.A. Affinage des Metaux v. Republique du Burundi*, ICSID, ARB/01/2, Award, 21 June 2012 and *Occidental Petroleum Corporation and Occidental Exploration and Production Company v. Republic of Ecuador*, ICSID, ARB/06/111, Award, 5 October 2012 (a case also chaired by Mr. Fortier).

### 3.   Tribunal's Analysis

1607. In Chapter IX.A above, the Tribunal reviewed some 28 instances of alleged "illegal and bad faith conduct" by Claimants or "attributable to the Claimants", which Respondent argues have contributed to Yukos' demise or should, in any event, prevent Claimants from recovering damages from the Russian Federation.  For the reasons set out in that chapter, the Tribunal has already concluded that most of these "actions or omissions" cannot be considered as having materially contributed to Yukos' demise.

1608. There are, however, four remaining instances of alleged willful or negligent conduct by Claimants and/or Yukos which, the Tribunal agrees, must be considered as potentially constituting fault that may have contributed to the destruction of Yukos, for which the Tribunal has found Respondent responsible.  These four instances are:

> i)   Yukos' conduct in some of the low-tax regions;
>
> ii)  Yukos' use of the Cyprus-Russia DTA;
>
> iii) Yukos' conduct in connection with the YNG auction, notably the procuring of a Temporary Restraining Order by a Texas court and the published threat of a "lifetime of litigation"; and
>
> iv)  Yukos' conduct in connection with its bankruptcy, notably the non-payment of the A Loan.

1609. The Tribunal will now review these four instances and seek to determine whether any one of them qualifies as contributory fault as that legal principle has been interpreted in the decisions which it has reviewed earlier.

### (a)   Conduct of Yukos in Some of the Low-Tax Regions

1610. At the outset of its review, the Tribunal needs to recall that the central, indeed the only, focus of its remit with respect to the tax optimization schemes in the ZATOs and other low tax regions of Russia was the series of arrangements implemented by one Russian oil company, Yukos. These arrangements have been documented by hundreds of exhibits which the Tribunal has considered and analyzed in Chapters VIII.A and VIII.B of the present Award.

1611. While there is ample evidence in the record that nearly all Russian oil companies also availed themselves of such tax optimization arrangements which were permitted by law, [2117] there is no evidence that the operations of those other oil companies, in any respect, breached the legislation and abused the low tax regimes as the Tribunal has found Yukos did through the sham-like nature of some elements of its operations in at least some of the low-tax regions notably in the ZATOs of Lesnoy and Trekhgorny.

1612. The Tribunal also recalls its further findings, in Chapters VIII.A and VIII.B above, that this abuse by Yukos in some of the low-tax regions occurred prior to the confrontation between President Putin and Mr. Khodorkovsky in February 2003.  At the February 2003 meeting, President Putin said to Mr. Khodorkovsky that, henceforth, he would no longer receive any protection from the Kremlin.  Specifically, President Putin said to Mr. Khodorkovsky:  "We have already discussed it with you recently, that your company, for example, has had problems with the payment of taxes."[2118]

1613. This specific reference by President Putin to Yukos' tax issues at the February 2003 meeting is significant.

1614. While the Tribunal has concluded, on the basis of the totality of the evidence, that Respondent's tax assessments and tax collection efforts against Yukos were not aimed primarily at the collection of taxes, but rather at bankrupting Yukos and facilitating the transfer of its assets to the State, it cannot ignore that Yukos' tax avoidance arrangements in some of the low-tax regions made it possible for Respondent to invoke and rely on that conduct as a justification of its actions against Mr. Khodorkovsky and Yukos.

1615. Accordingly, even though the Tribunal has found that President Putin and his administration used Yukos' tax problems as a pretextual justification for setting in motion a plan to bankrupt Yukos, as opposed to just collecting the taxes that might have been legitimately assessed

---

[2117]  Transcript of Testimony of Mikhail Kasyanov before the Khamovnichesky Court of Moscow of May 24, 2010, p. 3, Exh. C-440; Statement of Prime Minister Mikhail Mikhailovich Kasyanov of 8 July  2009 in *Khodorkovsky v. Russia 1*, ¶ 40, Exh. C-446; TNK-BP's use of low tax regions was disclosed in *TNK International Limited Interim Consolidated Financial Statements*, as of 30 June 2003, p. 8, Exh. C-391; and *TNK-BP Limited Consolidated Financial Statements*, as of 31 December 2003, Exh. C-392; Lukoil's use of low tax regions was noted in *Board of the Audit Chamber of the Russian Federation, Audit Chamber Report on Yukos, Lukoil and Sibneft for 2003 and January–March 2004*, Exh. R-266, *OAO Lukoil, Securities filing, Offering Circular*, 26 November 2002, Exh. R-322, and *OAO Lukoil, Annual Report for 2001*, Exh. R-321.

[2118]  Video recording and transcript of the meeting of the members of the Union of Industrialists and Entrepreneurs with President V. Putin held in the Ekaterininsky Hall, Kremlin, on 19 February 2003, Exh. C-1396.

against the trading companies on the basis of the "bad faith taxpayer" doctrine, the Tribunal concludes that there is a sufficient causal link between Yukos' abuse of the system in some of the low-tax regions and its demise which triggers a finding of contributory fault on the part of Yukos.

### (b)   Conduct of Yukos under the Cyprus-Russia DTA

1616. As detailed in the Expert Reports of Thomas Z. Lys, Yukos' "tax optimization" plan included use of the trading companies in the low-tax regions to receive proceeds from the sale of Yukos' oil and oil products, and the transfer of those proceeds to other Yukos-controlled trading and holding companies in the Russian Federation and in off-shore jurisdictions such as Cyprus and the British Virgin Islands.[2119]

1617. Respondent, relying on the expert reports of Professor H. David Rosenbloom,[2120] Professor Dr. Stef van Weeghel and Mr. Polyvios G. Polyviou, has argued that Yukos' use of the Cyprus-Russia DTA was abusive.  Claimants, relying on the Expert Report of Mr. Philip Baker QC, counter Respondent's argument and assert that the use by Yukos of the DTA was not abusive. It is noteworthy that the Parties did not call as witnesses one another's respective experts on that issue.

1618. Claimants note that, to this day, the Russian authorities "have done absolutely nothing" in respect of the alleged improper invocation of DTA benefits by Claimants, including under the specific mechanisms of review that exist under the treaty itself and/or under the domestic laws of the contracting parties.[2121]  They also submit that the first time Respondent raised any issue regarding the tax arrangements subject to the Cyprus-Russia DTA was on 6 October 2006 in the present arbitration and that Respondent "concocted [this issue] specifically for the purposes of these arbitrations."[2122]

1619. The Tribunal accepts Claimants' argument that it is incongruous for the Russian Federation to complain in these proceedings about Yukos' use of the treaty while never having invoked the

---

[2119]   Second Lys Report, , pp. 39 ff.

[2120]   Respondent's Post-Hearing Brief, ¶¶ 150–61.

[2121]   Claimants' Post-Hearing Brief, ¶¶ 192–202.

[2122]   *Ibid.* ¶¶ 198–200, referring to Respondent's Comments on Issues Raised by Procedural Order No. 2 of 8 September 2006.

mechanisms available to it to trigger the review of such use by, for example, invoking the information-sharing provisions of the treaty.[2123]

1620. At the same time, it seems clear to the Tribunal, on the facts, that Yukos' operations under the DTA were wholly conducted by Mr. Lebedev from Yukos' established offices in Moscow, that his "place of management" where he habitually concluded contracts relating to operations under the Treaty was in Moscow, which of itself demonstrates that Yukos' avoidance of hundreds of millions of dollars in Russian taxes through the Cyprus-Russia DTA, was questionable.  Hulley appears to the Tribunal to have falsely declared on Cypriot withholding tax forms that "income"—dividends from Yukos—"was not connected with activities carried on in the Russian Federation" despite Mr. Lebedev's activities in Moscow.[2124]

1621. In any event, even if there was an abuse by Yukos of that treaty, as in the Tribunal's *prima facie* view there was, such conduct would be subsumed into and enlarge the abuse by some of Yukos' trading companies in some of the low tax regions, which the Tribunal has already found amounted to contributory fault on the part of Yukos.

(c)    **Conduct of Yukos in Connection with YNG Auction**

1622. The Tribunal reiterates that the abusive use of some of the low-tax regions by Yukos including its questionable use of the Cyprus-Russia DTA occurred prior to the February 2003 encounter between President Putin and Mr. Khodorkovsky and thus prior to the plan formed by the Russian Federation not simply to collect taxes from Yukos but to bankrupt the company and transfer its assets to the State.

1623. The YNG auction took place in December 2004 well after Respondent had put in motion its plan to expropriate Yukos.  It was preceded by Yukos' resort to bankruptcy proceedings in Texas, the issuance of a Temporary Restraining Order by the Texas court, and Yukos' public threats, most strikingly a full page advertisement in the *Financial Times,* warning prospective purchasers of YNG against participating in the auction.

---

[2123]  Transcript, Day 20 at 146.

[2124]  Counter-Memorial, ¶ 164, referring to Hulley Enterprises Limited, Claims for an Exemption of Passive Incomes Sourced in Russia before the Payment is Made (Form 1013DT) for 2000, 2001, Exh. R-193; Veteran Petroleum Limited, Claims for an Exemption of Passive Incomes Sourced in Russia before the Payment is Made (Form 1013DT) for 2001, 2002, Exh. R-194; Hulley Enterprises Limited, Annual Report and Financial Statements for the year ended Dec. 31, 2003, 7 April 2004, Exh. R-190; Veteran Petroleum Limited, Annual Report and Financial Statements for the year ended Dec. 31, 2003, 15 December 2006 Exh. R-192.

1624. Respondent submits that these actions discouraged prospective purchasers of YNG from taking part in the auction and depreciated the price realized at the auction.

1625. The Tribunal agrees that, but for these actions of Yukos, it is reasonable to surmise that the auction of YNG on 19 December 2004, the unlawful measure of Respondent that dealt as "fatal blow" to the survival prospects of Yukos, could have resulted in a higher bid price than the auction actually did.  However, in the view of the Tribunal, Yukos' ultimate fate would have been no different if it had not threatened a lifetime of litigation or obtained a Temporary Restraining Order from a Texas Court.  Its demise may have been postponed, or the path to its demise altered in some minor way, but it would not have been avoided.

1626. The Tribunal observes with interest that the *RosinvestCo* tribunal found that "Yukos did in some respects contribute to its own demise" and that it referred in that context to the Houston bankruptcy proceedings.[2125]

1627. In addition, before concluding its analysis of this facet of Claimants' conduct, the Tribunal needs to contrast these actions of Yukos with a series of actions of Respondent before the YNG auction which must have depreciated the auction price very significantly and thus served the Russian Federation objective of acquiring the Yukos assets at a bargain price.

1628. Those actions of Respondent include:

- The threat by Russia's Ministry of Natural Resources to withdraw YNG's operating licenses;[2126]

- The massive tax liabilities imposed on YNG in October and December 2004;[2127]

- The statement by the Russian Federation Ministry of Justice that the USD 10.4 billion valuation of YNG was "due to the high risk to a potential buyer";[2128]

---

[2125]   *RosinvestCo* ¶ 634, Exh. C-1049.

[2126]   *Russian Government May Revoke YUKOS Unit's Licenses*, FWN Select, 10 September 2004, Exh. C-701.

[2127]   *Repeat Field Tax Audit Report No. 30-03-14/2*, 29 October 2004, Exh. C-251; *see* Decision of the Moscow Arbitrazh Court, 25 April 2006, p. 2, Exh. C-255; Memorial ¶ 271.

[2128]   *In the Yukos Saga, Yet Another Gloomy Chapter*, Wall Street Journal, 14 October 2004, Exh. C-713.

- The decision by Respondent to fix the date of the auction exactly one month after the auction was announced, being the minimum length of the notice required under Russian law;[2129]

- The alleged pressure of Respondent on would be bidders from India and China not to participate in the auction.[2130]

1629. In conclusion, the Tribunal finds that the actions of Yukos which may have depreciated the auction price, do not constitute contributory fault as they did not contribute in a material way to its demise.

### (d)   Conduct of Yukos in Connection with its Bankruptcy (Non-Payment of the A Loan)

1630. With respect to the non payment by Yukos of the A Loan and Respondent's submission that such non-payment rendered Yukos responsible for its own bankruptcy, the Tribunal accepts Respondent's contention that Yukos was in a position to pay off the balance of the A Loan and that its willful failure to do so contributed to the circumstances of its bankruptcy by leading SocGen to petition for it.  At the same time, the loan provisions contemplated that YNG oil production and sale would fuel payment of the loan, and it was understandable that, once YNG was taken over by Rosneft, Claimants should have felt that responsibility for repayment of the A Loan was not theirs or theirs alone.

1631. Moreover, in the view of the Tribunal, even if Yukos had paid off the A Loan, it represented only a fraction of the claims against Yukos which could have been used to petition the company into bankruptcy.  In view of the larger circumstances, it is difficult to conclude that, even if the A Loan had been paid, another ground for pushing Yukos into bankruptcy would not have been found.

1632. Consequently, the Tribunal concludes that, while Yukos may have been at fault in refusing to pay off the A Loan, its behavior does not rise to the level of contributory fault.

---

[2129]   In its report of 6 October 2004, Dresdner wrote that "[a] quick auction will most likely prevent the achievement of a full price since purchasers will only be able to conduct a limited audit of the financial and economic performance and accordingly will discount their valuation of the target asset." [emphasis added].   Dresdner Valuation Rpeort, Section 11.2, Exh. C-274.

[2130]   *Russia's Latest Auction Farce Eerily Familiar*, The Moscow Times, 21 December 2004, p. 1, Exh. C-739.

### 4.     Tribunal's Decision on Contributory Fault

1633. Paraphrasing the words of Article 39 of the ILC Articles on State Responsibility and its commentary, the Tribunal must now determine whether Claimants' and Yukos' tax avoidance arrangements in some of the low-tax regions, including their questionable use of the Cyprus-Russia DTA summarized above, contributed to their injury in a material and significant way, or were these minor contributory factors which, based on subsequent events such as the decision of the Russian authorities to destroy Yukos, cannot be considered, legally, as a link in the causative chain.   As the Tribunal noted earlier in this chapter, an award of damages may be reduced if the victim of the wrongful act of the respondent State also committed a fault which contributed to the prejudice it suffered and for which the trier of facts, in the exercise of its discretion, considers the claiming party should bear some responsibility.[2131]

1634. In the view of the Tribunal, Claimants should pay a price for Yukos' abuse of the low-tax regions by some of its trading entities, including its questionable use of the Cyprus-Russia DTA, which contributed in a material way to the prejudice which they subsequently suffered at the hands of the Russian Federation.

1635. In considering the extent of the contribution of Claimants' faults to their injury, the Tribunal notes that the subsequent conduct of the Russian Federation, as the Tribunal has found, was disproportionate and tantamount to expropriation of Claimants' investment in Yukos. Claimants' damages were caused by the series of events starting with the arrest of Messrs. Khodorkovsky and Lebedev, and the tax assessments, and culminating in the YNG auction, which led to the bankruptcy and liquidation of Yukos.   The Tribunal must now determine to what extent and in what proportion Claimants' and Yukos' conduct prior to 2003, including their questionable use of the Cyprus-Russia DTA, contributed so as to lessen the responsibility of Respondent.

1636. The Tribunal agrees with the ICSID Annulment Committee in the *MTD v. Chile* case that "the role of the two parties contributing to the loss [is] [ . . . ] only with difficulty commensurable

---

[2131]   *See* ruling in *MTD  v. Chile* ¶¶ 242–43 that "the Claimants should bear part of the damages suffered."  In that case, that "part" was quantified as 50 percent of the damages.  *See also Occidental Petroleum Corporation and Occidental Exploration and Production Company v. Republic of Ecuador*, ICSID, ARB/06/111, Award, 5 October 2012 ¶¶ 659–687.  In that case, that "part" was quantified as 25 percent of the damages.

and the Tribunal [has] a corresponding margin of estimation."[2132]   However, the Tribunal, as other tribunals have done, must reach a decision and it has done so on the basis of all the evidence which it has reviewed.

1637. Having considered and weighed all the arguments which the Parties have presented to it in respect of this issue the Tribunal, in the exercise of its wide discretion, finds that, as a result of the material and significant mis-conduct by Claimants and by Yukos (which they controlled), Claimants have contributed to the extent of 25 percent to the prejudice which they suffered as a result of Respondent's destruction of Yukos.  The resulting apportionment of responsibility as between Claimants and Respondent, namely 25 percent and 75 percent, is fair and reasonable in the circumstances of the present case.

## XI.   INTEREST

1638. As will be seen in Part XII of the Award dealing with quantification of Claimants' damages for Respondent's breach of the ECT, one of the elements factored into the Tribunal's calculation of damages will be interest.[2133]   Accordingly, the Tribunal, in the present Part XI will determine the applicable rate of such interest, whether it should be simple or compound and, if compound, the period of compounding.

### A.   CLAIMANTS' POSITION

1639. Claimants request the Tribunal to award them pre- and post-award interest.[2134]   In their Submission on Costs, Claimants also request interest on any costs awarded to them.[2135]

1640. According to Claimants, "payment of interest can be required to ensure full reparation."[2136] Claimants quote the tribunal in *Vivendi v. Argentina*, which stated that the purpose of the payment of interest is "to compensate the damage resulting from the fact that, during the period of non-payment by the debtor, the creditor is deprived of the use and disposition of that sum he

---

[2132]   *MTD Equity Sdn Bhd. v. The Republic of Chile*, ICSID Case No. ARB/01/7, Decision on Annulment, 21 March 2007 ¶ 101.  *See also Occidental Petroleum Corporation and Occidental Exploration and Production Company v. Republic of Ecuador*, ICSID, ARB/06/111, Award, 5 October 2012 ¶¶ 659–87.

[2133]   In particular see paragraphs 1822–23 below on pre-award interest on the dividend streams that Claimants would have obtained in the absence of Respondent's breach.

[2134]   Memorial ¶¶ 969–70; Reply ¶¶ 859, 1199; Claimants' Post-Hearing Brief ¶ 302.

[2135]   Claimants' Submission on Costs ¶ 64.

[2136]   Memorial ¶ 959, citing to ILC Articles on State Responsibility, Art. 38, Exh. C-1042.

was supposed to receive."[2137]   Claimants submit that the Tribunal has "full discretion to determine the most appropriate rate of interest to achieve full reparation"[2138] and quote the award in *Compañía del Desarollo de Santa Elena, S.A. v. Republic of Costa Rica* ("**Santa Elena**"):

> [T]he determination of interest is a product of the exercise of judgment, taking into account all of the circumstances of the case at hand and especially considerations of fairness which must form part of the law to be applied by this Tribunal.[2139]

1641.  Claimants further contend that the Tribunal may award compound interest[2140] and that compound interest has become "the norm in investment arbitration as regards full reparation."[2141]   Putting emphasis on the awards in *Santa Elena* and *Wena Hotels Limited v. Arab Republic of Egypt* ("**Wena**"), Claimants explain that compound interest should be awarded in order for the amount of compensation to reflect the additional sum that the claimant would have earned if the money had been reinvested each year at generally prevailing rates of interest.[2142]

1642.  Claimants' valuation expert, Mr. Kaczmarek, analyzed three possible rates of interest:  the LIBOR plus two or four percent; the yield on Russian sovereign bonds issued in USD; and the U.S. Prime rate of interest plus two percent.[2143]

1643.  According to Claimants:

> Navigant observed that the Russian Federation's breaches "have effectively turned Claimants into unwilling lenders to Russia."  The yield on Russian sovereign bonds issued

---

[2137]  *Ibid.*, citing to *Vivendi v. The Argentine Republic* ¶ 9.2.3, Exh. C-986.

[2138]  *Ibid.* ¶ 961.

[2139]  *Santa Elena* ¶ 103, Exh. C-952.

[2140]  Memorial ¶ 963, citing to *Metalclad v. Mexico*, ICSID Case No. ARB(AF)/97/1, Award, 30 August 2000 ¶ 128, Exh. C-954; *Wena Hotels Limited v. Arab Republic of Egypt*, ICSID Case No. ARB/98/4, Award, 8 December 2000 ¶ 129, Exh. C-956 (hereinafter "*Wena*"); *Santa Elena* ¶ 104, Exh. C-952; *MTD v. Chile* ¶ 251, Exh. C-969; *Azurix* ¶ 440, Exh. C-979; *Siemens* ¶¶ 399–401, Exh. C-983 (hereinafter "*Siemens*"); *ADC* ¶ 522, Exh. C-980; *Vivendi* ¶¶ 9.2.5–9.2.6, Exh. C-986; *Siag v. Egypt*, ICSID Case No. ARB/05/15, Award, 1 June 2009 ¶ 595, Exh. C-998; F.A. Mann, *Compound Interest as an Item of Damage in International Law*, 21 U.C. Davis L. Rev. 577 (1987–1988), Exh. C-1025; Stephen M. Schwebel, *Compound Interest in International Law*, 2(5) Transnational Dispute Management (2005), Exh. C-1029; John Yukio Gotanda, *Compounding Interest in Interest:  The Global Economy, Deflation, and Interest, in* CONTEMPORARY ISSUES IN INTERNATIONAL ARBITRATION AND MEDIATION. THE FORDHAM PAPERS (2009–2010), pp. 261–87, Exh. C-1024; *see also* Reply ¶ 845 n.1472, citing to *Kardassopoulos* ¶¶ 650–78, Exh. C-1533; *Gemplus S.A., SLP S.A., Gemplus et al. v. Mexico, Talsud S.A6. v. The United Mexico States*, ICSID Cases Nos. ARB (AF)/04/3 & ARB (AF)/04/4, Award, 16 June 2010 ¶¶ 16–26, Exh. C-1536 (hereinafter "*Gemplus*").

[2141]  Memorial ¶ 965.

[2142]  *Ibid.* ¶¶ 963–64, citing to *Wena* ¶ 129, Exh. C-956; *Santa Elena* ¶ 104, Exh. C-952.

[2143]  Memorial ¶ 966; First Kaczmarek Report ¶¶ 375–81; Reply ¶ 859 n.1491; Second Kaczmarek Report ¶¶ 64–65.

in U.S. dollars corresponds to the rate that the Russian Federation offers to its <u>willing</u> lenders.  Therefore, in order to be fully compensated for the Russian Federation's breaches, the Claimants should be awarded interest at a commercial rate <u>higher</u> than this latter rate.  LIBOR +4% would represent such an appropriate commercial rate, which is the rate used by Navigant in its expert report.[2144]

[emphasis in the original]

1644. Claimants have requested that interest of LIBOR plus 4 percent, compounded annually, be applied pre- and post- award, including on costs.[2145]

1645. At the Hearing, Claimants presented the following table to summarize their submission on interest rates:[2146]

| Interest Rate | Description | Justification |
|---|---|---|
| Russian Cost of Debt | Cost of raising money for the Russian Government | The actions have effectively turned the Claimants into unwilling lenders to Russia. |
| U.S. Prime Rate | Rate that US banks charge their most creditworthy customers | The U.S prime rate is not widely available in the market.  A 2% premium reflects a rate that would be more broadly available. |
| LIBOR | Rate of interest that banks charge one another for loans in the money market | Historically, LIBOR + 2% has closely tracked the U.S. Prime rate of interest.  As such, LIBOR + 4% would be a commercial rate of interest on par with the U.S. Prime rate + 2% |

1646. Claimants noted that the Russian cost of debt is "a natural candidate" for interest rate.[2147]  In response to a question by the Chairman whether Claimants "still rely on LIBOR", counsel for Claimants noted that he had "avoided making any comment on the reliability of LIBOR."[2148]

**B.    RESPONDENT'S POSITION**

1647. Respondent submits that Claimants' request for pre- and post-award interest is "manifestly unfounded and disproportionate, and should be rejected."[2149]  Respondent refers to the

---

[2144]   Memorial ¶ 967.

[2145]   Memorial ¶ 970; Reply ¶¶ 859, 1199; Claimants' Post-Hearing Brief ¶ 309; Claimants' Submission on Costs ¶ 64.

[2146]   Transcript, Day 17 at 259 (Claimants' closing), showing Exh. C-1787.

[2147]   *Ibid*.

[2148]   *Ibid*. at 260 (Claimants' closing).

Commentary on Article 38 of the ILC Articles on State Responsibility for the proposition that there is "no automatic entitlement to the payment of interest."[2150]

1648. Respondent emphasizes that compound interest is not awarded automatically by tribunals.[2151] Respondent observes that the *RosInvestCo* tribunal used LIBOR alone, calculated annually, without any compounding.[2152]

1649. Respondent criticizes Claimants and their expert for failing to provide a justification for their preferred rate of LIBOR plus four percent.[2153]  According to Respondent, awarding Claimants interest at LIBOR plus four percent compounded annually would "unduly punish" Respondent while granting Claimants a "windfall."[2154]

## C.  THE LEGAL FRAMEWORK

### 1.   Energy Charter Treaty

1650. Article 26(8) of the ECT provides that "awards of arbitration, <u>which may include an award of interest</u>, shall be final and binding upon the parties to the dispute" [emphasis added].  In the case of a lawful expropriation, Article 13(1) of the ECT directs that compensation "<u>shall</u> also include <u>interest at a commercial rate established on a market basis</u> from the date of Expropriation until the date of payment" [emphasis added].[2155]

---

[2149]  Rejoinder ¶ 1743.

