Exhibit 3

# judgment

**THE HAGUE DISTRICT COURT**

Chamber for Commercial Affairs

case number / cause list number

**Judgment of 20 April 2016**

in the following joined cases

**I.**      **the case with case number / cause list number**: **C/09/477160 / HA ZA 15-1 (hereinafter: case I)** of

**THE RUSSIAN FEDERATION**,
seated in Moscow, the Russian Federation,
claimant,
lawyer mr. L.Ph.J. Baron van Utenhove of The Hague,

versus

the company incorporated under and subject to Cypriot law
**VETERAN PETROLEUM LIMITED**,
with its registered office in Nicosia, Cyprus,
defendant,
lawyer mr. M.A. Leijten of Amsterdam;

**II.**      **the case with case number / cause list number**: **C/09/477162 / HA ZA 15-2 (hereinafter: case II)** of

**THE RUSSIAN FEDERATION**,
seated in Moscow, the Russian Federation,
claimant,
lawyer mr. L.Ph.J. Baron van Utenhove of The Hague,

versus

the company incorporated under and subject to Cypriot law
**YUKOS UNIVERSAL LIMITED**,
with its registered office in Douglas, Isle of Man,
defendant,
lawyer mr. M.A. Leijten of Amsterdam;

**III.**      **the case with case number / cause list number: C/09/481619 / HA ZA 15-112 (hereinafter: case III)** of

**THE RUSSIAN FEDERATION**,
seated in Moscow, the Russian Federation,

claimant,
lawyer mr. L.Ph.J. Baron van Utenhove of The Hague,

versus

the company incorporated under and subject to Cypriot law
**HULLEY ENTERPRISES LIMITED,**
with its registered office in Nicosia, Cyprus,
defendant,
lawyer mr. M.A. Leijten of Amsterdam.


Parties are hereinafter referred to as the Russian Federation, VPL, YUL and Hulley,
respectively. The court also jointly refers to the three defendants as "defendants".

C/09/477160 / HA ZA 15-1, C/09/477162 / HA ZA 15-2 and                                    3
C/09/481619 / HA ZA 15-112
20 april 2016

**INDEX**

**1.      THE PROCEEDINGS**

in case I                                                                                      1.1
in case II                                                                                     1.1
in case III                                                                                    1.1
in all cases                                                                                   1.1–1.3

**2.      THE FACTS ESTABLISHED BETWEEN THE PARTIES**

in all cases
          2.1-2.13

**3.      RELEVANT LEGISLATION**

*The Energy Charter Treaty ("ECT")*                                                            3.1
*The Vienna Convention on the Law of Treaties ("VLCT")*                                        3.2
*The Russian Constitution*                                                                     3.3
*The Russian Federal Law on International Treaties ("FLIT")*                                    3.4
*The Russian Fundamentals of Legislation*                                                      3.5
*The Law on Foreign Investments*                                                               3.6

**4.      THE DISPUTE BETWEEN THE PARTIES**

in all cases                                                                                   4.1–4.4

**5.      THE ASSESSMENT OF THE DISPUTES**

in all cases                                                                                   5.1–5.100

**INTRODUCTION**                                                                               5.1–5.3

*Authentic texts or translation?*                                                              5.1–5.2
*The competence of the court in these proceedings*                                             5.3

**THE COMPETENCE OF THE TRIBUNAL**                                                             5.4–5.96

**Introduction**                                                                               5.4–5.5

*Article 45 ECT*                                                                               5.6–5.31

*General*                                                                                      5.6
*Article 45 paragraph 1*                                                                       5.7–5.13
*Article 45 paragraph 2*                                                                       5.14–5.17
*Provisional conclusion on Article 45 paragraph 1*                                             5.18
*Object and purpose of the ECT and the nature of international law*                             5.19
*Opinion of other tribunal*                                                                    5.20

C/09/477160 / HA ZA 15-1, C/09/477162 / HA ZA 15-2 and                    4
C/09/481619 / HA ZA 15-112
20 april 2016

*State practice*                                                          5.21
*The travaux preparatoires*                                              5.22
*Conclusion about the interpretation of Article 45*                       5.23
*Prior declaration required?*                                            5.24–5.31

**Article 26 ECT**                                                        5.32–5.34

**The Law on Foreign Investments**                                        5.35–5.58

*General*                                                                 5.35–5.42
*Article 9 The Law on Foreign Investments 1991*                           5.43–5.51
*Article 10 The Law on Foreign Investments 1999*                          5.52–5.58

**The Explanatory Memorandum to the ratification act**                    5.59–5.63

**Interim statement on Article 26 ECT**                                   5.65

**Bound by virtue of signature or ratification?**                         5.66–5.74

*General*                                                                 5.66
*Articles 2, 6 and 23 FLIT*                                               5.67–5.71
*Article 39 ECT*                                                          5.72
*Provisional conclusion on the binding force of signature and ratification* 5.73

**The principal of seperation of powers**                                 5.74–5.95

*General*                                                                 5.74
*The Russian Constitution*                                                5.75–5.93
*Article 23 FLIT*                                                         5.94
*Final conclusion on the meaning of Article 45 ECT*
*in connection with Article 26 ECT*                                       5.95

**Final conclusion on the jurisdiction of the Tribunal**                  5.96

**THE CONSEQUENCES OF THE RULING ON THE JURISDICTION**
**OF THE TRIBUNAL**                                                       5.97–5.98

**THE COSTS OF THE PROCEEDINGS**                                          5.99–5.100

**6.       THE RULING**                                                   6.1–6.9

**in case I**                                                             6.1–6.3
**in case II**                                                            6.4–6.6
**in case III**                                                           6.7–6.9

C/09/477160 / HA ZA 15-1, C/09/477162 / HA ZA 15-2 and                                    5
C/09/481619 / HA ZA 15-112
20 april 2016

## 1.     THE PROCEEDINGS

1.1.     The course of the proceedings is evidenced by:

**in case I**

-        the summons of 10 November 2014 served on VPL, with Exhibits RF-1 up to and
         including RF-95;
-        the court documents in the interim proceedings for the consolidation of the
         proceedings, initiated by the Russian Federation, resulting in the decision on the
         procedural issue of 11 March 2015, in which the court joined this case with the
         cases II and III;

**in case II**

-        the summons of 10 November 2014 served on YUL, with Exhibits RF-1 up to and
         including RF-95;
-        the court documents in the interim proceedings for the consolidation of the
         proceedings, initiated by the Russian Federation, resulting in the decision on the
         procedural issue of 11 March 2015, in which the court joined this case with the
         cases I and III;

**in case III**

-        the summons of 10 November 2014 served on Hulley, with Exhibits RF-1 up to
         and including RF-95;
-        the court documents in the interim proceedings for the consolidation of the
         proceedings, initiated by the Russian Federation, resulting in the decision on the
         procedural issue of 11 March 2015, in which the court joined this case with the
         cases I and II;

**in all cases**

- the defendants' joint statement of defence of 20 May 2015, with Annexes numbered 1-7, of which Annex 1 comprises Exhibits HVY-1 up to and including HVY-107;
- the court's letter to the parties of 22 June 2015 containing the correspondence of the parties sent to the court (the letters of 18 and 25 May 2015 and 2 June 2015 from the Russian Federation and the letters of 21 May 2015 and 3 June 2015 from the defendants) concerning the subsequent course of the proceedings;
- the letter of 2 July 2015 from the Russian Federation, stating the dates on which the party is unable to appear as well as the terms for the reply and rejoinder;
- the interim judgment of 8 July 2015, in which the court referred the case to the 9 February 2016 hearing of a three-judge panel for the closing arguments;
- the e-mail message of 8 July 2015 from the registrar of the court to the lawyers, with the dates for presenting the replies and rejoinders;
- the joint reply of 16 September 2015 of the Russian Federation, with Exhibits RF-96 up to and including RF-198;
- the letter of 16 November 2015 from the Russian Federation, concerning some of the facilities available in the court room;
- the letter of 30 November 2015 from the Russian Federation, with Exhibit RF-199;
- the letter of 10 December 2015 from the registrar of the court to the parties, with a response to the letter of 16 November 2015;
- the letter of 15 December 2015 from the Russian Federation, with Annex 1, a translation into the Dutch language of the Interim Awards and the Final Awards, Annex 2, an overview of the folder structure on the USB flash drive submitted alongside the letter, and Annex 3, a USB flash drive containing all court documents and all documents previously submitted by the parties;
- the joint rejoinder of the defendants dated 15 December 2015, with Exhibits HVY-108 up to and including HVY-126;
- the letter of 11 January 2016 from the Russian Federation, regarding the course of action during the hearing (speaking time and audio recording);
- the letter of 13 January 2016 from the defendants, with a response to the letter of 11 January 2016;
- the letter of 19 January 2016 from the registrar of the court to the parties' lawyers, with the court's decisions on the procedural questions in the letters of 11 and 13 January 2016;
- the letter from the Russian Federation of 22 January 2016 with the document containing Exhibits RF-200 up to and including RF-222 of the same date;
- the letter from the Russian Federation of 25 January 2016 with the additional document containing Exhibits RF-223 up to and including RF-225, dated 25 January 2016;
- the letter of 26 January 2016 from the lawyer of the Russian Federation, listing the persons who would attend the hearing on the part of the Russian Federation;
- the letter of 26 January 2016 from the lawyer of the defendants, listing the persons who would attend the hearing on the part of the defendants;
- the letter of 27 January 2016 from the lawyer of the Russian Federation, with the additional document containing Exhibit RF-226 as well as a USB flash drive with

        Annexes to the previously submitted Exhibits RF-200 up to and including RF-202 and, again, Exhibit RF-225, dated 27 January 2016;

- the letter of 27 January 2016 from the Russian Federation, with Exhibit R-282 in hard copy (previously submitted on a USB flash drive);
- the letter of 28 January 2016 from the lawyer of the defendants, with an objection to the additional Exhibits of the Russian Federation;
- the official report of the hearing of 9 February 2016, for the closing arguments in this case, as well as the statements of case and other documents of the lawyer of the Russian Federation handling the case, Prof. mr. A.J. van den Berg, and of the defendants' lawyer and his colleague mr. M. Ynzonides;
- the dispatch on 16 February 2016 of this official report to the lawyers, with the notification that any remarks about the official report can be communicated to the court within two weeks of receipt;
- the letter of 22 February 2016 from the lawyer of the Russian Federation handling the case, with a response to the official report;
- the letter of 26 February 2016 from the lawyer of the defendants with a response to the official report and to the letter of 22 February 2016 from the lawyer of the Russian Federation;
- the letter of 1 March 2016 from the registrar of the court to the lawyers, containing the confirmation of receipt of the above-mentioned letters of 22 and 26 February 2016.

1.2.     At the end of the hearing of 9 February 2016, the court informed the parties that it would deliver its judgment on this day, 20 April 2016.

1.3.     In its judgment, the court has taken into account, in so far as possible, the remarks of the parties about the text of the official report of the hearing of 9 February 2016. For the rest, these remarks should be viewed as parties' positions.

## 2.     THE FACTS ESTABLISHED BETWEEN THE PARTIES

**in all cases**

2.1.     The Energy Charter Treaty was opened for signature in Portugal in December 1994. From Article 50 of said Treaty it follows that the English and French texts of the Treaty and associated Protocol, among other languages, are equally authentic. These equally authentic have been published in the Dutch Treaty Series (*Tractatenblad - Trb.* 1995, 108). The English-language version of the Treaty serves as the basis for this judgment and is designated as "the ECT" or "the Treaty". The provisions of the ECT relevant to this case are stated in the English-language version below, in 3.2. The ECT entered into force on 16 April 1998.

2.2.     Among the parties that signed the ECT is the Russian Federation, claimant in these proceedings. Mr O.D. Davydov, then Vice Prime Minister of the Russian Federation, signed the ECT on behalf of that state on 17 December 1994, thereby making the Russian Federation Signatory in the sense of Article 45 paragraph 1 ECT ("*Ondertekenende Partij*" in the Dutch version, as published in *Trb.* 1995, 250). The Russian Federation did not make

use of the possibility provided under Article 45 paragraph 2 under *a* ECT for a Signatory to submit a declaration that it is not able to accept provisional application of the ECT.

2.3.     On 26 August 1996, the government of the Russian Federation presented a legislative proposal to the Duma, as part of the Parliament of the Russian Federation, for ratification of the ECT. This legislative proposal contains the passages, among other things, cited under 5.9.

2.4.     The Parliament never ratified the ECT. On 20 August 2009, the Russian Federation notified the Portuguese Republic (the Depository under Article 49 ECT) of its intention not to become signatory to the ECT.

2.5.     The Russian company Yukos Oil Company (hereinafter: Yukos) was a major oil producer, through its subsidiaries and otherwise, at the start of the previous decade. Its CEO was Mr Mikhail Khodorkovsky. Each of the defendants was shareholder of Yukos – through other entities.

2.6.     In and after 2003, the Russian tax authorities took the position that Yukos had been involved in the systemic and large-scale evasion of regular taxation in the Russian Federation. This resulted in substantial tax assessments (including additional tax assessments and fines) and subsequently – among other things – in the seizure of Yukos assets. The execution of claims asserted by the tax authorities resulted in the execution sale of Yukos assets and in its bankruptcy (in August 2006).

2.7.     The Yukos shareholders have taken the position that by doing so the Russian Federation unlawfully expropriated most of Yukos' assets. Based on the argument that this constituted an unlawful expropriation of their investments, each of the defendants requested arbitration under Article 26 paragraph 4 sub b ECT and the Arbitration Rules of the United Nations Commission on International Trade Law.

2.8.     After each of the parties had appointed an arbitrator, the Secretary-General of the Permanent Court of Arbitration in The Hague appointed a third arbitrator on 21 July 2005, who was also Chairman of the arbitral tribunal (hereinafter: the Tribunal), Mr L.Yves Fortier. Following the replacement in 2007 of one of the arbitrators appointed in 2005, the Tribunal consisted of the aforementioned Mr Fortier (Chairman), Charles Poncet and Stephen M. Schwebel. The Tribunal was assisted by a secretary and (later also) by an official – described as "assistant" – a Mr Martin Valasek (hereinafter: Valasek).

2.9.     These arbitrations (hereinafter jointly referred to as "the Arbitration", singular) commenced on 31 October 2005. The place of arbitration was The Hague. In the Arbitration, the defendants in these proceedings – in brief – argued as respective claimants that the Russian Federation had unlawfully expropriated their investments in Yukos and had wrongfully failed to protect them from it, resulting in substantial losses. The defendants claimed compensation for these damages.

2.10.    After several hearings and so-called procedural orders, the Tribunal gave an interim award in each of the three parallel cases (hereinafter: Interim Award) on 30 November 2009. In these Interim Awards, the Tribunal answered several questions

regarding its jurisdiction. In so far as currently relevant, the Interim Awards pertain to the following. The articles cited by the Tribunal are provisions of the ECT – unless the following indicates otherwise. Footnotes have been omitted from this representation. The quotations are derived from the Interim Award in the case of defendant VPL and are virtually identical to the considerations in the Interim Awards of the other defendants. Defendant VPL is indicated with "Claimant" while the Russian Federation is indicated with "Respondent".

### b) Tribunal's Decision

*(…)*

264.   *In sum, the ordinary meaning to be given to the terms of Articles 45(1) and 45(2), when read together, demonstrates to the satisfaction of the Tribunal that the declaration which is referred to in Article 45(2) is a declaration which is not necessarily linked to the Limitation Clause of Article 45(1).*

*(…)*

284.   *The Tribunal therefore concludes, based on the ordinary meaning of Article 45(1) in its context, and subject to considerations of estoppel (addressed below), that the Russian Federation may, even after years of stalwart and unqualified support for provisional application and, until this arbitration, without ever invoking the Limitation Clause, claim an inconsistency between the provisional application of the ECT and its internal laws in order to seek to avoid the application of Part V of the ECT.*

*(…)*

### 4. What Effect Should Be Given to the Limitation Clause in Article 45(1)?
### a) All-or-Nothing vs. "Piecemeal" Approach

290.   *The Tribunal has concluded that Respondent may rely on the Limitation Clause of Article 45(1) even though it has neither made a declaration under Article 45(2) nor served any prior notice under Article 45(1). Thus, the Tribunal must determine what effect should be given to the Limitation Clause itself and it now turns its attention to that issue.*

*(…)*

292.   *(…) According to Respondent, the clause requires a "piecemeal" approach which calls for the analysis of the consistency of each provision of the ECT with the Constitution, laws and regulations of the Russian Federation. According to Claimant, the inquiry is an "all-or-nothing" exercise which requires an analysis and determination of whether the principle of provisional application per se is inconsistent with the Constitution, laws or regulations of the Russian Federation.*

### (ii) Tribunal's Decision

*(…)*

303.   *The Tribunal finds that neither party has properly parsed the Limitation Clause of Article 45(1). While each party has provided a starting point for the analysis, neither has carried it through to its conclusion:*
       *considering Respondent's argument first, the Tribunal agrees that the phrase "to the extent that" is often the language used when drafters of a clause in a treaty or a statute wish to make clear that a provision is to be applied only insofar as what then follows is the case. Far from being determinative of the meaning of the Limitation*

Clause, however, the use of the introductory words *"to the extent that"* requires the Tribunal to examine carefully the words that follow, namely *"that such provisional application is not inconsistent with [each signatory's] constitution, laws or regulations."*

- Turning to Claimant's argument about the meaning of these words, the Tribunal finds that Claimant does not provide sufficient support for its interpretation of the phrase <u>*"such provisional application"*</u> as necessarily referring to the principle of provisional application. Article 45(1) does not refer anywhere to the principle of provisional application, but rather to *"[e]ach signatory agree[ing] to apply this Treaty provisionally . . ."*

304.    For the Tribunal, the key to the interpretation of the Limitation Clause rests in the use of the adjective <u>*"such"*</u> in the phrase <u>*"such provisional application"*</u> *"Such,"* according to Black's Law Dictionary (Seventh Edition), means *"that or those; having just been mentioned."* The Merriam-Webster Collegiate Dictionary (Tenth Edition) defines *"such"* as *"of the character, quality, or extent previously indicated or implied."* The phrase *"such provisional application,"* as used in Article 45(1), therefore refers to the provisional application previously mentioned in that Article, namely the provisional application of *"this Treaty."*

305.    The Tribunal concludes, therefore, that the meaning of the phrase *"such provisional application"* is context-specific, in that its meaning is derived from the particular use of provisional application to which it refers. In Article 45(1), the particular use of provisional application to which it refers is provisional application of *"this Treaty."* Accordingly, Article 45(1) can therefore be read as follows:

> (1) Each signatory agrees to apply this Treaty provisionally pending its entry into force for such signatory in accordance with Article 44, to the extent that <u>the provisional application of this Treaty</u> is not inconsistent with its constitution, laws or regulations.

> *[emphasis added]*

306.    By contrast, the Tribunal refers to the Limitation Clause in Article 45(2)(c), which reads:

> (c) Notwithstanding subparagraph (a), any signatory making a declaration referred to in subparagraph (a) <u>shall apply Part VII provisionally</u> pending the entry into force of the Treaty for such signatory in accordance with Article 44, to the extent that <u>such provisional application</u> is not inconsistent with its laws or regulations.

> *[emphasis added]*

In this context, the phrase *"such provisional application"* necessarily has a different meaning, referring to the provisional application of only Part VII of the Treaty.

(…)

308.    There are two possible interpretations of the phrase *"the provisional application of this Treaty"*: it can mean either *"the provisional application of the entire Treaty"* or *"the provisional application of <u>some parts of</u> the Treaty."* The Tribunal finds

*that, in context, the former interpretation accords better with the ordinary meaning that should be given to the terms, as required by Article 31(1) of the VCLT. Indeed, without any further qualification, it is to be presumed that a reference to "this Treaty" is meant to refer to the Treaty as a whole, and not only part of the Treaty.*

309. *The Tribunal notes that its finding on the scope of provisional application in Article 45(1) is entirely consistent with the decision on jurisdiction rendered in the Kardassopoulos case. (…)*

311. *In the Tribunal's opinion, there is no basis to conclude that the signatories would have assumed an obligation to apply only part of the Treaty provisionally, without making such partial provisional application explicit. The Tribunal therefore concludes that the Limitation Clause in Article 45(1) contains an "all-or-nothing" proposition: either the entire Treaty is applied provisionally, or it is not applied provisionally at all.*

312. *Furthermore, the Tribunal concludes that the determination of this "all-or-nothing" question depends on the consistency of the principle of provisional application with a signatory's domestic law. The alternative—that the question hinges on whether, in fact, each and every provision of the Treaty is consistent with a signatory's domestic legal regime—would run squarely against the object and purpose of the Treaty, and indeed against the grain of international law.*

313. *Under the pacta sunt servanda rule and Article 27 of the VCLT, a State is prohibited from invoking its internal legislation as a justification for failure to perform a treaty. In the Tribunal's opinion, this cardinal principle of international law strongly militates against an interpretation of Article 45(1) that would open the door to a signatory, whose domestic regime recognizes the concept of provisional application, to avoid the provisional application of a treaty (to which it has agreed) on the basis that one or more provisions of the treaty is contrary to its internal law. Such an interpretation would undermine the fundamental reason why States agree to apply a treaty provisionally. They do so in order to assume obligations immediately pending the completion of various internal procedures necessary to have the treaty enter into force.*

314. *Allowing a State to modulate (or, as the case may be, eliminate) the obligation of provisional application, depending on the content of its internal law in relation to the specific provisions found in the Treaty, would undermine the principle that provisional application of a treaty creates binding obligations.*

315. *Provisional application as a treaty mechanism is a question of public international law. International law and domestic law should not be allowed to combine, through the deployment of an "inconsistency" or "limitation" clause, to form a hybrid in which the content of domestic law directly controls the content of an international legal obligation. This would create unacceptable uncertainty in international affairs. Specifically, it would allow a State to make fluctuating, uncertain and un-notified assertions about the content of its domestic law, after a dispute has already arisen. Such a State, as Claimant argues, "would be bound by nothing but its own*

*whims and would make a mockery of the international legal agreement to which it chose to subject itself." A treaty should not be interpreted so as to allow such a situation unless the language of the treaty is clear and admits no other interpretation. That is not the case with Article 45(1) of the ECT.*

320.    *The Tribunal reiterates that its interpretation of the Limitation Clause of Article 45(1) is based on its specific language in its context. The Tribunal recognizes, as do Claimant's experts, Professors Crawford and Reisman, that parties negotiating a treaty enjoy drafting freedom and could (using clear and unambiguous language) overcome the "strong presumption of the separation of international from national law." Indeed, parties to a treaty are free to agree to any particular regime. This would include a regime where each signatory could modulate (or eliminate) its obligation of provisional application based on consistency of each provision of the treaty in question with its domestic law. For the reasons set out above, however, agreement to such a regime would need to be clearly and unambiguously expressed, a standard which Article 45(1) does not meet.*

321.    *The Tribunal's interpretation of Article 45(1) is also supported by State practice. As already noted in an earlier section, six States (Austria, Luxembourg, Italy, Romania, Portugal and Turkey) relied expressly on the Limitation Clause in Article 45(1). An analysis of the statements or declarations made by these States confirms that each one of them relied on Article 45(1)—sometimes alone and sometimes in conjunction with Article 45(2))—for the non-application of the entire Treaty under the provisional application regime. Respondent itself has described these six signatories as States who "consider themselves unable to apply and have not applied any provision of the Treaty on a provisional basis." Not one of these six States, in other words, relied on the Limitation Clause in Article 45(1) for the interpretation now posited by Respondent, namely the selective or partial provisional application of the ECT based on the non-application of only those individual provisions that are claimed to be inconsistent with a signatory's domestic law.*

322.    *Similarly, in the lists it maintained to keep track of the intentions of the signatories, the ECT Secretariat identified the States that intended to rely on Article 45(1) as intending to do so in order to avoid provisional application of the Treaty altogether. Thus, the preliminary list of signatories prepared by the ECT Secretariat, dated 19 December 1994, described signatories intending to rely on Article 45(1) as States "which <u>will not apply the Treaty</u> provisionally in accordance with Article 45(1)"[emphasis added]. This preliminary list identified Austria, Italy, Portugal, Romania and Turkey. The updated list prepared by the ECT Secretariat, dated 1 March 1995, described the same category of signatories in exactly the same way, as States "<u>which will not apply the Treaty</u> provisionally in accordance with Article 45(1)" [emphasis added]. In addition to the countries already identified on the list dated 19 December 1994, this list included Hungary61 and Luxembourg.*

329.    *The Tribunal therefore concludes that Article 45(1) requires an analysis and determination of whether the principle of provisional application per se is inconsistent with the Constitution, laws or regulations of the Russian Federation. If it is not inconsistent, then this Tribunal has jurisdiction to hear Claimant's claims*

*under Article 26 of the Treaty, which would apply provisionally in the Russian Federation in accordance with Article 45(1). It is to that issue that the Tribunal now turns.*

**b) Is the Principle of Provisional Application Inconsistent with Russian Law?**

330.  *There is no significant debate between the Parties on the issue of whether the principle of provisional application per se is inconsistent with the Constitution, law or regulations of the Russian Federation. Claimant asserts that the principle is not inconsistent with Russian law, citing ample legislative and doctrinal authorities in support of its submission, and concludes on that basis that the Limitation Clause in Article 45(1) is unavailable to the Russian Federation. Respondent does not seriously challenge the authorities cited by Claimant on this point. Respondent's principal argument against provisional application of the ECT, as seen earlier, is based on the interpretation of Article 45(1), not on the assertion that provisional application per se is unknown or unrecognized by Russian law.*

*(…)*

338.  *The Tribunal therefore has no difficulty in concluding that the principle of provisional application is perfectly consistent with the Constitution, laws and regulations of the Russian Federation. Accordingly, the Tribunal finds that the whole of the ECT applied provisionally in the Russian Federation until such provisional application was terminated, in accordance with the notification that the Russian Federation made on 20 August 2009, pursuant to Article 45(3)(a) of the Treaty, of its intention not to become a Contracting Party to the Treaty.(…)*

343.  *The Tribunal is of the view that the determination as to whether or not the principle of provisional application is consistent with the constitution, the laws or the regulations of the host State in which the Investment is made must be made in the light of the constitution, laws and regulations at the time of signature of the ECT. (…)*

**c) Are the Provisions of the ECT Relating to Dispute Resolution Inconsistent with Russian Law?**

346.  *In view of the Tribunal's conclusion with respect to the interpretation of Article 45(1), there is no need, in principle, to address Respondent's submission that the provisions of the ECT relating to dispute resolution are themselves inconsistent with Russian law.*

347.  *However, since both sides made extensive submissions to the Tribunal with respect to the so-called "piecemeal" approach and because, as will be seen, the Tribunal's analysis and findings with respect to the consistency with Russian laws and Constitution of these provisions of the ECT relating to dispute resolution lead the Tribunal to the same conclusion, the Tribunal has nevertheless decided to set out its analysis under this alternative approach.*

*(…)*

### (ii) Tribunal's Decision

370.   After having considered the totality of the Parties' submissions and having deliberated, the Tribunal concludes that Article 26 of the ECT is not inconsistent with the Constitution, laws or regulations of the Russian Federation. The terms of the Russian Federation's Law on Foreign Investment (both the 1991 and 1999 versions) are crystal clear. Investor-State disputes such as the present one are arbitrable under Russian law. The Tribunal recalls the key provisions of the law which inform its conclusion. (…)

371.   Furthermore, the definitions of "foreign investor" and "foreign investment" in both the 1991 and 1999 versions of the Law on Foreign Investment are consistent with the definitions of "Investor" and "Investment" in Article 1 of the ECT. (…)

372.   On the issue of standing, the Tribunal concludes that Claimant is claiming for violation of its own rights under the ECT, not the rights of Yukos. The Tribunal agrees with Claimant's characterization of its claim, which is not a derivative action, but an action for the direct loss by Claimant of its shares and their value.

374.   The Tribunal's conclusions are confirmed by the representations of the Government of the Russian Federation in the Explanatory Note which it submitted to the State Duma of the Federal Assembly of the Russian Federation when the ECT was submitted for ratification. The following extracts from the Note are particularly relevant:

Prior to the entry into force of the ECT, the majority of the Contracting Parties agreed to apply the treaty on a provisional basis. In this respect, it was decided that such provisional application of the ECT would be implemented to the extent that it would not be inconsistent with the constitution, laws and regulations of the country in question. At the time for the signing of the ECT, its provisions on provisional application were in conformity with the Russian legal acts. For that reason, the Russian side did not make declarations as to its inability to accept provisional application (such declarations were made by 12 of the 49 ECT signatories).
[. . .]
The provisions of the ECT are consistent with Russian legislation.
[. . .]
The legal regime of foreign investments envisaged under the ECT is consistent with the provisions of the existing Law of the RSFSR on Foreign Investments in the RSFSR, as well as with the amended version of the Law currently being discussed in the State Duma, and does not require the acknowledgement of any concessions or the adoption of any amendments to the abovementioned Law. The ECT is also consistent with the provisions of Russian bilateral international treaties on the promotion and protection of investment.
[emphasis added]

375.   During his cross-examination, Professor Avakiyan, one of Respondent's expert witnesses, confirmed that he agreed with the contents of the Explanatory Note cited in the previous paragraph. The Tribunal's conclusion on the consistency of Article 26 of the ECT with Russian law is also supported by the writings of Professor Yershov, who was a member of the Russian delegation to the ECT negotiations.

*During parliamentary hearings concerning the ECT, Professor Yershov submitted a paper in which he noted the following:*

*From the standpoint of Russian interests, the compromise achieved in developing the ECT language guarantees Russia a solution to a critical foreign trade problem: receipt and codification of a liberal nondiscriminatory trade policy regime for an EMP exporter otherwise unattainable in such a short time. In exchange for this, under the ECT, Russia grants foreign investors an energy investment regime acceptable to them that does not require any concessions on Russia's part beyond the framework of current law.*
*[emphasis added]*

376. *As to the BIT practice of the Russian Federation, in the Tribunal's opinion, it is of little assistance to either Party. On the one hand, Claimant refers to the many BITs entered into by the Russian Federation that provide for investor-State arbitration, inviting the conclusion that investor-State arbitration is not inconsistent with Russian law. As Respondent has pointed out, however, the BITs in force in the Russian Federation have all been ratified, thus eliminating any concern with provisions in the BITs that might be different from the underlying Russian legislation. The ratified BITs therefore do little to advance Claimant's position.*

377. *On the other hand, Respondent seeks support for its position by pointing out that some of the explanatory notes submitted to the Duma in connection with the ratification of BITs have made it explicit that the BIT in question is subject to ratification because it contains a provision for the settlement of investor-State disputes through international arbitration. As Claimant points out, however, none of the BITs in question contains a provisional application regime such as that found in Article 45(1) of the ECT. Ratification by the State Duma is thus required in order for the Russian Federation to express its consent to arbitration.*

378. *At this point, the Tribunal recalls again its fundamental finding on the meaning and interpretation of Article 45(1): irrespective of any inconsistencies that might exist between Article 26 of the ECT and Russian law, Article 26 of the ECT, as well as other provisions of the Treaty, apply provisionally and the Russian Federation has therefore consented to international arbitration.*

379. *Pursuing nevertheless its detailed analysis of Article 26, in particular, through the prism of the FLIT, the Tribunal will now seek to answer the question whether the signature of a treaty which contains a provisional application clause is sufficient to establish the consent of the Russian Federation to international arbitration of disputes arising under the Treaty.*

382. *These provisions* [this refers to Articles 2 and 6, added by the court] *of the FLIT are very clear. There is no room for ambiguity. The Tribunal therefore concludes that the Russian Federation has consented to be bound — albeit provisionally — by Article 26 of the ECT by its signature of the ECT. Article 45(1) of the ECT establishes beyond the shadow of a doubt, and notwithstanding Article 39 of the ECT, that the Russian Federation and other signatories agreed that their signature of the Treaty would have the effect of expressing the consent of the Russian Federation (and each other signatory) to be provisionally bound by its terms.*

383.   *The Tribunal notes that Article 11 of the FLIT provides that the decision to sign a treaty is a decision which rests with the Executive: (…)*
       *Moreover, as we saw earlier, Article 23(1) of the FLIT makes it clear that provisional application is permissible under the legislation of the Russian Federation. Therefore, the obligation assumed by the Russian Federation to be bound, prior to ratification, by the dispute settlement provisions (including international arbitration) of a provisionally applied treaty such as the ECT, and the consent expressed therein, are not inconsistent with the Constitution, laws or regulations of the Russian Federation, and the Tribunal so finds.*

384.   *Respondent argues that a treaty must be ratified by the Russian Federation, and therefore be in force, in order to establish the consent of the Russian Federation to an arbitration provision of the treaty. As shown above, however, under the FLIT, ratification is not the only means by which the Russian Federation can express its consent to the terms of a treaty: signature can express consent where the treaty, such as the ECT, so provides, as it does by specifying in Article 45 the obligations not of a party to the treaty but of a "signatory."*

385.   *That there is a distinction between consenting to be bound provisionally by the treaty and, on the other hand, the treaty being "in force" for a State is also clear from the definition of "Contracting Party" in Article 1(2) of the ECT. As used in the ECT, "Contracting Party" means "a state or Regional Economic Integration Organization which has consented to be bound by this Treaty and for which the Treaty is in force." [emphasis added] The use of the conjunction "and" between the clauses "which has consented to be bound by this Treaty" and "for which the Treaty is in force" means that there must be circumstances, in the eyes of the parties to the ECT, including the Russian Federation, where a State for which the ECT is not "in force," has nevertheless consented to be bound by its terms.*

386.   *There is one last argument of Respondent which the Tribunal finds important to address. Article 23(2) of the FLIT requires that a treaty subject to provisional application must be submitted to and ratified by the State Duma within six months from its signature and the start of its provisional application. It is common ground between the Parties that the ECT which was signed on 17 December 1994 has never been ratified by the State Duma. Respondent submits that since the six-month period had long expired, any continued provisional application of the ECT would have been inconsistent with Russian law.*

387.   *In the view of the Tribunal, the six-month limit is merely an internal requirement; failure to respect that procedure does not in and of itself automatically terminate provisional application. (…)*

392.   *The Tribunal's analysis leads it to conclude that Article 26 of the ECT is not inconsistent with the Constitution, laws or regulations of the Russian Federation. Although, as noted at the outset of this section, this analysis was not essential in view of the Tribunal's dispositive interpretation of Article 45(1), it does sustain the Tribunal's decision.*

**5. Conclusion**

*(…)*

394.   *In this chapter, the Tribunal has found that:*
*d) The regimes of provisional application in Article 45(1) and 45(2) are separate, and the Russian Federation can benefit from the Limitation Clause in Article 45(1) even though it made no declaration under Article 45(2);*
*e) The Russian Federation can invoke the Limitation Clause in Article 45(1) even though it made no prior declaration nor gave any prior notice to other signatories that it intended to rely on Article 45(1) to exclude provisional application;*
*f) The Limitation Clause of Article 45(1) negates provisional application of the Treaty only where the principle of provisional application is itself inconsistent with the constitution, laws or regulations of the signatory State; and*
*g) In the Russian Federation, there is no inconsistency between the provisional application of treaties and its Constitution, laws or regulations.*

395.   *Accordingly, the Tribunal has concluded that the ECT in its entirety applied provisionally in the Russian Federation until 19 October 2009, and that Parts III and V of the Treaty (including Article 26 thereof) remain in force until 19 October 2029 for any investments made prior to 19 October 2009. Respondent is thus bound by the investor-State arbitration provision invoked by Claimant.*

396.   *The Tribunal is comforted in its decision by its further finding that, had it been an essential consideration under the Limitation Clause of Article 45(1)—which it is not— Article 26 of the ECT itself, as well as Articles 1(6) and 1(7), are consistent with Respondent's Constitution, laws and regulations.*

*(…)*

2.11.   The operative part of the Interim Awards of 30 November 2009 is as follows:

**IX. DECISION**

612.   *For the reasons set forth above, the Tribunal:*

*(a) DISMISSES the objections to jurisdiction and/or admissibility based on Article 1(6) and 1(7), Article 17, Article 26(3)(b)(i) and Article 45 of the ECT (…).*

2.12.   Arbitration was continued after this. On 18 July 2014, the Tribunal delivered a Final Award in each of the three cases brought before it.

2.13.   In the arbitral proceedings instituted by VPL, the Russian Federation was ordered to pay compensation in the amount of $ 8.203.032.751. In the arbitral proceedings initiated by YUL and Hulley, these defendants were awarded $ 1.846.000.687 and $ 39.971.834.360 respectively in damages.

3.      RELEVANT LEGISLATION

*The Energy Charter Treaty ("ECT")*

3.1.    Articles 1, 2, 10, 13, 26, 39, 44 and 45 ECT read as follows:

***Article 1. Definitions***

*As used in this Treaty:*

1.      *"Charter" means the European Energy Charter adopted in the Concluding Document of the Hague Conference on the European Energy Charter signed at The Hague on 17 December 1991; signature of the Concluding Document is considered to be signature of the Charter.*

2.      *"Contracting Party" means a state or Regional Economic Integration Organization which has consented to be bound by this Treaty and for which the Treaty is in force.*

6.      *"Investment" means every kind of asset, owned or controlled directly or indirectly by an Investor (…)*

7.      *"Investor" means:*
        *a) with respect to a Contracting Party:*
                *(i) a natural person having the citizenship or nationality of or who is permanently residing in that Contracting Party in accordance with its applicable law;*
                *(ii) company or other organization organized in accordance with the law applicable in that Contracting Party;*
        *b) with respect to a "third state", a natural person, company or other organization which fulfils, mutatis mutandis, the conditions specified in subparagraph a) for a Contracting Party.*

***Article 2. Purpose of the Treaty***

*This Treaty establishes a legal framework in order to promote long-term cooperation in the energy field, based on complementarities and mutual benefits, in accordance with the objectives and principles of the Charter.*

***Article 10. Promotion, protection and treatment of investments***

1.      *Each Contracting Party shall, in accordance with the provisions of this Treaty, encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to Make Investments in its Area. Such conditions shall include a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment. Such Investments shall also enjoy the most constant protection and security and no*

*Contracting Party shall in any way impair by unreasonable or discriminatory measures their management, maintenance, use, enjoyment or disposal. In no case shall such Investments be accorded treatment less favourable than that required by international law, including treaty obligations. Each Contracting Party shall observe any obligations it has entered into with an Investor or an Investment of an Investor of any other Contracting Party*

3.     *For the purposes of this Article, "Treatment" means treatment accorded by a Contracting Party which is no less favourable than that which it accords to its own Investors or to Investors of any other Contracting Party or any third state, whichever is the most favourable.*

7.     *Each Contracting Party shall accord to Investments in its Area of Investors of other Contracting Parties, and their related activities including management, maintenance, use, enjoyment or disposal, treatment no less favourable than that which it accords to Investments of its own Investors or of the Investors of any other Contracting Party or any third state and their related activities including management, maintenance, use, enjoyment or disposal, whichever is the most*

12.    *Each Contracting Party shall ensure that its domestic law provides effective means for the assertion of claims and the enforcement of rights with respect to Investments, investment agreements, and investment authorizations.*

### Article 13. Expropriation

1.     *Investments of Investors of a Contracting Party in the Area of any other Contracting Party shall not be nationalized, expropriated or subjected to a measure or measures having effect equivalent to nationalization or expropriation (hereinafter referred to as "Expropriation") except where such Expropriation is:*

       *a) for a purpose which is in the public interest;*
       *b) not discriminatory;*
       *c) carried out under due process of law; and*
       *d) accompanied by the payment of prompt, adequate and effective compensation.*

       *Such compensation shall amount to the fair market value of the Investment expropriated at the time immediately before the Expropriation or impending Expropriation became known in such a way as to affect the value of the Investment (hereinafter referred to as the "Valuation Date"). (...)*

2.     *The Investor affected shall have a right to prompt review, under the law of the Contracting Party making the Expropriation, by a judicial or other competent and independent authority of that Contracting Party, of its case, of the valuation of its Investment, and of the payment of compensation, in accordance with the principles set out in paragraph 1.*

3.     *For the avoidance of doubt, Expropriation shall include situations where a Contracting Party expropriates the assets of a company or enterprise in its Area in*

which an Investor of any other Cotracting Party has an Investment, including
through the ownership of shares.

### Article 21. Taxation

1.   Except as otherwise provided in this Article, nothing in this Treaty shall create
     rights or impose obligations with respect to Taxation Measures of the Contracting
     Parties. In the event of any inconsistency between this Article and any other
     provision of the Treaty, this Article shall prevail to the extent of the inconsistency.

(…)

5.   a) Article 13 shall apply to taxes.

### Article 26. Settlement of disputes between an Investor and a Contracting Party

1.   Disputes between a Contracting Party and an Investor of another Contracting Party
     relating to an Investment of the latter in the Area of the former, which concern an
     alleged breach of an obligation of the former under Part III shall, if possible, be
     settled amicably.

2.   If such disputes cannot be settled according to the provisions of paragraph 1 within
     a period of three months from the date on which either party to the dispute
     requested amicable settlement, the Investor party to the dispute may choose to
     submit it for resolution:
     a) to the courts or administrative tribunals of the Contracting Party party to the
     dispute;
     b) in accordance with any applicable, previously agreed dispute settlement
     procedure; or
     c) in accordance with the following paragraphs of this Article.

3.   a) Subject only to subparagraphs b) and c), each Contracting Party hereby gives its
     unconditional consent to the submission of a dispute to international arbitration or
     conciliation in accordance with the provisions of this Article.
     b)
              (i) The Contracting Parties listed in Annex ID do not give such
              unconditional consent where the Investor has previously submitted the
              dispute under subparagraph 2a) or b).
              (ii) For the sake of transparency, each Contracting Party that is listed in
              Annex ID shall provide a written statement of its policies, practices and
              conditions in this regard to the Secretariat no later than the date of the
              deposit of its instrument of ratification, acceptance or approval in
              accordance with Article 39 or the deposit of its instrument of accession in
              accordance with Article 41.
     c) A Contracting Party listed in Annex IA does not give such unconditional consent
     with respect to a dispute arising under the last sentence of Article 10(1).

4.       *In the event that an Investor chooses to submit the dispute for resolution under subparagraph 2 c), the Investor shall further provide its consent in writing for the dispute to be submitted to:*

        *a)*

            *(i) The International Centre for Settlement of Investment Disputes, established pursuant to the Convention on the Settlement of Investment Disputes between States and Nationals of other States opened for signature at Washington, 18 March 1965 (hereinafter referred to as the "ICSID Convention"), if the Contracting Party of the Investor and the Contracting Party party to the dispute are both parties to the ICSID Convention; or (ii) The International Centre for Settlement of Investment Disputes, established pursuant to the Convention referred to in subparagraph a)(i), under the rules governing the Additional Facility for the Administration of Proceedings by the Secretariat of the Centre (hereinafter referred to as the "Additional Facility Rules"), if the Contracting Party of the Investor or the Contracting Party party to the dispute, but not both, is a party to the ICSID Convention;*

        *b) a sole arbitrator or ad hoc arbitration tribunal established under the Arbitration Rules of the United Nations Commission on International Trade Law (hereinafter referred to as "UNCITRAL"); or*

        *c) an arbitral proceeding under the Arbitration Institute of the Stockholm Chamber of Commerce.*

5.

        *a) The consent given in paragraph 3 together with the written consent of the Investor given pursuant to paragraph 4 shall be considered to satisfy the requirement for:*

            *(i) written consent of the parties to a dispute for purposes of Chapter II of the ICSID Convention and for purposes of the Additional Facility Rules; (ii) an "agreement in writing" for purposes of article II of the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, done at New York, 10 June 1958 (hereinafter referred to as the "New York Convention"); and (iii) "the parties to a contract [to] have agreed in writing" for the purposes of article 1 of the UNCITRAL Arbitration Rules.*

        *b) Any arbitration under this Article shall at the request of any party to the dispute be held in a state that is a party to the New York Convention. Claims submitted to arbitration hereunder shall be considered to arise out of a commercial relationship or transaction for the purposes of article I of that Convention.*

6.       *A tribunal established under paragraph 4 shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law.*

7.       *An Investor other than a natural person which has the nationality of a Contracting Party party to the dispute on the date of the consent in writing referred to in paragraph 4 and which, before a dispute between it and that Contracting Party arises, is controlled by Investors of another Contracting Party, shall for the purpose of article 25(2)b) of the ICSID Convention be treated as a "national of another*

*Contracting State" and shall for the purpose of article 1(6) of the Additional Facility Rules be treated as a "national of another State".*

8.      *The awards of arbitration, which may include an award of interest, shall be final and binding upon the parties to the dispute. An award of arbitration concerning a measure of a sub-national government or authority of the disputing Contracting Party shall provide that the Contracting Party may pay monetary damages in lieu of any other remedy granted. Each Contracting Party shall carry out without delay any such award and shall make provision for the effective enforcement in its Area of such awards.*

### Article 39. Ratification, acceptance or approval

*This Treaty shall be subject to ratification, acceptance or approval by signatories. Instruments of ratification, acceptance or approval shall be deposited with the Depositary.*

### Article 44. Entry into force

1.      *This Treaty shall enter into force on the ninetieth day after the date of deposit of the thirtieth instrument of ratification, acceptance or approval thereof, or of accession thereto, by a state or Regional Economic Integration Organization which is a signatory to the Charter as of 16 June 1995.*

2.      *For each state or Regional Economic Integration Organization which ratifies, accepts or approves this Treaty or accedes thereto after the deposit of the thirtieth instrument of ratification, acceptance or approval, it shall enter into force on the ninetieth day after the date of deposit by such state or Regional Economic Integration Organization of its instrument of ratification, acceptance, approval or accession.*

3.      *For the purposes of paragraph 1, any instrument deposited by a Regional Economic Integration Organization shall not be counted as additional to those deposited by member states of such Organization.*

### Article 45. Provisional application

1.      *Each signatory agrees to apply this Treaty provisionally pending its entry into force for such signatory in accordance with Article 44, to the extent that such provisional application is not inconsistent with its constitution, laws or regulations.*

2.

*a) Notwithstanding paragraph 1 any signatory may, when signing, deliver to the Depositary a declaration that it is not able to accept provisional application. The obligation contained in paragraph 1 shall not apply to a signatory making such a declaration. Any such signatory may at any time withdraw that declaration by written notification to the Depositary.*
*b) Neither a signatory which makes a declaration in accordance with subparagraph a nor Investors of that signatory may claim the benefits of provisional application under paragraph 1.*
*c) Notwithstanding subparagraph a), any signatory making a declaration referred to in subparagraph a shall apply Part VII provisionally pending the entry into force of the Treaty for such signatory in accordance with Article 44, to the extent that such provisional application is not inconsistent with its laws or regulations.*

3.

*a) Any signatory may terminate its provisional application of this Treaty by written notification to the Depositary of its intention not to become a Contracting Party to the Treaty. Termination of provisional application for any signatory shall take effect upon the expiration of 60 days from the date on which such signatory's written notification is received by the Depositary.*
*b) In the event that a signatory terminates provisional application under subparagraph a, the obligation of the signatory under paragraph 1 to apply Parts III and V with respect to any Investments made in its Area during such provisional application by Investors of other signatories shall nevertheless remain in effect with respect to those Investments for twenty years following the effective date of termination, except as otherwise provided in subparagraph c).*
*c) Subparagraph b) shall not apply to any signatory listed in Annex PA. A signatory shall be removed from the list in Annex PA effective upon delivery to the Depositary of its request therefor.*

*The Vienna Convention on the Law of Treaties ("VCLT")*

3.2.      Articles 11, 12, 14, 25, 27, 31 and 32 VCLT in the official English version are as follows.

### Article 11. Means of expressing consent to be bound by a treaty

*The consent of a State to be bound by a treaty may be expressed by signature, exchange of instruments constituting a treaty, ratification, acceptance, approval or accession, or by any other means if so agreed.*

### Article 12. Consent to be bound by a treaty expressed by signature

1.      *The consent of a State to be bound by a treaty is expressed by the signature of its representative when:*
        *(a) the treaty provides that signature shall have that effect;*
        *(b) it is otherwise established that the negotiating States were agreed that signature should have that effect; or*
        *(c) the intention of the State to give that effect to the signature appears from the full powers of its representative or was expressed during the negotiation.*
2.      *For the purposes of paragraph 1:*
        *(a) the initialling of a text constitutes a signature of the treaty when it is established that the negotiating States so agreed;*
        *(b) the signature ad referendum of a treaty by a representative, if confirmed by his State, constitutes a full signature of the treaty.*

### Article 14. Consent to be bound by a treaty expressed by ratification, acceptance or approval

1.      *The consent of a State to be bound by a treaty is expressed by ratification when:*
        *(a) the treaty provides for such consent to be expressed by means of ratification;*
        *(b) it is otherwise established that the negotiating States were agreed that ratification should be required;*
        *(c) the representative of the State has signed the treaty subject to ratification; or*
        *(d) the intention of the State to sign the treaty subject to ratification appears from the full powers of its representative or was expressed during the negotiation.*

2.      *The consent of a State to be bound by a treaty is expressed by acceptance or approval under conditions similar to those which apply to ratification.*

### Article 25. Provisional application

1.      *A treaty or a part of a treaty is applied provisionally pending its entry into force if:*
        *(a) the treaty itself so provides; or*
        *(b) the negotiating States have in some other manner so agreed.*

2.      *Unless the treaty otherwise provides or the negotiating States have otherwise agreed, the provisional application of a treaty or a part of a treaty with respect to a State shall be terminated if that State notifies the other States between which the treaty is being applied provisionally of its intention not to become a party to the treaty.*

### Article 27. Internal law and observance of treaties

        *A party may not invoke the provisions of its internal law as justification for its failure to perform a treaty. This rule is without prejudice to article 46.*

### Article 31. General rule of interpretation

1.      *A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose.*

2.      *The context for the purpose of the interpretation of a treaty shall comprise, in addition to the text, including its preamble and annexes:*
        *(a) any agreement relating to the treaty which was made between all the parties in connexion with the conclusion of the treaty;*
        *(b) any instrument which was made by one or more parties in connexion with the conclusion of the treaty and accepted by the other parties as an instrument related to the treaty.*

3.      *There shall be taken into account, together with the context:*
        *(a) any subsequent agreement between the parties regarding the interpretation of the treaty or the application of its provisions;*
        *(b) any subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation;*
        *(c) any relevant rules of international law applicable in the relations between the parties.*

4.      *A special meaning shall be given to a term if it is established that the parties so intended.*

### Article 32. Supplementary means of interpretation

*Recourse may be had to supplementary means of interpretation, including the preparatory work of the treaty and the circumstances of its conclusion, in order to confirm the meaning resulting from the application of article 31, or to determine the meaning when the interpretation according to article 31:*
*(a) leaves the meaning ambiguous or obscure; or*
*(b) leads to a result which is manifestly absurd or unreasonable.*

*The Russian Constitution*

3.3.     Articles 10, 15, 86, 94, 105 and 106 of the Russian Constitution, according to the unofficial English translation submitted by the Russian Federation, read as follows:

### Article 10

*State power in the Russian Federation shall be exercised on the basis of its division into legislative, executive and judicial. The legislative, executive and judicial authorities shall be independent.*

C/09/477160 / HA ZA 15-1, C/09/477162 / HA ZA 15-2 and                        26
C/09/481619 / HA ZA 15-112
20 april 2016

*Article 15*

1.  *The Constitution of the Russian Federation shall have the supreme juridical force, direct application and shall be used on the whole territory of the Russian Federation. Laws and other legal acts adopted in the Russian Federation shall not contradict the Constitution of the Russian Federation.*

2.  *The bodies of state authority, bodies of local self-government, officials, private citizens and their associations shall be obliged to observe the Constitution of the Russian Federation and laws.*

3.  *Laws shall be officially published. Unpublished laws shall not be used. Normative legal acts concerning human rights, freedoms and duties of man and citizen may not be used, if they are not officially published for general knowledge.*

4.  *The universally-recognised norms of international law and international treaties and agreements of the Russian Federation shall be a component part of its legal system. If an international treaty or agreement of the Russian Federation establishes other rules than those envisaged by law, the rules of the international agreement shall be applied.*

*Article 86*

*The President of the Russian Federation shall*
*a) Govern the foreign policy of the Russian Federation,*
*b) Hold negotiations and sign international treaties and agreements of the Russian Federation,*
*c) Sign ratification instruments (…)*

*Article 94*

*The Federal Assembly – the parliament of the Russian Federation – shall be the representative and legislative body of the Russian Federation.*

*Article 95*

1.  *The Federal Assembly consists of two chambers – the Council of the Federation and the State Duma (…)*

*Article 105*

1.  *Federal laws shall be adopted by the State Duma. (…)*

*Article 106*

*Federal laws adopted by the State Duma on the following issues shall be the liable to obligatory consideration by the Council of the Federation*
*a) federal budget;*
*b) federal taxes and dues;*

*c) financial, currency, credit, customs regulation, and money issue;*
*d) ratification and denunciation of international treaties and agreements of the Russian Federation;*
*e) the status and protection of the state border of the Russian Federation;*
*f) peace and war.*

*The Russian Federal Law on International Treaties ("FLIT")*

3.4.      Articles 2, 6, 11, 14, 15 and 23 of the Russian Federal Law on International Treaties, also designated as RFW International Treaties by the Russian Federation, hereinafter: FLIT, are as follows, according to the unofficial English translation submitted by the Russian Federation:

### Article 2 Use of terms

*For the purposes of this Federal Law:*
*[. . .]*
*b) "ratification," "approval," "acceptance," and "accession" mean in each case a form whereby the Russian Federation expresses its consent to be bound by an international treaty;*
*c) "signature" means either a stage in the conclusion of a treaty, or a form of expressing consent of the Russian Federation to be bound by an international treaty, if the treaty provides that signature shall have that effect, or it is otherwise established that the Russian Federation and the other negotiating States were agreed that signature should have that effect, or the intention of the Russian Federation to give that effect to the signature appears from the full powers of its representative or was expressed during the negotiation;*
*d) "conclusion" means the expression of consent of the Russian Federation to be bound by an international treaty;*

### Article 6 Expression of consent of the Russian Federation to be bound by an international treaty

1.      *Consent of the Russian Federation to be bound by an international treaty may be expressed by means of:*
*signature of the treaty;*
*exchange of the documents constituting the treaty;*
*ratification of the treaty;*
*approval of the treaty;*
*acceptance of the treaty;*
*accession to the treaty; or*
*any other means of expressing consent agreed by the contracting parties.*

2.      *Decisions to grant consent for the Russian Federation to be bound by international treaties shall be made by state bodies of the Russian Federation in accordance with their competence as established by the Constitution of the Russian Federation, this Federal Law and other legislative acts of the Russian Federation.*

*Article 11*

1.   *Decisions to negotiate and to sign international treaties of the Russian Federation shall be made:*
     *a) with respect to treaties to be concluded on behalf of the Russian Federation, by the President of the Russian Federation, but with respect to treaties to be concluded on behalf of the Russian Federation on matters under the jurisdiction of the Government of the Russian Federation, by the Government of the Russian Federation;*
     *b) with respect to treaties to be concluded on behalf of the Government of the Russian Federation, by the Government of the Russian Federation.*
2.   *Decisions to negotiate and to sign international treaties of the Russian Federation on matters under the jurisdiction of the Government of the Russian Federation shall be made by the President of the Russian Federation if circumstances so require.*

**Article 14 Ratification of international treaties of the Russian Federation**

   *In accordance with the Constitution of the Russian Federation the ratification of international treaties of the Russian Federation shall be effected through the enactment of federal law.*

**Article 15 International treaties of the Russian Federation subject to ratification**

1.   *The following international treaties of the Russian Federation shall be subject to ratification:*
     *a) international treaties whose implementation requires amendment of existing legislation or enactment of new federal laws, or that set out rules different from those provided for by a law;*
     *b) international treaties whose subject is basic rights and freedoms of the person and the citizen;*
     *c) international treaties concerning the territorial demarcation of the Russian Federation with other States, including international treaties on the State Border of the Russian Federation, as well as international treaties concerning the demarcation of the exclusive economic zone or continental shelf of the Russian Federation;*
     *d) international treaties concerning the basis of inter-State relations, concerning issues affecting the defense capability of the Russian Federation, concerning disarmament and international arms control, and international peace and security, as well as peace treaties and collective security treaties;*
     *e) international treaties concerning the participation of the Russian Federation in inter-State unions, international organizations, and other inter-State associations, if such treaties require the Russian Federation to transfer certain powers to them or establish that decisions of their bodies are binding upon the Russian Federation.*

2.   *An international treaty shall likewise be subject to ratification if the parties have agreed to subsequent ratification when concluding the international treaty.*

C/09/477160 / HA ZA 15-1, C/09/477162 / HA ZA 15-2 and          29
C/09/481619 / HA ZA 15-112
20 april 2016

### Article 23 Provisional application of international treaties by the Russian Federation

1.    *An international treaty or a part of a treaty may, prior to its entry into force, be applied by the Russian Federation provisionally if the treaty itself so provides or if an agreement to that effect has been reached with the parties that have signed the treaty.*

2.    *Decisions on the provisional application of a treaty or a part thereof by the Russian Federation shall be made by the body that has taken the decision to sign the international treaty according to the procedure set out in Article 11 of this Federal Law.*

   *If an international treaty - the decision on the consent to the binding character of which for the Russian Federation is, under this Federal Law, to be taken in the form of a Federal Law - provides for the provisional application of the treaty or a part thereof, or if an agreement to that effect was reached among the parties in some other manner, then this treaty shall be submitted to the State Duma within six months from the start of its provisional application. The term of provisional application may be prolonged by way of a decision taken in the form of a federal law according to the procedure set out in Article 17 of this Federal Law for the ratification of international treaties.*

3.    *Unless the international treaty provides otherwise, or the respective States otherwise agree, the provisional application by the Russian Federation of a treaty or a part thereof shall be terminated upon notification to the other States that apply the treaty provisionally of the intention of the Russian Federation not to become a party to the treaty.*

*The Russian Fundamentals of Legislation*

3.5.    Articles 1 and 43 of the Fundamentals of Legislation on Foreign Investments in the USSR 1991 (hereinafter: the Fundamentals of Legislation) read as follows, according to the unofficial English translation submitted by the Russian Federation:

### Article 1

   *Legislation on Foreign Investments of the USSR and republics Relations in connection with foreign investments in the territory of the USSR shall be regulated by the legislation of the USSR and republics, except where these Fundamentals and other legislation of the USSR and the republics on foreign investments provide otherwise. The laws of the republics shall regulate in accordance with these Fundamentals the relations arising in connection with foreign investments in the republics' territories, subject to specific features of their economic operations and investment policy, except to the extent that regulation of the relations is referred to the jurisdiction of the Union, and the relations that must be regulated by the Union pursuant to the USSR international treaties.*

*Article 43*

> Disputes between foreign investors and the State are subject to consideration in the USSR in courts, unless otherwise provided by international treaties of the USSR.
>
> Disputes of foreign investors and enterprises with foreign investments with Soviet State bodies acting as a party to relationships regulated by civil legislation, enterprises, social organizations and other Soviet legal entities, disputes between participants of the enterprise with foreign investments and the enterprise itself are subject to consideration in the USSR in courts or, upon agreement of the parties, in arbitration proceedings, inter alia, abroad, and in cases provided by legislative acts of the Union of SSR and the republics - in arbitrazh courts, economic courts and others.

*The Law on Foreign Investments*

3.6.       Articles 2, 7, and 9 of the Law on Foreign Investments 1991, also designated as RFW Foreign Investments 1991 (hereinafter: the Law of Foreign Investments 1991) by the Russian Federation, are as follows, according to the unofficial English translation submitted by the Russian Federation or derived from the export report of A. Asoskov (Expert Report Annex 30) mentioned below:

**Article 2. Foreign investments**

> Foreign investments are all types of material assets and intellectual property injected by foreign investors into objects of entrepreneurial and other types of activity with the aim of obtaining profit (income).

**Article 7. Guarantees Against Expropriation and Unlawful Actions of State Bodies and Their Officials**

> Foreign investments in the RSFSR may not be subject to nationalization, requisition or confiscation, except in cases provided by legislative acts, when such measures are taken in public interest. In cases of nationalization or requisition prompt, adequate and effective compensation is paid to the foreign investor.
>
> Decisions on nationalization are made by the Supreme Council of the RSFSR.
>
> Decisions on requisition and confiscation are made under the procedure prescribed by the legislation in effect in the territory of the RSFSR.
>
> Decisions of governmental bodies on expropriation of foreign investments may be contested in the RSFSR courts.
>
> Foreign investors are entitled to compensation of damages, including lost profit, incurred as a result of compliance with the instructions of State bodies of the RSFSR and their officials that are inconsistent with the legislation in effect in the territory of the RSFSR, and as a result of improper discharge by such bodies and

*their officials of statutory obligations owed to the foreign investor or an enterprise with foreign investments.*

### Article 9. Dispute Resolution

*Investment disputes, including disputes over the amount, conditions and procedure of the payment of compensation, shall be resolved by the Supreme Court of the RSFSR or the Supreme Arbitrazh Court of the RSFSR, unless another procedure is established by an international treaty in force in the territory of the RSFSR.*

*Disputes of foreign investors and enterprises with foreign investments against RSFSR State bodies, disputes between investors and enterprises with foreign investments involving matters relating to their operations, as well as disputes between participants of an enterprise with foreign investments and the enterprise itself shall be resolved by the RSFSR courts, or, upon agreement of the parties, by an arbitral tribunal, or, in cases specified by the laws, by authorities authorized to consider economic disputes.*

*International treaties in force in the territory of the RSFSR may provide for recourse to international means of resolution of disputes arising in connection with foreign investments in the territory of the RSFSR.*

3.7.      Articles 2 and 10 of the Law on Foreign Investments 1999, also designated as RFW Foreign Investments 1999 (hereinafter: the Law on Foreign Investments 1999) by the Russian Federation, are as follows, according to the unofficial English translation submitted by the Russian Federation or derived from the export report of A. Asoskov (Expert Report Annex 31):

### Article 2. The Basic Terms Used in the Present Federal Law

*The following basic terms are used for the purposes of the present Federal Law:*
*(…)*
***foreign investment*** *- the injection of foreign capital in objects of entrepreneurial activity in the territory of the Russian Federation in the form of objects of civil law rights belonging to a foreign investor, unless such objects are excluded from the realm of civil law relations or are restricted in the Russian Federation pursuant to federal laws, including money, securities (denominated in a foreign currency and the currency of the Russian Federation), other property, property rights which can be evaluated in a monetary form, exclusive rights to the results of intellectual activities (intellectual property), as well as services and information.*

### Article 10. Guarantees of Due Resolution of Disputes Arising in Connection with Investments and Business of a Foreign Investor in the Territory of the Russian Federation

*A dispute of a foreign investor arising in connection with its investments and business activity conducted in the territory of the Russian Federation shall be resolved in accordance with international treaties of the Russian Federation and*

*federal laws in courts, arbitrazh courts or through international arbitration
(arbitral tribunal).*

## 4.    THE DISPUTE BETWEEN THE PARTIES

**in all cases**

4.1.    The Russian Federation requires, in brief, that the court quash the Interim Awards
of 30 November 2009 and the Final Awards of 18 July 2014 (hereinafter jointly referred to
as: the Yukos Awards) issued in the cases between the Russian Federation as Respondent in
the Arbitration and the defendants as the respective Claimants in the Arbitration in a
provisionally enforceable judgment, in so far as is possible, and that the court order the
defendants to pay the costs of these proceedings, plus interest at the statutory rate from the
fourteenth day following the date of this judgment.

4.2.    In brief, the Russian Federation bases these identical claims on the following.
There are six grounds in Section 1065 subsection 1 of the Dutch Code of Civil Procedure
(Rv), which is relevant to this case, that each lead to the legal effect of reversal of the Yukos
Awards. The six grounds are stated in Section 1065 subsection 1 under the following letters:
(1)     *a* (absence of valid arbitration agreement), in connection with which the Tribunal
        was not competent to take cognizance of and given an award on the defendant's
        claims;
(2)     *c* (the Tribunal overstepped its remit);
(3)     *b* (there were irregularities in the Tribunal's composition), particularly because
        assistant Valasek evidently played a significant substantive role in assessing the
        evidence, in the deliberations of the Tribunal and in preparing the Final Awards;
(4)     *d* (the Yukos Awards lack substantiation in several critical aspects);
(5)     *e* (the Yukos Awards are contrary to Dutch to public policy and public morality,
        including in this case the fundamental right of the Russian Federation to a fair
        trial), since the Awards show the Tribunal's partiality and biases.

4.3.    The defendants have disputed all of the aspects of the Russian Federation's claim
supported by reasons.

4.4.    The parties' arguments and other assertions are discussed in more detail below, in
so far as relevant.

## 5.    THE ASSESSMENT OF THE DISPUTES

**in all cases**

### INTRODUCTION

*Authentic texts or translation?*

5.1.    The relevant passages from the Yukos Awards in the authentic, English version are
cited in 2.10-12. The quotations below from the Awards are shown in Dutch in the Dutch-
language judgment. For this, the court has used the Dutch translation produced by the

Russian Federation. It should be noted that the defendants have not argued that this translation is inadequate.

5.2.      Citations of the ECT are hereinafter in the previously used English-language version, in principle. Whenever the court uses the Dutch translation, it makes use of the Dutch text as published in the Treaty Series (*Tractatenblad*).

*The competence of the court in these proceedings*

5.3.      Since The Hague was the place of Arbitration, this court is competent to take cognizance of the claim described in 4.1. This follows from Section 1073 subsection 1 Rv, in conjunction with Section 1064 subsection 2 Rv, as it applied up until 1 January 2015. Section 1074 Rv *old* applies in this case based on Section IV of the Act of 2 June 2014 (*Stb.* 200) which stipulates that this Act, containing new arbitration regulations, applies to arbitrations pending on or after the date of the entry into force of the Act. At the time, on 1 January 2015, the Arbitration was no longer pending.

THE COMPETENCE OF THE TRIBUNAL

**Introduction**

5.4.      In view of the first ground put forward by the Russian Federation to support its request for reversal of the Yukos Awards, the court will first assess whether the Tribunal was competent to take cognizance of the claims of the Claimants in the Arbitration. First and foremost, the court would like to state the following regarding the assessment framework. Although under Section 1052 subsection 1 Rv the appointed Tribunal in the Arbitration was qualified to assess its jurisdiction, the fundamental character of the right to access to the courts entails that ultimately an ordinary court is entrusted with answering the question whether or not a valid arbitration agreement in the sense of Section 1065 subsection 1 under *a* Rv was lacking. This fundamental character also entails that, in deviation from a principally restrictive assessment in reversal proceedings, the court does not restrictively assess a request for reversal of an arbitral award on the ground of a lacking valid agreement (cf. recent Supreme Court ruling of 26 September 2014, ECLI:NL:HR:2014:2837). Furthermore, in assessing such a request, the court takes as a starting point that the onus is on the defendants to prove that the Tribunal is competent. After all, the burden of proof was also on them (as Claimants) in the Arbitration, while in the current proceedings the same jurisdiction issue is to be dealt with.

5.5.      The Tribunal based its jurisdiction assessment on two independent grounds. These grounds, which are discussed below, are linked to (1) the meaning of Article 45 ECT and (2) the question whether the arbitration provision of Article 26 ECT is "not inconsistent" with the Russian Constitution, laws or other regulations.

C/09/477160 / HA ZA 15-1, C/09/477162 / HA ZA 15-2 and                    34
C/09/481619 / HA ZA 15-112
20 april 2016

## Article 45 ECT

*General*

5.6.     Before discussing the meaning of Article 45 ECT, the court would like to remind the parties that the Russian Federation did not ratify the ECT. Article 39 ECT mainly pertains to ratification, as does Article 44, which relates to the entry into force of the Treaty. However, by way of exception, the Treaty also provides for a "provisional application", laid down in Article 45.

*Article 45 paragraph 1*

5.7.     The first ground for reversal is linked to the meaning of Article 45 paragraph 1 ECT, which forms the basis for the provisional application of the Treaty referred to in this section. According to that provision, each Signatory consents to the provisional application of the ECT "*to the extent that such provisional application is not inconsistent with its constitution, laws or regulations*". The court designates this restriction hereinafter as the "Limitation Clause", in accordance with the terminology used in the Interim Awards. The Tribunal decided that by signing the ECT the Russian Federation consented to the provisional application of the entire Treaty pending its entry into force, unless the principle of provisional application itself were contrary to the Russian Constitution, laws or other regulations. According to the Tribunal, the Limitation Clause contained in Article 45 paragraph 1 entailed an "all or nothing" approach. This opinion, extensively covered in 2.10, can be summarised as follows, only taking into account the considerations relevant to this judgment. The numbers in parentheses refer to the corresponding grounds for the decision of the Tribunal.
-     The phrase "*to the extent*" is often used as a formulation when drafters of a provision in a treaty or act want to express that a particular provision should only be applied to the extent to which the subsequent words are complied with. (303)
-     However, the key to the interpretation of the Limitation Clause in this case is to be found in the word "*such*". The phrase "*such provisional application*" refers to the provisional application stated earlier in the paragraph, namely the provisional application of "*this Treaty*". The meaning of the phrase "*such provisional application*" is therefore context-specific: the meaning is derived from the specific use of the provisional application referred to in this phrase. (304 and 305)
-     In the context of Article 45 paragraph 2 under *c* ECT, the phrase "*such provisional application*" necessarily has another meaning. It refers to the provisional application of only Part VII of the Treaty. (306)
-     There are two possible interpretations of the phrase concerning the provisional application of this treaty. The passage could provide for the provisional application of the _entire_ treaty or _several parts_ of the treaty. Considering the context, the first interpretation corresponds better with the ordinary meaning that must be ascribed to the terms. (308)
-     This conclusion fully agrees with the decision the tribunal took regarding its jurisdiction in the Kardassopoulos case. (309)
-     The alternative to the Tribunal's "all or nothing" approach is that the provisional application depends on the answer to the question whether one specific provision of the Treaty can be reconciled with the national legislation regime of a Signatory.

This would be diametrically opposed to the object and purpose of the Treaty, and even to the nature of international law. And it would also be incompatible with the *pacta sunt servanda* principle and Article 27 of the Vienna Convention on the Law of Treaties (VCLT). (312-319)

- The chosen interpretation of Article 45 paragraph 1 ECT is also supported by state practice. Six states expressly invoked the Limitation Clause of Article 45 paragraph 1. Similarly, in the lists the Secretariat of the ECT kept of signatories' intentions, it designated the states that planned to invoke Article 45 paragraph 1 as intending to completely avoid provisional application of the Treaty. (321 and 322)
- In view of the conclusion of the Tribunal on the interpretation of Article 45 paragraph 1, it is unnecessary to take the *travaux preparatoires* into account. (329)
- The provisional application principle is not contrary to Russian laws. (330 et seq.)

5.8.    The Russian Federation contested the Tribunal's interpretation of Article 45 paragraph 1, stating reasons. In the opinion of the Russian Federation, the scope of the provisional application depends on the agreement of each individual treaty provision with the Constitution, laws or regulations. By relying on the same arguments as are stated in the Interim Awards, the defendants have supported the Tribunal's opinion. This means that it essentially concerns the question whether or not the Limitation Clause should be interpreted in such a way that this clause relates to the provisional application principle – in which case the possibility of applying the ECT (as a whole) provisionally depends on the answer to the question whether national law provides for this principle – or that the provisional application of the ECT is limited to the treaty provisions that are not contrary to national law.

5.9.    The interpretation of the Limitation Clause must take place according to the regulations laid down in Articles 31 and 32 (VCLT), that is in accordance with the meaning assigned to the phrases in common parlance, with due observance of their context and in light of the object of the ECT (Article 31 paragraph 1 VCLT). The context of a treaty in any case comprises the text, including preamble and annexes (Article 31 paragraph 2 VCLT). Article 31 paragraph 3 VCLT states that an interpretation should include, among other things, all later use in the application of the treaty resulting in agreement among the parties about the interpretation of the treaty. Pursuant to Article 32 paragraph 2 VCLT, significance can also be attached to supplemental means of interpretation, and in particular preparatory work (*travaux preparatoires*) and the circumstances in which the treaty was concluded. These interpretation means can be used to confirm the meaning ensuing from the application of Article 31, or to determine the meaning if the interpretation, also by applying Article 31, leaves the meaning (a) ambiguous or obscure, or (b) leads to a manifestly absurd or unreasonable result.

5.10.    In interpreting Article 45 paragraph 1 ECT, the ordinary meaning of phrases is paramount. This particularly concerns the word *"extent"*, which the *Oxford Thesaurus of English* defines as *"degree, scale, level, magnitude, scope, extensiveness, amount, size; coverage, breadth, width, reach and range."* This dovetails with the Russian Federation's stated description of the words *"to the extent"* and which it derived from the *Oxford English dictionary* (second edition, 1989) and *Webster's Third International Dictionary of the English Language* (1961): *"to the extent"*: *"space or degree to which anything is extended",*

C/09/477160 / HA ZA 15-1, C/09/477162 / HA ZA 15-2 and                     36
C/09/481619 / HA ZA 15-112
20 april 2016

*"width of application, operation, etc. scope"*, *"range (as of inclusiveness or application) over which something extends"* and *"the limit to which something extends"*.

5.11.     The term *"to the extent"* in common parlance signifies a degree of application, scope or – formulated slightly differently – a differentiation. This meaning is also expressed in several other language versions of the treaty. For instance, in the German-language version, the term is translated as *"in dem Maße"*, in the French-language version as *"dans la mesure où"* and in the Dutch-language version as *"voor zover"*.

5.12.     Separate from their context, the ordinary meaning of these words is more indicative of the accuracy of the explanation put forward by the Russian Federation. After all, in the interpretation of the Tribunal – in which the word "if" would be more fitting – the Limitation Clause is limited to one form of irreconcilability with national law, namely a ban on provisional application itself. The Tribunal has specifically acknowledged that the drafters of a treaty or legislative provision often use the term *"to the extent"* to indicate that a provision can only be applied to the extent to which the subsequent words are complied with. However, considering the context in which this term should be placed, the Tribunal attached decisive importance to the adjective *"such"*. According to the Tribunal, the words *"such provisional application"* only refer to the term *"this Treaty"* mentioned earlier in Article 45 paragraph 1, and it concerns whether or not *"such provisional application of this Treaty"* is not contrary to national law. The court holds that this notional addition does not provide clarity. This reference to the treaty, which is evident – another interpretation is after all inconceivable – does not provide clarity on the question whether the provisional application can only relate to the Treaty as a whole, and therefore to the provisional application principle, or only parts of the treaty, meaning particular treaty provisions. Special significance can therefore not be attached to the reference to *"this Treaty"* in the interpretation of the Limitation Clause.

5.13.     However, what the court does deem relevant for the context-related interpretation is first and foremost the circumstance that Article 45 paragraph 1 ECT links the provisional application to the irreconcilability with not only the *"constitution"* and *"laws",* but expressly also to *"regulations"*. The Russian Federation rightly pointed out that a ban on the provisional application of treaties as such usually results from constitutional requirements and may be enshrined in a formal act. It is, however, inconceivable that a ban on the provisional application of a treaty can be laid down in delegated legislation, given the principal nature of a ban. But it is conceivable that a test of compatibility of individual treaty provisions is laid down in delegated legislation. Regarding this aspect, the defendants limited themselves to stating that the use of the word *"regulations"* only emphasises that the drafters of the ECT intended to provide a broad as possible overview to ensure that each provision of the law of a Signatory incompatible with a provisional application as such was included. This may be unusual, according to the defendants, but they do not deem it impossible that a regulation contains a provision related to the principle of provisional application. The court finds this explanation insufficient and furthermore holds that any reference to such intention on the part of the drafters of the Treaty is lacking.

C/09/477160 / HA ZA 15-1, C/09/477162 / HA ZA 15-2 and                    37
C/09/481619 / HA ZA 15-112
20 april 2016

*Article 45 paragraph 2*

5.14.　　Regarding the context in which the explanation of the Limitation Clause should take place, Article 45 paragraph 2 ECT is also relevant. At the time of signing, a state can submit a declaration that it is not able to accept provisional application (Article 45 paragraph 2 under *a* ECT).  For such situations, Article 45 paragraph 2 under *c* provides for the Signatory to nevertheless comply with the provisional application *"to the extent that such provisional application is not inconsistent with its laws and regulations"* of Part VII of the Treaty *("Structure and Institutions")*. In this paragraph, the same terminology is used as in the first paragraph, with the difference that Article 45 paragraph 2 under *c* does not contain a reference to the Constitution. The Tribunal failed to clearly address the meaning of Article 45 paragraph 2 under *c* and limited itself to the opinion that in the context of this provision, the phrase *"such provisional application"* necessarily has a different meaning than the same reference in Article 45 paragraph 1, and referred to the provisional application of only Part VII of the Treaty. Whether the Tribunal was referring to the principle of provisional application does not become clear from its considerations.

5.15.　　Since the provisional application in Article 45 paragraph 2 under c remains limited to Part VII, this alone does not make it evident that in this provision the principle of provisional application is designated as a relevant criterion. After all, such a principle can only concern a treaty as a whole; and it is not conceivable that it regards part of a treaty. This was also acknowledged in the Interim Awards under 311 in the consideration that the Limitation Clause entails an "all or nothing" approach: either the entire Treaty is applied provisionally, or not at all. If Article 45 paragraph 2 under *c* does cover the provisional application principle, as put forward by the defendants, it is furthermore difficult to understand why this provision lacks *"the constitution"* as assessment criterion. In light of this, it must be assumed that Article 45 paragraph 2 under *c*, which makes the scope of the provisional applications exclusively conditional on compatibility of Part VII with legislation, primary or delegated, also covers the specific treaty provisions from that part. The court does not agree with the Tribunal's explanation if that explanation differs from the interpretation in this section.

5.16.　　In this respect, the Russian Federation rightly pointed out that in their approach the defendants have lost sight of the interaction between paragraphs 1 and 2 of Article 45 ECT. In their vision (discussed in section 5.24 and subsequent sections), a Signatory may only invoke the Limitation Clause if its national laws prohibit provisional application as such and if it has submitted a declaration in the sense of Article 45 paragraph 2. Invocation of the Limitation Clause, which relies on incompatibility of the principle of provisional application with the Constitution and other laws and regulations, appears to be difficult to reconcile with the obligation of Article 45 paragraph 2 under *c* to, in that case, still apply Part VII *"to the extent that such provisional application"* is not contrary to said laws and regulations.

5.17.　　In short, the Tribunal interpreted the Limitation Clause in a way that significantly deviates from the meaning that must be assigned to the corresponding words in Article 45 paragraph 2 under c ECT. In the opinion of the court, there is no proper ground for this deviation. A consistent explanation of both paragraphs supports the interpretation of the Limitation Clause, in the opinion of the Russian Federation.

*Provisional conclusion on Article 45 paragraph 1*

5.18.     The above considerations lead to the conclusion that the ordinary meaning of the term *"to the extent"* in paragraph 1, partly in the context of the term, results in an interpretation of the Limitation Clause in which the option of provisional application is focused on and depends on the compatibility of separate treaty provisions with national laws.

*Object and purpose of the ECT and the nature of international law*

5.19.     The Tribunal also held that the interpretation of the Limitation Clause it had rejected supposedly conflicted with the object and purpose of the ECT and the nature of international law. This opinion is based on the *pacta sunt servanda* principle of Article 26 VCLT and the associated principle, laid down in Article 27 VCLT, that a signatory may not invoke the provisions of its national laws to justify the non-application of a treaty. The court does not agree with this opinion of the Tribunal either. The court would like to state first and foremost that although the Tribunal made a general reference to the object of the ECT (providing a legal framework to promote long-term cooperation in the area of energy, based on mutual benefit and complementarity and in accordance with the objects and principles of the Treaty), but failed to specify to what extent a limited application of the treaty provisions – under Article 45 ECT – would be contrary to this object. Be that as it may, the principles in Articles 26 and 27 VCLT, referred to by the Tribunal, do not automatically lead to the interpretation of Article 45 as applied by the Tribunal. These principles express that signatories are bound by a treaty that has entered into effect and may not frustrate the application of the treaty by invoking national laws. And although these principles similarly extend to treaties that have entered into force based on provisional application, they are not limitless. Signatories to a treaty can explicitly limit the provisional application of treaty provisions, as becomes apparent from Article 25 VCLT which reads as follows, in so far as is relevant: *"A treaty or a part of a treaty is applied provisionally pending its entry into force if (a) the treaty itself so provides".* As argued by the Russian Federation, with reference also to academic lawyers, a provision such as the Limitation Clause provides for the solution of conflicts between states' national laws and international obligations that ensure from the provisional application of treaties (see the summons, 148 and the literature in note 163). In this case, the Signatories to the ECT have explicitly laid down in the Limitation Clause in Article 45 paragraph 1 ECT, explained in the sense accepted by the court, that the scope of the provisional application is limited to treaty provisions that are not contrary to national law. Even while it is possible that provisions of national law can stand in the way of the performance of one or more provisions of the ECT, the basis for doing so is encased in the ECT itself – i.e., at treaty level. In other words: a state that relies on a conflict between a treaty provision and national law, on sound grounds and referencing the Limitation Clause, does not act contrary to the *pacta sunt servanda* principle, nor to the principle of Article 27 VCLT. As was considered by the Tribunal and is relevant in this case, the fact that the invocation of a provision of national law can lead to a discussion about the meaning of the contents of said provision and thus result in uncertainty in international matters, does not affect this. After all, that is inherent in the Limitation Clause contained in the ECT.

C/09/477160 / HA ZA 15-1, C/09/477162 / HA ZA 15-2 and                                    39
C/09/481619 / HA ZA 15-112
20 april 2016

*Opinion of other tribunal*

5.20.    For the sake of completeness, the court also considers that for the interpretation of the Limitation Clause significance should also not be attached to the circumstance that the Tribunal's opinion is supported by the opinion of another tribunal – Chaired by the same person, incidentally – in another ECT-based arbitration, namely the Kardassopoulos case. The motivation in the Interim Awards of the award in that case does not contain substantive arguments for a different interpretation of Article 45 paragraph 1 ECT.

*State practice*

5.21.    All parties have discussed the meaning of state practice. The court disregards this practice and the meaning of this practice in its assessment of Article 45 paragraph 1 ECT. This is furthermore also the primary standpoint of the defendants (see: statement of defence, 145 and the rejoinder, 56). Article 31 paragraph 3 preamble and under *b* VCLT links the acknowledgement of relevance of state practice to the condition that through this later use the parties agree on the interpretation of the treaty concerned. In other words: significance can only be attached to this practice if the states involved have explicitly or implicitly accepted it. None of the parties have argued that there is a (wide) application practice supported by all states involved, nor has any evidence arisen to prove this practice.

*The travaux preparatoires*

5.22.    Another question to be answered concerning the interpretation of Article 45 paragraph 1 ECT is whether significance should be attached to the *travaux preparatoires* of the ECT, as mentioned by the Russian Federation. From Article 32 VCLT it follows that if application of the interpretation rules contained in Article 31 leaves the meaning ambiguous or obscure or leads to a result that is manifestly absurd or unreasonable, use may be made of supplemental means of interpretation, specifically of (data from) the preparatory work referred to here. There is no ground to apply this supplemental means of interpretation; the court holds that the explanation – in accordance with Article 31 VCLT – does not lead to an ambiguous or obscure meaning or to a result that is manifestly absurd or unreasonable. Superfluously, the court would like to point out the statement of the Russian Federation concerning the addition of the term *"regulations"* to the draft text of the Limitation Clause. Mr Bamberger, chairman of the legal advisory committee to the Conference on the ECT, answered the question of the Secretary-General of the Conference on the ECT about the addition of this term as follows:

> *"the effect is to suggest that relatively minor impediments in the form of regulations, no matter how insignificant they may be, can be the occasion for failing to apply the Treaty provisionally when in fact those regulations could be brought into conformity without serious effort."*

*Conclusion about the interpretation of Article 45*

5.23.    The foregoing considerations lead to the conclusion that the court accepts the Russian Federation's supported interpretation of Article 45 ECT. This means that the Russian Federation was only bound by the treaty provisions reconcilable with Russian law.

Before delivering its opinion on the compatibility of Article 26 ECT with Russian law, the court will first deal with the following issue raised by the defendants.

*Prior declaration required?*

5.24.    The defendants have taken the viewpoint – as they also did in the Arbitration – that based on Article 45 paragraph 1 ECT a prior declaration is required, which the Russian Federation failed to submit. In support of this assertion, they argued that paragraphs 1 and 2 of Article 45 are complementary in the sense that in the first paragraph the general rule of provisional application is laid down, while in the second paragraph the notification procedure is explained. This standpoint, which implies that the Russian Federation was obliged to submit a declaration that it did not consent to the provisional application of the ECT, is not only confirmed in a textual interpretation of Article 45 but is also in accordance with the object and purpose of the ECT, according to the defendants.

5.25.    The court is inclined to follow the reasoning of the Russian Federation when it argues that this issue cannot be raised in the current reversal proceedings. The Tribunal did not follow the reasoning of the defendants and therefore did not base its competence on the absence of such a declaration. In accordance with the legal system of reversal proceedings, from which it follows that the grounds for reversal are stated in the summons and which has determined that a ground for reversal can only be directed against a positive arbitral decision on jurisdiction (Section 1064 subsection 5 and Section 1065 subsection preamble and under *a* Rv), there appears to be no room in these proceedings to form an opinion on the question whether or not the Tribunal could have assumed its jurisdiction based on another argument it rejected.

5.26.    Nevertheless, the court will discuss this issue for the sake of completeness. The court deems the Tribunal's opinion correct based on the following grounds. In these considerations, the court once again starts from the ordinary meaning of the used words referred to in Article 31, as considered in their context.

5.27.    In light of their ordinary meaning, the wording of paragraphs 1 and 2 of Article 45 ECT – read in isolation and together – do not indicate that the Limitation Clause of paragraph 1 depends on the submission of a declaration under paragraph 2. Although the first paragraph contains an arrangement for provisional application, the same holds for the second paragraph. Nothing in the texts of these paragraphs indicates that paragraph 2 is intended as a procedure rule for the specification of the arrangement in paragraph 1. Article 45 paragraph 2 describes a specific regime that enables a Signatory to completely renounce provisional application, also if under paragraph 1 there is no impediment for provisional application, and therefore there is no incompatibility with national law. Furthermore, the word "*[n]otwithstanding*" used in Article 45 paragraph 2, which is used at the beginning of the second paragraph and which indicates a deviation from, and not continuation of, the first paragraph, and the word "*may*", which refers to a possibility and not to a prescribed mechanism in conjunction with paragraph 1, indicate that Article 45 paragraph 2 does not contain a procedural rule to specify Article 45 paragraph 1. The ordinary meaning of the components of Article 45 mentioned here therefore leads to an explanation in which the first paragraph does not require a prior declaration.

5.28.      States wishing to invoke the exception of Article 45 paragraph 2 are bound by submitting an express declaration, while such a declaration cannot be deduced from Article 45 paragraph 1. Incidentally, there are insufficient grounds for the opinion that regardless of this situation, a certain form of prior declaration or notification is required to be able to invoke the Limitation Clause of Article 45 paragraph 1. Although during the negotiations the various states stressed the importance of transparency regarding an invocation of the Limitation Clause, and the Secretariat of the ECT encouraged the Signatories to be transparent about the provisional application (see the Interim Awards under 282), these circumstances are not compelling enough to deduce an implicit obligation to submit a prior declaration. If the drafters of the Treaty had also wanted to make invocation of the Limitation Clause due to incompatibility with national law conditional on a prior declaration, they obviously would have expressly included this, like they also did in paragraph 2. They did not do this. The argument of the defendants regarding the object and purpose of the ECT can be largely reduced to the already mentioned desirability of transparency and therefore does not lead to a different opinion. The principle of reciprocity mentioned by the defendant in that respect, which they believe will be impaired it the Tribunal's explanation were to be followed, also does not succeed. In connection with this aspect, the Russian Federation has correctly remarked that Article 45 paragraph 1 ECT does not contain indications for a requirement of absolute reciprocity. The fact that Article 45 paragraph 2 under *b* contains the principle of reciprocity for the cases described in paragraph 2 under *a* does not automatically lead to the opinion that Article 45 paragraph 1 contains an obligation to submit a prior declaration.

5.29.      The defendants can also not successfully derive an argument from the context of paragraphs 1 and 2 of Article 45 ECT. In referring to that context, they first and foremost allude to Article 45 paragraph 3 ECT, which contains an arrangement for the termination of the provisional application of the ECT, and for the provisions of Parts III and V to remain in effect with respect to any investments made in the territory of the state concerned during such provisional application for twenty years following termination of the provisional application. The defendants argue that if Article 45 paragraph 1 ECT would allow a Signatory to dodge provisional application at any given time and with immediate effect, the detailed provisions of Article 45 paragraph 3 ECT would not have any effect. The court rejects this argument. First, the defendants forget that material conditions are attached to an invocation of the Limitation Clause – unlike the termination in Article 45 paragraph 3 ECT – namely conflict between a Treaty provision and national law. Furthermore, the Russian Federation rightly argues that there is no incompatibility. With the express reference to the obligation on the Signatory under the first paragraph to apply Parts III and V, Article 45 paragraph 3 under b ECT limits the continued effect of the Treaty provisions in the same way as the Limitation Clause.

5.30.      Finally, it also applies to the issue that has been discussed here that since it has neither been argued, nor has it become evident that there was agreement among the Signatories on the application practice regarding invocation of the clauses in Article 45 paragraph 1 and paragraph 2 ECT, and the defendants did not rely on a subsequent state practice, no significance can be attached to the manner in which the states involved have implemented Article 45 ECT. Superfluously, the court considers that it is not disputed between the parties that a number of states have invoked the Limitation Clause without explicitly submitting the declaration stated in Article 45 paragraph 2 ECT. The singe fact

that these states appear on a list compiled by the Secretariat of states supposedly not
intending to provisionally apply the ECT, is irrelevant here.

5.31.      The court arrives at the conclusion that even if this question were relevant to the
decision on the claim, the Russian Federation was not obliged to submit a prior declaration
in the sense of Article 45 paragraph 2 for a successful reliance on the Limitation Clause of
Article 45 paragraph 1.

**Article 26 ECT**

5.32.      In light of the meaning the court assigns to the Limitation Clause of Article 45
paragraph 1 ECT, the question arises – and this is also the subject of dispute between the
parties – whether the arbitral provision in Article 26 ECT, from which the Tribunal derived
its competence, is in accordance with Russian law. This provision, as follows from
paragraph 1 of Article 26, relates to *"disputes between a Contracting Party and an Investor
of another Contracting Party relating to an Investment of the latter in the Area of the
former, which concern an alleged breach of an obligation of the former under Part III"*.
Article 26 has therefore only created the option for arbitration for an (alleged) breach of
obligations as laid down in Part III of the Treaty (*"Investment Promotion and Protection"*).
One of the obligations laid down can be found in Article 10 ECT. This provision obliges the
contracting parties to treat the investments of foreign investors fairly and equitably and to
refrain from taking discriminatory measures which hamper (the use of) these investments.
Another obligation (to refrain from an action), laid down in Article 13 ECT, put briefly,
determines that investors may not be nationalised, expropriated or subject to measures with
a similar effect as nationalisation or expropriation. The obligations arising from Articles 10
and 13 ECT, through reference in Article 21 ECT which relates to "taxes", may also
pertain to taxes or tax measures of contracting parties. The defendants' claims for
compensation in the Arbitration are based on the assertion that the Russian Federation has
breached these obligations. The breach of the obligations of Article 10 ECT asserted by the
defendants consisted of, among other things, impeding the course of justice and a fair trial,
more specifically, by the numerous house searches and seizures, the failure to give due
notice of administrative acts, cases not being heard by an impartial judge, the sale by
auction of Yugansknefiegaz (YNG) and the initiation of bankruptcy proceedings against
Yukos. The defendants have based their allegation about a breach of the obligations in
Article 13 ECT on a number of circumstances, some of which also form the basis of the
breach of Article 10 ECT. This includes, among other things, the seizure of the defendants'
shares in Yukos, the additional tax assessments over the years 2000-2004, the sale of YNG
at a sham auction and the initiation of Yukos' bankruptcy. According to the defendants,
these circumstances have led to the deprivation of all of their investments. They qualified
this as expropriation. In the Final Awards, the Tribunal accepted the breach of Article 13
ECT and therefore did not take a position on the alleged breach of Article 10 ECT.

5.33.      Against this backdrop, the court will now assess whether the provisional
application of the arbitral provision of Article 26 ECT is in accordance with the Russian
Constitution, laws or other regulations. In this context, the court states the following first
and foremost. In the view of the defendants, a provision of the ECT, such as Article 26, can
only be incompatible with Russian law if the Treaty provision concerned is *prohibited* in
national law. They believe that there cannot be incompatibility if Russian law does not

expressly provide for the treaty provision concerned. The court holds that the defendants' interpretation is too limited. Leaving aside the fact that a linguistic explanation of Article 45 ECT does not yield a basis for such an interpretation, it is also not evident. Given in part the fact that the provisional application finds its legitimacy in the signing (and the sovereignty of the Signatories is at stake in a number of treaty provisions), the provisional application of the arbitral provision contained in Article 26 is also contrary to Russian law if there is no legal basis for such a method of dispute settlement, or – when viewed in a wider perspective – if it does not harmonise with the legal system or is irreconcilable with the starting points and principles that have been laid down in or can be derived from legislation. Whenever the court for the sake of brevity uses "compatibility" of the provisions of the ECT with Russian laws below, the court refers to this interpretation of the term "*not inconsistent*" in Article 45 paragraph 1 ECT.

5.34.    It is, rightly, not contested between the parties that the issue of compatibility or incompatibility should be answered according to Russian law. In the Dutch legal system, foreign law is not designated as a fact, but as law. This follows from Section 25 Rv, which stipulates that the court may supplement legal bases of its own motion. It is accepted in the legal system that the law court must apply pursuant to this section also includes foreign law (see among other cases, *HR* 22 February 2002, ECLI: NL: HR: 2002:AD8197 and more recently *HR* 17 December 2010, ECLI: NL: HR: 2010:BO1979). From this it follows that the court must determine the contents of the relevant Russian laws in these reversal proceedings. While the determination thereof does not take place based on provided evidence, as is evident from the foregoing, it can be determined in part based on the expert's reports provided by the parties. The Russian Federation has taken advantage of the opportunity to provide experts' reports regarding the relevant Russian laws. The reports chiefly concern the February 2006 expert's report of A.A. Kostin (hereinafter: Kostin), which was also submitted in the Arbitration, whose position is described as "*Senior Professor and head of the Private International and Civil Law Department of the Moscow State Institute of International Relations*", and the October 2014 expert's report with annexes of A.V. Asoskov (hereinafter: Asoskov) submitted in these reversal proceedings. The positions of this expert are designated as "*Professor of the International Private Law Department of the Russian School of Private Law and Assistant Professor of the Civil Law Department at M.V. Lomonosov Moscow State University*". In the court's establishment of the contents of Russian law, which first and foremost examines substantive legislation and regulations, these experts' reports are included.

**The Law on Foreign Investments**

*General*

5.35.    The Tribunal sought the answer to the question whether (the provisional application of) the arbitral provision of Article 26 ECT is contrary to Russian law in two consecutive provisions in the Law on Foreign Investments. This concerns Article 9 paragraph 2 of this act of 1991 and Article 10 of the same act in its 1999 version. Based on these two provisions, the Tribunal arrived at the opinion that disputes between investors and a state of a nature that is relevant to these proceedings may be arbitrated under Russian law (Interim Award under 370).

5.36.    In examining the meaning of these two legislative provisions, the court will first
discuss the standpoint of the Russian Federation that other Russian laws have never allowed
for arbitration for disputes arising from public-law legal relations. In this context, the
Russian Federation pointed out provisions from various Russian laws, a number of which
were in force prior to the signing of the ECT while others entered into force more recently.
This concerns, among other things, Article 1 paragraph 2 of the 1993 International
Arbitration Law (expert's report Asoskov, note 7). Herein it is determined that:

> "The following kinds of disputes shall be submitted for international commercial
> arbitration by agreement between the parties: disputes arising from contractual
> and other civil law relationships arising from the maintenance of foreign trade and
> other international economic relations, if the commercial enterprise of at least one
> of the parties is located abroad (…)".

A quotation from the manual "*International Commercial Arbitration*" written by Prof. V.A.
Musin and Prof. O.Yu. Skvortsov in 2012 (expert's report Asoskov, note 16) states the
following, among other things, about this provision:

> "Therefore, if relations between the parties are of a public law nature, then a
> dispute arising out of such relations cannot be referred to international
> commercial arbitration."

5.37.    In addition, both Asoskov and Kostin listed legislative provisions which make
arbitration conditional on the nature of the dispute. Pursuant to Article 21 of the 1992
Arbitrazh Procedure Code, arbitration based on agreement is possible in case of an
"*economic dispute*" (expert's report Asoskov, note 9). Article 1 of the 1992 Provisional
Regulation on Arbitral Tribunal for Resolving Economic Disputes mentions arbitration of
disputes "*arising out of civil law relations*"(expert's report Asoskov, note 10). In Article 23
of the 1995 Arbitrazh Procedure Code and in Article 4 of the same act in the 2002 version,
the option of arbitration is also related to disputes "*that arises out of civil law relations*"
(expert's report Asoskov, note 11 and 12). The same applies to Article 11 of the 1995
Russian Civil Code (expert's report Asoskov, note 27) and Article 3 of the 2002 Civil
Procedure Code (expert's report Asoskov, note 14).

5.38.    Both Asoskov (in sections 23 and 24 of his expert's report) and Kostin (on page 3
of his expert's report) have concluded that public-law disputes cannot be settled by
arbitration, referencing various quotations from Russian legal literature. From the Russian
literature and jurisprudence stated therein (as mentioned in the expert's report of Asoskov in
sections 28-30) it transpires that disputes arising from disputes between unequal parties –
also designated as "*the principle of subordination*" – are viewed as public-law disputes,
while private-law disputes arise from relations between equal parties. In connection with the
latter, the term "*the principle of coordination*" is used. Furthermore, disputes can have a
public-law character, also when they arise from contracts, if there is a "*concentration of
socially significant public elements*". This is the case when a public interest, the
involvement of public body or the use of budgetary means is concerned (expert's report
Asoskov under 34 and the jurisprudence mentioned there).

5.39.     Asoskov furthermore called attention to Article 16 of the Russian Civil Code,
which provides for the right to damages in cases that involve actions of the state (expert's
report Asoskov, note 44):

> "Damages caused to an individual or a legal entity as a result of unlawful actions
> (or failure to act) by State bodies, bodies of local self-government, or officials of
> these bodies, including the adoption of an act by a State body of local self-
> government that is inconsistent with a law or other regulatory act, shall be
> compensated by the Russian Federation, the respective Russian Federation subject,
> or the municipal formation."

5.40.     The public-law nature of unlawful acts on which, in the sense of this Article 16,
claims for damages can be based, entails according to the expert's report of Asoskov and the
literature contained therein (in 64-67) that such claims for compensation, even though they
are governed by civil law, cannot be submitted in arbitral proceedings. After all, an
assessment of such a claim inevitably entails an assessment of the underlying exercise of
public-law authorities of Russian state bodies. From the referenced literature it also becomes
apparent that a claim for compensation based on unlawful acts of state bodies in typical
private-law relations – which do not involve the exercise of public-law authorities – can be
subjected to arbitration.

5.41.     The court follows the analysis in the experts' reports based on the legal provisions
and the references to the Russian doctrine and jurisprudence cited in the two experts'
reports. Incidentally, the defendants did not contest this interpretation of the legal provisions
discussed above. In this context, they limited their defence to the argument that the legal
provisions solely relate to arbitration within the Russian Federation's national legal system.
Even if their defence were correct – which in any case does not hold for the 1993
International Arbitration Law van 1993, which explicitly concerns cases in which one of the
parties is not established in the Russian Federation – this does not alter the fact that the
Russian legislation mentioned here limits the option of arbitration to civil-law disputes.
Moreover, the court does not agree with the defendants' argument that the fact that public-
law disputes can only be brought before the national court is in no way contrary to the fact
that the Russian Federation has committed at an international level to compensating foreign
investors for damages ensuing from acts of the State that are contrary to international rules
(statement of defence, under 256). In their statement, the defendants ignore that
incompatibility with Russian law can also exist if that law does not provide for the option of
arbitration as laid down in Article 26 ECT. The legislative provisions discussed above in
any case do not provide for the option of arbitration for disputes arising from a legal
relationship between the Russian Federation and (foreign) investors, in which the public-law
nature of the Russian Federation's actions in that relationship is predominant and in which
an assessment of the exercise of public-law authorities by Russian Federation state bodies is
concerned. In the opinion of the court, it is beyond doubt that such a dispute exists in the
current cases. The conduct for which the defendants reproach the Russian Federation cannot
be designated as acts carried out by the Russian Federation as an equal party or private-law
party. Moreover, the Tribunal did not derive its jurisdiction from these legal provisions.

5.42.     The court will examine below whether Article 9 paragraph 2 and Article 10 of the
Law on Foreign Investments, in the 1991 and 1999 version, respectively, and which the

C/09/477160 / HA ZA 15-1, C/09/477162 / HA ZA 15-2 and                    46
C/09/481619 / HA ZA 15-112
20 april 2016

Tribunal deemed decisive for determining its jurisdiction, allow a farther-reaching option
for arbitration than can be derived from the Russian laws discussed above. It should be
noted – by way of introduction – that Article 9 was in force at the time of the signing of the
ECT, but not when the Arbitration commenced, while Article 10 entered into force after the
signing of the ECT and was in force at the time the Arbitration commenced. However, the
court will not take a position on whether both provisions form part of Russian law referred
to in Article 26 ECT and will examine, like the Tribunal and parties also did, whether the
competence of the Tribunal can be derived from one of the two provisions. Here, too, the
starting point applies that the court must determine the meaning of the provisions on its
own.

*Article 9 The Law on Foreign Investments 1991*

5.43.     The following applies concerning Article 9 of the Law on Foreign Investments
1991. The Russian Federation has rightly taken the position that this article cannot be read
in isolation, but must be viewed in conjunction with Article 43 of the Fundamentals of
Legislation. After all, Article 1 of the Fundamentals of Legislation ("*The laws of the
republics shall regulate in accordance with these Fundamentals the relations arising in
connection with foreign investments in the republics 'territories, subject to specific features
of their economic operations and investment policy*") expresses that the other acts which
provide for legal relationships involving foreign investments must be in accordance with the
fundamentals. The phrase after the last comma of this provision does not necessitate a
different, narrower, interpretation, contrary to the defence of the defendants. It is also
irrelevant for this assessment that, as assumed by the defendants based on the remarks of
Asoskov (expert's report in note 67), the Fundamentals of Legislation were no longer in
force at the time of the signing of the ECT. After all, it is not disputed whether or not the
Fundamentals of Legislation were in force at the time the Law on Foreign Investments 1991
was drafted. In fact: both acts entered into force at virtually the same time. In this sense, the
Fundamentals of Legislation could have served as a basis for the contents of the 1991 act.

5.44.     The phrasing of Article 43 of the Fundamentals of Legislation also indicate the
connection with Article 9 of the Law on Foreign Investments 1991. For clarity's sake, the
two provisions are shown again below. Article 43 of the Fundamentals of Legislation reads
as follows:

> Paragraph 1: "*Disputes between foreign investors and the State are subject to
> consideration in the USSR in courts, unless otherwise provided by international
> treaties of the USSR.*"

> Paragraph 2: "*Disputes of foreign investors and enterprises with foreign
> investments with Soviet State bodies acting as a party to relationships regulated by
> civil legislation, enterprises, social organizations and other Soviet legal entities,
> disputes between participants of the enterprise with foreign investments and the
> enterprise itself are subject to consideration in the USSR in courts or, upon
> agreement of the parties, in arbitration proceedings, inter alia, abroad, and in
> cases provided by legislative acts of the Union of SSR and the republics - in
> arbitrazh courts, economic courts and others.*"

5.45.    When reading the two paragraphs, it is clear that Article 43 makes a distinction between two types of dispute. Following the words of expert Asoskov, the court holds that the first paragraph concerns investment disputes *"within the strict meaning of this term"*. It furthermore concerns disputes arising from the exercise of public-law authorities, or sovereign government actions (expert's report Asoskov, under 73). This dispute type must be brought before a Russian court *unless* other proceedings are provided for in an international treaty of the Russian Federation. The second paragraph of Article 43 concerns investment disputes between various entities, including between companies and between companies and Russian state bodies, in which the latter act in the capacity of a private party (*"acting as a party to relationships regulated by civil legislation"*). This type of dispute must – in so far as is relevant – be adjudicated by a Russian court *or* by arbitration if provisions have been made for arbitration in an agreement. In short, concerning the first type of dispute, Article 43 paragraph 1 of the Fundamentals of Legislation appoints the Russian court as the competent court and stipulates that arbitration is only possible when there is a treaty. The second paragraph contains an explicit provision for arbitration besides regular proceedings if the parties have agreed to that.

5.46.    Article 9 of the Law on Foreign Investments 1991 also makes a distinction between two types of dispute, to which different dispute resolution regimes apply.

> Paragraph 1 stipulates: *"Investment disputes, including disputes over the amount, conditions and procedure of the payment of compensation, shall be resolved by the Supreme Court of the RSFSR or the Supreme Arbitrazh Court of the RSFSR, unless another procedure is established by an international treaty in force in the territory of the RSFSR."*

> Paragraph 2 stipulates: "*Disputes of foreign investors and enterprises with foreign investments against RSFSR State bodies, disputes between investors and enterprises with foreign investments involving matters relating to their operations, as well as disputes between participants of an enterprise with foreign investments and the enterprise itself shall be resolved by the RSFSR courts, or, upon agreement of the parties, by an arbitral tribunal, or, in cases specified by the laws, by authorities authorized to consider economic disputes.*"

5.47.    Although the wording of Article 9 is not literally the same as that of Article 43 of the Fundamentals of Legislation, a comparison of both provisions appears to reveal that Article 9 is based on the same principles as Article 43. Article 9 paragraph 2 also applies to both disputes between foreign investors and state bodies and disputes between foreign investors and other companies – disputes in the latter situation being civil-law in nature by definition – while, as in Article 43 paragraph 2, arbitration is possible besides regular proceedings if the parties have agreed to that (*"or, upon agreement by the parties"*). Unlike in Article 43 paragraph 2, Article 9 paragraph 2 does not contain the explicit statement that the paragraph exclusively provides for cases in which the government acts in the capacity of a private party, but that scope of application appears to be implied, in light of the disputes and the context of the disputes described in Article 9 paragraph 1.  For its part, Article 9 paragraph 1 appears to be in line with Article 43 paragraph 1 and explicitly designates the regular Russian courts as the competent authorities, with the added remark that this principle

can only be deviated from by an international treaty *("unless another procedure is established by an international treaty in force")*.

5.48.    The fact that Article 9 envisages a similar distinction as Article 43 Fundamentals of Legislation is supported by the expert's report of Asoskov (sections 75 et seq.) and the Russian doctrine cited by him. Article 9 paragraph 1, which according to Asoskov concerns (civil-law) disputes arising from sovereign government actions which mainly concern expropriation of foreign investments, is often viewed in conjunction with Article 7 paragraph 3 of the Law on Foreign Investments 1991, which stipulates *"Decisions of governmental bodies on expropriation of foreign investments may be contested in the RSFSR courts."* This provision indicates that public-law disputes regarding expropriation can only be adjudicated by the Russian courts. To this extent, the court shares the view of the Russian Federation. The defendants otherwise not explained argument that the words *"may be appealed against"* could indicate an option to submit such disputes to the Russian court but that another, alternative course of justice is not excluded, is not supported by the text of Article 7 paragraph 3. According to Asoskov, a claim based on Article 7 paragraph 3 can result in proceedings in the sense of Article 9 paragraph 1, in which compensation can be claimed for damages arising from expropriation measures. Asoskov confirms that on the opposite end of the disputes described above that ensue from public-law legal relations are the investment disputes ensuing from civil-law legal relations contained in Article 9 paragraph 2.

5.49.    In the quotation provided by Asoskov of B.N. Toporin in *Russian Law and Foreign Investments*, page 30 (1995), this distinction is acknowledged and described as follows (expert's report Asoskov, 78):

> *"[Article 9] of the Law on Foreign Investments in the RSFSR divided disputes with the participation of foreign investors into two groups. One group comprised investment disputes as such, including the disputes on the issue of the amount, terms and procedure of payment of compensation in case of nationalization or confiscation. (...) The other group comprised disputes related to economic activity of the enterprises with foreign investments."*

5.50.    The description of the investment disputes in Article 9 paragraph 1 is in line with the writings of R. Nagapetyanys in *Treaties for the Promotion and Reciprocal of Investments/Foreign Trade*, no. 5, page 14 (1991) on the practice of investment treaties at the time of the drafting of the law of 1991 (expert's report Asoskov, note 54):

> *"In treaties for the protection of investments that the USSR concludes with foreign States, the USSR gives its consent to the consideration [of investment disputes] in international arbitral tribunals. The scope of such disputes is limited to civil law issues only (primarily, determination of the amount of compensation and the procedure for its payment in the event of nationalization of investments and transfer of profits and other payments due to the investor)."*

5.51.    Based on the considerations stated here, the court concludes that Article 9 paragraph 1 concerns (civil-law) disputes arising from legal relations between foreign investors and the Russian Federation in which the public-law nature predominates. The

scope of application of Article 9 paragraph 2, on the other hand, is limited to investment
disputes of a predominantly civil-law nature. This is in line with the distinction made by
Russian jurisprudence and doctrine, as described in section 5.36 et seq. in this judgment.
The Tribunal did not acknowledge this distinction. Instead, it limited itself to the
representation of Article 9 paragraph 2 in the Interim Awards and subsequently drew the
conclusion that disputes between an investor and a state can be settled by arbitration
according to Russian law. The court deems this opinion incorrect. As has been considered
above, the Arbitration is connected to the previously described mode of action of the
Russian Federation, which in the view of the defendants constitutes a breach of Article 13
(and Article 10) ECT. The Arbitration concerned a dispute that had arisen from a public-law
legal relationship and that centred on compensation for damage caused by the actions of the
government. This finding means that the option of arbitration is not determined by Article 9
paragraph 2, as was the reasoning of the Tribunal, but by the first paragraph of Article 9. In
view of the fact that Article 9 paragraph 1 favours proceedings before the Russian court for
civil-law disputes arising from public-law legal relationships and only provides for other
modes of dispute resolution if a treaty provides for it, this provision does not offer an
independent legal basis for arbitration between the defendants and the Russian Federation.

*Article 10 The Law on Foreign Investments 1999*

5.52.     The Tribunal furthermore based its jurisdiction on Article 10 of the Law on
Foreign Investments 1999. This article, which does not distinguish between various
categories of disputes, reads as follows:

> *"A dispute of a foreign investor arising in connection with its investments and
> business activity conducted in the territory of the Russian Federation shall be
> resolved in accordance with international treaties of the Russian Federation and
> federal laws in courts, arbitrazh courts or through international arbitration
> (arbitral tribunal)."*

5.53.     The Tribunal did not devote a separate consideration to the meaning of Article 10.
Here, too, the Tribunal limited itself to the opinion that based on Article 10 disputes
between an investor and a state, such as is the case in the current proceedings, can be settled
by arbitration. The court does not share this opinion either, for the following reasons.

5.54.     The expert's report of Asoskov and the quotations he provided clearly show that in
Russian legal literature there is a distinction between three types of legal provision. S.S.
Alexeev in *General Theory of Law* (1982) gave the following description (expert's report
Asoskov, 84):

> *"Elements of a legal provision can be set out using three techniques: direct,
> referential, and blanket. Depending on the above, legal provisions can be
> distinguished accordingly: direct, referential and blanket. In the case of a direct
> provision, all elements of the provision are directly set out in an article of the
> regulatory act. In the case of a referential provision, certain elements of the
> provision are not set out directly in the article; the article itself provides a
> reference to another provision containing the required instructions. This technique
> is used to establish connections between parts of a particular set of rules, and in*

> *order to avoid repetitions. In the case of a blanket provision, certain elements of the provision are not set out directly, and its missing elements are not compensated for by some clearly referenced provision, but rather by rules of a certain kind that can evolve with time. In other words, the provision contains an 'empty blank,' a reference to a certain type of rule."*

5.55.    A similar classification is described by N.I. Matuzov and A.V. Malko in *Theory of State and Law: Treatise* (2004). They have described the *"blanket mode"* as the *"mode, where the article provides for a reference not to a specific article, but to a set of other regulatory acts, rules (…)."* (expert's report Asoskov, 85). M.N. Marchenko has also given a similar description (expert's report Asoskov, 86).

5.56.    Article 10 is characterised by a general reference to both treaties and federal laws that could create authorities for regular courts to settle disputes involving foreign investors, but also for "arbitrazh tribunals" and for international arbitration between foreign investors and the Russian state. Article 10 therefore does not create a direct legal basis for arbitration of disputes over obligations of Part III of the ECT, but rather makes the option of arbitration conditional on the existence of a provision in treaties and federal laws to that effect. The court agrees with the Russian Federation that the nature of Article 10 provides for a *"blanket provision"* or a mutatis mutandis clause (*"schakelbepaling"* in Dutch). This interpretation of Article 10 is in line with the perceptions in Russian doctrine mentioned by Asoskov. I.Z. Farkhudinov, A.A. Danelian and M.Sh. Magomedov in *National Regulation of Foreign Investments in Russia* (2013) establish that:

> *"However, unfortunately, many of its provisions [provisions of the 1999 law] are of a declaratory or blanket nature only and do not add anything to the regulatory treatment of foreign investments. Instead of provisions that are empty in substance, the Law should include rules that would provide efficient protection for foreign investments"* (expert's report Asoskov, 91).

5.57.    More specifically, these authors noted in relation to Article 10: *"In substance, it makes the investor's right to resolution of its dispute conditional upon the existence of an international treaty or relevant provision in a federal law."* (expert's report Asoskov, 92). M.M. Boguslavksy describes Article 10 as being *"too generic"* (*Legal Regulation of Foreign Trade*, 2001, expert's report Asoskov, 93), while S. Ripinsky deduces from the 1999 Law that *"[t]he Law does not provide for investor-State arbitration"* (*Commentaries on Selected Model Investment Treaties*, Chapter 14: Russia, 2013, summons under 230, note 274).

5.58.    Based on the foregoing, the court arrives at the opinion that also Article 10 of the Law on Foreign Investments 1999 does not provide a separate legal base for the arbitration of disputes between an investor and a state in international arbitral proceedings, as provided for in Article 26 ECT. Therefore, the court does not follow the Tribunal's opinion that such disputes, and therefore also the current dispute, can be arbitrated based on Russian law.

**The Explanatory Memorandum to the ratification act**

5.59.    The court's interpretation of Articles 9 and 10 of the Law on Foreign Investments, in the respective versions, is not altered by the remarks made by the Russian government in 1996 in the explanatory memorandum for the intended ratification of the ECT. According to the defendants, great significance should be attached to this explanatory memorandum for the explanation of these legal provisions – and in this they follow the Tribunal – and have mainly focused on the following three passages:

> *"The provisions of the ECT are consistent with Russian legislation."*

> *"The legal regime of foreign investments envisaged under the ECT is consistent with the provisions of the existing Law [...] on Foreign Investment in [Russia], as well as with the amended version of the Law currently being discussed in the State Duma".*

> [The regime of the ECT for foreign investments] *"does not require the acknowledgement of any concessions or the adoption of any amendments to the abovementioned Law".*

5.60.    It is the court's opinion that in assessing the meaning of the explanatory memorandum the Tribunal insufficiently recognised that this memorandum originated from the executive and was primarily aimed at prompting the Duma, as part of the legislature, to ratify the ECT. Since the ECT was never ratified, the opinion of the executive (the government) cannot be ascribed to the legislature and the government's standpoint therefore does not have independent meaning. This observation alone necessitates an assessment of (the relevance of) the explanatory memorandum from the government with the utmost restraint. This is all the more relevant since the explanatory memorandum only discusses the compatibility of the ECT with Russian laws in general terms. For instance, the arbitral provision of Article 26 ECT is not explicitly stated in the explanatory memorandum. Furthermore, the court follows the standpoint taken by the Russian Federation on this aspect that the remark of the government that (the regime of) the ECT is in line with Russian law and "*does not require the acknowledgement of any concessions or the adoption of any amendments*" of Russian legislation, should be viewed against the backdrop of the intended ratification. Whether or not the ratification of the ECT and more specifically of Article 26 would require and adjustment of Russian legislation, is a wholly different question than the question whether the provisional application of this provision is in accordance with Russian law. The latter question is not answered in the explanatory memorandum.

5.61.    For the same reason, concerning the interpretation of Articles 9 and 10 of the Law on Foreign Investments, no significance should be attached to the remarks, mentioned by the Tribunal, of Professor Yershov who was a member of the Russian delegation during the ECT negotiations. Incidentally, like the explanatory memorandum, he also concluded in very general terms only that *"under the ECT, Russia grants foreign investors an energy investment regime acceptable to them that does not require any concessions on Russia's part beyond the framework of current law"*. In this context, significance should also not be attached to a statement by the expert of the Russian Federation, Professor Avakiyan who, according to the Tribunal had confirmed during his witness hearing to agree with the

contents of the government's explanatory memorandum. Aside from the fact that in the transcript of 17 November 2008 the court was unable to find such a statement, Avakiyan stressed that the explanatory memorandum reflects the viewpoint of the Russian government and that only the Duma can decide whether Russian legislation needs to be adjusted.

5.62.     The parliamentary history of a significant number of bilateral investment agreements the Russian Federation has concluded and ratified, as provided by the Russian Federation, rather supports the view that the arbitration of disputes, such as the ones in these proceedings, is not provided for in Russian law. The list concerns a total of 57 ratified investment treaties – according to the Russian Federation's undisputed assertion. Among other things, the Russian Federation pointed out (summons, 232) the parliamentary history concerning the ratification of the *"Agreement between the Government of the Russian Federation and the Government of the Republic of Argentina on Encouragement and Reciprocal of Investments"*, which states among other things:

> *"Considering that the Agreement contains provisions different from those provided by the Russian legislation, it is subject to ratification in accordance with clause 1a, 15 of the Federal Law (…) 'on International Treaties of the Russian Federation'."*

> *"The key issues by virtue of which the above Agreement is subject to ratification are as follows (…)"*

> *"the settlement in an international arbitration court of investment disputes between one Party and an investor of the Other Party, as well as disputes between the Parties concerning the interpretation and application of the Agreement (…)"*

> *"the Federal Law No. 1545-1 of July 4, 1991 'On Foreign Investment in the RSFRS' does not provide for a mechanism of settlement of such type of dispute by international arbitration".* (*explanatory note* of 25 October 1999)

5.63.     The explanatory note of 8 April 2000 to the proposal to ratify the bilateral investment agreement between the Russian Federation and the Republic of South Africa also states that *"the Agreement contains provisions different from those set forth in the Russian legislation"* and therefore *"[is] subject to ratification"* and that the Law on Foreign Investments 1991 does not contain a *"mechanism of consideration"* for the arbitration of investment disputes between a foreign investor and the State. In the explanatory note to the ratification of the bilateral investment treaty between the Russian Federation and Japan of 29 February 2000, a similar passage can be found on the Law on Foreign Investments 1999 (summons, 234).

5.64.     These explanatory notes support the opinion that the Law on Foreign Investments in the versions of 1991 and 1999 does not contain a legal provision for arbitration in cases as referred to in Article 26 ECT, such as the current case. The court rejects the interpretation defended by the defendants which holds that from these explanatory notes it can only be deduced that the Law on Foreign Investments does not have a specific mechanism for arbitration between foreign investors and the State in the sense that the law does not include specific rules and a procedure that must be adhered to. This viewpoint proceeds from a too restrictive reading of the explanatory notes. The provided parliamentary notes can only be

taken to mean that the versions of the Law on Foreign Investments of 1991 and 1999 do not contain any type of legal basis for investment arbitrations such as the ones in these proceedings. If arbitration had been permitted under this law, the arbitration provisions in the investment treaties concluded by the Russian Federation would not have been designated as "*provisions different from those provided by the Russian legislation*" and ratification would not have been deemed necessary. The fact that possibly not all explanatory notes to the ratified investment treaties discuss the differences between the arbitration clauses contained in the treaties and Russian law, as also argued by the defendants, does not alter the clear wording of the other explanatory notes.

**Interim statement on Article 26 ECT**

5.65.     It can be concluded from the foregoing that the arbitration clause of Article 26 ECT does not have a legal basis in Russian law and is incompatible with the starting points laid down in that law.

**Bound by virtue of signature or ratification?**

*General*

5.66.     The foregoing does not provide a final answer to the question whether Article 26 ECT could be applied provisionally based on its signing, or that the provisional application required the approval of the Russian legislature. The Tribunal appears to have acknowledged this issue by asking in section 379 of the Interim Awards whether signing a treaty containing a provisional application clause is sufficient to determine that the Russian Federation consented to the international arbitration of disputes arising from the ECT. The Tribunal held that it was. Essentially, the Tribunal held that Articles 2 and 6 FLIT imply that by signing the ECT the Russian Federation and the other Signatories consented to the provisional binding force of the Treaty, albeit provisionally and notwithstanding Article 39 ECT, and therefore also to international arbitration as laid down in Article 26 ECT (Interim Awards, 382). In arriving at this opinion, the Tribunal furthermore attached significance to Article 11 FLIT, from which it follows that the executive determines whether to sign a treaty. The Tribunal also referred to its prior opinion on the question whether the principle of provisional application is permitted under the legislation of the Russian Federation, and in this context referred to Article 23 paragraph 1 FLIT as the basis for that provisional application (383). The Tribunal concluded that in the opinion of the parties to the ECT, there must be circumstances based on which a state for whom the ECT "has not entered into effect" nonetheless has still consented to being bound by the ECT's conditions (385). The court will discuss this opinion below and will include the provisions of the FLIT, even though it entered into force on 21 July 1995, six months after Davydov signed the ECT – except Article 23, which entered into force retroactively by Presidential Instruction.

*Articles 2, 6 and 23 FLIT*

5.67.     The object of the FLIT is evident from Article 1 paragraph 1 FLIT:

> "*The present Federal Law determines the procedure for the conclusion, fulfillment, and termination of international treaties of the Russian Federation.*

C/09/477160 / HA ZA 15-1, C/09/477162 / HA ZA 15-2 and                    54
C/09/481619 / HA ZA 15-112
20 april 2016

> *International treaties of the Russian Federation shall be concluded, fulfilled, and*
> *terminated in accordance with generally-recognized principles and norms of*
> *international law, the provisions of the treaty itself, the Constitution of the Russian*
> *Federation, and the present Federal Law."*

5.68.      Articles 2 and 6 FLIT, which have also been shown above, read as follows (as was provided by the Russian Federation in a Dutch translation), in so far as relevant:

**Article 2 Use of terms**

> *For the purposes of this Federal Law:*
> *[. . .]*
> *b) "ratification," "approval," "acceptance," and "accession" mean in each case a*
> *form whereby the Russian Federation expresses its consent to be bound by an*
> *international treaty;*
> *c) "signature" means either a stage in the conclusion of a treaty, or a form of*
> *expressing consent of the Russian Federation to be bound by an international*
> *treaty, if the treaty provides that signature shall have that effect, or it is otherwise*
> *established that the Russian Federation and the other negotiating States were*
> *agreed that signature should have that effect, or the intention of the Russian*
> *Federation to give that effect to the signature appears from the full powers of its*
> *representative or was expressed during the negotiation;*
>
> *(. . .)*

**Article 6 Expression of consent of the Russian Federation to be bound by an international treaty**

> *1.      Consent of the Russian Federation to be bound by an international treaty may be*
> *expressed by means of:*
> *signature of the treaty;*
> *exchange of the documents constituting the treaty;*
> *ratification of the treaty;*
> *approval of the treaty;*
> *acceptance of the treaty;*
> *accession to the treaty; or*
> *any other means of expressing consent agreed by the contracting parties.*
>
> *2.      Decisions to grant consent for the Russian Federation to be bound by international*
> *treaties shall be made by state bodies of the Russian Federation in accordance with*
> *their competence as established by the Constitution of the Russian Federation, this*
> *Federal Law and other legislative acts of the Russian Federation.*

5.69.      Article 6 FLIT is based on Article 11 VCLT, which describes the various means in which a state can express consent to be bound by a treaty. Article 11 VCLT, and consequently also Article 6 FLIT, lists the means of signature, ratification, acceptance,

approval and accession as well as other means. These means of expressing consent are detailed in Articles 12 and 14 VCLT. Article 12 VCLT concerns the means of signature and dictates that a state's expression of consent to be bound by a treaty is expressed by the signature of its representative, if the treaty provides that signature has that effect. Following from this, Article 2 under *c* FLIT expressly determines that the signing of a treaty can only be interpreted as consent by the Russian Federation to be bound by a treaty if "*the treaty provides that signature shall have that effect*". These provisions leave it to the drafters of a treaty to establish which consequences a signature will have. Article 14 FLIT also determines that the consent of a state to be bound by a treaty is expressed by ratification, if the treaty provides that ratification has that effect.

5.70.    Article 23 paragraph 1 FLIT is also derived from a provision of the VCLT, namely Article 25. Under these provisions, a treaty or parts of a treaty can be provisionally applied pending its entry into force, if the treaty so provides.

5.71.    Other than manifestly ruled by the Tribunal, neither the above provisions of the FLIT nor those of the VCLT provide an independent – meaning, separate from the text of the ECT – basis for the unlimited provisional binding force of the Treaty. Both Article 2 under *c* FLIT (and Article 12 VCLT) and Article 23 paragraph 1 FLIT (and Article 25 VCLT) explicitly refer to the concrete text of the treaty for the interpretation of the meaning of signing a treaty and for the possibility – and therefore also scope – of provisional application. In other words: whether or not a signatory is bound by a treaty based on provisional application is not determined by the general provisions of the FLIT and VCLT, but by the treaty itself. For the same reason, Article 11 FLIT, which exclusively concerns the body authorised to sign, does not provide an independent ground for the provisional application of a treaty provision.

*Article 39 ECT*

5.72.    Article 39 ECT designates – in accordance with the terminology of Article 14 VCLT and Article 6 FLIT – ratification, acceptance or approval as the means through which the Treaty can enter into force. This means that it cannot enter into force by signature, which is not in dispute. In light of its considerations in 382 and 385 of the Interim Awards, it is clear that also for the Tribunal the starting point was that Davydov's signature could not replace the ratification required under Article 39 ECT and only related to the provisional application of the ECT. However, by attributing to the signing of the ECT the effect of unconditional consent of the Russian Federation to be provisionally bound by the Treaty and therefore also to Article 26 ECT, the Tribunal failed to realise that the scope of the signing was expressly restricted by the Limitation Clause in Article 45. As has been considered above, from Article 45 ECT it follows, in the interpretation of Article 45 ECT which the court considers correct, that the possibility of provisional application is focused on and depends on the compatibility of separate treaty provisions with the national law of a Signatory. From the treaty text it thus follows that by signing the ECT, the Russian Federation was provisionally bound by the arbitration clause of Article 26, in so far as this clause could be reconciled with Russian law. The mentioned general provisions of the FLIT therefore do not provide cause for the Tribunal's opinion. In its interpretation of these general provisions, the Tribunal essentially deprived all meaning of the Limitation Clause and the requirement of ratification laid down in Article 39 ECT. Upon closer inspection, the

Tribunal's opinion implies that each treaty provision, even if the provisional application thereof is incompatible with national laws and the constitution, is assigned full force. This view can only be followed if the Limitation Clause is considered as an "all or nothing" provision, but as has been explained above, the court does not follow this interpretation.

*Provisional conclusion on the binding force of signature and ratification*

5.73.    With its opinion, the Tribunal failed to answer the question formulated in 5.66 within the correct assessment framework. The question whether the arbitration clause could be applied provisionally without ratification must be primarily answered, as the Russian Federation rightly argued, based on the provisions of the 1993 Russian Constitution. In this context, the Russian Federation, in brief, argued that the principle of separation of powers enshrined therein entails that the Parliament of the Russian Federation (the Duma and the Council of the Federation jointly, hereinafter the Federal Parliament) must ratify treaties that supplement or amend Russian law by adopting a federal law. According to the Russian Federation, the ECT, and particularly Article 26 ECT, warrants such an approach, and this provision could not be provisionally applied without ratification.

**The principle of separation of powers**

*General*

5.74.    The Tribunal did not formulate a specific opinion – and neither did the defendants in these reversal proceedings – on the principle of the separation of powers and its relevance to the option of provisional application of Article 26 ECT. They only dealt with the meaning of Article 15 paragraph 4 of the Constitution, about which it should be noted that in connection with this the Tribunal only examined the question whether the principle of provisional application is compatible with Russian legislation – a question which follows on from its interpretation of Article 45 ECT. In determining the scope and relevance of the principle of the separation of powers the court – like the parties – will base its assessment on Russian legislation, as laid down in the Constitution and as it extends to other legislation. This will also involve a discussion of Article 15 paragraph 4 of the Constitution.

*The Russian Constitution*

5.75.    The following provisions in the Constitution are relevant in this case. Article 10 of the Constitution stipulates the principle of the separation of powers, and expresses that the legislature, executive and judiciary are each independent:

> *"State power in the Russian Federation shall be exercised on the basis of its division into legislative, executive and judicial. The legislative, executive and judicial authorities shall be independent."*

5.76.    The supremacy of the Constitution over federal laws is derived from Article 15 paragraph 1 of the Constitution:

> *"The Constitution of the Russian Federation shall have the supreme juridical force, direct application (...). Laws and other legal acts adopted in the Russian Federation shall not contradict the Constitution of the Russian Federation."*

5.77.    Article 15 paragraph 4 of the Constitution contains the following rule:

> *"The universally-recognised norms of international law and international treaties and agreements of the Russian Federation shall be a component part of its legal system. If an international treaty or agreement of the Russian Federation establishes other rules than those envisaged by law, the rules of the international agreement shall be applied."*

5.78.    Article 94 of the Constitution determines that the Federal Parliament is the legislative body of the Russian Federation. Pursuant to Article 106 preamble and under d of the Constitution, federal laws concerning the *"ratification and denunciation of international treaties and agreements of the Russian Federation"* must be enacted by the Federal Parliament.

5.79.    The Russian Federation submitted experts' reports in the Arbitration in support of its standpoint. The defendants also submitted experts' reports in the arbitral proceedings. Like it did in setting out Russian substantive law, the court will make use of the experts' reports submitted by the parties as well as of the commentaries in legal handbooks they referred to in order to determine the contents of the Constitution and the associated legislation. The Russian Federation submitted the following experts' reports, as well as other reports:

- Dr Marat V. Baglay, designated as *Doctor of law, Professor of constitutional law and former judge at the Constitutional Court of the Russian Federation* (Expert Opinion On Provisional Application of International Treaties according to the Constitution of the Russian Federation, 26 February 2006);
- Prof. Suren A. Avakyian, designated as *Doctor of Law, Head of the Department of Constitutional and Municipal Law of the Faculty of Law of the Moscow State University of M.V. Lomonosov* (Expert Opinion on the constitutional legal aspects of the conclusion and application of international treaties of the Russian Federation, 21 February 2006 and Expert Opinion of 29 June 2006);
- A. Nussberger, Professor at the University of Cologne and Director of the Institute of Eastern Law (Opinion Concerning the Provisional Application of the Energy Charter Treaty by the Russian Federation of 17 January 2007).

The defendants' main expert's report is the 29 June 2006 opinion of V. Gladyshev, lawyer in Moscow and former employee of the Russian Ministry of Foreign Affairs. Since none of the other experts' reports submitted by the defendants have specific relevance to Russian constitutional law, the court will disregard these opinions.

5.80.    Various experts have opined on the principle of the separation of powers and the attendant implications. Baglay wrote on this subject:

> *"The Russian Parliament is the only body possessing legislative power in the Russian Federation, no other federal state body is entitled to adopt laws or other*

> *statutory acts having the force of law. Ratification of international treaties of the Russian Federation also falls within the exclusive competence of the Parliament. The Constitution does not authorize other branches of power to give consent in the name of the Russian Federation to be bound by an international treaty, if the treaty is subject to ratification."* (Baglay opinion, page 3)

5.81.    Avakiyan noted that the starting point of the separation of powers entails that each international treaty that annuls, modifies or adds any provisions to Russian legislation must be ratified before it can be applied:

> *"The principle of separation of powers as it applies to international treaties means the following: some bodies of state power, in accordance with the interest of the state, are vested with the authority to conduct negotiations and to sign treaties, while other bodies of state power, in accordance with the interest of the state, are vested with the authority to assess the signed treaties and to put them in effect on the basis of constitutional requirements. Any treaty that annuls, modifies or adds any provisions to the Russian legislation must, under the principle of separation of powers, undergo the process of ratification in order to become effective."*
> (Avakiyan opinion, page 4)

Article 86 of the Constitution determines that the president of the Russian Federation is authorised to conduct negotiations and sign international treaties. Avakiyan holds that the Russian government also has this authority, under Article 114 of the Constitution, in so far as that authrority is laid down in a federal law. Avakiyan has made the following comment about this:

> *"However, neither the President of het Russian Federation, nor the Government of the Russian Federation has the right to make a final determination in respect of an international treaty of a legislative nature. The process with respect to such treaties also involves the legislative power of the Russian Federation - The Federal Assembly".*

He refers to the ratification procedure under Articles 105 and 106 of the Constitution (Avakiyan opinion, page 6).

5.82.    Nussberger also mentioned the authorities of the president under Article 86 of the Constitution regarding negotiations about and signature of international treaties. However, she pointed out that

> *"the roles of the Duma and the Council of the Federation, however, remain essential to international treaties requiring ratification. The Duma adopts a law on the ratification of a treaty if ratification is necessary."* (Nussberger opinion, page 18)

5.83.    The Russian Federation also referenced the Russian commentators who agree with the opinion that the Russian Constitution assigns exclusive authority to the Federal Parliament to approve of the binding force of treaties (statement of reply, 141 and sources in the note under 238).

5.84.     The cited experts and commentators support the standpoint of the Russian Federation that the Federal Parliament plays a vital role in the constitutional system in effectuating international treaties that deviate from or supplement Russian legislation. The court follows this standpoint. The approval of the binding force of international treaties– especially if a treaty deviates from or adds new provisions to national legislation – cannot be viewed as anything other than the creation of new legislation. Following from this and based on the principle of the separation of powers, the authority to create new legislation is exclusively accorded to the legislature.

5.85.     In this context, it should be noted that, in accordance with and resulting from the constitutional principle of the separation of powers, Article 15 paragraph 1 FLIT – which, as has been stated, entered into force shortly after the ECT was signed – stipulates that certain treaties, including *"international treaties whose implementation requires amendment of existing legislation or enactment of new federal laws, or that set out rules different from those provided for by law"*, are subject to ratification. Based on the second paragraph, the ratification requirement also applies *"if the parties have agreed to subsequent ratification when concluding the international treaty"*. Although the former Soviet Union had a different state system than the one that was introduced in 1993, Article 12 of the predecessor of the FLIT, the Law of the USSR of 6 July 1978 *"on the Procedure for Conclusion, Performance, and Denunciation of International Treaties of the USSR"*, contained a similar ratification requirement as Article 15 FLIT. That requirement applied, among other things, to *"treaties providing for rules different from those contained in the USSR legislative acts"* as well as to *"international treaties of the USSR (…) where the contracting parties have agreed on subsequent ratification when concluding the treaty"*.

5.86.     With respect to the meaning of Article 15 paragraph 1 FLIT, the comment of D.A. Shilyantsev in *Commentary to the Federal law on international treaties of the Russian Federation* (2006) is worth noting (also contained in section 141 of the statement of reply):

> *"(…) the consent of the Russian Federation to be bound by an international treaty containing rules different from those provided for by law may be expressed only in the form of a federal law. This rule serves as a guarantee of the normal functioning of the separation of powers principle, because neither the President of the Russian Federation, nor the Government of the Russian Federation, much less a federal agency, is authorizes to take a decision on the consent of the Russian Federation to be bound by an international treaty establishing rules different from those provided for by law, or implementation of which requires amendment to existing or adaptation of new federal laws."*

5.87.     The principle of the separation of powers and the ensuing requirement of approval by the Russian Parliament of treaties is also reflected in Article 15 paragraph 4 of the Constitution. Under this provision, standards of international law and treaties form part of national law. If a treaty contains rules that deviate from national law, the treaty takes precedence. Whereas this provision mainly comprises a conflict rule and does not primarily answer the question whether an arbitration clause, such as the one contained in Article 26 ECT, requires ratification, the experts of the Russian Federation emphasise the importance of the Federal Parliament's legislative authorities in interpreting this provision. According to

COPY

C/09/477160 / HA ZA 15-1, C/09/477162 / HA ZA 15-2 and                                    60
C/09/481619 / HA ZA 15-112
20 april 2016

Baglay and Avakiyan, for international treaties to be incorporated in the Russian legal
system under Article 15 paragraph 4 of the Constitution, they first must be ratified. Baglay's
opinion is as follows:

> "*It follows that international treaties can be an integral part of the Russian legal
> system and have priority over federal laws only after duly becoming effective.
> International treaties that are not subject to ratification shall have no priority over
> the federal law. Otherwise in case of a conflict an international treaty not
> approved by the Parliament would have had priority over federal laws.*" (Baglay
> opinion, page 2)

5.88.    Avakiyan wrote the following on this subject:

> "*The rules referred to above are important because they contain a profound
> constitutional logic: if international treaties become an integral part of Russia's
> legal system (Article 15.4 of the Constitution), it is essential to protect the integrity
> of this system, and to achieve this, it is necessary to ensure that it is amended and
> supplemented by the joint integral will of all bodies of the state within the system of
> separation of powers in the Russian Federation.*" (Avakiyan opinion, page 7)

5.89.    Gladyshev, the experts on whom the defendants rely, is the only expert with a
deviating opinion on Article 15 paragraph 4 of the Constitution:

> "*All treaties which are internationally binding on the Russian Federation enjoy, by
> virtue of Article 15(4) of the Russian Constitution, absolute and unconditional
> precedence over domestic Russian laws.*" (Gladyshev opinion, page 6)
> (…)
> "*Importantly, contemporary Russian authors clearly have taken the position that
> Article 15(4) of the Russian Constitution extends not only to ratified treaties, but to
> all other treaties applied by the Russian Federation.*" (Gladyshev opinion, page
> 17)

5.90.    Nussberger refuted Gladhysev's standpoint. Although she acknowledged that
"*Article 15(4) does not explicitly specify the conditions under which international treaties
prevail over domestic law*" (Nussberger opinion, page 29), she also pointed out that most
Russian legal experts argue that based on Article 15 paragraph 4 of the Constitution, only
ratified treaties can be incorporated in the Russian legal system and take precedence over
federal laws:

> "*The majority of Russian legal scholars argue that <u>only international treaties
> ratified</u> on the basis of a parliamentary law can take precedence over other
> parliamentary laws.*" (Nussberger opinion, page 29; underlining added by the
> court)

5.91.    The court shares the interpretation of Article 15 paragraph 4 of the Constitution as can
be read in the opinions of the experts on which the Russian Federation relies. This
interpretation is also supported in the resolutions mentioned by the Russian Federation in
section 135 of the statement of reply of 31 October 1995 and of 10 October 2003 of the

Russian Supreme Court and of 6 November 2014 of the Constitutional Court (see: statement of reply, 135). A different interpretation of Article 15 paragraph 4 of the Constitution would allow treaties not approved by the legislature to form part of Russian law and also supersede legislation not compatible with such treaties. Such an interpretation cannot be reconciled with the principle of separation of powers.

5.92.     In this context, the court discusses the defendants' invocation of jurisprudence of the Constitutional Court concerning the fact that provisionally applicable treaties also form part of the Russian legal system (statement of defence, 193). This starting point, which was touched upon briefly earlier in this judgment in 5.19, does not alter the fact that – as is also expressed in the same jurisprudence of the Constitutional Court – a treaty like the ECT can limit the scope of the provisional application to those treaty provisions that are compatible with the Russian Constitution and other laws and regulations. This jurisprudence also does not offer a basis for the unrestricted provisional application of the provisions of the ECT.

5.93.     The constitutional limitations discussed above require that treaties that deviate from or supplement national Russian laws, cannot be applied based only on their signature, but require prior ratification. In accordance with this, these limitations also apply if treaties, like the ECT, are applied provisionally. As has been considered earlier in this judgment, through Article 26 ECT the Russian Federation is exposed to investment disputes in which foreign investors could accuse the Russian Federation of breach of the legal standards of Chapter III of the ECT. The court concludes that Russian law does not offer an independent legal basis for the settlement of such disputes in international arbitral proceedings. Considering existing Russian legislation, Article 26 ECT constitutes a new form of dispute resolution, namely a form which limits the sovereignty of the Russian Federation in the settlement of international public-law disputes to such an extent that an international tribunal would be competent to rule on the exercise of public-law government actions rather than a national court. The Constitution and the principle of the separation of powers enshrined therein preclude a representative of the executive from being able to bind the Russian Federation to Article 26 ECT. This means, as is also argued by the experts Avakiyan (Opinion of 21 February 2006, pages 8 and 9) and Baglay (Opinion, page 5), as well as A. Martynov in an opinion of 14 December 2006, who at the time participated in the negotiations on the ECT on behalf of the Ministry of Foreign Economic Relations of the Russian Federation, that provisional application of Article 26 ECT is contrary to the constitutional separation of the executive, legislative and judiciary powers.

*Article 23 FLIT*

5.94.     The provisions of Article 23 paragraph 2 FLIT, which is a supplement to the general rule of Article 23 paragraph 1 FLIT, do not affect this opinion. Based on this second paragraph, a treaty that must be ratified by federal law and which provides for the provisional application must be submitted to the Federal Parliament within six months. Although it should be ruled that provisional application of the arbitration clause was incompatible with the Constitution and the ensuing principle of the separation of powers from the outset – given the assessment framework of Article 45 paragraph 1 ECT and the significance attached therein to the Constitution – it is agreed that the provisional application was no longer in accordance with the Constitution after the six-month term. The notification requirement of Article 23 paragraph 3 FLIT, which makes the termination of

provisional application conditional on the notification to the other states that have applied the treaty provisionally, does not alter this opinion. In its view (in 387 et seq. in the Interim Awards) that the six-month term is merely an internal requirement, the Tribunal insufficiently recognised the meaning of the Limitation Clause in this context, too. This clause concerns incompatibility of the provisional application of the treaty provisions with Russian national law, including the Constitution. In short, in the absence of approval of the legislature, the Limitation Clause precluded a longer provisional application of Article 26 ECT than the six months. In this context, the court refers to pages 39 and following of Nussberger's extensive opinion and the Russian doctrine discussed therein, as well as to the opinion of Avakiyan of 29 June 2006. In this context, independent significance can also not be attached to Article 45 paragraph 3 ECT discussed in this judgment under 5.29. The court also does not share the opinion of the Tribunal in this area. As has been considered above, with the explicit reference to the first paragraph, Article 45 paragraph 3 ECT restricts the continued application in the same manner as the Limitation Clause.

*Final conclusion on the meaning of Article 45 ECT in connection with Article 26 ECT*

5.95.    The opinion delivered in this judgment leads to the final conclusion that from Article 45 paragraph 1 ECT it follows that based only on the signature of the ECT, the Russian Federation was not bound by the provisional application of the arbitration regulations of Article 26 ECT. The Russian Federation never made unconditional offer for arbitration, in the sense of Article 26 ECT. As a result, the defendants' "*notice of arbitration*" did not form a valid arbitration agreement.

**Final conclusion on the jurisdiction of the Tribunal**

5.96.    From that which has been stated in 5.95, it follows that the Tribunal wrongly declared itself competent in the Arbitration to take cognizance of the claims and issue the ensuing award.

**THE CONSEQUENCES OF THE RULING ON THE JURISDICTION OF THE TRIBUNAL**

5.97.    The incompetence of the Tribunal leads to the reversal of the Interim Awards and the Final Awards based on Section 1065 subsection 1 under *a* Rv.

5.98.    This means that the other grounds for reversal in 4.2 are left undiscussed.

**THE COSTS OF THE PROCEEDINGS**

5.99.    In view of the reversal of the Yukos Awards of the Tribunal, the defendants are to be deemed the parties against whom judgment has been given, and will be ordered to pay the costs of these proceedings on the part of the Russian Federation. The costs of the proceedings in each of the joined cases are estimated at €3,957.80 in disbursements (€93.80 for the summons and €3,864 in court fees) and at €12,844 (four items at €3,211, according to rate VIII) in lawyer's fees, amounting to a total of €16,801.80.

5.100.    It should be noted that during the proceedings, the court fees charged to the parties were increased. The initially applied rate in court fees, for claims of undetermined value, was changed to the rate for cases with a financial interest of the highest category at the 9 February 2016 hearing.

## 6.      THE RULING

The court:

**in case I**

6.1.       quashes the Interim Award of 30 November 2009 issued in the Arbitration between VPL as Claimant and the Russian Federation as Respondent as well as the Final Award of 18 July 2014;

6.2.       orders VPL to pay the costs in these proceedings incurred by the Russian Federation, provisionally estimated, up to this judgment, at €16,801.80;

6.3.       declares this judgment provisionally enforceable;

**in case II**

6.4.       quashes the Interim Award of 30 November 2009 issued in the Arbitration between YUL as Claimant and the Russian Federation as Respondent as well as the Final Award of 18 July 2014;

6.5.       orders YUL to pay the costs in these proceedings incurred by the Russian Federation, provisionally estimated, up to this judgment, at €16,801.80;

6.6.       declares this judgment provisionally enforceable;

**in case III**

6.7.       quashes the Interim Award of 30 November 2009 issued in the Arbitration between Hulley as Claimant and the Russian Federation as Respondent as well as the Final Award of 18 July 2014;

6.8.       orders Hulley to pay the costs in these proceedings incurred by the Russian Federation, provisionally estimated, up to this judgment, at €16,801.80;

6.9.       declares this judgment provisionally enforceable.


This judgment was passed by mr. D. Aarts, mr. I.A.M. Kroft and mr. H.F.M. Hofhuis and pronounced in open court on 20 April 2016.

type: 1820

F wej ''Qtki kpcn''qh

Exhibit 5

# vonnis

**RECHTBANK DEN HAAG**

Team handel

zaaknummer / rolnummer

**Vonnis van 20 april 2016**

in de navolgende gevoegde zaken:

**I.**      **de zaak met zaaknummer / rolnummer: C/09/477160 / HA ZA 15-1 (hierna: zaak I)** van

**DE RUSSISCHE FEDERATIE,**
zetelend te Moskou, de Russische Federatie,
eiseres,
advocaat mr. L.Ph.J. baron van Utenhove te Den Haag,

tegen

de vennootschap opgericht naar en onderworpen aan het recht van Cyprus
**VETERAN PETROLEUM LIMITED,**
gevestigd te Nicosia, Cyprus,
gedaagde,
advocaat mr. M.A. Leijten te Amsterdam;

**II.**      **de zaak met zaaknummer / rolnummer: C/09/477162 / HA ZA 15-2 (hierna: zaak II)** van

**DE RUSSISCHE FEDERATIE,**
zetelend te Moskou, de Russische Federatie,
eiseres,
advocaat mr. L.Ph.J. baron van Utenhove te Den Haag,

tegen

de vennootschap opgericht naar en onderworpen aan het recht van Cyprus
**YUKOS UNIVERSAL LIMITED,**
gevestigd te Douglas, Isle of Man,
gedaagde,
advocaat mr. M.A. Leijten te Amsterdam;

C/09/477160 / HA ZA 15-1, C/09/477162 / HA ZA 15-2 en                    2
C/09/481619 / HA ZA 15-112
20 april 2016

---

**III.     de zaak met zaaknummer / rolnummer: C/09/481619 / HA ZA 15-112 (hierna: zaak III)** van

**DE RUSSISCHE FEDERATIE,**
zetelend te Moskou, de Russische Federatie,
eiseres,
advocaat mr. L.Ph.J. baron van Utenhove te Den Haag,

tegen

de vennootschap opgericht naar en onderworpen aan het recht van Cyprus
**HULLEY ENTERPRISES LIMITED,**
gevestigd te Nicosia, Cyprus,
gedaagde,
advocaat mr. M.A. Leijten te Amsterdam.


Partijen worden hierna respectievelijk de Russische Federatie, VPL, YUL en Hulley
genoemd. De rechtbank duidt de drie gedaagden tezamen ook aan als "gedaagden".

C/09/477160 / HA ZA 15-1, C/09/477162 / HA ZA 15-2 en                    3
C/09/481619 / HA ZA 15-112
20 april 2016

INHOUDSOPGAVE

1.      DE PROCEDURES

in zaak I                                                                1.1
in zaak II                                                               1.1
in zaak III                                                              1.1
in alle zaken                                                            1.1–1.3

2.      DE FEITEN DIE TUSSEN PARTIJEN VASTSTAAN

in alle zaken                                                            2.1-2.13

3.      DE RELEVANTE WETGEVING

The Energy Charter Treaty ("ECT")                                        3.1
The Vienna Convention on the Law of Treaties ("VLCT")                    3.2
De Russische Grondwet                                                    3.3
De Russische Federal Law on International Treaties ("FLIT")              3.4
De Russische Grondbeginselenwet                                          3.5
The Law on Foreign Investments (Wet inzake de Buitenlandse Investeringen)  3.6

4.      DE GESCHILLEN VAN PARTIJEN

in alle zaken                                                            4.1–4.4

5.      DE BEOORDELING VAN DE GESCHILLEN

in alle zaken                                                            5.1–5.100

INLEIDING                                                                5.1–5.3

Authentieke teksten of vertaling?                                        5.1–5.2
De bevoegdheid van de rechtbank in deze procedure                        5.3

DE BEVOEGDHEID VAN HET SCHEIDSGERECHT                                    5.4–5.96

Inleiding                                                                5.4–5.5

Artikel 45 ECT                                                           5.6–5.31

Algemeen                                                                 5.6
Artikel 45 lid 1                                                         5.7–5.13
Artikel 45 lid 2                                                         5.14–5.17
Voorlopige conclusie over artikel 45 lid 1                               5.18
Voorwerp en doel van de ECT en de aard van het internationale recht      5.19
Oordeel ander scheidsgerecht                                             5.20
De statenpraktijk                                                        5.21

C/09/477160 / HA ZA 15-1, C/09/477162 / HA ZA 15-2 en       4
C/09/481619 / HA ZA 15-112
20 april 2016

*De travaux preparatoires*                                         5.22
*Conclusie over de uitleg van artikel 45*                          5.23
*Voorafgaande verklaring nodig?*                                   5.24–5.31

**Artikel 26 ECT**                                                 5.32–5.34

**De Wet inzake de Buitenlandse Investeringen**                    5.35–5.58

*Algemeen*                                                         5.35–5.42
*Artikel 9 Wet inzake de Buitenlandse Investeringen 1991*          5.43–5.51
*Artikel 10 Wet inzake de Buitenlandse Investeringen 1991*         5.52–5.58

**De memorie van toelichting bij de ratificatiewet**               5.59–5.63

**Tussenconclusie over artikel 26 ECT**                            5.65

**Gebondenheid door ondertekening of ratificatie?**                5.66–5.74

*Algemeen*                                                         5.66
*De artikelen 2, 6 en 23 FLIT*                                     5.67–5.71
*Artikel 39 ECT*                                                   5.72
*Voorlopige conclusie ten aanzien van de gebondenheid
 door ondertekening en ratificatie*                                5.73

**Het beginsel van de machtenscheiding**                           5.74–5.95

*Algemeen*                                                         5.74
*De Russische Grondwet*                                            5.75–5.93
*Artikel 23 FLIT*                                                  5.94
*Eindconclusie ten aanzien van de betekenis van artikel 45
 in verbinding met artikel 26 ECT*                                 5.95

**Eindconclusie ten aanzien van de bevoegdheid van het Scheidsgerecht**   5.96

**DE GEVOLGEN VAN HET OORDEEL OVER DE BEVOEGDHEID**                 5.97–5.98
        **VAN HET SCHEIDSGERECHT**

**DE PROCESKOSTEN**                                                5.99–5.100

**6.      DE BESLISSING**                                          6.1–6.9

**in zaak I**                                                      6.1–6.3
**in zaak II**                                                     6.4–6.6
**in zaak III**                                                    6.7–6.9

C/09/477160 / HA ZA 15-1, C/09/477162 / HA ZA 15-2 en          5
C/09/481619 / HA ZA 15-112
20 april 2016

1.     DE PROCEDURES

1.1.    Het verloop van de procedures blijkt uit:

**in zaak I**

-       . de aan VPL betekende dagvaarding van 10 november 2014, met de producties RF-
        1 tot en met RF-95;
-       de stukken in het door de Russische Federatie opgeworpen incident tot voeging,
        resulterend in het incidenteel vonnis van 11 maart 2015, waarbij de rechtbank deze
        zaak heeft gevoegd met de zaken II en III;

**in zaak II**

-       de aan YUL betekende dagvaarding van 10 november 2014, met de producties RF-
        1 tot en met RF-95;
-       de stukken in het door de Russische Federatie opgeworpen incident tot voeging,
        resulterend in het incidenteel vonnis van 11 maart 2015, waarbij de rechtbank deze
        zaak heeft gevoegd met de zaken I en III;

**in zaak III**

-       de aan Hulley betekende dagvaarding van 10 november 2014, met de producties
        RF-1 tot en met RF-95;
-       de stukken in het door de Russische Federatie opgeworpen incident tot voeging,
        resulterend in het incidenteel vonnis van 11 maart 2015, waarbij de rechtbank deze
        zaak heeft gevoegd met de zaken I en II;

C/09/477160 / HA ZA 15-1, C/09/477162 / HA ZA 15-2 en                          6
C/09/481619 / HA ZA 15-112
20 april 2016

**in alle zaken**

- de gezamenlijke conclusie van antwoord van 20 mei 2015 van gedaagden, met bijlagen die zijn genummerd als 1-7, waarvan bijlage 1 de producties HVY-1 tot en met HVY-107 omvat;
- de brief van 22 juni 2015 van de rechtbank aan partijen met de daarin vermelde correspondentie van partijen aan de rechtbank (de brieven van 18 en 25 mei 2015 en 2 juni 2015 van de Russische Federatie en de brieven van 21 mei 2015 en 3 juni 2015 van gedaagden) met betrekking tot het verdere verloop van de procedure;
- de brief van 2 juli 2015 van de zijde van de Russische Federatie, met een opgave van verhinderdata en termijnen voor de conclusies van re- en dupliek;
- het tussenvonnis van 8 juli 2015, waarin de rechtbank de zaak heeft verwezen naar de zitting van 9 februari 2016 van een meervoudige kamer voor de pleidooien;
- het e-mailbericht van 8 juli 2015 van de griffier van de rechtbank aan de advocaten, met de data voor het nemen van de conclusies van re- en dupliek;
- de gezamenlijke conclusie van repliek van 16 september 2015 van de zijde van de Russische Federatie, met de producties RF-96 tot en met RF-198;
- de brief van 16 november 2015 van de zijde van de Russische Federatie, met betrekking tot enkele faciliteiten in de zittingzaal;
- de brief van 30 november 2015 van de zijde van de Russische Federatie, met de producties RF-199;
- de brief van 10 december 2015 van de griffier van de rechtbank aan partijen, met een reactie op de brief van 16 november 2015;
- de brief van 15 december 2015 van de zijde van de Russische Federatie, met bijlage 1, een vertaling in de Nederlandse taal van de Interim Awards en de Final Awards, bijlage 2, een overzicht van de mappenstructuur op de bij de brief gevoegde usb-stick, en bijlage 3, een usb-stick die alle processtukken bevat en alle bestanden die partijen eerder hebben ingediend;
- de gezamenlijke conclusie van dupliek van gedaagden van 15 december 2015, met de producties HVY-108 tot en met HVY-126;
- de brief van 11 januari 2016 van de zijde van de Russische Federatie, over de gang van zaken tijdens zitting (spreektijd en geluidsopname);
- de brief van 13 januari 2016 van de zijde van gedaagden, met een reactie op de brief van 11 januari 2016;
- de brief van 19 januari 2016 van de griffier van de rechtbank aan de advocaten van partijen, met beslissingen van de rechtbank over de procedurele vragen in de brieven van 11 en 13 januari 2016;
- de brief van de Russische Federatie van 22 januari 2016 met de akte overlegging producties (RF-200 tot en met RF-222) van diezelfde datum;
- de brief van de Russische Federatie van 25 januari 2016 met daarbij gevoegd de aanvullende akte overlegging producties (met de producties RF-223 tot en met RF-225), die is gedagtekend op 25 januari 2016;
- de brief van 26 januari 2016 van de advocaat van de Russische Federatie, met de opgave van de personen die aan de zijde van de Russische Federatie de zitting zullen bijwonen;
- de brief van 26 januari 2016 van de advocaat van gedaagden, met de opgave van de personen die aan de zijde van gedaagden de zitting zullen bijwonen;

C/09/477160 / HA ZA 15-1, C/09/477162 / HA ZA 15-2 en    7
C/09/481619 / HA ZA 15-112
20 april 2016

- de brief van 27 januari 2016 van de advocaat van de Russische Federatie, met daarbij gevoegd de aanvullende akte overlegging producties (met de productie RF-226 en een usb-stick met bijlagen bij de eerder ingezonden producties RF-200 tot en met RF-202 en, nogmaals, de productie RF-225), die is gedagtekend op 27 januari 2016;
- de brief van 27 januari 2016 van de zijde van de Russische Federatie, met daarbij gevoegd de productie R-282 in een papieren versie (eerder overgelegd als document op een usb-stick);
- de brief van 28 januari 2016 van de advocaat van gedaagden, met bezwaar tegen de aanvullende producties van de Russische Federatie;
- het proces-verbaal van zitting van 9 februari 2016, voor de pleidooien in deze zaak, en de daarin vermelde pleitaantekeningen en verdere stukken van de behandelende advocaat van de Russische Federatie, prof. mr. A.J. van den Berg, en van de advocaat van gedaagden en diens kantoorgenoot mr. M. Ynzonides;
- de toezending op 16 februari 2016 van dit proces-verbaal aan de advocaten, met de mededeling dat eventuele opmerkingen daarover binnen twee weken na ontvangst ervan ter kennis van de rechtbank worden gebracht;
- de brief van 22 februari 2016 van de behandelende advocaat van de Russische Federatie, met een reactie op het proces-verbaal;
- de brief van 26 februari 2016 van de advocaat van gedaagden met een reactie op het proces-verbaal en op de brief van 22 februari 2016 van de advocaat van de Russische Federatie;
- de brief van 1 maart 2016 van de griffier aan de advocaten met onder meer de ontvangstbevestiging van de zojuist vermelde brieven van 22 en 26 februari 2016.

1.2.    Aan het einde van de zitting van 9 februari 2016 heeft de rechtbank aan partijen meegedeeld dat zij heden, 20 april 2016, vonnis zal wijzen.

1.3.    Bij dit vonnis heeft de rechtbank voor zoveel nodig rekening gehouden met de opmerkingen van partijen over de tekst van het aan hen gezonden proces-verbaal van de zitting van 9 februari 2016. Voor het overige zijn die opmerkingen te beschouwen als partijstandpunten.

**2.    DE FEITEN DIE TUSSEN PARTIJEN VASTSTAAN**

**in alle zaken**

2.1.    In december 1994 is in Portugal het Verdrag inzake het Energiehandvest (in de Engelse tekst: *The Energy Charter Treaty*) opengesteld voor ondertekening. Uit artikel 50 van dit verdrag volgt dat onder meer de Engelse en de Franse tekst van het verdrag en het bijbehorende Protocol authentiek zijn. Deze beide authentieke teksten zijn gepubliceerd in het Nederlandse *Tractatenblad* (*Trb.* 1995, 108). In dit vonnis wordt uitgegaan van de Engelse tekst van het verdrag, dat zal worden aangeduid als "de ECT" of als "het Verdrag". De in deze zaak relevante bepalingen van de ECT zijn hierna, in 3.2, weergegeven in de Engelstalige versie. De ECT is in werking getreden op 16 april 1998.

2.2.    Een van de partijen die de ECT hebben ondertekend is de Russische Federatie, de eiseres in deze procedure. De ondertekening namens deze staat is op 17 december 1994

C/09/477160 / HA ZA 15-1, C/09/477162 / HA ZA 15-2 en                    8
C/09/481619 / HA ZA 15-112
20 april 2016

geschied door de heer O.D. Davydov, destijds vicepremier van de Russische Federatie.
Daarmee werd de Russische Federatie "signatory" in de zin van artikel 45 lid 1 ECT
("Ondertekenende Partij" in de Nederlandse versie, zoals gepubliceerd in *Trb.* 1995, nr.
250). De Russische Federatie heeft geen gebruik gemaakt van de in artikel 45 lid 2 onder *a*
ECT voorziene mogelijkheid voor een Ondertekenende Partij om een verklaring in te dienen
dat zij niet kan instemmen met de in artikel 45 geregelde voorlopige toepassing van de ECT.

2.3.     Op 26 augustus 1996 heeft de regering van de Russische Federatie aan de Doema,
als onderdeel van het Parlement van de Russische Federatie, een wetsvoorstel voorgelegd
dat strekte tot ratificatie van de ECT. In dit wetsvoorstel komen onder meer de in 5.59
aangehaalde passages voor.

2.4.     Het Parlement is nooit tot ratificatie overgegaan. Op 20 augustus 2009 heeft de
Russische Federatie de Portugese Republiek (de depositaris op grond van artikel 49 ECT) in
kennis gesteld van haar voornemen om geen partij te worden bij de ECT.

2.5.     De Russische vennootschap Yukos Oil Company (hierna: Yukos) was, al dan niet
via dochtervennootschappen, in het begin van het vorige decennium een grote
olieproducent. Haar bestuursvoorzitter (CEO) was de heer Mikhail Khodorkovsky. Elk van
gedaagden was – door tussenkomst van andere rechtspersonen – aandeelhouder van Yukos.

2.6.     In en na 2003 heeft de Russische belastingdienst zich op het standpunt gesteld dat
Yukos zich stelselmatig en op grote schaal onttrok aan de reguliere belastingheffing in de
Russische Federatie. Dit heeft geleid tot belastingaanslagen (inclusief naheffingen en
boeten) van aanzienlijke omvang en vervolgens – onder meer – tot beslagen ten laste van
Yukos. De uitwinning van de vorderingen die de belastingdienst pretendeerde heeft geleid
tot executoriale verkoop van de bezittingen van Yukos en (in augustus 2006) tot haar
faillissement.

2.7.     De aandeelhouders van Yukos hebben zich op het standpunt gesteld dat de
Russische Federatie zich dusdoende het grootste deel van de bezittingen van Yukos
onrechtmatig heeft toegeëigend. Op basis van de stelling dat dit een onrechtmatige
ontneming van hun investeringen opleverde, heeft elk van gedaagden een arbitrage
aangevraagd op de voet van artikel 26 lid 4 onder b van de ECT en het Arbitragereglement
van de Commissie van de Verenigde Naties voor Internationaal Handelsrecht.

2.8.     Nadat elk van partijen in 2005 een arbiter had benoemd, heeft de secretaris-
generaal van het Permanente Hof van Arbitrage, in Den Haag, op 21 juli 2005 een derde
arbiter, tevens de voorzitter van het arbitrale college (hierna: het Scheidsgerecht), benoemd,
in de persoon van de heer L.Yves Fortier. Na de vervanging van een van de andere in 2005
benoemde arbiters in 2007, bestond het college (hierna: het Scheidsgerecht) uit de heren
Fortier voormeld (voorzitter), Charles Poncet en Stephen M. Schwebel. Het Scheidsgerecht
heeft zich laten bijstaan door een secretaris en (later ook) door een – als "assistent"
aangeduide – functionaris, de heer Martin Valasek (hierna: Valasek).

2.9.     Deze arbitrages (hierna tezamen aan te duiden als "de Arbitrage", in enkelvoud)
zijn aangevangen op 31 oktober 2005. De plaats van arbitrage was Den Haag. In de
Arbitrage hebben thans gedaagden, als de respectieve eisers, gesteld – kort samengevat –

dat de Russische Federatie zich hun investeringen in Yukos onrechtmatig had toegeëigend en ten onrechte hen daartegen niet had beschermd, hetgeen tot enorme verliezen heeft geleid. Gedaagden vorderden vergoeding van deze schade.

2.10.      Na diverse hoorzittingen en zogeheten *procedural orders* heeft het Scheidsgerecht op 30 november 2009 in elk van de drie parallelle zaken een tussenvonnis (hierna: Interim Award) gewezen. In deze Interim Awards heeft het Scheidsgerecht enkele vragen over zijn bevoegdheid beantwoord. Voor zover thans van belang, houden de Interim Awards het volgende in. De door het Scheidsgerecht vermelde artikelen zijn – tenzij uit het hierna volgende anders blijkt – bepalingen van de ECT. In deze weergave zijn de voetnoten weggelaten. De citaten komen uit de Interim Award van gedaagde VPL en zijn vrijwel identiek aan de overwegingen in de Interim Awards van de andere gedaagden. Gedaagde VPL wordt aangeduid als "*Claimant*", de Russische Federatie als "*Respondent*".

### *b) Tribunal's Decision*

*(...)*
264.    *In sum, the ordinary meaning to be given to the terms of Articles 45(1) and 45(2), when read together, demonstrates to the satisfaction of the Tribunal that the declaration which is referred to in Article 45(2) is a declaration which is not necessarily linked to the Limitation Clause of Article 45(1).*

*(...)*
284.    *The Tribunal therefore concludes, based on the ordinary meaning of Article 45(1) in its context, and subject to considerations of estoppel (addressed below), that the Russian Federation may, even after years of stalwart and unqualified support for provisional application and, until this arbitration, without ever invoking the Limitation Clause, claim an inconsistency between the provisional application of the ECT and its internal laws in order to seek to avoid the application of Part V of the ECT.*

*(...)*
### *4. What Effect Should Be Given to the Limitation Clause in Article 45(1)?*
### *a) All-or-Nothing vs. "Piecemeal" Approach*

290.    *The Tribunal has concluded that Respondent may rely on the Limitation Clause of Article 45(1) even though it has neither made a declaration under Article 45(2) nor served any prior notice under Article 45(1). Thus, the Tribunal must determine what effect should be given to the Limitation Clause itself and it now turns its attention to that issue.*

*(...)*
292.    *(...) According to Respondent, the clause requires a "piecemeal" approach which calls for the analysis of the consistency of each provision of the ECT with the Constitution, laws and regulations of the Russian Federation. According to Claimant, the inquiry is an "all-or-nothing" exercise which requires an analysis and determination of whether the principle of provisional application per se is inconsistent with the Constitution, laws or regulations of the Russian Federation.*

C/09/477160 / HA ZA 15-1, C/09/477162 / HA ZA 15-2 en          10
C/09/481619 / HA ZA 15-112
20 april 2016

---

### (ii) Tribunal's Decision

*(...)*

303.    *The Tribunal finds that neither party has properly parsed the Limitation Clause of Article 45(1). While each party has provided a starting point for the analysis, neither has carried it through to its conclusion:*
*considering Respondent's argument first, the Tribunal agrees that the phrase <u>"to the extent that"</u> is often the language used when drafters of a clause in a treaty or a statute wish to make clear that a provision is to be applied only insofar as what then follows is the case. Far from being determinative of the meaning of the Limitation Clause, however, the use of the introductory words "to the extent that" requires the Tribunal to examine carefully the words that follow, namely "that such provisional application is not inconsistent with [each signatory's] constitution, laws or regulations."*

- *Turning to Claimant's argument about the meaning of these words, the Tribunal finds that Claimant does not provide sufficient support for its interpretation of the phrase <u>"such provisional application"</u> as necessarily referring to the principle of provisional application. Article 45(1) does not refer anywhere to the principle of provisional application, but rather to "[e]ach signatory agree[ing] to apply this Treaty provisionally . . ."*

304.    *For the Tribunal, the key to the interpretation of the Limitation Clause rests in the use of the adjective <u>"such"</u> in the phrase <u>"such provisional application"</u> "Such," according to Black's Law Dictionary (Seventh Edition), means "that or those; having just been mentioned." The Merriam-Webster Collegiate Dictionary (Tenth Edition) defines "such" as "of the character, quality, or extent previously indicated or implied." The phrase "such provisional application," as used in Article 45(1), therefore refers to the provisional application previously mentioned in that Article, namely the provisional application of "this Treaty."*

305.    *The Tribunal concludes, therefore, that the meaning of the phrase "such provisional application" is context-specific, in that its meaning is derived from the particular use of provisional application to which it refers. In Article 45(1), the particular use of provisional application to which it refers is provisional application of "this Treaty." Accordingly, Article 45(1) can therefore be read as follows:*

> *(1) Each signatory agrees to apply this Treaty provisionally pending its entry into force for such signatory in accordance with Article 44, to the extent that <u>the provisional application of this Treaty</u> is not inconsistent with its constitution, laws or regulations.*

> *[emphasis added]*

306.    *By contrast, the Tribunal refers to the Limitation Clause in Article 45(2)(c), which reads:*

> *(c) Notwithstanding subparagraph (a), any signatory making a declaration referred to in subparagraph (a) <u>shall apply Part VII provisionally</u> pending the entry into force of the Treaty for such signatory in accordance with Article 44, to the extent that <u>such provisional application</u> is not inconsistent with its laws or regulations.*

*[emphasis added]*

      *In this context, the phrase "such provisional application" necessarily has a
different meaning, referring to the provisional application of only Part VII of the
Treaty.*

*(...)*

308.    *There are two possible interpretations of the phrase "the provisional application of
this Treaty": it can mean either "the provisional application of the entire Treaty"
or "the provisional application of <u>some parts of</u> the Treaty." The Tribunal finds
that, in context, the former interpretation accords better with the ordinary meaning
that should be given to the terms, as required by Article 31(1) of the VCLT. Indeed,
without any further qualification, it is to be presumed that a reference to "this
Treaty" is meant to refer to the Treaty as a whole, and not only part of the Treaty.*

309.    *The Tribunal notes that its finding on the scope of provisional application in Article
45(1) is entirely consistent with the decision on jurisdiction rendered in the
Kardassopoulos case. (...)*

311.    *In the Tribunal's opinion, there is no basis to conclude that the signatories would
have assumed an obligation to apply only part of the Treaty provisionally, without
making such partial provisional application explicit. The Tribunal therefore
concludes that the Limitation Clause in Article 45(1) contains an "all-or-nothing"
proposition: either the entire Treaty is applied provisionally, or it is not applied
provisionally at all.*

312.    *Furthermore, the Tribunal concludes that the determination of this "all-or-nothing"
question depends on the consistency of the principle of provisional application with
a signatory's domestic law. The alternative—that the question hinges on whether, in
fact, each and every provision of the Treaty is consistent with a signatory's domestic
legal regime—would run squarely against the object and purpose of the Treaty, and
indeed against the grain of international law.*

313.    *Under the pacta sunt servanda rule and Article 27 of the VCLT, a State is prohibited
from invoking its internal legislation as a justification for failure to perform a
treaty. In the Tribunal's opinion, this cardinal principle of international law
strongly militates against an interpretation of Article 45(1) that would open the
door to a signatory, whose domestic regime recognizes the concept of provisional
application, to avoid the provisional application of a treaty (to which it has agreed)
on the basis that one or more provisions of the treaty is contrary to its internal law.
Such an interpretation would undermine the fundamental reason why States agree
to apply a treaty provisionally. They do so in order to assume obligations
immediately pending the completion of various internal procedures necessary to
have the treaty enter into force.*

314.    *Allowing a State to modulate (or, as the case may be, eliminate) the obligation of
provisional application, depending on the content of its internal law in relation to
the specific provisions found in the Treaty, would undermine the principle that
provisional application of a treaty creates binding obligations.*

C/09/477160 / HA ZA 15-1, C/09/477162 / HA ZA 15-2 en                          12
C/09/481619 / HA ZA 15-112
20 april 2016

315.   Provisional application as a treaty mechanism is a question of public international
       law. International law and domestic law should not be allowed to combine, through
       the deployment of an "inconsistency" or "limitation" clause, to form a hybrid in
       which the content of domestic law directly controls the content of an international
       legal obligation. This would create unacceptable uncertainty in international
       affairs. Specifically, it would allow a State to make fluctuating, uncertain and un-
       notified assertions about the content of its domestic law, after a dispute has already
       arisen. Such a State, as Claimant argues, "would be bound by nothing but its own
       whims and would make a mockery of the international legal agreement to which it
       chose to subject itself." A treaty should not be interpreted so as to allow such a
       situation unless the language of the treaty is clear and admits no other
       interpretation. That is not the case with Article 45(1) of the ECT.

320.   The Tribunal reiterates that its interpretation of the Limitation Clause of Article
       45(1) is based on its specific language in its context. The Tribunal recognizes, as do
       Claimant's experts, Professors Crawford and Reisman, that parties negotiating a
       treaty enjoy drafting freedom and could (using clear and unambiguous language)
       overcome the "strong presumption of the separation of international from national
       law." Indeed, parties to a treaty are free to agree to any particular regime. This
       would include a regime where each signatory could modulate (or eliminate) its
       obligation of provisional application based on consistency of each provision of the
       treaty in question with its domestic law. For the reasons set out above, however,
       agreement to such a regime would need to be clearly and unambiguously expressed,
       a standard which Article 45(1) does not meet.

321.   The Tribunal's interpretation of Article 45(1) is also supported by State practice. As
       already noted in an earlier section, six States (Austria, Luxembourg, Italy, Romania,
       Portugal and Turkey) relied expressly on the Limitation Clause in Article 45(1). An
       analysis of the statements or declarations made by these States confirms that each
       one of them relied on Article 45(1)—sometimes alone and sometimes in conjunction
       with Article 45(2))—for the non-application of the entire Treaty under the
       provisional application regime. Respondent itself has described these six signatories
       as States who "consider themselves unable to apply and have not applied any
       provision of the Treaty on a provisional basis." Not one of these six States, in other
       words, relied on the Limitation Clause in Article 45(1) for the interpretation now
       posited by Respondent, namely the selective or partial provisional application of the
       ECT based on the non-application of only those individual provisions that are
       claimed to be inconsistent with a signatory's domestic law.

322.   Similarly, in the lists it maintained to keep track of the intentions of the signatories,
       the ECT Secretariat identified the States that intended to rely on Article 45(1) as
       intending to do so in order to avoid provisional application of the Treaty altogether.
       Thus, the preliminary list of signatories prepared by the ECT Secretariat, dated 19
       December 1994, described signatories intending to rely on Article 45(1) as States
       "which will not apply the Treaty provisionally in accordance with Article
       45(1)"[emphasis added]. This preliminary list identified Austria, Italy, Portugal,
       Romania and Turkey. The updated list prepared by the ECT Secretariat, dated 1

March 1995, described the same category of signatories in exactly the same way, as States "*which will not apply the Treaty* provisionally in accordance with Article 45(1)" [emphasis added]. In addition to the countries already identified on the list dated 19 December 1994, this list included Hungary61 and Luxembourg.

329.    The Tribunal therefore concludes that Article 45(1) requires an analysis and determination of whether the principle of provisional application per se is inconsistent with the Constitution, laws or regulations of the Russian Federation. If it is not inconsistent, then this Tribunal has jurisdiction to hear Claimant's claims under Article 26 of the Treaty, which would apply provisionally in the Russian Federation in accordance with Article 45(1). It is to that issue that the Tribunal now turns.

### b) Is the Principle of Provisional Application Inconsistent with Russian Law?

330.    There is no significant debate between the Parties on the issue of whether the principle of provisional application per se is inconsistent with the Constitution, law or regulations of the Russian Federation. Claimant asserts that the principle is not inconsistent with Russian law, citing ample legislative and doctrinal authorities in support of its submission, and concludes on that basis that the Limitation Clause in Article 45(1) is unavailable to the Russian Federation. Respondent does not seriously challenge the authorities cited by Claimant on this point. Respondent's principal argument against provisional application of the ECT, as seen earlier, is based on the interpretation of Article 45(1), not on the assertion that provisional application per se is unknown or unrecognized by Russian law.

(...)

338.    The Tribunal therefore has no difficulty in concluding that the principle of provisional application is perfectly consistent with the Constitution, laws and regulations of the Russian Federation. Accordingly, the Tribunal finds that the whole of the ECT applied provisionally in the Russian Federation until such provisional application was terminated, in accordance with the notification that the Russian Federation made on 20 August 2009, pursuant to Article 45(3)(a) of the Treaty, of its intention not to become a Contracting Party to the Treaty.(...)

343.    The Tribunal is of the view that the determination as to whether or not the principle of provisional application is consistent with the constitution, the laws or the regulations of the host State in which the Investment is made must be made in the light of the constitution, laws and regulations at the time of signature of the ECT. (...)

### c) Are the Provisions of the ECT Relating to Dispute Resolution Inconsistent with Russian Law?

346.    In view of the Tribunal's conclusion with respect to the interpretation of Article 45(1), there is no need, in principle, to address Respondent's submission that the provisions of the ECT relating to dispute resolution are themselves inconsistent with Russian law.

C/09/477160 / HA ZA 15-1, C/09/477162 / HA ZA 15-2 en          14
C/09/481619 / HA ZA 15-112
20 april 2016

347.   However, since both sides made extensive submissions to the Tribunal with respect
       to the so-called "piecemeal" approach and because, as will be seen, the Tribunal's
       analysis and findings with respect to the consistency with Russian laws and
       Constitution of these provisions of the ECT relating to dispute resolution lead the
       Tribunal to the same conclusion, the Tribunal has nevertheless decided to set out its
       analysis under this alternative approach.

(...)

       **(ii) Tribunal's Decision**

370.   After having considered the totality of the Parties' submissions and having
       deliberated, the Tribunal concludes that Article 26 of the ECT is not inconsistent
       with the Constitution, laws or regulations of the Russian Federation. The terms of
       the Russian Federation's Law on Foreign Investment (both the 1991 and 1999
       versions) are crystal clear. Investor-State disputes such as the present one are
       arbitrable under Russian law. The Tribunal recalls the key provisions of the law
       which inform its conclusion. (...)

371.   Furthermore, the definitions of "foreign investor" and "foreign investment" in both
       the 1991 and 1999 versions of the Law on Foreign Investment are consistent with
       the definitions of "Investor" and "Investment" in Article 1 of the ECT. (...)

372.   On the issue of standing, the Tribunal concludes that Claimant is claiming for
       violation of its own rights under the ECT, not the rights of Yukos. The Tribunal
       agrees with Claimant's characterization of its claim, which is not a derivative
       action, but an action for the direct loss by Claimant of its shares and their value.

374.   The Tribunal's conclusions are confirmed by the representations of the Government
       of the Russian Federation in the Explanatory Note which it submitted to the State
       Duma of the Federal Assembly of the Russian Federation when the ECT was
       submitted for ratification. The following extracts from the Note are particularly
       relevant:

       Prior to the entry into force of the ECT, the majority of the Contracting Parties agreed to
       apply the treaty on a provisional basis. In this respect, it was decided that such provisional
       application of the ECT would be implemented to the extent that it would not be inconsistent
       with the constitution, laws and regulations of the country in question. At the time for the
       signing of the ECT, its provisions on provisional application were in conformity with the
       Russian legal acts. For that reason, the Russian side did not make declarations as to its
       inability to accept provisional application (such declarations were made by 12 of the
       49 ECT signatories).
                                         [. . .]
       The provisions of the ECT are consistent with Russian legislation.
                                         [. . .]
       The legal regime of foreign investments envisaged under the ECT is consistent with the
       provisions of the existing Law of the RSFSR on Foreign Investments in the RSFSR, as well
       as with the amended version of the Law currently being discussed in the State Duma, and
       does not require the acknowledgement of any concessions or the adoption of any

> *amendments to the abovementioned Law. The ECT is also consistent with the provisions of*
> *Russian bilateral international treaties on the promotion and protection of investment.*
> *[emphasis added]*

375.   During his cross-examination, Professor Avakiyan, one of Respondent's expert
       witnesses, confirmed that he agreed with the contents of the Explanatory Note cited
       in the previous paragraph. The Tribunal's conclusion on the consistency of Article
       26 of the ECT with Russian law is also supported by the writings of Professor
       Yershov, who was a member of the Russian delegation to the ECT negotiations.
       During parliamentary hearings concerning the ECT, Professor Yershov submitted a
       paper in which he noted the following:

> *From the standpoint of Russian interests, the compromise achieved in developing the ECT*
> *language guarantees Russia a solution to a critical foreign trade problem: receipt and*
> *codification of a liberal nondiscriminatory trade policy regime for an EMP exporter*
> *otherwise unattainable in such a short time. In exchange for this, under the ECT, Russia*
> *grants foreign investors an energy investment regime acceptable to them that does not*
> *require any concessions on Russia's part beyond the framework of current law.*
> *[emphasis added]*

376.   As to the BIT practice of the Russian Federation, in the Tribunal's opinion, it is of
       little assistance to either Party. On the one hand, Claimant refers to the many BITs
       entered into by the Russian Federation that provide for investor-State arbitration,
       inviting the conclusion that investor-State arbitration is not inconsistent with
       Russian law. As Respondent has pointed out, however, the BITs in force in the
       Russian Federation have all been ratified, thus eliminating any concern with
       provisions in the BITs that might be different from the underlying Russian
       legislation. The ratified BITs therefore do little to advance Claimant's position.

377.   On the other hand, Respondent seeks support for its position by pointing out that
       some of the explanatory notes submitted to the Duma in connection with the
       ratification of BITs have made it explicit that the BIT in question is subject to
       ratification because it contains a provision for the settlement of investor-State
       disputes through international arbitration. As Claimant points out, however, none of
       the BITs in question contains a provisional application regime such as that found in
       Article 45(1) of the ECT. Ratification by the State Duma is thus required in order
       for the Russian Federation to express its consent to arbitration.

378.   At this point, the Tribunal recalls again its fundamental finding on the meaning and
       interpretation of Article 45(1): irrespective of any inconsistencies that might exist
       between Article 26 of the ECT and Russian law, Article 26 of the ECT, as well as
       other provisions of the Treaty, apply provisionally and the Russian Federation has
       therefore consented to international arbitration.

379.   Pursuing nevertheless its detailed analysis of Article 26, in particular, through the
       prism of the FLIT, the Tribunal will now seek to answer the question whether the
       signature of a treaty which contains a provisional application clause is sufficient to
       establish the consent of the Russian Federation to international arbitration of
       disputes arising under the Treaty.

382.   *These provisions* [bedoeld worden de artikelen 2 en 6, toevoeging rechtbank] *of the
       FLIT are very clear. There is no room for ambiguity. The Tribunal therefore
       concludes that the Russian Federation has consented to be bound — albeit
       provisionally — by Article 26 of the ECT by its signature of the ECT. Article 45(1)
       of the ECT establishes beyond the shadow of a doubt, and notwithstanding Article
       39 of the ECT, that the Russian Federation and other signatories agreed that their
       signature of the Treaty would have the effect of expressing the consent of the
       Russian Federation (and each other signatory) to be provisionally bound by its
       terms.*

383.   *The Tribunal notes that Article 11 of the FLIT provides that the decision to sign a
       treaty is a decision which rests with the Executive: (...)
       Moreover, as we saw earlier, Article 23(1) of the FLIT makes it clear that
       provisional application is permissible under the legislation of the Russian
       Federation. Therefore, the obligation assumed by the Russian Federation to be
       bound, prior to ratification, by the dispute settlement provisions (including
       international arbitration) of a provisionally applied treaty such as the ECT, and the
       consent expressed therein, are not inconsistent with the Constitution, laws or
       regulations of the Russian Federation, and the Tribunal so finds.*

384.   *Respondent argues that a treaty must be ratified by the Russian Federation, and
       therefore be in force, in order to establish the consent of the Russian Federation to
       an arbitration provision of the treaty. As shown above, however, under the FLIT,
       ratification is not the only means by which the Russian Federation can express its
       consent to the terms of a treaty: signature can express consent where the treaty,
       such as the ECT, so provides, as it does by specifying in Article 45 the obligations
       not of a party to the treaty but of a "signatory."*

385.   *That there is a distinction between consenting to be bound provisionally by the
       treaty and, on the other hand, the treaty being "in force" for a State is also clear
       from the definition of "Contracting Party" in Article 1(2) of the ECT. As used in the
       ECT, "Contracting Party" means "a state or Regional Economic Integration
       Organization which has consented to be bound by this Treaty and for which the
       Treaty is in force." [emphasis added] The use of the conjunction "and" between the
       clauses "which has consented to be bound by this Treaty" and "for which the
       Treaty is in force" means that there must be circumstances, in the eyes of the parties
       to the ECT, including the Russian Federation, where a State for which the ECT is
       not "in force," has nevertheless consented to be bound by its terms.*

386.   *There is one last argument of Respondent which the Tribunal finds important to
       address. Article 23(2) of the FLIT requires that a treaty subject to provisional
       application must be submitted to and ratified by the State Duma within six months
       from its signature and the start of its provisional application. It is common ground
       between the Parties that the ECT which was signed on 17 December 1994 has never
       been ratified by the State Duma. Respondent submits that since the six-month period
       had long expired, any continued provisional application of the ECT would have
       been inconsistent with Russian law.*

C/09/477160 / HA ZA 15-1, C/09/477162 / HA ZA 15-2 en                    17
C/09/481619 / HA ZA 15-112
20 april 2016

387.   In the view of the Tribunal, the six-month limit is merely an internal requirement;
       failure to respect that procedure does not in and of itself automatically terminate
       provisional application. (...)

392.   The Tribunal's analysis leads it to conclude that Article 26 of the ECT is not
       inconsistent with the Constitution, laws or regulations of the Russian Federation.
       Although, as noted at the outset of this section, this analysis was not essential in
       view of the Tribunal's dispositive interpretation of Article 45(1), it does sustain the
       Tribunal's decision.

       **5. Conclusion**

(...)
394.   In this chapter, the Tribunal has found that:
       d) The regimes of provisional application in Article 45(1) and 45(2) are separate,
       and the Russian Federation can benefit from the Limitation Clause in Article 45(1)
       even though it made no declaration under Article 45(2);
       e) The Russian Federation can invoke the Limitation Clause in Article 45(1) even
       though it made no prior declaration nor gave any prior notice to other signatories
       that it intended to rely on Article 45(1) to exclude provisional application;
       f) The Limitation Clause of Article 45(1) negates provisional application of the
       Treaty only where the principle of provisional application is itself inconsistent with
       the constitution, laws or regulations of the signatory State; and
       g) In the Russian Federation, there is no inconsistency between the provisional
       application of treaties and its Constitution, laws or regulations.

395.   Accordingly, the Tribunal has concluded that the ECT in its entirety applied
       provisionally in the Russian Federation until 19 October 2009, and that Parts III
       and V of the Treaty (including Article 26 thereof) remain in force until 19 October
       2029 for any investments made prior to 19 October 2009. Respondent is thus bound
       by the investor-State arbitration provision invoked by Claimant.

396.   The Tribunal is comforted in its decision by its further finding that, had it been an
       essential consideration under the Limitation Clause of Article 45(1)—which it is
       not—Article 26 of the ECT itself, as well as Articles 1(6) and 1(7), are consistent
       with Respondent's Constitution, laws and regulations.
(...)

2.11.   Het dictum van de Interim Awards van 30 november 2009 luidt als volgt:

**IX. DECISION**

612.   For the reasons set forth above, the Tribunal:

       (a) DISMISSES the objections to jurisdiction and/or admissibility based on Article
       1(6) and 1(7), Article 17, Article 26(3)(b)(i) and Article 45 of the ECT (...).

C/09/477160 / HA ZA 15-1, C/09/477162 / HA ZA 15-2 en                    18
C/09/481619 / HA ZA 15-112
20 april 2016

2.12.    Hierna is de Arbitrage voortgezet. Het Scheidsgerecht heeft op 18 juli 2014 in elk
         van de drie aan hem voorgelegde zaken een eindvonnis ("Final Award") gewezen.

2.13.    In de zaak die was aangespannen door VPL is de Russische Federatie (onder
         andere) veroordeeld om aan VPL een schadevergoeding ter hoogte van
         $ 8.203.032.751 te betalen. In de zaken die waren aangespannen door YUL en
         Hulley zijn aan deze gedaagden schadevergoedingsbedragen van respectievelijk
         $ 1.846.000.687 en $ 39.971.834.360 toegekend.

3.       DE RELEVANTE WETGEVING

*The Energy Charter Treaty ("ECT")*

3.1.     De artikelen 1, 2, 10, 13, 26, 39, 44 en 45 van de ECT luiden als volgt:

*Article 1. Definitions*

         *As used in this Treaty:*

*1.*      *"Charter" means the European Energy Charter adopted in the Concluding
          Document of the Hague Conference on the European Energy Charter signed at The
          Hague on 17 December 1991; signature of the Concluding Document is considered
          to be signature of the Charter.*

*2.*      *"Contracting Party" means a state or Regional Economic Integration Organization
          which has consented to be bound by this Treaty and for which the Treaty is in force.*

*6.*      *"Investment" means every kind of asset, owned or controlled directly or indirectly
          by an Investor (...)*

*7.*      *"Investor" means:*
          *a) with respect to a Contracting Party:*
                   *(i) a natural person having the citizenship or nationality of or who is
                   permanently residing in that Contracting Party in accordance with its
                   applicable law;*
                   *(ii) company or other organization organized in accordance with the law
                   applicable in that Contracting Party;*
          *b) with respect to a "third state", a natural person, company or other organization
          which fulfils, mutatis mutandis, the conditions specified in subparagraph a) for a
          Contracting Party.*

*Article 2. Purpose of the Treaty*

         *This Treaty establishes a legal framework in order to promote long-term
         cooperation in the energy field, based on complementarities and mutual benefits, in
         accordance with the objectives and principles of the Charter.*

C/09/477160 / HA ZA 15-1, C/09/477162 / HA ZA 15-2 en          19
C/09/481619 / HA ZA 15-112
20 april 2016

### Article 10. Promotion, protection and treatment of investments

1.      Each Contracting Party shall, in accordance with the provisions of this Treaty,
        encourage and create stable, equitable, favourable and transparent conditions for
        Investors of other Contracting Parties to Make Investments in its Area. Such
        conditions shall include a commitment to accord at all times to Investments of
        Investors of other Contracting Parties fair and equitable treatment. Such
        Investments shall also enjoy the most constant protection and security and no
        Contracting Party shall in any way impair by unreasonable or discriminatory
        measures their management, maintenance, use, enjoyment or disposal. In no case
        shall such Investments be accorded treatment less favourable than that required by
        international law, including treaty obligations. Each Contracting Party shall
        observe any obligations it has entered into with an Investor or an Investment of an
        Investor of any other Contracting Party

3.      For the purposes of this Article, "Treatment" means treatment accorded by a
        Contracting Party which is no less favourable than that which it accords to its own
        Investors or to Investors of any other Contracting Party or any third state,
        whichever is the most favourable.

7.      Each Contracting Party shall accord to Investments in its Area of Investors of other
        Contracting Parties, and their related activities including management,
        maintenance, use, enjoyment or disposal, treatment no less favourable than that
        which it accords to Investments of its own Investors or of the Investors of any other
        Contracting Party or any third state and their related activities including
        management, maintenance, use, enjoyment or disposal, whichever is the most

12.     Each Contracting Party shall ensure that its domestic law provides effective means
        for the assertion of claims and the enforcement of rights with respect to Investments,
        investment agreements, and investment authorizations.

### Article 13. Expropriation

1.      Investments of Investors of a Contracting Party in the Area of any other Contracting
        Party shall not be nationalized, expropriated or subjected to a measure or measures
        having effect equivalent to nationalization or expropriation (hereinafter referred to
        as "Expropriation") except where such Expropriation is:

        a) for a purpose which is in the public interest;
        b) not discriminatory;
        c) carried out under due process of law; and
        d) accompanied by the payment of prompt, adequate and effective compensation.

        Such compensation shall amount to the fair market value of the Investment
        expropriated at the time immediately before the Expropriation or impending
        Expropriation became known in such a way as to affect the value of the Investment
        (hereinafter referred to as the "Valuation Date"). (...)

2.      The Investor affected shall have a right to prompt review, under the law of the
        Contracting Party making the Expropriation, by a judicial or other competent and
        independent authority of that Contracting Party, of its case, of the valuation of its
        Investment, and of the payment of compensation, in accordance with the principles
        set out in paragraph 1.

3.      For the avoidance of doubt, Expropriation shall include situations where a
        Contracting Party expropriates the assets of a company or enterprise in its Area in
        which an Investor of any other Cotracting Party has an Investment, including
        through the ownership of shares.

### Article 21. Taxation

1.      Except as otherwise provided in this Article, nothing in this Treaty shall create
        rights or impose obligations with respect to Taxation Measures of the Contracting
        Parties. In the event of any inconsistency between this Article and any other
        provision of the Treaty, this Article shall prevail to the extent of the inconsistency.

(...)

5.      a) Article 13 shall apply to taxes.

### Article 26. Settlement of disputes between an Investor and a Contracting Party

1.      Disputes between a Contracting Party and an Investor of another Contracting Party
        relating to an Investment of the latter in the Area of the former, which concern an
        alleged breach of an obligation of the former under Part III shall, if possible, be
        settled amicably.

2.      If such disputes can not be settled according to the provisions of paragraph 1 within
        a period of three months from the date on which either party to the dispute
        requested amicable settlement, the Investor party to the dispute may choose to
        submit it for resolution:
        a) to the courts or administrative tribunals of the Contracting Party party to the
        dispute;
        b) in accordance with any applicable, previously agreed dispute settlement
        procedure; or
        c) in accordance with the following paragraphs of this Article.

3.      a) Subject only to subparagraphs b) and c), each Contracting Party hereby gives its
        unconditional consent to the submission of a dispute to international arbitration or
        conciliation in accordance with the provisions of this Article.
        b)
                (i) The Contracting Parties listed in Annex ID do not give such
                unconditional consent where the Investor has previously submitted the
                dispute under subparagraph 2a) or b).
                (ii) For the sake of transparency, each Contracting Party that is listed in
                Annex ID shall provide a written statement of its policies, practices and
                conditions in this regard to the Secretariat no later than the date of the

*deposit of its instrument of ratification, acceptance or approval in accordance with Article 39 or the deposit of its instrument of accession in accordance with Article 41.*

*c) A Contracting Party listed in Annex IA does not give such unconditional consent with respect to a dispute arising under the last sentence of Article 10(1).*

4. *In the event that an Investor chooses to submit the dispute for resolution under subparagraph 2 c), the Investor shall further provide its consent in writing for the dispute to be submitted to:*

*a)*

*(i) The International Centre for Settlement of Investment Disputes, established pursuant to the Convention on the Settlement of Investment Disputes between States and Nationals of other States opened for signature at Washington, 18 March 1965 (hereinafter referred to as the "ICSID Convention"), if the Contracting Party of the Investor and the Contracting Party party to the dispute are both parties to the ICSID Convention; or (ii) The International Centre for Settlement of Investment Disputes, established pursuant to the Convention referred to in subparagraph a)(i), under the rules governing the Additional Facility for the Administration of Proceedings by the Secretariat of the Centre (hereinafter referred to as the "Additional Facility Rules"), if the Contracting Party of the Investor or the Contracting Party party to the dispute, but not both, is a party to the ICSID Convention;*

*b) a sole arbitrator or ad hoc arbitration tribunal established under the Arbitration Rules of the United Nations Commission on International Trade Law (hereinafter referred to as "UNCITRAL"); or*

*c) an arbitral proceeding under the Arbitration Institute of the Stockholm Chamber of Commerce.*

5.

*a) The consent given in paragraph 3 together with the written consent of the Investor given pursuant to paragraph 4 shall be considered to satisfy the requirement for:*

*(i) written consent of the parties to a dispute for purposes of Chapter II of the ICSID Convention and for purposes of the Additional Facility Rules; (ii) an "agreement in writing" for purposes of article II of the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, done at New York, 10 June 1958 (hereinafter referred to as the "New York Convention"); and (iii) "the parties to a contract [to] have agreed in writing" for the purposes of article 1 of the UNCITRAL Arbitration Rules.*

*b) Any arbitration under this Article shall at the request of any party to the dispute be held in a state that is a party to the New York Convention. Claims submitted to arbitration hereunder shall be considered to arise out of a commercial relationship or transaction for the purposes of article I of that Convention.*

6. *A tribunal established under paragraph 4 shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law.*

C/09/477160 / HA ZA 15-1, C/09/477162 / HA ZA 15-2 en       22
C/09/481619 / HA ZA 15-112
20 april 2016

7.      *An Investor other than a natural person which has the nationality of a Contracting Party party to the dispute on the date of the consent in writing referred to in paragraph 4 and which, before a dispute between it and that Contracting Party arises, is controlled by Investors of another Contracting Party, shall for the purpose of article 25(2)b) of the ICSID Convention be treated as a "national of another Contracting State" and shall for the purpose of article 1(6) of the Additional Facility Rules be treated as a "national of another State".*

8.      *The awards of arbitration, which may include an award of interest, shall be final and binding upon the parties to the dispute. An award of arbitration concerning a measure of a sub-national government or authority of the disputing Contracting Party shall provide that the Contracting Party may pay monetary damages in lieu of any other remedy granted. Each Contracting Party shall carry out without delay any such award and shall make provision for the effective enforcement in its Area of such awards.*

**Article 39. Ratification, acceptance or approval**

*This Treaty shall be subject to ratification, acceptance or approval by signatories. Instruments of ratification, acceptance or approval shall be deposited with the Depositary.*

**Article 44. Entry into force**

1.      *This Treaty shall enter into force on the ninetieth day after the date of deposit of the thirtieth instrument of ratification, acceptance or approval thereof, or of accession thereto, by a state or Regional Economic Integration Organization which is a signatory to the Charter as of 16 June 1995.*

2.      *For each state or Regional Economic Integration Organization which ratifies, accepts or approves this Treaty or accedes thereto after the deposit of the thirtieth instrument of ratification, acceptance or approval, it shall enter into force on the ninetieth day after the date of deposit by such state or Regional Economic Integration Organization of its instrument of ratification, acceptance, approval or accession.*

3.      *For the purposes of paragraph 1, any instrument deposited by a Regional Economic Integration Organization shall not be counted as additional to those deposited by member states of such Organization.*

C/09/477160 / HA ZA 15-1, C/09/477162 / HA ZA 15-2 en          23
C/09/481619 / HA ZA 15-112
20 april 2016

*Article 45. Provisional application*

1.     Each signatory agrees to apply this Treaty provisionally pending its entry into force
       for such signatory in accordance with Article 44, to the extent that such provisional
       application is not inconsistent with its constitution, laws or regulations.

2.

       a) Notwithstanding paragraph 1 any signatory may, when signing, deliver to the
       Depositary a declaration that it is not able to accept provisional application. The
       obligation contained in paragraph 1 shall not apply to a signatory making such a
       declaration. Any such signatory may at any time withdraw that declaration by
       written notification to the Depositary.
       b) Neither a signatory which makes a declaration in accordance with subparagraph
       a nor Investors of that signatory may claim the benefits of provisional application
       under paragraph 1.
       c) Notwithstanding subparagraph a), any signatory making a declaration referred
       to in subparagraph a shall apply Part VII provisionally pending the entry into force
       of the Treaty for such signatory in accordance with Article 44, to the extent that
       such provisional application is not inconsistent with its laws or regulations.

3.

       a) Any signatory may terminate its provisional application of this Treaty by written
       notification to the Depositary of its intention not to become a Contracting Party to
       the Treaty. Termination of provisional application for any signatory shall take effect
       upon the expiration of 60 days from the date on which such signatory's written
       notification is received by the Depositary.
       b) In the event that a signatory terminates provisional application under
       subparagraph a, the obligation of the signatory under paragraph 1 to apply Parts
       III and V with respect to any Investments made in its Area during such provisional
       application by Investors of other signatories shall nevertheless remain in effect with
       respect to those Investments for twenty years following the effective date of
       termination, except as otherwise provided in subparagraph c).
       c) Subparagraph b) shall not apply to any signatory listed in Annex PA. A signatory
       shall be removed from the list in Annex PA effective upon delivery to the Depositary
       of its request therefor.

*The Vienna Convention on the Law of Treaties ("VCLT") (het Weens Verdragenverdrag; in
het vonnis verder afgekort als "WVV")*

3.2.    De artikelen 11, 12, 14, 25, 27, 31 en 32 van het WVV in de officiële Engelse versie
luiden als volgt.

*Article 11. Means of expressing consent to be bound by a treaty*

       The consent of a State to be bound by a treaty may be expressed by signature,
       exchange of instruments constituting a treaty, ratification, acceptance, approval or
       accession, or by any other means if so agreed.

### Article 12. Consent to be bound by a treaty expressed by signature

1.      The consent of a State to be bound by a treaty is expressed by the signature of its representative when:
        (a) the treaty provides that signature shall have that effect;
        (b) it is otherwise established that the negotiating States were agreed that signature should have that effect; or
        (c) the intention of the State to give that effect to the signature appears from the full powers of its representative or was expressed during the negotiation.
2.      For the purposes of paragraph 1:
        (a) the initialling of a text constitutes a signature of the treaty when it is established that the negotiating States so agreed;
        (b) the signature ad referendum of a treaty by a representative, if confirmed by his State, constitutes a full signature of the treaty.

### Article 14. Consent to be bound by a treaty expressed by ratification, acceptance or approval

1.      The consent of a State to be bound by a treaty is expressed by ratification when:
        (a) the treaty provides for such consent to be expressed by means of ratification;
        (b) it is otherwise established that the negotiating States were agreed that ratification should be required;
        (c) the representative of the State has signed the treaty subject to ratification; or
        (d) the intention of the State to sign the treaty subject to ratification appears from the full powers of its representative or was expressed during the negotiation.

2.      The consent of a State to be bound by a treaty is expressed by acceptance or approval under conditions similar to those which apply to ratification.

### Article 25. Provisional application

1.      A treaty or a part of a treaty is applied provisionally pending its entry into force if:
        (a) the treaty itself so provides; or
        (b) the negotiating States have in some other manner so agreed.

2.      Unless the treaty otherwise provides or the negotiating States have otherwise agreed, the provisional application of a treaty or a part of a treaty with respect to a State shall be terminated if that State notifies the other States between which the treaty is being applied provisionally of its intention not to become a party to the treaty.

### Article 27. Internal law and observance of treaties

        A party may not invoke the provisions of its internal law as justification for its failure to perform a treaty. This rule is without prejudice to article 46.

C/09/477160 / HA ZA 15-1, C/09/477162 / HA ZA 15-2 en          25
C/09/481619 / HA ZA 15-112
20 april 2016

*Article 31. General rule of interpretation*

*1.*   *A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose.*

*2.*   *The context for the purpose of the interpretation of a treaty shall comprise, in addition to the text, including its preamble and annexes:*
*(a) any agreement relating to the treaty which was made between all the parties in connexion with the conclusion of the treaty;*
*(b) any instrument which was made by one or more parties in connexion with the conclusion of the treaty and accepted by the other parties as an instrument related to the treaty.*

*3.*   *There shall be taken into account, together with the context:*
*(a) any subsequent agreement between the parties regarding the interpretation of the treaty or the application of its provisions;*
*(b) any subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation;*
*(c) any relevant rules of international law applicable in the relations between the parties.*

*4.*   *A special meaning shall be given to a term if it is established that the parties so intended.*

*Article 32. Supplementary means of interpretation*

*Recourse may be had to supplementary means of interpretation, including the preparatory work of the treaty and the circumstances of its conclusion, in order to confirm the meaning resulting from the application of article 31, or to determine the meaning when the interpretation according to article 31:*
*(a) leaves the meaning ambiguous or obscure; or*
*(b) leads to a result which is manifestly absurd or unreasonable.*

*De Russische Grondwet*

3.3.   De artikelen 10, 15, 86, 94, 105 en 106 van de Russische Grondwet luiden, volgens de door de Russische Federatie overgelegde niet-officiële Engelse vertaling, als volgt:

*Article 10*

*State power in the Russian Federation shall be exercised on the basis of its division into legislative, executive and judicial. The legislative, executive and judicial authorities shall be independent.*

### Article 15

1.      *The Constitution of the Russian Federation shall have the supreme juridical force,
        direct application and shall be used on the whole territory of the Russian
        Federation. Laws and other legal acts adopted in the Russian Federation shall not
        contradict the Constitution of the Russian Federation.*

2.      *The bodies of state authority, bodies of local self-government, officials, private
        citizens and their associations shall be obliged to observe the Constitution of the
        Russian Federation and laws.*

3.      *Laws shall be officially published. Unpublished laws shall not be used. Normative
        legal acts concerning human rights, freedoms and duties of man and citizen may not
        be used, if they are not officially published for general knowledge.*

4.      *The universally-recognised norms of international law and international treaties
        and agreements of the Russian Federation shall be a component part of its legal
        system. If an international treaty or agreement of the Russian Federation
        establishes other rules than those envisaged by law, the rules of the international
        agreement shall be applied.*

### Artikel 86

        *The President of the Russian Federation shall
        a) Govern the foreign policy of the Russian Federation,
        b) Hold negotiations and sign international treaties and agreements of the Russian
        Federation,
        c) Sign ratification instruments (...)*

### Article 94

        *The Federal Assembly – the parliament of the Russian Federation – shall be the
        representative and legislative body of the Russian Federation.*

### Article 95

1.      *The Federal Assembly consists of two chambers – the Council of the Federation and
        the State Duma (...)*

### Article 105

1.      *Federal laws shall be adopted by the State Duma. (...)*

### Article 106

        *Federal laws adopted by the State Duma on the following issues shall be the liable
        to obligatory consideration by the Council of the Federation
        a) federal budget;
        b) federal taxes and dues;*

*c) financial, currency, credit, customs regulation, and money issue;*
*d) ratification and denunciation of international treaties and agreements of the*
*Russian Federation;*
*e) the status and protection of the state border of the Russian Federation;*
*f) peace and war.*

*De Russische Federal Law on International Treaties ("FLIT")*

3.4.     De artikelen 2, 6, 11, 14, 15 en 23 van de Russische Federal Law on International
Treaties, door de Russische Federatie ook RFW Internationale verdragen genoemd (hierna:
de FLIT), luiden, volgens de door de Russische Federatie overgelegde niet-officiële Engelse
vertaling, als volgt:

*Article 2 Use of terms*

> *For the purposes of this Federal Law:*
> *[. . .]*
> *b) "ratification," "approval," "acceptance," and "accession" mean in each case a*
> *form whereby the Russian Federation expresses its consent to be bound by an*
> *international treaty;*
> *c) "signature" means either a stage in the conclusion of a treaty, or a form of*
> *expressing consent of the Russian Federation to be bound by an international*
> *treaty, if the treaty provides that signature shall have that effect, or it is otherwise*
> *established that the Russian Federation and the other negotiating States were*
> *agreed that signature should have that effect, or the intention of the Russian*
> *Federation to give that effect to the signature appears from the full powers of its*
> *representative or was expressed during the negotiation;*
> *d) "conclusion" means the expression of consent of the Russian Federation to be*
> *bound by an international treaty;*

*Article 6 Expression of consent of the Russian Federation to be bound by an international*
*treaty*

> *1.      Consent of the Russian Federation to be bound by an international treaty may be*
> *expressed by means of:*
> *signature of the treaty;*
> *exchange of the documents constituting the treaty;*
> *ratification of the treaty;*
> *approval of the treaty;*
> *acceptance of the treaty;*
> *accession to the treaty; or*
> *any other means of expressing consent agreed by the contracting parties.*

> *2.      Decisions to grant consent for the Russian Federation to be bound by international*
> *treaties shall be made by state bodies of the Russian Federation in accordance with*
> *their competence as established by the Constitution of the Russian Federation, this*
> *Federal Law and other legislative acts of the Russian Federation.*

### Article 11

1.  Decisions to negotiate and to sign international treaties of the Russian Federation shall be made:
    a) with respect to treaties to be concluded on behalf of the Russian Federation, by the President of the Russian Federation, but with respect to treaties to be concluded on behalf of the Russian Federation on matters under the jurisdiction of the Government of the Russian Federation, by the Government of the Russian Federation;
    b) with respect to treaties to be concluded on behalf of the Government of the Russian Federation, by the Government of the Russian Federation.
2.  Decisions to negotiate and to sign international treaties of the Russian Federation on matters under the jurisdiction of the Government of the Russian Federation shall be made by the President of the Russian Federation if circumstances so require.

### Article 14 Ratification of international treaties of the Russian Federation

In accordance with the Constitution of the Russian Federation the ratification of international treaties of the Russian Federation shall be effected through the enactment of federal law.

### Article 15 International treaties of the Russian Federation subject to ratification

1.  The following international treaties of the Russian Federation shall be subject to ratification:
    a) international treaties whose implementation requires amendment of existing legislation or enactment of new federal laws, or that set out rules different from those provided for by a law;
    b) international treaties whose subject is basic rights and freedoms of the person and the citizen;
    c) international treaties concerning the territorial demarcation of the Russian Federation with other States, including international treaties on the State Border of the Russian Federation, as well as international treaties concerning the demarcation of the exclusive economic zone or continental shelf of the Russian Federation;
    d) international treaties concerning the basis of inter-State relations, concerning issues affecting the defense capability of the Russian Federation, concerning disarmament and international arms control, and international peace and security, as well as peace treaties and collective security treaties;
    e) international treaties concerning the participation of the Russian Federation in inter-State unions, international organizations, and other inter-State associations, if such treaties require the Russian Federation to transfer certain powers to them or establish that decisions of their bodies are binding upon the Russian Federation.

2.  An international treaty shall likewise be subject to ratification if the parties have agreed to subsequent ratification when concluding the international treaty.

C/09/477160 / HA ZA 15-1, C/09/477162 / HA ZA 15-2 en                                    29
C/09/481619 / HA ZA 15-112
20 april 2016

---

*Article 23 Provisional application of international treaties by the Russian Federation*

1.       *An international treaty or a part of a treaty may, prior to its entry into force, be applied by the Russian Federation provisionally if the treaty itself so provides or if an agreement to that effect has been reached with the parties that have signed the treaty.*

2.       *Decisions on the provisional application of a treaty or a part thereof by the Russian Federation shall be made by the body that has taken the decision to sign the international treaty according to the procedure set out in Article 11 of this Federal Law.*

         *If an international treaty - the decision on the consent to the binding character of which for the Russian Federation is, under this Federal Law, to be taken in the form of a Federal Law - provides for the provisional application of the treaty or a part thereof, or if an agreement to that effect was reached among the parties in some other manner, then this treaty shall be submitted to the State Duma within six months from the start of its provisional application. The term of provisional application may be prolonged by way of a decision taken in the form of a federal law according to the procedure set out in Article 17 of this Federal Law for the ratification of international treaties.*

3.       *Unless the international treaty provides otherwise, or the respective States otherwise agree, the provisional application by the Russian Federation of a treaty or a part thereof shall be terminated upon notification to the other States that apply the treaty provisionally of the intention of the Russian Federation not to become a party to the treaty.*

*De Russische Grondbeginselenwet*

3.5.     De artikelen 1 en 43 van de Fundamentals of Legislation on Foreign Investments in the USSR 1991 (hierna: de Grondbeginselenwet) luiden, volgens de door de Russische Federatie overgelegde niet-officiële Engelse vertaling, als volgt:

*Article 1*

         *Legislation on Foreign Investments of the USSR and republics Relations in connection with foreign investments in the territory of the USSR shall be regulated by the legislation of the USSR and republics, except where these Fundamentals and other legislation of the USSR and the republics on foreign investments provide otherwise. The laws of the republics shall regulate in accordance with these Fundamentals the relations arising in connection with foreign investments in the republics' territories, subject to specific features of their economic operations and investment policy, except to the extent that regulation of the relations is referred to the jurisdiction of the Union, and the relations that must be regulated by the Union pursuant to the USSR international treaties.*

### Article 43

*Disputes between foreign investors and the State are subject to consideration in the USSR in courts, unless otherwise provided by international treaties of the USSR.*

*Disputes of foreign investors and enterprises with foreign investments with Soviet State bodies acting as a party to relationships regulated by civil legislation, enterprises, social organizations and other Soviet legal entities, disputes between participants of the enterprise with foreign investments and the enterprise itself are subject to consideration in the USSR in courts or, upon agreement of the parties, in arbitration proceedings, inter alia, abroad, and in cases provided by legislative acts of the Union of SSR and the republics - in arbitrazh courts, economic courts and others.*

*De Law on Foreign Investments (Wet inzake de Buitenlandse Investeringen)*

3.6.     De artikelen 2, 7, en 9 van de Law on Foreign Investments 1991, door de Russische Federatie ook genoemd RFW Buitenlandse Investeringen 1991 (hierna: de Wet inzake de Buitenlandse Investeringen 1991) luiden, volgens de door de Russische Federatie overgelegde niet-officiële Engelse vertaling of ontleend aan bijlagen bij het hierna te noemen deskundigenrapport van A. Asoskov (Expert Report Annex 30), als volgt:

### Article 2. Foreign investments

*Foreign investments are all types of material assets and intellectual property injected by foreign investors into objects of entrepreneurial and other types of activity with the aim of obtaining profit (income).*

### Article 7. Guarantees Against Expropriation and Unlawful Actions of State Bodies and Their Officials

*Foreign investments in the RSFSR may not be subject to nationalization, requisition or confiscation, except in cases provided by legislative acts, when such measures are taken in public interest. In cases of nationalization or requisition prompt, adequate and effective compensation is paid to the foreign investor.*

*Decisions on nationalization are made by the Supreme Council of the RSFSR.*

*Decisions on requisition and confiscation are made under the procedure prescribed by the legislation in effect in the territory of the RSFSR.*

*Decisions of governmental bodies on expropriation of foreign investments may be contested in the RSFSR courts.*

*Foreign investors are entitled to compensation of damages, including lost profit, incurred as a result of compliance with the instructions of State bodies of the RSFSR and their officials that are inconsistent with the legislation in effect in the territory of the RSFSR, and as a result of improper discharge by such bodies and*

C/09/477160 / HA ZA 15-1, C/09/477162 / HA ZA 15-2 en          31
C/09/481619 / HA ZA 15-112
20 april 2016

> their officials of statutory obligations owed to the foreign investor or an enterprise
> with foreign investments.

**Article 9. Dispute Resolution**

> Investment disputes, including disputes over the amount, conditions and procedure
> of the payment of compensation, shall be resolved by the Supreme Court of the
> RSFSR or the Supreme Arbitrazh Court of the RSFSR, unless another procedure is
> established by an international treaty in force in the territory of the RSFSR.

> Disputes of foreign investors and enterprises with foreign investments against
> RSFSR State bodies, disputes between investors and enterprises with foreign
> investments involving matters relating to their operations, as well as disputes
> between participants of an enterprise with foreign investments and the enterprise
> itself shall be resolved by the RSFSR courts, or, upon agreement of the parties, by
> an arbitral tribunal, or, in cases specified by the laws, by authorities authorized to
> consider economic disputes.

> International treaties in force in the territory of the RSFSR may provide for
> recourse to international means of resolution of disputes arising in connection with
> foreign investments in the territory of the RSFSR.

3.7.     De artikelen 2 en 10 van de Law on Foreign Investments 1999, door de Russische
Federatie ook genoemd RFW Buitenlandse Investeringen 1999 (hierna: de Wet inzake de
Buitenlandse Investeringen 1999) luiden, volgens de door de Russische Federatie
overgelegde niet-officiële Engelse vertaling of ontleend aan bijlagen bij het bedoelde
deskundigenrapport van A. Asoskov  (Expert Report Annex 31), als volgt:

**Article 2. The Basic Terms Used in the Present Federal Law**

> The following basic terms are used for the purposes of the present Federal Law:
> (...)
> **foreign investment** - the injection of foreign capital in objects of entrepreneurial
> activity in the territory of the Russian Federation in the form of objects of civil law
> rights belonging to a foreign investor, unless such objects are excluded from the
> realm of civil law relations or are restricted in the Russian Federation pursuant to
> federal laws, including money, securities (denominated in a foreign currency and
> the currency of the Russian Federation), other property, property rights which can
> be evaluated in a monetary form, exclusive rights to the results of intellectual
> activities (intellectual property), as well as services and information.

**Article 10. Guarantees of Due Resolution of Disputes Arising in Connection with
Investments and Business of a Foreign Investor in the Territory of the Russian
Federation**

> A dispute of a foreign investor arising in connection with its investments and
> business activity conducted in the territory of the Russian Federation shall be
> resolved in accordance with international treaties of the Russian Federation and

C/09/477160 / HA ZA 15-1, C/09/477162 / HA ZA 15-2 en          32
C/09/481619 / HA ZA 15-112
20 april 2016

*federal laws in courts, arbitrazh courts or through international arbitration
(arbitral tribunal).*

**4.      DE GESCHILLEN VAN PARTIJEN**

**in alle zaken**

4.1.     De Russische Federatie vordert, samengevat, dat de rechtbank, voor zover mogelijk
uitvoerbaar bij voorraad, de tussen haar als de verweerster in de Arbitrage en gedaagden als
de respectieve eisers in de Arbitrage gewezen Interim Awards van 30 november 2009 en de
Final Awards van 18 juli 2014 (tezamen: de Yukos Awards) vernietigt, met veroordeling
van gedaagden in de kosten van dit geding, te vermeerderen met de wettelijke rente vanaf
veertien dagen na de dagtekening van het vonnis.

4.2.     De Russische Federatie legt aan deze gelijkluidende vorderingen, samengevat, het
volgende ten grondslag. Voor de vernietiging van de Yukos Awards bestaan zes – in het hier
toepasselijke artikel 1065 lid 1 van het Wetboek van Burgerlijke Rechtsvordering (Rv)
voorziene – gronden, die elk tot het rechtsgevolg van vernietiging moeten leiden. Dit betreft
de gronden genoemd in artikel 1065 lid 1 onder de letters:
(1)      *a* (een geldige overeenkomst tot arbitrage ontbreekt), in verband waarmee het
         Scheidsgerecht niet bevoegd was tot kennisneming en beslissing op de vorderingen
         van gedaagden;
(2)      *c* (het Scheidsgerecht heeft zich niet aan zijn opdracht gehouden);
(3)      *b* (het Scheidsgerecht was onregelmatig samengesteld), in het bijzonder doordat
         zijn assistent Valasek klaarblijkelijk een inhoudelijke rol van betekenis heeft
         vervuld bij het beoordelen van het bewijs, bij de beraadslaging van het
         Scheidsgerecht en bij de voorbereiding van de Final Awards;
(4)      *d* (de Yukos Awards zijn ten aanzien van diverse cruciale aspecten niet met
         redenen omkleed);
(5)      *e* (de Yukos Awards zijn strijdig met de Nederlandse openbare orde en de goede
         zeden, waaronder in dit geval de fundamentele rechten van de Russische Federatie
         op een eerlijk proces), nu uit de Awards de partijdigheid en de vooroordelen van
         het Scheidsgerecht blijken.

4.3.     Gedaagden hebben ten aanzien van al deze aspecten de vordering van de Russische
Federatie gemotiveerd weersproken.

4.4.     Op de (verdere) stellingen van partijen wordt hierna, voor zover van belang, nader
ingegaan.

5.    **DE BEOORDELING VAN DE GESCHILLEN**

**in alle zaken**

**INLEIDING**

*Authentieke teksten of vertaling?*

5.1.    In 2.10-12 zijn de voor deze zaak relevante passages uit de Yukos Awards aangehaald in de authentieke, Engelstalige, versie. De hierna volgende citaten uit de Awards zullen in dit (Nederlandstalige) vonnis in de Nederlandse taal worden weergegeven. Daarbij maakt de rechtbank gebruik van de Nederlandse vertaling die de Russische Federatie in het geding heeft gebracht. Opmerking verdient dat gedaagden niet hebben aangevoerd dat deze vertaling niet adequaat is.

5.2.    Aanhalingen van de ECT zullen hierna in beginsel in de eerder weergegeven Engelstalige versie geschieden. Als de rechtbank zich bedient van de Nederlandse vertaling, maakt zij gebruik van de Nederlandstalige tekst, zoals gepubliceerd in het *Tractatenblad*.

*De bevoegdheid van de rechtbank in deze procedure*

5.3.    Doordat Den Haag de plaats van de Arbitrage was, is deze rechtbank bevoegd tot kennisneming van de in 4.1 omschreven vordering. Dit volgt uit artikel 1073 lid 1 Rv, in verbinding met artikel 1064 lid 2 Rv, zoals dit tot 1 januari 2015 luidde. Artikel 1064 Rv *oud* is in dit geval nog van toepassing op grond van artikel IV van de Wet van 2 juni 2014 (*Stb.* 200), dat bepaalt dat deze wet, die nieuwe regels voor arbitrage bevat, van toepassing is op arbitrages die aanhangig zijn op of na de datum van inwerkingtreding van de wet. De Arbitrage was toen, op 1 januari 2015, niet meer aanhangig.

**DE BEVOEGDHEID VAN HET SCHEIDSGERECHT**

**Inleiding**

5.4.    De rechtbank zal, gelet op de eerste grond die de Russische Federatie voor haar vordering tot vernietiging van de Yukos Awards aanvoert, allereerst beoordelen of het Scheidsgerecht bevoegd was tot kennisneming van de vorderingen van de eisers in de Arbitrage. Daarbij stelt zij ten aanzien van het toetsingskader het volgende voorop. Het in de Arbitrage benoemde Scheidsgerecht was op de voet van artikel 1052 lid 1 Rv weliswaar gerechtigd te oordelen over zijn bevoegdheid, maar het fundamentele karakter van het recht op toegang tot de rechter brengt mee dat de beantwoording van de vraag of een geldige arbitrageovereenkomst in de zin van artikel 1065 lid 1 onder *a* Rv ontbreekt, uiteindelijk aan de gewone rechter is opgedragen. Dit fundamentele karakter brengt ook mee dat de rechter – in afwijking van de in beginsel beperkte toetsing in een vernietigingsprocedure – een vordering tot vernietiging van een arbitraal vonnis op de grond dat een geldige overeenkomst ontbreekt, niet terughoudend toetst (vergelijk recent Hoge Raad 26 september 2014, ECLI:NL:HR:2014:2837). Bij het oordeel hierover neemt de rechtbank bovendien als uitgangspunt dat op gedaagden de bewijslast rust ten aanzien van de bevoegdheid van het

C/09/477160 / HA ZA 15-1, C/09/477162 / HA ZA 15-2 en                    34
C/09/481619 / HA ZA 15-112
20 april 2016

Scheidsgerecht. Die bewijslast rustte in de Arbitrage immers ook op hen (als eisers), terwijl
in deze procedure dezelfde bevoegdheidskwestie aan de orde is.

5.5.    Het Scheidsgerecht heeft zijn bevoegdheidsoordeel gebaseerd op twee zelfstandige
gronden. Deze hierna te bespreken gronden hangen samen met (1) de betekenis van artikel
45 ECT en (2) de vraag of het in artikel 26 ECT neergelegde arbitraal beding *"not
inconsistent"* is met de Russische constitutie, wetgeving of andere regelgeving.

**Artikel 45 ECT**

*Algemeen*

5.6.    Voordat zij ingaat op de betekenis van artikel 45 ECT brengt de rechtbank in
herinnering dat de Russische Federatie de ECT niet heeft geratificeerd. Artikel 39 ECT stelt
ratificatie (bekrachtiging, *"ratification"*) voorop. Dit is ook het geval in artikel 44, dat
betrekking heeft op de inwerkingtreding van het Verdrag. Het Verdrag kent echter ook, bij
wijze van uitzondering, de in artikel 45 voorziene mogelijkheid van "voorlopige
toepassing".

*Artikel 45 lid 1*

5.7.    De eerste vernietigingsgrond hangt samen met de betekenis van artikel 45 lid 1
ECT, dat de basis vormt voor de hier bedoelde voorlopige toepassing van het Verdrag.
Iedere Ondertekenende Partij heeft blijkens die bepaling ingestemd met voorlopige
toepassing van de ECT *"to the extent that such provisional application is not inconsistent
with its constition, laws or regulations"*. De rechtbank duidt dit voorbehoud hierna, in
overeenstemming met de in de Interim Awards gebruikte terminologie, aan als de
"Limitation Clause". Het Scheidsgerecht heeft geoordeeld dat de Russische Federatie door
ondertekening van de ECT ermee heeft ingestemd dat het Verdrag als geheel voorlopig zou
worden toegepast in afwachting van de inwerkingtreding ervan, tenzij het principe van
voorlopige toepassing zelf strijdig zou zijn met de Russische Grondwet, wetten of andere
voorschriften. Volgens het Scheidsgerecht behelst de in artikel 45 lid 1 vervatte Limitation
Clause dus een "alles of niets"-benadering. Dit oordeel, dat in 2.10 uitgebreid is
weergegeven, laat zich als volgt samenvatten, waarbij alleen de voor dit vonnis relevante
overwegingen worden weergegeven. Hierbij verwijzen de tussen haken geplaatste nummers
naar de desbetreffende rechtsoverwegingen van het Scheidsgerecht.
-        De zinsnede *"to the extent"* wordt vaak als formulering gebruikt wanneer opstellers
         van een bepaling in een verdrag of een wet duidelijk willen maken dat een bepaling
         alleen moet worden toegepast in de mate waarin wordt voldaan aan hetgeen daarop
         volgt. (303)
-        De sleutel voor de interpretatie van de Limitation Clause ligt in dit geval echter in
         het woord *"such"*. De zinsnede *"such provisional application"* (*"deze voorlopige
         toepassing"*) verwijst naar de eerder in dat artikellid genoemde voorlopige
         toepassing, te weten de voorlopige toepassing van *"this Treaty"*. De betekenis van
         de zinsnede *"deze voorlopige toepassing"* is dan ook context-specifiek: de
         betekenis ervan is ontleend aan het specifieke gebruik van de voorlopige
         toepassing waarnaar deze zinsnede verwijst. (304 en 305)

-      In de context van artikel 45 lid 2 onder *c* ECT heeft de zinsnede *"deze voorlopige toepassing"* noodzakelijkerwijs een andere betekenis. Zij verwijst naar de voorlopige toepassing van alleen Deel VII van het Verdrag. (306)
-      Er zijn twee mogelijke interpretaties van de zinsnede over de voorlopige toepassing van dit verdrag. De passage kan het oog hebben op de voorlopige toepassing van het gehele verdrag of van enkele delen van het verdrag. De eerste interpretatie stemt, in de context, beter overeen met de gewone betekenis die aan de termen moet worden toegeschreven. (308)
-      Deze conclusie stemt volledig overeen met de beslissing die het scheidsgerecht in de Kardassopouloszaak over zijn bevoegdheid heeft gegeven. (309)
-      Het alternatief van de door het Scheidsgerecht gekozen "alles of niets"-benadering is dat de voorlopige toepassing afhangt van het antwoord op de vraag of een afzonderlijke bepaling van het Verdrag verenigbaar is met het nationale wetgevingsregime van een Ondertekenende Partij. Dit zou volledig indruisen tegen het voorwerp en doel van het Verdrag, en zelfs met de aard van het internationale recht. Dit zou zich ook niet verdragen met het *pacta sunt servanda*-beginsel en met artikel 27 van het WVV. (312-319)
-      De gekozen interpretatie van artikel 45 lid 1 ECT wordt ook ondersteund door de statenpraktijk. Zes staten hebben een uitdrukkelijk beroep gedaan op de Limitation Clause van artikel 45 lid 1. Op gelijke wijze heeft het Secretariaat van de ECT in de lijsten die het bijhield om de bedoelingen van de ondertekenaars bij te houden, de staten die voornemens waren artikel 45 lid 1 in te roepen, aangemerkt als voornemens dit te doen om voorlopige toepassing van het Verdrag volledig te vermijden. (321 en 322)
-      In het licht van de conclusie van het Scheidsgerecht over de interpretatie van artikel 45 lid 1 is het niet nodig om acht te slaan op de *travaux preparatoires*. (329)
-      Het principe van de voorlopige toepassing is niet strijdig met de Russische wetgeving. (330 en volgende)

5.8.     De Russische Federatie heeft de door het Scheidsgerecht aan artikel 45 lid 1 ECT gegeven uitleg gemotiveerd bestreden. In haar visie hangt de reikwijdte van de voorlopige toepassing af van de overeenstemming van iedere afzonderlijke verdragsbepaling met de Grondwet, wetten of voorschriften. Gedaagden hebben zich met een beroep op dezelfde argumenten als in de Interim Awards zijn te lezen, achter het oordeel van het Scheidsgerecht geschaard. Het gaat er dus in de kern om of de Limitation Clause zo moet worden uitgelegd dat deze clausule betrekking heeft op het principe van de voorlopige toepassing – bij welke uitleg de mogelijkheid van de voorlopige toepassing van de ECT (als geheel) afhangt van het antwoord op de vraag of het nationale recht dit principe kent –, dan wel dat de voorlopige toepassing van de ECT is beperkt tot de verdragsbepalingen die niet strijdig zijn met het nationale recht.

5.9.     De uitleg van de Limitation Clause dient te geschieden volgens de regels die zijn neergelegd in de artikelen 31 en 32 WVV, dat wil zeggen overeenkomstig de betekenis die de bewoordingen in het normale spraakgebruik hebben, met inachtneming van hun context en in het licht van het doel van de ECT (artikel 31 lid 1 WVV). De context van een verdrag omvat in elk geval de tekst, met inbegrip van preambule en bijlagen (artikel 31 lid 2 WVV). Artikel 31 lid 3 WVV bepaalt dat bij de uitleg daarnaast rekening moet worden gehouden

met onder meer ieder later gebruik in de toepassing van het verdrag waardoor overeenstemming van de partijen inzake de uitlegging van het verdrag is ontstaan. Ingevolge artikel 32 lid 2 WVV kan bovendien betekenis toekomen aan aanvullende middelen van uitlegging, en in het bijzonder aan de voorbereidende werkzaamheden (*travaux preparatoires*) en de omstandigheden waaronder het verdrag is gesloten. Deze middelen kunnen worden ingezet om de betekenis die voortvloeit uit de toepassing van artikel 31 te bevestigen of de betekenis te bepalen indien de uitlegging, geschied overeenkomstig artikel 31, (a) de betekenis dubbelzinnig of duister laat of (b) leidt tot een resultaat dat duidelijk ongerijmd of onredelijk is.

5.10.     Bij de uitleg van artikel 45 lid 1 ECT komt het in de eerste plaats aan op de gewone betekenis daarvan. Daarbij gaat het in het bijzonder om de woorden *"to the extent"*. De betekenis van het woord *"extent"* wordt in de *Oxford Thesaurus of English* onder meer omschreven als *"degree, scale, level, magnitude, scope, extensiveness, amount, size; coverage, breadth, width, reach en range."* Dit sluit aan bij de door de Russische Federatie genoemde, aan de *Oxford English dictionary* (tweede editie 1989) en de *Webster's Third International Dictionary of the English Language* (1961) ontleende omschrijving van de woorden *"to the extent"*: *"space or degree to which anything is extended"*, *"width of application, operation, etc. scope"*, *"range (as of inclusiveness or application) over which something extends"* en *"the limit to which something extends"*.

5.11.     Met de term *"to the extent"* wordt dus volgens de betekenis daarvan in het normale spraakgebruik een mate, een reikwijdte of – iets anders gezegd – een differentiatie weergegeven. Deze betekenis komt ook tot uitdrukking in een aantal andere taalversies van het verdrag. Zo is de term in de Duitse versie vertaald als *"in dem Maße"*, in de Franse versie als *"dans la mesure où"* en in de Nederlandse versie als "voor zover".

5.12.     De gewone betekenis van deze woorden duidt, los van de context daarvan, meer in de richting van de juistheid van de door de Russische Federatie verdedigde uitleg. In de door het Scheidsgerecht gevolgde interpretatie – waarbij beter het woord "indien" past – is de Limitation Clause immers beperkt tot één vorm van onverenigbaarheid met nationaal recht, te weten een verbod van voorlopige toepassing als zodanig. Het Scheidsgerecht heeft ook met zoveel woorden onderkend dat de opstellers van een verdrags- of wetsbepaling de term *"to the extent"* vaak gebruiken om duidelijk te maken dat een bepaling alleen toepassing ken vinden in de mate waarin wordt voldaan aan hetgeen erop volgt. Het Scheidsgerecht heeft echter in het kader van de context waarin deze term moet worden gelezen, beslissend belang gehecht aan het bijvoeglijk naamwoord *"such"*. Volgens het Scheidsgerecht kunnen de woorden *"such provisional application"* alleen verwijzen naar het eerder in artikel 45 lid 1 opgenomen begrip *"this Treaty"* en gaat het erom of *"such provisional application of this Treaty"* niet strijdig is met het nationaal recht. Naar het oordeel van de rechtbank verschaft deze denkbeeldige toevoeging geen verduidelijking. Deze verwijzing naar het verdrag, die vanzelf spreekt – een andere lezing is immers niet goed denkbaar –, geeft geen duidelijkheid over de vraag of de voorlopige toepassing alleen betrekking kan hebben op het Verdrag als geheel, dus op het principe van voorlopige toepassing, of slechts op delen daarvan, en dus op afzonderlijke verdragsbepalingen. Aan de verwijzing naar *"this Treaty"* komt dan ook bij de uitleg van de Limitation Clause geen bijzondere betekenis toe.

C/09/477160 / HA ZA 15-1, C/09/477162 / HA ZA 15-2 en          37
C/09/481619 / HA ZA 15-112
20 april 2016

5.13.    Wat de rechtbank voor de aan de context gerelateerde uitleg wel relevant acht, is
allereerst de omstandigheid dat artikel 45 lid 1 ECT de voorlopige toepassing in verband
brengt met de onverenigbaarheid niet alleen met *"constitution"* en *"laws"*, maar
uitdrukkelijk ook met *"regulations"*. De Russische Federatie heeft terecht erop gewezen dat
een verbod op voorlopige toepassing van verdragen als zodanig gewoonlijk het gevolg is
van constitutionele vereisten en verankerd kan liggen in een wet in formele zin. Niet goed
denkbaar is evenwel dat een verbod op voorlopige toepassing van een verdrag, gegeven het
principiële karakter daarvan, is neergelegd in lagere wetgeving. Daarentegen is een toets op
verenigbaarheid van afzonderlijke verdragsbepalingen met lagere wetgeving wel
voorstelbaar. Gedaagden hebben op dit punt volstaan met het betoog dat het gebruik van het
woord *"regulations"* slechts beklemtoont dat de opstellers van de ECT een zo ruim
mogelijk overzicht wilden geven om ervoor te zorgen dat elke bepaling van het recht van
een Ondertekenende Partij zou worden opgenomen die strijdig was met voorlopige
toepassing als zodanig. Het is volgens gedaagden misschien ongebruikelijk, maar zij achten
het niet onmogelijk dat een voorschrift een bepaling bevat met betrekking tot het principe
van de voorlopige toepassing. De rechtbank acht deze toelichting niet overtuigend en mist
daarin bovendien een verwijzing naar een dergelijke bedoeling van de opstellers van het
Verdrag.

*Artikel 45 lid 2*

5.14.    Met betrekking tot de context waarbinnen de uitleg van de Limitation Clause dient
te geschieden is daarnaast het tweede lid van artikel 45 ECT van belang. Een staat kan op
het tijdstip van ondertekening een verklaring indienen dat hij niet kan instemmen met
voorlopige toepassing (artikel 45 lid 2 onder *a* ECT). Artikel 45 lid 2 onder *c* brengt voor
dat geval mee dat een Ondertekenende Partij niettemin Deel VII van het Verdrag
(*"Structure and Institutions"*) voorlopig moet toepassen *"to the extent that such provisional
application is not inconsistent with its laws and regulations."* In dit artikellid wordt dus
dezelfde terminologie gebruikt als in het eerste lid, met dit verschil dat artikel 45 lid 2 onder
c geen verwijzing maakt naar de Grondwet. Het Scheidsgerecht heeft zich niet in duidelijke
bewoordingen uitgesproken over de betekenis van artikel 45 lid 2 onder c. Het heeft zich
beperkt tot het oordeel dat in de context van deze bepaling de zinsnede *"such provisional
application"* noodzakelijkerwijs een andere betekenis heeft dan dezelfde verwijzing in
artikel 45 lid 1 en verwijst naar de voorlopige toepassing van alleen Deel VII van het
Verdrag. Of hiermee ook is gedoeld op het principe van de voorlopige toepassing, maken de
overwegingen niet duidelijk.

5.15.    Nu de voorlopige toepassing in artikel 45 lid 2 onder *c* beperkt blijft tot Deel VII,
ligt het al daarom niet voor de hand dat in deze bepaling het principe van de voorlopige
toepassing als relevant criterium is aangewezen. Een dergelijk principe kan immers alleen
een verdrag als geheel betreffen; niet goed denkbaar is dat het ziet op een afzonderlijk deel.
Dit is ook in de Interim Awards onder 311 onderkend in de overweging dat de Limitation
Clause een "alles of niets"-benadering behelst: ofwel het gehele Verdrag wordt voorlopig
toegepast, of het wordt helemaal niet voorlopig toegepast. Indien, zoals gedaagden hebben
verdedigd, artikel 45 lid 2 onder *c* wel het oog zou hebben op het principe van de voorlopige
toepassing, is bovendien niet goed te begrijpen waarom in deze bepaling *"the constitution"*
als toetsingscriterium ontbreekt. In het licht van dit een en ander moet worden aangenomen
dat artikel 45 lid 2 onder *c*, dat de reikwijdte van de voorlopige toepassing uitsluitend

C/09/477160 / HA ZA 15-1, C/09/477162 / HA ZA 15-2 en                           38
C/09/481619 / HA ZA 15-112
20 april 2016

afhankelijk maakt van de verenigbaarheid van Deel VII met (lagere) wetgeving, daarbij het
oog heeft op de specifieke verdragsbepalingen uit dat deel. De rechtbank volgt het
Scheidsgerecht niet indien het een andere uitleg heeft bedoeld.

5.16.     De Russische Federatie heeft er in dit verband nog terecht op gewezen dat de
benadering van gedaagden de interactie tussen de leden 1 en 2 van artikel 45 ECT uit het
oog verliest. In hun (hierna in de onderdelen 5.24 en volgende nader te bespreken) visie kan
een ondertekenende Partij alleen een beroep doen op de Limitation Clause als haar nationale
recht voorlopige toepassing als zodanig verbiedt en zij een verklaring in de zin van artikel
45 lid 2 heeft afgelegd. Een beroep op de Limitation Clause, dat berust op strijdigheid van
het principe van de voorlopige toepassing met de Grondwet en andere wet- en regelgeving,
lijkt zich echter moeilijk te verdragen met de verplichting van artikel 45 lid 2 onder *c* om in
dat geval desondanks Deel VII toe te passen *"to the extent that such provisional
application"* niet strijdig is met die wet- en regelgeving.

5.17.     Kortom, het Scheidsgerecht heeft de Limitation Clause uitgelegd op een wijze die
in grote mate afwijkt van de betekenis die aan de dienovereenkomstige woorden in artikel
45 lid 2 onder *c* ECT moet worden toegekend. Voor deze afwijking bestaat naar het oordeel
van de rechtbank geen goede grond. Een consistente uitleg van de beide artikelleden
ondersteunt juist de uitleg van de Limitation Clause volgens de opvatting van de Russische
Federatie.

*Voorlopige conclusie over artikel 45 lid 1*

5.18.     Het hiervoor overwogene leidt tot de conclusie dat de normale betekenis van de in
lid 1 voorkomende term *"to the extent"*, mede in de context daarvan, voert tot een uitleg van
de Limitation Clause waarbij de mogelijkheid van voorlopige toepassing is toegespitst op en
afhangt van de verenigbaarheid van afzonderlijke verdragsbepalingen met het nationale
recht.

*Voorwerp en doel van de ECT en de aard van het internationale recht*

5.19.     Het Scheidsgerecht heeft nog geoordeeld dat de door hem verworpen uitleg van de
Limitation Clause volledig zou indruisen tegen het voorwerp en doel van de ECT en de aard
van het internationale recht. Dat oordeel is gestoeld op het *pacta sunt servanda*-beginsel van
artikel 26 WVV en het daarmee samenhangende, in artikel 27 WVV neergelegde, beginsel
dat een partij zich niet mag beroepen op de bepalingen van haar nationale recht om het niet
ten uitvoer leggen van een verdrag te rechtvaardigen. Ook hierin volgt de rechtbank het
Scheidsgerecht niet. Daarbij stelt zij voorop dat het Scheidsgerecht weliswaar in zijn
algemeenheid heeft verwezen naar het doel van de ECT (het bieden van een juridisch kader
voor het bevorderen van de samenwerking op lange termijn op energiegebied, op basis van
wederzijds voordeel en complementariteit en overeenkomstig de doelstellingen en
beginselen van het Verdrag), maar niet heeft geëxpliciteerd in hoeverre een – door artikel 45
ECT ingegeven – gelimiteerde toepassing van de verdragsbepalingen zou indruisen tegen
dat doel. Wat daarvan ook zij, de door het Scheidsgerecht bedoelde, in artikel 26 en 27 WVV
neergelegde beginselen dwingen niet tot de door hem gevolgde interpretatie van artikel 45
ECT. Deze beginselen brengen tot uitdrukking dat verdragspartijen gebonden zijn aan een in
werking getreden verdrag en de tenuitvoerlegging daarvan niet mogen frustreren door een

beroep te doen op nationaal recht. Hoewel deze beginselen zich evenzeer uitstrekken tot
verdragen die op basis van voorlopige toepassing in werking zijn, zijn de beginselen niet
onbegrensd. De ondertekenende partijen bij een verdrag kunnen de voorlopige toepassing
van verdragsbepalingen uitdrukkelijk beperken, zoals ook volgt uit artikel 25 WVV, dat
voor zover van belang luidt: *"A treaty or a part of a treaty is applied provisionally pending
its entry into force if (a) the treaty itself so provides"*. Zoals de Russische Federatie, mede
met verwijzing naar rechtsgeleerde auteurs, heeft betoogd, biedt een bepaling als de
Limitation Clause een voorziening voor de oplossing van conflicten tussen nationaal recht
en de internationale verplichtingen van staten als gevolg van de voorlopige toepassing van
verdragen (zie de dagvaardingen, 148 met de in noot 163 genoemde literatuur). In dit geval
hebben de Ondertekenende Partijen bij de ECT in de Limitation Clause van artikel 45 lid 1
ECT, uitgelegd in de door de rechtbank aanvaarde betekenis, met zoveel woorden
vastgelegd dat de reikwijdte van de voorlopige toepassing beperkt is tot verdragsbepalingen
die niet strijdig zijn met het nationale recht. Ook al is het dus mogelijk dat bepalingen van
nationaal recht in de weg kunnen staan aan de uitvoering van een of meer bepalingen van de
ECT, de grondslag daarvoor is in de ECT zelf – dus op verdragsniveau – gegeven. Anders
gezegd: een staat die zich onder verwijzing naar de Limitation Clause op goede gronden
beroept op strijdigheid tussen een verdragsbepaling en nationaal recht, handelt niet in strijd
met het *pacta sunt servanda*-beginsel, noch met het beginsel van artikel 27 WVV. Dat, zoals
het Scheidsgerecht heeft overwogen en in deze zaak aan de orde is, de inroeping van een
bepaling van nationaal recht tot discussie kan leiden over de betekenis van de inhoud
daarvan en dus onzekerheid kan scheppen in internationale zaken, doet daaraan niet af. Dat
is immers inherent aan de in de ECT opgenomen Limitation Clause.

*Oordeel ander scheidsgerecht*

5.20.     Volledigheidshalve overweegt de rechtbank nog dat voor de uitleg van de
Limitation Clause evenmin gewicht toekomt aan de omstandigheid dat het oordeel van het
Scheidsgerecht wordt ondersteund door een beslissing van een ander scheidsgerecht – met
overigens dezelfde voorzitter – in een eveneens op basis van de ECT gevoerde arbitrage in
de Kardassopouloszaak. De in de Interim Awards weergegeven motivering van die
beslissing bevat geen inhoudelijke argumenten voor een andere uitleg van artikel 45 lid 1
ECT.

*De statenpraktijk*

5.21.     Alle partijen zijn ingegaan op de betekenis van de statenpraktijk. De rechtbank zal
(de betekenis van) deze praktijk bij haar oordeel over artikel 45 lid 1 ECT buiten
beschouwing laten. Dit is overigens ook het primaire standpunt van gedaagden (zie de
conclusie van antwoord, 145 en de conclusie van dupliek, 56). Artikel 31 lid 3 aanhef en
onder *b* WVV verbindt aan toekenning van relevantie aan de statenpraktijk immers de
voorwaarde dat door dit latere gebruik overeenstemming van de partijen over de uitleg van
het desbetreffende verdrag is ontstaan. Met andere woorden: aan deze praktijk kan alleen
gewicht worden toegekend als de betrokken staten – uitdrukkelijk of impliciet – haar hebben
aanvaard. Geen van partijen heeft gesteld dat sprake is van een (brede) uitvoeringspraktijk
die door alle betrokken staten wordt gedragen. Ook overigens is daarvan niet gebleken.

*De travaux preparatoires*

5.22.    De vraag rijst nog of bij de uitleg van artikel 45 lid 1 ECT betekenis kan toekomen
aan de door de Russische Federatie genoemde *travaux preparatoires* van de ECT. Uit artikel
32 WVV vloeit voort dat als toepassing van de in artikel 31 WVV vermelde uitlegregels de
betekenis dubbelzinnig of duister laat of tot een resultaat leidt dat duidelijk ongerijmd of
onredelijk is, gebruik kan worden gemaakt van aanvullende middelen van uitlegging, in het
bijzonder (gegevens uit) de hier bedoelde voorbereidende werkzaamheden. Voor het
gebruik van dit middel als aanvulling op de uitleg bestaat geen grond; de hiervoor –
overeenkomstig artikel 31 WVV – gegeven uitleg leidt naar het oordeel van de rechtbank
niet tot een onduidelijke of duistere betekenis, noch tot een resultaat dat duidelijk ongerijmd
of onredelijk is. Geheel ten overvloede wijst de rechtbank nog wel op hetgeen de Russische
Federatie heeft betoogd met betrekking tot de toevoeging van de term *"regulations"* aan de
ontwerptekst van de Limitation Clause. De heer Bamberger, voorzitter van de juridische
adviescommissie van de Conferentie over het Europese Energiehandvest, heeft in reactie op
een vraag van de secretaris-generaal van de Conferentie over de ECT de volgende uitleg
gegeven over de toevoeging van deze term:

>        *"the effect is to suggest that relatively minor impediments in the form of regulations,
>        no matter how insignificant they may be, can be the occasion for failing to apply the
>        Treaty provisionally when in fact those regulations could be brought into
>        conformity without serious effort."*

*Conclusie over de uitleg van artikel 45*

5.23.    De bovenstaande overwegingen leiden tot de conclusie dat de rechtbank de door de
Russische Federatie verdedigde uitleg van artikel 45 ECT volgt. Dit betekent dat de
Russische Federatie uitsluitend gebonden was aan de met het Russische recht verenigbare
Verdragsbepalingen. Voordat zij een oordeel geeft over de verenigbaarheid van artikel 26
ECT met het Russisch recht, zal de rechtbank nog ingaan op de volgende door gedaagden
opgeworpen kwestie.

*Voorafgaande verklaring nodig?*

5.24.    Gedaagden hebben – ook in de Arbitrage – het standpunt ingenomen dat op grond
van artikel 45 lid 1 ECT een voorafgaande verklaring is vereist, die echter niet door de
Russische Federatie is gegeven. Daartoe hebben zij betoogd dat de leden 1 en 2 van artikel
45 complementair zijn in deze zin dat in het eerste lid de algemene regel voor de voorlopige
toepassing is neergelegd, terwijl het tweede lid de (kennisgevings)procedure uiteenzet. Dit
standpunt, dat impliceert dat de Russische Federatie gehouden was om bij de ondertekening
van de ECT een verklaring af te leggen dat zij niet met de voorlopige toepassing van de
ECT instemde, vindt volgens gedaagden niet alleen bevestiging in een tekstuele interpretatie
van artikel 45, maar is haars inziens ook in overeenstemming met het onderwerp en het doel
van de ECT.

5.25.    De rechtbank is geneigd de Russische Federatie te volgen in haar betoog dat deze
kwestie niet in deze vernietigingsprocedure aan de orde kan worden gesteld. Het
Scheidsgerecht heeft gedaagden niet in hun standpunt gevolgd en heeft zijn bevoegdheid

dus niet gebaseerd op het ontbreken van een dergelijke verklaring. In overeenstemming met het wettelijke systeem van de vernietigingsprocedure, waaruit volgt dat de vernietigingsgronden in de dagvaarding worden weergegeven en waarin besloten ligt dat alleen tegen een positieve arbitrale bevoegdheidsbeslissing een vernietigingsgrond kan zijn gericht (de artikelen 1064 lid 5 en 1065 lid 1 aanhef en onder *a* Rv), lijkt er geen ruimte te zijn om in deze procedure een oordeel te geven over de vraag of het Scheidsgerecht zijn bevoegdheid had kunnen aannemen op basis van een ander, door hem verworpen argument.

5.26.    Niettemin zal de rechtbank deze kwestie volledigheidshalve bespreken. Zij acht op de hierna te vermelden gronden het oordeel van het Scheidsgerecht juist. Bij deze overwegingen gaat de rechtbank wederom uit van de in artikel 31 WVV bedoelde gewone betekenis van de gebruikten woorden, bezien in hun context.

5.27.    Gegeven hun gewone betekenis wijzen de bewoordingen van de leden 1 en 2 van artikel 45 ECT – afzonderlijk dan wel in onderlinge samenhang gelezen – er niet op dat de Limitation Clause van lid 1 afhankelijk is van het afleggen van een verklaring op grond van lid 2. Weliswaar bevat het eerste lid een regeling voor de voorlopige toepassing, maar datzelfde geldt voor het tweede lid. Niets in de tekst van deze artikelleden wijst erop dat het tweede lid is bedoeld als een procedureregel ter uitwerking van de regeling van lid 1. Artikel 45 lid 2 beschrijft een eigen regime, dat het mogelijk maakt dat een Ondertekenende Partij helemaal afziet van voorlopige toepassing, ook als op grond van lid 1 geen beletsel voor die voorlopige toepassing bestaat, en er dus geen strijd bestaat met nationale wetgeving. Ook het in artikel 45 lid 2 gebruikte woord "*[n]otwithstanding*", waarmee het tweede lid aanvangt en dat duidt op een afwijking van, niet op het voortbouwen op, het eerste lid, en het woord "*may*", dat verwijst naar een mogelijkheid en niet naar een met het eerste lid samenhangend, verplicht voorgeschreven mechanisme, wijzen erop dat artikel 45 lid 2 geen procedureregel bevat ter uitwerking van artikel 45 lid 1. De gewone betekenis van de hier aangehaalde onderdelen van artikel 45 leidt dus tot een uitleg waarin het eerste lid geen voorafgaande verklaring vereist.

5.28.    Staten die een beroep willen doen op de uitzondering van artikel 45 lid 2 zijn gehouden een uitdrukkelijke verklaring te doen, terwijl zo'n verplichting dus niet uit artikel 45 lid 1 kan worden afgeleid. Voor het oordeel dat desondanks een bepaalde vorm van voorafgaande verklaring of kennisgeving is vereist om een beroep te kunnen doen op de Limitation Clause van artikel 45 lid 1 bestaat ook overigens echter onvoldoende grond. Weliswaar hebben diverse staten tijdens de onderhandelingen het belang van transparantie met betrekking tot het inroepen van de Limitation Clause beklemtoond en heeft het Secretariaat van de ECT de Ondertekenende Partijen aangemoedigd transparant te zijn over de voorlopige toepassing (zie de Interim Awards onder 282), maar deze omstandigheden zijn onvoldoende zwaarwegend om daaruit een impliciete verplichting tot het afleggen van een voorafgaande verklaring af te leiden. Indien de opstellers van het Verdrag ook een beroep op de Limitation Clause wegens strijdigheid van verdragsbepalingen met nationaal recht afhankelijk hadden willen stellen van een voorafgaande verklaring, had het voor de hand gelegen dat dit, evenals in het tweede lid is gebeurd, uitdrukkelijk zou zijn bepaald. Dit is niet gebeurd. Het betoog van gedaagden over het onderwerp en het doel van de ECT is grotendeels te herleiden tot de al genoemde wenselijkheid van transparantie en leidt dan ook niet tot een ander oordeel. Ook het in dat verband genoemde beginsel van de wederkerigheid, waaraan volgens gedaagden afbreuk wordt gedaan indien de uitleg van het

C/09/477160 / HA ZA 15-1, C/09/477162 / HA ZA 15-2 en                    42
C/09/481619 / HA ZA 15-112
20 april 2016

Scheidsgerecht wordt gevolgd, kan hun niet baten. Zoals de Russische Federatie in dit
verband met juistheid heeft opgemerkt, is in artikel 45 lid 1 ECT geen aanwijzing te vinden
voor een vereiste van absolute wederkerigheid. Dat in artikel 45 lid 2 onder *b* voor de in lid
2 onder *a* beschreven gevallen wel het beginsel van wederkerigheid is neergelegd, dwingt
dan ook niet tot het oordeel dat in artikel 45 lid 1 de verplichting tot een voorafgaande
verklaring ligt besloten.

5.29.    Gedaagden kunnen ook niet met succes een argument ontlenen aan de context van
de leden 1 en 2 van artikel 45 ECT. Met die context doelen zij allereerst op artikel 45 lid 3
ECT, dat een regeling bevat voor de beëindiging van de voorlopige toepassing van de ECT
en de na de beëindiging doorlopende werking gedurende twintig jaar van de bepalingen van
de Delen III en V ten aanzien van investeringen die tijdens die voorlopige toepassing op het
grondgebied van een betrokken staat zijn gedaan. Gedaagden betogen dat als artikel 45 lid 1
ECT een Ondertekenende Partij zou toestaan op elk willekeurig moment en met
onmiddellijke ingang te ontkomen aan voorlopige toepassing, de gedetailleerde bepalingen
van artikel 45 lid 3 ECT geen enkele werking hebben. De rechtbank verwerpt dit betoog.
Gedaagden verliezen hierbij allereerst uit het oog dat aan een beroep op de Limitation
Clause – in tegenstelling tot de beëindiging van artikel 45 lid 3 ECT – materiële
voorwaarden worden gesteld, te weten strijdigheid van een Verdragsbepaling met nationaal
recht. Bovendien stelt de Russische Federatie terecht dat geen sprake is van
onverenigbaarheid. Door de uitdrukkelijke verwijzing naar de krachtens het eerste lid op de
Ondertekenende Partij rustende verplichting om de Delen III en V toe te passen, beperkt
artikel 45 lid 3 onder *b* ECT de voortdurende werking van de Verdragsbepalingen op
dezelfde wijze als de Limitation Clause.

5.30.    Ook voor de hier besproken kwestie heeft ten slotte te gelden dat, nu niet is gesteld
of gebleken dat over de toepassingspraktijk met betrekking tot het inroepen van de in artikel
45 lid 1 en lid 2 ECT gegeven clausules bij de Ondertekenende Partijen overeenstemming
bestond en gedaagden evenmin een beroep hebben gedaan op een latere statenpraktijk, geen
betekenis kan toekomen aan de wijze waarop de betrokken staten uitvoering hebben
gegeven aan artikel 45 ECT. Geheel ten overvloede overweegt de rechtbank nog dat op
zichzelf niet tussen partijen in geschil is dat een aantal staten zich heeft beroepen op de
Limitation Clause zonder uitdrukkelijk de in artikel 45 lid 2 ECT bedoelde verklaring te
doen. Het enkele feit dat deze staten wel voorkomen op een door het Secretariaat opgestelde
lijst van staten die geen voorlopige toepassing aan de ECT zouden geven, is hierbij niet
relevant.

5.31.    De rechtbank komt tot de conclusie dat, indien deze kwestie al relevant is voor de
beslissing op de vordering, de Russische Federatie niet gehouden was een voorafgaande
verklaring zoals in artikel 45 lid 2 bedoeld af te leggen voor een succesvol beroep op de
Limitation Clause van artikel 45 lid 1.

**Artikel 26 ECT**

5.32.    Gegeven de betekenis die de rechtbank aldus aan de Limitation Clause van artikel
45 lid 1 ECT toekent, rijst de – tussen partijen ook in geschil zijnde – vraag of het in artikel
26 ECT neergelegde arbitraal beding, waaraan het Scheidsgerecht zijn bevoegdheid heeft
ontleend, in overeenstemming is met het Russisch recht. Dit beding heeft, zo volgt uit lid 1

van dit artikel 26, betrekking op *"disputes between a Contracting Party and an Investor of
another Contracting Party relating to an Investment of the latter in the Area of the former,
which concern an alleged breach of an obligation of the former under Part III"*. Artikel 26
schept dus alleen een mogelijkheid tot arbitrage voor een (beweerde) schending van
verplichtingen die zijn neergelegd in Deel III van het Verdrag *("Bevordering bescherming
en behandeling van investeringen")*. Een van de daarin neergelegde verplichtingen is te
vinden in artikel 10 ECT. Deze bepaling verplicht de verdragsluitende partijen er onder
meer toe investeringen van buitenlandse investeerders eerlijk en billijk te behandelen en
zich te onthouden van discriminatoire maatregelen die (het gebruik van) deze investeringen
belemmeren. Een andere verplichting (tot een nalaten) is neergelegd in artikel 13 ECT.
Daarin is, kort gezegd, bepaald dat investeerders niet mogen worden genationaliseerd,
onteigend of onderworpen aan maatregelen met een soortgelijk effect als nationalisatie of
onteigening. De verplichtingen uit artikel 10 en 13 ECT kunnen door verwijzingen in artikel
21 ECT, dat gaat over "belastingen", ook betrekking hebben op belastingen of
belastingmaatregelen van verdragsluitende partijen. De schadevergoedingsvorderingen van
gedaagden in de Arbitrage zijn gegrond op de stelling dat de Russische Federatie deze
verplichtingen heeft geschonden. De door gedaagden gestelde schending van de in artikel 10
ECT neergelegde verplichtingen bestaat volgens hen onder meer in het belemmeren van een
behoorlijke rechtsgang en een eerlijk proces, meer specifiek door de talloze huiszoekingen
en inbeslagnemingen, het achterwege laten van behoorlijke kennisgevingen van
bestuurshandelingen, het niet zijn gehoord door een onpartijdige rechter, de veilingverkoop
van Yuganskneftegaz (YNG) en het aanhangig maken van de faillissementsprocedure tegen
Yukos. Gedaagden hebben hun stelling over schending van de verplichtingen uit artikel 13
ECT op een aantal omstandigheden gegrond, waarvan een deel ook ten grondslag is gelegd
aan de schending van artikel 10. Daarbij gaat het onder meer om de inbeslagneming van de
door gedaagden in Yukos gehouden aandelen, de naheffingsaanslagen over de jaren 2000-
2004, de verkoop van YNG op een schijnveiling en het initiëren van het faillissement van
Yukos. Deze omstandigheden hebben volgens gedaagden ertoe geleid dat zij geheel en al
van hun investering zijn beroofd. Zij kwalificeren die als een onteigening. Het
Scheidsgerecht heeft in de Final Awards de schending van artikel 13 ECT aangenomen en is
daarom niet toegekomen aan een oordeel over de gestelde schending van artikel 10 ECT.

5.33.     Tegen deze achtergrond zal de rechtbank nu beoordelen of de voorlopige
toepassing van het arbitraal beding van artikel 26 ECT in overeenstemming is met de
Russische constitutie, wetten of andere regelgeving. Daarbij stelt zij het volgende voorop. In
de visie van gedaagden is een bepaling van de ECT, zoals artikel 26, alleen dan
onverenigbaar met Russisch recht indien de desbetreffende Verdragsbepaling in het
nationale recht wordt *verboden.* Van inconsistentie is in hun optiek echter geen sprake als
het Russische recht niet uitdrukkelijk in die verdragsbepaling voorziet. Naar het oordeel van
de rechtbank gaan gedaagden hiermee uit van een te beperkte opvatting. Nog daargelaten
dat een taalkundige uitleg van artikel 45 ECT geen aanknopingspunten geeft voor een
dergelijke opvatting, ligt deze ook overigens niet voor de hand. De voorlopige toepassing
van het in artikel 26 vervatte arbitraal beding komt, mede gegeven het feit dat de voorlopige
toepassing haar legitimiteit vindt in de ondertekening (en bij een aantal verdragsbepalingen
de soevereiniteit van de Ondertekenende Partijen in het geding is), ook in strijd met
Russisch recht als een dergelijke wijze van geschilbeslechting geen wettelijke grondslag
heeft, of – in een iets ruimer perspectief – niet past in het wettelijk systeem of niet
verenigbaar is met de uitgangspunten en beginselen die zijn neergelegd in of kenbaar zijn uit

C/09/477160 / HA ZA 15-1, C/09/477162 / HA ZA 15-2 en                44
C/09/481619 / HA ZA 15-112
20 april 2016

de wetgeving. Als de rechtbank in het navolgende kortheidshalve spreekt over de
"verenigbaarheid" van bepalingen van de ECT met de Russische wetgeving, heeft zij het
oog op deze uitleg van het begrip "*not inconsistent*" in artikel 45 lid 1 ECT.

5.34.      Tussen partijen is terecht niet in debat dat de kwestie van de (on)verenigbaarheid
moet worden beantwoord naar Russisch recht. In het Nederlandse rechtstelsel wordt
buitenlands recht niet als feit aangemerkt maar als recht. Dat volgt uit artikel 25 Rv, waarin
is bepaald dat de rechter ambtshalve de rechtsgronden aanvult. De rechtspraak aanvaardt dat
onder het recht dat de rechter ingevolge dit artikel ambtshalve moet toepassen, ook vreemd
recht valt (zie onder meer HR 22 februari 2002, ECLI:NL:HR:2002:AD8197 en recenter
HR 17 december 2010, ECLI:NL:HR:2010:BO1979). Hieruit volgt dat de rechtbank in deze
vernietigingsprocedure de inhoud van het relevante Russische recht zelf moet vaststellen.
Ofschoon de vaststelling daarvan, zoals uit het voorgaande volgt, niet door bewijslevering
plaatsvindt, kan die vaststelling wel geschieden mede aan de hand van de door partijen
ingebrachte deskundigenberichten. De Russische Federatie heeft gebruikgemaakt van de
mogelijkheid om met betrekking tot het relevante Russisch recht deskundigenberichten in te
brengen. Daarbij gaat het in het bijzonder om het al in de Arbitrage ingebrachte
deskundigenbericht van februari 2006 van A.A. Kostin (hierna: Kostin), wiens functie is
aangeduid als "*Senior Professor and head of the Private International and Civil Law
Department of the Moscow State Institute of International Relations*", en het in deze
vernietigingsprocedure overlegde deskundigenbericht met bijlagen van oktober 2014 van
A.V. Asoskov (hierna: Asoskov). De functies van deze deskundige zijn aangeduid als
"*Professor of the International Private Law Department of the Russian School of Private
Law and Assistant Professor of the Civil Law Department at M.V. Lomonosov Moscow State
University*". De rechtbank zal bij de vaststelling van de inhoud van het Russische recht,
waartoe allereerst de materiële wet- en regelgeving zal worden onderzocht, deze
deskundigenberichten betrekken.

**De Wet inzake de Buitenlandse Investeringen**

*Algemeen*

5.35.      Het Scheidsgerecht heeft het antwoord op de vraag of (de voorlopige toepassing
van) het arbitraal beding van artikel 26 ECT in strijd is met het Russische recht, gezocht in
twee opvolgende bepalingen van de Wet inzake de Buitenlandse Investeringen. Daarbij gaat
het om artikel 9 lid 2 van deze wet uit 1991 en artikel 10 van diezelfde wet in de versie van
1999. Het Scheidsgerecht is op basis van beide bepalingen tot het oordeel gekomen dat
geschillen tussen investeerders en een staat van de hier aan de orde zijnde aard arbitrabel
zijn op grond van Russisch recht (Interim Awards onder 370).

5.36.      Bij het onderzoek naar de betekenis van deze twee wetsbepalingen zal de rechtbank
allereerst ingaan op het standpunt van de Russische Federatie dat de overige Russische
wetgeving nimmer arbitrage heeft toegelaten voor geschillen die voortvloeien uit
publiekrechtelijke rechtsbetrekkingen. De Russische Federatie heeft in dit verband gewezen
op bepalingen uit verschillende Russische wetten, waarvan een aantal van kracht was vóór
de ondertekening van de ECT en een aantal van recenter datum is. Dit betreft onder meer
artikel 1 lid 2 van de International Arbitration Law van 1993 (deskundigenbericht Asoskov,
noot 7). Daarin is bepaald:

> *"The following kinds of disputes shall be submitted for international commercial
> arbitration by agreement between the parties: disputes arising from contractual
> and other civil law relationships arising from the maintenance of foreign trade and
> other international economic relations, if the commercial enterprise of at least one
> of the parties is located abroad (...)".*

Een door Asoskov genoemd citaat uit het handboek *"International Commercial
Arbitration"* van prof. V.A. Musin en prof. O.Yu. Skvortsov uit 2012 (deskundigenbericht
Asoskov, noot 16) vermeldt over deze bepaling onder meer:

> *"Therefore, if relations between the parties are of a public law nature, then a
> dispute arising out of such relations cannot be referred to international
> commercial arbitration."*

5.37.    Daarnaast hebben zowel Asoskov als Kostin wetsbepalingen genoemd die de
mogelijkheid van arbitrage afhankelijk maken van de aard van het geschil. Ingevolge artikel
21 van de Arbitrazh Procedure Code van 1992, is arbitrage op grond van een overeenkomst
mogelijk bij een *"economic dispute"* (deskundigenbericht Asoskov, noot 9). Artikel 1 van de
Provisional Regulation on Arbitral Tribunal for Resolving Economic Disputes van 1992
spreekt over arbitrage van geschillen *"arising out of civil law relations"*
(deskundigenbericht Asoskov, noot 10). In artikel 23 van de Arbitrazh Procedure Code van
1995 en artikel 4 van deze zelfde wet in de tekst van 2002 is de mogelijkheid van arbitrage
eveneens gerelateerd aan geschillen *"that arises out of civil law
relations"* (deskundigenbericht Asoskov, noten 11 en 12). Datzelfde geldt voor artikel 11
van de Russian Civil Code van 1995 (deskundigenbericht Asoskov, noot 27) en artikel 3 van
de Civil Procedure Code van 2002 (deskundigenbericht Asoskov, noot 14).

5.38.    Zowel Asoskov (in de paragrafen 23 en 24 van zijn deskundigenbericht) als Kostin
(op bladzijde 3 van zijn deskundigenbericht) hebben, met verwijzing naar verschillende
citaten uit de Russische juridische literatuur, geconcludeerd dat geschillen van
publiekrechtelijke aard niet door arbitrage kunnen worden beslecht. Uit de daarin genoemde
Russische literatuur en jurisprudentie (zoals vermeld in het deskundigenbericht van Asoskov
in de paragrafen 28-30) komt naar voren dat geschillen die voortvloeien uit betrekkingen
tussen ongelijkwaardige partijen – ook wel uitgedrukt als *"the principle of subordination"* –
als publiekrechtelijke geschillen worden beschouwd, terwijl privaatrechtelijke geschillen
voortvloeien uit betrekkingen tussen gelijkwaardige partijen. In dit laatste verband wordt de
term *"the principle of coordination"* gebruikt. Daarnaast kunnen geschillen, ook als zij
voortkomen uit overeenkomsten, een publiekrechtelijk karakter hebben indien sprake is van
een *"concentration of socially significant public elements"*. Dit is het geval indien een
publiek belang, de betrokkenheid van een publiek lichaam of het gebruik van budgettaire
middelen aan de orde is (deskundigenbericht Asoskov, 34, en de daar genoemde
rechtspraak).

5.39.    Asoskov heeft verder nog gewezen op artikel 16 van de Russian Civil Code, waarin
het recht op schadevergoeding bij overheidsoptreden is geregeld (deskundigenbericht
Asoskov, noot 44) :

C/09/477160 / HA ZA 15-1, C/09/477162 / HA ZA 15-2 en                                    46
C/09/481619 / HA ZA 15-112
20 april 2016

> *"Damages caused to an individual or a legal entity as a result of unlawful actions*
> *(or failure to act) by State bodies, bodies of local self-government, or officials of*
> *these bodies, including the adoption of an act by a State body of local self-*
> *government that is inconsistent with a law or other regulatory act, shall be*
> *compensated by the Russian Federation, the respective Russian Federation subject,*
> *or the municipal formation."*

5.40.    Het publiekrechtelijke karakter van het onrechtmatige handelen waarop een
vordering tot schadevergoeding als bedoeld in dit artikel 16 gebaseerd kan zijn, brengt
volgens het deskundigenbericht van Asoskov en de daarin vermelde literatuur (in 64-67)
echter mee dat deze vorderingen tot schadevergoeding, ook al worden deze op zichzelf
beheerst door civiel recht, niet via een arbitrale procedure kunnen worden ingesteld.
Beoordeling van de vordering tot schadevergoeding brengt in dat geval immers
onvermijdelijk de beoordeling van de aan de schade ten grondslag liggende uitoefening van
publiekrechtelijke bevoegdheden van autoriteiten van de Russische staat mee. Uit de
aangehaalde literatuur blijkt ook dat schadevergoeding op basis van onrechtmatig handelen
van autoriteiten in typisch privaatrechtelijke betrekkingen – waarbij niet de uitoefening van
publiekrechtelijke bevoegdheden speelt – wel aan arbitrage kan worden onderworpen.

5.41.    De rechtbank neemt op grond van de in deze twee deskundigenberichten
aangehaalde wetsbepalingen en de verwijzingen naar de Russische doctrine en
jurisprudentie de in deze berichten gemaakte analyse over. Gedaagden hebben deze uitleg
van de hiervoor besproken wetsbepalingen als zodanig overigens ook niet weersproken. Zij
hebben hun verweer in dit verband beperkt tot het betoog dat de wetsbepalingen uitsluitend
betrekking hebben op arbitrage binnen het nationale rechtssysteem van Rusland. Ook als zij
hierin gelijk zouden hebben – wat in elk geval niet opgaat voor de International Arbitration
Law van 1993, die uitdrukkelijk betrekking heeft op gevallen waarin een van partijen niet in
Rusland is gevestigd –, doet dat niet af aan het oordeel dat de hier genoemde Russische
wetgeving de mogelijkheid van arbitrage beperkt tot civielrechtelijk gerelateerde geschillen.
Bovendien volgt de rechtbank gedaagden niet in hun betoog dat het feit dat
publiekrechtelijke geschillen uitsluitend kunnen worden voorgelegd aan de nationale
rechter, op generlei wijze in strijd is met het gegeven dat de Russische Federatie zich op
internationaal niveau heeft verbonden om buitenlandse investeerders te compenseren voor
schade die voortvloeit uit handelingen van de Staat in strijd met internationale regels
(conclusie van antwoord, onder 256). Gedaagden miskennen met dit betoog dat van
onverenigbaarheid met Russisch recht ook sprake kan zijn als dat recht niet zelf voorziet in
de mogelijkheid van arbitrage zoals geregeld in artikel 26 ECT. De hiervoor besproken
wetsbepalingen voorzien in elk geval niet in de mogelijkheid van arbitrage voor geschillen
die voortvloeien uit een rechtsbetrekking tussen de Russische Federatie en (buitenlandse)
investeerders waarin het publiekrechtelijke karakter van de handelwijze van de Russische
Federatie in die rechtsbetrekking overheerst en waarin de beoordeling van de uitoefening
van publiekrechtelijke bevoegdheden door autoriteiten van de Russische Federatie aan de
orde is. Dat het in deze zaken om een dergelijk geschil gaat, staat naar het oordeel van de
rechtbank buiten twijfel. De gedragingen die gedaagden aan de Russische Federatie
verwijten zijn immers niet aan te merken als handelingen die door de Russische Federatie
zijn uitgevoerd als gelijkwaardige partij of als privaatrechtelijke partij. Het Scheidsgerecht
heeft zijn bevoegdheid overigens ook niet aan deze wetsbepalingen ontleend.

5.42.     Hierna zal de rechtbank onderzoeken of de door het Scheidsgerecht voor zijn
bevoegdheid beslissend geachte artikelen 9 lid 2 en 10 van de Wet inzake de Buitenlandse
Investeringen, in de versies van 1991 respectievelijk 1999, een verdergaande mogelijkheid
van arbitrage toestaan dan uit de hiervoor besproken Russische wetgeving kan worden
afgeleid. Daarbij verdient – ter inleiding – opmerking dat artikel 9 van toepassing was op
het moment van ondertekening van de ECT, maar niet op het moment van de aanvang van
de Arbitrage, terwijl artikel 10 pas in werking is getreden na de ondertekening van de ECT
en van kracht was ten tijde van de aanvang van de Arbitrage. De rechtbank zal echter in het
midden laten of beide bepalingen deel uitmaken van het in artikel 26 ECT bedoelde
Russische recht en zal, evenals het Scheidsgerecht en partijen hebben gedaan, onderzoeken
of de bevoegdheid van het Scheidsgerecht kan worden ontleend aan (een van) deze beide
bepalingen. Ook hierbij heeft als uitgangspunt te gelden dat de rechtbank de betekenis van
deze bepalingen zelf moet vaststellen.

*Artikel 9 Wet inzake de Buitenlandse Investeringen 1991*

5.43.     Met betrekking tot artikel 9 van de Wet inzake de Buitenlandse Investeringen van
1991 geldt het volgende. De Russische Federatie heeft zich terecht op het standpunt gesteld
dat dit artikel niet afzonderlijk moet worden beschouwd, maar in samenhang met artikel 43
van de Grondbeginselenwet. In artikel 1 van de Grondbeginselenwet ("*The laws of the
republics shall regulate in accordance with these Fundamentals the relations arising in
connection with foreign investments in the republics 'territories, subject to specific features
of their economic operations and investment policy*") is immers tot uitdrukking gebracht dat
de overige wetten waarin rechtsbetrekkingen worden geregeld die samenhangen met
buitenlandse investeringen, in overeenstemming moeten zijn met de grondbeginselen. De
zinsnede na de laatste komma van deze bepaling dwingt, anders dan gedaagden hebben
verdedigd, niet tot een andere, beperktere, uitleg. Evenmin is voor dit oordeel van belang
dat, zoals gedaagden op basis van de uitlatingen van Asoskov (deskundigenbericht, noot 67)
hebben verondersteld, de Grondbeginselenwet ten tijde van de ondertekening van de ECT
mogelijk niet meer van kracht was. Niet in geschil is immers dat de Grondbeginselenwet
nog wel van kracht was op het moment van de totstandkoming van de Wet inzake de
Buitenlandse Investeringen 1991. Sterker: deze beide wetten zijn nagenoeg gelijktijdig in
werking getreden. De Grondbeginselenwet heeft dus als basis kunnen dienen voor de inhoud
van de wet van 1991.

5.44.     Ook de bewoordingen van artikel 43 van de Grondbeginselenwet wijzen op de
samenhang met artikel 9 van de Wet inzake de Buitenlandse Investeringen 1991. Voor een
goed begrip zullen deze bepalingen hier nogmaals worden weergegeven. Artikel 43 van de
Grondbeginselenwet luidt als volgt:

> Lid 1: "*Disputes between foreign investors and the State are subject to
> consideration in the USSR in courts, unless otherwise provided by international
> treaties of the USSR.*"

> Lid 2: "*Disputes of foreign investors and enterprises with foreign investments with
> Soviet State bodies acting as a party to relationships regulated by civil legislation,
> enterprises, social organizations and other Soviet legal entities, disputes between
> participants of the enterprise with foreign investments and the enterprise itself are*

*subject to consideration in the USSR in courts or, upon agreement of the parties, in arbitration proceedings, inter alia, abroad, and in cases provided by legislative acts of the Union of SSR and the republics - in arbitrazh courts, economic courts and others."*

5.45.    Lezing van deze beide leden maakt duidelijk dat artikel 43 onderscheid maakt tussen twee typen geschillen. Op het voetspoor van de deskundige Asoskov is de rechtbank van oordeel dat het eerste lid betrekking heeft op investeringsgeschillen *"within the strict meaning of this term"*. Daarbij gaat het om geschillen die voortvloeien uit de uitoefening van publiekrechtelijke bevoegdheden, ofwel soeverein overheidshandelen (deskundigenbericht Asoskov, 73). Dit type geschillen moet worden voorgelegd aan de Russische gerechten, *tenzij* een andere procedure is voorzien bij een internationaal verdrag van de Russische Federatie. Het tweede lid van artikel 43 heeft betrekking op investeringsgeschillen tussen verschillende entiteiten, waaronder ondernemingen onderling en ondernemingen en Russische staatsorganen, waarbij deze laatste handelen in de hoedanigheid van een private partij *("acting as a party to relationships regulated by civil legislation"*). Dit type geschillen moet – voor zover van belang – worden beslist door Russische gerechten *of* in arbitrage indien daarin is voorzien bij overeenkomst. Kortom, ten aanzien van het eerste type geschillen wijst artikel 43 lid 1 van de Grondbeginselenwet de Russische rechter aan als de bevoegde rechter en is arbitrage alleen bij verdrag mogelijk, terwijl het tweede lid wel een uitdrukkelijke voorziening biedt voor arbitrage naast reguliere rechtspraak indien de betrokken partijen dat overeenkomen.

5.46.    Ook artikel 9 van de Wet inzake de Buitenlandse Investeringen 1991 maakt onderscheid tussen twee typen geschillen. Daarvoor gelden verschillende regimes van geschillenbeslechting.

Lid 1 bepaalt: *"Investment disputes, including disputes over the amount, conditions and procedure of the payment of compensation, shall be resolved by the Supreme Court of the RSFSR or the Supreme Arbitrazh Court of the RSFSR, unless another procedure is established by an international treaty in force in the territory of the RSFSR."*

Lid 2 bepaalt: *"Disputes of foreign investors and enterprises with foreign investments against RSFSR State bodies, disputes between investors and enterprises with foreign investments involving matters relating to their operations, as well as disputes between participants of an enterprise with foreign investments and the enterprise itself shall be resolved by the RSFSR courts, or, upon agreement of the parties, by an arbitral tribunal, or, in cases specified by the laws, by authorities authorized to consider economic disputes."*

5.47.    Ook al komen de bewoordingen van dit artikel 9 niet letterlijk overeen met die van artikel 43 van de Grondbeginselenwet, een vergelijking van de beide bepalingen lijkt uit te wijzen dat artikel 9 op dezelfde uitgangspunten berust als die van artikel 43. Ook artikel 9 lid 2 heeft betrekking op zowel geschillen tussen buitenlandse investeerders en staatsorganen, als geschillen tussen buitenlandse investeerders en andere ondernemingen – welke laatste categorie geschillen per definitie civielrechtelijk van aard is –, terwijl, evenals in artikel 43 lid 2, arbitrage naast reguliere rechtspraak mogelijk is indien partijen dat zijn

overeengekomen *("or, upon agreement by the parties")*. Ook al is in artikel 9 lid 2, anders
dan in artikel 43 lid 2, niet uitdrukkelijk bepaald dat dat artikellid uitsluitend ziet op
gevallen waarin de overheid in de hoedanigheid van een private partij handelt, dit
toepassingsbereik lijkt daarin, gezien de in artikel 9 lid 1 beschreven geschillen en de
context van die bepaling, wel besloten te liggen. Artikel 9 lid 1 lijkt op zijn beurt aan te
sluiten bij artikel 43 lid 1 en wijst uitdrukkelijk de reguliere Russische gerechten als
bevoegde instanties aan, met de toevoeging dat van dit uitgangspunt alleen door een
internationaal verdrag kan worden afgeweken *("unless another procedure is established by
an international treaty in force")*.

5.48.    Dat met artikel 9 eenzelfde onderscheid is beoogd als met artikel 43
Grondbeginselenwet, vindt steun in het deskundigenbericht van Asoskov (paragrafen 75 en
volgende) en de door hem aangehaalde Russische doctrine. Artikel 9 lid 1, dat volgens
Asoskov betrekking heeft op (civielrechtelijke) geschillen die voortkomen uit soeverein
overheidshandelen dat veelal bestaat in onteigening van buitenlandse investeringen, wordt
wel in samenhang gezien met artikel 7 lid 3 van de Wet inzake de Buitenlandse
Investeringen van 1991. Dit lid bepaalt: *"Decisions of governmental bodies on
expropriation of foreign investments may be contested in the RSFSR courts."* Deze bepaling
duidt erop dat publiekrechtelijke geschillen met betrekking tot onteigening uitsluitend door
de Russische rechter kunnen worden beslist. In zoverre deelt de rechtbank dus de visie van
de Russische Federatie. Voor het niet nader toegelichte betoog van gedaagden dat de
woorden *"may be appealed against"* weliswaar duiden op de mogelijkheid om dergelijke
geschillen voor te leggen aan de Russische rechter maar dat een andere, alternatieve
rechtsgang, niet wordt uitgesloten, is geen steun te vinden in de tekst van artikel 7 lid 3.
Volgens Asoskov kan een op artikel 7 lid 3 gestoelde vordering uitmonden in een in artikel
9 lid 1 bedoelde procedure, waarin vergoeding van de door de onteigeningsmaatregelen
veroorzaakte schade kan worden gevorderd. Asoskov bevestigt dat tegenover de hiervoor
beschreven geschillen die voortvloeien uit publiekrechtelijke rechtsbetrekkingen, de in
artikel 9 lid 2 bedoelde investeringsgeschillen staan die voortvloeien uit civielrechtelijke
rechtsbetrekkingen.

5.49.    In het door Asoskov weergegeven citaat van B.N. Toporin in *Russian Law and
Foreign Investments*, bladzijde 30 (1995) is dit onderscheid onderschreven en als volgt
aangeduid (deskundigenbericht Asoskov, 78):

> *"[Article 9] of the Law on Foreign Investments in the RSFSR divided disputes with
> the participation of foreign investors into two groups. One group comprised
> investment disputes as such, including the disputes on the issue of the amount,
> terms and procedure of payment of compensation in case of nationalization or
> confiscation. (...) The other group comprised disputes related to economic activity
> of the enterprises with foreign investments."*

5.50.    De omschrijving van de investeringsgeschillen in artikel 9 lid 1 komt overeen met
wat R. Nagapetyanys in *Treaties for the Promotion and Reciprocal of Investments/Foreign
Trade,* nr. 5, bladzijde 14 (1991) heeft geschreven over de praktijk van
investeringsverdragen ten tijde van de totstandkoming van de wet van 1991
(deskundigenbericht Asoskov, noot 54):

C/09/477160 / HA ZA 15-1, C/09/477162 / HA ZA 15-2 en          50
C/09/481619 / HA ZA 15-112
20 april 2016

> *"In treaties for the protection of investments that the USSR concludes with foreign*
> *States, the USSR gives its consent to the consideration [of investment disputes] in*
> *international arbitral tribunals. The scope of such disputes is limited to civil law*
> *issues only (primarily, determination of the amount of compensation and the*
> *procedure for its payment in the event of nationalization of investments and*
> *transfer of profits and other payments due to the investor)."*

5.51.     Op grond van de hier vermelde overwegingen komt de rechtbank tot de conclusie
dat artikel 9 lid 1 betrekking heeft op (civielrechtelijke) geschillen die voortvloeien uit
rechtsbetrekkingen tussen buitenlandse investeerders en de Russische Federatie waarin het
publiekrechtelijke karakter overheerst. Het toepassingsbereik van artikel 9 lid 2 is
daarentegen beperkt tot investeringsgeschillen waarin het civielrechtelijke karakter
overheerst. Dit sluit aan bij het in 5.36 en volgende van dit vonnis beschreven onderscheid
dat de Russische rechtspraak en doctrine maakt. Het Scheidsgerecht heeft dit onderscheid
niet onder ogen gezien. Het heeft in de Interim Awards volstaan met de weergave van
artikel 9 lid 2 en heeft daaraan de conclusie verbonden dat geschillen tussen een
investeerder en een staat arbitrabel zijn op grond van Russisch recht. Dit oordeel acht de
rechtbank niet juist. Zoals overwogen, hangt de Arbitrage samen met de eerder beschreven
handelwijze van de Russische Federatie, die in de visie van gedaagden een schending van
artikel 13 (en artikel 10) ECT oplevert. De Arbitrage heeft dus betrekking op een geschil dat
voortvloeide uit een publiekrechtelijke rechtsbetrekking en die strekte tot vergoeding van
door het overheidshandelen veroorzaakte schade. Die vaststelling brengt mee dat de
mogelijkheid van arbitrage niet, zoals het Scheidsgerecht heeft gedaan, wordt bepaald door
artikel 9 lid 2, maar juist door het eerste lid van deze bepaling. Aangezien artikel 9 lid 1 de
rechtsgang naar de Russische rechter voor de civielrechtelijke geschillen die voortvloeien
uit rechtsbetrekkingen met een publiekrechtelijk karakter vooropstelt en een andere wijze
van geschilbeslechting slechts mogelijk maakt indien een verdrag daarin voorziet, biedt deze
bepaling geen zelfstandige wettelijke basis voor arbitrage tussen gedaagden en de Russische
Federatie.

*Artikel 10 Wet inzake de Buitenlandse Investeringen 1999*

5.52.     Het Scheidsgerecht heeft zijn bevoegdheid voorts gebaseerd op artikel 10 van de
Wet inzake de Buitenlandse Investeringen 1999. Dit artikel, dat geen onderscheid maakt
tussen verschillende categorieën van geschillen, luidt als volgt:

> *"A dispute of a foreign investor arising in connection with its investments and*
> *business activity conducted in the territory of the Russian Federation shall be*
> *resolved in accordance with international treaties of the Russian Federation and*
> *federal laws in courts, arbitrazh courts or through international arbitration*
> *(arbitral tribunal)."*

5.53.     Het Scheidsgerecht heeft geen afzonderlijke overwegingen gewijd aan de betekenis
van artikel 10. Ook ten aanzien van deze bepaling heeft het Scheidsgerecht volstaan met het
oordeel dat op grond daarvan geschillen tussen een investeerder en een staat, zoals het
onderhavige geschil, arbitrabel zijn. De rechtbank deelt ook dit oordeel niet. Daartoe is het
volgende redengevend.

5.54.    Het deskundigenbericht van Asoskov en door hem genoemde verwijzingen maken
duidelijk dat in de Russische literatuur onderscheid wordt gemaakt tussen drie typen
wetsbepalingen. Zo heeft S.S. Alexeev in *General Theory of Law* (1982) de volgende
beschrijving gegeven (deskundigenbericht Asoskov, 84):

> *"Elements of a legal provision can be set out using three techniques: direct,
> referential, and blanket. Depending on the above, legal provisions can be
> distinguished accordingly: direct, referential and blanket. In the case of a direct
> provision, all elements of the provision are directly set out in an article of the
> regulatory act. In the case of a referential provision, certain elements of the
> provision are not set out directly in the article; the article itself provides a
> reference to another provision containing the required instructions. This technique
> is used to establish connections between parts of a particular set of rules, and in
> order to avoid repetitions. In the case of a blanket provision, certain elements of
> the provision are not set out directly, and its missing elements are not compensated
> for by some clearly referenced provision, but rather by rules of a certain kind that
> can evolve with time. In other words, the provision contains an 'empty blank,' a
> reference to a certain type of rule."*

5.55.    Eenzelfde classificatie is beschreven door N.I. Matuzov en A.V. Malko, in: *Theory
of State and Law: Treatise* (2004). The *"blanket mode"* is daarin omschreven als de "*mode,
where the article provides for a reference not to a specific article, but to a set of other
regulatory acts, rules (...)."* (deskundigenbericht Asoskov, 85). Ook M.N. Marchenko geeft
een soortgelijke omschrijving (deskundigenbericht Asoskov, 86).

5.56.    Artikel 10 kenmerkt zich hierdoor dat het een algemene verwijzing bevat naar
zowel verdragen als federale wetten die voor geschillen van buitenlandse investeerders een
bevoegdheid kunnen scheppen voor de reguliere rechter, voor "arbitrazh-gerechten" en voor
internationale arbitrage tussen buitenlandse investeerders en de Russische staat. Artikel 10
schept dus geen directe wettelijke basis voor arbitrage ten aanzien van geschillen over
verplichtingen van Deel III van de ECT, maar maakt de mogelijkheid van arbitrage
afhankelijk van het bestaan van een daartoe strekkende voorziening in verdragen en federale
wetten. Met de Russische Federatie is de rechtbank dan ook van oordeel dat artikel 10 het
karakter heeft van een *"blanket provision"* of – in de Nederlandse terminologie –
schakelbepaling. Deze uitleg van artikel 10 strookt met de door Asoskov genoemde
opvattingen in de Russische doctrine. Zo stellen I.Z. Farkhudinov, A.A. Danelian en M.Sh.
Magomedov in *National Regulation of Foreign Investments in Russia* (2013) vast:

> *"However, unfortunately, many of its provisions [provisions of the 1999 law] are
> of a declaratory or blanket nature only and do not add anything to the regulatory
> treatment of foreign investments. Instead of provisions that are empty in substance,
> the Law should include rules that would provide efficient protection for foreign
> investments"* (deskundigenbericht Asoskov, 91).

5.57.    Meer specifiek hebben deze auteurs ten aanzien van artikel 10 opgemerkt: *"In
substance, it makes the investor's right to resolution of its dispute conditional upon the
existence of an international treaty or relevant provision in a federal law."*
(deskundigenbericht Asoskov, 92). M.M. Boguslavksy beschrijft artikel 10 als "*too generic*"

C/09/477160 / HA ZA 15-1, C/09/477162 / HA ZA 15-2 en
C/09/481619 / HA ZA 15-112
20 april 2016

52

(*Legal Regulation of Foreign Trade*, 2001, deskundigenbericht Asoskov, 93), terwijl S. Ripinsky uit de wet van 1999 afleidt dat "*[t]he Law does not provide for investor-State arbitration*" (*Commentaries on Selected Model Investment Treaties*, hoofdstuk 14: Russia, 2013, dagvaardingen onder 230, noot 274).

5.58.    De rechtbank komt op grond van het voorgaande tot het oordeel dat ook artikel 10 van de Wet inzake de Buitenlandse Investeringen 1999 geen afzonderlijke wettelijke basis biedt voor beslechting van geschillen tussen een investeerder en een staat door internationale arbitrage zoals is voorzien in artikel 26 ECT. De rechtbank volgt het Scheidsgerecht dan ook niet in het oordeel dat dergelijke geschillen, en dus ook het onderhavige geschil, arbitrabel zijn op grond van het Russische recht.

**De memorie van toelichting bij de ratificatiewet**

5.59.    Aan de door de rechtbank gegeven uitleg van de hier besproken artikelen 9 en 10 van de Wet inzake de Buitenlandse Investeringen, in de respectieve versies, doet niet af hetgeen de Russische regering in 1996 heeft vermeld in de memorie van toelichting ten behoeve van de beoogde ratificatie van de ECT. Gedaagden, volgens wie – in navolging van het Scheidsgerecht – voor de uitleg van deze wetsbepalingen grote betekenis toekomt aan deze toelichting, hebben daarbij met name het oog op de volgende drie passages:

> "*The provisions of the ECT are consistent with Russian legislation.*"

> "*The legal regime of foreign investments envisaged under the ECT is consistent with the provisions of the existing Law [...] on Foreign Investment in [Russia], as well as with the amended version of the Law currently being discussed in the State Duma*".

> [Het regime van de ECT voor buitenlandse investeringen] "*does not require the acknowledgement of any concessions or the adoption of any amendments to the abovementioned Law*".

5.60.    Naar het oordeel van de rechtbank heeft het Scheidsgerecht bij de beoordeling van de betekenis van de memorie van toelichting onvoldoende onderkend dat deze toelichting afkomstig was van de uitvoerende macht en er primair toe strekte de Doema, als onderdeel van de wetgevende macht, te bewegen tot ratificatie van de ECT. Nu het niet tot die ratificatie is gekomen, kan de opvatting van de uitvoerende macht (de regering) niet aan de wetgever worden toegeschreven en komt aan het regeringsstandpunt geen zelfstandige betekenis toe. Deze constatering dwingt er reeds toe (de relevantie van) de toelichting van regeringszijde met grote terughoudendheid te beoordelen. Dit geldt temeer nu de toelichting slechts in algemene bewoordingen ingaat op de verenigbaarheid van de ECT met Russische wetgeving. Zo is het arbitraal beding van artikel 26 ECT nergens expliciet vermeld. Bovendien volgt de rechtbank het in dit verband door de Russische Federatie ingenomen standpunt dat de opmerking van de regering dat (het regime van) de ECT in overeenstemming is met Russisch recht en "*does not require the acknowledgement of any concessions or the adoption of any amendments*" van Russische wetgeving, moet worden beschouwd tegen de achtergrond van de beoogde ratificatie. Of de ratificatie van de ECT en meer specifiek van artikel 26 aanpassing van Russische wetgeving zou vereisen, is echter

een andere vraag dan de vraag of de voorlopige toepassing van deze bepaling in overeenstemming is met Russisch recht. Deze laatste vraag is in de toelichting niet beantwoord.

5.61.    Om dezelfde reden kan voor de uitleg van de bedoelde artikelen 9 en 10 van de Wet op de Buitenlandse Investeringen geen betekenis toekomen aan de door het Scheidsgerecht vermelde uitingen van professor Yershov, die lid was van de Russische delegatie tijdens de ECT-onderhandelingen. Ook hij heeft overigens in overeenstemming met de memorie van toelichting slechts in algemene bewoordingen geconcludeerd dat *"under the ECT, Russia grants foreign investors an energy investment regime acceptable to them that does not require any concessions on Russia's part beyond the framework of current law".* Evenmin komt in dit verband gewicht toe aan een verklaring van de deskundige van de Russische Federatie professor Avakyian, die volgens het Scheidsgerecht tijdens zijn getuigenverhoor heeft bevestigd het eens te zijn met de inhoud van de memorie van toelichting van de regering. Nog daargelaten dat de rechtbank in het transcript van de zitting van 17 november 2008 een dergelijke uitspraak niet heeft kunnen terugvinden, heeft Avakyian beklemtoond dat de memorie van toelichting het standpunt van de Russische regering weergeeft en dat alleen de Doema kan bepalen of aanpassing van de Russische wetgeving is vereist.

5.62.    Veeleer geeft de door de Russische Federatie genoemde parlementaire geschiedenis van een groot aantal door haar gesloten en wél geratificeerde bilaterale investeringsverdragen steun aan het oordeel dat arbitrage voor geschillen als de onderhavige niet is voorzien in het Russische recht. Daarbij gaat het – zoals de Russische Federatie onweersproken heeft gesteld – om in totaal 57 investeringsverdragen die zijn geratificeerd. De Russische Federatie heeft onder meer gewezen (dagvaardingen, 232) op de parlementaire geschiedenis die betrekking heeft op de bekrachtiging van de *"Agreement between the Government of the Russian Federation and the Government of the Republic of Argentina on Encouragement and Reciprocal of Investments."* Daarin is onder meer het volgende vermeld:

> *"Considering that the Agreement contains provisions different from those provided by the Russian legislation, it is subject to ratification in accordance with clause 1a, 15 of the Federal Law (...) 'on International Treaties of the Russian Federation'."*

> *"The key issues by virtue of which the above Agreement is subject to ratification are as follows (...)"*

> *"the settlement in an international arbitration court of investment disputes between one Party and an investor of the Other Party, as well as disputes between the Parties concerning the interpretation and application of the Agreement (...)"*

> *"the Federal Law No. 1545-1 of July 4, 1991 'On Foreign Investment in the RSFRS' does not provide for a mechanism of settlement of such type of dispute by international arbitration".* (*explanatory note* van 25 oktober 1999)

5.63.    Ook in de toelichting van 8 april 2000 op het voorstel tot de bekrachtiging van een bilateraal investeringsverdrag tussen de Russische Federatie en de republiek Zuid-Afrika is

C/09/477160 / HA ZA 15-1, C/09/477162 / HA ZA 15-2 en     54
C/09/481619 / HA ZA 15-112
20 april 2016

te lezen dat *"the Agreement contains provisions different from those set forth in the Russian legislation"* en daarom *"subject [is] to ratification"* en dat de Wet inzake de Buitenlandse Investeringen 1991 geen *"mechanism of consideration"* bevat voor de behandeling in arbitrage van investeringsgeschillen tussen een buitenlandse investeerder en de Staat. In de toelichting op de bekrachtiging van een bilateraal investeringsverdrag tussen de Russische Federatie en Japan van 29 februari 2000 is eenzelfde passage te vinden over de Wet inzake de Buitenlandse Investeringen 1999 (dagvaardingen, 234).

5.64.     Deze toelichtingen geven steun aan het oordeel dat de Wet inzake de Buitenlandse Investeringen in de versies van 1991 en 1999 geen wettelijke voorziening bevat voor arbitrage in gevallen als bedoeld in artikel 26 ECT, zoals hier aan de orde is. De rechtbank verwerpt de door gedaagden verdedigde lezing die inhoudt dat uit deze toelichtingen slechts kan worden afgeleid dat de Wet inzake de Buitenlandse Investeringen geen specifiek mechanisme bevat voor arbitrage tussen buitenlandse investeerders en de Staat in die zin dat de wet geen specifieke regels en te volgen procedure bevat. Dit standpunt gaat uit van een te beperkte lezing van de toelichtingen. De weergegeven parlementaire toelichtingen laten zich niet anders begrijpen dan dat daarmee is bedoeld dat de versies van de Wet inzake de Buitenlandse Investeringen van 1991 en die van 1999 in het geheel geen wettelijke grondslag bevatten voor investeringsarbitrage als die onderhavige. Als arbitrage wel zou zijn toegestaan op grond van deze wet, zouden de arbitragebepalingen in de door de Russische Federatie gesloten bilaterale investeringsverdragen ook niet zijn aangewezen als *"provisions different from those provided by the Russian legislation"* en zou ratificatie niet nodig zijn geacht. Dat, zoals gedaagden nog hebben betoogd, mogelijk niet alle toelichtingen op de geratificeerde investeringsverdragen uitdrukkelijk ingaan op de verschillen tussen de daarin vervatte arbitrageclausules en Russisch recht, doet niet af aan de duidelijke bewoordingen in de andere toelichtingen.

**Tussenconclusie over artikel 26 ECT**

5.65.     De conclusie uit het voorgaande is dat de arbitrageclausule van artikel 26 ECT geen wettelijke basis heeft in het Russisch recht en zich niet verdraagt met de uitgangspunten die in dat recht zijn neergelegd.

**Gebondenheid door ondertekening of ratificatie?**

*Algemeen*

5.66.     Met het voorgaande is nog geen definitief antwoord gegeven op de vraag of artikel 26 ECT op voorlopige basis kon worden toegepast op grond van de ondertekening of dat voor de voorlopige toepassing goedkeuring door de Russische wetgever nodig was. Het Scheidsgerecht lijkt dat te hebben onderkend door zich in onderdeel 379 van de Interim Awards de vraag te stellen of de ondertekening van een verdrag dat een clausule met betrekking tot de voorlopige toepassing bevat, voldoende is om vast te stellen dat de Russische Federatie heeft ingestemd met internationale arbitrage van geschillen die voortvloeien uit de ECT. Het Scheidsgerecht heeft deze vraag bevestigend beantwoord. In de kern luidt zijn oordeel dat de artikelen 2 en 6 FLIT meebrengen dat de Russische Federatie en de andere Ondertekenende Partijen met de ondertekening van de ECT, zij het voorlopig en niettegenstaande artikel 39 ECT, hebben ingestemd met voorlopige

C/09/477160 / HA ZA 15-1, C/09/477162 / HA ZA 15-2 en                    55
C/09/481619 / HA ZA 15-112
20 april 2016

gebondenheid aan het Verdrag en dus ook aan internationale arbitrage als geregeld in artikel
26 ECT (Interim Awards, 382). Voor dit oordeel heeft het Scheidsgerecht bovendien
betekenis toegekend aan artikel 11 FLIT, waaruit volgt dat het aan de uitvoerende macht is
om te besluiten een verdrag te ondertekenen. Ook heeft het Scheidsgerecht verwezen naar
zijn eerdere oordeel over de vraag of het principe van de voorlopige toepassing is toegestaan
op grond van de wetgeving van de Russische Federatie, in welk verband het artikel 23 lid 1
FLIT als grondslag voor die voorlopige toepassing heeft genoemd (383). Het Scheidsgerecht
is tot de conclusie gekomen dat er in de ogen van de partijen bij de ECT omstandigheden
moeten zijn op grond waarvan een staat waarvoor de ECT niet "in werking is", desondanks
heeft ingestemd met gebondenheid aan de voorwaarden ervan (385). De rechtbank zal dit
oordeel hierna bespreken. Daarbij betrekt zij de bepalingen van de FLIT, ook al is deze wet
– met uitzondering van artikel 23, waaraan door een Presidentiële Instructie terugwerkende
kracht is toegekend – pas op 21 juli 1995, dus zes maanden na de ondertekening van de ECT
door Davydov, in werking getreden.

*De artikelen 2, 6 en 23 FLIT*

5.67.    De strekking van de FLIT volgt uit artikel 1 lid 1 van de FLIT:

> *"The present Federal Law determines the procedure for the conclusion,*
> *fulfillment, and termination of international treaties of the Russian Federation.*
> *International treaties of the Russian Federation shall be concluded, fulfilled, and*
> *terminated in accordance with generally-recognized principles and norms of*
> *international law, the provisions of the treaty itself, the Constitution of the Russian*
> *Federation, and the present Federal Law."*

5.68.    De artikelen 2 en 6 van de FLIT, die al eerder in dit vonnis zijn weergegeven,
luiden (in de door de Russische Federatie overgelegde Nederlandse vertaling), voor zover
relevant:

***Artikel 2 Gebruik van termen***

> *Voor de toepassing van deze Federale Wet: (. . .)*
> *b) [betekenen] "ratificatie", "goedkeuring", "aanvaarding" en "toetreding" (...)*
> *in elk geval een manier waarop de Russische Federatie kenbaar kan maken in te*
> *stemmen met gebondenheid aan een internationaal verdrag;*
> *c) [betekent] "ondertekening" (...) ofwel een fase in de totstandkoming van een*
> *verdrag ofwel een manier waarop de Russische Federatie instemming met*
> *gebondenheid aan een internationaal verdrag kenbaar kan maken, indien het*
> *verdrag bepaalt dat ondertekening dit gevolg zal hebben, of indien anderszins is*
> *vastgesteld dat de Russische Federatie en de andere onderhandelende Staten zijn*
> *overeengekomen dat ondertekening dit gevolg moet hebben, of indien de intentie*
> *van de Russische Federatie om dat gevolg aan ondertekening te geven blijkt uit de*
> *volmachten van haar vertegenwoordiger of is uitgedrukt tijdens de*
> *onderhandelingen;*
>
> *(. . .)*

***Artikel 6 Het kenbaar maken van instemming van de Russische Federatie met
gebondenheid aan een internationaal verdrag***

> *1. Instemming van de Russische Federatie met gebondenheid aan een
> internationaal verdrag kan kenbaar worden gemaakt door middel van:
> ondertekening van het verdrag; (...)*
> *ratificatie van het verdrag;*
> *2. Besluiten om instemming te verlenen voor gebondenheid van de Russische
> Federatie aan een internationaal verdrag dienen te worden genomen door
> staatsorganen van de Russische Federatie in overeenstemming met hun
> bevoegdheid, zoals gedefinieerd door de Grondwet van de Russische Federatie,
> deze Federale Wet en andere wetgeving van de Russische Federatie.*

5.69.    Artikel 6 FLIT is gebaseerd op artikel 11 WVV, waarin de verschillende
mogelijkheden zijn beschreven waarmee een staat uitdrukking kan geven aan (zijn
instemming met) gebondenheid aan een verdrag. Artikel 11 WVV vermeldt, evenals in
navolging daarvan artikel 6 FLIT, onder meer de mogelijkheden van ondertekening,
bekrachtiging, aanvaarding, goedkeuring en toetreding. Deze wijzen van het uiten van
instemming zijn uitgewerkt in de artikelen 12 en 14 WVV. Artikel 12 WVV betreft de
mogelijkheid van ondertekening en bepaalt dat instemming van een staat met gebondenheid
aan een verdrag tot uitdrukking wordt gebracht door de ondertekening door de
vertegenwoordiger van deze Staat, indien het verdrag erin voorziet dat de ondertekening dit
gevolg heeft. In deze lijn bepaalt artikel 2 onder *c* FLIT uitdrukkelijk dat ondertekening van
een verdrag alleen dan kan worden uitgelegd als toestemming van de Russische Federatie
om door een verdrag gebonden te worden "*indien het verdrag bepaalt dat ondertekening dit
gevolg zal hebben*". Deze bepalingen laten het dus aan de opstellers van een verdrag over
welke gevolgen ondertekening kan meebrengen. Ook artikel 14 WVV bepaalt dat de
instemming van een staat aan gebondenheid tot uitdrukking wordt gebracht door
bekrachtiging, indien het verdrag daarin voorziet.

5.70.    Ook artikel 23 lid 1 FLIT is ontleend aan een bepaling uit het WVV, te weten
artikel 25. Ingevolge deze bepalingen kan een verdrag of een deel daarvan voorlopig worden
toegepast in afwachting van zijn inwerkingtreding indien het verdrag dat bepaalt.

5.71.    Anders dan het Scheidsgerecht klaarblijkelijk heeft geoordeeld, verschaffen noch
de hiervoor genoemde bepalingen van de FLIT, noch die van het WVV, een zelfstandige –
los van de verdragstekst van de ECT bestaande – grondslag voor een ongelimiteerde
voorlopige gebondenheid aan het Verdrag. Zowel artikel 2 onder *c* FLIT (en artikel 12
WVV) als artikel 23 lid 1 FLIT (en artikel 25 WVV) verwijzen voor de betekenis van de
ondertekening van een verdrag en voor de mogelijkheid – en dus ook de reikwijdte – van de
voorlopige toepassing uitdrukkelijk naar datgene wat op concreet verdragsniveau daarover
wordt bepaald. Anders gezegd: of een ondertekenende staat op basis van een voorlopige
toepassing gebonden is aan een verdrag, wordt dus niet bepaald door de algemene
bepalingen van de FLIT en het WVV, maar door het verdrag zelf. Om dezelfde reden biedt
ook artikel 11 FLIT, dat uitsluitend betrekking heeft op het tot ondertekening bevoegde
orgaan, geen zelfstandige grond voor de voorlopige toepasselijkheid van een
verdragsbepaling.

C/09/477160 / HA ZA 15-1, C/09/477162 / HA ZA 15-2 en                  57
C/09/481619 / HA ZA 15-112
20 april 2016

*Artikel 39 ECT*

5.72.    In artikel 39 ECT is – in overeenstemming met de terminologie van artikel 14
WVV en artikel 6 FLIT – de bekrachtiging, aanvaarding of goedkeuring aangewezen als
instrument voor de inwerkingtreding van het Verdrag. De inwerkingtreding kan dus niet
plaatsvinden door ondertekening. Dat staat ook niet ter discussie. Ook voor het
Scheidsgerecht is, gezien zijn overwegingen in 382 en 385 van de Interim Awards,
kennelijk uitgangspunt geweest dat de ondertekening door Davydov niet de in artikel 39
ECT vereiste ratificatie kan vervangen en slechts betrekking heeft op de voorlopige
toepassing van de ECT. Door aan de ondertekening van de ECT niettemin het effect toe te
kennen van een ongeclausuleerde instemming van de Russische Federatie met een
voorlopige gebondenheid aan het Verdrag en dus ook aan artikel 26 ECT, heeft het
Scheidsgerecht onvoldoende onder ogen gezien dat de reikwijdte van de ondertekening
uitdrukkelijk was beperkt door de Limitation Clause van artikel 45. Zoals hiervoor is
overwogen, vloeit uit artikel 45 ECT, in de uitleg die de rechtbank voor juist houdt, immers
voort dat de mogelijkheid van de voorlopige toepassing is toegespitst op en afhangt van de
verenigbaarheid van afzonderlijke verdragsbepalingen met het nationale recht van een
Ondertekenende Partij. Uit de verdragstekst volgt dus dat de Russische Federatie door de
ondertekening van de ECT uitsluitend (voorlopig) gebonden was aan de arbitrageclausule
van artikel 26 voor zover deze clausule verenigbaar was met Russisch recht. De genoemde
algemene bepalingen van de FLIT zijn dan ook niet redengevend voor het door het
Scheidsgerecht gegeven oordeel. Met de uitleg die het Scheidsgerecht daaraan heeft
gegeven, heeft het in wezen elke betekenis aan de Limitation Clause en de in artikel 39 ECT
neergelegde eis van bekrachtiging ontnomen. Goed beschouwd brengt dit oordeel mee dat
aan iedere verdragsbepaling, ook als de voorlopige toepassing daarvan zich niet verdraagt
met de nationale (grond)wetgeving, volledige werking toekomt. Deze visie is alleen
begrijpelijk indien de Limitation Clause als een 'alles of niets"-bepaling wordt beschouwd.
Deze interpretatie is echter, zoals reeds is uiteengezet, niet die van de rechtbank.

*Voorlopige conclusie ten aanzien van de gebondenheid door ondertekening en ratificatie*

5.73.    Met zijn oordeel heeft het Scheidsgerecht de in 5.66 geformuleerde vraag niet aan
de hand van het juiste toetsingskader beantwoord. De vraag of de arbitrageclausule op
voorlopige basis zonder ratificatie toepassing kon vinden, moet, zoals de Russische
Federatie terecht heeft betoogd, primair worden beantwoord aan de hand van de bepalingen
uit de Russische Grondwet van 1993. De Russische Federatie heeft in dit verband, kort
gezegd, betoogd dat het beginsel van de machtenscheiding dat daarin ligt verankerd,
meebrengt dat het Russische Parlement (de Doema en de Constitutionele Raad samen)
verdragen die het Russische recht aanvullen of wijzigen door het aannemen van een federale
wet moet bekrachtigen. Volgens de Russische Federatie gaat het bij de ECT en in het
bijzonder bij artikel 26 ECT om een dergelijk geval en kon deze bepaling niet voorlopig
worden toegepast zonder ratificatie.

C/09/477160 / HA ZA 15-1, C/09/477162 / HA ZA 15-2 en                                58
C/09/481619 / HA ZA 15-112
20 april 2016

---

**Het beginsel van de machtenscheiding**

*Algemeen*

5.74.    Het Scheidsgerecht heeft zich – evenmin als gedaagden in deze
vernietigingsprocedure – niet specifiek uitgesproken over het beginsel van de
machtenscheiding en de relevantie daarvan voor de mogelijkheid van de voorlopige
toepassing van artikel 26 ECT. Zij zijn uitsluitend ingegaan op de betekenis van artikel 15
lid 4 Grondwet, waarbij aantekening verdient dat het Scheidsgerecht in dit verband alleen de
– uit zijn uitleg van artikel 45 ECT voortvloeiende – vraag of het principe van de voorlopige
toepassing in overeenstemming is met de Russische wetgeving, onder ogen heeft gezien. De
rechtbank zal zich bij de vaststelling van de reikwijdte en de relevantie van het beginsel van
de machtenscheiding – evenals partijen – baseren op het Russische recht zoals dat is
vastgelegd in de Grondwet en doorwerkt in andere wetgeving. Daarbij komt ook artikel 15
lid 4 Grondwet ter sprake.

*De Russische Grondwet*

5.75.    De volgende bepalingen van de Grondwet zijn in dit kader relevant. In artikel 10
Grondwet is het principe van de machtenscheiding neergelegd, waarmee tot uitdrukking is
gebracht dat de wetgevende, de uitvoerende en de rechtsprekende macht elk onafhankelijk
zijn:

> *"State power in the Russian Federation shall be exercised on the basis of its
> division into legislative, executive and judicial. The legislative, executive and
> judicial authorities shall be independent."*

5.76.    De suprematie van de Grondwet boven federale wetten volgt uit artikel 15 lid 1
Grondwet:

> *"The Constitution of the Russian Federation shall have the supreme juridical force,
> direct application (...). Laws and other legal acts adopted in the Russian Federation
> shall not contradict the Constitution of the Russian Federation."*

5.77.    Artikel 15 lid 4 Grondwet bevat de volgende regel:

> *"The universally-recognised norms of international law and international treaties
> and agreements of the Russian Federation shall be a component part of its legal
> system. If an international treaty or agreement of the Russian Federation
> establishes other rules than those envisaged by law, the rules of the international
> agreement shall be applied."*

5.78.    In artikel 94 Grondwet is bepaald dat het Federale Parlement het wetgevende
orgaan is van de Russische Federatie. Op grond van artikel 106 aanhef en onder *d* Grondwet
moeten federale wetten inzake de *"ratification and denunciation of international treaties
and agreements of the Russian Federation"* door het Federale Parlement worden
aangenomen.

5.79.    De Russische Federatie heeft in de Arbitrage deskundigenberichten overgelegd om
haar standpunt kracht bij te zetten. Ook gedaagden hebben in die procedure
deskundigenberichten in het geding gebracht. Evenals bij de uitleg van het materiële
Russische recht is gebeurd, zal de rechtbank bij de vaststelling van de inhoud van de
Grondwet en de daarmee samenhangende wetgeving gebruikmaken van de door partijen
ingebrachte deskundigenberichten en van door hen genoemde commentaren in juridische
handboeken. Aan de zijde van de Russische Federatie gaat het om deskundigenberichten
van de hand van onder meer:

-    Dr. Marat V. Baglay, aangeduid als *Doctor of law, Professor of constitutional law
     en voormalig rechter bij the Constitutional Court of the Russian Federation* (Expert
     Opinion On Provisional Application of International Treaties according to the
     Constitution of the Russian Federation, 26 februari 2006);
-    Prof. Suren A. Avakiyan, aamgeduid als *Doctor of Law, Head of the Department of
     Constitutional and Municipal Law of the Faculty of Law of the Moscow State
     University of M.V. Lomonosov* (Expert Opinion on the constitutional legal aspects
     of the conclusion and application of international treaties of the Russian Federation,
     21 februari 2006 en Expert Opinion van 29 juni 2006);
-    A. Nussberger, hoogleraar aan de Universiteit van Keulen en directeur van het
     *Institute of Eastern Law* (Opinion Concerning the Provisional Application of the
     Energy Charter Treaty by the Russian Federation van 17 januari 2007).

Aan de zijde van gedaagden betreft het allereerst een deskundigenbericht van 29 juni 2006
van V. Gladyshev, advocaat in Moskou en eerder werkzaam bij het Russische Ministerie
van Buitenlandse Zaken. Geen van de overige door gedaagden ingebrachte
deskundigenberichten heeft betrekking op de specifieke relevantie van het Russische
constitutionele recht. De rechtbank zal die berichten daarom niet bij haar oordeel betrekken.

5.80.    Over het beginsel van de machtenscheiding en de implicaties daarvan, hebben
verschillende deskundigen zich uitgesproken. Zo heeft Baglay daarover geschreven:

> *"The Russian Parliament is the only body possessing legislative power in the
> Russian Federation, no other federal state body is entitled to adopt laws or other
> statutory acts having the force of law. Ratification of international treaties of the
> Russian Federation also falls within the exclusive competence of the Parliament.
> The Constitution does not authorize other branches of power to give consent in the
> name of the Russian Federation to be bound by an international treaty, if the treaty
> is subject to ratification."* (opinie Baglay, bladzijde 3)

5.81.    Avakiyan heeft opgemerkt dat het uitgangspunt van de scheiding der machten
meebrengt dat elk internationaal verdrag dat een Russische wettelijke bepaling buiten
werking stelt, verandert of nieuw recht vormt, geratificeerd moet worden voordat het
toegepast kan worden:

> *"The principle of separation of powers as it applies to international treaties means
> the following: some bodies of state power, in accordance with the interest of the
> state, are vested with the authority to conduct negotiations and to sign treaties,
> while other bodies of state power, in accordance with the interest of the state, are
> vested with the authority to assess the signed treaties and to put them in effect on*

C/09/477160 / HA ZA 15-1, C/09/477162 / HA ZA 15-2 en          60
C/09/481619 / HA ZA 15-112
20 april 2016

> *the basis of constitutional requirements. Any treaty that annuls, modifies or adds*
> *any provisions to the Russian legislation must, under the principle of separation of*
> *powers, undergo the process of ratification in order to become effective."* (opinie
> Avakyian, bladzijde 4)

In artikel 86 van de Grondwet is bepaald dat de President van de Russische Federatie
bevoegd is onderhandelingen te voeren en internationale verdragen te ondertekenen.
Volgens Avakiyan heeft ook de Russische regering deze bevoegdheid, en wel op grond van
artikel 114 van de Grondwet voor zover die bevoegdheid is vastgelegd in een Federale wet.
Avakiyan maakt daarbij echter de volgende kanttekening:

> *"However, neither the President of het Russian Federation, nor the Government of*
> *the Russian Federation has the right to make a final determination in respect of an*
> *international treaty of a legislative nature. The process with respect to such*
> *treaties also involves the legislative power of the Russian Federation - The Federal*
> *Assembly".*

Hij verwijst naar de ratificatieprocedure op grond van de artikelen 105 en 106 van de
Grondwet (opinie Avakiyan, bladzijde 6).

5.82.    Ook Nussberger heeft melding gemaakt van de bevoegdheden van de President op
grond van artikel 86 van de Grondwet ten aanzien van de onderhandeling over en de
ondertekening van internationale verdragen. Zij heeft er echter op gewezen dat

> *"the roles of the Duma and the Council of the Federation, however, remain*
> *essential to international treaties requiring ratification. The Duma adopts a law on*
> *the ratification of a treaty if ratification is necessary."* (opinie Nussberger,
> bladzijde 18)

5.83.    De Russische Federatie heeft daarnaast verwezen naar Russische commentatoren
die onderschrijven dat op grond van de Russische Grondwet aan het Federale Parlement
exclusieve bevoegdheid toekomt om in te stemmen met de gebondenheid aan verdragen
(conclusie van repliek, 141, en de vindplaatsen in de noot onder 238).

5.84.    De aangehaalde deskundigen en commentatoren geven steun aan het door de
Russische Federatie ingenomen standpunt dat in het systeem van de Grondwet het Federale
Parlement een essentiële rol vervult bij het effectueren van internationale verdragen die een
afwijking vormen van de Russische wetgeving of deze aanvullen. De rechtbank neemt dit
standpunt over. De instemming met gebondenheid aan internationale verdragen kan – zeker
als een verdrag een afwijking of aanvulling van bestaand nationaal recht behelst – niet
anders worden beschouwd dan als de vorming van nieuwe wetgeving. De bevoegdheid
daartoe komt op grond van het beginsel van de machtenscheiding uitsluitend aan de
wetgever toe.

5.85.    In dit verband verdient opmerking dat, in overeenstemming met en als uitvloeisel
van het grondwettelijke beginsel van de machtenscheiding, in artikel 15 lid 1 FLIT – dat,
zoals gezegd, in werking is getreden kort na de ondertekening van de ECT – is bepaald dat
bepaalde verdragen, waaronder *"international treaties whose implementation requires*

*amendment of existing legislation or enactment of new federal laws, or that set out rules
different from those provided for by law"*, zijn onderworpen aan ratificatie. Op grond van
het tweede lid geldt het bekrachtigingsvereiste evenzeer *"if the parties have agreed to
subsequent ratification when concluding the international treaty"*. Hoewel de voormalige
Sovjet-Unie een andere staatsinrichting kende dan die welke sinds 1993 bestaat, bevatte de
voorganger van de FLIT, de Wet van de USSR van 6 juli 1978 *"on the Procedure for
Conclusion, Performance, and Denunciation of International Treaties of the USSR"*, in
artikel 12 een soortgelijk bekrachtigingsvereiste als artikel 15 FLIT. Dit vereiste was onder
meer van toepassing op *"treaties providing for rules different from those contained in the
USSR legislative acts"* evenals op *"international treaties of the USSR (...) where the
contracting parties have agreed on subsequent ratification when concluding the treaty"*.

5.86.    Met betrekking tot de betekenis van artikel 15 lid 1 FLIT is nog vermeldenswaard
het commentaar van D.A. Shilyantsev in *Commentary to the Federal law on international
treaties of the Russian Federation* (2006) over dit artikel (ook weergegeven in onderdeel
141 van de conclusie van repliek):

> *"(...) the consent of the Russian Federation to be bound by an international treaty
> containing rules different from those provided for by law may be expressed only in
> the form of a federal law. This rule serves as a guarantee of the normal functioning
> of the separation of powers principle, because neither the President of the Russian
> Federation, nor the Government of the Russian Federation, much less a federal
> agency, is authorizes to take a decision on the consent of the Russian Federation to
> be bound by an international treaty establishing rules different from those provided
> for by law, or implementation of which requires amendment to existing or
> adaptation of new federal laws."*

5.87.    Het beginsel van de scheiding der machten en het daaruit voortvloeiende vereiste
van goedkeuring door het Russische Parlement van verdragen vinden ook hun weerslag in
artikel 15 lid 4 Grondwet. Op grond van deze bepaling maken normen van internationaal
recht en verdragen deel uit van het nationale recht. Indien een verdrag regels bevat die
afwijken van het nationale recht, prevaleert het verdrag. Ofschoon deze bepaling voor een
belangrijk deel een conflictregel behelst en niet primair antwoord geeft op de vraag of een
arbitrageclausule zoals die van artikel 26 ECT ratificatie verlangt, beklemtonen de
deskundigen waarop de Russische Federatie zich heeft beroepen het belang van de
wetgevende bevoegdheden van het Federale Parlement bij de uitleg van deze bepaling.
Volgens Baglay en Avakiyan moeten internationale verdragen die op grond van artikel 15
lid 4 van de Grondwet worden opgenomen in het Russische rechtssysteem, eerst het
ratificatieproces hebben doorlopen. De opvatting van Baglay houdt in:

> *"It follows that international treaties can be an integral part of the Russian legal
> system and have priority over federal laws only after duly becoming effective.
> International treaties that are not subject to ratification shall have no priority over
> the federal law. Otherwise in case of a conflict an international treaty not
> approved by the Parliament would have had priority over federal laws."* (opinie
> Baglay, bladzijde 2)

C/09/477160 / HA ZA 15-1, C/09/477162 / HA ZA 15-2 en                    62
C/09/481619 / HA ZA 15-112
20 april 2016

5.88.    Avakiyan heeft hierover geschreven:

>    *"The rules referred to above are important because they contain a profound
>    constitutional logic: if international treaties become an integral part of Russia's
>    legal system (Article 15.4 of the Constitution), it is essential to protect the integrity
>    of this system, and to achieve this, it is necessary to ensure that it is amended and
>    supplemented by the joint integral will of all bodies of the state within the system of
>    separation of powers in the Russian Federation."* (opinie Avakiyan, bladzijde 7)

5.89.    Gladyshev, de deskundige op wie gedaagden zich beroepen, is als enige een andere
mening toegedaan over artikel 15 lid 4 van de Grondwet:

>    *"All treaties which are internationally binding on the Russian Federation enjoy, by
>    virtue of Article 15(4) of the Russian Constitution, absolute and unconditional
>    precedence over domestic Russian laws."* (opinie Gladyshev, bladzijde 6)
>    (…)
>    *"Importantly, contemporary Russian authors clearly have taken the position that
>    Article 15(4) of the Russian Constitution extends not only to ratified treaties, but to
>    all other treaties applied by the Russian Federation."* (opinie Gladyshev, bladzijde
>    17)

5.90.    Nussberger heeft het standpunt van Gladhysev weersproken. Weliswaar heeft zij
erkend dat *"Article 15(4) does not explicitly specify the conditions under which
international treaties prevail over domestic law"* (opinie Nussberger, bladzijde 29), maar zij
heeft er ook op gewezen dat de meerderheid van de Russische rechtsgeleerden van mening
is dat op grond van artikel 15 lid 4 van de Grondwet alleen geratificeerde verdragen binnen
het Russisch rechtssysteem kunnen worden toegepast en boven Federale wetten kunnen
worden gesteld:

>    *"The majority of Russian legal scholars argue that <u>only international treaties
>    ratified</u> on the basis of a parliamentary law can take precedence over other
>    parliamentary laws."* (opinie Nussberger, bladzijde 29; onderstreping rechtbank)

5.91.    De rechtbank onderschrijft de uitleg van artikel 15 lid 4 Grondwet die te lezen is in
de opinies van de deskundigen waarop de Russische Federatie zich heeft beroepen. Deze
uitleg vindt overigens ook steun in de door de Russische Federatie in onderdeel 135 van de
conclusie van repliek genoemde resoluties van 31 oktober 1995 en van 10 oktober 2003 van
het Russische Hooggerechtshof en 6 november 2014 van het Constitutionele Hof (zie
conclusie van repliek, 135). Een andere uitleg van artikel 15 lid 4 Grondwet zou mogelijk
maken dat niet door de wetgever goedgekeurde verdragen onderdeel vormen van het
Russische recht en bovendien daarmee strijdige wetgeving opzij kunnen zetten. Een
dergelijke uitleg is niet te rijmen met het beginsel van de machtenscheiding.

5.92.    In dit verband bespreekt de rechtbank nog het beroep van gedaagden op de
jurisprudentie van het Constitutionele Hof die inhoudt dat ook verdragen die op voorlopige
basis toepasselijk zijn, integraal onderdeel uitmaken van het Russische rechtssysteem
(conclusie van antwoord, 193). Dit uitgangspunt, dat eerder in dit vonnis, in 5.19, kort is
aangestipt, laat onverlet dat – zoals ook in dezelfde jurisprudentie van het Constitutionele

Hof tot uitdrukking is gebracht – een verdrag zoals de ECT de reikwijdte van de voorlopige toepassing kan beperken tot verdragsbepalingen die verenigbaar zijn met de Russische Grondwet en overige wet- en regelgeving. Ook deze jurisprudentie biedt dus geen grondslag voor een onbeperkte voorlopige toepassing van de bepalingen van de ECT.

5.93.      De hiervoor besproken grondwettelijke beperkingen brengen mee dat verdragen die een afwijking van of een aanvulling op nationaal Russisch recht vormen, niet op basis van de enkele ondertekening kunnen worden toegepast maar voorafgaande ratificatie verlangen. In overeenstemming hiermee gelden deze beperkingen evenzeer indien verdragen, zoals de ECT, op voorlopige basis toepassing vinden. Zoals eerder in dit vonnis overwogen, onderwerpt de Russische Federatie zich door artikel 26 ECT aan investeringsgeschillen waarin haar door buitenlandse investeerders schending van rechtsnormen van hoofdstuk III van de ECT kan worden tegengeworpen. De rechtbank is tot het oordeel gekomen dat het Russische recht geen afzonderlijke wettelijke basis biedt voor de beslechting van dit soort geschillen door internationale arbitrage. Artikel 26 ECT houdt ten opzichte van het bestaande Russische recht een nieuwe vorm van geschilbeslechting in, te weten een vorm waarbij de soevereiniteit van de Russische Federatie ten aanzien van geschilbeslechting van internationale geschillen met een publiekrechtelijk karakter in zoverre wordt ingeperkt dat niet langer de overheidsrechter maar een internationaal scheidsgerecht de bevoegdheid zou krijgen te oordelen over de uitoefening van publiekrechtelijk overheidshandelen. De Grondwet en het daarin verankerde beginsel van de machtenscheiding verzetten zich ertegen dat een vertegenwoordiger van de uitvoerende macht de Russische Federatie zou kunnen binden aan artikel 26 ECT. Dit betekent, zoals ook de deskundigen Avakyan (opinie van 21 februari 2006, bladzijden 8 en 9) en Baglay (opinie, bladzijde 5) hebben betoogd, evenals overigens A. Martynov, die destijds namens het Ministerie van Buitenlandse Economische Betrekkingen van de Russische Federatie heeft deelgenomen aan de onderhandelingen over de ECT in een opinie van 14 december 2006, dat voorlopige toepassing van artikel 26 ECT in strijd is met de grondwettelijke verdeling van de bevoegdheden van de uitvoerende, de wetgevende en de rechtsprekende macht.

*Artikel 23 FLIT*

5.94.      Aan dit oordeel doet niet af hetgeen in artikel 23 lid 2 FLIT ter aanvulling op de algemene regel van artikel 23 lid 1 FLIT is bepaald. Op grond van dit tweede lid moet een verdrag waarvan de vaststelling door een federale wet moet plaatsvinden en dat voorziet in de voorlopige toepassing, binnen een termijn van zes maanden aan het Federale Parlement worden voorgelegd. Zo al niet moet worden geoordeeld dat – gegeven het toetsingskader van artikel 45 ECT lid 1 en het daarbinnen aan de constitutie toegekende belang – voorlopige toepassing van de arbitrageclausule van artikel 26 ECT zich van meet af aan niet verdroeg met de Grondwet en het daaruit voortvloeiende beginsel van de machtenscheiding, heeft in elk geval te gelden dat na het einde van deze termijn van zes maanden de voorlopige toepassing daarmee niet langer in overeenstemming was. Het notificatievereiste van artikel 23 lid 3 FLIT, dat de beëindiging van de voorlopige toepassing afhankelijk stelt van de kennisgeving aan de andere staten die het verdrag voorlopig toepassen, maakt dit oordeel niet anders. Met zijn oordeel (in 387 en volgende van de Interim Awards) dat de grens van zes maanden een louter intern vereiste is, heeft het Scheidsgerecht ook in deze context de betekenis van de Limitation Clause onvoldoende onderkend. Deze clausule heeft juist betrekking op strijdigheid van de voorlopige toepassing van verdragsbepalingen met

intern Russisch recht, waaronder de Grondwet. Kortom, de Limitiation Clause stond, bij gebreke van instemming van de wetgevende macht, in de weg aan een langere voorlopige toepassing van artikel 26 ECT dan gedurende die zes maanden. De rechtbank verwijst in dit verband naar de bladzijden 39 en volgende van de uitgebreide opinie van Nussberger en de daarin verwerkte Russische doctrine, alsmede naar de opinie van 29 juni 2006 van Avakiyan. Evenmin komt in dit verband afzonderlijke betekenis toe aan het onder 5.29 van dit vonnis besproken artikel 45 lid 3 ECT. Ook in zoverre deelt de rechtbank de opvatting van het Scheidsgerecht niet. Zoals overwogen, beperkt artikel 45 lid 3 ECT door de uitdrukkelijke verwijzing naar het eerste lid de voortdurende werking op dezelfde wijze als de Limitation Clause.

*Eindconclusie ten aanzien van de betekenis van artikel 45 in verbinding met artikel 26 ECT*

5.95.    Het in dit vonnis gegeven oordeel leidt tot de slotconclusie dat uit artikel 45 lid 1 ECT volgt dat met de enkele ondertekening van de ECT de Russische Federatie zich niet heeft gebonden aan de voorlopige toepassing van (de arbitrageregeling van) artikel 26 ECT. De Russische Federatie heeft dan ook nimmer een onvoorwaardelijk aanbod tot arbitrage gedaan, zoals bedoeld in artikel 26 ECT. Als gevolg daarvan is met de "*notice of arbitration*" van gedaagden geen geldige overeenkomst tot arbitrage tot stand gekomen.

**Eindconclusie ten aanzien van de bevoegdheid van het Scheidsgerecht**

5.96.    Uit het in 5.95 vermelde volgt dat het Scheidsgerecht zich in de Arbitrage ten onrechte bevoegd heeft verklaard tot kennisneming van de vorderingen en beslissing daarop.

**DE GEVOLGEN VAN HET OORDEEL OVER DE BEVOEGDHEID VAN HET SCHEIDSGERECHT**

5.97.    De onbevoegdheid van het Scheidsgerecht leidt tot vernietiging van de Interim Awards en de Final Awards op grond van artikel 1065 lid 1 onder *a* Rv.

5.98.    Dit betekent dat de overige in 4.2 genoemde vernietigingsgronden onbesproken kunnen blijven.

**DE PROCESKOSTEN**

5.99.    Gegeven de vernietiging van de Yukos Awards van het Scheidsgerecht dienen gedaagden te worden beschouwd als de in het ongelijk gestelde partijen. Dit rechtvaardigt hun veroordeling tot betaling van de proceskosten aan de zijde van de Russische Federatie. Deze kosten worden in elk van de gevoegde zaken begroot op € 3.957,80 wegens verschotten (€ 93,80 wegens de dagvaarding en € 3.864 wegens het griffierecht) en op € 12.844 (vier punten à € 3.211, volgens tarief VIII) wegens het salaris van de advocaat; in totaal dus € 16.801,80.

5.100.    Opmerking verdient nog dat tijdens deze procedures het aan partijen in rekening gebrachte griffierecht is verhoogd. Het aanvankelijk toegepaste tarief voor vorderingen van onbepaalde waarde is vervangen door het tarief voor zaken met een geldelijk belang in de hoogste categorie. De rechtbank heeft hierover met partijen gesproken tijdens de zitting van 9 februari 2016.

C/09/477160 / HA ZA 15-1, C/09/477162 / HA ZA 15-2 en                65
C/09/481619 / HA ZA 15-112
20 april 2016

## 6.    DE BESLISSING

De rechtbank:

**in zaak I**

6.1.    vernietigt de tussen VPL als eiseres en de Russische Federatie als verweerster in de Arbitrage gewezen Interim Award van 30 november 2009 en de Final Award van 18 juli 2014;

6.2.    veroordeelt VPL in de kosten van deze procedure aan de zijde van de Russische Federatie en tot aan dit vonnis begroot op € 16.801,80;

6.3.    verklaart dit vonnis uitvoerbaar bij voorraad;

**in zaak II**

6.4.    vernietigt de tussen YUL als eiseres en de Russische Federatie als verweerster in de Arbitrage gewezen Interim Award van 30 november 2009 en de Final Award van 18 juli 2014;

6.5.    veroordeelt YUL in de kosten van deze procedure aan de zijde van de Russische Federatie en tot aan dit vonnis begroot op € 16.801,80;

6.6.    verklaart dit vonnis uitvoerbaar bij voorraad;

**in zaak III**

6.7.    vernietigt de tussen Hulley als eiseres en de Russische Federatie als verweerster in de Arbitrage gewezen Interim Award van 30 november 2009 en de Final Award van 18 juli 2014;

6.8.    veroordeelt Hulley in de kosten van deze procedure aan de zijde van de Russische Federatie en tot aan dit vonnis begroot op € 16.801,80;

6.9.    verklaart dit vonnis uitvoerbaar bij voorraad.

Dit vonnis is gewezen door mr. D. Aarts, mr. I.A.M. Kroft en mr. H.F.M. Hofhuis en in het openbaar uitgesproken op 20 april 2016.

type: