# Exhibit 4

DE BRAUW
BLACKSTONE
WESTBROEK

# STATEMENT OF APPEAL PART I

DE BRAUW
BLACKSTONE
WESTBROEK

# 1 INTRODUCTION

## 1.1 Introductory remarks

1. In 2003, Yukos[1] was one of the largest oil and gas companies in the world. In the period between 2003 and 2007, the Russian Federation destroyed Yukos with brute force and took control of its most valuable assets and activities, mostly by transferring them to the Russian State-owned company Rosneft. The Russian Federation has benefited from the considerable value of Yukos' former assets ever since and continues to do so. The destruction of Yukos and the taking of its assets was the largest, most complete and most systematically executed theft of private property by a State in modern history.

2. HVY are companies incorporated in Cyprus and the Isle of Man, respectively, and together they owned approximately 70% of Yukos' shares. As a consequence of the destruction of Yukos and the taking of its assets by the Russian Federation, HVY's investments in Yukos were unlawfully expropriated. This constitutes a violation of Article 13 of the Energy Charter Treaty (the "**ECT**"), which stipulates that investments of investors not be expropriated without, among other things, the payment of fair, prompt and adequate compensation. The unlawful expropriation of HVY's investments has been established unanimously by a reputable and independent Arbitral Tribunal in the Arbitrations between the parties, which took almost ten years. This assessment as such is no longer in dispute in these setting-aside proceedings.

3. The main reason for the destruction of Yukos and the taking of its assets was that President Putin and his entourage came to see 'Yukos' CEO, Mikhail Khodorkovsky, as a potentially strong political opponent. The elimination of Mr Khodorkovsky as an opponent and the seizing of control over Yukos' assets, would significantly increase Mr Putin's grip on power in the Russian Federation and considerably expand the State's control over the country's oil- and gas-production industry. This attack on Mr Khodorkovsky by the Russian authorities took place in the form of an unparalleled campaign of abuse of power, violence and intimidation, in which, incidentally, not only Yukos was brought down. Also, by means of politically driven show trials (other) members of the management of Yukos were prosecuted. Many people associated with Yukos were hunted down and arrested like criminals.

4. With this unprecedented unlawful expropriation both the Russian Federation and President Putin showed their true face to the world[2]. For years on end, the

---

[1] Defined terms and abbreviations have the meaning HVY assigned to them in the first instance, unless expressly mentioned. An overview of all defined terms and abbreviations used is attached as Annex 1.
[2] Also in other matters the Russian Federation appears not to give a hoot for the international legal order. For example – to mention just a few well-known examples – the military intervention in and

Russian Federation and President Putin believed that they could get away with this unprecedented abuse of power by a State, which was committed with total disregard for international law and the rule of law. The Arbitral Awards, in which every single facet of the actions of the Russian Federation in the context of the destruction of Yukos has been assessed down in detail against the background of the ECT and international law, ultimately held the Russian Federation accountable and liable for its wrongdoings. This is in essence what this case is about. The message of the independent and impartial Arbitral Tribunal' was as strong as it was clear: the rule of law also applies to the Russian Federation. Nonetheless, the Russian Federation is relentless in its endeavour to avoid having to comply with this independent and impartial Judgement of its actions.

5. That the Russian Federation still hopes it can get away with all this can be explained in part because with the passage of time the attention will be drawn to other developments. Who, for example, still thinks of the pictures of Khodorkovsky in a steel cage during his show trials in Moscow, or incarcerated in a penal colony in Siberia? For the remainder, the Russian Federation's hope to avoid being held accountable can be explained because the Russian Federation has applied all thinkable (and unthinkable) means to exercise its control over each and everything.

6. To start with, this of course manifests itself in legislation. A striking example is legislation the Russian Federation has introduced in relation to the various decisions of the ECtHR in Yukos-related cases in which the Russian Federation is held responsible for wrongful actions.[3] The Russian Federation, after it was held accountable for its serious wrongdoings with regard to Yukos by the ECtHR, adopted knee-jerk legislation allowing for the review of ECtHR decisions, on the basis of which the ECtHR decisions could be submitted for review by the constitutional court of the Russian Federation (the "**Constitutional Court**"). The outcome of these proceedings – on whether the Russian Federation, still led by Mr Putin, is to comply with the Judgement of the ECtHR regarding Yukos – was not difficult to predict. On 19 January 2017, the Russian Constitutional Court ruled that the Judgement of the ECtHR in which the Russian Federation was ordered to pay compensation to the former Yukos shareholders would violate the Russian Constitution of 1993,[4] and therefore

---

subsequent annexation of Crimea, the political and military involvement of the Russian Federation in East Ukraine and Georgia, the bringing down of the MH-17 and the course of events surrounding the Greenpeace vessel the Arctic Sunrise.

[3] For this, see the Statement of Defence, para. 704-712.

[4] HVY submit to the Court together with this Statement of Appeal sworn translations of the 1993 Constitution ("**1993 Constitution**") (**Exhibit HVY-127**), the 1991 and 1999 Federal Foreign Investment Laws ("**1991 Investment Law**", **Exhibit HVY-128** and "**1999 Investment Law**", **Exhibit HVY-129**, respectively, jointly referred to as the "**Investment Laws**") the Federal Law on International Treaties of 17 July 1995 (the FLIT) (**Exhibit HVY-130**), the Federal Constitutional Law on the Constitutional Court (**Exhibit HVY-131**) and the 1991 Fundamentals of Legislation on Foreign Investments in the USSR ("**USSR Fundamentals**", **Exhibit HVY-**

