# Exhibit 10

# How Rosneft Turned Rule of Law to Its Own Advantage

**Russian Fraud**

Revealing emails show how Russian state-owned oil company Rosneft manipulated the legal systems of the Netherlands and Armenia. "Delete all communication after reading."

**Renée Postma & Joep Dohmen, November 24, 2016**

**Moscow, February 21, 2011**

The Russian capital has been in the grip of temperatures of 30 degrees below zero for weeks now. A Siberian chill lingers in Gasheka Street, the business district that is home to firms such as Citibank and Goldman Sachs. At ten thirty in the morning, Edward Mouradian gets out of his taxi. Moments later, he'll announce his arrival at the reception desk of the American law firm Baker Botts. That same morning at 5 AM, Mouradian left Armenia in a hurry. He works as a lawyer and, just like Baker Botts, has been hired by the Russian state-owned oil company Rosneft. There's a job to be done, an urgent one.

Two days from now and two-thousand kilometers south from here, in Yerevan, capital of the former Soviet republic of Armenia, judge Surik Ghazaryan will announce his verdict in 'case 1494' between Rosneft and the former owners and directors of Yukos Oil, once Russia's largest oil company.



**Illustration by Anne van Wieren**

The judge will have to decide who is the rightful owner of Yukos CIS, the Armenian branch of the now bankrupt and dismantled Yukos. Rosneft already took possession of Yukos's oil fields, refineries, and pipelines in Russia, and the company is now claiming ownership of the Armenian branch as well. The Yukos camp contests this claim.

On that day in Gasheka Street, Mouradian and Baker Botts' employees will assume control of the Armenian rule of law. They will personally write the verdict that Ghazaryan will announce two days later. A verdict that very much benefits Rosneft.

**Amsterdam, May 17, 2011**

Rosneft is also taking the initiative in Amsterdam. At the court of appeal on the Prinsengracht, the Russian state-owned oil company is getting the upper hand in a whole series of cases lodged against Yukos. The parties ended up in this court because Yukos's Armenian holdings have been placed behind a legal protective structure in the Netherlands – through an Amsterdam foundation – to guard the Yukos share capital from being plundered by Rosneft. At stake on the Prinsengracht, is the ultimate authority over the Armenian branch, which is valued at 337 million dollars (314 million euro). The Dutch court will have to decide whether Rosneft is entitled to dismiss the Yukos board member in Armenia, which is only permitted if it can be established that Rosneft's acquisition of Yukos CIS in Armenia was lawful.

Rosneft's strategy is successful. The court of appeal bases its judgment on the preceding verdict by Armenian judge Surik Ghazaryan. Under international treaties, Dutch courts have to ratify foreign rulings in corporate conflicts. The Amsterdam court of appeal therefore rules that Rosneft must be

1

recognized as shareholder of Yukos CIS. The former management must transfer Yukos CIS's entire business administration to Rosneft.

**Ghazaryan's Flight**

After eighteen months of appeals, cassation appeals, and summary procedures, the Amsterdam court is again examining the conflict. In the fall of 2012, chief justice Jan Peeters hears the Yukos attorneys read a statement by Surik Ghazaryan, who eighteen months earlier in Armenia issued the verdict composed by Rosneft. Ghazaryan no longer works as a judge and appears to have fled Armenia. He and his family are living in the United States where he was granted political asylum. Ghazaryan received assistance from the Yukos camp, which is also supporting him financially.

In his notary-certified statement, Ghazaryan talks about his ruling in 'case 1494' from February of 2011. A higher-ranked colleague handed him the text and, according to Ghazaryan, he could not refuse the instructions he received. His position was already becoming untenable. In 2010, Ghazaryan had come into conflict with his superiors in another Yukos case, in which he refused to collaborate in so-called 'telephone justice,' an old Soviet-era custom in which verdicts were dictated from above.

Ghazaryan is assigned to 'case 1494' in late 2010. According to his own statement, he tried to get out of it by calling in sick, but his highest boss still forced him to issue a ruling. Almost immediately after justice was served, Ghazaryan was pushed aside. The celebrated judge – a decorated air force veteran – was forced to submit his resignation and give up all his privileges and his pension. They don't even allow him to pull poems that he wrote from his computer. This completes the utter humiliation of the judge that tried to refuse.

Sitting in a courtroom in Amsterdam, chief justice Jan Peeters takes it all in. If Ghazaryan's statements are true, the independent rule of law has been compromised, in the Netherlands as much as in Armenia. In an interim judgment, the Yukos attorneys are offered the opportunity to provide additional evidence to show that no independent and impartial justice had been served in Armenia. The interim judgment states that if the attorneys succeed in producing such evidence, the protective measures in the Netherlands will remain in place.

**Rosneft's Unmasking**

The Yukos party turns out to work in mysterious ways. The exact timeline is unclear, but somewhere in 2013, Yukos obtains emails from the computer of a high-level manager at Rosneft. The same happens with emails from the Armenian law firm operated by Edward Mouradian, the lawyer who took that early flight to Moscow in 2011.

The loot consists of documents that, according to the Yukos camp, show that no independent justice was served in Armenia. Not in the verdict issued by Ghazaryan and not in the other Yukos cases either. The attorneys working for Yukos submit the materials to the Amsterdam court in the summer of 2014. Their conclusion is that Rosneft held sway over the Armenian judiciary and thereby succeeded in manipulating the Dutch legal system as well.

The Rosneft camp protests against the emails being entered into the procedure. The Rosneft camp claims that the emails were obtained through hacking and were thus secured illegally. The plea is ultimately unsuccessful. In January 2015, the court rules that the exhibits will continue to be part of the procedural documents.

The *NRC* newspaper has these procedural documents in its possession. The information in the emails completely corresponds to the statements that former judge Ghazaryan made under oath. It turns out that Rosneft, aided by the American firm of Baker Botts and the offices of attorney Edward Mouradian, corrupted the Armenian judiciary.

**The Russian Secret Service**
It is generally assumed in the West that in politically sensitive cases, the rule of law in Russia is steered by the Kremlin. One clear example of this was the dismantling of the Yukos oil company. The procedural documents show in minute detail, perhaps for the very first time, how these matters are arranged behind the scenes.

Rosneft turns out to wield a high-level network in Armenia. The company does not merely use judges, but also the Public Prosecutor's Office, the president's office, and contacts within the FSB, the Russian secret service.

Edward Mouradian is a linchpin in all of this. He is more than just a lawyer. Mouradian is a former judge, former minister, and an advisor to the Armenian government. The emails also mention a Gevorg Kostyan. At the time, he was a legal advisor to the president and the Armenian representative to the European Court of Human Rights.

The emails show that the Rosneft legal team is aware that it's illegal to manipulate the rule of law. For instance, in an email sent in the summer of 2010, a Rosneft paralegal asks a colleague to keep quiet about the activities.

Another example can be found in an email by attorney Mouradian that includes instructions to the Armenian public servant Armen Nikoghosyan. He sends a copy of the email to a colleague, with the message "*top secret*". "Delete all communication after reading."

Public servant Armen Nikoghosyan heads the department for the protection of national interests at the Public Prosecutor's Office. Nikoghosyan receives his instructions from Moscow through email address: sedalgo@mail.ru. This is the email address of his father's import-export business. The secret emails explain to Nikoghosyan what is and what isn't in Rosneft's interest, and tell him what the criteria for the verdict are.

Nikoghosyan is not acting on his own. It can be inferred from the emails that his highest boss, the attorney general of the Public Prosecutor's Office, is aware of the situation. On the side of the judiciary, the implementation of the instructions falls to Court of Cassation judge Drmeyan. Drmeyan is the man who handed judge Surik Ghazaryan the USB drive that held the verdict written by Rosneft. Drmeyan, in turn, reports to judge Mkrtumyan, president of the Court of Cassation.

This is a well-oiled machine that betrays the influence of the FSB secret service. The emails portray former FSB captain Achkoebek Achkoebekov – now employed by Rosneft – as someone skilled at making things run smoothly, doing all kinds of odd jobs here and there. Using his private email address, he forwards draft verdicts to the Rosneft attorneys and maintains contacts with the Armenian government.

**Manipulated Rulings**
In total, the powerful Russian state-owned oil company directs the verdicts of five cases in front of the court of appeal and the Court of Cassation. Rosneft wins every single one of them.

One of these is 'case 1494'. The emails show exactly how this case was handled. From Mouradian's early-morning flight to icy Moscow, to details on how the verdicts were honed and edited. Ryan Bull, partner in the American law firm, and his employee Izabella Sarkisyan also work on the verdicts from their Moscow office.

The legal team of the Russian state-owned company also draws up the draft for the ruling by the Court of Cassation, dated May 11, 2011. Attorney Mouradian adds some changes to this draft that end up word for word in the official verdict. The text is provided in a completely finished state, including the official seal of the Republic of Armenia.

The judgment of October 29, 2010, in which the Court of Cassation rules that Rosneft is the new, lawful owner of the Armenian Yukos branch, is also spoon-fed to the judges. And prior to the ruling of the Court of Cassation on July 19, 2010, attorney Ryan Bull receives an email from Rosneft with the question whether the "possible ruling by the Court of Cassation" that is attached to the message meets "our interests in the case in the Netherlands."

Another example of manipulation is a verdict by the court of appeal dated June 10, 2011. Rosneft stipulates that the ruling must include the statement that the procedure complies with the European Convention on Human Rights. The court of appeal copies the text word for word.

The emails show that the Rosneft attorneys already have the final text of the verdict in their possession three days before it is issued.

**Amsterdam, April 1, 2015**
Rosneft's fortunes are changing. No matter how insistently the Russian oil company objects against it, the Amsterdam court permits Yukos to introduce the damaging emails as procedural documents. After this, the court is ready to issue a ruling. Chief justice Peeters has already been very clear about it: if Yukos can show that no independent and impartial justice had been served in Armenia, the protective measures in the Netherlands will remain in place.

But before the manipulation of the rule of law can be discussed in a public hearing, and before the court can issue a verdict, the Rosneft camp takes a radical decision. The Russians are looking for a settlement.

Rosneft withdraws all its claims on the Armenian Yukos branch. The former owners can keep their possessions. An amount of at least 337 million dollars is divided over all shareholders who lost their cash investments when Yukos was expropriated. These are the first funds from the capital of the dismantled oil company that are paid out to the former shareholders.

In exchange, Yukos will drop all claims on Rosneft. And – rather relevant as well – the manipulation of the rule of law is kept behind closed doors.


TRANSPERFECT

City of New York, State of New York, County of New York

I certify under penalty of perjury that the following is a true and correct translation into <u>ENGLISH</u> of the attached document(s) relating to:

Hoe Rosneft de rechtspraak naar zijn hand zette written in DUTCH.

_____

Aurora Landman
TransPerfect Translations International, Inc.

Sworn to before me this
June 8, 2017

_____
Signature, Notary Public

ANGELA LO
NOTARY
NO. 01LO6353549
QUALIFIED IN
NEW YORK COUNTY
COMM. EXP.
01-30-2021
PUBLIC
STATE OF NEW YORK

_____
Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS

THREE PARK AVENUE, 39TH FLOOR, NEW YORK, NY 10016 | T 212.689.5555 | F 212.689.1059 | WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE

# Dutch Original of Exhibit 10

**nrc** |

Onbeperkt nrc.nl    Alle abonnementen

Menu ☰    🔍

Binnenland    Buitenland    Economie    Cultuur    Sport    Opinie    Wetenschap    Tech & Media    Me▾

# Hoe Rosneft de rechtspraak naar zijn hand zette

## Russische fraude

Onthullende e-mails laten zien hoe het Russische staatsoliebedrijf Rosneft de rechtspraak in Nederland en Armenië manipuleerde. „Na lezing alle correspondentie vernietigen."

✏ Renée Postma & Joep Dohmen    🕐 24 november 2016



## Moskou, 21 februari 2011

Al weken is de Russische hoofdstad in de greep van temperaturen tot 30 graden onder nul. In de Gasjekastraat, in de zakenwijk waar firma's als Citibank en Goldman Sachs kantoor houden, hangt een Siberische kou. Het is half elf als Edward Mouradian zich uit zijn taxi wurmt. Kort daarna meldt hij zich bij de receptie van het Amerikaanse advocatenkantoor Baker Botts. Mouradian is die ochtend om vijf uur in allerijl uit Armenië vertrokken. Hij is advocaat en, net als Baker Botts, ingehuurd door het Russische staatsoliebedrijf Rosneft. Er moet een klus geklaard worden waar haast bij is.

Tweeduizend kilometer zuidelijker, in hoofdstad Jerevan van de voormalige Sovjetstaat Armenië, gaat rechter Surik Ghazaryan over twee dagen uitspraak doen in 'zaak 1494' tussen Rosneft en de voormalige eigenaren en bestuurders van Yukos Oil, ooit Ruslands grootste olieconcern.



Beeld Anne van Wieren 📷

De rechter moet beslissen wie de rechtmatige eigenaar is van Yukos CIS, de Armeense tak van het failliet verklaarde en ontmantelde Yukos. Rosneft legde al de hand op de olievelden, raffinaderijen en pijpleidingen van Yukos in Rusland, en zegt ook eigenaar te zijn van de Armeense tak. Dat wordt betwist door het Yukos-kamp.

Lees ook het nieuwsbericht: **Rosneft manipuleerde de rechtsgang in Nederland**

In de Gasjeka-straat zullen Mouradian en medewerkers van Baker Botts die dag de Armeense rechtspraak overnemen. Zij schrijven eigenhandig het vonnis dat rechter Ghazaryan twee dagen later gaat voorlezen. Een vonnis dat gunstig uitpakt voor Rosneft.

*De ondergang van Yukos. Tekst gaat verder onder de tijdlijn:*

## Amsterdam, 17 mei 2011

Ook in Amsterdam heeft Rosneft het initiatief. Bij het gerechtshof aan de Prinsengracht is het Russische staatsoliebedrijf aan de winnende hand in een reeks procedures tegen Yukos. De partijen zijn hier beland omdat de Armeense bezittingen van Yukos in Nederland achter een juridische beschermingsconstructie zijn geplaatst – via een stichting in Amsterdam – om aandelenroof door

Rosneft te voorkomen. Aan de Prinsengracht is de inzet de uiteindelijke zeggenschap over de Armeense tak, ter waarde van 337 miljoen dollar (314 miljoen euro). De Nederlandse rechter moet beslissen of Rosneft de Yukos-bestuurder in Armenië mag ontslaan. Dat kan alleen als wordt vastgesteld dat de overname van Yukos CIS in Armenië door Rosneft rechtmatig is geweest.

De strategie van Rosneft werkt. Het hof baseert zijn oordeel op het eerdere vonnis van rechter Surik Ghazaryan in Armenië. Volgens internationale verdragen nemen Nederlandse rechters buitenlandse vonnissen over in zakelijke geschillen. Het Amsterdamse hof oordeelt daarom dat Rosneft erkend moet worden als aandeelhouder van Yukos CIS. Het voormalige management moet de volledige bedrijfsadministratie van Yukos CIS overdragen aan Rosneft.

## De vlucht van Ghazaryan

Anderhalf jaar van beroepen, cassaties en gedingen verder buigt de rechtbank in Amsterdam zich opnieuw over het conflict. Najaar 2012 hoort rechtbankpresident Jan Peeters hoe de advocaten van Yukos een verklaring voorlezen van Surik Ghazaryan, die anderhalf jaar eerder in Armenië het door Rosneft bewerkte vonnis velde. Hij is inmiddels ex-rechter. Ghazaryan blijkt gevlucht te zijn uit Armenië. Nu woont hij met zijn gezin in de Verenigde Staten waar hij politiek asiel kreeg. Ghazaryan is daarbij geholpen door het Yukos-kamp dat hem ook financieel ondersteunt.

In de notarieel vastgelegde verklaring vertelt Ghazaryan over zijn vonnis in 'zaak 1494' uit februari 2011. Hij kreeg de tekst aangeleverd van een hoger geplaatste collega en kon niet anders dan diens instructies opvolgen, zegt hij. Zijn positie stond al onder druk. In 2010 was Ghazaryan in botsing gekomen met zijn meerderen in een eerdere Yukos-zaak omdat hij weigerde mee te doen aan 'telefonische rechtspraak', de gewoonte uit de Sovjettijd om het vonnis van hogerhand voorgezegd te krijgen.



## Notariële verklaring rechter Surik Ghazaryan

Eind 2010 kreeg Ghazaryan 'zaak 1494' toegewezen. Hij probeerde er nog onderuit te komen door zich ziek te melden, verklaart hij. Zijn hoogste baas dwong hem toch vonnis te wijzen. Vrijwel meteen daarna werd Ghazaryan afgeserveerd. De gelauwerde rechter – gedecoreerd oud-strijder van de luchtmacht – werd gedwongen om zijn ontslag in te dienen. Met inlevering van al zijn privileges, en zijn pensioen. Zelfs zijn eigen gedichten mocht hij niet van zijn computer halen en meenemen. De vernedering van de rechter die probeerde tegen te sputteren was totaal.

