UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE APPLICATION FOR AN ORDER PURSUANT TO 28 U.S.C. § 1782 TO CONDUCT DISCOVERY FOR USE IN A FOREIGN PROCEEDING<br><br>HULLEY ENTERPRISES LTD., YUKOS UNIVERSAL LTD., AND VETERAN PETROLEUM LTD.,<br><br>Petitioners,<br><br>v.<br><br>BAKER BOTTS LLP, *et al.*,<br><br>Respondents. | Misc. Case No. 17-1466 (BAH)<br><br>Chief Judge Beryl A. Howell |

**MEMORANDUM OPINION AND ORDER**

The petitioners, Hulley Enterprises Ltd., Yukos Universal Ltd., and Veteran Petroleum Ltd., seek reconsideration of the denial of their application, pursuant to 28 U.S.C. § 1782, to compel discovery from the law firm of Baker Botts LLP and a firm partner (together, "respondents"), regarding, *inter alia*, all communications among attorneys within the respondent firm about and with its long-standing client of over ten years, Rosneft, the world's largest publicly traded oil company, as well as Rosneft's subsidiaries, Rosneft's officers, and respondents' co-counsel in representing Rosneft, pertaining to certain proceedings in Armenian and Dutch courts involving either Rosneft or the Russian Federation. *See* Pet'rs' Mot. Reconsideration, ECF No. 15; *In re Application for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in a Foreign Proceeding* ("Appl. Denial Order"), Misc. No. 17-1466 (BAH), 2017 U.S. Dist. LEXIS 142969, at *1 (D.D.C. Aug. 18, 2017) (denying petitioners'

1

Application for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in a Foreign Proceeding and Stmt. Supp. ("Appl.")), ECF No. 1).[1]

The petitioners have been embroiled in multifront litigation around the world for over a decade, arising out of the collapse of the Yukos Oil Company, of which the petitioners were majority shareholders. *See* Appl. Denial Order, 2017 U.S. Dist. LEXIS 142969, at *2–4 (providing background on the legal disputes). The litigation has largely concerned the Russian Federation's seizure of Yukos's assets, beginning in 2003 and culminating with Yukos's liquidation in 2007. *See id*. One part of this litigation is currently pending before the Court of Appeal of the Hague, where the petitioners have appealed a Dutch trial court's 2016 decision to set aside, on jurisdictional grounds, over $50 billion in arbitral awards issued to the petitioners and against the Russian Federation based on the allegations of expropriation. *See id.*; *Hulley Enters. v. Russian Fed'n*, 211 F. Supp. 3d 269, 272–76 (D.D.C. 2016).[2] While the respondents do not currently represent the Russian Federation, they have represented, since 2006, Rosneft, which is majority-owned by the Russian Federation, in connection with the petitioners' "threats to enforce the . . . arbitration awards against Rosneft," Appl. Denial Order, 2017 U.S. Dist. LEXIS 142969, at *3 (alteration in original) (quoting Resps.' Opp'n Appl. Discovery Pursuant 28 U.S.C. § 1782 ("Resps.' Opp'n") at 4, ECF No. 11), and other litigation brought by former Yukos executives in Armenia "to halt Rosneft's acquisition of an Armenian Yukos-related

---

[1] The topics for the requested depositions and fifteen categories of requested documents are enumerated in the following sources: Appl., Attach. 7, Ex. 1 to Declaration of Christopher M. Ryan ("Ryan Decl."), Subpoena Testify Deposition Civ. Action (Baker Botts LLP), ECF No. 1-7; *id.*, Attach. 8, Ex. 2 to Ryan Decl., Subpoena Testify Deposition Civ. Action (Ryan E. Bull), ECF No. 1-8; *id.*, Attach. 9, Ex. 3 to Ryan Decl., Subpoena Produce Docs., Information, Objects or to Permit Inspec. Premises Civ. Action (Baker Botts LLP) ("Subpoena to Baker Botts"), ECF No. 1-9; *id.*, Attach. 10, Ex. 4 to Ryan Decl., Subpoena Produce Docs., Information, Objects or to Permit Inspec. Premises Civ. Action (Ryan E. Bull) ("Subpoena to Ryan E. Bull"), ECF No. 1-10.