[2150]  *Ibid.*, quoting Commentary on ILC Articles on State Responsibility, Article 38 ¶ 7, Exh. R-4235.

[2151]  *Ibid.*  Respondent explains that, as noted by the tribunal in *Duke Energy Electroquil Partners and Electroquil S.A. v. Republic of Ecuador*, ICSID ARB/04/19, Award, 18 August 2008 ¶ 473, Exh. C-993, "the award of compound interest is not a principle of international law."  As explained by BORZU SABAHI, COMPENSATION AND RESTITUTION IN INVESTOR-STATE ARBITRATION (2011), p. 152, Exh. R-4234, "compound interest, in international investment law, may be awarded if the aggrieved party can prove that it 'could have received compound interest . . . by placing its money in a readily available and commonly used investment vehicle . . .'."  In *RosInvestCo* ¶¶ 688–90, Exh. C-1049, the tribunal notes that the practice of awarding compound interest is "by no means unanimous" and that awarding interest at "a normal commercial rate" does not imply that the tribunal "is bound to award compound interest."  Rejoinder ¶ 1743 n.2952.

[2152]  Rejoinder ¶ 1746; *RosInvestCo* ¶¶ 684–90, Exh. C-1049.

[2153]  Rejoinder ¶ 1746.

[2154]  *Ibid.* ¶ 1747, quoting John Yukio Gotanda, *Awarding Interest in International Arbitration*, 90 Am. J. of Int'l Law 40 (1996) pp. 59–60, Exh. R-4236.

[2155]  See Subsection XII.C.1(b) below for discussion on the applicability of the Article 13 standard in lawful and unlawful expropriations.

1651. The Tribunal observes that arbitral tribunals hearing disputes under the ECT have awarded pre- and post-award interest at various rates.[2156]

### 2. ILC Articles on State Responsibility

1652. Article 38 of the ILC Articles on State Responsibility reads as follows:

> 1. Interest on any principal sum due under this chapter shall be payable when necessary in order to ensure full reparation.  The interest rate and mode of calculation shall be set so as to achieve that result.

> 2. Interest runs from the date when the principal sum should have been paid until the date the obligation to pay is fulfilled.[2157]

1653. The Commentary on Article 38 provides that "[t]he awarding of interest depends on the circumstances of each case; in particular, on whether an award of interest is necessary in order to ensure full reparation."[2158]

### 3. *RosInvestCo* and *Quasar*

1654. The *RosInvestCo* tribunal awarded pre- and post-award interest using LIBOR alone, calculated annually, without any compounding,[2159] while the *Quasar* tribunal awarded pre- and post-award interest at a rate of 6.434 percent (corresponding to the relevant average yield of medium-term Russian sovereign bonds dealt in USD) compounded annually.[2160]

### 4. Treatises

1655. Two books on the issue of damages in international investment cases have recently been published.  The Tribunal has found the chapters of these books dealing with interest very informative.[2161]

---

[2156] *See e.g. Nykomb Synergetics Technology Holding AB (Sweden) v. Latvia*, SCC, Award, 16 December 2003, p. 40 (pre-award and post-award interest at six percent, corresponding to the prevailing interest rate in Latvia), Exh. C-967; *Kardassopoulos* ¶¶ 658–68, 677–78 (pre-award and post-award interest at LIBOR plus four percent compounded semi-annually), Exh. C-1533.

[2157] Exh. C-1042.

[2158] ¶ 7, Exh. C-1042.

[2159] *RosInvestCo* ¶¶ 684–92, Exh. C-1049.

[2160] *Quasar* ¶ 226, Exh. R-3383.

[2161] Sergey Ripinsky & Kevin Williams, Damages in International Investment Law (2008), pp. 363–91 (other extracts of which constitute Exh. C-1610) (hereinafter "Ripinsky and Williams"); Irmgard Marboe, Calculation

1656. The following paragraphs summarize these authors' respective analyses and conclusions on various aspects of the issue of interest in international investment cases.

### (a)   General Issues

1657. Dr. Irmgard Marboe explains that, on the one hand, interest should compensate the temporary withholding of money: interest should address the claimant's financial disadvantage of not being able to dispose of money, which materializes either in loss of profit from alternative investments or in costs for a loan.[2162]   On the other hand, the awarding of interest should prevent the debtor's unjust enrichment since the debtor gains a financial profit through the withholding of the money.[2163]   Additionally, post-award interest, writes Dr. Marboe, serves the purpose of creating an effective incentive for the respondent to comply with an arbitral award without delay.[2164]

1658. Dr. Sergey Ripinsky and Mr. Kevin Williams stress the well-established mantra that tribunals enjoy a wide margin of discretion in awarding interest.[2165]

### (b)   Rate

1659. Dr. Ripinsky and Mr. Williams write that choosing the rate is "perhaps the issue where one sees the greatest variety in approaches of arbitration tribunals."[2166]   They consider four different approaches.

1660. The first is the "investment alternatives" approach, adopted by the majority opinion in the Iran–U.S. Claims Tribunal case *Sylvania Technical Systems v. Iran* ("**Sylvania**") and explained in the following terms:

> [T]he Tribunal will derive a rate of interest based approximately on the amount that the successful claimant would have been in a position to have earned if it had been paid in time

---

OF COMPENSATION AND DAMAGES IN INTERNATIONAL INVESTMENT LAW (2009), pp. 317–92 (other extracts of which constitute Exh. C-1607) (hereinafter "Marboe").

[2162]   Marboe ¶ 6.05.

[2163]   *Ibid*. ¶ 6.06; *see also Santa Elena* ¶ 101, Exh. C-952 ("[the claimant] is entitled to the full present value of the compensation that it should have received at the time of the taking.  Conversely, the taking state is not entitled unjustly to enrich itself by reason of the fact that the payment of compensation has been long delayed.").

[2164]   Marboe ¶ 6.38, citing to John Yukio Gotanda, SUPPLEMENTAL DAMAGES IN PRIVATE INTERNATIONAL LAW, 1997, p. 58.

[2165]   Ripinsky and Williams, pp. 365–66.

[2166]   *Ibid*., p. 366. Dr. Marboe calls it "one of the most difficult decisions."  Marboe ¶ 6.40.

and thus had the funds available to invest in a form of commercial investment in common use in its own country.[2167]

1661. According to Dr. Ripinsky and Mr. Williams, this approach was followed in subsequent awards of the Iran–U.S. Claims Tribunal as well as by the *Santa Elena* tribunal.[2168]

1662. The second approach is the "borrowing rate" approach, which is based on borrowing rates from banks in the claimant's country.[2169]  Investment tribunals have often used the LIBOR, an inter-bank borrowing rate of interest.  Some tribunals have also added a certain percentage to the LIBOR rate to arrive at the approximate rate that international investors would have had to pay if they had been obliged to borrow the money.  According to Ripinsky and Williams, tribunals have "normally" added two percent to LIBOR.[2170]

1663. Dr. Marboe notes that Judge Holtzmann had argued in favor of a borrowing rate approach in his separately recorded view on interest in the *Sylvania* decision, because it "is reasonable to assume that most businesses habitually borrow while fewer regularly invest in certificates of deposit."[2171]  Dr. Marboe writes that the borrowing rate approach can lead to different results, such as the selection of the prime rate, the borrowing rate of the investor, the cost of capital of the investor, the borrowing rate of the State (the "coerced loan theory") or the average borrowing rate.[2172]

1664. In respect of the prime rate, Dr. Marboe writes:

> The "prime" or "base" rate plays an important role in negotiations about company loan conditions in Anglo-American countries.  As such, it seems to be an appropriate basis for the assessment of the damages incurred by a delayed payment.  However, it must be taken into account that not all enterprises can borrow money from the banks at the prime rate.  Therefore, an increase by a few percentage points might be necessary as has been the practice in the cases mentioned above.  The question then arises, of course, how many percentage points are appropriate.  It appears, therefore, that the prime rate does not really offer a viable means of ensuring adequate and consistent decisions on interest.[2173]

1665. In respect of the "coerced loan theory", she opines:

---

[2167]  Ripinsky and Williams, p. 368, quoting *Sylvania Technical Systems v. Iran*, Award, 27 June 1985, 8 Iran–U.S. Claims Tribunal Reports, 298, 320 (footnote omitted) (hereinafter "*Sylvania*").

[2168]  *Ibid.*, p. 368; *see* Marboe ¶¶ 6.107–6.120.

[2169]  Ripinsky and Williams, p. 369.

[2170]  *Ibid.*, p. 370.

[2171]  Marboe ¶ 6.82, quoting *Sylvania*, p.321 n.13.

[2172]  *Ibid.* ¶¶ 6.85–6.106.

[2173]  *Ibid.* ¶ 6.93.

According to this approach, the amount of interest has nothing to do with the claimant's actual loss, but rather depends on the respondent's risk characteristics.

This approach measures the financial effect of the delay from the perspective of the respondent. It has to be borne in mind, however, that pre-award interest in international investment cases should fulfil the function of compensation or damages. Therefore, the perspective of the claimant is decisive.

The perspective of the respondent, however, is important when it comes to the prevention of enrichment as an additional function of the interest claim. While this is only of secondary importance concerning pre-award interest, it becomes relevant with regard to post-award interest. This means that the "coerced loan theory" would better fit with the determination of post-award interest.[2174]

1666. The third approach to interest is to rely on the interest rate applicable under the host State's domestic law provisions concerned. Dr. Ripinsky and Mr. Williams observe that investment tribunals have done so,[2175] while Dr. Marboe asserts that, in international investment disputes, "national legal interest rates are not applicable and not adequate."[2176]

1667. Finally, in a number of disputes, write Dr. Ripinsky and Mr. Williams, tribunals have adopted a specific rate ranging from 5 to 10 percent, calling it "reasonable", "fair" or "appropriate".[2177] Dr. Marboe writes that "fair" rates have ranged from 5 to 17.5 percent.[2178]

1668. The Tribunal notes that, overall, Dr. Ripinsky and Mr. Williams favor the "investment alternatives" approach, with the caveat that, in situations where the debtor's actions force the claimant to borrow funds, it would be appropriate to award interest at the claimant's actual borrowing rate,[2179] whereas Dr. Marboe appears to prefer the use of inter-bank interest rates.[2180]

(c)   *Dies a quo*

1669. The authors of both treatises affirm that, in cases of expropriation, "interest has invariably been calculated from the date of the taking."[2181]

---

[2174]   *Ibid*. ¶¶ 6.101–6.103 (footnote omitted).

[2175]   Ripinsky and Williams, pp. 370–72.

[2176]   Marboe ¶¶ 6.70.

[2177]   Ripinsky and Williams, p. 372.

[2178]   Marboe ¶ 6.149; *see also* ¶¶ 6.150–6.161.

[2179]   Ripinsky and Williams, p. 373.

[2180]   *See* Marboe ¶ 6.147.

[2181]   Ripinsky and Williams, p. 375; *see ibid*. ¶ 6.163.

**(d)  Simple or Compound**

1670. With respect to the important issue of whether interest awarded should be simple or compound, Dr. Ripinsky and Mr. Williams opine that "there is a trend away from only awarding simple interest to generally awarding compound interest,"[2182] while Dr. Marboe states that "compound interest as opposed to simple interest appears to be predominantly accepted as appropriate in recent international investment arbitration" because it is "regarded as better reflecting actual economic realities both for the purpose of remedying the loss actually incurred by the injured party and for the prevention of unjustified enrichment of the respondent State."[2183] Dr. Ripinsky and Mr. Williams refer to the *Santa Elena* award, issued in 2000, as "a turning point in jurisprudence."[2184]

1671. Dr. Ripinsky and Mr. Williams observe that the period of compounding has ranged from one year to one month and that annual compounding has been "predominant."[2185]

**(e)  Post-Award Interest**

1672. After an extensive review of arbitral decisions, Dr. Ripinsky and Mr. Williams conclude that in the majority of cases, tribunals have not considered post-award interest separately from pre-award interest and have simply granted interest until the date of full payment of the award. This "automatically turns pre-award interest into post-award."[2186]

1673. They note that when post-award interest has been granted separately, tribunals have been more severe towards the respondent, compared to the pre-award interest granted.[2187]

1674. According to Dr. Ripinsky and Mr. Williams, "[t]hese changes can be explained by the desire of some tribunals to ensure prompt compliance with the award by adding a punitive element to

---

[2182]   Ripinsky and Williams, p. 379.

[2183]   Marboe ¶ 6.236; but see Marboe's list of exceptions ¶¶ 6.237–6.261.

[2184]   Ripinsky and Williams, p. 385.

[2185]   *Ibid.*, p. 387.

[2186]   *Ibid.*; *see also* Marboe ¶¶ 6.243–6.261.

[2187]   Ripinsky and Williams, p. 389.

interest and thereby turning the post-award interest from a purely compensatory instrument into a sanction."[2188]

1675. Dr. Ripinsky and Mr. Williams also note that some tribunals have provided for a grace period following the date of the award, during which interest does not accrue.[2189]

## D. TRIBUNAL'S DECISION

1676. The Tribunal, having considered the Parties' submissions, the treatises of the learned authors quoted extensively above, the many decisions of tribunals which have traversed the issue of interest and, of course, the totality of the evidence in the case at hand that it considers pertinent to its determination of this facet of the present arbitrations, will now proceed with its analysis and exercise its judgment.

1677. As we saw earlier, the ECT, the relevant legal instrument, envisages an award of interest in an arbitral award.  In addition, the Treaty decrees mandatory payment of interest "at a commercial rate established on a market basis" in the case of a lawful arbitration.  In the view of the Tribunal, there can be no doubt that, *a fortiori*, in the case of an unlawful expropriation, as in the present case, Claimants are entitled to interest from Respondent in order to ensure full reparation for the injury they suffered as a result of those of Respondent's measures that the Tribunal has found to be internationally wrongful.

1678. Neither the Treaty nor the ILC Articles on State Responsibility provide specific rules regarding how interest should be determined.  In addition, as the Tribunal has found, the practice of past tribunals is varied and inconsistent and does not provide clear guidance.  Thus, as is well established, the Tribunal has a wide margin of discretion to determine the rate of interest applicable and whether it should be simple or compound.

1679. Of the three rates proposed by Claimants, the LIBOR plus two or four percent, the yield on Russian sovereign bonds issued in USD and the U.S. Prime rate plus two percent, the Tribunal has rejected outright the first two for the following brief reasons.  LIBOR, as Claimants' counsel implicitly recognized during the Hearing, has been discredited, while the yield on

---

[2188]   *Ibid.*, p. 389; *see* Marboe ¶ 6.245.

[2189]   Ripinsky and Williams, p. 390; *see also* Marboe ¶¶ 6.262–6.268.

Russian sovereign bonds issued in USD would lead, in the Tribunal's opinion, to excessive compensation for Claimants.

1680. As for the U.S. Prime rate plus two percent, the Tribunal initially saw merit in this rate which is a version of the borrowing rate approach reviewed earlier.  The Tribunal notes that this method was put forward by Judge Holtzmann in his separately recorded view on interest in the *Sylvania* Iran–U.S. Claims Tribunal case.[2190]

1681. The Tribunal has concluded however that this method should also be rejected.  It is not an appropriate basis for the assessment of the damages in this case.  There is no evidence that Claimants had to borrow money because they were not compensated at the time of the expropriation.

1682. On the other hand, the Tribunal finds apposite the following statement of the *Siemens v. Argentina* tribunal:

> The Tribunal considers that the rate of interest to be taken into account is not the rate associated with corporate borrowing but the interest rate the amount of compensation would have earned had it been paid after the expropriation.[2191]

1683. The Tribunal recalls that a rate of interest based on return of investment during the relevant period was adopted by the *Santa Elena* tribunal:

> [W]here an owner of property has at some earlier time lost the value of his asset but has not received the monetary equivalent that then became due to him, the amount of compensation should reflect, at least in part, the additional sum that his money would have earned, had it, and the income generated by it, been reinvested each year at generally prevailing rates of interest.[2192]

1684. The Tribunal observes that many investor-state tribunals have adopted this "investment alternatives approach,"[2193] using rates of U.S. debt instruments even when the claimant was not a U.S. investor.[2194]

---

[2190] *Sylvania*, p. 321 n.13.

[2191] *Siemens* ¶ 396, Exh. C-983.

[2192] *Santa Elena* ¶ 104, Exh. C-952.  The Chairman of the Tribunal was also the Chairman of the ICSID tribunal in *Santa Elena*.

[2193] Ripinsky and Williams, pp. 368–69; Marboe ¶¶ 6.107–6.119; *Sylvania*, pp. 320–21; *Santa Elena* ¶ 104, Exh. C-952; *Siemens* ¶ 396, Exh. C-983.

[2194] Ripinsky and Williams, p. 369 & n.42; *see e.g.*, *Alpha Projektholding GmbH (Austria) v. Ukraine*, ICSID Case No. ARB/07/16, Award, 8 November 2010 ¶ 514 & n.666; *EDF International S.A., SAUR International S.A. Leon*

1685. The Tribunal, in the exercise of its discretion, has concluded that it would be appropriate to award to Claimants interest on a rate based on ten-year U.S. Treasury bond rates.

1686. As will be seen in Part XII on damages, the Tribunal has ruled that Claimants' shares in Yukos should be valued as of the date of the Award.  Accordingly, there will be no pre-award interest granted to Claimants in respect of the damages representing the value of their shares.[2195]

1687. However, in order that they may be made whole, the Tribunal will grant pre-award interest to Claimants for the damages which represent the value of the dividend streams for which, as will be seen,[2196] the Tribunal has decided Claimants should be compensated.  In order to compute the pre-award interest awarded to Claimants at the rate based on ten-year U.S. Treasury bond rates, the Tribunal will use the average yield of ten-year U.S. Treasury bonds over the period from 1 January 2005 to 30 May 2014 as the applicable rate of interest, which the Tribunal has determined to be 3.389 percent.[2197]

1688. As will also be seen in Part XII on damages, the Tribunal has decided to award Claimants post-award interest on the damages of USD 50,020,867,798 for which the Tribunal has found Respondent liable.

1689. As to whether the interest awarded should be simple or compound, while the Tribunal recognizes that the awarding of compound interest under international law now represents a form of "jurisprudence constante" in investor-state expropriation cases,[2198] the Tribunal has concluded that, in the circumstances of this case, it would be just and reasonable to award Claimants simple pre-award interest and post-award interest compounded annually if Respondent fails to pay in full to Claimants the damages for which it has been held liable before the expiry of the grace period hereinafter granted.

---

*Participationes Argentinas S.A. v. The Argentine Republic*, ICSID Case No. ARB/03/23, Award, 11 June 2012 ¶ 1325ff, Exh. R-4186; *Gemplus*, Exh. C-1536.

[2195] Pre-award interest on the value of the Claimants' shares has, however, been applied in the context of calculating the amount of damages that would have to be awarded on the basis of a valuation date corresponding to the date of the expropriation of Claimants' investment.  *See* paragraph 1847 below.

[2196] *See* Subsection XII.C.4.

[2197] *See* Table T9 appended to this Award.

[2198] *Oko Pankki Oyj (formerly called OKO Osuuspankkien Keskuspankki OYJ), VTB Bank (Deutschland) AG (formerly called Ost-West Handelsbank AG) and Sampo Bank PLC v. The Republic of Estonia*, ICSID Case No. ARB/04/6), Award, 19 November 2007 ¶ 349, Exh. C-1530.

1690. The Tribunal notes that Claimants claim interest on the costs that may be awarded to them by the Tribunal at the same rate as the interest awarded to them on the damages.[2199]  In the event that Respondent fails to pay in full to Claimants the costs awarded to them in Part XIII of the present Award before the expiry of the grace period, post-award interest will accrue on any outstanding amount, compounded annually.

1691. In the circumstances of the present case, in view of the significant amount of damages which Respondent owes Claimants as a result of this Final Award, the Tribunal considers it reasonable to grant to Respondent a grace period of 180 days following the date of the Award before interest will accrue if not paid in full to Claimants by then.

1692. In order to compute any post-award interest awarded to Claimants on their damages and their costs, the Tribunal orders that the interest rate be determined as the yield on ten-year U.S. Treasury bonds as of 15 January 2015 and then the dates of compounding yearly thereafter.

## XII.   THE QUANTIFICATION OF CLAIMANTS' DAMAGES

1693. The Tribunal will now determine the damages caused to Claimants by Respondent's breach of Article 13 of the ECT.  The Parties' positions in this regard can be summarized as follows.

## A.   CLAIMANTS' POSITION

1694. Claimants assert that they are entitled to full reparation for Respondent's breach of its obligations under the ECT "through financial compensation measured at the date of expropriation or at the date of the award, whichever is the greatest"[2200] and seek damages in "an amount to be determined by the Arbitral Tribunal," but estimated at "no less than US$ 114.174 billion."[2201]  Claimants maintain that, while Article 13(1) of the ECT provides a specific rule of compensation, this rule applies only to legal expropriations (i.e., expropriations satisfying the conditions contained in Article 13(1)), and that, where one or more of the conditions of Article 13(1) have not been met, the rules of customary international law apply to the issue of

---

[2199]   Claimants' Submission on Costs ¶ 64.

[2200]   Claimants' Post-Hearing Brief ¶ 232.

[2201]   Reply ¶ 1199.  *See also* Claimants' Post-Hearing Brief ¶ 302.

reparation.[2202]   According to Claimants, in order to achieve full reparation in the event of an unlawful expropriation, an investor must be able to choose between a valuation of the damages it has suffered as at the date of the breach and a valuation as at the date of the award.[2203]

### 1.    Valuation Date

1695.   Claimants submit that there are two potentially relevant dates with regard to the assessment of damages, namely the moment when a treaty breach occurs and the moment when an award is rendered.   Claimants take the view that "an investor should be compensated in the highest amount between the valuation of the damages it has suffered as at the date of the breach and that at the date of the award."[2204]   The reason for this alternative valuation, according to Claimants, is that "to the extent the assets expropriated have increased in value during the arbitration process, this increase must accrue for the benefit of the Claimants, not to the Russian Federation."[2205]   Claimants refer to a number of legal authorities to support the conclusion that, in cases of unlawful expropriations, investors are entitled to choose between a valuation as at the date of the breach and a valuation as at the date of the award.[2206]

1696.   Claimants assert that the date of the expropriation of their investment in this case was 21 November 2007, the date on which Yukos was struck off the Russian register of legal entities.   The justification for choosing this date, according to Claimants, is that "[i]n cases involving expropriations through a series of coordinated interferences by the State, the date of expropriation corresponds to the date on which the governmental interference ripened into an irreversible deprivation of the investor's property,"[2207] and that striking Yukos from the register of legal entities constituted "a point of no return."[2208]

---

[2202]   Memorial ¶¶ 897–99; Transcript, Day 17 at 219–18.

[2203]   Memorial ¶ 917.

[2204]   *Ibid*.   *See also* ¶ 913; Claimants' Post-Hearing Brief ¶¶ 232–33.

[2205]   Memorial ¶ 913.

[2206]   Memorial ¶¶ 915–17; Reply ¶ 845.   Claimants refer in particular to *ADC*, ¶¶ 496–97, Exh. C-980; *Siemens* ¶ 352, Exh. C-983; *Kardassopoulos* ¶ 514, Exh. C-1533; *Amoco International Finance Corporation v. Iran*, Partial Award, 14 July 1987, 15 Iran–U.S. Claims Tribunal Reports, 189,  pp. 300–01, Exh. C-939 (hereinafter "*Amco*").

[2207]   Memorial ¶ 912, n.1314.   *See also* Reply ¶ 940.

[2208]   Reply ¶ 943.

### 2.   Causation

1697. With regard to causation, Claimants assert that they do not need to establish a link between individual actions of Respondent and the damages suffered, but that it suffices for them to show that the sum of Respondent's actions caused those damages.  Claimants argue that:

> [T]he Russian Federation sought and achieved the dismantlement and destruction of Yukos, and the Claimants' investments therein, through a series of cumulative actions. . . . The breach, and the Respondent's responsibility, arises from the Russian Federation's actions taken as a whole and not from each and every one of these actions.  It is the cumulative effect of these acts that is criticized by the Claimants.[2209]

1698. Claimants also argue that:

> [A] causal link needs only be established between the actions of the Russian Federation taken as a whole and the Claimants' damages, namely the destruction of their investments.  This causal link is obvious . . . .[2210]

1699. According to Claimants, there is ample authority to support their position that the Tribunal need only consider "the totality of the Russian Federation's actions and their result:  the inexcusable treatment of the Claimants' investments and, ultimately, their outright expropriation."[2211]

### 3.   Calculations Performed by Claimants and Mr. Kaczmarek

1700. Claimants have submitted two expert reports on damages authored by Mr. Brent Kaczmarek of Navigant Consulting, dated 15 September 2010 and 15 March 2012, together with their Memorial and their Reply, respectively.   The calculations contained in these reports and referred to in Claimants' pleadings can be summarized as follows.

### (a)   The "Scenarios" Presented by Claimants

1701. Claimants perform calculations based on three different "scenarios."   Within each of these scenarios, Claimants also differentiate between a number of sub-scenarios.

1702. The first scenario developed by Claimants is based on two fundamental assumptions, namely (a) that the tax assessments against Yukos constituted a breach of the ECT, and (b) that this

---

[2209] *Ibid.* ¶ 904.