cannot be enforced. In fact, the Russian Federation thus uses its courts as an instrument to get its way in Yukos-related matters. This is exactly in line with the findings of the Arbitral Tribunal in the Arbitrations that the "*Russian courts bent to the will of Russian executive authorities to bankrupt Yukos*".[5] This is a perfectly clear example that the violations of international law committed by the Russian Federation in connection with Yukos have not ended after Yukos was destroyed, but that they continue even today. The Russian Federation does use truly every means at its disposal to avoid its responsibility under international law, and it will continue to do so even before this Court of Appeal,. In this regard it is interesting that the Russian Federation in these proceedings has repeatedly relied on the Judgements of the ECtHR, and has presented them to the courts as providing support for the Russian Federation's positions. At the same time, the Russian Federation has failed to comply with the aforementioned Judgement of the ECtHR, and has even argued before its own Constitutional Court that the ECtHR Judgement was unconstitutional, which the Constitutional Court promptly accepted. This is exemplary for the opportunistic approach to both international law and its domestic law that the Russian Federation adopts also in these proceedings.

7. Also in the present case there are ample further examples of the Russian Federation using its own legislation to escape from independent and impartial findings on its destruction of Yukos and the unlawful expropriation of HVY's investments in Yukos. By relying on, among other things, subsequent Russian laws – which are moreover falsely interpreted – the Russian Federation attempts to avoid the effects of provisional application of the ECT and in particular of Article 26 ECT. More generally – as will become clear in this Statement (the "**Statement**") – the Russian Federation more generally makes every effort, whether or not with the help of its own "experts" (more about which below in **Section 1.4**), to mislead the setting-aside court on the interpretation of Russian law to achieve a result that best suits the Russian Federation. It knowingly presents a false picture of its own form of government and law, *inter alia* by representing the powers of the President and the Government as far more limited than these powers are in actual fact. The Russian Federation describes these powers as far too limited in particular with regard to the negotiating and signing of treaties, including their provisional application. In addition, it misleads the setting-aside court on its own law by arguing that its laws on foreign investments, which on their face clearly authorise investor-State arbitration, actually do not authorise investor-State arbitration.

8. In addition, the Russian Federation also manages to fully control the Russian judiciary in cases involving its own and Yukos's interests. That the

---

[5] **132**). References in this Statement of Appeal to the above-mentioned laws therefore always concern references to the sworn translations thereof.
Final Award, para. 1583.

DE BRAUW
BLACKSTONE
WESTBROEK

administration of justice in the Russian Federation does not meet elementary principles of independence and impartiality in the context of Yukos has already been established by the Court of Appeal of Amsterdam.[6] The Final Awards also provide scores of examples of the extremely questionable role of the Russian judiciary in the context of the destruction of Yukos. In addition, there is moreover even indirect evidence that the judge who delivered the criminal Judgement in one of the criminal cases against Khodorkovsky, did not draft this Judgement himself but was supplied with it from the outside.[7]

9. Meanwhile, however, information has come to light through other proceedings that defies all imagination. The Russian Federation's control of the judiciary even extends across its borders. Recently, extensive direct evidence has come to light showing that state-owned Rosneft (the Russian Federation's most important extension in the worldwide battle surrounding the Yukos group) corrupted legal proceedings and influenced Armenian judges in Yukos-related cases in which the interests of the Russian Federation were evidently involved. More specifically, this concerns evidence from which it is apparent that Rosneft and others, with the aid of their international and Armenian teams of lawyers,[8] colluded with the Armenian authorities and judges in Armenian proceedings. They have not only instructed the Armenian judges as to the Judgements that were to be rendered in these proceedings, but even drafted these themselves. The explicit objective of this was not only to ensure that the Armenian Judgements were to Rosneft's advantage, but indeed that these Judgements would contain specific considerations that, in related proceedings before the Dutch courts, would make the Dutch judges believe that the Armenian Judgements were the result of proper judicial procedure. As a result, the question to whom the shares in a specific Yukos company belonged, was said to have already been answered by independent and impartial judges in Armenia.[9] That the parties involved initially succeeded in this purpose is demonstrated by the Judgement of the Court of Appeal of Amsterdam of 17 May 2011,[10] in which a Judgement of the Armenian cassation court of 29 October 2010 is recognised, part of which was drafted by Rosneft's lawyers.

10. The Russian Federation also exercises control over witnesses, largely through intimidation and coercion. This case shows some striking examples of this. Where necessary, HVY will explain how certain of the Russian Federation's "witness statements" were obtained, and explain that these statements are

---

[6] See Court of Appeal Amsterdam 28 April 2009, ECLI:NL:GHAMS:2009:BI2451, JOR 2009/208.
[7] NRC 14 February 2011, "Hoe het vonnis van Chodorkovski tot stand kwam", **Exhibit HVY-133**.
[8] The lawyers involved in this, of Baker Botts LLP, in the background also assist the Russian Federation in this case.
[9] NRC 25 November 2016, "Hoe de Russen hier de rechter misleidden. Advocaten van de Russische oliemaatschappij Rosneft zijn erin geslaagd een Nederlands vonnis te manipuleren". **Exhibit HVY-134**.
[10] Unpublished, therefore hereby submitted to the Court of Appeal as **Exhibit HVY-135**.

often verifiably incorrect or contradictory to earlier statements made by the same persons. In addition, it should be noted that persons who were arrested by the Russian Federation yet subsequently were unwilling to testify for the Russian Federation, sometimes were in store for a terrible fate. A harrowing example of this is Vasily Aleksanyan, the former Head of Yukos' Legal Department and Executive Vice-President of Yukos, who was arrested by the Russian Federation.[11] During his captivity Mr Aleksanyan's health rapidly deteriorated as a result of HIV-related diseases. In violation of the most basic human rights the Russian Federation refused to provide the necessary medical aid, unless he falsely testified against Mr Khodorkovsky. Mr Aleksanyan refused and therefore remained in detention. The ECtHR ruled that the Russian Federation had violated the European Convention for the Protection of Human Rights and Fundamental Freedoms and demanded Mr Aleksanyan's immediate release.[12] The Russian Federation ignored the ECtHR's orders for some time, but Mr Aleksanyan was ultimately released and the charges against him were dropped. By that time, his health had deteriorated in such a serious way that he eventually, after his release from prison in 2011, died from his illness that was complicated by the inhuman treatment and conditions during his detention.