In de Amsterdamse zittingszaal hoort president Peeters het allemaal aan. Als het waar is wat Ghazaryan verklaart dan is de onafhankelijke rechtspraak ondermijnd, ook in Nederland. In een tussenvonnis krijgen de advocaten van Yukos de kans aanvullend bewijs te leveren dat er in Armenië geen sprake was van onafhankelijke en onpartijdige rechtspraak. Slagen de advocaten daarin, dan blijven de beschermingsmaatregelen in Nederland in stand, staat in het tussenvonnis.

## Ontmaskering van Rosneft

De wegen van de Yukos-partij blijken ondoorgrondelijk. Wanneer precies is niet duidelijk, maar ergens in 2013 krijgt Yukos e-mails uit de computer van een hoge manager van Rosneft in handen. Dat gebeurt ook met e-mails van het Armeense advocatenkantoor van Edward Mouradian, die in 2011 de ochtendvlucht nam naar Moskou.

De buit bestaat uit documenten die volgens het Yukos-kamp laten zien dat in Armenië van een onafhankelijke rechtspraak geen sprake was. Niet in de uitspraak van rechter Ghazaryan, en ook niet in de andere uitspraken rond Yukos. De advocaten van Yukos leveren het materiaal in de zomer van 2014 in bij de rechtbank Amsterdam. Hun conclusie: Rosneft heeft de Armeense rechterlijke macht naar zijn hand gezet en daarmee ook de Nederlandse rechtsgang gemanipuleerd.

Het Rosneft-kamp verzet zich ertegen dat de e-mails worden ingebracht in de procedure. Volgens het Rosneft-kamp zijn ze gehackt en dus onrechtmatig verkregen. Dat verweer helpt niet. In januari 2015 oordeelt de rechtbank dat de producties tot de processtukken blijven behoren.

*NRC* heeft deze processtukken. De informatie uit de e-mails komt tot in detail overeen met wat ex-rechter Ghazaryan eerder onder ede heeft verklaard. Rosneft blijkt, geholpen door het Amerikaanse Baker Botts en het kantoor van advocaat Edward Mouradian, de rechterlijke macht in Armenië te hebben gecorrumpeerd.

*De hoofdrolspelers en hun relatie. Tekst gaat verder onder deze infographic:*

## De Russische geheime dienst

In het Westen wordt algemeen aangenomen dat de rechtspraak in Rusland in politiek gevoelige zaken gestuurd wordt door het Kremlin. De ontmanteling van olieconcern Yukos is daar een voorbeeld van. De processtukken laten, misschien wel voor het eerst, tot in detail zien hoe dat achter de schermen geregeld wordt.

In Armenië beschikt Rosneft over een netwerk tot op het hoogste niveau, zo blijkt. Daarbij worden niet alleen rechters ingezet, maar ook het Openbaar Ministerie, het bureau van de president en contacten van de FSB, de Russische geheime dienst.

Een centrale figuur is advocaat Edward Mouradian. Hij is niet zomaar een advocaat. Mouradian is oud-rechter, oud-minister en adviseur van de Armeense regering. In de mails komt ook Gevorg

Kostyan voor. Hij is dan juridisch adviseur van de president en vertegenwoordiger van Armenië bij het Europese Hof voor de Rechten van de Mens.

Het juridische team van Rosneft is zich ervan bewust dat het manipuleren van de rechtsgang illegaal is, blijkt uit de mails. Zo vraagt een juridisch medewerker van Rosneft een collega in de zomer van 2010 in een mail de activiteiten stil te houden.

📄

## E-mailverkeer binnen Rosneft

Een ander voorbeeld is een e-mail van advocaat Mouradian met instructies aan de Armeense ambtenaar Armen Nikoghosyan. Een afschrift van deze e-mail stuurt hij aan een kantoorgenoot met de boodschap „*top secret*". „Na lezing alle correspondentie vernietigen."

📄

## Rosneft advocaat in Armenië

Ambtenaar Armen Nikoghosyan is hoofd van de afdeling ter bescherming van staatsbelangen bij het Openbaar Ministerie. Nikoghosyan ontvangt zijn instructies uit Moskou via het e-mailadres sedalgo@mail.ru. Dat is het adres van de import-exportfirma van zijn vader. In de geheime e-mails wordt Nikoghosyan uitgelegd wat wel en wat niet in het belang van Rosneft is en aan welke eisen het vonnis moet voldoen.

Nikoghosyan handelt niet zelfstandig. Ook zijn hoogste baas, de procureur generaal van het Openbaar Ministerie, weet ervan, kan worden opgemaakt uit de mails. Bij de rechterlijke macht is de uitvoering van de instructies in handen van rechter Drmeyan van het Hof

van Cassatie. Drmeyan is de man die de usb-stick met
het door Rosneft geschreven vonnis heeft overhandigd aan rechter Surik Ghazaryan. Op zijn beurt
rapporteert Drmeyan aan rechter Mkrtumyan, president van het Hof van Cassatie.

Het is een geoliede machine die de hand van de geheime dienst FSB verraadt. Oud-FSB-kapitein
Achkoebek Achkoebekov – nu in dienst van Rosneft – komt uit de mails tevoorschijn als oliemannetje
dat hand-en-spandiensten verleent. Via zijn privémailadres sluist hij conceptvonnissen door naar de
advocaten van Rosneft en onderhoudt hij contacten met de Armeense overheid.

## Gemanipuleerde vonnissen

In totaal redigeert het machtige Russische staatsoliebedrijf de vonnissen in vijf zaken bij het
gerechtshof en het Hof van Cassatie. Rosneft wint ze allemaal.

Een daarvan is 'zaak 1494'. De e-mails laten de precieze
gang van zaken zien. Van de vroege vlucht van advocaat
Mouradian naar het ijskoude Moskou, tot de details over
het redigeren van het vonnis. Vanuit de Moskouse
vestiging van het Amerikaanse advocatenkantoor Baker
Botts schrijven partner Ryan Bull en zijn medewerker
Izabella Sarkisyan mee.

Het juridische team van het Russische staatsbedrijf stelt
ook het concept op van het arrest van het Hof van
Cassatie van 11 mei 2011. Advocaat Mouradian maakt in
dat concept aanpassingen die in exact dezelfde bewoordingen terechtkomen in het uiteindelijke
arrest. De tekst wordt compleet aangeleverd, met inbegrip van het officiële wapen van de Armeense
republiek.



## Met het officiele wapen van Armenië

Ook het arrest van 29 oktober 2010 waarin het Hof van Cassatie oordeelt dat Rosneft de nieuwe,
wettige eigenaar is van de Armeense tak van Yukos wordt voorgekauwd. En voorafgaande aan de
beslissing van het Hof van Cassatie van 19 juli 2010 krijgt advocaat Ryan Bull een e-mail van Rosneft
met de vraag of de in de bijlage opgenomen „mogelijke beslissing van het Hof van Cassatie"
beantwoordt „aan onze belangen in de zaak in Nederland."

## De Nederlandse belangen

Een ander voorbeeld is de manipulatie van een arrest van het gerechtshof van 10 juni 2011. Rosneft bepaalt dat in de uitspraak moet worden opgenomen dat de procedure in overeenstemming is geweest met het Europees Verdrag voor de Rechten van de Mens. Het hof neemt de tekst letterlijk over.

Uit de e-mails blijkt dat de advocaten van Rosneft de definitieve tekst van het arrest al drie dagen vóórdat het wordt uitgesproken in hun bezit hebben.

## Amsterdam, 1 april 2015

De wind draait voor Rosneft. Hoe hard het Russische olieconcern ook protesteert, de rechtbank Amsterdam staat toe dat Yukos de belastende e-mails als processtukken mag inbrengen. Waarna de rechter klaarzit om een oordeel te vellen. Rechtbankpresident Peeters was er eerder al helder over: als Yukos kan bewijzen dat er in Armenië geen onafhankelijke en onpartijdige rechtspraak was, dan blijven de beschermingsmaatregelen in Nederland in stand.

> Lees ook: **Rusland wint, maar de zaak-Yukos is nog lang niet voorbij**

Vóórdat de manipulatie van de rechtspraak aan de orde kan komen in een openbare terechtzitting, en vóórdat de rechtbank vonnis kan wijzen, neemt het Rosneft-kamp een rigoureus besluit. De Russen willen schikken.

Rosneft trekt alle vorderingen ten aanzien van de Armeense tak van Yukos in. De voormalige eigenaren mogen de bezittingen houden. Ten minste 337 miljoen dollar wordt verdeeld onder alle aandeelhouders die hun geldbelegging verloren met de onteigening van Yukos. Het is het eerste geld van het vermogen van het ontmantelde olieconcern dat naar de voormalige aandeelhouders gaat.

In ruil laat Yukos vorderingen tegen Rosneft vallen. En – niet geheel onbelangrijk – de manipulatie van rechtspraak blijft binnenskamers.

*Reageren? Mail naar* onderzoek@nrc.nl*.*

## REACTIES. ROSNEFT: VONNISSEN ZIJN CORRECT TOT STAND GEKOMEN

**Rosneft** laat weten dat de Armeense vonnissen correct tot stand zijn gekomen. In de Nederlandse procedures zijn over en weer beschuldigingen gedaan, volgens het olieconcern. Die zijn uitvoerig besproken, waarna de zaak geschikt is, aldus Rosneft, dat de zaak als „gesloten" beschouwd.

**Baker Botts** wijst iedere beschuldiging dat zijn advocaten de rechtspraak in Armenië zouden hebben beïnvloed van de hand. „Deze aantijgingen (…) dateren van een procedure van drie jaar geleden die inmiddels is geschikt." Baker Botts zegt „gezien de vertrouwelijkheidsregels" geen nader commentaar te kunnen geven.

De Armeense advocaat **Edward Mouradian** ontkent de gerechtelijke vonnissen gemanipuleerd te hebben. Gedetailleerd reageren kan hij niet, zegt hij, omdat partijen een schikking getroffen hebben.

**Een woordvoerder van Yukos** reageert dat dit toont hoever de Russische Federatie wil gaan om de rechtsgang te manipuleren.

De volledige reacties, onvertaald:

Opmerkingen? Mail ons

# Exhibit 10(1)(a)



1993: Formation of Yukos

The Russian oil company Yukos was formed from the Russian privatizations in the 1990s and eventually grew into one of the world's biggest oil companies. At the beginning of this century, Khodorkovsky came into conflict with President Putin when he exhibited political ambitions.



www.newtypecommunications.com

445 Fifth Avenue
New York, New York 10016
Phone  212-686-5555

**CERTIFICATION**

I certify under penalty of perjury that the following is a true and correct translation into
<u>ENGLISH</u> of the attached document(s) relating to:

1993: Formation of Yukos

written in <u>DUTCH</u>.

NEWTYPE COMMUNICATIONS, INC.

Executed on June 7, 2017

# Dutch Original of Exhibit 10(1)(a)



## 1993: ontstaan Yukos

Het Russische olieconcern Yukos ontstond uit de Russische privatiseringen van de jaren negentig en groeide tijd uit tot een van de grootste olieconcerns in de wereld. Begin deze eeuw kwam Chodorkovski in botsing met president Poetin, toen hij politieke ambities toonde.

# Exhibit 10(1)(b)



2006: Bankruptcy

Yukos was declared bankrupt by a Russian court in 2006. CEO Mikhail Khodorkovsky had already been arrested in 2003 on suspicion of corruption and tax evasion. In 2005, he was sentenced to 8 years in a labor camp. He was released at the end of 2013 and now lives in Switzerland.



www.newtypecommunications.com

445 Fifth Avenue
New York, New York 10016
Phone  212-686-5555

**CERTIFICATION**

I certify under penalty of perjury that the following is a true and correct translation into
<u>ENGLISH</u> of the attached document(s) relating to:

2006: Bankruptcy

written in <u>DUTCH</u>.

NEWTYPE COMMUNICATIONS, INC.

Executed on June 7, 2017

# Dutch Original of Exhibit 10(1)(b)



## 2006: Faillissement

Yukos werd in 2006 door de Russische rechter failliet verklaard. Topman Michail Chodorkovski was al in 2003 gearresteerd op verdenking van corruptie en belastingontduiking. In 2005 werd hij veroordeeld tot 8 jaar strafkamp. Hij kwam eind 2013 vrij en woont nu in Zwitserland.

# Exhibit 10(1)(c)



2014: $50 billion fine after takeover by Rosneft

After the bankruptcy, the Russian holdings of Yukos came under the control of Rosneft, which is headed by Igor Sechin, a Putin confidant. In 2014, the Permanent Court of Arbitration ordered Russia to pay a fine of 50 billion dollars because the country had violated the International Energy Charter. That award was set aside by a court in The Hague, and since then the former owners have lodged an appeal.



www.newtypecommunications.com

445 Fifth Avenue
New York, New York 10016
Phone  212-686-5555

## CERTIFICATION

I certify under penalty of perjury that the following is a true and correct translation into
ENGLISH of the attached document(s) relating to:

2014: $50 billion fine after takeover by Rosneft

written in DUTCH.


NEWTYPE COMMUNICATIONS, INC.


Executed on June 7, 2017

# Dutch Original of Exhibit 10(1)(c)



## 2014: $50 miljard boete na overname door Rosneft

Na het faillissement kwamen de Russische bezittingen van Yukos in handen van Rosneft dat onder leiding staat van Igor Setjsin, een vertrouweling van Poetin. Het Permanente Hof van Arbitrage veroordeelde Rusland in 2014 tot een boete van 50 miljard dollar omdat het land het Internationale Energiehandvest had geschonden. Dat vonnis werd vernietigd door een Haagse rechtbank, inmiddels hebben de voormalige eigenaren beroep aangetekend.

# Exhibit 10(1)(d)



2015: Russian legislation takes precedence over European

Previously the European Court of Human Rights (ECtHR, photo) had ordered Russia to pay the Yukos camp compensation of 1.9 billion euros. That money was never paid because in 2015 a Russian judge ruled that national legislation prevails over ECtHR decisions.



www.newtypecommunications.com

445 Fifth Avenue
New York, New York 10016
Phone  212-686-5555

### CERTIFICATION

I certify under penalty of perjury that the following is a true and correct translation into
<u>ENGLISH</u> of the attached document(s) relating to:

2015: Russian legislation takes precedence over European

written in <u>DUTCH</u>.

NEWTYPE COMMUNICATIONS, INC.

Executed on June 7, 2017

# Dutch Original of Exhibit 10(1)(d)



## 2015: Russische wetgeving gaat voor Europese

Eerder al had het Europese Hof voor de Rechten van de Mens (EHRM, foto) Rusland veroordeeld tot een vergoeding aan het Yukos-kamp van 1,9 miljard euro. Dat geld is nooit uitgekeerd omdat een Russische rechter in 2015 oordeelde dat nationale wetgeving prevaleert boven uitspraken van het EHRM.

# Exhibit 10(2)

## WRITTEN STATEMENT BY SURIK GHAZARYAN

I, Surik Ghazaryan, declare the following under oath:

1.   I am a citizen of Armenia, born on January 5, 1958 in the village of Gegashen, province of Kotayk, Armenia. From 1976 through 1978, I served in the Soviet Army as a parachutist. I hold eight military honors. In addition, I fought during the military conflict in Nagorno-Karabakh. My full CV describing my professional work experience and military honors is attached to this Statement as Annex 1.

2.   In 1974, I completed my schooling in the village of Gegashen, and in 1984 I completed my studies at the law school of the State University of Yerevan. From 1991 through 2011, I worked as a judge in the first and second instance. Before I assumed the position of judge, I worked as a researcher at the Ministry of Internal Affairs of the Armenian Socialist Soviet Republic.

3.   In 2008, I was appointed judge for the district court with general jurisdiction for the administrative districts of Arabkir and Kanaker-Zeytun in the city of Yerevan – the capital of Armenia. I held that position until March 19, 2011.

4.   Based on my experience, I could write a book about the pressure that was periodically exerted on me as a member of the Armenian judiciary in general and as a judge in cases relating to Yukos Oil Company ("Yukos") in particular. As is made clear in the following, it is clearly evident from the experiences that I had as former judge and now as a plaintiff in cases relating to my pension and social benefits that one can be subjected to reprisals for unacceptable judicial decisions and that in

Judge Surik Ghazaryan   [*signature*]

Armenia "telephone justice" based on the Soviet model exists on a large scale. By "telephone justice," I refer to the practice whereby judges [*officials*] are considered to be following orders from higher-placed members of the judiciary. This practice was widespread in the Soviet period, and it exists in Armenia's judiciary to this day. Because the independence of courts is a distinguishing feature of any just society and because such independence in Armenia comes off badly in the event of politically important cases, including cases in which "Yukos" is involved, I am freely making a statement about my direct findings relating to injustices that have taken place within the Armenian legal system.