[2] In a separate matter pending in this Court, the petitioners seek confirmation of the arbitration awards, but that action has been stayed while the arbitration awards are under appellate review in the Netherlands. *See Hulley*, 211 F. Supp. 3d at 272.

entity, Yukos CIS Investment," and related "legal actions in the Netherlands, British Virgin Islands, and the United Kingdom." *Id.*[3]

In a bold move, on June 19, 2017, the petitioners applied, pursuant to 28 U.S.C. § 1782, to obtain discovery for the pending Dutch appeal by deposing and compelling production of documents from respondents regarding their representation of Rosneft in the Armenian-related proceedings in 2010 and 2011. *See* Appl. at 4–8. Specifically, the petitioners seek evidence of the Russian Federation's attempts "to manipulate judges in the Armenian courts" at a time when, petitioners contend, "Rosneft, acting through counsel to the Russian Federation, arranged the outcome of several Yukos-related judicial decisions in Armenia" with at least one decision influencing proceedings in the Netherlands. *Id.* at 5. The petitioners aver that they would use the requested evidence defensively to respond "to the Russian Federation's submissions" to the Court of Appeal of the Hague alleging that the petitioners had "unclean hands" and to "allow the Dutch Appellate Court to fully and fairly assess the conduct of the Russian Federation in its dealings with foreign courts." *Id.* at 4; Appl. Denial Order, 2017 U.S. Dist. LEXIS 142969, at *6–8.

Although the petitioners' Application met the statutory requirements for discovery sought under § 1782, the discovery demand was nonetheless denied as a matter of discretion under the factors required by *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 264–65 (2004). Appl. Denial Order, 2017 U.S. Dist. LEXIS 142969, at *11. The fourth of those factors—"whether the request is 'unduly intrusive or burdensome'"—was the salient one, *id.* at *13 (quoting *Intel*, 542 U.S. at 264–65), especially when balanced against the "thin" and "tenuous"

---

[3] Further details on the relationship between the respondents and Rosneft, as well as between the respondents and the Russian Federation before 2016, are set out in the declaration of William Jeffress previously submitted in this action. *See* Resps.' Opp'n, Attach. 1, Declaration of William H. Jeffress ("Jeffress Decl.") ¶¶ 2–3, ECF No. 11-1.

relevance and "limited usefulness" of evidence of the Russian Federation's purported manipulation of Armenian court proceedings in 2010 and 2011 to a foreign appellate proceeding focused on a jurisdictional issue relating to events occurring before and up to 2007, *id.* at *14–17 (citing *In re Veiga*, 746 F. Supp. 2d 8, 19 (D.D.C. 2010)). In evaluating the intrusiveness and burdens of the requested discovery, the Court found that the plain terms of the requests targeted "sensitive attorney-client information" and thereby implicated privilege and work-product concerns, which could spawn significant collateral litigation and put at risk significant aspects of respondents' litigation strategy on behalf of their client. *Id.* at *14–17. Accordingly, the burden imposed by the requested discovery was determined to be "simply too significant to warrant granting the Application absent a showing that the requested discovery would be of even moderate relevance." *Id.* at *17.

Undeterred, the petitioners now seek reconsideration of that decision by rehashing already rejected or unpursued arguments and contending, for the first time, that the Court must undertake a choice-of-law analysis. *See* Pet'rs' Mem. Supp. Mot. Reconsideration ("Pet'rs' Mem. Reconsideration") at 4, ECF No. 15-1. This Motion for Reconsideration represents merely the latest effort to drag this Court into the ongoing international litigation between the parties and related entities. For the reasons explained below, the petitioners' Motion for Reconsideration is DENIED.

## I. LEGAL STANDARD

The petitioners invoke Federal Rule of Civil Procedure 59(e) as the authority to seek reconsideration of this Court's Order denying the requested discovery.[4] "Rule 59(e) permits a

---

[4] The petitioners additionally bring the Motion for Reconsideration under Federal Rule of Civil Procedure 60(b), but because they filed the motion twenty-one days after the Court's Order of August 18, 2017, the motion is considered under Rule 59(e). *See Owen-Williams v. BB & T Inv. Servs., Inc.*, 797 F. Supp. 2d 118, 121–22 (D.D.C. 2011) ("As a general matter, courts treat a motion for reconsideration as originating under Rule 59(e) if it is filed