[2210] *Ibid.* ¶ 911.

[2211] Claimants' Post-Hearing Brief ¶ 191, citing to *e.g., Walter Bau* ¶ 12.43, Exh. C-1000; *Pope & Talbot v. Canada*, UNCITRAL, Award on the Merits of Phase 2 ¶ 181, Exh. C-1518; *Kardassopoulos* ¶ 451, Exh. C-1533; *El Paso* ¶ 519, Exh. C-1544/R-4190.

breach caused the merger between Yukos and Sibneft to be cancelled.  In addition, Claimants call in aid an optional assumption in the context of this scenario, namely (c) that Yukos would have had a 70 percent chance of obtaining a listing on the NYSE, which would have further increased its value.[2212]  Claimants' first scenario can thus be subdivided into two sub-scenarios: sub-scenario 1a, which is based only on assumptions (a) and (b); and sub-scenario 1b, which is based on all three assumptions (a), (b), and (c).

1703. Claimants' second scenario is based on assumption (a) described above, namely that the tax assessments against Yukos constituted a breach of the ECT, whilst excluding assumption (b) (thus not seeking damages for the demerger between Yukos and Sibneft).  Here again two sub-scenarios can be distinguished: sub-scenario 2a is based solely on assumption (a), whereas sub-scenario 2b is based on both assumptions (a) and (c).

1704. Claimants' third scenario assumes that the tax assessments against Yukos did not constitute a breach of the ECT, but that the subsequent enforcement of the tax claims did.  Accordingly, Claimants calculate the "damages arising out of the 2004 and 2007 auctions, regardless of the merits of the alleged tax claims imposed on Yukos."[2213]  Within this third scenario, Claimants distinguish five sub-scenarios (subsequently referred to as 3a, 3b, 3c, 3d and 3e),[2214] all of which assume that Yukos should have been allowed to settle its alleged tax debts one way or another (thus avoiding the liquidation of the company), but propose different modalities as to how this could have been done.[2215]

1705. Sub-scenario 3a assumes that Yukos would have been allowed a grace period of five years and would then have "been able to pay off the entire amount of its alleged tax liabilities out of its operating cash-flows only by 2009."[2216]

1706. Sub-scenario 3b assumes that Yukos would have been granted a grace period of three years and would then have been able to pay off its alleged tax liabilities with a combination of its free cash flows and the sale of non-core assets during that period.[2217]

---

[2212]   First Kaczmarek Report ¶ 20.

[2213]   Memorial ¶ 977.

[2214]   Sub-scenarios 3b and 3d were first presented in Reply ¶ 873.

[2215]   Memorial ¶ 979.

[2216]   *Ibid.* ¶ 983.  *See also* Second Kaczmarek Report ¶ 33.

[2217]   Second Kaczmarek Report ¶ 36.

1707. Sub-scenario 3c assumes that Yukos would have been granted a grace period of one year and would then been able to pay off its alleged tax liabilities with a combination of its free cash flows, the sale of non-core assets and debt financing during that period.[2218]

1708. Sub-scenario 3d also assumes that Yukos would have been granted a grace period of only one year, but then assumes (in contradistinction to sub-scenario 3c) that Yukos would have paid off its alleged tax liabilities with a combination of free cash flows, the sale of certain core assets and (limited) debt financing.[2219]

1709. Finally, sub-scenario 3e assumes that, while Yukos would have had to sell YNG to settle its alleged tax obligations, the auction "would have been conducted in a manner ensuring a fair, rather than grossly undervalued, price," generating proceeds of USD 19.703 billion,[2220] with the result that Yukos would have paid off its alleged tax liabilities with these proceeds as well as its cash flows in 2004 and 2005, while remaining a going concern.[2221]

1710. In accordance with Claimants' submissions regarding the relevant valuation dates, Claimants base their damages calculations in the first place on a valuation date of 21 November 2007. Accordingly, Claimants provide calculations for all three scenarios based on this date. In addition, Claimants also carry out a number of calculations based on the date of 1 January 2012, as a proxy for the date of the award, "for comparison purposes."[2222] Claimants provide calculations based on this date for scenarios 1 and 2, but not for scenario 3.

(b)     **Methodology Used for Calculations Based on Scenarios 1 and 2**

1711. Claimants' calculations for scenarios 1 and 2 as of November 2007 are in principle based on the following methodology: the total of the damages claimed corresponds to the sum of Claimants' share in a hypothetical Yukos entity as of the valuation date plus the hypothetical cash flows that Claimants would have received in the form of dividends based on Claimants' shareholding in Yukos from 2004 to November 2007. In addition, in scenarios 1b and 2b, Claimants also

---

[2218]   *Ibid.* ¶ 34.

[2219]   *Ibid.* ¶ 38.

[2220]   Memorial ¶¶ 989–90.

[2221]   *Ibid.* ¶ 993.  *See also* Second Kaczmarek Report ¶ 30.

[2222]   Second Kaczmarek Report ¶ 155; Reply ¶ 946.

include the value they attribute to the "lost chance" of listing Yukos' shares on the NYSE.[2223] The total amount thus obtained is then "brought forward" to a date close to the date of Mr. Kaczmarek's report by adding pre-award interest.[2224] Each one of these steps is set out in more detail below.

### i.    Value of Shares

1712. With regard to the valuation date of 21 November 2007, Claimants calculate the value of their shares in Yukos as follows:

#### (a)  Valuation of Yukos

1713. As a first step, Claimants calculate the value of the relevant Yukos entity, as defined by the assets that Claimants assume Yukos would have owned in November 2007 in the absence of Respondent's alleged breaches.[2225] The assets taken into account depend on the scenario. For the purposes of scenario 1, both Yukos' and Sibneft's original assets are taken into account,[2226] whereas for scenario 2 the calculations are based only on Yukos' assets.[2227] Claimants use three different methods for valuating Yukos, namely the DCF method, the comparable companies method and the comparable transactions method.[2228]

1714. With regard to the DCF method, Claimants describe their approach as an attempt to reconstruct the "pro-forma financial statements" that the relevant Yukos entity would have presented in November 2007, based on the financial and operational data published by Rosneft and Gazprom Neft, which held the majority of Yukos' assets at that point in time.[2229] Where no such data is available, Claimants rely on "historical financial statements and operating information published by Yukos and Sibneft . . . as well as a benchmark of indicators from

---

[2223] The total loss T under Claimants' scenario 1b based on a valuation date of November 2007 can thus be described as T = Value of Shares in November 2007 (V) + Dividends received from 2004 to 2007 (D) + Value of "lost chance" to list shares on NYSE (LC). Memorial ¶ 920. *See also* Claimants' Opening Slides, p. 204.

[2224] Memorial ¶¶ 925, 969, 976. *See also* Claimants' Opening Slides, p. 204.

[2225] Memorial ¶ 931.

[2226] *Ibid*.

[2227] *Ibid*. ¶ 972.

[2228] *Ibid*. ¶¶ 927, 972.

[2229] *Ibid*. ¶ 931.  For scenario 2, Mr. Kaczmarek uses the Dicounted Cash Flow (hereinafter "DCF") model developed for scenario 1 with a number of adjustments. First Kaczmarek Report ¶ 417.

Yukos' and Sibneft's industry peers in Russia."[2230]  Based on this data, Claimants estimate cash flows between 2007 and 2015 as well as a "terminal value" of the entity in 2015.[2231]  Claimants then bring the above estimates to their November 2007 value by applying a discount rate based on Yukos' cost of capital.[2232]  This operation leads them to Yukos' enterprise value as of November 2007.[2233]

1715. Claimants also use a comparable companies approach, based on data available for a pool of Russian (Rosneft, Gazprom Neft, Lukoil, TNK-BP and Surgutneftegaz) and international (BP, Chevron, Conoco-Philips, Exxon-Mobil, Royal Dutch Shell and Total SA) oil companies.[2234] This approach identifies companies with characteristics similar to Yukos (notably in terms of production, reserves, profitability, revenue growth and financing structure), establishes the ratios between the enterprise value of these companies and relevant operating or financial metrics (EBITDA, reserves and production), and then applies these ratios to the relevant metrics of Yukos in order to estimate the latter's enterprise value.[2235]  The net income, EBITDA, reserves and production of Yukos are derived from the "pro-forma financial statements" established in the context of the DCF method.[2236]

1716. Finally, Claimants use a comparable transactions approach based on public purchase transactions of comparable companies.[2237]  In this regard, Claimants apply a "sum of the parts valuation," in which they select transactions that are meant to match the upstream and downstream business of Yukos separately.[2238]  Here again, the operating and financial metrics of Yukos as determined in the context of the DCF method are used to calculate the value of the company.[2239]

1717. Claimants then calculate a synthesized enterprise value of Yukos based on the results of the three approaches, weighing the DCF approach at 50 percent, the comparable companies

---

[2230] Memorial ¶ 931.

[2231] Ibid. ¶ 932.

[2232] Ibid. ¶¶ 933–34.  See also First Kaczmarek Report ¶¶ 84, 87.

[2233] Memorial ¶ 935.

[2234] Ibid. ¶ 938.

[2235] Ibid.

[2236] First Kaczmarek Report ¶ 429.

[2237] Memorial ¶ 940.

[2238] Ibid. ¶ 941.

[2239] Ibid.

approach at 40 percent and the comparable transactions approach at 10 percent.[2240]   By then subtracting Yukos' assumed debt, they arrive at Yukos' synthesized equity value.[2241]

*(b)  Calculation of the Value of Claimants' Shareholding*

1718. In a final step, for each of the scenarios considered, Claimants calculate the value of Claimants' shareholding in Yukos by multiplying the company's equity value by Claimants' share in the company—53 percent (corresponding to the dilution of Claimants' shareholding associated with the creation of YukosSibneft) for scenario 1 and 70.5 percent (corresponding to Claimants' original shareholding in Yukos) for scenario 2.[2242]

ii.     **Additional Indicators Relied on by Claimants to Confirm the Value of Yukos Shares**

1719. With regard to scenario 1, Mr. Kaczmarek avers that he confirmed his valuation with a number of additional indicators.  Claimants calculate Yukos' enterprise value based on the market capitalization of Rosneft in November 2007, with a number of adjustments made in order to take into account the differences between Rosneft's assets and Yukos' (fictitious) assets as of that date.  The result of this calculation is an enterprise value that is about USD 4.5 billion lower than the enterprise value calculated on the basis of the above-described methodology.[2243]

1720. Mr. Kaczmarek  also confirms his valuation of Yukos' enterprise value as of November 2007 based on the increase of three benchmarks (Urals blend prices, the RTS Oil and Gas index and Lukoil's market capitalization) between October 2003 and November 2007.[2244]   These calculations lead to an enterprise value of Yukos that is approximately halfway between USD 14.4 billion lower (RTS Oil and Gas) and USD 46.5 billion higher (Lukoil market capitalization) than the enterprise value of Yukos calculated on the basis of Claimants' basic methodology.[2245]

---

[2240]   *Ibid.* ¶¶ 944–45.  Claimants note that they assign a low weight to the results of their comparable transactions approach, due to the "absence of a transaction involving a company similar to YukosSibneft in the years preceding the date of valuation." *Ibid.* ¶ 945.

[2241]   *Ibid.* ¶ 945.

[2242]   *Ibid.* ¶¶ 949, 972.

[2243]   Claimants' Post-Hearing Brief ¶ 263.  *See also* Memorial ¶ 946.

[2244]   Claimants' Post-Hearing Brief ¶ 260.  *See also* Exh. C-1783.

[2245]   Claimants' Post-Hearing Brief ¶ 261.  *See also* Exh. C-1783.

1721. Finally, Claimants calculate Yukos' enterprise value on the basis of a share swap involving YNG shares that would have taken place between Rosneft and Yukos in October 2006, which Claimants say implies a valuation of YNG's equity at USD 46.2 billion at that point in time.[2246] On that basis, Claimants calculate an enterprise value of Yukos as of 21 November 2007 that is approximately USD 12.8 billion lower than the value calculated on the basis of their basic methodology.[2247]

### iii.   Hypothetical Cash Flows from Dividends

1722. The second component of Claimants' damages calculation is the cash flows from dividends that Claimants argue would have been paid to them in the first and second scenarios but for Respondent's treaty breaches.  Claimants assume that, without the alleged breaches of the ECT by Respondent, Yukos would have paid dividends to its shareholders between 30 September 2003 and 21 November 2007.[2248]  Accordingly, Claimants say that they would have received a pro rata share of these dividends, calculated on the basis of their shareholding in the company.[2249]

### iv.   Loss of Chance

1723. The third component of Claimants' damages calculation is based on Claimants' valuation of what they refer to as the loss of a chance to obtain a listing of Yukos on the NYSE.  Claimants submit that, without the breaches of Respondent, Yukos would likely have been listed on the NYSE, and that this listing would have decreased the company's costs of capital and thus increased Yukos' share value.[2250]  Claimants quantify the value of the loss of this chance by multiplying the assumed increase in share value with the probability of a successful listing, which they assume to be 70 percent.[2251]  This loss for Claimants is the amount thus obtained, multiplied by Claimants' shareholding in Yukos.[2252]

---

[2246]   Claimants' Post-Hearing Brief ¶ 262.  *See also* Exh. C-1773.

[2247]   Claimants' Post-Hearing Brief ¶ 262.  *See also* Exh. C-1784.

[2248]   Memorial ¶ 952.

[2249]   *Ibid*. ¶ 953.

[2250]   *Ibid*. ¶¶ 954–56.

[2251]   *Ibid*. ¶ 958.

[2252]   *Ibid*. ¶¶ 956, 958.

### v.    Pre-Award Interest

1724. In a final step for purposes of their calculations with regard to scenarios 1 and 2, Claimants bring forward the total amount thus obtained to a date close to the date of their last submissions,[2253] and add pre-award interest of LIBOR plus four percent on a compound basis.[2254]

### (c)    Methodology Used for Calculations Based on Scenario 3

1725. Claimants' calculations for scenarios 3a to 3d are based on their calculations for the second scenario, but are adjusted to take into account the settlement of Yukos' tax liabilities through Yukos' cash flow, the sale of certain assets and/or debt financing.[2255]  These scenarios do not assume any payment of dividends to Yukos' shareholders or the loss of a chance of obtaining a listing of Yukos on the NYSE.[2256]  Rather, Claimants determine Yukos' equity value as of November 2007 and derive the value of their ownership interest in Yukos from that figure. They then bring forward the amount thus obtained to a date close to the date of their last submissions again by adding compound pre-award interest at a rate of LIBOR plus four percent.[2257]

1726. Claimants' calculations for scenario 3e (which assumes the sale of YNG at a price higher than that achieved in the 2004 auction) are somewhat more complex.  In this scenario, Claimants estimate the enterprise value of YNG as of November 2007, and then subtract this amount from their estimate of the enterprise value of Yukos as of the same date.  This leaves Claimants with a figure for the enterprise value of Yukos' assets without YNG.[2258]  Claimants then subtract the assumed debt of this smaller Yukos entity and thus arrive at the equity value of Yukos (without YNG) in November 2007.[2259]  Claimants calculate their losses as a pro rata share (based on their 70.5 percent shareholding in Yukos) of the sum of this equity value, their estimate of free cash flows that a diminished Yukos (without YNG) would have achieved between January

---

[2253]  The date used for purposes of Mr. Kaczmarek's second report is 15 March 2012.  Second Kaczmarek Report ¶ 15.

[2254]  Memorial ¶ 969.  For Claimants' arguments on interest see Section XI.A.1 above.

[2255]  First Kaczmarek Report ¶¶ 555, 567.

[2256]  *Ibid*. ¶¶ 556, 568.

[2257]  *Ibid*.

[2258]  *Ibid*. ¶ 545.

[2259]  *Ibid*. ¶ 546.

2005 and November 2007, and pre-award interest brought forward to a date close to the date of their last submissions.[2260]

### (d)    Methodology Used for Calculations Based on 2012 Valuation Date

1727. The position of Claimants is that, because of the unlawful taking by Respondent of Yukos, they are entitled to select the evaluation of the damages either at the date of Respondent's breach or at the date of the award, whichever is the highest.[2261]  Thus, Claimants, in their Reply, also quantify their damages in scenarios 1 and 2 based on a valuation date of 1 January 2012. Claimants state they chose this date for practical purposes since it is close to the date of submission of Mr. Kaczmarek's second expert report and that, if need be, calculations "can subsequently be updated at a date closer to the award."[2262]

1728. While Mr. Kaczmarek does not set out the methodology used in this regard in any great detail,[2263] it can be inferred from some of the appendices to his second report.[2264]  In these appendices, Mr. Kaczmarek estimates Yukos' cash flows for the years 2004 to 2011 as well as the terminal value of Yukos as of 1 January 2012 for scenarios 1 and 2 and then applies pre-award interest of LIBOR plus four percent to bring these figures to the present (*i.e.*, 15 March 2012)[2265] value and thus obtain Yukos' total damages.[2266]  For scenarios 1b and 2b, Claimants also add the incremental value of the chance of obtaining a listing on the NYSE.[2267] Claimants then calculate their damages as a percentage of Yukos' damages, based on their shareholding in the relevant entity.[2268]

---

[2260]  *Ibid.* ¶ 547.

[2261]  Memorial ¶ 917.

[2262]  Claimants' Post-Hearing Brief ¶ 233 n.499.

[2263]  *See* Second Kaczmarek Report ¶ 155.

[2264]  Second Kaczmarek Report, Appendices AG to AK.

[2265]  *Ibid.*

[2266]  Second Kaczmarek Report, Appendices AG.1 and AK.1.  Claimants provide alternative computations based on pre-award interest at Russian Sovereign Cost of Debt, Prime +2 percent and LIBOR +2 percent.  Second Kaczmarek Report, Appendices AG.3 to AG.8 and AK.2 to AK.4.

[2267]  Second Kaczmarek Report, Appendices AH and AI.

[2268]  *Ibid.*, Appendices AG.1 and AI.

(e)     **Summary of Results of Claimants' Calculations**

1729. The valuation by Mr. Kaczmarek of each of the scenarios described above (including pre-award interest through 15 March 2012) is summarized in the following table (amounts in USD billion):

| Valuation date | Scenario | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 1a | 1b | 2a | 2b | 3a | 3b | 3c | 3d | 3e |
| 21 November 2007 | 106.815[2269] | 114.174[2270] | 102.015[2271] | 107.966[2272] | 67.236[2273] | 68.593[2274] | 62.763[2275] | 69.583[2276] | 33.317[2277] |
| 1 January 2012 | 91.922[2278] | 94.931[2279] | 88.737[2280] | 91.217[2281] | n.a. | n.a. | n.a. | n.a. | n.a. |

**4.     Failure of Claimants to Mitigate**

1730. In response to Respondent's contention that Claimants should promptly have paid the original taxes assessed against Yukos (as well as those Yukos should have anticipated would be imposed for succeeding years on the same grounds) to avoid massive damages, Claimants aver that there is no "duty to appease" and that "a victim of extortion is not to blame if the threats against it are carried out after it refuses to pay."[2282]

1731. Claimants also argue that Yukos had no reason to concede the validity of the Russian authorities' position with regard to the initial tax assessments "in circumstances where its objections to the December 29, 2003 Audit Report were still under consideration" and where it

---

[2269]   *Ibid.* ¶ 15.

[2270]   Reply ¶ 859.

[2271]   Second Kaczmarek Report ¶ 18.

[2272]   Reply ¶ 861.

[2273]   *Ibid.* ¶ 875.

[2274]   *Ibid.*

[2275]   *Ibid.*

[2276]   *Ibid.*

[2277]   *Ibid.* ¶ 864.

[2278]   Second Kaczmarek Report ¶ 155.

[2279]   Second Kaczmarek Report, Appendix AH.

[2280]   Second Kaczmarek Report ¶ 155 and Appendix AK.

[2281]   Second Kaczmarek Report, Appendix AI.

[2282]   Claimants' Post-Hearing Brief ¶ 275.

had received advice from its lawyers that the Audit Report was "totally inconsistent with the Russian tax law."[2283]   In any event, Claimants say that Yukos did not have enough cash to settle an alleged tax debt of USD 9 billion in the first quarter of 2004.[2284]

1732. In addition, Claimants assert that, to apply Respondent's argument, "the Tribunal would need to ignore the most salient facts—the Respondent's breaches—and assume . . . that the very same Russian authorities who committed those breaches would have acted differently if only Yukos had taken the actions specified by the Respondent."[2285]   In particular, with regard to Respondent's argument that Yukos could have significantly reduced its tax burden by filing corrected VAT returns during the first quarter of 2004, Claimants contend that the actual conduct of the Russian authorities demonstrates that any amended returns that Yukos might have submitted would, in any event, have been either ignored or rejected.[2286]

### 5.   Windfall and Double-Recovery

1733. Finally, Claimants also reject Respondent's arguments that any award of damages should avoid presenting Claimants with a windfall and take into account the risk of double-recovery. According to Claimants, these arguments of Respondent merely seek to "repackage its so-called 'unclean hands' theory in the context of damages" and Respondent, they say, "has failed to articulate any basis on which alleged collateral illegalities could . . . be relevant to an assessment of damages."[2287]   In any event, conclude Claimants, any benefits they may have received through their investments prior to Respondent's breaches of the ECT are irrelevant for the calculation of the damages in the present arbitration and, furthermore, any assets located outside Russia have been excluded from Mr. Kaczmarek's valuations.[2288]

---

[2283]   *Ibid.* ¶ 281, quoting Sergey Pepeliaev, Summary of the tax inspection of OAO NK Yukos, 5 January 2004, pp. 1, 3, Exh. C-1128.

[2284]   *Ibid.* ¶ 292.

[2285]   *Ibid.* ¶ 276.

[2286]   *Ibid.* ¶ 287.

[2287]   Reply ¶¶ 883–85.

[2288]   Reply ¶ 963.

## B.   RESPONDENT'S POSITION

1734. Respondent argues that, even if it were held to be liable for a breach of the ECT, Claimants should not be awarded any damages in this case.[2289]   Respondent has submitted two expert reports on damages by Professor James Dow, one dated 1 April 2011 and the other 15 August 2012, with their Counter-Memorial and their Rejoinder, respectively.   These reports and Respondent's arguments with regard to Claimants' damages calculations can be summarized as follows.

### 1.   Valuation Date

1735. Respondent disagrees with both valuation dates proposed by Claimants.

1736. With regard to Claimants' valuation as of the date of expropriation, Respondent invokes the principle that "the valuation date should be when the purported substantial deprivation of the investor's investment has occurred."[2290]   Respondent objects, however, to Claimants' assessment that in this case a substantial deprivation of their investment occurred on 21 November 2007, a date which Respondent considers "arbitrary."[2291]   Respondent argues that "the hallmark of an appropriate valuation date is the loss of effective control over the investor's investment"[2292] and concludes that "Claimants have repeatedly averred that they lost control of their investment and that it lost all value long before November 21, 2007."[2293]

1737. As a result, Respondent disputes that the date of 21 November 2007 chosen by Claimants has any relevance.   As Professor Dow explained at the Hearing:

> I am very clear in stating that the 2007 date has no economic relevance, in my view.  And I say that because at the end of 2004 Yukos shares had lost essentially all of their value. Yukos was a penny stock.  It wasn't expected to recover, the market did not expect it to recover; that was reflected in the share price. . . .  So from an economic point of view, the date of delisting in 2007 is a bureaucratic event, not an event at which value was lost.[2294]

---

[2289]   Respondent's Post-Hearing Brief ¶¶ 262–63.

[2290]   Rejoinder ¶ 1666.

[2291]   Counter-Memorial ¶ 1618.

[2292]   Rejoinder ¶ 1666.

[2293]   Ibid. ¶ 1666.  *See also* Respondent's Post-Hearing Brief ¶ 238.

[2294]   Transcript, Day 12 at 14.  *See also* at 49.

1738. While Respondent does not propose any specific alternative date when Claimants lost control of their investments, Professor Dow suggested at the Hearing that such a date would, in any event, have to be before the end of 2004.[2295]

1739. Respondent also rejects Claimants' submission that the date of an award can be used as an alternative valuation date.  In this regard, Respondent argues that the "standard theoretical framework economists typically use to calculate damages is an '*ex ante*' one" where damages are assessed at the moment of the relevant breaches and then brought to present value with pre-judgment interest.[2296]  By contrast, an "*ex post*" approach would, according to Respondent, use information based on hindsight, provide no principled basis for choosing a date and therefore be vulnerable to error.[2297]  In addition, Respondent claims that, "with each passing day after the alleged takings date, it becomes increasingly speculative to value the asset taken as of some later date."[2298]

1740. In his first report, Professor Dow writes that there is a "general preference among economists for the *ex ante* approach when evaluating damages in commercial matters" and refers, in this connection, to an article published in the 1990 Journal of Accounting, Auditing and Finance.[2299]  Relying on this article, Respondent submits that "an expropriation relieves the owner not only of the value of the asset on the date of expropriation, but also of the risk associated with owning it" and that, as a consequence, "[t]he only way to recognize both aspects is to assess the value of the asset on the date of expropriation, when neither its owner nor the State knows whether the asset will increase or decrease in value."[2300]

### 2.    Causation

1741. Respondent also disagrees with Claimants with respect to causation.  In particular, Respondent emphasizes the need to establish "a sufficient causal link" between breach and damage, where

---

[2295]    *Ibid.* at 175.