11. Lastly, in addition to all this there has been great diplomatic pressure and massive propaganda from the Russian Federation. In its Statement of Rejoinder in the first instance (para. 12), HVY already pointed to the diplomatic notes that countries such as France and the United States had received from the Russian Federation in which it threatened to use retaliatory measures if the French and US courts respectively allowed the Arbitral Awards to be enforced. Due to the Russian Federation's lobbying and pressure, Belgium and France (the two States where HVY have attached assets) have meanwhile adjusted their laws to make the attachment of assets of a foreign State by a debtor much more difficult. These attempts to influence pending court proceedings make clear that the Russian Federation does not have any respect for the independence of the judiciary in these countries. For a small but telling view of the way in which the Russian Federation attempts to influence the public opinion, HVY refer to the report published in mid-2016 of the *Wilfried Martens Centre for European Studies* under the telling title "*The Bear in Sheep's Clothing. Russia's Government-Funded Organisations in the EU*".[13] And this report is only about the influence the Russian Federation surreptitiously exerts via the funding of all sorts of NGOs. Furthermore, by way of example HVY point

---

[11] Another example of how the Russian Federation deals with people who are unwilling to testify for it, or refuse to cooperate in some other way is Mr Pichugin, the former head of Yukos' security department, who was sentenced to life imprisonment by the Russian regular court in 2007. In 2012 the European Court for Human Rights ruled that the Russian Federation had also violated the Convention for the Protection of Human Rights and Fundamental Freedoms in the show trial against Pichugin.

[12] European Court of Human Rights, Aleksanyan v. Russia (Application No. 46468/06), Judgement of 22 December 2008, available at: http://hudoc.echr.coe.int/eng?i=001-90390, **Exhibit HVY-136**.

[13] http://www.martenscentre.eu/sites/default/files/publication-files/russia-gongos.pdf.

DE BRAUW
BLACKSTONE
WESTBROEK

to the existence of the *International Centre for Legal Protection*, set up by the Russian Ministry of Justice with the instruction to coordinate the worldwide conflict involving Yukos group, not least by propaganda.

12. HVY look forward to an independent, impartial and undistorted analysis of the issues that arise in this case by your Court. In this context HVY strongly request your Court to consider very critically all the positions taken by the Russian Federation in this matter. More often than not it turns out after thorough investigation and sound analysis that contentions are incorrect, incomplete or even untrue. This Statement (in particular in **Chapters 5 and 6**) will make clear that incorrectness applies in particular to the way in which the Russian Federation believes it should interpret its own law. A striking example of, to put it mildly, an incomplete submission (in violation of the duty to tell the truth of Article 21 Dutch Code of Civil Procedure (DCCP)) is that HVY have only recently been able to trace three judicial decisions from successive judicial instances which show that the privatisation of Yukos at the time was assessed and found to be lawful in by the Russian courts. Nevertheless, in these appeal proceedings the Russian Federation again refers to all kinds of irregularities in the context of the privatisation of Yukos.[14] It does so, however, without mentioning the aforementioned three Judgements. This behaviour is all the more problematic given that the Russian Federation was indeed a party to these proceedings and has defended the lawfulness of the privatisation. A striking example of an untrue contention is the position adopted during the oral arguments before the District Court that Yukos's electronic shareholders' register which the Russian Federation seized in 2003 had been coded, such that the Russian Federation was only able to access this information in the year 2015. An investigation by an expert, Mr Racich, shows that this is simply not true. When one adds to all this the fact that the Russian Federation apparently does not shy away from manipulating the judiciary, coercing witness statements and exercising control over experts, there can only be one conclusion: the Russian Federation cannot be trusted as a party to the proceedings. This is a harsh conclusion, certainly in the context of proceedings before a Dutch court, but unfortunately it is one compelled by the facts.

13. Judging by its fierce opposition to the Arbitral Tribunal's jurisdiction, the Russian Federation is clearly seeking to avoid any such independent, impartial and undistorted analysis. In this regard, it is remarkable that the Russian Federation has strongly turned against the separate discussion of Article 45 ECT and Russian law in its correspondence leading towards the Procedural Hearing of 16 January 2017. In its letter dated 18 August 2016, the Russian Federation even suggested that an "alternative reasoning" can be given to the

---

[14] See the pleadings of the Russian Federation for the procedural hearing of 16 January 2017 ("**Written Summary of Oral Arguments Russian Federation Procedural Hearing**" and "**Procedural Hearing**", respectively), Section IX and in particular para. 73.

DE BRAUW
BLACKSTONE
WESTBROEK

decision of the District Court. Also during the Procedural Hearing the Russian Federation pointed to other setting-aside grounds, stating that they are "easy to determine". The fact that the Russian Federation has repeatedly tried to evade a separate and thorough examination of the discussion concerning Article 45 ECT speaks volumes about its confidence in the strength of its own position and the correctness of the Judgement of the District Court (the "**Judgement**").