5.   In February 2010, I was the presiding judge of a multiple-judge chamber that was in charge of a case that had been assigned to me through regular channels. The case related to the claim that had been filed by the companies Moravel Investment Limited Company ("Moravel") and Yukos International (UK) B.V. ("Yukos International B.V.") concerning the recognition and enforcement of an award handed down by the London Court of International Arbitration ("LCIA") in favor of Moravel and against "Yukos." In an arbitral award dated September 16, 2005, the LCIA ordered "Yukos" to pay Moravel some 655 million US dollars plus interest and expenses ("Moravel Arbitral Award"). The situation in March 2008 was that the total debt of "Yukos" to Yukos International B.V., which had acquired Moravel's rights, came to around 847 million US dollars.

Judge Surik Ghazaryan   [*signature*]

6.   Because the Moravel Arbitral Award was in conformity with the 1958 New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards, which was signed by Armenia, on February 12, 2010 I handed down a judgment affirming that Yukos International B.V. had a right to enforcement of the Moravel Arbitral Award (Moravel Enforcement Order). Annex 2 contains an authentic and true copy of the Moravel Enforcement Order in Armenian. Annex 3 contains an English translation of the order. When I was dealing with the case and issued the Moravel Enforcement Order, I was not aware that the order was regarded by the Presiding Judge of the Armenian Court of Cassation, Mkrtumyan, and by people behind him as contrary to the interests of the Russian Federation and consequently the interests of the Republic of Armenia.

7.   Shortly after the Moravel Enforcement Order was issued and as a direct result of the judgment against "Rosneft," I was the victim of considerable reprisals and repression, and ultimately I felt compelled to offer my resignation and withdraw as a member of the judiciary. The measures taken against me complemented each other and were intended not only to frighten me, but also to exert influence over other judges so that they would comply with the instructions of higher judges.

8.   First of all, the Presiding Judge of the District Court of Arabkir and Kanaker-Zeytun, Judge Mger Khachatryan, informed me at the end of February 2010 that the Armenian Courts Department had requested a copy of the Moravel Enforcement Order.

Judge Surik Ghazaryan   [*signature*]

A representative of the Courts Department called on me personally at the district courthouse and asked for the original of the order. I sensed that there was a problem because they usually pull judgments from the judicial files on their own if they want to check them. This was the first time in my career as judge that this sort of thing had happened to me. This was clearly done in order to frighten me.

9.   Second, on March 26, 2010 the Disciplinary Committee of the Council of Justice launched a disciplinary case against me regarding a matter that had nothing to do with "Yukos." Although only the minister of justice is authorized to submit a request for disciplinary measures against judges, in my case this request was personally submitted to the Disciplinary Committee of the Council of Justice by the Presiding Judge of the Court of Cassation, Arman Mkrtumyan. He said that I had wrongly disregarded certain evidence relating to a case. However, the record of the case that I examined proved that I could not have considered the evidence in question, because it did not become known until a month after I had handed down the judgment. Nevertheless, on April 10, 2010 I received an official warning from the Council of Justice for the Republic of Armenia, of which Presiding Judge Mkrtumyan was also the chair, relating to the purported fact that I had violated Armenian procedural law. This was the first reprimand that I had ever received in my twenty-year career as a judge and my thirty-six-year career in the law enforcement system.

10.  Third, in August 2010 the Court of Arabkir received an award as best court in the city of Yerevan. Approximately one week later, Presiding Judge Mkrtumyan personally

Judge Surik Ghazaryan   [*signature*]

paid a visit to our court in order to present a certificate and a picture of Lady Justice as a motivational prize. In the presence of all the judges and staff of the Court of Arabkir, he accused me of "having had the nerve" to handle a case of international importance in which "Yukos" was involved and of handing down a judgment "without having first discussed the case with him and obtaining his consent." I protested publicly, declaring that I had not made any mistakes in my judgment and that the judgment itself was lawful. That did not play a role for Presiding Judge Mkrtumyan.

11.  Fourth, on the same day the Presiding Judge of the District Court, Judge Mger Khachatryan, Presiding Judge Mkrtumyan, and Court of Cassation judges David Avetisyan and Slava Sarkisyan appeared in my office, where my certificates and honors hung on the wall (which are named in Annex 1). Judge David Avetisyan looked at those honors and remarked that "none of my former honors and achievements would help me" in this situation.

12.  At that point, the Presiding Judge of the District Court, Judge Mger Khachatryan, tried to defend me and told everyone present that I was one of the best judges on our court and often handled multiple difficult cases at the same time. Despite Judge Khachatryan's experience, age, and authority, Presiding Judge Mkrtumyan ignored his remark, and it was clear that he had no intention of halting the pressure exerted on me personally.

13.  Fifth, a short time later I received an official warning from the chair of the Judicial Ethics Committee, David Avetisyan, who is also a judge and chair of the Board for Criminal Cases at the Court of Cassation, saying that

Judge Surik Ghazaryan   [*signature*]

disciplinary measures could again be taken against me, this time because of my failure to attend seminars in connection with ongoing judicial education. Contrary to what was alleged, I had been officially exempted from attending those seminars because I was the presiding judge for court hearings about serious criminal matters that could not be interrupted. It bears noting here that I had been exempted from mandatory attendance of the seminars by none other than Judge Avetisyan. My colleagues at the district court were aware of my difficult situation and of the fact that Presiding Judge Mkrtumyan had chosen me as the target of extreme disciplinary measures.

14. Sixth, in August 2010 the presiding judge of the District Court, Mger Khachatryan, instructed me to handle a second case relating to "Yukos." I understood that that case had been assigned to me as the next punishment for the judgment previously handed down concerning Moravel. The measure in question was exceptional and was clearly intended to send the following signal to my fellow judges: anyone who dares deviate from the existing "rules" and does not follow directions can count on retaliation measures and ==will have to solve the resulting problem on his own.== Although I protested this exceptional assignment and stated that I did not want to handle this case, Judge Mger Khachatryan informed me that I had no choice if I "wanted to save my skin." Judge Mger Khachatryan told me that I should contact the Court of Cassation for further instructions. There I met with the chair of the Board for Civil Cases, Judge Yervand Khundkaryan, who ordered me to contact Judge Mamikon Drmeyan, who was also

Judge Surik Ghazaryan   [*signature*]

a member of the Board for Civil Cases within the Court of Cassation. From these instructions and from the pressure exerted on me, I concluded that Judge Drmeyan was the actual "responsible judge" for all cases relating to "Yukos," whereby he received instructions from Presiding Judge Mkrtumyan.

15. The second case had to do with the claim by the Armenian citizen Armen Mikaelyan – the director of the Armenian company Yukos CIS Investment Ltd. ("Yukos CIS"), Yukos CIS, Yukos International B.V., Luxtona Ltd. and Administratiekantoor FPH versus "Rosneft" (Russian state oil company) and the Armenian State Agency for the Registration of Legal Entities. The plaintiffs challenged the right of "Rosneft" to bring Yukos CIS under its control. Based on what Judge Mger Khachatryan had told me, I understood that Yukos CIS possessed valuable economic interests. Among other things, the plaintiffs claimed that the acquisition of Yukos CIS by the defendant was invalid owing to serious violations based on Russian legislation. They claimed that "Rosneft" was thus not the lawful owner of Yukos CIS and that the registration of Rosneft as the owner of Yukos CIS in the State Register of Legal Entities of the Republic of Armenia must be deleted.

16. Right after I assumed the case on August 9, 2010, Court of Cassation Judge Mamikon Drmeyan, during the first meeting with him, ordered me to look for a way to keep the case from going to trial and said that I had to rule against the plaintiffs. Based on this instruction, on August 13 I refused to consider the merits of the case, justifying that by saying that it fell outside our jurisdiction. Annex 4 contains an authentic and true

Judge Surik Ghazaryan   [*signature*]

copy of my judgment in Armenian. Annex 5 contains an English translation of that judgment. I realized that this was one of the sensitive cases that had to be ruled on in a specific, predetermined way.

17. All five of the plaintiffs filed an appeal. The civil court of appeal dismissed the appeal by Yukos CIS but remanded the case to the district court with respect to the four other plaintiffs, whereby the civil court of appeal declared that the district court did have jurisdiction to hear the case. In December 2010, I got the case back with five boxes of evidence that had to be evaluated. In keeping with instructions received earlier, I went to Judge Drmeyan of the Court of Cassation and told him that evaluating the additionally presented evidence would take some time. Judge Drmeyan ordered me not to consider any new evidence, to schedule a hearing date in the form of accelerated proceedings, and to await further instructions. Considering the available dates in my court calendar, I scheduled hearings on February 17, 2011. While I prepared for the hearing, I also began composing a document in Word in which I transcribed the parties' positions as articulated in the documents provided by them.

18. On February 14, 2011, I asked Judge Khachatryan for permission to take my annual leave, which he granted. The handling of cases for which a hearing is scheduled during the judge's leave period is usually put on hold until the judge has returned. The stress that I had experienced over the two prior months weighed on me heavily; the state of my health had worsened, and I had become dependent on

Judge Surik Ghazaryan   [*signature*]

insulin (I had been diagnosed with type 2 diabetes on August 7, 2003). During my visit to a doctor, he advised me to get treatment for diabetes during the vacation period, and he prepared a certificate of temporary disablement for me. According to Armenian legislation, someone who is temporarily on leave owing to disablement cannot be summoned to return to work. I hoped that this temporary leave owing to disablement would give me enough time to work on my health and to make my constitution stress-free, since I would be able to escape heading up the second "Yukos" case. However, I underestimated Presiding Judge Mkrtumyan's desire to punish me. The next day, the Presiding Judge of the District Court, Mger Khachatryan, called me to return to work. He said that I could not ignore the work (by taking sick leave or going on vacation) until I had handed down a judgment in the "Yukos" case in keeping with the February 17 hearing scheduled in the first instance. All other cases that I was dealing with were postponed because of my planned absence, but I had to return and deal with that case relating to "Yukos."

19.   In accordance with Judge Mger Khachatryan's instructions, I held the sitting concerning the case on February 17. Over the course of the proceedings, I periodically took breaks so that I could report to Judge Drmeyan and receive instructions. On that day, during the hearing, I phoned Judge Drmeyan at least twice in order to report to him on the handling of the case.

20.   A couple of days after the hearing, Judge Drmeyan summoned me to give me the judgment that I was supposed to hand down in the case. I gave him my memory card

Judge Surik Ghazaryan   [*signature*]

and he transferred the judgment in the case to it. The judgment received from Judge Drmeyan was favorable to Rosneft and the Armenian State Agency for the Registration of Legal Entities. Judge Drmeyan asked me to hold off delivering the judgment until he had spoken with Presiding Judge Mkrtumyan and received his definitive approval. Judge Drmeyan then ordered me to use the judgment stored on my memory card as if it were my own judgment.

21. On February 23, I felt that I had no choice and followed Judge Drmeyan's instructions by delivering a judgment in favor of "Rosneft" (which was actually regarded by everyone as part of the Russian government). Annex 6 contains an authentic and true copy of the judgment in question. Annex 7 contains the English translation.

22. Even though I delivered a judgment in favor of "Rosneft" and the Russian state in keeping with the instructions received, I was still forced to resign as judge. Besides the fact that I had been punished for the judgment in favor of "Yukos" in February 2010 in connection with the Moravel Enforcement Order, the people in charge of the Armenian judiciary in all likelihood wanted to send a clear signal to the rest of the judiciary that judges are required to follow directions from above. Thirty minutes after the judgment of February 23, 2010 had been handed down, Judge Mger Khachatryan called on me to resign, effective immediately. I was dismayed and surprised by this call, but I again felt that I had no choice. This time I had underestimated the wrath of Presiding Judge

Judge Surik Ghazaryan   [*signature*]

Mkrtuyan [sic]. He now found it necessary to show that he had the courts and judges under his thumb. Refusal was impossible. When it became known that Presiding Judge Mkrtuyan [sic] had it out for me, I became completely isolated within the court and a target of ridicule. Presiding Judge Mger Khachatryan informed me that I had only one choice – resigning.

23.  At his initiative and in my presence, Presiding Judge Mger Khachatryan phoned Presiding Judge Mkrtumyan to further specify the conditions for my resignation. While Presiding Judge Mger Khachatryan spoke with Presiding Judge Mkrtumyan by phone, I could hear Presiding Judge Mkrtumyan's voice; I heard him personally promise Presiding Judge Mger Khachatryan that they would allow me to keep all my privileges and my pension (as a resigned judge, I would have the right to such privileges in accordance with the laws of Armenia). Presiding Judge Mger Khachatryan also told me that after his phone conversation. However, Presiding Judge Mkrtumyan did not keep his promise and subsequently took measures to block all of my attempts to receive a pension. That has continued to this day.

24.  Despite my cooperation with handing down the judgment in favor of "Rosneft" and Presiding Judge Mkrtumyan's promise, further retaliation measures were taken against me personally even after my resignation. Specifically: even though based on Armenian labor legislation I had the right to 75% of my last salary as judge, the Ministry of Labor and Social Affairs refused to give me a pension or benefits – both of the sort that is awarded to judges and the sort to which one is entitled in the regular sense. I contested that decision before the Administrative Court of the Republic of Armenia.

Judge Surik Ghazaryan   [*signature*]

After lengthy delays and postponements in taking up the case, on August 3, 2011 the Administrative Court handed down a decision awarding me a pension of 55% of my last monthly salary for the function of judge. The Ministry of Labor and Social Affairs contested that decision, however. After the court hearing was over and at the moment when the judges were in chambers, the Court of Appeal – contrary to all laws and under pressure from Presiding Judge Mkrtumyan, which is unquestionably a usual practice – accepted the appeal by the Ministry of Finance, which stated that the ministry had not been involved in the handling of the case (whereas I had personally informed the ministry).[1] As a result, the Administrative Court of Appeal set aside the decision and remanded the case to the Administrative Court. For nearly ten months, the Ministry of Finance has refused to take part in court hearings and the court has refused to expedite the case, even though the court does have the authority to do so. The case is still pending to this day. Because I have essentially been denied my judge's pension in this way, I have tried to obtain a general pension and a disability pension. That has also been denied me.

25. After I had exhausted all possibilities for getting a pension within the Armenian courts, in early September of this year I made contact with the offices of Court of Cassation Judges Yervand Khundkaryan and David Avetisyan. Judge David Avetisyan ignored my request for a meeting, but Judge Yervand Khundkaryan personally phoned on the evening of

---

[1] Armenian legislation requires that the Ministry of Finance be informed about any matter that could have consequences for the state budget.

Judge Surik Ghazaryan   [*signature*]

September 25. I asked him to inform Presiding Judge Mkrtumyan of the problems that I was having and about my request for an end to the persecution and to make it possible for me to receive a pension. My requests have been ignored to this day.

26.   I assume that Presiding Judge Mkrtumyan and the people behind him are willing to take extreme measures to punish me and thus to set an example. I know of no cases in which a judge who has submitted his resignation, and was not fired for valid reasons, has not been awarded a judge's pension or benefits.

27.   After I had submitted my resignation, I sought work with ZAO [*private limited liability company*] "ArmRusGazProm," "Armyanskie Elektroseti," "Yerevan Gaz," and the Pedagogic University of Yerevan. I had made provisional arrangements with some of those organizations, which had proposed putting me in charge of departments responsible for legal disputes. All of those organizations refused to hire me, without a word of explanation.

28.   For a year and a half now, I have received no pension or benefits. Having had recourse to all judicial authorities (having pursued all possible proceedings), I am convinced that my chance of getting a pension or privileges is nearly nil. I have repeatedly contacted the Armenian president, the Armenian ombudsman, and ambassadors of European countries, but to no avail. I have tried to become established as a legal consultant, but all of my potential clients have figured out that their claims were doomed to fail because I was regarded as a dissident who had quarreled with the Armenian judiciary. Even the bulk of my family members and former colleagues have broken off all contact with me, because I am publicly critical of those in charge of the Armenian judiciary.

Judge Surik Ghazaryan   [*signature*]

29. Furthermore, in June 2012 my case was discussed in the report on human rights in Armenia in 2011 by the US State Department. I became even more isolated. The problems that I have described in the previous paragraphs continue. Every day I feel the pressure growing stronger and I become more isolated. I am continuing with the revelations about this system in my press publications and writings. I have written articles and published poems about the injustice and manipulation of the legal system and about the contempt for the legal order.