court to alter or amend a judgment, but it 'may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment.'" *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008) (citation omitted); *see also Cohen v. Bd. of Trs. of the Univ. of the Dist. of Columbia*, 819 F.3d 476, 485 (D.C. Cir. 2016) (declining to "rehash" consideration of arguments where the plaintiff failed to "raise any new arguments in support of his motion for reconsideration under Federal Rules 59(e) and 60(b)"); *District of Columbia v. Doe*, 611 F.3d 888, 896 (D.C. Cir. 2010) (noting that "[i]t is well settled that 'an issue presented for the first time in a motion pursuant to Federal Rule of Civil Procedure 59(e) generally is not timely raised . . .'") (citation omitted). This is because "Rule 59(e) motions are aimed at reconsideration, not initial consideration." *GSS Grp. Ltd v. Nat'l Port Auth.*, 680 F.3d 805, 812 (D.C. Cir. 2012) (quoting *Doe*, 611 F.3d at 896). Only extraordinary circumstances may warrant granting a Rule 59(e) motion, including "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Ciralsky v. CIA*, 355 F.3d 661, 671 (D.C. Cir. 2004) (quoting *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996)); *see also Mohammadi v. Islamic Republic of* Iran, 782 F.3d 9, 17 (D.C. Cir. 2015) ("[R]econsideration of a judgment after its entry is an extraordinary remedy which should be used sparingly.") (alteration in original) (citation omitted); *Anyanwutaku v. Moore*, 151 F.3d 1053, 1057–58 (D.C. Cir. 1998).

---

within 28 days of the entry of the order at issue and as originating under Rule 60(b) if filed thereafter."). In any event, "[t]he standards that govern Rule 60(b) are even more restrictive" and "'in most cases, the bar stands even higher for a party to prevail on a Rule 60(b) motion for relief from judgment' than on a Rule 59(e) motion." *Taitz v. Obama*, 754 F. Supp. 2d 57, 58 (D.D.C. 2010) (quoting *Uberoi v. EEOC*, 271 F. Supp. 2d 1, 2 (D.D.C. 2002)); *see also Hall v. CIA*, 437 F.3d 94, 99 (D.C. Cir. 2006) ("Relief under Rule 60(b)(1) motions is rare; such motions allow district courts to correct only limited types of substantive errors.").

## II. DISCUSSION

The petitioners do not argue that controlling law has changed or that new evidence became available, but only that the denial of their application for discovery was wrong for three reasons, none of which is sufficiently persuasive to disturb the Court's previous determination that the plainly significant burden triggered by the requested discovery overcomes the limited, if any, relevance of this discovery to the Dutch appellate proceeding.

First, the petitioners contend that the prior Order "was predicated on an unsupported assumption" of privilege, *see* Pet'rs' Mem. Reconsideration at 2, because the respondents did not precisely identify any documents that were privileged and, in the petitioners' view, thereby failed to assert any privilege at all. *Id.* at 4. This argument is almost farcical, given both the nature of the petitioners' discovery demands, which plainly target privileged communications and documents between the respondents and its long-standing client, and the respondents' declaration detailing the nature of their attorney-client relationship with Rosneft and the burdens subpoena compliance would engender. *See, e.g.*, Resps.' Opp'n, Attach. 1, Declaration of William H. Jeffress ("Jeffress Decl.") ¶¶ 2–3, ECF No. 11-1 (describing respondents' attorney-client relationship with Rosneft and Russian Federation); Resps.' Opp'n at 18–19 (discussing "undue burden" discovery demand would impose by requiring the respondents to prepare a privilege log covering a "broad scope of materials," which could reveal to the petitioners "strategies and internal deliberations of their adversaries," and which would require the respondents to expend significant resources to sift through a "staggering" amount of data "involv[ing] multiple languages").

For instance, the petitioners pose discovery demands for "[a]ll Documents and Communications between Baker Botts and Rosneft pertaining to" the Yukos Armenia