[2296]    Counter-Memorial ¶ 1617.

[2297]    *Ibid.* ¶ 1618.

[2298]    Respondent's Post-Hearing Brief ¶ 239.

[2299]    First Dow Report ¶ 13, citing to Franklin M. Fisher and R. Craig Romaine, *Janis Joplin's Yearbook and the Theory of Damages*, Journal of Accounting, Auditing and Finance (1990), p. 153, Exh. R-1980.

[2300]    Respondent's Post-Hearing Brief ¶ 239.

the latter is the "proximate result" of the former.[2301]   Respondent advocates the following methodology:

> [I]f the damages are caused by a series of harmful actions . . . each violation can be treated as a new action and the corresponding incremental change can be estimated at the time of the action, . . . [t]he incremental damage figures for each violation can then be added together to obtain a total damage figure.[2302]

1742. According to Respondent, Claimants' approach to damages fails "to connect any of the alleged treaty violations to a specific amount of damages" and provides "no mechanism for determining the incremental damages allegedly caused by any specific alleged violation."[2303] As a consequence, Respondent alleges that Claimants' valuations "do not accommodate the situation where the Tribunal finds that fewer than all of the scores of alleged 'bad acts' were violations."[2304]

### 3. Specific Aspects of the Calculations Performed by Claimants Criticized by Respondent

1743. Principally, Respondent criticizes Claimants' damages claims as being "based on inherently incorrect or speculative assumptions."[2305]   According to Professor Dow, Mr. Kaczmarek's various calculations are "riddled with errors" and the obvious result of "reverse engineering to a desired result."[2306]   Respondent and its expert raise numerous arguments in support of their criticism, the most important of which are summarized below.

### (a) Credibility of Claimants' DCF Analysis

1744. One of Respondent's main criticisms with regard to Claimants' valuation is directed at Mr. Kaczmarek's DCF analysis.   In particular, in his first expert report, Professor Dow identifies what Respondent claims are "three obvious and significant errors" regarding the valuation of YNG.[2307]   Respondent points out that, while Mr. Kaczmarek admitted to two of

---

[2301]   Counter-Memorial ¶ 1606, quoting U.S. and Germany Mixed Claims Commission, Administrative Decision No. II, 1 November 1923, 23, p. 29, Exh. R-1188.

[2302]   *Ibid.* ¶ 1617.

[2303]   *Ibid.* ¶ 1619.  *See also* ¶ 1627.

[2304]   *Ibid.* ¶ 1619.  *See also* ¶ 1628.

[2305]   *Ibid.* ¶ 1637.

[2306]   Second Dow Report ¶ 422.

[2307]   Counter-Memorial ¶ 1630.

these errors in his second expert report, the valuation of YNG remained virtually unchanged.[2308] As a consequence, Respondent claims that Mr. Kaczmarek's "main task" in his second report must have been to "find a way to make up for gaping holes in his initial valuation that he concedes were the result of readily identifiable errors that he realized had to be corrected, after Professor Dow had identified them."[2309]   Respondent points out that, while the necessary corrections identified by Professor Dow caused Claimants' expert to make adjustments of over USD 10 billion to his valuation of YNG, Mr. Kaczmarek still ended up with virtually the same figure as in his first report as a consequence of a series of simultaneous "discretionary" upward adjustments.[2310]

1745. Respondent also claims that Claimants' expert "did the same thing in his other two DCF models, correcting mistakes that reduce his valuation of Yukos and YukosSibneft by USD 40 billion and USD 90 billion, respectively, and then adjusting other elements to bring his conclusions back up to where he started."[2311]   According to Respondent, "Mr. Kaczmarek confirmed . . . that his DCF model is simply a device for justifying an *a priori* conclusion, conceding repeatedly that his focus was not on critically analyzing the inputs to his model, but rather on whether the output met pre-conceived notions that were never disclosed in his reports."[2312]   As a result, Respondent concludes that Claimants' results have been "reverse engineered"[2313] and are "made-up numbers around which models were built."[2314]

    **(b)**    **Claimants' Selection of Comparable Companies for Purposes of the Comparable Companies Analysis**

1746. With regard to Claimants' use of the comparable companies method, Respondent criticizes Claimants' valuation as being based on an "unsupportable decision to weigh Rosneft as 70% of the analysis, when Rosneft's market metrics never resembled Yukos' or those of other private

---

[2308]   Second Dow Report ¶ 8.  *See also* Second Kaczmarek Report ¶¶ 82–97.

[2309]   Rejoinder ¶ 1606.

[2310]   *Ibid*. ¶ 1612.

[2311]   *Ibid*. ¶ 1613.  Respondent identifies a number of errors which it says were made by Mr. Kaczmarek in his first report before being corrected in his second report.  In addition, Respondent identifies a number of errors which it says were made by Mr. Kaczmarek in his second report.  Rejoinder ¶¶ 1620–36.

[2312]   Respondent's Post-Hearing Brief ¶ 240, citing to Trancript, Day 11 at 112, 116–17, 143–44, 153–54.

[2313]   Rejoinder ¶ 1618, quoting Second Dow Report ¶ 390.

[2314]   *Ibid*. ¶ 1619.

Russian oil companies."[2315]   Professor Dow, provides a "corrected" comparable companies analysis that excludes the data with regard to Rosneft, Gazprom Neft and the international major oil companies from the analysis,[2316] and leads to an enterprise value for Yukos in 2007 that is approximately USD 32 billion lower than the enterprise value calculated by Mr. Kaczmarek based on the comparable companies method.[2317]

### (c)   Claimants' Reliance on Comparable Transactions

1747. With regard to Claimants' calculations based on comparable transactions, Respondent asserts that Claimants' expert, Mr. Kaczmarek, admits that no truly comparable transactions exist.[2318] In addition, Professor Dow criticizes Mr. Kaczmarek's selection criteria for identifying comparable upstream and downstream transactions as "indefensible from an economic perspective."[2319]

### (d)   Claimants' Calculations of Hypothetical Cash Flows from Dividends

1748. Respondent does not explicitly address Claimants' calculations of hypothetical dividends that would have been paid by Yukos to its shareholders if there had been no breach of the ECT as alleged by Claimants.   However, when criticizing Mr. Kaczmarek's calculations with regard to scenario 3, Professor Dow does comment on the free cash flows of Yukos that, according to Claimants, would have been the basis for the payment of dividends.   Thus, according to Professor Dow, the free cash flows identified by Mr. Kaczmarek in this context are "inflated because they are based on his . . . grossly erroneous[] Yukos DCF model that overstates Yukos cash flows."[2320]   Professor Dow provides an alternative set of figures that he refers to as the "corrected" cash flows from Mr. Kaczmarek's model.[2321]

---

[2315]   Respondent's Post-Hearing Brief ¶ 242.

[2316]   Second Dow Report ¶ 417.

[2317]   Second Dow Report, p. 195, Figure 73.

[2318]   Respondent's Post-Hearing Brief ¶ 242.  *See also* Second Dow Report ¶ 420.

[2319]   Second Dow Report ¶ 423.

[2320]   *Ibid.* ¶ 492.

[2321]   *Ibid.* ¶ 492 and Figure 81.

(e)   **Claimants' Calculations Based on the Loss of a Chance to Obtain a Listing on the New York Stock Exchange**

1749. Professor Dow also criticizes Claimants' assumption that Yukos would have benefited from a listing on the NYSE as "thrice wrong because it assumes an event that did not happen, that was entirely within Yukos' control, and overstates the economic benefit that would be expected were the event to have come to pass."[2322]   In addition, Professor Dow states that there is no basis for the assumption that, without Respondent's actions, Yukos would have had a 70 percent chance of being listed on the NYSE.[2323]

(f)   **Claimants' Calculations Based on the Assumption of a Completed Yukos–Sibneft Merger**

1750. Professor Dow criticizes Claimants' calculations based on a completed Yukos–Sibneft merger arguing that such a merger was never completed and that the valuation of a combined YukosSibneft entity is therefore utterly speculative.[2324]   In particular, Professor Dow claims that Mr. Kaczmarek's calculations largely ignore "the effects of the merger on operational costs, any impact on costs as a result of changed regulatory requirements, and the combined entity's creditworthiness and cost of borrowing."[2325]

(g)   **Claimants' Scenarios 3a to 3d**

1751. With regard to Claimants' scenarios 3a to 3d, which assume payment of Yukos' tax liabilities over a period of one, three or five years, Respondent asserts that Russian law did not allow the Tax Ministry to enter into any such arrangements as postulated by Claimants[2326] and that it was, in any event, not obligated to do so.[2327]   In addition, Respondent claims that, based on the knowledge available regarding the development of oil prices in 2004, Claimants' calculations in relation to expected cash flows are not realistic.[2328]   Respondent also disputes that Claimants

---

[2322]   *Ibid.* ¶ 204.

[2323]   *Ibid.* ¶ 215.

[2324]   *Ibid.* ¶ 204.

[2325]   *Ibid.* ¶ 208.

[2326]   Counter-Memorial ¶ 1631.

[2327]   Rejoinder ¶ 1662 and n.2559.

[2328]   Counter-Memorial ¶ 1631.  *See also* Second Dow Report ¶ 492.

would have been able to negotiate a loan of USD 16 billion, as assumed in Claimants' scenario 3c.[2329]

### (h)   Claimants' Scenario 3e and the Valuation of YNG

1752. With regard to Claimants' scenario 3e (which assumes that the auctioning of YNG was necessary, but should have been realized at a fair price) and the valuation of YNG in Mr. Kaczmarek's first expert report, Respondent claims that Mr. Kaczmarek made three "obvious and significant errors" relating to the application of the inflation rate, the export duty rate and the mineral extraction tax rate.[2330]   Adjusting for these errors, the valuation of YNG would have been USD 12.5 billion,[2331] with the consequence that Yukos would not have been able to pay its taxes by the end of 2005, even if YNG had been sold at a higher price.[2332]

### (i)   Claimants' Calculation of Pre-Award Interest

1753. As described in Part XI above, Respondent submits that Claimants are not entitled to claim pre-award interest.

### 4.   Failure of Claimants to Mitigate

1754. Respondent asserts that Claimants had "repeated opportunities to mitigate the damage caused,"[2333] and that, in particular, by paying its taxes in early 2004, Yukos could have "halved the total amount to be paid"[2334] rather than "subject[ing] itself to . . . US$ 12 billion in additional 2000–2003 Avoidable Taxes and Fees."[2335]  If Yukos had paid its taxes and filed appropriate returns during the first quarter of 2004, Respondent says it "would have survived as a going concern and still could have pursued a claim for a refund of any amounts the courts found it did not need to pay."[2336]  Accordingly, the "loss of all value of Yukos" would be "the

---

[2329] Counter-Memorial ¶ 1632; Rejoinder ¶¶ 1655–57.

[2330] Counter-Memorial ¶ 1630.  *See also* Respondent's Post-Hearing Brief ¶ 246; Second Dow Report ¶ 452.

[2331] Counter-Memorial ¶ 1630; Rejoinder ¶ 1647.

[2332] Counter-Memorial ¶ 1630.

[2333] *Ibid*. ¶ 1602.

[2334] Rejoinder ¶ 1729.

[2335] *Ibid*. ¶ 1730.  *See also* Respondent's Post-Hearing Brief ¶ 220.

[2336] Respondent's Post-Hearing Brief ¶¶ 220–22, 250.

consequence of the contributory fault and the failure to mitigate of Yukos, under the control of Claimants."[2337]

1755. Respondent claims that, as a consequence, "Claimants' maximum damage claim is for their proportion of the harm (if any) Yukos would have suffered if the assessment and payment of the 2000–2003 Unavoidable Taxes were deemed to constitute a violation of the ECT."[2338] Respondent calculates this "maximum damage" as amounting to USD 6.27 billion.[2339]

### 5.    Windfall and Double-Recovery

1756. In addition, Respondent claims that any calculation of damages should take into account any previous benefits obtained by Claimants from their investments in Russia, so as to prevent any "double-recovery."[2340]    Respondent contends that granting Claimants the damages sought "would be a massive windfall to Claimants, who have already received far more from their investment in Yukos than they would have received had they invested in a comparable Russian oil company during the same period."[2341]   Respondent also suggests that, had the market known of "Yukos' lack of transparency, its disregard of minority interests, and its failures of corporate governance, not to mention its internal documents acknowledging the civil and criminal exposure it faced from its massive tax fraud, Yukos would not have experienced the share appreciation . . . on which Claimants' damages claim depends."[2342]    As a consequence, Respondent claims that "the market metrics . . . are not fair indicators of value and cannot be relied upon by the Tribunal."[2343]

1757. Respondent concludes that "any damages award should provide for no more than a reasonable rate of return."[2344]   Since Claimants would "have already gained that return through Yukos' dividends and share repurchases, . . . hundreds of millions of dollars worth of Russian taxes

---

[2337]  *Ibid.* ¶ 250.

[2338]  Rejoinder ¶ 1732.  *See also* Respondent's Post-Hearing Brief ¶¶ 220, 233, 252.

[2339]  Respondent's Post-Hearing Brief ¶ 252.  *See also* Transcript, Day 19 at 270.

[2340]  Counter-Memorial ¶ 1648.

[2341]  Respondent's Post-Hearing Brief ¶ 232 (footnote omitted).

[2342]  *Ibid.* ¶ 261.

[2343]  *Ibid.* ¶ 261.

[2344]  *Ibid.* ¶ 233.  *See* ¶¶ 254–62.

they evaded through abuse of the [Cyprus-Russia DTA], and all the assets that were stripped from Yukos," the "proper measure of damages in this case" would in any event be "zero."[2345]

C.   TRIBUNAL'S ANALYSIS AND DECISION

1758. Having reviewed and considered the Parties' submissions and their experts' reports, the Tribunal will now determine the damages suffered by Claimants as a result of Respondent's unlawful expropriation of Yukos' assets in breach of Article 13 of the ECT.

1.   Valuation Date

1759. With regard to the date of valuation, the Tribunal needs to address two issues, namely (a) the date of the expropriation of Claimants' investment by Respondent, and (b) whether Claimants are entitled to choose between a valuation based on that date of expropriation and a valuation based on the date of the award.  Each of these questions is addressed in turn.

(a)   The Date of the Expropriation

1760. As noted earlier, Claimants have advanced the date of 21 November 2007, the day on which Yukos was struck off the Russian register of legal entities, as the date of the expropriation of their investment, and have performed their main damages analysis based on a valuation of their shares in Yukos as of that date.

1761. The Tribunal agrees with Respondent that the date of 21 November 2007 cannot be the date of Yukos' expropriation.  The Tribunal observes that both Parties are agreed that, in principle, in the event of an expropriation through a series of actions, the date of the expropriation is the date on which the incriminated actions first lead to a deprivation of the investor's property that crossed the threshold and became tantamount to an expropriation.[2346]  This is the date that is relevant for the determination of the Tribunal.

1762. The Tribunal finds that the threshold to the expropriation of Claimants' investment was crossed earlier than in November 2007.  On the basis of the record, it is clear to the Tribunal that a substantial and irreversible deprivation of Claimants' assets occurred on 19 December 2004,

---

[2345]   *Ibid*.  ¶ 262.

[2346]   Memorial ¶ 912, n.1314; Reply ¶ 940; Rejoinder ¶ 1666; Respondent's Post-Hearing Brief ¶ 238.

the date of the YNG auction.  YNG was Yukos' main production asset and its loss, with the conclusion of the auction on that date, marked a substantial and irreversible diminution of Claimants' investment.[2347]  This conclusion of the Tribunal is confirmed by statements made by Claimants in December 2004 to the effect that they had "lost the power to govern the financial and operating policies of Yukos so as to obtain the benefits from its activities" and that Yukos had become "incapable of operating as a business."[2348]  The date of the expropriation of Claimants' investment is therefore determined by the Tribunal to be 19 December 2004.

> **(b)** **The Possibility for Claimants to Choose Between a Valuation as of the Date of Expropriation and a Valuation as of the Date of the Award**

1763. The Tribunal also holds that, in the case of an unlawful expropriation, as in the present case, Claimants are entitled to select either the date of expropriation or the date of the award as the date of valuation.

1764. As the Tribunal noted earlier, Respondent, relying on the opinion of its expert on damages, maintains that Claimants may not make such a choice and that there is a preference amongst economists for what he refers to as an "*ex ante*" approach to the evaluation of damages.[2349]  In support of his opinion, Professor Dow relies on a single article published in an economics journal in 1990.[2350]

1765. Neither the text of Article 13 of the ECT nor its *travaux* provide a definitive answer to the question of whether damages should be assessed as of the date of expropriation or the date of the award.  The text of Article 13, after specifying the four conditions that must be met to render an expropriation lawful, provides that for "such" an expropriation, that is, for a lawful expropriation, damages shall be calculated as of the date of the taking.  *A contrario,* the text of Article 13 may be read to import that damages for an unlawful taking need not be calculated as of the date of taking.  It follows that this Tribunal is not required by the terms of the ECT to assess damages as of the time of the expropriation. Moreover, conflating the measure of

---

[2347]  *See* Subsection VIII.F.3(c) above.

[2348]  YUL (and its subsidiaries), Annual Report and Consolidated Financial Statements for The Year Ended 31 December 2004, Exh. R-4229.  *See also* Rejoinder ¶ 1673.

[2349]  First Dow Report ¶ 13.

[2350]  Franklin M. Fisher and R. Craig Romaine, *Janis Joplin's Yearbook and the Theory of Damages*, Journal of Accounting, Auditing and Finance (1990), p. 153, Exh. R-1980.

damages for a lawful taking with the measure of damages for an unlawful taking is, on its face, an unconvincing option.

1766. In the view of the Tribunal, and in exercise of the latitude that the terms of Article 13 of the ECT afford it in this regard, the question of whether an expropriated investor is entitled to choose between a valuation as of the expropriation date and the date of an award is one best answered by considering which party should bear the risk and enjoy the benefits of unanticipated events leading to a change in the value of the expropriated asset between the time of the expropriatory actions and the rendering of an award.   The Tribunal finds that the principles on the reparation for injury as expressed in the ILC Articles on State Responsibility are relevant in this regard.   According to Article 35 of the ILC Articles, a State responsible for an illegal expropriation is in the first place obliged to make restitution by putting the injured party into the position that it would be in if the wrongful act had not taken place.   This obligation of restitution applies as of the date when a decision is rendered.   Only to the extent where it is not possible to make good the damage caused by restitution is the State under an obligation to compensate pursuant to Article 36 of the ILC Articles on State Responsibility.

1767. The consequences of the application of these principles (restitution as of the date of the decision, compensation for any damage not made good by restitution) for the calculation of damages in the event of illegal expropriation are twofold.   First, investors must enjoy the benefits of unanticipated events that increase the value of an expropriated asset up to the date of the decision, because they have a right to compensation in lieu of their right to restitution of the expropriated asset *as of that date*.   If the value of the asset increases, this also increases the value of the right to restitution and, accordingly, the right to compensation where restitution is not possible.

1768. Second, investors do not bear the risk of unanticipated events decreasing the value of an expropriated asset over that time period.   While such events decrease the value of the right to restitution (and accordingly the right to compensation in lieu of restitution), they do not affect an investor's entitlement to compensation of the damage "not made good by restitution" within the meaning of Article 36(1) of the ILC Articles on State Responsibility.   If the asset could be returned to the investor on the date where a decision is rendered, but its value had decreased since the expropriation, the investor would be entitled to the difference in value, the reason being that in the absence of the expropriation the investor could have sold the asset at an earlier date at its previous higher value.   The same analysis must also apply where the asset cannot be returned, allowing the investor to claim compensation in the amount of the asset's higher value.

1769. It follows for the several reasons stated above that in the event of an illegal expropriation an investor is entitled to choose between a valuation as of the expropriation date and as of the date of the award.  The Tribunal finds support for this conclusion in the fact that this approach has been adopted by tribunals in a number of recent decisions dealing with illegal expropriation.[2351]  One of these tribunals, in *Ioannis Kardassopoulous and Ron Fuchs v. The Republic of Georgia*, so interpreted the ECT.[2352]

## 2. Causation

1770. The Parties disagree with regard to the requirements for showing the causation of damages.[2353]  The Tribunal finds it useful to address the Parties' views on this matter in two steps.  First, the Tribunal will address the requirements for showing the causation of damages where several actions are invoked at the same time.  Second, it will deal with the consequences of damage being caused by several actions, only some of which are breaches attributable to the respondent party.

### (a) Causation and Reliance on Multiple Actions

1771. Claimants assert that "a causal link needs only be established between the actions of the Russian Federation taken as a whole and Claimants' damages" and that "[t]his causal link is obvious."[2354]  Respondent takes the view that, by simply asserting a link between the totality of a number of "bad acts" and the damage, Claimants put themselves in a position where they have to show that "all of the scores of alleged 'bad acts' were [treaty] violations."[2355]

1772. The Tribunal holds that Claimants do, in fact, establish that a specific series of actions of Respondent, consisting of the 2000–2004 tax assessments against Yukos and the subsequent enforcement measures (including the forced auction of YNG), constituted an illegal

---

[2351] *See e.g.*, *ADC* ¶¶ 496–97, Exh. C-980; *Siemens* ¶ 352, Exh. C-983; *Amoco*, pp. 300–301, Exh. C-939.  *See also* Marboe ¶ 3.287, Exh. C-1607.

[2352] *Kardassopoulos* ¶ 514, Exh. C-1533.

[2353] Reply ¶ 911 (Claimants assert that "a causal link needs only be established between the actions of the Russian Federation taken as a whole and the Claimants' damages" and that "[t]his causal link is obvious.").  *See also* Claimants' Post-Hearing Brief ¶ 191.  By contrast, *see* Counter-Memorial ¶ 1619 (Respondent takes the view that, by simply asserting a link between the totality of a number of "bad acts" and a damage, Claimants put themselves in a position where they have to show that "all of the scores of alleged 'bad acts' were [treaty] violations.").  *See also* Counter-Memorial ¶ 1628

[2354] Reply ¶ 911.  *See also* Claimants' Post-Hearing Brief ¶ 191.

[2355] Counter-Memorial ¶ 1619.  *See also* Counter-Memorial ¶ 1628.

expropriation of Claimants' investment, and that this expropriation caused Claimants damage. In particular, the 2000–2004 tax assessments were actions that contributed to the expropriation of Claimants' investment, and without these assessments, the damage to Claimants would not have occurred.  While other actions taken by Respondent may or may not have contributed to a violation of the ECT's standards, showing that they did is not required for establishing causation with regard to the damage suffered by Claimants.  All of the heads of damage subsequently identified by the Tribunal are consequences of the 2000–2004 tax assessments that led to the expropriation of Claimants' investment, and this expropriation was clearly a breach of Article 13 ECT.

### (b)   Multiple Causes for the Same Damage

1773. The Parties also do not agree with regard to the consequences of damage being caused by several events, where only some of those events are breaches attributable to a respondent party. Respondent appears to suggest that concurrent causation of a particular line of damage by Claimants' own conduct, the conduct of third parties and conduct of Respondent that is not wrongful should exclude Respondent's responsibility for that damage,[2356] and that Claimants bear the burden of showing that no such causation exists.[2357]  The Tribunal does not agree with that argument.

1774. In this regard, the Tribunal finds it instructive to look to the ILC Articles on State Responsibility.  Article 31 of the ILC Articles provides that "[t]he responsible State is under an obligation to make full reparation for the injury caused."[2358]  The official commentary to this provision notes that "[o]ften two separate factors combine to cause damage," before pointing out that:

> Although, in such cases, the injury in question was effectively caused by a combination of factors, only one of which is to be ascribed to the responsible State, international practice and the decisions of international tribunals do not support the reduction or attenuation of reparation for concurrent causes, except in cases of contributory fault. . . .  Such a result should follow *a fortiori* in cases where the concurrent cause is not the act of another State . . . but of private individuals. . . .  [U]nless some part of the injury can be shown to

---

[2356]   Respondent's Post-Hearing Brief ¶ 234.  *See also* Counter-Memorial ¶ 1619; Rejoinder ¶ 1719.  Claimants do not specifically address this point.

[2357]   Rejoinder ¶ 1719.

[2358]   Exh. R-1031.

> be severable in causal terms from that attributed to the responsible State, the latter is held responsible for all the consequences, not being too remote, of its wrongful conduct.[2359]

1775. As the commentary makes clear, the mere fact that damage was caused not only by a breach, but also by a concurrent action that is not a breach does not, as such, interrupt the relationship of causation that otherwise exists between the breach and the damage. Rather, it falls to the Respondent to establish that a particular consequence of its actions is severable in causal terms (due to the intervening actions of Claimants or a third party) or too remote to give rise to Respondent's duty to compensate. As the Tribunal considers that Respondent has not demonstrated this with regard to any of the heads of damage identified in the remainder of this Chapter, the Tribunal holds that causation exists between the damage and Respondent's expropriation of Claimants' investment.[2360]

### 3. Failure of Claimants to Mitigate

1776. Respondent asserts that Claimants could have significantly mitigated their damages by taking a few simple steps in the first quarter of 2004, namely by paying the taxes then assessed against Yukos, filing amended VAT returns in Yukos' name, and filing amended tax returns for the years 2000–2002 and a tax return for 2003 recognizing all of Yukos' income without assigning it to its trading entities. The Tribunal has considered each of the actions Respondent suggests Claimants should have taken (set out in paragraphs 679–80, 745–48 and 934–35 above) and has concluded that the suggested actions would not ultimately have made a difference to the enforcement measures subsequently taken by the Russian Federation. As seen in Part VIII above, the measures taken by the Russian Federation demonstrate that its primary objective was to bankrupt Yukos and appropriate its assets and that it was determined to do whatever was necessary to achieve this purpose. In light of this finding, the Tribunal cannot accept that by paying the taxes then assessed or re-filing VAT and tax returns in early 2004, Claimants could have deterred Respondent in the pursuit of its objective.