**1.2    Background to these appeal proceedings**

**1.2.1    The Arbitrations**

14.  The present case of course began with the Arbitrations. The Arbitrations are fully about the actions of the Russian Federation in the period July 2003 – November 2007. For a summary of these unlawful actions, HVY refer to paras. 63-105 of the Final Awards. For a detailed description, reference is made to Chapters VIII.B to VIII.H of the Final Awards.[15] HVY highly recommend reading these Chapters. Without doing so, the unlawfulness of the *de facto* expropriation remains rather abstract.[16] It is only after reading this that it sinks in what exactly took place, and what the impact has been on very many of those involved. At the end of **Chapter 2**, HVY will come back to this briefly.

15.  HVY, as the former majority shareholders in Yukos, consider the actions of the Russian Federation to be in violation of Article 10 and Article 13 ECT. On that basis, they have submitted the dispute to the Arbitral Tribunal in accordance with Article 26 ECT. In the arbitral proceedings, the Russian Federation invoked lack of jurisdiction of the Arbitral Tribunal and the inadmissibility of HVY's claims. The Russian Federation also put up a defence on the merits of the claim.

16.  Following very extensive arbitral proceedings over 10 years in which the parties were given every opportunity to explain their positions and furnish evidence and in which the Russian Federation actively participated and nominated an arbitrator itself (Judge Schwebel), the Arbitral Tribunal in its Interim Awards declared that it had jurisdiction and could take cognisance of the dispute, and in its Final Awards unanimously established that Article 13 ECT (prohibition of unlawful expropriation) had been violated.[17] (Partial) compensation totalling over USD 50 billion was awarded.

---

[15]   See also Schedule 4 of HVY's Statement of Defence.
[16]   The only place where the District Court indirectly refers to what has happened, is the second half of para. 5.32 of the Judgement. This passage gives rise to the suspicion that the District Court has not really understood what the accusation of unlawful expropriation is about.
[17]   For a description of the extensiveness of the proceedings, including the number of pleadings and expert and witness statements submitted, see Chapter 2.3, Part I and Schedules 2 and 3 of HVY's Statement of Defence.

# Exhibit 6

DE BRAUW
BLACKSTONE
WESTBROEK

**7** / 293

# MEMORIE VAN GRIEVEN DEEL I

DE BRAUW
BLACKSTONE
WESTBROEK

# 1 INLEIDING

## 1.1 Inleidende opmerkingen

1. Yukos[1] was in 2003 een van de grootste olie- en gasondernemingen ter wereld. Tussen 2003 en 2007 heeft de Russische Federatie Yukos met brute kracht te gronde gericht en haar meest waardevolle bezittingen en activiteiten afgepakt. Deze zijn vervolgens voor het grootste deel overgeheveld naar het Russische staatsbedrijf Rosneft. De Russische Federatie heeft geprofiteerd – en profiteert nog altijd – van de aanzienlijke waarde die de voormalige bezittingen van Yukos vertegenwoordigen. De vernietiging van Yukos en het afpakken van haar bezittingen was dan de grootste, meest volledige en systematisch uitgevoerde diefstal van privébezit door een staat in de recente geschiedenis.

2. HVY zijn vennootschappen die in Cyprus respectievelijk het Isle of Man zijn opgericht en zij bezaten gezamenlijk ongeveer 70% van de aandelen in Yukos. Als gevolg van de vernietiging van Yukos en het afpakken van haar bezittingen door de Russische Federatie zijn de investeringen van HVY in Yukos op onrechtmatige wijze onteigend. Dit kwalificeert als een schending van artikel 13 van de *Energy Charter Treaty* (de "**ECT**"), dat voorschrijft dat investeringen van investeerders niet mogen worden onteigend zonder onder andere betaling van een billijke, prompte en adequate vergoeding. Dat de investeringen van HVY op onrechtmatige wijze zijn onteigend is unaniem vastgesteld door een gerenommeerd, onafhankelijk Scheidsgerecht in bijna tien jaar durende Arbitrages tussen partijen. Dit oordeel staat als zodanig in deze vernietigingsprocedure niet meer ter discussie.

3. De belangrijkste reden voor het vernietigen van Yukos en het afpakken van haar bezittingen was gelegen in het feit dat President Poetin en de zijnen Mikhail Khodorkovsky, bestuursvoorzitter van Yukos, begonnen te zien als een potentiële sterke politieke tegenstrever. De eliminatie van Khodorkovsky als politieke tegenstander en het overnemen van de zeggenschap over de activa van Yukos zou Poetins macht in de Russische Federatie nog verder versterken en de controle van de staat over de gas- en olieproducerende industrie enorm uitbreiden. De aanval op Khodorkovsky door de Russische autoriteiten kreeg de vorm van een ongeëvenaarde campagne van machtsmisbruik, geweld en intimidatie, waarin overigens niet alleen Yukos te gronde werd gericht. Daarnaast werden door middel van politiek gemotiveerde schijnprocessen (andere) leden van het management van Yukos strafrechtelijk vervolgd. Veel personen die betrokken waren bij Yukos werden als criminelen opgejaagd en gearresteerd.

---

[1] Gedefinieerde termen en afkortingen hebben de betekenis die HVY daaraan in eerste aanleg hebben gegeven, tenzij uitdrukkelijk anders vermeld. Een overzicht van alle gebruikte gedefinieerde termen en afkortingen is aangehecht als Bijlage 1.