30. As is generally known and as I know from experience, the judiciary in Armenia is not independent and is subject to strong controls. This is true specifically of politically important cases. Cases in which "Yukos," affiliated companies, and "Rosneft" (the Russian government) are involved take a predetermined course in concrete terms. Every Armenian judge in charge of proceedings having to do with "Yukos" has received a clear and unambiguous signal: either you follow directions from above and hand down judgments in favor of "Rosneft" and against "Yukos," or you face serious consequences. I was a judge with years of experience, an irreproachable record of service, and a number of honors, but even that played no role and did not help me avoid being fired, because I had not submitted to the wishes of those on high. Any judge who acts in that way meets the same fate and gets the same punishment.

31. I would like people to understand the motives for my story: I have decided to make a statement in the interest of justice, and I do not harbor any personal animosity toward

Judge Surik Ghazaryan   [*signature*]

Russia or Armenia. Although I fear for my life and for the safety of my family, I consider it my duty to expose the "telephone justice" practiced in the Armenian judiciary, as well as concrete details of the practices applied in cases relating to "Yukos."

I declare that the preceding is true and accurate to the best of my knowledge. I am willing to provide a statement about these facts before courts in the Netherlands and elsewhere and any other competent institution, and this statement was signed in *Los Angeles* on *October 19, 2012*.

_____[*signature*]
Surik Ghazaryan
Resigned judge, Republic of Armenia

MADE UNDER OATH AND SIGNED BY ME ON THIS DATE, *19 October* 2012

[*signature*]
Notary in and on behalf of the state CAL

[*English-language stamp*]

[*illegible seal*]

Judge Surik Ghazaryan   [*signature*]



www.newtypecommunications.com

445 Fifth Avenue
New York, New York 10016
Phone  212-686-5555

## CERTIFICATION

I certify under penalty of perjury that the following is a true and correct translation into
<u>ENGLISH</u> of the attached document(s) relating to:

Written Statement by Surik Ghazaryan dated October 19, 2012

written in <u>DUTCH</u>.


NEWTYPE COMMUNICATIONS, INC.


Executed on June 7, 2017

Dutch Original of
Exhibit 10(2)

## SCHRIFTELIJKE VERKLARING VAN SURIK GHAZARYAN

Ik, Surik Ghazaryan, verklaar onder ede het volgende:

1.  Ik ben Armeens staatsburger, geboren op 5 januari 1958 in het dorp Gegashen, provincie Kotajk, Armenië. Ik heb vanaf 1976 t/m 1978 in het Sovjetleger gediend als parachutist. Ik bezit acht militaire onderscheidingen. Bovendien heb ik gevochten tijdens het militaire conflict in Nagorno-Karabach. Mijn volledige CV, waarin mijn professionele werkervaring en militaire onderscheidingen worden genoemd, is als Bijlage 1 bij deze Verklaring gevoegd.

2.  In 1974 heb ik mijn schoolopleiding in het dorp Gegashen afgerond en in 1984 mijn studie aan de juridische faculteit van de Staatsuniversiteit van Yerevan. Vanaf 1991 t/m 2011 heb ik als rechter in eerste en tweede aanleg gewerkt. Voordat ik de functie van rechter ging bekleden, heb ik als rechercheur gewerkt bij het ministerie van Binnenlandse Zaken van de Armeense Socialistische Sovjetrepubliek.

3.  In 2008 ben ik benoemd tot rechter van de districtsrechtbank met algemene jurisdictie voor de administratieve districten Arabkir en Kanaker-Zejtun in de stad Yerevan – de hoofdstad van Armenië. Deze functie heb ik bekleed t/m 19 maart 2011.

4.  Dankzij mijn ervaring kan ik een boekje opendoen over de druk die geregeld werd uitgeoefend op mij als lid van de Armeense rechterlijke macht in het algemeen en als rechter in zaken met betrekking tot Yukos Oil Company ("Yukos") in het bijzonder. Zoals hieronder duidelijk wordt, blijkt uit de ervaring die ik heb opgedaan als afgetreden rechter en thans als eiser in zaken betreffende mijn pensioen en sociale uitkeringen duidelijk dat men voor onaanvaardbare rechterlijke beslissingen of handelingen represailles tegemoet kan zien en dat in

Rechter Surik Ghazaryan    [*handtekening*]

Armenië op grote schaal sprake is van "telephone justice" naar Sovjetmodel. Met "telephone justice" bedoel ik de praktijk dat rechters [*officials*] worden geacht orders van hoger geplaatste leden van de rechterlijke macht op te volgen. In de Sovjetperiode was deze praktijk wijdverbreid en in de rechterlijke macht van Armenië bestaat zij tot op heden. Omdat de onafhankelijkheid van rechtbanken een onderscheidend kenmerk is van iedere rechtvaardige maatschappij en omdat deze onafhankelijkheid in Armenië in de meeste gevallen het loodje legt in het geval van politiek gewichtige zaken, onder meer in zaken waarbij "Yukos" betrokken is, leg ik vrijelijk een verklaring af over mijn directe bevindingen met betrekking tot onrechtvaardigheden die zich hebben afgespeeld binnen het Armeense rechtssysteem.

5.  In februari 2010 was ik voorzitter van een meervoudige kamer die belast was met een zaak die mij op reguliere wijze was toegewezen. De zaak had betrekking op de eis die was ingediend door de bedrijven Moravel Investment Limited Company ("Moravel") en Yukos International (UK) B.V. ("Yukos International B.V.") inzake erkenning en gedwongen tenuitvoerlegging van een vonnis van de London Court of International Arbitration ("LCIA") ten gunste van Moravel en ten nadele van "Yukos". In een arbitraal vonnis van 16 september 2005 veroordeelde het LCIA het bedrijf "Yukos" tot betaling van ruim 655 miljoen US dollar plus rente en kosten aan Moravel ("Moravel arbitraal vonnis"). In maart 2008 was de situatie, dat de totale schuld van "Yukos" aan het bedrijf Yukos International B.V., die de rechten van Moravel had verkregen, ruim 847 miljoen US dollar bedroeg.

Rechter Surik Ghazaryan   [*handtekening*]

6.  Daar het Moravel arbitraal vonnis in overeenstemming was met het Verdrag van New York van
    1958 tot erkenning en tenuitvoerlegging van buitenlandse arbitrale vonnissen, dat is
    ondertekend door Armenië, sprak ik op 12 februari 2010 een vonnis uit, waarmee ik bevestigde
    dat Yukos International B.V. recht had op de gedwongen tenuitvoerlegging van het Moravel
    arbitraal vonnis (Moravel Exequatur Vonnis). Bijlage 2 bevat een authentieke en
    waarheidsgetrouwe kopie van het Moravel Exequatur Vonnis in de Armeense taal. Bijlage 3
    bevat een Engelse vertaling van het vonnis. Toen ik de zaak behandelde en het Moravel
    Exequatur Vonnis uitsprak, was ik mij er niet van bewust dat het vonnis door de Voorzitter van
    het Armeense Hof van Cassatie Mkrtumyan en mensen achter hem werd beschouwd als strijdig
    met de belangen van de Russische Federatie en dientengevolge de belangen van de Republiek
    Armenië.

7.  Kort na de uitspraak van het Moravel Exequatur Vonnis en als direct gevolg van het vonnis
    tegen "Rosneft'" werd ik het slachtoffer van aanzienlijke represailles en onderdrukking en zag
    ik mij tenslotte gedwongen om mijn ontslag in te dienen en mij terug te trekken als lid van de
    rechterlijke macht. De tegen mij getroffen maatregelen vulden elkaar aan en waren niet alleen
    bedoeld om mij bang te maken, maar ook om invloed uit te oefenen op andere rechters, opdat zij
    gehoor zouden geven aan de aanwijzingen van hogere rechters.

8.  Ten eerste liet de Voorzitter van de Districtsrechtbank Arabkir en Kanaker-Zejtun, de rechter
    Mger Khachatryan, mij eind februari 2010 weten dat het Armeens Gerechtsdepartement had
    gevraagd om een kopie van Moravel Exequatur Vonnis

Rechter Surik Ghazaryan   [*handtekening*]

Een vertegenwoordiger van het Gerechtsdepartement kwam persoonlijk langs bij de districtsrechtbank en vroeg om het originele vonnis. Ik voelde aan dat er sprake was van een probleem omdat zij in de regel zelf vonnissen uit gerechtelijke dossiers halen als zij die willen controleren. Het was de eerste keer in mijn carrière als rechter dat mij zoiets overkwam. Men deed dit duidelijk om mij bang te maken.

9.   Ten tweede spande de Disciplinaire Commissie van de Raad voor Justitie op 26 maart 2010 een disciplinaire zaak tegen mij aan inzake een kwestie die niets met "Yukos" te maken had. Hoewel alleen de minister van Justitie bevoegd is om een verzoek in te dienen tot het treffen van disciplinaire maatregelen tegen rechters, werd dit verzoek aan de Disciplinaire Commissie van de Raad voor Justitie in mijn geval persoonlijk ingediend door de Voorzitter van het Hof van Cassatie, Arman Mkrtumyan. Hij verklaarde dat ik bepaalde bewijzen met betrekking tot een zaak onrechtmatig had genegeerd. De stukken van de door mij onderzochte zaak bewezen echter dat ik de bewijzen in kwestie niet in beschouwing had kunnen nemen, omdat deze pas een maand nadat ik het vonnis had uitgesproken bekend waren geworden. Niettemin kreeg ik op 10 april 2010 een officiële waarschuwing van de Raad voor Justitie van de Republiek Armenië, waarvan Voorzitter Mkrtumyan overigens voorzitter was, vanwege het zogenaamde feit dat ik het Armeense procesrecht zou hebben geschonden. Dit was de eerste berisping die men mij heeft gegeven in mijn twintigjarige carrière als rechter en mijn zesendertigjarige carrière in het rechtshandhavingssysteem.

10.   Ten derde ontving de Rechtbank van Arabkir in augustus 2010 een onderscheiding als beste rechtbank van de stad Yerevan. Ongeveer een week later bracht Voorzitter Mkrtumyan persoonlijk

Rechter Surik Ghazaryan   [*handtekening*]

een bezoek aan onze rechtbank om een Oorkonde en een beeld van Vrouwe Justitia te overhandigen bij wijze van aanmoedigingsprijs. In de aanwezigheid van alle rechters en medewerkers van de Rechtbank van Arabkir beschuldigde hij mij ervan dat ik "het lef had gehad" om een zaak van internationaal belang waar "Yukos" bij betrokken was te behandelen en er een vonnis over uit te spreken "zonder de zaak eerst met hem te hebben besproken en zonder zijn toestemming te hebben ontvangen". Ik protesteerde publiekelijk, waarbij ik verklaarde dat ik geen fouten had gemaakt in mijn vonnis en het vonnis op zichzelf wettig was. Voor Voorzitter Mkrtumyan speelde dat geen enkele rol.

11. Ten vierde verschenen dezelfde dag de Voorzitter van de Districtsrechtbank rechter Mger Khachatryan, Voorzitter Mkrtumyan en de rechters van het Hof van Cassatie David Avetisyan en Slava Sarkisyan in mijn kantoor, waar aan de muur mijn certificaten en onderscheidingen hingen (die worden genoemd in Bijlage 1). Rechter David Avetisyan keek naar deze onderscheidingen en merkte op dat "geen van mijn vroegere onderscheidingen en wapenfeiten mij zouden helpen" in deze situatie.

12. De Voorzitter van de Districtsrechtbank rechter Mger Khachatryan probeerde mij op dat moment te verdedigen en zei tegen alle aanwezigen dat ik een van de beste rechters van onze rechtbank was en vaak meerdere zware zaken tegelijk behandelde. Ondanks de ervaring, leeftijd en autoriteit van rechter Khachatryan negeerde Voorzitter Mkrtumyan zijn opmerking, het was duidelijk dat hij niet van plan was om te stoppen met het uitoefenen van druk op mijn persoon.

13. Ten vijfde kreeg ik korte tijd later van de voorzitter van de Gerechtelijke Commissie voor Ethiek David Avetisyan, die tevens rechter en voorzitter is van het College voor Strafzaken van het Hof van Cassatie, een officiële waarschuwing dat men opnieuw

Rechter Surik Ghazaryan    [handtekening]

disciplinaire maatregelen tegen mij zou kunnen treffen, ditmaal vanwege het niet deelnemen aan seminars in het kader van de juridische education permante. In tegenstelling tot wat werd beweerd, was ik officieel vrijgesteld van deelname aan deze seminars, omdat ik voorzitter was bij hoorzittingen over ernstige strafzaken die niet konden worden onderbroken. Hierbij moet worden opgemerkt dat ik was vrijgesteld van de verplichte deelname aan de seminars door niemand minder dan rechter Avetisyan. Mijn collega's van de districtsrechtbank waren op de hoogte van mijn lastige situatie en van het feit dat Voorzitter Mkrtumyan mij had gekozen als doelwit voor extreme disciplinaire maatregelen.

14. Ten zesde droeg de voorzitter van de Districtsrechtbank Mger Khachatryan mij in augustus 2010 op een tweede rechtszaak met betrekking tot "Yukos" in behandeling te nemen. Ik begreep dat men mij die zaak had opgedragen als de volgende straf voor het eerder door mij uitgesproken vonnis inzake Moravel. De maatregel in kwestie was uitzonderlijk en had duidelijk ten doel mijn collega-rechters het volgende signaal te geven: iedereen die het waagt om af te wijken van de bestaande "regels" en aanwijzingen niet opvolgt, kan rekenen op vergeldingsmaatregelen en zal het ontstane probleem zelf moeten oplossen. Hoewel ik protesteerde tegen deze uitzonderlijke opdracht en aangaf deze zaak niet te willen voeren, gaf rechter Mger Khachatryan te kennen dat ik geen keus had, als ik "mijn hachje wilde redden". Rechter Mger Khachatryan vertelde me dat ik mij voor nadere instructies diende te wenden tot het Hof van Cassatie. Daar ontmoette ik de voorzitter van het College voor Civiele Zaken, rechter Yervand Khundkaryan, die mij gebood contact op te nemen met rechter Mamikon Drmeyan, die ook

Rechter Surik Ghazaryan   [*handtekening*]

lid was van het College voor Civiele Zaken binnen het Hof van Cassatie. Uit deze instructies en de druk die op mij was uitgeoefend maakte ik op dat rechter Drmeyan de feitelijk "verantwoordelijke rechter" was voor alle zaken met betrekking tot "Yukos", waarbij hij aanwijzingen kreeg van de Voorzitter Mkrtumyan.

15. De tweede zaak had te maken met de eis van de Armeense burger Armen Mikaelyan – directeur van het Armeense bedrijf Yukos CIS Investment Ltd. ("Yukos CIS"), Yukos CIS, Yukos International B.V., Luxtona Ltd. en Administratiekantoor FPH tegen "Rosneft'" (Russische staatsoliemaatschappij) en het Armeens Staatsagentschap voor de Registratie van Rechtspersonen. De eisers betwistten het recht van "Rosneft'" om Yukos CIS onder haar controle te brengen. Op basis van hetgeen de rechter Mger Khachatryan mij had verteld, begreep ik dat het bedrijf Yukos CIS waardevolle economische belangen bezit. De eisers stelden onder andere dat de verwerving van Yukos CIS door de gedaagden ongeldig was als gevolg van ernstige overtredingen volgens de Russische wetgeving. Zij stelden dat "Rosneft'" derhalve niet de rechtmatige eigenaar was van Yukos CIS en dat de registratie van Rosneft' als eigenaar van Yukos CIS in het Staatsregister van Rechtspersonen van de Republiek Armenië moest worden geschrapt.

16. Direct na de aanname van de zaak op 9 augustus 2010 gelastte de rechter van het Hof van Cassatie Mamikon Drmeyan in de loop van de eerste bespreking met hem dat ik een manier moest zoeken om de zaak onbehandeld te laten en een vonnis moest uitspreken ten nadele van de eisers. Op basis van deze instructie weigerde ik op 13 augustus de zaak te inhoudelijk te behandelen met als reden dat deze buiten onze jurisdictie zou vallen. Bijlage 4 bevat een authentieke en waarheidsgetrouwe

Rechter Surik Ghazaryan   [*handtekening*]

kopie van mijn vonnis in de Armeense taal. Bijlage 5 bevat een Engelse vertaling van dit vonnis. Het werd mij duidelijk dat dit een van de gevoelige zaken was, waarover diende te worden gevonnist op een specifieke, vooraf bepaalde wijze.