6

Proceedings, including contacts with Rosneft, Rosneft's subsidiaries, and respondents' co-counsel, Prudence Legal Advisory and Counseling ("Prudence Legal"), "pertaining to the judgments . . . ." Appl., Attach. 9, Ex. 3 to Declaration of Christopher M. Ryan ("Ryan Decl."), Subpoena Produce Docs., Information, Objects or to Permit Inspec. Premises Civ. Action (Baker Botts LLP) ("Subpoena to Baker Botts") at 7 (Request 3), ECF No. 1-9. *See also, e.g.*, *id.* at 8–9 (Request 10) (requesting "[a]ll Documents and Communications between Baker Botts and Rosneft pertaining to: (a) the relationship of the Yukos Armenia Proceedings to the decision of the Dutch courts in the Dutch Bankruptcy Proceedings; and (b) the effect the judgment(s) in the Yukos Armenia Proceedings may have on the Dutch Bankruptcy Proceedings"); Appl., Attach. 10, Ex. 4 to Ryan Decl., Subpoena Produce Docs., Information, Objects or to Permit Inspec. Premises Civ. Action (Ryan E. Bull) ("Subpoena to Ryan E. Bull") at 7 (Request 3), ECF No. 1-10 (seeking "[a]ll Documents and Communications between Mr. Bull and Rosneft pertaining to" the Yukos Armenia Proceedings, including contacts with Rosneft, Rosneft's subsidiaries, and Prudence Legal, "pertaining to the judgments . . ."); *id.* at 9 (Request 10) (requesting "[a]ll Documents and Communications between Mr. Bull and Rosneft pertaining to" the same subcategories of information related to the Yukos Armenia Proceedings and Dutch Bankruptcy Proceedings as in the Subpoena to Baker Botts).[5] Other discovery demands by the petitioners similarly expressly target the respondents' direct communications with its co-counsel, Prudence Legal, regarding matters implicating the client's interests. *See* Subpoena to Baker Botts at 7 (Request 4) (requesting "[a]ny and all Documents between Baker Botts and Prudence Legal

---

[5] The document requests define the "Yukos Armenia Proceedings" to refer to Yukos-related decisions in the Armenian courts. Subpoena to Baker Botts at 2–3 (Definitions ¶ 12). The "Dutch Bankruptcy Proceedings" refers to cases in Dutch courts relating to Yukos's bankruptcy, and the "Dutch Set Aside Proceeding" refers to the litigation currently pending in the Court of Appeal of the Hague to review the setting aside of arbitral awards. *Id.* at 2 (Definitions ¶¶ 5–6).

pertaining to" the Yukos Armenia Proceedings); Subpoena to Ryan E. Bull at 7–8 (Request 4) (seeking "[a]ll Documents and Communications between Mr. Bull and Prudence Legal pertaining to" the Yukos Armenia Proceedings).

The petitioners' contention that error occurred by "assuming" privilege attached ignores the obvious fact that the discovery demands were framed precisely to cover such privileged communications and documents. Indeed, the discovery request is predicated on the petitioners' belief that Rosneft's counsel was involved in corrupting the administration of justice in Armenian and Dutch proceedings, making counsel's communications with Rosneft and its affiliates the precise focus of the discovery. *See, e.g.*, Appl. at 5 (alleging "Rosneft, acting through counsel to the Russian Federation, arranged the outcome of several Yukos-related decisions"); *id.* at 7 (contending that, in the alleged manipulation, "Rosneft was assisted by the American legal firm Baker Botts LLP") (quoting Appl., Attach. 15, Ex. 9 to Ryan Decl., Joep Dohmen and Renée Postma, *Rosneft manipulated the judicial process in the Netherlands*, NRC HANDELSBAD (Nov. 24, 2016) ("NRC Article 1") at 1, ECF No. 1-15); *id.* (discussing role of respondent Baker Botts partner, Ryan Bull, and his associate, Izabella Sarkisyan, as well as Edward Mouradian, an Armenian attorney with Prudence Legal, in the alleged manipulation) (quoting Appl., Attach. 16, Ex. 10 to Ryan Decl. ("Ryan Decl., Ex. 10"), Joep Dohmen and Renée Postma, *How Rosneft Turned Rule of Law to Its Own Advantage*, NRC HANDELSBAD (Nov. 24, 2016) ("NRC Article 2") at 3, ECF No. 1-16).

Although the petitioners criticize the Court's "assumption" of privilege as unsubstantiated, the petitioners' argument is predicated on a clear misunderstanding of the law. Specifically, the petitioners repeatedly assert that the respondents "did not establish—or even argue—that any privilege might apply" to the requested documents, Pet'rs' Mem.

8

Reconsideration at 1, apparently because the respondents did not "identify responsive documents, indicate the number of documents that may be subject to a claim of privilege, or detail the alleged 'burden' they faced—even though it was incontestably their duty to come forward with such evidence," Pet'rs' Reply Mem. Supp. Pet'rs' Mot. Reconsideration ("Pet'rs' Reply Reconsideration") at 1, ECF No. 19. In other words, the petitioners believe, absent the respondents undertaking a massive effort to produce a catalogue of privileged documents generated by over a decade of representing Rosneft, the respondents "waived" any privilege. Pet'rs' Reply Resps.' Opp'n Appl. ("Pet'rs' Reply") at 22, ECF No. 13 ("[Respondents'] failure to properly invoke privilege or demonstrate a burden in their Opposition waives their right to claim these protections.").