### 4. The Methodology Followed by the Tribunal

1777. Having made these determinations in respect of the valuation dates, causation and mitigation, the Tribunal now turns to the specific methodology of establishing the damages in this

---

[2359] *Ibid.* ¶¶ 12–13 (footnotes omitted), Exh. R-1031.

[2360] Claimants' contributory fault and the associated reduction of the damages suffered has already been addressed above in Chapter X.E.

arbitration. As an initial matter, the Tribunal observes that, since it has decided that Claimants are entitled to the higher of the damages determined as of the date of expropriation and as of the date of the award, the Tribunal must establish the total amount of damages caused by Respondent's actions on each of the two valuation dates identified, namely the date of the YNG auction and the date of this Award. For purposes of the Tribunal's calculations, the date of the Award will be deemed to be 30 June 2014. Claimants will be entitled to the higher of these two figures, subject to the deduction of 25 percent for contributory fault.[2361]

1778. On each of these valuation dates, Claimants are entitled to the following heads of damages: (1) the value of Claimants' shares in Yukos valued as of the valuation date; (2) the value of the dividends that the Tribunal determines would have been paid to Claimants by Yukos up to the valuation date but for the expropriation of Yukos; and (3) pre-award simple interest on these amounts.

1779. By contrast, the Tribunal considers that a potential listing of Yukos on the NYSE and the benefits that Claimants might have derived from such a listing are too uncertain to be taken into account for purposes of calculating Claimants' damages. This element of Claimants' damages case is therefore rejected.

1780. The Tribunal also finds that the assessment of Claimants' damages must be based on their shareholding in Yukos, without taking into account the potential effects of a completed merger between Yukos and Sibneft. The Tribunal has not been convinced, on the balance of probabilities, that in the absence of Respondent's expropriatory actions, the envisaged merger would have been completed;[2362] indeed, the Tribunal considers that assuming a completed merger in the "but for" scenario is too speculative. As a consequence, the Tribunal rejects Claimants' first damages scenario, notably the valuation of Claimants' share in YukosSibneft.

1781. Before turning to the calculation of the damages components for the two relevant valuation dates, the Tribunal explains in the following subsections the methodology it has decided to adopt for valuing Yukos on each of the given dates, and the basis on which it has determined the amount of dividends that would likely have been paid to Claimants, in the "but for" scenario, prior to each of the valuation dates.

---

[2361] *See* Chapter X.E.

[2362] *See* Chapter VIII.D.

(a)     Valuation of Yukos

1782. As set out earlier in this chapter, for purposes of the damages calculation, the Tribunal has decided that the relevant valuation dates are the date of the YNG auction and the date of this Award.  However, the starting point for the Tribunal's analysis must be the calculations done by Claimants as of their suggested valuation date of 21 November 2007.  Claimants have put forward alternative valuations of Yukos as of that date calculated on the basis of various valuation methods.  These methods and the valuations of Yukos derived from them (in USD billion) are summarized in the following table:[2363]

| | |
|---|---|
| DCF method | 88.593[2364] |
| Comparable companies method | 92.924[2365] |
| Comparable transactions method | 87.620[2366] |
| Rosneft's market capitalization on 21 November 2007, adjusted | 83.07[2367] |
| Yukos' market capitalization on 24 October 2003 adjusted pursuant to development of Urals Blend price index | 104.835[2368] |
| Yukos' market capitalization on 24 October 2003 adjusted pursuant to development of RTS Oil & Gas index | 74.191[2369] |
| Yukos' market capitalization on 24 Oct 2003 adjusted pursuant to development of Lukoil's market capitalization | 129.028[2370] |
| Implied value of YNG based on share swap between Rosnett and Yukos in October 2006 (adjusted pursuant to development of RTS Oil & Gas index) and proceeds from auctions of non-YNG assets in 2007 | 75.657[2371] |

1783. Respondent has not put forward a methodology for valuating Yukos or any valuation figures of its own.  However, Professor Dow has provided a "corrected" version of Claimants' comparable companies analysis, making adjustments for what he considered to be the principal errors

---

[2363] For any of these valuations, Claimants' respective damages (under this head of damage) would correspond to their pro rata stake in the outstanding shares of Yukos, which were 56.3 percent for Hulley, 2.6 percent for YUL and 11.6 percent for VPL (a total of 70.5 percent for Claimants taken together).  All figures are in USD.

[2364] Second Kaczmarek Report, p. 11, Table 3; ¶ 69.

[2365] Second Kaczmarek Report, p. 11, Table 3; p. 38, Table 24..

[2366] Second Kaczmarek Report, p. 11, Table 3; p. 39, Table 25.

[2367] Claimants' Post-Hearing Brief ¶ 263; Exh. C-1785.  The equity value has been obtained from the enterprise value assumed by Claimants (USD 92.3 billion) on the basis of an assumed 90/10 equity/capital structure.  *See* Exh. C-1784.

[2368] Claimants' Post-Hearing Brief ¶ 261; Exh. C-1785.

[2369] Claimants' Post-Hearing Brief ¶ 261; Exh. C-1785.  The RTS Oil and Gas index is built up of the prices of Russian share companies in the oil and gas sector.  Transcript, Day 12 at 68 (Professor Dow).

[2370] Claimants' Post-Hearing Brief ¶ 261; Exh. C-1785.

[2371] Claimants' Post-Hearing Brief ¶ 262; Exhs. C-1784, C-1785.

contained therein.[2372]  Based on these adjustments, Respondent's expert arrives—in orally advancing what "could be" a "useful" evaluation—at a "corrected" enterprise value of Yukos, as of 21 November 2007, in the amount of USD 67.862 billion.[2373]  Assuming a 90/10 equity/debt capital structure of Yukos, this corresponds to an equity value of Yukos, as of 21 November 2007, of approximately USD 61.076 billion. [2374]

1784. Having considered the extensive expert evidence presented by Mr. Kaczmarek and Professor Dow, including the written evidence in the two expert reports that each submitted (with detailed accompanying annexes and appendices), and the testimony that was elicited from them during the Hearing, the Tribunal concludes, for the reasons set out below, that the "corrected" comparable companies figure is the best available estimate for what Yukos would have been worth on 21 November 2007 but for the expropriation.

1785. The Tribunal finds that neither of the other two primary valuation methods put forward by Claimants is sufficiently reliable to ground a determination of damages for this case.  On balance, the Tribunal was persuaded by Professor Dow's analysis of Claimants' DCF model, and is compelled to agree that little weight should be given to it.  The Tribunal observes that Claimants' expert admitted at the Hearing that his DCF analysis had been influenced by his own pre-determined notions as to what would be an appropriate result.[2375]  Similarly, the Tribunal can put little stock in Claimants' calculations based on the comparable transactions method, since both Parties agree that, in fact, there were no comparable transactions,[2376] and thus no basis that would allow a useful comparison.

1786. As for the remaining valuation methods put forward by Claimants, and the valuations of Yukos generated by them, the Tribunal notes that Claimants use these secondary valuations primarily in support of their main valuation.  Moreover, some of these figures were only introduced by Claimants at a very late stage of the proceedings (through demonstrative exhibits at the Hearing and in Claimants' Post-Hearing Brief[2377]) and could therefore not be properly addressed by

---

[2372]   Second Dow Report ¶ 417.

[2373]   *Ibid*. ¶ 444; p. 182, Figure 67; p. 195, Figure 73; Appendix 16.1.  *See also* Transcript, Day 12 at 47 (Professor Dow).

[2374]   A 90/10 equity/capital structure corresponds to the assumption made by Claimants for purposes of their calculations. *See* Exh. C-1784.

[2375]   Transcript, Day 11 at 190.

[2376]   Memorial ¶ 945; Respondent's Post-Hearing Brief ¶ 242.

[2377]   Claimants' Post-Hearing Brief ¶¶ 261–63; Exh. C-1785.

Respondent.  Accordingly, the Tribunal finds that none of these secondary valuation methods can serve as a suitable independent basis for determining the value of Yukos.

1787. By contrast to all of the other methods canvassed above, the Tribunal does have a measure of confidence in the comparable companies method as a means of determining Yukos' value. While Professor Dow stated at the Hearing that he had not performed an analysis sufficient to fully endorse the figure resulting from his corrections to Claimants' comparable companies approach, he agreed that it "could be a useful valuation."[2378]  The Tribunal  for its part finds that the comparable companies method is, in the circumstances, the most tenable approach to determine Yukos' value as of 21 November 2007, and therefore the starting point for the Tribunal's further analysis.

1788. The next step for the Tribunal consists in determining the value of Yukos as of the relevant valuation dates by adjusting Yukos' value as of November 2007 on the basis of the development of a relevant index.  Having considered the various options in this regard, the Tribunal finds that the RTS Oil and Gas index is the most appropriate index for that purpose. The RTS Oil and Gas index is based on prices of trades executed in securities admitted to trading on the Moscow Stock Exchange[2379] and presently includes preferred or common shares of nine Russian oil and gas companies, the most important of which are Gazprom, Lukoil, Novatek, Rosneft and Surgutneftegas.[2380]  The methodology for establishing the index as well as its current and historical values are transparent and publicly available on the webpage of the Moscow Stock Exchange.[2381]  Both Parties have referred to the RTS Oil & Gas index as a reliable indicator reflecting the changes in the value of Russian oil and gas companies[2382] and have used it in their calculations to carry forward certain valuations from one date to another.[2383]

---

[2378] Transcript, Day 12 at 47.

[2379] "Methodology of the Moscow Exchange Sector Indices calculation," March 2013 ¶ 1.1, available at http://fs.moex.com/files/4032 (last accessed 4 July 2014).

[2380] Preferred or common shares in each of these companies are weighted as 15 percent of the index's total.  *See* "Constituents of Sectoral Indices valid from December 17, 2013 to March 17, 2014," available at http://moex.com/s933 (last accessed 4 July 2014).

[2381] http://fs.moex.com/files/4032 (last accessed 4 July 2014).

[2382] Transcript, Day 12 at 67–68 (Professor Dow); Claimants' Post-Hearing Brief ¶ 260.

[2383] Second Kaczmarek Report ¶ 134, n.282 (carrying forward a valuation of certain Yukos assets from November 2007 to December 2005); Second Dow Report ¶ 519 and Appendix 15.2 (carrying forward a valuation of Tomskneft and Samareneftegaz from November 2007 to May 2007); Appendix 28.3 (carrying forward a valuation of certain Yukos assets from November 2007 to December 2004).

1789. In order to determine the value of Yukos on each of the two valuation dates, the Tribunal will now adjust Yukos' value as of 21 November 2007 (USD 61.076 billion) by multiplying it by a factor that reflects the change in the RTS Oil and Gas index between 21 November 2007 and each of the two valuation dates.  This adjustment factor is calculated and applied for each of the two valuation dates in subsections 5(a) and 5(b) below.

1790. Having explained the Tribunal's methodology in respect of the first head of damage (the valuation of Yukos on each of the valuation dates), the Tribunal will now explain the basis on which it has determined the value of "lost" dividends, namely the dividends that would likely have been paid to Claimants, in the "but for" scenario, prior to each of the valuation dates.

### (b)   Valuation of Lost Dividends

1791. A second element of the damages suffered by Claimants as a result of Respondent's expropriation of their investment is the loss of dividends that would otherwise have been paid to them as Yukos shareholders.  For each valuation calculated as of the two valuation dates, the Tribunal must determine the value of the lost dividends up to each date, since the value of Yukos as of that date, while it captures the expectations of future profit, does not capture any of the past profit that the company would likely have generated.

1792. The Tribunal recalls that the two valuation dates are the date of the YNG auction (19 December 2004) and the date of this Award (deemed to be 30 June 2014 for valuation purposes).  For the first valuation date, the Tribunal must therefore determine the value of the lost dividends up to 19 December 2004; for the second valuation date, the Tribunal must determine the value of the lost dividends up to 30 June 2014.

1793. The starting point for the Tribunal's analysis are the "Yukos lost cash flows" (*i.e.*, free cash flow to equity) that Claimants' expert calculated with respect to his valuation of Claimants' damages.  In his first report, Mr. Kaczmarek values Yukos as of 21 November 2007 only, and therefore produces a model of "lost cash flows" that does not extend beyond that date.[2384]  The "lost cash flows" between 2004 and 21 November 2007 are presented as being based on actual historical information, as opposed to the cash flows included in Mr. Kaczmarek's DCF model

---

[2384]   First Kaczmarek Report, Appendix J.1.

for the period 21 November 2007 through the end of 2015, which are based on forecasts and projections built up from information available prior to the period.[2385]

1794. In his second report, Mr. Kaczmarek updates his valuation of Yukos as of November 2007 (including his presentation of "lost cash flows" to that date),[2386] but also presents, for the first time, a valuation of Yukos as of 1 January 2012 (as a proxy for the valuation of Yukos as of the date of the Award).[2387]   For purposes of the valuation as of 1 January 2012, Mr. Kaczmarek produces a model of "lost cash flows" that extends from 2004 through to the end of 2011.[2388] The "lost cash flows" between 2004 and 2011 are presented as being based on actual historical information, as opposed to the cash flows included in Mr. Kaczmarek's DCF model for the period 2012 through the end of 2019, which are based on forecasts and projections built up from information available prior to the period.[2389]

1795. The Tribunal observes that no free cash flow to equity figures are provided by Claimants' expert for the years 2012 to 2014.   While Claimants offered to update their damages calculations at a date closer to the Award,[2390] the Tribunal has been able to establish the relevant figures on the basis of Mr. Kaczmarek's methodology, using data provided elsewhere in Mr. Kaczmarek's reports.   The Tribunal's calculations are set out in Tables T4 to T6, attached to the Award, and explained in greater detail in the following paragraphs.

1796. To calculate Yukos' free cash flow to equity, Mr. Kaczmarek uses the following formula: Free cash flow to equity = Free cash flow to the firm – Tax-adjusted interest payments + Change in net debt + 20 percent of Sibneft dividends.[2391]   Mr. Kaczmarek provides figures regarding the free cash flow to the firm and the tax-adjusted interest payments for the relevant time period in Appendix AJ.2 to his second report.[2392]   In addition, in note (5) to Appendix AJ.1 to his second report, Mr. Kaczmarek defines Yukos' annual change in net debt as the annual change in

---

[2385]   *Ibid.*, Appendix J.2.

[2386]   Second Kaczmarek Report, Appendix J.1–updated.

[2387]   *Ibid.* ¶ 155.

[2388]   *Ibid.*, Appendix AJ.1.

[2389]   *Ibid.*, Appendix AJ.2.

[2390]   Reply ¶ 946; Second Kaczmarek Report ¶ 155.

[2391]   Second Kaczmarek Report, Appendix AJ.1.

[2392]   Tables T4 and T5 attached to the Award.

Yukos' long-term debt plus its short-term debt less its cash.[2393]  Mr. Kaczmarek provides these figures in Appendix AJ.4 to his second report.[2394]  With regard to the Sibneft dividends, Mr. Kaczmarek provides figures for years 2004 through 2011 in Appendix AJ.1 to his second report.[2395]  For the years 2012 through 2014, the Tribunal has assumed that the Sibneft dividends would have been equal to those paid in 2010, the last year for which Mr. Kaczmarek has provided an annual figure (his figure for 2011 being based on annualized third quarter figures).

1797. With these additional numbers calculated by the Tribunal, on the basis of data and formulas set out in Mr. Kaczmarek's reports, the Tribunal is able to arrive at numbers for Yukos' "lost cash flows" (*i.e.*, free cash flows to equity) for the entire period extending from 2004 through 2014. The Tribunal then, in principle, has the input it needs in order to determine the lost dividends for each of the valuation dates: for the first valuation date (the date of the YNG auction), the Tribunal can therefore arrive at a value (based on Mr. Kaczmarek's model) for the lost dividends up to 19 December 2004; and for the second valuation date (the date of the Award), the Tribunal can also arrive at a value (based on Mr. Kaczmarek's model) of the lost dividends up to 30 June 2014.  The Tribunal notes that the total amount of lost dividends, based on Mr. Kaczmarek's model, for the period from 2004 to 30 June 2014, is USD 67.213 billion.[2396]

1798. As mentioned earlier, however, Claimants' calculation of Yukos' lost cash flows is merely a starting point for the Tribunal's determination of what it views as the correct estimate of the dividends that Claimants would have earned from Yukos in the "but for" scenario.  As explained in the following paragraphs, several fundamental considerations lead the Tribunal to modify the calculations of Claimants' expert.

1799. Firstly, although Yukos' lost cash flows determined by Mr. Kaczmarek are based in part on actual historical information (*i.e.*, largely information about the performance of Yukos' former assets disclosed by Rosneft in its financial reports),[2397] the Tribunal is unable to dissociate them

---

[2393]  Table T5 attached to the Award.

[2394]  Table T6 attached to the Award.

[2395]  Second Kaczmarek Report, Appendix AJ.1.

[2396]  The relevant calculations with regard to both dividends and interest are set out in Table T3 attached to this Award.

[2397]  *See e.g.*, Second Kaczmarek Report, Appendix AJ.8, nn.6–8 (which indicate that actual tariff rates and tax expenses, as reported by Rosneft, are used for the 2004–2011 period).  *See also* Second Kaczmarek Report, Appendix AJ.9, n.2 (which indicates that "[f]or the period 2004–2011, the crude sales percentages are based on actual crude sales as reported by Rosneft and Lukoil").

from Claimants' DCF model, which was convincingly criticized by Respondent's expert and its counsel.

1800. In his second report, Professor Dow identifies and explains a "series of errors" embedded in Claimants' DCF valuation of Yukos.[2398]   His "corrections" of those errors result in a very substantial reduction (51 percent) in the valuation of Yukos generated by the DCF model. Although not all of those "corrections" apply to the cash flows discussed above, which are based in part on actual historical information (and thus are not plagued by some of the errors associated with forecasts and projections), some of the "corrections"—notably those related to the interpretation of the historical information—in the view of the Tribunal, do impact the cash flows.

1801. For example, the Tribunal accepts Professor Dow's opinion that Claimants have underestimated Yukos' transportation costs (by implicitly assuming that, in the "but for" scenario, "Yukos would have been able to capture the efficiencies of Rosneft's proprietary pipeline network").[2399] The Tribunal also accepts Professor Dow's opinion that Claimants' model overlooks certain operating expenses of Yukos, thus evidencing a "basic flaw" in Claimants' DCF model, namely that there is "no systematic attempt" to ensure that all of Yukos' costs have been accounted for.[2400]

1802. Although, for the reasons stated above, the Tribunal does not consider it appropriate to accept all of Professor Dow's "corrections" for purposes of the valuation of the dividends, the Tribunal notes that the spreadsheets submitted by Respondent's expert with his Second Report allow the Tribunal to calculate "corrected" free cash flow to equity figures for the relevant years.[2401]   While Respondent's expert has not explicitly endorsed this "corrected" version as representing his views with regard to Yukos' free cash flow to equity, it is evident to the Tribunal that it represents a figure that is more in line with his views.   According to this "corrected" methodology, Yukos' dividends in 2004 would have been USD 3.218 billion

---

[2398]   Second Dow Report ¶¶ 237–317.

[2399]   *Ibid.* ¶ 256.

[2400]   *Ibid.* ¶ 277.

[2401]   Second Dow Report, Appendix 1 (in Excel format).  The results obtained by switching the values in the "Corrected?" column on the first sheet of Appendix 1 (Appendix 1.1) from 0 to 1 (meaning that the corrections are applied) in sheets 2 and 3 (Appendix J.1 and Appendix J.2) are reproduced in Annex A1 to this Award.

(instead of USD 3.645 billion), and the sum of Yukos' dividends over the period from 2004 through the first half of 2014 would have been USD 49.293 billion (instead of USD 67.213).[2402]

1803. The Tribunal has formed the view that Professor Dow's corrections, however, do not take into account all the risks that Yukos would have had to contend with in carrying on business during the period 2004 through to the present if the company had not been expropriated. The Tribunal agrees with Respondent that "an expropriation relieves the owner not only of the value of the asset on the date of expropriation, but also of the risk associated with owning it."[2403] Accordingly, in any model of the cash flows that would have been generated by Yukos had it not been expropriated (*i.e.*, the cash flows in a "but for" scenario), it is necessary to take into account the risks to those cash flows that were eliminated by the expropriation. Those risks must be factored back into the cash flow model in the "but for" scenario.

1804. The Tribunal observes that Mr. Kaczmarek's cash flow model does not factor in those risks in his calculations. To the contrary, Mr. Kaczmarek models Yukos' financial performance after the date of expropriation based, in large measure, on the results achieved by Yukos' assets *in the hands of Rosneft*.[2404] As Respondent rightly submits, "Mr. Kaczmarek effectively valued Yukos as if it were a State-owned strategic enterprise, which it never was."[2405]

1805. The first significant risk that, in the Tribunal's view, is not adequately accounted for in the cash flow models of either expert is the real risk of substantially higher taxes. Since taxes other than income taxes (also referred to as "non-income taxes") consistently account for well over 50 percent of Yukos' net income from year to year,[2406] Yukos' cash flows could be significantly affected by any increases in the tariffs and rates relating to the non-income taxes.[2407] In Mr. Kaczmarek's model, the taxes that are established annually by legislation (such as the export customs duty and domestic excise tax for refined products) are based on actual historical data (if available) and, for the forecast period, are based on the prior year's tax rate plus an adjustment to account for annual inflation.[2408] In other words, there is no accounting for the

---

[2402] The relevant calculations with regard to both dividends and interest are set out in Table T3 attached to this Award.

[2403] Respondent's Post-Hearing Brief ¶ 239.

[2404] Second Kaczmarek Report, Appendix AJ and related Appendices.

[2405] Respondent's Post-Hearing Brief ¶ 242.

[2406] *See* line items for "taxes other than income tax" and "net income" in Second Kaczmarek Report, Appendix AJ.3.

[2407] *See* breakdown of Yukos' non-income taxes (including crude oil unified mineral extraction tax, export customs duties, and various excise taxes) and associated tariffs and rates. Second Kaczmarek Report, Appendix AJ.8.

[2408] First Kaczmarek Report ¶ 259.

possibility—even likelihood—that had Yukos remained in private hands, the State would have increased taxes, perhaps even substantially, in order to capture a greater share of the rent earned from the exploitation of Russia's natural resources.  Yet, the record shows that this is precisely what the Russian Federation did in 2002 and 2003, when Yukos was still in private hands.  In paragraph 188 of his first report, for example, Mr. Kaczmarek explains that large tax increases in 2002 and 2003 caused surging profits at Yukos to level off during that period.[2409]

1806. In this connection, the Tribunal notes that Yukos, in its 2002 Annual Report, disclosed the following concerns about taxation:

> We are subject to numerous taxes that have had a significant effect on our results of operations. Russian tax legislation is and has been subject to varying interpretations and frequent changes. [2410]
>
> . . .
>
> In the context of the significant regulatory changes related to Russia's transition from a centrally planned to a market economy over the past 10 years and the general instability of the new market institutions introduced in connection with this transition, taxes, tax rates and implementation of taxation in Russia have experienced numerous changes.  Although there are signs of improved political stability in Russia, further changes to the tax system may be introduced which may adversely affect the financial performance of our Company.  In addition, uncertainty related to Russian tax laws exposes us to enforcement measures and the risk of significant fines and could result in a greater than expected tax burden.[2411]

1807. The 2002 Annual Report also alerted the Yukos shareholders to risks related to the Company's dividend policy:

> Reserves available for distribution to shareholders are based on the statutory accounting reports of YUKOS Oil Company, which are prepared in accordance with Regulations on Accounting and Reporting of the Russian Federation and which differ from U.S. GAAP. Russian legislation identifies the basis of distribution as net income. For 2002, the current year statutory net income for YUKOS Oil Company as reported in the annual statutory accounting reports was RR 40,701 million.  However, current legislation and other statutory laws and regulations dealing with distribution rights are open to legal interpretation and, consequently, actual distributable reserves may differ from the amount disclosed.[2412]

1808. Finally, and perhaps most significantly, there are the risks associated with the complex and opaque structure set up by Claimants, or by others on their behalf, in order to transfer money earned by Yukos out of the Russian Federation through a vast offshore structure.  This structure

---

[2409]  First Kaczmarek Report ¶ 188.

[2410]  Yukos Annual Report, 2002, p. 81, Exh. C-26.

[2411]  *Ibid.*, p. 84.