DE BRAUW
BLACKSTONE
WESTBROEK

4. Met deze ongekende onrechtmatige onteigening toonden zowel de Russische Federatie als President Poetin hun ware gezicht aan de wereld.[2] De Russische Federatie en Poetin dachten vervolgens jarenlang dat zij weg konden komen met dit ongeëvenaarde machtsmisbruik door een staat, uitgevoerd met een totale minachting voor de regels van het internationale recht en de rechtsstaat. In de Arbitrale Vonnissen, waarin werkelijk elk aspect van het handelen van de Russische Federatie in het kader van de vernietiging van Yukos tot in detail is getoetst tegen de achtergrond van de ECT en internationaal recht, is de Russische Federatie uiteindelijk verantwoordelijk gehouden en aansprakelijk geoordeeld voor haar misdragingen. Dat is in essentie waar deze zaak om draait. De boodschap van het onafhankelijke en onpartijdige Scheidsgerecht was even krachtig als duidelijk: de regels van de rechtsstaat gelden ook voor de Russische Federatie. Desondanks houdt de Russische Federatie hardnekkig haar pogingen vol om niet aan dit onafhankelijk en onpartijdig oordeel over haar handelen te hoeven voldoen.

5. Dat de Russische Federatie er nog steeds mee weg hoopt te kunnen komen, laat zich deels verklaren doordat met het verstrijken van de tijd de aandacht inmiddels wordt opgeëist door andere ontwikkelingen. Wie denkt bijvoorbeeld nog aan de beelden van Khodorkovsky in een stalen kooi tijdens zijn schijnprocessen in Moskou of weggestopt in een strafkolonie in Siberië? Voor het overige laat de hoop van de Russische Federatie dat zij met haar handelen kan wegkomen, zich verklaren doordat de Russische Federatie werkelijk alle denkbare (en ondenkbare) middelen inzet om alles en iedereen naar haar hand te zetten.

6. Dat manifesteert zich uiteraard om te beginnen in wetgeving. Een treffend voorbeeld daarvan is wetgeving die de Russische Federatie heeft ingevoerd in relatie tot de verschillende aan de Yukos-zaak gerelateerde EHRM-uitspraken waarin zij verantwoordelijk wordt gehouden voor onrechtmatig handelen.[3] De Russische Federatie heeft, nadat het door het EHRM verantwoordelijk was gehouden voor haar ernstige misdragingen inzake Yukos, gelegenheidswetgeving aangenomen op basis waarvan de EHRM-uitspraken onderworpen konden worden aan de beoordeling door het eigen constitutionele hof van de Russische Federatie (het "**Constitutionele Hof**"). De uitkomst van deze procedure - waarin de vraag centraal stond of de Russische Federatie, nog altijd onder leiding van Poetin, de veroordeling door het EHRM inzake Yukos dient na te leven - liet zich niet moeilijk raden. Op 19 januari 2017 heeft het Constitutionele Hof geoordeeld dat de uitspraak van het EHRM waarin de Russische Federatie werd veroordeeld tot betaling van schadevergoeding aan

---

[2] Ook in andere kwesties lijkt de Russische Federatie zich niets gelegen te laten liggen aan de internationale rechtsorde. Te denken valt aan - om zo maar wat bekende voorbeelden te noemen - de militaire interventie in en de daarop volgende annexatie van de Krim; de politieke en militaire bemoeienis van de Russische Federatie in Oost-Oekraïne en Georgië; het neerhalen van MH-17 en de gang van zaken rond het Greenpeace-schip de Arctic Sunrise.
[3] Zie in dit opzicht de CvA, par. 704 t/m 712

de voormalige aandeelhouders van Yukos, een schending zou vormen van de Russische Grondwet van 1993,[4] en om die reden niet ten uitvoer zou kunnen worden gelegd. In feite gebruikt de Russische Federatie haar gerechten dus als instrumenten om haar zin te krijgen in Yukos-gerelateerde zaken. Dit is volledig in lijn met de bevinding van het Scheidsgerecht in de onderhavige Arbitrages dat "*Russian courts bent to the will of Russian executive authorities to bankrupt Yukos*".[5] Dit is een volmaakt helder voorbeeld van het feit dat de schendingen van internationaal recht die de Russische Federatie heeft gepleegd in verband met Yukos, niet zijn geëindigd nadat Yukos te gronde was gericht, maar dat die schendingen nu nog steeds voortduren. De Russische Federatie gebruikt, en zal dat ook voor uw Hof doen, werkelijk alle middelen om haar verantwoordelijkheid naar internationaal recht te ontlopen. In dit verband is het opmerkelijk dat de Russische Federatie in de onderhavige vernietigingsprocedure zich herhaaldelijk heeft beroepen op de EHRM-uitspraken, en erover heeft gesteld dat die haar positie zouden ondersteunen. Tegelijkertijd heeft de Russische Federatie evenwel nagelaten te voldoen aan waartoe zij die voornoemde EHRM-uitspraak was veroordeeld, en heeft zelfs voor haar eigen Constitutionele Hof beargumenteerd dat die uitspraak ongrondwettig zou zijn, hetgeen het Constitutionele Hof dus prompt heeft gehonoreerd. Dit is exemplarisch voor de opportunistische wijze waarop de Russische Federatie ook in deze zaak met internationaal recht en haar interne recht omgaat.

7. De onderhavige zaak vormt ook in andere opzichten een goed voorbeeld van hoe de Russische Federatie haar eigen wetgeving aangrijpt om te ontkomen aan onafhankelijke en onpartijdige oordelen ten aanzien van de onrechtmatige onteigening van HVY's investeringen in Yukos. Door onder andere een beroep te doen op latere Russische wetgeving – die ook nog eens onjuist wordt uitgelegd – tracht de Russische Federatie onder de werking van voorlopige toepassing van de ECT en in het bijzonder artikel 26 ECT uit te komen. Het vervolg van deze memorie (de "**Memorie**") zal duidelijk maken dat de Russische Federatie er meer in het algemeen in deze zaak alles aan doet om - al dan niet met behulp van eigen "deskundigen" (waarover hierna meer in **onderdeel 1.4**) - de vernietigingsrechter te misleiden over de uitleg van Russisch recht om zo tot een uitkomst te komen die het meest bij de Russische Federatie in de smaak valt. Zij geeft willens en wetens een onjuist beeld van haar eigen staatsbestel en wetgeving, onder andere door de macht van de President en de regering veel