17. Alle vijf de eisers tekenden beroep aan. Het civiele hof van beroep wees het beroep van Yukos CIS af, maar verwees de zaak voor behandeling terug naar de districtsrechtbank voor zover het de andere vier eisers betrof, waarbij het civiele hof van beroep bepaalde dat de rechtbank wel bevoegd was de zaak te behandelen. In december 2010 kreeg ik de zaak terug met vijf dozen bewijsmateriaal, dat beoordeeld diende te worden. Volgens eerder ontvangen instructies ging ik naar rechter Drmeyan van het Hof van Cassatie en vertelde hem dat de beoordeling van het aanvullend gepresenteerde bewijsmateriaal enige tijd in beslag zou nemen. Rechter Drmeyan beval mij geen nieuw bewijsmateriaal in behandeling te nemen, een datum voor een hoorzitting in de vorm van een versneld proces af te spreken en te wachten op verdere instructies. Rekening houdende met de beschikbare data in mijn gerechtelijk rooster, bepaalde ik hoorzittingen op 17 februari 2011. Terwijl ik de hoorzitting voorbereidde, begon ik ook een document samen te stellen in Word, waarin ik de posities van de partijen kopieerde, zoals die waren verwoord in de door hen aangeleverde documenten.

18. Op 14 februari 2011 vroeg ik rechter Khachatryan om toestemming voor het opnemen van mijn jaarlijkse vakantieverlof en kreeg hier toestemming voor. De behandeling van zaken waarvoor een hoorzitting is gepland in een verlofperiode van de rechter, wordt gewoonlijk aangehouden tot de rechter is teruggekeerd. De stress die ik de twee voorgaande maanden had doorgemaakt, drukte zwaar op mij, mijn gezondheidstoestand verslechterde en ik werd afhankelijk van

Rechter Surik Ghazaryan    [*handtekening*]

insuline (op 7 augustus 2003 is diabetes type 2 bij mij vastgesteld). Tijdens mijn bezoek aan een arts, adviseerde deze mij een behandeling tegen diabetes in de vakantieperiode en maakte hij een bewijs van tijdelijke arbeidsongeschiktheid voor mij op. Volgens de Armeense wetgeving mag iemand die tijdelijk met verlof is vanwege arbeidsongeschiktheid niet worden opgeroepen om weer aan het werk te gaan. Ik hoopte dat dit tijdelijke verlof vanwege arbeidsongeschiktheid mij voldoende tijd zou geven om te werken aan mijn gezondheid en mijn gestel stressvrij te maken, daar ik in staat zou zijn om te ontsnappen aan het voorzitterschap bij de tweede "Yukos"-zaak. Ik onderschatte echter de wil van Voorzitter Mkrtumyan om mij te straffen. De volgende dag riep de Voorzitter van de Districtsrechtbank rechter Mger Khachatryan mij op om aan het werk te gaan. Hij zei dat ik het werk niet kon laten liggen (door ziekteverlof op te nemen of op vakantie te gaan), totdat ik een vonnis zou hebben uitgesproken over de zaak "Yukos" overeenkomstig de in eerste instantie vastgelegde hoorzittingsdatum van 17 februari. Alle overige zaken die ik in behandeling had, werden uitgesteld op grond van mijn geplande afwezigheid, maar ik moest terugkeren en die met "Yukos" verband houdende zaak behandelen.

19.   Overeenkomstig de aanwijzingen van rechter Mger Khachatryan heb ik op 17 februari de hoorzitting betreffende de zaak geleid. In de loop van het proces heb ik geregeld pauzes ingelast, zodat ik kon rapporteren aan rechter Drmeyan en instructies kon ontvangen. Die dag heb ik gedurende de hoorzitting minstens twee maal met rechter Drmeyan gebeld, om verslag aan hem uit te brengen over het verloop van de behandeling van de zaak.

*17/2/2011*

20.   Een paar dagen na de hoorzitting riep rechter Drmeyan mij bij zich om mij het vonnis te geven dat ik over de zaak diende uit te spreken. Ik gaf hem mijn memory card

Rechter Surik Ghazaryan    [*handtekening*]

en hij zette er het vonnis over de zaak op. Het van rechter Drmeyan ontvangen vonnis was in het voordeel van Rosneft'en het Armeens Staatsagentschap voor de Registratie van Rechtspersonen. Rechter Drmeyan vroeg mij te wachten met het uitspreken van het vonnis tot hij zou hebben gesproken met Voorzitter Mkrtumyan en zijn definitieve goedkeuring zou hebben ontvangen. Vervolgens droeg rechter Drmeyan mij op om het op mijn memory card opgeslagen vonnis te gebruiken alsof het mijn eigen vonnis was.

21. Op 23 februari voelde ik dat ik geen andere keus had en volgde ik de instructies van rechter Drmeyan op door een vonnis uit te spreken ten gunste van "Rosneft'" (dat feitelijk door iedereen werd beschouwd als een deel van de Russische overheid). Bijlage 6 bevat een authentieke en waarheidsgetrouwe kopie van het vonnis in kwestie. Bijlage 7 bevat de Engelse vertaling.

22. Hoewel ik in overeenstemming met de ontvangen instructies een vonnis heb uitgesproken ten gunste van "Rosneft'" en de Russische staat, dwong men mij eveneens mijn ontslag in te dienen als rechter. Naast het feit dat men mij had gestraft voor het vonnis ten gunste van "Yukos" in februari 2010 in verband met het Moravel Exequatur Vonnis, wilde de leiding van de Armeense rechterlijke macht naar alle waarschijnlijkheid een duidelijk signaal afgeven aan de rest van de rechterlijke macht, dat rechters worden geacht aanwijzingen van bovenaf op te volgen. Dertig minuten nadat het vonnis van 23 februari 2010 was uitgesproken, riep rechter Mger Khachatryan mij op om per direct mijn ontslag in te dienen. Ik was ontsteld en verbaasd door die oproep, maar voelde wederom ik dat ik geen keus had. Ditmaal had ik de toorn van Voorzitter

Rechter Surik Ghazaryan   [*handtekening*]

Mkrtuyan onderschat. Nu vond hij het nodig om te laten zien dat hij de rechtbanken en rechters onder de duim had. Weigeren was onmogelijk. Toen bekend was geworden dat Voorzitter Mkrtuyan het op mij had voorzien, raakte ik in de rechtbank compleet geïsoleerd en werd ik er een mikpunt van spot. Voorzitter Mger Khachatryan gaf me te kennen dat ik maar één keus had – mijn ontslag indienen.

23. Op zijn initiatief en in mijn aanwezigheid belde Voorzitter Mger Khachatryan Voorzitter Mkrtumyan om de voorwaarden voor mijn ontslag nader te bepalen. Terwijl voorzitter Mger Khachatryan over de telefoon met Voorzitter Mkrtumyan sprak, hoorde ik de stem van Voorzitter Mkrtumyan; ik hoorde dat hij voorzitter Mger Khachatryan persoonlijk beloofde dat men zou toestaan dat ik al mijn privileges en mijn pensioen zou behouden (als afgetreden rechter zou ik recht hebben op dergelijke privileges in overeenstemming met de wetten van Armenië). Voorzitter Mger Khachatryan vertelde mij dat ook na zijn telefoongesprek. Voorzitter Mkrtumyan hield zich echter niet aan zijn belofte en trof vervolgens maatregelen om al mijn pogingen om een pensioen te ontvangen te blokkeren. Dit duurt voort tot op heden.

24. Ondanks mijn medewerking bij het uitspreken van het vonnis te gunste van "Rosneft'" en de belofte van Voorzitter Mkrtumyan, ging men ook na mijn ontslag door met het treffen van vergeldingsmaatregelen tegen mijn persoon. Concreet: hoewel ik conform de Armeense arbeidswetgeving recht had op 75% van mijn laatste salaris als rechter, weigerde het ministerie van Arbeid en Sociale Zaken mij een pensioen of een uitkering te verstrekken – zowel van het soort dat rechters wordt toegekend, als van het soort waar men in reguliere zin recht op heeft. Ik vocht dit besluit aan bij de Administratieve Rechtbank van de Republiek Armenië.

Rechter Surik Ghazaryan   [*handtekening*]

Na langdurige vertragingen en uitstel van behandeling vaardigde de Administratieve Rechtbank op 3 augustus 2011 een besluit uit waarmee mij een pensioen werd toegekend ter hoogte van 55% van mijn laatste maandsalaris voor de functie van rechter. Het ministerie van Arbeid en Sociale Zaken vocht dit besluit echter aan. Na afloop van de rechtszitting en op het moment waarop de rechters zich in raadkamer bevonden, honoreerde het Hof van Beroep in strijd met alle wetten en onder druk van Voorzitter Mkrtumyan, hetgeen ongetwijfeld een gangbare praktijk is, het beroep van het ministerie van Financiën, dat stelde dat het ministerie niet betrokken was geweest bij de behandeling van de zaak (terwijl ik het ministerie persoonlijk op de hoogte had gebracht).[1] Het gevolg was dat het Administratieve Hof van Beroep het besluit vernietigde en de zaak terugverwees naar de Administratieve Rechtbank. Het ministerie van Financiën weigert bijna tien maanden lang deel te nemen aan rechtszittingen en de rechtbank weigert de zaak te bespoedigen, terwijl de rechtbank daar wel toe bevoegd is. De zaak is tot op heden in behandeling. Omdat mij hierdoor in feite mijn rechterspensioen is geweigerd, heb ik geprobeerd een algemeen pensioen te verkrijgen en een invaliditeitspensioen. Dit is mij eveneens geweigerd.

25.   Nadat ik alle mogelijkheden om een pensioen te verkrijgen binnen de rechtbanken van Armenië had uitgeput, nam ik begin september van dit jaar contact op met de kantoren van de Rechters van het Hof van Cassatie Yervand Khundkaryan en David Avetisyan. Rechter David Avetisyan negeerde mijn verzoek om elkaar te ontmoeten, maar rechter Yervand Khundkaryan belde mij persoonlijk 's avonds op 25

---

[1] Volgens de Armeense wetgeving is men verplicht om het ministerie van Financiën te informeren over iedere zaak die gevolgen zou kunnen hebben voor de staatsbegroting.

Rechter Surik Ghazaryan   [handtekening]

september. Ik vroeg hem Voorzitter Mkrtumyan in te lichten over de problemen die ik ondervond en over mijn verzoek om te stoppen met de vervolging en het mij mogelijk te maken een pensioen te ontvangen. Mijn verzoeken worden tot op heden genegeerd.

26. Ik ga er vanuit dat Voorzitter Mkrtumyan en de mensen achter hem bereid zijn extreme maatregelen te treffen om mij te straffen en aldus tot voorbeeld te stellen. Ik ken geen gevallen waarin een rechter die zijn ontslag heeft ingediend, en niet is ontslagen om gegronde redenen, geen rechterspensioen of uitkering is toegekend.

27. Nadat ik mijn ontslag had ingediend, heb ik gesolliciteerd naar werk bij ZAO [*B.V.*] "ArmRusGazProm", "Armyanskie Elektroseti", "Yerevan Gaz" en de Pedagogische Universiteit van Yerevan. Ik had voorlopige afspraken gemaakt met enkele van deze organisaties, die mij hadden voorgesteld leiding te gaan geven aan afdelingen voor rechtsgeschillen. Al deze organisaties weigerden mij in dienst te nemen zonder een woord van uitleg.

28. Het lukt mij reeds anderhalf jaar lang niet om aan een pensioen of uitkering te komen. Na mij tot alle juridische instanties te hebben gewend (alle mogelijke processen te hebben doorlopen), ben ik ervan overtuigd dat mijn kans om een pensioen of privileges te verkrijgen nagenoeg nul is. Ik heb mij vele malen tot de Armeense president, de Armeense ombudsman en ambassadeurs van Europese landen gewend, maar zonder resultaat. Ik heb geprobeerd mij als juridische adviseur te vestigen, maar al mijn potentiële klanten hadden door dat hun vorderingen gedoemd waren te mislukken, omdat ik wordt beschouwd als een dissident die ruzie heeft gehad met de Armeense rechterlijke macht. Zelfs het gros van mijn familieleden en voormalige collega's heeft alle contacten met mij verbroken, omdat ik publiekelijk kritiek lever op de leiding van de Armeense rechterlijke macht.

Rechter Surik Ghazaryan   [*handtekening*]

29. Bovendien is mijn zaak in juni 2012 besproken in het rapport over de mensenrechten in Armenië in 2011 van het US State Department. Ik raakte nog meer geïsoleerd. De problemen die ik in de voorgaande alinea's heb beschreven, duren voort. Iedere dag voel ik de druk zwaarder worden en raak ik verder geïsoleerd. Ik ga door met het onthullen van dit systeem in mijn perspublicaties en geschriften. Ik heb artikelen geschreven en gedichten gepubliceerd over de onrechtmatigheid en manipulaties van het rechtssysteem en over de minachting voor de rechtsorde.

30. Zoals algemeen bekend en zoals ik weet uit ervaring, is de rechterlijke macht in Armenië niet onafhankelijk en wordt deze streng gecontroleerd. Dit geldt met name voor politiek gewichtige zaken. Zaken waarbij "Yukos", daaraan gelieerde bedrijven en "Rosneft'" (de Russische overheid) betrokken zijn, hebben concreet een van tevoren vastgestelde afloop. Iedere Armeense rechter die een met "Yukos" samenhangende procedure leidt, heeft een duidelijk en ondubbelzinnig signaal gekregen: of je volgt aanwijzingen van bovenaf op en spreekt vonnissen uit ten gunste van "Rosneft'" en ten nadele van "Yukos", of je krijgt te maken met ernstige consequenties. Ik ben rechter geweest met een jarenlange ervaring, een onberispelijke staat van dienst en tal van onderscheidingen, maar zelfs dat heeft geen enkele rol gespeeld en mij niet geholpen te ontkomen aan ontslag omdat ik mij niet had onderworpen aan de wensen van hogerhand. Iedere rechter die zo handelt treft hetzelfde lot en krijgt dezelfde straf.

31. Ik wil graag dat men de motieven voor mijn relaas begrijpt: ik heb besloten een verklaring af te leggen in het belang van het recht, ik koester hierbij geen persoonlijke vijandige gevoelens jegens

Rechter Surik Ghazaryan   [*handtekening*]

Rusland of Armenië. Hoewel ik vrees voor mijn leven en voor de veiligheid van mijn gezin, acht ik het mijn taak om de in de Armeense rechtspraak gehanteerde "telephone justice" aan de kaak te stellen, evenals concrete details van de praktijk die wordt gebezigd in zaken met betrekking tot "Yukos".

Ik verklaar dat het voornstaande naar mijn beste weten waar en juist is. Ik ben bereid om een verklaring over deze feiten af te leggen voor de Nederlandse en andere gerechten en iedere andere bevoegde instantie, en deze verklaring is ondertekend in *Los Angeles* op *19 oktober* 2012.

                                ____[*handtekening*]
                                Surik Ghazaryan
                                Afgetreden rechter, Republiek

Armenië

AFGELEGD ONDER EDE EN ONDERTEKEND VOOR MIJ, HEDEN D.D. *19 oktober* 2012

                                [*handtekening*]
                           Notaris te en namens de staat  CAL

[*Engelstalig stempel*]

                                         [*onleesbaar zegel*]

Rechter Surik Ghazaryan    [*handtekening*]

Exhibit 10(3)

**THE CASE**
**Who is the boss of Yukos's foreign branches?**

After Yukos's 2006 bankruptcy, the Russian holding came under the control of **Rosneft (Russian state-owned company)** via a Russian bankruptcy trustee.

**The Armenian branch of Yukos, Yukos CIS**, was also **sold to Rosneft** by the same bankruptcy trustee.

**The Dutch branch of Yukos, Yukos Finance BV**, was sold by the bankruptcy trustee to **Promneftstroy** (a Russian company).

Back in 2005, Yukos had placed both foreign branches behind a **protective legal structure** (a foundation in Amsterdam). The Yukos camp denies that Rosneft and Promneftstroy are the new owners.

In 2015, Rosneft and Yukos settled in the Yukos CIS case after internal emails showed that the judicial process in Armenia was unlawful. The battle over Yukos Finance BV continues.

**Control over Rosneft and its attorneys**

**FEBRUARY 2011**
(1) Judge **Ghazaryan** hands down a decision in Yerevan (Armenia) in the case of Yukos CIS versus Rosneft, in which Rosneft prevails.
(2) Judge Ghazaryan had the judgment in Rosneft's favor delivered to him on a USB drive. Rosneft's attorney in Armenia, **Edward Mouradian**, cleared the content in Moscow with lawyers from **Baker Botts**.
**MAY 2011**
(3) The judge in Amsterdam recognizes Rosneft as the legal owner of Yukos CIS. The judge bases his ruling on the Yerevan judgment.
Appeal and cassation appeal follow.
**END OF 2012**
(4) Ghazaryan defects to the US, where he is granted political asylum. He declares under oath that the judgment was forced on him.
**2013/2014**
(5) The Dutch judge allows Yukos to prove that the administration of justice in Armenia was not independent. Internal emails from Rosneft and its Armenian attorney emerge that show how Rosneft dictated the judgment.
**APRIL 2015**
(6) Rosneft and Yukos settle. The revelatory emails about influencing the judicial process in Armenia remain behind closed doors.
**NOVEMBER 2015**
(7) The emails are again introduced in a case about another foreign branch of Yukos: Yukos Finance BV, which goes before the Amsterdam Court of Appeals on Monday.