To the contrary, when a discovery request demands production of an attorney's records in connection with representation of a client, invocation of the protections of the attorney-client privilege and work-product doctrine may be effective without requiring a detailed privilege log. Otherwise, any objection to the scope of a discovery demand would be rendered moot because interposing that objection would trigger the very burdensome obligation to prepare a privilege log that the objection would be intended to avoid. *See Dell Inc. v. Decosta*, 233 F. Supp. 3d 1, 3–4 (D.D.C. 2017) (concurring with defendants that document requests "served on prior counsel" were "overbroad and unduly burdensome" since compliance "would impose an undue and disproportionate burden on Defendants to prepare a privilege log of the thousands of documents that Defendants could reasonably be expected to 'possess' after a decade of [client] representation but most of which would be protected by the attorney-client privilege or attorney work-product doctrine"); *Prism Techs., LLC v. Adobe Sys.*, No. 8:10CV220, 2011 U.S. Dist. LEXIS 131321, at *10–13 (D. Neb. Nov. 14, 2011) (adopting "assumption[]" used by other

courts "that limit[s] the necessity to create such 'privilege logs' of communications between a party and counsel in cases where attorney-client privilege is evident, particularly when the communications are voluminous") (citing *United States v. Bouchard Transp.*, No. 08-CV-4490 (NGG) (ALC), 2010 U.S. Dist. LEXIS 37438, at *4 (E.D.N.Y. Apr. 14, 2010) ("[P]rivilege logs are commonly limited to documents created before the date litigation was initiated . . . . [I]n many situations, it can be assumed that all documents created after charges have been brought or a lawsuit has been filed and withheld on the grounds of privilege were created 'because of' that pending litigation."); *Ryan Inv. Corp. v. Pedregal De Cabo San Lucas*, No. C 06-3219, 2009 U.S. Dist. LEXIS 118337, at *9 (N.D. Cal. Dec. 18, 2009) (denying plaintiff's motion to compel, explaining that "counsel's communications with the client and work product developed once the litigation commences are presumptively privileged and need not be included on any privilege log")). The petitioners acknowledge the immense burden on respondents that would be triggered by the broad discovery demands for privileged and protected information and suggest only that the Court participate in narrowing the scope. *See* Pet'rs' Reply Reconsideration at 6.[6]

In sum, simply because the Court agreed with respondents about the scope and sensitivity of the requested discovery, with its concomitant cost and burdens, and made a determination on the Application without requiring a privilege log, Appl. Denial Order, 2017 U.S. Dist. LEXIS

---

[6] The petitioners contend that they only "seek two narrow categories of documents" from "a discreet time period"—"(a) communications between the Respondents and specific entities relating to judgments" in Armenia and the Netherlands and "(b) *ex parte* communications between the Respondents and Armenian, Russian, and Dutch government officials relating to those legal proceedings," Pet'rs' Reply Reconsideration at 6—but this characterization is belied by the text of the discovery demands submitted with the original Application. Specifically, the petitioners' Application seeks fifteen categories of documents, with, as noted, specific requests for respondents' communications with their client concerning matters in which respondents were representing or assisting in representing their client in proceedings involving Yukos in both the Armenian courts and the Dutch courts. *See* Subpoena to Baker Botts at 6–10; Subpoena to Ryan E. Bull at 6–10; *see also* Resps.' Opp'n at 15–16 & n.9 (discussing "broadly intrusive" requests). With regard to the communications with foreign officials, the petitioners contend the communications would not be privileged because they involve third parties, *see* Pet'rs' Mem. Reconsideration at 10–12, but to the extent requests for such documents are integrated into the other broad requests, determining where exceptions may apply would only add to the burden of complying with the discovery sought.