[2412]  *Ibid.*, p. 58.

is well documented in the reports of Professor Lys.  An organizational chart attached as an appendix to a letter from PwC Cyprus to PwC Moscow dated 10 April 2003 shows the complexity of the structure as of that date, and the fact that Yukos' control over it was established by means of call options.[2413]  With this structure, Yukos was able to consolidate the profits of the trading companies and offshore holding companies (entities within its "consolidation perimeter") into its results while remaining "free to segregate these profits from minority shareholder claims whenever it served the majority shareholders' or management's interests."[2414]

1809. As Respondent rightly points out, Yukos' claim of corporate governance reforms, Western standards of transparency and protection of minority interests, which Mr. Kaczmarek highlighted in his first report[2415] (and which was a recurring theme heard from Claimants in this case), "was a façade."[2416]  Notably, even the company's President, Mr. Theede, testified that they had no knowledge that Yukos was using offshore structures that it did not own.[2417]

1810. The Tribunal notes that even after the tax assessments at issue in the present arbitration were issued, Claimants and their owners were able to divert money earned by Yukos out of Yukos, and into the two Stichtings,[2418] and therefore away from the tax authorities. The Tribunal cannot exclude the possibility that, but for the expropriation, the very same mechanism would have been resorted to by Claimants under different circumstances to divert some of the money earned by Yukos.

1811. In light of all the circumstances, and taking into account:   (a) the figures based on Mr. Kaczmarek's calculations; (b) the figures based on Professor Dow's "corrections"; and (c) the additional risks described above, which the Tribunal finds must be factored into its damages analysis, the Tribunal, in the exercise of its discretion, concludes that it is appropriate to determine and fix the dividend payments that it assumes Yukos would have paid to its

---

[2413]   Exh. R-3165, p. 5.  The Tribunal has included a copy of the chart in Annex A2 to this Award.  *See also* Second Lys Report, Appendix F.

[2414]   Respondent's Post-Hearing Brief ¶ 258.

[2415]   First Kaczmarek Report ¶ 156.

[2416]   Respondent's Post-Hearing Brief ¶ 260.

[2417]   Transcript, Day 11 at 59.  The Tribunal notes that Mr. Kosciusko-Morizet, the Chairman of the Board's Audit Committee, acknowledged that he had no opinion, and had made no enquiries, as to whether Yukos owned the low tax region entities (*see* Transcript, Day 4 at 60–61).

[2418]   Respondent's Counter-Memorial ¶¶ 528–39.  The Tribunal recalls that Claimants do not dispute that money was transferred into the Stichtings.  *See* above at ¶¶ 1054–60, 1124.

shareholders in the "but for" scenario in the amounts set out in the far right column of the following table (in USD billion):

| Year | Kaczmarek | Dow | Tribunal |
|---|---|---|---|
| 2004 | 3.645 | 3.218 | 2.5 |
| 2005 | 4.796 | 4.489 | 3.5 |
| 2006 | 4.677 | 4.396 | 3.5 |
| 2007 | 8.484 | 7.670 | 6 |
| 2008 | 7.819 | 6.749 | 6 |
| 2009 | 7.642 | 5.463 | 5 |
| 2010 | 4.254 | 4.842 | 3.5 |
| 2011 | 6.285 | 4.283 | 4 |
| 2012 | 8.395 | 3.724 | 5 |
| 2013 | 7.628 | 3.148 | 4 |
| 2014 (first half) | 3.586 | 1.310 | 2 |
| Total | 67.213 | 49.293 | 45 |

1812. Accordingly, the Tribunal concludes that Yukos' dividends in 2004 would have been USD 2.5 billion, and the sum of Yukos' dividends over the period from 2004 through the first half of 2014 would have been USD 45 billion.[2419]

### 5. Application of the Methodology Followed by the Tribunal

1813. The Tribunal, applying the methodology outlined above to the two valuation dates of 19 December 2004 and 30 June 2014, can now proceed to the valuation of the expropriated company as of those two dates.[2420]

---

[2419] The relevant calculations with regard to both dividends and interest are set out in Table T3 attached to this Award.

[2420] *See* Table T1 annexed to this Award.

(a)      **Calculations Based on 19 December 2004 Valuation Date**

1814. The damages suffered by Claimants based on a valuation date of 19 December 2004 are determined as follows.

i.      **Valuation of Shares in Yukos**

1815. As explained earlier, the Tribunal will determine the equity value of Yukos as of 19 December 2004 by adjusting what it considers, based on the Parties' submissions, to be the best available estimate of this value as of 21 November 2007, *i.e.*, an amount of USD 61.076 billion, with a factor that reflects the development of the RTS Oil and Gas index between 19 December 2004 and 21 November 2007.  The value of the RTS Oil and Gas index on 19 December 2004 was 92.85, whereas on 21 November 2007 it had a value of 267.8.  The adjustment factor to be applied to determine Yukos' value as of the earlier date is therefore x=92.85/267.8=0.3467.  By applying this factor to the amount of USD 61.076 billion, the Tribunal arrives at an equity value of Yukos as of 19 December 2004 in the amount of USD 21.176 billion.[2421]

1816. The value of Claimants' 70.5 percent share in Yukos, calculated as a pro rata share of this amount, corresponds to USD (70.5/100)*21.176=14.929 billion.

ii.      **Dividends**

1817. According to the Tribunal's methodology outlined above, the dividends that would have been paid to Yukos' shareholders throughout 2004 will be assumed to be USD 2.5 billion.  Since the valuation date is 19 December 2004, there are 12 days missing for the full year which must be taken into consideration.  Accordingly, this amount must be multiplied by a factor x=(365–12)/365, corresponding to approximately 97 percent.  This gives a total amount of free cash flow to equity based on a valuation date of 19 December 2004 of USD 2.418 billion.   Claimants' share of this amount corresponds to dividends of USD (70.5/100)*2.418=1.705 billion.

---

[2421]      *See* Table T2 annexed to this Award.

### iii.    Interest

1818. By applying an annual interest rate of 3.389 percent,[2422] the total amount of interest payable on the equity value of Yukos and the dividends that would have been paid to its shareholders from 1 January 2005 to 30 June 2014 is 7.596 billion.[2423]   The total amount of interest payable to Claimants on this basis is 70.5 percent of this figure, *i.e.*, USD 5.355 billion.

### iv.    Total Damages Suffered by Claimants

1819. The damages suffered by Claimants due to the breach by Respondent of Article 13 of the ECT based on a 19 December 2004 valuation date is the sum of the Claimants' share of these components calculated above, *i.e.*, 70.5 percent of (21.176 + 2.418 + 7.596), which amounts to USD 21.988 billion.[2424]

### (b)    Calculations Based on 2014 Valuation Date

1820. The damages suffered by Claimants based on a valuation date of 30 June 2014 are determined as follows.

### i.    Valuation of Claimants' Share in Yukos

1821. As for the calculations based on the date of the expropriation, the Tribunal will determine the equity value of Yukos as of 30 June 2014 by adjusting what it considers, based on the Parties' submissions, the best available estimate of this value as of 21 November 2007, *i.e.*, the amount of USD 61.076 billion, with a factor that reflects the development of the RTS Oil and Gas index between 21 November 2007 and 30 June 2014.  For practical purposes, and in order to eliminate the effects of random fluctuations of the index on the amount to be awarded, the

---

[2422] *See* Part XI.  The Tribunal has assumed that dividends would have been paid in each case at the end of the relevant year and that interest would have started accruing at the determined pre-award interest rate from 1 January of the year thereafter.

[2423] To avoid unnecessarily complicating the calculations, this figure does not take into account interest for the period from 19 to 31 December 2004.  Adding this interest would not affect the Tribunal's conclusions.

[2424] *See* Table T1 annexed to this Award.  Claimants' shareholdings in Yukos, as percentages of Yukos Issued Shares, were 48.72 percent, 2.25 percent and 10 percent for Hulley, YUL and VPL, respectively.  Interim Awards ¶ 419 (Hulley); ¶ 419 (YUL); ¶ 419 (VPL).  In absolute numbers, out of a total number of 2,236,964,578 Issued Shares, Hulley held 1,090,043,968 shares, YUL held 50,340,995 shares and VPL held 223,699,175 shares, while 302,000,000 shares were Treasury Shares.  First Kaczmarek Report, Appendix C.5.b.  This translates into a total number of 1,934,964,578 Outstanding Shares, of which 56.33405 percent, 2.60165 percent and 11.56089 percent were held by Hulley, YUL and VPL, respectively.  The exact combined share of Claimants in Yukos Outstanding Shares was 70.49659 percent.

Tribunal has chosen to use the average of the values of the index over the period from 6 January 2014 to 24 June 2014 as the basis for its calculations. This average value of the RTS Oil and Gas index is 186.90.[2425] The adjustment factor to be applied to determine Yukos' value as of the later date is therefore x=186.90/267.8=69.79 percent. By applying this factor to the amount of USD 61.076 billion the Tribunal arrives at an equity value of Yukos as of 30 June 2014 in the amount of USD 42.625 billion.[2426]

1822. The value of Claimants' 70.5 percent share in Yukos, calculated as a pro rata share of this amount, corresponds to USD (70.5/100)*42.625=30.049 billion.

## ii.   Dividends and Interest on Dividends

1823. According to the Tribunal's methodology outlined earlier, the dividends that would have been paid to Yukos' shareholders from the beginning of 2004 to 30 June 2014 will be assumed to correspond to USD 45 billion. Together with interest, the total amount for this period is USD 51.981 billion.[2427]

1824. Claimants' share of this amount corresponds to USD (70.5/100)*51.981=36.645 billion.

## iii.   Total Damages Suffered by Claimants

1825. The damages suffered by Claimants due to the breach by Respondent of Article 13 of the ECT, based on a valuation date of 30 June 2014, is the sum of the Claimants' share of the two components calculated above, *i.e.*, 70.5 percent of (42.625 + 51.981), which amounts to USD 66.694 billion.[2428]

## (c)   Comparison of the Results Based on the Two Different Valuation Dates

1826. The total amount of Claimants' damages based on a valuation date of 19 December 2004 is USD 21.988 billion, whereas the total amount of their damages based on a valuation date of 30 June 2014 is USD 66.694 billion. Since the Tribunal has concluded earlier that Claimants are entitled to the higher of these two amounts, the total amount of damages to be awarded

---

[2425]   *See* Table T8 annexed to this Award.

[2426]   *See* Table T2 annexed to this Award.

[2427]   *See* Table T3 annexed to this Award.

[2428]   *See* Table T1 annexed to this Award.

before taking into account any deductions necessary as a consequence of Claimants' contributory fault is USD 66.694 billion.

### 6.     Deductions Due to Claimants' Contributory Fault

1827. As determined earlier,[2429] the Tribunal has concluded that the Claimants contributed to the extent of 25 percent to the prejudice they suffered at the hands of the Russian Federation.  As a consequence, the amount of damages to be paid by Respondent to Claimants will be reduced by 25 percent to USD 50,020,867,798 and the Tribunal so finds.[2430]

### 7.     Windfall and Double Recovery

1828. The Tribunal sees no reason to make any further deductions beyond those set out above.  In particular, any advantages that Claimants may have obtained through their investments prior to Respondent's expropriatory actions can not have any impact on the damages they have suffered.  The Tribunal sees no risk of "double-recovery" in this regard.

1829. Finally, the rate of return that Claimants may realize on their original investment in Yukos as a result of the damages that the Tribunal has awarded to them for the expropriation of their shares is irrelevant.  It is the value of the expropriated investment on the date of the Award rather than the amount originally invested by Claimants that is the basis for the calculation of the damages awarded.

## XIII.  COSTS

### A.     INTRODUCTION

1830. The Tribunal notes that Claimants and Respondent have each requested that the opposing party be ordered to pay the full costs of the arbitration.[2431]

1831. The Tribunal observes that the Treaty contains no provisions on the allocation of the costs of arbitration in the case of a dispute between an Investor and a Contracting Party.[2432]

---

[2429]   *See* Section X.E.4.

[2430]   Claimants shall be paid this amount in proportion to their shareholdings (as to which see n.2424 above) as follows: EUR 39,971,834,360 (Hulley), EUR 1,846,000,687 (YUL) and EUR 8,203,032,751 (VPL).  As per paragraphs 1690–92 above, post-award interest will be due on any outstanding amounts not paid in full within 180 days.

[2431]   Reply ¶ 1199(5); Rejoinder ¶ 1748(v).

1832. However, Articles 38 to 40 of the UNCITRAL Rules do provide the Tribunal with guidelines with respect to the allocation of costs in arbitration.

1833. Article 38 defines the "costs of arbitration" as follows:

> The arbitral tribunal shall fix the costs of arbitration in its award.  The term "costs" includes only:
>
> (a) The fees of the arbitral tribunal to be stated separately as to each arbitrator and to be fixed by the tribunal itself in accordance with article 39;
>
> (b) The travel and other expenses incurred by the arbitrators;
>
> (c) The costs of expert advice and of other assistance required by the arbitral tribunal;
>
> (d) The travel and other expenses of witnesses to the extent such expenses are approved by the arbitral tribunal;
>
> (e) The costs for legal representation and assistance of the successful party if such costs were claimed during the arbitral proceedings, and only to the extent that the arbitral tribunal determines that the amount of such costs is reasonable;
>
> (f) Any fees and expenses of the appointing authority as well as the expenses of the Secretary-General of the Permanent Court of Arbitration at The Hague.

1834. Paragraphs 1 and 2 of Article 40 of the UNCITRAL Rules set out the guidelines which will inform the Tribunal in its determination of the apportionment of costs.  They read as follows:

> 1. Except as provided in paragraph 2, the costs of arbitration shall in principle be borne by the unsuccessful party.  However, the arbitral tribunal may apportion each of such costs between the parties if it determines that apportionment is reasonable, taking into account the circumstances of the case.
>
> 2. With respect to the costs of legal representation and assistance referred to in article 38, paragraph (e), the arbitral tribunal, taking into account the circumstances of the case, shall be free to determine which party shall bear such costs or may apportion such costs between the parties if it determines that apportionment is reasonable.

1835. On 18 March 2014, the Tribunal requested the Parties to file their claims for costs with appropriate schedules by 17 April 2014 and to submit comments on the opposing Party's claims by 6 May 2014.  The Tribunal wrote:

> The Parties are requested to present their claims with schedules showing a breakdown of costs for legal representation and assistance, including lawyers' fees, experts' fees and other costs associated with presenting their case.  The breakdown of lawyers' fees should indicate the number of attorneys (together with charge out rates) and the amount of time involved in the discrete phases of these proceedings (Phase 1 being the period up to the

---

[2432]   As opposed to the allocation of the costs of arbitration in the case of a dispute between Contracting Parties, which is addressed in Article 27(3)(j) as follows:  "The expenses of the tribunal, including the remuneration of its members, shall be borne in equal shares by the Contracting Parties parties to the dispute. The tribunal may, however, at its discretion direct that a higher proportion of the costs be paid by one of the Contracting Parties parties to the dispute."

> Interim Awards; Phase 2 being the period after the Interim Awards).  It is expected that the breakdowns should be in sufficient detail for the Tribunal to appreciate the work in respect of which the costs were incurred.

1836. As requested, the Parties filed their cost claims on 17 April 2014 and submitted comments on the opposing side's cost claims on 6 May 2014.

## B.   CLAIMANTS' POSITION

### 1.   Claimants are Entitled to Recover All Costs Incurred in Connection with these Arbitrations

1837. Claimants note that Article 40 of the UNCITRAL Rules "establishes two approaches with respect to costs."[2433]  Firstly, Article 40(1) establishes a "clear presumption" that the losing party pays all costs referred to in Article 38(a) to (d) and (f)—"loser pays" or "costs follow the event."[2434]  Secondly, Article 40(2) requires that, when allocating costs for legal representation referred to in Article 38(e), tribunals take into account "the circumstances of the case."[2435]

1838. Claimants submit that Respondent should bear all costs set out in Article 38(a) to (d) and (f), namely the fees and expenses of the Tribunal and the PCA (including those of the PCA's Secretary-General).

1839. Claimants aver that Respondent was the unsuccessful party in the jurisdiction and admissibility phase.  Claimants assert that they "prevailed on every single issue that was finally decided in the jurisdiction and admissibility phase of these arbitrations."[2436]  They consider that Respondent should bear the fees and expenses of the Tribunal and the PCA related to that phase.

1840. Claimants submit that they should prevail at the merits stage as well and that Respondent should bear the fees and expenses of the Tribunal and the PCA related to that phase.[2437]

---

[2433]   Claimants' Submission on Costs ¶ 4.

[2434]   *Ibid.* ¶ 5.

[2435]   *Ibid.* ¶ 6.

[2436]   *Ibid.* ¶ 10.

[2437]   *Ibid.* ¶ 11.

1841. According to Claimants, no circumstances in this case require the Tribunal to depart from the starting point of "costs follow the event"; to the contrary, they argue, the circumstances in this case "only further necessitate" an order of costs in favour of Claimants.[2438]

1842. Claimants submit that, taking into account the circumstances of the case—and in particular the Parties' success in the arbitrations, their conduct during the proceedings, and the actual measures of Respondent which gave rise to the dispute—Respondent should bear all of Claimants' costs of legal representation and assistance.

1843. Claimants contend that where the investor prevails in an investor-State arbitration, an order that the State pay the investor's costs of legal representation is based on the principle of reparation, which mandates that the investor be fully compensated for its losses, including those incurred as a result of having to litigate.[2439]

1844. According to Claimants:

> In the present case, the Respondent's approach to these proceedings has been to raise (and re-raise) as many objections, arguments and issues as possible, no matter how irrelevant or implausible they may be, in the hopes of delaying the proceedings and somehow burying or obfuscating the straightforward facts of the case.[2440]

1845. Claimants opine that Respondent's "obstructionist conduct" in this case should lead the Tribunal to order it to pay all costs of legal representation.[2441]

1846. Claimants submit that "in no other case has the need to take into account the underlying conduct of the host State been more relevant than in these arbitrations."[2442]   Claimants argue

---

[2438]   *Ibid.* ¶ 12.

[2439]   Claimants' Submission on Costs ¶¶ 17–19 (quoting *Gemplus* ¶¶ 17-21–17-22, Exh. C-1536; *ADC* ¶ 533, Exh. C-980; *Southern Pacific Properties (Middle East) Limited v. Arab Republic of Egypt*, ICSID Case No. ARB/84/3, Award, 20 May 1992, ¶ 207, Exh. C-945.

[2440]   Claimants' Submission on Costs ¶ 22.

[2441]   Claimants' Submission on Costs ¶¶ 22, 52–53.  Claimants list what they term Respondent's "constant attempts to extend deadlines and otherwise prolong or disrupt the proceedings" (¶¶ 23–31), "deliberate attempts to withhold evidence" (¶¶ 32–39), "manifest disregard for the Arbitral Tribunal's orders" (¶¶ 40–41), "renewed and abandoned jurisdiction and admissibility objections" (¶¶ 42–48), and "overly burdensome, disorganized and fundamentally misleading presentation of its case" (¶¶ 49–51).

[2442]   Claimants' Submission on Costs ¶ 54 (referring to *Deutsche Bank AG v. Democratic Socialist Republic of Sri Lanka* ICSID Case No. ARB/09/02, Award, 31 October 2012, ¶ 588, Exh. C-1792; *ADC* ¶ 533, Exh. C-980; *Kardassopoulos* ¶ 689, Exh. C-1533.

that Respondent's conduct "has been decried by every single court or tribunal, organization, and independent observer outside Russia" and "must be sanctioned in full."[2443]

### 2. Claimants' Costs are Reasonable

1847. Pursuant to the Tribunal's directions, Claimants presented a summary of the costs they have incurred in connection with these arbitrations on a per-phase basis:[2444]

| Table 1: The Claimants' costs for legal representation incurred in Phase 1 | |
|---|---|
| **Shearman & Sterling LLP Fees and Expenses** | |
| 1. Legal assistants | |
| Number of legal assistants | 4 |
| Charge out rate range (USD/hour) | 160.00-200.00 |
| Total hours | 4,376.40 |
| Total legal assistant fees | USD 763,222.50 |
| 2. Attorneys | |
| Number of attorneys | 21 |
| Charge out rate range (USD/hour) | 235.00-995.00 |
| Total hours | 52,076.90 |
| Total attorney fees | USD 23,018,168.50 |
| 3. Expenses | USD 2,081,685.55 |
| 4. Total | USD 25,863,076.55 |
| **Expert Fees and Expenses** | |
| 1. Prof. James Crawford | USD 53,222.06 |
| 2. Mr. Vladimir Gladyshev | USD 1,269,662.80 |
| 3. Mr. Brian Green QC | GBP 996,962.10 |
| 4. Navigant | USD 1,052,897.49 |
| 5. Prof. W. Michael Reisman | USD 204,000.00 |
| 6. Total | USD 2,579,782.35 |
| | GBP 996,962.10 |
| **Deductions[89]** | |
| | USD 482,260.11 |
| **Grand Total (Phase 1)** | |
| | USD 27,960,598.79 |
| | GBP 996,962.10 |

[89] The deducted amounts comprise: (i) experts' fees and expenses advanced by Shearman & Sterling LLP and subsequently reimbursed by the Claimants (deducted to avoid double-counting of those amounts); and (ii) the fees and expenses of persons consulted by the Claimants, but who did not tender testimony.

. . .

---

[2443] Claimants' Submission on Costs ¶ 55.

[2444] *Ibid.* ¶¶ 56–63.

**Table 2: The Claimants' costs for legal representation incurred in Phase 2**

| Shearman & Sterling LLP Fees and Expenses[90] | |
|---|---|
| 1. Legal assistants | |
| Number of legal assistants | 7 |
| Charge out rate range (USD/hour) | 205.00-255.00 |
| Total hours | 4,887.60 |
| Total legal assistant fees | USD 1,123,195.50 |
| 2. Attorneys | |
| Number of attorneys | 27 |
| Charge out rate range (USD/hour) | 290.00-1,065.00 |
| Total hours | 70,525.90 |
| Total attorney fees | USD 39,931,981.50 |
| 3. Expenses | USD 3,252,001.07 |
| 4. Total | USD 44,307,178.07 |
| **Expert Fees and Expenses** | |
| 1. Dr. Philip Baker QC | GBP 69,500.00 |
| 2. Dr. Sergei Kovalev | USD 70,000.00 |
| 3. Navigant | USD 7,370,493.22 |
| 4. Total | USD 7,440,493.22 |
| | GBP 69,500.00 |
| **Compensation for Witness Time and Expenses** | |
| 1. Mr. Y Schmidt | USD 70,000.00 |
| **Deductions**[91] | |
| | USD 150,214.52 |
| **Grand Total (Phase 2)** | |
| | USD 51,667,456.77 |
| | GBP 69,500.00 |

---

[90] The Shearman & Sterling LLP Fees and Expenses for Phase 2 comprise invoices up to and inclusive of December 2012.

[91] The deducted amounts comprise: (*i*) experts' fees and expenses advanced by Shearman & Sterling LLP and subsequently reimbursed by the Claimants (deducted to avoid double-counting of those amounts); (*ii*) the fees and expenses of persons consulted by the Claimants, but who did not tender testimony; and (*iii*) the compensation for the time and expenses of Mr. Schmidt, which were advanced by Shearman & Sterling LLP and subsequently reimbursed by the Claimants (deducted to avoid double-counting of this amount).

1848. Claimants submit that their costs in the jurisdiction and admissibility phase are reasonable given:

> *(i)* the large number of objections raised by the Respondent in the jurisdiction and admissibility phase, *(ii)* the numerous expert opinions tendered by the Respondent, *(iii)* the volume of procedural issues that arose in the course of the proceedings attributable solely to the Respondent, and *(iv)* the matters and amounts at stake in the arbitrations.[2445]

---

[2445] Claimants' Submission on Costs ¶ 60.

1849. Claimants submit that their costs in the merits phase are reasonable given:

> (*i*) the large number of issues raised by the Respondent in the merits phase, (*ii*) the numerous expert statements tendered by the Respondent, (*iii*) the volume of procedural issues that arose in the course of the proceedings attributable solely to the Respondent, and (*iv*) the matters and amounts at stake in the arbitrations.[2446]

1850. Claimants request interest on any cost award at a rate of LIBOR + 4 percent compounded annually.[2447]

### 3.   Claimants' Comments on Respondent's Submission on Costs

1851. Claimants summarize their comments on Respondent's Submission on Costs as follows:

> Respondent has elected not to provide a "breakdown of costs", as directed by the Arbitral Tribunal.  Its so-called "Schedule of Costs" cannot in any way facilitate the Tribunal's task in reaching its decision on costs, including in assessing the reasonableness of either of the Parties' claimed amounts.  Moreover, the Respondent's argument that each Party should bear its own costs is based on a flawed presentation of investment treaty case law and a blatantly self-serving description of the Respondent's conduct throughout these arbitrations.  At the same time, the Respondent's position speaks volumes as to its true conviction (or lack thereof) in its defenses to the Claimants' claims.  Had the Respondent truly believed that the Claimants, Yukos and/or related persons and entities had engaged in large-scale criminal conduct—ranging from embezzlement and money laundering to tax fraud and even murder—it would have insisted that its full costs be shouldered by the Claimants, instead of proposing, as it has done now, that it bear its own costs in defending the Claimants' claims.[2448]

1852. Claimants assert that comparing the comprehensive presentation of their costs for legal representation with Respondent's "opaque" Schedule of Costs would be "akin to comparing apples and oranges."[2449]   Even then, Claimants maintain that their costs would still be reasonable.  In particular, Claimants note that "in ordering respondent States to bear investors' costs, investment treaty tribunals have found that it is not unusual for claimants' costs to be higher than those of respondents, given that, *inter alia*, the burden of proof generally falls on claimants."[2450]

---

[2446]   Claimants' Submission on Costs ¶ 63.

[2447]   *Ibid.* ¶ 64.