---

[4] HVY brengen bij deze Memorie beëdigde vertalingen in van de Grondwet van 1993 ("**Grondwet van 1993**") (**Productie HVY-127**), de Federale Wetten op de Buitenlandse Investeringen van 1991 en 1999 ("**Investeringswet van 1991**", **Productie HVY-128**, respectievelijk "**Investeringswet van 1999**", **Productie HVY-129**, samen de "**Investeringswetten**") de Federale Wet op Internationale Verdragen van 17 juli 1995 (de FLIT) **Productie HVY-130**), Federale Constitutionele Wet inzake het Constitutionele Hof (**Productie HVY-131**) en de 1991 Fundamentals of Legislation on Foreign Investments in the USSR ("**Grondbeginselenwet**", **Productie HVY-132**). Verwijzingen in deze Memorie naar deze voornoemde wetten betreffen dan ook steeds verwijzingen naar de beëdigde vertalingen daarvan.
[5] Arbitraal Eindvonnis (HEL), par. 1583.

DE BRAUW
BLACKSTONE
WESTBROEK

beperkter voor te stellen dan die macht in werkelijkheid is. De Russische Federatie stelt die macht in het bijzonder veel te beperkt voor ten aanzien van het onderhandelen over en ondertekenen van verdragen, inclusief de voorlopige toepassing daarvan. Daarnaast misleidt zij de vernietigingsrechter over haar eigen recht door te stellen dat haar wetten ten aanzien van buitenlandse investeringen die reeds op eerste gezicht onmiskenbaar arbitrage tussen investeerders en de staat toelaten, dat in feite niet zouden doen.

8. Daarnaast weet de Russische Federatie ook de Russische rechterlijke macht volledig naar haar hand te zetten in zaken waarin haar eigen belangen en die van Yukos aan de orde zijn. Dat rechtspraak in de Russische Federatie in dit soort zaken niet voldoet aan elementaire beginselen van onafhankelijkheid en onpartijdigheid, is in het kader van Yukos al eerder vastgesteld door Hof Amsterdam.[6] De Arbitrale Eindvonnissen geven verder tal van voorbeelden van de uiterst bedenkelijke rol die de Russische rechterlijke macht heeft gespeeld in het kader van de vernietiging van Yukos. Daarnaast is er bovendien zelfs indirect bewijs voorhanden dat de rechter die het strafvonnis in één van de strafzaken tegen Khodorkovsky heeft gewezen, dat vonnis niet zelf heeft geschreven maar van buiten aangereikt heeft gekregen.[7]

9. Inmiddels is via andere procedures informatie aan het licht gekomen die elke verbeelding tart. De controle die de Russische Federatie uitoefent over de rechterlijke macht reikt zelfs tot buiten haar landsgrenzen. Er is recent uitgebreid direct bewijs bekend geworden waaruit blijkt dat staatsonderneming Rosneft (het belangrijkste verlengstuk van de Russische Federatie in de wereldwijde strijd rond het Yukos-concern) lopende procedures heeft gecorrumpeerd en Armeense rechters heeft beïnvloed in aan Yukos gerelateerde zaken waarin de belangen van de Russische Federatie evident een rol spelen. Meer concreet gaat het om bewijs waaruit blijkt dat Rosneft en anderen, met behulp van hun internationale en Armeense advocatenteams[8], met de Armeense autoriteiten en rechters in Armeense procedures hebben samengespannen. Zij hebben de door die Armeense rechters in die procedures te wijzen uitspraken niet slechts ingefluisterd, maar zelfs eigenhandig geschreven. Het expliciete doel daarvan was niet enkel om te stellen dat de Armeense uitspraken in het voordeel van Rosneft zouden zijn, maar juist dat deze uitspraken specifieke overwegingen zouden bevatten die de Nederlandse rechter in verwante Nederlandse rechtszaken zouden doen aannemen dat de Armeense uitspraken het resultaat waren van behoorlijke rechtspleging. Daarmee zou de vraag aan wie aandelen in een bepaalde Yukos-vennootschap toekomen al door onafhankelijke en

---

[6] Zie Hof Amsterdam 28 april 2009, ECLI:NL:GHAMS:2009:BI2451, JOR 2009/208.
[7] NRC 14 februari 2011, "Hoe het vonnis van Chodorkovski tot stand kwam", **Productie HVY-133**.
[8] De advocaten die hierbij betrokken waren, van Baker Botts LLP, staan op de achtergrond ook de Russische Federatie bij in deze zaak.

DE BRAUW
BLACKSTONE
WESTBROEK

onpartijdige rechters in Armenië zou zijn beantwoord.[9] Dat de betrokkenen aanvankelijk in die opzet zijn geslaagd, blijkt uit het arrest van Hof Amsterdam van 17 mei 2011,[10] waarin een uitspraak wordt erkend van de Armeense cassatierechter van 29 oktober 2010 waaraan de advocaten van Rosneft nota bene hebben meegeschreven.