**Baker Botts attorneys co-wrote
the judgment in Yerevan**

**Ryan Bull**
Baker Botts, Washington
office

**Izabella Sarkisian**
Baker Botts, partner
Moscow office

**Political asylum
for Ghazaryan
in the US**

**MOSCOW**

**Attorney
Edward
Mouradian**
(flew from
Moscow to
Yerevan in

**YEREVAN**
2011 with a
judgment on a
USB drive.

**In Armenia
Rosneft
manipulates
at least 5 judgments**



www.newtypecommunications.com

445 Fifth Avenue
New York, New York 10016
Phone  212-686-5555

## CERTIFICATION

I certify under penalty of perjury that the following is a true and correct translation into ENGLISH of the attached document(s) relating to:

THE CASE - Who is the boss of Yukos's foreign branches?

written in DUTCH.

NEWTYPE COMMUNICATIONS, INC.

Executed on June 7, 2017

Dutch Original of
Exhibit 10(3)

## DE ZAAK

### Wie is de baas van de buitenlandse takken van Yukos?

Na het faillissement van Yukos in 2006 komen de Russische bezittingen via een Russische curator in handen van **Rosneft (Russisch staatbedrijf).**

**De Armeense tak van Yukos, Yukos CIS,** wordt door dezelfde Russische curator ook aan **Rosneft verkocht.**

**De Nederlandse tak van Yukos, Yukos Finance BV,** wordt door de curator verkocht aan **Promneftstroy** (een Russische vennootschap).

Beide buitenlandse takken waren in 2005 al door Yukos achter een **juridische beschermingsconstructie** (een stichting in Amsterdam) geplaatst. Het Yukos-kamp betwist dat Rosneft en Promneftstroy de nieuwe eigenaren zijn.

In 2015 schikken Rosneft en Yukos in de zaak van Yukos CIS, nadat interne mails hebben aangetoond dat de rechtsgang in Armenië onrechtmatig was. De strijd om Yukos Finance BV gaat door.

## De sturing van Rosneft en zijn advocaten

**FEBRUARI 2011**
**1** Rechter **Ghazaryan** doet uitspraak in Jerevan (Armenië) in de zaak Yukos CIS vs Rosneft waarbij Rosneft wint.


**Ghazaryan**

**2** Het vonnis dat Rosneft in het gelijk stelt heeft rechter Ghazaryan van hogerhand op een usb-stick aangeleverd gekregen. Advocaat voor Rosneft in Armenië **Edward Mouradian** heeft de inhoud in Moskou afgestemd met juristen van **Baker Botts.**

**MEI 2011**
**3** De rechter in Amsterdam erkent Rosneft als wettige eigenaar Yukos CIS. De rechter baseert zich op het vonnis uit Jerevan.

Hoger beroep en cassatie volgen.

**EIND 2012**
**4** Ghazaryan wijkt uit naar de VS waar hij politiek asiel krijgt. Hij verklaart onder ede dat het vonnis hem was opgedrongen.

**2013/2014**
**5** Yukos mag van de Nederlandse rechter bewijzen dat de rechtspraak in Armenië niet onafhankelijk was. Er komen interne mails van Rosneft en zijn Armeense advocaat op tafel die laten zien hoe Rosneft het vonnis heeft gedicteerd.

**APRIL 2015**
**6** Rosneft en Yukos schikken. De onthullende mails over de beïnvloeding van de Armeense rechtsgang blijven binnenskamers.

**NOVEMBER 2016**
**7** De mails zijn opnieuw ingebracht in een zaak over een andere buitenlandse tak van Yukos: Yukos Finance BV, die maandag dient voor het gerechtshof Amsterdam.



Baker Botts advocaten schreven mee aan het vonnis in Jerevan

**Ryan Bull**
Baker Botts, kantoor Washington

**Izabella Sarkisian**
Baker Botts, partner kantoor Moskou

**Advocaat Edward Mouradian** (vliegt in 2011 met een vonnis op een usb-stick van Moskou naar Jerevan.

**Politiek asiel Ghazaryan in de VS**

**MOSKOU**
**2**

**AMSTERDAM**
**3** **5** **6** **7**

**JEREVAN**
**1**

**4**

In Armenië manipuleert Rosneft zeker 5 vonnissen

NRC 251116 / Studio NRC

# Exhibit 10(4)(a)

| | |
|---|---|
| **From:** | Nikita Tolstikov <nikita.tolstikov@gmail.com> |
| **Sent time:** | 25 June 2010 at 6:43:53 |
| **To:** | Elena Zavaleeva <elena.zavaleeva@gmail.com> |
| **Subject:** | Re: Armenian news |

understood. What's being said about the local GD?

Sent from my iPhone

On 24 June 2010, at 11:06, Elena Zavaleeva wrote:

I'm crying, we are stuck here until tomorrow! Victor and I obviously didn't take things with us) in short it's screwed up) in essence, they are promising that everything will be ok, but only time will show. Except I BEG YOU, it's like you don't know anything, neither about the trip, nor its goals nor about the fact that we were promised support!

24.06.10, Nikita Tolstikov wrote:
Are there news?!? I worry, you know...

Sent from my iPhone

On 23 June 2010, at 11:50, Elena Zavaleeva wrote:

We have big changes, the wheels have started turning......WE are NO LONGER ORPHANS!!!!
tomorrow we're flying to drink arm.cognac: myself, LV, Viktor (in one day, back tomorrow, by charter) it's horrible!!!!! you can't even imagine how much I don't want to fly!!!!!!!!!!! tired, just back from tomsk today...........

LV is pressuring SV about the criminal info.....he probably called you?

On 23 June 2010 at 9:58 user Nikita Tolstikov wrote:
The registration – this is great!!!!

Everything else – concerning. Don't even know what to say. What's happening with 02.07.10??? Are we going? If yes then what are the dates? I would prefer to avoid a red-eye and stay straight until tuesday. What do you think?

Competitors should only be taken out through the handlers. IMHO

Sent from my iPhone

# Exhibit 10(4)(b)

On 21 June 2010, at 07:52, Elena Zavaleeva wrote:

Hi!
You won't believe it – today, on the day of the announcement of the decision on the case "on recognition", vardan and Bekmezyan with KP came to the court, and were told that there will be no announcement, since the computer of the judge broke down!!!!!!!!!!! Incredible! Does this remind you of anything???????

Marina Kovaleva kept calling me today – getting details about 02.07.10 (what's the case, who filed the claim and all that)……probably tasked by Akhk. This is slightly stressing me out, since it turns out that two "competing firms" are working on the same matter

Last week I passed on information to someone "influential", who was supposed to arrange negotiations on the level that BB is dreaming of. Armen called today, said that the process has started, so Akhk. might not turn out to be very appropriate at the moment.

Bekmezyan wrote a second letter to the authorities – which one, we don't now yet. Tomorrow Armen is supposed meet with him, maybe it'll be possible to make a copy. We'll be preparing yet another report.

Changes are registered, the certificate has been stamped, the certificate is in Armen's office!

# Exhibit 10(5)

| From: | Edward Mouradian |
|-------|------------------|
| To: | Karapet Badalyan |
| Subject: | X |
| Date: | 17 July 2010 22:21:17 |

The previous was about the head of the department of prosecution Armen Nikoghosyan. All contact with him is top secret (except for Elena): we report to him about the development of the cases. Delete all communication after reading. ☺

**Edward A. Mouradian** | Prudence CJSC
**Managing Partner**

Citadel Business Centre
105/1 Terian Street
Yerevan 0009, Armenia

Telephone: +374 (10) 514-830
Facsimile: + 374 (10) 514-832
Direct: +374(91) 423-632

edmouradian@prudencelegal.com
www.prudencelegal.com

WARNING

THIS COMMUNICATION AND THE ATTACHED MATERIALS ARE CONFIDENTIAL AND ARE INTENDED ONLY FOR THE ADDRESSEE. DISSEMINATION OF THESE MATERIALS MAY RESULT IN SERIOUS CIVIL AND CRIMINAL RESPONSIBILITY FOR YOU. IN CASE YOU RECEIVE THIS MESSAGE BY MISTAKE, PLEASE LET US KNOW, WHICH WILL ALLOW YOU TO AVOID  RESPONSIBILITY.

**PRIVILEGED AND CONFIDENTIAL**

THIS COMMUNICATION AND ANY ATTACHMENT THERETO ARE FOR THE INTENDED ADDRESSEE ONLY AND MAY CONTAIN CONFIDENTIAL INFORMATION OR BE PRIVILEGED AS AN ATTORNEY-CLIENT COMMUNICATION. UNAUTHORIZED USE OR DISSEMINATION OF THESE MATERIALS MAY RESULT IN SERIOUS DAMAGES FOR THE PARTIES INVOLVED. IF YOU HAVE RECEIVED THIS MESSAGE IN ERROR PLEASE CONTACT US BY PHONE OR E-MAIL.

Prudence is a legal services corporation (law firm) established under the laws of Armenia as a closed joint stock company (CJSC) with the head office at the address above. The state registration number: 273.120.05258; registration code: 39332391; Tax Payer Registration Number: 01567754. More information on the firm is available on its website www.prudencelegal.com. Please forward your inquiries to info@prudencelegal.com.

SAVE FORESTS – THINK BEFORE YOU PRINT THIS!



**TRANSPERFECT**

City of New York, State of New York, County of New York

I certify under penalty of perjury that the following is a true and correct translation into <u>ENGLISH</u> of the attached document(s) relating to:

Email from Edward Mouradian to Karapet Badalvan, dated July 17, 2010 written in ARMENIAN.

_____
Aurora Landman
TransPerfect Translations International, Inc.

Sworn to before me this
June 8, 2017

_____
Signature, Notary Public

_____
Stamp, Notary Public

ANGELA LO
NOTARY
NO. 01LO6353549
QUALIFIED IN
NEW YORK COUNTY
COMM. EXP.
01-30-2021
PUBLIC OF NEW YORK

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS

THREE PARK AVENUE, 39TH FLOOR, NEW YORK, NY 10016  I  T 212.689.5555  I  F 212.689.1059  I  WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE

# Armenian Original of Exhibit 10(5)

**From:** Edward Mouradian
**To:** Karapet Badalyan
**Subject:** X
**Date:** 17 July 2010 22:21:17

The previous was about the head of the department of prosecution Armen Nikoghosyan. All contact with him is top secret (except for Elena): we report to him about the development of the cases. Delete all communication after reading. ☺

**Edward A. Mouradian** | Prudence CJSC
**Managing Partner**

Citadel Business Centre
105/1 Terian Street
Yerevan 0009, Armenia

Telephone: +374 (10) 514-830
Facsimile: + 374 (10) 514-832
Direct: +374(91) 423-632

edmouradian@prudencelegal.com
www.prudencelegal.com

ՆԱԽԱԶԳՈՒՇԱՑՈՒՄ
ԱՅՍ ՀԱՂՈՐԴԱԿՑՈՒԹՅՈՒՆԸ ԵՎ ԿՑՎՈՂ ՆՅՈՒԹԵՐԸ ԳԱՂՏՆԻ ԵՆ ԵՎ ՆԱԽԱՏԵՍՎԱԾ ԵՆ ՄԻԱՅՆ ՀԱՍՑԵԱՏԻՐՈՋ ՀԱՄԱՐ: ԴՐԱՆՑ ՏԱՐԱԾՈՒՄԸ ԿԱՐՈՂ Է ՁԵՐ ՀԱՄԱՐ ԼՈՒՐՋ ՔԱՂԱՔԱՑԻԱԿԱՆ ԵՎ ՔՐԵԱԿԱՆ ՊԱՏԱՍԽԱՆԱՏՎՈՒԹՅՈՒՆ ԱՌԱՋԱՑՆԵԼ: ԽՆԴՐՈՒՄ ԵՆՔ ՏԵՂԵԿԱՑՆԵԼ ՄԵԶ ԱՅՍ ՀԱՂՈՐԴԱԳՐՈՒԹՅՈՒՆԸ ՍԽԱԼՄԱՄԲ ՍՏԱՆԱԼՈՒ ԴԵՊՔՈՒՄ, ԻՆՉ ԹՈՒՅԼ ԿՏԱ ԽՈՒՍԱՓԵԼ ՊԱՏԱՍԽԱՆԱՏՎՈՒԹՅՈՒՆԻՑ:

**PRIVILEGED AND CONFIDENTIAL**
THIS COMMUNICATION AND ANY ATTACHMENT THERETO ARE FOR THE INTENDED ADDRESSEE ONLY AND MAY CONTAIN CONFIDENTIAL INFORMATION OR BE PRIVILEGED AS AN ATTORNEY-CLIENT COMMUNICATION. UNAUTHORIZED USE OR DISSEMINATION OF THESE MATERIALS MAY RESULT IN SERIOUS DAMAGES FOR THE PARTIES INVOLVED. IF YOU HAVE RECEIVED THIS MESSAGE IN ERROR PLEASE CONTACT US BY PHONE OR E-MAIL.

Prudence is a legal services corporation (law firm) established under the laws of Armenia as a closed joint stock company (CJSC) with the head office at the address above. The state registration number: 273.120.05258; registration code: 39332391; Tax Payer Registration Number: 01567754. More information on the firm is available on its website www.prudencelegal.com. Please forward your inquiries to info@prudencelegal.com.

**SAVE FORESTS – THINK BEFORE YOU PRINT THIS!**

# Exhibit 10(6)

**From:** Edward Mouradian
**To:** Karapet Badalyan
**Subject:** X
**Date:** 17 July 2010 22:21:17

The previous was about the head of the department of prosecution Armen Nikoghosyan. All contact with him is top secret (except for Elena): we report to him about the development of the cases. Delete all communication after reading. ☺

**Edward A. Mouradian** | Prudence CJSC
**Managing Partner**

Citadel Business Centre
105/1 Terian Street
Yerevan 0009, Armenia

# Exhibit 10(7)

[seal]

## COURT OF CASSATION OF THE REPUBLIC OF ARMENIA

The decision of the                                    Civil case No. YAKD/1494/02/10

RA Court of Civil Appeals                                    2011

Civil case No. YAKD/1494/02/10

Presiding judge: T. Nazaryan

## DECISION

## ABOUT THE REMANDING OF THE CASSATION APPEAL

May 11, 2011                                                Yerevan

The civil and administrative chamber of the Court of Cassation of the Republic of Armenia (hereinafter Court of Cassation)

| | |
|---|---|
| *Under the chairmanship of* | E. Khundkaryan |
| *And with the participation of judges* | M. Drmeyan |
| | V. Abelyan |
| | S. Antonyan |
| | V. Avanesyan |
| | A. Barseghyan |
| | G. Hakobyan |
| | E. Hayriyan |
| | T. Petrosyan |
| | E. Soghomonyan |

Discussing according to the petition of Stichting Administratiekantoor Financial Performance Holdings Foundation (hereinafter Foundation), Luxtona Limited Company, Yukos International UK B.V, Yukos SNG Investment LLC

**Comment [KS1]:** Formatted: Armenian

**Comment [KS2]:** Formatted: Armenian

**Comment [KS3]:** Formatted: Armenian

**Comment [KS4]:** Formatted: Armenian

**Comment [KS5]:** Formatted: Armenian

**Comment [KS6]:** Formatted: French (France)


TRANSPERFECT

City of New York, State of New York, County of New York

I certify under penalty of perjury that the following is a true and correct translation into <u>ENGLISH</u> of the attached document(s) relating to:

Decision about the remanding of the cassation appeal excerpt, dated May 11, 2011 written in ARMENIAN.

_____
Aurora Landman
TransPerfect Translations International, Inc.

Sworn to before me this
June 8, 2017

_____
Signature, Notary Public

_____
Stamp, Notary Public

ANGELA LO
NOTARY
NO. 01LO6353549
QUALIFIED IN
NEW YORK COUNTY
COMM. EXP.
01-30-2021
STATE OF NEW YORK
PUBLIC

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS

THREE PARK AVENUE, 39TH FLOOR, NEW YORK, NY 10016  |  T 212.689.5555  |  F 212.689.1059  |  WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE

# Armenian Original of Exhibit 10(7)



# ՀԱՅԱՍՏԱՆԻ ՀԱՆՐԱՊԵՏՈՒԹՅՈՒՆ
## ՎՃՌԱԲԵԿ ԴԱՏԱՐԱՆ

ՀՀ վերաքննիչ քաղաքացիական
դատարանի որոշում
Քաղաքացիական գործ թիվ ԵԱՔԴ/1494/02/10
Նախագահող դատավոր՝ Տ. Նազարյան

Քաղաքացիական գործ թիվ **ԵԱՔԴ/1494/02/10**
2011թ.