10

142969, at *17, does not mean it either misunderstood or missed some consideration requiring modification of the Order.[7]

Second, the petitioners raise a brand new argument about the necessity of a choice-of-law analysis, contending that such an analysis would show that either Russian or Armenian law applies, and neither law would protect the requested documents. Pet'rs' Mem. Reconsideration at 4–12. Nothing about the law, however, has changed since the original briefing, which, to the extent foreign laws were considered, contained discussion only about the applicability of Dutch attorney-secrecy rules. *See* Pet'rs' Reply at 11–15. This choice-of-law argument is, thus, not timely raised. *Patton Boggs LLP v. Chevron Corp.*, 683 F.3d 397, 403 (D.C. Cir. 2012) (finding no abuse of discretion in denial of reconsideration "[b]ecause Rule 59(e) is not a vehicle to present a new legal theory that was available prior to judgment").

In any event, contrary to the petitioners' argument, American law on privilege would not automatically be displaced here. "Because the jurisdictional basis for this action rests on a federal statute, federal common law governs any assertions of privilege." *In re Veiga*, 746 F. Supp. 2d at 32. Although "the protections afforded by § 1782(a) also extend to privileges recognized by foreign law," such foreign privileges "only [apply] in certain narrow and circumscribed circumstances." *Id.* The petitioners believe such circumstances exist here since the requested discovery targets respondents' communications with their client regarding foreign

---

[7] The petitioners' reliance on *People for the Ethical Treatment of Animals v. U.S. Dep't of Health & Human Servs.* (*PETA*), 226 F. Supp. 3d 39, 46–50 (D.D.C. 2017) and other nonbinding district court cases is misplaced. *See* Pet'rs' Reply Reconsideration at 5; Pet'rs' Mem. Reconsideration at 3–4. In *PETA*, the parties were relieved, under Rule 60(b), from a summary judgment order after new, previously undisclosed information was presented that rendered the original order "inherently unfair to the third parties whose business information is at risk." *PETA*, 226 F. Supp. 3d at 46–50. By contrast, in this case, the petitioners "have not pointed to facts unavailable to them at the time of the underlying briefing," Resps.' Opp'n Reconsideration at 6, and no "harm to the interests of third parties, as opposed to the erring litigant," which was central to *PETA*'s holding, *see PETA*, 226 F. Supp. at 47, is at issue here. More significantly, given that the Court has "considerable" discretion under the *Intel* factors, *see Lazaridis v. Int'l Ctr. for Missing & Exploited Children (In re Order Pursuant to 28 U.S.C. § 1782)*, 473 F. App'x 2, 4 (D.C. Cir. 2012), the petitioners have hardly shown that the denial of the Application under those factors is "inherently unfair."

litigation and, further, that if the law of either Russia or Armenia applied, communications with the attorneys in these countries would not be protected because the respondents are not registered as "advokats" in Russia or "advocates" in Armenia. Pet'rs' Mem. Reconsideration at 6–9. In the petitioners' view, countries where the litigation occurred have stronger interests than the United States, notwithstanding that the requested discovery targets the records, communications and work of U.S. counsel.

The petitioners' position raises a host of thorny issues. Given the parties' disputes about the protections provided by foreign law, the Court would be drawn into legal experts' debates about the meaning and scope of the laws of at least two, and perhaps more, countries. In addition, as the respondents point out, a choice-of-law analysis would likely result in a "hybrid regime that combines narrow foreign privilege rules with broad U.S. discovery." Resps.' Opp'n Pet'rs' Mot. Reconsideration ("Resps.' Opp'n Reconsideration") at 14, ECF No. 17. Indeed, the finding urged by petitioners that no foreign attorney-client privilege law would protect the requested documents would encourage parties involved in ligation overseas to exploit the broad discovery regime available under the Federal Rules of Civil Procedure while simultaneously seeking to defeat fundamental protections for attorney-client privilege and work product guaranteed by the American legal system. *See Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981) (emphasizing importance of attorney-client privilege because of its purpose "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice"). This result would be particularly problematic for public policy reasons, including that a hybrid regime would "reach results" on privilege and discovery issues that "no affected jurisdiction would reach on its own."

Resps.' Opp'n Reconsideration at 14. These issues of foreign privilege laws need not be addressed now on reconsideration, however, because they were not previously raised.