[2448]   Claimants' Comments on Respondent's Submission on Costs dated 6 May 2014, p. 1.

[2449]   *Ibid.*, p. 3.

[2450]   *Ibid.*, p. 3 (referring to *ADC* ¶ 535, Exh. C-980; *Waguih Elie George Siag and Clorinda Vecchi v. The Arab Republic of Egypt*, ICSID Case No. ARB/05/15, Award, 1 June 2009, ¶ 624, Exh. C-998.

### C.   RESPONDENT'S POSITION

### 1.   Equal Apportionment is an Appropriate Exercise of the Tribunal's Discretion on Costs

1853. Respondent notes that, while Article 40(1) of the UNCITRAL Rules states that the costs referred to in Article 38(a) to (d) and (f) should "in principle be borne by the unsuccessful party," it gives the Tribunal the discretion to "apportion each of such costs between the parties if it determines that apportionment is reasonable, taking into account the circumstances of the case."  Respondent asserts that Article 40(2) grants the Tribunal "complete discretion" in its apportionment of the Parties' costs of legal representation.[2451]

1854. Respondent argues that the following factors should inform the exercise of the Tribunal's discretion:

(a) whether the dispute involved novel and complex questions of law and a long and complex procedure such that it would be unfair to penalize a non-prevailing party for maintaining its positions with an adverse costs award;

(b) the constructive and professional conduct of the parties and their positive impact on the tribunal's settlement of the dispute, which militates in favor of equal apportionment of costs;

(c) any bad faith, unreasonable or unnecessarily burdensome conduct of a party for which the other party should be compensated;

(d) whether the non-prevailing party succeeds in some respects during the arbitration with legal, factual or procedural arguments, making it inappropriate to award the ultimately successful party its costs; and

(e) the nature of the dispute resolution mechanism and the traditional position under public international law and in investor-state arbitration that parties "bear their own costs of legal representation and assistance."[2452]

1855. Respondent submits that, in light of the above-mentioned factors, the "appropriate approach here is for each side to bear its own costs."[2453]  Further:

If, in the exercise of its discretion, the Tribunal decides that equal apportionment of costs in these cases is not appropriate, and that the costs incurred by the prevailing party should be borne by the unsuccessful party, Respondent would then request that Claimants should bear Respondent's costs based upon the relative success of the parties in these arbitrations on issues of jurisdiction, the merits and Claimants' demand for damages.  It is clear from

---

[2451]   Respondent's Submission on Costs ¶ 3.

[2452]   *Ibid.* ¶ 4 (footnote omitted).

[2453]   *Ibid.* ¶¶ 5–8.

the Procedural Orders issued throughout the proceedings and from the Interim Awards on Jurisdiction and Admissibility that neither side has been fully successful.[2454]

### 2. Schedule of "Types of Costs" Incurred by Respondent

1856. Respondent submits a schedule indicating the "types of costs" incurred by Respondent in defense of Claimants' claims.

#### A. Tribunal and PCA Fees and Expenses

Initial and supplemental deposits paid to the PCA

TOTAL  €3,950,000

#### B. Attorneys' Fees and Expenses

Phase 1

For the period from February 3, 2005 to November 30, 2009:

Review of Claimants' Notifications of Claim dated October 27, 2004; review of Claimants' Statements of Claim dated February 3 and February 14, 2005; preparation of Respondent's Statements of Defense dated October 15, 2005; preparation of Respondent's First Memorials on Jurisdiction and Admissibility dated February 28, 2006; review of Claimants' Counter-Memorials on Jurisdiction and Admissibility dated June 30, 2006; preparation of requests for disclosure, preparation of documents and responses to Claimants' requests for disclosure, review of documents produced by Claimants; preparation of Respondent's Second Memorials on Jurisdiction and Admissibility dated January 31, 2007; review of Claimants' Rejoinders on Jurisdiction and Admissibility dated June 1, 2007;

Correspondence and various procedural submissions with the Tribunal and Claimants' counsel;

Attendance at hearings of October 31, 2005, December 1, 2007, May 8-9, 2008 and from November 17 to December 1, 2008.

Lawyers Involved in Phase 1

Partners (5), billing range $700-900/hour, in excess of 3,500 hours

Associates (15), billing range $300-$625/hour, in excess of 12,000 hours

Paralegals/stagiaires/trainees (10), billing range $125-$225/hour, in excess of 5,000 hours

Phase 2

For the period from November 30, 2009 until the present:

Review of Claimants' Memorial on the Merits dated September 16, 2010; preparation of Respondent's Counter-Memorial on the Merits dated April 4, 2011; preparation of requests for disclosure, preparation of documents and responses to Claimants' requests for disclosure, review of documents produced by Claimants; preparation of Respondent's Short Submission on Bifurcation of Liability and Quantum and on Referral under Article 21 of the ECT dated April 29, 2011; preparation of Respondent's First and Second Submissions on Confidentiality dated January 18 and February 2, 2012; review of Claimants' Reply on the Merits dated March 15, 2012;

---

[2454]    *Ibid.* ¶ 9.

preparation of Respondent's Rejoinder on the Merits dated August 16, 2012; preparation of Respondent's Post-Hearing Brief dated December 21, 2012;

Correspondence and various procedural submissions with the Tribunal and Claimants' counsel;

Attendance at hearings of May 7, 2010, May 9, 2011 and from October 10 to November 9, 2012.

Lawyers Involved in Phase 2

Partners (5), billing range $775-950/hour, in excess of 7,000 hours

Associates (20), billing range $375-$675/hour, in excess of 25,000 hours

Paralegals/stagiaires/trainees (15), billing range $150-$275/hour, in excess of 10,000 hours

   TOTAL  US$ 27,000,000

**C. Experts' Fees and Expenses**

For services provided by expert witnesses in connection with preparation of expert reports for submission with Respondent's First Memorials on Jurisdiction and Admissibility, Second Memorials on Jurisdiction and Admissibility, Counter-Memorial on the Merits and Rejoinder on the Merits and preparation for testimony at the hearings on jurisdiction and admissibility and the merits and remaining jurisdiction and admissibility issues, and related expenses.

   TOTAL  US$ 4,500,000[2455]

**3.    Respondent's Comments on Claimants' Submission on Costs**

1857. With respect to Claimants' request for costs, Respondent says it is "plainly excessive and unprecedented in its amount" and opines that it "raises serious questions of credibility."[2456]

1858. Respondent submits that Claimants' characterization of the proceedings amounts to "outright misrepresentations rather than the actual facts."[2457]   According to Respondent, the alleged misrepresentations of Claimants include:  Claimants' "continued disregard for the ECtHR's unanimous rejections of the essential premise for Claimants' contentions here,"[2458] "misrepresentation that Respondent abandoned its unclean hands defense,"[2459] "mischaracterization of Respondent's justified requests for extensions of deadlines, alleged 'delay tactics' and approach to document production,"[2460] "meritless criticisms of Respondent's

---

[2455]   Respondent's Submission on Costs ¶ 10.

[2456]   Respondent's Comments on Claimants' Submission on Costs dated 6 May 2014 ¶ 2 n.1.

[2457]   *Ibid.* ¶ 9.

[2458]   *Ibid.* ¶¶ 10–15.

[2459]   *Ibid.* ¶¶ 16–18.

[2460]   *Ibid.* ¶¶ 19–31.

presentation of its case,"[2461] and "conspicuous silence concerning their own misconduct in these arbitrations."[2462]

### D.   TRIBUNAL'S DECISION ON COSTS

#### 1.   Fixing and Allocation of Costs of the Arbitration Pursuant to Article 40(1) of the UNCITRAL Rules

1859. The Parties deposited with the PCA a total of EUR 8,440,000 to cover the costs of the arbitration; EUR 4,240,000 by Claimants and EUR 4,200,000 by Respondent.[2463]   In determining the amount of its members' fees, the Tribunal has taken account of Article 39(1) of the UNCITRAL Rules, pursuant to which "[t]he fees and expenses of the arbitral tribunal shall be reasonable in amount, taking into account the amount in dispute, the complexity of the subject matter, the time spent by the arbitrators and any other relevant circumstances of the case."

1860. The fees of Mr. Daniel Price, the arbitrator initially appointed by Claimants, amount to EUR 103,537.50.   Mr. Price's expenses amount to EUR 3,678.99.   The fees of Dr. Charles Poncet, the arbitrator appointed by Claimants following the resignation of Mr. Price, amount to EUR 1,513,880.   Dr. Poncet's expenses amount to EUR 85,549.64.

1861. The fees of Judge Stephen M. Schwebel, the arbitrator appointed by Respondent, amount to EUR 2,011,092.66.   His expenses amount to EUR 51,927.29.

1862. The fees of The Hon. L. Yves Fortier, PC CC OQ QC, the Chairman, amount to EUR 1,732,937.50.   The Chairman's expenses amount to EUR 51,782.24.

1863. The fees of Mr. Martin J. Valasek, the Assistant to the Tribunal, amount to EUR 970,562.50.   Mr. Valasek's expenses amount to EUR 51,718.96.

1864. Pursuant to the Terms of Appointment and the agreement of the Parties, the PCA Secretary-General served as the Appointing Authority, and the International Bureau of the PCA was

---

[2461]   *Ibid.* ¶¶ 32–36.

[2462]   *Ibid.* ¶¶ 37–38.

[2463]   Over the course of the proceedings, the Parties contributed in equal shares to the deposits.   In July 2014, the Tribunal requested a final supplementary deposit of EUR 40,000 and invited either Party to cover the full amount in advance of issuance of the Final Awards, which Claimants accepted to do.

designated to act as Registry in these arbitrations.  The PCA's fees for its services amount to EUR 866,552.60.

1865. Other tribunal costs, including court reporters, interpreters, hearing rooms, meeting facilities, travel and all other expenses relating to the arbitration proceedings, amount to EUR 996,780.12.

1866. Accordingly, the costs of the arbitration, including all items set out in paragraphs (a), (b), (c), (d) and (f) of Article 38 of the UNCITRAL Rules, amount to EUR 8,440,000 for the jurisdiction and merit phases.

1867. The Tribunal recalls again the terms of Article 40(1) of the UNCITRAL Rules:

> Except as provided in paragraph 2, the costs of arbitration shall in principle be borne by the unsuccessful party.  However, the arbitral tribunal may apportion each of such costs between the parties if it determines that apportionment is reasonable, taking into account the circumstances of the case.

1868. The costs are therefore to be awarded to the successful party and against the unsuccessful party, unless the circumstances of the case justify a different approach.

1869. In the present proceedings, it is clear that Claimants have prevailed and been successful in both the jurisdiction and merits phases.  The Tribunal can see no reason why Respondent, the unsuccessful party, should not bear the costs of the arbitration, EUR 8,440,000, and it so orders Respondent to bear such costs and to reimburse the contributions that Claimants deposited in the amount of EUR 4,240,000.[2464]

1870. There is no unexpended balance on deposit.

## 2. Fixing and Allocation of Costs for Legal Representation and Assistance of the Parties Pursuant to Article 40(2) of the UNCITRAL Rules

1871. The Tribunal recalls again the terms of Article 40(2) of the UNCITRAL Rules:

> With respect to the costs of legal representation and assistance referred to in article 38, paragraph (e), the arbitral tribunal, taking into account the circumstances of the case, shall be free to determine which party shall bear such costs or may apportion such costs between the parties if it determines that apportionment is reasonable.

---

[2464] Claimants shall be paid this amount in proportion to their shareholdings (as to which see n.2424 above) as follows: EUR 3,388,197 (Hulley), EUR 156,476 (YUL) and EUR 695,327 (VPL).  As per paragraphs 1690–92 above, post-award interest will be due on any outstanding amounts not paid in full within 180 days.

1872. Paragraph (e) of Article 38 provides that the term "costs" includes:

> The costs for legal representation and assistance of the successful party if such costs were claimed during the arbitral proceedings, and only to the extent that the arbitral tribunal determines that the amount of such costs is reasonable.

1873. The Tribunal observes that Claimants' costs for their legal representation and the assistance of their experts amount to USD 79,628,055.56 plus an additional GBP 1,066,462.10, which, Claimants submit, are "reasonable" taking into account the circumstances of the case.

1874. Respondent, on the other hand, provides the Tribunal with a schedule indicating the "types of costs" incurred by Respondent in its defence.  It presents a "total" figure of USD 27,000,000 which does not adequately assist the Tribunal in assessing the reasonableness of the Parties' respective costs.

### 3.  Conclusion on the Award of Costs

1875. It is well established that an UNCITRAL tribunal such as the present one has the unfettered discretion to fix and to decide in what proportion the costs for legal representation and assistance of the parties shall be borne by the Parties.

1876. In the present case, the Tribunal has formed the view that Claimants, the successful Party, should be awarded a significant portion of their costs of legal representation and assistance. The Tribunal now has to determine the portion which it considers reasonable.  In determining this reasonable portion, the Tribunal takes into account a number of relevant factors.  The Tribunal will now proceed to review some of the factors which it considers particularly relevant in the instant case.

1877. Claimants, in their prayer for relief, asked the Tribunal to order Respondent to pay to Claimants damages of more than USD 100 billion.

1878. The stakes were high and, if Claimants were thorough and vigorous in pressing their claims, Respondent was no less thorough and vigorous in presenting its defences.

1879. The thousands of pages of written pleadings and exhibits submitted by the Parties, the myriad requests for production of documents, the Tribunal's lengthy procedural orders, the ten days of hearings in The Hague in the fall of 2008 on Respondent's objections to jurisdiction and admissibility, the 21 days of Hearings on the Merits in The Hague in the fall of 2013, all demonstrate the importance which both sides attached to this arbitration.

1880. The Parties litigated vigorously.  Each Party was represented by eminent counsel.  The quality of the written and oral pleadings was outstanding.  Counsel of both Parties are commended for their high professionalism.

1881. In the circumstances, it is unsurprising that the cost submissions of the Parties, as to their amounts, should reflect the very considerable work which each Party was required to expend in order to, on the one hand, press its claims and, on the other hand, defend itself.

1882. It also is not surprising that Claimants' costs in this case should be higher than those of Respondent since they bore the burden of proof for their claims under the ECT and produced many fact witnesses in the Hearing on the Merits whereas Respondent produced no fact witness.

1883. However, the Tribunal agrees with Respondent that some of the fees of Claimants' experts are "plainly excessive".

1884. Another factor which the Tribunal considers relevant in fixing the costs of Claimants which should be borne by Respondent is the fact that, at the end of the day, Claimants' experts were of limited assistance to the Tribunal in its determination of Claimants' damages.

1885. Even if Claimants were successful in asserting the Tribunal's jurisdiction over Respondent, in prevailing on the liability of Respondent and being awarded an immense sum in damages, at the end of the day, as was seen in Part XII, the damages awarded to Claimants were reduced significantly by the Tribunal from the claims advanced by them.

1886. Finally, a factor which the Tribunal has considered particularly relevant in fixing the portion of their costs which Claimants should be awarded is the egregious nature of many measures of Respondent which the Tribunal has found were in breach of the ECT.

1887. Having scrutinized the costs for legal representation and assistance of Claimants and taking into consideration all the factors traversed above, the Tribunal, in the exercise of its discretion, considers that reimbursement by Respondent to Claimants of USD 60,000,000 as part of their costs would be fair and reasonable in the circumstances and it so orders.[2465]  The Tribunal notes that USD 60,000,000 is approximately 75 percent of Claimants' grand total of costs for the jurisdiction and merits phases, namely USD 79,628,055.56 and GBP 1,066,462.10.

---

[2465]   Claimants shall be paid this amount in proportion to their shareholdings (as to which see n.2424 above) as follows: EUR 47,946,190 (Hulley), EUR 2,214,277 (YUL) and EUR 9,839,533 (VPL).  As per paragraphs 1690–92 above, post-award interest will be due on any outstanding amounts not paid in full within 180 days.

## XIV.  DECISION

1888. For the reasons set forth above, the Tribunal unanimously:

(a)   DISMISSES the objections to jurisdiction and/or admissibility, based on Article 21 of the Energy Charter Treaty;

(b)   DISMISSES the objections to jurisdiction and/or admissibility, pertaining to Respondent's contentions concerning "unclean hands" and "illegal and bad faith conduct";

(c)   DISMISSES the renewed objections to jurisdiction and/or admissibility based on Article 26(3)(b)(i) of the Energy Charter Treaty;

(d)   HOLDS that the present dispute is admissible and within the Tribunal's jurisdiction;

(e)   DECLARES that Respondent has breached its obligations under Article 13(1) of the Energy Charter Treaty;

(f)   ORDERS Respondent to pay to Claimant Veteran Petroleum Limited damages in the amount of USD 8,203,032,751;

(g)   ORDERS Respondent to pay the amount of EUR 695,327 to Claimant Veteran Petroleum Limited as reimbursement for the costs of the arbitration;

(h)   ORDERS Respondent to pay the amount of USD 9,839,533 to Claimant Veteran Petroleum Limited for a portion of the costs of its legal representation and assistance in the arbitration proceedings; and

(i)   ORDERS Respondent to pay to Claimant Veteran Petroleum Limited, if within 180 days of the issuance of this Award Respondent fails to pay in full the amounts set forth in paragraphs (f), (g) and (h) above, post-award interest on any outstanding amount starting from 15 January 2015, compounded annually. Post-award interest shall be determined as the yield on 10-year U.S. treasury bonds as of 15 January 2015 and then the dates of compounding yearly thereafter.

Done at The Hague, this 18th day of July , 2014.


_____
Dr. Charles Poncet
Co-arbitrator


_____
Judge Stephen M. Schwebel
Co-arbitrator


_____
The Hon. L. Yves Fortier PC CC OQ QC
Chairman

**ANNEXES**

A.   ANNEX A1:  APPENDIX 1.1, APPENDIX J.1 AND APPENDIX J.2 TO SECOND DOW REPORT
     (modified as described in note 2401 of the Award)

     (a)   Appendix 1.1

| "Updated" Yukos 2007 DCF Error Correction | Corrected? |
|---|---|
| Upstream Capex Base Year | 1 |
| US Cost of Equity | 1 |
| Refining Capex Partial Year Error | 1 |
| Missing Opex | 1 |
| Transport Cost Error | 1 |
| Forecasts-Forwards Conflation Error | 1 |
| PPP & Inflation Related Errors | 1 |

| Enterprise Value | | |
|---|---|---|
| Original | $ | 95,251,061,670 |
| New | $ | 46,461,814,366 |
| Diff. | $ | 48,789,247,303 |

Note:
Results obtained from the live (excel) version of Appendix 1 to Second Dow Report provided by Respondent together with  its Rejoinder by switching the values in the "Corrected?" column on the first sheet of the Appendix (Appendix 1.1) from 0 to 1.  The Annex shows the resulting figures for Appendix J.1 and Appendix J.2 to Second Dow Report.

A-1

**(b)    Appendix J.1 New**

| Notes and Sources | JD Notes | Calculation Logic | Component | 2003 | 2004 | 2005 | 2006 | 2007 (thru 11/21) |
|---|---|---|---|---|---|---|---|---|
| 1 | | [A] | Net Income | | 3,218,665,217 | 4,769,239,020 | 4,605,289,478 | 5,791,709,065 |
| 2 | | [B] | Tax-Adjusted Interest Payments | | 195,973,436 | 248,407,275 | 314,870,094 | 354,283,284 |
| 1 | | [C] | Depreciation | | 1,115,919,143 | 1,322,594,049 | 1,567,551,997 | 2,045,753,987 |
| 3 | | [D] | Working Current Assets | 6,162,391,781 | 6,024,533,190 | 7,377,817,999 | 8,724,114,903 | 9,724,344,823 |
| 3 | | [E] | Working Current Liabilities | 2,134,154,107 | 2,668,988,513 | 3,420,223,168 | 4,389,513,676 | 5,143,659,866 |
| Calc. | | [F] = D - E | Working Capital | 4,028,237,674 | 3,355,544,677 | 3,957,594,831 | 4,334,601,227 | 4,580,684,958 |
| Calc. | | [G] = $F_t$ - $F_{t-1}$ | Change in Working Capital | | (672,692,997) | 602,050,154 | 377,006,395 | 246,083,731 |
| 4 | | [H] | Capital Expenditures | | 2,466,678,051 | 2,397,031,851 | 2,729,804,072 | 3,506,855,747 |
| Calc. | | [I] = A + B + C - G - H | Free Cash Flow to the Firm | | 2,736,572,742 | 3,341,158,338 | 3,380,901,101 | 4,438,806,858 |
| 2 | | [J] = -B | Tax-Adjusted Interest Payments | | (195,973,436) | (248,407,275) | (314,870,094) | (354,283,284) |
| 5 | | [K] | Change in Net Debt | | 659,445,111 | 944,541,730 | 1,209,587,786 | 1,765,630,302 |
| 6 | | [L] | 20% of Sibneft Dividends | | 18,332,400 | 452,067,800 | 120,400,000 | 367,673,425 |
| Calc. | | [M] = I + J + K + L | Free Cash Flow to Equity | | 3,218,376,817 | 4,489,360,593 | 4,396,018,793 | 6,217,827,301 |
| | | | | | | | | 5.079593664 |

Kaczmarek Sources & Notes:

(1) See Appendix J.3 - Updated - Yukos Income Statement

(2) Interest expense from Appendix J.3 - Updated multiplied by (1-t), where t is equal to the tax rate, found in Appendix J.14 - Updated.  Tax is deducted because FCFF should not include the tax benefits associated with interest deductions (however, the tax benefit is included in FCFE).

(3) Total current assets and total current liabilities from Appendix J.4 - Updated - Yukos Balance Sheet.  To estimate current assets and liabilities as of November 21, 2007, we prorate the growth in current assets and liabilities using the portion of the year that has passed (324 of 365 days).

(4) See Appendix J.11 - Updated - Yukos Capital Expenditures

(5) Equal to the annual change in long-term debt plus short-term debt less cash from Appendix J.4 - Updated - Yukos Balance Sheet.  To estimate Change in Net Debt through November 21, 2007, we prorated total annual Change in Net Debt using the portion of the year that has passed (324 of 365 days).

(6) 20 percent of Sibneft dividends paid in period as per Gazprom Neft 2008 Databook at "Consolidated Statement of Cash Flow" tab.  (NAV – 93)

Note that 2007 dividends through November 21, 2007 are prorated using the portion of the year that has passed (324 of 365 days).

**Sibneft Dividend Calculations:**

| | | | | | | |
|---|---|---|---|---|---|---|
| [1] | Sibneft Dividend Percent of FCFE | 0.570% | 10.070% | 2.739% | 5.913% |
| [2] | 3-year trailing average: | | | 4.459% | 6.241% |
| [3] | Original 2007 3-year trailing average | | | | 5.763% |

**JD Sources & Notes:**

[1]   I calculate the percent of Sibneft dividends out of the total Free Cash Flow to Equity

[2]   I take a 3-year trailing average of the Sibneft dividend percentage

[3]   I use the 3-year trailing average from 2007, from Mr. Kaczmarek's original Appendix J.1 - Updated, not
accounting for any of my error corrections.