10. De Russische Federatie weet daarnaast, voornamelijk door intimidatie en dwang, ook getuigen naar haar hand te zetten. Deze zaak bevat daar fraaie staaltjes van. Waar nodig zullen HVY toelichten hoe de Russische Federatie aan bepaalde "getuigenverklaringen" is gekomen en uitleggen dat deze verklaringen vaak controleerbaar onjuist zijn en tegenstrijdig aan eerdere verklaringen afgelegd door diezelfde personen. Het verdient daarnaast opmerking dat personen die door de Russische Federatie zijn gearresteerd maar vervolgens desondanks niet bereid waren voor haar te getuigen, soms een verschrikkelijk lot stond te wachten. Een schrijnend voorbeeld daarvan is de heer Vasily Aleksanyan, voormalig hoofd van de afdeling Juridische Zaken van Yukos en *Executive Vice-President* van Yukos, die door de Russische Federatie is gearresteerd.[11] Tijdens zijn gevangenschap verslechterde de gezondheid van Aleksanyan zienderogen als gevolg van hiv-gerelateerde ziektes. In strijd met de meest basale mensenrechten weigerde de Russische Federatie de nodige medische hulp te bieden als hij niet bereid was een valse getuigenis af te leggen tegen Khodorkovsky. Aleksanyan weigerde en bleef dus in hechtenis. Het EHRM heeft geoordeeld dat de Russische Federatie het Europees Verdrag voor de Rechten van de Mens had geschonden en eiste Aleksanyans onmiddellijke vrijlating.[12] De Russische Federatie heeft de uitspraken van het EHRM een tijdlang weten te negeren, maar heeft uiteindelijk Aleksanyan toch in vrijheid gesteld en de aanklacht tegen hem ingetrokken. Tegen die tijd was zijn gezondheid echter zo zeer verslechterd dat hij kort na zijn vrijlating in 2011 overleed als gevolg van complicaties die waren opgetreden door zijn onmenselijke behandeling en de omstandigheden waarin hij was vastgehouden.

11. Een en ander gaat tot slot nog gepaard met zware diplomatieke druk en massale propaganda van de Russische Federatie. Bij Dupliek in eerste aanleg (par. 12) hebben HVY al gewezen op de diplomatieke memo's die landen als Frankrijk en

---

[9] NRC 25 november 2016, "Hoe de Russen hier de rechter misleidden. Advocaten van de Russische oliemaatschappij Rosneft zijn erin geslaagd een Nederlands vonnis te manipuleren", productie **Productie HVY-134**.

[10] Niet gepubliceerd, dus hierbij overlegd als **Productie HVY-135**.

[11] Een ander voorbeeld van hoe de Russische Federatie omgaat met mensen die niet voor haar willen getuigen, dan wel op een andere manier weigeren mee te werken, is de heer Pichugin, het voormalig hoofd van de beveiligingsafdeling van Yukos, die in 2007 tot levenslang is veroordeeld door de Russische overheidsrechter. Het Europese Hof voor de Rechten van de Mens heeft in 2012 geoordeeld dat de Russische Federatie ook bij het schijnproces tegen Pichugin het Europees Verdrag voor de rechten van de mens had geschonden.

[12] Het Europese Hof voor de rechten van de Mens, de zaak van Aleksanyan v. de Russische Federatie (aanvraagnummer: 46468/06), beschikbaar op: http://hudoc.echr.coe.int/eng?i=001-90390, **Productie HVY-136**.

de Verenigde Staten van de Russische Federatie hadden ontvangen waarin gedreigd wordt met represaillemaatregelen als de Franse en Amerikaanse rechtbanken de tenuitvoerlegging van de Arbitrale Vonnissen zouden toestaan. Als gevolg van de lobby van de Russische Federatie en de door haar uitgeoefende druk hebben België en Frankrijk (de twee staten waarin HVY beslag hebben laten leggen op bezittingen) hun wetgeving inmiddels zodanig aangepast dat beslaglegging op bezittingen van een buitenlandse staat voortaan aanmerkelijk moeilijker is. Deze pogingen tot het beïnvloeden van lopende rechtszaken maken duidelijk dat de Russische Federatie geen enkel respect opbrengt voor de onafhankelijkheid van de rechterlijke macht in deze staten. Voor een klein maar veelzeggend inkijkje in de wijze waarop de Russische Federatie zoal de publieke opinie tracht te beïnvloeden, verwijzen HVY naar het medio 2016 verschenen rapport van het *Wilfried Martens Centre for European Studies* onder de veelzeggende titel "*The Bear in Sheep's Clothing. Russia's Government-Funded Organisations in the EU*".[13] En dan gaat het in dat rapport alleen nog maar over de invloed die Rusland heimelijk uitoefent via het financieren van allerhande Ngo's. HVY wijzen voorts bij wege van voorbeeld op het bestaan van het *International Centre for Legal Protection*, opgezet door het Russische Ministerie van Justitie met als opdracht om de wereldwijde strijd rond het Yukos-concern te coördineren, niet in de laatste plaats via propaganda.

12. HVY hopen op een onafhankelijke, onpartijdige en niet-vertekende analyse door uw Hof van de onderwerpen die in deze zaak aan bod komen. Daarbij verzoeken HVY uw Hof met klem om uiterst kritisch om te gaan met alle door de Russische Federatie ingenomen stellingen. Vaker wel dan niet, blijkt na intensief onderzoek en grondige analyse dat stellingen onjuist, onvolledig of zelfs onwaarachtig zijn. Deze Memorie (met name de **hoofdstukken 5 en 6**) zal duidelijk maken, dat onjuistheid met name geldt voor de uitleg die de Russische Federatie aan haar eigen recht meent te moeten geven. Een treffend voorbeeld van een minst genomen onvolledige stellingname (in strijd met de waarheidsplicht van artikel 21 Rv) is dat HVY pas recent drie rechterlijke uitspraken in opvolgende rechterlijke instanties hebben kunnen achterhalen, waaruit blijkt dat de privatisering van Yukos destijds in Russische rechterlijke instanties is getoetst en rechtmatig is bevonden. Desondanks spreekt de Russische Federatie in dit hoger beroep weer over allerhande onrechtmatigheden in het kader van de privatisering van Yukos.[14] Zij doet dat echter zonder melding te maken van voornoemde drie uitspraken. Dit gedrag klemt te meer nu de Russische Federatie nota bene partij was in die procedure en de rechtmatigheid van de privatisering daarin heeft verdedigd. Een treffend voorbeeld van een onwaarachtige stelling is de tijdens pleidooi bij de Rechtbank ingenomen stelling dat het elektronische