# Ո Ր Ո Շ Ո Ւ Մ

## ՎՃՌԱԲԵԿ ԲՈՂՈՔԸ ՎԵՐԱԴԱՐՁՆԵԼՈՒ ՄԱՍԻՆ

«11» մայիսի 2011թ.                                                                                       ք. Երևան

Հայաստանի Հանրապետության վճռաբեկ դատարանի քաղաքացիական
և վարչական պալատը (այսուհետ՝ Վճռաբեկ դատարան),

| *նախագահությամբ* | Ե. ԽՈՒՆԴԿԱՐՅԱՆԻ |
| *մասնակցությամբ դատավորներ* | Մ. ԴՐՄԵՅԱՆԻ |
| | Վ. ԱԲԵԼՅԱՆԻ |
| | Ս. ԱՆՏՈՆՅԱՆԻ |
| | Վ. ԱՎԱՆԵՍՅԱՆԻ |
| | Ա. ԲԱՐՍԵՂՅԱՆԻ |
| | Գ. ՀԱԿՈԲՅԱՆԻ |
| | Է. ՀԱՅՐԻՅԱՆԻ |
| | Տ. ՊԵՏՐՈՍՅԱՆԻ |
| | Ե. ՍՈՂՈՄՈՆՅԱՆԻ |

քննարկելով ըստ հայցի Ստիխտինգ Ադմինիստրատիեկանտոր Ֆայնենշլ
Փերֆորմանս Հոլդինգ հիմնադրամի (այսուհետ՝ Հիմնադրամ), «Լուքսթոնա Լիմիթեդ»
ընկերության, Յուկոս Ինթերնեյշնլ UK B.V.-ի, «Յուկոս ՄՆԳ Ինվեստմենթս» ՍՊԸ-ի

# Exhibit 10(8)

[seal]

Comment [n1]: Formatted: Armenian

COURT OF CASSATION OF THE REPUBLIC OF ARMENIA

The decision of the                    Civil case No. <u>YAKD/1494/02/10</u>
RA Court of Civil Appeals                         2011
Civil case No. YAKD/1494/02/10
Presiding judge: T. Nazaryan

DECISION
ABOUT THE REMANDING OF THE CASSATION APPEAL

May 11, 2011                                          Yerevan

Comment [n2]: Formatted: Armenian
Comment [n3]: Formatted: Armenian
Comment [n4]: Formatted: Armenian
Comment [n5]: Formatted: Armenian

The civil and administrative chamber of the Court of Cassation of the Republic of Armenia
(hereinafter Court of Cassation)

| | |
|---|---|
| *Under the chairmanship of* | E. Khundkaryan |
| *And with the participation of judges* | M. Drmeyan |
| | V. Abelyan |
| | S. Antonyan |
| | V. Avanesyan |
| | A. Barseghyan |
| | G. Hakobyan |
| | E. Hayriyan |
| | T. Petrosyan |
| | E. Soghomonyan |

Comment [n6]: Formatted: French (France)

Discussing according to the petition of Stichting Administratiekantoor Financial Performance Holdings Foundation (hereinafter Foundation), Lukstona Limited Company, Yukos International UK B.V, Yukos SNG Investment LLC (hereinafter Organization) and the claim of Armen Mikayelyan against Arabkir Regional Branch of the State Agency for the Registration of Legal Entities of the R[epublic] [of] A[rmenia's] Ministry of Justice (hereinafter Agency), OC Rosneft OJSC (hereinafter Company) on the demand of implementing the consequences of the invalidity of the void transaction, and the issue of examination of the cassation appeal of ~~representative~~ Karen Petrosyan <u>in the name of</u> the Organization against the decision of 10/27/2010 of the Court of Civil Appeals of the Republic of Armenia.

ASCERTAINED

Comment [n7]: Formatted: French (France)

1. **Procedural background of the case**

By the decision of 08/13/2010 of the Court of General Competence of Arabkir and Kanaker-Zeytun Administrative Districts of Yerevan (hereinafter Court) the claim has been remanded.

By the decision of 10/27/2010 of the Court of Civil Appeals of the R[epublic of]. A[rmenia]. (hereinafter Court of Appeal) the Fund, Lukstona Limited company

The cassation appeal of the representative Armen Mikayelyan and Yukos International UK B.V. Karen Petrosyan was given satisfaction and the decision of the Court to "Remanding the claim back" as of 08/13/2010  was annulled  and the decision as of 08/13/2010 of the Court about remanding the claim of ~~representative~~ Karen Petrosyan on behalf of the Organization was left valid.

For this case ~~representative of the Organization~~ Karen Petrosyan filed a cassation appeal on behalf of the Organization.

**2. The basis, justification and the demand of the cassation appeal**

The cassation appeal was brought on the basis of the violation of the right of trial.

*It was justified in the appeal that the Court of Appeal has violated the requirements of the 3rd, 18th, [and] 19th of the Constitution of the R[epublic of] A[rmenia].*

The appellant justifies the issue of taking this cassation appeal into proceedings on the following basis:

*An apparent judicial mistake has been made by the Court of Appeal.*

The appellant gives reasons for the mentioned justification by the following arguments:

By the decision made the Court of Appeal has violated the statutory remedy rights of the Organization.

During the proceedings the rights of the organization have been violated several times and as a result the organization has been deprived of efficient opportunity of implementing remedial measures.

On 07/31/2009 the Agency registered OC Rosneft OJSC as the owner of 100% of the shares in the authorized capital of the Organization and days later also registered the change of the manager. In this situation, when there was a dispute in the courts and they were not concluded, the Agency has predetermined those arguments by its administrative act, while, on the contrary, it was obliged to stop all administrative proceedings that were brought to it which were related to the subject matter of the dispute. As a result, OC Rosneft OJSC, as well as the new appointed manager of the Company, on behalf of the Organization started to take back the complaints and the claims brought, and the licenses of the former representatives were illegally called back. The appellant presented sufficient reasoning to the Court that the authorization to act on behalf of the Organization preserved its legal power and did not end.

The appellant demanded to eliminate the decision of the Court of Appeal as of 10/27/2010.

**3.The justifications and the conclusion of the Court of Appeal**
The Court of Appeal discussing the reasoning of the appellant about taking the cassation appeal into proceedings assumes that the cassation appeal is subject to return with the following reasons:
According to Subpoint 1 of Point 1 of Article 233 of the Civil Procedure Code of the Republic of Armenia the cassation appeal is returned if the cassation appeal is not relevant to the requirements of Articles 231 and the 1st point of the Article 234 of the same Code.

**Comment [n1]:** Formatted: Armenian

**Comment [n2]:** Formatted: Armenian

**Comment [n3]:** Formatted: Armenian

**Comment [n4]:** Formatted: Armenian

3

**Comment [n1]:** Formatted: Armenian

According to Subpoint 3 of Point 1 of Article 234 of the Civil Procedure Code of the Republic of Armenia, the Court of Appeal takes the appeal into proceedings if according to the Court of Cassation it is justified in the appeal that an apparent judicial mistake is made by the subordinate court.

The Court of Cassation considers that the reasoning of the appellant about the judicial mistake of the Court of Appeal is disproved by the reasons mentioned in the decision of the Court of Appeal.

Thus, the Court of Appeal, according to the requirements of Article 213 of the Civil Procedure Code of the Republic of Armenia justified that "including which could affect Branch of State Agency for the Registration of Legal Entities of the R[epublic of] A[rmenia] Ministry of Justice as a defendant still doesn't give evidence about the fact that this argument is driven from the legal relationship of the public," but "a demand had been presented about the implementation of annulment results of a null and void transaction, and the issue mentioned is regulated by the civil-legal standards and so its investigation cannot be under the jurisdiction of the Administrative Court." In such conditions, "The court has come to a wrong conclusion about making the decision of remanding the claim, and thus the decision mentioned is subject to annulment.'' In addition, "Karen Petrosyan is not a representative of Yukos SNG Investment LLC, so the claim filed to the Court for on the part of Yukos SNG Investment LLC was signed by a person who doesn't have authorization for signing it. Taking into account the position of Yukos SNG Investment LLC about the fact that the latter hasn't filed a claim to the Court, the decision of the Court related to that part should remain unchanged. But the reasoning section of the decision should be changed in such a way that the Court of Appeal has the authorization according to Article 221 of Civil procedure Code of the Republic of Armenia." That is to say- The claim filed on behalf of Yukos SNG Investment LLC is subject to remand not on the basis of the violation of jurisdiction rules but on the basis of Point 2 of Part 1 of Article 92 of the Civil Procedure Code of the Republic of Armenia according to which the claim is subject to return if it is not signed or it is signed by a person who is not authorized to sign it.''

By Article 226 of the Civil Procedure Code of the Republic of Armenia, judicial mistakes, violation of material or procedural right which may affect the outcome of the case, [and] newly appeared or new circumstances are the basis for bringing a cassation appeal.

In such conditions the justification of the appellant to take the cassation appeal into proceedings about the existence of such a judicial mistake is ill-founded as in such case the existence of violation of ~~such~~ any judicial right is not justified ~~which could affect the outcome of the case~~. Moreover, from the materials of the case it is evident that Karen Petrosyan hadn't an authorization to sign the claim on behalf of the Organization and he wasn't authorized also to file a cassation appeal on behalf of the organization which is also a basis for returning the cassation appeal according to Point 3 of Part 1 of Article 233 of the Civil Procedure Code of the Republic of Armenia.

**Comment [n2]:** Formatted: Armenian

**Comment [n3]:** Formatted: Armenian

4

The Court of Cassation considers that the cassation appeal does not meet the requirements of Point 1 of Article 234 of the Civil Procedure Code of the Republic of Armenia. Therefore, it is subject to remand according to Subpoint 1 of Point 1 of Article 233 of the Civil Procedure Code of the Republic of Armenia.

**Comment [n1]:** Formatted: Armenian

**Comment [n2]:** Formatted: Armenian

Taking into account the above mentioned justifications and following the Article 233 and 234 of the Civil Procedure Code of the Republic of Armenia, the Court of Cassation

DECIDED

1.  To remand the cassation appeal brought by ~~Karen Petrosyan on behalf~~ ~~the~~ ~~representative~~ of Yukos SNG Investment LLC against the decision of 27.10.2010 of the Court of Appeal of the Republic of Armenia on the civil case No. EAKD/1494/02/10.

2.  The decision enters into force from the moment of its pronouncement and is not subject to appeal.

*Chairman:*          E. Khundkaryan
*Judges:*             M. Drmeyan
                      V. Abelyan
                      S. Antonyan
                      V. Avanesyan
                      A. Barseghyan
                      G. Hakobyan
                      E. Hayriyan
                      T. Petrosyan
                      E. Soghomonyan



TRANSPERFECT

City of New York, State of New York, County of New York

I certify under penalty of perjury that the following is a true and correct translation into <u>ENGLISH</u> of the attached document(s) relating to:

Decision about the remanding of the cassation appeal page 1, dated May 11, 2011 written in ARMENIAN.

_____

Aurora Landman
TransPerfect Translations International, Inc.

Sworn to before me this
June 8, 2017

_____

Signature, Notary Public

ANGELA LO
NOTARY
NO. 01LO6353549
QUALIFIED IN
NEW YORK COUNTY
COMM. EXP.
01-30-2021
PUBLIC
STATE OF NEW YORK

_____

Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS

THREE PARK AVENUE, 39TH FLOOR, NEW YORK, NY 10016  |  T 212.689.5555  |  F 212.689.1059  |  WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE



**TRANSPERFECT**

City of New York, State of New York, County of New York

I certify under penalty of perjury that the following is a true and correct translation into <u>ENGLISH</u> of the attached document(s) relating to:

Decision about the remanding of the cassation appeal page 2 written in ARMENIAN.

Aurora Landman
TransPerfect Translations International, Inc.

Sworn to before me this
June 8, 2017

Signature, Notary Public

Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS

THREE PARK AVENUE, 39TH FLOOR, NEW YORK, NY 10016  |  T 212.689.5555  |  F 212.689.1059  |  WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE


TRANSPERFECT

City of New York, State of New York, County of New York

I certify under penalty of perjury that the following is a true and correct translation into <u>ENGLISH</u> of the attached document(s) relating to:

Decision about the remanding of the cassation appeal page 3 written in ARMENIAN.

_____
Aurora Landman
TransPerfect Translations International, Inc.

Sworn to before me this
June 8, 2017

_____
Signature, Notary Public

ANGELA LO
NOTARY
NO. 01LO6353549
QUALIFIED IN
NEW YORK COUNTY
COMM. EXP.
01-30-2021
PUBLIC
STATE OF NEW YORK

_____
Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS

THREE PARK AVENUE, 39TH FLOOR, NEW YORK, NY 10016  |  T 212.689.5555  |  F 212.689.1059  |  WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE



TRANSPERFECT

City of New York, State of New York, County of New York

I certify under penalty of perjury that the following is a true and correct translation into <u>ENGLISH</u> of the attached document(s) relating to:

Decision about the remanding of the cassation appeal page 4 written in ARMENIAN.

_____

Aurora Landman
TransPerfect Translations International, Inc.

Sworn to before me this
June 8, 2017

_____
Signature, Notary Public

_____
Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS

THREE PARK AVENUE, 39TH FLOOR, NEW YORK, NY 10016  I  T 212.689.5555  I  F 212.689.1059  I  WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE

# Armenian Original of Exhibit 10(8)



## ՀԱՅԱՍՏԱՆԻ ՀԱՆՐԱՊԵՏՈՒԹՅՈՒՆ
## ՎՃՌԱԲԵԿ ԴԱՏԱՐԱՆ

ՀՀ վերաքննիչ քաղաքացիական       Քաղաքացիական գործ թիվ **ԵԱՔԴ/1494/02/10**
դատարանի որոշում                                2011թ.
Քաղաքացիական գործ թիվ ԵԱՔԴ/1494/02/10
Նախագահող դատավոր` S. Նազարյան

# Ո Ր Ո Շ Ո Ւ Մ

## ՎՃՌԱԲԵԿ ԲՈՂՈՔԸ ՎԵՐԱԴԱՐՁՆԵԼՈՒ ՄԱՍԻՆ

«11» մայիսի 2011թ.                                                ք. Երևան

Հայաստանի Հանրապետության վճռաբեկ դատարանի քաղաքացիական
և վարչական պալատը (այսուհետ` Վճռաբեկ դատարան),

նախագահությամբ               Ե. ԽՈՒՆԴԿԱՐՅԱՆԻ
մասնակցությամբ դատավորներ    Մ. ԴՐՄԵՅԱՆԻ
                                     Վ. ԱԲԵԼՅԱՆԻ
                                     Ս. ԱՆՏՈՆՅԱՆԻ
                                     Վ. ԱՎԱՆԵՍՅԱՆԻ
                                     Ա. ԲԱՐՍԵՂՅԱՆԻ
                                     Գ. ՀԱԿՈԲՅԱՆԻ
                                     Է. ՀԱՅՐԻՅԱՆԻ
                                     S. ՊԵՏՐՈՍՅԱՆԻ
                                     Ե. ՍՈՂՈՄՈՆՅԱՆԻ

քննարկելով ըստ հայցի Ստիխտինգ Ադմինիստրատիեկանտոր Ֆայնենշլ Ֆերֆորմանս Հոլդինգ հիմնադրամի (այսուհետ` Հիմնադրամ), «Լուքսոտնա Լիմիթեդ» ընկերության, Յուկոս Ինթերնեշշլ UK B.V.-ի, «Յուկոս ՍՆԳ Ինվեսթմենթ» ՍՊԸ-ի (այսուհետ` Կազմակերպություն) և Արմեն Միքայելյանի ընդդեմ ՀՀ Արդարադատության նախարարության իրավաբանական անձանց պետական ռեգիստրի գործակալության Արաբկիրի տարածքային բաժնի (այսուհետ` Գործակալություն), «ՆԿ Ռոսնեֆտ» ԲԲԸ-ի (այսուհետ` Ընկերություն) առողինս գործարքի անվավերության հետևանքները կիրառելու պահանջի մասին, քաղաքացիական գործ ՀՀ վերաքննիչ քաղաքացիական դատարանի 27.10.2010 թվականի որոշման դեմ Կազմակերպության ~~անունից~~~~ներկայացուցիչ~~ Կարեն Պետրոսյանի բերած վճռաբեկ բողոքը քննության ընդունելու հարցը,

## ՊԱՐԶԵՑ

### 1. Գործի դատավարական նախապատմությունը

Երևանի Արաբկիր և Քանաքեռ-Զեյթուն վարչական շրջանների ընդհանուր իրավասության դատարանի (այսուհետ` Դատարան) 13.08.2010 թվականի որոշմամբ հայցադիմումը վերադարձվել է:

ՀՀ վերաքննիչ քաղաքացիական դատարանի (այսուհետ` Վերաքննիչ դատարան) 27.10.2010 թվականի որոշմամբ Հիմնադրամի, «Լուքսոտնա Լիմիթեդ» ընկերության,

2

Յուկոս Ինթերնեշլն UK B.V.-ի և Արմեն Միքայելյանի ներկայացուցիչ Կարեն Պետրոսյանի վերաբերից բողոքը բավարարվել է և Դատարանի 13.08.2010 թվականի «Հայգադիմումը վերադարձնելու մասին» որոշումը վերացվել է, իսկ Դատարանի 13.08.2010 թվականի որոշումը Կազմակերպության ~~ներկայացուցիչ~~ անունից Կարեն Պետրոսյանի հայգադիմումը վերադարձնելու մասով, թողնվել է օրինական ուժի մեջ:

Սույն գործով ~~Կազմակերպության անունից~~ վճռաբեկ բողոք է ներկայացրել ~~Կազմակերպության ներկայացուցիչը~~Կարեն Պետրոսյանը:

## 2. Վճռաբեկ բողոքի հիմքերը, հիմնավորումները և պահանջը

Վճռաբեկ բողոքը բերվել է դատավարական իրավունքի խախտման հիմքով:

*Բողոքում պատճառաբանվել է, որ Վերաքննիչ դատարանը խախտել է ՀՀ Սահմանադրության 3-րդ, 18-րդ, 19-րդ հոդվածների պահանջները:*

Բողոք բերած անձը սույն վճռաբեկ բողոքը քննության ընդունելու հարցը պատճառաբանում է հետևյալ հիմնավորմամբ.