Finally, the petitioners revive an argument previously relegated to a short footnote in their reply brief that any applicable privilege would be "undermined by the fact that the communications sought involve allegations of criminal and fraudulent activity." Pet'rs' Mem. Reconsideration at 14; Pet'rs' Reply at 18 n.6 (commenting that, as the respondents "have not formally invoked a privilege, the Petitioners cannot fully address the scope of [the crime-fraud] exception, but reserve the right to do so if the Witnesses attempt to assert a privilege in the future"). As support, the petitioners rely on "allegations of manipulation . . . supported by the articles, emails, and judicial affidavit submitted with the 1782 Application." Pet'rs' Reply Reconsideration at 20; *see also* Pet'rs' Mem. Reconsideration at 12–13. Notably, these materials were submitted with the original Application and contain nothing new for the motion for reconsideration. In any case, on this record, the petitioners fail to establish a *prima facie* case for applying the crime-fraud exception.

The doctrine of the crime-fraud "[e]xception comes into play when a privileged relationship is used to further a crime, fraud, or other fundamental misconduct." *In re Sealed Case*, 676 F.2d 793, 807 (1982).[8] If the crime-fraud exception applies, then the attorney-client communications are not privileged. *In re Grand Jury*, 475 F.3d 1299, 1305 (D.C. Cir. 2007); *In re Sealed Case*, 754 F.2d 395, 399 (D.C. Cir. 1985). To satisfy its burden of proof to show that the crime-fraud exception applies, a party may offer "evidence that if believed by the trier of fact

---

[8] The crime-fraud exception also applies to work-product protection, requiring "some valid relationship between the work product under subpoena and the prima facie violation." *In re Sealed Case*, 676 F.2d at 814–15. As previously noted in this opinion and in the prior Order, both attorney-client and work-product protections are implicated by the scope of the discovery demands at issue. *See* Appl. Denial Order, 2017 U.S. Dist. LEXIS 142969, at *17.

would establish the elements of an ongoing or imminent crime or fraud," *In re Grand Jury*, 475 F.3d at 1305 (internal quotation marks and citation omitted), but it "need not prove the existence of a crime or fraud beyond a reasonable doubt," *In re Sealed Case*, 754 F.2d at 399. "The determination that a prima facie showing has been made lies within the sound discretion of the district court," *id.*, which must "independently explain what facts would support th[e] conclusion" that the crime-fraud exception applies, *Chevron Corp. v. Weinberg Grp.*, 682 F.3d 96, 97 (D.C. Cir. 2012).

The petitioners' submissions here fall short of making a *prima facie* showing that the crime-fraud exception would apply to the respondents' assertions of privilege. Of the over 130 pages of exhibits on which the petitioners rely to make their case for the exception, including three newspaper articles, one affidavit of a former judicial officer, three email chains, and two images of alleged draft decisions with track changes, only two of the articles, from the same Dutch publication by the same authors published on the same day, make direct allegations about Baker Botts's involvement with Rosneft in any purported manipulation of the Armenian courts. *See* NRC Article 1 at 1; NRC Article 2 at 3. The remaining article discusses "Rosneft lawyers" without mentioning respondents, *see generally* Appl., Attach. 17, Ex. 11 to Ryan Decl., Catherine Belton and Michael Stott, *Rosneft lawyers manipulated Yukos rulings, emails suggest*, FINANCIAL TIMES (Nov. 28, 2016), ECF No. 1-17, and indisputably Rosneft employs other counsel in addition to respondents.[9] Meanwhile, the emails, which the parties do not dispute were obtained through an unauthorized access "hack" in 2013, *see* Resps.' Opp'n at 5 (citing NRC Article 2 at 2, provided by petitioners), and track-changed documents lack any context

---

[9] The respondents contend, largely based on the timing of the articles in connection with another Dutch proceeding involving Yukos-related entities, that the reports cited by the petitioners "were obviously based on information and arguments given to reporters by representatives of the Yukos parties." Resps.' Opp'n at 6.

14

implicating Rosneft's use of its relationship with Baker Botts or the firm's work product to manipulate a court.[10] Furthermore, the affidavit of a former Armenian judicial officer, who is now apparently on the petitioners' payroll, discusses pressures he experienced from other Armenian judicial offers to issue judgments that were not his own, again, with no reference to respondents. Ryan Decl., Ex. 10(2) (Written Statement, dated Oct. 19, 2012, by Surik Ghazaryan, ¶¶ 17, 20–21).[11] The petitioners now ask for a significant logical leap to tie together these disparate materials, with virtually no reference to respondents other than in the cited press articles, as establishing that respondents were engaged in ongoing or imminent crime or fraud. Indeed, the very fact that the petitioners submitted the articles, emails, documents, and affidavit in the original round of briefing but did not then rely on the materials to make any crime-fraud exception argument reflects a recognition that these materials do not establish a basis for applying this exception to avoid the otherwise applicable protections afforded by the attorney-client privilege and work-product doctrine.[12]