**(c)   Appendix J.2 New**

| Notes and Sources | JD Notes | Calculation Logic | Component | 2007 (11/21) | 2007 (11/21-12/31) | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | [A] | Net Income | | 1,361,133,090 | 7,455,550,093 | 6,427,501,357 | 6,006,613,697 | 5,045,829,975 | 4,384,146,086 | 3,708,280,652 | 3,070,944,832 | 2,334,065,782 |
| 2 | | [B] | Tax-Adjusted Interest Payments | | 44,832,144 | 479,741,072 | 531,331,847 | 571,246,674 | 605,797,716 | 629,784,929 | 651,057,050 | 669,451,288 | 684,150,862 |
| 1 | | [C] | Depreciation | | 258,876,276 | 2,704,730,012 | 3,104,829,762 | 3,504,929,511 | 3,905,029,260 | 4,305,129,010 | 4,705,228,759 | 5,105,328,509 | 5,505,428,258 |
| 3 | | [D] | Working Current Assets | 9,724,344,823 | 9,850,917,128 | 12,177,374,651 | 12,589,339,638 | 13,407,409,267 | 13,369,206,217 | 13,408,627,169 | 13,531,800,418 | 13,703,949,405 | 13,851,885,035 |
| 3 | | [E] | Working Current Liabilities | 5,143,659,866 | 5,239,091,945 | 6,978,529,152 | 7,314,488,967 | 7,856,248,155 | 7,923,070,306 | 8,013,305,077 | 8,146,948,549 | 8,301,151,669 | 8,440,844,708 |
| Calc. | | [F] = D - E | Working Capital | 4,580,684,958 | 4,611,825,183 | 5,198,845,499 | 5,274,850,671 | 5,551,161,112 | 5,446,135,911 | 5,395,322,092 | 5,384,851,869 | 5,402,797,736 | 5,411,040,326 |
| Calc. | | [G] = F$_t$ - F$_{t-1}$ | Change in Working Capital | | 31,140,225 | 587,020,316 | 76,005,171 | 276,310,442 | (105,025,201) | (50,813,819) | (10,470,224) | 17,945,867 | 8,242,591 |
| 4 | | [H] | Capital Expenditures | | 443,768,783 | 4,431,646,288 | 4,875,675,642 | 5,328,869,547 | 5,477,680,110 | 5,630,784,296 | 5,788,308,596 | 5,950,383,281 | 6,117,142,509 |
| Calc. | | [I] = A + B + C - G - H | Free Cash Flow to the Firm | | 1,189,932,502 | 5,621,354,572 | 5,111,982,153 | 4,477,609,893 | 4,184,002,043 | 3,739,089,547 | 3,286,728,089 | 2,877,395,481 | 2,398,259,802 |
| 5 | | [J] | Present Value Factor | | 0.99 | 0.94 | 0.85 | 0.77 | 0.70 | 0.63 | 0.57 | 0.51 | 0.47 |
| Calc. | | [K] = I x J | 21 Nov 2007 Value of Cash Flows | | 1,183,236,882 | 5,288,134,152 | 4,349,283,009 | 3,445,414,267 | 2,911,749,015 | 2,353,394,696 | 1,870,938,602 | 1,481,365,313 | 1,116,672,182 |
| | [1] | | Tax-Adjusted Interest Payments | | (44,832,144) | (479,741,072) | (531,331,847) | (571,246,674) | (605,797,716) | (629,784,929) | (651,057,050) | (669,451,288) | (684,150,862) |
| | [2] | | Change in Net Debt | | 223,428,526 | 1,218,705,221 | 567,399,775 | 656,429,909 | 457,761,231 | 400,500,967 | 330,547,803 | 260,836,833 | 178,168,714 |
| | [3] | | 20% of Sibneft Dividends | | 83,698,156 | 388,992,116 | 314,850,715 | 279,056,857 | 246,836,495 | 214,656,963 | 181,411,623 | 150,988,716 | 115,730,221 |
| | [4] | | Free Cash Flow to Equity | 6217827301 | 1,452,227,040 | 6,749,310,837 | 5,462,900,795 | 4,841,849,986 | 4,282,802,054 | 3,724,462,548 | 3,147,630,465 | 2,619,769,742 | 2,008,007,875 |
| | | | | | 7,670,054,341 | 6,749,310,837 | 5,462,900,795 | 4,841,849,986 | 4,282,802,054 | 3,724,462,548 | 3,147,630,465 | 2,619,769,742 | 2,008,007,875 |

A-3

| Notes and Sources | JD Notes | Calculation Logic | Component | 2007 (11/21) | 2008 (11/21-12/31) | 2009 | 2010 |
|---|---|---|---|---|---|---|---|
| | | **Terminal Value Calculation:** | | | | | |
| Calc. | | $[L] = J_{2015} \times (1 + M)$ | Terminal Year FCFF | 2,482,198,895 | | | |
| 6 | | [M] | Terminal Growth Rate | 3.50% | | | |
| 7 | | [N] | WACC | 10.57% | | | |
| Calc. | | $[O] = L / (N - M)$ | Terminal Value as of 2015 | 35,114,161,268 | | | |
| Calc. | | $[P] = J_{2015}$ | Present Value Factor | 0.47 | | | |
| **Calc.** | | $[Q] = O \times P$ | **Terminal Value as of 11/21/2007** | 16,349,774,549 | | | |
| | | **Enterprise Value Summary:** | | | | | |
| Calc. | | $[R] = \sum(K)$ | Sum of Discounted Cash Flows | 24,000,188,118 | | | |
| Calc. | | $[S] = Q$ | Discounted Terminal Value | 16,349,774,549 | | | |
| 8 | | [T] | Value of 20% of Sibneft | 6,111,851,700 | | | |
| **Calc.** | | $[U] = R + S + T$ | **Enterprise Value as of 11/21/2007** | 46,461,814,366 | | | |

**Kaczmarek Sources & Notes:**

(1) See Appendix J.3 - Updated - Yukos Income Statement

(2) Interest expense from Appendix J.3 - Updated multiplied by (1-t), where t is equal to the tax rate, found in Appendix J.14 - Updated. Tax is deducted because FCFF should not include the tax benefits associated with interest deductions (the benefit is captured through the use of after-tax cost of debt in the WACC).

(3) Total current assets and total current liabilities from Appendix J.4 - Updated - Yukos Balance Sheet. To estimate current assets and liabilities as of November 21, 2007, we prorate the growth in current assets and liabilities using the portion of the year that has passed (324 of 365 days).

(4) See Appendix J.11 - Updated - Yukos Capital Expenditures

(5) Present value factor calculated as $1 / (1+WACC)^t$, where t = number of years from 11/21/2007 to cash flow date. We assume mid-year (June 30) cash flows in our DCF valuation.

(6) Terminal growth rate represents the perpetual growth rate for Yukos FCFF. Our estimate of 3.5% is based on analyst estimates for Yukos and Rosneft (which is comprised primarily of former Yukos assets). See HSBC. *Yukos: A potential alignment of interests* at p. 19. 25 May 2004. **(NAV – 401)**; Erste Bank.. *Company Report: Yukos* at p. 9. 26 January 2004. **(NAV – 412)**; Smith Barney. *Yukos: A binary issue* at p. 3. 28 April 2004. **(NAV – 173)**; Credit Suisse. *Yukos: Increasing Concerns* at p. 18. 21 December 2004. **(NAV – 402)**; Brunswick UBS Warburg. *Yukos: The "GEM supermajor"* at p. 12. 10 April 2003. **(NAV – 398)**; Morgan Stanley. *Rosneft: All Access* at p. 31. 29 August 2006. **(NAV – 272)**; ABN Amro. *Rosneft: Outcome of Yukos auctions* at p. 18. 5 September 2007. **(NAV – 262)**; HSBC. *Rosneft OAO* at p. 8. 7 December 2007. **(NAV – 273)**; Deutsche UFG. *Rosneft: Blue-Sky's down to Earth* at p. 4. 11 July 2007. **(NAV – 259)**

(7) See Appendix J.15 - Updated - Yukos WACC Calculation

(8) Based on 20% of Sibneft adjusted market capitalization as of 21 November 2007. See Appendix F.4 - Updated.

**JD Sources & Notes:**

[1] I copy tax-adjusted interest payments from above

[2] I calculate Change in Net Debt using Mr. Kaczmarek's method from his Appendix J.1 - Updated

[3] I infer Sibneft dividends as the difference between FCFE and the non-dividend components of FCFE.

[4] I calculate Free Cash Flow to Equity using Mr. Kaczmarek's method from his Appendix J.1 - Updated. I adjust by a percentage factor to account for Sibneft dividends, equal to the percent of those dividends out of FCFE for the prior 3 years. See Appendix J.1

A-4

**B.**   **ANNEX A2:  YUKOS COMPANY STRUCTURE**
  **(extract from Exh. R-3165, referred to in note 2413 of the Award)**



**C.   TABLES T1–T9 SHOWING THE TRIBUNAL'S DAMAGES CALCULATIONS**

1.   **Table T1:  Calculation of Total Damages of Claimants as of 19 December 2004 (Date of Expropriation) vs. 30 June 2014 (Date of Award for Valuation Purposes)**

| 19  December  2004 | |
|---|---|
| **Damages component** | **Amount** *(in USD)* |
| Yukos Equity Value | 21,175,832,823 |
| Dividends to end of 2004 | 2,417,808,219 |
| *Sum of Equity Value and Dividends* | *23,593,641,042* |
| Interest through 30 June 2014 | 7,596,090,702 |
| **Total** | **31,189,731,744** |

| | Outstanding Shares | % of Outstanding Shares | Damages *(in USD)* |
|---|---|---|---|
| **Yukos Total** | 1,934,964,578 | 100.00 | **31,189,731,744** |
| Claimant Hulley | 1,090,043,968 | 56.33405 | 17,570,439,964 |
| Claimant YUL | 50,340,995 | 2.60165 | 811,447,480 |
| Claimant VPL | 223,699,175 | 11.56089 | 3,605,811,362 |
| **Claimants Total** | 1,364,084,138 | 70.49659 | **21,987,698,805** |

| 30  June  2014 | |
|---|---|
| **Damages component** | **Amount** *(in USD)* |
| Yukos Equity Value | 42,625,343,615 |
| Dividends and interest (through 30 June 2014) | 51,981,340,000 |
| **Total** | **94,606,683,615** |

| | Outstanding Shares | % of Outstanding Shares | Damages *(in USD)* |
|---|---|---|---|
| **Yukos Total** | 1,934,964,578 | 100.00 | **94,606,683,615** |
| Claimant Hulley | 1,090,043,968 | 56.33405 | 53,295,779,147 |
| Claimant YUL | 50,340,995 | 2.60165 | 2,461,334,249 |
| Claimant VPL | 223,699,175 | 11.56089 | 10,937,377,001 |
| **Claimants Total** | 1,364,084,138 | 70.49659 | **66,694,490,398** |

| Damages After 25% Reduction | |
|---|---|
| Claimant Hulley | 39,971,834,360 |
| Claimant YUL | 1,846,000,687 |
| Claimant VPL | 8,203,032,751 |
| **Claimants Total** | **50,020,867,798** |

Note: Claimants' shareholdings and total number of Outstanding Shares taken from Appendix C.5.b to First Kaczmarek Report

2.   **Table T2:  Equity Value of Yukos Based on Adjustments Made by Professor Dow to Mr. Kaczmarek's Comparable Companies Calculations and the Evolution of the RTS Oil & Gas Index**

| Valuation Date | RTS Oil & Gas Index | Ratio between RTS Index at given date and 21 November 2007 | Value of Yukos *(in USD)* |
|---|---|---|---|
| **19 December 2004** | 92.85 | 0.346713966 | 21,175,832,823 |
| **21 November 2007** | 267.8 | 1 | 61,075,800,000 |
| **30 June 2014** | 186.90* | 0.697908887 | 42,625,343,615 |

* RTS Oil & Gas Index value corresponding to average of values over first 5 months in 2014, *see* **Table T8**

3. **Table T3:  Calculation of Dividends and Interest up to Valuation Date for Valuation as of 30 June 2014**

| Year | Kaczmarek FCFtE figure | Dow-adjusted Kaczmarek FCFtE figure | Tribunal's FCFtE figure | Interest to 30 June 2014 | Total |
|------|------|------|------|------|------|
| **2004** | 3,645,331,570 | 3,218,376,817 | 2,500,000,000 | 804,887,500 | 3,304,887,500 |
| **2005** | 4,796,449,237 | 4,489,360,593 | 3,500,000,000 | 1,008,227,500 | 4,508,227,500 |
| **2006** | 4,676,741,445 | 4,396,018,793 | 3,500,000,000 | 889,612,500 | 4,389,612,500 |
| **2007** | 8,484,005,345 | 7,670,054,341 | 6,000,000,000 | 1,321,710,000 | 7,321,710,000 |
| **2008** | 7,818,745,258 | 6,749,310,837 | 6,000,000,000 | 1,118,370,000 | 7,118,370,000 |
| **2009** | 7,642,393,629 | 5,462,900,795 | 5,000,000,000 | 762,525,000 | 5,762,525,000 |
| **2010** | 4,254,461,116 | 4,841,849,986 | 3,500,000,000 | 415,152,500 | 3,915,152,500 |
| **2011** | 6,285,189,113 | 4,282,802,054 | 4,000,000,000 | 338,900,000 | 4,338,900,000 |
| **2012** | 8,395,083,921 | 3,724,462,548 | 5,000,000,000 | 254,175,000 | 5,254,175,000 |
| **2013** | 7,627,873,208 | 3,147,630,465 | 4,000,000,000 | 67,780,000 | 4,067,780,000 |
| **2014 (to 30 June)** | 3,586,359,907 | 1,309,884,871 | 2,000,000,000 | 0 | 2,000,000,000 |
| **Sum** | 67,212,633,749 | 49,292,652,101 | 45,000,000,000 | 6,981,340,000 | **51,981,340,000** |

Notes:
- Kaczmarek figures for 2004 to 2011 taken from Second Kaczmarek Report, Appendix AJ.1.
- Kaczmarek figures for 2012 to 2014 calculated as follows:
Free cash flow to equity (FCFTE) = Free cash flow to the firm - Tax-adjusted interest payments + Change in net debt + 20% of Sibneft dividends, see Appendix AJ.1 to Second Kaczmarek Report.
- Dow-adjusted Kaczmarek figures calculated with excel version of Appendix 1 to Second Dow Report (taking into account all of Dow's corrections).
- Interest has been applied in line with the factors stated in Table T7.

**4.    Table T4:  FCFtE for Years 2012–2014
(Based on Mr. Kaczmarek's Figures)**

|      | Free cash flow to the firm | Total adjustment as calculated in Table T5 | Adjusted result |
|------|---------------------------|---------------------------------------------|-----------------|
| 2012 | 8,650,212,831 | -255,128,910 | 8,395,083,921 |
| 2013 | 7,838,948,724 | -211,075,516 | 7,627,873,208 |
| 2014 | 7,330,053,779 | -157,333,965 | 7,172,719,814 |

Notes:
- Free cash flow to the firm figures taken from Appendix AJ.2 to Second Kaczmarek Report.
- Total adjustment calculated in Table T5.

A-9

5.    **Table T5:  Total Adjustment of Free Cash Flow to the Firm**
      **(Required to Obtain FCFtE value for Years 2012–2014 for Mr. Kaczmarek)**

|  | Tax-adjusted interest payments (subtracted) | Change in net debt | 20% of Sibneft dividends | Total adjustment |
|---|---|---|---|---|
| 2012 | -381,230,527 | -19,498,383 | 145,600,000 | -255,128,910 |
| 2013 | -375,218,163 | 18,542,647 | 145,600,000 | -211,075,516 |
| 2014 | -373,949,497 | 71,015,532 | 145,600,000 | -157,333,965 |

Notes:
- Total adjustment formula taken from Appendix AJ.1 to Second Kaczmarek Report.
- Figures for tax-adjusted interest payments taken from Appendix AJ.2 to Second Kaczmarek Report.
- Change in net debt calculated in Table T6.
- For Sibneft dividends for years 2012 to 2014, it has been assumed that these were equal to the dividends paid in 2010, the last year for which Claimants have provided annual figures (the 2011 figures were based on annualized third quarter figures, see note (6) to Appendix AJ.1 to the Second Kaczmarek Report).

6.    **Table T6:  Change in Net Debt for Years 2012–2014**

| | Change in net debt | | |
|---|---|---|---|
| | **2012** | **2013** | **2014** |
| Long-term debt Y | 7,000,000,000 | 6,965,681,451 | 6,952,780,045 |
| Short-term debt Y | 597,731,821 | 594,801,351 | 593,699,697 |
| | | | |
| Long-term debt Y-1 | 7,189,462,610 | 7,000,000,000 | 6,965,681,451 |
| Short-term debt Y-1 | 613,910,083 | 597,731,821 | 594,801,351 |
| Difference between Sum of Long-term and Short-term debt for Y and Y-1 | -205,640,872 | -37,249,019 | -14,003,060 |
| | | | |
| Cash Y | 2,468,733,701 | 2,412,942,035 | 2,327,923,443 |
| Cash Y-1 | 2,654,876,190 | 2,468,733,701 | 2,412,942,035 |
| Difference Cash Y and Cash Y-1 | -186,142,489 | -55,791,666 | -85,018,592 |
| Difference 1 minus Difference 2 | -19,498,383 | 18,542,647 | 71,015,532 |

Note:
- Formula for change in net debt (as change in long-term debt plus short-term debt, less cash) taken from note (5) to Appendix AJ.1 to Second Kaczmarek Report and Appendix AJ.4 to Second Kaczmarek Report.

7.     **Table T7:  Interest Factors Based on Annual Rate of 3.389 percent (see Table T9)**

|  | Interest Factors |
|---|---|
| 0.5Y | 0.01695 |
| 1Y | 0.03389 |
| 1.5Y | 0.05084 |
| 2.5Y | 0.08473 |
| 3.5Y | 0.11862 |
| 4.5Y | 0.15251 |
| 5.5Y | 0.18640 |
| 6.5Y | 0.22029 |
| 7.5Y | 0.25418 |
| 8.5Y | 0.28807 |
| 9.5Y | 0.32196 |

8.    Table T8:  RTS Oil and Gas Index Values from 1 January to 24 June 2014

| Date | Value |
|------|-------|
| 24.06.2014 | 212.32 |
| 23.06.2014 | 204.45 |
| 20.06.2014 | 202.34 |
| 19.06.2014 | 204.35 |
| 18.06.2014 | 204.70 |
| 17.06.2014 | 201.10 |
| 16.06.2014 | 202.16 |
| 11.06.2014 | 201.74 |
| 10.06.2014 | 200.20 |
| 09.06.2014 | 198.74 |
| 06.06.2014 | 198.02 |
| 05.06.2014 | 193.64 |
| 04.06.2014 | 191.37 |
| 03.06.2014 | 191.84 |
| 02.06.2014 | 192.09 |
| 30.05.2014 | 187.51 |
| 29.05.2014 | 191.62 |
| 28.05.2014 | 190.06 |
| 27.05.2014 | 190.95 |
| 26.05.2014 | 197.69 |
| 23.05.2014 | 196.70 |
| 22.05.2014 | 195.66 |
| 21.05.2014 | 196.28 |
| 20.05.2014 | 193.19 |
| 19.05.2014 | 191.71 |
| 16.05.2014 | 188.03 |
| 15.05.2014 | 186.38 |
| 14.05.2014 | 187.74 |
| 13.05.2014 | 186.26 |
| 12.05.2014 | 184.38 |
| 08.05.2014 | 184.14 |
| 07.05.2014 | 184.98 |
| 06.05.2014 | 177.49 |
| 05.05.2014 | 173.50 |
| 02.05.2014 | 174.25 |
| 30.04.2014 | 175.39 |
| 29.04.2014 | 175.77 |
| 28.04.2014 | 173.16 |
| 25.04.2014 | 170.99 |
| 24.04.2014 | 173.90 |
| 23.04.2014 | 176.68 |

| Date | Value |
|------|-------|
| 22.04.2014 | 177.43 |
| 21.04.2014 | 178.37 |
| 18.04.2014 | 179.98 |
| 17.04.2014 | 175.73 |
| 16.04.2014 | 173.51 |
| 15.04.2014 | 172.15 |
| 14.04.2014 | 176.96 |
| 11.04.2014 | 179.60 |
| 10.04.2014 | 181.58 |
| 09.04.2014 | 177.85 |
| 08.04.2014 | 177.96 |
| 07.04.2014 | 176.97 |
| 04.04.2014 | 181.85 |
| 03.04.2014 | 178.37 |
| 02.04.2014 | 179.82 |
| 01.04.2014 | 181.96 |
| 31.03.2014 | 181.08 |
| 28.03.2014 | 175.42 |
| 27.03.2014 | 175.17 |
| 26.03.2014 | 177.70 |
| 25.03.2014 | 172.92 |
| 24.03.2014 | 167.71 |
| 21.03.2014 | 169.63 |
| 20.03.2014 | 172.14 |
| 19.03.2014 | 172.44 |
| 18.03.2014 | 172.97 |
| 17.03.2014 | 168.16 |
| 14.03.2014 | 162.30 |
| 13.03.2014 | 165.81 |
| 12.03.2014 | 168.25 |
| 11.03.2014 | 171.47 |
| 07.03.2014 | 174.78 |
| 06.03.2014 | 175.04 |
| 05.03.2014 | 177.77 |
| 04.03.2014 | 178.02 |
| 03.03.2014 | 169.50 |
| 28.02.2014 | 186.96 |
| 27.02.2014 | 186.38 |
| 26.02.2014 | 189.54 |
| 25.02.2014 | 191.17 |
| 24.02.2014 | 192.46 |
| 21.02.2014 | 191.80 |
| 20.02.2014 | 190.39 |
| 19.02.2014 | 190.63 |

| Date | Value |
|---|---|
| 18.02.2014 | 195.14 |
| 17.02.2014 | 195.39 |
| 14.02.2014 | 195.31 |
| 13.02.2014 | 192.39 |
| 12.02.2014 | 196.54 |
| 11.02.2014 | 194.62 |
| 10.02.2014 | 193.61 |
| 07.02.2014 | 193.33 |
| 06.02.2014 | 191.41 |
| 05.02.2014 | 189.33 |
| 04.02.2014 | 186.14 |
| 03.02.2014 | 186.13 |
| 31.01.2014 | 188.71 |
| 30.01.2014 | 192.36 |
| 29.01.2014 | 189.39 |
| 28.01.2014 | 192.63 |
| 27.01.2014 | 195.94 |
| 24.01.2014 | 196.68 |
| 23.01.2014 | 199.51 |
| 22.01.2014 | 200.07 |
| 21.01.2014 | 200.13 |
| 20.01.2014 | 199.53 |
| 17.01.2014 | 199.45 |
| 16.01.2014 | 199.19 |
| 15.01.2014 | 200.58 |
| 14.01.2014 | 199.51 |
| 13.01.2014 | 200.84 |
| 10.01.2014 | 199.89 |
| 09.01.2014 | 198.47 |
| 08.01.2014 | 198.14 |
| 06.01.2014 | 198.55 |
|  |  |
| Sum | 21680.08 |
| Average | 186.90 |

A-15

9.    **Table T9:  10-Year U.S. Sovereign Bond Rate 2005–2014**

| Date | Value |
|------|-------|
| 2005-01 | 4.22 |
| 2005-02 | 4.17 |
| 2005-03 | 4.50 |
| 2005-04 | 4.34 |
| 2005-05 | 4.14 |
| 2005-06 | 4.00 |
| 2005-07 | 4.18 |
| 2005-08 | 4.26 |
| 2005-09 | 4.20 |
| 2005-10 | 4.46 |
| 2005-11 | 4.54 |
| 2005-12 | 4.47 |
| 2006-01 | 4.42 |
| 2006-02 | 4.57 |
| 2006-03 | 4.72 |
| 2006-04 | 4.99 |
| 2006-05 | 5.11 |
| 2006-06 | 5.11 |
| 2006-07 | 5.09 |
| 2006-08 | 4.88 |
| 2006-09 | 4.72 |
| 2006-10 | 4.73 |
| 2006-11 | 4.60 |
| 2006-12 | 4.56 |
| 2007-01 | 4.76 |
| 2007-02 | 4.72 |
| 2007-03 | 4.56 |
| 2007-04 | 4.69 |
| 2007-05 | 4.75 |
| 2007-06 | 5.10 |
| 2007-07 | 5.00 |
| 2007-08 | 4.67 |
| 2007-09 | 4.52 |
| 2007-10 | 4.53 |
| 2007-11 | 4.15 |
| 2007-12 | 4.10 |
| 2008-01 | 3.74 |
| 2008-02 | 3.74 |
| 2008-03 | 3.51 |
| 2008-04 | 3.68 |
| 2008-05 | 3.88 |

| Date | Value |
| --- | --- |
| 2008-06 | 4.10 |
| 2008-07 | 4.01 |
| 2008-08 | 3.89 |
| 2008-09 | 3.69 |
| 2008-10 | 3.81 |
| 2008-11 | 3.53 |
| 2008-12 | 2.42 |
| 2009-01 | 2.52 |
| 2009-02 | 2.87 |
| 2009-03 | 2.82 |
| 2009-04 | 2.93 |
| 2009-05 | 3.29 |
| 2009-06 | 3.72 |
| 2009-07 | 3.56 |
| 2009-08 | 3.59 |
| 2009-09 | 3.40 |
| 2009-10 | 3.39 |
| 2009-11 | 3.40 |
| 2009-12 | 3.59 |
| 2010-01 | 3.73 |
| 2010-02 | 3.69 |
| 2010-03 | 3.73 |
| 2010-04 | 3.85 |
| 2010-05 | 3.42 |
| 2010-06 | 3.20 |
| 2010-07 | 3.01 |
| 2010-08 | 2.70 |
| 2010-09 | 2.65 |
| 2010-10 | 2.54 |
| 2010-11 | 2.76 |
| 2010-12 | 3.29 |
| 2011-01 | 3.39 |
| 2011-02 | 3.58 |
| 2011-03 | 3.41 |
| 2011-04 | 3.46 |
| 2011-05 | 3.17 |
| 2011-06 | 3.00 |
| 2011-07 | 3.00 |
| 2011-08 | 2.30 |
| 2011-09 | 1.98 |
| 2011-10 | 2.15 |
| 2011-11 | 2.01 |
| 2011-12 | 1.98 |
| 2012-01 | 1.97 |

| Date | Value |
|------|-------|
| 2012-02 | 1.97 |
| 2012-03 | 2.17 |
| 2012-04 | 2.05 |
| 2012-05 | 1.80 |
| 2012-06 | 1.62 |
| 2012-07 | 1.53 |
| 2012-08 | 1.68 |
| 2012-09 | 1.72 |
| 2012-10 | 1.75 |
| 2012-11 | 1.65 |
| 2012-12 | 1.72 |
| 2013-01 | 1.91 |
| 2013-02 | 1.98 |
| 2013-03 | 1.96 |
| 2013-04 | 1.76 |
| 2013-05 | 1.93 |
| 2013-06 | 2.30 |
| 2013-07 | 2.58 |
| 2013-08 | 2.74 |
| 2013-09 | 2.81 |
| 2013-10 | 2.62 |
| 2013-11 | 2.72 |
| 2013-12 | 2.90 |
| 2014-01 | 2.86 |
| 2014-02 | 2.71 |
| 2014-03 | 2.72 |
| 2014-04 | 2.71 |
| 2014-05 | 2.56 |
| Sum | 383.01 |
| **Average** | **3.389** |

Note:
- Ten-year US treasury constant maturities, according to
*http://www.federalreserve.gov/releases/h15/data.htm*