---

13   http://www.martenscentre.eu/sites/default/files/publication-files/russia-gongos.pdf.
14   Zie de pleitaantekeningen van de Russische Federatie voor de regiezitting van 16 januari 2017 (respectievelijk "**Pleitnotities Russische Federatie Regiezitting** en "**Regiezitting**"), onderdeel IX en in het bijzonder, par. 73.

aandeelhoudersregister van Yukos dat de Russische Federatie in 2003 in beslag heeft genomen gecodeerd was als gevolg waarvan de Russische Federatie eerder dan in het jaar 2015 geen toegang had kunnen krijgen tot die informatie. Een onderzoek door een deskundige, de heer Racich, toont dat dit eenvoudigweg niet waar is. Voegt men dit alles bij het gegeven dat de Russische Federatie er blijkbaar ook niet voor terugdeinst om rechtspraak te manipuleren, getuigenverklaringen af te dwingen en deskundigen naar haar hand te zetten, dan is helaas slechts één conclusie mogelijk: de Russische Federatie kan als procespartij niet worden vertrouwd. Die conclusie is hard, zeker in de context van een procedure voor een Nederlandse rechter, maar de feiten dwingen helaas daartoe.

13. Afgaand op haar hevige verzet tegen de bevoegdheid van het Scheidsgerecht, is de Russische Federatie er duidelijk op uit alles op alles te zetten om een dergelijke onafhankelijke, onpartijdige en niet vertekende analyse te voorkomen. In dat verband is het opmerkelijk dat de Russische Federatie in de correspondentie die voorafging aan de Regiezitting van 16 januari 2017, zich sterk heeft gekeerd tegen de afzonderlijke behandeling van de discussie over artikel 45 ECT en Russisch recht. In haar brief van 18 augustus 2016 heeft de Russische Federatie zelfs gesuggereerd dat er een "alternatieve grondslag" kan worden gegeven aan de beslissing van de Rechtbank. Ook tijdens de Regiezitting heeft de Russische Federatie verwezen naar andere vernietigingsgronden, met de opmerking dat die "eenvoudig te beoordelen" zouden zijn. Het feit dat de Russische Federatie herhaaldelijk heeft gepoogd om een afzonderlijke en nauwgezette behandeling van de discussie over artikel 45 ECT te voorkomen, spreekt boekdelen over het vertrouwen dat de Russische Federatie heeft in de kracht van haar eigen positie en de juistheid van het vonnis van de Rechtbank (het "**Vonnis**").

## 1.2   Achtergrond van dit hoger beroep

### 1.2.1   De Arbitrages

14. De onderhavige zaak is uiteraard begonnen met de Arbitrages. Die Arbitrages draaien volledig om de onrechtmatige handelingen van de Russische Federatie in de periode juli 2003 tot en met november 2007. Voor een samenvatting van die onrechtmatige handelingen verwijzen HVY naar par. 63-105 van de Arbitrale Eindvonnissen. Voor een gedetailleerde beschrijving verwijzen zij naar de hoofdstukken VIII.B tot VIII.H van die Arbitrale Eindvonnissen.[15] HVY bevelen lezing van die hoofstukken van harte aan. Zonder die lezing blijft de onrechtmatigheid van de feitelijke onteigening immers nogal abstract.[16] Na lezing

---

[15] Zie ook bijlage 4 bij CvA HVY
[16] De enige plaats waar de Rechtbank zijdelings refereert aan het gebeurde is de tweede helft van r.ov. 5.32 van het Vonnis. Die passage doet vermoeden dat de Rechtbank niet heeft meegekregen waar het verwijt van onrechtmatige onteigening werkelijk om draait.

Our ref. M27256860/1/20618530/sjk

dringt pas door wat hier precies heeft plaatsgevonden en welke impact dat op heel veel betrokkenen heeft gehad. Aan het eind van **hoofdstuk 2** komen HVY daar nog kort op terug.

15. HVY hebben als voormalig meerderheidsaandeelhouders in Yukos de handelingen van de Russische Federatie aangemerkt als schending van artikel 10 en artikel 13 ECT. Op die grondslag hebben zij het geschil aan het Scheidsgerecht voorgelegd conform het bepaalde in artikel 26 ECT. De Russische Federatie heeft zich in de Arbitrages beroepen op onbevoegdheid van het Scheidsgerecht en op niet-ontvankelijkheid van de vorderingen van HVY. Ook heeft de Russische Federatie inhoudelijk verweer gevoerd.

16. Na een zeer uitvoerige, tien jaar durende arbitrale procedure waarin partijen alle gelegenheid hebben gekregen hun standpunten toe te lichten en bewijs aan te dragen en waarin de Russische Federatie actief heeft geparticipeerd en zelf een arbiter (*Judge* Schwebel) heeft benoemd, heeft het Scheidsgerecht zich in zijn Arbitrale Tussenvonnissen unaniem bevoegd verklaard om van het geschil kennis te nemen en in zijn Arbitrale Eindvonnissen unaniem schending van artikel 13 ECT (het verbod op onrechtmatige onteigening) aangenomen.[17] Daarbij is een (gedeeltelijke) schadevergoeding van in totaal ruim USD 50 miljard toegewezen.

---

[17] Zie hoofdstuk 2.3, Deel I en bijlagen 2 en 3 bij CvA HVY voor een omschrijving van de omvang van de procedures, inclusief het aantal overgelegde pleitnotities, deskundigenberichten en getuigenverklaringen