*Վերաքննիչ դատարանի կողմից թույլ է տրված առերևույթ դատական սխալ:*

Բողոք բերած անձը նշված հիմնավորումը պատճառաբանում է հետևյալ փաստարկներով.

Վերաքննիչ դատարանն իր կայացրած որոշմամբ խախտել է Կազմակերպության դատական պաշտպանության իրավունքը:

Դատավարությունների ընթացքում կազմակերպության իրավունքները բազմիցս խախտվել են և արդյունքում Կազմակերպությունը զրկվել է արդյունավետ դատական պաշտպանության իրականացման հնարավորությունից:

Գործակալությունը «ՆԿ Ռոսնեֆտ» ԲԲԸ-ին 31.07.2009 թվականին գրանցել է, Կազմակերպության կանոնադրական կապիտալում 100% բաժնեմասի սեփականատեր, իսկ այնուհետև՝ օրեր անց, գրանցել է նաև տնօրենին փոփոխություն: Այն դեպքում, երբ առկա էր վեճ դատարաններում և դրանք դեռևս ավարտված չէին, Գործակալությունն իր վարչական ակտով կանխորոշել է հետս այդ վեճերի ելքը, թեև հակառակը՝ պատոտավոր էր կասեցնել իր մոս հարուցվլած և վեճի առարկային առնչվող բոլոր վարչական վարույթները: Արդյունքում «ՆԿ «Ռոսնեֆտ» ԲԲԸ-ն, ինչպես նաև այդ ընկերության կողմից նորանշանակ տնօրենը սկսեցին Կազմակերպության անունից հետ վերջնել բերված բողոքներն ու հայգադիմումները, ինչպես նաև Կազմակերպության նախկին ներկայացուցիչների լիազորագրերն ապօրինաբար հետ կանչլեցին: Բողոք բերած անձի կողմից Դատարանին ներկայացվել են բավարար հիմնավորումներ, որ Կազմակերպության անունից հանդես գալու իր լիազորագիրը պահպանել է իրավաբանական ուժ և չի դադարել:

Բողոք բերած անձը պահանջել է վերացնել Վերաքննիչ դատարանի 27.10.2010 թվականի որոշումը:

## 3. Վճռաբեկ դատարանի պատճառաբանությունները և եզրահանգումը

Վճռաբեկ դատարանը, քննարկելով բողոք բերած անձի հիմնավորումը՝ վճռաբեկ բողոքը քննության ընդունելու մասին, գտնում է, որ վճռաբեկ բողոքը ենթակա է վերադարձման հետևյալ պատճառաբանությամբ.

ՀՀ քաղաքացիական դատավարության օրենսգրքի 233-րդ հոդվածի 1-ին կետի 1-ին ենթակետերի համաձայն՝ վճռաբեկ բողոքը վերադարձվում է, եթե վճռաբեկ բողոքը չի համապատասխանում նույն օրենսգրքի 231-րդ հոդվածի և 234-րդ հոդվածի 1-ին կետի պահանջներին:

3

Formatted: Armenian

ՀՀ քաղաքացիական դատավարության օրենսգրքի 234-րդ հոդվածի 1-ին կետի 3-րդ ենթակետի համաձայն՝ վճռաբեկ դատարանը բողոքն ընդունում է քննության, եթե վճռաբեկ դատարանի կարծիքով բողոքում հիմնավորված է, որ ստորադաս դատարանի կողմից թույլ է տրված առերևույթ դատական սխալ։

Վճռաբեկ դատարանը գտնում է, որ Վերաքննիչ դատարանի կողմից թույլ տրված դատական սխալի մասին բողոք բերած անձի հիմնավորումը հերքվում է Վերաքննիչ դատարանի որոշմամբ նշված պատճառաբանություններով։

Այսպես, Վերաքննիչ դատարանը, ՀՀ քաղաքացիական դատավարության օրենսգրքի 213-րդ հոդվածի պահանջներին համապատասխան, որոշում կայացնելիս պատճառաբանել է, որ «հայցվորների կողմից ՀՀ արդարադատատության նախարարության իրավաբանական անձանց պետական ռեգիստրի գործակալության Արարկիրի տարածքային բաժնին որպես պատասխանող ներգրավելը դեռևս չի վկայում այն մասին, որ սույն վեճը բխում է հանրային իրավահարաբերություններից», այլ «պահանջ է ներկայացվել առումիս գործարքի անվավերության հետևանքներ կիրառելու մասին, ինչ նշված հարցը կարգավորվում է քաղաքացիաիրավական նորմերով, հետևաբար, դրա քննությունը վարչական դատարանի իրավասության ենթակա լինել չի կարող»։ Նման պայմաններում «Դատարանը սխալ եզրահանգման է եկել հայցադիմումը վերադարձնելու մասին որոշում կայացնելիս, հետևաբար, նշված որոշումը ենթակա է վերացման»։ Բացի այդ, «Կարեն Պետրոսյանը չի հանդիսանում «Յուկոս ՄՆԳ Ինվեսթմենթ» ՍՊԸ-ի ներկայացուցիչ, հետևաբար, Դատարանն ներկայացված հայցը «Յուկոս ՄՆԳ Ինվեսթմենթ» ՍՊԸ-ի մասով ստորոգորվել է այն ստորոգորդերն լիազորություն չունեցող անձի կողմից։ Հաշվի առնելով «Յուկոս ՄՆԳ Ինվեսթմենթ» ՍՊԸ-ի դիրքորոշումն այն մասին, որ վերջինս հայցադիմում չի ներկայացրել Դատարան, ուստի այդ մասով Դատարանի որոշումը պետք է թողնել անփոփոխ, սակայն որոշման պատճառաբանական մասը պետք է փոփոխել, որպիսի լիազորությամբ Վերաքննիչ դատարանն օժտված է ՀՀ քաղաքացիական դատավարության օրենսգրքի 221-րդ հոդվածով»։ Այսինքն՝ ««Յուկոս ՄՆԳ Ինվեսթմենթ» ՍՊԸ-ի անունից ներկայացված հայցադիմումը ենթակա է վերադարձման ոչ թե ընդդատության կանոնների խախտման հիմքով, այլ՝ ՀՀ քաղաքացիական դատավարության օրենսգրքի 92-րդ հոդվածի 1-ին մասի 2-րդ կետի հիմքով, ըստ որի՝ հայցադիմումը ենթակա է վերադարձման, եթե այն ստորոգորված չէ կամ ստորոգրել է այն ստորոգրելու լիազորություն չունեցող անձի»։

ՀՀ քաղաքացիական դատավարության օրենսգրքի 226-րդ հոդվածի համաձայն՝ վճռաբեկ բողոք բերելու հիմքերն են դատական սխալը՝ նյութական կամ դատավարական իրավունքի այնպիսի խախտումը, որը կարող էր ազդել գործի ելքի վրա, նոր երևան եկած կամ նոր հանգամանքները։

Նման պայմաններում վճռաբեկ բողոքը քննության ընդունելու վերաբերյալ բողոք բերած անձի հիմնավորումը դատական սխալի առկայության մասին անհիմն է, քանի որ տվյալ դեպքում հիմնավորված չէ դատավարական իրավունքի ~~այնպիսի~~ որևէ խախտման առկայությունը, ~~որը կարող էր ազդել գործի ելքի վրա~~ Ավելին, գործծ նյութերից ակնհայտ է, որ Կարեն Պետրոսյանը ոչ միայն լիազորություն չուներ հայցադիմում ստորագրելու Կազմակերպության անունից, այլ նաև լիազորված չէ՛ր Կազմակերպության անունից վճռաբեկ բողոք ներկայացնելու համար, ինչ նույնպես ՀՀ քաղաքացիական դատավարության օրենսգրքի 233-րդ հոդվածի 1-ին մասի 3-րդ կետի համաձայն վճռաբեկ բողոքը վերադարձնելու հիմք է։

Formatted: Armenian
Formatted: Armenian

Case 1:17-mc-01466-BAH Document 1-16 Filed 06/19/17 Page 104 of 116

Վճռաբեկ դատարանը գտնում է, որ սույն վճռաբեկ բողոքը չի համապատասխանում ՀՀ քաղաքացիական դատավարության օրենսգրքի 234-րդ հոդվածի 1-ին կետի պահանջներին։ Հետևաբար, ՀՀ քաղաքացիական դատավարության օրենսգրքի 233-րդ հոդվածի 1-ին կետի 1-ին ենթակետի համաձայն, այն ենթակա է վերադարձման։

*[Formatted: Armenian]*

*[Formatted: Armenian]*

Հաշվի առնելով վերը շարադրված հիմնավորումները և ղեկավարվելով ՀՀ քաղաքացիական դատավարության օրենսգրքի 233-րդ և 234-րդ հոդվածներով՝ Վճռաբեկ դատարանը

## Ո Ր Ո Շ Ե Ց

1. Վերադարձնել թիվ ԵԱՔԴ/1494/02/10 քաղաքացիական գործով ՀՀ վերաքննիչ քաղաքացիական դատարանի 27.10.2010 թվականի որոշման դեմ «Յունյու ՄՆԳ Ինվեսթմենթ» ՄՊԸ-ի անունից Կարեն Պետրոսյանիներկայացուցչի բերած վճռաբեկ բողոքը։

2. Որոշումն օրինական ուժի մեջ է մտնում կայացման պահից և ենթակա չէ բողոքարկման։

| Նախագահող՝ | _____ | Ե. ԽՈՒՆԴԿԱՐՅԱՆ |
|---|---|---|
| Դատավորներ՝ | _____ | Մ. ԴՐՄԵՅԱՆ |
| | _____ | Վ. ԱԲԵԼՅԱՆ |
| | _____ | Մ. ԱՆՏՈՆՅԱՆ |
| | _____ | Վ. ԱՎԱՆԵՍՅԱՆ |
| | _____ | Ա. ԲԱՐՍԵՂՅԱՆ |
| | _____ | Գ. ՀԱԿՈԲՅԱՆ |
| | _____ | Է. ՀԱՅՐԻՅԱՆ |
| | _____ | Տ. ՊԵՏՐՈՍՅԱՆ |
| | _____ | Ե. ՍՈՂՈՄՈՆՅԱՆ |

Exhibit 10(9)(a)

From:       Elena Zavaleeva
To:         Edward Mouradian, Ryan.Bull@bakerbotts.com
Subject:    case No. 0002
Date:       Monday 19 July 2010 23:41

Dear Edward and Ryan!
Please confirm that the attached substantiation of a possible decision of the Cassation Court on the dismissal of the claim of Petrosyan answers our interest on account of the case in Holland.

Thank you,
Elena

Exhibit 10(9)(b)

**Briefing note that answers the interests of the Company on the substantive part of the decision of the Cassation court on the dismissal of the Cassation appeal of Yukos CIS Inv. as presented by Karen Petrosyan on case N 0002**

In accordance with cl. 4 pt.1 art. 233 of the RA CPC, the cassation appeal is subject to dismissal in the even that it was filed after the expiration of the statute of limiations, as established by the RA CPC, if the appeal does not contain a motion for renewal or if if the renewal of the statute of limiations was rejected.

The timeframe established by pt.4 art. 213 of the RA CPC for the filing of a cassation appeal relating to the dismissal of an appeal complaint is 2 weeks from the moment of receipt of the disputed legal act by the party.

The legal act (the contested decision on dismissal of the appellate complaint) was accepted by the appellate court on 21.08.2010.

YUKOS CIS Inv. Is the party to the case.

YUKOS CIS Inv. (and not Karen Petrosyan), as a party in the case, received the disputed decision of the RA Appellate court on dismissing the appellate complaint on 25.08.2009, which is confirmed by the notification upon receipt by A. Mkrtchyan of a copy of the decision of the Appellate court and forms part of the case materials; Mkrtchyan serves as the representative of YUKOS CIS Inv upon power of attorney, also part of the case materials.

There is no basis not to recognize this power of attorney and the authorities bestowed by the power of attorney to A. Mkrtchyan to act on behalf of YUKOS CIS Inv.

Thus, the timeframe for filing the cassation appeal by YUKOS CIS Inv against the decision of 21.08.2009 began on 26.08.2009 (the next day after receipt of the legal act by A. Mkrtchyan on behalf of YUKOS CIS Inv.) and expired on **08.09.2009**.

Based on the aforementioned, the cassation appeal is subject to dismissal on the ground of a missed deadline to file.

It will also answer the interests of the Company if in addition to reasoning about the missed deadlines, the resolutive part of the Cassation court ruling will also draw the conclusion that the ruling of the Cassation court of 29.01.2010 on case No 4342, based on which K. Petrosyan bases his right to file a claim on behalf of Yukos CIS Inv., relates exclusively to case No 4342 and gives Karen Petrosyan the right to be heard on behalf of Yukos CIS Inv. only within the framework of case No 4342.

Note: That said, special attention must be paid to the fact that the given reasoning must be made extremely prudently and must not allow for an interpretation that in the presence/absence of Karen Petrosyan's authority to act on behalf of Yukos CIS Inv in case No 0002 and contest the decision on the given case depends on the resolution of case No 4342

# Exhibit 10(10)(a)

# BAKER BOTTS L.L.P.

## Baker Botts

"These allegations made by the Yukos parties, and similar allegations made by Rosneft about the Yukos parties, were made more than three years ago in litigation that was subsequently settled. Any suggestion that Baker Botts lawyers perverted justice in Armenia is false. At all times Baker Botts lawyers acted lawfully and ethically. Given the rules surrounding client confidentiality we cannot provide further comment."

# Exhibit 10(10)(b)

# Rosneft

Case 1:14-cv-01466-BAH Document 1-16 Filed 06/19/17 Page

"We appreciate your source has given you access to the entire court file, so you will know that he ill founded contentions you refer to were strongly denied in a Dutch court years ago. The decisions of the Armenian courts were correct on the merits under Armenian law. We are confident that you will also note that similar allegations of misconduct were made against the Yukos side. The Armenian issues with allegations of impropriety made by both parties against each other were fully briefed in court and settled two years ago as part of an overall settlement. Voluminous pleadings on these issues are available from the court file and a newspaper is not well-equipped to deal with the matter. Thus, discussions of separate episodes are futile. The sudden interest to a long ago closed issue is another attempt on the Yukos side to reverse the course of the pending litigations and overcome their recent losses through mass media in order to influence the public opinion and the courts. We understand Yukos' hope to make up for the lack of legal arguments by the press publications, but we will not encourage such attempts and consider the matter closed."

Exhibit 10(10)(c)

"We would like to thank you for giving us an opportunity to comment on the allegations. We deny any fact of improperly influencing court decisions by any member of Prudence. However, we are not in position to further elaborate on the allegations as the matter has been settled between the parties and we are bound by rules of attorney-client confidentiality."

# Exhibit 10(10)(d)



Yukos

"The Yukos Foundations' board has spent a decade fighting the Russian Federation and its network of lawyers and state-run businesses to protect its financial assets and return them to their rightful owners. This case shows the extent to which the Russian Federation will go to manipulate the legal process and ignore the rule of law" said a Yukos spokesperson."