---

[10] These materials are provided without much context necessary for evaluating their probative value. For instance, the petitioners submitted an email purportedly from Mr. Mouradian of Prudence Legal instructing another attorney within the firm to "delete all communication" regarding the "top secret" contact with "the head of the department of prosecution Armen Nikoghosyan" about "the development of the cases," but the text provides no other detail about the "communication" at issue or, more significantly, the relationship to Baker Botts. *See* Ryan Decl., Ex. 10(5) (Email, dated July 17, 2010, from Edward Mouradian to Karapet Badalyan). The petitioners also cite emails from a Rosneft employee to a colleague about a "secret" scheme and "use of Armenian government officials in the scheme" that also make no reference to the respondents. *See* Pet'rs' Reply Reconsideration at 20 (citing emails in Ryan Decl., Ex. 10(4)(a)–(b) (Emails, dated June 21 and 24, 2010, from Elena Zavaleeva to Nikita Tolstikov)). Furthermore, petitioners cite an email from the Rosneft employee to respondent Mr. Bull asking him to review "substantiation of a possible decision of the Court of Cassation" to determine if it "answers our interests on account of the case in Holland," without additional information as to how that information would be or may have been used. *See* Ryan Decl., Ex. 10(9)(a)–(b) (Email, dated July 19, 2010, from Elena Zavaleeva to Edward Mouradian and Ryan Bull). Finally, regarding the track-changed documents of Court of Cassation decision drafts, *see* Ryan Decl., Exs. 10(7)–(8) (providing images of documents), the petitioners offer no insight into whether Armenian courts require litigants to provide draft orders in some capacity, akin to the practice in this Court. *See* LCvR 7(c) ("Each motion and opposition shall be accompanied by a proposed order.").

[11] The financial ties between Judge Ghazaryan and the petitioners are discussed in an article relied on by the petitioners, *see* NRC Article 2 at 2 ("Ghazaryan received assistance from the Yukos camp, which is also supporting him financially."), and the petitioners do not otherwise dispute that the former judicial official is compensated by Yukos.

[12] The petitioners ask, in the alternative, for the Court to conduct an *in camera* review of "the materials" but fail to specify the nature, volume, or source of such evidence. Petr's' Reply Reconsideration at 23. *In camera*, *ex*

15

***

The petitioners' arguments fail to demonstrate that any "clear error" occurred or "manifest injustice" resulted from the denial of their discovery demands to respondents. *See Ciralsky*, 355 F.3d at 671; *Firestone*, 76 F.3d at 1208. Instead, the prior assessment correctly concluded that the discovery requests pose an extraordinary burden on the respondents and the Court to identify and resolve the inevitable privilege and work-product issues, since the requests target a decade-long attorney-client relationship and, as such, also pose a significant risk of revealing litigation strategy in ongoing proceedings. Appl. Denial Order, 2017 U.S. Dist. LEXIS 142969, at *13–17. Those burdens and risks are not warranted given that the petitioners have failed to show "that the requested discovery would be of even moderate relevance" in the Dutch appellate proceeding. *Id*. at *17.

## III. CONCLUSION

For the foregoing reasons, the petitioners have not shown that reconsideration of their Application for discovery, pursuant to 28 U.S.C. § 1782, is warranted. Accordingly, it is hereby

**ORDERED** that the petitioners' Motion for Reconsideration, ECF No. 15, is **DENIED**.

**SO ORDERED.**

Date: December 9, 2017

_____
BERYL A. HOWELL
Chief Judge

---

*parte* proceedings may be used to determine the existence of a crime-fraud exception to privilege "when such proceedings are necessary to ensure the secrecy" of ongoing proceedings. *In re Grand Jury Subpoena, Judith Miller*, 438 F.3d 1141, 1151 (D.C. Cir. 2006) (quoting *In re Sealed Case* No. 98-3077, 151 F.3d 1059, 1075 (D.C. Cir. 1998)). "[*I*]n camera, *ex parte* submissions generally deprive one party to a proceeding of a full opportunity to be heard on an issue, and thus should only be used where a compelling interest exists." *In re Sealed Case* No. 98-3077, 151 F.3d at 1075 (internal citation and quotation marks omitted). No "compelling interest exists" here and, consequently, the request for *in camera* review is denied.